

05 - 499

James H. Goetz
J. Devlan Geddes
**GOETZ, GALLIK & BALDWIN, P.C.**
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Ph:    406-587-0618
Fax:   406-587-5144

Bonnie Steingart    (*Pro Hac Vice* Application forthcoming)
John W. Brewer    (*Pro Hac Vice* Application forthcoming)
**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP**
One New York Plaza
New York, New York 10004
(212) 859-8000

ATTORNEYS FOR PLAINTIFF

FILED
_____, MT

___ ___ 19   AM 10 57

PATRICK E. DUFFY, CLERK

BY _____

DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BUTTE DIVISION

* * * * * * * *

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION, | Cause No. CV-04-26-BU-RFC |
| Plaintiff, | |
| -against- | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| MIKE J. HANSON, JACK D. HAFFEY, ERNIE J. KINDT, and ELLEN M. SENECHAL, | |
| Defendants. | |

Plaintiff Magten Asset Management Corporation ("Magten"), by its undersigned attorneys, hereby alleges in support of its Complaint on personal knowledge as to its own acts and on information and belief as to all other matters as follows:

## INTRODUCTION

1.    Magten is a creditor of Clark Fork and Blackfoot, LLC ("Clark Fork"), formerly known as NorthWestern Energy, LLC ("NWE"), and prior to that known as The Montana Power Company LLC ("MPLLC"). Magten brings this lawsuit to obtain redress for the wrongful actions of defendants Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen M. Senechal, all of whom were

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 1

**EXHIBIT**

_A_

1    officers of Clark Fork on November 15, 2002 and enabled the transfer on that date (the "Transaction")

2    of Clark Fork's key assets — electric, natural gas and propane utility assets (the "Montana Utility

3    Assets") — to its corporate parent NorthWestern Corporation ("NorthWestern") without adequate

4    consideration. The Transaction unjustly enriched NorthWestern by hundreds of millions of dollars while

5    destroying Clark Fork's solvency and thus its ability to meet its obligations to Magten and its other

6    creditors. The defendants, as officers of Clark Fork, had a fiduciary duty to Clark Fork's creditors not

7    to engage in transactions that would render Clark Fork insolvent. In connection with the Transaction,

8    Clark Fork purported to have NorthWestern assume Clark Fork's liabilities, but NorthWestern's other

9    liabilities were so massive that, even after paying inadequate consideration to Clark Fork for the

10   Montana Utility Assets, NorthWestern could not pay its own pre-existing creditors, and filed a

11   voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result of defendants'

12   actions, Magten is now owed well in excess of $20 million dollars by a company which defendants

13   rendered unable to meet its obligations to Magten. Magten seeks appropriate compensatory and

14   punitive damages, in an amount to be determined at trial.

15                                   **THE PARTIES**

16       2.      Plaintiff is a corporation validly organized and doing business under the laws of the

17   State of Delaware with its principal place of business in the State of New York and is, therefore,

18   deemed to be a citizen of Delaware and New York pursuant to 28 U.S.C § 1332(c)(1).

19       3.      Defendant Mike J. Hanson is a citizen of the State of Montana and is believed to reside

20   at 1805 C St., Butte, Montana 59701. As of November 15, 2002, Hanson was Chief Executive

21   Officer of Clark Fork.

22       4.      Defendant Jack D. Haffey is a citizen of the State of Montana, and is believed to reside

23   at 2101 Garfield St., Anaconda, Montana 59711. As of November 15, 2002, Haffey was President of

24   Clark Fork.

25       5.      Defendant Ernie J. Kindt is a citizen of the State of Montana, and is believed to reside

26   at 5 Amber Way, Butte, Montana 59701. As of November 15, 2002 Kindt was Vice President and

27   Chief Accounting Officer of Clark Fork.

28       6.      Defendant Ellen M. Senechal is a citizen of the State of Montana, and is believed to

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 2

1  reside at 75 Park Drive, Clancy, Montana 59634. As of November 15, 2002, Senechal was Vice

2  President, Treasurer and Chief Financial Officer of Clark Fork.

3                              <u>JURISDICTION AND VENUE</u>

4        7.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

5  1332, as it is between citizens of different States and the matter in controversy exceeds the sum or

6  value of $75,000, exclusive of interest and costs.

7        8.      Venue is proper pursuant to 28 U.S.C. 1391, because all defendants reside in this

8  judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this

9  judicial district.

10            <u>FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS</u>

11  <u>The Montana Power Company</u>

12       9.      The Montana Power Company ("Montana Power") was incorporated in 1961 under

13  the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger

14  of four regional electric companies.

15       10.     By the year 2000, Montana Power was engaged in activities related to

16  telecommunications and energy related activities including activities in the fields of oil, coal, natural gas,

17  and electricity.

18       11.     In November 1996, Montana Power and Bank of New York entered into that certain

19  Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities (the "Indenture").

20       12.     Pursuant to the Indenture, Montana Power issued the Junior Subordinated Interest

21  Debentures (the "Junior Debentures").

22       13.     At or about the same time, pursuant to the Amended and Restated Trust Agreement

23  (the "Trust Agreement") between itself and various other persons, Montana Power created Montana

24  Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act.

25  Bank of New York was designated as the Property Trustee of the Trust as well as serving as Trustee

26  under the Indenture.

27       14.     As detailed below, as of November 2002, Clark Fork had succeeded to Montana

28  Power's obligations with respect to the Junior Indentures. The Bank of New York has been

COMPLAINT AND DEMAND FOR JURY TRIAL                                           PAGE 3

1   succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law

2   Debenture Trust Company of New York ("Law Debenture").

3        15.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued

4   the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS").

5        16.    The Trust holds 100% of the Junior Debentures, with a total face amount of

6   approximately $67 million, which constitute its sole meaningful asset. The value of the QUIPS is

7   entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay

8   interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would then in turn be

9   passed on by the Trust to the holders of the QUIPS.

10       17.    The Junior Debentures were not sold directly to investors; rather, purchasing the

11  QUIPS provided investors with substantially the same rights and the same potential investment return as

12  they would have had had they been able to own Junior Debentures directly. The entire structure of the

13  transaction was designed to put investors in the same position as if they had directly purchased the

14  Junior Debentures, while providing Montana Power with a more favorable accounting treatment than

15  would have been possible had the Junior Debentures been sold directly to the investing public.

16       18.    Accordingly, in Section 610 of the Indenture Clark Fork (as successor to Montana

17  Power) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the

18  Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the

19  Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue

20  directly to enforce the Property Trustee's rights.

21       19.    Magten owns in excess of 33% of the QUIPS.

22       20.    In connection with the Trust Agreement and the Indenture, Montana Power also

23  entered into a Guarantee Agreement with the Bank of New York as Guarantee Trustee (the

24  "Guarantee Agreement"). Pursuant to the Guarantee Agreement, Montana Power, as guarantor,

25  agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the

26  Trust, and to the extent the Property Trustee had funds available in a specified account. As with the

27  Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original

28  roles and responsibilities of Montana Power and Bank of New York respectively.

COMPLAINT AND DEMAND FOR JURY TRIAL                                          PAGE 4

**The Sale of the Montana Power Company's Utility Assets**

21.     On March 28, 2000, Montana Power announced plans to restructure its business. This restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane utility assets, in order to allow Montana Power to focus on telecommunications.

22.     On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with NorthWestern, pursuant to which NorthWestern agreed to purchase control of the Montana Utility Assets, then owned by Montana Power, in a multi-step transaction.

23.     On February 13, 2002, Montana Power merged its energy assets into MPLLC (the "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

24.     Specifically, in connection with the Merger, on February 13, 2002, pursuant to the First Supplemental Indenture, MPLLC assumed the obligations of Montana Power under the Indenture.

25.     In addition, in connection with the Merger, on February 13, 2002, pursuant to a letter agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

26.     On February 15, 2002, NorthWestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this consideration was received or retained by MPLLC. It was thus not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

27.     On March 19, 2002, MPLLC was renamed NWE.

28.     On August 13, 2002, NorthWestern entered into the Second Supplemental Indenture, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the Indenture.

29.     On August 13, 2002, NorthWestern entered into an Amendment to the Guarantee Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the Guarantee Agreement.

30.     On August 13, 2002, NorthWestern entered into a letter agreement amending the Trust Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

1  the Trust Agreement.

2  **The Transfer**

3  31.  On November 15, 2002, defendants, as officers of Clark Fork, carried out a scheme

4  to defraud, injure and deprive Magten of the ability to receive the benefits due to it from Clark Fork in

5  connection with the Junior Debentures and the QUIPS, by, in the Transaction, transferring substantially

6  all of Clark Fork's assets, the Montana Utility Assets, to NorthWestern without receiving adequate

7  consideration in return.  Clark Fork received no cash for the Transfer, and the consideration

8  purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets

9  were transferred to NorthWestern, and only approximately $700 million dollars in Clark Fork liabilities

10 were purportedly assumed by NorthWestern.  Indeed, with respect to some if not all of the liabilities

11 purportedly assumed, NorthWestern was already a co-obligor with Clark Fork prior to the Transaction

12 and/or Clark Fork remained obligated jointly and severally with NorthWestern subsequent to the

13 Transaction, thus making any purported assumption of the liabilities in connection with the Transaction

14 valueless.

15 32.  In particular, NorthWestern was already a co-obligor as to Clark Fork's obligations

16 with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained

17 obligated jointly and severally with NorthWestern with respect to the Junior Indentures and QUIPS

18 subsequent to the Transaction.  Indeed, Clark Fork requested Bank of New York (at the time still the

19 Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork

20 from its continuing obligations under the Indenture, but Bank of New York refused to provide such a

21 release.

22 33.  As an immediate result of the consummation of the Transfer, Clark Fork was insolvent.

23 Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior

24 Debentures and QUIPS and did not do so.

25 34.  Both prior to and following the Transaction, NorthWestern was itself insolvent, making

26 both its August 2002 assumption of liabilities with respect to the Junior Debentures and QUIPS and any

27 purported further assumption of those liabilities in connection with the Transaction of little or no value to

28 the holders of the QUIPS and other creditors of Clark Fork.  Even the hundreds of millions of dollars

COMPLAINT AND DEMAND FOR JURY TRIAL                                                    PAGE 6

by which it was unjustly enriched by the Transaction were insufficient to overcome the massive imbalance between assets and liabilities created by its various other failed business ventures.

35.    The defendants all knew, should have known, and/or were reckless with respect to knowing that Clark Fork would be rendered insolvent as a result of the Transaction and that NorthWestern was insolvent both before and after the Transaction.

36.    No interest on the Junior Debentures was paid by either NorthWestern or Clark Fork since prior to September 14, 2003. In excess of $2 million of interest on the Junior Debentures is now past due. If paid, that interest would have been passed on by the Trust to the holders of the QUIPS such as Magten. Moreover, the entire principal amount of the Junior Debentures was accelerated pursuant to the terms of the Indenture no later than September 14, 2003.

37.    Following the Transaction, Clark Fork retained only the Milltown Dam, a two megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license that expires in 2007, and the related environmental liabilities.

38.    Following the Transaction, NorthWestern operated the Montana Utility Assets as part of NorthWestern's NorthWestern Energy Division.

39.    After the Transaction, NWE remained a subsidiary of NorthWestern and on November 20, 2002, NWE was re-named Clark Fork.

40.    Clark Fork continues to operate the Milltown Dam.

41.    Clark Fork is entirely dependent upon NorthWestern for continued funding of the Milltown Dam and its corporate existence, and NorthWestern is required, under certain agreements with Clark Fork, which require NorthWestern to pay any costs and expenses that arise in connection with the operation of the Milltown Dam.

42.    Less than a year later, on September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

43.    The Montana Utility Assets generate approximately 80% of NorthWestern's consolidated EBITDA, although NorthWestern did not pay fair value for those assets, thus injuring Magten and Clark Fork's other creditors.

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 7

44.     The Montana Utility Assets are now available to all creditors of NorthWestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in NorthWestern's reorganization plan.

45.     On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in NorthWestern's bankruptcy case for leave to commence an adversary proceeding against NorthWestern seeking to have the Transaction set aside as a fraudulent conveyance.

## STATEMENT OF CLAIM

### FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

46.     Plaintiff repeats and realleges paragraphs 1-45 and incorporates them herein by reference.

47.     Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, defendants, as officers of Clark Fork, owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

48.     The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

49.     The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

50.     Defendants breached their fiduciary duties to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

51.     Defendants also breached their fiduciary duties to the Trust and Magten's predecessors

COMPLAINT AND DEMAND FOR JURY TRIAL                                          PAGE 8

1  in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and

2  QUIPS to NorthWestern, when they knew NorthWestern was insolvent and would remain insolvent,

3  and would thus be unable to perform those obligations.

4      52.    By reason of the foregoing acts, practices and course of conduct, the defendants have

5  breached their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss,

6  in an amount to be proven at trial, but in excess of $20 million.

7      53.    Punitive damages in an amount to be determined at trial should also be awarded due to

8  the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

9

10                              **PRAYER FOR RELIEF**

11

12      WHEREFORE, plaintiff respectfully requests that this Court enter judgment against defendants

13  as follows:

14      1.    Awarding plaintiff compensatory and punitive damages, in an amount

15  determined at trial but in excess of $20 million;

16      2.    Awarding plaintiff all allowable costs, attorneys' fees and other litigation

17  expenses to the extent recoverable under law; and

18      3.    Awarding plaintiff such other and further relief as to this Court may be just,

19  proper and equitable.

20      DATED this 15th day of April, 2004.

21

22                              GOETZ, GALLIK & BALDWIN, P.C.

23

24

25

26                      By: _____

27                      for:   James H. Goetz

                        ATTORNEYS FOR PLAINTIFF

28

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 9

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 15th day of April, 2004.

GOETZ, GALLIK & BALDWIN, P.C.

By: _____
/s/ James H. Goetz
ATTORNEYS FOR PLAINTIFF

E:\JIM\Karen\Magten Asset Mgmt Corp 4032\Pleadings\Complaint.4 15 04.wpd

COMPLAINT AND DEMAND FOR JURY TRIAL

COPY

1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:                                          Chapter 11
                                                Case No.
NORTHWESTERN CORPORATION,                       03-12872 (CGC)

                        Debtor,
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x .

                        July 27, 2004
                        11:59 A.M.


        Deposition of MAGTEN ASSET MANAGEMENT

GROUP, by TALTON EMBRY, taken by Debtor, pursuant

to Notice and Agreement, at the offices of Paul,

Hastings, Janofsky & Walker LLP, 75 East 55th

Street, New York, New York 10022 before Anneliese

R. Tursi, a Registered Professional Reporter and

Notary Public within and for the State of New

York.

EXHIBIT
B



ARTA PASCULLO, President

**CLASSIC REPORTING, INC.**
TOTAL LITIGATION SUPPORT
13 West 36th Street • New York, New York 10018
Tel: (212) 268-2590 • Fax: (212) 268-2596

2

1

2    A P P E A R A N C E S:

3         GREENBERG TRAURIG, LLP
              Attorneys for Debtor
4             Brandywine Building
              1000 West Street, Suite 1540
5             Wilmington, Delaware 19801

6         BY:  SCOTT D. COUSINS, ESQ.
              WILLIAM E. CHIPMAN, JR., ESQ.

7

8         PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
              Attorneys for Creditors Committee
9             1285 Avenue of the Americas
              New York, New York 10019-6064

10

         BY:  MIKHAIL RATNER, ESQ.

11

12        NIXON PEABODY LLP
              Attorneys for the Law Debenture
13            100 Summer Street
              Boston, Massachusetts 02110-2131

14

         BY:  JOHN V. SNELLINGS, ESQ.

15

16        FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
              Attorneys for Magten Asset Management
17            One New York Plaza
              New York, New York 10004-1980

18

         BY:  BONNIE STEINGART, ESQ.
19            GARY L. KAPLAN, ESQ.
              JORDANA NADRITCH, ESQ.

20

    ALSO PRESENT:

21

         THOMAS J. KNAPP
22       NorthWestern

23       Daniel R. Fisher, Esq.
         Law Debenture

24

25

3

1                          T. Embry

2    T A L T O N    E M B R Y,

3              having been first duly sworn by the

4              Notary Public (Anneliese R. Tursi), was

5              examined and testified as follows:

6    EXAMINATION BY MR. COUSINS:

7              Q.    My name is Scott Cousins.

8              Could you state your full name

9    for the record, please.

10             A.    Talton, T-A-L-T-O-N, Robert,

11   R-O-B-E-R-T, Embry, E-M-B-R-Y.

12             Q.    Mr. Embry, could I have your

13   business address and phone number, please?

14             A.    410 Park Avenue, 14th floor, New

15   York, New York, 10022.  212-813-0900.

16             Q.    And by whom are you employed?

17             A.    I'm not employed.

18             Q.    Are you a consultant?

19             A.    No.

20             Q.    What are, other than investments,

21   what are your sources of income?

22             MS. STEINGART:  I'm sorry, you

23             are asking him working income or

24             wealth?

25             MR. COUSINS:  Working income.  I

4

1                    T. Embry

2        don't care about his wealth.

3              MS. STEINGART:  Okay.

4        A.    None.

5        Q.    What is your relationship to

6   Magten?

7        A.    I own it.

8        Q.    What is your percentage of

9   ownership in Magten?

10       A.    100 percent.

11       Q.    Do you have any unpaid positions

12  with Magten?

13       A.    I call myself chairman.

14       Q.    Do you have any employee or

15  officer positions with Magten?

16       A.    I have a secretary.

17              MS. STEINGART:  I'm sorry, do you

18        mean does he have positions or did he

19        have others in positions?

20              MR. COUSINS:  No, he --

21              MS. STEINGART:  You want to know

22        if he holds any other titles besides

23        chairman in connection with Magten?

24              MR. COUSINS:  Yes.

25       A.    Not that I'm aware of.

5

1                              T. Embry

2           Q.    And how many employees does

3    Magten have?

4           A.    One.

5           Q.    Who is that?

6           A.    Jean Colditz, C-O-L-D-I-T-Z.

7           Q.    In what is Jean's position?

8           A.    She is a secretary.

9           Q.    Mr. Embry, what did you do to

10   prepare for today's deposition?

11          A.    I met with my counsel beforehand.

12   I went over the documents that I had submitted

13   to you, and we talked about what questions

14   might be asked.

15          Q.    Did you only review the documents

16   that were submitted?

17          A.    I believe that's correct.

18          Q.    Have you ever been deposed

19   before?

20          A.    I have.

21          Q.    And what context, please?

22          A.    Numerous times.

23          Q.    Can you start with the most

24   recent?

25          A.    I don't know what the most recent

6

1                          T. Embry

2    was.  I'm sure there have been some between

3    1993 and today, but I can't remember what they

4    are.

5                    In 1993 I had a disciplinary

6    action with Securities and Exchange Commission

7    and was deposed on that.

8                    During that same time frame, I

9    was a witness for the U.S. Attorney's Office

10   in a securities fraud.

11                   The first time that I can

12   remember being deposed was in the Unocal

13   takeover, I think, by Carl Icahn going back in

14   the '80s.

15        Q.    To what did the disciplinary

16   action by the S.E.C. relate?

17        A.    It related to my being -- signing

18   consent that I had taken an opportunity that

19   should have been my client's, that I returned

20   money that I had made on it, plus interest,

21   and on paper -- my books and records were not

22   perfect.

23        Q.    And were you employed at the time

24   of this disciplinary action?

25        A.    Yes.

7

```
 1                        T. Embry

 2          Q.     By whom?

 3          A.     Magten Asset Management.

 4          Q.     How long have you been with

 5  Magten?

 6          A.     1978.

 7          Q.     And since 1978 have you always

 8  owned 100 percent of the equity of Magten?

 9          A.     No.

10          Q.     In 1978, what was the equity

11  ownership of Magten?

12          A.     I think I owned 50 percent and a

13  fellow, Angus Douglass owned the other 50

14  percent.

15          Q.     When did Mr. Douglass dispose of

16  his interests in Magten?

17          A.     Sometime in the early '80s.

18          Q.     Did he transfer that interest to

19  you?

20          A.     Yes.

21          Q.     So since the early '80s, you have

22  owned 100 percent of Magten?

23          A.     Yes.

24          Q.     Now, what was your role with

25  respect to the Unocal case?
```

8

1                          T. Embry

2              A.    I had proffered to buy

3    subordinated debt in the new company to be

4    formed in the buyout of Unocal.

5              Q.    Did you get embroiled in the

6    Chance report litigation over Unocal with

7    Icahn, is that --

8                   MS. STEINGART:   I object to form.

9                   Do you want to ask if he was a witness

10                  or a party in the dispute, maybe that

11                  will help.

12             Q.    Why were you asked to testify in

13   connection with Unocal?

14             A.    Because I had offered to buy some

15   of the subordinated securities of the new

16   company.

17             Q.    And who deposed you?

18             A.    Skadden Arps.

19             Q.    Who was -- who was Skadden

20   representing?

21             A.    Unocal.

22             Q.    Did you testify at trial?

23             A.    No.

24             Q.    Does Magten have any affiliates?

25             A.    What is an affiliate?

9

```
1                          T. Embry

2          Q.    Let me show you a definition of

3    affiliate.

4                 MR. COUSINS:  Can you mark as D-1

5          a document Order Permitting Securities

6          Trading Upon Establishment of Ethical

7          Wall in the NorthWestern Corp.

8          bankruptcy.

9                 (Document entitled "Order

10                Permitting Securities Trading

11                Upon Establishment of Ethical

12                Wall (Re: Docket No. 257)" marked

13                Debtor's Exhibit 1 for

14                identification, as of this date.)

15                MS. STEINGART:  Do you want to

16          direct his attention to something?

17          Q.    Mr. Embry, if it is easier, the

18    reporter will mark it and then both you and

19    your counsel can have a copy.

20                If you turn to about five pages

21    in, there is a page marked "Definitions" and

22    there is a definition of affiliate.

23                Could you read that definition to

24    yourself and let me know if you have an

25    understanding as to what an affiliate is?
```

10

```
 1                   T. Embry
 2             (Witness and counsel confer.)
 3             MR. COUSINS:  Let the record
 4        reflect that deponent referred --
 5             MS. STEINGART:  Consulted with
 6        counsel.
 7             MR. COUSINS:  Consulted with
 8        counsel.
 9        A.    Not that I'm aware of.
10        Q.    So that was a response to my
11   question, does Magten have any affiliates?
12        A.    Yes.
13        Q.    What are your day-to-day duties
14   and responsibilities with respect to Magten?
15        A.    I don't have any duties.
16        Q.    Do you have any responsibilities?
17        A.    I invest money.
18        Q.    What type of business is Magten
19   in?
20        A.    Buys and sells investments.
21        Q.    Any particular investments?
22             MS. STEINGART:  Excuse me.  You
23        want to know what the holdings of
24        Magten are, because I'm not going to
25        let him describe other things in which
```

11

1              T. Embry

2       they have an interest until I ascertain

3       if they are publicly reported.  I'm not

4       going to let him talk about the other

5       things.

6            If you want to ask him if he

7       invests in equities or debt or that

8       kind of thing or the full panoply, but

9       before we get into other individual

10      investments, I would have to consult

11      with him.

12           MR. COUSINS:  I don't know what

13      that means.

14      Q.    What type of investments does

15  Magten invest in?

16      A.    Bonds, preferreds, stocks.

17      Q.    Does it have any other types of

18  investments other than securities?

19      A.    It has an investment in one

20  partnership.

21      Q.    What is the business of the

22  partnership?

23      A.    Owns athletic clubs.

24      Q.    What types of bonds does Magten

25  invest in?

12

1                    T. Embry

2            MS. STEINGART:  I'm sorry, I

3        didn't hear the last word.

4            Q.    What types of bonds does Magten

5    invest in?

6            A.    Generally lower grade bonds.

7            Q.    Does Magten invest in any bonds

8    that trade at par?

9            A.    We have.

10           Q.    Do you currently hold any par

11   investments in bonds?

12           A.    Yes.

13           Q.    Now, your investment in bonds,

14   are those acquired off of exchanges, public

15   exchanges?

16           A.    Is that today?

17           Q.    Yes.

18           A.    No.

19           Q.    The bonds that you currently

20   hold, how are they acquired?

21           A.    Purchased through a broker.

22           Q.    You mentioned preferred.  Were

23   you referring to preferred stock or some

24   preferred type of debt instrument?

25           A.    Preferred stock.

13

1                        T. Embry

2          Q.      Preferred stock that Magten

3    currently holds, how was that acquired?

4          A.      Through open market purchases.

5          Q.      And does Magten hold any stock

6    other than preferred?

7          A.      Yes.

8          Q.      And how does Magten acquire stock

9    other than preferred?

10         A.      Open market purchases.

11         Q.      Other than Magten's interest in

12   the partnership you referred to, does Magten

13   hold any other investments other than bonds,

14   preferred stock, stock?

15         A.      Not that I'm aware of.

16         Q.      When did Magten start investing

17   in the lower grade securities?

18         A.      1978.

19         Q.      Would you say that Magten is

20   experienced in investing in lower grade

21   securities?

22         A.      I would say that we have done it.

23         Q.      Well, you have done it since

24   1978, right?

25         A.      Right.

14

1                          T. Embry

2          Q.     And you are doing it today,

3    right?

4          A.     Right.

5          Q.     You wouldn't say that you are

6    experienced in lower grade investments?

7          A.     I may be in the business, but

8    naive.

9          Q.     So would you consider yourself a

10   naive investor?

11         A.     I don't know.  Experience is not

12   a word that I know the exact definition.

13         Q.     How would you characterize the

14   acumen of Magten with respect to investments?

15         A.     What do you mean?

16         Q.     Would you consider yourself a

17   novice?

18         A.     No.

19         Q.     Would you consider yourself a

20   veteran?

21         A.     I -- I have been at it a long

22   time, yes.  Veteran is a good word.

23         Q.     Would you consider Magten a

24   sophisticated investor?

25         A.     There is an exact definition of

15

1                          T. Embry

2    that and I'm not sure that we are or not.

3          Q.    Why does Magten invest in lower

4    grade investments?

5          A.    In the hopes of making a profit.

6          Q.    And is Magten profitable?

7          A.    No.

8          Q.    When was the last time Magten was

9    profitable?

10         A.    It was profitable last year, but

11   not the year before.

12         Q.    And for the first six months of

13   2004, has Magten been profitable?

14         A.    No.

15         Q.    Do you understand the risks

16   associated with trading in lower grade

17   investments?

18              MS. STEINGART:  Object to the

19              form.

20         Q.    You can answer.

21         A.    Not always.

22         Q.    You have been in business since

23   1978 and you don't understand risks associated

24   with trading in lower grade investments?

25              MS. STEINGART:  Object to the

16

1                              T. Embry

2            form.

3            Q.    You can answer.

4            A.    Repeat the question.

5                  MR. COUSINS:  Could you read that

6            back, please.

7                  (Record read.)

8            A.    Not all of them.

9            Q.    Who made the decision for Magten

10    to acquire the NorthWestern QUIPS?

11                 Do you know what I mean by the

12    QUIPS?

13           A.    Yes, I do.

14           Q.    Who made that decision?

15           A.    I did.

16           Q.    What was that decision based

17    upon?

18           A.    Based upon my review of the

19    company.

20           Q.    And what did you do to review the

21    company?

22           A.    I read the 10-Q's and 10-K,

23    10-K's, 2001, 2002, and I guess the first

24    quarter of 2003.

25           Q.    Did you review the April 1, 2002

17

1                         T. Embry

2    10-K?

3           A.    April 1st which year?

4           Q.    2002.

5           A.    I believe so.

6           Q.    Did you review the April 16, 2003

7    10-K?

8           A.    I can't certify the date, but I

9    reviewed the 2002 10-K.

10          Q.    Well, when you say the 2002 10-K,

11   are you talking about the 10-K that came out

12   in 2002?

13          A.    No, 10-K for fiscal year,

14   calendar year 2002.

15          Q.    So you read a 10-K in 2003 that

16   related to fiscal year 2002?

17          A.    Yes, sir.

18          Q.    Let's talk about due diligence

19   that Magten typically performs before making

20   an investment.

21                Do you normally look at S.E.C.

22   filings?

23          A.    I do.

24          Q.    Do you review any other public

25   filings?

18

1                         T. Embry

2          A.    What I'm aware of.

3          Q.    Do you typically review an

4    indenture for indebtedness?

5          A.    I do.

6          Q.    And for preferred stock, do you

7    typically review the stock certificates with a

8    designation of rights?

9                MS. STEINGART:  Designation of?

10               MR. COUSINS:  Rights.

11         A.    It depends upon the situation.

12         Q.    What is that dependent upon?

13         A.    It is dependent upon generally

14   whether a company is in arrears or not.

15         Q.    And if a company is in arrears,

16   what do you do?

17         A.    I look to see what the

18   consequences of the arrearage is.

19         Q.    If there is an arrearage, would

20   you then look at the stock certificate or

21   designation of rights?

22         A.    Generally, yes.

23         Q.    Does Magten use outside

24   professionals in connection with its review of

25   potential investments?

19

1                          T. Embry

2          A.    No.

3          Q.    Is that, you never use outside

4    professionals?

5          A.    I have on other times.

6          Q.    In connection with the QUIPS, did

7    you use outside professionals?

8          A.    I hired Fried, Frank, Harris

9    Shriver & Jacobson.

10         Q.    You hired them prior to your

11   acquisition of the QUIPS?

12         A.    After my acquisition of the

13   QUIPS.

14         Q.    So in connection with your

15   investment in the QUIPS, you were the only

16   Magten officer that reviewed the documentation

17   prior to investing in the QUIPS?

18              MS. STEINGART:  I object to the

19              form.

20         A.    Yes.

21         Q.    Have you ever hired an investment

22   banker in connection with a potential

23   acquisition?

24              MS. STEINGART:  A potential

25              acquisition?

20

1                    T. Embry

2              MR. COUSINS:  Yes.  Of

3         securities.

4         A.    No.

5         Q.    Accountants.  The same question.

6         A.    No.

7         Q.    When did Magten first acquire an

8    interest in any of the NorthWestern

9    securities?

10        A.    The end of April 2003.

11        Q.    And what did Magten acquire?

12        A.    It acquired shares of preferred

13   stock of Montana Power.

14        Q.    How many shares?

15        A.    Approximately a million.

16        Q.    And you acquired those shares

17   over the open market?

18        A.    I did.

19        Q.    Subsequent to the acquisition of

20   the preferred shares, has Magten bought

21   additional preferred shares?

22        A.    I don't -- I don't understand the

23   question.

24        Q.    How many shares of preferred

25   shares of NorthWestern does Magten currently

21

1                    T. Embry

2    hold?

3         A.    In excess of a million shares.

4         Q.    When was the next time that you

5    acquired or disposed of preferred shares?

6         A.    Last week, the week before last,

7    I don't recall.

8              MS. STEINGART:  His question is

9              after the initial purchase that you

10             made that you testified about at the

11             end of April 2003, when is the next

12             occasion that you recall having bought

13             or sold.

14        A.    It would be May.

15        Q.    May?

16        A.    2003.

17        Q.    And what did you buy or sell?

18        A.    We purchased, I purchased.

19        Q.    How many?

20        A.    I have misspoken, or I didn't

21    understand a question.

22             MS. STEINGART:  Okay.

23        A.    We own in excess of a million

24    shares.  We purchased them over time in the

25    open market.  After I bought shares one day, I

CLASSIC REPORTING, INC. (212) 268-2590

22

```
 1                      T. Embry
 2    bought more shares the next day, the day after
 3    that.
 4          Q.    Have you disposed of any shares
 5    since your initial purchase?
 6          A.    Yes.
 7          Q.    Do you know when you disposed of
 8    shares?
 9          A.    I do not.
10          Q.    Did you dispose of shares during
11    the bankruptcy?
12                MS. STEINGART:  I'm sorry.  When
13          was the bankruptcy filed?  Can we put a
14          date on that just so we --
15                MR. CHIPMAN:  September 14th.
16                MS. STEINGART:  September 14,
17          2003?
18                MR. RATNER:  Yes.
19          A.    Yes.
20          Q.    Did you acquire or sell preferred
21    shares while Magten was a member of the
22    creditors committee?
23          A.    We did.
24          Q.    Do you recall whether it was an
25    acquisition or --
```

23

1                          T. Embry

2          A.    It was an acquisition.

3          Q.    Do you recall when or how much?

4          A.    I recall that we purchased 1,000

5    shares after my first creditors meeting.  I

6    don't know how much we purchased prior to

7    that.

8                 We had sought advice of counsel

9    as to the propriety of it and once I went on

10   to the creditors committee, I ceased

11   purchasing and tried to get a trading paper

12   such as you have before me.

13         Q.    That trade was after Magten was

14   appointed to the creditors committee?

15         A.    That was after my first meeting

16   with the creditors committee.

17         Q.    Was Magten a member of the

18   committee at that point?

19         A.    Yes, it was.

20         Q.    D-1, Exhibit 1, on the same page,

21   it lists the members.  Do you see that in the

22   definition section?

23                Is Magten listed as a member of

24   the committee?

25                MS. STEINGART:  I'm sorry, D-1,

CLASSIC REPORTING, INC. (212) 268-2590

24

1                          T. Embry

2            where are we looking, sir?

3                  MR. COUSINS:  "Definitions."

4                  MS. STEINGART:  Oh, members.

5          A.    No.

6          Q.    And do you have an understanding

7    as to why Magten was not listed on this?

8          A.    No.

9                  MS. STEINGART:  Well, he didn't

10            prepare the document.

11                  MR. COUSINS:  I'm asking for his

·12            understanding.

13                  MS. STEINGART:  Okay.

14          A.    No.

15          Q.    If you turn to the last page of

16    D-1, it is a document called "Unbound-by-Order

17    Notice Regarding Order Permitting Securities

18    Trading Upon Establishment of Ethical Wall."

19                  Did I read that correctly?

20          A.    I believe so.

21          Q.    Has Magten ever filed one of

22    these with the Bankruptcy Court?

23          A.    No.

24          Q.    Now, we talked about preferred

25    shares.

25

1          T. Embry

2          Did Magten acquire any other

3  securities after the end of April 2003 in

4  NorthWestern?

5          A.   Yes.

6          Q.   Just so I got my nomenclature

7  right, preferred shares, are you referring to

8  QUIPS or preferred stock?

9          A.   In what context?

10          Q.   Well, tell me what the security

11  is that Magten currently holds?

12          A.   We bought QUIPS.

13          Q.   Do you have an understanding as

14  to whether QUIPS, the priority of payment of

15  QUIPS --

16          MS. STEINGART:  I'm sorry, I

17          don't understand.

18          Q.   -- are they subordinated?

19          MS. STEINGART:  In the plan, you

20          mean?

21          MR. COUSINS:  No, his

22          understanding of the security.

23          A.   They are subordinated.

24          MS. STEINGART:  I see.

25          Q.   Do you have an understanding as

26

```
1                        T. Embry
2    to what they are subordinated to?
3            A.    Yes.
4            Q.    To what are they subordinated?
5            A.    To the medium term notes of
6    Montana Power and the first mortgage notes of
7    Montana Power.
8            Q.    Are they subordinated to the
9    senior unsecured notes?
10           A.    The ones I just mentioned.
11           Q.    Are they subordinated to trade
12   debt?
13           A.    No.
14           Q.    Are they senior to trade debt or
15   pari passu, I guess is the only alternative?
16           A.    I believe, although I may have
17   been wrong as to whether they are pari passu
18   or whatever the prior question was, normally,
19   they would be pari passu with trade debt, and
20   I can't remember whether these are any
21   different.
22           Q.    Do you know whether -- well, have
23   you ever invested in any other QUIPS in any
24   other cases?
25               MS. STEINGART:  In any other
```

27

```
 1                    T. Embry

 2          companies or cases?

 3                MR. COUSINS:  Sure.  Cases or

 4          companies.

 5          A.    Yes.

 6          Q.    And what cases or companies?

 7          A.    AES, Kalpine.  K-A-L-P-I-N-E, I

 8   believe.

 9          Q.    Any others?

10          A.    Not that I can -- I'm not even

11   sure of those two.

12          Q.    Can you describe the nature of

13   QUIPS:  Are they equity, are they debt, are

14   they a quasi instrument?

15          A.    They are debt.

16          Q.    At the time of the transfer of

17   assets from Clark & Blackfut, was Magten a

18   creditor of Clark & Blackfut?

19          A.    No.

20          Q.    At the time of the transfer of

21   assets from Clark & Blackfut, was Magten a

22   creditor of NorthWestern?

23          A.    No.

24          Q.    Now, we talked generally about

25   the due diligence you do and you talked about
```

28

1                          T. Embry

2    the Q's and the K's you looked at in

3    connection with NorthWestern.

4                    Did you look at the indenture

5    prior to the acquisition of the securities?

6            A.    I can't recall.

7            Q.    Did you review the first

8    supplemental indenture?

9            A.    In the time up to today?

10           Q.    I'm sorry.    I will be a little

11   clearer.

12                   Prior to your acquisition of the

13   QUIPS, did you review the indenture?

14           A.    I don't know.

15           Q.    And prior to your acquisition of

16   the QUIPS, did you review the first

17   supplemental indenture?

18           A.    I don't know.

19           Q.    Prior to your acquisition of the

20   QUIPS, did you review the second supplemental

21   indenture?

22           A.    I don't know.

23           Q.    Prior to your acquisition of the

24   QUIPS, did you review the third supplemental

25   indenture?

29

1                    T. Embry

2         A.    I don't know.

3         Q.    Prior to your acquisition of the

4    QUIPS, did you review the amendment to

5    guarantee agreement?

6         A.    I don't know.

7         Q.    Prior to your acquisition of the

8    QUIPS, did you review the guarantee agreement?

9         A.    I don't know.

10             THE WITNESS:  May I?

11             MS. STEINGART:  Is there a

12        question pending?  If there is not a

13        question, he would like to consult with

14        counsel.  If there is not a question --

15             MR. COUSINS:  There isn't a

16        question, but I have to object to you

17        guys consulting.

18             MS. STEINGART:  If the witness

19        wants to ask me a question, that's why

20        I'm here.  So if you have an objection,

21        put your objection on the record.

22             (Witness and counsel confer.)

23             MR. COUSINS:  I will note that

24        the witness and his advisor are

25        consulting.

CLASSIC REPORTING, INC. (212) 268-2590

30

1                          T. Embry

2              I'm going to explore whether it

3         is a -- it is a question of privilege

4         and the counsel has not instructed the

5         witness not to answer on that basis.

6              MS. STEINGART:  We have consulted

7         and there is not a privilege involved.

8              You refer to one purchase.  The

9         witness has already testified that

10         there was more than one purchase and

11         all the questions that you are asking,

12         are prefaced with the initial purchase.

13              MR. COUSINS:  That's right.

14              MS. STEINGART:  I'm just

15         reminding you of that scenario because

16         the witness has a concern that you may

17         misinterpret his answers.

18              MR. COUSINS:  Okay.

19         Q.    Mr. Embry, what did you and

20    counsel just confer about?

21              MS. STEINGART:  No, he is not

22         answering that question.

23              MR. COUSINS:  You refreshed his

24         recollection.

25              MS. STEINGART:  I'm telling you

31

1                           T. Embry

2           that that conversation is privileged

3           and I'm instructing him not to answer.

4                   You may ask the witness about the

5           subject matter that you were pursuing

6           before we had a discussion concerning

7           that which was calculated to determine

8           if there were -- if he could embellish

9           on answers without violating privilege

10          and he is not going to reveal the

11          conversation I had with him.

12                  MR. COUSINS:  I'm going to ask

13          about the subject matter.  You

14          refreshed his recollection.

15          Q.      Did you consult with your

16      attorney during the deposition?

17                  MS. STEINGART:  He is not going

18          to answer that question.  The record

19          reflects -- I'm instructing him not to

20          answer.

21                  The record reflects that on one

22          occasion, before he consulted with me

23          while no question was pending, and just

24          a couple of minutes ago he consulted

25          with me while no question was pending,

32

1                          T. Embry

2          and the substance of his consultation

3          with me, I consider to be privileged,

4          and I am instructing the witness not to

5          answer.

6                  MR. COUSINS:  Deutschman v.

7          Beneficial Corp., are you familiar with

8          Deutschman?

9                  MS. STEINGART:  Do I remember

10         Deutschman?  No, I don't remember

11         Deutschman.

12                 MR. COUSINS:  Okay.

13         Q.      We are still talking about prior

14    to your first acquisition.

15                 Did you review the trust which

16    holds the QUIPS?

17         A.      I don't recall.

18         Q.      Did you review the amended and

19    restated trust agreement?

20         A.      In what time period?  I forgot.

21         Q.      Prior to your first acquisition

22    of the QUIPS.

23         A.      Oh, I don't recall.

24         Q.      Prior to your first acquisition

25    of the QUIPS, did you review the November 15,

33

1                    T. Embry

2    2002 asset and stock transfer agreement?

3         A.    I don't recall.

4         Q.    Prior to your first acquisition

5    of the QUIPS, did you review the unit purchase

6    agreement with Montana dated September 29,

7    2000?

8         A.    I don't recall.

9         Q.    Prior to your first acquisition

10   of the QUIPS, did you review any FERC filings

11   made by NorthWestern?

12        A.    I don't recall.

13        Q.    Are you familiar with what's been

14   called the going-flat transaction?

15        A.    I am.

16        Q.    When did you first become aware

17   of the going-flat transaction?

18        A.    In reviewing the company's 10-Q,

19   the quarter-ending September 30, 2002.

20             MS. STEINGART:  He wants to know

21             when you did that.

22        A.    In reviewing that document.

23        Q.    Did you review that document

24   prior to your acquisition of the QUIPS, your

25   initial acquisition of the QUIPS?

34

1                    T. Embry

2          A.    I believe so.

3          Q.    Did you have an understanding at

4     the time that you reviewed that 10-Q whether

5     FERC authorization was necessary for the

6     consummation of the going-flat transaction?

7          A.    No.

8          Q.    Prior to your initial acquisition

9     of the QUIPS, did you review any Montana

10    Public Service Commission filings?

11         A.    I do not recall.

12         Q.    Prior to your initial acquisition

13    of the QUIPS, did you review any press

14    releases of NorthWestern?

15         A.    Yes.

16         Q.    Do you recall which ones?

17         A.    No.

18         Q.    Do you recall when you reviewed

19    the press releases?

20         A.    No.

21         Q.    Prior to your initial acquisition

22    of the QUIPS, how did you familiarize yourself

23    with the going-flat transaction?

24         A.    The company said in its September

25    30, 2002 10-Q that those would be the last

35

1          T. Embry

2   published figures of Montana Power as a

3   separate entity.

4          Q.    Did you do any further due

5   diligence with respect to the going-flat

6   transaction, at that time?

7          A.    That's overly broad.

8          MS. STEINGART:  He is asking you

9          if you looked at any other documents

10          that informed you or described the

11          going-flat transaction.

12          Is that fair?

13          MR. COUSINS:  Sure.

14          A.    Whatever was -- I don't recall.

15          Q.    Can you give me a time frame as

16   to when you were reviewing the public filings

17   in relationship to when you first acquired the

18   QUIPS?

19          A.    I don't know.

20          Q.    Prior to acquiring your initial

21   acquisition of the QUIPS, did you -- what due

22   diligence did you do immediately prior to your

23   first acquisition of the QUIPS?

24          MS. STEINGART:  Object as to

25          form.  By immediately, do you mean a

36

1                     T. Embry

2          day, a month?

3                MR. COUSINS:  Whatever his

4          understanding is.  Bonnie, we can do it

5          that way.

6          Q.    A week before.

7                THE WITNESS:  What was the

8          question?

9                (Record read.)

10         A.    I read the public documents of

11  Montana Power registered with the S.E.C. in

12  the S.E.C. system, and public documents in the

13  S.E.C. system of NorthWestern Corp.

14         Q.    Did you review any other

15  documents?

16         A.    Press releases.  If there was

17  anything from Wall Street that came in across

18  my desk, I don't know.

19         Q.    Wall Street, are you referring to

20  analysts' reports?

21         A.    Yes.

22         Q.    Which analysts' reports do you

23  recall reviewing at that time?

24         A.    Merrill Lynch for certain.  I

25  don't recall any others.

37

```
 1                          T. Embry
 2           Q.    At the time prior to the
 3     acquisition of the QUIPS, were you satisfied
 4     with your understanding of the going-flat
 5     transaction?
 6           A.    Yes.
 7                 MR. COUSINS:  Off the record,
 8           please.
 9                 (Discussion held off the record.)
10                 MR. COUSINS:  Handing the
11           reporter what I would like to mark as
12           D-2.
13                 (U.S. Bankruptcy Court, District
14                 of Delaware, Notice of Electronic
15                 Filing with attachments marked
16                 Debtor's Exhibit 2 for
17                 identification, as of this date.)
18           Q.    Mr. Embry, have you seen -- you
19     have to pass the first page which is a
20     Bankruptcy Court filing.
21           A.    Um-hmm.
22           Q.    Do you recognize this document?
23                 MS. STEINGART:  So starting with
24           page 3, do you recognize the document?
25           A.    I believe that it is the request
```

38

1                         T. Embry

2    for a deposition that was served on me or

3    served on me through Fried, Frank.

4          Q.    And did you assist in collating

5    the documents requested herein?

6          A.    Yes.

7          Q.    Mr. Embry, if you can turn to

8    Exhibit A, it is probably about four pages

9    back.

10              What I'm going to ask you is

11   whether you are the person most knowledgeable

12   at Magten with respect to each of those

13   paragraphs.

14              Rather than reading it, if I

15   could ask you and please read it, I don't want

16   to demand a fast answer.

17              MS. STEINGART:  Could I -- are

18              you asking him whether he is most

19              knowledgeable about the collection of

20              documents or about the substance of the

21              request for the documents?

22              MR. COUSINS:  The topics.

23              MS. STEINGART:  Okay.

24         A.    Yes.

25         Q.    So with respect to 1 through 7 --

39

```
 1                      T. Embry
 2          A.    Yes.
 3          Q.    -- in response to the discovery,
 4   what did you do to collate documents?
 5          A.    I sent all of the papers I had
 6   and all the e-mails I had to Fried, Frank.
 7          Q.    Do you recall, Mr. Embry, when
 8   Magten was appointed to the creditors
 9   committee in NorthWestern?
10          A.    I don't remember the date.
11          Q.    How did Magten get appointed to
12   the creditors committee?
13          A.    We were appointed by the U.S.
14   Trustee.
15          Q.    And did the U.S. Trustee appoint
16   Magten to the committee at the initial
17   organizational meeting of creditors, do you
18   recall?
19          A.    No.
20          Q.    Do you have an understanding as
21   to how the U.S. Trustee came about to appoint
22   Magten after the organizational meeting?
23          A.    We requested the appointment
24   through Fried, Frank.
25          Q.    So Fried, Frank wrote a letter to
```

40

```
1                        T. Embry

2    the U.S. Trustee; is that correct?

3            A.     That is correct.

4            Q.     Do you recall which month you

5    were appointed to the committee?

6            A.     I believe it was November.

7            Q.     And Magten is no longer a member

8    of the committee; is that correct?

9            A.     That's correct.

10           Q.     Why?

11                  MS. STEINGART:  Objection to the

12           form.

13           A.     We were taken off the committee,

14   I believe, by the U.S. Trustee.

15           Q.     Do you have an understanding as

16   to why the U.S. Trustee took Magten off the

17   committee?

18           A.     No.

19           Q.     Were you asked --

20           A.     I'm sorry, what is an

21   understanding?  I mean, I understand the legal

22   argument.  I don't understand why he did it.

23           Q.     What is the legal argument?

24           A.     The legal argument was that we

25   were trying -- that if Magten was successful
```

41

1                          T. Embry

2    in its suit, that the requested remedy would

3    remove assets from the estate and there is, I

4    believe, that there is something in the

5    Bankruptcy Code or I have been told that --

6              MS. STEINGART:  Certainly don't

7         reveal your conversations with counsel.

8         A.     -- that that gave the U.S.

9    Trustee the ability to object to our presence

10   on the committee.

11        Q.    Do you recall the letter to your

12   counsel removing Magten from the committee?

13        A.    No.

14        Q.    Did you ever see it?

15        A.    Yes.

16        Q.    Prior to being taken off the

17   committee by the U.S. Trustee, did the

18   committee or its professionals ask that Magten

19   resign from the committee?

20        A.    Yes.

21        Q.    And when was that?

22             MS. STEINGART:  I'm not sure what

23        the relevance of all of this is, but it

24        is your afternoon.

25             MR. COUSINS:  Thank you.  I can

42

1                    T. Embry

2        tell you the relevance.  You don't want

3        to hear it.

4              MS. STEINGART:  Well, no, I'm

5        happy to hear it.

6        A.    The --

7              MS. STEINGART:  But let's answer

8        the question.

9              THE WITNESS:  Repeat it for me.

10             (Record read.)

11             MR. RATNER:  Let me intercede

12       here for the record and make an

13       observation that any conversations that

14       were taking place in the committee

15       while Magten was a member of the

16       committee were confidential, so there

17       was a lot of privileged information

18       that was exchanged and I would reserve

19       the committee's privilege.

20             It still is a committee privilege

21       and I would ask that that be noted for

22       the record.  The committee would like

23       to keep its privilege vis-a-vis

24       conversations that were taking place.

25       Any nonprivileged information, the

43

```
 1                    T. Embry
 2         witness may testify to, but privileged
 3         communications --
 4              MS. STEINGART:  I don't remember
 5         the question.  The question was about
 6         conversations concerning a request to
 7         resign.
 8              MR. RATNER:  If there was any
 9         advice imparted during those meetings,
10         he mentioned the professionals at this
11         meeting.
12              MR. COUSINS:  I erred if I asked
13         about conversations and I'm not going
14         to deliberately go into that.
15              MS. STEINGART:  If we can just
16         have the question again.
17              (Record read.)
18              THE WITNESS:  Do you have
19         anything to say?
20              MR. RATNER:  I have stated my
21         objection on the record.
22         A.    The committee's professionals
23    requested that we resign.
24         Q.    And do you have an understanding
25    as to why the committee's professionals asked
```

44

1                      T. Embry

2    you to resign?

3          A.    For the same reason that the U.S.

4    Trustee asked us to resign.

5          Q.    And I take it, because the U.S.

6    Trustee took you off the committee, that you

7    did not voluntarily resign; is that correct?

8          A.    That is correct.

9               MS. STEINGART:  Again, I don't

10              know what the relevance is.

11              MR. COUSINS:  I will tell you

12              later.  You are not going to want to

13              hear it.

14              MR. COUSINS:  Bonnie, can we take

15              a five-minute break?

16              MS. STEINGART:  Sure.

17              (Recess taken.)

18         Q.    Mr. Embry, you were Magten's

19   representative on the NorthWestern creditors

20   committee; is that correct?

21         A.    That's correct.

22         Q.    And you are the one at Magten

23   making trading decisions; is that correct?

24         A.    That is correct.

25         Q.    Has Magten purchased any -- any

45

1                         T. Embry

2    other claims, whether trade claims or

3    securities, other than QUIPS during a

4    bankruptcy case?

5          A.    No.

6          Q.    Do you have an understanding as

7    to the Bank of New York's role with respect to

8    the NorthWestern QUIPS?

9          A.    Yes.

10         Q.    And what is your understanding?

11         A.    That they used to be in the place

12   that Law Debenture is today.

13         Q.    And do you have an understanding

14   as to why Bank of New York resigned as

15   indentured trustee?

16         A.    No.

17         Q.    Does Magten have any claims

18   against Bank of New York that you know of?

19              MS. STEINGART:   In its role as

20              indentured trustee?

21              MR. COUSINS:   In its role as

22              indentured trustee.

23         A.    Not that I'm aware of today.

24         Q.    Are you familiar with a complaint

25   to avoid for Clark Fork transaction?

CLASSIC REPORTING, INC. (212) 268-2590

46

1                         T. Embry

2         A.    I have read it, yes.

3         Q.    Do you have an understanding as

4    to what's been requested in that complaint?

5         A.    Yes.

6               MS. STEINGART:  My understanding

7         is that this deposition concerns the

8         objection that we filed in connection

9         with disclosure statement that is

10        related to confirmation.

11              Now, as I understand it, the

12        debtor has declined to engage in any

13        discovery with respect to the adversary

14        proceeding until the judge decides the

15        motion with respect to standing.

16              The debtor has declined to

17        produce documents with respect to that

18        proceeding.  And I would ask that you

19        not ask questions or examine this

20        witness with respect to the adversary

21        proceeding.

22              If there is some dispute about

23        that, I think we should call the judge.

24              MR. COUSINS:  Okay.

25              MS. STEINGART:  But I'm happy and

47

1                        T. Embry

2              he is prepared to be here today and to

3              testify about possible objections or

4              objections that were suggested in our

5              disclosure statement objection filing

6              that relate to confirmation.

7         Q.    Mr. Embry, do you have an

8    understanding about the status of discovery in

9    the adversary proceeding?

10        A.    Not beyond what I have just

11   heard.

12        Q.    Has Magten asserted that the plan

13   of reorganization can't be confirmed unless

14   the adversary proceeding has been determined?

15        A.    I believe that we have.

16        Q.    Do you have an understanding as

17   to why?

18             MS. STEINGART:  To the extent

19             that he is asking for advice of

20             counsel, please reframe --

21             MR. COUSINS:  I'm not asking for

22             discussions.

23        Q.    Your understanding.

24        A.    Do I understand why?

25        Q.    Yes.

48

```
 1                      T. Embry

 2          A.     I believe so.

 3          Q.     And what's that understanding?

 4          A.     As a creditor of Montana Power,

 5   the only -- or the remedy that is available to

 6   us is a constructive trust on the assets that

 7   were wrongly transferred to NorthWestern Corp.

 8                  The company is unwilling or

 9   unable to negotiate any settlement other than

10   that.

11          Q.     Did the adversary proceeding ask

12   for a constructive trust on the assets?

13          A.     I believe that's correct.

14          Q.     And when did Magten become a

15   creditor of Montana Power?

16          A.     When it first bought the QUIPS.

17          Q.     In connection with the adversary

18   proceeding, Magten has asserted that BNY has

19   refused to execute the third supplemental

20   indenture if it contained a release of Clark

21   Fork's obligations under the indenture.

22          A.     Did you say E&Y or BNY?

23          Q.     BNY, Bank of New York.

24                 MS. STEINGART:  We are not going

25          to answer questions --
```

49

T. Embry

1

2          MR. COUSINS:  You instruct him

3          not to answer, I will get the judge.

4          MS. STEINGART:  I'm instructing

5          him not to answer.  Get the judge.

6          (Discussion held off the record.)

7          Q.     Has Magten had any communications

8     with any other creditor of NorthWestern

9     regarding a potential objection to

10    confirmation of the NorthWestern plan?

11         A.     We sent a letter to Bruce Karsh,

12    which we produced.  I have talked to two

13    creditors that I can recall, and that's it.

14         Q.     And Mr. Karsh is with Oakwood, is

15    that correct?

16         A.     It is not Oakwood.  It is

17    something else.

18         MS. STEINGART:  I think it is

19         Oaktree.

20         MR. COUSINS:  I apologize.

21         A.     Oaktree, yes.

22         Q.     And what was the nature of the

23    discussion with Oaktree?

24         A.     That rather than -- rather than

25    putting the Montana assets into a constructive

50

1                    T. Embry

2      trust, that I was willing to accept a new

3      preferred stock of the reorganized

4      Northwestern Corporation, thereby eliminating

5      the constructive trust.

6            Q.    Do you have an understanding as

7      to whether Oaktree is going to object to

8      confirmation?

9            A.    I have no understanding.

10           Q.    Did you have any other

11     conversations with Oaktree regarding

12     objections to confirmation to the plan?

13           A.    No, not that I remember.

14           Q.    And you had previously testified

15     that you talked to two other creditors.

16                 Do you recall who those creditors

17     were?

18           A.    One is a fellow Kim Kirsten and

19     the other is a man, Michael Ashner.

20           Q.    Do you know who Kim Kirsten is

21     with?

22           A.    He is not with anyone.  He is

23     retired.

24           Q.·   Is he a private investor, do you

25     know?

51

1                         T. Embry

2        A.    He is a retiree.

3        Q.    Is he a creditor of NorthWestern?

4        A.    I believe so.

5        Q.    And Michael Ashton?

6        A.    Ashner, A-S-H-N-E-R.

7        Q.    Is he employed?

8        A.    He is employed.

9        Q.    By a creditor of NorthWestern?

10       A.    By a creditor of NorthWestern?

11       Q.    Yes.

12       A.    No, not that I'm aware of.

13       Q.    Is he a private investor?

14       A.    He --

15             MS. STEINGART:  Are you asking if

16       that's his profession?

17       Q.    Let me short-circuit it.

18       A.    He has private investments, I

19  believe.

20       Q.    Let me short-circuit it.

21             Why were you talking to Michael

22  Ashner regarding a potential objection to

23  confirmation?

24       A.    Because he called me and asked

25  how he should vote on the plan.

52

```
1                         T. Embry

2          Q.    Is he a QUIP holder?

3          A.    Yes, he is.

4          Q.    And Mr. Kirsten, is he a QUIP

5    holder?

6          A.    He is.

7          Q.    Have you ever talked to RCG

8    Carpathia Master Fund about an objection to

9    confirmation?

10         A.    Not that I can recall.

11         Q.    Have you ever heard of RCG

12   Carpathia?

13         A.    No, I haven't.  I don't think it

14   could -- I don't think that I have ever heard

15   of it.

16         Q.    Have you ever talked to

17   Performance Capital in connection with the

18   NorthWestern bankruptcy?

19         A.    I have not.

20         Q.    Have you ever talked to Ramius

21   Capital Group about --

22         A.    I have not.

23         Q.    Have you talked to any other

24   distressed traders regarding NorthWestern and

25   objection to confirmation?
```

53

1                    T. Embry

2              MS. STEINGART:  So people who

3         aren't creditors but traders?

4              MR. COUSINS:  Yes.

5              MS. STEINGART:  I see.  Okay.

6         A.     About -- I sent the -- this is an

7    analyst out of Imperial Corp., who wrote a

8    piece on NorthWestern, and I sent him our

9    complaint, the company's motion for dismissal,

10   and our comments on the motion for dismissal,

11   but that's all.

12        Q.     Do you have an understanding as

13   to what Imperial Corp. is?

14        A.     It is a broker/dealer.

15        Q.     And does it do analyst reports?

16        A.     It does.

17        Q.     Does it hold for its own account?

18        A.     I don't know.

19        Q.     Do they have a particular area of

20   expertise, to your knowledge?

21        A.     Smaller companies.

22        Q.     And do they specialize in

23   distressed debt, to your knowledge?

24        A.     They trade in it, yes.

25        Q.     Is there any written

54

1                        T. Embry

2    communication between you and either Mr.

3    Kirsten or Mr. Ashner?

4         A.    Yes.   There is a letter to

5    Michael which we have provided to you, I

6    believe.

7              MR. COUSINS:  I don't believe

8              that's been produced.

9              MS. STEINGART:  You have what you

10             have.  As I sit here today, I don't

11             have a microfilm of what I produced to

12             you.

13        Q.    Has Magten retained any financial

14   advisor in connection with the NorthWestern

15   bankruptcy?

16        A.    No.

17        Q.    Does Magten have any valuations

18   with respect to NorthWestern?

19        A.    No.

20        Q.    Has Magten made any calculations

21   regarding distributions it will receive in

22   connection with confirmation of the plan?

23        A.    Yes.

24        Q.    What calculations has Magten

25   made?

55

1                    T. Embry

2         A.    There are two.  The first is

3    2.1125 percent compounded quarterly from

4    January 1, 2003 on $25.  The second one is our

5    share of 2 percent.

6         Q.    Explain to me what you mean by

7    Magten's share of 2 percent.

8         A.    Under the plan that is on the

9    table now, Magten would share 2 percent of the

10   equity with subordinated securities of

11   NorthWestern Corp.

12        Q.    Do you have an idea of, on a

13   percentage base, how much of the QUIPS Magten

14   holds?

15        A.    In excess of 40 percent.

16        Q.    When is the last time Magten

17   acquired additional QUIPS?

18        A.    A month ago.

19        Q.    And how do you track acquisitions

20   and dispositions of the QUIPS in the

21   NorthWestern case?

22        A.    Can you be --

23        Q.    Do you have a spreadsheet, a

24   printout?

25        A.    It is kept on the computer.

56

1                          T. Embry

2          Q.    Is it on a spreadsheet?

3          A.    No.  It is on a listing.

4          Q.    Do you have an understanding as

5    to whether Magten is going to object to

6    confirmation of a plan?

7          A.    I do.

8          Q.    And what is that understanding?

9          A.    That we are going to object.

10         Q.    And do you have an understanding

11   as to the grounds that Magten is going to

12   object?

13         A.    Yes.

14         Q.    And what are those grounds?

15         A.    First, that we have the lawsuit

16   outstanding.

17               Second, that we are incorrectly

18   categorized or classified.

19               Third, that the convenience class

20   is not de minimis.

21               Fourth, that releases are being

22   granted to officers and directors with no

23   payment for those.

24               And offhand, I can't remember the

25   others.

57

1                    T. Embry

2          Q.    Let's take those in order.

3                With respect to the lawsuit, what

4     is your understanding as to the basis for

5     objection to confirmation with regard to the

6     lawsuit?

7          A.    That the Montana assets were

8     wrongly transferred to NorthWestern.

9          Q.    And how does that affect

10    confirmation?

11         A.    That if we were successful in our

12    suit, the assets would have been put into a

13    constructive trust which would be a different

14    corporate structure than the one that is

15    proposed in the plan.

16         Q.    And if successful, do you have an

17    understanding as to the effect that that would

18    have on the QUIPS?

19         A.    Yes.

20         Q.    And what's that understanding?

21         A.    That they would be paid in full.

22         Q.    Does Magten assert that the plan

23    cannot be confirmed until the adversary

24    proceeding is determined?

25         A.    Yes.

58

1                          T. Embry

2          Q.     I think you indicated that your

3    second objection would be that the plan

4    incorrectly categorizes the QUIPS; is that

5    correct?

6          A.     That's correct.

7          Q.     And what's the basis of that?

8          A.     The QUIPS are obligations of

9    Montana Power and we are categorized or

10   classified with the NorthWestern holding

11   company, QUIPS or toppers.

12         Q.     Does Magten hold any securities

13   of Clark & Blackfut?

14                MS. STEINGART:  Clark Fork &

15                Blackfut, LLP.

16         A.     No.  The QUIPS are obligations of

17   Clark & Blackfut.

18         Q.     Other than the conviction, just

19   to make it --

20         A.     No.

21         Q.     I think you indicated that the

22   convenience class is not de minimis; is that

23   correct?

24         A.     That is my understanding, yes.

25         Q.     And do you have an understanding

59

T. Embry

1

2    as to what an appropriate convenience class

3    threshold should be?

4         A.    It depends on the -- it would be

5    nice to know the number of participants in the

6    class and what their claims are individually

7    and in the aggregate.  Otherwise, I couldn't

8    answer.

9         Q.    And you indicated that there

10   would be a forthcoming objection regarding the

11   releases contained in the plan; is that

12   correct?

13        A.    I believe that's correct.

14        Q.    And do you have an understanding

15   as to the basis of that objection?

16        A.    That the officers and directors

17   of the company are being released from

18   liability for now consideration.

19        Q.    And does Magten have any claims

20   against the officers and directors who are

21   being released?

22        A.    Yes.

23        Q.    And do you have an understanding

24   as to those claims?

25        A.    Yes.

60

1                    T. Embry

2        Q.    And what is that understanding?

3        A.    Let's see.  The Northwestern

4    Corporation owed a duty to Montana Power, as

5    it was its creature or controlled entity.  And

6    it owed a duty to the creditors of Montana

7    Power because NorthWestern was insolvent.  And

8    when a company is insolvent, the directors

9    duty is to the creditors.

10               Secondly, the officers and

11   directors of Montana Power allowed the

12   transfer or the assumption of the debt.  And

13   the transfer of the assets, one, either -- and

14   which they seem to have put into it a

15   declaration, one, not caring what they said

16   because they were under the complete

17   domination of NorthWestern.

18               And, two, knowing that

19   NorthWestern's numbers -- or should have known

20   that NorthWestern's numbers were not any good

21   at the time they made the transfer.

22               MR. COUSINS:  Can we take a

23          break?  Judge Case says we can dial in

24          now.

25               MS. STEINGART:  Great, let's do

61

1                    T. Embry

2          that.

3                (Discussion held off the record.)

4                (Conference call placed with

5          Judge Case; transcript bound

6          separately.)

7                MR. COUSINS:  Let's take five

8          minutes.

9                MS. STEINGART:  Of course.

10               (Recess taken.)

11         Q.    Mr. Embry, you indicated that

12    there may be claims against the officers and

13    directors that would be affected by the

14    releases; is that correct?

15         A.    That's my understanding, but I'm

16    not a lawyer.

17         Q.    And how is Magten --

18         A.    Can you -- I answered too

19    quickly, what was that question?

20               (Record read.)

21         A.    Yes, okay.

22         Q.    Is Magten pursuing those claims

23    against the officers and directors?

24         A.    Yes.

25         Q.    How?

62

1                      T. Embry

2           A.    We have a suit in Montana.

3           Q.    What is the suit in Montana?

4           A.    Against the officers and

5      directors.

6           Q.    And what are the nature of the

7      claims in the suit in Montana?

8           A.    Breach of fiduciary duty, amongst

9      others.  I'm not a lawyer.  I have reviewed

10     the legal documents, but I can't remember

11     them.

12          Q.    Do you know who the parties are

13     in that litigation?

14          A.    There are four individuals who

15     purported to represent Montana Power at one

16     time and then denied it.

17          Q.    Those are the defendants?

18          A.    That's correct.

19          Q.    And do you know who the

20     plaintiffs are, or plaintiff?

21          A.    Myself.

22          Q.    Is that Magten?

23          A.    Yes.

24          Q.    Are you familiar with the Public

25     Utility Holding Act of 1935?

63

1                    T. Embry

2          A.    No.

3          Q.    Has Magten been asked to join in

4   any litigation in the bankruptcy claiming that

5   NorthWestern somehow violated the Public

6   Utility Holding Company Act?

7          A.    No.

8          Q.    Do you believe that Magten's

9   distributions under the current plan are less

10  than what Magten would receive under Chapter 7

11  of the bankruptcy code?

12              MS. STEINGART:  He means under

13              liquidation.

14         A.    Yes.

15         Q.    Do you intend to object to

16  confirmation on that basis?

17         A.    I am going to leave the exact

18  nature of the legal objections to counsel.

19         Q.    And do you have an understanding

20  as to why you believe Magten would receive

21  less under the current plan as opposed to on a

22  liquidation?

23         A.    Yes.

24         Q.    What's that understanding?

25         A.    That the assets of Montana Power

64

1                    T. Embry

2   would more than cover my obligation.

3          Q.    Does this relate to the adversary

4   being successful in connection with the

5   adversary complaint?

6          A.    Yes.

7          Q.    Have you performed any analysis

8   with respect to the recovery under Chapter 7

9   versus under the current plan?

10         A.    Yes, I believe I will get the

11  same that Montana that I'm money good.

12              MS. STEINGART:  Do understand

13              Chapter 7 is a liquidation?

14              THE WITNESS:  Yes, and if the

15              adversary is won and the assets are not

16              liquidated and we were the adversary,

17              that the money would flow to the QUIPS

18              before it went to the rest of the

19              NorthWestern estate.

20              MS. STEINGART:  Okay.

21         Q.    Mr. Embry, you indicated that you

22  performed two calculations, if I recall,

23  2.1125 percent and then the calculation of

24  Magten's share of 2 percent; is that correct?

25         A.    Yes.

65

1                         T. Embry

2          Q.    Did you perform a liquidation

3    analysis also?

4          A.    No.

5          Q.    Have you performed any other type

6    of valuation of NorthWestern?

7          A.    I have done several.

8          Q.    I apologize.

9          A.    I have done several.

10         Q.    In addition to the two

11   calculations that you talked about, you have

12   done additional valuations; is that correct?

13         A.    When I first -- yes.

14         Q.    And what valuations have you

15   done?

16         A.    Multiples of EBITDA.

17         Q.    And what do your valuations show

18   with respect to multiples of EBITDA?

19         A.    That the Montana Power QUIPS are

20   covered 7 to 1 approximately, to the best of

21   my recollection.

22         Q.    Do you recall which multiple of

23   EBITDA you used?

24         A.    I believe it was around 7

25   percent -- 7 times.

66

1                          T. Embry

2          Q.    Did you perform any other

3    valuations?

4          A.    No.

5          Q.    Did you do a

6    proceed-in-transaction valuation?

7          A.    Excuse me?

8                MS. STEINGART:   A --

9          Q.    You are not an investment banker;

10   is that correct?

11         A.    That's correct.

12         Q.    Did you look at any other market

13   multiples in doing your valuation?

14         A.    Yes, just generally.

15         Q.    And can you describe what you

16   did?

17         A.    I think there is a Merrill Lynch

18   research piece, there is ValuLine, whatever.

19         Q.    Did you rely on the analysts'

20   reports prior to first acquiring any QUIPS?

21         A.    No.

22         Q.    Did you rely on analysts' reports

23   prior to acquiring any additional QUIPS?

24         A.    No.

25         Q.    There was some questions about

67

1                            T. Embry

2    what due diligence Magten performed prior to

3    its initial acquisition of QUIPS.  Do you

4    recall that?

5          A.    Yes.

6          Q.    Subsequent to the initial

7    acquisition of QUIPS, what due diligence did

8    Magten do with respect to NorthWestern?

9          A.    Read the indenture and all the

10   guaranty material, the amendments, all of

11   that.

12         Q.    So did you become familiar with

13   the provisions in the indenture?

14         A.    To the extent that it is possible

15   for a nonlawyer.

16         Q.    Did you review the first

17   supplemental indenture at that point in time?

18         A.    I believe so, yes.

19         Q.    Did you review the second

20   supplemental indenture?

21         A.    I did.

22         Q.    Did you review the third

23   supplemental indenture?

24         A.    I did.

25         Q.    Did you review the amendment to

68

1                          T. Embry

2    guaranty agreement at that time?

3          A.    I cannot recall.

4          Q.    Did you review the guaranty

5    agreement at that time?

6          A.    Yes.

7          Q.    Did you review the guaranty

8    assumption agreement at that time?

9          A.    Yes.

10         Q.    Did you review the Montana Power

11   Capital 1 Trust at that time?

12         A.    Yes.

13         Q.    Can I ask, what time frame we are

14   talking about?

15         A.    The -- we purchased securities

16   over an extended period of time and the -- I

17   would say a week or so after the first

18   purchase, we had reviewed -- a week or two

19   after the first purchase, we have reviewed all

20   of the documents I just referred to.

21         Q.    Can I ask you what you mean by we

22   "reviewed"?

23         A.    That's the royal way.

24         Q.    You?

25         A.    Yes.

69

                              T. Embry

1

2          Q.      Anyone else?

3          A.      No.

4          Q.      So you acquired your initial

5    position in the QUIPS prior to reviewing all

6    of these documents; is that correct?

7          A.      Prior to reviewing the legal

8    contracts underlying the QUIPS.

9          Q.      After acquiring your initial

10   position in the QUIPS, approximately a week or

11   so thereafter you reviewed the legal documents

12   that I'm referring to; is that correct?

13         A.      Yes.

14         Q.      Did you review the amended and

15   restated trust agreement at that time?

16         A.      Yes.  I reviewed whatever was on

17   file with the Securities and Exchange

18   Commission.

19         Q.      Do you recall if you reviewed the

20   November 15, 2002 Asset and Stock Transfer

21   Agreement?

22         A.      I don't know.

23         Q.      Do you know if you reviewed the

24   unit purchase agreement dated for September

25   29, 2000 for Montana Power?

70

1                          T. Embry

2          A.    Yes.

3          Q.    Did you review that agreement?

4          A.    I believe so.

5          Q.    At that time did you review any

6    FERC filings?

7          A.    I did not.

8          Q.    Have you ever reviewed any of the

9    FERC filings?

10         A.    Outside of documents in this

11   case, no.

12         Q.    When do you recall the first time

13   you reviewed various FERC filings?

14         A.    The first time I saw FERC filings

15   referred to in this, or quoted in this

16   proceeding.

17         Q.    At this period of time after your

18   initial purchase of the QUIPS, did you review

19   any Montana Public Service Commission filings?

20         A.    No.

21         Q.    Have you ever reviewed any

22   Montana Public Service Commission filings?

23         A.    Only what has been quoted in

24   legal documents in this case.

25         Q.    Has Magten sent or received any

71

```
 1                    T. Embry
 2    communications with regard to the purchase or
 3    sale of NorthWestern; not the securities, but
 4    the company itself?
 5         A.    The -- I received one
 6    communication, I believe, from Paul Weiss.
 7              MR. RATNER:  Again, I want to
 8              just state for the record that the
 9              privilege runs to the committee and not
10              to Magten.  And so I would object to
11              any information, privileged information
12              that the witness will disclose.
13         Q.    Without revealing the content, do
14    you recall what the subject matter of that --
15         A.    That a buyout firm wanted to
16    acquire it.
17         Q.    Do you recall which buyout firm?
18         A.    Yes.
19         Q.    Which one?
20         A.    Lindsay Goldberg.
21         Q.    That's the only communication you
22    have had?
23         A.    That's the only one that I
24    recall.
25         Q.    Do you intend to object to
```

72

1                    T. Embry

2    confirmation on the basis that the settlement

3    of claims between Class 7 and Class 8 is

4    unfair or unreasonable?

5             A.    I don't know for sure.

6             MS. STEINGART:  I would just like

7             to say for purposes of the record that

8             as different settlements are put before

9             the court and as the plan changes

10            between the disclosure statement and

11            the confirmation, we will be advising

12            Magten as to the settlements and

13            whether there is anything objectionable

14            in them.

15            I don't know if you are referring

16            to settlements that have been

17            post-disclosure statement or recently,

18            just so that there are no surprises.

19            THE WITNESS:  I'm not even sure I

20            even know what settlements -- if

21            settlement is the distribution of

22            securities under the plan.  Is that 6

23            and 7 or 7 and 8?  Who is the senior

24            unsecured debt?

25            MS. STEINGART:  Well, that is not

73

```
 1                          T. Embry
 2         involved in 6 and 7 and 7 and 8.
 3                 THE WITNESS:  I don't know who 6
 4         is and who 7 is and --
 5                 MS. STEINGART:  Then you don't
 6         know the answer to the question.  So
 7         your answer has to be that you don't
 8         know.
 9         A.    I don't know.
10         Q.    Do understand what class the
11    QUIPS are classified in?
12         A.    The best of my recollection,
13    Class 7.
14         Q.    I believe in connection with your
15    disclosure statement objection, you asserted
16    that the debtor was soliciting votes in bad
17    faith.  Do you recall that assertion?
18         A.    Not off the top of my head, no.
19         Q.    Do you have an understanding as
20    to whether you are going to object to
21    confirmation on that basis?
22         A.    Well, I would certainly hope that
23    we would, if the company was soliciting votes
24    in bad faith.
25                 MR. COUSINS:  I'm handing to the
```

74

T. Embry

1

2          reporter a document marked Merrill

3          Lynch.  You can mark that as D-3.

4                    (Merrill Lynch analyst report

5                    dated May 19, 2003 bearing

6                    production Nos. 001 through 025

7                    marked Debtor's Exhibit 3 for

8                    identification, as of this date.)

9          Q.    I apologize.  What I have handed

10     is more than just the Merrill Lynch analyst's

11     report.  The first two pages, can you identify

12     what the first two pages are, Mr. Embry?

13         A.    This is a Merrill Lynch analyst

14     report from the 19th of May, 2003.

15         Q.    And have you seen this report

16     before?

17         A.    I have.

18         Q.    And was this produced in response

19     to our document production request?

20         A.    Yes, it was.

21                MS. STEINGART:  Just for the

22                record, the document is Bates stamped

23                001 through 025.  It is a series of

24                documents that have been made into a

25                composite exhibit by debtor.  And we

75

                        T. Embry

1

2        have no objection to the exhibit being

3        a composite.

4               MR. COUSINS:   Thank you.

5        Q.    How is this responsive to our

6    document production request?

7               MS. STEINGART:   I object as to

8        form.

9        Q.    Do you know why it was produced?

10       A.    It was -- I believe that it was

11   called for in your document request.

12       Q.    How do you keep your files with

13   respect to your investment in NorthWestern,

14   how are those files kept?

15       A.    Mostly e-mail.

16       Q.    Do you have copies of the

17   documents that we discussed that you reviewed

18   after your initial acquisition of the QUIPS?

19       A.    Those are always on Bloomberg.

20       Q.    So you don't keep paper copies,

21   you primarily do it on the computer?

22       A.    Yes.

23       Q.    Is that your regular practice?

24       A.    Yes.

25       Q.    There are numbers at the bottom

76

1                    T. Embry

2    of these documents that will have Magten's

3    name and then some numbers after it on the

4    bottom right.

5            A.    Um-hmm.

6            Q.    I think it will be quicker if we

7    just go by that.

8            A.    Okay.

9            Q.    We are now looking at Magten 003

10   and Magten 004.  Do you recognize this

11   document?

12           A.    These are Merrill Lynch reports

13   from the 25th of July, 2003.

14           Q.    And do you have an understanding

15   as to why this report was produced?

16           A.    That it was -- I believe that it

17   was produced because it was called for in your

18   request for documents.

19           Q.    If I could refer you to Bates

20   stamps No. 005, 006 and 007, do you recognize

21   this document?

22           A.    This is a Standard & Poors

23   research piece on NorthWestern that was

24   supplied to me by the creditors' committee and

25   provided to you because it seemed to fall

77

1                          T. Embry

2     within the documents that I was to produce for

3     you.

4              Q.    In the first sentence it reads:

5     "It is very difficult to estimate recovery

6     values" --

7              A.    Wait a minute.  First sentence of

8     what?

9              Q.    My apologies.  Magten 005, first

10    paragraph, middle of the first paragraph.  I'm

11    going to read a sentence to you.

12             A.    Okay.

13             Q.    "It is very difficult to estimate

14    recovery values for unsecured creditors

15    because unsecured obligations can increase

16    materially during bankruptcy proceedings

17    resulting in different (generally lower)

18    recoveries than initial valuations would

19    suggest."

20                   Did I read that correctly?

21             A.    I believe so.

22             Q.    Would you agree with that

23    statement?

24                   MS. STEINGART:  As a general

25                   matter or in connection with this

78

1                           T. Embry

2          company?

3               Q.    Tell me if you agree with that

4          statement.

5                     MS. STEINGART:  I object to the

6               form.

7               Q.    You can answer.

8               A.    I don't -- I mean, I have no

9          opinion on that statement.

10              Q.    Well, you have been investing in

11         distressed debt since 1978; is that correct?

12              A.    That's correct.

13              Q.    And do you have some type of

14         model that pegs recovery on distressed debt in

15         every bankruptcy case?

16              A.    No.

17              Q.    Why not?

18              A.    Because I don't.

19              Q.    Is that something that exists?

20                    MS. STEINGART:  I'm sorry, such a

21              model?

22                    MR. COUSINS:  Yes.

23              A.    I don't know.

24              Q.    Down about three-quarters of the

25         first page, 005, the last sentence of the -- I

79

1                          T. Embry

2      apologize, the last two sentences of the

3      paragraph with the heading, "Valuation Method"

4      reads:

5                  "Holders of Trust Preferred could

6            also lodge claims.  It is difficult to

7            assess the value of these claims in a

8            bankruptcy proceeding."

9            Did I read that correctly?

10     A.     I believe so.

11     Q.     Do you agree with that?

12           MS. STEINGART:  I object as to

13           form.

14     A.     No.

15     Q.     Why don't you agree with that?

16     A.     Because in the case of the

17     Montana Power preferred, I didn't find it

18     difficult to assess the value of the claims.

19     Q.     When did you perform your

20     valuations based on multiple EBITDA?

21           MS. STEINGART:  That he described

22           earlier?

23           MR. COUSINS:  Yes.

24           MS. STEINGART:  Okay.

25     A.     Probably in the first part of the

80

1                          T. Embry

2    year, 2003.

3           Q.    After you acquired the initial

4    QUIPS?

5           A.    No, I don't believe so.

6           Q.    Before the initial QUIPS?

7           A.    Yes.

8           Q.    Other than reviewing the public

9    record and performing the valuation models

10   that we discussed earlier, what did you do

11   prior to acquiring the initial tranche of

12   QUIPS?

13          A.    I read what was available in the

14   S.E.C. documents for Montana Power, Montana

15   Capital and NorthWestern.  Then on the

16   Bloomberg machine.

17          Q.    And why do you believe that it

18   was not difficult to value the QUIPS in

19   connection with NorthWestern?

20          A.    Because NorthWestern could not

21   make a promise, could not fulfill the promise

22   that it made to pay the QUIPS.

23          Q.    How does that failure to fulfill

24   a promise affect value?

25          A.    Therefore, they, I believe -- not

81

1                           T. Embry

2      being a lawyer, but I didn't believe that they

3      could properly assume the QUIPS and the

4      transfer of the Montana assets.

5              Q.    Well, you testified before that

6      one of the remedies you were seeking is a

7      constructive trust; is that correct?

8              A.    That is correct.

9              Q.    And how would the constructive

10     trust satisfy your claims in full?

11             A.    My understanding, although not

12     being a lawyer, is that the Montana assets

13     would be segregated.  That value would flow to

14     the preferred and then to the common

15     shareholder, NorthWestern Corp. and that the

16     result would only be that the unsecured

17     creditors of the holding company.

18     NorthWestern would get less than they are

19     getting today, or promised in the plan.

20             Q.    Where would that value flow from?

21             A.    From the Montana assets.

22             Q.    And what Montana assets would

23     that be?

24             A.    Power plants.

25             Q.    Do you have an understanding as

82

1                           T. Embry

2      to what Montana assets there are?

3              A.    Plants that produce power,

4      distribution facilities.

5              Q.    What type of power plants?

6              A.    I don't know.  Whatever they

7      have, hydroelectric, coal.

8              Q.    Do you know if NorthWestern has

9      hydroelectric power plants?

10             A.    Yes.

11             Q.    And they do have hydroelectric

12     power plants?

13             A.    I think -- I believe so, yes.

14             Q.    Does NorthWestern have coal power

15     plants?

16             A.    I don't know for sure.  I believe

17     so.

18             Q.    Any other power plants, other

19     than coal and hydroelectric?

20             A.    I don't know.

21             Q.    If you could turn to Bates No.

22     006, there is a heading called "Assumptions."

23     It is about the middle of the page.  The

24     sentence reads:

25                    "Standard & Poors believes that

83

1                        T. Embry

2            the unsecured debt issued by the former

3            utilities is not likely to have

4            priority over any other unsecured debt

5            issued at the corporate level due to

6            the flat corporate structure created by

7            NorthWestern when it made the two

8            utilities operating divisions and

9            eliminated NorthWestern Energy LLC."

10                Did I read that correctly?

11           A.    I believe you did.

12           Q.    And do you agree with that

13    statement?

14           A.    No.

15           Q.    You talked about a 7 times EBITDA

16    multiple?

17           A.    Yes.

18           Q.    Did you get that multiple from

19    the Standard & Poors report?

20           A.    I don't know exactly where I got

21    that multiple.

22                MS. STEINGART:   There has been no

23            testimony that he had this at the time

24            he purchased.   I just want to remind

25            you of that.

84

T. Embry

1

2      MR. COUSINS:  You are wrong.  He

3      did the valuation before he purchased.

4      MS. STEINGART:  No, I'm talking

5      about this document.

6      MR. COUSINS:  Okay.  Well, then

7      he answered it.

8      MS. STEINGART:  No, I understand

9      he answered.  It is just that I didn't

10     know if you were confused in terms of

11     the questions about when he had this.

12     Q.    Mr. Embry, can you tell me who

13  Alan A. Brown is?

14     A.    Alan Brown used to work for me.

15     Q.    And do you know where he works

16  now?

17     A.    He works for Concordia.

18     Q.    What is Concordia?

19     A.    Concordia is a hedge fund.

20     Q.    Is it located in New York?

21     A.    I believe so, yes.

22     Q.    And when did he work for you?

23     A.    He left in 2001 or 2002.

24     Q.    And what position did he hold

25  when he worked for you?

1                          T. Embry

2          A.    He was an analyst.

3          Q.    Was he a managing director?

4          A.    Yes, I believe so.

5          Q.    And what were his

6    responsibilities as a managing director?

7          A.    To look for investment ideas.

8          Q.    Did Mr. Brown look at the

9    investment on the QUIPS?

10         A.    He was not working for me at the

11   time.

12         Q.    If you turn to what's been marked

13   as Magten Bates No. 008 through 014, I ask you

14   if you recognize that document.

15         A.    This is a research report from

16   Imperial Capital.

17         Q.    Who is Imperial Capital?

18         A.    Imperial Capital is a

19   broker/dealer.

20         Q.    And are they recognized as

21   specializing in high yield research?

22         A.    I don't know.

23         Q.    Have you ever heard of Imperial

24   Capital prior to seeing this document for the

25   first time?

86

1                          T. Embry

2          A.    Yes.

3          Q.    In what context?

4          A.    We purchased securities through

5    them, sold securities through them.

6          Q.    Does Magten regularly purchase

7    securities through Imperial Capital?

8          A.    Regularly is not a -- not

9    regularly.

10         Q.    Which broker/dealers do you

11   normally deal with?

12         A.    Bear Stearns.

13         Q.    When you acquired the QUIPS, how

14   did you acquire them again?

15         A.    Through various broker/dealers.

16         Q.    And at what prices did you

17   acquire the QUIPS?

18               MS. STEINGART:  I object to the

19               form.  I'm sorry, I object to the

20               question.  It is not relevant and I'm

21               instructing him not to answer.

22         Q.    If you could turn to Bates Nos.

23   015 and 016, do you recognize this letter?

24         A.    Yes.

25         Q.    And can you tell me what this

87

1                    T. Embry

2    letter is?

3         A.    It is the letter to Bruce Karsh.

4         Q.    Do you understand the purpose of

5    this letter?

6         A.    Yes.

7         Q.    And what's the purpose?

8         A.    To see if we could settle this

9    suit.

10             MS. STEINGART:  If you note on

11             the front page, it indicates it is for

12             settlement purposes only.  And while

13             that doesn't preclude inquiry here, I

14             would just note that for the record.

15        Q.    The middle paragraph on the first

16   page reads:

17             "While everyone is entitled to be

18             passionate about their respective

19             points of view, we should never allow

20             professionals for a creditors'

21             committee or the Chapter 11 process to

22             preclude any arm's length and fair

23             dialogue."

24             Did I read that correctly?

25        A.    1 believe so.

88

1                          T. Embry

2          Q.    May I ask you what you meant by

3     "passionate"?

4                MS. STEINGART:  No, I'm

5                instructing him not to answer that

6                question.

7                     Is there something you want to

8                ask him about in connection with the

9                objection to confirmation, you may.

10               But there is a settlement document and

11               I am not going to permit general

12               inquiry about the writing and the

13               communication with Mr. Karsh.

14                    If there is something here that

15               you think has to do with an objection

16               that has been lodged, you may ask it.

17               But that question doesn't go to that,

18               and it is really just inquiry about a

19               settlement proposal which is not

20               something that should be happening

21               anyway.

22         Q.    If you could turn to Bates No.

23    Magten 017.  I ask you to identify that

24    document, if you can.

25         A.    This is an e-mail from Bruce

89

```
1                        T. Embry
2    Karsh to myself.
3            Q.    And do you understand the purpose
4    of this e-mail?
5            A.    To answer my settlement letter of
6    May 27.
7            Q.    And do you have an understanding
8    as to what Oaktree Capital's response was?
9            A.    That I didn't have -- I didn't
10   have an investment, really, in the -- they
11   weren't interested in changing their position.
12           Q.    Well, Magten had asked Oaktree
13   to -- for some type of an alliance; is that
14   correct?
15           MS. STEINGART:  I object.  I'm
16           instructing him not to answer.
17           MR. COUSINS:  Well, this isn't
18           protected.
19           MS. STEINGART:  Well, this has --
20           you are referring to his earlier
21           settlement offer.  This isn't marked
22           settlement, this is marked settlement.
23           You can ask him about the response.
24           The proposal, the settlement proposal
25           speaks for itself.
```

90

```
 1                          T. Embry

 2              Q.     Was Oaktree responding to your

 3    request to form an alliance?

 4              A.     No.

 5              Q.     Did Oaktree indicate that it was

 6    not going to object to the plan as drafted?

 7              A.     No.

 8              Q.     They didn't say that.  What did

 9    they say?

10              A.     They said that they were not

11    going to change their position.  And that they

12    had slightly more Montana bonds than

13    NorthWestern, and would be benefited

14    financially by the success of our suit.

15              Q.     Now, I note that there is, I

16    believe, a response on Magten Bates No. 018.

17    Did you have any other conversations with

18    Oaktree, other than this e-mail?

19              A.     No.

20              Q.     Oaktree is on the committee; is

21    that correct?

22              A.     That is correct, to the best of

23    my knowledge.

24              Q.     If you could turn to Magten Bates

25    No. 020, can you identify that document?
```

91

1                          T. Embry

2           A.    This is -- this is a Bloomberg I

3    believe -- I don't know.  It is a Bloomberg

4    that I forwarded to Meghan Costello of Fried,

5    Frank, Harris, Shriver & Jacobson.

6           Q.    Why did you forward it to her?

7           A.    To inform her what somebody

8    thought about the -- about what was going on.

9           Q.    Has a portion of this e-mail been

10   redacted, to your knowledge?

11          A.    I have no idea.

12               MS. STEINGART:  I don't think so.

13               I'm looking at it.  We usually mark it

14               if we redact it.  He didn't do the

15               markings and the Bates stamp -- we did

16               that and we usually mark it.  I will

17               check it and confirm that, but I don't

18               believe it has been redacted.

19          Q.    If you could turn to Magten 021,

20   the same question.  Mr. Embry, I will take a

21   representation from counsel, you may not be

22   able to answer whether the top portion has

23   been redacted.

24               MS. STEINGART:  I don't know.  I

25               really don't know.  I will have to

CLASSIC REPORTING, INC.  (212) 268-2590

92

T. Embry

1

2          check that.

3                (Discussion off the record.)

4                MS. STEINGART:  Well, I have been

5          informed that it has been redacted and

6          it should say so.  But because it

7          was -- Ms. Costello is a lawyer who

8          works with me and I don't know what the

9          content of this was, as I sit here

10         today.  But the attachments that were

11         with it, that did go to persons outside

12         of the firm, have been provided.

13         Q.   If you could turn to Magten 025.

14   Can you identify that document?

15         A.   This is another Bloomberg.  This

16   time from Credit Suisse First Boston on

17   something that came over the Bloomberg that I

18   forwarded to Meghan Costello just for her

19   information.

20               MR. COUSINS:  And, again, Bonnie,

21         do you know if that has been redacted?

22               MS. STEINGART:  I don't believe

23         it has been redacted, but I will

24         provide you with another set that marks

25         each and every spot that is redacted.

93

1                          T. Embry

2          Q.    There is a reference down at the

3    bottom about body language.  Do you have an

4    understanding of what that means?

5                 MS. STEINGART:  On page 25?

6                 MR. COUSINS:  Page 25.

7          A.    No.

8          Q.    I'm sorry, I didn't hear your

9    answer.

10         A.    I don't, really.  It is not my

11   memo.

12                MR. COUSINS:  Can we take five?

13                MS. STEINGART:  Um-hmm.

14                (Recess taken.)

15         Q.    Mr. Embry, is there any reason

16   why you could not truthfully answer the

17   questions that I posed today?

18                MS. STEINGART:  I object.  He is

19           not answering that question.

20         Q.    Are you on any medication?

21                MS. STEINGART:  You can answer

22           that question.

23         Q.    The question is:  Are you on any

24   medications that would limit your ability to

25   respond truthfully to the questions that I

94

1                    T. Embry

2    posed?

3         A.    No.

4              MR. COUSINS:  Bonnie, there were

5         a couple of things that I'm going to

6         ask that you produce.  And I want to

7         keep the deposition open until I have

8         seen it.  Records of trades --

9              MS. STEINGART:  When you provide

10        a document request that has those

11        things, then we will respond to the

12        request.

13             MR. COUSINS:  Let me make my

14        record.  There is a letter to Michael

15        Ashner.  There is calculations, I think

16        the testimony was 2.1125 percent and

17        secondarily, Magten's share of 2

18        percent.

19             THE WITNESS:  Excuse me.

20             MS. STEINGART:  No, no, no.  Let

21        him finish.  That's okay.

22             MR. COUSINS:  There were

23        additional valuations that were derived

24        that were based on multiples of EBITDA.

25        And, actually, I think it was a

95

1                    T. Embry

2       computer listing of trades.

3            If I have to follow-up with a

4       letter, I will, but I have no further

5       questions subject to leaving the

6       deposition open and limiting it to

7       additional questions regarding those

8       documents.

9            MS. STEINGART:  Okay.  The

10      document request that was provided in

11      connection with the notice of

12      deposition made no request for either

13      trades, computer printout of trades or

14      any of that.  So to the extent that you

15      would like to serve a document demand,

16      that's appropriate.  That contains such

17      a request.  I will deal with the

18      request when it is made.

19           As to the other documents, to the

20      extent that they exist, we will provide

21      them.  But at this point, I am unaware

22      that they do exist.  But we will go

23      back and look and provide them if they

24      do exist.

25           Does the committee have any

96

1                         T. Embry

2          questions?

3                    MR. RATNER:   No, the committee

4          has no questions.

5                    MS. STEINGART:   Well, I have some

6          questions.

7     EXAMINATION BY MS. STEINGART:

8               Q.   Mr. Embry, you testified earlier

9     about a purchase of stock that was made on

10    December 18 of 2003.  Do you recall that?

11              A.   Yes.

12              Q.   I'm sorry --

13              A.   Yes.

14              Q.   Now, Magten was appointed to the

15    creditors' committee on or about the end of

16    November; is that correct?

17              A.   That's correct.

18                   MR. COUSINS:   Objection.  That's

19              not what his testimony was.  Go ahead.

20                   THE WITNESS:   Well, I --

21                   MR. COUSINS:   He didn't know when

22              it was appointed.  I asked him that.

23              You are asking leading questions.

24                   MS. STEINGART:   Yes, it is a

25              leading question and we are in a trial.

97

1                    T. Embry

2              MR. COUSINS:  It is your witness.

3              MS. STEINGART:  I see.

4              MR. COUSINS:  Stop testifying.

5              MS. STEINGART:  Well, you have

6        your objection.

7              Q.    Now, prior to that time had

8        Magten -- prior to Magten's appointment to the

9        committee, Magten had purchased QUIPS,

10       correct?

11             A.    That is correct.

12             Q.    After Magten was appointed to the

13       committee, and before Magten attended meetings

14       with the creditors committee, did Magten

15       receive confidential information?

16             A.    No.

17             Q.    At the time that Magten attended

18       the first meeting of the creditors committee,

19       had Magten already placed the order that was

20       closed on December 18th for the purchase of

21       QUIPS?

22             A.    Yes.

23             Q.    Did Magten direct any broker to

24       purchase any QUIPS on its behalf, from the

25       time it attended the first meeting of the

98

1                    T. Embry

2    creditors committee until it was removed from

3    the creditors committee?

4         A.    No.

5         Q.    After Magten was removed from the

6    creditors committee, did Magten purchase

7    additional QUIPS?

8         A.    Yes.

9         Q.    And just to clarify, prior to the

10   first committee meeting, did Magten receive

11   any confidential information concerning the

12   debtor?

13        A.    We received no confidential

14   information.  And the information we received

15   at the first meeting may or may not have

16   been -- it was confidential, but it was not

17   important.

18        Q.    Was it related to the -- when you

19   say that the -- I don't want to go into the

20   material that was received at the first

21   creditors committee meeting, because that

22   might be offensive to the committee.

23             MS. STEINGART:  I have no further

24        questions.

25   FURTHER EXAMINATION

99

T. Embry

1

2  BY MR. COUSINS:

3      Q.    Mr. Embry, when was the first

4  creditors' meeting?

5          MS. STEINGART:   That Magten

6      attended.

7      A.    That I attended?

8      Q.    Yes.

9      A.    In December.

10     Q.    Do you recall the date?

11     A.    I don't recall the date.

12     Q.    You recall the date that you

13  bought stock, but you don't recall the date of

14  the first creditors committee meeting?

15     A.    No.  I am -- I am agreeing here

16  that the first creditors' meeting was on the

17  18th.  And I will agree that stock was

18  purchased either that day or the next day on

19  an outstanding order that had been placed,

20  say, a week or two before.

21     Q.    Do you recall the exact date that

22  the outstanding order was placed?

23     A.    I do not.

24     Q.    I think you said the computer

25  listing of trades, would that reflect when

100

1                          T. Embry

2    that order was placed?

3         A.    Yes.  It will reflect trades with

4    that broker prior to those.

5              MS. STEINGART:  He asked if it

6         reflected --

7         A.    No, it won't reflect the placing

8    of the order.

9         Q.    Will it reflect the actual

10   purchase, however?

11        A.    Yes, it will.

12        Q.    Do you have a telephone record

13   that will reflect the placing of that order

14   with that broker?

15        A.    No.

16        Q.    Who was the broker?

17        A.    Tradition Asiel, I believe it is

18   A-S-I-E-L.

19        Q.    Does anyone else at Magten have a

20   record of the placement of that order?

21        A.    No.

22        Q.    Your secretary wouldn't have it

23   either?

24        A.    No.

25        Q.    Now, your counsel asked you about

101

1                          T. Embry

2      confidential information in your possession

3      prior to the December meeting that Magten

4      attended with the committee; is that correct?

5           A.    Yes.

6           Q.    How about material nonpublic

7      information?

8           A.    No material nonpublic

9      information.

10          Q.    What information did you receive

11     from the committee?  And I'm not asking about

12     the communication, but what information did

13     you receive from the committee between the

14     time of your appointment and the first

15     meeting?

16          A.    I don't recall.

17          Q.    Would your records reflect what

18     information you received?

19          A.    I believe that it would -- I -- I

20     don't know.  I mean, I believe it.

21               MS. STEINGART:  You believe what.

22          A.    I believe that we should have the

23     e-mails from that period of time, which you --

24          Q.    And those e-mails are still

25     intact?

102

1                    T. Embry

2    A.    Yes.

3          MR. COUSINS:  I will request this

4    in writing, too, but I would ask that

5    counsel take steps to avoid

6    despoliation of the e-mails that Mr.

7    Embry got from the creditors committee.

8          MS. STEINGART:  I think that

9    request is insulting and not necessary.

10   I'm going to pretend we didn't hear it.

11         Mr. Embry received documents and

12   we were not producing the documents

13   that he had received from the

14   committee.  To the extent that you want

15   those and you want to make a request of

16   those, we are happy for you to make

17   such a request.

18         In response, we I guess we would

19   provide copies of those documents to

20   counsel for the committee and counsel

21   for the committee can decide which of

22   those documents they wish to produce to

23   you.

24         MR. RATNER:  Thank you, we will

25   take that under advisement.

103

1                     T. Embry

2          MR. COUSINS:  Thank you, we are

3      done.

4               (Time noted:  3:09 P.M.)

5          _____

6          Talton Embry

7   Subscribed and sworn to

8   before me this_____day

9   of_____2004.

10  _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

104

1

2                       C E R T I F I C A T E

3
STATE OF NEW YORK        )
4                        )   ss.:
COUNTY OF NEW YORK       )
5
            I, ANNELIESE R. TURSI, a
6
       Registered Professional Reporter and Notary
7
       Public within and for the State of New
8
       York, do hereby certify:
9
            That I reported the proceedings in
10
       the within-entitled matter, and that the
11
       within transcript is a true record of
12
       such proceedings.
13
            I further certify that I am not
14
       related, by blood or marriage, to any of
15
       the parties in this matter and that I am
16
       in no way interested in the outcome of
17
       this matter.
18
            IN WITNESS WHEREOF, I have hereunto
19
       set my hand this  28th  day of    July    ,
20
       2004.
21
       _____
22             ANNELIESE R. TURSI, RPR
23

24

25

105

1

2       July 27, 2004

3                               I N D E X

4       WITNESS                                              PAGE
        TALTON EMBRY

5              Examination by Mr. Cousins                      3
                                                              99

6              Examination by Ms. Steingart                   96

7                             E X H I B I T S

8       DEBTOR'S
        FOR IDENTIFICATION                                   PAGE

9       1       Document entitled "Order Permitting
                Securities Trading Upon

10              Establishment of Ethical Wall
                (Re: Docket No. 257)"                          9

11

12      2       U.S. Bankruptcy Court, District
                of Delaware, Notice of Electronic

12              Filing with attachments                       37

13

        3       Merrill Lynch analyst report

14              dated May 19, 2003 bearing
                production Nos. 001 through 025               74

15

16                        DOCUMENT REQUEST
                          PAGE            LINE

17                         94               4

18

                       DIRECTIONS NOT TO ANSWER

19                        PAGE            LINE
                           30              19

20                         31              15
                           86              16

21                         88               2
                           89              12

22

23

24

25

COPY    EXHIBITS

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:                                Chapter 11
                                      Case No.
NORTHWESTERN CORPORATION,             03-12872 (CGC)

            Debtor,
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

            July 27, 2004
            11:59 A.M.


            DEBTOR EXHIBIT NOS. 1-3
            in the Deposition of
            TALTON EMBRY