

05

05 - 499

# ORIGINAL



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| NORTHWESTERN CORPORATION, | : | Case No. Case No. 03-12872 (CGC) |
| Debtor. | : | |

## ORDER PERMITTING SECURITIES TRADING UPON ESTABLISHMENT OF
## ETHICAL WALL [Re: Docket No. 257]

Upon the motion (the "Motion"), dated October 17, 2003, of the Official Committee of

Unsecured Creditors (the "Committee") appointed in the chapter 11 case of the above-captioned

debtor and debtor in possession (the "Debtor") for an order permitting Members[1] (present and

future, if any) to trade in the NOR Group's Securities upon the establishment and

implementation of Ethical Walls and in accordance with the terms and conditions of this Order;

and due and proper notice of the motion having been given, and after due deliberation, and

sufficient cause appearing therefore, it is hereby

ORDERED, that a Member acting in any capacity will not violate its duties and,

accordingly, will not subject its claims to possible disallowance, subordination or other adverse

treatment, if a Member or any of its Affiliates (collectively, an "Ethical Wall Entity")

participates in a Transaction in the Securities; and it is further

ORDERED, that any Ethical Wall Entity choosing to participate in a Transaction must

effectively implement and strictly adhere to policies and procedures to erect and maintain an

Ethical Wall to prevent:

---

[1] All capitalized terms not otherwise defined herein have the meaning ascribed to them in the Motion or Exhibit A hereto.



  (i) the Ethical Wall Entity's trading personnel from misusing any material non-public information obtained by such Ethical Wall Entity's designated representative(s) involved in Committee-related or reorganization-related activities ("C/R Personnel"); and

  (ii) C/R Personnel from receiving material non-public information regarding such Ethical Wall Entity's trading in the Securities in advance of such trades. This Order does not preclude this Court from taking any action it deems appropriate in the event that an actual breach of fiduciary duty has occurred; and it is further

ORDERED, that Members and their Affiliates may participate in any Transactions in the Securities pursuant to the conditions of this Order, and be subject to the protections and authorizations herein, without the necessity of filing a Bound-by-Order Notice; and it is further

ORDERED, that each Member electing to avail itself, or its Affiliates, of the protections of this Order shall remain bound by the terms and conditions herein until such party files an Unbound-by-Order Notice.[2] An Unbound-by-Order Notice filed by any Member of an Affiliated group shall be effective as to all members of such group. No Unbound-by-Order Notice shall permit any entity to make any unlawful use of any material non-public information; and it is further

ORDERED, that the provisions of this Order shall apply and inure to the benefit of all present Members and their Affiliates as well as any entities that become members of the Committee, including their successors and assigns, after the date hereof; and it is further

---

[2] A form of Unbound-by-Order Notice is attached to this Order as Exhibit B.

07/26/2004    09:42    GREE ERG TRAURIG DEL → 912123194090    NO.250    P04



ORDERED, that this Court shall retain jurisdiction to (i) enforce and interpret the terms

and conditions of this Order, and (ii) preside over any conflict arising from the terms and

conditions hereof.

Dated: Wilmington, Delaware
       November 6, 2003

Honorable Charles G. Case
United States Bankruptcy Judge

3

# EXHIBIT A

07/26/2004    09:42    GRI BERG TRAURIG DEL → 912123194090    NO.250    D06

## DEFINITIONS

"**Affiliate**" means with respect to any entity, any other entity directly or indirectly controlling, controlled by, or under common control with such other entity. For the purpose of this definition, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

"**Ethical Wall**" means procedures established by an organization to isolate its trading activities from its activities as a member of an official creditors' committee or in monitoring and collecting a claim against the Debtor. These procedures will consist of whatever procedures the organization has or puts in place which are responsibly designed to be effective to prevent any material nonpublic information from going from Committee/Reorganization Personnel to trading personnel. The precise structure of Ethical Walls inside different organizations will necessarily differ from those in place at other organizations, due to the unique history, structure and other attributes of each different organization. Often, Ethical Walls include procedures inside the organization which (i) comply with the requirements for insulating certain people from certain material nonpublic information but (ii) function without unnecessary disruption to the management and operation of the organization. Such Ethical Wall arrangements can consist of the following, to the extent necessary to achieve compliance: staffing arrangements whereby the institution's personnel responsible for performing committee functions are different than the personnel responsible for performing trading functions; physical separation of the office and file spaces used by those personnel; establishment of procedures for securing committee-related files; establishment of separate telephone and facsimile lines for trading activities and Committee/Reorganization activities; and special procedures for the delivery and posting of telephone messages.

"**Members**" means OCM Opportunities Fund IV, L.P. c/o Oaktree Capital Management, LLC, Franklin Templeton Mutual Series Fund c/o Franklin Mutual Advisers, LLC, The Bank of New York as Trustee, Wilmington Trust Company as Trustee, HSBC Bank USA, Avenue Capital Management, AG Capital Recovery Partners III, L.P. c/o Angelo Gordon & Co., Comanche Park, LLC, and each future member of the Committee, if any.

"**Securities**" means the stock, notes, bonds or debentures of any one or more members of the NOR Group or participation in any of such debt obligations or any other claims against or interests in any one or more members of the NOR Group (whether or not covered by Bankruptcy Rule 3001(c)) which constitute "securities" within the meaning of applicable state or federal securities laws or both.



**EXHIBIT B**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|                              |   |                                |
|------------------------------|---|--------------------------------|
| In re:                       | : | Chapter 11                     |
|                              | : |                                |
| NORTHWESTERN CORPORATION,    | : | Case No. Case No. 03-12872 (CGC) |
|                              | : |                                |
| Debtor.                      | : |                                |

### UNBOUND-BY-ORDER NOTICE REGARDING
### ORDER PERMITTING SECURITIES TRADING
### UPON ESTABLISHMENT OF ETHICAL WALL

PLEASE TAKE NOTICE that the undersigned, on behalf of itself and its

Affiliates, hereby elects to cease being bound by the ORDER PERMITTING SECURITIES

TRADING UPON ESTABLISHMENT OF ETHICAL WALL (the "Order") issued in the above-

captioned action on October _____, 2003.

Dated: Wilmington, Delaware
_____, 2003

[Entity Name]

By: _____
    [Name]
    [Address]

**File a Notice:**
03-12872-CGC NorthWestern Corporation

**U.S. Bankruptcy Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Chipman Jr., William E. entered on 7/1/2004 at 12:57 PM
EDT and filed on 7/1/2004
**Case Name:**       NorthWestern Corporation
**Case Number:**     03-12872-CGC
**Document Number:** 1587

**Docket Text:**
Notice of Service *of Discovery re: Magten Asset Corporation* Filed by NorthWestern Corporation
(Chipman Jr., William)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** C:\Documents and Settings\lantolfa\My Documents\Magten.PDF
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=7/1/2004] [FileNumber=2761204-0]
[50a37b8e14f03e6e463a9f6ef8bc7d2990d4a9d5e4d3f4c748c3a56933d48c0e03694
a8a624b0f7870c0b125128a6920fda7f8c8ed0a2546e2a17420bab7cb0b]]

**03-12872-CGC Notice will be electronically mailed to:**

Dallas L. Albaugh   ,

Dallas L. Albaugh   dalbaugh@pryorcashman.com

Elihu Ezekiel Allinson III   bankruptcy@pacdelaware.com

Marc Barreca   marcb@prestongates.com, bankruptcyecf@prestongates.com

Ian Connor Bifferato   bankruptcy@bbglaw.com

William Pierce Bowden   wbowden@ashby-geddes.com

Al Stevens Brogan   abrogan@state.mt.us, rmchugh@state.mt.us

Paul D. Brown   brownp@gtlaw.com,

William J. Burnett   burnett@blankrome.com, burnett@blankrome.com

Noel C. Burnham   nburnham@mmwr.com, bankruptcy@mmwr.com;jperri@mmwr.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :         Chapter 11
                                          :
NORTHWESTERN CORPORATION,                 :         Case No. 03-12872 (CGC)
                                          :
        Debtor.                           :
                                          :
- - - - - - - - - - - - - - - - - - - - x

### NOTICE OF SERVICE OF DISCOVERY

I, William E. Chipman, Jr., being duly sworn according to law, deposes and says that I am employed by Greenberg Traurig, LLP, which is counsel for the Debtor, and that on the 25th of June, 2004, I caused to be served copies of the following documents to be served upon the following in the manner indicated:

Notice of Deposition of Magten Asset Management Corporation

Debtor's First Request for Production of Documents to Magten Asset Corporation

VIA HAND DELIVERY AND TELECOPIER
William J. Burnett, Esq.
Blank Rome, LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
302-425-6464

VIA FIRST CLASS U.S. MAIL AND TELECOPIER
Bonnie Steingart, Esq.
Fried, Frank, Harris, Shriver & Jacobsen LLP
One New York Plaza
New York, NY 10004
212-859-4000

Date: June 29, 2004

GREENBERG TRAURIG, LLP

William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

And

PAUL HASTINGS JANOFKSY & WALKER, LLP
600 Peachtree Street, Suite 2400
Jesse H. Austin, II, Esquire
Karol K. Denniston, Esquire
Atlanta, GA 30308
(404) 815-2400

Counsel for Debtor and Debtor-in-Possession

*Original*

PAUL, HASTINGS, JANOFSKY & WALKER, LLP
Suite 2400
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2222
Telephone: (404) 815-2400
Facsimile: (404) 815-2424
Jesse H. Austin, III, Esq.
Karol K. Denniston, Esq.

GREENBERG TRAURIG, LLP
The Brandywine Building, Suite 1540
1200 West Street
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Scott D. Cousins, Esq. (No. 3079)
Victoria Watson Counihan, Esq. (No. 3488)
William E. Chipman, Jr. (No. 3818)

Counsel for Northwestern Corporation as
Debtor and Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------

In re                                      :    · CHAPTER 11
                                           :
NORTHWESTERN CORPORATION,                  :    Case No. 03-12872 (CGC)
                                           :
            Debtor.                        :

--------------------------------------------------------------

### NOTICE OF DEPOSITION OF MAGTEN ASSET MANAGEMENT CORPORATION

TO:   Magten Asset Management Corporation by and through its attorneys of record, Fried,
      Frank, Harris, Shriver & Jacobsen LLP, One New York Plaza, New York, New York
      10004 and Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801

      Under Federal Rule of Civil Procedure 30(b)(6), as incorporated by Federal Rule of

Bankruptcy Procedure 9014, Northwestern Corporation as debtor and debtor in possession (the

"Debtor") will take the deposition of Magten Asset Management Corporation on July 26, 2004,

at 11:00 a.m., in the offices of Paul, Hastings, Janofsky & Walker, LLP, Park Avenue Tower, 75

East 55th Street, New York, New York 10022, or at such other place as the parties may

ATL /1042268 1

mutually agree, concerning the topics listed in Exhibit A attached hereto.  Debtor requests that

Magten Asset Management Corporation's counsel notify counsel for the Debtor in writing of the

names of all persons designated to testify on behalf of Plaintiff at least 24 hours prior to the

deposition.  The depositions will be recorded stenographically, and will continue from day to day

until completed.

Dated: June 25, 2004

> PAUL, HASTINGS, JANOFSKY & WALKER, LLP
> Jesse H. Austin, III, Esq.
> Karol K. Denniston, Esq.
> 600 Peachtree Street, N.E., Suite 2400
> Atlanta, Georgia  30308-2222
> Telephone:  (404) 815-2400
> Facsimile:   (404) 815-2424
>
> And
>
> GREENBERG TRAURIG, LLP
> Scott D. Cousins, Esq. (No. 3079)
> Victoria Watson Counihan, Esq. (No. 3488)
> William E. Chipman, Jr., Esq. (No. 3818)
> The Brandywine Building, Suite 1540
> 1000 West Street
> Wilmington, DE  19801
> Telephone:  (302) 661-7000
> Facsimile:  (302) 661-7360
>
> *Counsel for Northwestern Corporation*
> *as Debtor and Debtor-In-Possession*

## EXHIBIT A

Debtor will take the oral deposition of the representative(s) of Magten Asset

Management Corporation ("Magten") with the best knowledge regarding the following

areas of inquiry:

1.  All bases for any objection you may assert in connection with the Debtor's First Amended Plan of Reorganization (hereinafter the "Plan").

2.  Any analyses or studies of the amounts that general unsecured creditors of Debtor's will receive under the Plan[1] as compared to the amounts that such creditors would receive pursuant to a liquidation under chapter 7 of the Bankruptcy Code, including, but not limited to, the any assumptions employed in any such analyses or studies.

3.  The collection, review, and production of the documents specified in Debtor's Request for Production of Documents.

4.  Correspondence or communications between Magten and any other Creditor, the Creditors' Committee, or the Debtor concerning the Plan, the Plan Supplement, or any of the appendices or exhibits to the Disclosure Statement, including, but not limited to, correspondence or communications concerning all analyses or studies of the Plan, the Plan Supplement, or any of the appendices or exhibits to the Disclosure Statement.

5.  Correspondence or communications between Magten and any other Creditor, the Creditors' Committee, or the Debtor concerning voting in connection with the Plan including, but not limited to, correspondence or communications concerning casting, or not casting, votes in connection with the Plan.

6.  Offers, solicitations, correspondence, or communications that Magten has transmitted or received concerning the purchase or sale of any of the Debtor's assets.

7.  Offers, solicitations, correspondence, or communications that Magten has transmitted or received concerning the sale, assignment, or any other transfer of claims held or asserted by Magten, or similarly situated claimants, against the Debtor.

---

[1] Unless otherwise defined, capitalized terms used herein shall be given the meaning ascribed to such terms in Debtor's First Amended Plan.

ATL/1042279.1

1

## CERTIFICATE OF SERVICE

This is to certify that I have this date served all parties with a copy of the foregoing

**NOTICE OF DEPOSITION OF MAGTEN ASSET MANAGEMENT CORPORATION** to

be served upon the following as indicated:

VIA FIRST CLASS U.S. MAIL AND VIA TELECOPIER
Bonnie Steingart
Gary Kaplan
Fried, Frank, Harris, Shriver & Jacobsen LLP
One New York Plaza
New York, New York 10004
212-859-4000

VIA HAND DELIVERY AND VIA TELECOPIER
William J. Burnett
Blank Rome LLP
1201 Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6464

Dated: June 25, 2004

BY:  _____
William E. Chipman, Jr. (No. 3818)

*Original*

PAUL, HASTINGS, JANOFSKY & WALKER, LLP
Suite 2400
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2222
Telephone: (404) 815-2400
Facsimile: (404) 815-2424
Jesse H. Austin, III, Esq.
Karol K. Denniston, Esq.

GREENBERG TRAURIG, LLP
The Brandywine Building, Suite 1540
1200 West Street
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Scott D. Cousins, Esq. (No. 3079)
Victoria Watson Counihan, Esq. (No. 3488)
William E. Chipman, Jr. (No. 3818)

Counsel for Northwestern Corporation as
Debtor and Debtor-In-Possession

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------------

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |

------------------------------------------------------------------

### DEBTOR'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
### OF DOCUMENTS TO MAGTEN ASSET MANAGEMENT CORPORATION

Under Federal Rule of Civil Procedure 26 and 34, as incorporated by Federal Rule of

Bankruptcy Procedure 9014, Northwestern Corporation as Debtor and debtor in possession (the

"Debtor") requests that Magten Asset Management Corporation produce the documents and

things described below for inspection and copying at the offices of Paul, Hastings, Janofsky &

Walker, LLC, Park Avenue Tower, 75 East 55th Street, New York, New York 10022, or before

ATL/1042276 1


July 9, 2004, which is 14 days from the date of service of these requests, as provided for in the proposed scheduling order.

Please note that in the event the proposed scheduling order is not entered, the Debtor will be filing a motion asking the Court to shorten the response deadline for these requests for production to 20 days in order to ensure that documents are available prior to the deposition(s) contemplated by the accompanying deposition notice(s).

## DEFINITIONS AND INSTRUCTIONS

A.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term. If a document or group of documents comes from a file, binder, or any other container, a copy of the label of such file, binder, or container shall be attached to the document.

B.      As used herein, the term "relating to" means constituting, containing, showing, relating, concerning, or referring in any way, in whole or in part, including but not limited to documents underlying, supporting, currently or previously attached or appended to, or used in the preparation of any document called for by the request. If a document or group of documents comes from a file, binder, or any other container, a copy of the label of such file, binder, or container shall be attached to the document.

C.      As used herein, the terms "and" as well as "or" shall be construed as necessary in order to bring within the scope of the request all documents which might otherwise be construed to be outside its scope. Also, the terms "each and "any" shall include both "each" and "every" whenever appropriate.

ATL /1042276 1

D.     The terms "You," and "Your," as used herein mean, refer to and include Magten Asset Management Corporation, its predecessor(s)-in-interest; subsidiaries; parent companies; joint ventures; affiliates, companies, divisions, or other businesses of which assets or product lines have been acquired; and its (and their) present and former officers, directors, employees, agents, representatives and attorneys, and all other persons acting or purporting to act on behalf of Magten Asset Management Corporation.

E.     The term "Northwestern," and "Debtor" as used herein shall collectively and separately refer to Northwestern and its affiliated Debtor entities, as debtors and debtors in possession.

F.     "Correspondence" means any letter, memorandum, or other writing.

G.     "Communication" or "communications" includes, without limitation, in-person or telephone conversations, telegrams, telexes, tapes, or other sound recordings or means or transmitting information form one source to another.

H.     As used herein, the term "Plan" shall refer to NorthWestern's First Amended Plan of Reorganization.

I.     Unless otherwise defined, all capitalized terms used herein shall be ascribed the definition given to such terms in NorthWestern's First Amended Plan of Reorganization.

J.     Any reference herein to an individual includes any agent, attorney, representative, or other person acting for or on behalf of such individual, and any reference to any organization or other entity includes any subsidiary, affiliate, division, department or any other unit therein,

any employee, member, officer, director, representative, agent, attorney or other person acting for or on behalf, as well as any predecessor or successor entity.

K.    As used herein, "person" means an individual, firm, partnership, corporation, proprietorship, association, governmental body, or any other organization or entity.

L.    The singular includes the plural and vice versa.

M.    In the event You seek to withhold any document because of a claim of privilege, furnish a list identifying each such document by specifying (i) the type of document (i.e., letter, memorandum, etc.) or some other means of accurately identifying it; (ii) its date, if any, or an estimate thereof and so indicated as an estimate if no date appears on the document; (iii) its author, if any; (iv) its addressee, if any; (v) each recipient, if any; (vi) its present location; (vii) its present custodian; (viii) its general subject matter, as described in the document; and (ix) the nature of the claimed privilege.

N.    As used herein, the term "Confirmation Hearing" shall refer to the hearing regarding confirmation of the Plan that is currently scheduled to occur on August 25, 2004.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.    All documents relating to Your contention that Your distributions under the Plan will be less than Your distributions pursuant to a liquidation under chapter 7 of the Bankruptcy Code including, but not limited to, all documents relating to any analyses You have performed or plan to perform or that You have reviewed to determine whether the Plan does not satisfy Bankruptcy Code section 1129(a)(7)(A)(ii) and all documents relating to or reflecting any assumptions employed in any such analyses.



2.    All documents relating to any liquidation analyses that You have performed or plan to perform or that you have reviewed relating to the Debtor including, but not limited to, all documents relating to or reflecting any assumptions employed in any such analyses.

3.    All documents relating to Your calculation of the present value of Your distributions under the Plan, or Your review of any calculations of the present value of any distributions under the Plan, whether performed by You or someone other than You, including, but not limited to, all documents relating to or reflecting any assumptions employed in any such calculations.

4.    All documents relating to Your calculation or Your review of any calculation performed by someone other than You, relating to the amounts that You would be paid pursuant to a liquidation under chapter 7 of the Bankruptcy Code including, but not limited to, all documents relating to or reflecting any assumptions employed in any such calculations.

5.    All documents relating to correspondence or communications between You and any other Creditor concerning any objections you may assert and/or any opposition you may raise to the Plan or at the Confirmation Hearing.

6.    All documents relating to correspondence or communications between You and any other Creditor concerning the casting of votes on the Plan.

7.    All documents relating to analyses that You have performed or plan to perform to determine the amount of distributions that You will receive under the Plan as filed.



8.    All documents relating to any offers, solicitations, correspondence, or communications that You have transmitted or received concerning the purchase or sale of any of the Debtor's assets.

9.    All documents relating to reports or draft reports that reflect the opinions of any financial advisor that You have retained or plan to retain, or that someone other than You retained or plans to retain, in connection with objections You intend to assert and/or opposition you may raise to the Plan or at the Confirmation Hearing.

10.    All documents reviewed by any financial advisor that You have retained or plan to retain, or that someone other than You retained or plans to retain, in connection with objections You intend to assert and/or opposition you may raise to the Plan or at the Confirmation Hearing.

11.    All correspondence or communications to or from any financial advisor that You have retained or plan to retain, or that someone other than You retained or plans to retain, in connection with any objection You intend to assert and/or any opposition you may raise to the Plan or at the Confirmation Hearing.

12.    All documents relating to Your contention that the compromise and settlement of claims reflected by the treatment of Class 7 and Class 8 Claimants as set forth in the Plan is unfair and unreasonable, including, but not limited to, documents relating to Your contention that the allowances set forth in section 4.7(b) and (c) and 4.8(b) and (c) of the Plan are unreasonable.

13.  All documents relating to Your contention that the classification of claims in Class 7 and

Class 8 as set forth in the Plan are improper and/or the Debtor's classification fails to

classify claims properly.

14.  All documents relating to Your contention that the solicitation of any vote to accept or

reject the Plan was in bad faith pursuant to section 1125(e) of the Bankruptcy Code.

15.  All documents relating to Your contention that any vote to accept or reject the Plan was

cast in bad faith pursuant to section 1125(e) of the Bankruptcy Code.

16.  All documents relating to offers, solicitations, correspondence or communications that

You have transmitted or received concerning the sale, assignment, or any other transfer of

claims held or asserted by You, or similarly situated claimants, against the Debtor.

Dated: June 25, 2004

PAUL, HASTINGS, JANOFSKY & WALKER, LLP
Jesse H. Austin, III, Esq.
Karol K. Denniston, Esq.
600 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia  30308-2222
Telephone:  (404) 815-2400
Facsimile:   (404) 815-2424

And

_____
GREENBERG TRAURIG, LLP
Scott D. Cousins, Esq. (No. 3079)
Victoria Watson Counihan, Esq. (No. 3488)
William E. Chipman, Jr., Esq. (No. 3818)
The Brandywine Building, Suite 1540
1000 West Street
Wilmington, DE  19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360

*Counsel for Northwestern Corporation*
*as Debtor and Debtor-In-Possession*

## CERTIFICATE OF SERVICE

This is to certify that I have this date served all parties with a copy of the foregoing

**DEBTOR'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO MAGTEN**

**ASSET MANAGEMENT CORPORATION upon the following**

VIA FIRST CLASS U.S. MAIL AND VIA TELECOPIER
Bonnie Steingart
Gary Kaplan
Fried, Frank, Harris, Shriver & Jacobsen LLP
One New York Plaza
New York, New York 10004
212-859-4000

VIA HAND DELIVERY AND VIA TELECOPIER
William J. Burnett
Blank Rome LLP
1201 Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6464

Dated: June 25 2004

BY: _____
William E. Chipman, Jr. (No. 3818)

EXHIBIT

D-3

Classic Reporting, Inc.
(212) 268-...

 **Merrill Lynch**                              The Therm Monitor – 19 May 2003

## Moody's Takes Surprising Action on NiSource

In an unexpected move, on May 13 Moody's placed NiSource (NI: Baa3↓/BBB) on review for possible downgrade. The agency cited concerns that despite NI's deleveraging efforts, NI's balance sheet remains highly leveraged. The timing of Moody's action is surprising given that NI had issued $735 million in common stock late last year in order to address rating agency concerns.

However, another part of NI's deleveraging plan, the sale of its E&P business, has taken longer than expected. Because NI has forward sold much of its production, it has not benefited from the run up in commodity prices this year. Furthermore, there is a $260 million long-term gas prepay contract at the E&P unit that Moody's views as debt.

NI has paid down $1.5 billion of debt since the end of 2001 with the proceeds of the equity offering and through asset sales. Consolidated debt to EBITDA has improved to 4.1 times from 5.3 times during that time. However, we believe Moody's is concerned that because NI does not generate any material free cash flow, it will not be able to deleverage further organically. Furthermore, the agency cited NI's high dividend payout

### Not an Energy Merchant, but with Refinancing Needs

Positively, because NI is not an energy merchant, a downgrade below investment grade should not have a material impact on its business. NI indicated that a downgrade could trigger collateral calls totaling $275 million. However, we do note that NI has a $750 million holding company debt maturity in November that it needs to refinance. We also note that NI chose not to renew a $500 million credit facility that matured in March. It does have a $1.25 billion multi-year facility due March 2004. As of March 31, 2003, NI had $924.6 million available under $1.25 billion facility ($64.3 million CP, $97 million borrowings and $161.1 million LCs were outstanding against the facility).

### Focus on Goodwill

One comment of note from the Moody's release was this when it adjusts NI's balance sheet for off-balance sheet items like leases and the gas prepay, and backs out the goodwill associated with NI's prior acquisitions (principally Columbia Energy), it arrives at an adjusted debt to capital ratio of over 90%. The principal cause of this dramatic change versus the 61% unadjusted ratio is the adjustment for goodwill. In the accompanying table, we show for selected other utility holding companies, goodwill as a percentage of equity. NI has the highest ratio of the seven companies shown.

**Table 2: Goodwill versus Common Equity for Selected Utility Holding Companies**

|                    | Goodwill | Common Equity | Goodwill % of Common |
|--------------------|----------|---------------|----------------------|
| Dominion Resources | 4,301    | 10,213        | 42.1                 |
| DTE Energy         | 2,119    | 4,565         | 46.4                 |
| Energy East        | 1,518    | 2,461         | 61.7                 |
| FirstEnergy        | 5,896    | 7,120         | 82.8                 |
| NiSource           |          |               |                      |
| Progress Energy    | 3,719    | 6,677         | 55.7                 |
| Wisconsin Energy   | 833      | 2,139         | 38.9                 |
|                    | 22,094   | 37,350        | 59.2                 |

Source: Merrill Lynch.

NI's holding company bonds widened by 60 bp in response to the Moody's review. We believe that NI has some more downside in the event Moody's actually downgrades the rating below investment grade, which appears likely absent an action in response from the company. We also note that some of the bonds are trading at a significant premium to par, putting further technical pressure on NI. The 6.15's of 2013 are now +195-185 bp. By comparison, the split-rated CenterPoint Energy Resources (CNP: Ba1/BBB) 7 7/8's of 2013 are at +215-205 bp. **Accordingly, we suggest that investors consider selling now and buying after the downgrade**

## NorthWestern Corp: Recommend Underweight

We recommend investors to **Underweight** NorthWestern Corp (NOR: Caa1/CCC+↓) unsecured bonds based on our view that liquidity prospects are weaker than previously expected placing more pressure on the company to raise proceeds from asset sales. In its 10-Q filed this morning, the company provided guidance suggesting that total changes in cash during 2003 would approximate negative $48 million versus prior guidance of positive $2 million. The reason for the change was attributed mostly to working capital uses, but there was no indication that there was an expectation of a return of this cash during 2003 or 2004. Prior guidance was provided as recently as April 1 in the company's 2002 10-K filing. As a result, we expect NOR's cash balance at the end of 2003 to be roughly $5 million, leaving little margin for error. Worth noting is that this assumes a cessation of the company's $30 million in preferred dividends. The company's maintained its guidance for 2004 of a $19 million cash use. NOR has an additional $90 million of maturities during 2005.

We apply conservative assumptions in assessing asset coverage due to the poor performance of the company's non-regulated businesses, ongoing restructuring of these businesses and the recently disclosed SEC investigation into accounting matters. Applying a 7.5x multiple to annual utility EBITDA of $225 million, we estimate that coverage of unsecured debt to be in the mid-80's, after

The Therm Monitor – 19 May 2003     **Merrill Lynch**

**Table 3: NorthWestern Corp: Sum of the Parts Valuation ($ millions)**

| Northwestern Corp | Valuation Basis EBITDA 2003E | Multiple | Asset Value | Debt | Assets to Debt | Note |
|---|---|---|---|---|---|---|
| Utility Assets | 225 | 7.5 | 1,688 | | | |
| Non-Utility Assets/Equity Value | 0 | n/a | 0 | | | |
| | | | | | | |
| **Secured Debt** | | | | | | |
| Montana Power | FMBs Securing Credit Facility | | | 280 | | |
| | First Mortgage Bonds | | | 157 | | |
| | Pollution Control Bonds | | | 170 | | |
| | Secured Medium Term Notes | | | 28 | | |
| | Transition Funding Bonds | | | 51 | | |
| | Unsecured Medium Term Notes | | | 40 | | Assumes structurally senior to NOR debt |
| Northwestern Corp | FMBs Securing Credit Facility | | | 110 | | |
| | First Mortgage Bonds | | | 115 | | |
| | Pollution Control Bonds | | | 21 | | |
| | | | | | | |
| **Unsecured Debt** | | | | | | |
| Northwestern Corp | Senior Notes | | | 825 | | |
| | Expanets Inventory Obligation | | | 27 | | |
| | | | | | | |
| Other Potential Claims | Minority Interest Puts | | | 10 | | |
| | Capital Leases | | | 14 | | |
| | Pension Obligations | | | 119 | | Assume treated as unsecured claim |

Source: Merrill Lynch

giving consideration for approximately $972 million of secured debt* (See Table 2). Assuming a one-year restructuring period and a 25% IRR requirement, we believe that unsecured bonds would be fairly valued in the mid-60's. However, as we note above, this is likely conservative.

(*Please note updated and corrected information regarding asset value from our comment published on 5/15/03)

## Aquila: Maintain Underweight

We reiterate our **Underweight** recommendation on **Aquila (Caa1/B)** bonds based upon our long-term concerns regarding the company's inability to fund its capital expenditures and its consequent dependence on asset sales to offset the cash burn. We estimate annual consolidated EBITDA to approximate $265 million ($400 million in positive EBITDA from domestic and international networks offset by $135 million in negative EBITDA from wholesale and capacity services). With annual interest payments of about $265 million, this leaves little, if any, cash available for forecasted capital expenditures of $285 million and $325 million in 2003 and 2004, respectively. We do not expect the cash burn

from Aquila's capacity and wholesale services to improve significantly, largely due to the company's prepaid natural gas obligation. However, we recognize that liquidity through 2003 and into early 2004 appears adequate pending the expected Q3 2003 closing of the sale of Aquila's interests in Australia. Worth noting is that we are increasing our projected funding gap for year-end 2004 to $348 million from $278 million primarily due to changes in assumptions with respect to the expected return of collateral.

Aquila's 14.875% Senior Notes due 2012 were recently offered at 105 for a YTW of 13.883%.

## Calpine: Liquidity Enhancing Transactions Expected Soon; Maintain Overweight

We reiterate our **Overweight** recommendation on **Calpine (B1/B+)** bonds based upon our view that the company will be successful in completing much needed liquidity enhancing transactions that will enable it to complete its power plant development program. During its first quarter conference call, management provided an updated timeline for the completion of these various transactions, many of which appear imminent in the next


**Merrill Lynch**

**HIGH YIELD**

25 July 2003

David Silverstein
(1) 212 449-7467

Tatyana Dobryanskaya
(1) 212 449-5723

# NorthWestern Corp

*Downside Volatility Should Be Limited*

United States
Utilities



## Highlights of This Issue

Table 1: NOR's Securities Prices as of July 25, 2003

| Select Issues | Coupon | Maturity | Rating | Amount | Offer Price | YTW | STW |
|---|---|---|---|---|---|---|---|
| Senior Notes | 7.875% | 3/15/07 | Caa1/CCC+↓ | $250mm | $76 | 17.002% | 1,507 |
| Senior Notes | 8.75% | 3/15/12 | Caa1/CCC+↓ | $470mm | $74 | 14.036% | 987 |
| Senior Notes | 6.95% | 11/15/28 | Caa1/CCC+↓ | $105mm | $70 | 10.303% | 519 |

Source: Merrill Lynch

We are changing our recommendation on NorthWestern Corp unsecured bonds to Neutral from Underweight based on our view the future bond price volatility has an equal amount of downside and upside potential, but that downside risk would be short-lived. We believe current bond prices are at or below our conservative estimates for asset coverage in the event of a Chapter 11 filing, which at this point appears to be a 50% probability of occurring within the next several months. However, should the company be successful in completing asset sales and completing an expected $50 million accounts receivable financing prior to its next large interest payment due date on September 15, we believe bond prices could appreciate materially. We believe positive news on this front would drive bond prices for NOR's 8.75% Senior Notes due 2012 to trade through 11% suggesting a price in the high 80's. However, our Neutral recommendation reflects the lack of visibility being offered by management on near term liquidity prospects and asset sales.

*Market Comment*

As noted in our weekly report, The Therm Monitor, dated May 19, 2003, we conservatively estimated asset coverage of NOR's unsecured bonds to be in the mid-80's and possibly as low as the mid-70's if other potential claims were applied. We believe our asset value calculations are conservative as we apply no credit to equity stakes in NOR's non-regulated businesses. Recent lows were in the low 70's, however, we believe there is considerable appetite for NOR unsecured bonds at these levels, which should mitigate downward price volatility. Furthermore, a low 70's price for NOR bonds implies as much as a 20% IRR for a one year restructuring period assuming a mid-80's recovery.

*Liquidity Update*

Management continues to be silent on where liquidity stands today and where it was at the end of the second quarter. We believe the company underestimated the working capital drain following the most recent downgrades by the rating agencies. We spoke with NorthWestern natural gas and electricity suppliers, who indicated they are now requiring up-front cash payments for deliveries and/or are limiting receivable amounts due from NOR for any given week. Separately, NOR recently opted to defer payment for part of its mid-year property taxes in Montana and pay through installments during the course of the year to preserve cash.

Refer to important disclosures at the end of this report.
Analyst Certification on page 2.

Merrill Lynch Global Securities Research & Economics Group
High Yield Credit Research

RC#14520802

Investors should assume that Merrill Lynch is seeking or will seek investment banking or other business relationships with the companies in this report.

NorthWestern Corp – 25 July 2003 

NOR had $96.7 million of cash on hand at March 31, 2003. Based on management guidance and our own estimates, we believe that cash at the end of 2003 will approximate $28 million and that the company will exhaust cash resources by the end of 2004. To the extent that working capital usage increased by even a modest $10-15 million from management's previous guidance, we believe this increases the likelihood that the company will voluntarily file for Chapter 11 during 2003 unless NOR can generate additional liquidity as mentioned above.

As a result, we believe that second quarter results may prove to be a key inflection point for NOR bonds as we will get a clearer picture as to the extent of the cash burn rate since the end of the first quarter. Management expects to file its second quarter 10-Q by August 15, but has no plans to hold a conference call.

### Requesting Increase for Authorized Shares

Management has been on the road recently meeting with equity investors to rally support for a massive increase in the number of authorized shares. The objective is to ultimately offer holders of the company's preferred securities and unsecured bonds to exchange their instruments for common equity. This issue will be voted on at the company's annual meeting on August 26. However, management has indicated that they do not expect to launch an exchange offer until April of next year following the completion of its 2003 10-K. We believe a successful debt for equity exchange would substantially decrease annual interest costs and likely result in the company turning free cash flow positive. Regarding the likelihood of a successful shareholder vote in this matter, we believe equity holders should be motivated to vote in favor of the increase in authorized shares as management appears intent on seeking Chapter 11 unless the debt burden can be decreased out of court. Management estimates that they need approximately 75% of common shareholders to approve the share increase versus the normal 51% due to the significant short positions on outstanding stock.

### Regulatory Developments

NOR recently had electric and gas rate cases reviewed by the Montana Public Service Commission (MPSC), during which the company was not awarded full recovery of incurred expenses. We do not believe the annual impact to cash flow from these cases would materially change the company's liquidity prospects, and the company is appealing the decisions. Separately, the MPSC held a session a couple of weeks ago to review utility bankruptcy proceedings in order to familiarize itself with the process and the potential role of the commission. Additionally, The Montana Legislature and Governor have discussed the possibility of authorizing the use of excess funds to secure energy purchase contracts in the event of a NOR bankruptcy. While we do not believe that Montana lawmakers and regulators have any more insight than the public as to the financial future for NOR, we believe the actions by the aforementioned parties suggest that a bailout orchestrated to avoid a bankruptcy will not be tabled.

### Analyst Certification

I, David Silverstein, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject securities and issuers. I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or view expressed in this research report.

MAGTEN          004

| STANDARD &POOR'S | RATINGSDIRECT |
|---|---|

Return to Regular Format

# Research:
## NorthWestern Corp.'s Debtholders May Be Disappointed
Publication date: 26-Nov-2003
Credit Analyst: Peter Otersen, New York (1) 212-438-7674

Investors have typically recovered 100% of their investment in electric utilities that have filed for bankruptcy. Nonregulated businesses generally have lower recovery rates. NorthWestern Corp.'s bankruptcy may be different from other electric utility bankruptcies because the unsecured debtholders are not likely to recover the full value of their investment. Similar to other utility bankruptcies, the secured debtholders will most likely receive full recovery. It is very difficult to estimate recovery values for unsecured creditors because unsecured obligations can increase materially during bankruptcy proceedings resulting in different (generally, lower) recoveries than initial valuations would suggest. However, initial valuation estimates based on a multiple of EBITDA suggest that the unsecured debtholders may recover between 30% and 50% of their investment. In addition, Standard & Poor's believes the entire reorganization process could take the typical three years that utilities have experienced due to the multi-jurisdictional regulatory approvals that NorthWestern will need.

On Sept. 14, 2003, NorthWestern voluntarily filed for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code as debtor in possession (DIP) with the intention of reorganizing. The filing was with the U.S. Bankruptcy Court for the District of Delaware. NorthWestern is the parent of the utility division NorthWestern Energy, Expanets Inc. (telecommunications), and Blue Dot Inc. (heating, air conditioning, and ventilation service). Expanets and Blue Dot were not part of the Chapter 11 filing so as to expedite the sale of both entities. NorthWestern Energy provides electric and natural gas distribution service to 598,000 customers in Montana, South Dakota, and Nebraska.

## Background
Chapter 11 filings for regulated utilities continue to be uncommon, with only five bankruptcies occurring over the past 25 years, including Columbia Gas Systems Inc., Public Service Co. of New Hampshire, El Paso Electric Co., Pacific Gas & Electric Co., and now NorthWestern. Chapter 11 filings for utilities differ from other industrial bankruptcies for two reasons. According to Standard & Poor's research, utility reorganizations last about 36 months compared with 15 months for industrial corporations and the mean recovery for utilities is about 126% versus 60% for nonutilities. For utilities, the prolonged time to emerge from bankruptcy is due primarily to the time required to receive all of the necessary consents from state regulatory commissions and potentially the FERC, in addition to the normal creditor committee.

## Valuation Method

For the purposes of this article, an EBITDA market capitalization approach is used to estimate the value of NorthWestern as a going concern. Using EBITDA and a market multiple is one simple method of valuation. It is important to note that the actual valuation at the time of sale or emergence from bankruptcy can and will vary depending on many factors, both economic and noneconomic. For example, unsecured obligations could arise from any number of lawsuits settled in the plaintiff's favor, such as the common shareholders class-action lawsuits, lingering litigation related to transfer of Montana Power Co. assets, additional tax liens, economic damages from customers, and other claims unknown to Standard & Poor's. Holders of trust preferred could also lodge claims. It is difficult to assess the value of these claims in a bankruptcy proceeding.

NorthWestern's most recent 12 months of EBITDA is used as a proxy on a going-forward basis as the company emerges from bankruptcy. The EBITDA amount is multiplied by a representative market valuation multiple. Standard & Poor's has used a multiple of five for some industrial corporations, but Standard & Poor's also adjusts this multiple to address specific situations and industries. For NorthWestern, a range of market multiples from 6x to 7x is used to reflect the lower risk associated with regulated utilities. This range is supported by recent utility sales, such as CILCORP Inc. and the

MAGTEN    005



pending sale of Portland General Electric Co. Public information regarding these sales indicates multiples of 6.5x to 6.8x EBITDA. Known priority claims are then deducted from the value. Similarly, the value of other existing secured debt, such as industrial revenue bonds, mortgage debt, or secured lease debt is subtracted from the enterprise value to derive a value for the unsecured noteholders.

## ▦ Assumptions

NorthWestern has about $530 million of secured debt (first mortgage bonds, general mortgage bonds, pollution control bonds, and a $390 million secured bank loan that is also secured by a lien on the utility assets. As of Sept. 30, 2003, $865 million of unsecured debt and $365 million of trust preferred stock were outstanding. NorthWestern is current on its interest payments to secured debtholders, but has discontinued principal and interest payments to unsecured debtholders and dividend payments to the trust preferred holders. The secured debt is associated with the utility operations and is secured by the assets of the utility operating divisions NorthWestern Montana and NorthWestern South Dakota. The asset pools are not commingled and in the event of a liquidation the debtholders could only look to the assets of the division that originally issued the debt. The secured bank loan that was borrowed in December 2002 is secured by a combination of both utilities' assets. Standard & Poor's believes that there are sufficient assets available to satisfy the secured debtholders in the event of a liquidation.

The capital structure includes $105 million of unsecured debt that was issued by the former NorthWestern Public Service Co. (the forerunner of NorthWestern Energy/South Dakota) and $40 million of unsecured debt issued by the former Montana Power (the forerunner of NorthWestern Energy/Montana). Standard & Poor's believes that the unsecured debt issued by the former utilities is not likely to have priority over any other unsecured debt issued at the corporate level, due to the flat corporate structure created by NorthWestern when it made the two utilities operating divisions and eliminated NorthWestern Energy LLC. The remaining $720 million of unsecured debt was issued in 2002 by NorthWestern to acquire the Montana Power assets and the nonregulated telecommunications company, Expanets. Therefore, Standard & Poor's believes any write-off of unsecured debt will be pari passu among all unsecured debtholders.

NorthWestern intends to emerge from reorganization as a utility company only and has made gains in that direction by recently announcing the sale of Expanets for about $150 million to Avaya Inc. NorthWestern expects to net about $70 million to $80 million. In addition, the company has either sold or closed many of the individual operation sites of its heating, air conditioning, and ventilation subsidiary BlueDot. Therefore, valuing the business on a going forward basis strictly focuses on utility operations. To value the reorganized company, the EBITDA for the most recent 12 months (Oct. 1, 2002 to Sept. 30, 2003) for the combined utility operations was used. The Montana Public Service Commission and the South Dakota Public Utility Commission regulate the utilities and the current EBITDA reflects the most recent cost structure and rates that the commissions have approved. The EBITDA for this period is $218.4 million. NorthWestern had about $40 million of priority tax liens and a $100 million DIP credit facility as of Sept. 30, 2003. The DIP facility remains undrawn, but has a $6 million LOC issue under it. The priority liens and the full amount of the $100 million DIP are used to adjust the value of the going concern in this example. For the purposes of this analysis, Standard & Poor's has assumed that secured debt will remain in place and that the unsecured debtholders will be issued new 10-year debt on a pro rata basis with an 8.125% interest rate.

## ▦ Valuation

Based on the most recent 12-month EBITDA of $218.4 million and a 7x EBITDA multiple, Standard & Poor's estimates that the value of NorthWestern as a going concern is about $1.39 billion, adjusted for priority liens and DIP financing. Assuming the secured debt of $920 million remains in place, then the residual unsecured is about $467 million or write-off of about $398 million. This represents about a 46% loss of value for the unsecured debtholders at a minimum. Using a lower multiple of 6x would result in a going concern value of $1.17 billion and a residual unsecured debt value of $249 million or a write-off of $616 million. This represents a loss of about 71% in value to the unsecured debtholders. As mentioned at the beginning of this article, it is difficult to accurately value recovery for unsecured creditors, but it does seem clear that the unsecured creditors for NorthWestern will not fare as well as the unsecured creditors at other electric utilities that have emerged from bankruptcy. In this instance, it does not appear that the unsecured creditors will be able to recover the full value of their investment.



Copyright © 1994-2003 Standard & Poor's, a division of The McGraw-Hill Companies.
All Rights Reserved. Privacy Policy          The McGraw Hill Companies

MAGTEN          0 0 7

 

**Imperial Capital, LLC**

# High Yield Research

## NorthWestern Corp.
## Status Update on Reorganization Process

### Securities Description

**Charles Ronson**
212-351-9701
cronson@
imperialcapital.com

| Pre Petition Cap Structure Description | Rate | Maturity | Amt | Claim % | Claim | Recent Price |
|---|---|---|---|---|---|---|
| Sr. Secured CSFB Facility | | | $ 395 | 100% | $ 395 | |
| Other Sr. Secured | | | 535 | 100% | 535 | |
| Cap'l Lease Obligations | | | 10 | 100% | 10 | |
| | | | | | | |
| Northwestern Sr. Sub. | 7.88% | 2007 | 250 | 103.9% | 260 | |
| Northwestern Sr. Sub. | 8.75% | 2012 | 470 | 104.4% | 490 | $ 82.50 |
| Northwestern Sr. Sub. | 6.95% | 2028 | 105 | 102.0% | 107 | |
| Mont Pwr MTN s | 7.57% | Various | 40 | 101.6% | 41 | |
| | | | | | | |
| Norwestern Tr. Pfd ($25) | 7.99% Avg | | 310 | 103.6% | $ 321 | $ 2.20 |
| Mont Pwr QUIPS ($25) | 8.45% | | 67 | 103.8% | 69.5 | $ 13.25 |

### Summary & Update

NorthWestern Corp. ("NOR" or "the Company") filed Ch 11 on 9/13/03 (Delaware, 03-12872). The Disclosure Statement for the 1st Amended Plan of Northwestern was approved on 5/16/04. Plan confirmation is scheduled for 8/25/04.

- The Plan estimates a Total Enterprise Value (TEV) of $1.5B and a Reorganized Equity Value (REV) of $710MM.
- The Plan assumes recovery of $738/1000 allowed claim for NOR and Montana Notes.

The Plan is controversial because it treats the Sr notes issued by NOR and Montana Power (a subsidiary acquired in 2/02) as pari passu. It also makes pari NOR's Trust Preferred (TP) and Montana's QUIPS. Holders of Montana's Notes and QUIPS have alleged fraudulent conveyance when the NOR subsidiary that had originally acquired Montana upstreamed the assets and liabilities to the parent level (see below). Shareholders of Montana are also asserting claims relating to the transactions.

At current levels, NOR's Notes suggest the Plan's estimated value is understated 5% - 8% and that TEV is at least $1.57B - $1.61B (depending on the eventual outcome of the NOR/Montana status issue). At a TEV of $1.7B, the implied recovery on the Sr Notes would provide investors at current levels with an annualized ROIs (over our expected 7 month holding period) of approximately 20%.

*Ratings, Certifications and Disclosures*
*See the final page of this report for important information on disclosures, analyst certifications and other information concerning conflicts of interest that may exist between the subject of this report and IC and/or an analyst.*

We anticipate a number of parties objecting to Plan confirmation. In particular, we believe both the projected TEV and the NOR/Montana issues will be contested.

150 SOUTH RODEO DRIVE
SUITE 100
BEVERLY HILLS, CA 90212

(310) 246 3700
(800) 929 2299
(310) 246-3794 (FAX)

E-MAIL: RESEARCH@
IMPERIAL.CAPITAL.COM

Recoveries could be significantly affected by the outcome of these issues. If the pari treatment is implemented, we see QUIP/TP recoveries of $1.13 (perhaps as high as $2.30 if the step-down is reduced). If the Montana challenge is successful, the QUIPS should recover their $25 liq preference, while the TP will have downside risk. Given these uncertainties, we are withholding formal ratings. Due to the nature of the unresolved issues, we do not believe the Plan will go effective prior to 4Q04.



 Capital, LLC

## NorthWestern Corp.

### Table 1: Post-Effective Capital Structure ($MM)

| Period | 4Q04 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY04E EBITDA (ended 12/31/04) | $ 210 | | | | | | | | | | | | | | |
| Settlement Date | 5/15/04 | Cum. Debt Face | LTM EBITDA Mult. | Net Cum. Debt Face | LTM EBITDA Mult. | Debt Mkt | Net Cum. Debt Mkt | LTM EBITDA Mult. | Price | YTM | Mat. | Rate/ Coup. | | Est. Int. Exp. | |
| Pro Forma Cash | $ 40 | | | $ (40) | | $ (40) | | | -100 | | | | | | |
| Sr. Secured Debt | $ 780 | | | | | | | | 100 | n/a | Various | 6.50% | $ | 51 | |
| Capital Leases & Other | 10 | | | | | | | | 100 | n/a | Various | 7.00% | | 0.7 | |
| | $ 790 | $ 790 | 3.8x | $ 750 | 3.6x | $ 790 | $ 750 | 3.6x | | | | | $ | 51 | |
| Common Stock (Book Value) | $ 20.00 | | | | | | | | | | | Fix Charge | | 4.1 | |
| Common Stock | $ 710 | $ 1,500 | 7.1x | $ 1,460 | 7.0x | $ 710 | $ 710 | 3.4x | $ 20.00 | 35.50 | Shrs | | | 91 | |

Source: Company SEC filings and Imperial Capital estimates.

### Table 2: Historic & Projected Financial Performance

| | FY03 | FY04E* | FY05E** |
|---|---|---|---|
| Revenues | $ 1,018 | $ 1,025 | $ 1,049 |
| EBITDA | $ 213 | $ 210 | $ 213 |
| Fixed Exps - Interest | $ 148 | $ 51 | $ 51 |
| - CAPEX | 71 | 71 | 71 |
| Total Fixed | $ 218 | $ 122 | $ 122 |
| Free Cash Flow | $ (5) | $ 88 | $ 91 |
| Revenues | 100.00% | 100.00% | 100.00% |
| COS | 53.82% | 53.44% | 52.29% |
| Gross Profit | 46.18% | 46.56% | 47.71% |
| SGA | 25.27% | 26.07% | 27.40% |
| EBITDA | 20.91% | 20.96% | 20.31% |

* EBITDA per Financial Advisor's Est.
** Per Financial Advisor's Est.

Source: Company SEC filings and Imperial Capital estimates.

### Table 3: Case Data

| Case Data | |
|---|---|
| Jurisdiction: | Delaware |
| Case #: | 03-12872 |
| Chapter: | 11 |
| Petition: | 9/13/03 |
| Confirmation Hearing: | 8/25/04 |
| Est Effective: | 12/31/04 |
| Company Lawyer: | Paul, Hastings, Janofsky & Walker Jesse Austin (404) 815-2400 |
| Company Fin Adv: | Lazard Freres & Co. |
| Comm Lawyer: | Paul, Weiss, Rifkind Alan Komberg (212) 273-3000 |
| Comm Fin Adv: | Houlihan Loukey |

Source: Court Filings and Imperial Capital estimates.



**Imperial Capital, LLC**

## NorthWestern Corp.

### Corporate Background

The Company historically distributed electricity and natural gas in South Dakota and Nebraska. During the late 1990s, it sought diversification by entering telecommunications and HVAC (heating, ventilation and air conditioning) markets. In 2/02, NOR bought the electricity and natural gas distribution business of Montana Power (discussed further below). The cost of entering these businesses and funding their respective capital requirements exceeded NOR's ability to generate cash. The Company filed Ch 11 on 9/14/03. It has since sold its telecom and HVAC units with the cash earmarked to pay down DIP and pre-petition secured borrowings.

### Notes on Plan Distributions

**Secured Debt** - NOR's secured debt and capital leases are unimpaired and reinstated. The Plan proposes using cash accumulated during Ch 11 to reduce outstanding secured debt and capital leases to $790MM on the effective date.

**Unsecured Notes and General Unsecured Claims (GUCs)** – will share 98% of the reorganized equity. NOR has $865MM (par) unsecured notes with total allowed claims of $898MM. For Plan purposes, GUCs were estimated at $45MM as of 3/11/04.

**Trust Preferred and QUIPS** - NOR's $310MM TP and Montana Power's $67MM QUIPS will share 2% of the reorganized equity.

### Notes on Plan Valuation

**Plan Value** - The Financial Advisor (FA) estimates the midpoint value of reorganized NOR at $1.5B (including a $45MM NOL). With an estimated $790MM of Secured Debt and Capital Leases at the effective date, the Company's equity value is projected to be $710MM.

The FA projects FY04 normalized EBITDA of $210MM. The Plan projects 35.5MM shares and an annual dividend (DVD) of $0.83/share for a DVD yield of 4.15%. The total projected cash DVD - $29.5MM - represents 33% of Free Cash (EBITDA minus Interest and CAPX).

- **Recovery** - Unsecured Notes and GUCS are projected to recover 73.8 per 1000 allowed claim.
- **Recovery** – TP and QUIPS are projected to recover 3.6 per allowed claim. Since the securities have a $25 Liquidation Preference, the recovery translates into a market price of $0.91 per TP / QUIP.

Table 4: Plan Recovery

| Recovery Analysis | | Comm Stk | | Plan Val |
|---|---|---|---|---|
| Unsec'd Notes | Amt | 34.79MM / 98% | $ | 696 |
| | Per 1000 | 36.89 | | 73.8% |
| | | | | |
| Tr Pfd & QUIPS | Amt | 0.71MM / 2% | $ | 14 |
| | Per 1000 | 1.82 | | 3.6% |
| | Per Curr Tr Pfd & QUIP * | | $ | 0.91 |

\* Tr Pfd & QUIPS have $25 Liquidating Preferences.

Source: Company SEC filings and Imperial Capital estimates.



Imperial
Capital, LLC

## NorthWestern Corp.

**Comments on Plan Assumptions and Related Litigation**

**Montana Power Assets and Liabilities** - Through three transactions from 3/00 through 11/02, NOR acquired the assets of Montana Power and upstreamed those assets and accompanying liabilities to the parent level.

- In 3/00, Montana Power created Montana Power LLC ("MPLLC") and contributed the power generating assets to MPLLC. In conjunction with the transfer of assets, MPLLC assumed Montana Power's obligations for the 8.45% Jr Sub Nts (the "8.45s"), which in turn support Montana Power Capital I (the "Trust") obligations under the $67MM in QUIPS issued by the Trust.
- In 2/02, NOR acquired 100% of the units of MPLLC and renamed MPLLC NorthWestern Energy LLC ("NW Energy"). NOR paid $478MM in cash and assumed $511MM in liabilities for the MPLLC units. After NOR's acquisition, NOR and NW Energy were jointly and severally liable for the 8.45s.
- In 11/02, NOR upstreamed substantially all of NW Energy's assets and liabilities, thereby creating a "flat" corporate structure. After the upstreaming of the assets and liabilities, the only asset at NW Energy was the Milltown Dam, a two-megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers.

**The Fraudulent Conveyance Claim** - In 4/04, a complaint was filed by Montana creditors against NOR seeking to avoid the upstreaming of the assets. The suit alleges NW Energy transferred the assets for less than equivalent value and that such transfer rendered NW Energy insolvent – a fraudulent conveyance. The complaint seeks an order avoiding the transfer of assets and liabilities and ruling that the former NW Energy assets are not property of NOR's estate. One of the key issues is whether holders of the QUIPs are creditors of NW Energy and able to assert fraudulent conveyances against NOR in NOR's bankruptcy proceeding. Key in resolving this issue is whether NW Energy remained obligated under the 8.45s after the upstreaming transaction. We expect the Bankruptcy Court will encourage the parties to reach a negotiated settlement. A pre-trial conference has been scheduled for 6/21/04. If the QUIP holders succeed in the lawsuit, and the assets and liabilities formerly owned by Montana Power are segregated from NOR's other assets and liabilities, then holders of the QUIPs should recover approximately 103.8%.

**The Montana Shareholder Claim** — Further complicating the status of the of the Montana power asset acquisition is a lawsuit recently brought by shareholders of Montana Power. This action, which the Bankruptcy Court recently ruled could proceed, asserts that the original sale was defective because it was completed without shareholder approval. We have not had a chance to review the complaint, but understand that if successful the lawsuit would allow the Montana shareholders to assert a damage claim that could dilute other creditor recoveries.

**Public Utility Holding Company Act of 1935 (PUHCA)** – A recently filed suit against NOR alleges that, as a result of acquiring Montana Power, NOR became a holding company within the meaning of the PUHCA. It was consequently required to register under PUHCA unless it qualified for an exemption. NOR filed an exemption application provided for companies primarily engaged in non-utility businesses. The suit states NOR was predominantly engaged in the utility business at the time of the application and did not qualify for exemption. Approximately $720MM ($250MM - 7.875; $470MM – 8.75) and $390 senior secured debt (the CSFB Debt) was issued after NOR's bad faith PUHCA filing. The suit states that under the case law, that debt is void "yet the debtor's recently filed Plan of Reorganization proposes to pay more than $1B on account of this debt."

**Comments on Valuation Assumptions**

**Valuation** – The Plan assumes TEV of $1.5B. At their current price, NOR's Sr Notes suggest a TEV $1.57B. In order for investors to achieve annualized ROIs of 20%, Sr Noteholders require TEV of $1.7B (assuming NOR/Montana pari passu).

June 21, 2004

 Imperial Capital, LLC

## NorthWestern Corp.

Current prices for Montana's QUIPS and NOR's Sr Notes therefore strongly suggest that Plan TEV ($1.5B) is low by $160 - $200MM (10% - 12%).

**Valuation in this industry is based in large part on dividend yield.** The Plan assumes reorganized NOR pays an annual dividend of $29.5MM and offers a current yield of 4.15%. Current yields in the utility sector have increased since these projections were originally published (3/11/04). Assuming a current yield of 4.45%, an increase of $9 - $11MM to the projected dividend payout should suffice to increase TEV $160 - 200MM to the $1.66 - $1.70B range.

We believe it is reasonable to assume a greater DVD payout and higher TEV. We note the FA projects FY04 EBITDA of $210MM. Subtracting CAPX ($71MM) and interest ($51MM) should leave free cash flow $88MM available for paying cash taxes, equity dividends and reducing debt. Cash taxes and required payments on secured debt are under $48MM so "bumping" equity dividends to the $40MM level and supporting TEV of $1.7B is a possibility.

### Valuations Supporting Different Assumptions

Table 5 shows recovery levels at different TEVs assuming the NOR and Montana claims are treated as pari passu.

- Column (1) represents recoveries using Plan TEV and REV.
- Column (2) shows TEV and REV implied by current prices for NOR's Sr Notes.
- Columns (3) and (4) show TEV and REV required for the Sr Notes to generate annualized ROIs of 20% and 25%, respectively.

Table 5: Valuation Assuming NOR/Montana Claims Pari

| Reorganized Equity & QUIPS | # Shares | Par Claim | Plan Val (1) | Curr Pr (2) | Upside Estimate Hgr DVD Payout 20% ROI (3) | 25% ROI (4) |
|---|---|---|---|---|---|---|
| Plan Value | | | $ 1,500 | $ 1,569 | $ 1,860 | $ 1,883 |
| Est Secured Debt | | | 790 | 790 | 790 | 790 |
| Reorg Equity Value | | | $ 710 | $ 779 | $ 870 | $ 893 |
| Price / Share | 35.5 | | $ 20.00 | $ 21.94 | $ 24.52 | $ 25.16 |
| NOR Notes & GUCs Recovery | | | | | | |
| NOR Notes & GUCs - % of Allocated Equity | | 98% | | | | |
| NOR Notes & GUCs - Est Recovery - $ | $ 943 | | $ 696 | $ 763 | $ 853 | $ 875 |
| - # Shares | | | 34.79 | 34.79 | 34.79 | 34.79 |
| NOR Tr Pfd & Mont QUIP Recovery | | | | | | |
| NOR Tr Pfd & Mont QUIP - Est Recovery - $ | $ 391 | | $ 14 | $ 16 | $ 17 | $ 18 |
| - # Shares | | | 0.71 | 0.71 | 0.71 | 0.71 |
| - Est. Recovery - % $25 Liq. Value | | | 3.6% | 4.0% | 4.5% | 4.6% |
| - Est. Recovery per Tr. Pfd & QUIP | | | $ 0.91 | $ 1.00 | $ 1.11 | $ 1.14 |
| TEV / FY04 EBITDA | | | | | | |
| TEV / FY 04E EBITDA | $ 210 | | 7.1 | 7.5 | 7.9 | 8.0 |
| Proj DVD Yield | | | 4.15% | 4.15% | 4.45% | 4.45% |
| Proj DVD Payment ($MMs) | | | $ 29.47 | $ 32.3 | $ 38.7 | $ 39.7 |

Source: Company SEC filings and Imperial Capital estimates.

Table 6 shows recovery levels at different TEV's assuming the claims of Montana Power's creditors are upheld. Columns (1) – (4) all assume Montana's Sr Notes receive par value plus pre-petition interest.

- Column (1) represents recoveries using Plan TEV and REV. Under this scenario, NOR's Sr Notes recovery falls to 69.5 from 73.8.
- Column (2) shows the TEV and REV implied by current prices for Montana's QUIPS and NOR's Sr Notes.

  Imperial
Capital, LLC

## NorthWestern Corp.

### Research Staff

Stephen G. Moyer, CFA
Director of Research
(310) 246-3784
smoyer@
Imperialcapital.com

Mary Ross Gilbert, CFA
Managing Director
(310) 246-3757
mgilbert@
Imperialcapital.com

Robert Konefal
Senior Vice President
(212) 351-9754
rkonefal@
imperialcapital.com

Andrew Cray
Vice President
(212) 351-9704
acray@
Imperialcapital.com

Joseph J. Farricielli, Jr.
Vice President
(310) 246-3631
jfarricielli@
imperialcapital.com

Christopher Provost, J.D.
Vice President
(310) 246-3793
cprovost@
Imperialcapital.com

Charles Ronson
Vice President
(212) 351-9701
cronson@
imperialcapital.com

Kevin Starke, CFA
Vice President
(212) 351-9774
kstarke@
Imperialcapital.com

Melissa Henderson
Research Associate
(310) 246-3640
mhenderson@
imperialcapital.com

Randy Laufman
Research Associate
(310) 246-3695
rlaufman@
Imperialcapital.com

Ryan P. Whitesell
Research Assistant
(310) 246-3647
rwhitesell@
Imperialcapital.com

- Columns (3) and (4) show TEV and REV required for Montana's QUIPS and NOR's Sr Notes to both generate annualized ROIs of 20% and 25%, respectively.

### Table 6: Valuation Assuming NOR/Montana Claims Seperated

| | # Shares | Allowed Claim | | Plan Val (1) | | Curr Pr (2) | | Upside Estimate 20% ROI (3) | | 25% ROI (4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Plan Value | | | $ | 1,600 | $ | 1,606 | $ | 1,696 | $ | 1,719 |
| Est Secured Debt | | | | 790 | | 790 | | 790 | | 790 |
| Reorg Equity Value | | | $ | 710 | $ | 816 | $ | 906 | $ | 929 |
| Price / Share | 35.5 | | $ | 20.00 | $ | 22.99 | $ | 25.53 | $ | 26.17 |
| Montana MTN - Est Recovery - $ | $ | 41 | $ | 41 | $ | 41 | $ | 41 | $ | 41 |
| - # Shares | | | | 2.03 | | 1.77 | | 1.59 | | 1.55 |
| Est. Recovery Per 1000 Allowed Claim | | | | 100% | | 100% | | 100% | | 100% |
| Montana QUIPs - Est Recovery - $ | $ | 29 | $ | 29 | $ | 29 | $ | 33 | $ | 34 |
| - # Shares | | | | 1.47 | | 1.28 | | 1.29 | | 1.29 |
| Est Recovery per Allowed Claim | | | | 44% | | 44% | | 49% | | 50% |
| Est Recovery per QUIP ($25 Liq. Value) | | | $ | 11.00 | $ | 11.00 | $ | 12.23 | $ | 12.60 |
| NOR Notes & GUCs - % of Remaining Equity | | 98% | | | | | | | | |
| NOR Notes & GUCs - Est Recovery - $ | $ | 902 | $ | 627 | $ | 731 | $ | 816 | $ | 838 |
| - # Shares | | | | 31.35 | | 31.80 | | 31.97 | | 32.00 |
| NOR Tr Pfd - Est Recovery - $ | $ | 321 | $ | 13 | $ | 15 | $ | 17 | $ | 17 |
| - # Shares | | | | 0.64 | | 0.65 | | 816.25 | | 0.65 |
| - Est. Recovery - % $25 Liq. Value | | | | 4.0% | | 4.6% | | 5.2% | | 5.3% |
| - Est. Recovery per Tr. Pfd ($25 Liq. Value) | | | $ | 1.00 | $ | 1.16 | $ | 1.30 | $ | 1.33 |
| TEV / FY 04E EBITDA | $ | 210 | | 7.1 | | 7.8 | | 8.1 | | 8.2 |
| Proj DVD Yield | | | | 4.15% | | 4.15% | | 4.45% | | 4.45% |
| Proj DVD Payment ($MMs) | | | $ | 29.47 | $ | 33.9 | $ | 40.3 | $ | 41.5 |

Source: Company SEC filings and Imperial Capital estimates.

### Table 7: Comparative Valuations

| | AVG | Duquesne Light Hdg DQE | Entergy ETR | Nstar NST | Northeast Utilities NU | Puget Energy PSD | Pepco Hdgs POM |
|---|---|---|---|---|---|---|---|
| Shars Pr | $ | 19.38 | $ 54.04 | $ 47.02 | $ 19.04 | $ 21.32 | $ 18.36 |
| # Sh | | 75.4 | 231.0 | 53.0 | 131.0 | 94.5 | 171.8 |
| Eq. Cap | $ | 1,461 | $ 12,485 | $ 2,482 | $ 2,494 | $ 2,826 | $ 3,155 |
| ST Db | | | 524 | 469 | | | 913 |
| LT Db | | 1,007 | 7,400 | 1,962 | 2,546 | 6,372 | |
| Pfd | | 89 | 334 | 43 | 116 | - | 108 |
| Cash | | (200) | (692) | (30) | (37) | (50) | (100) |
| Other | | - | 164 | - | - | - | - |
| TEV / LTM EBITDA | 7.9 | 8.4 | 8.4 | 7.2 | 8.3 | 7.7 | 10.4 |
| P/E Ratio - FY04 (e) | 14.3 | 17.6 | 12.8 | 13.3 | 14.5 | 13.7 | 13.7 |
| DVD Yield | 4.42% | 5.16% | 3.33% | 4.72% | 3.15% | 4.59% | 5.45% |
| DVD / FCF | 51% | 88% | 21% | 49% | 44% | 54% | 223% |
| DVD / EPS | 81% | 91% | 43% | 83% | 46% | 64% | 75% |
| DVD / CS | | $ 1.00 | $ 1.80 | $ 2.22 | $ 0.60 | $ 1.00 | $ 1.00 |
| FY 04(e) EPS | | $ 1.10 | $ 4.22 | $ 3.63 | $ 1.31 | $ 1.56 | $ 1.34 |
| EBITDA - FY 02 | | $ 317 | $ 2,318 | $ 684 | $ 847 | $ 804 | $ 785 |
| EBITDA - FY 03 | | $ 238 | $ 2,485 | $ 692 | $ 974 | $ 849 | $ 1,026 |
| EBITDA - INT + CAPX | | $ 86 | $ 2,006 | $ 242 | $ 177 | $ 175 | $ 77 |

Source: Company SEC filings and Imperial Capital estimates.

MAGTEN     013



## NorthWestern Corp.

## IMPORTANT RATINGS, CERTIFICATIONS AND DISCLOSURES

### Ratings Distribution and Definitions

| Rating | Debt | Equity | Ratings Definitions |
|--------|------|--------|---------------------|
| Buy | 33.9% | 62.5% | Buy: TRR will exceed basket by at least 10% |
| Hold | 40.4% | 25.0% | Hold: TRR expected to be in line with basket |
| Sell | 11.9% | 0.0% | Sell: TRR will under-perform basket by at least 10% |
| NR | 13.8% | 12.5% | NR: Not Rated. |

This Ratings Distribution reflects the percentage distribution of ratings for the type of security referenced. Rating definitions are expressed as the total rate of return (TRR) relative to the expected performance of a basket of like securities over a twelve month period. For complex capital structures, we include the rating only once, unless there are multiple ratings within the same capital structure, in which case more than one rating is included. N/R is typically only counted in situations where no security in the capital structure is rated. As of 4/1/04.

*Analyst Certification:* The research analyst whose name appears, in bold, on the front page certifies that: (1) the views expressed in this report accurately reflect the analyst's personal views about the subject securities or issuers; and (2) none of the analyst's compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed herein.

The analyst(s) responsible for the preparation of this report receive(s) compensation primarily based upon individual performance and the overall financial performance of Imperial Capital LLC, including revenues from investment banking activities.

| COMPANY | DISCLOSURE* |
|---------|-------------|
| Northwestern Corp. | 2,3 |

[1] As of the date hereof, the analyst or other Imperial Capital (IC) employee who assisted in the drafting of this report (or a member of his/her household) has a financial interest in the securities of this entity.
[2] IC makes markets in the debt securities of this entity.
[3] IC makes markets in the equity securities of this entity.
[4] As of the date hereof, IC or persons associated with it own securities of this entity.
[5] In the past 12 months, IC has managed or co-managed a public offering of securities or received compensation for investment banking services for this entity.
[6] IC has received compensation for investment banking services from this entity within the 12 months prior to the date hereof.
[7] IC expects to receive or intends to seek compensation for investment banking services from this entity within three months from this date hereof.
[8] An employee of IC serves on the board of directors of this entity.

*Disclosure items appropriate to each entity, if any, listed below.

The table above discloses, as of the date hereof, IC's ownership, if any, of securities mentioned herein. While this report is in circulation, IC may, from time to time, make purchases or sales for its own account of securities of any entity. The table above also discloses, as of the date hereof, whether or not IC makes a market in any of the debt securities mentioned herein. For this purpose—and due to the unique nature of the distressed, high yield, and convertible debt markets—market making may constitute IC quoting markets in, as well as standing ready to make purchases or sales of, securities on a regular or continuous basis. Notwithstanding IC's market making activities as of the date hereof, while this report is in circulation IC may begin or discontinue such market making activity for any entity.

This report is for information purposes only. Under no circumstances is it to be used or considered as an offer to sell, or a solicitation of an offer to buy any security. While the information contained in this report has been obtained from sources believed to be reliable, we do not represent or guarantee that the report is accurate or complete, and it should not be relied upon as such. Based on information available to us, prices and opinions expressed in this report reflect judgments as of this date and are subject to change without notice. The securities covered by or mentioned in this report involve substantial risk and should generally be purchased only by investors able to accept the risk. Any opinions expressed assume that this type of investment is suitable for the investor. This report may be the last or only report covering the issuer(s), industries sectors and/or securities discussed. Decisions to cease coverage are based on a variety of factors. In the case of distressed, high yield, and convertible debt issues, IC research coverage is opportunistic in nature and analysts are not assigned continuing-coverage responsibilities for any issuer, industry, sector or security. As a result, coverage of such issues is frequently characterized by either isolated reports or long periods between reports. IC's views of a security, issuer, industry, or sector may change without the issuance of a new report. If you would like to know whether IC's views have changed or whether it intends to publish an additional report on the issue, please call us at 310-246-3700.

June 21, 2004

MAGTEN        014



For Settlement Purposes Only
Privileged and Confidential

May 27, 2004

*Via Electronic Mail*

Mr. Bruce Karsh
Oaktree Capital Management
333 South Grand Avenue
28th Floor
Los Angeles, CA 90071

      Re:    In re NorthWestern Corporation ("NorthWestern")
                 Chapter 11 Case No. 03-12872

Dear Bruce:

        Magten Asset Management Corporation ("Magten") is one of the largest holders of the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS") that were issued by Montana Power Capital I. Holders of the QUIPS have a variety of claims arising from and in connection with the fraudulent transfer of the assets of NorthWestern's subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork"), to NorthWestern. This transfer resulted in all of the Montana utility assets – which comprise at least 80% of the value of NorthWestern's estate – being transferred up to NorthWestern for inadequate consideration.

        I am writing to you with the hope that the two of us can open a constructive dialogue regarding the various claims, issues, and concerns that have been advanced by Magten and others. Even if, at the end of the day, you conclude that Magten's points of view and arguments are without merit, it is essential that there be an open exchange. For the past several months, we have been witness to the efforts by the professionals for the Official Creditors' Committee to censor and stifle any and all meaningful dialogue about and negotiation with respect to the fraudulent transfer and other claims. While everyone is entitled to be passionate about their respective points of view, we should never allow professionals for a creditors' committee or the chapter 11 process to preclude an arms-length and fair dialogue.

        The claims of the holders of the QUIPS total approximately $69 million in principal and accrued interest. This is a fraction of NorthWestern's overall obligations. Given the relatively small amount of this debt on the one hand and the massive disruption that will result if Magten and other creditors are successful, for several months my advisors and I have been trying to get the professionals for the Creditors' Committee to consider a proposal that would resolve the various disputes. One timesaving and elegant solution that we have proposed would be to allow the QUIPS to "ride through" the chapter 11 process unimpaired. Clearly, this proposal represents a reordering of the priorities as currently viewed by the Creditors' Committee so that instead of being junior creditors, the QUIPS would be senior to the substantial senior claims.



For Settlement Purposes Only
Privileged and Confidential

Mr. Bruce Karsh

May 27, 2004
Page 2

However, given the relatively small dollar amounts involved and the litigation profile described below, it would be useful for the two of us to meet and discuss this proposal or some variant thereof.

To date, Magten has engaged two teams of legal professionals to ensure that Magten ,receives fair treatment. When Magten's efforts to work with the Creditors' Committee were dismissed out of hand, Magten pursued a number of efforts to obtain redress for the harm inflicted on the holders of the QUIPS as a result of the fraudulent transfer. Those efforts have included (i) the commencement of an adversary proceeding against NorthWestern seeking to avoid the fraudulent transfer of assets from Clark Fork to NorthWestern, (ii) the filing of a complaint in Federal District Court in Montana against the officers of Clark Fork for, among other things, breach of duty and aiding and abetting the fraudulent transfer, and (iii) the filing of a complaint in Montana state court against Paul, Hastings, Janofsky & Walker LLP, the attorneys for NorthWestern, for its role in structuring the fraudulent transfer. In reviewing the facts and circumstances of the transfer, there may be a number of other individuals and institutions that may have liability as a result of the transfer. Additionally, because the transferred assets are central to NorthWestern's estate, NorthWestern's reorganization cannot be successfully completed absent resolution of the issues raised by Magten. Magten intends to object to confirmation of the Debtor's chapter 11 plan and to seek to prevent the plan from being confirmed until the adversary proceeding is resolved by a final non-appealable order.

In order to begin constructive principal-to-principal dialogue to consensually resolve the issues surrounding the fraudulent transfer and the claims of the holder of the QUIPS, I suggest that the two of us have a face to face meeting in the near term. To that end, please contact me at your earliest convenience to schedule such a meeting.

Very truly yours,

Talton Embry

cc:     Lisa Arakaki, Esq.
        Brad Eric Scheler, Esq.

## TREMBRY

| | |
|---|---|
| **From:** | "Karsh, Bruce" <BKarsh@OakTreeCap.com> |
| **To:** | "'TREMBRY'" <trembry@magten.com> |
| **Sent:** | Thursday, June 03, 2004 3:00 PM |
| **Subject:** | RE: May 26, 2004 |

Dear Tally,

Sorry for the delay in responding. First, a holiday weekend; second, I wanted to take time to get up to speed on the issues you raised in your letter.

You probably don't know that we have substantially reduced our holdings of Northwestern Corp. debt to the point that we are not a significant creditor at this point. When we owned a larger position, it was clearly in our interest to support the plan as currently drafted. In fact, our legal representative on the Committee (from whom we've been walled off and have had no contact with regarding this matter since she and her predecessor were placed on the Committee) had marching orders from us from the outset to proceed as things have essentially unfolded.

Given that our position has been substantially reduced, it turns out we actually own slightly more Montana Power bonds than Northwestern Corp bonds. However, we are still walled off from our representative on the Committee, and her marching orders are as they've been from the outset. Given the small remaining investment we have here, and the very active and visible role we played during the bankruptcy in getting to this point, we do not feel it would be in our overall interest to change our position. From an economic perspective, if the arguments you advance prevail, we would be slightly better off.

I hope and presume you understand our position. To the extent you wish to make a proposal, I encourage you to speak with the Committee's Chairman, Tom Fuller at Angelo Gordon. My guess is they have significantly more at stake than do we.

Sincerely,

Bruce

> -----Original Message-----
> **From:** TREMBRY [mailto:trembry@magten.com]
> **Sent:** Thursday, May 27, 2004 12:40 PM
> **To:** bruce karsh
> **Cc:** brad scheler; lisa arakaki
> **Subject:** May 26, 2004

MAGTEN     017

| | |
|---|---|
| **From:** | Magten: Embry, Talton |
| **Sent:** | Wednesday, July 07, 2004 2:22 PM |
| **To:** | meagan costello |
| **Subject:** | Fw: May 26, 2004 |

----- Original Message -----
**From:** TREMBRY <mailto:trembry@magten.com>
**To:** Karsh, Bruce <mailto:BKarsh@OakTreeCap.com>
**Sent:** Tuesday, June 15, 2004 6:46 PM
**Subject:** Re: May 26, 2004

Now I'm the one who is sorry for the delay.
Thanks for getting back to me. I understand your position.
Thanks
Tally

----- Original Message -----
**From:** Karsh, Bruce <mailto:BKarsh@OakTreeCap.com>
**To:** 'TREMBRY' <mailto:trembry@magten.com>
**Sent:** Thursday, June 03, 2004 3:00 PM
**Subject:** RE: May 26, 2004

Dear Tally,

Sorry for the delay in responding. First, a holiday weekend; second, I wanted to take time to get up to speed on the issues you raised in your letter.

You probably don't know that we have substantially reduced our holdings of Northwestern Corp. debt to the point that we are not a significant creditor at this point. When we owned a larger position, it was clearly in our interest to support the plan as currently drafted. In fact, our legal representative on the Committee (from whom we've been walled off and have had no contact with regarding this matter since she and her predecessor were placed on the Committee) had marching orders from us from the outset to proceed as things have essentially unfolded.

Given that our position has been substantially reduced, it turns out we actually own slightly more Montana Power bonds than Northwestern Corp bonds. However, we are still walled off from our representative on the Committee, and her marching orders are as they've been from the outset. Given the small remaining investment we have here, and the very active and visible role we played during the bankruptcy in getting to this point, we do not feel it would be in our overall interest to change our position. From an economic perspective, if the arguments you advance prevail, we would be slightly better off.

I hope and presume you understand our position. To the extent you wish to make a proposal, I encourage you to speak with the Committee's Chairman, Tom Fuller at Angelo Gordon. My guess is they have significantly more at stake than do we.

MAGTEN    018

Sincerely,


Bruce

-----Original Message-----
**From:** TREMBRY [mailto:trembry@magten.com]
**Sent:** Thursday, May 27, 2004 12:40 PM
**To:** bruce karsh
**Cc:** brad scheler; lisa arakaki
**Subject:** May 26, 2004

| | |
|---|---|
| **From:** | Magten: Embry, Talton |
| **Sent:** | Wednesday, July 07, 2004 2:22 PM |
| **To:** | meagan costello |
| **Subject:** | Fw: NorthWestern-Reorg Analysis |

----- Original Message -----
From: "Imperial Capital Research" <rreports@imperialcapital.com>
To: <trembry@magten.com>
Sent: Monday, June 21, 2004 6:44 PM
Subject: NorthWestern-Reorg Analysis

> NorthWestern Corp. filed Ch 11 on 9/13/03 (Delaware, 03-12872). The
Disclosure Statement for the 1st Amended Plan of Northwestern was
approved
on 5/16/04 and the Plan confirmation is scheduled for 8/25/04. We
anticipate
a number of parties objecting to the Plan for treating the Sr notes
issued
by the Company and Montana Power (a subsidiary acquired in 2/02) as pari
passu and other valuation issues.  We believe recoveries could be
significantly affected by the outcome of these matters, which we present
in
this report.
>
> Click below to open the report.
>
http://www.imperialcapital.com/rpt/browsePDF.aspx?GUID=C5E3BD53-011D-433
3-4492-C24C3D33AB7F-8CCEC645-7085-42D6-ADF6-104334BE8E15
>
>
>
> Click below to be removed from our mailing list.
>
http://www.imperialcapital.com/rpt/removeme.aspx?email=trembry@magten.co
m
>
>
>
> This message is intended only for the use of the individual or entity
to
which it is addressed, and may contain information that is privileged,
confidential and exempt from disclosure under applicable law. If the
reader
of this message is not the intended recipient, or employee, or agent
responsible to deliver it to the intended recipient, you are hereby
notified
that reading, disseminating, distributing or copying this communication
is
strictly prohibited. If you have received this communication in error,
please immediately notify us by e-mail, telephone, or facsimile.
Further,
pursuant to Securities and Exchange Commission and National Association
of
Securities Dealers requirements, all incoming and outgoing email of
Imperial
Capital, LLC is subject to review by its compliance department.
>

| From: | | Magten: Embry, Talton |
| Sent: | Wednesday, July 07, 2004 2:58 PM |
| To: | meagan costello |
| Subject: | Fw: Northwestern Corp. |

```
>
>
>
> ----- Original Message -----
> From: "Scheler, Brad Eric" <SchelBr@ffhsj.com>
> To: "Austin, Jesse" <jessaustin@paulhastings.com>; "| Paul Weiss:
Kornberg,
> Alan" <akornberg@paulweiss.com>; "David Kurtz"
<david.kurtz@lazard.com>;
> <bill.austin@northwestern.com>
> Cc: <costeme@ffhsj.com>; <KaplaGa@ffhsj.com>
> Sent: Wednesday, February 25, 2004 9:28 AM
> Subject: RE: Northwestern Corp.
>
>
> > Jesse, always great to hear from you. On value and recovery it is
simple,
> Magten must receive par plus accrued. On currency, now that you and
the
> Company have redirected your thinking, we will need to confer with
Lazard
> and Houlihan on enterprise value, equity value and debt capacity for
the
> reorganized company, and then consider form of currency be it debt,
equity,
> a combination, etc. On your further question, that should be evident
from
> our written work but we will expand when we meet.
> >
```



> > On my availability, I am always tickled when that becomes an issue in a
> case ( issues such as priority, fraudulent conveyance, value, recovery,
> etc., all ever so pedestrian; lets focus on Scheler's schedule!; ah if only
> life worked that way...). Please do know that, most especially with respect
> to any engagement related to Magten, I am available anywhere, anytime, 24 -
> 7, 366 days this year. Knowing that all of you and your colleagues are far
> busier and more important than I, just let us know what works for you and
I
> will rearrange my calendar. If you are busy during the week, I would be
> delighted to host you at my home in Larchmont over the weekend. When we do
> meet it will be best if you are joined by my other friend, David Kurtz.
Many
> thanks. |Brad.
> >
> > -----Original Message-----
> > From: Austin, Jesse [mailto:jessaustin@paulhastings.com]
> > Sent: Tuesday, February 24, 2004 9:55 PM
> > To: 'KaplaGa@ffhsj.com'; | Paul Weiss: Kornberg, Alan
> > Cc: 'SchelBr@ffhsj.com'; 'costeme@ffhsj.com';
> > 'bill.austin@northwestern.com'
> > Subject: Re: Northwestern Corp.
> >
> >
> > We have been available to meet but msr. Scheler's schedule has been
> limited.
> > We will contact u to see if a mnutually acceptable time to meet can be
> agreed.
> > But since we propose to convert all public bond debt -- both senior and
> > subordinated to equity -- it seems that the questions are: 1. How much
> equity
> > does magten want and 2 why is it entitled to more than other subordinated
> > noteholders?   Your response to these questions would b e helpful.
> > --------------------------
> > Sent from my BlackBerry Wireless Handheld
> >
> >
> > -----Original Message-----
> > From: Kaplan, Gary <KaplaGa@ffhsj.com>
> > To: Austin, Jesse <jessaustin@paulhastings.com>
> > CC: Scheler, Brad Eric <SchelBr@ffhsj.com>; Costello, Meagan
> > <costeme@ffhsj.com>
> > Sent: Tue Feb 24 21:43:56 2004
> > Subject: FW:  Northwestern Corp.
> >
> > Jess-
> >
> > As you know, for quite some time, we have been trying to schedule a meeting to
> > discuss Magten's concerns regarding the Transfer.  Unfortunately, although
> the
> > issues concerning the Transfer are central to this chapter 11 case, no





> such
> > meeting has been scheduled.  We continue to hope that a meeting can be
> > arranged in the near term to bring these issues to the forefront. In the
> > meantime, we are disturbed to hear that the Debtors continue to spend their
> > time and resources developing a chapter 11 plan.  As we have indicated to
> you .
> > on multiple occasions, unless and until the issues concerning the Transfer
> are
> > resolved to the satisfaction of Magten and others or are fully and completely
> > litigated, there can be no plan.
> >
> > Please let me know when you are available to meet to discuss the issues
> raised |
> > in the memorandum.
> >
> > Regards,
> >
> > Gary
> >
> >
> > >  -----Original Message-----
> > > From: Kaplan, Gary
> > > To: 'Austin, Jesse'
> > > Subject: Northwestern Corp.
> > >
> > > As we discussed previously, attached is a memo we have prepared
> addressing
> > the issues surrounding the transfer of the Montana Power utility assets to
> the
> > Debtor.  We look forward to discussing this with you in the near term.
> > >
> > > >  <<memo to committee re transfer.DOC>>
> >
> > _____
> > This message is sent by a law firm and may contain information that is
> > privileged or confidential.  If you received this transmission in error,
> > please notify the sender by reply e-mail and delete the message and any
> > attachments.
> >
> > For additional information, please visit our website at
> www.paulhastings.com.
> >
> >      .
> >
> > _____
> > Confidentiality Notice:  The information contained in this e-mail and any
> attachments may be legally privileged and confidential.  If you are not an
> intended recipient, you are hereby notified that any dissemination,



```
> distribution or copying of this e-mail is strictly prohibited.  If you
have
> received this e-mail in error, please notify the sender and
permanently
> delete the e-mail and any attachments immediately.  You should not
retain,
> copy or use this e-mail or any attachment for any purpose, nor
disclose
all
> or any part of the contents to any other person.   Thank you.
> >
> >
> >
>
```



From:            | Magten: Embry, Talton
Sent:            Wednesday, July 07, 2004 2:45 PM
To:              meagan costello
Subject:         Fw: NORTHWESTERN: IMPORTANT HEARING ON 4/8/04: HIGHLIGHTS I


----- Original Message -----
From: "TALTON EMBRY, MAGTEN ASSET MANAGEM" <MAGTEN@bloomberg.net>
To: <TREMBRY@MAGTEN.COM>
Sent: Wednesday, March 31, 2004 12:46 PM
Subject: Fwd: NORTHWESTERN: IMPORTANT HEARING ON 4/8/04: HIGHLIGHTS I


> ---- Original Msg from: BARRY BERGMAN, CREDIT SUISSE FIRST At:  3/31
11:43
>
> NORTHWESTERN: IMPORTANT HEARING ON 4/8/04: HIGHLIGHTS INCLUDE
>  1) motion of magten for an order granting relief from the autom
> atic stay to commence adversary proceeding seeking to avoid frau
> dulent transfers
>  2) motion extending th exclusivity period of the debtor to soli
> cit acceptances of its plan of reorganization
>  3) motion to appoint official equity security holders committee
>
>  * body language of this hearing is imporant in determining 1) t
> iming of exit 2) how difficult the valuation fight could be 3) h
> ow willing the montana preferred are to settle.
>  * we have opinions on all these issues and do not think these b
> onds are worth any more than 90.....call with ??S
>
>
>
>
>

MAGTEN          025