

05 - 199

SECRETARY OF STATE
STATE OF MONTANA
MIKE COONEY



Business Services Bureau
LesLee Shell-Beckert, Deputy

Montana State Capitol
PO Box 202801
Helena, MT 59620-2801
(406)444-3665
http://www.state.mt.us/sos/

PAM MERRELL
THE MONTANA POWER COMPANY
40 E BROADWAY
BUTTE MT 59701-9394

September 29, 2000

RE: THE MONTANA POWER, L.L.C.
ARTICLES OF ORGANIZATION
Date of Filing: September 28, 2000
Filing Number: 372934 - C105835

Dear Ms. Merrell:

I've approved the filing of the documents for the above named entity. The document number and filing date have been recorded on the original document. This letter serves as your certificate of filing and should be maintained in your files for future reference.

Pursuant to your request, I have deducted $90.00 from your prepaid account to cover the costs of this transaction.

Thank you for giving this office the opportunity to serve you. If you have any questions in this regard, or need additional assistance, please do not hesitate to contact the Business Services Bureau professionals at (406) 444-3665.

Sincerely,

Mike Cooney

Mike Cooney
Secretary of State
Enclosure

**EXHIBIT**
_C_

STATE OF MONTANA

FILED

SEP 2 8 2000

SECRETARY OF STATE

## ARTICLES OF ORGANIZATION
### OF
## THE MONTANA POWER, L.L.C.

The undersigned, acting as organizer of The Montana Power, L.L.C., under the Montana Limited Liability Company Act, (hereinafter the "Act") adopt the following Articles of Organization for said Limited Liability Company:

### I.
### NAME OF COMPANY

The name of the limited liability company is The Montana Power, L.L.C. (the "Company").

### II.
### PERIOD OF DURATION

The Company shall be an "At Will" company as defined in §35-8-102(2) of the Act.

### III.
### PURPOSE

The Company is organized for any legal and lawful purpose pursuant to the Montana Limited Liability Company Act, except for the purpose of banking or insurance.

### IV.
### PRINCIPAL PLACE OF BUSINESS

The Company's principal place of business in Montana is:

40 E Broadway
Butte, Montana 59701-9394

### V.
### REGISTERED AGENT

The Company's registered agent and address is as follows:

Corporation Service Company
26 West Sixth Avenue
Helena, Montana 59601

### VI.
### MEMBERS

The total amount of cash contributed by check or wire or certified funds and the fair market value of property contributed by the Member is $500.00. The Member has not agreed to

make any additional contributions, but may agree to do so in the future upon the terms and conditions set forth in the Operating Agreement.

## VII.
## ADDITIONAL MEMBERS

The Member reserves the right to admit additional Members upon the unanimous agreement of the Member as to the admission of, and the consideration to be paid by, such new Members, and subject to the terms and conditions of the Company's Operating Agreement.

## VIII.
## OPERATING AGREEMENT

The Operating Agreement of the Company shall be executed by each Member of the Company and shall set forth all provisions for the affairs of the Company and the conduct of its business to the extent that such provisions are not inconsistent with law or these Articles.

## IX.
## LIABILITIES OF MEMBERS AND MANAGERS

Members and managers of the Company are not liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the Company.

## X.
## MANAGERS

The Company will be managed by its member. The name and business address of which is:

Touch America Holdings, Inc.
40 East Broadway Street
Butte, Montana, 59701-9394

The manager may be removed and replaced by the Member, as provided in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned have caused these Articles of Organization to be executed this 28th day of September, 2000.

By: _____

Pamela K. Merrell
Organizer

## The Montana Power, L.L.C.

### WRITTEN CONSENT OF SOLE MEMBER AND MANAGER TO ACTION IN LIEU OF MEETING

Effective Date:  As of February 15, 2002

Pursuant to the provisions of Sections 35-8-307 (1) and (4) of the Limited Liability Company Law of the State of Montana (the "Act"), and consistent with the provisions of the Articles of Organization and Limited Liability Company Operating Agreement, (the "Operating Agreement") of The Montana Power, L.L.C., a Montana limited liability company (the "Company"), the undersigned, constituting the sole member and manager of the Company (the "Manager") hereby consents to the adoption of the following preamble and resolutions and to the taking of the actions contemplated thereby, in each case, with the same force and effect as if presented to and adopted at a meeting of the members of the Company:

WHEREAS, in accordance with the Operating Agreement, the Manager desires to create certain officer positions for the Company and designate the authority of such officers to serve at the pleasure of the Manager; and

WHEREAS, the Manager desires to appoint the persons specified in Annex A hereto to the officer positions of the Company referenced in Annex A; and

WHEREAS, the Manager desires to authorize officers of the Company to execute and/or deliver certain documents relating to the financing arrangements entered into in connection with NorthWestern Corporation's ("NorthWestern") acquisition of the outstanding units of the Company;

NOW THEREFORE, IT IS HEREBY

RESOLVED, that the officers (the "Officers") of the Company shall be a Chief Executive Officer, a President, a Secretary and a Treasurer. The Company may also have at the discretion of the Manager, a Controller, one or more Executive Vice Presidents, one or more Senior Vice Presidents, one or more Vice Presidents, one or more Chief Operating Officers, one or more Assistant Secretaries, one or more Assistant Treasurers and one or more Assistant Controllers. One person may hold two or more offices. All such Officers shall serve at the pleasure of the Manager.

RESOLVED, that the Manager hereby designates the authority of each of the officers as follows:

Chief Executive Officer. Subject to such supervisory powers, if any, retained by the Manager, the Chief Executive Officer shall have such powers and duties as generally pertain to his office as well as general supervision, direction and control of the day to day business and affairs of the Company.

EXHIBIT

D

NY/0718726

President.  If the Manager has not designated a Chief Executive Officer, the President shall be the Chief Executive Officer with the powers and duties set forth in the above paragraph.  If the Manager has designated a Chief Executive Officer, the President shall have such powers and duties as generally pertain to his office as well as such powers and duties as from time to time may be prescribed by the Manager, the Chief Executive Officer or the Operating Agreement.

Executive Vice Presidents and Senior Vice Presidents.  The Executive Vice Presidents and Senior Vice Presidents, if any, shall have such powers and perform such duties as generally pertain to their respective offices as well as such powers and duties as from time to time may be prescribed by the Manager, the Chief Executive Officer or the Operating Agreement.

Chief Operating Officers.  The Chief Operating Officers, if any, shall have such powers and duties as generally pertain to their respective offices as well as such powers and duties as from time to time may be prescribed by the Manager, the Chief Executive Officer or the Operating Agreement.

Vice Presidents.  The Vice Presidents, if any, shall have such powers and duties as generally pertain to their respective offices as well as such powers and duties as from time to time may be prescribed by the Manager or the Chief Executive Officer or the Operating Agreement.

Secretary.  The Secretary shall keep, or cause to be kept, a book of minutes at the principal office of the Company or such other place as the Manager may order, of all meetings of the Members, with the time and place of holding, whether regular or special, and, if special, how authorized, the notice thereof given, the names of those present at Members' meetings, the number of units present or represented at Members' meetings and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal office of the Company and at the office of the Company's transfer agent, if a transfer agent shall be appointed, a unit ledger, or a duplicate unit ledger, showing the names of the Members and their addresses; the number and classes of units held by each; the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all the meetings of the Members required by the Operating Agreement or by law to be given, and shall keep the seal of the Company in safe custody, and shall have such powers and duties as generally pertain to the office of Secretary as well as such powers and duties as may be prescribed by the Manager, the Chief Executive Officer or the Operating Agreement.

Treasurer.  The Treasurer shall keep or cause to be kept full and accurate records of all receipts and disbursements in the books of the Company and shall have the care and custody of all funds and securities of the Company.  In the absence of a Controller, the Treasurer shall also assume the duties of the Controller.

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company with such depositaries as may be designated by the Manager or the Chief Executive Officer. He shall disburse the funds of the Company as may be ordered by the Manager or the Chief Executive Officer, shall render to the Chief Executive Officer, the President and Manager, whenever they request it, an account of all of his transactions as Treasurer and shall have such powers and duties as generally pertain to his office as well as such powers and duties as may be prescribed by the Manager, the Chief Executive Officer or the Operating Agreement.

Controller. The Controller, if any, shall be the chief accounting officer of the Company. He shall keep or cause to be kept all books of accounts and accounting records of the Company and shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, surplus and shares. The books of account shall at all times be open to inspection by the Manager. He shall prepare or cause to be prepared appropriate financial statements for the Company and shall have such powers and duties as generally pertain to his office as well as such powers and duties as may be prescribed by the Manager, the Chief Executive Officer or the Operating Agreement.

FURTHER RESOLVED, that Manager appoints the persons listed in Annex A to the respective officer positions specified in Annex A to serve at the pleasure of the Manager in accordance with the Company's Operating Agreement, as amended;

RESOLVED, that each of the officers of the Company is hereby authorized, empowered and directed to execute and/or deliver any agreements, certificates, schedules or other documents requested by Manager relating to that certain Credit Agreement dated as of January 14, 2002 among NorthWestern Corporation, Credit Suisse First Boston, CIBC Inc., ABN Amro Bank N.V. and Barclays Capital.

FURTHER RESOLVED, that the proper officers of the Company (the "Authorized Officers") be, and each of them hereby is, severally authorized, empowered and directed, to perform or to cause to be performed, in the name and on behalf of the Company or otherwise, such other acts, to pay or to cause to be paid on behalf of the Company such related expenses, and to execute and deliver or cause to be executed and delivered such other instruments, certificates, notices, tax returns, requests, directions, consents, approvals, orders, applications, agreements, undertakings, supplements, amendments, further assurances or other papers, documents or communications, under the corporate seal of the Company or otherwise, as they or any of them may deem to be necessary, advisable or convenient in order to effectuate the intent of the foregoing resolutions or to comply with the requirements of the instruments approved and authorized by the foregoing resolutions or to effectuate fully the transactions contemplated by the foregoing resolutions, the execution and delivery thereof to be conclusive evidence of the approval and the authority of such Authorized Officer;

FURTHER RESOLVED, that any acts of the Authorized Officers which acts would have been authorized by the foregoing resolutions except that such acts were taken

prior to the adoption of such resolutions be, and such acts hereby are, severally ratified, confirmed, approved and adopted as acts in the name and on behalf of the Company; and

FURTHER RESOLVED, that this written consent be filed with the minutes of proceedings of the Company.

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date and year first indicated above.

SOLE MEMBER and MANAGER:

NORTHWESTERN CORPORATION

By: _____

Name: Eric R. Jacobson
Title:   Senior Vice President, General Counsel

-1-

NY971571 1

## Annex A

| | |
|---|---|
| M. J. Hanson | Chief Executive Officer |
| J. D. Haffey | President |
| W. A. Pascoe | Vice President – Transmission Services |
| D. A. Johnson | Vice President – Distribution Services |
| E. M. Senechal | Vice President, Chief Financial Officer and Treasurer |
| E. J. Kindt | Vice President, Chief Accounting Officer and Controller |
| D. N. Ottolino | Vice President and Chief Information Officer |
| P. K. Merrell | Vice President, Human Resources and Administration |
| P. R. Corcoran | Vice President, Regulatory Affairs |
| M. P. Manion | Vice President and Chief Legal Counsel |
| A. D. Dietrich | Secretary |

E

## NORTHWESTERN ENERGY, L.L.C.

## WRITTEN CONSENT OF SOLE MEMBER AND MANAGER
## TO ACTION IN LIEU OF MEETING

### Effective Date: As of August 7, 2002

Pursuant to the provisions of Sections 35-8-307 (1) and (4) of the Limited Liability Company Law of the State of Montana (the "Act"), and consistent with the provisions of the Articles of Organization and Limited Liability Company Operating Agreement (the "Operating Agreement") of NorthWestern Energy, L.L.C., a Montana limited liability company (the "Company"), the undersigned, constituting the sole member and manager of the Company (the "Manager") hereby consents to the adoption of the following preamble and resolutions and to the taking of the actions contemplated thereby, in each case, with the same force and effect as if presented to and adopted at a meeting of the members of the Company:

WHEREAS, the Company desires to transfer substantially all of its assets to the Manager, except for those assets (and liabilities) associated with the Milltown hydroelectric dam on the Clark Fork River (the "Milltown Dam") (collectively, excluding the Milltown Dam Asset and Liabilities, the "NWE Assets and Liabilities");

WHEREAS, the Company desires to effect the transfer of the NWE Assets and Liabilities by it to the Manager (the "NWE Asset Transfer") such that upon the consummation of the NWE Asset Transfer all assets and liabilities associated with the Milltown Dam remain with the Company;

WHEREAS, the Company deems it to be in the best interest of the Company that it transfer the NWE Assets and Liabilities to the Manager and, from and after the consummation of the NWE Asset Transfer, to continue to operate and administer the Milltown Dam Assets and Liabilities; and

WHEREAS, the Company has obtained insurance coverage against a risk of catastrophic dam failure at the Milltown Dam;

NOW, THEREFORE, BE IT RESOLVED that the Manager hereby authorizes, empowers and directs the officers of the Company, or any of them, to execute and deliver an asset and stock transfer agreement to be entered into between the Company and the Manager (the "Transfer Agreement"), to effect the NWE Asset Transfer, as well as any agreements, instruments, or documents contemplated thereby or in connection therewith ("Ancillary Agreements"), as the proper officers of the Corporation deem necessary or desirable, with such modifications or amendments thereto as such officers shall approve and the execution of such Transfer Agreement and Ancillary Agreements shall be deemed conclusive evidence of such approval;

EXHIBIT

E

FURTHER RESOLVED, that the Manager hereby authorizes, empowers and directs the officers of the Company, or any of them, to take whatever steps are necessary or desirable to ensure that the assets and the liabilities associated with the Milltown Dam remain with the Company, and do not comprise the NWE Assets and Liabilities;

FURTHER RESOLVED, that the Manager hereby authorizes, empowers and directs the proper officers of the Company, or any of them, to execute and deliver a power purchase agreement with the Manager for the sale of power from the Milltown Dam to the Manager at a price equal to the price authorized in the Company's Tier II proceeding (the "PPA") and keepwell agreements to be entered into between the Company and the Manager pursuant to which the Manager will ensure that the Company will have necessary funds to pay (i) the maintenance and operating costs of the Milltown Dam not paid pursuant to the PPA and (ii) the Company's percentage share of environmental liabilities relating to the Milltown Dam (collectively, the "Keepwell Agreements"), on mutually agreeable terms, with such modifications or amendments thereto as such officers shall approve and the execution of such PPA and Keepwell Agreements shall be deemed conclusive evidence of such approval;

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized, empowered and instructed on behalf of the Company to take all other actions to effect the NWE Asset Transfer, such as, among other things, obtaining any necessary or desirable consents, or providing necessary or desirable notices, certificates, ratings confirmation letters or taking other actions, including, without limitation, under, or in connection with, the Company's debt instruments or capital leases and any contracts requiring consent, notice or other actions to which the Company is a party;

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized, empowered and instructed on behalf of the Company and in its name to prepare, execute and file with the Securities and Exchange Commission any and all documents, reports, statements, filings, requests and information supplements as may be necessary or desirable for the purpose of completing the transactions contemplated by, or in connection with, the NWE Asset Transfer;

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized, empowered and instructed on behalf of the Company to take all action, and act in the name of, or represent, the Company where necessary or desirable to comply with any and all applicable federal, state and local laws, rules and regulations applicable to the Company or the NWE Asset Transfer, including, without limitation, in connection with the Federal Energy Regulatory Commission and state and other federal regulatory agencies;

FURTHER RESOLVED, that the officers of the Company be, and each of them is, authorized, empowered and instructed, for and on behalf of the Company, to

retain such consultants, advisors, attorneys, independent contractors, investor and public relations firms as they deem necessary or desirable and on such terms and conditions as they deem appropriate to effect the NWE Asset Transfer and further the purposes and intent of these resolutions;

FURTHER RESOLVED, that the Manager hereby authorizes, empowers and directs the officers of the Company to take all actions as are necessary or desirable to address environmental conditions relating to the Milltown Dam, including, without limitation, the authority to negotiate with regulatory authorities and other third parties regarding any remedy in connection therewith;

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized, empowered and instructed, for and on behalf of the Company, to take all such further actions and to negotiate, execute and deliver any and all documents, flings, reports, statements, instruments and certificates, and to do or cause to be done any and all acts as such officers may deem necessary or appropriate in order to carry out the purposes and intentions of these resolutions, including, but not limited to, the transactions in anticipation of, contemplated by, or in connection with the NWE Asset Transfer;

FURTHER RESOLVED, that any and all actions taken by any officer or employee or agent of the Company in furtherance of the foregoing resolutions and within the authority conferred by the foregoing resolutions are hereby ratified and approved in all respects; and

FURTHER RESOLVED, that this written consent be filed with the minutes of proceedings of the Company.

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date and year first indicated above.

**SOLE MEMBER and MANAGER:**

**NORTHWESTERN CORPORATION**

By:  _____

Name: Merle D. Lewis

Title:  Chairman & Chief Executive Officer

F



## ASSET AND STOCK TRANSFER AGREEMENT

**Dated as of November 15, 2002**

**by and between**

**NORTHWESTERN ENERGY, L.L.C.**
**(formerly known as THE MONTANA POWER, L.L.C.)**

**and**

**NORTHWESTERN CORPORATION**



**EXHIBIT**

F

 

TABLE OF CONTENTS

1.   DEFINITIONS ............................................................................................ 1

2.   TRANSFER OF ASSETS ........................................................................... 5

    2.1   Transfer ........................................................................................... 5

    2.2   Excluded Assets ............................................................................. 5

    2.3   Assumption of Certain Liabilities .................................................. 5

    2.4   Excluded Liabilities ....................................................................... 5

    2.5   Closing ............................................................................................ 5

    2.6   Transactions and Documents at Closing ....................................... 6

    2.7   Further Assurances ......................................................................... 6

    2.8   Grant of Easements ........................................................................ 6

3.   REPRESENTATIONS AND WARRANTIES OF TRANSFEROR .............. 6

    3.1   Organization and Compliance ....................................................... 6

    3.2   Enforceability of Agreement ......................................................... 7

    3.3   No Inconsistent Obligations .......................................................... 7

    3.4   Possession of Franchises, Licenses, Etc ....................................... 7

4.   REPRESENTATIONS AND WARRANTIES OF TRANSFEREE ............... 7

    4.1   Organization .................................................................................... 7

    4.2   Authorization; Enforceability of Agreement ................................ 7

    4.3   No Inconsistent Obligations .......................................................... 8

5.   COVENANTS OF TRANSFEROR ............................................................. 8

    5.1   Regulatory and Other Approvals .................................................. 8

    5.2   Fulfillment of Conditions .............................................................. 8

6.   COVENANTS OF TRANSFEREE .............................................................. 8

    6.1   Regulatory and Other Approvals .................................................. 8

    6.2   Fulfillment of Conditions .............................................................. 9

7.   CONDITIONS PRECEDENT TO OBLIGATIONS OF TRANSFEREE ...... 9

    7.1   Proceedings and Documents Satisfactory .................................... 9

    7.2   Representations and Warranties .................................................... 9

    7.3   Compliance with Agreements and Conditions ............................. 9

    7.4   No Injunctions, Restraints or Litigation ....................................... 9

    7.5   Master Back-to-Back Agreement ................................................ 10

 

TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 7.6 | Power Purchase Agreement | 10 |
| 7.7 | Maintenance and Operating Costs Support Agreement | 10 |
| 7.8 | Environmental Liabilities Support Agreement | 10 |
| 7.9 | Interconnection Agreement | 10 |
| 7.10 | Secondment Agreement | 10 |
| 7.11 | Pollution Liability Insurance | 10 |
| 7.12 | Environmental Liabilities Report | 10 |
| 7.13 | Approvals of Governmental or Regulatory Authorities | 11 |
| 7.14 | Exempt Wholesale Generator Status | 11 |
| 7.15 | Other Consents | 11 |
| 7.16 | Release of Excluded Assets | 11 |
| 7.17 | Other Transfer Documents | 11 |
| 8. | CONDITIONS PRECEDENT TO OBLIGATIONS OF TRANSFEROR | 11 |
| 8.1 | Proceedings and Documents Satisfactory | 11 |
| 8.2 | Representations and Warranties | 11 |
| 8.3 | Compliance with Agreements and Conditions | 12 |
| 8.4 | No Injunctions, Restraints or Litigation | 12 |
| 8.5 | Master Back-to-Back Agreement | 12 |
| 8.6 | Power Purchase Agreement | 12 |
| 8.7 | Maintenance and Operating Costs Support Agreement | 12 |
| 8.8 | Environmental Liabilities Support Agreement | 12 |
| 8.9 | Interconnection Agreement | 12 |
| 8.10 | Secondment Agreement | 12 |
| 8.11 | Pollution Liability Insurance | 12 |
| 8.12 | Environmental Liabilities Report | 12 |
| 8.13 | Approvals of Governmental or Regulatory Authorities | 12 |
| 8.14 | Release of Excluded Assets | 13 |
| 8.15 | Other Assumption Documents | 13 |
| 9. | EVIDENCE OF CLOSING | 13 |
| 9.1 | Closing Certificate | 13 |

TABLE OF CONTENTS
(continued)

10.    SURVIVAL ................................................................................................ 13
       10.1  Survival of Representations, Warranties, Covenants and Agreements................ 13
11.    MISCELLANEOUS .................................................................................... 13
       11.1  Counterparts.................................................................................... 13
       11.2  Entire Agreement ............................................................................ 13
       11.3  Governing Law ................................................................................ 13
       11.4  Successors and Assigns.................................................................... 14
       11.5  Partial Invalidity and Severability .................................................. 14
       11.6  Waiver............................................................................................. 14
       11.7  Headings ......................................................................................... 14
       11.8  Number and Gender........................................................................ 14
       11.9  Time of Performance ...................................................................... 14
       11.10 No Third Party Beneficiary............................................................. 14

TABLE OF SCHEDULES AND EXHIBITS

**SCHEDULES**

Schedule 2.2 — Excluded Assets

Schedule 2.4 — Excluded Liabilities


**EXHIBITS**

Exhibit A — Bill of Transfer and Assignment

Exhibit B — Master Assumption Agreement

Exhibit C — Master Back-to-Back Agreement

Exhibit D — Maintenance and Operating Costs Support Agreement

Exhibit E — Environmental Liabilities Support Agreement

Exhibit F — Interconnection Agreement

Exhibit G — Employee Secondment and Administrative Services Agreement

Exhibit H-1 — Closing Certificate (Transferor)

Exhibit H-2 — Closing Certificate (Transferee)

## ASSET AND STOCK TRANSFER AGREEMENT

THIS ASSET AND STOCK TRANSFER AGREEMENT (this **"Agreement"**) is made and entered into as of the 15th day of November, 2002, by and between NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company (**"Transferor"**) and NORTHWESTERN CORPORATION, a Delaware corporation (**"Transferee"**).

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

**WHEREAS**, on January 31, 2002, the Montana Public Service Commission (the "MPSC") issued its Final Order No. 6353c, in Docket No. D2001.1.5, approving the stipulation filed by The Montana Power Company ("MPC"), Transferee, the Montana Consumer Counsel, the Large Customer Group and Commercial Energy Montana, finding that MPC's utility operations, as a subsidiary or division of Transferee, would be a fit, willing and able provider of adequate utility service and facilities at just and reasonable rates;

**WHEREAS**, in accordance with the Final Order, on February 15, 2002, Transferee purchased all of the outstanding membership interests in Transferor pursuant to the Unit Purchase Agreement, dated as of September 29, 2000, as amended, between Transferee, MPC and Touch America Holdings, Inc. and Transferee continues to own all of the membership interests in Transferor;

**WHEREAS**, the parties desire that Transferor transfer substantially all of Transferor's assets to Transferee, except for those assets and liabilities associated with the Milltown hydroelectric dam on the Clark Fork River (the **"Milltown Dam"**) and certain other excluded assets and liabilities, as set forth more fully herein; and

**WHEREAS**, from and after the consummation of the transfer and assumption contemplated hereby, Transferee desires to operate the business comprising the Transferred Assets as a division of Transferee to be known as **"NorthWestern Energy;"**

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.  DEFINITIONS

As used in this Agreement, the following defined terms have the meanings indicated below:

**"Agreement"** shall have the meaning ascribed to such term in the recitals herein.

**"Assumed Liabilities"** shall have the meaning ascribed to such term in Section 2.3 herein.



"**UPA**" shall mean that certain Unit Purchase Agreement, dated as of September 29, 2000, by and between Transferee, Touch America Holdings, Inc. and The Montana Power Company, as amended.

## 2.    TRANSFER OF ASSETS

2.1    **Transfer**.  Subject to the terms and conditions contained herein, Transferor agrees to transfer, convey and assign to Transferee, and Transferee agrees to acquire from Transferor, on the Closing Date, all of Transferor's right, title and interest in and to all of the assets and properties of Transferor, real, personal and mixed, of every kind and nature, including without limitation, contracts, insurance policies and rights to coverage under insurance policies now or at any time obtained by Transferor or any of its predecessor entities, choses in action and other rights and interests of Transferor, excluding, however, the Excluded Assets (all of the foregoing, excluding the Excluded Assets, being the "**Transferred Assets**").  The transfer of the Transferred Assets hereunder, to the extent applicable, is expressly made subject to that certain Mortgage and Deed of Trust, dated as of October 1, 1945, from Transferor (as successor to the utility business of MPC) to the Bank of New York (successor Corporate Trustee) and Douglas J. MacInnes (successor Co-trustee), as Trustees, as supplemented and amended (the "**First Mortgage**"), and upon such terms as fully to preserve and in no respect impair the lien or security of the First Mortgage.

2.2    **Excluded Assets**.  Notwithstanding anything in this Agreement to the contrary, the Transferred Assets shall not include the assets and property related to, or in connection with, the Milltown Dam and certain other assets of Transferor, all as described more fully in Schedule 2.2 attached hereto (the "**Excluded Assets**").

2.3    **Assumption of Certain Liabilities**.  Transferee agrees to assume on the Closing Date, and to pay or perform, in accordance with their terms, any and all obligations and liabilities of Transferor, direct or indirect, known or unknown, absolute or contingent, arising or relating to the period before the Closing, except the Excluded Liabilities (the "**Assumed Liabilities**").

2.4    **Excluded Liabilities**.  Notwithstanding anything in this Agreement to the contrary, the Assumed Liabilities shall not include (i) any obligations and liabilities of Transferor described in Schedule 2.4 attached hereto or (ii) any obligations or liabilities of Transferor not related to the Transferred Assets, whether arising or related to the period before or following the Closing (the "**Excluded Liabilities**").

2.5    **Closing**.  In the event that the FERC Securities Order is issued on or before November 15, 2002, the consummation of the transactions contemplated in this Agreement (the "**Closing**") shall be held at 10:00 am, local time, on November 15, 2002 or at such other date or time as shall be mutually acceptable to the parties (the "**Closing Date**").  If the FERC Securities Order has not been issued by November 15, 2002, then on the Closing Date, the parties shall execute and deliver all documents and instruments, which shall be dated the Closing Date, contemplated to be delivered hereby or in connection herewith on or prior to the Closing to Crowley, Haughey, Hanson, Toole & Dietrich P.L.L.P. ("**CHHTD**") to be held in escrow by

5



CHHTD until the date on which the FERC Securities Order has been issued (the "**Effective Date**"). On the Effective Date, CHHTD shall release all such documents and instruments from escrow and the Closing shall be deemed to have occurred and all such documents and instruments shall be deemed effective and in full force and effect or otherwise delivered, filed or processed as directed by the parties. The Closing shall be held at the offices of the Transferor in Butte, Montana, or at such other place as shall be mutually acceptable to the parties.

     **2.6**    **Transactions and Documents at Closing.** At the Closing, Transferor shall convey to Transferee all of Transferor's right, title and interest in and to the Transferred Assets (and not the Excluded Assets), subject to the First Mortgage and in furtherance thereof shall deliver to Transferee a Bill of Transfer and Assignment in substantially the form attached hereto as Exhibit A, together with such other deeds, bills of sale, assignments, certificates of title, stock or unit certificates, documents and other instruments of transfer and conveyance as are specified in Section 7 hereof or as Transferee shall reasonably request (collectively, the "**Transfer Documents**"), and Transferee shall deliver to Transferor a Master Assumption Agreement in substantially the form attached hereto as Exhibit B pursuant to which Transferee shall assume the Assumed Liabilities (and not the Excluded Liabilities) together with such other documents and instruments as are specified in Section 8 hereof or as Transferor shall reasonably request (collectively, the "**Assumption Documents**").

     **2.7**    **Further Assurances.** Each party shall, at the request of any other party from time to time and at any time, whether on or after the Closing Date, and without further consideration, take such action and execute and deliver such deeds, assignments, transfers, assumptions, conveyances, powers of attorney, receipts, acknowledgements, acceptances, assurances and other documents as may be reasonably necessary or useful to procure for the party so requesting, and its successors and assigns, for aiding and assisting in collecting and reducing to possession, or for vesting and perfecting title to, any and all of the Transferred Assets or the Assumed Liabilities, or otherwise to satisfy and perform the obligations of the parties hereunder.

     **2.8**    **Grant of Easements.** Transferor will, at Transferee's request and expense and without additional consideration, grant to Transferee, at Closing and from time to time subsequent to Closing, all appropriate easements across lands included in the Excluded Assets (i) for existing electric and gas transmission and distribution lines and related facilities included in the Transferred Assets and (ii) for access to the Transferred Assets, on forms reasonably acceptable to Transferee.

**3.**    **REPRESENTATIONS AND WARRANTIES OF TRANSFEROR**

     To induce Transferee to enter into this Agreement, to acquire the Transferred Assets and to assume the Assumed Liabilities, Transferor represents and warrants to Transferee as follows:

     **3.1**    **Organization and Compliance.** Transferor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Montana.

**[SIGNATURES TO THIS TRANSFER AGREEMENT]**

       **IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

                                 **TRANSFEROR:**

                                 NORTHWESTERN ENERGY, L.L.C.

                                 By:

                                     Name:   Michael J. Hanson
                                     Title:   President and CEO

                                 **TRANSFEREE:**

                                 NORTHWESTERN CORPORATION

                                 By:

                                     Name:   Eric R. Jacobsen
                                                     Senior Vice President, General Counsel
                                     Title:   &amp; Chief Legal Officer

15



**[SIGNATURES TO THIS TRANSFER AGREEMENT]**

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**TRANSFEROR:**

NORTHWESTERN ENERGY, L.L.C.

By: _____
　　　Name: _____
　　　Title: _____

**TRANSFEREE:**

NORTHWESTERN CORPORATION

By: _____
　　　Name: _____
　　　Title: _____

15

G

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| NORTHWESTERN CORPORATION, | ) Case No. 03-12872 (CGC) |
|  | ) |
| Debtor. | ) |
|  | ) |
| MAGTEN ASSET MANAGEMENT CORPORATION | ) |
| & LAW DEBENTURE TRUST COMPANY OF NEW | ) |
| YORK, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) Adv. No. _____ |
|  | ) |
| NORTHWESTERN CORPORATION, | ) |
|  | ) |
| Defendant. | ) |

## COMPLAINT TO AVOID THE TRANSFER OF ASSETS OF CLARK FORK AND BLACKFOOT LLC (F/K/A NORTHWESTERN ENERGY LLC) <u>TO NORTHWESTERN CORPORATION</u>

Magten Asset Management Corporation (*"Magten"*) individually in its capacity as a

creditor of Clark Fork and Blackfoot, LLC (*"Clark Fork"*), and on behalf of Montana Capital I

(the *"Trust"*) together with Law Debenture Trust Company of New York (*"Law Debenture"* and

collectively with Magten *"the Plaintiffs"*), in its capacity as the Trustee under the Indenture for

the Unsecured Subordinated Debt Securities Relating to Trust Securities dated November 1,

1996 (the *"Indenture"*), and in its capacity as Guarantee Trustee under that certain Guarantee

Agreement dated November 1, 1996 (the *"Guarantee Agreement"*), for this complaint alleges as

follows:

      1.     Plaintiffs bring this adversary proceeding in accordance with Rule 7001 of the

Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) because NorthWestern

Corporation, the above-captioned debtor (the *"Debtor"*) received, in a fraudulent conveyance,

**EXHIBIT**

*G*

120087.01600/40138386v1

substantially all of the assets of its wholly owned subsidiary, Clark Fork (an entity formerly known as NorthWestern Energy, LLC (*"NWE"*)).

2.      At the time of the transfer of the assets of Clark Fork to the Debtor (the *"Transfer"*), the Debtor was the sole equity holder of Clark Fork. Using this control of Clark Fork, the Debtor transferred the assets and liabilities of Clark Fork to itself. The assets of Clark Fork were valued at between $1.15 billion and $1.4 billion while the assumed liabilities amounted to approximately $700 million. However, the Debtor's other liabilities were so excessive that, even after obtaining Clark Fork's assets for inadequate consideration, the Debtor could not pay its own creditors and ultimately filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      Prior to the Transfer, Clark Fork was a solvent and reasonably capitalized entity. The Transfer rendered Clark Fork insolvent and undercapitalized and thereby injured the creditors of Clark Fork, including Magten. The Transfer unjustly enriched the Debtor by hundreds of millions of dollars while destroying Clark Fork's solvency and, thus, its ability to meet its obligations to Magten and its other creditors.

4.      By this Complaint, Plaintiffs seek, among other things, (i) the avoidance of the Transfer, (ii) a declaration that the assets that were fraudulently transferred are not the property of the Debtor's estate in its chapter 11 case, (iii) the imposition of a constructive trust over the transferred assets for the benefit of the Trust, and (iv) the return of such assets to Clark Fork.[1]

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

6.      This proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H) and (O).

---

[1]      This Court set January 15, 2004, as the deadline for filing proofs of claim against the Debtor. Magten, as an individual holder of the QUIPS and Law Debenture Trust Company of New York, as Indenture Trustee, each filed timely proofs of claim for damages incurred as a result of the Transfer.

2

7.     Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

8.     Magten is a corporation validly organized and doing business under the laws of the State of Delaware.

9.     Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the *"QUIPS"*), issued by the Trust. The Trust is a business trust established pursuant to the Delaware Business Trust Act.

10.     The Trust was established by The Montana Power Company (*"Montana Power"*), predecessor in interest to Clark Fork (f/k/a NWE), as a financing vehicle. The sole asset of the Trust are the 8.45% Junior Subordinated Debentures due 2036 (the *"Junior Debentures"*). Section 610 of the Indenture governing the Junior Debentures grants to Magten, as a holder of the QUIPS, "the right to institute a legal proceeding directly against [the Debtor]" to enforce certain rights relating to the QUIPS or to the Amended and Restated Trust Agreement (the *"Trust Agreement"*).

11.     Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York.

12.     Law Debenture brings this complaint as a co-plaintiff in its capacity as successor trustee under the Indenture on behalf of all holders of the QUIPS.

13.     The defendant in this adversary proceeding is the Debtor in the above-captioned chapter 11 case.

14.     The Debtor is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota.

15.     On September 14, 2003, the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its businesses and manage its properties as a debtor in possession.

3

16.     The Debtor owns and operates utility companies in the United States. The Debtor and its direct and indirect nondebtor energy subsidiaries comprise of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 598,000 customers throughout Montana, South Dakota and Nebraska.

## BACKGROUND

### The Montana Power Company

17.     Montana Power was incorporated in 1961 under the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger of four regional electric companies.

18.     By the year 2000, Montana Power was engaged in activities related to telecommunications and energy related activities including activities in the fields of oil, coal, natural gas, and electricity.

19.     In November 1996, Montana Power and The Bank of New York (*"BNY"*) as Trustee entered into the Indenture. Law Debenture subsequently succeeded BNY as Trustee under the Indenture.

20.     Pursuant to the Indenture, Montana Power issued the Junior Debentures.

21.     Also in November 1996, pursuant to the Trust Agreement, Montana Power, BNY as Property Trustee and certain individuals as Administrative Trustees, created the Trust. Law Debenture and BNY are currently taking the necessary steps to enable Law Debenture to succeed BNY as Property Trustee.

22.     Pursuant to the Trust Agreement, the Trust issued the QUIPS.

23.     The Trust holds 100% of the Junior Debentures, with a total face amount of $65 million, which constitute its sole meaningful asset. The value of the QUIPS is entirely based on the value of the Junior Debentures, and, thus, the ability of Clark Fork to pay interest and principal to the Trust. Amounts paid by Clark Fork to the Trust are, in turn, paid by the Trust to the holders of the QUIPS.

4

24.    The Junior Debentures were not sold directly to investors. Rather, they were sold to BNY as Property Trustee under the Trust Agreement. Investors thereby acquired an indirect undivided beneficial interest in the Junior Debentures and obtained substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

25.    In connection with the Indenture, Montana Power agreed that the holders of the Junior Debentures would have the absolute and unconditional right to receive principal and interest. Under the Indenture, those payments of principal and interest were to be paid to the Property Trustee.

26.    Montana Power entered into the Guarantee Agreement with BNY (as Guarantee Trustee) in November 1996. Law Debenture subsequently succeeded BNY as Guarantee Trustee. Pursuant to the Guarantee Agreement, Montana Power, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust and to the extent that BNY, as Property Trustee has funds available in a specified account.

27.    Taken together Montana Power's obligations under the Indenture, the Trust Agreement, the Expense Agreement and the Guarantee provide, in the aggregate, a full, irrevocable and unconditional guarantee of payments of distributions and other amounts due to the holders of the QUIPS.

**The Sale of the Montana Power Company's Utility Assets**

28.    On March 28, 2000, The Montana Power Company, (*"Montana Power"*), announced plans to restructure its business. This restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane utility assets, in order to allow Montana Power to focus on its telecommunications business.

5

29.     On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with the Debtor, pursuant to which the Debtor agreed to purchase Montana Power's electric, natural gas and propane utility assets (the *"Montana Utility Assets"*). In order to facilitate the assets sale to the Debtor, Montana Power created a subsidiary, Montana Power Company LLC (*"MPLLC"*).

30.     On February 13, 2002, Montana Power merged its energy assets into MPLLC (the *"Merger"*). As a result of this, MPLLC held and operated the Montana Utility Assets.

31.     In connection with the Merger, on February 13, 2002, MPLLC entered into the First Supplemental Indenture, pursuant to which MPLLC assumed the obligations of Montana Power under the Indenture.

32.     In connection with the Merger, on February 13, 2002, pursuant to a letter agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

33.     On February 15, 2002 the Debtor's acquisition of MPLLC was completed with the payment by the Debtor of $478 million in cash to the parent of MPLLC and the assumption of $511 million of MPLLC liabilities. As a result of the acquisition, MPLLC became a wholly owned subsidiary of the Debtor.

34.     None of the cash paid for the Montana Utility Assets was retained by MPLLC. It was, thus, not thereafter available to assist Clark Fork in meeting its obligations to its creditors.

35.     On March 19, 2002, MPLLC was renamed NWE. NWE was a duly organized Montana limited liability company and is now known as Clark Fork.

36.     On August 13, 2002, the Debtor entered into the Second Supplemental Indenture, pursuant to which the Debtor assumed all of the obligations under the Indenture on a joint and several basis with Clark Fork.

37.     On August 13, 2002, the Debtor entered into an Amendment to the Guarantee Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Guarantee Agreement.

6

38.    On August 13, 2002, the Debtor entered into a letter agreement amending the Trust Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Trust Agreement.

39.    The Debtor was insolvent both immediately before and immediately after the assumption of liabilities.  The Debtor was engaged in business with unreasonably small capital and incurred debts beyond its ability to pay both immediately before and immediately after the assumption of liabilities.

**The Transfer**

40.    On November 15, 2002, Clark Fork transferred substantially all of its assets, the Montana Utility Assets, to the Debtor and retained only the Milltown Dam, a two megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers.  The Milltown Dam operates under a license that expires in 2007.

41.    Although Clark Fork transferred over $1 billion of assets to the Debtor, Clark Fork received no cash for the Transfer, and the only consideration was the assumption of certain liabilities (estimated to be only approximately $700 million) by the Debtor.  As a result of the Transfer, Clark Fork was rendered insolvent.

42.    Because Clark Fork was rendered insolvent and undercapitalized as a result of the Transfer, it is entirely dependent upon the Debtor for the continued funding of the Milltown Dam and, indeed, for the funding of its continuing corporate existence.  The Debtor funds the costs and expenses associated with the operation of the Milltown Dam under the terms of certain agreements with Clark Fork.

43.    In connection with the Transfer, on November 15, 2002, the Debtor executed the Third Supplemental Indenture, pursuant to which the Debtor expressly assumed the due and punctual payment of the principal and interest on the securities issued under the Indenture.

44.    On November 15, 2002, the Debtor executed the Guarantee Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Guarantee Agreement.

7

45.     On November 15, 2002, the Debtor executed the Trust Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Trust Agreement.

46.     Following the Transfer, the Debtor operated the Montana Utility Assets as part of the Debtor's NorthWestern Energy Division.

47.     On November 20, 2002, the Montana Power energy subsidiary was officially renamed Clark Fork. Clark Fork continues to operate the Milltown Dam.

**The Debtor's Attempt to Release Clark Fork**

48.     Article Eleven of the Indenture purports to release Montana Power (or its successor in interest) upon the transfer of substantially all of the assets of Montana Power if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

49.     Upon information and belief, in connection with the Transfer of the Montana Utility Assets, the Debtor requested that BNY, as the initial Trustee under the Indenture execute the Third Supplemental Indenture with language that expressly released Clark Fork from its obligations under the Indenture.

50.     Upon information and belief, BNY refused to execute the Third Supplemental Indenture in its capacity as Indenture Trustee if such contained a release of Clark Fork's obligations under the Indenture.

51.     The Third Supplemental Indenture, as executed by BNY in its capacity as Indenture Trustee did not include a release of Clark Fork's obligations under the Indenture.

52.     In additional, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

8

## FIRST CAUSE OF ACTION

### (The Transfer was Fraudulent Under Montana Law Because of an Actual Intent to Hinder, Delay, or Defraud Creditors)

53.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 52 as if fully set forth here.

54.    Under the Montana Code Annotated ("MCA") § 31-2-333, a transfer may be avoided if, the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor.

55.    Pursuant to MCA § 31-2-333, in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

56.    The QUIPS holders are creditors of the Debtor, and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

57.    The Debtor is the parent of Clark Fork and, as such, exercised complete control over Clark Fork. As a result of this relationship, the Debtor qualifies as an insider under Montana law.

58.    In connection with the Transfer, Clark Fork transferred assets to the Debtor that are valued between $1.15 billion and $1.4 billion, and the only consideration received for the Transfer was the assumption of approximately $700 million in liabilities.

59.    Prior to the Transfer, Clark Fork was a solvent entity. The transfer of substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become insolvent.

60.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity. The transfer of substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become undercapitalized.

9

120087.01600/40138386v1

61.    Because the Montana Utility Assets that the Debtor received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Debtor, Clark Fork did not receive reasonably equivalent value for the transfer.

## SECOND CAUSE OF ACTION

### (The Transfer was Fraudulent As a Constructive Fraud Which Rendered Clark Fork Insolvent)

62.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 61 as if fully set forth here.

63.    Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

64.    Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer.  The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

65.    After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities.  Despite the decimated asset pool, Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

66.    The Transfer rendered Clark Fork insolvent.

10

## THIRD CAUSE OF ACTION

### (The Transfer was Fraudulent As a Constructive Fraud Because it Rendered Clark Fork Undercapitalized)

67.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 66 as if fully set forth here.

68.    Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

69.    Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer.  The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

70.    After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities.  Despite the decimated asset pool, Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

71.    The Transfer rendered Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

72.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 71 as if fully set forth herein.

73.    The Debtor was the recipient of the Montana Utility Assets.

11

120087.01600/40138386v1

74.     The Transfer was fraudulent under MCA §§31-2-333 and 31-2-334.

75.     Prior to the Transfer, Clark Fork was solvent. As a result of the Transfer, the Debtor received assets valued between $1.15 billion and $1.4 billion, for which the assumption of $700 million of liabilities by the Debtor was less than reasonably equivalent value.

76.     Upon information and belief, the Montana Utility Assets comprise approximately 80% of the Debtor's consolidated EBITDA. In light of this and the fact that Clark Fork received less than reasonably equivalent value for the Transfer, the receipt by the Debtor of the Montana Utility Assets has unjustly enriched the Debtor and the Debtor's creditors.

77.     Absent the Transfer, the holders of the QUIPS would have received payment in full from Clark Fork, as a solvent utility company, on behalf of their claims. However, as a result of the Transfer, the holders of the QUIPS may receive nothing on account of their claims.

78.     The Junior Debentures were subordinated obligations to the other debt owed by Montana Power. Upon the assumption of liabilities by the Debtor, the Debtor has asserted that these obligations are junior to approximately $1.7 billion of senior debt. In light of the fact that the Debtor was insolvent at the time of the assumption of liabilities, the Debtor's creditors would be unjustly enriched if the QUIPS are treated as *pari passu* or junior to the Debtor's other indebtedness.

## PRAYER FOR RELIEF

*WHEREFORE*, Plaintiffs respectfully requests that the Court enter judgment against the Defendant[2] as follows:

---

[2]     Though not named herein, Plaintiffs hereby retain all rights to amend this complaint bring suit against all parties that orchestrated or other wise benefited from the Transfer.

120087.01600/40138386v1

(a)    Avoiding the Transfer;

(b)    Declaring that the Montana Utility Assets are not the property of the Debtor's estate in the chapter 11 case;

(c)    Imposing a constructive trust on the Montana Utility Assets for the benefit of the Trust and ordering the return of such assets to Clark Fork;

(d)    Attorney's fees and costs of this action; and

(e)    Such other relief as this Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

13

Dated: Wilmington, Delaware
    April __, 2004

**NIXON PEABODY LLP**

_John Snellings_
John V. Snellings (BBO No. 548791)
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1202
Facsimile: (866) 947-1732

Counsel for Law Debenture Trust
Company of New York

**BLANK ROME LLP**

_William J. Burnett /mmb_
William J. Burnett (DE No. 4078)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile:   (302) 425-6464

        - and -

**FRIED, FRANK, HARRIS, SHRIVER &
    JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
    Corporation