A



05 - 499

04/21/2004 07:48 FAX 4065873144          GOETZ LAW FIRM                    ☑002/011

1 | James H. Goetz
  | J. Devlan Geddes
2 | **GOETZ, GALLIK & BALDWIN, P.C.**
  | 35 North Grand
3 | P.O. Box 6580
  | Bozeman, MT 59771-6580
4 | Ph:   406-587-0618
  | Fax:  406-587-5144
5 |
6 | Bonnie Steingart   (*Pro Hac Vice* Application forthcoming)
  | John W. Brewer    (*Pro Hac Vice* Application forthcoming)
7 | **FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP**
  | One New York Plaza
8 | New York, New York 10004
  | (212) 859-8000
9 | ATTORNEYS FOR PLAINTIFF

FILED
BUTTE, MT

'04 APR 19  AM 10 57

PATRICK E. DUFFY, CLERK

BY _____

DEPUTY CLERK

10
11 |         IN THE UNITED STATES DISTRICT COURT
12 |            FOR THE DISTRICT OF MONTANA
13 |                  BUTTE DIVISION
14 |            * * * * * * * *
15 | MAGTEN ASSET MANAGEMENT CORPORATION,      Cause No. *CV-04-36-BU-RFC*
16 |                  Plaintiff,
17 |         -against-                          **COMPLAINT AND**
                                                **DEMAND FOR JURY TRIAL**
18 | MIKE J. HANSON, JACK D. HAFFEY, ERNIE J.
  | KINDT, and ELLEN M. SENECHAL,
19 |
20 |                  Defendants.
21 |        Plaintiff Magten Asset Management Corporation ("Magten"), by its undersigned attorneys,
22 | hereby alleges in support of its Complaint on personal knowledge as to its own acts and on information
23 | and belief as to all other matters as follows:
24 |                      **INTRODUCTION**
25 |        1.     Magten is a creditor of Clark Fork and Blackfoot, LLC ("Clark Fork"), formerly
26 | known as NorthWestern Energy, LLC ("NWE"), and prior to that known as The Montana Power
27 | Company LLC ("MPLLC"). Magten brings this lawsuit to obtain redress for the wrongful actions of
28 | defendants Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen M. Senechal, all of whom were

COMPLAINT AND DEMAND FOR JURY TRIAL                                      PAGE 1



EXHIBIT

A

1   officers of Clark Fork on November 15, 2002 and enabled the transfer on that date (the "Transaction")

2   of Clark Fork's key assets — electric, natural gas and propane utility assets (the "Montana Utility

3   Assets") — to its corporate parent NorthWestern Corporation ("NorthWestern") without adequate

4   consideration. The Transaction unjustly enriched NorthWestern by hundreds of millions of dollars while

5   destroying Clark Fork's solvency and thus its ability to meet its obligations to Magten and its other

6   creditors. The defendants, as officers of Clark Fork, had a fiduciary duty to Clark Fork's creditors not

7   to engage in transactions that would render Clark Fork insolvent. In connection with the Transaction,

8   Clark Fork purported to have NorthWestern assume Clark Fork's liabilities, but NorthWestern's other

9   liabilities were so massive that, even after paying inadequate consideration to Clark Fork for the

10  Montana Utility Assets, NorthWestern could not pay its own pre-existing creditors, and filed a

11  voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result of defendants'

12  actions, Magten is now owed well in excess of $20 million dollars by a company which defendants

13  rendered unable to meet its obligations to Magten. Magten seeks appropriate compensatory and

14  punitive damages, in an amount to be determined at trial.

15                                **THE PARTIES**

16        2.      Plaintiff is a corporation validly organized and doing business under the laws of the .

17  State of Delaware with its principal place of business in the State of New York and is, therefore,

18  deemed to be a citizen of Delaware and New York pursuant to 28 U.S.C § 1332(c)(1).

19        3.      Defendant Mike J. Hanson is a citizen of the State of Montana and is believed to reside

20  at 1805 C St., Butte, Montana 59701. As of November 15, 2002, Hanson was Chief Executive

21  Officer of Clark Fork.

22        4.      Defendant Jack D. Haffey is a citizen of the State of Montana, and is believed to reside

23  at 2101 Garfield St., Anaconda, Montana 59711. As of November 15, 2002, Haffey was President of

24  Clark Fork.

25        5.      Defendant Ernie J. Kindt is a citizen of the State of Montana, and is believed to reside

26  at 5 Amber Way, Butte, Montana 59701. As of November 15, 2002 Kindt was Vice President and

27  Chief Accounting Officer of Clark Fork.

28        6.      Defendant Ellen M. Senechal is a citizen of the State of Montana, and is believed to

04/21/2004 07:48 FAX 4065813144          GOETZ LAW FIRM                    @004/011

1   reside at 75 Park Drive, Clancy, Montana 59634.  As of November 15, 2002, Senechal was Vice

2   President, Treasurer and Chief Financial Officer of Clark Fork.

3                           JURISDICTION AND VENUE

4          7.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

5   1332, as it is between citizens of different States and the matter in controversy exceeds the sum or

6   value of $75,000, exclusive of interest and costs.

7          8.      Venue is proper pursuant to 28 U.S.C. 1391, because all defendants reside in this

8   judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this

9   judicial district.

10                 FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

11  The Montana Power Company

12         9.      The Montana Power Company ("Montana Power") was incorporated in 1961 under

13  the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger

14  of four regional electric companies.

15         10.     By the year 2000, Montana Power was engaged in activities related to

16  telecommunications and energy related activities including activities in the fields of oil, coal, natural gas,

17  and electricity.

18         11.     In November 1996, Montana Power and Bank of New York entered into that certain

19  Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities (the "Indenture").

20         12.     Pursuant to the Indenture, Montana Power issued the Junior Subordinated Interest

21  Debentures (the "Junior Debentures").

22         13.     At or about the same time, pursuant to the Amended and Restated Trust Agreement

23  (the "Trust Agreement") between itself and various other persons, Montana Power created Montana

24  Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act.

25  Bank of New York was designated as the Property Trustee of the Trust as well as serving as Trustee

26  under the Indenture.

27         14.     As detailed below, as of November 2002, Clark Fork had succeeded to Montana

28  Power's obligations with respect to the Junior Indentures.  The Bank of New York has been

COMPLAINT AND DEMAND FOR JURY TRIAL                                      PAGE 3

1    succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law

2    Debenture Trust Company of New York ("Law Debenture").

3          15.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued

4    the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS").

5          16.    The Trust holds 100% of the Junior Debentures, with a total face amount of

6    approximately $67 million, which constitute its sole meaningful asset. The value of the QUIPS is

7    entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay

8    interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would then in turn be

9    passed on by the Trust to the holders of the QUIPS.

10          17.    The Junior Debentures were not sold directly to investors; rather, purchasing the

11    QUIPS provided investors with substantially the same rights and the same potential investment return as

12    they would have had had they been able to own Junior Debentures directly. The entire structure of the

13    transaction was designed to put investors in the same position as if they had directly purchased the

14    Junior Debentures, while providing Montana Power with a more favorable accounting treatment than

15    would have been possible had the Junior Debentures been sold directly to the investing public.

16          18.    Accordingly, in Section 610 of the Indenture Clark Fork (as successor to Montana

17    Power) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the

18    Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the

19    Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue

20    directly to enforce the Property Trustee's rights.

21          19.    Magten owns in excess of 33% of the QUIPS.

22          20.    In connection with the Trust Agreement and the Indenture, Montana Power also

23    entered into a Guarantee Agreement with the Bank of New York as Guarantee Trustee (the

24    "Guarantee Agreement"). Pursuant to the Guarantee Agreement, Montana Power, as guarantor,

25    agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the

26    Trust, and to the extent the Property Trustee had funds available in a specified account. As with the

27    Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original

28    roles and responsibilities of Montana Power and Bank of New York respectively.

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 4

1    **The Sale of the Montana Power Company's Utility Assets**

2        21.    On March 28, 2000, Montana Power announced plans to restructure its business.  This

3    restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane

4    utility assets, in order to allow Montana Power to focus on telecommunications.

5        22.    On September 29, 2000, Montana Power entered into a Unit Purchase Agreement

6    with NorthWestern, pursuant to which NorthWestern agreed to purchase control of the Montana Utility

7    Assets, then owned by Montana Power, in a multi-step transaction.

8        23.    On February 13, 2002, Montana Power merged its energy assets into MPLLC (the

9    "Merger").  As a result of the Merger, MPLLC thereafter held and operated the Montana Utility

10    Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and

11    the QUIPS.

12        24.    Specifically, in connection with the Merger, on February 13, 2002, pursuant to the First

13    Supplemental Indenture, MPLLC assumed the obligations of Montana Power under the Indenture.

14        25.    In addition, in connection with the Merger, on February 13, 2002, pursuant to a letter

15    agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

16        26.    On February 15, 2002, NorthWestern purchased 100% of the equity of MPLLC, and,

17    thus, the corresponding control of the Montana Utility Assets, for $478 million in cash.  None of this

18    consideration was received or retained by MPLLC.  It was thus not thereafter available to Clark Fork

19    to assist Clark Fork in meeting its obligations to its creditors.

20        27.    On March 19, 2002, MPLLC was renamed NWE.

21        28.    On August 13, 2002, NorthWestern entered into the Second Supplemental Indenture,

22    whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the

23    Indenture.

24        29.    On August 13, 2002, NorthWestern entered into an Amendment to the Guarantee

25    Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

26    the Guarantee Agreement.

27        30.    On August 13, 2002, NorthWestern entered into a letter agreement amending the Trust

28    Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 5

1   the Trust Agreement.

2   **The Transfer**

3       31.     On November 15, 2002, defendants, as officers of Clark Fork, carried out a scheme

4   to defraud, injure and deprive Magten of the ability to receive the benefits due to it from Clark Fork in

5   connection with the Junior Debentures and the QUIPS, by, in the Transaction, transferring substantially

6   all of Clark Fork's assets, the Montana Utility Assets, to NorthWestern without receiving adequate

7   consideration in return. Clark Fork received no cash for the Transfer, and the consideration

8   purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets

9   were transferred to NorthWestern, and only approximately $700 million dollars in Clark Fork liabilities

10  were purportedly assumed by NorthWestern. Indeed, with respect to some if not all of the liabilities

11  purportedly assumed, NorthWestern was already a co-obligor with Clark Fork prior to the Transaction

12  and/or Clark Fork remained obligated jointly and severally with NorthWestern subsequent to the

13  Transaction, thus making any purported assumption of the liabilities in connection with the Transaction

14  valueless.

15      32.     In particular, NorthWestern was already a co-obligor as to Clark Fork's obligations

16  with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained   .

17  obligated jointly and severally with NorthWestern with respect to the Junior Indentures and QUIPS

18  subsequent to the Transaction. Indeed, Clark Fork requested Bank of New York (at the time still the

19  Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork

20  from its continuing obligations under the Indenture, but Bank of New York refused to provide such a

21  release.

22      33.     As an immediate result of the consummation of the Transfer, Clark Fork was insolvent.

23  Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior

24  Debentures and QUIPS and did not do so.

25      34.     Both prior to and following the Transaction, NorthWestern was itself insolvent, making

26  both its August 2002 assumption of liabilities with respect to the Junior Debentures and QUIPS and any

27  purported further assumption of those liabilities in connection with the Transaction of little or no value to

28  the holders of the QUIPS and other creditors of Clark Fork. Even the hundreds of millions of dollars

COMPLAINT AND DEMAND FOR JURY TRIAL                                          PAGE 6

1 by which it was unjustly enriched by the Transaction were insufficient to overcome the massive
2 imbalance between assets and liabilities created by its various other failed business ventures.

3       35.    The defendants all knew, should have known, and/or were reckless with respect to
4 knowing that Clark Fork would be rendered insolvent as a result of the Transaction and that
5 NorthWestern was insolvent both before and after the Transaction.

6       36.    No interest on the Junior Debentures was paid by either NorthWestern or Clark Fork
7 since prior to September 14, 2003. In excess of $2 million of interest on the Junior Debentures is now
8 past due. If paid, that interest would have been passed on by the Trust to the holders of the QUIPS
9 such as Magten. Moreover, the entire principal amount of the Junior Debentures was accelerated
10 pursuant to the terms of the Indenture no later than September 14, 2003.

11       37.    Following the Transaction, Clark Fork retained only the Milltown Dam, a two
12 megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license
13 that expires in 2007, and the related environmental liabilities.

14       38.    Following the Transaction, NorthWestern operated the Montana Utility Assets as part
15 of NorthWestern's NorthWestern Energy Division.

16       39.    After the Transaction, NWE remained a subsidiary of NorthWestern and on November
17 20, 2002, NWE was re-named Clark Fork.

18       40.    Clark Fork continues to operate the Milltown Dam.

19       41.    Clark Fork is entirely dependent upon NorthWestern for continued funding of the
20 Milltown Dam and its corporate existence, and NorthWestern is required, under certain agreements
21 with Clark Fork, which require NorthWestern to pay any costs and expenses that arise in connection
22 with the operation of the Milltown Dam.

23       42.    Less than a year later, on September 14, 2003, NorthWestern filed a voluntary petition
24 for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the
25 District of Delaware.

26       43.    The Montana Utility Assets generate approximately 80% of NorthWestern's
27 consolidated EBITDA, although NorthWestern did not pay fair value for those assets, thus injuring
28 Magten and Clark Fork's other creditors.

COMPLAINT AND DEMAND FOR JURY TRIAL                                                    PAGE 7

44.    The Montana Utility Assets are now available to all creditors of NorthWestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in NorthWestern's reorganization plan.

45.    On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in NorthWestern's bankruptcy case for leave to commence an adversary proceeding against NorthWestern seeking to have the Transaction set aside as a fraudulent conveyance.

## STATEMENT OF CLAIM

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

46.    Plaintiff repeats and realleges paragraphs 1-45 and incorporates them herein by reference.

47.    Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, defendants, as officers of Clark Fork, owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

48.    The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

49.    The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

50.    Defendants breached their fiduciary duties to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

51.    Defendants also breached their fiduciary duties to the Trust and Magten's predecessors

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 8

1  in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and

2  QUIPS to NorthWestern, when they knew NorthWestern was insolvent and would remain insolvent,

3  and would thus be unable to perform those obligations.

4      52.    By reason of the foregoing acts, practices and course of conduct, the defendants have

5  breached their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss,

6  in an amount to be proven at trial, but in excess of $20 million.

7      53.    Punitive damages in an amount to be determined at trial should also be awarded due to

8  the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

9

10  **PRAYER FOR RELIEF**

11

12      WHEREFORE, plaintiff respectfully requests that this Court enter judgment against defendants

13  as follows:

14      1.    Awarding plaintiff compensatory and punitive damages, in an amount

15  determined at trial but in excess of $20 million;

16      2.    Awarding plaintiff all allowable costs, attorneys' fees and other litigation

17  expenses to the extent recoverable under law; and

18      3.    Awarding plaintiff such other and further relief as to this Court may be just,

19  proper and equitable.

20      DATED this 15th day of April, 2004.

21

22      GOETZ, GALLIK & BALDWIN, P.C.

23

24

25

26      By: _____

27      For:   James H. Goetz

    ATTORNEYS FOR PLAINTIFF

28

COMPLAINT AND DEMAND FOR JURY TRIAL                    PAGE 9

## DEMAND FOR JURY TRIAL

3  Plaintiff hereby demands a trial by jury on all issues so triable.

5  DATED this 15th day of April, 2004.

7  GOETZ, GALLIK & BALDWIN, P.C.

11  By: _____
          James H. Goetz

12  ATTORNEYS FOR PLAINTIFF

15  E:\JIM\Karen\Magten Asset Mgmt Corp 4032\Pleadings\Complaint.4 15 04.wpd

**COMPLAINT AND DEMAND FOR JURY TRIAL**                    **PAGE 10**

**B**

Exhibit 4(c)

THE MONTANA POWER COMPANY

TO

THE BANK OF NEW YORK

Trustee

INDENTURE
(FOR UNSECURED SUBORDINATED DEBT SECURITIES
RELATING TO TRUST SECURITIES)

DATED AS OF _____, _____

EXHIBIT
B

however, so long as a Trust holds Securities of any series, such
Trust may not waive compliance or waive any default in compliance
by the Company with any covenant or other term contained in this
Indenture or the Securities of such series without the approval
of the holders of at least a majority in aggregate liquidation
preference of the outstanding Preferred Securities issued by such
Trust affected, obtained as provided in the Trust Agreement
pertaining to such Trust.

SECTION 608.   RESTRICTION ON PAYMENT OF DIVIDENDS.
        The Company shall not, and shall not permit any
subsidiary to, (a) declare or pay any dividends or distributions
on, or redeem, purchase, acquire or make a liquidation payment
with respect to, any of the Company's capital stock (other than
dividends or distributions in common stock of the Company), or
(b) make any payment of principal of or, interest or premium, if
any, on or repay or repurchase or redeem any debt securities
(including other Securities) that rank pari passu with or junior
in interest to the Securities or make any guarantee payments with
respect to such indebtedness if at such time (i) there shall have
occurred and be continuing a payment default pursuant to Section
801(a) or 801(b) (whether before or after expiration of any
period of grace), or (ii) the Company shall have elected to
extend any interest payment period as provided in Section 312,
and any such period, or any extension thereof, shall be
continuing.

SECTION 609.   MAINTENANCE OF TRUST EXISTENCE.

        So long as Preferred Securities of any series remain
outstanding, the Company shall (i) maintain direct or indirect
ownership of all interests in the Trust which issued such
Preferred Securities, other than such Preferred Securities, (ii)
not voluntarily (to the extent permitted by law) dissolve,
terminate, liquidate or wind up such Trust, except in connection
with a distribution of the Securities to the holders of the
Preferred Securities in liquidation of such Trust or in
connection with certain mergers, consolidations or amalgamations
permitted by the Trust Agreement, (iii) remain the sole Depositor
under the Trust Agreement (the "Depositor") of such Trust and
timely perform in all material respects all of its duties as
Depositor of such Trust, and (iv) use reasonable efforts to cause
such Trust to remain a business trust and otherwise continue to
be treated as a grantor trust for Federal income tax purposes
provided that any permitted successor to the Company under this
Indenture may succeed to the Company's duties as Depositor of
such Trust; and provided further that the Company may permit such
Trust to consolidate or merge with or into another business trust
or other permitted successor under the Trust Agreement pertaining
to such Trust so long as the Company agrees to comply with this
Section 609 with respect to such successor business trust or
other permitted successor.

SECTION 610.   RIGHTS OF HOLDERS OF PREFERRED SECURITIES.
        The Company agrees that, for so long as any Preferred
Securities remain outstanding, its obligations under this
Indenture will also be for the benefit of the holders from time
to time of Preferred Securities, and the Company acknowledges and
agrees that if the property trustee under the related Trust
Agreement (the "Property Trustee") fails to enforce its rights
with respect to the Securities or the related Trust Agreement, a
holder of Preferred Securities may institute a legal proceeding
directly against the Company to enforce the Property Trustee's

rights with respect to the Securities or such Trust Agreement, to
the fullest extent permitted by law, without first instituting
any legal proceeding against the Property Trustee or any other
person or entity.

ARTICLE SEVEN

SATISFACTION AND DISCHARGE

SECTION 701.  SATISFACTION AND DISCHARGE OF SECURITIES.
        Any Security or Securities, or any portion of the
principal amount thereof, shall be deemed to have been paid for
all purposes of this Indenture, and the entire indebtedness of
the Company in respect thereof shall be deemed to have been
satisfied and discharged, if there shall have been irrevocably
deposited with the Trustee or any Paying Agent (other than the
Company), in trust:

        (a)  money in an amount which shall be sufficient, or
        (b)  in the case of a deposit made prior to the Maturity
of such Securities or portions thereof, Government
Obligations, which shall not contain provisions permitting the
redemption or other prepayment thereof at the option of the
issuer thereof, the principal of and the interest on which
when due, without any regard to reinvestment thereof, will
provide moneys which, together with the money, if any,
deposited with or held by the Trustee or such Paying Agent,
shall be sufficient, or

        (c)  a combination of (a) or (b) which shall be
sufficient,

to pay when due the principal of and premium, if any, and
interest, if any, due and to become due on such Securities or
portions thereof on or prior to Maturity; provided, however, that
in the case of the provision for payment or redemption of less
than all the Securities of any series, such Securities or
portions thereof shall have been selected by the Trustee as
provided herein and, in the case of a redemption, the notice
requisite to the validity of such redemption shall have been
given or irrevocable authority shall have been given by the
Company to the Trustee to give such notice, under arrangements
satisfactory to the Trustee; and provided, further, that the
Company shall have delivered to the Trustee and such Paying
Agent:

        (x)  if such deposit shall have been made prior to
the Maturity of such Securities, a Company Order stating
that the money and Government Obligations deposited in
accordance with this Section shall be held in trust, as
provided in Section 703; and

        (y)  if such deposit shall have been made prior to
the Maturity of such Securities, an Opinion of Counsel to
the effect that the Holders of such Securities will not
recognize income, gain or loss for Federal income tax
purposes as a result of the satisfaction and discharge of
the Company's indebtedness in respect of such Securities,
and such Holders will be subject to Federal income
taxation on the same amounts and in the same manner and
at the same times as if such satisfaction and discharge
had not occurred.

C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |

## FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE PLAN OF REORGANIZATION OF THE DEBTOR

**PAUL, HASTINGS, JANOFSKY & WALKER , LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
Telephone: (404) 815-2400

Co-Counsel to the Debtor
and Debtor-in-Possession

**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

Dated:    May 17, 2004
              Wilmington, Delaware

ATL/993177.56



EXHIBIT

C

The Debtor has articulated its intent to request the MPSC to authorize periodic adjustments to utility rates based upon increases in the Debtor's property tax obligations. Such adjustments could result in rate changes that would require MPSC approval prior to (or following) Plan confirmation.

The Debtor, the MPSC and the MCC have conducted, either directly or through representatives, a series of meetings and discussions with respect to the Debtor's Chapter 11 case, the Financial Investigation and the regulatory climate in Montana in which the Reorganized Debtor will operate. The Debtor, the MPSC and the MCC have recently reached an agreement in principle to resolve the issues by and among the Debtor, the MPSC and the MCC. The stipulation and settlement agreement, contemplated by the agreement in principle, will resolve both the Financial Investigation and the disputes pending before the Bankruptcy Court, including the Debtor's motion to enforce the automatic stay. See Exhibit E. This agreement in principle, if concluded, will be implemented by way of a compromise and settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and thereafter by entry of an order by the MPSC implementing the terms of the stipulation and settlement agreement.

**E.    Events Precipitating Chapter 11 Filing**

Several factors contributed to the Debtor's pre-petition financial difficulties. The Debtor incurred a significant amount of debt as a result of the investments it made in Expanets, Blue Dot, and CornerStone, and with respect to the Debtor's purchase of the Montana Operations. The Montana Operations have contributed substantially to the Debtor's revenues and operating income, but Expanets, Blue Dot, and CornerStone performed poorly. The Debtor's non-regulated businesses adversely impacted its overall results of operations, financial condition and liquidity. By late 2002, the Debtor was significantly overleveraged, with current and projected income insufficient to support existing debt levels, and the Debtor determined that it would never recover its investments in Expanets, Blue Dot, and CornerStone, each of which is or was a non-regulated energy business, and that these entities would not generate cash flows in sufficient amounts to provide meaningful contributions to the Debtor's debt service. On December 31, 2002, the Debtor had a common stockholders' deficit of $456.1 million and on September 30, 2003, the common stockholders' deficit was $556.6 million. On the date that the Debtor filed its petition, it had approximately $2.2 billion in debt and trust preferred instruments outstanding.

Expanets was a nationwide provider of networked communications and data services and solutions to small to mid-sized businesses. Expanets' business and financial condition was severely and adversely impacted by the downturn in the economy that began in 2000 and performance problems with its "EXPERT" enterprise system. The Debtor recorded losses before minority interests with respect to Expanets of $19.8 million, $87.0 million and $445.6 million in fiscal 2000, 2001 and 2002, respectively. As of December 31, 2003, after impairment charges and recognition of net losses, the net recorded book value of the Debtor's aggregate $364.1 million equity investment in Expanets and $225.7 million of intercompany advances to Expanets was reduced to $49.8 million. Expanets sold its assets to Avaya on November 25, 2003. Avaya paid Expanets (n/k/a Netexit, Inc.) ("Netexit") cash of approximately $50.8 million and assumed debt of approximately $38.1 million. In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not

D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                               )
                                     )    Chapter 11
NORTHWESTERN CORPORATION,            )
                                     )    Case No. 03-12872 (CGC)
                          Debtor.    )
                                     )

## MEMORANDUM DECISION

Jess H. Austin, III                      Kathleen M. Miller
Karol K. Denniston                       Smith, Katzenstein & Furlow LLP
Paul, Hastings, Janofsky & Walker LLP    P.O. Box 410
600 Peachtree Street, Suite 2400         800 Delaware Avenue
Atlanta, GA 30308                        Wilmington, DE 19899

David L. Finger                          - and -
Charles Slanina
Finger & Slanina, LLC                    Bijan Amini
One Commerce Center                      Storch Amini & Munves PC
1201 Orange Street, Suite 725            2 Grand Central Tower
Wilmington, DE 19801-1155                New York, NY 10017

- and -                                  Attorneys for Magten Asset Management
                                            Corporation

Dennis E. Glazer
D. Scott Tucker
Catherine Lifeso
David Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Attorneys for Paul, Hastings, Janofsky
   & Walker LLP



Scott D. Cousins
William E. Chipman, Jr.
Charles Michael Terribile
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

Attorneys for Debtors and Debtors-in-
     Possession

Dated:  July 23, 2004

**CASE, J.**

Magten Asset Management Corporation ("Magten") has filed a motion to disqualify

Debtor's counsel, Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") [Docket No. 1502].

A hearing was held on July 15, 2004, after which the matter was taken under advisement. For

the reasons set forth below, the motion will be denied.

## I.    BACKGROUND FACTS

In 2002, certain power and distribution assets owned by Montana Power Company were

transferred to Montana Power LLC, now known as Clark Fork and Blackfoot, LLC ("Clark

Fork"). The Debtor acquired the equity ownership in Clark Fork. Thereafter, the energy assets

were transferred from Clark Fork to the Debtor; the Debtor assumed certain obligations of Clark

Fork and Montana Power, including approximately sixty-seven million dollars in 8.45% junior

subordinated deferrable interest debentures due 2036. Paul Hastings represented the Debtor and

Clark Fork, its wholly owned subsidiary, in connection with this transfer of assets and

assumption of liabilities, referred to in these proceedings as the "going flat" transaction. The

Debtor has consistently alleged, and Magten has never disputed, that Magten did not own any of

the debentures prior to the time the assets were transferred to the Debtor. Rather, Magten

acquired the debentures after the transaction was complete. Therefore, the Debtor asserts and

Magten has not disputed, that Magten was never a creditor of Clark Fork at a time when Clark

Fork held the disputed energy assets. Rather, Magten became a holder of the debentures only

after the transaction was completed and was a matter of public record.

On September 14, 2003, the Debtor filed a voluntary petition for relief under chapter 11

of the Bankruptcy Code. An application to employ Paul Hastings as counsel for the Debtor and

3

Debtor-in-Possession was filed soon thereafter, accompanied by an affidavit of Jesse H. Austin III, lead counsel for Paul Hastings. An order approving the application was entered in due course thereafter.

On January 14, 2004, (Docket No. 686), Magten filed a notice of appearance and request for service of papers. This motion was filed by Magten on June 18, 2004.

A hearing on confirmation of the Debtor's plan is currently scheduled for August 25, 2004.

Boiled to its essence, Magten argues that Paul Hastings should be disqualified for two reasons:

1.  Paul Hastings did not adequately disclose that it represented both the Debtor and Clark Fork in the "going flat" transaction. It therefore violated its obligations under section 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure to disclose "all connections" that it has with all parties in interest[1]. Because of this inadequate disclosure, Magten argues that Paul Hastings should now be disqualified.

2.  Whether the disclosure was adequate or not, Paul Hastings should be disqualified because it has an actual and irreconcilable conflict of interest resulting from its dual representation of the Debtor and Clark Fork. The basis for this assertion is Magten's contention that the interests of Clark Fork (and its creditors, to whom Magten argues Paul Hastings owed a fiduciary obligation) were harmed because

---

[1]    Paul Hastings filed a supplemental affidavit disclosing this dual representation on July 7, 2004.

4

the assets were transferred for virtually no consideration. Magten argues that it is

a creditor of Clark Fork because it holds debt instruments, the junior subordinated

debentures, on which Clark Fork was obligated at the time the assets were

transferred.

## II.    ANALYSIS

### A.    The Disclosure Issue

It is clear that the initial disclosure by Paul Hastings was inadequate. Although Paul

Hastings now argues that there was no conflict because the transaction benefitted both parties,

that is not the test for disclosure. Section 327 and Rule 2014 make it clear that *all connections*

must be disclosed whether they give rise to an actual conflict of interest or not. Paul Hastings

failed to do this.

At the hearing, the attorney for the United States Trustee advised the Court and other

parties that he had thoroughly vetted the dual representation with Paul Hastings at the beginning

of the case and that he was satisfied with the explanations given. While he stated that he

believed the dual representation was a matter of public record, he did not share that information

with others nor did he request that Paul Hastings file a supplemental affidavit of disclosure. In

retrospect, he acknowledged that this was a mistake. Nevertheless, these representations by the

attorney for the United States Trustee support the conclusion that there was no conscious effort

by Paul Hastings to conceal its dual representation. This fact is relevant to what remedy, if any,

should be imposed for the inadequate disclosure.

As noted above, following a hearing at which counsel for Magten asked the Court to

direct Paul Hastings to file a supplement disclosure, and the Court so ordering, Paul Hastings did

5

file the July 7, 2004 affidavit. Therefore, as of this time, the matter has been fully and adequately

disclosed. The issue presented is whether the previous failure to disclose justifies

disqualification at this point.

The answer is no. Inadequate disclosure does not mandate disqualification of counsel.

Rather, the appropriate remedy is left to the broad discretion of the court. *See, e.g., In re Best*

*Craft Gen. Contractor and Design Cabinet, Inc.*, 239 B.R. 462 (Bankr. E.D.N.Y. 1999). In this

case, the disclosure was made at the outset of the case to the United States Trustee and formal

disclosure was later made. Also, as noted, the prior disclosure to the United States Trustee is

indicative of a lack of intent to conceal. Further, as discussed in the next session, this is not a

case where full disclosure would have revealed an actual conflict. Rather, full disclosure would

have alerted all parties to facts that should have been known but which, in the end, do not bear

upon Paul Hastings' qualification to serve as counsel. For these reasons, the Court will not now

disqualify Paul Hastings for its previous failure to disclose.

B.    Is There a Conflict?

A primary purpose of the disclosure rules is to allow parties in interest, and the Court, to

determine whether the proposed counsel is disinterested and whether such counsel holds or

represents an interest adverse to the estate. The question presented here, therefore, is whether

Paul Hastings prior dual representation meets either of those standards. It does not.

This motion has been brought solely by Magten; no other creditor has joined. As noted

above, Magten was not a creditor of Clark Fork at the time the transaction took place. Rather, it

only became a creditor of the Debtor after the Debtor assumed the liability associated with the

junior subordinated debenture initially issued by Montana Power Company. Thus, Magten is not

6

only not a party directly affected by the transaction - such as Clark Fork itself - but it was also not

an indirect party at the time the transaction took place. Thus, its relationship to the transaction

for the purposes of asserting a disqualification motion is tenuous at best.

Here, neither the Debtor nor Clark Fork, the two parties directly involved, have

complained. Indeed, the transaction was approved by the boards of directors of each company

and was perceived by them to be in the best interests of those companies.

At bottom, Magten's argument is that Paul Hastings must be disqualified for its dual

representation because Magten, as a third party who claims to have been injured by the

transaction, is now challenging it. This is a novel theory that does not withstand scrutiny. First,

as noted, even if third party creditors were injured by the transaction, Magten was not one of

them. Second, there is no present proof of injury in any event; while that issue has been asserted

in Adversary Proceeding No. 04-53324, captioned <u>Magten Asset Management Corporation v.

NorthWestern Corporation</u>, pending before this Court, no such finding has yet been made. Thus,

there is no basis for asserting actual injury that may create an actual conflict. Finally, even if

actual injury were eventually proven, the fact that Paul Hastings represented the injured party,

Clark Fork, would not necessarily mean that it holds an interest adverse to this estate or any class

of its creditors. Clark Fork is not a debtor; therefore, the test is not whether Paul Hastings holds

an interest adverse to a class of Clark Fork's creditors but whether it holds an interest adverse to

a class of Northwestern's creditors. Yes, Magten is a member of a class of the Debtor's

creditors–the subordinated debenture holders–but it asserts it has been injured not in that capacity

7

(after all, the Debtor assumed its debt), but in its non-existent capacity as a creditor of Clark

Fork.[2] The prohibition against counsel holding an "adverse interest" does not stretch so far.

## III.    CONCLUSION

For the foregoing reasons, Magten's motion to disqualify is denied.  An order is to be

submitted under certification of counsel.

Charles G. Case, II
United States Bankruptcy Judge

---

[2]    The gist of the fraudulent conveyance claim asserted in Adv. Proc. 04-53324 is that
the utility assets should be returned to Clark Fork to be shared only by its creditors, rather than be
subject to claims of NorthWestern's other creditors whose debts did not originate with Montana
Power.

8

E

UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re NORTHWESTERN CORPORATION, | ) ) ) | In Chapter 11 proceedings |
| | ) | Case No. 03-12872 (CGC) |
| Debtor. | ) ) | |
| | ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION & LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) | ADV. NO. 04-53324 (PBL) |
| Plaintiffs, | ) ) ) | UNDER ADVISEMENT DECISION RE: MOTION TO DISMISS |
| v. | ) ) | |
| NORTHWESTERN CORPORATION, | ) ) | |
| Defendant. | ) ) | |

## I.    Introduction

Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively referred to hereafter as "Plaintiffs") filed a complaint against Debtor NorthWestern Corporation in April, 2004, challenging the prepetition transfer from Clark Fork and Blackfoot, LLC ("Clark Fook"), fka NorthWestern Energy, LLC, of essentially all of its assets to its parent corporation Debtor NorthWestern. The crux of Plaintiffs' complaint is that Debtor caused the transfer of over $1 billion in Clark Fork assets to itself in exchange for the assumption by Debtor of only about $700 million in Clark Fork liabilities. Plaintiffs allege the transfer ultimately left Debtor unable to pay its own creditors and resulted in Debtor's bankruptcy, under which Plaintiffs will receive virtually nothing. Further, the transfer rendered Clark Fork insolvent and undercapitalized, again leaving Plaintiffs, as creditors of Clark Fork, with nothing. Not only was the transfer itself a fraudulent conveyance, Plaintiffs argue, but Debtor also engaged in a fraudulent scheme by misrepresenting its financial standing at the time of the transfer.

In Count I, Plaintiffs contend that Debtor made the transfer with the actual intent to hinder,



delay or defraud its creditors as defined by section 31-20333 of the Montana Code. In Counts II and III, Plaintiffs allege that the transfer was fraudulent under section 31-2-334 of the Montana Code because Debtor made the transfer without receiving equivalent value and because Debtor was insolvent at the time or rendered insolvent as a result of the transfer. In Count IV, Plaintiffs allege that Debtor and its creditors were unjustly enriched by the transfer.

## II.     Factual Background

In 1996, the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork/Northwestern Energy, created the Montana Power Capital Trust I ("Trust") as a financing vehicle with the Bank of New York ("BNY") as Trustee. The sole asset of the Trust was 8.45% Junior Subordinated Debentures due 2036 ("Junior Debentures"). After formation of the Trust, Montana Power and BNY entered into the Indenture for Unsecured Subordinated Debt Securities relating to the Trust Securities ("Indenture"). At about the same time, the Trust issued $65 million of 8.45% cumulative Quarterly Income Preferred Securities ("QUIPS"), Series A, the proceeds of which were used to purchase an equal amount of Junior Debentures, 8.45% Series due 2036, from Montana Power. Montana Power also entered into a Guarantee Agreement with BNY, under which Montana Power provided a limited guarantee of obligations with respect to the QUIPS – "only if and to the extent that the Property Trustee has available in the Payment Account funds sufficient to make payment."

Four years later, in 2000, Debtor NorthWestern purchased substantially all of Montana Power's electric, natural gas, and propane utility assets under a Unit Purchase Agreement. The structure of the sale was as follows. Montana Power created a subsidiary called The Montana Power LLC ("MP-LLC"), which Debtor intended to acquire as a division of itself as opposed to a subsidiary. The parties refer to such an acquisition as "going flat."

The going flat deal was disclosed to the Federal Energy Regulatory Commission ("FERC") by Debtor and Montana Power in their Joint Application of the Montana Power Company and NorthWestern Corporation for Approval of Disposition of Jurisdictional Facilities. In the application, the parties indicated that the proposed sale was not contingent on any particular

structure, but that NorthWestern intended to either form a holding company to acquire MP-LLC as a wholly owned subsidiary or to acquire MP-LLC in its current "flat" structure such that MP-LLC would become a separate division of NorthWestern and not a subsidiary. After resolving a variety of issues with respect to the transfer, it was approved by both the FERC and the Montana Public Service Commission.

The assets were then transferred to MP-LLC by Montana Power in February, 2002. As part of this conveyance, the MP-LLC and BNY, as Trustee, executed a supplemental indenture under which MP-LLC assumed all obligations of Montana Power under the original Indenture. Subsequently, Debtor NorthWestern's acquisition of MP-LLC was completed with the payment of $478 million cash and the assumption of $511 million of MP-LLC's liabilities, which included the claims of the QUIPS and the Indenture. MP-LLC was then a subsidiary of Debtor and renamed NorthWestern Energy, LLC.

In order to "go flat" with the now named Northwestern Energy, as it originally intended, Debtor disclosed to the SEC that it intended "to transfer the energy and natural gas transmission and distribution operations of NorthWestern Energy, LLC to NorthWestern Corporation." NorthWestern accomplished this by executing a Second Supplemental Indenture with NorthWestern Energy and the Trustee BNY, in which it contends it "fully and unconditionally assumed NorthWestern Energy's obligations (as successor to MP-LLC, as the successor to Montana Power) with respect to the QUIPS and the performance of every covenant, obligation and agreement under the Indenture." It apparently paid no cash for NorthWestern Energy's assets, but assumed all its liabilities except those associated with the Milltown Dam. The Second Supplemental Indenture also expressly subordinated the obligations Debtor assumed from NorthWestern Energy to its "Senior Indebtedness" and released NorthWestern Energy from any and all obligations under the QUIPS debenture, the Indenture and the Second Supplemental Indenture.

NorthWestern, Northwestern Energy and BNY also executed the Amendment to Guaranty Agreement whereby NorthWestern attempted to assume completely the limited obligations of Montana Power under the original Guaranty Agreement. Debtor subsequently sought and received

3

the FERC's approval to assume the QUIPS, along with other debt of NorthWestern Energy. A Third Supplemental Indenture was executed in which Debtor expressly assumed "the covenants of NorthWestern Energy contained in the Indenture and the Securities issued thereunder" and assumed the payments of principal and premium on outstanding securities issued under the Indenture and the performance of every covenant thereunder. Subsequently, NorthWestern Energy was renamed Clark Fork and Blackfoot, LLC.

Plaintiff Magten holds in excess of 33% of the Series A, 8.45% QUIPS issued by the Trust. Plaintiff Magten purchased its share of the QUIPS *after* the transfer of NorthWestern Energy's assets to Debtor and sometime shortly before or after Debtor filed bankruptcy. Plaintiff Law Debenture is the successor trustee to BNY under the Indenture on behalf of the holders of the QUIPS.

As a result of these transfers, Plaintiffs complain that they have relegated to the bottom of the heap of Debtor's creditors. While they (or their predecessors) were once essentially at the top of the heap of Clark Fork's creditors, upon the transfer to Debtor, they were subordinated to Debtor's senior creditors, which in essence left them with little at the end of the day under Debtor's Plan. By this action, they seek to undo the transfer so that the assets will be returned to Clark Fork.

### III. Analysis

Debtor NorthWestern seeks dismissal of Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in bankruptcy proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. In determining whether to grant the motion to dismiss, this Court must assume the facts as pled in the complaint are true. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Debtor begins by challenging Plaintiffs' standing, alleging that they are creditors of Debtor NorthWestern only and not of Clark Fork. The standing argument highlights the difficulty with this case. This is not a typical fraudulent conveyance complaint where the *debtor in possession* sues a *third party* seeking to bring assets back *into* the estate. Instead, this is an alleged *creditor of a non-debtor* suing the *Debtor* in order to *divest the estate* of assets and return them to the non-debtor. Acknowledging that they must be creditors of Clark Fork to bring this action, Plaintiffs argue that

4

they are so due to the invalidity of the transfers.

Debtor says this is impossible, as the very structure of the transfer ended any debtor-creditor relationship between Plaintiffs and Clark Fork. Debtor argues that any transfers of assets completed in accordance with Section 1101 of the Indenture result in the successor entity (Debtor in this case) succeeding to and being substituted for the prior entities (Clark Fork) such that the successor entity (Debtor) is the only entity obligated to the QUIPS. Critically, Section 1102 of the Indenture in turn expressly relieves the predecessor entity, here Clark Fork, of all obligations and covenants under the Indenture. The QUIPS holders, therefore, are creditors solely of Debtor as long as the transfer was in compliance with Section 1101 of the Indenture, which Debtor contends Plaintiffs do not challenge.

A.    **Did Debtor Comply with the Indenture?**

1.    Is there a guarantee of solvency?

Plaintiffs disagree for several reasons. First, Plaintiffs argue that because Debtor used false financial statements and was insolvent, it did not in fact comply with the terms of the Indenture and, therefore, did not properly assume Clark Fork's liabilities: Clark Fork is therefore still liable to Plaintiffs. In support of this position, Plaintiffs point to two requirements in Section 1101 of the Indenture requiring Debtor to "assume . . . [1]the due and punctual payment of the principal and premium, if any, and interest, if any on all Outstanding Securities *and [2]* the performance of every covenant of this Indenture on the part of [Clark Fork] to be performed or observed." Plaintiffs assert that, because Debtor is unable to make the payments due the QUIPS, Debtor did not in fact comply with the terms of Section 1101 of the Indenture.

Plaintiffs argument is flawed. Plaintiffs read this language as a guarantee of solvency by Debtor upon executing the transfer. It is not. The language only requires that Debtor assume the obligations, not that it actually be able to perform the obligations. Debtor in fact did assume the obligations.

2.    Was Consent of the Holders Required?

Plaintiffs also argue that Debtor's alleged insolvency wrongfully impaired their rights

5

under the Indenture to receive payment of principal and interest and therefore the transaction had to be approved by the holders of the securities. This argument is similarly misplaced. While the Indenture and the Trust Indenture Act of 1939 do in fact provide that "the right of any holder of any indenture security to receive payment of the principal of and interest on such security . . . shall not be impaired," this applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself. Plaintiffs' legal rights were not impaired. Again, there is no guarantee against default.

**B.    Are the Plaintiffs Creditors Under The Guarantee?**

Plaintiffs are also not creditors of Clark Fork by way of the Guarantee Agreement that is part of the original debt transaction. Both parties have treated this argument in a superficial and conclusory fashion; it is more complicated than it seems.

As noted, the QUIPS were issued in a two-step transaction. Montana Power Company (referred to for ease of reference as "Clark Fork") issued subordinated debentures (the "Debentures"), all of which were purchased and held by the Trust. The Trust, in turn, issued the QUIPS to Holders, such as Magten's predecessor in interest, in consideration of payment of a corresponding pro rata amount of the Debentures (which funds were then used to purchase that amount of the Debentures). The Holders then were entitled to a specific percentage of the distributions made by Clark Fork to the Trust on account of the Debentures.[1]

The Guarantee appears to exist as protection against the unlikely event that Clark Fork makes required distributions to the Trust but the Trust thereafter fails to distribute the funds to the Holders. Although it contains many of the same terms and obligations of a true third party guarantee, it is fundamentally different. In the third party setting, the guarantor unconditionally guarantees that a creditor will receive payment of its debt from the obligor. In this case, Clark Fork guaranteed that the Holders would receive their distributions only to the extent that Clark Fork had already paid the

---

[1]Technically, the distributions were made by Clark Fork to a Property Trust (created simultaneously with the Trust with the same trustee) to receive and distribute the funds on a pro rata basis to the holders of the QUIPS.

Trust. Guarantee § 1.01 (definition of "Guarantee Payments"). In no event would Clark Fork be liable to "pay twice"; rather, its liability is limited to the situation where the middleman (the Trust) fails to pay over what it has already received from Clark Fork. For example, it does not guarantee payment in the situation where, for whatever reason, the Trust receives the money and uses it for some other purpose.[2] Or, more bluntly, it does not guarantee payment if the Trustee misuses or commingles the Trust's assets. In either of those situations, the extent of Clark Fork's guarantee liability is limited to the *lesser* of the aggregate of the Liquidation Amount (a defined term) and all accrued and unpaid distributions *and* the amount of Trust's assets remaining available for distribution.[3] Thus, regardless of whether the Liquidation Amount and the accrued and unpaid distributions exceed the amount of assets remaining in the Trust, Clark Fork's liability is limited to those assets. In a real sense, therefore, Clark Fork's guarantee liability is fundamentally *in rem* because it is limited to the whatever remains of the distributions it has already paid over to the Trust.[4]

The Guarantee specifically references Article 11 of the Indenture and provides that Clark Fork's obligations under the Guarantee may only be assigned pursuant to a transaction authorized thereunder. However, as noted by Plaintiff Magten, the Guarantee does not specifically provide, as does Section 1102 of the Indenture, that a Section 1101 transaction releases Clark Fork from its guarantee obligations. Debtor NorthWestern fails to address this critical issue and merely assumes that a Section 1102 transaction releases the guarantee obligation to the same extent as the underlying obligation on the debentures. The question is – does it?

Under Delaware law, all related documents and instruments in a single transaction together

---

[2] Again, this is a highly unlikely event given that the Trust is a specially created vehicle solely for the purpose of this transaction.

[3] Of course, the Holders may have claims in these circumstances against the Trustee but that is irrelevant for the purpose of determining if these plaintiffs have standing in this case.

[4] If the guarantee is triggered, Clark Fork is subrogated to the rights of the Holders to pursue the issuer for the funds it holds but has not paid. Guarantee § 5.06.

are harmonized to the extent possible. *Simon v. The Navellier Series Fund,* 2000 WL 1597890 (Del. Ch. 2000) (citing *Crown Books,* 17A C.J.S. *Contracts* § 315, at 337 (1999), 11 Williston on Contracts § 30:26, at 239-42 (4th ed. 1999), and Restatement (Second) of Contracts § 202(2) (1981)); *Crown Books Corp. v Bookstop, Inc.,* 1990 WL 26166 (Del. Ch. 1990). An interpretation that leads to an absurd result is disfavored. *Collins & Aikman Corp. v. Compo Industries, Inc.,* 1982 WL 17804 (Del. Ch. 1982). Here, the Indenture specifically provides that Clark Fork is released from its underlying liability on the debentures in a Section 1101 transaction. All of those obligations, including making distributions to the Trust for the purpose of paying the Holders, now lie exclusively with the successor in interest, here Debtor NorthWestern. Given the quasi *in rem* nature of the guarantee,[5] it is nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction) would retain any liability under the Guarantee. It only makes sense that any such liability has been released as well.

While the language is not explicit, Section 8.01 supports this interpretation: "Except in connection with a consolidation, merger or sale involving the Guarantor that is permitted under Article Eleven of the Indenture, the Guarantor shall not assign its obligations hereunder." The specific reference to Article Eleven (and not merely Section 1101) implies that all aspects of that Article are to be effective. Because a transaction that is permitted under Article Eleven automatically effects a release of the underlying debt, it is consistent to conclude that such a release would also extend to the guarantee.

Section 5.03 of the Guarantee does not compel a contrary result. That section makes clear that the validity of the Guarantee is not affected by the release or waiver of any of the *Issuer's* (the Trust's) obligations or by any lack of diligence by the *Holders* or any invalidity of the *QUIPS.* However, it does not say that the guarantee survives the release of Clark Fork's obligations under the debentures in the event of an Section 1101 transaction. Clearly, the guarantee would survive if Clark Fork's liability were "settled" or "compromised" outside of Section 1101 (Section 5.03(f));

---

[5]The liability is not technically *in rem* because the guarantor must first pay and is allowed to recover through subrogation.

8

but that is far different from a release of Clark Fork's obligations that occurs because a successor has assumed all of those obligations in a permitted transaction. Finally, Section's 5.03(g)'s admonition that "it [is] the intent of this Section 5.03 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances" is wholly consistent with the full, complete, absolute and unconditional assumption of the Guarantor's obligations in a permitted Section 1101 transaction. It is neither reasonable nor logical to read Section 5.03(g) to apply to a Section 1101 transaction.

For these reasons, the Court concludes that Plaintiffs are not creditors of Clark Fork because of the Guarantee. Rather, Clark Fork's obligations under the Guarantee, to the same extent as its obligations under the Debentures, were released in the Section 1101 transaction with NorthWestern. Therefore, the Guarantee is not a source of standing for these Plaintiffs. However, the question remains whether Plaintiffs have standing under their fraudulent scheme argument.

### 3.    Was there a Fraudulent Scheme?

Next, Plaintiffs argue that the purported release of Clark Fork under Section 1102 itself was obtained by fraud such that the release is void. According to Plaintiffs, at the time of the transfer, Debtor intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly. This argument may have legs. Simply because Debtor may have complied with the technical, procedural requirements of the Indenture does not mean Debtor can insulate the fraudulent transaction from all attack. The argument goes well beyond merely alleging the transaction was a fraudulent conveyance. This argument at its essence is that Debtor engaged in a knowing and conscious fraudulent scheme.

Critical to Debtor's position is that the release of Clark Fork under Section 1102 was effective, thereby removing Plaintiffs as creditors of Clark Fork. However, if Plaintiffs can prove (as they have alleged) that the release was obtained through fraud, then the release would be ineffective.

"If action is taken for a fraudulent purpose or to carry out a fraudulent purpose or to carry out a fraudulent scheme, the action is void and of no force or effect." Richard A. Lord, *Williston On*

9

*Contracts* Sec. 69.4 (4th Ed. 2003). A release may be set aside if it was obtained fraudulently. *Stanley v. Holms*, 975 P.2d 1242 (Mont. 1999) (recognizing the invalidity of releases under fraudulent conditions but granting a motion for summary judgment because party had not set forth sufficient indicia of fraud); *Riggs et al. v. Gillespie*, 241 F. 311 (4th Cir. 1917) (finding a release invalid as it was obtained by a "fraud in equity"); *see also Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001) (acknowledging that a release is a voidable contract when a party is fraudulently induced to execute a release). If a release is obtained by fraud, it is unenforceable under Montana law. *Association of Unit Owners of the Deer Lodge Condominium v. Big Sky of Montana, Inc.*, 798 P.2d 1018 (Mont. 1990). In that sense, a release is treated as any other contract obtained by fraud. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1133-34 (D.C. App. 1987) (reversing lower court's grant of summary judgment and permitting plaintiffs to proceed with underlying claims where plaintiffs' purported release of such claims was part of the misrepresentation of which the defendant was accused).

Debtor directly challenges Plaintiffs' fraud argument, contending that this case must be dismissed because there simply was no fraud. Debtor hangs its hat on the fact that numerous transactions making up to the transfer were disclosed in both regulatory filings and in documents executed by the Trustee. According to Debtor, the terms of the deals were known to all and, therefore, by definition mean there was in fact no fraudulent intent on Debtor's part.

While Debtor's disclosure may be one factor in favor of finding no fraudulent intent on Debtor's part, it is far from conclusive at the motion to dismiss stage. Debtor may have disclosed the nuts and bolts of the transfers, but Plaintiffs' allegations go beyond simply that the actual transfer itself was fraudulent in its terms. As alleged, the questions are whether Debtor knew at the time that it could not do the transaction based on its restated accountings etc. and whether the financial information Debtor provided the public was in fact false. These are fact questions not appropriately resolved on a motion to dismiss.

## III.    Conclusion

Therefore, the motion to dismiss will be granted in part and denied in part, as follows:

The Plaintiffs lack standing as creditors of Clark Fork to pursue a fraudulent conveyance action against the Debtor because of the Section 1102 release, unless they can prove under applicable law that the Section 1102 release was obtained through actual fraud or as part of a fraudulent scheme.

Counsel for Debtor is to submit an order under certification of counsel.

So ordered.

DATED: __8/20/04__

CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

11