

05 - 499

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No.  03-12872 (CGC) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT | : | |
| CORPORATION and LAW DEBENTURE TRUST | : | |
| COMPANY OF NEW YORK, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. No. 04-53324-CGC |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Defendant. | : | |

**NORTHWESTERN CORPORATION'S MOTION, AND SUPPORTING BRIEF,
TO DISMISS THE COMPLAINT OF MAGTEN ASSET MANAGEMENT
CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK
FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED**

NorthWestern Corporation, a Delaware corporation ("NorthWestern" or the

"Debtor"), by and through its undersigned counsel, and pursuant to Federal Rule of

Bankruptcy Procedure 7012(b), which makes Federal Rule of Civil Procedure 12(b)(6)

applicable to bankruptcy cases, files this Motion (the "Motion"), and Supporting Brief, to

Dismiss the Complaint of Magten Asset Management Corporation ("Magten") and Law



Debenture Trust Company of New York ("Law Debenture" and collectively "Plaintiffs")

on the grounds set forth below:

## INTRODUCTION

Plaintiffs' Complaint fails to state a claim upon which relief can be

granted. <u>First</u>, Plaintiffs lack standing to bring this Complaint because Plaintiffs, by

operation of the Indenture Agreement which govern their claims, are creditors of

NorthWestern and not creditors of Clark Fork.[1] As creditors of NorthWestern, Plaintiffs

cannot use avoidance powers to avoid the allegedly fraudulent transfers of assets from

Clark Fork to NorthWestern. <u>Second</u>, the intention to transfer assets from Clark Fork to

NorthWestern was disclosed in both public documents and in amendments to the

Indenture that were executed by the Trustee and cannot be set aside under applicable law.

<u>Third</u>, the Indenture expressly permits the transfer of assets that occurred, and does not

grant Plaintiffs the right to object to transfers of property or assets covered by the

Indenture. Plaintiffs should not be allowed to request that this Court grant Plaintiffs

rights they do not have under the Indenture. <u>Finally</u>, the Indenture Trustee never objected

to any of the transfers and, consequently, waived any potential right to object by this

failure to assert a position contrary to the documents.

## BACKGROUND

1.    On September 14, 2003, NorthWestern filed its voluntary petition for

relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

---

[1] Capitalized terms used in this Introduction shall be as defined herein.

ATL/1029981.12

Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, NorthWestern continues to operate its business and manage its properties as debtor-in-possession.

2.      No request has been made for the appointment of a trustee or examiner in this case. The Official Committee of Unsecured Creditors was appointed by the Office of the United States Trustee on September 30, 2003.[2]

3.      NorthWestern is a publicly traded Delaware corporation which was incorporated in 1923. NorthWestern and its direct and indirect non-NorthWestern subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

4.      Magten is a holder of certain Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS") issued by Montana Power Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The sole assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 (the "Junior Debentures").

5.      Law Debenture is a limited purpose trust company organized under the laws of New York and is the successor Trustee to the Bank of New York ("BNY"), the original Trustee of the Trust.

**The Indenture**

---

[2] Magten and Law Debenture were members of the Official Committee of Unsecured Creditors (the "Committee"). Recent action by the U.S. Trustee has resulted in Magten and Law Debenture being removed from the Committee.

6.      In or around November 1996, The Montana Power Company ("Montana

Power") created the Trust to hold the Junior Debentures that were issued by Montana

Power.

7.      After formation of the Trust, Montana Power and BNY, as Trustee,

entered into the Indenture For Unsecured Subordinate Debt Securities dated as of

November 1, 1996 relating to Trust Securities (the "Indenture"). A true and correct copy

of the Indenture is attached hereto as Exhibit A.

8.      In or around November 1996, the Trust issued $65,000,000 of 8.45%

Cumulative Quarterly Income Preferred Securities ("QUIPS"), Series A. The proceeds

from the sale of the QUIPS were used to purchase an equal amount of Junior Debentures,

8.45% Series due 2036, from Montana Power.

9.      Pursuant to the Indenture Section 1101, Montana Power was authorized to

"convey or otherwise transfer, or lease, its properties and assets substantially as an

entirety to any Person," if:

> a) the corporation formed by such consolidation or into which the
> Company is merged …shall be a Person organized and validly existing
> under the laws of the United States, any State thereof, …and shall assume,
> either by the operation of applicable law or by an indenture supplemental
> hereto, executed and delivered to the Trustee, in form satisfactory to the
> Trustee, the due and punctual payment of the principal of and premium, if
> any, and interest, if any, on all Outstanding Securities and the performance
> of every covenant of the Indenture on the part of the Company to be
> performed or observed;
>
> b) immediately after giving effect to such transaction no Event of
> Default with respect to Securities of any series, and no event which, after
> notice or lapse of time or both, would become an Event of Default with
> respect to Securities of any series, shall have occurred and be continuing;
> and

-4-

c) the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, or other transfer or lease and such supplemental indenture comply with this Article and that all conditions precedent herein provided for relating to such transactions have been complied with.

10.    If Montana Power, in conveying or otherwise transferring substantially all of its assets to another entity, complied with Section 1101 of the Indenture, Section 1102 of the Indenture would control the effect of the transfer on the both Montana Power, as the predecessor entity, and the purchasing, or successor, entity.

11.    Section 1102 of the Indenture provides that:

[T]he Successor Corporation shall succeed to, and be substituted for, and may exercise every right and power of, the Company [Montana Power] under this Indenture with the same effects as if such Successor Corporation had been named as the Company herein, and thereafter the predecessor Person shall be relieved of all obligations and covenants under this indenture and the Securities Outstanding hereunder.

12.    Magten's rights, as a holder of certain QUIPS, are governed by the Indenture.  On information and belief, Magten acquired its interests in the QUIPS immediately prior to or after NorthWestern filed its Chapter 11 petition.

13.    Law Debenture's duties as Successor Trustee are governed by Section 901 of the Indenture which gives the Trustee "all the duties and responsibilities specified with respect to an indenture trustee in the Trust Indenture Act."

14.    Montana Power also entered into the Amended and Restated Trust Agreement by and among the Montana Power Company, as depositor and, *inter alia*, The Bank of New York, as Property Trustee, and The Bank of New York (Delaware) as

-5-

Delaware Trustee (the "Trust Agreement"), a true and correct copy of which is attached

hereto as Exhibit B.

15.    Montana Power also entered into the Guarantee Agreement with the Bank

of New York (the "Guarantee Agreement") dated as of November 1, 1996, under which,

Montana Power, as guarantor, agreed to a limited guarantee of obligations with respect to

the QUIPS. A true and correct copy of the Guarantee Agreement is attached hereto as

Exhibit C. The Guarantee Agreement was limited by its terms to guarantee distributions

to the QUIPS "...only if and to the extent that the Property Trustee has available in the

Payment Account funds sufficient to make payment...." *See* Guarantee Agreement, Sec.

1.01 Definitions, "Guarantee Payments."

**The Acquisition of Montana Power by NorthWestern**

16.    On or about September 29, 2000, NorthWestern entered into a Unit

Purchase Agreement with Montana Power, by which NorthWestern was to purchase

substantially all of Montana Power's electric, natural gas, and propane utility assets (the

"Montana Assets").

17.    To facilitate the transfer of the Montana Assets to NorthWestern, Montana

Power created a subsidiary, The Montana Power L.L.C. ("MP-LLC").

18.    As part of the transaction under the Unit Purchase Agreement,

NorthWestern disclosed it intentions to make Montana Power a division of

NorthWestern, not just a wholly owned subsidiary. This transaction has been referred to

by NorthWestern as "going flat."

19.    On or about December 20, 2000, NorthWestern disclosed its intention to "go flat" with the Montana Assets in a joint application by NorthWestern and Montana Power filed with the Federal Energy Regulatory Commission ("FERC"), a true and correct copy of which is attached hereto as Exhibit D. The application stated that the proposed transaction was not contingent on any particular structure and that NorthWestern would either: (a) form a holding company so that it would acquire MP-LLC as a wholly-owned subsidiary; or (b) acquire MP-LLC in its current "flat" structure, whereby MP-LLC would become a separate division of NOR rather than a subsidiary. Attached to the FERC application as Exhibit C were charts demonstrating NorthWestern's post-transaction organizational structure for both potential options.

20.    On or about January 12, 2001, NorthWestern again disclosed its intention to "go flat" with the Montana Assets in a joint application filed with the Montana Public Service Commission ("MPSC"). A true and correct copy of the MPSC application is attached hereto as Exhibit E. Notice of this application was published in the Federal Register.

21.    On or about February 20, 2001, FERC issued a statement granting approval of the purchase of the Montana Assets by NorthWestern, a true and correct copy of which is attached hereto as Exhibit F.

22.    On or about June 27, 2001, the MPSC issued an Order Denying Application as Filed and Providing Direction and an Opportunity to Refile, determining that it needed additional information and analysis from NorthWestern and Montana

Power regarding the transfer of the Montana Assets. A true and correct copy of the MPSC order is attached hereto as Exhibit G.

23.     On or about December 28, 2001, NorthWestern and Montana Power filed a stipulation (the "Stipulation"), along with other interested parties, resolving issues between the parties, including issues related to the transfer of the Montana Assets. A true and correct copy of this Stipulation is attached hereto as Exhibit H. The Stipulation concluded that the MPSC should approve NorthWestern's acquisition of MP-LLC as a subsidiary or division of NorthWestern.

24.     On or about January 31, 2002, MPSC approved the Stipulation filed by NorthWestern and Montana Power, authorizing the transfer of the Montana Assets. A true and correct copy of the approved Stipulation is attached hereto as Exhibit I.

25.     On or about February 13, 2002, Montana Power transferred the Montana Assets to MP-LLC.

26.     As part of the conveyance of the Montana Assets to MP-LLC, on or about February 13, 2002, MP-LLC and BNY, as Trustee, executed the First Supplemental Indenture, a true and correct copy of which is attached hereto as Exhibit J.

27.     Pursuant to the First Supplemental Indenture, MP-LLC assumed all of the obligations of Montana Power under the Indenture.

28.     BNY, the Indenture Trustee at the time, did not object to the transfer of the Montana Assets from Montana Power to MP-LLC.

29.     On or about February 15, 2002, NorthWestern's acquisition of MP-LLC was completed with the payment by NorthWestern of $478 million in cash to the parent

of MP-LLC and the assumption of $511 million of MP-LLC liabilities, which liabilities included claims under the QUIPS and the Indenture. As a result of the acquisition, MP-LLC became a wholly-owned subsidiary of NorthWestern.

30.    On March 19, 2002, MP-LLC was renamed NorthWestern Energy, L.L.C. ("NorthWestern Energy").

31.    On or about April 1, 2002, NorthWestern, in its 10-K filing with the SEC for the period ended December 31, 2001, expressly and publicly disclosed its intention to "go flat" with the Montana Assets. NorthWestern announced that "we intend to transfer the energy and natural gas transmission and distribution operations of NorthWestern Energy LLC to NorthWestern Corporation during 2002." NorthWestern made similar announcements in subsequent SEC filings. True and correct copies of these filings are attached hereto as Exhibit K.

32.    On or about August 13, 2002, NorthWestern Energy, NorthWestern and BNY, as Indenture Trustee executed the Second Supplemental Indenture. A true and correct copy of the Second Supplemental Indenture is attached hereto as Exhibit L.

33.    Pursuant to the Second Supplemental Indenture, NorthWestern fully and unconditionally assumed NorthWestern Energy's obligations (as successor to MP-LLC, as the successor to Montana Power) with respect to the QUIPS and the performance of every covenant, obligation and agreement under the Indenture.

34.    The Second Supplemental Indenture expressly subordinated the obligations NorthWestern assumed to the "Senior Indebtedness" of NorthWestern.

ATL/1029981.12

35.     The Second Supplemental Indenture expressly stated that it was entered into:

> without prejudice to any rights of each of the Company
> [NorthWestern Energy] and NOR [NorthWestern] under the QUIPS
> Debenture, the Indenture and this Second Supplemental Indenture,
> including, without limitation, the right of each of the Company and NOR
> to consolidate with or merge into any other corporation, or convey or
> otherwise transfer, or lease, its properties and assets substantially as an
> entirety to any Person, and to be relieved from its obligations under the
> QUIPS Debenture, the Indenture and hereunder as provided in Article
> Eleven of the Indenture.

36.     The Second Supplemental Indenture, in further confirmation that it did not impair NorthWestern Energy's ability to transfer the Montana Assets to NorthWestern, stated:

> the Company [NorthWestern Energy] may consolidate with or
> merge into NOR [NorthWestern] or convey or otherwise transfer, or lease,
> its properties and assets substantially as an entirety to NOR, and be
> relieved of its obligations under the QUIPS Debentures, the Indenture and
> hereunder as provided in Article Eleven of the Indenture notwithstanding
> the fact that NOR has assumed the Company's obligations under the
> QUIPS Debenture and the Indenture pursuant to this Second Supplemental
> Indenture, and such assumption hereunder is expressly subject to such
> right.

37.     BNY, as Indenture Trustee, did not object to the Second Supplemental Indenture, or express reservations as to the right of NorthWestern and NorthWestern Energy to transfer substantially all of its assets with a result being that NorthWestern Energy would be relieved of any obligations under the QUIPS Debenture, the Indenture and the Second Supplemental Indenture.

38.     NorthWestern, NorthWestern Energy and BNY, as Trustee, also executed the Amendment to Guaranty Agreement dated as of August 13, 2002 whereby

-10-

NorthWestern fully and unconditionally assumed the limited obligations of Montana

Power under the Guaranty Agreement. A true and correct copy of the Amendment to

Guaranty Agreement is attached hereto as Exhibit M.

39.    The Amendment to the Guaranty expressly stated that it was entered into:

> without prejudice to any rights of the Guarantor [NorthWestern Energy] and NOR [NorthWestern] under the Guarantee Agreement and this Amendment, including, without limitation, the right of Guarantor and NOR to assign their obligations under the Guarantee Agreement and hereunder in connection with a consolidation, merger or sale involving the Guarantor or NOR that is permitted under Article Eleven of the Subordinated Indenture, as the same may be amended.

40.    The Amendment to the Guaranty, in further confirmation that it did not

impair NorthWestern Energy's ability to transfer the Montana Assets to NorthWestern,

stated:

> such right to assign shall apply to any assignment of the Guarantor's [NorthWestern Energy] obligations under the Guarantee Agreement and hereunder in connection with a consolidation or merger of the Guarantor with or into NOR [NorthWestern] or any conveyance or transfer of the Guarantor's properties and assets substantially as an entirety to NOR in compliance with Article Eleven of the Subordinated Indenture notwithstanding the fact that NOR has assumed the Guarantor's obligations under the Guarantee Agreement pursuant to this Amendment and such assumption hereunder expressly subject to such right.

41.    BNY, as Trustee, did not object to the Second Supplemental Indenture, or

expressly reserve rights to NorthWestern and NorthWestern Energy to consolidate, with a

result being that NorthWestern Energy would be relieved of any obligations under the

QUIPS Debenture, the Indenture and the Second Supplemental Indenture.

42.    On or about October 25, 2002, NorthWestern filed an application with

FERC seeking permission to assume the QUIPS, along with other debt of NorthWestern

Energy. A true and correct copy of this FERC Application is attached hereto as Exhibit N.

43.     On or about November 15, 2002, FERC approved NorthWestern's assumption of the QUIPS, along with other debt of NorthWestern Energy. A true and correct copy of this Approval is attached hereto as Exhibit O.

44.     On or about November 15, 2002, NorthWestern Energy and NorthWestern entered into an Asset and Stock Transfer Agreement dated as of November 15, 2002 pursuant to which the property and assets of NorthWestern Energy substantially as an entirety were transferred to NorthWestern, and NorthWestern assumed substantially all of the liabilities of NorthWestern Energy.

45.     On or about November 15, 2002, as part of the transfer of assets, NorthWestern and BNY, as Trustee, entered into the Third Supplemental Indenture. A true and correct copy of the Third Supplemental Indenture is attached hereto as Exhibit P. BNY, as Trustee, did not object to the transfer of the Montana Assets from NorthWestern Energy to NorthWestern.

46.     Pursuant to the Third Supplemental Indenture, NorthWestern expressly assumed, "pursuant to Sections 1101(a) and 1201 of the Indenture," the "covenants of NorthWestern Energy contained in the Indenture and the Securities issued thereunder."

47.     Pursuant to the Third Supplemental Indenture, NorthWestern expressly assumed "the due and punctual payment of the principal of and premium, if any and interest, if any, on all Outstanding Securities issued under the Indenture and the

-12-

performance of every covenant of the Indenture on the part of NorthWestern Energy to be performed or observed."

48.    The Third Supplemental Indenture also stated that the First Supplemental Indenture was performed in accordance with the requirement of the Indenture and that NorthWestern Energy assumed the "covenants of MPC [Montana Power] contained in the Indenture and the Securities issued thereunder."

49.    Subsequent to NorthWestern Energy's completing the transfer of its assets to and the assumption of the liabilities by NorthWestern, NorthWestern Energy was renamed Clark Fork and Blackfoot LLC ("Clark Fork").

50.    Each of the respective consolidations, conveyances and transfer of assets – from Montana Power to MPC-LLC to NorthWestern Energy to NorthWestern – were consolidations, conveyances and transfers of assets and property in accordance with Section 1101 of the Indenture.

51.    Because each of the respective consolidations, conveyances and transfers of assets were consolidations, conveyances and transfers of assets and property in accordance with Section 1101 of the Indenture, Section 1102 of the Indenture operated to relieve the predecessor entities of "all obligations and covenants under this Indenture and the Securities Outstanding hereunder."

52.    Accordingly, having completed the various consolidations, conveyances and transfers in accordance with the Indenture – which did not require the consent either of the Indenture Trustee or the holders of the QUIPS – Montana Power, MPC-LLC and Clark Fork (f/k/a NorthWestern Energy) were by the express terms of the Indenture

-13-


relieved of obligations and covenants under the Indenture and amounts owing to the

QUIPS, and only NorthWestern remains an obligor thereon.

## ARGUMENT AND CITATION OF AUTHORITIES

I.   MOTION TO DISMISS STANDARD

In determining whether a complaint should be dismissed for failure to state a

claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6),

which is made applicable to an adversary proceeding in a bankruptcy matter by Federal

Rule of Bankruptcy Procedure 7012(b), the allegations of the complaint are accepted as

true for purposes of testing the sufficiency of the complaint. *Hishon v. King & Spalding*,

467 U.S. 69, 73 (1984). Consistent with this requirement, a complaint should be

dismissed for failure to state a claim if it appears that the plaintiff would not be entitled to

relief under any set of facts which could be proved in support of his claim. *Conley v.

Gibson*, 355 U.S. 41, 45-46 (1957). Plaintiffs' complaint fails to state a claim upon

which relief can be granted because it fails to allege facts sufficient to provide Plaintiffs

standing to bring the complaint, it fails to allege the facts necessary to show that a

publicly disclosed transaction is done with fraudulent intent or is fraudulent when no

harm is done by the transfer, it fails to allege facts that show why a transfer that is

expressly permitted by the Indenture should be rescinded, and by not objecting to the

transfer of the Montana Assets at any point prior hereto Plaintiffs have waived the right

to object at this late date.

II.  PLAINTIFFS ARE CREDITORS ONLY OF NORTHWESTERN AND DO
     NOT HAVE STANDING TO BRING THIS ACTION

-14-

A central tenet to support a fraudulent conveyance claim by Plaintiffs on behalf of

Clark Fork against NorthWestern is that Plaintiffs must establish they are creditors of

Clark Fork. *In re Xonics Photochemicals, Inc.*, 841 F.2d 198, 202 (7th Cir. 1988) ("It is

not as if Mitsui [plaintiff in adversary proceeding seeking to set aside fraudulent transfer

of debtor] itself has been harmed by the allegedly fraudulent conveyances; they preceded

the payments in issue. Mitsui is seeking to stand in the shoes of creditors who may have

been harmed, but only a trustee or debtor in possession can do that."); *accord, In re*

*Kathleen Fry*, 1997 Bankr. LEXIS 1709, at *5 (Bankr. N.D. Ill. Oct. 28, 1997); *see also*

*Moldo v. World Net Dev. Group., Inc.*, 2000 U.S. Dist. LEXIS 19092, at *23 (C.D. Cal.

2000) ("The UFTA provides that "creditors" . . . may sue to set aside fraudulent

transfers.").

Pursuant to the terms of the Indenture, if consolidations, conveyances and transfer

of assets are completed in accordance with Section 1101 of the Indenture, then the

successor entity succeeds to and is substituted for the prior entity, and it is solely the

successor which is obligated for payment of amounts owing under the QUIPS and to

perform the covenants and other obligations under the Indenture. *See* Indenture, Sec.

1102. Section 1102 specifically provides that the predecessor entity (here Clark Fork)

has been relieved of all obligations and covenants under the Indenture and the QUIPS.

As a result, Plaintiffs do not have standing to pursue a fraudulent conveyance claim as to

NorthWestern. *See, e.g., In re Allard*, 198 B.R. 715, 718 (Bankr. N.D. Ill. 1996)

("[I]ndividual creditors are not empowered to use the trustee's avoidance powers either

for their own benefit or for the benefit of the estate, not even to attack transfers the

-15-

creditors could have avoided under state law because of harm to them personally."); *In re Feldhahn*, 92 B.R. 834, 836 (Bankr. S.D. Iowa 1988).

Plaintiffs do not assert that any of the predecessor transfers in any way violated Section 1101 of the Indenture. Indeed, in all instances, the transfer of the Montana Assets and the assumption of liabilities from Montana Power to MPC-LLC to NorthWestern Energy to NorthWestern were all conducted in accordance with the specific terms and conditions of the Indenture. At this point, NorthWestern has assumed the obligations of, and has become the successor-in-interest to, Clark Fork with respect to the claims under the Indenture and the QUIPS, and Clark Fork, as the predecessor entity, has been relieved of any and all liability under the express terms of the Indenture. Accordingly, Plaintiffs are creditors of NorthWestern, not Clark Fork, and do not have standing to initiate the proposed adversary proceeding.

III.    THE ULTIMATE TRANSFER OF THE MONTANA ASSETS TO NORTHWESTERN WAS DISCLOSED, IN BOTH REGULATORY FILINGS AND IN AMENDMENTS TO THE INDENTURE, WELL IN ADVANCE OF THE TRANSFER AND CANNOT BE SET ASIDE UNDER MONTANA LAW

Even if Plaintiffs have standing to file their Complaint, the transfer of assets to NorthWestern from Clark Fork was publicly disclosed, in both regulatory filings and in documents executed by the Trustee, and cannot be fraudulent under Section 31-2-333 of Montana Statutes. *See Pare v. Morrison*, 241 Mont. 218, 786 P.2d 655 (1990) (upholding a lower court ruling that the buyers of property that was encumbered with restrictive covenants were not fraudulently induced into purchasing property because the buyers knew of the restrictive covenants before the purchase). Plaintiffs allege that the

-16-

transfer was made with actual intent to hinder, delay, or defraud Plaintiffs and point to

several factors that should be considered in determining fraudulent intent. *See*

Complaint, ¶ 54-61. These factors, or "badges of fraud," are not per se proof of fraud,

but are merely grounds to support an inference of fraud and should be disregarded when

the facts show that a transfer was publicly disclosed. *See* MT Stat. §31-2-333; *See*

*O'Connor v. Lewis*, 238 Mont. 270, 277, 776 P.2d 1228, 1233 (1989).

Even though certain factors, or "badges of fraud," may be present, NorthWestern

lacked actual fraudulent intent, demonstrated by the numerous disclosures of "going flat,"

both to the public and in documents executed by the Trustee. The potential of

NorthWestern "going flat" with the Montana Assets was first disclosed in

NorthWestern's and Montana Power's joint application for FERC approval of the

purchase of the Montana Assets filed December 20, 2000. The joint application openly

discloses that NorthWestern intended, contingent on certain facts, to make Montana

Power a division of NorthWestern and included organizational charts showing Montana

Power as a division in the "flat" structure of NorthWestern.[3] Also, on January 12, 2001,

in a joint application to the MPSC and on December 28, 2001 in a Stipulation filed with

the MPSC, NorthWestern and Montana Power disclosed the possibility that the Montana

Assets would be made a division of NorthWestern.[4] NorthWestern also stated in its SEC

10-K report for the period ended December 31, 2001, filed on April 1, 2002, that "we

---

[3] The joint application was subsequently approved by FERC on February 20, 2001.

[4] The Stipulation was subsequently approved by the MPSC on January 31, 2002.

-17-

intend to transfer the energy and natural gas transmission and distribution operations of

NorthWestern Energy LLC to NorthWestern Corporation during 2002." Finally,

NorthWestern disclosed its intention to "go flat" with the Montana Assets in its

October 25, 2002 application to the FERC seeking authorization to assume the liabilities

of Clark Fork.[5] All of these public disclosures were made in advance of the November

15, 2002 transfer of assets from Clark Fork to NorthWestern.

Further, NorthWestern's intention to "go flat" with the Montana Assets was

expressed in two documents executed by the Trustee – the Second Supplemental

Indenture and the Amendment to Guarantee Agreement. Both of these documents were

executed on August 13, 2002 and both state that Clark Fork and NorthWestern retained

the right to transfer substantially all of their assets to another entity. Further, these

documents clarify that Clark Fork was not hindered in its ability to transfer substantially

all of its assets to NorthWestern, with the result that Clark Fork would be relieved of all

obligations under the Indenture and to QUIPS holders. These disclosures, made directly

to and ratified by the Trustee, combined with the numerous public disclosures of "going

flat" show that NorthWestern lacked actual fraudulent intent, and as such Plaintiffs'

Complaint fails to allege facts sufficient to support a fraudulent transfer claim under

Montana Statute § 31-2-333.

Plaintiffs' Complaint also fails to state a claim for fraudulent transfer under

Montana Statute § 31-2-334(1). This section requires that the transfer was not for

---

[5] This application was subsequently approved by FERC on November 15, 2002.

-18-

equivalent value and that at the time of the transfer the debtor was insolvent or that the debtor became insolvent as a result of the transfer. *See* MT Stat. § 31-2-334(1). Plaintiffs' Complaint fails to allege a claim under this section for two reasons; first, NorthWestern expressly assumed all obligations to Plaintiffs; and second, since NorthWestern assumed all of these obligations that debt was no longer the debt of Clark Fork.

At the time of the transfer of the Montana Assets from Clark Fork to NorthWestern, NorthWestern and the Trustee executed the Third Supplemental Indenture. Under the Third Supplemental Indenture, NorthWestern expressly assumed the responsibility of payment under the Indenture and "the performance of every covenant of the Indenture on the part of NorthWestern Energy to be performed or observed." These obligations would have included any obligation remaining with Clark Fork under the Amendment to Guarantee Agreement. Under these facts, Plaintiffs suffered no harm by the transfer of assets and all of Plaintiffs' debt was now the exclusive obligation on NorthWestern. When a transaction does not harm an alleged creditor, it should not be considered a fraudulent conveyance. *See Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984) (dismissing fraudulent transfer claim because the allegedly fraudulent transfer "did not diminish the assets of the debtor which were available to its creditor"); *In re Trace Int'l Holdings, Inc.*, 287 B.R. 98, 111 (Bankr. S.D.N.Y. 2002) ("creditors must actually be harmed in order to avoid a fraudulent transfer"); *Bear, Stearns Securities Corp. v. Gredd*, 275 B.R. 190 (S.D.N.Y. 2002) (if allegedly fraudulent transfer does not leave creditor in worse position than it

-19-

would have been in had the transfer never occurred, the transfer does not offend

bankruptcy policies).

As part of the transfer of the Montana Assets to NorthWestern from Clark Fork,

NorthWestern expressly assumed the debt under the QUIPS. Plaintiffs allege that this

asset transfer rendered Clark Fork either insolvent or undercapitalized. *See* Complaint, ¶

62-71. Pursuant to the Third Supplemental Indenture, however, NorthWestern expressly

assumed the debt under the QUIPS, and obsolving Clark Fork of any ongoing obligation

to pay the QUIPS. For that reason, the debt under the QUIPS cannot be considered in

determining if Clark Fork was insolvent or undercapitalized after the transaction. When

the debt under the QUIPS, and the other debt expressly assumed by NorthWestern as part

of the transfer[6] are removed from the equation, Clark Fork is not insolvent or

undercapitalized. Consequently, because Clark Fork was not rendered insolvent or

undercapitalized as a result of the transfer of the Montana Assets to NorthWestern,

Plaintiffs' complaint fails to allege facts sufficient to state a claim under Montana Statute

§ 31-2-334.

Furthermore, because the Plaintiffs' Complaint fails to allege any facts that allege

a claim for fraudulent transfer, the Plaintiffs' claim for unjust enrichment must also be

dismissed. The Plaintiffs allege that NorthWestern was unjustly enriched by receiving an

---

[6] FERC expressly allowed NorthWestern to assume $355,402,000 of First Mortgage
Bonds, $40,000,000 of Medium-Term Notes and $62,700,000 of Transition Bonds from
Clark Fork. *See* Authorization from FERC dated November 15, 2002. These debts
should also not be taken into account when determining the financial condition of Clark
Fork as a result of the transfer of assets to NorthWestern.

alleged fraudulent transfer of the Montana Assets. *See* Complaint ¶ 74-76. The facts

alleged do not support any of the Plaintiffs' claims of fraudulent transfer. In the absence

of a fraudulent transfer, the Plaintiffs' claim fails to allege fact sufficient to support a

claim of unjust enrichment and, consequently, fails to state a claim upon which relief can

be granted.

IV.    THE INDENTURE DOCUMENTS EXPRESSLY PERMITTED THE
       TRANSFER OF THE MONTANA ASSETS TO NORTHWESTERN

        Plaintiffs' Complaint fails to state a claim upon which relief can be granted

because the Indenture expressly states that a transfer of assets conducted in accordance

with section 1101 of the Indenture has the affect of releasing the predecessor entity of all

obligations under the Indenture or any Outstanding Securities thereunder. *See* Indenture,

Sec. 1101-1102. Further, the Indenture controls the rights of Plaintiffs and Plaintiffs

should not be allowed to object to acts that were performed in accordance with the terms

of the Indenture. *cf. In re Terry Limited Partnership*, 27 F.3d 241, 243 (7th Cir.

1994)(stating a presumption that bankruptcy courts should uphold prebankruptcy

contractual entitlements to increased postpetition interest rates when equitable

considerations do not rebut the presumption); *cf. In re Holiday Mart, Inc*, 715 F.2d 430,

432 (9th Cir. 1983)(recognizing that valid subordination agreements are normally

enforced in accordance with their terms); *cf. In re Coronet Capital Company*, 1995 U.S.

Dist LEXIS 10175, *11 (S.D.N.Y. 1995)(stating that contractual subordination

agreements are enforceable under section 510(a) of the Bankruptcy Code, which seeks to

uphold agreements "regarding order of payments"). Since each of the transfers of the

-21-

Montana Assets complied with Section 1101 of the Indenture and released the

predecessor entities under Section 1102, Plaintiffs should not be allowed to request that

this Court rescind a transaction that was completed in accordance with the rights granted

to NorthWestern under the Indenture.

The Indenture allows property of the original entity to be transferred to "a Person

organized and validly existing under the laws of the United States, any State thereof, or

any other jurisdiction." *See* Indenture, Sec. 1101. Plaintiffs' Complaint confirms that

this requirement of section 1101 has been satisfied because NorthWestern "is a

corporation validly organized under the laws of the State of Delaware." *See* Magten's

Complaint, Para. 13. The only other requirements in Section 1101 of the Indenture are

that, immediately after the transaction, no Event of Default "shall have occurred and be

continuing" and that the Trustee receive an "Officer's Certificate and an Opinion of

Counsel, each stating that" all of the conditions for the transfer have been met. *See*

Indenture, Sec. 1101(b)-(c). Plaintiffs have not alleged noncompliance with either of

these remaining requirements. Conspicuously absent from the Indenture is any

requirement of approval by the Indenture Trustee or a holder of an interest in the

Indenture Trust. *See* Indenture, Sec. 1101. Therefore, since each of the Transfers

complied with Section 1101, Section 1102 releasing predecessor entities should be

allowed to operate.

Section 1102 states that a transfer that complies with section 1101 relieves the

predecessor entity, such as Montana Power, MP-LLC or Clark Fork, from "all obligations

and covenants under this Indenture" and makes the successor entity, NorthWestern, subject to those obligations and covenants. *See* Indenture, Sec. 1102. Plaintiffs' Complaint fails to allege facts showing noncompliance with the requirements of Section 1101 or a reason why Section 1102 should not operate when Section 1101 has been complied with and, consequently, Plaintiffs' Complaint fails to allege the facts necessary to state a claim upon which relief can be granted.

Further, the Second Supplemental Indenture and the Amendment to Guarantee Agreement, executed by the Trustee, NorthWestern and Clark Fork, expressly reserve the right of Clark Fork to transfer substantially all of its assets to NorthWestern. The Second Supplemental Indenture clearly states the right of Clark Fork to transfer substantially all of its assets and the document clarifies that this right includes the right of Clark Fork to transfer substantially all of its assets to NorthWestern. *See* Second Supplemental Indenture, Section 201. The language is also clear that such a transfer to NorthWestern would relieve Clark Fork of "its obligations under the QUIPS Debenture, the Indenture and hereunder as provided in Article Eleven of the Indenture." *See* Second Supplemental Indenture, Section 201. The Amendment to Guarantee Agreement contains similar language; it reserves the right of Clark Fork to transfer substantially all of its assets to another entity, and clarifies that this right includes the right of Clark Fork to transfer substantially all of its assets to NorthWestern. *See* Amendment to Guarantee Agreement, section 201. The section also makes clear that such a transfer can be accomplished in compliance with the Indenture. *See* Amendment to Guarantee Agreement, section 201. These documents, executed by the Trustee, further confirm the view that a transfer of

-23-

substantially all of Clark Fork's assets to NorthWestern, in compliance with the

Indenture, would operate to release Clark Fork from any obligations it may have had

under the Indenture. The transfer of the Montana Assets by Clark Fork to NorthWestern

was allowed by the Indenture and confirmed in later documents executed by the Trustee

and cannot be treated as fraudulent because the transfers were within the rights granted to

Clark Fork and NorthWestern by the Indenture and these future documents.

Consequently, the Plaintiffs' Complaint fails to allege facts sufficient to state a claim for

fraudulent transfer upon which relief can be granted.

V.    THE INDENTURE TRUSTEE DID NOT OBJECT TO ANY OF THE
      TRANSACTIONS AND SHOULD BE PRECLUDED FROM OBJECTING AT
      THIS LATE DATE

       Any potential objection to the transfer of the Montana Assets to NorthWestern

from Clark Fork has been waived by the Trustee's failure to object to any of the transfers

at the time of the transfers. Waiver is an intentional relinquishment of a known right

either in express terms or by such conduct as indicates an intention to renounce such a

right. *See e.g., Godwin v. Continental Ins. Co.*, 306 F. Supp. 238, 243 (D. Del. 1969). As

discussed above, the intention to finally transfer the assets to NorthWestern was publicly

disclosed on numerous occasions and well in advance of the actual transfer. Further,

each time a transfer of the Montana Assets occurred (from Montana Power to MP-LLC to

NorthWestern Energy to NorthWestern), the Trustee did not object to the transfer, but

consented to and executed a supplemental Indenture. The Trustee in fact consented to the

Second Supplemental Indenture which specifically reserved the right of Clark Fork to

transfer substantially all of its assets to NorthWestern and clearly stated that Clark Fork

-24-

would be released from any obligation under the Indenture as a result of the transfer of substantially all of its assets. The Trustee did not have to join in such supplemental Indentures, giving tacit approval to the transfers, but the Trustee did so. Also, the Amendment to the Guarantee Agreement expressly reserved the same right, and once again, the Trustee executed the document instead of objecting. Further, the Trustee never objected or even hinted at a desire to withhold approval of any of the transfers. Such consistent silence on the part of the Trustee should be treated as waiver, and the holders of claims under the Indenture should also be treated as having waived any potential objection (and should be forced to seek restitution from the wrongdoing trustee). Consequently, any claims the Plaintiffs may have had have been waived and, the Plaintiffs' Complaint cannot allege facts sufficient to support a claim upon which relief can be granted[7].

Alternatively, the equitable defense of laches precludes the Plaintiffs from asserting this claim. Laches bars an action from proceeding due to "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Hassler v. Assimos*, 53 B.R. 453, 456 (Bankr. D. Del. 1985), citing *E.E.O.C. v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69 (3d Cir. 1984), cert. dismissed, 469 U.S. 925 (1984). In this case all of the elements of laches exist. As stated numerous times above, NorthWestern's intention to "go flat" with the Montana Assets

---

[7] Magten is estopped from complaining regarding the transfer of the Montana Assets to NorthWestern. Magten purchased the QUIPS well after the transfer of the assets to NorthWestern and with full knowledge of the transaction.

-25-

was publicly disclosed to regulatory agencies and even in NorthWestern's 2001 Form 10-K. Further, NorthWestern's intention to "go flat" was clearly shown in documents executed by the Trustee. Despite all of this disclosure, at each transfer of the Montana Assets the Trustee assented to the transfer by executing a supplement to the Indenture. The Trustee could have refused to execute these supplements or made some formal objection, but the Trustee never did either of these things. Instead, the Trustee sat on its hands doing nothing. This lack of action is prejudicial to NorthWestern because now the Plaintiffs, and in particular the Trustee, seek to rescind a legitimate and expressly permitted transfer. Such a result, having to return legitimately received assets, would be prejudicial to NorthWestern, its estate, and creditors of its estate. Under these facts, laches clearly applies and therefore, the Plaintiffs' Complaint cannot allege facts sufficient to support a claim upon which relief can be granted.

## CONCLUSION

For the foregoing reasons this Court should dismiss Plaintiff's Complaint for failure to state a valid claim upon which relief can be granted.

This 14th day of May, 2004.

> Respectfully submitted,
> PAUL, HASTINGS, JANOFSKY & WALKER LLP
> 600 Peachtree Street
> Suite 2400
> Atlanta, GA 30308
> Jesse H. Austin, III
> Karol K. Denniston
> C. Carolyn Chayavadhanangkur
> Telephone: (404) 815-2400

-26-

And

GREENBERG TRAURIG, LLP

 /s/ William E. Chipman, Jr.
Scott D. Cousins (No. 3079)
Victoria Watson Counihan (No. 3488)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

Counsel for NorthWestern Corporation, as Debtor and
Debtor-in-Possession

ATL/1029981.12

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served Plaintiffs' with the foregoing Motion, and Supporting Brief, to Dismiss The Complaint Of Magten Asset Management Corporation And Law Debenture Trust Company Of New York For Failure To State A Claim Upon Which Relief Can Be Granted in the above-captioned case by depositing a copy of the same in the United States Mail, postage prepaid, addressed as follows:

> William J. Burnett
> Blank Rome LLP
> 1201 Market Street, Suite 800
> Wilmington, Delaware  19801
>
> -and-
>
> Fried, Frank, Harris, Shriver & Jacobsen LLP
> One New York Plaza
> New York, New York  10004
> *Counsel for Magten Asset Management*
> *Corporation*
>
> John V. Snellings
> Nixon & Peabody LLP
> 100 Summer Street
> Boston, Massachusetts  02100
> *Counsel for Law Debenture Trust Company of New*
> *York*

This _____ day of May, 2004.


_____
William E. Chipman, Jr. (No. 3818)

G



| ABOUT US | CUSTOMERS | INVESTORS | CAREERS | NEWS CENTER |

Wednesday, September 08, 2004

*NEWS CENTER* **News Display**

earch News
rchive
edia Contacts
ey Executives
age Gallery
ews Delivery
ervice

# NorthWestern Corporation Reports 2002 Financial Results

### *Company Reports Loss of $892.9 Million for Full-Year 2002*

### *Update Provided on Turnaround Plan*

SIOUX FALLS, S.D. – April 16, 2003 – NorthWestern Corporation (NYSE:NOR), one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, today reported its financial results for the year ended Dec. 31, 2002, following the filing with the Securities and Exchange Commission of its Annual Report on Form 10-K and amended Quarterly Reports on Form 10-Q/A which restated prior unaudited results for the first three quarters of 2002. In addition, the Company updated the progress of its turnaround plan.

The Company reported a loss on common stock for the year ended Dec. 31, 2002, of $892.9 million, or $30.04 per diluted share, compared with earnings on common stock of $37.5 million or $1.53 per diluted share in 2001. Full-year 2002 results were negatively impacted by $878.5 million in charges.

Consolidated revenues for 2002 were $2.0 billion, a 15.5 percent increase from $1.7 billion in 2001. Revenue increased in 2002 due to the addition of the newly acquired Montana electric and natural gas utility operations as well as increased revenue at Blue Dot, the Company's heating, ventilation and air conditioning business, primarily as the result of several acquisitions. However, consolidated revenues were adversely impacted by a substantial decrease in revenue from Expanets, the Company's communications services business, due primarily to deteriorating telecommunications markets and problems caused by complications with its EXPERT billing and collection system.

### 2002 Charges
As previously announced, NorthWestern reported significant charges in 2002 totaling $878.5 million. The breakdown of the charges are as follows:

- Impairment of Blue Dot goodwill and other long-lived assets million — $301.7
- Impairment of Expanets goodwill and other long-lived assets million — $288.7
- Discontinued operations of CornerStone Propane, net of tax benefits million — $101.7
- Valuation allowance for deferred tax asset million — $71.5
- Expanets billing adjustments and accounts receivable write-offs and reserves million — $65.8
- Impairment of Montana First Megawatts project million — $35.7
- Retirement of acquisition term loan, net of tax benefits million — $13.4

EXHIBIT
G

**Restatement of Quarterly Results**
Immediately prior to filing NorthWestern's 2002 Annual Report on Form 10-K,
NorthWestern filed amended Quarterly Reports on Form 10-Q/A for the periods ended
March 31, 2002, June 30, 2002, and Sept. 30, 2002. The quarterly reports were
restated and include additional disclosures in the appropriate periods related to:

- billing adjustments reducing revenues and increases in accounts receivable
  reserves and write-offs resulting from significant deficiencies in Expanets'
  EXPERT billing and collection system;
- the inadequacy of data to support recording certain revenues on a percentage of
  completion basis, thereby requiring utilization of completed contract revenue
  recognition methodology for such revenues and cost recognition;
- the impact resulting from the finalization of the purchase accounting for the
  acquisition of the Montana utility operations;
- the reversal of losses previously allocated to minority shareholders of Blue Dot as
  a result of the finalization of the purchase accounting for acquisitions made in
  2002;
- the timing, amount and disclosure of adjustment to certain accruals;
- the quarterly impact of certain other adjustments.

**Results from Core Utility Operations for 2002**
NorthWestern's core electric and natural gas utility, NorthWestern Energy, reported
operating income of $145.0 million, compared with operating income of $45.9 million in
2001.  Revenues for 2002 increased to $775.4 million, up substantially from revenues
of $251.2 million in 2001.  Results for 2002 include 11 months of Montana energy
operations, which were acquired in February 2002.  In 2002, Montana utility operations
contributed $113.1 million in operating income, with revenues of $562.6 million,
excluding results from January 2002.  South Dakota and Nebraska operations
contributed $31.9 million in operating income in 2002, with revenues of $212.7 million.

Total sales of electricity increased to approximately 9.4 million megawatt hours in 2002,
compared with 1.6 million megawatt hours in 2001.  Total sales of natural gas grew to
approximately 36.7 million MMBTU, compared with 18.3 million MMBTU in 2001.
Energy sales in 2002 reflect 11 months of results from Montana operations.

**Results from Nonutility Operations for 2002**
For 2002, Expanets reported an operating loss of $391.9 million, compared with an
operating loss of $102.6 million in 2001.  Full-year 2002 results were adversely
impacted by goodwill and other long-lived asset impairments in the fourth quarter of
2002 of $288.7 million and a $65.8 million increase in reserves and write-offs for billing
adjustments and accounts receivable and ongoing complications with Expanets'
EXPERT enterprise billing and collection system.  Revenues decreased in 2002 to
$710.5 million, compared with $1.0 billion in 2001, due to deteriorating
telecommunications markets and ongoing complications with the EXPERT system.

Blue Dot reported an operating loss in 2002 of $311.3 million, compared with an
operating loss of $13.8 million in 2001.  Blue Dot's results were adversely impacted by
goodwill and other long-lived asset impairments of $301.7 million and challenging
economic conditions.  Revenues were $471.8 million in 2002, compared with revenues
in 2001 of $423.8 million.  The increase in revenues was primarily due to acquisitions
made during 2001 and 2002.

**Turnaround Plan Update**
As previously announced, NorthWestern is implementing a turnaround plan involving
the following actions:

- Focusing on the Company's core electric and natural gas utility business.
- Reducing debt by applying net proceeds from the sale of noncore assets and
  businesses, including Blue Dot, Expanets, the Montana First Megawatts

generation project and the Colstrip (Montana) transmission line.
- Reducing costs and improving cash flow.
- Strengthening internal financial controls and procedures.

NorthWestern reported that progress has been made on several fronts regarding its turnaround plan, including:

- As part of a new agreement, Avaya, Inc. relinquished its equity interest in Expanets and canceled a noninterest bearing subordinated note with Expanets in the face amount of $35 million due in 2005, which had a carrying value of approximately $27 million. In addition, Expanets extended the payment schedule for approximately $27 million of debt owed to Avaya, originally due Dec. 31, 2002, and now due in three equal payments on Jan. 1, April 1 and July 1, 2004. NorthWestern has an obligation to purchase inventory and receivables in an amount equal to the outstanding balance in the event it is not repaid by Expanets.
- NorthWestern has engaged an investment advisor to pursue a possible sale or disposition of Blue Dot and Expanets. In addition, the Company does not intend to make additional significant investments in Blue Dot and Expanets and is working to improve their financial independence.
- Blue Dot has sold 15 of 16 noncore business locations that it had previously targeted for sale. Selling these underperforming locations, along with reductions in corporate overhead, will help Blue Dot to become more self sufficient.
- The Company has hired a chief restructuring officer, reporting directly to the Chief Executive Officer, and retained advisors to assist in developing strategic alternatives to reduce costs, improve cash flow and reduce debt.
- The Company has hired a vice president of audit and controls, reporting directly to the Chief Executive Officer, to assess, implement and monitor internal controls.

NorthWestern said that based on current plans and business conditions, the Company expects that its cash flows from operations, cash and cash equivalents will be sufficient to meet its cash requirements for the next 12 months. The Company believes that it may need additional funding sources or proceeds from the sale of noncore assets by the end of 2004 or early 2005. In 2005, the Company faces substantial debt maturities.

Given the Company's significant debt, the board of directors intends to review the appropriateness of each periodic interest payment of its trust preferred securities in light of, among other things, the progress of its turnaround plan and the Company's liquidity needs. The Company has the right to defer interest payments for up to 20 consecutive quarters. If interest payments are deferred, cash distributions on the trust preferred securities will also be deferred. In each case, interest would accrue on deferred payments.

Absent the receipt of significant proceeds from the sale of noncore assets, the raising of additional capital or a restructuring of existing debt, the Company will not be able to meet its substantial debt maturities. The Company is currently working with outside advisors to identify alternatives to restructure its long-term debt.

"Recognizing our significant challenges, we are taking steps to try and stabilize NorthWestern's current financial position and ensure that we maintain sufficient funds to support our core utility business and meet our obligations," said Gary G. Drook, NorthWestern's Chief Executive Officer. "In the near term, we are taking actions intended to assist us in reducing debt and returning our focus to our core utility business. In the longer term, we are evaluating our options for restructuring our indebtedness."

**About NorthWestern**
NorthWestern Corporation is one of the largest providers of electricity and

natural gas in the Upper Midwest and Northwest, serving approximately 598,000 customers in Montana, South Dakota and Nebraska. NorthWestern also has investments in Expanets, Inc., a leading nationwide provider of networked communications and data services to small and mid-sized businesses, and Blue Dot Services Inc., a provider of heating, ventilation and air conditioning services to residential and commercial customers.

## Forward-Looking Statements

*STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: All statements contained herein, as well as statements made in press releases and oral statements that may be made by us or by officers, directors or employees acting on our behalf, that are not statements of historical fact constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that could cause our actual results to be materially different from historical results or from any future results expressed or implied by such forward-looking statements. Among the factors that could cause our actual results or outcomes to differ materially are: the adverse impact of weather conditions and seasonal fluctuations; unscheduled generation outages, maintenance or repairs; unanticipated changes to fuel supply costs or availability due to higher demand, shortages, transportation problems or other developments; developments in the federal and state regulatory environment and the terms associated with obtaining regulatory approvals and rate orders; costs associated with environmental liabilities and compliance with environmental laws; the rate of growth and economic conditions in our service territories and those of our subsidiaries; the speed and degree to which competition enters the industries and markets in which our businesses operate; the timing and extent of changes in interest rates and fluctuations in energy-related commodity prices; risks associated with acquisitions, transition and integration of acquired companies, including the transmission and distribution business of the former Montana Power Company and the Growing and Emerging Markets Division of Lucent Technologies, Inc., and the implementation of information systems and realization of efficiencies in excess of any related restructuring charges; pending litigation relating to our acquisition of the former Montana Power Company; a lack of minority interest basis, which requires us to recognize an increased share of operating losses at certain of our subsidiaries; our ability to recover transition costs; disallowance by the Montana Public Service Commission of the recovery of the costs incurred in entering into our default supply portfolio contracts while we are required to act as the "default supplier;" disruptions and adverse effects in the capital markets due to the changing economic environment; our ability to maintain effective systems of internal controls, including significant implementation difficulties with the Expert system at Expanets; the impact of war, hostilities or terrorist actions; our credit ratings with Moody's, Standard & Poor's and Fitch; potential delays in financings or Securities and Exchange Commission filings because we changed auditors; our substantial indebtedness, which could limit our operating flexibility and ability to borrow additional funds; our ability to obtain additional capital to refinance our indebtedness that is scheduled to mature and for working capital purposes; our ability to identify and successfully complete proposed asset divestitures and additional impairment charges that may result from sales below book value; the ability of our unregulated businesses to obtain independent financing without reliance or us; changes in customer usage patterns and preferences; possible future actions and developments of CornerStone Propane Partners L.P., Expanets, Inc. and Blue Dot Services Inc.; and other factors identified from time to time in our filings with the SEC. This news release should be read in conjunction with our Annual Report on Form 10-K for 2001, as amended, and any subsequent quarterly reports on Form 10-Q and current reports on Form 8-K, which can be located at www.sec.gov or requested from the Company.*

*Any forward-looking statement speaks only as of the date on which such statement is made, and, except as required by law, we undertake no obligation to update any*

*forward-looking statement to reflect events or circumstances after the date on
which such statement is made or to reflect the occurrence of unanticipated events.
New factors emerge from time to time, and it is not possible for management to predict
all such factors.*

###

**Investors/Media:**
Roger Schrum
605-978-2848
roger.schrum@northwestern.com

**Additional Information**
Download or view attachment

About Us | Investors | Careers | News Center | Contact Us | Site Map | Home
Privacy | Terms & Conditions | Copyright © 2004 NorthWestern Corporation

**H**



| ABOUT US | CUSTOMERS | INVESTORS | CAREERS | NEWS CENTER |

Wednesday, September 08, 2004

*NEWS CENTER* **News Display**

arch News
rchive
edia Contacts
ey Executives
nage Gallery
ews Delivery
ervice

# NorthWestern Reports Blue Dot and Expanets Units Have Received SEC Subpoenas

SIOUX FALLS, S.D. – Dec. 31, 2003 – NorthWestern Corporation (OTC Pink Sheets: NTHWQ) today reported that the U.S. Securities and Exchange Commission (SEC) has issued subpoenas to Blue Dot Services Inc. and Expanets, Inc. requesting the production of documents as part of a now formal investigation of NorthWestern. This follows the SEC's requests for information made in connection with the previously announced SEC informal inquiry.

NorthWestern reported in April 2003 that it had been notified by the SEC that it was conducting an informal inquiry relating to questions regarding restatements and other accounting and financial reporting matters. NorthWestern has been cooperating fully with the SEC's inquiry, and it intends to provide the requested information as expeditiously as possible.

NorthWestern filed for Chapter 11 reorganization in the U.S. Bankruptcy Court in Delaware on Sept. 14, 2003. The filing did not include Blue Dot, a heating, ventilation and air conditioning services business, or Expanets, a communications services business. As part of its restructuring, NorthWestern has been selling its nonutility businesses and assets, including Expanets and Blue Dot, to focus on its core utility operations. On Nov. 26, 2003, NorthWestern completed the sale of substantially all of Expanets' assets to Avaya, Inc. for $152 million in cash and the assumption of specified liabilities, less certain post-closing working capital adjustments and the payment of certain excluded liabilities. As of Dec. 30, 2003, Blue Dot has sold 46 of its 63 business locations.

***About NorthWestern***
NorthWestern Corporation is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving approximately 600,000 customers in Montana, South Dakota and Nebraska. Further information about NorthWestern is available on the Internet at www.northwestern.com.

###

**Contacts:**
**Investors/Media:**
Roger Schrum
605-978-2848
roger.schrum@northwestern.com

About Us | Investors | Careers | News Center | Contact Us | Site Map | Home
Privacy | Terms & Conditions | Copyright © 2004 NorthWestern Corporation



EXHIBIT
H