

05- 499

# 842

Form B10 (Official Form 10) (12/03)

| United States Bankruptcy Court for the District of Delaware | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number |
|---|---|
| NorthWestern Corporation | 03-12872 (CGC) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): | |
|---|---|
| Magten Asset Management Corp. | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |

Name and address where notices should be sent:
Magten Asset Management Corp.          Fried, Frank, Harris, Shriver & Jacobson LLP
410 Park Avenue                        One New York Plaza
New York, NY 10022       - and -       New York, New York  10004
Tel: (212) 813-0900                    Tel: (212) 859-8000
Attn: Talton Embry                     Attn: Brad Eric Scheler, Esq
                                       Gary Kaplan, Esq.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor.

Check here ☐ replaces ☐ amends a previously filed claim, dated:_____
If this claim

**1. Basis for Claim:**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other _____ See attached Addendum

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of SS #:_____ ___ ___
  Unpaid compensations for services performed
  from _____ to _____
       (date)              (date)

**2. Date Debt Was Incurred:**
See attached Addendum

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ _See attached Addendum___ _____ _____ _See attached Addendum_
(unsecured)     (secured)     (priority)     (Total)

If all or part of your claim is secured or entitled to priority, **also complete** Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges **in addition** to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
- ☐ Real Estate  ☐ Motor Vehicle
- ☐ Other

Value of Collateral:   $_____

Amount of arrearage and other charges _at time case filed_ included in secured claim,
if any: $_____

**6. Unsecured Nonpriority Claims** $___See attached Addendum___
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
  Amount entitled to priority $_____
  Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650)* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier -- 11 U.S.C. § 507(a)(3)
- ☐ Contributions to an employee benefit plan -- 11 U.S.C. § 507(a)(4)
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use -- 11 U.S.C. § 507(a)(6)
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child -- 11 U.S.C. § 507(a)(7)
- ☐ Taxes or penalties owed to governmental units -- 11 U.S.C. § 507(a)(8)
- ☐ Other -- Specify applicable paragraph of 11 U.S.C. § 507(a) (___)

*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**9. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**10. Date-Stamped Copy** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED

JAN 1 4 2004

KURTZMAN CARSON

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| January 13, 2004 | Magten Asset Management Corp. <br><br> By _____ <br> Talton Embry <br> Chairman |

_Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571._



0312872040114000000000172

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------------x

In re:                                                    :        Chapter 11
                                                          :
Northwestern Corporation,                                 :
                                                          :        Case No. 03-12872 (CGC)
                           Debtor.                        :
                                                          :
                                                          :
-----------------------------------------------------------------------x

## ADDENDUM TO PROOF OF
## CLAIM OF MAGTEN ASSET MANAGEMENT CORP.

Talton Embry, Chairman of Magten Asset Management Corp. ("Magten"), whose business address and mailing address is 410 Park Avenue, New York, NY 10022, says:

1.     I, Talton Embry, am the Chairman of Magten. I am authorized to execute this proof of claim on behalf of Magten.

2.     Magten holds in excess of 33% of the Series A 8.45% Cumulative Quarterly Income Preferred Securities ("Preferred Securities") issued by Montana Power Capital I ("Montana Capital"). Montana Capital is a business trust, which exists for the sole purpose of issuing the common securities and the Preferred Securities (together the "Trust Securities") and investing the proceeds in the Junior Subordinated Interest Debentures 8.45% Series due 2036 ("Junior Debentures"), that were issued by The Montana Power Company ("Montana Power"). Montana Power owns all the common securities of Montana Capital, which represents 3% of the aggregate liquidation amount of the Trust Securities and is also the owner of all of the beneficial interests represented by the Trust Securities. In addition, Montana Power guaranteed payment of the Preferred Securities.

3.     In a series of transactions, detailed in sections 4 to 6 below, Montana Power was merged into the above captioned debtor and debtor in possession ("NWC") and NWC

assumed Montana Power's obligations under the Junior Debentures and the guarantee of the Preferred Securities.

4.     On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with NWC, whereby NWC agreed to purchase The Montana Power, LLC ("Montana Power, LLC"), which would hold the assets, liabilities and other commitments related to Montana Power's electric utility businesses.

5.     On February 13, 2002, Montana Power merged into Montana Power, LLC, with Montana Power, LLC as the surviving entity. On February 15, 2002, Montana Power, LLC was acquired by NWC for $602 million in cash and the assumption of $488 million of debt. Montana Power, LLC remained a subsidiary of NWC and on March 19, 2002, Montana Power, LLC was renamed NorthWestern Energy, LLC ("NorthWestern Energy").

6.     On November 15, 2002, NorthWestern Energy transferred (the "Transfer") its utility assets and operations to NWC, which, in turn, assumed certain of the liabilities and guarantees of NorthWestern Energy pursuant to that certain Asset and Stock Transfer Agreement by and between NorthWestern Energy (formerly known as Montana Power, LLC) and NWC (the "Transfer Agreement"). NorthWestern Energy was subsequently renamed Clark Fork and Blackfoot LLC ("Clark Fork") on November 20, 2002. In August 2002, in connection with the Transfer, NWC assumed joint and several liability with NorthWestern Energy (now Clark Fork) for the debt originally issued by Montana Power, thereby making certain NorthWestern Energy creditors also creditors of NWC. Following the Transfer, NWC operated the former Montana Power business as part of the NorthWestern Energy Division of NWC. The Transfer resulted in the outstanding NorthWestern Energy debt (most of which originated with Montana Power) being treated *pari passu* with the like-kind (but more substantial amount of) NWC's debt.

7.     On September 14, 2003, NWC filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

- 2 -

8.      Under Montana law, MCA §§ 31-2-326 - 31-2-342, a transfer may be avoided if, among other things, the action is brought within two years after the transfer was made, and the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor. Alternatively, a transfer may be avoided if the debtor received less than reasonably equivalent value and either (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond its ability to pay as the debts became due.

9.      Pursuant to MCA § 31-2-333(2), in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

10.      When these factors are considered in the context of the Transfer, it appears that the Transfer was made with actual intent to hinder, delay, or defraud the Preferred Securities' holders. First, the transferee, NWC, is the parent and in control of NorthWestern Energy, and thus qualifies as "insider" under Montana law. Second, before the transfer was made, NorthWestern Energy had several suits pending against it and incurred a $67 million obligation on account of the Junior Debentures. Third, the transfer was of substantially all NorthWestern Energy's assets. Finally, in accordance with to the Transfer Agreement, in exchange for the transfer of substantially all of NorthWestern Energy's assets to NWC, NWC assumed the liabilities of NorthWestern Energy. The assets that NWC received were the assets of Montana Power, which was a viable, profitable utility business. Since the value of those assets is substantially higher than the relatively small amount of liabilities assumed, NorthWestern Energy did not receive reasonably equivalent value for the Transfer. Thus, the

- 3 -

Transfer was made with actual intent to hinder, delay, or defraud the Preferred Securities' holders.

11.    Additionally, NorthWestern Energy did not receive reasonably equivalent value for the Transfer, and NorthWestern Energy either engaged in a transaction for which its remaining assets were unreasonably small in relation to the transaction, or intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Clark Fork, the remaining entity, was left only with the Milltown Dam and corresponding environmental liabilities as a result of the Transfer, despite the fact that it was still liable (on a joint and several basis with NWC) for the Montana Power obligations. The assets that remained in Clark Fork after the Transfer were insufficient to pay the debts owed by Clark Fork or continue the operation of the Milltown Dam.

12.    Magten holds a claim against NWC, as the recipient of fraudulent transfer under Montana law, for the damages associated with the fraudulent transfer described above.

13.    Therefore, Magten holds a claim against NWC for the face amount of the Preferred Securities held by Magten.

14.    Because all of the documents supporting Magten's claim are in NWC's possession and are voluminous, they have not been attached hereto.

15.    No judgment has been rendered on this claim.

16.    No part of the claim asserted herein has been paid.

17.    This claim is not subject to any setoff or counterclaim.

18.    Magten does not waive any right to any security held by or for it or any right to claim specific assets or any right or rights of action that Magten has or may have against NWC or any other person or persons.

19.    Nothing in this claim should limit the right of Magten to assert other remedies, including seeking the imposition of a constructive trust, and Magten expressly reserves such rights.

- 4 -

20.     Magten expressly reserves the right to amend and/or supplement this proof

of claim in any respect.

21.     In filing this proof of claim, Magten does not submit itself to the

jurisdiction of this Court for any purpose other than with respect to such claim.

## ALL NOTICES AND DISTRIBUTIONS WITH RESPECT TO THIS CLAIM SHOULD BE SENT TO:

Fried, Frank, Harris, Shriver & Jacobson LLP
Attorneys for Magten Asset Management Corp.
One New York Plaza
New York, New York 10004
Attn: Brad Eric Scheler, Esq.
        Gary Kaplan, Esq.

With a copy to:

Magten Asset Management Corp.
410 Park Avenue
New York, NY 10022
Tel: (212) 813-0900
Attn: Talton Embry

_____

PENALTY FOR PRESENTING A FRAUDULENT CLAIM:
Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3623.

454735

- 5 -

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>NORTHWESTERN CORPORATION,<br><br>Debtor. | Chapter 11<br><br>Case No. 03-12872 (CGC) |
| MAGTEN ASSET MANAGEMENT CORPORATION<br>& LAW DEBENTURE TRUST COMPANY OF NEW<br>YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | Adv. No. _____ |

**COMPLAINT TO AVOID THE TRANSFER OF ASSETS OF CLARK FORK
AND BLACKFOOT LLC (F/K/A NORTHWESTERN ENERGY LLC)
TO NORTHWESTERN CORPORATION**

Magten Asset Management Corporation (*"Magten"*) individually in its capacity as a

creditor of Clark Fork and Blackfoot, LLC (*"Clark Fork"*), and on behalf of Montana Capital I

(the *"Trust"*) together with Law Debenture Trust Company of New York (*"Law Debenture"* and

collectively with Magten *"the Plaintiffs"*), in its capacity as the Trustee under the Indenture for

the Unsecured Subordinated Debt Securities Relating to Trust Securities dated November 1,

1996 (the *"Indenture"*), and in its capacity as Guarantee Trustee under that certain Guarantee

Agreement dated November 1, 1996 (the *"Guarantee Agreement"*), for this complaint alleges as

follows:

1.      Plaintiffs bring this adversary proceeding in accordance with Rule 7001 of the

Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) because NorthWestern

Corporation, the above-captioned debtor (the *"Debtor"*) received, in a fraudulent conveyance,

120087.01600/40138386v1



0312872040416000000000004

substantially all of the assets of its wholly owned subsidiary, Clark Fork (an entity formerly known as NorthWestern Energy, LLC ("*NWE*")).

2.      At the time of the transfer of the assets of Clark Fork to the Debtor (the "*Transfer*"), the Debtor was the sole equity holder of Clark Fork. Using this control of Clark Fork, the Debtor transferred the assets and liabilities of Clark Fork to itself. The assets of Clark Fork were valued at between $1.15 billion and $1.4 billion while the assumed liabilities amounted to approximately $700 million. However, the Debtor's other liabilities were so excessive that, even after obtaining Clark Fork's assets for inadequate consideration, the Debtor could not pay its own creditors and ultimately filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      Prior to the Transfer, Clark Fork was a solvent and reasonably capitalized entity. The Transfer rendered Clark Fork insolvent and undercapitalized and thereby injured the creditors of Clark Fork, including Magten. The Transfer unjustly enriched the Debtor by hundreds of millions of dollars while destroying Clark Fork's solvency and, thus, its ability to meet its obligations to Magten and its other creditors.

4.      By this Complaint, Plaintiffs seek, among other things, (i) the avoidance of the Transfer, (ii) a declaration that the assets that were fraudulently transferred are not the property of the Debtor's estate in its chapter 11 case, (iii) the imposition of a constructive trust over the transferred assets for the benefit of the Trust, and (iv) the return of such assets to Clark Fork.[1]

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

6.      This proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H) and (O).

---

[1]      This Court set January 15, 2004, as the deadline for filing proofs of claim against the Debtor. Magten, as an individual holder of the QUIPS and Law Debenture Trust Company of New York, as Indenture Trustee, each filed timely proofs of claim for damages incurred as a result of the Transfer.

2

7.     Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

8.     Magten is a corporation validly organized and doing business under the laws of the State of Delaware.

9.     Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the *"QUIPS"*), issued by the Trust. The Trust is a business trust established pursuant to the Delaware Business Trust Act.

10.     The Trust was established by The Montana Power Company (*"Montana Power"*), predecessor in interest to Clark Fork (f/k/a NWE), as a financing vehicle. The sole asset of the Trust are the 8.45% Junior Subordinated Debentures due 2036 (the *"Junior Debentures"*). Section 610 of the Indenture governing the Junior Debentures grants to Magten, as a holder of the QUIPS, "the right to institute a legal proceeding directly against [the Debtor]" to enforce certain rights relating to the QUIPS or to the Amended and Restated Trust Agreement (the *"Trust Agreement"*).

11.     Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York.

12.     Law Debenture brings this complaint as a co-plaintiff in its capacity as successor trustee under the Indenture on behalf of all holders of the QUIPS.

13.     The defendant in this adversary proceeding is the Debtor in the above-captioned chapter 11 case.

14.     The Debtor is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota.

15.     On September 14, 2003, the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its businesses and manage its properties as a debtor in possession.

3

16.    The Debtor owns and operates utility companies in the United States. The Debtor and its direct and indirect nondebtor energy subsidiaries comprise of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 598,000 customers throughout Montana, South Dakota and Nebraska.

## BACKGROUND

### The Montana Power Company

17.    Montana Power was incorporated in 1961 under the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger of four regional electric companies.

18.    By the year 2000, Montana Power was engaged in activities related to telecommunications and energy related activities including activities in the fields of oil, coal, natural gas, and electricity.

19.    In November 1996, Montana Power and The Bank of New York (*"BNY"*) as Trustee entered into the Indenture. Law Debenture subsequently succeeded BNY as Trustee under the Indenture.

20.    Pursuant to the Indenture, Montana Power issued the Junior Debentures.

21.    Also in November 1996, pursuant to the Trust Agreement, Montana Power, BNY as Property Trustee and certain individuals as Administrative Trustees, created the Trust. Law Debenture and BNY are currently taking the necessary steps to enable Law Debenture to succeed BNY as Property Trustee.

22.    Pursuant to the Trust Agreement, the Trust issued the QUIPS.

23.    The Trust holds 100% of the Junior Debentures, with a total face amount of $65 million, which constitute its sole meaningful asset. The value of the QUIPS is entirely based on the value of the Junior Debentures, and, thus, the ability of Clark Fork to pay interest and principal to the Trust. Amounts paid by Clark Fork to the Trust are, in turn, paid by the Trust to the holders of the QUIPS.

4

24.    The Junior Debentures were not sold directly to investors. Rather, they were sold to BNY as Property Trustee under the Trust Agreement. Investors thereby acquired an indirect undivided beneficial interest in the Junior Debentures and obtained substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

25.    In connection with the Indenture, Montana Power agreed that the holders of the Junior Debentures would have the absolute and unconditional right to receive principal and interest. Under the Indenture, those payments of principal and interest were to be paid to the Property Trustee.

26.    Montana Power entered into the Guarantee Agreement with BNY (as Guarantee Trustee) in November 1996. Law Debenture subsequently succeeded BNY as Guarantee Trustee. Pursuant to the Guarantee Agreement, Montana Power, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust and to the extent that BNY, as Property Trustee has funds available in a specified account.

27.    Taken together Montana Power's obligations under the Indenture, the Trust Agreement, the Expense Agreement and the Guarantee provide, in the aggregate, a full, irrevocable and unconditional guarantee of payments of distributions and other amounts due to the holders of the QUIPS.

**The Sale of the Montana Power Company's Utility Assets**

28.    On March 28, 2000, The Montana Power Company, (*"Montana Power"*), announced plans to restructure its business. This restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane utility assets, in order to allow Montana Power to focus on its telecommunications business.

5

29.     On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with the Debtor, pursuant to which the Debtor agreed to purchase Montana Power's electric, natural gas and propane utility assets (the *"Montana Utility Assets"*). In order to facilitate the assets sale to the Debtor, Montana Power created a subsidiary, Montana Power Company LLC (*"MPLLC"*).

30.     On February 13, 2002, Montana Power merged its energy assets into MPLLC (the *"Merger"*). As a result of this, MPLLC held and operated the Montana Utility Assets.

31.     In connection with the Merger, on February 13, 2002, MPLLC entered into the First Supplemental Indenture, pursuant to which MPLLC assumed the obligations of Montana Power under the Indenture.

32.     In connection with the Merger, on February 13, 2002, pursuant to a letter agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

33.     On February 15, 2002 the Debtor's acquisition of MPLLC was completed with the payment by the Debtor of $478 million in cash to the parent of MPLLC and the assumption of $511 million of MPLLC liabilities. As a result of the acquisition, MPLLC became a wholly owned subsidiary of the Debtor.

34.     None of the cash paid for the Montana Utility Assets was retained by MPLLC. It was, thus, not thereafter available to assist Clark Fork in meeting its obligations to its creditors.

35.     On March 19, 2002, MPLLC was renamed NWE. NWE was a duly organized Montana limited liability company and is now known as Clark Fork.

36.     On August 13, 2002, the Debtor entered into the Second Supplemental Indenture, pursuant to which the Debtor assumed all of the obligations under the Indenture on a joint and several basis with Clark Fork.

37.     On August 13, 2002, the Debtor entered into an Amendment to the Guarantee Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Guarantee Agreement.

6

38.    On August 13, 2002, the Debtor entered into a letter agreement amending the Trust Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Trust Agreement.

39.    The Debtor was insolvent both immediately before and immediately after the assumption of liabilities. The Debtor was engaged in business with unreasonably small capital and incurred debts beyond its ability to pay both immediately before and immediately after the assumption of liabilities.

**The Transfer**

40.    On November 15, 2002, Clark Fork transferred substantially all of its assets, the Montana Utility Assets, to the Debtor and retained only the Milltown Dam, a two megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers. The Milltown Dam operates under a license that expires in 2007.

41.    Although Clark Fork transferred over $1 billion of assets to the Debtor, Clark Fork received no cash for the Transfer, and the only consideration was the assumption of certain liabilities (estimated to be only approximately $700 million) by the Debtor. As a result of the Transfer, Clark Fork was rendered insolvent.

42.    Because Clark Fork was rendered insolvent and undercapitalized as a result of the Transfer, it is entirely dependent upon the Debtor for the continued funding of the Milltown Dam and, indeed, for the funding of its continuing corporate existence. The Debtor funds the costs and expenses associated with the operation of the Milltown Dam under the terms of certain agreements with Clark Fork.

43.    In connection with the Transfer, on November 15, 2002, the Debtor executed the Third Supplemental Indenture, pursuant to which the Debtor expressly assumed the due and punctual payment of the principal and interest on the securities issued under the Indenture.

44.    On November 15, 2002, the Debtor executed the Guarantee Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Guarantee Agreement.

7

45.    On November 15, 2002, the Debtor executed the Trust Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Trust Agreement.

46.    Following the Transfer, the Debtor operated the Montana Utility Assets as part of the Debtor's NorthWestern Energy Division.

47.    On November 20, 2002, the Montana Power energy subsidiary was officially renamed Clark Fork.  Clark Fork continues to operate the Milltown Dam.

**The Debtor's Attempt to Release Clark Fork**

48.    Article Eleven of the Indenture purports to release Montana Power (or its successor in interest) upon the transfer of substantially all of the assets of Montana Power if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

49.    Upon information and belief, in connection with the Transfer of the Montana Utility Assets, the Debtor requested that BNY, as the initial Trustee under the Indenture execute the Third Supplemental Indenture with language that expressly released Clark Fork from its obligations under the Indenture.

50.    Upon information and belief, BNY refused to execute the Third Supplemental Indenture in its capacity as Indenture Trustee if such contained a release of Clark Fork's obligations under the Indenture.

51.    The Third Supplemental Indenture, as executed by BNY in its capacity as Indenture Trustee did not include a release of Clark Fork's obligations under the Indenture.

52.    In additional, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

8

## FIRST CAUSE OF ACTION

**(The Transfer was Fraudulent Under Montana Law Because of an Actual
Intent to Hinder, Delay, or Defraud Creditors)**

53.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 52 as if
fully set forth here.

54.    Under the Montana Code Annotated ("MCA") § 31-2-333, a transfer may be
avoided if, the debtor made the transfer with actual intent to hinder, delay, or defraud any
creditor.

55.    Pursuant to MCA § 31-2-333, in determining actual intent to hinder, delay, or
defraud any creditor, consideration may be given, among other factors, to whether: the transfer
was to an insider; before the transfer was made, the debtor had been sued; the transfer was of
substantially all the debtor's assets; and the value of the consideration received by the debtor was
reasonably equivalent to the value of the assets transferred.

56.    The QUIPS holders are creditors of the Debtor, and of Clark Fork by operation of
the Guarantee Agreement and the Indenture.

57.    The Debtor is the parent of Clark Fork and, as such, exercised complete control
over Clark Fork. As a result of this relationship, the Debtor qualifies as an insider under
Montana law.

58.    In connection with the Transfer, Clark Fork transferred assets to the Debtor that
are valued between $1.15 billion and $1.4 billion, and the only consideration received for the
Transfer was the assumption of approximately $700 million in liabilities.

59.    Prior to the Transfer, Clark Fork was a solvent entity. The transfer of
substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become insolvent.

60.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity. The transfer
of substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become
undercapitalized.

9

61.    Because the Montana Utility Assets that the Debtor received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Debtor, Clark Fork did not receive reasonably equivalent value for the transfer.

## SECOND CAUSE OF ACTION

### (The Transfer was Fraudulent As a Constructive Fraud Which Rendered Clark Fork Insolvent)

62.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 61 as if fully set forth here.

63.    Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

64.    Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer.  The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

65.    After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities.  Despite the decimated asset pool, Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

66.    The Transfer rendered Clark Fork insolvent.

10

## THIRD CAUSE OF ACTION

### (The Transfer was Fraudulent As a Constructive Fraud Because it Rendered Clark Fork Undercapitalized)

67.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 66 as if fully set forth here.

68.    Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

69.    Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer.  The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

70.    After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities.  Despite the decimated asset pool, Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

71.    The Transfer rendered Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

72.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 71 as if fully set forth herein.

73.    The Debtor was the recipient of the Montana Utility Assets.

11

120087.01600/40138386v1

74. The Transfer was fraudulent under MCA §§31-2-333 and 31-2-334.

75. Prior to the Transfer, Clark Fork was solvent. As a result of the Transfer, the Debtor received assets valued between $1.15 billion and $1.4 billion, for which the assumption of $700 million of liabilities by the Debtor was less than reasonably equivalent value.

76. Upon information and belief, the Montana Utility Assets comprise approximately 80% of the Debtor's consolidated EBITDA. In light of this and the fact that Clark Fork received less than reasonably equivalent value for the Transfer, the receipt by the Debtor of the Montana Utility Assets has unjustly enriched the Debtor and the Debtor's creditors.

77. Absent the Transfer, the holders of the QUIPS would have received payment in full from Clark Fork, as a solvent utility company, on behalf of their claims. However, as a result of the Transfer, the holders of the QUIPS may receive nothing on account of their claims.

78. The Junior Debentures were subordinated obligations to the other debt owed by Montana Power. Upon the assumption of liabilities by the Debtor, the Debtor has asserted that these obligations are junior to approximately $1.7 billion of senior debt. In light of the fact that the Debtor was insolvent at the time of the assumption of liabilities, the Debtor's creditors would be unjustly enriched if the QUIPS are treated as *pari passu* or junior to the Debtor's other indebtedness.

### PRAYER FOR RELIEF

*WHEREFORE,* Plaintiffs respectfully requests that the Court enter judgment against the Defendant[2] as follows:

---

[2] Though not named herein, Plaintiffs hereby retain all rights to amend this complaint bring suit against all parties that orchestrated or other wise benefited from the Transfer.

12

(a)     Avoiding the Transfer;

(b)     Declaring that the Montana Utility Assets are not the property of the Debtor's

estate in the chapter 11 case;

(c)     Imposing a constructive trust on the Montana Utility Assets for the benefit of the

Trust and ordering the return of such assets to Clark Fork;

(d)     Attorney's fees and costs of this action; and

(e)     Such other relief as this Court deems just and proper.


*[Remainder of Page Intentionally Left Blank]*

13

Dated: Wilmington, Delaware
   April __, 2004

**NIXON PEABODY LLP**

*John Snellings*

John V. Snellings (BBO No. 548791)
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1202
Facsimile: (866) 947-1732

Counsel for Law Debenture Trust
Company of New York

**BLANK ROME LLP**

*William J. Burnett* /mmb

William J. Burnett (DE No. 4078)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile:   (302) 425-6464

- and -

**FRIED, FRANK, HARRIS, SHRIVER &**
   **JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
   Corporation

UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re NORTHWESTERN CORPORATION, | ) ) ) | In Chapter 11 proceedings |
| Debtor. | ) ) ) | Case No. 03-12872 (CGC) |
| | ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION & LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) | ADV. NO. 04-53324 (PBL) |
| Plaintiffs, | ) ) | UNDER ADVISEMENT DECISION RE: MOTION TO DISMISS |
| v. | ) ) | |
| NORTHWESTERN CORPORATION, | ) ) | |
| Defendant. | ) ) | |

I.    Introduction

Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively referred to hereafter as "Plaintiffs") filed a complaint against Debtor NorthWestern Corporation in April, 2004, challenging the prepetition transfer from Clark Fork and Blackfoot, LLC ("Clark Fook"), fka NorthWestern Energy, LLC, of essentially all of its assets to its parent corporation Debtor NorthWestern. The crux of Plaintiffs' complaint is that Debtor caused the transfer of over $1 billion in Clark Fork assets to itself in exchange for the assumption by Debtor of only about $700 million in Clark Fork liabilities. Plaintiffs allege the transfer ultimately left Debtor unable to pay its own creditors and resulted in Debtor's bankruptcy, under which Plaintiffs will receive virtually nothing. Further, the transfer rendered Clark Fork insolvent and undercapitalized, again leaving Plaintiffs, as creditors of Clark Fork, with nothing. Not only was the transfer itself a fraudulent conveyance, Plaintiffs argue, but Debtor also engaged in a fraudulent scheme by misrepresenting its financial standing at the time of the transfer.

In Count I, Plaintiffs contend that Debtor made the transfer with the actual intent to hinder,

delay or defraud its creditors as defined by section 31-20333 of the Montana Code. In Counts II and III, Plaintiffs allege that the transfer was fraudulent under section 31-2-334 of the Montana Code because Debtor made the transfer without receiving equivalent value and because Debtor was insolvent at the time or rendered insolvent as a result of the transfer. In Count IV, Plaintiffs allege that Debtor and its creditors were unjustly enriched by the transfer.

## II.    **Factual Background**

In 1996, the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork/Northwestern Energy, created the Montana Power Capital Trust I ("Trust") as a financing vehicle with the Bank of New York ("BNY") as Trustee. The sole asset of the Trust was 8.45% Junior Subordinated Debentures due 2036 ("Junior Debentures"). After formation of the Trust, Montana Power and BNY entered into the Indenture for Unsecured Subordinated Debt Securities relating to the Trust Securities ("Indenture"). At about the same time, the Trust issued $65 million of 8.45% cumulative Quarterly Income Preferred Securities ("QUIPS"), Series A, the proceeds of which were used to purchase an equal amount of Junior Debentures, 8.45% Series due 2036, from Montana Power. Montana Power also entered into a Guarantee Agreement with BNY, under which Montana Power provided a limited guarantee of obligations with respect to the QUIPS – "only if and to the extent that the Property Trustee has available in the Payment Account funds sufficient to make payment."

Four years later, in 2000, Debtor NorthWestern purchased substantially all of Montana Power's electric, natural gas, and propane utility assets under a Unit Purchase Agreement. The structure of the sale was as follows. Montana Power created a subsidiary called The Montana Power LLC ("MP-LLC"), which Debtor intended to acquire as a division of itself as opposed to a subsidiary. The parties refer to such an acquisition as "going flat."

The going flat deal was disclosed to the Federal Energy Regulatory Commission ("FERC") by Debtor and Montana Power in their Joint Application of the Montana Power Company and NorthWestern Corporation for Approval of Disposition of Jurisdictional Facilities. In the application, the parties indicated that the proposed sale was not contingent on any particular

2

structure, but that NorthWestern intended to either form a holding company to acquire MP-LLC as a wholly owned subsidiary or to acquire MP-LLC in its current "flat" structure such that MP-LLC would become a separate division of NorthWestern and not a subsidiary. After resolving a variety of issues with respect to the transfer, it was approved by both the FERC and the Montana Public Service Commission.

The assets were then transferred to MP-LLC by Montana Power in February, 2002. As part of this conveyance, the MP-LLC and BNY, as Trustee, executed a supplemental indenture under which MP-LLC assumed all obligations of Montana Power under the original Indenture. Subsequently, Debtor NorthWestern's acquisition of MP-LLC was completed with the payment of $478 million cash and the assumption of $511 million of MP-LLC's liabilities, which included the claims of the QUIPS and the Indenture. MP-LLC was then a subsidiary of Debtor and renamed NorthWestern Energy, LLC.

In order to "go flat" with the now named Northwestern Energy, as it originally intended, Debtor disclosed to the SEC that it intended "to transfer the energy and natural gas transmission and distribution operations of NorthWestern Energy, LLC to NorthWestern Corporation." NorthWestern accomplished this by executing a Second Supplemental Indenture with NorthWestern Energy and the Trustee BNY, in which it contends it "fully and unconditionally assumed NorthWestern Energy's obligations (as successor to MP-LLC, as the successor to Montana Power) with respect to the QUIPS and the performance of every covenant, obligation and agreement under the Indenture." It apparently paid no cash for NorthWestern Energy's assets, but assumed all its liabilities except those associated with the Milltown Dam. The Second Supplemental Indenture also expressly subordinated the obligations Debtor assumed from NorthWestern Energy to its "Senior Indebtedness" and released NorthWestern Energy from any and all obligations under the QUIPS debenture, the Indenture and the Second Supplemental Indenture.

NorthWestern, Northwestern Energy and BNY also executed the Amendment to Guaranty Agreement whereby NorthWestern attempted to assume completely the limited obligations of Montana Power under the original Guaranty Agreement. Debtor subsequently sought and received

3

the FERC's approval to assume the QUIPS, along with other debt of NorthWestern Energy. A Third Supplemental Indenture was executed in which Debtor expressly assumed "the covenants of NorthWestern Energy contained in the Indenture and the Securities issued thereunder" and assumed the payments of principal and premium on outstanding securities issued under the Indenture and the performance of every covenant thereunder.  Subsequently, NorthWestern Energy was renamed Clark Fork and Blackfoot, LLC.

Plaintiff Magten holds in excess of 33% of the Series A, 8.45% QUIPS issued by the Trust. Plaintiff Magten purchased its share of the QUIPS *after* the transfer of NorthWestern Energy's assets to Debtor and sometime shortly before or after Debtor filed bankruptcy. Plaintiff Law Debenture is the successor trustee to BNY under the Indenture on behalf of the holders of the QUIPS.

As a result of these transfers, Plaintiffs complain that they have relegated to the bottom of the heap of Debtor's creditors. While they (or their predecessors) were once essentially at the top of the h eap o f C lark F ork's c reditors, u pon t he t ransfer t o D ebtor, t hey w ere s ubordinated t o Debtor's senior creditors, which in essence left them with little at the end of the day under Debtor's Plan. By this action, they seek to undo the transfer so that the assets will be returned to Clark Fork.

**III.    Analysis**

Debtor NorthWestern seeks dismissal of Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in bankrupcty proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.   In determining whether to grant the motion to dismiss, this Court must assume the facts as pled in the complaint are true. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Debtor begins by challenging Plaintiffs' standing, alleging that they are creditors of Debtor NorthWestern only and not of Clark Fork. The standing argument highlights the difficulty with this case. This is not a typical fraudulent conveyance complaint where the *debtor in possession* sues a *third party* seeking to bring assets back *into* the estate. Instead, this is an alleged *creditor of a non-debtor* suing the *Debtor* in order to *divest the estate* of assets and return them to the non-debtor. Acknowledging that they must be creditors of Clark Fork to bring this action, Plaintiffs argue that

4

they are so due to the invalidity of the transfers.

Debtor says this is impossible, as the very structure of the transfer ended any debtor-creditor relationship between Plaintiffs and Clark Fork. Debtor argues that any transfers of assets completed in accordance with Section 1101 of the Indenture result in the successor entity (Debtor in this case) succeeding to and being substituted for the prior entities (Clark Fork) such that the successor entity (Debtor) is the only entity obligated to the QUIPS. Critically, Section 1102 of the Indenture in turn expressly relieves the predecessor entity, here Clark Fork, of all obligations and covenants under the Indenture. The QUIPS holders, therefore, are creditors solely of Debtor as long as the transfer was in compliance with Section 1101 of the Indenture, which Debtor contends Plaintiffs do not challenge.

### A.    Did Debtor Comply with the Indenture?

#### 1.    Is there a guarantee of solvency?

Plaintiffs disagree for several reasons. First, Plaintiffs argue that because Debtor used false financial statements and was insolvent, it did not in fact comply with the terms of the Indenture and, therefore, did not properly assume Clark Fork's liabilities: Clark Fork is therefore still liable to Plaintiffs. In support of this position, Plaintiffs point to two requirements in Section 1101 of the Indenture requiring Debtor to "assume . . . [1]the due and punctual payment of the principal and premium, if any, and interest, if any on all Outstanding Securities *and [2]* the performance of every covenant of this Indenture on the part of [Clark Fork] to be performed or observed." Plaintiffs assert that, because Debtor is unable to make the payments due the QUIPS, Debtor did not in fact comply with the terms of Section 1101 of the Indenture.

Plaintiffs argument is flawed. Plaintiffs read this language as a guarantee of solvency by Debtor upon executing the transfer. It is not. The language only requires that Debtor assume the obligations, not that it actually be able to perform the obligations. Debtor in fact did assume the obligations.

#### 2.    Was Consent of the Holders Required?

Plaintiffs also argue that Debtor's alleged insolvency wrongfully impaired their rights

5

under the Indenture to receive payment of principal and interest and therefore the transaction had to be approved by the holders of the securities. This argument is similarly misplaced. While the Indenture and the Trust Indenture Act of 1939 do in fact provide that "the right of any holder of any indenture security to receive payment of the principal of and interest on such security . . . shall not be impaired," this applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself. Plaintiffs' legal rights were not impaired. Again, there is no guarantee against default.

### B.     Are the Plaintiffs Creditors Under The Guarantee?

Plaintiffs are also not creditors of Clark Fork by way of the Guarantee Agreement that is part of the original debt transaction. Both parties have treated this argument in a superficial and conclusory fashion; it is more complicated than it seems.

As noted, the QUIPS were issued in a two-step transaction. Montana Power Company (referred to for ease of reference as "Clark Fork") issued subordinated debentures (the "Debentures"), all of which were purchased and held by the Trust. The Trust, in turn, issued the QUIPS to Holders, such as Magten's predecessor in interest, in consideration of payment of a corresponding pro rata amount of the Debentures (which funds were then used to purchase that amount of the Debentures). The Holders then were entitled to a specific percentage of the distributions made by Clark Fork to the Trust on account of the Debentures.[1]

The Guarantee appears to exist as protection against the unlikely event that Clark Fork makes required distributions to the Trust but the Trust thereafter fails to distribute the funds to the Holders. Although it contains many of the same terms and obligations of a true third party guarantee, it is fundamentally different. In the third party setting, the guarantor unconditionally guarantees that a creditor will receive payment of its debt from the obligor. In this case, Clark Fork guaranteed that the Holders would receive their distributions only to the extent that Clark Fork had already paid the

---

[1]Technically, the distributions were made by Clark Fork to a Property Trust (created simultaneously with the Trust with the same trustee) to receive and distribute the funds on a pro rata basis to the holders of the QUIPS.

6

Trust. Guarantee § 1.01 (definition of "Guarantee Payments"). In no event would Clark Fork be liable to "pay twice"; rather, its liability is limited to the situation where the middleman (the Trust) fails to pay over what it has already received from Clark Fork. For example, it does not guarantee payment in the situation where, for whatever reason, the Trust receives the money and uses it for some other purpose.[2] Or, more bluntly, it does not guarantee payment if the Trustee misuses or commingles the Trust's assets. In either of those situations, the extent of Clark Fork's guarantee liability is limited to the *lesser* of the aggregate of the Liquidation Amount (a defined term) and all accrued and unpaid distributions *and* the amount of Trust's assets remaining available for distribution.[3] Thus, regardless of whether the Liquidation Amount and the accrued and unpaid distributions exceed the amount of assets remaining in the Trust, Clark Fork's liability is limited to those assets. In a real sense, therefore, Clark Fork's guarantee liability is fundamentally *in rem* because it is limited to the whatever remains of the distributions it has already paid over to the Trust.[4]

The Guarantee specifically references Article 11 of the Indenture and provides that Clark Fork's obligations under the Guarantee may only be assigned pursuant to a transaction authorized thereunder. However, as noted by Plaintiff Magten, the Guarantee does not specifically provide, as does Section 1102 of the Indenture, that a Section 1101 transaction releases Clark Fork from its guarantee obligations. Debtor NorthWestern fails to address this critical issue and merely assumes that a Section 1102 transaction releases the guarantee obligation to the same extent as the underlying obligation on the debentures. The question is – does it?

Under Delaware law, all related documents and instruments in a single transaction together

---

[2]Again, this is a highly unlikely event given that the Trust is a specially created vehicle solely for the purpose of this transaction.

[3]Of course, the Holders may have claims in these circumstances against the Trustee but that is irrelevant for the purpose of determining if these plaintiffs have standing in this case.

[4]If the guarantee is triggered, Clark Fork is subrogated to the rights of the Holders to pursue the issuer for the funds it holds but has not paid. Guarantee § 5.06.

are harmonized to the extent possible. *Simon v. The Navellier Series Fund*, 2000 WL 1597890 (Del. Ch. 2000) (citing *Crown Books*, 17A C.J.S. *Contracts* § 315, at 337 (1999), 11 Williston on Contracts § 30:26, at 239-42 (4th ed. 1999), and Restatement (Second) of Contracts § 202(2) (1981)); *Crown Books Corp. v Bookstop, Inc.*, 1990 WL 26166 (Del. Ch. 1990). An interpretation that leads to an absurd result is disfavored. *Collins & Aikman Corp. v. Compo Industries, Inc.*, 1982 WL 17804 (Del. Ch. 1982). Here, the Indenture specifically provides that Clark Fork is released from its underlying liability on the debentures in a Section 1101 transaction. All of those obligations, including making distributions to the Trust for the purpose of paying the Holders, now lie exclusively with the successor in interest, here Debtor NorthWestern. Given the quasi *in rem* nature of the guarantee,[5] it is nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction) would retain any liability under the Guarantee. It only makes sense that any such liability has been released as well.

While the language is not explicit, Section 8.01 supports this interpretation: "Except in connection with a consolidation, merger or sale involving the Guarantor that is permitted under Article Eleven of the Indenture, the Guarantor shall not assign its obligations hereunder." The specific reference to Article Eleven (and not merely Section 1101) implies that all aspects of that Article are to be effective. Because a transaction that is permitted under Article Eleven automatically effects a release of the underlying debt, it is consistent to conclude that such a release would also extend to the guarantee.

Section 5.03 of the Guarantee does not compel a contrary result. That section makes clear that the validity of the Guarantee is not affected by the release or waiver of any of the *Issuer's* (the Trust's) obligations or by any lack of diligence by the *Holders* or any invalidity of the *QUIPS*. However, it does not say that the guarantee survives the release of Clark Fork's obligations under the debentures in the event of an Section 1101 transaction. Clearly, the guarantee would survive if Clark Fork's liability were "settled" or "compromised" outside of Section 1101 (Section 5.03(f));

---

[5] The liability is not technically *in rem* because the guarantor must first pay and is allowed to recover through subrogation.

but that is far different from a release of Clark Fork's obligations that occurs because a successor has assumed all of those obligations in a permitted transaction. Finally, Section's 5.03(g)'s admonition that "it [is] the intent of this Section 5.03 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances" is wholly consistent with the full, complete, absolute and unconditional assumption of the Guarantor's obligations in a permitted Section 1101 transaction. It is neither reasonable nor logical to read Section 5.03(g) to apply to a Section 1101 transaction.

For these reasons, the Court concludes that Plaintiffs are not creditors of Clark Fork because of the Guarantee. Rather, Clark Fork's obligations under the Guarantee, to the same extent as its obligations under the Debentures, were released in the Section 1101 transaction with NorthWestern. Therefore, the Guarantee is not a source of standing for these Plaintiffs. However, the question remains whether Plaintiffs have standing under their fraudulent scheme argument.

### 3.    Was there a Fraudulent Scheme?

Next, Plaintiffs argue that the purported release of Clark Fork under Section 1102 itself was obtained by fraud such that the release is void. According to Plaintiffs, at the time of the transfer, Debtor intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly. This argument may have legs. Simply because Debtor may have complied with the technical, procedural requirements of the Indenture does not mean Debtor can insulate the fraudulent transaction from all attack. The argument goes well beyond merely alleging the transaction was a fraudulent conveyance. This argument at its essence is that Debtor engaged in a knowing and conscious fraudulent scheme.

Critical to Debtor's position is that the release of Clark Fork under Section 1102 was effective, thereby removing Plaintiffs as creditors of Clark Fork. However, if Plaintiffs can prove (as they have alleged) that the release was obtained through fraud, then the release would be ineffective.

"If action is taken for a fraudulent purpose or to carry out a fraudulent purpose or to carry out a fraudulent scheme, the action is void and of no force or effect." Richard A. Lord, *Williston On*

*Contracts* Sec. 69.4 (4th Ed. 2003). A release may be set aside if it was obtained fraudulently. *Stanley v. Holms*, 975 P.2d 1242 (Mont. 1999) (recognizing the invalidity of releases under fraudulent conditions but granting a motion for summary judgment because party had not set forth sufficient indicia of fraud); *Riggs et al. v. Gillespie*, 241 F. 311 (4th Cir. 1917) (finding a release invalid as it was obtained by a "fraud in equity"); *see also Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001) (acknowledging that a release is a voidable contract when a party is fraudulently induced to execute a release). If a release is obtained by fraud, it is unenforceable under Montana law. *Association of Unit Owners of the Deer Lodge Condominium v. Big Sky of Montana, Inc.*, 798 P.2d 1018 (Mont. 1990). In that sense, a release is treated as any other contract obtained by fraud. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1133-34 (D.C. App. 1987) (reversing lower court's grant of summary judgment and permitting plaintiffs to proceed with underlying claims where plaintiffs' purported release of such claims was part of the misrepresentation of which the defendant was accused).

Debtor directly challenges Plaintiffs' fraud argument, contending that this case must be dismissed because there simply was no fraud. Debtor hangs its hat on the fact that numerous transactions making up to the transfer were disclosed in both regulatory filings and in documents executed by the Trustee. According to Debtor, the terms of the deals were known to all and, therefore, by definition mean there was in fact no fraudulent intent on Debtor's part.

While Debtor's disclosure may be one factor in favor of finding no fraudulent intent on Debtor's part, it is far from conclusive at the motion to dismiss stage. Debtor may have disclosed the nuts and bolts of the transfers, but Plaintiffs' allegations go beyond simply that the actual transfer itself was fraudulent in its terms. As alleged, the questions are whether Debtor knew at the time that it could not do the transaction based on its restated accountings etc. and whether the financial information Debtor provided the public was in fact false. These are fact questions not appropriately resolved on a motion to dismiss.

## III.    Conclusion

Therefore, the motion to dismiss will be granted in part and denied in part, as follows:

10

The Plaintiffs lack standing as creditors of Clark Fork to pursue a fraudulent conveyance action against the Debtor because of the Section 1102 release, unless they can prove under applicable law that the Section 1102 release was obtained through actual fraud or as part of a fraudulent scheme.

Counsel for Debtor is to submit an order under certification of counsel.

So ordered.

DATED: _8/20/04_

CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

11

D

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |
| NORTHWESTERN CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| MAGTEN ASSET MANAGEMENT | : Adv. No. _____ |
| CORPORATION, and TALTON R. EMBRY, | : |
| | : |
| Defendants. | : |
| | : |
| | : |

## COMPLAINT

NorthWestern Corporation, a Delaware corporation (**"NorthWestern,"** the

**"Debtor"** or the **"Plaintiff"**), by and through its undersigned counsel, for (i) its

complaint against Defendants Magten Asset Management Corporation (**"Magten"**) and

Talton R. Embry (**"Embry,"** together with Magten, the **"Defendants"**), and (ii) its

Objection to Claim Number 842 of Magten Asset Management Corporation (the

**"Objection"**), hereby alleges as follows:

### NATURE OF THE ACTION

1.      This is an action relating to the Defendants' misappropriation and use of

material, non-public, information in purchasing approximately 40% of the Debtor's

Series A 8.45% Quarterly Income Preferred Securities (the **"QUIPS"**). As members of

the Official Committee of Unsecured Creditors (the **"Committee"**), the Defendants were



03128720408200000000000009

vested with legal, contractual, and fiduciary duties not to misappropriate non-public information for their own self interest. The Defendants willfully breached each of these duties in connection with their purchase of more than 100,000 QUIPS after becoming members of the Committee and receiving material, non-public information concerning the Debtor.

2.      By this adversary proceeding, the Debtor seeks damages and equitable relief relating to the Defendants' improper trading activity. In particular, the Debtor seeks damages (including disgorgement of any ill-gotten gains) to compensate itself and its creditors for the Defendants' breach of fiduciary duty, breach of contract, and violation of an express Court order prohibiting the very trading activity in which the Defendants engaged. Based upon the same inequitable and self interested conduct, the Debtor also objects to and seeks subordination of Magten's claim in this Chapter 11 case under Sections 502(b) and 510(c) of the Bankruptcy Code, respectively.

### PARTIES

3.      Plaintiff NorthWestern is a corporation organized under the laws of Delaware, having its principal place of business located in Sioux Falls, South Dakota.

4.      NorthWestern is a publicly traded Delaware corporation which was incorporated in 1923. NorthWestern and its direct and indirect non-NorthWestern subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

- 2 -

5.      Defendant Magten is a corporation organized under the laws of Delaware, having its principal place of business located at 410 Park Avenue, 14th Floor, New York, New York 10022.

6.      Defendant Embry was at all relevant times the 100% owner and Chairman of Magten. Other than Embry, Magten has only one employee, a secretary named Jean Colditz.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this Chapter 11 case and this Complaint are proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

8.      On September 14, 2003 (the **"Petition Date"**), NorthWestern filed its voluntary petition for relief under chapter 11 of The Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the **"Bankruptcy Code"**). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, NorthWestern continues to operate its business and manage its properties as debtor-in-possession.

9.      No request has been made for the appointment of a trustee or examiner in this case. The Committee was appointed by the Office of the United States Trustee on September 30, 2003.

10.     By Order dated October 10, 2003, this Court established January 15, 2004 at 5:00 p.m. (Pacific Standard Time) (the **"Bar Date"**) as the deadline for creditors to file proofs of claim for each claim they assert against the Debtor that arose before the Petition

- 3 -

Date. Notice of the Bar Date was mailed to all known creditors of the Debtor and

published in numerous regional and national newspapers.

11.     Magten filed Proof of Claim, designated claim number 842 by the

Debtor's claims agent (the **"Magten Claim"**). The Magten Claim asserts unliquidated

claims against the Debtor's estate for: (i) damages resulting from the alleged fraudulent

transfer of the utility assets of NorthWestern Energy, LLC to the Debtor on November

15, 2002 (the **"Transfer"**); and (ii) the face amount of the QUIPS held by Magten as of

the Petition Date.

12.     On or about November 6, 2003, this Court entered its Order Permitting

Securities Trading Upon Establishment of Ethical Wall [Docket No. 257] (the

**"Securities Trading Order"**). The Securities Trading Order prohibits members of the

Committee (present and future, each a **"Member"**) from trading in the securities of the

Debtor and its affiliates, unless and until such Member establishes and implements an

ethical wall (the **"Ethical Wall"**) in accordance with the terms and conditions of the

Securities Trading Order, so as to prevent:

> (i) the Ethical Wall Entity's trading personnel from misusing any material
> non-public information obtained by such Ethical Wall Entity's designated
> representative(s) involved in Committee-related or reorganization-related
> activities (**"C/R Personnel"**); and
>
> (ii) C/R Personnel from receiving material non-public information
> regarding such Ethical Wall Entity's trading in the Securities in advance
> of such trades. This Order does not preclude this Court from taking any
> action it deems appropriate in the event that an actual breach of fiduciary
> duty has occurred.

13.     Accordingly, to comply with the Securities Trading Order, Members of

the Committee were required to establish an Ethical Wall before trading in the Securities.

- 4 -

14.     Upon request of the Defendants, by notice dated November 25, 2003, the Office of the United States Trustee for the District of Delaware (the **"U.S. Trustee"**) appointed Magten to the Committee. Magten was represented on the committee by its 100% principal, Embry.

15.     Upon information and belief, upon appointment to the Committee or shortly thereafter, the Defendants became aware of the Securities Trading Order.

16.     Upon information an belief, upon being appointed to the Committee, Magten obtained possession of the Debtor's and the Committee's material, non-public information.

17.     Once appointed to the Committee, Magten's fiduciary and other common law duties precluded it from trading in the securities of the Debtor and its affiliates, including without limitation, the QUIPS, except as provided in the Securities Trading Order.

18.     On December 18, 2003, Embry, as Chairman of and on behalf of Magten, executed a Confidentiality Agreement with Official Committee of Unsecured Creditors (the **"Confidentiality Agreement"**). Under the Confidentiality Agreement, the Defendants agreed maintain confidential all nonpublic and proprietary information provided by or to the Committee.

19.     By executing the Confidentiality Agreement, Embry as Chairman of and on behalf of Magten, acknowledged that he was aware, and he would advise Magten's representatives that the United States securities laws prohibit any person in receipt from an issuer of material, non-public information from purchasing or selling or offering to purchase or sell securities of the issuer or from communication of the information to any

- 5 -

other person under circumstances in which it is reasonably foreseeable that the person

would have been likely to purchase or sell securities.

20.    Defendants' understanding of the Securities Trading Order and the

Confidentiality Agreement was made clear when, on or about February 5, 2004, counsel

for Magten requested the U.S. Trustee's approval on a motion exempting Magten from

the Securities Trading Order (the **"Draft Motion"**). The Draft Motion was never filed

with this Court and no order of this Court has been entered relieving Defendants

obligations under the Securities Trading Order.

21.    In the Draft Motion, Defendants admitted their understanding that they

were prohibited from trading in the Debtor's securities while members of the Committee

without establishing an Ethical Wall. In their draft motion, Defendants asserted:

> Because of Magten's structure, it is impossible for Magten to comply with
> the precise terms of the Trading Order and trade through an Ethical Wall
> Entity without further clarification of the Trading Order. Thus, by this
> Motion, Magten seeks an order clarifying the Trading Order so as to make
> it clear that if Magten uses the services of an independent third-party
> broker (the "Broker") who does not receive any confidential information
> regarding the Debtor and that has autonomy in making buy/sell decisions
> in executing trades in the securities of the Debtor and its affiliates, Magten
> will receive the protections afforded by the Order.

22.    Thereafter, on April 16, 2004, Magten and Law Debenture Company of

New York filed an adversary proceeding to avoid the transfer of assets of Clark Fork and

Blackfoot LLC (f/k/a NorthWestern Energy LLC) (**"Clark Fork"**) to the Debtor in

November 2002 pursuant to what is generally referred to as the "going flat" transaction

(the **"Magten Adversary Proceeding"**).

23.    The Magten Adversary Proceeding resulted in an inherent conflict

between the Defendants and the Committee. Accordingly, in a letter dated May 6, 2004,

the Trustee removed Magten from the Committee stating the relief sought in the Magten Adversary Proceeding "is inconsistent with Magten's . . . fiduciary duty to the Committee's constituents, the general unsecured creditors of NorthWestern Corporation."

24.    After being expelled from the Committee, Magten was still bound by the terms of Confidentiality Agreement and the Securities Trading Order, to the extent Magten was still in possession of material, non-public information it had obtained while serving as a Member of the Committee.

### DEFENDANTS PURCHASE THE DEBTOR'S QUIPS WHILE IN POSSESSION OF THE DEBTOR'S NON-PUBLIC INFORMATION

25.    Notwithstanding the Confidentiality Agreement in which they acknowledged that use of the Debtor's non-public information constituted a potential violation of the securities laws, and the Securities Trading Order, Embry caused Magten to purchase over 123,000 of the Debtor's QUIPS and sell 3,800 of the Debtor's QUIPS in a series of market transactions after joining the Committee. Upon information and belief, Defendants were in possession of and relied upon the Debtor's and the Committee's non-public information when executing the securities transactions.

26.    Between November 25, 2003 and May 4, 2004—the dates within which Defendants were Committee members, the Defendants purchased 28,540 of the Debtor's QUIPS as follows:

| | |
|---|---|
| 12/01/03 | 4,300 |
| 12/01/03 | 1,000 |
| 12/01/03 | 500 |
| 12/01/03 | 1,000 |
| 12/01/03 | 1,100 |
| 12/01/03 | 1,400 |
| 12/01/03 | 1,800 |
| 12/01/03 | 3,500 |
| 12/01/03 | 1,000 |

| | |
|---|---|
| 12/03/03 | 2,440 |
| 12/03/03 | 1,000 |
| 12/03/03 | 1,000 |
| 12/05/03 | 7,500 |
| 01/21/04 | 1,000 |
| **Total** | 28,540 |

27.    Between November 25, 2003 and May 4, 2004—the dates within which

Defendants were Committee members, the Defendants sold 3,800 of the Debtor's QUIPS

as follows:

| | |
|---|---|
| 12/17/03 | 1,900 |
| 12/17/03 | 1,900 |
| **Total** | 3,800 |

28.    The Defendants' purchases of QUIPS accelerated immediately after May

4, 2004, when the Defendants purchased through July 8, 2004 an additional 95,000 of the

Debtor's QUIPS as follows:

| | |
|---|---|
| 05/14/04 | 1,000 |
| 05/14/04 | 1,000 |
| 05/18/04 | 1,500 |
| 05/18/04 | 1,500 |
| 05/19/04 | 500 |
| 05/19/04 | 500 |
| 05/20/04 | 1,250 |
| 05/20/04 | 1,300 |
| 05/20/04 | 2,000 |
| 05/20/04 | 4,450 |
| 05/28/04 | 1,200 |
| 06/01/04 | 1,000 |
| 06/03/04 | 5,000 |
| 06/07/04 | 800 |
| 06/08/04 | 10,500 |
| 06/09/04 | 1,500 |
| 06/15/04 | 11,600 |
| 06/16/04 | 4,000 |
| 06/17/04 | 8,700 |
| 06/18/04 | 14,000 |
| 06/21/04 | 4,000 |

| 06/23/04 | 2,000 |
| 06/29/04 | 6,800 |
| 07/02/04 | 600 |
| 07/06/04 | 3,500 |
| 07/08/04 | 4,800 |
| **Total** | 95,000 |

29.     Upon information and belief, the Defendants remained in possession of, and relied upon, the Debtor's and the committee's non-public information with respect to some or all of these QUIPS purchases. As a result of its purchases, Magten holds approximately 40% of outstanding QUIPS, and has filed a claim with regard to those QUIPS in this case.

30.     This adversary proceeding seeking subordination of Magten's claims, actual damages, equitable relief, and objecting to the Magten Claim follows.

## COUNT I

## BREACH OF FIDUCIARY DUTY

31.     Plaintiff repeats and realleges the allegations set forth in the Paragraphs 1 through 30 as though fully set forth herein.

32.     As members of the Committee, Defendants were vested with a fiduciary duty to all unsecured creditors, among other things, to act with due care, not to act in furtherance of their self-interests to the potential detriment of other creditors, to maintain confidentiality, and to guide their actions so as to safeguard the rights of minority as well as majority creditors.

33.     In addition, as members of the Committee, Defendants were obligated to comply with the Securities Trading Order. The Securities Trading Order prohibited trading by Committee members, such as Defendants, while members of the Committee and in possession of non-public information without first establishing an Ethical Wall.

- 9 -

34.     In addition, as members of the Committee, Defendants were obligated to comply with the Confidentiality Agreement they signed, under which they confirmed their duty to keep confidential all non-public information obtained as part of the Committee.

35.     Upon information and belief, after being appointed to the Committee, and after receiving material, non-public information from the Debtor and the Committee, the Defendants purchased over 100,000 shares of the Debtor's QUIPS.

36.     The Defendants' trades willfully violated their fiduciary duty to other creditors as a matter of law, under the Confidentiality Agreement, and under the Securities Trading Order.

37.     The Defendants' willful violation of their fiduciary duties caused the Debtor, the Committee, and the creditors damages in an amount to be determined.

## COUNT II

## EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510(c)

38.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 37 as though fully set forth herein.

39.     The Defendants willfully violated their fiduciary duties, willfully violated the Securities Trading Order, willfully violated the Confidentiality Agreement, and potentially violated the federal securities laws when they purchased over 100,000 shares of the Debtor's QUIPS in market trades after receipt of the Committee's and the Debtor's non-public information.

40.     The Defendant's conduct in misappropriating and using the Committee's and the Debtor's non-public information for their self interests constitutes inequitable

conduct that caused injury to the Debtor, its creditors, and the Committee. The maintenance and use of the non-public information also conferred upon the Defendants an unfair advantage over other creditors.

41.     Because of the actions described herein, the claims of Magten against the Debtor's estate should be equitably subordinated to the level of equity interests in the Debtor pursuant to section 510(c) of the Bankruptcy Code.

## COUNT III

## OBJECTION TO THE MAGTEN CLAIM

42.     Plaintiff repeats and realleges the allegations set forth in the paragraphs 1 through 41 above as though fully set forth herein.

43.     The Magten Claim asserts unliquidated claims against the Debtor's estate for: (i) damages resulting from the alleged fraudulent transfer of the utility assets of NorthWestern Energy, LLC to the Debtor on November 15, 2002 (the **"Transfer"**); and (ii) the face amount of the QUIPS held by Magten as of the Petition Date.

44.     The Defendants violated their fiduciary duties, violated the Securities Trading Order, violated the Confidentiality Agreement, and potentially violated the federal securities laws when they purchased over 100,000 shares of the Debtor's QUIPS in market trades after receipt of the Committee's and the Debtor's non-public information.

45.     The Defendant's conduct in misappropriating and using the Committee's and the Debtor's non-public information for their self interests constitutes inequitable conduct that caused injury to the Debtor, its creditors, and the Committee. The

maintenance and use of the non-public information also conferred upon the Defendants an unfair advantage over other creditors.

46.     Because of the actions described herein, the Magten Claim should be limited to the amount that Magten paid for the QUIPS.

## COUNT IV

### DAMAGES FOR VIOLATION OF THE SECURITIES TRADING ORDER

47.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 46 as though fully set forth herein.

48.     As members of the Committee, Defendants were obligated to comply with the Securities Trading Order. The Securities Trading Order prohibited trading by Committee members, such as Defendants, while members of the Committee and in possession of non-public information without first establishing an Ethical Wall.

49.     Upon information and belief, while a Member of the Committee, the Defendants were furnished material, non-public information of the Committee and the Debtor. The Defendants have retained possession, custody, and control over the non-public information.

50.     Upon information and belief, after receipt of the non-public information, and while in possession, custody, and control of such information, the Defendants purchased shares of the Debtor's QUIPS.

51.     Upon information and belief, the Defendants misappropriated and used the non-public information in determining to purchase some or all of the Debtor's securities.

52.     Upon information and belief, the Defendants, as members of the Committee, did not establish an Ethical Wall prior to trading in the Debtor's securities.

- 12 -

53.     The Defendants' trades in the Debtor's QUIPS while members of the Committee without first establishing an Ethical Wall violated the Securities Trading Order.

54.     The Defendants' violation of the Securities Trading Order caused the Debtor, the Committee, and the creditors damages in an amount to be determined. The Debtor is also entitled to an award of punitive damages.

## RESERVATION OF RIGHTS

55.     The Debtor reserves the right to amend, modify or supplement this Complaint and Objection and to object further to the Magten Claim on any and all additional factual or legal grounds, including if such claim is not reduced or disallowed as requested herein or if additional information regarding the disallowance or reduction of such claim is discovered upon further review thereof or through discovery pursuant to the applicable provisions of the Bankruptcy Rules.

56.     This Objection complies with Del. Bankr. L R 3007-1(e). No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, Plaintiff respectfully demands judgment against Defendants as follows:

A.     For actual damages in an amount to be determined at trial;

B.     Sustaining the Debtor's objection to the Magten Claim;

C.     Compelling Defendants to account for any and all profits obtained by reason of the misconduct alleged herein and the imposition of a constructive trust on such ill-gotten profits;

D.     Subordinating the Defendants' claims;

- 13 -

E       For Defendants' willfull conduct, punitive damages in an amount to be

determined at trial;

F.      For attorney's fees and costs; and

F.      Granting such other and further relief as the Court deems just and

appropriate.

Dated: Wilmington, Delaware
August 20, 2004

                              GREENBERG TRAURIG, LLP

                              Scott D. Cousins (No. 3079)
                              William E. Chipman, Jr. (No. 3818)
                              Paul D. Brown (No. 3903)
                              The Brandywine Building
                              1000 West Street, Suite 1540
                              Wilmington, DE 19801
                              Telephone: (302) 661-7000

                              And

                              Adam D. Cole
                              GREENBERG TRAURIG, LLP
                              885 Third Avenue
                              New York, NY 10022
                              Telephone: (212) 801-2100

                              *Counsel for the Debtor and
                              Debtor-in-Possession*

- 14 -

| (Rev. 8/87)    ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | Adversary Proceeding Number<br>(Court Use Only) |
|---|---|

| PLAINTIFF<br><br>NORTHWESTERN CORPORATION | DEFENDANTS<br><br>MAGTEN ASSET MANAGEMENT CORPORATION and<br>TALTON R. EMBRY |
|---|---|
| ATTORNEYS (Firm, Address and Telephone No.)<br><br>Scott D. Cousins, Esq.<br>William E. Chipman, Jr., Esq.<br>Greenberg Traurig, LLP<br>1000 West Street, Suite 1540<br>Wilmington, DE 19801<br>Telephone: (302) 661-7000    Facsimile: (302) 661-7360<br><br>Adam Cole, Esq.<br>Greenberg Traurig LLP<br>885 Third Avenue<br>New York, NY 10166<br>Telephone: (212) 801-9200    Facsimile: (212) 801-6400 | ATTORNEYS (If Known)<br><br>Bonnie Steingart, Esq.<br>Gary Kaplan, Esq.<br>Fried Frank Harris Shriver & Jacobson LLP<br>One New York Place<br>New York, NY 10004<br>Telephone: (212) 859-8000 Facsimile: (212) 859-4000<br><br>William J. Burnett, Esquire<br>Blank Rome LLP<br>1201 Market Street, Suite 800<br>Wilmington, DE 19801<br>Telephone: (302) 425-6400 Facsimile: (302) 425-6464 |

CAUSE OF ACTION (Write A Brief Statement Of Cause Of Action, Including All U.S. Statutes Involved)
Defendants' misappropriation and use of material, non-public information in purchasing approximately 40% of the Debtor's Series A 8.45% Quarterly Income Preferred Securities.

| NATURE OF SUIT |
|---|

(Check the one most appropriate box only.)

| [ X ] 454 To Recover Money or Property<br>[ ] 435    To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property<br>[ ] 458    To obtain approval for the sale of both the interest of the estate and of a co-owner in property<br>[ ] 424    To object or to revoke a discharge 11 U.S.C. § 727 | [ ] 455    To revoke an order of confirmation of a Chap. 11 or Chap. 13 Plan<br>[ ] 426    To determine the dischargeability of a debt 11 U.S.C. § 523<br>[ ] 434    To obtain an injunction or other equitable relief<br>[ X ] 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan | [ ] 456 To obtain a declaratory judgment relating to any of foregoing causes of action<br>[ ] 459    To determine a claim or cause of action removed to a bankruptcy court<br>[ ] 498    Other (specify) |
|---|---|---|

| ORIGIN OF PROCEEDINGS<br>(Check one box only.)<br>Bankruptcy Court | [X] 1 Original<br>Proceeding | [ ] 2 Removed<br>Proceeding | [ ] 4 Reinstated<br>or Reopened | [ ] 5 Transferred<br>from Another | [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |
|---|---|---|---|---|---|

| DEMAND | NEAREST THOUSAND<br>$ TBD | OTHER RELIEF SOUGHT<br>Objection to and subordination of Defendants' proof of claim | [ ] JURY DEMAND<br>No |
|---|---|---|---|

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES |
|---|

| NAME OF DEBTOR<br><br>NORTHWESTERN CORPORATION | BANKRUPTCY CASE NO.<br><br>03-12872 |
|---|---|
| DISTRICT IN WHICH CASE IS PENDING<br>DELAWARE | DIVISIONAL OFFICE | NAME OF JUDGE<br>The Honorable Charles G. Case |

| RELATED ADVERSARY PROCEEDING (IF ANY) |
|---|

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

| FILING FEE<br>(Check One Box Only)    [X] Fee Attached  [ ] Fee Not Required    [ ] Fee Is Deferred |
|---|

| DATE<br>August 20, 2004 | PRINT NAME<br>William E. Chipman, Jr. | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|---|---|

B-104
(Rev 8/87)

24717-1/sdc/adversarycover.doc

## ADVERSARY PROCEEDING COVER SHEET (Reverse Side)

This cover sheet must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney) and submitted to the Clerk of the court upon the filing of a complaint initiating an adversary proceeding.

The cover sheet and the information contained on it *do not* replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. This form is required for the use of the clerk of the court to initiate the docket sheet and to prepare necessary indices and statistical records. A separate cover sheet must be submitted to the clerk of the court for each complaint filed. The form is largely self explanatory.

**Parties.** The names of the parties to the adversary proceeding *exactly* as they appear on the complaint. Give the names and addresses of the attorneys if known. Following the hearing "Party," check the appropriate box indicating whether the United States is a party named in the complaint. If the plaintiff is *pro se*, that is, not represented by an attorney, check the box labeled "no attorney."

**Cause of Action.** Give a brief description of the cause of action including all federal statutes involved. For example, "Complaint seeking damages for failure to disclose information, Consumer Credit Protection Act, 15 U.S.C. §§ 1601 et seq.," or "Complaint by trustee to avoid a transfer of property by the debtor, 11 U.S.C. § 544."

**Nature of Suit.** Place an "X" in the appropriate box. Only one box should be checked. If the cause fits more than one category of suit, select the most definitive.

**Origin of Proceedings.** Check the appropriate box to indicate the origin of the case:

1. Original Proceeding.
2. Removed from a State or District Court.
3. Reinstated or Reopened.
4. Transferred from Another Bankruptcy Court.

**Demand.** On the next line, state the dollar amount demanded in the complaint in thousands of dollars. For $1,000 enter "1," for $10,000 enter "10," for $100,000 enter "100," if $1,000,000, enter "1000." If $10,000,000 or more, enter "9999." If the amount is less than $1,000, enter "0001." If no monetary demand is made, enter "XXXX." If the plaintiff is seeking non-monetary relief, state the relief sought, such as injunction or foreclosure of a mortgage.

**Bankruptcy Case In Which This Adversary Proceeding Arises.** Enter the name of the debtor and the docket number of the bankruptcy case from which the proceeding now being filed arose. Beneath, enter the district and divisional office where the case was filed, and the name of the presiding judge.

**Related Adversary Proceedings.** State the names of the parties and the six digit adversary proceeding number from any adversary proceeding concerning the same two parties or the same property currently pending in any bankruptcy court. On the next line, enter the district where the related case is pending, and the name of the presiding judge.

**Filing Fee.** Check one box. The fee must be paid upon filing unless the plaintiff meets one of the following exceptions. The fee is not required if the plaintiff is the United States government or the debtor. If the plaintiff is the trustee or a debtor in possession, and there are no liquid funds in the estate, the filing fee may be deferred until there are funds in the estate. (In the event no funds are ever recovered for the estate, there will be no fee). There is no fee for adding a party after the adversary proceeding has been commenced.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the right of the last line of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is *pro se*, that is, not represented by an attorney, the plaintiff must sign.

The name of the signatory must be printed in the box to the left of the signature. The date of the signing must be indicated in the box on the far left of the last line.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | Case No. 03-12872 (JLP) |
| Reorganized Debtor. | ) | |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 04-55051 (JLP) |
| | ) | |
| MAGTEN ASSET MANAGEMENT | ) | Re: Docket No. 89 |
| CORPORATION, and TALTON R. | ) | |
| EMBRY, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ALLOWING THE DEBTOR TO DISMISS ITS COMPLAINT
AGAINST MAGTEN ASSET MANAGEMENT CORPORATION AND
TALTON R. EMBRY, WITH PREJUDICE, PURSUANT TO RULE 7041(a)
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND
RULE 41(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Plaintiff Northwestern Corporation has filed a motion for order allowing the Plaintiff to

dismiss the above-captioned adversary proceeding pursuant to Rule 7041(a) of the Federal Rules

of Bankruptcy Procedure and Rule 41(a) of the Federal Rules of Civil Procedure [Docket No. 89]

(the "Motion"); and Defendant Magten Asset Management filed a limited objection consenting to

the dismissal, but reserving any rights to seek attorney's fees and costs incurred in connection

with this adversary proceeding [Docket No. 93]; and it appearing that the Court has jurisdiction

over the Motion pursuant to 28 U.S.C. § 1334 and that it is a core matter pursuant to 28 U.S.C.

§ 157(b)(2); and the Court having determined that the relief requested in the Motion is in the best

interests of the Debtor, its estate, its creditors and other parties-in-interest; and it appearing that due notice of the Motion has been provided and that no other further notice need be given; and sufficient cause appearing therefore; it is hereby

**ORDERED,** that the Motion is granted as modified by this Order; and it is further

**ORDERED,** that the above-captioned adversary proceeding is hereby dismissed, with prejudice, pursuant to Rule 7041(a) of the Federal Rules of Bankruptcy Procedure and Rule 41(a) of the Federal Rules of Civil Procedure, and it is further

**ORDERED,** that nothing shall prejudice Defendants' rights to pursue an award of for attorney's fees and costs incurred in connection with the above-captioned adversary proceeding, and it is further

**ORDERED,** that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: March 9, 2005

Honorable John L. Peterson
United States Bankruptcy Judge