

05 - 499

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 05-_____ |
| | ) | |
| NORTHWESTERN CORPORATION, GARY G. DROOK, MICHAEL J. HANSON, BRIAN B. BIRD, THOMAS J. KNAPP and ROGER P. SCHRUM. | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT TO REVOKE ORDER OF CONFIRMATION PURSUANT TO SECTION 1144 OF THE BANKRUPTCY CODE AND RULE 7001(5) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND FOR BREACH OF FIDUCIARY DUTY

Magten Asset Management Corporation ("Magten"), together with Law Debenture Trust Company of New York ("Law Debenture" and collectively with Magten the "Plaintiffs"), in its capacity as Trustee under the Indenture for the Unsecured Subordinated Debt Securities Relating to Trust Securities dated November 1, 1996, for this complaint (the "Complaint") alleges as follows:

- 1 -

## INTRODUCTION

1.     This adversary proceeding has been commenced because the order confirming NorthWestern Corporation's Second Amended and Restated Plan of Reorganization, entered by this Court on October 19, 2004, was procured by fraud, with the aid and complicity of certain of the senior management of NorthWestern Corporation ("NorthWestern") (collectively, the "Defendants").

2.     In the haste to usher NorthWestern out of chapter 11 in the shortest possible time, many Claims[1] were left unresolved on the Effective Date. However, in order to provide a mechanism to protect the holders of Disputed Claims, and to ensure that such holders were not prejudiced by NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan"), NorthWestern was required to assume, unless otherwise agreed or estimated by this Court, that the full amount of a Disputed Claim would become an Allowed Claim. Specifically, to ensure the protection of holders of Disputed Claims, the Plan required that NorthWestern set aside sufficient New Common Stock to ensure that once Disputed Claims are Allowed, they would receive the same distribution as claims that were allowed at the time of confirmation. In other words, in order to proceed with the confirmation of the Plan before all of the Claims against NorthWestern had been Allowed, NorthWestern promised to place a sufficient amount of New Common Stock in the Disputed Claims Reserve to provide the holders of Disputed Claims with the full recovery to which they were entitled once such Disputed claims became Allowed.

3.     If NorthWestern had not agreed to set aside an adequate reserve of New Common Stock, NorthWestern would not have been able to obtain confirmation of its Plan.

---

[1]     All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the Plan.

120087.01600/40152516v1

4.      Upon confirmation of the Plan, NorthWestern determined to set aside 13.5% of New Common Stock in the Disputed Claims Reserve to satisfy the requirements of the Plan, which amount is now known to be insufficient to satisfy all Disputed claims as Allowed Claims.

5.      On March 2, 2005, only four months after the Plan became effective and only two months after filing notice of substantial confirmation of the Plan, NorthWestern advised this Court that contrary to its obligation under the Plan and this Court's direction in the order confirming the Plan (the "Confirmation Order"), it placed insufficient stock in the Disputed Claims Reserve. In addition, this Court found that although NorthWestern had estimated Disputed Claims to total $140 million, this amount was insufficient to satisfy even NorthWestern's largest Disputed Claims, no less the approximately 190 other Disputed Claims still unresolved.

6.      In acknowledgement of this fraudulent conduct, this Court, counsel for the Creditors' Committee, counsel for the ad hoc committee of Class 7 claimants and NorthWestern have recognized that although only 2 of the approximately 200 Disputed Claims have been settled, there is insufficient New Common Stock in the Disputed Claims Reserve to satisfy the Disputed Claims in full, as required by the Plan.

7.      NorthWestern obtained the Confirmation Order on the basis that it was reserving sufficient stock to satisfy all Disputed Claims in full. Instead, NorthWestern has knowingly and willfully underfunded the Disputed Claims Reserve and, in doing so, committed a fraud upon this Court in the procurement of that Order. Therefore, Plaintiffs seek the entry of an order (i) revoking the Confirmation Order and NorthWestern's discharge or, in the alternative, requiring NorthWestern to adequately fund the Disputed Claims Reserve in accordance with the

- 3 -

terms of the Plan and declaring that because of the gross negligence or willful misconduct in underfunding the Disputed Claims Reserve, no party or entity is entitled to exoneration or exculpation pursuant to Section 10.1 of the Plan; (ii) finding that the Defendants breached their fiduciary and other duties to Plaintiffs; (iii) awarding Plaintiffs damages, costs and reasonable attorney's fees; and (iv) granting such other relief as this Court deems just and proper.

### JURISDICTION AND VENUE

8.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

9.    This proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (J), and (L).

10.    Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### THE PARTIES

11.    Magten is a corporation validly organized and doing business under the laws of the State of Delaware.

12.    Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS").

13.    Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York.

14.    On September 14, 2003, NorthWestern filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

15.    NorthWestern is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota.

- 4 -

16.     NorthWestern owns and operates utility companies in the United States. The Debtor and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 600,000 customers throughout Montana, South Dakota and Nebraska.

17.     Gary G. Drook ("Drook") was Chief Executive Officer of NorthWestern from January 2003 until March 2005.  Drook was also the President of NorthWestern from August 2003 until March 2005.

18.     Michael J. Hanson ("Hanson") was the Chief Operating Officer of NorthWestern from August 2003 until March 2004.  Beginning in March 2004, Hanson became President of NorthWestern.

19.     Brian B. Bird ("Bird") has been the Chief Financial Officer of NorthWestern since December 2003.

20.     Thomas J. Knapp ("Knapp") has been General Counsel of NorthWestern since November 2004.

21.     Roger P. Schrum ("Schrum") has been NorthWestern's Vice-President of Human Resources and Communications since December 2003.

## BACKGROUND

### The Fraudulent Conveyance Proceeding

22.     In January 2004, Plaintiffs each timely filed proofs of claim asserting, among other things, claims against NorthWestern for damages resulting from the fraudulent transfer of certain Montana utility assets to NorthWestern.

23.     On April 16, 2004, after this Court granted Plaintiffs relief from the automatic stay, they filed a complaint against NorthWestern in the Bankruptcy Court on behalf

- 5 -

of the holders of the QUIPS seeking to set aside the fraudulent conveyance of the Montana utility assets to NorthWestern (the "Fraudulent Conveyance Proceeding").

24.    On May 14, 2004, NorthWestern filed a motion to dismiss the Fraudulent Conveyance Proceeding. Following completion of briefing, on August 20, 2004, the Court, denied NorthWestern's motion to dismiss. At the time the Plan was filed (and later confirmed), the Fraudulent Conveyance Proceeding had not been resolved and, as a result, the QUIPS Litigation Claim was treated as a Disputed Claim.

**The Establishment of the Disputed Claims Reserve**

25.    On August 31, 2004, NorthWestern filed the Plan and disclosure statement in support of the Plan (the "Disclosure Statement"). In the Plan, NorthWestern required that the holders of the QUIPS choose between (i) a 14.3% recovery and forfeit their right to pursue the Fraudulent Conveyance Proceeding or (ii) pursuing the Fraudulent Conveyance Proceeding, which, if successful, would result in those holders receiving an Allowed Class 9 Claim to be satisfied from the Disputed Claims Reserve. Plan at p. 37, § 4.8(b)(ii).

26.    Section 7.5 of the Plan, entitled "Establishment and Maintenance of Reserve for Disputed Claims" required NorthWestern to "maintain the Disputed Claims Reserve equal to the aggregate of any distributable amount of Cash and New Common Stock equal to the relevant percentage of Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order." The Plan further provided that the only method by which an amount less than the full amount of a Disputed Claim could be reserved by NorthWestern was if either the Bankruptcy Court estimated the amount of such Disputed Claim or NorthWestern and the holder of a Disputed Claim agreed in writing. Plan at p. 59, § 7.5.

- 6 -

27. In papers filed with this Court, NorthWestern specifically represented that the Plan met the requirements of the Bankruptcy Code and did not unfairly discriminate against those holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding. See Memorandum of Law in Further Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and in Response to Supplemental Objections to Confirmation, at p. 13. For a plan of reorganization not to discriminate against a dissenting class, the members of the dissenting class must be provided with the value provided to all other similarly situated classes. Thus, the holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding hold a Disputed Class 9 Claim such that, if successful in the Fraudulent Conveyance Proceeding, the holders of the QUIPS Litigation Claims must be provided with the same value as the other holders of Allowed Class 9 Claims.

28. During the confirmation hearing on October 6, 2004, counsel for NorthWestern represented to this Court that consistent with its obligation under the Plan, it would "put into the Class 9 reserve an amount for the claim that would hold back a certain level of the stock for the eventuality that the litigation may well result in a favorable judgment for those QUIP holders that are pursuing the litigation." Transcript of October 6, 2004 Hearing at pp. 233-234.

29. In its oral ruling confirming the Plan held on October 8, 2004 (the "Oral Ruling"), this Court found that the QUIPS Litigation Claim was an disputed unsecured claim that was entitled to a reserve consistent with Section 7.5 of the Plan, such that if the Fraudulent Conveyance Proceeding is successful, holders of the QUIPS Litigation Claim will receive the distribution provided to holders Allowed Class 9 Claims. See Transcript of Hearing Held on October 8, 2004 at pp. 30, 39.

- 7 -

30.    On October 13, 2004, counsel for NorthWestern submitted a certification of counsel and draft confirmation order to this court (the "Draft Confirmation Order"). This Draft Confirmation Order, required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Draft Confirmation Order at ¶ 27. At all times during the confirmation hearing and the confirmation process, the information regarding the methodology for establishing the reserve and the sufficiency of the reserve was solely in NorthWestern's possession and control.

31.    The 13.5% reserve proposed by NorthWestern in the Draft Confirmation Order was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

32.    On October 19, 2004, this Court entered the Confirmation Order, which like the Draft Confirmation Order suggested by NorthWestern, required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Confirmation Order at ¶ 27.

33.    Only four months after confirmation, counsel for NorthWestern disclosed that the 13.5% reserve did not represent an amount sufficient to comply with Section 7.5 of the Plan. Despite NorthWestern's promise in the plain language of Section 7.5 of the Plan and despite its repeated representations to this Court, NorthWestern did not set the Disputed Claims Reserve at 100%. Instead, the Disputed Claims Reserve was set based on NorthWestern's

- 8 -

general estimation of "all contingent, unliquidated claims at 50% of the face amount of the stated claim" and the placing of New Common Stock sufficient to satisfy an Allowed Claim in that amount in the Disputed Claims Reserve. 9019 Objection at ¶ 66 (as defined in ¶ 46, below).

34.    Upon entry of the Confirmation Order, Magten sought a stay pending appeal to prevent the Plan from becoming effective. In denying Magten's motion for a stay pending appeal, this Court again found that "just like any other Creditor of claimant of an unsecured nature in class 9, that [the QUIPS Litigation Claims holders] would be entitled to have a disputed claim reserve amount determined, either by stipulation or by the Court in accordance with Section 7.5 of the Plan." Transcript of Hearing Held on October 25, 2004, at p. 28.

35.    This Court also went on to find that because the holders of the QUIPS Litigation Claims were being protected by being included in the Disputed Claims Reserve, Magten and the other holders of the QUIPS were being treated fairly and "for that reason there is – there has been an inadequate showing of irreparable harm..." Transcript of Hearing Held on October 25, 2004, at p. 29. Thus, this Court expressly relied on NorthWestern's assertions that a 13.5% reserve was sufficient to fully fund the Disputed Claims reserve in accordance with the Plan not only when it entered the Confirmation Order, but also when it denied Magten's motion for a stay pending appeal.

36.    On October 25, 2004, NorthWestern filed its Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Paragraph 27 of the Confirmation Order (the "Notice of Claim Reserve"). In the Notice of Claim Reserve, NorthWestern acknowledged that pursuant to Section 7.5 of the Plan and Paragraph 27 of the Confirmation Order, NorthWestern was required to "maintain a Disputed Claim Reserve equal to the aggregate

of any distributable amounts of New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order." Notice of Claim Reserve at p. 1.

37.    On October 29, 2004, in connection with Magten's further pursuit of a stay pending appeal, counsel for NorthWestern represented to the United States District Court for the District of Delaware that "there is more than enough reserve being set aside in the Class 9 reserve pool for Class 9 unsecured claims." See Transcript of District Court Hearing Held on October 29, 2004 at p. 35.

38.    Also, on October 29, 2004, NorthWestern and Law Debenture entered into the Stipulation, whereby NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders (the "QUIPS Claims Reserve")" and set forth the rights of the QUIPS Litigation Claims holders to recover on account of an Allowed Claim in excess of that amount. Stipulation at p. 2 ¶ 1. By its express terms, the Stipulation did not cap the recovery on account of the QUIPS Litigation Claim at $25 million claim. The Stipulation provided that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve.

39.    Law Debenture entered into the Stipulation in reliance on NorthWestern's assertions that the Disputed Claims Reserve was sufficiently funded to comply with the terms of the Plan and the Confirmation Order and provide the holders of the QUIPS Litigation Claims with the same recovery accorded to holders of Allowed Class 9 Claims.

40.    The Plan became effective on November 1, 2004.

- 10 -

**The Disclosure of the Fraud**

41.    On December 29, 2004, NorthWestern filed a <u>Notice of Substantial Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code</u> (the "Substantial Consummation Notice"). In Section 4(b) of the Substantial Consummation Notice, NorthWestern claims to have reserved 4,409,100 shares of New Common Stock in accordance with Section 7.5 of the Plan.

42.    On January 27, 2005, Magten, Law Debenture as Indenture Trustee for the QUIPS and NorthWestern executed a settlement agreement whereby the Fraudulent Conveyance Proceeding and all other litigation between the parties would come to an end (the "Settlement Agreement"). Pursuant to the terms of the Settlement Agreement, the holders of the QUIPS were to receive (i) 382,732 shares of common stock at the reorganization plan value of $20.00 per share ("Plan Value") and the 710,449 warrants and (ii) the shares segregated as the QUIPS Claims Reserve plus an additional $300,000 of common stock of reorganized NorthWestern at Plan Value. The Settlement Agreement provided the holders of the QUIPS with a less than they would be entitled to recover if the Fraudulent Conveyance Proceeding is successful.

43.    Based on the terms of the Settlement Agreement, if approved, the holders of the QUIPS Litigation Claims would have received a total of 1,252,732 shares of New Common Stock (excluding warrants), with a Plan Value of $25,054,640. This amount represents a 50.1% recovery on account of the QUIPS Litigation Claim, significantly below the 63% recovery that the holders of such claims would recover if their Disputed Claims were Allowed in full.[2] The Settlement Agreement not only provided the holders with the QUIPS with a recovery significantly less than the full $50 million Allowed Claim to which they would have been

---

2    Although the Disclosure Statement in support of the Plan (the "Disclosure Statement") estimated that holders of Allowed Claims would likely receive a 68% recovery on account of those claims, ultimately, holders of Allowed Claims actually received an approximately 63% recovery on account of those claims.

- 11 -

entitled if the Fraudulent Conveyance Proceeding was successful, but also settled nine other outstanding litigations between NorthWestern, Plaintiffs, and related parties.

44.     After NorthWestern disavowed the Settlement Agreement, Plaintiffs filed a joint motion seeking this Court's approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 (the "9019 Motion"), in order to enforce the terms of the Settlement Agreement.

45.     On March 8, 2005, this Court held a hearing on the 9019 Motion (the "9019 Hearing") wherein the Debtor acknowledged that it has approximately 200 claims that are seeking recovery from the Disputed Claims Reserve such that the 382,732 shares of common stock that were the primary subject of NorthWestern's 9019 Objection could not be allocated to the holders of the QUIPS from the Disputed Claims Reserve. Transcript of 9019 Hearing at p. 44.

46.     Based upon NorthWestern's objection to the 9019 Motion (the "9019 Objection") and the arguments presented at the hearing, it became apparent that in establishing and funding the Disputed Claims Reserve, NorthWestern failed to reserve the maximum claim amount asserted by holders of Disputed Claims, as required by the Plan. Specifically, NorthWestern acknowledged at the hearing that there were over 200 Disputed Claims awaiting resolution. As of the Confirmation Date, 2 holders of Claims had agreed to estimate their Claims at approximately 50% for the purposes of setting up the reserve, resulting in segregated disputed claims reserves within the total $140 million Disputed Claims Reserve of $25 million and $70 million, respectively. Other significant Claims against NorthWestern included Mr. Hylland's $30 million Claim and rejected pension plans Claims of approximately $15 million. Thus, for

- 12 -

those 4 claims alone, the disputed claims Reserve should have held $140 million. That does not account for the 196 or so remaining Disputed claims.[3]

47.    Thus, without accounting for the more than 190 other Disputed Claims, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy $295 million of Disputed Claims. Instead, upon information and belief, the Disputed Claims Reserve contained only enough New Common Stock to satisfy $140 million of Disputed Claims. Thus, it appears that in blatant violation of the Plan, NorthWestern fraudulently "estimated all contingent, unliquidated claims. . . at 50% of the face amount of the stated claim" and only placed enough New Common Stock sufficient to satisfy half of the Allowed Claims in the Disputed Claims Reserve, not the 100% promised by the Plan and in open Court. 9019 Objection at ¶ 66.

48.    The inadequacy of the Disputed Claims Reserve led to counsel for the ad hoc committee of Class 7 Claimants to state that it was apparent that "there just isn't enough stock in Class 9." Transcript of 9019 Hearing at p. 74.

49.    On March 10, 2004 this Court denied the 9019 Motion, in part, because the Disputed Claims Reserve, as established by NorthWestern, did not contain enough stock to distribute any stock in excess of a $25 million claim to the holders of the QUIPS, despite the clear language of the Plan and the Confirmation Order, resulting in a "financial dilemma" that led to the failure of the Settlement Agreement. 9019 Opinion at p. 6.

---

[3]    In addition, on the Effective Date of the Plan, Cornerstone Propane, L.P. ("Cornerstone") held a Disputed Claim in the amount of $130 million. Although NorthWestern had filed a motion to approve a settlement between NorthWestern and Cornerstone whereby Cornerstone would receive an Allowed Claim of $19.5 million, this settlement was not approved until after the Effective Date. As a result, because Section 7.5 of the Plan permits NorthWestern to reserve an amount less than the full amount of a Disputed Claim only by Order of this Court or by written agreement of the parties, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy Cornerstone's asserted Claim of $130 million.

- 13 -

50.     Specifically, this Court found that the Stipulation recognized the $50 million QUIPS Litigation Claim and reserved 50% of that claim, or a $25 million claim of Class 9 reserved shares. This Court further found that pursuant to the Stipulation, "to the extent that the [QUIPS] litigation claim exceeded $25 million, 'the holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve' described in the Plan." 9019 Opinion at p. 4-5 (citing the Stipulation).

## FIRST CAUSE OF ACTION

### (NorthWestern Procured the Confirmation Order by Fraud by Knowingly and Wilfully Failing to Properly Fund the Disputed Claims Reserve in Accordance with the Provisions of the Plan and the Confirmation Order)

51.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 50 as if fully set forth here.

52.     Section 1144 of the Bankruptcy Code provides as follows:

On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall –

(1) contain such provisions as are necessary to protect an entity acquiring such rights in good faith and on reliance on the order of confirmation ; and

(2) revoke the discharge of the debtor.

11 U.S.C. § 1334.

53.     Plaintiffs, parties in interest to NorthWestern's chapter 11 case, have filed this complaint within 180 days of the entry of the Confirmation Order.

54.     In order to procure this Court's approval of the Plan, NorthWestern represented to this Court that it would establish a Disputed Claims Reserve with a sufficient amount of New Common Stock to satisfy all Disputed Claims as if those claims were allowed.

- 14 -

55.     In establishing the Disputed Claims Reserve, NorthWestern asserted that by setting aside 13.5% of New Common Stock, the Disputed Claims Reserve would contain sufficient New Common Stock to ensure that the holders of Disputed Claims would receive a 63% recovery once such claim became an Allowed Claim, as required by the Plan.

56.     On March 2, 2005, in its 9019 Objection, NorthWestern admitted that, contrary to the requirements of the Plan and the Confirmation Order, the Disputed Claims Reserve may not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

57.     On March 8, 2005, at the 9019 Hearing, NorthWestern and other parties in interest made known that contrary to the requirements of the Plan and the Confirmation Order, the Disputed Claims Reserve does not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

58.     On March 10, 2005, this Court acknowledged that NorthWestern faced a "financial dilemma" because the Disputed Claims Reserve may not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

59.     NorthWestern made fraudulent misrepresentations in the Plan and in the Confirmation Order submitted by it and entered by this Court, that the Disputed Claims Reserve was funded in accordance with the requirements of Section 7.5 of the Plan.    These misrepresentations were made with the intent that this Court (and NorthWestern's creditors) rely

- 15 -

on them to the Court's and the creditors' detriment. The approval of the Plan and the entering of the Confirmation Order were based on intentionally false and misleading information.

60.    The Court and NorthWestern's creditors, including Plaintiffs, relied upon NorthWestern's representations and were damaged as a result.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

61.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 60 as if fully set forth here.

62.    NorthWestern owed fiduciary duties of loyalty, good faith and candor this Court and to NorthWestern's creditor constituency.

63.    Drook, Hanson, Bird, Knapp and Schrum owed fiduciary duties of loyalty, good faith and candor to NorthWestern's creditor constituency.

64.    The Defendants breached their duties when they grossly underfunded the Disputed Claims Reserve, thereby violating the terms of the Plan.

65.    NorthWestern's creditor constituency, including Plaintiffs, were damaged as a result of Defendants' failure to fully fund the Disputed Claims Reserve with sufficient stock to satisfy the QUIPS Litigation Claim as an Allowed Claim.

## THIRD CAUSE OF ACTION

### (For Declaratory Judgment)

66.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 65 as if fully set forth here.

67.    Pursuant to Section 10.1 of the Plan "none of the [Exculpated Parties] shall have to incur any liability to any holder of the Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or

- 16 -

formulation of the Plan, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, <u>except for willful misconduct or gross negligence</u>..." (emphasis added).

68.    The actions and omissions detailed above could only have occurred because willful misconduct or gross negligence in either failing to adequately fund the Disputed Claims or failing to adequately supervise the establishment of the Disputed Claims Reserve.

69.    Upon information and belief, the Exculpated Persons do not and will not concede that their actions and omissions were the product of willful misconduct or gross negligence. Accordingly, a controversy exists between the parties as to whether such parties are entitled to exculpation.

70.    Plaintiffs are entitled to a declaratory judgment resolving whether the Exculpated Parties have acted with willful misconduct or gross negligence with respect to the controversy surrounding the adequacy of the Disputed Claims Reserve.

71.    Because the Confirmation Order was intentionally procured by acts of fraud, Plaintiffs are entitled to a declaratory judgment permitting Plaintiffs to seek damages for the fraud from the Exculpated Parties.

### PRAYER FOR RELIEF

***WHEREFORE***, Plaintiffs respectfully request that the Court enter judgment as follows:

(a)    Revoking the Confirmation Order and NorthWestern's discharge, or in the alternative, requiring NorthWestern to adequately fund the  Disputed Claims Reserve in accordance with the terms of the Plan and declaring that because of the gross negligence or willful misconduct in underfunding the Disputed Claims Reserve, the Exculpated Parties are not entitled to exoneration or exculpation pursuant to Section 10.1 of the Plan;

- 17 -

120087.01600/40152516v1

(b)    Finding that the Defendants breached their fiduciary and other duties to

Plaintiffs;

(c)    Awarding Plaintiffs damages, costs, and reasonable attorneys fees; and

(d)    Awarding such other relief as may be just and proper.

Dated: Wilmington, Delaware    **BLANK ROME LLP**
April 15, 2005

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:  (302) 425-6464

- and -

**FRIED, FRANK, HARRIS, SHRIVER &**
**JACOBSON LLP**
Bonnie Steingart
Gary Kaplan
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset Management
Corporation
- and -

**SMITH, KATZENSTEIN & FURLOW, LLP**

_/s/ Kathleen M. Miller_
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Facsimile: (302) 652-8405

- 18 -

- and -

**NIXON PEABODY LLP**
Amanda D. Darwin (BBO No. 547654)
John V. Snellings (BBO No. 548791)
Lee Harrington (DE No. 4046)
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Attorneys for Law Debenture Trust Company of
New York

120087.01600/40152516v1

David R. Paoli
PAOLI & SHEA, P.C.
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
Facsimile: (406) 542-3332

Bijan Amini (*Pro Hac Vice* Application forthcoming)
STORCH AMINI & MUNVES, P.C.
405 Lexington Avenue 51st Floor
New York, New York 10174
Telephone: (212) 490-4100
Facsimile: (212) 490-4208



FILED

MAY 20 2004

LORI MALONEY CLERK

By_____
Deputy Clerk

        *Attorneys for Plaintiff*

### MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION Suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC | ) ) ) | Cause No. *DV-04-131* |
| Plaintiff, | ) ) ) | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | ) ) | |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | ) ) | |
| Defendant. | ) ) ) | |

Magten Asset Management Corporation ("Magten" or the "Plaintiff"), by and through its

attorneys Storch Amini & Munves, P.C., and Paoli & Shea, P.C., as and for its Complaint against

Paul Hastings Janofsky & Walker LLP ("Paul Hastings" or the "Defendant") alleges as follows:

### INTRODUCTION

1.      This complaint involves a scheme to defraud the creditors of Northwestern

Energy LLC, now known as Clark Fork and Blackfoot LLC (herein, "Clark Fork"), and

Defendant's breach of its duties to Clark Fork and its creditors in connection therewith. To

cover up losses from poor investment decisions, the Northwestern Corporation ("Northwestern") decided to strip the assets of Clark Fork, its solvent and profitable subsidiary. In doing so, Northwestern defrauded the creditors of the subsidiary, including a trust that had invested in the subsidiary on the basis of those very same valuable assets.

2.      The chronology of the events in question is stark testimony to the fraudulent nature of the scheme. In September 2000, Northwestern agreed to acquire the profitable transmission assets and the Milltown Dam of the Montana Power Company. By the time the transaction was consummated on February 15, 2002, Northwestern was drowning in red ink from bad investment decisions. A mere nine months later, slowed only by regulatory requirements, Northwestern transferred Clark Fork's profitable assets of between $1.1 and 1.4 billion in value for no payment whatsoever. Consideration supplied in the form of assumption of $700 million in Clark Fork's debt, on its face inadequate, was in fact itself illusory. Northwestern promptly encumbered the assets with new debt to temporarily cover its ineptitude, disenfranchising Clark Fork's creditors altogether. A mere ten months later, Northwestern was bankrupt.

3.      The officers and directors of Clark Fork were fully complicit in placing the company they had a duty to protect into insolvency. They willfully disregarded the fiduciary duties they owed to the creditors of Clark Fork by blindly obeying the orders of their parent.

4.      The Defendant served as counsel to Clark Fork, advising these same officers and directors. While the scheme's premise was simple, the execution of it was quite complex. Paul Hastings' assistance was crucial in guiding Northwestern and Clark Fork through the complex legal and regulatory hurdles necessary to effect Northwestern's desired result.

5.      In reality, Paul Hastings, which was hopelessly conflicted, devised, structured and negotiated the entire scheme. As counsel to Northwestern, the only party that benefited in the

transaction, Paul Hastings not only aided and abetted the Clark Fork officers and directors fiduciary breaches, but breached its own duties to Clark Fork in merely doing whatever it took to aid Northwestern in its fraudulent undertaking.

6.      By this action, Magten, as a creditor of Clark Fork and by virtue of its rights to enforce obligations under the Trust, seeks damages from Paul Hastings for its role in aiding and abetting the breach of fiduciary duties owed to the creditors of Clark Fork, aiding and abetting the fraudulent transfer of Clark Fork's assets to Northwestern, and its malpractice.

## THE PARTIES

7.      The Plaintiff, Magten, is a corporation organized under the laws of the State of Delaware, with its principle place of business in the State of New York.

8.      The Defendant, Paul Hastings, is a limited liability partnership organized under the laws of California. It has significant offices in New York. Many of its partners reside in the state of New York.

9.      Northwestern is a corporation incorporated in the State of Delaware with its corporate headquarters in Sioux Falls, South Dakota.

10.     Clark Fork and Blackfoot LLC is a Montana corporation, with its principal place of business in Montana. The energy assets at stake in this litigation were all situated in Montana.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to Rule 4(B) of the Montana Rules of Civil Procedure.

12.     In connection with its representation of Clark Fork, Paul Hastings regularly communicated with and visited Clark Fork at its location in Montana.

13. Additionally, in connection with the transactions complained of, at least throughout 2002, Paul Hastings represented Clark Fork before the Federal Energy Regulatory Commission.

14. As set forth below, in connection with the acts complained of herein, Paul Hastings caused over $1 billion of Clark Fork's assets located in the State of Montana to be transferred out of Clark Fork and out of the reach of Clark Fork's creditors.

## BACKGROUND

15. The Montana Power Company was incorporated in 1961, as successor to an energy corporation formed in 1912. It operated as the sole gas and electric utility throughout the state of Montana.

16. In 1996, the Montana Power Company and the Bank of New York ("BNY") as Trustee entered into an Indenture for the Unsecured Subordinated Debt Securities dated November 1, 1996 (the "Indenture"), pursuant to which the Montana Power Company issued $65 million in 8.45% Junior Subordinated Debentures (the "Junior Debentures").

17. At or about the same time, pursuant to the Amended and Restated Trust Agreement (the "Trust Agreement") between itself and various other persons, the Montana Power Company created Montana Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act. BNY was designated as the Property Trustee of the Trust as well as serving as Trustee under the Indenture.

18. As detailed below, as of November 2002, Clark Fork had succeeded to the Montana Power Company's obligations with respect to the Junior Indentures. The BNY has been succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law Debenture Trust Company of New York ("Law Debenture").

19.     The Junior Debentures were not sold directly to investors. Instead, they were sold to the Property Trustee of the Trust. The Trust holds 100% of the Junior Debentures, with a total face amount of approximately $67 million, which constitute its sole meaningful asset.

20.     The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS"). The value of the QUIPS is entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would, in turn, be passed on by the Trust to the holders of the QUIPS.

21.     The Trust's purpose, structured solely for accounting purposes, is to hold all of the Junior Debentures. Purchasers of QUIPS acquire an indirect undivided beneficial interest in the Junior Debentures and obtain substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

22.     The entire structure of the transaction was designed to put investors in the same position as if they had directly purchased the Junior Debentures, while providing the Montana Power Company with a more favorable accounting treatment than would have been possible had the Junior Debentures been sold directly to the investing public.

23.     In Section 610 of the Indenture, Clark Fork (as successor to the Montana Power Company) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue directly to enforce the Property Trustee's rights.

24.     Magten owns in excess of 33% of the QUIPS.

25.   In connection with the Trust Agreement and the Indenture, Montana Power also entered into a Guarantee Agreement with the BNY as Guarantee Trustee (the "Guarantee Agreement").   Pursuant to the Guarantee Agreement, the Montana Power Company, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust, and to the extent the Property Trustee had funds available in a specified account.   As with the Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original roles and responsibilities of the Montana Power Company and BNY, respectively.

## EVENTS LEADING UP TO THE CLAIMS

26.   In 1997, the Montana legislature passed the Energy Deregulation Act, deregulating the administrative controls Montana had put on the Montana Power Company for the better part of a century.   Almost immediately, the Montana Power Company began looking for ways to unload its energy assets ("The Montana Power Assets"), its long term debt and its environmental liabilities.

27.   The plan developed as follows: the Montana Power Company transferred the Montana Power Assets into a new, wholly-owned subsidiary to which it also transferred the liability saddled Milltown Dam as well as the obligation to fund the Junior Debentures. Northwestern then purchased the Montana subsidiary and in due turn transferred the assets to itself, leaving the liabilities unfunded.   As Northwestern later stated (see below) the sole purpose of structuring the transaction this way was to avoid the liabilities associated with these assets.

28.   On September 29, 2000, the Montana Power Company entered into a Unit Purchase Agreement with Northwestern.   The Montana Power Company agreed to create a

subsidiary, the Montana Power Company LLC ("MPLLC") to which it would transfer the Montana Power Assets. Northwestern agreed to purchase this subsidiary.

29.    Paul Hastings represented Northwestern in this transaction and was instrumental in structuring and negotiating it. Another of Paul Hastings' clients, Credit Suisse First Boston Corporation ("CSFB"), served as Financial Consultant for Northwestern on the transaction.

30.    Over the next two years, Paul Hastings assisted Northwestern in clearing the state and federal regulatory hurdles necessary to consummate the purchase of MPLLC.

31.    However, by October of 2001, Northwestern and Paul Hastings knew that Northwestern was running out of funds. Therefore, Paul Hastings, as counsel to Northwestern, assisted Northwestern in preparing a $720 million securities offering in which Paul Hastings' other client, CSFB, would act as lead initial purchaser and underwriter of $250 million 7 7/8% Five Year Notes and $470 million 8 ¼% Ten Year Notes. That purchase agreement was finally signed March 8, 2002.

32.    To finance the acquisition of MPLLC, on January 14, 2002, Northwestern entered into a $1 billion credit agreement with CSFB and other lenders. The credit facility consisted of a $280 million revolving credit facility and a $720 million acquisition term loan. CSFB, Paul Hastings' client, also served as administrative agent. Paul Hastings represented Northwestern in connection with this credit agreement.

33.    On February 13, 2002, following the clearance of regulatory hurdles, the Montana Power Company merged the Montana Power Assets into MPLLC (the "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

34.    On February 15, 2002, Northwestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this consideration was received or retained by MPLLC. Thus, it was not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

35.    Paul Hastings represented Northwestern in its purchase of MPLLC. In connection with this purchase, Paul Hastings issued an Opinion Letter to the Securities and Exchange Commission ("SEC") regarding Northwestern's Form U-1 Application. In it, Paul Hastings represented that, among other things, the purchase of MPLLC would "not violate the legal rights of the holders of any securities issued by Northwestern or any 'associate company of Northwestern'.

36.    In its Form U-1Application, Northwestern maintained that it was exempt from the stringent requirements of the Federal Public Utility Holdings Act ("PUHCA") in part on the grounds that its utility interests comprised only a small and not substantial part of Northwestern's business. This statement to the SEC was materially false. Through the purchase of the Montana Utility Assets, Northwestern's most valuable revenue producing arm would be those utility assets. Paul Hastings represented Northwestern on this filing and submitted its Opinion Letter in connection with it.

37.    Furthermore, in its Form U-1 Application, Northwestern revealed that the *sole* purpose of structuring the acquisition so that Northwestern would first purchase a subsidiary and then a few months later transfer the assets to itself was to avoid the liabilities associated with those assets.

38.    On March 19, 2002, MPLLC was renamed Northwestern Energy LLC ("Northwestern Energy"). Northwestern Energy was a duly organized Montana limited liability company. It is now known as Clark Fork.

## THE FRAUDULENT TRANSFER

39.    By the time Northwestern acquired control of Clark Fork in 2002, Northwestern was insolvent. Consequently, Northwestern and its counsel Paul Hastings worked out a plan whereby Northwestern would acquire the assets of Clark Fork for vastly less consideration than they were worth. Then they would immediately apply to borrow additional funds.

40.    On August 13, 2002, in accordance with the plan worked out by Paul Hastings, Northwestern entered into a series of agreements whereby it assumed on a joint and several basis with Clark Fork all of Clark Fork's obligations under the Indenture, the Guarantee Agreement and the Trust Agreement. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

41.    This transfer was illusory in that Northwestern did not have the resources by which to meet the assumed obligations. Northwestern was insolvent both immediately before and immediately after the assumption of these liabilities. Paul Hastings knew or should have known these facts.

42.    On November 15, 2002, in accordance with the prearranged plan worked out by Paul Hastings, Clark Fork and Northwestern entered into the Asset Transfer and Stock Purchase Agreement (the "Asset Transfer"), discussed below. On information and belief, Paul Hastings structured the transaction, and actually drafted the Asset Transfer as counsel to both Northwestern and Clark Fork.

43.    Through this Asset Transfer, the officers of Clark Fork and Northwestern, carried out a scheme to defraud, injure and deprive the Trust of the ability to receive the benefits due to it from Clark Fork in connection with the Junior Debentures, and consequently holders of the QUIPS, by, in the Transaction, transferring substantially all of Clark Fork's assets, to Northwestern without receiving adequate consideration in return. Clark Fork received no cash for the Transfer, and the consideration purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets were transferred to Northwestern, and only approximately $700 million dollars in Clark Fork liabilities were purportedly assumed by Northwestern. Indeed, with respect to some if not all of the liabilities purportedly assumed, Northwestern was already a co-obligor with Clark Fork prior to the Transaction and/or Clark Fork remained obligated jointly and severally with Northwestern subsequent to the Transaction, thus making any purported assumption of the liabilities in connection with the Transaction valueless. Northwestern's assumption of the debt was illusory in any event, having already predetermined to encumber the very assets that were available to satisfy them to repay prior losses, effectively leaving Clark Fork's creditors without recourse.

44.    In particular, Northwestern was already a co-obligor as to Clark Fork's obligations with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained obligated jointly and severally with Northwestern with respect to the Junior Indentures and QUIPS subsequent to the Transaction. Indeed, Clark Fork, through Paul Hastings, requested BNY (at the time still the Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork from its continuing obligations under the Indenture, but BNY refused to provide such a release.

45.     As an immediate result of the consummation of the Transfer, Clark Fork was insolvent. Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior Debentures and QUIPS and did not do so.

46.     Under the Asset Transfer, Clark Fork transferred substantially all of its assets, the energy assets from the Montana Power Company, and retained only the Milltown Dam. The Milltown Dam was, and still is, saddled with enormous environmental liabilities. The Milltown Dam operates under a license set to expire in 2007.

47.     Also in connection with the Asset Transfer, and also in accord with the plan devised by Paul Hastings, on November 15, 2002, Northwestern purported to execute a Third Supplemental Indenture, a Guarantee Assumption Agreement, and a Trust Assumption Agreement pursuant to which the Debtor would assume all of Clark Fork's obligations on the Junior Debentures. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

48.     Article Eleven of the Indenture purports to release the Montana Power Company (or its successor in interest) upon the transfer of substantially all of the assets of the Montana Power Company if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

49.     Additionally, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

## EVENTS FOLLOWING THE ASSET TRANSFER

50.    Following the Asset Transfer, Northwestern operated the energy assets it had sought in 2000 and acquired through the assistance of Paul Hastings as part of its Northwestern Energy Division.

51.    On November 20, 2002, Clark Fork became the official name of the subsidiary.

52.    On December 17, 2002, only days thereafter, Northwestern entered into a new $390 million senior secured credit agreement with CSFB and other financial institutions. This credit agreement was partly secured by $280 million in aggregate principal amount of First Mortgage Bonds, which granted a first mortgage in the energy assets previously held by Clark Fork.

53.    Ten months after the Asset Transfer, on September 14, 2003, Northwestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

54.    The Montana Utility Assets generate approximately 80% of Northwestern's consolidated EBITDA, although Northwestern did not pay fair value for those assets, thus injuring Magten and Clark Fork's other creditors.

55.    The Montana Utility Assets are now available to all creditors of Northwestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in Northwestern's reorganization plan.

56.    On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in Northwestern's bankruptcy case for leave to commence an adversary

proceeding against Northwestern seeking to have the Asset Transfer set aside as a fraudulent transfer.

57.     On April 8, 2004 Magten filed a complaint against Northwestern in the United States Bankruptcy Court for the District of Delaware to avoid the Asset Transfer as a fraudulent transfer.

58.     On April 19, 2004, Magten filed a complaint against the officers and directors of Clark Fork for breach of fiduciary duty in the District Court of Montana, Butte Division.

### FIRST CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duties Owed to Creditors of Clark Fork in the Zone of Insolvency

59.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

60.     Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, the officers of Clark Fork owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

61.     The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

62.     The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

63.     The Defendant aided and abetted the officers of Clark Fork in breaching their fiduciary duties owed to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

64.     The Defendant also aided and abetted the officers of Clark Fork in breaching their fiduciary duties to the Trust and Magten's predecessors in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and QUIPS to Northwestern, when they knew Northwestern was insolvent and would remain insolvent, and would thus be unable to perform those obligations.

65.     Paul Hastings knew or should have known that the conduct of the Clark Fork officers constituted a breach of their fiduciary duties.  However, conflicted due to their joint representation of Northwestern, Paul Hastings substantially assisted and encouraged these breaches in order to benefit its long time client, Northwestern.

66.     By reason of the foregoing acts, practices and course of conduct, the Defendant aided and abetted the Clark Fork officers and directors breach of their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss, in an amount to be proven at trial.

67.     Punitive damages in an amount to be determined at trial should also be awarded due to the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraudulent Transfer

68.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

69.    The Montana Uniform Fraudulent Transfer Act § 31-2-333, MCA provides that a transfer made by a debtor is fraudulent as to any creditor where it was made 1) with actual intent to hinder, delay or defraud any creditor of the debtor, or 2) without receiving a reasonably equivalent value in exchange and the debtor was engaged or about to engage in a business for which its remaining assets were unreasonably small or believed, or reasonably should have believed, that the debtor would incur debts beyond the Debtor's ability to pay as they came due.

70.    Pursuant to § 31-2-333, MCA in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

71.    The Montana Uniform Fraudulent Transfer Act § 31-2-334, MCA provides that a transfer made by a debtor is fraudulent as to creditors whose claims arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time.

72.    Magten was a creditor of Northwestern and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

73.    Northwestern was a parent of Clark Fork and, as such, exercised complete control over Clark Fork.  As a result of this relationship, Northwestern qualified as an insider under Montana law.

74.    In connection with the Transfer, Clark Fork transferred assets to Northwestern that are valued between $1.15 billion and $1.4 billion, and the only alleged consideration

received for the Transfer was the assumption of approximately $700 million in liabilities, itself illusory.

75.    Prior to the Transfer, Clark Fork was a solvent entity.    The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become insolvent.

76.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity. The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become undercapitalized.

77.    Because the Montana Utility Assets that Northwestern received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Northwestern, Clark Fork did not receive reasonably equivalent value for the transfer.

78.    Paul Hastings knew or should have known that by structuring the Asset Transfer the way it did, Clark Fork would be rendered insolvent and the QUIPS holders would be hindered, delayed or defrauded.

79.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork with unreasonably small remaining assets or without ability to pay its debts as they became due.

80.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork insolvent as a result.

81.    Paul Hastings provided substantial assistance to Northwestern and Clark Fork to effect this fraudulent transfer. The Defendant substantially assisted the directors and officers of Clark Fork by structuring and effectively orchestrating the entire Asset Transfer.

82.    Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

### THIRD CAUSE OF ACTION

### Civil Conspiracy to Conduct Fraudulent Transfer

83.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

84.    Paul Hastings and Northwestern intended when fraudulently transferring the Montana Utility Assets of Clark Fork to Northwestern to hinder, delay or defraud the creditors of Clark Fork.

85.    Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving reasonably equivalent value in exchange, rendering Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

86.    Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving a reasonably equivalent value in exchange, leaving Clark Fork with only the liability saddled Milltown Dam, and rendering Clark Fork insolvent.

87.    Paul Hastings and Northwestern agreed on a course of action whereby Paul Hastings and Northwestern would enact the requisite agreements in order conduct that fraudulent transfer.

88.    In furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the

Montana Uniform Fraudulent Transfers Act in order to hinder, delay or defraud the creditors of Clark Fork.

89.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange and Clark Fork became insolvent as a result.

90.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange rendering Clark Fork engaged in a business or transaction for which the remaining assets of Clark Fork were unreasonably small.

91.    As damages, Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

### FOURTH CAUSE OF ACTION

**Malpractice**
**Magten suing directly, on behalf of the Trust and derivatively on behalf of Clark Fork**

92.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

93.    The Defendant owed a duty of care to Clark Fork.

94.    The Defendant also owed a duty of care to Northwestern.

95.    The Defendant breached its duty to Clark Fork by failing to disclose its conflict of interest to Clark Fork's officers and directors.

96.     Because Paul Hastings failed to disclose its conflict of interest to Clark Fork and instead structured a transaction for Clark Fork whereby Clark Fork was forced to relinquish substantially all of its assets, Clark Fork and its creditors suffered an amount to be determined at trial.

97.     In as much as Paul Hastings' actions caused Clark Fork to become insolvent, and enter the zone of insolvency, Magten, on its own behalf, on behalf of the Trust and on behalf of Clark Fork, is entitled to recover for Paul Hastings' malpractice.

WHEREFORE, Plaintiff prays for all damages caused by the actions of defendant and enter judgment against defendant as follows:

1.     For Plaintiff's compensatory damages;

2.     An award of punitive damages to punish defendant for its intentional and malicious conduct;

3.     For Plaintiff's costs, attorneys' fees and any other recoverable expenses related to this litigation; and

4.     Such further and additional relief this Court deems just and proper.

DATED this ⁄⁄ᵗʰ day of May, 2004.

PAOLI & SHEA, P.C.


By: _David R. Paoli_____
        David R. Paoli
        *Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues.

DATED this /9th day of May, 2004.

PAOLI & SHEA, P.C.

By: _David R. Paoli_____

David R. Paoli
*Attorney for Plaintiff*

RECEIVED

SEP 1 0 2004

POORE, ROTH & ROBINSON, P.C.
OUR FILE NO. 2620 - 1164

FILED
GREAT FALLS DIV. 24

'04 SEP 8 PM 4 20

PATRICK ..... . CLERK
BY
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

MAGTEN ASSET MANAGEMENT
CORPORATION Suing individually and
derivatively on behalf of CLARK FORK
AND BLACKFOOT, LLC,

                          Plaintiff,

vs.

PAUL HASTINGS JANOFSKY &
WALKER LLP,

                          Defendant.

No. CV 04-49-BU-SEH

MEMORANDUM AND ORDER

## INTRODUCTION

Magten Asset Management Corporation brought this action "individually and derivatively

on behalf of CLARK FORK AND BLACKFOOT, LLC" in Montana state district court alleging

breach of fiduciary duties, aiding and abetting fraudulent transfer, civil conspiracy and

malpractice.[1] Defendant removed to this Court under 28 U.S.C. § 1452(a) as a case "related to"

---

[1] Magten Asset Management Corporation Suing individually and derivatively on behalf
of Clark Fork and Blackfoot, LLC v. Paul Hastings Janofsky & Walker LLP, Cause No. DV 04-
131, Montana Second Judicial District Court, Silver Bow County.

-1-

bankruptcy of Northwestern Corporation (Northwestern), parent corporation of Clark Fork and

Blackfoot, LLC. Plaintiff has moved to remand. Defendant has moved to have the case

transferred to the District of Delaware, where Northwestern's bankruptcy is pending, or to the

District of New York. As an alternative to transfer, Defendant asks that the case be stayed

pending the outcome of certain adversary proceedings involving Northwestern pending in the

Delaware Bankruptcy Court. All motions are opposed.

### Motion to Remand

A case is "related to" bankruptcy "if the outcome could alter the debtors' rights,

liabilities, options or freedoms of action (either negatively or positively) and which in any way

impacts upon the handling and administration of the bankruptcy estate." In re Fietz, 852 F.2d

455, 457 (9th Cir. 1988)(quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)).

Here, the claims asserted by Plaintiff are said to be brought in part on behalf of Clark Fork and

Blackfoot, LLC. Clark Fork and Blackfoot, LLC is a wholly-owned subsidiary of Northwestern.

Successful prosecution of this case could have a positive effect on the size and value of

Northwestern's estate in bankruptcy, thus impacting, at a minimum, options available to the

bankrupt, and administration of its estate. The "relating to" test of Fietz is met. This Court has

jurisdiction. Remand for lack of jurisdiction is not appropriate.

### Motion to Transfer

A motion for transfer under 28 U.S.C. § 1404(a) may be granted if: "(1) . . . venue is

proper in the transferor district; (2) . . . the transferee district is one where the action might have

been brought; and (3) . . . the transfer will serve the convenience of the parties and witnesses and

will promote the interest of justice." Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp.,

-2-

820 F. Supp. 503, 506 (C.D. Cal. 1992). Such a motion is addressed to the discretion of the court and is to be decided on an individualized case-by-case consideration of convenience and fairness. Jones v. GNC Franchising, Inc., 211 F.3d 495, 498 (9th Cir. 2000). Factors to be taken into account in evaluating convenience and fairness include: "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986)(quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

Upon review of the record and the materials provided by both parties, the Court is persuaded that the interests of justice and of convenience and fairness are best served by transfer of this case to the District of Delaware. As noted, Plaintiff already has filed an adversary proceeding claim in Northwestern's bankruptcy in Delaware, the outcome of which may substantially impact the vitality of the claims asserted in this case. Many of the obligations claimed against Defendant in the Montana case appear to mirror allegations in the adversary proceedings. Plaintiff's choice of forum warrants less consideration since neither party is a citizen of Montana. Plaintiff is a citizen of Delaware. Both Plaintiff and Defendant have offices in New York. Neither has officers or employees in Montana. By all accounts, most of all the significant witnesses reside outside Montana. Substantially all legal activities giving rise to the case occurred outside Montana and in locations on the east coast. Records relating to the transactions in question are in venues located outside Montana and closer to Delaware than to Montana.

-3-

**ORDERED**

1.     Plaintiff's Motion to Remand[2] is DENIED.

2.     Defendant's motion to transfer this case to the District of Delaware for the convenience of parties and witnesses and in the interest of justice[3] is GRANTED.

3.     Defendant's motion to stay is DENIED without prejudice to renewal following transfer to the District of Delaware.

The clerk is directed to transfer this case to the United States District Court for the District of Delaware.

DATED this ___8th___ day of September, 2004.

SAM E. HADDON
United States District Judge

---

[2] Docket No. 16.

[3] Docket No. 15.

-4-