

05 - 499

James H. Goetz
J. Devlan Geddes
**GOETZ, GALLIK & BALDWIN, P.C.**
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Ph:    406-587-0618
Fax:   406-587-5144

Bonnie Steingart    (*Pro Hac Vice* Application forthcoming)
John W. Brewer    (*Pro Hac Vice* Application forthcoming)
**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP**
One New York Plaza
New York, New York 10004
(212) 859-8000

ATTORNEYS FOR PLAINTIFF

FILED
....., MT

' '.' °°° 19  AM 10 57

PATRICK E. DUFFY, CLERK
BY _____
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF MONTANA

### BUTTE DIVISION

* * * * * * * *

MAGTEN ASSET MANAGEMENT CORPORATION,    )
                                        )
Plaintiff,    )
                                        )
-against-    )
                                        )
MIKE J. HANSON, JACK D. HAFFEY, ERNIE J.    )
KINDT, and ELLEN M. SENECHAL,    )
                                        )
Defendants.    )

Cause No. *CV-04-26-BU-RFC*

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff Magten Asset Management Corporation ("Magten"), by its undersigned attorneys,

hereby alleges in support of its Complaint on personal knowledge as to its own acts and on information

and belief as to all other matters as follows:

### INTRODUCTION

1.    Magten is a creditor of Clark Fork and Blackfoot, LLC ("Clark Fork"), formerly

known as NorthWestern Energy, LLC ("NWE"), and prior to that known as The Montana Power

Company LLC ("MPLLC"). Magten brings this lawsuit to obtain redress for the wrongful actions of

defendants Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen M. Senechal, all of whom were

1  officers of Clark Fork on November 15, 2002 and enabled the transfer on that date (the "Transaction")

2  of Clark Fork's key assets — electric, natural gas and propane utility assets (the "Montana Utility

3  Assets") — to its corporate parent NorthWestern Corporation ("NorthWestern") without adequate

4  consideration. The Transaction unjustly enriched NorthWestern by hundreds of millions of dollars while

5  destroying Clark Fork's solvency and thus its ability to meet its obligations to Magten and its other

6  creditors. The defendants, as officers of Clark Fork, had a fiduciary duty to Clark Fork's creditors not

7  to engage in transactions that would render Clark Fork insolvent. In connection with the Transaction,

8  Clark Fork purported to have NorthWestern assume Clark Fork's liabilities, but NorthWestern's other

9  liabilities were so massive that, even after paying inadequate consideration to Clark Fork for the

10 Montana Utility Assets, NorthWestern could not pay its own pre-existing creditors, and filed a

11 voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result of defendants'

12 actions, Magten is now owed well in excess of $20 million dollars by a company which defendants

13 rendered unable to meet its obligations to Magten. Magten seeks appropriate compensatory and

14 punitive damages, in an amount to be determined at trial.

15                                     **THE PARTIES**

16      2.      Plaintiff is a corporation validly organized and doing business under the laws of the

17 State of Delaware with its principal place of business in the State of New York and is, therefore,

18 deemed to be a citizen of Delaware and New York pursuant to 28 U.S.C § 1332(c)(1).

19      3.      Defendant Mike J. Hanson is a citizen of the State of Montana and is believed to reside

20 at 1805 C St., Butte, Montana 59701. As of November 15, 2002, Hanson was Chief Executive

21 Officer of Clark Fork.

22      4.      Defendant Jack D. Haffey is a citizen of the State of Montana, and is believed to reside

23 at 2101 Garfield St., Anaconda, Montana 59711. As of November 15, 2002, Haffey was President of

24 Clark Fork.

25      5.      Defendant Ernie J. Kindt is a citizen of the State of Montana, and is believed to reside

26 at 5 Amber Way, Butte, Montana 59701. As of November 15, 2002 Kindt was Vice President and

27 Chief Accounting Officer of Clark Fork.

28      6.      Defendant Ellen M. Senechal is a citizen of the State of Montana, and is believed to

COMPLAINT AND DEMAND FOR JURY TRIAL                                           PAGE 2

1   reside at 75 Park Drive, Clancy, Montana 59634. As of November 15, 2002, Senechal was Vice

2   President, Treasurer and Chief Financial Officer of Clark Fork.

3                          **JURISDICTION AND VENUE**

4       7.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

5   1332, as it is between citizens of different States and the matter in controversy exceeds the sum or

6   value of $75,000, exclusive of interest and costs.

7       8.      Venue is proper pursuant to 28 U.S.C. 1391, because all defendants reside in this

8   judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this

9   judicial district.

10              **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

11  **The Montana Power Company**

12      9.      The Montana Power Company ("Montana Power") was incorporated in 1961 under

13  the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger

14  of four regional electric companies.

15      10.     By the year 2000, Montana Power was engaged in activities related to

16  telecommunications and energy related activities including activities in the fields of oil, coal, natural gas,

17  and electricity.

18      11.     In November 1996, Montana Power and Bank of New York entered into that certain

19  Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities (the "Indenture").

20      12.     Pursuant to the Indenture, Montana Power issued the Junior Subordinated Interest

21  Debentures (the "Junior Debentures").

22      13.     At or about the same time, pursuant to the Amended and Restated Trust Agreement

23  (the "Trust Agreement") between itself and various other persons, Montana Power created Montana

24  Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act.

25  Bank of New York was designated as the Property Trustee of the Trust as well as serving as Trustee

26  under the Indenture.

27      14.     As detailed below, as of November 2002, Clark Fork had succeeded to Montana

28  Power's obligations with respect to the Junior Indentures. The Bank of New York has been

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 3

1  succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law
2  Debenture Trust Company of New York ("Law Debenture").

3      15.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued
4  the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS").

5      16.    The Trust holds 100% of the Junior Debentures, with a total face amount of
6  approximately $67 million, which constitute its sole meaningful asset. The value of the QUIPS is
7  entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay
8  interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would then in turn be
9  passed on by the Trust to the holders of the QUIPS.

10     17.    The Junior Debentures were not sold directly to investors; rather, purchasing the
11 QUIPS provided investors with substantially the same rights and the same potential investment return as
12 they would have had had they been able to own Junior Debentures directly. The entire structure of the
13 transaction was designed to put investors in the same position as if they had directly purchased the
14 Junior Debentures, while providing Montana Power with a more favorable accounting treatment than
15 would have been possible had the Junior Debentures been sold directly to the investing public.

16     18.    Accordingly, in Section 610 of the Indenture Clark Fork (as successor to Montana
17 Power) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the
18 Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the
19 Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue
20 directly to enforce the Property Trustee's rights.

21     19.    Magten owns in excess of 33% of the QUIPS.

22     20.    In connection with the Trust Agreement and the Indenture, Montana Power also
23 entered into a Guarantee Agreement with the Bank of New York as Guarantee Trustee (the
24 "Guarantee Agreement"). Pursuant to the Guarantee Agreement, Montana Power, as guarantor,
25 agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the
26 Trust, and to the extent the Property Trustee had funds available in a specified account. As with the
27 Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original
28 roles and responsibilities of Montana Power and Bank of New York respectively.

COMPLAINT AND DEMAND FOR JURY TRIAL                          PAGE 4

1    **The Sale of the Montana Power Company's Utility Assets**

2        21.    On March 28, 2000, Montana Power announced plans to restructure its business. This
3    restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane
4    utility assets, in order to allow Montana Power to focus on telecommunications.

5        22.    On September 29, 2000, Montana Power entered into a Unit Purchase Agreement
6    with NorthWestern, pursuant to which NorthWestern agreed to purchase control of the Montana Utility
7    Assets, then owned by Montana Power, in a multi-step transaction.

8        23.    On February 13, 2002, Montana Power merged its energy assets into MPLLC (the
9    "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility
10   Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and
11   the QUIPS.

12       24.    Specifically, in connection with the Merger, on February 13, 2002, pursuant to the First
13   Supplemental Indenture, MPLLC assumed the obligations of Montana Power under the Indenture.

14       25.    In addition, in connection with the Merger, on February 13, 2002, pursuant to a letter
15   agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

16       26.    On February 15, 2002, NorthWestern purchased 100% of the equity of MPLLC, and,
17   thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this
18   consideration was received or retained by MPLLC. It was thus not thereafter available to Clark Fork
19   to assist Clark Fork in meeting its obligations to its creditors.

20       27.    On March 19, 2002, MPLLC was renamed NWE.

21       28.    On August 13, 2002, NorthWestern entered into the Second Supplemental Indenture,
22   whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the
23   Indenture.

24       29.    On August 13, 2002, NorthWestern entered into an Amendment to the Guarantee
25   Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under
26   the Guarantee Agreement.

27       30.    On August 13, 2002, NorthWestern entered into a letter agreement amending the Trust
28   Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

1    the Trust Agreement.

2    **The Transfer**

3        31.    On November 15, 2002, defendants, as officers of Clark Fork, carried out a scheme

4    to defraud, injure and deprive Magten of the ability to receive the benefits due to it from Clark Fork in

5    connection with the Junior Debentures and the QUIPS, by, in the Transaction, transferring substantially

6    all of Clark Fork's assets, the Montana Utility Assets, to NorthWestern without receiving adequate

7    consideration in return.  Clark Fork received no cash for the Transfer, and the consideration

8    purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets

9    were transferred to NorthWestern, and only approximately $700 million dollars in Clark Fork liabilities

10   were purportedly assumed by NorthWestern.  Indeed, with respect to some if not all of the liabilities

11   purportedly assumed, NorthWestern was already a co-obligor with Clark Fork prior to the Transaction

12   and/or Clark Fork remained obligated jointly and severally with NorthWestern subsequent to the

13   Transaction, thus making any purported assumption of the liabilities in connection with the Transaction

14   valueless.

15       32.    In particular, NorthWestern was already a co-obligor as to Clark Fork's obligations

16   with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained

17   obligated jointly and severally with NorthWestern with respect to the Junior Indentures and QUIPS

18   subsequent to the Transaction.  Indeed, Clark Fork requested Bank of New York (at the time still the

19   Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork

20   from its continuing obligations under the Indenture, but Bank of New York refused to provide such a

21   release.

22       33.    As an immediate result of the consummation of the Transfer, Clark Fork was insolvent.

23   Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior

24   Debentures and QUIPS and did not do so.

25       34.    Both prior to and following the Transaction, NorthWestern was itself insolvent, making

26   both its August 2002 assumption of liabilities with respect to the Junior Debentures and QUIPS and any

27   purported further assumption of those liabilities in connection with the Transaction of little or no value to

28   the holders of the QUIPS and other creditors of Clark Fork.  Even the hundreds of millions of dollars

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 6

1   by which it was unjustly enriched by the Transaction were insufficient to overcome the massive

2   imbalance between assets and liabilities created by its various other failed business ventures.

3         35.     The defendants all knew, should have known, and/or were reckless with respect to

4   knowing that Clark Fork would be rendered insolvent as a result of the Transaction and that

5   NorthWestern was insolvent both before and after the Transaction.

6         36.     No interest on the Junior Debentures was paid by either NorthWestern or Clark Fork

7   since prior to September 14, 2003. In excess of $2 million of interest on the Junior Debentures is now

8   past due. If paid, that interest would have been passed on by the Trust to the holders of the QUIPS

9   such as Magten. Moreover, the entire principal amount of the Junior Debentures was accelerated

10   pursuant to the terms of the Indenture no later than September 14, 2003.

11        37.     Following the Transaction, Clark Fork retained only the Milltown Dam, a two

12   megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license

13   that expires in 2007, and the related environmental liabilities.

14        38.     Following the Transaction, NorthWestern operated the Montana Utility Assets as part

15   of NorthWestern's NorthWestern Energy Division.

16        39.     After the Transaction, NWE remained a subsidiary of NorthWestern and on November

17   20, 2002, NWE was re-named Clark Fork.

18        40.     Clark Fork continues to operate the Milltown Dam.

19        41.     Clark Fork is entirely dependent upon NorthWestern for continued funding of the

20   Milltown Dam and its corporate existence, and NorthWestern is required, under certain agreements

21   with Clark Fork, which require NorthWestern to pay any costs and expenses that arise in connection

22   with the operation of the Milltown Dam.

23        42.     Less than a year later, on September 14, 2003, NorthWestern filed a voluntary petition

24   for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the

25   District of Delaware.

26        43.     The Montana Utility Assets generate approximately 80% of NorthWestern's

27   consolidated EBITDA, although NorthWestern did not pay fair value for those assets, thus injuring

28   Magten and Clark Fork's other creditors.

COMPLAINT AND DEMAND FOR JURY TRIAL                             PAGE 7

1    44.    The Montana Utility Assets are now available to all creditors of NorthWestern, most of

2  whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's

3  assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for

4  their claims in NorthWestern's reorganization plan.

5    45.    On April 8, 2004, the United States Bankruptcy Court for the District of Delaware

6  granted Magten's motion in NorthWestern's bankruptcy case for leave to commence an adversary

7  proceeding against NorthWestern seeking to have the Transaction set aside as a fraudulent

8  conveyance.

9                          **STATEMENT OF CLAIM**

10                          **FIRST CAUSE OF ACTION**

11                          **(Breach of Fiduciary Duty)**

12    46.    Plaintiff repeats and realleges paragraphs 1-45 and incorporates them herein by

13  reference.

14    47.    Clark Fork was a company within the zone of insolvency on November 15, 2002.

15  Accordingly, defendants, as officers of Clark Fork, owed individual fiduciary duties to Clark Fork's

16  creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors

17  in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to

18  perform its obligations with respect to the Junior Debentures and QUIPS.

19    48.    The Trust and the QUIPS holders, including Magten's predecessors in interest, were

20  creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility

21  Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

22    49.    The Property Trustee has failed to enforce the Trust's rights, so Magten has standing

23  under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the

24  QUIPS holders who were its predecessors in interest.

25    50.    Defendants breached their fiduciary duties to the Trust and Magten's predecessors in

26  interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility

27  Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

28    51.    Defendants also breached their fiduciary duties to the Trust and Magten's predecessors

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 8

1  in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and
2  QUIPS to NorthWestern, when they knew NorthWestern was insolvent and would remain insolvent,
3  and would thus be unable to perform those obligations.

4      52.    By reason of the foregoing acts, practices and course of conduct, the defendants have
5  breached their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss,
6  in an amount to be proven at trial, but in excess of $20 million.

7      53.    Punitive damages in an amount to be determined at trial should also be awarded due to
8  the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

9
10                              **PRAYER FOR RELIEF**
11
12      WHEREFORE, plaintiff respectfully requests that this Court enter judgment against defendants
13  as follows:

14      1.    Awarding plaintiff compensatory and punitive damages, in an amount
15  determined at trial but in excess of $20 million;

16      2.    Awarding plaintiff all allowable costs, attorneys' fees and other litigation
17  expenses to the extent recoverable under law; and

18      3.    Awarding plaintiff such other and further relief as to this Court may be just,
19  proper and equitable.

20      DATED this 15th day of April, 2004.

21
22                              GOETZ, GALLIK & BALDWIN, P.C.
23
24
25
26      By: _____
27      for: James H. Goetz
28      ATTORNEYS FOR PLAINTIFF

COMPLAINT AND DEMAND FOR JURY TRIAL                              PAGE 9

1
2

### DEMAND FOR JURY TRIAL

3      Plaintiff hereby demands a trial by jury on all issues so triable.

4

5      DATED this 15th day of April, 2004.

6

7                              GOETZ, GALLIK & BALDWIN, P.C.

8
9
10
11                    By: _____

12                        James H. Goetz

                    ATTORNEYS FOR PLAINTIFF
13
14
15

16  E:\JIM\Karen\Magten Asset Mgmt Corp 4032\Pleadings\Complaint.4 15 04.wpd

17
18
19
20
21
22
23
24
25
26
27
28

**COMPLAINT AND DEMAND FOR JURY TRIAL**                                PAGE 10

1      UNITED STATES BANKRUPTCY COURT
              DISTRICT OF DELAWARE

2

3    IN RE:                        .    Chapter 11
                                   .
4    NORTHWESTERN CORPORATION,     .    Case No. 03-12872(CGC)
                                   .
5           Debtor.                .    Oct. 8, 2004 (8:50 a.m.)
                                   .    (Phoenix, Arizona)

6

7              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE CHARLES G. CASE, II
8         UNITED STATES BANKRUPTCY COURT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21      Proceedings recorded by electronic sound recording;
22         transcript produced by transcription service.

23

24

25



0312872041026000000000003



1    equity and the sub-debt out of the market -- excuse me, out

2    of the money, and that even at the high end of the Houlihan

3    analysis, which does include the non-core assets, the sub-

4    debt remains out of the money by over $200 million.  With

5    regard to the objections that had been raised by Magten, they

6    turn largely upon the special circumstances alleged to exist

7    by Magten because of their having brought the fraudulent

8    conveyance case and having survived in that case a motion to

9    dismiss.  Again, I will note for the record that I largely

10   accepted the debtor's/defendant's arguments with regard to

11   the lack of standing by Magten to bring the action except if

12   Magten can show that there was actual fraud that occurred in

13   the context of the transaction itself.  That could lead, if

14   that were proven, to an unwinding of or to an invalidation of

15   the release of Clark Fork and the assumption by Northwestern,

16   which is the critical part of Northwestern's lack of standing

17   defense.  But in the absence of the actual fraud, I do think

18   the lack of standing defense still is valid.  Nevertheless,

19   there is a pending lawsuit and that's the burden that they

20   have to overcome, and I'm certainly making no prejudgment

21   today one way or the other about what the evidence will show

22   in that particular case but the primary point, a primary

23   point of the Magten position and the Law Debenture position

24   is that the Montana utility assets are not property of the

25   estate because they are subject in effect to a constructive

1  trust in favor of Magten as plaintiff in the fraudulent

2  conveyance case.  Everyone agrees that there has been no

3  action yet actually taken to impose a constructed trust.  At

4  this point we only have the allegations, which as noted, have

5  narrowly survived a motion to dismiss with a high burden

6  placed on the plaintiff even to stay in the game at this

7  point.  Magten strongly relies, frankly without citation,

8  upon Montana law from the notion that there is no remedy at

9  law but only equitable remedies that do not give rise to

10 money damages.  Therefore, it is not the holder of a claim

11 that can either be discharged or treated as an unsecured

12 claim, but rather it's the holder of, in effect, an in rem

13 interest in the Montana utility assets.  There's been no

14 Montana case cited to support this interpretation, and indeed

15 there was no case from any other jurisdiction with a

16 similarly situated or structured law.  And upon closer

17 examination, there is nothing arcane or extraordinary about

18 the remedies available under Montana law.  Montana has,

19 similarly to most jurisdictions around the country, adopted

20 the Uniform Fraudulent Transfer Act of which the section in

21 question, which is 31 to 339, is Section 7.  The Uniform

22 Fraudulent Transfer Act updated, modernized, and harmonized

23 fraudulent conveyance juris prudence with the 1978 Bankruptcy

24 Code among other things and just generally with the evolving

25 nature of fraudulent conveyance juris prudence over the years

1 from the statute of Elizabeth to the present. And indeed, as

2 I read that section and the commentaries that are related to

3 that section, particularly Section 7 of the Uniform

4 Fraudulent Transfer Act, the intent was not to limit remedies

5 but to expand remedies. For example, there were certain pre-

6 judgment remedies that were put into the law that to the

7 extent they are consistent with Supreme Court juris prudence

8 on notice and due process and so on, are now part of the

9 available remedies. And, specifically, Section 7(a) which is

10 339(a) provides that a remedy is the avoidance, quote, "to

11 the extent necessary to satisfy the creditor's claim", close

12 quote. That clearly contemplates money damages. There's

13 nothing in the remedy section that I found of the Montana

14 fraudulent conveyance law that gives rise to an automatic

15 constructive trust upon the mere filing of a lawsuit, and as

16 my colloquy with counsel during the course of the proceeding

17 indicated, I would find that to be an extraordinary provision

18 indeed. That would put at risk virtually every transaction

19 that was ever done until such time as the statute of

20 limitations would run. On the other hand, I do think that

21 the general Montana law on constructive trust, which was

22 cited by the debtors, that's Montana Code 33319 would apply

23 and that does require clear and satisfactory and convincing

24 proof that is practically clear from doubt as stated by a

25 Montana case interpreting that particular statute. Thus, I

1  think, what the law provides is that a constructive trust is

2  the exception and not the rule whether under Montana law or

3  generally.  And of course, the imposition of any constructive

4  trust is contrary to basic principles of ratable distribution

5  and is generally disfavored in the bankruptcy context because

6  of the adverse impact on other creditors, particularly where

7  there are ways of fashioning remedies that would protect the

8  plaintiffs or those asserting fraudulent conveyance theories.

9  Although Section 550 is not applicable here because this is

10  not an action brought by a trustee to avoid either under

11  545(b) or 548, I think it is instructive of the policies

12  behind fraudulent conveyance law as it has evolved, and 550

13  clearly contemplates that in addition to the mere setting

14  aside avoidance or return of the assets that a money

15  equivalent is appropriate.  So my conclusion on that issue is

16  that there is no constructive trust at present.  It is

17  unlikely that there will be one even if the plaintiffs are

18  successful, that the Montana assets are property of the

19  estate, that the Quips have an adequate remedy of law, that

20  there is no in rem right or property right created by virtue

21  of their status as a plaintiff in a fraudulent conveyance

22  case in those Montana utility assets.  I find and conclude

23  that the Quips come to the debtor's table like any other

24  unsecured creditors are to be treated in the same way.  And

25  indeed if it was different from that, the issue of unfair

1  discrimination would run the other way.  And that would be
2  unfair to those creditors.  So, in sum, is this an unsecured
3  claim?  The answer is, yes.  Is it a property interest?  The
4  answer is, no.  Is it a disputed unsecured claim?  Certainly
5  at this point it is.  Is it entitled, therefore, to a
6  reserve?  It would certainly appear that it is under Section
7  7.5 of the plan.  Is it entitled to a cash reserve?  No, it's
8  not entitled to a any reserve that's different from the
9  reserve that would be set up in connection with any other
10  unsecured claim so that it would be entitled to property or a
11  reserve of the distributable stock just like any other
12  unsecured claim, and the amount would then need to be
13  determined in accordance with the procedures set forth in the
14  7.5 of the plan, which includes either the amount of the
15  claim or such other amount as is estimated by the Court if
16  the parties can't agree.  So, I'm going to leave that part to
17  play out its course assuming the ultimate confirmation of
18  this plan.  Now, what about the election of remedies issue?
19  This is frankly the heart of the Magten objection, from where
20  I sit, and that is whether or not it is fair and equitable to
21  -- Just give me one moment here.  Basically, Magten's
22  argument is the debtor's best case or as Ms. Steingart put
23  it, the best day for the debtor is the 8 percent plus the
24  warrants.  Why is it fair for the Quips to lose that recovery
25  if they choose also to pursue the fraudulent conveyance?

31

1    Well, I've already found that based upon the valuation that

2    this is indeed what can be fairly called a gift case, that is

3    to say that there is not an absolute entitlement to the 8

4    percent or the 13 percent in warrants that has been set aside

5    here for Class 8, but rather that is money that is coming out

6    of the recoveries that would otherwise be available to

7    Classes 7 and 9 as non-subordinated unsecured creditors.

8    Magten suggested even if this is a so-called gift case, that

9    the requirements of the Code would nevertheless apply with

10   regard to the fairness of the treatment.  As a general

11   proposition, I don't agree with that, but I do think that

12   there might be circumstances under which a treatment could be

13   so substantially unfair that notwithstanding the fact that

14   it's a gift that it would be subject to inquiry by the Court,

15   but I don't think that set of facts and circumstances arises

16   here.  And as I've said before, the valuation establishes

17   that the sub-debt is out of the money.  Now the election of

18   remedies provision of Class 8-B requires a choice.  The sub-

19   debt, Magten argue that that violates -- it is contrary to

20   the holding of the AOV case.  AOV is, however, I think

21   different because there were two independent claims in AOV, a

22   primary claim and a secondary claim or a guarantee claim that

23   were -- that co-existed.  The question here is whether or not

24   these two claims can in fact co-exist.  If there was a

25   fraudulent conveyance than Northwestern is not liable on the

1   Quips, and it would be unfair to the other unsecured
2   creditors for the Quips to receive a distribution on a debt
3   on which the debtor is not liable.  If there wasn't a
4   fraudulent conveyance, then the Quips are in fact owed the
5   money.  So the real issue presented is why shouldn't the
6   Quips have the backstop of the 8 percent if it turns out that
7   they are wrong and they lose the lawsuit.  That's the heart
8   of what Magten is arguing.  I'm certain the plan could have
9   been drafted that way, but it certainly is not.  The question
10  then is does that make the plan with regard to the treatment
11  of 8-B un-confirmable.  My conclusion is, no.  The valuation
12  establishes that there's no right to the 8 percent because
13  the sub-debt is out of the money.  If the plan had separated
14  them out and not given them that treatment, then as suggested
15  the unfair discrimination might be implicated.  But we don't
16  get to that point because it does give them the 8 percent.
17  The two particular kinds of remedies are in fact completely
18  inconsistent.  And it is consistent with election of remedies
19  law that you have to choose which path you're going to do
20  down.  In addition here, where a class does not have a vested
21  right to a certain treatment, the 8 percent, it is not
22  unreasonable or unfair to make it pay for the option of
23  seeking a higher return based upon a legal theory which if
24  correct would disqualify them even from getting the gift.  In
25  effect, this is a put your money where your mouth is plan,

33

1    and in the absence of an independent secondary liability,

2    which would exist coincidentally with the right to receive a

3    distribution under the plan, it is not unfair to require them

4    to make that choice. There's also a classification argument

5    that is raised by the sub-debt that it is inappropriate to

6    put the note claims, the Quips claims and the fraudulent

7    conveyance claims in the same class pursuant to this election

8    procedure. As I just stated, the note claims, however, are

9    premised upon affirmance of the obligation by Northwestern to

10   the Quips and this only arises if the going-flat transaction

11   remains in place. The assumption of the debtor under the

12   second indenture doesn't change this. Mr. Snellings I

13   thought valiantly tried to convince me that there was a

14   separate basis for the assumption by Northwestern of the

15   Quips obligation. However, in reviewing all of the

16   underlying transaction documents in connection with the

17   going-flat transaction, it is clear to me -- and the

18   applicable law, it is clear to me that this was really all

19   one transaction. So that the second indenture was one step

20   in an overall going-flat transaction and to leave it intact,

21   and to undo the rest would exalt form over substance, and

22   that absent the going-flat transaction, Northwestern would

23   have no liability on the Quips. If the fraudulent conveyance

24   claims -- they are premised upon the undoing of the going-

25   flat transaction including the assumption of the Quips by

34

Nor. Under this view of the world, the obligor should be
Clark Fork and Blackfoot, not Northwestern. And Clark Fork
and Blackfoot still would have the Montana utility assets to
satisfy the claims of the Quips. So, viewed in that way, I
find and conclude that these two sets of claims are
exclusionary and not cumulative. So that it is not
inappropriate to have a member of Class B choose which one of
these paths they want to do down. If they were separate and
independent liabilities that could co-exist and could
essentially be paid or could be two separate bases upon which
payment could be made and exist at the same time, I think the
conclusion would be different. The next question is whether
the Quips and the Toppers should be in the same class. This
is going to be a little tedious but I think it's important to
talk about it. Magten's original objection was that they
shouldn't be in the same class. Now, in effect, they're
taking the opposite view. Section 1122 does not require that
all claims of similar priority be placed in the same class,
rather only and if claims are placed in the same class that
they have to be substantially similar. The case law has
developed to limit excessive classes primarily because of
attempts to create a consenting impaired class to satisfy
1129(a)(10) so that a non-consenting and usually much larger
class of similar priority may be crammed down. That's not
what's happening here. Indeed, a ballot report suggests that

1   if 8-A and 8-B were aggregated the class would accept the

2   plan, and we wouldn't have a cram-down situation at all.

3   Here the separate classification protects the rights of the

4   Quips, which is the smaller debt issue rather than adversely

5   effecting those rights by allowing a larger debt issue to

6   Toppers to dominate.  There are many essential differences.

7   These are different issues of debt, different issuers,

8   different trustees, and more importantly there are different

9   litigation rights.  While both parties may have had standing

10   to raise PUHCA issues, the reality is only the Toppers

11   actually raised them in any meaningful way.  Only the Quips

12   had the standing or the potential standing to raise

13   fraudulent conveyance issues as to the going-flat

14   transaction.  Thus, it begs the question, in my view, to

15   suggest that the Toppers should be treated exactly the same

16   as the Quips when that is impossible given the facts that the

17   Quips have two types of claims that are exclusionary and not

18   cumulative.  So that leads to the question of whether also

19   the Quips and the Toppers are pari passu or is one

20   subordinate to the other.  Well, the debtor's plan treats

21   them as pari passu.  Wilmington Trust had previously asserted

22   that such pari passu treatment was improper.  Although that

23   issue was not fully briefed, it was simply raised in a pro

24   forma objection.  In reviewing the indentures I have

25   concluded the following:  The Quips' indenture provides that

36

1  senior indebtedness means any debt for borrowed money and
2  that includes assumed debt.  Unless the other instrument in
3  this case, the Toppers' indenture, expressly provides that
4  the Toppers are junior to or pari passu with the Quips.  And
5  there is no such provision in the Toppers' indenture either
6  specifically or generally unless the senior indebtedness
7  definition in the Toppers' indenture includes the Quips.
8  Now, does the Toppers' indenture so provide?  Well, the
9  Toppers' indenture provides that the senior indebtedness
10 means indebtedness issued by the company, Northwestern.
11 Evidence by securities except that that is by its terms
12 subordinated to a pari passu with the Toppers.  The Quips'
13 indentures requires that the Toppers' indenture expressly
14 provide that the Toppers are junior or pari passu, and there
15 is no such expressed provision.  So one could conclude that
16 in fact the Toppers are senior to the Quips.  However, the
17 same could be said of the Quips' indenture.  In other words,
18 beginning from the Toppers' side, one could conclude that the
19 Quips are senior because that indenture does not, quote, "by
20 its terms", close quote, which is the language used,
21 subordinate or made pay passu the Quips to the Toppers.
22 There are a couple of other interesting differences.  First,
23 the senior debt under the Toppers' indenture only extends --
24 that is to say, senior indebtedness to the Toppers only
25 extends to debt that's issued by Northwestern.  At least

that's how it reads.  The underlying debenture supporting the

Quips was issued by Montana Power and then to the financing

vehicle and not by Northwestern.  And unlike the Toppers'

indenture which expressly includes assumed debt, which is

what the Quips are, the Quips' indenture is limited to issued

debt.  So it strikes me that there is a potential there under

that particular difference between issued and assumed debt

that it could be concluded that the Quips are -- or that the

Toppers are senior to the Quips.  In addition, there's

another exception to the senior indebtedness and the Toppers'

indenture relied upon by Wilmington that at first had some

surface appeal.  This is because it references debt issued

through a financing vehicle such as occurred here with

Montana Power in the trust that was set up and the trust set

up as part of the transaction.  But as I read that exception,

it is limited by its terms to debt by or among Northwestern

and its affiliates, as that term is used in the indenture,

and the Quips do not fall within that definition.  Now, in

conclusion on this rather arcane issue, it is an issue that

has not been fully litigated or briefed.  It was merely

mentioned but not briefed by Wilmington in the objection

filed before the settlement was reached.  The language in the

two indentures is substantially similar though not identical

with regard to the circularity issue or problem of the senior

versus the junior debt.  So that it can neither be said that

1  the Quips' indenture by its terms subordinates the Quips to

2  the Toppers nor can it be said that the Toppers' indenture,

3  quote, "expressly provide", close quote, which is the

4  language from that indenture that the Toppers are not

5  superior to the Quips.  Likewise, the other exception in the

6  Toppers' indenture appears not to apply because the Quips are

7  not debt between Nor and its affiliate, and that particularly

8  the trust, which actually issued the Quips themselves, does

9  not qualify as an affiliate, I don't believe, but even if it

10  did, it wouldn't work because the debt must be issued to,

11  quote, "any other trust", suggesting that there has to be

12  another layer.  But there is this material difference between

13  the issued language and the assumed language that could

14  support the conclusion that the Toppers are seniors to the

15  Quips.  Obviously, the debtor's plan does not suggest that.

16  However, that change or that difference to me is another

17  substantial reason why the separate classification of 8-A and

18  8-B is appropriate.  Does this have an impact upon whether or

19  not this is a gift plan or not?  Well the analysis of value

20  above moots out that issue because my conclusion is that the

21  sub-debt is out of the money even if the two issues of sub-

22  debt are pari passu.  We next have the issue of unfair

23  discrimination.  That basically is if Classes 9 and 11 are

24  treated better than Class 8-B, and that they are of similar

25  priority.  Well, Class 11 is treated pursuant to a settlement

1 approved by the Court which compromises substantially, very

2 substantially, larger liability that the debtor had.  That's

3 the environmental claims on the Mill Town Dam and plus the

4 nature of the claim, you know, may be of a relatively same

5 priority is different because of obligations under the

6 environmental laws under 28 U.S.C. 959 and so on.  So this is

7 an area where because of the regulation and the public

8 interest and importance of environmental laws, make it as not

9 unfair discrimination to treat them better.  Certainly Class

10 9 is not treated better than the fraudulent conveyance claim,

11 because I found that the fraudulent conveyance claim should

12 be in 9 and should be treated as 9.  And in fact, 9 is better

13 than 8-B because 8-B is contractually subordinated to 7 and 9

14 is not.  So there's no unfair discrimination in terms of how

15 those particular classifications work.  There is an argument

16 that the plan violates the absolute priority rule because the

17 payment to the security claim plaintiffs in effect gives

18 money to equity equivalent parties who have 510(b) claims

19 without paying in full the senior debt obligations, in this

20 case, the Quips.  But, I've already found in connection with

21 my memorandum decision for the MOU that the proceeds are not

22 property of the estate so that does not implicate, therefore,

23 the absolute priority rule.  Part of Law Debenture's argument

24 further is that the adversary proceeding must be resolved

25 before the plan can be confirmed.  In my view this is

antithetical to fundamental Chapter 11 principles. There are
many vehicles available for determining such claims. For
example, temporary allowance estimation and other procedures
in the courts that deal with speedy resolution of claims.
And so, the real issue is, is there an adequate way to
protect the interest of the Quips, any final outcome of the
adversary proceeding as to those Quips who actually choose to
go that way, and what is the nature of that claim, and I've
already found that they are unsecured claims, and that there
is a way of protecting them through the establishment of a
reserve. Magten also raises issues with the D&O trust
channelling injunction and releases. I will note that this
is not a Quips' issue. This is not really an issue in which
the Magten or the holders of the Quips have any particular
interest. However, their argument is that the plan can't be
confirmed with that provision in it if it violates law so I
need to take an independent look at that. Their argument is
these are non-consensual releases and that they release
valuable claims of the estate. However, I will note that I
disagree. Section 524(e) does not limit injunctions of this
sort as found by a number of cases in this district and in
other districts where there's an identity of interest because
of the contractual and statutory indemnification
reimbursement rights between the debtor in this case and the
Ds and Os, whether there is sufficient consideration for the

41

releases, and I find that there is.  Where there's a
mechanism where this is included as a way of providing a
mechanism to implement the MOU that is itself of significant
benefit to the estate, and where, perhaps most importantly,
has been unanimously supported by the class members who voted
who the ones who are directly affected by this provision.
And while the plan does not guarantee full payment to claims
that are channeled to the trust, it provides more than would
be otherwise available because of the subordinated status of
the claims and the contribution of the 2.5 million.  By the
subordinated status of the claims I mean the fact that these
reimbursement claims are themselves 510(b) claims.  And it
does provide a mechanism for opt-out parties to recover
although there is no guarantee of full payment.  So based
upon those findings, I find it consistent with applicable law
the D&O channelling trust injunction and the releases are
appropriate and do not require that the plan not be
confirmed.  Law Debenture raises a number of other issues,
which are similar.  One that the interest in the Montana
utility assets must be protected specifically, but I found
that it is not an in rem interest and so, therefore, property
right protection is not appropriate and that there has to be
a cash reserve of at least $69 million, and number one, the
voting shows that there are $50 million only who have opted
the fraudulent conveyance lawsuit route and that they don't

1  need to be protected in cash. That reserve needs to be set

2  up in accordance with applicable plan procedures, and if the

3  parties cannot agree, the Court will set that amount and a

4  subsequent hearing to be set on shortened notice. Finally,

5  there's an issue with regard to unfair discrimination arguing

6  that Class 9 is receiving a substantially higher amount then

7  Class 8-B, and there is a difference in what is being received

8  but it's not unfair because Class 8-B is subject to the

9  subordination provisions and Class 9 is not. And further, it

10  is misleading to say that Class 11 is receiving a hundred

11  percent where in fact the amount being paid under Class 11 is

12  a deeply discounted compromised amount with the bulk of that

13  liability being assumed by third party Arco. The last issue

14  raised by Law Debenture is PUHCA asserting trying to

15  bootstrap essentially on the PUHCA issues that have been

16  previously raised by Wilmington and Harbert. But there was

17  not a shred of evidence presented by Law Debenture or Magten

18  on this, and there's no basis to determine, no evidentiary

19  basis at all to determine that the senior debt should be

20  voided or subordinated. So, that objection is overruled.

21  With regard to Mr. Hylland, he complains that the plan

22  deprives him of the right to arbitrate his claim. That's

23  been resolved. The debtor has consented or clarified that

24  that was not the intent. Mr. Hylland further thinks that to

25  the extent -- that the plan is unfair because to the extent

1 recording of this proceeding will be available and a

2 transcript can be made immediately available and under the

3 normal procedures.  We will see that a -- frankly, I don't

4 know how we do that, Stacey, whether we do it here or we send

5 it to Delaware.  What have we been doing?  We will burn a CD

6 and send it to the Bankruptcy Court in Delaware by overnight

7 mail.  It will be there on Monday, so any party who wishes to

8 either have a transcript or a copy of the CD can get it that

9 way.  All right.  I don't think we have anything else to do,

10 and with that, we are adjourned.

11          ALL (TELEPHONIC):  Thank you, Your Honor.

12          (Whereupon at 10:20 p.m. these proceedings in this

13 matter were concluded.)

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19 United States Courts, certify that the foregoing is a correct

20 transcript from the electronic sound recording of the

21 proceedings in the above-entitled matter.

22

23 *Elaine M. Ryan*                              10-15-04
   Elaine M. Ryan
   2801 Faulkland Road
24 Wilmington, DE 19808
   (302) 683-0221

25

Stanley T. Kaleczyc
Kimberly A. Beatty
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
139 North Last Chance Gulch
P.O. Box 1697
Helena, MT 59624
Phone: (406) 443-6820
Fax: (406) 443-6883

HELENA DIVISION

2005 APR 21    PM 4 25

PATRICK E. DUFFY, CL

BY _____

DEPUTY CL

Attorneys for Defendants.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION, | Case No.: CV-04-26-BU-RFC |
| Plaintiff, | **ANSWER OF DEFENDANTS MICHAEL J. HANSON AND ERNIE J. KINDT** |
| vs. | |
| MIKE J. HANSON, and ERNIE J. KINDT, | |
| Defendant | |

Michael J. Hanson and Ernie J. Kindt, the remaining defendants in this action "defendants", through their attorneys of record, answer Plaintiff's Complaint as follows:

1.    With respect to the allegations contained in paragraph 1 of Plaintiff's Complaint, Defendants Hanson and Kindt admit that they had the titles of officers of Clark Fork and Blackfoot, LLC ("Clark Fork") as of November 15, 2002. Defendants further admit that on or about September 14, 2003 NorthWestern Corporation ("NorthWestern") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. To the extent that paragraph 1 of Plaintiff's Complaint contains legal conclusions, Defendants are not required to respond to the

ANSWER OF DEFENDANTS
HANSON AND KINDT                    1                    164314/1674.044

same. Defendants deny each and every other allegation contained in paragraph 1 of Plaintiff's Complaint for which a response is required.

2.     Defendants are without sufficient information concerning the allegations in paragraph 2 of Plaintiff's Complaint and therefore deny the same.

3.     Defendant Hanson denies that he is a citizen of the State of Montana and further denies that he resides in Montana. Defendant Hanson admits that as of November 15, 2002, he was Chief Executive Officer of Clark Fork.

4.     Jack D. Haffey is no longer a defendant in this lawsuit and therefore no response to paragraph 4 of Plaintiff's Complaint is required.

5.     Defendant Kindt admits the allegations contained in paragraph 5 of the Plaintiff's complaint.

6.     Ellen M. Senechal is no longer a party to this action and therefore no response to paragraph 6 of Plaintiff's Complaint is required.

7.     Defendants are without sufficient information concerning the citizenship of Plaintiff and therefore deny the allegations contained in paragraph 7 of Plaintiff's Complaint. If there is diversity of citizenship between the Plaintiff and the Defendants, then Defendants admit this Court has jurisdiction pursuant to 28 U.S.C. § 1332; however Defendants allege that this is not the only basis for federal jurisdiction.

8.     Defendants deny that all defendants reside in this Judicial District or that a substantial part of the events or omissions giving rise to the claims alleged in Plaintiff's Complaint occurred in this Judicial District and therefore deny the allegations contained in paragraph 8 of Plaintiff's Complaint.

9.    Upon information and belief, Defendants admit the allegations contained in paragraph 9 of Plaintiff's Complaint.

10.    Upon information and belief, Defendants admit the allegations contained in paragraph 10 of Plaintiff's Complaint.

11.    Defendants admit the allegations contained in paragraph 11 of Plaintiff's Complaint.

12.    Defendants admit the allegations contained in paragraph 12 of Plaintiff's Complaint.

13.    Defendants admit The Montana Power Company created Montana Power Capital I (the "Trust") on or about October 15, 1996 pursuant to that certain Trust Agreement executed by it and various other persons. Defendants admit The Montana Power Company and various other persons executed that certain Amended and Restated Trust Agreement dated on or about November 1, 1996. Defendants admit the Trust is a business trust established pursuant to the Delaware Business Trust Act. Defendants admit the last sentence of paragraph 13 of Plaintiff's Complaint. Defendants deny all other allegations contained in paragraph 13 of Plaintiff's Complaint.

14.    With respect to the allegations contained in paragraph 14 of Plaintiff's Complaint, Defendants admit that as of February 15, 2002 Clark Fork, then known as, Montana Power, LLC had succeeded to the Montana Power Company's obligations with respect to the Junior Debentures. On November 15, 2002 NorthWestern succeeded to these same obligations. Upon information and belief, Defendants admit the last sentence of paragraph 14 of Plaintiff's Complaint.

15.    With respect to the allegations contained in paragraph 15 of Plaintiff's Complaint, Defendants do not know what Plaintiffs mean by the term "special purpose vehicle" and therefore deny the allegations contained therein. Otherwise, the Trust Agreement identified in Plaintiff's Complaint speaks for itself and no response is required.

16.    With respect to the allegations contained in paragraph 16 of Plaintiff's Complaint, Defendants are informed and believe that Clark Fork has no current obligation to make any payments with respect Junior Debentures and thus deny the allegations contained in paragraph 16 of Plaintiff's Complaint. Otherwise, the terms of the Trust Agreement which set forth the operative terms with respect to the QUIPS and the Junior Debentures speak for themselves and no response is required.

17.    Defendants are informed and believe that The Montana Power Company sold the Junior Debentures to the trust which held the Junior Debentures as an investment. To the extent that the allegations contained in the remainder of paragraph 17 of Plaintiff's Complaint are legal conclusions, no response is required. To the extent that the remaining allegations of paragraph 17 purport to recite the terms and conditions of the Trust Agreement, that document speaks for itself and no response is required. Defendants are without personal knowledge as to the intent of The Montana Power Company in issuing the Junior Debentures and thus deny the remaining allegations of paragraph 17.

18.    Paragraph 18 of Plaintiff's Complaint purports to state the terms of section 6.10 of an indenture. To the extent that it does, the Indenture speaks for itself and thus no response is required.

19.    Defendants are without sufficient knowledge or information to respond to paragraph 19 of Plaintiff's Complaint and therefore deny the same.

20.    To the extent that paragraph 20 of Plaintiff's Complaint purports to paraphrase certain of the terms and conditions of the Guarantee Agreement, that Guarantee Agreement speaks for itself and no response is required. With respect to the last sentence of paragraph 20 of Plaintiff's Complaint, the sentence is unintelligible and therefore Defendants are unable to respond to the same. Further, to the extent that the last sentence of paragraph 20 calls for a legal conclusion, no response is required.

21.    Defendants admit the allegations contained in paragraph 21 of Plaintiff's Complaint.

22.    Defendants admit that on or about September 29, 2000 NorthWestern entered into a Unit Purchase Agreement with The Montana Power Company and Touch America Holdings to acquire the unit ownership of the Montana Power, LLC. To the extent that the allegations contained in paragraph 22 of Plaintiff's Complaint purport to paraphrase the terms of the Unit Purchase Agreement, that document speaks for itself and no response is required.

23.    The terms and conditions of the Merger documents speak for themselves, and thus, no response is necessary.

24.    To the extent the allegations in paragraph 24 of Plaintiff's Complaint purport to paraphrase or summarize the terms and conditions of the First Supplemental Indenture, that document speaks for itself, and thus, no response is required.

25.    To the extent the allegations in paragraph 25 of Plaintiff's Complaint purport to paraphrase or summarize the terms and conditions of a "letter agreement" or of the Guarantee Agreement, those documents speak for themselves, and thus, no response is required.

26.    Defendants admit that on February 15, 2002, pursuant to the terms of the Unit Purchase Agreement, NorthWestern acquired the unit ownership of MPLLC. To the extent that



the allegations contained in paragraph 26 purport to paraphrase the terms of the Unit Purchase Agreement, that document speaks for itself and no response is required. Insofar as neither MPLLC nor Clark Fork were the Sellers, allegations contained in the second and third sentences of paragraph 26 are irrelevant, imply legal conclusions which have no basis in fact or in law, and thus no response is required.

27.     Defendants admit that MPLLC was renamed NorthWestern Energy, LLC ("NWE"). Defendants affirmatively allege that NWE is now known as Clark Fork.

28.     Defendants admit NorthWestern entered into the Second Supplemental Indenture; however, to the extent that paragraph 28 of Plaintiff's Complaint purports to paraphrase the terms of the Second Supplemental Indenture, that document speaks for itself and thus no response is required. To the extent that the allegations contained paragraph 28 consist of one or more legal conclusions, no response is required.

29.     Defendants admit NorthWestern entered into an Amendment to the Guarantee Agreement; however, to the extent that paragraph 29 of Plaintiff's Complaint purports to paraphrase the terms of the Amendment to the Guarantee Agreement, that document speaks for itself and thus, no response is required. To the extent that paragraph 29 of Plaintiff's Complaint contains one or more legal conclusions, no response is required.

30.     To the extent that paragraph 30 of Plaintiff's Complaint purports to paraphrase the terms of a certain letter agreement, that document speaks for itself and no response is required. To the extent that paragraph 30 of Plaintiff's Complaint contains one or more legal conclusions no response is required.

31.     Defendants admit that on November 15, 2002, NorthWestern and Clark Fork and closed a transaction. The closing documents speak for themselves and thus, no further response

is required. Defendants deny the allegations contained in paragraph 31 of Plaintiff's Complaint that are not consistent with the specific terms and conditions of the closing documents. Further, Defendants specifically deny the allegations contained in the First Sentence of paragraph 31.

32.    To the extent that the allegations contained in paragraph 32 of Plaintiff's Complaint contain legal conclusions, no response is required. To the extent that paragraph 32 of Plaintiff's Complaint purports to summarize terms, conditions and statements contained in various documents related to the closing of the agreement to transfer certain assets and liabilities from Clark Fork to NorthWestern, those documents speak for themselves and no response is required. With respect to the last sentence of Paragraph 32 of Plaintiff's Complaint, Defendants are without sufficient knowledge and information with respect to such allegations and therefore deny the same.

33.    To the extent that paragraph 33 of Plaintiff's Complaint contains one or more legal conclusions, no response is required. Otherwise, Defendants deny the allegations contained in paragraph 33 of Plaintiff's Complaint.

34.    The allegations contained in paragraph 34 of Plaintiff's Complaint are not specific as to time frame, and thus, it is impossible to respond to the same.

35.    Defendants deny the allegations contained in paragraph 35 of Plaintiff's Complaint.

36.    Defendants do not understand what Plaintiff means when it alleges that "no interest … was paid … since prior to the September 14, 2003" (emphasis added) and Defendants find this sentence unintelligible and, therefore, are unable to respond to the same. Defendants are without sufficient information to know the amount of interest currently due or past due on the Junior Debentures. The third sentence of paragraph 36 of Plaintiff's Complaint would require

the Defendants to speculate as to what the trust might have done and, therefore, Defendants deny the same. The last sentence of paragraph 36 of Plaintiff's Complaint purports to paraphrase the terms of the Indenture, which document speaks for itself and, thus, no response is required. To the extent the last sentence of paragraph 36 of Plaintiff's Complaint calls for a legal conclusion, no response is required.

37.    Defendants admit that following the transfer of certain assets and liabilities from Clark Fork to NorthWestern, Clark Fork retained among its assets and liabilities the Milltown Dam and related environmental liabilities. Defendants deny the inference that these were the only assets and liabilities retained by Clark Fork.

38.    Defendants admit that after the transfer of certain assets and liabilities from Clark Fork to its parent corporation, NorthWestern Corporation operated the electric and natural gas transmission and distribution business in Montana as a division of NorthWestern, which division is known as NorthWestern Energy.

39.    Defendants admit the allegations contained in paragraph 39 of Plaintiff's Complaint.

40.    Defendants admit the allegations contained in paragraph 40 of Plaintiff's Complaint.

41.    Defendants deny the allegations contained in paragraph 41 of Plaintiff's Complaint. To the extent the allegations purport to paraphrase certain agreements between NorthWestern and Clark Fork, those certain agreements speak for themselves and no response is required.

42.    Defendants admit the allegations contained in paragraph 42 of Plaintiff's Complaint.

43.     Defendants affirmatively allege that NorthWestern's public financial documents speak for themselves, and thus, no response is required. Defendants deny the remainder of the allegations contained in paragraph 43 of Plaintiff's Complaint.

44.     To the extent that the allegations contained in paragraph 44 of Plaintiff's Complaint contain legal conclusions, no response is required. To the extent that the allegations contained in paragraph 44 of Plaintiff's Complaint require Defendants to speculate as to the future, no response is required. Otherwise, Defendants deny the allegations contained in paragraph 44 of Plaintiff's Complaint.

45.     To the extent that paragraph 45 of Plaintiff's Complaint purports to paraphrase an April 8, 2004 Order of the United States Bankruptcy for the District of Delaware, that Order speaks for itself and no response is required.

## STATEMENT OF CLAIM

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

46.     Defendants repeat and re-allege their responses contained in paragraph 1-45 of this Answer and incorporate them herein by reference.

47.     To the extent the allegations contained in paragraph 47 of Plaintiff's Complaint contain legal conclusions, no response is required. Otherwise, Defendants deny the allegations contained in paragraph 47 of Plaintiff's Complaint.

48.     Defendants deny the allegations contained in paragraph 48 of Plaintiff's Complaint.

49.    To the extent the allegations contained in paragraph 49 of Plaintiff's Complaint contain legal conclusions, no response is required.  Otherwise, Defendants deny the allegations contained in paragraph 49 of Plaintiff's Complaint.

50.    Defendants deny the allegations contained in paragraph 50 of Plaintiff's Complaint.

51.    Defendants deny the allegations contained in paragraph 51 of Plaintiff's Complaint.

52.    Defendants deny the allegations contained in paragraph 52 of Plaintiff's Complaint.

53.    Defendants deny the allegations contained in paragraph 53 of Plaintiff's Complaint.

54.    To the extent any allegation contained in Plaintiff's Complaint is neither admitted nor otherwise responded to, Defendants deny all such other allegations.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

55.    Plaintiff fails to state a cause of action for which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

56.    At all times material to this Complaint, Clark Fork formerly known as NWE and MPLLC, was a wholly owned subsidiary of NorthWestern and NorthWestern was the sole member and manager of Clark Fork.  NorthWestern and not Defendants possessed the sole authority to make any decisions concerning the business operations of Clark Fork .

## THIRD AFFIRMATIVE DEFENSE

57.     At all times material to this Complaint, Defendants reasonably believed that NorthWestern and Clark Fork and were solvent.

## FOURTH AFFIRMATIVE DEFENSE

58.     At no time material to this Complaint did Defendants owe a fiduciary duty to any creditor of Clark Fork.

## FIFTH AFFIRMATIVE DEFENSE

59.     At no time material to this Complaint did Defendants owe a fiduciary duty to any creditor of NorthWestern.

## SIXTH AFFIRMATIVE DEFENSE

60.     Plaintiff was responsible, in whole or in part, for any damages which it may have suffered because it acquired its interest in the QUIPS after the November 15, 2002 transaction of which Plaintiff now complains.

## SEVENTH AFFIRMATIVE DEFENSE

61.     Plaintiff is responsible, in whole or in part, for any damages which it may have suffered because it knew, or should have known, of the financial condition of NorthWestern at the time it purchase its interest in the QUIPS.

## EIGHTH AFFIRMATIVE DEFENSE

62.     Both prior to and subsequent to the purchase by NorthWestern of the entire unit interest in MPLLC, it was a matter of public record that NorthWestern would hold the Montana electric and natural gas transmission and distribution business it was acquired pursuant to the terms of the Unit Purchase Agreement, as either a division of NorthWestern or as a wholly owned subsidiary of NorthWestern. Thus, at all times material to the Complaint, Plaintiff knew,



or should have known, that NorthWestern had the legal authority to order and direct the transfer of certain assets and liabilities associated with the Montana electric and natural gas transmission and distribution business from its wholly owned subsidiary, Clark Fork, to the parent corporation, which was the sole member and manager of the subsidiary.

## NINTH AFFIRMATIVE DEFENSE

63.    At all times material to this Complaint, it was a matter of public record that NorthWestern intended to transfer certain of the assets and liabilities associated with the Montana electric and natural gas transmission and distribution business in Montana from its wholly owned subsidiary, Clark Fork to the parent, NorthWestern.  Thus, Plaintiff knew, or should have known, that NorthWestern had the legal authority to order and direct the transfer of certain assets and liabilities associated with the Montana electric and natural gas transmission and distribution business in Montana from its wholly owned subsidiary, Clark Fork to the parent corporation which was the sole member and manager of the subsidiary.

## TENTH AFFIRMATIVE DEFENSE

64.    The Indenture for Unsecured Subordinated Debt Securities relating to Trust Securities, under the terms of which the Montana Power Company issued the Junior Subordinated Interest Debentures provides on its face that Montana Power Company or its successor in interest could assign the obligation to pay the Junior Debentures without the consent of the holder of the QUIPS.  Thus, at all times material to this Complaint, Plaintiff knew, or should have known, that NorthWestern had the legal authority to order and direct the transfer of certain assets and liabilities, including assets and liabilities associated with Junior Debentures and the QUIPS, from its wholly owned subsidiary, Clark Fork to the parent corporation, NorthWestern, without the consent of the holders of the QUIPS.

## ELEVENTH AFFIRMATIVE DEFENSE

65.    At all times material to the Complaint, the Defendants reasonably believed Clark Fork received good and valuable consideration in the form of the assumption of liabilities of Clark Fork by NorthWestern Corporation and guarantees from NorthWestern to Clark Fork which would permit Clark Fork to meet its financial obligations.

## TWELFTH AFFIRMATIVE DEFENSE

66.    At all times material to this Complaint, Defendants reasonably believed the transfer of certain assets and liabilities associated with the Montana electric and natural gas transmission and distribution business from Clark Fork, to NorthWestern was done with no intent to harm any creditors, including any holders or other creditors of the QUIPS.

## THIRTEENTH AFFIRMATIVE DEFENSE

67.    The negligence of Plaintiff, Magten, was greater than the negligence, if any, of the Defendants. Thus, Plaintiff should take nothing from this action.

## FOURTEENTH AFFIRMATIVE DEFENSE

68.    Only the Trustee has standing to bring an action for breach of any duty associated with the failure to comply with the Indenture, and thus, Plaintiff has no standing to bring this action.

## FIFTEENTH AFFIRMATIVE DEFENSE

69.    At no time material to this Complaint were the Defendants, or either of them, consulted or had any discretion with respect to the decision of NorthWestern to transfer certain assets and liabilities associated and held by its wholly owned subsidiary, Clark Fork to the parent corporation.



## SIXTEENTH AFFIRMATIVE DEFENSE

70.    Venue is not proper in that not all the defendants live in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred outside this judicial district.

## SEVENTEENTH AFFIRMATIVE DEFENSE

71.    This Court has jurisdiction pursuant to 28 U.S.C. §1334 since this case is related to NorthWestern's bankruptcy, which is a case filed under Title 11 of the United States Code.

72.    As a case related to a matter in bankruptcy, change of venue of this case to the United States District Court for the District of Delaware is appropriate pursuant to 28 U.S.C. §1412.

## EIGHTEENTH AFFIRMATIVE DEFENSE

73.    Change of venue of this case to the United States District Court for the District of Delaware is appropriate pursuant to 28 U.S.C. §1404.

## NINTEENTH AFFIRMATIVE DEFENSE

74.    Pursuant to the terms of the Second Supplemental Indenture, NorthWestern became a co-obligor with NWE with respect to the obligations of the QUIPS Debentures and the Indenture. NorthWestern's assumption of such obligations was without prejudice to the rights of NorthWestern or NWE to transfer assets and liabilities to any Person, including NorthWestern. Upon such transfer, the Second Supplemental Indenture provides for the full release of the transferor of all obligations under the QUIPS Debentures and the Indenture.    Thus, the Defendants and each of them did not breach any duties owed to the Plaintiff.

## TWENTYETH AFFIRMATIVE DEFENSE

75.    Pursuant to the terms of the Amendment to Guarantee Agreement, NorthWestern became a co-obligor with NWE with respect to the obligations of the Guarantee Agreement. NorthWestern's assumption of such obligations was without prejudice to the rights of NorthWestern or NWE to transfer or assign their obligations under the Guarantee Agreement. Thus, the Defendants and each of them did not breach any duties owed to the Plaintiff.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

76.    Pursuant to the terms of the Second Supplemental Indenture and the Amendment to Guarantee Agreement, each executed on August 13, 2002 by the parties including the Bank of New York as Trustee, NorthWestern became a co-obligor with NWE with respect to the obligations of the QUIPS Debentures. NorthWestern's assumption of such obligations was without prejudice to the rights of NorthWestern or NWE to transfer assets and liabilities to any Person, including NorthWestern. Upon such transfer, the Second Supplemental Indenture provides for the full release of the transferor of all obligations under the QUIPS Debentures and the Indenture. Upon the closing of the transfer of the assets and liabilities to NorthWestern, therefore, Clark Fork was relieved of all further obligations. Thus, the Defendants and each of them did not breach any duties owed to the Plaintiff.

## ADDITIONAL AFFIRMATIVE DEFENSES

77.    To the extent that Defendants or any of them during the course of this litigation become aware of additional affirmative defenses or become aware that one or more of the affirmative defenses pled need to be modified or amended or deleted, Defendants reserve the right to do the same.



## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully request this Court enter judgment against Plaintiffs as follows.

1. . Deny Plaintiff's any compensatory or punitive damages.

2. Award to Defendants, all allowable costs, attorneys' fees and other litigation expenses to the extent recoverable under the law.

3. Dismiss Plaintiff's Complaint with prejudice.

4. Award Defendants such other and further relief as this Court may deem just proper and equitable.

Dated this 21st day of April, 2005.

BROWNING, KALECZYC, BERRY & HOVEN, P.C.

By _Kimberly Beatty_____
Stanley T. Kaleczyc
Kimberly A. Beatty

Attorneys for Defendants.

ANSWER OF DEFENDANTS
HANSON AND KINDT                16                164314/1674.044

CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of April, 2004, a true and correct copy of the foregoing was mailed by first-class mail, postage prepaid, addressed to:

James H. Goetz
J. Devlan Geddes
Goetz, Gallik & Baldwin, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580

Bonnie Steingart
John W. Brewer
Fried, Frank, Harris, Shriver & Jacobsen, LLP
One New York Plaza
New York, NY 10004

BROWNING, KALECZYC, BERRY & HOVEN, P.C.