

RECEIVED

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

0 5 - 4 9 9

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (CGC) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION & LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 04-53324 (CGC) |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT TO AVOID THE TRANSFER
OF ASSETS OF CLARK FORK AND BLACKFOOT LLC
(F/K/A NORTHWESTERN ENERGY LLC) TO NORTHWESTERN CORPORATION**

Magten Asset Management Corporation (*"Magten"*) individually in its capacity as a creditor of Clark Fork and Blackfoot, LLC (*"Clark Fork"*), and on behalf of Montana Capital I (the *"Trust"*) together with Law Debenture Trust Company of New York (*"Law Debenture"* and collectively with Magten the *"Plaintiffs"*), in its capacity as the Trustee under the Indenture for the Unsecured Subordinated Debt Securities Relating to Trust Securities dated November 1, 1996 (the *"Indenture"*), and in its capacity as Guarantee Trustee under that certain Guarantee Agreement dated November 1, 1996 (the *"Guarantee Agreement"*), for this complaint alleges as follows:

1.    Plaintiffs bring this adversary proceeding in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) because NorthWestern Corporation, the above-captioned debtor (the *"Debtor"*) received, in a fraudulent conveyance, substantially all of the assets of its wholly owned subsidiary, Clark Fork (an entity formerly known as NorthWestern Energy, LLC (*"NWE"*)).

2.    At the time of the transfer of the assets of Clark Fork to the Debtor (the *"Transfer"*), the Debtor was the sole equity holder of Clark Fork. Using this control of Clark Fork, the Debtor transferred the assets and liabilities of Clark Fork to itself. The assets of Clark Fork were valued at between $1.15 billion and $1.4 billion while the assumed liabilities amounted to approximately $700 million. However, the Debtor's other liabilities were so excessive that, even after obtaining Clark Fork's assets for inadequate consideration, the Debtor could not pay its own creditors and ultimately filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.    Prior to the Transfer, Clark Fork was a solvent and reasonably capitalized entity. The Transfer rendered Clark Fork insolvent and undercapitalized and thereby injured the creditors of Clark Fork, including Magten. The Transfer unjustly enriched the Debtor by hundreds of millions of dollars while destroying Clark Fork's solvency and, thus, its ability to meet its obligations to Magten and its other creditors.

4.    In addition, as a result of the acquisition of NWE, the Debtor became a holding company within the meaning of Public Utility Holding Company Act of 1935, 15 U.S.C. § 79a, *et seq.* ("*PUHCA*") and, consequently, was required to register under PUHCA and to satisfy that statute's requirements unless it qualified for an exemption.

120087.01600/40145524v1

5.     To avoid having to register, under PUHCA, on February 14, 2002 the Debtor filed an exemption application (the "*Application*"), contending that it fell within the exemption provided by section 3(a)(3) for companies that are primarily engaged in non-utility businesses and are "only incidentally a holding company." Moreover, the Debtor asserted that it only needed an exemption while it undertook to complete certain transactions related to the Milltown Dam. The mere filing of the Application suspended the Debtor's obligation to register as a PUHCA holding company – provided that the Application had been filed in good faith.

6.     By February 2002 – before the Second Supplemental Indenture or Third Supplemental Indenture (as defined herein) were issued – the Debtor's predominant business was focused on its profitable utility operations and was, therefore, ineligible for a PUHCA exception. At this time, the Debtor repeatedly directed investors' attention in public statements to its utility operations as the Debtor's primary source of revenue. The Debtor also entered into contracts drastically altering the rights of the holders of the QUIPS.

7.     Under PUHCA, if a contract, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, PUHCA, is made in violation of PUHCA such contract is void (i) as to the party to the contract that committed the violation and (ii) as to any person, who although not a party to the contract, acquired rights under that contract with actual knowledge of the facts that constitute the PUHCA violation.

8.     Because at the time of the Application the Debtor knew that its primary source of income was its utility assets, the Application was not filed in good faith. Because the Application was not filed in good faith, all of the contracts executed by the Debtor after February 14, 2002, including those relating to the Transfer, are void. Therefore, the Montana Utility Assets properly belong to Clark Fork, Clark Fork was never released from its obligations under

-3 -

the Indenture and, as Creditors of Clark Fork, Plaintiffs have standing to seek the recovery of those assets.

9.      By this Complaint, Plaintiffs seek, among other things, (i) a declaration that because the Debtor violated PUHCA, all contracts relating to the Montana Utility Assets and the Transfer that were executed between the filing of the Application and the date of the Transfer are void, (ii) the avoidance of the Transfer, (iii) a declaration that the assets that were fraudulently transferred are not the property of the Debtor's estate in its chapter 11 case, (iv) the imposition of a constructive trust over the transferred assets for the benefit of the Trust, and (v) the return of such assets to Clark Fork.[1]

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

11.      This proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H) and (O).

12.      Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

13.      Magten is a corporation validly organized and doing business under the laws of the State of Delaware.

14.      Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the "*QUIPS*"), issued by the Trust. The Trust is a business trust established pursuant to the Delaware Business Trust Act.

---

[1]      This Court set January 15, 2004, as the deadline for filing proofs of claim against the Debtor. Magten, as an individual holder of the QUIPS and Law Debenture Trust Company of New York, as Indenture Trustee, each filed timely proofs of claim for damages incurred as a result of the Transfer.

-4-

15.    The Trust was established by The Montana Power Company (*"Montana Power"*), predecessor in interest to Clark Fork (f/k/a NWE), as a financing vehicle. The sole asset of the Trust are the 8.45% Junior Subordinated Debentures due 2036 (the *"Junior Debentures"*).

16.    Section 610 of the Indenture governing the Junior Debentures grants to Magten, as a holder of the QUIPS, "the right to institute a legal proceeding directly against [the Debtor]" to enforce certain rights relating to the QUIPS or to the Amended and Restated Trust Agreement (the *"Trust Agreement"*).

17.    Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York.

18.    Law Debenture brings this complaint as a co-plaintiff in its capacity as successor trustee under the Indenture on behalf of all holders of the QUIPS.

19.    The defendant in this adversary proceeding is the Debtor in the above-captioned chapter 11 case.

20.    The Debtor is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota.

21.    On September 14, 2003, the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its businesses and manage its properties as a debtor in possession.

22.    The Debtor owns and operates utility companies in the United States. The Debtor and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 598,000 customers throughout Montana, South Dakota and Nebraska.

-5-

## BACKGROUND

### THE MONTANA POWER COMPANY

23.    Montana Power was incorporated in 1961 under the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger of four regional electric companies.

24.    In November 1996, Montana Power and The Bank of New York (*"BNY"*) as Trustee entered into the Indenture. Law Debenture subsequently succeeded BNY as Trustee under the Indenture.

25.    Pursuant to the Indenture, Montana Power issued the Junior Debentures.

26.    Also in November 1996, pursuant to the Trust Agreement, Montana Power, BNY as Property Trustee and certain individuals as Administrative Trustees, created the Trust. Law Debenture and BNY are currently taking the necessary steps to enable Law Debenture to succeed BNY as Property Trustee.

27.    Pursuant to the Trust Agreement, the Trust issued the QUIPS.

28.    The Trust holds 100% of the Junior Debentures, with a total face amount of $65 million, which constitute its sole meaningful asset. The value of the QUIPS is entirely based on the value of the Junior Debentures, and, thus, the ability of Clark Fork to pay interest and principal to the Trust. Amounts paid by Clark Fork to the Trust are, in turn, paid by the Trust to the holders of the QUIPS.

29.    The Junior Debentures were not sold directly to investors. Rather, they were sold to BNY as Property Trustee under the Trust Agreement. Investors thereby acquired an indirect undivided beneficial interest in the Junior Debentures and obtained substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

-6-

30.    In connection with the Indenture, Montana Power agreed that the holders of the Junior Debentures would have the absolute and unconditional right to receive principal and interest. Under the Indenture, those payments of principal and interest were to be paid to the Property Trustee.

31.    Montana Power entered into the Guarantee Agreement with BNY (as Guarantee Trustee) in November 1996. Law Debenture subsequently succeeded BNY as Guarantee Trustee. Pursuant to the Guarantee Agreement, Montana Power, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust and to the extent that BNY, as Property Trustee has funds available in a specified account.

32.    Taken together, Montana Power's obligations under the Indenture, the Trust Agreement, the Expense Agreement and the Guarantee provide, in the aggregate, a full, irrevocable and unconditional guarantee of payments of distributions and other amounts due to the holders of the QUIPS.

## THE SALE OF THE MONTANA POWER COMPANY'S UTILITY ASSETS & THE PUHCA APPLICATION

33.    On March 28, 2000, The Montana Power Company, announced plans to restructure its business. This restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane utility assets, in order to allow Montana Power to focus on the telecommunications business.

34.    On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with the Debtor, pursuant to which the Debtor agreed to purchase Montana Power's electric, natural gas and propane utility assets (the *"Montana Utility Assets"*). In order to facilitate the assets sale to the Debtor, Montana Power created a subsidiary, Montana Power Company LLC (*"MPLLC"*).

-7-

35.    On February 13, 2002, Montana Power merged its energy assets into MPLLC (the *"Merger"*). As a result of this, MPLLC held and operated the Montana Utility Assets.

36.    On or about February 14, 2002, the Debtor filed its Application for an exemption from various aspects of PUHCA under PUHCA Section 3(a)(3).

37.    On February 15, 2002 the Debtor's acquisition of MPLLC was completed with the payment by the Debtor of $478 million in cash to the parent of MPLLC and the assumption of $511 million of MPLLC liabilities.

38.    As a result of the acquisition on February 15, 2002, MPLLC became a wholly owned subsidiary of the Debtor and became a public utility holding company as defined under PUHCA because it controlled more than 10% of the outstanding securities of the MPLLC.

39.    In the Application, the Debtor claimed that it qualified as an exempt holding company under PUHCA Section 3(a)(3) and that the mere pendency of the Application exempted the Debtor from being required to register with the SEC.

40.    The importance of the Montana Utility Assets to the Debtor's continued viability was grossly understated in the Application. By 2001, utility income was a very material component – in some periods the *only* source – of the Debtor's net income. The gas and electric operations, of which the Montana Utility Assets comprised a substantial part, *contributed 100%* of the positive income (before accounting for minority interests) for all of the Debtor's lines of business in the nine months ending September 30, 2001, and approximately 96% in the same period during 2003; the corresponding proportion of operating income was 81% for 2001 and 73% for 2000.

-8-

41.    At the time Debtor filed the Application for exemption from PUHCA, and contrary to what the Debtor claimed in the Application, it was predominantly engaged in the public utility business with the vast majority of its income derived from its utility subsidiary. Therefore, Debtor did not qualify for the exemption it sought and all subsequent contracts are void under PUHCA. Had the Debtor not filed the Application, all material contracts including its assumption of liabilities under the Indenture would have been subject to SEC review and approval.

42.    In early 2002, the Debtor admitted that its utility operations provided a significant portion of its income and observed that "CornerStone [the Debtor's propane business has historically been a *minor contributor* to NorthWestern's earnings and cash flow." "By excluding CornerStone and adding Montana Power's utility operations, *approximately two-thirds of NorthWestern's targeted 2002* earnings before interest, taxes and depreciation and amortization *is attributable to our utility businesses.*" NorthWestern Corp. 8-K filed February 7, 2002 at 2. (emphasis added). This statement was made one week *before* the Debtor filed the Application.

43.    The Debtor's 2001 Annual Shareholder's Report issued on February 15, 2002 was even more direct: "we are targeting approximately two-thirds of NorthWestern's total operating income to come from our energy business in 2002." NorthWestern Corp., Annual Shareholder Report 6-7 (2001). Despite these statements, the Debtor's Application failed to even mention, much less analyze, the Debtor's previously announced expectation that utility operations did and would provide, as of the beginning of 2002, the bulk of its income going forward.

44.    In connection with the Merger, on February 13, 2002, MPLLC entered into the First Supplemental Indenture, pursuant to which MPLLC assumed the obligations of Montana Power under the Indenture.

-9-

45.   In connection with the Merger, on February 13, 2002, pursuant to a letter agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

46.   None of the cash paid for the Montana Utility Assets was retained by MPLLC. It was, thus, not thereafter available to assist Clark Fork in meeting its obligations to its creditors.

47.   On March 19, 2002, MPLLC was renamed NWE. NWE was a duly organized Montana limited liability company and is now known as Clark Fork.

48.   On August 13, 2002, the Debtor entered into the Second Supplemental Indenture, pursuant to which the Debtor assumed all of the obligations under the Indenture on a joint and several basis with Clark Fork.

49.   On August 13, 2002, the Debtor entered into an Amendment to the Guarantee Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Guarantee Agreement.

50.   On August 13, 2002, the Debtor entered into a letter agreement amending the Trust Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Trust Agreement.

51.   The Debtor was insolvent both immediately before and immediately after the acquisition of MPLLC and the assumption of related liabilities. The Debtor was engaged in a business with unreasonably small capitalization and incurred debts beyond its ability to pay both immediately before and immediately after the acquisition of MPLLC and the assumption of liabilities.

-10-

**THE TRANSFER**

52.    On November 15, 2002, Clark Fork transferred substantially all of its assets, which included the Montana Utility Assets, to the Debtor and retained only the Milltown Dam, a two megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers. The Milltown Dam operates under a license that expires in 2007.

53.    Although Clark Fork transferred over $1 billion of assets to the Debtor, Clark Fork received no cash for the Transfer, and the only consideration was the assumption of certain liabilities (estimated to be only approximately $700 million) by the Debtor. As a result of the Transfer, Clark Fork was rendered insolvent.

54.    Because Clark Fork was rendered insolvent and undercapitalized as a result of the Transfer, it is entirely dependent upon the Debtor for the continued funding of its obligations associated with the Milltown Dam and, indeed, for the funding of its continuing corporate existence. The Debtor funds the costs and expenses associated with the operation of the Milltown Dam under the terms of certain agreements with Clark Fork.

55.    In connection with the Transfer, on November 15, 2002, the Debtor executed the Third Supplemental Indenture, pursuant to which the Debtor expressly assumed the due and punctual payment of the principal and interest on the securities issued under the Indenture.

56.    On November 15, 2002, the Debtor executed the Guarantee Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Guarantee Agreement.

57.    On November 15, 2002, the Debtor executed the Trust Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Trust Agreement.

-11-

58.     Following the Transfer, the Debtor operated the Montana Utility Assets as part of the Debtor's NorthWestern Energy Division.

59.     On November 20, 2002, the Montana Power energy subsidiary was officially renamed Clark Fork. Clark Fork continues to operate the Milltown Dam.

## THE DEBTOR'S FRAUDULENT FINANCIAL STATEMENTS AND SUBSEQUENT CHAPTER 11 FILING

60.     On April 16, 2003, the Debtor reported its financial results for the fiscal year ended ("FYE") 2002 – the year in which the Transfer occurred. These filings included a restatement of the previously unaudited quarterly results for the first three quarters of FYE 2002. Specifically, the Debtor's restated financials indicated an additional $878.5 million in previously unreported "negative charges."

61.     Immediately thereafter, the SEC launched an informal investigation into the Debtor's financial restatements. This investigation became a formal investigation in December 2003, and has not yet been resolved.

62.     On May 23, 2003, only six months after the Transfer, the Debtor announced that it would defer all interest payments due on all subordinated debentures of all series of its trust securities, including the QUIPS.

63.     As disclosed to this Court on the Petition Date, Clark Fork was severely undercapitalized as a result of the Transfer. On the Petition Date, the Debtor filed a Motion seeking court authorization to, among other things, continue to fund certain limited intercompany obligations (the "Clark Fork Motion"). In that pleading, the Debtor disclosed the existence of a Maintenance and Operating Costs Support Agreement dated as of November 15, 2002, between itself and the predecessor to Clark Fork (the "Support Agreement").

-12-

64.    In the Clark Fork Motion, the Debtor disclosed that pursuant to the terms of the Support Agreement, the Debtor is required to make certain payments with respect to the Milltown Dam, Clark Fork's only remaining asset, to the extent Clark Fork is unable to make such payments. Subsequently, the Debtor received approval to pay up to $370,000 per month on behalf of Clark Fork in connection with the terms of the Support Agreement, thereby evidencing Clark Fork's complete dependence on the Debtor for its very corporate existence. As a result of the Transfer, as evidenced by the Support Agreement, it is clear that the Debtor understood that Clark Fork would be unable to satisfy the claims of its creditors, including Plaintiffs' claims.

**THE DEBTOR'S ATTEMPT TO RELEASE CLARK FORK**

65.    Article Eleven of the Indenture purports to release Montana Power (or its successor in interest) upon the transfer of substantially all of the assets of Montana Power if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

66.    Upon information and belief, in connection with the Transfer of the Montana Utility Assets, the Debtor requested that BNY, as the initial Trustee under the Indenture execute the Third Supplemental Indenture with language that expressly released Clark Fork from its obligations under the Indenture.

67.    Upon information and belief, BNY refused to execute the Third Supplemental Indenture in its capacity as Indenture Trustee if such contained a release of Clark Fork's obligations under the Indenture.

68.    The Third Supplemental Indenture, as executed by BNY in its capacity as Indenture Trustee did not include a release of Clark Fork's obligations under the Indenture and

-13-

was executed by BNY in reliance upon the Debtor's fraudulent financial statements, while the Debtor hid its true financial condition from BNY and from its investors.

69.    In additional, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

## FIRST CAUSE OF ACTION

### (A Declaration that all Documents Executed in Furtherance of the Transfer are Void)

70.    The Plaintiffs repeat and re-allege the allegation of paragraphs 1-69 as if fully set forth here.

71.    PUHCA Section 3(a)(3) in pertinent part exempts a holding company that:

> is only incidentally a holding company, being primarily engaged or interested in one or more businesses other than the business of a public-utility company and (A) not deriving, directly or indirectly, any material part of its income from any one or more subsidiary companies, the principal business of which is that of a public-utility company ....

PUHCA Section 3(a)(3).

72.    Under PUHCA, the rights of a party to a contract made while there was a PUHCA violation – including lack of good faith in filing an application for a PUHCA exemption, are void.

73.    The Application was not filed in good faith because the Debtor knew that it derived a material part of its income from its utility business.

74.    The contracts executed in connection with the Transfer, including the Third Supplemental Indenture, were executed after the Debtor filed the Application in bad faith.

75.    By filing the Application in bad faith and failing to register with the SEC, the Debtor was in violation of PUHCA and the Transfer contracts described above are void because

-14-

these contracts were executed after the Application was filed in bad faith and without proper SEC approval. Therefore the Transfer and the contracts executed in connection therewith, including the Third Supplemental Indenture, must be invalidated.

### SECOND CAUSE OF ACTION

**(The Transfer was Fraudulent Under Montana Law Because of an Actual Intent to Hinder, Delay, or Defraud Creditors)**

76.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1-75 as if fully set forth here.

77.    Under the Montana Code Annotated (*"MCA"*) § 31-2-333, a transfer may be avoided if, the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor.

78.    Pursuant to MCA § 31-2-333, in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

79.    The QUIPS holders are creditors of the Debtor, and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

80.    The Debtor is the parent of Clark Fork and, as such, exercised complete control over Clark Fork. As a result of this relationship, the Debtor qualifies as an insider under Montana law.

81.    In connection with the Transfer, Clark Fork transferred assets to the Debtor that are valued between $1.15 billion and $1.4 billion, and the only consideration received for the Transfer was the assumption of approximately $700 million in liabilities.

-15-

82.    Prior to the Transfer, Clark Fork was a solvent entity.    The transfer of substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become insolvent.

83.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity.  The transfer of substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become undercapitalized.

84.    Because the Montana Utility Assets that the Debtor received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Debtor, Clark Fork did not receive reasonably equivalent value for the transfer.

### THIRD CAUSE OF ACTION

**(The Transfer was Fraudulent As a Constructive Fraud Which
Rendered Clark Fork Insolvent)**

85.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1-84 as if fully set forth here.

86.    Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

87.    Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer.  The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

88.    After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities.  Despite the decimated asset pool,

-16-

Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

89.     The Transfer rendered Clark Fork insolvent.

## FOURTH CAUSE OF ACTION

### (The Transfer was Fraudulent As a Constructive Fraud Because it Rendered Clark Fork Undercapitalized)

90.     The Plaintiffs repeat and re-allege the allegations of paragraphs 1-89 as if fully set forth here.

91.     Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

92.     Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer. The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

93.     After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities. Despite the decimated asset pool, Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

120087.01600/40145524v1

94.     The Transfer rendered Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment)

95.     The Plaintiffs repeat and re-allege the allegations of paragraphs 1-94 if fully set forth herein.

96.     The Debtor was the recipient of the Montana Utility Assets.

97.     The Transfer was fraudulent under MCA §§31-2-333 and 31-2-334.

98.     Prior to the Transfer, Clark Fork was solvent. As a result of the Transfer, the Debtor received assets valued between $1.15 billion and $1.4 billion, for which the assumption of $700 million of liabilities by the Debtor was less than reasonably equivalent value.

99.     Upon information and belief, the Montana Utility Assets comprise approximately 80% of the Debtor's consolidated EBITDA. In light of this and the fact that Clark Fork received less than reasonably equivalent value for the Transfer, the receipt by the Debtor of the Montana Utility Assets has unjustly enriched the Debtor and the Debtor's creditors.

100.    Absent the Transfer, the holders of the QUIPS would have received payment in full from Clark Fork, as a solvent utility company, on behalf of their claims. However, as a result of the Transfer, the holders of the QUIPS may receive nothing on account of their claims.

101.    The Junior Debentures were subordinated obligations to the other debt owed by Montana Power. Upon the assumption of liabilities by the Debtor, the Debtor has asserted that these obligations are junior to approximately $1.7 billion of senior debt. In light of the fact that the Debtor was insolvent at the time of the assumption of liabilities, the Debtor's creditors would be unjustly enriched if the QUIPS are treated as *pari passu* or junior to the Debtor's other indebtedness.

-18-

120087.01600/40145524v1

## CONCLUSION

*WHEREFORE*, Plaintiffs respectfully requests that the Court enter judgment against the

Defendant[2] as follows:

      (a)    Declaring that all documents executed in furtherance of the Transfer are void;

      (b)    Avoiding the Transfer;

      (c)    Declaring that the Montana Utility Assets are not the property of the Debtor's

estate in the chapter 11 case;

      (d)    Imposing a constructive trust on the Montana Utility Assets for the benefit of the

Trust and ordering the return of such assets to Clark Fork;

      (e)    Attorney's fees and costs of this action; and

      (f)    Such other relief as this Court deems just and proper.

Dated: Wilmington, Delaware
       October 4, 2004

**SMITH, KATZENSTEIN & FURLOW, LLP**    **BLANK ROME LLP**

_/s/ Kathleen M. Miller_

Kathleen M. Miller (DE No. 2898)         Elio Battista, Jr. (DE No. 3814)
800 Delaware Avenue, 7th Floor          1201 Market Street, Suite 800
Wilmington, DE 19899                Wilmington, DE 19801
Telephone:    (302) 652-8400         Telephone: (302) 425-6400
Facsimile:    (302) 652-8405         Facsimile:   (302) 425-6464

      - and -                      - and -

---

2      Though not named herein, Plaintiffs hereby retain all rights to amend this complaint bring suit against all
parties that orchestrated or other wise benefited from the Transfer.

-19-

**NIXON PEABODY LLP**
John V. Snellings (BBO No. 548791)
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1202
Facsimile: (866) 947-1732

Counsel for Law Debenture Trust Company of
New York

**FRIED, FRANK, HARRIS, SHRIVER**
**& JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
Corporation

-20-

120087.01600/40145524v1