# Exhibit A

# UNITED STATES BANKRUPTCY COURT

## IN AND FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re NORTHWESTERN CORPORATION,<br><br>Debtor. | In Chapter 11 proceedings<br><br>Case No. 03-12872 (CGC) |
| MAGTEN ASSET MANAGEMENT CORPORATION & LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | ADV. NO. 04-53324 (PBL)<br><br>UNDER ADVISEMENT DECISION RE: MOTION TO DISMISS |

## I.    Introduction

Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively referred to hereafter as "Plaintiffs") filed a complaint against Debtor NorthWestern Corporation in April, 2004, challenging the prepetition transfer from Clark Fork and Blackfoot, LLC ("Clark Fook"), fka NorthWestern Energy, LLC, of essentially all of its assets to its parent corporation Debtor NorthWestern. The crux of Plaintiffs' complaint is that Debtor caused the transfer of over $1 billion in Clark Fork assets to itself in exchange for the assumption by Debtor of only about $700 million in Clark Fork liabilities. Plaintiffs allege the transfer ultimately left Debtor unable to pay its own creditors and resulted in Debtor's bankruptcy, under which Plaintiffs will receive virtually nothing. Further, the transfer rendered Clark Fork insolvent and undercapitalized, again leaving Plaintiffs, as creditors of Clark Fork, with nothing. Not only was the transfer itself a fraudulent conveyance, Plaintiffs argue, but Debtor also engaged in a fraudulent scheme by misrepresenting its financial standing at the time of the transfer.

In Count I, Plaintiffs contend that Debtor made the transfer with the actual intent to hinder,

delay or defraud its creditors as defined by section 31-20333 of the Montana Code. In Counts II and III, Plaintiffs allege that the transfer was fraudulent under section 31-2-334 of the Montana Code because Debtor made the transfer without receiving equivalent value and because Debtor was insolvent at the time or rendered insolvent as a result of the transfer. In Count IV, Plaintiffs allege that Debtor and its creditors were unjustly enriched by the transfer.

## II.    Factual Background

In 1996, the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork/Northwestern Energy, created the Montana Power Capital Trust I ("Trust") as a financing vehicle with the Bank of New York ("BNY") as Trustee. The sole asset of the Trust was 8.45% Junior Subordinated Debentures due 2036 ("Junior Debentures"). After formation of the Trust, Montana Power and BNY entered into the Indenture for Unsecured Subordinated Debt Securities relating to the Trust Securities ("Indenture"). At about the same time, the Trust issued $65 million of 8.45% cumulative Quarterly Income Preferred Securities ("QUIPS"), Series A, the proceeds of which were used to purchase an equal amount of Junior Debentures, 8.45% Series due 2036, from Montana Power. Montana Power also entered into a Guarantee Agreement with BNY, under which Montana Power provided a limited guarantee of obligations with respect to the QUIPS – "only if and to the extent that the Property Trustee has available in the Payment Account funds sufficient to make payment."

Four years later, in 2000, Debtor NorthWestern purchased substantially all of Montana Power's electric, natural gas, and propane utility assets under a Unit Purchase Agreement. The structure of the sale was as follows. Montana Power created a subsidiary called The Montana Power LLC ("MP-LLC"), which Debtor intended to acquire as a division of itself as opposed to a subsidiary. The parties refer to such an acquisition as "going flat."

The going flat deal was disclosed to the Federal Energy Regulatory Commission ("FERC") by Debtor and Montana Power in their Joint Application of the Montana Power Company and NorthWestern Corporation for Approval of Disposition of Jurisdictional Facilities. In the application, the parties indicated that the proposed sale was not contingent on any particular

2

structure, but that NorthWestern intended to either form a holding company to acquire MP-LLC as a wholly owned subsidiary or to acquire MP-LLC in its current "flat" structure such that MP-LLC would become a separate division of NorthWestern and not a subsidiary. After resolving a variety of issues with respect to the transfer, it was approved by both the FERC and the Montana Public Service Commission.

The assets were then transferred to MP-LLC by Montana Power in February, 2002. As part of this conveyance, the MP-LLC and BNY, as Trustee, executed a supplemental indenture under which MP-LLC assumed all obligations of Montana Power under the original Indenture. Subsequently, Debtor NorthWestern's acquisition of MP-LLC was completed with the payment of $478 million cash and the assumption of $511 million of MP-LLC's liabilities, which included the claims of the QUIPS and the Indenture. MP-LLC was then a subsidiary of Debtor and renamed NorthWestern Energy, LLC.

In order to "go flat" with the now named Northwestern Energy, as it originally intended, Debtor disclosed to the SEC that it intended "to transfer the energy and natural gas transmission and distribution operations of NorthWestern Energy, LLC to NorthWestern Corporation." NorthWestern accomplished this by executing a Second Supplemental Indenture with NorthWestern Energy and the Trustee BNY, in which it contends it "fully and unconditionally assumed NorthWestern Energy's obligations (as successor to MP-LLC, as the successor to Montana Power) with respect to the QUIPS and the performance of every covenant, obligation and agreement under the Indenture." It apparently paid no cash for NorthWestern Energy's assets, but assumed all its liabilities except those associated with the Milltown Dam. The Second Supplemental Indenture also expressly subordinated the obligations Debtor assumed from NorthWestern Energy to its "Senior Indebtedness" and released NorthWestern Energy from any and all obligations under the QUIPS debenture, the Indenture and the Second Supplemental Indenture.

NorthWestern, Northwestern Energy and BNY also executed the Amendment to Guaranty Agreement whereby NorthWestern attempted to assume completely the limited obligations of Montana Power under the original Guaranty Agreement. Debtor subsequently sought and received

3

the FERC's approval to assume the QUIPS, along with other debt of NorthWestern Energy. A Third Supplemental Indenture was executed in which Debtor expressly assumed "the covenants of NorthWestern Energy contained in the Indenture and the Securities issued thereunder" and assumed the payments of principal and premium on outstanding securities issued under the Indenture and the performance of every covenant thereunder. Subsequently, NorthWestern Energy was renamed Clark Fork and Blackfoot, LLC.

Plaintiff Magten holds in excess of 33% of the Series A, 8.45% QUIPS issued by the Trust. Plaintiff Magten purchased its share of the QUIPS *after* the transfer of NorthWestern Energy's assets to Debtor and sometime shortly before or after Debtor filed bankruptcy. Plaintiff Law Debenture is the successor trustee to BNY under the Indenture on behalf of the holders of the QUIPS.

As a result of these transfers, Plaintiffs complain that they have relegated to the bottom of the heap of Debtor's creditors. While they (or their predecessors) were once essentially at the top of the heap of Clark Fork's creditors, upon the transfer to Debtor, they were subordinated to Debtor's senior creditors, which in essence left them with little at the end of the day under Debtor's Plan. By this action, they seek to undo the transfer so that the assets will be returned to Clark Fork.

## III.   Analysis

Debtor NorthWestern seeks dismissal of Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in bankruptcy proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. In determining whether to grant the motion to dismiss, this Court must assume the facts as pled in the complaint are true. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Debtor begins by challenging Plaintiffs' standing, alleging that they are creditors of Debtor NorthWestern only and not of Clark Fork. The standing argument highlights the difficulty with this case. This is not a typical fraudulent conveyance complaint where the *debtor in possession* sues a *third party* seeking to bring assets back *into* the estate. Instead, this is an alleged *creditor of a non-debtor* suing the *Debtor* in order to *divest the estate* of assets and return them to the non-debtor. Acknowledging that they must be creditors of Clark Fork to bring this action, Plaintiffs argue that

4

they are so due to the invalidity of the transfers.

Debtor says this is impossible, as the very structure of the transfer ended any debtor-creditor relationship between Plaintiffs and Clark Fork. Debtor argues that any transfers of assets completed in accordance with Section 1101 of the Indenture result in the successor entity (Debtor in this case) succeeding to and being substituted for the prior entities (Clark Fork) such that the successor entity (Debtor) is the only entity obligated to the QUIPS. Critically, Section 1102 of the Indenture in turn expressly relieves the predecessor entity, here Clark Fork, of all obligations and covenants under the Indenture. The QUIPS holders, therefore, are creditors solely of Debtor as long as the transfer was in compliance with Section 1101 of the Indenture, which Debtor contends Plaintiffs do not challenge.

**A.    Did Debtor Comply with the Indenture?**

　　1.    Is there a guarantee of solvency?

Plaintiffs disagree for several reasons. First, Plaintiffs argue that because Debtor used false financial statements and was insolvent, it did not in fact comply with the terms of the Indenture and, therefore, did not properly assume Clark Fork's liabilities: Clark Fork is therefore still liable to Plaintiffs. In support of this position, Plaintiffs point to two requirements in Section 1101 of the Indenture requiring Debtor to "assume . . . [1]the due and punctual payment of the principal and premium, if any, and interest, if any on all Outstanding Securities *and [2]* the performance of every covenant of this Indenture on the part of [Clark Fork] to be performed or observed." Plaintiffs assert that, because Debtor is unable to make the payments due the QUIPS, Debtor did not in fact comply with the terms of Section 1101 of the Indenture.

Plaintiffs argument is flawed. Plaintiffs read this language as a guarantee of solvency by Debtor upon executing the transfer. It is not. The language only requires that Debtor assume the obligations, not that it actually be able to perform the obligations. Debtor in fact did assume the obligations.

　　2.    Was Consent of the Holders Required?

Plaintiffs also argue that Debtor's alleged insolvency wrongfully impaired their rights

under the Indenture to receive payment of principal and interest and therefore the transaction had to be approved by the holders of the securities. This argument is similarly misplaced. While the Indenture and the Trust Indenture Act of 1939 do in fact provide that "the right of any holder of any indenture security to receive payment of the principal of and interest on such security . . . shall not be impaired," this applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself. Plaintiffs' legal rights were not impaired. Again, there is no guarantee against default.

### B.    Are the Plaintiffs Creditors Under The Guarantee?

Plaintiffs are also not creditors of Clark Fork by way of the Guarantee Agreement that is part of the original debt transaction. Both parties have treated this argument in a superficial and conclusory fashion; it is more complicated than it seems.

As noted, the QUIPS were issued in a two-step transaction. Montana Power Company (referred to for ease of reference as "Clark Fork") issued subordinated debentures (the "Debentures"), all of which were purchased and held by the Trust. The Trust, in turn, issued the QUIPS to Holders, such as Magten's predecessor in interest, in consideration of payment of a corresponding pro rata amount of the Debentures (which funds were then used to purchase that amount of the Debentures). The Holders then were entitled to a specific percentage of the distributions made by Clark Fork to the Trust on account of the Debentures.[1]

The Guarantee appears to exist as protection against the unlikely event that Clark Fork makes required distributions to the Trust but the Trust thereafter fails to distribute the funds to the Holders. Although it contains many of the same terms and obligations of a true third party guarantee, it is fundamentally different. In the third party setting, the guarantor unconditionally guarantees that a creditor will receive payment of its debt from the obligor. In this case, Clark Fork guaranteed that the Holders would receive their distributions only to the extent that Clark Fork had already paid the

---

[1]Technically, the distributions were made by Clark Fork to a Property Trust (created simultaneously with the Trust with the same trustee) to receive and distribute the funds on a pro rata basis to the holders of the QUIPS.

Trust. Guarantee § 1.01 (definition of "Guarantee Payments").  In no event would Clark Fork be liable to "pay twice"; rather, its liability is limited to the situation where the middleman (the Trust) fails to pay over what it has already received from Clark Fork.  For example, it does not guarantee payment in the situation where, for whatever reason, the Trust receives the money and uses it for some other purpose.[2]  Or, more bluntly, it does not guarantee payment if the Trustee misuses or commingles the Trust's assets.  In either of those situations, the extent of Clark Fork's guarantee liability is limited to the *lesser* of the aggregate of the Liquidation Amount (a defined term) and all accrued and unpaid distributions *and* the amount of Trust's assets remaining available for distribution.[3]  Thus, regardless of whether the Liquidation Amount and the accrued and unpaid distributions exceed the amount of assets remaining in the Trust, Clark Fork's liability is limited to those assets.  In a real sense, therefore, Clark Fork's guarantee liability is fundamentally *in rem* because it is  limited to the whatever remains of the distributions it has already paid over to the Trust.[4]

The Guarantee specifically references Article 11 of the Indenture and provides that Clark Fork's obligations under the Guarantee may only be assigned pursuant to a transaction authorized thereunder. However, as noted by Plaintiff Magten, the Guarantee does not specifically provide, as does Section 1102 of the Indenture, that a Section 1101 transaction releases Clark Fork from its guarantee obligations.  Debtor NorthWestern fails to address this critical issue and merely assumes that a Section 1102 transaction releases the guarantee obligation to the same extent as the underlying obligation on the debentures.  The question is – does it?

Under Delaware law, all related documents and instruments in a single transaction together

---

[2]Again, this is a highly unlikely event given that the Trust is a specially created vehicle solely for the purpose of this transaction.

[3]Of course, the Holders may have claims in these circumstances against the Trustee but that is irrelevant for the purpose of determining if these plaintiffs have standing in this case.

[4]If the guarantee is triggered, Clark Fork is subrogated to the rights of the Holders to pursue the issuer for the funds it holds but has not paid. Guarantee § 5.06.

are harmonized to the extent possible. *Simon v. The Navellier Series Fund,* 2000 WL 1597890 (Del. Ch. 2000) (citing *Crown Books,* 17A C.J.S. *Contracts* § 315, at 337 (1999), 11 Williston on Contracts § 30:26, at 239-42 (4th ed. 1999), and Restatement (Second) of Contracts § 202(2) (1981)); *Crown Books Corp. v Bookstop, Inc.,* 1990 WL 26166 (Del. Ch. 1990). An interpretation that leads to an absurd result is disfavored. *Collins & Aikman Corp. v. Compo Industries, Inc.,* 1982 WL 17804 (Del. Ch. 1982). Here, the Indenture specifically provides that Clark Fork is released from its underlying liability on the debentures in a Section 1101 transaction. All of those obligations, including making distributions to the Trust for the purpose of paying the Holders, now lie exclusively with the successor in interest, here Debtor NorthWestern. Given the quasi *in rem* nature of the guarantee,[5] it is nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction) would retain any liability under the Guarantee. It only makes sense that any such liability has been released as well.

While the language is not explicit, Section 8.01 supports this interpretation: "Except in connection with a consolidation, merger or sale involving the Guarantor that is permitted under Article Eleven of the Indenture, the Guarantor shall not assign its obligations hereunder." The specific reference to Article Eleven (and not merely Section 1101) implies that all aspects of that Article are to be effective. Because a transaction that is permitted under Article Eleven automatically effects a release of the underlying debt, it is consistent to conclude that such a release would also extend to the guarantee.

Section 5.03 of the Guarantee does not compel a contrary result. That section makes clear that the validity of the Guarantee is not affected by the release or waiver of any of the *Issuer's* (the Trust's) obligations or by any lack of diligence by the *Holders* or any invalidity of the *QUIPS*. However, it does not say that the guarantee survives the release of Clark Fork's obligations under the debentures in the event of an Section 1101 transaction. Clearly, the guarantee would survive if Clark Fork's liability were "settled" or "compromised" outside of Section 1101 (Section 5.03(f));

---

[5]The liability is not technically *in rem* because the guarantor must first pay and is allowed to recover through subrogation.

but that is far different from a release of Clark Fork's obligations that occurs because a successor has assumed all of those obligations in a permitted transaction. Finally, Section's 5.03(g)'s admonition that "it [is] the intent of this Section 5.03 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances" is wholly consistent with the full, complete, absolute and unconditional assumption of the Guarantor's obligations in a permitted Section 1101 transaction. It is neither reasonable nor logical to read Section 5.03(g) to apply to a Section 1101 transaction.

For these reasons, the Court concludes that Plaintiffs are not creditors of Clark Fork because of the Guarantee. Rather, Clark Fork's obligations under the Guarantee, to the same extent as its obligations under the Debentures, were released in the Section 1101 transaction with NorthWestern. Therefore, the Guarantee is not a source of standing for these Plaintiffs. However, the question remains whether Plaintiffs have standing under their fraudulent scheme argument.

### 3.    **Was there a Fraudulent Scheme?**

Next, Plaintiffs argue that the purported release of Clark Fork under Section 1102 itself was obtained by fraud such that the release is void. According to Plaintiffs, at the time of the transfer, Debtor intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly. This argument may have legs. Simply because Debtor may have complied with the technical, procedural requirements of the Indenture does not mean Debtor can insulate the fraudulent transaction from all attack. The argument goes well beyond merely alleging the transaction was a fraudulent conveyance. This argument at its essence is that Debtor engaged in a knowing and conscious fraudulent scheme.

Critical to Debtor's position is that the release of Clark Fork under Section 1102 was effective, thereby removing Plaintiffs as creditors of Clark Fork. However, if Plaintiffs can prove (as they have alleged) that the release was obtained through fraud, then the release would be ineffective.

"If action is taken for a fraudulent purpose or to carry out a fraudulent purpose or to carry out a fraudulent scheme, the action is void and of no force or effect." Richard A. Lord, *Williston On*

*Contracts* Sec. 69.4 (4th Ed. 2003). A release may be set aside if it was obtained fraudulently. *Stanley v. Holms*, 975 P.2d 1242 (Mont. 1999) (recognizing the invalidity of releases under fraudulent conditions but granting a motion for summary judgment because party had not set forth sufficient indicia of fraud); *Riggs et al. v. Gillespie*, 241 F. 311 (4th Cir. 1917) (finding a release invalid as it was obtained by a "fraud in equity"); *see also Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001) (acknowledging that a release is a voidable contract when a party is fraudulently induced to execute a release). If a release is obtained by fraud, it is unenforceable under Montana law. *Association of Unit Owners of the Deer Lodge Condominium v. Big Sky of Montana, Inc.*, 798 P.2d 1018 (Mont. 1990). In that sense, a release is treated as any other contract obtained by fraud. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1133-34 (D.C. App. 1987) (reversing lower court's grant of summary judgment and permitting plaintiffs to proceed with underlying claims where plaintiffs' purported release of such claims was part of the misrepresentation of which the defendant was accused).

Debtor directly challenges Plaintiffs' fraud argument, contending that this case must be dismissed because there simply was no fraud. Debtor hangs its hat on the fact that numerous transactions making up to the transfer were disclosed in both regulatory filings and in documents executed by the Trustee. According to Debtor, the terms of the deals were known to all and, therefore, by definition mean there was in fact no fraudulent intent on Debtor's part.

While Debtor's disclosure may be one factor in favor of finding no fraudulent intent on Debtor's part, it is far from conclusive at the motion to dismiss stage. Debtor may have disclosed the nuts and bolts of the transfers, but Plaintiffs' allegations go beyond simply that the actual transfer itself was fraudulent in its terms. As alleged, the questions are whether Debtor knew at the time that it could not do the transaction based on its restated accountings etc. and whether the financial information Debtor provided the public was in fact false. These are fact questions not appropriately resolved on a motion to dismiss.

## III.    Conclusion

Therefore, the motion to dismiss will be granted in part and denied in part, as follows:

The Plaintiffs lack standing as creditors of Clark Fork to pursue a fraudulent conveyance action against the Debtor because of the Section 1102 release, unless they can prove under applicable law that the Section 1102 release was obtained through actual fraud or as part of a fraudulent scheme.

Counsel for Debtor is to submit an order under certification of counsel.

So ordered.

DATED: _8/20/04_

_Charles G. Case_

CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

11

# Exhibit B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NORTHWESTERN CORPORATION,<br><br>Debtor. | Chapter 11<br><br>Case No. 03-12872 (CGC) |
| MAGTEN ASSET MANAGEMENT CORPORATION & LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | Adv. No. 04-53324 (CGC) |

## FIRST AMENDED COMPLAINT TO AVOID THE TRANSFER OF ASSETS OF CLARK FORK AND BLACKFOOT LLC (F/K/A NORTHWESTERN ENERGY LLC) TO NORTHWESTERN CORPORATION

Magten Asset Management Corporation (*"Magten"*) individually in its capacity as a creditor of Clark Fork and Blackfoot, LLC (*"Clark Fork"*), and on behalf of Montana Capital I (the *"Trust"*) together with Law Debenture Trust Company of New York (*"Law Debenture"* and collectively with Magten the *"Plaintiffs"*), in its capacity as the Trustee under the Indenture for the Unsecured Subordinated Debt Securities Relating to Trust Securities dated November 1, 1996 (the *"Indenture"*), and in its capacity as Guarantee Trustee under that certain Guarantee Agreement dated November 1, 1996 (the *"Guarantee Agreement"*), for this complaint alleges as follows:

1.      Plaintiffs bring this adversary proceeding in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) because NorthWestern Corporation, the above-captioned debtor (the *"Debtor"*) received, in a fraudulent conveyance, substantially all of the assets of its wholly owned subsidiary, Clark Fork (an entity formerly known as NorthWestern Energy, LLC (*"NWE"*)).

2.      At the time of the transfer of the assets of Clark Fork to the Debtor (the *"Transfer"*), the Debtor was the sole equity holder of Clark Fork. Using this control of Clark Fork, the Debtor transferred the assets and liabilities of Clark Fork to itself. The assets of Clark Fork were valued at between $1.15 billion and $1.4 billion while the assumed liabilities amounted to approximately $700 million. However, the Debtor's other liabilities were so excessive that, even after obtaining Clark Fork's assets for inadequate consideration, the Debtor could not pay its own creditors and ultimately filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      Prior to the Transfer, Clark Fork was a solvent and reasonably capitalized entity. The Transfer rendered Clark Fork insolvent and undercapitalized and thereby injured the creditors of Clark Fork, including Magten. The Transfer unjustly enriched the Debtor by hundreds of millions of dollars while destroying Clark Fork's solvency and, thus, its ability to meet its obligations to Magten and its other creditors.

4.      In addition, as a result of the acquisition of NWE, the Debtor became a holding company within the meaning of Public Utility Holding Company Act of 1935, 15 U.S.C. § 79a, *et seq.* (*"PUHCA"*) and, consequently, was required to register under PUHCA and to satisfy that statute's requirements unless it qualified for an exemption.

- 2 -

5.    To avoid having to register, under PUHCA, on February 14, 2002 the Debtor filed an exemption application (the "*Application*"), contending that it fell within the exemption provided by section 3(a)(3) for companies that are primarily engaged in non-utility businesses and are "only incidentally a holding company." Moreover, the Debtor asserted that it only needed an exemption while it undertook to complete certain transactions related to the Milltown Dam. The mere filing of the Application suspended the Debtor's obligation to register as a PUHCA holding company – provided that the Application had been filed in good faith.

6.    By February 2002 – before the Second Supplemental Indenture or Third Supplemental Indenture (as defined herein) were issued – the Debtor's predominant business was focused on its profitable utility operations and was, therefore, ineligible for a PUHCA exception. At this time, the Debtor repeatedly directed investors' attention in public statements to its utility operations as the Debtor's primary source of revenue. The Debtor also entered into contracts drastically altering the rights of the holders of the QUIPS.

7.    Under PUHCA, if a contract, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, PUHCA, is made in violation of PUHCA such contract is void (i) as to the party to the contract that committed the violation and (ii) as to any person, who although not a party to the contract, acquired rights under that contract with actual knowledge of the facts that constitute the PUHCA violation.

8.    Because at the time of the Application the Debtor knew that its primary source of income was its utility assets, the Application was not filed in good faith. Because the Application was not filed in good faith, all of the contracts executed by the Debtor after February 14, 2002, including those relating to the Transfer, are void. Therefore, the Montana Utility Assets properly belong to Clark Fork, Clark Fork was never released from its obligations under

-3-

the Indenture and, as Creditors of Clark Fork, Plaintiffs have standing to seek the recovery of those assets.

9.      By this Complaint, Plaintiffs seek, among other things, (i) a declaration that because the Debtor violated PUHCA, all contracts relating to the Montana Utility Assets and the Transfer that were executed between the filing of the Application and the date of the Transfer are void, (ii) the avoidance of the Transfer, (iii) a declaration that the assets that were fraudulently transferred are not the property of the Debtor's estate in its chapter 11 case, (iv) the imposition of a constructive trust over the transferred assets for the benefit of the Trust, and (v) the return of such assets to Clark Fork.[1]

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

11.      This proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H) and (O).

12.      Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

13.      Magten is a corporation validly organized and doing business under the laws of the State of Delaware.

14.      Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the *"QUIPS"*), issued by the Trust.  The Trust is a business trust established pursuant to the Delaware Business Trust Act.

---

[1]      This Court set January 15, 2004, as the deadline for filing proofs of claim against the Debtor.  Magten, as an individual holder of the QUIPS and Law Debenture Trust Company of New York, as Indenture Trustee, each filed timely proofs of claim for damages incurred as a result of the Transfer.

-4 -

120087.01600/40145524v1

15.    The Trust was established by The Montana Power Company (*"Montana Power"*), predecessor in interest to Clark Fork (f/k/a NWE), as a financing vehicle.  The sole asset of the Trust are the 8.45% Junior Subordinated Debentures due 2036 (the *"Junior Debentures"*).

16.    Section 610 of the Indenture governing the Junior Debentures grants to Magten, as a holder of the QUIPS, "the right to institute a legal proceeding directly against [the Debtor]" to enforce certain rights relating to the QUIPS or to the Amended and Restated Trust Agreement (the *"Trust Agreement"*).

17.    Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York.

18.    Law Debenture brings this complaint as a co-plaintiff in its capacity as successor trustee under the Indenture on behalf of all holders of the QUIPS.

19.    The defendant in this adversary proceeding is the Debtor in the above-captioned chapter 11 case.

20.    The Debtor is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota.

21.    On September 14, 2003, the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its businesses and manage its properties as a debtor in possession.

22.    The Debtor owns and operates utility companies in the United States.  The Debtor and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 598,000 customers throughout Montana, South Dakota and Nebraska.

-5-

120087.01600/40145524v1

## BACKGROUND

### THE MONTANA POWER COMPANY

23.     Montana Power was incorporated in 1961 under the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger of four regional electric companies.

24.     In November 1996, Montana Power and The Bank of New York (*"BNY"*) as Trustee entered into the Indenture. Law Debenture subsequently succeeded BNY as Trustee under the Indenture.

25.     Pursuant to the Indenture, Montana Power issued the Junior Debentures.

26.     Also in November 1996, pursuant to the Trust Agreement, Montana Power, BNY as Property Trustee and certain individuals as Administrative Trustees, created the Trust. Law Debenture and BNY are currently taking the necessary steps to enable Law Debenture to succeed BNY as Property Trustee.

27.     Pursuant to the Trust Agreement, the Trust issued the QUIPS.

28.     The Trust holds 100% of the Junior Debentures, with a total face amount of $65 million, which constitute its sole meaningful asset. The value of the QUIPS is entirely based on the value of the Junior Debentures, and, thus, the ability of Clark Fork to pay interest and principal to the Trust. Amounts paid by Clark Fork to the Trust are, in turn, paid by the Trust to the holders of the QUIPS.

29.     The Junior Debentures were not sold directly to investors. Rather, they were sold to BNY as Property Trustee under the Trust Agreement. Investors thereby acquired an indirect undivided beneficial interest in the Junior Debentures and obtained substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

-6 -

30.    In connection with the Indenture, Montana Power agreed that the holders of the Junior Debentures would have the absolute and unconditional right to receive principal and interest.  Under the Indenture, those payments of principal and interest were to be paid to the Property Trustee.

31.    Montana Power entered into the Guarantee Agreement with BNY (as Guarantee Trustee) in November 1996.  Law Debenture subsequently succeeded BNY as Guarantee Trustee.  Pursuant to the Guarantee Agreement, Montana Power, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust and to the extent that BNY, as Property Trustee has funds available in a specified account.

32.    Taken together, Montana Power's obligations under the Indenture, the Trust Agreement, the Expense Agreement and the Guarantee provide, in the aggregate, a full, irrevocable and unconditional guarantee of payments of distributions and other amounts due to the holders of the QUIPS.

## THE SALE OF THE MONTANA POWER COMPANY'S UTILITY ASSETS & THE PUHCA APPLICATION

33.    On March 28, 2000, The Montana Power Company, announced plans to restructure its business.  This restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane utility assets, in order to allow Montana Power to focus on the telecommunications business.

34.    On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with the Debtor, pursuant to which the Debtor agreed to purchase Montana Power's electric, natural gas and propane utility assets (the *"Montana Utility Assets"*).  In order to facilitate the assets sale to the Debtor, Montana Power created a subsidiary, Montana Power Company LLC (*"MPLLC"*).

-7-

35.    On February 13, 2002, Montana Power merged its energy assets into MPLLC (the *"Merger"*). As a result of this, MPLLC held and operated the Montana Utility Assets.

36.    On or about February 14, 2002, the Debtor filed its Application for an exemption from various aspects of PUHCA under PUHCA Section 3(a)(3).

37.    On February 15, 2002 the Debtor's acquisition of MPLLC was completed with the payment by the Debtor of $478 million in cash to the parent of MPLLC and the assumption of $511 million of MPLLC liabilities.

38.    As a result of the acquisition on February 15, 2002, MPLLC became a wholly owned subsidiary of the Debtor and became a public utility holding company as defined under PUHCA because it controlled more than 10% of the outstanding securities of the MPLLC.

39.    In the Application, the Debtor claimed that it qualified as an exempt holding company under PUHCA Section 3(a)(3) and that the mere pendency of the Application exempted the Debtor from being required to register with the SEC.

40.    The importance of the Montana Utility Assets to the Debtor's continued viability was grossly understated in the Application.  By 2001, utility income was a very material component – in some periods the *only* source – of the Debtor's net income.  The gas and electric operations, of which the Montana Utility Assets comprised a substantial part, *contributed 100%* of the positive income (before accounting for minority interests) for all of the Debtor's lines of business in the nine months ending September 30, 2001, and approximately 96% in the same period during 2003; the corresponding proportion of operating income was 81% for 2001 and 73% for 2000.

-8-

41.    At the time Debtor filed the Application for exemption from PUHCA, and contrary to what the Debtor claimed in the Application, it was predominantly engaged in the public utility business with the vast majority of its income derived from its utility subsidiary. Therefore, Debtor did not qualify for the exemption it sought and all subsequent contracts are void under PUHCA. Had the Debtor not filed the Application, all material contracts including its assumption of liabilities under the Indenture would have been subject to SEC review and approval.

42.    In early 2002, the Debtor admitted that its utility operations provided a significant portion of its income and observed that "CornerStone [the Debtor's propane business has historically been a *minor contributor* to NorthWestern's earnings and cash flow." "By excluding CornerStone and adding Montana Power's utility operations, *approximately two-thirds of NorthWestern's targeted 2002* earnings before interest, taxes and depreciation and amortization *is attributable to our utility businesses*." NorthWestern Corp. 8-K filed February 7, 2002 at 2. (emphasis added). This statement was made one week *before* the Debtor filed the Application.

43.    The Debtor's 2001 Annual Shareholder's Report issued on February 15, 2002 was even more direct: "we are targeting approximately two-thirds of NorthWestern's total operating income to come from our energy business in 2002." NorthWestern Corp., Annual Shareholder Report 6-7 (2001). Despite these statements, the Debtor's Application failed to even mention, much less analyze, the Debtor's previously announced expectation that utility operations did and would provide, as of the beginning of 2002, the bulk of its income going forward.

44.    In connection with the Merger, on February 13, 2002, MPLLC entered into the First Supplemental Indenture, pursuant to which MPLLC assumed the obligations of Montana Power under the Indenture.

-9-

45.    In connection with the Merger, on February 13, 2002, pursuant to a letter agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

46.    None of the cash paid for the Montana Utility Assets was retained by MPLLC. It was, thus, not thereafter available to assist Clark Fork in meeting its obligations to its creditors.

47.    On March 19, 2002, MPLLC was renamed NWE.  NWE was a duly organized Montana limited liability company and is now known as Clark Fork.

48.    On August 13, 2002, the Debtor entered into the Second Supplemental Indenture, pursuant to which the Debtor assumed all of the obligations under the Indenture on a joint and several basis with Clark Fork.

49.    On August 13, 2002, the Debtor entered into an Amendment to the Guarantee Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Guarantee Agreement.

50.    On August 13, 2002, the Debtor entered into a letter agreement amending the Trust Agreement, whereby it assumed on a joint and several basis with Clark Fork all of the obligations under the Trust Agreement.

51.    The Debtor was insolvent both immediately before and immediately after the acquisition of MPLLC and the assumption of related liabilities.  The Debtor was engaged in a business with unreasonably small capitalization and incurred debts beyond its ability to pay both immediately before and immediately after the acquisition of MPLLC and the assumption of liabilities.

120087.01600/40145524v1

**THE TRANSFER**

52.    On November 15, 2002, Clark Fork transferred substantially all of its assets, which included the Montana Utility Assets, to the Debtor and retained only the Milltown Dam, a two megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers.  The Milltown Dam operates under a license that expires in 2007.

53.    Although Clark Fork transferred over $1 billion of assets to the Debtor, Clark Fork received no cash for the Transfer, and the only consideration was the assumption of certain liabilities (estimated to be only approximately $700 million) by the Debtor.  As a result of the Transfer, Clark Fork was rendered insolvent.

54.    Because Clark Fork was rendered insolvent and undercapitalized as a result of the Transfer, it is entirely dependent upon the Debtor for the continued funding of its obligations associated with the Milltown Dam and, indeed, for the funding of its continuing corporate existence.  The Debtor funds the costs and expenses associated with the operation of the Milltown Dam under the terms of certain agreements with Clark Fork.

55.    In connection with the Transfer, on November 15, 2002, the Debtor executed the Third Supplemental Indenture, pursuant to which the Debtor expressly assumed the due and punctual payment of the principal and interest on the securities issued under the Indenture.

56.    On November 15, 2002, the Debtor executed the Guarantee Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Guarantee Agreement.

57.    On November 15, 2002, the Debtor executed the Trust Assumption Agreement, whereby it assumed the obligations and liabilities of Clark Fork under the Trust Agreement.

-11 -

58.    Following the Transfer, the Debtor operated the Montana Utility Assets as part of the Debtor's NorthWestern Energy Division.

59.    On November 20, 2002, the Montana Power energy subsidiary was officially renamed Clark Fork. Clark Fork continues to operate the Milltown Dam.

## THE DEBTOR'S FRAUDULENT FINANCIAL STATEMENTS AND SUBSEQUENT CHAPTER 11 FILING

60.    On April 16, 2003, the Debtor reported its financial results for the fiscal year ended ("*FYE*") 2002 – the year in which the Transfer occurred. These filings included a restatement of the previously unaudited quarterly results for the first three quarters of FYE 2002. Specifically, the Debtor's restated financials indicated an additional $878.5 million in previously unreported "negative charges."

61.    Immediately thereafter, the SEC launched an informal investigation into the Debtor's financial restatements. This investigation became a formal investigation in December 2003, and has not yet been resolved.

62.    On May 23, 2003, only six months after the Transfer, the Debtor announced that it would defer all interest payments due on all subordinated debentures of all series of its trust securities, including the QUIPS.

63.    As disclosed to this Court on the Petition Date, Clark Fork was severely undercapitalized as a result of the Transfer. On the Petition Date, the Debtor filed a Motion seeking court authorization to, among other things, continue to fund certain limited intercompany obligations (the "*Clark Fork Motion*"). In that pleading, the Debtor disclosed the existence of a Maintenance and Operating Costs Support Agreement dated as of November 15, 2002, between itself and the predecessor to Clark Fork (the "*Support Agreement*").

-12-

64.    In the Clark Fork Motion, the Debtor disclosed that pursuant to the terms of the Support Agreement, the Debtor is required to make certain payments with respect to the Milltown Dam, Clark Fork's only remaining asset, to the extent Clark Fork is unable to make such payments. Subsequently, the Debtor received approval to pay up to $370,000 per month on behalf of Clark Fork in connection with the terms of the Support Agreement, thereby evidencing Clark Fork's complete dependence on the Debtor for its very corporate existence. As a result of the Transfer, as evidenced by the Support Agreement, it is clear that the Debtor understood that Clark Fork would be unable to satisfy the claims of its creditors, including Plaintiffs' claims.

## THE DEBTOR'S ATTEMPT TO RELEASE CLARK FORK

65.    Article Eleven of the Indenture purports to release Montana Power (or its successor in interest) upon the transfer of substantially all of the assets of Montana Power if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

66.    Upon information and belief, in connection with the Transfer of the Montana Utility Assets, the Debtor requested that BNY, as the initial Trustee under the Indenture execute the Third Supplemental Indenture with language that expressly released Clark Fork from its obligations under the Indenture.

67.    Upon information and belief, BNY refused to execute the Third Supplemental Indenture in its capacity as Indenture Trustee if such contained a release of Clark Fork's obligations under the Indenture.

68.    The Third Supplemental Indenture, as executed by BNY in its capacity as Indenture Trustee did not include a release of Clark Fork's obligations under the Indenture and

-13-

was executed by BNY in reliance upon the Debtor's fraudulent financial statements, while the Debtor hid its true financial condition from BNY and from its investors.

69.   In additional, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

## FIRST CAUSE OF ACTION

### (A Declaration that all Documents Executed in Furtherance of the Transfer are Void)

70.   The Plaintiffs repeat and re-allege the allegation of paragraphs 1-69 as if fully set forth here.

71.   PUHCA Section 3(a)(3) in pertinent part exempts a holding company that:

> is only incidentally a holding company, being primarily engaged or interested in one or more businesses other than the business of a public-utility company and (A) not deriving, directly or indirectly, any material part of its income from any one or more subsidiary companies, the principal business of which is that of a public-utility company ....

PUHCA Section 3(a)(3).

72.   Under PUHCA, the rights of a party to a contract made while there was a PUHCA violation – including lack of good faith in filing an application for a PUHCA exemption, are void.

73.   The Application was not filed in good faith because the Debtor knew that it derived a material part of its income from its utility business.

74.   The contracts executed in connection with the Transfer, including the Third Supplemental Indenture, were executed after the Debtor filed the Application in bad faith.

75.   By filing the Application in bad faith and failing to register with the SEC, the Debtor was in violation of PUHCA and the Transfer contracts described above are void because

-14-

these contracts were executed after the Application was filed in bad faith and without proper SEC approval. Therefore the Transfer and the contracts executed in connection therewith, including the Third Supplemental Indenture, must be invalidated.

## SECOND CAUSE OF ACTION

### (The Transfer was Fraudulent Under Montana Law Because of an Actual Intent to Hinder, Delay, or Defraud Creditors)

76.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1-75 as if fully set forth here.

77.    Under the Montana Code Annotated (*"MCA"*) § 31-2-333, a transfer may be avoided if, the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor.

78.    Pursuant to MCA § 31-2-333, in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

79.    The QUIPS holders are creditors of the Debtor, and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

80.    The Debtor is the parent of Clark Fork and, as such, exercised complete control over Clark Fork. As a result of this relationship, the Debtor qualifies as an insider under Montana law.

81.    In connection with the Transfer, Clark Fork transferred assets to the Debtor that are valued between $1.15 billion and $1.4 billion, and the only consideration received for the Transfer was the assumption of approximately $700 million in liabilities.

-15-

82.    Prior to the Transfer, Clark Fork was a solvent entity.    The transfer of substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become insolvent.

83.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity.    The transfer of substantially all of Clark Fork's assets to the Debtor caused Clark Fork to become undercapitalized.

84.    Because the Montana Utility Assets that the Debtor received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Debtor, Clark Fork did not receive reasonably equivalent value for the transfer.

### THIRD CAUSE OF ACTION

**(The Transfer was Fraudulent As a Constructive Fraud Which Rendered Clark Fork Insolvent)**

85.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1-84 as if fully set forth here.

86.    Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

87.    Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer.    The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

88.    After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities.    Despite the decimated asset pool,

-16-

Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

89.    The Transfer rendered Clark Fork insolvent.

## FOURTH CAUSE OF ACTION

### (The Transfer was Fraudulent As a Constructive Fraud Because it Rendered Clark Fork Undercapitalized)

90.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1-89 as if fully set forth here.

91.    Pursuant to MCA §31-2-334, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

92.    Clark Fork transferred the Montana Utility Assets without receiving reasonably equivalent value in exchange for the Transfer. The Montana Utility Assets that the Debtor received in the Transfer were substantially more valuable than the liabilities that were assumed. Clark Fork did not receive reasonably equivalent value for the transfer.

93.    After the Transfer, Clark Fork, the remaining entity, was left with only the Milltown Dam and corresponding environmental liabilities. Despite the decimated asset pool, Clark Fork was still liable for, among other things, the covenants and obligations under Guarantee Agreement and the Indenture, and the environmental liabilities associated with the Milltown Dam.

-17-

94.    The Transfer rendered Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment)

95.    The Plaintiffs repeat and re-allege the allegations of paragraphs 1-94 if fully set forth herein.

96.    The Debtor was the recipient of the Montana Utility Assets.

97.    The Transfer was fraudulent under MCA §§31-2-333 and 31-2-334.

98.    Prior to the Transfer, Clark Fork was solvent.  As a result of the Transfer, the Debtor received assets valued between $1.15 billion and $1.4 billion, for which the assumption of $700 million of liabilities by the Debtor was less than reasonably equivalent value.

99.    Upon information and belief, the Montana Utility Assets comprise approximately 80% of the Debtor's consolidated EBITDA.  In light of this and the fact that Clark Fork received less than reasonably equivalent value for the Transfer, the receipt by the Debtor of the Montana Utility Assets has unjustly enriched the Debtor and the Debtor's creditors.

100.    Absent the Transfer, the holders of the QUIPS would have received payment in full from Clark Fork, as a solvent utility company, on behalf of their claims.  However, as a result of the Transfer, the holders of the QUIPS may receive nothing on account of their claims.

101.    The Junior Debentures were subordinated obligations to the other debt owed by Montana Power.  Upon the assumption of liabilities by the Debtor, the Debtor has asserted that these obligations are junior to approximately $1.7 billion of senior debt.  In light of the fact that the Debtor was insolvent at the time of the assumption of liabilities, the Debtor's creditors would be unjustly enriched if the QUIPS are treated as *pari passu* or junior to the Debtor's other indebtedness.

-18-

## CONCLUSION

*WHEREFORE*, Plaintiffs respectfully requests that the Court enter judgment against the

Defendant[2] as follows:

    (a)    Declaring that all documents executed in furtherance of the Transfer are void;

    (b)    Avoiding the Transfer;

    (c)    Declaring that the Montana Utility Assets are not the property of the Debtor's

estate in the chapter 11 case;

    (d)    Imposing a constructive trust on the Montana Utility Assets for the benefit of the

Trust and ordering the return of such assets to Clark Fork;

    (e)    Attorney's fees and costs of this action; and

    (f)    Such other relief as this Court deems just and proper.


Dated: Wilmington, Delaware
       October 4, 2004

**SMITH, KATZENSTEIN & FURLOW, LLP**    **BLANK ROME LLP**


*/s/ Kathleen M. Miller*

Kathleen M. Miller (DE No. 2898)           Elio Battista, Jr. (DE No. 3814)
800 Delaware Avenue, 7th Floor           1201 Market Street, Suite 800
Wilmington, DE 19899                    Wilmington, DE 19801
Telephone:    (302) 652-8400          Telephone:  (302) 425-6400
Facsimile:    (302) 652-8405           Facsimile:  (302) 425-6464

    - and -                            - and -

---

2      Though not named herein, Plaintiffs hereby retain all rights to amend this complaint bring suit against all
parties that orchestrated or other wise benefited from the Transfer.

**NIXON PEABODY LLP**
John V. Snellings (BBO No. 548791)
100 Summer Street
Boston, MA 02110
Telephone:  (617) 345-1202
Facsimile:  (866) 947-1732

Counsel for Law Debenture Trust Company of
New York

**FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
    Corporation

-20-