**Exhibit F**

NOV-14-2002  00:58          MPC. LEGAL                    406 497 2451    P.05

# NorthWestern
## Energy

40 East Broadway St.
Butte, MT 59701
Telephone: 406-497-3000
Facsimile: 406-497-2535
www.northwesternergy.com

November 15, 2002

The Bank of New York,
as Trustee under the Indenture
(as defined below)
101 Barclay Street, 8 West
New York, New York 10286
Attention: Vice President,
        Corporate Trust Administration

Re: Company Order by NorthWestern Energy, L.L.C. (formerly known as The Montana Power,
    L.L.C. and successor by merger to (The Montana Power Company) under the Junior
    Subordinated Deferrable Interest Debentures, 8.45% Series due 2036 issued under the
    Indenture dated as of November 1, 1996 – Transfer of Assets and Liabilities to
    NorthWestern Corporation

Ladies and Gentlemen:

Reference is made to the Indenture, dated as of November 1, 1996, between The Montana Power
Company ("MPC"), and you, as Trustee (the "Trustee"), as supplemented by the First
Supplemental Indenture, dated as of February 13, 2002, and the Second Supplemental Indenture,
dated as of August 13, 2002, each between NorthWestern Energy, L.L.C. (formerly known as
The Montana Power, L.L.C. and successor by merger to MPC) ("NorthWestern Energy") and the
Trustee (collectively, the "Indenture"). This Company Order is being delivered in connection
with the intra-company restructuring transaction contemplated whereby the transfer of
substantially all of the assets and liabilities of NorthWestern Energy will be acquired by NorthWestern
Corporation ("NorthWestern") pursuant to the Asset and Stock Transfer Agreement dated as of
November 15, 2002, including the assumption by NorthWestern of NorthWestern Energy's
obligations with respect to the Indenture and the 8.45% Junior Subordinated Debentures due
December 31, 2036 (the "QUIPs Debentures") outstanding under the Indenture, by execution and
delivery of the Third Supplemental Indenture thereto (the "Third Supplemental Indenture"),
dated as of November 15, 2002

We are pleased to hand you herewith our Company Order for the execution and delivery of the
Third Supplemental Indenture, under Section 1201 of, and supplemental to, the Indenture.
Accompanying this Company Order are the following papers:

1.    Four counterparts of the Third Supplemental Indenture, pursuant to Sections 1101(a) and 1201 of the Indenture, which have been executed on behalf of NorthWestern Energy and NorthWestern;

2.    an Officer's Certificate, executed by an officer of NorthWestern Energy and of NorthWestern, pursuant to Sections 102 and 1101(c) of the Indenture;

3.    an Opinion of Paul Hastings, Janofsky & Walker LLP, special New York counsel to NorthWestern and NorthWestern Energy, pursuant to Sections 102 and 1203 of the Indenture;

4.    an Opinion of Vice President – Legal Administration and Corporate Secretary, NorthWestern;

5.    an Assumption Agreement (QUIPs Guarantee) pursuant to which NorthWestern assumes the obligations of NorthWestern Energy under the Guarantee, pursuant to Section 8.01 of the Guarantee and Sections 1101 and 1002 of the Indenture; and

6.    an Assignment and Assumption Agreement (QUIPs Agreement) executed by NorthWestern, and assuming the obligations and liabilities of NorthWestern Energy connection with the Trust Agreement and the Expense and Liability Agreement.

We request that you execute all four counterparts of the Third Supplemental Indenture and, when so executed, return two counterparts for The Bank of New York and deliver the remaining two counterparts to James M. McGuinnEss, Paul, Hastings, Janofsky & Walker LLP, 75 East 55th Street, New York NY 10022.

Kindly acknowledge receipt of this Company Order and accompanying papers referred to herein by signing and returning the copy of this letter hereto attached.

Very truly,

NORTHWESTERN ENERGY, L.L.C.

By: _____
Eric J. Klidt
Vice President & Chief Accounting Officer

NOV-14-2002  08:59      MFC. LEGAL                      406 497 2451    P.07

The undersigned, as Trustee under the Indenture referred to above, hereby acknowledges receipt of the above-mentioned documents listed in the Company Order of NorthWestern Energy, L.L.C.

THE BANK OF NEW YORK,
    as Trustee

By: _____
Name: MaryBeth A. Lewicki
Title: Vice President

Dated: November ___, 2002

TOTAL P.07

EXECUTION VERSION

## OFFICER'S CERTIFICATE

Dated: November 15, 2002

The undersigned hereby certifies that he is the duly elected and acting President and Chief Executive Officer of NorthWestern Energy, L.L.C., a Montana limited liability company (formerly known as The Montana Power, L.L.C., successor by merger to The Montana Power Company ("MPC") and President and CEO of NorthWestern Energy Division of NorthWestern Corporation, a Delaware corporation ("NorthWestern"), and is an Authorized Officer, as defined in the Indenture, dated as of November 1, 1996, between MPC, a corporation formed under the laws of the State of Montana, and The Bank of New York, as trustee (the "Trustee"), as supplemented by the First Supplemental Indenture, dated as of February 13, 2002, and the Second Supplemental Indenture, dated as of August 13, 2002, by and between NorthWestern Energy and the Trustee (collectively, the "Indenture"). He has read and is familiar with the covenants and conditions contained in the provisions in Articles 11 and 12 of the Indenture the covenants and conditions provided for in the Indenture with respect to compliance with which this certificate is made, and the definitions in the Indenture relating thereto and has examined the various certificates and instruments prepared in compliance with said covenants and conditions, as well as the Asset and Stock Transfer Agreement, dated as of November 15, 2002, between NorthWestern Corporation, a Delaware corporation ("NorthWestern"), relating to the transfer of substantially all of the assets of NorthWestern Energy to, and the assumption of substantially all of the liabilities of NorthWestern Energy by NorthWestern (the "Transaction"). As to certain factual matters, information with respect to which is in the possession of NorthWestern Energy, or received from other officer or officers of NorthWestern Energy, and, in the opinion of the undersigned, he has made such examination and investigation as is necessary to enable him to express an informed opinion as to whether or not such covenants and conditions have been complied with and, in the opinion of the undersigned, such covenants and conditions have been complied with. He further certifies that:

The Transaction complies with Article 11 of the Indenture and all conditions precedent in the Indenture (including any covenants compliance with which constitutes a condition precedent) as they relate to the Transaction have been complied with.

The Third Supplemental Indenture, dated as of November 15, 2002 between NorthWestern and the Trustee (the "Supplement") complies with Article 11 of the Indenture and all conditions precedent provided for in the Indenture as they relate to the Supplement (including any covenants compliance with which constitutes a condition precedent), including the execution and delivery of the Supplement by the parties thereto, have been complied with and the execution of the Supplement is authorized or permitted by the Indenture.

[Signature Page to Follow]

Executed as of the date first written above.

Name: Michael J. Hanson
Title: President and Chief Executive Officer
of NorthWestern Energy, LLC and
President and CEO of NorthWestern
Energy Division of NorthWestern
Corporation.



125 S. Dakota Avenue
Sioux Falls, SD 57104-6403
Telephone: 605-978-2908
Facsimile: 605-978-2910
www.northwestern.com

Alan D. Dietrich
Vice President - Legal Administration &
Corporate Secretary
Telephone: (605) 978-2907
Facsimile: (605) 978-2817
alan.dietrich@northwestern.com

November 15, 2002

The Bank of New York,
as Trustee under the Indenture
(as defined below)
101 Barclay Street, 21 West
New York, New York 10286

Attention:    Vice President, Corporate Trust Administration

Re:    NorthWestern Energy, L.L.C. (formerly known as The Montana
Power L.L.C., successor by merger to The Montana Power
Company)/QUIPs issued under the Trust Agreement dated as of
November 1, 1996 - Transfer of Assets and Liabilities by
NorthWestern Energy, L.L.C. to NorthWestern Corporation

Ladies and Gentlemen:

This opinion is rendered in connection with the Indenture, dated as of November 1, 1996 (the "Indenture"), between NorthWestern Energy, L.L.C. ("NorthWestern Energy"), formerly known as The Montana Power, L.L.C., successor by merger to The Montana Power Company) and you as Trustee (the "Trustee"), as such Indenture relates to the transfer of the properties and assets of NorthWestern Energy, substantially as an entirety, to NorthWestern Corporation ("NorthWestern"), pursuant to the terms of the Asset and Stock Transfer Agreement dated as of November 15, 2002 (the "Transfer Agreement"), between NorthWestern Energy and NorthWestern (such transfer and assumption being the "Transaction"), and the assumption by NorthWestern of the liabilities and obligations of NorthWestern Energy under the Indenture and, the NorthWestern Energy's Quarterly Income Preferred Securities (the "QUIPs") issued under the Indenture.

I am the Vice-President–Legal Administration and Corporate Secretary of NorthWestern. As such, I am familiar generally with its corporate proceedings. In addition, in connection with the Transaction, I have reviewed, among other things, copies of the Indenture and the Third Supplemental Indenture, dated the date hereof, between NorthWestern and the Trustee (the "Third Supplemental Indenture"). I have also examined and am familiar with the originals or copies, certified or otherwise identified to my satisfaction, of such other documents, corporate records, certificates of public officials, certificates of officers and representatives of NorthWestern and NorthWestern Energy and other instruments, questions of law and other matters as I have considered necessary or appropriate for the purpose of enabling me to express this opinion.

I am a member of the bars of South Dakota and Nebraska, and my opinion herein is limited to the General Corporation Law of the State of Delaware (based solely on my review of a standard compilation of such laws) and the federal laws of the United States, and I do not express any opinion as to the laws of any other state or jurisdiction. I express no opinion as to any county, municipal, city, town or village ordinance, rule or regulation.

Based upon and subject to the assumptions, exceptions, qualifications and limitations set forth herein, it is my opinion that as of the date of this opinion:

1.     NorthWestern is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

2.     NorthWestern has all right, power and authority to execute and deliver the Third Supplemental Indenture, and has duly authorized, executed and delivered the Third Supplemental Indenture.

Paul, Hastings, Janofsky & Walker LLP may rely upon this opinion in the preceding paragraph for purposes of their opinion to The Bank of New York, as Trustee under the Indenture.

Very truly yours,

Alan D. Dietrich
Vice President (Legal Administration & Corporate Secretary)



**PaulHastings**

Paul, Hastings, Janofsky & Walker LLP
75 East 55th Street, New York, New York 10022-3205
telephone 212-318-6000 / facsimile 212-319-4090 / Internet www.paulhastings.com

November 15, 2002

The Bank of New York,
as Trustee under the Indenture
(as defined below)
101 Barclay Street, 21 West
New York, New York 10286

Attention:    Vice President, Corporate Trust Administration

Re:    NorthWestern Energy, L.L.C. (formerly known as The Montana
Power L.L.C., successor by merger to The Montana Power
Company)/QUIPs issued under the Trust Agreement dated as of
November 1, 1996 - Transfer of Assets and Liabilities by
NorthWestern Energy L.L.C. to NorthWestern Corporation

Ladies and Gentlemen:

This opinion is furnished to you pursuant to Sections 102, 1101(a) and 1203 of the
Indenture, dated as of November 1, 1996 (the "Indenture"), between NorthWestern Energy,
L.L.C. ("NorthWestern Energy", formerly known as The Montana Power L.L.C., (the first
successor by merger to The Montana Power Company) and you, as Trustee (the "Trustee"), and
relates to the transfer of the property and assets of NorthWestern Energy, substantially as an
entirety, to NorthWestern Corporation ("NorthWestern"), as such transfer relates to the
assumption by NorthWestern of the liabilities and obligations of NorthWestern Energy under the
Indenture and the NorthWestern Energy Quarterly Income Preferred Securities (the "QUIPs")
issued under the Indenture.

In rendering the following opinions, we have read and are familiar with the covenants and
conditions contained in Articles 11 and 12 of the Indenture, the covenants and conditions
provided for in the Indenture with respect to compliance with which this opinion is rendered (the
"Covenants and Conditions"), and the definitions in the Indenture relating thereto. In addition,
we have examined originals, or copies certified to our satisfaction, of the various certificates and
instruments prepared in compliance with the Covenants and Conditions, the Asset and Stock
Transfer Agreement, dated as of November 15, 2002, by and between NorthWestern Energy and
NorthWestern (the "Asset Transfer Agreement," together with all transactions contemplated

NY55/026735.1

*Paul Hastings*

thereby, the "Transaction") and such other instruments and documents and made such examination as we have deemed necessary as a basis for an informed opinion. In such examination, we have assumed the genuineness of all signatures (except with respect to signatures on behalf of NorthWestern and NorthWestern Energy on the Asset Transfer Agreement and other documents delivered to the Trustee in connection with the assumption by NorthWestern of the liabilities and obligations of NorthWestern Energy under the Indenture and the QUIPS), the authenticity of all documents submitted to us as originals; the conformity with the original documents of all documents submitted to us as copies and the authenticity of the originals of such latter documents. As to various questions of fact material to this opinion information with respect to which is in the possession of NorthWestern Energy, we have, when relevant facts were not independently established, relied upon representations or certifications by officers of NorthWestern Energy. In our opinion, we have made such examination and investigation as is necessary to enable us to express an informed opinion as to whether or not the Covenants and Conditions have been complied with and, in our opinion, the Covenants and Conditions have been complied with.

All capitalized terms set forth herein, and not otherwise defined herein, are used herein as defined in the Indenture.

Based upon the foregoing, we are of the opinion that:

1.    The Transaction complies with Article 11 of the Indenture and all conditions precedent in the Indenture (including any covenants, compliance with which constitutes a condition precedent) as they relate to the Transaction have been complied with.

2.    (a)    The Third Supplemental Indenture, dated as of November 15, 2002, between NorthWestern and the Trustee (the "Supplement") complies with Article 11 of the Indenture; (b) all conditions precedent provided for in the Indenture as they relate to the Supplement (including any covenants, compliance with which constitutes a condition precedent, including the execution and delivery of the Supplement by the parties thereto), have been complied with; and (c) the execution and delivery of the Supplement is permitted or authorized by the Indenture.

We are members of the bar of the State of New York and we do not express any opinion as to matters governed by laws other than the laws of the State of New York and the Federal laws of the United States of America.

Very truly yours,

*Paul Hastings Janofsky & Walker LLP*

**Exhibit G**

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4   IN RE:                     :   CASE NO. 03-12872 (JLP)
     NORTHWESTERN CORPORATION,  :
 5          Reorganized Debtor  :
     -------------------------------:
 6   MAGTEN ASSET MANAGEMENT    :   CIVIL ACTION
     CORPORATOIN and LAW DEBENTURE :
 7   TRUST COMPANY OF NEW YORK, :
                Plaintiffs      :
 8                              :
                                :
 9          vs.                 :
                                :
10   NORTHWESTERN CORPORATION,  :
                Defendant       :   NO. 04-01494 (JJF)
     -------------------------------:
11   MAGTEN ASSET MANAGEMENT    :   CIVIL ACTION
     CORPORATION, individually and :
12   Derivatively on behalf of  :
     Clark Fork and Blackfoot, LLC, :
13              Plaintiff       :

14          v.                  :
                                :
15   PAUL, HASTINGS, JANOFSKY & :
     WALKER, LLP,               :
16              Defendant       :   NO. 04-01256 (JJF)

17                         - - -

18                              Wilmington, Delaware
                                Friday, October 21, 2005
19                              9:33 o'clock, a.m.

20                         - - -

21   BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

22                         - - -

23

24                              Valerie J. Gunning
                                Official Court Reporter
25
```

2

```
 1   APPEARANCES:

 2           GREENBERG TRAURIG, LLP
             BY:  WILLIAM E. CHIPMAN, JR., ESQ.
 3
                     -and-
 4
             PAUL, HASTINGS, JANOFSKY & WALKER LLP
 5           BY:  JESSE H. AUSTIN, III, ESQ. and
                  (Atlanta, Georgia)
 6
                     -and-
 7
             CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 8           BY:  JOSEPH D. PIZZURRO, ESQ. and
                  STEVEN J. REISMAN, ESQ.
 9                (New York, New York)

10           Counsel for Northwestern Corporation

11
             BLANK ROME LLP
12           BY:  DALE R. DUBE, ESQ.

13                  -and-

14           FRIED FRANK
             BY:  BONNIE STEINGART, ESQ. and
15                GARY L. KAPLAN, ESQ.
                  (New York, New York)
16
             Counsel for Magten Management Corporation
17

18           SMITH, KATZENSTEIN FURLOW LLP
             BY:  ROBERT J. KATZENSTEIN, ESQ.
19
             Counsel for Magten Asset Management
20           Corporation and Law Debenture Trust Company
             of New York
21

22           STORCH AMINI MUNVES PC
             BY:  BIJAN AMINI, ESQ.
23                (New York, New York)

24           Counsel for Magten Asset Management
             Corporation
25
```

3

```
1   APPEARANCES (Continued):

2           THE BAYARD FIRM
            BY:  NEIL GLASSMAN, ESQ.
3
                 -and-
4
            PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
5           BY:  ALAN W. KORNBERG, ESQ. and
                 MARGARET PHILLIPS, ESQ.
6                (New York, New York)

7                Counsel for the Plan Committee

8
            NIXON PEABODY LLP
9           BY:  JOHN V. SNELLINGS, ESQ.
                 (Boston, Massachussetts)
10
                 Counsel for Law Debenture Trust Company of
11               New York

12
            EDWARDS & ANGELL
13          BY:  DENISE KRAFT, ESQ.

14               -and-

15          BROWNING, KALECZYC, BERRY & HOVEN, P.C.
            BY:  STANLEY T. KALECZYC, ESQ. and
16               KIMBERLY A. BEATTY, ESQ.
                 (Helena, Montana)
17
                 Counsel for Mike J. Hanson and
18               Ernie J. Kindt

19
            MORRIS, NICHOLS, ARSHT & TUNNELL.
20          BY:  ROBERT J. DEHNEY, ESQ.

21                  -and-

22          DAVIS POLK & WARDWELL
            BY:  D. SCOTT TUCKER, ESQ.
23               (New York, New York)

24               Counsel for Paul, Hastings, Janofsky &
                 Walker, LLP
25
```

4

```
 1   APPEARANCES (Continued):

 2           LANDIS, RATH & COBB
             BY:  JAMIE EDMONSON, ESQ.
 3
                 Counsel for the Ad Hoc Committee of
 4               Note Holders

 5
             FINGER & SLANINA, LLC.
 6           BY:  DAVID L. FINGER, ESQ.

 7               Counsel for Northwestern

 8                   - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              MR. AMINI:  Your Honor, Bijan Amini for Magten as

2    well.

3              On the Paul Hastings case, we're in agreement

4    with everything Ms. Steingart had to say.

5              THE COURT:  You agree with it all?

6              MR. AMINI:  Absolutely.

7              MR. SNELLINGS:  Your Honor, John Snellings for

8    Law Debenture.

9              We also agree with Ms. Steingart's argument.

10             THE COURT:  All right.  So now we'll hear from

11   the folks that understand it's just a bad, bad idea.

12             MR. PIZZURRO:  Good morning, your Honor.

13             THE COURT:  Good morning.

14             MR. PIZZURRO:  Let me address one of the issues

15   that your Honor started out with when it just came up, and

16   that is why this case hasn't settled.

17             Your Honor is aware there was a mediation back in

18   May and the mediation was unsuccessful.  Those of us

19   representing the debtor and Paul Hastings, and they can speak

20   for themselves obviously, but we believe that there is a

21   substantial possibility that a renewed mediation at this

22   point in time with the change of circumstances in the case

23   would be successful, and we have been trying to encourage

24   Magten to participate in that process, so far without

25   success.  But I would like to make it clear, your Honor's

14

1    question why hasn't this case settled --

2         THE COURT:  No.  I didn't say why.  I said it's

3    clear to me that the case isn't capable of settling because

4    of the effort that was put back in through May 12th, I think

5    it was, of 2005, and then you all went out and spent a lot of

6    money briefing, finishing up July and August.

7         MR. PIZZURRO:  Right.

8         THE COURT:  But I'm happy to hear why you think

9    it didn't settle, but I want to be a little careful because

10   there are some substantive arguments in front of me that I

11   don't need to know too much about why it didn't settle.

12   But I understand your position, that if Magten were really

13   as reasonable as they say in their papers, that you all

14   could go back to a renewed effort and this case might go

15   away.

16        MR. PIZZURRO:  That's correct, your Honor.

17   And we all welcome that and would like to have that

18   opportunity.

19        THE COURT:  Now, who would you go back in front

20   of?  Who would you go back with?  Who would you want to go

21   talk to?

22        MR. PIZZURRO:  I think that -- I don't have the

23   name and we don't have a particular individual, but I think

24   that the parties could come, you know, between themselves,

25   or among themselves, to agreement on a mediator, be

1  satisfactory to everybody.  We'd sit down and do this and

2  we'd do it on an expedited basis.  That's the thinking that

3  we have on this.

4          THE COURT:  Now, Magten is not going to tell a

5  Judge that you're not interested in having a brief settlement

6  discussion, are you?

7          MS. STEINGART:  Your Honor, I would never say

8  that, but I must -- I must just make one statement for the

9  Court.

10          THE COURT:  Sure.

11          MS. STEINGART:  When the mediation -- when first

12  the settlement agreement occurred, when Northwestern first

13  sought to renounce the settlement agreement, we sought

14  renewed discussions.  We came to a mediation with principals

15  as everyone did, in good faith.

16          The mediation was not successful.  Immediately

17  after the mediation, we sought another mediation.  As you

18  know, we wrote to the Court.  We asked for another mediator

19  to be appointed for a variety of reasons, but even in

20  addition to that, throughout the summer, so that we could

21  avoid the briefing that we've all had to do, we requested

22  mediation.  We requested discussion.  We sent letters.

23          Your Honor, it was just Friday night that my

24  partner received a call from Northwestern after all of these

25  matters were scheduled, after your Honor had decided the

1    withdrawals of reference that are currently before the Court

2    and after the status conference had been arranged.  Indeed,

3    on the eve, because it has been scheduled for quite a while,

4    your Honor, that Friday, late in the day, my partner received

5    a call about mediation.

6            So, your Honor, you'll have to excuse us from

7    having the point of view that this is a fairly tactical --

8            THE COURT:  A delaying tactic.

9            MS. STEINGART:  Well, yes.  And so to the extent

10    that the Court is interested in sort of -- you know, because

11    we all agree that settlement attempts are better and we're

12    happy to do that, but we would urge the Court that to the

13    extent that that is something that the parties would like to

14    do, that the Court permit us to commence discovery on the

15    issues --

16            THE COURT:  We're not at that issue.

17            MS. STEINGART:  I know that we're not there yet,

18    but I don't think that these can be discussed -- that their

19    desire for mediation at the eleventh hour can be discussed in

20    isolation is all.

21            THE COURT:  You know what happens with bankruptcy

22    lawyers?  I used to do Chapter 11's and then I was saved. .

23    I actually did first day orders.  What was I thinking?

24            But after that, I know it was a few years of

25    experience, what I learned about bankruptcy lawyers -- I

1    mean, bankruptcy lawyers are excellent at settling matters

2    and making decisions.  We in the Courts screw it up, in my

3    view anyway, which is why I'm glad to be out of the

4    substantive work of Chapter 11's.  But the reason I don't

5    want you to talk about the discovery, and I know it's

6    very limited that you want to do, is it's this simple.

7    When these cases get to the next court, sometimes the

8    transcripts of what is discussed isn't as clear, and I've

9    watched a number of cases, not just from this district,

10   where they make decisions based on a single statement

11   somewhere or reference outside of the context of what

12   we're really talking about.

13           So I want you to understand, I'm not cutting

14   you off about that discovery.  It's up here.  It's in the

15   back a little bit, because I thought what really joined you

16   in the dispute was whether 9019 or the confirmation appeal go

17   forward.

18           I'm going to give you a chance to talk about that

19   discovery, but I just don't want the record to get messed

20   up.

21           MS. STEINGART:  Okay.  I understand.

22           THE COURT:  I want it to be real clear so when

23   law clerks in the Third Circuit read it, they'll know what we

24   were talking about.

25           So we're just talking a little bit about

1   settlement here that Friday night, apparently, your folks.

2   They're saying they are willing to talk to you but they don't

3   want to be engaged for some delaying tactic.  I'm sure you

4   wouldn't come to me for some purpose of delay?

5           MR. PIZZURRO:  No.  I can assure the Court and I

6   can assure Magten and their counsel that both my client and

7   the counsel are acting in good faith.  This is not a delaying

8   tactic.  In fact, we have offered and are willing to proceed

9   with mediation on an expedited basis.  We don't want to delay

10  this.  We want to get it done.  We want to get it done

11  quickly.

12          THE COURT:  Let me ask you this question

13  following up, because what they've essentially said is, they

14  tried to give me some background, but they really didn't

15  oppose your suggestion.  They just want to be sure that the

16  case is going to move forward.  If by chance there's a little

17  bit of strategic planning going on here for delay or strategy

18  for delay, I asked you this before, who would you go to?  Do

19  you have somebody to go to who could be quick?

20          MR. PIZZURRO:  Well --

21          THE COURT:  Do you have a suggestion?

22          MR. PIZZURRO:  Well, our suggests --

23          THE COURT:  Give me your suggests.

24          MR. PIZZURRO:  We have come up with -- we've got

25  four names of people that we would present to Magten and,

# Exhibit H

1 | James H. Goetz
    | J. Devlan Geddes
2 | **GOETZ, GALLIK & BALDWIN, P.C.**
    | 35 North Grand
3 | P.O. Box 6580
    | Bozeman, MT 59771-6580
4 | Ph:   406-587-0618
    | Fax:  406-587-5144
5 |

6 | Bonnie Steingart    (*Pro Hac Vice* Application forthcoming)
    | John W. Brewer    (*Pro Hac Vice* Application forthcoming)
7 | **FRIED. FRANK, HARRIS, SHRIVER & JACOBSON, LLP**
    | One New York Plaza
8 | New York, New York 10004
    | (212) 859-8000

9 | ATTORNEYS FOR PLAINTIFF

FILED
BUTTE, MT

'04 APR 19  AM 10 57

PATRICK E. DUFFY, CLERK

BY _____

DEPUTY CLERK

10

11                      IN THE UNITED STATES DISTRICT COURT

12                          FOR THE DISTRICT OF MONTANA

13                                 BUTTE DIVISION

                                 * * * * * * * *

14

15 | MAGTEN ASSET MANAGEMENT CORPORATION,          Cause No. CO-04-36-BU-RFC
16 |                        Plaintiff,
17 |             -against-                          **COMPLAINT AND
                                                    DEMAND FOR JURY TRIAL**
18 | MIKE J. HANSON, JACK D. HAFFEY, ERNIE J.
    | KINDT, and ELLEN M. SENECHAL,
19 |
    |                        Defendants.
20

21          Plaintiff Magten Asset Management Corporation ("Magten"), by its undersigned attorneys,

22 hereby alleges in support of its Complaint on personal knowledge as to its own acts and on information

23 and belief as to all other matters as follows:

24                                   **INTRODUCTION**

25          1.    Magten is a creditor of Clark Fork and Blackfoot, LLC ("Clark Fork"), formerly

26 known as NorthWestern Energy, LLC ("NWE"), and prior to that known as The Montana Power

27 Company LLC ("MPLLC"). Magten brings this lawsuit to obtain redress for the wrongful actions of

28 defendants Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen M. Senechal, all of whom were

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 1

04/21/2004 07:49 FAX 4065875144          GOETZ LAW FIRM                    ☐003/011

1  officers of Clark Fork on November 15, 2002 and enabled the transfer on that date (the "Transaction")

2  of Clark Fork's key assets — electric, natural gas and propane utility assets (the "Montana Utility

3  Assets") — to its corporate parent NorthWestern Corporation ("NorthWestern") without adequate

4  consideration. The Transaction unjustly enriched NorthWestern by hundreds of millions of dollars while

5  destroying Clark Fork's solvency and thus its ability to meet its obligations to Magten and its other

6  creditors. The defendants, as officers of Clark Fork, had a fiduciary duty to Clark Fork's creditors not

7  to engage in transactions that would render Clark Fork insolvent. In connection with the Transaction,

8  Clark Fork purported to have NorthWestern assume Clark Fork's liabilities, but NorthWestern's other

9  liabilities were so massive that, even after paying inadequate consideration to Clark Fork for the

10  Montana Utility Assets, NorthWestern could not pay its own pre-existing creditors, and filed a

11  voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result of defendants'

12  actions, Magten is now owed well in excess of $20 million dollars by a company which defendants

13  rendered unable to meet its obligations to Magten. Magten seeks appropriate compensatory and

14  punitive damages, in an amount to be determined at trial.

15                          **THE PARTIES**

16        2.      Plaintiff is a corporation validly organized and doing business under the laws of the

17  State of Delaware with its principal place of business in the State of New York and is, therefore,

18  deemed to be a citizen of Delaware and New York pursuant to 28 U.S.C § 1332(c)(1).

19        3.      Defendant Mike J. Hanson is a citizen of the State of Montana and is believed to reside

20  at 1805 C St., Butte, Montana 59701. As of November 15, 2002, Hanson was Chief Executive

21  Officer of Clark Fork.

22        4.      Defendant Jack D. Haffey is a citizen of the State of Montana, and is believed to reside

23  at 2101 Garfield St., Anaconda, Montana 59711. As of November 15, 2002, Haffey was President of

24  Clark Fork.

25        5.      Defendant Ernie J. Kindt is a citizen of the State of Montana, and is believed to reside

26  at 5 Amber Way, Butte, Montana 59701. As of November 15, 2002 Kindt was Vice President and

27  Chief Accounting Officer of Clark Fork.

28        6.      Defendant Ellen M. Senechal is a citizen of the State of Montana, and is believed to

**COMPLAINT AND DEMAND FOR JURY TRIAL**                                    PAGE 2

04/21/2004 07:49 FAX  4065875144        GOETZ LAW FIRM                      ☒004/011

1    reside at 75 Park Drive, Clancy, Montana 59634.  As of November 15, 2002, Senechal was Vice

2    President, Treasurer and Chief Financial Officer of Clark Fork.

3                                    **JURISDICTION AND VENUE**

4        7.        This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

5    1332, as it is between citizens of different States and the matter in controversy exceeds the sum or

6    value of $75,000, exclusive of interest and costs.

7        8.        Venue is proper pursuant to 28 U.S.C. 1391, because all defendants reside in this

8    judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this

9    judicial district.

10                **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

11   **The Montana Power Company**

12       9.        The Montana Power Company ("Montana Power") was incorporated in 1961 under

13   the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger

14   of four regional electric companies.

15       10.       By the year 2000, Montana Power was engaged in activities related to

16   telecommunications and energy related activities including activities in the fields of oil, coal, natural gas,

17   and electricity.

18       11.       In November 1996, Montana Power and Bank of New York entered into that certain

19   Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities (the "Indenture").

20       12.       Pursuant to the Indenture, Montana Power issued the Junior Subordinated Interest

21   Debentures (the "Junior Debentures").

22       13.       At or about the same time, pursuant to the Amended and Restated Trust Agreement

23   (the "Trust Agreement") between itself and various other persons, Montana Power created Montana

24   Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act.

25   Bank of New York was designated as the Property Trustee of the Trust as well as serving as Trustee

26   under the Indenture.

27       14.       As detailed below, as of November 2002, Clark Fork had succeeded to Montana

28   Power's obligations with respect to the Junior Indentures.  The Bank of New York has been

**COMPLAINT AND DEMAND FOR JURY TRIAL**                                     **PAGE 3**

1   succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law

2   Debenture Trust Company of New York ("Law Debenture").

3          15.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued

4   the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS").

5          16.    The Trust holds 100% of the Junior Debentures, with a total face amount of

6   approximately $67 million, which constitute its sole meaningful asset. The value of the QUIPS is

7   entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay

8   interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would then in turn be

9   passed on by the Trust to the holders of the QUIPS.

10         17.    The Junior Debentures were not sold directly to investors; rather, purchasing the

11  QUIPS provided investors with substantially the same rights and the same potential investment return as

12  they would have had had they been able to own Junior Debentures directly. The entire structure of the

13  transaction was designed to put investors in the same position as if they had directly purchased the

14  Junior Debentures, while providing Montana Power with a more favorable accounting treatment than

15  would have been possible had the Junior Debentures been sold directly to the investing public.

16         18.    Accordingly, in Section 610 of the Indenture Clark Fork (as successor to Montana

17  Power) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the

18  Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the

19  Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue

20  directly to enforce the Property Trustee's rights.

21         19.    Magten owns in excess of 33% of the QUIPS.

22         20.    In connection with the Trust Agreement and the Indenture, Montana Power also

23  entered into a Guarantee Agreement with the Bank of New York as Guarantee Trustee (the

24  "Guarantee Agreement"). Pursuant to the Guarantee Agreement, Montana Power, as guarantor,

25  agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the

26  Trust, and to the extent the Property Trustee had funds available in a specified account. As with the

27  Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original

28  roles and responsibilities of Montana Power and Bank of New York respectively.

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 4

<u>**The Sale of the Montana Power Company's Utility Assets**</u>

21.    On March 28, 2000, Montana Power announced plans to restructure its business.  This restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane utility assets, in order to allow Montana Power to focus on telecommunications.

22.    On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with NorthWestern, pursuant to which NorthWestern agreed to purchase control of the Montana Utility Assets, then owned by Montana Power, in a multi-step transaction.

23.    On February 13, 2002, Montana Power merged its energy assets into MPLLC (the "Merger").  As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

24.    Specifically, in connection with the Merger, on February 13, 2002, pursuant to the First Supplemental Indenture, MPLLC assumed the obligations of Montana Power under the Indenture.

25.    In addition, in connection with the Merger, on February 13, 2002, pursuant to a letter agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

26.    On February 15, 2002, NorthWestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash.  None of this consideration was received or retained by MPLLC.  It was thus not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

27.    On March 19, 2002, MPLLC was renamed NWE.

28.    On August 13, 2002, NorthWestern entered into the Second Supplemental Indenture, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the Indenture.

29.    On August 13, 2002, NorthWestern entered into an Amendment to the Guarantee Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the Guarantee Agreement.

30.    On August 13, 2002, NorthWestern entered into a letter agreement amending the Trust Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

**COMPLAINT AND DEMAND FOR JURY TRIAL**                                    PAGE 5

1  the Trust Agreement.

2  **The Transfer**

3      31.     On November 15, 2002, defendants, as officers of Clark Fork, carried out a scheme

4  to defraud, injure and deprive Magten of the ability to receive the benefits due to it from Clark Fork in

5  connection with the Junior Debentures and the QUIPS, by, in the Transaction, transferring substantially

6  all of Clark Fork's assets, the Montana Utility Assets, to NorthWestern without receiving adequate

7  consideration in return.  Clark Fork received no cash for the Transfer, and the consideration

8  purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets

9  were transferred to NorthWestern, and only approximately $700 million dollars in Clark Fork liabilities

10  were purportedly assumed by NorthWestern.  Indeed, with respect to some if not all of the liabilities

11  purportedly assumed, NorthWestern was already a co-obligor with Clark Fork prior to the Transaction

12  and/or Clark Fork remained obligated jointly and severally with NorthWestern subsequent to the

13  Transaction, thus making any purported assumption of the liabilities in connection with the Transaction

14  valueless.

15      32.     In particular, NorthWestern was already a co-obligor as to Clark Fork's obligations

16  with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained

17  obligated jointly and severally with NorthWestern with respect to the Junior Indentures and QUIPS

18  subsequent to the Transaction.  Indeed, Clark Fork requested Bank of New York (at the time still the

19  Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork

20  from its continuing obligations under the Indenture, but Bank of New York refused to provide such a

21  release.

22      33.     As an immediate result of the consummation of the Transfer, Clark Fork was insolvent.

23  Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior

24  Debentures and QUIPS and did not do so.

25      34.     Both prior to and following the Transaction, NorthWestern was itself insolvent, making

26  both its August 2002 assumption of liabilities with respect to the Junior Debentures and QUIPS and any

27  purported further assumption of those liabilities in connection with the Transaction of little or no value to

28  the holders of the QUIPS and other creditors of Clark Fork.  Even the hundreds of millions of dollars

COMPLAINT AND DEMAND FOR JURY TRIAL                                          PAGE 6

1   by which it was unjustly enriched by the Transaction were insufficient to overcome the massive

2   imbalance between assets and liabilities created by its various other failed business ventures.

3       35.     The defendants all knew, should have known, and/or were reckless with respect to

4   knowing that Clark Fork would be rendered insolvent as a result of the Transaction and that

5   NorthWestern was insolvent both before and after the Transaction.

6       36.     No interest on the Junior Debentures was paid by either NorthWestern or Clark Fork

7   since prior to September 14, 2003. In excess of $2 million of interest on the Junior Debentures is now

8   past due. If paid, that interest would have been passed on by the Trust to the holders of the QUIPS

9   such as Magten. Moreover, the entire principal amount of the Junior Debentures was accelerated

10  pursuant to the terms of the Indenture no later than September 14, 2003.

11      37.     Following the Transaction, Clark Fork retained only the Milltown Dam, a two

12  megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license

13  that expires in 2007, and the related environmental liabilities.

14      38.     Following the Transaction, NorthWestern operated the Montana Utility Assets as part

15  of NorthWestern's NorthWestern Energy Division.

16      39.     After the Transaction, NWE remained a subsidiary of NorthWestern and on November

17  20, 2002, NWE was re-named Clark Fork.

18      40.     Clark Fork continues to operate the Milltown Dam.

19      41.     Clark Fork is entirely dependent upon NorthWestern for continued funding of the

20  Milltown Dam and its corporate existence, and NorthWestern is required, under certain agreements

21  with Clark Fork, which require NorthWestern to pay any costs and expenses that arise in connection

22  with the operation of the Milltown Dam.

23      42.     Less than a year later, on September 14, 2003, NorthWestern filed a voluntary petition

24  for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the

25  District of Delaware.

26      43.     The Montana Utility Assets generate approximately 80% of NorthWestern's

27  consolidated EBITDA, although NorthWestern did not pay fair value for those assets, thus injuring

28  Magten and Clark Fork's other creditors.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                                          **PAGE 7**

44.   The Montana Utility Assets are now available to all creditors of NorthWestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in NorthWestern's reorganization plan.

45.   On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in NorthWestern's bankruptcy case for leave to commence an adversary proceeding against NorthWestern seeking to have the Transaction set aside as a fraudulent conveyance.

## STATEMENT OF CLAIM

### FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

46.   Plaintiff repeats and realleges paragraphs 1–45 and incorporates them herein by reference.

47.   Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, defendants, as officers of Clark Fork, owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

48.   The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

49.   The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

50.   Defendants breached their fiduciary duties to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

51.   Defendants also breached their fiduciary duties to the Trust and Magten's predecessors

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 8

1  in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and

2  QUIPS to NorthWestern, when they knew NorthWestern was insolvent and would remain insolvent,

3  and would thus be unable to perform those obligations.

4      52.    By reason of the foregoing acts, practices and course of conduct, the defendants have

5  breached their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss,

6  in an amount to be proven at trial, but in excess of $20 million.

7      53.    Punitive damages in an amount to be determined at trial should also be awarded due to

8  the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

9

### PRAYER FOR RELIEF

10

11

12      WHEREFORE, plaintiff respectfully requests that this Court enter judgment against defendants

13  as follows:

14      1.    Awarding plaintiff compensatory and punitive damages, in an amount

15  determined at trial but in excess of $20 million;

16      2.    Awarding plaintiff all allowable costs, attorneys' fees and other litigation

17  expenses to the extent recoverable under law; and

18      3.    Awarding plaintiff such other and further relief as to this Court may be just,

19  proper and equitable.

20      DATED this 15th day of April, 2004.

21

22              GOETZ, GALLIK & BALDWIN, P.C.

23

24

25

26  By: _____
27  for:    James H. Goetz

         ATTORNEYS FOR PLAINTIFF

28

COMPLAINT AND DEMAND FOR JURY TRIAL                                PAGE 9

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 15th day of April, 2004.

GOETZ, GALLIK & BALDWIN, P.C.

By: _James H. Goetz_

ATTORNEYS FOR PLAINTIFF

E:\JIM\Karen\Magten Asset Mgmt Corp 4032\Pleadings\Complaint.4 15 04.wpd

COMPLAINT AND DEMAND FOR JURY TRIAL                    PAGE 10