# Exhibit I

David R. Paoli
PAOLI & SHEA, P.C.
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
Facsimile: (406) 542-3332

Bijan Amini (*Pro Hac Vice* Application forthcoming)
STORCH AMINI & MUNVES, P.C.
405 Lexington Avenue 51st Floor
New York, New York 10174
Telephone: (212) 490-4100
Facsimile: (212) 490-4208



FILED

MAY 20 2004

LORI MALONEY CLERK

By_____
                Deputy Clerk

   *Attorneys for Plaintiff*

## MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION<br>Suing individually and derivatively on behalf of CLARK<br>FORK AND BLACKFOOT, LLC<br><br>    Plaintiff,<br><br>     v.<br><br>PAUL HASTINGS JANOFSKY & WALKER LLP,<br><br>    Defendant. | Cause No. _DV-04-131_<br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

  Magten Asset Management Corporation ("Magten" or the "Plaintiff"), by and through its

attorneys Storch Amini & Munves, P.C., and Paoli & Shea, P.C., as and for its Complaint against

Paul Hastings Janofsky & Walker LLP ("Paul Hastings" or the "Defendant") alleges as follows:

### INTRODUCTION

  1.  This complaint involves a scheme to defraud the creditors of Northwestern

Energy LLC, now known as Clark Fork and Blackfoot LLC (herein, "Clark Fork"), and

Defendant's breach of its duties to Clark Fork and its creditors in connection therewith. To

cover up losses from poor investment decisions, the Northwestern Corporation ("Northwestern") decided to strip the assets of Clark Fork, its solvent and profitable subsidiary. In doing so, Northwestern defrauded the creditors of the subsidiary, including a trust that had invested in the subsidiary on the basis of those very same valuable assets.

2.      The chronology of the events in question is stark testimony to the fraudulent nature of the scheme. In September 2000, Northwestern agreed to acquire the profitable transmission assets and the Milltown Dam of the Montana Power Company. By the time the transaction was consummated on February 15, 2002, Northwestern was drowning in red ink from bad investment decisions. A mere nine months later, slowed only by regulatory requirements, Northwestern transferred Clark Fork's profitable assets of between $1.1 and 1.4 billion in value for no payment whatsoever. Consideration supplied in the form of assumption of $700 million in Clark Fork's debt, on its face inadequate, was in fact itself illusory. Northwestern promptly encumbered the assets with new debt to temporarily cover its ineptitude, disenfranchising Clark Fork's creditors altogether. A mere ten months later, Northwestern was bankrupt.

3.      The officers and directors of Clark Fork were fully complicit in placing the company they had a duty to protect into insolvency. They willfully disregarded the fiduciary duties they owed to the creditors of Clark Fork by blindly obeying the orders of their parent.

4.      The Defendant served as counsel to Clark Fork, advising these same officers and directors. While the scheme's premise was simple, the execution of it was quite complex. Paul Hastings' assistance was crucial in guiding Northwestern and Clark Fork through the complex legal and regulatory hurdles necessary to effect Northwestern's desired result.

5.      In reality, Paul Hastings, which was hopelessly conflicted, devised, structured and negotiated the entire scheme. As counsel to Northwestern, the only party that benefited in the

transaction, Paul Hastings not only aided and abetted the Clark Fork officers and directors fiduciary breaches, but breached its own duties to Clark Fork in merely doing whatever it took to aid Northwestern in its fraudulent undertaking.

6.     By this action, Magten, as a creditor of Clark Fork and by virtue of its rights to enforce obligations under the Trust, seeks damages from Paul Hastings for its role in aiding and abetting the breach of fiduciary duties owed to the creditors of Clark Fork, aiding and abetting the fraudulent transfer of Clark Fork's assets to Northwestern, and its malpractice.

## THE PARTIES

7.     The Plaintiff, Magten, is a corporation organized under the laws of the State of Delaware, with its principle place of business in the State of New York.

8.     The Defendant, Paul Hastings, is a limited liability partnership organized under the laws of California.  It has significant offices in New York.  Many of its partners reside in the state of New York.

9.     Northwestern is a corporation incorporated in the State of Delaware with its corporate headquarters in Sioux Falls, South Dakota.

10.    Clark Fork and Blackfoot LLC is a Montana corporation, with its principal place of business in Montana.  The energy assets at stake in this litigation were all situated in Montana.

## JURISDICTION

11.    This Court has jurisdiction over this action pursuant to Rule 4(B) of the Montana Rules of Civil Procedure.

12.    In connection with its representation of Clark Fork, Paul Hastings regularly communicated with and visited Clark Fork at its location in Montana.

13.     Additionally, in connection with the transactions complained of, at least throughout 2002, Paul Hastings represented Clark Fork before the Federal Energy Regulatory Commission.

14.     As set forth below, in connection with the acts complained of herein, Paul Hastings caused over $1 billion of Clark Fork's assets located in the State of Montana to be transferred out of Clark Fork and out of the reach of Clark Fork's creditors.

## BACKGROUND

15.     The Montana Power Company was incorporated in 1961, as successor to an energy corporation formed in 1912. It operated as the sole gas and electric utility throughout the state of Montana.

16.     In 1996, the Montana Power Company and the Bank of New York ("BNY") as Trustee entered into an Indenture for the Unsecured Subordinated Debt Securities dated November 1, 1996 (the "Indenture"), pursuant to which the Montana Power Company issued $65 million in 8.45% Junior Subordinated Debentures (the "Junior Debentures").

17.     At or about the same time, pursuant to the Amended and Restated Trust Agreement (the "Trust Agreement") between itself and various other persons, the Montana Power Company created Montana Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act. BNY was designated as the Property Trustee of the Trust as well as serving as Trustee under the Indenture.

18.     As detailed below, as of November 2002, Clark Fork had succeeded to the Montana Power Company's obligations with respect to the Junior Indentures. The BNY has been succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law Debenture Trust Company of New York ("Law Debenture").

19.    The Junior Debentures were not sold directly to investors. Instead, they were sold to the Property Trustee of the Trust. The Trust holds 100% of the Junior Debentures, with a total face amount of approximately $67 million, which constitute its sole meaningful asset.

20.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS"). The value of the QUIPS is entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would, in turn, be passed on by the Trust to the holders of the QUIPS.

21.    The Trust's purpose, structured solely for accounting purposes, is to hold all of the Junior Debentures. Purchasers of QUIPS acquire an indirect undivided beneficial interest in the Junior Debentures and obtain substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

22.    The entire structure of the transaction was designed to put investors in the same position as if they had directly purchased the Junior Debentures, while providing the Montana Power Company with a more favorable accounting treatment than would have been possible had the Junior Debentures been sold directly to the investing public.

23.    In Section 610 of the Indenture, Clark Fork (as successor to the Montana Power Company) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue directly to enforce the Property Trustee's rights.

24.    Magten owns in excess of 33% of the QUIPS.

25.    In connection with the Trust Agreement and the Indenture, Montana Power also entered into a Guarantee Agreement with the BNY as Guarantee Trustee (the "Guarantee Agreement"). Pursuant to the Guarantee Agreement, the Montana Power Company, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust, and to the extent the Property Trustee had funds available in a specified account. As with the Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original roles and responsibilities of the Montana Power Company and BNY, respectively.

## EVENTS LEADING UP TO THE CLAIMS

26.    In 1997, the Montana legislature passed the Energy Deregulation Act, deregulating the administrative controls Montana had put on the Montana Power Company for the better part of a century. Almost immediately, the Montana Power Company began looking for ways to unload its energy assets ("The Montana Power Assets"), its long term debt and its environmental liabilities.

27.    The plan developed as follows: the Montana Power Company transferred the Montana Power Assets into a new, wholly-owned subsidiary to which it also transferred the liability saddled Milltown Dam as well as the obligation to fund the Junior Debentures. Northwestern then purchased the Montana subsidiary and in due turn transferred the assets to itself, leaving the liabilities unfunded. As Northwestern later stated (see below) the sole purpose of structuring the transaction this way was to avoid the liabilities associated with these assets.

28.    On September 29, 2000, the Montana Power Company entered into a Unit Purchase Agreement with Northwestern. The Montana Power Company agreed to create a

subsidiary, the Montana Power Company LLC ("MPLLC") to which it would transfer the Montana Power Assets. Northwestern agreed to purchase this subsidiary.

29.    Paul Hastings represented Northwestern in this transaction and was instrumental in structuring and negotiating it. Another of Paul Hastings' clients, Credit Suisse First Boston Corporation ("CSFB"), served as Financial Consultant for Northwestern on the transaction.

30.    Over the next two years, Paul Hastings assisted Northwestern in clearing the state and federal regulatory hurdles necessary to consummate the purchase of MPLLC.

31.    However, by October of 2001, Northwestern and Paul Hastings knew that Northwestern was running out of funds. Therefore, Paul Hastings, as counsel to Northwestern, assisted Northwestern in preparing a $720 million securities offering in which Paul Hastings' other client, CSFB, would act as lead initial purchaser and underwriter of $250 million 7 7/8% Five Year Notes and $470 million 8 ¾% Ten Year Notes. That purchase agreement was finally signed March 8, 2002.

32.    To finance the acquisition of MPLLC, on January 14, 2002, Northwestern entered into a $1 billion credit agreement with CSFB and other lenders. The credit facility consisted of a $280 million revolving credit facility and a $720 million acquisition term loan. CSFB, Paul Hastings' client, also served as administrative agent. Paul Hastings represented Northwestern in connection with this credit agreement.

33.    On February 13, 2002, following the clearance of regulatory hurdles, the Montana Power Company merged the Montana Power Assets into MPLLC (the "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

34.     On February 15, 2002, Northwestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this consideration was received or retained by MPLLC. Thus, it was not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

35.     Paul Hastings represented Northwestern in its purchase of MPLLC. In connection with this purchase, Paul Hastings issued an Opinion Letter to the Securities and Exchange Commission ("SEC") regarding Northwestern's Form U-1 Application. In it, Paul Hastings represented that, among other things, the purchase of MPLLC would "not violate the legal rights of the holders of any securities issued by Northwestern or any 'associate company of Northwestern'.

36.     In its Form U-1 Application, Northwestern maintained that it was exempt from the stringent requirements of the Federal Public Utility Holdings Act ("PUHCA") in part on the grounds that its utility interests comprised only a small and not substantial part of Northwestern's business. This statement to the SEC was materially false. Through the purchase of the Montana Utility Assets, Northwestern's most valuable revenue producing arm would be those utility assets. Paul Hastings represented Northwestern on this filing and submitted its Opinion Letter in connection with it.

37.     Furthermore, in its Form U-1 Application, Northwestern revealed that the *sole* purpose of structuring the acquisition so that Northwestern would first purchase a subsidiary and then a few months later transfer the assets to itself was to avoid the liabilities associated with those assets.

38.    On March 19, 2002, MPLLC was renamed Northwestern Energy LLC ("Northwestern Energy"). Northwestern Energy was a duly organized Montana limited liability company. It is now known as Clark Fork.

## THE FRAUDULENT TRANSFER

39.    By the time Northwestern acquired control of Clark Fork in 2002, Northwestern was insolvent. Consequently, Northwestern and its counsel Paul Hastings worked out a plan whereby Northwestern would acquire the assets of Clark Fork for vastly less consideration than they were worth. Then they would immediately apply to borrow additional funds.

40.    On August 13, 2002, in accordance with the plan worked out by Paul Hastings, Northwestern entered into a series of agreements whereby it assumed on a joint and several basis with Clark Fork all of Clark Fork's obligations under the Indenture, the Guarantee Agreement and the Trust Agreement. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

41.    This transfer was illusory in that Northwestern did not have the resources by which to meet the assumed obligations. Northwestern was insolvent both immediately before and immediately after the assumption of these liabilities. Paul Hastings knew or should have known these facts.

42.    On November 15, 2002, in accordance with the prearranged plan worked out by Paul Hastings, Clark Fork and Northwestern entered into the Asset Transfer and Stock Purchase Agreement (the "Asset Transfer"), discussed below. On information and belief, Paul Hastings structured the transaction, and actually drafted the Asset Transfer as counsel to both Northwestern and Clark Fork.

43.     Through this Asset Transfer, the officers of Clark Fork and Northwestern, carried out a scheme to defraud, injure and deprive the Trust of the ability to receive the benefits due to it from Clark Fork in connection with the Junior Debentures, and consequently holders of the QUIPS, by, in the Transaction, transferring substantially all of Clark Fork's assets, to Northwestern without receiving adequate consideration in return.  Clark Fork received no cash for the Transfer, and the consideration purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets were transferred to Northwestern, and only approximately $700 million dollars in Clark Fork liabilities were purportedly assumed by Northwestern.  Indeed, with respect to some if not all of the liabilities purportedly assumed, Northwestern was already a co-obligor with Clark Fork prior to the Transaction and/or Clark Fork remained obligated jointly and severally with Northwestern subsequent to the Transaction, thus making any purported assumption of the liabilities in connection with the Transaction valueless.  Northwestern's assumption of the debt was illusory in any event, having already predetermined to encumber the very assets that were available to satisfy them to repay prior losses, effectively leaving Clark Fork's creditors without recourse.

44.     In particular, Northwestern was already a co-obligor as to Clark Fork's obligations with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained obligated jointly and severally with Northwestern with respect to the Junior Indentures and QUIPS subsequent to the Transaction.  Indeed, Clark Fork, through Paul Hastings, requested BNY (at the time still the Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork from its continuing obligations under the Indenture, but BNY refused to provide such a release.

45.    As an immediate result of the consummation of the Transfer, Clark Fork was insolvent. Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior Debentures and QUIPS and did not do so.

46.    Under the Asset Transfer, Clark Fork transferred substantially all of its assets, the energy assets from the Montana Power Company, and retained only the Milltown Dam. The Milltown Dam was, and still is, saddled with enormous environmental liabilities. The Milltown Dam operates under a license set to expire in 2007.

47.    Also in connection with the Asset Transfer, and also in accord with the plan devised by Paul Hastings, on November 15, 2002, Northwestern purported to execute a Third Supplemental Indenture, a Guarantee Assumption Agreement, and a Trust Assumption Agreement pursuant to which the Debtor would assume all of Clark Fork's obligations on the Junior Debentures. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

48.    Article Eleven of the Indenture purports to release the Montana Power Company (or its successor in interest) upon the transfer of substantially all of the assets of the Montana Power Company if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

49.    Additionally, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

## EVENTS FOLLOWING THE ASSET TRANSFER

50.     Following the Asset Transfer, Northwestern operated the energy assets it had sought in 2000 and acquired through the assistance of Paul Hastings as part of its Northwestern Energy Division.

51.     On November 20, 2002, Clark Fork became the official name of the subsidiary.

52.     On December 17, 2002, only days thereafter, Northwestern entered into a new $390 million senior secured credit agreement with CSFB and other financial institutions. This credit agreement was partly secured by $280 million in aggregate principal amount of First Mortgage Bonds, which granted a first mortgage in the energy assets previously held by Clark Fork.

53.     Ten months after the Asset Transfer, on September 14, 2003, Northwestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

54.     The Montana Utility Assets generate approximately 80% of Northwestern's consolidated EBITDA, although Northwestern did not pay fair value for those assets, thus injuring Magten and Clark Fork's other creditors.

55.     The Montana Utility Assets are now available to all creditors of Northwestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in Northwestern's reorganization plan.

56.     On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in Northwestern's bankruptcy case for leave to commence an adversary

proceeding against Northwestern seeking to have the Asset Transfer set aside as a fraudulent transfer.

57.    On April 8, 2004 Magten filed a complaint against Northwestern in the United States Bankruptcy Court for the District of Delaware to avoid the Asset Transfer as a fraudulent transfer.

58.    On April 19, 2004, Magten filed a complaint against the officers and directors of Clark Fork for breach of fiduciary duty in the District Court of Montana, Butte Division.

## FIRST CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duties Owed to Creditors of Clark Fork in the Zone of Insolvency

59.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

60.    Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, the officers of Clark Fork owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

61.    The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

62.    The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

63.    The Defendant aided and abetted the officers of Clark Fork in breaching their fiduciary duties owed to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

64.    The Defendant also aided and abetted the officers of Clark Fork in breaching their fiduciary duties to the Trust and Magten's predecessors in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and QUIPS to Northwestern, when they knew Northwestern was insolvent and would remain insolvent, and would thus be unable to perform those obligations.

65.    Paul Hastings knew or should have known that the conduct of the Clark Fork officers constituted a breach of their fiduciary duties. However, conflicted due to their joint representation of Northwestern, Paul Hastings substantially assisted and encouraged these breaches in order to benefit its long time client, Northwestern.

66.    By reason of the foregoing acts, practices and course of conduct, the Defendant aided and abetted the Clark Fork officers and directors breach of their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss, in an amount to be proven at trial.

67.    Punitive damages in an amount to be determined at trial should also be awarded due to the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraudulent Transfer

68.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

69.    The Montana Uniform Fraudulent Transfer Act § 31-2-333, MCA provides that a transfer made by a debtor is fraudulent as to any creditor where it was made 1) with actual intent to hinder, delay or defraud any creditor of the debtor, or 2) without receiving a reasonably equivalent value in exchange and the debtor was engaged or about to engage in a business for which its remaining assets were unreasonably small or believed, or reasonably should have believed, that the debtor would incur debts beyond the Debtor's ability to pay as they came due.

70.    Pursuant to § 31-2-333, MCA in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether:  the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

71.    The Montana Uniform Fraudulent Transfer Act § 31-2-334, MCA provides that a transfer made by a debtor is fraudulent as to creditors whose claims arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time.

72.    Magten was a creditor of Northwestern and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

73.    Northwestern was a parent of Clark Fork and, as such, exercised complete control over Clark Fork.  As a result of this relationship, Northwestern qualified as an insider under Montana law.

74.    In connection with the Transfer, Clark Fork transferred assets to Northwestern that are valued between $1.15 billion and $1.4 billion, and the only alleged consideration

received for the Transfer was the assumption of approximately $700 million in liabilities, itself illusory.

75.    Prior to the Transfer, Clark Fork was a solvent entity.    The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become insolvent.

76.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity.  The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become undercapitalized.

77.    Because the Montana Utility Assets that Northwestern received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Northwestern, Clark Fork did not receive reasonably equivalent value for the transfer.

78.    Paul Hastings knew or should have known that by structuring the Asset Transfer the way it did, Clark Fork would be rendered insolvent and the QUIPS holders would be hindered, delayed or defrauded.

79.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork with unreasonably small remaining assets or without ability to pay its debts as they became due.

80.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork insolvent as a result.

81.    Paul Hastings provided substantial assistance to Northwestern and Clark Fork to effect this fraudulent transfer.  The Defendant substantially assisted the directors and officers of Clark Fork by structuring and effectively orchestrating the entire Asset Transfer.

82.    Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

## THIRD CAUSE OF ACTION

### Civil Conspiracy to Conduct Fraudulent Transfer

83.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

84.    Paul Hastings and Northwestern intended when fraudulently transferring the Montana Utility Assets of Clark Fork to Northwestern to hinder, delay or defraud the creditors of Clark Fork.

85.    Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving reasonably equivalent value in exchange, rendering Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

86.    Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving a reasonably equivalent value in exchange, leaving Clark Fork with only the liability saddled Milltown Dam, and rendering Clark Fork insolvent.

87.    Paul Hastings and Northwestern agreed on a course of action whereby Paul Hastings and Northwestern would enact the requisite agreements in order conduct that fraudulent transfer.

88.    In furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the

Montana Uniform Fraudulent Transfers Act in order to hinder, delay or defraud the creditors of Clark Fork.

89.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange and Clark Fork became insolvent as a result.

90.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange rendering Clark Fork engaged in a business or transaction for which the remaining assets of Clark Fork were unreasonably small.

91.    As damages, Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

## FOURTH CAUSE OF ACTION

### Malpractice
**Magten suing directly, on behalf of the Trust and derivatively on behalf of Clark Fork**

92.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

93.    The Defendant owed a duty of care to Clark Fork.

94.    The Defendant also owed a duty of care to Northwestern.

95.    The Defendant breached its duty to Clark Fork by failing to disclose its conflict of interest to Clark Fork's officers and directors.

96.    Because Paul Hastings failed to disclose its conflict of interest to Clark Fork and instead structured a transaction for Clark Fork whereby Clark Fork was forced to relinquish substantially all of its assets, Clark Fork and its creditors suffered an amount to be determined at trial.

97.    In as much as Paul Hastings' actions caused Clark Fork to become insolvent, and enter the zone of insolvency, Magten, on its own behalf, on behalf of the Trust and on behalf of Clark Fork, is entitled to recover for Paul Hastings' malpractice.

WHEREFORE, Plaintiff prays for all damages caused by the actions of defendant and enter judgment against defendant as follows:

1.    For Plaintiff's compensatory damages;

2.    An award of punitive damages to punish defendant for its intentional and malicious conduct;

3.    For Plaintiff's costs, attorneys' fees and any other recoverable expenses related to this litigation; and

4.    Such further and additional relief this Court deems just and proper.

DATED this 19th day of May, 2004.

PAOLI & SHEA, P.C.

By: _David R. Paoli_____
David R. Paoli
*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues.

DATED this 19th day of May, 2004.

PAOLI & SHEA, P.C.

By: _David R. Paoli_____

David R. Paoli
*Attorney for Plaintiff*

# Exhibit J

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | Case No. 03-12872 (CGC) |
| Debtor. | ) | |
| | ) | |

## **MEMORANDUM DECISION**

Jess H. Austin, III
Karol K. Denniston
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308

David L. Finger
Charles Slanina
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155

- and -

Dennis E. Glazer
D. Scott Tucker
Catherine Lifeso
David Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Attorneys for Paul, Hastings, Janofsky
& Walker LLP

Kathleen M. Miller
Smith, Katzenstein & Furlow LLP
P.O. Box 410
800 Delaware Avenue
Wilmington, DE 19899

- and -

Bijan Amini
Storch Amini & Munves PC
2 Grand Central Tower
New York, NY 10017

Attorneys for Magten Asset Management
Corporation

Scott D. Cousins
William E. Chipman, Jr.
Charles Michael Terribile
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

Attorneys for Debtors and Debtors-in-
    Possession

Dated:  July 23, 2004

**CASE, J.**

Magten Asset Management Corporation ("Magten") has filed a motion to disqualify Debtor's counsel, Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") [Docket No. 1502]. A hearing was held on July 15, 2004, after which the matter was taken under advisement. For the reasons set forth below, the motion will be denied.

## I.    **BACKGROUND FACTS**

In 2002, certain power and distribution assets owned by Montana Power Company were transferred to Montana Power LLC, now known as Clark Fork and Blackfoot, LLC ("Clark Fork"). The Debtor acquired the equity ownership in Clark Fork. Thereafter, the energy assets were transferred from Clark Fork to the Debtor; the Debtor assumed certain obligations of Clark Fork and Montana Power, including approximately sixty-seven million dollars in 8.45% junior subordinated deferrable interest debentures due 2036. Paul Hastings represented the Debtor and Clark Fork, its wholly owned subsidiary, in connection with this transfer of assets and assumption of liabilities, referred to in these proceedings as the "going flat" transaction. The Debtor has consistently alleged, and Magten has never disputed, that Magten did not own any of the debentures prior to the time the assets were transferred to the Debtor. Rather, Magten acquired the debentures after the transaction was complete. Therefore, the Debtor asserts and Magten has not disputed, that Magten was never a creditor of Clark Fork at a time when Clark Fork held the disputed energy assets. Rather, Magten became a holder of the debentures only after the transaction was completed and was a matter of public record.

On September 14, 2003, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An application to employ Paul Hastings as counsel for the Debtor and

3

Debtor-in-Possession was filed soon thereafter, accompanied by an affidavit of Jesse H. Austin III, lead counsel for Paul Hastings.  An order approving the application was entered in due course thereafter.

On January 14, 2004, (Docket No. 686), Magten filed a notice of appearance and request for service of papers.  This motion was filed by Magten on June 18, 2004.

A hearing on confirmation of the Debtor's plan is currently scheduled for August 25, 2004.

Boiled to its essence, Magten argues that Paul Hastings should be disqualified for two reasons:

1.     Paul Hastings did not adequately disclose that it represented both the Debtor and Clark Fork in the "going flat" transaction.  It therefore violated its obligations under section 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure to disclose "all connections" that it has with all parties in interest[1].  Because of this inadequate disclosure, Magten argues that Paul Hastings should now be disqualified.

2.     Whether the disclosure was adequate or not, Paul Hastings should be disqualified because it has an actual and irreconcilable conflict of interest resulting from its dual representation of the Debtor and Clark Fork.  The basis for this assertion is Magten's contention that the interests of Clark Fork (and its creditors, to whom Magten argues Paul Hastings owed a fiduciary obligation) were harmed because

---

[1]     Paul Hastings filed a supplemental affidavit disclosing this dual representation on July 7, 2004.

4

the assets were transferred for virtually no consideration. Magten argues that it is a creditor of Clark Fork because it holds debt instruments, the junior subordinated debentures, on which Clark Fork was obligated at the time the assets were transferred.

II.    **ANALYSIS**

A.    The Disclosure Issue

It is clear that the initial disclosure by Paul Hastings was inadequate. Although Paul Hastings now argues that there was no conflict because the transaction benefitted both parties, that is not the test for disclosure. Section 327 and Rule 2014 make it clear that *all connections* must be disclosed whether they give rise to an actual conflict of interest or not. Paul Hastings failed to do this.

At the hearing, the attorney for the United States Trustee advised the Court and other parties that he had thoroughly vetted the dual representation with Paul Hastings at the beginning of the case and that he was satisfied with the explanations given. While he stated that he believed the dual representation was a matter of public record, he did not share that information with others nor did he request that Paul Hastings file a supplemental affidavit of disclosure. In retrospect, he acknowledged that this was a mistake. Nevertheless, these representations by the attorney for the United States Trustee support the conclusion that there was no conscious effort by Paul Hastings to conceal its dual representation. This fact is relevant to what remedy, if any, should be imposed for the inadequate disclosure.

As noted above, following a hearing at which counsel for Magten asked the Court to direct Paul Hastings to file a supplement disclosure, and the Court so ordering, Paul Hastings did

5

file the July 7, 2004 affidavit.  Therefore, as of this time, the matter has been fully and adequately disclosed.  The issue presented is whether the previous failure to disclose justifies disqualification at this point.

The answer is no.  Inadequate disclosure does not mandate disqualification of counsel.  Rather, the appropriate remedy is left to the broad discretion of the court.  *See, e.g., In re Best Craft Gen. Contractor and Design Cabinet, Inc.*, 239 B.R. 462 (Bankr. E.D.N.Y. 1999).  In this case, the disclosure was made at the outset of the case to the United States Trustee and formal disclosure was later made.  Also, as noted, the prior disclosure to the United States Trustee is indicative of a lack of intent to conceal.  Further, as discussed in the next session, this is not a case where full disclosure would have revealed an actual conflict.  Rather, full disclosure would have alerted all parties to facts that should have been known but which, in the end, do not bear upon Paul Hastings' qualification to serve as counsel.  For these reasons, the Court will not now disqualify Paul Hastings for its previous failure to disclose.

B.    Is There a Conflict?

A primary purpose of the disclosure rules is to allow parties in interest, and the Court, to determine whether the proposed counsel is disinterested and whether such counsel holds or represents an interest adverse to the estate.  The question presented here, therefore, is whether Paul Hastings prior dual representation meets either of those standards.  It does not.

This motion has been brought solely by Magten; no other creditor has joined.  As noted above, Magten was not a creditor of Clark Fork at the time the transaction took place.  Rather, it only became a creditor of the Debtor after the Debtor assumed the liability associated with the junior subordinated debenture initially issued by Montana Power Company.  Thus, Magten is not

6

only not a party directly affected by the transaction - such as Clark Fork itself - but it was also not an indirect party at the time the transaction took place. Thus, its relationship to the transaction for the purposes of asserting a disqualification motion is tenuous at best.

Here, neither the Debtor nor Clark Fork, the two parties directly involved, have complained. Indeed, the transaction was approved by the boards of directors of each company and was perceived by them to be in the best interests of those companies.

At bottom, Magten's argument is that Paul Hastings must be disqualified for its dual representation because Magten, as a third party who claims to have been injured by the transaction, is now challenging it. This is a novel theory that does not withstand scrutiny. First, as noted, even if third party creditors were injured by the transaction, Magten was not one of them. Second, there is no present proof of injury in any event; while that issue has been asserted in Adversary Proceeding No. 04-53324, captioned <u>Magten Asset Management Corporation v. NorthWestern Corporation</u>, pending before this Court, no such finding has yet been made. Thus, there is no basis for asserting actual injury that may create an actual conflict. Finally, even if actual injury were eventually proven, the fact that Paul Hastings represented the injured party, Clark Fork, would not necessarily mean that it holds an interest adverse to this estate or any class of its creditors. Clark Fork is not a debtor; therefore, the test is not whether Paul Hastings holds an interest adverse to a class of Clark Fork's creditors but whether it holds an interest adverse to a class of Northwestern's creditors. Yes, Magten is a member of a class of the Debtor's creditors–the subordinated debenture holders–but it asserts it has been injured not in that capacity

7

(after all, the Debtor assumed its debt), but in its non-existent capacity as a creditor of Clark

Fork.[2] The prohibition against counsel holding an "adverse interest" does not stretch so far.

**III.    CONCLUSION**

For the foregoing reasons, Magten's motion to disqualify is denied.  An order is to be

submitted under certification of counsel.

_____
Charles G. Case, II
United States Bankruptcy Judge

---

[2]    The gist of the fraudulent conveyance claim asserted in Adv. Proc. 04-53324 is that
the utility assets should be returned to Clark Fork to be shared only by its creditors, rather than be
subject to claims of NorthWestern's other creditors whose debts did not originate with Montana
Power.