*EXHIBIT B*

UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re NORTHWESTERN CORPORATION,<br><br>Debtor.<br>——————————————————<br>MAGTEN ASSET MANAGEMENT CORPORATION & LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | In Chapter 11 proceedings<br><br>Case No. 03-12872 (CGC)<br><br><br>ADV. NO. 04-53324 (PBL)<br><br><br>UNDER ADVISEMENT DECISION RE: MOTION TO DISMISS |

## I.  Introduction

Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively referred to hereafter as "Plaintiffs") filed a complaint against Debtor NorthWestern Corporation in April, 2004, challenging the prepetition transfer from Clark Fork and Blackfoot, LLC ("Clark Fook"), fka NorthWestern Energy, LLC, of essentially all of its assets to its parent corporation Debtor NorthWestern. The crux of Plaintiffs' complaint is that Debtor caused the transfer of over $1 billion in Clark Fork assets to itself in exchange for the assumption by Debtor of only about $700 million in Clark Fork liabilities. Plaintiffs allege the transfer ultimately left Debtor unable to pay its own creditors and resulted in Debtor's bankruptcy, under which Plaintiffs will receive virtually nothing. Further, the transfer rendered Clark Fork insolvent and undercapitalized, again leaving Plaintiffs, as creditors of Clark Fork, with nothing. Not only was the transfer itself a fraudulent conveyance, Plaintiffs argue, but Debtor also engaged in a fraudulent scheme by misrepresenting its financial standing at the time of the transfer.

In Count I, Plaintiffs contend that Debtor made the transfer with the actual intent to hinder,

delay or defraud its creditors as defined by section 31-20333 of the Montana Code. In Counts II and III, Plaintiffs allege that the transfer was fraudulent under section 31-2-334 of the Montana Code because Debtor made the transfer without receiving equivalent value and because Debtor was insolvent at the time or rendered insolvent as a result of the transfer. In Count IV, Plaintiffs allege that Debtor and its creditors were unjustly enriched by the transfer.

## II. Factual Background

In 1996, the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork/Northwestern Energy, created the Montana Power Capital Trust I ("Trust") as a financing vehicle with the Bank of New York ("BNY") as Trustee. The sole asset of the Trust was 8.45% Junior Subordinated Debentures due 2036 ("Junior Debentures"). After formation of the Trust, Montana Power and BNY entered into the Indenture for Unsecured Subordinated Debt Securities relating to the Trust Securities ("Indenture"). At about the same time, the Trust issued $65 million of 8.45% cumulative Quarterly Income Preferred Securities ("QUIPS"), Series A, the proceeds of which were used to purchase an equal amount of Junior Debentures, 8.45% Series due 2036, from Montana Power. Montana Power also entered into a Guarantee Agreement with BNY, under which Montana Power provided a limited guarantee of obligations with respect to the QUIPS – "only if and to the extent that the Property Trustee has available in the Payment Account funds sufficient to make payment."

Four years later, in 2000, Debtor NorthWestern purchased substantially all of Montana Power's electric, natural gas, and propane utility assets under a Unit Purchase Agreement. The structure of the sale was as follows. Montana Power created a subsidiary called The Montana Power LLC ("MP-LLC"), which Debtor intended to acquire as a division of itself as opposed to a subsidiary. The parties refer to such an acquisition as "going flat."

The going flat deal was disclosed to the Federal Energy Regulatory Commission ("FERC") by Debtor and Montana Power in their Joint Application of the Montana Power Company and NorthWestern Corporation for Approval of Disposition of Jurisdictional Facilities. In the application, the parties indicated that the proposed sale was not contingent on any particular

2

structure, but that NorthWestern intended to either form a holding company to acquire MP-LLC as a wholly owned subsidiary or to acquire MP-LLC in its current "flat" structure such that MP-LLC would become a separate division of NorthWestern and not a subsidiary. After resolving a variety of issues with respect to the transfer, it was approved by both the FERC and the Montana Public Service Commission.

The assets were then transferred to MP-LLC by Montana Power in February, 2002. As part of this conveyance, the MP-LLC and BNY, as Trustee, executed a supplemental indenture under which MP-LLC assumed all obligations of Montana Power under the original Indenture. Subsequently, Debtor NorthWestern's acquisition of MP-LLC was completed with the payment of $478 million cash and the assumption of $511 million of MP-LLC's liabilities, which included the claims of the QUIPS and the Indenture. MP-LLC was then a subsidiary of Debtor and renamed NorthWestern Energy, LLC.

In order to "go flat" with the now named Northwestern Energy, as it originally intended, Debtor disclosed to the SEC that it intended "to transfer the energy and natural gas transmission and distribution operations of NorthWestern Energy, LLC to NorthWestern Corporation." NorthWestern accomplished this by executing a Second Supplemental Indenture with NorthWestern Energy and the Trustee BNY, in which it contends it "fully and unconditionally assumed NorthWestern Energy's obligations (as successor to MP-LLC, as the successor to Montana Power) with respect to the QUIPS and the performance of every covenant, obligation and agreement under the Indenture." It apparently paid no cash for NorthWestern Energy's assets, but assumed all its liabilities except those associated with the Milltown Dam. The Second Supplemental Indenture also expressly subordinated the obligations Debtor assumed from NorthWestern Energy to its "Senior Indebtedness" and released NorthWestern Energy from any and all obligations under the QUIPS debenture, the Indenture and the Second Supplemental Indenture.

NorthWestern, Northwestern Energy and BNY also executed the Amendment to Guaranty Agreement whereby NorthWestern attempted to assume completely the limited obligations of Montana Power under the original Guaranty Agreement. Debtor subsequently sought and received

3

the FERC's approval to assume the QUIPS, along with other debt of NorthWestern Energy. A Third Supplemental Indenture was executed in which Debtor expressly assumed "the covenants of NorthWestern Energy contained in the Indenture and the Securities issued thereunder" and assumed the payments of principal and premium on outstanding securities issued under the Indenture and the performance of every covenant thereunder. Subsequently, NorthWestern Energy was renamed Clark Fork and Blackfoot, LLC.

Plaintiff Magten holds in excess of 33% of the Series A, 8.45% QUIPS issued by the Trust. Plaintiff Magten purchased its share of the QUIPS *after* the transfer of NorthWestern Energy's assets to Debtor and sometime shortly before or after Debtor filed bankruptcy. Plaintiff Law Debenture is the successor trustee to BNY under the Indenture on behalf of the holders of the QUIPS.

As a result of these transfers, Plaintiffs complain that they have relegated to the bottom of the heap of Debtor's creditors. While they (or their predecessors) were once essentially at the top of the heap of Clark Fork's creditors, upon the transfer to Debtor, they were subordinated to Debtor's senior creditors, which in essence left them with little at the end of the day under Debtor's Plan. By this action, they seek to undo the transfer so that the assets will be returned to Clark Fork.

### III. Analysis

Debtor NorthWestern seeks dismissal of Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in bankrupcty proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. In determining whether to grant the motion to dismiss, this Court must assume the facts as pled in the complaint are true. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Debtor begins by challenging Plaintiffs' standing, alleging that they are creditors of Debtor NorthWestern only and not of Clark Fork. The standing argument highlights the difficulty with this case. This is not a typical fraudulent conveyance complaint where the *debtor in possession* sues a *third party* seeking to bring assets back *into* the estate. Instead, this is an alleged *creditor of a non-debtor* suing the *Debtor* in order to *divest the estate* of assets and return them to the non-debtor. Acknowledging that they must be creditors of Clark Fork to bring this action, Plaintiffs argue that

4

they are so due to the invalidity of the transfers.

Debtor says this is impossible, as the very structure of the transfer ended any debtor-creditor relationship between Plaintiffs and Clark Fork. Debtor argues that any transfers of assets completed in accordance with Section 1101 of the Indenture result in the successor entity (Debtor in this case) succeeding to and being substituted for the prior entities (Clark Fork) such that the successor entity (Debtor) is the only entity obligated to the QUIPS. Critically, Section 1102 of the Indenture in turn expressly relieves the predecessor entity, here Clark Fork, of all obligations and covenants under the Indenture. The QUIPS holders, therefore, are creditors solely of Debtor as long as the transfer was in compliance with Section 1101 of the Indenture, which Debtor contends Plaintiffs do not challenge.

### A.    Did Debtor Comply with the Indenture?

#### 1.    Is there a guarantee of solvency?

Plaintiffs disagree for several reasons. First, Plaintiffs argue that because Debtor used false financial statements and was insolvent, it did not in fact comply with the terms of the Indenture and, therefore, did not properly assume Clark Fork's liabilities: Clark Fork is therefore still liable to Plaintiffs. In support of this position, Plaintiffs point to two requirements in Section 1101 of the Indenture requiring Debtor to "assume . . . [1]the due and punctual payment of the principal and premium, if any, and interest, if any on all Outstanding Securities *and [2]* the performance of every covenant of this Indenture on the part of [Clark Fork] to be performed or observed." Plaintiffs assert that, because Debtor is unable to make the payments due the QUIPS, Debtor did not in fact comply with the terms of Section 1101 of the Indenture.

Plaintiffs argument is flawed. Plaintiffs read this language as a guarantee of solvency by Debtor upon executing the transfer. It is not. The language only requires that Debtor assume the obligations, not that it actually be able to perform the obligations. Debtor in fact did assume the obligations.

#### 2.    Was Consent of the Holders Required?

Plaintiffs also argue that Debtor's alleged insolvency wrongfully impaired their rights

5

under the Indenture to receive payment of principal and interest and therefore the transaction had to be approved by the holders of the securities. This argument is similarly misplaced. While the Indenture and the Trust Indenture Act of 1939 do in fact provide that "the right of any holder of any indenture security to receive payment of the principal of and interest on such security . . . shall not be impaired," this applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself. Plaintiffs' legal rights were not impaired. Again, there is no guarantee against default.

### B. Are the Plaintiffs Creditors Under The Guarantee?

Plaintiffs are also not creditors of Clark Fork by way of the Guarantee Agreement that is part of the original debt transaction. Both parties have treated this argument in a superficial and conclusory fashion; it is more complicated than it seems.

As noted, the QUIPS were issued in a two-step transaction. Montana Power Company (referred to for ease of reference as "Clark Fork") issued subordinated debentures (the "Debentures"), all of which were purchased and held by the Trust. The Trust, in turn, issued the QUIPS to Holders, such as Magten's predecessor in interest, in consideration of payment of a corresponding pro rata amount of the Debentures (which funds were then used to purchase that amount of the Debentures). The Holders then were entitled to a specific percentage of the distributions made by Clark Fork to the Trust on account of the Debentures.[1]

The Guarantee appears to exist as protection against the unlikely event that Clark Fork makes required distributions to the Trust but the Trust thereafter fails to distribute the funds to the Holders. Although it contains many of the same terms and obligations of a true third party guarantee, it is fundamentally different. In the third party setting, the guarantor unconditionally guarantees that a creditor will receive payment of its debt from the obligor. In this case, Clark Fork guaranteed that the Holders would receive their distributions only to the extent that Clark Fork had already paid the

---

[1] Technically, the distributions were made by Clark Fork to a Property Trust (created simultaneously with the Trust with the same trustee) to receive and distribute the funds on a pro rata basis to the holders of the QUIPS.

6

Trust. Guarantee § 1.01 (definition of "Guarantee Payments"). In no event would Clark Fork be liable to "pay twice"; rather, its liability is limited to the situation where the middleman (the Trust) fails to pay over what it has already received from Clark Fork. For example, it does not guarantee payment in the situation where, for whatever reason, the Trust receives the money and uses it for some other purpose.[2] Or, more bluntly, it does not guarantee payment if the Trustee misuses or commingles the Trust's assets. In either of those situations, the extent of Clark Fork's guarantee liability is limited to the *lesser* of the aggregate of the Liquidation Amount (a defined term) and all accrued and unpaid distributions *and* the amount of Trust's assets remaining available for distribution.[3] Thus, regardless of whether the Liquidation Amount and the accrued and unpaid distributions exceed the amount of assets remaining in the Trust, Clark Fork's liability is limited to those assets. In a real sense, therefore, Clark Fork's guarantee liability is fundamentally *in rem* because it is limited to the whatever remains of the distributions it has already paid over to the Trust.[4]

The Guarantee specifically references Article 11 of the Indenture and provides that Clark Fork's obligations under the Guarantee may only be assigned pursuant to a transaction authorized thereunder. However, as noted by Plaintiff Magten, the Guarantee does not specifically provide, as does Section 1102 of the Indenture, that a Section 1101 transaction releases Clark Fork from its guarantee obligations. Debtor NorthWestern fails to address this critical issue and merely assumes that a Section 1102 transaction releases the guarantee obligation to the same extent as the underlying obligation on the debentures. The question is – does it?

Under Delaware law, all related documents and instruments in a single transaction together

---

[2] Again, this is a highly unlikely event given that the Trust is a specially created vehicle solely for the purpose of this transaction.

[3] Of course, the Holders may have claims in these circumstances against the Trustee but that is irrelevant for the purpose of determining if these plaintiffs have standing in this case.

[4] If the guarantee is triggered, Clark Fork is subrogated to the rights of the Holders to pursue the issuer for the funds it holds but has not paid. Guarantee § 5.06.

7

are harmonized to the extent possible. *Simon v. The Navellier Series Fund*, 2000 WL 1597890 (Del. Ch. 2000) (citing *Crown Books*, 17A C.J.S. *Contracts* § 315, at 337 (1999), 11 Williston on Contracts § 30:26, at 239-42 (4th ed. 1999), and Restatement (Second) of Contracts § 202(2) (1981)); *Crown Books Corp. v Bookstop, Inc.*, 1990 WL 26166 (Del. Ch. 1990). An interpretation that leads to an absurd result is disfavored. *Collins & Aikman Corp. v. Compo Industries, Inc.*, 1982 WL 17804 (Del. Ch. 1982). Here, the Indenture specifically provides that Clark Fork is released from its underlying liability on the debentures in a Section 1101 transaction. All of those obligations, including making distributions to the Trust for the purpose of paying the Holders, now lie exclusively with the successor in interest, here Debtor NorthWestern. Given the quasi *in rem* nature of the guarantee,[5] it is nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction) would retain any liability under the Guarantee. It only makes sense that any such liability has been released as well.

While the language is not explicit, Section 8.01 supports this interpretation: "Except in connection with a consolidation, merger or sale involving the Guarantor that is permitted under Article Eleven of the Indenture, the Guarantor shall not assign its obligations hereunder." The specific reference to Article Eleven (and not merely Section 1101) implies that all aspects of that Article are to be effective. Because a transaction that is permitted under Article Eleven automatically effects a release of the underlying debt, it is consistent to conclude that such a release would also extend to the guarantee.

Section 5.03 of the Guarantee does not compel a contrary result. That section makes clear that the validity of the Guarantee is not affected by the release or waiver of any of the *Issuer's* (the Trust's) obligations or by any lack of diligence by the *Holders* or any invalidity of the *QUIPS*. However, it does not say that the guarantee survives the release of Clark Fork's obligations under the debentures in the event of an Section 1101 transaction. Clearly, the guarantee would survive if Clark Fork's liability were "settled" or "compromised" outside of Section 1101 (Section 5.03(f));

---

[5]The liability is not technically *in rem* because the guarantor must first pay and is allowed to recover through subrogation.

but that is far different from a release of Clark Fork's obligations that occurs because a successor has assumed all of those obligations in a permitted transaction. Finally, Section's 5.03(g)'s admonition that "it [is] the intent of this Section 5.03 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances" is wholly consistent with the full, complete, absolute and unconditional assumption of the Guarantor's obligations in a permitted Section 1101 transaction. It is neither reasonable nor logical to read Section 5.03(g) to apply to a Section 1101 transaction.

For these reasons, the Court concludes that Plaintiffs are not creditors of Clark Fork because of the Guarantee. Rather, Clark Fork's obligations under the Guarantee, to the same extent as its obligations under the Debentures, were released in the Section 1101 transaction with NorthWestern. Therefore, the Guarantee is not a source of standing for these Plaintiffs. However, the question remains whether Plaintiffs have standing under their fraudulent scheme argument.

### 3.   Was there a Fraudulent Scheme?

Next, Plaintiffs argue that the purported release of Clark Fork under Section 1102 itself was obtained by fraud such that the release is void. According to Plaintiffs, at the time of the transfer, Debtor intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly. This argument may have legs. Simply because Debtor may have complied with the technical, procedural requirements of the Indenture does not mean Debtor can insulate the fraudulent transaction from all attack. The argument goes well beyond merely alleging the transaction was a fraudulent conveyance. This argument at its essence is that Debtor engaged in a knowing and conscious fraudulent scheme.

Critical to Debtor's position is that the release of Clark Fork under Section 1102 was effective, thereby removing Plaintiffs as creditors of Clark Fork. However, if Plaintiffs can prove (as they have alleged) that the release was obtained through fraud, then the release would be ineffective.

"If action is taken for a fraudulent purpose or to carry out a fraudulent purpose or to carry out a fraudulent scheme, the action is void and of no force or effect." Richard A. Lord, *Williston On*

9

*Contracts* Sec. 69.4 (4th Ed. 2003). A release may be set aside if it was obtained fraudulently. *Stanley v. Holms*, 975 P.2d 1242 (Mont. 1999) (recognizing the invalidity of releases under fraudulent conditions but granting a motion for summary judgment because party had not set forth sufficient indicia of fraud); *Riggs et al. v. Gillespie*, 241 F. 311 (4th Cir. 1917) (finding a release invalid as it was obtained by a "fraud in equity"); *see also Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001) (acknowledging that a release is a voidable contract when a party is fraudulently induced to execute a release). If a release is obtained by fraud, it is unenforceable under Montana law. *Association of Unit Owners of the Deer Lodge Condominium v. Big Sky of Montana, Inc.*, 798 P.2d 1018 (Mont. 1990). In that sense, a release is treated as any other contract obtained by fraud. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1133-34 (D.C. App. 1987) (reversing lower court's grant of summary judgment and permitting plaintiffs to proceed with underlying claims where plaintiffs' purported release of such claims was part of the misrepresentation of which the defendant was accused).

Debtor directly challenges Plaintiffs' fraud argument, contending that this case must be dismissed because there simply was no fraud. Debtor hangs its hat on the fact that numerous transactions making up to the transfer were disclosed in both regulatory filings and in documents executed by the Trustee. According to Debtor, the terms of the deals were known to all and, therefore, by definition mean there was in fact no fraudulent intent on Debtor's part.

While Debtor's disclosure may be one factor in favor of finding no fraudulent intent on Debtor's part, it is far from conclusive at the motion to dismiss stage. Debtor may have disclosed the nuts and bolts of the transfers, but Plaintiffs' allegations go beyond simply that the actual transfer itself was fraudulent in its terms. As alleged, the questions are whether Debtor knew at the time that it could not do the transaction based on its restated accountings etc. and whether the financial information Debtor provided the public was in fact false. These are fact questions not appropriately resolved on a motion to dismiss.

### III. Conclusion

Therefore, the motion to dismiss will be granted in part and denied in part, as follows:

The Plaintiffs lack standing as creditors of Clark Fork to pursue a fraudulent conveyance action against the Debtor because of the Section 1102 release, unless they can prove under applicable law that the Section 1102 release was obtained through actual fraud or as part of a fraudulent scheme.

Counsel for Debtor is to submit an order under certification of counsel.

So ordered.

DATED: 8/20/04

*[signature]*
CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

11