# Exhibit B

Cite as: 549 U. S. ____ (2007)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 05–7058 and 05–7142

———

LORENZO L. JONES, PETITIONER

05–7058            *v.*

BARBARA BOCK, WARDEN, ET AL.

TIMOTHY WILLIAMS, PETITIONER

05–7142            *v.*

WILLIAM S. OVERTON ET AL.

JOHN H. WALTON *v.* BARBARA BOUCHARD ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 22, 2007]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In an effort to address the large number of prisoner complaints filed in federal court, Congress enacted the Prison Litigation Reform Act of 1995 (PLRA), 110 Stat. 1321–71, as amended, 42 U. S. C. §1997e *et seq.* Among other reforms, the PLRA mandates early judicial screening of prisoner complaints and requires prisoners to exhaust prison grievance procedures before filing suit. 28 U. S. C. §1915A; 42 U. S. C. §1997e(a). The Sixth Circuit, along with some other lower courts, adopted several procedural rules designed to implement this exhaustion requirement and facilitate early judicial screening. These rules require a prisoner to allege and demonstrate exhaus-

Opinion of the Court

tion in his complaint, permit suit only against defendants who were identified by the prisoner in his grievance, and require courts to dismiss the entire action if the prisoner fails to satisfy the exhaustion requirement as to any single claim in his complaint. Other lower courts declined to adopt such rules. We granted certiorari to resolve the conflict and now conclude that these rules are not required by the PLRA, and that crafting and imposing them exceeds the proper limits on the judicial role.

I

Prisoner litigation continues to "account for an outsized share of filings" in federal district courts. *Woodford* v. *Ngo*, 548 U. S. ___, ___, n. 4 (2006) (slip op., at 12, n. 4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations.[1] Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit. See *Neitzke* v. *Williams*, 490 U. S. 319, 327 (1989).

Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. See *Porter* v. *Nussle*, 534 U. S. 516, 524 (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Con-

---

[1] See Administrative Office of the United States Courts, Judicial Facts and Figures, Tables 4.4, 4.6, http://www.uscourts.gov/judicialfactsfigures/contents.html (as visited Jan. 17, 2007, and available in Clerk of Court's case file). That number *excludes* habeas corpus petitions and motions to vacate a sentence. If these filing are included, prisoner complaints constituted 24 percent of all civil filings in 2005.

Cite as: 549 U. S. ____ (2007)          3

Opinion of the Court

gress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit.

The exhaustion provision of the PLRA states:

> "No action shall be brought with respect to prison conditions under [42 U. S. C. §1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."    42 U. S. C. §1997e(a).

Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record. *Woodford, supra,* at ____ (slip op., at 12).  In an attempt to implement the exhaustion requirement, some lower courts have imposed procedural rules that have become the subject of varying levels of disagreement among the federal courts of appeals.

The first question presented centers on a conflict over whether exhaustion under the PLRA is a pleading requirement the prisoner must satisfy in his complaint or an affirmative defense the defendant must plead and prove.[2]

_____

[2] Compare *Steele* v. *Federal Bureau of Prisons,* 355 F. 3d 1204, 1210 (CA10 2003) (pleading requirement); *Brown* v. *Toombs,* 139 F. 3d 1102, 1104 (CA6 1998) (*per curiam*) (same); *Rivera* v. *Allin,* 144 F. 3d 719, 731 (CA11 1998) (same), with *Anderson* v. *XYZ Correctional Health Servs., Inc.,* 407 F. 3d 674, 681 (CA4 2005) (affirmative defense); *Wyatt* v. *Terhune,* 315 F. 3d 1108, 1119 (CA9 2003) (same); *Casanova* v. *Dubois,* 304 F. 3d 75, 77, n. 3 (CA1 2002) (same); *Ray* v. *Kertes,* 285 F. 3d 287, 295 (CA3 2002) (same); *Foulk* v. *Charrier,* 262 F. 3d 687, 697 (CA8 2001) (same); *Massey* v. *Helman,* 196 F. 3d 727, 735 (CA7 1999) (same); *Jenkins* v. *Haubert,* 179 F. 3d 19, 28–29 (CA2 1999) (same).  See

The Sixth Circuit, adopting the former view, requires prisoners to attach proof of exhaustion—typically copies of the grievances—to their complaints to avoid dismissal. If no written record of the grievance is available, the inmate must plead with specificity how and when he exhausted the grievance procedures. *Knuckles El* v. *Toombs*, 215 F. 3d 640, 642 (2000).

The next issue concerns how courts determine whether a prisoner has properly exhausted administrative remedies—specifically, the level of detail required in a grievance to put the prison and individual officials on notice of the claim. The Sixth Circuit requires that a prisoner have identified, in the first step of the grievance process, each individual later named in the lawsuit to properly exhaust administrative remedies. *Burton* v. *Jones*, 321 F. 3d 569, 575 (2003). Other circuits have taken varying approaches to this question, see, *e.g., Butler* v. *Adams*, 397 F. 3d 1181, 1183 (CA9 2005) (proper exhaustion requires use of the administrative process provided by the State; if that process does not require identification of specific persons, neither does the PLRA); *Johnson* v. *Johnson*, 385 F. 3d 503, 522 (CA5 2004) ("[T]he grievance must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit"); *Riccardo* v. *Rausch*, 375 F. 3d 521, 524 (CA7 2004) (exhaustion satisfied if grievance "served its function of alerting the state and inviting corrective action"), none going as far as the Sixth Circuit in requiring in every case that the defendants have been named from the beginning of the grievance process.

Finally, the circuits are divided over what the PLRA

---

also *Johnson* v. *Johnson*, 385 F. 3d 503, 516, n. 7 (CA5 2004) (noting the conflict but not deciding the question); *Jackson* v. *District of Columbia*, 254 F. 3d 262, 267 (CADC 2001) (treating exhaustion as an affirmative defense).

Cite as: 549 U. S. ____ (2007)                    5

Opinion of the Court

requires when both exhausted and unexhausted claims are included in a complaint.[3] Some circuits, including the Sixth Circuit, apply a "total exhaustion" rule, under which no part of the suit may proceed if any single claim in the action is not properly exhausted. See, *e.g., Jones Bey* v. *Johnson,* 407 F. 3d 801, 805 (CA6 2005). Among circuits requiring total exhaustion there is further disagreement over what to do if the requirement is not met. Most courts allow the prisoner to amend his complaint to include only exhausted claims, *e.g., Kozohorsky* v. *Harmon,* 332 F. 3d 1141, 1144 (CA8 2003), but the Sixth Circuit denies leave to amend, dismisses the action, and requires that it be filed anew with only unexhausted claims, *Baxter* v. *Rose,* 305 F. 3d 486, 488 (2002); *Jones Bey, supra,* at 807. See also *McGore* v. *Wrigglesworth,* 114 F. 3d 601, 612 (1997). Other circuits reject total exhaustion altogether, instead dismissing only unexhausted claims and considering the rest on the merits. See, *e.g., Ortiz* v. *McBride,* 380 F. 3d 649, 663 (CA2 2004).

A

Petitioners are inmates in the custody of the Michigan Department of Corrections (MDOC). At the time petitioners filed their grievances, MDOC Policy Directive 03.02.130 (Nov. 1, 2000) set forth the applicable grievance procedures. 1 App. 138–157.[4] The policy directive de-

---

[3] Compare *Jones Bey* v. *Johnson,* 407 F. 3d 801, 805 (CA6 2005) (requiring dismissal of the entire action if one unexhausted claim is present); *Ross* v. *County of Bernalillo,* 365 F. 3d 1181, 1189 (CA10 2004) (same); *Vazquez* v. *Ragonese,* 142 Fed. Appx. 606, 607 (CA3 2005) *(per curiam)* (same); *Kozohorsky* v. *Harmon,* 332 F. 3d 1141, 1144 (CA8 2003) (same), with *Lira* v. *Herrera,* 427 F. 3d 1164, 1175 (CA9 2005) (allowing dismissal of only unexhausted claims); *Ortiz* v. *McBride,* 380 F. 3d 649, 663 (CA2 2004) (same); *Lewis* v. *Washington,* 300 F. 3d 829, 835 (CA7 2002) (same). See also *Johnson, supra,* at 523, n. 5 (suggesting that total exhaustion is an open question in the Fifth Circuit).

[4] MDOC has since revised its policy. See Policy Directive 03.02.130

Opinion of the Court

scribes what issues are grievable and contains instructions for filing and processing grievances.

Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue. *Id.*, at 147. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process, and submit a completed grievance form within five business days of the attempted oral resolution. *Id.*, at 147, 149–150. The Step I grievance form provided by MDOC (a one-page form on which the inmate fills out identifying information and is given space to describe the complaint) advises inmates to be "brief and concise in describing your grievance issue." 2 *id.*, at 1. The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent—generally the supervisor of the person being grieved. 1 *id.*, at 150.

If the inmate is dissatisfied with the Step I response, he may appeal to Step II by obtaining an appeal form within five business days of the response, and submitting the appeal within five business days of obtaining the form. *Id.*, at 152. The respondent at Step II is designated by the policy, *id.*, at 152–153 (*e.g.*, the regional health administrator for medical care grievances). If still dissatisfied after Step II, the inmate may further appeal to Step III using the same appeal form; the MDOC director is designated as respondent for all Step III appeals. *Id.*, at 154.

*Lorenzo Jones*

Petitioner Lorenzo Jones is incarcerated at the MDOC's Saginaw Correctional Facility. In November 2000, while in MDOC's custody, Jones was involved in a vehicle accident and suffered significant injuries to his neck and back. Several months later Jones was given a work assignment

---

(effective Dec. 19, 2003), App. to Brief for Respondents 1b. The new policy is not at issue in these cases.

Opinion of the Court

he allegedly could not perform in light of his injuries. According to Jones, respondent Paul Morrison—in charge of work assignments at the prison—made the inappropriate assignment, even though he knew of Jones's injuries. When Jones reported to the assignment, he informed the staff member in charge—respondent Michael Opanasenko—that he could not perform the work; Opanasenko allegedly told him to do the work or "'suffer the consequences.'" *Id.,* at 20. Jones performed the required tasks and allegedly aggravated his injuries. After unsuccessfully seeking redress through the MDOC's grievance process, Jones filed a complaint in the Eastern District of Michigan under 42 U. S. C. §1983 for deliberate indifference to medical needs, retaliation, and harassment. Jones named as defendants, in addition to Morrison and Opanasenko, respondents Barbara Bock (the warden), Valerie Chaplin (a deputy warden), Janet Konkle (a registered nurse), and Ahmad Aldabaugh (a physician).

A Magistrate recommended dismissal for failure to state a claim with respect to Bock, Chaplin, Konkle, and Aldabaugh, and the District Court agreed. 1 App. 41. With respect to Morrison and Opanasenko, however, the Magistrate recommended that the suit proceed, finding that Jones had exhausted his administrative remedies as to those two. *Id.,* at 18–29. The District Court disagreed. In his complaint, Jones provided the dates on which his claims were filed at various steps of the MDOC grievance procedures. *Id.,* at 41. He did not, however, attach copies of the grievance forms or describe the proceedings with specificity. Respondents attached copies of all of Jones's grievances to their own motion to dismiss, but the District Judge ruled that Jones's failure to meet his burden to plead exhaustion in his complaint could not be cured by respondents. *Id.,* at 42. The Sixth Circuit agreed, holding both that Jones failed to comply with the specific pleading requirements applied to PLRA suits, 135 Fed. Appx. 837,

Opinion of the Court

839 (2005) *(per curiam)* (citing *Knuckles El*, 215 F. 3d, at 642), and that, even if Jones had shown that he exhausted the claims against Morrison and Opanasenko, dismissal was still required under the total exhaustion rule, 135 Fed. Appx., at 839 (citing *Jones Bey*, 407 F. 3d, at 806).

### Timothy Williams

Petitioner Timothy Williams is incarcerated at the MDOC's Adrian Correctional Facility. He suffers from noninvoluting cavernous hemangiomas in his right arm, a medical condition that causes pain, immobility, and disfiguration of the limb, and for which he has undergone several surgeries. An MDOC physician recommended further surgery to provide pain relief, but MDOC's Correctional Medical Services denied the recommendation (and subsequent appeals by the doctor) on the ground that the danger of surgery outweighed the benefits, which it viewed as cosmetic. The MDOC Medical Services Advisory Committee upheld this decision. After Correctional Medical Services indicated that it would take the request under advisement, Williams filed a grievance objecting to the quality of his medical care and seeking authorization for the surgery. He later filed another grievance complaining that he was denied a single-occupancy handicapped cell, allegedly necessary to accommodate his medical condition. After both grievances were denied at all stages, Williams filed a complaint in the Eastern District of Michigan under §1983, naming as respondents William Overton (former director of MDOC), David Jamrog (the warden), Mary Jo Pass and Paul Klee (assistant deputy wardens), Chad Markwell (corrections officer), Bonnie Peterson (health unit manager), and Dr. George Pramstaller (chief medical officer for MDOC).

The District Judge found that Williams had failed to exhaust his administrative remedies with regard to his medical care claim because he had not identified any of

Cite as: 549 U. S. ___ (2007)          9

Opinion of the Court

the respondents named in his lawsuit during the griev-
ance process.[5]  Although Williams's claim concerning the
handicapped cell had been properly exhausted, the Dis-
trict Judge—applying the total exhaustion rule—
dismissed the entire suit. The Sixth Circuit affirmed. 136
Fed. Appx. 859, 861–863 (2005) (citing *Burton,* 321 F. 3d,
at 574, *Curry* v. *Scott,* 249 F. 3d 493, 504–505 (CA6 2001),
and *Jones Bey,* 407 F. 3d, at 805).

### John Walton

Petitioner John Walton is incarcerated at the MDOC's
Alger Maximum Correctional Facility.  After assaulting a
guard, he was sanctioned with an indefinite "upper slot"
restriction.[6]  Several months later, upon learning that
other prisoners had been given upper slot restrictions of
only three months for the same infraction, he filed a griev-
ance claiming that this disparity was the result of racial
discrimination (Walton is black, the two other prisoners he
identified in his grievances are white).  After the grievance
was denied, Walton filed a complaint in the Western
District of Michigan under §1983, claiming race discrimi-
nation.   He named as respondents Barbara Bouchard
(former warden), Ken Gearin, David Bergh, and Ron Bobo

------

[5] Dr. Pramstaller was mentioned at Step III of the grievance process,
but was apparently never served with the complaint initiating the
lawsuit.  The Magistrate stated that even if the claims against Pram-
staller had been properly exhausted they nonetheless were subject to
dismissal under the total exhaustion rule.  1 App. 86, 101.  It also
appears that under the Sixth Circuit's rule requiring a defendant to be
named at Step I of the grievance process, the claims against Pram-
staller, who was not mentioned until Step III, would not have been
exhausted. See *supra,* at 4; n. 7, *infra.*  Because Pramstaller was never
served, he is not a respondent in this Court.

[6] An upper slot restriction limits the inmate to receiving food and
paperwork via the lower slot of the cell door.  Brief for Respondents 5–
6.  Presumably, this is less desirable than access through the upper
slot; the record does not reveal how effective this particular sanction is
in discouraging assaults on staff.

(assistant deputy wardens), Catherine Bauman (resident unit manager), and Denise Gerth (assistant resident unit supervisor).

The District Judge dismissed the lawsuit because Walton had not named any respondent other than Bobo in his grievance. His claims against the other respondents were thus not properly exhausted, and the court dismissed the entire action under the total exhaustion rule. The Sixth Circuit affirmed, reiterating its requirement that a prisoner must "file a grievance against the person he ultimately seeks to sue," *Curry, supra,* at 505, and that this requirement can only be satisfied by naming each defendant at Step I of the MDOC grievance process. Because Walton had exhausted prison remedies only as to respondent Bobo, the Sixth Circuit affirmed the District Court's dismissal of the entire action. 136 Fed. Appx. 846, 848–849 (2005).

### B

Jones sought review in a petition for certiorari, arguing that the Sixth Circuit's heightened pleading requirement and total exhaustion rule contravene the clear language of the Federal Rules of Civil Procedure and the PLRA. Williams and Walton filed a joint petition under this Court's Rule 12.4, contending that the rule requiring every defendant to be named during the grievance process is not required by the PLRA, and also challenging the total exhaustion rule. We granted both petitions for certiorari, 547 U. S. ___ (2006), and consolidated the cases for our review.

### II

There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court. *Porter,* 534 U. S., at 524. What is less clear is whether it falls to the prisoner to plead and dem-

Opinion of the Court

onstrate exhaustion in the complaint, or to the defendant
to raise lack of exhaustion as an affirmative defense. The
minority rule, adopted by the Sixth Circuit, places the
burden of pleading exhaustion in a case covered by the
PLRA on the prisoner; most courts view failure to exhaust
as an affirmative defense. See n. 2, *supra*.

We think petitioners, and the majority of courts to
consider the question, have the better of the argument.
Federal Rule of Civil Procedure 8(a) requires simply a
"short and plain statement of the claim" in a complaint,
while Rule 8(c) identifies a nonexhaustive list of affirma-
tive defenses that must be pleaded in response. The PLRA
itself is not a source of a prisoner's claim; claims covered
by the PLRA are typically brought under 42 U. S. C.
§1983, which does not require exhaustion at all, see *Patsy*
v. *Board of Regents of Fla.*, 457 U. S. 496, 516 (1982).
Petitioners assert that courts typically regard exhaustion
as an affirmative defense in other contexts, see Brief for
Petitioners 34–36, and nn. 12–13 (citing cases), and re-
spondents do not seriously dispute the general proposition.
We have referred to exhaustion in these terms, see, *e.g.*,
*Wright* v. *Universal Maritime Service Corp.*, 525 U. S. 70,
75 (1998) (referring to "failure to exhaust" as an "affirma-
tive defens[e]"), including in the similar statutory scheme
governing habeas corpus, *Day* v. *McDonough*, 547 U. S.
___, ___ (2006) (slip op., at 8) (referring to exhaustion as a
"defense"). The PLRA dealt extensively with the subject of
exhaustion, see 42 U. S. C. §§1997e(a), (c)(2), but is silent
on the issue whether exhaustion must be pleaded by the
plaintiff or is an affirmative defense. This is strong evi-
dence that the usual practice should be followed, and the
usual practice under the Federal Rules is to regard ex-
haustion as an affirmative defense.

In a series of recent cases, we have explained that courts
should generally not depart from the usual practice under
the Federal Rules on the basis of perceived policy con-

12                 JONES *v.* BOCK

Opinion of the Court

cerns. Thus, in *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U. S. 163 (1993), we unanimously reversed the court of appeals for imposing a heightened pleading standard in §1983 suits against municipalities. We explained that "[p]erhaps if [the] Rules . . . were rewritten today, claims against municipalities under §1983 might be subjected to the added specificity requirement . . . . But that is a result which must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Id.,* at 168.

In *Swierkiewicz* v. *Sorema N. A.,* 534 U. S. 506 (2002), we unanimously reversed the court of appeals for requiring employment discrimination plaintiffs to specifically allege the elements of a prima facie case of discrimination. We explained that "the Federal Rules do not contain a heightened pleading standard for employment discrimination suits," and a "requirement of greater specificity for particular claims" must be obtained by amending the Federal Rules. *Id.,* at 515 (citing *Leatherman*). And just last Term, in *Hill* v. *McDonough,* 547 U. S. ___ (2006), we unanimously rejected a proposal that §1983 suits challenging a method of execution must identify an acceptable alternative: "Specific pleading requirements are mandated by the Federal Rules of Civil Procedure, and not, as a general rule, through case-by-case determinations of the federal courts." *Id.,* at ___ (slip op., at 8) (citing *Swierkiewicz*).

The Sixth Circuit and other courts requiring prisoners to plead and demonstrate exhaustion in their complaints contend that if the "new regime" mandated by the PLRA for prisoner complaints is to function effectively, prisoner complaints must be treated outside of this typical framework. See *Baxter,* 305 F. 3d, at 489. These courts explain that the PLRA not only imposed a new mandatory exhaustion requirement, but also departed in a fundamental way from the usual procedural ground rules by requiring judi-

Opinion of the Court

cial screening to filter out nonmeritorious claims: Courts are to screen inmate complaints "before docketing, if feasible, or . . . as soon as practicable after docketing," and dismiss the complaint if it is "frivolous, malicious, . . . fails to state a claim upon which relief may be granted[,] or . . . seeks monetary relief from a defendant who is immune from such relief." 28 U. S. C. §§1915A(a), (b). All this may take place before any responsive pleading is filed—unlike in the typical civil case, defendants do not have to respond to a complaint covered by the PLRA until required to do so by the court, and waiving the right to reply does not constitute an admission of the allegations in the complaint. See 42 U. S. C. §1997e(g)(1), (2). According to respondents, these departures from the normal litigation framework of complaint and response mandate a different pleading requirement for prisoner complaints, if the screening is to serve its intended purpose. See, e.g., Baxter, supra, at 489 ("This court's heightened pleading standards for complaints covered by the PLRA are designed to facilitate the Act's screening requirements . . ."); Knuckles El, 215 F. 3d, at 642. See also Brief for Respondents 17.

We think that the PLRA's screening requirement does not—explicitly or implicitly—justify deviating from the usual procedural practice beyond the departures specified by the PLRA itself. Before the PLRA, the in forma pauperis provision of §1915, applicable to most prisoner litigation, permitted sua sponte dismissal only if an action was frivolous or malicious. 28 U. S. C. §1915(d) (1994 ed.); see also Neitzke, 490 U. S., at 320 (concluding that a complaint that fails to state a claim was not frivolous under §1915(d) and thus could not be dismissed sua sponte). In the PLRA, Congress added failure to state a claim and seeking monetary relief from a defendant immune from such relief as grounds for sua sponte dismissal of in forma pauperis cases, §1915(e)(2)(B) (2000 ed.), and provided for judicial screening and sua sponte dismissal of prisoner

suits on the same four grounds, §1915A(b); 42 U. S. C. §1997e(c)(1). Although exhaustion was a "centerpiece" of the PLRA, *Woodford*, 548 U. S., at ___ (slip op., at 1–2), failure to exhaust was notably not added in terms to this enumeration. There is thus no reason to suppose that the normal pleading rules have to be altered to facilitate judicial screening of complaints specifically for failure to exhaust.

Some courts have found that exhaustion is subsumed under the PLRA's enumerated ground authorizing early dismissal for "fail[ure] to state a claim upon which relief may be granted." 28 U. S. C. §§1915A(b)(1), 1915(e)(2)(B); 42 U. S. C. §1997e(c)(1). See *Baxter, supra*, at 489; *Steele v. Federal Bureau of Prisons*, 355 F. 3d 1204, 1210 (CA10 2003); *Rivera v. Allin*, 144 F. 3d 719, 731 (CA11 1998). The point is a bit of a red herring. A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief. If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense, see Fed. Rule Civ. Proc. 8(c). Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract. See *Leveto v. Lapina*, 258 F. 3d 156, 161 (CA3 2001) ("[A] complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face" (internal quotation marks omitted)). See also *Lopez-Gonzalez v. Municipality of Comerio*, 404 F. 3d 548, 551 (CA1 2005) (dismissing a complaint barred by the statute of limitations under Rule 12(b)(6)); *Pani v. Empire Blue Cross Blue Shield*, 152 F. 3d 67, 74–75 (CA2 1998) (dismissing a complaint barred by official immunity under

Opinion of the Court

Rule 12(b)(6)). See also 5B C. Wright & A. Miller, Federal Practice and Procedure §1357, pp. 708–710, 721–729 (3d ed. 2004). Determining that Congress meant to include failure to exhaust under the rubric of "failure to state a claim" in the screening provisions of the PLRA would thus not support treating exhaustion as a pleading requirement rather than an affirmative defense.

The argument that screening would be more effective if exhaustion had to be shown in the complaint proves too much; the same could be said with respect to any affirmative defense. The rejoinder that the PLRA focused on exhaustion rather than other defenses simply highlights the failure of Congress to include exhaustion in terms among the enumerated grounds justifying dismissal upon early screening. As noted, that is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim. It is to say that there is no basis for concluding that Congress implicitly meant to transform exhaustion from an affirmative defense to a pleading requirement by the curiously indirect route of specifying that courts should screen PLRA complaints and dismiss those that fail to state a claim.

Respondents point to 42 U. S. C. §1997e(g) as confirming that the usual pleading rules should not apply to PLRA suits, but we think that provision supports petitioners. It specifies that defendants can waive their right to reply to a prisoner complaint without the usual consequence of being deemed to have admitted the allegations in the complaint. See §1997e(g)(1) (allowing defendants to waive their response without admitting the allegations "[n]otwithstanding any other law or rule of procedure"). This shows that when Congress meant to depart from the usual procedural requirements, it did so expressly.

We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in

Opinion of the Court

their complaints.  We understand the reasons behind the decisions of some lower courts to impose a pleading requirement on plaintiffs in this context, but that effort cannot fairly be viewed as an interpretation of the PLRA. "Whatever temptations the statesmanship of policymaking might wisely suggest," the judge's job is to construe the statute—not to make it better.  Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 533 (1947).  The judge "must not read in by way of creation," but instead abide by the "duty of restraint, th[e] humility of function as merely the translator of another's command."  *Id.,* at 533–534.  See *United States* v. *Goldenberg,* 168 U. S. 95, 103 (1897) ("No mere omission . . . which it may seem wise to have specifically provided for, justif[ies] any judicial addition to the language of the statute").  Given that the PLRA does not itself require plaintiffs to plead exhaustion, such a result "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."  *Leatherman,* 507 U. S., at 168.

## III

The Sixth Circuit threw out the Williams and Walton suits because those prisoners had not identified in their initial grievances each defendant they later sued.  136 Fed. Appx., at 862–863; *id.,* at 848–849.  See *Burton,* 321 F. 3d, at 575.[7]  Here again the lower court's procedural

---

[7] This "name all defendants" rule apparently applies even when a prisoner does not learn the identity of the responsible party until a later step of the grievance process.  Upon learning the identity of the responsible party, the prisoner is required to bring an entirely new grievance to properly exhaust.  136 Fed. Appx. 846, 849 (CA6 2005) ("At that point [after he learned, in response to a Step I grievance, that Gearin was responsible for the upper slot restriction], Walton was armed with all of the information that he needed to file a Step I grievance against . . . Gearin—and a federal complaint against Gearin once the claim had been exhausted—but he simply chose not to follow this

Opinion of the Court

rule lacks a textual basis in the PLRA. The PLRA requires exhaustion of "such administrative remedies as are available," 42 U. S. C. §1997e(a), but nothing in the statute imposes a "name all defendants" requirement along the lines of the Sixth Circuit's judicially created rule. Respondents argue that without such a rule the exhaustion requirement would become a "'useless appendage,'" Brief for Respondents 44 (quoting *Woodford*, 548 U. S., at ____ (slip op., at 11)), but the assertion is hyperbole, and the citation of *Woodford* misplaced.

*Woodford* held that "proper exhaustion" was required under the PLRA, and that this requirement was not satisfied when grievances were dismissed because prisoners had missed deadlines set by the grievance policy. *Id.,* at ____ (slip op., at 11–13). At the time each of the grievances at issue here was filed, in contrast, the MDOC policy did not contain any provision specifying who must be named in a grievance. MDOC's policy required only that prisoners "be as specific as possible" in their grievances, 1 App. 148, while at the same time the required forms advised them to "[b]e brief and concise." 2 *id.,* at 1. The MDOC grievance form does not require a prisoner to identify a particular responsible party, and the respondent is not necessarily the allegedly culpable prison official, but rather an administrative official designated in the policy to respond to particular types of grievances at different levels. *Supra,* at 6. The grievance policy specifically provides that the grievant at Step I "shall have the opportunity to explain the grievance more completely at [an] interview, enabling the Step I respondent to gather any additional information needed to respond to the grievance." 1 App. 151. Nothing in the MDOC policy itself supports the conclusion that the grievance process was

─────────

route"). At oral argument, Michigan admitted that it did not agree with at least this application of the rule. Tr. of Oral Arg. 44–45.

improperly invoked simply because an individual later named as a defendant was not named at the first step of the grievance process.

Nor does the PLRA impose such a requirement. In *Woodford*, we held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," 548 U. S., at __ (slip op., at 5)—rules that are defined not by the PLRA, but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. As the MDOC's procedures make no mention of naming particular officials, the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion is unwarranted.

We have identified the benefits of exhaustion to include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record. See *id.*, at ___ (slip op., at 6–8); *Porter*, 534 U. S., at 524–525. The Sixth Circuit rule may promote early notice to those who might later be sued, but that has not been thought to be one of the leading purposes of the exhaustion requirement. See *Johnson*, 385 F. 3d, at 522 ("We are mindful that the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation"); see also Brief for American Civil Liberties Union et al. as *Amici Curiae* 8–9, and n. 6 (collecting grievance proce-

Opinion of the Court

dures and noting that the majority do not require prisoners to identify specific individuals).

We do not determine whether the grievances filed by petitioners satisfied the requirement of "proper exhaustion," *Woodford, supra,* at ___ (slip op., at 11), but simply conclude that exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances. We leave it to the court below in the first instance to determine the sufficiency of the exhaustion in these cases.

## IV

The final issue concerns how courts should address complaints in which the prisoner has failed to exhaust some, but not all, of the claims asserted in the complaint.[8] All agree that no unexhausted claim may be considered. The issue is whether the court should proceed with the exhausted claims, or instead—as the Sixth Circuit has held—dismiss the entire action if any one claim is not properly exhausted. See *Jones Bey,* 407 F. 3d, at 807.[9]

Here the Sixth Circuit can point to language in the PLRA in support of its rule. Section 1997e(a) provides that "[n]o action shall be brought" unless administrative

---

[8] Although we reverse the Sixth Circuit's rulings on the substantive exhaustion requirements as to all three petitioners, the question whether a total exhaustion rule is contemplated by the PLRA is not moot. In Jones's case, the Sixth Circuit ruled in the alternative that total exhaustion required dismissal. 135 Fed. Appx. 837, 839 (CA6 2005) *(per curiam)* ("[E]ven if Jones had shown he had exhausted some of his claims, the district court properly dismissed the complaint because Jones did not show that he had exhausted all of his claims").

[9] After we granted certiorari, the Sixth Circuit suggested that the adoption of a total exhaustion rule in that Circuit in *Jones Bey* ran contrary to previous panel decisions and was therefore not controlling. *Spencer* v. *Bouchard,* 449 F. 3d 721, 726 (2006). See also Rule 206(c) (CA6 2006). As total exhaustion was applied in the cases under review, and the Sixth Circuit is not the only court to apply this rule, we do not concern ourselves with this possible intracircuit split.

JONES *v.* BOCK

Opinion of the Court

procedures are exhausted.   Respondents argue that if
Congress intended courts to dismiss only unexhausted
claims while retaining the balance of the lawsuit, the word
"claim" rather than "action" would have been used in this
provision.

   This statutory phrasing—"no action shall be brought"—
is boilerplate language.   There are many instances in the
Federal Code where similar language is used, but such
language has not been thought to lead to the dismissal of
an entire action if a single claim fails to meet the perti-
nent standards.   Statutes of limitations, for example, are
often introduced by a variant of the phrase "no action shall
be brought," see, *e.g., Beach* v. *Ocwen Fed. Bank*, 523 U. S.
410, 416 (1998); 18 U. S. C. §1030(g) (2000 ed., Supp. IV),
but we have never heard of an entire complaint being
thrown out simply because one of several discrete claims
was barred by the statute of limitations, and it is hard to
imagine what purpose such a rule would serve.   The same
is true with respect to other uses of the "no action shall be
brought" phrasing.   See, *e.g., Hawksbill Sea Turtle* v.
*Federal Emergency Management Agency*, 126 F. 3d 461,
471 (CA3 1997) (dismissing only claims that fail to comply
with the citizen suit notification requirement of 16 U. S. C.
§1540(g)(2), which states that "[n]o action may be com-
menced" until an agency has declined to act after being
given written notice).

   More generally, statutory references to an "action" have
not typically been read to mean that every claim included
in the action must meet the pertinent requirement before
the "action" may proceed.   See, *e.g., Exxon Mobil Corp.* v.
*Allapattah Services, Inc.*, 545 U. S. 546, 560–563 (2005)
(District Court had jurisdiction over a "civil action" under
28 U. S. C. §1367(a), even if it might not have jurisdiction
over each separate claim comprising the action); *Chicago*
v. *International College of Surgeons*, 522 U. S. 156, 166
(1997) (District Court had jurisdiction over removed "civil

Opinion of the Court

action" even if every claim did not satisfy jurisdictional prerequisites).

As a general matter, if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad. "[O]nly the bad claims are dismissed; the complaint as a whole is not. If Congress meant to depart from this norm, we would expect some indication of that, and we find none." *Robinson* v. *Page,* 170 F. 3d 747, 748–749 (CA7 1999) (considering §1997e(e)).

Respondents note an exception to this general rule, the total exhaustion rule in habeas corpus. In *Rose* v. *Lundy,* 455 U. S. 509, 522 (1982), we held that "mixed" habeas petitions—containing both exhausted and unexhausted claims—cannot be adjudicated. This total exhaustion rule applied in habeas was initially derived from considerations of "comity and federalism," not any statutory command. *Rhines* v. *Weber,* 544 U. S. 269, 273 (2005); *id.,* at 274 (noting that Congress "preserved *Lundy*'s total exhaustion requirement" in 28 U. S. C. §2254(b)(1)(A)). Separate claims in a single habeas petition generally seek the same relief from custody, and success on one is often as good as success on another. In such a case it makes sense to require exhaustion of all claims in state court before allowing the federal action to proceed. A typical PLRA suit with multiple claims, on the other hand, may combine a wide variety of discrete complaints, about interactions with guards, prison conditions, generally applicable rules, and so on, seeking different relief on each claim. There is no reason failure to exhaust on one necessarily affects any other. In any event, even if the habeas total exhaustion rule is pertinent, it does not in fact depart from the usual practice—as we recently held, a court presented with a mixed habeas petition "should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims . . . ." *Rhines, supra,* at 278. This is the opposite of the rule the Sixth Circuit adopted,

Opinion of the Court

and precisely the rule that respondents argue against.

Respondents' reading of 42 U. S. C. §1997e(a) to contain a total exhaustion rule is bolstered by the fact that other sections of the PLRA distinguish between actions and claims. Section 1997e(c)(1), for example, provides that a court shall dismiss an *action* for one of four enumerated deficiencies, while §1997e(c)(2) allows a court to dismiss a *claim* for one of these reasons without first determining whether the claim is exhausted. Similarly, 28 U. S. C. §1915A(b) directs district courts to dismiss "the complaint, or any portion of the complaint" before docketing under certain circumstances. This demonstrates that Congress knew how to differentiate between the entire action and particular claims when it wanted to, and suggests that its use of "action" rather than "claim" in 42 U. S. C. §1997e(a) should be given effect.

But the interpretation respondents advocate creates its own inconsistencies. Section 1997e(e) contains similar language, "[n]o . . . action may be brought . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury," yet respondents cite no case interpreting this provision to require dismissal of the entire lawsuit if only one claim does not comply, and again we see little reason for such an approach. Accord, *Cassidy* v. *Indiana Dept. of Corrections,* 199 F. 3d 374, 376–377 (CA7 2000) (dismissing only the portions of the complaint barred by §1997e(e)); see also *Williams* v. *Ollis,* 230 F. 3d 1361 (CA6 2000) (unpublished table decision) (same). Interpreting the phrase "no action shall be brought" to require dismissal of the entire case under §1997e(a) but not §1997e(e) would contravene our normal rules of statutory construction. *National Credit Union Admin.* v. *First Nat. Bank & Trust Co.,* 522 U. S. 479, 501–502 (1998).

In pressing the total exhaustion argument, respondents also marshal the policy and purpose underlying the PLRA—this time in a supporting rather than lead role.

Opinion of the Court

The invigorated exhaustion requirement is a "centerpiece" of the statute, *Woodford*, 548 U. S., at ___ (slip op., at 1–2), and if the exhaustion requirement of §1997e(a) is not effectuated by a total exhaustion rule, they argue, inmates will have little incentive to ensure that they have exhausted all available administrative remedies before proceeding to court. The PLRA mandated early judicial screening to reduce the burden of prisoner litigation on the courts; a total exhaustion rule allows courts promptly to dismiss an action upon identifying an unexhausted claim. The alternative approach turns judges into editors of prisoner complaints, rather than creating an incentive for prisoners to exhaust properly. See *Ross* v. *County of Bernalillo*, 365 F. 3d 1181, 1190 (CA10 2004).

We are not persuaded by these policy arguments. In fact, the effect of a total exhaustion rule could be that inmates will file various claims in separate suits, to avoid the possibility of an unexhausted claim tainting the others. That would certainly not comport with the purpose of the PLRA to reduce the quantity of inmate suits. Additionally, district judges who delve into a prisoner complaint only to realize it contains an unexhausted claim, requiring dismissal of the entire complaint under the total exhaustion rule, will often have to begin the process all over again when the prisoner refiles. In light of typically short prison grievance time limits, prisoners' refiled complaints will often be identical to what the district court would have considered had it simply dismissed unexhausted claims as it encountered them and proceeded with the exhausted ones. Perhaps filing fees and concerns about the applicability of the "three strikes" rule, 28 U. S. C. §1915(g), would mitigate these effects, but the debate about consequences is close enough that there is no clear reason to depart from the more typical claim-by-claim approach.

24                    JONES *v.* BOCK

Opinion of the Court

\*      \*      \*

We are not insensitive to the challenges faced by the lower federal courts in managing their dockets and attempting to separate, when it comes to prisoner suits, not so much wheat from chaff as needles from haystacks. We once again reiterate, however—as we did unanimously in *Leatherman*, *Swierkiewicz*, and *Hill*—that adopting different and more onerous pleading rules to deal with particular categories of cases should be done through established rulemaking procedures, and not on a case-by-case basis by the courts.

The judgments of the United States Court of Appeals for the Sixth Circuit are reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*