IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP.<br>and LAW DEBENTURE TRUST COMPANY<br>OF NEW YORK,<br><br>        Plaintiffs,<br>     v.<br><br>NORTHWESTERN CORPORATION,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-1494-JJF |
| MAGTEN ASSET MANAGEMENT CORP.,<br><br>        Plaintiff,<br>     v.<br><br>MIKE J. HANSON and ERNIE J. KINDT,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 05-499-JJF |

**REPORT AND RECOMMENDATION OF SPECIAL MASTER
WITH RESPECT TO MOTION OF
MAGTEN ASSET MANAGEMENT CORPORATION
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK
TO COMPEL PRODUCTION OF DOCUMENTS AND FOR EXPENSES**

     1.     On February 8, 2006, the Honorable Joseph J. Farnan, Jr. appointed me to serve as Special Master in the above-referenced actions.

     2.     On December 15, 2006, Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively "Plaintiffs") filed a Motion to Compel Production of Documents and for Expenses (the "Motion to Compel") against Northwestern Corporation ("Northwestern") in Civil Action No. 04-1494-JJF and against Defendants

Mike J. Hanson ("Hanson") and Ernie J. Kindt ("Kindt") (collectively "Defendants") in Civil Action No. 05-499-JJF.[1]

3.      Upon the completion of briefing on Plaintiffs' Motion to Compel, a teleconference was held with the Special Master and counsel for the parties on January 15, 2007.

4.      At the conclusion of that hearing, I ordered further briefing with respect to Plaintiffs' Motion to Compel.  That additional supplemental briefing was completed on January 25, 2007.

5.      A second conference with counsel for the parties and the Special Master was held in person on January 29, 2007.  A copy of the transcript of that hearing is attached hereto as Exhibit A.

6.      As of the date of the hearing on January 29, 2007, Defendants Northwestern, Hanson, and Kindt had produced approximately 200,000 pages of documents to Plaintiffs.

7.      During the course of the January 29 hearing, the parties presented their respective positions with respect to the relevance, scope, burden and timing of responses as to the document requests at issue with respect to Plaintiffs' First and Second Requests for Production of Documents.

8.      During the course of the above-referenced hearing, the Special Master and the parties addressed certain specific document requests in Plaintiffs' First Request for Production of Documents, and all of the document requests contained in Plaintiffs' Second Request for Production of Documents.

---

[1]  Only Plaintiff Magten has asserted claims against Hanson and Kindt in Civil Action No. 05-499-JJF.

9.    My rulings with respect to each of the document requests at issue in Plaintiffs' First and Second Requests for Production are contained in the Hearing Transcript of January 29, 2007, at pages 63-116.   The rulings set forth therein are incorporated by reference in this Report and Recommendation to the Court.

10.    As part of my resolution of the disputes with respect to the requests for production at issue, I also determined the time by which Defendants were to produce documents and privilege logs consistent with my rulings at the January 29 Hearing.

11.    In this regard, I ordered Defendants to continue to  produce documents on a rolling basis to Plaintiffs and that, except for good cause shown, Defendants are required to have substantially completed their production of documents in response to Plaintiffs' two document requests, consistent with my rulings on such documents requests, no later than March 16, 2007.   Additionally, I ordered Defendants to produce any privilege logs to Plaintiffs, relating to Plaintiffs' document requests that were the subject of the January 29 Hearing, no later than March 23, 2007.

12.    Accordingly, for the reasons reflected in the January 29 Hearing Transcript, Plaintiffs' Motion to Compel is GRANTED in part and DENIED in part. Plaintiffs' request for an award of attorneys' fees and expenses is DENIED.

13.    This Report and Recommendation will become a final order of the Court unless objection is timely taken in accordance with the provisions of Fed.R.Civ.P. 53(g).

ENTERED this 1st day of February, 2007.

John E. James (No. 996)
Special Master

cc: The Honorable Joseph J. Farnan, Jr.
775761/30048-001

3

# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MAGTEN ASSET MANAGEMENT CORP.  )
and LAW DEBENTURE TRUST COMPANY )
OF NEW YORK,                   )
                               )
          Plaintiffs,          )
                               ) Civil Action
v.                             ) No. 04-1494-JJF
                               )
NORTHWESTERN CORPORATION,      )
                               )
          Defendant.           )
-------------------------------)
MAGTEN ASSET MANAGEMENT CORP., )
                               )
          Plaintiff,           )
                               ) Civil Action
v.                             ) No. 05-499-JJF
                               )
MIKE J. HANSON and ERNIE J. KINDT,)
                               )
          Defendants.          )

                    Potter, Anderson & Corroon LLP
                    1313 North Market Street
                    Wilmington, Delaware

                    Monday, January 29, 2007
                    2:30 p.m.


BEFORE:  JOHN E. JAMES, ESQ.
         SPECIAL DISCOVERY MASTER


             TRANSCRIPT OF PROCEEDINGS


                 WILCOX & FETZER
    1330 King Street - Wilmington Delaware   19801
                  (302) 655-0477
                  www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

*ORIGINAL*



```
 1    APPEARANCES:

 2          DALE R. DUBE, ESQ.

 3          BLANK ROME LLP.

 4            Chase Manhattan Centre

 5            1201 Market Street - Suite 800

 6            Wilmington, Delaware  19801

 7            For the Plaintiffs Magten Asset Management

 8            Corp. and Law Debenture Trust Company

 9            of New York

10          BONNIE STEINGART, ESQ.
            GARY KAPLAN, ESQ.
11          JOHN BREWER, ESQ.
            FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
12            One New York Plaza
              New York, New York  10004-1980
13            For the Plaintiff Magten Asset
              Management Corp.
14
            JOHN V. SNELLINGS, ESQ.
15          NIXON PEABODY LLP
              100 Summer Street
16            Boston, Massachusetts  02110-2131
              For the Plaintiff Law Debenture Trust
17            Company of New York

18          VICTORIA W. COUNIHAN, ESQ.
            GREENBERG TRAURIG LLP
19            The Nemours Building
              1007 North Orange Street - Suite 1200
20            Wilmington, Delaware  19801
                   - and -
21          JOSEPH D. PIZZURRO, ESQ.
            NANCY E. DELANEY, ESQ.
22          CURTIS MALLET-PREVOST COLT & MOSLE LLP
              101 Park Avenue
23            New York, New York  10178-0061
              For Defendant NorthWestern Corporation

24
```



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

APPEARANCES:   (Cont'd)

    DENISE KRAFT, ESQ.
    EDWARDS ANGELL PALMER & DODGE LLC
      919 North Market Street - Suite 1500
      Wilmington, Delaware  19801
        - and -
    STANLEY KALECZYC, ESQ. (Via teleconference)
    KIMBERLY BEATTY, ESQ. (Via teleconference)
    BROWNING KALECZYC BERRY & HOVEN, P.C.
      139 North Last Chance Gulch
      Helena, Montana  59624
      For the Defendants Mike J. Hanson
      and Ernie J. Kindt


        -  -  -  -  -

        SPECIAL DISCOVERY MASTER JAMES:  Special Master James.  We're resuming the hearing that was held on January 15, 2007 in the consolidated cases of Magten Asset Management Corp. and Law Debenture Trust Company of New York versus NorthWestern Corporation and Magten Asset Management Corp. versus Mike J. Hanson and Ernie J. Kindt.

        For the record, let's have each of the counsel, principal counsel who will be speaking today identify themselves and of course Delaware counsel should do so as well beginning with the plaintiff.

        MS. STEINGART:  Thank you.

        Bonnie Steingart from Fried, Frank on behalf of Magten.

        MS. DUBE:  Dale Dube of Blank, Rome on

1   behalf of Magten.

2          I'm also serving as Delaware counsel just

3   for today on behalf of Law Debenture Trust Company.

4          MR. SNELLINGS:   John Snellings from Nixon

5   Peabody.   I represent Law Debenture Trust Company of

6   New York, the indenture trustee.

7          MR. PIZZURRO:   Joseph Pizzurro, Curtis,

8   Mallet-Prevost, representing NorthWestern.

9          MS. COUNIHAN:   Victoria Counihan of

10  Greenberg, Traurig, local counsel to NorthWestern.

11         MS. KRAFT:   Denise Kraft of Edwards,

12  Angell, Palmer & Dodge, local counsel representing

13  Mike Hanson and Ernie Kindt.

14         MR. KALECZYC:   And Stan Kaleczyc,

15  Browning, Kaleczyc, Berry & Hoven, representing Hanson

16  and Kindt.

17         SPECIAL DISCOVERY MASTER JAMES:   Thank

18  you.

19         I obviously have read all of the

20  subsequent submissions which I appreciate receiving

21  from you on the rather expedited schedule that I

22  requested.   The first thing I would like to know

23  before we hear a little bit of the argument with

24  respect to the pending motions is whether there's been



1   any movement on the stipulations that were discussed

2   during the last hearing with respect to documents or

3   perhaps things beyond documents, stipulations of a

4   documentary character or otherwise that the parties

5   have been able to reach since our last meeting.

6           MS. STEINGART:   We have provided to

7   NorthWestern, we were hoping to provide by Monday but

8   did not provide it until Tuesday, stipulations that we

9   could talk about with respect to the assets

10  transferred from Clark Fork to NorthWestern, the

11  liabilities assumed and the financial condition of

12  Clark Fork subsequent to that transfer.

13          So I think those stipulations are the

14  subject now or will be the subject of give-and-take

15  between NorthWestern and Magten.   I think that we all

16  anticipate being able to reach a conclusion

17  satisfactorily on those, but we'll see.   Those are

18  stipulations that we could talk about because in a

19  sense much of the information about the value of those

20  assets and liabilities were available during the

21  bankruptcy proceeding so to the extent there might

22  have been additional documents but some of the values

23  were the subject of those proceedings, so we felt that

24  we could intelligently talk with NorthWestern about



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    stipulations on those topics.

2            There's a second area of stipulation that

3    arose in connection with the submission by

4    NorthWestern and at this point we haven't seen actual

5    stipulations.  It hasn't been very long since that

6    topic was raised, but at this point one of our

7    concerns is that because we have not begun to fact

8    gather at all on that issue it's really very hard for

9    us to know what we can stipulate to and what the

10   extent of either the wrongdoing or the issues are with

11   respect to the financials that were restated.  So from

12   that point of view, though we do believe that there

13   can be stipulations prior to trial of these matters, I

14   don't know at this point, not having seen any of those

15   documents, what stipulations we can agree to.

16           Now, to the extent that NorthWestern is

17   saying that well, they will stipulate that the

18   financials used during that period of time were

19   materially false and that they were knowingly

20   materially false, I don't know why we're not settling

21   the case if we're talking about those kinds of

22   stipulations.  But, again, because we are without any

23   information about NorthWestern's conduct and knowing

24   use of untrue financial statements for the period



1    preceding and during the transfer, it's hard for us to

2    agree to stipulations.

3              SPECIAL DISCOVERY MASTER JAMES:

4    Mr. Pizzurro, any comment on that?

5              MR. PIZZURRO:  We're reviewing the

6    stipulation of the value.  I have to say I think it

7    will require a lot of work based on what we received

8    and I also would say that I think a lot of the value

9    from our point of view of the stipulation may have now

10   just evaporated because most, if not all, of the

11   documents that we had hoped to save in production as a

12   result of the stip. have now been produced.  There may

13   be a few others.  I'm not undertaking to represent

14   that all of those have been produced, but by far and

15   away a vast majority have been.

16             Just for the record, as of today I think

17   we're in excess of 200,000 pages that have been

18   produced by NorthWestern to the plaintiffs and that

19   entails all of the production of documents from

20   defendants Hanson and Kindt.

21             On the stipulation relating to the

22   financial statements, I don't want to address

23   everything that Ms. Steingart just said because I

24   think that that's going to get us into some of the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   argument that you're going to hear in a moment.  I'm

2   going to let her go ahead and state her position.

3          Obviously, our position is that

4   stipulations such as the one she outlined might not

5   lead to settlement, but it certainly would preclude an

6   awful lot of even the discovery that we would have to

7   acknowledge as relevant given the ruling of Judge Case

8   and Judge Farnan.  But we believe with an appropriate

9   stipulation there's very little discovery that would

10   be left, but I'll address it when Ms. Steingart does.

11          SPECIAL DISCOVERY MASTER JAMES:  Okay.  I

12   read the supplemental papers.  I have some questions.

13          But, Ms. Steingart, why don't you briefly

14   restate your position, not repeating too much of what

15   you said before, but where things stand now and what

16   you're looking for.

17          MS. STEINGART:  Okay.  I think that it is

18   helpful to start with where things stand now because

19   during the pendency of your consideration of these

20   matters we have been receiving production from

21   NorthWestern.  As Mr. Pizzurro has indicated, we have

22   been informed that the production on behalf of Hanson

23   and Kindt is now complete.  We have received

24   additional documents from NorthWestern.

9

1          We don't know if they're at the end of

2    their response to the document production, but

3    certainly we only want what's responsive and if you're

4    there, that would be fine.  I think that would then

5    turn to the issues that remain.

6          SPECIAL DISCOVERY MASTER JAMES:  Excuse

7    me.  With respect to your response, I would like

8    you to focus on -- I mean, to me the three issues that

9    are outstanding are timing, relevance, scope/burden

10   that I'm reading from the papers, from the argument

11   the previous time and from the papers that have been

12   submitted to date.

13          Obviously things have changed a little

14   since the last hearing because at the last hearing

15   NorthWestern had produced 60,000 pages, as I recall,

16   and you're up to 200,000 now in two weeks and perhaps

17   more is coming.  We will get to that in a minute.

18          So when you discuss these issues those are

19   the principal things I want to focus on because

20   initially this was from your perspective a timing

21   issue and certainly that's still on the plate.  And I

22   guess I should ask has NorthWestern come back to you

23   and said we can finish by X date or have they said we

24   can't now because from our perspective the scope of



1    your request or the relevance of your request is not

2    within the ambit of what we think is appropriate?

3            MS. STEINGART:  Well, certainly as to

4    timing, we've not received an indication of a date

5    upon which document production will be complete.  If

6    it is complete, I'm sure that we'll hear that, but we

7    have not heard that it is complete, except with

8    respect to Messrs. Hanson and Kindt, although we have

9    received additional documents.

10           Now, timing also goes to the production

11    with respect to the SEC and the items contained in the

12    second document request.  To some extent, we believe

13    that those were encompassed in the first and we can

14    talk about the items in the first document request

15    that we think encompass those.  And the issues with

16    respect to timing, relevance, scope and burden I think

17    certainly pertain particularly to those and those

18    address some of the objections that have been raised

19    by NorthWestern.

20           Certainly as to relevance, Rule 26 is

21    pretty clear that a document must be produced in

22    connection with discovery if it's relevant to a claim

23    or a defense and here there can be no question but

24    that it's relevant to the defense that NorthWestern



1   has raised, which is that they were properly released

2   or Clark Fork was properly released of all liability.

3   And Judge Case's opinion said well, if there was fraud

4   in procuring that release, if the financial statements

5   of NorthWestern that were used in connection with this

6   transaction were fraudulent, then the release would

7   not be effective.

8        So certainly documents that have been

9   given to the SEC in the SEC's investigation of the

10  financial statements, the public financial statements

11  of NorthWestern that were used during the period of

12  the transfer are relevant.  The complaint alleges both

13  that NorthWestern was insolvent at the time of the

14  transfer and immediately before the transfer and the

15  fact that NorthWestern had financials out there that

16  said it wasn't and then three days after the transfer

17  said that its financials were being reviewed and three

18  months after it said that they were almost $900

19  million in error --

20        SPECIAL DISCOVERY MASTER JAMES:   Excuse

21  me.  I don't think that NorthWestern is really

22  contesting that.  As I understand their papers, they

23  admit that they had to restate their earnings or their

24  financials or whatever to the SEC.



1         And I also think -- correct me if I'm

2 wrong -- that they have produced some SEC documents or

3 some documents they produced to the SEC.

4         MS. STEINGART: Well, I would assume that

5 there are documents that in a random manner were

6 responsive to our request and to the SEC. We have

7 not, we have not received as far as I understand it

8 the SEC production as such. And Mr. Pizzurro can

9 correct me if I'm wrong, but I thought it was

10 resisting that request that was the subject of the

11 supplemental submissions and I do not believe that we

12 have received the SEC production.

13         SPECIAL DISCOVERY MASTER JAMES: Well, the

14 SEC, quote, production -- just let me ask you and then

15 I'm going to come back to you.

16         Just quickly, some of the documents that

17 you produced that are SEC documents, were they part of

18 the SEC production?

19         MR. PIZZURRO: Yes.

20         SPECIAL DISCOVERY MASTER JAMES: Okay.

21         MS. STEINGART: So I think that its

22 relevance is beyond dispute at this point. I think

23 the issue of the falsity of NorthWestern's financials

24 during this entire period has been on the table since

1    Judge Case's decision.   Certainly Judge Case refers to

2    it.   Judge Farnan refers to it.   There's an issue that

3    the Montana court, this decision that the Montana

4    court issued in connection with a motion by Hanson and

5    Kindt where the Montana court refers to the falsity of

6    the public financials.   So this is no surprise.   This

7    is not something that was unknown to NorthWestern from

8    the get-go.   So certianly it's relevant.

9               I think that with respect to timing, scope

10   and burden, suffice it to say that NorthWestern has

11   indicated that it already has these documents

12   segregated and reviewed; that they have been produced

13   to the government electronically so they're already on

14   CD's.   We have indicated our willingness to execute a

15   confidentiality agreement and certainly any documents

16   that are produced in advance to our executing that

17   would be governed by the local rule here that would

18   require once such request is made all documents be

19   held for attorneys' eyes only.

20               So I think that as to timing, scope and

21   burden that there should not be delay or new reviews

22   and new gathering of information that needs to be

23   done.

24               SPECIAL DISCOVERY MASTER JAMES:   Just as a



1    point of information then, you don't have a

2    confidentiality order in place in this case?

3              MS. STEINGART:   We don't have one in

4    place.  We received I think right before our hearing

5    on the 15th a draft and we had I think about a week

6    ago returned the markup and we haven't heard back on

7    the markup.  I think we're very close.

8              MR. PIZZURRO:   I think based on what we

9    received we will have one before the end of this week

10   for sure.

11             SPECIAL DISCOVERY MASTER JAMES:  So that's

12   not an issue.

13             MR. PIZZURRO:  That's not an issue.

14             MS. STEINGART:   That's not an impediment.

15   And we have been holding things confidential since we

16   received the request and we have no dispute or problem

17   with that whatsoever.

18             SPECIAL DISCOVERY MASTER JAMES:  Okay.

19             MS. STEINGART:  I think when we're talking

20   about the SEC production as to timing, scope and

21   burden, it should not delay things.  It might be a

22   burden for us to look at it, but we have asked for it

23   and it goes into the school of be careful what you

24   wish for, I think.  But we think it's relevant and we

15

1   think that they have already done the work that's

2   necessary to amass it.

3                   There's also been some question about the

4   relevance of things that were provided to regulators

5   in addition to the SEC.  And the issue there is during

6   the time of the transfer, of the going flat

7   transaction and not only was there information in

8   financials of NorthWestern given to the trustee, they

9   were also given to regulators.  And it's just further

10  evidence of what NorthWestern was doing with respect

11  to obtaining approvals and reliance based on these

12  false financials, approvals and reliance in connection

13  with the transfer of these very assets.

14                  The regulators for the energy regulators

15  would not have permitted a transaction where these

16  assets were going to an already-insolvent entity.  So

17  it really buttresses and provides further evidence of

18  the conduct of NorthWestern at the time in getting

19  approvals for the transfer of these assets based on

20  financials that were materially false and, if the

21  offer of the stipulation is correct, financials that

22  NorthWestern knew were materially false.

23                  At the same time as this was going on, you

24  had the officers and directors or the officers of



1   NorthWestern based on these materially false

2   financials getting bonuses and other income based on

3   what appeared to be the income and success of

4   NorthWestern when there was none.  And this also goes,

5   this is also evidence of the same kind of wrongdoing

6   and the same kind of scheme, the same use of this

7   public financial information, the same financials that

8   are inaccurate that were used for the going flat, that

9   were used for the trustee, that were used for the

10  regulators were also offered to the board so that the

11  directors could say hey, look at me; I deserve a

12  bonus.

13          SPECIAL DISCOVERY MASTER JAMES:  That's

14  one thing that has interested me because can you

15  explain to me how the information given to the Montana

16  regulators and then of course the Department of

17  Justice probe and then the McGreevey case, how from

18  your perspective the misrepresentations made to those

19  organizations would have differed, if at all, except

20  they would have been made to a different party than

21  the ones that are being produced to the SEC?

22          MS. STEINGART:  Right.  I agree with you,

23  sir.  They don't differ.  They have the same

24  misrepresentations.  It's just further evidence that



1    this was not a random or thoughtless or somehow

2    innocent act.

3              It shows that it was a scheme, that it was

4    a fraud and it just helps to prove that what was being

5    presented to the trustee and the results that

6    NorthWestern hoped to obtain by presenting false

7    information to the trustee were the same results that

8    they hoped to obtain by presenting the false

9    information elsewhere.  That's what it's in aid of.

10             SPECIAL DISCOVERY MASTER JAMES:  That goes

11   back to the standard for fraudulent inducement.  What

12   is your understanding of what you have to prove, you

13   and Law Debenture Trust have to prove to establish

14   that you were fraudulently induced to sign the release

15   in the third amended indenture?

16             MS. STEINGART:  Well, fraud is not

17   something that one can establish without showing some

18   purpose or intent on the part of NorthWestern.  So I

19   think that we should attempt to show -- I mean a court

20   may find that constructive fraud under these

21   circumstances are enough and under constructive fraud

22   specific as opposed to general intent is not as

23   necessary.

24             But if their defense is based on, if they



1    view the defense as you have to show that we really

2    had specific intent to defraud this trustee, I think

3    showing the manner in which these false financials

4    were used to induce others to give consents and

5    releases shows that knowledge in a more compelling way

6    than if you just show one use of it.

7              So just from a trial point of view a judge

8    may say once you show they knew these were false you

9    don't have to show me they knew they were false in

10   five different settings.  But we're, remember, still

11   at the discovery stage and showing that there was an

12   intent to gain approvals and gain personal enrichment

13   by using these same false financials in other settings

14   does help to establish the specific intent of the

15   fraud.

16             SPECIAL DISCOVERY MASTER JAMES:  What does

17   the Department of Justice probe relate to?

18             MS. STEINGART:  The Department of Justice

19   probe relates to the same thing as the SEC.  So I

20   think that the same series of financials and the same

21   public issuance of these financials, knowing they were

22   false, is the subject of the DOJ inquiry.

23             SPECIAL DISCOVERY MASTER JAMES:  Do you

24   have any sense of what portion of the documents you're



1    seeking are publicly available?

2         MS. STEINGART:   I don't know.   I don't

3    know.   Here we're not talking about the burden of a

4    third party.   Here we're talking about somebody who is

5    a party to a case.   This is the defendant.   And to a

6    certain extent I think that we in our papers describe

7    the injury is self-inflicted.   They have raised the

8    defense and now we need to see well, they have said

9    that we were released and the release sets us free.

10   Well, I don't think it sets them free if it was

11   obtained in a manner that was fraudulent.

12         SPECIAL DISCOVERY MASTER JAMES:   And

13   that's what Judge Case has held?

14         MS. STEINGART:   Right.   So from our point

15   of view as to timing, relevance, scope and burden,

16   really those problems are in a sense, Your Honor, ours

17   because they have the stuff assembled, they have a

18   confidentiality agreement, they have sifted through

19   it.   If they want an agreement as to inadvertent

20   waiver if they give us stuff, you know, we will give

21   them an agreement as to inadvertent waiver.   And then

22   we have the burden of sifting through it and being

23   prepared to take depositions within the time that's

24   been allotted to us and we will do that.



1          SPECIAL DISCOVERY MASTER JAMES:   How much

2  time -- we talked a little bit about this in the last

3  call.

4          How much time ideally would you want for

5  depositions?

6          MS. STEINGART:   Well, I think we're going

7  to have between -- I think that we're allowed ten.   I

8  think that the most we'll ask for beyond that is five.

9  So assuming for the moment that there be ten to

10  fifteen depositions, once we begin them I'm hoping

11  that most of them can be one day or less except for

12  maybe two or three of the principals.   So I would

13  think that a day a week for two weeks and then maybe a

14  week thereafter if there are certain depositions that

15  need more than one day.

16          But I'm hoping that 90 percent of the

17  depositions can be done in one day or less.

18          SPECIAL DISCOVERY MASTER JAMES:   Okay.

19  Anything else?

20          MS. STEINGART:   I think that's it, Your

21  Honor.   Thank you.

22          SPECIAL DISCOVERY MASTER JAMES:

23  Mr. Snellings, do you have anything to add?

24          MR. SNELLINGS:   No, Your Honor.



1     SPECIAL DISCOVERY MASTER JAMES:

2  Mr. Pizzurro?

3          MR. PIZZURRO:  Let me try to take the

4  issues in order as you stated them.

5          Timing, if we're talking about the

6  universe of documents, excluding the second document

7  request, which is what the scope and relevant issue I

8  believe is addressed to, but on the timing for the

9  other documents, we ought to be able and I'm confident

10  we will be able to complete production by the end of

11  February, at the latest the first week of March, which

12  would give the remainder of March and April for the

13  depositions that Ms. Steingart described.

14          SPECIAL DISCOVERY MASTER JAMES:  This is

15  putting aside the second request?

16          MR. PIZZURRO:  Exactly.  Exactly.  That

17  timing is going to be off considerably if NorthWestern

18  is compelled to produce certainly all the documents in

19  the -- I would point out that the scope of the second

20  set of requests is beyond simply what was produced to

21  the SEC.  It's all of the deposition transcripts and

22  exhibits to depositions and every subpoena and

23  basically it goes on for the MPSC investigation, as

24  well as the SEC investigation, the DOJ.  The McGreevey

1    lawsuit is mentioned in there as well.

2                As we have pointed out or stated in our

3    response, there are no documents that would be

4    responsive to the requests that relate to the

5    McGreevey case other than, I guess, the request that

6    asked for all documents relevant to a claim the

7    McGreevey claim posited which is identical to the

8    claim here.  So I think that's just redundant of

9    everything else, so I don't count that into any

10   calculus.

11               We have, I think it was in one of our

12   submissions, it's in the neighborhood of 1.1 million

13   documents which were produced to the SEC.  And

14   notwithstanding Ms. Steingart's argument on privilege,

15   the citation of the Westinghouse case is misplaced.

16   The Westinghouse case was interpreting privilege under

17   New Jersey law.  It's not binding on the Delaware

18   courts which uses Delaware state law on this issue.

19   And the Delaware decisions are at odds with the New

20   Jersey decisions, particularly if one produces

21   documents to a regulator such as the SEC with a

22   confidentiality agreement with the regulators and that

23   was the case here.

24               So it will require a substantial amount of



1   review of that universe of documents in order to cull

2   privileged documents.

3         SPECIAL DISCOVERY MASTER JAMES:   Speaking

4   of privilege, have you been producing a privilege log

5   on a going basis?

6         MR. PIZZURRO:   We're preparing a privilege

7   log on a going basis.   We haven't provided a privilege

8   log, which we will do when the production is complete.

9         SPECIAL DISCOVERY MASTER JAMES:   Okay.

10        MR. PIZZURRO:   To talk about relevance, as

11  we pointed out and as Your Honor started the

12  conference, you have to look to Rule 26.   The request

13  has to be relevant to a claim or defense, which means

14  that one has to go back to the complaint.   You have to

15  go back to the pleading because there isn't any other

16  place where one could find a claim or a defense.

17        As Fried, Frank, Ms. Steingart has put in

18  her papers very succinctly, their claim is a simple

19  fraudulent conveyance claim.   Their claim is that

20  NorthWestern and Clark Fork engaged in a transaction

21  in which Clark Fork was stripped of its assets and

22  rendered insolvent and that Clark Fork, therefore, had

23  no one to look to to pay their obligations.

24        Judge Case took that claim and said in



1    order to have that claim, a sine qua non, an element

2    of the claim is that you're a creditor of Clark Fork.

3    He then went through a detailed analysis of all of the

4    transaction documents and all of the arguments that

5    had been raised on behalf of Magten and discounted

6    each and every one of those arguments and found that

7    the transaction released Clark Fork, not NorthWestern.

8    The red herring here is there's an affirmative defense

9    of a release or any affirmative defense at all.  There

10   is none.

11            The release here is a release of Clark

12   Fork, which means that Magten is no longer a creditor

13   and Magten has no standing to assert the fraudulent

14   conveyance which it asserts.  Judge Case said but you

15   have said that that release was induced by fraud and I

16   think that that's something that cannot be determined

17   on a motion to dismiss.

18            So the issue of the fraud is whether the

19   trustee was induced by reliance on the false

20   financials in releasing Clark Fork.  After Judge

21   Case's decision, there was an amended complaint.  The

22   reason I have to assume that there was an amended

23   complaint based on at least what Judge Case said,

24   because there was this PUCA claim that was put in



1  which really is not part of this case anymore, was to

2  include the allegation which is at paragraph 68 that,

3  in fact, the indenture trustee did rely on the false

4  financials in releasing or in executing the third

5  supplemental indenture which Judge Case held operated

6  as a release of Clark Fork.  That was the allegation.

7          There's no allegation of an overarching

8  fraudulent scheme, and it's not just absent from the

9  second or from the first amended complaint.  It's

10  nowhere.  It is in no pleading in this case and,

11  indeed, it is in no legal argument in this case until

12  Your Honor asked for supplemental submissions.  And

13  now a theory of this case which is brand-new has been

14  posited and the theory of the case is that there was

15  this fraudulent scheme and that but for the false

16  financials of NorthWestern which induced regulators to

17  approve which induced the indenture trustee to

18  release, but for that the transfer never would have

19  occurred and, so they argue, Magten would be a

20  creditor of Clark Fork.

21          But that doesn't answer the standing issue

22  because what that argument is is there was a fraud and

23  we're entitled to prove that fraud and as a result we

24  go back in time and we are creditors now, not of an



1    asset-stripped company so we can now assert a

2    fraudulent conveyance claim.  We're a creditor of a

3    company that has the utility assets.

4              The injury, whatever that claim is, and

5    I'm not sure exactly what it is, but whatever that

6    claim is, not only is it not pled, the predicate for

7    the claim is not that Clark Fork has been injured

8    because it's a creditor -- or rather that Magten has

9    been injured because it's a creditor of Clark Fork.

10   The predicate for the claim is that Magten is injured

11   because they are a creditor of NorthWestern.  That's

12   the entire claim.

13             Their claim is you engaged in a fraud, as

14   a result of which you, NorthWestern, took the assets

15   and you assumed our obligations; you weren't able to

16   pay our obligations, as a result of which we're now

17   sitting here as a subordinated creditor in a

18   bankruptcy proceeding and we're asserting that fraud.

19             That theory with the fraud on the

20   regulators and the entire scheme as set forth in the

21   papers for the first time on this supplemental

22   submission is nowhere in any complaint.

23             SPECIAL DISCOVERY MASTER JAMES:  Let me

24   stop you there.



1          Do you agree with that?

2          MS. STEINGART:  No.

3          SPECIAL DISCOVERY MASTER JAMES:  Explain.

4          MS. STEINGART:  I don't agree with that

5   because, first of all, Judge Case did not find the

6   complaint to be inadequate.  He did not say the

7   complaint can survive if this kind of claim can be

8   pleaded, go plead it and amend your complaint.

9          The complaint was amended indeed to act

10  the PUCA claim.  That was the purpose of the

11  amendment, to which we had an immediate renewal of a

12  motion to dismiss which is still pending.  And that

13  motion to dismiss nowhere said that the other claim,

14  the fraudulent conveyance claim still was flawed

15  because it did not allege a fraudulent scheme.  It

16  nowhere said that somehow there's a failure to plead

17  fraud with particularity.

18          So the fraud that Judge Case very clearly

19  spoke of had to do with, one, whether the debtor knew

20  at the time it could not do the transaction based on

21  its restated earnings.  That's what Judge Case said.

22  And, two, whether the financial information provided

23  by the debtor to the public was false.  This was in

24  Judge Case's opinion from the get-go and it has always

1    been and is still the only issue in the case.

2         The other uses and the other fraudulent

3    activities really provides evidence of the wrongdoing

4    with respect to Clark Fork.

5         SPECIAL DISCOVERY MASTER JAMES:  Let me

6    see if I understand this correctly.

7         Assuming that you're able to prove fraud

8    in the inducement, does that permit Magten to then go

9    against the assets of Clark Fork or, as Mr. Pizzurro

10   seems to be saying, it simply affects you somehow with

11   respect to your claims against NorthWestern?

12        MS. STEINGART:  Well, it is a claim now

13   against NorthWestern because what would happen in the

14   normal fraudulent conveyance context is that if there

15   was a fraudulent conveyance and there was a

16   transferee, someone who had the assets --

17        SPECIAL DISCOVERY MASTER JAMES:  In this

18   case NorthWestern.

19        MS. STEINGART:  Right.  Then you would

20   have a constructive trust.  And what Judge Case said

21   is here we have a bankruptcy; the bankruptcy is

22   proceeding; you are a creditor in this class based on

23   your fraudulent conveyance claim so what you have now

24   instead of being able to freeze the transferee of the

1   assets, what you have is a class 9 claim.

2   So our fraudulent conveyance claim for the

3   assets from the transferee was changed to a fraudulent

4   conveyance claim as a class 9 claim for the amount

5   that NorthWestern paid those in the class.  So the

6   class 9 claim is worth two-thirds of face value or

7   three-quarters of face value.

8   So what Mr. Pizzurro is saying is that if

9   we hadn't gone through bankruptcy, NorthWestern would

10  be the transferee and we would be able to get from the

11  transferee the damage or a constructive trust on those

12  assets.

13  Here that's not the case just because of

14  the bankruptcy process which has converted our claim

15  to this class 9 claim.

16  When Mr. Pizzurro talks about the circle,

17  he's sort of saying the bigger the fraud I commit, the

18  more you have no recourse; so if I fraudulently take

19  both the assets and the transferor's obligation to pay

20  you, then you have no claim at all.  And that just

21  can't be the case.  Judge Case said that life doesn't

22  work that way.  The Montana judge very clearly when

23  Hanson and Kindt moved for dismissal of the complaint

24  said life doesn't work that way.

1    So we do have a claim and we have a claim

2  against the transferee for the excess value to the

3  extent of our QUIPS.

4    SPECIAL DISCOVERY MASTER JAMES:  Thank you

5  for that clarification.

6    MR. PIZZURRO:  First of all, my argument

7  or an explication of what I think is actually being

8  argued here by Magten has nothing to do with -- what

9  Ms. Steingart was talking about was remedy.  I'm not

10  talking about remedy.  I'm talking about a claim as

11  pled.

12    They have claimed in their complaint and

13  in the amended complaint that this was a fraudulent

14  transfer because Clark Fork gave up its assets for

15  insufficient consideration.  It was thereby rendered

16  insolvent to the detriment of Magten.  Obviously if

17  Magten is not a creditor of Clark Fork, then the

18  solvency or insolvency of Clark Fork is completely

19  irrelevant.

20    And when they argue that all of these

21  documents and when they argue this theory of fraud on

22  the regulators and that this transaction never would

23  have been able to have been accomplished but for that

24  fraud, they're not talking about a fraudulent



1  conveyance claim and an asset-stripped shell that they

2  must look to.

3              What they're talking about is a situation

4  in which their complaint is NorthWestern assumed the

5  obligation.  That's their complaint.  Their complaint

6  is that the obligor now turned out to be NorthWestern.

7  They want a world in which Clark Fork has the utility

8  assets throwing off sufficient income to be able to

9  pay off its debts, including the QUIPS, and that that

10  is the universe that had continued.

11             It didn't continue and their damage as

12  they really are articulating this claim now is because

13  they aren't creditors of Clark Fork; it's because

14  they're creditors of NorthWestern.  Now, that's not

15  the claim that Judge Case upheld.  It's not the claim

16  that's pled.

17             And the problem I have here -- and it's a

18  significant one because this goes well beyond simply

19  an issue of discovery.  I don't know what I'm

20  defending anymore.  I've got a complaint that says

21  it's a simple fraudulent conveyance and, indeed, if we

22  read the very beginning of the first supplemental

23  submission on behalf of Magten, that's what Magten

24  says:  It's a simple fraudulent conveyance and we are

1  injured as a result of the insolvency of Clark Fork.

2          SPECIAL DISCOVERY MASTER JAMES:  Can we

3  look at the amended complaint or the complaint?

4  Because I want to walk through this so I understand.

5  I think it's an exhibit to something.

6          MR. PIZZURRO:  Yes.  We submitted the

7  original complaint is Exhibit A to our supplemental,

8  NorthWestern's supplemental submission.

9          MR. BREWER:  It's Exhibit C to your

10  supplement.

11          (Discussion off the record.)

12          SPECIAL DISCOVERY MASTER JAMES:  Which

13  paragraphs are we focusing on?

14          MR. SNELLINGS:  Are you looking at the

15  original complaint or the first --

16          MR. PIZZURRO:  We're looking at the

17  original complaint, which I think is what you wanted

18  to look at.

19          MS. STEINGART:  I think the special master

20  asked for us to look at the amended complaint.

21          MR. PIZZURRO:  You want to look at the

22  amended complaint?

23          SPECIAL DISCOVERY MASTER JAMES:  Does it

24  make any difference?



1           MS. STEINGART:  Paragraph 68 with respect

2  to that is the only thing that changed where paragraph

3  68 talks about the fraudulent inducement of the

4  trustee.

5           SPECIAL DISCOVERY MASTER JAMES:  Well,

6  then, I think we should look at the amended complaint.

7           Is that part of the record?

8           MR. PIZZURRO:  Yes.

9           MS. STEINGART:  Yes, it is.

10          MR. PIZZURRO:  That's Exhibit C to our

11  submission.

12          SPECIAL DISCOVERY MASTER JAMES:  Okay.

13  All right.  Go ahead.

14          Walk me through your explanation as to why

15  the discovery they're seeking does not fit within the

16  ambit of what they have pled.

17          MR. PIZZURRO:  What they have pled is a

18  classic fraudulent conveyance claim which is that

19  NorthWestern had its subsidiary, Clark Fork, transfer

20  assets in exchange for insufficient consideration,

21  which was the assumption of liabilities.  As a result

22  of the transaction, Clark Fork was rendered insolvent

23  and they, Magten, have been injured.

24          SPECIAL DISCOVERY MASTER JAMES:  And



1   that's the second cause of action?

2       MR. PIZZURRO:   That's the second cause of

3   action.   And then it's repeated.   They use two

4   different provisions of the Uniform Fraudulent

5   Conveyance Act, but that's essentially 2 and 3, claims

6   2 and 3.

7       SPECIAL DISCOVERY MASTER JAMES:   The third

8   cause of action?

9       MR. PIZZURRO:   Yes.   Claims 2 and 3.

10      SPECIAL DISCOVERY MASTER JAMES:   What

11  about 4?

12      MR. PIZZURRO:   Well, 4 is -- what's 4?

13      SPECIAL DISCOVERY MASTER JAMES:   That's

14  Clark Fork.   Okay.

15      MR. PIZZURRO:   Rendered Clark Fork

16  undercapitalized.

17      So the predicate for that claim of course

18  is, and this is just to go back to what Judge Case was

19  talking about, the predicate for the claim is you had

20  to have been a creditor of Clark Fork.   In the classic

21  situation what would have occurred would have been

22  that NorthWestern would have taken the assets and left

23  the liabilities rather than assuming the liabilities,

24  left those liabilities with the sub so that now the



1   creditors, such as the QUIPS holders, are looking to

2   an entity which is severely undercapitalized, rendered

3   insolvent, it can't pay them off and they're entitled

4   to relief and that's what they claimed.

5          And of course Judge Case said why are you

6   here claiming that?  You are now creditors of

7   NorthWestern.  The only way that you can have this

8   claim is if you can show that the release of Clark

9   Fork on the indebtedness was obtained by fraud because

10  any contract is vitiated by fraud.

11          SPECIAL DISCOVERY MASTER JAMES:  Right.

12          MR. PIZZURRO:  And the language that

13  Ms. Steingart cites was stated by the judge in the

14  context of that analysis.  Fraud does not exist in the

15  air.  I don't have a claim for fraud against

16  NorthWestern and no one else in the public has a claim

17  against NorthWestern based on the fact that it might

18  have been publishing false financials unless, of

19  course, you purchased a security or you engaged in

20  some transaction with them.  But the fact that there's

21  false financials in the air doesn't mean anything.

22          SPECIAL DISCOVERY MASTER JAMES:  As I

23  understand her position, Magten's position, the fraud

24  in the inducement theory if she can support it or if



1   Magten can support it then puts them in a better

2   position within the bankruptcy context than they would

3   otherwise have been and that is pled in the amended

4   complaint in her view and is the thrust of Judge

5   Case's decision.

6         MR. PIZZURRO:  With all due respect,

7   that's not the thrust of Judge Case's decision.  The

8   thrust of Judge Case's decision has nothing to do with

9   the ultimate result of the merits of their claim or

10  the remedy to which they are entitled because Judge

11  Case went through an entire analysis where he threw

12  them out.  He said you don't have a claim here.  The

13  only way that you can begin to get to the point where

14  we can discuss the issues you just articulated is

15  whether you have status today as creditor of Clark

16  Fork.  Not that you're a disappointed creditor of

17  NorthWestern.  Not that you are subordinated to other

18  senior unsecured debt of NorthWestern.  They didn't

19  have a contract right to avoid that.  They had

20  essentially little, if any, rights as an unsecured

21  creditor.

22         And the QUIPS by their terms, there could

23  be subsequent senior borrowings, there could be

24  securitization of assets, there could be a suspension



1   of payments on the interest for up to 60 consecutive

2   months.   They don't have a claim based on the fact

3   that they ended up at the bottom of the heap of a

4   group of senior unsecured or even secured creditors.

5            SPECIAL DISCOVERY MASTER JAMES:   Why not?

6            MR. PIZZURRO:   Because their contract does

7   not give them that protection.   They can't get any

8   more protection from the law than their contract gives

9   them.

10            In other words, posit a situation, if you

11   will, where Clark Fork secured all of these assets and

12   Clark Fork borrowed a billion dollars or just make up

13   whatever numbers you want, and then rendering itself

14   insolvent as a result of being overleveraged

15   hypothetically.   There's no claim that these

16   securities holders would  have.

17            SPECIAL DISCOVERY MASTER JAMES:   So what

18   is your understanding then if Magten proves fraudulent

19   inducement, then what is the remedy that they will

20   have?

21            MR. PIZZURRO:   The remedy as I understand

22   it, because we are in a bankruptcy context and the

23   debtor has emerged and the plan has been confirmed, is

24   that they will be able to collect on their claim, as



1    Ms. Steingart explained, and recover from the disputed

2    claims reserve based on the plan value of stock at the

3    68 percent and change, whatever the number is.  So I

4    mean there's a formula for coming to whatever the

5    dollar amount would be, which essentially would be

6    payment in full of what they have claimed as principal

7    and accrued interest I guess up until the time of the

8    bankruptcy filing, but I don't want to quibble about

9    the number.

10            But that's essentially the remedy to which

11   they are entitled.  But that is a remedy to which they

12   are entitled only if they can show that that release

13   that they are not creditors, didn't become creditors

14   of NorthWestern.  The theory that we're seeing in

15   these papers and the problem that this presents for

16   NorthWestern is that now we have a completely

17   different theory where the injury is an injury to them

18   as a result of being the creditors of a company which

19   they claim was insolvent at the time of the

20   transfer -- by the way, Judge Case said there was no

21   guarantee of solvency, so that's not the basis for

22   anything -- and a company where they ended up at the

23   bottom of the heap of unsecured creditors and the

24   company ultimately went into bankruptcy.  And that's



1   essentially the injury that they are claiming based on
2   the theory that we now see in these papers, the theory
3   of fraud on the regulators, this theory that somebody
4   would have prevented this transfer from occurring and
5   we would have been saved from the predicament of being
6   a creditor of NorthWestern.

7          That doesn't solve their standing problem
8   and that's a completely different claim.  If they want
9   to plead that claim, I mean that's a different story.

10         I think something that Ms. Steingart said
11  this afternoon highlights the difficulty that this
12  creates for NorthWestern.  She is now talking about
13  the relevance of her discovery requests in terms of
14  evidence of intent and scienter, not in terms of the
15  overarching fraudulent scheme which showed up in these
16  papers for the first time but now in terms of fraud on
17  the indenture trustee.

18         So in the space of what is less than a
19  month, indeed less than, it's only two weeks, we now
20  have three separate theories to support these
21  discovery requests.  And I don't understand how those
22  requests can be substantiated in light of the
23  requirement of Rule 26(b) that they be relevant to a
24  claim or a defense.  There has got to be a claim here

1    and there is no claim of fraud on the regulators.

2    There is no claim that this transaction would never

3    have been able to occur because somebody would have

4    stopped it and, therefore, we're entitled to see all

5    of this.   Their claim is fraud on the indenture

6    trustee.

7            Now, as I said at the last meeting and we

8    have it in the papers, we're willing to give a

9    stipulation.   Now, the precise wording of the

10   stipulation would be subject obviously to negotiation,

11   but we would be willing to give a stipulation that

12   would take out of this case the issue of the false

13   financials and now if Magten would focus on the

14   remaining issue -- which is how did you use those?

15   Were they something that the company did use in order

16   to effectuate the release?   Was it something that was

17   presented to the indenture trustee?   Was it something

18   that would have mattered to the indenture trustee?

19   How were these things used?

20           A fraud requires not simply a material

21   misstatement.   We can get by the material

22   misstatement.   It requires reliance and that's

23   essentially what we think this case ought to be

24   focused on, if we give that stip.   Now, I understand



1   this was precisely what was in front of Judge Farnan

2   when we asked for a protective order, but we weren't

3   prepared to give the stip. at the time even though at

4   that time we were invited by Magten to do it.  They

5   said since you won't stip. to these issues, and Judge

6   Farnan agreed, there's more at stake here than simply

7   whether or not the indenture trustee relied.

8           Well, I think we can work out a stip. and

9   I think that we can avoid the millions of pages of

10   documents that would have to be reviewed and then

11   turned over and the burden that's going to put -- I

12   know they're not complaining about it, but the burden

13   that would be put on plaintiffs' counsel, as well as

14   the substantial burden that would be put on

15   NorthWestern.

16           SPECIAL DISCOVERY MASTER JAMES:  Let's

17   look at the Judge Case decision, page 9 where he talks

18   about was there a fraudulent scheme?

19           Does everybody have it?

20           MS. STEINGART:  Yes.

21           MR. SNELLINGS:  Yes.

22           SPECIAL DISCOVERY MASTER JAMES:  In the

23   penultimate paragraph Judge Case says, "Critical to

24   Debtor's position," which is NorthWestern, "is that



1   the release of Clark Fork under Section 1102 was

2   effective, thereby removing Plaintiffs as creditors of

3   Clark Fork.  However, if Plaintiffs can prove (as they

4   have alleged) that the release was obtained through

5   fraud, then the release would be ineffective."

6           Then he cites Williston:  "If action is

7   taken for a fraudulent purpose or to carry out a

8   fraudulent purpose or to carry out a fraudulent

9   scheme, the action is void and of no force or effect."

10           On the next page, page 10, it says, "If a

11   release is obtained by fraud, it is unenforceable

12   under Montana law" in the middle of that first

13   paragraph and citing various authorities.

14           Then it says, "Debtor directly challenges

15   Plaintiffs' fraud argument, contending that this case

16   must be dismissed because there simply was no fraud.

17   Debtor hangs its hat on the fact that numerous

18   transactions making up to the transfer were disclosed

19   to both regulatory filings and in documents executed

20   by the Trustee.  According to Debtor, the terms of the

21   deals were known to all and, therefore, by definition

22   mean there was in fact no fraudulent intent on

23   Debtor's part.

24           "While Debtor's disclosure may be one



1   factor in favor of finding no fraudulent intent on

2   Debtor's part, it is far from conclusive at the motion

3   to dismiss stage.  Debtor may have disclosed the nuts

4   and bolts of the transfers, but Plaintiffs'

5   allegations go beyond simply that the actual transfer

6   itself was fraudulent in its terms.  As alleged, the

7   questions are whether Debtor knew at the time that it

8   could not do the transaction based on its restated

9   accountings, etc. and whether the financial

10   information Debtor provided the public was in fact

11   false.  These are fact questions not appropriately

12   resolved on a motion to dismiss."

13           Now, my reading of that last paragraph,

14   and I would like you to respond to this, seems to go

15   well beyond what you are articulating as the scope of

16   discovery.  What's confusing to me, however, is that

17   as you seem to indicate Judge Case left up in the

18   air -- well, no.

19           Then looking to the last page, it says,

20   "The Plaintiffs lack standing as creditors of Clark

21   Fork to pursue a fraudulent conveyance action against

22   the Debtor because of the Section 1102 release, unless

23   they can prove under applicable law that the Section

24   1102 release was obtained through actual fraud or as



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   part of a fraudulent scheme."

2           So I just don't understand your argument

3   respectfully, Mr. Pizzurro, that that doesn't say

4   exactly what Magten is arguing here today and

5   supporting its right to obtain at least part of the

6   discovery that they're seeking.  Tell me what I'm

7   missing.

8           MR. PIZZURRO:  Okay.

9           SPECIAL DISCOVERY MASTER JAMES:  First

10  let's take a break.

11          (A brief recess was taken.)

12          MR. PIZZURRO:  I think it's very clear

13  when you look and it's particularly clear when you

14  look at the conclusion that you pointed to, Your

15  Honor.  What the judge said here is that this claim is

16  dismissed unless the release is obtained through

17  actual fraud or part of a fraudulent scheme.  Now, I

18  want to be clear about something here.

19          Although Judge Case alternately in his

20  opinion refers to Magten's position as arguments and

21  as allegations, there are no allegations anywhere in

22  the initial complaint that support this theory.  This

23  theory was a theory which was posited on argument for

24  the motion to dismiss.

1        So that's why there may have been other

2  reasons, but clearly a reason for Magten to have

3  amended its complaint was to pick up on this holding

4  by the judge.  Rule 26 doesn't talk about what judge's

5  opinions may or may not say.  Rule 26 talks about

6  claims or defenses.  And had Magten not amended the

7  complaint and had not asserted or included any

8  allegation whatsoever to support the opportunity here

9  to show standing, I think one could be confident that

10  NorthWestern would have moved again and had a

11  dismissal.

12        But they did amend the complaint and they

13  amended the complaint in this respect solely, as

14  Ms. Steingart said earlier today and as we pointed

15  out, solely in paragraph 68 of the amended complaint.

16  Paragraph 68 of the amended complaint is the only

17  place where any fraud in connection with the third

18  supplemental indenture, which is the Section 1102

19  release, is pled.  That's it.  It's only there.  So

20  there isn't, there isn't this pleading of a fraudulent

21  scheme or any of the other things that we have heard

22  about in the supplemental submissions.

23        Now, we had pointed out in response to the

24  argument that was made by Magten that this Rule 9(b)



1   requires that they plead this with particularity.

2   This is the particularity with which they pled it.

3   And the purpose of Rule 9(b) -- I'm not talking about

4   moving against us for failure to plead it with

5   particularity.  I'm talking about being bound to your

6   allegations so that the defendant knows what

7   wrongdoing he's being accused of.  And we can't

8   constantly have a moving target which is amending the

9   claim, the whole theory of the case in order to

10  justify overarching discovery requests.

11          Whether or not the financials were false

12  is an issue.  How those financials were used in

13  connection with obtaining the Section 1102 release is

14  relevant.  The knowledge and intent on the part of

15  NorthWestern is relevant.  The reliance, if any, by

16  the trustee is relevant.  All those issues are

17  relevant.  I'm not arguing that.

18          But everything that was turned over to the

19  SEC, everything that was turned over to the Montana

20  Public Service Commission, everything that was turned

21  over to the Justice Department?  None of those things

22  are relevant as those kinds of broad brush requests.

23  We can narrow this case.  We can get the veracity of

24  the financials, if you will, out of this case and then

1   we can focus on this fraud if they can prove it.  Were

2   the financials something which were, first of all,

3   falsified in order to obtain the release?  Were the

4   financials, in fact, intentionally used by

5   NorthWestern in order to do the going flat

6   transaction?  Was the indenture trustee presented with

7   the financials in executing the release?  Was there

8   reliance?  These kinds of issues.  That's not a

9   million documents.  It's not even 200,000 that have

10  already been produced.

11          That's a pretty discrete lawsuit which you

12  could probably do your discovery easily within the

13  time allotted and you could probably try that one in

14  three or four days.  But it's not what we have now on

15  the table.

16          SPECIAL DISCOVERY MASTER JAMES:  Have you

17  produced documents responsive to your articulation of

18  what your understanding is of paragraph 69?

19          MR. PIZZURRO:  Yes.  That's what we are

20  doing, and we have gone broader than that.

21          SPECIAL DISCOVERY MASTER JAMES:  You're in

22  the process of doing that?

23          MR. PIZZURRO:  That's what we're in the

24  process of doing, but we have gone broader than that.

1    We have gone broader than that.

2              SPECIAL DISCOVERY MASTER JAMES:   Some of

3    those include documents provided to the SEC?

4              MR. PIZZURRO:   That's correct.

5              SPECIAL DISCOVERY MASTER JAMES:   For my

6    information, because I don't think it's really

7    explained in the papers that have been given to me,

8    and I don't care who explains this to me, but since

9    you have got the podium now, what is the nature of

10   each of these investigations against NorthWestern?

11   That's your client.

12             So what's the nature of the SEC

13   investigation?  What are they looking for?  Why in

14   your view does what they're looking for extend way

15   beyond what is at issue here?

16             MR. PIZZURRO:   What the SEC is looking at

17   is the financial reporting with respect to two

18   non-utility business investments that had been made by

19   NorthWestern.   There's Blue Dot and there's Expanets.

20             And as I understand it, and I'm not, as I

21   pointed out, counsel in the SEC investigation, but the

22   investigation is of certain failure to report expense

23   items in connection with those investments,

24   overstating income resulting from those investments,



1    failure to make available to the public certain

2    substantial, certain substantial financial drain that

3    those investments made on NorthWestern so that when

4    NorthWestern filed its 10-K in April of 2003, it

5    restated its first three quarter Q's for 2002 and that

6    is what was resulted in the 800 plus billion -- or

7    million rather difference in the numbers.

8              And it was as a result of that that the

9    SEC commenced the investigation and has been

10   continuing with that investigation, but the focus of

11   the SEC has been on the Expanets and Blue Dot.  There

12   might be a couple of other minor transactions or

13   investments that are also at issue for the SEC.

14             SPECIAL DISCOVERY MASTER JAMES:  Let me

15   stop you there because as I understood this

16   transaction, that was the whole problem that led to

17   the bankruptcy.  And in demonstrating fraud in the

18   inducement I would think as Magten that I would want

19   to know a lot about the representations made to the

20   debenture trustee, the internal thinking about how to

21   account for the profits and loss of these non-utility

22   assets because they were releasing their right to

23   these utility assets which were pretty stable.

24             MR. PIZZURRO:  Let me correct that,



1    please.

2              SPECIAL DISCOVERY MASTER JAMES:   Okay.

3              MR. PIZZURRO:   The QUIPS had no right in

4    any respect --

5              SPECIAL DISCOVERY MASTER JAMES:   The

6    trustee did.

7              MR. PIZZURRO:   The trustee had none

8    either.   That argument has been made on a couple of

9    occasions to the Bankruptcy Court and the Bankruptcy

10   Court has rejected it.   There's no relationship

11   between the QUIPS and the assets.

12             The QUIPS holders had no right to have the

13   assets held by their obligor.   They were completely

14   unsecured.   This was rejected when they tried to

15   impose the constructive trust and the Court has said

16   no, you're unsecured creditors; you have absolutely no

17   rights in these assets.

18             And there was nothing in what the

19   indenture trustee was required to do or in the

20   transaction of assumption, if you will, which related

21   specifically to any rights that the QUIPS holders had

22   in these assets.

23             SPECIAL DISCOVERY MASTER JAMES:   Okay.

24   Let me hear from you on that.



1          MS. STEINGART:  All right.  It's hard to

2     know where to begin, but I'm going to begin with the

3     complaint or the amended complaint.  And there's a

4     threshold issue that I think is important to explain

5     and I really don't know if Mr. Pizzurro appreciates

6     this issue when he described what the nature of the

7     claim is.  But I would like to direct your attention,

8     if I might, to paragraph 48 of the amended complaint

9     because what paragraph 48 of the amended complaint

10    says is it talks about how the debtor entered into the

11    second supplemental indenture pursuant to which the

12    debtor assumed all the obligations under the indenture

13    on a joint and several basis.

14          So it's important to understand that

15    NorthWestern took the assets and the liabilities, but

16    Clark Fork, but for the release, remained a

17    co-obligor.  The transfer of the assets and

18    liabilities from Clark Fork to NorthWestern did not

19    remove Clark Fork as an entity that was responsible

20    for paying the QUIPS.  So when that transaction

21    occurred, both NorthWestern and Clark Fork were liable

22    for payment on the QUIPS.  All right?

23          So we have a situation that we're still

24    creditors of Clark Fork.  And the thing that made us



1   not a creditor of Clark Fork as well as NorthWestern

2   was the release.  So if the release is reversed, the

3   assets don't have to go back.  We are creditors of

4   Clark Fork with standing to assert the fraudulent

5   conveyance, and that is precisely what Judge Case

6   understood in this last page of his opinion.  That's

7   what this sentence was all about.  And that's in our

8   complaint.

9          What's also in our complaint is the SEC

10  investigation.  Paragraph 61, "Immediately thereafter

11  the SEC launched an informal investigation into

12  debtor's financial statements.  The truth or falsity

13  or knowing falsity of NorthWestern's public financial

14  statements have been at the heart of this issue from

15  the get-go."

16         And in addition to stating a claim not

17  only for fraudulent conveyance, which we have standing

18  to sue if that release is found to be ineffective, we

19  also state a claim for unjust enrichment.  And there's

20  nothing that's been said here today which undercuts

21  that claim no matter who is an obligor.

22         SPECIAL DISCOVERY MASTER JAMES:  How does

23  that work in bankruptcy?

24         MS. STEINGART:  Well, it is, as

1    Mr. Pizzurro says, if we could have obtained a

2    constructive trust of the assets, we would have been

3    secured.  Not having a constructive trust, we have a

4    claim against the transferee, which is NorthWestern,

5    which is your general unsecured claim.  And we have

6    been put in a class and what class we're in and the

7    percentage recovery we get is not really the issue.

8    The issue here is was there a fraudulent conveyance

9    and do we have a claim?  And I think all of the

10   elements of that claim are here.

11        NorthWestern puts us in a difficult

12   situation because I don't like to cast aspersions on

13   an adversary.  We each have our job to do.  But as you

14   can see from Judge Case's opinion on page 10, a

15   portion Your Honor that you read from, the debtor

16   directly challenged our argument by lauding, by

17   complimenting, by pointing out the representations

18   that it made to regulators and others.  It said look

19   at what we told them; look at what we did.

20        Mr. Pizzurro has just told you that the

21   falsity of NorthWestern's financials and the places

22   that those financials were used to obtain benefits and

23   results unjustly is the heart of what the SEC is

24   looking at.  It's the heart of what the DOJ is looking



1  at.  We are looking at the same financials.  It's not

2  as if the SEC is looking at financials for some other

3  period and I'm saying well, what they did five years

4  ago matters now because it shows that they have a

5  pattern.  We're looking at the very same misstated

6  financials, both we and the SEC and the DOJ.

7          And when we have NorthWestern saying well,

8  you have to show that we made these false so that we

9  could induce your trustee.  I'm saying poppycock, you

10  made these false so you could induce everybody and, in

11  fact, you did, so don't tell me how great you were

12  because you used these same financials with

13  regulators, because they were untrue when you used

14  them with the regulators too and they're untrue here.

15          So I think that the complaint clearly sets

16  forth that but for the release, the 1102 release, the

17  QUIPS would be creditors of Clark Fork and that we

18  would have standing to bring this fraudulent

19  conveyance suit against NorthWestern even though

20  NorthWestern was obligated to pay the QUIPS as well.

21  NorthWestern and Clark Fork were co-obligors but for

22  the release.  And Judge Case knew that.

23          And the use of these financials that were

24  admittedly false, that were materially false in each



1    of these settings at the same period of time is

2    relevant to finding fraud in their use with the

3    trustee.

4              MR. SNELLINGS:  Your Honor, if I could

5    also just add to that?

6              SPECIAL DISCOVERY MASTER JAMES:  Yes.

7              MR. SNELLINGS:  I mean, this argument that

8    this case can be narrowed to the reliance of Bank of

9    New York, which was the predecessor indenture trustee

10   in this case at the time of the going flat

11   transaction, has already been argued before Judge

12   Farnan.  He already decided at page 4 of his opinion

13   that the plaintiffs' standing to sue NorthWestern on

14   whether The Bank of New York relied on NorthWestern's

15   financial statements was not what Case found.  Case

16   noted that the essence of plaintiffs' fraud argument

17   was that NorthWestern engaged in a knowing and

18   conscious fraudulent scheme.

19             So he's already rejected this sort of

20   narrow reading, Judge Farnan has, of Judge Case's

21   decision and basically said that it shouldn't be

22   limited just to what the indenture trustee knew at the

23   time in which the transaction went forward.  So it's

24   sort of rearguing something that I think we already

56

1  won.

2       MR. PIZZURRO:   Let me just respond to

3  that.

4       SPECIAL DISCOVERY MASTER JAMES:

5  Certainly.

6       MR. PIZZURRO:   There were a couple of

7  things that Ms. Steingart said.  First of all, we're

8  not rearguing what we argued to Judge Farnan because,

9  as I said, and I made it very clear before, when we

10  moved for a protective order to Judge Farnan, we

11  argued that the only thing that was relevant initially

12  is the reliance by the indenture trustee. · We have

13  very good reason to believe based on positions that

14  Bank of New York has taken in litigation with Magten

15  that there was no such reliance.  But what we argued

16  was let's hold off on all this massive discovery, Your

17  Honor, examine this narrow issue because if The Bank

18  of New York says that we didn't care and wouldn't have

19  cared, then the fraud issue would go away.

20       And Judge Farnan disagreed with that, but

21  that's not what we're arguing here.  We're not arguing

22  here that these issues that Judge Farnan said were

23  relevant are irrelevant.  What we're offering to do is

24  to work out a stipulation which would take those

1   issues that Judge Farnan did focus on in addition to

2   the reliance issue, take those out of the picture.   And

3   there may be some other issues as Judge Farnan pointed

4   out.

5              So once the falseness of the financials

6   and the knowledge of NorthWestern is out of the case,

7   then let's focus on how they were used, if they were

8   used, in connection with inducing the execution of the

9   third supplemental indenture.   But that is the case.

10  Ms. Steingart points to paragraphs in the amended

11  complaint, I mean there's no issue in August of '02

12  that there was joint and several liability between

13  Clark Fork and NorthWestern on the QUIPS.   That went

14  away in November when there was the third supplemental

15  indenture and the release.   But that's irrelevant to

16  the issue of whether that release is effective.

17  That's the issue:   Was that release effective because

18  it was induced by fraud?

19             And the misrepresentation elements at

20  least in terms of the financials, we can get that out

21  of the case.   But why is it relevant as to what the

22  SEC was concerned about in terms of Expanets?   We have

23  agreed that we would produce, and we didn't object to

24  producing in the first set of document requests,



1   documents produced to regulators that concern the

2   going flat transaction.  I understand that point.  And

3   we have said fine, in part, large part because of the

4   fact that there isn't going to be anything there that

5   is going -- you know, that is beneficial to us.  But

6   we're happy to do that.  That's not what they're

7   asking for here.

8            They're asking for a range of documents

9   that has nothing whatsoever to do with this

10  transaction.

11           SPECIAL DISCOVERY MASTER JAMES:  Give me a

12  for example.

13           MR. PIZZURRO:  A for example?  If you have

14  documents that are produced to the SEC that deal with

15  the financial drain that may have been put on

16  NorthWestern in the first or second quarter of 2002

17  and the fact that that was not accurately reported in

18  the Q's at the time, as long as the issue of the fact

19  that those Q's were wrong, what difference does it

20  make as to the underlying investigation?  Unless of

21  course -- now, if they want to ask for documents that

22  the SEC was looking at or asking for in connection

23  with the going flat transaction, they have never asked

24  that question.  I don't have a problem with that.  I

1   really don't have a problem with that, but they refuse

2   to focus on this narrow fraud that they have alleged

3   and have expanded this into an enormous, you know,

4   this fraudulent scheme.

5        And really the whole basis and

6   justification for it is the use by Judge Case of the

7   phrase fraudulent scheme. Now, I don't know what

8   Judge Case was thinking about. I can't. He doesn't

9   describe the fraudulent scheme. So if I need to find

10  out what fraudulent scheme I'm defending against, I

11  guess I have to go to the complaint. There really

12  isn't anyplace else for me to go and there isn't

13  anything in there. There's nothing in there.

14       SPECIAL DISCOVERY MASTER JAMES:  The

15  problem that I'm struggling with and that I have to

16  resolve as part of the pending motion and it's very

17  difficult is to determine, A, what has been produced

18  in the DOJ action, the SEC action, the state actions,

19  et cetera, number one. I think I have a general idea

20  from what you have told me about that.

21       Number two, and I don't see any other way

22  of avoiding this, I think we have to go through the

23  document requests and find out from Magten what

24  exactly it wants and whether, in fact, you're going to



1   produce it or already have produced it because it

2   sounds like you have been producing things that

3   overlaps with the SEC activities.  I don't know

4   whether you produced anything that overlaps with the

5   Montana actions or not and I'm not sure whether we

6   even need that, just thinking out loud.

7          But let's take a look at the first and

8   second request for production.

9          MS. STEINGART:  May I just respond to

10  something very briefly?

11         SPECIAL DISCOVERY MASTER JAMES:  Sure.

12         MS. STEINGART:  I don't want us to lose

13  sight of the fact that it's the financials of

14  NorthWestern that were false.  That's the issue.  When

15  NorthWestern keeps talking about well, it's about the

16  going flat transactions, it's about the going flat

17  transaction, I know what the assets and liabilities of

18  Clark Fork were.  I know what Clark Fork's financial

19  condition was.

20         It was the fact that NorthWestern as a

21  company issued and used false financials in a variety

22  of contexts and the way in which they're false and the

23  way in which they were used will show the fraud.  I

24  mean, this is the first time I've seen someone who's

1   an admitted wrongdoer -- and I don't mean wrongdoer in

2   any sort of eternal damnation sense, but an admitted

3   wrongdoer telling me that I should have the documents

4   that show the wrongdoing, that I have to somehow in

5   advance stipulate to a state of mind when I can have

6   documents that will help to show that this was sort of

7   a general effort and that the trustee of the QUIPS was

8   just one of a dozen entities that were meant to be

9   drawn in to the fraud.

10           If NorthWestern is willing to say that

11   they had materially false financials, that it was

12   intentionally false, that they knew it was false, let

13   them just settle.  I mean, why are we fighting about

14   this?  The money is in a reserve.  The claim is

15   capped.  You know, we're not talking about punitives

16   here.  I mean, why are we fighting?  Why do I have to

17   look at a million documents if you're telling me

18   they're false?  But how can I not look at them and be

19   able to establish the kind of falsity and the kind of

20   intent that was going on everywhere if I'm going to

21   have to litigate it?

22           So we're sort of in a catch 22 here.  If

23   you want to make a clean break, make a clean break of

24   it, but don't make me sort of parse what I need and



1   what I don't need when you have admitted that both the

2   DOJ and the SEC are looking at the publicly false

3   financials that were used during this entire period

4   with the trustee and others.

5         MR. PIZZURRO:  Well, look, the fact that,

6   and I pointed this out earlier on and it is

7   fundamental to our argument, the fact that there were

8   false financials -- and you can't deny it.  They were

9   restated, right.  I'm not admitting anything.  The

10  financials that were extant in 2002 were inaccurate.

11  They were wrong and they were restated.  That does not

12  a fraud case for Magten make.

13         So on that stipulation, let's settle the

14  case, that's exactly my point.  Let's take that issue,

15  let's put it here (indicating).  Now let's focus on

16  all of the other elements that need to be proven

17  because under Ms. Steingart's theory the guy who

18  turned on the lights, the power company, has a fraud

19  claim.  The person who is delivering paper products

20  has a fraud claim.

21         If there's fraudulent financial statements

22  out there, now it's just a question of what my damages

23  are.  That's not, as we all know, what a fraud claim

24  is.



1          SPECIAL DISCOVERY MASTER JAMES:   What

2   she's saying as I understand it is that -- I don't

3   think you disagree with this -- based on Judge Case's

4   decision she has to show that there was the intent to

5   defraud by NorthWestern.

6          MR. PIZZURRO:   Defraud who?

7          SPECIAL DISCOVERY MASTER JAMES:   Defraud

8   the indenture trustee.

9          MR. PIZZURRO:   Exactly.

10          SPECIAL DISCOVERY MASTER JAMES:   And to do

11   that I believe that the plaintiff is entitled to

12   obtain certain documents within a reasonable scope

13   given the time constraints that we have in this case

14   to prove that portion of Magten's case.

15          So what we need to do now is to go through

16   the discovery requests and this is going to be tedious

17   and boring but necessary and that's why they have

18   special masters, because we do these tedious, boring,

19   necessary things, and see if we are on the same page

20   or not as to what the plaintiff seeks, whether

21   NorthWestern opposes it or whether NorthWestern has

22   indeed or will be producing documents responsive to

23   it.  And then I'll have to make a decision as to the

24   magnitude of what's going to be produced, whether it's

1   relevant and to the extent that I order something

2   produced, that will affect the timing on which it has

3   to be done.

4          Now, one threshold issue is Magten has

5   argued that they really didn't need to file the second

6   request for production of documents because everything

7   in this second request was the subject of certain of

8   the requests in their initial production.  And looking

9   at their initial request for production I should say,

10  which is Exhibit A to their original submission, from

11  my reading of this -- and, Ms. Steingart, please

12  correct me if I'm mistaken -- request numbers 14, 15,

13  16, 18, 19, 20, 21, 24, 25 request the type of

14  information that you have spelled out in greater

15  detail in the second request for production of

16  documents.

17          MS. STEINGART:  Right.  The only one that

18  I would add, Your Honor, is number 13, which requests

19  all applications or other documents submitted to

20  regulatory authorities in connection with the

21  transfer.

22          SPECIAL DISCOVERY MASTER JAMES:  All

23  right.

24          Mr. Pizzurro, what is your position with



1   respect to what NorthWestern has produced, intends to

2   produce or will not produce with respect to those

3   requests that I have just identified?

4           MR. PIZZURRO:   With respect to number 13,

5   we are producing documents, that is, applications

6   and/or documents submitted to regulatory authorities

7   in connection with the transfer.

8           My response to number 14 is we will

9   produce.  We have a caveat on that, which is we have

10  an objection to anything that goes back in time I

11  believe before 2002.  So to the extent it goes back to

12  2001, we have a standing objection which has not been

13  challenged.

14          SPECIAL DISCOVERY MASTER JAMES:   Okay.  Is

15  that accurate, Ms. Steingart?

16          MS. STEINGART:   Well, I think to the

17  extent that 2001 is evidence of what needs to be

18  reported in 2002, I mean 2002 encompasses some of the

19  material from 2001 so I don't know how you can avoid

20  producing that.

21          MR. PIZZURRO:   We have produced 2001

22  documents?

23          MS. STEINGART:   You have produced 2001 and

24  I think that we asked when we said that some of the



1    documents were illegible, I think some of those were

2    2001 documents actually and you were providing us with

3    legible copies.  That was just a technical thing with

4    the CD.

5           So I think that we do have 2001.

6           SPECIAL DISCOVERY MASTER JAMES:  I see one

7    of the Fried, Frank lawyers rising.

8           MR. BREWER:  I didn't remember an

9    objection on that particular timing thing and I was

10   trying to find it in the documents.

11          MS. STEINGART:  There has not been an

12   objection on that basis before and we had been getting

13   2001.

14          MS. DELANEY:  We had a standing objection

15   to documents prior to 2002, but because this transfer

16   actually took place, the initial transfer of the

17   assets to NorthWestern's subsidiary took place in

18   February of 2002, we went back into 2001 to reach

19   those regulatory submissions that were made prior to

20   that submission so that the record would be complete

21   now.

22          MS. STEINGART:  Right.  I can give you a

23   copy of your response.  It's not in your response.

24          MS. DELANEY:  You have the documents

1    though.  What we have is a standing objection.

2          MS. STEINGART:  I have the response.  I

3    don't know where the standing objection is I'm telling

4    you.  It's not in the response you gave us.

5          MS. DELANEY:  I think we did at the time.

6          SPECIAL DISCOVERY MASTER JAMES:  Well, I

7    have a representation from counsel, officers of the

8    court, that they have produced documents that relate

9    to 2001 to the extent it would have been incorporated

10   in the 2002 financials and I find that to be

11   acceptable.

12         MS. STEINGART:  Fine.

13         SPECIAL DISCOVERY MASTER JAMES:  Okay.

14   We're on number 15.

15         MR. PIZZURRO:  We have said that we would

16   produce documents that related to the financial

17   statements for the fiscal year ended 2001 through the

18   present, to the extent there are such documents.

19   That's our response.  That's one of the things we're

20   going through.

21         MS. STEINGART:  The documents that relate

22   to questions raised by regulators with respect to

23   2001, financials, year end, et cetera, to the extent

24   that that exists, that would be part of that request.

1          SPECIAL DISCOVERY MASTER JAMES:  Well,

2   let's hear from NorthWestern as to how they're reading

3   it and what they produced and then we will go from

4   there.

5          MS. STEINGART:  Okay.

6          SPECIAL DISCOVERY MASTER JAMES:  All

7   right.  We have on the record what you said about

8   number 15.

9          Number 16.

10         MR. PIZZURRO: 16.  16 we objected to and I

11  believe that 16 is one of the documents or one of the

12  categories of requests that we thought might be

13  obviated with a stip.  However, I do know that many,

14  many of the documents that relate to number 16 have

15  been produced.  They have been produced by Houlihan

16  Lokey who undertook some analyses or we have been

17  producing them.

18         SPECIAL DISCOVERY MASTER JAMES:  To the

19  extent that they have not been produced, I am ordering

20  them to be produced.

21         Request number 18.

22         MR. PIZZURRO:  Yes.  We objected to this

23  as it relates to Clark Fork.

24         SPECIAL DISCOVERY MASTER JAMES:  But

1    produced everything with respect to NorthWestern?

2            MR. PIZZURRO:  But we undertook to,

3    subject to our objection -- now this I have to say.

4    In reading this, I cannot say that our production

5    would encompass every one of these and this one

6    could -- and I'll grant Ms. Steingart this point if

7    this is the one to which she points saying this is

8    what we asked for in the remaining from there were 32

9    through 50, whatever it is in the second request.  So

10   to the extent that we are still arguing over

11   everything that was produced to the SEC and everything

12   that may have been communicated with respect to any

13   restatement of a publicly issued financial statement

14   of NorthWestern and Clark Fork, we disagree that

15   that's relevant.  That's essentially what we have been

16   arguing about.

17           SPECIAL DISCOVERY MASTER JAMES:  Then we

18   will address that when we look at the second request.

19           19.

20           MR. PIZZURRO:  Again, we undertook to

21   produce these documents and as I understand it they're

22   being produced.

23           SPECIAL DISCOVERY MASTER JAMES:  Number

24   20.



1    MR. PIZZURRO:  Again, we objected to this

2 because it relates to Clark Fork.  I believe that many

3 of these documents may have been produced.  We can

4 look into this.  This was another one of the requests

5 that would have been obviated if we had reached a

6 stipulation on the valuation issues.

7    SPECIAL DISCOVERY MASTER JAMES:  Let me

8 ask you:  Why do you want Clark Fork?

9    MS. STEINGART:  Because in terms of

10 showing that it's a fraudulent conveyance part of it

11 is showing the insolvency of Clark Fork after the

12 transfer.  So if you're a creditor of Clark Fork and

13 Clark Fork is solvent and then they take an asset

14 worth $10 but only give Clark Fork $5, Clark Fork

15 doesn't have $10 to pay you.  So it's the insolvency

16 of Clark Fork subsequently, the solvency before and

17 the insolvency after that's part of the cause of

18 action.

19    SPECIAL DISCOVERY MASTER JAMES:  Isn't

20 that kind of easy to deal with in terms of documents?

21    MS. DELANEY:  I don't know.

22    MR. PIZZURRO:  I don't know.  I honestly

23 don't know.

24    MS. STEINGART:  Right.  That's one of the

1    stipulations that we provided that following the

2    transfer of these assets that Clark Fork was unable

3    without the outside assistance to pay its obligations

4    as they became due.

5              SPECIAL DISCOVERY MASTER JAMES:   Okay.

6    I'm going to order those to be produced.

7              MR. PIZZURRO:   Is that number 20?

8              SPECIAL DISCOVERY MASTER JAMES:   Yes.

9              21.

10             MR. PIZZURRO:   We are producing in

11   response to 21.

12             SPECIAL DISCOVERY MASTER JAMES:   Okay.

13   Number 24.

14             MR. PIZZURRO:   Yes, we are producing with

15   respect to 24.

16             SPECIAL DISCOVERY MASTER JAMES:   25.

17             MR. PIZZURRO:   Yes, we are producing 25.

18             SPECIAL DISCOVERY MASTER JAMES:   Okay.   So

19   we made progress there in understanding what has been

20   produced.

21             So let's now turn to your responses to the

22   second set which begins with number 32.   And you

23   indicate there that you are providing non-privileged

24   documents.   Is that correct?



 1          MR. PIZZURRO:  Yes.

 2          SPECIAL DISCOVERY MASTER JAMES:  Request

 3   number 33 which is, if I can paraphrase, basically any

 4   document in the world provided to the SEC by

 5   NorthWestern.

 6          I guess, Ms. Steingart, I'm going to turn

 7   to you on this one.  That seems extraordinarily

 8   overbroad.

 9          MS. STEINGART:  Well, the term SEC

10   investigation is defined to refer to the SEC

11   investigation of the restated financials.  I'm just

12   looking for the SEC investigation definition.

13          SPECIAL DISCOVERY MASTER JAMES:  Which

14   definition?

15          MS. STEINGART:  It's number 12.

16          SPECIAL DISCOVERY MASTER JAMES:  No.

17          MR. BREWER:  19.

18          MS. STEINGART:  I'm sorry.  I don't have

19   my reading glasses, Your Honor.  It's 19.

20          SPECIAL DISCOVERY MASTER JAMES:  Let me

21   read it.

22          What's the Wells notices?

23          MS. STEINGART:  A Wells notice is

24   something that the subject of an investigation is



1    invited to do when the SEC has determined or the staff

2    has determined that it may bring charges or recommend

3    charges to the Commission.   Then the company is

4    invited to sort of write a brief and say this is why

5    what we did should not be the subject of action by the

6    SEC.

7            MR. BREWER:   If I could interject,

8    NorthWestern has disclosed in I believe its most

9    recent 10-Q that a number of current and former

10    employees have received Wells notices.

11            SPECIAL DISCOVERY MASTER JAMES:

12    Mr. Pizzurro, what's your response to this?

13            MR. PIZZURRO:   Well, I have a couple.

14    First of all, this is essentially what we're here

15    arguing about.

16            SPECIAL DISCOVERY MASTER JAMES:   This is

17    the whole thing?

18            MR. PIZZURRO:   This is everything and it

19    goes actually beyond that because it says -- and this

20    is a continuing problem, not the only one, but it's a

21    continuing problem.   It's not all documents produced

22    or provided to the SEC by NorthWestern concerning the

23    2002 financials, a restatement of those financials.

24            I read this definition as broader, but if



1   I have counsel's representation that that's what SEC

2   investigation means and it has only to do with the

3   restatement of the 2002, at least I understand the

4   definition.  I read this and I was unsure because it

5   says including, without limitation.

6         MS. STEINGART:  It does include without

7   limitation.  That's a fair statement.

8         SPECIAL DISCOVERY MASTER JAMES:  You say

9   it does or does not?

10         MS. STEINGART:  It says without

11   limitation.  What counsel said was a fair statement.

12   And certainly we don't want everything for all periods

13   of time.

14         What we want are the investigations that

15   relate to the financials used during 2002 and that

16   were restated at the end of 2002.

17         MR. PIZZURRO:  At least we know now what

18   the definition is.  That is the universe of the 1.1

19   million documents.

20         Now, this request also is any other

21   person.  Obviously that's objectionable.  I mean, at

22   the very most all a party can be expected to produce

23   is documents that it has under its custody and

24   control.  What may have been produced by another

1    person I don't even know and I don't know if anybody

2    knows, other than the SEC might know.

3              MS. STEINGART:  Right.  I agree.  It would

4    only need to be in your custody and control.

5    Sometimes companies do productions not only on behalf

6    of themselves, but they will make a production on

7    behalf of the person who was CFO at the company at the

8    time or they will make a production on behalf of

9    others who are being investigated or are the subject

10   of inquiry in addition to the company and that's all

11   this was meant to encompass.

12              Certainly we're not asking you to go and

13   ask other people.  And to the extent that you think it

14   includes that, we can only ask you, we agree, for

15   what's in your custody and control.

16              MR. PIZZURRO:  Having said that, even with

17   those two caveats, we're back to where we were at the

18   beginning of the day on this issue.

19              SPECIAL DISCOVERY MASTER JAMES:

20   Ms. Steingart, which of the requests in your first set

21   of document requests would you put this particular

22   request within?

23              MS. STEINGART:  I would certainly put this

24   within 18.  I want to go back to my first one.  This

1    is my second one.   I'm sorry.

2              "All documents concerning any possible or

3    actual restatement"...

4              SPECIAL DISCOVERY MASTER JAMES:   "Of any

5    publicly issued financial statements."

6              MS. STEINGART:  "Including, without

7    limitation, any communications with any governmental

8    agency."

9              I also think that it relates to 20 and 21

10   because I'm sure that the government received

11   documents created by both Deloitte and Arthur Andersen

12   in connection with the financials that it was

13   reviewing that were issued by NorthWestern.

14             And 15, all documents that relate to

15   publicly issued financial statements for NorthWestern

16   for the fiscal year ended 2001 through the present.

17             There's also some material that would be

18   relevant for year end 2001 because those year-end

19   financials were also used in connection with there was

20   a February application to regulators and in the first

21   quarter of '02 there was information given to

22   regulators that related to the year-end '01

23   financials, but we asked for that and I think that

24   NorthWestern said that we were getting the '01



1    material.

2              MS. DELANEY:  I only said that with

3    respect to submissions to the regulatory agencies that

4    preceded the February 15, 2002 approval.

5              SPECIAL DISCOVERY MASTER JAMES:  Yes.  I

6    think this is overbroad and I'm not going to require

7    NorthWestern to respond to this.

8              Let's move on to number 34.

9              MS. STEINGART:  So 33 in its entirety is

10   too broad?

11             SPECIAL DISCOVERY MASTER JAMES:  Yes.

12   Quite frankly, I think, if memory serves me, some of

13   the things sought there may be more discretely

14   requested in subsequent requests.

15             34, to which there is an objection.

16             MS. STEINGART:  Well, 34 asks for

17   communications between NorthWestern and the SEC and

18   others concerning the SEC investigation.  And if we

19   look at the SEC investigation as being related to the

20   restatement of the 2002 financials, I would imagine

21   that this is fairly discrete when limited to that.

22             SPECIAL DISCOVERY MASTER JAMES:

23   Mr. Pizzurro?

24             MS. STEINGART:  As well as the Wells



1    notices.  Wells notices are usually not more than

2    fifty, sixty, seventy pages long.

3                    SPECIAL DISCOVERY MASTER JAMES:  Right.

4                    MR. PIZZURRO:  Well, I mean, any document

5    concerning or reflecting oral or written communication

6    between NorthWestern or any other person --

7                    SPECIAL DISCOVERY MASTER JAMES:  Strike

8    "any other person."

9                    MR. PIZZURRO:  -- and the SEC.  I mean,

10   what are we talking about here?  I mean, I think if I

11   produce a document, that's a written communication.

12   Are we talking about what the lawyers had written to

13   the SEC?  Are we talking about briefs that may have

14   been made in the context of this investigation?  I

15   mean, I don't understand.

16                   Oral communications?  Are we talking about

17   now, as later on it gets picked up, are we talking

18   about all deposition transcripts?

19                   MS. STEINGART:  We'll get to those.  But

20   certainly communications between companies and the

21   government, whether they be through lawyers or not,

22   are not privileged.  I mean, these are -- so in

23   NorthWestern's hand these are not privileged

24   documents.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1          And to the extent that NorthWestern has

2    concerns about confidentiality, confidentiality

3    agreements are not a problem.  We're happy to have the

4    confidentiality agreement that we have been

5    discussing.  And to the extent that NorthWestern has

6    particular or special concerns and wants even more

7    special treatment of these kinds of documents, we're

8    open to that.  I mean, that's never been a problem or

9    an issue.

10         You know, I think this is the kind of

11   thing that's objection damaging.  I think that there

12   are a universe of core documents here.  We have always

13   been willing to talk about narrowing and if there's

14   some subset of documents that Mr. Pizzurro wants to

15   talk about, we're very happy to do that.  Striking

16   "any person," that's fine.  You know, talking about

17   this in terms of the 2002 restatement if that's the

18   relevant arena from your point of view, that's fine

19   with us.

20         SPECIAL DISCOVERY MASTER JAMES:  Let me

21   ask this question:  Does the SEC investigation go

22   beyond, quote, restatement of NorthWestern's

23   financials for the fiscal year 2002?

24         MR. PIZZURRO:  I don't understand that it

1    does but, again, I can't speak with authority because

2    I don't represent the company in that context.

3          I would also point out that I would

4    expect, and I don't know, I would expect that an awful

5    lot of documents that would be encompassed within

6    number 34 would be protected by rule of evidence 408.

7    I would expect that a lot of that would be back and

8    forth concerning settlement negotiations, and we would

9    object obviously.

10          SPECIAL DISCOVERY MASTER JAMES:  Well, you

11    obviously would put those on the log.

12          MS. STEINGART:  Most respectfully, 408

13    just has to do with admissibility at trial for any

14    purpose.  That's what 408 says.

15          It has nothing to do with being produced

16    in connection with discovery of a matter.

17          SPECIAL DISCOVERY MASTER JAMES:  That will

18    be an argument for another day, apparently.

19          MS. STEINGART:  Okay.

20          SPECIAL DISCOVERY MASTER JAMES:  But I'm

21    going to order production of this, subject to the

22    limitation that it's only NorthWestern; it's not any

23    other person and that it's restricted to the

24    restatement of NorthWestern's financials for the

1    fiscal year 2002.

2             I am not including in this depositions or

3    other forms of discovery but simply the reports given

4    by NorthWestern, reports, communications, the

5    underlying communications that it has been required by

6    the SEC to give to the SEC.

7             Now, when you talked about depositions

8    before, Mr. Pizzurro, is that depositions from the

9    underlying cases that the SEC wants or has the SEC

10   taken depositions itself of NorthWestern?

11            MR. PIZZURRO:  My understanding is that

12   they have taken depositions.

13            SPECIAL DISCOVERY MASTER JAMES:  Okay.

14   Those are offlimits.

15            Okay.  Request number 35, "All documents

16   provided by the SEC to NorthWestern or any other

17   Person in connection with the SEC Investigation."

18            Ms. Steingart, again, this seems -- well,

19   perhaps the SEC hasn't provided that much to

20   NorthWestern.  So I guess, Mr. Pizzurro, what's your

21   take on this?

22            MR. PIZZURRO:  Well, frankly, if you look

23   at number 32 which we said that we would produce,

24   that's document requests, information requests and/or



1   subpoenas.   Now, I don't know --

2         SPECIAL DISCOVERY MASTER JAMES:   Of

3   anything else?

4         MR. PIZZURRO:   -- of anything else, but I

5   can't deal with something that's so broad that I can't

6   define.

7         SPECIAL DISCOVERY MASTER JAMES:   Right.

8         MS. STEINGART:   There are other kinds of

9   written material that the SEC does provide from time

10  to time to subjects or targets and if counsel has

11  that -- it's certainly not a lot.   It's a very limited

12  kind of communication.

13        SPECIAL DISCOVERY MASTER JAMES:   Such as?

14        MS. STEINGART:   Sometimes they will do

15  letters to describe either things that they're looking

16  for or reports or it doesn't have a name like a Wells

17  submission or a subpoena, but sometimes there is

18  written correspondence between the SEC and a company.

19  And that's all really that addresses.

20        That just really picks up the odd thing

21  that's not included in 32.   It wouldn't be voluminous.

22        SPECIAL DISCOVERY MASTER JAMES:   Okay.

23  I'm going to order that to be produced.

24        MR. PIZZURRO:   Can we get the "or any



1    other Person" language out of request number 35?

2         SPECIAL DISCOVERY MASTER JAMES:  Yes.  In

3    fact, unless otherwise indicated, we can count that

4    out of all of these.  I may change my mind as I go

5    through these things.  Ms. Steingart may change my

6    mind on some of them, but for present purposes that's

7    I think well beyond the scope.

8         36.

9         MR. PIZZURRO:  I think we just discussed

10   that.

11        MS. STEINGART:  Right.  I think we just

12   discussed that.  You indicated that should not be

13   produced.

14        SPECIAL DISCOVERY MASTER JAMES:  Right.

15   Okay.

16        37.  Yes.  So that's out too.

17        38.

18        MS. STEINGART:  These would refer to

19   documents that were provided after deposition to the

20   SEC in connection with the 2002 restatement to the

21   extent that other things became relevant as a result

22   of the --

23        SPECIAL DISCOVERY MASTER JAMES:  Since I'm

24   not requiring them to produce depositions and whatnot,



1    I don't think -- this is not one of them that I'm

2    going to require them to respond to.

3              39.   Okay.   39 begins a series dealing

4    with other investigations, the Department of Justice.

5    What are the Montana proceedings called, their full

6    name, for the record?

7              You have the acronyms.   You should know

8    this by heart.

9              MS. STEINGART:   I should know this by

10   heart.   It's one of the things I don't know by heart,

11   but I'm losing those brain cells slowly as this case

12   continues.

13             MR. BREWER:   It's definition 10 and 11.

14             SPECIAL DISCOVERY MASTER JAMES:   Thank

15   you.

16             MS. STEINGART:   John, thank you.

17             So MCC is Montana Consumer Counsel and

18   MPSC is the Montana Public Service Commission.

19             SPECIAL DISCOVERY MASTER JAMES:   All

20   right.   And these really run the gamut from 39, 40

21   through...

22             MS. STEINGART:   I think it goes to 45.

23             SPECIAL DISCOVERY MASTER JAMES:   No.  It

24   goes beyond that.



1          MS. STEINGART:   Starting at 46 we have the

2     McGreevey, so it goes from 39 through 45.

3          SPECIAL DISCOVERY MASTER JAMES:   But

4     counting McGreevey.

5          MS. STEINGART:   Well, McGreevey, you know,

6     is 46 through 50.   There are no such documents.

7          SPECIAL DISCOVERY MASTER JAMES:   So those

8     are all moot.

9          MS. STEINGART:   So those are all moot.

10    So 46 through 50 we don't have to talk about at all.

11    So the ones that refer to the other government

12    agencies are 39 through 45.

13          SPECIAL DISCOVERY MASTER JAMES:   Okay.

14          MS. STEINGART:   These are a part of the

15    things that NorthWestern -- you know, some of them are

16    it's just congruent with the requests that we have

17    made with respect to the SEC.   The topic is the same.

18    It would be the 2002 restatement.

19          And some of these are things that relate

20    to investigation of the 2002 restatement and others

21    are materials that were submitted in connection with I

22    guess the approvals were in a different category, so

23    those we got.   So this would be only in connection

24    with the investigation.

1      SPECIAL DISCOVERY MASTER JAMES:   Is there

2  anything, any areas, categories that would be unique

3  to the Montana proceedings that would help you

4  demonstrate the fraudulent intent that would not have

5  been required to be submitted as part of the SEC

6  investigation?

7      MS. STEINGART:   Not being as familiar with

8  these kinds of investigations as I am with SEC

9  investigations, I can only surmise.  So I want you

10  to -- but the Montana consumer probe and the Public

11  Service Commission would also have concern with the

12  status of Clark Fork, not only the falsity of the

13  NorthWestern financials at the parent level.  They

14  would have concern with the impact of the falsity of

15  those financials on all of the operating companies

16  that delivered energy.

17      SPECIAL DISCOVERY MASTER JAMES:   But I

18  don't really see how that helps you that much in

19  demonstrating fraudulent intent because we know that

20  it's been admitted that the value given, or at least I

21  think it has, the value given for Clark Fork was

22  grossly inadequate.

23      MR. PIZZURRO:   Well, not --

24      MS. STEINGART:   He hasn't admitted it.



1            MR. PIZZURRO:   I have not admitted it.

2            SPECIAL DISCOVERY MASTER JAMES: Oh, I'm

3   sorry.

4            MS. STEINGART:   He hasn't admitted it.   He

5   says he will, he says he will, but he hasn't admitted

6   it yet.

7            SPECIAL DISCOVERY MASTER JAMES:   But, in

8   any event, it shows that the assets were X and all

9   NorthWestern did was assume the debt, paid no

10  consideration for the assets.   Draw your own

11  conclusions from that.

12           MS. STEINGART:   Right.   This goes more to

13  these agencies looking back to the approval they gave

14  and saying wait a minute; did I really want to give

15  this approval to the going flat transaction?   These

16  agencies began to reexamine, as I understand it and as

17  I understand the settlement that was done in

18  connection with the bankruptcy, the agencies

19  reexamined their review of the going flat transaction

20  and questioned whether they would have given the

21  approvals they gave or would not require refinancing

22  or other actions taken with respect to the energy

23  assets.

24           SPECIAL DISCOVERY MASTER JAMES:   Right.



1    MS. STEINGART:  So this would be a
2    circumstance where these agencies would say because of
3    the falsity of A, B and C, this should not have
4    happened with respect to Clark Fork.
5    SPECIAL DISCOVERY MASTER JAMES:  But how
6    does that help you show that the indenture trustee was
7    fraudulently induced?
8    MS. STEINGART:  Well, to the extent that
9    these agencies were relying on the same financial
10   information or had before them the same financial
11   information that was presented to the trustee, then it
12   would give an indication that the trustee was misled
13   and that there was a general effort by NorthWestern
14   during this time to obtain those assets so that it
15   could bolster NorthWestern despite of NorthWestern's
16   insolvency and in a manner that was harmful to Clark
17   Fork.
18   SPECIAL DISCOVERY MASTER JAMES:  Let me
19   get a bit of historical understanding here of the
20   transaction.
21   Before the third amended indenture was
22   approved which contained the release, what was the
23   status of the approval, if any, by the Montana Public
24   Service Commission or whatever of the deal?



1        MS. STEINGART:   During 2002 there was a

2  review by these agencies of the deal.   And according

3  to NorthWestern, what they told the agencies was that

4  the assets would either remain at the sub or would be

5  upstream to the parent.   And in connection with that,

6  they had to make certain representations about the

7  financial condition and solvency of NorthWestern.

8        And then what the agency said was that you

9  can proceed to either hold it in the sub, based on

10  these financials you can hold it in the sub or you can

11  upstream it.   And if those financials were false, just

12  as the financials used with the trustee were false,

13  then that is part of the fraudulent scheme.   And this

14  is part of the defense at least that was offered

15  before Judge Case as to why there was no question that

16  could be posed with respect to these transactions,

17  that the representations made to the regulators were

18  the same as the representations made to the U.S.

19  Trustee -- I'm sorry -- to the indenture trustee.

20        SPECIAL DISCOVERY MASTER JAMES:   Are there

21  allegations in your amended complaint that the trustee

22  was fraudulently induced in part because of its

23  reliance on what had happened with the Montana

24  regulatory agencies?



1    MS. STEINGART:  No, we do not have that

2    allegation in the complaint, but I don't think that we

3    need to to get discovery.  It's one thing for someone

4    to say that either this is not relevant at trial or

5    the connection you have shown between the use of the

6    financials in these two circumstances are not linked

7    enough so that you can either infer one from the other

8    or see a pattern of wrongdoing with respect to these

9    financials or see a pattern of wrongdoing with respect

10   to the effort to draw the assets out of Clark Fork.

11        One might say that at a later stage, but I

12   think that when we're talking about discovery I think

13   it's relevant enough to get discovery of it, you know,

14   to show that this was part of an overall effort to get

15   these assets out of Clark Fork to try to bolster the

16   failing NorthWestern.

17        So while the trustee may not have relied

18   upon it, it would be part of an overarching fraud.

19   Indeed, once we saw these if a trial judge or someone

20   else said look, it's not relevant, too far removed,

21   fine, but at this stage I don't think it means that we

22   don't at least get to see them and think about them

23   and try to draw that connection.

24        SPECIAL DISCOVERY MASTER JAMES:  How much



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    of this is publicly available?

2              MS. STEINGART:  I don't know.  I can

3    check.  But certainly it would be easier for us to get

4    it from the defendant than to make a FOIA request,

5    though I'm happy to make a FOIA request.

6              SPECIAL DISCOVERY MASTER JAMES:  How much

7    has actually been produced to Magten?

8              MR. PIZZURRO:  In relationship to?

9              SPECIAL DISCOVERY MASTER JAMES:  That

10   relates to the Montana commission proceedings.

11             MR. PIZZURRO:  I don't know.  I honestly

12   don't know.

13             SPECIAL DISCOVERY MASTER JAMES:  Has any?

14             MS. DELANEY:  Some have because the

15   closing documents have been produced.

16             MS. STEINGART:  No.  This is the

17   investigation that we're talking about in this

18   request, not the --

19             MS. DELANEY:  The investigation by whom?

20             MS. STEINGART:  By either the MPCC -- I'm

21   sorry.  The MCC or the MPSC.  There was a settlement

22   entered in connection with the bankruptcy of the

23   investigation.

24             MR. PIZZURRO:  I'm not sure that I can --



1          MR. BREWER:   I believe I can relate it to

2    the documents in the record, just so everyone is on

3    the same page.

4          This is Exhibit B and C to our

5    supplemental submission dated January 19th.   One is a

6    final order of the Montana commission.   The other is a

7    settlement with NorthWestern.   And so I'm not sure if

8    those were two aspects of the same proceeding or two

9    separate regulatory proceedings, but I think those two

10   documents produced in connection with those two

11   proceedings are what we're mostly talking about here.

12          MR. PIZZURRO:   May I make a point?

13          SPECIAL DISCOVERY MASTER JAMES:   You can

14   make as many points as you want.

15          MR. PIZZURRO:   Thank you.

16          What Ms. Steingart said in large part is

17   absolutely correct, except in the most critical part

18   because what Ms. Steingart is saying is that she's

19   justified in getting these documents because it will

20   show that if the regulators were induced to provide

21   approval for the assets to be acquired by NorthWestern

22   in reliance on the same financial statements that may

23   have been produced to the indenture trustee, that goes

24   to her theory of fraud in the inducement of the

1   release.  That's fine, except here's the problem:  The

2   approval, as she pointed out, was given by the

3   regulatory authorities in February 2002.  Let's not

4   forget something here.  NorthWestern purchased these

5   assets from Montana Power in a transaction that began

6   in 2000.  NorthWestern paid and bought these assets

7   and put them in its subsidiary.

8           SPECIAL DISCOVERY MASTER JAMES:  They were

9   wholly owned subsidiaries?

10          MR. PIZZURRO:  Correct.  And at the time

11  that the regulators were asked to approve that

12  transfer, that is to say the transfer of the utility

13  assets from Montana Power to NorthWestern, even though

14  it's being done with subsidiaries and membership

15  interests in LLC's, NorthWestern, as Ms. Steingart

16  pointed out, said to the regulators we're either going

17  to keep these assets in the sub or we're going to move

18  them up into the parent at some point in the future.

19  And the transaction was approved on that basis.

20  That's February 2002.  None of the restated

21  financials, none of the offending financial statements

22  existed because we're talking about, as we have

23  defined, 2002 first quarter, second quarter, third

24  quarter.  That's what was restated.



1    So what the regulators relied on in

2    providing approval for NorthWestern to take these

3    assets and either hold it in a sub or move them up was

4    based on financials that reflected the company's

5    position as of 2001.  There weren't any 2002

6    financials.  So what the regulators may have looked

7    at, how that sort of dovetails in with her theory of

8    this is the same thing that the indenture trustee was

9    looking at is absolutely different.  It's a completely

10   different set of financials.

11           MS. STEINGART:  The final order recites

12   that on December 23rd --

13           SPECIAL DISCOVERY MASTER JAMES:  Where are

14   you reading from?  Part of the record?

15           MS. STEINGART:  I'm looking at our

16   supplemental submission, the exhibit that Mr. Brewer

17   just referenced.

18           SPECIAL DISCOVERY MASTER JAMES:  Is this

19   the reply or the supplemental brief?

20           MS. STEINGART:  It's the supplemental,

21   it's the first one that we filed.

22           SPECIAL DISCOVERY MASTER JAMES:  Which

23   exhibit?

24           MS. STEINGART:  And it's Exhibit B, the



1    final order of the Montana Public Service Commission.

2    And it recites, the first paragraph says on December

3    23rd, 2002, NorthWestern filed an application to get

4    permission to do something.  And the thing that it

5    filed permission to do was to continue to consummate

6    and take steps in connection with the transaction that

7    had been presented and to sort of use the assets, to

8    encumber the assets in connection with further loans

9    that it wanted to have from CSFB.

10                  And then there's a stipulation of

11   settlement thereafter, which is the next exhibit,

12   Exhibit C, which talks about an investigation and a

13   hearing that the commission had with respect to the

14   approvals given for the events that were involved in

15   the going flat transaction and in using the assets to

16   finance further loans by NorthWestern.  So there were

17   additional submissions made to these commissions as

18   the transaction moved along and as different aspects

19   of the transaction were completed during that year

20   from the beginning of February to November to

21   December.

22                  And at various points along the way the

23   commission was brought up to date and given further

24   information.  And then when there was a sudden



1  restatement just weeks after that and then the filing

2  of the bankruptcy, the commission began its

3  investigation of that whole series of submissions.

4  And that's the investigation that we're trying to get

5  the information about because I think that the

6  commission questioned what it did based on the true

7  financials it then received.

8         SPECIAL DISCOVERY MASTER JAMES:  What does

9  the Department of Justice investigation relate to?  Is

10  it identical to the SEC and, if it is, why are they

11  wasting our tax money?

12         Do you know, Mr. Pizzurro?

13         MR. PIZZURRO:  I don't know.  I don't know

14  the answer to that question, either question.

15         MS. STEINGART:  I can try to shed some

16  light.  I don't know what this particular one is.

17  But, generally, if there is wrongdoing with respect to

18  public financials which amounts to criminal

19  wrongdoing, the Department of Justice will --

20         SPECIAL DISCOVERY MASTER JAMES:  The

21  Department of Justice gets involved.

22         MS. STEINGART:  -- sort of bring the

23  criminal charges that are analogues to the SEC's

24  jurisdiction.



1          SPECIAL DISCOVERY MASTER JAMES:  All

2    right.  Now, where did we stop on the requests?

3          MS. STEINGART:  I think we were looking at

4    the ones that were 39 through 45, which dealt with the

5    additional investigations being done by DOJ, Montana

6    Public Service Commission, et cetera.

7          SPECIAL DISCOVERY MASTER JAMES:  Yes,

8    that's a big et cetera:  "Or any other federal or

9    state governmental agency."

10         MS. STEINGART:  If there aren't any

11   others, I'm happy to...

12         MR. PIZZURRO:  If there aren't any others,

13   I'm sure you are.

14         MS. STEINGART:  We could talk about the

15   scope if you told me there were others.  We could

16   narrow it or limit it if you would tell me what was

17   out there.

18         SPECIAL DISCOVERY MASTER JAMES:  Well, 39

19   on its face sort of seems the equivalent of one we saw

20   with the SEC, which is requests made by these agencies

21   to NorthWestern, subpoenas, et cetera.

22         So on this one I'm going to require

23   NorthWestern to respond but only as it relates to the

24   MPSC and the MCC, not the DOJ, and because the



98

1    catchall is not sufficiently clear, nothing as to

2    that.

3              Now, 40 --

4              MS. STEINGART:  I will voluntarily delete

5    DOJ and any other federal agency from 40, if that

6    helps.

7              SPECIAL DISCOVERY MASTER JAMES:  Okay.

8    That's a start.

9              MS. STEINGART:  So we would just limit it

10   to the MPSC or the MCC.

11             MR. PIZZURRO:  Well, I think conceptually

12   there really isn't that much, although the universe

13   might be smaller, but conceptually there's no

14   difference between that and number 33, which was

15   everything produced to the SEC which has already been

16   struck.

17             MS. STEINGART:  Well, smaller is better

18   and this does really relate to the going flat.  It

19   goes to the review of their approval of the going flat

20   transaction.

21             SPECIAL DISCOVERY MASTER JAMES:  Yes.  As

22   worded, number 40 is overbroad.

23             41.

24             MS. STEINGART:  Well, is there a universe



1   within that that would be appropriate?

2           SPECIAL DISCOVERY MASTER JAMES:   That's

3   what we're getting to next, I believe, number 41.

4           MS. STEINGART:   I certainly will take out

5   the "any other Person" and we will take out the any

6   other federal agency and the DOJ.

7           SPECIAL DISCOVERY MASTER JAMES:   All

8   right.  With that qualification, I'm going to order

9   them.

10          MR. PIZZURRO:  Can I get an understanding?

11  If we look at -- now, I don't want to get whipsawed on

12  this thing.  If we look at the definition of

13  investigation in this document request, which is

14  paragraph 8, it's way beyond what Ms. Steingart said

15  she's interested in.  If we can narrow it to what she

16  said she's interested in, at least I know what I'm

17  dealing with.

18          But this "refers to any formal or informal

19  investigation or inquiry conducted by the DOJ, MPSC or

20  any other federal or state governmental agency,

21  including, without limitation, the investigation that

22  resulted in the stipulation and settlement between

23  NorthWestern, the MPSC and the MCC, dated as of July

24  8, 2004 (MPSC Docket No. D2003.8.109), and any other

1    investigations concerning the Transfer, NorthWestern's

2    financial statements, the solvency and ability of

3    NorthWestern and Clark Fork to meet their future

4    obligations and/or any of the allegations contained in

5    Plaintiffs' Complaint."

6              So this is now a huge universe.

7              SPECIAL DISCOVERY MASTER JAMES:   That's a

8    legitimate point.

9              MS. STEINGART:   So let's talk about the

10   transfer.

11             SPECIAL DISCOVERY MASTER JAMES:   Let me

12   look at this for a moment.

13             MS. STEINGART:   Sure.

14             SPECIAL DISCOVERY MASTER JAMES:   Okay.

15   Ms. Steingart, do you have a proposal for reducing the

16   scope of this definition?

17             MS. STEINGART:   I do.   I would take out

18   the words "without limitation."   I certainly would

19   just limit it to the MPSC or the MCC as we have the

20   request.   I would take out any other state or

21   government agency.

22             SPECIAL DISCOVERY MASTER JAMES:   "Federal

23   or state governmental agency."

24             MS. STEINGART:   Right.   So it would just



1   be the formal or informal investigation or inquiry by

2   MPSC or MCC, and I would take out "without

3   limitation," that resulted in the stipulation and

4   settlement, which we just referred to, and I would

5   take out "any other investigation." I would say

6   concerning the transfer and I think that

7   NorthWestern's financial statements, I think that's

8   fair to include. The solvency and ability of

9   NorthWestern and Clark Fork to meet their obligations.

10  And you said that the complaint has very few, if any,

11  allegations that go to this.

12          So why can't we leave in the allegations

13  of the complaint that have relevance?

14          MR. PIZZURRO: Any investigation that is

15  relevant to any allegation contained in the complaint?

16  So the burden is now on us to parse the complaint and

17  determine whether -- I mean, I just think that's

18  unreasonable.

19          SPECIAL DISCOVERY MASTER JAMES: Yes. I

20  do too.

21          MS. STEINGART: So we will take out the

22  last clause. How's that?

23          SPECIAL DISCOVERY MASTER JAMES: Yes.

24          MS. STEINGART: So there will be a period



1   after the words "their future obligations."

2           MR. PIZZURRO:  Okay.  Could you then

3   please read for me what you propose is the definition

4   of investigation?

5           MS. STEINGART:  A sentence that's

6   grammatically correct?

7           MR. PIZZURRO:  As close as we can get.

8           SPECIAL DISCOVERY MASTER JAMES:  Let me

9   read it for the record as I understand it:

10  Investigation refers to any formal or informal

11  investigation or inquiry conducted by the MPSC or the

12  MCC with respect to the investigation that resulted in

13  the stipulation and settlement between NorthWestern,

14  the MPSC and the MCC dated as of July 8, 2004 (MPSC

15  Docket No. D2003.8.109) concerning the transfer,

16  NorthWestern's financial statements, the solvency and

17  ability of NorthWestern and Clark Fork to meet their

18  future obligations, period.

19          All right.  With that qualification, I

20  think that takes care of number 41.

21          Number 42.

22          MS. STEINGART:  We would limit 42 in the

23  same way.  We would take out DOJ, take out any other

24  federal or state agency, so all documents provided by



1    MPSC and/or MCC to NorthWestern in connection with the

2    investigation as the definition is modified.

3                SPECIAL DISCOVERY MASTER JAMES:

4    Mr. Pizzurro?

5                MR. PIZZURRO:  Let me just see for one

6    second.

7                Okay.  That seems to me to be consistent

8    with what you have already done.

9                SPECIAL DISCOVERY MASTER JAMES:  Yes.

10               43 I'm not going to require production of.

11   If you want to try to get this stuff, you can get it

12   directly from those authorities.

13               44 relates to 43.  Therefore, I'm not

14   requiring that.

15               The same for 45.

16               Now we get to the McGreevey asset transfer

17   action.  Tell me a little bit about that,

18   Ms. Steingart.

19               MS. STEINGART:  Well, 46 through 50

20   NorthWestern has already said they have none.  We're

21   perfectly willing to accept that representation.

22               SPECIAL DISCOVERY MASTER JAMES:  All

23   right.

24               MS. STEINGART:  So that brings us to 51.



104

1          SPECIAL DISCOVERY MASTER JAMES:   What is

2    NorthWestern Growth?

3          MS. STEINGART:   As I understand it,

4    NorthWestern Growth was an entity used by

5    NorthWestern's management team to obtain extra

6    compensation in connection with the inflated

7    financials.   So it was an entity through which stock

8    options and other compensation were awarded to the

9    management based on general performance of

10   NorthWestern.

11          You can correct me in I'm wrong about

12   that, but from its public filings that's what I

13   understand.

14          SPECIAL DISCOVERY MASTER JAMES:

15   Mr. Pizzurro, what's your understanding of

16   NorthWestern Growth?

17          MR. PIZZURRO:   My understanding of

18   NorthWestern Growth is very limited.   I know it is a

19   holding company in the corporate organizational chart

20   which holds the Expanets and Blue Dot investments, as

21   well as others.

22          I don't really understand what any of this

23   has to do with the case.   It's pointed out to me that

24   in the initial, in the initial document requests they



1    had already asked for compensation paid at least to

2    Hanson and Kindt since the going flat transaction, as

3    well as what law firms were paid and other

4    professionals, and we objected to all of those.  They

5    have not come back to us on that.

6              I really don't understand this whole

7    theory.  If people got stock options, so what?  The

8    financials were false or they weren't false.  Did they

9    use the false financials to get themselves stock

10   options?  I don't know.  But is every aspect now open

11   so that Ms. Steingart is going to show us -- now the

12   overarching scheme is gone because we're not talking

13   anything about the going flat.  We're not even close.

14   Now we have some sort of pattern, if you will, which

15   is not anywhere near any allegation in this case.

16              SPECIAL DISCOVERY MASTER JAMES:

17   Ms. Steingart, what's your position?

18              MS. STEINGART:  I think that there was in

19   2002 -- we know that the financials for three of the

20   quarters were restated.  We know that the financials

21   for the year were restated.  Yet we know that these

22   are the basic materials upon which regulatory

23   approvals were sought, the trustee's sign-offs were

24   sought, compensation was paid, and I think that it

1   shows intent.  I think that it shows that there were

2   reasons and motivations; that it wasn't just that the

3   columns didn't add up correctly or that people made

4   some sort of good faith projection about what would

5   happen that didn't happen.

6           I think a lot of consequences flowed

7   during this period of time to this -- and we weren't

8   talking about inflated by insignificant amounts.

9   We're talking inflated by very, very substantial

10  amounts.  And generally managements that are

11  incentivized to do that because they have mechanisms

12  to also increase their own compensation to show that

13  you did something recklessly as well as negligently,

14  you know, it's more than negligent.  So if they did it

15  recklessly because only they were looking at their own

16  financial...

17          SPECIAL DISCOVERY MASTER JAMES:  Well-

18  being.

19          MS. STEINGART.  ...well-being as opposed

20  to just gee, let's screw the QUIPS holders, I think

21  that that matters.  Again, once we have discovery of

22  this, somebody could say at trial too attenuated,

23  can't use it.  But at the discovery phase, I think we

24  need to be able to evaluate how and why the financials



WILCOX & FETZER LTD.
Registered Professional Reporters

107

1    turned out to be as inaccurate as they were.

2                 And the fact that this is a serious and

3    far-reaching thing is confirmed by the number and

4    length of the investigations that have happened, so

5    we're not making something up out of whole cloth here,

6    we really aren't.

7                 SPECIAL DISCOVERY MASTER JAMES:   I think

8    one of your colleagues wants to aid your memory on

9    this.

10                MS. STEINGART:   Okay.

11                (Discussion off the record.)

12                MR. KAPLAN:   One thing also just for the

13   record is when the transfer was being reviewed by the

14   Montana regulators, one of the things that they did

15   note was the utilization of NorthWestern Growth

16   Corporation to what it looked to them like there was

17   some accounting improprieties and they ordered in

18   connection with, at some point they ordered

19   NorthWestern to cease making any further payments to

20   management because they said that it is completely

21   inappropriate.

22                So this was something around the time of

23   the transfer when the financial statements were out

24   there that I guess one of the regulators had a lot of



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    questions about.  And the only other thing is at least

2    one of the officers who was receiving payments was

3    fired for cause immediately upon the filing of the

4    Chapter 11.  So in the context of the fraudulent

5    scheme, you have a regulator agency saying that's

6    inappropriate conduct and you have a senior officer

7    fired for cause who was participating in this.

8            SPECIAL DISCOVERY MASTER JAMES:  Would any

9    of this have been, would any of this be included in

10   the prior requests that relate to the MP, the MCC or

11   MP, whatever, the Montana proceedings?

12           MS. STEINGART:  Well, to the extent

13   because --

14           SPECIAL DISCOVERY MASTER JAMES:  Or, for

15   that matter, would some of this stuff have been

16   included in the SEC investigation?

17           MS. STEINGART:  Well, it would have been.

18           SPECIAL DISCOVERY MASTER JAMES:  It would

19   have been.

20           MS. STEINGART:  But to a large extent the

21   document requests that have been eliminated from this

22   deal with -- NorthWestern now does not have to produce

23   to us the documents they provided either to the

24   Montana Public Service Commission or the SEC.  That's



109

1    one of the ways in which we have just narrowed these.

2            SPECIAL DISCOVERY MASTER JAMES:   Well,

3    that's not exactly true.

4            MS. STEINGART:   Some of them are coming

5    through, but I don't think when we were going through

6    the document requests --

7            SPECIAL DISCOVERY MASTER JAMES:   The only

8    ones that I struck on that were the ones that included

9    everything in the world.

10           MS. STEINGART:   But to the extent that

11   counsel says that in response to document requests in

12   the first response that covered those generally 14 or

13   13 or 18, that those are being produced, that's fine.

14   But I don't know that that's what counsel said.

15           SPECIAL DISCOVERY MASTER JAMES:

16   Mr. Pizzurro.

17           MR. PIZZURRO:   Well, the explanation that

18   I just heard for why these documents are relevant is

19   that somehow it influenced or impacted upon these

20   regulators.   And you have said that all documents

21   provided I think it's by or to --

22           SPECIAL DISCOVERY MASTER JAMES:   Right, it

23   is.

24           MR. PIZZURRO:   -- in connection with what



1    we have defined as the relevant investigation is

2    already called for.  So now just all documents

3    relating to NorthWestern Growth, I don't know what --

4    first of all, I don't know what that means.  I don't

5    know why this is relevant except to the extent, and

6    I'm not sure I agree with that, but if the documents

7    were provided in the context of an investigation like

8    that and you ordered us to produce them, then they

9    would be produced if there are any.

10           But everything that relates to

11   NorthWestern Growth?

12           SPECIAL DISCOVERY MASTER JAMES:  Yes.  I

13   see your point on that.

14           What I am going to do is rule that with

15   respect to NorthWestern Growth to the extent it comes

16   within the ambit of the prior requests that relate to

17   the Montana investigations that I have said I've

18   ordered NorthWestern to produce or, for that matter,

19   the SEC requests which I've ordered to be produced,

20   then they should be produced as well, but to the

21   limited extent previously discussed.

22           So that takes us through 51.

23           MS. STEINGART:  Just so that I understand

24   that, we would be getting the documents about

1    NorthWestern Growth that were given to the Montana

2    Public Service Commission?

3                SPECIAL DISCOVERY MASTER JAMES:  Yes.

4         MS. STEINGART:  Okay.  Thank you.

5         MR. PIZZURRO:  I don't want to end up

6    having a letter-writing campaign in a week.

7                SPECIAL DISCOVERY MASTER JAMES:  No.

8    Let's make this clear today.

9         MR. PIZZURRO:  As I understand it, what

10   you have ruled, which is I don't think the same as

11   what Mrs. Steingart just said --

12        MS. STEINGART:  I didn't mean to say...

13        MR. PIZZURRO:  Okay.  Just so we

14   understand, obviously if a request as has been

15   retooled here or you have retooled here calls for the

16   production of documents that relate to NorthWestern

17   Growth, those documents will be produced.  And if

18   that's all that Ms. Steingart meant to say, I have no

19   problem.

20               SPECIAL DISCOVERY MASTER JAMES:  That is

21   subject to the definition, I believe, of

22   investigation, which is the critical component for

23   determining the scope.

24        MR. PIZZURRO:  Yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

112

1          MS. STEINGART:  Right.

2          SPECIAL DISCOVERY MASTER JAMES:  Okay.

3          MR. PIZZURRO:  Yes.

4          SPECIAL DISCOVERY MASTER JAMES:  That

5  brings us to 53?  No.  That's NorthWestern as well.

6          MS. DELANEY:  To 52.

7          MS. STEINGART:  Well, 52 is just the

8  financial statements for NorthWestern Growth for 2001

9  through 2003.

10         SPECIAL DISCOVERY MASTER JAMES:  Yes.

11  Let's produce those.  That's easy.

12         What about 53?

13         MS. STEINGART: 53 is just Deloitte &

14  Touche's review of those documents.  I would

15  voluntarily, you know, limit that to 2001 to 2003 as

16  well, if that would be helpful.

17         SPECIAL DISCOVERY MASTER JAMES: 2001 and

18  2003?

19         MS. STEINGART:  No.  2001 through 2003.

20         MR. PIZZURRO:  Theoretically, that could

21  be hundreds of thousands of pages of documents.  What

22  are you talking about?  Accountant's work papers?

23         MS. STEINGART:  You said it's just a

24  holding company.  Why is it going to be hundreds of

1    thousands --

2              MR. PIZZURRO:  I have no idea.  I really

3    have no idea.  "All documents relating to Deloitte &

4    Touche's review of financial information, operating,

5    and other data related to NorthWestern Growth."

6    Frankly, why that's any less broad than 50 and any

7    more relevant than what would be subsumed in the other

8    requests we're talking about, I don't understand.

9              MS. STEINGART:  Well, we have modified

10   2001 through 2003.  I think you're right that there is

11   some overlap with other requests.  And if on your

12   inspection you believe that this is hundreds of

13   thousands of pages, we certainly can talk about that.

14             SPECIAL DISCOVERY MASTER JAMES:  Let's

15   make it clear today because talking hasn't worked out

16   too well so far in this case and we're approaching the

17   deadline and I want to make it clear today so we don't

18   have further disputes about it.

19             I think it's a legitimate source of

20   inquiry, but I do think that it needs to be reduced in

21   scope.  And I'm not sure.  Mr. Pizzurro, do you think

22   if we limit it to the extent that we have limited the

23   others such as NorthWestern Growth that that would be

24   manageable?

1        MR. PIZZURRO:  Limit it how?

2        SPECIAL DISCOVERY MASTER JAMES:  Limit it

3    so that it only relates to the investigation.

4        MR. PIZZURRO:  If it only relates to the

5    investigation as we have defined it, I think that is

6    probably very doable.

7        SPECIAL DISCOVERY MASTER JAMES:  Okay.

8    Well, let's have that produced on that basis.

9        MS. STEINGART:  Thank you.

10        And 54 they have said they will produce,

11    so we have no disagreement there.  Correct?

12        SPECIAL DISCOVERY MASTER JAMES:  Correct.

13        MR. PIZZURRO:  That's correct.

14        SPECIAL DISCOVERY MASTER JAMES:  So we

15    have managed to cut the Gordian knot to some extent

16    with respect to these requests.  However, that does

17    leave one major issue open.  We have dealt with

18    relevance and scope and now we have to deal with

19    timing.

20        I thought about this a great deal and in

21    light of what we have ordered to be produced today, I

22    am going to require NorthWestern to have substantially

23    completed its production of documents in response to

24    these two document requests, except for good cause



1    shown, no later than March 16, 2007 with a privilege

2    log relating to that production no later than March

3    23.

4              Any questions?

5         MR. PIZZURRO:  Understood.

6         MS. STEINGART:  I would just request, to

7    the extent that it's possible, for NorthWestern to

8    front load as much of that production as you can do

9    and if we can be of assistance in that by doing

10   anything.

11            SPECIAL DISCOVERY MASTER JAMES:  Yes.

12   This is going to be done on a rolling production

13   basis?

14        MR. PIZZURRO:  Yes.  We have been engaged

15   in rolling production.

16            SPECIAL DISCOVERY MASTER JAMES:  You have

17   200,000 documents now.  You can start certainly

18   reviewing those and that should inform you as to the

19   witnesses you're going to need to depose.  To the

20   extent some of those are third parties, you already

21   have enough documents to start deposing people, start

22   doing it.  But that will give you certainly a good six

23   weeks to take depositions, which given the restriction

24   on the number of depositions I think is fair to all



116

1    concerned.

2            MS. STEINGART:  Yes.

3            SPECIAL DISCOVERY MASTER JAMES:  And so

4    with that, for reasons of expedition I'm going to

5    treat today's hearing transcript, which will need to

6    be produced on an expedited basis, as my report and

7    recommendation to Judge Farnan.  I will issue a pro

8    forma order that says something to that effect

9    tomorrow or the next day, whenever I get the

10   transcript.

11           So to the extent someone wants to take an

12   appeal or whatever from my decision, your time will

13   run from whenever that order issued, which should

14   hopefully be tomorrow or the next day.

15           Thank you for all of your patience and

16   thoughtful insights and good luck going forward.

17           MS. STEINGART:  Thank you very much.

18           MR. PIZZURRO:  Thank you.

19           MR. SNELLINGS:  Thank you.

20           (Proceedings concluded at 5:30 p.m.)

21

22

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

117

1    State of Delaware.  )
                          )
2    New Castle County   )

3

4

5                    CERTIFICATE OF REPORTER

6

7         I, Kurt A. Fetzer, Registered Diplomate

8    Reporter and Notary Public, do hereby certify that the

9    foregoing record, pages 1 to 116 inclusive, is a true

10   and accurate transcript of my stenographic notes taken

11   on Monday, January 29, 2007, in the above-captioned

12   matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my hand

15   and seal this #### day of MONTHMONTH, 2007, at

16   Wilmington.

17

18

19        Kurt A. Fetzer KF

20        Kurt A. Fetzer, RDR, CRR

21        Certification No. 100-RPR

22        (Expires January 31, 2008)

23

24

