Westlaw.

Not Reported in A.2d                                                                                                    Page 1

Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Monsanto Co. v. Aetna Cas. & Sur. Co.
Del.Super.,1994.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
  Superior Court of Delaware, New Castle County.
      MONSANTO COMPANY, Plaintiff,
                        v.
        AETNA CASUALTY AND SURETY
         COMPANY, et al., Defendants.
               **No. 88C-JA-118.**

             Submitted: Feb. 2, 1994.
             Decided: May 31, 1994.


London Defendants' Motion for Return of Previously Disclosed Documents: Granted.

Charles S. Crompton, Jr., Richard E. Poole, and Richard L. Horwitz, of Potter Anderson & Corroon, Wilmington, Jerold Oshinsky, and Patricia A. Van Dyke, of Anderson Kill Olick & Oshinsky, Washington, DC and John M. Bray, and David J. Curtin, of Schwalb, Donnenfeld, Bray & Silbert, Washington, DC for plaintiff Monsanto Co.
Francis J. Murphy, and John S. Spadaro, of Murphy Welch & Spadaro, Wilmington, and Michael Nussbaum, Esq. and Bruce R. Grace, of Nussbaum & Wald, Washington, DC for Certain Underwriters at Lloyd's, London and London Market Ins. Companies.

               MEMORANDUM OPINION
RIDGELY, President Judge.
*1 Defendant Certain Underwriters at Lloyd's, London and London Market Insurance Companies (" London Defendants") have moved for an order to require Plaintiff Monsanto Company ("Monsanto") to return certain documents previously disclosed during discovery. Monsanto opposes the motion. For the reasons which follow, the Court concludes that the documents in issue are attorney work product which is privileged from disclosure. The documents must be returned.

                    I. FACTS

In the mid-1980s, members of several American law firms representing the London insurance market drafted seven "position papers" (the "Papers") on important issues affecting environmental insurance coverage. The Papers were originally distributed only to the London Defendants. However, by April 1988, the Papers also appeared in the files of the Hartford Accident and Indemnity Company (" Hartford") during discovery in several insurance coverage cases.

No one knows how the Papers came into Hartford's possession, although each side has its theory. Monsanto, citing the deposition testimony of Edmund A. Rosa ("Rosa"), Hartford's Deputy Director of Casualty Claims, contends Hartford might have received the Papers in order to explore coverage positions in the purchase of reinsurance in the London market. London Defendants assert the Papers might have been sent to Hartford by a London insurance company called Excess Insurance Company owned by Hartford or by a group that owns Hartford. However, the evidence in favor of either theory is inconclusive.

The Papers gained importance in this Court when, in July 1992, Hartford produced a large volume of documents, including the Papers, for North American Philips Corporation ("NAPC") in *North American Philips Corp. v. Aetna Casualty & Sur. Co.,* Del.Super., C.A. No. 88C-JA-155 ("*NAPC*").
In December of that year, the same volume of documents, including once again the Papers, was produced for Monsanto in this case. In neither production were the Papers marked "privileged" or " confidential;" however, they bore Hartford's Bates numbers.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 2
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

On January 5, 1993, Monsanto and NAPC [FN1] sent to Hartford, without copy to anyone else, a letter designating the documents to be used in the Rosa deposition which was scheduled in both cases. In the letter, the Papers were listed as documents produced only in the *NAPC* litigation. According to Monsanto, this was because the Papers first were produced in that case. At the Rosa deposition, the Papers were examined and marked as exhibits. London Defendants did not review the designation letter or documents and did not attend the deposition.

> FN1. Monsanto and NAPC are represented by the same counsel.

London Defendants became aware of Monsanto's possession of the Papers when, in a January 13, 1993 letter, Monsanto designated supplemental documents to be used at the deposition of John Holford ("Holford"). Included in that list of documents were two of the seven Papers. London Defendants immediately notified Monsanto that the Papers were privileged. Monsanto agreed not to use the Papers at the Holford deposition, and London Defendants began to investigate the circumstances under which the documents found their way to Hartford.

*2 On April 20, 1993, London Defendants objected to Monsanto's intended use of the Papers at any deposition and demanded their immediate return. That same date, London Defendants wrote to Hartford and other defendants potentially holding the Papers and requested the documents' return. The next day, Monsanto refused the request. After further correspondence between Monsanto and London Defendants on April 23, May 19, May 21, and June 7, 1993, London Defendants filed this motion to compel the Papers' return.

On August 9, 1993 the Special Discovery Master ("SDM") found: (1) the Papers were protected by the attorney-client privilege, and (2) no waiver of that privilege had occurred. *Monsanto Co. v. Aetna Casualty and Sur. Co.,* Del.Super., C.A. No. 99C-JA-118, Rubenstein, SDM (Aug. 9, 1993) ("*Monsanto* ") Order at 11-12 (Dkt. No. 4908) ("August 9, 1993 Order"). On October 19, 1993, upon Monsanto's exceptions to the August 9, 1993 Order, the Court reserved decision on the attorney-client privilege issue and remanded the matter to the SDM for a decision on the work product privilege raised by London Defendants. On December 6, 1993, the SDM found the papers protected by the work product privilege with no waiver having occurred. *Monsanto,* Rubenstein, SDM (Dec. 6, 1993) Order at 18 (Dkt. No. 5344) ("December 6, 1993 Order").

Monsanto filed exceptions to the SDM's December 6, 1993 Order. London Defendants opposed these exceptions. The Court heard oral argument on February 2, 1994. For the reasons that follow, the Court affirms the SDM's December 6, 1993 Order and grants London Defendants' motion to compel the Papers' return.

### II. CONTENTIONS OF THE PARTIES

London Defendants contend the Papers are protected by both the attorney-client and work product privileges, with no waiver of either privilege having occurred via the documents' inexplicable transmission to Hartford. Monsanto argues the Papers are not protected by either the attorney-client or work product privilege, or in the alternative, that any privilege which did obtain was subsequently waived by London Defendants' dissemination of the documents to Hartford.

### III. ANALYSIS

To begin, it is worth noting that these same Papers have been or are at issue in litigation other than *NAPC* and *Monsanto,* both here in Delaware and elsewhere. In fact, the Papers have surfaced in no fewer than eight other cases since 1990, with the privilege and waiver rulings by judges, magistrates, and special discovery masters far from unanimous. In some instances, both privileges have been found;[FN2] in others, only one privilege.[FN3] And in others, neither privilege was found.[FN4] Generally, where at least one privilege was found, the court found no waiver of that privilege.[FN5]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 3
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN2. *See E.I. DuPont de Nemours & Co. v. Admiral Ins. Co.,* Del.Super., C.A. No. 89C-AU-99-1-CV, Rubenstein, SDM (Jan. 18, 1994) ("*DuPont*") Order at 3, 8; *NL Ind., Inc. v. Commercial Union Ins. Co.,* 144 F.R.D. 225, 228 (D.N.J.1992) ("*NL Industries*") (finding both privileges for papers 1, 4, 5, and 6).

FN3. *See North American Philips Corp. v. Aetna Casualty & Sur. Co.,* Del.Super., C.A. No. 88C-JA-155, Rubenstein, SDM (Apr. 20, 1992) (Order); *Hatco v. W.R. Grace & Co.-Conn.,* D.N.J., No. 89-1031, Wolin, J. (May 10, 1991) ("*Hatco*") (finding work product privilege for papers 1, 4, 5, and 6).

FN4. *See Maryland Casualty Co. v. W.R. Grace & Co.-Conn.,* No. 88 Civ. 2613 (SWK), Bernikow, USMJ (S.D.N.Y., Dec. 8, 1993); *Public Service Electric & Gas Co. v. Associated Electric & Gas Ins. Services, Ltd.,* C.A. No. 88-4811, Politan, J. (D.N.J., Nov. 27, 1990); *In re Texas Eastern Transmission Corp.,* No. 764, VanArtsdalen, S.J. (E.D.Pa., Sep. 18, 1990) (Mem.Op.); *Central Illinois Public Service Co. v. Allianz Underwriters Ins. Co.,* Ill.Cir.Ct., No. 90-L-11094, Wolfson, J. (Feb. 13, 1991) (Order, memorializing oral ruling of Feb. 1, 1991).

FN5. *See DuPont* and *NL Industries, supra* note 2; *Hatco, supra* note 3; *Hercules v. Aetna,* C.A. Nos. 92C-10-105, 90C-FE-195, Glasscock, SDM (Feb. 14, 1994) (finding no waiver of whatever privilege exists).

Naturally, each side points the Court toward those decisions favorable to its current position. However, while the analyses of those courts may be helpful, the Court's task today is to determine the propriety of the SDM's decisions rendered in his August 9, 1993 and December 6, 1993 Orders. SDM decisions are reviewed under a "clearly erroneous" standard. *Monsanto,* Poppiti, J. (Dec. 7, 1989) Order at 2; *id.* Poppiti, J. (Apr. 8, 1991) (Order); *id.* (May 2, 1991) (Order).

A. Work Product Privilege

**\*3** The doctrine of work product privilege finds its roots in *Hickman v. Taylor,* 329 U.S. 495, 516 (1947) (Jackson, J., concurring). In order to preserve our adversarial judicial system, the doctrine protects an attorney's thoughts, mental impressions and analyses from disclosure. It is codified at Superior Court Civil Rule 26(b)(3):

Subject to the provisions of subdivision (b)(4) of this Rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the material by other means. In ordering the discovery of such materials when the required showing has been made, *the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.*

Super.Ct.Civ.R. 26(b)(3) (emphasis added).

In Delaware, the following factors must be considered in determining whether materials are protected by the work product doctrine: (1) whether the documents were prepared in anticipation of litigation, (2) whether the materials contain legal analysis and opinions or purely factual matters, (3) whether the materials were prepared or requested by the party or a representative, (4) whether the materials were routinely prepared, and (5) whether specific claims were present or whether discussions or negotiations had occurred at the time the materials were prepared. *Mullins v. Vakili,* Del.Super., 506 A.2d 192, 198 (1986) ("*Mullins*").

The main evidence to support a finding of work

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 4
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

product privilege here is the May 31, 1991 affidavit of Mr. James Teff, Claims Director of the Marine Division of Janson Green, Ltd., which is the Managing Agent for certain syndicates of Underwriters at Lloyd's, London. To facilitate a better understanding of the circumstances in which the Papers arose, Mr. Teff first explains how the London insurance market operates. Lloyd's may be viewed as a marketplace where individual underwriters function in groups, or "syndicates," in order to underwrite insurance. Teff Affidavit at 2. When an American assured desires insurance from the London market, a U.S.-based broker contacts a London broker to place business at Lloyd's. After determining the nature and amount of coverage sought, the London broker then approaches the Lloyd's underwriters or other companies operating in the broader London insurance market. *Id.*

The London broker first approaches a syndicate or company interested in accepting the proposed risk as the market "leader." *Id.* After negotiating the terms of coverage, the leader determines the proportion of the risk it will accept. *Id.* Acceptance is indicated on a "placing slip." *Id.* Following this, the London broker seeks out others in the London market to complete the coverage sought by the insured. *Id.* at 3. Underwriters subscribing to the risk become part of the "following market." *Id.* The subscription is complete when the broker fills the entire order. *Id.*

*4 Because of the number of insurers which may be covering a particular risk of a single insured, claims handling can be very complex. *Id.* For instance, when claims are presented under multiple policies covering multiple layers of coverage and spanning long time periods, hundreds of individual insurers may be involved. *Id.* In environmental litigation, the London brokers originally handled this task, but as the number of environmental claims presented against the London insurers grew, "it became apparent that the brokers were unable and/or unwilling to circulate claims information and collect fees and expenses expeditiously." *Id.* at 3-4. Thus, a group of market leaders, on behalf of all subscribing London insurers, retained Toplis & Harding (Market Services, Ltd.) to handle this responsibility. *Id.*

The Papers were prepared by American law firms retained by a group of individual underwriters and organized for the purpose of advising the London market insurers about ongoing and expected environmental coverage litigation, including *Occidental Chemical v. Hartford, Independent Petrochemical v. Aetna, Morton Thiokol v. General Accident,* and *Shell Oil Co. v. Accident & Casualty Ins. Co. of Winterthur. Id.* at 4-5. Toplis & Harding then distributed the Papers to the London market insurers. *Id.* at 5.

The Papers themselves were not marked "privileged" or "confidential" when disseminated by Toplis & Harding to the London insurers. London Defendants assert the Papers "were identified by cover letter or otherwise as confidential, attorney-client communications, and the leaders' intentions as expressed to [Toplis & Harding] were that they expected that the documents would be treated as confidential by the London Market Insurers that received them." *Id.* at 5. Monsanto stresses the individual Papers did not contain any markings on their face. Monsanto believes the only markings of confidentiality or privilege were in a cover letter which accompanied the first paper's transmittal. The second through seventh papers were allegedly disseminated at a later date, under a cover letter which contained no special markings of its own but merely referenced the first paper's cover letter. In support of this theory, Monsanto cites the findings of the District Court of New Jersey, which reviewed these same Papers in *Hatco v. W.R. Grace & Co.-Conn.,* D.N.J., No. 89-1031, Wolin, J. (May 10, 1991) at 2-4, a ruling which London Defendants themselves acknowledge and seemingly adopt at one point. *See* London Defendants' Opposition to Monsanto's Exceptions, January 5, 1994 (Dkt. No. 5685) at 2.

1. Anticipation of Litigation

The first *Mullins* factor is whether the materials were prepared in anticipation of litigation. Here, the American law firms retained by the London insurers prepared the Papers against the backdrop of several major pieces of environmental litigation, although the present case was not yet one of those.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                  Page 5
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Nevertheless, litigation relevant to the Papers' subject matter was in progress when the Papers were created, and it was reasonable to presume other similar litigation, such as this case, would follow. The Papers, therefore, were created for existing litigation and the reasonable likelihood of future litigation.

### 2. Legal Analysis and Opinions

*5 The next step is to determine whether the Papers contain legal analysis and opinions, or merely factual recitations. Each of the seven Papers here discusses a different legal subject, ranging from legal liability under CERCLA [FN6] to claims handling to available defenses. After reviewing the Papers, the Court concludes that each contains legal analysis and opinion on one or more topics relating to environmental litigation or claims handling.

> FN6. CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*)

Although Monsanto contends none of the Papers is work product, it takes particular issue with papers two, three, and seven. Again, it cites *Hatco* for support of this position. The *Hatco* court found no protection for these three papers because the papers did not discuss coverage or liability issues.

Paper number two, ironically, discusses the appropriate methods of protection of attorney-client and work product privileges in litigation. It features a discussion of what communications and disclosures should be made and how confidentiality is best maintained.

Paper number three discusses strategies for handling claims involving codefendants with adverse interests and the representation of more than one party.

Paper number seven deals with the issue of notice, particularly with respect to the insurer's obligation to notify the insured of any reservation of rights and defenses upon presentment of claims.

With due respect to the *Hatco* court, I agree with the SDM's finding that these three papers, like the others, are attorney work product. They are closely intertwined with the overall issues of coverage and claims handling which permeate the Papers as a whole, and they clearly contain strategies, tactics and caveats for the conscientious insurer. In sum, they contain mental impressions, thoughts, and legal analyses, which are the hallmark of attorney work product.

### 3. Materials Prepared by Party or Representative

The next factor is whether the documents were prepared either by the party or an authorized representative. On the evidence presented, it is clear the Papers were prepared by American attorneys retained by the London insurers through Toplis & Harding for the specific purpose of advising the insurers on American insurance law.

### 4. Routine Preparation

Materials prepared in the routine or ordinary course of business are less likely to be considered work product. It appears these papers were not prepared in the ordinary course of business. As noted earlier, the London insurers retained American lawyers for the specific purpose of providing advice on current issues in American insurance law. The attorneys generated the Papers to satisfy that specialized need.

### 5. Timeliness of Preparation

The final factor is whether the Papers were prepared at a time when specific claims had arisen or whether discussions or negotiations had already occurred.
It is clear that several major pieces of litigation involving London market insurers already existed when the attorneys prepared the Papers. *See Occidental Chemical, Independent Petrochemical, Morton Thiokol,* and *Shell Oil, supra* at 10. Thus, the Papers were timely.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 6
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*6 In light of the facts presented, the Court finds there was substantial evidence for the SDM to conclude that all five work product factors were satisfied. Thus, the SDM's findings were not clearly erroneous. For this reason, the Court affirms the SDM's finding that the Papers are protected by the attorney work product privilege. This leads to the question of waiver.

### B. Waiver

Waiver of work product privilege is normally analyzed under the standard announced in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103 (S.D.N.Y.1985) ("*Lois Sportswear*"). In *Lois Sportswear,* the Court stated that when a party requests the return of privileged documents, the key question is "whether or not the release of the documents was a knowing waiver or simply a mistake, immediately recognized and rectified." *Id.* at 105. The factors which determine whether privileged documents lose their protection once disclosed to an adversary are as follows: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of discovery and extent of disclosure, and (4) overall fairness, judged against the care or negligence with which the privilege is guarded. *Id.* Nothing in the *Lois Sportswear* opinion indicates any magical combination of these factors which automatically results in waiver or the lack of waiver. The application of the factors is simply a balancing process.

Here, the evidence indicates the precautions taken to protect the documents against inadvertent disclosure were minimal. No markings such as "confidential" or "privileged" appear on the copies of the Papers the Court has reviewed.[FN7] At best, the Papers were marked only via the cover letter(s) of transmittal, which evidently were separated from the Papers at a later date.

> FN7. The only markings of a protective nature on the Papers today are "PROTECTED MATERIAL-North American Philips Insurance Coverage Litigation" marked on each page. However, because the *NAPC* case did not originate until years after the Papers' creation, these markings could not have been present when the Papers were generated.

However, it certainly appears that London Defendants wasted no time in rectifying erroneous disclosure once they became aware of it. Nothing indicates London Defendants were aware of the documents' disclosure in this case prior to January 1993. Because Monsanto and NAPC notified only Hartford of the Rosa deposition and their intended usage of the Papers, London Defendants had no way of knowing the Papers were in Hartford's possession at that time. However, once London Defendants learned of Monsanto's intent to use the Papers at the Holford deposition, they immediately notified Monsanto of the claimed privilege and investigated the circumstances surrounding the documents' disclosure. Within three months, London Defendants made their demand upon Monsanto for the nonuse and return of the documents, which thereafter led to this motion.

Additionally, the scope of discovery here was great, compared to a relatively small number of privileged documents. Hartford's fateful production of materials involved thirty-nine boxes of documents, of which only these seven Papers constituted privileged documents inadvertently disclosed. Certainly, the smaller the number of privileged documents in relation to the overall production, the greater the likelihood that the producers did not make a knowing, voluntary waiver of privilege. *See In re Wyoming Tight Sands Antitrust Cases,* No. 85-2349-S, (D.Kan., Sep. 11, 1987) at 11 (stating that "[w]here document production is extensive ... a finding that an inadvertent disclosure of privileged documents waives the attorney-client privilege or work-product protection does not advance the aim of full and free discovery. Parties might tend to produce fewer documents or delay production for fear of losing protection for otherwise valid, privilege claims."). Here, the number of privileged documents is remarkably small, which supports a finding of no intentional waiver.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                    Page 7
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*7 Finally, overall fairness must be assessed. Here, London Defendants' Papers found their way, unexpectedly, into the hands of an adversary-Monsanto. While it is inconclusive precisely how or why Hartford acquired possession, it is clear that Hartford produced the Papers for Monsanto in good faith compliance with a discovery request. Monsanto had no reason to expect such confidential thoughts, impressions, and analyses of London Defendants' attorneys to be included in Hartford's production. Likewise, with no clear evidence as to how Hartford came into possession of the documents, London Defendants had no reason to suspect Monsanto's discovery demand of Hartford would result in a divulgence of attorney work product. Thus, Monsanto's acquisition of these Papers was nothing less than a windfall. Since learning of the inadvertent disclosure, London Defendants have taken prompt action to retrieve the Papers and minimize the damage. Fairness militates in favor of protecting London Defendants' reasonable expectations here.

The SDM found the *Lois Sportswear* factors, as applied to the facts at hand, demanded a finding of no waiver. For the reasons recounted above, the Court agrees. Although the precautions London Defendants took to mark and protect the Papers were minimal, this factor is outweighed by the promptness with which they have handled the issue after learning of disclosure, the scope of discovery, and the overall interest of fairness.

In sum, the SDM's findings of work product privilege with no waiver were not clearly erroneous. Therefore, the Court affirms the SDM's decision ordering Monsanto to return the Papers.

### C. Attorney-Client Privilege

Only one privilege is necessary to protect the Papers from disclosure to an adversary. With the Papers protected from disclosure via the work product privilege, the issue of attorney client privilege is moot. Therefore, the Court expresses no opinion today on the attorney-client privilege as applied to these Papers.

### IV. CONCLUSION

The Court finds today the Papers were prepared by American attorneys retained indirectly by the London Defendants for the specific purpose of addressing the insurers' concerns over existing and pending insurance litigation in American courts. The Papers contain the attorneys' thoughts, impressions, legal analyses, and opinions on the issues presented. As such, the Papers constitute attorney work product and are privileged from disclosure to adversaries. Further, while document protections and markings were minimal, the facts indicate, on balance, that London Defendants did not waive the work product privilege. For this reason, the SDM's findings to the same are not clearly erroneous.

The Papers must be returned; thus, London Defendants' motion for return of inadvertently disclosed documents is GRANTED. Monsanto shall return forthwith all copies of the Papers to the London Defendants and certify that it has done so.

An order will be entered consistent with this Memorandum Opinion.

### ORDER

*8 This 31st day of May, 1994, the Court having issued its memorandum opinion this date, and for the reasons assigned therein,

IT IS ORDERED that:

1. The motion of Defendant Certain Underwriters at Lloyd's, London and London Market Insurance Companies ("London Defendants") to require Plaintiff Monsanto Company ("Monsanto") to return certain documents previously disclosed during discovery (the "Position Papers") is GRANTED.

2. Monsanto shall return all copies of the Position Papers to the London Defendants forthwith and certify to the Court by June 30, 1994 that this has been accomplished.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 8
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Del.Super.,1994.
Monsanto Co. v. Aetna Cas. & Sur. Co.
Not Reported in A.2d, 1994 WL 315238 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.