# TAB 1

LEXSEE 2000 U.S. DIST. LEXIS 11961


Analysis
As of: Apr 13, 2007

GET-A-GRIP, II, INC. v. HORNELL BREWING CO., INC. d/b/a FEROLITA, VOLTAGGIO & SONS

CIVIL ACTION NO. 99-1332

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2000 U.S. Dist. LEXIS 11961

August 8, 2000, Decided
August 8, 2000, Filed; August 8, 2000, Entered

**DISPOSITION:** [*1] Defendant's Renewed Motion for Sanctions (Document No. 45) GRANTED.

**COUNSEL:** For GET-A-GRIP, II, INC., PLAINTIFF: GAVIN P. LENTZ, STEPHEN J. SPRINGER, BOCHETTO & LENTZ, P.C., PHILADELPHIA, PA USA.

For FEROLITO, VOLTAGGIO & SONS, DEFENDANT: GARY A. HECHT, SYNNESTVEDT AND LECHNER, PHILA, PA USA.

For HORNELL BREWING CO., INC., DEFENDANT: JOSEPH F. POSILLICO, JOSHUA R. SLAVITT, GARY A. HECHT, SYNNESTVEDT & LECHNER, PHILADELPHIA, PA USA.

**JUDGES:** THOMAS J. RUETER, United States Magistrate Judge.

**OPINION BY:** THOMAS J. RUETER

**OPINION:**

MEMORANDUM AND ORDER

THOMAS J. RUETER
United States Magistrate Judge

August 8, 2000

Presently before this court is defendant's renewed motion for sanctions (Document No. 45) filed with this court on June 15, 2000. n1 In its motion, defendant contends that plaintiff has failed to comply with the court's orders of February 8, 2000 (by Judge Kelly) and May 11, 2000 (by the undersigned) regarding a discovery dispute between the parties. A hearing on the motion was held before the undersigned on August 1, 2000. For the reasons stated below, defendant's motion is GRANTED. n2

   n1 By Order dated July 19, 2000, the Honorable James McGirr Kelly referred defendant's motion to the undersigned for disposition. (Document No. 50.)

[*2]

   n2 Plaintiff contends that defendant's motion is untimely under Fed. R. Civ. P. 72(a) because it is actually a motion seeking to set aside or modify this court's May 10, 2000 order. (Pl.'s Answer to Def.'s Renewed Mot. for Sanctions at 1-2.) Defendant's motion does not seek to modify this court's May 10, 2000 order. Rather, it seeks sanctions for plaintiff's continued failure to comply with court orders regarding discovery, including this court's May 10, 2000 order. Plaintiff's request that defendant's motion be denied as untimely is denied.

On May 10, 2000, after a hearing that same day, this court entered an order denying both plaintiff's motion for sanctions (Document No. 26) and defendant's motion for sanctions (Document No. 32). The court also ordered,

inter alia, that defendant shall review twenty-two boxes of documents identified by plaintiff's counsel during his inspection of February 17, 2000 and produce responsive documents by May 24, 2000; and that plaintiff shall produce all responsive documents to request number twenty-four in defendant's first set of requests for production [*3] of documents within ten days from the date of the court's order or, to the extent necessary, submit a privilege log in accordance with Fed. R. Civ. P. 26(b)(5). (Order, dated 5/10/00, at 1-2; Document No. 39).

At the May 10, 2000 hearing, defendant contended that plaintiff had not fully responded to request number twenty-four in defendant's first set of requests for production of documents. Plaintiff assured this court that it had fully responded to that discovery request based upon its narrow interpretation of what the request was seeking. (N.T., 5/10/00, at 41, 42, 44.) Plaintiff claimed that it produced 2,500 pages of documents relating to the prosecution history of the relevant patent. (N.T., 5/10/00, at 41, 44.) Defendant explained that the scope of request number twenty-four was not limited to the prosecution history of the patent ("Prosecution Information"), but also included documents which constitute, relate or refer to the expert analysis referred to in paragraph nineteen of the Complaint, or to any other opinion regarding the validity, enforceability, or infringement of the relevant patent ("Litigation Information"). (N.T., 5/10/00, at 39.) This court agreed with defendant [*4] that the scope of request number twenty-four included Litigation Information as well as Prosecution Information. (Order, dated 5/10/00, at 2 n.1.) Plaintiff argued that if request number twenty-four were to include Litigation Information, such documents would be subject to the attorney-client privilege and/or the work product doctrine. (N.T., 5/10/00, at 43.) Counsel for plaintiff represented to this court that plaintiff had not asserted the attorney-client privilege and/or the work product doctrine to request number twenty-four n3 because "we do not believe that we had to assert [sic] or that the discovery covered any communication with counsel in connection with the litigation." (N.T., 5/10/00, at 41.)

n3 Plaintiff did not assert the attorney-client privilege or the work product doctrine to any of defendant's discovery requests.

In reliance upon representations from plaintiff's counsel that plaintiff had produced all documents relating to the Prosecution Information and that plaintiff had not submitted a [*5] privilege log because plaintiff interpreted the scope of the document request narrowly, this court acted leniently and ordered plaintiff to produce all responsive documents and, to the extent necessary, a privilege log, within ten days of the date of this court's order, and denied defendant's request that plaintiff be deemed to have waived all claims of privilege.

At the hearing on defendant's instant motion, this court was dismayed to learn that plaintiff did not produce a privilege log as directed until after defendant filed the renewed motion for sanctions. Plaintiff produced the log to defendant on or about July 6, 2000. Plaintiff's counsel acknowledged that the untimely production of the log was due to his oversight. This court is troubled by counsel's response. The court's May 10, 2000 order required plaintiff to produce documents in response to request number twenty-four within ten days from the date of the order and, to the extent any documents were subject to a privilege, to produce a privilege log. The order was issued after a hearing that lasted approximately fifty minutes. (N.T., 5/10/00, at 1, 47.) Counsel presented argument to the court on these issues. In light of all [*6] these events focusing attention on the discovery requests and the privilege log, this court cannot accept counsel's statement that he "forgot" to prepare the log.

Even more troubling, however, is that plaintiff's counsel assured this court at the May 10, 2000 hearing that plaintiff had produced all documents relating to the Prosecution Information and that the only reason plaintiff did not file a privilege log was because plaintiff misinterpreted the scope of the document request. (N.T., 5/10/00 at 41-44.) Plaintiff's counsel informed this court that to the extent that request number twenty-four requested Litigation Information, the attorney-client privilege and/or work product doctrine would apply. (N.T., 5/10,00, at 43.) The privilege log produced by plaintiff, however, lists eighty documents most, if not all, of which relate to the Prosecution Information. Thus, it is apparent that plaintiff had not produced all of the Prosecution Information as counsel had represented.

Moreover, plaintiff now asserts that documents relating to the Prosecution Information are subject to the attorney-client privilege and/or the work product doctrine contrary to counsel's representations to this [*7] court at the May 10, 2000 hearing. At the August 1, 2000 hearing, plaintiff's counsel attempted to explain these inconsistencies by stating that the documents listed in the log were not responsive to request number twenty-four, but to request number nineteen and, in any event, he did not believe privileged documents to be covered by the discovery requests. As to the first argument, plaintiff did not object to document request number nineteen on the grounds of privilege and cannot do so at this belated hour. Moreover, as stated above, on several occasions at the May 10, 2000 hearing, plaintiff's counsel specifically represented to this court that plaintiff produced all documents relating to the Prosecution Information. As to the privilege log, plaintiff's counsel stated at the May 10, 2000 hearing that a privilege log was not required for

documents relating to Prosecution Information, only for Litigation Information. Counsel cannot now argue to the contrary.

For these reasons, this court will grant defendant's renewed motion for sanctions and order plaintiff to pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in preparing and prosecuting both [*8] of its motions for sanctions before the undersigned. n4 Such fees are appropriate under Fed. R. Civ. P. 37(a)(4)(A) which states as follows:

> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party . . . whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(4)(A). Additionally, Fed. R. Civ. P. 37(b)(2) provides that "if a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just . . . ." The court has broad discretion to impose any of the [*9] sanctions listed in Fed. R. Civ. P. 37(b)(2) or any other sanctions it deems just. Hicks v. Feeney, 850 F.2d 152, 155 (3d Cir. 1988). This court finds that prior to filing the instant motion, defendant made efforts to obtain the information from plaintiff which efforts resulted in defendant filing its first motion for sanctions. n5 Despite this court's May 10, 2000 order, plaintiff still failed to provide the required information which failure was not substantially justified. Moreover, the record indicates a history of lack of cooperation by the plaintiff. n6 See generally Wright v. Montgomery County, et al., 1999 U.S. Dist. LEXIS 900, 1999 WL 80275, at *3 (E.D. Pa. Feb. 3, 1999).

> n4 Defendant also seeks costs related to the preparation and prosecution of its original motion to compel. The original motion to compel was decided by Judge Kelly. Since this court was not involved in that decision, it will not award costs related to that original motion.

> n5 Plaintiff complains that defendant did not call him after he failed to produce the privilege log required by this court in its May 10, 2000 order but instead filed the renewed motion for sanctions. At that time, plaintiff was under order of this court to provide the log, it was not defendant's obligation to remind plaintiff to do so. This court finds that defendant attempted to resolve the discovery disputes with plaintiff without court intervention, but that those efforts were unsuccessful and resulted in defendant's two motions for sanctions.

[*10]

> n6 Plaintiff claims that defendant also has been uncooperative. However, at the May 10, 2000 hearing, it appeared that other than an issue concerning 22 boxes of documents, an issue which is addressed later in this order, defendant had complied with plaintiff's discovery request. (N.T., 5/10/00, at 25.)

The court also will order that plaintiff must produce all documents responsive to defendant's discovery requests, including the documents listed in the privilege log, and that any claim of attorney-client privilege and/or the work product doctrine have been deemed waived as untimely asserted. See, e.g, Massachusetts School of Law at Andover, Inc. v. Am. Bar Assoc., 914 F. Supp. 1172, 1178 (E.D. Pa. 1996) ("failure to assert a privilege properly may amount to a waiver of that privilege"). n7

> n7 Plaintiff's request that this court review the documents listed in plaintiff's privilege log in camera is denied since this court has found that plaintiff has waived any and all claims of attorney-client privilege and work product doctrine. (Ltr. dated 8/2/00 from Pl.'s Counsel to Court.)

[*11]

Additionally, at the May 10, 2000 hearing, plaintiff's counsel argued that on February 17, 2000 he marked twenty-two boxes of documents located at defendant's corporate headquarters, which he suspected were responsive to plaintiff's document request. (N.T., 5/10/00, at 25.) This court ordered defendant to review these boxes and to produce responsive documents to plaintiff by May 24, 2000. (Order, dated 5/10/00, at P 4.) After consider-

able effort and expense, defendant complied with the court's order and notified plaintiff's counsel on several occasions that the documents were available for inspection. Defense counsel reported that plaintiff's counsel did not respond to his communications and never inspected the documents which have since been returned to storage at defendant's facility. Plaintiff's counsel acknowledged at the August 1, 2000 hearing that he did not inspect the information defendant collected from the twenty-two boxes and explained that he chose to pursue an alternative means of discovery to obtain the information. This court also shall order that plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in reviewing and [*12] collecting information from the twenty-two boxes identified by plaintiff's counsel, and that plaintiff shall be deemed to have waived its request for those documents and shall not be entitled to inspect them. Such an order is just in this regard.

AND NOW, this 8th day of August, 2000, for all the above stated reasons, it is hereby

**ORDERED**

1. Defendant's Renewed Motion for Sanctions (Document No. 45) is **GRANTED**;

2. Plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in preparing and prosecuting both of its motions for sanctions (Documents Nos. 32 and 45) before the undersigned;

3. Plaintiff shall produce all documents responsive to defendant's document requests, including the documents listed in the privilege log, within ten (10) days from the date of this order or face further sanctions;

4. Any and all claims of attorney-client privilege and/or the work product doctrine by plaintiff have been deemed waived;

5. Plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in reviewing and collecting information from the twenty-two boxes identified by plaintiff's counsel; [*13]

6. Plaintiff is deemed to have waived its request for the documents in the twenty-two boxes and shall not be entitled to inspect them; and

7. Defendant shall provide to plaintiff's counsel within ten (10) days from the date of this order, the total costs, including attorney's fees, due to be paid under this order separated into the following categories: (1) costs related to defendant's first motion for sanctions (Document No. 32); (2) costs related to defendant's renewed motion to sanctions (Document No. 45); and (3) costs related to reviewing and collecting information from the twenty-two boxes. Counsel shall use their best efforts to agree on the amount to be paid hereunder and plaintiff's counsel shall pay such amount no later than ten (10) days after receiving the list of costs from defendant.

BY THE COURT:

THOMAS J. RUETER

United States Magistrate Judge

LEXSEE 1997 U.S. DIST. LEXIS 24216


Caution
As of: Apr 13, 2007

UNION PACIFIC RESOURCES GROUP, INC., and RESOURCES NEWCO, INC.,
Plaintiffs, v. PENNZOIL COMPANY, Defendant.

Misc. No. 97-64 JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1997 U.S. Dist. LEXIS 24216

September 2, 1997, Decided

**SUBSEQUENT HISTORY:** Stay granted by, Motion granted by Union Pac. Res. Group v. Pennzoil Co., 1997 U.S. Dist. LEXIS 24217 (D. Del., Sept. 3, 1997)

**PRIOR HISTORY:** Union Pac. Res. Group, Inc. v. Pennzoil Co., 1997 U.S. Dist. LEXIS 24215 (D. Del., Aug. 12, 1997)

**COUNSEL:** [*1] Charles F. Richards, Jr., Esquire, Thomas A. Beck, Esquire, Daniel A. Dreisbach, Esquire, Robert J. Stearn, Jr., Esquire, Todd C. Schlitz, Esquire, and J. Travis Laster, Esquire of RICHARDS, LAYTON & FINGER, Wilmington, Delaware. Of Counsel: Charles Alan Wright, Esquire, Austin, Texas. Attorneys for Defendant Pennzoil Company.

Stuart M. Grant, Esquire, and Herbert W. Mondros, Esquire of GRANT & EISENHOFER, P.A., Wilmington, Delaware. Attorneys for Non-Party Union Pacific Corporation.

**JUDGES:** Joseph J. Farnan Jr., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

MEMORANDUM OPINION

September 2, 1997

Wilmington, Delaware

Farnan, Chief Judge.

Presently before the Court is Pennzoil Company's Second Motion To Compel Production Of Documents From Union Pacific Corporation (D.I. 10). In its Motion, Pennzoil Company ("Pennzoil") contends that Union Pacific Corporation ("UPC") improperly asserts the attorney-client privilege and work product doctrine in an attempt to prevent discovery of the documents listed on the Second UPC Privilege Log (the "Second Privilege Log"). On Friday, August 22, 1997, the Court ordered expedited briefing on the issues raised [*2] by the Motion and in camera inspection of one-third of the over 200 documents in issue. For the reasons set forth below, the Court has granted Pennzoil's Second Motion To Compel.

BACKGROUND

The instant discovery dispute arises in connection with pending litigation between Pennzoil and Union Pacific Resources Group and Resources Newco, Inc. (jointly "UPR") in two courts, the United States District Court for the Northern District of Texas, Fort Worth Division and this Court. Both the Texas action and the Delaware action arise out of a hostile two-tiered tender offer for 50.1% of Pennzoil's common stock launched by UPR on June 18, 1997 (the "Tender Offer").

On June 26, 1997, in connection with the litigation pending in this Court, Pennzoil served a subpoena on UPC, a non-party to the Delaware and Texas actions, seeking production of documents relating to the spin-off of UPR from UPC (the "First Delaware Subpoena"). On July 8, 1997, UPC complied with this subpoena and produced one and a half boxes of documents. On July 18,

Case 1:05-cv-00499-JJF    Document 191-2    Filed 04/20/2007    Page 7 of 13

Page 2
1997 U.S. Dist. LEXIS 24216, *

1997, the Texas court entered an order in the action before it enjoining Pennzoil from seeking any relief in connection with the Delaware action, pending [*3] resolution of the Texas action on the merits.

On July 23, 1997, Pennzoil served a second subpoena on UPC bearing the caption of the Texas action and filed as a miscellaneous action in this Court (the "Second Delaware Subpoena"). On August 7, 1997, UPC produced its privilege log in connection with the documents produced in response to the First Delaware Subpoena (the "First Privilege Log"). Following the production of the First Privilege Log, Pennzoil moved to compel production of the documents listed on the First Privilege Log, or in the alternative, to compel production of a privilege log that complied with the standards of Rule 45(d)(2) (the "First Motion To Compel"). Finding the First Privilege Log to be inadequate under Rule 45(d)(2), this Court granted the First Motion To Compel and ordered UPC to submit a revised privilege log by August 15, 1997. Union Pacific Resources Group, Inc. v. Pennzoil Co., 1997 U.S. Dist. LEXIS 24215, Misc. No. 97-64-JJF (D. Del. Aug. 12, 1997).

With Pennzoil's consent, UPC produced its revised privilege log on August 17, 1997 (the "Second Privilege Log"). Upon examination of the Second Privilege Log, Pennzoil believed that UPC improperly invoked the privilege for a number [*4] of documents. On August 21, 1997, Pennzoil filed the instant Second Motion To Compel Production Of Documents and a motion seeking expedited treatment of the Second Motion To Compel. On August 22, 1997, the Court ordered expedited briefing on the Second Motion To Compel and in camera review of one-third of the disputed documents. After reviewing the arguments and documents submitted, the Court has determined that UPC improperly invoked the attorney-client privilege and work product doctrine for the documents listed on UPC's Second Privilege Log, and therefore, has granted Pennzoil's Motion To Compel.

## DISCUSSION

Described generally, Pennzoil seeks review of documents relating to a private letter ruling obtained by UPC from the United States Internal Revenue Service ("IRS") dealing with the tax-free spin-off of UPR from UPC. In order to understand the importance of certain dates and people involved in the Motion To Compel, a brief description of the spin-off transaction is helpful.

On October 17, 1995, UPR issued new stock, which diluted UPC's ownership to 83%, as part of a larger transaction in which UPC would divest itself of all of its ownership of UPR. On October 15, 1996, this [*5] transaction culminated in the spin-off of the remaining 83% of UPR to UPC shareholders. In order to assure the tax-free status of the spin-off, UPC undertook the task of obtaining a private letter ruling from the IRS. Among those involved in the spin-off transaction and accompanying efforts to obtain the private letter ruling are David Heywood, General Tax Counsel for UPC and Smith Barney, an investment bank.

## I. The Attorney Client Privilege

In order for the attorney-client privilege to apply, four elements must be established: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication is made is either a member of the bar of a court, or his subordinate, and is acting as a lawyer when the communication is made; (3) the attorney was informed of the communication by his client, without the presence of strangers, for the purpose of securing legal advice, and not for the purpose of committing a crime or tort; and (4) the client has claimed and not waived the privilege. American Standard, Inc. v. Pfizer, Inc., 1986 U.S. Dist. LEXIS 27389, 1986 WL 9713, at *2 (D. Del. Mar. 31, 1986). The party asserting the privilege has the burden [*6] of establishing that the privilege applies. Coastal Corp. v. Duncan, 86 F.R.D. 514, 520 (D. Del. 1980).

A. Documents Given To UPR By UPC After The October 17, 1995 Initial Public Offering And UPC's Announcement Of Its Intent To Spin-Off UPR

Among the largest category of documents sought by Pennzoil are those that were provided by UPC to UPR after October 17, 1995. With regard to these documents, Pennzoil asserts two arguments. First, Pennzoil contends that the attorney-client privilege should not extend to documents provided to UPR after the October 17, 1995 initial public offering and UPC's announcement of its intent to spin-off UPR, because (i) the parent-subsidiary rule protecting the documents does not apply and (ii) although UPR was still majority owned by UPC, it was acting like an independent entity, and therefore disclosure to UPR would waive the privilege. Second, Pennzoil contends that the attorney-client privilege should not apply to documents given to UPR after October 15, 1996, because at that point, UPR clearly became an independent entity and disclosure to such a third party would waive the privilege.

In response to these arguments, UPC raises [*7] two points. First, UPC contends that because UPC and UPR shared joint interests, the documents should be protected by the attorney-client privilege. Second, UPC contends that UPR maintained an attorney client relationship with UPC's in-house tax lawyers during the time these documents were produced. In support of this argument, UPC contends that David Heywood was an officer of the principal operating subsidiary of UPR and its principal tax lawyer.

1. Whether the Parent-Subsidiary Rule should apply to documents given to UPR between October 17, 1995 and October 15, 1996

As a general rule, a parent corporation and its wholly owned subsidiary are treated as a single entity for the purposes of applying the attorney client privilege to inter-corporate communications. However, this rule is not applied rigidly. Rather, courts that have applied this rule have done so "upon a showing that a common attorney was representing both corporate entities or that the two corporations shared a common legal interest and thus, came within the joint client rule, or that the disclosure was made to an employee of the subsidiary for the principal or sole purpose of eliciting assistance to the attorney in [*8] rendering legal advice or other legal services." Bowne of New York, Inc. v. AmBase Corp. 150 F.R.D. 465 (S.D.N.Y. 1993). Based upon this proposition, the court in Bowne refused to apply the parent-subsidiary rule where the subsidiary sold by the parent: (1) maintained its own in-house counsel, (2) was separately represented by outside counsel when it was sold by the parent; and (3) the common interest between the two was a business interest in consummating the sale, rather than a joint legal interest. Id. at 491.

Although UPR was majority owned and not wholly owned by UPC, the Court will presume the potential applicability of the parent-subsidiary rule in an effort to avoid rigid application of the rule. In evaluating the relationship between UPR and UPC, however, the Court concludes that in the instant context, the parent-subsidiary rule is inapplicable. Based on the circumstances in this case, the Court finds that during the relevant time frame, UPC and UPR were acting more like independent entities than as parent-subsidiary. Although UPC and UPR both wanted to secure the tax-free status of the spin-off, this common goal does not alter the fact [*9] that at the base line, both corporations maintained adverse interests. That both entities were negotiating at arm's length to complete the spin-off and to allocate the risk of a potentially enormous tax liability bolster this conclusion. Indeed, UPC itself noted the inherent adversity between the entities in documents in which it recognized the need to pay attention to conflicts of interest and to negotiate at terms similar to arm's length. (Reply Br., Ex. H at UPC 2436).

Moreover, the Court notes the similarity between UPR and the subsidiary in Bowne that the Bowne court concluded did not enjoy the protection of the parent-subsidiary doctrine. In Bowne, the subsidiary corporation maintained its own in-house counsel during the time it was a subsidiary, except for certain SEC filings which were prepared by the parent's counsel because the financials were done on a consolidated basis, and its own outside counsel for completion of the sale. Similarly, in this case, UPR maintained and relied upon its own in-house counsel during the spin-off negotiations and upon the outside counsel of Morgan, Lewis & Bockius for general corporate advice. To the extent that UPR maintained contact [*10] with Heywood, UPC's General Tax Counsel, the Heywood Affidavit indicates that his services primarily pertained to the private letter ruling. (Heywood Affidavit at 3). Thus, to the extent that any joint use of counsel existed in this case between UPC and UPR, the Court finds it to be quite narrow, and therefore, akin to the joint use of counsel in Bowne for the SEC filings and insufficient to a meaningful invocation of the parent-subsidiary doctrine.

2. Whether UPR was a client of UPC's Tax and Legal Departments such that disclosure to UPR would not waive the privilege

Independent of any application of the parent-subsidiary doctrine, UPC takes the position that its disclosures to UPR should not waive the privilege because UPR was a client of UPC's Tax and Legal Departments. UPC contends that this attorney-client relationship existed between UPC and UPR as early as October 17, 1995 and continues to exist to the present date. In support of this argument, UPC relies on (1) the dual role of Mr. Heywood as counsel to both UPC and UPR, and (2) the "Services Agreement" between UPR and UPC, which was entered into as part of the initial public offering.

In response, Pennzoil attacks both [*11] the Heywood Affidavit and the Services Agreement, upon which UPC relies. According to Pennzoil the general Services Agreement and the general relationship of Mr. Heywood to UPR are insufficient to confer "client status" on UPR. Moreover, Pennzoil argues that UPC's characterization of UPR as a client for legal purposes is a post hoc characterization of an otherwise general business and administrative relationship.

It is because of the special and unique relationship between attorney and client that the privilege against disclosure exists. In arguing that UPR is a client of UPC, UPC seeks to cloak UPR with the benefits that accompany this special relationship. However, in examining the nature of the relationship between UPC and UPR, this Court is unpersuaded by UPC's argument that UPR is or was a client of its legal department. While the Court acknowledges that the Heywood Affidavit and Services Agreement discuss the provision of legal advice to UPR by UPC, the Court believes that this interaction is more of a general, corporate and administrative nature, than of the more specialized attorney-client nature. Particularly persuasive to the Court in this regard, is the substance of UPR's [*12] public filings. For example, in describing the Services Agreement between UPC and UPR, UPR's Form S-3 states that the Services Agreement "provides

Case 1:05-cv-00499-JJF    Document 191-2    Filed 04/20/2007    Page 9 of 13

Page 4
1997 U.S. Dist. LEXIS 24216, *

for the continued provision of certain corporate and administrative services by [UPR] to UPC and by UPC to [UPR]." (Reply Br., Ex. J at 10). Notably, under the heading "Legal Matters" in the same document, UPR never indicates that it will be utilizing UPC's legal services, but instead refers to the company's retention of various outside law firms. (Reply Br., Ex. J. at 99). Indeed, in its own description of the Services Agreement in a document entitled "IPO Checklist" that UPC provided to Pennzoil after the Motion To Compel was filed, UPC omits any reference to legal services. (Reply Br., Ex. H at UPC 2435).

Moreover, the Court has independently examined the Services Agreement and notwithstanding its two sentences regarding legal assistance, the Court finds that the true nature of the Services Agreement is more consistent with a general, corporate administrative contract than with a contract establishing an attorney-client relationship. For example, the bulk of the Services Agreement deals with such general business topics as "Financial [*13] Reporting and Accounting Research," "Executive Incentive Plan Processing," "Internal and External Auditing," "Employee Benefits Plans," "Government Reports," "Secretarial Services and Stockholder Relations," "Insurance," "Charitable Contributions," and "Investor Relations." Therefore, based on the contents of the Services Agreement and UPR and UPC's own characterizations of the Services Agreement in various documents, the Court finds the Services Agreement insufficient to support a finding that UPR was or is a client of UPC. n1 (Reply Br., Ex. I).

n1 The Court acknowledges that in tort and malpractice cases, many courts tend to find that attorney-client relationships exist with less hesitancy. However, the concerns attending such cases, like policing the legal profession and providing redress for individuals who have been harmed by attorneys, are not present here. Rather, in this case, the Court is concerned with extending the attorney-client relationship to those who are not deserving of that protection. It is for this reason that the Court has undertaken a more extensive analysis of whether an attorney-client relationship was formed between UPR and UPC.

[*14]

Likewise, the Court is not persuaded that the statements contained within the Heywood Affidavit are sufficient to support a finding that UPR was or is UPC's client. Although Heywood indicates that he advised UPR with regard to some tax matters, the focus of the Heywood Affidavit is on Heywood's role as UPC's lead in-house attorney in connection with the preparation and submission of UPC's request to the IRS for the private letter ruling. As the Heywood Affidavit indicates, the private letter ruling was sought, in the first instance, by UPC. (Heywood Aff. at 2). To the extent that the interest in obtaining the private letter ruling may have applied to UPR, as well, the Court again notes that at the core of this tax issue was the allocation of the risk of tax liability, an issue in which UPC and UPR maintained adverse interests. In a situation such as this, where dual representation would strain ethical constraints, the Court is reluctant to find that an attorney-client relationship exists. See Del. R. Prof. Cond. 1.7(a) ("[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client"); L.E. Birdzell, Jr., Ethical Problems [*15] of Inside Counsel § 2.03[2][a] (discussing situation where decentralized companies spin-off divisions, but noting "it is however unethical [for corporate counsel] to represent the new entity in negotiations inherently adverse to counsel's former (or, up to the date of transfer, present) employer"). Therefore, the Court concludes that UPC's disclosure of documents to UPR constituted a waiver of the attorney-client privilege.

B. Documents Given To Smith Barney

The basic premise of Pennzoil's argument with regard to these documents is that UPC waived the privilege by disclosing the documents to Smith Barney, a third party. In examining this issue the parties disagree over both Smith Barney's role in the litigation and the applicable rule of law.

In describing Smith Barney's role, Pennzoil contends that UPC hired Smith Barney, an investment bank, to serve as the underwriter for UPR's initial public offering and to assist with the spin-off transaction. In contrast, UPC contends that while UPR hired Smith Barney as an underwriter, UPC did not. Rather, UPC contends that it hired Smith Barney for the "express purpose of assisting UPC's inside and outside tax counsel in helping [*16] to structure the transaction in such a manner as would pass muster with the IRS as a tax-free distribution under 26 U.S.C. § 355(a)." (Answer Br. at 15). According to UPC, Section 355 imports a number of business considerations for which responsible tax attorneys would commonly require the advice of other experts.

In accord with the dual characterization of Smith Barney, the parties' arguments fall under two different, but related legal standards. One strain of cases hold that disclosure of confidential communications to outside auditors or underwriters waives the attorney-client privilege as to those communications. See e.g. United States v. El Paso Co., 682 F.2d 530, 539-40 (5th Cir. 1982), cert. denied, 466 U.S. 944, 104 S. Ct. 1927, 80 L. Ed. 2d 473 (1984) (disclosure of tax pool analysis to independent accountants during audit by IRS waives attorney-

client privilege); In re John Doe Corp, 675 F.2d 482, 489 (2d Cir. 1982) ("Disclosure of the [report] to Underwriter Counsel either waives the privilege or, what is much the same thing in the circumstances of this case, evidences a corporate decision to use the materials for purposes other [*17] than seeking legal advice."). The second strain of cases involves Supreme Court Standard 503, which affords the attorney-client privilege to information exchanged between a client's attorney and his or her agent, for the purposes of obtaining legal advice. See In re Bieter Company, 16 F.3d 929 (8th Cir. 1994).

In its in camera review of the documents, the Court has examined a number of the Smith Barney documents that Pennzoil challenges and concludes that under either legal standard, the documents would not be privileged. In reviewing these documents, the Court finds that they are related primarily to financial advice and not legal advice. Without revealing the precise nature of the documents the Court notes that with some documents, even the author of the documents considered the matters contained in them to be more associated with business purposes, and investment banking decisions than with legal decisions. See Document 626, 628. Still other documents describe business activities and transactions of different subsidiaries, rather than legal matters. See Document 430.

Moreover, UPC's own public disclosures persuade the Court that UPC's current characterization [*18] of Smith Barney as "retained by UPC at the direction of UPC's lawyers for the express purpose of assisting UPC's inside and outside tax counsel" is an afterthought. At the time Smith Barney was retained, UPC made the public disclosure in its prospectus that "Smith Barney has been retained by UPC to provide strategic and financial advisory services in connection with the Distribution." (Reply Br., Ex. J. at 12). Given the nature of the financial nature of these documents and the fact that UPC never publicly disclosed a legal motivation in its interaction with Smith Barney, the Court concludes that UPC waived the privilege when it disclosed these documents to Smith Barney. See El Paso Co., 682 F.2d at 539-40; In re John Doe Corp, 675 F.2d at 489.

In addition, to the Court's finding that Smith Barney's role was more financial than legal, the Court also notes that UPC's publicly disclosed prospectus indicated that UPC and not UPC's attorneys hired Smith Barney. Therefore, this case is unlike those cases upon which UPC relies, because in those cases, the client's attorney retained the consultant and the consultant was hired to assist the attorney. See [*19] United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961); United States v. Schwimmer, 892 F.2d 237 (2d Cir. 1989).

Lastly, the Court notes that UPC has not provided any information that would lead the Court to believe Smith Barney was the functional equivalent of UPC. Therefore, the Court concludes that the instant case does not come within the purview of In re Bieter, 16 F.3d at 937 (8th Cir. 1994) (embracing consultant in privilege in circumstances in which consultant was really functioning as equivalent of client's employee by attending daily meetings for client and becoming intimately involved in client's objective). Therefore, the Court concludes that under either line of cases, the documents are not protected by the attorney-client privilege.

C. Business Not Legal Advice

Pennzoil also challenges a number of the documents on the grounds that the documents contain business, rather than legal advice. n2 UPC responds to this challenge by arguing that advice on obtaining tax relief is a core activity of tax attorneys, and as such, it should be protected even though it addresses business conduct. In reply, Pennzoil argues that [*20] both the spin-off and the objective of obtaining tax free treatment were obviously business purposes, and the fact that the UPR spin-off had to meet certain legal criteria to qualify for tax-free status should not convert a business issue into legal advice.

n2 Some of the documents challenged here were also challenged in the category of documents given to UPR by UPC between October 1995 and October 1996. Therefore, even if the privilege is not waived by disclosure to UPR, those documents are not privileged, because they contain business, rather than legal advice.

In support of its position, UPC relies on SCM Corporation v. Xerox Corporation, for the proposition that "the mere mention of business considerations is not enough to compel the disclosure of otherwise privileged material." 70 F.R.D. 508, 517 (D. Conn. 1976) (citations omitted). However, the court in SCM further explained, "that legal advice should remain protected along with 'nonlegal considerations' discussed between client and [*21] counsel that are relevant to that consultation, but when the ultimate decision then requires the exercise of business judgment and when what were relevant nonlegal consideration incidental to the formulation of legal advice emerge as the business reasons for and against a course of action, those business reasons considered among executives are not privileged." 70 F.R.D. at 517. Thus, the difficulty in this case comes in the characterization of the spin-off and tax-free treatment issues.

In situations such as this, in which legal considerations play a part in the formulation of business policy or

strategy, a claimant should specifically identify a disclosure made specifically to a lawyer for the purpose of assisting in rendering legal services. SICPA Holdings S.A. v. Optical Coating Lab., Inc., 1996 Del. Ch. LEXIS 118, C.A. No. 15129 (Del. Ch. Sept. 23, 1996). Here, UPC has not specifically identified a disclosure made to a lawyer for purposes of assisting in the rendition of legal services. Without identifying any particular document, UPC simply states that "each of the challenged documents contains legal and not business advice." (Answer at 19). Likewise, UPC relies on the general contention [*22] that "advising a client on how the conduct of its business will help or hurt in meeting certain legal requirements is indisputably legal advice protected by the attorney-client privilege." (Answer Br. at 20).

Given the nature of the documents that the Court has examined in this case, UPC's failure to meet its burden of proof and specifically discuss the documents in issue is particularly fatal. For example, upon inspection of the documents at issue, the Court finds that a number of documents contain non-legal information, like discussion of time tables for certain decisions, and discussions about certain people being out of the office. See Documents 104, 107-108. Absent some specific explanation by UPC, the Court is hard-pressed to see the relevance of the above-discussed type of information to legal advice. Therefore, with regard to those documents characterized as business documents by Pennzoil, the Court finds that UPC has failed to meet its burden of establishing that the attorney-client privilege applies.

## II. Work Product Doctrine

The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3). Stated generally, [*23] documents and tangible things are protected by the work product doctrine if two criteria are met: (1) they have been prepared by or for a party or by or for the party's representative (2) they have been prepared in anticipation of litigation or for trial. In order to overcome the protection of this doctrine, the party seeking the material must show substantial need. n3 In arguing that the work product doctrine does not apply to certain documents, Pennzoil raises three arguments: (1) certain entries on the privilege log do not indicate that the author was an attorney, that the document was prepared at the direction of an attorney, or that the document otherwise contained an attorney's thoughts or mental impressions; (2) certain entries on the log do not indicate that the documents were prepared in anticipation of litigation; and (3) Pennzoil has shown substantial need given the underlying Texas litigation involving the potential hostile takeover of Pennzoil by UPC.

n3 Again, the Court recognizes that a number of documents challenged under the work product doctrine are also challenged under the attorney-client privilege. Because the Court has already determined that the attorney-client privilege is inapplicable, the Court will examine the work product doctrine, as well.

[*24]

A. Preparation By Counsel

Pennzoil contends that UPC has failed to show that an attorney was involved in the preparation of certain documents, therefore the work product doctrine is inapplicable. However, Pennzoil's contention misstates the scope of the work product doctrine.

While some courts have focused on the involvement of attorneys in preparing documents, the express language of Rule 23 dictates a broader construction of the doctrine. The work product doctrine applies to documents prepared "by another party or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, or agent)." Fed. R. Civ. P. 26(b)(3). Therefore, an attorney need not be specifically involved in the production of the document for the work product doctrine to apply. According to the indications on the privilege log and the chart identifying names used in the privilege log, of the seven documents that Pennzoil challenges on this ground, four were prepared by UPC's Vice President-Taxes, one was prepared by UPC's General Tax Counsel-Federal, one was prepared by Human Resources, and two were prepared by UPC's Director, [*25] Income Taxes. Pennzoil's objection is clearly meritless as to the document prepared by General Tax Counsel. Moreover, the remaining parties, by virtue of their role in the corporation, are agents of UPC. Therefore, the Court rejects Pennzoil's argument and declines to disclose these documents, merely because an attorney may not have been involved in their preparation.

B. Anticipation Of Litigation

Pennzoil contends that a number of documents are not protected by the work product doctrine, because they were not prepared in anticipation of litigation. In response, UPC contends that because UPC retained the right to take the position that the spin-off would be tax-free, regardless of whether a private letter ruling was obtained, litigation with the IRS was a significant possibility that was recognized by UPC's tax lawyers. UPC further contends that although the private letter obviating the likelihood of litigation was ultimately obtained, this did not change UPC's anticipation of litigation at the time the documents were generated.

The Third Circuit has recognized that there is both a subjective and objective element in determining whether documents were prepared in anticipation [*26] of litigation. The initial focus of the inquiry is on the "unilateral belief" that litigation will result. However, the anticipation of litigation must also be objectively reasonable. See Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260 (3d Cir. 1993).

Courts have recognized that documents generated by attorneys who prepare tax returns are not within the work product privilege because of the ever-present specter of an IRS challenge or audit. See United States v. Davis, 636 F.2d 1028, 1040 (5th Cir.), cert. denied, 454 U.S. 862, 102 S. Ct. 320, 70 L. Ed. 2d 162 (1981). However, an attempt to obtain a private letter ruling is quite different from the routine preparation of tax returns. When one is seeking to obtain a private letter ruling, one is aware that the IRS may not grant that ruling. Therefore, litigation is more likely a possibility than in the context of filing a tax return.

In the context of private letter rulings, Pennzoil refers to Falcone v. IRS, 479 F. Supp. 985, 990 (E.D. Mich. 1979). In this case, the Eastern District of Michigan held that documents prepared by the IRS during the preparation of a revenue ruling were [*27] not protected by the work product doctrine, because they were not prepared in anticipation of litigation. Rather, these documents concerned the issue of whether the IRS's private letter ruling was consistent with the agency's policies. Based on this case, Pennzoil argues that if the IRS work papers connected with the issuance of a revenue ruling are not protected, then UPC's documents should not be protected merely because they were seeking a revenue ruling from the IRS.

However, as the party seeking, rather than issuing the ruling, UPC stands in a different position than the IRS, because UPC is the party that would be vulnerable to a lawsuit if the IRS ruled against it. Thus, unlike the IRS in Falcone, UPC was not preparing documents that concerned consistency with internal policy. Rather, aware that the UPC could rule against them, UPC was preparing documents in a more defensive mode. Thus, the Court finds that UPC had a subjective anticipation of litigation and that UPC's anticipation of litigation was objectively reasonable. Therefore, the Court declines to disclose the documents on the ground that they were not prepared in anticipation of litigation.

C. Substantial Need [*28] and Undue Hardship

According to Pennzoil, even if the work product doctrine applies, Pennzoil is still entitled to the documents because it has shown both "substantial need of the materials" and that it is "unable without undue hardship to obtain the equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3). Pennzoil's basis for substantial need stems from the underlying Texas litigation. In that case, Pennzoil has asserted claims that UPR made false and misleading disclosures in the Schedule 14D-1 that it filed in connection with its Tender Offer. Among Pennzoil's allegations are its assertion that the Schedule 14D-1 fails to disclose that an acquisition of Pennzoil by UPR could trigger the reversal of the IRS revenue ruling that granted tax-free status to the distribution of UPC's remaining 83% interest in UPR to UPC's shareholders. At the time of the spin-off, UPR undertook to indemnify UPC's shareholders for any such tax liability. According to Pennzoil, UPR's possible liability could have a material adverse effect on UPR and consequently, on the value of any consideration that would be received by Pennzoil stockholders who [*29] became UPR stockholders in the second step of UPR's proposed transaction. As such, Pennzoil contends that the shareholders should receive this information because it could influence their decision to tender.

In response, UPC simply states that Pennzoil has not made a showing of substantial need. In addition, UPC contends that much of what Pennzoil seeks is attorney opinion work product, which may not be discovered even upon a showing of substantial need.

Materials otherwise protected by the work product doctrine may be disclosed if the party seeking discovery establishes both substantial need and inability to obtain the substantial equivalent of materials by other means. However, Rule 26(b)(3) further admonishes that even where "substantial need" and "undue hardship" are shown, the court shall protect against the disclosure of counsel's mental impressions, conclusions, opinions, or legal theories. In order to compel disclosure of these types of documents, the Court of Appeals for the Third Circuit requires a stronger showing of need than is required for ordinary work product. See Sporck v. Peil, 759 F.2d 312, 316 (3d Cir. 1985) (attorney's selection from among thousands [*30] of documents was entitled to "near absolute protection"); Remington Arms Company v. Liberty Mutual Insurance Company, 142 F.R.D. 408, 419 (D. Del. 1992).

Although the Court believes the documents would otherwise be protected under the work product doctrine, under the circumstances of this case, the Court believes Pennzoil has shown more than substantial need. Indeed, the Court is of the opinion that Pennzoil has shown the stronger showing of substantial need that is required to overcome work product protection for opinion documents, as well as for fact documents. Unlike those cases in which a tender offer has been completed and parties are challenging a transaction with all the benefits of hindsight, the Tender Offer and take-over battle in this case is currently being staged. As UPC recognized in its

Case 1:05-cv-00499-JJF   Document 191-2   Filed 04/20/2007   Page 13 of 13

Page 8
1997 U.S. Dist. LEXIS 24216, *

Answer Brief, Pennzoil "is locked in a corporate life-and-death battle trying to fend off a hostile tender offer made by Union Pacific Resources Group, Inc." (Answer Br. at 1). In the corporate context, the Court cannot fathom a case of more substantial need than a corporation's battle for its very existence. Therefore, the Court finds that Pennzoil has shown more than [*31] substantial need for the documents it seeks, and therefore, has overcome any protection that the work product doctrine conferred on the documents sought.

### CONCLUSION

For the reasons discussed, the Court has granted Pennzoil's Second Motion To Compel (D.I. 10). Accordingly, the Court has ordered UPC to produce those documents sought by Pennzoil in its Motion.

An appropriate Order has been entered.

### ORDER

At Wilmington, this 29 day of August 1997, for the reasons set forth in the Memorandum Opinion to be issued Tuesday, September 2, 1997;

IT IS HEREBY ORDERED that:

1. Pennzoil Company's Second Motion To Compel Production Of Documents From Union Pacific Corporation (D.I. 10) is GRANTED.

2. Union Pacific Corporation shall produce the documents sought by Pennzoil in its Motion To Compel no later than 5:00 p.m. on Wednesday, September 3, 1997.

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE