# Exhibit 1

## UNITED STATES OF AMERICA
### Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 55416 / March 7, 2007**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 2573 / March 7, 2007**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-12585**

| | |
|---|---|
| In the Matter of<br><br>**NORTHWESTERN CORPORATION,**<br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934** |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that public cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against NorthWestern Corporation ("NorthWestern" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

During the first three quarters of 2002, NorthWestern filed quarterly and current reports with the Commission that materially misstated NorthWestern's financial position and misrepresented or did not disclose required information about its non-utility businesses, Expanets, Inc. ("Expanets") and Blue Dot Services, Inc. ("Blue Dot"). In its filings, after the effect of taxes, NorthWestern overstated its income from continuing operations for the first three quarters of 2002 by approximately 176%, 618%, and 109%, respectively, due to the company's improper accounting for accounts receivable, adjustments to customers' bills, and allocation of losses to minority interests. NorthWestern also misrepresented or did not disclose, among other things, the effects of significant problems with Expanets' new information technology system, the material impact of Expanets' reserve reductions and its receipt of non-compete payments on Expanets' income, large intercompany advances NorthWestern made to support Expanets and Blue Dot, and the timing of anticipated payments from the sale of certain utility assets. Through its financial misstatements, misrepresentations, and omissions, NorthWestern obscured the continuing poor performance of its subsidiaries at a time when it was publicly relying on these subsidiaries' operations to strengthen its financial condition.

### Respondent

1.     NorthWestern, a Delaware corporation with its principal executive offices in Sioux Falls, South Dakota, operates a regulated utility business in South Dakota, Nebraska, and Montana. During the period of conduct discussed herein, NorthWestern consolidated the financial results of two non-utility entities, Expanets and Blue Dot. NorthWestern's common stock was registered with the Commission under Section 12(b) of the Exchange Act and traded on the New York Stock Exchange until it was delisted shortly before NorthWestern declared bankruptcy in September 2003. In November 2004, NorthWestern emerged from bankruptcy. Its common stock is now registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ Global Select Market.

### Other Relevant Entities

2.     Expanets, formerly headquartered in Englewood, Colorado, was formed by NorthWestern in 1997 and provided networked telecommunications equipment and services to medium-sized businesses nationwide. NorthWestern wrote off substantially all of its investment in Expanets during the fourth quarter of 2002 as disclosed in the company's 2002 Form 10-K and announced its intention to sell Expanets in April 2003. In the second quarter of 2003, Expanets'

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

operations were discontinued, and in May 2004, Expanets (n/k/a Netexit) filed for Chapter 11 bankruptcy protection. Proceeds from the sale of Expanets' assets were distributed in bankruptcy.

3.    Blue Dot, formerly headquartered in Sunrise, Florida, and Sioux Falls, South Dakota, was formed by NorthWestern in 1997 and provided heating, ventilation and air conditioning ("HVAC") services nationwide. NorthWestern wrote off substantially all of its investment in Blue Dot during the fourth quarter of 2002 as disclosed in the company's 2002 Form 10-K and announced its intention to sell Blue Dot in April 2003. In the second quarter of 2003, Blue Dot's operations were discontinued, and NorthWestern thereafter sold or closed each of Blue Dot's HVAC businesses.

## Background

4.    For more than seventy years, NorthWestern operated a public utility business, providing electricity and natural gas to customers in South Dakota and Nebraska. In the late 1990s, NorthWestern formed Expanets and Blue Dot (the "non-utility businesses") to diversify into the telecommunications and HVAC sectors. NorthWestern's business plan was to acquire small telecommunications and HVAC companies and make them more profitable through central management, national branding and other economies of scale.

5.    From 1998 through the end of 2001, Expanets acquired twenty-six small telecommunications companies and a sales division of a large competitor. From 1997 through the end of 2001, Blue Dot acquired over ninety different HVAC and plumbing companies. By the end of 2001, NorthWestern had invested hundreds of millions of dollars in Expanets and Blue Dot to make these acquisitions and build those subsidiaries' central management. However, Expanets and Blue Dot incurred losses during most years and posted only small profits in other years. Because of their performance, Expanets and Blue Dot required investments of substantial amounts of cash by NorthWestern.

6.    In February 2002, NorthWestern effectively quadrupled its utility customer base by acquiring Montana Power Company ("Montana Power") for approximately $1.1 billion. NorthWestern originally financed its acquisition of Montana Power by utilizing, among other things, a $720 million acquisition loan. In March 2002, as part of a debt offering to retire the acquisition loan, NorthWestern issued $720 million in the form of senior notes.

7.    The magnitude of NorthWestern's increased debt as a result of the Montana Power acquisition threatened the company's credit ratings. As a result, NorthWestern announced its intention to conduct an equity offering during 2002 to raise approximately $200 million to pay down its debt and improve its debt/equity ratios.

8.    NorthWestern recognized that improvement in the performance of both Expanets and Blue Dot was critical to its planned equity offering. NorthWestern made public statements that both Expanets and Blue Dot would achieve 2002 targeted earnings and begin providing cash to the NorthWestern consolidated entity in 2002.

3

9.     NorthWestern conducted its equity offering during the third quarter of 2002, and raised approximately $87 million. Also during the third quarter of 2002, NorthWestern completed its registration and exchange of new notes for $720 million of debt it incurred to purchase Montana Power.

10.     In December 2002, NorthWestern disclosed that significant operational problems at Expanets and Blue Dot would materially impact the company's consolidated year-end financial results. In April 2003, NorthWestern filed its 2002 Form 10-K and simultaneously restated each of its Forms 10-Q for the first three quarters of 2002. NorthWestern's restated Forms 10-Q corrected material misstatements of previously reported financial results relating to Expanets and Blue Dot, and disclosed various operational difficulties these subsidiaries experienced throughout 2002. NorthWestern's 2002 Form 10-K further disclosed that the company did not anticipate recovering its past investments of hundreds of millions of dollars in Expanets and Blue Dot, and that neither entity would generate cash flows in sufficient amounts to provide meaningful contributions to service NorthWestern's debt load. NorthWestern's liquidity situation continued to deteriorate until the company filed for bankruptcy in September 2003. NorthWestern stock, which had traded for more than $20 per share in early 2002, was trading for less than a dollar by the time NorthWestern filed bankruptcy.

## Problems Relating to Expanets' Computer System

### Functionality of the EXPERT System

11.     During 2000 and 2001, Expanets developed an information technology system, called the "EXPERT" system, to serve as a platform for virtually all of its operations, including sales, inventory, project management, billing, collections and financial statement preparation. Because of its planned scope and impact across operations, the functionality of the EXPERT system was critical to Expanets.

12.     However, following its implementation in November 2001, the EXPERT system was unable to perform many of the basic tasks for which it had been designed. For example, for approximately a month after it was implemented, EXPERT could not generate any customer bills. From January through May 2002, many customer bills EXPERT generated were incomplete and inaccurate. Until approximately September 2002, the EXPERT system also could not properly apply cash collected to customer accounts or track the aging of accounts receivable balances. These problems materially affected Expanets' results from operations throughout 2002.

13.     NorthWestern's Forms 10-Q for the first and second quarters of 2002 and associated press releases attached to Forms 8-K mischaracterized EXPERT's billing activities as "fully operational" or "operational" and failed to adequately disclose the magnitude of the system's problems and the material impact of those problems on Expanets' operations. In its Form 10-Q for the third quarter of 2002, NorthWestern disclosed that EXPERT had encountered some problems, particularly as to billings and collections, but did not disclose the extent to which these system problems had impacted Expanets' operations. NorthWestern did not fully and adequately disclose the severity of the problems with the EXPERT system and the impact of those problems on

4

Expanets' operations until April 2003 when it filed its 2002 Form 10-K and restated its Forms 10-Q for the first three quarters of 2002.

## Aged Accounts Receivable

14.     In anticipation that some customer accounts might prove uncollectible, Expanets maintained a "bad debt" reserve, which had the effect of reducing Expanets' operating income. Prior to its implementation of EXPERT, Expanets calculated its bad debt reserve based on the age of uncollected receivables outstanding in a given period. However, during the first and second quarters of 2002, the EXPERT system could not properly apply cash collected from customers to their accounts or accurately track the aging of Expanets' accounts receivable. As a result, rather than considering the age of all of its receivables, Expanets estimated its bad debt reserve based on the percentage of revenue that had typically resulted in uncollectible accounts receivable.

15.     Expanets' bad debt reserve in 2002 was inadequate. As an initial matter, Expanets did not make appropriate adjustments for known aged receivables that pre-dated implementation of the EXPERT system.

16.     Expanets also failed to increase its bad debt reserve despite the markedly increased difficulties with collections that resulted from the EXPERT system's problems. For example, since EXPERT could not apply cash collected to the proper accounts, Expanets could not determine from which customers to seek payment, causing uncollected receivables to age further.

17.     Beginning in the third quarter of 2002, for the first time, the EXPERT system was able to generate accurate accounts receivable aging reports. These reports demonstrated that Expanets' uncollectible accounts receivable exceeded its existing bad debt reserve by tens of millions of dollars. Despite such data, Expanets did not increase its bad debt reserve or directly write off uncollectible accounts receivable.

18.     In its first and second quarter Forms 10-Q, NorthWestern did not disclose information indicating that a loss as a result of its uncollectible accounts receivable was probable or reasonably possible. In its third quarter Form 10-Q, NorthWestern disclosed that the EXPERT system's problems might lead to an increase in Expanets' bad debt reserve. However, this disclosure was inadequate since NorthWestern knew at that time that Expanets' bad debt reserve was materially insufficient.

19.     In December 2002, NorthWestern announced that it anticipated that Expanets would take substantial charges in the fourth quarter relating to Expanets' uncollectible accounts receivable. In April 2003, NorthWestern restated its Forms 10-Q for the first three quarters of 2002 and increased Expanets' bad debt reserve for each of these periods by approximately $5.2 million, $5.1 million, and $6.3 million, respectively.

20.     As a result of its improper accounting for uncollectible accounts receivable, NorthWestern overstated its income from continuing operations by approximately 16%, 19%, and 39% for the first three quarters of 2002, respectively, as reported in its Forms 10-Q and press

5

releases attached to Forms 8-K. Moreover, in its segment reporting for Expanets, NorthWestern understated Expanets' operating loss by approximately 66% for the first quarter of 2002, and overstated Expanets' operating income by approximately 86% and 270%, respectively, for the second and third quarters of 2002.

## Adjustments to Customer Bills

21.    As a result of the inaccurate customer bills generated by the EXPERT system, Expanets issued partial credits to affected customers. Expanets recorded these credits as "billing adjustments," which reduced both its revenue and income in the current period. Since Expanets credited customer accounts in periods after it initially recognized revenue from a transaction, Expanets maintained a "billing adjustment reserve" for anticipated credits to customer accounts. Expanets calculated its billing adjustment reserve based on the revenue it billed, its actual billing adjustments during the reporting period, and its evaluation of the aggregate accuracy of its customer bills.

22.    Because EXPERT generated a significant number of inaccurate and incomplete customer bills in the first quarter of 2002, Expanets' billing adjustments in the first quarter of 2002 surpassed projected levels of approximately $2 million per month and reached more than $3 million for March 2002. During the first quarter of 2002, Expanets also internally forecasted that EXPERT's billing accuracy problems would continue for several months. Still, Expanets increased its billing adjustment reserve by a net of only approximately $1.5 million in the first quarter of 2002.

23.    As EXPERT billings problems persisted during the second quarter of 2002, Expanets' billing adjustments significantly exceeded originally-projected levels and reached approximately $6 million for the month of June 2002. Expanets estimated that its billing adjustments would be $13 million higher than it had originally forecasted for the remainder of the year. However, Expanets did not increase its billing adjustment reserve to comport with these internal forecasts. Instead, Expanets reduced its billing adjustment reserve by $2.3 million during the second quarter, thereby increasing its operating income by the same amount.

24.    For the third quarter of 2002, Expanets' billing adjustments totaled more than $22 million, which again significantly exceeded its original and revised projections. Expanets further estimated that, due to a planned correction of a certain category of customer bills, its billing adjustments for the fourth quarter would exceed its revised estimates by an additional $3.4 million. However, Expanets again did not increase its billing adjustment reserve. Instead, it reduced this reserve by $4 million during the third quarter, which increased Expanets' operating income by the same amount.

25.    In December 2002, NorthWestern announced that it anticipated that Expanets would take substantial charges in the fourth quarter relating to Expanets' billing adjustments. In its April 2003 restatements for the first three quarters of 2002, NorthWestern acknowledged that it had understated its billing adjustment reserve in each of these quarters, and as a result, the company

6

reduced reported revenues and income by approximately $18.3 million, $10.1 million, and $5.4 million, respectively.

26.   As a result of its improper accounting for billing adjustments, NorthWestern overstated its income from continuing operations by approximately 98%, 46%, and 31% for the first three quarters of 2002, respectively, as reported in its Forms 10-Q and press releases attached to Forms 8-K.  In its segment reporting for Expanets, NorthWestern understated Expanets' operating loss by approximately 87% for the first quarter of 2002, and overstated Expanets' operating income by approximately 1094% and 164%, respectively, for the second and third quarters of 2002. NorthWestern also did not disclose in any of its filings for the first three quarters of 2002 that losses resulting from billing adjustments were probable or reasonably possible.

## The Quality of Expanets' Income

### Reserve Reductions

27.   During the first three quarters of 2002, Expanets reduced amounts it had recorded in at least fourteen of the reserve accounts it maintained on its balance sheet, including the billing adjustments reserve account discussed above.  These reductions materially increased Expanets' and NorthWestern's income.

28.   In the first quarter of 2002, $2.6 million of Expanets' income was derived from reserve reductions. This amount reduced by approximately 50% Expanets' reported segment operating loss of approximately $2.7 million and represented approximately 7% of NorthWestern's reported income from continuing operations for that quarter.

29.   In the second quarter of 2002, $8.8 million of Expanets' income was derived from reserve reductions. This amount represented approximately 80% of Expanets' reported segment operating income of $11 million and approximately 27% of NorthWestern's income from continuing operations for that quarter.

30.   In the third quarter of 2002, $27 million of Expanets' income was derived from reserve reductions.  With this income, Expanets was able to report $8.7 million of operating income rather than a substantial operating loss.  In addition, with this income, NorthWestern was able to report $14.6 million of income from continuing operations for that quarter rather than an operating loss.

31.   NorthWestern's Forms 10-Q for the first three quarters of 2002 did not disclose the material impact that these reserve reductions had on the reported results of operations of Expanets and NorthWestern during these periods.  NorthWestern did not disclose the material impact of these reserve reductions until April 2003 when it restated its Forms 10-Q for the first three quarters of 2002.

7

## Unusual Transactions

32.    In conjunction with Expanets' acquisition of certain assets of a competitor, Expanets agreed that, in exchange for payments from the competitor, Expanets would not solicit specific business of the competitor's customers. Expanets' competitor was obligated to make these "non-compete" type of payments to Expanets until March 2005. These payments were not characteristic of Expanets' regular operations and therefore represented unusual transactions.

33.    In the first quarter of 2002, NorthWestern reported in its segment disclosures that Expanets had an operating loss of approximately $2.7 million. Approximately $9.3 million of Expanets' income came from the non-compete payments. The $9.3 million also represented approximately 25% of NorthWestern's consolidated income from continuing operations for the quarter.

34.    In the second quarter of 2002, NorthWestern reported in its segment disclosures that Expanets had operating income of approximately $11 million. Approximately $10 million of Expanets' income came from the non-compete payments. The $10 million also represented approximately 31% of NorthWestern's consolidated income from continuing operations for the quarter.

35.    In the third quarter of 2002, NorthWestern reported in its segment disclosures that Expanets had operating income of approximately $8.7 million. Approximately $15.3 million of Expanets' income came from the non-compete payments. The $15.3 million also represented approximately 68% of NorthWestern's consolidated income from continuing operations for the quarter.

36.    NorthWestern's Forms 10-Q for the first three quarters of 2002 did not disclose Expanets' receipt of these unusual non-compete payments and their material effects on Expanets' and NorthWestern's income. NorthWestern did not disclose the existence of these non-compete payments or their effect until it filed its 2002 Form 10-K and restated its 2002 Forms 10-Q in April 2003.

### NorthWestern's Intercompany Advances to Expanets and Blue Dot

37.    EXPERT's inability to generate any customer bills in late 2001 and early 2002 and other billing problems that followed caused Expanets' cash flow from operations during the first quarter of 2002 to be a deficit of approximately $68.7 million. As a result, NorthWestern provided Expanets with significant intercompany advances during the first quarter of 2002 to enable Expanets to pay operating and other expenses, including a scheduled amount on a third-party credit facility. By the end of the first quarter of 2002, NorthWestern's intercompany advances to Expanets totaled $63.3 million.

38.    During the second quarter of 2002, EXPERT's continuing billing and collections problems caused Expanets' cash collections to lag significantly behind expected levels. NorthWestern therefore provided Expanets with additional intercompany advances of

8

approximately $50 million to help Expanets pay operating expenses and another scheduled amount on a third-party credit facility. By the end of the second quarter, NorthWestern's intercompany advances to Expanets totaled $113.4 million.

39.    Similarly, during the first quarter of 2002, NorthWestern provided Blue Dot with approximately $21 million in intercompany advances so that Blue Dot could pay off a large credit facility and operating expenses when due. NorthWestern's outstanding intercompany advances to Blue Dot totaled approximately $37.1 million at the end of the first quarter of 2002.

40.    In the second quarter of 2002, Blue Dot paid back some of the cash advanced by NorthWestern with proceeds from a one-time sale and leaseback transaction. Nevertheless, NorthWestern's outstanding intercompany advances to Blue Dot still totaled approximately $22.8 million at the end of that quarter.

41.    NorthWestern's intercompany advances to Expanets and Blue Dot demonstrated that these businesses were continuing to require further investments from the parent company, rather than providing cash to the consolidated entity. NorthWestern's need to advance funds to Expanets and Blue Dot was information that was necessary to understand NorthWestern's financial condition and was reasonably likely to impact NorthWestern's liquidity.

42.    NorthWestern's Form 10-Q for the first quarter of 2002 did not disclose NorthWestern's intercompany advances to Expanets or Blue Dot, or the significance of those advances. NorthWestern disclosed in its Form 10-Q for the second quarter of 2002 that it made intercompany advances to Expanets. However, NorthWestern still did not disclose its intercompany advances to Blue Dot or any information about the significance of the intercompany advances to either subsidiary. NorthWestern did not disclose the existence and amount of its intercompany advances until September 2002.

## Allocation of Losses to Blue Dot Minority Interests

43.    When Blue Dot acquired other businesses, it paid the former owners in part with Blue Dot common stock. As a result of these transactions, the former owners held minority interests in Blue Dot. NorthWestern allocated a portion of Blue Dot's losses to these minority interests, which had the effect of increasing NorthWestern's consolidated income from continuing operations. This accounting treatment was proper only to the extent that the losses applicable to the Blue Dot minority interest did not exceed the minority interest in the equity capital of Blue Dot.

44.    Before it filed its financial statements for the second quarter of 2002, NorthWestern received a third-party appraisal of Blue Dot for the purpose of assessing Blue Dot's enterprise value. Based on the total value of the Blue Dot entity as reflected in the appraisal, Blue Dot's common stock was worthless.

45.    Despite this information, in its financial statements for the second quarter of 2002, NorthWestern allocated $8.1 million of Blue Dot's losses to minority interests based on stock issued for acquisitions Blue Dot made that quarter. In addition, NorthWestern failed to disclose in

9

its second quarter Form 10-Q the material effects of the decrease in value of Blue Dot common stock, or any uncertainties about NorthWestern's ability to allocate losses to Blue Dot minority interests.

46. Because of its improper allocation of losses to minority interests, NorthWestern reported income from continuing operations of approximately $20.9 million rather than $12.8 million, an overstatement of approximately 63%, in its Form 10-Q for the second quarter of 2002 and a press release attached to a Form 8-K. NorthWestern reversed its allocation of losses to Blue Dot's minority interests when it restated its second quarter 2002 Form 10-Q in April 2003.

## The Colstrip Utility Asset Sale

47. In February 2002, when NorthWestern purchased Montana Power, NorthWestern became the successor-in-interest to a contract for the sale of certain assets known as the "Colstrip" transmission assets ("Colstrip assets"). The contract called for a payment of approximately $97 million to NorthWestern upon the satisfaction of certain conditions. During the second quarter of 2002, NorthWestern announced that it expected to collect the proceeds from the sale of the Colstrip assets by June or July 2002.

48. Throughout 2002, the sale of the Colstrip assets was significant to NorthWestern because it would have generated significant cash for the company and enhanced its liquidity position. Accordingly, analysts and rating agencies tracked the status of the sale.

49. Between May and July 2002, the other party to the Colstrip assets sale contract repeatedly informed NorthWestern that it would not close the sale until the parties were able to resolve other claims. On August 5, 2002, NorthWestern filed but did not serve a complaint against this party in a Montana State court.

50. NorthWestern's Form 10-Q for the second quarter of 2002 did not disclose the Colstrip asset sale dispute and its potential impact on NorthWestern's financial condition, including its impact on NorthWestern's liquidity. On September 4, 2002, NorthWestern served its complaint on the other party to the Colstrip sale and subsequently disclosed the existence of its lawsuit in its third quarter Form 10-Q. In May 2005, NorthWestern settled the lawsuit by agreeing to retain the Colstrip assets in exchange for, among other things, a $9 million payment from the other party.

## Violations

51. Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 require issuers to make and keep accurate books, records, and accounts, to file quarterly and current reports with the Commission, and to keep reported information current and not misleading. As a result of the conduct described above, NorthWestern violated Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 thereunder.

10

52.    Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles. As a result of the conduct described above, NorthWestern violated Section 13(b)(2)(B) of the Exchange Act.

## IV.

In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff.

## V.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent NorthWestern's Offer.

Accordingly, it is hereby ORDERED that Respondent cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 thereunder.

By the Commission.

Nancy M. Morris
Secretary

11

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | <br><br><br><br><br>C.A. No. 04-1494-JJF |

### RESPONSES AND OBJECTIONS OF NORTHWESTERN CORPORATION TO PLAINTIFFS' MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK'S FIRST SET OF INTERROGATORIES FOR DEFENDANT NORTHWESTERN CORPORATION

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, NorthWestern Corporation ("NorthWestern") through its undersigned counsel, hereby submits the following responses and objections to Plaintiffs' Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company Of New York ("Law Debenture" and collectively with Magten "Plaintiffs") First Set of Interrogatories for Defendant NorthWestern Corporation, dated February 28, 2007 ("Interrogatories").

### GENERAL OBJECTIONS

The following general objections are incorporated into each of NorthWestern's responses and objections to the Interrogatories, as if set forth fully therein. The stated objections shall be deemed continuous throughout the responses and objections to the specific Interrogatories that follow, even though such objections are not specifically referred to therein.

1.      NorthWestern's responses and objections are based upon information presently known to NorthWestern. These are made without prejudice to producing during discovery or at

trial information, documents or data that are (a) subsequently discovered or determined to be relevant for any purpose, or (b) produced as a result of ongoing investigations, or (c) subsequently determined to have been omitted from these disclosures.

2.      NorthWestern reserves the right at any time to revise and/or supplement these responses and objections.

3.      In each and every response to the Interrogatories where an objection is interposed, such objection shall be construed to preserve all rights to enter similar objections as to any future supplemental answer to such requests. Moreover, a failure to object herein shall not constitute a waiver of any objection that may be interposed as to future supplemental answers.

4.      Failure to object to any Interrogatory on a particular ground or grounds shall not be construed as any type of waiver of the right to object on any additional ground.

5.      NorthWestern objects to the Interrogatories including, without limitation, the "Definitions," and "Instructions" to the extent that they are inconsistent with the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Delaware ("Local Rules") or impose burdens or duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure or the Local Rules.

6.      NorthWestern objects to the Interrogatories to the extent that they seek information subject to any privilege, including without limitation, the attorney-client privilege, the work product doctrine, and/or any other applicable privilege. Any disclosure of such information is inadvertent and does not waive any applicable privilege.

7.      NorthWestern objects to the Interrogatories on the grounds that they are vague, ambiguous, overly broad, unduly burdensome, duplicative, cumulative, irrelevant, and/or that

-2-

plaintiffs have failed to establish that the requested material is reasonably calculated to lead to the discovery of admissible evidence.

8.    NorthWestern objects to the definition of "Transfer" insofar as it implies that the November 15, 2002 transfer of the Transferred Assets can be viewed in any respect as a discreet transaction rather than as the last step in NorthWestern's acquisition of the Transferred Assets commencing with the Unit Purchase Agreement between NorthWestern and Montana Power Company dated September 29, 2000.

9.    The production of any information when the production of such information is objected to herein shall not constitute a waiver of any applicable objections and is without prejudice to NorthWestern's right to object later that the production of any such information was inadvertent.

10.    No objection or limitation, or lack thereof, made in these responses and objections shall be deemed an admission by NorthWestern as to the existence or nonexistence of documents or information.

11.    NorthWestern's objections and/or responses to the Interrogatories, and its production of any documents or information shall not be construed as an admission of the relevance, materiality, or admissibility of any such documents or of the subject matter of any such documents, or as a waiver or abridgment of any applicable privilege or of any applicable objection set forth above or below, or as an agreement that requests for similar documents will be treated in a similar manner. The fact that NorthWestern responds to a particular interrogatory shall not be interpreted as implying that NorthWestern acknowledges the propriety of that request. NorthWestern submits these General Objections without conceding the competency, relevancy, materiality, or admissibility of the subject matter of any document or information

requested by the Interrogatories. NorthWestern reserves the right, without limitation, (i) to

supplement, amend, or correct all or any part of its objections or eventual responses; and (ii) to

object to the admissibility of the information ultimately provided in response to the

Interrogatories.

## SPECIFIC RESPONSES AND OBJECTIONS

Each of the foregoing general objections is expressly incorporated into each of the
specific responses and objections set forth below.

### INTERROGATORY NO. 1.

Specify the nature and dollar amount of all Value received by Clark Fork in exchange for
the Transfer of the Transferred Assets.

### INTERROGATORY RESPONSE TO NO. 1.

NorthWestern objects to this Interrogatory insofar as it uses the definition of "Transfer"

to imply that the transfer of Transferred Assets in November of 2002 can be viewed as a discreet

transaction. NorthWestern paid for and acquired the Transferred Assets in February 2002 when

it acquired the membership interests in The Montana Power LLC ("MPLLC") pursuant to the

terms of a Unit Purchase Agreement entered into with Touch America Holdings, Inc. ("Touch

America") and The Montana Power Company on September 29, 2000. NorthWestern paid

approximately $1.1 billion in cash and the assumption of liabilities of the seller for the

Transferred Assets. The "Transfer," as defined in the Interrogatories, was simply the last step in

a multi-step process in the overall transaction pursuant to which the Transferred Assets, already

paid for by NorthWestern, were brought up into NorthWestern as the parent of MPLLC, which

was renamed NorthWestern Energy LLC and then Clark Fork.

### INTERROGATORY NO. 2.

Identify all current or former directors, officers or employees of NorthWestern or any
subsidiary and/or affiliate thereof who knew that any of the Prior Financials were materially false
and misleading at the time(s) they were issued.

- 4 -

**INTERROGATORY RESPONSE TO NO. 2.**

NorthWestern objects to this Interrogatory in that it contains within it the false premise

that the Prior Financials, as defined, were materially false and misleading. NorthWestern further

objects to this Interrogatory in that it calls upon NorthWestern to ascertain or divine the state of

mind of any individual or individuals.

**INTERROGATORY NO. 3.**

Identify all current or former directors, officers or employees of NorthWestern or any
subsidiary and/or affiliate thereof who are the subject of any Wells notice issued by the Securities
and Exchange Commission, including but not limited to those Wells notices referenced in
NorthWestern's 10-K dated March 3, 2006 and 10Q's dated May 4, 2006, August 3, 2006, and
November 2, 2006 and describe the possible violations of law referenced in those Wells Notices
as to each individual identified.

**INTERROGATORY RESPONSE TO NO. 3.**

Bart Thielbar, Cary Griswold, Keith Beachler, David Monahan, Jana Quam, Merle Lewis,

Richard Hylland, Kipp Orme, Kurt Whitesel, Eric Jacobson, Richard Fresia, John Charters.

NorthWestern has not received the Wells Notices and does not know the contents of those

documents.

**INTERROGATORY NO. 4.**

State the date on which NorthWestern decided to cause Clark Fork to transfer the
Transferred Assets to it, rather than control those assets indirectly through its equity ownership of
Clark Fork.

**INTERROGATORY RESPONSE TO NO. 4.**

Consideration was given to holding the Transferred Assets at the parent company level at

least as early as January 11, 2001 which is the date of the applications for regulatory approval of

NorthWestern's acquisition of the membership interests in MPLLC pursuant to the terms of a

Unit Purchase Agreement entered into with Touch America and The Montana Power Company

on September 29, 2000. NorthWestern made clear in those applications that the Transferred

Assets would be held either in a subsidiary or at the parent company level. The final Board

resolution approving the Transfer of the Transferred Assets to NorthWestern was dated August 7,

2002.

### INTERROGATORY NO. 5.

State whether and when CSFB advised NorthWestern that it would not make the 2003
Loan or otherwise refinance the Bridge Loan unless the Transfer occurred.

### INTERROGATORY RESPONSE TO NO. 5.

NorthWestern objects to this Interrogatory on the grounds that it is vague and ambiguous.

Subject to this objection and the general objections contained herein, NorthWestern states that a

term of the 2003 Loan that was negotiated by NorthWestern with CSFB was that the 2003 Loan

would be secured by the First Mortgage Bonds issued pursuant to the Mortgage and Deed of

Trust dated October 1, 1945 from The Montana Power Company to the trustee named therein,

and pursuant to the General Mortgage Indenture and Deed of Trust dated as of August 1, 1993

between NorthWestern and The Chase Manhattan Bank, as trustee.

### INTERROGATORY NO. 6.

State the date on which NorthWestern became Insolvent.

### INTERROGATORY RESPONSE TO NO. 6.

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and

calls for a legal conclusion. Subject to this objection and the general objections contained herein,

the date upon which NorthWestern became insolvent was September 14, 2003.

### INTERROGATORY NO. 7.

State the date on which NorthWestern became aware that it was Insolvent.

**INTERROGATORY RESPONSE TO NO. 7.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and

calls for a legal conclusion. Subject to this objection and the general objections contained

herein, NorthWestern became aware it was insolvent on September 14, 2003.

**INTERROGATORY NO. 8.**

State the date on which NorthWestern first began to consider the possibility of non-cash
charges relating to goodwill and/or other intangible assets, as referenced in its 8-K dated
December 13, 2002.

**INTERROGATORY RESPONSE TO NO. 8.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous

and incomprehensible. Subject to this objection and the general objections contained herein,

NorthWestern's consideration of the possibility of making material non-cash changes relating to

goodwill is best reflected in the 8-K dated December 13, 2002.

**INTERROGATORY NO. 9.**

State the date on which NorthWestern first began to consider the possibility that it would
miss previously disclosed earnings estimates, as referenced in its 8-K dated December 13, 2002.

**INTERROGATORY RESPONSE TO NO. 9.**

NorthWestern objects to this Interrogatory on the grounds that it is vague and

incomprehensible. Subject to this objection and the general objections contained herein,

NorthWestern's consideration of the possibility that it would miss previously disclosed earnings

estimates on a consolidated basis is best reflected in its 8-K dated December 13, 2002.

**INTERROGATORY NO. 10.**

State the date on which NorthWestern first began to consider the possibility of restating
any of the Prior Financials.

**INTERROGATORY RESPONSE TO NO. 10.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and

incomprehensible. Subject to this objection and the general objections contained herein, the

decision to restate certain financial statements for the first three quarters of 2002 was made on or

about February 19, 2003.

**INTERROGATORY NO. 11.**

State the date on which NorthWestern first began to consider the possible need or
desirability of reducing or suspending the payment of dividends on its common stock, as it
ultimately did during 2003.

**INTERROGATORY RESPONSE TO NO. 11.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and

incomprehensible. Subject to this objection and the general objections contained herein, the

decision to suspend the payment of dividends on its common stock was made on or about

February 19, 2003.

**INTERROGATORY NO. 12.**

State the date on which NorthWestern first began to consider the possible need or
desirability of failing to make timely payments of interest on any debt securities (including those
included in the Assumed Liabilities), as it ultimately did during 2003.

**INTERROGATORY RESPONSE TO NO. 12.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and

incomprehensible. NorthWestern further objects to the use of the term "debt securities" as vague

and ambiguous. Subject to this objection and the general objections contained herein,

NorthWestern did not fail to make required payments of interest on any Assumed Liabilities prior

to September 14, 2003.

## INTERROGATORY NO. 13.

State the total dollar amount of Clark Fork's property (at a fair valuation within the meaning of Montana Code Annotated § 31-2-329) and liabilities immediately following the Transfer.

## INTERROGATORY RESPONSE TO NO. 13.

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous,

incomprehensible, incapable of an answer and calls for a legal conclusion. Furthermore, at the

present time NorthWestern has insufficient information to determine the precise fair valuation of

Clark Fork's property immediately after the Transfer. However, the fair value of Clark Fork's

assets was greater than its reasonably probable liabilities. Subject to this qualification and

specific and general objections contained herein, NorthWestern states that the balance sheet of

Clark Fork reflected total assets of $11,005,407 and total liabilities of $11,005,407 as of

December 31, 2002.

Dated: Wilmington, Delaware
      March 30, 2007

**GREENBERG TRAURIG LLP**

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Tel: (302) 661-7000

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
101 Park Avenue
New York, NY 10178
Telephone:   (212) 696-6000
Facsimile:    (212) 697-1559

Attorneys for NorthWestern Corporation

- 9 -

## CERTIFICATION

I, Thomas J. Knapp, Vice President and General Counsel of NorthWestern Corporation, state that I have read the foregoing Responses and Objections of Northwestern Corporation to Plaintiffs' Magten Asset Management Corporation and Law Debenture Trust Company of New York's First Set of Interrogatories for Defendant Northwestern Corporation, and that the answers to the Interrogatories are true, to the best of my knowledge, information and belief, based upon my personal knowledge and information obtained through various corporate sources. I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 28, 2007

By _____
Thomas J. Knapp, Esq.
Vice President and General Counsel
NorthWestern Corporation

# Exhibit 3

hrng012907 kf.txt

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MAGTEN ASSET MANAGEMENT CORP. )
and LAW DEBENTURE TRUST COMPANY )
OF NEW YORK, )
                              )
        Plaintiffs, )
                              ) Civil Action
v.                        ) No. 04-1494-JJF
                              )
NORTHWESTERN CORPORATION, )
                              )
        Defendant. )
------------------------------------)
MAGTEN ASSET MANAGEMENT CORP., )
                              )
        Plaintiff, )
                              ) Civil Action
v.                        ) No. 05-499-JJF
                              )
MIKE J. HANSON and ERNIE J. KINDT,)
                              )
        Defendants. )

                  Potter, Anderson & Corroon LLP
                  1313 North Market Street
                  Wilmington, Delaware

                  Monday, January 29, 2007
                  2:30 p.m.

BEFORE:  JOHN E. JAMES, ESQ.
          SPECIAL DISCOVERY MASTER

          TRANSCRIPT OF PROCEEDINGS

                WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801
                (302) 655-0477
                www.wilfet.com

&#10065;

2

1    APPEARANCES:

2        DALE R. DUBE, ESQ.

hrng012907 kf.txt
```
3      BLANK ROME LLP.

4         Chase Manhattan Centre

5         1201 Market Street - Suite 800

6         Wilmington, Delaware  19801

7         For the Plaintiffs Magten Asset Management

8         Corp. and Law Debenture Trust Company

9         of New York

10     BONNIE STEINGART, ESQ.
       GARY KAPLAN, ESQ.
11     JOHN BREWER, ESQ.
       FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
12        One New York Plaza
          New York, New York  10004-1980
13        For the Plaintiff Magten Asset
          Management Corp.
14
       JOHN V. SNELLINGS, ESQ.
15     NIXON PEABODY LLP
          100 Summer Street
16        Boston, Massachusetts  02110-2131
          For the Plaintiff Law Debenture Trust
17        Company of New York

18     VICTORIA W. COUNIHAN, ESQ.
       GREENBERG TRAURIG LLP
19        The Nemours Building
          1007 North Orange Street - Suite 1200
20        Wilmington, Delaware  19801
             - and -
21     JOSEPH D. PIZZURRO, ESQ.
       NANCY E. DELANEY, ESQ.
22     CURTIS MALLET-PREVOST COLT & MOSLE LLP
          101 Park Avenue
23        New York, New York  10178-0061
          For Defendant NorthWestern Corporation

24
```

                                                                    3


```
1    APPEARANCES:  (Cont'd)

2         DENISE KRAFT, ESQ.
          EDWARDS ANGELL PALMER & DODGE LLC
3            919 North Market Street - Suite 1500
             Wilmington, Delaware  19801
4               - and -
          STANLEY KALECZYC, ESQ. (Via teleconference)
5         KIMBERLY BEATTY, ESQ. (Via teleconference)
          BROWNING KALECZYC BERRY & HOVEN, P.C.
6            139 North Last Chance Gulch
             Helena, Montana  59624
7            For the Defendants Mike J. Hanson
             and Ernie J. Kindt
```

hrng012907 kf.txt

18    2003?
19              MS. STEINGART:  No.  2001 through 2003.
20              MR. PIZZURRO:  Theoretically, that could
21    be hundreds of thousands of pages of documents.  What
22    are you talking about?  Accountant's work papers?
23              MS. STEINGART:  You said it's just a
24    holding company.  Why is it going to be hundreds of
                                                    113


1    thousands --
2              MR. PIZZURRO:  I have no idea.  I really
3    have no idea.  "All documents relating to Deloitte &
4    Touche's review of financial information, operating,
5    and other data related to NorthWestern Growth."
6    Frankly, why that's any less broad than 50 and any
7    more relevant than what would be subsumed in the other
8    requests we're talking about, I don't understand.
9              MS. STEINGART:  Well, we have modified
10   2001 through 2003.  I think you're right that there is
11   some overlap with other requests.  And if on your
12   inspection you believe that this is hundreds of
13   thousands of pages, we certainly can talk about that.
14              SPECIAL DISCOVERY MASTER JAMES:  Let's
15   make it clear today because talking hasn't worked out
16   too well so far in this case and we're approaching the
17   deadline and I want to make it clear today so we don't
18   have further disputes about it.
19              I think it's a legitimate source of
20   inquiry, but I do think that it needs to be reduced in
21   scope.  And I'm not sure.  Mr. Pizzurro, do you think
22   if we limit it to the extent that we have limited the

hrng012907 kf.txt

23     others such as Northwestern Growth that that would be
24     manageable?

114

1                   MR. PIZZURRO:   Limit it how?
2                   SPECIAL DISCOVERY MASTER JAMES:   Limit it
3      so that it only relates to the investigation.
4                   MR. PIZZURRO:   If it only relates to the
5      investigation as we have defined it, I think that is
6      probably very doable.
7                   SPECIAL DISCOVERY MASTER JAMES:   Okay.
8      Well, let's have that produced on that basis.
9                   MS. STEINGART:   Thank you.
10                  And 54 they have said they will produce,
11     so we have no disagreement there.   Correct?
12                  SPECIAL DISCOVERY MASTER JAMES:   Correct.
13                  MR. PIZZURRO:   That's correct.
14                  SPECIAL DISCOVERY MASTER JAMES:   So we
15     have managed to cut the Gordian knot to some extent
16     with respect to these requests.   However, that does
17     leave one major issue open.   We have dealt with
18     relevance and scope and now we have to deal with
19     timing.
20                  I thought about this a great deal and in
21     light of what we have ordered to be produced today, I
22     am going to require Northwestern to have substantially
23     completed its production of documents in response to
24     these two document requests, except for good cause

115

hrng012907 kf.txt
1    shown, no later than March 16, 2007 with a privilege
2    log relating to that production no later than March
3    23.
4              Any questions?
5              MR. PIZZURRO:  Understood.
6              MS. STEINGART:  I would just request, to
7    the extent that it's possible, for Northwestern to
8    front load as much of that production as you can do
9    and if we can be of assistance in that by doing
10   anything.
11             SPECIAL DISCOVERY MASTER JAMES:  Yes.
12   This is going to be done on a rolling production
13   basis?
14             MR. PIZZURRO:  Yes.  We have been engaged
15   in rolling production.
16             SPECIAL DISCOVERY MASTER JAMES:  You have
17   200,000 documents now.  You can start certainly
18   reviewing those and that should inform you as to the
19   witnesses you're going to need to depose.  To the
20   extent some of those are third parties, you already
21   have enough documents to start deposing people, start
22   doing it.  But that will give you certainly a good six
23   weeks to take depositions, which given the restriction
24   on the number of depositions I think is fair to all

116

1    concerned.
2              MS. STEINGART:  Yes.
3              SPECIAL DISCOVERY MASTER JAMES:  And so
4    with that, for reasons of expedition I'm going to
5    treat today's hearing transcript, which will need to

hrng012907 kf.txt
6    be produced on an expedited basis, as my report and

7    recommendation to Judge Farnan.  I will issue a pro

8    forma order that says something to that effect

9    tomorrow or the next day, whenever I get the

10   transcript.

11              So to the extent someone wants to take an

12   appeal or whatever from my decision, your time will

13   run from whenever that order issued, which should

14   hopefully be tomorrow or the next day.

15              Thank you for all of your patience and

16   thoughtful insights and good luck going forward.

17              MS. STEINGART:  Thank you very much.

18              MR. PIZZURRO:  Thank you.

19              MR. SNELLINGS:  Thank you.

20              (Proceedings concluded at 5:30 p.m.)

21

22

23

24

117

1    State of Delaware.  )
                         )
2    New Castle County   )

3

4

5                        CERTIFICATE OF REPORTER

6

7              I, Kurt A. Fetzer, Registered Diplomate

8    Reporter and Notary Public, do hereby certify that the

9    foregoing record, pages 1 to 116 inclusive, is a true

10   and accurate transcript of my stenographic notes taken

# **Exhibit 4**

## CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

ATTORNEYS AND COUNSELLORS AT LAW
101 PARK AVENUE
NEW YORK, NEW YORK 10178-0061

FRANKFURT    MUSCAT
HOUSTON    PARIS
LONDON    STAMFORD
MEXICO CITY    WASHINGTON, D.C.
MILAN

TELEPHONE 212-696-6000
FACSIMILE 212-697-1559
E-MAIL INFO@CM-P.COM
INTERNET WWW.CM-P.COM

WRITER'S DIRECT:
TEL.: (212) 696-8895
E-MAIL JBAGNATO@CM-P.COM

April 5, 2007

### VIA EMAIL AND FIRST CLASS MAIL

John W. Brewer, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004

> Re:    *Magten Asset Management Corp. and Law*
> *Debenture Trust Co. v. NorthWestern Corp.*;
> C.A. No. 04-1494-JJF

Dear Bonnie:

The following documents contain attorney work product and attorney client privileged information. These documents, that were listed on the privilege log delivered to you on March 23, 2007, were inadvertently produced.

| | | |
|---|---|---|
| NOR 053296-97 | NOR 184858-59 | NOR 441828-32 |
| NOR 066670-71 | NOR 185818-820 | NOR 452810-11 |
| NOR 075185-86 | NOR 187057-058 | NOR 452812 |
| NOR 086411-12 | NOR 192884-983 | NOR 452820 |
| NOR 086481-501 | NOR 193851-53 | NOR 458221-26 |
| NOR 088303-05 | NOR 240045-46 | NOR 459119-20 |
| NOR 121152-73 | NOR 265143 | NOR 458213-215 |
| NOR 131455 | NOR 275785 | NOR 463654 |
| NOR 135865-67 | NOR 371624-2806 | NOR 481063-64 |
| NOR 142061 | NOR 374782-92 | NOR 481065-66 |

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
ATTORNEYS AND COUNSELLORS AT LAW

Page 2

Bonnie Steingart, Esq.
April 5, 2007

NOR 149263-64          NOR 374829-5523          NOR 481073
NOR 160675-76          NOR 411358-1450          NOR 482791-93
NOR 173136-38          NOR 413446-500
NOR 184691-94          NOR 414057-114

        In addition, the following documents contain attorney client privileged and attorney work product information and were inadvertently produced.

NOR 063216-7           NOR 087633-34           NOR 368363-70
NOR 067845-86          NOR 117952-953          NOR 405402-03
NOR 072813-14          NOR 119158-9            NOR 405928-930
NOR 072815-16          NOR 124686-87           NOR 406074-075
NOR 073773-74          NOR 160675-76           NOR 406175-180
NOR 076260-61          NOR 366792-809          NOR 406416-55
NOR 077858-59          NOR 367014-041          NOR 458032-035
NOR 081375-76          NOR 367140-151          NOR 469466
NOR 088910-11          NOR 368029-037          NOR 479145-146
NOR 092308-09          NOR 368234-261          NOR 481065-066

        Pursuant to Fed. R. Civ. P. 26(b)(5)(B), and paragraph 8 of the Stipulated Protective Order filed in the above referenced action, please destroy all of the documents listed above, or return these documents to me.

        Enclosed is an addendum to the privilege log which lists these documents, as well as documents which were withheld from production, but were not included on the log. Also enclosed is an updated names reference list. In addition, in connection with your letter of March 29, we are preparing an annotated log that notes the documents which were produced to the Securities and Exchange Commission.

                                        Very truly yours,

                                        Jennifer A. Bagnato

# Exhibit 5

## Brewer, John W.

| | |
|---|---|
| **From:** | Bagnato, Jennifer A. [jbagnato@cm-p.com] |
| **Sent:** | Thursday, April 05, 2007 10:57 PM |
| **To:** | Brewer, John W.; Bijan Amini Esq. (E-mail); Dale Dubè Esq. (E-mail); David A. Jenkins Esq. (E-mail); Denise Seastone Kraft Esq. (E-mail); Dennis A. Meloro Esq. (E-mail); John V. Snellings Esq. (E-mail); Kathleen M. Miller Esq. (E-mail); Kimberly A. Beatty Esq. (E-mail); Pizzurro, Joseph D.; Stanley T. Kaleczyc Esq. (E-mail); Victoria W. Counihan Esq. (E-mail); Delaney, Nancy E.; Steingart, Bonnie; Kaplan, Gary |
| **Cc:** | Bagnato, Jennifer A. |
| **Subject:** | Magten v. NOR |

**Attachments:** Updated reference sheet re employment.pdf; NorthWestern Privilege Log Supplement.pdf; Scan001.PDF

  

Updated reference    NorthWestern    Scan001.PDF (61
sheet re emp...    Privilege Log Sup...    KB)

Please see the attached correspondence to John Brewer.

```
Jennifer A. Bagnato, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
212.696.8895 tel.
917.368.8895 fax
jbagnato@cm-p.com
```

<<Updated reference sheet re employment.pdf>>  <<NorthWestern Privilege Log Supplement.pdf>>  <<Scan001.PDF>>

ANY STATEMENTS REGARDING FEDERAL TAX LAW CONTAINED HEREIN ARE NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW OR TO MARKET ANY ENTITY, INVESTMENT PLAN OR ARRANGEMENT.

This e-mail, including any attachments, may contain information that is protected by law as privileged and confidential, and is transmitted for the sole use of the intended recipient. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying or retention of this e-mail or the information contained herein is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by telephone or reply e-mail, and permanently delete this e-mail from your computer system. Your privacy is very important to our firm. Therefore, if this message contains unsolicited commercial content, you may forward this e-mail to unsubscribe@cm-p.com or click here (www.cm-p.com/unsubscribe.htm) if you do not want to receive further messages of this nature. Thank you.

Curtis, Mallet-Prevost, Colt & Mosle LLP (101 Park Avenue, New York, NY 10178)

# Exhibit 6

## Brewer, John W.

| | |
|---|---|
| **From:** | Brewer, John W. |
| **Sent:** | Thursday, April 05, 2007 3:22 PM |
| **To:** | 'Delaney, Nancy E.'; Steingart, Bonnie |
| **Cc:** | Stanley T. Kaleczyc Esq. (E-mail); Kimberly A. Beatty Esq. (E-mail); 'jsnellings@nixonpeabody.com'; Kaplan, Gary |
| **Subject:** | Orme Deposition |

Dear Counsel:  I wanted to let you know that per my most recent conversation with Kipp Orme's counsel his deposition will be going forth on the 12th at the Atlanta location set forth in the subpoena.  However, it will not start until early afternoon, probably 1 pm. We will try to confirm this more formally Monday but I wanted to make sure you were all up to speed for planning purposes in the meantime.

Please also note fyi that from around 5 pm today through Sunday I will be out of the office and not checking messages due to the observance of Good Friday and Easter. However, Bonnie will be reachable tomorrow.

JWB