# ADDENDUM OF UNREPORTED CASES

# TAB 1

Westlaw.

429 A.2d 509                                                                                         Page 1
429 A.2d 509
**(Cite as: 429 A.2d 509)**

**C**

Danklef v. Wilmington Medical CenterDel.Super., 1981.
Superior Court of Delaware, New Castle County.
Catherine A. DANKLEF, Petitioner,
v.
WILMINGTON MEDICAL CENTER, Respondent.
Resubmitted Jan. 14, 1981.
Decided March 26, 1981.

Patient sought subpoena duces tecum directed at medical center for production of file of center relating to operation performed by physician on patient and notes, memorandum, records, correspondence, photographs and reports relating to investigation conducted by center's credentials committee concerning operation. The Superior Court, in and for New Castle County, Taylor, J., held that: (1) statute governing immunity of officials reviewing medical records, medical care, and physician's work was applicable to patient's suit even though cause of action arose before enactment of statute, and (2) legislative policy of Delaware should be applied in determining question of privilege rather than legislative policy of Colorado which was forum state.

Ordered accordingly.
West Headnotes
**[1] Constitutional Law 92 ⚷➔328**

92 Constitutional Law
    92XIII Right to Justice and Remedies for Injuries
        92k328 k. Courts to Be Open. Most Cited Cases

**Pretrial Procedure 307A ⚷➔382**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(E) Production of Documents and Things and Entry on Land
            307AII(E)3 Particular Documents or Things
                307Ak382 k. Medical and Hospital Records. Most Cited Cases
Where patient was free to develop and present all facts pertaining to relationship of patient and physician, nature of condition, nature of procedure followed by physician and results of operation, not deprived of opportunity to develop resources other than records of medical center's credentials

committee, not deprived of opportunity used to take appropriate discovery, and suit was filed after enactment of statute providing confidentiality for records of the credentials committee of medical institutions, application of such statute to patient's case did not deprive patient of constitutional rights of access to courts and full hearing. 24 Del.C. § 1768; Del.C.Ann.Const. Art. 1, § 9.

**[2] Pretrial Procedure 307A ⚷➔382**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(E) Production of Documents and Things and Entry on Land
            307AII(E)3 Particular Documents or Things
                307Ak382 k. Medical and Hospital Records. Most Cited Cases
Where Colorado had no substantial contact with patient's cause of action other than as state in which personal jurisdiction could be obtained over doctor and possibly being present residence of patient, transaction occurred in Delaware, and facts of occurrence apparently could be proved by direct evidence not involving privileged material, Delaware was state of most significant relationship with transaction which was heart of patient's suit; therefore legislative policy of Delaware as provided in statute providing confidentiality for records of the credentials committee of medical institutions should be applied in determining question of privilege. 24 Del.C § 1768(b).

**[3] Health 198H ⚷➔195**

198H Health
    198HI Regulation in General
        198HI(B) Professionals
            198Hk191 Regulation of Professional Conduct; Boards and Officers
            198Hk195 k. Immunity of Boards and Officers. Most Cited Cases
            (Formerly 299k10 Physicians and Surgeons)
Statute governing immunity of officials reviewing medical records, medical care, and physicians' work was designed to govern rights and responsibilities of practice of medicine, provided for establishment and enforcement of professional standards and confidential protection for records and proceedings of committees charged with professional standards,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

review and enforcement as well as civil and criminal protection for those performing those functions, and established policy with respect to medical profession in state which is fundamental to conduct of profession; thus it is in interest of proper administration of standards of professional conduct that confidentiality of medical committee proceedings be preserved without exception. 24 Del.C. § 1768(b).

*509 James M. Winfield of Levin, Spiller & Goldlust, Wilmington, for petitioner.

William J. Wade of Richards, Layton & Finger, Wilmington, for respondent.

TAYLOR, Judge.

Petitioner seeks a subpoena duces tecum directed to Wilmington Medical Center (Center) for production of the file of the Center relating to the operation performed *510 by Peter A. Bassett, D.D.S. on Catherine A. Danklef on August 8, 1974 and the notes, memoranda, records, and correspondence, reports and photographs relating to an investigation conducted by the Center's Credentials Committee concerning that operation. The production is sought for use in conjunction with a proposed deposition of the Center in connection with litigation brought by petitioner against Dr. Bassett in the District Court in and for the County of LaPlata, Colorado. The Center opposes the petition insofar as it seeks to obtain the papers relative to the investigation by the Center's Credentials Committee. The Center does not oppose the production of the medical records pertaining to the operation performed by Dr. Bassett upon petitioner.

The Center's position is that the proceedings of the Credentials Committee are confidential by virtue of 24 Del.C. s 1768(b) which provides:

(b) The records and proceedings of any such committees or organizations as described in subsection (a) of this section shall be confidential and shall be used by such committees or organizations and the members thereof only in the exercise of the proper functions of the committee or organization and shall not be public records and shall not be available for court subpoena or subject to discovery; and no person in attendance at a meeting of any such committee or organization shall be required to testify as to what transpired thereat. No physician, hospital, organization or institution furnishing information, data, reports or records to any such committee or organization with respect to any patient examined or treated by such physician or confined in such hospital or institution shall, by reason of furnishing such

information, be liable in damages to any person or subject to any other recourse, civil or criminal. (24 Del.C. 1953, s 1768; 57 Del.Laws, c. 492; 59 Del.Laws, c. 50; 58 Del.Laws, c. 226; 60 Del.Laws, c. 462, s 3; 62 Del.Laws, c. 90, s 2).

The committees and organizations referred to in subsection (b) are defined in subsection (a) as follows:(a) The Board of Medical Practice, the Medical Society of Delaware, their members, or the members of any committees appointed thereby, and members of hospital and osteopathic medical society committees, or of a professional standards review organization established under federal law (or other peer review committee or organization), whose function is the review of medical records, medical care and physicians' work, with a view to the quality of care and utilization of hospital or nursing home facilities, home visits and office visits shall not be subject to, and shall be immune from, claim, suit, liability, ...

Two issues have been raised by the memoranda. The first is whether the above-quoted provisions, which were enacted by 60 Del.Laws Ch. 462, effective June 14, 1976, protect proceedings which occurred before the section was enacted, and the second is whether entitlement to this subpoena duces tecum is governed by Delaware law or by Colorado law.

I

(1) With respect to the contention that 24 Del.C. s 1768 was enacted after these proceedings before the Credentials Committee, petitioner contends that the section does not protect prior proceedings since there is no language in the statute indicating an intention to give retroactive effect to the section. Petitioner asserts that under the holding of the Supreme Court in Monacelli v. Grimes, Del.Supr., 99 A.2d 255 (1953) the petitioner's substantive right to have protection of such material should not be extinguished by the subsequent enactment. At the outset, it should be noted that the principle for which Monacelli v. Grimes, supra, is cited applies only with respect to substantive rights and that statutes which are procedural in nature will be given effect in pending proceedings even in the absence of legislative language indicating an intent to give retroactive effect to the statute. 73 Am.Jur.2d Statutes s 355, p. 490; 19 A.L.R.3d 138. The Delaware Supreme Court in *511Eudaily v. Harmon, Del.Supr., 420 A.2d 1175 (1980) discussed the true

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

meaning of Monacelli v. Grimes and concluded that Monacelli merely held that the procedure for service of process which was set forth in the amendatory statute denied the defendant a substantive right guaranteed under the constitutional principle of due process and that it did not align Delaware with the minority of States which bar the application of a statute to a cause of action which predated the statute.

In considering whether the statutory provision which bars disclosure of the Committee proceedings had a substantive effect upon petitioner's suit against the doctor, it is appropriate to consider its relationship to petitioner's trial evidence. The petitioner is free to develop and present all facts pertaining to the relationship of petitioner and the physician, the nature of the condition, the nature of the procedure followed by the physician and the results of the operation. Petitioner is not deprived of the opportunity to develop through sources other than the records of the Committee proceeding the names of those who have knowledge or information concerning the subject matter of this suit. She is not deprived of the opportunity to take appropriate discovery from those persons having personal knowledge or information of facts relevant to the case. At most, she is deprived only of the opportunity to examine the record of testimony which was given at the Committee proceedings and the findings of the Committee.

In Samuelson v. Susen, 3 Cir., 576 F.2d 546, 552 (1978), the Court of Appeals for the Third Circuit had occasion to consider the effect of an Ohio statute containing a provision similar to s 1768. Chief Judge Seitz observed:
(the statute) has a nonprocedural purpose. It has both procedural and nonprocedural aspects. We are reminded that "neither 'substance' nor 'procedure' represents the same invariants. Each implies different variables depending upon the particular problem for which it is used." Guaranty Trust Co. v. York, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945).
(10) In the context of these proceedings, s 2305.251 works to keep possibly relevant and otherwise admissible evidence from the trier of facts, and is thus clearly procedural. It does not impair the substantive law of defamation, or the substantial right of the plaintiff to bring a cause of action thereon. Therefore, it may be invoked by these deponents even though this action was commenced prior to the effective date of the statute.

It is noted that in Samuelson, as in this case, the

statute which created the privilege was enacted after the proceeding which is sought to be protected. The Court in Samuelson considered contentions similar to those presented here and concluded that retroactive application of the privilege did not violate plaintiff's rights.

Finally, it is noted that the present suit was filed after the enactment of s 1768. Therefore, s 1768 has been in effect during the entire Colorado litigation and petitioner has not been deprived of an opportunity which she could have asserted at an earlier stage in the Colorado litigation. Cf. Hess v. Carmine, Del.Super., 396 A.2d 173 (1978).

Petitioner's contention that the prospective application of s 1768 would deprive a person of access to the courts and would deny the right to a full hearing in violation of Article I s 9 of the Delaware Constitution is not supported by authority and, in view of the discussion above, does not bear further comment.

It is noted that in the area of medical malpractice litigation, Delaware has legislatively redefined the admissibility of expert testimony at trial and has specifically provided that that statute would apply to cases which were then pending. These statutory provisions have been applied by Delaware Courts. Loftus v. Hayden, Del.Super., 391 A.2d 749 (1978); affirming Loftus v. Hayden, Del.Super., 379 A.2d 1136 (1977); Register v. The Wilmington Medical Center, Del.Super., C.A. 675, 1973 (Opinion November 3, 1978, Walsh, J.).

It does not appear that a party is entitled to protection against a change in the Rules *512 of Evidence. Hence, a change of the Rules of Evidence subsequent to the occurrence which is the subject of the litigation may properly be applied to a subsequent trial. Hess v. Carmine, supra; Warren v. Waterville Urban Renewal Authority, Me.Supr., 235 A.2d 295 (1967); Samuelson v. Susen, supra. Cf. Delaware Uniform Rules of Evidence Rule 1103.

I conclude that the privilege created by 24 Del.C. s 1768 applies to on-going proceedings even though the cause of action predated enactment of the privilege.

II

The remaining issue is whether the issuance of this subpoena duces tecum should be governed by

429 A.2d 509
429 A.2d 509
(Cite as: 429 A.2d 509)

Page 4

Delaware law or Colorado law. Colorado has also enacted a statute which protects proceedings and records of professional review committees, but by its terms it applies only to professional proceedings occurring after July 1, 1977. If Colorado law governs, the proceedings of the Credentials Committee would not be protected. No Delaware or Colorado decision has been cited dealing with the question of which State statute should govern in a situation such as that presented here.

Restatement Second of Conflict of Laws provides s 139(2):
Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

This addresses the considerations which the trial court would utilize in determining the admissibility of communications which are privileged under the law of the State where the communication was made. It does not deal with action by a court of the State where the privilege exists.

(2) The Comment on Subsection 2, s 139, which also focuses on the considerations to be given by the forum states:
Among the factors that the forum will consider in determining whether or not to admit the evidence are (1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved, (2) the relative materiality of the evidence that is sought to be excluded, (3) the kind of privilege involved and (4) fairness to the parties.

Applying these considerations to the present case, it does not appear that Colorado has any substantial contact with the plaintiff's cause of action (other than being a suit in which personal jurisdiction could be obtained over defendant and possibly being the present residence of plaintiff), since the transaction occurred in Delaware, both parties were present in Delaware at the time of the occurrence. At best the evidence, if admissible, is secondary and the facts of the occurrence apparently could be proved by direct evidence not involving the privileged material. There has been no showing that the application of this statute would result in injustice to petitioner.

The reporter's note following s 139 states:
An analogous problem may arise when a deposition

is sought to be taken in a state other than the state of trial. To date, the courts of the deposition state have refused to admit evidence of a communication privileged under their local law, but it would appear that in all of these cases the deposition state was also the state of most significant relationship with the communication. Palmer v. Fisher, supra; Ex parte Sparrow, supra; Matter of Walsh, 40 Misc.2d 413, 243 N.Y.S.2d 325 (Sup.Ct.1963); Application of Queen, 233 N.Y.S.2d 798 (Sup.Ct.1962); Matter of Franklin Washington Trust Co., 1 Misc.2d 697, 148 N.Y.S.2d 731 (Sup.Ct.1956); cf. Application of Cepeda, supra. See also Note, 2 U.Chi.L.Rev. 704 (1956).

This appears to be a correct principle in a case such as this. Under the facts of this case I conclude that Delaware is the State of the most significant relationship with the transaction which is the heart of plaintiff's *513 suit and that therefore the legislative policy of this State should be applied in determining the question of privilege.

(3) 24 Del.C. s 1768 was enacted by 60 Del.Laws Ch. 462 as a part of a comprehensive revision of the statute which governs the practice of medicine, surgery and osteopathy bearing the title Delaware Medical Practices Act. It was designed to govern the rights and responsibilities of the practice of medicine and provided for establishment and enforcement of professional standards and in the furtherance thereof provided confidential protection for the records and proceedings of Committees charged with professional standards, review and enforcement as well as civil and criminal protection for those performing those functions. The focus of this statute is upon those who are providing medical services in the State of Delaware. I conclude that this statute establishes a policy with respect to the medical profession in Delaware which is fundamental to the conduct of the profession and that it is in the interest of the proper administration of standards of professional conduct in this State that the confidentiality of medical committee proceedings be preserved without exception. Applying the standards that are enumerated in the Comment on Subsection (2) of s 139 of Restatement Second of Conflict of Laws, I conclude that there is an overriding interest in this State in the protection of the members of its medical profession which should cause this Court to apply the restraints of 24 Del.C. s 1768 to bar the disclosure of proceedings and records of a Committee functioning in Delaware dealing with professional services rendered in Delaware. Cf. Samuelson v. Susen, supra.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

429 A.2d 509
429 A.2d 509
**(Cite as: 429 A.2d 509)**

Page 5

I conclude that this Court should apply Delaware law in determining whether the subpoena duces tecum should issue and that 24 Del.C. s 1768 bars production of the records of the Center's Credentials Committee.

### III

An order has been entered granting a subpoena duces tecum for production of the Center's file relating to the operation performed by Dr. Bassett on plaintiff at the Center on August 8, 1974. Based on the foregoing considerations, insofar as the petition seeks papers and records of the Credentials Committee the petition is denied. IT IS SO ORDERED.

Del.Super., 1981.
Danklef v. Wilmington Medical Center
429 A.2d 509

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 2**

LEXSEE 2005 U.S. DIST. LEXIS 3523

**FG HEMISPHERE ASSOCIATES, L.L.C., Plaintiff, -against- REPUBLIQUE DU CONGO, Defendant.**

**01 Civ. 8700 (SAS) (HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 3523*

**March 7, 2005, Decided**
**March 8, 2005, Filed**

**DISPOSITION:** [*1] Plaintiff's motion to compel granted and motion for sanctions denied as unenforceable.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > Discovery of Assets*
[HN1] When a party is a foreign sovereign, the universe of assets subject to execution is limited to assets used for a commercial activity. *28 U.S.C.S. § 1610*(a).

*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Pretrial Judgments > Default > Default Judgments*
*Civil Procedure > Pretrial Judgments > Default > Entry of Default Judgments*
[HN2] Although entry of a default judgment is an extreme measure, discovery orders are meant to be followed. A party who flouts such orders does so at his peril.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Criminal Law & Procedure > Search & Seizure > General Overview*
[HN3] Documents stored on electronic media are "documents" for the purposes of Fed. R. Civ. P. 34.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN4] See Fed. R. Civ. P. 26(b)(5).

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN5] Fed. R. Civ. P. 26(b)(5) is supplemented by U.S. Dist. Ct., S.D. N.Y., Civ. R. 26.2(a)(2)(A) which sets forth the specific information that must be disclosed when documents are withheld on the ground of privilege. Local Civil Rule 26.2(c) commands, inter alia, that when documents sought in a request made pursuant to Fed. R. Civ. P. 34 are withheld on the ground of privilege, the index required by Local Civil Rule 26.2(a)(2)(A) shall be furnished in writing at the time of the response to such discovery or disclosure, unless otherwise ordered by the court. It should be clear to all attorneys that the Federal Rules of Civil Procedure and the Local Civil Rules are not starting points for a discussion concerning the handling of privileged documents nor are they merely suggested practice guidelines that attorneys are free to disregard. They are rules, and in the absence of a court order or stipulation providing otherwise, they must be obeyed.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN6] The unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege.

2005 U.S. Dist. LEXIS 3523, *

**COUNSEL:** Danforth Newcomb, Esq., Brian Polovoy, Esq., Panagiotis Katsambas, Esq., Shearman & Sterling LLP, New York, New York, For Plaintiff.

Boaz S. Morag, Esq., Benjamin A. Rosen, Esq., Vitali S. Rosenfeld, Esq., Cleary, Gottlieb, Steen & Hamilton, New York, New York, For Defendant.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION:**

MEMORANDUM OPINION AND ORDER

PITMAN, United States Magistrate Judge:

I. Introduction

Plaintiff FG Hemisphere Associates, L.L.C. ("FG") moves for sanctions and to compel production of certain documents, claiming that defendant, the Republique du Congo (the "Congo"), has failed to comply with a discovery Order and has failed to properly schedule documents withheld on the ground of privilege. For the reasons set forth below, FG's motion is granted.

II. Facts

The facts underlying FG's claims against the Congo are set forth in my report and recommendation dated June 17, 2002, familiarity with which is assumed. Plaintiff is the assignee of a note made by the Congo. The Congo defaulted on the note, failed to answer or move with respect to FG's complaint in this action and failed to make any appearance [*2] whatsoever. As a result of the Congo's default, judgment has been entered against it in the aggregate sum of approximately $ 151 million. This sum represents the unpaid balance of the note, accrued interest and attorney's fees incurred in collection as of the date of the judgment.

The Congo has ignored the judgment, and FG has been forced to conduct post-judgment discovery in an effort to locate assets that are subject to execution. Because the Congo [HN1] is a foreign sovereign, the universe of assets subject to execution is limited to assets "used for a commercial activity." *28 U.S.C. § 1610(a)*.

In furtherance of its efforts to locate assets, FG served interrogatories and document requests on the Congo in January, 2003, and the Congo responded in March, 2003. In its response to the document request, the Congo produced approximately 350 pages of documents and asserted the attorney-client and work-product privileges with respect to certain documents. The Congo did not, however, submit an index of documents withheld on the ground of privilege. The matter was subsequently referred to me to oversee post-judgment discovery.

As a result of FG's dissatisfaction with [*3] the Congo's discovery responses, the parties conferred in the spring of 2003. During the course of these communications, the Congo's counsel wrote to FG's counsel, confirming the Congo's position as to certain discovery requests and agreeing to provide and index of any documents withheld on the ground of privilege. Specifically, in a letter to FG's counsel dated March 26, 2004, the Congo's counsel stated:

> As I mentioned in my letter of March 20, we are working with our client to produce responsive documents that are not subject to Congo's objections by April 3. I expect Congo's production will not be voluminous since the Congo does not engage in commercial activities in the United States. If responsive documents are withheld on the basis of attorney-client privilege or under the work product doctrine, we will provide you with a privilege log.

(Exhibit 10 to the Affidavit of Brian H. Polovoy, Esq., sworn to April 5, 2004 ("Polovoy Aff."), at 2). Notwithstanding the foregoing representation, the Congo did not produce an index of documents withheld on the ground of privilege.

The parties were unable to resolve their disputes concerning the Congo's document production, and [*4] a conference to discuss these disputes was held before the Honorable Shira A. Scheindlin, United States District Judge, on May 21, 2003. Before she referred the matter to me, Judge Scheindlin noted that the Congo needed to produce a list of documents withheld on the ground of privilege:

> As far as [the Congo's] objections, they don't sound concrete enough. I don't know what they are. I don't know if there are any privilege objections in there, in which case there should be a privilege log.

(Polovoy Aff., Ex. 6 at 11).

The Congo did not prepare a privilege log in response to Judge Scheindlin's admonition.

During the summer of 2003, I had several conferences and conference calls with counsel in an effort to

resolve the document disputes. Although the parties made some progress toward the resolution of their discovery disputes, there were still open issues as of September, 2003. Of particular frustration to both FG and the Court was the Congo's production of documents on an ongoing basis. As of September, 2003, the Congo had never represented that its production was complete, and it did not appear that the Congo was according substantial importance to its obligation to [*5] comply with its discovery obligations. The Congo's failure to complete its production was particularly frustrating to FG; until the Congo's production was complete, it was impossible to determine the full extent of the parties' discovery dispute. Defense counsel himself was "disappointed" at his client's production, and cited lack of resources as the principal reason for his client's failure to complete its production (Transcript of Tape-Recorded Conference Call conducted on September 18, 2003 at 4-6).

After hearing from counsel in a September 18, 2003 conference call, I attempted to bring the matter to a head by setting a firm deadline for the completion of document production and directing the production of an affidavit confirming that production was complete. Specifically, I issued the following Order on September 19, 2003:

> A tape-recorded conference call having been held on September 18, 2003 during which a discovery dispute was discussed, for the reasons stated on the record during the course of the conference call, it is hereby ORDERED that:
>
> > 1. No later than October 31, 2003, defendant shall complete its production of all documents in its possession, custody or control [*6] and all documents in the possession, custody or control of Societe Nationale de Petrol du Congo ("SNPC") concerning all assets that have any relationship whatsoever with the United States or that are physically located in the United States.
> >
> > 2. No later than October 31, 2003, defendant is directed to produce an affidavit confirming that it and SNPC have produced all documents in their possession, custody or control

> > > concerning all assets that have any relationship whatsoever with the United States or that are physically located in the United States and that each has performed a diligent search for such documents at each location in which such documents could reasonably expect to be found.

(Docket Item 27).

On November 4, 2003, in response to my Order, the Congo produced a declaration from Bruno J.R. Itoua, the Presidente-Directeur General of SNPC, and approximately 2,000 additional pages of documents. Itoua's declaration provided, in pertinent part:

> 2. I confirm that SNPC has produced all documents in its possession, custody or control concerning all assets of the SNPC, excluding diplomatic property, that have any relationship whatsoever with the United States or that [*7] are physically located in the United States.
>
> 3. Specifically, I confirm that SNPC, under my supervision, has performed a diligent search of its records at its offices in Brazzaville and in London. The records at each location have been diligently searched for all documents, dating from January 2000 to the present, relating to any of the following United States companies engaged in petroleum operations, or any of their affiliates: (i) Chevron Texaco Corporation; (ii) CMS Oil & Gas Company, (iii) Nuevo Congo Company; and (iv) Murphy Oil Corporation.
>
> 4. SNPC's search yielded approximately 1800 pages of documents, all of which SNPC has turned over to its counsel in this action, Cleary, Gottlieb, Steen & Hamilton.

(Polovoy Aff., Ex. 23).

A follow-up conference concerning the sufficiency of the Congo's November 4, 2003 production was held on November 25, 2003. At the conference, FG's counsel objected to the Congo's production on a number of grounds: (1) the Congo had only produced documents concerning petroleum-related assets and had not pro-

2005 U.S. Dist. LEXIS 3523, *

duced documents concerning other types of commercial transactions; (2) the affidavit described searches of SNPC's London and Brazzaville facilities [*8] but did not explain why searches were not performed at any other locations; (3) the Congo did not produce a log of documents withheld on the ground of privilege; (4) the documents the Congo had produced concerning its transactions with a specific United States company -- CMS Oil & Gas Company ("CMS") -- were a small fraction of the documents that CMS had advised FG that CMS possessed, and (5) the Congo failed to produce e-mails.

Because the parties had indicated some hope of being able to resolve these problems on their own, I gave them approximately six weeks to do so, and set January 16, 2004 as the deadline for the filing of any motion for sanctions. That date was subsequently extended to April 5, 2004 at the parties' request.

III. Analysis

FG now seeks sanctions for the Congo's failure to comply with my September 19, 2003 Order and an Order directing the Congo to produce all documents withheld on the ground of privilege on the theory that the Congo's failure to produce an index of documents withheld on the ground of privilege operates as a waiver.

A. The September 19, 2003 Order

There can be no serious question that discovery orders must be followed. As the Court [*9] of Appeals for the Second Circuit has stated in affirming the entry of a default judgment as a result of defendant's failure to provide discovery on liability and damages issues:

> [HN2] Although entry of a default judgment is an extreme measure, discovery orders are meant to be followed. "A party who flouts such orders does so at his peril." *Update Art, 843 F.2d 67, 73.* Defendants rolled the dice on the district court's tolerance for deliberate obstruction, and they lost. We have no intention of letting them return to the table. "If one suggests that our decision today is strong medicine, that is precisely what it is intended to be." Id. This is not the first time such potent medicine has been prescribed. See, e.g., *National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640, 96 S. Ct. 2778, 2779, 49 L. Ed. 2d 747 (1976)* (per curiam) (refusal for 17 months to answer "crucial" interrogatories); *Chira v. Lockheed Aircraft Corp., 634 F.2d 664, 666 (2d Cir. 1980)* (doing "absolutely nothing at all" to comply with court orders to pursue discovery and pre-

pare case for trial); *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062 (2d Cir. 1979)* [*10] (refusal for three years to comply with specific court orders to answer interrogatories on damages); *Independent Investor Protective League v. Touche Ross & Co., 607 F.2d 530, 25 F.R.Serv.2d 222 (2d Cir. 1978)* (failing for many months to comply with repeated court orders to answer critical interrogatories).

*Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 853-54 (2d Cir. 1995).*

In this case, there is little doubt that the Congo did not comply with my September 19, 2003 Order. As late as February 6, 2004, the Congo's counsel admitted that its document production was incomplete. On that date, the Congo's counsel wrote to FG's counsel, stating: "Although I had hoped that all the searches we have undertaken to conduct would be completed by today so we could produce any additional documents to you, that has not occurred despite my efforts to communicate the assignments and the deadline to the client" (Polovoy Aff., Ex. 29 at 1).

As of December 5, 2003, the Congo had made no effort to search its computers for responsive electronic documents. It was not until that date that counsel for the Congo advised counsel for FG that counsel for the Congo still had [*11] "inquiries outstanding in particular with regard to any electronic storage facilities that could be searched or whether they could be searched or what the expense would be, and we really just don't know what there is and what our client's position would be" (Polovoy Aff. P30). Given the fact that [HN3] documents stored on electronic media are "documents" for the purposes of *Rule 34, Anti-Monopoly, Inc. v. Hasbro, Inc., 1995 U.S. Dist. LEXIS 16355, 94 Civ. 2120 (LMM) (AJP), 1995 WL 649934 at *2 (S.D.N.Y. Nov. 3, 1995)*, it is impossible to reconcile this statement with the "diligent search" that Mr. Itoua swore to. In addition, the claim of the Congo's counsel that it did not believe its client made extensive use of e-mails (Affidavit of Boaz S. Morag, sworn to April 21, 2004, at P33), is little force in light of the fact that the Congo produced 14 e-mails that were sent or received over a 13-day period (Reply Affidavit of Brian H. Polovoy, Esq., sworn to May 4, 2004 ("Polovoy Reply Aff."), at P6).

In addition, FG has demonstrated that there is substantial reason to believe that the Congo has some sort of relationship or account at a New York office of Societe Generale (see Polovoy Reply Aff. [*12] , Exs. G and

H). The Congo has not produced any documents concerning this Societe Generale.

Finally, the incompleteness of the Congo's production is called into serious question by counsel's inconsistent statements concerning whether the Congo searched all potential locations in response to my September 19, 2003 Order or whether it limited its search to the Brazzaville and London facilities (compare Transcript of Proceedings dated November 25, 2004 at 18:8-22 with Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery and for Sanctions, dated April 21, 2004 at 16).

Although I find that the Congo has failed to comply with my September 19, 2003 Order, there does not appear to be any available remedy. The difficulties FG is currently having trying to collect its $ 151 million judgment establish that any monetary sanction would be close to meaningless. The sanction suggested by FG -- effectively, a trade embargo precluding the Congo from engaging in commercial activity in the United States -- is unquestionably a matter of foreign relations reserved for other branches of the government. See generally *Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 414, 156 L. Ed. 2d 376, 123 S. Ct. 2374 (2003).* [*13] Given the fact that the Congo is a foreign sovereign, there do not appear to be any coercive remedies that can be imposed against it. Thus, I reluctantly conclude that there is no vehicle to compel compliance with my September 19, 2003 Order.

B. The Congo's Failure to Provide a Log of Privileged Documents

[HN4] *Fed.R.Civ.P. 26(b)(5)* provides:

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

[HN5] *Rule 26(b)(5)* is supplemented by Local Civil *Rule 26.2(a)(2)(A)* which sets forth the specific information that must be disclosed when documents are withheld on the ground of privilege. Local Civil *Rule 26.2(c)* commands, inter alia, that when documents sought in a request made pursuant to *Fed.R.Civ.P. 34* [*14] are withheld on the ground of privilege, the index required by *Rule 26.2(a)(2)(A)* "shall be furnished in writing at

the time of the response to such discovery or disclosure, unless otherwise ordered by the court."

It should be clear to all attorneys that the Federal Rules of Civil Procedure and the Local Civil Rules are not starting points for a discussion concerning the handling of privileged documents nor are they merely suggested practice guidelines that attorneys are free to disregard. They are rules, and in the absence of a court Order or stipulation providing otherwise, they must be obeyed.

In this case, the Congo served its response to FG's post-judgment discovery request on or about March 3, 2003, and there is no dispute that it was not accompanied by an index of documents withheld on the ground of privilege. As other judges in this District and I have repeatedly held, [HN6] the unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege. See, e.g., *Bruker v. City of New York, 2002 U.S. Dist. LEXIS 5334, 93 Civ. 3848 (MGC) (HBP), 2002 WL 484843 at *5 (S.D.N.Y. Mar. 29, 2002);* [*15] *A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 2000 U.S. Dist. LEXIS 15141, 97 Civ. 4978 (LMM) (HBP), 2000 WL 1538003 at *3 (S.D.N.Y. Oct. 17, 2000); Jackson v. Edwards, 2000 U.S. Dist. LEXIS 8549, 99 Civ. 0982 (JSR) (HBP), 2000 WL 782947 at *2 (S.D.N.Y. June 16, 2000); Large v. Our Lady of Mercy Med. Ctr., 1998 U.S. Dist. LEXIS 1702, 94 Civ. 5986 (JGK) (THK), 1998 WL 65995 at *4 (S.D.N.Y. Feb. 17, 1998); Hurst v. F.W. Woolworth Co., 1997 U.S. Dist. LEXIS 1407, 95 Civ. 6584 (CSH), 1997 WL 61051 at *6 (S.D.N.Y. Feb. 11, 1997); PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp., 1996 U.S. Dist. LEXIS 13505, 93 Civ. 5375 (SAS) (HBP), 1996 WL 525862 at *3-*4 (S.D.N.Y. Sept. 17, 1996); John Labatt Ltd. v. Molson Breweries, 1995 U.S. Dist. LEXIS 507, 93 Civ. 75004 (RPP), 94 Civ. 71540 (RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995),* appeal transferred sub nom., *Dorf & Stanton Communications, Inc. v. Molson Breweries, 56 F.3d 13 (2d Cir. 1995),* aff'd, *100 F.3d 919 (Fed. Cir. 1996); Smith v. Conway Org., Inc., 154 F.R.D. 73, 76 (S.D.N.Y. 1994); Allstate Life Ins. Co. v. First Trust N.A., 1993 U.S. Dist. LEXIS 5461, 92 Civ. 4865 (SWK), 1993 WL 138844 at *3 (S.D.N.Y. Apr. 27, 1993); Bank v. Mfrs. Hanover Trust Co., 1990 U.S. Dist. LEXIS 13300, 89 Civ. 2946 (MJL), 1990 WL 155591* [*16] *at *2 (S.D.N.Y. Oct. 9, 1990); Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc., 130 F.R.D. 28, 32 (S.D.N.Y. 1990);* n1 see also *Sheikhan v. Lenox Hill Hosp., 1999 U.S. Dist. LEXIS 8770, 98 Civ. 6468 (WHP), 1999 WL 386714 at *3 (S.D.N.Y. June 11, 1999).* n2

n1 Although there is authority reaching a contrary result and limiting the remedy to the be-

lated preparation of the index of withheld documents, I do not find those cases persuasive. "Limiting the remedy to the belated preparation of a privilege log effectively tells practitioners they can flout the Court's Rules and incur no sanction other than an Order directing compliance with the rules." *PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp., supra, 1996 U.S. Dist. LEXIS 13505, 1996 WL 525862 at *4.* See 2 Michael C. Silberberg, Edward M. Spiro, Civil Practice in the Southern District of New York § 22:12 at 22-33 (2d ed. 2004) ("The cases imposing waiver appear to express the better view of the appropriate remedy in the event a party fails to timely provide the privilege list.").

n2 As the Congo's counsel correctly points out, I did depart from the precedents cited in the text in *A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 2002 U.S. Dist. LEXIS 20107, 97 Civ. 4978 (LMM) (HBP), 2002 WL 31385824 (S.D.N.Y. Oct. 21, 2002)* where plaintiffs had provided an index which listed the transcript of a tape-recording but inadvertently failed to list the tape-recording itself. On those unique facts, I concluded that "a finding of waiver is disproportionate to the default . . . ." *2002 U.S. Dist. LEXIS 20107, 2002 WL 31385824 at *8.* A.I.A. did not involve a total failure to provide any index, as is the case here.

[*17]

Since the Congo did not serve an index of documents withheld on the ground of privilege with its March 3, 2003 response to FG's document request and since the Congo offers no evidence of any agreement with FG or Order of the Court extending the date for the submission of such an index, I find that the Congo's unjustified failure to comply with Local Civil *Rule 26.2(c)* results in a waiver of any claim of privilege that might otherwise have existed with respect to all responsive documents in existence as of that date.

The Congo raises a number of arguments in its brief that can be quickly dispatched. To the extent the Congo is claiming that the Paris Bar Rules prevent it from providing an index, the argument is absurd on its face. First, the Congo has provided no evidence that such a rule exists or that it has the effect that the Congo's counsel suggests. Second, the Congo is an independent nation; it is not a member of the Paris Bar. Whatever entity promulgates the Paris Bar Rules, it has no more jurisdiction over the Congo than the Association of the Bar of the City of New York has over China or any other sovereign state. n3

n3 I am more than happy to revisit this issue if the Congo submits an affidavit from an appropriate government minister admitting that the Paris Bar Rules operate as a limit on the Congo's sovereign powers.

[*18]

The Congo also argues that to the extent documents are created in connection with ongoing litigations, they are necessarily privileged and need not be indexed. The Congo cites three cases in support of this proposition, none of which are persuasive. Two of the cases -- *Imperial Corp. of Am. v. Durkin, 174 F.R.D. 475, 478-79 (S.D. Cal. 1997)* and *S.E.C. v. Thrasher, 1996 U.S. Dist. LEXIS 3327, 92 Civ. 6987 (JFK) (MHD), 1996 WL 125661 at *2 (S.D.N.Y. Mar. 20, 1996)* -- deal with the format of the index to be provided with respect to post-litigation documents. Although these cases permitted an index which identified groups of documents by category, they do not hold or even state in dicta that post-litigation documents are totally exempt from being indexed. In Keenan v. Dresdner Bank AG, 97 Civ. 1930 (KMW) (DFE), 1999 WL 493342 at *2 (S.D.N.Y. July 12, 1999), the court merely stated "I see no reason why [defendant] should have to list documents which were created after plaintiff filed suit." It provided no analysis for this proposition and cited no authority. Accordingly, the persuasive force of the decision in Keenan is extremely limited.

The cases cited by [*19] the Congo are also all distinguishable on the ground that they relate to merits discovery, not post-judgment asset discovery. The difference is significant because if post-litigation documents do not need to be scheduled in any form, a judgment creditor would be significantly hampered in its ability to locate assets. Judgment debtors would have unilateral and unreviewable discretion to withhold documents on the ground of privilege so long as the documents were created after the initiation of the litigation and there was some theory, no matter how outlandish, that could support a claim of privilege. In addition, given the twenty-year life span of judgments in New York, the judgment debtor would possess this unilateral power for two decades plus the period elapsed between the commencement of the action and the entry of judgment. The judgment creditor would be entirely unable to challenge a claim of privilege because it would have no idea of the number or nature of the documents being withheld. The Congo's argument that it need not schedule post-litigation documents is, therefore, not supported by law or logic, and I decline to adopt it.

2005 U.S. Dist. LEXIS 3523, *

I find that the Congo has waived any claim of [*20] privilege it may have had with respect to documents in existence as of the date of its response to FG's document request, i.e., March 3, 2003, and that all such documents that are otherwise responsive to FG's document request must be produced.

IV. Conclusion

Accordingly, for all the foregoing reasons, I find that the Congo has violated my September 19, 2003 Order. Because there does not appear to be any effective available remedy, I do not impose any sanction at this time. I further find that the Congo has waived any privilege that it may have had with respect to documents that were in existence as of March 3, 2003 and that are responsive to plaintiff's document request. I direct that such documents be produced to plaintiff's counsel within thirty (30) days of the date of this Order.

Dated: New York, New York

March 7, 2005

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

**TAB 3**

LEXSEE 2000 US DIST LEXIS 11961

**GET-A-GRIP, II, INC. v. HORNELL BREWING CO., INC. d/b/a FEROLITA, VOLTAGGIO & SONS**

**CIVIL ACTION NO. 99-1332**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2000 U.S. Dist. LEXIS 11961*

**August 8, 2000, Decided**
**August 8, 2000, Filed; August 8, 2000, Entered**

**DISPOSITION:** [*1] Defendant's Renewed Motion for Sanctions (Document No. 45) GRANTED.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Misconduct*
[HN1] See *Fed. R. Civ. P. 37(a)(4)(A)*.

*Civil Procedure > Discovery > Misconduct*
[HN2] See *Fed. R. Civ. P. 37(b)(2)*.

*Civil Procedure > Discovery > Misconduct*
[HN3] The court has broad discretion to impose any of the sanctions listed in *Fed. R. Civ. P. 37(b)(2)* or any other sanctions it deems just.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN4] Failure to assert a privilege properly may amount to a waiver of that privilege.

**COUNSEL:** For GET-A-GRIP, II, INC., PLAINTIFF: GAVIN P. LENTZ, STEPHEN J. SPRINGER, BOCHETTO & LENTZ, P.C., PHILADELPHIA, PA USA.

For FEROLITO, VOLTAGGIO & SONS, DEFENDANT: GARY A. HECHT, SYNNESTVEDT AND LECHNER, PHILA, PA USA.

For HORNELL BREWING CO., INC., DEFENDANT: JOSEPH F. POSILLICO, JOSHUA R. SLAVITT, GARY A. HECHT, SYNNESTVEDT & LECHNER, PHILADELPHIA, PA USA.

**JUDGES:** THOMAS J. RUETER, United States Magistrate Judge.

**OPINION BY:** THOMAS J. RUETER

**OPINION:**

**MEMORANDUM AND ORDER**

THOMAS J. RUETER
United States Magistrate Judge

August 8, 2000

Presently before this court is defendant's renewed motion for sanctions (Document No. 45) filed with this court on June 15, 2000. n1 In its motion, defendant contends that plaintiff has failed to comply with the court's orders of February 8, 2000 (by Judge Kelly) and May 11, 2000 (by the undersigned) regarding a discovery dispute between the parties. A hearing on the motion was held before the undersigned on August 1, 2000. For the reasons stated below, defendant's motion is GRANTED. n2

n1 By Order dated July 19, 2000, the Honorable James McGirr Kelly referred defendant's motion to the undersigned for disposition. (Document No. 50.)

[*2]

n2 Plaintiff contends that defendant's motion is untimely under *Fed. R. Civ. P. 72(a)* because it

is actually a motion seeking to set aside or mod-
ify this court's May 10, 2000 order. (Pl.'s Answer
to Def.'s Renewed Mot. for Sanctions at 1-2.) De-
fendant's motion does not seek to modify this
court's May 10, 2000 order. Rather, it seeks sanc-
tions for plaintiff's continued failure to comply
with court orders regarding discovery, including
this court's May 10, 2000 order. Plaintiff's request
that defendant's motion be denied as untimely is
denied.

On May 10, 2000, after a hearing that same day, this
court entered an order denying both plaintiff's motion for
sanctions (Document No. 26) and defendant's motion for
sanctions (Document No. 32). The court also ordered,
inter alia, that defendant shall review twenty-two boxes
of documents identified by plaintiff's counsel during his
inspection of February 17, 2000 and produce responsive
documents by May 24, 2000; and that plaintiff shall pro-
duce all responsive documents to request number twenty-
four in defendant's first set of requests for production
[*3] of documents within ten days from the date of the
court's order or, to the extent necessary, submit a privi-
lege log in accordance with *Fed. R. Civ. P. 26(b)(5)*.
(Order, dated 5/10/00, at 1-2; Document No. 39).

At the May 10, 2000 hearing, defendant contended
that plaintiff had not fully responded to request number
twenty-four in defendant's first set of requests for pro-
duction of documents. Plaintiff assured this court that it
had fully responded to that discovery request based upon
its narrow interpretation of what the request was seeking.
(N.T., 5/10/00, at 41, 42, 44.) Plaintiff claimed that it
produced 2,500 pages of documents relating to the
prosecution history of the relevant patent. (N.T., 5/10/00,
at 41, 44.) Defendant explained that the scope of request
number twenty-four was not limited to the prosecution
history of the patent ("Prosecution Information"), but
also included documents which constitute, relate or refer
to the expert analysis referred to in paragraph nineteen of
the Complaint, or to any other opinion regarding the va-
lidity, enforceability, or infringement of the relevant pat-
ent ("Litigation Information"). (N.T., 5/10/00, at 39.)
This court agreed with defendant [*4] that the scope of
request number twenty-four included Litigation Informa-
tion as well as Prosecution Information. (Order, dated
5/10/00, at 2 n.1.) Plaintiff argued that if request number
twenty-four were to include Litigation Information, such
documents would be subject to the attorney-client privi-
lege and/or the work product doctrine. (N.T., 5/10/00, at
43.) Counsel for plaintiff represented to this court that
plaintiff had not asserted the attorney-client privilege
and/or the work product doctrine to request number
twenty-four n3 because "we do not believe that we had to
assert [sic] or that the discovery covered any communi-

cation with counsel in connection with the litigation."
(N.T., 5/10/00, at 41.)

n3 Plaintiff did not assert the attorney-client
privilege or the work product doctrine to any of
defendant's discovery requests.

In reliance upon representations from plaintiff's
counsel that plaintiff had produced all documents relat-
ing to the Prosecution Information and that plaintiff had
not submitted a [*5] privilege log because plaintiff in-
terpreted the scope of the document request narrowly,
this court acted leniently and ordered plaintiff to produce
all responsive documents and, to the extent necessary, a
privilege log, within ten days of the date of this court's
order, and denied defendant's request that plaintiff be
deemed to have waived all claims of privilege.

At the hearing on defendant's instant motion, this
court was dismayed to learn that plaintiff did not produce
a privilege log as directed until after defendant filed the
renewed motion for sanctions. Plaintiff produced the log
to defendant on or about July 6, 2000. Plaintiff's counsel
acknowledged that the untimely production of the log
was due to his oversight. This court is troubled by coun-
sel's response. The court's May 10, 2000 order required
plaintiff to produce documents in response to request
number twenty-four within ten days from the date of the
order and, to the extent any documents were subject to a
privilege, to produce a privilege log. The order was is-
sued after a hearing that lasted approximately fifty min-
utes. (N.T., 5/10/00, at 1, 47.) Counsel presented argu-
ment to the court on these issues. In light of all [*6]
these events focusing attention on the discovery requests
and the privilege log, this court cannot accept counsel's
statement that he "forgot" to prepare the log.

Even more troubling, however, is that plaintiff's
counsel assured this court at the May 10, 2000 hearing
that plaintiff had produced all documents relating to the
Prosecution Information and that the only reason plaintiff
did not file a privilege log was because plaintiff misin-
terpreted the scope of the document request. (N.T.,
5/10/00 at 41-44.) Plaintiff's counsel informed this court
that to the extent that request number twenty-four re-
quested Litigation Information, the attorney-client privi-
lege and/or work product doctrine would apply. (N.T.,
5/10/00, at 43.) The privilege log produced by plaintiff,
however, lists eighty documents most, if not all, of which
relate to the Prosecution Information. Thus, it is apparent
that plaintiff had not produced all of the Prosecution In-
formation as counsel had represented.

Moreover, plaintiff now asserts that documents re-
lating to the Prosecution Information are subject to the
attorney-client privilege and/or the work product doc-

2000 U.S. Dist. LEXIS 11961, *

trine contrary to counsel's representations to this [*7] court at the May 10, 2000 hearing. At the August 1, 2000 hearing, plaintiff's counsel attempted to explain these inconsistencies by stating that the documents listed in the log were not responsive to request number twenty-four, but to request number nineteen and, in any event, he did not believe privileged documents to be covered by the discovery requests. As to the first argument, plaintiff did not object to document request number nineteen on the grounds of privilege and cannot do so at this belated hour. Moreover, as stated above, on several occasions at the May 10, 2000 hearing, plaintiff's counsel specifically represented to this court that plaintiff produced all documents relating to the Prosecution Information. As to the privilege log, plaintiff's counsel stated at the May 10, 2000 hearing that a privilege log was not required for documents relating to Prosecution Information, only for Litigation Information. Counsel cannot now argue to the contrary.

For these reasons, this court will grant defendant's renewed motion for sanctions and order plaintiff to pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in preparing and prosecuting both [*8] of its motions for sanctions before the undersigned. n4 Such fees are appropriate under *Fed. R. Civ. P. 37(a)(4)(A)* which states as follows:

> [HN1]
> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party . . . whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

*Fed. R. Civ. P. 37(a)(4)(A)*. Additionally, [HN2] *Fed. R. Civ. P. 37(b)(2)* provides that "if a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just . . . ." [HN3] The court has broad discretion to impose any of the [*9] sanctions listed in *Fed. R. Civ. P. 37(b)(2)* or any other sanctions it

deems just. *Hicks v. Feeney, 850 F.2d 152, 155 (3d Cir. 1988)*. This court finds that prior to filing the instant motion, defendant made efforts to obtain the information from plaintiff which efforts resulted in defendant filing its first motion for sanctions. n5 Despite this court's May 10, 2000 order, plaintiff still failed to provide the required information which failure was not substantially justified. Moreover, the record indicates a history of lack of cooperation by the plaintiff. n6 See generally *Wright v. Montgomery County, et al., 1999 U.S. Dist. LEXIS 900, 1999 WL 80275*, at *3 (E.D. Pa. Feb. 3, 1999).

n4 Defendant also seeks costs related to the preparation and prosecution of its original motion to compel. The original motion to compel was decided by Judge Kelly. Since this court was not involved in that decision, it will not award costs related to that original motion.

n5 Plaintiff complains that defendant did not call him after he failed to produce the privilege log required by this court in its May 10, 2000 order but instead filed the renewed motion for sanctions. At that time, plaintiff was under order of this court to provide the log, it was not defendant's obligation to remind plaintiff to do so. This court finds that defendant attempted to resolve the discovery disputes with plaintiff without court intervention, but that those efforts were unsuccessful and resulted in defendant's two motions for sanctions.

[*10]

n6 Plaintiff claims that defendant also has been uncooperative. However, at the May 10, 2000 hearing, it appeared that other than an issue concerning 22 boxes of documents, an issue which is addressed later in this order, defendant had complied with plaintiff's discovery request. (N.T., 5/10/00, at 25.)

The court also will order that plaintiff must produce all documents responsive to defendant's discovery requests, including the documents listed in the privilege log, and that any claim of attorney-client privilege and/or the work product doctrine have been deemed waived as untimely asserted. See, e.g, *Massachusetts School of Law at Andover, Inc. v. Am. Bar Assoc., 914 F. Supp. 1172, 1178 (E.D. Pa. 1996)* [HN4] ("failure to assert a privilege properly may amount to a waiver of that privilege"). n7

2000 U.S. Dist. LEXIS 11961, *

n7 Plaintiff's request that this court review the documents listed in plaintiff's privilege log in camera is denied since this court has found that plaintiff has waived any and all claims of attorney-client privilege and work product doctrine. (Ltr. dated 8/2/00 from Pl.'s Counsel to Court.)

[*11]

Additionally, at the May 10, 2000 hearing, plaintiff's counsel argued that on February 17, 2000 he marked twenty-two boxes of documents located at defendant's corporate headquarters, which he suspected were responsive to plaintiff's document request. (N.T., 5/10/00, at 25.) This court ordered defendant to review these boxes and to produce responsive documents to plaintiff by May 24, 2000. (Order, dated 5/10/00, at P 4.) After considerable effort and expense, defendant complied with the court's order and notified plaintiff's counsel on several occasions that the documents were available for inspection. Defense counsel reported that plaintiff's counsel did not respond to his communications and never inspected the documents which have since been returned to storage at defendant's facility. Plaintiff's counsel acknowledged at the August 1, 2000 hearing that he did not inspect the information defendant collected from the twenty-two boxes and explained that he chose to pursue an alternative means of discovery to obtain the information. This court also shall order that plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in reviewing and [*12] collecting information from the twenty-two boxes identified by plaintiff's counsel, and that plaintiff shall be deemed to have waived its request for those documents and shall not be entitled to inspect them. Such an order is just in this regard.

AND NOW, this 8th day of August, 2000, for all the above stated reasons, it is hereby

**ORDERED**

1. Defendant's Renewed Motion for Sanctions (Document No. 45) is **GRANTED**;

2. Plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in preparing and prosecuting both of its motions for sanctions (Documents Nos. 32 and 45) before the undersigned;

3. Plaintiff shall produce all documents responsive to defendant's document requests, including the documents listed in the privilege log, within ten (10) days from the date of this order or face further sanctions;

4. Any and all claims of attorney-client privilege and/or the work product doctrine by plaintiff have been deemed waived;

5. Plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in reviewing and collecting information from the twenty-two boxes identified by plaintiff's counsel; [*13]

6. Plaintiff is deemed to have waived its request for the documents in the twenty-two boxes and shall not be entitled to inspect them; and

7. Defendant shall provide to plaintiff's counsel within ten (10) days from the date of this order, the total costs, including attorney's fees, due to be paid under this order separated into the following categories: (1) costs related to defendant's first motion for sanctions (Document No. 32); (2) costs related to defendant's renewed motion to sanctions (Document No. 45); and (3) costs related to reviewing and collecting information from the twenty-two boxes. Counsel shall use their best efforts to agree on the amount to be paid hereunder and plaintiff's counsel shall pay such amount no later than ten (10) days after receiving the list of costs from defendant.

BY THE COURT:

THOMAS J. RUETER

United States Magistrate Judge

**TAB 4**

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**H**
In re Best Lock Corp. Shareholder Litig.Del.Ch.,2000.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
In re BEST LOCK CORP. SHAREHOLDER LITIG.
**No. Civ.A. 16281.**

Dec. 18, 2000.

Dear Counsel:

CHANDLER, J.

*1 This is my decision on plaintiffs' motion to compel production of documents in the consolidated action against defendants Best Lock Corporation ("Best") and related companies and individuals that arose out of the three interrelated freeze-out mergers consummated on March 23, 1998 (the "freeze-out mergers").[FN1] For simplicity's sake, I will respond to each of plaintiffs' fourteen demands (demands A-N) in the order in which plaintiffs present them.

> FN1. The actions consolidated herein are *Wood v. Frank E. Best, Inc.,* Del. Ch., C.A. No. 16281 (the fiduciary duty class action) and *Mitchell v. Russell C. Best,* Del. Ch., C.A. No. 18203 (the appraisal action).

Plaintiff's first demand, Demand A, asks this Court to compel defendants to confirm whether they have made complete production of the documents they purportedly have agreed to produce responsive to Request Nos. 1, 3, 4, 5, 15, 18, 21 and 45.[FN2] The documents which defendants have agreed to produce are those nonprivileged documents responsive to these requests. Plaintiffs emphasize that they would like defendants to produce notes taken at board meetings, if such notes exist, as well as documents relating to the Genesis Group ("Genesis"), called for in Request Nos. 4 and 56.

> FN2. Pls.' Br. on Mot. to Compel Produc. of Docs., at 4 [hereinafter Pls.' Br.]. For a list of Pls.' Reqs., see Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br., at Ex. A, at 5-10.

With regard to each of these requests, defendants must make complete production and, if plaintiffs believe full production has not been made, confirm this fact to the plaintiffs by stating that all non-privileged documents that exist to the defendants' knowledge have been produced pursuant to these eight requests. These requests, which include board minutes and notes, documents from and to financial advisors, SEC filings, stock ledgers, directors' and financial advisors' communications, and the articles of the corporation, are well within the normal scope of discovery and should be produced or, if they do not exist, confirmed as to this fact. Thus, if notes were taken at the meetings, produce them if they are not privileged. If notes were not taken, confirm this fact.

As to documents relating to Genesis, defendants argue that such documents are not responsive to Request 4, which asks for "[a]ll documents supplied by the Best Companies and/or their officers or directors to any financial/investment bankers ...,"[FN3] since Genesis did not provide investment banking advice but rather insurance-related services. Defendants also argue that they did not produce documents in response to Request No. 56, which specifically asks for documents relating to communication between Best and Genesis, because there has been no showing as to why these communications with Genesis are reasonably calculated to lead to the discovery of admissible evidence. Although defendants may be correct as to Request No. 4, I do not find defendant's argument with regard to Request No. 56 persuasive. Genesis signed a confidentiality agreement with Best in October of 1997. The agreement states that Genesis "may receive certain non-public information regarding the [Best] Companies" in connection with the possible engagement of their services.[FN4] It is possible that information relating to such communications between Genesis and Best may lead to the discovery of admissible evidence. Such evidence may not prove to be ultimately admissible. At this stage in the proceedings, however, it need only be reasonably calculated to lead to admissible evidence. Since this agreement was signed during the same period Best was considering a cash-out transaction,[FN5] production of this evidence does seem reasonably calculated to lead to admissible evidence.

> FN3. Pls.' First Req. for Produc. of Docs.,

Not Reported in A.2d                                                                                           Page 2
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

excerpted in Pls.' Br., at Ex. A, at 6.

FN4. Pls.' Reply, at 3.

FN5. *See* Consol. Compl., at 37-38.

**\*2** Plaintiffs' second demand, Demand B, asks this Court to compel defendants to produce all documents relating to the freeze-out mergers that were submitted to any federal, state, or governmental agency in accordance with Request No. 6. Defendants have produced only those documents submitted to the SEC and the Delaware Secretary of State. While plaintiffs assert that defendants have not fully complied with their request, defendants state that while other government filings were made by Best, they have produced all of those made *"specific"* to the mergers. Request No. 6 asks for those documents *"concerning"* the mergers submitted by the Best Companies to any federal, state, or local governmental agency." FN6 If by "specific" the defendants mean "concerning," they have indeed complied with this request. If it is the case, however, that defendants withheld documents *concerning* but not *specific to* these mergers, defendants must now produce them.

FN6. Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. A, at 6.

Demand C asks this Court to compel defendants to "explain their ambiguous limitation" in response to Request Nos. 7, 9, 10, and 42. Defendants agreed to produce documents for each of these responses, adding that documents will be produced only for "each of the Best companies as a whole." Plaintiffs demand that defendants explain exactly what the phrase "as a whole" means. Defendants answer that this phrase was "a more precise manner of stating that they were producing exactly what was requested - corporate-level documents as opposed to documents that pertained to some smaller business unit." FN7 Plaintiffs' accept this definition, making the demand moot, but note that they should not have needed to bring a motion to compel in order to receive this definition from defendants.

FN7. Defs.' Answer, at 16.

Demand D asks this Court to compel defendants to produce all documents relating to actual or potential loans in excess of $1 million in accordance with Requests Nos. 12 and 13. Defendants have agreed to produce those documents submitted in connection with potential loans in excess of $5 million, as opposed to $1 million. Defendants argue that this $5 million limitation is "reasonable in light of the fact that $5,000,000 was significantly less than 5% of the Best Companies' revenues in the year before the mergers." FN8 Defendants also state that reducing the limitation to $1 million would produce no additional documents and is, therefore, moot. As with the last demand, plaintiffs concede, but note that "it should not have been necessary for plaintiffs to file the Motion to obtain defendants' cooperation in the discovery process." FN9

FN8. Defs.' Answer, at 16.

FN9. Pls.' Reply, at 8.

Demand E asks this Court to compel defendants to identify what documents, if any, responsive to Request Nos. 14, 19 and 23, they have withheld from production. Request No. 14 asks for production of "[a]ll loan or lease agreements to which the Best Companies were parties...." FN10 Defendants objected to this request on grounds of undue burden and relevance to the extent that "it seeks production of lease agreements with customers in lieu of sales or loans or lease agreements relating to miscellaneous vehicles, office equipment and small equipment." FN11 Request No. 19 asks for "[a]ll documents constituting or memorializing any communications between the Best Companies, or any of their officers and directors, and any shareholder in any of the Best Companies." FN12 Defendants object to this on grounds of overbreadth, relevance, and undue burden. Request No. 23 asks for "[a]ll documents concerning the market(s) for the products of the Best Companies." FN13 Defendants object to this request on grounds of overbreadth, relevance, and undue burden. They also state that they "interpret this request to be limited to seeking production of general product market research and analysis." FN14 Plaintiffs make the same response to each of defendants' objections. They state that "[a]ll [they] seek is the simple courtesy of a requested explanation." FN15 Plaintiffs do not respond to defendants' specific objections or limitations.

FN10. Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. A, at 7.

FN11. Defs.' Resps. and Objections to Pls.' First Req. for Produc. of Docs., excerpted in Motion to Compel at Ex. E, at 8.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN12. Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. A, at 7.

FN13. *Id.* at 8.

FN14. Defs.' Resps. and Objections to Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. E, at 11.

FN15. Pls.' Answer, at 9.

**\*3** With regard to Request No. 14, defendants have adequately responded. They placed a reasonable limitation on the request to exclude leases related to miscellaneous vehicles, office equipment and small equipment. Since plaintiffs did not specifically argue that this limitation is unacceptable and it appears to me to effectively narrow the request so as to prevent undue burden, I find that defendants have fully complied with this request. With regard to Request No. 19, defendants have given this Court no specific reason why the request for all communications between Best and its shareholders is overbroad, not likely to lead to admissible evidence, or unduly burdensome. In the absence of such an explanation, I will direct defendants to comply with this request, or indicate (if it is the case) that such communications do not exist. As to Request No. 23, I am not entirely certain what defendants mean by "general" product market research and analysis. This limitation seems to exclude "specific" product market research and analysis that may be properly discoverable. As to this request, I ask defendants either to define this limitation in greater detail or to produce all documents requested in the original request. If defendants choose the explanation alternative, plaintiffs must tell me if they find it unacceptable.

Part F asks this Court to compel defendants to produce all documents reflecting communications that occurred at meetings between representatives of Piper Jaffray and Russell and/or Mariea Best. In their response to the original Request No. 20, defendants placed a limitation that they would produce only such documents that were "prepared at or for" such meetings. Plaintiffs believed that this limitation excluded properly discoverable documents and asked for any such additional documents in this motion. Defendants answered that the issue is moot because they "have not located any additional documents that would be produced in response to the 'clarification' that have not already been produced." FN16 Once again, plaintiffs concede, but again note that "it should not have been necessary for plaintiffs to file

the Motion to obtain defendants' cooperation in the discovery process." FN17

FN16. Defs.' Answer, at 18.

FN17. Pls.' Reply, at 10.

Demand G asks this Court to compel defendants to produce documents reflecting all of the compensation received by Russell or Maria Best in accordance with Request No. 5. Defendant has thus far only agreed to produce SEC filings responsive to this request. Plaintiff ask that defendants produce all additional documents or, in the alternative, represent that neither Russell nor Mariea Best has received any compensation that is not disclosed in the SEC filings. Defendants respond that the SEC filings fully represent all compensation Russell or Mariea Best earned in their capacities as an executive or director. They further argue that plaintiffs have no right to learn about such additional compensation, noting that the claims set forth in the Consolidated Complaint do not include any premised upon excessive compensation. Plaintiffs point out in their answer that Russell or Mariea Best may have earned additional compensation other than in their capacities as an executive or director. They also disagree with defendants' legal argument that plaintiffs have no right to learn about such additional compensation. They believe this information is relevant in three contexts: (1) the payments may constitute a breach of fiduciary duty that may be valued in connection with the "fair price" prong of the "entire fairness" case, as well as in the appraisal action; (2) payments may bear on credibility; and (3) payments may be relevant in determining future cash flows.

**\*4** Although evidence of the alleged additional compensation may not ultimately be admissible for any of these purposes, its future admissibility is not the standard by which its discoverability is measured. It need only be reasonably calculated to lead to admissible evidence. As these documents appear relevant, or reasonably calculated to lead to admissible evidence, I direct the defendants to produce such documents, if they exist, evidencing additional payments to Russell or Mariea Best, whether or not it was in their capacities as executives or directors.

Demand H asks this Court to compel defendants to produce documents that would reflect third-party interest in one or more of the Best companies and/or their substantial assets in accordance with Request

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

No. 28. Defendants object to this request on two main theories. First, they argue that the price a third-party would be willing to pay to acquire Best is not relevant in a statutory appraisal action because the information is post-merger. I find this argument unpersuasive not only for the reason that the evidence need only be reasonably calculated to lead to admissible evidence (not *per se* admissible), but also because this is an action for breach of fiduciary duty in connection with a freeze-out merger. Whether the information, if it exists, is admissible in the pending appraisal action, is an issue for another day.

Defendants' second argument is that the request should be denied because it is not relevant to plaintiffs' *Revlon* claim, but, even if it was relevant, it still must be denied because plaintiffs do not have a valid *Revlon* claim (in effect, they ask the Court to rule on this claim before allowing discovery). Again, I am not persuaded by defendants' arguments. As an initial matter, it is not inappropriate for the plaintiffs to take discovery on this issue before the Court has decided the validity of the plaintiffs' *Revlon* claim. That is not an unusual occurrence in this Court. Moreover, information about third-party offers even as early as 1993 is still reasonably calculated to lead to admissible evidence since such offers might bear on the value of Best in 1995 and 1997, the period in which the Bests allegedly lost control of the companies. If this evidence proves to be irrelevant, it will be excluded at trial. At this point, however, it remains reasonably calculated to lead to admissible evidence and, therefore, defendants must produce it.

Demand I calls for the production of all documents respecting communications with investment advisors other than Piper Jaffray in accordance with Request No. 30. Defendants agreed to produce only such documents that concern the freeze-out mergers or their evaluation or review of a cash-out transaction. Plaintiffs find this limitation "unwarranted" since communications with investment advisors on other subjects might bear on the ultimate question of Best's fair value. Defendants object that the original request is too broad and "can only be described as an old-fashioned fishing expedition." [FN18] I disagree. These documents may indeed prove ultimately irrelevant and inadmissible but, at this point, they are reasonably calculated to lead to admissible evidence since there is a good possibility they may bear on the ultimate valuation issue. Moreover, as plaintiffs point out in their response, defendants do not argue it would be unduly burdensome for them to produce these records. Thus, I direct the defendants to produce these documents.

FN18. Defs.' Answer, at 20.

**\*5** Demands J and K ask this Court to compel defendants to produce *all* documents responsive to Request Nos. 31, 32, 33, 35, 37 and 38. These requests include production of documents concerning BLC's cost of raw materials, communications between BLC and its customers, contracts between BLC and its customers, and contemplated new products and/or renovations. These document requests are each preceded by the word "all." Defendants object to these requests on the grounds that they are overly broad, extremely burdensome and, ultimately, likely to be utterly irrelevant. For example, defendants note that BLC had well over 1000 customers during the period in question. Producing *every* contract and communication would amount to turning the company inside out and also compromising control and security procedures.

I agree with defendants that these requests are all too broad and would impose an undue burden on the defendants. Plaintiffs must narrow them where possible. For example, with regard to Requests 32 and 33, they might ask for contracts and communications of the twenty largest customers of Best as opposed to *all* customers. Similarly, they must define vague terms to both facilitate defendants' specific response to these requests and to limit the scope of the request. For example, Request Nos. 37 and 38 asks for documents relating to potential efficiencies. I am not sure what plaintiffs mean by "efficiencies" or what kind of documents, in particular, they seek. Finally, with regard to all of these documents, plaintiffs would be well advised to revise the requests with a limiting time frame. As they are currently drafted, each of these requests is far too broad and some of the ones mentioned above also suffer from fatal vagueness. I deny the motion to compel as to these requests. Plaintiffs must narrow and define the requests if they want defendants to respond.

Demand L asks this Court to compel defendants to produce documents dated beyond March 23, 1998 (the effective date of the freeze-out mergers). Defendants refuse to produce any documents after this date. Plaintiffs argue defendant's position is untenable for two reasons. First, plaintiffs argue that they are seeking rescissory damages, which necessitates post-merger discovery. Second, plaintiffs argue that "it is well-settled that post-merger discovery is proper even in a case in which the sole

Not Reported in A.2d                                                              Page 5
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

issue is the value of a given corporation on the date of a merger." [FN19] Defendants answer that allowing post-merger discovery up to 2 and 1/2 years after the merger, as plaintiffs request, would be an extraordinary result. They argue that *Cede* requires a plaintiff to articulate a sound justification for post-merger discovery before it is allowed.[FN20] They also respond to plaintiffs' rescissory damages argument by stating that discovery concerning rescissory damages "should not occur, if at all until the Court first determines that rescissory damages are appropriate under the law and the facts and establishes appropriate parameters for such claims." [FN21]

> FN19. Pls.' Br., at 18 (citing *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 758 A.2d 485, 499 n. 91 (2000)* and *Kaye v. Patone, Inc.,* Del. Ch., C.A. No. 5466, Hartnett, V.C. (Oct. 6, 1981)).

> FN20. *Cede,* 758 A.2d at 499.

> FN21. Defs.' Answer, at 6.

**\*6** I agree with the plaintiffs that *Cede,* in particular, as well as other cases, have relaxed significantly the limitations on discovery of post-merger evidence that *may* be admissible in certain circumstances even in appraisal cases that are statutorily limited to determining fair price at the time of the merger.[FN22] Moreover, the actions in these consolidated actions include a breach of fiduciary duty action (which may, ultimately, justify a rescissory damages remedy) as well as an appraisal case. Thus, these documents may be admissible for both of these reasons. As an aside, it is not necessary for the Court to determine whether rescissory damages are appropriate under the law and the facts before such discovery can proceed. Again, however, I emphasize that I am not deciding, at this stage, whether *any* of these documents will be admissible at a trial. I hold only that they appear reasonably calculated to lead to the discovery of admissible evidence. Thus, defendants must produce them.

> FN22. The Supreme Court notes in *Cede* that, "[i]n Gonsalves I, this Court held that post-merger evidence is admissible 'to show that plans in effect at the time of the merger have born fruition.' " *Cede,* 758 A.2d 499 (citing *Gonsalves I,* Del.Supr., 701 A.2d 357, 362 (1997)).

Demand M asks this Court to compel defendants to produce documents in accordance with Request No. 9. Defendants withheld these documents pursuant to a claim of accountant-client **privilege**. Plaintiffs state that "[i]t is well settled that Delaware does not recognize an accountant-client **privilege**." [FN23] Defendants answer that despite this general rule in Delaware, "*Lee* [cited by plaintiffs] recognized that Delaware also follows the **choice of law** principles in the Restatement of Conflicts, and that the Court must determine which state has the most significant relationship under the Restatement ... A **choice of law** 'analysis' that can only have one answer (Delaware) is not an analysis at all." [FN24] They argue that since Best is an Indiana corporation, Indiana law, which grants accountant-client **privilege**, should apply. Plaintiffs reply that while the current Best Lock Corporation is an Indiana corporation, BLC, the company that was a party to these alleged privileged communications, was a Delaware corporation.

> FN23. Pls.' Br., at 22 (citing *Lee v. Engle,* Del. Ch, C.A. No. 13323, Steele, V.C. (Dec. 15, 1995) and D.R.E. 501).

> FN24. Defs.' Reply, at 11-12.

Article V of the Delaware Rules of Evidence does not recognize an accountant-client privilege; nor do the federal courts.[FN25] Nevertheless, defendants argue that Indiana law should apply. As then Vice-Chancellor (now Justice) Steele did in *Lee* (the case on which both parties affirmatively rely), I will weigh the four factors listed in the Restatement of Conflicts [FN26] to determine whether to apply law other than that of the forum state. These factors include: (1) the number and nature of the contacts that the forum state has with the parties and the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties.[FN27] Applying these factors to the factual record, I conclude that Delaware law applies.

> FN25. *Lee,* C.A. No. 13323, at 6.

> FN26. The Court notes in *Lee* that "Delaware follows the Restatement's choice of law principles and the Restatement's 'most significant relationship' test. *Lee,* C.A. No. 13323, at 7 n. 3.

> FN27. Restatement (Second) of Conflicts, §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

139(2), Comment.

First, the former BLC was a Delaware corporation. Best Lock, however, did keep its offices in Indiana. Second, defendants do not refute that these documents may be material to the plaintiffs' case. Third, this privilege is unusual, not supported in Delaware or the federal courts. Fourth, and most importantly, it is most fair to apply the law of the forum sate-Delaware-in this case for the simple reason that BLC chose Delaware as its place of incorporation. Thus, defendants must produce the documents for which it has claimed an accountant-client privilege.

*7 Demand N asks this Court to order defendants to pay plaintiffs' the reasonable costs of bringing their motion to compel. They state that defendants' unjustifiably refused to respond to many of their requests and that their deficiencies are also unjustifiable. As this decision has made clear, defendants rightly objected on several points. They are being ordered to produce documents as a result of the motion on other points, but their conduct does not rise to the level that would prompt this Court to shift fees in a discovery dispute. Thus, I deny this aspect of the motion to compel. Although this motion, and the accompanying oral argument, have presented more jousting between counsel than is ordinarily the case in this Court, I find nothing untoward about the substantive positions of the parties, certainly nothing that would prompt me to shift fees.

Defendants will produce documents as described above and plaintiffs may resubmit certain discovery requests in accordance with this decision.

IT IS SO ORDERED.

Del.Ch.,2000.
In re Best Lock Corp. Shareholder Litig.
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 5**

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**H**
In re Cardinal Health, Inc. Securities Litigation
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re CARDINAL HEALTH, INC. SECURITIES
LITIGATION
**No. C2 04 575 ALM.**

Jan. 26, 2007.

Pending in the United States District Court for the
Southern District of Ohio, Eastern Division
PATTERSON, J.
**\*1** Non-party Kramer Levin Naftalis & Frankel
LLP ("Kramer Levin"), special counsel to the Audit
Committee of the Board of Directors of Cardinal
Health Inc. (the "Audit Committee") moves
pursuant to Rule 45(c)(3)(A)(iii) of the Federal
Rules of Civil Procedure to quash or modify a
subpoena duces tecum (the "Subpoena") served by
Plaintiffs' counsel in the Cardinal Health, Inc.
Securities Litigation pending in the Southern
District of Ohio (the "Underlying Litigation") as
calling for the production of documents protected
by the attorney-client privilege and/or work product
doctrine.

By cross motion to compel Plaintiffs insist that 1)
the documents are not entitled to any privilege and
2) Kramer Levin had waived any attorney-client or
work product privilege since Kramer Levin has
previously disclosed the documents to the United
States Securities and Exchange Commission ("SEC"
) and United States Attorney's Office for the
Southern District of New York ("USAO").

## I. FACTUAL BACKGROUND

In late 2003, the SEC began an inquiry into whether
certain accounting practices at Cardinal were not in
accordance with applicable laws and regulations,

and requested production of documents from
Cardinal. (Decl. of Arthur H. Aufses III, August 14,
2006 ("Aufses Decl.") ¶ 4.) As Cardinal reviewed
the documents to be produced, it discovered
documents suggesting certain employees might have
engaged in improper practices. (*Id.*) In April 2004,
the Audit Committee of Cardinal's Board of
Directors resolved to conduct its own independent
investigation of these accounting practices and
issues, and retained Kramer Levin to advise it. (*Id.*)
FN1

> FN1. It is undisputed that Kramer Levin's
> client was the Audit Committee, not
> Cardinal. The law firms of Gibson Dunn &
> Crutcher LLP ("Gibson Dunn") and
> Wachtell Lipton Rosen & Katz LLP ("
> Wachtell") represented Cardinal in the
> SEC investigation.

Kramer Levin performed a number of legal services
for the Audit Committee, including an investigation
of the legal and accounting issues that the Cardinal
documents had raised. (*Id.* at ¶ 5.) Kramer Levin
then obtained and reviewed and analyzed hundreds
of thousands of Cardinal documents and
interviewed dozens of present and former Cardinal
employees. (*Id.*) It also retained forensic
accountants at AlixPartners LLC ("AlixPartners"),
who carried out work under Kramer Levin's direct
supervision and who reported their findings directly
to Kramer Levin. (*Id.*)

After research of applicable legal and regulatory
principles and assessment of the evidence it had
compiled in the light of those principles, Kramer
Levin advised the Audit Committee of the results of
its legal analysis. (*Id.* at ¶ 6.) After receiving
Kramer Levin's legal advice, the Audit Committee
decided to recommend a number of steps to
Cardinal's Board of Directors, including a
restatement of certain of Cardinal's financial
statements, a series of improvements in Cardinal's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                              Page 2

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

policies and procedures for accounting and financial reporting, and actions concerning a number of Cardinal employees. (*Id.*)

While Kramer Levin was pursuing its investigation, it was contacted by the SEC and USAO, each of whom advised that it, too, was investigating accounting issues at Cardinal. (*Id.* at ¶ 7.) Both offices invited Kramer Levin to share the results of its investigation, including determinations whether any wrongdoing had occurred and, if so, the identities of persons responsible as well as proposed remedial measures. (*Id.*) Kramer Levin determined that its mandate was the same as that of the SEC and USAO, and, working closely, shared issues, evidence, and theories with the SEC and USAO in fulfilling the mandate of the Audit Committee. (*Id.* at ¶¶ 7-8.) On a number of occasions, the SEC advised Kramer Levin of documents and allegations of which its lawyers had become aware and asked Kramer Levin to investigate these issues. (*Id.* at ¶ 8.)

**\*2** To govern Kramer Levin's production of documents to the SEC, the SEC entered into a written confidentiality agreement with the Audit Committee and Kramer Levin. (*Id.* at ¶ 9.) The same documents were produced to the USAO without a confidentiality agreement with Kramer Levin, but the USAO has since advised Kramer Levin that it maintained confidentiality of all materials produced to it. (*Id.*)

A. The Issues Presented

Kramer Levin maintains that the Subpoena demands it produce almost all of the many hundreds of thousands of pages of material it created or compiled in carrying out its work, many of which are protected by the work product doctrine and/or the attorney-client privilege. (*Id.* at ¶ 10.) The Plaintiffs contend that the documents sought are not covered by the work product doctrine or the attorney-client privilege and that even if those privileges applied, the documents revealed to the SEC and USAO must be produced because by sharing those documents the Audit Committee and Kramer Levin waived any existing privilege.

Kramer Levin replies that Plaintiffs have not shown they have "substantial need of the materials" and are "unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3).

Kramer Levin seeks protection for:
1. interview memoranda and related exhibits of more than 300 witnesses;
2. presentation binders prepared for the Audit Committee containing a review of the evidence of accounting issues and actions of Cardinal employees involved in those issues;
3. work papers of AlixPartners containing its analysis of a series of issues presented to the Audit Committee with documentary support;
4. compilations of documents organized by issue and prepared by Kramer Levin;
5. materials compiled and produced by individual witnesses or lawyers for Cardinal.

(Aufses Decl. ¶ 11.) [FN2]

> FN2. See Aufses Decl. Ex. C for a more expansive set of categories that Kramer Levin believes are potentially response to the Subpoena.

B. Kramer Levin's Position

Kramer Levin principally asserts that (1) the documents responsive to the Subpoena are protected by the work product doctrine; (2) the protection has not been waived; and (3) Plaintiffs cannot show substantial need. (Oral Arg., Oct. 3, 2006, Tr. ("10/3 Tr.") 17.) Additionally, Kramer Levin argues that a subset of the documents is protected by the attorney-client privilege, which has not been waived. (Mem. in Supp. of Mot. to Quash or Modify Subpoena ("Kramer Levin Mem.") 8-12.)

As to each of the above five categories, Kramer Levin takes the position that there has been no waiver of the protection of the work product doctrine because:

First, the Audit Committee was charged with the task of conducting an entirely independent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 3

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

investigation and assessment of accounting at Cardinal. Kramer Levin was retained to conduct that investigation and advise the Audit Committee in that effort, which was the same mandate the SEC and the USAO had in analyzing the evidence eliminating any wrongdoing and preventing the recurrence of any accounting irregularities. (Aufses Decl. ¶ 12.)

**\*3** Second, as to the SEC, a written agreement preserving the confidentiality of all materials produced was entered into by Kramer Levin, the Audit Committee, and the SEC. (*Id.* at ¶ 9, 12.)

Third, as to the materials produced to the SEC and USAO, both agencies have assured Kramer Levin that the materials have been kept confidential. (*Id.*)

### C. Plaintiffs' Cross Motion

Plaintiffs have filed a cross motion to compel the production of documents supported by a memorandum of law and a declaration of Samuel H. Rudman dated September 8, 2006.[FN3]

> FN3. In view of the number of documents involved, a privilege log pursuant to Rule 26 of the Federal Rules of Civil Procedure or Local Civil Rule 26(2)(a)(1) at this stage would incur a needless expenditure of legal costs on the Audit Committee. (*See* 10/3 Tr. 16.)

In their opposition, Plaintiffs argue that Kramer Levin has not shown that the attorney-client privilege or work product doctrine applies to any of the following categories of documents:
1. presentation binders of material collected by Kramer Levin used in presentations to the Audit Committee and in presentations to the SEC and USAO;
2. interview memoranda and exhibits;
3. AlixPartners' forensic accounting work papers;
4. documents received from Cardinal and Cardinal's auditors;
5. documents received from other non-client witnesses;

6. Kramer Levin case files; and
7. Kramer Levin invoices.[FN4]

> FN4. This category is no longer at issue due to an agreement between the parties. (Pls' Opp. 10; Rudman Decl. ¶ 12, Ex. J; 10/3 Tr. 30.)

(Opp. to Non-Party Kramer Levin's Mot. to Quash or Modify Subpoena and Cross-Mot. to Compel Produc. of Docs. ("Pls' Opp.") 20-21; *see* Aufses Decl. Ex. C.) Additionally, Plaintiffs contend that Kramer Levin has waived any work product protection or attorney-client privilege with respect to documents it disclosed to the SEC and USAO, and move to compel the production of these documents. (Pls' Opp. 20-21.)

### II. DISCUSSION

Rule 45(c)(3)(A)(iii) of the Federal Rules of Civil Procedure permits parties subject to a subpoena to bring a motion to quash the subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies." Fed.R.Civ.P. 45(c)(3)(A)(iii). "[T]he party invoking a privilege bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,* 318 F.3d 379, 384 (2d Cir.2003); *see United States v. Adlman,* 68 F.3d 1495, 1499 (2d Cir.1995).

After first determining the scope of the work product doctrine, the Court will 1) address Plaintiffs' primary argument that none of the subpoenaed materials are protected by the work product doctrine since they were not prepared by or for Kramer Levin in anticipation of litigation, 2) determine separately whether the doctrine applies to each category of identified materials, and 3) determine whether disclosure to the government waived the doctrine's protection.

### A) The Work Product Doctrine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

The work product doctrine was first announced in *Hickman v. Taylor*, 329 U.S. 495 (1947), where the Court held on strong public policy grounds that attorney notes taken during witness interviews of the events leading to the lawsuit were not discoverable by the plaintiff. *Id.* at 509-13. The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998). The doctrine has been codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides in relevant part:
**\*4** Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation....

Fed.R.Civ.P. 26(b)(3). "Where ... the requested documents contain 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative' (Fed.R.Civ.P. 26(b)(3)), the required showing of substantial need is particularly stringent." *In re Natural Gas Commodities Litig.,* 232 F.R.D. 208, 212 (S.D.N.Y.2005) (citing *Adlman,* 134 F.3d at 1204).

The Second Circuit has interpreted the work product doctrine to apply to the selection and compilation of otherwise unprotected materials in certain circumstances:
Not every selection and compilation of third-party documents by counsel transforms that material into attorney work product. To fit within what we have repeatedly characterized as a "narrow exception" to the general rule that third-party documents in the possession of an attorney do not merit work product protection, the party asserting the privilege must show "a real, rather than speculative, concern" that counsel's thought processes "in relation to pending or anticipated litigation" will be exposed through disclosure of the compiled documents.

*In re Grand Jury Subpoenas,* 318 F.3d at 386 (internal citations omitted); *see McDaniel v. Freightliner Corp.,* No. 99 Civ. 4292, 2000 WL 303293, at \*4-5 (S.D.N.Y. Mar. 23, 2000) (recognizing a limited work product protection for materials that were not created in anticipation of litigation, but might nevertheless reveal an attorney's thought process regarding a lawsuit).

B. "In Anticipation of Litigation"

The *Wright and Miller* interpretation of the phrase " prepared in anticipation of litigation" has been adopted by the Second Circuit: "documents should be deemed prepared 'in anticipation of litigation,' and thus within the scope of the Rule, if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." ' *Adlman,* 134 F.3d at 1202 (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024, at 343 (1994) (emphasis added)).

**\*5** Plaintiffs take the position that the work product doctrine does not apply to any of the materials subpoenaed from Kramer Levin since they were not "prepared in anticipation of litigation": 1) Cardinal hired other firms-Gibson Dunn and Wachtell-to represent it in the litigation with the SEC, (Pls' Opp. 2); Kramer Levin was hired by the Audit Committee for business purposes to conduct an independent investigation and assessment of Cardinal's accounting documents, practices, and issues, (*id.* at 12-13); and 3) the purpose of the investigation was only to enable Kramer Levin to advise the Audit Committee as to whether any of Cardinal's accounting practices had been misused and how to prevent future misuse, (*id.* at 12-14). Plaintiffs rely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

on *In re Leslie Fay Cos. Sec. Litig.,* 161 F.R.D. 274, 280 (S.D.N.Y.1995), to claim that, under such circumstances, these documents are subject to production. (Pls' Opp. 13-14.)

Plaintiffs' argument overlooks the context in which Kramer Levin was hired by the Audit Committee:
In late 2003, the U.S. Securities and Exchange Commission began an inquiry into certain issues at Cardinal, and the SEC requested that Cardinal produce documents concerning those issues. As Cardinal began to collect and review documents in response to those requests, it discovered documents which suggested that certain Cardinal employees might have engaged in accounting practices that were not in accordance with applicable law and regulations. In April 2004, the Audit Committee of the Board of Directors of Cardinal resolved to conduct its own, independent investigation of those accounting practices and issues, and the Audit Committee retained Kramer Levin to advise it.

(Aufses Decl. ¶ 4.) The Audit Committee recognized that the SEC was investigating Cardinal's accounting practices and, after review of certain Cardinal documents, that these practices might not have been "in accordance with applicable law and regulations." (*Id.*) Thus, the likelihood of civil or criminal litigation was anticipated before hiring Kramer Levin. These facts, overlooked by Plaintiffs, differ from those in *Leslie Fay.* In *Leslie Fay* the SEC indicated its interest in that company's accounting practices after the investigation by its Audit Committee had commenced. *Leslie Fay,* 161 F.R.D. at 278. Here, the SEC had demanded accounting documents from Cardinal in late 2003 and in April 2004 the Audit Committee, with knowledge of the SEC's investigation and aware that Cardinal employees might have engaged in false and misleading accounting practices, decided to commence an independent investigation and retained outside counsel Kramer Levin to conduct that investigation.

Under similar circumstances the Second Circuit has held that the work product doctrine applies when outside counsel is retained to determine the vulnerability of the corporation in general to criminal and civil sanctions. *In re Grand Jury*

*Subpoena,* 599 F.2d 504, 511 (2d Cir.1979); *see In re Woolworth Corp. Sec. Class Action Litig.,* No. 94 Civ. 2217, 1996 WL 306576, *3 (S.D.N.Y. June 7, 1996) (noting that when government agencies request documents all participants know that civil and possibly criminal litigation is a practical certainty and when as a result a law firm is specially retained, "[a]pplying a distinction between ' anticipation of litigation' and 'business purposes' is ... artificial, unrealistic, and the line between is ... essentially blurred to oblivion"); *see also Upjohn Co. v. United States,* 449 U.S. 383, 397-402 (1981). Accordingly, "in light of the nature of the document [s collected] and the factual situation" leading to the retention of Kramer Levin "the document[s] can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Adlman,* 134 F.3d at 1202 (2d Cir.1998).

### C. Materials that were Created or Received by Kramer Levin that Appear to be Responsive to the Subpoena [FN5]

> FN5. The Court's analysis will track the categories identified by Kramer Levin and used by both parties in organizing their arguments in the moving papers. (*See* Aufses Decl. Ex. C; Pls' Opp. 20-21.)

### 1) Presentation Binders

**6 The presentation binders are binders of materials which Kramer Levin collected for, and used in, presentations to the Audit Committee. (Aufses Decl. ¶ 11, Ex. C.) Copies of the same binders were provided by Kramer Levin to the SEC and the USAO upon authorization by the Audit Committee. (10/3 Tr. 32-33.)

The binders are squarely covered by the work product doctrine since they represent Kramer Levin's legal analysis, opinions, and mental impressions concerning the issues investigated. Fed.R.Civ.P. 26(b)(3). Additionally, these binders are covered by the lawyer-client privilege since they were created for, and presented directly to, the Audit Committee by its counsel, Kramer Levin. *See*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 6

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*Upjohn Co. v. United States,* 449 U.S. 383 (1981).

### 2) The Interview Memoranda and Exhibits

The interview memoranda consist of memoranda prepared by Kramer Levin, exhibits collected by Kramer Levin, and Kramer Levin summaries of documentary interviews of current and former employees, customers, and outside auditors of Cardinal concerning the issues under review. (Aufses Decl. ¶ 11, Ex. C.) Contrary to Plaintiffs' reasonable speculations based on Kramer Levin's moving papers that these memoranda contain verbatim questions and answers, at oral argument, Mr. Aufses represented that they are "not set up, for example, in the form of question colon, answer colon" but are "discussions, based on the lawyers' notes ... of the principle issues that were covered and the responses that were given with references, in many cases, to the documents." (10/3 Tr. 20.) The issues discussed were framed by an overall analysis memorandum by Kramer Levin as to what the attorney would inquire about. (*Id.*)

Giving Plaintiffs access to these interview memoranda and summaries would reveal Kramer Levin's mental impressions and analysis of the principle issues related to its investigation. This is classic, core work product. *See Hickman,* 329 U.S. at 509-13. The associated exhibits, while not normally protected by the work product doctrine since they are third-party documents, fall under the selection and compilation exception. *In re Grand Jury Subpoenas,* 318 F.3d at 386; *see McDaniel,* 2000 WL 303293, at *4-5. The exhibits were selected by Kramer Levin as being particularly relevant to what Kramer Levin believed were key issues to investigate with each witness. Accordingly, producing these exhibits to Plaintiffs would expose Kramer Levin's legal theories and mental impressions concerning its investigation. *In re Grand Jury Subpoenas,* 318 F.3d at 386.

### 3) AlixPartners Documents

AlixPartners forensic accounting work papers include documents collected from Cardinal, work

paper compilations, summaries, charts, and memoranda reflecting analysis of Cardinal documents, financial statements and accounting materials as well as correspondence with Kramer Levin. (Aufses Decl. Ex. C.) The work papers, compilations, and charts were produced to the SEC and USAO by Kramer Levin, but the correspondence was not. (*Id.*)

**\*7** AlixPartners was retained by Kramer Levin for its expert accounting advice, which was used to prepare reports to the Audit Committee.[FN6] The AlixPartners papers, prepared on behalf of Kramer Levin, reflect the mental impressions of the Kramer Levin attorneys as to the importance of issues being investigated since Kramer Levin set the agenda for AlixPartners' analysis. (*Id.* at ¶ 5.) Accordingly, the work papers are protected by the work product doctrine. Fed.R.Civ.P. 26(b)(3).

> FN6. Kramer Levin set the agenda for the AlixPartners accountants, the accountants conducted their work under Kramer Levin's direct supervision, and the accountants reported their findings directly to Kramer Levin. (Aufses Decl. ¶ 5.)

### 4) The Cardinal Documents

This category encompasses documents Kramer Levin received from Cardinal, counsel for Cardinal, or auditors of Cardinal. (Aufses Decl. Ex. C.) Plaintiffs maintain that Jones Day, Cardinal's counsel in the Underlying Litigation, has been unable to confirm that the documents Cardinal produced to the SEC are the same as the documents Kramer Levin requested and received from Cardinal. (10/3 Tr. 26-28.)

Plaintiffs argue that since neither Cardinal, nor any law firm representing Cardinal, has confirmed that Kramer Levin's subset of hundreds of thousands of documents is contained in the six million documents produced by Cardinal to the SEC, Plaintiffs have shown a need for Kramer Levin's Cardinal documents to ensure that they have a complete set of documents. (*Id.* at 29-30.) However, Kramer Levin has asserted without contradiction that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 7

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Cardinal documents it received from Gibson Dunn comprise a subset of the six million Cardinal documents Gibson Dunn produced to the SEC, (Reply Mem. in Further Supp. of Mot. of Non-Party Witness, Kramer Levin, to Quash or Modify Subpoena and in Opp'n to Pls' Cross-Mot. to Compel ("Kramer Levin Repl. Mem.") 9), and Plaintiffs have not established by correspondence or other evidence from Gibson Dunn that any of Kramer Levin's documents were not produced to the SEC by Cardinal. Thus, Plaintiffs have failed to show a substantial need for Kramer Levin to produce the documents in order for Plaintiffs to prepare their class action case. *In re Natural Gas Commodities Litig.,* 232 F.R.D. at 211-12, Nor have Plaintiffs shown that they cannot ascertain from Gibson Dunn, Wachtell, or Cardinal's auditors what documents were sent to Kramer Levin, or that they cannot "without undue hardship ... obtain the substantial equivalent of the [Kramer Levin documents] by other means." Fed.R.Civ.P. 26(b)(3).

5) Materials Received From Lawyers for Individual Witnesses

These materials received by Kramer Levin consist of documents and correspondence concerning certain individual witnesses and their knowledge of and/or involvement in the issues under review. (Aufses Decl. ¶ 11, Ex. C.) Kramer Levin received the materials from the law firms Day Berry & Howard, Akin Gump Strauss Hauer & Feld, Cleary Gottlieb Steen & Hamilton, and Milbank Tweed Hadley & McCloy. (*Id.* at Ex. C.)

These documents were collected and provided to Kramer Levin pursuant to specific tailored requests made by Kramer Levin based on its analysis of the issues it was investigating for the Audit Committee. (Kramer Levin Repl. Mem. 6.) Thus the documents and correspondence concerning the individual witnesses pertain to their knowledge and/or involvement in the particular issues Kramer Levin determined to review. For Kramer Levin to reveal these documents would cause it to reveal, to some extent, its opinion as to the relevancy of the documents to the issues it investigated. Since these are third-party materials that were not themselves

prepared in anticipation of litigation, in order to be protected as attorney work product the materials would have to fall within the selection and compilation exception. *In re Grand Jury Subpoenas,* 318 F.3d at 386; *see McDaniel,* 2000 WL 303293, at *4-5. Although disclosure of these materials would not reveal Kramer Levin's analysis, mental impressions, and opinions to the same extent as some of the other targets of the Subpoena-e.g. the presentation binders, attorney case files, and AlixPartners work papers-considering Plaintiffs' failure to show that they have a substantial need for these materials and cannot obtain their substantial equivalent from other sources without undue hardship, these materials are protected from discovery by Fed.R.Civ.P. 26(b)(3). *See In re Natural Gas Commodities Litig.,* 232 F.R.D. at 211-12, In the absence of substantial need to obtain these documents from Kramer Levin as opposed to from other sources such as the various law firms, production of the documents from Kramer Levin will only serve to disclose Kramer Levin's theories and opinion as to what the relevant issues were in its investigation. *McDaniel,* 2000 WL 303293, at *4 (concluding "that discovery requests which seek to pry into counsel's selection of certain documents as particularly important or relevant violate the attorney work product doctrine in the absence of a showing of compelling need").

6) Kramer Levin Case Files

*8 Kramer Levin case files include:
1) working files of individual lawyers who worked on the matter
2) Kramer Levin central files, including background materials, lawyer notes, draft documents, legal research, and memoranda
3) compilations of Cardinal documents, organized by issue
4) correspondence files

(Aufses Decl. Ex. C.) First, Plaintiffs concede that the subset of these documents representing communications between Kramer Levin and its client, the Audit Committee, are protected by the attorney-client privilege. (Pls' Opp. 3.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 8

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

The case working files of individual lawyers and central files containing background motives, lawyer notes, draft documents, and legal research and memoranda undoubtedly reflect "the mental impressions, conclusions, opinions, or legal theories " of Kramer Levin attorneys. Fed.R.Civ.P. 26(b)(3). Kramer Levin's concern that the compilation of Cardinal documents-critically organized by *issue* -would reflect the issues deemed important by Kramer Levin and the relevance of the individual documents to those issues is " 'a real, rather than speculative, concern' that counsel's thought processes 'in relation to pending or anticipated litigation' will be exposed through disclosure of the compiled documents." *In re Grand Jury Subpoenas,* 318 F.3d at 386 (internal citations omitted); *see McDaniel,* 2000 WL 303293, at *4-5. Correspondence files would similarly reveal the issues deemed relevant by Kramer Levin attorneys, including, for instance, the language of Kramer Levin's requests for documents. Finally, Plaintiffs have not shown that they have a substantial need to obtain the Cardinal source materials from Kramer Levin, and that they are unable to obtain the substantial equivalent of the documents from another source without undue hardship. Fed.R.Civ.P. 26(b)(3); *see In re Natural Gas Commodities Litig.,* 232 F.R.D. at 211-12. To protect the mental impressions and opinions of the Kramer Levin attorneys, as directed in Rule 26(b)(3) , the materials in this category are protected from discovery by the work product doctrine.

### D. Waiver

In *In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2d Cir.1993), the Second Circuit held that Steinhardt's voluntary disclosure of privileged materials to the SEC, while under investigation by the SEC, waived the privilege protecting those materials. However, the Court

decline[d] to adopt a *per se* rule that all voluntary disclosures to the government waive work product protection. Crafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis.... Establishing a rigid rule would fail to anticipate situations in which the disclosing party and the government may share a

common interest in developing legal theories and analyzing information, or situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials. *See In re Sealed Case,* 676 F.2d at 817 (work product protection only waived if privileged material is disclosed to a party who doesn't share such common interests); *In re LTV Securities Litigation,* 89 F.R.D. 595, 614-15 (N.D.Tex.1981) (SEC and corporation shared interest in analyzing facts and legal theories upon appointment of an independent special investigatory officer by consent decree).

**\*9** *Id.* at 236.

In this case, waiver is only at issue with respect to the 1) presentation binders, 2) interview memoranda and exhibits, 3) AlixPartners' work papers, and 4) documents received from Cardinal and its auditors. Only materials from these four categories were shared with the SEC and/or the USAO. (Aufses Decl. Ex. C.)

Kramer Levin's moving papers declare that 1) in view of the SEC's subpoena of Cardinal documents, Kramer Levin was retained by the Audit Committee to conduct an independent investigation to determine whether illegal financial practices had been utilized at Cardinal; 2) on behalf of the Audit Committee, Kramer Levin obtained Cardinal documents; 3) Kramer Levin retained AlixPartners for expert accounting advice; and 4) Kramer Levin interviewed Cardinal employees and former employees to ascertain whether illegal practices or policies had been followed. (*Id.* at ¶¶ 4-5.) Kramer Levin then reported the results of its investigation-that there had been financial irregularities at Cardinal-to the Audit Committee, and obtained Audit Committee approval to share the results of its investigation with the SEC and the USAO. (*Id.* at ¶¶ 7-9.) This led to the SEC sharing additional Cardinal documents with Kramer Levin, as well as a written confidentiality agreement between Kramer Levin and the SEC. (*Id.*) Under these circumstances, it seems clear that the Audit Committee's purpose in authorizing the investigation in the face of almost certain litigation between Cardinal and the SEC or USAO-as well as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 495150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

in sharing the results with the SEC and USAO-was that Cardinal's financial and accounting practices be "clean as a hounds tooth," an interest in common with the SEC and USAO.[FN7]

> FN7. The SEC's obligation is to ensure that the securities laws of the United States are enforced, including that the financial reports of corporations are not false and misleading. The USAO investigates and prosecutes violators of the securities laws including individuals and corporations responsible for producing false and misleading financial statements.

In *In re Steinhardt,* the court not only refuses to create a *per se* rule for the waiver of work product protection when materials are disclosed to the government, but specifically points to the case of "common interest" as a foreseeable reason for doing so. 9 F.3d at 236.[FN8] Therefore, Kramer Levin's failure to obtain a confidentiality agreement with the USAO does not waive the work product protection. *Id.* The Audit Committee determined that it and the SEC shared a "common interest in developing legal theories and analyzing information" concerning potential financial irregularities at Cardinal and authorized sharing of documents with the SEC and the USAO. *Id.* Accordingly, the protection of the work product doctrine has not been waived by Kramer Levin or the Audit Committee sharing such documents with the SEC or the USAO. *See id.; In re Sealed Case,* 676 F.2d 793, 817 (D.C.Cir.1982); *In re LTV Sec. Litig.,* 89 F.R.D. 595, 614-15 (N.D.Tex.1981).

> FN8. Given that the work product doctrine is itself rooted in strong public policy concerns, *see Hickman,* 329 U.S. at 509-13, it is entirely appropriate, as recognized by the Second Circuit in *In re Steinhardt,* 9 F.3d at 236, for courts to protect work product in these circumstances to encourage cooperation between the private and public sectors acting with a common interest.

### III. CONCLUSION

For the foregoing reasons, Kramer Levin's motion to quash the Subpoena is granted, and Plaintiffs' cross-motion to compel is denied.

IT IS SO ORDERED.

S.D.N.Y.,2007.
In re Cardinal Health, Inc. Securities Litigation
Slip Copy, 2007 WL 495150 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 6**

LEXSEE 1995 DEL. CH. LEXIS 149

**ROBERT A. LEE, as owner of account Guarantee Trustee and trust F/B/O Robert Alton Lee JEREMIAH O'CONNOR and HARRY LEWIS, Plaintiffs, v. CLYDE WM. ENGLE, et al., Defendants. RICHARD N. FRANK, Plaintiff, v. CLYDE WM. ENGLE, et al., Defendants.**

**C.A. No. 13323, C.A. No. 13284**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1995 Del. Ch. LEXIS 149*

**August 21, 1995, Submitted
December 15, 1995, Decided**

**SUBSEQUENT HISTORY:**    [*1]  Released for Publication by the Court December 28, 1995.

**DISPOSITION:**    This Court grants in part and denies in part Plaintiffs' Motion to Compel the Production of Documents -- Defendants are to produce, at their own expense, those documents Plaintiffs demanded as part of its request for documents excluding the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld. Defendants are to produce these documents within seven working days of receipt of this order.

**COUNSEL:**   Kevin   Gross   of   ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Robert D. Goldberg of BIGGS & BATTAGLIA, Wilmington, Delaware. Attorneys for Plaintiffs.

OF COUNSEL: Stephen Lowey, Sherrie Brown of LOWEY,    DANNENBERG,    BEMPORAD    & SELINGER, P.C., New York, New York; Lawrence A. Sucharow, Linda P. Nussbaum, Barbara Hart of GOODKIND LABATON RUDOFF & SUCHAROW, New York, New York. Attorneys for Robert A. Lee, as owner of account Guarantee Trustee and Trust FBO Robert Alton Lee.

OF COUNSEL: Michael Fuchs, Roy Jacobs of WOLF POPPER ROSS WOLF & JONES, New York, New York. Attorneys for John C. Boland.

Clark W. Furlow, Joanne Marie H. Shalk of SMITH KATZENSTEIN & FURLOW,    [*2]    Wilmington, Delaware. OF COUNSEL: ZWERLING, SCHACHTER & ZWERLING, New York, New York. Attorneys for Defendant Sunstates Corporation.

Jesse A. Finkelstein, Matthew J. Ferretti, Lisa A. Schmidt of RICHARDS, LAYTON & FINGER, Wilmington, Delaware. Attorneys for Individual Defendants.

Michael D. Goldman, Stephen C. Norman, Kevin R. Shannon of POTTER ANDERSON & CORROON, Wilmington, Delaware. Attorneys for Defendants Hickory Furniture Co., Telco Capital Corp., and RDIS Corp.

**JUDGES:** MYRON T. STEELE, V.C.

**OPINION BY:** MYRON T. STEELE

**OPINION**

MEMORANDUM OPINION

STEELE, V.C.

CONTENTIONS OF PARTIES

On March 10, 1995, Plaintiffs brought a Motion to Compel Production of Documents they requested in the course of a shareholder derivative suit and class action. Defendants refused to produce the requested documents. Defendants assert the attorney-client privilege, work product doctrine, and accountant-client privilege protect these documents. This is the opinion deciding that motion to compel.

FINDINGS OF FACT

Plaintiff, Richard N. Frank, filed a shareholders' derivative suit and class action ("the Frank Action") on December 8, 1993 against Clyde Wm. Engle ("Engle"), William D. Schubert, Robert [*3] J. Spiller, Jr., Howard Friedman, Lee N. Mortenson, Harold Sampson (collec-

1995 Del. Ch. LEXIS 149, *

tively "the Individual Defendants"), Hickory Furniture Company ("Hickory"), Telco Capital Corporation ("Telco"), and Acton (now Sunstates) Corporation ("Sunstates" or "the Company"). The Frank Action alleges breaches of fiduciary duty, waste of corporate assets, failure to pay dividends on $ 3.75 cumulative Preferred Stock, and violation of the duty of disclosure with regard to the December 3, 1993 proxy statement. The Frank Action seeks injunctive, declaratory, and monetary relief.

Plaintiffs, Robert A. Lee, John C. Boland, Jeremiah O'Connor, and Harry Lewis filed a shareholders' derivative action ("the Lee Action") against the Individual Defendants, Hickory, Telco, and RDIS Corporation ("RDIS"), naming Sunstates as a nominal defendant. Engle is Chairman of the Board and Chief Executive Officer of Sunstates. The Lee Action alleges waste and breach of fiduciary duty. It also seeks declaratory and monetary relief. Plaintiffs in the Lee Action served a request for production of documents on February 2, 1994.

Sometime thereafter, the parties entered into a confidentiality stipulation and agreed to arrange discovery [*4] in both the Frank and Lee actions. Defendants have produced nearly 30,000 pages of documents to Plaintiffs. On August 19, 1994, Defendants provided Plaintiffs with a detailed privilege list. This list identified all documents which Defendants withheld or produced in redacted form on the basis of privilege. The list provided the date, author, recipient, copy, summary description, and privilege Defendants asserted. Defendants have refused to produce 731 documents based on attorney-client, accountant-client, and work product privilege.

On October 12, 1994, Plaintiffs responded with a letter voicing objections to the privilege list. The Individual Defendants responded to these objections in a letter dated December 2, 1994. Plaintiffs filed a motion to compel production of documents on March 10, 1995. The motion seeks production of every document Defendants withheld on the basis of privilege.

CONCLUSIONS OF LAW

1. Attorney-Client and Work Product Privilege

The attorney-client privilege is "to foster the confidence of the client and enable [him] to communicate without fear in order to seek legal advice." *Valente v. Pepsico, Inc., 68 F.R.D. 361, 367-68 (D. Del. 1975)*. The attorney-client [*5] privilege protects legal advice, as opposed to business or personal advice. *Securities and Exch. Comm. v. Gulf & Western Indus., Inc., 518 F. Supp. 675, 681 (D.D.C. 1981)*. This privilege only protects advice which a person gives within "a professional legal capacity." In re *Sealed Case, 237 U.S. App. D.C. 312, 737 F.2d 94, 99 (D.C. Cir. 1984)*.

Plaintiffs urge this Court to apply the Valente standard for attorney-client privilege protection. Absent some special cause, the attorney-client privilege does not protect a corporation's attorney's communications to the client corporation which relate to the subject of a later suit. *Valente, 68 F.R.D. at 367*; *see also Deutsch v. Cogan, Del. Ch., 580 A.2d 100, 104-05 (1990)*. This Court has been reluctant to apply *Valente* broadly. *See Gioia v. Texas Air Corp., Del. Ch., 1988 Del. Ch. LEXIS 30*, C.A. No. 9500, *7, Allen, C. (Mar. 3, 1988); *In the Matter of Heizer Corp.,* Del. Ch., C.A. No. 7949, Berger, V.C. (Nov. 9, 1987); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc., Del. Ch., 1987 Del. Ch. LEXIS 451*, *8, C.A. No. 8853, Jacobs, V.C. (Jun. 19, 1987); *Tabas v. Bowden, Del. Ch., 1982 Del. Ch. LEXIS 444*, *5, C.A. No. 6619, Hartnett, V.C. (Feb. 16, 1982). [*6] In *Deutsch,* this Court announced parties could not discover attorney-client confidential communications automatically in shareholder derivative suits. *580 A.2d at 106*.

Although not a binding case, this Court adopted and consistently has followed *Garner v. Wolfinbarger* as opposed to *Valente.* [1] *Garner v. Wolfinbarger, 430 F.2d 1093 (5th. Cir. 1970), cert denied, 401 U.S. 974, 28 L. Ed. 2d 323, 91 S. Ct. 1191 (1971); see Deutsch, 580 A.2d at 106; Matter of Heizer Corp.,* C.A. No. 7949; *Sealy Mattress Co. of N.J.,* C.A. No. 8853 at 7; *Tabas,* C.A. No. 6619 at 6. Under *Garner,* a suing shareholder may overcome corporate claims of attorney-client privilege only if he or she shows "good cause" motivates the discovery. *430 F.2d at 1103*. According to the *Garner* court,

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the [*7] availability of the privilege be subject to the right of the stockholders *to show cause* why it should not be invoked in the particular instance. (emphasis added).

*Garner, 430 F.2d at 1103-04*. This Court will not diverge from this established line of reasoning. The *Garner* analysis is appropriate. [2]

1   Even though *Valente* and *Garner* are facially at odds, Vice-Chancellor Hartnett harmonized the two in *Deutsch v. Cogan, Del. Ch., 580 A.2d 100, 106 (1990)*. The Vice-Chancellor explained,

> In *Garner* the court was not faced with a clear conflict of interest on the part of the attorneys as existed in *Valente*. The *Valente* court therefore may have just been applying the *Garner* balancing test to a clear conflict of interest and thereby arrived at the conclusion that the plaintiff had shown good cause.

2   Although I cannot embrace Plaintiffs' *Valente* argument which would automatically make the attorney-client privilege unavailable to directors, I agree directors owe a strict fiduciary duty to shareholders. They are responsible to minority shareholders. *Valente v. PepsiCo., Inc., 68 F.R.D. 361 (1975)*. This responsibility does not apply *per se*, thereby superseding the burden *Garner* attaches to discovery. *Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970)*.

[*8] In *Sealy Mattress Co.,* Vice-Chancellor Jacobs noted three factors of paramount importance to consider when determining whether the requisite good cause is present precluding invocation of the privilege:

> (i) 'the nature of the shareholders' claim and whether it is obviously colorable;' (2) 'the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources;' (3) 'the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing.' C.A. No. 8853, at 7 (citing *Garner, 430 F.2d at 1104*).

Defendants attempt to use the attorney-client privilege to insulate specific documents -- the ones which Secretary and Vice President Leonard authorized or received ("the Leonard documents"). True, Leonard is an attorney. True, Leonard could use both confidentiality protections *if* he were acting as legal counsel to Sunstates. However, Leonard did not act in the capacity of Sunstates' in-house counsel. The record does not indicate

Leonard prepared or reviewed meeting minutes or documents as an attorney. There was no attorney-client relationship between Leonard and Sunstates. [*9] Therefore, Leonard cannot avail himself of the protection associated with the attorney-client privilege or the work product doctrine. Accordingly, the attorney-client privilege cannot shield production of the Leonard documents.

Assuming arguendo, Leonard acted in the attorney-client capacity, applying the *Garner* criteria to the facts here, I find Plaintiffs have shown good cause necessitating production of certain withheld documents. First, Plaintiffs are minority shareholders of Sunstates seeking information related to transactions they challenge as breaches of fiduciary responsibility. They clearly have the right to bring a shareholder derivative action under Delaware law. *See Kramer v. Western Pac. Indus., Inc., Del. Supr., 546 A.2d 348, 351 (1988)*. A minority shareholder brings a shareholder derivative action "to enforce a *corporate* cause of action against officers, directors, and third parties." Dennis J. Block, Nancy E. Barton, and Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors,* (Fourth ed. 1993), p. 709 (citing *Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 111 S. Ct. 1711, 1716, 114 L. Ed. 2d 152 (1991)* (emphasis [*10] in original, and quoting *Ross v. Bernhard, 396 U.S. 531, 534, 24 L. Ed. 2d 729, 90 S. Ct. 733 (1970))*). The fact the Frank action and the Lee Action have progressed this far indicates viability. Otherwise, they may not have survived a motion to dismiss had one been presented. Plaintiffs' suit is, therefore, a "colorable claim."

Second, after careful scrutiny of the record, I find Plaintiffs have genuine cause for seeking production of the documents in question. It is both necessary and desirable for the plaintiff-shareholders to have the information. The withheld documents may lead to the discovery of information relevant to the transactions Plaintiffs contest as breaches of fiduciary duty. Furthermore, these documents may be the best evidence of the facts they contain which otherwise would be unavailable from any other practical source. The only *possible* alternative to this information may be an avoidable, unnecessarily cumbersome and expensive route of deposing in detail the individual directors.

Third, the record does not leave me with the impression Plaintiffs' request for document production constitutes a blind "fishing expedition." The record indicates Plaintiffs' desired [*11] documents are related to pursuit of their claims, even if they ultimately prove unsuccessful.

Furthermore, a fiduciary owes an obligation of complete candor and openness to its beneficiary. *See, e.g., Riggs Nat'l Bank of Washington, D.C. v. Zimmer, Del.*

1995 Del. Ch. LEXIS 149, *

*Ch.*, 355 A.2d 709 (1976). A corporation and its directors are fiduciaries. *Valente*, 68 F.R.D. at 367-68. The Board of Directors, as fiduciaries, owe Frank, a stockholder, complete candor and openness.

Alternatively, Defendants attempt to shield documents which Leonard prepared or reviewed behind the work product doctrine. The work product doctrine only applies to materials an attorney assembled and brought into being in anticipation of litigation. *United States v. El Paso Co., 682 F.2d 530, 542 (5th Cir. 1982), cert denied, 466 U.S. 944, 80 L. Ed. 2d 473, 104 S. Ct. 1927 (1984).* The work product doctrine protects "'the privacy of lawyers in their work and encourages ... freedom ... from interference in the task of preparing their clients' cases for trial.'" E.I. *DuPont de Nemours & Co. v. Admiral Ins. Co., Del. Super., 1992 Del. Super. LEXIS 517, *7,* C.A. No. 89 C-AU-99, Steele, J., (Dec. 23, 1992) (citing *Riggs Nat'l Bank of Washington,* [*12] *D.C. v. Zimmer, Del. Ch., 355 A.2d 709, 715 (1976)), interlocutory appeal denied, Del. Super., 622 A.2d 1095 (1993).* "It protects factual material gathered in preparation of a case and specifically shelters 'opinion' work product which includes attorneys' mental impressions, conclusions, opinion, and legal theories." Id. (citing *Hickman v. Taylor, 329 U.S. 495, 510-11, 91 L. Ed. 451, 67 S. Ct. 385 (1947).*

The work product doctrine is broader than the attorney-client privilege which protects only communications between the attorney and client. *Id., 1992 Del. Super. LEXIS 517, *8 (citing In re Grand Jury Proceedings, 604 F.2d 798, 801 (3d. Cir. 1979)).* The work product doctrine consists of "factual" information and "opinion" information. Id.

Factual or "ordinary" work product includes "written witness statements and all other trial preparation material not involving an attorney's thought processes...." 4 James W. Moore, et al., *Moore's Federal Practice P 26.15[3.-2]*, at 26-316 (2d ed. 1994). The party seeking discovery must show substantial need and inability to obtain the substantial equivalent without undue hardship. E.I. *DuPont de Nemours & Co., C.A. 1992 Del. Super. LEXIS 517, *9.* Even [*13] if a party sufficiently demonstrates his or her need to obtain the draft work product, the work product doctrine protects "opinion" work product. Id. at *7-8. Opinion work includes "attorneys' mental impressions, conclusions, opinions, and legal theories." Id. (citing *Hickman, 329 U.S. at 510-11).* The policy behind this theory encourages lawyers to maintain their freedom to express and to record mental impressions and opinions for the benefit of their clients without fear of their impressions and opinions being used against their clients. Id. at *8.

The work product doctrine cannot shield the Leonard documents from production. The record shows no evidence Leonard interacted with Sunstates as an attorney until after this litigation began. By Defendants' own admission, the word "Counsel" does not appear in Leonard's title. Therefore, Leonard could not have been an attorney assembling and bringing into being materials in anticipation of litigation. Although he had his legal degree, his relationship with Sunstates did not relate to delivery of legal services.

Plaintiffs urge the above privilege protections do not apply to documents intended for public disclosure. *See In re Micropro* [*14] *Sec. Litig., [1988-89 Transfer Binder] 1988 U.S. Dist. LEXIS 19375, Fed. Sec. L. Rep. (CCH) P 93,986 (N.D. Cal. 1988).* According to Plaintiffs, "handwritten notations on preliminary drafts are generally for the purpose of conveying factual data, not seeking legal advice." Their insistence seems consistent with the *Micropro Sec.* court who wrote,

> These communications, consisting as they do of factual information, do not call for a legal opinion or analysis. Such a communication does not constitute legal advice or a request for legal advice. Rather, the purpose of the communication is to furnish the information necessary to compile the offering materials required by the federal securities laws. Thus, the principle purpose for making the communication is not to secure legal advice but to secure what is essentially a business service (that, is to compile business data for disclosure in order to comply with the requirements of the federal securities laws). In receiving this information, the attorney herein were essentially serving as a conduit for factual data, and were not acting primarily as lawyers. *Hercules, Inc. v. Exxon Corp., 434 F. Supp. 136, 147 (D.Del. 1977); Hewlett Packard Co. v.* [*15] *Bausch & Lomb, Inc., 116 F.R.D. 533, 542 (N.D. Cal. 1987).*

*MicroPro, at* 90,593. The *MicroPro* court also emphasized,

> the information given the [attorney] was to assist in preparing such prospectus which was to be published to others and was not intended to be kept in confidence. That is the critical circumstance, to wit, the absence of any intent that the informa-

1995 Del. Ch. LEXIS 149, *

tion was to be kept in confidence. (citation omitted).

*Id.*

Although *MicroPro* is compelling, it is not binding on this Court. Chancellor Allen articulated this Court's position on the issue of producing draft documents in *Jedwab v. MGM Grand Hotels, Inc., Del. Ch., 1986 Del. Ch. LEXIS 383,* *6-7, C.A. No. 8077, Allen, C. (Mar. 20, 1986). Defendants, following the Chancellor's reasoning, argue the attorney-client privilege and work product doctrine protect the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld. I agree.

In *Jedwab,* this Court held preliminary drafts of documents a company later files with the Securities and Exchange Commission "are the proper subject of a claim of privilege and thus need not be produced." Id. at *7. Chancellor Allen [*16] based his decision on the fact that a plaintiff has available to it the publicly-filed documents. Id. Chancellor Allen wrote,

> The only information available from prior drafts relates to matters appearing in prior drafts that were deleted, augmented or otherwise modified in the final product. ... Such modifications are made as a result of communications between a client or its representatives and lawyers. Thus, new information disclosed from comparing drafts of SEC filings with the filed documents themselves necessarily relates to and may inferentially disclose communications between a client and its lawyers charged with preparing the final documents. Communications of this kind are clearly made "for the purpose of facilitating the rendition of professional legal services and lie at the heart of the confidential communications that the lawyer-client privilege seeks to protect

> ... Where... the document itself is prepared by a lawyer in a setting in which it is intended to remain confidential until a final version is deemed appropriate for public disclosure and where the only pertinence of the document to the discovery process is the inferential disclosure of the communication [*17] from a client to its lawyer, it strikes me that the underlying policies of the lawyer-client privilege are properly implicated and that discovery of such a document would inappropriately

permit access by third parties to privileged communications.

Id. at *8.

Similarly, the work product doctrine protects the draft documents from production. Chancery Court Rule 26(b)(3) specifies,

> [A] party may obtain discovery of [relevant] documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other patty's representative... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has heen made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Ch. Ct. R. 26(b)(3).

Here, the draft documents consist of both [*18] factual and opinion work product. As for the factual ones, Plaintiffs have not sufficiently shown why they would be unable to discover the same information without undue hardship. Our Courts have held a party may only compel production of opinion work product when a party puts that privileged information directly "at issue." *E.I. DuPont de Nemours & Co., C.A.* No. 89C-AU-99 at 7-8. At this time, the record does not indicate whether the party seeking the protection of the work product doctrine put opinion work, in fact, "in issue." A more careful analysis is unnecessary in any event. The attorney-client privilege shields the draft documents which Defendants intended for public disclosure. Defendants properly withheld the draft documents from Plaintiffs' scrutiny.

2. Accountant-Client Privilege

Finally, I turn to Plaintiffs request for the 110 documents which Defendants claim the Illinois Accountant-Client privilege protects. Delaware does not recognize the accountant-client privilege; nor do the Federal Courts. *State of Del. v. Wright, Del. Super.,* 1994 Del. Super. LEXIS 711, C.A. No. K94-02-0196I-0201I, Goldstein, J. (Jul. 20, 1994) (citing *U.S. v. Arthur Young &*

*Co., 465 U.S. 805, 817, 79 L. Ed. 2d 826, 104 S. Ct. 1495 (1984)*, [*19] *Couch v. United States, 409 U.S. 322, 335, 34 L. Ed. 2d 548, 93 S. Ct. 611 (1973)).*

Nevertheless, Defendants argue this Court should apply Illinois law which does recognize the accountant-client privilege, because "[Illinois] is the state with the most significant relationship to the communications in issue. I disagree.

According to the Restatement of Conflicts, [3] a court should weigh four factors when determining whether it should apply law other than that of the forum state: (1) the number and nature of the contacts that the forum state has with the parties and the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties. *Restatement (Second) of Conflicts, § 139(2)*, Comment. Applying these factors to the factual record, I find Delaware law applies.

3    Delaware follows the Restatement's choice of law principles and the Restatement's "most significant relationship" test. *Certain Underwriters at Lloyd's, London and London Market Insurance Cos., Del. Supr., 1994 Del. LEXIS 355, *6,* Veasey, C.J. (Nov. 10, 1994) (citing *Oliver B. Cannon & Son v. Dorr-Oliver, Inc., Del. Supr., 394 A.2d 1160, 1166 (1978).*

[*20]    First, Sunstates is a Delaware corporation. Incorporation in Delaware constitutes a knowing and voluntary request for the widely recognized benefits and advantages flowing from the application of Delaware general corporate law to the governance of the incorporator's business entity. Sunstates' principal place of business is in North Carolina, not in Illinois. Apparently, Illinois's only connection with Sunstates is that Illinois accountants originally generated or received the documents Defendants attempt to protect behind the accountant-client privilege. However, as Plaintiffs highlight in their Reply Memorandum in Support of Plaintiffs' Motion to Compel the Production of Documents, Sunstates' 1990 and 1991 Annual Reports state Ernst & Young, Raleigh, North Carolina are actually Sunstates' accountants. The Company's 1993 and 1994 SEC filings list Greensboro, North Carolina accountants as Sunstates accountants. [4] It seems, second only to Delaware, North Carolina, not Illinois, has the most significant relationship to the communications which Defendants claim the accountant-client privilege protects. [5] That circumstance is irrelevant, however. Delaware has the most significant contacts [*21] with the Sunstates documents in question. Second, Defendants have not refuted Plaintiffs' argument these documents are material to Plaintiffs' case. I see no reason why they are not material. Third, while I can

readily understand why some find the accountant-client privilege an important one, it is not the determining factor. Fourth, I see no reason why it is unfair to apply the law of the forum state -- Delaware -- here. If Sunstates did not intend to abide by Delaware law and anticipate Delaware law governing the conduct of its affairs, the Company would have incorporated elsewhere.

4    Not surprisingly an entity called "Sunstates" would necessarily be hard pressed to identify with Illinois.

5    North Carolina does not recognize the accountant-client privilege. *State v. Agnew, 294 N.C. 382, 241 S.E.2d 684, 692 (N.C. 1978)*, cert. denied, *Agnew v. N.C., 439 U.S. 830, 58 L. Ed. 2d 124, 99 S. Ct. 107 (1978).*

After weighing the evidence and applying it to the Restatement's four criteria, Delaware, [*22] not Illinois, is the state with the most significant relationship to the communications for which Defendants assert the accountant-client privilege. Since Delaware law recognizes no such privilege, there is no need to decide whether the privilege inures solely to the accountant or otherwise.

Accordingly, I grant in part and deny in part Plaintiffs' Motion to Compel Production of Documents. Plaintiffs are entitled to production of all documents they have specified in their Motion to Compel Production of Documents excluding the drafts of documents the Company intended for public disclosure. A separate order will follow reflecting this opinion.

*ORDER*

For the reasons set forth in the Court's Memorandum Opinion dated December 15, 1995:

This Court grants in part and denies in part Plaintiffs' Motion to Compel the Production of Documents --

Defendants are to produce, at their own expense, those documents Plaintiffs demanded as part of its request for documents excluding the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld.

Defendants are to produce these documents within seven working days of receipt of this order.

IT IS SO ORDERED [*23]    this 15th day of December, 1995.

MYRON T. STEELE

Vice-Chancellor