**TAB 7**

FOCUS - 5 of 70 DOCUMENTS

**Carolyn Lopez, Plaintiff, -against- The City of New York, Defendant.**

**05-CV-3624 (ARR)(KAM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 19694*

**March 20, 2007, Decided**
**March 20, 2007, Filed**

**COUNSEL:** [*1] For Carolyn Lopez, individually and as administratrix of the estate of Carlos Lopez, deceased, Plaintiff: Derek Sells, LEAD ATTORNEY, Paul A Marber, The Cochran Firm, New York, NY; Raymond L Colon, Law Office of Raymond L. Colon, New York, NY.

For City of New York, Defendant: Alan H. Scheiner, LEAD ATTORNEY, Kathleen M. Kilduff, The City of New York Law Department, Office of Corporation Counsel, New York, NY.

**JUDGES:** KIYO A. MATSUMOTO, United States Magistrate Judge.

**OPINION BY:** KIYO A. MATSUMOTO

**OPINION:**

ORDER

MATSUMOTO, United States Magistrate Judge:

Pending before the court is a request dated January 26, 2007 from defendant City of New York for an order compelling plaintiff to produce the witness statements of Sandra Britt, Jessica Wright, Tremain Kirby, n1 Deval Robinson and Nigel George. (*See* Dkt. 45, City's Motion to Compel, dated January 26, 2007 ("City's 1/26/07 Motion"), at 1.) On February 8, 2007, Plaintiff filed a Response in Opposition (dkt. 47, "Plaintiff's Opp."), and the City replied on February 15, 2007 (dkt. 51) and submitted an additional letter on February 26, 2007 (dkt. 53). On March 9, 2007, the Court ordered plaintiff, by March 13, 2007, to submit the witness [*2] statements for *in camera* review. Having reviewed the parties' submissions and the documents *in camera,* the Court hereby grants the City's motion for the reasons stated herein.

n1 Noting its confusion regarding Mr. Kirby's first name, the City refers to him as "Jermain Kirby" in its motion to compel, however, the documents submitted to the Court for *in camera* review reveal that Mr. Kirby's first name is "Tremain."

PROCEDURAL BACKGROUND

Plaintiff in this action, Carolyn Lopez, individually and as administrator of the estate of her son, Carlos Lopez, seeks damages pursuant to *42 U.S.C. § 1983* and the common law claims of negligence and respondeat superior for the alleged wrongful death of her son. (*See* dkt. 1, Verified Complaint, dated August 1, 2005, at Counts I-VII.) Plaintiff alleges that on the afternoon of May 1, 2003, New York City police officers, after hearing gunshots, misidentified Carlos Lopez as the shooter, shot him without probable cause, and thereafter [*3] refused to provide him with emergency medical treatment before he died. (*Id.* at PP 1-2.)

Pursuant to *Fed. R. Civ. P. 26(a)*, plaintiff served the City its Initial Disclosures on January 9, 2006 and listed Anthony Kirby, Sandra Britt, Jessica Wright, Deval Robinson and Tremain Kirby as individuals "likely to have discoverable information related to this action," but did not provide the addresses or telephone numbers of the witnesses as provided by *Rule (a)(1)(A).* Nor did plaintiff indicate that she possessed statements by the witnesses. (Dkt. 47, Plaintiff's Opp. at 6.) On January 23, 2006, the City served plaintiff its First Set of Interrogatories and Document Requests. (*See* City's 1/26/07 Motion, Ex. B.) Interrogatory No. 2 requested that plaintiff identify "all statements, signed or unsigned, recorded on tape electronically or otherwise, made by the City of New York . . . or of any other person with knowledge regarding or concerning any matters alleged in the complaint, taken by, or on behalf of, or in the possession of, plaintiff or

Case 1:05-cv-00499-JJF   Document 201-3   Filed 04/27/2007   Page 3 of 38

Page 2
2007 U.S. Dist. LEXIS 19694, *

her counsel." (*Id.*) Over two months later, plaintiff responded on April 4, 2006, that she "was aware [*4] of several statements taken in connection with this case that are protected by the attorney work product privilege as they were taken in anticipation of litigation . . . . A privilege log is being prepared for those documents protected by the attorney work product privilege." (*Id.*, Ex. C.)

After ongoing efforts by defendant to obtain plaintiff's responses to its document requests failed, on August 10, 2006, the City moved to compel plaintiff to respond to its Request for the Production of Documents. (Dkt. 36) The Court granted the motion and ordered plaintiff to produce documents by August 22, 2006, cautioning, "[S]hould [plaintiff] fail to comply with this order, she may be subject to sanctions, including but not limited to a recommendation that the case be dismissed." (Order dated 8/18/06.)

Plaintiff responded to the City's document requests by August 22, 2006, but again failed to include a privilege log. On October 18, 2006, the City wrote to plaintiff's counsel requesting, *inter alia*: (1) information regarding the subject matter of the potential testimony of the five witnesses identified in her Initial Disclosures; (2) the witnesses' contact information; and (3) a [*5] privilege log. (*See* City's 11/27/06 Motion, Ex. C.) The City repeated its requests on November 27, 2006. (*See id.*, Ex. D.) Having received no answer, the City filed a second motion to compel on November 27, 2006 (dkt. 43.), to which the Court ordered plaintiff to respond (*see* Order dated 11/28/06).

On November 30, 2006, plaintiff provided the City with contact information for the five previously identified witnesses, the subject matter of their potential testimony, and a privilege log. (*See* City's 1/26/07 Motion, Ex. A.) The privilege log lists a total of five items, each stating, "Statement by [name of one of the five witnesses] to investigator, dated [interview date]." (*Id.*) The interview dates reveal that four of the five witnesses were interviewed in June, 2005 -- two months before plaintiff filed her complaint on August 2, 2005. (*See id.*) The City now seeks an order compelling the production of the witness statements, asserting that plaintiff failed to establish the basis for the attorney work product privilege and waived its protection, and that the City's need for the statements overcomes any applicable privilege. (*See* City's 1/26/07 Motion at [*6] 3-5.)

DISCUSSION

As a preliminary matter, the Court finds that the witness statements are protected by the attorney work product privilege. *Fed. R. Civ. P. 26(b)(1)* provides, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." *Rule 26(b)(3)* further provides,

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials . . . and . . . is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering the discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative . . . .

*Fed. R. Civ. P. 26(b)(3).*

Because plaintiff's witness [*7] statements were "secured by an investigator working at the behest of plaintiff's counsel" and prepared "in anticipation of litigation" (dkt. 47, Plaintiff's Opp. at 1), the Court finds that the statements qualify as attorney work product. *See United States v. Nobles, 422 U.S. 225, 239, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975)* ("It is . . . necessary that the [work product] doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself."); *United States v. Adlman, 134 F.3d 1194, 1195 (2d Cir. 1998)* (according work product protection to documents that "would not have been prepared but for the prospect of that litigation"). The Court also notes, however, that because the documents are simply verbatim statements of each witnesses' recollection of the events of May 1, 2003, and do not contain any attorney mental impressions, conclusions, or thought processes, they are accorded a lower degree of protection. *See Malletier v. Dooney & Bourke, Inc., No. 04 Civ. 5316, 2007 U.S. Dist. LEXIS 2933, 2007 WL 54588, at *1 (S.D.N.Y. Jan. 4, 2007)* ("We do note that work-product immunity is a qualified protection, and that *Rule 26(b)(3)* authorizes disclosure -- at [*8] least of materials that do not include the 'mental impressions, conclusions, opinions or legal theories of an attorney' . . . ."); *Abdell v. City of New York, No. 05 Civ. 8453, 2006 U.S. Dist. LEXIS 66114, 2006 WL 2664313, at *6 (S.D.N.Y. Sept. 14, 2006)* (finding "'[c]ore' work product [consisting of attorney mental impressions] . . . subject to more stringent protection" than work product consisting merely of facts); *cf. In re Cardinal Health, Inc. Securities Litigation, No. C2 04 575, 2007 WL 495150, at *6 (S.D.N.Y. Jan. 26, 2007)* (finding documents "squarely covered by

2007 U.S. Dist. LEXIS 19694, *

the work product doctrine since they represent [the attorneys'] legal analysis, opinions, and mental impressions concerning the issues investigated.").

Despite the fact that the witness statements qualify for at least minimal work product protection, plaintiff has waived that protection by repeatedly failing to (1) sufficiently assert the basis for the privilege; and (2) timely produce a privilege log. *Fed. R. Civ. P. 26(b)(5)* provides,

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject [*9] to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

Likewise, *Local Rule 26.2* directs that parties asserting privilege shall disclose the type of document, general subject matter of the document, date, and any other information "sufficient to identify the document for a subpoena duces tecum, including . . . the author of the document, the addressees of the document . . . and the relationship of the author, addressees, and recipients to each other." *Local Civil Rule 26.2.*

Failing to include sufficiently descriptive information may result in waiver of the privilege. *See OneBeacon Ins. Co. v. Forman Int'l, Ltd., No. 04 Civ. 2271, 2006 U.S. Dist. LEXIS 90970, 2006 WL 3771010, *6 (S.D.N.Y. Dec. 15, 2006)* ("Courts in this Circuit have refused to uphold a claim of privilege where privilege log entries fail to provide adequate information to support the claim."); *United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996);* [*10] *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC, 964 F.2d 159, at 166 (2d Cir. 1992)* ("[T]he failure to comply with [*Rule 26*] may result in a finding that the privilege has been waived."); *Grossman v. Schwarz, 125 F.R.D. 376, 386-87 (S.D.N.Y. 1989)* ("failure to comply with the explicit requirements of [*Rule 26*] will be considered presumptive evidence that the claim of privilege is without factual or legal foundation"); *NextG Networks of N.Y., Inc. v. City of New York, No. 03 Civ. 9672, 2005 U.S. Dist. LEXIS 6381, 2005 WL 857433, at *2 (S.D.N.Y. Apr. 13, 2005);* *Bowne, Inc. v. AmBase Corp., 150 F.R.D. 465, 474-75 (S.D.N.Y. 1993).*

Failing to timely provide a privilege log may also result in waiver. *See Smith v. Franklin Hosp. Medical Center No., 04-CV-3555, 2005 WL 2219294, at *2 (E.D.N.Y. Sept. 25, 2005)* (quoting *FG Hemisphere Assocs. v. Du Congo, No. 01 Civ. 8700, 2005 U.S. Dist. LEXIS 3523, 2005 WL 545218, at *6 (S.D.N.Y. Mar. 8, 2005)* ("As other judges in this District and I have repeatedly held, the unjustified failure to list privileged documents on the required log of withheld documents [*11] in a timely and proper manner operates as a waiver of any applicable privilege") (citations omitted)); *Lugosch v. Congel, No. Civ. 1:00-CV-0784, 2006 U.S. Dist. LEXIS 53116, 2006 WL 931687, at *15 (N.D.N.Y. Mar. 7, 2006)* ("Failure to timely provide the privilege log or objection constitutes a waiver of any of the asserted privileges."); *Kitevski v. City of New York, No. 04 Civ. 7402, 2006 U.S. Dist. LEXIS 11017, 2006 WL 680527, at *4 (S.D.N.Y. Mar. 16, 2006)* ("The City has failed to provide a privilege log, and has failed to present any justification for that failure. It has, therefore, waived any privilege with respect to the . . . records by failing to properly identify the documents, and assert the privilege."); *Smith v. Conway Org., Inc., 154 F.R.D. 73, 76 (S.D.N.Y.1994).*

In violation of the Federal and Local Civil Rules, plaintiff failed to adequately "describe the nature of the documents . . . in a manner that . . . will enable other parties to assess the applicability of the privilege . . . ." *Fed. R. Civ. P. 26(b).* Indeed, over ten months after the defendant served interrogatories and document requests, plaintiff provided what is purported [*12] to be a privilege log in which plaintiff simply notes the date of the interview and the name of person interviewed, and fails to identify the "investigator." (*See* City's 1/26/07 Motion, Ex. A.) In addition, plaintiff failed to timely produce the privilege log. Plaintiff was obligated to produce a privilege log along with her discovery responses thirty days after receiving defendant's January 23, 2006 discovery requests. Plaintiff first revealed the existence of and asserted work product protection as to witness statements on April 4, 2006. Plaintiff stated that she "was aware of several statements . . . that are protected by the attorney work product privilege," and that "[a] privilege log is being prepared for those documents protected by the attorney work product privilege." (City's 1/26/07 Motion, Ex. C.) Despite that assertion, plaintiff only served her privilege log on November 30, 2006 -- more than seven months later and following two motions to compel (*see* dkts. 36 and 43). Based on plaintiff's repeated failures to submit a proper privilege log, which required defendant to move twice to compel discovery after plaintiff failed to respond, the Court finds that plaintiff [*13] has waived work product protection with respect to the witness statements. *See One Beacon, 2006 U.S. Dist. LEXIS*

2007 U.S. Dist. LEXIS 19694, *

*90970, 2006 WL 3771010 at *6*; *FG Hemisphere, 2005 U.S. Dist. LEXIS 3523, 2005 WL 545218 at *6.*

Pursuant to *Rule 26(b)(3)*, even if work product privilege were to apply to the witness statements, the lower protection afforded factual materials contained in otherwise privileged documents, combined with the City's substantial need for those documents, overcomes any application of the privilege. The City has substantial need for the statements because they were taken in June and September of 2005, much closer to the events on May 1, 2003 and are therefore more likely to reflect the witnesses' recollections than any testimony the City could elicit now, almost four years after the incident. Without the statements, the City will suffer continued prejudice due to plaintiff's delay in timely and properly asserting the privilege. The City is also entitled to cross-examine the witnesses based upon their prior statements. Notably, the City was prevented from doing so when it deposed Deval Robinson on September 26, 2006 without knowledge of his 2005 statement. (*See* dkt. 51, City's Reply at 2.) Moreover, [*14] the City may not obtain the equivalent without undue hardship both because, axiomatically, it is unable to interview the witnesses closer in time to the accident, and the address of Sandra Britt provided by plaintiff is no longer accurate. (*See* dkt. 53, Letter filed by the City, dated Feb. 26, 2007.) Accordingly, the City's substantial need for the witness statements overcomes the minimal protection afforded to them by the attorney work product privilege. *See Abdell, 2006 U.S. Dist. LEXIS 66114, 2006 WL 2664313 at *7* (Noting that while "[t]here may be alternative means of ascertaining what the police officers observed at the time of each arrest, none of the sources of such information is the 'substantial equivalent' of the DA Data Sheets. While the plaintiffs can take the deposition of each officer, the difficulty of recalling the details of chaotic events that took place more than two years ago is likely to diminish the utility of the testimony."); *Johnson v. Bryco Arms, No. 03-2582, 2005 U.S. Dist. LEXIS 2938, 2005 WL 469612, at *5 (E.D.N.Y. Mar. 1, 2005)* ("A prior statement by a witness -- in this case, a central witness to the case -- will provide plaintiffs with a critical piece of material, particularly [*15] if, as they have indicated, the witnesses' subsequent depositions have suggested inconsistencies or gaps in memory. The fact that plaintiffs' counsel were able to depose the witness does not obviate the need for the statement."); *Boyd v. City & County of San Francisco, No. C-04-5459, 2006 U.S. Dist. LEXIS 27647, 2006 WL 1141251, at *4 (N.D. Cal. May 1, 2006)* (in a case involving allegations of excessive force, "the identities and contemporaneous statements of witnesses are likely to provide the best evidence of excessive force."); *Doubleday v. Ruh, 149 F.R.D. 601, 608 (E.D. Cal. 1993)* (substantial need for notes of prior statements because "the passage of time and the present, potential bias of the defendants may color recollections such that what was said at the time cannot be accurately deciphered" through depositions).

For the foregoing reasons, the Court orders plaintiff to produce the witness statements of Sandra Britt, Jessica Wright, Tremain Kirby, Deval Robinson and Nigel George to the City by March 22, 2007.

**SO ORDERED.**

Dated: March 20, 2007

Brooklyn, New York

KIYO A. MATSUMOTO

United States Magistrate Judge

**TAB 8**

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

▷

Saito v. McKesson HBOC, Inc.Del.Ch.,2002.Only
the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Noel SAITO, Plaintiff,
v.
MCKESSON HBOC, INC., a Delaware corporation,
Defendant.
**No. Civ.A. 18553.**

Submitted Oct. 22, 2002.
Decided Oct. 25, 2002.
Revised Nov. 13, 2002.

Pamela S. Tikellis and Robert J. Kriner, Jr., of
Chimicles & Tikellis, Llp, Wilmington, Delaware;
Robert S. Green and Robert A. Jigarjian, of Green &
Jigarjian, LLP, San Francisco, California, for
Plaintiff, of counsel.
Anthony W. Clark, Paul J. Lockwood, Michael A.
Barlow and Cynthia E. Carrasco, of Skadden, Arps,
Slate, Meagher & Flom LLP, Wilmington, Delaware;
Jonathan J. Lerner, of Skadden, Arps, Slate, Meagher
& Flom LLP, New York, New York, and James E.
Lyons and Timothy A. Miller, of Skadden, Arps,
Slate, Meagher & Flom LLP, San Francisco,
California, for Defendant, of counsel.
Richard M. Humes and Melinda Hardy, Office of the
General Counsel, Securities and Exchange
Commission, Washington, D.C., for the SEC as
Amicus Curaie.

*OPINION*
CHANDLER, J.
**\*1** Plaintiff Noel Saito instituted this action under 8
*Del. C. § 220* to obtain access to certain books and
records of defendant McKesson Corporation
("McKesson"). This is the Court's decision, after a
trial and following briefing, with respect to certain
records of McKesson as to which it has asserted
attorney-client privilege and the work product
doctrine.[FN1]

> FN1. Following remand from the Supreme
> Court, this Court addressed the scope of
> plaintiff's demand in an Order dated
> September 20, 2002. I have stayed that

Order until the filing of this opinion.
Language in the Order addressing the
attorney-client privilege and the work
product doctrine refers specifically to the
results of this decision.

Plaintiff's action seeks the books and records of
McKesson Corporation (formerly McKesson HBOC,
Inc.), a Delaware corporation. McKesson HBOC was
formed through the merger of McKesson Corporation
and HBOC & Co. ("HBOC") on January 12, 1999.
Approximately 3 1/2 months after McKesson's
acquisition of HBOC became effective, McKesson
HBOC announced the first of what appears to be
three downward revisions of revenues, earnings, net
income, and other financial information, for financial
years 1996-1998.

After these announcements, the Securities and
Exchange Commission's (SEC) Office of
Enforcement began an informal inquiry into whether
McKesson HBOC had filed materially false or
misleading financial statements.[FN2] The next day
(April 29, 1999) the SEC notified McKesson that it
had begun an informal inquiry into whether
McKesson HBOC had filed materially false or
misleading financial statements. McKesson HBOC's
audit committee then retained Skadden, Arps, Slate,
Meagher & Flom LLP ("Skadden") on May 3, 1999.
Skadden, in conjunction with
PricewaterhouseCoopers LLP ("PwC"), conducted an
internal investigation of the alleged wrongdoing and
prepared a written report for the audit committee,
summarizing the relevant facts and legal principles
involved in the various pending actions and
investigations.

> FN2. Pl.App. of Docs. in Support of Mot. to
> Compel Ex. A, 14.

Skadden informed the SEC and the United States
Attorney's Office for the Northern District of
California ("USAO") of this investigation and
offered to disclose the work product generated from
this internal investigation upon the condition that the
materials would be subject to a confidentiality
agreement. Most of this work product was shared
after a confidentiality agreement was executed
among McKesson, the SEC, and the USAO on May
27 and 28, 1999. Five documents, however, were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                 Page 2
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

disclosed to the SEC prior to the execution of the confidentiality agreement. These documents are numbers 7 and 9-12 on the First Privilege Log.

Plaintiff, along with other shareholders, filed a derivative suit in this Court based on the earnings restatements and alleged wrongdoing.[FN3] Defendant moved to dismiss the derivative action, which I granted without prejudice. I also allowed plaintiff leave to amend the complaint after gathering the facts necessary to file a legally sufficient complaint.[FN4]

> FN3. *Ash v. McCall,* 2000 Del. Ch. LEXIS 144 at *1 (Del. Ch. Sept. 15, 2000).

> FN4. *Id.*

Plaintiff filed this § 220 action on December 14, 2000. At a pre-trial conference, the parties agreed to bifurcate the issues, addressing the scope of the inspection first, and later addressing the issues relating to attorney-client privilege and the work product doctrine. The issues concerning the scope of the inspection have been addressed in a separate opinion, and numerous documents and records have been ordered produced to plaintiff.[FN5] This opinion determines the applicability of the attorney-client privilege and work product doctrine to certain documents that continue to be in dispute.

> FN5. *Saito v. McKesson HBOC, Inc.,* 2001 Del. Ch. LEXIS 96 at *4 (Del. Ch. July 10, 2001); 806 A.2d 113 (Del.2002); Order dated Sept. 20, 2002 (identifying records to be produced).

**\*2** The disputed information plaintiff seeks is listed on four separate privilege logs. Defendant asserts that plaintiff is not entitled to these particular documents because of the attorney-client privilege, the work product doctrine, or both.[FN6] The documents are best identified by separating them into four different groups. Group A consists of documents McKesson HBOC produced to the SEC and the USAO.[FN7] Group B consists of premerger legal advice to defendant.[FN8] Group C consists of post-merger legal advice and board minutes.[FN9] Group D is a catch-all of all documents prepared by in-house counsel but not produced to the SEC or the USAO.[FN10] For reasons set forth below, I grant the motion to compel in part, and deny it in part.

> FN6. Each line of the privilege log states which defense is being made.

> FN7. Items 7, 9-21, 23-114 on the First Privilege Log, letter dated 11/19/99 on Fourth Privilege Log. Item 22 on the First Privilege Log was listed as a Group A document by plaintiff, but, since it was not produced to the SEC or the USAO, I address this document under Group C.

> FN8. All items on the Third Privilege Log.

> FN9. Items 1 and 22 on the First Privilege Log; all items on the Second Privilege Log; agenda dated 1/27/99 on Fourth Privilege Log.

> FN10. Items 2-6 and item 8 on the First Privilege Log; documents dated 5/14/99 and 5/20/99 on the Fourth Privilege Log.

I. ANALYSIS

*A. Documents Shared with the SEC and/or the USAO*

Group A documents are those disclosed by McKesson HBOC to the SEC. Most of these documents were not disclosed until a confidentiality agreement was signed with the SEC. Group A documents include Items 7, 9-21, 23-114 of the First Privilege Log and the letter dated 11/19/99 on the Fourth Privilege Log. The documents shown to the SEC before the confidentiality agreement was in place are documents 7 and 9-12 of the First Privilege Log. Defendant asserts a work product privilege as to all of these documents and attorney-client privilege as to four of them. Plaintiff Saito contends that these documents are not shielded by the work product doctrine or attorney-client privilege.

1. Work Product Doctrine

Saito contends that the work product doctrine is inapplicable to the Group A documents because the documents were not confidential and because any privilege that would have attached was waived when the documents were disclosed to potential adversaries -the SEC and/or USAO.

The documents in dispute were prepared in anticipation of litigation and were intended to be confidential. Thus, the documents clearly qualify as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

work product. Plaintiff argues that the McKesson HBOC board did not specifically empower the audit committee with defending securities litigation, so the resulting investigative reports by the audit committee were not prepared in anticipation of litigation. The audit committee retained the law firm of Skadden and the accounting firm PwC, however, for that specific purpose. Skadden shared a dual role-the firm was assisting McKesson HBOC in its internal review, as well as defending various lawsuits linked to the subject of this very same investigation.

Plaintiff also argues that McKesson HBOC never intended the reports to be confidential. McKesson HBOC, however, clearly negotiated a confidentiality agreement with the SEC before disclosing the documents at issue. Therefore, the documents do not lose their work product protection simply because the board failed explicitly to state that the report may also be used to assist in any anticipated litigation and that the materials prepared during the audit committee investigation were intended to be confidential.

**\*3** The pivotal question remaining is whether McKesson HBOC waived its work product privilege as to these documents by sharing them with the SEC in its investigation. The traditional work product doctrine has been codified in <u>Chancery Court Rule 26(b)(3)</u>, and generally bars the discovery of materials created in anticipation of litigation or for trial preparation.<sup>FN11</sup> But this bar is not an "impenetrable barrier." <sup>FN12</sup> It is a qualified immunity.<sup>FN13</sup> It allows a party to seek materials prepared in anticipation of litigation only when the party: 1) has a substantial need for the materials; and 2) the party cannot acquire a substantial equivalent of the materials by other means without undue hardship.<sup>FN14</sup> Even when such a showing of need and unavailability is made, the rule specifically protects the mental impressions, conclusions, opinions and legal theories of the party's attorney.<sup>FN15</sup> This is referred to as *opinion* work product (as opposed to trial preparations that are merely historical or fact based). Opinion work product is subject to disclosure according to a more stringent standard. A court will protect opinion work product unless the requesting party can show that it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling.*<sup>FN16</sup>

> FN11. In pertinent part, <u>Rule 26(b)(3)</u> provides that:
> [A] party may obtain discovery of

documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

> FN12. *Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254, 262 (Del.1995).

> FN13. *Id.*

> FN14. Del. Ct. Ch. R. 26(b)(3).

> FN15. *Id.* While the rule states that the Court "shall protect" against disclosure of attorney opinion work product, the Delaware Supreme Court has subsequently interpreted the rule to hold that opinion work product *is* discoverable upon an even stronger showing of substantial need and unavailability. *Tackett,* 653 A.2d at 262. This "more substantial need" is met when a party shows that the mental impressions are: 1) directed to the pivotal issue in the current litigation; and 2) the need for the information is compelling. *Id.*

> FN16. *Tackett,* 653 A.2d at 262.

All of the Group A documents are designated as work product. The issue is whether McKesson HBOC waived its claim to work product privilege over Group A documents when it disclosed those documents to the SEC.

a. Waiver of the Work Product Privilege

As with any privilege, the protection of work product may be waived when it no longer serves its useful purpose. The purpose behind the protection of work product is "to promote the adversary system by safeguarding the fruits of an attorney's trial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 4
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

preparations from the discovery attempts of the opponent." [FN17] The adversary system is promoted because this protection allows clients to seek informed legal guidance and allows attorneys to prepare their cases without fear that these preparations will be used against their clients. [FN18] Thus, the focus of the doctrine is upon preventing discovery of the work product from an *"opposing party in litigation,"* not necessarily from the rest of the world generally." [FN19] Courts and legislatures have consistently found that these benefits are so important that they outweigh society's competing interest in revealing all material facts relevant to the resolution of a dispute.[FN20]

> FN17. *United States v. AT & T Co., 642 F.2d 1285, 1299 (D.C.Cir.1980).*
>
> FN18. *Westinghouse Elec. Corp. v. Philippines, 951 F.2d 1414, 1428 (3d Cir.1992).*
>
> FN19. *United States v. AT & T Co., 642 F.2d 1298-99* (emphasis added).
>
> FN20. *See, e.g., Hickman v. Taylor, 329 U.S. 495 (1947); In re Subpoenas Duces Tecum, 738 F.2d 1367 (D.C.Cir.1984).*

Such waivers are rarely granted in Delaware because of their harsh result. [FN21] Indeed, a finding of waiver of opinion work product protection should only be made in cases of the most egregious conduct by the holder of the privilege.[FN22] In order to waive a privilege, an individual must know of a particular right and voluntarily and intentionally choose to relinquish it. [FN23] A waiver does not always have to be express, it may also be implied from the circumstances.[FN24]

> FN21. *Wolhar v. GMC, 712 A.2d 457, 463 (Del.Super.Ct.1997)* ("[A] finding of waiver is discretionary with the court and rarely granted, as it is a harsh result."); *see also Tackett, 653 A.2d at 260* (describing the "exacting" standard required to overcome work product protection, a standard that is "more stringent" than that required to overcome attorney client privilege).
>
> FN22. *Wolhar, 712 A.2d at 463.*
>
> FN23. *Metro. Bank & Trust Co. v.*

> *Dovenmuehle Mortgage, Inc., 2001 WL 1671445 at *5 (Del. Ch. Dec. 20, 2001).*
>
> FN24. *United States v. AT & T Co., 642 F.2d at 1298-99.*

*4 Disclosure of work product does not negate its protection unless the disclosure is "inconsistent with the maintenance of secrecy from the disclosing party's adversary." [FN25] A party may relinquish its right to protection of its work product if it knowingly and voluntarily discloses it with "either the intention or practical result that the opposing party may see the documents." [FN26]

> FN25. *Id.* at 1299 (quoting *GAF Corp. v. Eastman Kodak Co., 85 F.R.D. 46, 51-52 (S.D.N.Y.1979).*
>
> FN26. *Wolhar, 712 A.2d at 462-63.*

There is no waiver of privileged information to third parties if a disclosing party had a reasonable expectancy of privacy when it made an earlier disclosure. In assessing whether a party had a reasonable expectation of privacy in the disclosure, the Court generally asks two questions: 1) did the disclosing party believe its disclosure was confidential; and 2) will the law sanction that expectation? [FN27] Two contexts where this consideration arises are in the common interest exception and in making disclosures pursuant to a confidentiality agreement.

> FN27. *Jedwab v. MGM Grand Hotels, Inc., 1986 WL 34210 at *2 (Del. Ch. March 20, 1986).*

### 1. Common Interest Exception

Disclosures to a third party do not waive attorney work product when the disclosing party and its recipient share some common interest. Under this "common interest" exception, a communication may still be classified as confidential even after its disclosure to others, as long as those others have interests that are "so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers." [FN28] The traditional example of this is the co-defendant situation. This "common interest exception" or "joint prosecution privilege" [FN29] will attach when the persons sharing the information have a common

Not Reported in A.2d                                                                                      Page 5
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

adversary or share a common interest in the litigation. When persons sharing a common interest share work product, the parties reasonably expect the disclosures to be confidential. Courts sanction such disclosures because they further the adversarial system by allowing the attorneys to collectively gather fruits in preparation for litigation without the risk of those fruits being plucked by the common adversary.

FN28. *Id.*

FN29. *WT Equip. Partners, L.P. v. Parrish,* 1999 WL 743498 at *1 (Del. Ch. Sept. 1, 1999) (withholding oral disclosures because they were made in accordance with the joint prosecution privilege, provided little relevance to solving the substantive issues and outweighed the potential prejudice caused by chilling future counsel preparations).

McKesson-HBOC argues that it shared a common interest with the SEC when it disclosed the privileged documents at issue, and, therefore, the work product protection was not waived. Saito disagrees, insisting that McKesson HBOC was not aligned with the SEC and was, in fact, a target of an SEC investigation when the disclosure was made. Thus, Saito contends, the two entities did not share a common interest and McKesson HBOC had no reasonable expectation of privacy in the documents provided to the SEC.

The common interest question here boils down to whether the SEC acts as a friend or foe when it begins investigating a company for potential violations of the Securities Act. I think the more reasonable conclusion is that the SEC was a foe in this instance.[FN30]

FN30. The question in such cases is "who is the target" of the SEC's investigation. Is it the company? Senior officers? A rogue employee? In this particular case, it is clear that the company, at the very least, was a target, and that is sufficient for purposes of my analysis.

The adversarial relationship here is strikingly similar to that in *In re Steinhardt Partners, L.P.*[FN31] The *Steinhardt* Court noted that

FN31. 9 F.3d 230 (2d Cir.1993).

*5 the SEC stood in an adversarial position to Steinhardt when it requested assistance. This was not a case in which a party complied with a benign request to assist the SEC in performing its routine regulatory duties. The determinative fact in analyzing the adversarial nature of the relationship is that Steinhardt knew that it was the subject of an SEC investigation, and that the memorandum was sought as part of this investigation. The fact that the request came from the SEC's Enforcement Division further supports the conclusion that this was an adversarial relationship.[FN32]

FN32. *Id.* at 234.

Similarly, McKesson was aware that the nature of its relationship with the SEC was adversarial before disclosing its work product. McKesson knew it was a target, knew the disclosure was being sought as part of this investigation, and knew the investigation was being conducted by the enforcement arms of two different agencies immediately following a public admission of wrongdoing. These enforcement agencies were *not* "friendly" to McKesson. In fact, as Saito points out, and defendant concedes, the SEC expressly disavowed sharing a common interest with McKesson.[FN33]

FN33. One court has found that the SEC could potentially share a common interest with a corporation in situations where the SEC is not adverse because individual wrongdoers, as opposed to the corporation itself, are the focus of investigation. *McKesson HBOC, Inc. v. Adler,* 562 S.E.2d 809 (Ga.Ct.App.2002). The Georgia Court of Appeals directed the trial court to examine whether the fact that the SEC investigation's focus was on former officers and employees, as opposed to current employees or the corporation itself, indicated that the SEC shared a common interest with the disclosing corporation. This is not the situation here, however. McKesson was itself a target of the SEC investigation. Thus, I need not discuss whether the SEC or another law enforcement agency could possibly share a common interest with a disclosing corporation. Instead, McKesson is much more similar to *Cooper Hospital,* where law enforcement agencies were found to be

Not Reported in A.2d                                                                    Page 6
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

adverse because the agencies were targeting the corporation, not just a few errant employees. *Cooper Hospital/University Medical Center v. Sullivan,* 183 F.R.D. 119 (D.N.J.1998).

The fact that McKesson "cooperated voluntarily does not transform the relationship from adversarial to friendly." [FN34] McKesson had sufficient reason to comply with the SEC and USAO even if its interests were adverse. As other courts have noted, such enforcement agencies are formidable adversaries. [FN35] Even though they may be considered foes, a party under investigation has significant incentives to cooperate with the authorities. The disclosing party often decides that the benefits of cooperation outweigh the possible damage that may be caused by the information it discloses. Such benefits often include more lenient treatment, avoidance of extensive formal investigation and enforcement litigation, and an opportunity to narrow the issues.[FN36] By yielding to these formidable opponents in order to minimize future damages, a disclosing party does not make those opponents its friend. It merely concedes that it prefers not to anger such a foe.

FN34. *Cooper,* 183 F.R.D. at 119.

FN35. *In re Steinhardt Partners, L.P.,* 9 F.3d at 236; *In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1372 (D.C.Cir.1984); *In re Sealed Case,* 676 F.2d 793, 822-23 (D.C.Cir.1982).

FN36. *In re Steinhardt Partners, L.P.,* 9 F.3d at 236.

McKesson HBOC argues that it had a common interest with the SEC and USAO in that it too wanted to weed out the wrongdoers in the company. But this is not the type of common interest the exception contemplates. Cooperation with a government investigation may be a "laudable activity," [FN37] but it does not align one's interests with that government entity.[FN38] As noted above, the interest between the disclosing party and the recipient must be "so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers." [FN39] McKesson HBOC was not a joint venturer with the SEC or USAO because it was under investigation and its interests were adverse to these enforcement entities when the work product was disclosed. Thus, they did not share a common

interest.

FN37. *Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir.1981).

FN38. *E.g., United States v. MIT,* 129 F.3d 681, 686 (1st Cir.1997) ("In a rather abstract sense, MIT and the audit agency do have a 'common interest' in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills. But this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients-who are working together in prosecuting or defending a lawsuit or in certain other legal transactions-can exchange information among themselves without loss of the privilege. To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial, would be to dissolve the boundary almost entirely.").

FN39. *Id.*

2. Disclosure Pursuant to a Confidentiality Agreement

**\*6** Another instance in which a disclosing party's expectations of privacy may be heightened is when that party secures a confidentiality agreement before agreeing to disclosure of privileged information. As noted in *Westinghouse Elec. Corp. v. Philippines,*[FN40] there are

FN40. 951 F.2d 1414 (3d Cir.1992).

two distinct types of waivers: selective and partial. Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications.[FN41]

FN41. *Id.* at 1423 n. 7 (citations omitted).

The Delaware Supreme Court has already determined that it is sometimes unfair to allow for *partial* waivers of work product.[FN42] No Delaware court,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 7
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

however, has decided whether to allow *selective* waivers of work product. Selective waiver is the type of waiver at issue in this case, as McKesson HBOC has selectively disclosed its work product to the SEC and now resists its work product privilege as to these same documents when requested by plaintiff Saito.

> FN42. *Tackett v. State Farm Fire & Casualty Co.*, 653 A.2d 254 (Del.1995). A *partial* waiver may be implicit, even if unintentional, when fairness and consistency mandate that a partial disclosure of privileged information amounts to a full waiver of the privileged information if this disclosure places its opponent at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information. *Id.* at 259-60 (finding that insurance company asserting its routine handling of plaintiff's claim implicitly disclosed its reliance upon its counsel's communications and was, therefore, required to produce the privileged materials supporting this assertion).

Fairness concerns generally govern *partial* waivers,[FN43] but fairness has little relevance in the context of *selective* waivers.[FN44] This is because disclosure to one adversary does not prejudice a subsequent adversary any more than it would have if the initial disclosure had never been made. I agree with Chief Judge Becker of the United States Third Circuit Court of Appeals in that I "do not see how disclosing protected materials to one adversary disadvantages another." [FN45] Thus, fairness is not determinative and a plaintiff must provide some other reason why the privilege protecting the work product of its opponent should be waived when that work product was confidentially disclosed to a law enforcement agency in its investigation. Plaintiff Saito has failed to provide such a justification in this instance. Instead, public policy seems to mandate that courts continue to protect the confidentially disclosed work product in order to encourage corporations to comply with law enforcement agencies.

> FN43. Courts have noted that it may be unfair for a party to make an assertion revealing only portions of privileged information without allowing that party to examine the circumstances and evidence supporting that assertion. *See, e.g., Tackett v. State Farm Fire & Casualty Co.*, 653

A.2d 254 (Del.1995) (stating that "[i]mplicit waiver also requires that the partial disclosure place the party seeking discovery at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information."); *Westinghouse Elec. Corp.*, 951 F.2d at 1426 n. 13 (finding that partial waiver may disadvantage adversary by allowing the disclosing party to present a one-sided story to the court).

> FN44. *Westinghouse Elec. Corp.*, 951 F.2d at 1426 n. 14 (rejecting fairness rationale as basis for refusing selective disclosure because "when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred.").

> FN45. *Id.* at 1430.

I must first determine whether McKesson HBOC had a reasonable expectation of privacy in its work product documents when it disclosed those documents to the SEC pursuant to a confidentiality agreement in the course of an investigation. If so, I must then determine whether to sanction that expectation. First, I find that McKesson HBOC did have a reasonable expectation of privacy in its disclosure to the SEC of documents secured by a confidentiality agreement. [FN46] As already noted, the work product doctrine exists to protect the fruits of attorney preparations from being used against their clients. When attorneys secure a confidentiality agreement before sharing their work product with the SEC, as McKesson HBOC's attorneys did, those attorneys can reasonably assume that the SEC would not reveal those confidential disclosures to other adversaries.

> FN46. For those documents not secured by a confidentiality agreement before disclosure, it follows that McKesson HBOC did not have any reasonable expectation of privacy.

**\*7** Although it can be argued that McKesson HBOC should not have had an expectation of privacy because some other courts have decided that such disclosures waive work product privilege, the courts of Delaware have not considered the issue. In fact, plaintiff, defendant, and the SEC alike fight this battle in this Court using weaponry borrowed almost exclusively from foreign jurisdictional battlefields

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

because Delaware's terrain is barren. The vigorousness of this clashing of swords suggests that the matter is far from settled even on foreign soil.

The resulting decisions cover the entire spectrum-from protection of work product in the absence of a confidentiality agreement to no protection of work product even when a disclosure was secured by a confidentiality agreement. The Eighth Circuit first established the selective waiver doctrine and protected work product disclosures made to the SEC during a private, nonpublic investigation, even without a confidentiality agreement in place.[FN47] The D.C. Circuit has since found that work product privilege could only be preserved if a confidentiality agreement is in place before the disclosure. [FN48] The Second, Third, Fourth, and Sixth Circuits have found that waiver of the privilege as to one opponent waives the privilege as to all when there is no confidentiality agreement in place.[FN49] Of these, some indicated that a confidentiality agreement may have changed the outcome of their decision.[FN50] Only two cases cited to this Court found that the privilege was waived even when the disclosure was subject to a confidentiality agreement. [FN51] Therefore, in light of conflicting but non-binding precedent, McKesson HBOC acted reasonably in expecting that its disclosures to the SEC under a confidentiality agreement would not reach the hands of its other adversaries.

> FN47. *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 611 (8th Cir.1978).

> FN48. *Permian Corp. v. United States,* 665 F.2d 1214, 1218 (D.C.Cir.1981) (upholding trial court's conclusion that a confidentiality agreement was in place before disclosures were made to the SEC and that this agreement prevented waiver of the work product privilege as to these documents).

> FN49. *See, e.g., In re Steinhardt Partners,* 9 F.3d 230, 236 (2d Cir.1993); *Westinghouse Electric Corp. v. Philippines,* 951 F.2d 1414, 1431 (3d Cir.1992); *In re Martin Marietta Corp.,* 856 F.2d 619 (4th Cir.1988) (as to non-opinion work product); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.,* 293 F.3d 289 (6th Cir.2002).

> FN50. *See In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1375 (D.C.Cir.1984)

(finding that to maintain confidentiality over work product, a corporation can simply refuse to disclose the work product or "the company can insist upon a promise of confidentiality before disclosure to the SEC."); *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 236 (2d Cir.1993) (rejecting selective waiver in most situations but cautioning that "[e]stablishing a rigid rule would fail to anticipate situations ... in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials."); *Westinghouse Electric Corp. v. Philippines,* 951 F.2d 1414, 1431 (3d Cir.1992) (rejecting selective waiver doctrine as a general rule but finding that the result may differ when the SEC is not adversarial *and* disclosures were made pursuant to a confidentiality agreement).

> FN51. *Westinghouse Electric Corp.,* 951 F.2d at 1431; *In re Columbia/HCA Healthcare Corp.,* 192 F.R.D. 575 (D.Tenn.2000).

Second, because McKesson HBOC reasonably believed that its disclosures would remain confidential, the remaining question is whether this Court should sanction an expectation of privacy when it arose from an attempt to cooperate with a law enforcement agency investigation. For the reasons discussed below, I believe the more prudent policy would be to recognize such expectations of privacy and hold that McKesson HBOC can therefore assert its work product privilege over Group A documents disclosed under a confidentiality agreement.

As noted earlier, Delaware courts vigorously protect work product and treat waiver as an extremely harsh result. Waivers are meant to punish those who do not protect the secrecy of their work product from adversaries during discovery but then wish to prevent that disclosed work product from being introduced as evidence at trial. Waivers are a penalty reserved for egregious abuses by the privilege holder. I fail to see how an attorney who confidentially discloses work product on behalf of her client pursuant to a law enforcement agency investigation can be accused of egregious abuse of this privilege.

**\*8** Of course, as other courts have noted, voluntary disclosure is often made to law enforcement agencies because there is already some benefit to be gained

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

from such a disclosure.[FN52] For example, corporations may cooperate with SEC investigations to avoid extended formal investigation and enforcement litigation, to receive more lenient treatment, and to narrow the investigated issues.[FN53] Although there is something to be gained from cooperation, the fact remains that cooperation requires the company to often divulge highly sensitive and incriminating information. There is a balance in place already-whether the corporation should air its dirty laundry in exchange for mercy or whether to force the law enforcement agency to do its own legwork (and possibly overlook or fail to discover some of the incriminating evidence) at the cost of more stringent treatment.

FN52. *In re Steinhardt Partners, L.P.,* 9 F.3d at 235-36.

FN53. *Id.*

When courts amplify the risk of disclosure to include future private plaintiffs, the scales begin to tip further in favor of corporate noncompliance with investigative agencies. A rigid rule leading to such an unwholesome trend seems unwise. Instead, a practical rule that would reduce the risk of secondary unintended disclosure to private plaintiffs from this initial balance would likely benefit both law enforcement agencies and the future private plaintiffs they were established to protect.

A selective waiver rule is such a rule that benefits law enforcement agencies, such as the SEC. Encouraging corporations to disclose their internal investigations confidentially allows the SEC to resolve its investigations expeditiously and efficiently. The SEC restricts its grants of confidentiality to situations where it has reason to believe that obtaining work product is in the public interest and will result in greater efficiency in the investigation.[FN54] When the SEC benefits from a substantial savings in time and resources, it resolves a higher volume of investigations.[FN55]

FN54. Br. of the United States SEC as *Amicus Curiae* at 2

FN55. For example, the SEC in its *amicus* brief asserts that it saved several hundred hours, used half the number of staff to investigate, and completed the investigation of McKesson much earlier than it would

have done without the confidential disclosure in this case. The SEC has also benefited from confidentially disclosed reports from other targets that saved the SEC approximately 29,000 hours of work and another report saving approximately $9 million. Br. of the United States SEC as *Amicus Curiae* at 15-16.

These benefits have an interesting spillover benefit for private plaintiffs as well. Because of the SEC's savings and efficiency, greater protection is afforded to the beneficiaries that it was designed to protect-investing shareholders such as plaintiff Saito. The SEC is the "agency principally responsible for the administration and enforcement of federal securities laws, which are designed to protect investors and the integrity of our capital markets." [FN56] When the SEC more efficiently protects the integrity of capital markets, shareholders benefit. In fact, plaintiff Saito, the shareholder contesting the confidentiality of this disclosure, has already benefited by McKesson HBOC's disclosure. Thus, the SEC and private litigants alike benefit from confidential disclosures because the integrity of the capital markets is preserved at a lower cost to society.

FN56. Br. of the United States SEC as *Amicus Curiae* at 1.

Undoubtedly it would provide private plaintiffs a strong tactical advantage to have open access to the trial preparations of their opponents. Plaintiff, however, has offered no justification for receiving such open access into the legal strategies and opinion work product of its opponent. Such an assertion is no different from the "have my cake and eat it too" mentality with which some jurisdictions charge disclosing parties. For example, in the context of selective waiver of the attorney-client privilege, the D.C. Circuit stated that
**\*9** [t]he client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.... The attorney-client privilege was not designed for such tactical employment.[FN57]

FN57. *Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir.1981).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 10

Although the attorney-client privilege is waived more easily than the work product privilege, a few jurisdictions have extended this policy to further justify a full waiver of the work product privilege.[FN58] Some courts admonish disclosing parties for desiring to maintain secrecy over their work product because they already benefited from the disclosure by receiving potential lenient treatment from law enforcement agencies. Thus, the courts reason, the disclosing party should not later complain that this benefit resulted in the unpleasant consequence of stripping the privilege protection of those documents as against any and all future adversaries. They reason that litigants cannot pick and choose adversaries because they cannot have their cake and eat it too.

FN58. E.g., Bowne v. Ambase Corp., 150 F.R.D. 465, 480 (S.D.N.Y.1993); In re Subpoenas Duces Tecum, 738 F.2d 1367 (D.C.Cir.1984); In re Steinhardt Partners, L.P., 9 F.3d 230 (2d Cir.1993).

And yet, this reasoning fails to note two things: 1) disclosing parties actually are not having their cake and eating it too; and 2) the private litigating parties are just as guilty of wanting to have their cake and eat it too. First, disclosing parties can hardly be characterized as having their cake and eating it too. Disclosures made to the SEC when the corporation is under investigation are not really akin to enjoying a dessert. A disclosure to the SEC does not absolve the corporation of liability for the acts disclosed. The corporation may hope to obtain leniency by disclosing, but it comes with a cost-airing the corporation's dirty laundry.

Second, litigating shareholders want to have their cake and eat it too: they want disclosing parties to continue disclosing to the SEC so they are better protected, while at the same time they want access to these disclosures for their own tactical advantage. Yet, these two desires are in tension with one another because to encourage the first, the second is necessarily discouraged. Imposing the harsh consequence of a waiver upon disclosing parties would discourage confidential disclosures. When the benefits of leniency from the SEC are uncertain, yet the burden of exposing a company's Achilles heel to a flood of adversaries is certain, corporations will be less likely to choose to disclose work product to the SEC. It seems inconsistent to deny a selective waiver rule and expect continued cooperation with law enforcement agencies when a confidential disclosure

is such a double-edged sword for the corporation.

Private lawsuits are an important part of the enforcement scheme, but the SEC is the governmental institution established as the first line of defense. I see no reason why we should not tip the scales in its favor when it will advantage all parties involved in some way, and will disadvantage none of them. Private lawsuits are not deterred by encouraging cooperation with the SEC, as private plaintiffs may still bring suit and have the same ability to acquire such work product if their need is great enough.

*10 Plaintiff Saito has asserted no other policy reason why I should reject a selective waiver rule in favor of allowing it to access the trial preparations of its adversary. A fundamental advantage of our adversary system is that attorneys are able to prepare their own cases without fear of such preparations being used against their clients. Although both parties to a dispute generally work with the same non-privileged underlying information, their attorneys digest, analyze and organize the material in different ways, resulting in their unique work product. This work product often includes their mental impressions, conclusions, opinions and legal theories.

Work product is protected because courts have determined that the adversarial system is better served when parties have access to only each other's factual information in discovery, not to their thought processes. As noted by Justice Jackson, "discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." [FN59] I know of no good reason why an opponent should borrow the wits of its adversary simply because that adversary was cooperating with a law enforcement agency. This outcome prevents both the SEC and the private plaintiffs from benefiting from confidential disclosures of work product rather than encouraging the benefits inherent in a selective waiver approach. It simply increases the cost of compliance with law enforcement agencies. [FN60] As noted by the Eighth Circuit it may also "have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers." [FN61]

FN59. Hickman v. Taylor, 329 U.S. 495, 516 (1947) (Jackson, J., concurring).

Not Reported in A.2d                                                                 Page 11
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN60. *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.,* 293 F.3d 289, 311 (6th Cir.2002) (Boggs, J., dissenting op.) ("The court's rule does nothing more than increase the cost of cooperating with the government.").

FN61. *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 611 (8th Cir.1978).

This is a simple rule to navigate as well. There is no line-drawing problem because law enforcement agencies are readily distinguishable from private plaintiffs. Although there may be problems inherent in treating different *private* plaintiffs differently, there is no reason why a court should not treat a law enforcement agency differently than private plaintiffs. Law enforcement agencies are different types of adversaries. When corporations become less adversarial with law enforcement agencies, this cooperation is in the investing public's best interest.

The only other substantial argument made in opposition to the selective waiver rule is that it does not further the purpose of the attorney work product privilege-to promote the adversary system. This purpose may not be furthered, but it is also not hindered. Because a confidentiality agreement would prevent the law enforcement agency from passing along privileged information to other private adversaries, the adversarial system is still protected. Thus, this last justification for rejecting a selective waiver rule when a confidentiality agreement is in place seems inadequate to override the strong public interest such a rule would serve. As noted above, such a rule does not disadvantage private plaintiffs-they are in the exact same position they would have been if no disclosure had been made. Further, private plaintiffs still have the same ability to discover the work product of their opponent if they can show that their need is great enough.

**\*11** Thus, because I find that it is in the best interests of the shareholders to encourage corporate compliance, and because the law enforcement agencies are designed by our legislature as the first line of defense for such shareholders, I adopt a selective waiver rule for disclosures made to law enforcement agencies pursuant to a confidentiality agreement. Confidential disclosure of work product during law enforcement agency investigations relinquishes the work product privilege only as to that agency, not as to the client's other adversaries. The selective waiver rule encourages cooperation with law enforcement agencies without any negative cost to society or to private plaintiffs.

Accordingly, I conclude that McKesson HBOC had a reasonable expectation of privacy in its disclosure of work product to the SEC under the protection of a confidentiality agreement. This expectation is one that this Court will sanction. Therefore, McKesson HBOC did not waive its ability to assert the work product privilege as to most of the documents within Group A. Five documents (7 and 9-12 on the First Privilege Log) were shown to the SEC before the confidentiality agreement and were not protected by it. Thus, defendants had no expectation of privacy as to these documents and have waived their work product privilege. These documents must be given to plaintiff Saito. The other documents within Group A will maintain their work product protection. The only remaining question, then, is whether plaintiff Saito has shown a substantial need for the remaining Group A documents.

b. Overcoming Work Product Privilege

As noted above, there are two types of work product: non-opinion (factual/historical) work product and opinion work product. Each type of work product has its own standard of protection under Delaware law. A party may receive non-opinion work product when the party has a *substantial need* for the materials and the party cannot acquire a substantial equivalent of the materials by other means without *undue hardship.*FN62 A party may receive opinion work product when it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling.*FN63

FN62. Del. Ct. Ch. R. 26(b)(3).

FN63. *Tackett,* 653 A.2d at 262. This Court has only found two instances where mental impressions have been granted to opposing parties. The limited situations include a claim of bad faith against an insurance company, *see id.,* and the circumstances surrounding the approval of a settlement agreement by the defendant when the result of the agreement would be the elimination of claims by the plaintiff. *See Fitzergald v. Cantor,* 1999 Del. Ch. LEXIS 10 at \*11-\*14 (Del. Ch. January 28, 1999). In light of this, it is obvious that Delaware law protects opinion work product in all but the most compelling circumstances where those

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
(Cite as: Not Reported in A.2d)

mental impressions are crucial to the pivotal issue in the litigation and no other means of proving that issue exists.

### 1. Non-Opinion Work Product

Under <u>Chancery Court Rule 26(b)(3)</u>, a party may discover non-opinion work product if it shows it has a *substantial need* for the materials and it cannot acquire a substantial equivalent without *undue hardship*. The documents appearing to contain historical or fact information but no mental impressions, theories, or opinions are items 9-16, 23-25, 30-65, 67-73, 76-79, 81-101, 106-114 on the First Privilege Log and the letter dated 11/19/99 on Fourth Privilege Log.

Plaintiff has failed to meet the substantial need/undue hardship test in this instance. In his opening brief, plaintiff applies the *Garner* factors to the work product, even though this Court has held that there is no *Garner* exception to the work product privilege.[FN64] Of the twenty pages in this brief, only one paragraph is even dedicated to establishing Saito's need/hardship. Plaintiff limits his "proof" that he has a substantial need for the challenged documents to a conclusory statement that they are "necessary to his determination of Defendant's actions regarding the acquisition of HBOC and what fiduciary duties were breached in that transaction." [FN65] Undue hardship is based upon plaintiff's assertion that the "documents are available from no source other than Defendant." [FN66]

> FN64. *In re Fuqua Industries, Inc. S'holders Litig.*, 2002 Del. Ch. LEXIS 52 at *20 (Del. Ch. May 2, 2002).

> FN65. Pl.'s Op. Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 15.

> FN66. *Id.*

**\*12** Further, in his reply brief, plaintiff is similarly inattentive to the substantial need/undue hardship test. For Group A documents, Saito relies solely on the argument that work product protection was waived. Even giving Saito the benefit of an inferential leap by treating the documents as Group C documents,[FN67] Saito still fails to establish his substantial need/undue hardship. In his twenty-five page reply brief, plaintiff limits his substantial need argument to a statement that the documents "involve

discussion of the core matters Plaintiff is investigating." [FN68] Plaintiff provides no analysis of whether the challenged Group A documents fit the profile of such discussions, or even whether the documents in question were created before the challenged merger took place. Also, his undue hardship argument is limited to stating that "[t]here is no other way for Plaintiff to obtain the information contained in those [documents]." [FN69] Because plaintiff has failed to adequately assert his substantial need for these documents, Saito's motion to compel production of these documents is denied.

> FN67. Because the distinction of Group A documents (those disclosed to the SEC) disappears when the waiver argument fails, the documents should then be treated as no different from those in Group C (post-merger legal advice).

> FN68. Pl.'s Reply Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 17.

> FN69. *Id.*

### 2. Opinion Work Product

Opinion work product includes the "mental impressions, conclusions, opinions and legal theories of a party's attorney" and is only discoverable when the requesting party shows it is directed to the pivotal issue in the current litigation and the need for the information is compelling.[FN70] The documents appearing to contain mental impressions and opinion work product are items 7, 17-21, 26-29, 66, 74-75, 80, 102-105 on the First Privilege Log.

> FN70. *Tackett v. State Farm Fire & Casualty Co.*, 653 A.2d 254, 262 (Del.1995).

Just as Saito has failed to establish his substantial need/undue hardship for non-opinion work product, he has similarly failed to meet the higher burden required to receive opinion work product. Thus, the motion to compel these documents is denied.

### c. Attorney-Client Privilege

The attorney-client privilege is based upon <u>Rule 502(b) of the Delaware Rules of Evidence</u>. This

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 13

privilege protects communications made for the purpose of facilitating the rendition of professional legal services.[FN71] The privilege belongs to the client, and may be waived expressly or implicitly.[FN72] Waiver of one privilege does not necessarily waive another privilege, however, because the purposes behind each privilege are different.[FN73] I do not need to address attorney-client privilege in relation to most of the documents in Group A because they are protected by the work product doctrine and are subject to the analysis above, with the exception of document number seven on the First Privilege Log.

FN71. *Id. at* 259.

FN72. *Id.*

FN73. *Id.* at 260 (For example, "[w]aiver of the attorney-client privilege does not automatically relinquish the protection provided by the work product doctrine."); *Merisel, Inc. v. Turnberry Capital Mgmt., L.P.,* WL 252724 at *4 (Del. Ch. Apr. 20, 1999).

Because document number seven was disclosed to the SEC prior to the issuance of a confidentiality agreement, McKesson HBOC manifested its intent for the document not to remain confidential. Thus, it waived its attorney-client privilege as to this document.

*B. Pre-Merger Legal Advice*

Seven documents are sought under Group B. Defendant asserts attorney-client privilege on behalf of all seven. The second document on the third privilege log also contains a defense of work product and non-responsiveness to the claim. The privilege log description states that the document contains legal advice concerning the Amerisource litigation. This is a rather cryptic description, and it is unclear why plaintiff desires this information. Before I rule on this document, I ask defendant to produce the document(s) to me for an *in camera* inspection. The other documents will be addressed now.

**\*13** I grant the motion to compel production as to the documents relating to pre-merger legal advice as listed on the third privilege log, with the exception just stated concerning the Amerisource document. I base my decision on application of the well-known *Garner*[FN74] factors.

FN74. 430 F.2d 1093 (5th Cir.1970). I am, obviously, assuming (without deciding) that the pre-merger legal advice documents are protected by the attorney-client privilege. I hold only that Mr. Saito is entitled to access to the pre-merger documents because his status as a stockholder derivative plaintiff provides a mutual interest with McKesson. *See In re Fuqua Indus., Inc. S'holder Litig.,* 2002 WL 991666 at *4 (Del. Ch.).

In *Deutsch v. Cogan,*[FN75] this Court held that "if the corporation objects to discovery and successfully establishes that the material sought is a confidential communication as to legal services between it and its attorney, then discovery is not authorized, unless the plaintiff stockholder seeking discovery shows 'good cause' why the privilege should not attach."[FN76] *Garner v. Wolfinbarger*[FN77] provides "a non-exclusive list of factors for a Court to consider in deciding if 'good cause' exists."[FN78] The *Garner* factors relevant in a books and records action are:

FN75. 580 A.2d 100, 107 (Del.Ch.1990).

FN76. *Id.*

FN77. 430 F.2d 1093 (5th Cir.1970).

FN78. *Deutsch,* 580 A.2d at 107.

"(i) the number of shares owned by the shareholder and the percentage of stock they represent;
(ii) the assertion of a colorable claim;
(iii) the necessity of the information and its unavailability from other sources;
(iv) whether the stockholder has identified the information sought and is not merely fishing for information; and
(v) whether the communication is advice concerning the litigation itself."[FN79]

FN79. *Grimes v. DSC Communications Corp.,* 724 A.2d 561, 568 (Del.Ch.1998).

Of these five factors, I place the least weight on (i). Granted, plaintiff owns minimal stockholdings, but that factor is not dispositive in determining whether good cause has been shown. Only if no other factor supports good cause will the ownership factor come

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 14
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

into play. Therefore, I turn to factors (ii)-(v).

Plaintiff clearly asserts a colorable claim. As stated in this Court's earlier opinion:

The examination and inspection of the books and records demanded herein is requested for the purpose of enabling Mr. Saito, through his duly empowered attorneys: (1) to further investigate breaches of fiduciary duties by the boards of directors of HBO & Co., Inc., McKesson, Inc., and/or McKesson HBOC, Inc. related to their oversight of their respective company's accounting procedures and financial reporting; (2) to investigate potential claims against advisors engaged by McKesson, Inc. and HBO & Co., Inc. to the acquisition of HBO & Co., Inc. by McKesson, Inc.; and (3) to gather information relating to the above in order to supplement the complaint in *Ash v. McCall, et al., 2000 Del. Ch. LEXIS 144,* C.A. No. 17132 in accordance with the September 15, 2000, Opinion of the Court of Chancery of Delaware.[FN80]

> FN80. *Saito v. McKesson HBOC, Inc.,* 2001 Del. Ch. LEXIS 96 at *4 (Del. Ch. July 10, 2001).

To summarize, plaintiff's purpose is to recoup any investment loss that may have been the result of breaches of fiduciary duty. Plaintiff seeks books and records to determine if there was wrongdoing involved with the merger, which is a colorable claim.

The pre-merger legal advice is necessary to plaintiff's claim, and cannot be obtained elsewhere. Defendants assert that only financial advice is necessary for plaintiff to achieve his stated purpose. Plaintiff's purpose, however, is to determine what the board knew when approving the merger. The legal advice given to the board in conjunction with the merger is relevant and necessary in determining what information the board relied upon. This information, considered by the board before the merger, is not obtainable elsewhere. Therefore, plaintiff satisfies the third factor.

*14 The fourth factor is also met. Plaintiff seeks the legal advice given to the board prior to or in connection with the merger. This information is specific and relevant to plaintiff's stated purpose of determining whether wrongdoing occurred in connection with the merger.

The advice is also not addressed to the litigation

itself, because the litigation had not commenced and the merger was not yet complete when the disputed advice was given. The purpose behind the advice was to aid the decision making of the board with respect to the merger. The fifth factor thus is met.

Plaintiff has shown a colorable claim, that the information is necessary and otherwise unobtainable, and that it specifically listed the desired information. The advice does not concern the pending litigation. Because plaintiff has shown good cause, I grant his motion to compel production of the pre-merger legal advice.

### *C. Post-Merger Legal Advice*

Twenty-three documents relating to post-merger legal advice are sought here in Group C. Defendant asserts attorney-client privilege and work product protection on all documents. For the reasons that follow, I deny the motion to compel with respect to these documents.

To rebut the privilege, plaintiff must show good cause, as delineated above. In this instance, plaintiff fails to satisfy factors (iii) and (v), and that is enough to deny a finding of good cause. Plaintiff has obtained the necessary underlying information through documents previously provided to him by defendant during discovery. Plaintiff does not have a right to defendant's legal analysis of that same information.

Defendant's legal analysis is also related to the litigation at hand. The improprieties at issue were discovered post-merger. At that point, defendant obtained legal advice to prepare for the ensuing litigation. To grant plaintiff access to this information, in my opinion, would be improper.

Plaintiff is also denied the post-merger legal advice under the work product doctrine. Work product is information assembled by an attorney in anticipation of litigation.[FN81] Work product provides a broader protection than attorney-client privilege since it includes more than just communications with the client.[FN82] To obtain work product, plaintiff must show a substantial need for the information and the inability to obtain it without undue hardship. [FN83]

> FN81. *Lee v. Engle,* 1995 Del. Ch. LEXIS 149 at *11 (Del. Ch. Dec. 15, 1995).

Not Reported in A.2d                                                                 Page 15
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN82. *Id.* at *12.

FN83. *Grimes,* 724 A.2d at 570.

The documents in question are work product [FN84] because they were prepared by attorneys in anticipation of litigation. As discussed above, plaintiff already possesses the necessary information through other discovery provided by defendant. Because plaintiff has not shown a substantial need and undue hardship, I deny the motion to compel production of the twenty-three post-merger legal advice documents in Group C.

FN84. The Agenda dated 1/27/99 on the Fourth Privilege Log is not work product because it was created before the events leading to the litigation occurred. This document, however, is still protected under the attorney-client privilege.

*D. Post-Merger In-House Counsel Documents*

Plaintiff seeks six documents generated by in-house counsel. These six documents concern press relations, preservation of documents, and requests for information. Defendant asserts attorney-client privilege and work product protection. It also denies that the documents have any relevance to plaintiff's claims. Plaintiff makes the same arguments regarding these six documents as he does regarding the post-merger legal advice documents under Group C.

**\*15** Plaintiff's arguments with respect to privilege and work product fail for the same reasons stated above. Even if plaintiff showed good cause, substantial need, and undue hardship, however, the documents do not appear related to plaintiff's claims or purposes. In-house counsel created these documents to handle the non-substantive yet important issues related to McKesson being in litigation: dealing with the press, requests for information, and preservation of documents. None of these documents relate to plaintiff's purpose in determining if board members violated their fiduciary duties when they recommended and approved the merger. Plaintiff's motion to compel production of the in-house counsel documents is denied.

## II. CONCLUSION

For all the reasons stated above, I grant the motion to compel with respect to the documents disclosed to

the SEC prior to the confidentiality agreement: documents 7 and 9-12 on the First Privilege Log. I also grant the motion to compel with respect to the pre-merger legal advice documents in Group B: documents 1, 3-7 on the Third Privilege Log. I request defendant to deliver document 2 on the Third Privilege Log to my chambers for an *in camera* inspection.

I deny the motion to compel as to the remaining Group A documents: documents 13-21, 23-114 on the First Privilege Log and the letter dated 11/19/99 on the Fourth Privilege Log. I also deny the motion to compel as to the post-merger legal advice in Group C: documents 1 and 22 on the First Privilege Log, all documents on the Second Privilege Log, and the agenda dated 1/27/99 on the Fourth Privilege Log. Finally, the motion to compel is denied as to the post-merger in-house counsel documents in Group D: documents 2-6 and 8 on the First Privilege Log, documents dated 5/14/99 and 5/20/99 on the Fourth Privilege Log.

IT IS SO ORDERED.

Del.Ch.,2002.
Saito v. McKesson HBOC, Inc.
Not Reported in A.2d, 2002 WL 31657622 (Del.Ch.)

END OF DOCUMENT

**TAB 9**

LEXSEE 2004 US DIST LEXIS 24545

**SECURITIES AND EXCHANGE COMMISSION, Applicant, v. R.J. REYNOLDS TOBACCO, HOLDINGS, INC., Respondent.**

**Misc. Action No. 03-1651 (JDB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2004 U.S. Dist. LEXIS 24545; Fed. Sec. L. Rep. (CCH) P93,034*

**June 29, 2004, Decided**

**DISPOSITION:** SEC's application for order to show cause and to require obedience to its subpoena duces tecum and RJR's motion for protective order granted in part and denied in part.

**COUNSEL:** [*1]  Counsel for applicant: Suzanne J. Romajas, Securities and Exchange Commission, Washington, DC.

Counsel for respondent: Adrian Wager-Zito, Jones Day, Washington, DC; David B. Alden, JONES, DAY, REAVIS & POGUE, Cleveland, OH.

**JUDGES:** JOHN D. BATES, United States District Judge.

**OPINION BY:** JOHN D. BATES

**OPINION:**

### MEMORANDUM OPINION

Presently before the Court are the application of the Securities and Exchange Commission ("SEC") for an order to show cause and to require obedience to its subpoena duces tecum ("Subpoena"), and the motion of respondent R.J. Reynolds Tobacco Holdings, Inc. ("RJR") for a protective order. For the reasons that follow, the Court will grant in part and deny in part both the SEC's application and RJR's motion.

### BACKGROUND

On June 24, 2003, pursuant to Sections 21(a) and 21(b) of the Exchange Act, *15 U.S.C. § 78u(a)* and *(b)*, the SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony in an investigation captioned as In the Matter of R.J. Reynolds Tobacco Holdings, Inc. See Hagerup Decl., Ex. 1. Thereafter, on July 3, 2003, the SEC issued an administrative subpoena duces tecum directing [*2]  RJR to produce

certain documents and to provide testimony regarding certain matters pursuant to the June 24, 2003, order. See id., Ex. 2. Specifically, the Subpoena requires RJR to produce documents responsive to the following nine requests regarding "tobacco-related litigation costs":

1. All documents related to R.J. Reynolds' consideration given to disclosure of tobacco-related litigation costs and the effects of such costs on operating results, liquidity or other common measures used to evaluate operating results and liquidity, including but not limited to, all documents that were provided to R.J. Reynolds' officers, directors and senior executives.

2. All documents that describe, summarize or identify tobacco-related litigation costs or the effects of tobacco-related litigation costs on operating results, liquidity or other common measures used to evaluate operating results and liquidity, including without limitation all such documents provided to R.J. Reynolds' officers, directors and senior executives, and all such documents prepared in connection with R.J. Reynolds' financial statements or its financial performance, financial reporting or financial planning. [*3]

3. All documents sufficient to identify tobacco-related litigations. For each such litigation, provide all documents that identify the total costs and expenses incurred by R.J. Reynolds on a monthly, quarterly and annual basis.

4. All documents, including, but not limited to, Excel spreadsheets, that contain

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

information pertaining to tobacco-related litigation costs that have been included in R.J. Reynolds' LAS Access database.

5. All reports generated from R.J. Reynolds' LAS Access database that show the yearly, quarterly and monthly costs associated with each tobacco-related litigation matter or case.

6. All monthly, quarterly and yearly General Ledger detail reports for all tobacco-related litigation cost centers, including, but not limited to, Cost Centers 807 and 808.

7. All monthly, quarterly and yearly General, Administrative and Entertainment ("GAE") detail reports that contain tobacco-related litigations costs.

8. All monthly, quarterly and yearly Selling, General and Administrative ("SG&A") detail reports that contain tobacco-related litigation costs.

9. All monthly, quarterly and yearly budget forecasts or reports related to R.J. Reynolds' [*4] tobacco-related litigation costs.

Subpoena Att. at 2-3, SEC Applic., Ex. 2.

These nine requests fall into four general categories: (1) documents that quantify RJR's present and historical litigation fees and expenses on a monthly, quarterly and annual basis for each tobacco-related litigation (Req. Nos. 3, 4, and 5); (2) documents that quantify RJR's forecasted budget for litigation fees and expenses (Req. No. 9); (3) documents that concern the effect of such fees and expenses on various measures of RJR's financial condition (Req. Nos. 6, 7, and 8); and (4) documents that reflect the consideration given by RJR management to RJR's disclosure of such information (Req. Nos. 1 and 2). n1

n1 The SEC originally broke the nine requests into three categories that did not differentiate between the historical and forecasted costs for tobacco-related litigation. See SEC Applic. at 1.

Over the course of discussions between the SEC and RJR, the SEC agreed to narrow the definition of "to-

bacco-related litigations" [*5] to exclude from the Subpoena's scope any responsive documents relating to litigations under the antitrust or employment laws or that otherwise concern non-smoking or non-health issues. See Hagerup Decl., Exs. 8-10. The SEC also clarified that its focus is primarily quantitative in nature; it seeks documents reflecting dollar amounts spent by RJR on attorney fees and expenses in its tobacco-related litigations and the impact on RJR's financial condition, not documents that detail the substance of the work performed by RJR's attorneys. See id., Ex. 11.

The SEC claims that RJR has failed to comply fully with the Subpoena. According to the SEC, RJR initially produced a total of eleven documents in response to the Subpoena, n2 none of which contained quantitative fee and expense data or reflected the impact of such data on RJR's financial condition. SEC Applic. at 1; see also Hearing Transcript (January 8, 2004) at 5, 11. 2-5 (hereinafter "Tr."). On January 7, 2004, RJR produced to the SEC a document that contains the aggregate annual amounts spent on outside counsel and on other external items in RJR's tobacco-related litigations. The aggregate number produced in that document [*6] does not include any in-house costs for RJR's tobacco-related litigations. n3 As responses to Requests Nos. 6, 7, and 8, the SEC states that it is not completely satisfied that the documents so far produced by RJR are sufficient to comply with those requests. See Status Report by the SEC (January 15, 2004) at 1. The SEC represents, however, that it will consider that RJR has satisfactorily complied with Requests Nos. 6, 7, and 8 if RJR produces: (1) the monthly GAE and SG&A numbers for 1998 and the first half of 1999, and (2) the sub-ledger that it uses to reconcile its litigation-related fees and expenses to the GAE line item on its general ledger. Id.

n2 Four of the eleven documents reflect RJR's communications with the staff of the SEC's Division of Corporation Finance in late 2002 and early 2003 and address the issues on which Corporation Finance was focused during that period. One document is a printout of an RJR ledger for the periods ending December 31, 1998 through June 30, 2003, revealing the amount of RJR's total general administrative expenses and its total selling, general and administrative expenses for each month of the covered period. Six of the documents are charts that list, for the periods ended December 31, 1998 through June 30, 2003, an abbreviated case name, along with the date the complaint was served in that case, the jurisdiction where the case is pending, and the generic "category" into which RJR has classified the case. See SEC Opp. and Reply at 2.

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

[*7]

n3 Subsequent to the motions hearing held on January 8, 2004, counsel for the parties made a joint submission to this Court clarifying the description of the document produced by RJR on January 7, 2004, and fine-tuning representations made by counsel during the hearing. See Joint Status Report (January 30, 2004).

RJR acknowledges that it possesses other documents that are responsive to the Subpoena, but refuses to produce them on the grounds that they are protected from disclosure by the work product doctrine or the attorney-client privilege, or that they contain commercially sensitive information meriting confidential treatment. On August 14, 2003, the SEC filed an application in this Court for an order to show cause and to require RJR's obedience to the Subpoena. In response, RJR filed a motion for a protective order and its opposition to the SEC's application on August 29, 2003. A hearing was held on January 8, 2004.

**DISCUSSION**

RJR contends that certain documents that may be responsive to the SEC Subpoena are protected by privilege, including the work product doctrine -- specifically [*8] as opinion work product -- and attorney-client privilege. n4 RJR also maintains that it has made clear on repeated occasions that it is willing to produce non-privileged documents and reports responsive to all nine of the SEC Subpoena's Requests, to the extent that they exist. Nevertheless, RJR refuses to produce such documents absent reasonable confidentiality protections above and beyond those normally in place to protect confidential information from disclosure in an investigation conducted by the SEC. The SEC responds that the documents it seeks from RJR are not protected by privilege and that RJR has failed to demonstrate that any of the documents at issue qualify for confidential treatment beyond that which is normally accorded in an SEC investigation. The Court will address each argument in turn.

n4 RJR notes that the claims of attorney-client privilege largely overlap with its opinion work product protection claims. Accordingly, because the opinion work product protection is "broader than the attorney-client privilege", see *Linde Thomson Langworthy Kohn & Van Dyke P.C. v. R.T.C., 303 U.S. App. D.C. 316, 5 F.3d 1508, 1515 (D.C. Cir. 1993)*, RJR focuses its arguments on the opinion work product doctrine. See RJR Mot. and Opp. at 19 n. 15. The Court

therefore likewise focuses its analysis on the opinion work product doctrine and will refer to this entire category of argument loosely under the term "privilege."

[*9]

**I. Privilege**

The SEC asserts that its Subpoena seeks only documents that contain "quantitative data reflecting the dollar amounts spent by RJR on tobacco-related litigations and management's consideration of the impact that such data has on various measures of RJR's financial condition," and that it made clear to RJR that any descriptions of work performed by RJR's counsel need not be produced and could be redacted from otherwise responsive documents such as outside counsel's billing statements. SEC Applic. at 15. RJR argues that its documents containing information on the actual or budgeted litigation expenses for individual and aggregated tobacco-related matters are protected from disclosure by the work product doctrine because of the unique nature of the litigation threats that RJR faces and because the SEC's Subpoena seeks much more than merely aggregate quantitative data.

The work product privilege protects from disclosure the work of an attorney prepared in anticipation of litigation. *In re Sealed Case, 330 U.S. App. D.C. 368, 146 F.3d 881, 884 (D.C. Cir. 1998)*. The Supreme Court first articulated the principles undergirding the work product privilege in *Hickman v. Taylor, 329 U.S. 495, 509-14, 91 L. Ed. 451, 67 S. Ct. 385 (1947)*. [*10] There, the Court observed that

it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. . . . Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

interests of the clients and the cause of justice would be poorly served.

*Id. at 510-11.* The work product privilege was subsequently codified in *Fed. R. Civ. P. 26(b)(3).* Courts now analyze the work product doctrine under two rubrics: fact work product and opinion work product. Fact work product can be discovered on a showing of both a substantial need [*11] and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship. *In re Grand Jury Proceedings, 33 F.3d 342, 348 (4th Cir. 1994)* (citing *In re John Doe, 662 F.2d 1073, 1078 (4th Cir. 1981)*, cert. denied, *455 U.S. 1000, 71 L. Ed. 2d 867, 102 S. Ct. 1632 (1982)*). Opinion work product, on the other hand, represents the actual thoughts and impressions of the attorney, enjoys a nearly absolute immunity, and can only be discovered in rare and extraordinary circumstances. *33 F.3d at 348.*

The D.C. Circuit has articulated the "testing question" for the work product privilege as "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *In re Sealed Case, 146 F.3d at 884* (quoting *Senate of Puerto Rico v. U.S. Dep't of Justice, 262 U.S. App. D.C. 166, 823 F.2d 574, 586 n. 42 (D.C. Cir. 1987)*). If so, and the document embodies the mental impressions and thoughts of the attorney, then discovery of that document should generally be denied. *In re Allen, 106 F.3d 582, 607 (4th Cir. 1997).* [*12] However if, on the other hand, the documents are prepared by lawyers "in the ordinary course of business or for other nonlitigation purposes," the work product privilege is not applicable. *In re Sealed Case, 146 F.3d at 887* (quoting *Linde Thomson Langworthy Kohn & Van Dyke, 5 F.3d at 1515*). And if opinions and theories about the litigation are only part of a document otherwise discoverable, the court may require production of a redacted copy. *Nat'l Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc., 967 F.2d 980, 985 (4th Cir. 1992).*

The parties agree that the four categories of documents at issue are those that contain: (1) the actual historical and present litigation-related costs incurred by RJR on an aggregate and case-by-case basis (Req. Nos. 3, 4, and 5); (2) forecasted or budgeted litigation expenses on a monthly, quarterly, and annual basis (Req. No. 9); (3) comparisons of litigation costs to various other financial thresholds (Req. Nos. 6, 7, and 8) on a monthly, quarterly, and annual basis; and (4) the information provided to RJR's management about the effects of litigation costs on the company's financial [*13] condition (Req. Nos. 1 and 2). RJR represented at the hearing on January 8, 2004, that it no longer seeks to assert

privilege for documents falling into the first category that reflect aggregated figures. Tr. at 17, ll. 20-22, and 18, ll. 2-3, and 54, ll. 9-10. RJR stated that, instead, it seeks protection only for documents falling into category 1 that reflect case-by-case figures. Furthermore, because RJR has produced several documents in response to Requests Nos. 6, 7, and 8, the only documents in category 3 that are still at issue are the monthly GAE and SG&A numbers for 1998 and the first half of 1999, and the sub-ledger that RJR uses to reconcile its litigation-related fees and expenses to the GAE line item on its general ledger. See discussion supra at 4; Status Report by the SEC (January 15, 2004) at 1. RJR also indicated at the January 8, 2004, hearing that it no longer seeks to assert privilege for category 4 documents that reflect annual aggregate figures. RJR reiterated, however, that it is continuing to assert privilege for all documents that fall into category 2 -- i.e., the forecasted or budgeted expense information sought by the SEC in Request No. 9 of its Subpoena. [*14] In sum then, RJR seeks to protect as privileged: the documents or materials within category 1 that are presented on a case-by-case basis; the few documents still at issue within category 3 (the monthly GAE and SG&A numbers for 1998 and the first half of 1999, and the sub-ledger that RJR uses to reconcile its litigation-related fees and expenses to the GAE line item on its general ledger); documents within category 4 that reflect RJR's litigation costs presented on a case-by-case, monthly or quarterly -- but not aggregated annual -- basis; and all documents within category 2. The Court now turns to an assessment of those privilege claims.

## A. Expense Data Aggregated at Sub-Annual Levels (Categories 3 and 4)

RJR asserts that litigation-related expenses that are aggregated on a monthly or even quarterly basis are privileged even though RJR has conceded that annually-aggregated figures are not. RJR argues that the specificity of aggregated figures increases as the periods over which they are calculated decrease; RJR's concern is that its litigation adversaries might be able to "reverse engineer" what is happening in specific cases to discern the impact that they are having on the [*15] litigation costs incurred by RJR. Tr. at 19, ll. 3-8. As counsel explained at the January 8 hearing, "as soon as you start slicing [the aggregated expense figures], you get closer and closer to things from which people can divine what they're doing [to RJR]." Id. at 47, ll. 24-25, and 48, l. 1. Counsel for RJR admitted, however, that the distinction between the quarterly and monthly aggregate expense figures (for which it asserts privilege) and the annually-aggregated figures (for which it does not) is simply a "matter of degree." Id. at 48, l. 7.

In order to qualify for protection as work product, the materials and information at issue must have been

Case 1:05-cv-00499-JJF    Document 201-3    Filed 04/27/2007    Page 27 of 38

Page 5

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

prepared in anticipation of litigation and, in order to qualify for the heightened protection afforded to opinion work product, those materials and information must reveal the thoughts and opinions of the attorney. RJR argues vigorously that it faces a wide range of litigation adversaries who litigate against it for the express purpose of causing it to incur litigation expenses, which they hope will force RJR to raise the prices of its products or perhaps cease doing business altogether. RJR contends that this renders [*16] information about its litigation expenditures, that might otherwise not be considered sensitive, to be of special moment to its adversaries; the quantitative data would allow RJR's litigation adversaries to see how RJR's attorneys have considered and responded to their efforts, as well as provide a detailed account of the effectiveness of efforts to force RJR to incur additional litigation costs. Having conceded that the annual aggregate figures responsive to Requests Nos. 1 - 8 are not privileged, however, RJR has failed to point to anything in the record -- including the unique nature of the hostile litigation situation that RJR faces -- that can support the proposition that quarterly aggregate information reveals the mental impressions of attorneys when annual aggregate information does not. See Tr. at 54, 11. 14-21, and 56, 11. 17-20.

Furthermore, RJR contends that it is a "misconception that the only thing that can be work product is that which is prepared in anticipation of litigation." Id. at 49, 8-10. It is RJR's position, relying on the Eight Circuit's discussion and holding in *Simon v. G.D. Searle & Co., 816 F.2d 397 (8th Cir. 1987)*, that while ordinary [*17] work product must be prepared in anticipation of litigation, opinion work product is not subject to the same definitional requirement. Id., 11. 22-25. No other support for this proposition is offered, and upon a careful review of Simon, the Court disagrees with RJR. The Eighth Circuit held in Simon that while certain documents were not themselves prepared in anticipation of litigation, information contained therein was privileged as opinion work product because that information, which the Court concluded revealed the mental impressions of its preparing attorney, was "by [its] very nature . . . prepared in anticipation of litigation." *816 F.2d at 401*. The Eighth Circuit's holding distinguishes between documents prepared in anticipation of litigation and information prepared in anticipation of litigation; the court's reasoning, however, does not release the subject of opinion work product protection from the requirement of having been prepared in anticipation of litigation. Here, the record does not establish that either the documents reflecting aggregated historical litigation costs or the information itself was prepared in anticipation of litigation [*18] or would reveal attorney mental impressions and opinions.

Indeed, RJR has dropped its assertion of privilege for the annual aggregated figures sought in the SEC's Requests Nos. 1 - 8, and has effectively conceded that the information and materials that fall into categories 1, 3, and 4 as they have been defined for the purpose of this discussion are not by their very nature "prepared in anticipation of litigation." Having failed to support the proposition that historical litigation costs that are aggregated on a sub-annual level, or even presented on a case-by-case basis, are inherently distinct from those that are aggregated on an annual level, RJR has failed to establish that this information should be protected from disclosure to the SEC on the basis of privilege. n5 Finally, the fact that aggregated historical litigation cost information may have been provided to RJR management would not imbue it with attorney-client or work product protection it otherwise does not have.

n5 Counsel for RJR candidly stated at the hearing on January 8, 2004, in response to questioning on the distinction between annual aggregate historical cost figures and similar figures calculated at sub-annual levels, that "I'm defeated." Tr. at 56, 1. 23.

[*19]

**B. Budgeted Expense Data (Category 2)**

The SEC's Request No. 9 seeks all monthly, quarterly, and annual budget forecasts or reports related to RJR's tobacco-related litigation costs on both an aggregate basis and a case-by-case basis. This Court has, in the past, observed that while fee and billing information is the sort of communication between an attorney and his client that is not covered by an attorney-client privilege, it is possible that information regarding attorney-client fee arrangements may contain matters that may be covered by the work product doctrine. In re Grand Jury Proceedings, 201 F. Supp.2d 5, 13 (D.D.C. 1999). Relying on the Eighth Circuit's holding in Simon, RJR argues that all information and documents responsive to this request are protected by the opinion work product privilege. According to RJR, litigation budgeting and forecasts, whether on an aggregate, matter/type, or case-specific level, directly reveal the thoughts and mental impressions of RJR's attorneys regarding the anticipated direction of the litigation and RJR's anticipated responses, including which matters RJR believes pose the most significant risk, which matters RJR [*20] believes will proceed to trial, and which matters RJR believes will be disposed of in other ways. See Blixt Decl. at P 8.

The court in Simon protected from disclosure individual case reserve figures calculated by the defendant company's attorneys. The Eighth Circuit reviewed the

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

nature of the case reserves as assembled by the company and noted that they embodied the attorneys' estimate of anticipated legal expenses, settlement value, length of time to resolve the litigation, and geographic consideration, among other factors. *816 F.2d at 400-01*. The court then examined the use the company made of those figures, observing that "the aggregate reserve information in the risk management documents serves numerous business planning functions, but we cannot see how it enhances the defense of any particular lawsuit." *Id. at 401*. The court then distinguished the individual case reserve figures from the aggregate figures and concluded that:

> The individual case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation and, [*21] consequently, they are protected from discovery as opinion work product. We do not believe, however, that the aggregate reserve information reveals the individual case reserve figures to a degree that brings the aggregates within the protection of the work product doctrine. The individual figures lose their identity when combined to create the aggregate information.

*Id. at 401-02* (internal citations omitted).

Here, RJR's General Counsel testified in his declaration that, like the litigation reserve figures in Simon, the monthly, quarterly, or yearly budget forecasts for pending and anticipated litigation matters embody the estimates of anticipated litigation expenses that are based on the latest observations and impressions about various cases, by himself, attorneys under his supervision, and RJR's outside counsel. Those estimates are based on factors that include: the firm selected as lead counsel, the expected length of the litigation, the number of lawyers needed to staff the case, the jurisdiction of the litigation, the novelty or complexity of the issues presented, recent court rulings, and the likelihood of dismissal of the case, as opposed to a [*22] prolonged discovery period or trial. Blixt Decl. P 3.

The first question to be considered in determining whether such budgeted expense information is protected as work product is whether it was prepared in anticipation of litigation. As the Simon court observed, "[a] business corporation may engage in business planning on many fronts, among them litigation." *816 F.2d at 401*. Indisputably, budgets in general are business planning

tools. The question is whether, nevertheless, the budgeted figures at issue here are, by their nature, information prepared in anticipation of litigation and thus revealing the litigation-related thoughts and opinions of RJR's attorneys. The SEC points out that RJR's budgeted litigation cost figures can be distinguished from the litigation reserve figures in Simon because the reserve figures in Simon took into account the estimated amounts the company might have to pay out in judgments and settlements, while RJR's forecasted cost figures do not; n6 instead, they are based on the forecasted costs of paying RJR's attorneys. While appreciating the distinction, the Court nevertheless concludes that RJR's budgeted cost figures -- on a [*23] case-specific level -- are, like the case-specific reserve figures in Simon, by their very nature prepared in anticipation of litigation and directly reflect the mental impressions and judgments of RJR's attorneys with respect to forecasted costs in individual cases.

> n6 RJR has repeatedly stressed that it does not settle tobacco-related litigation. See, e.g., Tr. at 82, 11. 18-20 ("this company does not settle").

Forecasted litigation costs are, as a matter of definition, the expected costs of anticipated litigation and the forecasts can be said to have been, by their very nature, prepared in anticipation of litigation. Furthermore, when forecasted litigation costs are presented on a case-specific level, the mental impressions and judgments of the attorneys n7 who made the cost estimates may, to a certain extent, become apparent if the forecasts are revealed. This is much less true, however, of forecasted litigation costs that are aggregated; as forecasted costs for individual matters are aggregated, [*24] the ability to intimate any discernible underlying thoughts and assessment of the preparing lawyers is markedly diminished. The Court therefore concludes that RJR's forecasted costs of litigation that are broken down on a case-by-case basis are protected from disclosure as opinion work product. With respect to aggregated forecasted costs, however, the Court concludes that they are not protected from disclosure. RJR's argument that the mental impressions or opinions of attorneys as to specific cases can be discovered, or reverse-engineered, from aggregate information on literally thousands of cases is unconvincing (and indeed far-fetched). In coming to this conclusion, the Court determines that the aggregated forecasted costs do not comprise opinion work product, but need not decide whether they comprise fact work product. Even if the aggregated forecasted costs were to be considered fact work product, n8 that information would still be subject to disclosure to the SEC either on the basis of the SEC's showing of substantial need and

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

undue hardship that is required to overcome a fact work product assertion, see SEC Applic. at 17-18, or on the basis of waiver due to RJR's disclosure [*25] of these aggregated forecasted numbers to RJR's outside auditors, see Blixt Decl. P 7. n9

n7 As RJR's General Counsel has stated, the budgeted litigation cost numbers are crafted from elements that include the judgments of its lawyers regarding the novelty or complexity of the issues presented, recent court rulings, and the likelihood of dismissal. Blixt Decl. P 4.

n8 Such a determination would not necessarily be at odds with the Eighth Circuit's reasoning in Simon, assuming that RJR's aggregate forecasted figures are pure aggregations of the case-specific figures. The Eighth Circuit, in concluding that the aggregated reserve figures were not protected at all by the work product doctrine, noted that, in addition to the fact that the "individual figures lose their identity when combined to create the aggregate information," the aggregate figures at issue there were "the product of a formula that factors in variables such as inflation, further diluting the individual reserve figures." 816 F.2d at 402.

n9 See Couch v. United States, 409 U.S. 322, 335, 34 L. Ed. 2d 548, 93 S. Ct. 611 (1973) ("no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases").

[*26]

### C. Non-Aggregated Expense Data Presented On Case-By-Case Basis (Categories 1, 3, and 4)

RJR contends that non-aggregated, case-specific historical litigation cost information is also protected by the opinion work product doctrine. Although RJR admits that it has found no cases that explicitly support this proposition, RJR argues that a logical extension of Simon, which deals with forward-looking information rather than historical information, compels the conclusion that such historical information should also be protected. RJR argues that the case-specific historic cost and expense information "is merely trailing forecasted . . . information, and it really gives you the same thing". Tr. at 63:8-11. RJR emphasizes that it faces the unique litigation context of having numerous litigation adversaries that are intent on putting it out of business by driving up the cost of its litigation efforts. RJR argues that the sophistication, innovation, and persistence of its adversar-

ies create the danger that case-specific historical litigation costs, once disclosed, could be reverse-engineered and its adversaries could gain insight into how effective their efforts were in causing [*27] RJR to increase its litigation efforts and costs, or possibly even the thought processes of RJR's lawyers. Tr. at 61-64.

The Court observes, however, that strict numerical and quantitative data is not generally considered privileged. See In re Grand Jury Proceedings, 201 F. Supp.2d at 13 ("fee and billing information is exactly the sort of attorney-client communication that courts have with near uniformity held not to be covered by attorney-client privilege")(citing cases). Furthermore, the SEC has made clear that it is only interested in quantitative data and that descriptions of work performed by RJR's counsel need not be produced and could be redacted from otherwise responsive documents such as outside counsel's billing statements. SEC Applic. at 15; Hagerup Decl. P H and Ex. 11. Given that opinion work product protection attaches only to materials that have been prepared because of the prospect of litigation, and due to the fact that any descriptions of attorney work that might reveal attorney mental processes can be redacted from responsive documents, the Court concludes that case-specific cost and fee information that is historical and backward-looking [*28] in nature is not privileged and must be produced.

### II. Confidentiality

RJR represents that it has been willing all along to produce non-privileged documents and information responsive to all of the Subpoena's requests, to the extent that they exist, as long as the SEC agrees to accord the materials, which RJR claims are highly sensitive, confidentiality protections beyond those the SEC normally accords to materials that it acquires in an investigation. RJR Mot. and Opp. at 2-3. According to RJR, because the SEC refused to negotiate a confidentiality agreement, it now moves the Court, pursuant to Fed. R. Civ. P. 26(c), for a protective order in response to the SEC's application.

In seeking a protective order, RJR is effectively asking the Court to modify the terms of the SEC's Subpoena. There is no question that federal courts have the authority to modify federal agency subpoenas. See Adair v. Rose Law Firm, 867 F. Supp. 1111, 1119 (D.D.C. 1994) ("It is a legitimate exercise of the [federal] court's authority to modify the terms of an agency subpoena by providing additional confidentiality protections for a person or entity to whom the subpoena is directed. [*29] . . ." (citing United States v. Exxon Corp., 202 U.S. App. D.C. 70, 632 F.2d 70, 77 (D.C. Cir. 1980))). To succeed on a request for a protective order, a requestor must make a showing of good cause. EEOC v. Nat'l Children's Center, Inc., 321 U.S. App. D.C. 243, 98 F.3d 1406, 1411

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

*(D.C. Cir. 1996)* (citing *Seattle Times Co. v. Rinehart, 467 U.S. 20, 37, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984)).* According to *Rule 26(c),*

> the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden . . ., including . . . that a trade secret or other confidential information not be revealed or be revealed only in a designated way. . . .

*Fed. R. Civ. P. 26(c)(7).* A trial court possesses broad discretion in issuing a protective order and in determining what degree of protection is required. *Purcell v. MWI Corp., 209 F.R.D. 21, 27 (D.D.C. 2002)* (citing *Seattle Times, 467 U.S. at 36*). In exercising that discretion, the court must assess factors including the requestor's need for the information from this particular source, the relevance of the [*30] information to the litigation at hand, the burden of producing the sought-after material, and the harm which disclosure would cause to the party seeking to protect the information. *Id. at 27-28* (citing *Burka v. Dep't of Health and Human Servs., 318 U.S. App. D.C. 274, 87 F.3d 508, 517 (D.C. Cir. 1996)).* RJR contends that the information that the SEC Subpoena seeks is highly sensitive and confidential and that a protective order should be issued because of the harms that would likely be precipitated by disclosure of that information.

The information requested by the Subpoena that RJR identifies as highly sensitive and confidential includes: (1) RJR's law department's periodic costs and expenses (Req. No. 6), and (2) the General Ledger, general administrative expense and selling, and general administrative detail reports (Req. Nos. 7 & 8). RJR Mot. at 10. RJR asserts that some of the materials and information that the SEC has requested either have never been disclosed before by RJR to opposing parties in litigation, competitors, the public at large, the SEC, or any other government agency, or are not available to any other person or entity outside of RJR besides RJR's outside [*31] auditors. RJR contends that it is a unique respondent because it currently is defending itself in nearly 6,000 tobacco-related cases, including a case in which the United States Department of Justice ("DOJ") seeks hundreds of billions of dollars from RJR and other tobacco companies (United States v. Philip Morris, Civ. A. No. 99-2496 (GK) (D.D.C. filed Sept. 22, 1999)).

The main thrust of RJR's arguments in favor of granting a protective order is that RJR, because of its unique posture as a popular litigation target, stands to

suffer considerable harm if it were to disclose the information the SEC seeks. Specifically, RJR is concerned about the harm likely to ensue should sensitive information fall in the hands of the following groups: (1) RJR's litigation adversaries that number in the thousands; (2) RJR's competitors and joint defendants in the DOJ case; and (3) the DOJ itself. With respect to its litigation adversaries, RJR states that it believes that disclosure of the periodic costs and expenses of its law department to those adversaries, or to anti-smoking advocacy groups that support litigation against RJR, would allow such entities improperly to influence juries, thereby [*32] causing excessive compensatory or punitive damage awards against RJR; to gain important insight into RJR's litigation defense strategies, and changes in those strategies over time; to gauge the extent to which certain discovery or other litigation tactics could be used to increase RJR's cost of defending litigation; to determine how RJR is evaluating the relative risk of various cases by learning how much RJR is investing in the defense of them; and otherwise to embarrass, harass, and gain an advantage over RJR in litigation.

With respect to other tobacco companies facing similar tobacco-related litigation with whom RJR has allied itself in a joint-defense relationship, RJR is concerned that public disclosure of information like its various actual and projected legal department expenses could cause those joint-defense partners to cut back on their own joint defense activities, or to require RJR to assume different and additional burdens. RJR also speculates that costs and expenses like coupon pricing, consumer promotions, advertising and marketing expenses, actual and forecasted items like payroll, payroll-related costs, and legal expenses would be of incalculable value to its competitors [*33] who could use the information to plan, refine, and implement their own competitive pricing and marketing efforts to the detriment of RJR's competitive position. Moreover, RJR is concerned that tracking these expenses over time (from 1998 to the present) would allow its competitors to discern trends in RJR's marketing/advertising expenditures, which would allow them to anticipate RJR's future marketing plans.

But perhaps RJR's paramount concern relates to the formidable litigation adversary it has in the DOJ. RJR represents that the SEC has refused to assure RJR that it will not give DOJ lawyers working on the tobacco litigation the confidential information obtained during the SEC investigation, to which the DOJ would have no right otherwise. RJR believes that it would be seriously prejudiced by the release of such information to DOJ lawyers.

The SEC argues that the information at issue is not confidential and, even if it were, does not merit protections above and beyond those that are already in place

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

under SEC and Exchange Act Rules. The SEC maintains that there is no authority to support RJR's contention that the SEC's "usual precautions" are inadequate and that its data should [*34] be provided with additional confidential protections. According to the SEC, it is authorized by Congress to serve as the chief law enforcement agency with respect to the federal securities laws and, therefore, its function in that capacity would be seriously impeded if it were required to enter into any agreement restricting its Congressionally-granted powers. SEC Reply at 25. Furthermore, the SEC notes that its investigations are non-public except as provided by *17 C.F.R. § 240.0-4* or where the subpoena recipient makes it public. Id.

Under *Fed. R. Civ. P. 26(c)*, it is the movant's burden to make the necessary showing of good cause for the issuance of a protective order. RJR contends that it has demonstrated good cause to warrant a protective order through the harms that it identifies as likely to flow from the disclosure of RJR's law department's periodic costs and expenses (Req. No. 6) and its General Ledger, GAE and SG&A detail reports (Req. Nos. 7 & 8). To begin with, however, the dispute over the production of documents responsive to Requests Nos. 6-8 has narrowed considerably and now focuses only on (1) the monthly GAE and SG&A numbers for 1998 and the first half of 1999, [*35] and (2) the sub-ledger that RJR uses to reconcile its litigation-related fees and expenses to the GAE line item on its general ledger. See Status Report by the SEC (January 15, 2004) at 1. Even so, to the extent that RJR's arguments apply to the documents still in dispute, the harms described by RJR are ones that would flow in the event that the information at issue were disclosed not to the SEC, but to third parties like RJR's litigation adversaries, RJR's competitors, and the DOJ. The Court's analysis therefore focuses on whether there are sufficient protections in place before any third party disclosures would occur. n10

n10 The Court proceeds with this analysis on the assumption that the materials at issue qualify as "confidential" under the applicable standard.

**A. Potential Disclosure to Third Parties**

*Freedom of Information Act* ("FOIA") protections apply when third parties make requests to the SEC for information. *17 C.F.R. § 200.83*. When RJR produces a document to the SEC, it may designate it [*36] as confidential and the SEC will place that document in a non-public file for 10 years, unless prior to that time a third party submits to the SEC a request for access under FOIA. See SEC Applic. at 25. Once a third party request is made, the SEC will notify RJR so that it may provide written substantiation as to why its documents are confi-

dential and should not be disclosed to the requesting party. Id. (citing *17 C.F.R. § 200.83(d)(1)*). The SEC then makes a determination regarding whether or not RJR's information should remain confidential. Id. If RJR disagrees with the SEC's determination, it can appeal to the General Counsel and, ultimately, commence an action seeking judicial review.

RJR articulates its concern that in order to prevent the disclosure of sensitive information to its numerous and aggressive litigation adversaries, it will be forced repeatedly to seek review from the federal courts. RJR notes that if the Court granted a protective order now, RJR would be saved the inconvenience and expense that the FOIA process potentially presents, because the SEC could respond to third party FOIA requests simply by honoring the confidential nature of RJR's documents. [*37] Although the Court appreciates the efficiency that this option may afford RJR, it must weigh any convenience to RJR against the SEC's mandate. This Court has previously held that FOIA protection, by affording the document producer with notice in the event that the SEC determines that material requested by a third party under FOIA is not confidential and can be disclosed, is sufficient. *SEC v. Dresser Industries, Inc., 453 F. Supp. 573 (D.D.C. 1978)*, aff'd, *202 U.S. App. D.C. 345, 628 F.2d 1368 (D.C. Cir.)*, cert. denied, *449 U.S. 993, 66 L. Ed. 2d 289, 101 S. Ct. 529 (1980)*. RJR does not cite any authority that supports its contention that it is entitled to greater confidentiality than that provided by FOIA and the SEC's FOIA process.

RJR does, however, argue that the protections afforded confidential information by *Rule 26* in a normal litigation context are different from those afforded in the context of a FOIA request. See Tr. at 74, 11. 15-25. Under *Rule 26*, relevance to the litigation at hand is a factor to be considered in determining whether material qualifies as confidential and, therefore, is un-discoverable. See *Purcell, 209 F.R.D. at 27* (decision to limit or [*38] deny discovery under *Rule 26* protective order rests on balancing of several factors including its relevance to the litigation at hand). Under FOIA, however, relevance is not taken into account when determining whether or not information should be disclosed pursuant to a third party request. See *National Parks and Conservation Ass'n v. Kleppe, 178 U.S. App. D.C. 376, 547 F.2d 673, 677-78 (D.C. Cir. 1976)*. RJR argues, therefore, that RJR's thousands of adversaries in litigation could make an end run around the *Rule 26* confidentiality obstacles by seeking the same information through a FOIA request. Tr. at 73-76. Indeed, such an attempted use of FOIA to bypass or supplement civil discovery is not uncommon in the federal courts.

Again, however, RJR is not able to point to any authority to support the proposition that a protective order

Case 1:05-cv-00499-JJF    Document 201-3    Filed 04/27/2007    Page 32 of 38

Page 10

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

should be put in place because of concerns that material that would not be relevant in some other litigation could be obtained by a party to that other litigation through FOIA from a government body that is in possession of it. See Tr. at 77, ll. 2-12. The Court also observes that even if the SEC were to determine under FOIA, without taking into account relevancy, [*39] that material requested by a third party litigation adversary or competitor of RJR's was not confidential and could be disclosed, FOIA still provides RJR the opportunity to make its relevancy argument to a federal court by means of a "reverse FOIA" action before disclosure would take place. This Court therefore concludes that FOIA protections are sufficient to protect RJR from the harm that it fears would flow from disclosure to the SEC (and thereafter potentially to third parties) of the materials requested by the Subpoena.

**B. Potential Disclosure to the DOJ**

The DOJ is currently litigating against RJR and other tobacco companies in an action brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 et seq. See United States v. Philip Morris, Civ. A. No. 99-2496 (GK) (D.D.C.). FOIA confidentiality protection does not apply with respect to the DOJ. Accordingly, RJR expresses its concern that sensitive information produced to the SEC may be shared with the DOJ lawyers litigating against RJR in Philip Morris. Indeed, sections *21(b) and 24(c) of the Exchange Act*, and *Rule 24c-1* thereunder, allow the SEC [*40] to share documents and information with other law enforcement agencies (including DOJ) and regulatory organizations when the SEC deems it appropriate. See *15 U.S.C. § 78x(c)*; *17 C.F.R. § 240.24c-1*. The statutory and regulatory language is broad:

> The Commission may, in its discretion and upon a showing that such information is needed, provide all "records" . . . and other information in its possession to such persons, both domestic and foreign, as the Commission by rule deems appropriate if the person receiving such records or information provides such assurances of confidentiality as the Commission deems appropriate.

*15 U.S.C. § 78x(c)*.

The SEC represented at the hearing on January 8, 2004, however, that whether the SEC deems it appropriate to share information with an agency like the DOJ depends on whether the SEC "feel[s] it's important to the enforcement of the federal securities laws, to forward

information to the attorney general and to a whole host of other government and law enforcement agencies." Tr. at 35, ll. 13-16. Even so, should the SEC deem it appropriate to share information with the DOJ, it would [*41] do so without providing any notice to RJR or any opportunity for RJR to contest the disclosure as being inconsistent with the SEC's securities enforcement authority. Although the SEC resolutely maintains that the target of an investigation is not entitled to know when the SEC determines that it is appropriate to share information with another government agency, the Court is troubled by the lack of any procedural check or balance in this unique context where another government agency is presently actively litigating against the subject of the SEC's investigation. In Dresser, this Court examined a claim of impropriety where simultaneous investigations of the respondent were being undertaken by the SEC and the DOJ and SEC attorneys were assigned to assist the DOJ in its criminal investigation. The Court was assured that the attorneys assigned to the DOJ were not involved in the SEC investigation, but the District Court still felt compelled to admonish the SEC in that circumstance, where the investigated entity knew of the assignments of attorneys, to maintain strict ethical standards in order to avoid the appearance of impropriety. See *453 F. Supp. at 576.*

Given [*42] the breadth of discretion that a trial court possesses in issuing a protective order and in determining what degree of protection is required, see *Purcell, 209 F.R.D. at 27* (citing *Seattle Times, 467 U.S. at 36*), and this Court's concern for the lack of an opportunity by RJR to address any potential decision by the SEC to share information obtained pursuant to this investigation with the DOJ, and in the same spirit of the mild admonition made in Dresser, this Court proposes a limited protective order that, while not curtailing in any way the securities enforcement authority and rights granted to the SEC by Congress, would effectively provide RJR with an assurance that the SEC will not share with the DOJ the information RJR produces to it in a circumstance inconsistent with the strictures of the SEC's securities enforcement mandate. That order will provide that, before the SEC provides any information obtained pursuant to the Subpoena to lawyers or other persons involved in the Philip Morris case, the SEC shall, through an ex parte process, advise and obtain the permission of this Court.

**CONCLUSION**

For the foregoing reasons, [*43] the Court will grant in part and deny in part the SEC's application for an order compelling obedience to its Subpoena, and will grant in part and deny in part RJR's motion for protective order. The Court concludes that RJR's forecasted litigation costs broken down on a case-by-case basis are protected from disclosure by the opinion work product doc-

Case 1:05-cv-00499-JJF    Document 201-3    Filed 04/27/2007    Page 33 of 38

Page 11

2004 U.S. Dist. LEXIS 24545, *; Fed. Sec. L. Rep. (CCH) P93,034

trine. The Court also will enter a limited protective order requiring the SEC to obtain, through an ex parte process, advance permission of this Court before providing information obtained pursuant to the Subpoena to any lawyers or other persons at the DOJ litigating against RJR in the Philip Morris case. A separate order accompanies this memorandum opinion.

JOHN D. BATES

United States District Judge

Dated: June 29, 2004

## ORDER

Upon consideration of the Application of the Securities and Exchange Commission ("SEC") for an order to show cause and to require obedience to its subpoena duces tecum ("Subpoena"), the motion for protective order filed by respondent R.J. Reynolds Tobacco Holdings, Inc. ("RJR"), the memoranda in support, the hearing held in this case on January 8, 2004, and the entire record herein, and [*44] for the reasons stated in the Memorandum Opinion issued herewith, it is this 29th day of June, 2004, hereby ORDERED that:

1. The application of the SEC is GRANTED IN PART and DENIED IN PART;

2. RJR's motion for a protective order is GRANTED IN PART and DENIED IN PART;

3. RJR shall produce to the SEC:

a. All documents responsive to Requests Nos. 1-5 of the Subpoena;

b. All remaining documents responsive to Requests Nos. 6-8 of the Subpoena (i.e., the monthly GAE and SG&A numbers for 1998 and the first half of 1999, and the sub-ledger that RJR uses to reconcile its litigation-related fees and expenses to the GAE line item on its general ledger); and

c. All documents responsive to Request No. 9 presented on an aggregated basis only; and

4. The SEC shall notify and obtain, through an ex parte process, advance permission of this Court before providing to any lawyers or other persons at the Department of Justice litigating against RJR in United States v. Philip Morris, Civ. A. No. 99-2496 (GK) (D.D.C. filed Sept. 22, 1999), any materials or information produced to the SEC by RJR pursuant to the Subpoena and this Order.

JOHN D. BATES

United States [*45] District Judge

**TAB 10**

Westlaw.

Release No. 44969,  Release No. 34-44969,  Release No. AE - 1470, 76                                          Page 1
S.E.C. Docket 220, 2001 WL 1301408 (S.E.C. Release No.)

(Cite as:  Release No. 44969,  Release No. 34-44969,  Release No. AE - 1470, 76 S.E.C. Docket 220, 2001 WL
1301408 (S.E.C. Release No.))

**c**

Release No. 44969,  Release No. 34-44969,
Release No. AE - 1470, 76 S.E.C. Docket 220,
2001 WL 1301408 (S.E.C. Release No.)

S.E.C. Release No.

Securities Exchange Act of 1934
Accounting and Auditing Enforcement Act

**\*1** REPORT OF INVESTIGATION PURSUANT
TO SECTION 21(A) OF THE SECURITIES
EXCHANGE ACT OF 1934 AND COMMISSION
STATEMENT ON THE RELATIONSHIP OF
COOPERATION TO AGENCY ENFORCEMENT
DECISIONS

October 23, 2001

Today, we commence and settle a
cease-and-desist proceeding against Gisela de
Leon-Meredith, former controller of a public
company's subsidiary.[FN1] Our order finds that
Meredith caused the parent company's books and
records to be inaccurate and its periodic reports
misstated, and then covered up those facts.

We are not taking action against the parent
company, given the nature of the conduct and the
company's responses. Within a week of learning
about the apparent misconduct, the company's
internal auditors had conducted a preliminary
review and had advised company management who,
in turn, advised the Board's audit committee, that
Meredith had caused the company's books and
records to be inaccurate and its financial reports to
be misstated. The full Board was advised and
authorized the company to hire an outside law firm
to conduct a thorough inquiry. Four days later,
Meredith was dismissed, as were two other
employees who, in the company's view, had

inadequately supervised Meredith; a day later, the
company disclosed publicly and to us that its
financial statements would be restated. The price of
the company's shares did not decline after the
announcement or after the restatement was
published. The company pledged and gave
complete cooperation to our staff. It provided the
staff with all information relevant to the underlying
violations. Among other things, the company
produced the details of its internal investigation,
including notes and transcripts of interviews of
Meredith and others; and it did not invoke the
attorney-client privilege, work product protection or
other privileges or protections with respect to any
facts uncovered in the investigation.

The company also strengthened its financial
reporting processes to address Meredith's conduct --
developing a detailed closing process for the
subsidiary's accounting personnel, consolidating
subsidiary accounting functions under a parent
company CPA, hiring three new CPAs for the
accounting department responsible for preparing the
subsidiary's financial statements, redesigning the
subsidiary's minimum annual audit requirements,
and requiring the parent company's controller to
interview and approve all senior accounting
personnel in its subsidiaries' reporting processes.

Our willingness to credit such behavior in
deciding whether and how to take enforcement
action benefits investors as well as our enforcement
program. When businesses seek out, self-report and
rectify illegal conduct, and otherwise cooperate
with Commission staff, large expenditures of
government and shareholder resources can be
avoided and investors can benefit more promptly.
[FN2] In setting forth the criteria listed below,
we think a few caveats are in order:

**\*2** First, the paramount issue in every
enforcement judgment is, and must be, what best
protects investors. There is no single, or constant,
answer to that question. Self-policing,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 44969,  Release No. 34-44969,  Release No. AE - 1470, 76                    Page 2
S.E.C. Docket 220, 2001 WL 1301408 (S.E.C. Release No.)

(Cite as:  Release No. 44969,  Release No. 34-44969,  Release No. AE - 1470, 76 S.E.C. Docket 220, 2001 WL
1301408 (S.E.C. Release No.))

self-reporting, remediation and cooperation with law enforcement authorities, among other things, are unquestionably important in promoting investors' best interests. But, so too are vigorous enforcement and the imposition of appropriate sanctions where the law has been violated. Indeed, there may be circumstances where conduct is so egregious, and harm so great, that no amount of cooperation or other mitigating conduct can justify a decision not to bring any enforcement action at all. In the end, no set of criteria can, or should, be strictly applied in every situation to which they may be applicable.

Second, we are not adopting any rule or making any commitment or promise about any specific case; nor are we in any way limiting our broad discretion to evaluate every case individually, on its own particular facts and circumstances. Conversely, we are not conferring any "rights" on any person or entity. We seek only to convey an understanding of the factors that may influence our decisions.

Third, we do not limit ourselves to the criteria we discuss below. By definition, enforcement judgments are just that -- judgments. Our failure to mention a specific criterion in one context does not preclude us from relying on that criterion in another. Further, the fact that a company has satisfied all the criteria we list below will not foreclose us from bringing enforcement proceedings that we believe are necessary or appropriate, for the benefit of investors.

In brief form, we set forth below some of the criteria we will consider in determining whether, and how much, to credit self-policing, self-reporting, remediation and cooperation -- from the extraordinary step of taking no enforcement action to bringing reduced charges, seeking lighter sanctions, or including mitigating language in documents we use to announce and resolve enforcement actions.

1. What is the nature of the misconduct involved? Did it result from inadvertence, honest mistake, simple negligence, reckless or deliberate indifference to indicia of wrongful conduct, willful misconduct or unadorned venality? Were the company's auditors misled?

2. How did the misconduct arise? Is it the result of pressure placed on employees to achieve specific results, or a tone of lawlessness set by those in control of the company? What compliance procedures were in place to prevent the misconduct now uncovered? Why did those procedures fail to stop or inhibit the wrongful conduct?

3. Where in the organization did the misconduct occur? How high up in the chain of command was knowledge of, or participation in, the misconduct? Did senior personnel participate in, or turn a blind eye toward, obvious indicia of misconduct? How systemic was the behavior? Is it symptomatic of the way the entity does business, or was it isolated?

*3 4. How long did the misconduct last? Was it a one-quarter, or one-time, event, or did it last several years? In the case of a public company, did the misconduct occur before the company went public? Did it facilitate the company's ability to go public?

5. How much harm has the misconduct inflicted upon investors and other corporate constituencies? Did the share price of the company's stock drop significantly upon its discovery and disclosure?

6. How was the misconduct detected and who uncovered it?

7. How long after discovery of the misconduct did it take to implement an effective response?

8. What steps did the company take upon learning of the misconduct? Did the company immediately stop the misconduct? Are persons responsible for any misconduct still with the company? If so, are they still in the same positions? Did the company promptly, completely and effectively disclose the existence of the misconduct to the public, to regulators and to self-regulators? Did the company cooperate completely with appropriate regulatory and law enforcement bodies? Did the company identify what additional related misconduct is likely to have occurred? Did the company take steps to identify the extent of damage to investors and other corporate constituencies?  Did the company

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as:  Release No. 44969,  Release No. 34-44969,  Release No. AE - 1470, 76 S.E.C. Docket 220, 2001 WL
1301408 (S.E.C. Release No.))

appropriately recompense those adversely affected by the conduct?

9. What processes did the company follow to resolve many of these issues and ferret out necessary information? Were the Audit Committee and the Board of Directors fully informed? If so, when?

10. Did the company commit to learn the truth, fully and expeditiously? Did it do a thorough review of the nature, extent, origins and consequences of the conduct and related behavior? Did management, the Board or committees consisting solely of outside directors oversee the review? Did company employees or outside persons perform the review? If outside persons, had they done other work for the company? Where the review was conducted by outside counsel, had management previously engaged such counsel? Were scope limitations placed on the review? If so, what were they?

11. Did the company promptly make available to our staff the results of its review and provide sufficient documentation reflecting its response to the situation? Did the company identify possible violative conduct and evidence with sufficient precision to facilitate prompt enforcement actions against those who violated the law? Did the company produce a thorough and probing written report detailing the findings of its review? Did the company voluntarily disclose information our staff did not directly request and otherwise might not have uncovered? Did the company ask its employees to cooperate with our staff and make all reasonable efforts to secure such cooperation? [FN][FN3]

12. What assurances are there that the conduct is unlikely to recur? Did the company adopt and ensure enforcement of new and more effective internal controls and procedures designed to prevent a recurrence of the misconduct? Did the company provide our staff with sufficient information for it to evaluate the company's measures to correct the situation and ensure that the conduct does not recur?

*4 13. Is the company the same company in which the misconduct occurred, or has it changed through a merger or bankruptcy reorganization?

We hope that this Report of Investigation and Commission Statement will further encourage self-policing efforts and will promote more self-reporting, remediation and cooperation with the Commission staff. We welcome the constructive input of all interested persons. We urge those who have contributions to make to direct them to our Division of Enforcement. The public can be confident that all such communications will be fairly evaluated not only by our staff, but also by us. We continue to reassess our enforcement approaches with the aim of maximizing the benefits of our program to investors and the marketplace.

By the Commission (Chairman Pitt, Commissioner Hunt, Commissioner Unger).

FN1. *In the Matter of Gisela de Leon-Meredith*, Exchange Act Release No. 44970 (October 23, 2001).

FN2. We note that the federal securities laws and other legal requirements and guidance also promote and even require a certain measure of self-policing, self-reporting and remediation. *See, e.g.*, Section 10A of the Securities Exchange Act of 1934, 15 U.S.C. § 78j-1 (requiring issuers and auditors to report certain illegal conduct to the Commission); *In the Matter of W.R. Grace & Co.*, Exchange Act Release No. 39157 (Sept. 30, 1997) (emphasizing the affirmative responsibilities of corporate officers and directors to ensure that shareholders receive accurate and complete disclosure of information required by the proxy solicitation and periodic reporting provisions of the federal securities laws); *In the Matter of Cooper Companies, Inc.*, Exchange Act Release No. 35082 (Dec. 12, 1994) (emphasizing responsibility of corporate directors in safeguarding the integrity of a company's public statements and the interests of investors when evidence of fraudulent conduct by corporate management comes to their attention); *In the Matter of John Gutfreund*, Exchange Act Release No. 31554 (Dec. 3, 1992) (sanctions imposed against supervisors at broker-dealer for failing promptly to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 44969,  Release No. 34-44969,  Release No. AE - 1470, 76
S.E.C. Docket 220, 2001 WL 1301408 (S.E.C. Release No.)

Page 4

(Cite as:  Release No. 44969,  Release No. 34-44969,  Release No. AE - 1470, 76 S.E.C. Docket 220, 2001 WL
1301408 (S.E.C. Release No.))

bring misconduct to attention of the government).
*See also Federal Sentencing Guidelines* § 8C2.5(f)
& (g) (organization's ""culpability score" decreases
if organization has an effective program to prevent
and detect violations of law or if organization
reports offense to governmental authorities prior to
imminent threat of disclosure or government
investigation and within reasonably prompt time
after becoming aware of the offense); *New York
Stock Exchange Rules* 342.21 & 351(e) (members
and member organizations required to review
certain trades for compliance with rules against
insider trading and manipulation, to conduct prompt
internal investigations of any potentially violative
trades, and to report the status and/or results of such
internal investigations).

FN3. In some cases, the desire to provide
information to the Commission staff may cause
companies to consider choosing not to assert the
attorney-client privilege, the work product
protection and other privileges, protections and
exemptions with respect to the Commission. The
Commission recognizes that these privileges,
protections and exemptions serve important social
interests. In this regard, the Commission does not
view a company's waiver of a privilege as an end in
itself, but only as a means (where necessary) to
provide relevant and sometimes critical information
to the Commission staff. Thus, the Commission
recently filed an *amicus* brief arguing that the
provision of privileged information to the
Commission staff pursuant to a confidentiality
agreement did not necessarily waive the privilege as
to third parties. *Brief of SEC as Amicus Curiae,
McKesson HBOC, Inc.,* No. 99-C-7980-3 (Ga. Ct.
App. Filed May 13, 2001). Moreover, in certain
circumstances, the Commission staff has agreed that
a witness' production of privileged information
would not constitute a subject matter waiver that
would entitle the staff to receive further privileged
information.

Release No. 44969,  Release No. 34-44969,
Release No. AE - 1470, 76 S.E.C. Docket 220,
2001 WL 1301408 (S.E.C. Release No.)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.