# TAB A

# UNREPORTED CASES

LEXSEE


Caution
As of: May 02, 2007

**COOPER HOSPITAL/UNIVERSITY MEDICAL CENTER, et al., Plaintiffs, v. JOHN M. SULLIVAN, et al., Defendants. COOPER HOSPITAL/UNIVERSITY MEDICAL CENTER, et al., Plaintiffs, v. FLEX/SYS TECHNOLOGY CORPORATION, et al., Defendants.**

**Civil No. 96-5416 (JEI), Civil No. 96-3182 (SMO)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, CAMDEN VICINAGE DIVISION**

**1998 U.S. Dist. LEXIS 22198**

**May 7, 1998, Decided**
**May 7, 1998, Filed**

**NOTICE:** [*1] NOT FOR PUBLICATION

**DISPOSITION:** Defendants' application for order compelling Plaintiffs Cooper Hospital/University Medical Center and Cooper Healthcare Services, Inc. to produce report entitled "Report of the Ad Hoc Internal Control Committee of the Board of Trustees" ("Report") along with all Exhibits and Executive Summary GRANTED. Plaintiffs cross-application for protective order to preclude production of Report DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant accounting firm filed a motion requesting that it order a certain report to be produced by plaintiff hospital. The hospital filed a cross-motion requesting that the court issue a protective order under Fed. R. Civ. P. 26(c). The hospital contended that the report was protected the work-product doctrine, attorney-client privilege, the self-critical analysis privilege and that it was commercially sensitive material.

**OVERVIEW:** A hospital brought suit against its accounting firm, alleging that the firm was negligent because it did not promptly discover embezzlements. The firm filed a motion to compel against the hospital, requesting that the court order the hospital to produce an internal audit report. The hospital claimed that the report was privileged and also sought a protective order from the court. The court granted the motion to compel and denied the request for a protective order. The court found that the report was not protected by the work-product doctrine or attorney-client privilege because the report had already been voluntarily turned over to federal and state authorities and any privilege was waived. The court further found that the hospital had failed to meet its burden to demonstrate good cause for a protective order under rule 26(c)(7) because the hospital did not identify adequately what type of information contained in the report it feared could be misappropriated by competitors. The court also found that the report was not protected by the self-critical analysis privilege because the report was not performed with the expectation that its information would be kept confidential.

**OUTCOME:** The court granted the accounting firm's motion to compel the hospital to produce the report. The court rejected the hospital's claims that the report was protected because the hospital waived any privilege under the work-product doctrine or attorney-client privilege by disclosing it to federal and state authorities.

**CORE TERMS:** work-product, disclosure, attorney-client, sys, waived, protective order, legal advice, discovery, self-critical, common interest, grand jury, confidential, anticipation of litigation, disclose, confidentiality, state law, cross-application, waive, audit, judicial authority, federal common law, trade secret, third party,

good cause, investigating, ally, misappropriated, recommendations, completion, privileged

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Motions to Compel*
[HN1] Fed. R. Civ. P. 37 permits a party, upon reasonable notice to other parties, to apply for an order compelling discovery.

*Civil Procedure > Discovery > Disclosures > General Overview*
*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN2] Pursuant to Fed. R. Civ. P. 26, a party seeking a protective order bears the burden of demonstrating good cause to preclude or limit discovery. Fed. R. Civ. P. 26(c). To overcome the presumption in favor of discovery, the party seeking the protective order must show good cause by demonstrating a particular need for protection. The burden of establishing the existence of a privilege falls on the party asserting the privilege. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the rule 26(c) test.

*Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview*
*Evidence > Privileges > General Overview*
[HN3] When evidentiary privileges arise under federal and state law, the federal common law governs the privileges.

*Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN4] The work-product doctrine provides an independent basis upon which litigants may rely for protection of an attorney's trial preparation thoughts and materials. The work-product doctrine initially recognized in case-law and currently embodied in Fed. R. Civ. P. 26(b)(3), protects from disclosure those documents and other tangible things that a party or a party's representative prepares in anticipation of litigation, in recognition of the need for a lawyer to work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. The doctrine covers those written materials obtained or prepared by counsel with an eye toward litigation, and includes interviews, statements, memoranda, correspondence, briefs, mental impressions, and personal beliefs. Because the work-product doctrine is a rule of procedure, federal law always applies to assertions of work-product protection in federal court.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN5] To determine whether a document was prepared in anticipation of litigation, the relevant inquiry is whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN6] Because the work-product doctrine serves to protect an attorney's work-product from falling into the hands of an adversary, disclosure to a third party does not necessarily waive the protection of the work-product doctrine. Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information. When a party discloses protected materials to a government agency investigating allegations against it, the work-product doctrine is waived as to all other adversaries.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN7] The determination of the applicability of the attorney-client privilege must be determined on a case-by-case-basis.

*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN8] The traditional elements of the attorney-client privilege are (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made: (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
[HN9] The attorney-client privilege protects both communications between attorney and client, and legal advice or opinion from an attorney to his client. When a client's ultimate goal is not legal advice, but rather business advice, the attorney-client privilege is inapplicable. The privilege protects only those disclosures necessary to obtain informed legal advice that might not have been made absent the privilege. Accordingly, voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege.

*Contracts Law > Third Parties > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN10] When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege. For example, courts have held that the client may disclose communications to co-defendants or co-litigants without waiving the privilege. However, any disclosure to a government agency not for the purposes of obtaining legal advice, even if subject to a confidentiality agreement, waives the attorney client privilege.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
[HN11] The "common interest" doctrine preserves the attorney-client privilege for documents disclosed to an ally.

*Civil Procedure > Discovery > Protective Orders*
*Trade Secrets Law > Civil Actions > Discovery*
*Trade Secrets Law > Civil Actions > Protection Orders*
[HN12] A court may issue a protective order stating that disclosure may be had only on specified terms and conditions or that a trade secret or other confidential research, development, or commercial information not be revealed in a designated way. Fed. R. Civ. P. 26(c)(2) and (7).

*Civil Procedure > Discovery > Protective Orders*
[HN13] A court may consider in determining whether certain information should be protected as a trade secret or as other confidential information: 1) the extent to which the information is known outside of the owner's business; 2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Once it is determined that certain information constitutes a trade secret or confidential material, the court must balance the moving party's need for confidentiality against the opposing party's need for relevant evidence.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > Government Privileges > Official Information Privilege > Self-Critical Analysis Privilege*
[HN14] The self-critical analysis privilege has been recognized in a variety of actions in which confidentiality is essential to the free flow of information and the free flow of information is essential-to promote recognized public interests. Those courts that recognize a federal self-critical analysis privilege generally require three criteria to be met for the information to qualify for protection: first, the information must result from critical self-analysis undertaken by the party seeking protection; second, the public must have a strong interest in preserving the free flow of the type of information sought; finally, the information must be of the type whose flow would be curtailed if discovery were allowed. Courts have held that the self-critical analysis does not protect internal reviews which were not performed with the expectation that any information obtained would be kept confidential.

**COUNSEL:** Michael M. Rosenbaum, Esquire, David Novack, Esquire, Terrence Camp, Esquire, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C., Short Hills, New Jersey.

Richard S. Hyland, Esquire, John Frazier, Esquire, John Caruso, Esquire, Montgomery, McCracken, Walker & Rhoads, Cherry Hill, New Jersey.

John B. Kearney, Esquire, Kenney & Kearney, Cherry Hill, New Jersey.

Elliott Abrutyn, Esquire, Joseph G. Dolan, Esquire, Morgan, Melhuish, Monaghan, et al., Livingston, New Jersey.

Norman A. Bloch, Esquire, Grover & Bloch, New York, New York.

**JUDGES:** ROBERT B. KUGLER, United States Magistrate Judge. HONORABLE JOSEPH E. IRENAS.

**OPINION BY:** ROBERT B. KUGLER

**OPINION:**

**OPINION**

**KUGLER, UNITED STATES MAGISTRATE JUDGE:**

This matter comes before the Court on the application [*2] by Richard S. Hyland, Esquire, attorney for Defendant KPMG Peat Marwick LLP ("Peat Marwick") in the matter Cooper Hospital/University Medical Center, et al. v. Sullivan, et al., Civil No. 96-5416 (JEI), for an order compelling Plaintiffs Cooper Hospital/University Medical Center, Cooper Healthcare Services, Inc. and Cooper Data Services Corporation ("Cooper") to produce the report entitled "Report of the Ad Hoc Internal Control Committee of the Board of Trustees: The Cooper Health System" ("Report"). By letter brief dated January 30, 1998, Joseph Dolan, Esquire, attorney for Defendant Alan B. Reed, Individually, and Alan B. Reed, CPA ("Reed"), make a parallel application in the matter captioned Cooper Hospital/University Medical Center, et al. v. Flex/sys Corporation, et al., Civil No. 96-3182 (SMO) seeking an order compelling disclosure of the Report in that action. Defendants Flex/sys Corporation, Flex/sys Technology Corporation, Flex/sys (New Jersey) Corporation, Flex/sys Data Corporation - Cherry Hill (collectively "Flex/sys Defendants"), Donald G. Fellner and Walter I. Tanenbaum join Reed and Peat Marwick in this application. Cooper opposes the application to compel discovery [*3] of the Report in both actions and submits a cross-application for a protective order pursuant to Fed. R. Civ. P. 26(c).

Oral argument on these applications was heard on April 13, 1998. Peat Marwick introduced six (6) exhibits marked Defendant's Exhibits 1-6. At the hearing on April 13, 1998, after careful consideration of the parties' submissions and oral argument, the Court granted the defendants' applications to compel, denied the plaintiffs' application for a protective order and ordered Cooper to produce the Report, along with its Exhibits and Executive Summary, to the defendants. The Court further announced that a written opinion would follow. This Opinion sets forth, in greater detail, the reasoning in support of the Court's oral ruling.

I. FACTS AND PROCEDURAL HISTORY

Cooper was a victim of a fraud and embezzlement scheme perpetrated by two of Cooper's former executive officers, Defendants John M. Sullivan ("Sullivan"), Executive Vice President for Finance and Treasurer, and P. John Lashkevich ("Lashkevich"), Assistant Vice President and Controller, over the course of several years. Commencing in 1993, the federal government initiated an investigation into the fraud [*4] at Cooper. During 1993 and 1994, the federal grand jury served several subpoenas upon Cooper seeking certain financial and business records. Cooper publicly stated that it was cooperating with the government in its investigation of the fraud and related matters. Peat Marwick's Br. at Exhibit I (Jim Walsh, Cooper Gives Feds Report on Fraud, Courier-Post, March 13, 1997, at Al). On July 20, 1994, Sullivan, Lashkevich and John H. Crispo, a local businessman and former Cooper employee, entered guilty pleas to criminal charges in connection with the defalcation uncovered at Cooper in the United States District Court. Subsequent to the entry of the guilty pleas, the federal grand jury issued three more subpoenas during 1994 and 1995 seeking additional documents.

Once the fraud was exposed, Cooper's Board of Trustees appointed an Ad Hoc Internal Control Committee ("Committee") to review Cooper's financial controls and procedures and to make recommendations for changes. Peat Marwick's Br. at Exhibit C (Cooper Forms Committee, PR Newswire, July 26, 1994). The Committee was originally composed of Kevin Halpern, CEO of Cooper, Peter Driscoll, Chairman of Cooper's Board of Trustees, the [*5] Hon. Warren C. Douglas and Rabbi Fred J. Neulander. Id.; Cooper's Br. at p. 7. Two more openings on the Committee were reserved for community representatives. Ultimately, the Committee met on forty (40) or more occasions. Report at p. 40.

Around the time Cooper commissioned the Report, Cooper Executive Vice President Michael Dolfman announced at a news conference that the Report would be made public upon completion. Peat Marwick's Br. at Exhibit F (Maureen Graham, Hospital Gives State Its Audit, The Philadelphia Inquirer, May 14, 1997, at B1). Cooper hired the forensic accounting firm Nihill & Reidley and the law firm Saul, Ewing, Remick & Saul to prepare the Report. The forensic accountants conducted an extensive investigation by reviewing over 100,000 pages of documents and conducting numerous interviews. They also examined the financial books and records of Cooper and of certain entities with which Cooper did business. The attorneys, specifically J. Clayton Undercofler, Esquire, and Robert N. de Luca, Esquire, reviewed the results of the investigation, met with members of the Committee, wrote the Report and Executive Summary and compiled the accompanying Exhibits. In April [*6] 1995, Cooper released a two page interim

report summarizing its forthcoming recommendations for tighter financial controls. The Report was completed in November 1996 and consists of a 261 page volume of text, three volumes of exhibits and an executive summary. The finalized Report was submitted to the Board of Trustees in January 1997.

On February 24, 1997, Cooper issued a Prospectus in connection with a $ 69.4 million bond sale to the Camden County Improvement Authority. The 1995 financial statements incorporated in the Prospectus disclosed $ 3.8 million in losses from the fraud, offset by $ 3.6 million recovered from insurance and other sources. The Prospectus identified $ 21.8 million as "made or controlled by and/or to" Sullivan and Lashkevich. Peat Marwick's Br. at Exhibit N (Jim Walsh, Civil Lawsuits Seek Recovery of Millions in Cooper Fraud, Courier-Post, Feb. 28, 1997, at A1). On March 6, 1997, FBI agents seized a copy of the Prospectus from the Camden County Improvement Authority in furtherance of the federal investigation. Local newspapers reported that the FBI sought the report as part of a probe into whether Cooper violated federal securities laws and regulations by [*7] inadequately disclosing the Hospital's financial problems in the Prospectus. Peat Marwick's Br. at Exhibit E (Maureen Graham, FBI is probing Cooper Hospital to see if it broke securities laws, The Philadelphia Inquirer, 3, 1997) & Exhibit G (Jim Walsh, FBI review Cooper data, Courier Post, March 7, 1997).

On November 6, 1996, a complaint was filed by Cooper naming Sullivan, Lashkevich and the Estate of Crispo as defendants. Cooper then filed a second federal action, captioned Cooper Hospital/University Medical Center, et al. v. Flex/sys Corporation, et al., Civil No. 96-3182 (SMO), on June 12, 1996 alleging federal RICO claims against individuals and companies involved in a joint venture relationship with the Hospital. On March 13, 1997, Cooper filed another complaint in the Superior Court of New Jersey, Law Division, naming the accounting firm Peat Marwick as a defendant. Cooper's claims against Peat Marwick appear to arise out of its conduct in preparing independent audits of Cooper's financial statements for the years 1989, 1990 and 1991. Second Amended Complaint P 189. Cooper alleges that Peat Marwick negligently conducted its audits and thus "never discovered any [*8] of the fraudulent schemes" allegedly being carried out by the criminal defendants. Id. at PP 83-95, 185. On June 6, 1997, Cooper amended the complaint in the Sullivan action to add Helene Weinstein, Elarba Pagan and Thomas Damadio as defendants.

At the request of the United States Attorney's office, on March 12, 1997 Cooper provided a copy of the entire Report to the United States Attorney's Office, along with a letter which asserted and preserved Cooper's privileges attendant to it. On March 27, 1997, the commissioners of the New Jersey Department of Human Services and the New Jersey Department of Health and Senior Services each requested a copy of the Report on the grounds that it was the agencies' right and obligation to ensure that public funds dispensed to Cooper were being spent properly. In response to this request, on March 31, 1997, New Jersey Governor Christine cautioned Cooper that the state agencies would consider withholding Medicaid funding from the Hospital if the Report was not furnished. Cooper replied to the request by asserting that the Report was protected by the attorney-client privilege.

As of April 23, 1997, Cooper had failed to turn over the Report to [*9] the state agencies. On that date, the New Jersey Attorney General's office intervened and demanded a copy of the Report. On April 24, 1997, Cooper agreed to furnish the Report to the State and on May 14, 1997 Cooper rendered the document to the Attorney General's Office along with a letter asserting the privileged and confidential nature of the document. The Attorney General's office forwarded the Report to the Division of Criminal Justice for evaluation to determine if any potential criminal violations had taken place. On July 11, 1997, the Division of Criminal Justice completed its "initial review" of the Report and forwarded it to the Department of Human Services, the Department of Health and Senior Services and the Civil Law Division of the Attorney General's Office for further scrutiny for possible regulatory or statutory violations.

On August 14, 1997, the Honorable Samuel L. Supnick, the Judge presiding over Cooper's case against Peat Marwick, entered an order staying the state's case and compelling Cooper to seek leave to join Peat Marwick in the federal action. In order to comply with Judge Supnick's Order, Cooper sought leave to file a second amended complaint naming Peat [*10] Marwick as a defendant in the Sullivan case and Peat Marwick filed a cross-motion for leave to intervene. By Order dated November 20, 1997, this Court granted both Cooper's motion to file a second amended complaint and Peat Marwick's motion to intervene.

Initial disclosures were exchanged by the parties in the Sullivan matter pursuant to Fed. R. Civ. P. 26 on or about December 12, 1997. In the disclosures, Cooper identified the Report as a privileged document, claiming that it was protected by the attorney-client privilege and work product doctrine. Thereafter, Peat Marwick and the defendants in the related Flex/sys matter filed this application seeking to compel the production of the Report. Cooper served a cross application seeking a protective order barring the disclosure of the Report on the basis that the document is protected on the grounds of: 1) work-product doctrine; 2) attorney-client privilege; 3)

commercially sensitive material; and 4) the self-critical analysis privilege.

II. APPLICATIONS TO COMPEL CROSS-APPLICATION FOR A PROTECTIVE ORDER

The defendants seek an order compelling the production of the Report pursuant to Rule 37(a) of the Federal Rules [*11] of Civil Procedure. [HN1] Rule 37 permits a party, upon reasonable notice to other parties, to apply for an order compelling discovery.

[HN2] Pursuant to Rule 26 of the Federal Rules of Civil Procedure, a party seeking a protective order bears the burden of demonstrating good cause to preclude or limit discovery. Fed. R. Civ. P. 26(c). "To overcome the presumption [in favor of discovery], the party seeking the protective order must show good cause by demonstrating a particular need for protection." Cipollone v. Liggett Group, 785 F.2d 1108, 1121 (3d Cir. 1986). The burden of establishing the existence of a privilege falls on the party asserting the privilege. See In re Bevill, Busler & Schulman Asset Management Corp., 805 F.2d 120, 126 (3d Cir. 1986). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." Cipollone, 785 F.2d at 1121. [HN3] Since the claims and privileges at issue in this case arise under federal and state law, the federal common law governs evidentiary privileges. Torres v. Kuzniasz, 936 F. Supp. 1201, 1208 (D.N.J. 1996); Wei v. Bodner, 127 F.R.D. 91, 94 (D.N.J. 1989). [*12]

A. Work-Product Doctrine

[HN4] The work-product doctrine provides an independent basis upon which litigants may rely for protection of an attorney's trial preparation thoughts and materials. Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947). The work-product doctrine, initially recognized in Hickman and currently embodied in Fed. R. Civ. P. 26(b)(3), protects from disclosure those documents and other tangible things that a party or a party's representative prepares in anticipation of litigation, in recognition of the need for a lawyer to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Id. at 510-11. The doctrine covers those "written materials obtained or prepared by [] counsel with an eye toward litigation," and includes: "interviews, statements, memoranda, correspondence, briefs, mental impressions, [and] personal beliefs . . . ." Bogosian v. Gulf Oil Corp., 738 F.2d 587, 592 (3d Cir. 1984). Because the work-product doctrine is a rule of procedure, federal law always applies to assertions of work-product protection in federal court. United Coal Cos. v. Powell Const. Co., 839 F.2d 958, 966 (3d Cir. 1988). [*13]

[HN5] To determine whether a document was "prepared in anticipation of litigation," the relevant inquiry is "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1258 (3d Cir. 1993) (citing United States v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir. 1990)).

[HN6] Because the work-product doctrine serves to protect an attorney's work-product from falling into the hands of an adversary, disclosure to a third party does not necessarily waive the protection of the work-product doctrine. Westinghouse, 951 F.2d 1414 at 1428. Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information. Id.; 8 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 2024. When a party discloses protected materials to a government agency investigating allegations against it, the work-product doctrine is waived as to all other adversaries. Westinghouse, 951 F.2d at 1428. [*14]

In Westinghouse Electric Corp. v. Republic of the Philippines, the Third Circuit considered whether the attorney-client privilege and work-product protection were waived in circumstances similar to those in the case before this court. 951 F.2d 1414 (3d Cir. 1991). In that case, the plaintiffs alleged that Westinghouse had obtained a large power plant contract in the Philippines by bribing a former government official. During discovery, the plaintiff sought documents generated during an internal investigation conducted by Westinghouse's outside counsel. The internal inquiry was taken in response to the SEC's investigation into whether Westinghouse had obtained the contract with bribes. Westinghouse disclosed the documents sought by the plaintiffs to the Securities Exchange Commission ("SEC") and the Department of Justice ("DOJ") in order to cooperate with their investigations. The Third Circuit held that, despite Westinghouse's claims that it had disclosed the information to the SEC and the DOJ in order to cooperate with their investigations, Westinghouse's disclosures waived the protection because they did not further the goal of the work-product doctrine. 951 F.2d at 1431. [*15]

The defendants contend that Cooper, as the party asserting protections, cannot demonstrate that the Report would not have been made but for the client's need for legal advice or services or that its primary motivating purpose in commissioning the Report was to aid in possible future litigation. It argues that Cooper's own press release and other reports demonstrate that the Report was commissioned primarily to examine its system of internal controls and to restore the confidence of the public and the government in its management.

The defendants further assert that Cooper's release of the Report to the government waived any privilege which may have protected the document from disclosure because the federal and state government interest were adverse to Cooper's interests. In support of its argument, Peat Marwick cites several cases in which disclosure to the government under circumstances less contentious than those presented in this matter constituted disclosure to an adversary. United States v. Massachusetts Institute of Technology, 129 F.3d 681, 687 (1st Cir. 1997) (holding MIT waived its work-product protection in meeting minutes by providing them to audit agency [*16] which aids the DOD in reviewing contract performance); In re Grand Jury Subpoena Duces Tecum Dated March 24, 1983, 566 F. Supp. 883, 885 (S.D.N.Y. 1983) (ruling X Corp. did not share common interest with district attorney even though it understood an employee of X Corp to be the target of grand jury investigation).

In opposition, Cooper argues that the Report is protected by the work-product doctrine and that no waiver has occurred. It points out that the work-product doctrine test does not require pending litigation or that the sole reason for the preparation of the document be the anticipation of litigation. Cooper maintains that the Committee's inquiry into the scope and nature of the fraud was not made in the ordinary course of business and constituted an effort in anticipation for litigation. Cooper also contends that protection under the work-product doctrine was not waived by its disclosure of the Report to governmental authorities because its interests were aligned with the agencies investigating the circumstances surrounding the embezzlement of funds from the Hospital.

Because the Court finds that Cooper waived any privilege which may have existed under [*17] the work-product doctrine by voluntarily disclosing the Report to federal and state authorities, a determination that the Report constituted attorney work-product need not be made. However, the Court is skeptical that such a finding would be warranted under the circumstances. Cooper has failed to demonstrate that the Report was created "primarily in anticipation of litigation." Although one of the goals of the Report was to recommend legal action which could be taken by the Hospital to recover some of the misappropriated funds, this was clearly not the primary focus of the voluminous Report. The "Mission Statement/Charge of the Ad Hoc Control Committees" identified the tasks of the Committee as follows: "determining, with particularity to scope, individuals or entities involved, any and all irregularities or defalcations which may have occurred; to review existing organization and controls and offer recommendations for changes to such controls and organizations, if appropriate; and to recommend the commencement of appropriate legal activity to seek full restitution of any and all funds stolen or misappropriated." Peat Marwick's Reply Br. at Exhibit A. The statements of Cooper itself [*18] demonstrate that only one of the goals of the Report was to identify legal remedies available to the Hospital, not the primary focus. This is reflected in the Report itself, of which only a limited portion focuses on a discussion of legal options.

In addition, Cooper's original intention to disclose the document publicly upon completion further supports this view. It is difficult to argue that a document which was intended to be disclosed publicly could have been created in anticipation of litigation (which assumes a certain amount of confidentiality).

In any event, the facts and judicial authority strongly support the defendants' position that Cooper and the government were adversaries and, thus, that disclosure to the government resulted in the waiver of any work-product privilege which might have been asserted. In In re Grand Jury Subpoena, X Corp, like Cooper, claimed that it shared a common interest with the grand jury because each had a common adversary, an employee that X Corp believed had embezzled from X Corp. The court rejected the argument and wrote: "X Corp may have hoped that the grand jury's investigation was directed solely at the employee, and not, for example [*19] at X Corp. itself . . ., a mere hope or expectation that the District Attorney was an ally and not an adversary does not convert the relationship into a 'community of interest.' . . . It is arguable whether a grand jury can ever be deemed to be aligned in interest' with a private litigant." 566 F. Supp. at 885. In MIT, the court concluded that although MIT hoped that there was no controversy between it and the DOD, "the potential for dispute and even litigation was certainly there." 129 F.3d at 687.

Cooper concedes in its papers that when the federal grand jury commenced issuing subpoenas in 1993, Cooper was unable to determine the nature or subject of the investigation being conducted by the U.S. Attorney's Office. Cooper's Br. at p. 6. As In re Grand Jury Subpoena suggests, Cooper's hope that the government was an ally, not an adversary does not create a common interest. In fact, several newspapers were reporting that Cooper itself was the target of the investigations. See Margaret Graham, FBI is probing Cooper Hospital to see if it broke securities laws, The Philadelphia Inquirer, Peat Marwick's Br. at Exhibit E; Jim Walsh, FBI reviews [*20] Cooper data, Courier Post, March 7, 1997, Peat Marwick's Br. at Exhibit G. The United States Attorney had convened a grand jury and potentially was investigating what happened to the federal funds provided to Cooper. In addition, Cooper's hesitancy to disclose the Report to the state government, which resulted in a public threat by Governor Whitman to withhold state funds, reveals that it was forced to do so against its will. Furthermore, the Report was forwarded to several state

agencies for scrutiny regarding possible regulatory violations which does not suggest a "common interest" held.

It is likewise not dispositive that Cooper attempted to reserve its rights to invoke the protection of the work-product doctrine at a later date in transmittal letters to the government or that the government agencies agreed to keep the Report confidential. Westinghouse, 951 F.2d 1414 at 1430 ("even if we found that the agencies has made [a confidentiality] agreement, . . . it would not change our conclusion").

B. Attorney-Client Privilege

The most frequently cited discussion of the federal common law of the attorney-client privilege is the United States Supreme Court opinion [*21] in Upjohn Co. v. United States, 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). In Upjohn, the Court refused to create a bright-line rule by which to evaluate the attorney-client privilege. 449 U.S. at 396-97. Rather, the Court indicated that [HN7] the determination of the applicability of the privilege must be determined on a case-by-case-basis. Id.

[HN8] The traditional elements of the attorney-client privilege are:

> (1) the asserted holder of the privilege is or sought to become a client;
> (2) the person to whom the communication was made:
>
> > (a) is a member of the bar of a court, or his or her subordinate, and
> > (b) in connection with this communication is acting as a lawyer;
>
> (3) the communication relates to a fact of which the attorney was informed
>
> > (a) by his client
> > (b) without the presence of strangers
> > (c) for the purpose of securing primarily either
> > (i) an opinion of law or
> > (ii) legal services or
> > (iii) assistance in some legal proceeding, and
>
> (d) not for the purpose of committing a crime or tort; and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

**Rhone-Poulenc Rorer Inc.**, 32 F.3d 851 at 862 [*22] (citations omitted); **see also, Arcuri v. Trump Taj Mahal Assoc.**, 154 F.R.D. 97, 101-102 (D.N.J. 1994). [HN9] The privilege protects both communications between attorney and client, and legal advice or opinion from an attorney to his client. Id. at 102 (citing United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d Cir. 1980)). When a client's ultimate goal is not legal advice, but rather business advice, the attorney-client privilege is inapplicable. United States v. Rockwell Int'l, 897 F.2d 1255, 1264 (3d Cir. 1990).

The privilege "protects only those disclosures - necessary to obtain informed legal advice - which might not have been made absent the privilege." Fisher v. United States, 425 U.S. 391, 48 L. Ed. 2d 39, 96 S. Ct. 1569 (1976). Accordingly, voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege. United States v. AT&T, 206 U.S. App. D.C. 317, 642 F.2d 1285, 1299 (D.C. Cir. 1980). [HN10] When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions [*23] to the rule that disclosure waives the attorney-client privilege. For example, courts have held that the client may disclose communications to co-defendants or co-litigants without waiving the privilege. See Hunydee v. United States, 355 F.2d 183, 184-85 (9th Cir. 1965). However, any disclosure to a government agency not for the purposes of obtaining legal advice, even if subject to a confidentiality agreement, waives the attorney client privilege. Westinghouse, 951 F.2d at 1428.

Because the Court finds that Cooper waived any attorney-client privilege attendant to the Report by producing the Report to the government for purposes unrelated to obtaining legal advice, it is not necessary for the Court to determine whether the Report is protected by the attorney-client privilege. Nevertheless, having reviewed the Report, the Court cannot identify any legal advice being rendered by the authors or conclude that the process of preparing the Report was undertaken with the intention of confidentiality. After the Committee was formed, Mr. Halpern, CEO of Cooper, announced at a press conference that the Report would be made public upon completion. In the Foreward [*24] of the Report itself, the authors discuss the intention of Committee to release the Executive Summary to the public.

The defendants argue that, under Westinghouse, even if the Report was privileged at one time, Cooper waived the attorney-client privilege when it disclosed the Report to the state and federal governments.

Cooper concedes that under applicable federal doctrine and the Westinghouse case, disclosure of a privileged attorney-client communication for reasons other than obtaining legal advice terminates the privilege. However, Cooper argues that the federal privilege law should not govern the attorney-client privilege in this case. Cooper asks the Court to apply state law because it predicts the federal RICO claims will be dismissed in the Sullivan matter (as all of the individual defendants have failed to participate) leaving only state law claims against Peat Marwick and that, as a result, the Court will ultimately remand the case for lack of jurisdiction. It is the position of the plaintiffs that, under the New Jersey law of privilege, the "common interest" doctrine would apply. [HN11] The "common interest" doctrine preserves the privilege for documents disclosed [*25] to an ally. In re State Commission of Investigation Subpoena, 226 N.J. Super. 461, 544 A.2d 893 (App. Div. 1988) (when protected material is shared by parties with a sufficient commonality of legal interests waiver is precluded).

The Court concludes that, regardless of whether the Report was protected by the attorney-client privilege, the privilege was waived when Cooper voluntarily turned the Report over to the federal and state authorities. Although Cooper argues that the law of New Jersey should apply, Fed. R. Evid. 501 and judicial authority provide that when a complaint alleges both federal question claims and pendent state law claims, the federal common law applies to all claims. Wm. T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 103 (3d Cir. 1982) ("the Senate Report accompanying Rule 501 state that 'it is also intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case.'"); see also United States v. Keystone Sanitation Co., Inc., 899 F. Supp. 206, 207 (M.D. Pa. 1995) ("when a federal and state claim are tried together in federal [*26] court, if claim of privilege is raised only in reference to the state claim, the federal law of privilege applies."). As such, the reasoning of Westinghouse applies. Because Cooper has not demonstrated that disclosure was made to the government for the purposes of obtaining legal advice, any claim of attorney-client privilege attendant to the Report was waived.

C. Protective Order

[HN12] A court may issue a protective order stating that "disclosure . . . may be had only on specified terms and conditions . . ." or "that a trade secret or other confidential research, development, or commercial information not be revealed in a designated way." Fed. R. Civ. P. 26(c)(2) and (7). The Third Circuit has provided several factors that [HN13] a court may consider in determining whether certain information should be protected as a trade secret or as other confidential information: 1) the extent to which the information is known outside of the owner's business; 2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his [*27] competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989) (citing SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244 (3d Cir. 1985)). Once it is determined that certain information constitutes a trade secret or confidential material, the court must balance the moving party's need for confidentiality against the opposing party's need for relevant evidence.

It is Cooper's position that the Report consists of commercially sensitive material which could create significant competitive risks for Cooper if disclosed. Cooper contends that the "very nature of the Report suggests that there is a particular need for protection." Cooper's Br. at p. 23. It argues that the "business practices developed by Cooper are believed to constitute an innovation in hospital management . . ." and claims that since the underlying data is discoverable, there is no need for the defendants to gain access to the actual Report. Cooper Br. at p. 23.

In response, the defendants [*28] submit that Cooper has failed to meet its burden of showing that the Report should be protected pursuant to Fed. R. Civ. P. 26(c)(7) because it has not demonstrated a "particular need for protection." In addition, the defendants aptly point out that Cooper's assertion that the Report contains sensitive business information is inconsistent with its position that the Report contains legal advice and material prepared in anticipation for litigation. Peat Marwick also accuses Cooper of being disingenuous in that it now asserts that the underlying data is discoverable even though none was produced pursuant to Rule 26 disclosures.

The Court concludes that Cooper has failed to meet its burden to demonstrate good cause for a protective order pursuant to Rule 26(c)(7). Cooper does not identify adequately what type of information contained in the Report it fears could be misappropriated by competitors. Cooper has not addressed most of the factors set forth in the Smith case and has not referred to any judicial authority to support its general assertions.

D. Self-Critical Analysis Materials

[HN14] The self-critical analysis privilege has been recognized in a variety of actions in which [*29] confidentiality is "essential to the free flow of information and . . . the free flow of information is essential-to promote recognized public interests." Harding v. Dana Transport, Inc., 914 F. Supp. 1084 (D.N.J. 1996) (citing Note, The Privilege of Self-Critical Analysis, 96 Harv. L. Rev. 1083, 1087 (1983)). Those courts that recognize a federal self-critical analysis privilege generally require three criteria to be met for the information to qualify for protection: first, the information must result from critical self-analysis undertaken by the party seeking protection; second, the public must have a strong interest in preserving the free flow of the type of information sought; finally, the information must be of the type whose flow would be curtailed if discovery were allowed. Harding v. Dana Transport, 914 F. Supp. 1084, 1100 (D.N.J. 1996); Todd v. South Jersey Hosp. Sys., 152 F.R.D. 676, 683 (D.N.J. 1993); Dowling v. American Hawaii Cruises, Inc., 971 F.2d 423, 426 (9th Cir. 1992); Sheppard v. Consolidated Edison Co. of New York, Inc., 893 F. Supp. 6, 7 (E.D.N.Y. 1995). Courts have [*30] held that the self-critical analysis does not protect internal reviews which were not performed with the expectation that any information obtained would be kept confidential. Dowling v. American Hawaii Cruises, Inc., 971 F.2d 423, 426 (9th Cir. 1992).

Cooper believes that the Report should be protected based on its self-critical nature. Cooper states that the Ad Hoc Committee was appointed to work on a confidential basis in order to promote the free exchange of ideas and information about how best to identify and pursue culpable parties and to prevent future fraud. Cooper concedes that there may be public interest in the work of the Ad Hoc Committees, but that this interest was fulfilled by the U.S. Attorney's investigation and prosecution of the individual defendants.

The defendants maintains, and the Court concurs, that self-critical analysis protection is not applicable in this case because Copper has neither demonstrated that the information in the Report is the type whose flow would be curtailed if discovery were allowed nor shown that the information was prepared with the expectation that it would remain confidential.

III. CONCLUSION

For all of the [*31] foregoing reasons, the defendants' applications to compel Cooper to disclose the Report including Exhibits and the accompanying Executive Summary, is GRANTED and Cooper's cross-application for a protective order is DENIED. An accompanying Order shall be entered.

ROBERT B. KUGLER

United States Magistrate Judge

**ORDER**

THIS MATTER having been brought upon application before the Court by Richard S. Hyland, Esquire, attorney for Defendant KPMG Peat Marwick LLP ("Peat Marwick") in the matter Cooper Hospital/University Medical Center, et al. v. Sullivan, 1998 U.S. Dist. LEXIS 20586, Civil No. 96-5416 (JEI), for an order compelling discovery pursuant to Fed. R. Civ. P. 37(a); and upon application before the Court by Joseph G. Dolan, Esquire, attorney for Alan B. Reed, Individually, and Alan B. Reed, CPA, and by John B. Kearney, Esquire, attorney for Defendants Flex/sys Corporation, Flex/sys Technology Corporation, Defendants Flex/sys Corporation, Flex/sys Technology Corporation, Flex/sys (New Jersey) Corporation, Flex-sys Data Corporation - Cherry Hill, Donald G. Fellner and Walter I. Tanenbaum in the matter Cooper Hospital/University Medical Center, et al. v. Flex/sys Corporation, et al., 1998 U.S. Dist. LEXIS 20586, Civil No. [*32] 96-3182 (SMO) for an order compelling discovery pursuant to Fed. R. Civ. P. 37(a); and upon cross-application before the Court by David J. Novack, Esquire, attorney for Plaintiffs Cooper Hospital/University Medical Center and Cooper Healthcare Services, Inc., for a protective order pursuant to Fed. R. Civ. P. 26(c); and the Court having considered the moving papers and the opposition thereto; and having held oral argument on Aril 13, 1998; and for good cause shown herein and in the accompanying Opinion;

IT IS this 7th day of May, 1998 hereby

**ORDERED** that the defendants' application for an order compelling Plaintiffs Cooper Hospital/University Medical Center and Cooper Healthcare Services, Inc. to produce the report entitled "Report of the Ad Hoc Internal Control Committee of the Board of Trustees" ("Report"), along with all Exhibits and the Executive Summary, is **GRANTED**. It is

**FURTHER ORDERED** that the plaintiffs cross-application for a protective order to preclude the production of the Report is **DENIED**. It is

**FURTHER ORDERED** that, upon the request of Cooper and pursuant to Local Civil Rule 72.1(c)(1)(B), the herein order is stayed pending appeal. [*33]

ROBERT B. KUGLER

United States Magistrate Judge

LEXSEE


Analysis
As of: May 02, 2007

**GPA INCORPORATED, Plaintiff, -against- LIGGETT GROUP, INC., Defendant. ROSNER, BRESLER GOODMAN & GOLDEN, Plaintiff, -against- GPA INCORPORATED et al., Defendants.**

**94 Civ. 5735 (AGS), 95 Civ. 2652 (AGS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1996 U.S. Dist. LEXIS 9644**

**July 9, 1996, Decided**
**July 10, 1996, FILED**

**DISPOSITION:** [*1] Both motions to compel are granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a breach of contract case filed by plaintiff manufacturer against defendant distributor and a consolidated action for attorney's fees filed by plaintiff, the manufacturer's former law firm, against defendant manufacturer, the law firm and the distributor filed motions seeking leave to intervene in the other party's case for the limited purpose of pursuing discovery of sealed or otherwise unavailable documents held by the manufacturer.

**OVERVIEW:** The manufacturer sued the distributor, alleging breach of a contract that governed the production and distribution of certain discounted cigarettes. After the law firm withdrew from representing the manufacturer, the law firm sued the manufacturer for attorney's fees and the manufacturer counterclaimed and defended on the ground that the law firm misled it and betrayed its trust by disclosing the existence of documents related to a contract with a Spanish firm and by withdrawing the manufacturer's lost-profits claim. The court held that: (1) there was nothing to adjudicate on the law firm's motion to compel discovery because the manufacturer represented that it did not oppose production to the law firm of the information requested; (2) the distributor was entitled to discovery with respect to communications between the manufacturer and the law firm concerning the Spanish contract and the withdrawal of the lost-profits claim because the manufacturer waived the attorney-client privilege under the attorney self-defense exception to the privilege; and (3) the magistrate judge did not act on the motions to intervene because each movant obtained relief by discovery in its own case.

**OUTCOME:** The magistrate judge granted the law firm's motion to compel discovery in the absence of opposition by the manufacturer, granted the distributor's motion to compel discovery with respect to communications between the manufacturer and the law firm concerning the Spanish contract and the withdrawal of the lost-profits claim, ordered the manufacturer to produce all responsive documents within seven days, and did not act on the motions to intervene.

**CORE TERMS:** disclosure, lost-profits, discovery, privileged communications, withdrawal, waived, attorney-client, asserting, lawsuit, disclose, counterclaim, authorize, viability, waive, implied waiver, misfeasance, predictably, invoke, motion to compel, former client, law firm, authorization, withdrawing, misconduct, pre-trial, cigarette, withdrawn, withdraw, withhold, defended

**LexisNexis(R) Headnotes**

***Civil Procedure > Jurisdiction > General Overview***

***Governments > Courts > Judicial Precedents***
[HN1] When state case law on an issue in question is sparse, a federal court may look to legal authority in other jurisdictions, including a federal district court and a federal circuit court of appeals.

***Evidence > Privileges > Attorney-Client Privilege > Waiver***
***Evidence > Privileges > Government Privileges > Waiver***
***Legal Ethics > Client Relations > Confidentiality of Information***
[HN2] The attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. Waiver may occur even if the client does not intentionally relinquish a known right. If he voluntarily undertakes actions that will predictably lead to the disclosure of the document, then waiver will follow.

***Evidence > Privileges > Attorney-Client Privilege > Elements***
***Evidence > Privileges > Attorney-Client Privilege > Waiver***
***Evidence > Privileges > Government Privileges > Waiver***
[HN3] If a client authorizes disclosure of a privileged communication or a portion of a communication in the context of a lawsuit, there is a question of how broadly the waiver of the attorney-client privilege may be interpreted. Specifically, does the waiver extend only to the communication or portion disclosed, or does it require broader disclosure? New York applies a rule of subject-matter waiver in such circumstances, and thus requires disclosure of all otherwise privileged communications on the same subject. The alternative form of waiver of privileged communications is commonly known as waiver by assertion. The most commonly cited example of such a waiver is a party's invocation of an advice-of-counsel defense, which is deemed a waiver of any privilege barring disclosure of the asserted advice. Nonetheless, this principle is broader in scope, and compels an implied waiver where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information. In such an instance, the waiver extends to all communications on the subject matter in question.

***Criminal Law & Procedure > Defenses > Self-Defense***
***Evidence > Privileges > Attorney-Client Privilege > Waiver***
***Evidence > Privileges > Government Privileges > Waiver***
[HN4] Under the attorney self-defense exception to the attorney-client privilege, disclosure is permitted if the attorney is suing for his fee, or if he is being sued by his former client for malpractice or other misfeasance, or if the client is challenging the attorney's competence or integrity even though the attorney is not a party to the litigation. If the exception flows from an attack by the client on the attorney, it is appropriately viewed as a waiver of the privilege by the client.

***Evidence > Privileges > Attorney-Client Privilege > General Overview***
***Evidence > Privileges > Government Privileges > Waiver***
***Legal Ethics > Client Relations > Confidentiality of Information***
[HN5] A client cannot disclose, or authorize disclosure of, privileged information in a litigative context and still withhold the same information in a subsequent suit or from other parties.

**COUNSEL:**

For GPA INCORPORATED, plaintiff, counter-defendant: Philip M. Chiappone, FENNELL & CHIAPPONE, New York, NY. Dan J. Kazanas, Klutho, Cody & Kilo, P.C., St. Louis, MO.

For LIGGETT GROUP INC., defendant, counter-claimant: William F. Cavanaugh, Jr., Ellen M. Martin, Patterson, Belknap, Webb & Tyler, New York, NY. Eric Wertheim, Eric Wertheim, Attorney At Law, New York, NY.

**JUDGES:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE, Judge Allen G. Schwartz

**OPINION BY:** MICHAEL H. DOLINGER

**OPINION:**

MEMORANDUM & ORDER

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

At the termination of discovery in these two cases, the court confronts mirror-image motions by litigants in each of the cases, seeking leave to intervene in the other's case for the limited purpose of pursuing discovery of hitherto sealed or otherwise unavailable documents held

by GPA Incorporated. For the reasons that follow, we need not resolve the parties' disagreements concerning the appropriateness of intervention. Each movant seeks relief that it may obtain by discovery in its own case, and both motions to compel are granted.

A. Background

The first of these cases was filed by GPA in 1994 against the Liggett Group. GPA claimed in substance that it had been injured by virtue of Liggett's alleged breach of a contract with GPA that governed the production and distribution of certain so-called discounted cigarettes. At the time GPA was represented by the law firm of Rosner, Bresler, Goodman & Golden.

In the course of discovery, the Rosner firm learned [*2] that GPA had prepared a draft contract with a Spanish entity known as Tabacalera. The Tabacalera contract, although relevant to Liggett's defenses, was initially not produced in discovery, assertedly because GPA officials insisted that the document should not be turned over. This contretemps eventually led the Rosner firm to withdraw from its representation of GPA. Subsequently the court ordered production of the Tabacalera agreement and related documents over the opposition of GPA and its current attorneys, and Liggett has since asserted a counterclaim for fraud based on these events.

In addition, while the Rosner firm represented it, GPA withdrew its principal claim, for lost profits, which had been premised on Liggett's asserted breach of contract. It appears that the withdrawal of that claim followed the discovery that GPA had entered into a separate cigarette manufacturing contract with non-party Philip Morris for an overlapping time period.

Despite this withdrawal, when GPA prepared its portion of the joint pre-trial order, it resurrected that lost-profits claim. When called to account for this, GPA asserted, apparently for the first time, that the Rosner firm had withdrawn [*3] the lost-profits claim without authorization by the client.

The second lawsuit was filed by the Rosner firm, which is principally seeking fees allegedly due it from GPA. The former client has in turn counterclaimed and defended against the fee demand, asserting that the law firm misled it and betrayed its trust by disclosing the existence of the Tabacalera documents to Liggett and the court and then by withdrawing the lost-profits claim.

Discovery in these two cases is virtually complete. Nonetheless, Liggett has now indicated its interest in disclosure of any information produced in the Rosner litigation, with particular emphasis on communications between GPA and the Rosner firm concerning the Tabacalera transaction and documents and the lost-profits claim. The Rosner firm has, in turn, requested access to all discovery in the Liggett case, since it may be helpful to Rosner's prosecution of its own lawsuit.

GPA resists Liggett's efforts at intervention and discovery, asserting that intervention is not available to Liggett and that the disclosure it seeks is protected by the attorney-client privilege. Liggett in turn asserts that intervention is the appropriate procedure [*4] for obtaining access to the information in question and that the privilege, if ever applicable, has been waived by GPA in both lawsuits by its accusations of misconduct directed at its former attorneys.

As for the Rosner motion, GPA also argues that intervention is improper. Nonetheless, it indicates that it does not oppose disclosure to Rosner of the information that the firm seeks.

B. Analysis

We may readily dispose of the Rosner firm's motion. Since GPA represents that it does not oppose production to Rosner of the information that it seeks, there is nothing further to adjudicate. If it has not already done so, GPA is to produce that data within seven days.

The other motion, by Liggett, requires a somewhat more extended discussion. In substance, Liggett seeks disclosure of communications between GPA and the Rosner firm with regard to both the Tabacalera transaction and the viability of the previously withdrawn lost-profits claim, asserting that they are centrally relevant both to the fraud counterclaim asserted by Liggett and to the purportedly revived lost-profits claim of GPA. Although there is no question that such communications would ordinarily come within the scope [*5] of the attorney-client privilege, n1 Liggett asserts that the privilege has been waived by GPA, both by its assertions in support of the revival of its contract claim and by its representations and those of Rosner in the parallel lawsuit.

n1 Since both cases involve purely state-law claims and defenses, the privilege and its waiver are governed by the law of New York. See Fed. R. Evid. 501; Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (citing cases).

Liggett's waiver argument rests on two related but distinct theories. The first is that GPA has disclosed at least a portion of its privileged communications with its former attorneys and must therefore, as a matter of fairness, be deemed to have waived the privilege for all undisclosed portions of the same communications and all other communications on the same topics. The second is that, by the assertion of claims or defenses that rest upon implicit representations as to what was said between

GPA and the Rosner firm, [*6] GPA has waived the privilege since the validity of GPA's assertions cannot be assessed without disclosure of the substance of the privileged communications.

In addressing waiver, I note that the governing law is that of New York State. [HN1] Nonetheless, in view of the relative sparseness of case law in New York on some of the precise waiver issues in question, I look also to legal authority in other jurisdictions, including this court and the Second Circuit. See, e.g., Leon's Bakery, Inc. v. Grinnell Corp., 990 F.2d 44, 47-48 (2d Cir. 1993).

As a general matter, [HN2] the attorney-client privilege is waived if the "holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Sup. Ct. St. 511. See, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991) (citing cases). See generally 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence, P 511[02] at 511-4 to -8 (1994). Waiver may occur even if the client does not "intentionally relinquish[] a known right." Id. at 511-6 to -7 & nn. 14-16. Accord, e.g., In re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 823 (D.C. Cir. [*7] 1982); In re John Doe Corp., 675 F.2d 482, 488-89 (2d Cir. 1982). "If he voluntarily undertakes actions that will predictably lead to the disclosure of the document, then waiver will follow." Bowne, 150 F.R.D. at 479 (citing In re von Bulow, 828 F.2d 94, 100-01 (2d Cir. 1987)).

[HN3] If the client authorizes disclosure of a privileged communication or a portion of such a communication in the context of a lawsuit, there remains the question of how broadly the waiver may be interpreted. Specifically, does the waiver extend only to the communication or portion disclosed, or does it require broader disclosure? It appears that New York applies a rule of subject-matter waiver in such circumstances, e.g., AMBAC Indem. Corp. v. Bankers Trust Co., 151 Misc. 2d 334, 340-41, 573 N.Y.S.2d 204, 208 (Sup. Ct. 1991); Matter of Estate of Baker, 139 Misc. 2d 573, 576, 528 N.Y.S.2d 470, 473 (Sur. Ct. 1988); see also Bowne, 150 F.R.D. at 484-85 (construing New York law and citing cases), and thus requires disclosure of all otherwise privileged communications on the same subject. See also In re Kidder Peabody Secs. Litig., 1996 U.S. Dist. LEXIS 6700, 1996 WL 263030, at *10, 14-15 (S.D.N.Y. May 17, 1996) (undertaking [*8] same analysis under federal law).

The alternative form of waiver that is relevant to the current motion is commonly known as waiver by assertion. See, e.g., Jakobleff v. Cerrato, Sweeney & Cohn, 97 A.D.2d 834, 835, 468 N.Y.S.2d 895, 897 (2d Dep't 1983); In re von Bulow, 828 F.2d at 102. The most commonly cited example of such a waiver is a party's invocation of an advice-of-counsel defense, which is deemed a waiver of any privilege barring disclosure of the asserted advice. See, e.g., People v. Edney, 39 N.Y.2d 620, 625, 385 N.Y.S.2d 23, 26, 350 N.E.2d 400 (1976); Orco Bank v. Proteinas Del Pacifico, S.A., 179 A.D.2d 390, 577 N.Y.S.2d 841, 842 (1st Dep't 1992). Nonetheless, this principle is broader in scope, and compels an implied waiver "where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information." Bowne, 150 F.R.D. at 488 (quoting Jakobleff, 97 A.D.2d at 835, 468 N.Y.S.2d at 897). In such an instance, the waiver extends to all communications on the subject matter in question. See, e.g., von Bulow, 828 F.2d at 103 (quoting 8 C. Wigmore, Evidence [*9] § 2327, at 638 (McNaughten rev. ed. 1961)).

In this case, we see examples of both forms of waiver, although the analysis is more straightforward in connection with the waiver by assertion. In the Rosner litigation, GPA has made assertions in its own defense and in its counterclaims that both attack the performance of its former attorneys in representing GPA and disclose the substance of normally privileged communications between client and counsel. These assertions waive the privilege.

We start by noting the universally recognized [HN4] attorney self-defense exception to the privilege. As most commonly formulated, disclosure is permitted if the attorney is suing for his fee, or if he is being sued by his former client for malpractice or other misfeasance, or if the client is challenging the attorney's competence or integrity even though the attorney is not a party to the litigation. See, e.g., First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co., 110 F.R.D. 557, 560-64 (S.D.N.Y. 1986) (citing cases). If the exception flows from an attack by the client on the attorney, it is appropriately viewed as a waiver of the privilege by the client. See, e.g., id. [*10] at 561 (citing cases).

In this instance GPA has attacked its former attorneys in both cases. As noted, in the Rosner case GPA has defended against the firm's fee claim by asserting misconduct on the part of the lawyers in connection with both the Tabacalera contract and the lost-profits claim, and it has further pressed counterclaims based on the same purported misfeasance. Necessarily, these assertions call into question all communications between client and attorneys on these topics. If Rosner is to defend itself, it must be able to disclose all such otherwise privileged discussions, and GPA, by asserting its claims and defenses, must be deemed to have understood the implications of its legal posture on the continuing viability of its attorney-client privilege. Since GPA has acted in a manner that will predictably lead to the public disclosure

of those communications, either at trial or in motion practice, it cannot withhold them from Liggett in the related suit. n2

n2 This conclusion follows as well from the well-settled principle in this and other jurisdictions that [HN5] a client cannot disclose, or authorize disclosure of, privileged information in a litigative context and still withhold the same information in a subsequent suit or from other parties. See, e.g., Bowne, 150 F.R.D. at 479-81 (citing cases). Although GPA quarrels with this court's prior holding to the effect that implied waiver may be invoked when disclosure has been made in discovery in an earlier case, see GPA's Memo of Law at 9 n.15 (criticizing Bowne, 150 F.R.D. at 484-85), that is the law both in New York, see, e.g., Bowne, 150 F.R.D. at 485; Drimmer v. Appleton, 628 F. Supp. 1249, 1252 (S.D.N.Y. 1986) (applying New York law), and in this circuit. See, e.g., In re Kidder Peabody Secs. Litig., 1996 U.S. Dist. LEXIS 6700, 1996 WL 263030, at *9-11.

[*11]

As for GPA's own suit against Liggett, GPA has sought to resurrect its lost-profits claim in the joint pretrial order, in the face of its own then-attorney's prior written representation to the court that GPA had authorized the withdrawal of the claim. In seeking the court's imprimatur on this apparent U-turn, GPA has made an implicit representation to the court as to the substance of otherwise privileged communications between it and the Rosner firm concerning the retention or withdrawal of this claim. If Liggett is to be able to respond to these assertions of fact by GPA, and if the court is to be able to assess them, the substance of the privileged communications must be revealed.

Moreover, if the lost-profits claim is restored, at trial Liggett will undoubtedly use the letter from GPA's counsel withdrawing the claim as an admission on the part of GPA as to its meritlessness. Inevitably, GPA will then seek to demonstrate that the attorneys acted without authorization. Again, however, such a posture necessarily waives the privilege since Liggett cannot respond without access to the privileged communications.

In short, GPA's current assertions in this case waive the privilege. [*12] Moreover, the waiver extends not merely to those communications in which it authorized or refused to authorize the withdrawal, but also to any discussions with counsel as to the viability of the claim in the wake of the disclosure of GPA's agreement with Philip Morris. This extensive waiver of the privilege is compelled because the plausibility of GPA's denial that it authorized the withdrawal would be substantially weakened if it could be shown that the Rosner firm counselled GPA that the existence of the Philip Morris deal undercut the lost-profits claim. In short, GPA cannot seek to restore and press that claim without surrendering its privilege with respect to these related discussions with its counsel. n3

n3 GPA also argues in entirely conclusory terms that Liggett's motion should be denied because it seeks attorney's work product. This argument fails because GPA has not even attempted to demonstrate the factual predicate for the assertion of the workproduct rule. See, e.g., Bowne, 150 F.R.D. at 470-72. In any event, Rosner -- the party entitled to invoke the protection of the rule -- has no objection to the requested production. Furthermore, to the extent that GPA may have standing to invoke the work-product rule, it has waived any immunity from disclosure for the reasons discussed at length in connection with its assertion of the attorney-client privilege.

[*13]

CONCLUSION

For the reasons stated, the motion to compel by the Rosner firm is granted, in the absence of opposition by GPA. The motion to compel by Liggett is granted with respect to communications between GPA and representatives of the Rosner firm concerning the Tabacalera contract and the question of whether to withdraw the lost-profits claim. n4 All responsive documents are to be produced by GPA within seven days. The court does not act on the motions to intervene since their resolution is unnecessary to the disposition of the discovery disputes.

n4 Liggett seeks access to all discovery in the Rosner litigation. We infer that GPA, as defendant in that case, has access to all such documents and that our order for production addressed to it will fully satisfy Liggett's request for relief on its current motion.

Dated: New York, New York

July 9, 1996

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE

LEXSEE



Analysis
As of: May 02, 2007

**GET-A-GRIP, II, INC. v. HORNELL BREWING CO., INC. d/b/a FEROLITA, VOLTAGGIO & SONS**

**CIVIL ACTION NO. 99-1332**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2000 U.S. Dist. LEXIS 11961**

**August 8, 2000, Decided**
**August 8, 2000, Filed; August 8, 2000, Entered**

**DISPOSITION:** [*1] Defendant's Renewed Motion for Sanctions (Document No. 45) GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant renewed its motion for sanctions, contending that plaintiff failed to comply with the court's orders regarding a discovery dispute between the parties.

**OVERVIEW:** The court had previously denied the parties' motions for sanctions and had ordered the parties to produce responsive documents. The court had also ordered plaintiff to produce a privilege log within 10 days of its order. Plaintiff failed to produce a privilege log until defendant renewed its motion for sanctions. The court also concluded that plaintiff had not produced all of the documents responsive to defendant's production request since the privilege log listed additional documents that had not been produced. The court rejected plaintiff's claims that the additional documents were subject to attorney-client privilege or the work-product doctrine because plaintiff had waived the privilege by not raising the claim earlier. The court imposed sanctions on plaintiff and ordered it to produce all documents responsive to defendant's request, including the documents listed in the privilege log. The court also awarded defendant attorney's fees and costs associated with its production of documents that plaintiff failed to inspect.

**OUTCOME:** Motion for sanctions granted and plaintiff was ordered to produce all documents responsive to defendant's request, including documents listed in privilege log, because plaintiff had waived any privilege.

**CORE TERMS:** log, discovery, twenty-four, boxes, responsive, work product doctrine, attorney-client, twenty-two, documents relating, renewed motion, undersigned, untimely, waived, original motion, collecting, inspect, patent, production of documents, substantially justified, deemed waived, first motion, prosecuting, disclosure, inspection, preparing, modify, discovery request, responded, complied, assured

**LexisNexis(R) Headnotes**

***Civil Procedure > Discovery > Misconduct***
[HN1] See Fed. R. Civ. P. 37(a)(4)(A).

***Civil Procedure > Discovery > Misconduct***
[HN2] See Fed. R. Civ. P. 37(b)(2).

***Civil Procedure > Discovery > Misconduct***
[HN3] The court has broad discretion to impose any of the sanctions listed in Fed. R. Civ. P. 37(b)(2) or any other sanctions it deems just.

***Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers***
***Evidence > Privileges > Attorney-Client Privilege > Waiver***
[HN4] Failure to assert a privilege properly may amount to a waiver of that privilege.

**COUNSEL:** For GET-A-GRIP, II, INC., PLAINTIFF: GAVIN P. LENTZ, STEPHEN J. SPRINGER, BOCHETTO & LENTZ, P.C., PHILADELPHIA, PA USA.

For FEROLITO, VOLTAGGIO & SONS, DEFENDANT: GARY A. HECHT, SYNNESTVEDT AND LECHNER, PHILA, PA USA.

For HORNELL BREWING CO., INC., DEFENDANT: JOSEPH F. POSILLICO, JOSHUA R. SLAVITT, GARY A. HECHT, SYNNESTVEDT & LECHNER, PHILADELPHIA, PA USA.

**JUDGES:** THOMAS J. RUETER, United States Magistrate Judge.

**OPINION BY:** THOMAS J. RUETER

**OPINION:**

**MEMORANDUM AND ORDER**

THOMAS J. RUETER
United States Magistrate Judge

August 8, 2000

Presently before this court is defendant's renewed motion for sanctions (Document No. 45) filed with this court on June 15, 2000. n1 In its motion, defendant contends that plaintiff has failed to comply with the court's orders of February 8, 2000 (by Judge Kelly) and May 11, 2000 (by the undersigned) regarding a discovery dispute between the parties. A hearing on the motion was held before the undersigned on August 1, 2000. For the reasons stated below, defendant's motion is GRANTED. n2

n1 By Order dated July 19, 2000, the Honorable James McGirr Kelly referred defendant's motion to the undersigned for disposition. (Document No. 50.)

[*2]

n2 Plaintiff contends that defendant's motion is untimely under Fed. R. Civ. P. 72(a) because it is actually a motion seeking to set aside or modify this court's May 10, 2000 order. (Pl.'s Answer to Def.'s Renewed Mot. for Sanctions at 1-2.) Defendant's motion does not seek to modify this court's May 10, 2000 order. Rather, it seeks sanctions for plaintiff's continued failure to comply with court orders regarding discovery, including this court's May 10, 2000 order. Plaintiff's request that defendant's motion be denied as untimely is denied.

On May 10, 2000, after a hearing that same day, this court entered an order denying both plaintiff's motion for sanctions (Document No. 26) and defendant's motion for sanctions (Document No. 32). The court also ordered, inter alia, that defendant shall review twenty-two boxes of documents identified by plaintiff's counsel during his inspection of February 17, 2000 and produce responsive documents by May 24, 2000; and that plaintiff shall produce all responsive documents to request number twenty-four in defendant's first set of requests for production [*3] of documents within ten days from the date of the court's order or, to the extent necessary, submit a privilege log in accordance with Fed. R. Civ. P. 26(b)(5). (Order, dated 5/10/00, at 1-2; Document No. 39).

At the May 10, 2000 hearing, defendant contended that plaintiff had not fully responded to request number twenty-four in defendant's first set of requests for production of documents. Plaintiff assured this court that it had fully responded to that discovery request based upon its narrow interpretation of what the request was seeking. (N.T., 5/10/00, at 41, 42, 44.) Plaintiff claimed that it produced 2,500 pages of documents relating to the prosecution history of the relevant patent. (N.T., 5/10/00, at 41, 44.) Defendant explained that the scope of request number twenty-four was not limited to the prosecution history of the patent ("Prosecution Information"), but also included documents which constitute, relate or refer to the expert analysis referred to in paragraph nineteen of the Complaint, or to any other opinion regarding the validity, enforceability, or infringement of the relevant patent ("Litigation Information"). (N.T., 5/10/00, at 39.) This court agreed with defendant [*4] that the scope of request number twenty-four included Litigation Information as well as Prosecution Information. (Order, dated 5/10/00, at 2 n.1.) Plaintiff argued that if request number twenty-four were to include Litigation Information, such documents would be subject to the attorney-client privilege and/or the work product doctrine. (N.T., 5/10/00, at 43.) Counsel for plaintiff represented to this court that plaintiff had not asserted the attorney-client privilege and/or the work product doctrine to request number twenty-four n3 because "we do not believe that we had to assert [sic] or that the discovery covered any communication with counsel in connection with the litigation." (N.T., 5/10/00, at 41.)

n3 Plaintiff did not assert the attorney-client privilege or the work product doctrine to any of defendant's discovery requests.

In reliance upon representations from plaintiff's counsel that plaintiff had produced all documents relating to the Prosecution Information and that plaintiff had not submitted a [*5] privilege log because plaintiff interpreted the scope of the document request narrowly, this court acted leniently and ordered plaintiff to produce all responsive documents and, to the extent necessary, a privilege log, within ten days of the date of this court's order, and denied defendant's request that plaintiff be deemed to have waived all claims of privilege.

At the hearing on defendant's instant motion, this court was dismayed to learn that plaintiff did not produce a privilege log as directed until after defendant filed the renewed motion for sanctions. Plaintiff produced the log to defendant on or about July 6, 2000. Plaintiff's counsel acknowledged that the untimely production of the log was due to his oversight. This court is troubled by counsel's response. The court's May 10, 2000 order required plaintiff to produce documents in response to request number twenty-four within ten days from the date of the order and, to the extent any documents were subject to a privilege, to produce a privilege log. The order was issued after a hearing that lasted approximately fifty minutes. (N.T., 5/10/00, at 1, 47.) Counsel presented argument to the court on these issues. In light of all [*6] these events focusing attention on the discovery requests and the privilege log, this court cannot accept counsel's statement that he "forgot" to prepare the log.

Even more troubling, however, is that plaintiff's counsel assured this court at the May 10, 2000 hearing that plaintiff had produced all documents relating to the Prosecution Information and that the only reason plaintiff did not file a privilege log was because plaintiff misinterpreted the scope of the document request. (N.T., 5/10/00 at 41-44.) Plaintiff's counsel informed this court that to the extent that request number twenty-four requested Litigation Information, the attorney-client privilege and/or work product doctrine would apply. (N.T., 5/10,00, at 43.) The privilege log produced by plaintiff, however, lists eighty documents most, if not all, of which relate to the Prosecution Information. Thus, it is apparent that plaintiff had not produced all of the Prosecution Information as counsel had represented.

Moreover, plaintiff now asserts that documents relating to the Prosecution Information are subject to the attorney-client privilege and/or the work product doctrine contrary to counsel's representations to this [*7] court at the May 10, 2000 hearing. At the August 1, 2000 hearing, plaintiff's counsel attempted to explain these inconsistencies by stating that the documents listed in the log were not responsive to request number twenty-four, but to request number nineteen and, in any event, he did not believe privileged documents to be covered by the discovery requests. As to the first argument, plaintiff did not object to document request number nineteen on the grounds of privilege and cannot do so at this belated hour. Moreover, as stated above, on several occasions at the May 10, 2000 hearing, plaintiff's counsel specifically represented to this court that plaintiff produced all documents relating to the Prosecution Information. As to the privilege log, plaintiff's counsel stated at the May 10, 2000 hearing that a privilege log was not required for documents relating to Prosecution Information, only for Litigation Information. Counsel cannot now argue to the contrary.

For these reasons, this court will grant defendant's renewed motion for sanctions and order plaintiff to pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in preparing and prosecuting both [*8] of its motions for sanctions before the undersigned. n4 Such fees are appropriate under Fed. R. Civ. P. 37(a)(4)(A) which states as follows:

> [HN1]
> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party . . . whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(4)(A). Additionally, [HN2] Fed. R. Civ. P. 37(b)(2) provides that "if a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just . . . ." [HN3] The court has broad discretion to impose any of the [*9] sanctions listed in Fed. R. Civ. P. 37(b)(2) or any other sanctions it deems just. Hicks v. Feeney, 850 F.2d 152, 155 (3d Cir. 1988). This court finds that prior to filing the instant mo-

tion, defendant made efforts to obtain the information from plaintiff which efforts resulted in defendant filing its first motion for sanctions. n5 Despite this court's May 10, 2000 order, plaintiff still failed to provide the required information which failure was not substantially justified. Moreover, the record indicates a history of lack of cooperation by the plaintiff. n6 See generally Wright v. Montgomery County, et al., 1999 U.S. Dist. LEXIS 900, 1999 WL 80275, at *3 (E.D. Pa. Feb. 3, 1999).

n4 Defendant also seeks costs related to the preparation and prosecution of its original motion to compel. The original motion to compel was decided by Judge Kelly. Since this court was not involved in that decision, it will not award costs related to that original motion.

n5 Plaintiff complains that defendant did not call him after he failed to produce the privilege log required by this court in its May 10, 2000 order but instead filed the renewed motion for sanctions. At that time, plaintiff was under order of this court to provide the log, it was not defendant's obligation to remind plaintiff to do so. This court finds that defendant attempted to resolve the discovery disputes with plaintiff without court intervention, but that those efforts were unsuccessful and resulted in defendant's two motions for sanctions.

[*10]

n6 Plaintiff claims that defendant also has been uncooperative. However, at the May 10, 2000 hearing, it appeared that other than an issue concerning 22 boxes of documents, an issue which is addressed later in this order, defendant had complied with plaintiff's discovery request. (N.T., 5/10/00, at 25.)

The court also will order that plaintiff must produce all documents responsive to defendant's discovery requests, including the documents listed in the privilege log, and that any claim of attorney-client privilege and/or the work product doctrine have been deemed waived as untimely asserted. See, e.g, Massachusetts School of Law at Andover, Inc. v. Am. Bar Assoc., 914 F. Supp. 1172, 1178 (E.D. Pa. 1996) [HN4] ("failure to assert a privilege properly may amount to a waiver of that privilege"). n7

n7 Plaintiff's request that this court review the documents listed in plaintiff's privilege log in camera is denied since this court has found that plaintiff has waived any and all claims of attorney-client privilege and work product doctrine. (Ltr. dated 8/2/00 from Pl.'s Counsel to Court.)

[*11]

Additionally, at the May 10, 2000 hearing, plaintiff's counsel argued that on February 17, 2000 he marked twenty-two boxes of documents located at defendant's corporate headquarters, which he suspected were responsive to plaintiff's document request. (N.T., 5/10/00, at 25.) This court ordered defendant to review these boxes and to produce responsive documents to plaintiff by May 24, 2000. (Order, dated 5/10/00, at P 4.) After considerable effort and expense, defendant complied with the court's order and notified plaintiff's counsel on several occasions that the documents were available for inspection. Defense counsel reported that plaintiff's counsel did not respond to his communications and never inspected the documents which have since been returned to storage at defendant's facility. Plaintiff's counsel acknowledged at the August 1, 2000 hearing that he did not inspect the information defendant collected from the twenty-two boxes and explained that he chose to pursue an alternative means of discovery to obtain the information. This court also shall order that plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in reviewing and [*12] collecting information from the twenty-two boxes identified by plaintiff's counsel, and that plaintiff shall be deemed to have waived its request for those documents and shall not be entitled to inspect them. Such an order is just in this regard.

AND NOW, this 8th day of August, 2000, for all the above stated reasons, it is hereby

**ORDERED**

1. Defendant's Renewed Motion for Sanctions (Document No. 45) is **GRANTED**;

2. Plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in preparing and prosecuting both of its motions for sanctions (Documents Nos. 32 and 45) before the undersigned;

3. Plaintiff shall produce all documents responsive to defendant's document requests, including the documents listed in the privilege log, within ten (10) days from the date of this order or face further sanctions;

4. Any and all claims of attorney-client privilege and/or the work product doctrine by plaintiff have been deemed waived;

5. Plaintiff shall pay to defendant all reasonable costs, including attorney's fees, incurred by defendant in reviewing and collecting information from the twenty-two boxes identified by plaintiff's counsel; [*13]

6. Plaintiff is deemed to have waived its request for the documents in the twenty-two boxes and shall not be entitled to inspect them; and

7. Defendant shall provide to plaintiff's counsel within ten (10) days from the date of this order, the total costs, including attorney's fees, due to be paid under this order separated into the following categories: (1) costs related to defendant's first motion for sanctions (Document No. 32); (2) costs related to defendant's renewed motion to sanctions (Document No. 45); and (3) costs related to reviewing and collecting information from the twenty-two boxes. Counsel shall use their best efforts to agree on the amount to be paid hereunder and plaintiff's counsel shall pay such amount no later than ten (10) days after receiving the list of costs from defendant.

BY THE COURT:

THOMAS J. RUETER

United States Magistrate Judge

LEXSEE



Positive
As of: May 02, 2007

**FG HEMISPHERE ASSOCIATES, L.L.C., Plaintiff, -against- REPUBLIQUE DU CONGO, Defendant.**

**01 Civ. 8700 (SAS) (HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 3523**

**March 7, 2005, Decided**
**March 8, 2005, Filed**

**DISPOSITION:** [*1] Plaintiff's motion to compel granted and motion for sanctions denied as unenforceable.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant defaulted on a note in which plaintiff was the assignee. Judgment was entered against defendant and plaintiff was forced to conduct post-judgment discovery in an effort to locate assets that were subject to execution. Plaintiff moved for sanctions and to compel production of certain documents, claiming that defendant failed to comply with a discovery order and failed to properly schedule documents withheld on the ground of privilege.

**OVERVIEW:** Although defendant failed to comply with the court's order, there did not appear to be any available remedy. The difficulties plaintiff was having trying to collect its $ 151 million judgment established that any monetary sanction would have been close to meaningless. The sanction suggested by plaintiff--effectively, a trade embargo precluding defendant from engaging in commercial activity in the United States--was unquestionably a matter of foreign relations reserved for other branches of the government. Given the fact that defendant was a foreign sovereign, there did not appear to be any coercive remedies that could be imposed against it. Since defendant did not serve an index of documents withheld on the ground of privilege and since defendant offered no evidence of any agreement with plaintiff or court order extending the date for the submission of such an index, defendant's unjustified failure to comply with U.S. Dist. Ct., S.D. N.Y., Civ. R. 26.2(c) resulted in a waiver of any claim of privilege.

**OUTCOME:** The magistrate granted plaintiff's motion.

**CORE TERMS:** withheld, discovery, responsive, log, privileged, claim of privilege, post-litigation, post-judgment, interrogatories, searched, custody, electronic, persuasive, Paris Bar Rules, diligent search, physically, confirming, directing, deadline, e-mails, sworn, subject to execution, commercial activity, foreign sovereign, tape-recording, preparation, unjustified, withhold, indexed, belated

**LexisNexis(R) Headnotes**

***Civil Procedure > Discovery > Methods > Requests for Production & Inspection***
***Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview***
***Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > Discovery of Assets***
[HN1] When a party is a foreign sovereign, the universe of assets subject to execution is limited to assets used for a commercial activity. 28 U.S.C.S. § 1610(a).

***Civil Procedure > Discovery > Misconduct***

***Civil Procedure > Pretrial Judgments > Default > Default Judgments***
***Civil Procedure > Pretrial Judgments > Default > Entry of Default Judgments***
[HN2] Although entry of a default judgment is an extreme measure, discovery orders are meant to be followed. A party who flouts such orders does so at his peril.

***Civil Procedure > Discovery > Methods > Requests for Production & Inspection***
***Criminal Law & Procedure > Search & Seizure > General Overview***
[HN3] Documents stored on electronic media are "documents" for the purposes of Fed. R. Civ. P. 34.

***Civil Procedure > Discovery > Privileged Matters > General Overview***
[HN4] See Fed. R. Civ. P. 26(b)(5).

***Civil Procedure > Counsel > General Overview***
***Civil Procedure > Discovery > Methods > Requests for Production & Inspection***
***Civil Procedure > Discovery > Privileged Matters > General Overview***
[HN5] Fed. R. Civ. P. 26(b)(5) is supplemented by U.S. Dist. Ct., S.D. N.Y., Civ. R. 26.2(a)(2)(A) which sets forth the specific information that must be disclosed when documents are withheld on the ground of privilege. Local Civil Rule 26.2(c) commands, inter alia, that when documents sought in a request made pursuant to Fed. R. Civ. P. 34 are withheld on the ground of privilege, the index required by Local Civil Rule 26.2(a)(2)(A) shall be furnished in writing at the time of the response to such discovery or disclosure, unless otherwise ordered by the court. It should be clear to all attorneys that the Federal Rules of Civil Procedure and the Local Civil Rules are not starting points for a discussion concerning the handling of privileged documents nor are they merely suggested practice guidelines that attorneys are free to disregard. They are rules, and in the absence of a court order or stipulation providing otherwise, they must be obeyed.

***Civil Procedure > Discovery > Privileged Matters > General Overview***
[HN6] The unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege.

**COUNSEL:** Danforth Newcomb, Esq., Brian Polovoy, Esq., Panagiotis Katsambas, Esq., Shearman & Sterling LLP, New York, New York, For Plaintiff.

Boaz S. Morag, Esq., Benjamin A. Rosen, Esq., Vitali S. Rosenfeld, Esq., Cleary, Gottlieb, Steen & Hamilton, New York, New York, For Defendant.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION:**

MEMORANDUM OPINION AND ORDER

PITMAN, United States Magistrate Judge:

I. Introduction

Plaintiff FG Hemisphere Associates, L.L.C. ("FG") moves for sanctions and to compel production of certain documents, claiming that defendant, the Republique du Congo (the "Congo"), has failed to comply with a discovery Order and has failed to properly schedule documents withheld on the ground of privilege. For the reasons set forth below, FG's motion is granted.

II. Facts

The facts underlying FG's claims against the Congo are set forth in my report and recommendation dated June 17, 2002, familiarity with which is assumed. Plaintiff is the assignee of a note made by the Congo. The Congo defaulted on the note, failed to answer or move with respect to FG's complaint in this action and failed to make any appearance [*2] whatsoever. As a result of the Congo's default, judgment has been entered against it in the aggregate sum of approximately $ 151 million. This sum represents the unpaid balance of the note, accrued interest and attorney's fees incurred in collection as of the date of the judgment.

The Congo has ignored the judgment, and FG has been forced to conduct post-judgment discovery in an effort to locate assets that are subject to execution. Because the Congo [HN1] is a foreign sovereign, the universe of assets subject to execution is limited to assets "used for a commercial activity." 28 U.S.C. § 1610(a).

In furtherance of its efforts to locate assets, FG served interrogatories and document requests on the Congo in January, 2003, and the Congo responded in March, 2003. In its response to the document request, the Congo produced approximately 350 pages of documents and asserted the attorney-client and work-product privileges with respect to certain documents. The Congo did

not, however, submit an index of documents withheld on the ground of privilege. The matter was subsequently referred to me to oversee post-judgment discovery.

As a result of FG's dissatisfaction with [*3] the Congo's discovery responses, the parties conferred in the spring of 2003. During the course of these communications, the Congo's counsel wrote to FG's counsel, confirming the Congo's position as to certain discovery requests and agreeing to provide and index of any documents withheld on the ground of privilege. Specifically, in a letter to FG's counsel dated March 26, 2004, the Congo's counsel stated:

> As I mentioned in my letter of March 20, we are working with our client to produce responsive documents that are not subject to Congo's objections by April 3. I expect Congo's production will not be voluminous since the Congo does not engage in commercial activities in the United States. If responsive documents are withheld on the basis of attorney-client privilege or under the work product doctrine, we will provide you with a privilege log.

(Exhibit 10 to the Affidavit of Brian H. Polovoy, Esq., sworn to April 5, 2004 ("Polovoy Aff."), at 2). Notwithstanding the foregoing representation, the Congo did not produce an index of documents withheld on the ground of privilege.

The parties were unable to resolve their disputes concerning the Congo's document production, and [*4] a conference to discuss these disputes was held before the Honorable Shira A. Scheindlin, United States District Judge, on May 21, 2003. Before she referred the matter to me, Judge Scheindlin noted that the Congo needed to produce a list of documents withheld on the ground of privilege:

> As far as [the Congo's] objections, they don't sound concrete enough. I don't know what they are. I don't know if there are any privilege objections in there, in which case there should be a privilege log.

(Polovoy Aff., Ex. 6 at 11).

The Congo did not prepare a privilege log in response to Judge Scheindlin's admonition.

During the summer of 2003, I had several conferences and conference calls with counsel in an effort to resolve the document disputes. Although the parties made some progress toward the resolution of their discovery disputes, there were still open issues as of September, 2003. Of particular frustration to both FG and the Court was the Congo's production of documents on an ongoing basis. As of September, 2003, the Congo had never represented that its production was complete, and it did not appear that the Congo was according substantial importance to its obligation to [*5] comply with its discovery obligations. The Congo's failure to complete its production was particularly frustrating to FG; until the Congo's production was complete, it was impossible to determine the full extent of the parties' discovery dispute. Defense counsel himself was "disappointed" at his client's production, and cited lack of resources as the principal reason for his client's failure to complete its production (Transcript of Tape-Recorded Conference Call conducted on September 18, 2003 at 4-6).

After hearing from counsel in a September 18, 2003 conference call, I attempted to bring the matter to a head by setting a firm deadline for the completion of document production and directing the production of an affidavit confirming that production was complete. Specifically, I issued the following Order on September 19, 2003:

> A tape-recorded conference call having been held on September 18, 2003 during which a discovery dispute was discussed, for the reasons stated on the record during the course of the conference call, it is hereby ORDERED that:
>
> > 1. No later than October 31, 2003, defendant shall complete its production of all documents in its possession, custody or control [*6] and all documents in the possession, custody or control of Societe Nationale de Petrol du Congo ("SNPC") concerning all assets that have any relationship whatsoever with the United States or that are physically located in the United States.
> >
> > 2. No later than October 31, 2003, defendant is directed to produce an affidavit confirming that it and SNPC have produced all documents in their possession, custody or control

> concerning all assets that have any relationship whatsoever with the United States or that are physically located in the United States and that each has performed a diligent search for such documents at each location in which such documents could reasonably expect to be found.

(Docket Item 27).

On November 4, 2003, in response to my Order, the Congo produced a declaration from Bruno J.R. Itoua, the Presidente-Directeur General of SNPC, and approximately 2,000 additional pages of documents. Itoua's declaration provided, in pertinent part:

> 2. I confirm that SNPC has produced all documents in its possession, custody or control concerning all assets of the SNPC, excluding diplomatic property, that have any relationship whatsoever with the United States or that [*7] are physically located in the United States.
>
> 3. Specifically, I confirm that SNPC, under my supervision, has performed a diligent search of its records at its offices in Brazzaville and in London. The records at each location have been diligently searched for all documents, dating from January 2000 to the present, relating to any of the following United States companies engaged in petroleum operations, or any of their affiliates: (i) Chevron Texaco Corporation; (ii) CMS Oil & Gas Company, (iii) Nuevo Congo Company; and (iv) Murphy Oil Corporation.
>
> 4. SNPC's search yielded approximately 1800 pages of documents, all of which SNPC has turned over to its counsel in this action, Cleary, Gottlieb, Steen & Hamilton.

(Polovoy Aff., Ex. 23).

A follow-up conference concerning the sufficiency of the Congo's November 4, 2003 production was held on November 25, 2003. At the conference, FG's counsel objected to the Congo's production on a number of grounds: (1) the Congo had only produced documents concerning petroleum-related assets and had not produced documents concerning other types of commercial transactions; (2) the affidavit described searches of SNPC's London and Brazzaville facilities [*8] but did not explain why searches were not performed at any other locations; (3) the Congo did not produce a log of documents withheld on the ground of privilege; (4) the documents the Congo had produced concerning its transactions with a specific United States company -- CMS Oil & Gas Company ("CMS") -- were a small fraction of the documents that CMS had advised FG that CMS possessed, and (5) the Congo failed to produce e-mails.

Because the parties had indicated some hope of being able to resolve these problems on their own, I gave them approximately six weeks to do so, and set January 16, 2004 as the deadline for the filing of any motion for sanctions. That date was subsequently extended to April 5, 2004 at the parties' request.

III. Analysis

FG now seeks sanctions for the Congo's failure to comply with my September 19, 2003 Order and an Order directing the Congo to produce all documents withheld on the ground of privilege on the theory that the Congo's failure to produce an index of documents withheld on the ground of privilege operates as a waiver.

A. The September 19, 2003 Order

There can be no serious question that discovery orders must be followed. As the Court [*9] of Appeals for the Second Circuit has stated in affirming the entry of a default judgment as a result of defendant's failure to provide discovery on liability and damages issues:

> [HN2] Although entry of a default judgment is an extreme measure, discovery orders are meant to be followed. "A party who flouts such orders does so at his peril." Update Art, 843 F.2d 67, 73. Defendants rolled the dice on the district court's tolerance for deliberate obstruction, and they lost. We have no intention of letting them return to the table. "If one suggests that our decision today is strong medicine, that is precisely what it is intended to be." Id. This is not the first time such potent medicine has been prescribed. See, e.g., National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640, 96 S. Ct. 2778, 2779, 49 L. Ed. 2d 747 (1976) (per curiam) (refusal for 17 months to answer "crucial" interrogatories); Chira v. Lockheed Aircraft Corp., 634 F.2d 664, 666 (2d Cir. 1980) (doing "absolutely nothing at all" to comply with court orders to pursue discovery and pre-

> pare case for trial); Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062 (2d Cir. 1979) [*10] (refusal for three years to comply with specific court orders to answer interrogatories on damages); Independent Investor Protective League v. Touche Ross & Co., 607 F.2d 530, 25 F.R.Serv.2d 222 (2d Cir. 1978) (failing for many months to comply with repeated court orders to answer critical interrogatories).

Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 853-54 (2d Cir. 1995).

In this case, there is little doubt that the Congo did not comply with my September 19, 2003 Order. As late as February 6, 2004, the Congo's counsel admitted that its document production was incomplete. On that date, the Congo's counsel wrote to FG's counsel, stating: "Although I had hoped that all the searches we have undertaken to conduct would be completed by today so we could produce any additional documents to you, that has not occurred despite my efforts to communicate the assignments and the deadline to the client" (Polovoy Aff., Ex. 29 at 1).

As of December 5, 2003, the Congo had made no effort to search its computers for responsive electronic documents. It was not until that date that counsel for the Congo advised counsel for FG that counsel for the Congo still had [*11] "inquiries outstanding in particular with regard to any electronic storage facilities that could be searched or whether they could be searched or what the expense would be, and we really just don't know what there is and what our client's position would be" (Polovoy Aff. P30). Given the fact that [HN3] documents stored on electronic media are "documents" for the purposes of Rule 34, Anti-Monopoly, Inc. v. Hasbro, Inc., 1995 U.S. Dist. LEXIS 16355, 94 Civ. 2120 (LMM) (AJP), 1995 WL 649934 at *2 (S.D.N.Y. Nov. 3, 1995), it is impossible to reconcile this statement with the "diligent search" that Mr. Itoua swore to. In addition, the claim of the Congo's counsel that it did not believe its client made extensive use of e-mails (Affidavit of Boaz S. Morag, sworn to April 21, 2004, at P33), is of little force in light of the fact that the Congo produced 14 e-mails that were sent or received over a 13-day period (Reply Affidavit of Brian H. Polovoy, Esq., sworn to May 4, 2004 ("Polovoy Reply Aff."), at P6).

In addition, FG has demonstrated that there is substantial reason to believe that the Congo has some sort of relationship or account at a New York office of Societe Generale (see Polovoy Reply Aff. [*12] , Exs. G and H). The Congo has not produced any documents concerning this Societe Generale.

Finally, the incompleteness of the Congo's production is called into serious question by counsel's inconsistent statements concerning whether the Congo searched all potential locations in response to my September 19, 2003 Order or whether it limited its search to the Brazzaville and London facilities (compare Transcript of Proceedings dated November 25, 2004 at 18:8-22 with Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery and for Sanctions, dated April 21, 2004 at 16).

Although I find that the Congo has failed to comply with my September 19, 2003 Order, there does not appear to be any available remedy. The difficulties FG is currently having trying to collect its $ 151 million judgment establish that any monetary sanction would be close to meaningless. The sanction suggested by FG -- effectively, a trade embargo precluding the Congo from engaging in commercial activity in the United States -- is unquestionably a matter of foreign relations reserved for other branches of the government. See generally Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 414, 156 L. Ed. 2d 376, 123 S. Ct. 2374 (2003). [*13] Given the fact that the Congo is a foreign sovereign, there do not appear to be any coercive remedies that can be imposed against it. Thus, I reluctantly conclude that there is no vehicle to compel compliance with my September 19, 2003 Order.

B. The Congo's Failure to Provide a Log of Privileged Documents

[HN4] Fed.R.Civ.P. 26(b)(5) provides:

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

[HN5] Rule 26(b)(5) is supplemented by Local Civil Rule 26.2(a)(2)(A) which sets forth the specific information that must be disclosed when documents are withheld on the ground of privilege. Local Civil Rule 26.2(c) commands, inter alia, that when documents sought in a request made pursuant to Fed.R.Civ.P. 34 [*14] are withheld on the ground of privilege, the index required by Rule 26.2(a)(2)(A) "shall be furnished in writing at

the time of the response to such discovery or disclosure, unless otherwise ordered by the court."

It should be clear to all attorneys that the Federal Rules of Civil Procedure and the Local Civil Rules are not starting points for a discussion concerning the handling of privileged documents nor are they merely suggested practice guidelines that attorneys are free to disregard. They are rules, and in the absence of a court Order or stipulation providing otherwise, they must be obeyed.

In this case, the Congo served its response to FG's post-judgment discovery request on or about March 3, 2003, and there is no dispute that it was not accompanied by an index of documents withheld on the ground of privilege. As other judges in this District and I have repeatedly held, [HN6] the unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege. See, e.g., Bruker v. City of New York, 2002 U.S. Dist. LEXIS 5334, 93 Civ. 3848 (MGC) (HBP), 2002 WL 484843 at *5 (S.D.N.Y. Mar. 29, 2002); [*15] A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 2000 U.S. Dist. LEXIS 15141, 97 Civ. 4978 (LMM) (HBP), 2000 WL 1538003 at *3 (S.D.N.Y. Oct. 17, 2000); Jackson v. Edwards, 2000 U.S. Dist. LEXIS 8549, 99 Civ. 0982 (JSR) (HBP), 2000 WL 782947 at *2 (S.D.N.Y. June 16, 2000); Large v. Our Lady of Mercy Med. Ctr., 1998 U.S. Dist. LEXIS 1702, 94 Civ. 5986 (JGK) (THK), 1998 WL 65995 at *4 (S.D.N.Y. Feb. 17, 1998); Hurst v. F.W. Woolworth Co., 1997 U.S. Dist. LEXIS 1407, 95 Civ. 6584 (CSH), 1997 WL 61051 at *6 (S.D.N.Y. Feb. 11, 1997); PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp., 1996 U.S. Dist. LEXIS 13505, 93 Civ. 5375 (SAS) (HBP), 1996 WL 525862 at *3-*4 (S.D.N.Y. Sept. 17, 1996); John Labatt Ltd. v. Molson Breweries, 1995 U.S. Dist. LEXIS 507, 93 Civ. 75004 (RPP), 94 Civ. 71540 (RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995), appeal transferred sub nom., Dorf & Stanton Communications, Inc. v. Molson Breweries, 56 F.3d 13 (2d Cir. 1995), aff'd, 100 F.3d 919 (Fed. Cir. 1996); Smith v. Conway Org., Inc., 154 F.R.D. 73, 76 (S.D.N.Y. 1994); Allstate Life Ins. Co. v. First Trust N.A., 1993 U.S. Dist. LEXIS 5461, 92 Civ. 4865 (SWK), 1993 WL 138844 at *3 (S.D.N.Y. Apr. 27, 1993); Bank v. Mfrs. Hanover Trust Co., 1990 U.S. Dist. LEXIS 13300, 89 Civ. 2946 (MJL), 1990 WL 155591 [*16] at *2 (S.D.N.Y. Oct. 9, 1990); Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc., 130 F.R.D. 28, 32 (S.D.N.Y. 1990); n1 see also Sheikhan v. Lenox Hill Hosp., 1999 U.S. Dist. LEXIS 8770, 98 Civ. 6468 (WHP), 1999 WL 386714 at *3 (S.D.N.Y. June 11, 1999). n2

n1 Although there is authority reaching a contrary result and limiting the remedy to the belated preparation of the index of withheld documents, I do not find those cases persuasive. "Limiting the remedy to the belated preparation of a privilege log effectively tells practitioners they can flout the Court's Rules and incur no sanction other than an Order directing compliance with the rules." PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp., supra, 1996 U.S. Dist. LEXIS 13505, 1996 WL 525862 at *4. See 2 Michael C. Silberberg, Edward M. Spiro, Civil Practice in the Southern District of New York § 22:12 at 22-33 (2d ed. 2004) ("The cases imposing waiver appear to express the better view of the appropriate remedy in the event a party fails to timely provide the privilege list.").

n2 As the Congo's counsel correctly points out, I did depart from the precedents cited in the text in A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 2002 U.S. Dist. LEXIS 20107, 97 Civ. 4978 (LMM) (HBP), 2002 WL 31385824 (S.D.N.Y. Oct. 21, 2002) where plaintiffs had provided an index which listed the transcript of a tape-recording but inadvertently failed to list the tape-recording itself. On those unique facts, I concluded that "a finding of waiver is disproportionate to the default . . . ." 2002 U.S. Dist. LEXIS 20107, 2002 WL 31385824 at *8. A.I.A. did not involve a total failure to provide any index, as is the case here.

[*17]

Since the Congo did not serve an index of documents withheld on the ground of privilege with its March 3, 2003 response to FG's document request and since the Congo offers no evidence of any agreement with FG or Order of the Court extending the date for the submission of such an index, I find that the Congo's unjustified failure to comply with Local Civil Rule 26.2(c) results in a waiver of any claim of privilege that might otherwise have existed with respect to all responsive documents in existence as of that date.

The Congo raises a number of arguments in its brief that can be quickly dispatched. To the extent the Congo is claiming that the Paris Bar Rules prevent it from providing an index, the argument is absurd on its face. First, the Congo has provided no evidence that such a rule exists or that it has the effect that the Congo's counsel suggests. Second, the Congo is an independent nation; it is not a member of the Paris Bar. Whatever entity promulgates the Paris Bar Rules, it has no more jurisdiction over the Congo than the Association of the Bar of the City of New York has over China or any other sovereign state. n3

n3 I am more than happy to revisit this issue if the Congo submits an affidavit from an appropriate government minister admitting that the Paris Bar Rules operate as a limit on the Congo's sovereign powers.

[*18]

The Congo also argues that to the extent documents are created in connection with ongoing litigations, they are necessarily privileged and need not be indexed. The Congo cites three cases in support of this proposition, none of which are persuasive. Two of the cases -- Imperial Corp. of Am. v. Durkin, 174 F.R.D. 475, 478-79 (S.D. Cal. 1997) and S.E.C. v. Thrasher, 1996 U.S. Dist. LEXIS 3327, 92 Civ. 6987 (JFK) (MHD), 1996 WL 125661 at *2 (S.D.N.Y. Mar. 20, 1996) -- deal with the format of the index to be provided with respect to post-litigation documents. Although these cases permitted an index which identified groups of documents by category, they do not hold or even state in dicta that post-litigation documents are totally exempt from being indexed. In Keenan v. Dresdner Bank AG, 97 Civ. 1930 (KMW) (DFE), 1999 WL 493342 at *2 (S.D.N.Y. July 12, 1999), the court merely stated "I see no reason why [defendant] should have to list documents which were created after plaintiff filed suit." It provided no analysis for this proposition and cited no authority. Accordingly, the persuasive force of the decision in Keenan is extremely limited.

The cases cited by [*19] the Congo are also all distinguishable on the ground that they relate to merits discovery, not post-judgment asset discovery. The difference is significant because if post-litigation documents do not need to be scheduled in any form, a judgment creditor would be significantly hampered in its ability to locate assets. Judgment debtors would have unilateral and unreviewable discretion to withhold documents on the ground of privilege so long as the documents were created after the initiation of the litigation and there was some theory, no matter how outlandish, that could support a claim of privilege. In addition, given the twenty-year life span of judgments in New York, the judgment debtor would possess this unilateral power for two decades plus the period elapsed between the commencement of the action and the entry of judgment. The judgment creditor would be entirely unable to challenge a claim of privilege because it would have no idea of the number or nature of the documents being withheld. The Congo's argument that it need not schedule post-litigation documents is, therefore, not supported by law or logic, and I decline to adopt it.

I find that the Congo has waived any claim of [*20] privilege it may have had with respect to documents in existence as of the date of its response to FG's document request, i.e., March 3, 2003, and that all such documents that are otherwise responsive to FG's document request must be produced.

IV. Conclusion

Accordingly, for all the foregoing reasons, I find that the Congo has violated my September 19, 2003 Order. Because there does not appear to be any effective available remedy, I do not impose any sanction at this time. I further find that the Congo has waived any privilege that it may have had with respect to documents that were in existence as of March 3, 2003 and that are responsive to plaintiff's document request. I direct that such documents be produced to plaintiff's counsel within thirty (30) days of the date of this Order.

Dated: New York, New York

March 7, 2005

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

n3 I am more than happy to revisit this issue if the Congo submits an affidavit from an appropriate government minister admitting that the Paris Bar Rules operate as a limit on the Congo's sovereign powers.

[*18]

The Congo also argues that to the extent documents are created in connection with ongoing litigations, they are necessarily privileged and need not be indexed. The Congo cites three cases in support of this proposition, none of which are persuasive. Two of the cases -- Imperial Corp. of Am. v. Durkin, 174 F.R.D. 475, 478-79 (S.D. Cal. 1997) and S.E.C. v. Thrasher, 1996 U.S. Dist. LEXIS 3327, 92 Civ. 6987 (JFK) (MHD), 1996 WL 125661 at *2 (S.D.N.Y. Mar. 20, 1996) -- deal with the format of the index to be provided with respect to post-litigation documents. Although these cases permitted an index which identified groups of documents by category, they do not hold or even state in dicta that post-litigation documents are totally exempt from being indexed. In Keenan v. Dresdner Bank AG, 97 Civ. 1930 (KMW) (DFE), 1999 WL 493342 at *2 (S.D.N.Y. July 12, 1999), the court merely stated "I see no reason why [defendant] should have to list documents which were created after plaintiff filed suit." It provided no analysis for this proposition and cited no authority. Accordingly, the persuasive force of the decision in Keenan is extremely limited.

The cases cited by [*19] the Congo are also all distinguishable on the ground that they relate to merits discovery, not post-judgment asset discovery. The difference is significant because if post-litigation documents do not need to be scheduled in any form, a judgment creditor would be significantly hampered in its ability to locate assets. Judgment debtors would have unilateral and unreviewable discretion to withhold documents on the ground of privilege so long as the documents were created after the initiation of the litigation and there was some theory, no matter how outlandish, that could support a claim of privilege. In addition, given the twenty-year life span of judgments in New York, the judgment debtor would possess this unilateral power for two decades plus the period elapsed between the commencement of the action and the entry of judgment. The judgment creditor would be entirely unable to challenge a claim of privilege because it would have no idea of the number or nature of the documents being withheld. The Congo's argument that it need not schedule post-litigation documents is, therefore, not supported by law or logic, and I decline to adopt it.

I find that the Congo has waived any claim of [*20] privilege it may have had with respect to documents in existence as of the date of its response to FG's document request, i.e., March 3, 2003, and that all such documents that are otherwise responsive to FG's document request must be produced.

IV. Conclusion

Accordingly, for all the foregoing reasons, I find that the Congo has violated my September 19, 2003 Order. Because there does not appear to be any effective available remedy, I do not impose any sanction at this time. I further find that the Congo has waived any privilege that it may have had with respect to documents that were in existence as of March 3, 2003 and that are responsive to plaintiff's document request. I direct that such documents be produced to plaintiff's counsel within thirty (30) days of the date of this Order.

Dated: New York, New York

March 7, 2005

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

LEXSEE




**ROBERT A. LEE, as owner of account Guarantee Trustee and trust F/B/O Robert Alton Lee JEREMIAH O'CONNOR and HARRY LEWIS, Plaintiffs, v. CLYDE WM. ENGLE, et al., Defendants. RICHARD N. FRANK, Plaintiff, v. CLYDE WM. ENGLE, et al., Defendants.**

**C.A. No. 13323, C.A. No. 13284**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

**1995 Del. Ch. LEXIS 149**

**August 21, 1995, Submitted**
**December 15, 1995, Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court December 28, 1995.

**DISPOSITION:** This Court grants in part and denies in part Plaintiffs' Motion to Compel the Production of Documents -- Defendants are to produce, at their own expense, those documents Plaintiffs demanded as part of its request for documents excluding the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld. Defendants are to produce these documents within seven working days of receipt of this order.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, two shareholder groups (shareholders), filed separate shareholders' derivative suits against defendants, corporations and individual corporate officials (corporations). The parties agreed to arrange discovery in both actions. The corporations refused to produce some documents based on attorney-client, accountant-client, and work product privilege. The shareholders filed a motion to compel the production of the withheld documents.

**OVERVIEW:** The corporations claimed the attorney-client privilege applied to documents authorized or received by one corporation's secretary and vice president (VP), who was also an attorney. The corporations also argued the attorney client and work product privilege protected the preliminary drafts of certain board meeting and publicly filed documents. Also, the corporations claimed that the Illinois accountant-client privilege shielded certain documents. The court held that (1) the VP was not acting as in-house counsel, and, thus, there was no attorney-client relationship to support either application of a privilege with respect to the documents authorized by the VP; (2) the attorney-client and work product privileges applied to the drafts, which consisted of factual and opinion work product; (3) as to factual information, the shareholders failed to show that the same information was not obtainable without undue hardship as required by Del. Ch. Ct. R. 26(b)(3); (4) the opinion work product was not discoverable because the corporations did not put the information at issue; and (5) Delaware, rather than Illinois law, applied, and Delaware law did not recognize an accountant-client privilege.

**OUTCOME:** The shareholders' motion was granted, in part, and denied, in part. The shareholders were entitled to the production of all documents specified in their motion, apart from the drafts of documents intended for public disclosure.

**CORE TERMS:** attorney-client, work product doctrine, accountant-client, shareholder, discovery, withheld, legal advice, fiduciary duty, stockholder, accountant, good cause, public disclosure, significant relationship, disclosure, fiduciary, shield, compel production, shareholders' derivative action, derivative suit, anticipation of litigation, mental impressions, undue hardship, forum state, publicly-filed, confidential, preparation, confidence, impression, preparing, owe

**LexisNexis(R) Headnotes**

***Evidence > Privileges > Attorney-Client Privilege > General Overview***
[HN1]The purpose of the attorney-client privilege is to foster the confidence of the client and enable him to communicate without fear in order to seek legal advice. The attorney-client privilege protects legal advice, as opposed to business or personal advice. This privilege only protects advice which a person gives within a professional legal capacity.

***Civil Procedure > Class Actions > Derivative Actions > General Overview***
***Civil Procedure > Discovery > Privileged Matters > General Overview***
[HN2]Parties can not discover attorney-client confidential communications automatically in shareholder derivative suits.

***Evidence > Privileges > Attorney-Client Privilege > General Overview***
[HN3]A suing shareholder may overcome corporate claims of attorney-client privilege only if he or she shows "good cause" motivates the discovery.

***Evidence > Privileges > Attorney-Client Privilege > General Overview***
[HN4]Three factors are of paramount importance in determining whether the requisite good cause is present precluding invocation of the attorney-client privilege by a corporation against a suing shareholder: (1) The nature of the shareholders' claim and whether it is obviously colorable; (2) the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; and (3) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > General Overview***
***Business & Corporate Law > Corporations > Shareholders > General Overview***
***Governments > Fiduciary Responsibilities***
[HN5]A corporation and its directors are fiduciaries. The board of directors, as fiduciaries, owe a stockholder, complete candor and openness.

***Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product***
***Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders***
[HN6]The work product doctrine only applies to materials an attorney assembled and brought into being in anticipation of litigation. The work product doctrine protects the privacy of lawyers in their work and encourages freedom from interference in the task of preparing their clients' cases for trial. It protects factual material gathered in preparation of a case and specifically shelters "opinion" work product which includes attorneys' mental impressions, conclusions, opinion, and legal theories.

***Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview***
[HN7]The work product doctrine is broader than the attorney-client privilege which protects only communications between the attorney and client.

***Civil Procedure > Discovery > Privileged Matters > Work Product > Fact Work Product***
***Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product***
[HN8]Factual or "ordinary" work product includes written witness statements and all other trial preparation material not involving an attorney's thought processes. The party seeking discovery must show substantial need and inability to obtain the substantial equivalent without undue hardship. Even if a party sufficiently demonstrates his or her need to obtain the draft work product, the work product doctrine protects "opinion" work product. Opinion work includes attorneys' mental impressions, conclusions, opinions, and legal theories.

***Civil Procedure > Discovery > Privileged Matters > General Overview***
[HN9]Preliminary drafts of documents a company later files with the Securities and Exchange Commission are the proper subject of a claim of privilege and thus need not be produced.

***Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview***
[HN10]The work product doctrine protects the draft documents from production.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN11]Del. Ch. Ct. R. 26(b)(3) specifies that a party may obtain discovery of relevant documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other patty's representative only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*Evidence > Privileges > Accountant-Client Privilege > General Overview*
[HN12]Delaware does not recognize the accountant-client privilege; nor do the federal courts.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN13]A court should weigh four factors when determining whether it should apply law other than that of the forum state: (1) the number and nature of the contacts that the forum state has with the parties and the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties.

**COUNSEL:** Kevin Gross of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Robert D. Goldberg of BIGGS & BATTAGLIA, Wilmington, Delaware. Attorneys for Plaintiffs.

OF COUNSEL: Stephen Lowey, Sherrie Brown of LOWEY, DANNENBERG, BEMPORAD & SELINGER, P.C., New York, New York; Lawrence A. Sucharow, Linda P. Nussbaum, Barbara Hart of GOODKIND LABATON RUDOFF & SUCHAROW, New York, New York. Attorneys for Robert A. Lee, as owner of account Guarantee Trustee and Trust FBO Robert Alton Lee.

OF COUNSEL: Michael Fuchs, Roy Jacobs of WOLF POPPER ROSS WOLF & JONES, New York, New York. Attorneys for John C. Boland.

Clark W. Furlow, Joanne Marie H. Shalk of SMITH KATZENSTEIN & FURLOW, [*2] Wilmington, Delaware. OF COUNSEL: ZWERLING, SCHACHTER & ZWERLING, New York, New York. Attorneys for Defendant Sunstates Corporation.

Jesse A. Finkelstein, Matthew J. Ferretti, Lisa A. Schmidt of RICHARDS, LAYTON & FINGER, Wilmington, Delaware. Attorneys for Individual Defendants.

Michael D. Goldman, Stephen C. Norman, Kevin R. Shannon of POTTER ANDERSON & CORROON, Wilmington, Delaware. Attorneys for Defendants Hickory Furniture Co., Telco Capital Corp., and RDIS Corp.

**JUDGES:** MYRON T. STEELE, V.C.

**OPINION BY:** MYRON T. STEELE

**OPINION**

MEMORANDUM OPINION

STEELE, V.C.

CONTENTIONS OF PARTIES

On March 10, 1995, Plaintiffs brought a Motion to Compel Production of Documents they requested in the course of a shareholder derivative suit and class action. Defendants refused to produce the requested documents. Defendants assert the attorney-client privilege, work product doctrine, and accountant-client privilege protect these documents. This is the opinion deciding that motion to compel.

FINDINGS OF FACT

Plaintiff, Richard N. Frank, filed a shareholders' derivative suit and class action ("the Frank Action") on December 8, 1993 against Clyde Wm. Engle ("Engle"), William D. Schubert, Robert [*3] J. Spiller, Jr., Howard Friedman, Lee N. Mortenson, Harold Sampson (collectively "the Individual Defendants"), Hickory Furniture Company ("Hickory"), Telco Capital Corporation ("Telco"), and Acton (now Sunstates) Corporation ("Sunstates" or "the Company"). The Frank Action alleges breaches of fiduciary duty, waste of corporate assets, failure to pay dividends on $ 3.75 cumulative Preferred Stock, and violation of the duty of disclosure with regard to the December 3, 1993 proxy statement. The Frank Action seeks injunctive, declaratory, and monetary relief.

Plaintiffs, Robert A. Lee, John C. Boland, Jeremiah O'Connor, and Harry Lewis filed a shareholders' derivative action ("the Lee Action") against the Individual Defendants, Hickory, Telco, and RDIS Corporation

("RDIS"), naming Sunstates as a nominal defendant. Engle is Chairman of the Board and Chief Executive Officer of Sunstates. The Lee Action alleges waste and breach of fiduciary duty. It also seeks declaratory and monetary relief. Plaintiffs in the Lee Action served a request for production of documents on February 2, 1994.

Sometime thereafter, the parties entered into a confidentiality stipulation and agreed to arrange discovery [*4] in both the Frank and Lee actions. Defendants have produced nearly 30,000 pages of documents to Plaintiffs. On August 19, 1994, Defendants provided Plaintiffs with a detailed privilege list. This list identified all documents which Defendants withheld or produced in redacted form on the basis of privilege. The list provided the date, author, recipient, copy, summary description, and privilege Defendants asserted. Defendants have refused to produce 731 documents based on attorney-client, accountant-client, and work product privilege.

On October 12, 1994, Plaintiffs responded with a letter voicing objections to the privilege list. The Individual Defendants responded to these objections in a letter dated December 2, 1994. Plaintiffs filed a motion to compel production of documents on March 10, 1995. The motion seeks production of every document Defendants withheld on the basis of privilege.

. CONCLUSIONS OF LAW

1. Attorney-Client and Work Product Privilege

[HN1]The attorney-client privilege is "to foster the confidence of the client and enable [him] to communicate without fear in order to seek legal advice." Valente v. Pepsico, Inc., 68 F.R.D. 361, 367-68 (D. Del. 1975). The attorney-client [*5] privilege protects legal advice, as opposed to business or personal advice. Securities and Exch. Comm. v. Gulf & Western Indus., Inc., 518 F. Supp. 675, 681 (D.D.C. 1981). This privilege only protects advice which a person gives within "a professional legal capacity." In re Sealed Case, 237 U.S. App. D.C. 312, 737 F.2d 94, 99 (D.C. Cir. 1984).

Plaintiffs urge this Court to apply the Valente standard for attorney-client privilege protection. Absent some special cause, the attorney-client privilege does not protect a corporation's attorney's communications to the client corporation which relate to the subject of a later suit. Valente, 68 F.R.D. at 367; *see also* Deutsch v. Cogan, Del. Ch., 580 A.2d 100, 104-05 (1990). This Court has been reluctant to apply *Valente* broadly. *See* Gioia v. Texas Air Corp., Del. Ch., 1988 Del. Ch. LEXIS 30, C.A. No. 9500, *7, Allen, C. (Mar. 3, 1988); *In the Matter of Heizer Corp.*, Del. Ch., C.A. No. 7949, Berger, V.C. (Nov. 9, 1987); Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc., Del. Ch., 1987 Del. Ch. LEXIS 451, *8, C.A. No. 8853, Jacobs, V.C. (Jun. 19, 1987); Tabas v. Bowden, Del. Ch., 1982 Del. Ch. LEXIS 444, *5, C.A. No. 6619, Hartnett, V.C. (Feb. 16, 1982). [*6] In *Deutsch*, this Court announced [HN2]parties could not discover attorney-client confidential communications automatically in shareholder derivative suits. 580 A.2d at 106.

Although not a binding case, this Court adopted and consistently has followed *Garner v. Wolfinbarger as* opposed to *Valente.* [1] Garner v. Wolfinbarger, 430 F.2d 1093 (5th. Cir. 1970), *cert denied*, 401 U.S. 974, 28 L. Ed. 2d 323, 91 S. Ct. 1191 (1971); *see* Deutsch, 580 A.2d at 106; *Matter of Heizer Corp., C.A.* No. 7949; *Sealy Mattress Co. of N.J., C.A.* No. 8853 at 7; *Tabas*, C.A. No. 6619 at 6. Under *Garner*, [HN3]a suing shareholder may overcome corporate claims of attorney-client privilege only if he or she shows "good cause" motivates the discovery. 430 F.2d at 1103. According to the *Garner* court,

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the [*7] availability of the privilege be subject to the right of the stockholders *to show cause* why it should not be invoked in the particular instance. (emphasis added).

Garner, 430 F.2d at 1103-04. This Court will not diverge from this established line of reasoning. The *Garner* analysis is appropriate. [2]

1 Even though *Valente* and *Garner* are facially at odds, Vice-Chancellor Hartnett harmonized the two in Deutsch v. Cogan, Del. Ch., 580 A.2d 100, 106 (1990). The Vice-Chancellor explained,

> In *Garner* the court was not faced with a clear conflict of interest on the part of the attorneys as existed in *Valente*. The *Valente court* therefore may have just been applying the *Garner* balancing test to a clear conflict of interest and thereby arrived at the conclusion that the plaintiff had shown good cause.

2 Although I cannot embrace Plaintiffs' *Valente* argument which would automatically make the attorney-client privilege unavailable to directors, I agree directors owe a strict fiduciary duty to shareholders. They are responsible to minority shareholders. Valente v. PepsiCo., Inc., 68 F.R.D. 361 (1975). This responsibility does not apply *per se*, thereby superseding the burden *Garner* attaches to discovery. Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970).

[*8] In *Sealy Mattress Co.*, Vice-Chancellor Jacobs noted [HN4]three factors of paramount importance to consider when determining whether the requisite good cause is present precluding invocation of the privilege:

> (i) 'the nature of the shareholders' claim and whether it is obviously colorable;' (2) 'the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources;' (3) 'the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing.' C.A. No. 8853, at 7 (citing Garner, 430 F.2d at 1104).

Defendants attempt to use the attorney-client privilege to insulate specific documents -- the ones which Secretary and Vice President Leonard authorized or received ("the Leonard documents"). True, Leonard is an attorney. True, Leonard could use both confidentiality protections *if* he were acting as legal counsel to Sunstates. However, Leonard did not act in the capacity of Sunstates' in-house counsel. The record does not indicate Leonard prepared or reviewed meeting minutes or documents as an attorney. There was no attorney-client relationship between Leonard and Sunstates. [*9] Therefore, Leonard cannot avail himself of the protection associated with the attorney-client privilege or the work product doctrine. Accordingly, the attorney-client privilege cannot shield production of the Leonard documents.

Assuming arguendo, Leonard acted in the attorney-client capacity, applying the *Garner* criteria to the facts here, I find Plaintiffs have shown good cause necessitating production of certain withheld documents. First, Plaintiffs are minority shareholders of Sunstates seeking information related to transactions they challenge as breaches of fiduciary responsibility. They clearly have the right to bring a shareholder derivative action under Delaware law. *See* Kramer v. Western Pac. Indus., Inc., Del. Supr., 546 A.2d 348, 351 (1988). A minority shareholder brings a shareholder derivative action "to enforce a *corporate* cause of action against officers, directors, and third parties." Dennis J. Block, Nancy E. Barton, and Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors,* (Fourth ed. 1993), p. 709 (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 111 S. Ct. 1711, 1716, 114 L. Ed. 2d 152 (1991) (emphasis [*10] in original, and quoting Ross v. Bernhard, 396 U.S. 531, 534, 24 L. Ed. 2d 729, 90 S. Ct. 733 (1970))). The fact the Frank action and the Lee Action have progressed this far indicates viability. Otherwise, they may not have survived a motion to dismiss had one been presented. Plaintiffs' suit is, therefore, a "colorable claim."

Second, after careful scrutiny of the record, I find Plaintiffs have genuine cause for seeking production of the documents in question. It is both necessary and desirable for the plaintiff-shareholders to have the information. The withheld documents may lead to the discovery of information relevant to the transactions Plaintiffs contest as breaches of fiduciary duty. Furthermore, these documents may be the best evidence of the facts they contain which otherwise would be unavailable from any other practical source. The only *possible* alternative to this information may be an avoidable, unnecessarily cumbersome and expensive route of deposing in detail the individual directors.

Third, the record does not leave me with the impression Plaintiffs' request for document production constitutes a blind "fishing expedition." The record indicates Plaintiffs' desired [*11] documents are related to pursuit of their claims, even if they ultimately prove unsuccessful.

Furthermore, a fiduciary owes an obligation of complete candor and openness to its beneficiary. *See, e.g.,* Riggs Nat'l Bank of Washington, D.C. v. Zimmer, Del. Ch., 355 A.2d 709 (1976). [HN5]A corporation and its directors are fiduciaries. Valente, 68 F.R.D. at 367-68. The Board of Directors, as fiduciaries, owe Frank, a stockholder, complete candor and openness.

Alternatively, Defendants attempt to shield documents which Leonard prepared or reviewed behind the work product doctrine. [HN6]The work product doctrine only applies to materials an attorney assembled and brought into being in anticipation of litigation. United States v. El Paso Co., 682 F.2d 530, 542 (5th Cir. 1982), *cert denied,* 466 U.S. 944, 80 L. Ed. 2d 473, 104 S. Ct. 1927 (1984). The work product doctrine protects "'the privacy of lawyers in their work and encourages ... freedom ... from interference in the task of preparing their clients' cases for trial.'" E.I. DuPont de Nemours & Co. v. Admiral Ins. Co., Del. Super., 1992 Del. Super. LEXIS

517, *7, C.A. No. 89 C-AU-99, Steele, J., (Dec. 23, 1992) (citing *Riggs Nat'l Bank of Washington,* [*12] *D.C. v. Zimmer,* Del. Ch., 355 A.2d 709, 715 (1976)), *interlocutory appeal denied,* Del. Super., 622 A.2d 1095 (1993). "It protects factual material gathered in preparation of a case and specifically shelters 'opinion' work product which includes attorneys' mental impressions, conclusions, opinion, and legal theories." Id. (citing *Hickman v. Taylor,* 329 U.S. 495, 510-11, 91 L. Ed. 451, 67 S. Ct. 385 (1947).

[HN7]The work product doctrine is broader than the attorney-client privilege which protects only communications between the attorney and client. *Id.,* 1992 Del. Super. LEXIS 517, *8 *(citing In re Grand Jury Proceedings,* 604 F.2d 798, 801 (3d. Cir. 1979)). The work product doctrine consists of "factual" information and "opinion" information. Id.

[HN8]Factual or "ordinary" work product includes "written witness statements and all other trial preparation material not involving an attorney's thought processes...." 4 James W. Moore, et al., *Moore's Federal Practice P* 26.15[3.-2], at 26-316 (2d ed. 1994). The party seeking discovery must show substantial need and inability to obtain the substantial equivalent without undue hardship. *E.I. DuPont de Nemours & Co., C.A.* 1992 Del. Super. LEXIS 517, *9. Even [*13] if a party sufficiently demonstrates his or her need to obtain the draft work product, the work product doctrine protects "opinion" work product. Id. at *7-8. Opinion work includes "attorneys' mental impressions, conclusions, opinions, and legal theories." Id. (citing *Hickman,* 329 U.S. at 510-11). The policy behind this theory encourages lawyers to maintain their freedom to express and to record mental impressions and opinions for the benefit of their clients without fear of their impressions and opinions being used against their clients. Id. at *8.

The work product doctrine cannot shield the Leonard documents from production. The record shows no evidence Leonard interacted with Sunstates as an attorney until after this litigation began. By Defendants' own admission, the word "Counsel" does not appear in Leonard's title. Therefore, Leonard could not have been an attorney assembling and bringing into being materials in anticipation of litigation. Although he had his legal degree, his relationship with Sunstates did not relate to delivery of legal services.

Plaintiffs urge the above privilege protections do not apply to documents intended for public disclosure. *See In re Micropro* [*14] *Sec. Litig.,* [1988-89 Transfer Binder] 1988 U.S. Dist. LEXIS 19375, Fed. *Sec. L. Rep.* (CCH) P 93,986 (N.D. Cal. 1988). According to Plaintiffs, "handwritten notations on preliminary drafts are generally for the purpose of conveying factual data, not seeking legal advice." Their insistence seems consistent with the *Micropro Sec.* court who wrote,

> These communications, consisting as they do of factual information, do not call for a legal opinion or analysis. Such a communication does not constitute legal advice or a request for legal advice. Rather, the purpose of the communication is to furnish the information necessary to compile the offering materials required by the federal securities laws. Thus, the principle purpose for making the communication is not to secure legal advice but to secure what is essentially a business service (that, is to compile business data for disclosure in order to comply with the requirements of the federal securities laws). In receiving this information, the attorney herein were essentially serving as a conduit for factual data, and were not acting primarily as lawyers. *Hercules, Inc. v. Exxon Corp.,* 434 F. Supp. 136, 147 (D.Del. 1977); *Hewlett Packard Co. v.* [*15] *Bausch & Lomb, Inc.,* 116 F.R.D. 533, 542 (N.D. Cal. 1987).

*MicroPro, at* 90,593. The *MicroPro* court also emphasized,

> the information given the [attorney] was to assist in preparing such prospectus which was to be published to others and was not intended to be kept in confidence. That is the critical circumstance, to wit, the absence of any intent that the information was to be kept in confidence. (citation omitted).

*Id.*

Although *MicroPro* is compelling, it is not binding on this Court. Chancellor Allen articulated this Court's position on the issue of producing draft documents in *Jedwab v. MGM Grand Hotels, Inc.,* Del. Ch., 1986 Del. Ch. LEXIS 383, *6-7, C.A. No. 8077, Allen, C. (Mar. 20, 1986). Defendants, following the Chancellor's reasoning, argue the attorney-client privilege and work product doctrine protect the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld. I agree.

In *Jedwab,* this Court held [HN9]preliminary drafts of documents a company later files with the Securities

and Exchange Commission "are the proper subject of a claim of privilege and thus need not be produced." Id. at *7. Chancellor Allen [*16] based his decision on the fact that a plaintiff has available to it the publicly-filed documents. Id. Chancellor Allen wrote,

> The only information available from prior drafts relates to matters appearing in prior drafts that were deleted, augmented or otherwise modified in the final product. ... Such modifications are made as a result of communications between a client or its representatives and lawyers. Thus, new information disclosed from comparing drafts of SEC filings with the filed documents themselves necessarily relates to and may inferentially disclose communications between a client and its lawyers charged with preparing the final documents. Communications of this kind are clearly made "for the purpose of facilitating the rendition of professional legal services and lie at the heart of the confidential communications that the lawyer-client privilege seeks to protect
>
> ... Where... the document itself is prepared by a lawyer in a setting in which it is intended to remain confidential until a final version is deemed appropriate for public disclosure and where the only pertinence of the document to the discovery process is the inferential disclosure of the communication [*17] from a client to its lawyer, it strikes me that the underlying policies of the lawyer-client privilege are properly implicated and that discovery of such a document would inappropriately permit access by third parties to privileged communications.

Id. at *8.

Similarly, [HN10]the work product doctrine protects the draft documents from production. [HN11]Chancery Court Rule 26(b)(3) specifies,

> [A] party may obtain discovery of [relevant] documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other patty's representative... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has heen made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Ch. Ct. R. 26(b)(3).

Here, the draft documents consist of both [*18] factual and opinion work product. As for the factual ones, Plaintiffs have not sufficiently shown why they would be unable to discover the same information without undue hardship. Our Courts have held a party may only compel production of opinion work product when a party puts that privileged information directly "at issue." *E.I. Du-Pont de Nemours & Co., C.A.* No. 89C-AU-99 at 7-8. At this time, the record does not indicate whether the party seeking the protection of the work product doctrine put opinion work, in fact, "in issue." A more careful analysis is unnecessary in any event. The attorney-client privilege shields the draft documents which Defendants intended for public disclosure. Defendants properly withheld the draft documents from Plaintiffs' scrutiny.

2. Accountant-Client Privilege

Finally, I turn to Plaintiffs request for the 110 documents which Defendants claim the Illinois Accountant-Client privilege protects. [HN12]Delaware does not recognize the accountant-client privilege; nor do the Federal Courts. *State of Del. v. Wright,* Del. Super., 1994 Del. Super. LEXIS 711, C.A. No. K94-02-0196I-0201I, Goldstein, J. (Jul. 20, 1994) (citing *U.S. v. Arthur Young & Co.,* 465 U.S. 805, 817, 79 L. Ed. 2d 826, 104 S. Ct. 1495 (1984), [*19] *Couch v. United States,* 409 U.S. 322, 335, 34 L. Ed. 2d 548, 93 S. Ct. 611 (1973)).

Nevertheless, Defendants argue this Court should apply Illinois law which does recognize the accountant-client privilege, because "[Illinois] is the state with the most significant relationship to the communications in issue. I disagree.

According to the Restatement of Conflicts, [3] [HN13]a court should weigh four factors when determining whether it should apply law other than that of the forum state: (1) the number and nature of the contacts that the forum state has with the parties and the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties. *Restatement (Second) of Conflicts, § 139(2),* Comment. Applying

these factors to the factual record, I find Delaware law applies.

3 Delaware follows the Restatement's choice of law principles and the Restatement's "most significant relationship" test. *Certain Underwriters at Lloyd's, London and London Market Insurance Cos.*, Del. Supr., 1994 Del. LEXIS 355, *6, Veasey, C.J. (Nov. 10, 1994) (citing *Oliver B. Cannon & Son v. Dorr-Oliver, Inc.*, Del. Supr., 394 A.2d 1160, 1166 (1978).

[*20] First, Sunstates is a Delaware corporation. Incorporation in Delaware constitutes a knowing and voluntary request for the widely recognized benefits and advantages flowing from the application of Delaware general corporate law to the governance of the incorporator's business entity. Sunstates' principal place of business is in North Carolina, not in Illinois. Apparently, Illinois's only connection with Sunstates is that Illinois accountants originally generated or received the documents Defendants attempt to protect behind the accountant-client privilege. However, as Plaintiffs highlight in their Reply Memorandum in Support of Plaintiffs' Motion to Compel the Production of Documents, Sunstates' 1990 and 1991 Annual Reports state Ernst & Young, Raleigh, North Carolina are actually Sunstates' accountants. The Company's 1993 and 1994 SEC filings list Greensboro, North Carolina accountants as Sunstates accountants. [4] It seems, second only to Delaware, North Carolina, not Illinois, has the most significant relationship to the communications which Defendants claim the accountant-client privilege protects. [5] That circumstance is irrelevant, however. Delaware has the most significant contacts [*21] with the Sunstates documents in question. Second, Defendants have not refuted Plaintiffs' argument these documents are material to Plaintiffs' case. I see no reason why they are not material. Third, while I can readily understand why some find the accountant-client privilege an important one, it is not the determining factor. Fourth, I see no reason why it is unfair to apply the law of the forum state -- Delaware -- here. If Sunstates did not intend to abide by Delaware law and anticipate Delaware law governing the conduct of its affairs, the Company would have incorporated elsewhere.

4 Not surprisingly an entity called "Sunstates" would necessarily be hard pressed to identify with Illinois.

5 North Carolina does not recognize the accountant-client privilege. *State v. Agnew*, 294 N.C. 382, 241 S.E.2d 684, 692 (N.C. 1978), cert. denied, *Agnew v. N.C.*, 439 U.S. 830, 58 L. Ed. 2d 124, 99 S. Ct. 107 (1978).

After weighing the evidence and applying it to the Restatement's four criteria, Delaware, [*22] not Illinois, is the state with the most significant relationship to the communications for which Defendants assert the accountant-client privilege. Since Delaware law recognizes no such privilege, there is no need to decide whether the privilege inures solely to the accountant or otherwise.

Accordingly, I grant in part and deny in part Plaintiffs' Motion to Compel Production of Documents. Plaintiffs are entitled to production of all documents they have specified in their Motion to Compel Production of Documents excluding the drafts of documents the Company intended for public disclosure. A separate order will follow reflecting this opinion.

*ORDER*

For the reasons set forth in the Court's Memorandum Opinion dated December 15, 1995:

This Court grants in part and denies in part Plaintiffs' Motion to Compel the Production of Documents --

Defendants are to produce, at their own expense, those documents Plaintiffs demanded as part of its request for documents excluding the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld.

Defendants are to produce these documents within seven working days of receipt of this order.

IT IS SO ORDERED [*23] this 15th day of December, 1995.

MYRON T. STEELE

Vice-Chancellor