# TAB 1



*WEST'S* DELAWARE RULES OF COURT
DELAWARE RULES OF COURT
DELAWARE UNIFORM RULES OF EVIDENCE
ARTICLE V. PRIVILEGES

**RULE 510. WAIVER OF PRIVILEGE BY VOLUNTARY DISCLOSURE**

A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.

Current with amendments received through 5/1/2007

Copr. © 2007 Thomson/West.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2



MONTANA CODE ANNOTATED
TITLE 26. EVIDENCE
CHAPTER 10. MONTANA RULES OF EVIDENCE
ARTICLE V. PRIVILEGES

 **Rule 503. Waiver of privilege by voluntary disclosure**

(a) General rule. A person upon whom these rules confer a privilege against disclosure waives the privilege if the person or the person's predecessor while the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.

(b) Joint holders. Where two or more persons are joint holders of a privilege, a waiver of the right of a particular joint holder to claim the privilege does not affect the right of another joint holder to claim the privilege.

Current through 2005 Regular Session of the 59th Legislature
and the December 2005 Special Session.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3



SOUTH DAKOTA CODIFIED LAWS
TITLE 19. EVIDENCE
CHAPTER 19-13. PRIVILEGES

**19-13-26. (Rule 510) Waiver of privilege by voluntary disclosure**

A person upon whom this chapter confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This section does not apply if the disclosure itself is privileged.

Current through 2006 Reg. Session, Sup. Ct. Rule 06-77, and 2006 General Election

© 2007 by the State of South Dakota

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB  4

LEXSEE

**WARD L. BARNES, Plaintiff, v. MONTANA MILK EXPRESS, INC., a Montana Corporation; TRANSPORT LEASING/CONTRACT, INC., an Indiana Corporation, COUNTRY CLASSIC DAIRIES, INC., a Montana Corporation, JEFF McCOWN, an individual; and KEITH NYE, an individual, Defendants.**

**Cause No. DV 01-305**

**EIGHTEENTH JUDICIAL DISTRICT COURT OF MONTANA, GALLATIN COUNTY**

**2003 ML 2381; 2003 Mont. Dist. LEXIS 2625**

**April 29, 2003, Decided**

**CORE TERMS:** attorney-client, waive, disclosure, subject matter, privileged communication, deposition, waived, discovery, disclose, privileged, attorney client privilege, advice, consistency, discovery requests, reassignment, verified, partial, shield, sword, former attorney, new attorney, known right, confidentiality, relinquishment, impliedly, consented, prong, M.R Evid Rule, general rule, log books

**JUDGES:** [**1] Nels Swandal for Mark L. Guenther, DISTRICT COURT JUDGE.

**OPINION BY:** Nels Swandal for Mark L. Guenther

**OPINION**

*ORDER GRANTING MOTION TO COMPEL*

[*1] On February 21, 2003 plaintiff Ward Barnes (Barnes) filed a motion to compel confidential communications between defendant Montana Milk Express (MME) and MME's former attorney Jon Hesse (Hesse). MME responded on March 6, 2003. Barnes replied on March 11, 2003. The Court deems this matter submitted and is prepared to rule.

*BACKGROUND*

[*2] Barnes drove a truck for MME, picking up milk at Gallatin County dairy farms, and delivering it to the Darigold creamery. He was fired on July 20, 2000 for allegedly falsifying log books.

[*3] Sometime before firing Barnes, MME solicited and received advice from Hesse regarding Barnes possible "reassignment." That letter was included in MME's response to Barnes' discovery requests. Barnes then deposed McCown. One of the topics of the deposition was the letter. McCown testified that he planned on using the letter at trial to show he was acting on the advice of his attorney. During the deposition, Hesse made it clear that MME produced the letter with the intention of limiting [**2] the waiver of the attorney-client privilege to this one letter.

[*4] On November 12, 2002 Barnes took the deposition of Hesse, who had, at that time, withdrawn as MME's attorney. MME's new attorney, Michael Coil was at the deposition, representing MME.

[*5] During the deposition, Hesse's letter was discussed. Hesse stated that the disclosure of the letter was not an accident. However, when asked if Hesse has discussed disclosing the letter with MME, Hesse refused to answer the question, claiming attorney-client privilege. Subsequently, Barnes filed this motion to compel all communications between Hesse and MME on the subject matter of Barnes' "reassignment."

*DISCUSSION*

[*6] The Court has inherent discretionary power to control discovery based on its authority to control trial administration. *Anderson v. Werner Enterprises, Inc. (1998)*, 292 Mont. 284, P 13, 972 P.2d 806, P 13.

[*7] The first issue in this case is whether the intentional production of one piece of privileged communication constitutes a waiver of privilege for the all communications involving that subject matter. MCA § 26-1-803 provides:

(1) an attorney cannot, without [**3] the consent of his client, be examined as to any communication made by the client to him or his advice given to the client in

the course of professional employment. (2) A client cannot, except voluntarily, be examined as to any communication made by him to his attorney or the advice given to him by his attorney in the course of the attorney's professional employment.

[*8] The M.R.Evid., Rule 503 states:

(a) General Rule. A person upon whom these rules confer a privilege against disclosure waives the privilege if the person or the person's predecessor while the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.

[*9] Barnes argues that because MME voluntarily disclosed a privileged communication with the intent to use that information in trial, then Barnes should have the opportunity to fully discover all communications related to the disclosed letter. Barnes also argues that this result would be consistent with the M.R.Evid., Rule 503 since the rule suggests that if a party discloses a portion of the privileged communication, then the party [**4] waives privilege to the entire subject matter.

[*10] While Barnes notes that the Montana Supreme Court has not directly addressed this issue, Barnes provides many cases and authority that have addressed this matter. In dicta, the Montana Supreme Court stated "If the client elicits testimony from the lawyer-witness as to privileged communications this obviously would waive as to all consultations relating to the same subject, just as the client's own testimony would." *State v. Statczar*, 228 Mont. 446, 453, 743 P.2d 606, 610 (1987), *referring to* McCormick, Evidence Section 93 at 225.

[*11] Outside Montana, one court ruled:

Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the privilege. When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter...Courts need not allow a claim of privilege when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege. Thus, since the purpose of the attorney client privilege [**5] is to protect the confidentiality of attorney-client communications in order to foster candor within the attorney-client relationship, voluntary breach of confidence or selective disclosure for tactical purposes waives the privilege.

*In re Sealed Case*, 676 F.2d 793, 818 (D.C.Cir. 1982.)

[*12] In *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, the plaintiff attempted to use a report as evidence, while refusing to disclose the communications underlying the report. 895 F. Supp. 88 (E.D.Penn. 1995.) The court held that disclosure of and reliance of the report waived any privilege as to the underlying communications, even if they were privileged:

The underlying communication between the two were the bricks and mortar from which the report was constructed and when the report was put into issue, so too were the communications. In other words, when the report was attached to and relied on to prove the complaint, had there been any attorney-client privilege attached to the underlying communications, plaintiff would have put those communications into issue and thereby waived the privilege. Plaintiff cannot claim that some of the communications [**6] surrounding the report are privileged...and some are not. As it is often said, the attorney client privilege cannot be used as both a shield and a sword.

*Id.* at 92. See also, *Electro Scientific Industries, Inc. v. General Scanning, Inc.*, 175 F.R.D. 539, 543 (N.D.Cal. 1997) (disclosure of attorney's conclusion waived privilege as to all communications on the subject matter between attorney and client.)

[*13] Barnes argues that commentators have also written on this subject. According to one commentator:

**§ 9:28 Partial Disclosure-Selective Waiver Forbidden**

Courts will not allow the attorney-client privilege to be used as both a sword and shield. They will not permit a privilege holder to selectively disclose part of a privileged communication, or some of a larger number of communications, that are favorable to the client's position and then raise the privilege to prevent disclosure of the remaining portions, or the surrounding communications, that give context and meaning to what the client has disclose. At some point of disclosure, fairness will require that the privilege cease, regardless of whether the client intended that result.

[**7] [*14] 2 *Rice*, Attorney-Client Privilege in the United State, § 9:28 (West 1999.) Another commentator writes:

As a general rule, waiver of the privilege with regard to some communications waives the privilege as to all other communications relating to the "same subject matter." This rule seeks to avoid the unfairness that might result from selective disclosure while, at the same time, upholding the privilege and preserving the interest it protects from excessive exposure.

*Epstein*, The Attorney-Client Privilege and the Work-Product Doctrine, p. 378 (ABA 4th ed.)

[*15] The Court notes that MME did not address the issue of whether a partial waiver of the attorney client privilege waives all privilege pertaining to the disclosed subject matter. After careful consideration of Montana law and policy, the Court finds that a partial waiver of privilege does waive attorney-client privilege to all communications involving the subject matter. Thus, the Court turns to the second issue. Did MME waive its attorney-client privilege when it included the letter in response to discovery and then indicated that it would use the letter in trial?

[*16] Waiver is defined as the [**8] intentional or voluntary relinquishment of a known right or conduct which implies relinquishment of a known right. The burden of establishing waiver of the privilege is on the party seeking to overcome the privilege. *State v. Statczar*, 228 Mont. 446, 453, 743 P.2d 606, 610 (1987). There is a two-part test for waiver of attorney-client privilege. The Court must consider (1) the client's implied intention; and (2) the element of fairness and consistency. *PacifiCorp v. Department of Revenue of State of Mont.* (1992), 254 Mont. 387, 396, 838 P.2d 914, 919.

[*17] MME argues that under Montana law, an attorney cannot waive privilege without the consent of his client. M.R.Civ.P., Rule 37(a)(1). MME contends that according to *State v. Statczar*, an implied waiver must be supported by evidence showing that defendant, by words or by conduct, has impliedly forsaken his privilege of confidentiality with respect to the communication in question. 228 Mont. 446, 453, 743 P.2d 606, 610 (1987).

[*18] In *Statczar*, the defendant's attorney took the stand because "[He] felt it is necessary to make this statement." *Id.* at 453, 743 P.2d 606 [**9] . The statement disclosed certain privileged communications between the defendant and his attorney. The defendant did not object when his attorney took the stand. However, the defendant's new attorney later vigorously opposed the former attorney's conduct. *Id.* The Montana Supreme Court found there was no evidence that the defendant consented to his attorney taking the stand and testifying about their privileged communications because the defendant was never asked if he waived privilege. Thus, under the first prong of the waiver test, there was no implied consent. *Id.*

[*19] MME argues that like Statczar, MME never verbally consented to the waiver of privilege. MME argues that Jon Hesse, as MME's attorney, cannot waive the attorney-client privilege. MME argues that there is no evidence that it voluntarily waived this privilege. The letter was simply inadvertently produced.

[*20] Barnes argues that there are a number of facts that show MME voluntarily waive the privilege. First, MME included the letter in response to a discovery request. Second, two officers of MME verified the discovery responses. One was McCown, MME's general manager. The other was Irving Sewell, [**10] MME's president and member of the MME's board of directors. Both men verified that the answers to Barnes' discovery request were true and accurate. Second, once MME was notified, at McCown's deposition, that the letter was produced, MME did not immediately withdraw the letter, or state that it was a mistake. Again at Hesse's deposition, MME did not say disclosing the letter was a mistake. Instead, Hesse verified that the disclosure of the letter was intentional.

[*21] The Court finds that, based upon the above referenced acts, MME impliedly waived its attorney client privilege regarding Barnes' "reassignment" when it produced the letter and then did not retract the production when MME learn it was produced.

[*22] As to the second prong of the test, fairness and consistency, MME argues that it would not be fair to allow discovery because this would cause the parties to diverge from the true issue in the case, namely, whether Barnes falsified log books.

[*23] Barnes argues that fairness necessitates finding a waiver of privilege. Barnes contends that if the Court does not allow discovery, then MME would be able to use the letter at trial, and Barnes would not be able [**11] to effectively cross-examine the witness. In other words, such a ruling would allow MME to use the privilege as a shield as well as a sword.

[*24] The Court notes that one of the issues in the case is Barnes' wrongful discharge. Thus, while the Court understands that MME is focused upon its affirmative defenses, the Court finds that it is not the only issue in the case. The Court finds for fairness and consistency, Barnes must be allowed to discover all communications relating to the subject matter contained in the letter, since MME has indicated that it will use the letter at trial.

[*25] Based upon the foregoing the Court ORDERS:

[*26] Plaintiff's motion to compel is **GRANTED.**

Dated this 29th day of April, 2003.

Nels Swandal for Mark L. Guenther DISTRICT COURT JUDGE

# TAB 5

LEXSEE

Positive
As of: May 25, 2007

**CHEM-AGE INDUSTRIES, INC. a South Dakota Corporation; ROGER O. PEDERSON, and GARRY SHEPARD, Plaintiffs and Appellants, v. ALAN F. GLOVER, Defendant and Appellee, and BYRON DAHL, LYNN DAHL, and DOUG MacNIEL, Defendants.**

**# 22180**

**SUPREME COURT OF SOUTH DAKOTA**

**2002 SD 122; 652 N.W.2d 756; 2002 S.D. LEXIS 141**

**May 30, 2002, Argued**
**October 2, 2002, Opinion Filed**

**PRIOR HISTORY:** [***1] APPEAL FROM THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT CODINGTON COUNTY, SOUTH DAKOTA. HONORABLE JAMES W. ANDERSON Judge.

**DISPOSITION:** Affirmed in part, reversed in part, and remanded for trial.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Legal malpractice plaintiffs, a corporation and its investors, appealed from an order of the Circuit Court of the Third Judicial Circuit, Codington County, South Dakota, granting summary judgment in favor of defendant lawyer.

**OVERVIEW:** While obtaining substantial funds and credit from two investors, a client had his attorney incorporate a business, naming the two investors as incorporators and directors. Then the client misappropriated the investors' funds and gave some money and property to the lawyer. The investors and the corporation sued the lawyer, his client, and others to recover all the funds and property, alleging fraud, conversion, malpractice, and breach of fiduciary duty. The circuit court improperly granted summary judgment to the lawyer on all issues, ruling, among other things, that no privity of contract existed between anyone other than the lawyer and his individual client. The state supreme court granted review and concluded there were material questions of fact on whether the lawyer: (1) represented the corporation he created and did so negligently, (2) improperly obtained some of the money and property misappropriated by his client, and (3) knowingly assisted his client in breaching a fiduciary duty to the director-investors and the corporation.

**OUTCOME:** The judgment was affirmed in part, reversed in part, and the matter was remanded for trial.

**CORE TERMS:** fiduciary duty, fiduciary duty, nonclient, investor, shareholder's, fiduciary, material fact, attorney-client, advice, summary judgment, incorporation, aiding and abetting, signature, breached, privity, owed, malpractice, furniture, owe, legal services, proprietorship, conversion, assisting, genuine, gift, card, questions of fact, citation omitted, stock, relationship existed

**LexisNexis(R) Headnotes**

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN1]See S.D. Codified Laws § 20-10-2.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Evidence*
*Evidence > Hearsay > Exceptions > General Overview*

[HN2]Evidence submitted in affidavits as part of a summary judgment proceeding must be legally admissible. S.D. Codified Laws § 15-6-56(e). Parties cannot rely on recitations of hearsay in affidavit form, without also laying a foundation for an exception to the hearsay rule. In sum, those resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof.

***Torts > Intentional Torts > Conversion > Elements***
[HN3]Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right. Intent or purpose to do a wrong is not a necessary element of proof to establish conversion.

***Torts > Intentional Torts > Conversion > General Overview***
[HN4]The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.

***Business & Corporate Law > Corporations > Finance > Initial Capitalization & Stock Subscriptions > General Overview***
[HN5]See S.D. Codified Laws § 47-3-40.

***Torts > Malpractice & Professional Liability > Attorneys***
[HN6]To prevail in a legal malpractice claim, a plaintiff must prove: (1) the existence of an attorney-client relationship giving rise to a duty; (2) the attorney, either by an act or a failure to act, breached that duty; (3) the attorney's breach of duty proximately caused injury to the client; and (4) the client sustained actual damage. Whether an attorney-client relationship existed is ordinarily a question of fact.

***Legal Ethics > Client Relations > Conflicts of Interest***
[HN7]An attorney may represent both a corporation and individuals in the corporation.

***Contracts Law > Consideration > Enforcement of Promises > General Overview***
***Legal Ethics > Client Relations > Accepting Representation***
[HN8]South Dakota recognizes that an attorney-client relationship may arise expressly or impliedly from the parties' conduct. Such a relationship is created when: (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney's professional competence; and (3) the attorney expressly or impliedly agrees to give or indeed gives the advice or assistance. Whether an attorney agrees to give or actually gives the desired advice or assistance may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide those services and the attorney, aware of such reliance, does nothing to negate it.

***Business & Corporate Law > Agency Relationships > Causes of Action & Remedies > Breach of Fiduciary Duty > General Overview***
***Governments > Fiduciary Responsibilities***
***Torts > Intentional Torts > Breach of Fiduciary Duty > Elements***
[HN9]To ascertain a fiduciary duty, the court must find three things: (1) plaintiffs reposed faith, confidence and trust in the fiduciary, (2) plaintiffs were in a position of inequality, dependence, weakness, or lack of knowledge and, (3) the fiduciary exercised dominion, control or influence over plaintiffs' affairs. Fiduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other. To recover for breach of fiduciary duty, a plaintiff must prove: (1) that the defendant was acting as plaintiff's fiduciary; (2) that the defendant breached a fiduciary duty to plaintiff; (3) that plaintiff incurred damages; and (4) that the defendant's breach of the fiduciary duty was a cause of plaintiff's damages.

***Business & Corporate Law > Agency Relationships > Causes of Action & Remedies > Breach of Fiduciary Duty > General Overview***
***Governments > Fiduciary Responsibilities***
***Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview***
[HN10]Knowing participation in a fiduciary's breach of duty requires both knowledge of the fiduciary's status as a fiduciary and knowledge that the fiduciary's conduct contravenes a fiduciary duty. Although in some instances actual knowledge may be required, constructive knowledge will often suffice. Constructive knowledge is adequate when the aider and abettor has maintained a long-term or in-depth relationship with the fiduciary.

*Business & Corporate Law > Agency Relationships > Causes of Action & Remedies > Breach of Fiduciary Duty > General Overview*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Elements*
[HN11]To establish a cause of action for aiding or assisting in the breach of a fiduciary duty, a plaintiff must prove that: (1) the fiduciary breached an obligation to plaintiff; (2) defendant substantially assisted the fiduciary in the achievement of the breach; (3) defendant knew that the fiduciary's conduct constituted a breach of duty; and (4) damages were sustained as a result of the breach.

**COUNSEL:** LEE SCHOENBECK, Watertown, South Dakota, Attorney for plaintiffs and appellants.

THOMAS J. WELK of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, South Dakota, Attorneys for defendant and appellee.

**JUDGES:** KONENKAMP, Justice. GILBERTSON, Chief Justice, and AMUNDSON and ZINTER, Justices, concur. SABERS, Justice, concurs in part and dissents in part.

**OPINION BY:** KONENKAMP

**OPINION**

[**761] KONENKAMP, Justice

[*P1] We are confronted with the question whether a lawyer who incorporates a business on behalf of an individual client owes any duty of care to the corporation thus created and to its director-investors who have no contractual relationship with the lawyer. While obtaining substantial funds and credit from two investors, the client had his attorney incorporate a business, naming the two investors as incorporators and directors. Then the client misappropriated the investors' funds and gave some money and property to the lawyer. The investors and the corporation sued the lawyer, his client, and [***2] others to recover all the funds and property, alleging fraud, conversion, malpractice, and breach of fiduciary duty. The circuit court granted summary judgment to the lawyer on all issues, ruling, among other things, that no privity of contract existed between anyone other than the lawyer and his individual client. We conclude that there are material questions of fact on whether the lawyer (1) represented the corporation he created and did so negligently, (2) improperly obtained some of the money and property misappropriated by his client, and (3) knowingly assisted his client in breaching a fiduciary duty to the director-investors and the corporation. We affirm in part, reverse in part, and remand for trial.

**A. Background**

[*P2] In the past twenty years, attorney Alan F. Glover of Brookings, South Dakota, has represented Byron Dahl, a Watertown entrepreneur, in various transactions and lawsuits around the country. In March 1997, Dahl interested two Watertown businesspersons, Roger O. Pederson and Garry Shepard, in investing in a start-up firm, under the name Chem-Age Industries. Dahl would contribute equipment and expertise; Pederson, and, to a lesser extent, Shepard, [***3] would contribute capital. According to attorney Glover's deposition, Dahl had told him "that [Dahl] had basically started up a business in Watertown with the assistance of some people who had chosen to invest their money with him in this business." That is, Chem-Age as a brand new business did not pre-exist the agreement made by Dahl, Pederson, and Shepard.

[*P3] Sometime during their business engagement (the exact timing is disputed), Pederson obtained a report from a private investigator warning him that Dahl was a "crook." According to Pederson, the report indicated that Dahl had done this all over the country. He had done it on the east coast, he done it in Las Vegas. Guy lost his home in Las Vegas. The guy out east lost 300,000.

Pederson executed two "Stock Agreements" and a "Subscription Agreement and Letter of Investment," and despite this report continued to invest thousands of dollars in Dahl's enterprise. According to the terms of the stock agreements as prepared by Dahl, Pederson was to receive 48 shares of common stock in exchange for his investments. Pederson had originally given Dahl $ 25,000, but both Pederson and Shepard wanted the business to be incorporated [***4] before they invested more money. They pressed Dahl to get an attorney involved to set up the corporation. At some point between March and October 1997, Pederson, Shepard, and Dahl decided that Chem-Age Industries would be incorporated under the name "Chem-Age Industries, Inc." Pederson and Shepard agreed to serve as incorporators and directors of the corporation; Dahl agreed to serve as chief executive officer. With this understanding, Dahl engaged Glover to draw up articles of incorporation.

[**762] [*P4] Glover prepared the articles and faxed them, either to Dahl alone or to both Pederson and Shepard: the parties disagree on this point. In either case, Dahl secured the signatures of Pederson and Shepard. The articles were dated October 30, 1997. When Dahl delivered the signed articles to him, Glover notarized Pederson's and Shepard's signatures, despite the fact that they had not signed the document in his presence. ' On

the same day, Glover signed a Consent of Registered Agent, agreeing to act as registered agent for "Chem-Age Industries, Inc." Soon thereafter, at Dahl's request, Glover filed the articles with the South Dakota Secretary of State. On November 6, 1997, the Secretary [***5] of State issued a Certificate of Incorporation. Glover then sent a letter to the company, attaching an application to obtain a federal tax identification number for the corporation.

1 "It is a Class 2 misdemeanor for any notary public to affix his official signature to documents when the parties have not appeared before him." SDCL 18-1-11.

[*P5] On November 7, 1997, the day after Chem-Age Industries, Inc., was issued its Certificate of Incorporation, Sam's Club approved a "Business Membership-Credit Application" for "Chem-Age Industries" as a corporation. Pederson, in his capacity as President of Chem-Age, had completed and signed the document on the previous day, listing Dahl as "Billing Representative." By that date, Chem-Age had obtained a "Resale-Tax ID number." Soon thereafter, Pederson had acquired for the company a Bank One credit card, an American Express Optima card, and a charge account at Office Max. Pederson also obtained loans from Norwest Bank to provide operating [***6] capital for Chem-Age Industries, Inc. These amounted to some $ 140,000. It was the understanding of the Bank's representatives that the money was to be used by the corporation. With the number of judgments and liens against Dahl, the bankers would not have loaned him the money.

[*P6] In March 1998, Glover received a desk as a "gift" from Dahl. It was charged on the Chem-Age corporate credit card for $ 1,113. In August 1998, Sioux Valley Cooperative commenced a lawsuit against Chem-Age, Inc.; Glover was engaged as the attorney for the defendant in that case, serving and filing an answer and counterclaim on behalf of Chem-Age, Inc.

[*P7] By early fall of 1998, Pederson and Shepard became suspicious that they were being swindled: Dahl had accumulated large balances on the company's credit cards for what appeared to be personal items. [2] They engaged attorney John L. Foley of Watertown for legal advice. According to Foley's affidavit, a meeting was held in his office in October 1998. Present were plaintiffs Pederson and Shepard as well as defendants Glover and Dahl. At that meeting, Glover stated that he was representing "the corporation, Chem-Age Industries, Inc.," and that [***7] Dahl owned that entity. Foley also reported that Glover and Dahl were negotiating the sale of "the business" to New Age Chemical, Inc., a Wisconsin corporation. In Glover's presence, Dahl told Pederson and Shepard that "they would be paid out of the sale of the business." Pederson and Shepard claim that Glover led them to believe that he would be representing Chem-Age in this sale. Nonetheless, in a document entitled "License Agreement," dated November 11, 1998, the Chem-Age assets were sold to the Wisconsin business, under the name "Byron Dahl d/b/a BMD Associates, a South Dakota sole proprietorship." Glover [**763] represented Dahl in that transaction. When later questioned, Glover was not sure of the relationship between Chem-Age Industries, Inc., and BMD Associates.

2 Items charged included "Hamburger Helper"; "Bailey's 750 ml"; and "Food & Beverage" at the "Princess Tower Hotel, Freeport, Bahamas."

[*P8] On July 1, 1999, the Secretary of State sent to Glover, as agent of Chem-Age Industries, Inc., a Notice [***8] of Pending Administrative Dissolution. Glover was thereby notified that Chem-Age Industries, Inc., was delinquent in filing its annual report as required by SDCL 47-9-1, and that the corporation would be administratively dissolved if the report was not filed before September 13, 1999. After receiving this notice, Glover had separate conversations with Dahl and attorney Foley. Glover decided not to file the annual report, thus allowing an administrative dissolution. (Asserting attorney-client privilege, Glover did not reveal the substance of his conversation with Dahl, though his deposition testimony reveals that he made the decision not to file the report directly after his conversation with Dahl.) Glover did not notify directors Pederson and Shepard of his decision. The Secretary issued a Certificate of Administrative Dissolution on September 19, 1999.

[*P9] A year later, in apparent preparation for suit, new counsel obtained a legal reinstatement of the corporation with the Secretary of State. Thereafter, in October 2000, plaintiffs Chem-Age Industries, Inc., Pederson, and Shepard sued Dahl, Glover, and certain others who were later released by stipulation. [***9] Dahl was scheduled to give a deposition on May 3, 2001, but he failed to appear. In fact, Dahl, who initially indicated that he would act *pro se* in this case, has made himself unavailable throughout these proceedings. Glover moved for summary judgment on all claims against him. Plaintiffs, in turn, moved for summary judgment on two questions: whether Glover owed them a duty, and whether he had breached a fiduciary duty to them. The trial court denied plaintiffs' motion and granted summary judgment to Glover on all plaintiffs' claims.

[*P10] Plaintiffs now appeal on the following issues: (1) "Is there a question of material fact as to whether Glover committed a fraud on any or all of the plaintiffs?" (2) "Is there a question of material fact as to whether Glover converted property of any or all of the plaintiffs?" [3] (3) "Did Glover owe a duty to any or all of

the plaintiffs?" (4) "Is there a question of material fact as to whether Glover breached that duty to any or all of the plaintiffs?" (5) "Did Glover owe an additional fiduciary duty to any or all of the plaintiffs?" (6) "Is there a question of material fact as to whether Glover breached that fiduciary duty to any or [***10] all of the plaintiffs?" (7) "Is there a question of material fact on whether Glover, because of his conduct toward plaintiffs, should be subject to exemplary damages?" Rather than addressing these questions as framed by counsel, for a more thorough analysis, we explore these issues under the four principal causes of action against Glover: fraud, conversion, legal malpractice, and breach of fiduciary duty.

> 3    Our standard of review for summary judgments has been recited in numerous cases and need not be repeated here. *See* Kobbeman v. Oleson, 1998 SD 20, P4, 574 N.W.2d 633, 635. In accord with this standard, we have related the facts here in a light most favorable to the plaintiffs as the opposing parties.

**B.**

**Fraud**

[*P11] We begin with the question whether Chem-Age Industries, Inc., was a corporation. Glover declares that because no stock was ever issued, "there was never any corporation that could engage in business," [**764] and thus, as a non-operating entity, Chem-Age Industries, [***11] Inc., could not own property and, therefore, could not be aggrieved in the loss of property. On the contrary, "upon issuance of a certificate of incorporation, the corporate existence begins." SDCL 47-2-7. Furthermore, though Glover contends otherwise, it is a disputed fact whether the corporation, Chem-Age Industries, Inc., was empowered to do business because the provisions of SDCL 47-3-40 were not fulfilled. Plaintiffs insist that they did comply with the minimum paid in capital for stock requirement of this statute. Next, we ask, is there a question of material fact on whether Glover committed a fraud on the corporation or the individual plaintiffs?

[*P12] In alleging fraud, plaintiffs cite SDCL 20-10-1, which provides that "one who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." [HN1] SDCL 20-10-2 lists four types of deceit:

A deceit within the meaning of § 20-10-1 is either:

(1) The suggestion, as a fact, of that which is not true, by one who does [***12] not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

Did Glover's acts or representations fall under one or more of the four categories listed in this statute?

[*P13] Plaintiffs argue that Glover's act of drawing up the articles of incorporation on behalf of Pederson and Shepard, as incorporators, constituted deceit because Glover knew that Dahl had been previously sued for shady business practices, had even represented Dahl in those lawsuits, but "suppressed" this information by not telling Pederson and Shepard of Dahl's dishonest history. Glover had represented Dahl in various disputes in South Dakota, Arizona, Florida, and Virginia. It seems that Dahl has had a career of failed business ventures and financial adversity. But lack of success is not proof of dishonesty. Plaintiffs provide no confirmation of any actual dishonesty by Dahl in the [***13] past, much less Glover's knowledge of it. Evidently, no dispute ended with any official finding that Dahl committed fraud or deceit.

[*P14] Plaintiffs allege that Glover deceived Pederson and Shepard by leading them to believe that he was their attorney and by drawing up articles of incorporation naming them as incorporators and directors. To establish that Glover committed fraud, plaintiffs must present specific evidence tending to show that Glover knowingly acted directly to defraud them or knowingly acted to facilitate the fraud attributable to Dahl. SDCL 20-10-1 and 2. Fraud requires, among other things, a material misrepresentation, either known to be false when made or asserted without grounds for believing it to be true. *Id.*

[*P15] In Tucek v. Mueller, a father of an automobile accident victim defrauded his daughter by forging her name to negotiate a quick settlement with the insurance company, using the insurance money to pay off delinquent bank loans. Tucek v. Mueller, 511 N.W.2d 832 (SD 1994). There, we concluded that genuine issues of material fact remained on what role the insurer and its agent and the bank and its employee notary [***14] [**765] public had in assisting the father in the fraud, since it was "abundantly clear that [those individuals] either assisted or participated with Mueller in this adjudicated fraud and deceit." *Id.* at 834.

[*P16] In contrast, almost all the facts plaintiffs rely on here are oblique and conjectural. It is true that allegations of fraud and deceit are ordinarily questions of fact to be decided by a jury. *Id.* at 836 (citation omitted). But unsupported assertions do not raise a genuine issue of fact. Paradigm Hotel Mortg. Fund v. Sioux Falls Hotel Co., Inc., 511 N.W.2d 567, 569 (SD 1994). Moreover, averments of fraud must be stated with particularity. SDCL 15-6-9(b). Plaintiffs attempt to depict Glover not only as directly deceitful but also as Dahl's accomplice, a willing partner in Dahl's dishonesty. They claim that Glover knew Dahl was "involved in a scam," since Dahl has had a history of disputes with investors. Because Glover knew of these problems, they argue, he knew Dahl was cheating them, and thus his legal services constituted fraudulent conduct. Glover was aware of a criminal investigation of Dahl [***15] in Arizona occurring sometime in the past, but apparently no criminal charges were lodged against Dahl at that time. [4]

4 After the events here in question, Glover learned that Dahl had been criminally charged in Florida with another investment-related swindle.

[*P17] Plaintiffs' proof of Glover's knowledge comes in allegations mostly from affidavits. Much of it hardly rises to the level of bare insinuation. One affiant, for example, said that he invested money with Dahl in the early 1980s and later "determined he was pulling a scam." This person demanded his investment money back. He received it. In that instance, Glover represented Dahl. This affiant went on to speculate that Dahl obtained the money to pay him from other deceived investors. He also suggested that Dahl had false academic credentials. He later read in a Phoenix newspaper that Dahl was "taken to court in Phoenix and he and his two cohorts were ordered to pay back about $ 2 million."

[*P18] Certainly, this latter allegation and many [***16] of the others would never be admitted as evidence in trial. [HN2]Evidence submitted in affidavits as part of a summary judgment proceeding must be legally admissible. SDCL 15-6-56(e) ("affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence. . . ."). Parties cannot rely on recitations of hearsay in affidavit form, without also laying a foundation for an exception to the hearsay rule. Churchill Bus. Credit, Inc. v. Pac. Mut. Door Co., 49 F.3d 1334, 1337 and [6] (8th Cir 1995); Miller v. Solem, 728 F.2d 1020, 1026 (8th Cir 1984). In sum, those resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). A motion under SDCL 15-6-56 (Rule 56) is designed "to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). [***17] Therefore, the focus in summary judgment hearings centers on the existence of admissible and probative evidence to support the challenged claim or defense. Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8thCir 1997).

[*P19] Glover's past experience with Dahl in representing him in disputes with investors is not enough to create a [**766] question of material fact on whether Glover acted directly to defraud plaintiffs or on whether he knew or should have known that the incorporation documents he prepared would be used as a vehicle to bilk the investors. Without proof of a lawyer's complicity, a client's wrongful behavior, however egregious, may not be imputed to the lawyer. We conclude that the record is insufficient to show that Glover defrauded plaintiffs either alone or in concert with Dahl. As plaintiffs had the burden of proof in alleging fraud, and as Glover has demonstrated that no genuine issue of material fact exists, the circuit court correctly granted summary judgment on Glover's motion. [5]

5 Because we hold that plaintiffs have not established a cause of action for fraud, it does not mean that plaintiffs cannot proceed on their claim for punitive damages. SDCL 21-3-2. Conversion and breach of fiduciary duty may give rise to punitive damages, and plaintiffs may proceed to seek such damages if they succeed in either of those claims. Grynberg v. Citation Oil & Gas Corp., 1997 SD 121, P18, 573 N.W.2d 493, 500.

[***18] [HN3]**C.**

**Conversion**

[*P20] Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right. Ward v. Lange, 1996 SD 113, P17, 553 N.W.2d 246. "Intent or purpose to do a wrong is not a necessary element of proof to establish conversion." Rensch v. Riddle's Diamonds of Rapid City, Inc., 393 N.W.2d 269, 271 (SD 1986).

[HN4]The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.

*Id.* at 271 (quoting Poggi v. Scott, 167 Cal 372, 375, 139 P 815, 816 (Cal 1914)).

[*P21] Plaintiffs allege that Glover converted their corporate property, specifically, $ 1,800 in attorney's fees and $ 1,113 in office furniture. The attorney's fees apparently were paid either out of [***19] the loan money that Pederson secured for Chem-Age from the bank or from a cash advance on the American Express Optima credit card issued to Chem-Age Industries. Dahl obtained the furniture from Interstate Office Products in March 1998 by using the corporate Optima card, but the resulting debt was not paid by Dahl either personally or through Chem-Age. It seemingly remains a debt of the corporation, but Roger Pederson is also personally liable for it. Copies of cashed corporate checks attest to Glover's having received payment for attorney's fees. The record also shows that Glover remains in possession of the furniture because he contends that it was a gift from Dahl.

[*P22] To substantiate his claim that the furniture could not have been other than a gift from Dahl personally, Glover cites SDCL 47-3-40, which provides:

[HN5]A corporation except corporations not for profit shall not do or engage in any business or incur any indebtedness, except such as shall be incidental to its organization or to obtaining subscriptions to or payment for its shares, until there has been paid in for the issuance of shares consideration of the value of at least one thousand [***20] dollars.

Now, it is undisputed that Chem-Age Industries, Inc., had not issued any shares [**767] before its administrative dissolution in September 1999. By the terms of SDCL 47-3-40, Glover argues that the company was not authorized to engage in any business. Glover then reasons that, because Chem-Age could not conduct business, it could not, as a matter of law, own any property. However, Glover cites no authority for this claim, and failure to cite authority waives the argument that depends on it. Longwell v. Custom Benefit Programs Midwest, Inc., 2001 SD 60, P30, 627 N.W.2d 396, 401 (citing Hart v. Miller, 2000 SD 53, P45, 609 N.W.2d 138, 149).

[*P23] Material questions of fact exist on whether Glover converted property belonging to the corporation. Thus, summary judgment for Glover on this issue is reversed, and the matter is remanded for trial.

**D.**

**Legal Malpractice**

[*P24] [HN6]To prevail in a legal malpractice claim, a plaintiff must prove: (1) the existence of an attorney-client relationship giving rise to a duty; (2) the attorney, either by an act or a failure to act, breached that duty; (3) [***21] the attorney's breach of duty proximately caused injury to the client; and (4) the client sustained actual damage. Ford v. Moore, 1996 SD 112, P7, 552 N.W.2d 850, 852 (citation omitted). Whether an attorney-client relationship existed is ordinarily a question of fact. Keegan v. First Bank of Sioux Falls, 519 N.W.2d 607, 611 (SD 1994) (citation omitted). Here, we will examine the elements for an attorney-client relationship regarding, first, the corporation and, next, the individual plaintiffs.

**1. Corporation as Client**

[*P25] Dahl hired Glover to organize the business as a corporation. By his own admission, Glover's involvement with Dahl was directly related to that incorporation, notwithstanding Dahl's earlier engagement of Glover on personal matters before and independent of the events at issue here. As we concluded above, the business was incorporated. Glover contends nonetheless that he did not represent the corporation. This is clearly a question of material fact. In the absence of some indication otherwise, Glover can be deemed the attorney for the corporation, even if he was also representing Dahl personally. [HN7]An attorney may represent both [***22] a corporation and individuals in the corporation. [6] Torres v. Divis, 144 Ill. App. 3d 958, 494 N.E.2d 1227, 1231 (IllAppCt 1986). Plaintiffs offered evidence, albeit disputed, that Glover not only set up the corporation as a legal entity, but also held himself out as the company's attorney, both in personal conversations with outside parties and in a formal appearance in another court action.

6 *See also* South Dakota Rules of Professional Conduct Rule 1.13(e): "A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders."

[*P26] If it is shown that he represented the corporation, then it follows that Glover had a duty to the client corporation. Plaintiffs contend [***23] that Glover, along with Dahl, improperly arranged for the sale of corporate assets and that those assets were converted to personal use by Dahl. Consequently, plaintiffs assert that the company suffered losses. In the case of Willner's Fuel Distribs. v. Noreen, 882 [**768] P.2d 399 (Alaska 1994), the Alaska Supreme Court ruled that summary judgment for an attorney was improper in an action by a creditor of the corporation, where the attorney represented both the dissolved corporation and a director and

knew or should have known that the director may have intended to interfere with creditors' claims through improper distribution of assets. *See also* Good Old Days Tavern, Inc. v. Zwirn, 259 A.D.2d 300, 686 N.Y.S.2d 414 (1stDep't 1999), appeal and reargument denied, 261 A.D.2d 288, 691 N.Y.S.2d 759 (AppDiv1stDep't 1999). Here, plaintiffs have alleged sufficient facts to take this case beyond the reach of summary judgment. We reverse the circuit court's decision to the contrary and remand for trial.

**2. Individual Constituents as Clients**

[*P27] [HN8]South Dakota recognizes that an attorney-client relationship may arise expressly or impliedly from the parties' conduct. *Keegan*, 519 N.W.2d at 611 [***24] (citation omitted). Such a relationship is created when: (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney's professional competence; and (3) the attorney expressly or impliedly agrees to give or indeed gives the advice or assistance. *Id.* Whether an attorney agrees to give or actually gives the desired advice or assistance "may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide [those services] and the attorney, aware of such reliance, does nothing to negate it." McVaney v. Baird, Holm, McEachen, Pedersen, Hamman & Strasheim, 237 Neb. 451, 466 N.W.2d 499, 506 (Neb 1991).

[*P28] Here, the individual plaintiffs sought no advice from Glover. Correspondingly, Glover never agreed to advise or assist them. Moreover, Glover never sent them a bill for services rendered. *See* TJD Dissolution Corp. v. Savoie Supply Co., Inc., 460 N.W.2d 59, 62 (MinnApp 1990). Beyond a brief introduction to Pederson and Shepard, Glover's only communication was with his long-time client, Dahl. Glover had no personal consultation [***25] with Pederson and Shepard in creating the corporation. All their dealings were with Dahl. True, Glover notarized Pederson's and Shepard's signatures, without having them before him. However unlawful that was, it did not create an attorney-client relationship. Furthermore, nothing in the record suggests that the purpose of Glover's arrangement with Dahl was to confer the benefit of legal advice for plaintiffs. We conclude that the record is insufficient to show a contractual arrangement wherein Glover agreed to represent anyone other than Dahl and the corporation. Other courts have held similarly.[7]

7 Hile v. Firmin, Sprague & Huffman Co., L.P.A. et al., 71 OhioApp3d 838, 595 N.E.2d 1023 (OhioApp3d 1991) (attorney for corporation owed no duty to board of directors individually); Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 742 So. 2d 381 (FlaDistCtApp4th 1999) (attorney who represents corporation not in privity with and therefore owes no separate duty of care to individual shareholder absent special circumstances or an agreement to also represent the shareholder individually); Goerlich v. Courtney Industries, Inc. 84 MdApp 660, 581 A.2d 825, *cert. denied,* 322 Md 130, 586 A.2d 13 (1990) (no contractual privity between attorney and plaintiff in his capacity as employee); *see also* Restatement (Second) of Torts § 876(a).

[***26] [*P29] Certainly there may be unique circumstances, outside the ordinary corporate arrangement, where shareholders with equal interest in a close corporation who have ongoing contact with corporate counsel may reasonably believe that [**769] counsel is representing each of them. Rosman v. Shapiro, 653 F. Supp. 1441, 1445 (SDNY 1987); Bobbitt v. Victorian House, Inc., 545 F. Supp. 1124, 1126 (NDIll 1982) (question must be decided on the individual facts of each case). But in the absence of any professional contact between Glover and the individual plaintiffs, those singular circumstances do not exist here. Furthermore, if there had been proof that Glover engaged in some fraud to mislead these investors, we might view their claim differently. *See, for example*, Trust Co. of Louisiana v. N.N.P. Inc., 104 F.3d 1478 (5thCir 1997) (attorney for promoter of shell corporations falsely represented that he had custody of certificates available as collateral). We sustain the circuit court's grant of summary judgment on this question.

**3. Nonclient Third Party Beneficiaries**

[*P30] South Dakota has long subscribed to the strict privity rule [***27] in attorney malpractice cases. Thus, to recover for a lawyer's negligence, a plaintiff must first show that an attorney-client relationship existed between the lawyer and the plaintiff. *Ford*, 1996 SD 112 at P7, 552 N.W.2d at 852; McGlone v. Lacey, 288 F. Supp. 662, 665-66 (DSD 1968). In many other jurisdictions, however, although the state of the law governing attorney liability to nonclients remains unsettled, there has been a notable increase "in case law and professional literature on attorney liability to third parties." *See* Flaherty v Weinberg, 303 Md. 116, 492 A.2d 618, 620 (Md 1985). These authorities recognize a privity rule exception, particularly in contract actions, but its scope sometimes extends to the area of will drafting and estate planning. *See generally* Joan Teshima, Annotation, *Attorney's Liability, to One Other Than Immediate Client, for Negligence in Connection with* Legal Duties, 61 ALR4th 615 (1988). Assuming for the moment that we might recognize this exception, the question then is whether it should be expanded to negligence actions.

Obviously, this exception should not expose attorneys to unlimited litigation [***28] brought by anyone who might conceivably derive some indirect benefit from the performance of attorneys for their contractual clients. Moreover, this exception should have limited application in adversarial proceedings because the rules of ethics require that lawyers represent their clients zealously within the bounds of the law and that lawyers ordinarily not represent or act for conflicting interests in business transactions. South Dakota Rules of Professional Conduct, ch 16-18.

[*P31] There are several reasons courts are reluctant to relax the rule of privity in attorney malpractice cases. First, the rule preserves an attorney's duty of loyalty to and effective advocacy for the client. Simon v. Zipperstein, 32 Ohio St. 3d 74, 512 N.E.2d 636, 638 (Ohio 1987). Second, adding responsibilities to nonclients creates the danger of conflicting duties. John H. Bauman, *A Sense of Duty: Regulation of Lawyer Responsibility to Third Parties by the Tort System,* 37 S Tex L Rev 995, 1006 (1996). Third, once the privity rule is relaxed, the number of persons a lawyer might be accountable to could be limitless. Nat'l Savings Bank v. Ward, 100 U.S. 195, 198, 25 L. Ed. 621, 624 (1879). [***29] Fourth, a relaxation of the strict privity rule would imperil attorney-client confidentiality. Noble v. Bruce, 349 Md. 730, 709 A.2d 1264, 1278 (MdCtApp 1998). *See* SDCL 16-16-18 (oath of attorney); SDCL 16-18-18 (attorney's duty to respect client's confidence); South Dakota Rules of Professional Conduct, *Preamble, A Lawyer's Responsibilities*, ch 16-18, Appx.

[**770] [*P32] Those jurisdictions that maintain the strict privity rule do so because not only should an attorney know in advance who is being represented and for what purpose, but also the attorney should be able to control the scope of the representation and the risks to be accepted. Imposing liability in favor of nonclients, generally speaking, threatens those interests. In threatening the interests of the attorney, the interests of potential clients may also be compromised; they might not be able to obtain legal services as easily in situations where potential third party liability exists. Before abandoning privity, the courts need a good reason for thinking that the private arrangements are inadequate.

Bauman, 37 S Tex L Rev at 1005-06. Because [***30] trust and confidence between attorney and client are essential, the relationship requires greater protection from third-party claims than do nonconfidential relationships.

[*P33] Perhaps cognizant that legal malpractice is one of the last citadels of the privity doctrine, the Restatement (Third) of the Law Governing Lawyers sanctions limited instances where a lawyer owes a duty of care to nonclients. *See* Restatement (Third) of the Law Governing Lawyers § 51 (1998). Of course, the Restatement's pronouncements are not binding on this Court; nevertheless, we have found its reasoning persuasive in many instances. [8] Subsections (2) and (3) of § 51 provide in pertinent part:

> For purposes of liability under § 48, a lawyer owes a duty to use care within the meaning of § 52 in *each* of the following circumstances:
>
> (2) to a nonclient when and to the extent that:
>
> the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the nonclient so relies; and the nonclient is not, under applicable tort law, too remote from the lawyer to be entitled to protection;
>
> (3) to a nonclient [***31] when and to the extent that:
>
> the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the nonclient;
>
> such a duty would not significantly impair the lawyer's performance of obligations to the client; and the absence of such a duty would make enforcement of those obligations to the client unlikely; . . .

As to Subsection (2), unquestionably Glover's client, Dahl, did invite Pederson and Shepard to rely on Glover's services to effect incorporation, and their reliance was, at least arguably, reasonable. However, the routine act of incorporating a business is a function distinct and separate from advising and warning individual constituents of all the consequences and dangers inherent in investing in a corporation. *See* Michel v Gard, 181 Ill. App. 3d 630, 130 Ill. Dec. 164, 536 N.E.2d 1375 (1989). Pederson and Shepard never asked for any advice and never met with Glover regarding the process of incorporation. There is no evidence that Glover acquiesced in any invitation Dahl may have made to these investors to rely on Glover's opinion or to [**771] provide some additional legal service other than incorporating [***32] the business.

> 8 *See* J. Myron Jacobstein & Roy M. Mersky, Fundamentals of Legal Research 365 (5th ed. 1990) (the goal of the American Law Institute in publishing the Restatements was to "produce a clear and precise restatement of the existing common law").

[*P34] As to Subsection (3), we find no evidence in the record to establish that the primary purpose for Dahl's contacting an attorney to incorporate the business

was to benefit plaintiffs. The comment from § 51 further explains this requirement:

> A nonclient's claim under Subsection (3) is recognized *only* when doing so will both implement the client's intent and serve to fulfill the lawyer's obligations to the client without impairing performance of those obligations in the circumstances of the representation. A duty to a third person hence exists *only* when the client intends to benefit the third person as one of the primary objectives of the representation.

Restatement (Third) of the Law Governing Lawyers § 51 cmt f (1998); *see* [***33] *also* Lee v. Mitchell, 152 OrApp 159, 953 P.2d 414 (1998) (shareholders in close corporation's stock not third-party beneficiaries of corporation's contract with its attorneys; no proof that those who dealt with corporation intended to benefit shareholders as individuals). Under this limited exception, to establish a duty owed by the attorney to the nonclient, the nonclient must allege and prove that the intent of the client to benefit the nonclient was a direct purpose of the transaction or relationship. In this regard, the test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party.

*Flaherty*, 492 A.2d at 625. Thus, an incidental benefit to a nonclient is not sufficient. *Id.* at 625 n6.

[*P35] The South Dakota Rules of Professional Conduct provide that "in dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing." [***34] Rule 1.13(d). *See, e.g.*, Brennan v Ruffner, 640 So. 2d 143 (FlaDistApp4th 1994) (corporation attorney could not be liable to minority shareholder for breach of fiduciary duty in drafting of shareholders' agreement, where lawyer told shareholders collectively that he represented only the corporation in drafting of agreement). In our case, it is clear, at least in hindsight, that Dahl's interests were different from those of the corporation and its investors. Strict application of Rule 1.13(d) would have required that Glover explain to the directors (Pederson and Shepard) that he was undertaking to represent Dahl individually. However, apart from creating the corporation, he undertook no responsibility, such as preparing a shareholder agreement, which would call particular attention to the need to advise the others of his allegiance to Dahl only. Thus, even if we were to recognize the third party beneficiary exception, plaintiffs have brought forth insufficient evidence to invoke it here.

**E.**

**Breach of Fiduciary Duty**

**1. Direct Breach of Fiduciary Duty to Nonclients**

[*P36] As we determined above, there remains a question of material fact whether [***35] an attorney-client relationship existed between Glover and Chem-Age Industries, Inc. If such a relationship did exist, then Glover owed a fiduciary duty to the corporation. Himrich v. Carpenter, 1997 SD 116, P13, 569 N.W.2d 568, 572. If, in turn, Glover had such a fiduciary duty, then there remains a question of material fact whether Glover breached that duty. A [**772] fiduciary duty to the corporation, in that circumstance, would arise from the attorney-client relationship.

[*P37] On the other hand, we earlier found that no attorney-client relationship existed between Glover and the two investor-directors, Pederson and Shepard. We now turn to the question whether Glover may have owed a fiduciary duty to them or to the corporation, even in the absence of an attorney-client relationship. The existence and scope of a fiduciary duty are questions of law. High Plains Genetics Research, Inc. v. JK Mill-Iron Ranch, 535 N.W.2d 839, 842 (SD 1995) (citations omitted). Whether a breach of a fiduciary duty occurred, however, is a question of fact. *Id.*

[*P38] [HN9]To ascertain a fiduciary duty, we must find three things: (1) plaintiffs reposed "faith, confidence [***36] and trust" in Glover, (2) plaintiffs were in a position of "inequality, dependence, weakness, or lack of knowledge" and, (3) Glover exercised "dominion, control or influence" over plaintiffs' affairs. Garrett v. BankWest Inc., 459 N.W.2d 833, 838 (SD 1990) (citing Union State Bank v. Woell, 434 N.W.2d 712, 721 (ND 1989)). "Fiduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other." *High Plains Genetics Research, Inc.*, 535 N.W.2d at 842. To recover for breach of fiduciary duty, a plaintiff must prove: (1) that the defendant was acting as plaintiff's fiduciary; (2) that the defendant breached a fiduciary duty to plaintiff; (3) that plaintiff incurred damages; and (4) that the defendant's breach of the fiduciary duty was a cause of plaintiff's damages. Grand State Property, Inc. v. Woods, Fuller, Shultz, & Smith, P.C., 1996 SD 139, P16, 556 N.W.2d 84, 88 (citations omitted).

[*P39] We have always recognized the lawyer-client relationship as highly fiduciary. Rosebud Sioux Tribe v. Strain, 432 N.W.2d 259 (SD 1988). In South Dakota, however, we have not extended [***37] a cause of action for breach of fiduciary duty to instances involving lawyers and nonclients, but other jurisdictions have opened the door to this claim. In those cases, when attorneys breach a fiduciary duty to nonclients, liability typically arises when a trust or guardianship beneficiary sues

the trust or guardianship attorney for failing to prevent the misappropriation and mismanagement of the estate. [9] *See, e.g.*, Fickett v. Superior Court, 27 Ariz. App. 793, 558 P.2d 988 (ArizCtApp 1976); Pizel v. Zuspann, 247 Kan. 54, 795 P.2d 42 (Kan 1990). But liability also occurs in the corporate sphere. Collins v. Telcoa Intern. Corp., [**773] 283 A.D.2d 128, 726 N.Y.S.2d 679 (AppDiv2dDep't 2001) (allegations by minority shareholder that corporation's attorney had duty to act responsibly to protect shareholder's interests adequately stated cause of action for attorney's breach of fiduciary duty); Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, 107 Mich. App. 509, 309 N.W.2d 645, 648 (MichCtApp 1981) (question of fact existed whether confidential relationship existed between the two shareholders of a closely-held corporation and the corporation's attorney, even if no attorney-client relationship existed [***38] between them). *But see* Angel, Cohen & Rogovin v. Oberon Inv., N.V., 512 So. 2d 192 (Fla 1987).

9 The Restatement (Third) of the Law Governing Lawyers § 51 defines a lawyer's duties to a nonclient, when the lawyer's client is a fiduciary:

For purposes of liability under § 48, a lawyer owes a duty to use care within the meaning of § 52 in *each* of the following circumstances:

to a nonclient when and to the extent that:

the lawyer's client is a trustee, guardian, executor, or fiduciary acting primarily to perform similar functions for the nonclient;

the lawyer knows that appropriate action by the lawyer is necessary with respect to a matter within the scope of the representation to prevent or rectify the breach of fiduciary duty owed by the client to the nonclient, where (i) the breach is a crime or fraud or (ii) the lawyer has assisted or is assisting the breach;

the nonclient is not reasonably able to protect its rights; and such a duty would not significantly impair the performance of the lawyer's obligations to the client.

Restatement (Third) of the Law Governing Lawyers § 51(4) (1998).

[***39] [*P40] Plaintiffs Pederson and Shepard have submitted no evidence to show how they were in a confidential relationship with Glover, where they depended on him specifically to protect their investment interests, and where Glover exercised dominance and influence over their business affairs. On the contrary, they never consulted with Glover during the time he is alleged to have breached a fiduciary duty to them. Aside from simple avowals that they believed Glover was watching out for their interests, their claim that Glover was entrusted with explicit responsibility for their investments is "factually unsupported." *Celotex*, 477 U.S. 317, 323-324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265. Likewise for the corporation: outside the existence of an attorney-client relationship, we detect no facts justifying a fiduciary duty owed to the company. We conclude that there was no direct fiduciary relationship between Glover and plaintiffs.

**2. Aiding and Abetting Breach of Fiduciary Duty**

[*P41] Although he may not have directly breached a fiduciary duty, if Glover assisted Dahl in a breach of Dahl's fiduciary duty, Glover may still be subject to liability. [***40] Plaintiffs' complaint alleges that both Dahl and Glover breached their fiduciary duties. The Restatement provides:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

Restatement (Second) of Torts § 876(b) (1977). *See also* SDCL 15-8-11 (defining joint tortfeasor). Several courts recognize a cause of action for aiding and abetting the breach of fiduciary duty. [10] *See, e.g.*, Blow v. Shaughnessy, 88 N.C. App. 484, 364 S.E.2d 444 (NCApp 1988); Holmes v. Young, 885 P.2d 305, 308, 23 Colo. Law. 1887 (ColoApp 1994) (claim against attorney for aiding and abetting the breach of fiduciary duty in the partnership context). When they participate in their clients' tortious acts, lawyers are not exempt from liability under this theory.

10 *See generally* Bryan C. Barksdale, *Redefining Obligations in Close Corporation Fiduciary Representation: Attorney Liability For Aiding and Abetting the Breach of Fiduciary Duty In Squeeze-Outs*, 58 Wash & Lee L Rev 551 (Spring 2001).

[***41] Legal authorities . . . are unanimous in expressing the proposition that one who knowingly aids another in the breach of a fiduciary duty is liable to the one harmed thereby. That principle readily extends to lawyers. None of those authorities even implies that liability for participants in the breach of fiduciary duty is confined to those who *themselves* owe such duty.

Granewich v. Harding, 329 Or. 47, 985 P.2d 788, 793-94 (Or 1999) (footnotes omitted). [11]

In *Granewich*, the defendant attorneys [**774] provided substantial assistance to the controlling shareholders to squeeze out the minority shareholder in breach

of the fiduciary duties the majority shareholders owed to the minority shareholder. Unlike the fraud allegations against Glover, which require proof of misrepresentations, liability for aiding and abetting breach of a fiduciary duty requires only the giving of substantial assistance and encouragement. *See* Restatement (Second) of Torts § 876 cmt b (1979) (one who gives advice or encouragement to a tortfeasor is also a tortfeasor).

11 Indeed, the South Dakota Rules of Professional Conduct provide: "Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary." SDCL 16-18, comment to Rule 1.2.

[***42] [*P42] Dahl, as the operating officer of the corporation, owed a fiduciary duty to the company and to its investors. Like controlling shareholders, officers and directors possessing discretion in the management of a company have a fiduciary duty "to use their ability to control the corporation in a fair, just, and equitable manner. . . ." Jones v. H.F. Ahmanson & Co., 1 Cal. 3d 93, 460 P.2d 464, 471, 81 Cal. Rptr. 592 (Cal 1969). For summary judgment purposes, the evidence that Dahl breached his fiduciary duties to the corporation and the investor-directors remains wholly uncontradicted. He used corporate funds for personal expenditures; he failed to deliver promised stock issues; he sold corporate assets and kept the proceeds. Now the question is whether his lawyer may be subject to liability for assisting Dahl in his breach of fiduciary duties.

[*P43] Holding attorneys liable for aiding and abetting the breach of a fiduciary duty in rendering professional services poses both a hazard and a quandary for the legal profession. On the one hand, overbroad liability might diminish the quality of legal services, since it would impose "self protective reservations" in the attorney-client relationship. [***43] Goodman v. Kennedy, 18 Cal. 3d 335, 556 P.2d 737, 743, 134 Cal. Rptr. 375 (Cal 1976). Attorneys acting in a professional capacity should be free to render advice without fear of personal liability to third persons if the advice later goes awry. Schott v. Glover, 109 Ill. App. 3d 230, 440 N.E.2d 376, 379 (IllApp1stDist 1982). On the other hand, the privilege of rendering professional services not being absolute, lawyers should not be free to substantially assist their clients in committing tortious acts. To protect lawyers from meritless claims, many courts strictly interpret the common law elements of aiding and abetting the breach of a fiduciary duty. Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 186-87 (Minn 1999).

[*P44] The substantial assistance requirement carries with it a condition that the lawyer must actively participate in the breach of a fiduciary duty. *See* Spinner v. Nutt, 631 N.E.2d 542, 556 (Mass 1994) (allegation that trustees acted under legal advice of defendants, without more, is insufficient to give rise to claim that attorney is responsible to third persons for fraudulent acts of clients); Schatz v. Rosenberg, 943 F.2d 485, 487 (4thCir 1991) [***44] (attorney's liability for aiding and abetting a breach of duty under federal securities law). [12] Merely acting as a scrivener for a client is insufficient. [**775] *Id.* at 95-98. A plaintiff must show that the attorney defendant rendered "substantial assistance" to the breach of duty, not merely to the person committing the breach. [13] *Id. See also* *Witzman*, 601 N.W.2d at 188 ("substantial assistance" means more than providing routine professional services). In *Granewich*, the lawyers facilitated the squeeze-out, not just by providing legal advice and drafting documents, but by sending letters containing misrepresentations and helping to amend bylaws eliminating voting requirements that protected the minority shareholder's interest. 985 P.2d at 791-792.

12 The United States Supreme Court has since held that federal law does not permit a private cause of action for aiding and abetting a securities violation. *See* Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994). The analysis used by the federal courts regarding Restatement § 876(b) is still useful authority on the elements of common law aiding and abetting the breach of a fiduciary duty.

[***45]

13 It has been suggested that an element of wrongful intent should be included as part of the "substantial assistance" requirement. *See* Barksdale, 58 Wash & Lee L Rev at 601 (analogizing aiding and abetting breach of fiduciary duty to Restatement § 57(3), advising or assisting client to dissolve a legal relationship, which requires using wrongful means). *See* Restatement (Third) of Law Governing Law § 57(3) (2000). *Cf.* Skarbrevik v. Cohen, England & Whitfield, 231 Cal. App. 3d 692, 282 Cal.Rptr. 627, 639 (CalCtApp 1991) (conspiracy: nonfiduciary attorney must act in furtherance of own financial gain). One example of wrongful intent would be when a lawyer aids and abets the breach of a fiduciary duty in furtherance of the lawyer's own self-interest. Samuel M. Feinberg Testamentary Trust v. Carter, 652 F. Supp. 1066, 1082 (SDNY 1987). The receipt of legal fees may be a basis for concluding that an attorney "participated" in the client's breach of fiduciary duty for the attorney's own financial gain. *See* Weingarten v. Warren, 753 F. Supp. 491, 496 (SDNY 1990) (allowing aiding and abetting breach of fiduciary duty claim

against attorney because he reaped legal fees for twenty-eight years in representation of trustee). In most instances, however, the receipt of normal legal fees in this circumstance would not constitute a personal financial interest in the matter. *See* *Skarbrevik*, 282 Cal.Rptr. at 639 (defendant attorney received only modest compensation). Although not an element in proving aiding and abetting the breach of a fiduciary duty, certainly these are circumstances to consider in gauging a lawyer's alleged knowing participation and substantial assistance.

[***46] [HN10] [*P45] Another condition to finding liability for assisting in the breach of a fiduciary duty is the requirement that the assistance be "knowing." Restatement (Second) of Torts § 874 cmt c (1979). Knowing participation in a fiduciary's breach of duty requires both knowledge of the fiduciary's status as a fiduciary and knowledge that the fiduciary's conduct contravenes a fiduciary duty. *See* Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 282-83 (2dCir 1992). Although in some instances actual knowledge may be required, constructive knowledge will often suffice. *See* Terrydale Liquidating Trust v. Barness, 611 F. Supp. 1006, 1027 (SDNY 1984) (actual knowledge required under the circumstances); *Diduck*, 974 F.2d at 283-84 (duty to investigate when defendant was "on notice" that the breach may have been occurring). Constructive knowledge is adequate when the aider and abettor has maintained a long-term or in-depth relationship with the fiduciary. *See* *Witzman*, 601 N.W.2d at 188 (citing *Diduck*, 974 F.2d at 283-84).

[*P46] In accordance with these principles, we hold that [HN11]to establish [***47] a cause of action for aiding or assisting in the breach of a fiduciary duty, a plaintiff must prove that (1) the fiduciary breached an obligation to plaintiff; (2) defendant substantially assisted the fiduciary in the achievement of the breach; (3) defendant knew that the fiduciary's conduct constituted a breach of duty; and (4) damages were sustained as a result of the breach. *See* Holmes v. Young, 885 P.2d 305, 309 (ColoCtApp 1994) (attorney's substantial assistance is the gravamen of aiding and abetting breach of fiduciary duty (citation omitted); *Witzman*, 601 N.W.2d at 187-188 (accountant liability) (citing Restatement (Second) of Torts § 876(b) (1977)); *Diduck*, 974 F.2d at 281-82; S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2dCir 1987). [**776]

[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.] [*P47] Glover recounts that shortly after incorporation, Dahl told him that the two investors, Pederson and Shepard, had decided not to proceed and that the business would be solely controlled by Dahl as a proprietorship. Because no shares were issued, Glover took the position that the company had no official existence. But we think that what Glover actually knew and [***48] what he should have known are questions of credibility. After all, Glover notarized Pederson's and Shepard's signatures on corporate documents without having them in his presence. If he did not know his client was in the midst of a swindle, he certainly knew Dahl had several questionable investment schemes in the past, leaving unhappy investors in his wake. Thus his decision to notarize these signatures may or may not have been

an altogether innocuous act. Perhaps if Glover had met with Pederson and Shepard at that time, instead of simply notarizing their signatures unseen, and heard their expectations, he could have disabused them of any misunderstanding or encouraged them to seek independent legal advice. Pederson and Shepard allege that this was part of a pattern in which Glover allowed Dahl to use his legal services as a means to allow Dahl to misappropriate investor funds. The creation of a corporation with the assistance of an attorney gave a patina of authenticity to Dahl's otherwise rogue activities. Moreover, Glover listed himself as registered agent for the company. Pederson and Shepard claim that they began investing more heavily once they learned the company had been [***49] incorporated and an attorney was onboard. They say that they felt reassured upon incorporation that the business would proceed with all the formalities required of corporations.

[**778] [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.] [*P48] Four months after the business was incorporated, Glover received a "gift" of office furniture from Dahl, bought with the company credit card. Glover claimed he did not know how the furniture was paid for. Accepting such a "gift" from a client like Dahl, who Glover knew had longstanding financial problems, raises a question of constructive knowledge and exposes the problem of improper, personal financial gain in assisting Dahl.

[*P49] We think it also significant that Glover assisted Dahl in selling assets that were obtained with investor funds in the corporation. In a meeting with the investors and their lawyer, Glover was present when Dahl assured the investors that upon the sale, they would be receiving their money back. The next month, with Glover's help, the company's assets were sold to a Wisconsin business. Dahl and Glover had taken the position that Chem-Age Industries, Inc., was not a corporation but a proprietorship owned solely by Dahl. *See* SDCL 47-6-18, [***50] 47-6-19 (sale of substantially all assets authorization from board and resolution from sharehold-

ers). Yet Glover helped to arrange the sale of Chem-Age assets through another entity: "Byron Dahl d/b/a BMD Associates, a South Dakota sole proprietorship." Glover later testified that he did not know the relationship between BMD and Chem-Age.

[*P50] Although Glover may not have taken any active role in defrauding the investor-directors and may not have owed any direct fiduciary duty to them, Dahl did owe such a duty, and a material question of fact exists on whether Glover substantially assisted Dahl in breaching that duty. It may be that Glover, as much as Pederson and Shepard, was duped by Dahl's conniving business dealings, but that is for a jury to decide.

**F.**

**Conclusion**

[*P51] We affirm summary judgment for Glover on the claims of fraud and legal

[**777] [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.] malpractice pertaining to the individual investor-directors. Because there are genuine issues of material fact, we reverse and remand for trial the claims of conversion and aiding and abetting the breach of fiduciary duty, and if the jury concludes that Glover was in fact representing the corporation, then the [***51] jury must also decide the company's claims of malpractice and breach of fiduciary duty.

[*P52] Affirmed in part, reversed in part, and remanded for trial.

[*P53] GILBERTSON, Chief Justice, and AMUNDSON and ZINTER, Justices, concur.

[*P54] SABERS, Justice, concurs in part and dissents in part.

**CONCUR BY:** SABERS (In Part)

**DISSENT BY:** SABERS (In Part)

**DISSENT**

SABERS, Justice (dissenting in part B. and concurring in parts C., D.1., and E.2.).

[*P55] There are genuine issues of material fact whether Glover committed a fraud on the corporation and the individual plaintiffs.

[*P56] The majority opinion asks the right questions and gets most of the facts correct but reaches the wrong conclusion. The majority opinion asks at P11 ". . . is there a question of material fact on whether Glover committed a fraud on the corporation or the individual plaintiffs?" and at P12 "Did Glover's acts or representations fall under one or more of the four categories listed in [SDCL 20-10-2]?" The answer is Yes!

[*P57] Glover's acts or representations fall under SDCL 20-10-2(3): "The suppression of a fact by one who is bound to [***52] disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact. . ." The recitation of facts set forth in the majority opinion at PPP47, 48 and 49 raise genuine issues of material fact concerning fraud under SDCL 20-10-2(3) and are as follows:

[P47] Glover recounts that shortly after incorporation, Dahl told him that the two investors, Pederson and Shepard, had decided not to proceed and that the business would be solely controlled by Dahl as a proprietorship. Because no shares were issued, Glover took the position that the company had no official existence. But we think that what Glover actually knew and what he should have known are questions of credibility. After all, Glover notarized Pederson's and Shepard's signatures on corporate documents without having them in his presence. If he did not know his client was in the midst of a swindle, he certainly knew Dahl had several questionable investment schemes in the past, leaving unhappy investors in his wake. Thus his decision to notarize these signatures may or may not have been an altogether innocuous act. Perhaps if Glover had met with Pederson [***53] and Shepard at that time, instead of simply notarizing their signatures unseen, and heard their expectations, he could have disabused them of any misunderstanding or encouraged them to seek independent legal advice. Pederson and Shepard allege that this was part of a pattern in which Glover allowed Dahl to use his legal services as a means to allow Dahl to misappropriate investor funds. The creation of a corporation with the assistance of an attorney gave a patina of authenticity to Dahl's otherwise rogue activities. Moreover, Glover listed himself as registered agent for the company. Pederson and Shepard claim that they began investing more heavily once they learned that the company had been incorporated and an attorney was onboard. They say that they felt reassured upon incorporation that the business would proceed with all the formalities required of corporations.

[P48]Four months after the business was incorporated, Glover received a "gift" of office furniture from Dahl, bought with the company credit card. Glover claimed he did not know how the furniture was paid for. Accepting such a "gift" from a client like Dahl, who Glover knew had longstanding financial problems, [***54] raises a question of constructive knowledge and

exposes the problem of improper, personal financial gain in assisting Dahl.

[P49] We think it also significant that Glover assisted Dahl in selling assets that were obtained with investor funds in the corporation. In a meeting with the investors and their lawyer, Glover was present when Dahl assured the investors that upon the sale, they would be receiving their money back. The next month, with Glover's help, the company's assets were sold to a Wisconsin business. Dahl and Glover had taken the position that Chem-Age Industries, Inc. was not a corporation but a proprietorship owned solely by Dahl. *See* SDCL 47-6-18, 47-6-19 (sale of substantially all assets authorization from board and resolution from shareholders). Yet Glover helped to arrange the sale of Chem-Age assets through another entity: "Byron Dahl d/b/a BMD Associates, a South Dakota sole proprietorship." Glover later testified that he did not know the relationship between BMD and Chem-Age.

[*P58] As indicated in the majority opinion, Glover notarized the signatures even though Pederson and Shepard had not signed the document in [***55] his presence. This is not only a crime but enabled Dahl to use the corporation documents to defraud Pederson and Shepard and caused them to part with an additional $ 140,000.

[*P59] Shortly thereafter, Glover assisted Dahl in selling the assets of the corporation enabling Dahl to run off with the money. Throughout this time period, Glover was paid with corporation funds and even received a "gift" of office furniture from Dahl. None of this could have happened but for Glover's crime in notarizing the signatures, enabling the corporation to be set in motion, to purchase assets and then assist their sale by a "sole proprietorship" owned by Dahl.

[*P60] Clearly, these facts raise genuine issues whether Glover aided and abetted Dahl's fraud to the corporation and to the individuals from start to finish. Specifically, genuine issues of fact arise as to Glover's suppression of the fact that the corporation assets were not owned by Dahl as a sole proprietor from the corporation, Pederson, Shepard and from the buyer of the corporation assets. This suppression enabled Dahl to walk off with the money to their detriment in violation of SDCL 20-10-2(3).

[*P61] [***56] Therefore, I would reverse Issue B. Fraud and remand for a fair trial.

# TAB  6

LEXSEE

Analysis
As of: May 25, 2007

**COREGIS INSURANCE COMPANY, Appellant v. LAW OFFICES OF CAROLE F. KAFRISSEN, P.C.; CAROLE F. KAFRISSEN, Individually; CYNTHIA CLARK**

**No. 01-4517**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**57 Fed. Appx. 58; 2003 U.S. App. LEXIS 1806**

**October 31, 2002, Argued**
**January 27, 2003, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA. D.C. Civil No. 98-cv-06769. District Judge: The Honorable Eduardo C. Robreno.

**DISPOSITION:** Reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insurer filed for a declaratory judgment to define the scope of their coverage in the legal malpractice claim against defendant insured. The insured counterclaimed, alleging breach of contract and bad faith. The insured requested the entire claims file on the underlying malpractice claim. The United States District Court for the Eastern District of Pennsylvania ordered the insurer to produce six documents. The insurer appealed.

**OVERVIEW:** The district court cited Pennsylvania authority for the proposition that the insured did not need to demonstrate substantial hardship to obtain work product. The instant court found that the district court erred in its analysis. Unlike the attorney client privilege, the work product privilege was governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3). Thus, the insured must have made a showing of substantial need and undue hardship before the documents must have been produced. The instant court found that it was apparent that the six documents were prepared by the insurer or its representatives in anticipation of litigation involving coverage and should have been distinguished from the insurer's handling of the underlying malpractice claim. Disclosure was inappropriate because the documents anticipated coverage litigation and related primarily to the mental impressions and legal opinions on how to proceed with the coverage litigation. Because the documents related to the current litigation and not the underlying claim, the insured could not have demonstrated substantial need.

**OUTCOME:** The order of the district court compelling production of the six documents was reversed.

**CORE TERMS:** work product doctrine, malpractice, coverage, disclosure, attorney-client, discovery, impressions, advice of counsel, anticipation of litigation, settlement, insurer, federal standard, undue hardship, waived, underlying claim, legal theories, discoverable, memorandum, hardship

**LexisNexis(R) Headnotes**

***Civil Procedure > Discovery > Motions to Compel***
***Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview***

*Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine*
[HN1] An appellate court has jurisdiction pursuant to the collateral order doctrine over discovery orders compelling disclosure of material that may be protected by the work product doctrine or attorney-client privilege.

*Civil Procedure > Discovery > Motions to Compel*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] Although an appellate court generally reviews the decision to grant a motion to compel for abuse of discretion, the court's review is plenary where the decision was based upon the interpretation of a legal precept.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN3] The work product privilege is not absolute, and may be discoverable in situations where the legal opinion of an attorney is relevant in a civil action.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
[HN4] Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3). Under the federal work product doctrine, a party seeking discovery of documents created in the anticipation of litigation must show they have substantial need of the materials in the preparation of the party's case. Rule 26(b)(3). The parties must also show they are unable without undue hardship to obtain the substantial equivalent of the materials by other means. Rule 26(b)(3). Even if those requirements are met, the court will still withhold documents that would disclose mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the lawsuit. Rule 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN5] The decision that a document is protected by the work product doctrine is not a linear conclusion and is necessarily dependant on both the content of the document and the factual showing by the party seeking disclosure.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN6] In the context of the work product doctrine, an affirmative step must be taken to put the attorneys' mind in issue, mere relevance is not enough. Advice is not in issue merely because it is relevant, advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication.

**COUNSEL:** )Jeffrey A. Goldwater, Esq., Bryan G. Schumann, Esq., Edward F. Ruberry, Esq., Bollinger, Ruberry & Garvey, Chicago, IL.

Steven J. Polansky, Esq. (Argued), Marshall, Dennehey, Warner, Coleman & Goggin, Cherry Hill, NJ, Counsel for Appellant.

Thomas D. Schneider, Esq., Philadelphia, PA.

Ronald F. Kidd, Sr., Esq. (Argued), Philadelphia, PA, Counsel for Appellees.

**JUDGES:** BEFORE: NYGAARD and WEIS, Circuit Judges and IRENAS, * District Judge.

> * Honorable Joseph E. Irenas, Senior District Judge for the United States District Court for the District of New Jersey, sitting by designation .

**OPINION BY:** Richard L. Nygaard

**OPINION:**

[*59] OPINION OF THE COURT

NYGAARD, Circuit Judge.

The District Court ordered Coregis Insurance Company to produce six documents. On appeal Coregis alleges that the District Court erred by: (1) applying the [**2] Pennsylvania work product doctrine rather than the federal standard to four of the documents; (2) failing to apply the work product doctrine to the remaining two documents; (3) concluding that none of the documents were protected by the work product doctrine; and (4) holding that the Pennsylvania attorney-client privilege allowed the partial disclosure of two documents. [HN1] We have jurisdiction pursuant to the collateral order doc-

trine over discovery orders compelling disclosure of material that may be protected by the work product doctrine or attorney-client privilege. *In Re Ford Motor Co.*, 110 F.3d 954, 964 (3d Cir. 1997). [HN2] Although we generally review the decision to grant a motion to compel for abuse of discretion, our review is plenary where the decision was based upon the interpretation of a legal precept. *Armstrong v. Dwyer*, 155 F.3d 211, 214 (3d Cir. 1998). We will now reverse. n1

n1 Because we resolve this dispute on the federal work product doctrine issue, we do not reach the attorney-client privilege issue.

[**3]

The facts of the case are well known to the parties and we note only that this is a dispute between an attorney and her malpractice insurer over the settlement of an underlying malpractice claim. The insurer, Coregis, filed for a declaratory judgment to define the scope of their coverage in the malpractice claim against the Appellee, The Law Offices of Carole F. Kafrissen, P.C. Coregis sought to escape coverage liability based on contractual provisions in the insurance policy and recoup the amount already paid to Cynthia Clark, the malpractice claimant. Kafrissen counterclaimed, alleging breach of contract and bad faith. As part of discovery for the bad faith counterclaim, Kafrissen requested that Corgis provide the entire claims file it held on the underlying malpractice claim. Coregis produced nearly all of the documents from this file, but refused to provide a November 1998 memorandum prepared by a claims representative, and five other documents referred to in that memorandum, arguing that the work product doctrine and the attorney-client privilege protected these documents.

The District Court applied the Pennsylvania work product doctrine, codified at PA. R. CIV. P. 4003.3. [**4] n2 The Court found [*60] that [HN3] the "privilege is not absolute, and may be discoverable in situations where the legal opinion of an attorney is relevant in a civil action." Order of December 12, 2001, J.A. at 269-71. Although this statement is equally true in the federal context, the Court went on to find that "the information need only be 'relevant', and the party seeking the materials need not show substantial hardship." *Id.* The District Court cited Pennsylvania authority for the proposition that Kafrissen did not need to demonstrate substantial hardship. The District Court erred in its analysis.

n2 Section 4003.3 provides that:

> [A] party may obtain discovery of any matter discoverable under Rule 4003.1 even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his or her attorney, consultant, surety, indemnitor, insurer or agent. The discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories. With respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his or her mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics.

[**5]

In *United Coal Co. v. Powell Construction Co.*, 839 F.2d 958, 966 (3d Cir. 1988), we held that [HN4] "unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in FED. R. CIV. P. 26(b)(3)." Under the federal work product doctrine, a party seeking discovery of documents created in the anticipation of litigation must show they have "substantial need of the materials in the preparation of the party's case." FED. R. CIV. P. 26(b)(3). The parties must also show they are "unable without undue hardship to obtain the substantial equivalent of the materials by other means." *Id.* Even if those requirements are met, the court will still withhold documents that would disclose "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the lawsuit." *Id.* Thus, Kafrissen must make a showing of substantial need and undue hardship before these documents must be produced.

All six of the documents were submitted to us *in camera.* Upon examination, it is apparent that they were created by Coregis or its representatives in anticipation [**6] of the coverage litigation. The only question is whether Kafrissen's bad faith claim relates to the documents, in other words, if the documents sought represent mental impressions, etc. relevant to the accusations of bad faith in the underlying malpractice claim. Coregis urges that there is a distinction between the release of documents related to settlement of the underlying claim

and documents related to the instant coverage action. We agree. The documents before us were prepared in anticipation of litigation involving coverage and should be distinguished from Coregis' handling of the underlying malpractice claim.

[HN5] The decision that a document is protected by the work product doctrine is not a linear conclusion and is necessarily dependant on both the content of the document and the factual showing by the party seeking disclosure. Here, disclosure is inappropriate because the documents anticipate coverage litigation and relate primarily to the mental impressions and legal opinions on how to proceed with the coverage litigation. Because these documents relate to the current litigation and not the underlying claim, Kafrissen cannot demonstrate substantial need and the documents should [**7] be protected. n3

n3 Kafrissen also alleges that Coregis waived any privilege by attaching an affidavit from counsel that purports to explain what happened during settlement. Kafrissen claims that by relying on the 'advice of counsel' defense, Coregis has waived their work product and attorney-client privileges. Kafrissen is mistaken that the affidavit places the 'advice of counsel' in issue. Based on our precedent, [HN6] an affirmative step must be taken to put the attorneys' mind in issue, mere relevance is not enough. *Rhone-Poulenc Rorer, Inc. v. The Home Indemnity Co.*, 32 F.3rd 851, 863 (3d Cir. 1994)("Advice is not in issue merely because it is relevant...advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication."). Coregis has not pleaded this defense, nor has it placed 'advice of counsel' in issue merely by submitting the factual affidavit.

[*61] For the foregoing reasons, [**8] we will reverse the order of the District Court compelling production of these six documents.

/s/ Richard L. Nygaard

Circuit Judge

# TAB 7

LEXSEE

Caution
As of: May 25, 2007

**PEGGY DION, Plaintiff, vs. NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

**NO. CV-95-122-GF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, GREAT FALLS DIVISION**

**185 F.R.D. 288; 1998 U.S. Dist. LEXIS 21813**

**February 9, 1998, Decided**
**February 9, 1998, Filed**

**DISPOSITION:** [**1] Dion's motion to compel appropriately GRANTED in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insured injury victim filed a motion to compel defendant insurer to produce an insurance claim file generated and maintained by defendant with respect to her claim for underinsured motorists benefits. Plaintiff's action was filed pursuant to 28 U.S.C.S §§ 2201-2203. She sought a declaration regarding her entitlement to underinsured motorist benefits under defendant's policy.

**OVERVIEW:** In resisting the production of the claims file material, defendant asserted the documents therein were protected from discovery by the attorney-client privilege and/or the work product doctrine as encompassed in Fed. R. Civ. P. 26(b)(3). Defendant had named its attorney of record as an expert witness regarding insurance law, bad faith and unfair trade practices, in the action. The court ruled that the ordinary and opinion work product of defendant's agents, who made the decision regarding plaintiff's claim for benefits, were clearly discoverable. In addition, the court concluded that defendant in, naming its attorney of record in the case as an expert witness, necessarily waived the right to assert the work product privilege with respect to the remainder of the claims file. The court found that without that discovery, plaintiff would not have been able to ascertain the basis and facts upon which the attorney's expert opinions were based. The court concluded that defendant, upon naming its attorney as an expert witness, assumed the risk that any subsequent invocation of the attorney-client privilege would be abrogated.

**OUTCOME:** The court granted plaintiff's motion to compel in part.

**CORE TERMS:** attorney-client, insurer, work product, discovery, underinsured motorist, impressions, work product doctrine, advice of counsel, underlying claim, disclosure, waived, expert witness, anticipation of litigation, in camera, discoverable, compelling need, disclose, handling, waive, Montana Unfair Trade Practices Act, unfair trade, confidential communications, work product privilege, opposing party, cross-examination, work-product, requisite, discover, advice, sub judice

**LexisNexis(R) Headnotes**

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN1] Under the work product doctrine, materials prepared by an attorney in anticipation of litigation are protected from disclosure. The protection afforded by the work product doctrine has since been extended to encompass materials provided by or for another party or by or for that other party's representative (including the

other party's attorney, consultant, surety, indemnitor, insurer, or agent). Fed. R. Civ. P. 26(b)(3).

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN2] A party may discover work product material, provided the movant establishes a substantial need for the material and an inability to obtain the equivalent by other means. Fed. R. Civ. P. 26(b)(3). However, even if the movant is able to make the requisite showing, Fed. R. Civ. P. 26(b)(3) further directs the court to safeguard the disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation at hand, material which is generally referred to as opinion work product.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN3] Opinion work product is discoverable, however, when mental impressions are directly at issue in a case and the need for the material is compelling.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN4] Any determination as to whether sufficient adversity exists as to warrant the assertion of the work product privilege with respect to communications in an insurer's claims file must necessarily be made on a case-by-case basis. In determining that point in time at which an insurer's activity shifts from the ordinary course of business to anticipation of litigation, a court must determine whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Self-Incrimination Privilege > General Overview*
[HN5] The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived.

*Civil Procedure > Discovery > Relevance*
*Civil Procedure > Judgments > Relief From Judgment > General Overview*

*Evidence > Privileges > Attorney-Client Privilege > Scope*
[HN6] Recognition that the work product privilege is essential to the lawyer's role creates tension between the privilege and discovery which requires disclosure of relevant facts within the attorney's knowledge. In order to help relieve this tension, the attorney-client privilege is construed no more broadly than is necessary to effectuate its purpose.

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN7] The scope of the protection afforded by the attorney-client privilege in an action in federal court, where jurisdiction is predicated on diversity of citizenship, is determined by resort to state law. Fed. R. Evid. 501; Fed. R. Civ. P. 30(c).

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN8] The attorney-client privilege, which extends to written communications from an attorney to his client, is codified in Montana at Mont. Code Ann. § 26-1-803 (1995).

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN9] See Mont. Code Ann. § 26-1-803 (1995).

*Civil Procedure > Counsel > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Insurance Law > Bad Faith & Extracontractual Liability > General Overview*
[HN10] The attorney-client privilege applies with equal force in "bad faith" insurance litigation as in all other civil litigation. The Montana Supreme Court has, in the context of a third-party "bad faith" action, expressly rejected the proposition that the attorney-client privilege must give way, in "bad faith" litigation, in order for a plaintiff to determine whether an insurer had a good faith basis for its decision. Moreover, the attorney-client privilege protects communications in first-party bad faith cases when the insurer's attorney did not represent the interests of the insured in the underlying case.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Criminal Law & Procedure > Counsel > Right to Counsel > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN11] A litigant's pleading of a claim or defense to which attorney-client communications are relevant does not, by such pleading alone, waive the attorney-client privilege. However, the attorney-client privilege may be waived if a party injects into litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct. A privilege may also be impliedly waived where a party makes assertions in the litigation or asserts a claim that in fairness requires examination of the protected communications.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN12] A court may not find a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant. To waive a privilege, a party must do more than merely deny the opposing party's accusations, but must affirmatively raise the issue involving privileged communications. Implicit waiver can occur when a holder relies on a legal claim or defense, the truthful resolution of which will require examining confidential communications. Nonetheless, the issue need not be raised as an affirmative defense or by the party's pleadings.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN13] An implied waiver of the attorney-client privilege occurs when the party asserts the privilege as a result of some affirmative act, such as filing suit; through this affirmative act, the asserting party puts the privileged information at issue; and allowing the privilege would deny the opposing party access to information vital to its defense. The doctrine of waiver by implication reflects the notion that the attorney-client privilege was intended as a shield, not a sword. In other words, a defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. When confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Insurance Law > Bad Faith & Extracontractual Liability > General Overview*
[HN14] The attorney-client privilege applies unless an insurer directly relies on advice of counsel as a defense to a bad faith charge.

**COUNSEL:** For PEGGY DION, plaintiff: D. Patrick McKittrick, Timothy J. McKittrick, McKITTRICK LAW FIRM, PC, Great Falls, MT.

For NATIONWIDE MUTUAL INSURANCE COMPANY, defendant: Maxon R. Davis, DAVIS, HATLEY, HAFFEMAN & TIGHE, PC, Great Falls, MT.

**JUDGES:** Before PAUL G. HATFIELD, SENIOR UNITED STATES DISTRICT JUDGE.

**OPINION BY:** PAUL G. HATFIELD

**OPINION:**

[*290] **MEMORANDUM AND ORDER**

**BACKGROUND**

On December 31, 1993, the plaintiff, Peggy Dion, sustained serious personal injuries when the vehicle in which she was a passenger was struck by a vehicle driven by Bobby [*291] O'Brian Cole, Jr. Cole's vehicle was insured by Western Agriculture Insurance Company, a subsidiary of Mountain West Farm Bureau Mutual Insurance Company. At the time of the accident, Dion and her husband were named insureds under an automobile liability policy issued by the defendant, Nationwide Mutual Insurance Company ("Nationwide").

On July 28, 1995, Dion's counsel advised Nationwide that he had received an offer from Cole's insurance company to settle Dion's claim for the policy limits of $ 25,000, and requested Nationwide's consent to settle with Cole's insurer. In addition, counsel [**2] advised Nationwide of his intent to advance a claim for underinsured motorist benefits under the Dions' policy.

On September 12, 1995, Nationwide informed Dion's counsel that it had performed an asset check on Cole's finances, and agreed to waive its subrogation rights as against Cole. Accordingly, Dion settled her claim against Cole for his policy limits of $ 25,000. Dion asserted the settlement did not cover all of her losses, and she continued to pursue a claim for underinsured motorist coverage, under the Nationwide policy, for the excess damages she incurred.

On October 9, 1995, Nationwide denied coverage for Dion's injuries. On October 31, 1995, Dion instituted the above-entitled action, pursuant to 28 U.S.C. §§ 2201-2203, seeking a declaration regarding her entitlement to underinsured motorist benefits under the Nationwide policy. In addition, Dion's complaint advanced claims based upon Nationwide's purported (1) breach of the Montana Unfair Trade Practices Act, Mont. Code Ann. §§ 33-18-201, et seq.; and (2) violation of the duty of good faith and fair dealing attendant the insurance contract.

On April 22, 1997, the court entered a memorandum and order, holding the Nationwide [**3] policy provided underinsured motorist coverage to Peggy Dion for her injuries sustained in the underlying accident. On June 13, 1997, the declaratory judgment portion of the above-entitled action was settled by the parties for $ 150,000.00.

On May 8, 1997, the court conducted a status conference for the purpose of establishing a schedule for resolution of Dion's remaining claims for relief. Pursuant to discussion elicited at said conference, the court entered a scheduling order which called for, inter alia, the parties to disclose, on or before July 11, 1997, the identity of their respective expert witnesses.

On July 15, 1997, Nationwide filed its list of expert witnesses, which identified Paul C. Meismer, its attorney of record, as Nationwide's expert witness regarding insurance law, bad faith and unfair trade practices. Attorney Meismer subsequently moved the court for leave to withdraw as counsel for Nationwide. The court, on August 11, 1997, granted Meismer's request. Shortly thereafter, Nationwide's present counsel moved the court for leave to amend the scheduling order in order to name two additional expert witnesses. Dion strenuously objected to Nationwide's request. [**4]

On August 29, 1997, Nationwide filed an Amended List of Expert Witnesses, which added two witnesses--James Heckathorn (Insurance law, bad faith and unfair trade practices) and James Swan (Claims handling procedures, insurance law, bad faith and unfair trade practices). On September 3, 1997, Dion moved the court to enter an order striking the subsequently named experts.

On October 3, 1997, the court entered an order directing Nationwide to submit certain documents, i.e., the insurance claims file generated and maintained by Nationwide with respect to Dion's claim for underinsured motorist benefits, for the court's in camera inspection. The requested documents are the subject of a pending motion to compel, pursuant to Fed.R.Civ.P. 37, filed by Dion.

In resisting the production of the claims file material, Nationwide asserts the documents therein are protected from discovery by the attorney-client privilege and/or the work product doctrine as encompassed in Fed.R.Civ.P. 26(b)(3). Specifically, Nationwide maintains that material generated after October 11, 1995, the date Dion threatened to file a "bad faith" suit, were prepared "in response to a clear threat of litigation, [**5] and not merely document[s] prepared in the ordinary course of business with a general anxiety of potential litigation." Accordingly, Nationwide [*292] argues the materials are protected from discovery in the present first-party "bad faith" action. Having reviewed each of the in camera documents and considered the application of the privilege asserted by Nationwide in opposition to production of the particular document, the court is prepared to rule.

**DISCUSSION**

A. Work Product

[HN1] Under the work product doctrine first articulated by the Supreme Court in Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947), materials prepared by an attorney in anticipation of litigation are protected from disclosure. The protection afforded by the work product doctrine has since been extended to encompass materials provided "by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." See, Fed.R.Civ.P. 26(b)(3). The primary purpose of the work product doctrine is to "prevent exploitation of a party's efforts in preparing for litigation." Holmgren v. State Farm Mutual [**6] Auto. Ins Co., 976 F.2d 573, 576 (9th Cir. 1992), quoting, Admiral Ins. Co. v. United States District Court, 881 F.2d 1486, 1494 (9th Cir. 1989).

The fact that material may have been prepared in anticipation of litigation does not, however, render it immune from discovery. [HN2] A party may discover work product material, provided the movant establishes a substantial need for the material and an inability to obtain the equivalent by other means. See, Fed.R.Civ.P. 26(b)(3); 8 WRIGHT & MILLER, FED. PRAC. & PROC. CIVIL § 2024 (1970). However, even if the movant is able to make the requisite showing, Rule 26(b)(3) further directs the court to safeguard the disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation at hand, material which is generally referred to as "opinion work product".

[HN3] Opinion work product is discoverable, however, when mental impressions are directly at issue in a case and the need for the material is compelling. See,

Holmgren v. State Farm Mutual Auto. Ins Co., supra, 976 F.2d at 577.

> In a bad faith insurance claim settlement case, the "strategy, mental [**7] impressions and opinions of [the insurer's] agents concerning the handling of the claim are directly at issue." . . . Unless the information is available elsewhere, a plaintiff may be able to establish a compelling need for evidence in the insurer's claim file regarding the insurer's opinion of the viability and value of the claim. We review the question on a case-by-case basis.
>
> If a party has demonstrated the requisite level of need and hardship, the other party must produce the material

Id.

In the case sub judice, Nationwide asserts the claims file material generated after October 11, 1995, the date Dion first threatened to file a "bad faith" suit, were prepared "in anticipation litigation" and, as a result, are not discoverable. Assuming, arguendo, the subject material was prepared "in anticipation of litigation," n1 the dispositive issue, in resolving the pending motion to compel, is whether Dion has established the requisite level of need and hardship to compel production of the work product contained within Nationwide's claim file.

In order to prevail upon her claim under the Montana Unfair Trade Practices Act, Dion must establish Nationwide lacked [**8] reasonable justification for refusing payment of her claim for underinsured motorist benefits. See, Mont. Code Ann. § 33-18-201 (1995). Accordingly, the nature of Dion's claim necessarily places the strategy, mental [*293] impressions and opinions of Nationwide's agents regarding the underlying claim directly in issue. Because the claims file contains a detailed history of how Nationwide processed and considered Dion's claim, the documents therein are certainly relevant to the issues raised by Dion's complaint. Relevance, however, is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue. See, Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 864 (3rd Cir. 1994).

n1 [HN4] Any determination as to whether sufficient adversity exists as to warrant the assertion of the work product privilege with respect to communications in an insurer's claims file must necessarily be made on a case-by-case basis. In determining that point in time at which an insurer's activity shifts from the ordinary course of business to anticipation of litigation, a court must determine "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." APL Corp. v. Aetna Cas. & Surety Co., 91 F.R.D. 10, 18 (D. Md. 1980).

[**9]

In United States v. Nobles, 422 U.S. 225, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975), the Court was asked to decide whether an attorney's testimonial use of privileged materials prepared by him to enable him to present his client's case constituted a waiver of the work product privilege. The Court ultimately held that counsel had indeed waived the privilege with respect to the matter about which he testified. 422 U.S. at 239-240.

> [HN5]
> the privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived . . . . Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

Nobles, supra, 422 U.S. at 237.

The processing of a claim by an insurer is almost entirely an internal operation and its claims file reflects a unique, contemporaneous record of the handling of the claim. The need for such information "is not only substantial, but overwhelming." See, Brown [**10] v. Superior Court, 137 Ariz. 327, 670 P.2d 725, 734 (Ariz. 1983) (en banc). Accordingly, Dion's claim herein, i.e., violation of the Montana Unfair Trade Practices Act, necessarily creates a compelling need to discover the full context in which the insurer handled the underlying claim. See, Palmer by Diacon v. Farmers Insurance, 261 Mont. 91, 861 P.2d 895, 911 (Mont. 1993).

In Palmer, the Montana Supreme Court drew a distinction between the opinion work product of the insurer's attorneys and its representatives who actually denied the underlying claim.

> Farmers [Insurance Exchange], however, did not rely on advice of counsel as a defense to the bad faith charge. The insurer, not the attorneys, made the ultimate decision to deny coverage in this case. Therefore, attorney mental impressions and opinions are not directly at issue, so the threshold requirement of the test for discoverability of opinion work product is not met. As a result, materials that contain the mental impressions and opinions of Farmers' former attorneys are immune from discovery under the work product doctrine, unless a waiver occurred.

Palmer, supra, 861 P.2d at 912.

In the [**11] case sub judice, the ordinary and opinion work product of Nationwide's agents, who made the decision regarding Dion's claim for benefits, are clearly discoverable. In addition, the court concludes Nationwide, in naming Paul Meismer as an expert witness, has necessarily waived the right to assert the work product privilege with respect to the remainder of the claims file. Meismer was Nationwide's attorney of record while Dion's claim for underinsured motorist benefits was litigated. Because Nationwide has named Meismer as an expert witness, Dion has a particularized and compelling need to discover Meismer's opinion work product. Without said discovery, Dion will be unable to ascertain the basis and facts upon which Meismer's opinions are based and, as a result, her ability for effective cross-examination on crucial issues will undoubtedly be impaired.

Accordingly, Dion has established a compelling need justifying the discovery of the ordinary and opinion work product documents contained in Nationwide's claims file. Dion's motion to compel is hereby GRANTED with respect to those documents found in the in camera submission to which Nationwide has asserted the privilege of ordinary [**12] and opinion work product.

[*294] B. Attorney-Client Privilege

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). " [HN6] Recognition that the privilege is essential to the lawyer's role creates tension between the privilege and discovery which requires disclosure of relevant facts within the attorney's knowledge." In re LTV Securities Litigation, 89 F.R.D. 595, 600 (N.D. Texas 1981). In order to help relieve this tension, the attorney-client privilege "is construed no more broadly than is necessary to effectuate its purpose." Id. see also, United States v. Nixon, 418 U.S. 683, 710, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974).

[HN7] The scope of the protection afforded by the attorney-client privilege in an action in federal court, where jurisdiction is predicated on diversity of citizenship, is determined by resort to state law. Baker v. CNA Ins. Co., 123 F.R.D. 322, 323 (D.Mont. 1988), citing, Fed.R.Evid. 501; Fed.R.Civ.P. [**13] 30(c). [HN8] The attorney-client privilege, which extends to written communications from an attorney to his client, see, Kuiper v. District Court of the Eighth Judicial District, 193 Mont. 452, 632 P.2d 694, 700-701 (Mont. 1981), is codified in Montana at Mont.Code Ann. § 26-1-803 (1995):

> [HN9]
> (1) An attorney cannot, without consent of his client, be examined as to any communication made by the client to him or his advice given to the client in the course of professional employment.
>
> (2) A client cannot, except voluntarily, be examined as to any communication made by him to his attorney or the advice given to him by his attorney in the course of the attorney's professional employment. n2

n2 Noteworthy is the fact that Mont.Code Ann. § 26-1-803 was amended by the Montana Legislature in 1989 to include subpart 2 which codifies the right, recognized in common law, of an individual from being compelled to disclose the substance of confidential communications made to an attorney for the purpose of obtaining professional advice. See, Baker, 123 F.R.D. at 324. Prior to the codification of this aspect of the attorney-client privilege as recognized at the common law, Mont.Code Ann. § 26-1-803 was viewed as not precluding an individual civil litigant, called as a witness, from being compelled to disclose communications the individual litigant

had with an attorney, and which bore upon the litigation at hand. 123 F.R.D. at 324.

[**14]

[HN10] The attorney-client privilege applies with equal force in "bad faith" insurance litigation as in all other civil litigation. See, Baker, supra, 123 F.R.D. at 323. The Montana Supreme Court has, in the context of a third-party "bad faith" action, expressly rejected the proposition that the attorney-client privilege must give way, in "bad faith" litigation, in order for a plaintiff to determine whether an insurer had a good faith basis for its decision. See, State ex rel U.S. Fidelity & Guaranty Co. v. The Montana Second Judicial District Court, 240 Mont. 5, 783 P.2d 911 (Mont. 1989). Moreover, the attorney-client privilege protects communications in first-party bad faith cases when the insurer's attorney did not represent the interests of the insured in the underlying case. Palmer by Diacon v. Farmers Insurance, supra, 861 P.2d at 906.

Accordingly, Dion's prosecution of the present litigation does not, in and of itself, abrogate Nationwide's right to claim the attorney-client privilege as it pertains to communications generated in relation to the claim for underinsured motorist benefits. See, Dixie Mill Supply Co., Inc. v. Continental Cas. Co., 168 F.R.D. 554, 556 [**15] (E.D. La. 1996) ( [HN11] A litigant's pleading of a claim or defense to which attorney-client communications are relevant does not, by such pleading alone, waive the attorney-client privilege.). However, the attorney-client privilege may be waived if a party "injects into . . . litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct." Thornton v. Syracuse Savings Bank, 961 F.2d 1042, 1046 (2nd Cir. 1992), citing, GAB Business Services, Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir. 1987); Laughner v. United States, 373 F.2d 326 (5th Cir. 1967). A privilege may also be impliedly waived where a party makes assertions in the litigation or "asserts a claim that in fairness requires examination of the protected communications." [*295] United States v. Bilzerian, 926 F.2d 1285, 1292 (2nd Cir. 1991), cert. denied, 502 U.S. 813, 116 L. Ed. 2d 39, 112 S. Ct. 63 (1991). See also, In re Bairnco Corp. Securities Litigation, 148 F.R.D. 91, 101 (S.D.N.Y. 1993) ("To permit [defendant] to offer the fact of counsel's conclusions where such conclusions serve [defendant's] purposes without permitting plaintiffs [**16] access to all the communications between counsel and [defendant] would prejudice plaintiffs in the prosecution of their action.").

[HN12] A court may not, however, find a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant. Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1418 (11th Cir. 1994), quoting, Remington Arms Co. v. Liberty Mutual Ins. Co., 142 F.R.D. 408, 415 (D.Del. 1992). To waive a privilege, a party must do more than merely deny the opposing party's accusations, but must affirmatively raise the issue involving privileged communications. Lorenz v. Valley Forge Ins. Co., 815 F.2d 1095, 1098 (7th Cir. 1987) (Implicit waiver "can occur when a holder relies on a legal claim or defense, the truthful resolution of which will require examining confidential communications."). Nonetheless, the issue need not be raised as an affirmative defense or by the party's pleadings. In re Hillsborough Holdings Corp., 176 B.R. 223, 242 (M.D. Fla. 1994).

[HN13] An implied waiver of the attorney/client privilege occurs when (1) the party asserts the privilege as a result of some affirmative [**17] act, such as filing suit; (2) through this affirmative act, the asserting party puts the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information vital to its defense. Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975). The doctrine of waiver by implication reflects the notion that the attorney-client privilege "was intended as a shield, not a sword." Cox v. Administrator U.S. Steel & Carnegie, supra, 17 F.3d at 1418, citing, GAB Business Services, Inc. v. Syndicate 627, supra, 809 F.2d at 762. In other words, "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." Id., citing, United States v. Bilzerian, 926 F.2d 1285 (2nd Cir. 1991); United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982) ("Selective disclosure for tactical purposes waives the privilege."). When confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege. Conkling v. Turner, 883 F.2d 431, 435 (5th Cir. 1989). See also, Friction Div. Products v. E.I. [**18] Du Pont De Nemours, 117 F.R.D. 535, 538 (D.Del. 1987) (Where an insurer makes factual assertions in defense of a claim which incorporate, expressly or implicitly, the advice and judgment of its counsel, it cannot deny an opposing party "an opportunity to uncover the foundation for those assertions in order to contradict them.").

In the case sub judice, Nationwide maintains it will not assert advice of counsel as a defense to Dion's claims. If Nationwide were to assert the advice of counsel defense, any and all communications with its attorney would clearly be discoverable. See, Palmer by Diacon v. Farmers Insurance, supra, 861 P.2d at 907 (" [HN14] The attorney-client privilege applies 'unless the insurer directly relies on advice of counsel as a defense to the bad faith charge.'"). Nevertheless, while Nationwide may not

formally raise an advice of counsel defense, its decision to name attorney Meismer as an expert witness, bespeaks volumes about the posture of Nationwide's defense. Moreover, irrespective of the legal defenses Nationwide expects to raise, Dion's case will perforce place at issue Meismer's handling of the underlying claim. To permit Nationwide to offer Meismer's [**19] conclusions and expert opinions regarding the underlying claim, where such conclusions and opinions serve Nationwide's purposes, without permitting Dion access to all the communications between Meismer and Nationwide, would unduly prejudice Dion in the prosecution of the present action.

Consequently, the court concludes that Nationwide, upon naming its attorney as an expert witness, assumed the risk that any subsequent invocation of the attorney-client privilege would be abrogated. Accordingly, [*296] the court concludes that the communications between Meismer and Nationwide, up until that point in time at which the claim for underinsured motorist benefits was settled, should be made available to Dion.

CONCLUSION

Therefore, for the reasons set forth herein, the court concludes Dion's motion to compel is appropriately GRANTED to the extent set forth herein. Nationwide shall make the in camera materials available to Dion within ten (10) days of the date hereof.

IT IS SO ORDERED.

DATED this 9 day of February, 1998.

PAUL G. HATFIELD, SENIOR JUDGE

UNITED STATES DISTRICT COURT

# TAB  8

LEXSEE

Caution
As of: May 25, 2007

**PACIFICORP, an Oregon Corporation, Petitioner and Appellant, v. THE DEPARTMENT OF REVENUE OF THE STATE OF MONTANA and THE STATE TAX APPEAL BOARD OF THE STATE OF MONTANA, Respondent and Cross-Appellant**

**No. 91-242**

**Supreme Court of Montana**

**254 Mont. 387; 838 P.2d 914; 1992 Mont. LEXIS 239; 49 Mont. St. Rep. 774**

**May 21, 1992, Submitted**
**August 27, 1992, Decided**

**SUBSEQUENT HISTORY:** [***1] Released for Publication September 14, 1992.

**PRIOR HISTORY: Appeal from District Court of Lewis & Clark County. First Judicial District. Honorable Jeffrey Sherlock, Judge.**

**DISPOSITION:** Affirmed in part, reversed in part and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner corporation challenged the judgment of the Montana District Court, which reversed the State Tax Appeals Board's (STAB) admission of eight documents into evidence in an action by the corporation challenging the Montana Department of Revenue's (DOR) denial of tax refunds.

**OVERVIEW:** The corporation filed a complaint with STAB appealing the DOR's denial of refunds. The DOR had obtained tax audit reports from tax authorities and had determined that Montana was treating the corporation's Montana operations differently than the other states were. STAB denied the corporation's motion to compel the DOR to produce audit report documents generated by the Multistate Tax Commission (MTC). The corporation appealed the trial court's judgment, and the court held that the MTC audit reports were subject to discovery under Mont. Code Ann. § 15-1-60, consistent with the corporation's constitutional right to examine public documents. The corporation's right to know prevailed because no individual or corporate privacy was involved. Montana, California, and the MTC could not assert the right to privacy because they were not "individuals" under Montana law, but were governmental entities.

**OUTCOME:** The judgment of the lower court was affirmed in part and reversed in part.

**CORE TERMS:** audit, audit report, attorney-client, disclosure, sentence, discovery, privileged, privacy, right to know, known right, multistate, waive, inadvertent, refund, right to privacy, implied intention, relinquishment, dissemination, confidential, amicus, tax purposes, subject to discovery, individual privacy, voluntary relinquishment, substantial rights, consistency, requesting, prejudiced, disclose, tribunal

**LexisNexis(R) Headnotes**

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN1]Because the Multistate Tax Commission (MTC) derives powers from and on behalf of its member states, it exercises no more power than the states already possess. The MTC's audit information is not subject to any greater burden of confidentiality than Montana law commonly imposes on tax information gathered by the Montana Department of Revenue. Any further confiden-

tiality violates Montana's constitutional right to know provision, Mont. Const. art. II, § 9.

*Administrative Law > Governmental Information > Freedom of Information > General Overview*
[HN2]See Mont. Const. art. II, § 9.

*Constitutional Law > Substantive Due Process > Privacy > General Overview*
[HN3]See Mont. Const. art. II, § 10.

*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Evidence > Privileges > Government Privileges > Waiver*
[HN4]Application of the test for waiver of the attorney-client privilege requires consideration of two elements: (1) the element of implied intention; and (2) the element of fairness and consistency.

*Evidence > Privileges > Government Privileges > Waiver*
[HN5]Waiver imports the intentional relinquishment or abandonment of a known right. Inadvertent production is the antithesis of that concept.

**COUNSEL:** For Petitioner and Appellant: **Terry B. Cosgrove** argued, Luxan & Murfitt, Helena; **Milo E. Ormseth** argued and **Peter R. Jarvis**, Stoel, Rives, Boley, Jones & Grey, Portland, Oregon.

For Respondent and Cross-appellant: **David Woodgerd** argued, Dept. of Revenue, Helena.

For Amicus Curiae: **Benjamin Frederick Miller**, California Franchise Tax Board, Multistate Tax Affairs Bureau, Sacramento, California; **Paull Mines**, Multistate Tax Commission, Washington, D.C.; and **John L. Alke,** Hughes, Kellner, Sullivan & Alke, Montana Taxpayer's Association, Helena.

**JUDGES:** Justice Trieweiler delivered the opinion of the Court. Chief Justice Turnage, Justices Hunt, McDonough, Weber and Gray concur. Justice Harrison dissenting.

**OPINION BY:** TRIEWEILER

**OPINION**

[*389] [**915] The Montana Department of Revenue (DOR), defendant and respondent in this Court, pursuant to Rule 23(h), M.R.App.P., appeals from two final orders of the District Court of the First Judicial District, Lewis & Clark County. The District [***2] Court reversed the State Tax Appeal Board's (STAB) admission of eight documents into evidence based on PacifiCorp's attorney-client privilege, and remanded the case to STAB for a new hearing. Appellant PacifiCorp cross-appealed from an order of the District Court which upheld STAB's denial of PacifiCorp's motion to compel the DOR to produce audit report documents generated by the Multistate Tax Commission.

The Montana Taxpayers Association (MTA) filed an amicus curiae brief supporting PacifiCorp's position. The Multistate Tax Commission (MTC) and the California Franchise Tax Board (FTB) submitted amicus curiae briefs in support of the DOR's position. We affirm in part and reverse in part.

The issues on appeal are:

1. Did the District Court err in affirming STAB's decision that the audit reports performed by California for MTC at the request of Petitioner are not subject to discovery?

[*390] 2. Did the District Court err when it found that PacifiCorp did not waive its attorney-client privilege by producing eight documents during discovery?

3. Did the District Court err when it remanded this case to STAB for a new trial, based on the finding that eight documents were privileged [***3] and improperly admitted into evidence?

On October 6, 1986, the parties submitted an agreed statement of facts, which is summarized as follows:

PacifiCorp is the parent of an affiliated group of corporations engaged in business within Montana. The DOR conducted an audit covering PacifiCorp's corporation license tax returns from 1974 to 1979. On November 5, 1982, PacifiCorp filed amended returns for refunds for the years 1971 through 1979. In a letter dated June 3, 1983, the DOR informed PacifiCorp of a proposed additional tax assessment for the tax years 1974 to 1979, and also denied PacifiCorp's refund claims.

On June 28, 1983, PacifiCorp protested the deficiencies asserted in the DOR's June 3, 1983, letter. On June 29, 1983, PacifiCorp also filed a complaint with STAB appealing the DOR's denial of refunds. On August 2, 1983, pursuant to stipulation of the parties, STAB ordered that the refund appeal be held in abeyance pending a final decision on the tax deficiency protest.

The DOR obtained tax audit reports on PacifiCorp from tax authorities in Oregon, Idaho, and California,

and determined that [**916] Montana was treating PacifiCorp's Montana operations differently than the other [***4] states.

PacifiCorp contacted MTC and requested that it review the proposed assessment of additional taxes by Montana. The MTC is an association of about 20 states including Oregon, Idaho, California, and Montana. The MTC's amicus curiae brief states that the purpose of the Multistate Tax Compact is to facilitate the following:

> 1. Equitable tax apportionment of multistate businesses,
>
> 2. Uniformity among various state tax systems,
>
> 3. Avoidance of duplicative taxation,
>
> 4. Discussion of apportionment disputes,
>
> 5. Avoidance of state judicial procedures by providing an informal forum for dispute resolution,
>
> 6. Taxpayer convenience,
>
> 7. Good relations between taxpayers and the state.

In response to the request, MTC requested California to conduct a [*391] special audit of PacifiCorp and to provide reports to MTC and its members.

Both Montana and California are signatories to an Agreement on Exchange of Information between MTC members stating:

> 6. No information obtained pursuant to this Agreement shall be disclosed to any person not authorized by the laws of the undersigned states.

On May 3, 1985, the DOR sent PacifiCorp its final notice of additional tax due and denied all refund [***5] claims. On May 31, 1985, PacifiCorp appealed to STAB the DOR's additional tax assessment. This appeal was combined with the pending claim filed with STAB in 1983.

On July 15, 1985, PacifiCorp filed its first interrogatories and request for production of documents. Included within the request for production was a requirement that the DOR identify any and all documents which were "used, reviewed, created or considered by the Department which played any part in the Department's decision that Western and Resource did not constitute a unitary business with Pacific." The DOR identified and produced the audit report which its staff produced. However, the DOR identified, but refused to produce the Oregon and MTC audit reports.

On November 21, 1985, PacifiCorp filed with STAB a motion to compel the DOR to produce the documents which it identified but failed to produce. The DOR's brief of January 7, 1986, opposed the motion to compel and directed PacifiCorp to request the documents directly from the individual states. On May 14, 1986, STAB denied the motion to compel.

PacifiCorp attempted to obtain copies directly from the states. Oregon provided copies of its audit report. The FTB [***6] provided certain portions of the requested information, but did not release any portions from the first & second audit reports (1981 and 1982) which included the following:

1. Opinions, recommendations, judgments, or analysis in the audit narrative;

2. Proprietary-type of information about the internal decision making process which it thought the taxpayer could use to manipulate the system (audit guidelines, audit criteria, operational criteria, and memos);

3. Third-party information, unrelated to the taxpayer; or

4. Protest hearing reports.

[*392] The FTB also withheld the entire third report dated May 24, 1984, and state that a fourth report dated May 29, 1985, had not been specifically requested by PacifiCorp. Its letter explained that the undisclosed audit information was confidential under California law and would not be given to the taxpayer (PacifiCorp). The 1984 and 1985 reports from FTB were given to Oregon, Montana, Idaho, and MTC.

The letter also stated that FTB was providing the following information from the first and second reports (1981 & 1982):

1. Returns, reports, etc., that had been furnished to the department by the taxpayer;

2. The factual data contained in [***7] audit narratives and supporting workpapers; and

[**917] 3. Authority relied upon to make adjustments.

PacifiCorp also attempted to obtain audit reports directly from MTC, but MTC refused to provide copies.

On June 12, 1986, PacifiCorp filed a petition for judicial review. It sought an order reversing STAB and allowing discovery of the audit reports. The District Court found that it lacked jurisdiction and that a review would have to await final agency action. STAB entered judgment for the DOR on February 28, 1989. On November 22, 1989, the District Court reversed and remanded this decision due to unlawful ex parte procedures on the part of STAB and the DOR. On March 15, 1990, STAB once again entered judgment for the DOR. PacifiCorp appealed to the District Court, and the parties agreed to resolve the discovery and evidentiary issues before reviewing the merits. The District Court found the information in the audit was privileged under § 15-1-601, MCA, and affirmed STAB's ruling. This is the basis of PacifiCorp's cross-appeal.

During discovery, PacifiCorp inadvertently produced eight documents in response to the DOR's request. PacifiCorp moved to exclude the documents under the attorney-client [***8] privilege, but STAB admitted the documents, finding that PacifiCorp had waived its privilege. The District Court found that the eight documents were protected by the attorney-client privilege and remanded the case back to STAB for consideration without benefit of the information found in the documents.

I.

Did the District Court err in affirming STAB's decision that the [*393] audit reports performed by California for MTC at the request of Petitioner are not subject to discovery?

There is no dispute that the availability of the MTC audit report is governed by Article VIII, § 6, of the Multistate Tax Compact. Section 6 is adopted by and set forth in § 15-1-601, MCA:

> Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions, or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit and only through the appropriate agencies or officers of such states or subdivisions.

The dispute concerns the interpretation of the above statute, particularly the meaning of the second sentence. [***9] The District Court found that the first sentence precludes a party state from distributing the MTC audit report to the taxpayer.

The DOR maintains that the first sentence authorizes dissemination of MTC audit information to the member states, their subdivisions, or the United States for tax purposes only. The DOR contends that such disseminated information must remain confidential because the first sentence establishes a statutory privilege for information obtained during an MTC audit. The DOR argues that the second sentence, regarding availability, does not defeat the privilege because it refers to dissemination to a state's taxing authority for tax purposes only. We disagree.

We conclude that the first sentence does not preclude the state from distributing the audit to the taxpayer. Although the first sentence of the statute provides that the audit information is confidential, the second sentence provides that it will be available according to state law. The second sentence states that the laws of each state or subdivision "on whose account the audit is performed" govern the availability of the audits. Montana was provided the report as a state "on whose account" the audit [***10] was performed, thus, the MTC audit is a Montana audit. The second sentence allows discovery of the audit report pursuant to Montana law. *See Multistate Tax Com'n v. Merck & Co., Inc.* (Or. 1980), 617 P.2d 1371, 1375, where the Oregon Supreme Court held that an MTC audit is essentially an Oregon audit performed under Oregon law by its agent, MTC. Montana [**918] disclosure laws apply. California privilege laws are not applicable, except in tax litigation arising in California.

[*394] The DOR contends that public disclosure would undermine MTC's ability to function as an informal forum for issue resolution. The DOR's inconsistent disclosure practices belie this argument. The DOR admitted during oral argument that MTC audits *supporting Montana tax assessments* are often released to the taxpayer. There is no logical basis for releasing the information in some cases, but not in others. Given the inexplicable disparate treatment, arguments that disclosure will undermine MTC or Montana's participation are not persuasive.

[HN1]Because MTC derives powers from and on behalf of its member states, it exercises no more power than the states already possess. *Kinnear v. Hertz Corp.* (Wash. 1976), 545 P.2d 1186. [***11] The MTC's audit information is not subject to any greater burden of confidentiality than Montana law commonly imposes on tax information gathered by the DOR. Any further "confidentiality" violates Montana's constitutional right to know provision. [1]

1 [HN2]Article II, § 9, of the Montana Constitution, provides:

> *Right to Know*: No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

*Constitutional Considerations*

The District Court did not discuss PacifiCorp's right to know under Article II, § 9, of the Montana Constitution, nor did it address the right to privacy asserted by the DOR under Article II, § 10 of the Montana Constitution. [2]

2 [HN3]Article II, § 10, provides:

> *Right to Privacy*. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

[***12] Article II, § 9, of the Montana Constitution is the law of this State and gives PacifiCorp the right to examine these public documents unless some individual privacy interest is threatened.

The DOR compares its refusal to disclose information obtained from MTC with the refusal of the state auditor in *Belth v. Bennett* (1987), 227 Mont. 341, 740 P.2d 638, to provide information received from a multistate insurance regulation association on the basis that [*395] the information was privileged under Montana statute. In *Belth*, a newspaper was trying to obtain information about an insurance company. We held in *Belth* that a state agency can assert the privacy interest of another. In *Belth*, the statute allowed the state auditor to withhold information because the insurance company's right to privacy outweighed the public's right to know. The instant case, however, is not a situation where a citizen is attempting to obtain a file about another taxpayer; here, the taxpayer is requesting its own file. The privacy exception within the right to know clause only applies when a member of the public is requesting information about [***13] someone else. The State cannot assert the privacy right of the person requesting the disclosure. If so, the State could circumvent the individual's right to know.

The DOR also contends that it is claiming the right to privacy for MTC and its members. It asserts that because California and MTC have not waived their privilege, Montana cannot disclose the information. The DOR points out that in *Belth* we held that corporations may assert the right of privacy because the right is not limited to individuals. The DOR explains that the MTC is analogous to a corporation, not a government agency, because it is an organization comprised of members. However, MTC's amicus brief supporting the DOR contradicts the DOR by stating that the MTC is "properly classified as an instrumentality of state government," and in this capacity "represents the executive branch of member states."

PacifiCorp's right to know prevails because no individual or corporate privacy is involved. Montana, California, and MTC cannot assert the right to privacy. They [**919] are not "individuals" under Montana law -- they are government entities. The only privacy interest implicated here is the taxpayer's. We hold that [***14] MTC audit reports are subject to discovery under § 15-1-601, MCA, consistent with PacifiCorp's constitutional right to examine public documents.

II.

Did the District Court err when it found that PacifiCorp did not waive its attorney-client privilege by producing eight documents during discovery?

PacifiCorp invoked the attorney-client privilege pursuant to § 26-1-803(2), MCA, for eight documents produced during discovery. Rule 503, M.R.Evid., provides that waiver of a privilege occurs if "the holder of the privilege voluntarily discloses or consents to disclosure [*396] of any significant part of the privileged matter," unless the disclosure itself is privileged.

PacifiCorp's production of eight attorney-client documents was in response to a voluminous document request covering thousands of documents. Montana law has not yet addressed whether inadvertent production in large document cases constitutes waiver. [HN4]Application of the test for waiver of the attorney-client privilege outlined in *State v. Statczar* (1987), 228 Mont. 446, 743 P.2d 606, requires consideration of two elements: (1) the element of implied intention; and (2) the element [***15] of fairness and consistency. *Statczar* 743 P.2d at 610. We will consider the element of implied intention first.

In *Statczar*, we defined waiver as "the intentional or voluntary relinquishment of a known right or conduct which implies relinquishment of a known right." This is consistent with the Commission Comments to Rule 503, M.R.Evid., which provide that subjective intent is not the only factor for determining waiver -- conduct can also

constitute waiver. The Comments also state that knowledge is not a required element for waiver. Here, it is clear that PacifiCorp did not have knowledge of the inadvertent production of the documents until later. However, we still must determine whether PacifiCorp's conduct at any time implied relinquishment of a known right.

In Kuiper v. District Court (1981), 193 Mont. 452, 460, 632 P.2d 694, 698, we stated that if no legal action is taken to protect against wide dissemination of the materials, voluntary relinquishment of the right could be found. [3] Here, wide dissemination did not occur, and PacifiCorp immediately requested the return of the documents [***16] as soon as it became aware of the production. PacifiCorp took prompt reasonable steps to protect its privilege. PacifiCorp objected to any use being made of these documents and refused to permit questions to be asked about them as soon as the issue arose during depositions. Voluntary relinquishment was not established by lack of legal action in this case.

> 3 *See also* In re Grand Jury Proceedings (4th Cir. 1984), 727 F.2d 1352, 1356 (efforts taken to rectify error and extent of disclosure are factors in determining waiver); *FDIC v. Ernst & Whinney* (E.D.Tenn. 1991), 137 F.R.D. 14 (prompt objection and request for return of documents).

Moreover, the mere inadvertent production itself is not enough to [*397] establish voluntary relinquishment of a known right. *Mendenhall v. Barber-Greene Co.* (N.D.Ill. 1982), 531 F. Supp. 951, 954.

> We are taught from first year law school that [HN5]waiver imports the "intentional relinquishment [***17] or abandonment of a known right." Inadvertent production is the antithesis of that concept.

*Mendenhall* at 955. *See also,* United States v. Zolin (9th Cir. 1987), 809 F.2d 1411, 1417 (secretary's delivery of tapes under the mistaken impression that they were blank did not waive privilege because the disclosure was "sufficiently involuntary and inadvertent as to be inconsistent with a theory of waiver"), *aff'd in relevant part and vacated in part* (1989), 491 U.S. 554, 109 S. Ct. 2619, 105 L. Ed. 2d 469. Because PacifiCorp did not voluntarily relinquish a known right, an implied intention to waive the privilege cannot be found.

In addition to considering the element of implied intention, we must also consider the element of fairness and consistency. *Statczar* 743 P.2d at 610. In this case, [**920] PacifiCorp objected to use of the documents from the first time they were referred to during discovery. The DOR knew well in advance of trial that use of the documents was an issue, and therefore, should not be surprised or unprepared because of their [***18] exclusion. Fairness and consistency are served by the exclusion of the privileged documents.

Accordingly, we affirm the District Court's conclusion that PacifiCorp did not waive its attorney-client privilege when it inadvertently produced eight documents during discovery.

III.

Did the District Court err when it remanded this case to STAB for a new trial, based on the finding that eight documents were privileged and improperly admitted into evidence?

When reviewing conclusions of law by an agency, Workers' Compensation Court, or a trial court the standard of review is whether the tribunal's conclusions are correct. "The reasoning for simply determining if the court's conclusions are correct is that no discretion is involved when a tribunal arrives at a conclusion of law -- the tribunal either correctly or incorrectly applies the law." *Steer v. Dept. of Revenue* (1990), 245 Mont. 470, 474, 803 P.2d 601, 603. We find that the District Court correctly applied the law.

The District Court's review of STAB's agency findings is governed by § 2-4-704(2), MCA. The District Court properly noted that the statute allows reversal of an agency decision [***19] "where such [*398] decision violates constitutional or statutory provisions or is affected by other error of law." *See* § 2-4-704(2)(a)(i) and (iv), MCA. The District Court found that the admission of the eight documents violated PacifiCorp's statutory right to claim the attorney client privilege pursuant to § 26-1-803, MCA.

We must determine whether the above statutory violation prejudiced substantial rights of the appellant. Section 2-4-704(2), MCA. If substantial rights were prejudiced, then reversal is appropriate. *See Frasceli v. State Dept. of Revenue* (1988), 235 Mont. 152, 766 P.2d 850.

> The test of prejudicial error requiring reversal is whether there is a reasonable possibility the inadmissible evidence might have contributed to the verdict.

*Brodniak v. State* (1989), 239 Mont. 110, 779 P.2d 71 (quoting *State v. Gray* (1983) 207 Mont. 261, 268, 673 P.2d 1262, 1266).

After reviewing the record, we conclude that there is a reasonable possibility that the eight privileged documents contributed to STAB's decision. We hold that [***20] admission of the eight documents prejudiced substantial rights of PacifiCorp, and did not constitute harmless error.

We affirm the District Court's conclusions that PacifiCorp did not waive its attorney-client privilege and that remand to STAB was necessary. We reverse the District Court's conclusion that the MTC audit was not discoverable under Montana law.

This case is remanded to the State Tax Appeal Board for further proceedings consistent with this opinion.

**DISSENT BY:** HARRISON

**DISSENT**

JUSTICE HARRISON dissenting.

I totally disagree with the majority's reasoning in this opinion and therefore dissent to its holding herein.

# TAB 9

LEXSEE

Caution
As of: May 25, 2007

**In re: QWEST COMMUNICATIONS INTERNATIONAL INC., Securities Litigation, Petitioner. NEW ENGLAND HEALTH CARE EMPLOYEES PENSION FUND; CLIFFORD MOSHER; TEJINDAR SINGH; SAT PAL SINGH, Real-Parties-in-Interest, and ASSOCIATION OF CORPORATE COUNSEL; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, Amici Curiae.**

**No. 06-1070**

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

**450 F.3d 1179; 2006 U.S. App. LEXIS 14937; 70 Fed. R. Evid. Serv. (Callaghan) 492**

**June 19, 2006, Filed**

**SUBSEQUENT HISTORY:** Class certification granted by, Settled by, Dismissed by, in part, Injunction granted at, Judgment entered by, in part In re Qwest Communs. Int'l, Inc. Secs. Litig., 2006 U.S. Dist. LEXIS 71039 (D. Colo., Sept. 28, 2006)
US Supreme Court certiorari denied by Qwest Communications v. New Eng. Health Care Emp. 127 S. Ct. 584, 166 L. Ed. 2d 429, 2006 U.S. LEXIS 8627 (U.S., Nov. 13, 2006)

**PRIOR HISTORY:** [**1] ON PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO. (D.C. No. 01-CV-1451-REB-CBS). In re Qwest Communs. Int'l, Inc. Secs. Litig., 2006 U.S. Dist. LEXIS 14358 (D. Colo., Mar. 10, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner corporation sought a writ of mandamus with respect to a decision from the United States District Court for the District of Colorado, which ordered the corporation to produce to plaintiffs in a securities case certain documents that the corporation considered privileged, but that the corporation had previously turned over to federal agencies.

**OVERVIEW:** This case presented an issue of first impression for the court, namely, whether the corporation waived the attorney-client privilege and work-product doctrine, as to third-party civil litigants, by releasing privileged materials to federal agencies in the course of an investigation of the corporation. The corporation urged the adoption of a rule of "selective waiver" that would allow production of privileged documents to the United States Department of Justice (DOJ) and other agencies without waiver of protection for those materials. The court held that the district court did not abuse its discretion in declining to apply selective waiver here. Noting that there had been an almost unanimous rejection of selective waiver by other courts, the court declined to adopt the concept in this case where the disclosures to the agencies were under agreements that did little to limit further disclosure by the government. In sum, the court found that the record did not establish a need for a rule of selective waiver to assure cooperation with law enforcement, to further the purposes of the attorney-client privilege or work-product doctrine, or to avoid unfairness to the disclosing party.

**OUTCOME:** The court denied the corporation's petition for a writ of mandamus.

**CORE TERMS:** selective, disclosure, attorney-client, work-product, work product, confidentiality, cooperation, common law, confidentiality agreement, waived,

privileged, disclose, discovery, disclosing, law enforcement, tape, waiver doctrine, environmental, non-opinion, waive, privileged information, confidential, audit, united states, grand jury, quotation, rule-making, testimonial, unfairness, memorandum

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*
[HN1] The U.S. Supreme Court has required that a party seeking mandamus demonstrate that he has no other adequate means of relief and that his right to the writ is clear and indisputable. In a mandamus action in which a petitioner seeks to have discovery orders involving a claim of privilege reviewed, review is appropriate when: (1) disclosure of the allegedly privileged or confidential information renders impossible any meaningful appellate review of the claim of privilege or confidentiality; and (2) the disclosure involves questions of substantial importance to the administration of justice. In most cases disclosure makes meaningful review impossible because after disclosure whatever privilege attaches would be worthless.

*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*
[HN2] The issuance of a writ of mandamus rests within the court's discretion. The United States Court of Appeals for the Tenth Circuit considers five nonconclusive factors to assist in determining whether to grant mandamus relief: (1) whether the party has alternative means to secure relief; (2) whether the party will be damaged in a way not correctable on appeal; (3) whether the district court's order constitutes an abuse of discretion; (4) whether the order represents an often repeated error and manifests a persistent disregard of federal rules; and (5) whether the order raises new and important problems or issues of law of the first impression. The right to the writ is clear and indisputable when the petitioner can show a judicial usurpation of power or a clear abuse of discretion. When the district court errs in deciding a legal issue, it necessarily abuses its discretion.

*Evidence > Privileges > General Overview*
[HN3] Fed. R. Evid. 501 provides that privileges in federal-question cases generally are governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. The Advisory Committee Notes state that the rule reflects the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis.

*Evidence > Privileges > General Overview*
[HN4] The U.S. Supreme Court has cautioned that testimonial exclusionary rules and privileges contravene the fundamental principle that the public has a right to every man's evidence. Such rules and privileges must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth. Although Fed. R. Evid. 501 manifests a congressional desire not to freeze the law of privilege but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, the United States Court of Appeals for the Tenth Circuit is disinclined to exercise this authority expansively.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
[HN5] The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege serves the client's need for legal advice, but it also serves the attorney's need to receive complete information in order to give the proper advice. Under the common law, a critical component of the privilege is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence.

*Civil Procedure > Discovery > Privileged Matters > Attorney-Client Privilege*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN6] Because confidentiality is key to the attorney-client privilege, the privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party. The confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant. Courts need not allow the claim of attorney-client privilege when the party claiming the privilege is attempting to

utilize the privilege in a manner that is not consistent with the privilege. Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN7] See Fed. R. Civ. P. 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN8] At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. It is an intensely practical doctrine, grounded in the realities of the litigation in our adversary system.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN9] Work product can be opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances. The protection provided by the work-product doctrine is not absolute, and it may be waived. Production of work-product material during discovery waives a work-product objection.

*Evidence > Privileges > Attorney-Client Privilege > Exceptions*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN10] The U.S. Supreme Court has required caution in the arena of testimonial privileges: these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth. Because exceptions to the waiver rules necessarily broaden the reach of the privilege or protection, selective waiver must be viewed with caution. If a suggested exception advances the purpose of the privilege or protection, that exception should be viewed more favorably. The generally recognized exceptions already in place tend to serve the purposes of the particular privilege or protection. When disclosure is necessary to accomplish the consultation or assist with the representation, as in the case of an interpreter, translator, or secretary, an exception to waiver preserves the privilege. Similarly, when the disclosure is to a party with a common interest, the joint defense or common interest doctrine provides an exception to waiver because disclosure advances the representation of the party and the attorney's preparation of the case.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN11] The federal circuits have not expanded either the attorney-client privilege under Fed. R. Evid. 501 or the non-opinion work-product doctrine under Fed. R. Civ. P. 26(b)(3) or Hickman v. Taylor by applying selective waiver. A review of state appellate decisions yields substantially the same conclusion.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > General Overview*
[HN12] The U.S. Supreme Court has indicated it is especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself.

*Evidence > Privileges > General Overview*
[HN13] The Uniform Rules of Evidence are hostile to both the creation of new common law privileges (see Unif. R. Evid. 501 limiting the creation of privileges to constitution, statute, or state supreme court rule), and the idea of selective waiver (see Unif. R. Evid. 510 stating that a privilege is waived if a privilege holder voluntarily discloses or consents to disclosure of any significant part of the privileged matter). A majority of states have adopted forms of Unif. R. Evid. 501 and/or 510.

*Evidence > Privileges > General Overview*
[HN14] Fed. R. Evid. 501 places responsibility for development of the common law of testimonial privilege on the federal courts. Each decision along the path of the common law is directed by the discrete, underlying facts developed in the record. As decisions accrue, the process is facilitated by the accumulation of experience, but it remains dependent on the factual foundation of each constituent decision. Legislative and rule-making processes, however, are not confined by the same gradual, brick-by-brick progression. Legislatures and rule-making bodies are endowed with tools to marshal evidence, facts, and experience from numerous and diverse sources that can support more dramatic and immediate creation of new rules or modifications of old rules.

**COUNSEL:** David R. Boyd, Boies, Schiller & Flexner, LLP, Washington, D.C., (Jonathan D. Schiller, Alfred P. Levitt, Kenneth F. Rossman IV, Boies, Schiller & Flexner, LLP, Washington, D.C.; Terrence C. Gill, Sherman & Howard LLC, Denver, Colorado, with him on the brief), for Petitioner.

Joseph D. Daley, Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Diego, California, (Eric Alan Isaacson, Michael J. Dowd, Spencer A. Burkholz, Thomas E. Egler, X. Jay Alvarez, Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Diego, California; Robert J. Dyer, III, Kip B. Shuman, Jeffrey A. Berens, Dyer & Shuman, LLP, Denver, Colorado, with him on the briefs), for Real-Parties-in-Interest.

William J. Leone, United States Attorney, Denver, Colorado; Catherine Y. Hancock, Michael S. Rabb, Appellate Staff, United States Department of Justice, Washington, D.C., on the brief for the United States Department of Justice.

Susan Hackett, Association of Corporate Counsel; Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Inc.; W. Stephen Cannon, [**2] Todd Anderson, Jean Kim, Constantine Cannon, P.C., Washington, D.C., on the brief for Amici Curiae.

**JUDGES:** Before HENRY, MURPHY, and HARTZ, Circuit Judges.

**OPINION BY:** [*1181] MURPHY

**OPINION: MURPHY,** Circuit Judge.

In this mandamus action, Qwest Communications International, Inc. (Qwest), presents an issue of first impression in this circuit, namely, whether Qwest waived the attorney-client privilege and work-product doctrine, as to third-party civil litigants, by releasing privileged materials to federal agencies in the course of the agencies' investigation of Qwest. Qwest urges us to adopt a rule of "selective waiver" or "limited waiver" which would allow production of attorney-client privileged and work-product documents to the United States Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) without waiver of further protection for those materials. On the record before us, we hold that the district court did not abuse its discretion in declining to apply selective waiver. Thus, we DENY the petition for a writ of mandamus.

**I. Background and District Court Proceedings**

In early 2002, the SEC began investigating Qwest's business practices. In the summer of 2002, [**3] Qwest learned that the DOJ, through the United States Attorney's Office for the District of Colorado, had also commenced a criminal investigation of Qwest. During these investigations, Qwest produced to the agencies over 220,000 pages of documents protected by the attorney-client privilege and the work-product doctrine (the Waiver Documents). Qwest chose not to produce another 390,000 pages of privileged documents to the agencies.

The production of the Waiver Documents was pursuant to subpoena and pursuant to written confidentiality agreements between Qwest and each agency. n1 In relevant part, these agreements stated that Qwest did not intend to waive the attorney-client privilege or work-product protection. The SEC agreed to "maintain the confidentiality of the [Waiver Documents] pursuant to this Agreement and . . . not disclose them to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities." Pet'r Br., Ex. B at 1. Similarly, the DOJ agreed to maintain the Waiver Documents' confidentiality and not disclose them to third parties, "except [**4] to the extent that DOJ determines that disclosure is otherwise required by law or would be in furtherance of DOJ's discharge of its duties and responsibilities." *Id.*, Ex. C at 1. In addition, Qwest agreed that the DOJ could share the Waiver Documents with other state, local, and federal agencies, and that it could "make direct or derivative use of the [Waiver Documents] in any proceeding and its investigation." *Id.* at 1-2. In other agreements with the DOJ, Qwest agreed that the agency could

> make full use of any information it obtains under this agreement in any lawful manner in furtherance of its investigation, including, without limitation, analyses, interviews, grand jury proceedings, [*1182] court proceedings, consultation with and support of other federal, state or local agencies, consultations with experts or potential experts, and the selection and/or retention of testifying experts.

DOJ Resp. Br., Ex. 3 at 1; *see also id.* Ex. 4 at 3 (same); *id.* Ex. 5 (same) at 1-2.

n1 At oral argument Qwest disclaimed any argument that its production of the Waiver Documents to the agencies was involuntary. Thus, we take it as settled that Qwest's production of the Waiver Documents was voluntary, and we do not address the effect of the subpoenas. We commend Qwest for its candor, which allows us

to focus on material issues rather than extraneous matters.

[**5]

Even prior to the initiation of the federal investigations, plaintiffs had filed civil cases against Qwest that involved many of the same issues as the investigations. More such actions were filed after the federal investigations began. Several of the cases were filed in the United States District Court for the District of Colorado, and many were consolidated into a federal securities action designated *In re Qwest Communications International, Inc. Securities Litigation*, Case No. 1:01-CV-01451 REB-CBS (the Securities Case). The Real Parties in Interest before us (the Plaintiffs) are the lead plaintiffs in the Securities Case.

In the course of the Securities Case, Qwest produced millions of pages of documents to the Plaintiffs, but it did not produce the Waiver Documents. It argued the Waiver Documents remained privileged despite Qwest's production to the agencies. After the Plaintiffs moved to compel production of the Waiver Documents, the magistrate judge concluded Qwest had waived the attorney-client privilege and work-product protection by producing the Waiver Documents to the agencies and ordered Qwest to produce the Waiver Documents to the Plaintiffs. Qwest objected. The [**6] district court refused to overrule the magistrate judge's order compelling production and ordered Qwest to produce the Waiver Documents. The district court also ordered Qwest to produce certain reports prepared by its counsel Boies, Schiller & Flexner LLP (collectively, the BSF Report), redacted of attorney opinion work product.

Qwest filed a motion to reconsider the order to produce the Waiver Documents and to certify an interlocutory appeal. Granting the motion in part, the district court clarified its order to specify that Qwest could redact attorney opinion work product from the Waiver Documents, as well as from the BSF Report, before producing them to the Plaintiffs. The court, however, declined to certify an interlocutory appeal of the waiver issue. Consequently, Qwest filed a petition for a writ of mandamus in this court. At Qwest's request, the district court stayed its order to produce pending our mandamus decision.

Neither the directive to redact the BSF Report nor the order to disclose the redacted version have been challenged in this proceeding. Moreover, the parties have not challenged the order to redact attorney opinion work product from the Waiver Documents. Thus, [**7] there is no issue concerning opinion work product before us, and our decision is not directed to waiver of opinion work product. For purposes of clarity, we also note that this decision involves no issues of inadvertent disclosure, *see, e.g.*, Genentech, Inc. v. United States ITC, 122 F.3d 1409, 1417 (Fed. Cir. 1997), disclosure to a non-adverse party, *see* *In re M & L Bus. Mach. Co.*, 161 B.R. 689, 696 (D. Colo. 1993), or disclosure under a confidentiality agreement that prohibits further disclosures without the express agreement of the privilege holder.

**II. Analysis**

**A. Mandamus**

We must first decide whether it is appropriate for us to entertain Qwest's petition for an extraordinary writ. [HN1] "The Supreme Court has required that a party seeking mandamus demonstrate that he has no other adequate means of relief and that his right to the writ is 'clear and [*1183] indisputable.'" *Barclaysamerican Corp. v. Kane*, 746 F.2d 653, 654 (10th Cir. 1984) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35, 101 S. Ct. 188, 66 L. Ed. 2d 193 (1980) (per curiam)).

> In a mandamus action in which petitioner seeks to [**8] have discovery orders involving a claim of privilege reviewed, we have held that review is appropriate when: (1) disclosure of the allegedly privileged or confidential information renders impossible any meaningful appellate review of the claim of privilege or confidentiality; and (2) the disclosure involves questions of substantial importance to the administration of justice.

*Id.* at 654-55 (quotations omitted).

Citing *Boughton v. Cotter Corp.*, 10 F.3d 746 (10th Cir. 1993), the Plaintiffs first contend Qwest has adequate appellate remedies, in that the district court's order can be reviewed on direct appeal after final judgment. In *Boughton*, a company sought to bring an interlocutory appeal of an order to produce allegedly privileged documents. In considering whether other avenues of relief might be appropriate, this court held that it could not grant the defendant mandamus relief because the district court's order requiring production would be correctable on appeal. *Id.* at 751. Qwest replies that production would negate the value of the attorney-client privilege and work-product protection. Qwest further submits that appellate review [**9] after judgment would be meaningless because there are numerous other cases pending across the country in which coordinated discovery agreements would require it to disclose the Waiver Documents to other plaintiffs if it discloses them to the Plaintiffs in the Securities Case.

In *Barclaysamerican*, this court held that "[i]n most cases disclosure makes meaningful review impossible because after disclosure whatever privilege attaches would be worthless." 746 F.2d at 655 (quotation omitted); *see also* United States v. West, 672 F.2d 796, 799 (10th Cir. 1982) ("Whether disclosure is limited to a motion or granted in the course of the trial, the privilege is still rendered worthless. Any subsequent review, even after limited disclosure, would be for naught, because the damage would already be accomplished. Thus, appellate review of the claim would be meaningless."). *Boughton* did not address this principle. In this case, however, given the litigation pending outside this court's jurisdiction, normal appellate review could not return the parties to the status quo by ordering the return of any documents this court might determine were improperly ordered [**10] produced. As in *Barclaysamerican* and *West*, review after production would essentially be meaningless in terms of protecting the Waiver Documents.

The Plaintiffs also argue Qwest does not raise an issue of substantial importance to the administration of justice, and this case is instead merely a discovery dispute between private litigants. *See* Barclaysamerican, 746 F.2d at 655. To the contrary, it appears the issue of selective waiver is of considerable public interest. n2 In addition, in advocating the adoption of selective waiver, Qwest primarily relies on the interests of law enforcement in ensuring voluntary cooperation of companies subject to [*1184] investigation. To the extent this matter requires us to consider applying selective waiver, then, it presents an issue of substantial importance to the administration of justice.

n2 Indicia of public interest in selective waiver include numerous commentaries and articles, the filing of the amicus brief in this action, a recent oversight hearing by a House subcommittee, and recent developments before the United States Sentencing Commission and the Advisory Committee on Evidence Rules to the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (the Advisory Committee). The actions of Congress, the Sentencing Commission, and the Advisory Committee are discussed below.

[**11]

Finally, other circuit courts considering selective waiver have decided it was appropriate to do so in the context of a petition for a writ of mandamus. *See In re Steinhardt Partners, L.P.*, 9 F.3d 230, 233 (2d Cir. 1993); *Westinghouse Elec. Corp. v. Republic of the Phil.*, 951 F.2d 1414, 1422 (3d Cir. 1991); *In re Chrysler Motors Corp.*, 860 F.2d 844, 845 (8th Cir. 1988); *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 607 (8th Cir. 1977) (en banc). Noting that the question remained open in the circuit, that the district courts of the circuit and other circuit courts had split, and the consequence that the privilege would be lost if review awaited final judgment, the Second Circuit went so far as to state, "[t]his dispute presents one of the very rare circumstances permitting the use of mandamus to review a district court order." *Steinhardt Partners*, 9 F.3d at 233. For these reasons, this court addresses the merits of Qwest's petition.

[HN2] The issuance of the writ rests within the court's discretion. *Kerr v. United States Dist. Court*, 426 U.S. 394, 403, 96 S. Ct. 2119, 48 L. Ed. 2d 725 (1976). [**12] This court considers five nonconclusive factors to assist in determining whether to grant mandamus relief: (1) whether the party has alternative means to secure relief; (2) whether the party will be damaged "in a way not correctable on appeal"; (3) whether "the district court's order constitutes an abuse of discretion"; (4) whether the order "represents an often repeated error and manifests a persistent disregard of federal rules"; and (5) whether the order raises "new and important problems or issues of law of the first impression." *Pacificare of Okla., Inc. v. Burrage*, 59 F.3d 151, 153 (10th Cir. 1995). We have held that "[t]he right to the writ is clear and indisputable when the petitioner can show a judicial usurpation of power or a clear abuse of discretion." *West*, 672 F.2d at 799; *see also Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998) (holding that a district court's order compelling discovery is reviewed for abuse of discretion, legal questions are reviewed de novo and factual determinations for clear error). When the district court errs in deciding a legal issue, it necessarily abuses its discretion. [**13] *See Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996).

**B. The Attorney-Client Privilege and Work-Product Doctrine**

[HN3] Federal Rule of Evidence 501 provides that privileges in federal-question cases generally are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The Advisory Committee Notes state that the rule "reflect[s] the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis." n3

n3 Technically the work-product doctrine is distinguishable from the testimonial "true" privileges. *See* 1 Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 1.3.11 (Richard D. Friedman ed., 2002). The work-product

doctrine is embodied in Fed. R. Civ. P. 26(b)(3). It is therefore excepted from Rule 501, which applies except where "otherwise required . . . in rules prescribed by the Supreme Court pursuant to statutory authority." The principles of *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947), continue to govern the application of Rule 26(b)(3). Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 479-81 (4th ed. 2001). Given that our analysis focuses on the common law, the fact that the work-product doctrine is not a true privilege is not material in this case.

[**14]

[*1185] [HN4] The Supreme Court has cautioned that "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public . . . has a right to every man's evidence." *Trammel v. United States*, 445 U.S. 40, 50, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980) (quotations omitted). The Court further has cautioned that such rules and privileges "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 234, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960) (Frankfurter, J., dissenting)). "[A]lthough Rule 501 manifests a congressional desire not to freeze the law of privilege but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, we are disinclined to exercise this authority expansively." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189, 110 S. Ct. 577, 107 L. Ed. 2d 571 (1990) (citation and quotation omitted).

**1. Attorney-Client Privilege**

[HN5] The attorney-client privilege is "the [**15] oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The privilege serves the client's need for legal advice, but it also serves the attorney's need to receive complete information in order to give the proper advice. *See id.* at 390; *see also* 8 John Henry Wigmore, *Evidence* § 2291 (John T. McNaughton rev. 1961); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 3 (4th ed. 2001). Under the common law, a critical component of the privilege "is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence." *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir. 1985).

[HN6] Because confidentiality is key to the privilege, "[t]he attorney-client privilege [**16] is lost if the client discloses the substance of an otherwise privileged communication to a third party." *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990). This court has stated, "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *Id.* (quotation and alteration omitted). This court has also held that "[c]ourts need not allow the claim of attorney-client privilege when the party claiming the privilege is attempting to utilize the privilege in a manner that is not consistent with the privilege." *United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir. 1989). "Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege." *Id.*

**2. Work-Product Doctrine**

In *Hickman v. Taylor*, the source of the work-product doctrine, plaintiffs sought the production of certain witness statements collected by defendants' attorney and memoranda concerning the attorney's interviews of [**17] other witnesses. 329 U.S. 495, 499-500, 67 S. Ct. 385, 91 L. Ed. 451 (1947). The Court held that plaintiffs had made no showing of need for the materials or justification for securing them from defendants' [*1186] counsel. The requests thus "[fell] outside the arena of discovery and contravene[d] the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." *Id.* at 510. "In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Id.*

The work-product doctrine subsequently was incorporated into Fed. R. Civ. P. 26(b)(3), which provides:

> [HN7] [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another . . . party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in [**18] the preparation of the party's case

> and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Thus, the doctrine is interpreted under both the rule and *Hickman*. *See* Epstein at 479-81. [HN8] "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975). It "is an intensely practical [doctrine], grounded in the realities of the litigation in our adversary system." *Id.*

[HN9] Work product can be opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances. *See Frontier Ref.*, 136 F.3d at 704 n.12; *see also Hickman*, 329 U.S. at 511-12 [**19] (noting that, upon presentation of adequate reasons, non-privileged, relevant facts included in an attorney's files may be subject to discovery); Fed. R. Civ. P. 26(b)(3) (providing special protection for opinion work product). The protection provided by the work-product doctrine is not absolute, and it may be waived. *See Nobles*, 422 U.S. at 239. This court has indicated that production of work-product material during discovery waives a work-product objection. *Grace United Methodist Church v. City of Cheyenne*, 427 F.3d 775, 801-02 (10th Cir. 2005); *see also Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1272 (10th Cir. 1999) (indicating that the work-product doctrine is affected when a disclosure is to an adversary).

**C. Case Law on Selective Waiver**

In light of this precedent, Qwest will have waived the attorney-client privilege and work-product protection for the Waiver Documents by disclosing them to the SEC and the DOJ, unless this court adopts a selective waiver rule. This court has not yet considered the concept of selective waiver. Our review of the opinions of other circuits, however, [**20] indicates there is almost unanimous rejection of selective waiver. Only the Eighth Circuit has adopted selective waiver in circumstances applicable to Qwest.

**1. Attorney-Client Privilege**

**a. Circuit Adopting Selective Waiver**

The Eighth Circuit created the concept of selective waiver in *Diversified Industries*, [*1187] 572 F.2d at 611. There, a company defending a civil proceeding sought to protect a memorandum and a report prepared by its counsel that it had previously produced to the SEC in response to an agency subpoena. *Id.* at 599. The court's discussion of selective waiver is but a single paragraph:

> We finally address the issue of whether Diversified waived its attorney-client privilege with respect to the privileged material by voluntarily surrendering it to the SEC pursuant to an agency subpoena. As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred. To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, [**21] potential stockholders and customers.

*Id.* at 611 (citations omitted).

**b. Circuits Rejecting Selective Waiver**

Most circuits have rejected selective waiver of the attorney-client privilege. The D.C. Circuit was the first circuit to consider the issue after *Diversified*. In *Permian Corp. v. United States*, the Department of Energy requested documents from the SEC, which had obtained them from the company. 214 U.S. App. D.C. 396, 665 F.2d 1214, 1216-17 (D.C. Cir. 1981). After considering the privilege's purpose of protecting the attorney-client relationship by shielding confidential communications, the court held that the company bad "destroyed the confidential status of the seven attorney-client communications by permitting their disclosure to the SEC staff." *Id.* at 1219. It found the proposal of selective waiver "wholly unpersuasive." *Id.* at 1220.

> First, we cannot see how the availability of a "limited waiver" would serve the interests underlying the common law privilege for confidential communications between attorney and client. . . . Voluntary cooperation with government investigations may be a laudable activity, [**22] but it is hard to understand how such conduct improves the attorney-client relation-

> ship. If the client feels the need to keep his communications with his attorney confidential, he is free to do so under the traditional rule by consistently asserting the privilege, even when the discovery request comes from a "friendly" agency.

Id. at 1220-21. The court continued, "[t]he client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." Id. at 1221. "We believe that the attorney-client privilege should be available only at the traditional price: a litigant who wishes to assert confidentiality must maintain genuine confidentiality." Id. at 1222. The D.C. Circuit reiterated its position in In re Subpoenas Duces Tecum, 238 U.S. App. D.C. 221, 738 F.2d 1367, 1370 (D.C. Cir. 1984).

Using similar reasoning, the First, Second, Third, and Fourth Circuits all have joined the D.C. Circuit in rejecting selective [**23] waiver. *See* United States v. Mass. Inst. of Tech., 129 F.3d 681, 686 (1st Cir. 1997) ("Anyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those disclosures and say that, although the disclosure itself is not necessary to foster attorney-client communications, neither does it forfeit the privilege. With rare exceptions, courts have been unwilling to start down this path-which has no logical terminus-and we join in [*1188] this reluctance."); Westinghouse, 951 F.2d at 1425 ("[S]elective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the privilege beyond its intended purpose."); In re Martin Marietta Corp., 856 F.2d 619, 623-24 (4th Cir. 1988) ("The Fourth Circuit has not embraced the concept of limited waiver of the attorney-client privilege."); In re John Doe Corp., 675 F.2d 482, 489 (2d Cir. 1982) [**24] ("A claim that a need for confidentiality must be respected in order to facilitate the seeking and rendering of informed legal advice is not consistent with selective disclosure when the claimant decides that the confidential materials can be put to other beneficial purposes.").

The most recent circuit to reject selective waiver of the attorney-client privilege is the Sixth Circuit, which issued a comprehensive opinion in In re Columbia/HCA Healthcare Corp. Billing Practices Litigation, 293 F.3d 289 (6th Cir. 2002). As in this case, civil plaintiffs in *Columbia/HCA Healthcare* sought documents the company already had provided to the DOJ and other government agencies. Id. at 292-93. The court reviewed the available case law, which it characterized as falling into three categories: "selective waiver is permissible; selective waiver is not permissible in any situation; and selective waiver is permissible in situations where the Government agrees to a confidentiality order." Id. at 295 (citations omitted). It concluded, "after due consideration, we reject the concept of selective waiver, in any of its various forms." Id. at 302. [**25] "First, the uninhibited approach adopted out of wholecloth by the *Diversified* court has little, if any, relation to fostering frank communication between a client and his or her attorney." *Id.* (footnote omitted). "Secondly, any form of selective waiver, even that which stems from a confidentiality agreement, transforms the attorney-client privilege into 'merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage.'" *Id.* (quoting Steinhardt Partners, 9 F.3d at 235). Although recognizing "[t]here is considerable appeal, and justification, for permitting selective waiver when the initial disclosure is to an investigating arm of the Government," the court stated there is "no logical terminus" and that private litigants serve a valuable purpose as private attorneys general which should not be thwarted by imposition of selective waiver. Id. at 303 (quotation omitted).

In dissent, Judge Boggs stated that "[a]s the harms of selective disclosure are not altogether clear, the benefits of the increased information to the government should prevail." Id. at 311. He characterized [**26] the court's choice as:

> [N]ot one whether or not to release privileged information to private parties that has already been disclosed to the government, but rather one to create incentives that permit voluntary disclosures to the government at all. In the run of cases, either the government gets the disclosure made palatable because of the exception, or neither the government nor any private party becomes privy to the privileged material.

Id. at 312 (Boggs, J., dissenting). Because of the greater importance of governmental investigations, the fact that "increased access to privileged information increases the absolute efficacy of government investigations," and the fact that "the government has no other means to secure otherwise privileged information," id. at 311, Judge

Boggs "would have resolved this open question by holding that there is a government investigation exception to the third-party waiver rule," id. at 308.

[*1189] **c. Other Illustrative Cases**

In a case involving an asserted waiver of the law enforcement privilege, the Seventh Circuit did not foreclose adopting selective waiver. In *Dellwood Farms, Inc.* [**27] *v. Cargill, Inc.*, the government played certain tapes for corporate defense counsel to persuade the company to plead guilty. 128 F.3d 1122, 1124 (7th Cir. 1997). The plaintiffs in ensuing civil litigation against the company argued the government had waived its law enforcement privilege by playing the tapes. *Id.* Any release to the plaintiffs would make the tapes available to individuals who were the targets of then-uncompleted grand jury investigations. *Id.* The court adopted the government's selective waiver theory in the circumstances of that case, holding that "[s]ince there is no indication either that the government was acting in bad faith or that the plaintiffs in the present suits were hurt-and, to repeat, the government is not trying to take advantage of an adversary-interfering with a criminal investigation would be an excessive punishment." *Id.* at 1127. The court specifically noted, though, that it might find waiver (or, more accurately, forfeiture) if there were "conduct that warranted declaring a forfeiture." *Id.*

The Federal Circuit rejected selective waiver in a case involving an entirely different means of waiving attorney-client [**28] and work-product protection, namely, the careless disclosure of inadequately screened materials directly to the adversary. *See Genentech, Inc. v. United States ITC*, 122 F.3d 1409, 1417 (Fed. Cir. 1997) ("A small number of courts have recognized, in circumstances not present here, a limited waiver that enables the attorney-client privilege to survive certain breaches of confidentiality. This court, however, has never recognized such a limited waiver. Moreover, Genentech has presented no compelling arguments as to why we should apply such a limited waiver theory in this case." (citations omitted)).

In contrast is *In re M & L Business Machine Co.*, where the district court applied selective waiver of the attorney-client privilege where disclosures were protected by a confidentiality agreement. 161 B.R. 689 (D. Colo. 1993). There, a bank sought a protective order for its counsel's letters and memoranda that it had previously provided to the United States Attorney to assist in an investigation of one of the bank's clients, M & L Business Machines Co. *Id.* at 691-92. "The Bank's cooperation was expressly made subject to the [**29] requirement that any information provided under the Letter Agreement be treated as privileged, subject to protection under Fed. R. Crim. P. 16(a)(2) and not be disseminated except as required under federal law or the rules of criminal procedure." *Id.* at 691. The trustee of M & L then sought production of the materials. After reviewing *Diversified*, *Permian*, and other selective waiver cases, the district court stated, "while I am wary of extending evidentiary privileges, in the unique circumstances of this case, the policies upon which the above decisions were based lead me to conclude that the Bank has not waived the attorney-client privilege as to the Letters and Memoranda." *Id.* at 696. Specifically, the court's decision rested on: (1) the "substantial steps" the bank took to ensure the confidentiality of the materials disclosed; (2) the fact that there was "no evidence that the Bank's cooperation with the U.S. Attorney was for the purpose of obtaining some benefit for itself"; and (3) the fact that "the Bank does not seek to protect the privilege in an investigatory or law enforcement proceeding brought [**30] by another federal regulatory agency," but in bankruptcy adversary proceedings "akin to one brought by a civil litigant." *Id.*

[*1190] **2. Work-Product Doctrine**

**a. Circuits Adopting Selective Waiver**

Only one circuit has specifically adopted selective waiver in the work-product arena. The Fourth Circuit has approved using selective waiver in relation to opinion work product. In *Martin Marietta*, the court concluded the company had made testimonial use of non-opinion work product by disclosing it to the government, and that the waiver was comprehensive. 856 F.2d at 625. Noting that opinion work product generally receives greater protection from the courts, however, and that Federal Rule of Civil Procedure 26(b)(3) "suggests especial protection for opinion work product," the court declined to hold that the company had waived work-product protection for opinion work product. *Id.* at 626.

In *Permian*, the D.C. Circuit upheld the district court's finding that the work-product doctrine had not been waived as to the majority of documents. 665 F.2d at 1222. This ruling, however, contains no analysis [**31] and may have been the product of the clearly erroneous standard of review applied in that case. Moreover, the D.C. Circuit has since rejected selective waiver of work-product protection in other circumstances, as discussed below.

**b. Circuits Rejecting Selective Waiver**

Interestingly, the circuit that created selective waiver for attorney-client privilege rejected it in the context of non-opinion work product. In *Chrysler Motors*, the company had produced a computer tape to its adversaries in civil litigation under a non-waiver/confidentiality agreement. 860 F.2d at 845. When the United States Attorney sought production of the computer tape from the plain-

tiffs, the company protested. *Id.* The Eighth Circuit determined that the tape was not opinion work product. *Id.* at 846. It then held that "Chrysler waived any work product protection by voluntarily disclosing the computer tape to its adversaries, the class action plaintiffs, during the due diligence phase of the settlement negotiations." *Id.* The company's requirement that the plaintiffs enter into the non-waiver/confidentiality agreement was irrelevant; the crucial fact was that the computer [**32] tape had not been kept confidential. *Id.* at 847.

As discussed above, the Fourth Circuit applied selective waiver to protect opinion work product, but it declined to apply it to protect non-opinion work product. *See Martin Marietta Corp.*, 856 F.2d at 623. The First Circuit has also rejected selective waiver for non-opinion work product, stating "it would take better reason than we have to depart from the prevailing rule that disclosure to an adversary, real or potential, forfeits work product protection." *Mass. Inst. of Tech.*, 129 F.3d at 687.

The Third Circuit held that, while work-product protection may be retained where a disclosure furthers the goals underlying the doctrine:

> When a party discloses protected materials to a government agency investigating allegations against it, it uses those materials to forestall prosecution (if the charges are unfounded) or to obtain lenient treatment (in the case of well-founded allegations). These objectives, however rational, are foreign to the objectives underlying the work-product doctrine. Moreover, an exception for disclosures to government agencies is not necessary to further [**33] the doctrine's purposes; attorneys are still free to prepare their cases without fear of disclosure to an adversary as long as they and their clients refrain from making such disclosures themselves.

*Westinghouse*, 951 F.2d at 1429.

Finally, the Sixth Circuit concluded that "[m]any of the reasons for disallowing selective waiver in the attorney-client privilege [*1191] context also apply to the work product doctrine. The ability to prepare one's case in confidence . . . has little to do with talking to the Government." *Columbia/HCA Healthcare*, 293 F.3d at 306. It continued, "[e]ven more than attorney-client privilege waiver, waiver of the protections afforded by the work product doctrine is a tactical litigation decision. . . . [W]hether or not to 'show your hand' is quintessential litigation strategy." *Id.* at 306-07.

**c. Circuits Leaving Possibility of Selective Waiver Open**

Unlike their treatment of the attorney-client privilege, a few circuits have rejected selective waiver of work-product protection in the particular cases before them, while simultaneously leaving room for applying the doctrine in other circumstances. [**34]

In *In Re Sealed Case*, the D.C. Circuit rejected work-product protection against discovery by a grand jury of documents a company had previously made available to the SEC. 219 U.S. App. D.C. 195, 676 F.2d 793, 824 (D.C. Cir. 1982). The record in that case did not indicate whether the company had entered into a confidentiality agreement with the SEC. *Id.* at 820. In rejecting selective waiver, the court indicated it was reluctant to supply any such agreement: "[t]he SEC or any other government agency could expressly agree to any limits on disclosure to other agencies consistent with their responsibilities under law. But courts should not imply such agreements on a categorical basis." *Id.* at 824.

Shortly thereafter, in *In re Subpoenas Duces Tecum*, the D.C. Circuit applied *Sealed Case* to reject a claim of selective waiver for work-product material in circumstances similar to Qwest's case. 738 F.2d at 1371-72. The court, however, did not definitively reject the selective waiver doctrine under all circumstances; rather, the decision rested on three factors: (1) the proposed use of work-product protection was not consistent with the doctrine's [**35] purpose, (2) "appellants had no reasonable basis for believing that the disclosed materials would be kept confidential by the SEC," and (3) applying waiver "would not trench on any policy elements now inherent in this [protection]." *Id.* at 1372. Noting the company chose to participate in the SEC's voluntary disclosure program, the court stated:

> That decision was obviously motivated by self-interest. Appellants now want work product protection for those same disclosures against different adversaries in suits centering on the very same matters disclosed to the SEC. It would be unreasonable to suppose that litigation with these other adversaries was not anticipated at the time of disclosure to the SEC. It would also be inconsistent and unfair to allow appellants to select according to their own self-interest to which adversaries they will allow access to the materials.

*Id.* The court emphasized that the company had failed to ensure the SEC would in turn not disclose the materials,

stating that companies could protect their materials by not disclosing them, "[o]r the company can insist on a promise of confidentiality before disclosure to the SEC." *Id.* at [**36] 1375.

Similarly, in *Steinhardt Partners*, the Second Circuit denied mandamus relief to defendants claiming work-product protection for a memorandum previously disclosed to the SEC. 9 F.3d at 230. "Examination of conflicting authority and of the purposes of the work product doctrine convinces us that Steinhardt waived any work product protection by voluntarily submitting the memorandum to the SEC." *Id.* at 235. The court, however, continued, "[i]n denying the petition, we decline to adopt a *per se* rule that all voluntary disclosures [*1192] to the government waive work product protection. Crafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis." *Id.* at 236. It especially noted that a per se rule "would fail to anticipate situations . . . in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials." *Id.*

These decisions all involved situations in which the parties failed to enter into a confidentiality agreement before disclosing materials, not circumstances in which the government [**37] agreed to strict confidentiality in exchange for disclosure of work product. *But see* *Columbia/HCA Healthcare*, 293 F.3d at 307 (rejecting selective waiver for work product, despite existence of confidentiality agreement); *Westinghouse*, 951 F.2d at 1430 (same). As a consequence, it remains an open question in those circuits whether a stringent confidentiality agreement limiting further dissemination by the government might support selective waiver.

**D. No Selective Waiver In This Case**

Generally it is the nature of the common law to move slowly and by accretion; swift and massive movements are not impossible, but they are relatively rare. Justice Cardozo described the common law's modification process as "gradual. It goes on inch by inch. Its effects must be measured by decades and even centuries. Thus measured, they are seen to have behind them the power and the pressure of the moving glacier." Benjamin N. Cardozo, *The Nature of the Judicial Process* 24 (1921). The common law's methodology has been identified as both its strength and its weakness:

> [I]ts strength is derived from the manner in which it has been forged from actual experience [**38] by the hammer and anvil of litigation, and . . . its weakness lies in the fact that law guided by precedent which has grown out of one type of experience can only slowly and with difficulty be adapted to new types which the changing scene may bring.

Harlan F. Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 1, 7 (1936); *see also* Richard B. Cappalli, *The American Common Law Method* 15 (1997) (stating that "[t]he accretional nature of the common law is a great strength").

Keeping these precepts in mind, and having considered the purposes behind the attorney-client privilege and the work-product doctrine as well as the reasoned opinions of the other circuits, we conclude the record in this case is not sufficient to justify adoption of a selective waiver doctrine as an exception to the general rules of waiver upon disclosure of protected material. Qwest advocates a rule that would preserve the protection of materials disclosed to federal agencies under agreements which purport to maintain the attorney-client privilege and work-product protection but do little to limit further disclosure by the government. The record does not establish a need [**39] for a rule of selective waiver to assure cooperation with law enforcement, to further the purposes of the attorney-client privilege or work-product doctrine, or to avoid unfairness to the disclosing party. Rather than a mere exception to the general rules of waiver, one could argue that Qwest seeks the substantial equivalent of an entirely new privilege, i.e., a government-investigation privilege. Regardless of characterization, however, the rule Qwest advocates would be a leap, not a natural, incremental next step in the common law development of privileges and protections. On this record, "[w]e are unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination." *Branzburg v. Hayes*, 408 U.S. 665, 703, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972).

[*1193] **1. Cooperation with Law Enforcement**

Qwest argues selective waiver is necessary to ensure cooperation with government investigations. Selective waiver may well be a means to encourage cooperation with law enforcement, an end with unquestioned benefits to the commonweal. *See, e.g.*, Andrew J. McNally, *Revitalizing Selective Waiver: Encouraging Voluntary Disclosure of Corporate Wrongdoing by Restricting* [**40] *Third Party Access to Disclosed Materials*, 35 Seton Hall L. Rev. 823, 825-27 (2005). The Sixth Circuit majority in *Columbia/HCA Healthcare* conceded that a selective waiver rule would further the search for truth, realize considerable investigative efficiencies, encourage settlements, and possibly increase corporate self-policing. 293 F.3d at 303.

The record before us, however, does not support the contention that companies will cease cooperating with law enforcement absent protection under the selective waiver doctrine. Most telling is Qwest's disclosure of 220,000 pages of protected materials knowing the Securities Case was pending, in the face of almost unanimous circuit-court rejection of selective waiver in similar circumstances, and despite the absence of Tenth Circuit precedent. These actions undermine its argument that selective waiver is vitally necessary to ensure companies' cooperation in government investigations. *See* Steinhardt Partners, 9 F.3d at 236 ("The SEC has continued to receive voluntary cooperation from subjects of investigations, notwithstanding the rejection of the selective waiver doctrine by two circuits and [**41] public statements from Directors of the Enforcement Division that the SEC considers voluntary disclosures to be discoverable and admissible."); *Westinghouse*, 951 F.2d at 1426 ("[W]e do not think that a new privilege is necessary to encourage voluntary cooperation with government investigations. . . . We find it significant that Westinghouse chose to cooperate despite the absence of an established privilege[] protecting disclosures to government agencies."); *see also* Branzburg, 408 U.S. at 693-94 (rejecting creation of reporters' privilege and stating "the evidence fails to demonstrate that there would be a significant constriction of the flow of news to the public if this Court reaffirms the prior common-law and constitutional rule regarding the testimonial obligations of newsmen"). The record is equally deficient concerning whether the DOJ and the SEC may have independently gained access to the Waiver Documents by invoking other means or theories, such as the crime or fraud exception to the attorney-client privilege. The DOJ posed this very possibility in its response to Qwest's mandamus petition. *See* DOJ Resp. Br. at 2 n.1.

Further, if [**42] selective waiver were as essential to government operations as Qwest claims, it would seem the agencies would support Qwest's position. At the court's request, the DOJ responded to Qwest's petition. n4 Rather than urging the adoption of selective waiver, though, it carefully took no position on the parties' dispute. Additionally, the DOJ declined an invitation to participate in oral argument. It would appear, then, that the government's interest is not as Qwest portrays it. n5

n4 The court's order did not address the SEC. Unlike Association of Corporate Counsel and the Chamber of Commerce of the United States of America, the SEC did not file an amicus brief in this action.

n5 Qwest's confidentiality agreements provided that the agencies would not assert that production of the Waiver Documents constituted a waiver, as to a third party, of the attorney-client privilege, the work-product doctrine, or any other applicable privilege. *See* Pet'r Br., Ex. B at 2; *id.* Ex. C at 2. This restriction, however, does not prohibit the agencies from arguing in *favor* of a theory of selective waiver.

[**43]

[*1194] **2. Confidentiality Agreements**

Qwest also contends the key point distinguishing this case from the majority of the cases rejecting selective waiver is the fact that Qwest entered into confidentiality agreements with the agencies prior to disclosing the Waiver Documents. Some courts have held or indicated that the existence of a confidentiality agreement is irrelevant to a waiver of privileges. *See, e.g.*, Columbia/HCA Healthcare, 293 F.3d at 303; Chrysler Motors Corp., 860 F.2d at 847. Others, however, have indicated that the existence of a confidentiality agreement may justify adopting selective waiver. *See, e.g.*, Steinhardt Partners, 9 F.3d at 236; *M & L Bus. Mach. Co.*, 161 B.R. at 696.

The record does not support reliance on the Qwest agreements with the SEC and the DOJ to justify selective waiver. The agreements do little to restrict the agencies' use of the materials they received from Qwest. The agencies are permitted to use the Waiver Documents as required by law and in furtherance of the discharge of their obligations. The DOJ is specifically permitted to share the Waiver Documents with other agencies, [**44] federal, state, and local, and make use of them in proceedings and investigations. In its brief, the DOJ illustrates just how far some of the documents may have traveled, stating that, at a minimum, Waiver Documents have been introduced into evidence in a criminal trial, produced as discovery in three separate criminal proceedings, and used as exhibits to SEC investigative testimony. The DOJ also informs us it was not required to "segregate material obtained from Qwest, file it under seal, keep records of its use, or otherwise deal with the information in any special way," and it had made no effort to determine what information had been disseminated to third parties. DOJ Resp. Br. at 6.

The record does not indicate whether Qwest negotiated or could have negotiated for more protection for the Waiver Documents, or whether, as it asserted at oral argument, seeking further restrictions would have so diluted its cooperation to render it valueless. Be that as it may, the confidentiality agreements gave the agencies broad discretion to use the Waiver Documents as they saw fit, and any restrictions on their use were loose in practice. As Qwest has conceded, it is unknown how many or which [**45] of the Waiver Documents the

agencies have used or disclosed, how those uses or disclosures occurred, who might have had access to the Waiver Documents, and the extent of continuing disclosures. It is therefore not inappropriate to conclude that some undetermined number of Waiver Documents have been widely disseminated and have thus become public information.

At oral argument, Qwest essentially conceded that those widely distributed Waiver Documents have lost any protection they once enjoyed. In so conceding, Qwest is effectively advocating a rule that would place control of its attorney-client privilege and work-product protection in the hands of the agencies. Under this rule, the agencies would determine which documents would remain privileged or protected by limitation on further dissemination. The concession highlights a further record deficiency: the nature and severity of the burden placed upon the district court to sort through all 220,000 pages of Waiver Documents to determine what use the government made of each document, and whether any further disclosure had vitiated an otherwise applicable privilege or protection.

In short, Qwest's confidentiality agreements do not support [**46] adoption of selective waiver.

[*1195] **3. Purpose of Protections**

[HN10] The Supreme Court has required caution in the arena of testimonial privileges: "these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974). Because exceptions to the waiver rules necessarily broaden the reach of the privilege or protection, selective waiver must be viewed with caution. If the suggested exception advances the purpose of the privilege or protection, that exception should be viewed more favorably.

The generally recognized exceptions already in place tend to serve the purposes of the particular privilege or protection. When disclosure is necessary to accomplish the consultation or assist with the representation, as in the case of an interpreter, translator, or secretary, an exception to waiver preserves the privilege. *See* *Mass. Inst. of Tech.*, 129 F.3d at 684; *Westinghouse*, 951 F.2d at 1424. Similarly, when the disclosure is to a party with a common interest, the "joint defense" or "common [**47] interest" doctrine provides an exception to waiver because disclosure advances the representation of the party and the attorney's preparation of the case. *See* *Westinghouse*, 951 F.2d at 1424; *see also* *Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042-43 (10th Cir. 1998) (stating that establishing joint-defense privilege requires showing "(1) the documents were made in the course of a joint-defense effort; and (2) the documents were designed to further that effort").

The record in this case does not indicate that the proposed exception would promote the purposes of the attorney-client privilege or work-product doctrine. n6 Rather than promoting exchange between attorney and client, selective waiver could have the opposite effect of inhibiting such communication. If officers and employees know their employer could disclose privileged information to the government without risking a further waiver of the attorney-client privilege, they may well choose not to engage the attorney or do so guardedly. Such reticence and caution could be heightened where, as here, further disclosures by the government mean that the information may be disclosed to [**48] countless others.

> n6 Among the authorities advocating the adoption of selective waiver, including *Diversified*, Judge Boggs' dissent in *Columbia/HCA Healthcare*, and the SEC's position expressed in amicus briefs filed in other cases, none of their rationales appear to be premised on the purposes underlying the attorney-client privilege and work-product doctrine.

Moreover, the purpose of the work-product doctrine is to enable counsel to prepare a case in privacy. As other circuits have indicated, selective waiver does little to further this purpose and in some cases, may instead encourage counsel to conduct investigations with an eye toward pleasing the government. *See* *Columbia/HCA Healthcare*, 293 F.3d at 306; *Westinghouse*, 951 F.2d at 1429-30; *Steinhardt Partners*, 9 F.3d at 235.

**4. Unfairness to the Parties**

Qwest argues that adopting selective waiver would avoid unfairness to Qwest while visiting no unfairness on the Plaintiffs. If companies do [**49] not have the assurance of protection, Qwest theorizes, they simply will not release privileged documents to federal authorities. Thus, civil plaintiffs will not have access to them anyway. *See* *Columbia/HCA Healthcare*, 293 F.3d at 312 (Boggs, J., dissenting) ("[T]he choice presented in this case is not one whether or not to release privileged information to private parties that has already been disclosed to the government, but [*1196] rather one to create incentives that permit voluntary disclosures to the government at all."); *Westinghouse*, 951 F.2d at 1426 n.13 ("[I]n our view, when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred."). Allowing Qwest to choose who among its op-

ponents would be privy to the Waiver Documents is far from a universally accepted perspective of fairness. *See* Permian Corp., 665 F.2d at 1221; John Doe Corp., 675 F.2d at 489.

As discussed above, the record is silent on whether selective waiver truly is necessary to achieve cooperation. Qwest's fairness [**50] argument nevertheless rests on that very foundation. It is difficult to understand how a rejection of selective waiver will work an unfairness on Qwest when Qwest disclosed the Waiver Documents in the face of the known threat from Plaintiffs, the absence of Tenth Circuit precedent, and a dearth of favorable circuit authority. It hedged its bets by choosing to release 220,000 pages of documents but to retain another 390,000 pages of privileged documents. Qwest perceived an obvious benefit from its disclosures but did so while weighing the risk of waiver.

In sum, the record does not support application of selective waiver as a matter of fairness.

**5. Case Law**

As a review of federal circuit case law has indicated, there is but one circuit that has applied the selective waiver doctrine to attorney-client material. All other circuits addressing the matter have refused to apply the doctrine. In the context of non-opinion work product, no circuit has adopted selective waiver and five circuits have rejected the doctrine. Some circuits have expressly not precluded the application of selective waiver but have limited that possibility to cases where the initial disclosure was not to [**51] an adversary or was accomplished under a confidentiality agreement strictly limiting further dissemination by the government. Here, Qwest disclosed to adversaries under agreements which did not realistically control further dissemination.

The only conclusion from the federal case law is that [HN11] the federal circuits have not expanded either the attorney-client privilege under Federal Rule of Evidence 501 or the non-opinion work-product doctrine under Fed. R. Civ. P. 26(b)(3) or *Hickman v. Taylor* by applying selective waiver.

A review of state appellate decisions yields substantially the same conclusion. n7 *See* *McKesson Corp. v. Green*, 279 Ga. 95, 610 S.E.2d 54, 56 (Ga. 2005) (rejecting selective waiver of work-product protection where materials were disclosed to government, despite confidentiality agreement); *McKesson HBOC, Inc. v. Superior Court*, 115 Cal. App. 4th 1229, 9 Cal.Rptr. 3d 812, 819, 821 (Cal. Ct. App. 2004) (rejecting selective waiver of attorney-client privilege and work-product protection where materials were disclosed to government, despite confidentiality agreement); *State v. Thompson*, 306 N.W.2d 841, 843 (Minn. 1981) [**52] (finding "no occasion" to apply selective waiver and suppress testimony where the attorney-client privilege was waived through disclosure of investigation reports, notes, and statements to attorney-general and grand [*1197] jury); *but see* *Danielson v. Superior Court*, 157 Ariz. 41, 754 P.2d 1145 (Ariz. Ct. App. 1988) (adopting selective waiver of physician-patient privilege under the particular circumstances of that case). It is clear then that the common law of attorney-client privilege and the work-product doctrine in both state and federal courts has not embraced the doctrine of selective waiver.

n7 The Supreme Court has "observed that the policy decisions of the States bear on the question whether federal courts should [] amend the coverage of an existing [privilege]." *Jaffee v. Redmond*, 518 U.S. 1, 12-13, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996); *see also* *Trammel v. United States*, 445 U.S. 40, 48-50, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980); *United States v. Gillock*, 445 U.S. 360, 368, 100 S. Ct. 1185, 63 L. Ed. 2d 454 (1980).

[**53]

**6. New Privilege**

While Qwest has disavowed any intention of seeking to create a new privilege for materials surrendered in a government investigation, that does not necessarily foreclose the subject. There is a principled position that the breadth of the selective waiver doctrine advocated by Qwest is the substantial equivalent of a new privilege. Qwest justifies its proposed new rule on a policy of cooperation with government investigations. It does not ground its advocacy on the purposes underlying the attorney-client privilege. At least one court has indicated that such justification is suggestive of a new privilege, rather than gloss on an ancient one. *See* Westinghouse, 951 F.2d at 1425.

More often than not, the Supreme Court has declined to recognize new privileges. In *Branzburg*, for example, the Court rejected a proposed journalists' privilege against being compelled to testify before a grand jury. 408 U.S. at 667. In reaching its decision, the Court noted the proposed privilege was not recognized at common law, *id.* at 685; some states had adopted it, but the majority had not, and that no federal statute had adopted [**54] it, *id.* at 689; the evidence did not support the dire consequences the privilege's proponents predicted, *id.* at 693; even if the record had supported the need for the privilege, the public interest of pursuing and punishing criminal behavior would outweigh the interest in possible future news stories, *id.* at 695; and there were daunting logistical difficulties in implementing the pro-

posed privilege, id. at 703-04. The Court suggested other government bodies, such as Congress or the state legislatures and courts, could consider implementing the proposed privilege. Id. at 706.

In other cases, the Court has refused to adopt privileges for peer review materials, *see* Univ. of Pa., 493 U.S. at 189; for state legislators in federal criminal proceedings, *see* United States v. Gillock, 445 U.S. 360, 374, 100 S. Ct. 1185, 63 L. Ed. 2d 454 (1980); for the editorial processes of the media in defamation action, *see* Herbert v. Lando, 441 U.S. 153, 175, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979); for the President to refuse to produce materials in a criminal proceeding, *see* Nixon, 418 U.S. at 713; [**55] and for legislative aides to refuse to testify before a grand jury about actions not related to legislative activities, *see* Gravel v. United States, 408 U.S. 606, 627, 92 S. Ct. 2614, 33 L. Ed. 2d 583 (1972); *see also* Rubin v. United States, 525 U.S. 990, 119 S. Ct. 461, 464, 142 L. Ed. 2d 413 (1998) (Breyer, J., dissenting from denial of certiorari in case in which the appellate court rejected a privilege for Secret Service agents for information learned while protecting the President).

A notable exception to this trend is *Jaffee v. Redmond*, where the Court recognized a federal psychotherapist-patient privilege under Rule 501. 518 U.S. 1, 9-15, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996). Noting that the possibility of disclosure might impede successful treatment, it concluded the privilege promoted the important public interest in the treatment of mental and emotional problems. Id. at 11. The Court weighed the significant benefits of the rule with the "modest" evidentiary detriment, finding that in the absence of the privilege, much [*1198] of the evidence that would otherwise be discoverable would not come into existence. Id. at 11-12. Importantly, though, [**56] it also relied upon a consensus of "reason and experience" reflected in the adoption of a psychotherapist privilege, in some form, in all fifty states and the District of Columbia. Id. at 12 & n.11, 13 . In addition, it noted that a psychotherapist privilege was among the nine privileges originally proposed to be included in the Federal Rules of Evidence. Id. at 14-15.

In this case, there are no grounds to buck the trend of declining to create a new privilege. There is no groundswell in the state legislatures for a privilege for materials produced in a government investigation. n8 Nor was such a privilege among the nine originally proposed for inclusion in the Federal Rules of Evidence. Further, [HN12] the Supreme Court has indicated it is "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." Univ. of Pa., 493 U.S. at 189. In 1984, Congress rejected a SEC-proposed amendment to the Securities and Exchange Act of 1934 that would have established a selective waiver rule. *See* Westinghouse, 951 F.2d at 1425 [**57] (citing [*1199] 16 Sec. Reg. & L. Rep. 461 (Mar. 2, 1984)). More recently, the SEC withdrew a proposed regulation implementing selective waiver in light of questions about its authority to adopt such a regulation under the Sarbanes Oxley Act. *See* SEC Release Nos. 33-8185, 34-47276, *Implementation of Standards of Professional Conduct for Attorneys*, 68 Fed. Reg. 6296, 6312 (Feb. 6, 2003) (explaining withdrawal of 17 C.F.R. Part 205.3(e)(3)). All of these factors counsel against establishing a new government-investigation privilege and correspondingly counsel against adopting Qwest's proposed rule regardless of whether it be characterized as a new privilege or a new rule governing waiver.

n8 It does not appear that any state has implemented, by statute or rule, a general government-investigation privilege, and this type of privilege does not appear in the Uniform Rules of Evidence (Uniform Rules). The closest equivalents recognized in the states appear to be a privilege for reports required to be made by law, which has been adopted by only a small minority of states, *see* Alaska R. Evid. 502; Haw. Rev. Stat. § 626-1, R. 502; Nev. Rev. Stat. § 49.025; N.M. R. Rev. Rule 11-502; Tex. R. Evid. 502; Wis. Stat. § 905.02, and self-critical analysis privileges recognized for specified situations in a minority of states, *see, e.g.*, Alaska Stat. § 09.25.450 (environmental audit); Colo. Rev. Stat. § 13-25-126.5 (environmental audit); 215 Ill. Comp. Stat. 5/155.35 (insurance compliance); Kan. Stat. Ann. § 60-3351 (insurance compliance); *id.* § 60-3333 (environmental audit); Miss. Code Ann. § 49-2-71 (environmental audit); N.D. Cent. Code §§ 6-13-02 to 6-13-04 (financial institutions); *id.* §§ 26.1-51-02 to 26.1-51-04 (insurance compliance); Or. Rev. Stat. § 731.761 (insurance compliance); Tex. Rev. Civ. Stat. Ann., art. 4447cc, § 5 (Vernon) (environmental audit); Utah R. Evid. 508 (environmental audit). Neither of these privileges is included in the Uniform Rules.

Notably, [HN13] the Uniform Rules are hostile to both the creation of new common law privileges, *see* Unif. R. Evid. 501 (limiting the creation of privileges to constitution, statute, or state supreme court rule), and the idea of selective waiver, *see* Unif. R. Evid. 510 (stating that a privilege is waived if a privilege holder "voluntarily discloses or consents to disclosure of any significant part of the privileged matter"). A majority of states have adopted forms of Uniform

Rules 501 and/or 510. *See Uniform Rules of Evidence Locator*, http://www.law.cornell.edu/uniform/evidence.html (last visited May 31, 2006) (identifying states that have adopted the Uniform Rules).

In addition, our research indicates that where state legislatures have adopted selective waiver theories, they have done so not in the general law enforcement context, but in particularized circumstances not present here. *See, e.g.*, Cal. Gov't Code § 13954(h) (disclosures to verify claims on victims' compensation fund); Conn. Gen. Stat. § 19a-127o(f) (health providers' submission of patient safety work product to patient safety organization); Fla. Stat. § 633.175(6) (insurance company providing information to State Fire Marshal); La. Rev. Stat. Ann. § 40:31.66(D) (state Parkinson's Disease Registry); Neb. Rev. Stat. § 44-1107(5)(f) (examinations under Viatical Settlements Act); Ohio Rev. Code Ann. § 1753.38(A) (risk-based capital plans, reports and information). Most commonly, state legislatures have allowed selective waiver in connection with environmental self-audits, *see, e.g.*, Alaska Stat. § 09.25.455(b); Kan. Stat. Ann. § 60-3334(c); Tex. Rev. Civ. Stat. Ann., art. 4447cc, § 6(b) (Vernon), and reports to insurance commissioners, *see, e.g.*, Ind. Code § 27-1-15.6-15(e)(4); Ky. Rev. Stat. Ann. § 304.47-055(4); S.C. Code Ann. § 38-43-55(G)(4); Vt. Stat. Ann. tit. 8, § 4813m(f)(4); Wash. Rev. Code §§ 48.02.065(4), (6).

[**58]

**7. Culture of Waiver**

Amici curiae, Association of Corporate Counsel and the Chamber of Commerce of the United States of America, support Qwest's position by suggesting their employers and members, respectively, now litigate in a "culture of waiver" instituted by federal prosecutors. They argue that companies facing federal investigations do not choose to waive their privileges; under current enforcement standards, companies cannot risk being labeled as uncooperative; and cooperation, as defined by federal officials, requires producing privileged documents. n9 Amici state that "the demand for privilege waivers by the government as a pre-requisite to fair treatment by prosecutors is now routine." Amici Br. at 10. They urge the court "to note with disapproval this culture of waiver as a matter of policy that should be reversed." *Id.* at 8.

n9 The DOJ's enforcement position stems from certain DOJ memoranda. The 1999 "Holder Memorandum" written by Deputy Attorney General Eric Holder directed federal prosecutors to consider the company's willingness to waive privileges in evaluating cooperation. The currently controlling memorandum is the January 20, 2003 "Thompson Memorandum" authored by Deputy Attorney General Larry D. Thompson. On October 21, 2005, Acting Deputy Attorney General Robert D. McCallum, Jr. issued a memorandum supplementing the Thompson Memorandum that directs United States Attorneys to establish a written waiver review process prosecutors must follow in seeking privilege waivers.

The SEC's position is encapsulated in the "Seaboard Report," Securities Exchange Act of 1934 Release No. 44969 (Oct. 23, 2001). That report listed a company's desire to provide information as one of the criteria for assessing cooperation, and it noted that such a desire may cause companies to waive the attorney-client privilege, work-product doctrine, or other applicable privileges. "In this regard, the Commission does not view a company's waiver of a privilege as an end in itself, but only as a means (where necessary) to provide relevant and sometimes critical information to the Commission staff." *Id.* at n.3.

[**59]

Amici's position is supported by commentators. *See, e.g.*, Ronald C. Minkoff, *A Leak in the Dike: Expanding the Doctrine of Waiver of the Attorney-Client Privilege*, 154 PLI/NY 165, 178 (2005); *see also* Kathryn Keneally, *New Life for Selective Waiver*, 30 Champion 42 (2006). It is not, however, supported by the record. Aside from the anecdotal material serving as the foundation for the purported "culture of waiver," the record is silent regarding its existence, significance, and longevity. More specifically, the record is silent about Qwest's particular dealings with the agencies and whether it experienced the tactics deplored by amici. Even though common sense and human nature suggest there is some level of pressure for companies to satisfy the government by disclosing as much as possible, including even privileged and protected material, this court cannot rely on such a sparse record to recognize a new doctrine of selective waiver or to create a new privilege for government investigations.

[*1200] A similar argument has been unsympathetically received by at least one other circuit. The Second Circuit stated:

> Whether characterized as forcing a party in between a Scylla [**60] and Charybdis, a rock and a hard place, or some other tired but equally evocative metaphoric cliche, the "Hobson's choice" argument is unpersuasive given the facts of this case. An allegation that a party facing a federal investigation and the prospect of a civil fraud suit must make difficult choices is insufficient justification for carving a substantial exception to the waiver doctrine.

Steinhardt Partners, 9 F.3d at 236. In *Branzburg*, the Supreme Court found similar arguments about changing policies and practices insufficient to support the creation of a journalist's privilege:

> It is said that currently press subpoenas have multiplied, that mutual distrust and tension between press and officialdom have increased, that reporting styles have changed, and that there is now more need for confidential sources . . . . These developments, even if true, are treacherous grounds for a far-reaching interpretation of the First Amendment fastening a nationwide rule on courts, grand juries, and prosecuting officials everywhere.

408 U.S. at 699 (footnote omitted).

At least to the degree exhorted by amici, "the culture of waiver" appears [**61] to be of relatively recent vintage. Whether the pressures facing corporations in federal investigations present a hardened, entrenched problem suitable for common-law intervention or merely a passing phenomenon that may soon be addressed in other venues is unclear. For example, certain language in Application Note 12 to Sentencing Guideline § 8C2.5 can be read to tie cooperation to a waiver of applicable privileges. The Sentencing Commission, however, recently promulgated an amendment deleting that language because "the sentence at issue could be misinterpreted to encourage waivers." *Sentencing Guidelines for the United States Courts*, 71 Fed. Reg. 28063, 28073 (May 1, 2006). This amendment will take effect on November 1, 2006 unless Congress intervenes. *Id.* at 28063. Congress also appears concerned about these issues; the House Judiciary Committee's Subcommittee on Crime, Terrorism, and Homeland Security recently took oral testimony at an oversight hearing on corporate privilege waivers. *White Collar Enforcement (Part I): Attorney-Client Privilege and Corporate Waivers: Oversight Hearing Before the H. Comm. on the Judiciary, Subcomm. on Crime* [**62] , *Terrorism and Homeland Security*, 109th Cong. D193 (Mar. 7, 2006). Finally, the Advisory Committee on Evidence Rules recently voted to recommend publication of a proposed Rule 502, providing for selective waiver to the Committee on Rules of Practice and Procedure (the Standing Committee) of the Judicial Conference of the United States. The Standing Committee is expected to take up the issue at its June 2006 meeting.

[HN14] Rule 501 places responsibility for development of the common law of testimonial privilege on the federal courts. Each decision along the path of the common law is directed by the discrete, underlying facts developed in the record. As decisions accrue, the process is facilitated by the accumulation of experience, but it remains dependent on the factual foundation of each constituent decision. Legislative and rule-making processes, however, are not confined by the same gradual, brick-by-brick progression. Legislatures and rule-making bodies are endowed with tools to marshal evidence, facts, and experience from numerous and diverse sources that can support more dramatic and immediate creation of new rules or modifications of old [*1201] rules. *Cf.* *In re Subpoena Duces Tecum*, 738 F.2d at 1375 [**63] ("If a change is to be made because it is thought that such voluntary disclosure programs are so important that they deserve special treatment, that is a policy matter for the Congress, or perhaps through the SEC (through a regulation). Courts are not the appropriate forum-for one thing, courts do not know enough-to decide on policy grounds to treat those programs (or others like them) in an exceptional way."); *see also* *Branzburg*, 408 U.S. at 706 ("Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate.").

Whether a rule-making or legislative venue is appropriate to address the issues raised by Qwest and amici is a question for the Standing Committee and Congress. The rule-making and legislative processes, however, need not proceed wholly independent of the common law. The accumulated experience of federal common law in the area of attorney-client privilege and work-product protection is but another source for the legislative [**64] and rule-making bodies to draw on to inform their deliberations concerning the need for and parameters of selective waiver or a new privilege.

**III. Conclusion**

For the reasons discussed above, the record in this case does not justify adoption of selective waiver. Con-

450 F.3d 1179, *; 2006 U.S. App. LEXIS 14937, **;
70 Fed. R. Evid. Serv. (Callaghan) 492

sequently, the district court did not abuse its discretion in ordering Qwest to produce the Waiver Documents to the Plaintiffs. Qwest has not shown a clear and indisputable right to a writ of mandamus, and therefore its petition is DENIED.

Page 19