# TAB 19

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| CRYSTAL F. STATLER; | ) | CIV. 06-5003 |
| ANNA M. APPLEGATE; and | ) | |
| KARA L. RANDEN, | ) | |
| | ) | |
| Plaintiffs, | ) | ORDER ON MOTIONS |
| | ) | TO COMPEL |
| vs. | ) | |
| | ) | |
| BUFFALO-BODEGA COMPLEX, INC.; | ) | |
| JOHN MCGILL, in his individual | ) | |
| capacity; and ALLAN ROSENFELD, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the Court are two motions to compel discovery [doc. #s 41 & 43], filed by

the Plaintiffs. The first motion [doc. #41] seeks discovery from Defendant Buffalo-Bodega

Complex, Inc. ("Buffalo-Bodega"). All briefing is complete with regard to that motion, and it is

ripe for disposition. The second motion [doc. #43] seeks discovery from Defendant John

McGill. McGill did not respond to the motion, and the time to do so has passed. Thus, that

motion also is ripe for disposition. For the reasons that follow, the Court will grant in part and

deny in part the motion to compel discovery from Buffalo-Bodega, and grant the motion to

compel discovery from McGill.

## I. Background

Defendant Allan Rosenfeld is the principal shareholder of Buffalo-Bodega, which

operates as a bar/casino/restaurant business in Deadwood, South Dakota. The Plaintiffs worked

as bartenders and cocktail waitresses at Buffalo-Bodega. Defendant John McGill was the

manager of Buffalo-Bodega in the summer and fall of 2003, and acted as the Plaintiffs'
supervisor. McGill allegedly sexually harassed the Plaintiffs during their employment with
Buffalo-Bodega. The Plaintiffs informed Rosenfeld, who investigated the incidents and decided
to terminate McGill's employment. All three Plaintiffs allege that they later were either
discharged or constructively discharged.

## II. Discussion

### A.    Defendant Buffalo-Bodega

During an investigation into the events surrounding this lawsuit by the South Dakota
Division of Human Rights, Buffalo-Bodega produced copies of two letters sent to Buffalo-
Bodega by its former attorney. The letters contain attorney-client communication wherein the
attorney advised Buffalo-Bodega about certain actions it should take with regard to McGill.

The Plaintiffs contend that the voluntary disclosure of correspondence from Buffalo-
Bodega's former attorney waived the attorney-client privilege as to all information directly
related to the letters. See doc. #42 at 5-6 (quoting United States v. Workman, 138 F.3d 1261,
1265 (8th Cir. 1998); State v. Catch the Bear, 352 N.W.2d 640, 647 (S.D. 1984); SDCL 19-13-
26). The Plaintiffs move to compel production of the information, based on "a number of
important reasons." The Plaintiffs argue that "virtually everyone who worked at Defendant
Bodega knew how Defendant McGill was treating the Plaintiffs[, but] Defendant Rosenfeld
somehow maintains that he was unaware of such conduct until receiving" a letter from the
Plaintiffs' attorney. See id. at 6. The Plaintiffs argue the requested discovery will contain notes
or transcripts of employee interviews conducted by the former attorney, and such information is
crucial because these employees cannot be located at this time. Id. at 6-8. The discovery,

2

according to the Plaintiffs, "will likely further confirm that Defendant Bodega knew that Defendant McGill should have been prohibited from frequenting the premises." Id. at 7. The Plaintiffs claim the discovery will likely confirm the timing of certain key events related to this case. Id. Further, citing Fed. R. Civ. P. 26(b)(3), the Plaintiffs contend they should receive notes and transcripts of interviews of Buffalo-Bodega employees that its attorney conducted, claiming this information, particularly an interview of a former employee named Peter Heophner, would possibly show Rosenfeld lied during his deposition. The Plaintiffs argue they are entitled to discover this information because they have shown a substantial need for the information and could not obtain the substantial equivalent of it without undue hardship.

Buffalo-Bodega responds by noting that the work product privilege affords greater protection than the attorney-client privilege. See doc. #46 at 2-8. Buffalo-Bodega argues all the information sought here is opinion work product, which enjoys nearly absolute immunity and can be discovered only in extraordinary circumstances. Id. at 3 (quoting In re Chrysler Motors Corp., 860 F.2d 844, 846 (8th Cir. 1988)).

"The work product privilege is designed to promote the operation of the adversary system by ensuring that a party cannot obtain materials that his opponent has prepared in anticipation of litigation." Pittman v. Frazer, 129 F.3d 983, 988 (8th Cir. 1997). The work-product privilege should be "applied in a commonsense manner in light of reason and experience as determined on a case-by-case basis." Id. "The doctrine allows for discovery of such documents and tangible things only upon a showing of substantial need and an inability to secure the substantial equivalent of the items through alternate means without undue hardship for ordinary work product (such as photographs and raw information), and only in rare and extraordinary

3

circumstances for opinion work product (containing mental impressions, conclusions, opinions, or legal theories regarding the litigation)." Id. (citations and internal quotations omitted). However, "disclosure to an adversary waives work product protection as to items actually disclosed," although "disclosure of some documents does not destroy workproduct protection for other documents of the same character." Id. (citation omitted).

Based on the parties' submissions, it appears that the information sought in the instant motion is opinion work product. The discovery includes personal recollections, notes, and memoranda of conversations with witnesses, which the Eighth Circuit has concluded are entitled to absolute protection. See In re Grand Jury Proceedings, 473 F.2d 840, 848 (8th Cir. 1973) (concluding attorney's "personal recollections, notes, and memoranda pertaining to his conversations with nonemployees of his client" was "absolutely, rather than conditionally, protected"). Thus, the Court concludes the discovery the Plaintiffs request is opinion work product. As such, the discovery enjoys nearly absolute immunity and can be discovered only in extraordinary circumstances. See In re Chrysler Motors Corp., 860 F.2d at 846. No such extraordinary circumstances are present in this case, and the motion to compel will be denied. However, the disclosure of the letters to the South Dakota Division of Human Rights served to waive work product protection as to those two items, although disclosure of those documents does not destroy the protection provided for similar documents. See Pittman, 129 F.3d at 988.

Moreover, even assuming the information is only ordinary, rather than opinion, work product, the Plaintiffs have not shown a "substantial need and an inability to secure the substantial equivalent of the items through alternate means without undue hardship." See id. The Plaintiffs have asserted that the former employees with information cannot be located at this

4

time, but they do not provide information about what measures have been taken to locate the

missing former employees. The fact that the Plaintiffs are aware that "virtually everyone" who

worked at Buffalo-Bodega knew how McGill treated the Plaintiffs shows that the Plaintiffs are

not without information about the former employees and their knowledge regarding events

occurring at Buffalo-Bodega. The Plaintiffs have not shown Rosenfeld was lying when he stated

he does not know the location of former employee Peter Heophner, whom the Plaintiffs argue

will support their claim that Rosenfeld was aware of McGill's conduct. The mere assertion by

the Plaintiffs that they are unable to locate individuals the Plaintiffs believe may have

information related to this case does not constitute a "substantial need" or "an inability to secure"

equivalent information "without undue hardship." Thus, the Court concludes the Plaintiffs have

failed to meet the burden required to compel disclosure of the information requested.

Based on the foregoing, the Court concludes Buffalo-Bodega has waived its privilege

with regard to the letters previously disclosed, but the waiver stops there. The disclosure of those

letters did not destroy work-product protection as to other documents of the same character. See

id. Thus, the Plaintiffs' motion will be granted only as to the two letters already produced—

those in the Plaintiffs' possession at this time. The Court does not herein foreclose the

possibility that the Plaintiffs might file another motion to compel this information at a later date,

should they be unable to secure the information during the regular course of discovery.

**B.    Defendant McGill**

In the second motion, the Plaintiffs seek to compel various discovery from McGill. First,

the Plaintiffs state that McGill has not responded to their interrogatories or their requests for

5

production of documents. Also, the Plaintiffs move to compel McGill to provide initial
disclosures, as required under Fed. R. Civ. P. 26(a)(1).

The Plaintiffs have provided evidence that they attempted to contact McGill, by letters
and electronic mail, in an attempt to resolve the discovery dispute. The Plaintiffs note that they
started to communicate with McGill via electronic mail after they began to suspect that McGill
had moved away from South Dakota. McGill responded to one of their letters by stating he had
"mailed [the] Interrogatories." See doc. #44-2, Ex. C. However, the Plaintiffs contend, McGill
still has not served any responses to their discovery requests. Also, the Plaintiffs seek initial
disclosures from McGill. After requesting these disclosures from McGill and notifying him that
the disclosure were overdue, McGill responded via electronic mail, that he was "giv[ing] up [his]
right to prediscovery disclosures." Id. Although the Plaintiffs informed McGill that they were
not willing to waive their right to initial disclosures, McGill did not serve the initial disclosures
on the Plaintiffs. Furthermore, McGill did not file a response to the instant motion to compel.

The Court concludes the Plaintiffs have provided sufficient evidence that they requested
discovery from McGill, and McGill has not responded to their requests. Further, the record
indicates McGill has not provided initial disclosures to the Plaintiffs. McGill has not objected to
this motion nor stated any reason for his failure to comply with the reasonable, relevant discovery
requests at issue here. Accordingly, the motion to compel will be granted in full as to the
discovery sought from McGill.

## III. Conclusion

The discovery sought from Buffalo-Bodega is opinion work product and, as such, is
privileged, entitled to absolute protection except in extraordinary circumstances, which are not

6

present here. Even assuming, however, that the discovery constitutes only ordinary work product, the Plaintiffs have failed to show their need for the information is substantial, that they are unable to secure the information, or that securing it on their own would cause an undue hardship. The motion to compel discovery from Buffalo-Bodega will be denied except as to the documents already disclosed. The Plaintiffs have presented sufficient evidence that they requested discovery from McGill and that McGill has not responded to their requests, and also that McGill has not provided Rule 26(a)(1) initial disclosures. The motion to compel discovery from McGill will be granted in full. Accordingly, it is hereby

ORDERED that the Plaintiffs' motion [doc. #41] to compel seeking discovery from Defendant Buffalo-Bodega Complex, Inc. is GRANTED in part and DENIED in part, as set forth herein.

IT IS FURTHER ORDERED that the Plaintiffs' motion [doc. #43] to compel, seeking discovery from Defendant John McGill, is GRANTED. **On or before November 24, 2006,** McGill shall respond to the Plaintiffs' interrogatories and requests for production, and shall provide initial disclosures, as required under Fed. R. Civ. P. 26(a)(1).

Dated this 6th day of November, 2006.

BY THE COURT:

/s/ *Andrew W. Bogue*

ANDREW W. BOGUE
SENIOR DISTRICT JUDGE

# TAB  20

LEXSEE

Caution
As of: May 25, 2007

**United Coal Companies, Appellant v. Powell Construction Company and Interstate Equipment Corporation and Bethlehem Steel Corporation, Appellees**

**No. 87-3431**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**839 F.2d 958; 1988 U.S. App. LEXIS 1857; 25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947**

**December 16, 1987, Argued**
**February 17, 1988, Filed**

**PRIOR HISTORY:** [**1]

On Appeal from the United States District Court for the Western District of Pennsylvania, D.C. Civil Action No. 86-1521.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff coal company appealed the judgment from the United States District Court for the Western District of Pennsylvania, dismissing its diversity products liability complaint against Defendants, equipment and steel corporations, with prejudice for failure to comply with court orders respecting discovery. Plaintiff contended that the court erred in ordering discovery of materials to which attorney client or work product privileges applied.

**OVERVIEW:** Plaintiff coal company appealed from a final judgment dismissing its diversity products liability with prejudice for failure to comply with court orders respecting discovery. Plaintiff contended that the court erred in ordering discovery of materials to which the attorney client or work product privileges applied. Plaintiff also contended that the court erred in an earlier ruling that requests for admissions served by defendants would be deemed admitted. The appellate court concluded that the case should not have been dismissed and that the ruling with respect to requests for admissions was error. The court held that since a principal reason relied on for the entry of the order imposing the dismissal sanction

was legal error, the dismissal sanction must be reversed, and the case remanded. Further, it was clear that the court erred in holding that the work product privilege applied only to documents reflecting the attorney's mental impressions. As with the documents on which a claim of attorney client privilege was made, those on which a work product privilege claim was made must be inspected by the court in camera and ruled upon.

**OUTCOME:** The judgment dismissing plaintiff coal company's products liability complaint with prejudice for failure to comply with court orders respecting discovery was reversed and remanded. The proper procedure for consideration of the claim of attorney client privilege was an in camera inspection. It was also clear that the court erred in holding that the work product privilege applied only to documents reflecting the attorney's mental impressions.

**CORE TERMS:** inspection, insurer, bushing, discovery, work product privilege, reconsideration, pin, aerial tramway, lubrication, socket, impression, withheld, haul, rope, specifically denied, repair work, lubricated, nonparty, ratification, inspected, real party in interest, work product, in camera, privileged, scheduled, ordering, anticipation of litigation, deemed admitted, final judgment, documentation

**LexisNexis(R) Headnotes**

Case 1:05-cv-00499-JJF    Document 231-5    Filed 05/25/2007    Page 11 of 54

839 F.2d 958, *; 1988 U.S. App. LEXIS 1857, **;
25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947

*Civil Procedure > Parties > Capacity of Parties > General Overview*

*Civil Procedure > Parties > Joinder > General Overview*

*Civil Procedure > Parties > Real Parties in Interest > General Overview*

[HN1] Fed. R. Civ. P. 17(a) states that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*

*Evidence > Privileges > General Overview*

[HN2] In a diversity case, Fed. R. Evid. 501 refers the district court, on questions of privilege, to state law.

*Civil Procedure > Counsel > General Overview*

*Evidence > Privileges > Attorney-Client Privilege > General Overview*

[HN3] In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client. 42 Pa. Cons. Stat. Ann. § 5928.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*

[HN4] Where an attorney represents two clients, the privilege applies to those clients as against a common adversary. Pennsylvania law in this respect is consistent with the settled law in all American jurisdictions. Furthermore it is the attorney client status that determines the existence of the privilege, and not party status. The key is whether the person asserting the privilege had a professional consultation with an attorney, who acts or advises as such. Thus, non-parties may assert applicable privileges.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN5] The work product privilege is governed, even in diversity cases, by a uniform federal standard embodied

in Fed. R. Civ. P. 26(b)(3), which provides that subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview*

*Civil Procedure > Counsel > General Overview*

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN6] The work product privilege rule, applicable to civil cases, is a codification of the federal common law rule and that rule applies even in criminal cases. In the latter context the Supreme Court has observed that while the rule shelters the mental processes of any attorney, it is not so restricted. Rather, the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect materials prepared by agents for the attorney as well as those prepared by the attorney himself.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN7] The work product doctrine is not inapplicable merely because the material was prepared by or for a party's insurer or agents of the insurer. Counsel for an insurer may invoke work product protection in favor of documents prepared by it in anticipation of litigation even though the insurer is not a named party in an action.

*Civil Procedure > Discovery > Methods > Admissions > General Overview*

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*

[HN8] On an appeal from a final judgment an appellate court may ordinarily consider all prior rulings of the trial court.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview*

*Civil Procedure > Pleading & Practice > Pleadings > Answers*

*Civil Procedure > Discovery > Methods > Admissions > Responses*

[HN9] Fed. R. Civ. P. 36(a), which authorizes the service of requests for admission, provides that with respect to the form of response to such requests the answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview*

*Civil Procedure > Discovery > Methods > Admissions > Responses*

[HN10] The use of only the word "denied" is often sufficient under Fed. R. Civ. P. 36(a). Regardless of the subject matter of the Fed. R. Civ. P. 36 request, the statement of the fact itself should be in simple and concise terms in order that it can be denied or admitted with an absolute minimum of explanation or qualification. A request for an admission, except in a most unusual circumstance, should be such that it could be answered yes, no, the answerer does not know, or a very simple direct explanation given as to why he cannot answer, such as in the case of privilege. Fed. R. Civ. P. 36 should not be used unless the statement of fact sought to be admitted is phrased so that it can be admitted or denied without explanation.

**COUNSEL:**

David A. Scotti, Esq. (Argued) C. S. Fossee, Esq. Reale, Fossee & Ferry, P.C., Attorneys, for Interstate Equipment Co.

G. Daniel Carney, Esq. (Argued) Deborah P. Powell, Esq. Thorp, Reed & Armstrong, Attorneys, for Bethlehem Steel Corp.

Robert R. Reeder, Esq. (Argued) Susan M. Danielski, Esq. Judith A. Mackarey, Esq. Cozen and O'Connor; James R. Hankle, Esq. Doherty and Robb, P.C. Attorneys, for United Coal Companies.

Daniel J. Ryan, Esq. Labrum and Doak, Attorney, for Amicus Curiae The Defense Research Institute, Inc.

**JUDGES:**

Gibbons, Chief Judge, Sloviter and Cowen, Circuit Judges.

**OPINION BY:**

GIBBONS

**OPINION:**

[*960] **OPINION OF THE COURT**

GIBBONS, Chief Judge:

United Coal Companies (United) appeals from a final judgment dismissing its diversity products liability complaint against Interstate Equipment Corp. (Interstate) and Bethlehem Steel Corp. (Bethlehem) with prejudice for failure to comply with court orders respecting discovery. United contends that the court erred in ordering discovery of materials to which the attorney client or [**2] work product privileges applied. United also contends that the court erred in an earlier ruling that requests for admissions served by Interstate and Bethlehem would be deemed admitted. We conclude that the case should not have been dismissed and that the ruling with respect to requests for admissions was error. Thus we will reverse.

I.

Proceedings in the District Court

United owns a coal mine and processing plant at Big Rock, Virginia. At that site it operated an aerial tramway to move coal refuse from one of its processing facilities. On July 23, 1984 a haul rope supplied by Bethlehem and installed by Interstate broke, permitting sixty-two cars on the aerial tramway to fall to the ground. United was insured for casualty losses by Royal Insurance Company and St. Paul Fire & Marine Insurance Company. These casualty insurers paid a loss claim totalling $1.5 million, obtaining a subrogation of United's rights against third parties liable for the loss. The subrogation receipts authorized the insurers to sue in United's name. The insurers retained attorneys to do so, and on July 18, 1986 those attorneys filed a complaint seeking to hold Bethlehem and Interstate liable for the entire [**3] loss, including over $166,000 in damages for which United has not been reimbursed.

During the course of pretrial proceedings Bethlehem and Interstate filed a motion to dismiss or add Royal Insurance Company and St. Paul Fire & Marine Insurance Company as the real parties in interest. No order was ever entered on this motion, because in response to it the

839 F.2d 958, *; 1988 U.S. App. LEXIS 1857, **;
25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947

insurers executed and served on Bethlehem and Interstate agreements expressly ratifying United's suit and undertaking to be bound thereby. This action was taken pursuant to [HN1] Fed. R. Civ. P. 17(a), which in relevant part states:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Thus the effect of service of the Rule 17(a) ratification agreements was as if Royal Insurance Company and St. Paul Fire & Marine Insurance Company had been parties [**4] from the beginning of the action.

Extensive discovery had commenced before the real party in interest motion was filed, and continued after the filing of the Rule 17(a) ratification agreements. The district court imposed a discovery deadline of March 27, 1987, which was later extended to April 30, 1987. By then thirty-six depositions had been taken, and United had produced numerous documents, both from its own files and from the files of the insurers. Certain documents which were included in the Bethlehem or Interstate discovery requests were withheld, however, [*961] under claims of attorney client or work product privilege. These were listed in two letters from United's counsel to counsel for Bethlehem and Interstate.

On April 30, 1987 Bethlehem and Interstate filed a motion to compel production of the withheld documents. The motion states in relevant part:

> 14. Documents have been withheld from production pursuant to a claim of privilege asserted by counsel for plaintiffs.
>
> 15. Counsel for defendants are unable to test the validity of plaintiffs assertion of privilege since counsel for defendants have not viewed the documents which have been withheld.
>
> 16. Defendant [**5] would request that this court or this court's designee, e.g., a federal magistrate, review the

documents withheld by plaintiffs to determine whether or not plaintiff's assertion of privilege is well founded.

> 17. Upon completion of the requested document review, counsel for defendants request that plaintiffs be compelled to produce all documents or portions of documents which are not subject to privilege for inspection by counsel for defendants.
>
> WHEREFORE, defendants, Interstate Equipment Corporation and Bethlehem Steel Corporation respectfully request this Honorable Court to direct plaintiffs to turn over the withheld documents for review by the court and all properly discoverable documentation be turned over for review by defense counsel.

Thus Bethlehem and Interstate did not claim that the attorney client or work product privileges were generally inapplicable, but merely asked the court to examine the documents and rule on the applicability of those privileges to individual documents.

The district court scheduled a hearing on this motion on May 1, 1987. Local counsel for United thus had only one day notice, and did not have any opportunity to file a written response. [**6] Counsel for Interstate requested that the documents as to which a claim of privilege was made be produced for examination *in camera*. As he put it:

> All we are asking, whatever has been withheld, if Your Honor could review it, or even give it to a federal magistrate to review it so we can be sure.

The court addressed both claims of privilege. With respect to the attorney client privilege this colloquy took place between United's local counsel and the court:

> THE COURT: What's the basis of that; what have you maintained is the basis for their not reviewing them?
>
> MR. HANKLE: Most of the basis was attorney-client privilege. They were letters from us to those individuals.
>
> THE COURT: To your clients?

839 F.2d 958, *; 1988 U.S. App. LEXIS 1857, **;
25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947

MR. HANKLE: To the insurance companies, to the clients.

THE COURT: Wait a minute. The only protection is communications between you and your client. Letters to insurance companies are not protected.

* * *

THE COURT: That is not privileged. Only communications between the lawyer and his client are privileged.

MR. HANKLE: Even where they are subject to subrogation action, where the insurance companies are subrogating this action?

THE COURT: Are they your [**7] clients?

MR. HANKLE: Well, I guess ultimately the United Coal would be the client. We have to protect them as --

THE COURT: Then those are not protected. You have to give them those, those communications.


With respect to the work product privilege this colloquy took place:

MR. CARNEY [Counsel for Bethlehem]: Additionally, Your Honor, there was a classification of documents where counsel said they were privileged because they contained mental impressions pertaining to the litigation, and I don't know of any such privilege.

THE COURT: They were communications to who?

MR. CARNEY: Lay person to lay person, not involving a lawyer, an insurance adjuster to his insurance company.

THE COURT: Those aren't protected.

[*962] MR. CARNEY: I don't think so either.

THE COURT: Give him those documents that fit into that category.

MR. HANKLE: I was under the impression that the rules apply for mental impressions of the merits of the litigation.

THE COURT: The lawyers' mental impressions.

MR. HANKLE: But it is only the lawyers' that can be?

THE COURT: Yes.

MR. HANKLE: And not the adjuster's or anyone else?

THE COURT: That is right.


Without [**8] examining them, the court directed that all the disputed documents except letters between United and counsel should be turned over to Bethlehem and Interstate.

One additional issue was addressed at the May 1 hearing. Interstate's attorney announced that he intended to submit two additional discovery motions. The court directed "Let's do it right now." This colloquy followed:

MR. SCOTTI: Well, okay. Their answers to my request for admissions; first of all, there are several answers where the only response I got was one word, "denied."

THE COURT: So they are admitted.

MR. SCOTTI: Thank you.

THE COURT: That doesn't meet the requirements.


This ruling was made without prior notice to United, and without looking at the requests for admission, and answers. which read as follows:

10. Lack of adequate lubrication of the pin and bushing on the socket which failed was at least a contributing factor to the accident of July 23, 1984.

RESPONSE: Denied.

11. Lack of adequate lubrication of the pin and bushing on the socket which failed was the cause of the accident on July 23, 1984.

RESPONSE: Denied.

12. On or before July 23, 1984, there is no written agreement [**9] regarding the inspections and repair work that was to be performed by Interstate Equipment Corporation other than the purchase orders for the work performed or the inspections conducted.

RESPONSE: Denied.

15. Prior to July 23, 1984, United Coal Companies was aware that all the haul ropes on the aerial tramway system were scheduled to be changed, i.e., replaced during August of 1984.

RESPONSE: Denied.

16. Prior to the incident of July 23, 1984, United Coal Companies never contracted with Interstate to have Interstate review or revise the maintenance documentation of United.

RESPONSE: Denied.

19. Prior to July 23, 1984, it was the responsibility of United to perform all inspections of the aerial tramway system and its component parts in between the quarterly inspections being performed by Interstate Equipment Corporation.

RESPONSE: Denied.

The hearing concluded shortly thereafter with this notation:

THE COURT: The transcript of this conference is the order of the court. Upon request, the reporter will transcribe at the joint cost of the parties.

After the May 1 hearing United promptly advised Interstate that it was preparing a motion for reconsideration [**10] of the three discovery rulings. Nevertheless, on May 12 Interstate filed a Fed. R. Civ. P. 37 motion for sanctions. That motion relied on the transcript of the May 1 hearing as an order to produce the documents as to which attorney client and work product privileges were asserted. Although the transcript did not specify a time for production, the motion sought a dismissal of the action for willful failure to comply with the court's order. United moved for reconsideration of all three rulings, and for a stay of the orders requiring production of documents until the motion for reconsideration of those

orders was decided. United also prepared and served amended responses to the [*963] requests for admission, which are quoted in the margin. n1

n1 The amended answers for requests 10, 11, 12, 15, 16 and 19 were:

10. It is specifically denied that lack of adequate lubrication of the pin and bushing on the socket which failed was a contributing factor to the accident of July 23, 1984. To the contrary, United Coal personnel responsible for maintaining and supervising the maintenance work on the aerial tramway system have testified that the pins and bushings on the sockets were lubricated on a weekly basis, as was recommended by Interstate. In fact, David Pendergrass, third-shift mechanic responsible for the actual lubrication to the pins and bushings, testified that he lubricated the pins and bushings a few days before the accident. Moreover, the reports of Alpha Associates, Inc., state lubrication was not a contributing cause to the failure. Finally, Nicholas Portmann, an engineer who inspected the bushing on the socket which failed subsequent to the accident, testified that he inspected the bushing and found that it had been adequately lubricated prior to the accident.

11. It is specifically denied that lack of adequate lubrication of the pin and bushing on the socket which failed was the cause of the accident of July 23, 1984. To the contrary, United Coal personnel responsible for maintaining and supervising the maintenance work on the aerial tramway system have testified that the pins and bushings on the sockets were lubricated on a weekly basis, as was recommended by Interstate. In fact, David Pendergrass, third-shift mechanic responsible for the actual lubrication to the pins and bushings, testified that he lubricated

the pins and bushings a few days before the accident. Moreover, the reports of Alpha Associates, Inc., state lubrication was not a contributing cause to the failure. Finally, Nicholas Portmann, an engineer who inspected the bushing on the socket which failed subsequent to the accident, testified that he inspected the bushing and found that it had been adequately lubricated prior to the accident.

12. It is specifically denied that on or before July 23, 1984, there were no written agreements regarding the inspection and repair work that was to be performed by Interstate Equipment Corporation other than the purchase orders for the work performed or the inspections conducted. To the contrary, plaintiff's Exhibits No. 95 and 46 are the writings which pertain to inspections and repair work to be performed by Interstate Equipment Corporation.

15. It is specifically denied that prior to July 23, 1984, United Coal Company was aware that all the haul ropes on the aerial tramway system were scheduled to be changed, i.e., replaced during August of 1984. To the contrary, Interstate was the entity who determined when the haul ropes should be changed or replaced and testimony of both United Coal and Interstate employees confirms that United Coal always followed such recommendations. Interstate was also responsible for ordering and installing new haul ropes and United Coal was only aware that new haul ropes had been ordered by Interstate, but were not delivered to United Coal prior to the accident on July 23, 1984. After reasonable investigation, and as the deposition testimony confirms, United Coal cannot determine that its employees were aware that the haul ropes were scheduled to be changed in August of 1984.

16. It is specifically denied that prior to the incident of July 23,

1984, United Coal Company never contracted with Interstate to have Interstate review or revise the maintenance documentation of United. To the contrary, Interstate's own maintenance manual, plaintiff's Exhibit No. 46, specifically states that "the Interstate representative should care fully [sic] check and go over the log book [made by United] and discuss it with the personnel in charge of the equipment." Moreover, plaintiff's Exhibit No. 95 is the original proposal pertaining to inspections that Interstate would perform, which was accepted by United Coal. Interstate was to perform all repair work other than routine maintenance and inspection services as described in its maintenance manual.

19. It is specifically denied that prior to July 23, 1984, it was the responsibility to perform all inspections of the aerial tramway systems and its component parts in between the quarterly inspections being performed by Interstate Equipment Corporation. Pursuant to its agreement with Interstate, United Coal was to perform only routine maintenance work. Interstate was to perform all repair work, other than of a minor nature, and was to perform inspections on at least a quarterly basis. United Coal relied upon Interstate's knowledge and expertise with respect to the maintenance, inspection and repair of the aerial tramway system designed and installed by Interstate. Interstate was consulted by United Coal on a regular basis to inspect and/or repair any problems experienced with the tram and Interstate was frequently at United's aerial tram site performing such inspection and/or repair work.

[**11]

839 F.2d 958, *; 1988 U.S. App. LEXIS 1857, **;
25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947

A hearing on various motions was held on May 15. At the outset of the hearing the following exchange occurred:

> MR. FOSSEE (Counsel for Interstate): They were requested, and I was told that they would not be produced, and they would never produce them.
>
> [*964] MS. MACKAREY (Counsel for United Coal): Your Honor, what we advised the defendants was that we were in the process of preparing a motion for reconsideration of the court's order. I have a courtesy copy of that for you.
>
> THE COURT: That is not much good here.
>
> MS. MACKAREY: And a request for a stay.
>
> THE COURT: Your motion for reconsideration is denied, and your motion for stay is denied.
>
> MS. MACKAREY: Your Honor, if I could, just give us a moment to argue that motion.
>
> THE COURT: You had your moment, and that was on May 1.
>
> MS. MACKAREY: Your Honor, I think the problem is the insurance companies are our clients. You know, if I could just have a moment to address this.
>
> THE COURT: Not according to the caption of the case.
>
> MS. MACKAREY: They may not be named plaintiff. They are our clients. We were retained by them. They have an interest in this action.
>
> THE COURT: If those documents are not in the hands of [**12] these defendants by Monday at noon, this case will be dismissed.
>
> MS. MACKAREY: Your Honor, will you give me an opportunity to try to explain?
>
> THE COURT: No, I won't. No, I won't. You had that opportunity on May 1. We will not go into that again. I made my order on May 1. I have received no word from you until now about any re-

consideration of it. You knew what you were ordered to do. You have not done it.

> MS. MACKAREY: We are within the time in which to file a motion for reconsideration, and we are asking for a stay until the motion is decided.
>
> THE COURT: I am denying it.

Despite the peremptory denials of any reconsideration, the court finally did allow United's counsel some argument. The end result was the same, however, with the court denying the motion and ordering production of the relevant documents by 12:00 P.M. on Monday, May 18th on pain of dismissal. The court again based its ruling on the fact that the insurance companies were not named parties to the lawsuit.

On the issue of the work product privilege, the following exchange occurred:

> MS. MACKAREY: How about the work product privilege which is our privilege?
>
> THE COURT: You have never raised the [**13] work product privilege before now. You had a chance at the conference on May 1, and you did not raise that. Now you are thinking of anything else that you can raise.
>
> MS. MACKAREY: I believe it was just talked about.
>
> THE COURT: I heard enough. I am telling you what is going to happen. If these documents are not in the hands of the defendant by 12:00 on Monday, your case will be dismissed. I will not hear anything more.

The court also considered United's motion for reconsideration of the order deeming six requests for admission to be admitted. The requests for admission were couched in terms dispositive of critical factual or legal issues, and United argued that its answers were in compliance with Fed. R. Civ. P. 36. The court flatly rejected that contention. United also urged that it should at least be permitted to amend the disputed answers. The court reserved decision on the amendment issue.

On May 18 United, urging that compliance with the court's order to deliver privileged documents would cause it and the insurers irreparable harm, requested the

839 F.2d 958, *; 1988 U.S. App. LEXIS 1857, **;
25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947

court to certify the privilege issues for immediate appeal pursuant to 28 U.S.C. § 1292(b), [**14] and to stay the order pending such an appeal. Alternatively, United suggested that holding counsel in contempt was a more appropriate sanction than dismissal. n2

> n2 *See Hickman v. Taylor*, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947) (civil contempt sanction for failure to obey order violating work product privilege reversed on appeal).

[*965] On May 19 the district court dismissed the action with prejudice for failure to comply with its May 1 and May 15 orders for production of documents. The court rejected the contention that alternative sanctions would be effective.

II.

Attorney Client Privilege

[HN2] In this diversity case Fed. R. Evid. 501 refers the district court, on questions of privilege, to state law. The reference, in the first instance, is to the law of the forum state. *Samuelson v. Susen*, 576 F.2d 546, 549 (3d Cir. 1978). The parties do not suggest that Pennsylvania law would in this case look to the law of any other state with respect to the attorney [**15] client privilege, or that if it did such law would differ from Pennsylvania's. It is undisputed that the correspondence in issue is between attorneys and insurance companies which retained them to prosecute this action. It is undisputed that the action seeks recovery both for the insurance companies, and in a much smaller amount for United. The court ruled that as a matter of law the attorney client privilege was inapplicable. Thus our review of this legal issue is plenary. *See Sporck v. Peil*, 759 F.2d 312, 315, 319 (3d Cir.), *cert. denied*, 474 U.S. 903, 88 L. Ed. 2d 230, 106 S. Ct. 232 (1985); *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 591 (3d Cir. 1984).

Since 1887 the attorney client privilege has been codified. Act of May 23, 1887, P.L. 158, § 5(d), 1887 Pa. Laws 159. The present codification provides:

> [HN3]
> In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa. Cons. Stat. Ann. § 5928 (Purdon 1982). [HN4] [**16] Where, as here, an attorney represents two clients, the privilege applies to those clients as against a common adversary. *See Tracy v. Tracy*, 377 Pa. 420, 424, 105 A.2d 122, 125 (1954). Pennsylvania law in this respect is consistent with the settled law in all American jurisdictions. *See Eisenberg v. Gagnon*, 766 F.2d 770, 787-78 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S. Ct. 342, 88 L. Ed. 2d 290 (1985); G. Weissenberger, Weissenberger's Federal Evidence § 501.5 (1987); J. Wigmore, Wigmore on Evidence § 2312 (McNaughton rev. 1961). Furthermore it is the attorney client status that determines the existence of the privilege, and not party status. The key is whether the person asserting the privilege had a professional consultation with an attorney, who acts or advises as such. *Okum v. Commonwealth, Unemployment Compensation Bd. of Review*, 77 Pa. Commw. 386, 389, 465 A.2d 1324, 1325 (1983). Thus this court has recognized that non-parties may assert applicable privileges. *See In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d 798, 799-801 (3d Cir. 1979) (non-subpoenaed privilege holder, under [**17] grand jury investigation, could assert privilege); *In re Grand Jury Investigation (Sun Corp.)*, 599 F.2d 1224, 1228 (3d Cir. 1979) (subpoenaed subject of grand jury investigation could assert privilege). Thus the district court committed legal error when it ruled that the non-party status of the insurers was dispositive on their claim of attorney client privilege. They were clients, and no more was required to support their assertion of the privilege.

Even if the privilege were unavailable to non-parties, however, the court also erred in treating the insurance companies as non-parties in this instance. In response to the Rule 17(a) motion of Interstate and Bethlehem the insurers served ratification agreements. Thus for purposes of this case they were co-plaintiffs with United. As a result, even the ground on which the court erroneously relied is on this record completely insupportable.

Since a principal reason relied on for the entry of the order imposing the dismissal sanction was legal error, the dismissal sanction must be reversed and the case remanded to the district court for further [*966] consideration of the claim of attorney client privilege. The [**18] proper procedure for such consideration is that which the defendants asked for in the first place; *in camera* inspection by the court. *See Kerr v. United States District Court*, 426 U.S. 394, 405, 48 L. Ed. 2d 725, 96 S. Ct. 2119 (1976); *United States v. Nixon*, 418 U.S. 683, 706, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974); *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 596 (3d Cir. 1984).

III.

Work Product Privilege

Case 1:05-cv-00499-JJF   Document 231-5   Filed 05/25/2007   Page 19 of 54

839 F.2d 958, *; 1988 U.S. App. LEXIS 1857, **;
25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947

Unlike the attorney client privilege, [HN5] the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3), which provides:

> *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in [**19] the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The district court's ruling that the work product privilege is inapplicable to documents containing mental impressions of anyone other than a lawyer is inconsistent with the plain language of the rule. [HN6] The rule, applicable to civil cases, is a codification of the federal common law rule announced in *Hickman v. Taylor*, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947), and that rule applies even in criminal cases. *United States v. Nobles*, 422 U.S. 225, 236, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975). In the latter context the Supreme Court has observed that while the rule shelters the mental processes of any attorney, it is not so restricted. Rather,

> . . . the doctrine is an intensely practical one, grounded in [**20] the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect materi-

als prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 238-39. Accordingly, federal courts have consistently ruled that [HN7] the work product doctrine is not inapplicable merely because the material was prepared by or for a party's insurer or agents of the insurer. *See Railroad Salvage of Conn., Inc. v. Japan Freight Consolidators (U.S.A.), Inc.*, 97 F.R.D. 37, 41 (E.D.N.Y. 1983) (holding that correspondence between defendant and its liability carriers was protected), *aff'd*, 779 F.2d 38 (2d Cir. 1985); *Home Ins. Co. v. Ballenger Corp.*, 74 F.R.D. 93, 101 (N.D. Ga. 1977) (protecting from discovery a report to plaintiff insurer's home office made by plaintiff's regional claims supervisor). Counsel for an insurer may invoke work product protection in favor of documents prepared by it in anticipation [**21] of litigation even though the insurer is not a named party in an action. *See Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 772-73 (M.D. Pa. 1985) (non-party liability insurer was entitled to a Rule 26(c) protective order as to materials it prepared in anticipation of litigation). In *Hoffman v. Owens-Illinois Glass Co.*, 107 F.R.D. 793, 794 (D. Mass. 1985), the court held that a workers' compensation insurer, holding a subrogation interest in an action brought by the claimant against the manufacturer of a defective machine, was the claimant's "representative" for purposes of asserting the work product doctrine. The *Hoffman* holding is closely in point for [*967] purposes of the instant case, and is unquestionably sound.

It is clear, therefore, that the court erred in holding that the work product privilege applies only to documents reflecting the attorney's mental impressions. Thus the additional reason relied on for the entry of an order imposing the dismissal sanction cannot be relied upon to sustain it. As with the documents on which a claim of attorney client privilege was made, those on which a work product privilege claim was [**22] made must be inspected by the court *in camera* and ruled upon.

IV.

Requests for Admission

Bethlehem and Interstate contend that the district court's ruling on United's answers to requests for admission is not properly before us, because the court reserved decision on the motion to reconsider that ruling. While United's motion for reconsideration was not ruled upon prior to the order dismissing the complaint with prejudice, the record at the time of that final judgment contained the court's undisturbed ruling that the requests would be deemed admitted. [HN8] On an appeal from a

final judgment an appellate court may ordinarily consider all prior rulings of the trial court. If the court had indicated on May 15 that it was ready to reconsider its ruling on the requests for admission in its entirety, we might find persuasive the argument of Bethlehem and Interstate that there was no need to address that ruling. It is clear from the transcript of the May 15 hearing, however, that the court denied United's motion to reconsider the adequacy of its challenged responses. Nothing was left open except further consideration of whether amended answers would be permitted. In these circumstances [**23] it is entirely appropriate to consider whether the court ruled correctly when it deemed the requests for admission to be admitted.

[HN9] Fed. R. Civ. P. 36(a), which authorizes the service of requests for admission, provides as follows with respect to the form of response to such requests:

> The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.

In this case United did deny each of the six contested requests for admission. Thus the provision in Rule 36(a) requiring a statement of reasons why the party cannot truthfully admit or deny has no application. Neither in the district court nor here has Bethlehem or Interstate made any showing that the denials did not meet the substance of the requested admissions. Neither in the district court nor here has Bethlehem or Interstate made any showing that Interstate's [**24] questions were such as required, in good faith, a partial rather than a complete denial. The defendants are at considerable disadvantage in making such a showing, since they never had an opportunity to file moving papers. United is at an even greater disadvantage, however, since it never was informed in what respects Interstate objected to their responses, and thus never had an opportunity to defend the responses in the context of the pleadings, the completed discovery, the form of the questions, and the factual and legal issues which would be tried.

The purpose of Rule 36(a) is to narrow the issues for trial to those which are genuinely contested. See Webb v.

Westinghouse Elec. Corp., 81 F.R.D. 431, 436 (E.D. Pa. 1978); United States v. Watchmakers of Switzerland Information Center, Inc., 25 F.R.D. 197, 201 (S.D.N.Y. 1959). Where, as here, issues in dispute are requested to be admitted, a denial is a perfectly reasonable response. Furthermore, [HN10] the use of only the word "denied" is often sufficient under the rule. See, e.g., Continental Casualty Co. v. Brummel, 112 F.R.D. 77, 81-82 n.2 (D. Colo. 1986); Kleckner v. Glover Trucking Corp., 103 F.R.D. 553, 557 (M.D. Pa. 1984). [**25] "Regardless of the subject matter of the Rule 36 request, the statement [*968] of the fact itself should be in simple and concise terms in order that it can be denied or admitted with an absolute minimum of explanation or qualification." Havenfield Corp. v. H & R Block, Inc., 67 F.R.D. 93, 96 (W.D. Mo. 1973). "A request for an admission, except in a most unusual circumstance, should be such that it could be answered yes, no, the answerer does not know, or a very simple direct explanation given as to why he cannot answer, such as in the case of privilege." Johnstone v. Cronlund, 25 F.R.D. 42, 46 (E.D. Pa. 1960). "Rule 36 should not be used unless the statement of fact sought to be admitted is phrased so that it can be admitted or denied without explanation." Id. at 45.

A comparison of the answers given and the proposed amended answers quoted in the margin illustrates the difference in function between requests for admission and discovery requests such as interrogatories, depositions, or requests for inspection. The proposed amended answers paraphrase the requests for admission, and then cross-reference discovery materials [**26] suggesting that the issues to which the requests are addressed are matters in dispute. The cross-referenced materials are all already in the possession of Bethlehem and Interstate. We are unable, even after inquiring at oral argument, to identify any way in which more specific answers to these requests would in any way facilitate the trial, or trial preparation. Thus the trial court erred when it peremptorily ruled, without examining the specific requests for admission, that United's categorical denials were unresponsive, and that a "deemed admitted" sanction should be imposed.

V.

Conclusion

This case illustrates that even in administering a trial calendar the proverbial admonition "haste maketh waste" is a sound rule of conduct. The district court, disinclined to take the time to examine in camera documents as to which claims of privilege were made, thrust upon Bethlehem and Interstate rulings on the attorney client privilege they did not seek. Those parties were put in the unenviable position of defending here a legal ruling for which no support could be found. In ruling on the work

839 F.2d 958, *; 1988 U.S. App. LEXIS 1857, **;
25 Fed. R. Evid. Serv. (Callaghan) 170; 10 Fed. R. Serv. 3d (Callaghan) 947

product privilege without giving United an opportunity to respond in writing the court disregarded [**27] the controlling court rule and the governing caselaw. By insisting on an oral motion with respect to answers to the requests for admissions and ruling on that motion without a response, and without examining the requests, the court deprived itself of appropriate guidance from any of the parties. Now, after great delay and expense, the case must be returned for further proceedings. The judgment dismissing United's complaint with prejudice will be reversed, and the case remanded for proceedings consistent with this opinion.

# TAB 21

LEXSEE

△
Caution
As of: May 25, 2007

## UNITED STATES OF AMERICA, Petitioner-Appellee, Cross-Appellant, v. MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Respondent-Appellant, Cross-Appellee.

### No. 97-1287, No. 97-1382

### UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

### 129 F.3d 681; 1997 U.S. App. LEXIS 33462; 97-2 U.S. Tax Cas. (CCH) P50,955; 80 A.F.T.R.2d (RIA) 7981; 48 Fed. R. Evid. Serv. (Callaghan) 66; 39 Fed. R. Serv. 3d (Callaghan) 4

#### November 25, 1997, Decided

**PRIOR HISTORY:** [**1] APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. George A. O'Toole, Jr., U.S. District Judge.

**DISPOSITION:** On MIT's appeal, the judgment of the district court affirmed. On the government's cross-appeal, the judgment of the district court refusing to order production of three specified minutes vacated, and the matter remanded.

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Respondent sought review of an order by the United States District Court for the District of Massachusetts which issued a memorandum enforcing petitioner's administrative summons for copies of unredacted legal bills. Petitioner cross-appealed from the district court's order refusing the production by respondent of three remaining minutes of executive and auditing committees.

**OVERVIEW:** Petitioner conducted an examination of respondent's records to determine whether it was still eligible for tax-exempt status. In aid of this examination, petitioner requested copies of billing statements of law firms that had represented respondent and minutes of executive and auditing committees. Respondent supplied the information but redacted information claimed to be covered by attorney-client privilege. It appeared that the

same billing statements and possibly some of the minutes had earlier been provided to another government audit agency. The court affirmed the judgment of the district court because the attorney-client privilege was waived when respondent chose to disclose this privileged documentation to a third party. The court found that respondent's choice may have been reasonable, but it was still a foreseeable gamble. The court vacated the district court's order refusing the production of minutes of certain meeting because respondent's disclosure of the minutes to the audit agency was a disclosure to a potential adversary. The court found that disclosure to a potential adversary waived work product protection.

**OUTCOME:** The district court's order requiring respondent to turn over certain billing statements to petitioner was affirmed because respondent waived the attorney-client privilege when it previously gave the same billing statements to a separate government auditing agency. The court vacated and remanded petitioner's cross-appeal because respondent waived its work production protection when it disclosed the information to a possible adversary.

**CORE TERMS:** disclosure, audit, minutes, work product, attorney-client, billing, waived, disclose, auditing, summons, work product doctrine, government agency, unredacted, forfeit, anticipation of litigation, magic circle, common interest, work-product, contractor, disclosing, selective, outsider, legal theories, confidentiality,

safeguarding, consultation, withholding, regulation, impressions, forfeiture

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] On an appeal respecting a privilege claim, the standard of review depends on the issue. Rulings by the district court on issues of law are reviewed de novo; fact findings are tested under a clear error standard; and discretionary judgments such as evidentiary rulings are reviewed for abuse of discretion.

*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN2] The scope of the attorney-client privilege is governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. Fed. R. Evid. 501.

**COUNSEL:** Jeffrey Swope with whom Matthew P. Schaeffer and Palmer & Dodge LLP were on brief for respondent.

Sara S. Holderness, Tax Division, Department of Justice, with whom Loretta C. Argrett, Assistant Attorney General, Donald K. Stern, United States Attorney, and Charles E. Brookhart, Tax Division, Department of Justice, were on brief for petitioner.

**JUDGES:** Before Boudin, Circuit Judge, Hill, * Senior Circuit Judge, and Pollak, ** Senior District Judge.

     * Of the Eleventh Circuit, sitting by designation.

     ** Of the Eastern District of Pennsylvania, sitting by designation.

**OPINION BY:** BOUDIN

**OPINION:** [*682] BOUDIN, Circuit Judge. This case concerns an attempt by the Massachusetts Institute of Technology to assert the attorney-client privilege and

work-product doctrine in response to a document request by the [**2] Internal Revenue Service. The most important issue presented is whether MIT's disclosure of certain of the documents to another government agency caused it to lose the privilege. The background facts are essentially undisputed.

MIT is a famous university with tax-exempt status under 26 U.S.C. § 501(c)(3). In 1993, the IRS conducted an examination of MIT's records to determine whether MIT still qualified for exempt status and to determine whether it was complying with provisions relating to employment taxes and the reporting of unrelated business income. In aid of this examination, the IRS requested from MIT copies of the billing statements of law firms that had represented MIT and minutes of the MIT Corporation and its executive and auditing committees.

[*683] In response, MIT supplied the documents requested but redacted information claimed to be covered by the attorney-client privilege or the work-product doctrine or both. In mid-1994 the IRS requested that the redacted information be supplied, and MIT declined. At this point the IRS sought to obtain the same documents in unredacted form from the Defense Contract Audit Agency ("the audit agency"), the auditing arm of the Department of [**3] Defense.

It appears that the same billing statements and possibly some or all of the minutes sought by the IRS had earlier been provided to the audit agency pursuant to contracts between MIT and components of the Department of Defense. The audit agency helps entities in the Department of Defense review contract performance to be sure that the government is not overcharged for services. Not surprisingly, the audit agency often reviews the private contractor's books and records.

In November 1994, the audit agency advised the IRS that it would not turn over the documents provided to it by MIT without the latter's consent, which MIT declines to give. The audit agency had made no unconditional promise to keep the documents secret, but its regulations and practices offered MIT some reason to think that indiscriminate disclosure was unlikely. The IRS then served an administrative summons on MIT in December 1994 seeking specific unredacted minutes of nine meetings of the MIT Corporation and auditing and executive committees in 1990 and 1991, and attorneys' billing statements for almost all legal expenses paid or incurred by MIT from July 1, 1990, through June 30, 1991. 26 U.S.C. §§ 7402(b), [**4] 7604(a).

When MIT declined to comply, the IRS in early 1996 petitioned the district court to enforce the summons. The district court obtained briefs, heard arguments and considered the matter without an evidentiary hearing on the basis of the declaration filed by the IRS and an

affidavit submitted by MIT. In January 1997, the district court issued a memorandum and order enforcing the IRS administrative summons as to the unredacted legal bills and the unredacted versions of most of the minutes sought by the IRS.

The district court held that the disclosure of the legal bills to the audit agency forfeited the attorney-client privilege. As to the minutes, the district court said that the privilege remained available because the government had not proved that the minutes had been disclosed to the audit agency. After reviewing the minutes in camera, the court found that three contained privileged material and ordered MIT to turn over the others as unprivileged or because MIT had lost the privilege by disclosing the substance of the minutes in its now unprivileged legal bills.

The district court followed a different path in resolving MIT's work product objection. The court held that [**5] neither the legal bills nor the minutes were "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). It ruled that they were therefore discoverable as ordinary business records. Accordingly, the court did not discuss whether work product protection was waived by disclosure to the audit agency.

MIT now appeals, arguing that disclosure of the billing statements to the audit agency should not forfeit the privilege; MIT no longer claims work product protection for the billing statements. The government has cross-appealed from the district court's refusal to order production of the three remaining minutes; it says that the burden was on MIT to prove that the minutes had not been disclosed to the audit agency. MIT responds that the privilege was not waived even if the minutes were disclosed to the audit agency, and that the minutes remain protected by the work product doctrine.

[HN1] On an appeal respecting a privilege claim, the standard of review depends on the issue. Rulings by the district court on issues of law are reviewed de novo; fact findings are tested under a clear error standard; and discretionary judgments such as evidentiary rulings are reviewed for [**6] abuse of discretion. See United States v. Wilson, 798 F.2d 509, 512 (1st Cir. 1986). On the principal issue before us--forfeiture by disclosure--this case goes about as far as possible in posing an abstract issue of law and review is plenary.

[*684] The question whether MIT forfeited protection in disclosing documents to the audit agency is not governed by any federal constitutional provision, federal statute, or rule prescribed by the Supreme Court. Nor is the enforcement of an IRS summons a matter with respect to which state law supplies a rule of decision. Accordingly, [HN2] the scope of the privilege is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of

reason and experience." Fed. R. Evid. 501. See also United States v. Zolin, 491 U.S. 554, 562, 105 L. Ed. 2d 469, 109 S. Ct. 2619 (1989).

MIT's Appeal. We begin with the attorney-client privilege. That privilege has been familiarly summed up by Wigmore in a formula that federal courts have often repeated:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) [**7] by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 J. Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961). The government argues, and the district court agreed, that by its disclosure to the audit agency, MIT waived the privilege to whatever extent that it might otherwise have protected the billing statements and various of the minutes.

The attorney-client privilege is well-established and its present rationale straightforward: by safeguarding communications between lawyer and client, it encourages disclosures by client to lawyer that better enable the client to conform his conduct to the requirements of the law and to present legitimate claims or defenses when litigation arises. See Upjohn Co. v. United States, 449 U.S. 383, 389-90, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). Waiver issues aside, the contours of the privilege are reasonably stable.

Quite a different scene presents itself when one turns to the problem of "waiver," a loose and misleading label for what is in fact a collection of different rules addressed to different problems. Cases under this "waiver" heading include situations [**8] as divergent as an express and voluntary surrender of the privilege, partial disclosure of a privileged document, selective disclosure to some outsiders but not all, and inadvertent overhearings or disclosures. See McCormick on Evidence § 93, at 341-48 (J.W. Strong ed., 4th ed. 1992).

Even where the cases are limited to those involving a deliberate and voluntary disclosure of a privileged communication to someone other than the attorney or client, the case law is far from settled. But decisions do tend to mark out, although not with perfect consistency, a small circle of "others" with whom information may be shared without loss of the privilege (e.g., secretaries,

129 F.3d 681, *; 1997 U.S. App. LEXIS 33462, **;
97-2 U.S. Tax Cas. (CCH) P50,955; 80 A.F.T.R.2d (RIA) 7981

interpreters, counsel for a cooperating co-defendant, a parent present when a child consults a lawyer). n1

> n1 See, e.g., United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989); Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir. 1984); Indian Law Resource Center v. Department of the Interior, 477 F. Supp. 144, 148 (D.D.C. 1979); J. Weinstein & M. Berger, Weinstein's Federal Evidence § 503.08[2], at 503-36 (J. McLaughlin ed., 2d ed. 1997).

[**9]

Although the decisions often describe such situations as ones in which the client "intended" the disclosure to remain confidential, see, e.g., Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir. 1984), the underlying concern is functional: that the lawyer be able to consult with others needed in the representation and that the client be allowed to bring closely related persons who are appropriate, even if not vital, to a consultation. Cf. Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991). An intent to maintain confidentiality is ordinarily necessary to continued protection, but it is not sufficient.

On the contrary, where the client chooses to share communications outside this magic circle, the courts have usually refused to extend the privilege. n2 The familiar platitude [*685] is that the privilege is narrowly confined because it hinders the courts in the search for truth. See Fisher v. United States, 425 U.S. 391, 403, 48 L. Ed. 2d 39, 96 S. Ct. 1569 (1976); 8 Wigmore, supra, § 2291, at 554. Fairness is also a concern where a client is permitted to choose to disclose materials to one outsider while withholding them from another. See, e.g., [**10] Permian Corp. v. United States, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

> n2 In addition to the cases cited in note 3 below, see In re Grand Jury Proceedings, 78 F.3d 251, 254 (6th Cir. 1996); United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982); In re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 818 (D.C. Cir. 1982); In re Horowitz, 482 F.2d 72, 81 (2d Cir.), cert. denied, 414 U.S. 867, 38 L. Ed. 2d 86, 94 S. Ct. 64 (1973); McCormick on Evidence, supra, § 93, at 347-48.

Should this inclination not to protect a document disclosed outside the circle apply where, as here, the initial disclosure was to and at the request of a government agency? This problem has presented itself to six circuits. The most common cases have been disclosures of otherwise privileged attorney-client communications to the Securities and Exchange Commission by corporations during voluntary internal investigations or in response to SEC subpoenas. The Eighth Circuit, en banc but without more than a paragraph of analysis, treated this kind of disclosure [**11] as not comprising a total waiver of the privilege. See Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1978) (en banc). Subsequently, the Second, Third, Fourth, Federal and D.C. Circuits took the opposite view and ruled that such limited disclosures do destroy the privilege. n3

> n3 See Genentech, Inc. v. United States Internat'l Trade Comm'n, 122 F.3d 1409, 1417 (Fed. Cir. 1997); In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993); Westinghouse, 951 F.2d at 1424-26; In re Martin Marietta Corp., 856 F.2d 619, 623-24 (4th Cir. 1988), cert. denied, 490 U.S. 1011, 104 L. Ed. 2d 169, 109 S. Ct. 1655 (1989); Permian, 665 F.2d at 1220-21.

The primary argument in favor of the Eighth Circuit position is that loss of the privilege may discourage the frank exchange between attorney and client in future cases, wherever the client anticipates making a disclosure to at least one government agency. We put to one side the interest of the government agency in obtaining voluntary disclosures; such agencies [**12] usually have means to secure the information they need and, if not, can seek legislation from Congress. By contrast, the safeguarding of the attorney-client relationship has largely been left to the courts, which have a comparative advantage in assessing consequences in this sphere.

But MIT, like any client, continues to control both the nature of its communications with counsel and the ultimate decision whether to disclose such communications to third parties. The only constraint imposed by the traditional rule here invoked by the government--that disclosure to a third party waives the privilege--is to limit selective disclosure, that is, the provision of otherwise privileged communications to one outsider while withholding them from another. MIT has provided no evidence that respecting this constraint will prevent it or anyone else from getting adequate legal advice.

Admittedly, the arguments on the other side are far from overwhelming. The IRS' search for truth will not be much advanced if MIT simply limits or recasts its disclosures to the audit agency. But the general principle that disclosure normally negates the privilege is worth maintaining. To maintain it here makes [**13] the law more predictable and certainly eases its administration. Following the Eighth Circuit's approach would require, at

129 F.3d 681, *; 1997 U.S. App. LEXIS 33462, **;
97-2 U.S. Tax Cas. (CCH) P50,955; 80 A.F.T.R.2d (RIA) 7981

the very least, a new set of difficult line-drawing exercises that would consume time and increase uncertainty.

MIT says that even if we are not prepared to follow the Eighth Circuit onto new ground, MIT's disclosure to the audit agency should be regarded as akin to the disclosure by a client's lawyer to another lawyer representing another client engaged in a common defense. Invoking the concept of "common interest," MIT seeks to compare its situation to cases where disclosure has been allowed, without forfeiting the privilege, among separate parties similarly aligned in a case or consultation (e.g., codefendants, insurer and insured, patentee and licensee). n4

> n4 Compare In re Regents of Univ. of Cal., 101 F.3d 1386, 1390-91 (Fed. Cir. 1996), cert. denied, 137 L. Ed. 2d 695, 117 S. Ct. 1484 (1997), and Hewlett-Packard Co. v. Bausch & Lomb, Inc., 115 F.R.D. 308, 310 (N.D. Cal. 1987), and Roberts v. Carrier Corp., 107 F.R.D. 678, 687-88 (N.D. Ind. 1985), with In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 922-23 (8th Cir.), cert. denied, 117 S. Ct. 2482 (1997), and Linde Thomson Langworthy Kohn & Van Dyke, P.C., v. Resolution Trust Corp., 303 U.S. App. D.C. 316, 5 F.3d 1508, 1515 (D.C. Cir. 1993).

[**14]

[*686] In a rather abstract sense, MIT and the audit agency do have a "common interest" in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills. But this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients--who are working together in prosecuting or defending a lawsuit or in certain other legal transactions--can exchange information among themselves without loss of the privilege. To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial, would be to dissolve the boundary almost entirely.

MIT further argues that the disclosure to the audit agency was not "voluntary" because of the practical pressures and the legal constraints to which it was subject as a government contractor. The extent of those pressures and constraints is far from clear, n5 but assuming arguendo that they existed, MIT chose to place itself in this position by becoming a government contractor. In short, MIT's disclosure to the audit agency resulted from its own voluntary choice, even if that choice was made at the time it became a defense contractor [**15] and subjected itself to the alleged obligation of disclosure. See In re John Doe Corp., 675 F.2d 482, 489 (2d Cir. 1982).

> n5 MIT's main citation for its duty to disclose is not to a statute or regulation but to a procedures manual maintained by the audit agency. There is no actual evidence that MIT would have been denied payment if it had sought to negotiate some lesser disclosure.

Anyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those disclosures and say that, although the disclosure itself is not necessary to foster attorney-client communications, neither does it forfeit the privilege. With rare exceptions, courts have been unwilling to start down this path--which has no logical terminus--and we join in this reluctance.

We add, finally, a word about reliance and fair warning. MIT may have had some reason [**16] to think that the audit agency would not disclose the documents to the IRS (and the agency did not do so). But MIT had far less reason to think that it could disclose documents to the audit agency and still maintain the privilege when IRS then sought the same documents. See note 3, above. The choice to disclose may have been reasonable but it was still a foreseeable gamble.

The IRS Appeal. We turn now to the government's cross-appeal. Here, the IRS challenges the district court's refusal to require MIT to produce three specific minutes. The refusal reflected the district court's view that the documents contained privileged material, and that there was no waiver because MIT had not been shown to have disclosed those minutes to the audit agency. On the latter point, MIT effectively concedes error, and properly so.

Where privilege is claimed and the opponent alleges a specific disclosure, the burden of proof is upon the claimant to show nondisclosure wherever that is material to the disposition of the claim. Cf. United States v. Wilson, 798 F.2d 509, 512-13 (1st Cir. 1986). Here, MIT concedes that it cannot prove that the minutes in question were withheld from the audit [**17] agency. Instead, it proffers alternative grounds for sustaining the district court's judgment as to these minutes, namely, that the minutes were protected under the attorney-client privilege and the work product doctrine and that these protections were not waived even though the minutes were turned over to the audit agency.

A party may defend a judgment in its favor on any legitimate ground without appealing from the judgment on that issue. Martin v. Tango's Restaurant, Inc., 969 F.2d 1319, 1325 (1st Cir. 1992). Our discussion of the

billing statements disposes of MIT's argument that the protection of the attorney-client privilege survived disclosure to the audit [*687] agency. We therefore turn to the work product doctrine. In doing so, we reject the government's claim that MIT waived this work product argument by only raising it in its reply brief; MIT's "reply" brief was effectively its answering brief on the government's cross appeal, and the government filed its own "reply" in turn.

The district court assumed that work product protection did not apply because the minutes were not prepared "in anticipation of litigation," as required by Fed. R. Civ. P. 26(b)(3). MIT argues that [**18] the minutes contained substantive information that did represent attorney work product even if the minutes had a more general function. There is little law in this area--partly, one suspects, because work product usually remains embodied in documents unquestionably prepared for litigation or, if given to the client, in documents independently protected by the attorney client privilege.

The government has chosen in its brief to assume that, to the extent that the minutes contained "the mental impressions, conclusions, opinions, or legal theories" of MIT's attorneys, Fed. R. Civ. P. 26(b)(3), the district court erred in concluding that work product lost its protection when repeated in another confidential document not prepared in anticipation of litigation. A Third Circuit precedent supports this assumption, which MIT presses and the government does not resist. See In re Ford Motor Co., 110 F.3d 954, 967 (3d Cir. 1997). In view of the government's concession, we will take the point as settled for this case.

Nevertheless, the government claims that any such protection was lost when the minutes were turned over to the audit agency, MIT having conceded that it cannot prove that [**19] the minutes were not so disclosed. One might wonder why the standard of waiver for the attorney-client privilege--that any voluntary disclosure outside the magic circle constitutes waiver--would not also apply to the work product doctrine. Equivalent waiver standards would make easier the resolution of evidentiary disputes where, as often happens, the two objections are raised together.

Nonetheless, the cases approach uniformity in implying that work-product protection is not as easily waived as the attorney-client privilege. The privilege, it is said, is designed to protect confidentiality, so that any disclosure outside the magic circle is inconsistent with the privilege; by contrast, work product protection is provided against "adversaries," so only disclosing material in a way inconsistent with keeping it from an adversary waives work product protection. At least five circuits have adopted this rule in some form. n6 See also 8

C. Wright, A. Miller & R. Marcus, Federal Practice and Procedure § 2024, at 368-69 (1994) (citing cases).

n6 See Westinghouse, 951 F.2d at 1428-29; Steinhardt Partners, 9 F.3d at 234-35; In re Subpoenas Duces Tecum, 238 U.S. App. D.C. 221, 738 F.2d 1367, 1371-75 (D.C. Cir. 1984); Martin Marietta Corp., 856 F.2d at 625; In re Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d 844, 846-47 (8th Cir. 1988).

[**20]

Perhaps such formulations simply beg the question. If one wanted to explain the discrepant outcomes, it might be more persuasive to say that the privilege is strictly confined because it is absolute; on the other hand, work product protection (with certain qualifications) can be overcome by a sufficient showing of need. Fed. R. Civ. P. 26(b)(3). In all events, it would take better reason than we have to depart from the prevailing rule that disclosure to an adversary, real or potential, forfeits work product protection.

MIT's disclosure to the audit agency was a disclosure to a potential adversary. The disclosures did not take place in the context of a joint litigation where the parties shared a common legal interest. The audit agency was reviewing MIT's expense submissions. MIT doubtless hoped that there would be no actual controversy between it and the Department of Defense, but the potential for dispute and even litigation was certainly there. The cases treat this situation as one in which the work product protection is deemed forfeit. See, e.g., Steinhardt Partners, 9 F.3d at 234; Westinghouse, 951 F.2d at 1428-31; In re Subpoenas Duces Tecum, 738 F.2d at 1372 [**21] (D.C. Cir. 1984). [*688]

In closing, it may be helpful to stress that--with regard to both the attorney-client privilege and the work product doctrin ine--we are concerned only with loss of protection as to the very documents already disclosed to the audit agency. Nothing in this opinion is intended to be directed to the different and difficult question when disclosure of one document warrants forfeiture of protection for a different but related document. That issue was touched on in the district court but has not been pursued on appeal.

Similarly, even where work product can be discovered, the governing rule directs that "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3). Conceivably, the strong policy underlying this reservation might serve to protect such materials, even if protection of ordinary work product mate-

129 F.3d 681, *; 1997 U.S. App. LEXIS 33462, **;
97-2 U.S. Tax Cas. (CCH) P50,955; 80 A.F.T.R.2d (RIA) 7981

rials were deemed waived because of selective disclosure. This possibility has not been briefed or argued to us; it may or may not be pertinent in this case; and we mention it only to stress that we are not [**22] deciding the issue.

Accordingly, on MIT's appeal, the judgment of the district court is affirmed. On the government's cross-appeal, the judgment of the district court refusing to order production of three specified minutes is vacated, and the matter is remanded to the district court for further proceedings consistent with this opinion.

It is so ordered.

**TAB  22**

LEXSEE

⚠
Caution
As of: May 25, 2007

**WESTINGHOUSE ELECTRIC CORPORATION; and WESTINGHOUSE
INTERNATIONAL PROJECTS COMPANY, Petitioners v. THE REPUBLIC OF
THE PHILIPPINES; and NATIONAL POWER CORPORATION, Respondents
and HONORABLE DICKINSON R. DEBEVOISE, UNITED STATES DISTRICT
JUDGE, Nominal Respondent**

**No. 90-5920**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**951 F.2d 1414; 1991 U.S. App. LEXIS 29515; 35 Fed. R. Evid. Serv. (Callaghan)
1070; 22 Fed. R. Serv. 3d (Callaghan) 377**

**January 25, 1991, Argued
December 19, 1991, Filed**

**SUBSEQUENT HISTORY:** As Amended. As Corrected April 8, 1992.

**PRIOR HISTORY:** [**1] On Appeal From the United States District Court for the District of New Jersey. (D.C. Civil No. 88-05150)

**DISPOSITION:** Denied

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner corporations filed a petition for writ of mandamus after a decision of the United States District Court for the District of New Jersey that petitioners' disclosures of documents to federal agencies during the course of an investigation waived attorney-client privilege and work product doctrine completely, thus allowing discovery of documents in present litigation.

**OVERVIEW:** Petitioner corporations sought a writ of mandamus to review a lower court ruling that by disclosing documents to federal agencies during the course of investigations, petitioners waived their attorney-client privilege and work-product doctrine, so that documents could be discovered in other litigation. The court ruled that mandamus was a proper means of immediate appellate review of orders compelling the production of

documents claimed to be protected by privilege or other confidentiality interests, but it denied the petition. The court held that the attorney-client privilege was waived by petitioner's voluntary disclosure of privileged communications to a third party, since the disclosure was not necessary to obtain informed legal advice. It also held that protection of the work-product doctrine was fully waived because disclosure to the agencies did not further the doctrine's underlying goal of protecting an attorney's work product from falling into the hands of an adversary, since they were adversaries.

**OUTCOME:** The court denied the writ of mandamus in review of a lower court ruling that petitioner corporations waived attorney-client privilege and work-product doctrine by voluntarily disclosing confidential information to federal agencies because disclosure was unnecessary to obtain legal advice and did not further the goal of protecting work product from disclosure to adversaries.

**CORE TERMS:** disclosure, attorney-client, work-product, selective, waived, confidentiality, waiver rule, disclose, work product, partial, waive, disclosing, mandamus, third party, government agencies, subpoena, regulations, waiving, privileged information, discovery, confidentiality agreement, government agency, cooperate, voluntary disclosure, waiver doctrine, legal advice, grand jury, confidential, investigating, cooperation

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

**LexisNexis(R) Headnotes**

*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN1] Although the attorney-client privilege ordinarily is waived by the disclosure of privileged information to a third party, a circuit split exists over whether waiver occurs when the disclosure is made to the government. The Eighth Circuit holds that the attorney-client privilege is waived only with respect to the government, and the D.C. Circuit takes the position that the disclosure of privileged information to any third party, including the government, destroys the privilege. The D.C. Circuit's position represents the majority rule that the Third Circuit adopts.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN2] The work-product doctrine is not absolute and may be waived.

*Civil Procedure > Remedies > Writs > All Writs Act*
*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*
*Governments > Courts > Creation & Organization*
[HN3] Mandamus is authorized by the All Writs Act, 28 U.S.C.S. § 1651(a) (1988), which provides that the Supreme Court and all courts established by an act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law. The language of § 1651 itself establishes a prerequisite for a court's jurisdiction. Because the writ must be "in aid of" the court's jurisdiction, the case must be one that lies within some present or potential exercise of appellate jurisdiction. In addition, mandamus must not be used as a mere substitute for appeal.

*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*
[HN4] An order compelling or denying discovery does not fall within the orders that may be appealed under 28 U.S.C.S. § 1292(a).

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*

*Trade Secrets Law > Misappropriation Actions > Elements > Confidentiality*
[HN5] Mandamus may properly be used as a means of immediate appellate review of orders compelling the production of documents claimed to be protected by privilege or other interests in confidentiality.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN6] Mandamus is appropriate only in extraordinary situations, and the writ will be granted only where the petitioner has shown that a district court has committed a clear error of law.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Civil Procedure > Remedies > Writs > General Overview*
*Evidence > Inferences & Presumptions > General Overview*
[HN7] A petitioner seeking mandamus has the burden of showing that its right to mandamus relief is "clear and indisputable."

*Evidence > Privileges > Attorney-Client Privilege > Scope*
[HN8] The purpose of the attorney-client privilege is to encourage full and frank communication between attorneys and their clients. Full and frank communication is not an end in itself, however, but merely a means to achieve the ultimate purpose of the privilege: promoting broader public interests in the observance of law and administration of justice. The attorney-client privilege is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.

*Evidence > Privileges > Attorney-Client Privilege > Scope*
[HN9] Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly. The privilege protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Evidence > Privileges > Government Privileges > Waiver*

[HN10] When a client voluntarily discloses privileged communications to a third party, the attorney-client privilege is waived.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Evidence > Privileges > Government Privileges > Waiver*

[HN11] Under traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Evidence > Privileges > Government Privileges > Waiver*
*Securities Law > Liability > Disclosures > General Overview*

[HN12] 17 C.F.R. § 240.0-.04 (1978) provides that information obtained in the course of a non-public investigation must be made a matter of public record and provided upon request if the disclosure of the confidential information was not contrary to the public interest.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*

[HN13] A party who discloses documents protected by the work-product doctrine may continue to assert the doctrine's protection only when the disclosure furthers the doctrine's underlying goal of protecting an attorney's work product from falling into the hands of an adversary.

**COUNSEL:** RICHARD W. CLARY (Argued), DAVID BOIES, Cravath, Swaine & Moore, Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019, RAYMOND M. TIERNEY, JR. WILLIAM D. SANDERS, Shanley & Fisher, P.C., 131 Madison Avenue, Morristown, NJ 07962, JEROME J. SHESTACK, Schnader, Harrison, Segal & Lewis, Suite 3600, 1600 Market Street, Philadelphia, PA 19103, JONATHAN D. SCHILLER, Donovan, Leisure, Rogovin, Huge & Schiller, 1250 Twenty-

Fourth Street, NW, Washington, DC 20037, Attorneys for Petitioner

DAVID   J.   CYNAMON   (Argued),   MARK AUGENBLICK, P.C., ELLEN M. JAKOVIC, Shaw, Pittman, Potts & Trowbridge, 2300 N Street, NW, Washington, DC 20037, PAUL A. ROWE, ALAN S. NAAR, Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, P.O. Box 5600, Woodbridge, NJ 07095, Reichler, Appelbaum & Wippman, 1701 K Street NW, Suite 700, Washington, DC 20036, Clifford & Warnke, 815 Connecticut Avenue, NW, Washington, DC 20036, Attorneys for Respondent

**JUDGES:** Before: BECKER, HUTCHINSON, Circuit Judges and ATKINS, District Judge *

> * The Honorable C. Clyde Atkins, Senior United States District Judge for the Southern District of Florida, sitting by designation.

[**2]

**OPINION BY:** BECKER

**OPINION:**

[*1417] OPINION OF THE COURT

BECKER, *Circuit Judge.*

This petition for a writ of mandamus requires us to resolve an important issue that has divided the circuits: whether a party that discloses information protected by the attorney-client privilege and the work-product doctrine n1 in order to cooperate with a government agency that is investigating it waives the privilege and the doctrine only as against the government, or waives them completely, thereby exposing the documents to civil discovery in litigation between the discloser and a third party. The issue arises in an action brought by the Republic of the Philippines (the "Republic") and its National Power Corporation ("NPC") against Westinghouse Electric Corporation and its wholly-owned subsidiary, Westinghouse International Projects Company (collectively "Westinghouse"). The Republic and the NPC allege that Westinghouse obtained a large power plant contract in the Philippines by bribing a henchman of former President Ferdinand Marcos. Their complaint charges that Westinghouse and others tortiously interfered with and conspired to tortiously interfere with the fiduciary duties that President Marcos owed to the Philippine [**3] people and to the NPC. The complaint seeks damages on a variety of theories.

> n1 Although some writers refer to a work-product "privilege," we prefer the term "doc-

trine," for the doctrine encompasses both a limited immunity from discovery and a qualified evidentiary privilege. See *United States v Arthur Young & Co.*, 465 U.S. 805, 817-19, 104 S Ct 1495, 79 L. Ed. 2d 826 (1984) (distinguishing work-product immunity from accountant-client testimonial privilege and rejecting both); *Upjohn Co. v United States*, 449 U.S. 383, 397-402, 101 S. Ct. 677 , 66 L. Ed. 2d 584 (1981) (referring to work-product doctrine distinct from attorney-client privilege). See generally Sherman L. Cohn, *The Work Product Doctrine: Protection, Not Privilege*, 71 Geo. L.J. 917 (1983).

During discovery, the Republic sought certain documents generated during an internal investigation conducted by Westinghouse's outside counsel. The investigation was a response to an investigation [**4] by the Securities and Exchange Commission ("SEC") into allegations that Westinghouse had obtained contracts by bribing foreign officials. Westinghouse disclosed the documents in question to the SEC in order to cooperate with the agency's investigation. Westinghouse later disclosed the same documents, as well as other, related documents, to the Department of Justice ("DOJ") in order to cooperate with an investigation conducted by the DOJ. Westinghouse's petition for mandamus follows the district court's ruling that the disclosures effected a complete waiver of the attorney-client privilege and the work-product doctrine, thus rendering the documents available to the Republic in discovery.

[*1418] For the reasons that follow, we hold that by disclosing documents to the SEC and to the DOJ, Westinghouse waived both the attorney-client privilege and the work-product doctrine with respect to those documents. We also hold that we lack jurisdiction to review Westinghouse's request for a writ of mandamus commanding the turnover of certain documents that the Republic and the NPC shared with the DOJ pursuant to an agreement for mutual legal assistance.

I. FACTUAL BACKGROUND n2

n2 A more detailed account is found in the district court's two previous opinions in this case. See *Republic of the Philippines v Westinghouse Electric Corp.*, 714 F. Supp. 1362, 1364-67 (DNJ 1989), and *Republic of the Philippines v Westinghouse Electric Corp.*, 132 F.R.D. 384, 385-86 (DNJ 1990). See also *Republic of the Philippines v Westinghouse Electric Corp.*, 949 F.2d 653, 1991 U.S. App LEXIS 26992 (3d Cir) (denying stay pending appeal of district court order directing the unsealing of material filed under seal in

connection with Westinghouse's motion for summary judgment in this action).

[**5]

A. *The Contract*

In the mid-1970s, Westinghouse sought and obtained the prime contract to construct the first Philippine nuclear power plant and to ready it for use on a turnkey basis. n3 As part of Westinghouse's efforts to procure the contract, it retained as its "special sales representative" Herminio T. Disini, a Philippine businessman and close friend and associate of then-President Marcos. Disini agreed to promote Westinghouse's interests with the NPC, which was the Philippine government agency responsible for electric power generation and for contract negotiations on the power plant project. Westinghouse received the prime contract for the power plant. Several years later, newspaper articles appeared in the Philippine and American press, charging that the company had procured the contract by passing bribes to Philippine government officials through Disini.

n3 A turnkey project is one in which the contractor is engaged to design, construct, and otherwise ready the plant for operation and then to turn over the key to the owner. See *Ebasco Services, Inc. v Pennsylvania Power & Light Co.*, 402 F. Supp. 421, 424-25 (ED Pa 1975).

[**6]

B. *The SEC Investigation and Westinghouse's Disclosures Pursuant Thereto*

In January 1978, shortly after the appearance of the press reports concerning Westinghouse's alleged misconduct in connection with the Philippine nuclear plant, the SEC commenced an investigation into whether Westinghouse had violated United States securities laws by making illegal payments to obtain the contract. In March 1978, Westinghouse retained the law firm Kirkland & Ellis to conduct an internal investigation into whether company officials had made improper payments. In the course of the internal investigation, which lasted until November 1978, Kirkland & Ellis produced two letters reporting its findings.

The law firm, at the behest of Westinghouse, showed the SEC investigators one of the letter reports and, in addition, orally presented its findings to the agency. Kirkland & Ellis did not supply the SEC with any of the documents underlying the presentation and the report, and the SEC agreed not to retain the report. West-

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

inghouse asserts that in disclosing to the SEC the results of the Kirkland & Ellis investigation, it relied upon the SEC's confidentiality regulations, n4 as well as the Eighth [**7] Circuit's decision in *Diversified Industries, Inc. v Meredith, 572 F.2d 596 (8th Cir 1977)* (en banc), as creating a reasonable expectation of continuing confidentiality for the materials shown to the SEC.

> n4 The SEC regulations in effect at the time provided that "information or documents obtained by the [SEC] in the course of any investigation or examination, unless made a matter of public record, shall be deemed non-public." 17 CFR § 203.2 (1978). The regulations further provided that information or documents obtained in the course of an investigation would be deemed and kept confidential by SEC employees and officers unless disclosure was specifically authorized. 17 CFR § 240.0-4 (1978).

In 1980, the SEC served subpoenas on Disini, based on allegations that he had engaged in illegal activities relating to the award of the prime contract for the power [*1419] plant. Thereafter, counsel for Westinghouse and for Disini entered into a joint defense agreement, under which they agreed to exchange -- and to maintain [**8] confidentiality with respect to -- privileged information and work product. Counsel for Disini, the law firm Baker & McKenzie, subsequently began negotiating with the SEC on his behalf. As a result, the accounting firm Coopers & Lybrand was retained to perform audits tracing the funds that Westinghouse had paid to Disini. Coopers & Lybrand summarized the results of these audits in a report that Disini made available to the SEC, which in turn agreed to keep the contents of the report confidential and neither to copy nor to retain it. Pursuant to their joint defense agreement, Disini provided Westinghouse with a copy of the Coopers & Lybrand report. The SEC discontinued its investigation of Westinghouse in April 1983.

C.

*The Department of Justice Investigations and Westinghouse's Disclosures Pursuant Thereto*

In 1978, the DOJ began to investigate Westinghouse. The DOJ's investigation explored whether Westinghouse had made illegal payments to obtain contracts not only in the Philippines, but also in other countries. A grand jury subsequently issued a subpoena, with which Westinghouse complied, requesting that the company produce certain privileged documents (not at issue here) [**9] subject to the confidentiality protections of FRCrP 6(e). The DOJ's investigation ended when Westinghouse entered into a plea agreement concerning payments that the

company admitted making in order to obtain business in Egypt.

In 1986, after Marcos was deposed as President of the Philippines, the DOJ reactivated its 1978 investigation of Westinghouse's conduct in procuring the turnkey contract on the Philippine nuclear plant. A grand jury subpoenaed the Kirkland & Ellis letters reporting the results of Westinghouse's internal investigation, as well as all documents accumulated in connection with that investigation. In an effort to preserve its attorney-client privilege and work-product protection, Westinghouse moved to quash the subpoena. After entering into a confidentiality agreement with the DOJ, subsequently memorialized in a stipulated court order entered in the district court for the Western District of Pennsylvania, Westinghouse disclosed the subpoenaed documents to the grand jury. According to Westinghouse, this agreement, which was itself confidential, provided

that the [DOJ] review at Westinghouse counsel's office (but not keep copies of) attorney-client privileged and [**10] work product protected materials in the Kirkland & Ellis files, that the information contained therein would not be disclosed to anyone outside of the DOJ, and that such review of the Kirkland & Ellis documents would not constitute a waiver of Westinghouse's work product and attorney-client privileges.

See 132 F.R.D. at 385-86 . The DOJ's investigation is apparently still ongoing (at least the record does not indicate the contrary).

D.

*The Republic's Investigation*

In 1987, the Republic initiated its own investigation into the contract-procurement activities of Westinghouse and a second company, Burns & Roe Enterprises, Inc., a New Jersey corporation that had obtained the architecture and engineering contract on the power plant project and that also had secured the services of Disini as a "special sales representative." The Republic's Presidential Commission on Good Government (the "PCGG"), the government entity charged with investigating Westinghouse's and Burns & Roe's conduct, subsequently entered into an agreement with the DOJ, denominated the "Agreement on Procedures for Mutual Legal Assistance" (the "Agreement").

The Agreement, which is still in force, provides [**11] that the PCGG and to the DOJ will exercise their best efforts to provide one another with information and materials relevant to their concurrent investigations that can be used in any subsequent criminal, civil, and administrative proceedings. Under the Agreement, the PCGG

Case 1:05-cv-00499-JJF    Document 231-5    Filed 05/25/2007    Page 36 of 54

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

and the DOJ also have undertaken to maintain confidentiality [*1420] as to all correspondence concerning shared information.

## II. PROCEDURAL HISTORY

### A. *The Current Proceedings*

In December 1988, the Republic and the NPC brought suit against Westinghouse and Burns & Roe in the district court for the District of New Jersey. In a fifteen-count complaint, the Republic and the NPC alleged breach of contract, fraud, negligence, tortious interference with fiduciary relationship, civil conspiracy, violation of the federal Racketeer Influenced and Corrupt Organizations Act, and antitrust violations. The complaint also included a number of pendent state claims. Pursuant to a clause in its contract with the NPC, Westinghouse moved to stay the action pending arbitration. Relying on *Prima Paint Corp. v Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 87 S. Ct. 1801 , 18 L. Ed. 2d 1270 (1967), as well as other Supreme Court [**12] precedents, the district court stayed all claims except (1) the claim that Westinghouse, along with Burns & Roe, tortiously interfered with Marcos's performance of the fiduciary duties that he owed to the Philippine people and (2) the claim that the two defendants conspired to prevent Marcos from performing his fiduciary duties to the Philippine people and to the NPC.

In the course of discovery on these two claims, the Republic requested that Westinghouse produce the documents that it had made available to the SEC and to the DOJ. Westinghouse objected to this discovery request, invoking both the work-product doctrine and the attorney-client privilege. Westinghouse sought, in turn, to discover documents that the Republic had shared with the DOJ under the Agreement. The Republic resisted, asserting that these documents were protected by the work-product doctrine.

The magistrate judge supervising discovery concluded that Westinghouse had waived its attorney-client privilege regarding the documents it disclosed to the SEC and to the DOJ because at least in adversarial situations, once disclosure has been made to a government agency, any privilege is lost, notwithstanding any confidentiality [**13] agreement between Westinghouse and the government. He therefore ruled that Westinghouse must identify and produce all documents disclosed to the DOJ and to the SEC, although he invited Westinghouse to appeal this ruling to the district court.

The magistrate judge further held that the documents that Westinghouse had requested from the Republic were protected by the work-product doctrine and therefore were not subject to discovery. The magistrate judge reasoned that, because the DOJ is an *ally* of the Republic,

the latter, by sharing information with the agency, had not subverted the principles of the adversary system in which the work-product doctrine is grounded. The magistrate judge also reasoned that the sharing of information between the DOJ and the Republic was "highly unlikely" to lead to the disclosure of the information to adversaries.

### B. *The District Court's Opinion*

The district court affirmed both rulings. First, the court observed that [HN1] although the attorney-client privilege ordinarily is waived by the disclosure of privileged information to a third party, a circuit split exists over whether waiver occurs when the disclosure is made to the government. Because this [**14] court has not previously resolved the issue, the district court had to choose between the Eighth Circuit's holding in *Diversified Industries, Inc. v Meredith*, 572 F.2d 596 (8th Cir 1977) (en banc), that the attorney-client privilege is waived only with respect to the government, and the D.C. Circuit's position, articulated in *Permian Corp. v United States*, 214 App. D.C. 396, 665 F.2d 1214 (DC Cir 1981), that the disclosure of privileged information to any third party, including the government, destroys the privilege.

In *United States v Rockwell International*, 897 F.2d 1255 (3d Cir 1990), we expressly reserved the question whether the disclosure of protected information effects a complete, or only a selective, waiver of [*1421] the attorney-client privilege. The district court determined, however, that our earlier decision in *In re Grand Jury Investigation (Sun Co.)*, 599 F.2d 1224 (3d Cir 1979), effectively had resolved the issue for two reasons. First, the court concluded that our explicit rejection of *Diversified's* reasoning regarding the appropriate scope of the attorney-client privilege in the corporate context in *Sun Co.* [**15] implicitly rejected *Diversified's* reasoning in all contexts. Second, the court concluded that because we had sought in *Sun Co.* to enhance the development of a *uniform* rule concerning the application of the attorney-client privilege to corporate communications, we also would adopt the *majority* rule on whether the disclosure of privileged information to the government vitiates the privilege. The court took the D.C. Circuit's position to represent the majority rule that we would adopt.

The district court also held that the documents that Westinghouse had disclosed to the SEC and to the DOJ were not protected by the work product doctrine set forth in FRCP 26(b)(3). Citing the Supreme Court's decision in *United States v Nobles*, 422 U.S. 225, 95 S. Ct. 2160 , 45 L. Ed. 2d 141 (1975), as well as this court's decision in *Sun Co.*, the district court emphasized that [HN2] the work-product doctrine is not absolute and may be waived. 132 F.R.D. at 388-89 . Noting that this court had

not yet indicated the circumstances under which the work-product doctrine is waived, id at 389, the court looked to the opinions of other courts, id at 389-90. [**16] n5 On the basis of those opinions, the district court concluded that "since the work-product privilege doctrine is based on maintaining a healthy adversarial system, . . . once the privileged information is disclosed to any adversary the privilege is destroyed." Id at 390. Implicitly determining that the SEC and the DOJ were Westinghouse's adversaries, the court held that by voluntarily disclosing information and documents to these agencies, Westinghouse had waived the right to assert the protection of the doctrine.

> n5 The decisions that the district court looked to include *In re Chrysler Motors Corporation Overnight Evaluation Program Litigation*, 860 F.2d 844 (8th Cir 1988), *In re Subpoenas Duces Tecum*, 238 App. D.C. 221, 738 F.2d 1367 (DC Cir 1984), *In re Sealed Case*, 219 App. D.C. 195, 676 F.2d 793 (DC Cir 1982), and *Chubb Integrated Systems v National Bank of Washington*, 103 F.R.D. 52 , 224 U.S.P.Q. (BNA) 1002 (DDC 1984).

In contrast, the district court held that because the DOJ and the [**17] Republic are litigation "allies," their mutual disclosure of information under the Agreement did not give rise to a corresponding waiver of work-product protection. Id at 390-91. The court noted that this holding was consistent with its decision in *Shulton, Inc. v Optel Corp.*, 1987 U.S. Dist. LEXIS 10097 (D.N.J.). 132 F.R.D. at 390 . Following *Shulton*, the court reasoned that "disclosing information to any ally may strengthen, rather than destroy, the adversary process, as allies who fortify their cases against their mutual adversary have a greater chance of defeating that adversary." Id at 391.

The district court subsequently denied Westinghouse's motions for reargument or, in the alternative, for certification pursuant to 28 U.S.C. § 1292(b). The court, however, concluded that Westinghouse had raised "substantial questions" concerning the application of the attorney-client privilege and the work-product doctrine "which should be resolved by the Third Circuit in the last instance rather than myself." Therefore, the court granted Westinghouse's motion for a stay pending efforts to review its disclosure order.

### III. APPELLATE JURISDICTION [**18]

In its petition for the extraordinary writ of mandamus, Westinghouse asks that we set aside both aspects of the district court's order, which held that (1) Westinghouse had waived the attorney-client privilege and work-product doctrine regarding the documents it disclosed to the SEC and to the DOJ and that (2) the Republic had not waived the work-product doctrine regarding the documents it disclosed to the DOJ pursuant to the Agreement for Mutual Legal Assistance. As a threshold question, we must decide whether mandamus may be used as a means of reviewing those orders.

[*1422] [HN3] Mandamus is authorized by the All Writs Act, 28 USC § 1651(a) (1988), which provides:

The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

The language of section 1651 itself establishes a prerequisite for our jurisdiction: because the writ must be "in aid of" *our* jurisdiction, the case must be one that lies within "some present or potential exercise of appellate jurisdiction." *Bogosian v Gulf Oil Corp.*, 738 F.2d 587, 591 (3d Cir 1984) (quoting *United States v RMI Co.*, 599 F.2d 1183, 1185 (3d Cir 1979)). [**19] See also 16 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3932 at 185 (West 1977) ("Wright & Miller"). That prerequisite plainly is satisfied in this case. Given our jurisdiction to review final judgments under 28 USC § 1291, it is clear that the underlying case may at some future time come within the court's appellate jurisdiction. *Bogosian, 738 F.2d at 591* ; see also *McClellan v Carland*, 217 U.S. 268, 30 S. Ct. 501 , 54 L. Ed. 762 (1910) (writs of mandamus may issue in aid of appellate jurisdiction yet to be acquired).

Another prerequisite for mandamus jurisdiction emanates from the final judgment rule: mandamus must not be used as a mere substitute for appeal. 16 Wright & Miller, § 3932 at 185. That prerequisite is satisfied in this case with respect to the order compelling Westinghouse to produce the documents it disclosed to the SEC and to the DOJ. Westinghouse "has no other adequate means to attain the relief [it] desires," *Sporck v Peil*, 759 F.2d 312, 314 (3d Cir 1985) (quoting *Allied Chemical Corp. v Daiflon, Inc.*, 449 U.S. 33, 34, 101 S. Ct. 188 , 66 L. Ed. 2d 193 (1980)). "When a district [**20] court orders production of information over a litigant's claim of a privilege not to disclose, appeal after a final judgment is an inadequate remedy." *Bogosian, 738 F.2d at 591* (citation omitted). n6

> n6 [HN4] An order compelling or denying discovery does not fall within the orders that may be appealed under 28 USC § 1292(a), see *Borden Co. v Sylk*, 410 F.2d 843, 845 (3d Cir 1969), and the district court wisely exercised its discretion in

rejecting Westinghouse's attempt to pursue an interlocutory appeal pursuant to 28 USC § 1292(b).

Our jurisprudence also focuses attention on "the instructional goals of mandamus." *United States v Christian*, 660 F.2d 892, 897 (3d Cir 1981). Review would comport with that consideration, too. This court has not previously decided the important attorney-client privilege and work-product issues presented by Westinghouse's petition. Moreover, the other courts of appeals that have addressed the issue have reached contradictory results. Compare [**21] *Diversified*, 572 F.2d 596, with *Permian*, 214 App. D.C. 396, 665 F.2d 1214.

Therefore, we hold that Westinghouse's petition to set aside the district court's order directing Westinghouse to disclose the documents that it revealed to the government falls, at the threshold, within "the line of cases recognizing that [HN5] mandamus may properly be used as a means of immediate appellate review of orders compelling the production of documents claimed to be protected by privilege or other interests in confidentiality." *Bogosian*, 738 F.2d at 591. See also *Cipollone v Liggett Group, Inc.*, 785 F.2d 1108, 1118 (3d Cir 1986) ("Mandamus has been held to be appropriate when a failure to issue the writ would lead to the disclosure of confidential materials."). We also hold, however, that mandamus is *not* the appropriate avenue to review the district court's order *upholding* the work-product doctrine as applied to the documents the Republic shared with the DOJ. Unlike an order compelling disclosure, the effect of which is irrevocable, an order denying discovery may be reviewed on appeal from the final judgment, and, if erroneous, may be remedied [**22] by granting a new trial.

The decision to examine Westinghouse's attorney-client privilege and work-product claims at the threshold does not, however, conclude the mandamus issue, but only permits further consideration of the papers. The test for the grant of mandamus [*1423] is rigorous indeed. As we have explained, [HN6] mandamus is appropriate only in extraordinary situations, *Sporck*, 759 F.2d at 314, and the writ will be granted only where the petitioner has shown that the district court has committed a "clear error of law," id. Moreover, the [HN7] petitioner has the burden of showing that its right to mandamus relief is "clear and indisputable." Id. We now turn to Westinghouse's attorney-client privilege and work-product claims. As our discussion will demonstrate, this rigorous test is not met here.

## IV. THE ATTORNEY-CLIENT PRIVILEGE AND THE SELECTIVE WAIVER THEORY

The central question regarding Westinghouse's attorney-client privilege claim is the validity of the celebrated and controversial selective waiver n7 theory fash-

ioned by the Eighth Circuit in *Diversified Industries, Inc. v Meredith*, 572 F.2d 596 (8th Cir 1978) (en banc), and resoundingly rejected by [**23] the D.C. Circuit in *Permian Corp. v United States*, 214 App. D.C. 396, 665 F.2d 1214 (D.C. Cir 1981), and subsequent cases. n8 In *Diversified*, the Eighth Circuit held that disclosure of material protected by the attorney-client privilege to the SEC during a formal investigation constituted only a selective waiver of the privilege, and that therefore the material could not be discovered in subsequent civil litigation.

> n7 Although the rule in *Diversified* is often referred to as the "limited waiver rule," we prefer not to use that phrase because the word "limited" refers to two distinct types of waivers: selective and partial. Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications. See Breckinridge L. Willcox, *Martin Marietta and the Erosion of the Attorney-Client Privilege and Work-Product Protection*, 49 Md L Rev 917, 922 (1990); Developments in the Law, *Privileged Communications*, 98 Harv L Rev 1450, 1630-31 (1985).

> n8 See *In re Subpoenas Duces Tecum*, 238 App. D.C. 221, 738 F.2d 1367 (D.C. Cir 1984); *In re Sealed Case*, 219 App. D.C. 195, 676 F.2d 793 (D.C. Cir 1982).

[**24]

It is often stated that [HN8] the purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients." See, for example, *Upjohn Co. v United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). Full and frank communication is not an end in itself, however, but merely a means to achieve the ultimate purpose of the privilege: "promoting broader public interests in the observance of law and administration of justice." Id. See also Developments, 98 Harv L Rev at 1644 (cited in note 7). The Supreme Court recognized this underlying rationale for the privilege long ago, when it stated:

[The attorney-client privilege] is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely

Case 1:05-cv-00499-JJF    Document 231-5    Filed 05/25/2007    Page 39 of 54

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

and readily availed of when free from the consequences [**25] or the apprehension of disclosure.

*Hunt v Blackburn*, 128 U.S. 464, 470, 9 S. Ct. 125 , 32 L. Ed. 488 (1888) (quoted in *Upjohn*, 449 U.S. at 389). See also Edward W. Cleary, ed, *McCormick on Evidence*, § 87 at 204 (West 1972) ("The proposition is that the detriment to justice from a power to shut off inquiry to pertinent facts in court, will be outweighed by the benefits to justice (not to the client) from a franker disclosure in the lawyer's office.").

[HN9] Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly. *In re Grand Jury Investigation (Sun Co.)*, 599 F.2d 1224, 1235 (3d Cir 1979); *In re Grand Jury Investigation of Ocean Transportation*, 196 App. D.C. 8, 604 F.2d 672, 675 (D.C. Cir 1979); *Radiant Burners, Inc. v American Gas Association*, 320 F.2d 314, 323 (7th Cir 1963). n9 The privilege "protects *only* those disclosures--necessary to obtain informed legal [*1424] advice--which might not have been made absent the privilege." *Fisher v United States*, 425 U.S. 391, 403, 96 S. Ct. 1569 , 48 L. Ed. 2d 39 (1976) (emphasis added). Accordingly, voluntary [**26] disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege. *United States v AT&T*, 206 App. D.C. 317, 642 F.2d 1285, 1299 (D.C. Cir 1980). As one commentator cogently explained:

> n9 Regarding the narrow construction given privileges in general, see *University of Pennsylvania v EEOC*, 493 U.S. 182, 110 S. Ct. 577, 582 , 107 L. Ed. 2d 571 (1990); *Tramell v United States*, 445 U.S. 40, 50, 100 S. Ct. 906 , 63 L. Ed. 2d 186 (1980); *In re Grand Jury Investigation*, 918 F.2d 374, 383 (3d Cir 1990).

If clients themselves divulge such information to third parties, chances are that they would also have divulged it to their attorneys, even without the protection of the privilege. Thus, once a client has revealed privileged information to a third party, the basic justification for the privilege no longer applies . . .

Comment, *Stuffing the Rabbit Back into the Hat: Limited Waiver of the Attorney-Client Privilege in an Administrative* [**27] *Agency Investigation*, 130 U Pa L Rev 1198, 1207 (1982). Consequently, it is well-settled that [HN10] when a client voluntarily discloses privileged communications to a third party, the privilege is waived. See *Rockwell*, 897 F.2d at 1265 . See also 8 Wright &

Miller, § 2016 at 127 and n71; id, § 2024 at 210 (citing cases).

When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege. For example, courts have held that the client may allow disclosure to an "agent" assisting the attorney in giving legal advice to the client without waiving the privilege. 8 Wigmore, *Evidence* § 2301 at 583 (McNaughton rev 1961); McCormick, *Evidence* § 92 at 188. Courts have also held that the client may disclose communications to co-defendants or co-litigants without waiving the privilege. See, for example, *Hunydee v United States*, 355 F.2d 183, 184-85 (9th Cir 1965). These exceptions are consistent with the goal underlying the privilege because each type of disclosure is sometimes necessary for the client to obtain informed [**28] legal advice.

Westinghouse in essence asks that we recognize another exception to the waiver doctrine, one designed to accommodate voluntary disclosure to government agencies. In this regard, we note preliminarily that numerous cases have applied the traditional waiver doctrine to communications disclosed to government agencies. See Note, *The Limited Waiver Rule: Creation of an SEC-Corporation Privilege*, 36 Stan L Rev 789, 792 and n17 (1984) (citing cases finding waiver when disclosures made to various government agencies, including the IRS, the DOJ, the Department of Labor, and the SEC).

In *Diversified*, the Eighth Circuit departed from the traditional waiver doctrine by recognizing an exception for voluntary disclosures made in cooperation with SEC investigations. The court's explanation for its departure consists, in its entirety, of the following sentence:

To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers.

572 F.2d at 611 . n10

> n10 Westinghouse cites *Byrnes v IDS Realty Trust*, 85 F.R.D. 679 (SDNY 1980), and *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F. Supp. 368 (ED Wis 1979), as following *Diversified*. Both cases appear to have involved partial disclosures, a topic we discuss in note 13. In addition, in both cases, the court was construing Eighth Circuit precedent. We thus conclude that *Diversified* still stands alone.

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

[**29]

In rejecting *Diversified*, the D.C. Circuit observed that it could not see how the availability of a selective waiver "would serve the interests underlying the [attorney-client privilege]." *Permian*, 665 F.2d at 1220. The court reasoned that selective waiver "has little to do with" the privilege's purpose -- protecting the confidentiality of attorney-client communications in order to encourage clients to obtain informed legal assistance. Id. The court explained that while voluntary cooperation with government investigations "may be a laudable activity, . . . it is hard to understand how such conduct improves the attorney-client [*1425] relationship." Id at 1221. The court then advanced a second reason for rejecting the selective waiver rule, stating:

The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit. . . . The attorney-client privilege is not designed for such tactical employment.

Id.

We find the first part of the D.C. [**30] Circuit's reasoning persuasive. The Eighth Circuit's sole justification for permitting selective waiver was to encourage corporations to undertake internal investigations. Unlike the two widely recognized exceptions to the waiver doctrine we discussed at page 1424, selective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the privilege beyond its intended purpose. See Note, 36 Stan L Rev at 804 (noting that selective waiver rule merely encourages disclosure to government agencies); Developments, 98 Harv L Rev at 1645, 1647 (noting concern that selective waiver rule extends breadth of attorney-client privilege). Moreover, selective waiver does nothing to promote the attorney-client relationship; indeed, the unique role of the attorney, which led to the creation of the privilege, has little relevance to the selective waiver permitted in *Diversified*. See Note, 36 Stan L Rev at 804. The traditional waiver doctrine provides that disclosure to third parties [**31] waives the attorney-client privilege unless the disclosure serves the purpose of enabling clients to obtain informed legal advice. Because the selective waiver rule in *Diversified* protects disclosures made for entirely different purposes, it cannot be reconciled with traditional attorney-client privilege doctrine. Therefore, we are not persuaded to engraft the *Diversified* exception onto the attorney-client privilege. Westinghouse argues

that the selective waiver rule encourages corporations to conduct internal investigations and to cooperate with federal investigative agencies. We agree with the D.C. Circuit that these objectives, however laudable, are beyond the intended purposes of the attorney-client privilege, see *Permian*, 665 F.2d at 1221, and therefore we find Westinghouse's policy arguments irrelevant to our task of applying the attorney-client privilege to this case. In our view, to go beyond the policies underlying the attorney-client privilege on the rationale offered by Westinghouse would be to create an entirely new privilege.

Several factors counsel against the creation of a new privilege allowing parties to disclose communications to government [**32] agencies without waiving the attorney-client privilege. First, because privileges obstruct the truth-finding process, the Supreme Court has repeatedly warned the federal courts to be cautious in recognizing new privileges. See, for example, *University of Pennsylvania*, 110 S. Ct. at 582 (cited in note 8). In addition, the Supreme Court has been "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the competing concerns but has not provided the privilege itself." Id. In 1984, Congress rejected an amendment to the Securities and Exchange Act of 1934, proposed by the SEC, that would have established a selective waiver rule regarding documents disclosed to the agency. See *SEC Statement in Support of Proposed § 24(d) of the Securities and Exchange Act of 1934*, in 16 Sec Reg & L Rep at 461 (March 2, 1984).

Moreover, although a selective waiver rule might increase voluntary cooperation with government investigations, a new privilege must "promote[] sufficiently important interests to outweigh the need for probative evidence." *Trammel*, 445 U.S. at 50 (cited in note 8). We do not question [**33] the importance of the public interest in voluntary cooperation with government investigations. We have little reason to believe, however, that this interest outweighs "the fundamental principle [*1426] that 'the public . . . has a right to every man's evidence.'" *University of Pennsylvania*, 110 S Ct at 582 (citations omitted). n11

> n11 We also note that some commentators have expressed concern that the selective waiver rule, while furthering the public policy of encouraging voluntary cooperation with government investigations, might run afoul of another public policy, namely the policy embodied in the Freedom of Information Act. See, for example, Note, 36 Stan L Rev at 806-13.

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

In addition, we do not think that a new privilege is necessary to encourage voluntary cooperation with government investigations. Indeed, no such privilege was established at the time Westinghouse decided to cooperate with the SEC and the DOJ. When Westinghouse first disclosed privileged materials to the SEC, only one [**34] court of appeals had adopted the selective waiver rule. By the time Westinghouse made its disclosures to the DOJ, another court of appeals had trenchantly rejected the selective waiver rule. We find it significant that Westinghouse chose to cooperate despite the absence of an established privileged protecting disclosures to government agencies. We also note that many other corporations also have chosen to cooperate with the SEC despite the lack of an established privilege protecting their disclosures. See Note, 36 Stan L Rev at 822 (noting that over 425 corporations participated in the SEC's Voluntary Disclosure Program n12 in 1979, when only one court of appeals had adopted the selective waiver rule).

> n12 The SEC developed its Voluntary Disclosure Program in the mid-1970s, when it was investigating the political "slush fund" practices of several corporations. Realizing that it lacked the resources to investigate each case fully, the SEC encouraged corporations to appoint special committees, composed of directors not affiliated with management, to conduct independent investigations of the corporations' practices. These investigations were conducted by outside counsel responsible only to the special committees and their results were shared with the SEC staff. See *In re Sealed Case*, 219 App. D.C. 195, 676 F.2d 793, 800-01 (D.C. Cir 1982).

[**35]
Our rejection of the selective waiver rule does not depend, however, on the second reason the D.C. Circuit gave in *Permian* for rejecting *Diversified*. Generally, the "fairness doctrine" is invoked in partial (as opposed to selective) disclosure cases. n13 This case involves selective, rather than partial, disclosure. The courts and commentators disagree about whether there is anything unfair about selective disclosure. n14 Here is it unnecessary to decide the question. We need not find unfairness to the Republic in order to find waiver because we have concluded already that the attorney-client privilege protects only those disclosures necessary to encourage clients to seek informed legal advice and that Westinghouse's disclosures were not made for this purpose.

> n13 We have explained the distinction between partial and selective disclosures in note 7.

When a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary. See, for example, *In re Von Bulow*, 828 F.2d 94 (2d Cir 1987). If partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject.

[**36]

> n14 In *Permian* and its progeny, the D.C. Circuit has taken the view that it is inherently unfair for a party to selectively disclose privileged information in one proceeding but not another. See *Permian*, 665 F.2d at 1221 ; *In re Subpoenas Duces Tecum*, 238 App. D.C. 221, 738 F.2d 1367, 1370 (D.C. Cir 1984); *In Re Sealed Case*, 219 App. D.C. 195, 676 F.2d 793, 817-24 (D.C. Cir 1982). We hesitate to rely on this rationale, however, for in our view, when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred. See Developments, 98 Harv L Rev at 1631 n.14 ; see also Note, *Limited Waiver of the Attorney-Client Privilege upon Voluntary Disclosure to the SEC*, 50 Fordham L Rev 963, 981-82 (1982). But see Comment, 130 U Pa L Rev at 1226.

Westinghouse further contends, however, that the SEC's regulations concerning confidentiality and the stipulated court order memorializing the confidentiality agreement [**37] between Westinghouse and the DOJ must be regarded as preserving the attorney-client privilege with respect to the information disclosed because of Westinghouse's expectations of confidentiality engendered thereby. We reject Westinghouse's [*1427] argument that it did not waive the privilege because it reasonably expected that the SEC and the DOJ would maintain the confidentiality of the information that it disclosed to them.

Even though the DOJ apparently agreed not to disclose the information, [HN11] under traditional waiver doctrine a voluntary disclosure n15 to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else. See, for example, *Rockwell*, 897 F2d at 1265 ("The attorney-client privilege does not apply to com-

Case 1:05-cv-00499-JJF    Document 231-5    Filed 05/25/2007    Page 42 of 54

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

munications that are intended to be disclosed to third parties *or that in fact are so disclosed.*") (emphasis added). See also 8 Wigmore, *Evidence* § 2327 at 636; Note, 36 Stan L Rev at 792. We also note that the agreement between Westinghouse and the DOJ preserved Westinghouse's right to invoke the attorney-client privilege only as to the DOJ -- and does not appear in [**38] any way to have purported to preserve Westinghouse's right to invoke the privilege against a different entity in an unrelated civil proceeding such as the instant case.

> n15 We consider Westinghouse's disclosure to the DOJ to be voluntary even though it was prompted by a grand jury subpoena. Although Westinghouse originally moved to quash the subpoena, it later withdrew the motion and produced the documents pursuant to the confidentiality agreement. Had Westinghouse continued to object to the subpoena and produced the documents only after being ordered to do so, we would not consider its disclosure of those documents to be voluntary.

Moreover, even if Westinghouse could preserve the privilege by conditioning its disclosure upon a promise to maintain confidentiality, no such promise was made here regarding the information disclosed to the SEC. As Westinghouse emphasizes, SEC regulations in effect at the time of Westinghouse's disclosures to that agency provided that the SEC would maintain confidentiality as to information [**39] and documents obtained in the course of any investigation. See 17 CFR §§ 203.2, 240.0-4 (1978). We do not think, however, that these regulations justified a reasonable belief on Westinghouse's part that the attorney-client privilege would be preserved with respect to the Kirkland & Ellis letter and the other information disclosed to the SEC. As the Republic observes, the very regulations on which Westinghouse relies explicitly provided that [HN12] information obtained in the course of a non-public investigation must be made a matter of public record and provided upon request if the disclosure of the confidential information was "not contrary to the public interest." 17 CFR § 240.0-.04 (1978). Moreover, as the Republic further notes, the SEC unsuccessfully sought to have the Securities and Exchange Act of 1934 amended to include a specific provision establishing a selective waiver rule protecting corporate disclosures to the agency. See *SEC Statement in Support of Proposed § 24(d) of the Securities and Exchange Act of 1934*, in 16 Sec Reg & L Rep at 461 (March 2, 1984). That the SEC itself sought such legislation suggests that the SEC did not interpret its regulations to confer the

selective [**40] waiver that Westinghouse would have us find in them. n16

> n16 We do not infer an intention to prohibit the selective waiver rule from Congress's inaction. Rather, we mention the SEC's proposal to show that the agency responsible for construing the regulations on which Westinghouse relies did not interpret them as establishing a selective waiver rule.

## V. WESTINGHOUSE'S CLAIM FOR PROTECTION UNDER THE WORK-PRODUCT DOCTRINE

Westinghouse also argues that the work-product doctrine shields the documents that it disclosed to the SEC and to the DOJ from the Republic. Once again, Westinghouse's argument requires us to choose between positions taken by the Eighth and D.C. Circuits. In order to evaluate those positions, however, we must begin with a review of the purpose underlying the work-product doctrine.

The purpose of the work-product doctrine differs from that of the attorney-client privilege. See, for example, Stephen [*1428] A. Saltzburg, *Corporate and Related Attorney-Client Privilege Claims: A Suggested Approach*, 12 Hofstra L Rev 279, 303 n121 (1984); [**41] Willcox, 49 Md L Rev at 922-23. As we have explained, the attorney-client privilege promotes the attorney-client relationship, and, indirectly, the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys. In contrast, the work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients. *Hickman v Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385 , 91 L. Ed. 451 (1947); *United States v AT&T*, 206 App. D.C. 317, 642 F.2d 1285, 1299 (D.C. Cir 1980).

A disclosure to a third party waives the attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance. Because the work-product doctrine serves instead to protect an attorney's work product from falling into the hands of an adversary, a disclosure to a third party does not necessarily waive the protection [**42] of the work-product doctrine. Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the

Case 1:05-cv-00499-JJF    Document 231-5    Filed 05/25/2007    Page 43 of 54

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

information. See, for example, *AT&T*, 642 F.2d at 1299 . See also 8 Wright & Miller, § 2024 at 210 (citing cases).

We agree that the purpose of the work-product doctrine requires us to distinguish between disclosures to adversaries and disclosures to non-adversaries. We also find Westinghouse's argument that the DOJ and the SEC were not its adversaries to be without merit. Unlike a party who assists the government in investigating or prosecuting another, see *AT&T*, 642 F.2d at 1300 (party assisting DOJ investigation of another not an adversary to DOJ), Westinghouse was the target of investigations conducted by the agencies. Under these circumstances, we have no difficulty concluding that the SEC and the DOJ were Westinghouse's adversaries. See also *In re Subpoenas Duces Tecum*, 238 App. D.C. 221, 738 F.2d 1367, 1372 (D.C. Cir 1984) (" *Subpoenas*") ("no question" that target of SEC investigation was SEC's adversary).

The more difficult question is whether Westinghouse's disclosure to [**43] these two adversaries waives the protection of the work-product doctrine as against the Republic. Even though the courts generally agree that disclosure to an adversary waives the work-product doctrine, they disagree over the reasons behind this principle and thus, over its application to specific circumstances.

For example, the Eighth Circuit has found the mere fact of disclosure to one adversary sufficient to waive the work-product doctrine as against other adversaries, even when the first adversary agreed not to disclose the protected documents to anyone else. The court took this position in *In re Chrysler Motors Corp. Overnight Evaluation Program Litigation*, 860 F.2d 844 (8th Cir 1988). That case involved a corporation that had disclosed protected materials to its adversaries voluntarily in a civil suit during settlement negotiations and pursuant to a confidentiality agreement. The United States Attorney subsequently sought access to the materials for use in a related criminal action against the corporation. With little explanation, the Eighth Circuit held that, despite the confidentiality agreement, the corporation had waived the work-product doctrine by voluntarily [**44] disclosing the materials to an adversary. 860 F.2d at 846-47 .

In contrast, the D.C. Circuit has employed an analysis that considers the fairness of selectively disclosing work product, the discloser's expectations of confidentiality, and the policy underlying the work-product doctrine. The court applied this analysis in *Subpoenas*, which held that a corporation that had voluntarily disclosed materials protected by the work-product doctrine to the SEC, in order to take advantage of the agency's Voluntary Disclosure [*1429] Program, had waived the work-product doctrine as against the corporation's share-

holders, who sought access to the same materials for use in their subsequent civil suit against the corporation. The court first concluded that it was unfair to selectively disclose work product to one adversary and not to another. See 738 F.2d at 1372 . The court then determined that the corporation "did not have any proper expectations of confidentiality which might mitigate the weight against them of such general considerations of fairness." Id. Finally, the court decided that the policy considerations behind the work-product doctrine did not call for recognizing [**45] an exception for the SEC's Voluntary Disclosure Program. The court explained:

A healthy adversary system affords protection to an attorney's trial preparation as against actual and potential opponents. . . . It is said that [voluntary disclosure to government agencies] will be hindered unless the work product privilege covers it. *Permian* . . . has already rejected, for the attorney-client privilege, an exception for such disclosure, saying, "we cannot see how 'the developing procedure of corporations to employ independent outside counsel to investigate and advise them' would be thwarted by telling a corporation that it cannot disclose the resulting reports to the SEC if it wishes to maintain their confidentiality." The same choice is open under the work product privilege.

Id at 1375 (citations omitted).

We hold that Westinghouse's disclosure of work product to the SEC and to the DOJ waived the work-product doctrine as against all other adversaries. As we explained at page 1424, parties who have disclosed materials protected by the attorney-client privilege may preserve the privilege when the disclosure was necessary to further the goal underlying [**46] the privilege. We require the same showing of relationship to the underlying goal when a party discloses documents protected by the work-product doctrine. In other words, [HN13] a party who discloses documents protected by the work-product doctrine may continue to assert the doctrine's protection only when the disclosure furthers the doctrine's underlying goal.

Two considerations inform our formulation of this standard for waiving the work-product doctrine. First, we are mindful of the general principle that evidentiary privileges are to be strictly construed. See *University of Pennsylvania*, 110 S Ct at 582 (cited in note 8). Second, the work-product doctrine recognizes a *qualified* evidentiary protection, in contrast to the absolute protection afforded by the attorney-client privilege. *United States v Nobles*, 422 U.S. 225, 239, 95 S. Ct. 2160 , 45 L. Ed. 2d 141 (1975). The protection of the work-product doctrine, unlike that of the attorney-client privilege, may be overcome by a showing of substantial need, and "like other

qualified privileges, [it] may be waived." Id. These two considerations persuade us that the standard for waiving the work-product doctrine [**47] should be no more stringent than the standard for waiving the attorney-client privilege.

Applying this standard here, we hold that Westinghouse's disclosures to the SEC and to the DOJ waived the protection of the work-product doctrine because they were not made to further the goal underlying the doctrine. When a party discloses protected materials to a government agency investigating allegations against it, it uses those materials to forestall prosecution (if the charges are unfounded) or to obtain lenient treatment (in the case of well-founded allegations). These objectives, however rational, are foreign to the objectives underlying the work-product doctrine. Moreover, an exception for disclosures to government agencies is not necessary to further the doctrine's purpose; attorneys are still free to prepare their cases without fear of disclosure to an adversary as long as they and their clients refrain from making such disclosures themselves. Creating an exception for disclosures to government agencies may actually hinder the operation of the work-product doctrine. If internal investigations are undertaken with an eye to later disclosing the results to a government agency, the outside [**48] counsel conducting the investigation may hesitate [*1430] to pursue unfavorable information or legal theories about the corporation. Thus, allowing a party to preserve the doctrine's protection while disclosing work product to a government agency could actually discourage attorneys from fully preparing their cases.

We also reject Westinghouse's argument that it did not waive the work-product protection because it reasonably expected the agencies to keep the documents it disclosed to them confidential. Even if we had found that the agencies had made such an agreement, see discussion at pages 1427-30, it would not change our conclusion.

To support its contention that we should be persuaded by its alleged expectations of confidentiality, Westinghouse relies upon two cases decided by the D.C. Circuit, *Subpoenas* and *In re Sealed Case, 219 App. D.C. 195, 676 F.2d 793 (D.C. Cir 1982)*. *Sealed Case* involved a disclosure that was both selective and partial. Consequently, the court analyzed the waiver question in terms of the fairness doctrine typically applied to cases involving partial disclosures. Although *Subpoenas* involved only a selective disclosure, the court also relied [**49] upon the fairness analysis employed in *Sealed Case* when it implied that had the disclosing party reasonably expected confidentiality, its expectations would have mitigated against the "unfairness" of selective disclosure. We have distinguished between partial and selective disclosures of materials protected by the attorney-client privilege, see note 7, and we have observed that

the type of disclosure at issue in this case is selective disclosure. We also have explained that the fairness doctrine applies in cases in which there has been a partial (as opposed to selective) disclosure of communications protected by the attorney-client privilege. See pages 1426-27. Our analysis limiting the application of the fairness doctrine to *partial* disclosure applies equally in the context of the work-product doctrine. We decline to extend the fairness doctrine to cases involving selective disclosures because, as we explained at note 13, we do not see how disclosing protected materials to one adversary disadvantages another. Therefore, *Subpoenas* and *Sealed Case* do not aid Westinghouse's cause.

In *In re John Doe, 662 F.2d 1073 (4th Cir 1981)*, [**50] the Fourth Circuit also found the lack of a confidentiality agreement significant in determining whether a party had waived the work-product doctrine. *Doe*, however, is easily distinguished from the instant case. *Doe* arose when a criminal defendant informed the United States Attorney that Doe, his former lawyer, had advised him to give false testimony and to bribe witnesses. The United States Attorney instigated a grand jury investigation of Doe and presented to the grand jury documents that Doe had prepared while representing his former client and then inadvertently turned over to the client. Doe moved that the documents be returned to him and that the grand jury be dismissed as tainted by its improper consideration of material protected by the work-product doctrine. n17

> n17 Doe also moved to quash the grand jury's subpoena seeking additional documents related to those already disclosed. We do not discuss this aspect of *Doe* because it concerns the effect of a partial disclosure and the instant case involves only a selective disclosure.

[**51]

The Fourth Circuit focused on "a concern inherent in the work product rule: that since an attorney's work is for his client's advantage, opposing counsel or adverse parties should not gain the use of that work through discovery." *662 F.2d at 1081* . It reasoned that in order to waive the protection of the doctrine by disclosing material to a third party, the disclosure must indicate "conscious disregard" of the possibility that an adversary would gain access to the material. Id. The court then announced the following standard:

To effect a forfeiture of work product protection by waiver, disclosure must occur in circumstances in which the attorney cannot reasonably expect to limit the future use of the otherwise protected material.

951 F.2d 1414, *; 1991 U.S. App. LEXIS 29515, **;
35 Fed. R. Evid. Serv. (Callaghan) 1070; 22 Fed. R. Serv. 3d (Callaghan) 377

Id.

Applying that standard, the court determined that Doe had waived the protection of the work-product doctrine. At the time [*1431] Doe released the documents, his relationship with his former client was strained. Moreover, Doe failed to take steps to limit the client's future use of the documents. Therefore, the court concluded that Doe's disclosure "substantially and freely increased the possibility of disclosure" to anyone and thus waived the [**52] work-product protection. Id at 1082.

Unlike the instant case, *Doe* involved an inadvertent disclosure to a party who, while no longer sharing common interests with Doe, was not clearly an adversary. Under those circumstances, the court found it significant that Doe had taken no steps to protect the confidentiality of the documents he disclosed to his former client. Fear of waiving the doctrine's protection by an inadvertent disclosure, or by a disclosure to a non-adversary, might well chill attorneys from fully preparing their cases. Therefore, when the disclosure is either inadvertent or made to a non-adversary, it is appropriate to ask whether the circumstances surrounding the disclosure evidenced conscious disregard of the possibility that an adversary might obtain the protected materials. Thus, had the DOJ and the SEC not been Westinghouse's adversaries, and had we concluded that Westinghouse reasonably expected the agencies to keep the material that it disclosed to them confidential, we might reach a different result. But because Westinghouse deliberately disclosed work product to two government agencies investigating allegations against it, the Fourth Circuit's [**53] analysis in *Doe* does not apply here. n18

n18 The district court did not distinguish between opinion and non-opinion work product when it decided that Westinghouse had waived the protection of the work-product doctrine. The Fourth Circuit has made this distinction in *In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir 1988), cert denied, 490 U.S. 1011, 109 S. Ct. 1655 , 104 L. Ed. 2d 169 (1989), a case involving a waiver effected by a disclosure that was both partial and selective. The distinction between opinion and non-opinion work product was developed by the Supreme Court in *Hickman* to explain that a showing of necessity is sufficient to overcome the protection of the work-product doctrine when the documents sought do not contain opinion work product, i.e., writings which reflect an attorney's mental impressions, conclusions, opinions or legal theories. 329 U.S. at 508. We acknowledge that the work product at issue here undoubtedly is of both varieties. The parties have not argued, however, that the distinction is significant in answering the entirely different question of whether the protection of the doctrine has been waived, nor does it appear to us to be significant on this record. See Willcox, 49 Md L Rev at 933-34.

[**54]

## VI. CONCLUSION

For the foregoing reasons, we conclude that Westinghouse waived the attorney-client privilege and the work-product doctrine when it disclosed otherwise protected documents to the SEC and to the DOJ. Therefore, the district court did not commit clear error in ordering Westinghouse to produce the disputed material. Accordingly, the petition for a writ of mandamus will be denied.

# TAB 23

LEXSTAT RESTAT 3D OF THE LAW GOVERNING LAWYERS, § 79

Restatement of the Law, Third, The Law Governing Lawyers
Copyright (c) 2000, The American Law Institute

Case Citations

Chapter 5 - Confidential Client Information

Topic 2 - The Attorney-Client Privilege

Title C - Duration of the Attorney-Client Privilege; Waivers and Exceptions

Restat 3d of the Law Governing Lawyers, § 79

§ 79 Subsequent Disclosure

**The attorney-client privilege is waived if the client, the client's lawyer, or another authorized agent of the client voluntarily discloses the communication in a non-privileged communication.**

COMMENTS & ILLUSTRATIONS: Comment:

*a. Scope and cross-references.* This Section becomes relevant only if the requirements for the privilege (see §§ 68-72) have been satisfied. On waiver in the case of co-clients, see § 75, Comment *c*. Concerning separately represented clients who exchange confidential communications in a common-interest arrangement, see § 76, Comment *f*.

*b. Subsequent disclosure.* Voluntary disclosure of a privileged communication is inconsistent with a later claim that the communication is to be protected. When the disclosure has been made voluntarily, it is unnecessary that there have been detrimental reliance (compare § 78(2)).

*c. Authorized disclosure by a lawyer or other agent.* The privilege is waived if the client's lawyer or another authorized agent of the client discloses the communication acting under actual or apparent authority. A lawyer generally has implied authority to disclose confidential client communications in the course of representing a client (see § 27, Comment *c*; see also § 61). Ratification of the agent's authority has the same effect (see § 26, Comment *e*). Whether a sub-agent of the client or lawyer has authority to waive is governed by agency law. A file clerk in a law firm, for example, does not have implied authority.

Unauthorized disclosure by a lawyer not in pursuit of the client's interests does not constitute waiver under this Section. For example, disclosure of a client's confidential information to prevent a threat to the life or safety of another (§ 66) or to prevent a client crime or fraud (§ 67) does not constitute waiver within the meaning of this Section, although another basis for finding the privilege inapplicable may apply.

Because of the lawyer's apparent authority to act for the client, a lawyer's failure to consult the client about disclosing privileged information generally will not affect the rights of third persons. A third person may not, however, reasonably rely on acts of an opposing lawyer or other agent constituting manifest disregard of responsibility for the client's interests (see also § 60, Comment *l*, & § 71, Comment *c* (eavesdroppers)). Upon discovery of an agent's wrongful disclosure, the client must promptly take reasonable steps to suppress or recover the wrongfully disclosed communication in order to preserve the privilege.

Illustration:

1. Lawyer sends a confidential memorandum containing privileged communications to Client for Client's review. Lawyer sends it by a reputable document-courier service. An employee of the document-courier service opens the sealed envelope, makes copies, and gives the copies to a government agency. As soon as the existence of the copies is discovered, Lawyer takes reasonable steps to recover them and demands that the document-courier service and the government agency return all communications taken

or information gained from them. Even if the document-courier service is considered an agent of Lawyer for some purposes, its employee's actions do not waive Client's privilege in the communications.

*d. A privileged subsequent disclosure.* A subsequent disclosure that is itself privileged does not result in waiver. Thus, a client who discloses a communication protected by the attorney-client privilege to a second lawyer does not waive the privilege if the attorney-client privilege or work-product immunity protects the second communication. So also, showing a confidential letter from the client's lawyer to the client's spouse under circumstances covered by the marital privilege preserves the attorney-client privilege.

*e. Extent of disclosure.* Waiver results only when a nonprivileged person learns the substance of a privileged communication. Knowledge by the nonprivileged person that the client consulted a lawyer does not result in waiver, nor does disclosure of nonprivileged portions of a communication or its general subject matter. Public disclosure of facts that were discussed in confidence with a lawyer does not waive the privilege if the disclosure does not also reveal that they were communicated to the lawyer. See § 69, Comment *d* (distinction between communications and facts).

**Illustrations:**

2. Client, a defendant in a personal-injury action, makes a privileged communication to Lawyer concerning the circumstances of the accident. In a later judicial proceeding, Client, under questioning by Lawyer, testifies about the occurrence but not about what Client told Lawyer about the same matter. On cross-examination, the lawyer for Plaintiff inquires whether the Client's testimony is consistent with the account Client gave to Lawyer in confidence. Client's testimony did not waive the privilege.

3. The same facts as in Illustration 2, except that Client states that "I've testified exactly as I told Lawyer just a week after the accident happened. I told Lawyer that the skid marks made by Plaintiff's car were 200 feet long. And I've said the same things here." Such testimony waives the privilege by subsequent disclosure. On the extent of waiver, see Comment *f* hereto.

In the circumstances of Illustration 3, if the client merely testifies that the subject of skid marks was discussed with the client's lawyer, the privilege is not waived.

*f. Partial subsequent disclosure and "subject matter" waiver.* An initial disclosure resulting in waiver under this Section may consist of disclosure of fewer than all communications between lawyer and client on the subject. The question then arises whether an inquiring party is entitled to access to other relevant communications beyond those actually disclosed. (Similar questions can arise with respect to waiver under § 78 (waiver by agreement, disclaimer, or failure to object) and § 80 (waiver by putting assistance or communication in issue).)

General waiver of all related communications is warranted when a party has selectively offered in evidence before a factfinder only part of a more extensive communication or one of several related communications, and the opposing party seeks to test whether the partial disclosure distorted the context or meaning of the part offered. All authorities agree that in such a situation waiver extends to all other-wise-privileged communications on the same subject matter that are reasonably necessary to make a complete and balanced presentation (compare Federal Rules of Evidence, Rule 106). That breadth of waiver is required by considerations of forensic fairness, to prevent a partial disclosure that would otherwise mislead the factfinder because selectively incomplete. Similar considerations generally apply when the privilege holder makes a partial disclosure in pretrial proceedings, as in support of a motion for summary judgment or during a pretrial hearing on a request for provisional relief.

If partial disclosure occurs in a nontestimonial setting or in the context of pretrial discovery, a clear majority of decisions indicates that a similar broad waiver will be found, even though the disclosure is not intended to obtain advantage as a possibly misleading half-truth in testimony. Although arguably different considerations might apply (because of the absence of opportunity to mislead a factfinder by partial disclosure), courts insist in effect that a party who wishes to assert the privilege take effective steps to protect against even partial disclosure, regardless of the nontestimonial setting. In an appropriate factual setting, waiver may also be supportable on the ground that the partial disclosure was designed to mislead an opposing party in negotiations or was inconsistent with a candid exchange of information in pretrial discovery.

Parties may agree that disclosure of one privileged communication will not be regarded as waiver as to others, and a tribunal may so order, for example in a discovery protective order. Such an agreement or order governs questions of waiver both in the proceeding involved and, with respect to the parties to the agreement, in other proceedings.

*g. Voluntary subsequent disclosure.* To constitute waiver, a disclosure must be voluntary. The disclosing person need not be aware that the communication was privileged, nor specifically intend to waive the privilege. A disclosure in obedience to legal compulsion or as the product of deception does not constitute waiver.

**Illustrations:**

4. A burglar ransacks Client's confidential files and carries away copies of communications from Client to Lawyer protected by the attorney-client privilege. The police apprehend the burglar, recover the copies, and examine them in order to identify their owner. Client's right to invoke the privilege is not lost.

5. At a hearing before a tribunal, the presiding officer erroneously overrules Lawyer's objection to a question put to Client that calls for a communication protected by the attorney-client privilege. Client then testifies. By testifying, Client has not waived objection to efforts to elicit additional privileged communications in the litigation nor to claim on appeal that the hearing officer incorrectly overruled Lawyer's objection. Client also can seek protection of the attorney-client privilege in subsequent litigation.

On resisting disclosure by legal compulsion, see § 86.

*h. Inadvertent disclosure.* A subsequent disclosure through a voluntary act constitutes a waiver even though not intended to have that effect. It is important to distinguish between inadvertent waiver and a change of heart after voluntary waiver. Waiver does not result if the client or other disclosing person took precautions reasonable in the circumstances to guard against such disclosure. What is reasonable depends on circumstances, including: the relative importance of the communication (the more sensitive the communication, the greater the necessary protective measures); the efficacy of precautions taken and of additional precautions that might have been taken; whether there were externally imposed pressures of time or in the volume of required disclosure; whether disclosure was by act of the client or lawyer or by a third person; and the degree of disclosure to nonprivileged persons.

Once the client knows or reasonably should know that the communication has been disclosed, the client must take prompt and reasonable steps to recover the communication, to reestablish its confidential nature, and to reassert the privilege. Otherwise, apparent acceptance of the disclosure may reflect indifference to confidentiality. Even if fully successful retrieval is impracticable, the client must nonetheless take feasible steps to prevent further distribution.

**Illustration:**

6. Plaintiff has threatened Client with suit unless Client is able to persuade Plaintiff's lawyers that Client is free from fault. Plaintiff imposes a stringent deadline for Client's showing. Client authorizes Lawyer to produce a large mass of documents. Although reviewed by Lawyer, the documents include a confidential memorandum by Client to Lawyer. The standard procedure of lawyers in the circumstances would not have included reexamining the copies prior to submission. Lawyer's inadvertent disclosure did not waive the privilege. After discovering the mistake, Client must promptly reassert the privilege and demand return of the document.

*i. Consequences of client waiver of the privilege.* Waiver ordinarily extends to the litigation in or in anticipation of which a disclosure was made and future proceedings as well, whether or not related to the original proceeding. However, if no actual disclosure resulted from the waiver, a client might be in a position to reassert the privilege. For example, inadvertent disclosure of a privileged document in discovery should not preclude subsequent assertion of the privilege against a different opponent in different litigation if the disclosure does not result in the document becoming known to anyone other than the party who received it.

## REPORTERS NOTES: REPORTER'S NOTE

*Comment b. Subsequent disclosure.* See generally Revised Uniform Rules of Evidence, Rule 510 (1974) ("A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged"); Proposed Federal Rules of Evidence, Rule 511 (1972) (substantially similar); cf. Uniform Rules of Evidence, Rule 37(b) (1953) (waiver if holder of privilege "without coercion and

with knowledge of his privilege, made disclosure of any part of the matter or consented to such a disclosure made by any one").

*Comment c. Authorized disclosure by a lawyer or other agent.* E.g., Revised Uniform Rules of Evidence, Rule 510 (1974) (disclosure if client discloses "or consents to disclosure"); Proposed Federal Rules of Evidence, Rule 511 (1972). See generally *Restatement Second, Agency § 7* (express or implied authority); id. § 8 (apparent authority); id. § 82 (ratification by client). See also § 26 hereto (actual authority) and § 27 (apparent authority).

E.g., *United States v. Martin, 773 F.2d 579, 583-84 (4th Cir.1985)* (client impliedly authorized lawyer to disclose privileged communications in order to compromise question of tax liability by authorizing lawyer to negotiate with tax agency); *Drimmer v. Appleton, 628 F.Supp. 1249, 1251 (S.D.N.Y.1986)* (although present in courtroom, client was silent when lawyer testified to content of privileged communication); *Tucker v. State, 484 So.2d 1299, 1301 (Fla.Dist. Ct.App.1986)* (lawyer's implied authority to waive privilege by disclosing communications to psychiatrist called to testify by opposing party). Compare, e.g., *People v. Mudge, 492 N.E.2d 1050 (Ill.App.Ct.1986)* (no waiver when lawyer gave privileged document to pathologist who, without authority, showed it to opposing party's pathologist); *State ex rel. Lause v. Adolf, 710 S.W.2d 362, 364-65 (Mo. Ct.App.1986)* (officers and directors of organization who were named as defendants in suit to which organization was not party did not have implied authority to waive organization's privilege by pleading reliance on advice of counsel).

On wrongful disclosure by a lawyer or another agent, see Uniform Rules of Evidence, Rule 26(1)(c)(iii) (1953) (client has privilege to prevent witness from disclosing communication that came to knowledge of witness "as a result of a breach of the lawyer-client relationship"); Model Code of Evidence, Rule 210(c)(iii) (1942) (client can prevent witness from disclosing communication if witness "obtained knowledge or possession of the communication as a result of an intentional breach of the lawyer's duty of non-disclosure by the lawyer or his agent or servant"). The foregoing evidence codes refer to the agency-law-based concept of confidentiality stated in § 59. On the decisions, see, e.g., *United States v. Sindona, 636 F.2d 792, 804-05 (2d Cir.1980)* (evidence divulged by lawyer in breach of duties under attorney-client privilege properly excluded); *State v. Maxwell, 691 P.2d 1316, 1320 (Kan.Ct.App. 1984)* (when lawyer, without authorization from clients, disclosed damaging and otherwise privileged communications to opposing party's lawyer in clear breach of confidentiality obligation, privilege still applied). See generally § 60, Comment *m*, and Reporter's Note thereto.

On the rule that a lawyer's permissible disclosure to prevent a client crime does not waive the attorneyclient privilege, see *Purcell v. District Attorney, 676 N.E.2d 436 (Mass. 1997).*

*Comment d. A privileged subsequent disclosure.* E.g., Revised Uniform Rules of Evidence, Rule 510 (1974) (rule of waiver by disclosure "does not apply if the disclosure is itself a privileged disclosure"); Proposed Federal Rules of Evidence, Rule 511 (1972) (same). Decisions under the attorney-client privilege are rare. E.g., *Transmirra Prods. Corp. v. Monsanto Chem. Co., 26 F.R.D. 572, 576-77 (S.D.N.Y.1960)* (no waiver when confidential information disclosed in confidence to person with common interest in litigation). A few decisions have extended the concept of a subsequent privileged disclosure beyond the realm of strictly evidentiary privileges. E.g., *Lipton Realty, Inc. v. St. Louis Housing Auth., 705 S.W.2d 565, 570-71 (Mo.Ct.App.1986)* (state public-housing agency confidentially disclosed letter from its lawyer to federal agency officials supplying financing for housing). Some decisions finding no waiver are apparently based in part on a concept similar to the rule that the privilege is preserved when a lawyer presents confidential information to an adversary in the course of settlement discussions (see generally § 61, Comment *d*, & Reporter's Note thereto). E.g., *Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir.1977)* (en banc); *Byrnes v. IDS Realty Trust, 85 F.R.D. 679, 685, 688 (S.D.N.Y.1980)* (disclosure at "nonpublic proceeding" of enforcement agency; waiver rejected to encourage voluntary disclosures to agencies). Contra, e.g., *In re Penn Central Commercial Paper Litigation, 61 F.R.D. 453, 463-64 (S.D.N.Y.1973)* (voluntary testimony before nonpublic SEC investigation waives privilege).

*Comment e. Extent of disclosure.* See generally 2 J. Weinstein & M. Berger, Evidence P511[02] (1986); Marcus, The Perils of Privilege: Waiver and the Litigator, *84 Mich. L. Rev. 1605 (1986);* Davidson & Voth, Waiver of the Attorney-Client Privilege, *64 Or. L. Rev. 637 (1986);* Developments in the Law--Privileged Communications, *98 Harv. L. Rev. 1450, 1629-65 (1985).*

Courts generally have recognized the distinction between a fact and a communication concerning the same fact in determining whether a lawyer's or client's disclosure is inconsistent with the privilege. E.g., *Diotima Shipping Corp. v. Chase, Leavitt & Co., 102 F.R.D. 532, 536-37 (D.Me. 1984)* (client's disclosure of lawyer's report of publicly available facts not waiver of client communications to lawyer about other facts); *Mitchell v. Superior Court, 691 P.2d 642, 648 (Cal.1984)* (client's disclosure that she discussed subject with lawyer is no waiver of contents of discussion); *Brookings*

*v. State, 495 So.2d 135, 139-40 (Fla.1986)* (no waiver by testifying to same facts as were discussed with lawyer). Waiver does not occur if the client reveals only nonprivileged portions of what the client communicated to a lawyer. E.g., *Southern Ry. v. Lawson, 353 S.E.2d 491, 494-95 (Ga.1987)* (lawyer's testimony about mental state of client concerned no privileged matter, thus did not waive privilege for other, related information). Consistently, some decisions hold that the client's disclosure of even incriminating and embarrassing facts does not amount to waiver of the privilege with respect to client-lawyer communications about those same facts. Most of the decisions involve self-identified accomplices in crime who turn state's evidence, but then refuse to permit questioning concerning the version of facts that they had given to their lawyers. E.g., *Commonwealth v. Goldman, 480 N.E.2d 1023, 1027-29* (Mass.), cert. denied, *474 U.S. 906, 106 S.Ct. 236, 88 L.Ed.2d 237 (1985)*. Contra, e.g., *Jones v. State, 3 So. 379, 380 (Miss. 1887); see generally* Annot., *51 A.L.R.2d 521 (1957)*. For an attempt to construct a loose "balancing" test, see *State v. Cascone, 487 A.2d 186 (Conn.1985)*.

Courts have found waiver through subsequent disclosure in a wide variety of instances of client or lawyer disclosure to nonprivileged third persons. See, e.g., *United States v. Jones, 696 F.2d 1069, 1072-73 (4th Cir.1982)* (waiver by publishing lawyer's tax-law opinion in brochures); *In re John Doe Corp., 675 F.2d 482, 488-89 (2d Cir.1982)* (disclosing privileged material to independent accountant and to lawyer for third person); *In re Horowitz, 482 F.2d 72* (2d Cir.), cert. denied, *414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973)* (sending privileged documents to accountant); *Jonathan Corp. v. Prime Computer, Inc., 114 F.R.D. 693 (E.D.Va. 1987)* (sending memorandum to third person in course of business negotiations); *North Dakota ex rel. Olson v. Andrus, 581 F.2d 177, 180-81 (8th Cir.1978)* (disclosure to single nonprivileged person); *City of Los Angeles v. Superior Court, 216 Cal.Rptr. 311 (Cal.Ct.App.1985)* (client's discussion with newspaper reporter); *Agnew v. State, 446 A.2d 425 (Md.Ct. Spec.App.1982)* (client's publication of book).

On the extent of revelation necessary to constitute waiver by subsequent disclosure, see, e.g., *Mitchell v. Superior Court, 691 P.2d 642, 647-48 (Cal.1984)* (client's disclosure that she had talked to her lawyer about toxic chemical no waiver of privilege with respect to contents of communications); *Procacci v. Seitlin, 497 So.2d 969 (Fla.Dist.Ct.App.1986)* (although client waived privilege with respect to communications with lawyer involving land sale as to which client sued lawyer for legal malpractice, thus waiving privilege for purposes of present suit involving other party to land sale, waiver did not reach other transactions on which lawyer advised client in course of lengthy client-lawyer relationship).

*Comment f. Partial subsequent disclosure and "subject matter" waiver.* The evidence codes are unclear on the point addressed in the Comment. E.g., Revised Uniform Rules of Evidence, Rule 510 (1974) (waiver because of subsequent disclosure "of any significant part of the privileged matter"); Proposed Federal Rules of Evidence, Rule 511 (1972) (same); Uniform Rules of Evidence, Rule 37(b) (1953) (waiver by "disclosure of any part of the matter"); cf. Federal Rules of Evidence, Rule 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it").

On so-called subject-matter waiver for forensic-fairness reasons, see, e.g., *State v. Earnest, 703 P.2d 872, 877 (N.M.1985)* (client's testifying to what client had *not* told lawyer waived privilege with respect to testimony of lawyer about conversation), vacated on other grounds, *477 U.S. 648, 106 S.Ct. 2734, 91 L.Ed.2d 539 (1986).*

With respect to out-of-court partial disclosures, the substantial majority of decisions announces a broad and almost automatic subject-matter-waiver rule. E.g., *In re Sealed Case, 877 F.2d 976 (D.C.Cir.1989)* (waiver by subsequent disclosure of one document waives privilege as to all communications on same subject matter); *In re Martin Marietta Corp., 856 F.2d 619 (4th Cir.1988)*, cert. denied, *490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989)* (implied subject-matter waiver as result of statements by corporation to government in negotiating settlement that "of those consulted within the Company all will testify" to certain facts and that "there is no evidence, testimonial or documentary" of other facts; waiver extends to all details underlying statements); *AMCA Int'l Corp. v. Phipard, 107 F.R.D. 39 (D.Mass.1985)* (disclosing to adversary in course of presuit negotiations letter from lawyer to client on interpretation of contracts waived privilege with respect to all communications between lawyer and client concerning lawyer's letter, but not all communications concerning interpretation of contract); *Smith v. Alyeska Pipeline Serv. Co., 538 F.Supp. 977 (D.Del.1982)*, aff'd, *758 F.2d 668 (Fed.Cir.1984)*, cert. denied, *471 U.S. 1066, 105 S.Ct. 2142, 85 L.Ed.2d 499 (1985)* (when patentee claiming infringement of patent sent alleged infringer copy of lawyer's opinion letter concerning infringement 6 years prior to suit, patentee thereby waived privilege with respect to letter; patentee also waived privilege with respect to prior and later communications between lawyer and client relating to "subject matter" of infringement of patent in patentee's subsequent infringement action).

Restatement of the Law, Third, The Law Governing Lawyers, § 79

On contrary decisions dealing with nonlitigation disclosure, see, e.g., *In re von Bulow, 828 F.2d 94 (2d Cir. 1987)* (lawyer and client's participation in writing book about crime waived privilege with respect to communications there revealed, but not for nonrevealed communications); *Diotima Shipping Corp. v. Chase, Leavitt & Co., 102 F.R.D. 532, 537 (D.Me.1984)* (dicta) (plaintiff did not waive privilege for communications with New York lawyers by disclosing communications from lawyers in Maine and France); see also, e.g., C. Mueller & L. Kirkpatrick, Modern Evidence § 5.28, at 572-74 (1995); Harmon, Note, Fairness and the Doctrine of Subject Matter Waiver of the Attorney-Client Privilege in Extrajudicial Disclosure Situations, *1988 U. Ill. L. Rev. 999* (arguing that subject-matter waiver should be limited to situations in which significant risk exists that factfinder would otherwise be misled).

If subsequent disclosure occurs in the course of pretrial discovery, it has been held that *von Bulow* is inapplicable and subject-matter waiver applies, due to the controlled setting in which disclosure occurred as well as the policy of permitting opponents to prepare for trial. See *Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465 (S.D.N.Y.1993);* cf. *Stratagem Dev. Corp. v. Heron Int'l N.V., 153 F.R.D. 535, 544-45 (S.D.N.Y. 1994)* (waiver of privilege by subsequent disclosure did not independently call for subject-matter waiver under *von Bulow* in absence of showing of prejudice to party seeking additional documents).

*Comment g. Voluntary subsequent disclosure.* The weight of authority is that a client waives the privilege by subsequent disclosure regardless of the client's subjective intent concerning the privilege. See, e.g., C. Mueller & L. Kirkpatrick, Modern Evidence § 5.28, at 564 (1995); 2 J. Weinstein & M. Berger, Evidence P511[02], at 511-6 to 511-7 (1986); 8 J. Wigmore, Evidence § 2327, at 636 (J. McNaughton rev. ed.1961); C. McCormick, Evidence § 93, at 341 n.4 (J. Strong 4th ed.1992); *In re Grand Jury Investigation of Ocean Transportation, 604 F.2d 672 (D.C.Cir.), cert. denied, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979)* (intent not to waive privilege with respect to batch of documents marked "P" irrelevant, when lawyer, when asked by recipient agency whether mistake had been made, firmly insisted that documents were intended to be disclosed and no attempt to reclaim for almost year after mistake was discovered by lawyer); *Miller v. Continental Ins. Co., 392 N.W.2d 500, 505 (Iowa 1986)* (waiver found, rejecting party's contention that disclosures of privileged conversation in affidavit did not reflect intent to waive). Cf., e.g., *Weil v. Inv. Indicators Research & Management, Inc., 647 F.2d 18, 24 (9th Cir.1981)* (subjective intent is only one factor to be considered in determining whether waiver should be implied). But see Uniform Rules of Evidence, Rule 37(b) (1953) (language, not carried forward in subsequent evidence codes, that waiver by client's disclosing communication must be "with knowledge of his privilege").

A disclosure that is involuntary, because produced by either coercion or fraud, does not constitute waiver. E.g., *State v. Schmidt, 474 So.2d 899, 902-03 (Fla.Dist.Ct.App.1985)* (parties, who had interests adverse to client who was testifying at deposition in absence of his lawyer, deceived client into believing that his testimony would not waive privilege).

On Illustration 5, see Revised Uniform Rules of Evidence, Rule 511 (1974) ("A claim of privilege is not defeated by a disclosure which was (a) compelled erroneously or (b) made without opportunity to claim the privilege."); Uniform Rules of Evidence, Rule 38 (1953) ("Evidence of a statement or other disclosure is inadmissible against the holder of the privilege if the judge finds that he had and claimed a privilege to refuse to make the disclosure but was nevertheless required to make it."); Model Code of Evidence, Rule 232 (1942).

*Comment h. Inadvertent disclosure.* The modern law on inadvertent disclosure lies somewhere between two extreme positions. See generally C. Mueller & L. Kirkpatrick, Modern Evidence § 5.29 (1995); C. Wolfram, Modern Legal Ethics § 6.4.4, at 270-71 (1986). It might be contended, at one extreme, that the attorney-client privilege should be deemed waived only when waiver is intentional. This would be something akin to the "intentional relinquishment or abandonment" doctrine employed, for example, for right-to-counsel issues in *Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938);* cf. *Eisenberg v. Gagnon, 766 F.2d 770, 788 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985)* ("No matter what standard of waiver [of privilege] is applied, the waiver must be knowing"--quoting *In re Grand Jury (Malfitano), 633 F.2d 276, 280 (3d Cir. 1980)); Georgetown Manor, Inc. v. Ethan Allen, Inc., 753 F.Supp. 936, 939 (S.D.Fla.1991); Mendenhall v. Barber-Greene Co., 531 F.Supp. 951, 955 (N.D.Ill.1982);* Marcus, The Perils of Privilege: Waiver and the Litigator, *84 Mich. L. Rev. 1605, 1634-35 (1986)* (inadvertent disclosure should result in waiver only in rare instances in which disclosure is made to ultimate factfinder and fairness requires production).

At the other extreme, Dean Wigmore argued for a virtually automatic waiver rule for any instance of inadvertent disclosure. See 8 J. Wigmore, Evidence § 2326 (J. McNaughton rev.1961). Dean Wigmore carried his position to the

point of supporting a rule of waiver when a thief stole confidential client documents. Id. § 2325. In 1942, the Institute adopted the Wigmore position in the Model Code of Evidence rule 210, comment *b* (1942):

> [Rule 210(c)(iii)] protects the communication when it has been disclosed by the lawyer in breach of his duty owed to the client to keep it secret. If a stranger obtains knowledge of the communication in any other way, there is no privilege against disclosure by him. The cases dealing with this problem are cases of eavesdroppers, which reach the result stated in the Rule...

The Wigmore-Model Code approach at one time had a considerable following. See authorities cited in Davidson & Voth, Waiver of the Attorney-Client Privilege, *64 Or. L. Rev. 637, 640-41 (1986)*. The Institute abandoned the Wigmore position in the Uniform Rules of Evidence, Rule 26 (1953); see C. Wolfram, Modern Legal Ethics 265 (1986). Some few modern decisions continue the spirit of the former rule. E.g., Suburban Sew ' *N Sweep, Inc. v. Swiss-Bernina, Inc., 91 F.R.D. 254 (N.D.Ill.1981)* (waiver when, after two years of burrowing secretly in dumpster searching wastebasket leavings of client, opposing party found handwritten draft of client's letter to lawyer).

The modern decisions cannot all be satisfactorily reconciled with any one approach, but most courts take the intermediate position outlined in the Section and Comments. They preserve the privilege unless, in effect, the client's own negligence produced the compromising disclosure. Negligence in this instance is a realistic concept. E.g., *Transamerica Computer Co. v. International Business Mach. Corp., 573 F.2d 646, 652 (9th Cir.1978)* (where trial judge's "demanding timetable" confronted responding party in discovery with "extraordinary logistical difficulties" in reviewing 17-million pages of documents within 3 months, statistically likely occurrence of inadvertent disclosure, despite extraordinary precautions, does not result in waiver). Courts have been willing to overlook some forms of what might be referred to as mild negligence. E.g., *Eureka Fin. Corp. v. Hartford Accident & Indem. Co., 136 F.R.D. 179, 184 (E.D.Cal.1991)* (factors relevant in determining excusable inadvertence).

In assessing whether inadvertent subsequent disclosure amounts to waiver, courts look to several factors. Those mentioned in the Comment are reflected in the decisions or seem sound in principle. On whether the disclosure occurred under pressure of time imposed by a court or another party, see, e.g., *Transamerica Computer Co. v. International Business Mach. Corp., supra.* On whether the client or lawyer who inadvertently disclosed the communication could reasonably have exercised closer scrutiny over the confidential communication, see, e.g., *SEC v. Cassano, 189 F.R.D. 83 (S.D.N.Y.1999)* (SEC lawyer specifically authorized release of document without examining it after defense lawyers made special request for it); *United States v. Kelsey-Hayes Wheel Co., 15 F.R.D. 461, 465 (E.D.Mich.1954)* (waiver by inadvertent disclosure where assertedly privileged documents were indiscriminately mingled with routine corporate documents with no special effort to preserve them in separate files). On whether the client had to contend with document production in discovery that required delivery of great masses of documents and only a small number of privileged documents were released, see, e.g., *Kansas-Nebraska Nat. Gas Co. v. Marathon Oil Co., 109 F.R.D. 12, 21 (D.Neb.1983)* (no waiver when one document among 75,000 produced "slipped through the cracks" of otherwise careful screening procedure). On disclosures that occur while privileged communications are permissibly in the hands of third persons, see, e.g., *Eisenberg v. Gagnon, 766 F.2d 770, 788 (3d Cir.)*, cert. denied, *474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985)* (no waiver when opposing lawyer came into possession of documents submitted in camera under what judge had announced was a sealed transcript). On whether the client's or lawyer's postrelease reaction indicates a reasonable attempt promptly to recapture the inadvertently released communication, see, e.g., *Permian Corp. v. United States, 665 F.2d 1214, 1219-20 & n.11 (D.C.Cir.1981)* (waiver when, although initial disclosure might have been inadvertent, client, although presented with ample opportunities, did not thereafter take steps to preserve privilege claim).

Illustration 6 is based on *SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 519 (D.Conn.1976)* (lawyer's failure to edit matters turned over in course of en masse copying does not constitute implied waiver when lawyer previously had excised privileged portions of documents but later failed to detect lack of deletion in substituted copies of documents because of production pressures).

See also *Eigenheim Bank v. Halpern, 598 F.Supp. 988 (S.D.N.Y.1984)* (where document was identified as privileged in previous litigation and care was not taken to assert and protect client's privilege in document, party's lax, careless, and inadequate procedures resulting in inadvertent disclosure in subsequent litigation constitute waiver).

*Comment i. Consequences of client waiver of the privilege.* See generally C. McCormick, Evidence § 93, at 347-48 (J. Strong 4th ed.1992). On the irreversible effects of a waiver through subsequent disclosure by a client or the client's authorized agent, see, e.g., *Drimmer v. Appleton, 628 F.Supp. 1249, 1252 (S.D.N.Y.1986); United States v. Krasnov, 143 F.Supp. 184, 190-91 (E.D.Pa.1956)*, aff'd, *355 U.S. 5, 78 S.Ct. 38, 2 L.Ed.2d 22 (1957); Green v. Crapo, 62 N.E.*

Restatement of the Law, Third, The Law Governing Lawyers, § 79

*956, 959 (Mass.1902)* (Holmes, J.) (voluntary disclosure through testimony); *Hogg v. First Nat'l Bank, 386 N.W.2d 921, 926 (S.D.1986),* and authorities cited. On nonwaiver in subsequent proceedings when the original waiver did not in fact result in disclosure of a privileged communication, see, e.g., *United States v. Ballard, 779 F.2d 287, 292* (5th Cir.), cert. denied, *475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986)* (that client instituted malpractice suit against lawyer, which would have permitted lawyer there to discover and introduce otherwise privileged communications under exception for privileged communications put into issue by client (see § 80), does not waive privilege for unrelated subsequent criminal prosecution).