IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 04-1494-JJF |
| NORTHWESTERN CORPORATION, | ) ) | |
| Defendant. | ) ) | |
| MAGTEN ASSET MANAGEMENT CORP., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-499-JJF |
| MIKE J. HANSON and ERNIE J. KINDT, | ) ) | |
| Defendants. | ) ) | |

**REPORT AND RECOMMENDATION OF SPECIAL MASTER
WITH RESPECT TO CERTAIN DISCOVERY MOTIONS
FILED BY PLAINTIFFS AND DEFENDANTS**

1.　　On February 8, 2006, the Honorable Joseph J. Farnan, Jr.

appointed me to serve as Special Master in the above-referenced actions.

**The Pending Motions**

2.　　The Motions presently pending before me are as follows:

A.　　Plaintiffs' Emergency Motion Seeking Orders (a)

Shortening the Briefing Schedule under Local Rule 7.1.2 and Setting a Hearing Date

Before the Special Master; (b) Determining Privilege Status of Documents Northwestern

Seeks to Recall Under Claim of Inadvertent Production and Privilege; (c) Compelling

Northwestern to Produce Non-Privileged Documents; (d) Compelling Northwestern to

Produce Legible Versions of Documents Produced in Illegible Form; (e) Extending the Period for Completing Depositions; and (f) Assessing Fees and Costs Against Northwestern ("Plaintiffs' Emergency Motion Seeking Orders, etc.").

        B.     Emergency Cross-Motion of Defendant Northwestern Corporation for an Order Truncating the Normal Briefing Schedule Under Local Rule 7.1.2 and Setting an Immediate Telephonic Hearing and for an Order that Plaintiffs and Their Counsel Immediately Comply With Their Obligations Pursuant to Paragraph Eight of the Stipulated Protective Order of March 21, 2007 ("Emergency Cross-Motion of Northwestern, etc.").

        C.     Joint Motion of Defendants Northwestern Corporation, Michael J. Hanson, and Ernie J. Kindt for a Protective Order Pursuant to Fed.R.Civ.P. 26(c) and Local Rule 30.2.

        D.     Motion of Magten Asset Management Corporation for a Protective Order with Respect to the Deposition of Talton R. Embry.

### Introduction

    3.    On May 2, 2007, Judge Farnan advised me that he was referring the above-referenced Motions to me for decision.

    4.    Consistent with the Court's direction to me, I heard oral argument on the pending motions on May 18, 2007, beginning at 10:00 A.M. and concluding at 5:00 P.M.

    5.    As a prelude to the oral argument that was to be presented by the parties on May 18, 2007, I wrote to the parties on May 17, 2007 and identified ten issues that were raised by the Motions listed above in paragraph 2 and the order in which they

would be addressed during the oral argument on May 18. The May 17, 2007 letter ("the May 17 agenda letter") to counsel for the parties is attached hereto as Exhibit A.

6.    Because of the time constraints facing the parties in view of the Rule 16 Scheduling Order in this action, I advised the parties that with respect to some of the issues identified in the May 17 agenda letter, I expected to provide Bench Rulings in order to expedite the discovery process. However, I also indicated that the complexity of other issues required that I take them under advisement and that I would issue further rulings with respect to those issues after the oral argument and after supplemental submissions by the parties.

7.    This Report and Recommendation incorporates by reference the Bench Rulings that were made during the hearing on May 18. *See* Exhibit B hereto.

8.    The issues that I decided during the course of the hearing on May 18 are as follows:[1]

A.    1.    With respect to Plaintiffs' Emergency Motion Seeking Orders, etc., and the Emergency Cross-Motion of Defendant Northwestern, etc., whether Northwestern has waived privilege with respect to the documents that Northwestern produced to Plaintiffs or whether the production was inadvertent or privilege was otherwise not waived;

B.    2.    With respect to the parties' motions referenced in paragraph 1 above, whether Plaintiffs are immediately required to return the documents or destroy the documents that are alleged to have been produced inadvertently or whether Plaintiffs can retain them until their privileged status is resolved;

C.    6.    With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern should be

---

[1]    The numbered paragraphs in subparagraphs A through G are incorporated verbatim from the May 17 agenda letter, Exhibit A hereto.

required to produce certain documents in another electronic format;

D.    7.    The Joint Motion for Protective Order filed by Northwestern and Messrs. Hanson and Kindt as to certain depositions noticed by Plaintiffs;

E.    8.    Magten's Motion for Protective Order with respect to the deposition of Talton R. Embry;

F.    9.    Plaintiffs' motion to exceed the ten deposition limit and to extend the discovery schedule for the taking of depositions in this action; and

G.    10.   Whether sanctions should be imposed with respect to any of the motions addressed in paragraphs 1 through 8 above.[2]

### Plaintiffs' and Northwestern's Motions Concerning the Inadvertent Production of Allegedly Privileged Documents[3]

9.    The genesis of these applications relates to Northwestern's assertion that on or about April 3, 2007, allegedly as a result of lawyer error, it had produced, inadvertently, privileged documents to Magten as part of the document production process in the case. According to Northwestern, the discovery on April 3 of the inadvertent disclosure of a document that, in its view, was quite clearly protected by the attorney-client privilege, triggered an extensive review of the documents that had been previously produced to Magten. As a result of that review, Northwestern notified Magten during the course of April that it had produced other privileged documents inadvertently.

---

[2] No sanctions were issued as part of the Bench Rulings that are the subject of this Report and Recommendation.

[3] Issues number 1 and 2 in the May 17 agenda letter (Exhibit A hereto) were raised in Plaintiffs' Emergency Motion Seeking Orders, etc. and the Emergency Cross-Motion of Defendant Northwestern, etc.

4

10.    In connection with Northwestern's allegation that it had produced documents inadvertently to Magten, it advised Magten that it was invoking its rights for the return or destruction of those privileged documents in accordance with paragraph 8 of the Stipulated Protective Order entered by the Court on March 21, 2007, which states as follows:

> Inadvertent production of documents subject to work-product immunity, the attorney-client privilege or other legal privilege protecting information from discovery shall not constitute a waiver of the immunity or privilege, provided that the producing party shall promptly notify all receiving Parties in writing of such inadvertent production. Upon reasonable notice, such inadvertently produced documents and all copies thereof, as well as all notes or other work product reflecting the contents of such materials, shall be returned to the producing party or destroyed, upon request, and such returned or destroyed material shall be deleted from any litigation-support or other database. No use shall be made of such documents during any deposition, mediation, hearing or trial, nor shall they be shown to anyone who was not given access to them prior to the request to return or destroy them. The receiving party then may move the Court for an order compelling production of the material, but such motion shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production.

11.    Plaintiffs argued that paragraph 8 of the Stipulated Protective Order did not support Northwestern's position because, in their view, paragraph 8 required a determination by me, as a threshold matter, as to whether the documents were produced inadvertently. Such an interpretation of paragraph 8, in Plaintiffs' view, required an examination of the traditional factors, recognized in this court and elsewhere, as part of the common law (and now codified in Fed.R.Civ.P. 26(b)(5)(B)), that are used to determine whether privileged communications have been produced inadvertently. These factors include: (a) the number of privileged documents produced inadvertently in comparison to the total document production; (b) the procedures used by the producing

party to screen documents for privilege; (c) the amount of time that elapsed between the time of production of the documents and the discovery that they had been produced inadvertently; and (d) upon discovery of the inadvertent production, how quickly the party sought their return. *See, e.g., Helman v. Murry's Steaks, Inc.*, 728 F. Supp. 1099, 1104 (D. Del. 1990).

12.    Plaintiffs argued that even though the parties took the trouble to negotiate a provision specifically to deal with inadvertent production, that the provision did not provide any additional protection for inadvertently produced documents than was provided by Rule 26(b)(5)(B), except that paragraph 8 did not permit the party in receipt of the allegedly privileged documents to sequester them (rather than return or destroy them) pending a decision on whether the production was inadvertent. Yet, Plaintiffs had not returned or destroyed the privileged documents at the time of the May 18 hearing.

13.    For the reasons set forth in my Bench Ruling of May 18, 2007 at Page 54, Line 24 through Page 58, Line 1, which is incorporated by reference as if fully set forth herein, I conclude that the actions taken by Northwestern were protected by Paragraph 8 of the Stipulated Protective Order. As indicated in the Bench Ruling, the inadvertent production provision in the Stipulated Protective Order in this case is a much broader and more liberal form of such protection than is often used in other cases. For example, it is not unusual in these types of "pull-back" or "claw-back" provisions to limit the time in which the parties are permitted to require the return of inadvertently produced documents without a dispute concerning whether the production was inadvertent or not.

14.    Other forms of pull-back provisions have also set time periods but based on the discovery of the inadvertent production as opposed to the date of the

inadvertent production. The parties in the pending actions may have chosen not to include time periods within paragraph 8 of the Stipulated Protective Order because by the time the Stipulated Protective Order was entered on March 21, written discovery was to have concluded on March 16, 2007. In any event, as reflected in the above-referenced Bench Ruling, Plaintiffs' reading of paragraph 8 of the Stipulated Protective Order, and similar "pull-back" and "claw-back" orders would render them mere nullities. The entire reason for using provisions like paragraph 8 of the Stipulated Protective Order is to avoid wasteful litigation as to whether the disclosure of an allegedly privileged document was inadvertent or not. Having seen the documents, Plaintiffs can proceed to the merits and challenge Northwestern's designation of certain documents as privileged.

### Plaintiffs' Motion to Require Northwestern to Produce Certain Documents in a Different Electronic Format[4]

14.     The focus of this dispute is that Northwestern has produced electronic documents, primarily Excel spreadsheets, amounting to approximately 300,000 pages in a TIFF format to Plaintiffs. An Excel spreadsheet, when viewed in a TIFF or PDF image, or when printed, appears quite differently than when viewed on a computer in its "native" format. A document that is in Excel format and is approximately ten pages, could amount to several hundred pages when printed or viewed on a computer in TIFF or PDF. Further, when viewed in TIFF or PDF format, the organization of the cells of information that one normally views on a single page in Excel, may be strewn over scores of pages in the TIFF or PDF format or when printed.

---

[4] This issue appears in paragraph 6 in the May 17 agenda letter, attached hereto as Exhibit A.

15.    Plaintiffs, upon receiving the documents in the TIFF format, requested that certain of the approximately 3,200 Excel spreadsheets be electronically converted to a TIFF format that would have the same appearance as an Excel spreadsheet, but would not be in the "native" format that would permit a party to change the information in the document or to view the metadata that would explain to a party how the document was created.  Northwestern cooperated with these requests and has produced several score of these reconfigured Excel spreadsheets in a readable TIFF format.

16.    Notwithstanding the cooperation between Plaintiffs and Defendant Northwestern on this discovery issue, Plaintiffs requested that Northwestern produce all 3,200 spreadsheets in a TIFF format that could be read as an Excel spreadsheet, a request that would require Northwestern to spend weeks to reconfigure all such spreadsheets at substantial expense.  In fairness to Plaintiffs, the request for the 3,200 documents came as a result of a breakdown in the parties' cooperation until that point on the production of the reconfigured Excel spreadsheets on an ad hoc basis as requested by Plaintiffs.  It is obviously too burdensome and expensive, and also in all likelihood totally unnecessary, for Plaintiffs to have readable copies of all 3,200 Excel spreadsheets that have been produced by Northwestern.

17.    Accordingly, I incorporate herein by reference as if fully set forth herein my Bench Ruling at Page 247, Line 24 through Page 250, Line 7.  This Order essentially requires the parties to cooperate and Plaintiffs to be permitted to request the production of reconfigured Excel spreadsheets in a readable TIFF format, subject to the

right of Northwestern to apply to the Court or to the Special Master to the extent that such requests are alleged to become unduly burdensome.

### The Joint Motion for Protective Order Filed by Defendant Northwestern and Defendants Hanson and Kindt As to Certain Depositions Noticed by Plaintiffs[5]

18.    The essential nature of the Motion for Protective Order filed by Messrs. Hanson and Kindt and Northwestern relates to where the depositions of Defendants Hanson and Kindt and employees of Northwestern (including a Rule 30(b)(6) witness) should be taken.

19.    On the one hand, the moving Defendants argue that the traditional rule is that individual defendants or corporate defendants should be deposed in the jurisdiction in which the individual defendants reside or work, and in the case of a corporate defendant in the jurisdiction where its principal place of business is located.

20.    On the other hand, Plaintiffs argue that the depositions in question should be conducted in Delaware (or if the parties were to agree, in New York where the majority of counsel are located who represent the parties in the action). The rationale for this argument is that Northwestern voluntarily elected to file its bankruptcy case in the Bankruptcy Court in Delaware. Additionally, Defendants Hanson and Kindt, whom Magten had sued originally in Montana Federal Court, had successfully requested the Montana Federal Court to transfer their case to Delaware where Magten had filed other related actions, including the adversary against Northwestern.

21.    The issue then becomes one of balancing equities between the traditional deference given to deponents who are defendants in an action to be deposed in

---

[5] This discovery issue was identified in paragraph 7 of the May 17 agenda letter, Exhibit A hereto.

the jurisdiction in which they reside or have their principal place of business and the policy considerations attendant to the fact that Northwestern, Hanson and Kindt all elected to have their rights adjudicated in the Federal Court or Bankruptcy Court in this state.

      22.      My Bench Ruling, reflected at Page 232, Line 13, through Page 235, Line 4, and incorporated by reference as if fully set forth herein, ordered that the depositions of Hanson, Kindt and the Northwestern employees be taken in Sioux Falls, South Dakota, which is the principal place of business of Northwestern.[6]

      23.      The Magten argument that Northwestern, Hanson and Kindt all elected to litigate the present actions in Delaware is not persuasive. While it is true that Northwestern filed its bankruptcy action in Delaware, it is not entirely accurate to suggest that by doing so it waived whatever its rights might be when it became the defendant in the adversary actions that are often ancillary features of bankruptcy filings.

      24.      Furthermore, in the case of Hanson and Kindt, the action filed against them in Montana was not an adversary bankruptcy proceeding at all. It was filed in the United States District Court in Montana and was transferred to Delaware only because the defenses that Hanson and Kindt would be asserting would be closely connected with the defenses that Northwestern would raise in connection with the adversary proceeding brought by Plaintiffs against it in Delaware.

---

[6] Mr. Kindt is no longer an employee of Northwestern and is a resident of Montana. Under the Federal Rules of Civil Procedure, Magten could not compel him to appear for a deposition in Delaware under any theory. However, Mr. Kindt has agreed to appear for his deposition in Sioux Falls, along with four other employees of Northwestern whom Magten has decided to depose.

25.    Also, Hanson is currently the Chief Executive Officer of Northwestern. Northwestern is engaged in a transaction to sell the company, the consummation of which is imminent. Accordingly, I give this factor some weight in my decision that Hanson be deposed in Sioux Falls to avoid any disruption to such a significant economic development for the company. Lastly, it is important to note that, prior to the breakdown of efforts to agree among the parties as to locations for these depositions, there was a tentative agreement that these witnesses and certain non-parties would be deposed in Minneapolis if the scheduling for the witnesses and attorneys so permitted. Because of scheduling difficulties for a cluster of depositions in Minneapolis, that alternative did not work and led to the motion practice that is the subject of this decision. Sioux Falls is only one hour by air from Minneapolis. Thus, it is no great hardship to counsel for Plaintiffs to travel to that city.

**Magten's Motion for Protective Order**
**With Respect to the Deposition of Talton R. Embry**[7]

26.    At the hearing on May 18, the parties indicated that they believed they could resolve any disputes concerning the timing and location of Mr. Embry's deposition. *See* Bench Ruling at Page 199, Line 21, through Page 201, Line 4, which is incorporated by reference as if fully set forth herein.

---

[7] This issue appears as paragraph 8 in my letter of May 17, 2007, attached as Exhibit A hereto.

**Plaintiffs' Motion to Exceed the Ten Deposition Limit
and to Extend the Discovery Schedule
for the Taking of Depositions in this Action[8]**

27.    By this Motion, Plaintiffs sought to increase the number of depositions permitted by the Rule 16 Scheduling Order from ten to approximately fourteen and to also extend the time for the taking of depositions in the case beyond the May 2, 2007 cutoff for fact depositions.

28.    Plaintiffs argued that as a product of the review of written discovery in the action, the lack of knowledge of certain deponents whom they had deposed (one deponent asserted the Fifth Amendment right against self-incrimination in response to all questions during a deposition), they needed to exceed the ten deposition limit permitted to each side in the Rule 16 Scheduling Order. Significantly, Plaintiffs also emphasized that they could not realistically hope to complete all of the depositions they sought before May 2, 2007, the cutoff date for fact deposition discovery, because of the motion practice relating to the dispute among the parties concerning privileged communications that the Plaintiffs had challenged.

29.    For their part, Defendants argued that to a great extent the delay in taking the depositions was a function of Plaintiffs' lack of diligence and a more general concern that the fact deposition cutoff date should not be extended because of the potential domino effect it could have with respect to other dates in the case schedule relating to expert depositions, dispositive motions, and trial.

30.    I determined at the hearing on May 18 that Plaintiffs had demonstrated good cause with respect to both of their applications for additional

---

[8] The issues raised by this motion are identified in paragraph 9 of the May 17 agenda letter, Exhibit A hereto.

depositions, as well as for an extension of the discovery cutoff date. Accordingly, as reflected in the Bench Ruling that appears at Page 191, Line 21, through Page 199, Line 7, each side will be permitted to take 15 depositions and the revised fact deposition cutoff date will be moved from May 2 until June 30, 2007.

      31.     In subsequent Report(s) and Recommendation(s), I will address the three issues taken under advisement, which are identified in paragraphs 3 through 5 of the May 17 agenda letter, Exhibit A hereto.

      32.     This Report and Recommendation will become a final order of the Court unless objection is timely taken in accordance with the provisions of Fed.R.Civ.P. 53(g).

         IT IS SO ORDERED this 1st day of June, 2007.

                                            John E. James (No. 996)
                                          Special Master

cc:    The Honorable Joseph J. Farnan, Jr.
       Dale R. Dube, Esquire
       Victoria Watson Counihan, Esquire
       Denise Seastone Kraft, Esquire

798845/30048-001

# EXHIBIT A



Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**John E. James**
**Partner**
Attorney at Law
302 984-6018 Direct Phone
302 658-1192 Fax
jjames@potteranderson.com

May 17, 2007

**By Hand and By E-Mail**

Dale R. Dube, Esquire
Blank Rome LLP
Chase Manhattan Center – Suite 800
1201 North Market Street
Wilmington, DE 19801

Victoria Watson Counihan, Esquire
Greenberg Traurig LLP
Nemours Building – Suite 1200
1007 North Orange Street
Wilmington, DE 19801

Denise Seastone Kraft, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street – Suite 1500
Wilmington, DE 19801

RE:   *Magten Asset Management Corp. and Law Debenture Trust
      Company of New York, Plaintiffs, v. Northwestern
      Corporation, Defendant*, D. Del., C.A. No. 04-1494-JJF
      -and-
      *Magten Asset Management Corp., Plaintiff, v. Mike J. Hanson
      and Ernie J. Kindt, Defendant*, D. Del., C.A. No. 05-499-JJF

Dear Counsel:

        I have received correspondence from counsel for Magten and Northwestern in
response to my letter to the parties dated May 14, 2007 in which I outlined the agenda
for the hearing on Friday.  Based on the letters from Ms. Dube and Mr. Pizzurro, I
have slightly revised the schedule of the issues to be presented on Friday.  I have
identified below the order in which argument will now be presented to me at the
hearing:

        1.       With respect to Plaintiffs' Emergency Motion Seeking Orders, etc.,
                 and the Emergency Cross-Motion of Defendant Northwestern, etc.,

Dale R. Dube, Esquire
Victoria Watson Counihan, Esquire
Denise Seastone Kraft, Esquire
Page 2
May 17, 2007

whether Northwestern has waived privilege with respect to the documents that Northwestern produced to Plaintiffs or whether the production was inadvertent or privilege was otherwise not waived;

2.  With respect to the parties' motions referenced in paragraph 1 above, whether Plaintiffs are immediately required to return the documents or destroy the documents that are alleged to have been produced inadvertently or whether Plaintiffs can retain them until their privileged status is resolved;

3.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern's identification of certain documents as privileged after the fact discovery cutoff, constitutes a waiver of privilege as to those documents;

4.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether the disclosure by Northwestern to the SEC of allegedly privileged documents waived the privilege as to those documents;

5.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether certain other documents that are subject to Plaintiffs' discovery requests are privileged or whether the privilege has been waived;

6.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern should be required to produce certain documents in another electronic format;

7.  The Joint Motion for Protective Order filed by Northwestern and Messrs. Hanson and Kindt as to certain depositions noticed by Plaintiffs;

8.  Magten's Motion for Protective Order with respect to the deposition of Talton R. Embry; and

9.  Plaintiffs' motion to exceed the ten deposition limit and to extend the discovery schedule for the taking of depositions in this action; and

10.  Whether sanctions should be imposed with respect to any of the motions addressed in paragraphs 1 through 8 above.

Dale R. Dube, Esquire
Victoria Watson Counihan, Esquire
Denise Seastone Kraft, Esquire
Page 3
May 17, 2007

If I have failed to include any application that is pending before me, please notify me at your earliest convenience. Also, please forward this letter to all interested counsel.

Sincerely,

John E. James
Special Master

JEJ/cml
795277/30048-001 and 002

# EXHIBIT B



**WILCOX & FETZER LTD.**

In The Matter Of:

# Magten Asset Management Corp. and Law Debenture Trust Company of New York v. Northwestern Corporation and Hanon & Kindt

---

## Special Discovery Master Proceedings

## C.A. # 04-1494-JJF & 05-499-JJF

May 18, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MAGTEN ASSET MANAGEMENT CORP.      )
and LAW DEBENTURE TRUST COMPANY    )
OF NEW YORK,                       )
                                   )
          Plaintiffs,              )
                                   ) Civil Action
v.                                 ) No. 04-1494-JJF
                                   )
NORTHWESTERN CORPORATION,          )
                                   )
          Defendant.               )
-----------------------------------)
MAGTEN ASSET MANAGEMENT CORP.,     )
                                   )
          Plaintiff,               )
                                   ) Civil Action
v.                                 ) No. 05-499-JJF
                                   )
MIKE J. HANSON and ERNIE J. KINDT, )
                                   )
          Defendants.              )

                    Potter, Anderson & Corroon LLP
                    1313 North Market Street
                    Wilmington, Delaware

                    Friday, May 18, 2007
                    10:05 a.m.


  BEFORE:   JOHN E. JAMES, ESQ.
            SPECIAL DISCOVERY MASTER


            TRANSCRIPT OF PROCEEDINGS


                    WILCOX & FETZER
     1330 King Street - Wilmington Delaware  19801
                    (302) 655-0477
                    www.wilfet.com

Page 2

```
 1  APPEARANCES:
 2      DALE R. DUBE, ESQ.
        BLANK ROME LLP.
 3      Chase Manhattan Centre
        1201 Market Street - Suite 800
 4      Wilmington, Delaware 19801
        For the Plaintiff Magten Asset
 5      Management Corp.
            - and -
 6      BONNIE STEINGART, ESQ.
        GARY KAPLAN, ESQ.
 7      JOHN BREWER, ESQ.
        FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
 8      One New York Plaza
        New York, New York  10004-1980
 9      For the Plaintiff Magten Asset
        Management Corp.
10
        KATHLEEN M. MILLER, ESQ.
11      SMITH KATZENSTEIN & FURLOW
        800 Delaware Avenue
12      Wilmington, Delaware 19899
            - and -
13      JOHN V. SNELLINGS, ESQ.
        NIXON PEABODY LLP
14      100 Summer Street
        Boston, Massachusetts  02110-2131
15      For the Plaintiff Law Debenture Trust
        Company of New York
16
        VICTORIA W. COUNIHAN, ESQ.
17      GREENBERG TRAURIG LLP
        The Nemours Building
18      1007 North Orange Street - Suite 1200
        Wilmington, Delaware  19801
19          - and -
        JOSEPH D. PIZZURRO, ESQ.
20      NANCY E. DELANEY, ESQ.
        CURTIS MALLET-PREVOST COLT & MOSLE LLP
21      101 Park Avenue
        New York, New York  10178-0061
22      For Defendant NorthWestern Corporation
23
24
```

Page 3

```
 1  APPEARANCES:  (Cont'd)
 2      DENISE KRAFT, ESQ.
        EDWARDS ANGELL PALMER & DODGE LLC
 3      919 North Market Street - Suite 1500
        Wilmington, Delaware  19801
 4          - and -
        STANLEY KALECZYC, ESQ. (Via teleconference)
 5      KIMBERLY BEATTY, ESQ. (Via teleconference)
        BROWNING KALECZYC BERRY & HOVEN, P.C.
 6      139 North Last Chance Gulch
        Helena, Montana  59624
 7      For the Defendants Mike J. Hanson
        and Ernie J. Kindt
 8
 9          - - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1      SPECIAL DISCOVERY MASTER JAMES:  Good
 2  morning.  This is Special Master James.  It's Friday,
 3  May the 18th.
 4      We're here today in connection with
 5  discovery motions in two civil actions that have been
 6  consolidated for discovery purposes that are pending
 7  in the United States District Court for the District
 8  of Delaware.
 9      These two actions are Magten Asset
10  Management Corporation and Law Debenture Trust Company
11  of New York versus NorthWestern Corporation, Civil
12  Action No. 04-1494-JJF and Magten Asset Management
13  Corporation versus Michael J. Hanson and Ernie J.
14  Kindt, Civil Action No. 05-499-JJF.
15      Yesterday I sent a letter to counsel for
16  the parties identifying the order in which we were
17  going to address the issues today.  I asked in that
18  letter whether there were any issues that I had
19  missed.  I didn't hear any response from anyone.
20      Is this the current agenda that covers
21  everything?
22      MS. STEINGART:  I think that there were
23  two items that were mentioned as possible additions,
24  Your Honor.  I think that one thing we mentioned as a
```

Page 5

```
 1  possible addition was that there were privileged
 2  documents that were miscategorized as privileged,
 3  either because they went to third parties or for some
 4  other reason they were not.  And so that was
 5  additional to either inadvertence or to the privilege
 6  log being late.
 7      SPECIAL DISCOVERY MASTER JAMES:  I believe
 8  that's addressed in paragraph 5 of my letter of
 9  yesterday.
10      MS. STEINGART:  Oh, I'm sorry.  I don't
11  have the letter of yesterday.  I'm sorry.  I was
12  looking at the wrong one.
13      I was on another matter.  Excuse me, Your
14  Honor.  I withdraw that.
15      SPECIAL DISCOVERY MASTER JAMES:  All
16  right.  Before we get started, was there anything else
17  that needs to be added to the agenda?  Okay.
18      Why don't we have everyone go around and
19  introduce themselves and the parties that they
20  represent before we get started beginning with the
21  plaintiffs?
22      MS. STEINGART:  Bonnie Steingart from
23  Fried, Frank on behalf of Magten.
24      MS. DUBE:  Dale Dube from Blank, Rome on
```

### Page 6

1  behalf of Magten.

2      MR. BREWER: John Brewer, Fried, Frank on

3  behalf of Magten.

4      MR. KAPLAN: Gary Kaplan from Fried,

5  Frank, also on behalf of Magten.

6      MR. SNELLINGS: John Snellings from Nixon

7  Peabody on behalf of Law Debenture Trust Company of

8  New York, the indenture trustee.

9      MS. MILLER: Kathy Miller of Smith,

10  Katzenstein & Furlow, also for Law Debenture.

11      MS. KRAFT: Denise Kraft on behalf of

12  Mr. Hanson and Mr. Kindt.

13      MS. BEATTY: Kim Beatty with Browning,

14  Kaleczyc, Berry & Hoven on behalf of Mr. Hanson and

15  Mr. Kindt.

16      MR. KALECZYC: Stan Kaleczyc, Browning,

17  Kaleczyc, Berry & Hoven, for Hanson and Kindt.

18      MS. COUNIHAN: Victoria Counihan,

19  Greenberg Traurig, on behalf of NorthWestern.

20      MS. DELANEY: Nancy Delaney, Curtis,

21  Mallet, on behalf of NorthWestern.

22      MR. PIZZURRO: Joseph Pizzurro, Curtis

23  Mallet, on behalf of NorthWestern.

24      SPECIAL DISCOVERY MASTER JAMES: Very

### Page 7

1  good.

2      As indicated on the agenda, we're going to

3  start first, and I'll read this into the record, with

4  respect to plaintiffs' emergency motion seeking

5  orders, et cetera and the motion and cross-motion of

6  defendant NorthWestern, et cetera, whether or not

7  NorthWestern has waived privilege with respect to the

8  documents that NorthWestern produced to plaintiffs or

9  whether the production was inadvertent or privilege

10  was otherwise not waived.

11      I think it makes sense to address this

12  issue at the same time as we address the item

13  mentioned in number 2, which is with respect to the

14  parties' motions referenced in paragraph 1 above,

15  whether plaintiffs are immediately required to return

16  the documents or destroy the documents that are

17  alleged to have been produced inadvertently or whether

18  plaintiffs can retain them until their privilege

19  status is resolved.

20      Now, I would like to start with, I would

21  like to hear from counsel for NorthWestern first

22  because I think, A, the burden is on NorthWestern with

23  respect to showing that anything is privileged and

24  while the plaintiffs filed their motion first,

### Page 8

1  basically these are cross-motions seeking similar

2  relief with respect to this issue and, therefore, I

3  would like to hear from Mr. Pizzurro first with

4  respect to these two matters.

5      MR. PIZZURRO: All right. As I understand

6  it, the first issue is whether there is a waiver based

7  on inadvertent production. So we have to deal with

8  that issue before we can get to the issue of whether

9  absent inadvertent production documents would be

10  privileged or not based on some other basis.

11      SPECIAL DISCOVERY MASTER JAMES: That's

12  correct.

13      MR. PIZZURRO: And so let me address that

14  in the first instance. Our argument is based on

15  paragraph 8. It's also based on an ancillary matter

16  on Rule 26(b), but it is primarily based on paragraph

17  8 of the stipulated protective order which was entered

18  by Judge Farnan in this case. And I cannot think of

19  plainer language that would govern this situation.

20  This was language which in the first instance was

21  actually offered by counsel for the plaintiffs at the

22  last hearing that we had when they were seeking

23  immediate production of the documents.

24      Ms. Steingart said, as we have pointed out

### Page 9

1  in the transcript I think it's page 19 of the original

2  transcript, that in addressing the burdens of the

3  production of the hundreds of thousands of documents

4  on an almost immediate basis Ms. Steingart was saying

5  look, if they want, if they have got a problem and

6  they want a protection against inadvertent protection,

7  we will give them protection against inadvertent

8  production and then went on to say the burden is on

9  us, the plaintiffs, to deal with this massive material

10  within the period that Your Honor would order.

11      This was negotiated after that and this

12  language makes clear two things. First of all, that

13  inadvertent production cannot constitute a waiver of a

14  privilege. It says it in haec verba and it further

15  more says that when a party receiving those documents

16  is notified of the inadvertent production they have

17  one option and one option only and that is, two

18  options, to destroy the documents or to return them.

19      They then have the ability to make a

20  motion to compel and they can as a basis for that

21  motion as to whether or not the documents are

22  privileged one assumes they can raise virtually any

23  basis for challenging the privilege, except they may

24  not assert the fact or circumstances of the

Page 10

1  inadvertent production.
2       So this is what Judge Farnan ordered after
3  the parties had negotiated it very carefully in the
4  circumstances of this case. So for an argument to be
5  made that there is a waiver here based on the
6  inadvertent production or the circumstances and for
7  the plaintiffs to be relying on a body of law which
8  has, first of all, nothing to do with this order and
9  which even antedates the amendments to Rule 26 which
10  talks about circumstances in which the inadvertent
11  production of documents may or may not be a waiver,
12  that's a body of law which was developed in a regime
13  where inadvertent production might constitute a
14  waiver.
15       In this case inadvertent production cannot
16  constitute a waiver. Otherwise, what Judge Farnan
17  ordered is meaningless. There's no meaning that I can
18  find in this document, in this paragraph if one could
19  find a waiver based on inadvertent production.
20       The other argument that has been made is
21  whether the notice was adequate because it does
22  provide that the party shall constitute -- the party
23  shall promptly notify all receiving parties in writing
24  of the inadvertent production.

Page 11

1       The notice of inadvertent production in
2  this case when it was first discovered was within
3  hours of the discovery. And as our correspondence and
4  my affidavit makes clear, we immediately began an
5  investigation and as we discovered more inadvertently
6  produced privileged documents, there was an immediate
7  notice that was sent with respect to each.
8       The case law in the State of Delaware and
9  elsewhere which is dealing with the issue of whether
10  or not notice is prompt under these circumstances is
11  virtually unanimous in measuring the time from not
12  when the document was produced but when the discovery
13  of the inadvertent production was made, which only
14  makes sense because otherwise it becomes virtually
15  meaningless.
16       So if one might argue that had
17  NorthWestern sat for weeks on its rights having known
18  that this had occurred that the notice would not be
19  prompt and perhaps the provisions wouldn't be
20  triggered, but that argument is simply unavailing
21  here. So we notified them immediately. We provided
22  them with a subsequent privilege log which identified
23  all of the bases for the privilege, as well as they
24  didn't need the description of the document having had

Page 12

1  the document. We asked them to immediately certify
2  its destruction or to return it. We have received no
3  documents even to date. They were provided with
4  substitute disks which has the original production
5  with the inadvertently produced privileged documents
6  excised.
7       So I just don't understand given what the
8  parties here clearly intended and what the judge
9  ordered how there can be any basis for arguing that a
10  waiver occurred here based on the inadvertent
11  production.
12       SPECIAL DISCOVERY MASTER JAMES: Now, one
13  question I have, and this was raised by your
14  opponents, is that in your opening memorandum in
15  support of your motion you address Rule 26(b)(5)(B).
16  Based on your argument today and the argument you made
17  in your motion, what relevance, if any, does that rule
18  have to this process if, in fact, after that rule was
19  enacted the parties with Judge Farnan's approval
20  entered into paragraph 8 in the confidentiality order
21  that was entered I believe on March the 21st or
22  thereabouts?
23       MR. PIZZURRO: Well, I think the relevance
24  of the rule, and the rule changed, is really simply to

Page 13

1  provide context to show why these types of agreements
2  have become important and necessary and it's a
3  recognition by Congress and the Federal Rules that
4  with sort of the massive complete change now in
5  discovery with massive electronic discovery that the
6  concept of inadvertent production as a waiver is
7  something which has changed and it's changed in the
8  Federal Rules.
9       But as we pointed out, the commentary to
10  the rules makes clear as well that it's contemplated
11  that the parties will often have their own agreements
12  which may or may not be ordered by the Court. Here
13  it's ordered by the Court. And in the instance where
14  there's an inconsistency between the procedures that
15  are provided in the parties' own agreement or the
16  Court's order and the provisions of Rule 26(b) that
17  this agreement would govern.
18       Why is that important here? It's
19  important here because the plaintiffs have claimed
20  that they have a right under the procedures that are
21  provided for in the federal rule to retain the
22  documents, sequester them, provide them to the Court
23  and have the Court make a determination in camera.
24  And that is at odds with the provisions that the

Page 14

1    parties agreed to and the Court ordered in this case,
2    which is they have no such option.
3         The only thing I think one would imply
4    that is not in this agreement that is in the rule is
5    that once those documents were returned or if they
6    were certified destroyed that the producing party
7    would clearly be under an obligation to retain those
8    documents so that they would be available if the Court
9    wanted to view them in a subsequent motion. That's
10   specifically provided for in the federal rule. It's
11   not addressed in this paragraph. I think that's
12   something which is the only residual effect that the
13   rule would have here.
14        But here the provisions of the paragraph
15   which the judge ordered I think clearly govern.
16        SPECIAL DISCOVERY MASTER JAMES: Does Rule
17   26(b)(5)(B) do anything more than codify, if you will,
18   the rather extensive case law on inadvertent
19   production that had existed prior to that date?
20        MR. PIZZURRO: Well, you know, I could
21   speculate. I don't think there's very much case law,
22   if any, that answers that question.
23        SPECIAL DISCOVERY MASTER JAMES: Do the
24   committee -- I can't remember. Do the committee's

Page 15

1    comments or the comments to the rules state anything
2    about that?
3         MR. PIZZURRO: The advisory committee does
4    talk about the existing body of law that has developed
5    regarding inadvertent production and whether there's a
6    waiver. And I believe, not having it in front of me,
7    that it says that the rule does not necessarily
8    address that, but that issue I think is irrelevant.
9    That's why the parties, particularly in this case,
10   insisted on and had the judge order the provisions of
11   paragraph 8.
12        SPECIAL DISCOVERY MASTER JAMES: Did
13   either side in crafting paragraph 8 to the
14   confidentiality order, did either side take the lead
15   in that, preparing that language?
16        MS. DELANEY: I think we did the initial
17   draft and exchanged it with plaintiffs' counsel,
18   received extensive comments and there were maybe a
19   dozen exchanges of the agreement before it was
20   finalized.
21        SPECIAL DISCOVERY MASTER JAMES: That's
22   the whole agreement or paragraph 8?
23        MS. DELANEY: No. I don't recall -- the
24   whole agreement. The whole agreement. There was

Page 16

1    substantial back and forth on the entire agreement.
2    It took, it took more than a month for the agreement
3    to be finalized.
4         SPECIAL DISCOVERY MASTER JAMES: Yes.
5    What was the date of my order, my previous order in
6    this case?
7         MR. PIZZURRO: The 29th of January, I
8    believe.
9         SPECIAL DISCOVERY MASTER JAMES: So it
10   took you the better part of seven weeks to come up
11   with this after that, correct?
12        MR. PIZZURRO: Correct.
13        SPECIAL DISCOVERY MASTER JAMES: Was
14   paragraph 8 a sticking point in that process?
15        MR. PIZZURRO: I don't recall that it was.
16        MS. DELANEY: I don't recall that it was.
17        MR. PIZZURRO: No.
18        SPECIAL DISCOVERY MASTER JAMES: Now, I'm
19   probably older than anyone here, but I'm sure I've
20   seen -- these are commonly referred to as pullback
21   provisions or clawback provisions and I'm sure I have
22   seen more than Judge Farnan and probably any other
23   judge on the Court.
24        And I would gather, Mr. Pizzurro, that you

Page 17

1    have seen these quite frequently?
2         MR. PIZZURRO: I've seen them in other
3    agreements, yes, sir.
4         SPECIAL DISCOVERY MASTER JAMES: And what
5    is your general understanding of the purpose they are
6    to serve?
7         MR. PIZZURRO: My understanding of the
8    purpose they are to serve is to deal with situations
9    precisely that we have here, where you have massive
10   discovery, where it is virtually a certainty given the
11   circumstances that something is going to slip through
12   that ought to be designated as privileged. And the
13   intent is not to put a burden on the producing party
14   to have to defend itself against a claim of waiver
15   based on inadvertent production.
16        Any other basis that would exist in a
17   challenge to the production of the document as
18   privileged or not is obviously open, but the intent
19   here is to prevent arguments. I mean if -- what could
20   be clearer as a basis for a motion to compel you may
21   not assert the fact or circumstances of the
22   inadvertent production; inadvertent production shall
23   not constitute a waiver of immunity or privilege? The
24   language could not be clearer. There's no ambiguity

Page 18

1  in this.

2      SPECIAL DISCOVERY MASTER JAMES: Let's

3  take a minute and look at your affidavit in support of

4  your motion.

5      Off the record.

6      (Discussion off the record.)

7      SPECIAL DISCOVERY MASTER JAMES: Now,

8  initially there were some inadvertent productions I

9  guess of a more limited scale. I can't recall the

10  dates precisely, but I think it was maybe December or

11  January.

12      MR. PIZZURRO: I think they're discussed

13  at paragraphs 5 and 6 of my affidavit and it's January

14  and February.

15      SPECIAL DISCOVERY MASTER JAMES: Were

16  those inadvertent disclosures in terms of the number

17  of documents more limited than the later ones?

18      MR. PIZZURRO: They were more limited and

19  they were of a different nature. The problems that

20  came up in these instances were technical problems.

21  They were problems that had to do in one case with

22  what was on the load file as opposed to what was on

23  the disk.

24      Now, I'm --

Page 19

1      SPECIAL DISCOVERY MASTER JAMES: When you

2  say, "these instances," you're talking about the early

3  instances?

4      MR. PIZZURRO: The early instances. So

5  those were errors that occurred in terms of the

6  technology and it was discovered virtually immediately

7  because the technical people were able to say there's

8  a problem here and then a review and then boom, we

9  immediately notified them. And those instances did

10  not present any problems between the parties.

11      SPECIAL DISCOVERY MASTER JAMES: And do I

12  understand -- well, I can't remember if I saw a

13  letter. They're probably in here.

14      When you notified Magten of that

15  inadvertent production, was the language in the letter

16  advising them of that similar to the language employed

17  in the later letters, which is basically we've

18  inadvertently produced X range of documents; please

19  return them?

20      MR. PIZZURRO: We'll have to look at the

21  letter.

22      It says-

23      SPECIAL DISCOVERY MASTER JAMES: Direct me

24  to the exhibit.

Page 20

1      MR. PIZZURRO: The exhibit is Exhibit 1,

2  the letter of Ms. Bagnato of January 16, 2007. It's

3  Exhibit 1 to the affidavit. And the letter does say

4  that "The production of CD's delivered to you on

5  December 18 and 21, 2006 inadvertently contained

6  attorney-client privileged information. The

7  privileged material is redacted on the images

8  themselves and in the hard copies printed from the

9  images contain such redactions. However, the

10  privileged material was not redacted in a data field

11  on the concordance load file." And then there's a

12  list of the ranges of Bates numbers and then it says,

13  "Enclosed are two replacement CD's in which the

14  privileged material has been correctly redacted in the

15  all text data fields. Please destroy the previous

16  CD's or return them to my attention."

17      SPECIAL DISCOVERY MASTER JAMES: And how

18  did Magten respond to that?

19      MR. PIZZURRO: My recollection is that

20  they returned the CD's and we gave them, you know,

21  they took the new ones.

22      MS. STEINGART: Right. Can you just tell

23  me? I think we just threw them away and we confirmed

24  that.

Page 21

1      MR. PIZZURRO: Right.

2      SPECIAL DISCOVERY MASTER JAMES: Now, this

3  is before you even had paragraph 8 in the

4  confidentiality order, correct?

5      MR. PIZZURRO: That's correct.

6      SPECIAL DISCOVERY MASTER JAMES: Okay.

7  Now, as we move along in April looking at paragraphs 8

8  et seq. of your affidavit, there was the discovery on

9  the evening of April the 3rd that a privileged

10  document was inadvertently produced. Is that correct?

11      MR. PIZZURRO: Correct.

12      SPECIAL DISCOVERY MASTER JAMES: Now, was

13  that a function of a computer error or was that a

14  function of human error?

15      MR. PIZZURRO: That was human error. The

16  remainder of, everything from this date forward my

17  understanding is was based on human error.

18      SPECIAL DISCOVERY MASTER JAMES: So the

19  argument that Magten has made that while you recognize

20  that you had produced documents inadvertently in

21  December or January that that somehow should have

22  alerted you to go back and look at all of your

23  production or take whatever steps were reasonable

24  under the circumstances to see if you had

**Page 22**

1  inadvertently produced documents, is that a legitimate
2  argument to make under these circumstances?
3      MR. PIZZURRO: Well, I don't see how it
4  could be. First of all, there were no further
5  inadvertent productions as a result of technological
6  glitches, so that problem was rectified.
7      The problem that occurred thereafter was
8  one strictly of human error. So the procedures that
9  gave rise to the discovery in January and February
10 were completely different. It's just of a different
11 nature than what occurred subsequently.
12      Once we realized that there had been
13 error, and the first time we realized that there had
14 been human error was on April 3rd, we commenced
15 immediately a thorough re-review. And that's why it
16 took some time to finally resolve this because it was
17 an extraordinary mass of material that had to be
18 re-reviewed and as it was being re-reviewed and every
19 time we came across anything of inadvertent production
20 of privileged documents, we notified the plaintiffs.
21 And they received letters on the 3rd, they received a
22 letter on the 5th, they received -- there were two
23 letters on the 12th. The reason there were two
24 letters on the 12th is because there was the discovery

**Page 23**

1  of some information early in the day and Mr. Orme was
2  being deposed that afternoon in Atlanta and so the
3  people in the office felt that the prudent thing to do
4  would be to get a letter out before that deposition
5  were to start in the event that counsel had some of
6  this material and hadn't been notified of the
7  inadvertent production and then there was a subsequent
8  letter that evening and the final letter was I believe
9  the 16th.
10      SPECIAL DISCOVERY MASTER JAMES: How many
11 documents -- I know it's in the papers. But ballpark
12 number, how many pages of documents are you alleging
13 were inadvertently produced that were the subject of
14 the April discoveries?
15      MR. PIZZURRO: I don't know the number of
16 pages. I'm going to say a thousand. Is that right?
17      MS. STEINGART: Way more.
18      SPECIAL DISCOVERY MASTER JAMES: Is this
19 the six notebooks --
20      MR. PIZZURRO: Six binders like that
21 (indicating).
22      SPECIAL DISCOVERY MASTER JAMES: Six
23 binders.
24      MR. PIZZURRO: I take Ms. Steingart's

**Page 24**

1  word.
2      MS. STEINGART: Just as a fillup to that,
3  some of these documents, one document itself is a
4  three-binder document and four copies of that document
5  were produced, four different sets of Bates numbers,
6  so that copy was Bates stamped and produced in four
7  separate places in the production.
8      And so when we talk about the number
9  re-called, we're talking of tens of thousands of
10 documents that were recalled.
11      MR. PIZZURRO: Let me make a point on that
12 because I think that's the Hylland report and that
13 report was also, is also on the original privilege
14 log, so there's no question that the document was
15 recognized by us as privileged. Multiple copies of it
16 did get through, but it was on the original privilege
17 log.
18      So there isn't any issue as to whether or
19 not from NorthWestern's point of view it viewed the
20 document as privileged. It clearly did.
21      SPECIAL DISCOVERY MASTER JAMES: When did
22 that first privilege log come out?
23      MR. PIZZURRO: Well, the privilege log was
24 provided on the 23rd of March.

**Page 25**

1      SPECIAL DISCOVERY MASTER JAMES: So before
2  this April 3rd event.
3      MR. PIZZURRO: Yes.
4      SPECIAL DISCOVERY MASTER JAMES: What
5  exactly is this report?
6      MR. PIZZURRO: This is the special report
7  or a report by the special committee of the board of
8  directors investigating Mr. Hylland, who was the CEO
9  of the company during 2002.
10      SPECIAL DISCOVERY MASTER JAMES: Okay.
11 Now, you found one document on April 3rd that you
12 clearly knew was privileged. I'm a little intrigued
13 by the fact that that would lead you then to take a
14 wholesale review of all your documents, if I
15 understand you correctly.
16      Was there something special about this
17 document that was in a category that --
18      MR. PIZZURRO: Yes.
19      SPECIAL DISCOVERY MASTER JAMES: -- sort
20 of said to you as an experienced litigator well, the
21 associates who looked at this may have missed the ball
22 or what exactly led to that?
23      MR. PIZZURRO: This document was the
24 Hylland report. This was a document which in my

### Page 26

1  judgment never under any circumstances should have
2  permitted it to be produced and when I found out -- if
3  this had been an e-mail from the general counsel to
4  the CFO about, you know, X, Y, Z, three, four lines,
5  something like that, I think we still probably would
6  have wanted to review our procedures and see whether
7  we should conduct more extensive review, but given the
8  nature of this document it was clear that we needed to
9  do a thorough review of the production.
10      SPECIAL DISCOVERY MASTER JAMES:  Off the
11  record.
12      (Discussion off the record.)
13      SPECIAL DISCOVERY MASTER JAMES:  Okay.
14  Thank you.
15      Let's hear from Magten on this.
16      MS. STEINGART:  Thank you, Your Honor.
17      I think that I'll begin with paragraph 8
18  because Mr. Pizzurro has begun with paragraph 8 of the
19  order.  Certainly paragraph 8 of the order, from our
20  point of view paragraph 8 of the order and 26(b)(5)(B)
21  operate together.  And I do not disagree with
22  Mr. Pizzurro that where you have an order and you have
23  made an agreement that is different or exceeds or is
24  less than the rule that that governs.

### Page 27

1      However, it makes clear that the
2  production must first be inadvertent.  Inadvertence
3  was not waived in that paragraph.
4      SPECIAL DISCOVERY MASTER JAMES:  Every
5  single pullback order I have ever seen uses that word
6  in it.
7      MS. STEINGART:  Right.
8      SPECIAL DISCOVERY MASTER JAMES:  You have
9  seen many of these.  Have you seen any that did not
10  use the word inadvertent production?
11      MS. STEINGART:  Yes.  And because -- and
12  that paragraph is included very often because there
13  are circumstances and there are jurisdictions where
14  inadvertent production itself is a waiver.  And the
15  paragraph was put in and the paragraph was designed.
16  It was a boilerplate agreement that was given to us
17  and I have no dispute with that paragraph, but it does
18  not mean, it does not mean that there is a waiver of
19  the threshold question that arises when anyone
20  requests a pullback under that paragraph.  The
21  threshold question is inadvertence.
22      And most times, Your Honor, that is -- I
23  would accept, most times I accept the ipse dixit of
24  the producing party on inadvertence.  But let's be

### Page 28

1  clear here.  There were three occasions prior to this
2  occasion, not one, but there were three occasions
3  where CD's had been produced and where we received a
4  letter or replacement CD that indicated that
5  privileged material had inadvertently been produced.
6      And that occurred on December 18th, on
7  December 21st, on January 19th and on January 25th.
8  On each of those occasions we did what we were
9  requested to do.  That's number one.
10      On each of these --
11      SPECIAL DISCOVERY MASTER JAMES:  Let me
12  ask you:  Did it occur to you to challenge the
13  statement at that point that those documents had not
14  been inadvertently produced?
15      MS. STEINGART:  It did not occur to us.
16      SPECIAL DISCOVERY MASTER JAMES:  Why not?
17      MS. STEINGART:  Because those requests
18  came very soon after the production was given to us
19  and at the time we took a different position as to
20  this production.  The question about the document we
21  believed and it was not until we got the papers from
22  Mr. Pizzurro that he made a different assertion.  We
23  believe that the claim is being made because we
24  brought the document to their attention.  We had

### Page 29

1  written to them early on the day of April 5th and said
2  you produced many copies of Mr. Hylland's report in
3  your production, each bearing different Bates numbers,
4  Your Honor.  It's not that one copy slipped through.
5  There were a number of copies with different Bates
6  numbers.  And we said you have produced any number of
7  copies of Mr. Hylland's report and there's certain
8  exhibits.  The report is voluminous.  There's the body
9  of the report and then there's some exhibits.
10      Many of the exhibits, sir, are not
11  privileged documents.  They're e-mails or other things
12  that are in the normal course of business for the
13  company.
14      SPECIAL DISCOVERY MASTER JAMES:  Let me
15  stop you there.
16      Did you know or did you check, I assume
17  you did, with your staff to see if that document had
18  been listed on their log?
19      MS. STEINGART:  Well, it's hard -- we
20  can't tell which documents are listed on the log
21  because the Bates stamps are different, number one.
22      Number two, many of the documents, and I
23  have examples with me, sir, that were produced are
24  marked attorney-client privileged.  There are so many

## Page 30

1    times these documents were produced by NorthWestern --
2    this is not a hastily assembled, produced production
3    of documents. This production of documents has been
4    assembled and produced any number of times by
5    NorthWestern to various entities or government
6    agencies.
7        So our view is that there were a lot of
8    documents that were produced that said attorney-client
9    privilege that hadn't been requested back; that there
10    was a large number of this particular document, a
11    large number of copies of it produced. We had no way
12    of matching the Bates numbers of things that they said
13    were produced with the log or of knowing whether a
14    particular version of it that they had on the
15    privilege log was a version that they wanted to pull
16    back because there was some annotation on it.
17        SPECIAL DISCOVERY MASTER JAMES: How was
18    this report described on the privilege log?
19        MS. STEINGART: I don't recall, Your
20    Honor.
21        SPECIAL DISCOVERY MASTER JAMES:
22    Mr. Pizzurro, do you know?
23        MR. PIZZURRO: I believe, I believe it's
24    described as the special report or the report of the

## Page 31

1    special committee.
2        MR. BREWER: If he gives me the number,
3    I've got the log.
4        MR. PIZZURRO: I've got it.
5        MS. STEINGART: So, Your Honor, at the
6    time we believed the assertion it was privileged was
7    in response to a letter we sent that said you've
8    produced numerous copies of this report; where are the
9    exhibits?
10        Several hours later we received a letter
11    from Ms. Delaney that said that's privileged; give it
12    back. And we looked at each other and we said there
13    have been various requests back for privileged
14    material. In the last production of documents which
15    was on March 23rd -- the cutoff was March 16th. The
16    privilege log was due March 23rd. On March 23rd we
17    get the privilege log and we get additional documents
18    and what NorthWestern said is you're getting these
19    documents late with the privilege log because we had
20    initially designated them as privileged but changed
21    our mind; they're not privileged. No complaint from
22    us. Certainly close in time. They in good faith had
23    made a large pile of privileged things and someone had
24    gone through it and said not privileged.

## Page 32

1        Then as we're preparing for depositions,
2    we write asking for these exhibits and we get a
3    response no, this is a privileged document. It's not
4    as if we received the same unsolicited request from
5    the company that said we have inadvertently produced.
6        Now, we talk about notice and were they --
7        SPECIAL DISCOVERY MASTER JAMES: Let's
8    stop for a minute. Do we have the name of the
9    document?
10        MR. PIZZURRO: Yes. It's listed at entry
11    1669. It's described as the special committee of the
12    board of directors and PHJW, that's Paul, Hastings, as
13    special counsel. And the subject matter is
14    investigation of Richard Hylland's performance and
15    conduct in connection with mismanagement of
16    NorthWestern and its subsidiaries.
17        SPECIAL DISCOVERY MASTER JAMES: Is the
18    date given in the date field for privilege?
19        MS. DELANEY: 4-25-2003.
20        SPECIAL DISCOVERY MASTER JAMES: All
21    right. Now, on the one that was allegedly
22    inadvertently produced, what's the date that that
23    document bears?
24        MR. PIZZURRO: It's the same document.

## Page 33

1        MS. DELANEY: There's only one that I know
2    of.
3        MR. PIZZURRO: There's only one that I am
4    aware of.
5        SPECIAL DISCOVERY MASTER JAMES: So,
6    Ms. Steingart, you said it might have been a different
7    version.
8        MS. STEINGART: It could have been a
9    different version. I don't know that all of them have
10    the same date because I stopped looking at it once I
11    got the letter. So I don't know if the four copies
12    that I have are the same date or if one copy has an
13    annotation and that's why that copy is listed as
14    privilege. Certainly --
15        SPECIAL DISCOVERY MASTER JAMES: Well,
16    somebody on your staff certainly would have done that,
17    correct? Did Mr. Brewer do it?
18        MS. STEINGART: Well, did we compare every
19    version that we had of that document?
20        MR. BREWER: Well, one of the problems
21    was, Your Honor, that in the initial letter we got or
22    maybe the second letter we got said there are -- you
23    know, we're asking for these forty things back which
24    are on our log and there are an additional thirty

Page 34

1  things which were not on our original log but we're
2  putting on a supplemental log.  But that letter -- and
3  I understand it was prepared in haste -- did not match
4  up.  It did not say this one is our log entry
5  such-and-such.
6       So we did not at that time take those
7  forty documents and try to match them up with which of
8  the 1600 log entries they might correspond to, which
9  would have of course required us to be looking at each
10 of those documents carefully which they told us they
11 didn't want us to be doing.  We got at some point I
12 think in this supplemental log which we got I want to
13 say on April 22nd, or I could be wrong about that,
14 they added some Bates numbers which made it possible
15 for the first time to match up their requests with the
16 log by correlating the Bates numbers.
17      The other thing I would say from having
18 looked at the Hylland report before they asked for it
19 back is on its face I'm not doubting that lawyers were
20 involved in the drafting of the document.  Everyone
21 knows that's how special committee documents get done.
22 On its face it doesn't say this is the report of the
23 special committee and Paul, Hastings or the report
24 of -- it said this is the report of these two

Page 35

1  non-lawyer directors to the rest of the board.
2       So if I was comparing the log to the
3  document, I think we could have -- you know, obviously
4  if there was a draft, if Paul, Hastings had prepared
5  the final draft saying to the special committee this
6  is what we think you should deliver to the rest of the
7  board, that would be privileged.  The document we have
8  which cites on its face this is the report of these
9  two members of the board or the special committee to
10 the rest of the board.
11      SPECIAL DISCOVERY MASTER JAMES: That's
12 very helpful and that's very helpful background.
13      I want to focus primarily on the
14 inadvertence issue here and I want to focus primarily
15 on provision or paragraph 8 to the confidentiality
16 order.
17      What was your understanding when this was
18 signed and approved by the Court?  What would this do
19 that 26(b)(5)(B) would not do?
20      MS. STEINGART: What this would do, the
21 only thing that this would do that Rule 25(b)(5)(B)
22 would not do --
23      SPECIAL DISCOVERY MASTER JAMES: Rule 26.
24      MS. STEINGART: Rule 26. I'm sorry.

Page 36

1  26(b)(5)(B) would not do would be to require us to
2  destroy it before making a motion to compel.
3       But my view is that we did not waive any
4  dispute we had as to whether it was inadvertent, nor
5  did we have to accept if circumstances gave us
6  reasonable cause to believe it was not inadvertent a
7  characterization of inadvertence.  And, indeed, we
8  wrote a very detailed letter to counsel explaining
9  why, one, we did not believe it was inadvertent; two,
10 why we did not believe it was prompt and, three, why
11 we did not believe that much of the material requested
12 was privileged.
13      SPECIAL DISCOVERY MASTER JAMES: Yes. I'm
14 familiar with all of that.  Let me ask you, let me ask
15 you you have obviously had experience with pullback
16 and clawback provisions.
17      MS. STEINGART: Yes, I have.
18      SPECIAL DISCOVERY MASTER JAMES: Based on
19 what I am hearing today, it's your position, unless
20 this is sui generis, that a pullback or a clawback
21 provision really doesn't add anything to the process
22 of dealing with inadvertent production; that they may
23 have been used in jurisdictions where the law treated
24 any production of privileged documents as an automatic

Page 37

1  waiver so, therefore, it may have added some
2  protection.  But I'm just confused because in Delaware
3  where this case is being litigated and in the federal
4  court these provisions are used to avoid the very
5  dispute we're having today.
6       And I'm wondering whether you consulted
7  with your local counsel or with anyone else or looked
8  at Delaware law before you entered into this.
9       MS. STEINGART: We did, sir.  But we did
10 not think that we waived inadvertence.  We thought
11 that the circumstances here because of the three other
12 requests for return of disks, because this request was
13 in response to what we had asked, because there were
14 numerous copies of this voluminous document, for all
15 the good reasons that we thought about, because this
16 is -- and I'm sure you can understand from the back
17 and forth on this that especially prior to the cease
18 and desist order this was a very key document for
19 everybody and it's not something that we thought in
20 any way, shape or form was the product of
21 inadvertence.  And for the reasons that I described,
22 there were a number of other documents that were
23 labeled such as this that have been produced and not
24 clawed back.

Page 38

1    So sometimes when you have a production --
2 and I have done this as counsel and I'm sure that
3 Mr. Pizzurro has too. You get a voluminous production
4 and all of a sudden you see something that says
5 attorney-client privilege. The only thing you say is
6 you call the other side and say did you mean to do
7 this? We both have done that.
8    Here the production is riddled with such
9 documents because there was labeling done to produce
10 to the SEC. There was labeling done in other contexts
11 for the Justice Department, so there are numerous
12 documents throughout the production and, as I say, I
13 have some here with me that are labeled attorney-
14 client work product. That would not have been a
15 notice for us and that would be not something that
16 would have clued us into the status of the document.
17    We believed when we wrote this letter that
18 because subsequent to the production of these
19 documents and in connection with other disks that
20 there was the clawback for privilege that this was
21 just someone reevaluating a decision that was made.
22 And subsequent events have justified that view because
23 of the distribution that this document received, not
24 only to the SEC but to the director who was the

Page 39

1 subject of the, the officer and the director who was
2 the subject of the investigation who had already
3 resigned from the company and who was in an
4 adversarial position to NorthWestern who was provided
5 a copy of this report.
6    Indeed, I don't think Mr. Pizzurro as he
7 sits here today would be able to give us an exhaustive
8 and complete list of everyone who has received a copy
9 of this report.
10    SPECIAL DISCOVERY MASTER JAMES: Well,
11 that may go to whether it's privileged or not or
12 whether the privilege is waived, but it doesn't
13 necessarily deal with the issue I'm focusing on.
14    Let's look at paragraph 8. Do you have
15 that in front of you of the confidentiality order?
16    MS. STEINGART: Yes, Your Honor, I do.
17    SPECIAL DISCOVERY MASTER JAMES: What's
18 the meaning of the last sentence in your
19 interpretation?
20    MS. STEINGART: The meaning of the last
21 sentence is that the fact or circumstances of the
22 inadvertence could not be used as a claim for waiver.
23 And in a jurisdiction, in a jurisdiction where
24 inadvertence by itself does not provide grounds for

Page 40

1 waiver, this sentence has less meaning than in other
2 jurisdictions.
3    But if it means that one cannot question
4 inadvertence, then why have inadvertence in the
5 paragraph at all? Why not just have production of
6 documents subject to work product privilege? Why do
7 you even need inadvertence? You know, that's the
8 problem here. If you just say anything that people
9 say by ipse dixit is inadvertent, then you take it out
10 in two places. You take it out as the first word in
11 the sentence and you take it out in that paragraph.
12    SPECIAL DISCOVERY MASTER JAMES: Have you
13 seen versions of pullback orders in which there are
14 specific time periods either in which the party
15 claiming inadvertence has to or time periods from the
16 date of production or time periods from the date of
17 noticing the inadvertence to claim inadvertence?
18    MS. STEINGART: I have, I have -- I am
19 familiar with the fact that some people have
20 agreements like that. I have never been a party to
21 such an agreement that has a time frame.
22    And that's because I think, you know --
23 and it's not here because I think that the importance
24 of the time and the fact of the time and what it

Page 41

1 measures from differs from point to point. And when
2 people say well, I only discovered it at a certain
3 point, that in itself is a conclusion. There were
4 various points in time when there were questions
5 raised about the productions that were done and if you
6 get, if you have done a review for privilege and you
7 let something go through or you let a body of material
8 like this go through and then you say well, I looked
9 at it again and I decided these other things are
10 privileged or I looked at it differently or I'm
11 looking at it a third time, they could look at it next
12 week on this basis and the light bulb could go off
13 again that something is privileged and I would just
14 have to say okay if that's what this paragraph meant.
15    But I think that what this paragraph means
16 is that if I have a good faith belief based on facts
17 and circumstances that I can set before you that it's
18 not inadvertent, that it's not prompt, that it's not
19 privileged, that I get to see that and this doesn't
20 cut off my ability to do that. And I think here we
21 had every reasonable ground to think that those three
22 indicia were not present with respect to all or most
23 of the documents.
24    I mean, one of the things that

Page 42

1  Mr. Pizzurro said in passing was that gee, we had a
2  short time to produce hundreds of thousands of
3  documents. That's not so. That's just not so. They
4  had plenty of time. They knew for a year before they
5  began this production they would have to make this
6  production.
7          SPECIAL DISCOVERY MASTER JAMES: Well,
8  that's not correct because what was the purpose of my
9  ruling? The whole issue of whether they had to
10  produce documents was held in abeyance, whether that
11  was by -- I can't remember whether that was a function
12  of Judge Farnan's doing or not. I suspect it was.
13          I think, and correct me if I'm wrong, that
14  months, perhaps even more passed before the matter of
15  what was within the scope of discovery was finally
16  directed to me.
17          Are you saying that they had an obligation
18  to start collecting let's say, certainly not producing
19  because they had filed a motion, documents which in
20  the end I determined weren't even relevant or should
21  not be produced?
22          MS. STEINGART: On September 29th Judge
23  Farnan denied their request for protective order and
24  denied it in the broadest possible terms. There were

Page 43

1  a core and a body of documents that anyone in good
2  faith would know that in this situation had to be
3  produced. Maybe it was half. Maybe it was a third.
4  But they had to know that a substantial part of the
5  production was going to be called for.
6          And then when we appeared before Your
7  Honor, they said that they would roll, a rolling
8  production.
9          SPECIAL DISCOVERY MASTER JAMES: A rolling
10  production?
11          MS. STEINGART: Yes. And we had a lot of
12  rolling towards the end. And then you gave them an
13  option. You gave them an option that for good cause
14  shown they could come back, they could come back for
15  an extension on the production. They could come back
16  for an extension on the privilege log. They could
17  have asked us for a stipulation. They could have done
18  101 things, but they didn't. Okay?
19          They kept within the time frame and to the
20  extent that errors were made when we got the three
21  requests for return over a long period of time we
22  thought the errors were caught. We had every reason
23  to believe that this was a second-guessing of
24  decisions that had already been made.

Page 44

1          SPECIAL DISCOVERY MASTER JAMES: I must
2  say that this is one of the less arguable pullback
3  provisions that I have seen and one phrase that
4  bothers me is in the first sentence, I guess, "shall
5  promptly notify all receiving parties in writing of
6  such inadvertent production."
7          Now, it's your position, I believe, that
8  promptly notify means that they have to promptly
9  notify you of the inadvertent production after the
10  production as opposed to when they discover it?
11          MS. STEINGART: No. It's my view that
12  they reviewed these productions already and they made
13  a request back that didn't include these documents, so
14  they had notification when they first tried to claw
15  things back that their discovery, that their
16  productions were flawed.
17          And this goes to another part of
18  inadvertence here. We have been -- you know,
19  inadvertence and the issue of inadvertence has been at
20  the heart of this. They knew by my letters to them
21  that I questioned inadvertence from the get-go. There
22  was no explanation back about inadvertence.
23          And, indeed, as we sit here today, there's
24  been no sworn statement provided that says we had this

Page 45

1  process and this is why it failed here and this is why
2  it failed here and this is the good faith process we
3  had to catch this. There's no reason why I should sit
4  and think I only got the first three requests because
5  they're technical glitches and they had some other
6  supervening system in place.
7          My idea of promptly is once you realize
8  there are flaws that it means that you have notice and
9  that anything thereafter has to be taken from the time
10  that you first had notice of your glitches, that you
11  first had notice of problems with your production.
12  And, indeed, when we get to March 23rd, when we begin
13  to have a reevaluation of the production and documents
14  produced that are withheld -- and some of those have
15  been asked to be returned. Some of the documents that
16  they gave us on March 23rd where they say we've given
17  you these documents late because we did a privilege
18  review and we decided these aren't privileged; they
19  changed their minds on some of those.
20          And all of those factors led us to believe
21  that this was merely a change of heart and that
22  inadvertence has to be taken from the first time or
23  notice so that we can measure promptness. It has to
24  go back to December, January, February when they made

## Page 46

1  those initial clawbacks. That's why we believed it
2  wasn't prompt. And when we asked for explanation, we
3  didn't get explanation. We just got you're not even
4  allowed to ask these questions.
5      And we didn't write a letter that said
6  look, we don't accept your characterizations; give us
7  an explanation about why. We wrote a letter that said
8  exactly why we thought it didn't meet these standards,
9  the things that we considered. And we still received
10  no response about why each of the things that we said
11  led it to not come within the order were incorrect.
12      SPECIAL DISCOVERY MASTER JAMES: Let's
13  focus on promptness just in terms of production. I
14  mean, promptness is such a relative term. Why isn't
15  it prompt even if it's two months after the fact of
16  production if you're focusing on production as opposed
17  to time of discovery? Why isn't that prompt in this
18  case? Because we know from the case law that there
19  have been cases that held eight months is prompt.
20      MS. STEINGART: Right. Right. As to some
21  of the documents I think that our view as to the
22  requests for return of documents that occurred that
23  were part and parcel of productions that were already
24  clawed back and as part and parcel of the March 23rd

## Page 47

1  production that many of the documents don't come
2  within paragraph 8 because of lack of inadvertence and
3  others of the documents don't come into 8 because
4  they're prompt. It's not a matter of all the
5  documents not being prompt, but I think a good portion
6  of them weren't prompt.
7      And we can, you know, slice and dice the
8  request for return of documents and see which ones
9  were part of which productions and we can talk about
10  promptness in tranches of documents, if that's more
11  helpful.
12      But from our point of view the ones that
13  came from the earlier production and the ones that
14  came from the March 23rd production, well, that all of
15  them were not inadvertent because I think that we have
16  a problem that we don't know the system and, you know,
17  we don't know that there was the degree of care taken
18  that would lead you to determine that they were
19  inadvertent. Certainly we don't think so.
20      And as to the later stuff -- as to the
21  earlier things we don't think it was proper. So it's
22  really not -- well, all of it is not inadvertent, much
23  of it is not prompt.
24      And then you have the other tranche where

## Page 48

1  if you look at the Hylland report, at the thousands of
2  pages, many of the exhibits are not privileged and
3  then there's separate things that they have asked for
4  back that aren't part of the Hylland report, like
5  Mr. Hylland's resume that's clearly not privileged.
6  And then there are things that they have asked for
7  back that they now include in the most recent letter
8  that they provided to the Court where they have
9  changed their mind on privilege altogether.
10      So I think that we have a basis for
11  questioning inadvertence.
12      SPECIAL DISCOVERY MASTER JAMES: I assume
13  that of the documents produced you would agree, or
14  maybe you wouldn't, that apart from the inadvertent
15  perhaps waiver that they are privileged and if I find
16  that they should be returned you would do so in honor
17  of the privilege or am I incorrect, that basically
18  everything in these six binders in your view is not
19  privileged?
20      MS. STEINGART: Well, there are things
21  that are not privileged because of the waiver because
22  it was not inadvertent.
23      SPECIAL DISCOVERY MASTER JAMES: Put aside
24  that issue. Put aside that issue and out of your

## Page 49

1  mind. Take this hypothetical.
2      MS. STEINGART: Okay.
3      SPECIAL DISCOVERY MASTER JAMES: They're
4  all going to go back to them, let's say.
5      MS. STEINGART: Okay.
6      SPECIAL DISCOVERY MASTER JAMES: Are some
7  of them privileged and some of them not or are they
8  all non-privileged based on you've looked at them?
9      MS. STEINGART: Many of them are not
10  privileged. Most of them are not privileged.
11      SPECIAL DISCOVERY MASTER JAMES: Most of
12  them but some are?
13      MS. STEINGART: Some are privileged. I
14  have to say I could not give you a page count of the
15  ones that I think are privileged and the ones that are
16  not because many of the exhibits to Mr. Hylland's
17  deposition are not, of the special report are not
18  privileged. They're just not. They're e-mails from
19  company personnel.
20      SPECIAL DISCOVERY MASTER JAMES: So with
21  respect to the documents that you would argue are not
22  privileged, how will you be prejudiced if I order that
23  those documents be destroyed or returned? Because
24  you're obviously in a position to file another motion

Page 50

1  and argue that those documents are not privileged
2  because they don't meet the standards of the
3  appropriate rule.
4      MS. STEINGART: Well, I would certainly
5  hope that all of that could be encompassed in the
6  exercise that we're here for. But if a separate
7  motion would be necessary, then certainly if that's,
8  if that's what you decide, that is certainly something
9  that we would do.
10     SPECIAL DISCOVERY MASTER JAMES: Well, you
11  say that could be part of this exercise, but that's
12  not really possible because I haven't seen the
13  documents and I don't think -- there is nothing in the
14  record that provides a description of each document
15  that would give me any idea as to whether it's
16  privileged or not.
17     I would have to --
18     MR. BREWER: Your Honor, if I could
19  interject. One of the exhibits we provided is a
20  chart, it's Exhibit 43 to the declaration we submitted
21  with our reply brief, that shows the overlap between
22  the documents subject to the request, requests for
23  return or destruction, and the documents which they
24  have admitted were disclosed to the SEC, which is

Page 51

1  another issue that's teed up for decision today.
2      So, for example, if we were to receive a
3  ruling that disclosure to the SEC does constitute
4  waiver, there is a large chunk of the documents in
5  dispute that can be crossed off on that basis.
6      SPECIAL DISCOVERY MASTER JAMES: I
7  understand. Right.
8      MS. STEINGART: Right. And in connection
9  with the motion, we have offered the documents. You
10  know, we have provided the documents for an in camera
11  review.
12     SPECIAL DISCOVERY MASTER JAMES: Right?
13  Okay.
14     MS. STEINGART: But certainly to the
15  extent that it's the desire to have us provide an
16  item-by-item assessment of what our view of privilege
17  is, we're certainly happy to do that.
18     SPECIAL DISCOVERY MASTER JAMES: All
19  right. Both sides have argued the law with respect
20  to, the case law with respect to whether, putting
21  aside paragraph 8, this is inadvertent or not. I'm
22  very familiar with that law. I don't need to ask any
23  questions about that.
24     Mr. Pizzurro, do you have any response to

Page 52

1  Ms. Steingart's position on this issue?
2      MR. PIZZURRO: Well, if I understand
3  Ms. Steingart's argument, and let's try to take it
4  away from counsel's state of mind which I heard a lot
5  about as to what they believe, let's talk about, which
6  I don't know this is necessarily relevant, but it's
7  what does the stipulation and protective order
8  provide? What I heard is an argument that production
9  is not inadvertent unless the circumstances of the
10  production meet the tests that the case law has set
11  out where it does not find a waiver based on
12  inadvertence. And that's just sophistry. That
13  argument just can't go anywhere because, otherwise,
14  this agreement doesn't mean anything.
15     Inadvertent is not the same as the conduct
16  that would be required to find that there was no
17  waiver under the prior case law. This is a
18  meaningless paragraph if that were the case. So I
19  don't understand that argument.
20     The only other argument that I heard, I
21  believe, is that they just don't believe that it was
22  inadvertent. They just think now that this still was
23  a litigation tactic that was designed to thwart their
24  ability to conduct depositions, et cetera, et cetera.

Page 53

1      Now, I don't think anybody on the other
2  side of the table is calling me a liar. I swore to it
3  and I did it as an affidavit and not as a declaration
4  because I wanted to swear to it. This was
5  inadvertent, inadvertent in the dictionary sense of
6  the term. So it was not a litigation ploy.
7      Having said that, I believe that this
8  provision makes it clear that issue is off the table.
9  Now, whether there are other bases for them to
10  challenge the privilege is clearly up to them, but the
11  fact or circumstances of the inadvertent production is
12  not open to them. That's what Judge Farnan ordered.
13  That's what they agreed.
14     And to take out the word inadvertent --
15  another thing that Ms. Steingart said is well, that
16  doesn't make any sense; just take the word inadvertent
17  out. No, that would make no sense at all because that
18  would mean that -- you know, clearly a party can waive
19  attorney-client privilege. You can make a conscious
20  waiver and you can produce a document which otherwise
21  maybe you have an argument is attorney-client
22  privilege and that can be waived under circumstances.
23     So you wouldn't -- no one would have a
24  provision, a clawback provision which simply said it

**Page 54**

1 takes away the ability to waive the privilege. That's
2 nonsensical. I really don't think there can be any
3 dispute as to what the plain meaning of these words
4 mean and the plain intent of the clawback provision
5 was/ and to state what counsel may have believed or
6 not have believed is not relevant.
7    SPECIAL DISCOVERY MASTER JAMES: Anything
8 else?
9    MR. PIZZURRO: No.
10    SPECIAL DISCOVERY MASTER JAMES: All
11 right.
12    There are a number of issues today that
13 I'm going to take under advisement and issue an
14 opinion later, unfortunately, because I think that
15 time is very important in this case. You're on a very
16 prompt schedule and I want to keep everyone on that
17 schedule. It's unfortunate that the Court took
18 several weeks before deciding that this should be
19 referred to me.
20    Therefore, in keeping with my interest and
21 your interest in having these issues teed up
22 immediately, this is one issue that I'm going to rule
23 on today and it will be part of this transcript.
24    I'm going to grant the motion of

**Page 55**

1 NorthWestern and deny the motion of Magten with
2 respect to this issue relating to the inadvertent
3 production of documents. The basis for my ruling is
4 the clear, unequivocal language in paragraph 8 of the
5 stipulation and confidentiality order signed by Judge
6 Farnan and approved by the parties on I believe March
7 21.
8    This is a classic clawback provision,
9 pullback provision. It would serve absolutely no
10 purpose except be a license for litigating
11 inadvertence given the interpretation that Magten has
12 placed on it. In my 28 years of experience in these
13 courts I have seen many, many versions of these types
14 of agreements. In fact, as I've said before, I've
15 seen more than probably any judge sitting on this
16 Court. This is the first time I've ever heard a party
17 argue, take the position that Magten is arguing here
18 because it destroys the total utility of such a
19 provision.
20    Now, I say this. I'm mindful of the
21 position in the record and the position Ms. Steingart
22 has articulated today that there are questions about
23 whether these documents may be privileged. There are
24 questions that but for this provision these may not

**Page 56**

1 have been produced or discovered or notice may not
2 have been given in as timely a fashion as might
3 otherwise have been the case in a perfect world.
4    This particular provision as written is
5 very open-ended and liberal. Many of these provisions
6 contain specific time periods in which the parties are
7 expected or are limited in their ability to raise
8 inadvertent production either from the date of
9 production or from the date of discovery. Some of
10 them are done in two-tier fashions; that if a certain
11 number of days have passed and a party raises the
12 issue, if a certain number of days have passed since
13 the production and within that time period a request
14 is made for the pullback, then there's no argument.
15 And they also provide a second time period; that if
16 the discovery is made within that period, well, then,
17 the inadvertent production issue will be discussed or
18 will be argued as to whether it was, in fact,
19 inadvertent. That could have been done here. It was
20 not.
21    The only provision that gives me pause is
22 the provision that requires the party asserting that
23 the documents were inadvertently produced to provide
24 prompt notice. It's unclear whether it's prompt

**Page 57**

1 notice in relationship to the production or prompt
2 notice in relationship to the discovery.
3    Given the liberal and broad scope of this
4 provision, I think it's reasonable to construe it as
5 giving prompt notice after discovery that the
6 inadvertent production happened and that's I think a
7 reading consistent with the rest of the terms of this
8 particular provision.
9    Even if one looked at it in terms of
10 promptly seeking the documents after they were
11 produced, given the relatively short period of time
12 during which documents have been produced in this case
13 beginning last fall through March, I don't necessarily
14 based on the record before me agree, and I don't
15 agree, with Magten's position that the notice here was
16 not prompt.
17    Therefore, in accordance with paragraph 8
18 of the confidentiality order, I'm ordering Magten to
19 either destroy the documents in question or to return
20 them along with any work product reflecting the
21 contents of such materials by Wednesday of next week,
22 whatever date in May that is.
23    I am not going to award sanctions to
24 either party with respect to this aspect of this

Page 58

1 particular motion.

2     Do we need a recess? Does anyone need to

3 go off before we go to the next issue?

4     Okay. We're up to paragraph 3 of the

5 letter, my letter of the 17th, which is with respect

6 to the plaintiffs' motion referenced in paragraph 1

7 above whether NorthWestern's identification of certain

8 documents is privileged after the fact discovery

9 cutoff constitutes a waiver of privilege as to those

10 documents.

11     This is Magten's motion, so I will let

12 Ms. Steingart set forth your position.

13     MS. STEINGART: Well, the last time we

14 were before the special master there was a direction

15 to produce documents by the 16th and a privilege log

16 by the 23rd, unless good cause was shown. And as we

17 understand it and as we have understood practice in

18 this jurisdiction that to the extent that a party

19 believes it is unable to comply with a discovery

20 cutoff that there is a necessity that at least a

21 motion be made asking for some additional time or a

22 stipulation be requested.

23     And here in this instance neither of those

24 things occurred. And we think that because of that

Page 59

1 and because all parties understood what the directions

2 were that that constitutes a waiver of the issue and I

3 think it's as simple as that. I don't think it was a

4 complicated cutoff to be aware of, nor was

5 NorthWestern not in doubt about the issues that it was

6 confronting with respect to privilege.

7     So I think that requesting such an

8 extension so that everyone knew that these subsequent

9 requests might be made and difficulties avoided would

10 have been a very simple and straightforward thing to

11 do.

12     SPECIAL DISCOVERY MASTER JAMES: Now, how

13 many privilege documents were identified after March

14 the 23rd?

15     MS. STEINGART: Well, in one of the

16 requests there were 90 additional documents and I

17 think, I think that was on April 5th.

18     MR. BREWER: I can give you an exact

19 number, Your Honor.

20     Their original log ended with number 1625

21 and their two supplements get up to 1773, so that's,

22 well, very close to 150.

23     SPECIAL DISCOVERY MASTER JAMES: Pages?

24     MS. STEINGART: Documents.

Page 60

1     MR. BREWER: 150 documents.

2     SPECIAL DISCOVERY MASTER JAMES:

3 Documents.

4     MR. BREWER: And the first supplement was

5 put out I want to say it was April 5th. It

6 accompanied one of their return demand letters. The

7 second supplement was I want to say April twenty-

8 something. I'm sure it's in the record. It was a bit

9 later.

10     And some, but not all, of the documents of

11 these supplements were also subject to the return

12 demands, so there there might be an issue as to

13 whether the interplay between inadvertence and

14 discovery and the issue, but there are also, I

15 believe, 80 or 90 documents that were not logged by

16 March 23rd that they never produced to us, at least

17 they haven't asked for them back, so the issues there

18 may be a bit different.

19     SPECIAL DISCOVERY MASTER JAMES: Now, you

20 supplied some case law that supports your position,

21 correct?

22     MS. STEINGART: We did.

23     SPECIAL DISCOVERY MASTER JAMES: Yes. And

24 this raises an issue that I'm going to have to grapple

Page 61

1 with on a number of these motions and that is where

2 do -- well, which law of which jurisdiction should

3 govern these disputes? In fact, I think the same,

4 well, there may be a slightly different issue with

5 respect to the motions for protective order as to the

6 depositions of Messrs. Kindt and Hanson.

7     But at least with respect to this motion,

8 what is your position as to which jurisdiction's law

9 controls or in your mind is there no conflict?

10     MS. STEINGART: Well, I think that with

11 respect to, you know, if this is not an issue that is

12 governed by the procedural and practice rules of this

13 jurisdiction, because I think that to some extent this

14 is not substantive, I think this is a procedural issue, you

15 know, how the orders of the Court are treated and what

16 obligations those who practice before the Court have

17 if there is some issue about compliance and timing.

18 And those issues apply even if people know they're

19 late, they still make a motion saying I'm five days

20 late and this is the good cause and please grant

21 permission. And in here none of those either before

22 or after or at any time was a request made to extend

23 or good cause shown.

24     SPECIAL DISCOVERY MASTER JAMES: Right

Page 62

1  So I may have jumped the gun here because this really
2  deals with --
3      MS. STEINGART: I can get to that issue,
4  the choice of law, if you would like me to, sir.
5      SPECIAL DISCOVERY MASTER JAMES: I think
6  you can wait because I think this one is clearly
7  determined by the procedural rules of this
8  jurisdiction because it relates to compliance with a
9  cutoff date as opposed to whether the documents are
10 privileged themselves.
11     So, Mr. Pizzurro, let's hear from you
12 about why you haven't waived privilege by identifying
13 these documents late.
14     MR. PIZZURRO: I think you have to, as
15 Mr. Brewer said or or maybe Ms. Steingart said, you
16 have to examine two different categories of documents
17 or two different privilege logs, if you will. There
18 is a category of documents that were on the first
19 supplemental privilege log, which was April 5, which
20 are not subject to the clawback letters and then there
21 are the remainder on that log and all of the documents
22 which were on the final supplemental log, which I
23 believe is April 23 or 24, which are all subject to
24 the clawback letters.

Page 63

1      Now let's look at the same argument, there
2  is an argument, and I think this first argument
3  applies to that entire universe of documents, and that
4  is there is no law which says that if you have not
5  provided a privilege log on the date which has been
6  ordered, certainly in the first instance, that that
7  constitutes a waiver of the privilege. All of the
8  case law talks about unjustified and all of the case
9  law the circumstances of those cases it's very easy to
10 see the kind of egregious conduct that the party was
11 engaged in before the Court was pushed to finding that
12 there was a waiver of the privilege.
13     The case that is relied upon principally
14 by Magten, which is the Get-A-Grip case, which is out
15 of Pennsylvania, is probably the least egregious set
16 of circumstances. That's a case in which the Court
17 had already set I believe multiple deadlines; the last
18 deadline the Court had set was slipped or the
19 producing party let slip by two more months and the
20 Court was pushed to assessing the sanction of a
21 waiver.
22     The other cases -- first of all, that's
23 not anywhere near what we're talking about here with
24 respect to any of these. We're talking about a matter

Page 64

1  of days, weeks, not months and not multiple violations
2  of orders, not a situation like the Congo case and
3  many others in which the parties simply either
4  provided no privilege log at all or absolutely failed
5  to provide the detail in the log that's required by
6  the Federal Rules.
7      Now, there's no argument that I've heard,
8  nor can there be one that the privilege logs which
9  were provided here didn't conform to the requirements
10 of the rules. They give all the information that the
11 rules require. They are detailed and they are
12 voluminous.
13     Now, a ten-day delay between the 23rd of
14 March and the 5th of April for certain documents which
15 were not subject to the clawback doesn't even -- it's
16 not even in any universe of decisions that have been
17 reported where this kind of sanction has been leveled.
18     It was a situation again that was human
19 error. The log was being put together by a number of
20 different individuals and a small portion of the log
21 which had over 1600 entries was omitted on March 23.
22 That was discovered when this review began in early
23 April and as soon as it was discovered, that part of
24 the log, which was already in existence but simply

Page 65

1  hadn't been communicated, was communicated.
2      So I just don't believe that the
3  circumstances here could possibly warrant the
4  Draconian remedy or sanction of a deemed waiver of the
5  privilege. And I think that the circumstances extends
6  to the others, but with respect to the other entries
7  on the supplemental log there's another argument here,
8  and that is if there's a waiver as a result of not
9  providing those documents on a log that was in
10 existence on March 23 because you didn't know that
11 they had been inadvertently produced until sometime
12 subsequent to that, it essentially is a back door way
13 of gutting paragraph 8. There's just no way around
14 that. You would never have the protection of
15 paragraph 8 if by giving the receiving party the
16 information to which they are entitled with respect to
17 those inadvertently produced documents you are, in
18 effect, waiving the privilege. It just doesn't make
19 any sense.
20     So I can't, I can't possibly see any basis
21 for arguing that there is a waiver with respect to
22 certainly all the documents contained in the clawbacks
23 because that means we have just back-doored paragraph
24 8 and with respect to the limited number of documents

Page 66

1  which were on the portion of the April 5 log which was
2  submitted I guess it's about ten days after the
3  discovery cutoff, given the small amount of documents
4  in relation to the overall, not only the overall
5  production but in relation to the number of documents
6  on the original log and the small amount of time, it
7  just does not come within any of the case law finding
8  a waiver under those circumstances.
9        SPECIAL DISCOVERY MASTER JAMES: Did you
10  consider discussing the problem you've had with
11  opposing counsel before -- and maybe I'm wrong on
12  this, but I believe I understand the record to reflect
13  that you simply filed late the additional log and said
14  here it is. Is that correct?
15        MR. PIZZURRO: The log with respect to the
16  90, I take Mr. Brewer's word that it was 90, of the 90
17  documents which are on the log that was on April 5,
18  and there are additional documents which were the
19  clawback documents, we had just, we had just provided
20  them with the supplemental log. At that point I
21  believe, however, the parties had, you know, already
22  been engaged in a bit of a battle over this and I
23  think we had already been told at that point by
24  counsel that they were under no obligation under

Page 67

1  paragraph 8 and they were going to continue to use the
2  documents as they saw fit. That was Mr. Brewer's
3  earlier letter.
4        Ms. Steingart subsequently it's true in a
5  conversation with me said that that was not going to
6  be the case, but as far as we knew at that point in
7  time there was really no point in trying to have
8  discussions until we could be assured that our
9  documents were going to be given the protections to
10  which they were entitled under paragraph 8.
11        SPECIAL DISCOVERY MASTER JAMES: Just so I
12  am clear on the distinction between April 5 and April
13  23, April 23 is a log that incorporates only the
14  documents that you claim were inadvertently produced
15  and that you were seeking back, seeking to have
16  returned subject to paragraph 8?
17        MR. PIZZURRO: Not quite. The first
18  supplemental log which was provided on April 5 has on
19  it two categories of documents. It has documents
20  which should have been on the original privilege log
21  and were not subject to the clawback letters that were
22  extant on April 5 and included the documents which
23  were in the clawback letters as of that date, April 5.
24        The subsequent supplemental log, because

Page 68

1  if you recall there are a couple of more letters in
2  that interim, so the second supplemental log contains
3  the entries for all of those subsequent clawback
4  requests identifying them as required by the rules.
5        SPECIAL DISCOVERY MASTER JAMES:
6  Ms. Steingart.
7        MS. STEINGART: I think that the issue
8  here is twofold. I think, one, it's a requirement
9  that some requests be made either before or after for
10  relief from the order and that none, no such request
11  was made before or after. And I think that's more
12  than a technical issue in a situation where we have a
13  party that has been resisting discovery to the letter,
14  to the edge. And I think that's something that
15  everyone is entitled to do, Your Honor. You know, I
16  think that to the extent people want to play, you
17  know, out the discovery process by insisting that no
18  line ever be crossed for any reason whatsoever, you
19  know, and resisting discovery as much as may be, I
20  think that's fine, but then I think you're also held
21  on the other side to the same rules that you are
22  imposing. That is number one.
23        Number two, I don't think that
24  inadvertence can be assumed. I don't understand that

Page 69

1  the burden of having admittedly done prior reviews of
2  these documents and having this slip through and then
3  going back means that someone can say my log was late
4  because it was inadvertent if there's a significant
5  question about inadvertence. You know, I think it's
6  late. So I don't think that it's circular. I don't
7  think -- you know, I think that it bespeaks the same
8  kind of issue or the same kind of arrogance that
9  pertains to not either seeking before or after the
10  fact relief from the date and then accepting the
11  burden of good cause shown. That's what the ruling
12  was here, and I can read it to you.
13        It said upon good cause shown March 23rd,
14  March 16th. I think if they want to rely on
15  inadvertence, if they want to rely on these things,
16  they have to make a motion and show good cause. And I
17  don't think that's been done in any way, shape or
18  form.
19        So I think that we're back unfortunately
20  somewhat to that issue. And while I understand that
21  NorthWestern regards this as a Draconian remedy, I
22  think that either in their moving papers or their
23  reply or in any of the various things that have been
24  submitted here there has been no such showing.

Page 70

1     MR. BREWER: If I could just clarify one
2  fact. There have been -- there were a lot of letters
3  back and forth between the parties and it's very easy
4  to get the sequence muddled. I just wanted to clarify
5  one point Mr. Pizzurro had made where I think he
6  inadvertently got muddled, if I could use that word.
7     MR. PIZZURRO: It's entirely possible.
8     MR. BREWER: We got the first supplemental
9  log, which is the one that also includes these
10  documents with the clawback, was sent on March 5th.
11  This was the one that was sent at 11:00 p.m. on March
12  5th and because of the holidays frankly none of us
13  looked at until the following Monday when I was back
14  in the office and --
15     SPECIAL DISCOVERY MASTER JAMES: Did you
16  say March 5th or April 5th?
17     MR. BREWER: I'm sorry. April 5th. It
18  was one of those Monday-Thursday.
19     That had the supplemental, this first
20  supplemental log which included both thirty-odd
21  clawback documents that were simultaneously being
22  referred to in the covering letter and about 90 other
23  miscellaneous things. They had not contacted us prior
24  to that as best as I recall and said we need to

Page 71

1  supplement our log because we missed a few things.
2     My letter to Mr. Pizzurro or one of his
3  colleagues that he, rightly or wrongly, took to mean
4  it was not productive to talk to us was the following
5  week, I think was the Wednesday of the following week.
6  So whatever good reasons they may have had for not
7  wanting to talk to us in advance about the need to
8  supplement their log, something hadn't been, some word
9  processing glitch had kept something from getting
10  stuck in the final document, it was prior to that,
11  that letter he referred to. But there were a lot of
12  things going back and forth.
13     MR. PIZZURRO: That's entirely possible.
14  Let me make a point, if I could.
15     MS. STEINGART: Could I just finish?
16     MR. PIZZURRO: I'm sorry.
17     MS. STEINGART: Just one last point. It
18  does say in the notes to the rule that the privilege
19  log, and this is what it says --
20     SPECIAL DISCOVERY MASTER JAMES: Reading
21  from?
22     MS. STEINGART: I'm reading from the
23  committee notes to Rule 26(b)(5).
24     SPECIAL DISCOVERY MASTER JAMES: What

Page 72

1  page?
2     MS. STEINGART: I'm on page 150 of the
3  2007 edition and I'm at the bottom of that page.
4     And it's saying that in 1993 that
5  paragraph 5, which required the privilege log, is a
6  new provision, quote, a party must notify other
7  parties if it is withholding materials otherwise
8  subject to disclosure under the rule or pursuant to a
9  discovery request because it is asserting a claim of
10  privilege or work product protection. To withhold
11  materials without such notice is contrary to the rule,
12  subjects the party to sanctions under Rule 37(b)(2)
13  and may be viewed as a waiver of the privilege or
14  protection.
15     So from the get-go that is an available
16  remedy where the privilege log, either the deadline or
17  some other aspect of delivering a privilege log is not
18  complied with.
19     SPECIAL DISCOVERY MASTER JAMES: All
20  right. Anything else?
21     MS. STEINGART: That's all. Thank you.
22     MR. PIZZURRO: A couple of points. First
23  of all, we couldn't have provided the small portion of
24  the privilege log on April 5 which should have been

Page 73

1  and was prepared to be submitted on March 23rd until
2  then because we didn't know that that, in fact, had
3  occurred and as soon as we discovered it, we
4  immediately provided it.
5     So the terms of Your Honor's order were
6  that we were required to have substantially completed
7  our production of documents in response to the two
8  requests except for good cause shown no later than
9  March 16 or the privilege log relating to that
10  production no later than March 23.
11     Now, I don't know. The way -- I'm parsing
12  Your Honor's words and Your Honor knows what he meant
13  better than I do, I suppose, but substantial
14  compliance except for good cause shown. We're talking
15  about it's less than a percent, unless my math is way
16  off, of the documents that should have been on but
17  were not on the March 23 privilege log that were
18  provided on a privilege log ten days later. That I
19  think comes pretty close to substantial performance.
20  And if it's 9 percent, I'll take it. Whatever the
21  math is, it is a very small, very small percentage.
22     So, again, the case law I think makes very
23  clear that the courts are not going to find a waiver
24  of the privilege under these kinds of de minimis

Page 74

1  circumstances.
2      The second part of the argument that
3  Ms. Steingart made I think just demonstrates the point
4  that I made, and that is she's back to arguing that we
5  haven't demonstrated inadvertence and if we hadn't
6  demonstrated inadvertence, then we can't say there's a
7  late privilege log. Well, I believe we have had a
8  ruling on that and that's over with. That argument
9  has been put to rest.
10      So the only possible result to finding a
11  waiver with respect to the entries which are on the
12  supplemental logs related to the clawback letters is
13  to effectively gut paragraph 8.
14      SPECIAL DISCOVERY MASTER JAMES: Thank
15  you. All right. I'm going to take this paragraph
16  under advisement.
17      Let's take a short break. Five minutes.
18      MS. STEINGART: Thank you.
19      (A brief recess was taken.)
20      SPECIAL DISCOVERY MASTER JAMES:
21  Proceeding to the next issue, it's paragraph 4 of my
22  letter of yesterday, with respect to the plaintiffs'
23  motion referenced in paragraph 1 above whether the
24  disclosure by NorthWestern to the SEC of allegedly

Page 75

1  privileged documents waived the privilege as to those
2  documents.
3      I'm going to start with Magten, again
4  because it's Magten's motion.
5      This is where I would like some thoughts
6  on choice of law.
7      MS. STEINGART: Okay. This is an issue
8  that was somewhat previewed the last time we were
9  here. We talked about the production of material that
10  had been given to the SEC and we also talked about
11  production of privileged material that had been
12  provided to the SEC because there had been a selective
13  waiver by NorthWestern in connection with the
14  investigation of NorthWestern by the SEC.
15      Now, we are in the adversary proceeding
16  concerning Magten's and Law Debenture's claims against
17  NorthWestern concerning fraudulent conveyance. In a
18  bankruptcy court what a bankruptcy court usually does
19  in an adversary is apply state law if state law
20  provides the rule of decision. In the adversary
21  proceeding concerning Magten, Law Debenture and
22  NorthWestern, in addition to the adversary proceeding
23  that involves the two individuals, the applicable law
24  is Montana law. It's Montana law concerning a

Page 76

1  fraudulent conveyance that provides the rule of
2  decision.
3      In terms of all of the motions to dismiss
4  that were made, the motions for summary judgment by
5  the defendants in Montana, plus the motions made
6  before Judge Case and Judge Peterson, everyone relied
7  on Montana law as the rule of decision. Indeed, even
8  if we look at the Delaware court in this situation
9  that would be sitting and determining this issue, if
10  the Delaware court as it wants applies the substantial
11  contacts analysis, the law to be applied would be
12  Montana law. All of the transactions and the
13  occurrences occurred here, all of —
14      SPECIAL DISCOVERY MASTER JAMES: "Here"
15  you mean Montana?
16      MS. STEINGART: In Montana. All of the
17  persons, or South Dakota, all of the persons that
18  undertook the actions that are the subject of the
19  disputes here acted there. The meetings and
20  preparation of materials that are the subject of the
21  motion here were created there by persons who resided
22  there.
23      Indeed, in the restatement of law,
24  conflict of law would require the application of

Page 77

1  Montana or South Dakota law under these circumstances.
2      SPECIAL DISCOVERY MASTER JAMES: I want to
3  stop you there because the reason I asked this was I
4  don't have enough knowledge about the background of
5  the merits of the claim to be as informed on this as
6  you are.
7      You indicated Montana. Now, I've been
8  reading in the materials provided to me with respect
9  to these motions about the South Dakota nexus. As I
10  understand it, NorthWestern, its corporate
11  headquarters have at all times relevant to this
12  litigation been in Sioux Falls, South Dakota. Is that
13  correct?
14      MS. STEINGART: That's correct.
15      SPECIAL DISCOVERY MASTER JAMES: So
16  educate me as to why Montana versus South Dakota.
17      MS. STEINGART: Right. It has been argued
18  from the filing of the adversary proceeding that it's
19  Montana fraudulent conveyance law that will determine
20  whether a fraudulent conveyance has occurred here.
21      SPECIAL DISCOVERY MASTER JAMES: Let me
22  stop you there. I thought the decision of the
23  bankruptcy court was that there was no fraudulent
24  conveyance argument that you could make, but you could

Page 78

1  make an argument based on common law fraud. Is that
2  incorrect?
3        MS. STEINGART: What the Court said is
4  that if there was an overarching fraud that impacted
5  the transfer of assets from Clark Fork to NorthWestern
6  that we would not lose our standing as creditors of
7  Clark Fork to challenge the transfer.
8        In other words, to the extent that the
9  fraud was a bigger fraud because it involved both
10  movement of assets and liabilities, you can't say
11  because I did a bigger fraud you lose standing to
12  challenge. So the holding of the bankruptcy court was
13  that if we could show an overarching fraud under
14  Montana law, under any law, that would permit us to
15  not be deprived of our ability to assert the disparity
16  in value of assets and liabilities.
17        SPECIAL DISCOVERY MASTER JAMES: Okay.
18  Now, as I understand the going flat transaction
19  allegations, the overarching fraud would have emanated
20  from the actions or lack of actions taken by the
21  officers and directors of NorthWestern as opposed to
22  the subsidiary Clark Fork which was merged into the
23  parent and those actions would have been taken in
24  South Dakota, wouldn't they?

Page 79

1        MS. STEINGART: Right. I think those
2  actions were taken both in South Dakota and Montana.
3  I think the corporation had offices and headquarters,
4  though its main offices were in Sioux Falls, I think
5  it had a presence in both places and certainly was
6  answerable to regulatory authorities because the bulk
7  of its energy assets were located in Montana.
8        And so the law applied thus far to all of
9  the decisions concerning the claims, concerning the
10  existence of the claims, the scope of the claims, the
11  viability of the claims have all been the rule of
12  decision that's not Delaware law because really the
13  decision here is Delaware or not Delaware because
14  Delaware is the only jurisdiction that's relevant here
15  that in a lower court decision accepted selective
16  waiver.
17        And even when you look at Westinghouse,
18  which is a Third Circuit decision, that was a
19  diversity case. Westinghouse was a Delaware company
20  and the law applied was New Jersey law because New
21  Jersey law applied the rule of decision in the
22  substantive dispute that was being litigated.
23        SPECIAL DISCOVERY MASTER JAMES: I guess
24  my problem is when I make a decision on this I'm not

Page 80

1  sure I know whether I should choose Montana or South
2  Dakota or whether it makes any difference. The fact
3  that -- and maybe your adversaries will take a
4  different position. Maybe they agree that I don't
5  need to worry about this. Maybe it is just Montana or
6  Delaware.
7        But from your perspective, I need to know
8  whether it should be South Dakota or Montana.
9        MS. STEINGART: I think from my
10  perspective it's Montana. But I do think that whether
11  it's South Dakota or Montana would not yield a
12  different result. I think both of them do not, do not
13  have any authoritative decision that adopts selective
14  waiver. And, indeed, the vast majority of courts that
15  have considered the issue have rejected selective
16  waiver for any number of good and sufficient reasons
17  and, indeed, federal courts that have dealt with the
18  issue subsequent to the lower court decision in
19  Delaware have rejected that, have rejected the
20  analysis from the Saito decision and rejected any
21  notion of selective waiver.
22        SPECIAL DISCOVERY MASTER JAMES: Remind
23  me. Did you cite any Montana decisions in your
24  papers? I don't seem to recall any.

Page 81

1        MS. STEINGART: No, we didn't.
2        MR. BREWER: No. I don't think either
3  party could find any --
4        MS. STEINGART: There were none. There
5  were none.
6        MR. BREWER: -- on point, so the
7  assumption is that they follow the majority rule, the
8  majority national rule absent any indication to the
9  contrary.
10        MS. STEINGART: Right. And certainly
11  there's nothing that would suggest that selective
12  waiver would be adopted by them.
13        SPECIAL DISCOVERY MASTER JAMES: Now, one
14  thing I was considering was whether to hold up my
15  decision pending further submissions by both sides on
16  whether it's Montana, what Montana law says about
17  this.
18        But am I hearing from you that you have
19  looked and as far as you can tell, there's no law that
20  addresses this issue?
21        MS. STEINGART: Right.
22        SPECIAL DISCOVERY MASTER JAMES: Have you
23  looked at South Dakota?
24        MS. STEINGART: Yes. We have looked at

## Page 82

1  South Dakota.
2      SPECIAL DISCOVERY MASTER JAMES: And
3  nothing there either?
4      MS. STEINGART: No.
5      SPECIAL DISCOVERY MASTER JAMES: All
6  right. Sorry. Go ahead.
7      MS. STEINGART: So given that in the Third
8  Circuit there is no district court, whether applying
9  federal law or applying local law, that has ever
10  issued a decision in favor of selective waiver and
11  that here if we look at the applicable law there is no
12  decision that endorses selective waiver.
13      It seems to me that the only result that
14  is possible is that the materials provided to the SEC
15  that fall within the categories of materials that the
16  Court has previously found to be producible be
17  provided to us.
18      SPECIAL DISCOVERY MASTER JAMES: You
19  mentioned the restatement. Run me through the
20  restatement analysis and why you think that would
21  point to my reliance on Westinghouse instead of Saito.
22      MS. STEINGART: Under the restatement,
23  evidence that is not privileged under the local law of
24  the state which has the most significant relationship

## Page 83

1  with the communication will be admitted even though it
2  would be privileged under the local law of the forum
3  unless admission of such evidence is contrary to
4  strong public policy of the forum. And the forum with
5  the most significant contacts to this case and,
6  indeed, the forum whose law would apply here would be
7  Montana law. And given that analysis and given that
8  principle, that guiding principle in determining
9  privilege, we believe that selective waiver would not
10  be adopted there certainly and that since it does have
11  the greatest contacts that, you know, that their
12  material should be produced.
13      There's no nexus, there's no nexus between
14  the actions that are subject to adjudication and
15  events or people in Delaware. You know, so it's not
16  only the presence of substantial activity and the rule
17  of decision from another jurisdiction, but it's also
18  the absence of any activity or by persons or by the
19  company here. All the activity was elsewhere.
20      So I think that's compelling.
21      SPECIAL DISCOVERY MASTER JAMES: Now, one
22  of the things referenced in NorthWestern's opposition
23  to this motion was the fact that obviously this is a
24  very timely and very controversial issue and of course

## Page 84

1  the Congress is considering whether to amend the rules
2  of privilege to change the result basically of
3  Westinghouse and to follow the Circuit's decision on
4  selective or partial waiver, which is a distinction I
5  still can't quite understand.
6      But, in any event, what, if any, effect
7  does that have on your argument?
8      MS. STEINGART: Well, I think at this
9  point that amendment of the rule has been rejected and
10  I think that as a result of the rejection, it makes
11  the appropriateness of following the Westinghouse
12  decision more compelling. So I do think that given
13  the way a Delaware court would look at this issue or
14  the way a federal court would look at this issue or
15  the way the federal court would look at a Delaware
16  court looking at this issue, because we do have those
17  lenses when we're in this context, I think each of
18  those perspectives yield the same conclusion and I
19  think that's precisely the analysis that took place in
20  Westinghouse, which was a Delaware company.
21      SPECIAL DISCOVERY MASTER JAMES: Now, I
22  assume that all the SEC documents are identified on
23  the privilege log of NorthWestern?
24      MS. STEINGART: At this point I think they

## Page 85

1  are.
2      MR. BREWER: If I could correct on that.
3  I think that's --
4      MS. STEINGART: That's right. The last
5  tranche did not.
6      MR. BREWER: I think that's not the case.
7      MS. STEINGART: When we first received the
8  privilege log, as you could tell from the
9  correspondence, although we asked for SEC distribution
10  to be identified, because they were a third party, it
11  wasn't. After some going back and forth, we received
12  that information. And on the April 24th privilege log
13  which lists a number of items that return was sought
14  on, there is no indication about whether they were
15  provided to the SEC or not. These were not documents
16  previously on the privilege log, so we don't know the
17  status of those with respect to the SEC.
18      MR. BREWER: If I can, the chart that we
19  provided with our reply papers that shows for all the
20  items in dispute whether they were provided to the SEC
21  or not, it says yes, blank or question mark. And the
22  question mark is where generally because it was the
23  ones that were provided that were clawed back later,
24  logged late or for other reasons we were unable to

Page 86

1  correlate the document to the list they had given us
2  of which items on the privilege log had been provided
3  to the SEC.
4        SPECIAL DISCOVERY MASTER JAMES: Okay. I
5  have a present for Ms. Kraft.
6        MS. KRAFT: Thank you.
7        MR. BREWER: If I could make one point.
8        SPECIAL DISCOVERY MASTER JAMES: I was
9  distracted, I'm sorry, by that intrusion.
10       Can you just restate everything you just
11  said?
12       MR. BREWER: Okay. I better find the
13  right --
14       SPECIAL DISCOVERY MASTER JAMES: Yes.
15  Point me to your papers.
16       MR. BREWER: Let me find the right
17  exhibit.
18       MS. STEINGART: It's an exhibit to our
19  reply.
20       MR. BREWER: It's Exhibit 43 to the
21  supplemental Brewer declaration which was in our reply
22  papers with the emergency motion.
23       SPECIAL DISCOVERY MASTER JAMES: Okay.
24  43?

Page 87

1        MR. BREWER: Yes. So this chart, which
2  Ms. Steingart has pointed out is in unhelpfully small
3  type, was trying to help show how some of these
4  various issues overlap with respect to the documents
5  that were subject to the return demands. And there's
6  a column toward the right that says admittedly
7  disclosed to SEC. And at some point early in April
8  they gave us a list that corresponded to their log up
9  to that date of what they disclosed to the SEC.
10       So basically that column yes means it's on
11  their list, they told us they gave it to the SEC,
12  blank means apparently they did not disclose to the
13  SEC and question mark means basically the information
14  available to us was not sufficient to make that
15  determination generally because there were an
16  additional thirty-odd items that were the subject of
17  clawback letters subsequent to the list they gave us
18  of what they had given to the SEC, so we didn't have
19  the ability to cross-reference.
20       SPECIAL DISCOVERY MASTER JAMES: Okay. I
21  guess for purposes of this motion since it's all or
22  none, I don't really need to know the answer to that,
23  but I'm going to need -- I mean for the record let me
24  turn to Mr. Pizzurro just for a minute and I'll come

Page 88

1  back to you.
2        MS. STEINGART: Sure.
3        SPECIAL DISCOVERY MASTER JAMES: Do you
4  know the answer to whether these other documents were
5  given to the SEC or not?
6        MR. PIZZURRO: I don't know the answer to
7  that as sit here, no.
8        SPECIAL DISCOVERY MASTER JAMES: Okay. Go
9  ahead, Ms. Steingart.
10       MS. STEINGART: All right.
11       SPECIAL DISCOVERY MASTER JAMES: Is there
12  anything else?
13       MS. STEINGART: You know, I have to just
14  regretfully make one sort of little side note here and
15  this was something that I meant to discuss and you've
16  reminded me of it when you asked me about the waiver
17  under the privilege log and that is -- may I harken
18  back to that for 30 seconds?
19       SPECIAL DISCOVERY MASTER JAMES: Does this
20  relate to the thing I already ruled on?
21       MS. STEINGART: No. It's something that
22  you have reserved --
23       SPECIAL DISCOVERY MASTER JAMES: Okay.
24  Sure.

Page 89

1        MS. STEINGART: -- on the privilege log.
2  That one of the inadequacies in their privilege log
3  and one of the reasons, an additional reason that
4  there should be a waiver there is before the privilege
5  log was delivered to us we reminded NorthWestern that
6  they should disclose which documents on that log had
7  been provided to the SEC. When we first received the
8  privilege log, there was no such designation. And it
9  took additional correspondence and additional
10 persuasion before NorthWestern was willing to do that
11 even though a privilege log would require anyone to
12 show each of the parties, the preparing party, excuse
13 me, to show each person or entity to which the
14 privileged document had been provided.
15       SPECIAL DISCOVERY MASTER JAMES: So you're
16 saying that in addition to the reasons you've already
17 stated for waiver because of lateness, also the log
18 was inadequate and, therefore, privilege could be
19 waived on that basis?
20       MS. STEINGART: Right. And there can be
21 no inadvertence claimed with respect to that. That's
22 something that was discussed, was an issue here before
23 the Court, was something that we sent a letter on
24 before the privilege log was delivered and the

### Page 90

1  privilege log was devoid of any reference, nor even a
2  commitment to provide such or a request that we would
3  agree to a delay because they would provide such,
4  again which could have been made either before or
5  after the fact.
6        Back to choice of law. So I think that
7  where we are on choice of law is that the restatement,
8  the way the restatement would analyze the question and
9  the way that each of the courts would, we're at
10  Montana law and the amendments to 502 have not, have
11  not been adopted and have, in fact, been set aside. I
12  don't want to say rejected because who knows when
13  people may look at them again?
14        So a federal court would be constrained at
15  this point in this setting reject selective waiver.
16        SPECIAL DISCOVERY MASTER JAMES: Now,
17  remind me. I believe that I ordered production of SEC
18  documents, did I not?
19        MS. STEINGART: Yes.
20        SPECIAL DISCOVERY MASTER JAMES: And am I
21  correct that NorthWestern has produced some SEC
22  documents?
23        MS. STEINGART: Yes. Yes, they have. And
24  within the categories, you know, our request was

### Page 91

1  narrowed and within the categories that the Court
2  ordered production, we have production, except for the
3  items that are listed. In the production that
4  NorthWestern made to the SEC, they produced both
5  privileged and non-privileged documents. So to the
6  extent that they provided, that those things fell into
7  the items that you ordered, they provided us with the
8  non-privileged documents and as to the privileged
9  documents they provided to the SEC they maintain that
10  the privilege remains intact.
11        So, yes, we do have production of the
12  non-privileged materials.
13        MR. BREWER: And there's the Rule 408
14  stuff.
15        SPECIAL DISCOVERY MASTER JAMES: That's
16  part of another argument, or is that part of this?
17        MR. BREWER: There's the Rule 408 stuff.
18        MS. STEINGART: Right. The Rule 408 is
19  part of item 5, I think.
20        SPECIAL DISCOVERY MASTER JAMES: Right.
21        MR. BREWER: Okay.
22        SPECIAL DISCOVERY MASTER JAMES: Okay.
23  Mr. Pizzurro.
24        MR. PIZZURRO: All right. Let me first

### Page 92

1  briefly address the aside that Ms. Steingart just
2  mentioned on the privilege log.
3        As we pointed out in our papers, this
4  issue as to whether or not documents would be
5  produced, otherwise privileged documents would be
6  produced because they were produced to the SEC, it was
7  teed up between the parties in December in
8  correspondence between Ms. Steingart and myself. It
9  was presented again in front of Your Honor at the
10  January 29 hearing and it was the subject of that
11  letter.
12        And as Your Honor just pointed out, there
13  is absolutely no need to know what documents are on
14  the privilege log that were produced to the SEC in
15  order to get a ruling on this issue. This is a motion
16  that could have been, probably should have been made
17  months ago, so there is no issue here about a waiver
18  based on a deficient privilege log. And they can't
19  claim -- and this is another point on the overall
20  waiver of privilege log, slash privilege log issue.
21  There's no prejudice to Magten. There's no prejudice
22  on this issue. There's no prejudice on the other
23  issue.
24        So all of that, those are significant

### Page 93

1  factors that the Court would have to take into account
2  in trying to determine whether there was any waiver
3  because of the delay in the privilege log. But having
4  spoken to that, let me address the choice of law issue
5  in this entire matter.
6        I think where we are -- and I'm sure I'll
7  be reminded if we're not by Ms. Steingart -- is an
8  agreement that Westinghouse is not the controlling
9  rule of decision in this case. It simply is not. It
10  represents a majority view in Magten's view, but it is
11  not binding on Judge Farnan or Your Honor. And so the
12  issue here is what is the appropriate rule of
13  decision? Right? So we know it's not Westinghouse.
14  What is the rule?
15        The Third Circuit has said that the
16  federal court in assessing whether or not a privilege
17  applies under Rule 501 of the Federal Rules of
18  Evidence where it is sitting in diversity or it is
19  assessing a state law claim has to apply state law to
20  determine the privilege. And in the first instance
21  what that court then must do is apply the forum
22  state's choice of law principles and the choice of law
23  principles are designed not to determine what law
24  applies to the underlying claim. That's irrelevant.

Page 94

1  That's irrelevant under the restatement. It's
2  irrelevant under the Delaware formulation. Which is
3  different from the restatement, and that's an
4  important point.
5       What the Court's choice of law analysis
6  must do is determine what is the jurisdiction with the
7  most significant interest in the privilege issue, not
8  the underlying fraudulent conveyance issue. That's
9  completely, completely irrelevant. Even under the
10  restatement analysis what the Court is to look to is
11  where were the communications made? Where were the
12  disclosures made? It has nothing to do with the
13  underlying cause of action.
14       So when we look at --
15       SPECIAL DISCOVERY MASTER JAMES: Can I
16  interrupt?
17       MR. PIZZURRO: Certainly.
18       SPECIAL DISCOVERY MASTER JAMES: Where is
19  that discussed in your brief?
20       MR. PIZZURRO: What we discussed, the
21  whole choice of law analysis is at pages 8 through 10
22  and then we go to the substantive law of Delaware.
23       But the distinction here --
24       SPECIAL DISCOVERY MASTER JAMES: Where?

Page 95

1       MR. PIZZURRO: If I may, the issue that I
2  just particularized, which is to draw a distinction
3  between the choice of law with respect to the
4  underlying claim and the choice of law with respect to
5  the privilege, I think it's very clear from what we
6  put here, but the argument was never made that Montana
7  law or South Dakota law or some law should apply
8  because of the choice of law analysis with respect to
9  the underlying claim until there was a reply brief to
10  this.
11       So the first opportunity that we have to
12  make this clear is in this argument and that's what I
13  am making clear.
14       SPECIAL DISCOVERY MASTER JAMES: So none
15  of the cases that you have cited in your answering
16  brief are responsive to this because of your position
17  that this was raised for the first time in the reply?
18       MR. PIZZURRO: No. I think these cases do
19  answer the question. What I am saying is it's not
20  explicated the way that I am doing it in the argument.
21       What those cases I believe stand for is
22  that in a circumstance such as this where state law
23  governs the underlying claim, state law governs, not
24  federal law governs the privilege. Now you have to

Page 96

1  determine what state's law applies to the privilege.
2  And in the case law, the Delaware case law and the
3  analysis that the Delaware courts do, the analysis has
4  nothing to do with what is the law to be applied to
5  the underlying cause of action. The entire analysis
6  by all of these cases is what is the law to be applied
7  to the privilege issue?
8       And when they do the analysis of the
9  jurisdiction that has the most significant
10  relationship, they are talking about the privilege.
11  And you'll see in these cases that there is in many
12  cases little, if any, connection to the State of
13  Delaware other than the fact that Delaware happens to
14  be the forum and yet the courts routinely and almost
15  uniformly in Delaware apply Delaware law to the issue
16  because the focus of this choice of law analysis is
17  not what law applies to the underlying substantive
18  claim. It's what jurisdiction has the most
19  significant interest in seeing the privilege applied.
20       And the Delaware courts in cases that have
21  almost nothing to do with the State of Delaware,
22  including In Re: Best Lock which involved Indiana,
23  including I think it's -- I'm not as familiar with the
24  facts in the Lee v. Engle case. But what those cases

Page 97

1  do is say look, what we're going to do is we're going
2  to examine what is the interest with respect to the
3  privilege, and these cases come down on the
4  application of Delaware law.
5       So if you apply, which the Court must --
6  first of all, the restatement analysis is different
7  from the Delaware analysis and there can't be any
8  argument that the forum's choice of law principles are
9  what govern so we don't look at the restatement,
10  although I will circle back to it in a moment.
11  Delaware's analysis, which we do set forth here, has
12  led the Delaware courts in circumstances very similar
13  to this to apply Delaware law on the issue of the
14  privilege and, indeed, it has been argued by some that
15  this is a procedural issue in any event and,
16  therefore, the law of the forum should apply.
17       But let's look at the alternative analysis
18  for a moment because it doesn't get them anywhere.
19  What we have heard and what we know from our own
20  research is there really isn't any rule of decision on
21  this decision in Montana or South Dakota. The choice
22  of law rule is not that if there is a default, rather
23  is not that if you can't find what the applicable law
24  is in the jurisdiction that your choice of law

Page 98

1 analysis would normally point you to that you adopt
2 some majority rule. The default is always the state
3 of the forum. It's the forum's law.
4         If a party is saying that the law of
5 Montana applies and there is no Montana law, you don't
6 go to Westinghouse. You don't go to the District
7 Court of the District of Columbia. You don't go to
8 some commentator's view of what the majority rule is.
9 There's only one default, and that's the forum and
10 that's the case with respect to every choice of law
11 analysis.
12         So it doesn't do you any good to say that
13 Montana we think would follow the majority rule.
14 There is no Montana rule, so the rule has to be
15 Delaware.
16         And, finally, let me come back to the
17 restatement analysis because the restatement says, and
18 very clearly, even if you were to conduct this
19 alternative analysis which has to do with issues such
20 as where the communications were made, et cetera, that
21 analysis is always trumped by a public policy
22 consideration of the forum. And we believe here that
23 Delaware's public policy as evidenced by the decision
24 in Saito has got to be for selective waiver. And if

Page 99

1 the only reason for that is that Delaware has adopted
2 that stance in the face of the Westinghouse decision
3 and other decisions I think demonstrates that the
4 Courts in this state believe that that is an extremely
5 important, fundamental public policy of the state and
6 I think that in reading the Saito decision and the
7 reasons why Delaware has adopted a selective waiver
8 analysis and has rejected the Westinghouse position
9 and others is because of the very strong policy
10 Delaware places on encouraging parties to cooperate
11 with regulators and not be worried about a waiver of
12 otherwise privileged documents.
13         So I think whether you do the analysis,
14 which is the appropriate one, applying Delaware choice
15 of law principles to determine the state that has the
16 most fundamental issue, fundamental relationship or
17 interest in the issue, which is the privilege, that
18 leads you to Delaware law.
19         If you have some alternative analysis that
20 would lead you to look at Montana, since there is no
21 rule in Montana or South Dakota, default under a
22 choice of law principles guide you to the law of the
23 forum and under the restatement analysis, because of
24 the fundamental public policy that Delaware has

Page 100

1 evidenced in adopting the selective waiver rule, it
2 leads you back to Delaware.
3         And, finally, there is the view that in
4 all events this is a procedural issue which is
5 always governed by the law of the forum and that's
6 Delaware. So I think that it's clear here that the
7 production of the documents under a confidentiality
8 order with the SEC, and we put this all in the brief,
9 under the extraordinary precautions that NorthWestern
10 took and in accordance with the policy that has been
11 the consistent policy of the SEC itself and with what
12 is being considered as adoption as a uniform rule in
13 these circumstances, it's got to be clear that the
14 selective waiver rule of the Saito decision governs.
15         SPECIAL DISCOVERY MASTER JAMES: With
16 respect to the documents that were disclosed to the
17 SEC that you claim are privileged even under selective
18 waiver, were all of them -- and you may not know the
19 answer as you sit here. Were they all attorney-client
20 or were some of them work product? Was it a
21 combination?
22         MS. DELANEY: A combination.
23         MR. PIZZURRO: I believe it was a
24 combination. There's no, there's no privilege which

Page 101

1 is being asserted other than attorney-client, work
2 product or a combination of the two with respect to
3 these documents.
4         SPECIAL DISCOVERY MASTER JAMES: All
5 right. Now, in the Saito decision Chancellor Chandler
6 predicated his ruling in that case to some extent on
7 the fact that every single document at issue that had
8 been disclosed to the SEC in that case was work
9 product and, therefore, under his analysis the SEC --
10 I can't remember whether there was a confidentiality
11 order in that case or not. But his view was that in
12 terms of waiving the privilege, obviously a different
13 rule applies to work product than to attorney-client.
14         And with respect to work product, it is
15 the likelihood that the work product is going to fall
16 in the hands of your adversary. And he held in that
17 case that because probably there was a confidentiality
18 agreement that the documents given to the SEC would
19 not likely fall into the hands of an adversary.
20         Now, that logic doesn't work if the
21 privilege you're asserting, even under Saito, is only
22 the attorney-client privilege.
23         So I want your comment on Saito as applied
24 to attorney-client as opposed to work product.

## Page 102

1  MR. PIZZURRO: Well, first of all, I'm not
2  sure that I would agree with the premise that the
3  rationale does not apply to attorney-client
4  communications, as well as work product because you
5  similarly have an interest in maintaining the
6  confidentiality of attorney-client privileged
7  communications from your adversary as well as from, as
8  well as from anyone else.
9  SPECIAL DISCOVERY MASTER JAMES: Well, but
10  the rule in Delaware at least, and you're seeking to
11  apply Delaware law here, is very clear that to the
12  extent you intentionally disclose an attorney-client
13  document as opposed to a work product document that
14  you have waived the privilege unless, as you seem to
15  argue in your papers, there's a common interest
16  between the party to whom it's disclosed and the
17  client. And I want to get back to that in a minute.
18  So I'm a little -- and maybe you're not in
19  a position to discuss this because maybe you need to
20  look at Saito again and, if that's the case, just tell
21  me. But that seems to be a critical distinction in
22  Chancellor Chandler's mind and that may be a limiting
23  factor on how I decide this issue if I agree with you
24  that Delaware law should apply as opposed to some

## Page 103

1  other state.
2  MR. PIZZURRO: Well, I would always
3  welcome the opportunity to reexamine the case and to
4  maybe deal with a distinction here, but I believe that
5  the real issue, certainly in the attorney-client
6  privilege area in the case law in Delaware and
7  elsewhere, centers on whether the party has a
8  reasonable expectation of maintaining the
9  confidentiality of the communication and has taken the
10  appropriate steps to ensure that that is going to be
11  maintained.
12  And in this case that is without a doubt
13  the fact. There was a confidentiality agreement that
14  was entered into with the SEC. There were, as we
15  pointed out, there were even additional protections
16  that were sought in terms of possible FOIA disclosures
17  through public inquiry and you have to I think, I
18  think that has to be whetted, if you will, with the
19  public policy which I think is something that the
20  Chancellor had in mind in the Saito decision of
21  encouraging cooperation with regulators and not
22  putting the companies or others in a position where
23  they are going to be less than forthcoming in
24  cooperating with law enforcement because they're

## Page 104

1  afraid, having taken all of the precautions they can
2  possibly take, that there would be some waiver found
3  with respect to privileged communications as to third
4  parties.
5  So I think that there isn't anything that
6  I'm aware of -- again, I'll be happy and welcome the
7  opportunity to look at the case again even more
8  carefully. But I don't think there's anything in the
9  Saito decision that suggests that the Chancellor was
10  saying that the attorney-client privilege would not be
11  or would be waived under the circumstances. He was
12  dealing with work product. And I recognize even
13  Westinghouse has certain distinctions that it makes
14  between attorney-client and work product, but I don't
15  think that they are distinctions here that one would
16  be able to find under Saito or Delaware law.
17  SPECIAL DISCOVERY MASTER JAMES: All
18  right. Let's turn to common interest for a minute,
19  which Ms. Steingart didn't address but I'm sure she
20  will when she replies.
21  I find it a little hard but perhaps you
22  can persuade me how under these circumstances a
23  company that's being slammed with all kinds of
24  sanctions by the SEC could be viewed as a party with

## Page 105

1  whom NorthWestern shares a common interest.
2  MR. PIZZURRO: You mean the SEC and
3  NorthWestern?
4  SPECIAL DISCOVERY MASTER JAMES: Yes.
5  MR. PIZZURRO: Well, I think that actually
6  the outcome of the investigation and the cooperation
7  that NorthWestern provided answers that question very
8  clearly. NorthWestern immediately when the
9  investigation -- first of all, NorthWestern I believe,
10  and I'm pretty sure of this, instituted some of its,
11  certainly the internal investigation of Mr. Hylland
12  prior to the time that the SEC investigation was
13  commenced. So when issues regarding what had happened
14  in 2002 with respect to the financials at the company
15  came to light, the company itself began to take steps
16  to determine what had happened and who was
17  responsible. And when the SEC began its
18  investigation, the company cooperated entirely with
19  the SEC.
20  And ultimately if one looks at the cease
21  and desist order, which is public, all these documents
22  are public now, the cease and desist order with
23  respect to NorthWestern, they didn't get slammed with
24  any sanctions. They didn't get slammed with sanctions

Page 106

1  at all. They have an injunction not to violate the
2  securities laws in the future and the violations which
3  were found in the cease and desist order have nothing
4  to do with any fraud or other wrongdoing. It has to
5  do with really ministerial reporting requirements
6  under certain provisions of the securities laws.
7       The people who did get more substantive
8  sanctions who settled with the SEC were certain
9  corporate officials, certain corporate officials with
10 respect to whom the company was cooperating with the
11 SEC to determine who's responsible for this; let's get
12 to the bottom of this. So there was clearly a common
13 interest and as a result of that common interest in
14 the cooperation that the company provided, the company
15 was effectively exonerated and the individuals who
16 were responsible ended up having to settle and pay
17 some substantial fines.
18      SPECIAL DISCOVERY MASTER JAMES: And stay
19 out of the business?
20      MR. PIZZURRO: And they were barred I
21 think for five years from being directors of public
22 companies.
23      SPECIAL DISCOVERY MASTER JAMES: Where
24 does the SEC investigation stand now? Is the

Page 107

1  direction of this -- and "investigation" may be the
2  wrong word. I'm sure it's described in here and I've
3  just forgotten in the wealth of papers.
4       Are they pursuing the individuals only now
5  and the corporation is out of the picture? Explain
6  the procedural status to me.
7       MR. PIZZURRO: My understanding — and I
8  don't represent the company, I've made this caveat
9  before, I do not represent the company in the SEC
10 proceedings. So I'm giving you my best understanding,
11 is that there is no further action contemplated or
12 investigation of the company. There are continuing
13 investigations I think of some individuals. There's
14 some additional individuals who have not yet settled
15 with the SEC who have received Wells notices.
16      What the status of those investigations
17 are, I have no idea and I don't know if anybody has
18 any idea other than counsel and the individuals
19 involved, counsel for those individuals rather and
20 those individuals.
21      SPECIAL DISCOVERY MASTER JAMES: Can
22 counsel for Mr. Kindt and Mr. Hanson tell me whether
23 any SEC investigation is being conducted as to your
24 clients?

Page 108

1       MR. KALECZYC: There is none.
2       SPECIAL DISCOVERY MASTER JAMES: Thank
3  you.
4       Anything else?
5       MR. PIZZURRO: No, unless you have a
6  question.
7       MS. STEINGART: Let's start out with
8  choice of law in general. Okay? There is not one
9  case where a different state law was applied to
10 determine a privilege and a substantive decision in a
11 case. In each of the cases that Mr. Pizzurro refers
12 to, they were Delaware law cases. Each of the cases
13 in this section were sections where the Court was
14 adjudicating whether documents had to be turned over
15 under the corporate document section of Delaware law.
16      SPECIAL DISCOVERY MASTER JAMES: Section
17 220.
18      MS. STEINGART: Yes. But none was a case
19 where they said do you know what? This is a case
20 where New Jersey law applies, but because of some
21 overarching concern we have we're going to let New
22 Jersey law decide if there was wrongdoing here, but
23 we're going to let Delaware law decide if there was a
24 privilege. That has never happened.

Page 109

1       SPECIAL DISCOVERY MASTER JAMES: Well, I'm
2  afraid I'm going to have to disagree with you there.
3  I mean, at least NorthWestern knows that I know a
4  little bit about this because I wrote a book on
5  privilege on Delaware law. And there is not a single
6  case up to at least the time of this edition of the
7  book which held that privilege is not decided on a
8  state law other than Delaware. Every single state
9  case up to the time of the publication of this book
10 decided the privilege issue as a procedural matter on
11 Delaware law even though it involved substantive law
12 on other things in other jurisdictions that had no
13 connection whatsoever to Delaware.
14      Now, the cases that they may have cited
15 all may have been corporate cases and obviously there
16 the Delaware nexus and corporate governance cases
17 would apply. So there's no analysis in your briefing
18 that addresses the point that has been raised here by
19 Mr. Pizzurro that the fact is that you don't look at
20 the restatement. You look at what Delaware does.
21      And if you can cite a case to me where
22 Delaware has applied the state's law governing the
23 substantive merits of the case to privilege as opposed
24 to Delaware law, I would love to see it.

28 (Pages 106 to 109)

Page 110

1      MS. STEINGART: Well, certainly in
2  Westinghouse, Westinghouse is a Delaware company and
3  to the question of privilege the Court applied New
4  Jersey law.
5      SPECIAL DISCOVERY MASTER JAMES: Based on
6  a New Jersey District Court decision.
7      MS. STEINGART: Right. And certainly the
8  decision, the decisions in Delaware on selective
9  waiver, which goes to a different aspect of this, are
10  lower court decisions and not decisions that this
11  Court is bound to follow. It's not a decision of the
12  Delaware Supreme Court; only a decision of the
13  Chancery Court.
14      So on two different bases I think that
15  under circumstances such as these, a federal court
16  operating under 502 would --
17      SPECIAL DISCOVERY MASTER JAMES: You mean
18  501.
19      MS. STEINGART: 501. I'm sorry. Would
20  apply the law, the privilege law, the substantive
21  privilege law. It said where the state law provides
22  the rule of decision, the state law should govern the
23  privilege.
24      SPECIAL DISCOVERY MASTER JAMES: Yes.

Page 111

1      MS. STEINGART: That's what 501 says. So
2  from that point of view, I don't think that you will
3  find situations where they are applying that rule,
4  applying 501, a different privilege law and a
5  substantive law. And when I say that never
6  happens, really I am referring to 501. It doesn't
7  happen. And it would be in a sense contrary to 501.
8      SPECIAL DISCOVERY MASTER JAMES: Now, one
9  of the cases that I think you did cite was the
10  Remington Arms case. Maybe not. But that is a
11  decision by then Judge Latchum in which he held, he
12  did apply the privilege law of Connecticut in a
13  diversity action which was the substantive law
14  governing the merits of the case, so that is a
15  decision that would support your position.
16      I don't know whether you cited that or
17  not.
18      MS. STEINGART: I don't know if I cited it
19  here, I'm sorry to say. I wish I had.
20      SPECIAL DISCOVERY MASTER JAMES: But I
21  have to resolve -- I mean, whether that was correctly
22  decided or not is an issue I guess that isn't before
23  me.
24      But let's hear your commentary on Saito

Page 112

1  and its application to attorney-client as opposed to
2  work product.
3      MS. STEINGART: Well, there are two areas
4  where Saito I think differs, if Saito is applicable,
5  which I don't think it is for any number of reasons.
6      SPECIAL DISCOVERY MASTER JAMES: Right.
7      MS. STEINGART: There are two areas where
8  Saito differs from the gloss that NorthWestern places
9  on it. One is as to attorney-client. It does not
10  deal in the same way with attorney-client as it does
11  with work product. And I think that there are good
12  reasons for distinguishing between the two.
13      I think that attorney-client is really
14  based on secrecy and once that secrecy is no longer
15  there, once it's used as a sword, it can no longer be
16  used as a shield.
17      And I don't think that the analysis with
18  respect to selective waiver on work product really
19  diminishes the force of that truism with respect to
20  attorney-client. That has always been an important
21  factor in determining whether the limitation that is
22  imposed by attorney-client should be applied in any
23  situation that you can only use it as a shield, that
24  you can't use it as a sword and then turn around.

Page 113

1      The other instance where Saito is at odds
2  with the argument now made by NorthWestern is on
3  common interest. Saito specifically in words of one
4  syllable says that we do not, we can't find that
5  there's not a waiver here because of common interest
6  because of course there's no common interest. So from
7  that point of view, I don't think that's an argument
8  that supports what Mr. Pizzurro says.
9      The company was not exonerated. The
10  company went through bankruptcy and there were
11  different people there and it was a different time,
12  but there's no exoneration. And the fact that the
13  company could have engaged in such systematic and
14  widespread wrongdoing at a time that it was entering
15  into transactions, where it was issuing equity, where
16  it was reissuing $720 million, exchanging notes worth
17  $720 million and transferring $1.5 billion in assets
18  and be systematically intentionally using false
19  financials and to have somebody say the company is
20  exonerated when the four highest-ranking officers and
21  many others are now under investigation is just, is
22  just unacceptable. It's the trivialization of
23  something that is not trivial. There may be defenses
24  and technical issues that people are raising, but I

Page 114

1  don't think that we can in good faith sort of sit here
2  and say the company was exonerated.
3        And that's a significant issue here
4  because it goes to the heart of what courts talk about
5  when they talk about selective waiver.  Companies
6  should begin to throw themselves on the sword when
7  this kind of massive wrongdoing is uncovered.  It's
8  not a wrong thing for companies to seek to cooperate
9  with the government, but also companies should have to
10  face up to the injuries and to the damage that is
11  necessarily and intentionally caused by the same acts
12  for which they seek forgiveness.
13        I think that the Qwest decision in 2006
14  goes specifically point by point as to why Saito's
15  analysis of only cooperation will lead companies to
16  provide, you know, only finding selective privilege
17  would lead companies to provide cooperation with the
18  SEC, that is an utterly flawed kind of reasoning.
19  Companies want to cooperate because they want to
20  manage and deal with their exposure.  Well, part of
21  their exposure is not only to the government; it's to
22  the people that they have intentionally hurt.
23        So I think that there is a very strong
24  public policy that to the extent that this material

Page 115

1  has been used to bargain for and obtain leniency and
2  to throw various other people under the bus who should
3  have been thrown under the bus because they were, they
4  were the CEO, the CFO, the COO who led the company
5  into wrongdoing, well, there's a good reason why
6  companies should seek cooperation.  They shouldn't be
7  able to use those same things to shield themselves
8  from answering to the harm that they have caused.
9        So I think that here that a district court
10  applying 501 would not and district courts have not
11  found that there should be different rules that govern
12  procedure and govern substantive law and that even if
13  we were going to look at Delaware law, I think Saito
14  is a lower court decision and I don't think that it's
15  binding.
16        SPECIAL DISCOVERY MASTER JAMES:  Okay.
17  Thank you.
18        I'm going to take this part of the motion
19  under advisement.  However, I'm going to ask the
20  parties to supplement the record and I'll discuss with
21  you the timing on this.  But to the extent I'm being
22  asked to apply Montana or South Dakota law, it's not
23  enough for me for people to say well, there's nothing
24  to tell me about Montana or South Dakota law because

Page 116

1  there have to be certain general principles like you
2  waive something if you give it to a third party.  I
3  mean, we don't have -- obviously Montana may not have
4  addressed this particular issue, but I'm sure Montana
5  is not a tabla rasa and neither is South Dakota as to
6  basic issues of privilege.
7        So I want each side to submit
8  simultaneously to me a supplemental memo of five pages
9  that discusses the basic principles of privilege law
10  of those two states and how they would or would not
11  apply to the instant question of waiver as to
12  disclosing the materials to the SEC.
13        Is there any reason this can't be done by
14  next Friday?
15        MR. PIZZURRO:  No reason.
16        MS. DELANEY:  No.
17        SPECIAL DISCOVERY MASTER JAMES:  I'm
18  waiting for --
19        MS. STEINGART:  No.
20        SPECIAL DISCOVERY MASTER JAMES:  Next
21  Friday is okay?
22        MS. STEINGART:  That's fine.  Right.
23  That's fine.
24        SPECIAL DISCOVERY MASTER JAMES:  Is five

Page 117

1  pages enough?
2        MR. BREWER:  Yes.
3        MS. STEINGART:  If we could have between
4  five and ten.
5        What do you think?
6        MR. BREWER:  When you say --
7        MR. PIZZURRO:  I don't know.  If you give
8  us three weeks, we could probably do it in three
9  pages.
10        MR. BREWER:  I guess the question is do
11  you mean a five-page letter brief which is single
12  spaced or a five-page brief with a caption which is
13  double spaced?
14        SPECIAL DISCOVERY MASTER JAMES:  I don't
15  want anything single spaced.
16        MS. STEINGART:  I don't want anything
17  single spaced, John.  I've already explained that
18  nothing should ever be single spaced.
19        SPECIAL DISCOVERY MASTER JAMES:  Don't
20  ever mention that to a judge either.
21        MR. BREWER:  Okay.
22        MS. STEINGART:  Can we ask for between
23  five and ten?
24        SPECIAL DISCOVERY MASTER JAMES:  Let's say

Page 118

1 seven pages.

2     MS. STEINGART: Okay.

3     MR. BREWER: Okay.

4     SPECIAL DISCOVERY MASTER JAMES: And I'm

5 expecting one submission for all the defendants and

6 one submission from Magten and Law Debenture. All

7 right.

8     MS. STEINGART: If I could also just point

9 out the advisory notes to the rule —

10     SPECIAL DISCOVERY MASTER JAMES: Which

11 rule?

12     MS. STEINGART: To 501, which is on page

13 409, say that on the other hand, the federal courts

14 are bound to apply the state's privilege law in

15 actions founded upon a state-created right or defense

16 and that would remove the forum shopping incentive.

17     SPECIAL DISCOVERY MASTER JAMES: Okay.

18 It's now 12:41. I mean, I found this all very helpful

19 and I don't think we have wasted any time, but we're

20 clearly not going to finish before lunch.

21     So my suggestion is that we take an hour

22 break for lunch or maybe 45 minutes and come back at

23 1:30 and resume discussion of the issues that remain.

24     Is that acceptable with everyone? Because

Page 119

1 I want to get this done today and I think everyone

2 else does too. There's a cafeteria downstairs.

3 There's a cafeteria across the street in Dale's

4 building and, Victoria, you're in that building.

5 Right?

6     MS. COUNIHAN: Actually, Nemours.

7     SPECIAL DISCOVERY MASTER JAMES: Nemours.

8 Okay.

9     MS. STEINGART: I was just going to ask if

10 I can make a request.

11     SPECIAL DISCOVERY MASTER JAMES: Sure.

12     MS. STEINGART: My colleague, Mr. Kaplan,

13 will be dealing with the issue of number 9 and I would

14 like Mr. Kaplan to be able to get home before a

15 certain point in the day for certain observances and I

16 was going to ask if we could do that when we return

17 from lunch so that he could have an opportunity to

18 leave in a timely way.

19     SPECIAL DISCOVERY MASTER JAMES: Sure.

20     MS. STEINGART: If that's okay with

21 everybody?

22     MR. PIZZURRO: No problem. No problem at

23 all.

24     SPECIAL DISCOVERY MASTER JAMES: All

Page 120

1 right. So we will resume at 1:30.

2     (Recessed for lunch at 12:43 p.m.)

3     - - - - -

4     AFTERNOON SESSION

5     1:30 p.m.

6     SPECIAL DISCOVERY MASTER JAMES: We're

7 back on the record. The next issue we're going to be

8 addressing is paragraph number 5 of my May 17 letter

9 which states with respect to the plaintiffs' motion

10 referenced in paragraph 1 above whether certain other

11 documents that are subject to plaintiffs' discovery

12 requests are privileged or whether the privilege has

13 been waived.

14     Again, that is plaintiffs' motion and,

15 Ms. Steingart.

16     MS. STEINGART: Thank you.

17     Initially, we provided a letter to

18 NorthWest and I think that we provided the first, the

19 first of those letters at the beginning of April that

20 indicated that when we had scrubbed or gone through

21 the privilege log and we looked at the information on

22 the log concerning what the document was and who

23 created it and who received copies of it that it

24 appeared to us that either it was all non-lawyers or

Page 121

1 there were people who were not within the privilege,

2 third parties that were included.

3     Also, we have some concern about whether

4 there are certain documents that went to government

5 agencies that still is not included on the log, but

6 I'm assuming that will be updated to show what

7 government agencies —

8     SPECIAL DISCOVERY MASTER JAMES: Other

9 than the SEC?

10     MS. STEINGART: Yes.

11     MS. DELANEY: I don't recall any —

12     MS. STEINGART: Well, there may have been

13 government agencies other than the SEC, but that's not

14 noted on the log. There are certainly a tranche of

15 the documents that we're going to hear about whether

16 they went to the SEC, that last privilege log.

17     SPECIAL DISCOVERY MASTER JAMES: Well, I

18 would expect that any privilege log they have should

19 indicate on it who received copies, whether it's the

20 SEC or any government agency. If that's not clear, it

21 should be clear.

22     MR. PIZZURRO: I'm not aware that there is

23 any other government agency, but I will double-check

24 that.

## Page 122

1      MS. STEINGART: Right. I think that there

2  may be Montana Public Service Commission may have

3  gotten some or DOJ may have gotten some as well. We

4  sent a letter and because of the other disputes that

5  were percolating, NorthWest took the position that

6  they didn't have to respond to the questions we raised

7  about these documents.

8      In the reply brief on April 27th that was

9  filed, NorthWestern was still maintaining the

10  confidentiality of these documents and in a letter

11  that was addressed to you NorthWestern changed its

12  position on 211 of those documents.

13      SPECIAL DISCOVERY MASTER JAMES: Is this a

14  letter that just came out --

15      MS. STEINGART: On May 16th.

16      SPECIAL DISCOVERY MASTER JAMES: --

17  yesterday? Yes.

18      MS. STEINGART: Now, with respect to the

19  others, the other forty-odd documents that are on our

20  list, we don't know why they haven't withdrawn the

21  privilege as to those because the third parties are

22  apparent from the face. And we have prepared this

23  little summary that shows the items we requested back,

24  the notation about whether it was given to the SEC and

## Page 123

1  also the notation about the persons on the log that

2  signal to us that it was given to a third party.

3      We have indicated which ones are withdrawn

4  and which ones in bold are still pending. We also

5  prepared this supplement just to address the material

6  that on the logs that they haven't had a chance to

7  respond to but once the parameters are set I'm sure

8  that those same parameters will be applied to the

9  subsequent privilege logs that you provided us after

10  the 23rd. So this goes to the privilege logs that you

11  delivered on the 5th and 24th.

12      MR. PIZZURRO: Yes.

13      MS. STEINGART: Right. We had not given

14  you a list of the documents listed on those that were

15  third-party related.

16      MR. PIZZURRO: I see. I understand.

17      MS. STEINGART: So we're providing you

18  with that just so whatever we determine here I assume

19  that you will apply to those as well.

20      SPECIAL DISCOVERY MASTER JAMES: These are

21  third parties other than the SEC?

22      MR. BREWER: Yes.

23      MS. STEINGART: Yes. These are third

24  parties other than the SEC and if there were other

## Page 124

1  agencies than the SEC that as yet has not been

2  disclosed. At this point we don't have a rationale

3  for why these third parties do not waive the

4  privilege.

5      In addition, there is the issue which

6  certainly revolves around the special report

7  concerning Mr. Hylland. And during Mr. Hylland's

8  deposition we learned that there was a separate

9  independent reason for waiver of that privilege, and

10  that is that at a time after Mr. Hylland had resigned

11  from the company, the company provided him with a copy

12  of the report. And from my understanding of Delaware

13  law and the cases, even if Mr. Hylland was still a

14  director of the company to the extent a special

15  committee was formed and the interests of the special

16  committee were adverse to his and he was informed of

17  that process, the special committee and the board in

18  deliberating on an issue to which his interest was

19  adverse could exclude him from participation and

20  certainly he would have no expectation that the

21  privilege would apply to him.

22      For the first time we saw NorthWestern's

23  response to that argument in the same letter in which

24  we learned of the withdrawal of the privilege with

## Page 125

1  respect to the 211 documents.

2      I think that as a practical matter that

3  the reliance on Kirby v. Kirby as well as Moore

4  Business Forms v. Cordant on the face of those cases

5  is misplaced. There is no blanket rule that when

6  someone is a director they always get attorney-client

7  material that is prepared for the corporation during

8  their tenure. That's only true if other facts don't

9  exist that would make it inappropriate for the

10  attorney-client privilege to apply.

11      Indeed, in the case of, in the case of SBC

12  Interactive vs. Corporate Media Partners and other

13  defendants, which is a Delaware Chancery Court 1997

14  decision by Jacobs --

15      SPECIAL DISCOVERY MASTER JAMES: This was

16  not discussed in your brief, or was it?

17      MS. STEINGART: No. Because I didn't see

18  the cases until I got this letter yesterday.

19  Chancellor Jacobs --

20      SPECIAL DISCOVERY MASTER JAMES: Vice

21  Chancellor.

22      MS. STEINGART: -- distinguishes Moore and

23  says that the entitlement of a director is subject to

24  the facts and circumstances and that here in SBC there

Page 126

1  was a situation where there was a partnership that was
2  created and various of the partners were able to
3  designate people to go on the board. And the issue
4  became when there were considerations or evaluations
5  of whether the company should buy them out or continue
6  to have business with them whether they would be under
7  the umbrella of the privilege.
8         And the Court was very specific on page 4
9  of that opinion in dealing with the circumstances
10  where directors are often not entitled to information
11  that's being considered.
12         SPECIAL DISCOVERY MASTER JAMES: I must
13  have the wrong page. What's the actual star page?
14         MS. STEINGART: It's page 4 on top and the
15  star page is 12.
16         SPECIAL DISCOVERY MASTER JAMES: Thank
17  you.
18         MS. STEINGART: And the discussion really
19  begins there.
20         And here the Court is analyzing cases,
21  director cases and partnership cases together and the
22  Court indicates that the only way an attorney-client
23  relationship is arguable is if it's grounded in SBC's
24  contention that its status as a partner automatically

Page 127

1  and as a matter of law conferred upon it the status of
2  a client.
3         And then goes on to talk about when you
4  look at the circumstances here the answer to that is
5  an emphatic no. And the circumstances there were
6  circumstances where the partner had interests that
7  were adverse to the other partners at that time.
8         If what, if the language in or the
9  statements in Mr. Pizzurro's letter are true, you
10  could never really have a corporation acting in
11  executive session when it had interests that were
12  either conflicting or adverse to one of its directors.
13  And we all know corporations do that all the time and
14  that the corporation is in a position where it can
15  receive attorney-client advice on the issues to which
16  it's adverse and it doesn't have to share that with a
17  director who has had to recuse himself, should have
18  recused himself or was asked by the other directors to
19  recuse himself.
20         And this case goes on on that page and on
21  page 13 to distinguish Moore. Moore was a case where
22  the director who was held to have a share of privilege
23  because of its status as a director was given
24  attorney-client privileged material and that is

Page 128

1  because in Moore that director had a status as a
2  result of a contract and the other directors decided
3  to meet in special session without informing that
4  director that they were going to form a special
5  committee to consider buying out the interests of the
6  entity for whom that director was representing.
7         And in those circumstances where there was
8  a contractual right to be on the board and share in
9  the business information of the board and there was
10  this secret undertaking by others, the Moore court
11  said well, under these circumstances then the contract
12  required you to provide the material. But in other
13  circumstances, it cannot be the law that when five
14  directors decide that the sixth director has engaged
15  in systematic wrongdoing and form a special committee
16  to review that systematic wrongdoing and then report
17  to the rest of the committee, it cannot be that that
18  individual who's being accused would have access to
19  all the deliberations. And I think that the case law
20  more than supports it.
21         So as an independent, as a separate and
22  independent ground, other than provision to the SEC, I
23  think that this Hylland report has been distributed in
24  ways and at times that even Mr. Pizzurro at this point

Page 129

1  is unaware of. As we were sitting in the deposition,
2  Mr. Pizzurro was unaware that Mr. Hylland had been
3  provided with the report. There's no reason based on
4  Mr. Pizzurro's own experience that he should have
5  known that. The company was represented by others at
6  the time. The company was represented by others
7  during the bankruptcy.
8         However, one thing is clear, that very
9  often documents were designated as privileged where
10  there wasn't a thorough inquiry about where they had
11  gone or how they were created or how they had been
12  used. I don't think, as I said before, as we sit here
13  today that Mr. Pizzurro can say with certainty how
14  much distribution Mr. Hylland's special committee
15  report had.
16         And it was reflected also in the
17  deposition of Mr. Fresia. There were documents
18  created by Mr. Fresia that were to -- that were not
19  addressed to, that were not from a lawyer that
20  contained a listing of facts --
21         SPECIAL DISCOVERY MASTER JAMES: Who is
22  Mr. Fresia?
23         MS. STEINGART: Mr. Fresia was the CFO of
24  Expanet. And during his deposition Mr. Fresia said

Page 130

1  those documents were never prepared for a lawyer or at
2  the direction of a lawyer; that he did that on his own
3  as he was thinking about the course of events at the
4  company and becoming worried that blame would somehow
5  be pointed at him or shifted at him and he wanted to
6  make sure that he had written down his recollection.
7      SPECIAL DISCOVERY MASTER JAMES: Now, are
8  these documents listed on what you've handed me?
9      MS. STEINGART: Yes. Well, these
10  documents that we know went to third parties are
11  listed. Mr. Hylland's, if we look at the face of the
12  privilege log, Mr. Hylland's document wouldn't be here
13  because on the face of it --
14      SPECIAL DISCOVERY MASTER JAMES: It
15  doesn't show that he received it.
16      MS. STEINGART: It doesn't show.
17      SPECIAL DISCOVERY MASTER JAMES: The same
18  with Mr. Fresia?
19      MS. STEINGART: In Mr. Fresia's on the
20  face of it, it didn't show. So these are just the
21  ones that we know because the privilege log indicates
22  and while I'm sure that NorthWestern has made what
23  they understand to be a good faith assessment of it, I
24  think that we have learned enough in the course of the

Page 131

1  proceeding, a good faith assessment of which document
2  should be included on the log, I think that we have
3  learned in the course of these proceedings that
4  documents that may seem to fall under this rubric may
5  not.
6      So I think with respect to Hylland we
7  certainly should have a finding that this is no longer
8  a privileged document. We should have a finding that
9  the attachments to it which are not privileged should
10  be produced because there are a number of attachments
11  that are not otherwise available in the production,
12  e-mails and the like.
13      SPECIAL DISCOVERY MASTER JAMES: And you
14  know this because you have seen them?
15      MS. STEINGART: And I know because I have
16  seen them.
17      MR. BREWER: Yes.
18      SPECIAL DISCOVERY MASTER JAMES: When did
19  the Hylland and Fresia depositions take place?
20      MS. STEINGART: Mr. Hylland's deposition
21  was May 2nd and Mr. Fresia's deposition was April 30.
22      SPECIAL DISCOVERY MASTER JAMES: Okay.
23      MR. BREWER: So we have excerpts from the
24  Fresia transcript in our reply papers. I believe our

Page 132

1  reply brief was being filed more or less
2  simultaneously with the Hylland deposition going on so
3  we did not have access to the transcript.
4      MS. STEINGART: Right. And the reason why
5  we were able to ask Mr. Fresia about his document was
6  because there were versions of it that weren't marked
7  privileged and that weren't asked -- you know, none of
8  them were marked privilege, but there were versions of
9  it for which the return was not requested.
10      And the reason we were able to ask
11  Mr. Hylland about his document was because there was a
12  letter from the company to Mr. Hylland talking about
13  their various differences and referencing the fact
14  that they gave him a copy of it.
15      SPECIAL DISCOVERY MASTER JAMES: Where did
16  you get that document?
17      MS. STEINGART: We got that, the letter
18  from the company to Mr. Hylland was part of the
19  production and was not a privileged document. It was
20  not a document which the return was requested.
21      Also, there are references to the fact of
22  the special committee report concerning Mr. Hylland in
23  board minutes and other documents that haven't been.
24  So we know of the existence of the report. We know of

Page 133

1  the topics covered. We know that it's voluminous and
2  has three volumes outside of having seen it. And we
3  know the character of the documents that are attached
4  outside of having seen it because there are these
5  other documents that reference it.
6      I have part of the transcript from
7  Mr. Hylland's deposition and I asked him about it and
8  then Mr. Pizzarro voir dired him on the document and
9  questioned him about whether gee, you saw it but were
10  you supposed to keep it? Maybe you were supposed to
11  return it. Well, I don't think that a quick look by
12  an adversary makes something that's privileged to
13  begin with and then revealed, then privileged again
14  because you took it back. At the end of the day they
15  didn't take it back. His lawyer has it. And even if
16  he had taken it back, it wouldn't have made a
17  difference.
18      Just so that -- we didn't have this when
19  we filed our brief. This is just the excerpt.
20      Do we have additional copies of the
21  excerpts?
22      MR. BREWER: I think we do. I'm hoping
23  these are the same pages.
24      MS. STEINGART: It's 173 and beyond of the

Page 134

1  deposition.
2       SPECIAL DISCOVERY MASTER JAMES: Can I
3  have a minute to look at this?
4       MS. STEINGART: Oh, sure.
5       SPECIAL DISCOVERY MASTER JAMES: Thank
6  you.
7       MS. STEINGART: So I guess, in essence,
8  what we're asking for in terms of this item is, one,
9  for Hylland to be determined to be not privileged and
10 certainly it would impact the scope of what we would
11 commence doing when we leave here since the Hylland
12 report is three of the six volumes of material.
13      Second, that the other materials listed in
14 the documents that we've provided to NorthWest, the
15 ones they haven't withdrawn but they have had a chance
16 to think about, for them to indicate why those are
17 still privileged, for them to consider the materials
18 that we have identified from the subsequent privilege
19 logs and for them to represent to us at some point
20 whether there are other government agencies at all
21 that have received these materials, government
22 agencies, state or federal, or regulatory bodies; and,
23 lastly, to reconsider items on the log where there's
24 no designation of a third party but it's not apparent

Page 135

1  from the face of it that it's to or from a lawyer.
2       SPECIAL DISCOVERY MASTER JAMES:
3  Mr. Fetzer, could I have that read back, please, the
4  last part about what she would like, what
5  Ms. Steingart would like?
6       (The reporter read back as requested.)
7       SPECIAL DISCOVERY MASTER JAMES: Anything
8  else?
9       MS. STEINGART: That's all.
10      SPECIAL DISCOVERY MASTER JAMES: Thank
11 you.
12      Mr. Pizzurro.
13      MR. PIZZURRO: All right. Let me deal
14 with these I guess in the order they were presented.
15      First of all, the document that comes out
16 of Mr. Fresia's deposition, Mr. Fresia testified that
17 this was a time line that he had prepared. He turned
18 it over to the company. It was designated as
19 confidential and put on the privilege log because it
20 was an exhibit to the Hylland report. However, other
21 iterations of it were produced because no one looking
22 at this, and I agree, could determine that either
23 was privileged or was an appendix to the report or
24 anything else. We have withdrawn -- they have the

Page 136

1  document. They have used the document. We have
2  withdrawn our request that they replace or destroy or
3  return it, so that the Fresia one-page document is not
4  an issue.
5       SPECIAL DISCOVERY MASTER JAMES: Okay.
6       MR. PIZZURRO: Mr. Hylland -- it's
7  interesting because we really haven't had an
8  opportunity to argue this or brief this in any way,
9  but listening, and I'm sure that Ms. Steingart's
10 recitation of the case law or summation of the case
11 law is accurate, but I think what makes it clear is
12 based on what the facts are here the Hylland report is
13 attorney-client privilege and the privilege has not
14 been waived.
15      Mr. Hylland was provided a copy of the
16 report -- and these are facts which we can establish
17 and if additional submissions are needed, I'm happy to
18 do it -- Mr. Hylland was provided a copy of the report
19 on the 28th of April 2003. He was provided that
20 report, along with all of the other members of the
21 board because the report was to be considered at a
22 special meeting of the board that had been called for
23 I believe it was May 6th or May 7th to consider
24 whether or not Mr. Hylland would be terminated for

Page 137

1  cause.
2       Mr. Hylland on that day was both an
3  officer and director of the company. The following
4  day, either the 29th or the 30th, he resigned as an
5  officer. He did not resign as a director until the
6  1st of May. Under the terms of his employment
7  agreement, he had a right to be at and participate in
8  the board meeting which would determine whether or not
9  he should be terminated for cause. And he was
10 provided, as all the other board members were, with
11 the special report so that he could effectively defend
12 himself and participate in that meeting, although I
13 believe the terms of the employment agreement did not
14 provide or provides that he does not have a right to
15 vote on his own termination for cause.
16      But the point is under the case law that
17 we just heard clearly this is not a waiver of the
18 privilege. He was a member of the board. It was
19 prepared for the board. He had a right as a member of
20 the board to that report. He had a right as a member
21 of the board to appear and participate in the board
22 meeting which was specifically called to consider the
23 report.
24      So from what we've just heard, there isn't

Page 138

1  any waiver of the privilege because the report and its
2  appendices were provided to Mr. Hylland.
3      Let me try to deal with, if I can recall
4  or remember all of them, the additional documents
5  which I believe we started out with 257, 258 that were
6  in dispute and had certain things not happened this
7  probably -- the ordinary course in my experience is
8  when people have a dispute as to whether or not a
9  document which is listed on a privilege log ought to
10 belong on the log, there is some give-and-take and
11 negotiation and you try to work it out. We have
12 reviewed the 258. We have determined that 211 of
13 those were not properly on the privilege log and we
14 turned them over and they have them.
15     As to the remaining documents, we have
16 asserted the privilege, and I believe there is writing
17 back and forth on this. The basis for the privilege
18 is that the privilege was not waived because there
19 were third parties that are referenced on it because
20 these are cases in which there is one of two
21 exceptions that would apply. Either the third parties
22 are accountants and the communications were to
23 facilitate the giving of legal advice because there
24 were lawyers involved or the third parties were

Page 139

1  effectively agents of the company and were provided
2  with the advice as agents and, therefore, having been
3  provided with it doesn't constitute a waiver.
4      SPECIAL DISCOVERY MASTER JAMES: Because
5  of common interest?
6      MR. PIZZURRO: Well, because essentially
7  it's like --
8      SPECIAL DISCOVERY MASTER JAMES: An
9  employee.
10     MR. PIZZURRO: An employee, exactly.
11     Now, the only way it seems to us that you
12 can determine whether those are proper or not is if
13 you review the documents and, as we said in our
14 letter, we have copies of all of those 47 for you to
15 take a look at and you can make a determination, which
16 obviously is binding on the parties, as to whether or
17 not the privilege is properly asserted with respect to
18 each and any one of the 47.
19     The last issue, which we will undertake to
20 determine whether any documents -- I'm unaware of
21 any -- we'll undertake to determine whether any
22 documents may have been turned over to other
23 government regulators. Like I said, I'm not aware
24 that that is the case, but I will undertake to

Page 140

1  double-check on that.
2      What I don't understand is the last
3  request because if we're being asked to reconsider the
4  assertion of privilege with respect to things on the
5  privilege log where it is not apparent that a lawyer
6  was involved in the communication -- I think if
7  counsel has questions, which is what the 258 were, if
8  they say document number 17 over here doesn't look
9  like it ought to be privileged, fine, we'll undertake
10 to take a look at it. We will make a determination.
11 If we want to stand on the privilege, then we will
12 provide it to you.
13     But I don't think it's our job to go
14 through the privilege log and try to figure out where
15 they might think that they have a problem.
16     SPECIAL DISCOVERY MASTER JAMES: Yes. On
17 that point you're not saying, are you, that -- well,
18 maybe you are -- that the attorney-client privilege
19 does not apply to a situation where non-lawyers may be
20 communicating?
21     MS. STEINGART: I think that the
22 attorney-client privilege does not apply to that
23 situation, unless they are -- no. No. Unless there
24 is some other indicia that the communications are for

Page 141

1  the purpose of obtaining legal advice.
2      SPECIAL DISCOVERY MASTER JAMES: What did
3  the description say on the log?
4      MR. BREWER: There are a few examples on
5  this chart we passed around, if that would be helpful.
6  One is 349; another is 713. I mean, there were some
7  other things on the log where they said, you know,
8  non-lawyer A sent an e-mail to non-lawyer B and it was
9  described as forwarding legal advice received from
10 Paul, Hastings, whatever, and those we did not, those
11 we did not challenge.
12     SPECIAL DISCOVERY MASTER JAMES: Right.
13 Okay.
14     MS. STEINGART: We'll take it upon
15 ourselves if we have not identified those to identify
16 those for your consideration.
17     MR. PIZZURRO: Okay. Then we will do the
18 same exercise we did with respect to the 258 that you
19 had identified.
20     MS. STEINGART: Okay.
21     SPECIAL DISCOVERY MASTER JAMES: All
22 right. On that point, and this troubles me, a little
23 but not much, because these things happen in complex
24 litigation. Let's put some time parameters on that

## Page 142

1  because we want to move forward, we want to keep this
2  thing on schedule as much as we can.
3           How long will it take you to go through
4  the log and identify those? Can you do it over the
5  weekend is what I am asking, Mr. Brewer? No. I'm
6  just teasing.
7           MR. PIZZURRO: But just a little bit.
8           MR. BREWER: Well, we have already had a
9  couple of things put on our agenda for the very near
10 term. We have taken a first, for this I think we have
11 taken -- what we have already given them in terms of
12 items in dispute is the result of a pretty thorough
13 first pass through a very lengthy log, so we would be
14 doing some cleanup, a second round, for want of a
15 better word.
16          MS. STEINGART: So hopefully by a week
17 from today if there's anything additional we would
18 have it.
19          If that's acceptable?
20          SPECIAL DISCOVERY MASTER JAMES: Yes
21          MR. PIZZURRO: I just want to understand.
22 Is this (indicating) what you're referring to? These
23 are the documents that you on the supplemental logs
24 are asking about?

## Page 143

1           MS. STEINGART: Right.
2           MR. PIZZURRO: Is there any other universe
3  of documents outside of the 258 others that we have
4  discussed that you're talking about?
5           MS. STEINGART: No, not yet. I will do
6  the final scrub. That will be in a week.
7           MR. BREWER: Yes. And that was not in our
8  original list. We just had not gotten to that by the
9  time we were filing the motion. That's the reason
10 that's not on the main list.
11          SPECIAL DISCOVERY MASTER JAMES: All
12 right. So the end of next week, Friday, will also be
13 the day on which you provide to, Magten provides to
14 NorthWestern by letter any indication of other
15 documents on the privilege log as to which there's no
16 apparent indication that they're privileged and asking
17 them to review them and to respond.
18          When can you respond?
19          MR. PIZZURRO: We can respond within a
20 week of the notice.
21          SPECIAL DISCOVERY MASTER JAMES: Okay. So
22 we're looking at -- let's see. Today is the 18th.
23 The 25th. That would be --
24          MS. DELANEY: June the 1st.

## Page 144

1           SPECIAL DISCOVERY MASTER JAMES: -- June
2  the 1st.
3           MS. STEINGART: Yeah. That's June 1st,
4  that Friday.
5           MR. PIZZURRO: I assume. I'm taking your
6  word for it.
7           MS. COUNIHAN: It is. June 1st is a
8  Friday.
9           MS. STEINGART: June 1st is the Friday.
10          SPECIAL DISCOVERY MASTER JAMES: All
11 right.
12          I may want to revisit that date once we go
13 through everything else because this relates to
14 depositions, but let's go forward.
15          MR. PIZZURRO: Can I make an observation?
16 It's only an observation.
17          SPECIAL DISCOVERY MASTER JAMES: Yes.
18          MR. PIZZURRO: All right. We've agreed to
19 do this and we will do it, but this is a review of a
20 privilege log which they have now had since March 23
21 and I'm not going to make an argument that they have
22 waived the right having made the demands that they
23 have and made the motions that they have. I'm not
24 going to make that waiver argument, but it seems to me

## Page 145

1  it's difficult to find a colorable argument that there
2  was any waiver of any privilege by virtue of a
3  privilege log being submitted a few days late on a de
4  minimis number of documents and then to allow or to
5  have a situation where all of this additional time has
6  been given to review and to dispute some of the
7  entries on the log. It's an observation. We'll do --
8           SPECIAL DISCOVERY MASTER JAMES: Duly
9  noted.
10          Anything else on this issue?
11          MS. STEINGART: One thing that -- well, I
12 would like to respond slightly to Hylland, but there
13 is a tranche of documents that I did forget to note
14 and that is something that there has been a lot of to
15 and fro about and those are --
16          SPECIAL DISCOVERY MASTER JAMES: When you
17 say, "tranche," is that a fancy word for group?
18          MS. STEINGART: Group. A group of
19 documents. And that refers to the ones that are
20 claimed as privileged because of a 408 privilege.
21          SPECIAL DISCOVERY MASTER JAMES: Right.
22          MS. STEINGART: And I think that there are
23 two levels to that analysis. First of all, 408 is not
24 a privilege that precludes discovery. It's only a

Page 146

1 privilege -- it only has to do with the admissibility
2 at trial and then admissibility at trial only for
3 certain purposes. Certainly they can be used for
4 impeachment and other things. That's number one.
5     The other level -- so there is no
6 privilege. The argument that NorthWestern makes about
7 these documents is that well, they're not relevant.
8 And I think on that account there are a number of
9 factors that undercut that. First of all, these
10 documents are within the documents this Court has
11 already ordered to be produced. They're on the
12 privilege log because there's already been a
13 determination, there's been a narrowing of our
14 document request to certain items and those items were
15 found to be within the realm of relevance and the
16 realm of documents that were required to be produced,
17 so that the relevance argument is over. It was made
18 last time. There was a narrowing. There was an order
19 for production. And so certainly we can't resist
20 production at this point on the grounds of relevance.
21     SPECIAL DISCOVERY MASTER JAMES: And when
22 you say, "we," you mean NorthWestern?
23     MS. STEINGART: Right. Or they. I'm
24 sorry. They.

Page 147

1     So under 408 there's no relief from the
2 requirement for it to be produced because it's not a
3 privilege that's cognizable under these circumstances.
4     Number two, there's no relief because
5 they're not relevant because they have already been
6 determined to be relevant.
7     And, lastly, I think because since that
8 argument we have the cease and desist and we have all
9 these complaints that deal with the CFO, the CEO, the
10 COO, the controller, we see that the substance and
11 scope, that all of the items in the SEC investigation
12 were themselves relevant because each of the findings
13 establish the overall fact that the financials for
14 NorthWestern as a whole in each quarter during this
15 entire year were false.
16     So I think that at this point the Rule 408
17 objection is not well-taken and whether these
18 documents will be admissible for some purpose down the
19 road is still an open question, but I do think that
20 they need to be produced and that there's no grounds
21 for not producing them.
22     With respect to --
23     SPECIAL DISCOVERY MASTER JAMES: Let me
24 interrupt you on that.

Page 148

1     I believe I recall seeing in
2 NorthWestern's papers an argument -- and maybe I'm
3 wrong on this -- that you have a heightened burden in
4 trying to or in asking for the production of
5 settlement documents as opposed to other relevant
6 documents.
7     MS. STEINGART: Well, I think here since
8 we already have evidence that the SEC has considered
9 the financials to be systematically and intentionally
10 false that whatever the discussions there were as to
11 the scope and tenor of what the findings would be, of
12 what the admissions would be, of what the SEC was
13 asking and what the company was offering, I think that
14 those are relevant and in a very -- it goes to the
15 heart of what the fraud was and what the company
16 itself acknowledges is the fraud.
17     SPECIAL DISCOVERY MASTER JAMES: Well,
18 then, to what extent -- this always comes up, the
19 settlement documents. To what extent is it going to
20 add anything to what you already have? Why should we
21 invade -- I mean, settlement documents are
22 traditionally accorded a higher protection than other
23 documents. That's obviously why you have Rule 408.
24     And I don't know exactly, and maybe you

Page 149

1 can help me on this, tell me what kind of settlement
2 documents we're talking about. What are they going to
3 add to your fund of knowledge which you don't already
4 have? I mean, I have seen the exhibits attached to
5 your briefs that show the pleas and whatnot. You have
6 a lot of power stuff there.
7     So, first of all, tell me what settlement
8 documents are you talking about and, secondly, what
9 are they going to add to this that you don't already
10 have?
11     MS. STEINGART: Well, the settlement
12 documents I'm talking about are the ones that they
13 have listed on the privilege log.
14     SPECIAL DISCOVERY MASTER JAMES: How many
15 documents are there?
16     MR. BREWER: Eight or ten, a dozen,
17 something like that.
18     SPECIAL DISCOVERY MASTER JAMES: And
19 they're identified as privilege with 408?
20     MR. BREWER: It says 408 in the column
21 where you would expect it to say attorney-client or
22 work product or whatever.
23     SPECIAL DISCOVERY MASTER JAMES: Right.
24     MS. STEINGART: And part of it is that we

38 (Pages 146 to 149)

Page 150

1  don't even have -- I don't know if this is because you
2  do a 408 thing. But we don't even have the consent
3  decree signed by the company in connection with the
4  cease and desist. That can't be -- there can't be any
5  basis for withholding that and withholding the terms
6  and conditions of the consent.
7      That's number one.
8      SPECIAL DISCOVERY MASTER JAMES: Well, is
9  that one of the documents listed?
10     MR. PIZZURRO: No.
11     MR. BREWER: I don't believe that is --
12 I'm not sure if that one is logged.
13     MS. DELANEY: No.
14     MR. BREWER: I'm not sure there is a
15 timing issue there in terms of when they did the
16 settlement and when they did the log, but I'm not sure
17 if that one is logged.
18     MS. STEINGART: We have asked for it a
19 number of times and we have been refused on the basis
20 of some confidentiality privilege, and I don't know
21 what it is.
22     SPECIAL DISCOVERY MASTER JAMES: We'll let
23 them address that in a minute.
24     MS. STEINGART: 408, 408 does not create a

Page 151

1  heightened level for, I disagree for --
2      SPECIAL DISCOVERY MASTER JAMES: For
3  discovery purposes?
4      MS. STEINGART: -- discovery. It just
5  creates an obstacle for admission at trial. These are
6  the kinds of documents that are used for impeachment
7  all the time.
8      Also, there have been certain positions
9  taken by -- first of all, some of the witnesses have
10 pleaded the Fifth and in connection with using the
11 evidentiary assumption or the evidentiary burden that
12 we might be able to avail ourselves of having other
13 corroborating material is helpful. The flow of
14 negotiations between the company and the SEC
15 concerning this will give us what the company's
16 admissions and positions are with respect to possibly
17 a number of issues in the cease and desist and the
18 process, what the company was telling the SEC about
19 who they could deliver and what they could say,
20 especially in light of people taking the Fifth.
21     There may be, and I don't know, some
22 resistance with respect to the SEC complaints about
23 whether there's no admitting or denying that the SEC
24 complaints themselves establish fraud and that's why

Page 152

1  to some extent we need to depose the individuals
2  against whom the complaints were brought.
3      So I think that this really reinforces
4  that this provides us with actual admissions by the
5  company to the extent that the company does or decides
6  that it may take the position that the material in the
7  cease and desist is something that it still has the
8  flexibility to admit or deny.
9      I think that these are a limited number of
10 documents. They can be marked for attorneys' eyes
11 only so that they don't get currency or circulation
12 that is beyond any necessary group so that whatever
13 permitted use of it will be made and non-permitted
14 uses will not be open to abuse.
15     So I think that we can have, given the
16 structure of our confidentiality agreement, protection
17 here, a limited universe of documents and, again, this
18 is not a production privilege.
19     MR. BREWER: There are only eight
20 documents on their log where they give the basis as
21 Rule 408 rather than something else.
22     SPECIAL DISCOVERY MASTER JAMES: Thank
23 you.
24     Mr. Pizzurro.

Page 153

1      MR. PIZZURRO: Yes.
2      SPECIAL DISCOVERY MASTER JAMES: Let me
3  ask you first. There are eight documents. What are
4  they?
5      MR. PIZZURRO: Well...
6      SPECIAL DISCOVERY MASTER JAMES: You don't
7  know off the top of your head?
8      MR. PIZZURRO: Off the top of my head I
9  don't know.
10     SPECIAL DISCOVERY MASTER JAMES: I mean,
11 they are all settlement documents.
12     MR. PIZZURRO: I believe it's
13 correspondence. That's my recollection, but I'm
14 not -- I honestly don't want to make a representation
15 for sure.
16     SPECIAL DISCOVERY MASTER JAMES: Okay.
17     MR. BREWER: They're all described as
18 settlement letter re: something or other on the log.
19     SPECIAL DISCOVERY MASTER JAMES: Okay.
20     MR. PIZZURRO: Start with the proposition
21 that indeed the law is that where you are attempting
22 to get 408 material there is a heightened burden on
23 the party requesting it and they have to show that
24 there is a special need.

Page 154

1    Now let's talk. So the relevance issue
2  sort of does become, again, something that needs to be
3  talked about. We went through this, and I'm not going
4  to spend a lot of time on it because we went through
5  it very exhaustively the last time we were all
6  together in January, but I'm sure -- I'm not sure.
7    You may recall that among the arguments I was
8  making --
9    SPECIAL DISCOVERY MASTER JAMES: Don't say
10  sure.
11    MR. PIZZURRO: You may recall among the
12  arguments that I was making at the time is that as far
13  as we knew, there was absolutely nothing that the SEC
14  was looking at that had anything to do with the
15  transaction at issue in this case, these plaintiffs,
16  anything to do with this case, nothing.
17    Now that's clear. It is clear. The cease
18  and desist order, the complaints against the James
19  individuals, going flat transaction, sale of Montana
20  Power Company assets, QUIPS holders, nothing to do
21  with anything here. It's completely irrelevant and
22  they haven't been able with one witness to link up any
23  of this to the transaction.
24    So you talk about special need. We are

Page 155

1  way out in left field here. I really find it very
2  difficult. We hear about there was this fraud and we
3  keep hearing about fraud in the air. I believe that
4  if we're going to have any anchor at all in this case
5  and in the process that anchor has got to be in the
6  claim that has been asserted here. And there is
7  simply absolutely no connection between anything that
8  the SEC was looking at as near as anybody can tell
9  from the public documents that the SEC has put out
10  there. And all the indictments -- indictments is
11  wrong. All of the complaints and the settlements with
12  the individuals and the cease and desist order with
13  the company, there's just nothing, absolutely nothing.
14    So there isn't any expectation that would
15  be reasonable. I'm not making a representation
16  obviously as to what's in the documents that we have
17  withheld on this ground, but I don't think that these
18  plaintiffs can even begin to make the kind of showing
19  that they would have to make under 408 where they
20  can't even show based on now they have got everything.
21  They made their relevance argument last time. You
22  ruled on it. We turned it over.
23    The SEC, the last time we were together
24  the cease and desist was not finalized by the

Page 156

1  Commission. It wasn't available to the world. It is
2  and what is now clear, which we couldn't make clear at
3  the last time we were all together, is for sure
4  nothing the SEC was looking at had anything to do with
5  this case or this transaction.
6    So I think --
7    SPECIAL DISCOVERY MASTER JAMES: Let me
8  see if I understand you. You're saying the cease and
9  desist has nothing to do with this case?
10    MR. PIZZURRO: Nothing to do with this
11  case.
12    SPECIAL DISCOVERY MASTER JAMES: Is it a
13  public document?
14    MR. PIZZURRO: It is.
15    SPECIAL DISCOVERY MASTER JAMES: Can they
16  get it independently?
17    MR. PIZZURRO: They have it. They have it
18  and they have examined witnesses --
19    MS. STEINGART: Not the consent. Not the
20  consent that they signed with the SEC in order to
21  resolve the cease and desist order.
22    SPECIAL DISCOVERY MASTER JAMES: We'll get
23  back to you on that in a minute.
24    MR. PIZZURRO: If there's some additional

Page 157

1  document, I mean we can probably resolve that issue.
2    SPECIAL DISCOVERY MASTER JAMES: Now, the
3  408 documents that --
4    MR. PIZZURRO: But that's not the 408.
5  That's not what I have in mind. It's not what's on
6  our privilege log in terms of 408.
7    If there's some other document pursuant to
8  which the company agreed to the terms of the cease and
9  desist or otherwise agreed to resolve this, I'm going
10  to go back and if I find it I'm going to undertake to
11  advise my client that it should be produced. That
12  would be my advice to them. What position is taken, I
13  can't tell you.
14    But what I am saying is that what the SEC,
15  what is very apparent from the SEC's own documents,
16  the cease and desist order and all of the complaints
17  against the four individuals, is that the going flat
18  transaction is completely irrelevant. It has nothing
19  to do with any of this. It is entirely, as I said the
20  last time we were here, an investigation concerning
21  the company's financial reporting as it related to its
22  subsidiary Expanet and Blue Dot and some subsidiary
23  issues. And the idea that there has been a revelation
24  that the company's financial statements for the first

Page 158

1   three quarters of 2002 is now new, the company
2   restated its financials in April '03. By definition
3   they were wrong. By definition they were materially
4   false. Okay?
5           And now the SEC has done an investigation
6   to determine the facts and circumstances behind that
7   to see what kind of liability or responsibility that
8   there is and it is what it is, but it has nothing,
9   nothing to do with this transaction.
10          So why am I saying that? Why is that
11  relevant? It's relevant to this argument because they
12  have an obligation to show special need with respect
13  to these settlement materials. They can't even show
14  that the underlying settlement agreement, if you will,
15  the cease and desist order, is relevant to their case.
16  How are they going to meet the special need
17  requirement to show that some underlying
18  communications with the SEC that led to the settlement
19  has anything to do with the case?
20          SPECIAL DISCOVERY MASTER JAMES: Well,
21  it's been, as you say, a couple of, several weeks
22  since we have addressed this before, but I thought
23  their theory of the going flat transaction was that
24  NorthWestern failed to disclose at the time of the

Page 159

1   transaction the improper accounting numbers, the
2   improper or the inaccurate, their inaccurate, the
3   inaccuracies about the financial condition and as a
4   result they were, Magten and the trustee were misled
5   or defrauded because they would have done something if
6   they had known that information.
7           Now, clearly the admissions to me, if my
8   recollection is correct, that all these financial
9   problems are relevant and to the extent the consent
10  decree relates to that, that seems to be relevant.
11  But tell me if I'm misunderstanding this.
12          MR. PIZZURRO: The theory -- let me tell
13  you the theory that's pled and let me tell you the
14  theory that I've heard articulated, which isn't
15  anywhere other than in some transcripts.
16          The theory that is pled which was in the
17  amended complaint, which is after Judge Case, the
18  bankruptcy judge, effectively said you're not
19  creditors of Clark Fork and so you can't assert a
20  fraudulent conveyance claim, is that the indenture
21  trustee, not these QUIPS holders who bought their
22  QUIPS months after the restatement, months after all
23  the problems, Magten was not defrauded by anyone, nor
24  was this indenture trustee who is the replacement to

Page 160

1   The Bank of New York, who was the indenture trustee.
2   The indenture trustee signed off on a document which
3   effectively, the judge held as a matter of law,
4   released Clark Fork as the obligor on these
5   instruments and replaced that obligor with
6   NorthWestern.
7           SPECIAL DISCOVERY MASTER JAMES: Right.
8           MR. PIZZURRO: And the allegation in the
9   complaint is that Bank of New York was induced to
10  execute that document or documents based on fraudulent
11  financials. Okay?
12          So what does that mean? In terms of, in
13  terms of whether the financials were false or not, as
14  I was arguing the last time we were here, that's
15  really not an issue because of the restatement. The
16  underlying facts and circumstances of why they were
17  false, unless the SEC were actually investigating the
18  use of the financials in connection with this
19  transaction, which they were not, is completely
20  irrelevant. And now we know that The Bank of New
21  York, whose deposition was taken and whose
22  representatives testified, they didn't look at the
23  financials because they didn't care.
24          And, furthermore, there is now a decision

Page 161

1   by Justice Freed --
2           SPECIAL DISCOVERY MASTER JAMES: Which
3   I've read.
4           MR. PIZZURRO: -- which makes it clear
5   that Bank of New York had no obligation to even care
6   at that time or a subsequent time. So the theory as
7   pled has nothing to do with any fraud on these
8   plaintiffs. It has to do with vitiating the
9   underlying release and as pled I'm pretty confident
10  that that theory isn't going anywhere anymore.
11          Now, we have also heard a theory which has
12  never been articulated in any pleading, so I don't
13  really know what effect it has, but I'll give counsel
14  due for having to expressed it, and as I understand it
15  that is some theory that there was a fraud here
16  because at the time that NorthWestern assumed these
17  obligations it knew that it didn't have the financial
18  wherewithal to pay the obligations.
19          Again, you can argue back and forth all
20  day long, but as to whether that's true and whether
21  there's any evidence of that, I don't see any yet.
22  But that has nothing to do with the SEC's
23  investigation and that has nothing to do with --
24  unless the SEC had made some finding that the company

Page 162

1  was insolvent or unable to meet its obligations as
2  they became due sometime during this period when the
3  transaction was done, the investigation would have no
4  relevance and, indeed, there isn't anything in the
5  report to that effect.
6          So why we are fixated — we have spent a
7  lot of time and a lot of money. It is what it is.
8  We're going to have some more depositions and we're
9  going to have — but at the end of the day all of this
10  has been leading nowhere. They have got a lot worse
11  case today than they did the last time we were all
12  together before they got this stuff.
13          My point is I don't see how they can
14  possibly under the circumstances and given what we
15  know the SEC said and investigated, and there isn't
16  any dispute as to what they said or investigated, they
17  can show some heightened need to get the 408 material.
18  They can't even show -- if they had this to do all
19  over again, if we had the benefit of the SEC's cease
20  and desist order back in January, I'm pretty confident
21  Your Honor might have had a different view of all of
22  the documents that they were asking for and that you
23  allowed them to get. That's water over the dam.
24  That's fine.

Page 163

1          But it is a different ball game today and
2  I just don't see how they can make the showing that
3  they're required to make. And, again 408, is it
4  technically a privilege? No, it's not. But they do
5  have under the case law the heightened burden. We put
6  it on the log and we specifically had it as 408 in
7  part because it was an issue that we flagged the last
8  time we were here and you said put it on the log so
9  we'll sort it out another day and that's what we're
10  here to do today.
11          SPECIAL DISCOVERY MASTER JAMES: Okay.
12  MS. STEINGART: Well, you know, we hear
13  every time we're here about what Mr. Pizzurro would
14  like this case to be about, but it's not what this
15  case is about.
16          Judge Farnan issued a decision in denying
17  the motion to quash that says, and which Judge Farnan
18  held --
19          SPECIAL DISCOVERY MASTER JAMES: Quash
20  against whom?
21  MS. STEINGART: A protective order for
22  discovery here where this argument, this specific
23  argument was made, and in response what Judge Farnan
24  said in his opinion was, quote, "Judge Case's language

Page 164

1  does not condition plaintiffs' standing to sue
2  NorthWestern on whether The Bank of New York relied on
3  NorthWestern's financial statements. Rather, Judge
4  Case noted that the essence of plaintiffs' fraud
5  argument was that NorthWestern engaged in a knowing
6  and conscious fraudulent scheme. In light of this
7  characterization, Judge Case determined that the
8  relevant inquiry is whether Debtor knew at the time
9  that it could not do the transaction based on its
10  restated accountings, et cetera and whether the
11  financial information the Debtor provided the public
12  was, in fact, false."
13          Now --
14  MR. PIZZURRO: Can you keep reading
15  though, Bonnie? I mean, please.
16  MS. STEINGART: This is Judge Farnan's
17  opinion. Bank of New York stated during its
18  deposition that it did not look at the financials, but
19  if it knew at the time that all of the financials that
20  were publicly issued and outstanding for NorthWestern
21  was false, it would not have done what it had done.
22  It would not have signed the release and it would not
23  have gone forward with the transaction. That's what
24  Bank of New York testified to during the deposition.

Page 165

1          They said they didn't look at the
2  financials, but if the day before they had to sign the
3  release it was disclosed that NorthWestern had filed
4  three false 10-Q's that misstated NorthWestern's
5  consolidated income by 600 percent that they would
6  have been on inquiry notice and they would have made
7  such inquiry.
8          SPECIAL DISCOVERY MASTER JAMES: That's a
9  deposition in this case?
10  MS. STEINGART: At a deposition in this
11  case.
12          SPECIAL DISCOVERY MASTER JAMES: How does
13  that relate -- I mean was that testimony provided to
14  the State Supreme Court in New York before the
15  decision was made?
16  MS. STEINGART: No. No, it was not
17  because that deposition occurred after, after that
18  decision was rendered or while or at the same time.
19  They were probably hours apart.
20  MR. KAPLAN: Also, there was an agreement
21  because discovery was stayed in the state court, in
22  the state court action so they agreed to have
23  discovery proceed in this litigation, but it wasn't
24  going to be used in the state court litigation. So

Page 166

1 there was a timing issue, but we also had to agree
2 with them that it was limited to this case.
3     MS. STEINGART: And so also Mr. Pizzurro
4 is very cavalier in saying it was false and we said it
5 was false, we withdrew them and we stated that it was
6 false.
7     But the issue here, besides that they were
8 false, they were intentionally false and that's what
9 the key of these findings are. It wasn't that
10 somebody said oh, my gosh, I made a mistake; oh, my
11 gosh, the accounting rules changed; oh, my gosh,
12 somebody got sick and we didn't find this pile of
13 documents.
14     What the SEC found was that there was a
15 systematic, consistent, intentional fraud and that
16 fraud went on because unless the financials were
17 false, the company could not do its equity offering,
18 could not replace that 720 million in bonds and could
19 not effectuate. The SEC didn't address the going flat
20 transaction because that was not a transaction that
21 was -- that was a private transaction and not a public
22 transaction. But there's no doubt about that the
23 representations that were made to the rating agency
24 and to others about the health of this company, about

Page 167

1 the cash flow of this company in order that
2 transaction should occur.
3     So the tale that Mr. Pizzurro spins about
4 what he would like this case to be about and the
5 firewall that he would like to erect between the
6 damaging information that has emerged and the going
7 flat transaction is a wall that is impossible to
8 build.
9     The more information and data we have that
10 show that the company knew that its financials were
11 false, knew that it had to withdraw them, knew that
12 without issuing the false financials it could not
13 engage in the capital transactions it did during 2002,
14 the stronger our case is to do what Judge Case said we
15 had to do, would be to show --
16     SPECIAL DISCOVERY MASTER JAMES: Judge
17 Farnan or Judge Case?
18     MS. STEINGART: Judge Case that Judge
19 Farnan then said that this is the issue, a knowing and
20 conscious fraudulent scheme. Any such fraudulent
21 scheme that materially misstated the financials during
22 the time of the going flat transaction necessarily
23 implicated whether that transaction would occur. And
24 Mr. Pizzurro's need to say no, it doesn't, no, it

Page 168

1 doesn't because the SEC doesn't say going flat does
2 not make it so.
3     SPECIAL DISCOVERY MASTER JAMES: Okay,
4 I've heard enough excellent advocacy on this issue.
5 Here's what I'm going to do.
6     I'm going to revisit -- well, first of
7 all, before I forget it, I would like an affidavit
8 from you with respect to the Hylland matter which we
9 do not have in the record anywhere, if you could get
10 that to me by next Wednesday.
11     Secondly, with respect to the schedule for
12 determining what the universe of contested privilege
13 documents is which I may then have to review, I'm
14 going to push back the dates on that. It sounds from
15 what Mr. Brewer said and also based on the time that
16 you have had the privilege log that it shouldn't take
17 a week to get that to me. Therefore, I'm going to ask
18 that the re-review of the log and any supplementation
19 with respect to the documents that are still in
20 dispute, which includes the two handouts that I have
21 been given today by Magten's counsel, should be in the
22 hands of NorthWestern, the defendants, by 12:00 noon
23 on Wednesday. And I want a response from defendants
24 as to whether they want me to look at those documents

Page 169

1 or whether they're going to give them up by the close
2 of business on Friday.
3     Now, with respect to the 408 documents,
4 when the process is done Friday at close of business
5 and you decide what you're going to be sending me, I
6 want to see the 408 documents.
7     Now, does that leave anything that I have
8 missed?
9     MR. PIZZURRO: I think that the 47
10 documents --
11     SPECIAL DISCOVERY MASTER JAMES: Include
12 the 408's?
13     MR. PIZZURRO: No. No. We brought with
14 us 47 documents as to which we're still asserting the
15 privilege out of the original 258.
16     SPECIAL DISCOVERY MASTER JAMES: Right. I
17 don't want it piecemeal. I want you to send them to
18 me all at once because I'm afraid I will lose track of
19 stuff.
20     MR. PIZZURRO: Right. So what we would be
21 sending --
22     SPECIAL DISCOVERY MASTER JAMES: Is the 47
23 plus any others that --
24     MR. PIZZURRO: Plus whatever else we have

Page 170

1  a dispute on, plus the 408.
2      SPECIAL DISCOVERY MASTER JAMES: Right.
3      MR. PIZZURRO: Got it.
4      SPECIAL DISCOVERY MASTER JAMES: Correct?
5      MS. STEINGART: All right.
6      MS. DELANEY: I wonder just for the sake
7  of clarity, since we got two schedules, a letter and
8  then an addendum today, that when plaintiffs identify
9  the documents in dispute we get one comprehensive list
10  of what remains.
11      SPECIAL DISCOVERY MASTER JAMES: Sure.
12      MR. BREWER: Okay.
13      MS. STEINGART: You do have a list of
14  that. You have the ones that you haven't withdrawn,
15  so that list is complete, that one (indicating).
16      MS. DELANEY: Where does (indicating) this
17  go?
18      MS. STEINGART: And this comes from your
19  two supplemental logs.
20      MS. DELANEY: So are you going to include
21  this on what you give us on Wednesday?
22      MR. BREWER: We can do that. We can do
23  that in a single document. It seems a little unwieldy
24  to have to add back in your -- you already prepared

Page 171

1  the list of 51 you're maintaining on.
2      MS. DELANEY: So whatever you give us is
3  in addition to the 47 that we still continue to assert
4  the privilege, correct?
5      MR. BREWER: Yes.
6      MS. STEINGART: But you're on notice now
7  that those will be on the list so you don't have to
8  wait.
9      MR. BREWER: Whatever we give you on
10  Wednesday will be in addition to your list of 47, I
11  think you said, that you've indicated you're still
12  maintaining privilege on. We already know what those
13  are and there's no point in copying that into a
14  separate document.
15      MS. DELANEY: Thank you.
16      MR. BREWER: Okay.
17      SPECIAL DISCOVERY MASTER JAMES: And then
18  on -- let me see. Next Friday is the 25th.
19      On the 29th, Tuesday, the 29th, whatever
20  documents are in dispute should be delivered, should
21  be in my hands along with the relevant log entries
22  relating to those documents.
23      MS. STEINGART: Is there anything
24  supplemental that you would like from us on Hyland?

Page 172

1      SPECIAL DISCOVERY MASTER JAMES: No. I
2  mean, I'm going to be getting Hylland. You mean in
3  terms of the deposition? No.
4      MS. STEINGART: In terms of you asked
5  Mr. Pizzurro for an affidavit. Is there anything else
6  additional that we can provide to you on Hylland in
7  terms of the letter that indicates that the report was
8  provided to him and the fact that there was a dispute
9  during that period or an analysis of the cases that
10  respond to those in the letter that Mr. Pizzurro
11  provided to you? Would that be of any help?
12      SPECIAL DISCOVERY MASTER JAMES: Yes. Why
13  don't you do that on Wednesday as well?
14      MS. STEINGART: Thank you.
15      SPECIAL DISCOVERY MASTER JAMES: Okay.
16  What I would like from local counsel is a letter on
17  Monday that memorializes these dates and when things
18  are going to be due.
19      MS. DUBE: A joint letter you want?
20      SPECIAL DISCOVERY MASTER JAMES: Yes.
21  This relates solely to paragraph number 5 of my May 17
22  letter.
23      I don't see any reason, for the benefit of
24  Mr. Kaplan, the order of the last four or five

Page 173

1  elements doesn't have any particular significance the
2  way that I organized the first five, so I'm happy to
3  jump to depositions, the issues raised by paragraph 9
4  of my letter which states "Plaintiffs' motion to
5  exceed the ten deposition limit and to extend the
6  discovery schedule for the taking of depositions in
7  this action."
8      Before I hear from you, Mr. Kaplan, it's
9  quite obvious that, first of all, we're beyond the May
10  2nd discovery cutoff, so clearly there will be
11  depositions taken after today. I'm going to permit
12  such depositions to be taken.
13      Now, whether I limit that to ten or not is
14  another matter and I guess that's what I want to hear
15  from you about.
16      MR. KAPLAN: Thank you. A couple of
17  points that I think are important to set the
18  background on this issue.
19      The first is that the concept of us
20  exceeding the ten deposition limit is not something
21  that's new. This is something that we had discussed
22  with opposing counsel for a long time and there are
23  e-mails and letters that are attached to various
24  motions that acknowledge from both sides without any

44 (Pages 170 to 173)

## Page 174

1  dispute the fact that we'll likely be exceeding ten
2  depositions.
3       When we were here last time I believe that
4  Your Honor had asked how many depositions we thought
5  and we gave a rough number of probably twelve to
6  fifteen. Again, there are letters when we were
7  discussing scheduling, there are a number of letters
8  and e-mails from all the counsel on the other side
9  that acknowledged that the number of depositions would
10  be more than ten and we're setting schedules for
11  twelve depositions or so. So this is not a new
12  request and, in fact, we were under the impression
13  that we would have a stipulation to the effect of,
14  number one, extending the time to do depositions and,
15  number two, to resolve the issue of the number of
16  depositions to avoid having to come before you today
17  and deal with this issue.
18       And it was only as the original discovery
19  cutoff was fast approaching that we learned that there
20  was not going to be any agreement on extending
21  depositions and it seemed that all negotiations with
22  respect to depositions were simply breaking down which
23  required us to come in and ask to, again, do both. I
24  understand we have resolved the issue of the

## Page 175

1  extension, but we still have I think a dispute about
2  the number of depositions.
3       One of the things that the debtors argue
4  or that NorthWestern argues in their papers to which
5  we haven't yet replied is the same theme that
6  Mr. Pizzuro tried just now, which is well, their case
7  is over because of his view of what he would like our
8  case to be and, therefore, you shouldn't let them
9  continue to go forward because NorthWestern has
10  convinced themselves of what our case should be and
11  they have somehow convinced themselves that any
12  further discovery in this is fruitless.
13       Obviously, based on the decision that
14  Ms. Steingart read, every judge who has looked at this
15  so far has come to a totally different conclusion. So
16  that's number one.
17       Number two --
18       SPECIAL DISCOVERY MASTER JAMES: Number
19  two for me is how many depositions have been taken by
20  each side?
21       MR. KAPLAN: So far NorthWestern has not
22  taken any depositions. Nobody on the other side of
23  the table have taken any depositions.
24       We have taken five depositions. We have

## Page 176

1  taken five depositions so far. Of those, there were
2  several other depositions that had to move as a result
3  of the document issues that we have been discussing
4  all morning. If not for the re-calling of the
5  documents and all the privilege issues, there were
6  several other depositions and, in fact, the vast
7  majority of the depositions would have been done.
8       We had firm dates set for Mr. Hanson, for
9  Mr. Kindt, for a number of deponents, but because of
10  these specific document issues we ended up having to
11  move the depositions because we had NorthWestern and
12  Mr. Hanson's and Kindt's counsel saying you're only
13  getting him once without a fight and if we're going to
14  have to bring him back, we're going to fight you on
15  it.
16       And our view as well, there are so many
17  documents, some of them key documents, still in
18  dispute it wasn't worth trying to take a deposition
19  with a limited universe of documents, not knowing how
20  Your Honor would rule on it and then having to come
21  back again and say gee, now can we have them again?
22       SPECIAL DISCOVERY MASTER JAMES: Are the
23  five depositions that you have taken, are they
24  completed without regard to my rulings on the

## Page 177

1  privilege issues?
2       MR. KAPLAN: Yes, those are. But there
3  are, however, other depositions. Those are some of
4  the party ones, Mr. Hanson, Mr. Kindt, we also had a
5  30(b)(6) deposition of NorthWestern, all of which
6  were, in essence, in abeyance pending a resolution of
7  these issues.
8       There are some other depositions that we
9  have sought that have also been delayed because of
10  document issues. For example, we sought to take the
11  deposition of Merle Lewis, who is the former CEO of
12  NorthWestern. It was originally noticed for April
13  17th and all of a sudden we ran into all of these
14  document issues, among other things, that led us to
15  conclude that it didn't make sense at the time to go
16  forward with that deposition. So even though it was
17  noticed for April 17th, we ended up at the time
18  adjourning that deposition to a date later. We
19  probably would have had that deposition by now but
20  with all of the motion practice and everything being
21  held in abeyance, scheduling on that has stopped.
22       Other depositions that have been out there
23  have been delayed also for document issues but some
24  slight differently. For example, one of the