IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>    Plaintiffs,<br>  v.<br><br>NORTHWESTERN CORPORATION,<br><br>    Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 04-1494-JJF<br>)<br>)<br>)<br>)<br>)<br>) |
| MAGTEN ASSET MANAGEMENT CORP.,<br><br>    Plaintiff,<br>  v.<br><br>MIKE J. HANSON and ERNIE J. KINDT,<br><br>    Defendants.<br>_____ | )<br>)<br>)  Civil Action No. 05-499-JJF<br>)<br>)<br>)<br>)<br>)<br>) |

**REPORT AND RECOMMENDATION OF SPECIAL MASTER
WITH RESPECT TO PLAINTIFFS' CHALLENGE TO
NORTHWESTERN'S DESIGNATION OF PRIVILEGED DOCUMENTS**

1.      On February 8, 2006, the Honorable Joseph J. Farnan, Jr. appointed me to serve

as Special Master in the above-referenced actions.

**Plaintiffs' Motion Challenging Northwestern's
Designation of Privileged Documents
Included on Northwestern's Privilege Log[1]**

2.      The motion that is the subject of this ruling is:

Plaintiffs' Emergency Motion Seeking Orders (a) Shortening the Briefing
Schedule under Local Rule 7.1.2 and Setting a Hearing Date Before the
Special Master; (b) Determining Privilege Status of Documents
Northwestern Seeks to Recall Under Claim of Inadvertent Production and
Privilege; (c) Compelling Northwestern to Produce Non-Privileged

---

[1]  This issue is identified in paragraph 5 of the May 17 agenda letter, Exhibit A hereto.

Documents; (d) Compelling Northwestern to Produce Legible Versions of Documents Produced in Illegible Form; (e) Extending the Period for Completing Depositions; and (f) Assessing Fees and Costs Against Northwestern ("Plaintiffs' Emergency Motion Seeking Orders, etc.").

3.    Plaintiffs' motion challenges the privilege designation made by Northwestern with respect to 34 documents. These 34 documents can be divided into three categories. First, there are 25 documents as to which either the attorney-client or work product privileges have been asserted by Northwestern and challenged by Plaintiffs. Second, of the 34 documents, there are eight documents that Northwestern has withheld from production based not on the attorney-client or work product privileges but upon Federal Rule of Evidence 408. Lastly, there is one document that by agreement has not been submitted to me for *in camera* review that is a Special Report prepared for the benefit of the Northwestern Board of Directors regarding the termination of an officer and director of Northwestern, Mr. Hylland (the "Hylland Report"). For ease of reference, attached as Exhibit B hereto is a privilege log provided by Northwestern that contains the information concerning the 34 documents at issue, other than the Hylland Report, that have been submitted to me for *in camera* review, including the documents that are sought to be withheld based upon the Rule 408 argument.

### The Twenty-Five Privileged Communications (Apart From the Rule 408 Documents) in Dispute[2]

4.    Document No. 29 – The information on the privilege log concerning this document is somewhat confusing and may explain, in part, why Plaintiffs have challenged the privileged nature of the document. First, the document is described on the privilege log as an attachment. However, what has been presented to me *in camera* consists of a transmittal e-mail with the attached document in question. The e-mail is from Wylie Strout, an associate at the law

---

[2]  Each of these documents will be evaluated in the order that they appear on the Northwestern privilege log, Exhibit B hereto.

firm of Paul, Hastings, Janofsky & Walker, LLP ("Paul, Hastings") in New York City. The attachment is clearly the handiwork of an attorney and is in draft form. Further, the e-mail indicates that the draft attachment was sent to Northwestern employees and Paul, Hastings' lawyers. It does not indicate, contrary to the information on the privilege log, that the document was sent to Bankers Trust/Deutsche Bank, the Bank of New York, Louis P. Young, or Mellon Leasing Company. I will assume that the privilege log's description of the recipients is inaccurate. Accordingly, I conclude that the document is privileged and should not be produced to Plaintiffs.

5.      Document No. 55 – Although this collection of e-mails is identified as "privileged and confidential attorney-client work product," the information contained in the collection of e-mails is strictly factual in nature. The discussion focuses on operating costs and other financial aspects of a Montana dam owned at one time by Northwestern. This document is ordered to be produced to Plaintiffs.

6.      Document Nos. 56, 140, 141 – The identification of these three documents together is confusing. The document identified as No. 56 that has been submitted to me *in camera* is clearly an e-mail dated December 3, 2002 from Michael Young, Senior Corporate Counsel at Northwestern, with an attached draft letter also dated December 3, 2002. Documents 140 and 141, based on the description in the privilege log (Exhibit B), are also documents authored by Michael Young, but dated December 10, 2002 and December 11, 2002, respectively. I was not provided copies of Document Nos. 140 and 141 because of the assertion that those documents are duplicates of Document No. 56. For purposes of this motion, I accept counsel's representation that Document Nos. 56, 140, and 141 are the same and that the description on the privilege log is, again, inaccurate. The e-mail transmittal from Mr. Young , an in-house attorney

3

at Northwestern, indicates that he is distributing a draft letter that was to be submitted to Michael McGrath, the Attorney General of Montana. The letter clearly addresses legal issues that relate primarily to the Milltown Dam and various legal issues concerning that dam. The transmittal e-mail reflects that it was distributed to Northwestern's attorneys, employees of Northwestern, and to consultants retained by Northwestern. As to the consultants, they are ELM and the Graves Law Offices, P.C., which, according to the ELM website, www.elmllc.com, provide a comprehensive array of services, including legal advice, with respect to environmental liabilities. Counsel for Northwestern has advised me that one of the ELM consultants copied on this e-mail was an attorney, Mr. Graves, and one was not, Mr. Williams.

7.      The fact that this e-mail and the attached draft document were sent to a non-lawyer consultant for review and analysis raises an issue that arises with respect to a number of documents provided to me for *in camera* review. Does the fact that Northwestern provided these documents and others to their professional advisers waive the attorney-client or work product privileges, as Plaintiffs apparently contend?

8.      Before looking at the law, the common sense answer to this issue must be that a party is entitled to share privileged communications with its professional non-lawyer advisers without waiving any of its privileges. In countless scenarios, it would be impossible for an attorney to provide competent legal advice to a client without input from the client's professional advisers, such as investment bankers, accounting experts, other financial specialists, scientists, engineers, experts on environmental hazards and remediation, etc.

9.      The law comports with common sense in this instance.[3] Delaware Uniform Rule of Evidence 502(b)(1) considers confidential communications between a client's

---

[3] No party has supplied me with any relevant Montana law and I have found none.

"representative" and the client's lawyer to be privileged if the communications relate to the rendition of professional legal services. "Representative" is not defined in Rule 502, but it obviously should be construed to extend beyond the client's employees because Rule 502 could easily have been limited to "employees," but was not. The client's agents or professional advisers must fall within the ambit of "representatives" if the attorney-client relationship is to be at all effective, provided, of course, that the activities of those "representatives" or professionals are necessary to the rendition of professional legal services. Indeed, even if one were to subscribe to the outdated, formalistic notion that the professional must be hired and paid by the lawyer seeking the professional's advice, that requirement is satisfied here because ELM was retained on behalf of Northwestern's in-house counsel, as well as its outside counsel.

10.    The decisional law from both the federal courts and the Delaware courts support the above conclusion. For example, in *Viacom, Inc. v. Sumitomo Corp.* (*In re Copper Market Antitrust Litig.*), 200 F.R.D. 213 (S.D.N.Y. 2001), the court, applying federal law, addressed the issue of whether certain communications between Sumitomo's legal counsel and a public relations firm used by Sumitomo in connection with the antitrust action brought against it were privileged. As here, the argument by the opposing side was that an independent consultant, such as a public relations firm, was not an employee of the corporation, and, therefore, no privilege claim could be made between such an independent contractor and its communications with the client's law firm.

11.    In addressing this argument, the court started its analysis with Federal Proposed Rule of Evidence 503, also known as Supreme Court Standard 503, which was not incorporated into the Federal Rules of Evidence but has served as guidance to the federal courts in attempting to shape the federal common law attorney-client privilege. Significantly, proposed Rule of

Evidence 503 is substantially identical to Delaware Uniform Rule of Evidence 502. The court, in *Viacom*, focused on the same language in proposed Rule of Evidence 503 as I have above, which states that the attorney-client privilege applies "between himself [the client] *or his representative* and his lawyer or his lawyer's representative . . . ." (emphasis added) The court in *Sumitomo* ultimately concluded that the public relations firm was a client representative and, therefore, was within the ambit of protected privileged communications among the client, Sumitomo, and its outside counsel. *Id.* at 217-219.

12.      The *Viacom* court reached its decision in part by reliance upon the analysis of a similar situation in *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994). In *Bieter*, the court stated the question before it as "whether an independent consultant can be *a representative* of the client for purposes of applying the attorney-client privilege" based upon Supreme Court Standard 503(b)(1) (emphasis added).     In *Bieter*, the party asserting the privilege argued that an independent real estate consultant retained by the client qualified as a "representative" of the client, and, for purposes of the attorney-client privilege, his involvement in privileged communications with counsel did not constitute a waiver of the privilege. The court stated:

> Such information [from an independent consultant] will, in the vast majority of cases, be available from the client or the client's employees, but there undoubtedly are situations, . . . in which too narrow a definition of "representative of the client" will lead to attorneys not being able to confer confidentially with non employees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely.

*Id.* at 937-938.

13.      As Northwestern points out, other federal cases have considered this issue under the rubric of the "functional employee" test.    In those cases, the courts have attempted to determine whether the independent consultant's relationship is of such a degree of importance to

the rendition of legal advice by the client's attorney that the independent consultant is a *de facto* employee. In *In re Bristol-Myers Squibb Securities Litig.*, C.A. No. 00-1990 (SRC), 2003 U.S. Dist. LEXIS 26985, at *11-14 (D.N.J. June 25, 2003), the court held that the "key to deciding if a consultant should be protected under the 'functional equivalent' exception is if the consultant acts for the corporation and possesses the information needed by attorneys in rendering legal advice." *Id.* at *12. Applying such a standard to the ELM employees who were privy to the communications with respect to the documents at issue on this motion, there is no question that neither the in-house counsel at Northwestern nor their outside counsel could have provided the necessary legal analysis without input from such environmental specialists.

14.    The same logic has been applied by the Delaware state courts. *See, e.g., Cede & Co. v. Joule Inc.*, C.A. No. 696-N, 2005 Del. Ch. LEXIS 21, at *2 (Del. Ch. Feb. 7, 2005) (privilege applied to communications involving client's investment banker); *Davenport Group v. Strategic Investment*, C.A. No. 14426-NC, 1995 Del. Ch. LEXIS 109, at *2-4 (Del. Ch. Aug. 24, 1995) (privilege held to apply to communications involving the client, counsel and the client's accounting firm); *Tabas v. Bowden*, C.A. No. 6619, 1982 WL 17820 (Del. Ch. Feb. 16, 1982) (privilege held to apply to communications involving the client's counsel and an investment broker).

15.    For all of the reasons set forth above, this document, therefore, need not be produced to Plaintiffs.

16.    Document No. 61 – This document contains a transmittal e-mail from Michael Young, in-house counsel for Northwestern, to various parties, including Northwestern's counsel at Paul, Hastings and an ELM lawyer and ELM professional. The transmittal e-mail attaches a draft application that was to be submitted to the Department of Public Service Regulation before

the Public Service Commission of the State of Montana. The document reflects privileged communications concerning a number of legal issues affecting the treatment of the Milltown Dam near Missoula, Montana, including, *inter alia*, compliance with CERCLA obligations and FERC requirements relating to whether the Milltown Dam could qualify as an exempt wholesale generator of electricity. Northwestern is not required to produce this document to Plaintiffs.

17.     Document No. 92 – This series of e-mails relates, as indicated on the privilege log to the NorCom – Expanets transaction. The series of e-mails includes discussions concerning legal issues relating to that transaction and is, therefore, privileged. Northwestern need not disclose this document to Plaintiffs.

18.     Document No. 94 – This document consists of a transmittal e-mail from Northwestern's general counsel to Charles Patrizia, an attorney at Paul, Hastings. The attachment to the e-mail is a draft letter to Catherine Fisher at the office of Public Utility Regulation with the Securities and Exchange Commission in Washington. The letter obviously contains legal analysis in draft form that relates to legal matters affecting the Milltown Dam and certain conditions pertaining to that facility that would affect the Dam's status as an exempt wholesale generator and the collateral effects that would have with respect to certain reporting requirements under the Public Utility Holding Act of 1935. This document contains privileged communications and should not be produced to Plaintiffs.

19.     Document No. 107 – As reflected in the description of this document on the privilege log, this is an e-mail from Northwestern's in-house counsel to Mike Hanson, the CEO, concerning discussions with EPA representatives as to potential environmental problems at the Milltown Dam. Two representatives of Northwestern's environmental consulting firm are copied on the e-mail. The fact that representatives of Northwestern's environmental consulting

firm are copied on the e-mail does not vitiate any applicable privilege, as discussed above. Their knowledge and analysis would have been necessary to any informed legal judgment relating to this problem. This document is privileged and need not be produced.

20.      Document No. 139 – The subject matter description of this document, as reflected on the privilege log, is accurate. This is a draft memorandum prepared by a law firm that was provided to Lee Graves, a lawyer with Northwestern's environmental consulting firm. The document provides a lengthy legal analysis of the relative exposure facing Northwestern with respect to environmental issues related to the operation of the Milltown Dam. The Bates stamp on the document indicates that it was produced by Northwestern in this case. Accordingly, it is protected by the attorney-client privilege and the work product doctrine since the memorandum relates to potential legal action that might be brought by the EPA. This document need not be produced to Plaintiffs.

21.      Document No. 140 – I was not provided with a copy of this document. According to correspondence from counsel for Northwestern to me, this document is a duplicate of Document No. 56, even though it bears a different date. Most of the information with respect to this document on the privilege log, except for the date, is identical to the log's description of Document No. 56. To the extent Document No. 140 is a duplicate of Document No. 56, then my decision with respect to Document No. 56 applies to Document No. 140 as well.

22.      Document No. 141 – I was not provided with a copy of this document. Again, this document is described by counsel for Northwestern as a duplicate of Document No. 56. However, the subject matter description for this document on the log is not the same as the subject matter description for Document No. 56, and the date on the log is also different from the date for Document No. 56 and Document No. 140. However, to the extent that the document is a

duplicate of Document No. 56, as represented by Northwestern's counsel, my decision with respect to Document No. 56 applies to Document No. 141 as well.

23.     Document No. 166 – This document consists of a transmittal e-mail and a draft Press Release with respect to Northwestern's reorganization of its Montana utility operations that was to be sent on or about November 20, 2002. While certain Northwestern in-house counsel are copied on this document, the document contains no privileged communications. It consists entirely of factual recitations and business information and does not reflect professional legal advice. Accordingly, this document should be produced to Plaintiffs.

24.     Document No. 183 – This is a two-page e-mail, only part of which is the basis of an assertion of the attorney-client privilege. A portion of the second page of this two-page e-mail has been redacted on the basis of the attorney-client privilege. The redacted portion reflects comments to Ms. Buus, a supervisor in Northwestern's corporate accounting department, reflecting legal advice concerning information to be provided in Northwestern's Form 10-K. The redaction is privileged and should not be produced to Plaintiffs. This document is also represented by Northwestern's counsel to be a duplicate of Document No. 434, a document not provided to me. To the extent that they are identical, this ruling shall apply to Document No. 434 as well.

25.     Document No. 338 – There are two short redacted sections on two pages of this multi-page document, *i.e.*, on Pages 991 and 992. Both of the paragraphs that have been redacted contain factual statements or analyses that are not privileged. This document should be produced to Plaintiffs without the redactions.

26.     Document No. 341 – This document is the same document as Document No. 338, except that it is distributed to additional recipients. The same information has been redacted

from this document as from Document No. 338. Accordingly, this document should be produced to the Plaintiffs without redactions for the same reasons set forth with respect to Document No. 338.

27.      Document No. 349 – This "document" consists of a series of e-mails that relate primarily to Paul, Hastings' fees charged to Northwestern with respect to the going flat transaction and other matters and a Paul, Hastings' statement for professional services rendered through November 30, 2002. First, the Paul, Hastings' statement bearing Bates Nos. 5619 through 5642 contains descriptions of the work performed by Paul, Hastings on behalf of Northwestern and is, therefore, protected by the attorney-client privilege. The series of e-mails bearing Bates Nos. 1202486 – 1202488 and 1203183 – 1203185 consist of privileged and non-privileged material. The only privileged material within these pages is the e-mail message from Susan G. Curtis to Scott C. Kline dated March 25, 2002 at 2:46 P.M. that starts at the bottom of Page 1203183 and includes all of Page 1203184. That e-mail contains legal advice relating to Form 10-K reporting requirements as to various matters. Accordingly, that material can be redacted. The remainder of the e-mails should be produced to Plaintiffs.

28.      Document No. 352 – This document is simply a three-page subset of the previous document, Document No. 349. Specifically, it contains Pages 1203183 – 1203185. As indicated in my decision with respect to Document 349, the e-mail from Susan G. Curtis to Scott C. Kline can be redacted, but the remainder of this "document" should be produced.

29.      Document No. 484 – This is a series of e-mails between Northwestern in-house counsel and Mike Hanson, Northwestern's CEO. The subject matter of the e-mails relates to meetings that Northwestern legal representatives had with legal representatives for the federal government, the State of Montana, and another PRP with respect to the Milltown Dam

environmental liabilities. The bulk of this document consists of one e-mail in which counsel for Northwestern provides an analysis of a meeting in Denver on October 29-30, 2002 and contains insights reflecting professional advice on what was clearly a significant legal issue concerning these environmental issues. Accordingly, the document is privileged and should not be produced to Plaintiffs.

30.     Document No. 583 – This document consists of two e-mails relating to the discussion among Paul, Hastings' attorneys concerning information to be included in the Northwestern Form 10-K. In addition to the attorneys who authored or received this e-mail or Northwestern non-attorneys who received the e-mail, the e-mail was sent to accountants at Arthur Andersen who were obviously retained to assist Paul, Hastings as well as Northwestern. The e-mails are privileged. To the extent that the privilege is challenged because representatives of Arthur Andersen were included in the e-mail discussions, their involvement does not vitiate the privilege as discussed above.

31.     Document No. 713 – This document consists of two e-mails dated July 16, 2002. The privilege log entry is not completely accurate in that it reflects that the principal e-mail was from Mike Hanson to Kipp Orme. A much longer e-mail is attached, and it is from Michael Young, in-house counsel at Northwestern, to Eric Jacobsen, general counsel for Northwestern. The second e-mail, which is attached to the shorter e-mail from Hanson to Kipp, contains legal analyses concerning a Northwestern S-4 Disclosure. The document is privileged and should not be produced to Plaintiffs.

32.     Document No. 810 – This is a series of e-mails that is virtually identical to Document Nos. 338 and 341. Accordingly, the two short redactions on the first two pages of this

series of e-mails should be removed and the entire document should be produced to Plaintiffs because it is not privileged.

33.     Document No. 1521 – This is an e-mail that contains an eight-word handwritten note that has been redacted and is illegible from my review.  For purposes of this motion, I assume that counsel for Northwestern has been able to decipher the handwriting and made a good faith determination that the handwriting was made in connection with the rendition of legal advice with respect to the substance of the e-mail which deals with paying for financial experts in the Northwestern bankruptcy proceeding.  It is difficult to understand how this document is even remotely relevant to Plaintiffs' claims, but Northwestern has obviously gone the extra mile and produced the document.  In any event, the handwritten redacted note need not be produced to Plaintiffs.

34.     Document No. 1663 – This is a legal memorandum prepared by an attorney at Paul, Hastings that provides a six-page executive summary containing legal analyses with respect to various aspects of the Northwestern bankruptcy process.   It is a privileged communication that should not be produced to Plaintiffs.  The fact that the memorandum was also provided to representatives of Lazard Frerers & Co. does not waive the privilege, as discussed above.

35.     Document No. 1711 – This "document" consists of two documents identified as Rider 31A and Rider 39A which apparently were required to be filed with the SEC in accordance with Sarbanes-Oxley directives.  The documents are identified on the privilege log as drafts and they reflect the work product and legal analysis of the Paul, Hastings' lawyers involved in their preparation.  Accordingly, this document should not be produced to Plaintiffs.

36.    Document No. 1723 – This document is a draft of information that was intended to be incorporated in Northwestern's Form 10-K report concerning year-end adjustments requiring quarterly restatements. The document obviously contains the legal analysis of some attorney, although the identity of the attorneys is apparently unknown as indicated by the privilege log. Each page of the document, however, does indicate that it is attorney work product. Therefore, the document is privileged and does not have to be produced to Plaintiffs.

37.    Document No. 1771 – This is a series of e-mails among Expanets and Northwestern employees, including one attorney from Expanets. The series of e-mails does not appear to be primarily, if at all, for the rendition of professional legal advice. Rather, it consists of an analysis of factual matters relating to accounting issues for Expanets that is not privileged. This document should be produced to Plaintiffs.

38.    In sum, Plaintiffs' Emergency Motion Seeking Orders, etc., is GRANTED in part and DENIED in part, consistent with the above rulings.

## Should Northwestern Produce the Eight Documents That It Has Withheld from Production Based Upon Fed. R. Evid. 408?

39.    To a great extent, the fate of the eight documents bearing numbers 1512-1519 that are identified on the Northwestern privilege log has already been determined by my ruling on June 8, 2007 that, under the applicable law of Montana, the documents protected by the attorney-client and work product privileges lost that privileged status when Northwestern produced those documents to the Securities and Exchange Commission ("SEC").

40.    While the decision with respect to the documents provided to the SEC in my June 8, 2007 Report and Recommendation to the Court was determined under the state law of Montana, I found that the principal authority controlling the outcome of that dispute between

Plaintiffs and Northwestern was the Third Circuit's decision in *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414 (3d Cir. 1991).

41.    With respect to the so-called "privileged" settlement documents that are at issue here, Montana law does not apply because there is no attorney-client or work product (or other) privilege that would shield the settlement negotiations between Northwestern and the SEC from production.    However, Northwestern, recognizing implicitly that the production of these documents is an issue governed by the Federal Rules of Evidence (specifically Rule 408) and the Federal Rules of Civil Procedure, argues that a more stringent standard should apply to Plaintiffs' discovery of the settlement documents than to other documents that Northwestern has produced to Plaintiffs which were also provided to the SEC.

42.    For example, while there appears to be no authority directly on point from the Third Circuit, District Courts within the Third Circuit have held that the discovery standard for obtaining the production of documents relating to settlement agreements is a higher standard or requires a greater showing of need.[4]

43.    In one of these cases, *Lesal,* the court recognized that there was an inherent tension between Rule 26 and Rule 408 in that, on the one hand, Rule 26 and the discovery rules in general encourage the discovery of information related to litigation, while Rule 408 of the Rules of Evidence reflects a strong public interest in encouraging settlement of litigation which necessarily includes protection for disclosures made in that process. *Lesal,* 153 F.R.D. at 561-62. In reconciling these two disparate goals, the court stated that "the most reasonable means of doing this, and one which best effectuates the aims of both rules, is to require a greater, more

---

[4] *See, e.g., Doe v. Methacton School District,* 164 F.R.D. 175, 176-77 (E.D. Pa. 1995); *Lesal Interiors, Inc. v. Resolution Trust Corp.,* 153 F.R.D. 552, 561-64 (D.N.J. 1994); *Fidelity Federal Savings & Loan Ass'n. v. Felicetti,* 148 F.R.D. 532 (E.D. Pa. 1993).

'particularized showing' that the evidence sought is relevant and calculated to lead to the discovery of admissible evidence." *Id.* at 562.[5]

44.    The hearing and Bench Ruling of January 29, 2007 in these actions (and my Report and Recommendation of February 1, 2007) were a harbinger of the debate that is now before me.  At the hearing in January, Northwestern objected to the scope of Plaintiffs' request for the production of documents between Northwestern and the SEC.  In resolving that dispute, I narrowed the scope of the request to documents that were transmitted only between Northwestern and the SEC.   Bench Ruling at 77-81, Exhibit A to the Report and Recommendation dated February 1, 2007.  At the time of that ruling, the issue of the effect of Rule 408 was raised and deferred pending the parties' compliance with my ruling.

45.    I find that Plaintiffs have satisfied the "particularized showing" to the extent that such a standard is a standard that would be adopted by the Third Circuit.[6]   There are two principal reasons that lead to this conclusion based on the present record.  First, I have already determined that under the law of the Third Circuit (*viz. Westinghouse*), Northwestern cannot shield privileged communications from Plaintiffs when they are disclosed to the SEC or other government agency.  Having reviewed *in camera* some of the privileged documents at issue in this case, and having reviewed *in camera* the Rule 408 settlement documents that Northwestern seeks to protect from discovery, I find that the information contained in the settlement

---

[5]  On the other hand, government agencies have argued unsuccessfully in some instances that Fed. R. Evid. 408 should serve as a protective barrier or "privilege" to public access to documentation that is the product of the government's settlement negotiations with private parties.  *See, e.g., NAACP Legal Defense and Educational Fund v. U.S. Dept. of Justice*, 612 F.Supp. 1143, 1146 (D.D.C. 1985) (court rejected the DOJ's argument for a Rule 408 privilege, because Rule 408 could not be used to circumvent the strong public policy in favor of disclosure of government activities under FOIA).

[6]  Neither the parties nor I have found any decisions from the Third Circuit or this District Court with respect to a Rule 408 "privilege" or any heightened standard that must be satisfied by the parties seeking the production of settlement documents.

documents to be more likely to lead to the production of admissible evidence than the privileged communications that have been waived by virtue of their production to the SEC. Furthermore, there is no question that the standard for waiver of privilege is a more exacting and higher standard than that for any limitations on the production of documents that might implicate settlement negotiations under Fed. R. Evid. 408. Indeed, Northwestern will still have the opportunity to argue at a later date that the documents that are subject to this discovery order should not be admitted into evidence at trial under Rule 408. That is not the case with the privileged communications that were the subject of my Report and Recommendation dated June 8, 2007.

46.     A different result may have eventuated on this topic had not Northwestern and the SEC entered into the Cease and Desist Order which marked the consummation of the settlement negotiations between Northwestern and the SEC. In one of the cases relied upon by Northwestern, the *Lesal* decision, the court there held that the party seeking production of the settlement negotiation documents as part of discovery could not meet the higher showing required for the production of those documents in part because the documents related to ongoing negotiations between a private party and a government agency. The court found that permitting the discovery of those settlement negotiations to a third party before the settlement had reached fruition could cause the settlement to "self destruct." *Lesal*, 153 F.R.D. at 563-64. The logic of that analysis does not apply here because the SEC and Northwestern have reached a settlement agreement.

47.     Accordingly, Plaintiffs' Emergency Motion Seeking Orders, etc. is GRANTED as to this issue, and Northwestern is ordered to produce forthwith to Plaintiffs the so-called privileged settlement documents, *i.e.* Document Nos. 1512-1519.

**The Hylland Report**

48.        The last issue that is the subject of the parties' pending discovery disputes is whether the so-called Hylland Report should be produced by Northwestern to Plaintiffs.[7]  The issue of whether the Hylland Report is privileged or not is to some extent moot.  In my Report and Recommendation of June 8, 2007, I determined that documents such as the Hylland Report, that Northwestern produced to the SEC, are no longer privileged because any attorney-client or work product privilege has been waived by the producing of such documents to an adverse party.  However, as a matter of judicial economy, to the extent that the Court determines that Northwestern's production of documents to the SEC does not constitute a waiver of the attorney-client and work product privileges, I will issue a decision as part of this Report and Recommendation as to whether the Hylland Report, apart from its waiver, is privileged.  In addressing this issue, I have decided, primarily in the interest of providing the parties with an expedited decision, that I would not review the Report and its voluminous attachments *in camera*.  In this regard, whether the Report itself is privileged or not, Plaintiffs' counsel, who have seen the Hylland Report and its attachments because the Hylland Report was one of those documents produced inadvertently by Northwestern to Plaintiffs, contend that a substantial number of the attachments to the Hylland Report are not protected by either the attorney-client or work product privilege.  To the extent that my Report and Recommendation of June 8, 2007 is not adopted by the Court, the issue of whether the attachments to the Hylland Report are privileged will be left for a later date.

---

[7]  The Hylland Report was a report prepared by a Special Committee of the Northwestern Board of Directors to determine whether Mr. Hylland, the then President and Chief Operating Officer of Northwestern, should be terminated by this Board, as an employee (not as a director), pursuant to the terms of his employment agreement dated March 1, 2001.

### Choice of Law

49.     Unlike the discovery issue that was the focus of the previous section of this
Report and Recommendation concerning the discovery issue posed by Fed. R. Evid. 408,
whether the Hylland Report is privileged returns us to the state arena in accordance with Fed. R.
Evid. 501, for the reasons set forth in my Report and Recommendation of June 8.  Of course, in
that Report and Recommendation, I determined that Montana law controlled the determination of
whether the disclosure of the documents by Northwestern to the SEC constituted a waiver of the
attorney-client and work product privileges.  It does not follow, though, that Montana law
necessarily controls the privilege issue affecting the Hylland Report.

50.     An argument could be made that applying the four factor significant contacts test
of § 139 of the *Restatement* leads to the selection of Delaware law here, as opposed to the
privilege law of Montana.  There are several reasons which would support this approach.  First,
the issue of whether Mr. Hylland's employment would be terminated was subject to his
employment agreement which contained a choice of law provision requiring the application of
Delaware law.  Further, the decision to terminate Mr. Hylland's employment or not was a
function ceded to the Northwestern Board of Directors.  Northwestern was and is, of course, a
Delaware corporation and the actions of the Special Committee, which consisted of two of the
Northwestern directors, and the Board of Directors itself, would appear to have a substantial
nexus to Delaware and to Delaware's interest in determining issues related to Delaware
corporate governance.  It is well-established that Delaware courts, particularly the Court of

Chancery, will not hesitate to address a matter of Delaware corporate law in a case before it, even if there are other and earlier filed cases addressing the same issue.[8]

51.     As reflected below, I need not determine, for purposes of this decision, whether Delaware law or Montana law controls this issue of privilege because there is no conflict of law. Indeed the Montana courts have relied upon Delaware precedent in determining whether the report is privileged.

### Analysis Of The Privilege Question

52.     To a considerable degree, the question of whether the Hylland Report is privileged or not depends on whether the privilege was waived by providing it to Mr. Hylland, which depends in turn on whether Mr. Hylland was a director at the time he received the report and, as a director, therefore, entitled to share privileged communications with other members of the Board of Directors of Northwestern.  As reflected in the supplementary submissions by Plaintiffs and Northwestern after the May 18 hearing, there is a fundamental factual dispute as to whether Mr. Hylland was a director when he was provided with a copy of the report prepared by the Special Committee of the Board of Directors.

53.     On the one hand, the evidence to which Plaintiffs point includes a statement in the Minutes of the Board of Directors' Special Meeting dated May 6, 2003, which indicates that Mr. Hylland, by letter dated April 28, 2003, resigned from the Northwestern Board.  That would be significant because the Report, according to both Northwestern and Plaintiffs, was provided to Mr. Hylland most likely on April 29, 2003.  In a letter written by a Northwestern Vice President to Mr. Hylland providing Mr. Hylland with notice of the Board's determination to fire him for cause, the Northwestern Vice President stated that Mr. Hylland had been provided a copy of the

---

[8] *See, e.g., In re Topps Co. Shareholder Litig.*, C.A. No. 2786-VCS, 2007 Del. Ch. LEXIS 61, at *16-28 (Del. Ch. May 9, 2007).

Special Committee's report on April 29, 2003. In this regard, Northwestern has provided a copy of an e-mail dated April 28 that indicates that copies of the Special Committee's report were disseminated to the Directors, including Mr. Hylland, on April 28, 2003. Thus, it is likely that Mr. Hylland received the report on April 29, 2003.

54.     What may be the source of confusion as to when Mr. Hylland resigned his position as a Director could be the fact that Mr. Hylland resigned as President and Chief Operating Officer of Northwestern by communication on April 28, 2003 that indicated the effective date of his resignation would be April 30, 2003. However, as Northwestern points out, that resignation did not include his resignation from the Board of Directors. Northwestern has submitted a letter from Mr. Hylland dated April 30, 2003 that indicates he was resigning his position as the Director of the Board, effective April 30. On May 1, Northwestern issued a press release which indicated that Mr. Hylland had resigned from the Board of Directors but did not indicate the date of his resignation. The key evidentiary component on this issue appears to be the letter from Hylland to the corporate secretary of Northwestern dated April 30, 2003 in which he specifically states that he resigns, effective April 30, 2003, from the Board of Directors of Northwestern. Thus, for purposes of determining whether the Hylland Report is privileged or not, I conclude that Mr. Hylland was in possession of the Report before he resigned as a member of the Board of Directors of Northwestern.

55.     Both the Montana and Delaware Courts have issued decisions directly on point with respect to the issue that is raised by Plaintiffs' motion. First, in Montana, in the case of *Inter-Fluve v. Montana Eighteenth Judicial District Court,* 112 P.3d 258 (Mont. 2005), the precise issue at hand was resolved by the Montana Supreme Court. In *Inter-Fluve*, a dispute arose among the directors of a closely held corporation. As with the case at bar, one of the

directors and employees of the company was terminated, which caused him to file an action against Inter-Fluve, as well as the two majority directors that were involved in the decision to terminate the dissenting director's employment. As part of the discovery process in that case, the plaintiff director sought the production of communications between the two majority directors and counsel for *Inter-Fluve* that occurred before he resigned from the Board. The trial court held that the plaintiff director was entitled to the production of these communications because the privilege belonged to the Board of Directors and at the time of the communications the plaintiff director was still a member of the Board.    To the extent that the majority directors were interested in obtaining legal advice that they could shield from the plaintiff director, they would have been required to retain separate and independent counsel from the corporation. *Id.* at 259-260.

56.    On appeal to the Montana Supreme Court, that court first rejected the argument by the majority directors that corporate legal advice belonged only to the incorporeal entity, the corporation, and not to the directors. The court observed that corporations can only act through directors, and, accordingly, the advice from lawyers to the corporation inures to the benefit of the directors of the corporation. *Id.* at 263.

57.    Secondly, the court held that corporate directors are jointly responsible for the proper management of a corporation and, as such, they necessarily must be viewed as joint clients with respect to legal advice rendered to the corporation through one of its officers or directors. *Id.* at 264 (*citing Kirby v. Kirby*, C.A. No. 8604, 1987 Del. Ch. LEXIS 463, at *19 (Del. Ch. July 29, 1987)). Thus, when the plaintiff director "was a part of the collective body of Inter-Fluve's Board of Directors, he was entitled to access the attorney-client communications occurring between corporate counsel and other directors. The fact that Miller is no longer a

director is not sufficient cause to render these communications privileged against him." *Inter-Fluve*, 112 P.3d at 264.  Citing another Delaware Court of Chancery decision, *Moore Business Forms, Inc. v. Cordant Holdings Corp.*, C.A. No. 13911, 1996 Del. Ch. LEXIS 56, at *18 (Del. Ch. June 4, 1996), the Montana Supreme Court agreed with the Court of Chancery that because the attorney-client privilege belongs to the client, it would be perverse to allow the privilege to be asserted against the client, in this case the plaintiff director. *Inter-Fluve*, 112 P.3d at 264. Thus, the court held that "the confidentiality of the attorney-client privilege is not violated when a former director of a closely-held corporation, who has brought claims against the corporation, is allowed to discover communications between corporate counsel and other directors which occurred during his tenure as a director." *Id.*

58.     In the briefing on this issue, Plaintiffs, who contend that Montana law governs any privilege disputes in this case, did not cite the *Inter-Fluve* case, or for that matter any other Montana decision.  Plaintiffs, like Northwestern, relied upon decisions from the Delaware Court of Chancery.  Not surprisingly, Northwestern relied upon the two decisions cited by the Montana Supreme Court, the *Kirby* case and the *Moore* case, in support of their contention that the Hylland Report was privileged because it was prepared and provided to Mr. Hylland at the time he was a director of the corporation.

59.     The decision in *Inter-Fluve* comports with the majority of Delaware cases that have analyzed a situation similar to the one here, *i.e.* a dissident director's access to privileged communications provided to the full board of directors while the dissident director was on the Board but also during the time that his conflict with the Board arose.  The *Inter-Fluve* decision relied upon the *Moore* and *Kirby* cases.  In addition to those decisions by the Court of Chancery, similar results obtained in the Chancery decisions in *KLM v. Checchi*, C.A. No. 14764-NC, 1997

23

Del. Ch. LEXIS 118, at *3-4 (Del. Ch. July 23, 1997) (directors who were representatives of a large stockholder in Northwest Airlines argued successfully that those directors were entitled to access to privileged communications of the remainder of the Northwest Airlines board relating to the adoption of a poison pill that would affect the interests of KLM) and *Rainbow Navigation, Inc. v. Yonge*, C.A. No. 9432, 1988 Del. Ch. LEXIS 18, at *4-5 (Del. Ch. Jan. 29, 1988) (where the issue in dispute concerned who were the properly elected directors to the Board, the court found that privileged communications directed to the corporation before the plaintiff had allegedly exercised consents to replace the Board with its own directors, should be produced to the new directors because to do otherwise would be to pre-judge the § 225 issue (concerning proceedings to determine the validity of a contested election of directors)).

60.    Accordingly, based upon the law of Montana and Delaware, I find that the distribution of the Special Committee's report to Mr. Hylland while he was a director and during the period in which he had a dispute with other members of the Board concerning his tenure, are nonetheless privileged because of Hylland's right of access to privileged communications provided to the Board of Directors as a whole before his resignation as a Director. Plaintiffs' Emergency Motion Seeking Orders, etc. is, therefore, DENIED as to this issue.

61.    No sanctions will be assessed with respect to any of the issues addressed in this Report and Recommendation.

62.    This Report and Recommendation will become a final order of the Court unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g).

IT IS SO ORDERED this 14th day of June, 2007.

_____

John E. James
Special Master

cc: The Honorable Joseph J. Farnan, Jr.
   Dale R. Dube, Esquire
   Victoria Watson Counihan, Esquire
   Denise Seastone Kraft, Esquire
   Kathleen M. Miller, Esquire

800298/30048-001

# EXHIBIT A



Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

John E. James
Partner
Attorney at Law
302 984-6018  Direct Phone
302 658-1192  Fax
jjames@potteranderson.com

May 17, 2007

**By Hand and By E-Mail**

Dale R. Dube, Esquire
Blank Rome LLP
Chase Manhattan Center – Suite 800
1201 North Market Street
Wilmington, DE  19801

Victoria Watson Counihan, Esquire
Greenberg Traurig LLP
Nemours Building – Suite 1200
1007 North Orange Street
Wilmington, DE  19801

Denise Seastone Kraft, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street – Suite 1500
Wilmington, DE  19801

RE:   *Magten Asset Management Corp. and Law Debenture Trust*
*Company of New York, Plaintiffs, v. Northwestern*
*Corporation, Defendant*, D. Del., C.A. No. 04-1494-JJF
-and-
*Magten Asset Management Corp., Plaintiff, v. Mike J. Hanson*
*and Ernie J. Kindt, Defendant*, D. Del., C.A. No. 05-499-JJF

Dear Counsel:

I have received correspondence from counsel for Magten and Northwestern in
response to my letter to the parties dated May 14, 2007 in which I outlined the agenda
for the hearing on Friday.  Based on the letters from Ms. Dube and Mr. Pizzurro, I
have slightly revised the schedule of the issues to be presented on Friday.  I have
identified below the order in which argument will now be presented to me at the
hearing:

1.   With respect to Plaintiffs' Emergency Motion Seeking Orders, etc.,
and the Emergency Cross-Motion of Defendant Northwestern, etc.,

Dale R. Dube, Esquire
Victoria Watson Counihan, Esquire
Denise Seastone Kraft, Esquire
Page 2
May 17, 2007

whether Northwestern has waived privilege with respect to the documents that Northwestern produced to Plaintiffs or whether the production was inadvertent or privilege was otherwise not waived;

2.  With respect to the parties' motions referenced in paragraph 1 above, whether Plaintiffs are immediately required to return the documents or destroy the documents that are alleged to have been produced inadvertently or whether Plaintiffs can retain them until their privileged status is resolved;

3.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern's identification of certain documents as privileged after the fact discovery cutoff, constitutes a waiver of privilege as to those documents;

4.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether the disclosure by Northwestern to the SEC of allegedly privileged documents waived the privilege as to those documents;

5.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether certain other documents that are subject to Plaintiffs' discovery requests are privileged or whether the privilege has been waived;

6.  With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern should be required to produce certain documents in another electronic format;

7.  The Joint Motion for Protective Order filed by Northwestern and Messrs. Hanson and Kindt as to certain depositions noticed by Plaintiffs;

8.  Magten's Motion for Protective Order with respect to the deposition of Talton R. Embry; and

9.  Plaintiffs' motion to exceed the ten deposition limit and to extend the discovery schedule for the taking of depositions in this action; and

10.  Whether sanctions should be imposed with respect to any of the motions addressed in paragraphs 1 through 8 above.

Dale R. Dube, Esquire
Victoria Watson Counihan, Esquire
Denise Seastone Kraft, Esquire
Page 3
May 17, 2007

  If I have failed to include any application that is pending before me, please notify me at your earliest convenience.  Also, please forward this letter to all interested counsel.

Sincerely,

John E. James
Special Master

JEJ/cml
795277/30048-001 and 002

# EXHIBIT B

**DISPUTED PRIVILEGED DOCUMENTS AND FED. EVID. R. 408 MATERIAL**
*Magten Asset Management Co. v. NorthWestern Corporation*

| Document No. | Privilege Type | Document Type | Date | Author | Recipient | CC | Subject |
|---|---|---|---|---|---|---|---|
| 29 | ACP | Attachment | 8/14/2002 | Hanson, Mike (CEO) | Bankers Trust/Deutsche Bank; The Bank of New York; Louis P. Young; Mellon Leasing Corp. | Knapp, Thomas; McCarrick, James | NorthWestern Energy LLC Colstrip 4 Lease Transactions |
| 55 | ACP | E-mail | 11/19/2002 | Todd Williams | Hanson, Mike | Young, Michael; Lee Graves | RE: Call from Arco re: Going Flat Transaction |
| 56 | ACP | E-mail | 12/3/2002 | Young, Michael | Hanson, Mike; Jacobsen, Eric; Lopach, Dennis | twilliams@elmllc.com; lgraves@elmllc.com | Draft Letter to McGrath re: Milltown and Going Flat Transaction |
| 61 | ACP | E-mail | 1/29/2003 | Young, Michael | Lopach, Dennis; jenniferhong@paulhastings.com | twilliams@elmllc.com; lgraves@elmllc.com; charlespatrizia@paulhastings.com; Hanson, Mike; Jacobsen, Eric; Knapp, Tom | Milltown MPSC Application |
| 92 | ACP | E-mail | 3/27/2003 | Hanson, Mike | Monaghan, David A | | RE: NorCom-Expanets Transaction |
| 94 | AWP | Attachment | 3/__/2003 | Patrizia, Charles | Fischer, Catherine (Office of Public Utility Regulation, Securities and Exchange Commission) | | Attached draft letter re: NorthWestern Corp. by Charles Patrizia |
| 107 | ACP/AWP | E-mail | 5/9/2003 | Young, Michael | Hanson, Mike | lgraves@elmllc.com; twilliams@elmllc.com | Milltown Update re: May 8th Discussion with Wardell, Eisen and Forba |
| 139 | ACP | Document | 7/24/2002 | George, Jerry (Campbell, George & Strong LLP) | Graves, Lee | | Memorandum re: Liability Assessment - Milltown Dam Facility |
| 140 | ACP/AWP | Document | 12/10/2002 | Young, Michael | Hanson, Mike; Jacobsen, Eric; Lopach, Dennis | twilliams@elmllc.com; lgraves@elmllc.com | Draft letter to McGrath re: Milltown Dam and Going Flat Transaction |
| 141 | ACP | Document | 12/11/2002 | Young, Michael | Hanson, Mike; Jacobsen, Eric; Lopach, Dennis | twilliams@elmllc.com; lgraves@elmllc.com | Revised Draft Letter to McGrath |
| | ACP | E-mail and attachment | 11/20/2002 | Lee C. Graves | Schtum, Roger | Young, Michael; Todd Williams; Lopach, Dennis | FW: Current Draft |
| 166 | ACP | E-mail and attachment | 3/21/2002 | Buus, Joylynn | Hyland, Richard; Jacobsen, Eric; Orme, Kipp; Young, Michael; Orme, Kurt; Kline, Scott; Craig Whitesel; Dav Olson; Dietrich, Alan Arends | | Form 10-K Draft |
| 183 | | | | | | | |

| No. | Priv. | Type | Date | From | To | CC / Other Recipients | Description |
|---|---|---|---|---|---|---|---|
| 338 | ACP | E-mail | 1/29/2003 | D'Souza, Rolston P (BearingPoint) | Whitesel, Kurt | | RE: Draft Valuation Report - MPLLC |
| | ACP | E-mail | 1/29/2003 | D'Souza, Rolston P (BearingPoint) | Whitesel, Kurt | david.monaghan@northwestern.com; kipp.orme@northwestern.com; Musur, Robert J (BearingPoint); Yarlagadda, Chakradhar (BearingPoint) | Draft Valuation Report - SD Assets |
| 341 | ACP | E-mail and attachments | 2/28/2003 | Smook, Karen | Whitesel, Kurt; Monaghan, David A; Hanson, Mike; Orme, Kipp | Bohrer, Corinne | FW: FCC Billing and Going Flat Project |
| 349 | ACP | E-mail | 3/27/2002 | Whitesel, Kurt | craig.r.arends@us.andersen.com | | FW: NOR 10-K Question |
| 352 | ACP | E-mail | 11/11/2002 | Young, Michael | Hanson, Mike (CEO) Jacobsen, Eric | lgraves@elmllc.com; twilliams@elmllc.com | RE: Summary of Milltown Meeting in Denver October 29-30, 2002 |
| 484 | ACP | E-mail | 5/31/2002 | Kline, Scott C. | Saks, Scott R.; kipp.orme@northwestern.com; eric.jacobsen@northwestern.com; Kurt.Whitesel@northwestern.com; mike.nieman@northwestern.com; david.a.olson@us.andersen.com; dawn.a.dexter@us.andersen.com | Pollock, Thomas R.; Schwitter, William F.; Zuppone, Michael; Tyras, Jonathan C. | RE: NorthWestern -- Response to SEC |
| 583 | ACP | E-mail | 7/16/2002 | Hanson, Mike | Orme, Kipp | | FW: Milltown Registration Statement Disclosure |
| 713 | ACP | E-mail | 1/29/2003 | Whitesel, Kurt | D'Souza, Rolston | | Draft MPC Valuation Report |
| 810 | ACP | E-mail | 1/29/2003 | Whitesel, Kurt | D'Souza, Rolston | | Draft MPC Valuation Report |
| 1521 | ACP/AWP | E-mail | 9/26/2003 | Whitney, Kate | Lopach-Dennis, Beatty, Kim | | PSC & MCC choice of financial expert (redacted and produced at NOR 463191) |
| 1512 | Fed. R. Evid. 408 | Letter | 4/5/2006 | John A. Reding, Esq. | Kurt L. Gotshall, Branch Chief, Securities and Exchange Commission | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |
| 1513 | Fed. R. Evid. 408 | Letter | 8/18/2006 | John A. Reding, Esq. | Donald M. Hoerl, Laurie Metcalf, Kurt L. Gotshall, Securities and Exchange Commission | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |

| # | Type | Document | Date | From | To | CC | Description |
|---|---|---|---|---|---|---|---|
| 1514 | Fed. R. Evid. 408 | Letter | 9/1/2006 | John A. Reding, Esq. | Donald Hoerl, Securities and Exchange Commission | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |
| 1515 | Fed. R. Evid. 408 | Email attaching documents | 12/20/2006 | Rebecca Torres (on behalf of John A. Reding) | Kurt L. Gottshall; Noel Franklin, Securities and Exchange Commission | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |
| 1516 | Fed. R. Evid. 408 | Email attaching documents | 1/4/2007 | Rebecca Torres (on behalf of John A. Reding) | Kurt L. Gottshall; Noel Franklin, Securities and Exchange Commission | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |
| 1517 | Fed. R. Evid. 408 | Email attaching documents | 1/24/2007 | Rebecca Torres (on behalf of John A. Reding) | Kurt L. Gottshall; Noel Franklin, Securities and Exchange Commission | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |
| 1518 | Fed. R. Evid. 408 | Letter | 2/6/2007 | Kurt L. Gottshall, Branch Chief, Securities and Exchange Commission | John A. Reding Esq.; Edward Han Esq. | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |
| 1519 | Fed. R. Evid. 408 | Letter | 3/1/2007 | Kurt L. Gottshall, Branch Chief, Securities and Exchange Commission | John A. Reding Esq. | | Settlement letter re: In the matter of NorthWestern Corporation; SEC File No. D-02572-A |
| 1663 | ACP/AWP | Document | 11/16/2003 | Jess Austin (Paul, Hastings, Janofsky & Walker LLP) | Gary Drook; Larry Ness; Larry Ramaekers; Jerry Johnson | Mike Hanson; Bill Austin; E. Jacobsen; Karol Denniston; Tom Pollock; David Kurtz; Andrew Yearley | Development of NOR reorganization plan |
| 1711 | ACP | Document | Oct 2004 | Paul, Hastings, Janofsky & Walker LLP | | | Sarbanes-Oxley Draft Riders 31A, 39A to financial statements |
| 1723 | ACP | Document | none | | | | Lead-In to 10-K re: year end adjustments requiring quarterly restatements |
| 1771 | ACP | Email | 3/30/2003 | Charters, John | Kliewer, Kendall; Atkinson, Timothy; Charters, John; Younger, Chris | Jacobsen, Eric; Orme, Kipp; Whitesel, Kurt; Roof, Becky | Memorandum for Expanets Disclosure Subcommittee (NOR 406165-406169) |