IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> NORTHWESTERN CORPORATION, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) )    C.A. No. 04-1494-JJF |
| MAGTEN ASSET MANAGEMENT CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. HANSON and ERNIE J. KINDT, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) )    C.A. No. 05-499-JJF |

**DEFENDANTS MICHAEL J. HANSON AND ERNIE J. KINDT'S
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Denise Seastone Kraft (#2778)
EDWARDS ANGELL PALMER & DODGE LLP
919 North Market Street, 15th Fl.
Wilmington, DE 19801
(302) 777-7770
*Counsel to Michael J. Hanson
and Ernie J. Kindt*

OF COUNSEL:

Stanley T. Kaleczyc
Kimberly A. Beatty
BROWNING, KALECZYC, BERRY
& HOVEN, P.C.
139 North Last Chance Gulch
Helena, MT 59624
(406) 443-6820

November 30, 2007

# TABLE OF CONTENTS

**Pages**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... iii

SUMMARY OF ARGUMENT ........................................................................................ 1

STATEMENT OF UNCONTESTED FACTS ................................................................. 2

   I.     Background Discussion Of QUIPS........................................................................ 2

   II.    Northwestern's Acquisition Of Clark Fork................................................... 4

   III    The Transaction And Transfer Of Securities Obligations To Northwestern. ............... 5

   IV.   Northwestern's Disclosures Regarding QUIPS Payments. ........................................ 14

   V.    Magten's Acquisition Of QUIPS. ................................................................. 14

   VI.   Magten's Creditor Status Allegations.......................................................... 15

   VII.  Magten's Expert Opinions. .......................................................................... 16

STANDARD ................................................................................................................... 19

ARGUMENT .................................................................................................................. 20

   I.     MAGTEN LACKS STANDING TO SUE HANSON AND KINDT. ......................... 20

      A.    Magten's Allegations of Breaches of Fiduciary Duty are Derivative Claims. ......... 22

      B.    Magten Lacks Standing to Bring a Derivative Claim Under Montana Limited
           Liability Company Act Law. ........................................................................ 25

         1.   Asserting that Clark Fork was in the "Zone of Insolvency" Does Not Confer
             Standing on Magten Because a Creditor Cannot Bring a Direct Action Against
             Officers or Directors of a Company for Breach of Fiduciary Duty. ........................ 26

         2.   Magten Cannot Satisfy the Contemporaneous Ownership Requirement Necessary
             for it to Step into the Shoes of the Members. ................................................. 28

         3.   The Indenture Does not Confer Standing on Magten. ....................................... 30

   II.    THERE ARE NO MATERIAL FACTS IN DISPUTE WHICH SUPPORT THE
         BREACH OF FIDUCIARY DUTY CLAIM ASSERTED BY MAGTEN AGAINST
         HANSON AND KINDT. ........................................................................... 31

      A.    Magten Cannot Meet its Burden of Proof Establishing a Claim for Breach of
           Fiduciary Duty. ....................................................................................... 33

      B.    There Are No Material Facts in Dispute Which Would Have Caused Hanson to
           Conclude that NorthWestern Was Insolvent Either Before or Immediately After the
           Transaction.............................................................................................. 34

         1.   Hanson Was in Charge of the Utility Operations of NorthWestern and Was not
             Responsible for the Non-Utility Businesses. ................................................... 34

         2.   Hanson Had Limited Knowledge About the Finances of NorthWestern and the Non-
             Utility Businesses and What Little He Knew  Should Not and Could Not Have Led
             Him to Conclude that the Transfer of the QUIPS Obligation to NorthWestern Would
             Create an Immediate Event of Default.................................................................... 35

      C.    There Are No Material Facts in Dispute Which Would Have Caused Kindt to
           Conclude that NorthWestern Was Insolvent Either Before or Immediately After the
            Transaction.............................................................................................. 39

         1.   Kindt Was the Chief Accountant for the Montana Utility Operations and Was Not
             Responsible For Nor Did He Have Any Knowledge of the Non-Utility Businesses.
             .............................................................................................................. 39

i

2.     Kindt Had Virtually No Knowledge About the Finances of NorthWestern and the Non-Utility Businesses and Thus Had No Knowledge Which Should or Could have Given Him any Basis to Conclude that the Transfer of the QUIPS Obligation to NorthWestern Would Create an Immediate Event of Default. ................................. 40

D.     There is no Evidence that NorthWestern was Insolvent Either Before or After the Transaction. .................................................................................................................. 41

E.     There Are No Material Facts in Dispute Which Would Have Caused Either Hanson or Kindt to Conclude that Clark Fork Was Rendered Insolvent Immediately After the Transaction. ...................................................................................................... 41

1.     There Was No Reason for Either Defendant to Believe that the Assumption of the QUIPS Obligation by NorthWestern Was Invalid as a Matter of Law. .................... 42

2.     The Assumption of the QUIPS Obligation by NorthWestern Was and Is Valid. ..... 43

a.     The Terms of the Relevant Documents on which Magten Bases Its Claim Expressly Permitted the Transfer of the Assets and Liabilities at Issue Here from Clark Fork to NorthWestern. ............................................................................................ 43

b.     Clark Fork Was Validly Released from Any Obligation to Make QUIPS Payments. .......................................................................................................................... 46

c.     There is no Evidence Clark Fork was Insolvent After the Transaction and, the Solvency of Clark Fork Notwithstanding, the Issue is Moot in the Face of a Valid and Binding Assumption of the QUIPS Obligations by NorthWestern. ................. 47

III.     MAGTEN'S RECOVERY OF COMPENSATORY DAMAGES IS LIMITED BY OPERATION OF MONTANA LAW. ........................................................................ 47

A.     Montana Law Does Not Allow a Party to Profit From Compensatory Damages and Thus Limits the Amount of Compensatory Damages Recoverable by Magten Because Magten Cannot Collect More in Compensatory Damages Than It Spent Purchasing the QUIPS. .............................................................................................. 47

B.     Magten Failed to Mitigate its Damages, and Instead Purchased a Strike Suit, Further Limiting or Precluding its Recovery of Compensatory Damages. ........................... 49

IV.     THE UNDISPUTED FACTS FAIL TO PROVIDE A BASIS TO AWARD PUNITIVE DAMAGES. .............................................................................................................. 53

A.     Plaintiff Can Prove No Set of Circumstances Indicating Actual Fraud by Hanson or Kindt. ...................................................................................................................... 54

B.     Plaintiff Can Prove No Set of Circumstances Indicating Actual Malice Committed by Hanson or Kindt. ................................................................................................. 56

V.     MAGTEN IS NOT ENTITLED TO ATTORNEYS FEES OR COSTS. ..................... 59

CONCLUSION. ................................................................................................................ 60

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Baker v. Carr*, 369 U.S. 186 (1962).................................................................... 20

*Borelli v. City of Reading*, 532 F.2d 950 (3d Cir. 1976)...................................... 21

*Burk Ranches, Inc. v. State***,** 242 Mont. 300, P.2d 443 (Mont.1990) ........................................... 46

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................ 19, 20

*Drachman v. Harvey*, 453 F.2d 722 (2nd Cir. 1971) .............................................. 28

*Edgeworth v. First Natl. Bank of Chi.*, 677 F.Supp. 982 (S.D. Ind. 1988)................................. 28

*Erker v. Kestner*, 296 Mont. 123, 988 P.2d 1221 (1999)........................................ 55

*Franklin Mutual Funds Fee Litigation*, 388 F.Supp.2d 451 (D. N.J. 2005)................................ 22

Gliko v. Perman, 331 Mont. 112, 130 P.3d 155 (2006)................................................. 23

*Harrington v. Holiday Rambler Corp.***,** 176 Mont. 37, 575 P.2d 578 (Mont. 1978) ................... 46

*In re Bank of New York Derivative Litigation*, 320 F.3d 291(2nd Cir. 2003) ............................. 27

*In re Holiday Mart, Inc.*, 715 F.2d 430 (9th Cir. 1983)........................................... 42

*In re Tower Air, Inc.* 416 F.3d 229 n. 12 (3rd Cir. 2005) ........................................... 26

*Inter-Fluve v. Montana Eighteenth Jud. Dist. Ct.*, 2005 MT 103, 327 Mont. 14, 112 P.3d
258 ................................................................................................ 26

*Karmen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 111 S. Ct. 1711, 114 L.Ed.2d 152
(1991)............................................................................................... 22

*Lazard Debt Recovery GP, LLC. v. Weinstock***,** 864 A.2d 955 (Del.Ch. 2004)............................ 48

*Lewis v. Chiles*, 719 F.2d 1044 (9th Cir. 1983) ................................................ 28

*McPherson v. Kerr***,** 195 Mont. 454, 636 P.2d 852 (1981) ........................................ 47

*North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930
A.2d 92 (Del. Supr. 2007)............................................................................ 26

*Performance Machinery Co., Inc. v. Yellowstone Mountain Club, LLC*, 2007 MT 250,
339 Mont. 259, 169 P.3d 394, 403 (Mont. 2007) ...................................................... 46

*Prod. Res. Group, LLC v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. Ct. 2004)............. 23, 25, 26

*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc. (PIRG
v. MEIC)*, 123 F.3d 111, (3d Cir. 1997)............................................................ 21

*Richland Nat'l Bank & Trust v. Swenson*, 816 P.2d 1045 (Mont. 1991)...................................... 24

*Satori v. S & S Trucking, Inc.*, 332 Mont. 503,  139 P.3d 806 (2006)................................ 55, 56

*Sax v. World Wide Press, Inc.*, 809 F.2d 610 (9th Cir.1987)....................................... 22, 23

*Schiaffo v. Helstoski*, 492 F.2d 413 (3d Cir. 1974) ....................................................................... 21

*Silling v. Erwin*, 881 F.Supp. 236 (S.D. W.Va. 1995) ................................................................. 28

*Spackman v. Ralph M. Parsons Co.*, 147 Mont. 500, 414 P.2d 918 (Mont. 1966) ............... 45, 46

*Sunburst School Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, 338 Mont. 259, 165 P.3d 1079
    (Mont. 2007 ............................................................................................................................ 46

*Town Pump, Inc. v. Diteman*, 191 Mont. 98, 622 P.2d 212 (Mont. 1981) .................................. 47

*Trifad Entertainment, Inc. v. Anderson*, 2001 MT 227, 306 Mont. 499, 36 P.3d 363. ......... 53, 54

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................................................... 20

## Statutes

Mont. Code Ann. § 27-1-221(1) ................................................................................................. 50

Mont. Code Ann. § 27-1-221(2) ................................................................................................. 53

Mont. Code Ann. § 27-1-221(3) ................................................................................................. 51

Mont. Code Ann. § 27-1-221(4) ................................................................................................. 51

Mont. Code Ann. § 27-1-221(5) ................................................................................................. 50

Mont. Code Ann. § 35-8-1104 ................................................................................. 24, 26, 27, 29

Mont. Code Ann. § 35-8-1104(2) ............................................................................................... 27

Mont. Code Ann. § 35-8-310 ..................................................................................................... 31

Mont. Code Ann. § 35-8-310(2) ................................................................................................. 31

Mont. Code Ann. § 35-8-310(8) ................................................................................................. 32

Mont. Code Ann. §35-8-310(3) .................................................................................................. 31

## Other Authorities

12B W, Fletcher, *Cyclopedia of the Law of Private Corporations.* § 5911 (rev. perm. Ed.
    1984) ................................................................................................................................ 22, 23

7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND
    PROCEDURE § 1828 (2d Ed.1986) .......................................................................................... 27

## Rules

Fed R. Civ. P. 23.1 .................................................................................................................... 27

Fed. R. Civ. P. 56(c) .................................................................................................................. 19

Defendants Michael J. Hanson ("Hanson") and Ernie J. Kindt ("Kindt") (collectively, "Defendants"), by and through their counsel of record, hereby submit their Brief in Support of Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

The core allegation in Magten's Complaint is that Hanson and Kindt, as officers of Clark Fork, assisted NorthWestern in a transaction that Magten alleges was a fraudulent transfer of assets from Clark Fork to NorthWestern (the "Transaction"). Magten's breach of fiduciary duty claim must be dismissed because Magten lacks standing to bring this derivative claim on behalf of Clark Fork and Blackfoot, LLC ("Clark Fork")[1] because Magten was not a member or creditor of Clark Fork at the time the Transaction took place. It is undisputed that Magten is not now, and never has been, a member of Clark Fork. Statement of Uncontested Facts[2] ("Uncontested Facts") 10, 34, 48, 49. Further, Magten admitted that it did not acquire any QUIPS until well after the transaction at issue here had occurred. Uncontested Facts 58, 60, 62 – 65. Finally, Judge Case, the Delaware Bankruptcy Court Judge, has already held, and Magten has not disputed, that it has never been a creditor of Clark Fork. Uncontested Fact 65; *see* also Beatty Aff. Exh[3]. 31. Plaintiff's reliance on one provision in the Indenture to confer legal standing on Plaintiff to bring this action is misplaced. As discussed below, Plaintiff's theory is a meritless attempt to circumvent the legal standing requirements and the prohibition on purchasing grievances.

Further, the uncontested facts do not give Magten a cause of action for alleged breach of fiduciary duty for which relief may be granted since: (1) there is no evidence that either Defendant knew or should have known that NorthWestern was unable to meet the obligations which it assumed upon the transfer of the assets and liabilities; and, in fact, NorthWestern did

---

[1] On or about February 14, 2002, NorthWestern Corporation acquired the membership interest in Montana Power, LLC. Montana Power, LLC was later re-named NorthWestern Energy, LLC, and then again re-named Clark Fork and Blackfoot, LLC. Throughout this brief, for the easy reference of this Court, Defendants refer to this entity as "Clark Fork" regardless of its actual legal name at the time.

[2] Defendants' Statement of Uncontested Facts appears immediately following this Summary of Argument.

[3] References to "Beatty Aff. Exh. ___" are references to exhibits attached to the Affidavit of Kimberly A. Beatty submitted in support of this Motion and Brief.

meet those obligations and no event of default occurred until ten months after the transfer was completed; (2) there is no evidence that NorthWestern was insolvent or in the zone of insolvency either before or after the Transaction; and (3) there is no evidence that Clark Fork was insolvent after the Transaction since the assumption of the QUIPS obligations by NorthWestern and the release of Clark Fork to pay the QUIPS obligations were valid and has been so determined by a court of competent jurisdiction. *See generally*, Statement of Uncontested Facts, *infra*.

Magten's damages are significantly limited, if any award is permitted at all. Magten began to purchase QUIPS only after NorthWestern had announced that it might not be able to continue to pay on the QUIPS, and continued to purchase QUIPS after NorthWestern exercised its contractual rights to suspend payments due under the QUIPS, and still continued to purchase QUIPS even after NorthWestern filed a petition in bankruptcy, which was an event on default of the QUIPS obligations. Uncontested Facts 58-63. Because Magten clearly and intentionally purchased a strike suit, *see* Uncontested Fact 62, it is precluded from, or at best limited, in any recovery of compensatory damages.

There is no evidence that the Defendants acted in a fraudulent or malicious manner and thus as a matter of law Magten is not entitled to punitive damages. *See generally*, Statement of Uncontested Facts, *infra*. Finally, as a matter of law, Magten is not entitled to recover its attorneys fees or costs.

## STATEMENT OF UNCONTESTED FACTS

Defendants' Statement of Uncontested Facts is as follows:

**I.  Background Discussion Of QUIPS.**

1.      In November 1996, The Montana Power Company ("MPC") and the Bank of New York entered into an Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities (the "Indenture"). *See* Complaint, ¶ 11, Beatty Aff. Exh. 3, 29.

2.      Pursuant to the Indenture, MPC issued certain Junior Subordinated Interest Debentures (the "Junior Debentures"). All of the Junior Debentures were purchased by a Delaware business trust, Montana Power Capital I (the "Trust"). *See* Complaint, ¶¶ 12-16,

2

Beatty Aff. Exh. 29.  The Trust was created for the sole purpose of issuing trust securities and investing proceeds in the Junior Debentures.  MPC was to be the owner of all of the beneficial interests represented by common securities of the Trust.  *See* Scherf Report, p. 5[4]; *see also* Montana Power Capital I 8.45% Cumulative Quarterly Income Preferred Securities, Series A Prospectus ("QUIPS Prospectus"), p. i, Beatty Aff. Exh. 1

3.      Following the issuance of the Junior Debentures, the Trust issued the 2,600,000 40-year preferred securities, called Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPS").  *See* Scherf Report, p. 5.

4.      The QUIPS Prospectus described several risks associated with the QUIPS, including:

    a.  MPC's obligations under the Junior Debentures and therefore MPC's obligations to make QUIPS payments are "unsecured, subordinated and junior in right of payment to Senior Indentures of [MPC];

    b.  So long as an "Event of Default" had not occurred, MPC had the right to defer payments of interest on the Junior Debentures and the QUIPS for up to 20 consecutive quarters;

    c.  The Guarantee contained in the Indenture did not entitle QUIPS holders to seek accrued and unpaid distributions from MPC as the Guarantee was an unsecured obligation of MPC and ranked subordinate and junior to all Senior Indebtedness of MPC;

    d.  Upon the occurrence of certain "Special Events," MPC could cause a mandatory redemption of the QUIPS at a stated "Redemption Price";

    e.  MPC retained the right to terminate the Trust at any time and cause the Junior Debentures to be distributed to the holders of the Trust's securities and such

---

[4] The Scherf Report is the Expert Report of Stephen Scherf attached to the Affidavit of Mr. Scherf submitted in this action and in support of Defendants' Motion for Summary Judgment.

distributed securities may trade at a discount to the price paid by the holder of the QUIPS;

f.   The QUIPS holders would have limited voting rights relating only to the modification of the QUIPS and the direction of remedies upon the occurrence of an Event of Default under the Trust Agreement; and

g.   While the QUIPS were approved for listing on the NYSE, they may trade at a price that does not reflect the value of accrued but unpaid interest with respect to the Junior Debentures.

*See* QUIPS Prospectus, pp. 3-5, Beatty Aff. Exh. 1.

**II.    Northwestern's Acquisition Of Clark Fork.**

5.   On or about September 28, 2000, The Montana Power Company created a wholly owned subsidiary, the Montana Power, LLC ("MPLLC"), by filing its Articles of Organization with the Montana Secretary of State. *See* Articles of Organization of the Montana Power, LLC, Beatty Aff. Exh. 6.

6.   On or about September 29, 2000, NorthWestern Corporation ("NorthWestern") agreed to acquire certain transmission and distribution energy assets and liabilities from MPC by purchasing the unit interest in MPLLC. *See* Unit Purchase Agreement, dated September 29, 2000, Beatty Aff. Exh. 7.

7.   In January 2002, NorthWestern attained approval from the Montana Public Service Commission ("MPSC") to acquire the assets and liabilities of MPLLC. The MPSC authorized NorthWestern to hold MPLLC as either a subsidiary or division of NorthWestern. *See* Montana Public Service Commission Final Order No. 6353c, Docket No. D2001.1.5 (January 31, 2002) , Beatty Aff. Exh. 8.

8.   On or about February 13, 2002, MPC transferred these assets and liabilities to be acquired by NorthWestern into, MPLLC. *See* Complaint, ¶ 23, Beatty Aff. Exh. 29.

9.      MPLLC was later renamed NorthWestern Energy, LLC and was subsequently renamed Clark Fork and Blackfoot, LLC ("Clark Fork").[5]  *See* Complaint, ¶ 1, Beatty Aff. Exh. 29.

10.     Pursuant to the Unit Purchase Agreement, on February 15, 2002, NorthWestern purchased 100% of the equity or the "unit interest" of Clark Fork for $478 million and assumed approximately $511 million of liabilities.  *See* NorthWestern Form 10-K for the period December 31, 2002, p. 5, Beatty Aff. Exh. 24; Hanson Depo., p. 15, ln. 15 – p. 16, ln. 8, Beatty Aff. Exh. 34.

**III     The Transaction And Transfer Of Securities Obligations To Northwestern.**

11.     On or about August 7, 2002, the Board of Directors of NorthWestern, the sole Member and Manager of Clark Fork, passed resolutions authorizing NorthWestern to guarantee payment of the QUIPS obligations and authorizing the transfer of substantially all of the assets and liabilities of Clark Fork's Montana utility business to NorthWestern.  *See* NorthWestern Corporation Board of Directors Minutes of Regular Meeting August 7, 2002, Beatty Aff. Exh. 10.

12.     Also on August 7, 2002, NorthWestern, as the sole member and manager of Clark Fork, executed a Written Consent of Sole Member to Action in Lieu of Meeting, containing, among others, the following resolutions:

> NOW, THEREFORE, BE IT RESOLVED that the Manager [NorthWestern] hereby *authorizes, empowers and directs* the officers of [Clark Fork], or any of them, to execute and deliver an asset and stock transfer agreement to be entered into between [Clark Fork] and the Manager (the "Transfer Agreement"), to effect the NWE Asset Transfer, as well as any agreements, instruments, or documents contemplated thereby or in connection therewith ("Ancillary Agreements"), as the proper officers of the Corporation deem necessary or desirable, with such modifications or amendments thereto as such officers shall approve and the execution of such Transfer Agreement and Ancillary Agreements shall be deemed conclusive evidence of such approval.

---

[5] For purposes of convenience, all references to MPLLC, NorthWestern Energy, LLC and Clark Fork will be made as Clark Fork.

> FURTHER RESOLVED, that any and all actions taken by any officer or employee or agent of [Clark Fork] in furtherance of the foregoing resolutions and within the authority conferred by the foregoing resolutions are hereby ratified and approved in all respects.

*See* NorthWestern Energy, L.L.C. Written Consent of Sole Member to Action in Lieu of Meeting, dated August 7, 2002, (emphasis added), Beatty Aff. Exh. 9.

13.    On or about August 13, 2002, NorthWestern, Clark Fork, and the Trustee executed a Second Supplemental Indenture and an Amendment to Guarantee Agreement.  These agreements expressly reserved the right of Clark Fork to transfer substantially all of its assets and liabilities to NorthWestern, thereby relieving Clark Fork of "its obligations under the QUIPS Debenture, the Indenture and hereunder as provided in Article Eleven of the Indenture."  *See* Second Supplemental Indenture, § 201, Beatty Aff. Exh. 11; Amendment to Guarantee Agreement, Beatty Aff. Exh. 12; *see also* Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities, § 1101, Beatty Aff. Exh. 13.

14.     On November 15, 2002, Clark Fork and NorthWestern entered into an Asset and Stock Transfer Agreement.  Pursuant to the terms of the agreement, Clark Fork transferred the majority of its assets (the "Transferred Assets") and designated liabilities to NorthWestern (the "Transaction").  Excluded from the Transaction were Clark Fork's assets and insurance policies relating to the Milltown Dam as well as a parcel of property located in Missoula County, Montana.  Also excluded from the Transaction were certain liabilities, including environmental liabilities associated with the Milltown Dam and liabilities and obligations relating to certain pending and potential litigation.  *See* Asset and Stock Transfer Agreement, Beatty Aff. Exh. 15.

15.    Clark Fork was solvent prior to the Transaction occurring.  *See* Scherf Report, p. 10; *see also* Plaintiff's Complaint, ¶¶ 33-35, Beatty Aff. Exh. 29; *see also* Marcus Depo., p. 176, ln. 5 – p. 177, ln. 20, Beatty Aff. Exh. 42.

16.    NorthWestern was solvent both prior to and after November 15, 2007 under Generally Accepted Accounting Principles ("GAAP").  *See* Scherf Report, p. 12, discussing Berliner Report, Appendix A-4.

17.     NorthWestern had adequate liquidity throughout 2002 and into 2003.  *See* Expert Report of Christopher J. Kearns, pp. 3-4, Beatty Aff. Exh. 40; *see also* Marcus Depo., p. 137, ln. 19 – p. 140, ln. 10 ("Looking briefly at [the Expert Report of Christopher J. Kearns], as I've done just now, I'm not sure I understand what his point is about actually having adequate liquidity in 2002-2003.  We all knew [NorthWestern] had that even with all the misinformation in the marketplace."), Beatty Aff. Exh. 42.

18.     The Asset and Stock Transfer Agreement provided, in relevant part:

> [NorthWestern agrees] to assume on the Closing Date [November 15, 2002], and to pay or perform, in accordance with their terms, any and all obligations and liabilities of the Transferor [Clark Fork, f/k/a NorthWestern Energy, LLC], direct or indirect, known or unknown, absolute or contingent, arising or relating to the period before the Closing, except the Excluded Liabilities.

The Excluded Liabilities set forth in the Asset and Stock Transfer Agreement did not include the obligations under the QUIPS.  Asset and Stock Transfer Agreement, p. 5, Beatty Aff. Exh. 15.

19.     Concurrently with the Asset and Stock Transfer Agreement, NorthWestern and Clark Fork executed several agreements requiring NorthWestern to provide funds to Clark Fork. Specifically, NorthWestern and Clark Fork signed a Maintenance and Operating Costs Support Agreement, Beatty Aff. Exh. 16, and an Environmental Liabilities and Support Agreement, Beatty Aff. Exh. 17, (collectively, the "Support Agreements").

20.     Pursuant to the Environmental Liabilities Support Agreement, NorthWestern agreed to provide sufficient capital to ensure Clark Fork had, at all times, a net worth, as determined in accordance with the Generally Accepted Accounting Principles, of at least $1,000. *See*, Environmental Support Agreement, p. 1, Beatty Aff. Exh. 17.

21.     Other documents executed concurrently with the Asset and Stock Transfer Agreement included a Notice to the Trustee, Bank of New York, of the Transaction, Beatty Aff. Exh. 22, a Third Supplemental Indenture under the terms of which NorthWestern expressly assumed the obligations to make the QUIPS payments pursuant to the Indenture, Beatty Aff. Exh. 19, an Agreement between Clark Fork and NorthWestern under the terms of which

NorthWestern assumed the Guarantee of payment of the QUIPS, Beatty Aff. Exh. 20, and an Agreement between those same entities under which NorthWestern assumed the obligation to make all payments with respect to the QUIPS, Beatty Aff. Exh. 21.

22.     At the time of the Transaction, Michael Hanson served as Clark Fork's President and Chief Executive Officer.  Hanson was also the President and Chief Executive Officer of NorthWestern Public Service Division, a division of NorthWestern responsible for overseeing NorthWestern's utility operations in Montana, South Dakota and Nebraska.  *See* Hanson Depo., p. 25, ln. 7 – p. 32, ln. 3, Beatty Aff. Exh. 34; *see also* Officer's Certificate, dated November 15, 2002, Beatty Aff. Exh. 34.

23.     Mr. Hanson did not manage NorthWestern's non-utility businesses, including Expanets, and did not know the details of those businesses' financing.  *See* Hanson Depo. p. 121, ln. 4 – p. 124, ln. 12, Beatty Aff. Exh. 34.

24.     Mr. Hanson was aware during 2002 that Expanets was having certain problems, but was repeatedly informed Expanets was working to fix these problems.  Each time a problem was discussed, there was a discussion of actions which were going to be taken to fix the problem and constant assurances Expanets was going to improve.  *See* Hanson Depo. p. 112, lns. 12 – 23; p. 119, ln. 20 – p. 120, ln. 13;  p. 140, ln. 15 – p. 141, ln. 8, Beatty Aff. Exh. 34.

25.     Between December 2001 and November 2002, Mr. Hanson received periodic Management Financial and Information Reports ("MFIRs") and attended certain meetings at which the various businesses of NorthWestern were discussed.  However, these MFIRs provided only selective information about each of the operating companies and did not contain balance sheets, income statements or statements of cash flow for any of NorthWestern's operating companies.  *See* Hanson Depo., p. 41, ln. 11 – p. 45, ln. 17, Beatty Aff. Exh. 34; *see also* Scherf Report, p. 17.

26.     While the MFIRs for May, June and July 2002 contained charts indicating that Expanets' experienced some delays in repaying cash advances previously made by NorthWestern, the MFIRs contained only selected financial information and did not contain

sufficient information for the reader to conclude that NorthWestern would have been unable to make QUIPS payments after November 2002 or that Expanets would never be able to repay its parent.  *See* Hanson Depo., p. 123, ln. 19 – p. 124, ln. 12, Beatty Aff. Exh. 34; *see also* Scherf Report, pp. 16-18.

27.     In his capacity as CEO of Clark Fork, Mr. Hanson executed certain Officer's Certificates relating to the Transaction.  *See* Hanson Depo., p. 223, ln. 16 – p. 230, ln. 17.

28.     First, in August 2002, Mr. Hanson executed an Officer's Certificate Pursuant to Section 102 of the Indenture.  In relevant part, Mr. Hanson certified that all conditions precedent provided in the Indenture relating to the execution and delivery of the Second Supplement Indenture had been complied with.  *See* Officer's Certificate Pursuant to Section 102 of the Indenture, dated August 2002, Beatty Aff. Exh. 13.

29.     Second, on November 15, 2002, Mr. Hanson executed a second Officer's Certificate relating to the Transaction.  In this Certificate, Mr. Hanson certified that the Transaction complied with Article 11 of the Indenture and all conditions precedent in the Indenture as they related to the Transaction had been complied with.  Specifically, the Certificate made two limited representations:  (1) the transfer of the assets and liabilities was to a corporation (NorthWestern) duly existing under the laws of the United States; and (2) the transfer would not create an ***immediate event of default*** with respect to the obligations, including the QUIPS obligations.  *See* Officer's Certificate, dated November 15, 2002, (emphasis added) Beatty Aff. Exh. 18.

30.     As the Trustee for the Indenture, the Bank of New York was responsible for supporting the requirements under the Indenture.  In its role as Trustee and in executing the Third Supplemental Indenture, the Bank of New York relied on Officer's Certificates from the issuer pursuant to the Indenture.  Bank of New York does not, however, review financial statements of the issuer.  *See* Indenture, generally, Beatty Aff. Exh. 3; *see also* Lewicki Depo., p. 12, ln. 13 – p. 13, ln. 6; p. 14, ln. 7 – p. 15, ln. 14; p. 57, ln. 17 – p. 58, ln. 10, Beatty Aff. Exh. 33.

31.     In executing such officer's certificates, Mr. Hanson relied on Management Information Reports, SEC filings, other public financial statements, and presentations to NorthWestern's board.  Mr. Hanson "had no basis for believing that [the documents he relied upon] were false or misleading."  *See* Hanson Depo., p. 223, ln. 16 – p. 230, ln. 17; p. 272, ln. 10 – p. 280, ln 19; p. 285, lns. 6-15; p. 283, lns. 1-13 ("My testimony is that upon signing these documents, I did not know [the 2002 10-Qs were false or misleading] nor did I have any basis to know or believe that to be the case."), Beatty Aff. Exh.34.

32.     Hanson further relied on the management of NorthWestern and on officers of its subsidiaries regarding any perceived financial problems with NorthWestern or its related companies.  *See* Hanson Depo., p. 112, lns. 12 – 23; p. 116, ln. 10 – p. 118, ln. 8; p. 123, ln. 25 – p. 124, ln. 12; p. 223, ln. 16 – p. 230, ln. 17; p. 272, ln. 10 – p. 280, ln 19, Beatty Aff. Exh. 34.

33.     Based on his involvement with NorthWestern and his general understanding, Hanson had no reason to question either the advisability of the Transaction or the ability of NorthWestern to pay the QUIPS obligations.  *See* Hanson Depo., p. 65, lns. 2 – 20; p. 274, lns. 8-19, Beatty Aff. Exh. 34; *see also* Scherf Report, p. 23.

34.     Concerning the Transaction, Mr. Hanson followed the directive of NorthWestern to transfer substantially all of the assets and liabilities of Clark Fork to NorthWestern.  According to Mr. Hanson, "[NorthWestern] owned them both.  There was no change.  [NorthWestern] owned the equity of [Clark Fork] before the transaction.  They owned it after the transaction."  *See* Hanson Depo., p. 275, ln. 23 – p. 276, ln. 23, Beatty Aff. Exh. 34; *see also* NorthWestern Energy, L.L.C. Written Consent of Sole Member to Action in Lieu of Meeting, dated August 7, 2002, Beatty Aff. Exh. 9.

35.     At the time of the Transaction, Ernie Kindt served as Clark Fork's Vice President and Chief Accounting Officer.  As an officer of Clark Fork, Mr. Kindt was responsible for ensuring filing requirements with certain debt holders were completed on time.  Mr. Kindt's responsibilities were limited to the Montana utility assets owned by Clark Fork.  *See* Kindt

Depo., p. 15, ln. 11 – p. 19, ln. 10, Beatty Aff. Exh. 35; *see also* NorthWestern Energy, L.L.C. Resolution of Managing Member, dated November 5, 2002, Beatty Aff. Exh. 14.

36.    During the summer of 2002, Mr. Kindt became Clark Fork's contact for the Trustee, the Bank of New York, with respect to the QUIPS.  Mr. Kindt had only one or two phone calls with the Trustee prior to the Transaction.  These communications related to interest payments and to the annual filing.  *See* Kindt Depo., p. 22, ln. 18 – p. 23, ln. 7; p. 70, ln. 2 – p. 71, ln. 6; p. 83, lns. 6-9, Beatty Aff. Exh. 35.

37.    Mr. Kindt was neither involved in the decision to consummate the Transaction nor did he have access to information which would provide a basis for opining on the advisability of the Transaction.  *See* Kindt Depo., p. 18, ln. 1 – p. 19 ln. 10; p. 23, lns. 8-11, Beatty Aff. Exh. 35; *see also* Scherf Report, pp. 14-15.

38.    Mr. Kindt did not review NorthWestern's financial statements or public financial disclosures in connection with the Transaction.  *See* Kindt Depo., p. 31, lns. 1-6; p. 32, lns. 9-13, Beatty Aff. Exh. 35.

39.    Mr. Kindt did not receive financial statements of NorthWestern's other divisions or subsidiaries and had limited information regarding the net income of these entities.  *See* Kindt Depo., p. 50, lns. 17-19; p. 72, lns. 4-23, Beatty Aff. Exh. 35.

40.    Mr. Kindt did not see any Management Financial and Information Reports produced by NorthWestern.  *See* Kindt Depo., p. 50, lns. 17-19, Beatty Aff. Exh. 35.

41.    Mr. Kindt did not discuss with anyone at NorthWestern or with Mr. Hanson the company's ability to service the QUIPS debt after the Transaction.  *See* Kindt Depo., p. 31, ln. 25 – p. 32, ln. 22, Beatty Aff. Exh. 35.

42.    In 2002, shortly after NorthWestern acquired the unit interest of Clark Fork, Mr. Kindt attended one NorthWestern meeting attended by all of the Montana vice presidents and the presidents of NorthWestern's various divisions and subsidiaries.  At that meeting, the division and subsidiary presidents each spent ten to fifteen minutes updating the attendees on their

progress. "Expanets was confident they would meet their annual budgeted target which they indicated was an aggressive target." *See* Kindt Depo., p. 72, lns. 4-16, Beatty Aff. Exh. 35.

43.    The only information Mr. Kindt had regarding Expanets was from the single meeting he attended and from a one-line comparison of Expanets' net income compared to their budget for each month and for the year-to-date contained in the NorthWestern utility financial statements. Mr. Kindt never reviewed any financial statements for Expanets. *See* Kindt Depo., p. 72, lns. 1-25, Beatty Aff. Exh. 35.

44.    At the time of the Transaction, Kindt believed NorthWestern had the "financial wherewithal to continue to service the [QUIPS] debt" and that "whenever the utility needed cash, it was available." Kindt had no concerns with respect to whether NorthWestern could satisfy the QUIPS obligations as "[t]he balance sheet of NorthWestern was strong" and "[t]he company had just recently issued some debt and did not have a difficult time issuing that debt." Further, Kindt was not aware of any concerns with respect to NorthWestern's liquidity or cash flows until the late winter or early spring of 2003. Kindt Depo., p. 31, lns. 7-19; p. 32, lns. 19-22; p. 63, lns. 8-14; p. 86, ln. 17 – p. 87, ln. 2, Beatty Aff. Exh. 35.

45.    Mr. Kindt believed there was "no need for concern" regarding Clark Fork's cash flows after the Transaction due to the Support Agreements guaranteeing sufficient cash flows to Clark Fork from NorthWestern. Concerning the Transaction, Mr. Kindt believed "NorthWestern was the owner of the assets and that all [NorthWestern] was doing was changing the form of that ownership from ownership of [Clark Fork] to direct ownership of the net assets." *See* Kindt Depo., p. 40, lns. 3-9; p. 45, lns. 8-23; p. 47, lns. 12-21 Beatty Aff. Exh. 35.

46.    Mr. Kindt's only roles in the Transaction were to adjust company codes for the assets and transmit certain paperwork relating to the debt, including the Notice to the Trustee, Bank of New York, of the Transaction. There "wasn't a whole lot of activity that was required on the [Clark Fork] books." *See* Kindt Depo., p. 18, ln. 1 – p. 20, ln. 15, Beatty Aff. Exh. 35.

47.    Two internal investigations by NorthWestern's Board of Directors and a separate investigation by the SEC revealed no improper activity on the part of either Mr. Hanson or Mr.

Kindt. *See* Affidavit of Michael Hanson; Affidavit of Ernie Kindt; *see also* Scherf Report, pp. 24-26.

48.    At the time of the Transaction, NorthWestern was the sole member and manager of Clark Fork. *See* Limited Liability Company Operating Agreement of Montana Power Company L.L.C., Beatty Aff. Exh. 5; *see also* Written Consent of Sole Member and Manager to Action in Lieu of Meeting, dated August 7, 2002, Beatty Aff. Exh. 9; *see also* NorthWestern Form 10-K for the period ending December 31, 2002, p. 5 filed April 15, 2003, Beatty Aff. Exh. 24.

49.    The Operating Agreement for Clark Fork, provides that the company shall be managed by its sole Member. *See* Limited Liability Company Operating Agreement of Montana Power L.L.C., Beatty Aff. Exh. 5.

50.    Following the Transaction, NorthWestern made two (2) quarterly payments on the QUIPS, in December 2002 and March 2003. After making these two quarterly payments, in May 2003 NorthWestern exercised its contractual right to defer future quarterly payments on the QUIPS. Such a deferral was allowed by the Indenture and did not constitute an Event of Default. *See* NorthWestern Form 8-K, dated May 23, 2003, Beatty Aff. Exh. 27; *see also* Indenture, § 301, 312, Beatty Aff. Exh. 3.

51.    NorthWestern never defaulted on its obligation to make QUIPS payments until it filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 14, 2003. *See* Indenture, Article Eight; *see also* NorthWestern Form 8-K, dated September 15, 2003, Beatty Aff. Exh. 28.

52.    On December 13, 2002, NorthWestern issued a Form 8-K indicating that it might have to restate its public financial disclosures for 2002. As of this time, NorthWestern's auditors had not determined the magnitude of any restatement which might be required. *See* NorthWestern Form 8-K, dated December 13, 2002, Beatty Aff. Exh. 23.

**IV.     Northwestern's Disclosures Regarding QUIPS Payments.**

53.     On April 16, 2003, NorthWestern filed with the SEC amended quarterly reports, Forms 10-Q/A for the period ending March 31, 2002, June 30, 2002, and September 30, 2002. NorthWestern also filed its Form 10-K, Annual Report, and a Form 8-K on that date. *See* NorthWestern Form 8-K, dated April 16, 2003, Beatty Aff. Exh. 25.

54.     The Form 8-K filed on April 16, 2003 also stated NorthWestern had the right to defer interest payment for up to 20 consecutive quarters and that NorthWestern may not be able to meet its debt obligations. *See* NorthWestern Form 8-K, dated April 16, 2003, Beatty Aff. Exh. 25.

55.     On May 15, 2003, NorthWestern filed with the SEC a Form 8-K indicating, among other information, NorthWestern was considering deferring QUIPS payments and that it is "likely that such payments will be deferred." *See* NorthWestern Form 8-K, dated May 15, 2003, Beatty Aff. Exh. 26.

56.     On May 23, 2003, NorthWestern filed a Form 8-K announcing that its "Board of Directors has elected to defer interest payments on the subordinated debentures of all series of its trust preferred securities [QUIPS]." *See* NorthWestern Form 8-K, dated May 23, 2003, Beatty Aff. Exh. 27.

57.     The liabilities transferred from MPC to Clark Fork and then from Clark Fork to NorthWestern included the Junior Debentures issued by MPC and held by the Trust. *See* Complaint, ¶¶ 16, 23, 31, Beatty Aff. Exh. 29.

**V.     Magten's Acquisition Of QUIPS.**

58.     Magten first acquired a beneficial interest in the Junior Debentures by purchasing the QUIPS issued by the Trust beginning on or about April 30, 2003, approximately five months after the Transaction and exactly two weeks after NorthWestern restated its financials for three quarters of 2002. *See* Complaint, ¶¶ 15-19, Beatty Aff. Exh. 29; s*ee also* Embry Depo., p. 14, lns. 19-22, p. 40 lns. 11-14 (Q: "Were you an investor in the QUIP's [sic] in 2002?  And when I

14

say you, Magten on behalf of its clients. A: No."), Beatty Aff. Exh. 36; *see also* Magten Asset Management Corp., Inc. Master Summary of Holdings as of 7/24/04, Beatty Aff. Exh. 30.

59.     Prior to purchasing the QUIPS, Magten reviewed all financial information that was available relating to NorthWestern and Montana Power Company, including Form 10-Qs and 10-Ks from 2002 as well as restated financial filings.  Magten also reviewed the Indenture, the Second Supplemental Indenture, the Third Supplemental Indenture and the Assumption Agreement.  *See* Embry Depo., p. 16, ln. 24 – p. 21, ln. 25, Beatty Aff. Exh. 36.

60.     Magten purchased additional QUIPS on May 12, 2003, June 3, 2003 and various dates throughout the remainder of 2003.  *See* Magten Asset Management Corp., Inc. Master Summary of Holdings as of 7/24/04, Beatty Aff. Exh. 30; *see also* Embry Depo., p. 91, lns. 3-7, Beatty Aff. Exh. 36.

61.     Magten knew NorthWestern was in bankruptcy the day it filed its petition.  *See* Embry Depo., p. 94, lns. 18-20, Beatty Aff. Exh. 36.

62.     Magten continued to purchase additional QUIPS after NorthWestern filed for bankruptcy protection in September 2003.  Mr. Embry, Magten's sole director and officer, believed the QUIPS purchases while NorthWestern was in bankruptcy was a "good investment" "[b]ecause [NorthWestern] had engaged in a fraud which had -- which gave rise to a fraudulent conveyance claim, which the securities represent a claim on."  *See* Embry Depo., p. 94, lns. 9-19, Beatty Aff. Exh. 36; *see also* Magten Asset Management Corp., Inc. Master Summary of Holdings as of 7/24/04, Beatty Aff. Exh. 30.

63.     Magten continued to acquire QUIPS until approximately May of 2006.  Magten's last purchase of the QUIPS was for $15.00 per security.  *See* Embry Depo., p. 116, lns. 6-17; p. 136, ln. 21 – p. 137, ln. 9, Beatty Aff. Exh. 36.

**VI.     Magten's Creditor Status Allegations.**

64.     Magten does not allege in the Complaint that it was a creditor of Clark Fork or owned any QUIPS prior to or at the time the Transaction occurred.  *See generally* Complaint, Beatty Aff. Exh. 29.

65.     In the NorthWestern bankruptcy, the United States Bankruptcy Court for the

District of Delaware found:

> The Debtor has consistently alleged, and Magten has never disputed, that Magten
> did not own any of the debentures prior to the time the assets were transferred to
> the Debtor.  Rather, Magten required the assets after the transaction was
> complete.  Therefore, the Debtor asserts and Magten has not disputed, that
> Magten was never a creditor of Clark Fork at a time when Clark Fork held the
> disputed energy assets.  Rather, Magten became a holder of the debentures only
> after the transaction was completed and was a matter of public record.

*In re NorthWestern Corp.*, No. 03-12872 (CGC), 2004 WL 1661016, at *1 (Bankr. D. Del. July

23, 2004), Beatty Aff. Exh. 31.

66.     Magten owns in excess of 33% of the QUIPS.  *See* Complaint, ¶ 13, Beatty Aff.

Exh. 29.

67.     Neither Hanson nor Kindt received any of the assets transferred from Clark Fork

to NorthWestern.  *See* Complaint, ¶ 31, Beatty Aff. Exh. 29.

68.     Plaintiff's Complaint contains one claim against Mr. Hanson and Mr. Kindt.

Plaintiff's sole count is a direct claim for breach of fiduciary duty based on transferring assets

when the company was insolvent or in the zone of insolvency.  *See generally*, Complaint, and ¶

47, Beatty Aff. Exh. 29.

**VII.    Magten's Expert Opinions.**

69.     Magten has retained two experts in this matter – Robert Berliner and Paul Marcus

– both of whom have provided expert reports.  Plaintiff's experts express no opinion as to

whether NorthWestern was insolvent or in the zone of insolvency prior to or after the

Transaction nor were Plaintiff's experts asked to opine on these issues, although these issues

form the basis of Plaintiff's one count breach of fiduciary duty claim.  In fact, Mr. Berliner

testified he was "delighted" at not being asked to opine on NorthWestern's solvency.  *See*

Berliner Depo., p. 26, ln. 5 – p. 32, ln. 3, Beatty Aff. Exh. 41; *see* Marcus Depo., p. 17, ln. 19 –

p. 19, ln. 14, Beatty Aff. Exh. 42.

16

70.     Plaintiff's experts express no opinion as to whether Clark Fork remained liable for the QUIPS obligations after the Transaction.  However, both of Plaintiff's experts were expressly instructed to assume Clark Fork remained liable for the QUIPS obligations after the Transaction. *See* Berliner Depo., p. 28, ln. 5 – p. 32, ln. 3, Beatty Aff. Exh. 41; *see* Marcus Depo., p. 191, ln. 21 – p. 192, ln. 25, Beatty Aff. Exh. 42.  Absent the assumption which Magten's counsel directed them to make, they had no opinion concerning the solvency of Clark Fork after the Transaction, *see* Berliner Depo. p. 138 – 139, ln. 18, Beatty Aff. Exh. 41; *see* Marcus Depo. p. 137, ln. 2-14, Beatty Aff. Exh. 42.

71.     Plaintiff's expert, Robert Berliner, and his company spent approximately 3,100 hours over a ten-month period reviewing the documents relating to Magten's cases against Hanson and Kindt and NorthWestern and generating Mr. Berliner's expert report.  *See* Berliner Depo., p. 140, ln. 18 – p. 142, ln. 8, Beatty Aff. Exh. 41.  In his report, Mr. Berliner relied upon the independent appraisals conducted by American Appraisal Associates and internal investigation conducted by NorthWestern's Board.  See, e.g., Berliner Report 1-1, 2-4, 2-5, 2-10 – 2-18, Beatty Aff. Exh. 37.

72.     Neither of Plaintiff's experts considered or formed opinions as to whether Mr. Hanson or Mr. Kindt violated any Generally Accepted Accounting Principles ("GAAP"), failed to timely recognize goodwill impairments, were involved in any alleged failure to provide adequate consideration regarding the Transaction, or breached any fiduciary duties to anyone. *See* Berliner Depo., p. 147, ln. 9 – p. 150, ln. 9, Beatty Aff. Exh.41; *see* Marcus Depo., p. 163, ln. 14 – p. 168, ln. 19, Beatty Aff. Exh.42.

73.     NorthWestern's "Senior Management," as used in Mr. Berliner's Expert Report, refers to Kipp Orme, Merle Lewis, Richard Hylland, and Kendall Kliewer.  According to Mr. Berliner, Plaintiff's expert, these four individuals were responsible for NorthWestern's alleged failure to comply with SEC disclosure requirements, the knowing dissemination of materially false and misleading information to the public, failure to timely recognize goodwill impairment losses and NorthWestern's alleged GAAP violations.  Neither Mr. Hanson nor Mr. Kindt are

17

included in Mr. Berliner's references to NorthWestern's "Senior Management." *See* Berliner Depo., p. 156, ln. 6 – 159, ln. 9, Beatty Aff. Exh. 41.

74.     The Berliner Report discusses various deficient disclosures and accounting inaccuracies by NorthWestern and "NorthWestern's Management," but contains no reference to Mr. Hanson or Mr. Kindt and provides no basis for including Mr. Hanson or Mr. Kindt as part of "NorthWestern's Management."  The only reference to either Mr. Hanson or Mr. Kindt in the Berliner Report is a single mention of Hanson in regards to a January 28, 2002 memorandum he co-authored.  *See* Berliner Report, pp. 1-4 – 1-6, 1-8 – 1-9, 1-12 – 1-13, 2-5 – 2-22, 3-3 – 3-10, 5-1, Beatty Aff. Exh. 41.

75.     Prior to completing his expert report, Plaintiff's expert, Paul Marcus, was unaware his report would be used in connection with Magten's case against Mr. Hanson and Mr. Kindt.  Mr. Marcus did not review the Complaint against Mr. Hanson and Mr. Kindt, nor did Mr. Marcus have a general understanding of the allegations made in that Complaint.  *See* Marcus Depo., p. 155, ln. 16 – p. 156, ln. 10, Beatty Aff. Exh. 42.

76.     The Marcus Report makes no mention of Mr. Kindt and contains only two references to Mr. Hanson.  Specifically, the Marcus Report states:

> 121. Regarding the transfer, Michael Hanson, president and CEO of NorthWestern Energy in 2002, stated that in executing the officer's certificate in connection with the transfer of the assets, he relied on NorthWestern's false and misleading financial statements.

> . . .

> 125. Additionally supporting my belief is the fact that the negative consequences to Montana Power as a result of the acquisition by NorthWestern stand in stark contrast to the assurances provided to the MPSC by Michael Hanson prior to the acquisition.  When asked to "address financial capability under two aspects: financial strength and financial flexibility", Mr. Hanson stated that:

>> In general, we believe that capital will be no more expensive with NorthWestern as owner of MPC than is the case today.  As I indicated, NorthWestern has enjoyed consistent access to capital on reasonable terms.  While our corporate structure may seem complex on first examination, it assures separation of the utility

18

> related financings from other activities, and it should not create
> any new or additional concerns for this Commission because MPC
> has itself had significant non-utility operations.

*See* Marcus Report, pp. 47, 49, Beatty Aff. Exh. 38.

      77.    Mr. Berliner opined in his Expert Report that had a goodwill impairment analysis

been done as of June 30, 2002, NorthWestern would have known that it violated certain debt

covenants.  See Berliner Report, pp. 4-1 – 4-2, Beatty Aff. Exh. 37.

Defendants' expert Stephen Scherf concluded that after reviewing the spreadsheets and other

financial documents contained in the Berliner Report, the very financial information relied upon

by Mr. Berliner demonstrates NorthWestern was solvent on November 15, 2002.  Mr. Scherf

further concluded: "We are not aware of any analysis that has concluded that NorthWestern was

insolvent or even in the 'zone of insolvency' as of November 15, 2002."  *See* Scherf Report, p.

12.

## **STANDARD**

      Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." Where, as here, the non-

moving party bears the burden of proof at trial, the moving party is entitled to summary

judgment by demonstrating that the non-moving party cannot establish the existence of any

element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

("The plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element on which that party will bear the burden of

proof at trial."). In *Celotex*, the Supreme Court explained:

> In such a situation, there can be no 'genuine issue as to any material fact,' since a
> ***complete failure of proof concerning an essential element of the nonmoving
> party's case necessarily renders all other facts immaterial***. The moving party is
> entitled to 'judgment as a matter of law' because the nonmoving party has failed

19

to make a sufficient showing on an essential element of her case with respect to
which she has the burden of proof.

477 U.S. at 323 (emphasis added).  The moving party in such a case is not required to offer

evidence negating any element of the nonmoving party's claim.  *Id*. at 323.  Rather, the burden

on the moving party may be discharged by "pointing out to the district court that there is an

absence of evidence to support the nonmoving party's case." *Id*. at 325.  Here, Plaintiff Magten

bears the burden of proof at trial as to its claims.

## <u>ARGUMENT</u>

## I.    MAGTEN LACKS STANDING TO SUE HANSON AND KINDT.

It has long been settled that a plaintiff may not avail itself of the federal courts unless an

actual case or controversy exists and it has standing to bring the lawsuit.  The "gist of the

question of standing" is "[h]ave the appellants alleged such a personal stake in the outcome of

the controversy as to assure that concrete adverseness which sharpens the presentation of issues."

*Baker v. Carr*, 369 U.S. 186, 204 (1962).  The United States Supreme Court has held:

> The rules of standing, whether as aspects of the Art. III case-or-controversy
> requirement or as reflections of prudential considerations defining and limiting
> the role of the courts, are threshold determinants of the propriety of judicial
> intervention.  It is the responsibility of the complainant clearly to allege facts
> demonstrating that he is a proper party to invoke judicial resolution of the dispute
> and the exercise of the court's remedial powers.

*Warth v. Seldin*, 422 U.S. 490, 517-18 (1975).  The Third Circuit has provided a roadmap for

standing determinations, instructing:

> Standing is a threshold jurisdictional requirement, derived from the "case or
> controversy" language of Article III of the Constitution.  *See Valley Forge
> Christian College v. Americans United for Separation of Church and State*, 454
> U.S. 471-73, 102 S. Ct. 752, 757-59, 70 L.Ed.2d 700 (1982).  Plaintiffs must have
> standing at all stages of the litigation, *see National Organization for Women, Inc.
> v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), and they bear
> the burden of proving it "with the manner and degree of evidence required at the
> successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136.  In
> addition, federal appellate courts have a bedrock obligation to examine both their
> own subject matter jurisdiction and that of the district courts.  *See FW/PBS Inc. v.
> City of Dallas*, 493 U.S. 215, 230-231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603
> (1990.  *See also Chabal v. Reagan*, 822 F.2d 349, 355 (3d Cir. 1987) (speaking of

"overarching principle that requires us continually to inquire into our own jurisdiction").

*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc. (PIRG v. MEIC)*, 123 F.3d 111, 117 (3d Cir. 1997). The *PIRG* court also noted: "Like any jurisdictional requirement, ***standing cannot be waived***. Therefore, throughout the entire litigation, it remained PIRG's responsibility to demonstrate that it has standing to pursue this case." *Id.* (emphasis added). Therefore, without the requisite standing, the case is barred.

Standing is a threshold judicial determination that must be made to ensure the propriety of judicial intervention. Moreover, "[t]he question of standing is generally determined from the face of the complaint." *Borelli v. City of Reading*, 532 F.2d 950, 951 (3d Cir. 1976) (*citing Schiaffo v. Helstoski*, 492 F.2d 413, 423 (3d Cir. 1974). It is the claimant's burden to allege facts sufficient in its complaint to demonstrate it is a proper party entitled to judicial resolution of the dispute. Given, the totality of the allegations set forth in Magten's Complaint against Hanson and Kindt, it is clear that Magten lacks standing and its case is barred and must be dismissed.

### A.    Magten's Allegations of Breaches of Fiduciary Duty are Derivative Claims.

As noted previously, the core allegation in the Complaint is that Hanson and Kindt, as officers of Clark Fork, assisted NorthWestern in what Magten characterizes as a fraudulent conveyance of assets from a wholly owned subsidiary to the parent company. In its Complaint, Magten asserts that it is a creditor of Clark Fork (Compl. ¶ 1); that Clark Fork was in the zone of insolvency prior to the Transaction (Compl. ¶ 47); that the transaction rendered Clark Fork insolvent (Compl. ¶ 1, 33, 35, 47); that the officers of Clark Fork owed fiduciary duties to the Clark Fork creditors (Compl. ¶ 1, 47); and that Hanson and Kindt breached those fiduciary duties when they assisted Clark Fork in transferring those assets to NorthWestern without receiving adequate consideration and assigned QUIPS obligations to NorthWestern when they knew NorthWestern (i) was insolvent, (ii) would remain insolvent, and (iii) would be unable to perform the QUIPS obligations (Compl. ¶ 50, 51). All of these allegations, if any are cognizable, are derivative claims belonging only to Clark Fork.

21

Whether a plaintiff's claims are direct or derivative is a question of state law; and the Court must look to the law of the state of incorporation. *See, Karmen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 108-109, 111 S. Ct. 1711, 114 L.Ed.2d 152 (1991); *see also, Franklin Mutual Funds Fee Litigation*, 388 F.Supp.2d 451, 462 (D. N.J. 2005). While the Montana Supreme Court has not had the opportunity to provide a definitive definition of what constitutes a direct versus a derivative claim, in 1987 the Ninth Circuit, interpreting a Montana question, provided the answer. In *Sax v. World Wide Press, Inc.*, the Ninth Circuit held:

> Under Montana law, a shareholder can enforce a corporate right in a derivative action if certain conditions are met. Mont.R.Civ.P. 23.1: *see S-W Co. v. John Wight, Inc.*, 179 Mont. 392, 402-03, 587 P.2d 3.48, 354 (1978). **As a general rule, an action enforces a corporate right "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders."** 12B W, Fletcher, *Cyclopedia of the Law of Private Corporations.* § 5911 (rev. perm. Ed. 1984) (footnotes omitted); *see* Annotation *Stockholder's Right to Maintain (Personal) Action Against Third Person as Affected by Corporations' Right of Action for the Same Wrong*, 167 A.L.R. 279, 280 (1947) (cited by Mont.R.Civ.P. 23.1 comment). *614 **Therefore, if the corporate wrong decreases the value of the corporation's stock, it does not necessarily create a direct cause of action for shareholders.** *Lewis*, 719 F.2d at 1049 (applying Oregon law); W. Fletcher, *supra*, § 5913; Annot., 167 A.L.R. 279, 280 (1947). The general rule that a shareholder cannot enforce corporate rights in a direct action applies to actions arising out of either contract or tort law. *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir. 1968 (application Texas law). A direct action can be brought either when there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, or when the shareholder suffers injury separate and distinct from that suffered by other shareholders. W. Fletcher, *supra*, §5911; *see Schaffer*, 397 F.2d at 896.

*Sax v. World Wide Press, Inc.*, 809 F.2d 610, 613-614 (9th Cir.1987) (emphasis added). The treatise cited with approval by the Ninth Circuit goes on to note that waste and mismanagement of corporate assets, issuing stock for inadequate consideration, depreciation in the value of the stock and violation of federal securities laws are all examples of derivative claims because they affect the entire corporation, not just a few shareholders. W. Fletcher, *supra*, §5913, 5923, 5923.2. The treatise instructs:

> A shareholder ordinarily cannot, as an individual as distinguished from a representative of the corporation, sue directors or other corporate officers for mismanagement, negligence or the like, on a cause of action which belongs to the corporation. The remedial rights of minority shareholders with respect to wrongs committed against the corporation by the officers and directors in the management of corporate affairs are derivative rights and any action taken by the shareholders to redress such wrongs must be for the benefit of the corporation. …
>
> The policy supporting the rule forbidding direct suits against management is most compelling when the plaintiff is similarly situated to other shareholders, suffers the same injury, and retains the same opportunity to be made whole by a corporate recovery from the wrongdoer. …
>
> … Improper manipulation of funds by the controlling shareholder creates a cause of action in favor of the corporation rather than in favor of a shareholder as an individual, as does a wrongful diversion of corporate assets. Similarly, an action based on a claim of waste of corporate assets is properly asserted derivatively, and cannot be brought as an individual action.

W. Fletcher, *supra*, §5924 (footnotes omitted).

The allegation that Clark Fork transferred assets without receiving adequate consideration to a transferee unable to comply with the obligations transferred clearly belongs to Clark Fork because, if true, the improper acts operate to injure the company in the first instance by reducing its value. *See, Sax*, 809 F.2d at 613-614 (*holding* damages for loss of interest income on stock investments are incidental to injuries to the company and therefore are not personal injuries *and finding* the fiduciary relationship claimed was not separate and distinct from that owed to other shareholders, thus precluding a direct action because the injury affected the whole of the corporation); *Prod. Res. Group, LLC v. NCT Group, Inc.*, 863 A.2d 772, 776 (Del. Ch. Ct. 2004) (*holding* that a loss of corporate assets that are alleged to be breaches of equitable fiduciary duties are harms to the corporate entity itself and are not personal to shareholders or creditors); W. Fletcher, *supra*, § 5911, 5913, 5923, 5923.2, 5924.

This Court recognized that Magten's allegations stemming from the Transaction are derivative in nature in its January 12, 2007 decision in the related matter of *Magten v. Paul Hastings Janofsky and Walker*, Civil Action No. 04-1256-JJF. *See* Memorandum Opinion ("PHJW Order"), at p. 8 (*citing Kondelik v. First Fidelity Bank*, 857 P.2d 687, 692 (Mont. 1993) (*overruled on other grounds by* Gliko v. Perman, 331 Mont. 112, 130 P.3d 155 (2006) and

*quoting Richland Nat'l Bank & Trust v. Swenson*, 816 P.2d 1045, 1054 (Mont. 1991)).  In the PHJW Order, this Court recognized that Montana law is clear that the "stockholders and guarantors of a corporation do not have the right to pursue an action on their own behalf when the cause of action accrues to the corporation" and further held that "regardless of any claims that Clark Fork was 'in the zone of insolvency,' the Court concludes that Magten's claims are appropriately considered to be derivative claims."  Magten's allegations here are clearly derivative.

**B.**  **Magten Lacks Standing to Bring a Derivative Claim Under Montana Limited Liability Company Act Law.**

Clark Fork is a Montana limited liability company.  Uncontested Fact 5.  As such, it is governed by the Montana Limited Liability Company Act.  Mont. Code Ann. § 35-8-1104 clearly states that:

> in a derivative action for a limited liability company, the plaintiff ***must be a member of the company when the action is commenced <u>and</u>***:  (a) ***must have been a member at the time the transaction*** of which the plaintiff complains; **or** (b) the ***plaintiff's status as a member must have devolved*** upon the plaintiff by operation of law or pursuant to the terms of the operating agreement ***from a person who was a member at the time of the transaction***.

(emphasis added).  Clark Fork's sole member and manager at all times material to this case was and is NorthWestern Corporation.  Uncontested Facts 48-49.  Because Magten was never a member of Clark Fork, it lacks standing to assert these derivative claims.

**1.**  **Asserting that Clark Fork was in the "Zone of Insolvency" Does Not Confer Standing on Magten Because a Creditor Cannot Bring a Direct Action Against Officers or Directors of a Company for Breach of Fiduciary Duty.**

In a transparent attempt to overcome these clear statutory bars to its standing, Magten alleges that Clark Fork's officers and directors owed individual fiduciary duties to it as Clark Fork's creditor because Clark Fork was in the "zone of insolvency" at the time of the Transaction at issue.  (Compl. ¶ 47).  This reasoning is fatally flawed because it impermissibly relies on the

24

premise that an alleged insolvency will transform these claims from derivative claims into direct creditor claims. A creditor cannot bring a direct action against officers or directors of a company for breach of fiduciary duty, regardless of whether the company was solvent, insolvent or in the zone of insolvency. In *Production Resources Group, L.L.C. v. NCT Group, Inc.*, the Delaware Court of Chancery held that:

> More to the current point, the transformation of a creditor into a residual owner ***does not change the nature of the harm in a typical claim for breach of fiduciary duty by corporate directors.***
>
> ***
>
> In other words, even in the case of an insolvent firm, ***poor decisions by directors that lead to a loss of corporate assets and are alleged to be a breaches of equitable fiduciary duties remain harms to the corporate entity itself. Thus, regardless of whether they are brought by creditors when a company is insolvent, these claims remain derivative . . . .*** The reason for this bears repeating-***the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. . . . Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.***

863 A.2d 772, (Del. Ch. Ct. 2004) (emphasis added).

The Supreme Court of Delaware has recently settled any potential question left open by *Production Resources* by holding:

> Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors. Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation. Accordingly, we hold that ***individual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors***.

*North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. Supr. 2007) (internal citations omitted) (emphasis added).[6]

The fact that Montana has not specifically examined the issue of whether a creditor may bring a derivative action does not preclude this Court from applying the analysis set forth in the recent Delaware decisions to this case.  The Montana Supreme Court has frequently looked to Delaware for authority where little exists in Montana.  *See*, *e.g.*, *Inter-Fluve v. Montana Eighteenth Jud. Dist. Ct.*, 2005 MT 103, ¶ 22, 327 Mont. 14, ¶ 22, 112 P.3d 258, ¶ 22 (relying on multiple Delaware decisions addressing the attorney client privilege in the context of corporate directors).  Given the extensive case law and discussions of corporate issues in Delaware, of the *Kondelik* decision, and the clear language of Mont. Code Ann. § 35-8-1104, Montana law falls squarely in line with Delaware's jurisprudence on the issues relating to claims against corporate officers.

### 2.    Magten Cannot Satisfy the Contemporaneous Ownership Requirement Necessary for it to Step into the Shoes of the Members.

Even assuming, *arguendo*, that Magten can get around the bar to its suit based on its lack of membership status by asserting that it is a creditor and thus can bring direct claims against the officers because Clark Fork was in the zone of insolvency, Magten still lacks standing for three reasons.

First, Magten was not a creditor at the time of the Transaction.  See, *Memorandum Decision* dated July 23, 2004 and (b) the *Under Advisement Decision re: Motion to Dismiss* dated August 20, 2004 each issued in *In re NorthWestern Corp.*, No. 03-12872 (CGC).  See also, Uncontested Facts 58-65.

---

[6] While these leading Delaware cases specifically reference directors, as opposed to officers, there is no distinction in the treatment of directors and officers for purposes of fiduciary duties.  For example, under the Montana Business Corporation Act, Mont. Code Ann. § 35-1-101, *et seq.*, corporate directors and officers have identical duties to the entity.  *See* Mont. Code Ann. §§ 35-1-418, 35-1-443.  For purposes of determining the viability of derivative claims, Delaware courts have also made no distinction between directors' and officers' fiduciary duties.  *See generally, Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch., 2004); *see also In re Tower Air, Inc.* 416 F.3d 229, 238 n. 12 (3rd Cir. 2005) ("Unless stated otherwise, we therefore will assume for the purposes of this case that theories of liability against corporate directors apply equally to corporate officers.") citing *Arnold v. Society for Savings Bancorp, Inc.*, 678 A.2d 533, 539 (Del.1996).

26

Second, Clark Fork was not in the zone of insolvency.  Uncontested Facts 69-78.

Third, Magten still cannot satisfy the "contemporaneous ownership" requirements of Mont. Code Ann. § 35-8-1104.  *See* PHJW Opinion, at p. 9.  That statute requires the plaintiff to either have been a member of the company when the Transaction occurred or acquire such status "by operation of law or pursuant to the terms of the operating agreement from a person who was a member ***at the time of the transaction***."  Mont. Code Ann. § 35-8-1104(2) (emphasis added).  Therefore, if Magten were to assert it is somehow permitted to stand in the shoes of the member to assert this derivative action, it must likewise satisfy the "contemporaneous ownership" mandate with which shareholders must comply.

As Judge Farnan noted, the purpose of the Montana statute and the contemporaneous ownership requirement is "particularly applicable here, i.e. to prevent courts from litigating 'purchased grievances.'"  PHJW Opinion, at p. 10.  The Federal Rules of Civil Procedure also reflect this same concern for purchased grievances in Rule 23.1, which provides, in relevant part:

> ***In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association***, the corporation or association having failed to enforce a right which may properly be asserted by it, ***the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law***, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

(emphasis added).

Other courts have similarly concluded that "purchased grievances" or so-called "strike suits," such as the one now before this Court, are prohibited by the contemporaneous ownership requirement.  *See In re Bank of New York Derivative Litigation*, 320 F.3d 291, 297 (2nd Cir. 2003) ("The main purpose of this so-called 'contemporaneous ownership' rule is to 'prevent[ ] ... courts from being used to litigate purchased grievances.'") *quoting* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1828 (2d Ed.1986).

That Magten purchased a grievance or strike suit is not in dispute.  Through the sworn testimony of Magten's sole owner and director, Talton Embry, Magten admitted it purchased the

QUIPS because it believed "[NorthWestern] had engaged in a fraud which had – which gave rise to a fraudulent conveyance claim, which the securities represent a claim on." Uncontested Fact 62. See also, Section III, *infra*. Because Magten intentionally purchased a strike suit, after the Transaction was completed, it cannot satisfy the contemporaneous ownership requirement.

### 3.    The Indenture Does not Confer Standing on Magten.

Magten cannot circumvent the contemporaneous ownership requirement by relying on language contained in the November 1996 Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities ("Indenture"). According to Plaintiff's Complaint, the Indenture "expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue directly to enforce the Property Trustee's rights." (Compl. ¶ 18.) Magten alleges because the Trustee has "failed to enforce the Trust's rights," it "has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were predecessors in interest." (Compl. ¶ 49.)

Magten's theory conferring standing is clearly erroneous and does not establish Magten's right to assert derivative claims on behalf of Clark Fork. The Indenture does not grant Magten legal standing to bring ***derivative claims*** on behalf of Clark Fork. A party's capacity to bring a derivative suit on behalf of a corporation or limited liability company is an equitable right which cannot be contractually assigned or transferred. *See, e.g.*, *Lewis v. Chiles*, 719 F.2d 1044, 1048 (9th Cir. 1983). While a few courts have held that beneficiaries of a trust may have standing to sue where the trust corpus consists of shares, such standing is ***only conferred where the plaintiff is a beneficiary or beneficial owner of shares at the time of the alleged wrongful actions***. *See Silling v. Erwin*, 881 F.Supp. 236, 239 (S.D. W.Va. 1995); *see also Drachman v. Harvey*, 453 F.2d 722 (2nd Cir. 1971) (shareholders owning stock at time of alleged wrongful action have standing to assert derivative claims); *Edgeworth v. First Natl. Bank of Chi.*, 677 F.Supp. 982 (S.D. Ind. 1988). Thus, the limited authority these few courts have granted to trust beneficiaries

is consistent with the contemporaneous ownership requirement set forth in Montana's limited liability company act and the basic premise that courts should not be used to litigate purchased grievances.

Magten was not, and has never been, a member of Clark Fork. Magten was not, has never been, a creditor of Clark Fork. Magten was not a beneficial owner of the trust owning shares at the time the alleged wrongful acts occurred. Therefore, Magten cannot satisfy the statutory requirements of Mont. Code Ann. § 35-8-1104; it lacks standing to sue; and its derivative claims must be dismissed.

## II.    THERE ARE NO MATERIAL FACTS IN DISPUTE WHICH SUPPORT THE BREACH OF FIDUCIARY DUTY CLAIM ASSERTED BY MAGTEN AGAINST HANSON AND KINDT.

According to the Complaint, the critical facts underpinning Magten's breach of fiduciary duty claim alleged against Hanson and Kindt are that NorthWestern was insolvent both immediately before, and immediately after, the Transaction and that Clark Fork was "rendered insolvent" as a result of the Transaction. Compl. ¶ 35. See also Compl. ¶ 47, alleging Clark Fork was in the zone of insolvency on the date of the Transaction; ¶ 50, alleging that because the assets and liabilities were allegedly transferred without adequate consideration, Clark Fork was rendered insolvent; ¶ 51, alleging Hanson and Kindt knew NorthWestern was insolvent. After more than three and a half years of litigation, Magten has been able to adduce no proof that Clark Fork was insolvent after the Transaction, or that NorthWestern was insolvent either immediately before, or immediately after, the Transaction. Since Magten can not prove – and has not proven -- these allegations, its Complaint fails and the action against the Defendants must be dismissed with prejudice.

Magten can point to no documents to support their allegations or that show either Hanson or Kindt knew or should have known that NorthWestern or Clark Fork were insolvent, in the zone of insolvency, or otherwise unable to meet the obligations to the QUIPS holders. Indeed, two internal investigations by NorthWestern's Board of Directors and a separate investigation by

29

the SEC revealed no improper activity on the part of either Hanson or Kindt. Uncontested Fact 47. *See also* affidavits of Hanson and Kindt submitted with this Motion and Brief. Neither can Magten cite to any deposition testimony to support their allegations. In fact, as will be demonstrated below, neither Hanson nor Kindt possessed any information which would have led them to conclude that NorthWestern was insolvent either before or immediately after the Transaction, nor should they have in the absence of any evidence presented by Magten to the contrary.

Further, Magten has presented no expert witness testimony to buttress their allegations against Hanson and Kindt. Rather, Magten's expert witnesses have expressly rendered no opinions as to whether NorthWestern was insolvent either before or after the going flat Transaction. Uncontested Fact 69. One of their experts, Mr. Marcus, has even opined that NorthWestern was liquid both before and after the Transaction. Uncontested Fact 17. Magten's expert, Mr. Berliner, who was "delighted" that he did not have to render a solvency opinion, opines, after more than 3,100 hours of document review and analysis by him and his team of advisors, that, had a good will impairment analysis been done as of June 30, 2002, NorthWestern would have known that it had violated certain debt covenants. Uncontested Fact 69, Berliner Report at 4. However, Mr. Berliner also specifically opined that the individuals at NorthWestern who allegedly hid material information which, had it been known, would have resulted in the interim impairment analysis, were senior management officers of NorthWestern (and not of Clark Fork); and, he specifically testified in his deposition that neither Hanson nor Kindt were among those culpable senior managers. Uncontested Facts 73 - 74.

The only opinion which Mr. Berliner or Mr. Marcus had as to the solvency of Clark Fork immediately after the Transaction was premised upon one assumption they were required to make by Magten's attorneys; namely, that Clark Fork was still liable for the QUIPS obligation after the Transaction was completed. Uncontested Fact 70. As will be demonstrated below, as a matter of law, this assumption is invalid. Moreover, there was no basis for either Hanson or

Kindt to make a *legal* conclusion that the assumption of the QUIPS obligation by NorthWestern was invalid.

Because Magten can not meet its burden of proof and there are no facts which support its legal theory, this case must be dismissed with prejudice.

**A.     Magten Cannot Meet its Burden of Proof Establishing a Claim for Breach of Fiduciary Duty.**

Assuming, *arguendo*, that this Court does not accept the argument outlined above in Section I of this Brief that Magten lacks standing to assert a breach of fiduciary duty claim, the scope of any fiduciary duty owed is limited and Magten has a heavy burden to demonstrate that the Defendants here breached any such fiduciary duty. The fiduciary duties which the Defendants had are set forth in Mont. Code Ann. § 35-8-310, which delineates the duties owed by Members in a Member-Managed limited liability company and the duties owed by a Manager in a Member-Managed limited liability company as the duties of loyalty and care.

The duty of loyalty is defined in Mont. Code Ann. § 35-8-310(2), which provides:

A member's duty of loyalty to a member-managed company and its other members is limited to the following:

> (a) to account to the company and to hold as trustee for it any property, profit or benefit derived by the member in the conduct or winding up of the company's business or derived from use by the member of the company's property, including the appropriation of a company's opportunity;

> (b) to refrain from dealing with the company in the conduct or winding up of the company's business on behalf of a party or as a person having an interest to the company; and

> (c) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

Mont. Code Ann. §35-8-310(3) defines the duty of care:

> A member's duty of care to a member-managed company and the other members in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or knowing violation of the law.

31

Mont. Code Ann. § 35-8-310(8) provides that the duties of loyalty and care set forth above are applicable to a Manager in a Manager-Managed limited liability company.  The breach of fiduciary duty alleged by Magten is that the "officers" of the Member-Managed limited liability company "willfully and wantonly" transferred assets to NorthWestern, without receiving adequate consideration, rendering Clark Fork insolvent, and transferring the QUIPS obligation to NorthWestern when they knew it was insolvent and unable to meet the QUIPS obligations.

To prove its case, then, Magten must prove that each Defendant was not merely careless, but was grossly negligent or reckless in their conduct and each Defendant was grossly negligent or reckless when he failed to know or take reasonable actions to learn that: (a) NorthWestern was insolvent both before and after Transaction, and (b) Clark Fork was both insolvent and was joint and severally liable for the QUIPS payments after the Transaction.  The uncontested evidence in this case does not support any of these allegations.

**B.     There Are No Material Facts in Dispute Which Would Have Caused Hanson to Conclude that NorthWestern Was Insolvent Either Before or Immediately After the Transaction.**

**1.     Hanson Was in Charge of the Utility Operations of NorthWestern and Was not Responsible for the Non-Utility Businesses.**

It is undisputed that at all times material to Magten's Complaint, that is, from February 15, 2002, the effective date on which NorthWestern acquired its unit interest in Clark Fork, until November 15, 2002, the effective date of the Transaction, Hanson was responsible for the Utility Division of NorthWestern, in which the South Dakota and Nebraska utility assets and liabilities were located, and for Clark Fork, which held the Montana utility business assets and liabilities. Uncontested Fact 22.  It is equally undisputed that Hanson was not an officer or manager of NorthWestern's non-utility business, Expanets and Blue Dot.  Uncontested Fact 23.  Magten has consistently maintained throughout this litigation that NorthWestern ultimately was unable to meet its obligations under the QUIPS documents because the non-utility businesses of NorthWestern dragged NorthWestern down so that on September 14, 2003, almost a full ten months after the closing of the Transaction,  NorthWestern declared bankruptcy, an event of

default under the QUIPS Indenture.  Uncontested Fact 51.  However, because Hanson was responsible for the utility business, and only the utility business, he had no personal knowledge of the day-to-day workings of the non-utility businesses.  As Hanson testified, "I did not manage those businesses.  I do not know those details.  All I had was the information given to me."  Uncontested Fact 32; Hanson Depo. p. 124, lns 3-7.  Rather, as he testified during his deposition, he relied upon the representations of his counterparts, the Presidents and CEOs of Blue Dot and Expanets, to report on how those businesses were performing and the predictions of their management for their future performance.  Those predictions consistently were that any problems were being resolved and things were getting better.   Uncontested Fact 32;  Hanson Depo.  p. 112, lns 12 – 23; p 120, lns 8 – 13;  P. 141, lns. 5-8.

> **2.      Hanson Had Limited Knowledge About the Finances of NorthWestern and the Non-Utility Businesses and What Little He Knew  Should Not and Could Not Have Led Him to Conclude that the Transfer of the QUIPS Obligation to NorthWestern Would Create an Immediate Event of Default.**

Hanson had limited information concerning the financial condition of NorthWestern and the non-utility businesses of NorthWestern between February and November 2002; and, that information was not adequate to cause him to conclude that NorthWestern was insolvent either before or after the transaction, or even that NorthWestern was unable to meet its obligations under the QUIPS Indenture after the Transaction was completed.

First, as Hanson testified during his deposition, like everyone else, during the relevant time period in 2002, he reviewed the public filings of NorthWestern, relied upon them, and had no reason to believe at that time that they were false or misleading.  Uncontested Fact 31; Hanson Depo. p. 283, lns 10 – 13. The first, second and third quarter 10 Q's issued by NorthWestern in 2002 contained no information which would lead the reader to conclude that NorthWestern was either insolvent or even in the zone of insolvency.[7]  It is also undisputed that

---

[7] At one point in its Complaint, Magten seems to change its theory of the case and alleges that NorthWestern was in the zone of insolvency, rather than insolvent.  That distinction is immaterial here as a factual matter, since Magten has produced no expert testimony to support either proposition.

it was not until December 13, 2002 that NorthWestern issued an 8K indicating that it might have to restate its financials for 2002; however, as of that time, NorthWestern's auditors had not determined the magnitude of any restatement which might be required. Uncontested Fact 52. That restatement was not issued until April 6, 2003, five months after the Transaction was completed and after NorthWestern had continued to comply with its QUIPS obligations by making both the requisite fourth quarter 2002 and first quarter 2003 payments on the QUIPS. Uncontested Fact 53.

Second, Hanson did receive Monthly Financial Information Reports ("MFIRs") and did attend certain management meetings at which the various businesses of NorthWestern were discussed. Uncontested Fact 25. However, these MFIRs provided only selective information about each of the operating companies and none of this information is sufficient to conclude that NorthWestern would have been unable to make QUIPS payments after November 2002. Uncontested Fact 26. The unrebutted expert report of Mr. Scherf summarizes what Hanson could have gleaned from a review of the MFIRs:

> Our examination of the underlying documents notes that they changed over time
> and did not contain enough information to determine the purpose of their use.
> Therefore any conclusions drawn by Hanson from the information could be
> subject to interpretation or may be speculative.

Scherf Report at 17.

While the MFIRs for May, June and July 2002 do contain charts indicating that Expanets was having continuing problems in repaying cash advances previously made by NorthWestern, the MFIRs even for those months do not contain sufficient information for the reader to conclude that Expanets would never be able to repay its parent. Uncontested Fact 26. Moreover, the MFIRs need to be reviewed in the context of the management presentations which Hanson heard during that time period. As discussed above, and as Hanson's unrefuted testimony reflects, "[e]very time they discussed a problem there was also a discussion of actions they were going to do about it and the constant theme was it's going to improve, going to improve." Hanson Depo. p. 120, lns. 8-13.

34

Likewise, other information available to Hanson during this time period could not – and should not – have led him to conclude that NorthWestern could not pay the QUIPS after November 15, 2002. Mr. Scherf looked at the following additional factors: Board of Directors information, the NCS Audit Report, Board questions concerning Messrs. Hylland and Lewis, and the memoranda from the first part of 2002 requesting bonus consideration. See Scherf Report at 18 – 23. With respect to each of these factors, his unrebutted expert opinion stated "with a reasonable degree of professional certainty" that Hanson "did not know and had no reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries. As such it was perfectly reasonable and within prudent business judgment for Hanson to execute the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern." *Id*. at 23.

Simply stated, there is no evidence to link what was then perceived and disclosed to Hanson as only a temporary inability of Expanets to repay cash advances to NorthWestern in 2002 to an inability of NorthWestern to repay QUIPS obligations after it transferred the assets and corresponding liabilities of the Montana utility business which clearly were generating sufficient cash over the course of the year to satisfy the QUIPS obligations. As a result, Hanson could, and did, execute an officer's certificate in his capacity as CEO of NorthWestern Energy LLC which made two limited representations: first, that the transfer of the assets and liabilities was to a corporation (NorthWestern) duly existing under the laws of the United States; and, second, that the transfer would not create an immediate event of default with respect to the obligations, including the QUIPS obligations. Uncontested Fact 29. These were the only representations which he was required to make and did make to satisfy the terms of the QUIPS Indenture. The fact that NorthWestern ***did*** make the next two succeeding QUIPS payments is evidence that Hanson was correct when he made the representation that the transfer would not

result in an *immediate*[8] event of default.

Finally, Magten has produced no expert opinion that NorthWestern was insolvent at the time of the Transaction. In fact, although it is a critical underpinning of Magten's Complaint against both Hanson and Kindt, Magten has apparently abandoned that allegation and, instead, now has offered testimony through its expert, Mr. Berliner, that had NorthWestern done an impairment analysis as of June 30, 2002, it would have concluded that it was in default on certain loan covenants. Berliner Report at 4. First, this is not what has been pled in this litigation, so the analysis – to the extent it is correct (and both NorthWestern and Hanson and Kindt dispute that it is correct) – is irrelevant to the Complaint here. Second, as Mr. Scherf points out in his expert report, even if such an analysis were done, it is unlikely it would have been completed by November 15, 2002. Scherf Report at , p. 28. Third, as Mr. Berliner testified, it took his firm approximately 3,100 hours to complete his analysis – more than a year's worth of one individual's time – conducted with the benefit of hindsight review of independent appraisals of Expanets and Blue Dot by an internationally recognized appraisal company (and there is no evidence that Hanson had access to or had even seen these appraisals), and internal investigations conducted by NorthWestern after the Transaction was completed. Uncontested Fact 71. Magten can not be heard to say that Hanson should have done a year's worth of expert work between February and November 2002 to reach the same conclusion as Mr. Berliner while Hanson simultaneously managed the utility businesses of NorthWestern in three states.

Magten can not make a credible argument, either as a matter of law or as a matter of fact, that Hanson had a fiduciary duty to investigate in depth the inner workings of other subsidiaries of NorthWestern over which he had no responsibility. The Montana Limited Liability Company Act's recitation of the limited nature of an officer's fiduciary duties imposes no such unreasonable obligation. Rather, the evidence clearly establishes that Hanson neither knew, nor

---

[8] In addition to making these next two payments, NOR exercised its contractual right in May 2003 to defer the QUIPS payments for up to 20 consecutive quarters. This election was likewise *not* an event of default under the QUIPS instruments. In fact, no event of default occurred until the day NOR filed for bankruptcy, ten months after the Transaction. There is no question that the passage of ten months does not constitute an "immediate event of default."

should have known, that ten months later, with the filing of NorthWestern's bankruptcy petition, there would only then be an event of default under the QUIPS Indenture.

       **C.**      **<u>There Are No Material Facts in Dispute Which Would Have Caused Kindt to Conclude that NorthWestern Was Insolvent Either Before or Immediately After the Transaction.</u>**

             **1.**      **Kindt Was the Chief Accountant for the Montana Utility Operations and Was Not Responsible For Nor Did He Have Any Knowledge of the Non-Utility Businesses.**

There is absolutely no evidence which Magten has brought forth to support its contention that Kindt breached any fiduciary duty it may have owed to Magten in November 2002. As a threshold matter, Kindt was not even privy to the meetings, discussion or information to which Hanson was exposed which, as demonstrated above, are inadequate to make out a case against even Hanson. Uncontested Facts 35, 39 - 40. Kindt was at all times material to the case against him the chief accountant for the Montana utility business. He held a similar position with The Montana Power Company prior to February 15, 2002. Kindt was familiar with the Montana utility business, but was not familiar with the details of the obligations with respect to the QUIPS and certainly had no familiarity with the other business entities which NorthWestern owned at the time Clark Fork was acquired by NorthWestern. Uncontested Facts 35 - 43. It was not until some time in the summer of 2002 that for the first time Kindt became responsible for communicating with the Bank of New York, the Trustee under the QUIPS Indenture. And, even then, as he testified, his communications were perfunctory and ministerial in nature. Uncontested Fact 46.

//

2.   **Kindt Had Virtually No Knowledge About the Finances of NorthWestern and the Non-Utility Businesses and Had No Knowledge Which Should or Could have Given Him any Basis to Conclude that the Transfer of the QUIPS Obligation to NorthWestern Would Create an Immediate Event of Default.**

Kindt's only exposure to the business of NorthWesten's other subsidiaries was in early 2002, shortly after NorthWestern acquired the Montana utility business, at a management meeting involving representatives of all of NorthWestern's business units. At that meeting, he heard a presentation in which the CEOs of Expanets and Blue Dot explained that neither company was meeting its targets for 2002, but both predicted that by year end their respective companies would be meeting their goals. This was Kindt's only exposure to financial information about those companies, other than information contained in the Ks and Qs issued in 2002 by NorthWestern. Uncontested Facts 37 - 44. Kindt never saw any MFIRs, never saw any balance sheets for the other subsidiaries, and never attended any other management presentations about the other subsidiaries. Uncontested Facts 39, 40, 42, 43.

What Kindt did know was that prior to the Transaction, the QUIPS payments had been made, and that there was sufficient cash flow from the Montana utility business to continue to make those payments. Uncontested Fact 44. As Kindt testified during his deposition, NorthWestern had recently completed various financing transactions and he had no reason to even suspect that after November 2002 it would not be able to make the QUIPS payments. Uncontested Fact 45. His expectation was borne out since NorthWestern did, in fact, make the next two QUIPS payments on time after the Transaction was completed. Uncontested Fact 50. See also Footnote 4 *infra*. As previously stated, and as the record makes clear, it was not until ten months afterward that an event of default occurred with respect to the QUIPS.

D.   **There is no Evidence that NorthWestern was Insolvent Either Before or After the Transaction.**

Neither of Magten's experts has rendered any opinion that NorthWestern was insolvent either before or after the Transaction. Neither of Magten's experts has rendered an opinion that

NorthWestern was even in the zone of insolvency either before or after the Transaction.  Mr.
Marcus, during his deposition, admitted that there was not even a liquidity issue at NorthWestern
either immediately before or immediately after the Transaction (or throughout the year 2003 for
that matter) and the liquidity of NorthWestern "was not all that important."  Uncontested Facts
17, 69; Marcus Depo. p. 139, lns 17 – 24.  Thus, there is no evidence that the financial condition
of NorthWestern pled in the Complaint has any basis in fact.

Moreover, as Mr. Scherf concludes in his expert report, after reviewing the spreadsheets
and other financial documents contained in the Berliner report submitted by Magten, the very
financial information relied upon by Mr. Berliner demonstrates that NorthWestern was solvent
on November 15, 2002.  Scherf Report at 12.  As Mr. Scherf concludes, "We are not aware of
any analysis that has concluded that NorthWestern was insolvent or even in the 'zone of
insolvency' as of November 15, 2002."  *Id.*; *see also*, Uncontested Fact 72.

In view of the fact that Magten can not demonstrate that NorthWestern was insolvent at
the times material to their Complaint here, and with the unrebutted expert report of Mr. Scherf
reaching the opposite conclusion based on the information proffered in the Berliner report and
used by Berliner to reach his opinions, there is no factual predicate for the Complaint.

     **E.**    **There Are No Material Facts in Dispute Which Would Have Caused Either
Hanson or Kindt to Conclude that Clark Fork Was Rendered Insolvent
Immediately After the Transaction.**

     **1.**    **There Was No Reason for Either Defendant to Believe that the
Assumption of the QUIPS Obligation by NorthWestern Was
Invalid as a Matter of Law.**

The Transaction was carefully documented, with the appropriate resolution passed by the
Board of Directors of NorthWestern, the sole Member-Manager of NorthWestern Energy LLC,
on August 7, 2002 authorizing NorthWestern's guarantee of payment of the QUIPS obligation
and authorizing the transfer of substantially all of the assets and liabilities of the Montana utility
business to the parent from its wholly owned subsidiary.  Uncontested Facts 11 - 120.  Shortly
thereafter, NorthWestern also executed a Second Supplemental Indenture and Amendment to the
Guarantee Agreement under the terms of which NorthWestern became jointly and severally

liable with Clark Fork for the QUIPS obligation.  Then, on the closing date of the Transaction, NorthWestern and Clark Fork executed, among other documents, the Asset and Stock Transfer Agreement by which NorthWestern received substantially all the assets and liabilities, the Environmental Support Agreement between NorthWestern and Clark Fork, and the Administrative Support Agreement between NorthWestern and Clark Fork.  Also, included among the closing documents was the Officer's Certificate executed by Hanson, discussed above, in which he stated that the transaction would not create an immediate event of default with respect to the QUIPS.  Uncontested Facts 13 - 14.  Other closing documents for the transaction included a Notice to the Trustee, Bank of New York, of the restructuring transaction, opinions of counsel concerning the validity of the transaction, a Third Supplemental Indenture under the terms of which NorthWestern expressly assumed the obligations to make the QUIPS payments pursuant to the Indenture, an Agreement between Clark Fork and NorthWestern under the terms of which NorthWestern assumed the Guarantee of payment of the QUIPS, and an Agreement between those same entities under which NorthWestern assumed the obligation to make all payments with respect to the QUIPS. Uncontested Fact 21.

Kindt's sole role in connection with the Transaction was to adjust the books of Clark Fork to reflect the transfer of the assets and liabilities related to the Montana utility business to a division of NorthWestern, and to transmit certain closing documents to the Bank of New York. As Kindt testified at his deposition, these ministerial tasks were easily accomplished.  He had no other substantive role and, as he also testified and as discussed above, he had no reason to believe that NorthWestern would not be able to pay the QUIPS-related debt.  Uncontested Facts 36 - 46.

Hanson, while a lawyer by education, was not one of the legal counsel to the Transaction. Rather, as discussed above, his involvement in the Transaction was in his capacity as CEO of Clark Fork.  In that capacity he did read the relevant transaction documents and the underlying documents referenced in his Officer's Certificate.  Uncontested Facts 28 - 29. He had no reason to believe, and certainly was never asked to render a legal opinion, concerning the validity of the

40

assumption by NorthWestern of the QUIPS obligations.  What Hanson did know from a review of the documents, as discussed below, is that the Indenture permitted the assumption under certain conditions which, as far as he knew in November 2002, were met.  Uncontested Facts 28 - 29.

> ### 2.    The Assumption of the QUIPS Obligation by NorthWestern Was and Is Valid.
>
> #### a.    The Terms of the Relevant Documents on which Magten Bases Its Claim Expressly Permitted the Transfer of the Assets and Liabilities at Issue Here from Clark Fork to NorthWestern.

As discussed earlier in this brief, and as admitted by Mr. Embry, Magten first acquired the QUIPS some six months after the Transaction, with full knowledge of the Transaction and its effects.  Uncontested Facts 58 - 59.  Magten acknowledges it was not a creditor of Clark Fork at the time of the Transaction.  By that time, by operation of the Trust Indenture documents, Magten's predecessors were no longer creditors of Clark Fork, but were creditors of NorthWestern.  Further, Magten had actual knowledge of these facts, as it acquired the QUIPS beginning no earlier than six months after the Transaction was completed and after performing due diligence.  Uncontested Facts 50 - 59.

Under the Second Supplemental Indenture, executed by the Trustee, Clark Fork reserved the right to transfer all of its assets to NorthWestern and that such transfer would relieve Clark Fork of "its obligations under the QUIPS Debenture, the Indenture and hereunder as provided in Article Eleven of the Indenture."  Uncontested Fact 13.  Section 1101 of the Indenture clearly empowered Clark Fork, to "convey or otherwise transfer, or lease, its properties and assets substantially as an entirety to any Person."  Indenture § 1101.  The prerequisites of any such transaction were also spelled out in Section 1101(a) of the Indenture, which required only that: the surviving corporation to be "organized and validly existing under the laws of the United States, and State thereof …" and the surviving corporation "assume" in an indenture "executed and delivered to the Trustee, in form satisfactory to the Trustee" the "due and punctual payment of the principal of and premium, if any, and interest, if any, on all Outstanding

Securities and the performance of every covenant of the Indenture on the part of the Company to be performed or observed."

The Indenture also expressly states that a transfer of assets conducted in accordance with section 1101 of the Indenture has the affect of releasing the predecessor entity of all obligations under the Indenture for any Outstanding Securities thereunder.  *See* Indenture, §§ 1101-1102. The Indenture controls the rights of Magten and Magten can not be allowed to object to acts that were performed in accordance with the terms of the Indenture.  *cf. In re Holiday Mart, Inc.*, 715 F.2d 430, 432 (9th Cir. 1983) (recognizing that valid subordination agreements are normally enforced in accordance with their terms).  Since the transfer of the Montana utility business complied with Section 1101 of the Indenture and released the predecessor entities under Section 1102, Magten can not be heard to say that anyone violated any alleged duty when the Transaction was completed in accordance with the rights granted under the Indenture.

The Indenture also allows property of the original entity to be transferred to "a Person organized and validly existing under the laws of the United States, any State thereof, or any other jurisdiction."  *See* Indenture, § 1101.  The only other requirements in Section 1101 of the Indenture are that, **_immediately after_** the transaction, no Event of Default "**_shall have occurred and be continuing_**" and that the Trustee receive an "Officer's Certificate and an Opinion of Counsel, each stating all of the conditions for the transfer have been met."  *See* Indenture, § 1101(b)-(c).  Importantly, Magten has not alleged, and cannot allege, noncompliance with either of these remaining requirements.  Conspicuously absent from the Indenture is any requirement of approval by the Indenture Trustee or a holder of an interest in the Indenture Trust prior to a transfer.  *See* Indenture, Sec. 1101.  Therefore, the Transaction complained of here complied with § 1101, and the transfer was thus valid.

The Second Supplemental Indenture, signed by the Trustee, also clearly preserves the right of Clark Fork to transfer substantially all of its assets to another entity and clarifies that this right includes the right of Clark Fork to transfer substantially all of its assets to NorthWestern. *See* Uncontested Fact 13.  The language is also clear that such a transfer to NorthWestern would

relieve Clark Fork of "its obligations under the QUIPS Debenture, the Indenture and hereunder as provided in Article Eleven of the Indenture." *Id.*

At the same time that the Second Supplemental Indenture was executed, the Trustee, NorthWestern, and Clark Fork also executed an Amendment to Guarantee Agreement. The Amendment to Guarantee Agreement contains language similar to the Second Supplemental Indenture; it reserves the right of Clark Fork to transfer substantially all of its assets to another entity, and clarifies that this right includes the right of Clark Fork to transfer substantially all of its assets to NorthWestern. *See* Amendment to Guarantee Agreement, section 201. The agreement also makes clear that such a transfer can be accomplished in compliance with the Indenture. *See* Amendment to Guarantee Agreement, section 201.

These documents further confirm that a transfer of the Montana utility assets and liabilities from Clark Fork to NorthWestern, in compliance with the Indenture, was permissible. The transfer of the Montana utility assets and liabilities by Clark Fork to NorthWestern was allowed by the Indenture and confirmed in later documents executed by the Trustee; the transfers were within the rights granted to Clark Fork and NorthWestern by the Indenture and these other documents. Magten, therefore, can not now complain because NorthWestern and Clark Fork exercised their rights under documents approved by the Trustee of the QUIPS. Nor may Magten hold the "officers" of the limited liability company liable for a transfer of assets and liabilities permitted by those governing documents, approved by the Trustee, and required by the sole member and manager of Clark Fork.

Further, all parties executed the Third Supplemental Indenture in which NorthWestern "expressly assume[d] the due and punctual payment of the principal of and premium, if any, and interest, if any, on all Outstanding Securities issued under the Indenture and the performance of every covenant of the Indenture on the part of NorthWestern Energy to be performed or observed." Third Supplemental Indenture, § 101. And, in fact, NOR did timely make payments which were due following the Transaction.

43

        **b.**      **Clark Fork Was Validly Released from Any Obligation to Make QUIPS Payments.**

In the NorthWestern Bankruptcy in the adversarial proceeding *Magten v. NorthWestern Corp.,* Case No. 03-12872 (CGC), ADV. NO. 04-53324, Judge Case in his order dated August 20, 2004, after reviewing the Indenture, the Second Amendment, and the Guarantee discussed above, held:

> Here, the Indenture specifically provides that Clark Fork is released from its underlying liability on the debentures in a Section 1101 transaction. All of those obligations, including making distributions to the Trust for the purpose of paying the [QUIPS] Holders, now lie exclusively with the successor in interest, here Debtor NorthWestern. Given the quasi *in rem* nature of the guarantee, it is nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction) would retain any liability under the Guarantee. It only makes sense that any such liability is released as well.
>
> … Because a transaction that is permitted under Article Eleven automatically effects a release of the underlying debt, it is consistent to conclude that such a release would also extend to the guarantee.
>
>        *       *       *
>
>       For these reasons, ***the Court concludes that Plaintiffs are not creditors of Clark Fork*** because of the Guarantee. Rather, ***Clark Fork's obligations under the Guarantee, to the same extent as its obligations under the Debentures, were released*** in the Section 1101 transaction with NorthWestern.

Order dated August 20, 2004 at 8 – 9. (emphasis added).

Thus, it has already been judicially determined that the assumption of the QUIPS obligations by NorthWestern relieved Clark Fork of any further obligations. Therefore, Magten, which purchased their QUIPS after the Transaction, was never a creditor of Clark Fork.

        **c.**      **There is no Evidence Clark Fork was Insolvent After the Transaction and, the Solvency of Clark Fork Notwithstanding, the Issue is Moot in the Face of a Valid and Binding Assumption of the QUIPS Obligations by NorthWestern.**

The record is clear that Clark Fork was not insolvent immediately after the Transaction, nor is it insolvent today. In fact, Magten's expert, Mr. Berliner, had no opinion concerning the solvency of Clark Fork after the Transaction, absent the flawed

legal assumption which Magten's attorneys required him to make.  For the reasons set forth in the preceding section, that assumption is incorrect as a legal matter; and, therefore, the issue of the solvency of Clark Fork is itself moot.  The only way Magten arguably can obtain any relief from some source is if it can demonstrate that the release of Clark Fork was procured by fraud as part of a fraudulent conveyance transaction.  *See* Order of August 20, 2004, *supra*, at 9.  However, the case against Hanson and Kindt is ***not*** one in which a fraudulent conveyance has been pled.  Rather, the case against them here is for an alleged breach of fiduciary duty.  However, as explained above, any claim for a breach of fiduciary duty by Hanson or Kindt must be premised upon what they reasonably could be expected to have known at the time of the Transaction.  They were entitled to rely upon the presumptive validity of the terms of the Indenture, the Second and Third Amendments to the Indenture, and the Assumption of the Guarantees which created a valid release of Clark Fork from any further liability to make QUIPS  payments.

## III.  MAGTEN'S RECOVERY OF COMPENSATORY DAMAGES IS LIMITED BY OPERATION OF MONTANA LAW.

### A.  <u>Montana Law Does Not Allow a Party to Profit From Compensatory Damages and Thus Limits the Amount of Compensatory Damages Recoverable by Magten Because Magten Cannot Collect More in Compensatory Damages Than It Spent Purchasing the QUIPS.</u>

In *Spackman v. Ralph M. Parsons Co.*, 147 Mont. 500, 414 P.2d 918 (Mont. 1966), the Montana Supreme Court described the purpose and availability of compensatory damages under Montana's tort law.  The *Spackman* Court stated that:

> As for the issue of compensatory damages, the question is always a difficult one. In tort actions, the wrongdoer is liable, in general, for any injury which is the natural and probable consequence of the wrong. These may include both the direct and indirect, but reasonably probable, results of the wrong. Where damage to property is concerned, the purpose of awarding damages is to return the party injured to the same, or as nearly possible the same, condition as he enjoyed before the injury to his property. ***The injured party is to be made as nearly whole as possible-but not to realize a profit.  Compensatory damages are designed to compensate the injured party for actual loss or injury-no more, no less.***

*Id*. at 506 (emphasis added).

*Spackman's* holding that an injured party cannot profit from compensatory damages has been relied upon by the Montana Supreme Court in cases such as *Burk Ranches, Inc. v. State*, 242 Mont. 300, 307, 790 P.2d 443, 447 (Mont.1990) and *Sunburst School Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 40, 338 Mont. 259, 272, 165 P.3d 1079, 1088 (Mont. 2007). While *Burk Ranches*, *Chandler v. Madsen*, 197 Mont. 234, 642 P.2d 1028 (Mont. 1982), and other cases have made it clear that *Spackman* may lose some of its vitality when applied to real property disputes, *Spackman* still very much applies to "readily replaceable items with an established market value." *See*, *Chandler*, 197 Mont. at 243 ("This Court approved the determination of damages and noted that the *Spackman* rule dealt with readily replaceable items with an established market value."); *see also Sunburst School Dist. No. 2 v. Texaco*, 2007 MT 183, ¶ 29 (*stating Spackman* did not apply in that case because the issue did not involve a readily replaceable item of personal property with an established market value).

The QUIPS at issue in this case are readily replaceable items of personal property with an established market value. Therefore, *Spackman's* prohibition against profiting from compensatory damages applies, and Magten is not entitled to any recovery for compensatory damages which exceeds the amount Magten actually paid for the QUIPS.

## B. Magten Failed to Mitigate its Damages, and Instead Purchased a Strike Suit, Further Limiting or Precluding its Recovery of Compensatory Damages.

Montana law also requires an injured party to act reasonably under the circumstances so as not to unnecessarily enlarge damages caused by a default or injury. *Performance Machinery Co., Inc. v. Yellowstone Mountain Club, LLC*, 2007 MT 250, ¶ 42, 339 Mont. 259, 169 P.3d 394, 403 (Mont. 2007), (*citing Gierke v. Walker*, 279 Mont. 349, 354, 927 P.2d 524, 527 (1996)). This rule applies to both tort and contract actions. *See*, *Spackman*, *supra*, (tort claim regarding the negligent severing of a sewer line); *Harrington v. Holiday Rambler Corp.*, 176 Mont. 37, 575 P.2d 578 (Mont. 1978) (contract dispute regarding alleged defects in a travel trailer).

A party must attempt to mitigate their damages and cannot collect damages that they enlarged by their own unreasonable actions or by failing to take reasonable actions. *See*,

*Performance Machinery Co., Inc., supra*, (Performance Machinery was not entitled to loss of use damages that it could have avoided by fixing the damaged vehicle); *Town Pump, Inc. v. Diteman*, 191 Mont. 98, 104, 622 P.2d 212, 216 (Mont. 1981) (*holding* "Whether one regards it as a rule under indemnity, or as an application of the principle of proximate cause, or of the rule requiring mitigation of damages, ***there can be no recovery*** for damages which might have been prevented by reasonable efforts of the claimant." (emphasis added, citations omitted)).  The test for whether a party should have acted to mitigate the damages is what an ordinary prudent person would be expected to do if capable, under the circumstance.  *McPherson v. Kerr*, 195 Mont. 454, 459, 636 P.2d 852, 855, (1981) (*citing*, *Spackman, supra*).  If the actions taken by the claimant are not reasonably calculated to mitigate the damages, the claimant is not entitled to a recover compensatory damages or the recovery must be reduced by the amount mitigation efforts would have recovered.

In his sworn deposition testimony, Talton Embry, Magten's sole director and officer, admitted that Magten ***intentionally purchased QUIPS to increase the amount of damages*** it might collect in a lawsuit against Northwestern.  Uncontested Fact 62, Embry Depo. p. 94, ln. 9-19 (Q.  Why did you continue to buy QUIPS after NorthWestern was in bankruptcy?  A.  I thought it was a good investment.  Q.  Why did you think it was a good investment?  A.  Because the company had engaged in a fraud which had – which gave rise to a fraudulent conveyance claim, which the securities represents a claim on.").  Magten's campaign to intentionally enlarge its damages through its own actions is in direct contravention of Montana's requirement that every party mitigate their damages.

That Magten sought to purchase a strike suit is made evident by a review of a series of public statements made by NorthWestern beginning before Magten acquired its first QUIPS.

On April 16, 2003, NorthWestern filed amended Quarterly Reports on Form 10-Q/A for the periods ended March 31, 2002, June 30, 2002, and September 30, 2002. NorthWestern Corp., Form 8-K (April 16, 2003).  NorthWestern simultaneously filed its 2002 Annual Report on Form 10-K. NorthWestern Corp., Form 8-K (April 16, 2003).  In that filing, Northwestern reported

losses on common stock for the year ended December 31, 2002, of $892.9 million, or $30.04 per diluted share, compared with earnings on common stock of $37.5 million or $1.53 per diluted share in 2001. NorthWestern Corp., Form 8-K (April 16, 2003).

> In the news release describing the company's losses in 2002, NorthWestern stated:
>
> Given [NorthWestern's] significant debt, ***the board of directors intends to review the appropriateness of each periodic interest payment of its trust preferred securities*** in light of, among other things, the progress of its turnaround plan and [NorthWestern's] liquidity needs. ***[NorthWestern] has the right to defer interest payment for up to 20 consecutive quarters. If interest payments are deferred, cash distributions on the trust preferred securities will also be deferred.*** In each case, interest would accrue on payments.
>
> Absent the receipt of significant proceeds from the sale of noncore assets, the raising of additional capital or a restructuring of existing debt, [NorthWestern] will not be able to meet its substantial debt maturities.

NorthWestern Corp., Form 8-K (April 16, 2003) (emphasis added).    Magten made its first purchases of QUIPS on April 30, 2006, two weeks after NorthWestern warned that it may not be able to meet its debt obligations[9].   Uncontested Fact 58.  Magten made another purchase on May 12, 2003. Uncontested Fact 60.

On May 15, 2003, NorthWestern stated that its board of directors was reviewing its ability to meet its upcoming payments on NorthWestern's Trust Preferred Securities and clearly stated that it is "likely that such payments will be deferred." NorthWestern Corp., Form 8-K (May 15, 2003).

---

[9] Clearly, Magten is a distressed debt investor in the QUIPS and it operates outside the lines of ordinary prudence. The Delaware Court of Chancery's description of the complaint in ***Lazard Debt Recovery GP, LLC. v. Weinstock***, 864 A.2d 955, 960 (Del.Ch. 2004) provides insight into the methods of the distressed debt investor:

> Investment in distressed debt is a risky, complicated and potentially lucrative business, in which the [] investment team must identify distressed debt opportunities by leveraging off the extensive relationships that have been established with investors, brokers, banks and other advisory professionals. Having identified distressed debt opportunities, the investment team[] must then perform rigorous credit analyses and make assessments about intrinsic values and the probability and timing of key events that drive the market recognition of values. Given the volatility and relative instability of distressed debt companies, investments must be monitored daily, with numerous trades being executed each day.

*Id.*

On May 23, 2003, NorthWestern issued a press release announcing that its "Board of Directors has elected to defer interest payments on the subordinated debentures of all series of its trust preferred securities" including the QUIPS.  NorthWestern Corp., Form 8-K (May 23, 2003).  In describing the decision to defer payment on the QUIPS, Gary Drook, NorthWestern's acting CEO at that time, stated:

> We are focused on NorthWestern's turnaround and are committed to taking appropriate actions to restore financial stability to [NorthWestern.]  Although deferring interest payments on the subordinated debentures and, consequently distributions on our trust preferred securities was a difficult decision by the Board, it will result in a reduction of cash expenditures of approximately $30 million annually which is necessary to help improve [NorthWestern's] liquidity.

NorthWestern Corp., Form 8-K (May 23, 2003).

Despite these disclosures and despite that NorthWestern elected to avail itself of its contractual rights under the QUIPS instruments to defer payments made on the QUIPS for up to twenty consecutive quarters, Magten did not attempt to mitigate its damages by halting its campaign to acquire QUIPS or by attempting to liquidate its QUIPS holdings.  Instead, Magten began a massive buying binge on June 3, 2003 that continued well through NorthWestern's Bankruptcy and continued even after Magten filed this instant lawsuit against Hanson and Kindt.  Uncontested Facts 60, 62, 63; *see also*, Embry Depo. p. 91, ln. 3-7 ("Q. You continued to buy QUIPS after NorthWestern Corporation filed for reorganization and bankruptcy in September 2003, correct?  A.  Correct.").

Further, on or about September 14, 2003, NorthWestern filed its petition in Bankruptcy.  NorthWestern Corp., Form 8-K (September 15, 2003).  The filing of the bankruptcy petition was an event of default under the QUIPS instruments.  Magten admits that as a result of the bankruptcy, "Magten and other QUIPS holders are likely to receive little to no recovery for their claims in NorthWestern's reorganization plan."  Compl. ¶ 44.  However, instead of fleeing from the effects of a pending catastrophe, Magten ran towards it – continuing to purchase QUIPS after NorthWestern filed for bankruptcy.  Uncontested Fact 60; Embry Depo. p. 91, ln. 3-7.

As a result of its own actions, Magten is precluded by operation of Montana law from recovering damages for compensatory losses it intentionally incurred after NorthWestern deferred its payment obligations on the QUIPS and certainly after NorthWestern filed for bankruptcy which triggered an event of default on the QUIPS. Uncontested Facts 51, 54, 56, 58, 60, 62, 63. Magten's compensatory damages for out-of-pocket losses for QUIPS purchases made prior to May 23, 2003 must also be reduced by the amount of loss Magten could have mitigated if it had sold the QUIPS after NorthWestern's May 23, 2003 announcement it was deferring its payments on the QUIPS.

Magten was not purchasing the QUIPS with the belief that NorthWestern would be able to satisfy its QUIPS obligations. To the contrary, Magten purchased the QUIPS specifically because it believed that ownership of the QUIPS allowed the holder to participate in a "fraudulent conveyance claim." *See*, Embry Depo. p. 94, ln. 9-19. Mr. Embry's admission demonstrates that Magten purchased the QUIPS after NorthWestern's public announcements and continued after it filed for bankruptcy only to enlarge any possible compensatory damages that it may receive in a fraudulent conveyance action. Magten's purposeful enlargement of its alleged injury is a blatant violation of Montana's mitigation of damages requirement and therefore precludes any recovery of damages incurred after May 23, 2003, and certainly after September 14, 2003.

## IV.    THE UNDISPUTED FACTS FAIL TO PROVIDE A BASIS TO AWARD PUNITIVE DAMAGES.

Under Montana law, reasonable punitive damages may be awarded only when the plaintiff can prove the defendant acted with actual fraud or actual malice. Mont. Code Ann. § 27-1-221(1). All elements of the claim for punitive damages must be proven by clear and convincing evidence, meaning "there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Mont. Code Ann. § 27-1-221(5). Clear and convincing evidence "is more than a preponderance of evidence but less than beyond a reasonable doubt." *Id.* Because the undisputed facts demonstrate neither actual fraud nor actual

50

malice on the part of Hanson or Kindt, Defendants are entitled to judgment as a matter of law on Plaintiff's request for punitive damages.

### A.    Plaintiff Can Prove No Set of Circumstances Indicating Actual Fraud by Hanson or Kindt.

A defendant is guilty of actual fraud only if the defendant: (1) makes a representation with knowledge of its falsity; or (2) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury.  Mont. Code Ann. § 27-1-221(3).  Further, "[a]ctual fraud exists only when the plaintiff has a right to rely upon the representation of the defendant and suffers injury as a result of that reliance.  Mont. Code Ann. § 27-1-221(4).

In the present case, the undisputed evidence clearly proves that neither Hanson nor Kindt: (1) made any representations to Magten, (2) knew of any falsity in representations made to Magten or any other individuals or entities; or (3) concealed any material facts with the purpose of depriving Magten of property or legal rights or otherwise causing injury to Magten.

Plaintiff can prove no set of facts whereby Hanson or Kindt made any false or misleading representations to Magten (or to any other QUIPS holder) or whereby Magten (or any other QUIPS holder) relied on any such representations, let alone had a right to rely on such representations, and thereby suffered injury as a result of such reliance.  As discussed above, at the time of the Transaction, Magten had no ownership in or creditor relationship with either Clark Fork or NorthWestern.  Magten did not begin purchasing the QUIPS until April 2003, more than five (5) months after the Transaction.  Uncontested Fact 58.  Yet Hanson's and Kindt's purely ministerial roles in the Transaction constitute the sole basis for Magten's claims against them.  Therefore, it is factually impossible for Magten to have relied on any representation by Hanson or Kindt.  Similarly, Magten could not have been injured by its

reliance on any representation made by Hanson or Kindt as the Transaction had already occurred by the time Magten first acquired its interest in the QUIPS.

Further, the record is entirely devoid of any evidence proving Hanson or Kindt knew of any falsity in representations or concealed material facts from Magten. Both of Plaintiff's experts testified they made no determination that either Hanson or Kindt perpetrated any wrongdoing. Uncontested Fact 72. In fact, Mr. Berliner testified in his deposition that the individuals responsible for NorthWestern's alleged GAAP violations, failure to timely recognize goodwill impairments, failure to comply with SEC disclosure requirements, and knowing dissemination of materially false and misleading information to the public were officers and directors of NorthWestern, not Clark Fork. Uncontested Facts 73-74. Mr. Berliner specifically identified four senior NorthWestern managers as the allegedly culpable persons. Uncontested Fact 73. Neither expert opined that either Hanson or Kindt played any role in the NorthWestern's alleged misconduct or made any representations or misrepresentations to Magten (or any other QUIPS holders).

Similarly, there is no evidence contained in the more than 500,000 pages of discovery produced by Hanson, Kindt and NorthWestern in this litigation[10] which indicate Hanson or Kindt participated in any false statements or material concealments. *See*, Section II, *supra*. In fact, Magten cannot point to a single document linking Hanson or Kindt to any misstatements or knowledge of any misstatements. *See* Undisputed Facts 22-34, 37-46, 72-74; *see also* Scherf Report p. 23. Rather, after two internal investigations and an SEC investigation, no internal disciplinary action and no SEC civil or criminal action has been brought against either Hanson or Kindt. Undisputed Fact 47.

---

[10] Documents produced by NorthWestern are in regards to the matter of Magten v. NorthWestern Corp., C.A. No. 04-1494-JJF, which has been consolidated with this case for purposes of discovery.

As discussed in detail above, Magten's claim against Hanson and Kindt is, in short, simply a series of unsupported allegations.  Such allegations both fail to establish any breach of fiduciary duty and also fail to establish Hanson or Kindt committed actual fraud.

### B.    Plaintiff Can Prove No Set of Circumstances Indicating Actual Malice Committed by Hanson or Kindt.

A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (1) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (2) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.  Mont. Code Ann. § 27-1-221(2).  Even where a defendant is found to have breached his fiduciary duties to a plaintiff, punitive damages may be inappropriate.  *Trifad Entertainment, Inc. v. Anderson*, 2001 MT 227, ¶¶ 49, 56, 306 Mont. 499, ¶¶ 49, 56, 36 P.3d 363, ¶¶ 49, 56.

In *Trifad*, a corporation and its majority shareholder sued the company's minority shareholder based on the minority shareholder's sale of corporate assets without approval from the majority shareholder.  *Id*. at ¶ 31.  The Montana Supreme Court reversed the district court's finding that the minority shareholder did not breach his fiduciary duties.  *Id*. at ¶ 49.  However, the Court upheld the district court's refusal to award punitive damages.  *Id*. at ¶ 56.  In so holding, the Court reasoned that the minority shareholder engaged in an unauthorized sale of corporate assets, but the facts did not support a finding that he did so with "knowledge that his actions would create a high probability of injury to the [corporation and majority shareholder] or that he intentionally concealed his actions to injure" these parties.  *Id*. at ¶ 55.  Instead, the Court considered the evidence that the defendant believed he should transfer the assets based on the majority shareholder's imprisonment and doing so was in the best interests of the corporation

and its majority shareholder.  *Id*.  Further, while the defendant failed to inform the majority

shareholder of the sale, such conduct did not amount to actual malice or actual fraud.  *Id*. at ¶ 56.

The present case is analogous to *Trifad*.  As discussed above, Hanson and Kindt were

officers of Clark Fork.  Uncontested Facts 22, 35.  Both individuals had limited roles in the

Transaction and had no decision-making authority in this process.  Uncontested Facts 34, 37,

Specifically, Kindt only provided limited ministerial accounting activities relating to the

Transaction, and was never asked to consider the financial impacts of the Transaction on Clark

Fork or NorthWestern.  Uncontested Facts 35-46.  In fact, Kindt had no knowledge that

NorthWestern's 2002 financial statements were false or misleading or of its alleged inability to

service the QUIPS obligations after the Transaction.  *Id*.  To the contrary, based upon the

information that Kindt did have available to him, he believed NorthWestern had the "financial

wherewithal" to service the QUIPS obligations and was unaware of any concerns with

NorthWestern's liquidity or cash flows.  Uncontested Fact 44.  Finally, Kindt justifiably relied

on the Support Agreements in believing Clark Fork would continue to maintain positive cash

flow.  Uncontested Facts 19, 20, 45; *see also* Scherf Report p. 11.  In fact, NorthWestern did

meet all of its QUIPS obligations and did not default on those obligations until nearly a year after

the Transaction was completed.  Uncontested Facts 50-51.

Similarly, Hanson's role in the Transaction was limited to ministerial duties he performed

as President and CEO of Clark Fork.  Concerning the Transaction, Hanson, at the direction of

NorthWestern, executed two Officer's Certificates certifying that the Transaction complied with

the terms and conditions of the Indenture.  Uncontested Facts 27-29.  In executing these

certificates, Hanson relied on various internal documents and public filings and presentations

made to NorthWestern's Board.  Uncontested Fact 31.  Hanson did not believe any of these

documents were false or misleading and had no reason for such a belief.  Id.  Hanson further

relied on the management of NorthWestern and on officers of NorthWestern's other operating divisions and subsidiaries regarding any financial matters relating to NorthWestern or its subsidiaries. Uncontested Fact 32. Hanson had no reason to question either the advisability of the Transaction or the ability of NorthWestern to pay the QUIPS obligations. Uncontested Fact 33. Again, NorthWestern did meet all of its QUIPS obligations and did not default on those obligations until nearly a year after the Transaction was completed.

As in *Trifad*, the undisputed facts here clearly demonstrate that neither Kindt nor Hanson acted with actual malice. Kindt and Hanson did not have "knowledge that [their] actions would create a high probability of injury" to Magten or that they "intentionally concealed [their] actions to injure" Magten. Both Kindt and Hanson played very limited roles in the Transaction and were not the parties responsible for making the decision to go forward with the Transaction. Further, neither believed nor had reason to believe that the Transaction was not advisable or that NorthWestern did not have the ability to pay the QUIPS obligations following the Transaction.

Because the undisputed facts show Hanson and Kindt did not act with actual fraud or actual malice, Magten cannot, as a matter of law, prove a claim for punitive damages. Therefore, Hanson and Kindt are entitled to judgment as a matter of law on the issue of punitive damages.

## V.    MAGTEN IS NOT ENTITLED TO ATTORNEYS FEES OR COSTS.

The longstanding rule in Montana, often referred to as the American Rule, is that absent statutory or contractual authority, attorney's fees will **not** be awarded to the prevailing party in a lawsuit. *Erker v. Kestner*, 296 Mont. 123, 134, 988 P.2d 1221, 1228 (1999) (citations omitted). Here, there is no contractual or statutory provision that entitles Magten to any award of attorneys fees related to its allegations of breach of fiduciary duty. *See e.g., Satori v. S & S Trucking, Inc.*, 332 Mont. 503, 509, 139 P.3d 806, 809 (2006) (*holding* there was no specific contractual provision in agreement at issue to award attorneys fees *and therefore denying* such an award.)

55

Only in rare instances may a district court award attorney's fees to make an injured party whole under its equity powers. *Id.* 296 Mont. at 135; 988 P.2d 1228 (citations omitted). The exception permitting such rare awards of attorneys fees "has been narrowly drawn and is applicable only where the action into which the prevailing party has been forced is utterly without merit or frivolous, and only in cases with particularly limited facts." *Id.* (citations omitted). The Montana Supreme Court has also held, "that where a party chooses to institute a suit against others, an award of attorney's fees to the plaintiff will normally be precluded." *Id.* (citations omitted).

Magten initiated this litigation, and therefore pursuant to the longstanding legal precedent set forth in *Erker*, Magten is not entitled to an award of attorneys fees. The rare and unusual circumstances Montana courts have used to justify invoking the exception to the general rule do not apply here. Further, Magten lacks standing to sue and has failed entirely to assert a single fact supporting its allegations. Rather than bringing a meritorious case, Magten filed suit against these Defendants merely to leverage its position in a thinly veiled attempt to pressure NorthWestern to settle other litigation on terms favorable to Magten. Such motives do not merit the invocation of this Court's equitable power to award attorneys fees. Any claim asserted by Magten for the recovery of attorneys fees and costs should be denied. In fact, if any attorneys fees should be granted, they should be granted to Hanson and Kindt based upon Magten's complete and total failure to offer one shred of expert evidence to support its insolvency or zone of insolvency theories and contentions, the very allegations upon which its Complaint is based.

## CONCLUSION

Magten's Complaint against Hanson and Kindt must be dismissed with prejudice for the following two reasons: (1) Magten lacks standing to bring a breach of fiduciary duty claim against these Defendants; and (2) the undisputed facts demonstrate a complete lack of evidence supporting Magten's claims. To the extent the Court does not enter judgment in Defendants' favor on the first two grounds, Defendants are entitled to judgment as a matter of law limiting or precluding in its entirety any judgment Magten may obtain against Defendants. Finally,

Defendants are entitled to judgment as a matter of law on Plaintiff's request for punitive damages and Plaintiff is not entitled to recover attorneys fees or costs.  For the reasons set forth in this brief, Defendants Hanson and Kindt respectfully request the Court enter judgment as a matter of law against Magten and dismiss this action.

EDWARDS ANGELL PALMER & DODGE LLP

_____

Denise Seastone Kraft (#2778)
919 North Market Street
Wilmington, DE  19801
(302) 777-7770
dkraft@eapdlaw.com
   *Counsel to Michael J. Hanson*
   *and Ernie J. Kindt*

OF COUNSEL:

Stanley T. Kaleczyc
Kimberly A. Beatty
BROWNING, KALECZYC, BERRY
  & HOVEN, P.C.
139 North Last Chance Gulch
Helena, MT  59624
(406) 443-6820

November 30, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 30, 2007, the attached **DEFENDANTS MICHAEL J. HANSON AND ERNIE J. KINDT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

> Victoria Watson Counihan, Esquire
> Greenberg Traurig, LLP
>
> Dale R. Dube, Esquire
> Blank Rome LLP
>
> Kathleen M. Miller, Esquire
> Smith, Katzenstein & Furlow

In addition, the undersigned forwarded a copy of same in the manner indicated below to:

### BY E-MAIL AND HAND-DELIVERY

| | |
|---|---|
| Victoria W. Counihan, Esquire | Dale R. Dube, Esquire |
| Greenberg Traurig, LLP | Blank Rome LLP |
| The Nemours Building | 1201 Market Street, Suite 800 |
| 1007 North Orange Street, Suite 1200 | Wilmington, DE  19801 |
| Wilmington, DE  19801 | |

Kathleen M. Miller, Esquire
Smith Katzenstein & Furlow LLP
800 Delaware Avenue
Wilmington, DE  19801

### BY E-MAIL AND FIRST-CLASS MAIL

| | |
|---|---|
| Steven J. Reisman, Esquire | John Snellings, Esquire |
| Joseph D. Pizzurro, Esquire | Nixon Peabody, LLP |
| Nancy E. Delaney, Esquire | 100 Summer Street |
| Miriam K. Harwood, Esquire | Boston, MA  02110-2131 |
| Curtis, Mallet-Prevost, Colt & Mosle, LLP | |
| 101 Park Avenue | |
| New York, NY  10178-0061 | |

58

Bonnie Steingart, Esquire
Gary L. Kaplan, Esquire
John W. Brewer
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY  1004-1980

/s/ *Denise Seastone Kraft*
Denise Seastone Kraft (#2778)
Edwards Angell Palmer & Dodge LLP
Wilmington, DE  19801
(302) 777-7770
*dkraft@eapdlaw.com*

59