IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-1494-JJF |
| v. | ) ) ) | |
| NORTHWESTERN CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 05-499-JJF |
| v. | ) ) ) | |
| MICHAEL J. HANSON and ERNIE J. KINDT, | ) ) ) | |
| Defendants. | ) ) | |

**AFFIDAVIT OF STEPHEN SCHERF**

| | |
|---|---|
| STATE OF PENNSYLVANIA | ) |
| | :ss |
| County of PHILADELPHIA | ) |

STEPHEN SCHERF, first being duly sworn upon his oath deposes and says:

1.    I am a Managing Director with ESBA Management & Financial Consultants ("ESBA").

2.    I was engaged by Defendant's counsel, Browning, Kaleczyc, Berry, & Hoven, P.C., to render certain expert opinions in the case of *Magten Asset Management Corporation v. Hanson and Kindt.*

3.    Attached to this affidavit is a true and correct copy of my expert report ("Expert Report") dated October 17, 2007.

4.    I incorporate with this affidavit as my sworn testimony my Expert Report and if called upon to testify at trial in this matter, my testimony would incorporate the opinions stated in my Expert Report.

1

Further affiant sayeth not.

Stephen Scherf

Subscribed and sworn to before me this _____ day of November, 2007.

(Notarial Seal)

Notary Public in and for the State of Pennsylvania
Printed Name: NOTARIAL SEAL
Residing at: JANICE LaMARCO - NOTARY PUBLIC
My Commission Expires: City of Philadelphia, Philadelphia County
MY COMMISSION EXPIRES APR. 21, 2011

319737/1674.044

# Exhibit A



# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| _____ | : | |
| MAGTEN ASSET MANAGEMENT | : | C.A. No. 05-499 (JJF) |
| CORPORATION | : | |
|  | : | |
| Plaintiff | : | |
|  | : | |
| v. | : | |
|  | : | |
| MIKE J. HANSON and ERNIE J. KINDT | : | |
|  | : | |
| Defendants | : | |
| _____ | : | |

**CONFIDENTIAL, SUBJECT TO PROVISIONS OF CONFIDENTIALITY AGREEMENT**

---

Expert Report
by
Stephen J. Scherf, CPA

October 17, 2007

---



# TABLE OF CONTENTS

1. BACKGROUND ................................................................................................ 2

2. BASIS FOR ANALYSIS .................................................................................. 3

3. ANALYSIS ........................................................................................................ 4

   3.1. QUIPS ..................................................................................................... 5

   3.2. NORTHWESTERN ENERGY TRANSACTION .................................. 8

   3.3. "ZONE OF INSOLVENCY" ................................................................ 10

   3.4. DOCUMENTS AND INFORMATION AVAILABLE TO KINDT AND HANSON.................. 13

      3.4.1. Information and Documents Available to Kindt................................ 14

      3.4.2. Information and Documents Available to Hanson............................ 16

         3.4.2.1. Monthly Financial and Information Reports ("MFIRs")....................... 16

         3.4.2.2. Board of Directors' Information.............................................. 18

         3.4.2.3. NCS Audit Report.................................................................. 20

         3.4.2.4. Board Questions Concerning Lewis and Hylland ................. 22

         3.4.2.5. Request for Bonus Compensation ......................................... 22

         3.4.2.6. Summary ............................................................................... 23

      3.4.3. Plaintiff's Analysis........................................................................... 23

   3.5. INTERNAL AND EXTERNAL INVESTIGATIONS OF NORTHWESTERN ........................ 24

      3.5.1. Board of Directors Investigations ................................................... 25

      3.5.2. Gibson Dunn Investigation ............................................................. 25

      3.5.3. SEC Activities ................................................................................. 26

   3.6. OBSERVATIONS CONCERNING THE BERLINER AND MARCUS REPORTS .................. 27

      3.6.1. Observations Concerning the Berliner Report.................................. 27

      3.6.2. Observations Concerning the Marcus Report ................................. 30

         3.6.2.1. Opinion 1 – Given Knowledge of Errors & Omissions Asset Transfer Impeded.................................................................................................. 31

         3.6.2.2. Opinion 2 – Absent Transfer QUIPS Investors Covered by NorthWestern Energy Assets ................................................................... 34

         3.6.2.3. Opinion 3 – Solvency of Clark Fork ..................................... 35

   **4. CONCLUSION**.................................................................................................. **35**



**Stephen J. Scherf**
Managing Director
sscherf@esba.com
p 215.568.5788

2 Penn Center Plaza, Suite 1730
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
www.esba.com

CONFIDENTIAL, SUBJECT TO PROVISIONS OF CONFIDENTIALITY AGREEMENT

# MAGTEN ASSET MANAGEMENT CORPORATION
## V.
# MIKE J. HANSON AND ERNIE J. KINDT

Our firm was engaged by Defendants' counsel (Browning, Kaleczyc, Berry & Hoven, P.C.) to assess the allegations made by Magten Asset Management Corporation ("Magten" or "Plaintiff") in its suit against Michael J. Hanson ("Hanson") and Ernie J. Kindt ("Kindt") (collectively the "Defendants"). In addition, it was requested that we provide our observations concerning the Expert Reports of Robert W. Berliner ("Berliner") and Paul A. Marcus ("Marcus") each dated September 19, 2007.

This report sets out the results of our analysis and is structured as follows:

1. Background
2. Basis for Analysis
3. Analysis
4. Conclusions
   Exhibits

# 1. BACKGROUND

The Montana Power Company ("Montana Power") was engaged in telecommunications and energy related activities including oil, coal, natural gas and electricity. In November 1996, Montana Power issued Quarterly Income Preferred Securities ("QUIPS") with a total face amount of $65 million. In March 2000 Montana Power decided to focus its efforts on its telecommunications business and announced plans to restructure its business. In September 2000, Montana Power entered into a Unit Purchase Agreement with NorthWestern Corporation ("NorthWestern") wherein NorthWestern agreed to purchase the Montana utility business of Montana Power, subject to regulatory approval. Upon obtaining such regulatory approval, NorthWestern was allowed to purchase the assets and to hold them either in the form of a wholly owned entity or as a division of NorthWestern. In February 2002, NorthWestern acquired the ownership interests of the Montana Power[1] utility business for $478 million in cash and the assumption of $511 million in debt and preferred securities.[2] Included in the liabilities assumed by NorthWestern as part of the transaction were the QUIPS.

According to press releases and other statements, NorthWestern made it clear to the public that the Montana utility business (now known as NorthWestern Energy, LLC ("NorthWestern Energy")), would eventually become a division of NorthWestern, rather than being held as a separate entity. NorthWestern initially applied for a temporary exemption to hold the energy related assets and liabilities in a separate subsidiary, and ultimately converted NorthWestern Energy into a division of NorthWestern. On November 15, 2002 NorthWestern exchanged its equity interest in NorthWestern Energy for direct ownership of the individual assets and liabilities, excluding the Milltown Dam assets and liabilities.[3]

---

[1] The equity interests were the membership units of Montana Power, LLC that NorthWestern subsequently re-named NorthWestern Energy, LLC.

[2] NorthWestern Form 10-K for the period ended December 31, 2002 filed April 15, 2003, page 5.

[3] NorthWestern Energy, LLC subsequently changed its name to Clark Fork and Blackfoot, LLC ("Clark Fork").

We understand that Magten began to purchase QUIPS in or around April 2003[4] and continued to purchase QUIPS even after NorthWestern filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the District of Delaware on September 14, 2003.[5]  Magten currently owns in excess of 33 percent of the QUIPS.  In April 2004, Magten filed suit alleging damages as a result of a breach of fiduciary duty by Hanson and Kindt, who were officers of NorthWestern Energy at the time of the November 15, 2002 transaction.

## 2. BASIS FOR ANALYSIS

The analysis and opinions in this report are based upon the documentation available to date and my experience in performing similar financial and forensic analyses.  I have been qualified and presented testimony on numerous occasions in courts throughout the United States.  I am a Certified Public Accountant, a Certified Fraud Examiner, a Certified Forensic Accountant, and have a Master of Science degree with a concentration in Finance.  Furthermore, I have been an officer of several organizations including being a Senior Vice President of a $2.5 billion financial institution and Chief Financial Officer of two privately held organizations.

I am a Managing Director with ESBA.  My current curriculum vitae and information concerning my testimony history, publications and speaking engagements is attached as Exhibit A.

I, and others under my direct supervision, have performed this analysis with the documentation available to date.  Accordingly, we reserve the right to supplement and/or amend our analysis and this report should additional or updated information become available.  When I testify at trial, I may illustrate my testimony with demonstrative aids such as graphs, charts and/or slides.

---

[4] July 12, 2007 Deposition of Talton R. Embry, page 14.
[5] July 12, 2007 Deposition of Talton R. Embry, page 49.

Our analysis was based on the documentation listed in Exhibit B. The documents and information utilized are the types of documents and information experts in my field typically rely upon in performing such an analysis.

Our firm is being compensated at rates of $125 to $425 per hour. Our compensation is not contingent upon the outcome of this litigation.

## 3. ANALYSIS

As will be shown in the analysis that follows, Plaintiff has failed to establish the proper relationship between the loss that they have allegedly suffered and the alleged breach of fiduciary duty by Hanson or Kindt. Plaintiff has failed to properly account for the risks that they assumed in purchasing the QUIPS, has failed to properly analyze and calculate their damages, and has failed to show that Hanson and/or Kindt knew or should have known about the financial misstatements of NorthWestern and its subsidiaries. Moreover, Plaintiff has employed two experts that have prepared speculative analyses and have failed to show any causal relationship between the alleged breach of fiduciary duty of Hanson and Kindt and the damages asserted. As a result, their expert reports are not reliable and/or relevant. Our analysis is structured as follows:

- QUIPS
- NorthWestern Energy Transaction
- "Zone of Insolvency"
- Documents and Information available to Kindt and Hanson
- Internal and External Investigations of NorthWestern
- Observations concerning the Berliner and Marcus Reports

### 3.1. QUIPS

QUIPS are defined as "shares that are an interest in a limited partnership that exists solely for the purpose of issuing preferred securities and lending the proceeds of the sales to its parent company.  They usually have a $25 par value, NYSE listing and cumulative quarterly distributions."[6]   In essence, they are long-term debt instruments used by companies to obtain funds.

On or about November 6, 1996, Montana Power issued 2,600,000 40 year preferred securities under a QUIPS offering, with a total face value of $65 million.  Montana Power Capital was formed under the laws of the State of Delaware to act as the statutory business trust for Montana Power.  Montana Power was to be the owner of all the beneficial interests represented by common securities ("trust securities") of Montana Power Capital.  Montana Power Capital's existence was for the sole purpose of issuing trust securities and investing the proceeds in junior subordinated deferrable interest debentures ("junior subordinated debentures") to be issued by Montana Power.[7]

According to the offering memorandum, the Montana Power QUIPS were subject to the following risks:

- Dependence of Montana Power Capital on Montana Power for funds; subordination of junior subordinated debentures and guarantee:

    "The ability of Montana Power Capital to pay amounts due on the Preferred Securities is solely dependent upon [Montana Power] making payments on the Junior Subordinated Debentures as and when required.  [Montana Power's] obligations under the Junior Subordinated Debentures and the Guarantee are unsecured, subordinated and junior in right of payment to Senior Indebtedness of [Montana Power]."

---

[6] Obtained from Investopedia.
[7] Montana Power Capital I ("Montana Power Capital")8.45% Cumulative Quarterly Income Preferred Securities, Series A (QUIPS) Prospectus, page i.

- Option to extend interest payment period; tax consequences; potential market volatility during extension period:

  "So long as no Debenture Event of Default shall have occurred and be continuing, [Montana Power] has the right to defer payments of interest on the Junior Subordinated Debentures for Extension Periods of up to 20 consecutive quarters… If interest payments are so deferred, distributions on the Preferred Securities also will be deferred…"

- Rights under the guarantee; limited funds available to Montana Power Capital:

  "The Guarantee guarantees to the Holders of the Preferred Securities the payment and not the collection of (i) any accrued and unpaid distributions required to be paid on the Preferred Securities, but only if and to the extent that the Property Trustee has available funds sufficient to make such payment… If [Montana Power] were to default on its obligations under the Junior Subordinated Debentures, Montana Power Capital would lack available funds for the payment of distributions or amounts payable on redemption of the Preferred Securities or otherwise, and in such event Holders of the Preferred Securities would not be able to rely upon the Guarantee for payment of such amounts. The Guarantee will constitute an unsecured obligation of [Montana Power] and will rank subordinate and junior in right of payment to all Senior Indebtedness of [Montana Power]."

- Special event redemption:

  "Upon the occurrence and continuation of a Special Event, [Montana Power] has the right to redeem the Junior Subordinated Debentures, in whole but not in part, within 90 days following the occurrence of such Special Event and thereby cause a mandatory redemption of the Preferred Securities at the Redemption Price."

- Distribution of junior subordinated debentures upon termination, potential adverse effect upon market price:

  "[Montana Power] shall have the right to terminate Montana Power Capital at any time and cause the Junior Subordinated Debentures to be distributed to the Holders of Trust Securities in liquidation of Montana Capital Power."

- Limited voting rights:

  "Holders of Preferred Securities generally will have limited voting rights relating only to the modification of the Preferred Securities and the direction of remedies upon the occurrence of an Event of Default under the Trust Agreement. Holders of Preferred Securities will not be entitled to vote to appoint, remove or replace any Trustees, which voting rights are vested exclusively in the Holder of the Common Securities, except upon the occurrence of certain events…"

- No established trading market for the preferred securities, trading price, potential adverse income tax effect.

"The Preferred Securities have been approved for listing on the NYSE. The Preferred Securities may trade at a price that does not fully reflect the value of accrued but unpaid interest with respect to the underlying Junior Subordinated Debentures."

Based upon our analysis of the offering memorandum and other research on QUIPS, a transaction such as the NorthWestern Energy acquisition could occur, and principal and interest under the QUIPS was not guaranteed. QUIPS are also subject to the same risks associated with Montana Power. These risks include but are not limited to the utility business being subjected to extensive environmental regulations, such as the Clean Air Act Amendment of 1990, and potential environmental liabilities governed by the U.S. Environmental Protection Agency, which could result in significant costs and liabilities. In addition, a changing economic environment can cause disruptions in the financial markets, resulting in the lower availability of credit or a higher cost of capital. Furthermore, changes in the commodity prices can cause either an increase in costs to produce and distribute electricity and natural gas or a decrease in the amount received from selling electricity and natural gas. Lastly, considering that the electric and gas utility business is a seasonal business, operating results can fluctuate according to this factor.[8]

Subsequent to the November 15, 2002 transaction, NorthWestern made timely payments on account of the QUIPS in December 2002 and March 2003. We understand that NorthWestern elected under the terms of the QUIPS to defer the June 2003 payment. As a result of the bankruptcy filing, the QUIPS defaulted. Prior to the filing of the bankruptcy, however, no default had occurred with respect to the QUIPS.

As noted previously, we understand that Magten initially started purchasing the QUIPS in April 2003, subsequent to the November 15, 2002 transfer in question. Furthermore, we understand that Magten continued to purchase additional QUIPS after NorthWestern's

---

[8] These risks were identified in NorthWestern Corporation's April 24, 2002 Form S-4 filing, pages 10 through 15. Montana Power is also subject to the same risks as both companies are in the Energy industry.

bankruptcy filing. Given the timing of Magten's purchases of the QUIPS, it is clear that they were aware of the risks inherent in this investment. We understand that any plaintiff has a duty to mitigate its damages; Magten's continuing purchases of the QUIPS does not appear consistent with that duty.

## 3.2. NORTHWESTERN ENERGY TRANSACTION

As noted previously, NorthWestern purchased the equity interests of Montana Power, LLC in February, 2002 for "$478 million in cash and the assumption of $511 million in existing debt and mandatory redeemable preferred securities."[9] Given its regulatory approval, NorthWestern had the ability to hold the assets directly or in the form of a subsidiary.[10] "As a result of the acquisition, from February 15, 2002, the closing date of the acquisition, through November 15, 2002, we [NorthWestern] distributed electricity and natural gas in Montana through our wholly owned subsidiary, NorthWestern Energy LLC. Effective November 15, 2002, we [NorthWestern] transferred all of the energy and natural gas transmission and distribution operations of NorthWestern Energy LLC to NorthWestern Corporation and since that date, we have operated that business as part of our NorthWestern Energy division."[11]

While the February and November 2002 transactions occurred nine months apart, they are clearly part of the same transaction. Months prior to the February 2002 closing, on October 16, 2001, NorthWestern told its rating agencies that it intended to hold the assets as part of NorthWestern.[12] This position was reiterated in NorthWestern's April 30, 2002 First Quarter 2002 Earnings conference call.[13] Furthermore, in the prepared testimony dated August 27, 2001 of Hanson before the Public Service Commission of the State of Montana, the following was disclosed:

---

[9] NorthWestern Form 10-K for the period December 31, 2002 filed April 15, 2003, page 5.
[10] It should be noted that had NorthWestern elected to acquire the assets in February 2002 as a division, the lawsuit against Hanson and Kindt could not exist.
[11] NorthWestern Form 10-K for the period December 31, 2002 filed April 15, 2003, page 5.
[12] NorthWestern Rating Agency Presentation, October 16, 2001 (CSFB015656) [Marcus Report, page 8].
[13] NorthWestern, Transcript from First Quarter 2002 Earnings conference call, April 30, 2002, page 54. (NOR379816) [Marcus Report, page 8].

> "NorthWestern [NorthWestern Public Service] plans to make the requisite filings, and take the other steps necessary, to authorize it to obtain exempt status under the Public Utilities Holding Company Act, as amended, with both MPC [Montana Power Company] and NorthWestern Public Service becoming subsidiaries of the parent corporation [NorthWestern Corporation]. If NorthWestern ultimately does not implement a holding company structure, then upon closing of the transaction, it will retain its current divisional structure and MPC will become a division rather than a subsidiary of the company."[14]

In its November 20, 2002, Form 8-K, NorthWestern stated, "On November 20, 2002, NorthWestern Corporation ("NorthWestern") issued the press release attached hereto as Exhibit 99.1 and completed the final stage of its acquisition of the Montana utility operations of its subsidiary NorthWestern Energy, L.L.C."  The press release describes the transaction in more detail as follows:

> "SIOUX FALLS, S.D. – Nov. 20, 2002 – NorthWestern Corporation (NYSE:NOR) today announced that it has completed its previously announced plan to restructure its Montana utility operations as a division of NorthWestern Corporation.  The restructuring involved the intra-company transfer of substantially all of the assets and liabilities of NorthWestern Energy, L.L.C. to NorthWestern Corporation.  NorthWestern Energy, L.L.C. had substantially been comprised of the former Montana Power Company transmission and distribution business acquired by NorthWestern in February 2002.
>
> 'This action completes our previously announced plan to hold our regulated utility operations at the parent level as operating divisions of NorthWestern Corporation in what is known as a 'flat structure',' said Eric Jacobson, NorthWestern senior vice president and general counsel.  'Our Montana utility operations will be conducted by the NorthWestern Energy division of NorthWestern Corporation and its operations and customers will not be affected by the structural change.' "

The November 15, 2002 transaction that occurred between NorthWestern Energy and NorthWestern was at fair market value, meaning reasonably equivalent value was given and received.  While the documentation of the transaction was more complicated,[15] in essence NorthWestern relinquished its right to hold the assets in a subsidiary for the right to hold those assets directly.  In other words, NorthWestern exchanged its membership

---

[14] Testimony of Michael J. Hanson of NorthWestern Corporation before the Public Service Commission of the State of Montana, In the Matter of the Joint Application for Approval of the Sale of Montana Power Company to NorthWestern Corporation, page 4 (NOR044696)
[15] Certain assets and liabilities remained in NorthWestern Energy, subject to assumption and support agreements.

units (which would be valued at the equity value[16] of the subsidiary) for the value of the assets less the liabilities.  As noted by Kindt, "there, wasn't a whole lot of activity that was required on the books"[17] to record the transaction.

### 3.3. "ZONE OF INSOLVENCY"

Magten has asserted in its complaint against Hanson and Kindt that NorthWestern Energy was in the "zone of insolvency" on November 15, 2002 and that as a result, Hanson and Kindt, as officers of NorthWestern Energy, owed a duty to NorthWestern Energy's creditors.  We note that in its complaint against NorthWestern, Magten has asserted that prior to the transfer to NorthWestern, NorthWestern Energy was a solvent and reasonably capitalized entity.  Prior to the November 15, 2002 transaction, we understand Hanson and Kindt, as officers of NorthWestern Energy, owed their fiduciary duty to the sole member and manager of NorthWestern Energy (i.e. NorthWestern).

Magten's experts, Berliner and Marcus, conclude that Clark Fork became insolvent assuming that Clark Fork remained directly obligated under QUIPS following the November 15, 2002 transaction.  As part of the transaction, NorthWestern agreed:

> "to assume on the Closing Date [November 15, 2002], and to pay or perform, in accordance with their terms, any and all obligations and liabilities of Transferor [NorthWestern Energy], direct or indirect, known or unknown, absolute or contingent, arising or relating to the period before the Closing, except the Excluded Liabilities." [18]

The excluded liabilities did not include the obligations under the QUIPS, and as a result, NorthWestern became fully responsible for the payment of the QUIPS.  Given the forgoing, the assumption made by Berliner and Marcus is not appropriate from a business perspective.

---

[16] From a valuation and accounting perspective equity is defined as assets less liabilities.
[17] June 28, 2007 Deposition of Ernie J. Kindt, page 18.
[18] Asset and Stock Transfer Agreement dated November 15, 2002, page 5.

We note that NorthWestern did not directly acquire certain assets and liabilities of Clark Fork, primarily those associated with the Milltown Dam.  However, NorthWestern did agree to provide support to Clark Fork through several agreements, including a Maintenance and Operating Costs Support Agreement, Employee Secondment and Administrative Services Agreement, and Environmental Liabilities and Support Agreement.  The intent of these agreements was to ensure that Clark Fork would remain solvent after the transfer.  For example, NorthWestern agreed "that it shall cause Subsidiary [Clark Fork] to have at all times a net worth, as determined in accordance with generally accepted accounting principles in the United States of America, of at least US$1,000."[19]  Based upon what Hanson and Kindt knew or should have known at the time of the November 15, 2002 transaction, and as prudent business persons, Hanson and Kindt had the right to rely upon the agreements and their anticipated effect.

Assuming for the moment that the November 15, 2002 transaction should be viewed as a separate transaction (a proposition which with we disagree) rather than a continuation of the February 2002 purchase transaction,[20] in order for Hanson's and Kindt's fiduciary duty to favor the creditors, they would had to have known that the transaction rendered Clark Fork insolvent.

Given the structure of the November 15, 2002 transaction, including the assumption and support agreements provided by NorthWestern, Clark Fork could have been insolvent or in the "zone of insolvency" on November 15, 2002 only if NorthWestern was insolvent on that date.  On November 15, 2002 NorthWestern's stock was trading at $7.43 per share, resulting in a market capitalization of approximately $278 million.  This information would indicate that the market viewed NorthWestern as solvent on that

---

[19] Environmental Liabilities Support Agreement.
[20] Support for viewing the transaction as one include statements by NorthWestern to regulatory and rating agencies prior to the transaction and statements to the public after the transaction that NorthWestern intended to eventually have the Montana Power assets operated as a division rather than as a separate subsidiary.  In addition, the original PUCHA application anticipated the two step transaction structure that occurred.

CONFIDENTIAL, SUBJECT TO PROVISIONS OF CONFIDENTIALITY AGREEMENT

date.[21]   Furthermore, even assuming all the Berliner adjustments, some of which are based upon hindsight, even Berliner estimated[22] that NorthWestern was solvent on November 15, 2002 under Generally Accepted Accounting Principles ("GAAP").[23]   We are not aware of any analysis that has concluded that NorthWestern was insolvent or even in the "zone of insolvency" as of November 15, 2002.

Assuming, for the sake of argument, that based upon the facts in this matter Hanson and Kindt needed to evaluate the transaction from the vantage point of creditors, a point with which we disagree, in order for Hanson and Kindt to be liable for damages, one would have to establish that Hanson and Kindt did not exercise reasonable business judgment in allowing the transaction to move forward.   In addition, we understand that typically a liability determination in a deepening insolvency or "zone of insolvency" matter is based upon whether there was actual fraud on the part of the defendants.   We understand that Berliner and Marcus allege fraudulent activities on the part of management of NorthWestern.[24]   Our analysis of their reports and other documents produced in this matter (which will be addressed in later sections) do not indicate that the management that knew or should have known of the alleged fraudulent activities included Hanson or Kindt.[25]

Furthermore, if liability is established, damages need to be calculated.   It is our understanding that the damages related to a deepening insolvency or "zone of

---

[21] We have seen no analysis that would indicate the effect on the market that the restatements would have had had they been known as of November 15, 2002.  However, we do note that on April 15, 2003, the day the restated financials were filed with the SEC, NorthWestern still had a positive stock price of $2.27 and a resultant market capitalization of approximately $85 million.

[22] Expert Report of Robert W. Berliner, CPA, CFE, dated September 19, 2007 – [Appendix A-4] Total Assets in (000s) of $3,142,134 less total liabilities of $3,075,238 (000s) equals $66,896 (000s).

[23] We understand that for determining solvency, GAAP based principles do not control.  In addition, as will be shown later in the report Hanson and Kindt had no reason to be aware of the restatement adjustments, or the additional adjustments (with which we disagree), that Berliner proposes.  These additional adjustments serve to lower his GAAP based determination of solvency.

[24] We were engaged to evaluate what Hanson and Kindt knew or should have known concerning the financial condition of NorthWestern in connection with their execution of the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern.  We were not engaged to evaluate the activities of other members of NorthWestern's management; therefore we have not done so and offer no opinion with respect to their actions.

[25] It should be noted that Kindt was not an officer of NorthWestern on November 15, 2002.

insolvency" matter, to the extent that such claims are even viable, should be quantified by reference to the decline in value of the equity caused by the harm. That is to say, there is something less available to the creditors as a result of the alleged actions. In calculating such damages one needs to consider segregating the following items:

- Losses that are the result of the good faith efforts of officers to improve operations from those that resulted from the alleged harmful actions of the defendants or in this case the alleged harmful actions of others.
- Losses that may have occurred based upon the mere passage of time.
- Losses caused by alleged negligence versus those caused by alleged fraudulent activities.

We understand that Plaintiff's claim that their damages equal the total principal and interest that would have been contractually due at the time of judgment had NorthWestern not filed for bankruptcy and paid off the QUIPS in full.[26]  As noted above, the return of principal on the QUIPS is not due until 2036. Thus, Plaintiff's calculation of damages is methodologically flawed, overly simplistic, speculative, and would have a tendency to overstate damages in that it assumes a premature return of principal, does not consider amounts available under the NorthWestern plan of reorganization and does not properly measure all the risks and relevant factors facing the holder of the QUIPS.

### 3.4. DOCUMENTS AND INFORMATION AVAILABLE TO KINDT AND HANSON

We obtained documents and information that were available to Hanson and Kindt for the period from December 2001 through November 15, 2002 to determine what they knew or should have known about the financial condition of NorthWestern and NorthWestern Energy at the time of the November 15, 2002 closing. We have segregated our analysis into those documents and information available to Hanson and those available to Kindt.

---

[26] We understand that Plaintiff is also seeking consequential, incidental and punitive damages. (Magten Asset Management Corporation's response to Michael J. Hanson and Ernie J. Kindt's First Set of Interrogatories).

### 3.4.1. Information and Documents Available to Kindt

Prior to the November 15, 2002 transaction, Kindt was an officer of NorthWestern Energy.  Kindt was not involved in the decision to transfer the assets from NorthWestern Energy to NorthWestern,[27] but rather, was informed that since NorthWestern was denied its exemption to hold NorthWestern Energy separately, a divisional structure would have to be implemented.[28]  Kindt's involvement in the transaction was out of necessity as he was NorthWestern Energy's chief accounting officer.  Kindt was consulted to determine the simplest way to account for the transaction.[29]

Kindt was not an officer of NorthWestern.  As such, Kindt had limited information on NorthWestern other than information that would be available to the general public.  As the chief accounting officer of NorthWestern Energy, Kindt had details about NorthWestern Energy's financial condition, but was not privy to the operations or financial condition of NorthWestern, or its various subsidiaries.  Kindt did not receive or see the Monthly Financial and Information Reports ("MFIRs") that were provided to certain other NorthWestern employees.[30]  From his knowledge and experience with NorthWestern, he believed NorthWestern had the "financial wherewithal to continue to service the [QUIPS] debt" and that "whenever the utility needed cash, it was available."[31] Kindt indicated that at the time of the transaction, "The balance sheet of NorthWestern was strong.  They were a very large company.  The company had just recently issued some debt and did not have a difficult time issuing that debt."[32]  Kindt was not aware of any concerns with respect to the liquidity or cash flow issues of NorthWestern until "the spring, late winter, early spring of 2003"[33] – after the November 15, 2002 transaction occurred.

---

[27] June 28, 2007 Deposition of Ernie J. Kindt, page 23.
[28] June 28, 2007 Deposition of Ernie J. Kindt, page 23.
[29] June 28, 2007 Deposition of Ernie J. Kindt, page 23.
[30] June 28, 2007 Deposition of Ernie J. Kindt, page 50.
[31] June 28, 2007 Deposition of Ernie J. Kindt, page 31.
[32] June 28, 2007 Deposition of Ernie J. Kindt, pages 86 to 87.
[33] June 28, 2007 Deposition of Ernie J. Kindt, page 63.

In late summer 2002, the treasurer of NorthWestern Energy left the company and Kindt became responsible for the filing requirements under the QUIPS. The filing requirements were contained in a book that listed what needed to be done including items that needed to be filed annually including an officer's certificate.[34] Prior to that time period, Kindt had no direct duties with respect to the QUIPS.

We understand that Kindt attended only one NorthWestern meeting shortly after NorthWestern purchased the Montana utility business wherein all the former Montana utility business vice presidents attended. "There was a presentation at that conference where the presidents of the various divisions of the company spent ten or 15 minutes updating people on their progress. Expanets at that point in time was confident that they would meet their annual budgeted target which they indicated was an aggressive target."[35] Finally, the only other information Kindt would receive on Expanets would be a one-line comparison of net income compared to budget on both a monthly and year-to-date basis.[36]

Therefore, based upon our analysis of the documents and information that was available to Kindt, it is our opinion within a reasonable degree of professional certainty that he did not know and had no reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries. As such, it was perfectly reasonable and within prudent business judgment for Kindt to execute the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern.

---

[34] June 28, 2007 Deposition of Ernie J. Kindt, pages 14 to 16.
[35] June 28, 2007 Deposition of Ernie J. Kindt, page 72.
[36] June 28, 2007 Deposition of Ernie J. Kindt, page 72.

### 3.4.2. Information and Documents Available to Hanson

Hanson is now the President and CEO of NorthWestern. The officers who were senior to Hanson as of November 15, 2002 have since left the company, and as will be described later in this report, many were alleged to have participated in a scheme to mislead investors and the general public concerning the financial condition of NorthWestern. In essence, Hanson was the highest ranking NorthWestern officer at the time of the transaction who was determined by internal, external and Security and Exchange Commission ("SEC") investigators not to be involved in the alleged scheme.

As an officer of NorthWestern Energy and as an officer of NorthWestern, Hanson had more information available to him than did Kindt. We have therefore separated this portion of the report into the following sections:

- Monthly Financial and Information Reports ("MFIRs")
- Board of Directors Information
- NCS Audit Report
- Board Questions Concerning Lewis[37] and Hylland[38]
- Request for Bonus Compensation
- Summary

#### 3.4.2.1. Monthly Financial and Information Reports ("MFIRs")

As the officer responsible for the utility businesses of NorthWestern, Hanson received MFIRs. In addition, Hanson attended management meetings wherein the contents of the MFIRs were discussed. The MFIRs contained selected financial information concerning each of the various operating groups of NorthWestern, initially including NCG, CNO, Blue Dot, Expanets and Corporate & Other. The components of the selected information changed over time. By the end of 2002 the various remaining operating groups were

---

[37] Chairman of the Board and Chief Executive Officer, retired December 31, 2002.
[38] President and Chief Operating Officer of NorthWestern.

NorthWestern Energy, Corporate & Other, Expanets and Blue Dot.  The MFIRs included a balance sheet and income statement for NorthWestern, however no statement of cash flow was provided.  Furthermore, the MFIRs did not contain balance sheets, income statements or statements of cash flow for any of the operating groups, making a complete financial analysis of these companies extremely difficult, if not impossible.[39]  In response to questioning, Hanson noted that "[e]very time they discussed a problem there was also a discussion of actions they were going to do about it and the constant theme was it's going to improve, going to improve."[40]

Our examination of the underlying documents noted that they changed over time and did not contain enough information to determine the purpose of their use.  Therefore any conclusions drawn by Hanson from the information could be subject to interpretation or may be speculative.

During the periods May, June, and July, 2002, the MFIRs contain information in a graph showing Expanets' NorthWestern Incremental Borrowings.  In each case the forecast shows a decline in the level of incremental borrowings, however, the total borrowings increase over time.  This information disappears from the MFIRs in August 2002 and does not reappear at least through the November 15, 2002 transaction date.

The MFIRs also contain information concerning "Funds Availability".  In each MFIR that we analyzed for the period December 2001 through December 2002, according to the "Funds Availability" section there were available funds.

Based upon our analysis of the MFIRs in conjunction with the statements made by management to Hanson, we have determined that, based on the MFIRs, Hanson did not

---

[39] Consistent with our conclusion, during his deposition, Kindt was shown for the first time certain of the MFIRs and noted that the information was not sufficient for him to make a determination as to the cash flow of NorthWestern (Kindt June 28, 2007, page 51 to 55).  In response to other questions concerning the MFIRs, Kindt made it clear that there is not enough information to make the determinations counsel was requesting him to make (Kindt June 28, 2007, page 55 to 58).

[40] June 27, 2007 Deposition of Michael J. Hanson, page 120, see also pages 106, 112,116, 124 and 141.

know and had no reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries.

### 3.4.2.2. Board of Directors' Information

As an officer of NorthWestern, Hanson attended select Board meetings and received select information that was also provided to the Board.   We have analyzed this information in two sections.  Section 1 includes information that was presented to Hanson at the November 2002 Board of Directors' Meeting, including Hanson's notes made at the meeting.  Section 2 includes information that was presented at the remaining Board meetings, as well as information that Hanson may have received since we cannot be sure if Hanson had an opportunity to review this information, even if he were not at the meeting.  We have examined the underlying board of directors' information to determine what Hanson knew or should have known regarding the financial condition of NorthWestern including its subsidiaries Expanets and Blue Dot.

- November 2002 Board Meeting

The November 6, 2002 Board meeting was the last Board meeting that Hanson attended prior to executing the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern.  As such, it would have formed the most up to date basis of his knowledge concerning the financial condition of NorthWestern.

Hanson's notes from the November 6, 2002 Board Meeting included the following concerning Expanets:

- Continuing problems with Expert
- Economy – Cost deferring projects
- Expense control has helped

CONFIDENTIAL, SUBJECT TO PROVISIONS OF CONFIDENTIALITY AGREEMENT                    Page 19

- COGS have not changes drastically as % of Rev., but GM have improved (40%) – sustainable @ 43-44%

- Cash collections now strong (last 2 weeks) – bills now accurate

- DSO coming down

- Greater efficiency of A/E's? → not spending as much time collecting & handling customer complaints.

- John is confident in $20m Quarterly EBITDA could be as high as $27M

- Has seen uptick in site contracts this year – better rev. this yr – will show up in future years. Plus GM % stronger (65%) vs. 45%) – Therefore get uplift in product mix

- Normalized Revenue excluding billing problems, etc. was about 65 M/mo in 02 – 03 have to get to $73 M/mo -11% growth, if business stabilizes would do $23M/Q EBITDA → $92 M annual

Hanson's notes from the Board Meeting included the following concerning Blue Dot:

- Rely on "field" to budget and FCST

- Revenue budget built 1st – "Negotiated w/field to finalize

- Don used Alix Partner initiatives to build overall budget – then had field build their budgets – Had to 'pull them back' b/c came in higher than He and Alix proposed – don't have higher degree of confidence they can hit #'s.

- Doesn't have visibility into local operations b/c has no systems to do that → Budgeting, tracking, & reporting done locally.

During the board meeting, Kipp D. Orme ("Orme")[41] indicated that anticipated 2002 earnings per share (EPS) were going to be reduced. Although EPS was declining, NorthWestern was still forecasting positive EPS. Positive EPS would indicate that NorthWestern was profitable. Orme also indicated:

---

[41] NorthWestern's Chief Financial Officer

*Magten v. Hanson and Kindt*

> "As discussed and demonstrated in the 'Base Level' Liquidity/Financing sheet on page 4 of the Liquidity/Financing section of the Board package, the liquidity provided by the base operating plan is not sufficient absent further financing and/or other liquidity enhancement action. To that end, page 5 and 6 denote current opportunities that are being aggressively pursued to enhance our liquidity position."[42]

At the meeting Hanson was presented with budget information for 2003 as well as forecasted information through 2006. This information indicated that NorthWestern was going to continue to be profitable and that it had enough cash flows from operations to make significant principal repayments on its debts. Furthermore, the forecasted information anticipated improving results at both Expanets and Blue Dot.

Based upon the November 2002 Board materials we analyzed, including the positive plans and statements shown above, we have determined that Hanson did not know and had no reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries.

- Other Board Meeting Information

We analyzed the other board meeting information for 2002 (similar to the data contained in the November 2002 package above) that Hanson received or may have received. Based upon the materials we analyzed, we have determined that Hanson did not know and had no reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries.

### 3.4.2.3. NCS Audit Report

Hanson was the CEO of NorthWestern Services Group ("NSG"), of which NCS was an operating division. In approximately May 2002, NorthWestern decided to transfer NCS from NSG to Expanets and began to conduct due diligence. During the course of their review, Expanets noted what appeared to be financial misstatements. As a result, Hanson requested an audit of NCS' financial statements be conducted by NorthWestern's internal

---

[42] October 30, 2002 Memorandum of Orme, NOR045248 – 50.

audit group. On September 6, 2002, Audit Services released an audit report detailing their findings concerning NCS' financials, including issues regarding recognition of revenue, inventory and goodwill. The misstatements were material to NCS, however, NCS was considered to be "a very insignificant piece of the business"[43] of NorthWestern.[44]

As the CEO of NSG, Hanson performed his duty in calling for the review of NCS' financials. This review occurred in July 2002.[45] Moreover, the problems identified with the NCS financials were insignificant in relation to NorthWestern's operations as a whole. We understand that the adjustments were recorded upon completion of the internal audit. We also understand that Hanson was aware that "Mr. Hylland directed NWE [NorthWestern] to 'push the envelop' in capitalizing expenses."[46] In addition, "Mr. Hylland would state that as long as NWE's [NorthWestern's] reporting complied with Generally Accepted Accounting Principles ("GAAP"), then that was how the reporting should be done."[47] Given that Hanson believed that reporting was in accordance with GAAP, the NCS audit results should not have caused Hanson to conclude that there were issues concerning the accounting and disclosures of the other subsidiaries, or that the November 15, 2002 transaction should not move forward.

We note that subsequent to November 15, 2002, the SEC filed complaints against five individuals in connection with activities at NCS. Hanson was not one of those

---

[43] Deposition of Kendall Kliewer, taken June 29, 2007, pages 224 through 229.

[44] We understand that the SEC has alleged that the misstatements were material, however the United States District Court for the District of South Dakota, Southern Division ruled in CV 06-4253 that Bart Theilbar's contention that the amounts were not material is correct. We understand that the SEC is seeking to amend the complaint in that matter.

[45] According to the Association of Certified Fraud Examiners, "tips were the most common means by which occupational fraud was detected… and the majority of tips – nearly two out of three – were received from employees." (Association of Certified Fraud Examiners, 2006 Report to the Nation on Occupational Fraud and Abuse, (Austin, TX:  ACFE, 2006), page 29).

[46] Michael Hanson's April 10, 2003 Declaration to Paul Hastings Janofsky & Walker LLP.

[47] Michael Hanson's April 10, 2003 Declaration to Paul Hastings Janofsky & Walker LLP.

individuals.  Four of those individuals entered into final judgments.[48]  We understand that Bart Thielbar is still contesting the SEC allegations.

### 3.4.2.4. Board Questions Concerning Lewis and Hylland

In or around November 2002, Gary Drook[49] ("Drook"), a member of the NorthWestern Board of Directors ("Board") requested that Hanson conduct an investigation concerning personal items being expensed to NorthWestern by senior officers, Lewis, Hylland, and possibly others.  It appears that Hanson's involvement in the investigation was completed prior to November 15, 2002.  Sometime around November 5th or 6th of 2002, Drook indicated that the Board would take the investigation from there.[50]  Hanson's investigation revealed that there was some credibility with respect to certain of the allegations, but that "the majority of the items were either misperceptions or not founded with the possible exception of the wine, the Dom Perignon."[51]  Hanson was not asked to investigate further, and did not have any indication from this limited investigation that the financial statements of NorthWestern should have been restated.

### 3.4.2.5. Request for Bonus Compensation

We note that Hanson and Jacobsen authored a memorandum to Lewis, Hylland and John Van Camp, requesting bonus compensation based upon their involvement in the acquisition of the Montana utility business.  In the memorandum, Hanson and Jacobsen discuss the historical financial performance of Expanets for the year ended December 31, 2001 and the effect that Expanets had on NorthWestern's liquidity during the last half of 2001.[52]  These results were not strong, but as of November 15, 2002, this information would have been almost a year old.  NorthWestern had gone through several placements

---

[48] We understand the final judgments were entered without the defendants admitting or denying the allegations of the Complaint (except as to jurisdiction), but with the waiver of findings of fact and conclusions of law, and any right to appeal from the final judgments.
[49] Drook became Chief Executive Officer in January 2003.
[50] June 27, 2007 Deposition of Michael J. Hanson, pages 190 to 217.
[51] June 27, 2007 Deposition of Michael J. Hanson, page 213.
[52] June 27, 2007 Deposition of Michael J. Hanson, pages 103 to 112.

CONFIDENTIAL, SUBJECT TO PROVISIONS OF CONFIDENTIALITY AGREEMENT                Page 23

of debt and equity since then.  As we noted in our analysis of the November 2002 Board meeting information, more recent information concerning operating performance would have been more relevant to Hanson in evaluating the November 15, 2002 transaction. Therefore the fact that Hanson knew about poor historical performance of a subsidiary would not provide Hanson with knowledge about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries.

### 3.4.2.6. Summary

Hanson had more information concerning the results of operations of NorthWestern's other operations and subsidiaries then did Kindt.  While there was information that may have caused some concern on the part of Hanson, other members of management, either superiors or persons directly involved in the management of those operations, indicated that the issues were going to be resolved in short order and that the company would meet their going forward plan.  Therefore, it is our opinion within a reasonable degree of professional certainty that Hanson did not know and had no reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries.  As such it was perfectly reasonable and within prudent business judgment for Hanson[53] to execute the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern.

### 3.4.3. Plaintiff's Analysis

Plaintiff puts forward two experts in this matter.  Assuming for the moment that Hanson and Kindt needed to perform any analysis prior to closing on the November 15, 2002 transaction (a proposition with which we disagree), Marcus is the only expert for the Plaintiff that performs any analysis that the Plaintiff suggests should have been

---

[53] We have previously concluded that it was it was perfectly reasonable and within prudent business judgment for Kindt to execute the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern.

performed by Hanson or Kindt.[54]  As we will see later on in this report, the conclusions of Plaintiff's experts are speculative and have numerous flaws (the most significant of which is that there is no linkage to Hanson and Kindt).  Further, assuming for the sake of argument that the Plaintiff's experts are correct and that the analysis performed by those experts is the appropriate analysis (propositions which with we disagree), Marcus is "a professional with over twenty years of experience in corporate finance, mergers and acquisitions, valuation, financial analysis, and advising on complex financial transactions.  [He holds] an M.B.A. from the University of Chicago and a B.S. from Tufts University.  [He also holds] the Chartered Financial Analysts designation granted by the CFA Institute and successfully completed a formal credit training program at Bank of America."  Clearly Marcus has more financial analysis experience than the average prudent business person, including Hanson or Kindt, yet Marcus needed to rely on the conclusions of a Certified Fraud Examiner and Certified Public Accountant so much so that if the assumptions of Berliner prove to be incorrect, Marcus' report is not reliable and/or relevant.

### 3.5. INTERNAL AND EXTERNAL INVESTIGATIONS OF NORTHWESTERN

There were various investigations conducted concerning the activities of the officers of NorthWestern, specifically regarding their conduct and the improper reporting that eventually lead to the restatement of NorthWestern's financial statements.  We have structured this section of the report as follows:

- Board of Directors Investigations
- Gibson Dunn Investigation
- SEC Activities

---

[54]  As noted earlier, we have not seen any analysis concerning the solvency of NorthWestern as of November 15, 2002.

### 3.5.1. Board of Directors Investigations

As noted above, in or around November 2002, Drook, a member of the NorthWestern Board requested that Hanson conduct an investigation concerning personal items being expensed to NorthWestern by senior officers, Hylland and Lewis.  Subsequently, the Board of Directors conducted an additional or continued investigation.

At a Special Meeting of the Board, on February 18, 2003, the Board created a "Special Committee" to:

- Evaluate Hylland's performance and conduct in connection with his management of NorthWestern and its subsidiaries.
- To make detailed findings.
- To recommend to the Board the appropriate action, if any, to be taken with respect to the evaluated conduct.

Kindt is not even mentioned in the report by the Special Committee.  During the course of the Special Committee's investigation, Hanson was interviewed.[55]  Although, Hanson is mentioned in the Special Committee's report, his mention does not indicate or imply that he would know or have reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries.  As such it was perfectly reasonable and within prudent business judgment for both Hanson and Kindt to execute the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern.

### 3.5.2. Gibson Dunn Investigation

NorthWestern's Board engaged Gibson Dunn to perform an investigation into Expanets accounting and disclosure issues in 2002.  The scope included:

---

[55] Kindt was not interviewed by the Special Committee.

- Expert system impacts on integrity of financial statements; internal control issues.
- Timing/materiality of accounting concerns
- Disclosure process
- NorthWestern and Expanets management involvement

Neither Hanson nor Kindt were interviewed as part of the investigation, demonstrating their lack of knowledge or potential involvement in the alleged scheme.

### 3.5.3. SEC Activities

Finally, we understand that the SEC conducted an investigation into the operations of NorthWestern and its subsidiaries, the result of which was the imposition of a Cease-and-Desist Order dated March 7, 2007 ("Cease-and-Desist Order").[56]  Also in connection with its investigation, the SEC brought legal actions against at least 11 individuals employed by NorthWestern and its subsidiaries, including the following:

- Merle Lewis, former Chairman of the Board and CEO of NorthWestern
- Kipp Orme, former CFO of NorthWestern
- Richard Hylland, former COO of NorthWestern
- Kurt Whitesel, former controller of NorthWestern
- Richard Fresia, former CFO of Expanets

Neither Hanson nor Kindt were charged in connection with this investigation, demonstrating their lack of involvement in the alleged scheme.

---

[56] Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934, dated March 7, 2007.

### 3.6. OBSERVATIONS CONCERNING THE BERLINER AND MARCUS REPORTS

#### 3.6.1. Observations Concerning the Berliner Report

The first opinion[57] offered by Berliner is an adoption of the restated financial statements that were contained in filings with the SEC. Berliner does not specify that Hanson or Kindt were included in the members of management that knew that the financials as originally filed were incorrect. As a result, Berliner's first opinion does not address whether Hanson or Kindt breached their fiduciary duty and is therefore not relevant.

The second opinion[58] offered by Berliner is that certain adjustments should have been made to the restated financials that were not made. Similar to Berliner's first opinion, Berliner does not specify that Hanson or Kindt were included in the members of management that knew that the financials as originally filed were incorrect. As a result, Berliner's second opinion does not address whether Hanson or Kindt breached their fiduciary duty and is therefore not relevant. Moreover, the second opinion contains methodological flaws and is speculative and without proper basis.

Berliner claims that NorthWestern improperly accounted for liability reserves and other accruals at Expanets. This claim is based upon the Cease-and-Desist Order dated March 7, 2007, which does not provide sufficient information for Berliner to determine if further adjustments to the restated financial statements are warranted. As a result, Berliner's adjustment is speculative and cannot be stated within a reasonable degree of professional certainty. Berliner knows he is just guessing, as is shown in the following description in his report:

---

[57] Expert Report of Robert W. Berliner, CPA, CFE, dated September 19, 2007 – page 1-1.
[58] Expert Report of Robert W. Berliner, CPA, CFE, dated September 19, 2007 – page 2-1.

> "For each of the three quarters, NW's Form 10-Q/A Amendment No. 2 does not provide sufficient disclosure to enable a reader to understand the amount of Expanets' income derived from the reserve reductions, or how the reserve reductions complied with FAS 5 and FIN 14. Therefore, I was unable to quantify the exact amount of Expanets' reserve reversals that were not in compliance with GAAP. For this reason, I included the entire amounts identified in the SEC's Cease-and-Desist Order less the portions thereof restated by NW as adjustments to the revised financial statements presented in Attachments A-1 through A-10."[59]

Berliner's analysis is pure conjecture based upon hindsight. Berliner knows or should have known that his guess was without basis and made purely to bolster the Plaintiff's arguments. Berliner's speculation is highly objectionable and demonstrates bias rather than presenting an opinion that will assist the trier of fact. Furthermore, Berliner in essence inappropriately accuses Deloitte and Touche ("D&T")[60] of incompetence in their restatement of the financial statements based only on his own speculation. We understand that neither D&T nor Arthur Anderson have been sued in connection with their work on NorthWestern's financial statements or the restatements.

Berliner then makes an adjustment to record an impairment charge against goodwill in the amount of $390,000,000.[61] The adjustment to goodwill is in essence a valuation adjustment. As such, it is an adjustment that is based upon what is known or knowable at the time of the adjustment. Berliner's adjustment is based on hindsight, violating this basic premise of developing a value based upon information that was known or knowable at the time. D&T completed the NorthWestern audit for the year ended December 31, 2002. During the same period, D&T oversaw the restatements made to the Forms 10-Q for the periods ended March 31, 2002, June 30, 2002 and September 30, 2002. The December 31, 2002 financials and the restatements were filed with the SEC on the same day. D&T made an impairment adjustment for the year ended December 31, 2002, yet chose not to record the adjustment in earlier periods even though it was restating the financial statements of NorthWestern for those periods. Clearly, D&T was in a better

---

[59] Expert Report of Robert W. Berliner, CPA, CFE, dated September 19, 2007 – pages 2-21 to 2-22.

[60] D&T were NorthWestern's replacement auditors. In May 2002, NorthWestern replaced Arthur Anderson with D&T.

[61] As a technical matter, Berliner prepares his adjustment by focusing on the income approach (DCF method) rather than considering all of the applicable approaches to valuation.

position to understand what was known or knowable at the time than Berliner was approximately 5 years later.

Berliner's third conclusion[62] is that NorthWestern violated the disclosure requirements under GAAP and SEC regulations. It is important to note that Berliner does not link the lack of disclosure in the originally filed financial statements to Hanson or Kindt. Therefore Berliner's conclusion is not relevant in determining whether Hanson or Kindt breached their fiduciary duty.

We understand that Hanson oversaw the "Colstrip assets" but it is important to note that it was not Hanson's responsibility to determine whether the dispute regarding the "Colstrip assets" should be disclosed. Many factors go into determining whether an item should or should not be disclosed to the public. We have seen no evidence to indicate that Hanson did not properly advise senior members of NorthWestern regarding the status of the "Colstrip assets," therefore, Hanson's actions should not be considered a breach of his fiduciary duties.

Berliner's fourth opinion[63] is based upon his flawed second opinion. As shown in Berliner's report, there is no violation of NorthWestern's debt covenants for the quarters ended June 30, 2002 and September 30, 2002 prior to his goodwill impairment and reserve and other accruals adjustments. Since the Berliner adjustments in his second opinion are speculative and methodologically flawed, Berliner's fourth conclusion is also speculative and flawed. Given the fact that Berliner has not adequately demonstrated that his goodwill impairment and reserve and other accruals adjustments should be made, his adjustment to reclassify $231,000,000 in long-term debt to a current liability is inappropriate.

---

[62] Expert Report of Robert W. Berliner, CPA, CFE, dated September 19, 2007 – page 3-1.
[63] Expert Report of Robert W. Berliner, CPA, CFE, dated September 19, 2007 – page 4-1.

Berliner's fifth and final opinion[64] is based upon an assumption that Clark Fork remained directly obligated for the QUIPS following the November 15, 2002 transaction.   As discussed previously, NorthWestern assumed the obligation for the QUIPS as part of the November 15, 2002 transaction.  To the extent that Berliner's assumption is incorrect, his conclusion is not reliable and/or relevant.   Furthermore, Berliner fails to properly consider the relevant documents he should have in reaching his conclusion.

### 3.6.2. Observations Concerning the Marcus Report

The Marcus report sets out the following opinions:[65]

1. Had the misstatements and omissions in NorthWestern's financial statements, Registration statement, and other public disclosures "…been disclosed to the public prior to October 8 and November 15, 2002, respectively, the equity offering would not have occurred and the asset transfer would have been impeded by the attempts of security holders and regulators to protect their respective investments…"

2. "Had the assets of NorthWestern Energy, L.L.C. not been transferred to NorthWestern, the QUIPS investors would have been covered by the former's assets and not junior to the debt and other liabilities of NorthWestern Corp."

3. "Assuming Clark Fork remained liable for the QUIPS obligations; Clark Fork would not have had the financial ability to meet those obligations."

In summary, the conclusions reached in the Marcus report are based on a speculative foundation of assumptions, which, upon examination, renders the Marcus report unreliable.  On the assumption that one can get past Marcus' rampant speculation and tortured analysis, it is important to note that the Marcus report is predicated upon Berliner's analysis and conclusions, which, as noted above, contain significant flaws and methodological errors.  For example, if Berliner's second opinion adjustments are not

---

[64] Expert Report of Robert W. Berliner, CPA, CFE, dated September 19, 2007 – Page 5-1.
[65] Expert Report of Paul A. Marcus, dated September 19, 2007 – pages 5 to 7.

appropriate or relevant, then NorthWestern's restated financial statements would have been in compliance with loan covenants.   This would render Marcus's analysis inappropriate and irrelevant since Marcus assumes the breach of the loan covenants as part of his analysis.  Further, consistent with Berliner, Marcus does not establish a causal link between the misstatement activities and the actions of Hanson or Kindt.  This is in direct contrast to internal, external, and SEC investigations, which indicate that the term "management" as utilized in the Marcus report does not include the Defendants.  In other words, the information that Hanson or Kindt knew or should have known on or before November 15, 2002 did not include the knowledge that the originally filed financial statements of NorthWestern were misstated.   Therefore, the analysis performed in the Marcus report could not (and would not) have been performed by either Hanson or Kindt. Given these shortcomings, we have serious reservations on Marcus' ability to express his opinions within a reasonable degree of professional certainty.

The following paragraphs address the assumptions that inherently form the basis of the opinions included in the Marcus report.  Given the sheer volume of the speculations included in the Marcus report, we have focused our analysis on the more obvious speculative statements.

### 3.6.2.1. Opinion 1 – Given Knowledge of Errors & Omissions Asset Transfer Impeded

Marcus expresses the opinion that had the misstatements and omissions in NorthWestern's financial statements, Registration statement, and other public disclosures "…been disclosed to the public prior to October 8 and November 15, 2002, respectively, the equity offering would not have occurred and the asset transfer would have been impeded by the attempts of security holders and regulators to protect their respective investments…"  This opinion is based on the following assertions:[66]

---

[66] Expert Report of Paul A. Marcus, dated September 19, 2007 – page 6.

- "The market's knowledge that NorthWestern would never realize a return on or cash flow from its significant investment (including preferred stock and intercompany advances) in its unregulated subsidiaries, Blue Dot and Expanets, would have been accelerated."

- "The precipitous drop in NorthWestern's stock price would have been accelerated."

- "The downgrading of NorthWestern's credit to below investment grade would have been accelerated."

- "NorthWestern would have defaulted on financial covenants related to its $280 million facility for which Credit Suisse First Boston ("CSFB") was the administrative agent."

- "CSFB would likely not have funded the $280 million facility."

- "The suspension of NorthWestern's dividend would have been accelerated."

- "The $390 million debt financing with CSFB would have been unlikely."

While Marcus' opinion is based on the outcome of the assertions set out above, we are unable to determine the relative weight of these factors in relation to the opinion expressed. For example, to the extent that one or more of these assumptions is proven wrong, there is no way of determining the relative impact on Marcus' opinion. Further, in order for Marcus' opinion to be expressed within a reasonable degree of professional certainty there must be a high probability of occurrence for each of the underlying assertions. Marcus' analysis does not meet this criteria, but rather appears to be expressed using a "more likely than not" threshold. Marcus' failure to establish a causal link between the opinion expressed and the underlying assertions (i.e. Hanson's and Kindt's breach of fiduciary duty) within a reasonable degree of professional certainty results in an unreliable and unduly speculative analysis.

Examples of Marcus' speculation and failure to establish an opinion within a reasonable degree of professional certainty are summarized as follows:

- The market became aware of the fact that NorthWestern would not be able to recover its investments in Expanets and Blue Dot or that these entities would not generate cash flows in sufficient amounts to provide meaningful contributions to debt services in December 2002.  At that time, NorthWestern recorded impairment charges to reflect these changes.  Marcus implies that the impairment disclosure should have been in June 2002.  As noted above, D&T did not include the impairment charges as part of its restatements.  Marcus comes to this conclusion only as a result of the hindsight analysis conducted by Berliner.  Marcus' conclusion is therefore speculative and inaccurate.

- Marcus is speculating that the restatements would have resulted in a precipitous drop in the stock price.  Marcus does not know this.  Marcus' conclusion should be more appropriately stated as "maybe there would be a precipitous drop in the stock price, or maybe not."   A review of the data as shown in Exhibit 3 of the Marcus report indicates that the EPS release and the dividend cut had larger effects on the decline in the stock price than the restatements.  While Marcus may argue that the EPS release is similar to the restatements, the simple fact is that he just does not know and therefore cannot form this opinion within a reasonable degree of professional certainty.

- We agree that the downgrading of NorthWestern's credit would have been accelerated if the restatements were reported at an earlier time; however, Marcus' analysis fails to establish the nature or timing of this acceleration.  In addition, it should be noted that the rating agencies, like Hanson and Kindt, had to rely upon the best information available at the time in making their rating decisions (i.e., the rating agencies also relied upon the financials statements as originally that were ultimately determined to be incorrect).

- The Marcus report does not independently establish that NorthWestern would have defaulted on the financial covenants related to its $280 million facility for which Credit Suisse First Boston ("CSFB") was the administrative agent.  Lacking any independent analysis, Marcus relies entirely upon the analysis of Berliner to make this assertion.  However, as noted above, Berliner's second

opinion adjustments are flawed. Absent these adjustments, NorthWestern's restated financial statements would have been in compliance with loan covenants rendering Marcus' assertion irrelevant.

- The Marcus report incorrectly states that "CSFB would likely not have funded the $280 million facility." The $280 million facility was already in place at the time of the misstatements. Accordingly, CSFB had an obligation to fund the facility unless NorthWestern was in default, which the Marcus Report does not establish.

- The decision of whether or not to pay a dividend is ultimately based on cash flow. However, the Marcus report does not consider NorthWestern's cash flow and its impact on the payment of a dividend. Clearly, NorthWestern was able to make the dividend payments that were paid. Accordingly, we are unable to determine how the Marcus report concludes that NorthWestern's dividend suspension would have been accelerated. Absent an analysis of cash flow this is nothing more than speculation.

- The $390 million debt financing provided by CSFB was secured. While the nature of the transaction may have been altered if the restatements were known (i.e., more fees, lower loan amount), Marcus cannot establish that, given sufficient security, CSFB would not have gone forward with the transaction. This is pure speculation on the part of Marcus.

### 3.6.2.2. Opinion 2 – Absent Transfer QUIPS Investors Covered by NorthWestern Energy Assets

Marcus' opinion that absent the transfer of assets, the QUIPS investors would have been covered by the NorthWestern Energy assets is speculative. Based upon the data we analyzed, we are in agreement with Magten's contention that NorthWestern Energy was solvent as of November 15, 2002. However, Marcus' opinion assumes that all interest and principal payments between November 15, 2002 and November 2036 would have been received. This assumption is mere speculation and does not comport with the

reality that numerous other factors could have impacted the repayment of the QUIPS during the period from November 15, 2002 to November 2036, including, for example, future changes in the economy and marketplace, the potential future sale of NorthWestern Energy, future changes in the financial condition of NorthWestern Energy, the development of alternative forms of energy, new technology, etc. Marcus' analysis does not consider the impact of other risk factors, but merely assumes that absent the transfers, the QUIPS investors would have been covered by NorthWestern Energy assets.

### 3.6.2.3. Opinion 3 – Solvency of Clark Fork

Marcus comes to a similar conclusion as Berliner with respect to the solvency of Clark Fork. Marcus' analysis also assumes that Clark Fork remained directly obligated for the QUIPS following the November 15, 2002 transaction. To the extent that Marcus' assumption is incorrect, his conclusion is likewise inappropriate and not relevant. Furthermore, like Berliner, Marcus fails to properly consider the relevant documents he should have in reaching his conclusion.

## 4. CONCLUSION

Based upon our analyses, it is our opinion within a reasonable degree of professional certainty that there is no basis to conclude that Hanson or Kindt knew or had reason to know about future potential cash flow issues, alleged misstatements or alleged lack of disclosures by NorthWestern or its various subsidiaries. As such, it was perfectly reasonable and within prudent business judgment for Hanson and Kindt to execute the required November 15, 2002 transaction documents as mandated by the sole member and manager, NorthWestern.

Furthermore, Plaintiff's damage calculation is fundamentally flawed, overly simplistic, speculative, and has a tendency to overstate damages in that it assumes a premature return of principal, does not consider amounts available under the NorthWestern plan of

reorganization and does not properly measure all the risks and relevant factors facing the holder of the QUIPS.

Finally, Plaintiff's experts do not address the actions of Hanson or Kindt.  As a result, they do not provide any causal linkage to the alleged breach of fiduciary duty and are not relevant.  Furthermore, their reports contain significant flaws and rampant speculation yielding inappropriate conclusions.


Stephen J. Scherf, CPA
Managing Director

**Exhibit A**

**STEPHEN J. SCHERF, CPA/ABV,
CFE, CICA, CIRA, CrFA, CVA**

<u>EDUCATION:</u>

Mr. Scherf has a B.B.A. in Accounting from Temple University (1980) and a Master of Science in Finance (1986) and an Advanced Professional Certificate in Taxation (1987) from Drexel University. His education has been supplemented by various continuing education courses offered by a variety of professional organizations. He has spoken before professional and educational groups on various aspects of business valuation, litigation consulting, fraud investigations and economic damages.

Licenses:    Certified Public Accountant in Pennsylvania and Delaware

<u>EMPLOYMENT/EXPERIENCE:</u>

Mr. Scherf has provided a wide array of accounting and consulting services to clients with an emphasis on business valuations, fraud investigations, bankruptcy, and litigation matters. Mr. Scherf has testified on numerous occasions in arbitrations, depositions and Federal Court. Mr. Scherf has taught for the American Institute of Certified Public Accountants, The National Association of Certified Valuation Analysts and other professional organizations.

Mr. Scherf's employment experience includes "Big Four" regional and a "boutique" accounting firm. In the private sector, Mr. Scherf held officer positions at a $2.5 billion financial institution, a major real estate developer and an investment firm.

<u>ASSOCIATIONS:</u>

American Arbitration Association National Roster of Commercial Panel of Neutrals
American Institute of Certified Public Accountants
Delaware Society of Certified Public Accountants
Pennsylvania Institute of Certified Public Accountants (PICPA)
    PICPA Forensic/Litigation Services Committee
    PICPA Business Valuation Committee
    PICPA Committee on Cooperation with the Bars
National Association of Certified Valuation Analysts (NACVA)
    NACVA Training Development Team
    NACVA Standards Committee
American Bankruptcy Institute
American College Board of Forensic Examiners
Association of Certified Fraud Examiners
Association of Insolvency and Restructuring Advisors
Diplomate of the American Board of Forensic Accounting
International Association of Consultants, Valuers and Analysts
Institute of Business Appraisers
Institute for Internal Controls
Turnaround Management Association

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure - Testimony**

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2007 | United States District Court<br>Eastern District of Pennsylvania | Deposition | AmerisourceBergen Drug Company v. American Associated<br>Druggists d/b/a United Drugs and Cardinal Health, Inc. |
| 2007 | United States Bankruptcy Court<br>Eastern District of Pennsylvania | Deposition | Total Containment, Inc. |
| 2007 | United States District Court<br>District of Arizona | Deposition | Biltmore Associates v. Peter Thimmesch et al. |
| 2007 | United States Bankruptcy Court<br>Eastern District of Pennsylvania | Hearing | Elan Strominger v. Richard Giquinto |
| 2007 | United States District Court<br>District of New Jersey | Deposition | Balmoral Financial Corporation v.<br>Prestige Capital Corporation |
| 2007 | Court of Common Pleas<br>Philadelphia County | Trial | Wood v. Grosso |
| 2006 | United States Bankruptcy Court<br>Eastern District of Pennsylvania | Hearing | Frascella Enterprises, Inc. |
| 2006 | United States District Court<br>Eastern District of Pennsylvania | Deposition | AmerisourceBergen Drug Company v. American Associated<br>Druggists d/b/a United Drugs |
| 2006 | Court of Chancery of the State of Delaware<br>New Castle County | Deposition | Escalon Medical Corp. and Escalon Holdings, Inc. v. IntraLase |
| 2006 | Court of Common Pleas<br>Philadelphia County, Pennsylvania | Trial | Nathan R. Kurland v. Monika Turtle, Monika Turtle Studio and<br>Monika Turtle Studio, Ltd. |
| 2005 | United States Bankruptcy<br>Middle District of Florida | Trial | Maxxim Medical, Inc. v. Professional Hospital Supply, Inc. and<br>Karen McCauley |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure - Testimony**

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2005 | United States Bankruptcy Middle District of Florida | Deposition | Maxxim Medical, Inc. v. Professional Hospital Supply, Inc. and Karen McCauley |
| 2005 | Court of Common Pleas Allegheny County, Pennsylvania | Trial | Aidan J. McKenna v. OpenWebs Corporation, CarParts Technologies, Inc., Mark Woodward and Paul Campbell |
| 2005 | United States Bankruptcy Court District of Delaware | Trial | Winstar Communications, Inc., et al. v. Lucent Technologies Inc. |
| 2005 | American Arbitration Association Philadelphia, PA | Trial | Bachmann Industries, Inc. v. BDO Seidman, LLP |
| 2005 | United States District Court Easter District of Pennsylvania | Trial | United States of America v. Barry Budilov |
| 2005 | United States District Court Eastern District of Pennsylvania | Deposition | Koken v. Viad Corp. |
| 2004 | United States Bankruptcy Court District of Delaware | Deposition | Neilson v. SMED International |
| 2004 | United States District Court Eastern District of Pennsylvania | Trial | Out-A-Sight Pet Containment, Inc. v. Radio Systems Corporation, et al. |
| 2004 | Court of Common Pleas, State of South Carolina, County of Richland | Trial | Heritage Propane Partners, L.P. and Heritage Operating L.P. v. SCANA Corporation, et al. |
| 2004 | Office of State Bank Commissioner State of Delaware | Trial | In the matter of Lehman Brothers Bank, FSB |
| 2004 | Court of Common Pleas Bucks County, Pennsylvania | Trial | Andrew C. Monaghan, et al. v. Renu Labs, Inc. et al. |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure - Testimony**

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2004 | Court of Common Pleas<br>Luzerne County, Pennsylvania | Trial | Joseph LaRock, Cinda LaRock Danna, and Mary Louise LaRock Burke v. Board of Supervisors of Sugarloaf Township |
| 2004 | Court of Common Pleas, State of South Carolina, County of Richland | Deposition | Heritage Propane Partners, L.P. and Heritage Operating L.P. v. SCANA Corporation, et al. |
| 2004 | United States Bankruptcy Court<br>Eastern District of Pennsylvania | Deposition | ATS Products Corp. v. Willow Grove Bank |
| 2004 | American Arbitration Association<br>Philadelphia, PA | Trial | Horizon Stevedoring, Inc. v. Int'l Longshoremen's Association, et al. |
| 2004 | American Arbitration Association<br>Philadelphia, PA | Trial | Valu Engineering, Inc. and Solus Industrial Innovations, LLC v. Nolu Plastics Inc., et al. |
| 2004 | United States District Court<br>Eastern District of Pennsylvania | Hearing | Out-A-Sight Pet Containment, Inc. v. Radio Systems Corporation, et al. |
| 2004 | American Arbitration Association<br>Philadelphia, PA | Deposition | Valu Engineering, Inc. and Solus Industrial Innovations, LLC v. Nolu Plastics Inc., et al. |
| 2004 | United States Bankruptcy Court<br>District of Delaware | Deposition | Winstar Communications, Inc., et al. v. Lucent Technologies Inc. |
| 2004 | United States District Court<br>Eastern District of Pennsylvania | Deposition | Out-A-Sight Pet Containment, Inc. v. Radio Systems Corporation, et al. |
| 2003 | American Arbitration Association<br>Philadelphia, Pennsylvania | Trial | American Homestead Mortgage Corp. v. Wilmington Savings Fund Society, FSB |
| 2003 | Court of Common Pleas<br>Carbon County, Pennsylvania | Trial | Mahoning Valley Cinemas, Inc. v. Carriage Associates Limited Partnership, et al. |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure - Testimony**

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2003 | Court of Common Pleas<br>Susquehanna County, Pennsylvania | Trial | Norman E. Turner v. The Turner Family Partners, L.P., et al. |
| 2003 | United States District Court<br>Southern District of New York | Trial | Shared Communications Services, Inc. v. Goldenberg Rosenthal,<br>LLP and David Gruber |
| 2003 | Family Court of the State of Delaware<br>New Castle County | Trial | Carmen J. Facciolo, Jr. v. Pamela Joan Facciolo |
| 2003 | Court of Common Pleas<br>Philadelphia County | Trial | Aaron Wesley Wyatt v. Richard G. Phillips |
| 2003 | Court of Common Pleas<br>Philadelphia County | Trial | Pennsylvania Orthopedic Society v. Independence Blue Cross, et al. |
| 2003 | American Arbitration Association<br>Philadelphia, Pennsylvania | Trial | National Business Adjusters, Inc., and Gary Morgan v.<br>Global Energy Resources, et al. |
| 2003 | Court of Common Pleas, State of South<br>Carolina, County of Richland | Deposition | Heritage Propane Partners, L.P. and Heritage Operating L.P. v.<br>SCANA Corporation, et al. |
| 2003 | United States District Court<br>Eastern District of Pennsylvania | Deposition | Out-A-Site Pet Containment, Inc. v. Radio Systems<br>Corporation, et al. |
| 2003 | United States District Court<br>Middle District of Pennsylvania | Trial | Jama Corporation v. Giriwarlal Gupta, et al. |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure - Publications**

| _Date_ | _Publication_ | _Title_ |
|------|-------------|-------|
| 2007 | ABF Journal (Co-Author with G Urbanchuk) | *Newton and Fraud: What Goes Up Must Come Down* |
| 2002 | Parente Randolph Newsletter | *Fraud on the Rise* |
| 2002 | Parente Randolph Newsletter | *Shareholder Disputes* |
| 2002 | Parente Randolph Newsletter | *Employee Fraud* |
| 2001 | Pennsylvania Bar Institute – Business Divorce | *Business Divorce* |
| 2000 | Small Business Journal | *Valuing Your Business* |
| 2000 | Small Business Journal | *Crisis Management to Improve Profitability* |
| 1999 | PICPA Mock Trial Program and PBI Litigating in Bankruptcy Court Programs | *How to be an "Expert" Expert Witness* |
| 1999 | National Association of Certified Valuation Analysts | *Determining the Appropriate Valuation Method Self Study Course* |
| 1997 | Pennsylvania CPA Journal | *Discount and Capitalization Rates for Business Valuations:  The Income Method* |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure – Speaking Engagements**

| *Date* | *Description* | *Location* |
|---|---|---|
| 2007 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Brookfield, WI |
| 2006 | Discounting of Damages, Selecting Appropriate Discount<br>Rate - Forensic & Litigation Services Conference<br>Pennsylvania Institute of Certified Public Accountants | King of Prussia, PA |
| 2006 | Business Valuation: How to Make or Break Your Case<br>Montgomery County Bar Association<br>Pennsylvania Institute of Certified Public Accountants | Norristown, PA |
| 2006 | National Business Institute<br>Financial Statement Analysis for the Non-Financial<br>Advisor in Pennsylvania | Philadelphia, PA |
| 2006 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | San Antonio, TX |
| 2006 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Chicago, IL |
| 2005 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Ft. Lauderdale, FL |
| 2005 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Jersey City, NJ |
| 2005 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Philadelphia, PA |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure – Speaking Engagements**

| *Date* | *Description* | *Location* |
|---|---|---|
| 2005 | Association of Government Accountants<br>Philadelphia Chapter<br>Business Valuation Fundamentals and Techniques | Lester, PA |
| 2005 | Association of Government Accountants<br>Philadelphia Chapter<br>Ownership and Acquisition Disputes and the Role of the<br>Forensic Accountant | Lester, PA |
| 2004 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Las Vegas, NV |
| 2004 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Chicago, IL |
| 2004 | AICPA Conferences on Fraud and Litigation Services<br>Case Management | Phoenix, AZ |
| 2003 | Pennsylvania Institute of Certified Public Accountants<br>Business Valuation Methods and Current Hot HV Topics | Bethlehem, PA |
| 2003 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | San Diego, CA |
| 2003 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | New Orleans, LA |
| 2003 | AICPA National Conference on Advance Litigation<br>Services<br>Purchase Price & Acquisition Disputes – Practical<br>Application and Hot Issues | Miami Beach, FL |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure – Speaking Engagements**

| *Date* | *Description* | *Location* |
|---|---|---|
| 2003 | Pennsylvania Institute of Certified Public Accountants<br>Fraud and Internal Controls | Hershey, PA |
| 2003 | Institute of Internal Auditors<br>Forensic Accounting | Pittston, PA |
| 2002 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Atlanta, GA |
| 2002 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Phoenix, AZ |
| 2002 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Toronto, Canada |
| 2002 | Pennsylvania Institute of Certified Public Accountants<br>Not-For-Profit Fraud Schemes | Hershey, PA |
| 2002 | PA Department of Banking<br>Fraud Red Flags | Harrisburg, PA |
| 2002 | Association of Government Accountants<br>Forensic Accounting | Philadelphia, PA |
| 2001 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Las Vegas, NV |
| 2001 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Orlando, FL |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure – Speaking Engagements**

| *Date* | *Description* | *Location* |
|--------|---------------|------------|
| 2001 | Pennsylvania Bar Institute<br>Business Divorce | Mechanicsburg, PA |
| 2001 | Pennsylvania Institute of Certified Public Accountants<br>Accounting for Troubled Businesses - Practical Tips | Valley Forge, PA |
| 2001 | Pennsylvania Institute of Certified Public Accountants<br>Fraud, Testing and Internal Controls | Hershey, PA |
| 2000 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Las Vegas, NV |
| 2000 | Pennsylvania Institute of Certified Public Accountants<br>Valuing Stock Options and Warrants | Valley Forge, PA |
| 2000 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Chicago, IL |
| 2000 | Pennsylvania Bar Institute – Finding Hidden Assets | Philadelphia, PA |
| 2000 | Seventh Annual Conference of Certified Valuation Analysts<br>Valuation Methods – Pros & Cons | Dallas, TX |
| 1999 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | New Orleans, LA |
| 1999 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | San Raphael, CA |
| 1999 | National Association of Certified Valuation Analysts<br>Determining the Appropriate Valuation Method | Hyannis, MA |

# Stephen J. Scherf, CPA/ABV, CFE, CICA, CIRA, CrFA, CVA
**Rule 26 Disclosure – Speaking Engagements**

| Date | Description | Location |
|------|-------------|----------|
| 1999 | Pennsylvania Institute of Certified Public Accountants<br>Pennsylvania Bar Education Center<br>Mock Trial - Battling the IRS in District Court | Philadelphia, PA |

Magten Asset Management Corp., v. Michael J. Hanson and Ernie J. Kindt                                      **Exhibit B**
Documents Relied Upon

| Document Description | Bates Range |
|---|---|
| Montana Power Capital 1 8.45% Cumulative Quarterly Income Preferred Securities, Series A (QUIPS) Prospectus | |
| Deposition Transcript of Bart Theilbar, taken June 21, 2007 and Exhibits | |
| Deposition Transcript of Ernie Kindt, taken June 28, 2007 and Exhibits | |
| Deposition Transcript of Gary Drook, taken April 25, 2007 and Exhibits | |
| Deposition Transcript of Eric Jacobsen, taken June 19, 2007 and Exhibits | |
| Deposition Transcript of Kendall Kliewer, taken June 29, 2007 and Exhibits | |
| Deposition Transcript of Talton R. Embry, taken July 12, 2007 and Exhibits | |
| Deposition Transcript of Michael J. Hanson, taken June 27, 2007 and Exhibits | |
| Deposition Transcript of Richard Hylland, taken May 2, 2007 and Exhibits | |
| Deposition Transcript of Kipp Orme, taken April 12, 2007 and Exhibits | |
| Deposition Transcript of Mary Lewicki, taken May 2, 2007 | |
| Deposition Transcript of Merle Lewis, taken June 20, 2007 and Exhibits | |
| Deposition Transcript of Richard Fresia, taken April 30, 2007 and Exhibits | |
| Deposition Transcript of Michael Neiman, taken June 29, 2007 and Exhibits | |
| Complaint and Demand for Jury Trial of Magten Asset Management Corp. v. Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt, and Ellen M. Senechal, dated April 15, 2004 | |
| Amended Answer, Affirmative Defenses, and Withdrawl of Counterclaims to First Amended Complaint, other than Objection to the Quips Litigation Claim of Magten Asset Management Corp and Law Debenture Trust Company of NY v. Northwestern Corporation | |
| First Amended Complaint to Avoid the Transfer of Assets of Clark Fork and Blackfoot LLC of Magten Asset Management Corp and Law Debenture Trust Company of NY v. Northwestern Corporation, dated October 4, 2004 | |
| Judgment in a Civil Case of Magten Asset Management Corp, suing individually and derivatively on the behalf of Clark Fork and Blackfoot, LLC v. Paul Hastings Janofsky & Walker, LLP | |
| Jacobsen-Hanson Memorandum, dated July 9, 2002 regarding Northwestern Energy LTIP | |
| Answer of Defendants Michael J. Hanson and Ernie J. Kindt of Magten Asset Management Corp. v. Mike J. Hanson and Ernie J. Kindt, dated April 21, 2004 | |
| Under Advisement Decision RE: Motion to Dismiss of Magten Asset Management Corp and Law Debenture Trust Company of NY v. Northwestern Corporation | |
| Jacobsen-Hanson Memorandum, dated March 18, 2002 regarding MPC Compensation Proposal | |
| Asset and Stock Transfer Agreement between Northwestern Energy and Northwestern Corp, dated November 12, 2002 | NOR000074 NOR000164 |
| BearingPoint, Inc's Valuation Report Prepared for: Northwestern Corporation - Determination of the Fair Value of Certain Underlying Assets Acquired from Montana Power, LLC, dated December 31, 2002 | NOR008848 NOR008941 |
| Guarantee Agreement between Montana Power Company and Bank of NY, dated November 1, 1996 | NOR009092 NOR009113 |
| Montana Power Company to Bank of New York: Indenture (for unsecured subordinated debt securities relating to trust securities), dated November 1, 1996 | NOR009214 NOR009296 |
| American Appraisal Reports: Expanents, Inc and Subsidiaries Fair Value, dated January 1, 2002 | NOR305016 NOR305182 |
| Unit Purchase Agreement between Northwest Corporation, Touch America Holdings, Inc and Montana Power Company with respect to all outstanding membership interests in Montana Power LLC, dated September 29, 2000 | NOR002632 NOR002700 |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held January 2, 2002 | NOR009538 NOR009729 |
| Amended and Restated Trust Agreement among Montana Power Company and Bank of NY, Ellen M. Senechal, Jerrold P. Pederson and Pamela K. Merrell, dated November 1, 1996 | NOR009009 NOR009075 |
| Magten Asset Management Corp's Response to Michael Hanson and Ernie Kindt's First Set of Requests to Admit | |
| Magten Asset Management Corp's Response to Michael Hanson and Ernie Kindt's First Set of Interrogatories | |
| Michael Hanson's Responses to Magten Asset Management Corp's Request for Admission | |
| Michael Hanson's Responses to Plaintiff's First Set of Interrogatories | |
| Ernie Kindt's Responses to Plaintiff's Request for Admission | |
| Ernie Kindt's Responses to Plaintiff's First Set of Interrogatories | |
| Form 8-K for Northwestern Corporation, dated November 20, 2002 | |
| Report of the Special Committee of the Board of Directors of Northwestern Corporation, dated April 25, 2003 (vol. 1 of 2) | |
| Report of the Special Committee of the Board of Directors of Northwestern Corporation, dated April 25, 2003 (vol. 2 of 2) | |
| NCS Audit Documents (vol. 1 of 2) | |
| NCS Audit Documents (vol. 2 of 2) | |

Magten Asset Management Corp., v. Michael J. Hanson and Ernie J. Kindt                                    **Exhibit B**
Documents Relied Upon

| Document Description | Bates Range |
|---|---|
| Bear Stearns Presentation to Northwestern Corporation Regarding Financing Alternatives, dated September 12, 2002 | |
| Bear Stearns Presentation to Northwestern Corporation Regarding Financing Alternatives, dated September 20, 2002 | |
| Bear Stearns Presentation to Northwestern Corporation Board of Directors, dated September 23, 2002 | |
| Bear Stearns Presentation to Northwestern Corporation Board of Directors, dated September 27, 2002 | |
| Bear Stearns Presentation to Northwestern Corporation, dated November 6, 2002 | |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held January 2, 2002 | |
| Form 8-K for Northwestern Corporation from 2002 to April 2003 | |
| Form 10-Q and S-4 for Northwestern Corporation for 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended December 31, 2001 | |
| Northwestern Corporation Management Financial and Information Report for month ended January 31, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended February 28, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended March 31, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended April 30, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended May 31, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended June 30, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended July 31, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended August 31, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended September 30, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended October 31, 2002 | |
| Northwestern Corporation Management Financial and Information Report for month ended November 30, 2002 | |
| Various documents associated with Northwestern Corporation and Northwestern Energy, LLC Debt Restructuring and Transfer of Assets and Liabilities of Northwestern Energy to Northwestern Corporation | NOR198029 NOR201057 |
| Complaint of Securities and Exchange Commission v. Richard R. Hylland, filed April 25, 2007 | |
| Consent of Kipp Orme for the Securities and Exchange Commission v. Kipp Orme, filed April 25, 2007 | |
| Consent of Merle Lewis for the Securities and Exchange Commission v. Merle Lewis, filed April 25, 2007 | |
| Complaint of Securities and Exchange Commission v. Merle Lewis, filed April 25, 2007 | |
| Complaint of Securities and Exchange Commission v. Kipp Orme, filed April 25, 2007 | |
| Complaint of Securities and Exchange Commission v. Kurt D. Whitesel, filed April 25, 2007 | |
| Consent of Kurt D. Whitesel for the Securities and Exchange Commission v. Kurt D. Whitesel, filed April 25, 2007 | |
| Consent of Richard Hylland for the Securities and Exchange Commission v. Richard Hylland, filed April 25, 2007 | |
| Order instituting cease-and-desist proceedings, making finding and imposing a cease-and-desist order pursuant to Section 21C of the Securities Exchange Act of 1934, in the matter of Northwestern Corporation | |
| Complaint of Securities and Exchange Commission v. Richard Fresia, filed July 23, 2007 | |
| Complaint of Securities and Exchange Commission v. John Charters, dated July 23, 2007 | |
| Civil Cover Sheet for Securities and Exchange Commission v. John Charters, dated July 23, 2007 | |
| Special Assignment Form for Securities and Exchange Commission v. John Charters, dated July 23, 2007 | |
| Consent of Cary Griswold for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold, dated May 24, 2006 | |
| Final Judgment as to Defendant David A. Monahan for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold | |
| Consent of Jana Quam for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold, dated May 22, 2006 | |
| Final Judgment as to Defendant Cary Griswold for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold | |
| Motion for Leave to File Amended Complaint for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold, dated October 5, 2007 | |
| Amended Complaint for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold | |
| Final Judgment as to Defendant Keith W. Beachler for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold | |
| Consent of Keith W. Beachler for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold, dated May 22, 2006 | |
| Memorandum Opinion and Order for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold, Filed September 28, 2006 | |

Magten Asset Management Corp., v. Michael J. Hanson and Ernie J. Kindt                                    **Exhibit B**
Documents Relied Upon

| Document Description | Bates Range |
|---|---|
| Final Judgment as to Defendant Jana Quam for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold | |
| Consent of David A. Monaghan for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold, dated June 8, 2006 | |
| Complaint for the Securities and Exchange Commission v. Bart A. Thielbar, David A. Monaghan, Keith W. Beachler, Jana Quam and Cary Griswold, dated December 1, 2006 | |
| Memorandum from Kipp Orme to Northwestern Board of Directors RE:  Northwestern Liquidity Update, dated December 8, 2002 | NOR174528 NOR174529 |
| Email chain between Travis Gjoraas and Richard Hylland, Kipp Orme, Trey Bradley, Michael Nieman RE:  Cash Receipts Update - 5/8/02, dated May 8, 2002 | NOR406205 |
| Memorandum from Kipp Orme to Northwestern Board of Directors RE:  Cash Flow Projections, dated January 21, 2003 | NOR233361 NOR233362 |
| Memorandum from Merle Lewis and Richard Hylland to All Northwestern, Expanets, Blue Dot and Energy Team Members RE:  Northwestern Financing Update, dated December 18, 2002 | NOR129410 |
| Memorandum from Kipp Orme to Northwestern Board of Directors RE:  Cash Flow Projections, dated February 23, 2003 | NOR369571 NOR369572 |
| Email chain between Michael Nieman and Kipp Orme RE:  Cash Flow reconciliation, dated May 7, 2002 | NOR277366 NOR277367 |
| Email chain between Richard Hylland and Kipp Orme RE:  Draft 1stQ Forecast Release, dated April 7, 2002 | NOR405696 NOR405697 |
| Memorandum from Mike Hanson and Eric Jacobsen to the Board of Directors RE:  Update on Montana Power Acquisiton, dated January 28, 2002 | NOR142389 NOR142392 |
| Schedule of various action plans and statuses of their progress | NOR025086 NOR025095 |
| Memorandum from Merle Lewis and Richard Hylland to Board of Directors RE:  NOR Financing Status and REcommendations, dated December 7, 2002 | NOR069739 |
| Email chain between Richard Hylland and John Charters, BCC: Kipp Orme RE:  Cash Situation update, dated October 10, 2002 | NOR405610 |
| Email chain between Kipp Orme and Gary Drook RE:  Updated Liquidity Analysis, dated October 10, 2002 | NOR405886 NOR405887 |
| Northwestern Corporation Reports 1st Q 2002 EPS of 65 Cents from Continuing Operations Press Release, dated April 30, 2002 | NOR145392 NOR145397 |
| Northwestern Corporation Completes Sale of $720 Million in Senior Notes in Rule 144A Offering Press Release, dated March 13, 2002 | NOR378593 NOR378595 |
| Email chain between Kipp Orme and Eric Jacobsen RE:  Board Update Memo, dated December 4, 2002 | NOR092311 NOR092313 |
| Memorandum from Alan D. Dietrich to Northwestern Board of Directors RE:  Northwestern Additional Financing Authorization REsolution, dated March 4, 2002 | NOR052381 |
| Email chain between Travis Gjoraas and Richard Hylland, Kipp Orme, Kurt Whitesel, Michael Nieman RE:  Expanets Cash Update, dated July 26, 2002 | NOR406247 |
| Northwestern Corporation Reaffirms 2002 Performance and Annualizaed Free Cash Flow Targets; Selects New Independent Accountants for 2002 Press Release, dated May 17, 2002 | NOR377088 NOR377091 |
| Email chain between Randy Darcy and Richard Hylland RE:  August Update, dated September 5, 2002 | NOR053665 NOR053667 |
| Draft of Northwestern lowers guidance for estimated 2002 results year end charges being reviewed Press Release, dated December 2002 | NOR192453 NOR192457 |
| Northwestern Corporation Board of Directors Minutes of Annual Meeting April 30 - May 1, 2002 | NOR009556 NOR009558 |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held September 10, 2002 | NOR009584 NOR009585 |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held March 18, 2002 | NOR009551 NOR009553 |
| Northwestern Corporation Outlines Turnaround Plan Press Release, dated February 19, 2003 | NOR159256 NOR159260 |
| Northwestern Corporation Board of Directors Minutes of Regular Meeting November 6-7, 2001 | NOR009503 NOR009517 |
| Draft of Northwestern to defer distributions on all series of trust preferred securities Press Release, dated May 23, 2003 | NOR001173 NOR001175 |
| Memorandum from Kipp Orme to Northwestern Board of Directors RE:  Bond Offering, undated | NOR464756 NOR464761 |
| Northwestern enters into $390 million secured credit facility Press Release, dated December 18, 2003 | NOR129411 NOR129413 |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held September 12, 2002 | NOR009586 NOR009587 |
| Northwestern Corporation Form U-1, dated February 14, 2002 | NOR003477 NOR003497 |
| Memorandum from Eric Jacobsen to Northwestern Board of Directors RE:  "Going Flat" Resolution, undated July 31, 2002 | |
| Memorandum from Mike Hanson and Eric Jacobsen to the Board of Directors RE:  Update on Montana Power Acquisiton, dated January 28, 2002 | |
| Memorandum from Kipp Orme to Merle Lewis, Dick Hylland, and Eric Jacobsen RE:  Financing plans and considerations, dated May 28, 2002 | NOR056238 NOR056245 |

Magten Asset Management Corp., v. Michael J. Hanson and Ernie J. Kindt                    **Exhibit B**
Documents Relied Upon

| Document Description | Bates Range |
|---|---|
| Presentation - Liquidity, Financing Opportunities, and Strategic planning and sensitivities board summary, dated October 2002 | NOR054582 NOR054600 |
| Memorandum from Kipp Orme to Northwestern Board of Directors RE:  revised proposed 2003 operating plan, dated October 30, 2002 | NOR174387 NOR174389 |
| Presentation - Liquidity, Financing Opportunities, and Strategic planning and sensitivities board summary, dated October 2002 | NOR351316 NOR351335 |
| Gibson Dunn presentation to Northwestern Audit Committee, dated April 10, 2003 | NOR521370 NOR521440 |
| Memorandum from Kipp Orme to Northwestern Board of Directors RE:  Financing and IR plans, dated June 17, 2002 | NOR053464 NOR053469 |
| Memorandum from Kipp Orme to Northwestern Board of Directors RE:  Financing plans, dated August 2, 2002 | NOR053581 NOR053585 |
| Presentation - Liquidity, Financing Opportunities, and Strategic planning and sensitivities board summary, dated October 2002 | NOR054582 |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held December 12, 2002 | NOR009610 NOR009619 |
| Northwestern Corporation Board of Directors Minutes of Regular Meeting February 5, 2003 | NOR009627 NOR009630 |
| Merrill Lynch assessment of Northwestern Corporation, dated August 19, 2002 | NOR026460 NOR026463 |
| Approval of Minutes of Previous Meetings | NOR009637 NOR009642 |
| Email chain between Kipp Orme and Peter Otersen RE:  Dow Jones Article, dated September 18, 2002 | NOR160508 NOR160509 |
| Northwestern Corporation Board of Directors Minutes of Regular Meeting August 7, 2002 | NOR009568 NOR009583 |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held September 27, 2002 | NOR009595 NOR009597 |
| Northwestern Corporation Board of Directors Minutes of the Special Meeting held September 20, 2002 | NOR009590 NOR009593 |
| 1st Set of Discovery Requests of Defendants Michael Hanson and Ernie Kindt to Magten Asset Management Corp | |
| Ernie Kindt's Responses to Magten's Requests for Admission | |
| Ernie Kindt's Responses to Plaintiff's 1st Set of Interrogatories | |
| Magten Asset Management Corporation and Law Debenture Trust Company of NY's 1st Set of Interrogatories for Defendant Northwestern Corporation | |
| Magten Asset Management Corporation and Law Debenture Trust Company of NY's 2nd Set of Interrogatories for Defendant Northwestern Corporation | |
| Magten Asset Management Corporation's Response to Michael Hanson and Ernie Kindt's 1st Set of Document Requests | |
| Magten Asset Management Corporation's Response to Michael Hanson and Ernie Kindt's 1st Set of Document Requests to Admit | |
| Magten Asset Management Corporation's Response to Michael Hanson and Ernie Kindt's 1st Set of Interrogatories | |
| Michael J. Hanson's Responses to Magten's Requests for Admission | |
| Michael J. Hanson's Responses to Plaintiff's 1st Set of Interrogatories | |
| Northwestern Corporation's 1st Request for Production of Documents to Magten | |
| Objections and Responses of Defendant Northwestern to Plaintiffs 1st Request for Admissions | |
| Plaintiffs' 1st Request for Production of Documents for Defendant Michael Hanson | |
| Plaintiffs' 1st Request for Production of Documents for Defendant Northwestern | |
| Plaintiff's 1st Set of Interrogatories for Defendants Hanson and Kindt | |
| Plaintiffs' 2nd Request for Production of Documents for Defendant Northwestern | |
| Plaintiff's 2nd Set of Requests for Admissions Pursuant to Rule 36 of the Federal Rules of Civil Procedure for Defendant Northwestern | |
| Plaintiffs' Request for Admissions pursuant to Rule 36 of the Federal Rules of Civil Procedures for Defendant Northwestern Corporation | |
| Response of Defendant Hanson to Plaintiffs' 1st Request for Production of Documents | |
| Response of Defendant Kindt to Plaintiffs' 1st Request for Production of Documents | |
| Responses and Objections of Northwestern to Plaintiffs Magten Asset Management and Law Debenture Trust Company of NY's 1st Set of Interrogatories for Defendant Northwestern | |
| Responses and Objections of Northwestern to Plaintiffs 2nd Request for Admissions | |
| Northwestern Corporation's 2nd Request for Production of Documents to Magten | |
| Northwestern Corporation's 1st Set of Interrogatories for Plaintiff Law Debenture Trust Company of NY | |
| Northwestern Corporation's 1st Set of Interrogatories for Plaintiff Magten | |
| Northwestern Corporation's 1st Request of Production of Documents to Law Debenture Trust Company of NY | |
| Defendant Northwestern Responses and Objections to Plaintiffs' 2nd Request for Production of Documents | |
| Notice of Service of Discovery | |

**Magten Asset Management Corp., v. Michael J. Hanson and Ernie J. Kindt**                                                    **Exhibit B**
**Documents Relied Upon**

| Document Description | Bates Range |
|---|---|
| Plaintiffs' 1st Request for Production of Documents for Defendant Ernie Kindt | |
| Plaintiffs' Request for Admissions pursuant to Rule 36 of the Federal Rules of Civil Procedures for Defendant Hanson and Kindt | |
| January 2002 Materials for Board Meetings | |
| February 2002 Materials for Board Meetings | |
| March 2002 Materials for Board Meetings | |
| April 2002 Materials for Board Meetings | |
| May 2002 Materials for Board Meetings | |
| June 2002 Materials for Board Meetings | |
| July 2002 Materials for Board Meetings | |
| August 2002 Materials for Board Meetings | |
| September 2002 Materials for Board Meetings | |
| October 2002 Materials for Board Meetings | |
| November 2002 Materials for Board Meetings | |
| December 2002 Materials for Board Meetings | |
| Department of Public Service Regulation Joint Application of the Montana Power Company and Northwestern Corporation | NOR044299 NOR044695 |
| Department of Public Service Regulation Testimony of Michael J. Hanson of Northwestern Corporation | NOR044744 NOR044755 |
| Annual Report of Major Electric Utilities, Licensees and Others | NOR044026 NOR044298 |
| Department of Public Service Regulation Joint Application of the Montana Power Company and Northwestern Corporation Supplemental Filing | NOR044696 NOR044743 |
| Department of Public Service Regulation Joint Application of the Montana Power Company and Northwestern Corporation Final Order | NOR044756 NOR044872 |
| NOR Staff Meeting, dated December 2, 2002 | NOR 045006 NOR 045221 |
| 2002 NOR Management Report | NOR044873 NOR045005 |
| Form 10-Q for Northwestern Corporation for March 31, 2001 | NOR043146 NOR043165 |
| Form 10-Q for Northwestern Corporation for March 31, 2003 | NOR043166 NOR043233 |
| Form 10-Q for Northwestern Corporation for June 30, 2004 | NOR043234 NOR043301 |
| Form 10-Q for Northwestern Corporation for September 30, 2004 | NOR043302 NOR043377 |
| Form 10-K for Northwestern Corporation for December 31, 2003 | NOR043378 NOR043497 |
| Form 10-K/A for Northwestern Corporation for December 31, 2001 | NOR043498 NOR043613 |
| FERC Form No. 1, dated December 31, 2003 | NOR043614 NOR043849 |
| Form 10-K for Northwestern Corporation for December 31, 2002 | NOR043850 NOR044025 |
| Northwestern Corporation Letter of Recommendations, dated April 4, 2003 | NOR045433 NOR045476 |
| Northwestern Corporation Board of Directors Minutes of Regular Meeting, dated November 6, 2002 | NOR045222 NOR045231 |
| Northwestern Corporation Board of Directors Meeting, dated November 2002 | NOR045232 NOR045432 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 30, 2007, the attached **AFFIDAVIT OF STEPHEN SCHERF** was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

> Victoria Watson Counihan, Esquire
> Greenberg Traurig, LLP
>
> Dale R. Dube, Esquire
> Blank Rome LLP
>
> Kathleen M. Miller, Esquire
> Smith, Katzenstein & Furlow LLP

In addition, the undersigned forwarded a copy of same in the manner indicated below to:

### BY E-MAIL AND HAND-DELIVERY

Victoria W. Counihan, Esquire
Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

Dale R. Dube, Esquire
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801

Kathleen M. Miller, Esquire
Smith Katzenstein & Furlow LLP
800 Delaware Avenue
Wilmington, DE 19801

### BY E-MAIL AND FIRST-CLASS MAIL

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
Curtis, Mallet-Prevost, Colt & Mosle, LLP
101 Park Avenue
New York, NY 10178-0061

John Snellings, Esquire
Nixon Peabody, LLP
100 Summer Street
Boston, MA 02110-2131

4

319737/1674.044

Bonnie Steingart, Esquire
Gary L. Kaplan, Esquire
John W. Brewer
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 1004-1980


                                        /s/ Denise Seastone Kraft
                                        Denise Seastone Kraft (#2778)
                                        Edwards Angell Palmer & Dodge LLP
                                        Wilmington, DE 19801
                                        (302) 777-7770
                                        dkraft@eapdlaw.com

319737/1674.044