# Exhibit 7
# (Part A)

UNIT PURCHASE AGREEMENT

dated as of September 29, 2000

by and between

NORTHWESTERN CORPORATION,

TOUCH AMERICA HOLDINGS, INC.

and

THE MONTANA POWER COMPANY

with respect to all
outstanding membership interests in

THE MONTANA POWER LLC

NY1:#3264263v6
31287-02300

NOR002632

# TABLE OF CONTENTS

This Table of Contents is not part of the Agreement to which it is attached but is inserted for convenience only.

ARTICLE I SALE OF SHARES AND CLOSING...................................................................1
 1.01  Purchase and Sale ..............................................................................1
 1.02  Purchase Price....................................................................................1
 1.03  Closing ...............................................................................................1
 1.04  Further Assurances; Post-Closing Cooperation ................................2

ARTICLE II REPRESENTATIONS AND WARRANTIES OF SELLER AND MPC...................3
 2.01  Corporate Existence of Seller and MPC............................................3
 2.02  Authority.............................................................................................3
 2.03  Existence of the Company ..................................................................3
 2.04  Capitalization......................................................................................3
 2.05  Subsidiaries ........................................................................................4
 2.06  No Conflicts........................................................................................4
 2.07  Governmental Approvals and Filings.................................................5
 2.08  Books and Records .............................................................................5
 2.09  Financial Statements and Condition ...................................................5
 2.10  Taxes ..................................................................................................6
 2.11  Legal Proceedings...............................................................................8
 2.12  Compliance With Laws and Orders ...................................................8
 2.13  Benefit Plans; ERISA .........................................................................8
 2.14  Property.............................................................................................10
 2.15  Intellectual Property Rights ..............................................................10
 2.16  Contracts ...........................................................................................10
 2.17  Licenses ............................................................................................13
 2.18  Insurance ...........................................................................................13
 2.19  Affiliate Transactions.......................................................................13
 2.20  Labor and Employment Matters.......................................................13
 2.21  Environmental Matters .....................................................................14
 2.22  Information Supplied.........................................................................14
 2.23  Vote Required...................................................................................15
 2.24  Brokers..............................................................................................15
 2.25  Public Utility Holding Company Act ...............................................15
 2.26  Regulatory Filings............................................................................15
 2.27  Rights Agreement .............................................................................15
 2.28  Effect of Restructuring......................................................................16

ARTICLE III REPRESENTATIONS AND WARRANTIES OF PURCHASER.............................16
 3.01  Corporate Existence..........................................................................16

NY1:#3264263v6

31287-02300

NOR002633

| | | |
|---|---|---|
| 3.02 | Authority | 16 |
| 3.03 | No Conflicts | 16 |
| 3.04 | Governmental Approvals and Filings | 17 |
| 3.05 | Legal Proceedings | 17 |
| 3.06 | Purchase for Investment | 17 |
| 3.07 | Brokers | 17 |
| 3.08 | Financing | 17 |
| 3.09 | Ownership of the Capital Stock | 18 |
| 3.10 | Exon-Florio | 18 |
| 3.11 | Independent Evaluation | 18 |

**ARTICLE IV COVENANTS OF SELLER AND MPC** .......... 18

| | | |
|---|---|---|
| 4.01 | Regulatory and Other Approvals | 18 |
| 4.02 | HSR Filings | 19 |
| 4.03 | Investigation by Purchaser | 19 |
| 4.04 | No Solicitations | 19 |
| 4.05 | Conduct of Business | 20 |
| 4.06 | Financial Statements and Reports | 21 |
| 4.07 | Certain Restrictions | 21 |
| 4.08 | Affiliate Transactions | 23 |
| 4.09 | Fulfillment of Conditions | 24 |
| 4.10 | Completion of Restructuring | 24 |
| 4.11 | Preparation and Mailing of Proxy Statement | 24 |
| 4.12 | Approval of MPC Stockholders | 24 |
| 4.13 | Completion of the Divestiture | 24 |
| 4.14 | Regulatory Proceedings | 24 |
| 4.15 | Sale of Colstrip 1, 2, and 3 Transmission System | 25 |
| 4.16 | QF Contracts | 25 |
| 4.17 | MPC Benefit Restoration Plans | 25 |
| 4.18 | Power Supply | 25 |
| 4.19 | Generation Sale Proceeds | 25 |
| 4.20 | Regional Transmission Organization and Independent Transmission Company | 25 |
| 4.21 | Notification of Certain Matters | 26 |
| 4.22 | Confidentiality and Standstill Agreements | 26 |

**ARTICLE V COVENANTS OF PURCHASER** .......... 26

| | | |
|---|---|---|
| 5.01 | Regulatory and Other Approvals | 26 |
| 5.02 | HSR | 26 |
| 5.03 | [INTENTIONALLY OMITTED | 27 |
| 5.04 | Employee Matters | 27 |
| 5.05 | Fulfillment of Conditions | 30 |
| 5.06 | Communication Between the Parties | 30 |
| 5.07 | Charitable Contributions | 31 |
| 5.08 | Transaction Structure | 31 |

- ii -

NOR002634

ARTICLE VI CONDITIONS TO OBLIGATIONS OF PURCHASER ................................................31
    6.01       Representations and Warranties ................................................31
    6.02       Performance ................................................31
    6.03       Officers' Certificates ................................................31
    6.04       Orders and Laws ................................................31
    6.05       Regulatory Consents and Approvals ................................................32
    6.06       Third Party Consents ................................................32
    6.07       Completion of the Restructuring ................................................32
    6.08       Assignment of Contracts ................................................32
    6.09       Benefits Plans ................................................32
    6.10       Resignation of Seller as Manager of the Company ................................................32

ARTICLE VII CONDITIONS TO OBLIGATIONS OF SELLER ................................................32
    7.01       Representations and Warranties ................................................32
    7.02       Performance ................................................32
    7.03       Officers' Certificates ................................................33
    7.04       Orders and Laws ................................................33
    7.05       Regulatory Consents and Approvals ................................................33
    7.06       Third Party Consents ................................................33

ARTICLE VIII TAX MATTERS AND POST-CLOSING TAXES ................................................33
    8.01       Tax Returns ................................................33
    8.02       Notice of Audit ................................................34
    8.03       Tax Adjustments ................................................34
    8.04       Tax Sharing Agreements ................................................35
    8.05       Transfer Taxes ................................................35
    8.06       Post-Closing Elections ................................................35
    8.07       Post-Closing Transactions not in the Ordinary Course ................................................36
    8.08       Allocation of Purchase Price ................................................36
    8.09       Section 338(h)(10) Election ................................................36
    8.10       Section 338(g) Election ................................................36
    8.11       Nonforeign Affidavit ................................................36
    8.12       Code Section 754 Election ................................................36

ARTICLE IX SURVIVAL; NO OTHER REPRESENTATIONS ................................................37
    9.01       Survival of Representations, Warranties, Covenants and Agreements ................................................37
    9.02       No Other Representations ................................................37

ARTICLE X INDEMNIFICATION ................................................37
    10.01      Tax Indemnification ................................................37
    10.02      Indemnification for Restructuring; Divestiture; Oil and Gas Sale ................................................38
    10.03      Other Indemnification ................................................38
    10.04      Special Environmental Indemnity ................................................38
    10.05      Special Litigation Indemnity ................................................39
    10.06      Method of Asserting Claims ................................................39

- iii -

10.07    Requirements for Indemnity ...................................................42
10.08    Exclusivity ...........................................................................42

ARTICLE XI TERMINATION ..........................................................42
11.01    Termination ..........................................................................42
11.02    Effect of Termination ..........................................................43
11.03    Fees and Expenses ...............................................................45

ARTICLE XII DEFINITIONS ...........................................................45
12.01    Definitions ............................................................................45

ARTICLE XIII MISCELLANEOUS ...................................................55
13.01    Notices ..................................................................................55
13.02    Entire Agreement .................................................................57
13.03    Expenses ...............................................................................57
13.04    Public Announcements ........................................................57
13.05    Confidentiality .....................................................................57
13.06    Waiver ...................................................................................58
13.07    Amendment ...........................................................................58
13.08    No Third Party Beneficiary .................................................58
13.09    No Assignment; Binding Effect ..........................................58
13.10    Headings ...............................................................................58
13.11    Invalid Provisions ................................................................59
13.12    Governing Law .....................................................................59
13.13    Counterparts .........................................................................59
13.14    Insurance Coverage After Closing ......................................59

## EXHIBITS

EXHIBIT A        Officer's Certificate of Seller
EXHIBIT B        Secretary's Certificate of Seller
EXHIBIT C        Officer's Certificate of Purchaser
EXHIBIT D        Secretary's Certificate of Purchaser

## ANNEXES

Annex I          Financial Statement
Annex II         Budget Principles

NY1:#3264263v6

31287-02300

NOR002636

This UNIT PURCHASE AGREEMENT dated as of September 29, 2000 is made and entered into by and between NorthWestern Corporation, a Delaware corporation ("Purchaser"), Touch America Holdings, Inc., a Delaware corporation ("Seller") and The Montana Power Company, a Montana corporation ("MPC"). Capitalized terms not otherwise defined herein have the meanings set forth in Section 12.01.

WHEREAS, prior to the closing of the transactions contemplated by this Agreement and as a condition to Purchaser's obligation to effect such closing, Seller will cause the Restructuring (pursuant to which, among other things, the Company (as defined below) shall become the owner of all assets and securities currently owned by MPC, other than Entech and its subsidiaries) to become effective; and

WHEREAS, prior to the closing of the transactions contemplated by this Agreement, Seller will own all of the outstanding membership interests in The Montana Power LLC, a Montana limited liability company (the "Company"), such membership interests being referred to herein as the "Units"; and

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, the Units on the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## SALE OF SHARES AND CLOSING

1.01    Purchase and Sale. Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, all of the right, title and interest of Seller in and to the Units at the Closing on the terms and subject to the conditions set forth in this Agreement.

1.02    Purchase Price. The aggregate purchase price for the Units is $602 million (the "Purchase Price"), payable in immediately available United States funds at the Closing in the manner provided in Section 1.03.

1.03    Closing. The Closing will take place at the offices of Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, or at such other place as Purchaser and Seller mutually agree, at 10:00 A.M. local time, on the Closing Date. At the Closing, Purchaser will pay the Purchase Price by wire transfer of immediately available funds to such account as Seller may reasonably direct by written notice delivered to Purchaser by Seller at least two (2) Business Days before the Closing Date. Simultaneously, Seller will assign and transfer to Purchaser all of Seller's right, title and interest in and to the Units. At the Closing, there shall also be delivered to Seller and Purchaser the certificates to be delivered under Articles VI and VII.



NY1:#3264263v6
31287-02300

1.04    Further Assurances; Post-Closing Cooperation.  (a)  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, each of the parties hereto shall execute and deliver such other documents and instruments, provide such materials and information and take such other actions as may reasonably be necessary, proper or advisable, to the extent permitted by Law, to fulfill its obligations under this Agreement.

(b)    Following the Closing, each party will provide the other party, its counsel and its accountants with copies of information or other data relating to the Business or Condition of MPC and the Company in its possession with respect to periods prior to the Closing, to the extent that such information or data may be reasonably required by the requesting party in connection with (i) the preparation of Tax Returns, (ii) compliance with the requirements of any Governmental or Regulatory Authority, or (iii) any third party actual or threatened Action or Proceeding.  Further, each party agrees for a period extending six (6) years after the Closing Date not to destroy or otherwise dispose of any such books, records and other data (excluding copies of materials previously supplied to the other party) unless such party shall first offer in writing to surrender such books, records and other data to the other party and such other party shall not agree in writing to take possession thereof during the thirty (30) day period after such offer is made.

(c)    If, in order properly to prepare its Tax Returns, other documents or reports required to be filed with Governmental or Regulatory Authorities or its financial statements or to fulfill its obligations hereunder, it is necessary that a party be furnished with additional information, documents or records relating to the Business or Condition of MPC and the Company not referred to in paragraph (b) above, and such information, documents or records are in the possession or control of the other party, such other party agrees to use its reasonable best efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's request, cost and expense.  Any information obtained by a party hereto in accordance with this paragraph shall be held confidential by such party in accordance with Section 13.05.

(d)    In addition to furnishing information pursuant to paragraph (b) and (c) of this Section 1.04, in order to close the books of MPC, the Company and the Subsidiaries for accounting purposes, each party agrees to direct its accounting personnel to provide reasonable cooperation and assistance to any other party's accounting personnel to accomplish the work necessary to close such books.  Seller and Purchaser also agree to direct their human resources and payroll personnel to cooperate with, and provide reasonable cooperation and assistance to each other in connection with, preparing W-2's and other associated payroll tax or related documents.

NOR002638

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF SELLER AND MPC

Seller and MPC, jointly and severally, hereby represent and warrant to Purchaser as follows:

2.01    Corporate Existence of Seller and MPC.  Seller is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and MPC is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Montana.  Each of Seller and MPC has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby, including, as to Seller, without limitation, to own, hold, sell and transfer (pursuant to this Agreement) the Units.

2.02    Authority.  The execution and delivery by Seller and MPC of this Agreement, and the performance by Seller of its obligations hereunder, have been duly and validly authorized by the Boards of Directors of Seller and MPC, and, with the exception of the vote referred to in Section 2.23, no other corporate action on the part of Seller or MPC is necessary.  This Agreement has been duly and validly executed and delivered by Seller and MPC and constitutes a legal, valid and binding obligation of Seller and MPC enforceable against Seller and MPC in accordance with its terms.

2.03    Existence of the Company.  The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Montana, and has full corporate power and authority to conduct its business as and to the extent now conducted and to own, use and lease its Assets and Properties.  MPC is, and prior to and as of the Closing Date, MPC and the Company will be, duly qualified, licensed or admitted to do business and each is in good standing in those jurisdictions specified in Section 2.03 of the Disclosure Schedule, which are the only jurisdictions in which the ownership, use or leasing of its Assets and Properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary, except for those jurisdictions in which the adverse effects of all such failures to be qualified, licensed or admitted and in good standing could not in the aggregate reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company.  Seller has prior to the execution of this Agreement made available to Purchaser true and complete copies of the certificate of formation of the Company as in effect on the date hereof.

2.04    Capitalization.  The authorized capitalization of the Company consists of the Units.  The Units are duly authorized, validly issued, outstanding, fully paid and nonassessable.  On and as of the Closing Date, Seller will own the Units, beneficially and of record, free and clear of all Liens.  Except for this Agreement and as disclosed in Section 2.04 of the Disclosure Schedule, as of the date of this Agreement there are, and on and as of the Closing Date there will be, no outstanding Options with respect to the Company.  The delivery of a certificate or certificates at the Closing representing the Units in the manner provided in Section 1.03 will transfer to Purchaser good and valid title to the Units, free and clear of all Liens other than Liens created or suffered to exist by Purchaser.

NOR002639

2.05    <u>Subsidiaries</u>. (a) Each Subsidiary is a corporation validly existing and in good standing under the Laws of its jurisdiction of incorporation disclosed in <u>Section 2.05(a) of the Disclosure Schedule</u>, and has full corporate power and authority to conduct its business as and to the extent now conducted and to own, use and lease its Assets and Properties. Each Subsidiary is duly qualified, licensed or admitted to do business and is in good standing in those jurisdictions disclosed in <u>Section 2.05(a) of the Disclosure Schedule</u>, which are the only jurisdictions in which the ownership, use or leasing of such Subsidiary's Assets and Properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary, except for those jurisdictions in which the adverse effects of all such failures by MPC or the Company and the Subsidiaries to be qualified, licensed or admitted and in good standing could not in the aggregate reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company. <u>Section 2.05(a) of the Disclosure Schedule</u> lists for each Subsidiary the amount of its authorized capital stock, the amount of its outstanding capital stock and the record owners of such outstanding capital stock. Except as disclosed in <u>Section 2.05(a) of the Disclosure Schedule</u>, all of the outstanding shares of capital stock of each Subsidiary have been duly authorized and validly issued, are fully paid and nonassessable, and are owned, directly or indirectly by MPC and, immediately prior to the Closing will be owned, directly or indirectly, by the Company, beneficially and of record, free and clear of all Liens. Except as set forth in <u>Section 2.05(a) of the Disclosure Schedule</u>, there exists no restriction on the payment of cash dividends by any Subsidiary. Except as disclosed in <u>Section 2.05(a) of the Disclosure Schedule</u>, there are, and on and as of the Closing Date there will be, no outstanding Options with respect to any Subsidiary. Seller has prior to the execution of this Agreement made available to Purchaser true and complete copies of the certificate or articles of incorporation and by-laws (or other comparable corporate charter documents) of each of the Subsidiaries as in effect on the date hereof.

(b)    Except as set forth on <u>Section 2.05(b) of the Disclosure Schedule</u>, as of the Closing Date, the Company will not directly or indirectly beneficially own more than five percent (5%) of either the equity interests in, or the voting control of, any Person, other than the Subsidiaries.

2.06    <u>No Conflicts</u>. The execution and delivery by Seller and MPC of this Agreement do not, and the performance by Seller and MPC of their respective obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

(a)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the certificate or articles of incorporation or by-laws (or other comparable corporate charter documents) of Seller, MPC, the Company or any Subsidiary;

(b)    subject to obtaining the consents, approvals and actions, making the filings and giving the notices disclosed in <u>Section 2.07 of the Disclosure Schedule</u>, conflict with or result in a violation or breach of any term or provision of any Law or Order applicable to Seller, MPC, the Company or any Subsidiary or any of their respective Assets and Properties (other than such conflicts, violations or breaches (i) which could not in the aggregate reasonably be expected to adversely affect the validity or enforceability of this Agreement or to have a material adverse effect on the Business or Condition of MPC and the Company or (ii) as would occur solely as a result of the identity or the legal or regulatory status of Purchaser or any of its Affiliates); or

4

NOR002640

(c)     except as disclosed in Section 2.06 of the Disclosure Schedule or as could not, individually or in the aggregate, reasonably be expected to be materially adverse to the Business or Condition of MPC and the Company or to adversely affect the ability of Seller or MPC to consummate the transactions contemplated hereby or to perform their obligations hereunder, (i) conflict with or result in a violation or breach of, (ii) constitute (with or without notice or lapse of time or both) a default under, (iii) require Seller, MPC, the Company or any Subsidiary to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (iv) result in or give to any Person any right of termination, cancellation, acceleration, non-performance or modification in or with respect to, or (v) result in the creation or imposition of any Lien upon Seller, MPC, the Company or any Subsidiary or any of their respective Assets and Properties under, any Contract or License to which Seller, MPC, the Company or any Subsidiary is a party or by which any of their respective Assets and Properties is bound.

2.07    Governmental Approvals and Filings.  Except as disclosed in Section 2.07 of the Disclosure Schedule, no consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority on the part of Seller, MPC, the Company or any Subsidiary is required in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby, except (i) where the failure to obtain any such consent, approval or action, to make any such filing or to give any such notice could not reasonably be expected to adversely affect the ability of Seller or MPC to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder, or to have a material adverse effect on the Business or Condition of MPC and the Company, or (ii) those as would be required solely as a result of the identity or the legal or regulatory status of Purchaser or any of its Affiliates.

2.08    Books and Records.  The minute books and other similar records of MPC, the Company and the Subsidiaries as made available to Purchaser prior to the execution of this Agreement contain a true and complete record, in all material respects, of all action taken at all meetings and by all written consents in lieu of meetings of the stockholders, members, the boards of directors and committees of the boards of directors of MPC, the Company and the Subsidiaries. The stock transfer ledgers and other similar records of MPC, the Company and the Subsidiaries as made available to Purchaser prior to the execution of this Agreement accurately reflect all record transfers prior to the execution of this Agreement in the capital stock or membership interests of MPC, the Company and the Subsidiaries.

2.09    Financial Statements and Condition.  (a)  Prior to the execution of this Agreement, Seller has made available to Purchaser true and complete copies of the following financial statements:

(i)  the unaudited balance sheet of MPC and the Subsidiaries as of December 31, 1999 and the related unaudited consolidated statement of operations for fiscal years of 1997, 1998 and 1999; and

(ii)  the unaudited balance sheet of MPC and the Subsidiaries as of July 31, 2000 (attached as Annex I hereto).

NOR002641

Except as set forth in the notes thereto and as disclosed in <u>Section 2.09(a) of the Disclosure Schedule</u>, all such financial statements were prepared in accordance with GAAP and fairly present in all material respects the consolidated financial condition and statement of operations of MPC and its consolidated Subsidiaries as of the respective dates thereof and for the respective periods covered thereby. Except for those Subsidiaries disclosed in <u>Section 2.09(a) of the Disclosure Schedule</u>, the financial condition and statement of operations of each Subsidiary are, and for all periods referred to in this <u>Section 2.09</u> have been, consolidated with those of MPC. Except as disclosed in <u>Section 2.09(a) of the Disclosure Schedule</u>, and except for matters reflected or reserved against in the financial statements referred to in clauses (i) and (ii) above (or the notes thereto), as of the date of this Agreement, neither MPC, the Company, nor any Subsidiary has any liabilities or obligations (whether absolute, accrued, contingent, fixed or otherwise, or whether due or to become due) of any nature that would be required by GAAP to be reflected on a consolidated balance sheet of MPC or the Company and Subsidiaries (including the notes thereto), except liabilities or obligations (i) that were incurred in the ordinary course of business consistent with past practice since July 31, 2000, or (ii) that, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company. At and as of the Closing Date, the total of Indebtedness of the Company, the Subsidiaries and MPC Natural Gas Funding Trust and the face amount of the outstanding preferred trust securities of the Montana Power Capital I (Trust) shall not exceed $488 million.

(b)     Except for the execution and delivery of this Agreement and the transactions to take place pursuant hereto on or prior to the Closing Date and as disclosed in <u>Section 2.09(b) of the Disclosure Schedule</u>, since the Interim Financial Statement Date the business of MPC and the Subsidiaries has been operated in all material respects in the ordinary course of business consistent with past practice and there has not been any material adverse change in the Business or Condition of MPC, other than those occurring as a result of general economic or financial conditions or other developments which are not unique to MPC and the Subsidiaries but also affect to a similar extent other Persons who participate or are engaged in the lines of business in which MPC and the Subsidiaries participate or are engaged.

2.10    <u>Taxes</u>. (a) Seller, the Company, its Subsidiaries, and all members of the MPC Affiliated Group, each have filed all material Income Tax Returns (including, but not limited to, any consolidated federal Tax Return of Seller, the Company, its Subsidiaries and all members of the MPC Affiliated Group, and any state or local Income Tax Return that includes Seller, the Company, the Subsidiaries and all members of the MPC Affiliated Group on a consolidated, combined or unitary basis) that they were required to file. All such Income Tax Returns were complete and correct in all material respects. All Income Taxes owed by Seller, the Company, its Subsidiaries and all members of the MPC Affiliated Group have been paid. MPC, Seller, the Company and its Subsidiaries each have filed all material Tax Returns (including, but not limited to, any federal Tax Return of MPC, Seller, the Company and the Subsidiaries, and any state or local Tax Return that includes MPC, Seller, the Company, and the Subsidiaries on a consolidated, combined or unitary basis) that they were required to file. All such Tax Returns were complete and correct in all material respects. All Taxes owed by MPC, Seller, the Company and each Subsidiary have been paid. Except as disclosed in Section 2.10(a) of the Disclosure Schedule, there are no Liens on any of the Assets or Properties of any of MPC,

NOR002642

the Company or the Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax.

(b)    (i)    Except as disclosed in Section 2.10(b) of the Disclosure Schedule, there is no dispute or claim concerning any Income Tax liability of any of Seller, the Company, any Subsidiary, or any member of the MPC Affiliated Group either (A) claimed or raised by any Governmental or Regulatory Authority in writing or (B) as to which any of Seller, the Company, the Subsidiaries, or any member of the MPC Affiliated Group and the directors and officers thereof has any Knowledge. Section 2.10(b) of the Disclosure Schedule lists all Income Tax Returns filed by the Company, its Subsidiaries or any member of the MPC Affiliated Group for Tax periods ending on or after December 31, 1990, (and for any prior Tax periods to the extent that the statute of limitations for that Tax period has not lapsed), indicates those Income Tax Returns that have been audited, and indicates those Income Tax Returns that currently are the subject of audit. All Income Taxes due with respect to such audits (as described in Section 2.10(b) of the Disclosure Schedule) have been paid or have been reserved for in the Financial Statements. Furthermore, all such Income Taxes being contested are being contested in good faith by appropriate proceedings (as described in Section 2.10(b) of the Disclosure Schedule).

(ii)    Except as disclosed in Section 2.10(b) of the Disclosure Schedule, there is no dispute or claim concerning any Tax liability of any of MPC, Seller, the Company, or any Subsidiary either (A) claimed or raised by any Governmental or Regulatory Authority in writing or (B) as to which any of MPC, Seller, the Company, or the Subsidiaries, and the directors and officers thereof has any Knowledge. Section 2.10(b) of the Disclosure Schedule lists all Tax Returns filed by MPC, the Company and its Subsidiaries for Tax periods ending on or after December 31, 1990, (and for any prior Tax periods to the extent that the statute of limitations for that Tax period has not lapsed), indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. All Taxes due with respect to such audits (as described in Section 2.10(b) of the Disclosure Schedule) have been paid or have been reserved for in the Financial Statements. Furthermore, all such Taxes being contested are being contested in good faith by appropriate proceedings (as described in Section 2.10(b) of the Disclosure Schedule).

(c)    Except as disclosed in Section 2.10(c) of the Disclosure Schedule, neither MPC, Seller, the Company, any of the Subsidiaries (other than CMPL), nor any member of the MPC Affiliated Group has waived any statute of limitations in respect of Income Taxes or agreed to any extension of time with respect to an Income Tax assessment or deficiency for any Tax period. Except as disclosed in Section 2.10(c) of the Disclosure Schedule, CMPL has not waived any statute of limitations in respect of Income Taxes or agreed to any extension of time with respect to an Income Tax assessment or deficiency for any Tax period.

(d)    Except as disclosed in Section 2.10(d) of the Disclosure Schedule, none of MPC, the Company and its Subsidiaries is or was a party to or liable under any Income Tax allocation or sharing agreement.

(e)    Except as disclosed in Section 2.10(e) of the Disclosure Schedule, neither the Company, any of its Subsidiaries, nor any member of the MPC Affiliated Group has been a

NY1:#3264263v6
31287-02300

NOR002643

member of an Affiliated Group, filing a consolidated federal Income Tax Return other than a group the common parent of which is MPC.

(f)    Seller, the Company, the Subsidiaries, and the members of MPC Affiliated· Group have withheld and paid all material Taxes required to have been withheld and paid and complied in all material respects with all information reporting and backup withholding requirements, including maintenance of records thereto, in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other Person.

(g)    None of Seller, the Company, the Subsidiaries, or any member of the MPC Affiliated Group have filed a consent under Code section 341(f) concerning collapsible corporations.

(h)    MPC, Seller, the Company, and the Subsidiaries have complied with the normalization rules of accounting in accordance with Code section 168(i)(9).

(i)    For federal Income Tax purposes, the Company is or will be disregarded as an entity separate from its owners under Treas. Reg. section 301.7701-3(b). No election with respect to the Company has been or will be made to treat the Company as anything other than a disregarded entity.

2.11    Legal Proceedings.

(a)    There are no Actions or Proceedings pending or, to the Knowledge of Seller and MPC, threatened against, relating to or affecting Seller, MPC, the Company or any Subsidiary in relation to any of their respective Assets and Properties which could reasonably be expected (i) to result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or (ii) except as disclosed in Section 2.11(a) of the Disclosure Schedule or in Sections 2.10(b), 2.13(e), 2.20 or 2.21(b), individually or in the aggregate with other such Actions or Proceedings, to have a material adverse effect on the Business or Condition of MPC and the Company.

(b)    There are no Orders outstanding against MPC, the Company or any Subsidiary which, individually or in the aggregate with other such Orders, have had, or could have, a material adverse effect on the Business or Condition of MPC and the Company.

2.12    Compliance With Laws and Orders. Except as disclosed in Section 2.12 of the Disclosure Schedule or as described in Section 2.21, neither Seller, MPC, the Company nor any Subsidiary is in violation of or in default under any Law or Order applicable to Seller, MPC, the Company or any Subsidiary or any of their respective Assets and Properties the effect of which, individually or in the aggregate with other such violations and defaults, could reasonably be expected to be materially adverse to the Business or Condition of MPC and the Company.

2.13    Benefit Plans; ERISA. (a)    Section 2.13(a) of the Disclosure Schedule contains a true and complete list and description of each of the Benefit Plans, and identifies each of the Benefit Plans that is a Qualified Plan.

NOR002644

(b)    Except as disclosed in <u>Section 2.13(b) of the Disclosure Schedule</u>, neither MPC, the Company, any Subsidiary, nor any other corporation or organization controlled by or under common control with any of the foregoing within the meaning of Section 4001 of ERISA has at any time contributed to any "multiemployer plan", as that term is defined in Section 4001 of ERISA and incurred any withdrawal liability, as that term is defined in Section 4201 of ERISA, for any plan of the type described in Sections 4063 and 4064 of ERISA or in Section 413 of the Code (and regulations promulgated thereunder).

(c)    Each of the Benefit Plans is, and its administration is and has been since inception, in compliance with its terms and, where applicable, with ERISA and the Code in all respects, except for such failures to comply which, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company.

(d)    All contributions and other payments required to be made by Seller, MPC, the Company or any Subsidiary or any ERISA Affiliate as defined in <u>Section 12.01</u> hereof to any Benefit Plan with respect to any period ending before or at or including the Closing Date have been or will be made.  Except as disclosed in <u>Section 2.13(d) of the Disclosure Schedule</u> all benefit obligations and liabilities under any Benefit Plan have been or will be reflected in Financial Statements in accordance with GAAP.

(e)    Except as disclosed in <u>Section 2.13(e) of the Disclosure Schedule</u>, to the Knowledge of Seller and MPC, there are no pending claims by or on behalf of any Benefit Plan, by any employee, director, contractor or consultant of MPC (or a beneficiary of such an employee, director, contractor or consultant), which allege violations of Law which, individually or in the aggregate, could reasonably be expected to result in liability on the part of Purchaser, MPC, the Company, any Subsidiary or any ERISA Affiliate as defined in <u>Section 12.01</u> hereof or any fiduciary of any such Benefit Plan material to the Business or Condition of MPC and the Company.

(f)    Except as set forth in <u>Section 2.13(f) of the Disclosure Schedule</u>, complete and correct copies of the following documents have been made available to the Purchaser prior to the execution of this Agreement:

(i)    the Benefit Plans and any related trust agreements and insurance contracts;

(ii)    current summary Plan descriptions of each Benefit Plan subject to ERISA;

(iii)    the most recent Form 5500 and Schedules thereto for each Benefit Plan subject to ERISA reporting requirements;

(iv)    the most recent determination of the IRS with respect to the qualified status of each Qualified Plan;

(v)    the most recent actuarial report of the qualified actuary of any Defined Benefit Plan or any other Benefit Plan with respect to which actuarial valuations are conducted; and

NOR002645

(vi)    all Governmental or Regulatory Authority filings with respect to any reportable event, excise tax, or other extraordinary event that occurred within the past three years and was related to a Benefit Plan.

(g)    Except as set forth in Section 2.13(g) of the Disclosure Schedule, (i) neither MPC, the Company nor any Subsidiary is obligated to pay any benefit under any Benefit Plan solely as a result of a "change in control" as defined in 280G of the Code, (ii) neither MPC, the Company, nor any Subsidiary is obligated to make any payment that would be disallowed as a deduction under 280G or 162(m) of the Code, and (iii) neither this transaction, the Restructuring or the Divestiture shall increase the obligation of MPC, the Company or any Subsidiary to fund benefits accrued or benefits payable under any Benefit Plan.

2.14    Property.  MPC, the Company or a Subsidiary is in possession of and has good title to, or has valid leasehold interests in or valid rights under Contract to use, all property used in and individually or in the aggregate with other such property material to the Business or Condition of MPC and the Company.  All such property is free and clear of all Liens, other than Permitted Liens and Liens disclosed in Section 2.14 of the Disclosure Schedule, and is in all material respects in good working order and condition, ordinary wear and tear excepted.

2.15    Intellectual Property Rights.  MPC, the Company and the Subsidiaries currently own, or have license to use, all Intellectual Property material to the Business or Condition of MPC and the Company without any material restrictions as to use or enjoyment.  As soon as possible after the execution hereof, Seller will furnish to Purchaser a list of all such Intellectual Property.  Neither MPC, the Company nor any of the Subsidiaries has granted, nor is obligated to grant, any material license, sub-license or assignment in respect of any of the Intellectual Property.  Neither MPC, the Company nor any of the Subsidiaries is in breach of any license, sub-license or assignment granted to it in respect of any Intellectual Property, and to the Knowledge of Seller and MPC, the operation of the business of MPC, the Company and each Subsidiary does not infringe upon the intellectual property rights of any other Person, except for such breaches or infringements that, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company.

2.16    Contracts.  (a)    Section 2.16(a) of the Disclosure Schedule (with paragraph references corresponding to those set forth below) contains a true and complete list of each of the following Contracts to which MPC, the Company or any Subsidiary is a party or by which any of their respective Assets and Properties is bound:

(i)    all Contracts (excluding Benefit Plans) providing for a commitment of employment for a specified or unspecified term or otherwise relating to employment or the termination of employment;

(ii)    all Contracts with any Person containing any provision or covenant prohibiting or materially limiting the ability of MPC, the Company or any Subsidiary to engage in any business activity or compete with any Person or prohibiting or materially limiting the ability of any Person to compete with MPC, the Company or any Subsidiary;

NY1:#3264263v6
31287-02300

10

NOR002646

(iii)    all material partnership, joint venture, shareholders' or other similar Contracts with any Person other than Contracts listed pursuant to (vii) through (xvi) below;

(iv)    all Contracts relating to Indebtedness of MPC, the Company or any Subsidiary in excess of $1,000,000 or to preferred stock issued by MPC, the Company or any Subsidiary (other than Indebtedness owing to or preferred stock owned by MPC, the Company or any wholly-owned Subsidiary);

(v)    all Contracts (other than Contracts listed pursuant to (vii) through (xvi) below) relating to (A) the future disposition or acquisition by MPC, the Company or any Subsidiary of any Assets and Properties individually or in the aggregate in excess of $1,000,000, and (B) any merger or other business combination;

(vi)    all collective bargaining or similar labor Contracts;

(vii)    all Contracts active as of June 30, 2000, relating to MPC's purchase of natural gas in its capacity as the natural gas supplier to MPC's utility customers calling for annual payments in excess of, or potentially in excess of $1,000,000 or having a term in excess of one year;

(viii)    all Contracts active as of June 30, 2000, relating to MPC's purchase of electrical power in its capacity as the electrical power supplier to MPC's utility customers calling for annual payments in excess of, or potentially in excess of, $1,000,000 or having a term in excess of one year;

(ix)    all Contracts active as of June 30, 2000, relating to MPC's sale of electric power as a commodity to third party customers calling for annual payments in excess of, or potentially in excess of, $1,000,000 or having a term in excess of one year;

(x)    all Contracts active as of June 30, 2000, relating to MPC's electric transmission system or the Colstrip Transmission System calling for annual payments in excess of, or potentially in excess of, $1,000,000 or having a term in excess of one year;

(xi)    all Contracts active as of June 30, 2000, relating to MPC's natural gas transmission and storage system calling for annual payments in excess of, or potentially in excess of, $1,000,000 or having a term in excess of one year;

(xii)    all material Contracts active as of June 30, 2000, relating to MPC's interest in Milltown Dam;

(xiii)    all material Contracts active as of June 30, 2000, relating to MPC's interest in Colstrip Unit 4;

(xiv)    all material Contracts between MPC and PPL Montana, LLC relating to the generation assets sale transaction between MPC and PPL Montana, LLC which closed on December 17, 1999;

NOR002647

(xv)    all material Contracts active as of June 30, 2000, to which One Call Locators, Ltd. is a party;

(xvi)    all material Contracts active as of June 30, 2000, to which DES is a party;

(xvii)    all Contracts, correspondence and other documents relating to the buy-out negotiations regarding MPC's contracts to purchase power from QFs, including, without limitation, signed letters of intent, whether or not binding on either or both parties thereto, offers and counteroffers;

(xviii)    all Contracts relating to MPC's electric and gas transmission and distribution business, not included in (i) through (xvi) above, under which MPC made payments to the other party in excess of $1,000,000 in 1999 or under which, as of the date of this Agreement, MPC expects to make payments to the other party in excess of $1,000,000 in 2000;

(xix)    all Contracts relating to MPC's electric and gas transmission and distribution business, not included in (i) through (xvi) above, under which MPC received payments from the other party in excess of $1,000,000 in 1999 or under which, as of the date of this Agreement, MPC expects to receive payments from the other party in excess of $1,000,000 in 2000; and

(xx)    all Contracts (other than this Agreement) that (A) limit or contain restrictions on the ability of MPC, the Company or any Subsidiary to declare or pay dividends on, to make any other distribution in respect of or to issue or purchase, redeem or otherwise acquire its capital stock, to incur Indebtedness, to incur or suffer to exist any Lien, to purchase or sell any Assets and Properties, to change the lines of business in which it participates or engages or to engage in any merger or other business combination or (B) require MPC, the Company or any Subsidiary to maintain specified financial ratios or levels of net worth or other indicia of financial condition.

(b)    Each Contract required to be disclosed in Section 2.16(a) of the Disclosure Schedule is in full force and effect and constitutes a legal, valid and binding agreement, enforceable in accordance with its terms, of MPC, the Company or a Subsidiary and, to the Knowledge of Seller and MPC, of each other party thereto; and except as disclosed in Section 2.16(b) of the Disclosure Schedule neither MPC, the Company, any Subsidiary nor, to the Knowledge of Seller and MPC, any other party to such Contract is in violation or breach of or default under any such Contract (or with notice or lapse of time or both, would be in violation or breach of or default under any such Contract), the effect of which, individually or in the aggregate, could reasonably be expected to be materially adverse to the Business or Condition of MPC and the Company.

(c)    Prior to the Closing Date, Seller and MPC have furnished or made available to Purchaser a copy of each Contract or other document required to be disclosed in Section 2.16(a) of the Disclosure Schedule.

2.17    Licenses. Each of MPC, the Company and the Subsidiaries has obtained all Licenses used in and, individually or in the aggregate, with other such Licenses material to

NOR002648

the Business or Condition of MPC and the Company.  Except as disclosed in <u>Section 2.17 of the Disclosure Schedule</u>:

          (i)      MPC or the Company and each Subsidiary owns or validly holds all such Licenses;

          (ii)     each such License is valid, binding and in full force and effect; and

          (iii)    to the Knowledge of Seller and MPC neither MPC, the Company nor any Subsidiary is in default (or with the giving of notice or lapse of time or both, would be in default) under any such License in any material respect.

     2.18    <u>Insurance</u>.  <u>Section 2.18 of the Disclosure Schedule</u> contains a true and complete list of all material insurance policies currently in effect that insure the business, operations or employees of MPC, the Company or any Subsidiary or affect or relate to the ownership, use or operation of any of the Assets and Properties of MPC, the Company or any Subsidiary.  Except as set forth in <u>Section 2.18 of the Disclosure Schedule</u> and except for failures to maintain insurance that, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company, each of MPC, the Company, and the Subsidiaries has been continuously insured with financially responsible insurers, in each case in such amounts and with respect to such risks and losses as are customary for companies in the United States conducting the business conducted by MPC, the Company, and the Subsidiaries.  Except as set forth in <u>Section 2.18 of the Disclosure Schedule</u>, neither Seller, MPC, the Company nor any of the Subsidiaries has received any notice of cancellation, termination or suspension with respect to any of their respective insurance policies, except with respect to any cancellation, termination or suspension that, individually or in the aggregate, has not had and could not reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company.

     2.19    <u>Affiliate Transactions</u>.  Except as disclosed in <u>Section 2.19 of the Disclosure Schedule</u>, as of Closing, neither MPC, the Company nor the Subsidiaries will have any Contractual obligations with respect to Seller or its Affiliates (other than MPC, the Company or the Subsidiaries).

     2.20    <u>Labor and Employment Matters</u>.  Except as disclosed in <u>Section 2.20 of the Disclosure Schedule</u>, no employee of MPC, the Company or any Subsidiary is presently a member of a collective bargaining unit and, to the Knowledge of Seller and MPC, there are no threatened or contemplated attempts to organize for collective bargaining purposes any of the employees of MPC, the Company or any Subsidiary, and, to the Knowledge of Seller and MPC, there are no threatened or pending actions or proceedings before any Governmental or Regulatory Authority relating to such attempts to organize.  Since January 1, 1998, there has been no work stoppage, strike or other concerted action by employees of MPC, the Company or any Subsidiary which materially adversely affected the Business or Condition of MPC and the Company.  Except as disclosed in <u>Section 2.20 of the Disclosure Schedule</u>, there are no unfair labor practice charges or other matters pending before the National Labor Relations Board to which either MPC or any of the Subsidiaries is a party.

NOR002649

2.21    Environmental Matters. (a)   Each of MPC, the Company and the Subsidiaries has obtained all Licenses which are required under applicable Environmental Laws in connection with the conduct of the business or operations of MPC, the Company or such Subsidiary, except where the failure to obtain any such License could not reasonably be expected to be, individually or in the aggregate with other such failures, materially adverse to the Business or Condition of MPC and the Company. Each of such Licenses is in full force and effect and each of MPC, the Company and the Subsidiaries is in compliance with the terms and conditions of all such Licenses and with any applicable Environmental Law, except where the failure to be in compliance could not reasonably be expected to be, individually or in the aggregate with other such failures, materially adverse to the Business or Condition of MPC and the Company.

(b)   Except as noted in the Pilko Environmental Reports and as set forth in Section 2.21 of the Disclosure Schedule, (i) neither MPC, the Company, nor any Subsidiary has received written notice of violation of an Environmental Law with respect to any of the Assets and Properties of MPC, the Company, or any Subsidiary, which individually, or in the aggregate with other violations of Environmental Laws, would materially adversely affect the Business or Condition of MPC and the Company; (ii) no site or facility now or previously owned, operated, or leased by MPC, the Company, or any Subsidiary is listed or proposed for listing on the NPL, CERCLIS or any similar state or local list of sites requiring investigation or clean-up, or would require remediation or response under applicable Environmental Laws that would result in expenditures in excess of $500,000 individually, or $1,000,000 in the aggregate; and (iii) to the Knowledge of MPC and Seller, no facts, events or conditions relating to the past or present facilities, properties or operations of MPC, the Company, or any of the Subsidiaries will prevent continued compliance with Environmental Laws or can reasonably be expected to give rise to any investigatory, remedial or corrective obligations pursuant to Environmental Laws, including without limitation any such liabilities or noncompliance relating to onsite or offsite releases or threatened releases of hazardous materials, substances or wastes, which individually or in the aggregate with other such facts, events or conditions, would materially adversely affect the Business or Condition of MPC and the Company.

2.22    Information Supplied. The proxy statement relating to the MPC Stockholders' Meeting (as defined in Section 4.11), as amended or supplemented from time to time (as so amended and supplemented, the "Proxy Statement"), and any other documents to be filed by MPC with the SEC or any other Governmental or Regulatory Authority in connection with the Restructuring and the other transactions contemplated hereby will (in the case of the Proxy Statement and any such other documents filed with the SEC under the Exchange Act or the Securities Act) comply as to form in all material respects with the requirements of the Exchange Act and the Securities Act, respectively, and will not, on the date of its filing or, in the case of the Proxy Statement, at the date it is mailed to stockholders of MPC and at the time of the MPC Stockholders' meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

2.23    Vote Required. Assuming the accuracy of the representation and warranty contained in Section 3.09, the affirmative vote of the holders of record of at least two-thirds of the issued and outstanding common stock of MPC with respect to the adoption of this Agreement and the Restructuring is the only vote of the holders of any class or series of the capital stock of

NOR002650

MPC required to adopt this Agreement and approve the Restructuring and the other transactions contemplated hereby.

2.24    Brokers. Except for Goldman, Sachs & Co., whose fees, commissions and expenses are the sole responsibility of Seller, all negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Seller and MPC directly with Purchaser without the intervention of any Person on behalf of Seller and MPC in such manner as to give rise to any valid claim by any Person against Purchaser, MPC, the Company or any Subsidiary for a finder's fee, brokerage commission or similar payment.

2.25    Public Utility Holding Company Act. As of the date of this Agreement, none of the Subsidiaries is a "public utility company," a "holding company," a "subsidiary company" or an "affiliate" of any public utility company within the meaning of Section 2(a)(5), 2(a)(8) or 2(a)(11) of the Public Utility Holding Company Act of 1935, as amended (the "1935 Act"), respectively. Neither MPC, the Company nor any Subsidiary is currently regulated under the 1935 Act.

2.26    Regulatory Filings. All filings (other than immaterial filings) required to be made by MPC or any of the Subsidiaries since January 1, 1997 under the 1935 Act, the Federal Power Act, the Federal Communications Act of 1934 and applicable state Laws, have been timely filed with the SEC, the FERC, the Department of Energy, the FCC or any applicable state public utility commissions (including, to the extent required, the Montana Public Service Commission), as the case may be, including all forms, statements, reports, agreements (oral or written) and all documents, exhibits, amendments and supplements appertaining thereto, including all rates, tariffs, franchises, service agreements and related documents and all such filings complied in all material respects, as of their respective dates, with all applicable requirements of the applicable statute and the rules and regulations thereunder, except for filings the failure of which to make, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on the Business or Condition of MPC and the Company.

2.27    Rights Agreement. As of the date of this Agreement, MPC, or the Board of Directors of MPC, as the case may be, has taken all necessary actions so as to render the Rights Agreement dated March 2, 1999, as amended, inapplicable to the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, the Restructuring, the Divestiture and any other transactions contemplated hereby.

2.28    Effect of Restructuring. Except as disclosed in Section 2.28 of the Disclosure Schedule, as a consequence of the Restructuring, as of the Closing Date, by operation of law pursuant to Section 35-1-817 and 35-8-1203 of the Montana Code Annotated (1999), the Company will have succeeded to all of MPC's right, title and interest in the Assets and Properties of MPC and constituting the utility business of MPC (the "Utility Business"), as described in that certain Confidential Offering Memorandum dated May 2000 prepared by Goldman, Sachs & Co., except for Assets or Properties acquired or disposed of in compliance with this Agreement, including Section 4.07.

NOR002651

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller and MPC as follows:

3.01    Corporate Existence.    Purchaser is a corporation duly incorporated, validly existing and in good standing under the Laws of the state of its incorporation.  Purchaser has full corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.

3.02    Authority.    The execution and delivery by Purchaser of this Agreement, and the performance by Purchaser of its obligations hereunder, have been duly and validly authorized by the Board of Directors of Purchaser, no other corporate action on the part of Purchaser or its stockholders being necessary.  This Agreement has been duly and validly executed and delivered by Purchaser and constitutes a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

3.03    No Conflicts.    The execution and delivery by Purchaser of this Agreement do not, the performance by Purchaser of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

(a)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the certificate of incorporation or by-laws of Purchaser;

(b)    subject to obtaining the consents, approvals and actions, making the filings and giving the notices disclosed in Schedule 3.04 hereto, conflict with or result in a violation or breach of any term or provision of any Law or Order applicable to Purchaser or any of its Assets and Properties (other than such conflicts, violations or breaches which could not in the aggregate reasonably be expected to adversely affect the validity or enforceability of this Agreement); or

(c)    except as disclosed in Schedule 3.03 hereto or as could not, individually or in the aggregate, reasonably be expected to adversely affect the ability of Purchaser to consummate the transactions contemplated hereby or to perform its obligations hereunder, (i) conflict with or result in a violation or breach of, (ii) constitute (with or without notice or lapse of time or both) a default under, (iii) require Purchaser to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, or (iv) result in the creation or imposition of any Lien upon Purchaser or any of its Assets or Properties under, any Contract or License to which Purchaser is a party or by which any of its Assets and Properties is bound.

3.04    Governmental Approvals and Filings.    Except as disclosed in Schedule 3.04 hereto, no consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby, except where the failure to obtain any such consent, approval or action, to make any such filing or to give any such notice could not reasonably be expected to

NOR002652

adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder.

3.05    Legal Proceedings. There are no Actions or Proceedings pending or, to the knowledge of Purchaser, threatened against, relating to or affecting Purchaser or any of its Assets and Properties which could reasonably be expected to result in the issuance of any Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement.

3.06    Purchase for Investment. The Units will be acquired by Purchaser (or, if applicable, its assignee pursuant to Section 13.09(b)) for its own account for the purpose of investment, it being understood that the right to dispose of such Units shall be entirely within the discretion of Purchaser (or such assignee, as the case may be). Purchaser (or such assignee, as the case may be) will refrain from transferring or otherwise disposing of any of the Units, or any interest therein, in such manner as to cause Seller to be in violation of the registration requirements of the Securities Act or applicable state securities or blue sky laws.

3.07    Brokers. Except for Credit Suisse First Boston, whose fees, commissions and expenses are the sole responsibility of Purchaser, all negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Purchaser directly with Seller without the intervention of any Person on behalf of Purchaser in such manner as to give rise to any valid claim by any Person against Seller, the Company or any Subsidiary for a finder's fee, brokerage commission or similar payment.

3.08    Financing. Purchaser has sufficient cash and/or available credit facilities or written commitments for credit facilities (and has provided Seller and MPC with evidence thereof) to pay the Purchase Price and to make all other necessary payments of fees and expenses in connection with the transactions contemplated by this Agreement.

3.09    Ownership of the Capital Stock. Purchaser does not beneficially own any of the capital stock of MPC.

3.10    Exon-Florio. Purchaser is not a "foreign person" for purposes of the Exon-Florio Amendment.

3.11    Independent Evaluation. Purchaser is experienced and knowledgeable in the utility business, and is aware of its risks. Purchaser has been afforded the opportunity to examine the materials made available to it by Seller in Seller's offices in Butte, Montana (the "Data Room") with respect to MPC, the Company, its Subsidiaries and their business (the "Background Materials"). The Background Materials include files, or copies thereof, that MPC, the Company and its Subsidiaries have used in their normal course of business and other information about MPC, the Company and its Subsidiaries and their business that MPC, the Company and its Subsidiaries have compiled or generated; however, Purchaser acknowledges and agrees that neither MPC, the Seller nor the Company, the Subsidiaries or other Person has made any representations or warranties, express or implied, written or oral, as to the accuracy or completeness of the Background Materials or, except for the representations and warranties of Seller contained in this Agreement, as to any other information relating to MPC, the Company,

NY1:#3264263v6
31287-02300

17

NOR002653

the Subsidiaries or their business furnished or to be furnished to Purchaser or its representatives by or on behalf of Seller. In entering into this Agreement, Purchaser acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of this transaction including its own estimate and appraisal of the extent and value of and the risks associated with the utility business. Purchaser's representatives have visited the offices of Seller and have been given opportunities to examine the Books and Records Seller has made available relating to MPC, the Company, the Subsidiaries and their business. Except as expressly provided in this Agreement, neither Seller nor MPC, the Company nor the Subsidiaries shall have any liability to Purchaser or its Affiliates, agents, representatives or employees resulting from any use, authorized or unauthorized, by Purchaser or its Affiliates, agents, representatives or employees of the Background Materials or other information relating to MPC, the Company, the Subsidiaries or their business provided by or on behalf of MPC, any Seller, the Company or its Subsidiaries.

ARTICLE IV

COVENANTS OF SELLER AND MPC

Each of Seller and MPC covenants and agrees with Purchaser that, at all times from and after the date hereof until the Closing, Seller and MPC will comply with all covenants and provisions of this Article IV, except to the extent Purchaser may otherwise consent in writing.

4.01    Regulatory and Other Approvals.  Seller and MPC will, and will cause the Company and the Subsidiaries to, as promptly as practicable (a) take all commercially reasonable steps necessary or desirable to obtain all consents, approvals or actions of, make all filings with and give all notices to Governmental or Regulatory Authorities or any other Person required of Seller, MPC, the Company or any Subsidiary to consummate the transactions contemplated hereby, including without limitation those described in Sections 2.06 and 2.07 of the Disclosure Schedule, (b) provide such other information and communications to such Governmental or Regulatory Authorities or other Persons as such Governmental or Regulatory Authorities or other Persons may reasonably request in connection therewith and (c) provide reasonable cooperation to Purchaser in connection with the performance of its obligations under Sections 5.01 and 5.02. Seller and MPC will provide prompt notification to Purchaser when any such consent, approval, action, filing or notice referred to in clause (a) above is obtained, taken, made or given, as applicable, and will advise Purchaser of any communications (and, unless precluded by Law, provide copies of any such communications that are in writing) with any Governmental or Regulatory Authority or other Person regarding any of the transactions contemplated by this Agreement.

4.02    HSR Filings.  In addition to and not in limitation of Seller's and MPC's covenants contained in Section 4.01, Seller and MPC will (a) take promptly all actions necessary to make the filings required of Seller, MPC or their Affiliates under the HSR Act, (b) comply at the earliest practicable date with any request for additional information received by Seller, MPC or their Affiliates from the Federal Trade Commission or the Antitrust Division of the Department of Justice pursuant to the HSR Act and (c) cooperate with Purchaser in connection


NOR002654

with Purchaser's filing under the HSR Act and in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by either the Federal Trade Commission or the Antitrust Division of the Department of Justice or state attorneys general. In the event that a suit or objection is instituted by any Person challenging this Agreement and the transactions contemplated hereby as violative of applicable competition and antitrust laws, each of Purchaser and Seller, MPC and the Company shall use commercially reasonable efforts to resist or resolve such suit or objection.

4.03    Investigation by Purchaser.  Seller and MPC will, and will cause the Company and the Subsidiaries to, (a) provide Purchaser and its officers, employees, counsel, accountants, financial advisors, consultants and other representatives (together, "Representatives") with full access, upon reasonable prior notice and during normal business hours, to all officers, employees, agents and accountants of MPC, the Company and the Subsidiaries and their Assets and Properties and Books and Records, but only to the extent that such access does not unreasonably interfere with the business and operations of MPC, the Company and the Subsidiaries, and (b) furnish Purchaser and such other Persons with all such information and data (including without limitation copies of Contracts, Benefit Plans and other Books and Records) concerning the business and operations of MPC, the Company and the Subsidiaries as Purchaser or any of such other Persons reasonably may request in connection with such investigation (and permit the copying thereof), except to the extent that furnishing any such information or data would violate any Law, Order, Contract or License applicable to Seller, MPC, the Company or any Subsidiary or by which any of their respective Assets and Properties is bound.

4.04    No Solicitations.  Seller and MPC will not take, nor will they permit the Company, the Subsidiaries or any Affiliate of Seller or MPC (or authorize or permit any investment banker, financial advisor, attorney, accountant or other Person retained by or acting for or on behalf of Seller, MPC, the Company, the Subsidiaries or any such Affiliate) to take, directly or indirectly, any action to solicit, encourage, receive, negotiate, assist or otherwise facilitate (including by furnishing confidential information with respect to MPC, the Company or any Subsidiary or permitting access to the Assets and Properties and Books and Records of MPC, the Company or any Subsidiary) or accept any offer or inquiry from any Person concerning an Acquisition Proposal.  Notwithstanding the foregoing, MPC or its Board of Directors shall be permitted to (A) to the extent applicable, comply with Rule 14e-2(a) promulgated under the Exchange Act with regard to an Acquisition Proposal, or (B) engage in any discussions or negotiations with, or provide any information to any Person in response to an unsolicited bona fide written Acquisition Proposal, by any such Person, if and only to the extent that, in the case of the actions referred to in clause (B), (i) the MPC Stockholders' Meeting shall not have occurred, (ii) the Board of Directors of MPC, concludes in good faith after consultation with its financial advisors and legal advisors, that such Acquisition Proposal would reasonably be expected to constitute a Superior Proposal, (iii) prior to providing any information or data to any Person in connection with an Acquisition Proposal by any such Person, the Board of Directors of MPC receives from such Person an executed confidentiality agreement on terms no less favorable to the Company than those contained in the Confidentiality Agreement between MPC and Purchaser regarding the sale of the Utility Business and (iv) prior to providing any information or data to any Person or entering into discussions or negotiations with any Person, the Board of Directors of MPC notifies Purchaser immediately of such inquiries, proposals or

NOR002655

offers received by, any such information requested from, or any such discussions or negotiations sought to be initiated or continued with, any of its representatives indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposals or offers. Seller and MPC agree immediately to cease and cause to be terminated any existing activities, discussions, or negotiations with any parties heretofore conducted with respect to any Acquisition Proposal. Seller and MPC agree to take the necessary steps promptly to inform all such Persons of its obligations hereunder. Nothing in this Section 4.04 shall (x) permit Seller or MPC to terminate this Agreement (except as specifically provided in Article XI), or (y) affect any other obligation of Seller or MPC under this Agreement.

4.05    Conduct of Business.  MPC will, and will cause the Company and the Subsidiaries to, conduct business only in the ordinary course consistent with past practice and in compliance with applicable Law and will timely seek renewal of all Licenses and permits required or necessary for the operation of the Utility Business. Without limiting the generality of the foregoing, and other than with respect to, and in connection with, the Restructuring and the Divestiture, MPC will, and will cause the Company and the Subsidiaries to, use commercially reasonable efforts, to the extent the officers of MPC believe such action to be in the best interests of MPC and the Subsidiaries, to (a) preserve intact the present business organization, reputation and franchises of MPC, the Company and the Subsidiaries in all material respects, (b) keep available (subject to dismissals and retirements (including retirements pursuant to MPC's "Special Retirement Program") in the ordinary course of business and consistent with past practice and transfers to any Affiliate of MPC) the services of the key officers and employees of MPC and the Subsidiaries, (c) maintain the Assets and Properties of MPC, the Company and the Subsidiaries in good working order and condition, ordinary wear and tear excepted, and (d) maintain the good will of key customers, suppliers and lenders and other Persons with whom MPC or any Subsidiary otherwise has significant business relationships.

4.06    Financial Statements and Reports.  (a)  As promptly as practicable and in any event no later than forty five (45) days after the end of each fiscal quarter ending after the date hereof and before the Closing Date (other than the fourth quarter) or ninety (90) days after the end of each fiscal year ending after the date hereof and before the Closing Date, as the case may be, MPC will deliver to Purchaser true and complete copies of the unaudited consolidated balance sheet and the related unaudited consolidated statement of operations of MPC and the Subsidiaries, in each case as of and for the fiscal year then ended or as of and for each such fiscal quarter and the portion of the fiscal year then ended, as the case may be, together with the notes, if any, relating thereto, which financial statements shall be prepared on a basis consistent with the Financial Statements.

(b)    As promptly as practicable, MPC will deliver to Purchaser true and complete copies of such other regularly-prepared financial statements, reports and analyses as may be prepared or received by MPC, the Company or any Subsidiary relating to the business or operations of MPC, the Company or any Subsidiary.

4.07    Certain Restrictions.  MPC will, and will cause the Subsidiaries to refrain from:

NOR002656

(a)    except as disclosed in Section 4.07(a) of the Disclosure Schedule, and except as may be necessary or desirable in connection with the Restructuring, amending their certificates or articles of incorporation or by-laws (or other comparable corporate charter documents) in any material respect or taking any action with respect to any such amendment or any recapitalization, reorganization, liquidation or dissolution of any such corporation;

(b)    except as disclosed in Section 4.07(b) of the Disclosure Schedule, and except as may be necessary or desirable in connection with the Restructuring, authorizing, issuing, selling or otherwise disposing of any shares of capital stock of or any Option with respect to MPC, the Company or any Subsidiary, or modifying or amending any right of any holder of outstanding shares of capital stock of or Option with respect to MPC, the Company or any Subsidiary;

(c)    except for (i) the declaration of regular quarterly cash dividends on the MPC common stock not to exceed twenty (20) cents per share, and (ii) the payment of dividends required to be paid in respect of MPC outstanding preferred stock, declaring, setting aside or paying any dividend or other distribution in respect of the capital stock of MPC, the Company or any Subsidiary or directly or indirectly redeeming, purchasing or otherwise acquiring any capital stock of or any Option with respect to MPC, the Company or any Subsidiary;

(d)    except as disclosed in Section 4.07(d) of the Disclosure Schedule and as specified in the Budget, acquiring or disposing of, or incurring any Lien (other than a Permitted Lien) on, any Assets and Properties individually or in the aggregate material to the Business or Condition of MPC and the Company;

(e)    except (i) as disclosed in Section 4.07(e) of the Disclosure Schedule, and (ii) in the ordinary course of business consistent with past practices, the Budget and the terms and provisions of this Agreement, entering into, or in any material respect amending, modifying, terminating (partially or completely), granting any waiver under or giving any consent with respect to any Contract to which MPC, the Company or any Subsidiary is a party which is material to the Business or Condition of MPC and the Company;

(f)    other than as specified in the Budget, (i) voluntarily incurring Indebtedness in an aggregate principal amount exceeding $5,000,000 (other than refinancings where the principal amount refinanced is no greater than the amount repaid), or (ii) purchasing, canceling, prepaying or otherwise providing for a complete or partial discharge in advance of a scheduled payment date with respect to, or waiving any right under, any Indebtedness in an aggregate principal amount exceeding $1,000,000 (in either case other than Indebtedness of MPC, the Company or a Subsidiary owing to MPC, the Company or a wholly-owned Subsidiary); provided, however, that MPC, Seller, the Company and the Subsidiaries may take any and all actions necessary or appropriate to terminate the Employee Stock Ownership Plan portion of the MPC 401(k) Plan, and to prepay any outstanding Indebtedness of MPC, the Company and the Subsidiaries attributable to such Employee Stock Ownership Plan;

(g)    other than in connection with the Restructuring, engaging with any Person in any merger or other business combination;

NOR002657

(h)    except as set forth in the Budget, making (1) capital expenditures or commitments for additions to property, plant or equipment constituting capital assets or (2) making expenditures with respect to operations and maintenance or incurring general and administrative expenses, in each case in an aggregate amount exceeding $1,000,000;

(i)    except to the extent required by applicable Law or reasonably and in good faith believed by the officers of MPC or the Company to be in the best interests of MPC, the Company and the Subsidiaries (and subject in each case to prior written notice to, and consultation with, Purchaser), making any material change in (A) any pricing, investment, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy, or (B) any method of calculating any bad debt, contingency or other reserve for accounting, financial reporting or Tax purposes;

(j)    other than in the ordinary course of business or to the extent required by applicable Law (including without limitation, the duty to bargain in good faith under any collective bargaining agreement) (and subject in each case to prior written notice to, and consultation with, Purchaser), adopting, entering into or becoming bound by any material Benefit Plan, employment-related Contract or collective bargaining agreement, or amending, modifying or terminating (partially or completely) any such Benefit Plan (other than the Employee Stock Ownership Plan portion of the MPC 401(k) Plan), employment-related Contract or collective bargaining agreement if such action will result in material additional cost to MPC;

(k)    making any change in its fiscal year;

(l)    except as set forth in the Budget, making any loans or advances by it to, or guarantee, endorse or otherwise be or become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or owning, purchasing or acquiring stock, obligations or securities of, or any other interest in, or make any capital contributions to, any Person;

(m)    effectuating a "plant closing" or "mass layoff", as those terms are defined in the Worker Adjustment and Retraining Act, affecting in whole or in part any site of employment, facility, operating unit or employee of MPC, the Company or any Subsidiary;

(n)    paying, discharging or satisfying any claims, liabilities or obligations (obsolete, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction in the ordinary course of business and consistent with past practice of liabilities reflected or reserved against in the balance sheet comprising the Interim Financial Statements;

(o)    making or changing any Tax election, filing any amended Tax Return, settling or compromising any federal, state, local or foreign Tax liability, changing any annual Tax accounting period, changing any method of Tax accounting, entering into any closing agreement relating to any Tax, surrendering any right to claim a Tax refund, or consenting to any extension or waiver of the limitations period applicable to any Tax claim or assessment, in each case in a manner which could reasonably be expected to have material adverse effect on Purchaser, the Company or the Subsidiaries for any post Closing period; or



NY1:#3264263v6
31287-02300

22

(p)    selling any cushion gas other than sales in accordance with prudent utility practices, the proceeds of which will remain with, or be used for the benefit of, MPC; or

(q)    entering into any Contract to do or engage in any of the foregoing.

Notwithstanding any provision to the contrary, nothing in this <u>Section 4.07</u> or <u>Section 4.05</u> shall require MPC, Seller or the Company to revise, dishonor or delay performance of any obligation under agreements in existence prior to the date hereof.

4.08    <u>Affiliate Transactions</u>.  Except as disclosed in <u>Section 4.08 of the Disclosure Schedule</u>, immediately prior to the Closing, all Indebtedness and other amounts owing under Contracts between Seller, any officer, director or Affiliate (other than MPC, the Company or any Subsidiary) of Seller, on the one hand, and MPC, the Company or any of the Subsidiaries, on the other (each an "<u>Affiliate Contract</u>"), including the policy among the members of the MPC Affiliated Group as described in <u>Section 2.10(d) of the Disclosure Schedule</u>, will be paid in full. With respect to any Affiliate Contract disclosed in <u>Section 4.08 of the Disclosure Schedule</u> or entered into after the date hereof, which provides for the provision of services to MPC, the Company or any Subsidiary, Seller and MPC will, at Purchaser's election prior to the Closing Date, either (i) terminate such Contract or cause it to be terminated, effective as of the Closing Date, or (ii) cause such Contract to provide, effective as of the Closing Date, that the same is terminable at the option of MPC, the Company or the Subsidiary, as applicable, upon not more than 30 days prior notice or such shorter period as may be provided for under the existing provisions of such Contract.

4.09    <u>Fulfillment of Conditions</u>.  Seller and MPC will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each condition to the obligations of Purchaser contained in this Agreement and will not, and will not permit the Company or any Subsidiary to, take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

4.10    <u>Completion of Restructuring</u>.  Seller and MPC will use their best efforts to cause the Restructuring to become effective prior to the Closing.

4.11    <u>Preparation and Mailing of Proxy Statement</u>.  As soon as practicable after the date of this Agreement, MPC shall prepare and mail the Proxy Statement to the holders of MPC capital stock entitled to vote at the meeting of the stockholders of MPC to be called by MPC for the purpose of obtaining the MPC Stockholders Approval (the "<u>MPC Stockholders' Meeting</u>") at the earliest practicable time following the date hereof.

4.12    <u>Approval of MPC Stockholders</u>.  MPC shall, through its Board of Directors, duly call, give notice of, convene and hold the MPC Stockholders Meeting for the purpose of voting on the approval and adoption of this Agreement and the Restructuring (the "<u>MPC Stockholders' Approval</u>") as soon as reasonably practicable after the date hereof.  Subject to the following sentence MPC shall, through its Board of Directors, include in the Proxy Statement the recommendation of the Board of Directors of MPC that the stockholders of MPC approve and adopt this Agreement and the Restructuring, and shall use its best efforts to obtain such approval and adoption.  The Board of Directors of MPC shall not withdraw, amend or

NOR002659

modify in a manner adverse to Purchaser its recommendation referred to in the preceding sentence (or announce publicly its intention to do so), except that such Board of Directors shall be permitted to withdraw, amend or modify its recommendation (or publicly announce its intention to do so) if: (i) Seller and MPC have complied with Section 4.04; (ii) an unsolicited Superior Proposal shall have been proposed by any Person other than Purchaser and such proposal is pending at the time of such withdrawal, amendment or modification; and (iii) MPC shall have notified Purchaser in writing of such Superior Proposal at least three (3) Business Days in advance of such withdrawal, amendment or modification.

4.13     Completion of the Divestiture.  Seller and MPC will use their commercially reasonable efforts to cause the Divestiture to be completed prior to the Closing.

4.14     Regulatory Proceedings.  Seller, MPC and the Company will take commercially reasonable steps to enable Purchaser to participate as a party in interest in all current and future FERC proceedings and PSC proceedings, including but not limited to, stranded costs, default supplier rules, regional transmission organizations and electric and gas rate increase requests.  In the event that applicable rules will not allow Purchaser to so participate in such proceedings, Seller, MPC and the Company agree to furnish Purchaser with all documentation filed in connection therewith and to consult and cooperate with Purchaser on an ongoing basis regarding the conduct thereof.

4.15     Sale of Colstrip 1, 2, and 3 Transmission System.  Seller and MPC will use their commercially reasonable efforts to consummate the sale of the interest in the Colstrip 1, 2, and 3 Transmission System to PPL Montana LLC for the agreed consideration of $97 million cash and the proceeds of which will remain with, or be used for the benefit of, MPC.

4.16     QF Contracts.  Seller and MPC agree to advise, consult and cooperate with Purchaser regarding all negotiations for the buyout or buydown of QF contracts and promptly furnish copies to Purchaser of all new letters of intent and definitive agreement for the buyout or buydown of QF contracts.

4.17     MPC Benefit Restoration Plans.  Seller and MPC agree that, from and after the date of this Agreement, Seller and MPC will not allow any new participant in the MPC Benefit Restoration Plan for Senior Executives or the MPC Benefit Restoration Plan for Directors nor amend or modify the terms of such plans other than to transfer participants or obligations out of such plans to Seller or its Affiliates in a manner that results in no liability to Purchaser.

4.18     Power Supply.  Seller and MPC agree to advise, consult and cooperate with Purchaser regarding steps to be taken to manage power supply risks, including (i) securing power to replace that currently supplied under the wholesale buyback agreement with PPL Montana LLC that expires on June 30, 2001, (ii) supplying MPC's residual customer load in full in the event the PSC proceeding on default supplier rules is not resolved by June 30, 2001, or if MPC's default supplier role is extended beyond July 1, 2002, and (iii) securing power to serve MPC's power supply obligations to Advanced Silicon Materials, Inc.  Seller and MPC agree to take reasonable and prudent steps to mitigate such risk, including contracting for additional power supply, and to consult and cooperate with Purchaser in the taking of such steps.


NOR002660

4.19    Generation Sale Proceeds. Seller and MPC agree to maintain the net after tax cash proceeds from the sale of generation and related assets to PPL Montana LLC, after reduction for unrecovered regulatory assets, as cash reserves (which as of the date hereof, shall not be less than $55,000,000) and not to apply the same except as mandated by the PSC or FERC final order (or if such order is appealed by the final non-appealable order of the applicable court with jurisdiction over such appeal) on stranded cost recovery or as otherwise consented to by Purchaser.

4.20    Regional Transmission Organization and Independent Transmission Company. Seller and MPC agree to advise, consult and cooperate with Purchaser regarding all negotiations and agreements for the potential inclusion of MPC or the Company in any Independent Transmission Company or Regional Transmission Company or Regional Transmission Organization. Seller and MPC agree to promptly furnish Purchaser copies of all agreements regarding the Independent Transmission Company or Regional Transmission Organization.

4.21    Notification of Certain Matters. Seller and MPC shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Seller and MPC, of (i) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate and (ii) any failure of Seller, MPC, the Company, or any Subsidiary or Purchaser, as the case may be, to comply with or satisfy any covenant, condition or agreement to be completed with or satisfied by it hereunder; provided, however, that the delivery of any notice pursuant to this Section 4.21 shall not limit or otherwise affect the remedies available hereunder to the party entitled to receive such notice.

4.22    Confidentiality and Standstill Agreements. From the date hereof to the Closing Date, neither Seller, MPC, nor the Company shall terminate, amend, modify or waive any provisions of any confidentiality or standstill agreement relating to the Utility Business to which it is a party or by which it is bound. During such period, Seller, MPC and the Company each shall enforce, to the fullest extent permitted under applicable law, the provisions of any such agreement, including but not limited to, by obtaining injunctive relief to prevent any breaches of such agreements and to enforce specifically the terms and provisions thereof in any court having jurisdiction.

## ARTICLE V
## COVENANTS OF PURCHASER

Purchaser covenants and agrees with Seller and MPC that, at all times from and after the date hereof until the Closing and, in the case of Section 5.04 and Section 5.07, thereafter, Purchaser will comply with all covenants and provisions of this Article V, except to the extent Seller and MPC may otherwise consent in writing.

5.01    Regulatory and Other Approvals. Purchaser will as promptly as practicable (a) take all commercially reasonable steps necessary or desirable to obtain all consents, approvals or actions of, make all filings with and give all notices to Governmental or

NOR002661

Regulatory Authorities or any other Person required of Purchaser to consummate the transactions contemplated hereby, including without limitation those disclosed in Schedules 3.03 and 3.04 hereto, and those that may be required in connection with the transaction structure contemplated by Section 5.08, (b) provide such other information and communications to such Governmental or Regulatory Authorities or other Persons as such Governmental or Regulatory Authorities or other Persons may reasonably request in connection therewith and (c) provide reasonable cooperation to Seller, the Company and the Subsidiaries in connection with the performance of their obligations under Sections 4.01 and 4.02. Purchaser will provide prompt notification to Seller when any such consent, approval, action, filing or notice referred to in clause (a) above is obtained, taken, made or given, as applicable, and will advise Seller of any communications (and, unless precluded by Law, provide copies of any such communications that are in writing) with any Governmental or Regulatory Authority or other Person regarding any of the transactions contemplated by this Agreement.

      5.02   HSR. In addition to and without limiting Purchaser's covenants contained in Section 5.01, Purchaser will (i) take promptly all actions necessary to make the filings required of Purchaser or its Affiliates under the HSR Act, (ii) comply at the earliest practicable date with any request for additional information received by Purchaser or its Affiliates from the Federal Trade Commission or the Antitrust Division of the Department of Justice pursuant to the HSR Act and (iii) cooperate with Seller in connection with Seller's filing under the HSR Act and in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by either the Federal Trade Commission or the Antitrust Division of the Department of Justice or state attorneys general.

      5.03   [INTENTIONALLY OMITTED.]

      5.04   Employee Matters.

      (a)   Continuation of Compensation and Benefits. Except as otherwise provided in this Section 5.04, during the period from the Closing Date until twenty-four months following the Closing Date, the Purchaser will maintain, or shall cause the Company and the Subsidiaries to maintain, base salary, wages, compensation levels (including, without limitation, incentive compensation or comparable cash equivalent plan) and employee pension and welfare benefit plans and programs for the benefit of the employees of MPC, the Company and the Subsidiaries, which, in the aggregate, are at least equal to, or equivalent in value to, the base salary, wages, compensation levels, and Benefit Plans listed in Section 2.13(a) of the Disclosure Schedule provided to the employees of MPC, the Company and the Subsidiaries on the date of this Agreement, plus any base salary and wage adjustments made in the ordinary course of business between the date of this Agreement and the Closing Date.

      (b)   Service Credit. The Purchaser shall provide, or shall cause the Company and the Subsidiaries to provide, each employee of MPC, the Company and the Subsidiaries with credit for all service with MPC, the Company and the Subsidiaries for all purposes under each employee benefit plan, program, or arrangement of the Purchaser or its Affiliates in which such employee is eligible to participate, except to the extent that such service credit would result in a duplication of benefits with respect to the same period of service.

NOR002662

(c)    <u>Bonuses; Incentive Compensation</u>.  The Purchaser shall maintain, or shall cause the Company and the Subsidiaries to maintain, the bonus plans and other incentive compensation plans and programs maintained by Seller and/or any of its Affiliates or comparable cash equivalent plans in which the employees of MPC, the Company and the Subsidiaries are eligible to participate (including terminated or retired employees) who remain eligible to participate under the terms of such plans, as in effect on the date of this Agreement, through the end of the calendar year in which the Closing Date occurs, with the bonuses and incentive compensation to be paid thereunder by Purchaser and/or its Affiliates determined (i) in accordance with calculation methods directed by Seller, such methods to be consistent with the terms of such incentive compensation plans in effect on the date of this Agreement and MPC's, the Company's and the Subsidiaries' past practices, as appropriate, and (ii) in such a manner so that the effects of the transaction contemplated by this Agreement will not unduly burden or benefit the employees of MPC, the Company and the Subsidiaries.

(d)    <u>Severance Policy; Other Agreements</u>.  Except as disclosed in <u>Section 5.04(d) of the Disclosure Schedule</u>, if the employment of any employee of the Company or a Subsidiary, is terminated within twenty-four months after the Closing Date by (i) action of the Purchaser or any of its Affiliates other than for Cause or (ii) action of an employee following (A) a reduction in such employee's base salary equal to or greater than fifteen percent (15%) or (B) such employee's decision not to relocate more than fifty (50) miles from his or her then current job location, then Purchaser shall pay, or shall cause the Company or the affected Subsidiary to pay, each such employee a lump sum severance benefit (less required tax withholding and other withholding obligations required by Law) in an amount equal to the sum of (x) ten percent (10%) of such employee's base salary multiplied by such employee's "years of service" up to a maximum of one hundred percent (100%) of such base salary, plus (y) six thousand dollars ($6,000).  For purposes of the foregoing, "years of service" shall mean the employee's aggregate total years of service (pro-rated to the date of termination) with MPC, the Purchaser and any of their respective Affiliates.  Notwithstanding the foregoing, for those employees disclosed in <u>Section 5.04(d) of the Disclosure Schedule</u> who are parties to an individual change in control severance agreement with MPC, the terms of such agreement shall apply with respect to any termination of such employee, and the consummation of the transaction contemplated by this Agreement will be deemed to constitute a "Change in Control" for purposes of each such agreement. The Purchaser shall honor, or shall cause the Company and the Subsidiaries to honor, all such individual change in control severance agreements with such employees, and the Purchaser shall be liable for any amount(s) or benefit(s) due thereunder.

(e)    <u>Benefit Plan Obligations</u>.  The Purchaser shall be, or shall cause the Company and the Subsidiaries to be, responsible for all obligations existing on the Closing Date (including, without limitation, any such obligations that have been incurred but not yet paid) under any Benefit Plan (including, without limitation, all health and welfare, life insurance and disability plans and programs) applicable to the employees and former employees of MPC, the Company and the Subsidiaries and to certain former employees of Affiliates of MPC, as disclosed in <u>Section 5.04(e) of the Disclosure Schedule</u> (collectively, the "<u>Covered Participants</u>") and their covered dependents. Effective as of the Closing Date, Seller and its Affiliates (other than MPC, the Company or any Subsidiary) shall have no liability or responsibility for any obligation under any Benefit Plan applicable to the Covered Participants and their covered dependents with respect to claims incurred by the Covered Participants or their covered

NOR002663

dependents prior to the Closing Date under each Benefit Plan. Expenses and benefits with respect to claims incurred by the Covered Participants or their covered dependents on or after the Closing Date shall be the responsibility of Purchaser. For purposes of this paragraph, a claim is deemed incurred when the services that are the subject of the claim are performed; in the case of life insurance, when the death occurs, and, in the case of short-term or long-term disability benefits, when the disability occurs. The Purchaser shall, or shall cause the Company and the Subsidiaries to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Covered Participants and their covered dependents under any Benefit Plan, in which such Covered Participants and their covered dependents may be eligible to participate after the Closing Date and (ii) provide each Covered Participant and their covered dependents with credit for any co-payments and deductibles paid prior to the Closing Date in satisfying any applicable deductible or out-of-pocket requirements under any Benefit Plan in which such Covered Participants and their covered dependents are eligible to participate after the Closing Date.

(f)  MPC 401(k) Plan. Effective as of the Closing Date, Purchaser shall sponsor and maintain, or shall cause the Company to sponsor and maintain, the MPC 401(k) Plan, or a comparable Qualified Plan (with the employer contribution being made in cash not shares), for the eligible participants and beneficiaries (including continuing the Seller stock investment fund for the exclusive benefit of the eligible participants and beneficiaries who had balances in such fund on the Closing Date) for at least twenty-four months after the Closing Date. Effective as of the Closing Date, employees of the Seller and its Affiliates (other than MPC, the Company and the Subsidiaries) shall cease to accrue benefits and service credits under the MPC 401(k) Plan. To the extent Purchaser sponsors or maintains a comparable plan rather than the MPC 401(k) Plan, such comparable plan shall provide for the acceptance of a trust to trust transfer and rollover distributions from MPC Qualified Plans and/or conduit individual retirement accounts established by such participants and beneficiaries.

(g)  MPC Pension Plan. Effective as of the Closing Date, Purchaser shall sponsor and maintain, or shall cause the Company to sponsor and maintain, the Montana Power Company Pension Plan (the "MPC Pension Plan"), or a comparable plan, for eligible participants and beneficiaries for at least twenty-four months after the Closing Date. Effective as of the Closing Date, employees of the Seller and its Affiliates (other than MPC, the Company and the Subsidiaries) shall cease to accrue benefits under the MPC Pension Plan.

(h)  Supplemental Retirement Plans. Except as disclosed in Section 5.04(h) of the Disclosure Schedule, effective as of the Closing Date the Purchaser shall maintain and shall be responsible for, or shall cause the Company and the Subsidiaries to maintain and be responsible for, all current and future obligations of MPC, the Company and the Subsidiaries under any supplemental pension benefit or benefit replacement or restoration plan, program or individual arrangement maintained by MPC, the Company and the Subsidiaries as in effect on the Closing Date.

(i)  Stock Option Obligation. On the Closing Date, each unvested stock option on MPC common stock issued under any plan or program of MPC or its Affiliates under which the employees of MPC, the Company and the Subsidiaries have previously been awarded stock options on MPC common stock (an "MPC Stock Option") shall be cancelled, and the

NOR002664

holder thereof shall be entitled to receive on the Closing Date or as soon as practicable thereafter, from the Purchaser as consideration for such cancellation, either (i) stock options of substantially equivalent value ("Substitute Stock Options") to such holder's MPC Stock Options (with Seller reserving reasonable reasonable discretion to determine whether such Substitute Stock Options are of "substantially equivalent value"), or (ii) an amount in cash (less required tax withholding and other withholding obligations required by Law) equal to the product of (x) the number of shares previously subject to such MPC Stock Option and (y) the excess, if any, of the market price per share (the average of the high and low prices of the underlying MPC common stock as reported on the New York Stock Exchange Composite Tape on the Closing Date) over the exercise price per share of the cancelled MPC Stock Option; provided, however, that if the Purchaser provides Substitute Stock Options in accordance with (i) of this paragraph, then the Purchaser shall pay, or shall cause the Company or the Subsidiaries to pay, in cash to any employee of MPC, the Company and the Subsidiaries who receives Substitute Stock Options, but whose employment terminates before such Substitute Stock Options vest under circumstances that would entitle the employee to the benefit described in Section 5.04(d), the amount computed under (ii) above as of the Closing Date.

       (j)    Retiree Benefits.  Except as disclosed in Section 5.04(j) of the Disclosure Schedule, effective as of the Closing Date, the Purchaser shall maintain and shall be responsible for, or shall cause the Company and the Subsidiaries to maintain and be responsible for, all current and future obligations of MPC, the Company and the Subsidiaries with respect to (i) any post-retirement health or welfare benefit plan, program or arrangement maintained by MPC, the Company and the Subsidiaries as in effect on the Closing Date and (ii) the utility discount provided to certain retired employees and certain other employees, as disclosed in Section 5.04(j) of the Disclosure Schedule, of MPC, the Company and the Subsidiaries.  The post retirement health and welfare benefits described in (i) above shall be continued for their full terms as provided in the applicable plan, program or arrangement as in effect on the Closing Date, and the utility discount described in (ii) above shall be continued at least until residential customer choice for electric and natural gas utility service is fully implemented in Montana.

       (k)    Collective Bargaining Agreements.  The wages, compensation levels and employee pension and welfare benefit plans and programs for the benefit of employees of MPC, the Company and the Subsidiaries who are covered by a collective bargaining agreement shall be governed by the terms of such collective bargaining agreement, except (i) to the extent that an employee is eligible for the benefits provided under Section 5.04(c) and/or Section 5.04(d) and (ii) Section 5.04(b) shall apply with respect to all such employees.  To the extent that the terms or provisions of any such collective bargaining agreement conflict with any of the terms or provisions of this Agreement, the terms or provisions of the collective bargaining agreement shall govern.

       (l)    Continuing Obligation.  If the Purchaser sells or otherwise disposes of all or substantially all of the stock or assets of the Company within twenty-four months of the Closing Date, or such other longer time period as may be applicable to any individual change in control severance agreement, the Purchaser shall, in connection with such disposition cause the transferee of such stock or assets to honor the provisions of this Section 5.04 until twenty-four months after the Closing Date, or such other longer time period as may be applicable under any individual change in control severance agreement.

NOR002665