# Exhibit 7
# (Part B)

5.05  <u>Fulfillment of Conditions</u>.  Purchaser will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each condition to the obligations of Seller contained in this Agreement and will not take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

5.06  <u>Communication Between the Parties</u>.  If Purchaser develops information prior to the Closing Date that leads Purchaser to believe that Seller has breached a representation or warranty under this Agreement, Purchaser shall inform Seller of such potential breach as soon as possible, but in any event, at or prior to Closing.

5.07  <u>Charitable Contributions</u>.  During the period from the Closing Date until twenty-four months following the Closing Date, Purchaser shall, or shall cause the Company and the Subsidiaries to, continue to provide charitable contributions or other financial support for non-profit organizations and educational institutions as disclosed in <u>Section 5.07 of the Disclosure Schedule</u>, in amounts substantially comparable to MPC's past practices as set forth in <u>Section 5.07 of the Disclosure Schedule</u> taking into account the Restructuring and the Divestiture.

5.08  <u>Transaction Structure</u>.  Purchaser may determine, in its discretion, to obtain the approval of the SEC under the 1935 Act, or to make the requisite filing within the SEC under Rule 2 of the 1935 Act, to consummate the transactions contemplated by this Agreement pursuant to an exempt holding company structure under the 1935 Act.

ARTICLE VI
CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser hereunder to purchase the Units are subject to the fulfillment, at or before the Closing, of each of the following conditions (all or any of which may be waived in whole or in part by Purchaser in its sole discretion):

6.01  <u>Representations and Warranties</u>.  The representations and warranties made by Seller and MPC in this Agreement shall be true and correct on and as of the Closing Date as though made on and as of the Closing Date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date; except for such failures of representations and warranties to be true and correct (without regard to any materiality qualifier therein) that, individually or in the aggregate, could not result in a material adverse effect to the Business or Condition of MPC and the Company.

6.02  <u>Performance</u>.  Seller and MPC shall have performed and complied with, in all material respects, the agreements, covenants and obligations required by this Agreement to be so performed or complied with by Seller and MPC at or before the Closing.

6.03  <u>Officers' Certificates</u>.  Seller shall have delivered to Purchaser a certificate, dated the Closing Date and executed in the name and on behalf of Seller by the Chairman of the Board, the President or any Executive or Senior Vice President of Seller, substantially in the form and to the effect of <u>Exhibit A</u> hereto, and a certificate, dated the Closing

NOR002666

Date and executed by the Secretary or any Assistant Secretary of Seller, substantially in the form and to the effect of Exhibit B hereto.

6.04    Orders and Laws. There shall not be in effect on the Closing Date any Order or Law restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement.

6.05    Regulatory Consents and Approvals. All consents, approvals and actions of, filings with and notices to any Governmental or Regulatory Authority set forth in Schedules 3.03 and 3.04 necessary to permit Purchaser and Seller to perform their obligations under this Agreement and to consummate the transactions contemplated hereby, other than those referred to in Section 5.08, shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental or Regulatory Authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act, shall have occurred.

6.06    Third Party Consents. The consents (or in lieu thereof waivers) listed in Section 6.06 of the Disclosure Schedule shall have been obtained and shall be in full force and effect.

6.07    Completion of the Restructuring. The Restructuring shall have been completed.

6.08    Assignment of Contracts. All rights and obligations under those Contracts listed on Schedule 6.08 hereto shall have been duly and validly assigned to the Company or the Subsidiaries by MPC and any required third party consents shall have been obtained.

6.09    Benefits Plans. All Benefits Plans listed on Schedule 6.09 of the Disclosure Schedule hereto shall either have been terminated to the satisfaction of Purchaser or transferred to Seller in a manner that results in no liability to Purchaser.

6.10    Resignation of Seller as Manager of the Company. Immediately prior to Closing, Seller shall have resigned as manager of the Company.

ARTICLE VII
CONDITIONS TO OBLIGATIONS OF SELLER

The obligations of Seller hereunder to sell the Units are subject to the fulfillment, at or before the Closing, of each of the following conditions (all or any of which may be waived in whole or in part by Seller in its sole discretion):

7.01    Representations and Warranties. The representations and warranties made by Purchaser in this Agreement, taken as a whole, shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date.



NOR002667

7.02   Performance.  Purchaser shall have performed and complied with, in all material respects, the agreements, covenants and obligations required by this Agreement to be so performed or complied with by Purchaser at or before the Closing.

7.03   Officers' Certificates.  Purchaser shall have delivered to Seller a certificate, dated the Closing Date and executed in the name and on behalf of Purchaser by the Chairman of the Board, the President or any Executive or Senior Vice President of Purchaser, substantially in the form and to the effect of Exhibit C hereto, and a certificate, dated the Closing Date and executed by the Secretary or any Assistant Secretary of Purchaser, substantially in the form and to the effect of Exhibit D hereto.

7.04   Orders and Laws.  There shall not be in effect on the Closing Date any Order or Law restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement.

7.05   Regulatory Consents and Approvals.  All consents, approvals and actions of, filings with and notices to any Governmental or Regulatory Authority set forth in Sections 2.06 and 2.07 of the Disclosure Schedule necessary to permit Seller and Purchaser to perform their obligations under this Agreement and to consummate the transactions contemplated hereby shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental or Regulatory Authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act, shall have occurred.

7.06   Third Party Consents.  The consents (or in lieu thereof waivers) listed in Section 7.06 of the Disclosure Schedule shall have been obtained and shall be in full force and effect.

ARTICLE VIII
TAX MATTERS AND POST-CLOSING TAXES

8.01   Tax Returns.  (a) Seller and MPC will include the income of the Company and the Subsidiaries (including any deferred income triggered into income by Treas. Reg. section 1.1502-13 and any excess loss accounts taken into account under Treas. Reg. section 1.1502-19) on Seller's or MPC's consolidated, combined or unitary federal or state or local Tax Returns for all periods through the Closing Date.  Seller shall prepare or cause to be prepared and file or caused to be filed all Tax Returns for MPC, the Company and the Subsidiaries for all periods ending on or prior to the Closing Date which are filed after the Closing Date in accordance with past custom and practice. The Company and the Subsidiaries will furnish Tax information to Seller for inclusion in the relevant Tax Returns in accordance with the past custom and practice of MPC, the Company and the Subsidiaries.  Seller shall pay all amounts shown as owing on such Tax Returns, and shall be liable for all such Taxes for periods ending on or prior to the Closing Date.

(b)   Purchaser shall prepare or cause to be prepared and Purchaser shall file or cause to be filed any Tax Returns of MPC, the Company and the Subsidiaries for Tax periods which begin before the Closing Date and end after the Closing Date in accordance with past

NY1:#3264263v6
31287-02300

NOR002668

custom and practice. Purchaser will allow Seller an opportunity to review and comment upon such Tax Returns (including any amended returns) to the extent that they relate to MPC, the Company and the Subsidiaries. Purchaser will take no position on such Tax Returns that relate to MPC, the Company and the Subsidiaries that would materially adversely affect Seller after the Closing Date without the prior written consent of Seller. Seller will furnish Tax information to Purchaser for inclusion in the relevant Tax Returns in accordance with the past custom and practice of MPC, the Company and the Subsidiaries. Seller shall pay to Purchaser within fifteen Business Days after the date on which Taxes are paid with respect to such periods an amount equal to the portion of the amounts shown as owing on such Tax Returns which relates to the portion of such Tax period ending on the Closing Date to the extent such amounts are not reflected in a reserve (other than any reserve for deferred Taxes established to reflect timing differences between book and Tax) for tax liability on MPC's, the Company's or the Subsidiaries' financial statements made available to the Purchaser pursuant to Section 2.09(ii) or Section 4.06 hereof. For purposes of this Section, in the case of any Taxes that are imposed on a periodic basis and are payable for a Tax period that includes (but does not end on) the Closing Date, the portion of such Tax which relates to the portion of such Tax period ending on the Closing Date shall (x) in the case of any Taxes other than Income Taxes, be deemed to be the amount of such Tax for the entire Tax period multiplied by a fraction, the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period, and (y) in the case of any Income Tax, be deemed to be equal to the amount which would be payable if the relevant Tax period ended on the Closing Date. Any credits relating to a Tax period that begins before and ends after the Closing Date shall be taken into account as though the relevant Tax period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations shall be made by Purchaser in a manner consistent with prior practice of MPC, the Company and the Subsidiaries. Seller shall be liable for Taxes of MPC, the Company and the Subsidiaries which are attributable to periods ending on or prior to the Closing Date pursuant to this Section 8.01(b) to the extent such Taxes are not reflected in a reserve (other than any reserve for deferred Taxes established to reflect timing differences between book and Tax) for tax liability on MPC's, the Company's or the Subsidiaries' financial statements made available to the Purchaser pursuant to Section 2.09(ii) or Section 4.06 hereof. Purchaser shall be liable for Taxes of the Company and the Subsidiaries which are attributable to periods after the Closing Date pursuant to this Section 8.01(b).

(c)    As soon as reasonably practicable after the signing of this Agreement, Seller will deliver to Purchaser true and correct copies of the federal Income Tax workpapers of the Subsidiaries, Income Tax Returns of the Subsidiaries filed on a stand alone basis within any State, and the Canadian Income Tax Returns of CMPL, each with respect to the Tax periods from 1997 through 1999.

8.02    Notice of Audit.  Seller and Purchaser agree that if any of them receives any notice of an audit or examination from any Governmental or Regulatory Authority with respect to Taxes of MPC, the Company, or the Subsidiaries for any taxable period or portion thereof ending on or prior to the Closing Date, then the recipient of such notice shall, within ten days of the receipt thereof, notify and provide copies of such notice to the other party, as the case may be, in accordance with the notice provisions of Section 13.01.

NOR002669

8.03    Tax Adjustments. (a)    Any Tax refunds that are received by Purchaser or MPC, Seller, the Company or any Subsidiary, and any amounts credited against Tax to which Purchaser or MPC, Seller, the Company or any Subsidiary become entitled, that relate to Tax periods or portions thereof ending on or before the Closing Date shall be for the account of Seller, and Purchaser shall pay over to Seller any such refund or the amount of any such credit within fifteen days after receipt or entitlement thereto. In addition, to the extent that a claim for refund or a proceeding results in a payment or credit against Tax by a taxing authority to Purchaser or MPC, Seller, the Company or any Subsidiary of any amount accrued on MPC's, Seller's, the Company's or any Subsidiary's financial statements made available to Purchaser pursuant to Section 2.09(a)(ii) or Section 4.06 hereof, Purchaser shall pay such amount to Seller within fifteen days after receipt or entitlement thereto.

(b)    Any increase in Tax liability of MPC, the Company or any Subsidiary which is the responsibility of Seller under the provisions of Section 8.01(a) or Section 8.01(b) shall be paid by Seller to Purchaser or the relevant Governmental or Regulatory Authority as appropriate. Seller has the right to control the handling and disposition of the audit and any related administrative or court proceeding which might give rise to such increase in Tax liability of MPC, the Company or any Subsidiary; provided, however, that the Seller will not enter into any compromise or agreement to settle any Tax claim pursuant to a Tax audit or proceeding which could reasonably be expected to have a material adverse effect on Purchaser, the Company, MPC, or the Subsidiaries for any post Closing period without the prior written consent of Purchaser (which shall not be unreasonably withheld). Purchaser shall, and shall cause the Company and the Subsidiaries to, cooperate fully with Seller with respect to the handling and disposition of any such audit or related administrative or court proceeding.

(c)    Any increase or decrease in Taxes of MPC, the Company or any Subsidiary resulting from adjustments made for periods after the Closing Date shall be for the account of Purchaser.

8.04    Tax Sharing Agreements. All tax sharing agreements or similar agreements with respect to or involving MPC, the Company or the Subsidiaries shall be terminated as of the Closing Date and, after the Closing Date, MPC, the Company and the Subsidiaries shall not be bound thereby or have any liability thereunder.

8.05    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be paid by Purchaser when due, and Purchaser will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, Seller will, if necessary, join in the execution of any such Tax Returns and other documentation.

8.06    Post-Closing Elections. At Seller's request, the Purchaser will cause the Company and its Subsidiaries to make and/or join with Seller in making any tax election if the making of such election does not have a material adverse impact on the Purchaser, the Company or the Subsidiaries for any post-acquisition period.

NOR002670

8.07    Post-Closing Transactions not in the Ordinary Course. Purchaser and Seller agree to report all transactions not in the ordinary course of business occurring on the Closing Date after Purchaser's purchase of the Units of the Company on Purchaser's federal income tax return to the extent permitted by Treas. Reg. section 1.1502-76(b)(1)(B).

8.08    Allocation of Purchase Price. (a) To the extent that Purchaser and Seller make a Code section 338(h)(10) election (and any corresponding elections under state, local or foreign Tax Law) as provided in Section 8.09 of this Agreement, Purchaser and Seller shall cooperate fully with each other in the making of such election. In particular, and not by way of limitation, Purchaser shall, within 150 days of the Closing Date, prepare for Seller's review Internal Revenue Service Form 8023, any attachments to be filed therewith, and an allocation of the purchase price attributable thereto, all in accordance with applicable Laws. Upon Seller's approval (which shall not be unreasonably withheld or delayed), Purchaser and Seller shall jointly execute such form. Purchaser, Seller, MPC, the Company and the Subsidiaries will file all Tax Returns (including all amended returns and claims for refund) and information reports in a manner consistent with such form.

(b)    Purchaser shall, within 150 days of the Closing Date, prepare for Seller's review Internal Revenue Service Form 8594, and any attachments to be filed therewith, in accordance with applicable Laws. Upon Seller's approval (which shall not be unreasonably withheld), Purchaser and Seller shall each file such Form 8594 with their Income Tax Returns for the year in which Closing occurs. Purchaser, Seller, MPC, the Company and the Subsidiaries will file all Tax Returns (including all amended returns and claims for refund) and information reports in a manner consistent with the allocation contained on such Form 8594.

8.09    Section 338(h)(10) Election. At Purchaser's option (which must be exercised by written notice to Seller on or before the Closing Date) Seller will join with Purchaser in making an election under Code Section 338(h)(10) (and any corresponding elections under state, local, or foreign tax law) with respect to the purchase and sale of the stock of any of the Subsidiaries hereunder (other than CMPL).

8.10    Section 338(g) Election. At Purchaser's option, Purchaser shall make an election under Code Section 338(g) (and any corresponding election under state, local, or foreign tax law) with respect to the purchase of the stock of CMPL hereunder.

8.11    Nonforeign Affidavit. Seller shall furnish Purchaser an affidavit, stating under penalty of perjury, the transferor's United States taxpayer identification number and that the transferor is not a foreign person pursuant to Code § 1445(b)(2).

8.12    Code Section 754 Election. At Purchaser's request, with respect to any interest in a Person that is taxed as a partnership for federal Income Tax purposes (a "Partnership") that Purchaser acquires hereunder, Seller agrees to cause any such Partnership (if Seller has control over such Partnership) to make a Code section 754 election for the Tax period in which the purchase of the Units occurs.

NOR002671

## ARTICLE IX
## SURVIVAL; NO OTHER REPRESENTATIONS

9.01    Survival of Representations, Warranties, Covenants and Agreements.
Except as otherwise set forth herein, the representations, warranties, covenants and agreements contained in this Agreement shall not survive Closing and there shall be no liability in respect thereof, whether such liability has accrued prior to the Closing Date or after the Closing Date, on the part of either party or its officers, directors, employees, agents and Affiliates. This Section shall not limit in any way the survival and enforceability of any covenant or agreement of the parties hereto which by its terms contemplates performance after the Closing Date, which shall survive for the respective periods set forth herein.

9.02    No Other Representations.  Notwithstanding anything to the contrary contained in this Agreement, it is the explicit intent of each party hereto that neither Seller, MPC nor anyone on their behalf, including its advisor Goldman, Sachs & Co. is making any representation or warranty whatsoever, express or implied, except any representation or warranty contained in Article II and in any certificate delivered pursuant to Section 6.03. In particular, neither Seller nor MPC makes any representation or warranty to Purchaser with respect to (i) the information set forth in the Confidential Offering Memorandum dated May 2000 prepared by Goldman, Sachs & Co. or (ii) any financial projection or forecast relating to the Business or Condition of MPC and the Company. With respect to any projection or forecast delivered by or on behalf of Seller or MPC to Purchaser, Purchaser acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts, (ii) it is familiar with such uncertainties, (iii) it is taking full responsibility for making its own evaluation of the adequacy and accuracy of all such projections and forecasts furnished to it and (iv) it shall have no claim against Seller with respect thereto.

## ARTICLE X
## INDEMNIFICATION

10.01    Tax Indemnification.

(a)    Seller agrees to indemnify, defend and hold harmless, Purchaser, any Affiliate of Purchaser and their officers, directors, employees, stockholders, representatives and agents, including after the Closing Date, the Company, and the Subsidiaries (collectively "Purchaser Indemnitees") from and against any Adverse Consequences the Purchaser Indemnitees may suffer resulting from, arising out of, or relating to any liability of Seller, the Company, MPC, and the Subsidiaries (x) for any Taxes of the Seller, the Company, MPC and any member of the MPC Affiliated Group (other than the Subsidiaries) and for any Taxes of the Subsidiaries, with respect to any Tax year or portion thereof ending on or before the Closing Date (or for any Tax year beginning before and ending after the Closing Date to the extent allocable (determined in a manner consistent with Section 8.01(b)) to the portion of such period beginning before and ending on the Closing Date), and (y) for the unpaid Taxes of any Person under Treas. Reg. § 1.1502-6.

NOR002672

(b)     Purchaser agrees to indemnify Seller, and their officers, directors, employees, stockholders, representatives and agents (the "Seller Indemnitees"), from and against any Adverse Consequences Seller Indemnitees may suffer resulting from, arising out of, or relating to, any liability of Seller for any Taxes of Purchaser, the Company and the Subsidiaries with respect to any Tax year or portion thereof after the Closing Date (or for any Tax year beginning before and ending after the Closing Date to the extent allocable (determined in a manner consistent with Section 8.01(b)), to the portion of such period ending after the Closing Date.

(c)     The obligations of Seller and Purchaser under this Section 10.01 shall survive until the expiration of the applicable statute of limitations.

10.02   Indemnification for Restructuring; Divestiture; Oil and Gas Sale.  (a) Seller agrees to indemnify Purchaser Indemnitees in respect of and hold each of them harmless from and against any Adverse Consequences suffered, incurred or sustained by any of them and resulting from, arising out of or relating to (i) the Restructuring and/or the Divestiture, (ii) any aspect of the business of Seller (other than the Company and the Subsidiaries) or (iii) regulatory requirements with respect to the use of the proceeds of the Oil and Gas Sale. Seller's obligations under this Section 10.02 shall survive indefinitely.

(b)     To the extent such amount is not paid prior to Closing, Seller agrees to indemnify Purchaser Indemnitees in respect of and hold each of them harmless with respect to the amount of $3,894,823 set forth on PP&L Montana, LLC's Invoice Number 82200, dated September 25, 2000 relating to the Wholesale Transmission Services Agreement.

10.03   Other Indemnification.  Subject to the other Sections of this Article X, Purchaser shall indemnify the Seller and its directors, officers, employees and agents in respect of, and hold each of them harmless from and against, any and all Adverse Consequences suffered, incurred or sustained by any of them or of or relating to MPC, the Company and the Subsidiaries resulting from or arising out of the operation of the business of MPC, the Company and the Subsidiaries from and after Closing (including, without limitation, Adverse Consequences arising out of or relating to any Environmental Law); provided, however, that such indemnity shall not apply until the total amount of such Adverse Consequences shall exceed $1,000,000 at which time the entire amount of all such Adverse Consequences shall be indemnified hereunder.

10.04   Special Environmental Indemnity.  Seller shall indemnify, defend and hold harmless Purchaser Indemnitees against any Adverse Consequences which Purchaser Indemnitees may suffer, sustain, or become subject to, resulting from or arising out of: any claims, damages, liabilities, taxes, injuries to Persons, property or natural resources, fines, penalties, costs and expenses, including without limitation, settlement costs and reasonable legal, accounting or other expert fees and costs, incurred in connection with investigating or defending any action (an "Environmental Loss") sustained or required to be paid by reason of, or arising out of or caused by any act or omission occurring, or condition existing, on or prior to the Closing Date which related directly or indirectly to the business or operations or facilities (past or present) of MPC, the Company or its Subsidiaries, and which relate to a violation of or liability to pay costs, penalties, fines or damages under Environmental Laws; provided, however,

NOR002673

that such indemnity shall be subject to the following: (i) it shall not apply until the total amount of such Environmental Loss exceeds $50,000,000; (ii) after the first $50,000,000 of Environmental Loss, Seller shall be liable for the next $25,000,000 of Environmental Loss; (iii) Seller shall be liable for 50% of all Environmental Loss in excess of $75,000,000 in the aggregate; and (iv) in no event shall Seller's obligations under this Section 10.04 exceed $100,000,000.  Seller's obligations under this Section 10.04 shall survive for a period of five years from the Closing Date.

10.05   Special Litigation Indemnity.  Seller shall indemnify, defend and hold harmless Purchaser Indemnitees against and pay on behalf of or reimburse Purchaser Indemnitees as and when incurred for any Adverse Consequences which Purchaser Indemnitees may suffer, sustain or become subject to, resulting from or arising out of those matters set forth on Schedule 10.05 hereto.  Seller's obligations under this Section 10.05 shall survive indefinitely. Purchaser agrees that it will make any employees of the Company or the Subsidiaries connected to the matters set forth in Schedule 10.05 reasonably available to Seller, upon Seller's reasonable request and at Seller's sole expense, for the purposes of defending the matters set forth in this Section 10.05.

10.06   Method of Asserting Claims.  All claims for indemnification by any Indemnified Party under this Article X will be asserted and resolved as follows:

(a)     In the event any claim or demand in respect of which an Indemnified Party might seek indemnity under this Article X is asserted against or sought to be collected from such Indemnified Party by a Person other than Seller or any Affiliate of Seller or of Purchaser (a "Third Party Claim"), the Indemnified Party shall deliver a Claim Notice with reasonable promptness to the Indemnifying Party.  The Indemnifying Party will notify the Indemnified Party as soon as practicable within the Dispute Period whether the Indemnifying Party disputes its liability to the Indemnified Party under this Article X and whether the Indemnifying Party desires, at its sole cost and expense, to defend the Indemnified Party against such Third Party Claim.

(i)     If the Indemnifying Party notifies the Indemnified Party within the Dispute Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this Section 10.06(a), then the Indemnifying Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, such Third Party Claim by all appropriate proceedings, which proceedings will be vigorously and diligently prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the Indemnifying Party (but only with the consent of the Indemnified Party, which consent will not be unreasonably withheld, in the case of any settlement that provides for any relief other than the payment of monetary damages as to which the Indemnified Party will be indemnified in full).  The Indemnifying Party will have full control of such defense and proceedings, including (except as provided in the immediately preceding sentence) any settlement thereof and shall keep the Indemnified Party informed of all material developments relating to such proceedings; provided, however, that if requested by the Indemnifying Party, the Indemnified Party will, at the sole cost and expense of the Indemnifying Party, cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the

NOR002674

Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the Person asserting the Third Party Claim, or any cross-complaint against any Person (other than the Indemnified Party or any of its Affiliates). The Indemnified Party may retain separate counsel to represent it in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this clause (i), and the Indemnified Party will bear its own costs and expenses with respect to such separate counsel except as provided in the preceding sentence and except that the Indemnifying Party will pay the costs and expenses of such separate counsel if (x) in the Indemnified Party's good faith judgment, it is advisable, based on advice of counsel, for the Indemnified Party to be represented by separate counsel because a conflict or potential conflict exists between the Indemnifying Party and the Indemnified Party or (y) the named parties to such Third Party Claim include both the Indemnifying Party and the Indemnified Party and the Indemnified Party determines in good faith, based on advice of counsel, that defenses are available to it that are unavailable to the Indemnifying Party. Notwithstanding the foregoing, the Indemnified Party may retain or take over the control of the defense or settlement of any Third Party Claim the defense of which the Indemnifying Party has elected to control if the Indemnified Party irrevocably waives its right to indemnity under this Article X with respect to such Third Party Claim.

(ii)    If the Indemnifying Party fails to notify the Indemnified Party within the Dispute Period that the Indemnifying Party desires to defend the Third Party Claim pursuant to Section 10.06(a), then the Indemnified Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be vigorously and diligently prosecuted by the Indemnified Party to a final conclusion or will be settled at the discretion of the Indemnified Party (with the consent of the Indemnifying Party, which consent will not be unreasonably withheld). The Indemnified Party will have full control of such defense and proceedings, including (except as provided in the immediately preceding sentence) any settlement thereof; provided, however, that if requested by the Indemnified Party, the Indemnifying Party will, at the sole cost and expense of the Indemnifying Party, cooperate with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the Person asserting the Third Party Claim, or any cross-complaint against any Person (other than the Indemnifying Party or any of its Affiliates). Notwithstanding the foregoing provisions of this clause (ii), if the Indemnifying Party has notified the Indemnified Party within the Dispute Period that the Indemnifying Party disputes its liability hereunder to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party in the manner provided in clause (iii) below, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this clause (ii) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation. The Indemnifying Party may retain separate counsel to represent it in, but not control, any defense or settlement

NOR002675

controlled by the Indemnified Party pursuant to this clause (ii), and the Indemnifying Party will bear its own costs and expenses with respect to such participation.

(iii)    If the Indemnifying Party notifies the Indemnified Party that it does not dispute its liability to the Indemnified Party with respect to the Third Party Claim under this Article X or fails to notify the Indemnified Party within the Dispute Period whether the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim, the Adverse Consequences arising from such Third Party Claim will be conclusively deemed a liability of the Indemnifying Party under this Article X and the Indemnifying Party shall pay the amount of such Adverse Consequences to the Indemnified Party on demand following the final determination thereof. If the Indemnifying Party has timely disputed its liability with respect to such claim, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations within the Resolution Period, such dispute shall be resolved by litigation in a court of competent jurisdiction.

(iv)    Notwithstanding any other provision of this Section 10.06(a) to the contrary, Purchaser shall have the right to defend all Third Party Claims covered by Section 10.04, by all appropriate proceedings, which proceedings will be vigorously and diligently prosecuted by Purchaser to a final conclusion or will be settled at the discretion of Purchaser (but only with the consent of Seller, which consent will not be unreasonably withheld, in the case of any settlement that provides for any relief involving Seller other than the payment of monetary damages). Purchaser will have full control of such defense and proceedings, including (except as provided in the immediately preceding sentence) any settlement thereof, and shall keep Seller informed of all material developments relating to such proceedings. Seller may retain separate counsel to represent it in, but not control, any defense or settlement of any Third Party Claim controlled by Purchaser pursuant to this Section 10.06(a)(iv) and Seller will bear its own costs and expenses with respect to such counsel.

(b)    In the event any Indemnified Party should have a claim under this Article X against any Indemnifying Party that does not involve a Third Party Claim, the Indemnified Party shall deliver an Indemnity Notice with reasonable promptness to the Indemnifying Party. If the Indemnifying Party notifies the Indemnified Party that it does not dispute the claim described in such Indemnity Notice or fails to notify the Indemnified Party within the Dispute Period whether the Indemnifying Party disputes the claim described in such Indemnity Notice, the Adverse Consequences arising from the claim specified in such Indemnity Notice will be conclusively deemed a liability of the Indemnifying Party under this Article X and the Indemnifying Party shall pay the amount of such Adverse Consequences to the Indemnified Party on demand following the final determination thereof. If the Indemnifying Party has timely disputed its liability with respect to such claim, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations within the Resolution Period, such dispute shall be resolved by litigation in a court of competent jurisdiction.

(c)    In the event of any claim for indemnity under this Article X, each party agrees to give reasonable access to its Books and Records and employees in connection with the

NOR002676

matters for which indemnification is sought to the extent a party reasonably deems necessary in connection with its rights and obligations under this <u>Article X</u>.

10.07  <u>Requirements for Indemnity</u>.  Notwithstanding anything to the contrary contained in this Agreement, no amounts of indemnity shall be payable as a result of any claim in respect of any and all Adverse Consequences arising under this <u>Article X</u>, (a) unless the Indemnified Party has given the Indemnifying Party a Claim Notice or Indemnity Notice, as applicable, with respect to such claim, setting forth in reasonable detail the specific facts and circumstances pertaining thereto, (i) as soon as practical following the time at which an officer of the Indemnified Party discovered or reasonably should have discovered such claim and (ii) in any event prior to the applicable Cut-off Date, and (b) to the extent that the Indemnified Party had a reasonable opportunity, but failed, in good faith to mitigate the Adverse Consequences, including but not limited to the failure to use commercially reasonable efforts to recover under a policy of insurance or under a contractual right of set-off or indemnity.

10.08  <u>Exclusivity</u>.  After the Closing, to the extent permitted by Law, the indemnities set forth in this <u>Article X</u> shall be the exclusive remedies of Purchaser and Seller and their respective officers, directors, employees, agents and Affiliates for any misrepresentation, breach of warranty or nonfulfillment or failure to be performed of any covenant or agreement contained in this Agreement, and the parties shall not be entitled to a rescission of this Agreement or to any further indemnification rights or claims of any nature whatsoever in respect thereof, all of which the parties hereto hereby waive.

ARTICLE XI
TERMINATION

11.01  <u>Termination</u>.  This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing, whether prior to or after the MPC Stockholders' Approval:

(a)  by mutual written agreement of Seller, MPC and Purchaser;

(b)  by Seller, MPC or Purchaser, in the event that any Order or Law becomes effective, and is non-appealable, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement, upon notification of the non-terminating party by the terminating party;

(c)  by Seller, MPC or Purchaser if the MPC Stockholders' Approval shall not be obtained by reason of the failure to obtain the requisite vote upon a vote actually held at the MPC Stockholders' Meeting;

(d)  by Seller, MPC or Purchaser (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if there shall have been a material breach of any of the representations, warranties, covenants or other agreements contained in this Agreement on the part of the other party, which breach either (i) is not cured with fifteen (15) days following written notice by the terminating

NOR002677

party to the party committing such breach, or (ii) by its nature, cannot be cured prior to March 31, 2002;

(e)    at any time after March 31, 2002, by Seller, MPC or Purchaser upon notification of the non-terminating party by the terminating party if the Closing shall not have occurred on or before such date and such failure to consummate is not caused by a breach of this Agreement by the terminating party;

(f)    by Purchaser if (i) the Board of Directors of MPC shall have (A) failed to recommend, or withdrawn, modified or amended in any respect adverse to Purchaser its approval or recommendation of, this Agreement or the transactions contemplated herein or resolved to do so, or (B) approved or recommended a Superior Proposal from a Person (other than Purchaser) or resolved to do so, or (ii) Seller or MPC breaches any of its agreements in Section 4.04, Section 4.11 or Section 4.12; or

(g)    by Seller or MPC (but only prior to adoption of the MPC Stockholders' Approval), if the Board of Directors of MPC, by majority vote, shall have determined that an Acquisition Proposal constitutes a Superior Proposal; provided that, (i) MPC shall have provided to Purchaser three (3) Business Days' notice of its intention to terminate this Agreement pursuant to this Section 11.01(g) (which notice shall include the most current version of the agreement to be entered into in connection with the Superior Proposal (or a description of all of the material terms and conditions thereof)), (ii) MPC has complied with the provisions of Section 4.04, Section 4.11 and Section 4.12, (iii) the Superior Proposal is pending at the time of such termination, (iv) the Board of Directors shall have determined in good faith, after giving effect to all concessions and modifications which may be offered by Purchaser pursuant to clause (v) below, and after consultation with its financial advisors and outside legal counsel, that such proposal is a Superior Proposal, (v) during the three (3) Business Days' notice referred to in (i) above, Seller and MPC shall, and shall cause the financial and legal advisors to, negotiate in good faith with Purchaser with respect to any modifications to the terms of this Agreement proposed by Purchaser that would enable MPC and Purchaser to proceed with the transactions contemplated hereby, and (vi) it shall be a condition precedent to the termination of this Agreement by Seller or MPC pursuant to this Section 11.01(g) that Seller and MPC shall have made the payment of the Fee and Expenses required by Section 11.03.

11.02    Effect of Termination.  If this Agreement is validly terminated pursuant to Section 11.01 and subject to the payment of amounts due under Section 11.03 below, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of Seller, MPC or Purchaser (or any of their respective officers, directors, employees, agents or other representatives or Affiliates), except that (i) the provisions with respect to expenses in Section 13.03 and confidentiality in Section 13.05 will continue to apply following any such termination, and (ii) that nothing contained herein shall relieve any party hereto from liability for willful breach of its representations, warranties, covenants or agreements contained in this Agreement.

NOR002678

11.03    Fees and Expenses.

(a)    If this Agreement is terminated (i) pursuant to Section 11.01(f) or (g), then Seller and MPC, jointly and severally, shall pay to Purchaser, (A) simultaneously with any termination by Seller or MPC pursuant to Section 11.01(g), and (B) within one Business Day following any termination by Purchaser contemplated by Section 11.01(f), a fee, in cash, equal to $50,000,000 (the "Fee"), and (ii) by Purchaser pursuant to Section 11.01(d), and any Person shall have made an Acquisition Proposal prior to such termination, then MPC and Seller, jointly and severally, shall pay to Purchaser on the date of execution of a definitive agreement with respect to an Acquisition Proposal, or, if earlier, consummation of an Acquisition Proposal, the Fee, provided, however, that no Fee shall be payable pursuant to clause (ii) of this Section 11.03 unless and until, within 12 months of such termination, MPC or Seller enter into a definitive agreement to consummate, or consummates, any transaction the proposal of which would have constituted an Acquisition Proposal, and provided, further, that Seller and MPC shall not in any event be obligated to pay more than one such fee with respect to all such occurrences and such termination. It is understood and agreed that the Fee constitutes liquidated damages and not a penalty.

(b)    In addition to the Fee payable pursuant to Section 11.03(a), (i) within one Business Day after the termination of this Agreement pursuant to Section 11.01(c), (f) or (g), or (ii) if this Agreement is terminated by Purchaser pursuant to Section 11.01(d) and Purchaser is entitled to receive a Fee pursuant to Section 11.03(a) in connection with such termination, on the date of the execution of a definitive agreement with respect to an Acquisition Proposal, or, if earlier, consummation of an Acquisition Proposal, Seller and MPC, jointly and severally, shall pay all of Purchaser's Expenses (as defined below) up to a maximum payment pursuant to this Section 11.03(b) of $10,000,000. The term "Expenses" shall include all out-of-pocket expenses and fees (including without limitation fees and expenses payable to all banks, investment banking firms and other financial institutions and their respective agents and counsel for arranging or providing financial advice or financing commitments with respect to this Agreement and the transactions contemplated hereby and all reasonable fees and expenses of counsel, accountants, experts and consultants to Purchaser) actually incurred by Purchaser or on its behalf in connection with the consummation of all transactions contemplated by this Agreement.

ARTICLE XII
DEFINITIONS

12.01    Definitions. (a) Defined Terms. As used in this Agreement, the following defined terms have the meanings indicated below:

"1935 Act" has the meaning ascribed to it in Section 2.25.

"Acquisition Proposal" means any proposal or offer with respect to (i) a merger, reorganization, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving (x) prior to the Restructuring MPC or any of its subsidiaries, and (y) from and after the Restructuring but prior to Closing, Seller or any of its subsidiaries, or (ii)

NOR002679

any direct or indirect acquisition of all or any substantial portion of the assets or 10% or more of the equity securities of (x) prior to the Restructuring, MPC or any of its subsidiaries, and (y) from and after the Restructuring but prior to Closing, Seller or any of its subsidiaries, other than, in any such case, the transactions contemplated by this Agreement and the Divestiture.

"Actions or Proceedings" means any action, suit, proceeding, claims, demands, complaints, arbitration or Governmental or Regulatory Authority investigation.

"Adverse Consequences" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, deficiencies, costs, liabilities, obligations, taxes, liens, losses, expenses, and fees, including, without limitation, court costs, interest and reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any claim, default or assessment.

"Affiliate" means any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by Contract or otherwise.

"Affiliate Contract" has the meaning ascribed to it in Section 4.08.

"Affiliated Group" means any affiliated group within the meaning of Code § 1504(a), or any similar group defined under a similar provision of state, local or foreign Law.

"Agreement" means this Stock Purchase Agreement and the Disclosure Schedule and the certificates delivered in accordance with Sections 6.03 and 7.03, as the same shall be amended from time to time.

"Assets and Properties" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person.

"beneficially" means the beneficial owner of such securities under Rule 13d-3 of the Securities Exchange Act of 1934, as amended, including securities which such Person has a right to acquire (whether such right is exercisable immediately or only after the passage of time).

"Benefit Plan" means any Plan established by MPC, the Company or any Subsidiary, or any predecessor or Affiliate of any of the foregoing, existing at the Closing Date (or at any time within the five (5) year period prior thereto for a Plan subject to Title IV of ERISA), to which MPC, the Company or any Subsidiary contributes or has contributed, or under which any employee, former employee or director of MPC, the Company or any Subsidiary or any beneficiary thereof is covered, is eligible for coverage or has benefit rights.

"Background Materials" has the meaning ascribed to it in Section 3.11.

NOR002680

"Books and Records" means all files, documents, instruments, papers, books and records relating to the Business or Condition of MPC and the Company, including without limitation financial statements, Tax Returns and related work papers and letters from accountants, budgets, pricing guidelines, ledgers, journals, deeds, title policies, minute books, stock certificates and books, stock transfer ledgers, Contracts, Licenses, customer lists, computer files and programs, retrieval programs, operating data and plans and environmental studies and plans.

"Budget" means, with respect to fiscal year 2000, the FY2000 operating and capital budget of MPC and the Subsidiaries attached as Section 12.01 of the Disclosure Schedule hereto, and, with respect to fiscal year 2001, the FY2001 operating and capital budget of MPC and the Subsidiaries which shall be delivered to Purchaser not later than December 15, 2000 provided that the amounts budgeted therein shall be within 5% (plus or minus) of the amounts set forth in Annex II attached hereto for the line items set forth thereon, unless MPC has previously notified Purchaser and Purchaser has consented to such other amounts, such consent not to be unreasonably withheld or delayed.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the State of Montana are authorized or obligated to close.

"Business or Condition of MPC and the Company" means the business, financial condition or results of operations of MPC, the Company and the Subsidiaries taken as a whole.

"Cause" means the failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason; provided, however, that legitimate business reasons shall not include reductions in force, reorganizations, nor restructuring.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended and the rules and regulations promulgated thereunder.

"CERCLIS" means the Comprehensive Environmental Response and Liability Information System, as provided by 40 C.F.R. §300.5.

"Claim Notice" means written notification pursuant to Section 10.06(a) of a Third Party Claim as to which indemnity under Article X is sought by an Indemnified Party, enclosing a copy of all papers served, if any, and specifying the nature of and the basis for such Third Party Claim and for the Indemnified Party's claim against the Indemnifying Party under Article X, together with the amount of, or if not then reasonably determinable, the estimated amount, determined in good faith, of the Adverse Consequences arising from such Third Party Claim.

"Closing" means the closing of the transactions contemplated by Section 1.03.

"Closing Date" means (a) the fifth Business Day after the day on which the last of the consents, approvals, actions, filings, notices or waiting periods described in or related to the filings described in Sections 6.04 through 6.10 and Sections 7.04 through 7.06 has been obtained, made or given or has expired, as applicable, or (b) such other date as Purchaser and Seller mutually agree upon in writing.

NOR002681

"CMPL" means Canadian-Montana Pipe Line Corporation, an Alberta corporation.

"Coal Sale" means the sale, by Entech, of all the outstanding capital stock of Basin Resources Inc., a Colorado corporation, Horizon Coal Services Inc., a Montana corporation, North Central Energy Company, a Colorado corporation, Northwestern Resources Co., a Montana corporation and Western Energy Company, a Montana corporation.

"Code" means the Internal Revenue Code of 1986, as amended, or any replacement, and the rules and regulations promulgated thereunder.

"Colstrip 1, 2 and 3 Transmission Assets" has the meaning ascribed to it in that certain Asset Purchase Agreement, dated October 31, 1998, as amended, by and between PPL Montana LLC and MPC.

"Common Stock" means the common stock, par value $.01 per share, of the Company.

"Company" has the meaning ascribed to it in the forepart of this Agreement.

"Contract" means any agreement, lease, license, evidence of Indebtedness, mortgage, indenture, security agreement or other contract; provided, however, that Contract shall not mean a transaction under a published tariff approved by a Governmental or Regulatory Authority.

"Covered Participants" has the meaning ascribed to it in Section 5.04(e).

"Cut-off Date" means, with respect to any representation, warranty, covenant or agreement contained in this Agreement, the date on which such representation, warranty, covenant or agreement ceases to survive as provided in Section 9.01 or Article X.

"Data Room" has the meaning ascribed to it in Section 3.11.

"Defined Benefit Plan" means each Benefit Plan which is subject to Part 3 of Title I of ERISA, Section 412 of the Code or Title IV of ERISA.

"DES" means Discovery Energy Solutions, Inc., a Montana corporation.

"Disclosure Schedule" means the record delivered to Purchaser by Seller herewith and dated as of the date hereof, containing all lists, descriptions, exceptions and other information and materials as are required to be included therein by Seller pursuant to this Agreement.

"Dispute Period" means the period ending thirty (30) days following receipt by an Indemnifying Party of either a Claim Notice or an Indemnity Notice.

"Divestiture" means the completion of the IPP Sale, the Oil and Gas Sale and the Coal Sale.

NY1:#3264263v6
31287-02300

NOR002682

"Dollar" or "$" means a United States dollar, the lawful currency of the United States, unless otherwise designated.

"Entech" means Entech, Inc., a Montana corporation.

"Environmental Law" means any Law or Order relating to the regulation or protection of human health, public health or safety or the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes.

"Environmental Loss" has the meaning ascribed to it in Section 10.04.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any Person who is in the same controlled group of corporations or who is under common control with Seller or, before the Closing, the Company or any Subsidiary (within the meaning of Section 414 of the Code).

"Exchange Act" means the Exchange Act of 1934, as amended.

"Exon-Florio Amendment" means Section 721 of the Defense Production Act of 1950, as amended, and any successor thereto and the regulations issued pursuant thereto or in consequence thereof.

"Expenses" shall have the meaning ascribed to it in Section 11.03(b).

"Fee" shall have the meaning ascribed to it in Section 11.03(a).

"FCC" means the Federal Communications Commission, or any successor entity thereto.

"FERC" means the Federal Energy Regulatory Commission, or any successor entity thereto.

"Financial Statements" means the consolidated financial statements of MPC and its consolidated subsidiaries delivered to Purchaser pursuant to Section 2.09 or 4.06.

"GAAP" means United States generally accepted accounting principles, consistently applied throughout the specified period and in the immediately prior comparable period.

NOR002683

"Governmental or Regulatory Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or Canada or any state, county, city or other political subdivision.

"HSR Act" means Section 7A of the Clayton Act (Title II of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended) and the rules and regulations promulgated thereunder.

"Income Taxes" means any federal, state, local, or foreign income Tax, including any interest, penalty, or addition thereto, whether disputed or not.

"Income Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Income Taxes, including any schedule or attachment thereto.

"Indebtedness" means, with respect to any Person, whether recourse is to all or a portion of the Assets or Properties of such Person and whether or not contingent, (i) every obligation of such Person for money borrowed, (ii) every obligation for such Person evidenced by bonds, debentures, notes or similar instruments, including obligations incurred in connection with the acquisition of property, assets or businesses, (iii) every obligation of such Person issued or assumed as the deferred purchase price of property or services (but excluding trade accounts payable or accrued liabilities arising in the ordinary course of business), (iv) every capital lease obligation of such Person, (v) the maximum fixed redemption or repurchase price of mandatorily redeemable stock of such Person at the time of determination, (vii) every obligation to pay rent or other payment amounts of such Person with respect to any sale and leaseback transaction to which such Person is a party, (vii) all obligations under interest rate protection, hedging or similar agreements, (ix) every obligation of the type referred to in clauses (i) through (vii) of another Person and all dividends of another Person the payment of which, in either case, such Person has guaranteed or is responsible or liable for, directly or indirectly, as obligor, guarantor or otherwise, or which is secured by a Lien on any Asset or Property of such Person.

"Indemnified Party" means any Person claiming indemnification under any provision of Article X.

"Indemnifying Party" means any Person against whom a claim for indemnification is being asserted under any provision of Article X.

"Indemnity Notice" means written notification pursuant to Section 10.06(b) of a claim for indemnity under Article X by an Indemnified Party, specifying the nature of and basis for such claim, together with the amount or, if not then reasonably determinable, the estimated amount, determined in good faith, of the Adverse Consequences arising from such claim.

"Independent Transmission Company" means a for-profit independent transmission company proposed to be created by MPC, Avista Corp., Portland General Electric Co., Puget Sound Energy, Inc., Sierra Pacific Power Co., and Nevada Power Co., pursuant to the Independent Transmission Company Memorandum of Understanding dated April 26, 2000, or any other independent transmission company of similar nature that conforms to FERC Order

NOR002684

2000, whether in existence or proposed to be created, of which MPC, the Company or any Subsidiary is a member or proposes to be a member.

"Intellectual Property" means all patents and patent rights, trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service names and service name rights, brand names, inventions, copyrights and copyright rights, processes, formulae, trade dress, business and product names, logos, slogans, trade secrets, industrial models, processes, designs, methodologies, computer programs (including all source codes but excluding third party commercial software used in the ordinary course of business) and related documentation, technical information, manufacturing, engineering and technical drawings, know-how and all pending applications for and registrations of patents, trademarks, service marks and copyrights.

"Interim Financial Statement Date" means July 31, 2000.

"Interim Financial Statements" means the Financial Statements for the most recent fiscal period of MPC delivered to Purchaser pursuant to Section 2.09(a)(ii).

"IPP Sale" means the sale of the outstanding capital stock of Continental Energy Services, Inc. a Montana corporation, by Entech.

"IRS" means the United States Internal Revenue Service or any successor agency.

"Knowledge of Seller and MPC" (including any correlative term) with respect to a particular fact or other matters, means that any officer of MPC, the Company or any Subsidiary, or a reasonably prudent individual in the position of such officer, after due inquiry, knows or is actually aware of such fact or other matter.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental or Regulatory Authority.

"Licenses" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"Liens" means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"MPC" has the meaning ascribed to it in the forepart of this Agreement.

"MPC Affiliated Group" means the Affiliated Group of which MPC has been or is the common parent including MPC.

"MPC 401(k) Plan" means the Montana Power Company and Subsidiaries Employee Retirement Savings Plan, as in effect from time to time.

NOR002685

"MPC Pension Plan" has the meaning ascribed to it in Section 5.04(g).

"MPC Stock Option" has the meaning ascribed to it in Section 5.04(i).

"MPC Stockholders' Approval" has the meaning ascribed to it in Section 4.12.

"MPC Stockholders' Meeting" has the meaning ascribed to it in Section 4.11.

"NPL" means the National Priorities List under CERCLA.

"Oil and Gas Sale" means the sale, by Entech, of all the outstanding capital stock and assets of Altana Exploration Company, a Montana corporation, and all the outstanding capital stock of Entech Gas Ventures, Inc., a Montana corporation, Glacier Gas Company, a Montana corporation, North American Resources Company, a Montana corporation, The Montana Power Gas Company, a Montana corporation, The Montana Power Trading & Marketing Company, a Montana corporation, and Altana Exploration Ltd., an Alberta corporation.

"Option" with respect to any Person means any security, convertible security, right, subscription, call, warrant, option, "phantom" stock right or other Contract that gives the right to (i) purchase or otherwise receive or be issued any shares of capital stock of such Person or any security of any kind convertible into or exchangeable or exercisable for any shares of capital stock of such Person or (ii) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to the holder of shares of capital stock of such Person, including any rights to participate in the equity or income of such Person or to participate in or direct the election of any directors or officers of such Person or the manner in which any shares of capital stock of such Person are voted.

"Order" means any writ, judgment, decree, injunction or other order of any Governmental or Regulatory Authority (in each such case whether preliminary or final).

"Partnership" has the meaning ascribed to it in Section 8.12.

"PBGC" means the Pension Benefit Guaranty Corporation established under ERISA.

"PSC" means the Montana Public Service Commission.

"Permitted Lien" means (i) any Lien for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of Law with respect to a Liability that is not yet due or delinquent and (iii) any minor imperfection of title or similar Lien which individually or in the aggregate with other such Liens could not reasonably be expected to materially adversely affect the Business or Condition of MPC and the Company.

"Pension Benefit Plan" means each Benefit Plan which is a pension benefit plan within the meaning of Section 3(2) of ERISA.

NOR002686

"Person" means any natural person, corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority.

"Pilko Environmental Reports" means the reports prepared by Pilko & Associates, Inc. for MPC, titled as follows: "Environmental Assessment of Montana Power's Utility Business" (including Attachments A and B thereto) dated June, 2000; "Phase II Investigation Colstrip Project" dated August, 1998; "Phase II Investigation Corette Project" dated August, 1998; "Phase II Investigation Hydroelectric Project Portfolio (except Milltown)" dated August, 1998; and "Phase II Investigation Milltown Hydroelectric Project" dated August, 1998.

"Plan" means any bonus, incentive compensation, deferred compensation, pension, profit sharing, retirement, stock purchase, stock option, stock ownership, stock appreciation rights, phantom stock, leave of absence, layoff, vacation, day or dependent care, legal services, cafeteria, life, health, accident, disability, workmen's compensation or other insurance, severance, separation or other employee benefit plan, practice, policy or arrangement of any kind, whether written or oral, including, but not limited to, any "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"Proxy Statement" has the meaning ascribed to it in Section 2.22.

"Purchase Price" has the meaning ascribed to it in Section 1.02.

"Purchaser" has the meaning ascribed to it in the forepart of this Agreement.

"Purchaser Indemnitees" has the meaning ascribed to it in Section 10.01.

"Qualified Plan" means each Benefit Plan which is intended to qualify under Section 401 of the Code.

"QF" means Qualified Facilities as defined in the Public Utility Regulatory Policies Act of 1978 and the regulations promulgated thereunder, specifically 18 CFR Part 292.

"Regional Transmission Organization" means that not-for-profit corporation incorporated in the State of Washington on April 27, 2000 in relation to the creation of a regional transmission organization (having the characteristics and functions set forth in FERC Order 2000) by and among Avista, the Bonneville Power Authority, Idaho Power Company, MPC, Nevada Power Company, PacifiCorp, Portland General Electric Company, Puget Sound Energy, Inc. and Sierra Pacific Power Company and any other electric energy transmission system owners willing to participate.

"Representatives" has the meaning ascribed to it in Section 4.03.

"Resolution Period" means the period ending thirty (30) days following receipt by an Indemnified Party of a written notice from an Indemnifying Party stating that it disputes all or any portion of a claim set forth in a Claim Notice or an Indemnity Notice.

NOR002687

"Restructuring" means the reorganization of the corporate structure of MPC including, but not limited to, (i) the merger of Entech with and into Entech LLC, a Montana limited liability company wholly owned by MPC, following which Entech LLC shall be the survivor, (ii) the merger of MPC with and into the Company, a Montana limited liability company wholly owned by Seller, pursuant to which shareholders of MPC will receive capital stock of Seller in exchange for capital stock of MPC, and following which the Company shall be the survivor, and (iii) the distribution of the capital stock of Entech LLC by the Company to Seller.

"Rights Agreement" has the meaning ascribed to it in Section 2.27.

"SEC" means the Securities and Exchange Commission or any successor entity thereto.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" has the meaning ascribed to it in the forepart of this Agreement.

"Seller Indemnitees" has the meaning ascribed to it in Section 10.01(b).

"Subject Defined Benefit Plan" means each Defined Benefit Plan listed and described in Section 2.13(a) of the Disclosure Schedule.

"Subsidiaries" means CMPL, DES, Colstrip Community Services Company, a Montana corporation, Montana Power Services Company, a Montana corporation, and One Call Locators, Ltd., a Montana corporation.

"Substitute Stock Options" has the meaning ascribed to it in Section 5.04(i).

"Superior Proposal" shall mean a bona fide written Acquisition Proposal which the Board of Directors of MPC (prior to the Restructuring and prior to Closing) or Seller (after the Restructuring but prior to Closing) concludes in good faith after consultation with a financial advisor of nationally recognized reputation, taking into account, all legal, financial, regulatory and other aspects of the proposal and the Person making the proposal (including, but not limited to, any break-up fees, expense reimbursement provisions and conditions to consummation), (i) would, if consummated, result in a transaction that is more favorable to all of the stockholders (in their capacities as stockholders) of MPC (prior to the Restructuring) or Seller (after the Restructuring but prior to Closing), from a financial point of view than the transactions contemplated by this Agreement and (ii) is reasonably capable of being consummated; provided, that for purposes of this definition, the term "Acquisition Proposal" shall have the meaning set forth in Section 12.01 except that (x) the reference to "10%" in the definition of "Acquisition Proposal" shall be deemed to be a reference to "51%", (y) "Acquisition Proposal" shall only be deemed to refer to a transaction involving, prior to the Restructuring MPC, and after the Restructuring, but prior to Closing, Seller, and (z) the reference to "assets" shall refer to the assets of, prior to the Restructuring, MPC and its subsidiaries taken as a whole, and after the Restructuring but prior to Closing to Seller and its subsidiaries, taken as a whole, and not the assets of any of the Subsidiaries alone.

NOR002688

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Third Party Claim" has the meaning ascribed to it in Section 10.06(a).

"Treas Reg." means the regulations (including any proposed or temporary regulations) issued under the Code by the Department of Treasury as they may be amended from time to time, or any applicable successor regulations.

"Units" has the meaning ascribed to it in the recitals to this Agreement.

"Utility Business" has the meaning ascribed to it in Section 2.28.

"Wholesale Transmission Services Agreement" means the Wholesale Transmission Services Agreement dated December 17, 1999, by and between MPC and PP&L Montana, LLC.

(b)     Construction of Certain Terms and Phrases. Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; and (v) the phrase "ordinary course of business" refers to the business of the Company or a Subsidiary. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP. Any representation or warranty contained herein as to the enforceability of a Contract shall be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

## ARTICLE XIII
## MISCELLANEOUS

13.01  Notices. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers:

NOR002689

If to Purchaser, to:

NorthWestern Corporation
125 South Dakota Avenue
Sioux Falls, SD 57104-6403
Facsimile No.: (605) 978-2910
Attn:   Eric R. Jacobsen
        Vice President, General Counsel

with a copy to:

Paul, Hastings, Janofsky, & Walker, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Facsimile No.: (202) 508-9700
Attn:   Charles A. Patrizia

If to Seller, to:

Touch America Holdings, Inc.
40 East Broadway Street
Butte, Montana  59701-9394
Facsimile No.: (406) 497-2451
Attn:   Vice President and General Counsel

If to MPC:

40 East Broadway Street
Butte, Montana  59701-9394
Facsimile No.: (406) 497-2451
Attn:  Vice President and General Counsel

, in each case with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005
Facsimile No.: (212) 530-5219
Attn: John T. O'Connor

All such notices, requests and other communications will (i) if delivered personally to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided in this Section, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above to the address as provided in this Section, be deemed given upon receipt (in each case regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice, request or other communication is to be delivered pursuant to this Section).  Any party from time to time

NOR002690

may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

13.02  Entire Agreement.  This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof, including without limitation that certain confidentiality agreement between the parties dated June 1, 2000, and contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

13.03  Expenses.  Except as otherwise expressly provided in this Agreement (including without limitation as provided in Sections 11.02 and 11.03), whether or not the transactions contemplated hereby are consummated, each party will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the transactions contemplated hereby.

13.04  Public Announcements.  At all times at or before the Closing, MPC, Seller and Purchaser will not issue or make any reports, statements or releases to the public or generally to the employees, customers, suppliers or other Persons to whom MPC, the Company and the Subsidiaries sell goods or provide services or with whom the Company and the Subsidiaries otherwise have significant business relationships with respect to this Agreement or the transactions contemplated hereby (including transition, integration and similar plans) without the consent of the other, which consent shall not be unreasonably withheld.  If any party is unable to obtain the approval of its public report, statement or release from the other party and such report, statement or release is, in the opinion of legal counsel to such party, required by Law in order to discharge such party's disclosure obligations, then such party may make or issue the legally required report, statement or release and promptly furnish the other party with a copy thereof. MPC, Seller and Purchaser will also obtain the other party's prior approval which approval shall not be unreasonably withheld of any press release to be issued immediately following the Closing announcing the consummation of the transactions contemplated by this Agreement.

13.05  Confidentiality.  Each party hereto will hold, and will use its best efforts to cause its Affiliates, and in the case of Purchaser, any Person who has provided, or who is considering providing, financing to Purchaser to finance all or any portion of the Purchase Price, and their respective Representatives to hold, in strict confidence from any Person (other than any such Affiliate, Person who has provided, or who is considering providing, financing or Representative), unless (i) compelled to disclose by judicial or administrative process (including without limitation in connection with obtaining the necessary approvals of this Agreement and the transactions contemplated hereby of Governmental or Regulatory Authorities) or by other requirements of Law or (ii) disclosed in an Action or Proceeding brought by a party hereto in pursuit of its rights or in the exercise of its remedies hereunder, all documents and information concerning the other party or any of its Affiliates furnished to it by the other party or such other party's Representatives in connection with this Agreement or the transactions contemplated hereby, except to the extent that such documents or information can be shown to have been (a) previously known by the party receiving such documents or information, (b) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such receiving party or (c) later acquired by the receiving party from another source if the receiving party is not aware that such source is under an obligation to another party

NOR002691

hereto to keep such documents and information confidential; provided that following the Closing the foregoing restrictions will not apply to Purchaser's use of documents and information concerning MPC, the Company and the Subsidiaries furnished by Seller and MPC hereunder. In the event the transactions contemplated hereby are not consummated, upon the request of the other party, each party hereto will, and will cause its Affiliates, any Person who has provided, or who is providing, financing to such party and their respective Representatives to, promptly (and in no event later than five (5) Business Days after such request) redeliver or cause to be redelivered all copies of confidential documents and information furnished by the other party in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by the party which furnished such documents and information or its Representatives.

13.06  <u>Waiver</u>.  Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition.  No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.  All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

13.07  <u>Amendment</u>.  This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party hereto.

13.08  <u>No Third Party Beneficiary</u>.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

13.09  <u>No Assignment; Binding Effect</u>.  Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any party hereto without the prior written consent of the other party hereto and any attempt to do so will be void, except (a) for assignments and transfers by operation of Law and (b) that Purchaser may assign any or all of its rights, interests and obligations hereunder to a wholly-owned subsidiary, provided that any such subsidiary agrees in writing to be bound by all of the terms, conditions and provisions contained herein, but no such assignment referred to in clause (b) shall relieve Purchaser of its obligations hereunder.  Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and assigns.

13.10  <u>Headings</u>.  The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

13.11  <u>Invalid Provisions</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and (c) the

NOR002692

remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

13.12   Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York applicable to a Contract executed and performed in such State.

13.13   Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

13.14   Insurance Coverage After Closing.  The parties hereto agree and acknowledge that, except as disclosed in Section 13.14 of the Disclosure Schedule, each insurance policy listed in Section 2.18 of the Disclosure Schedule maintained by Seller and its Affiliates (including MPC, the Company and the Subsidiaries) shall be available to or cover MPC, the Company and the Subsidiaries or their respective assets, properties, operations and liabilities after the Closing Date, and all benefits and coverage under each such insurance policy shall continue following the Closing Date.

NOR002693

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officer of each party hereto as of the date first above written.

NORTHWESTERN CORPORATION

By: _____
Name: _ERIC R. JACOBSEN_
Title: _Vice President, General Counsel_

TOUCH AMERICA HOLDINGS, INC.

By: _____
Name: _J. P. Pederson_
Title: _V P & CFO_

THE MONTANA POWER COMPANY

By _____
Name: _J. P. Pederson_
Title: _Vice Chair & CFO._

NY1:#3264263v6
31287-02300

ANNEX I

NY1:#3264263v6
31287-02300

NOR002695

**The Montana Power Company**
**Utility Business**
**Closing Balance Sheet**
**July 31, 2000**
**(In Millions)**

## Assets

|  | July 31, 2000 |
|---|---|
| **PLANT AND PROPERTY IN SERVICE** | |
| Utility plant | $ 1,630 |
| Less - accumulated depreciation and depletion | 542 |
| Net plant | 1,088 |
| **MISCELLANEOUS INVESTMENTS** | 17 |
| **CURRENT ASSETS** | |
| Cash and cash equivalents | 58 |
| Accounts receivable, net of allowance for doubtful accounts | 69 |
| Materials and supplies (principally at average cost) | 12 |
| Prepayments and other assets | 53 |
| Deferred income taxes | 5 |
| Total current assets | 197 |
| **DEFERRED CHARGES** | |
| Regulatory assets related to income taxes | 61 |
| Regulatory assets - other | 153 |
| Other deferred charges | 216 |
| Total deferred charges | 430 |
| **TOTAL ASSETS** | $ 1,732 |

## Liabilities and Shareholders' Equity

|  | July 31, 2000 |
|---|---|
| **CAPITALIZATION** | |
| Common shareholders' equity | |
| Common stock (240,000,000 shares authorized; 105,621,241 shares issued) | $ 704 |
| Treasury stock (4,682,100 shares authorized, issued and repurchased by the Company) | (145) |
| Unallocated stock held by trustee for retirement savings plan | (19) |
| Retained earnings and other shareholders' equity | (66) |
| Accumulated other comprehensive loss | (24) |
| Total common shareholders' equity | 450 |
| Preferred stock | 0 |
| Company obligated manditorily redeemable preferred securities of trust which holds soley company junior subordinated debentures | 65 |
| Long-term debt | 374 |
| Total capitalization (excluding short term debt) | 889 |
| **CURRENT LIABILITIES** | |
| Long-term debt - portion due within one year | 7 |
| Dividends payable | 23 |
| Income taxes | 0 |
| Other taxes | 30 |
| Accounts payable | 15 |
| Notes payable | 41 |
| Interest accrued | 11 |
| Other current liabilities | 59 |
| Total current liabilities | 186 |
| **DEFERRED CREDITS** | |
| Deferred income taxes | 263 |
| Net proceeds from generation sale | 215 |
| Other deferred credits | 179 |
| Total deferred credits | 657 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 1,732 |

NOR002696

## *UTILITY BUSINESS*

## NOTES TO JULY 31, 2000 CONSOLIDATED BALANCE SHEET

### Principles of Consolidation

The consolidated financial statements of the Utility Business include the electric and natural gas transmission and distribution accounts of The Montana Power Company ("MPC"), Colstrip Unit 4 Lease Management Division, Canadian-Montana Pipe Line Corporation, Montana Power Capital One, Montana Power Natural Gas Funding Trust ("Trust"), Colstrip Community Services Company, One Call Locators, Ltd, and Montana Power Services Company. The energy productivity improvement activities of the Utility Business are also included under a new subsidiary, Discovery Energy Solutions, Inc., formed for that purpose.

### Plant and Property in Service, Deferred Charges and Deferred Credits

Proceeds received in excess of the basis of the electric generating assets sold to PPL Montana of $249,000,000 were recorded on the March 31, 2000 Balance Sheet under "Utility Plant" in accordance with FERC regulations. For the purposes of external reporting and the July 31, 2000, Balance Sheet, $215,000,000 of these proceeds have been reclassified from the plant account into a deferred credit account titled "Net Proceeds from Generation Sale." The remaining $34,000,000, a recovery of previously flowed-through deferred taxes, reduces regulatory assets.

### Cash

The cash balance for the Utility Business is expected to be $58,000,000 at the date of sale. This is the net after tax cash proceeds from the generation sale ($118,000,000) reduced by the remaining un-recovered regulatory assets ($63,000,000), and the cash balance of the Montana Power Natural Gas Funding Trust ($3,000,000). The use of the excess generation proceeds will be subject to the outcome of the Tier II filing. The Trust is a bankruptcy remote entity that is responsible for its own cash.

### Related Party Receivables and Payables

Receivables and payables among the MPC companies (except for trade receivables and payables) which make up the Utility Business, and Entech, or any other subsidiary thereof have been eliminated through dividends or capital contributions.

### Long-term Debt

Scheduled debt repayments for the remainder of 2000 and the four years ending December 31, 2004, on the long-term debt outstanding are as follows: $8,000,000 in 2000; $68,000,000 in 2001; $7,000,000 in 2002; $24,000,000 in 2003; $9,000,000 in 2004; and $266,000,000 thereafter.

NOR002697

**Employee-Related Assets and Obligations**

Assets and obligations related to the retirement, benefit restoration, postretirement (SFAS No. 106) and post-employment (SFAS No. 112) benefit plans, top hat contracts, medical plans, flexible spending withholding and income taxes withheld as described in the paragraphs below are recognized as follows:

| | Assets | Obligations |
|---|---|---|
| | (Thousands of Dollars) | |
| Retirement................................................ | $230,344* | $197,339** |
| Benefit restoration.................................... | 17,379* | 17,379** |
| Post-employment (SFAS No. 112) .......... | - | 6,632** |
| Post-retirement medical (SFAS No. 106) | 9,509 | 14,116** |
| Top Hat contracts..................................... | - | 2,888** |
| Medical plans ........................................... | - | 1,221 |
| Flexible spending withholding.................. | - | 412 |
| Income tax withholding ............................ | - | 435 |
| Accrued flex leave.................................... | - | 6,572 |
| Student Aid Loans..................................... | - | 350 |
| Incentive Compensation......................... | - | 2,778 |

---

\* These assets are estimates that have been determined by reducing the total plan assets by the estimated dollars that will be transferred to the respective purchasers in the Oil & Gas Sale, Coal Sale, and IPP sale and those assets that will stay with Seller.

\*\* These obligations are estimates that have been actuarially calculated by Towers Perrin and MCG.

= The Utility Business will continue the corporation's cash balance defined benefit pension plan. The figures above reflect the obligations for the Utility Business's eligible active employees, (including the Utility Business's estimated percentage (75%) of the Shared Administrative Services eligible active employees; the other 25% being Seller's estimated obligation), and all of the eligible inactive participants (retired and terminated vested employees) of MPC and its direct and indirect subsidiaries (including those subsidiaries being sold in the Oil and Gas Sale, Coal Sale, and IPP Sale) except those inactive employees covered by Altana Exploration Ltd. and Basin Resources. The Purchaser will continue to sponsor this plan. Based on the current plan assets and actuarial assumptions, the retirement plan is over funded as of July 31, 2000.

The Utility Business also has nonqualified benefit restoration plans covering senior management executives and directors of MPC. The Purchaser of the Utility Business will be required to assume the sponsorship of these plans and be responsible for providing the benefits delivered under the plans, and as such will continue to own the assets in the plan's trust. (The Purchaser will not be responsible for the Entech benefit restoration plans.) The estimated cash surrender value of the life insurance policies owned by the trustee of these plans indicates that actuarially estimated liabilities are close to being fully funded as of July 31, 2000.

The Utility Business also provides certain health care and life insurance benefits for its active and retired employees. The figures above reflect the obligations for the Utility Business's eligible active employees, (including the Utility Business's estimated percentage (75%) of the Shared Administrative Services eligible active employees; the other 25% being Seller's estimated obligation), and all of the eligible retired participants of MPC and its direct and indirect subsidiaries (including those subsidiaries being sold in the Oil and Gas Sale, Coal Sale, and IPP Sale) except those retired employees covered by Altana Exploration Ltd. and Basin Resources. The Purchaser of the Utility Business will continue to sponsor these welfare plans, and as such will continue to

NOR002698

own the assets in the plan's trust.  No assets from this trust will be moved with the sale of the other Business Units.  Based on the current plan assets and actuarial assumptions, ssets in the trust are not sufficient to cover the liability.

The Utility Business has provided certain senior employees with a deferred compensation arrangement known as a Top Hat contract.  The Utility Business will continue to be responsible for providing the payments provided by these contracts.  The liability for these payments is not funded.

The Utility Business self-insures its Workers' Compensation Benefits.  The value of its obligation for claims incurred from January 1, 1990 to December 31, 1999 has been established at $1,661,000 by independent adjusters. Included in this number is $970,000 for Utility Business employees.  The remaining $691,000 is associated with claims incurred by employees that worked for the generation business that was sold to PPL Montana in December of 1999.  An independent adjuster has recently completed the process of reviewing claims prior to January 1, 1990 to establish the Utility Business's obligation for these Workers' Compensation claims.  The additional estimated liability for these claims is $2,541,000.

The Utility Business also accrues its anticipated obligations for the calendar year under its incentive compensation plans for employees.  The balance at July 31, 2000 is $2,778,000.

The Utility Business's benefit obligations include the benefit obligations for the corporation's Shared Administrative Services employees that will be assigned to the Utility Business.

### Income Taxes

The Seller will assume all obligations relating to current taxes; accordingly, current tax liabilities have been eliminated from the July 31, 2000 balance sheet.

### Preferred Stock

Preferred stock has been eliminated from the July 31, 2000 Balance Sheet as it will remain with the Seller.

### Retained Earnings

Retained Earnings decreased due primarily to eliminating entries related to the assumptions discussed above.



NOR002699

ANNEX II

| | |
|---|---|
| Capital Expenditures | $ 60,000,000 |
| Regulated O & M/G & A | $106,000,000 |
| Non-Regulated O & M/G & A | $ 97,000,000 |

NY1:#3264263v6
31287-02300

NOR002700