# Exhibit 8

Service Date:  January 31, 2002

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA
* * * * *

| | | |
|---|---|---|
| IN THE MATTER of the Application of | ) | UTILITY DIVISION |
| MONTANA POWER COMPANY for | ) | |
| Approval of its Electric Utility Restructuring | ) | DOCKET NO. D97.7.90 |
| Transition Plan Filed Pursuant to Senate Bill 390. | ) | ORDER NO. 5986w |
| | | |
| IN THE MATTER of | ) | UTILITY DIVISION |
| the Joint Application for Approval of the | ) | |
| Sale of Montana Power Company | ) | DOCKET NO. D2001.1.5 |
| To NorthWestern Corporation | ) | ORDER NO. 6353c |

# FINAL ORDER

## APPEARANCES

FOR THE APPLICANTS:

<u>Montana Power Company</u>

John Alke, Attorney at Law, Hughes, Kellner, Sullivan & Alke, 40 West Lawrence,
Suite A, P.O. Box 1166, Helena, Montana  59624-1166.
Michael P. Manion, Staff Attorney, Montana Power Company, 40 East Broadway,
Butte, Montana  59701

<u>NorthWestern Corporation</u>

Dennis Lopach, Attorney at Law, 208 N. Montana Avenue, Suite 104,
Helena, Montana  59601

FOR THE INTERVENORS:

<u>Montana Consumer Counsel</u>

Robert A. Nelson, Montana Consumer Counsel, 616 Helena Avenue, P.O. Box 201703,
Helena, Montana  59620-1703

<u>Large Customer Group</u>

Donald W. Quander, Attorney at Law, Holland & Hart, 401 North 31st Street,
Suite 1500, Billings, Montana 59101.

NOR001080

DOCKET NO. D97.7.90; ORDER NO. 5986w                                     2
DOCKET NO. D2001.1.5, ORDER NO. 6353c

BEFORE:

     Gary Feland, Chairman
     Jay Stovall, Vice Chairman
     Bob Anderson, Commissioner
     Matt Brainard, Commissioner
     Bob Rowe, Commissioner

COMMISSION STAFF:

     Will Rosquist, Staff Economist
     Eric Eck, Bureau Chief, Revenue Requirements
     David Hoffman, Utility Division Administrator
     Robin A. McHugh, Staff Attorney

## INTRODUCTION

In this Order the Montana Public Service Commission (Commission) approves a Stipulation submitted by certain parties to these dockets, approves the sale of Montana Power Company to NorthWestern Corporation and closes Docket No. D2001.1.5, and settles the transition costs issue in Docket No. D97.7.90, all as explained and discussed below.

## FINDINGS
### BACKGROUND
#### Docket No. D2001.1.5

1.     On January 12, 2001 the Montana Power Company (MPC) and NorthWestern Corporation (NorthWestern) jointly filed an application with the Commission for approval of the sale of MPC to NorthWestern.[1]  The application was assigned Docket No. D2001.1.5, sometimes referred to as the "sale" docket. The Commission issued a notice of the application on March 1, 2001, and on March 21, 2001 granted intervention in D2001.1.5 to the Montana Consumer Counsel (MCC), the Large Customer Group (LCG), Colstrip Energy Limited Partnership (CELP), Yellowstone Energy Limited Partnership (YELP), and the Montana Department of Natural Resources and Conservation.

---

[1] This Order applies to the sale of MPC's energy public utility businesses.  Other energy businesses are also included in the sale.

DOCKET NO. D97.7.90; ORDER NO. 5986w                                                    3
DOCKET NO. D2001.1.5, ORDER NO. 6353c

2.      On June 27, 2001, the Commission issued Order No. 6353 in the sale docket,
Order Denying Application as Filed and Providing Direction and an Opportunity to Refile. In
Order No. 6353 the Commission found, "[t]he application submitted by MPC and
[NorthWestern] is inadequate, given the scope of the Commission's authority and responsibility
to review and approve sales and transfers of public utility assets and service obligations." Id.,
pp. 3-4. The Commission declined to process the docket further until the applicants provided
additional information and analysis.

3.      In response to Order No. 6353 MPC and NorthWestern, on August 28, 2001,
made a supplemental filing in the sale docket. On October 19, 2001 MPC filed a Motion for
Expedited Procedural Schedule in the docket. In late October 2001, the Commission denied the
Motion, finding, among other things, that setting a schedule in the sale docket should wait until
after MPC's transition costs filing in Docket No. D97.7.90, which, at that time, was expected
shortly. See Notice of Commission Action, Docket No. D2001.1.5, October 26, 2001.

Docket No. D97.7.90

4.      In 1997 the Montana Legislature passed and the Governor signed the Electric
Utility Industry Restructuring and Customer Choice Act (Choice Act),[2] codified at §§ 69-8-101 -
702, MCA. The Choice Act was amended in 1999 and 2001. Implementation of the Choice Act
has been largely the responsibility of the Commission. Shortly before the first utility company
filings pursuant to the Choice Act the Commission assigned Docket No. D97.7.90 to the MPC
transition plan filing, which was received on July 1, 1997.[3] All subsequent matters involving
MPC's transition plan have been processed under that docket, including MPC's most recent
transition cost filing, which is addressed by this Order. There are currently 38 intervenors in
Docket No. D97.7.90.[4]

_____

[2] The Choice Act was signed and effective on May 2, 1997.
[3] MPC was required to file a transition plan pursuant to § 69-8-202(1), MCA.
[4] Montana Consumer Counsel; TransCanada Energy; Large Customer Group; Big Horn County
Electric Coop; Montana Electric Coops Association; Central Montana Electric Coop; PacifiCorp
Montana Department of Health and Human Services; MHA Ventures, Inc.; Montana Retail
Association; Natural Resources Defense Council/Renewables Northwest; Montana Department
of Environmental Quality; Northwest Power Planning Council; Montana-Dakota Utilities Co.;
District XI Human Resource Council; Montana Department of Natural Resources &
Conservation; Montana Resources, A Partnership; Oregon Public Utility Commission; Energy
Services, Inc.; Rainbow Energy Marketing; Power Procurement Group; United States Executive
[4] (cont'd) Agencies; Bonneville Power Administration; Washington Water Power

NOR001082

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    4
DOCKET NO. D2001.1.5, ORDER NO. 6353c

    5.     The entire procedural history of Docket No. D97.7.90 is very complex and does not need to be reviewed here.  Essentially, Docket No. D97.7.90 has been divided into two groups, or tiers, of issues.  Tier I issues were addressed in Order No. 5986d (June 23, 1998), which contains an extensive background to the docket up to that time.  On July 1, 1999 MPC made a filing to address Tier II issues, including transition costs.  On November 24, 1999 the Commission issued Order No. 5986m, requiring, among other things, that MPC amend its Tier II filing with respect to transition costs.  MPC filed a Motion for Reconsideration of Order No. 5986m, which, in significant part and with respect to the requirements of the Tier II transition costs filing, the Commission denied in Order No. 5986n, issued January 26, 2000.

    6.     In February of 2000 MPC challenged Commission Order Nos. 5986m and 5986n in court, a challenge that was finally resolved by the Montana Supreme Court in June of 2001.[5] The Commission's direction to MPC to amend its July 1, 1999 Tier II transition plan filing, given in Order No. 5986m, was affirmed by the Montana courts.  Thus, on October 29, 2001, almost two years after the Commission issued Order No. 5986m, MPC made an amended Tier II filing in Docket No. D97.7.90.

<u>Docket Nos. D2001.1.5 and D97.7.90</u>

    7.     Following MPC's amended Tier II filing the procedural histories of Docket Nos. D2001.1.5 and D97.7.90 merge.  On October 30, 2001 MPC filed another Motion for Expedited Procedural Schedule in D2001.1.5.  Rather than act on the Motion the Commission directed its staff to meet with the parties to see if agreement on a schedule could be reached.  The schedule the parties and staff developed reflected a disagreement between MPC on the one hand, and the parties, the staff and the Commission on the other, over whether there was or might be a connection between the sale docket and the Tier II transition costs proceeding.  MPC contended there was no connection; the others contended there either was a connection, or might be a connection.  In order to explore a connection between the proceedings, and also expedite the sale

---

Company/Avista Energy, Inc.; Enron Capital & Trade; Colstrip Energy Limited Partnership; Yellowstone Energy Limited Partnership; Montana Society of Association Executives; Energy West Resources, Inc.; David Ewer; Cenex, Inc.; Continental Hydro Corporation; Xenergy; Montana Food Distributors Association; Montana Energy Brokers; Commercial Energy of Montana, Inc.; Confederated Salish and Kootenai Tribes of the Flathead Reservation; Montana Attorney General.
[5] <u>Montana Power Company v. Montana Public Service Commission, Montana Consumer Counsel and Large Customer Group</u>, 305 Mont. 260, 26 P.3d 91 (June 12, 2001).

NOR001083

DOCKET NO. D97.7.90; ORDER NO. 5986w                                      5
DOCKET NO. D2001.1.5, ORDER NO. 6353c

docket, the parties and staff proposed, and the Commission approved, a procedural order
covering both dockets and a common procedural schedule through the deadline for intervenor
testimony. Compared to a normal schedule in a major Commission proceeding the schedule was
extremely expedited. The procedural order was issued on November 9, 2001 and required
intervenor testimony to be filed by December 21, 2001. After that date the schedule contained no
further deadlines for Tier II, but did contain further deadlines in the sale docket leading to an
anticipated hearing on January 16, 2002.[6]

     8.     As the December 21, 2001 deadline for filing intervenor testimony approached,
the Commission was informed that certain parties to the sale docket and the Tier II proceeding
were intensely engaged in settlement discussions. On December 21, 2001 these parties jointly
filed, and the Commission granted, an extension of the intervenor testimony filing deadline to
December 28, 2001; the negotiating parties pledged, "If an agreement is not reached [by that
date], testimony will be filed regarding Tier II and the Sale." December 21, 2001 Motion to
Extend, p. 2.


                                   Stipulation

     9.     On December 28, 2001, MPC, NorthWestern, MCC, LCC, and Commercial
Energy Montana (CEM)[7] filed a Stipulation settling certain issues in Docket Nos. D97.7.90 and
D2001.1.5. A true and accurate copy of the Stipulation is attached hereto as Exhibit "A".

     10.    The primary components of the Stipulation are as follows:

     a.     NorthWestern has sufficiently demonstrated its capability to assume responsibility
for the MPC utility operations, and MPC's utility operations, as a subsidiary or division of
NorthWestern, will continue to be a fit, willing and able provider of adequate service and
facilities at just and reasonable rates;

_____

[6] The procedural order and schedule also included Docket No. D2001.10.144, MPC's proposed
default supply portfolio (often referred to as the "portfolio" docket). As with Tier II, the
schedule covered process in D2001.10.144 through the filing of intervenor testimony on
December 21, 2001. The portfolio docket schedule was subsequently amended and the
intervenor testimony date extended to January 18, 2002. This Order does not address the
portfolio docket. The procedural order was in one document covering three dockets and has
three order numbers: Order No. 5986v (D97.7.90), Order No. 6353a (D2001.1.5), and Order
No. 6382a (D2001.10.144). Procedural Order No. 6382a, as amended, remains effective in the
portfolio docket.
[7] Commercial Energy Montana is a party to Docket No. D97.7.90, but not to D2001.1.5.

NOR001084

DOCKET NO. D97.7.90; ORDER NO. 5986w                6
DOCKET NO. D2001.1.5, ORDER NO. 6353c

     b.    MPC and NorthWestern will fund an account in an amount of $30 million to be used solely as a credit for the MPC electric distribution customers through the establishment of a per kilowatt hour credit beginning July 1, 2002. The credit will be calculated to exhaust the account in approximately a one-year period;

     c.    The net present value of MPC's transition costs is $244,711,065, and this amount shall constitute a full and final settlement of all transition costs claimed by the utility pursuant to § 69-8-211(5), MCA, and shall be a final release by MPC to all its customers with regard to all liabilities, including but not limited to all environmental liabilities associated with MPC's generation business;

     d.    No MPC customers, choice or non-choice, will have any obligation to pay any transition costs accrued under or relating to the accounting orders issued by the Commission in Docket D97.7.90, specifically including Order Nos. 5986d, 5986h, 5986l, 5986o, 5986r and 5986s; and NorthWestern will file with the Commission no later than March 29, 2002, information that will facilitate an evaluation of the feasibility of transition bond financing for all transition costs, in accordance with § 69-8-503, MCA.

     11.    On January 4, 2002, the Commission issued a Notice of Opportunity to Comment on Stipulation and Notice of Required Comments on Stipulation, served on the parties to Docket Nos. D2001.1.5, D97.7.90 and D2001.10.144, establishing a hearing date and procedure. Additionally, a Revised Notice of Public Hearing was issued by the Commission on January 4, 2002, for publication in the major newspapers, setting forth the primary components of the Stipulation and inviting both parties and the public to make comments at the hearing and to comment specifically on any implications the Stipulation may have on the portfolio docket, D2001.10.144.

     12.    In Dockets D97.7.90 and D2001.1.5, comments were received from the following: MCC, LCG, CELP/YELP, the Federal Executive Agencies ("FEA"), Central Montana Electric Power Cooperative, Inc. ("Big Horn"), American Association of Retired Persons ("AARP"), and Comanche Park, LLC ("Comanche"). No other written comments from intervenors were received.

     13.    During the period from January 16 through January 24, 2002, the Commission conducted public hearings throughout the State of Montana in which parties and the public

NOR001085

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    7
DOCKET NO. D2001.1.5, ORDER NO. 6353c

provided the Commission with presentation of their evidence and/or comments regarding the
Stipulation issues. The Commission also received many written comments from citizens.

14.    Generally, all written comments filed by the parties support the adoption of the
terms of the Stipulation with respect to the sale of the MPC utility to NorthWestern, the
transition costs determination, and the other issues agreed to by the parties to the Stipulation.

<u>The Record in the Dockets</u>

15.    The following was admitted into the evidentiary record at hearing:

a.     All data responses filed in D2001.1.5;

b.     All data responses filed in D97.7.90, since the October 29, 2001 Tier II filing;

c.     The Joint Application of MPC and NorthWestern in D2001.1.5;

d.     The prefiled testimony of Jerrold Pederson in D2001.1.5;

e.     The prefiled testimony of Patrick Corcoran in D97.7.90;

f.     The prefiled testimony of Ernie Kindt in D97.7.90;

g.     The prefiled testimony of William Pascoe in D97.7.90;

h.     The prefiled testimony of Ellen Senechal in D97.7.90;

i.     The prefiled testimony of James Stilwell in D97.7.90;

j.     The prefiled testimony of Michael Hanson in D2001.1.5;

k.     Accompanying exhibits to the prefiled testimony filed in D97.7.90 and
D2001.1.5;

l.     The Stipulation in D97.7.90 and D2001.1.5, attached to this Order.

16.    Also part of the evidentiary record is the examination of witnesses at the hearing.
All evidence described above was admitted only for the purpose of evaluating whether the
Commission should approve the Stipulation. Regarding the Stipulation, there is also much in the
administrative record of the dockets, including written comments of parties and nonparties, oral
comments and argument of attorneys for the parties, public comment both written and oral, and a
post-hearing brief from the parties to the Stipulation.

DISCUSSION

Docket No. D2001.1.5

17.    The Stipulation constitutes the case in chief of MCC and LCG. Brief of

Stipulating Parties, p. 6. These parties assert that the Stipulation resolves their concerns regarding the sale. Based on the responses to their discovery, MCC and LCG conclude that NorthWestern has sufficiently demonstrated that it is capable of assuming responsibility for MPC's utility operations. MCC and LCG argue that the Commission should approve the sale and adopt the conclusion of the applicants: that MPC's utility operations will continue to be a fit, willing and able provider of adequate utility service at just and reasonable rates under NorthWestern ownership. Stipulation, p. 3.

      18.    The Commission conducted a review of the Joint Application, the Supplemental Filing and the extensive written discovery conducted during the proceeding by MCC and LCG. The Commission finds, based on this review, that these parties thoroughly inquired into NorthWestern's financial, managerial and technical capabilities with respect to owning and operating electric and natural gas public utility transmission and distribution systems.

      19.    The information contained in the record sufficiently demonstrates that NorthWestern conducted reasonable due diligence in the course of submitting an offer and negotiating the Unit Purchase Agreement, including the purchase price and terms contained therein. Under the structure of the sale, the day-to-day operations of MPC will largely stay the same, and there will not be an immediate impact on MPC's existing operational structure. NorthWestern expects minimal efficiency gains, primarily from combining support systems and developing common platforms for computers and the deployment of other technology. Transcript of Proceedings (TR), p. 45.

      20.    Both MPC and NorthWestern currently provide high levels of service reliability. The Commission is encouraged by NorthWestern's philosophy and commitment to build on the strengths of MPC and to enhance the quality of utility service provided to customers. TR, p. 46. The Commission also welcomes the more frequent dialogue and information exchange outside the contested case process suggested by NorthWestern witness Michael Hanson. TR, p. 99.

      21.    Mr. Hanson, President and Chief Executive Officer of NorthWestern Public Service, was questioned at length at the public hearing and discussed a wide range of issues related to the operation and management of public utilities. TR, pp. 38-93. Mr. Hanson credibly and capably represented NorthWestern before the Commission. NorthWestern is enthusiastic about providing regulated public utility service in Montana and its rural communities. This is not true of MPC. Rather than being an electric and natural gas utility, MPC would like to focus on

its telecommunications business. There is positive value for utility ratepayers in being served by a company that genuinely wants to excel in the provision of regulated utility service.

22.     The Stipulation establishes a $30 million fund, "[t]o resolve the MCC and LCG concerns regarding the disposition of the gain on the sale...." Stipulation, p. 3. The obligations for establishing the fund are divided between Touch America ($20 million) and NorthWestern ($10 million). TR, pp. 190-191. The record does not establish any direct connection between the $30 million fund and the after tax gain associated with the sale, which MPC witness Jerrold Pederson, Chief Financial Officer, estimated would be roughly $32 million. TR, p. 15. The $30 million fund results in significant near-term benefits to electric distribution ratepayers, who may face substantial rate increases as a result of the portfolio docket (D2001.10.144). The record does not contain a completely satisfying justification for the allocation of the $30 million fund solely to electric ratepayers, when the Stipulation resolves issues related to the gain on the sale of both the natural gas and electric utilities. However, in the context of the overall settlement of multiple issues in multiple cases (discussed below), the Commission agrees that the $30 million fund, combined with the other components in the Stipulation, represents a reasonable resolution of the issues related to the gain associated with the sale in this particular case.

23.     No party to the case opposed the sale or presented testimony supporting approval in a form different than that contained in the Stipulation.


Docket No. D97.7.90

24.     MPC's October 29, 2001 Tier II filing represented an affirmative showing of the Company's claimed transition costs pursuant to § 69-8-211(2), MCA. This showing reflected MPC's mitigation efforts. MPC reasonably demonstrated the methods it relied on to determine the value of all generation assets, liabilities and electricity supply costs. MPC established a value for the hydroelectric and thermal generating plants it sold to PPL Montana based on the purchase price associated with that sale, which was the result of a competitive bid process. MPC established a value for qualifying facility (QF) power production based on an estimate of the future market value of the electricity provided by the QF contracts. Regulatory assets have value because of past regulatory actions by this Commission. MPC identified the regulatory asset-related costs it claimed as transition costs and the associated value of those assets carried on the books and records of the Company. MPC showed the value of the Milltown dam as a function of

NOR001088

its current book value and future environmental liabilities stemming from contamination due to mining wastes that washed down stream and settled in sediments behind the dam.

25.    MPC's Tier II filing provided a transition costs claim reduced to a net sum based on the value of all generation assets, liabilities and electricity supply costs. This claim was approximately $304.7 million in net present value. Thus, MPC complied with the requirements of § 69-8-211, MCA as interpreted by the Commission in Order No. 5986m.

26.    As with the sale of MPC to NorthWestern, Docket No. D2001.1.5, the Stipulation represents the case in chief of intervenors MCC, LCG and CEM in Docket No. D97.7.90. CELP/YELP, active parties in the dockets, filed comments on the methodology used by MPC in the Stipulation regarding future prices of energy. CELP/YELP, however, withdrew their prefiled testimony and did not enter an appearance at the public hearing.

27.    The FEA filed comments stating that MPC's methodology resulted in collections that are low compared to MPC's request in D2001.10.144. However, it appears FEA mistook the "weighted average" figure from the portfolio filing for the in-market determination of QF costs. Additionally, FEA stated the inflation rate used may be inappropriate.

28.    Central Montana and Big Horn argued that as former and current customers of MPC, they are among those who are released from all transition liabilities, including but not limited to all environmental liabilities associated with MPC's generation business. Both of these parties chose not to participate in the hearing on the Stipulation.

29.    Comanche argued that the Stipulation should not affect the schedule of review of the default supply filing in D2001.10.144, that action on the Stipulation by the Commission may be premature because NorthWestern does not currently control MPC, that the Stipulation may address issues that implicate § 69-8-210(4), MCA, and that the record is insufficient to justify approval of the Stipulation. Comanche also chose not to participate in the hearing, nor did it offer for introduction any testamentary or documentary evidence.

30.    AARP urged the Commission to thoroughly evaluate the effects of the Stipulation. AARP commented that the stipulating parties failed to provide the Commission with sufficient information, data and reasoning to verify the terms of the Stipulation. AARP further commented that, if the Commission is unable to obtain this information, data and reasoning, the Commission should reject the Stipulation and go forward with an evidentiary proceeding.

NOR001089

DOCKET NO. D97.7.90; ORDER NO. 5986w                                      11
DOCKET NO. D2001.1.5, ORDER NO. 6353c

31.    For the reasons set forth below, the Commission finds that approving the Stipulation produces a reasonable resolution of the transition costs issues as well as a lawful basis for determining the amount of transition costs.

<u>Settlements</u>

32.    Settlements are an established and lawful means of resolving contested issues in administrative proceedings before the Commission. Numerous Commission proceedings have been resolved fully or in part by settlements reached among the parties. Settlements can produce outcomes that are in the public interest. The settlement process can enhance the flow of information among parties with disparate interests, which in turn can improve understanding of the various positions. The settlement process can enhance a party's ability to negotiate for things it values more and compromise on things it values less.

33.    Many variables can affect a settlement process, its outcome, individual bargaining strategies and willingness to participate. Some of these variables include: sufficient representation by parties with a broad range of interests, time pressures, perceived risk of an adverse Commission decision relative to the desired outcome, information and evidence available to participants, relative costs associated with participating in the settlement process and the contested case process and the relative bargaining strength and abilities of the participants. If the Commission determines that the settlement process includes an adequate array of interests, each with sufficient access to the resources and skills necessary to represent their particular interest, then the Commission can be reasonably confident that any stipulation resulting from the settlement process falls within a range of reasonable outcomes that are in the public interest. This is a threshold determination, but does not relieve the Commission from its responsibility to make its own determination that the Stipulation is in the public interest, as described in this Order.

34.    The Commission concludes that in this case the parties to the Stipulation were fully capable of promoting their interests. MPC has been a public utility for over 80 years and has represented its interests before the Commission since the Commission's creation. MPC has sufficient legal, financial, economic and technical knowledge and expertise to evaluate and react to settlement positions advanced by other participants.

NOR001090

35.    MCC is a state office created by the Montana Constitution for the express purpose of representing consumer interests before the Commission. Mont. Const. art. XIII, § 2. The office and activities of the MCC are funded by a special tax on regulated companies. The MCC has a full time staff that includes an economist, a rate analyst and an attorney. The MCC's budget allows it to contract for additional financial, economic and technical knowledge and expertise as needed to adequately perform his duties and to effectively represent consumers in settlement negotiations. The MCC has been an active party in Docket No. D97.7.90 since the Commission initiated the proceeding.

36.    LCG is made up of very large purchasers of electricity supply and delivery services from MPC. LCG's membership includes companies involved in mining, wood products, refining and manufacturing. For nearly 15 years LCG has been an active party in numerous Commission proceedings involving MPC's electric and natural gas utilities. LCG retains the services of an attorney and financial, economic and technical consultants as needed to adequately represent its interests in matters before the Commission and in settlement negotiations.

37.    CEM is an electricity and natural gas marketer licensed by the Commission to sell these products to retail consumers in the state of Montana. CEM is a frequent participant in Commission proceedings with considerable knowledge and expertise in energy markets. CEM has obtained contracts to sell electricity to a number of medium sized consumers including hospitals, schools and retail chain stores. CEM brings a strong understanding of the interests of these mid-sized businesses and organizations to Commission proceedings and settlement discussions.

38.    NorthWestern is an established electric and natural gas utility with customers in South Dakota and Nebraska. NorthWestern has experience appearing before regulatory commissions and negotiating settlements of contested cases. NorthWestern has arranged financing to close a $1.1 billion purchase of the MPC electric and natural gas utilities. NorthWestern has the financial, economic and technical knowledge and expertise to adequately represent its interests in settlement negotiations.

39.    Clearly the settlement process in this case was characterized by representation from a broad array of interests. Consumer interests, from the smallest household to the largest industrial plant, were fully engaged. There is no evidence suggesting a large disparity in

NOR001091

bargaining strength or abilities. MPC desired a quick resolution due to a business plan involving its telecommunications affiliate that depends heavily on the Commission approving the sale. Further, the financial condition of MPC's telecommunications affiliate appears dire. NorthWestern also was interested in quick approval in order to minimize financing costs. The consumer interests, while certainly in favor of a timely resolution, do not appear to have been motivated by time to the extent the utilities were. This may have worked to the advantage of the consumer interests. In any case, there is no indication that the consumer interests were negotiating from a position of weakness. To the contrary, the settlement process in this case appears to have produced a result that is balanced in achieving benefits for each of the participants.

### Commission Review

40.     Although the active parties did not submit prefiled testimony (the Stipulation was submitted in lieu of their testimony), substantial record information exists. In addition to the testimony, exhibits and work papers filed by MPC, active parties and the Commission conducted extensive discovery on MPC's filing. Once the Stipulation was filed, the Commission submitted additional requests for information from the stipulating parties. The Commission further investigated the Stipulation at the public hearing.

41.     Typically, in a contested case that does not settle, the Commission's decision relies heavily on record evidence, in the form of testimony and exhibits submitted by the witnesses for the parties. However, the Commission also relies on its own expertise in the decision-making process. So while intervenors in this case did not submit testimony, the Commission had substantial opportunity to evaluate the Stipulation based on other available information and its own expertise.

42.     Obviously the Commission is not in a position to replicate the rate case strategies that would have been used by MCC and LCG had there not been a stipulation. However, it is possible to obtain by careful review of the parties' discovery requests, and MPC's responses to those requests, a general sense of the issues MCC and LCG would have addressed in testimony. Of particular relevance in this case is the Commission's sense that MCC and LCG would not have challenged MPC's basic assertion that the sales price paid by PPL Montana for almost all MPC's hydroelectric and thermal generating plants established a reasonable value for these

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    14
DOCKET NO. D2001.1.5, ORDER NO. 6353c

assets. It does appear that MCC and LCG would have questioned many of MPC's numerous

additions to and subtractions from this sales price to calculate the net transition costs amount. It

also appears they would have questioned some of the underlying assumptions related to MPC's

calculation of the QF-related transition costs. In a fully litigated contested case MPC is entitled

to an opportunity to rebut testimony submitted by the intervenors.

43.      The Commission's analysis of record information in the case, together with the

inherent integrity of the settlement process in this case, indicates that the stipulated net transition

cost of $244.7 million, on a net present value basis, is demonstrable and verifiable within an

acceptable range of reasonableness.

44.      The Commission evaluated alternatives to approving the Stipulation. The results

of this evaluation further convinced the Commission of the reasonableness of the overall balance

struck by the Stipulation.

45.      Based on its extensive examination of parties and their positions, the Commission

accepts the stipulating parties' representations that any modification to the Stipulation would

cause it to unravel and would be tantamount to rejecting the Stipulation. The Commission also

finds credible the assertions of MPC and NorthWestern that rejecting the Stipulation would

probably mean the sale either would not or could not occur. If the Commission rejected the

Stipulation, the contested case process would resume for both the sale and Tier II dockets. MCC

and LCG would have the opportunity to submit testimony and presumably would argue that the

two cases are linked or related.

46.      The Commission engaged NorthWestern extensively on the so-called "QF

shortfall" issue at the public hearing. The nature of this issue demonstrates the relationship

between Tier II and the sale; the Commission's decision on the level of net transition costs has a

direct impact on the cash flow generated by competitive transition charges and the utility's total

revenue from which QF contract costs must be paid. This relationship suggests that the

Commission should resolve the Tier II transition costs issue before it approves the sale so that it

can evaluate whether NorthWestern is financially capable of assuming any liability associated

with the transition costs decision. This is an important issue because the Choice Act requires

netting the value of various generation assets, liabilities and supply costs. With the sale

NorthWestern could assume liabilities related to certain MPC assets without having the

opportunity to benefit fully from other MPC assets that have positive value, namely the

NOR001093

DOCKET NO. D97.7.90; ORDER NO. 5986w                                      15
DOCKET NO. D2001.1.5, ORDER NO. 6353c

hydroelectric and thermal plants previously sold to PPL Montana.

    47.    It is reasonable to conclude that a fully litigated Tier II proceeding would take several more months at a minimum. Given the substantial interests involved, the Commission's decision could be followed by protracted litigation with an uncertain outcome. Under these conditions the sale might not occur for years, if ever. Approving the Stipulation produces benefits for consumers, including the $30 million fund and a company that desires to serve utility customers; rejecting the Stipulation risks losing those benefits and creating a very uncertain outcome. However, as discussed already, the level of transition costs in the Stipulation falls within a range of reasonableness, and off-setting benefits are not obvious given the large transactions costs associated with the fully litigated contested case scenario.

    48.    NorthWestern participation in the settlement process offers some assurance that the level of transition cost liability the Company is acquiring is manageable within the Company's overall business and financial activities.

    49.    Finally, no party opposed the level of transition costs in the Stipulation, or presented testimony or evidence supporting a different level of transition costs. The Commission heard comments from the public at nine satellite hearings around the state. The majority of the public comments supported the Stipulation. Extensive discussion at these meetings concerned the amount of information available to the Commission and the public; the terms of the settlement; NorthWestern's plans for the distribution system; the development of the default supply portfolio and other important issues in Montana energy policy; and specific issues such as those associated with the Milltown dam.

## CONCLUSIONS OF LAW

    1.    All conclusions of law reached above are incorporated herein.

    2.    The Montana Public Service Commission (Commission) regulates the rates and services of public utilities. Title 69, Chapter 3, MCA.

    3.    The Montana Power Company (MPC) is a public utility subject to the jurisdiction of the Commission.

    4.    If the sale of MPC to NorthWestern Corporation (NorthWestern) is completed, Montana Power, LLC, owned by NorthWestern, will be a public utility under the jurisdiction of the Commission, with the corresponding obligations of a public utility.

NOR001094

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    16
DOCKET NO. D2001.1.5, ORDER NO. 6353c

    5.     The Commission has jurisdiction over and must approve any sale or transfer of utility assets and obligations in order to assure generally that utility customers will continue to have adequate service, that utility rates will not increase as a result of the sale or transfer, and that the acquiring entity is fit, willing and able to assume the service responsibilities associated with owning utility facilities.

    6.     The amount of transition costs that MPC or a successor public utility may recover from its customers must be determined and approved by the Commission.  § 69-8-211, MCA.

    7.     The Commission's approval of the Stipulation represents a final and lawful determination of the transition costs MPC/NorthWestern may recover from customers.

    8.     The Commission's approval of the Stipulation does not violate § 69-8-210, MCA.

    9.     When implementing the Choice Act the Commission must protect the interests of Montana consumers and foster the financial integrity of electric utilities.

    10.    The Commission has the power to prescribe rules of procedure and to do all things necessary and convenient in the exercise of its powers, including the power to regulate the mode and manner of all investigations and hearings.  Title 69, Chapter 3, MCA.

### ORDER

    1.     The Commission hereby approves the Stipulation (in form attached hereto as Exhibit "A") in its entirety and without modification.

    2.     MPC is authorized to complete its proposed sale of Montana Power, LLC (composed of its utility business) to NorthWestern, subject to the provisions of paragraphs 9-17 of the Stipulation.  Funding of the $30 million credit account is contingent upon closing the sale transaction, as provided in the Stipulation.

    3.     Upon completion of the sale, Montana Power, LLC (then being owned by NorthWestern) shall implement paragraphs 18-29 of the Stipulation, which include a final settlement of all transition cost claims, and also the filing with the Commission no later than March 29, 2002, of information needed to evaluate transition bond financing.

    4.     The following Orders issued in Docket D97.7.90 are vacated and no longer effective immediately upon closing of the sale:  Order No. 5986d (June 23, 1998); Order No. 5986h (March 31, 1999); Order No. 5986l (September 29, 1999); Order No. 5986o (February 4, 2000); Order No. 5986r (November 8, 2000); Order No., 5986s (January 19, 2001).

NOR001095

DOCKET NO. D97.7.90; ORDER NO. 5986w                                          17
DOCKET NO. D2001.1.5, ORDER NO. 6353c

     5.     Montana Power, LLC shall timely file rates and tariffs with the Commission consistent with the terms of the Stipulation.  Upon approval by the Commission, such rates and tariffs shall become effective July 1, 2002.

     6.     The transition costs amount as set forth in the Stipulation is hereby approved as the full and final transition cost amount that may be collected by Montana Power, LLC.

     7.     The parties to the Stipulation are hereby ordered to abide by all terms and conditions contained therein and as discussed in the above Order paragraphs.

     8.     By this Order, the Commission closes out Docket D2001.1.5 and finalizes the transition costs portion only of Docket D97.7.90.  Docket No. D97.7.90 remains open and will apply to remaining transition plan implementation.

     DONE AND DATED this 29th day of January, 2002, by a vote of 5-0.

NOR001096

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    18
DOCKET NO. D2001.1.5, ORDER NO. 6353c

BY ORDER OF THE MONTANA PUBLIC SERVICE COMMISSION


———————————————————
GARY FELAND, Chairman


———————————————————
JAY STOVALL, Vice Chairman


———————————————————
BOB ANDERSON, Commissioner


———————————————————
MATT BRAINARD, Commissioner


———————————————————
BOB ROWE, Commissioner

ATTEST:


Rhonda J. Simmons
Commission Secretary

(SEAL)


NOTE:    Any interested party may request the Commission to reconsider this decision. A
         motion to reconsider must be filed within ten (10) days. See 38.2.4806, ARM.

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                    19

## CONCURRING OPINION OF COMMISSIONER ROWE

### Docket No. D2001.1.5

NorthWestern has demonstrated its commitment to providing good quality service to Montana customers, and has amply demonstrated its eagerness to work with Montana in times of great uncertainty. Montana is fortunate that the MPC properties are being acquired by a rural-based company with a reputation for good service. Particularly impressive are NorthWestern's vision as a provider of good service to relatively rural areas; its earnestness and modesty; and the apparent absence of a rigid agenda or grand scheme beyond its vision. I respect its sincere willingness to work with Montanans as we proceed through a critical and difficult period.[8]

**A.**      **Comments on the Stipulation.**

The Commission has aggressively managed an energy situation it did not create. I commend the Commission for taking many strong steps including:

- ✓ Rejecting a $.04 kWh supply price last Spring that subsequent events demonstrated would have been substantially out-of-market;

- ✓ Prevailing in litigation concerning determination of stranded costs, requiring that stranded costs be netted and summed;

- ✓ Rejecting pre-approval of Qualifying Facility buyout contracts;

- ✓ Refusing to pre-approve piecemeal power supply contracts proposed for inclusion in the default supply portfolio; and,

- ✓ Keeping tight control over the schedule and issues in these two dockets by finding MPC and NorthWestern's initial filing insufficient and requiring a comprehensive supplemental filing, by managing the sale and stranded cost dockets on parallel procedural schedules, and by actively examining potential relationships between the two cases.

---

[8] The PSC's review primarily concerns the future provision of monopoly utility service to Montana customers, and the highly contested matter of stranded costs associated with the "transition to choice." These decisions are critical to all sectors of the Montana economy. The PSC's review does not directly concern MPC's plans to become a competitive telecommunications provider. I do, however, wish Touch America well. If it succeeds and retains a strong Montana presence, that will also be good for Montana.

NOR001098

But for the Commission's efforts, it is highly unlikely stranded cost issues would now be part of a final settlement. I am also very pleased with the detailed examination individual commissioners and staff gave to the issues and volumes of information in this case. Most especially, I commend the commissioners for engaging in an extended and informed discussion with the citizens of Montana concerning the issues before us.

I am satisfied that all sides in the negotiations leading to the stipulation were effectively represented. The stipulation reaches outcomes that generally appear to be within the range of reasonableness. As described immediately below, there are several areas where questions remain, or where a fully adjudicated case might have produced different outcomes. However, the substantial cost and uncertainty of rejecting the stipulation and proceeding through judicial review clearly and greatly outweighs the possible benefits. I reject this unpredictable certainty, and encourage us instead to focus on the questions outlined in Part B, below.

The Stipulation is far from perfect. Some parties' responses to the Commission's questions, in some cases, created more uncertainty than they resolved, nearly risking snatching rejection from the jaws of approval. For example:

- ✓ The thirty million dollar fund should perhaps more properly be funded entirely by MPC. From the structure of the stipulation, creation of this fund appears to recognize "the MCC and LCG concerns regarding disposition of gain on the sale." Paragraph 10. (At the hearing, the Consumer Counsel instead appeared to disclaim a connection.)

- ✓ Parties did not attempt to offer a principled explanation as to why the thirty million dollar fund benefits only MPC electric customers, even though natural gas customers also paid a return on and of the value of the assets being sold. The best answer I can offer is that, last year, the Commission mitigated the significant run-up in gas supply costs by offsetting thirty-two million dollars from gain on the sale of other MPC gas-related properties. Docket No. D96.2.22. We now do something similar for electric customers.

- ✓ The twenty-three million dollar write off of MPC' stranded cost claims benefits only those customers who did not take supply service from MPC, even though "non choice" customers paid the expenses which "choice" customers will now not have to

CONCURRING OPINION OF COMMISSIONER ROWE

pay.[9] If non-choice customers receive a comparable benefit under the stipulation, it has not been explained in a way that is clear to me.

✓ It is correct to say that the cost of Qualifying Facility contract payments claimed for stranded cost recovery is known and has been reduced to a sum. Based on the record, it is at least more difficult to say that the offsetting value of those contracts has been demonstrated, and that mitigation and netting is adequate to comply with the Montana Supreme Court's decision in MPC v. PSC. 305 Mont. 260 (2001), interpreting Sections 69-8-211(2)(a), (b), and (3)(a).[10]

✓ NorthWestern assumed substantial risk under the stipulation. (It appears to have played the role of "reasonable party.") This is clearly true concerning stranded costs, where the eventual net outcome for NorthWestern is unknown. It is also true concerning future environmental costs, particularly concerning Milltown Dam. Significantly, the stipulation protects customers from rate increases associated with environmental costs; however, the Unit Purchase Agreement provides only partial indemnification by Touch America to NorthWestern. Stipulation paragraph 26; UPA Article X, paragraph 10.04. The Commission spent considerable effort assuring itself that NorthWestern would be able to manage the bundle of risks it is assuming with no greater risk to customers than would be faced under continued MPC management.

**B.    Distribution System Management.**

The Commission engaged in an extensive and productive discussion with NorthWestern's witness, President and Chief Executive Officer, Mike Hanson, concerning the company's plans for its Montana operation. Several of those issues merit follow up.[11] There are three areas I suggest for early attention:

---

[9] This benefit inures roughly eighty-five percent to the industrial class, fourteen percent to the commercial class (including institutional customers such as schools), and one percent to other (small business or residential) customers.

[10] We have MPC's case, including witness testimony, work papers, and responses to the Commission's and the parties' discovery. We do not have the analysis conducted by parties, including the analysis prepared separate and apart from settlement negotiations.

[11] Strikingly, MPC's attorney argued that the PSC should approve the sale in part because "the state has grown weary of my client's stewardship." (It should be noted that this view was not expressed by any of the commissioners or by others at the hearing.) MPC's attorney did not explain why this might be the case, but – to the extent there may be any truth – it does argue for NorthWestern actively to manage the operation it is now acquiring.

NOR001100

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                      22
CONCURRING OPINION OF COMMISSIONER ROWE

**1.    Default portfolio design.**

Intervener testimony and data request responses in Docket D2001.10.144 raise significant questions concerning the process through which the portfolio was assembled, the allocation of risk among various contract parties, how renewables should be considered, whether efficiency is appropriately considered, and other issues.

More fundamental issues concern the relationship between default supply design and an eventual "transition to choice." These include the relative merits of long-term contracts as opposed to either short-term contracts or rate-basing resources; the potential for something like "stranded costs"; and, ultimately whether small customers will realistically "transition to choice" or remain as customers of an integrated distribution and supply service.

In addition to the standard practice of filing response testimony defending the portfolio decisions already made, I urge NorthWestern to consider seriously the many constructive comments offered by the Northwest Power Planning Council office and others, and where it believes those comments have merit to modify its filing accordingly.

**2.    Retail Competition.**

Montana's 1997 electric competition law was adopted based on a very specific set of assumptions, and was driven especially by the vision of one company.[12] Some of the initial assumptions have proven correct. Others have not.

At the hearing, most parties agreed that there is a long list of work remaining to be done even to finalize a "transition plan" appropriate for present circumstances. Items on this list include whether or how to transition small customers to retail choice; pilot programs; customer education and information; metering; billing and collection; and, rate design consistent with facilitating efficient choice decisions.

NorthWestern has not "restructured" in its home territory, South Dakota, and brings a very different perspective to the Montana discussions. As argued by the parties, the stipulation allows a fresh start in several areas. I am aware of no interest in returning large customers to captive service, and also believe there is room for expanded choice among medium-sized

---

[12] In 1997, one of the arguments for restructuring was the unSchumpetarian claim that a pro-competition statute would "save MPC as a Montana-owned company." Predictably instead, the law of unintended consequences set in motion a series of occurrences that, as to the specifics, no one could have foreseen. This was another unpredictable certainty.

NOR001101

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                          23
                     CONCURRING OPINION OF COMMISSIONER ROWE

customers. The tough nut, as it always has been, is meeting the needs of residential and small

business customers. I encourage NorthWestern to speak honestly and constructively concerning

its views about policies appropriate to meet the needs of smaller and medium-sized customers,

and I encourage others to respond in kind.

      **a.**    **Distribution System Mission, Structure, and Regulation.**

    Most mergers are touted on the basis of breathtaking "synergies." NorthWestern, more

honestly, states that because the Montana and South Dakota systems operate in asynchronous

power pools there are few operational efficiencies, but says there may be management

efficiencies to be gained. This, coupled with the obligations and risks assumed by NorthWestern

in the transaction, and the assurance that no acquisition adjustment will be sought (such

adjustments were prohibited under Montana law until 1995, and are still disfavored), place

NorthWestern in a critical position.

    There are two conflicting distribution system models.[13] Under one view, consistent with

the most rigorous approach to competition (which uses policy tools to drive hard toward

"workably competitive" rather than merely "contestable" retail markets), the "disco" may only

provide core monopoly functions, and others must provide all potentially competitive functions.

(This disco "ain't no party.") Under another view, the distribution company may be relatively

more entrepreneurial and innovative in meeting customers' needs. The appropriate model may

be different depending upon how Montana finally resolves issues concerning retail choice for

small customers. It is possible that, as in telecommunications, a more active disco may be

especially valuable in rural areas such as Montana. The appropriate model is also related to

choices to be made about appropriate regulation of the disco, and regulatory incentives it faces.

    Examples include traditional rate of return versus performance regulation; the appropriate

level of restrictions on affiliate interest activities; any role for something like integrated resource

planning;[14] decoupling of disco rewards from transmitting volumes of energy; incentives for high

---

[13] The pro-restructuring Center for the Advancement of Energy Markets is currently undertaking a "Disco
of the Future" project in which I am participating. See, http://www.caem.org.
[14] Many of the values citizens now say they want to achieve in energy policy and experts advocate have a
familiar ring to those who helped develop and implement integrated resource planning (IRP). These
include openness, accounting for positive and negative externalities; an end-to-end consideration of
economic alternatives, including but not limited to efficiency investments; the use of optioning to maintain
flexibility and shorten planning horizons. It is difficult but not impossible to achieve these goals in the
more delaminated restructured model.

NOR001102

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                    24
CONCURRING OPINION OF COMMISSIONER ROWE

quality or innovative customer service. As NorthWestern takes the reins, I look forward to continuing an open and in-depth discussion of these issues.

### 3.    Good Regulation and Missed Opportunities.

The parties bargained hard. I have no doubt that small customers were well represented in the negotiations by the Consumer Counsel. In this case, there does not appear to be anything in the stipulation might not have been agreed to many months earlier. The outcome appears to have been reached, when it was reached, by the combination of NorthWestern's determination to close the deal (it's focus and willingness to negotiate) and by the pressure of time. Uncertainty over the extent of the Commission's authority to review sales of property used to serve customers of regulated services may have affected negotiating positions.[15]

Stipulations are a simple (and sometimes crude) form of "alternative dispute resolution" (ADR). Stipulations can, under appropriate circumstances, achieve better results than can traditional regulation.[16] Well-designed ADR has many benefits as a compliment to traditional contested case approaches. In addition to certainty of outcomes, efficiency, and acceptance by parties, ADR can often identify and resolve issues that contested cases cannot. At its best, ADR can increase public confidence in commission outcomes affecting public interests.

An excellent example of ADR, dealing with much more complicated issues than those in the present case, is the highly open and transparent process through which this commission is working with other states on local telecommunications competition. A more modest version of ADR could have been employed in this case. It would have reached results at least as good as those achieved by the parties through traditional closed negotiations, would have resulted in greater public confidence in the outcome, and would have strengthened sound policy generally. Had the parties accepted such an approach when it was first suggested, I sincerely believe resolution could have been reached more quickly as well.

The Montana Consumer Counsel has an especially important role in developing appropriate regulatory practices and policies. Unlike any other party appearing before the

---

[15] This uncertainty has been a factor in previous cases, including most recently the sale of PacifiCorp's distribution system to Flathead Electric Cooperative.

[16] *See*, Zhongmin Wang, "The Negotiated Settlement Approach to Utility Ratemaking" (September 2001), comparing adjudication and negotiated settlement approaches in FERC rate cases, and concluding negotiated settlement improves welfare in multi-issue situations because it is not subject to an issue-by-issue agenda as would be the case in formal adjudication.

NOR001103

CONCURRING OPINION OF COMMISSIONER ROWE

Commission, it has a constitutional duty to represent customers. Its interest, on behalf of the citizens of Montana, should extend not just to good outcomes in specific cases, but also to effective regulation generally. Attributes of good regulation include, at the least:

- ✓ As open a process as possible;
- ✓ Transparency of decision-making;
- ✓ Relative predictability of results; and,
- ✓ Sufficient analytical rigor.

In this case, the Consumer Counsel was "negotiating in a pressure cooker," and appears to have done a good job. I encourage the Consumer Counsel to place great emphasis on promoting good regulation generally. I look forward to positive discussions with the Consumer Counsel on this topic at an appropriate time in the near future.

RESPECTFULLY SUBMITTED this 31st day of January, 2002.

_____
Bob Rowe
Commissioner

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                        26

## CONCURRING OPINION OF COMMISSIONER ANDERSON

### The STIPULATED AGREEMENT

The Commission has voted unanimously to approve the stipulated agreement in these cases. The Commission's order explains well the virtues of both the process and the outcome.

Critics of the stipulation argued: not enough details about the agreement were known to enable the public to evaluate its merits; and the agreement was a "backroom deal" among the big companies.

Public opinion is important to the Commission. However, public opinion is not the Commission's only criterion for good decisions. More important is the quality of the outcome. It would not be in the public interest to reject a proposal which arouses public suspicion if the result would likely make the public worse off. It is the Commission's duty to look beyond the perception of the settlement to the result.

It is the PSC's responsibility to determine if the settlement:

- resulted from a robust process in which the public's interests were well represented, and
- the outcome is in the public interest.

The missing "details" in this case would have been the intervenors' testimony, due on December 28, 2001. Instead of filing that testimony, the intervenors, along with the filing companies, filed the stipulated agreement. In addition, there might have been useful information added to the record through discovery on intervenor testimony, rebuttal testimony, and cross-examination of witnesses' testimony.

The lack of this information is not necessarily fatal to good process or good outcomes. Perhaps the testimony would have been enlightening, but it can largely be inferred from the other information, such as data requests and responses, available in the record. The Commission and its staff have reviewed the record in great detail.

Also, importantly, the public can have confidence that its interests were just as effectively pursued in settlement negotiations as they would have been in litigation before the Commission.

Was the settlement a backroom deal? Yes—such is the nature of settlements. But, once made, the settlement was subject to careful scrutiny by commissioners and Commission staff. That scrutiny included examination of alternatives:

- accepting the agreement without modification,
- rejecting the agreement and setting the matters for hearing,
- accepting the agreement with minor modifications,
- adjusting the agreement and returning it to the parties for acceptance or rejection, and
- rejecting the agreement, approving the sale, and setting the other matters for hearing.

NOR001105

CONCURRING OPINION OF COMMISSIONER ANDERSON

Examination of these alternatives included an assessment of legal viability (e.g. affording the parties their due process rights) and likelihood of achieving acceptable or better outcomes.

Rejecting the settlement (or altering it, even in minor ways, which would have been unacceptable at least to some of the parties) would have required confidence that a better outcome could have been achieved. That outcome would not just have to be as good as the stipulation; it would have to be better to offset:

- features of the stipulation not otherwise available (for example MPC's $20 million contribution to ratepayers and indemnification from environmental costs),
- additional costs, such as increased capital costs due to the likely financial demise of Touch America and, with it, Montana Power,
- additional costs of continued litigation before the Commission and the courts, and
- having a utility owner whose heart is not committed to its duty to serving its legal duty.

That examination led the staff to a strong recommendation to accept the agreement without modification. The Commission rightly concurred.

## THE FUTURE

Approval of the sale and settlement of stranded cost issues closes certain matters before the Commission. Others remain.

NWC cost recovery. Questions were raised in hearing about NorthWestern Corporation's ability to recover costs not currently in rates. Answers were less than satisfying: NWC said it would "manage" them and would not ask for rate increases to cover them. The Commission should closely monitor NWC's performance to be sure service quality and reliability aren't sacrificed.

Default supplier role. NWC will step into MPC's shoes as the default electricity supplier. At the same time, NWC has a generator in that default portfolio. This raises questions of affiliate relations and conflict of interest. The burden will be on NWC to convince the Commission that the portfolio is "prudent" and that its relations with a generation subsidiary are at arm's length.

The Commission should revisit the adequacy of its affiliate relations and transactions rules.

Additional transition issues. The promise of electric utility restructuring has been something of a chimera. Nevertheless, it is the law (probably irreversible) and the Commission must seek to fulfill its potential. In doing so, the Commission must address many issues. The Commission must carefully consider whether or not docket D97.7.90 should be closed at this time and these issues addressed in subsequent cases or the docket should remain open.

Regulation of the distribution company. In the press to deal with restructuring issues, one important one has been deferred: how to regulate a distribution company. Current tariffs are the

result of unbundling the vertical utility. Going forward, NWC and Commission should examine how the interests of the distribution company and its customers should be aligned. These interests include:

- just and reasonable prices for customers,
- cost recovery for the company,
- effective price signals for the customers,
- minimizing externalities such as environmental effects, and
- energy conservation.

Rate-base, rate-of-return regulation may not be the best strategy. Various forms of performance-based regulation, such as revenue-per-customer caps, should be examined.

Integrated Resource Planning. The Integrated Resource Planning statute remains in effect. How should NWC plan for its investments to meet customer needs consistent with the statute, which embodies principles still valid in the post-restructuring era?

RESPECTFULLY SUBMITTED this 31st day of January, 2002.


_____
Bob Anderson
Commissioner

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA

RECEIVED BY

* * * * *

| | | |
|---|---|---|
| IN THE MATTER of the Application of | ) | UTILITY DIVISION |
| MONTANA POWER COMPANY for | ) | |
| Approval of its Electric Utility Restructuring | ) | DOCKET NO. D97.7.90 |
| Transition Plan Filed Pursuant to Senate Bill 390 | ) | |
| | | |
| IN THE MATTER of | ) | UTILITY DIVISION |
| The Joint Application for Approval of the | ) | |
| Sale of Montana Power Company | ) | DOCKET NO. D2001.1.5 |
| To NorthWestern Corporation | ) | |

STIPULATION


COME NOW, The Montana Power Company (MPC), NorthWestern Corporation

(NWC), The Montana Consumer Counsel (MCC), Commercial Energy (CEM) and the

Large Customer Group (LCG), and agree and stipulate as follows:


1.    On July 1, 1997, MPC filed a transition plan and supporting testimony, pursuant

    to Sec. 69-8-801, et seq., MCA, the Electric Utility Industry Restructuring and

    Customer Choice Act.  The filing was assigned Docket No. D97.7.90 by the

    Montana Public Service Commission (PSC or Commission).


2.    MCC, LCG and CEM intervened in Docket No. D97.7.90.


3.    On January 7, 1998, the Commission ordered Docket No. D97.7.90 split into two

    parts, or "tiers", with Tier I to include issues requiring resolution before the

    proposed completion of the generation sale (especially large customer choice).

    Tier II, to be scheduled later, was to deal with transition cost quantification and

1

NOR001108

recovery issues. (The procedural history of Docket No. D97.7.90 is extremely complex and is recited in detail in the orders in that proceeding.)

4.    MPC has been authorized to accumulate certain amounts on its books related to qualifying facility (QF) and generation-related regulatory assets (RA) costs accumulated for choice customers since July 1, 1998, but certain customers contest the level of the recorded costs. The orders in question were all issued in Docket D97.7.90: Order No. 5986d (June 23, 1998); Order No. 5986h (March 31, 1999); Order No. 5986l (September 29, 1999); Order No. 5986o (February 4, 2000); Order No. 5986r (November 8, 2000); and Order No. 5986s (January 19, 2001).

5.    The intervenors have conducted extensive discovery in Tier II.

6.    On September 29, 2000, the MPC, NWC and Touch America Holdings entered a Unit Purchase Agreement (UPA), under which, following the completion of a series of restructuring steps, NWC would purchase MPC, LLC, which would constitute MPC's utility businesses.

7.    On January 12, 2001, MPC and NWC filed with the Montana Public Service Commission (PSC) a Joint Application in which they seek a determination by the PSC "that Montana Power's utility operations, as a subsidiary or division of NorthWestern, will continue to be a fit, willing and able provider of adequate service and facilities at just and reasonable rates." Joint Application at pp 1 and 20. The Joint Application was docketed as PSC Docket D2001.1.5.

8.    Both the MCC and the LCG have intervened in PSC Docket D2000.1.5. Their concerns are: (1) whether NWC has sufficiently demonstrated that MPC's utility operations, as a subsidiary or division of NWC, will continue to be a fit, willing and able provider of adequate service and facilities at just and reasonable rates including provision for transition costs in PSC Docket D97.7.90 (Tier II); and (2)

2

the disposition of the anticipated gain on the sale. They have conducted extensive discovery in the docket to address those concerns.

## PROPOSED SETTLEMENT IN PSC DOCKET D2001.1.5

9.    After conducting their discovery, the MCC and LCG believe that NWC has sufficiently demonstrated its capability to assume responsibility for the MPC utility operations, and that the PSC should issue the determination requested in the Joint Application: that MPC's utility operations, as a subsidiary or division of NWC, will continue to be a fit, willing and able provider of adequate service and facilities at just and reasonable rates. This Stipulation is presented in lieu of the testimony of the parties. If the Stipulation is rejected by the PSC, all rights of the parties are reserved and a request will be made to the Commission for a new date to file intervenor testimony.

10.    To resolve the MCC and LCG concerns regarding the disposition of the gain on the sale MPC, NWC, MCC, and LCG agree that a fair and equitable resolution of the issue would be as follows:

A.    Unless accelerated pursuant to the provisions of paragraph 11 below, the PSC should hear the Joint Application at the currently scheduled January 16, 2002, hearing;

B.    Unless accelerated pursuant to the provisions of paragraph 11 below, the PSC should issue an order which makes the determination requested in the Joint Application as soon as possible, but not later than the currently scheduled January 31, 2002;

C.    Subject to the provisions of paragraphs 12-13 below, MPC and NWC will fund an account, in the amount of thirty million dollars ($30,000,000), which will be used solely for the credit of the MPC electric distribution

3

NOR001110

customers, in the manner described in paragraph 14 below. The account shall be established promptly following closing, but in no event later than within two (2) business days thereafter, by NWC as deemed appropriate by the PSC, under the provisions of paragraphs 9-17 of this Stipulation.

11. If the parties to the docket do not object, the PSC should accelerate the current hearing date in this docket. If the PSC does accelerate the current hearing date in this docket, it should also accelerate the current final order date.

12. No interest will accrue on the obligation specified in paragraph 10 C until the account has been established in accordance with this Stipulation.

13. The agreement of MPC and NWC to establish the account specified in paragraph 10 C above is expressly conditioned upon the following:

A. The PSC conducts a hearing in this docket, no later than January 16, 2002, which complies with the contested case requirements of the Montana Administrative Procedures Act, Mont. Code Ann. §§ 2-4-601 et seq;

B. After hearing, but no later than January 31, 2002, the Commission issues a final order in this docket which approves the proposed settlement set forth in paragraphs 9-17 of this Stipulation in its entirety, and without modification;

C. The sale of The Montana Power L.L.C. (MPC LLC) to NWC is completed, and NWC irrevocably becomes the lawful owner of MPC LLC.

14. Subject to the provisions of paragraphs 12 and 13 above, the proceeds of the account shall be credited to the MPC electric distribution customers through the establishment of a per kilowatt hour credit beginning July 1, 2002, until the funds in the account are completely exhausted. A credit mechanism shall be designed

4

NOR001111

by the PSC, in consultation with MPC, NWC, MCC, LCG and the other parties to the docket, which:

A.  Provides MPC electric distribution customers, except those identified in Mont. Code Ann. § 69-8-211(3)(b), with a per kilowatt hour credit spread between rate classes in the same fashion as the competitive transition costs are spread in the MPC filing, dated October 29, 2001, in Tier II of PSC Docket D97.7.90. Appendix A illustrates the manner in which this credit would be implemented;

B.  Is calculated to exhaust the account, including actual interest thereon, over a one-year period beginning July 1, 2002;

C.  Is trued up at the end of the one year period, whether a positive or negative adjustment is required, so that there is a dollar for dollar match of the credits actually received by the MPC electric distribution customer under this agreement to the funds contributed to the account.

15.  MPC, NWC, MCC, and LCG propose the settlement contained in paragraphs 9-17 of this Stipulation as a reasonable settlement of the issues in PSC Docket D2000.1.5. However, none of the stipulating parties' positions in this docket are accepted by any of the parties by virtue of their entry into this Stipulation, nor does it indicate their acceptance, agreement, or concession to any principle of utility regulation, including utility rate making, or legal principle, embodied or arguably embodied, in paragraphs 9-17 of this Stipulation.

16.  The various provisions of paragraphs 9-17 of this Stipulation are inseparable from the whole of the parties' agreement contained in those paragraphs. The reasonableness of the proposed settlement is critically dependent upon its adoption, in its entirety, by the Commission. If the Commission decides not to adopt, in its entirety, and without modification, the proposed settlement set forth

5

in paragraphs 9-17 of this Stipulation, then the entire Stipulation is null and void, and no party to the Stipulation is bound by any provision of it, and it shall have no force or effect whatsoever.

17.    Touch America Holdings, Inc., will be responsible for discharging the obligations of MPC under paragraph 10 C of the settlement agreement set forth in this Stipulation. It is expressly agreed by Touch America Holdings, Inc., through its signature below, that the obligations of MPC under paragraph 10 C are specifically enforceable against it, by the MCC, LCG, or the PSC, through a civil action for mandatory injunction, or such other legal or equitable remedy as they may elect.

PROPOSED SETTLEMENT OF PSC DOCKET D97.7.90

18.    After conducting their discovery, the MCC, CEM and LCG enter into the proposed settlement agreement with NWC in PSC Docket D97.7.90 which is set forth in paragraphs 18-29 of this Stipulation. MCC, CEM and LCG recognize that NWC is not a party in PSC Docket D97.7.90, and does not have the power or authority to bind MPC to the proposed settlement which is set forth in paragraphs 18-29 of this Stipulation. However, MCC, CEM and LCG recognize, and NWC agrees, that: (1) if the PSC approves the proposed settlement in PSC Docket D2001.1.5 set forth in paragraphs 9-17 of this Stipulation; and (2) the proposed sale of MPC LLC to NWC is completed, NWC will own and control MPC LLC, and can and will cause MPC LLC to act in accordance with the proposed settlement agreement which is set forth in paragraphs 18-29 of this Stipulation. This Stipulation is presented in lieu of the testimony of MCC, LCG and CEM. If the Stipulation is rejected by the PSC, all rights of the parties are reserved and a request will be made to the Commission for a new date to file intervenor testimony.

6

NOR001113

19.    If the PSC adopts in a final order the proposed settlement in PSC Docket D2001.1.5 set forth in paragraphs 9-17 of this Stipulation, and if the sale of MPC LLC to NWC is completed, NWC, MCC, CEM and LCG, propose the following settlement of the issues raised, or which could be raised in PSC Docket D97.7.90.

20.    NWC, MCC, CEM and LCG agree that a fair and equitable resolution of the issues raised, or which could be raised, in PSC Docket D97.7.90, and which reflect their respective interests, would be as set forth below.

21.    The net present value (NPV) of MPC LLC's transition costs, determined in accordance with Mont. Code Ann. §69-8-101, et seq., should be established at $244,711,065, a reduction of sixty million dollars ($60,000,000), in the NPV presented in the October 29, 2001 filing made by MPC. The transition charges established by the PSC to recover the agreed upon transition costs should utilize a hybrid of non-levelized and levelized annual costs as set forth in Appendix B. However, if the MPC LLC transition costs established in accordance with this paragraph are funded entirely through the issuance of transition bonds under paragraph 23 below, the transition cost amount proposed in this paragraph shall not exceed the amount stated in this paragraph, and the annual transition charges would be those necessary to fund the repayment of the bonds and related expenses in accordance with the provisions of Mont. Code Ann. §§ 69-8-501, et seq. The parties further agree that the hybrid of non-levelized and levelized transition costs set forth in Appendix B will not be further adjusted to reflect tax impacts on MPC LLC.

22.    If the annual transition costs set forth in Appendix B are established by the PSC as the transition costs to be collected (instead of the costs necessary to fund the repayment of bonds in accordance with the provisions of Mont. Code Ann. §§ 69-

7

8-501, et seq.), the annual transition charges will be trued up at the end of each year, whether a positive or negative adjustment is required, to account for any variation between the total annual amount of electricity actually distributed by MPC LLC (and subject to the transition charge) and the total annual amount of electricity which was assumed to be distributed by MPC in that year for purposes of calculating the annual transition charges set forth, illustratively, in Appendix C. The total annual amounts of retail electricity assumed to be distributed to customers in each year through July 1, 2006, (and subject to the transition charge) are set forth in Appendix C, and thereby incorporated herein.

23.   After the sale of MPC LLC to NWC is completed, NWC, through MPC LLC, will file information with the PSC by March 29, 2002, that will facilitate an evaluation of the feasibility of transition bond financing, under Mont. Code Ann. 69-8-503 of the entire transition cost referenced in paragraph 21. NWC, MCC, CEM and LCG acknowledge that they have not thoroughly evaluated this alternative, and the March 29, 2002 filing is intended as a means of providing a factual evaluation of the bonding alternative under Mont. Code Ann. 69-8-503. NWC, MCC CEM and LCG agree that the PSC should, following its evaluation, issue an order directing the pursuit of such financing, with any net savings to be provided to customers, if it determines such financing would be cost effective for the ratepayer, and consistent with the PSC's statutory authority.

24.   NWC, acting through MPC LLC, agrees that if the sale of MPC LLC to NWC is completed, and if the PSC adopts the proposed settlement in PSC Docket D97.7.90 set forth in paragraphs 18-29 of this Stipulation, then no customers, choice or non-choice, shall have any obligation to pay any transition costs accrued under or relating to the accounting orders issued by the PSC in Docket D97.7.90, specifically Order 5986d (June 23, 1998); Order 5986h (March 31, 1999); Order 5986l (September 29, 1999); Order 5986o (February 4, 2000); and Order 5986r

NOR001115

(November 8, 2000); and Order 5986s (January 19, 2001).  In that event, NWC, MCC, CEM and LCG agree that those accounting orders should be vacated and eliminated.

25.   After the sale of MPC LLC to NWC is completed, and if the PSC adopts the proposed settlement in PSC Docket D97.7.90 set forth in paragraphs 18-29 of this Stipulation, NWC, acting through MPC LLC, will agree to deliver the scheduled energy from QF contracts to default supply customers at the scheduled prices shown in Appendix D.  NWC, acting through MPC LLC, shall be responsible for the delivery of replacement power, if needed, to meet the QF energy volumes shown in Appendix D at the scheduled prices shown in Appendix D.  Delivery of this replacement power shall conform to the historical energy deliveries of the QF resource, or resources, for which the replacement power is required.

26.   The approval by the PSC of the transition costs set forth in this proposed settlement of PSC Docket D97.7.90 is intended as a final settlement of all transition cost claims by the utility, as provided in § 69-8-211 (5) MCA, and shall be a final release of customers with regard to all liabilities, including but not limited to all environmental liabilities associated with MPC's generation business.

27.   NWC, MCC, CEM and LCG expressly recognize that MPC does not and will not support the proposed settlement agreement set forth in paragraphs 18-29 of this Stipulation before the sale of MPC LLC to NWC is completed.

28.   The various provisions of paragraphs 18-29 of this Stipulation are inseparable from the whole of the agreement between NWC, MCC, CEM and LCG contained in those paragraphs.  The reasonableness of the proposed settlement is critically dependent upon its adoption, in its entirety, by the Commission.  If the Commission decides not to adopt, in its entirety and without modification, the

NOR001116

proposed settlement set forth in paragraphs 18-29 of this Stipulation in its final order in Docket D97.7.90, then the proposed settlement agreement set forth in 18-29 of this Stipulation is null and void, and NWC, MCC, CEM and LCG are not bound by any provision of it, and it shall have no force or effect whatsoever.

29.    Under the UPA, and the structure of this Stipulation, NWC will not control MPC LLC until its purchase by NWC has been completed.  It is expressly agreed by NWC, through its authorized signature below, that it can and will cause MPC LLC to act in accordance with the proposed settlement agreement which is set forth in paragraphs 18-29 of this Stipulation, and that its agreement is specifically enforceable against it, by the MCC, LCG, CEM or the PSC, through a civil action for mandatory injunction, or such other legal or equitable remedy as they may elect.

30.    NWC, MCC, LCG, CEM and MPC agree that if the PSC decides not to adopt this Stipulation, in its entirety and without modification, then this Stipulation and all its parts shall be null and void, no party shall be bound by any provision of it, and it shall have no force or effect whatsoever.  The parties recognize that the closing of the sale as referenced in paragraphs 9-17 is a condition precedent to the proposed settlement set forth in paragraphs 18-29.

        Respectfully submitted this 28th day of December, 2001.

                        _____
                        Montana Power Company
                        John Alke
                        Hughes, Kellner, Sullivan & Alke


                        _____
                        Northwestern Corporation
                        Dennis Lopach

10

NOR001117

Montana Consumer Counsel
Robert A. Nelson

Large Customer Group
Donald W. Quander
Holland & Hart

Commercial Energy
Ron Perry

NOR001118

Docket No. 2001.1.5
Illustrative Credit for Retail Customers Computations (See Note Below)

| Customer Rate Class | Loss Factor | 2002 - 2003 Retail kWh Sales | Retail kWh Sales weighted by Losses | 2002 - 2003 Credit | Credit Revenues/ Check |
|---|---|---|---|---|---|
| Residential | 8.5100% | 2,061,814,785 | 2,237,058,203 | $ (0.004347) | $ (8,962,477) |
| General Service Secondary | 8.5100% | 2,564,727,565 | 2,782,985,881 | $ (0.004347) | $(11,149,663) |
| General Service Primary | 5.5400% | 314,704,028 | 332,138,629 | $ (0.004228) | $ (1,330,669) |
| General Service Substation | 4.6300% | 1,752,290,354 | 1,833,421,397 | $ (0.004192) | $ (7,345,359) |
| General Service Transmission | 4.0000% | 123,199,546 | 128,127,528 | $ (0.004167) | $ (513,326) |
| Irrigation | 8.5100% | 101,077,919 | 109,679,650 | $ (0.004347) | $ (439,417) |
| Lighting | 8.5100% | 59,597,393 | 64,669,131 | $ (0.004347) | $ (259,088) |
| System Average | 7.3220% | 6,977,211,588 | 7,488,080,419 | | $(30,000,000) |
| Credit | | | | $ (30,000,000) | |
| Credit - System Rate w/losses | | | | $ (0.004006) | |

**Note:** The credit is fixed at $30,000,000 as presented in paragraph 10.C of the stipulation. The annual rate will be trued up at the end of the one-year period, whether a positive or negative adjustment is required, so there is a dollar for dollar match of the credits actually received by customers to the funds contributed to this account.

NOR001119

**Appendix B, Page 1 of 1**
12/28/2001 9:58

Docket No. D97.7.90
Hybrid Annual QF Out-of-Market Payment Amounts

| Years | Modified Levelized Annual QF Out-of-Market Payment Amounts |
|---|---|
| 2002-2003 | $14,893,987 |
| 2003-2004 | $16,528,053 |
| 2004-2005 | $17,605,484 |
| 2005-2006 | $25,566,513 |
| 2006-2007 | $25,566,513 |
| 2007-2008 | $25,566,513 |
| 2008-2009 | $25,566,513 |
| 2009-2010 | $25,566,513 |
| 2010-2011 | $25,566,513 |
| 2011-2012 | $25,566,513 |
| 2012-2013 | $25,566,513 |
| 2013-2014 | $25,566,513 |
| 2014-2015 | $25,566,513 |
| 2015-2016 | $25,566,513 |
| 2016-2017 | $25,566,513 |
| 2017-2018 | $25,566,513 |
| 2018-2019 | $25,566,513 |
| 2019-2020 | $25,566,513 |
| 2020-2021 | $25,566,513 |
| 2021-2022 | $25,566,513 |
| 2022-2023 | $25,566,513 |
| 2023-2024 | $25,566,513 |
| 2024-2025 | $25,566,513 |
| 2025-2026 | $25,566,513 |
| 2026-2027 | $25,566,513 |
| 2027-2028 | $25,566,513 |
| 2028-2029 | $25,566,513 |
| 2029-2030 | $0 |
| 2030-2031 | $0 |
| 2031-2032 | $0 |
| Totals | $662,623,824 |

NPV =   $244,711,065

NOR001120

Docket No. D97.7.90
Illustrative Annual QF Out-of-Market Retail Charges

Illustrative Rate Computations ( See Note Below )

| Customer Rate Class | Loss Factor | 2002 - 2003 Retail kWh Sales | Retail kWh Sales weighted by Losses | 2002 - 2003 CTC-QF kWh Charges | | QF Revenues/Cost Check | |
|---|---|---|---|---|---|---|---|
| **QF Rates for 2002 - 2003** | | | | | | | |
| Residential | 8.5100% | 2,061,814,785 | 2,237,058,203 | $ | 0.002158 | $ | 4,449,567 |
| General Service Secondary | 8.5100% | 2,564,727,565 | 2,782,985,881 | $ | 0.002158 | $ | 5,535,431 |
| General Service Primary | 5.5400% | 314,704,026 | 332,138,629 | $ | 0.002099 | $ | 660,632 |
| General Service Substation | 4.6300% | 1,752,290,354 | 1,833,421,397 | $ | 0.002081 | $ | 3,646,723 |
| General Service Transmission | 4.0000% | 123,199,546 | 128,127,528 | $ | 0.002069 | $ | 254,849 |
| Irrigation | 8.5100% | 101,077,919 | 109,679,650 | $ | 0.002158 | $ | 218,156 |
| Lighting | 8.5100% | 59,597,393 | 64,669,131 | $ | 0.002158 | $ | 128,629 |
| System Average | 7.3220% | 6,977,211,588 | 7,488,080,419 | $ | 0.002135 | $ | 14,893,987 |
| | | | | | | | |
| QF Transition Cost | | | $ | 14,893,987 | | | |
| CTC-QF System Rate w/losses | | | $ | 0.001989 | | | |
| | | | | | | | |
| **QF Rates for 2003 - 2004** | | | | | | | |
| Residential | 8.5100% | 2,082,230,933 | 2,259,428,785 | $ | 0.002378 | $ | 4,951,727 |
| General Service Secondary | 8.5100% | 2,590,374,841 | 2,810,815,740 | $ | 0.002378 | $ | 6,180,138 |
| General Service Primary | 5.5400% | 317,851,066 | 335,460,015 | $ | 0.002313 | $ | 735,189 |
| General Service Substation | 4.6300% | 1,752,290,354 | 1,833,421,397 | $ | 0.002293 | $ | 4,018,096 |
| General Service Transmission | 4.0000% | 123,199,546 | 128,127,528 | $ | 0.002279 | $ | 280,802 |
| Irrigation | 8.5100% | 101,077,919 | 109,679,650 | $ | 0.002378 | $ | 240,372 |
| Lighting | 8.5100% | 59,597,393 | 64,669,131 | $ | 0.002378 | $ | 141,728 |
| System Average | 7.3290% | 7,026,622,051 | 7,541,602,246 | $ | 0.002352 | $ | 16,528,053 |
| | | | | | | | |
| QF Transition Cost | | | $ | 16,528,053 | | | |
| CTC-QF System Rate w/losses | | | $ | 0.002192 | | | |
| | | | | | | | |
| **QF Rates for 2004 - 2005** | | | | | | | |
| Residential | 8.5100% | 2,103,053,242 | 2,282,023,073 | $ | 0.002515 | $ | 5,289,353 |
| General Service Secondary | 8.5100% | 2,616,278,589 | 2,838,923,897 | $ | 0.002515 | $ | 6,580,157 |
| General Service Primary | 5.5400% | 321,029,576 | 338,814,615 | $ | 0.002446 | $ | 785,316 |
| General Service Substation | 4.6300% | 1,752,290,354 | 1,833,421,397 | $ | 0.002425 | $ | 4,249,568 |
| General Service Transmission | 4.0000% | 123,199,546 | 128,127,528 | $ | 0.002411 | $ | 296,978 |
| Irrigation | 8.5100% | 101,077,919 | 109,679,650 | $ | 0.002515 | $ | 254,219 |
| Lighting | 8.5100% | 59,597,393 | 64,669,131 | $ | 0.002515 | $ | 149,892 |
| System Average | 7.3360% | 7,076,526,620 | 7,595,659,291 | $ | 0.002488 | $ | 17,605,484 |
| | | | | | | | |
| QF Transition Cost | | | $ | 17,605,484 | | | |
| CTC-QF System Rate w/losses | | | $ | 0.002318 | | | |
| | | | | | | | |
| **QF Rates for 2005 - 2006** | | | | | | | |
| Residential | 8.5100% | 2,124,083,774 | 2,304,843,304 | $ | 0.003626 | $ | 7,702,592 |
| General Service Secondary | 8.5100% | 2,642,441,375 | 2,867,313,136 | $ | 0.003626 | $ | 9,582,318 |
| General Service Primary | 5.5400% | 324,239,872 | 342,202,761 | $ | 0.003527 | $ | 1,143,613 |

NOR001121

Appendix D, Page 1 of 1

## Annual QF Supply Volumes and Prices

| Years | QF Supply MWh | QF Supply $/MWh |
|---|---|---|
| 2002-2003 | 810,392 | $32.75 |
| 2003-2004 | 809,002 | $32.75 |
| 2004-2005 | 809,002 | $32.75 |
| 2005-2006 | 809,002 | $32.75 |
| 2006-2007 | 809,002 | $32.75 |
| 2007-2008 | 809,002 | $33.38 |
| 2008-2009 | 808,423 | $34.01 |
| 2009-2010 | 808,423 | $34.66 |
| 2010-2011 | 807,609 | $35.31 |
| 2011-2012 | 807,609 | $35.98 |
| 2012-2013 | 807,609 | $36.67 |
| 2013-2014 | 807,609 | $37.37 |
| 2014-2015 | 807,337 | $38.08 |
| 2015-2016 | 807,337 | $38.80 |
| 2016-2017 | 807,337 | $39.54 |
| 2017-2018 | 807,337 | $40.29 |
| 2018-2019 | 807,337 | $41.05 |
| 2019-2020 | 807,133 | $41.83 |
| 2020-2021 | 806,930 | $42.63 |
| 2021-2022 | 799,819 | $43.44 |
| 2022-2023 | 799,819 | $44.26 |
| 2023-2024 | 798,702 | $45.10 |
| 2024-2025 | 745,303 | $45.96 |
| 2025-2026 | 437,992 | $46.83 |
| 2026-2027 | 437,992 | $47.72 |
| 2027-2028 | 437,992 | $48.63 |
| 2028-2029 | 219,866 | $49.55 |
| 2029-2030 | 1,740 | $50.50 |
| 2030-2031 | 1,740 | $51.46 |
| 2031-2032 | 1,740 | $52.43 |

NOR001122

LAW OFFICES

## HUGHES, KELLNER, SULLIVAN & ALKE

JOHN ALKE
ELIZABETH S. BAKER
AMY D. CHRISTENSEN
STEPHEN M. FRANKINO
STUART L. KELLNER
MICHAEL F. McMAHON*
JOHN F. SULLIVAN

MICHAEL J. HUGHES
(1922-1999)

40 W. LAWRENCE, SUITE A    P.O. BOX 1166    TELEPHONE
HELENA, MONTANA 59624    (406) 442-3690

FAX
(406) 442-2649
*MEMBER OF NORTH DAKOTA BAR
MEMBER OF SOUTH DAKOTA BAR (INACTIVE)

RECEIVED BY
2002 JAN 24 PM 2:45
PUBLIC SERVICE
COMMISSION

January 24, 2002

SUBJECT:    HKSA 1050-1

IN THE MATTER OF THE APPLICATION OF MONTANA POWER COMPANY FOR APPROVAL OF ITS ELECTRIC UTILITY RESTRUCTURING TRANSITION PLAN FILED PURSUANT TO SENATE BILL 390

PUBLIC SERVICE COMMISSION D97.7.90

AND

IN THE MATTER OF THE JOINT APPLICATION FOR APPROVAL OF THE SALE OF MONTANA POWER COMPANY TO NORTHWESTERN CORPORATION

PUBLIC SERVICE COMMISSIONN D2000.1.5

Mr. Steve Vick
Montana Public Service Commission
P.O. Box 202601
Helena, MT 59620

Dear Steve:

Enclosed please find the original and 10 copies of the signature page of Touch America Holdings, Inc. to the Stipulation filed in the above-entitled dockets on December 28, 2001. This page was inadvertently omitted when the Stipulation was filed with the Commission and served upon the service list. The signature page should be physically attached to the December 28, 2001 filing, and not filed as a separate document.

If you have any questions, please immediately get in touch with me.

Best regards,

John L. Alke

MPC.A

Enclosures

c/enc:    Service List

NOR001123

Touch America Holdings, Inc.
Jerrold P. Pederson

12

NOR001124