EXHIBIT B

## MASTER ASSUMPTION AGREEMENT

THIS MASTER ASSUMPTION AGREEMENT is executed and delivered as of this 15th day of November, 2002, by and between NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company ("**Transferor**") and NORTHWESTERN CORPORATION, a Delaware corporation ("**Transferee**").

## W I T N E S S E T H :

**WHEREAS,** Transferor and Transferee entered into that certain Asset and Stock Transfer Agreement dated as of November 15, 2002 (the "**Transfer Agreement**"), providing for the transfer and assignment of substantially all of the assets and properties of Transferor to Transferee; and

**WHEREAS,** all of the instruments, documents and agreements required to be executed and delivered in order to consummate the transactions provided in the Transfer Agreement are being executed and delivered by and to the respective parties to the Transfer Agreement concurrently herewith:

**NOW, THEREFORE,** in consideration of the premises and the transfer by Transferor concurrently herewith of substantially all of the assets and properties of Transferor in accordance with and pursuant to the Transfer Agreement, Transferee hereby agrees as follows:

1.    Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Transfer Agreement.

2.    Transferee hereby assumes and agrees to pay, perform and discharge the Assumed Liabilities, as and when the same become due or are required to be performed or discharged and to perform and observe each of the terms, covenants, conditions and provisions of the Assumed Liabilities to be performed or observed by Transferor when and as the same are required to be performed or observed.

3.    Transferee further covenants and agrees with Transferor that Transferee will do, execute and deliver, or will cause to be done, executed and delivered, all such further instruments, documents, agreements and assurances as may be requested by Transferor, or which may be necessary or desirable, in order to evidence and provide for the specific assumption by Transferee of any one or more or all of the Assumed Liabilities.

Exhibit B-1

NOR000122

4.    This Master Assumption Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, determined without reference to principles of conflicts of laws.

**[SIGNATURES TO THIS MASTER ASSUMPTION AGREEMENT
ARE ON THE FOLLOWING PAGE]**

Exhibit B-2

**[SIGNATURES TO THIS MASTER ASSUMPTION AGREEMENT]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Master Assumption Agreement to be duly executed by their duly authorized officers, and their seals to be affixed hereto, as of the date first above written.

**TRANSFEROR:**

NORTHWESTERN ENERGY, L.L.C.

[SEAL]

By: _____
Title: _____

ATTEST:

_____
Secretary/Assistant Secretary

Signed, sealed and delivered before the undersigned this 15th day of November, 2002.

_____
Notary Public
My Commission Expires: _____

**TRANSFEREE:**

NORTHWESTERN CORPORATION

[CORPORATE SEAL]

By: _____
Title: _____

ATTEST:

_____
Secretary/Assistant Secretary

Signed, sealed and delivered before the undersigned this 15th day of November, 2002.

_____
Notary Public
My Commission Expires: _____

Exhibit B-3

NOR000124

EXHIBIT C

MASTER BACK-TO-BACK AGREEMENT

THIS MASTER BACK-TO-BACK AGREEMENT (this "**Agreement**") is made and entered into as of the 15th day of November, 2002, by and between NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company ("**Transferor**") and NORTHWESTERN CORPORATION, a Delaware corporation ("**Transferee**"). Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Transfer Agreement (hereinafter defined).

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Asset and Stock Transfer Agreement dated as of November 15, 2002, by and between Transferor and Transferee (the "**Transfer Agreement**"), Transferor has agreed to transfer and assign the Transferred Assets to Transferee;

WHEREAS, it is a condition precedent to the consummation of the transactions contemplated by the Transfer Agreement, that the Transferor and Transferee enter into this Agreement which addresses (i) those rights and obligations under contracts, leases, agreements, understandings, property interests or other interests included in the Transferred Assets and Assumed Liabilities, the transfer or assumption of which requires the consent, approval or other action of a party or parties thereto other than Transferor or Transferee or requires the satisfaction, removal or waiver of other restrictions on transfer which consent, approval or other action has not been duly obtained or which restrictions have not been duly satisfied, removed or waived at the time of the Closing ("**Pending Contract**" or "**Pending Contracts**") and (ii) those Permits comprising the Transferred Assets that are not issued in the name of Transferee or the transfer of which requires the consent, approval or other action of or by a Governmental or Regulatory Authority which has not been duly obtained or accomplished at the time of the Closing ("**Pending Permit**" or "**Pending Permits**");

WHEREAS, the parties desire to set forth their agreements and understandings with respect to the Pending Contracts and the Pending Permits from and after the Closing;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

1.    **PENDING CONTRACTS.** With respect to each Pending Contract, from and after the date hereof:

1.1    Transferor and Transferee agree to take and shall be deemed to have taken such actions (including execution of documents), at Transferee's expense, as may be requested by

Exhibit C-1

NOR000125

Transferee or which may be appropriate, in order to place Transferee, insofar as is reasonably practicable and not prohibited by such Pending Contract, in the same position as if such Pending Contract had been transferred to Transferee as contemplated by the Transfer Agreement and so that all the benefits and burdens relating thereto, including possession, use, risk of loss, potential for gain or loss, dominion and control, shall inure to Transferee.

1.2     If such Pending Contract provides for Transferor to furnish any goods, services, property or right of possession or use of property or other performance to the counterparty under such Pending Contract (the "**Counterparty**"), then Transferee agrees to furnish such goods, services, property or right of possession or use of property or other performance in accordance with the terms and conditions of such Pending Contract, to Counterparty, directly in the name, place and stead of Transferor or to the extent necessary, indirectly through Transferor, in compliance with such Pending Contract.

1.3     If such Pending Contract provides for Transferor to receive any goods, services, property or right of possession or use of property or other performance from the Counterparty under such Pending Contract, then Transferor will furnish, or cause the Counterparty to furnish, such goods, services, property or right of use or possession of property or other performance to Transferee, directly in the name, place and stead of Transferor or, to the extent necessary, indirectly through Transferor, in compliance with such Pending Contract.

1.4     If such Pending Contract provides for Transferor to make any payments to the Counterparty thereunder, Transferee will make all such payments, punctually and in the full amount due,  in accordance with the terms of such Pending Contract and in compliance therewith.

1.5     If Transferor receives any payments under any Pending Contract, Transferor shall pay over to Transferee the amount received, immediately upon receipt thereof and in the same form as received by Transferor.

2.     **PENDING PERMITS.** From and after the Closing and in compliance with and to the extent permitted by all applicable Laws, with respect to each Pending Permit, pending the completion of the transfer of such Pending Permit to Transferee in accordance with the terms of the Transfer Agreement or pending the issuance of a replacement Permit in the name of Transferee, Transferor and Transferee agree to take and shall be deemed to have taken such actions (including execution of documents), at Transferee's expense, as may be requested by Transferee or which may be appropriate, in order to place Transferee insofar as is reasonably practicable, in the same position as if the Pending Permit had been transferred to Transferee or issued in the name of Transferee, and so that all the benefits and burdens relating thereto shall inure to Transferee, and Transferee agrees to assume and comply with all of the terms and conditions of such Pending Permits. Without limiting the generality of the foregoing, and in compliance with and to the extent permitted by all applicable Laws, Transferor shall continue to be responsible to the Governmental and Regulatory Authorities as the permitee under the relevant Permits and the Transferee agrees to conduct the day-to-day activities and operations of

Exhibit C-2

NOR000126

the Transferred Assets on behalf of the Transferor until the Pending Permits have been transferred to Transferee or replacement Permits have been issued in the name of Transferee. Until such time, the parties intend that Transferee's conduct of day-to-day activities not trigger "operator" status under any applicable Environmental Law, the Transferor shall remain subject to the obligations and responsibilities associated with the Permits, and Transferee shall conduct the day-to-day activities on behalf of the Transferor in compliance with Environmental Laws.

**3.    REGULATORY AND OTHER APPROVALS**.  Transferor and Transferee agree to comply with Sections 5.1 and 6.1 of the Transfer Agreement until all Pending Contracts and all Pending Permits have been transferred to Transferee or replacements have been issued in the name of Transferee.

**4.    MISCELLANEOUS.**

4.1    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

4.2    Entire Agreement.  This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof, and this Agreement contains the sole and entire agreement among the parties with respect to the matters covered hereby.  This Agreement shall not be altered or amended except by an instrument in writing signed by or on behalf of the party entitled to the benefit of the provision against whom enforcement is sought.

4.3    Governing Law.  The validity and effect of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to principle of conflicts of law.

4.4    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, legal representatives, successors and assigns.

4.5    Partial Invalidity and Severability.  All rights and restrictions contained herein may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws and are intended to be limited to the extent necessary to render this Agreement legal, valid and enforceable.  If any term of this Agreement, or part thereof, not essential to the commercial purpose of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining terms hereof, or part thereof shall constitute their agreement with respect to the subject matter hereof and all such remaining terms, or parts thereof, shall remain in full force and effect.  To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision which will implement the commercial purpose of the illegal, invalid or unenforceable provision.

Exhibit C-3

NOR000127

4.6    Waiver.  Any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof, but only if such waiver is evidenced by a writing signed by such party.  No failure on the part of any party hereto to exercise, and no delay in exercising any right, power or remedy created hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  No waiver by any party hereto to any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.

4.7    Headings.  The headings of particular provisions of this Agreement are inserted for convenience only and shall not be construed as a part of this Agreement or serve as a limitation or expansion on the scope of any term or provision of this Agreement.

4.8    Number and Gender.  Where the context requires, the use of the singular form herein shall include the plural, the use of the plural shall include the singular, and the use of any gender shall include any and all genders.

4.9    Time of Performance.   Time is of the essence in this performance of this Agreement.

4.10    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

**[SIGNATURES TO THIS MASTER BACK-TO-BACK AGREEMENT
ARE ON THE FOLLOWING PAGE]**

Exhibit C-4

**[SIGNATURES TO THIS MASTER BACK-TO-BACK AGREEMENT]**

     **IN WITNESS WHEREOF,** the parties have executed this Master Back-to-Back Agreement as of the day and year first above written.

TRANSFEROR:

NORTHWESTERN ENERGY, L.L.C.

By: _____
    Name: _____
    Title: _____

TRANSFEREE:

NORTHWESTERN CORPORATION

By: _____
    Name: _____
    Title: _____

Exhibit C-5

EXHIBIT D

MAINTENANCE AND OPERATING COSTS SUPPORT AGREEMENT

THIS MAINTENANCE AND OPERATING COSTS SUPPORT AGREEMENT (this "**Agreement**") is made as the 15th day of November, 2002, between NORTHWESTERN CORPORATION, a Delaware corporation ("**Parent**"), and NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company ("**Subsidiary**").

WHEREAS, on January 31, 2002, the Montana Public Service Commission issued its Order No. 6353c in Docket No. D 2001.1.5 pursuant to which, among other things, it approved the acquisition by Parent of the utility business of The Montana Power Company (the predecessor in interest to Subsidiary) and the continued operation of such business "as a subsidiary or division" of Parent;

WHEREAS, on February 15, 2002, Parent acquired and continues to own 100% of the membership interests of Subsidiary;

WHEREAS, pursuant to the Asset and Stock Transfer Agreement, dated as of November 15, 2002 (the "**Transfer Agreement**"), between Parent and Subsidiary, the parties propose to consummate a restructuring transaction involving the assignment by Subsidiary to Parent and the assumption by Parent of substantially all of Subsidiary's assets and liabilities (the "**Transaction**");

WHEREAS, certain assets of Subsidiary will not be transferred to Parent pursuant to the Transaction, including the hydroelectric generating facility known as the Milltown Dam Assets and associated physical structures more particularly described on Schedule 1 hereto (the "**Milltown Dam Assets**");

WHEREAS, Parent and Subsidiary have entered into a Unit Power Purchase Agreement, dated as of September 20, 2002 (the "**Power Purchase Agreement**"), providing for the sale by Subsidiary to Parent of the power and energy produced by the Milltown Dam Assets, effective upon consummation of the Transaction, and such agreement was accepted for filing by order of the Federal Energy Regulatory Commission pursuant to Section 205 of the Federal Power Act;

WHEREAS, it is the desire of Parent and Subsidiary that they enter into this Agreement providing for Parent to make available to Subsidiary funds necessary to ensure that Subsidiary will be able to make payment on any of Subsidiary's trade accounts arising in the ordinary course of business and other costs and expenses, all as relating to or arising in connection with the operation and maintenance of the Milltown Dam Assets subsequent to the consummation of the Transaction, taking into account payments due and to become due from Parent under the Power Purchase Agreement.

NOW, THEREFORE, Subsidiary and Parent agree as follows:

Exhibit D-1

1.    Support Obligation.  If Subsidiary at any time is unable, after taking into account payments due and to become due from Parent under the Power Purchase Agreement, to make payment on any of its trade accounts arising in the ordinary course of business or to pay any other costs and expenses (other than Environmental Liabilities, as defined in the Transfer Agreement), in each case relating to or arising in connection with the operation and maintenance of the Milltown Dam Assets ("**Milltown Operating Expenses**"), then Subsidiary will promptly notify Parent of the shortfall and Parent will make available to Subsidiary, before the due date of any such Milltown Operating Expenses, funds sufficient to enable it to pay any such Milltown Operating Expenses in full as they fall due.  Subsidiary will use the funds made available to it by Parent solely for the payment when due of such Milltown Operating Expenses.  It is understood and agreed that Milltown Operating Expenses shall include any and all amounts payable by Subsidiary to Parent under the Employee Secondment and Administrative Services Agreement of even date between Parent and Subsidiary pursuant to which Parent has agreed to second certain employees to Subsidiary in connection with operating the Milltown Dam Assets.

2.    Waiver.  Parent hereby waives any failure or delay on the part of the Subsidiary in asserting or enforcing any of its rights or in making any claims or demands hereunder.

3.    Not a Guarantee.  This Agreement is not, and nothing herein contained and nothing done pursuant hereto by Parent shall be deemed to constitute, a guarantee, direct or indirect, by Parent of any debt, liability or obligation arising out of a borrowing of money or a trade payable, or any other debt, liability or obligation, of any kind or character whatsoever, of Subsidiary.

4.    Modification and Amendment.  This Agreement may be modified or amended only by the written agreement of Parent and Subsidiary; provided, however, that no such modification or amendment shall have a material adverse effect upon the ability of Subsidiary to meet any of its payment obligations described in Section 1 above.

5.    Termination.  This Agreement and the obligations of Parent hereunder shall terminate upon the expiration or earlier termination of the Power Purchase Agreement in accordance with its terms.

6.    Bankruptcy, Liquidation or Moratorium.  Any rights and obligations which either of the parties has under this Agreement will remain valid and binding notwithstanding any bankruptcy, insolvency or liquidation of, or moratorium involving, Subsidiary.

7.    Successors and Assigns.  The agreements herein set forth shall be mutually binding upon, and inure to the mutual benefit of, Parent and Subsidiary and their respective successors.  Neither this Agreement nor the rights or duties of any party hereto may be assigned without the prior written consent of the other party hereto.

8.    Governing Law.  This Agreement shall be governed by the internal laws of the State of New York, determined without reference to principles of conflicts of laws.

Exhibit D-2

NOR000131

[SIGNATURES TO THIS MAINTENANCE AND OPERATING
COSTS SUPPORT AGREEMENT ARE ON THE FOLLOWING PAGE]

Exhibit D-3

NOR000132

**[SIGNATURES TO THIS MAINTENANCE AND OPERATING
COSTS SUPPORT AGREEMENT]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Maintenance and Operating Costs Support Agreement to be executed and delivered as of the day and year first above written.

NORTHWESTERN CORPORATION

By: _____
      Name: _____
      Title: _____

NORTHWESTERN ENERGY, L.L.C.

By: _____
      Name: _____
      Title: _____

Exhibit D-4

SCHEDULE 1
(TO MAINTENANCE AND OPERATING
COSTS SUPPORT AGREEMENT)

MILLTOWN DAM ASSETS

All of Subsidiary's right, title and interest in and to all of the assets and properties included within, or related or appertenant to (i) the Milltown Dam Project (the "**Milltown Dam Project**") as described in that certain application filed by The Montana Power Company on August 30, 1965, as amended on April 8, 1968, for a license under Section 4(e) of the Federal Power Act for constructed Project No. 2543 known as the Milltown Project (the "**Application**"); (ii) the Disposal Area Number 1; and (iii) the Milltown Rehabilitation Upland Disposal Area, including without limitation the following:

1.      All lands and interests in lands (i) constituting the Milltown Dam Project area and enclosed by the project boundary, the limits of which are otherwise defined, the use and occupancy of which are necessary for the purposes of the Milltown Dam Project; such Milltown Dam Project area and project boundary being shown and described by Exhibits J and K: Sheet 1, FPC No. 2543-8 – showing location of project works and project boundary  - which exhibits are attached to the Application; (ii) the Disposal Area Number 1, which is located on a bluff on the west side of the Milltown Dam reservoir, just south of the Bonner Tunnel (an abandoned railway tunnel), where The Montana Power Company deposited sediment removed from upstream of the Milltown Dam spillway in connection with repairs to the spillway made in 1986 and 1987; (iii) the Milltown Rehabilitation Upland Disposal Area, which is located on the west side of the Milltown Dam reservoir, in the vicinity of the abandoned Chicago, Milwaukee, St. Paul & Pacific Railroad tracks, where The Montana Power Company deposited sediment removed from upstream of the base of the Milltown Dam in connection with repairs to the dam made in 1988 and 1989; and (iv) constituting additional lands or interests in lands related to the Milltown Dam Project as included in the descriptions set forth below.  A description of such lands, located in Missoula County, Montana, is, without limiting the generality of the introductory paragraph or the foregoing general description, set forth on Appendix A, attached hereto.

2.      Milltown Dam Project works consisting of the following:

        (a)     a dam in four sections:  a 244-foot concrete abutment wall, a 152-foot concrete gravity section (maximum height about 45 feet), integral with the powerhouse, a 52-foot long concrete sluice gate section containing four steel gates 9 feet by 14 feet and a 216-foot long rock crib spillway beyond the concrete sluice;

        (b)     a reservoir with a capacity of approximately 300 acre-feet at maximum pond elevation of about 3,260 feet;

        (c)     a brick powerhouse containing five units with a total installed capacity of 3,040 kilowatts;

Exhibit D (Schedule 1)-1

NOR000134

(d)    2.3 kv bus at the plant; and

(e)    appurtenant facilities; the location, nature and character of which are more specifically shown and described by Exhibit L, Sheet 1, FPC No. 2543-2 (Showing Project plan and elevations), Sheet 2, FPC No. 2543-3 (showing Powerhouse floor plan), Sheet 3 FPC No. 2543-4 (showing Powerhouse section), and Sheet 4, FPC No. 2543-5 (showing abutment wall elevation and sections), and Exhibit M (consisting of two typewritten pages entitled "General Description of Mechanical, Electrical, and Transmission Equipment, Milltown Project"), which exhibits were attached to the Application.

3.    All other structures, fixtures, equipment or facilities used or useful in the maintenance and operation of the Milltown Dam Project and located on the Milltown Dam Project area and all riparian or other rights, the use or possession of which is necessary or appropriate in the maintenance or operation of the Milltown Dam Project.

4.    The interconnection point (the "**Interconnection Point**") between the Milltown Dam Project and the Transferred Assets is that point located on the utility pole structure lying north of the Montana Rail Link Railroad right of way, approximately 500 feet north of the Milltown Dam Project, one pole south of the radial line's intersection with Transferor circuit number 61.

5.    Except for the transmission line from the Milltown Dam Project powerhouse to the Interconnection Point, the Excluded Assets shall not include any electric or gas transmission or distribution lines or related facilities which are located on the lands described in Section 1 to this Schedule 1.

6.    All water rights appurtenant to the Milltown Dam Project including without limitation the following:

(i)    Water Right Number 76F 30850 00, Ground Water Certificate;
(ii)    Water Right Number 76F 94407 00, Statement of Claim;
(iii)    Water Right Number 76M 94404 00, Statement of Claim;
(iv)    Water Right Number 76M 94405 00, Statement of Claim and
(v)    Water Right Number 76M 94406 00, Statement of Claim.

Exhibit D (Schedule 1)-2

APPENDIX A
(TO SCHEDULE 1,
MILLTOWN DAM ASSETS)

MILLTOWN DAM PROJECT REAL PROPERTY
MISSOULA COUNTY, MONTANA
FEE LANDS, EASEMENTS AND OTHER INTERESTS

A.    **FEE LANDS**

Parcel I

That certain piece, parcel or tract of land located in Sections 20, 21, 22, 27, 28 and 34, Township 13 North, Range 18 West, M.P.M., Missoula County, Montana, and more particularly described as follows, to-wit:

Beginning at the Southwest corner of the E½SE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., and running thence South to the South line of the NE¼SE¼ of said Section 20; thence East along said South line of the NE¼SE¼ of said Section 20 and along the North line of SW¼SW¼ of Section 21, 820 feet more or less to a point where the North line of the SW¼SW¼ of Section 21 intersects the East right-of-way line of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company; thence along said East line of said Railroad right-of-way, across and through the S½SW¼ of Section 21, NW¼ and E½ of Section 28, 8255 feet, more or less, to the East line of said Section 28; thence South along the East line of said Section 28, 500 feet, more or less, to the Southeast corner of said Section 28; thence South along the West line of the NW¼ of Section 34, 2830 feet, more or less, to the Southwest corner of the NW¼ of Section 34; thence East along the South line of the NW¼ of Section 34, 2640 feet, more or less, to the center of said Section 34; thence North along the center line of Section 34, 920 feet; thence North 73° East, 367 feet; thence due East 250 feet; North 31° East, 334 feet, more or less to a point at the high water line on the South bank of the Missoula or Hellgate River; thence Northwesterly along the South bank of said river, and following the high water line of said River, on the West and South banks thereof to the West boundary line of NE¼ of Section 34; thence North and across said River, and along the North and South center line of said Section 34, to the South line of Section 27; thence Easterly along the South line of said Section 27, 1252 feet; thence North 5°5' West, 370 feet; thence North 23°10' West, 467 feet; thence North 35°25' West, 250 feet; thence North 8°20' West, 223 feet; thence North 27°30' West, 124 feet; thence North 44°30' West, 325 feet; thence North 79°30' West, 138 feet; thence North 30°01' West, 452.9 feet; thence South 53°17' West, 260 feet, more or less, to the center line of Section 27; thence Northerly along the center line of said Section 27, to the South boundary of the Northern Pacific Railway Company right-of-way; thence Northwesterly and along said right-of-way line and across the NW¼ of Section 27, 3260 feet, more or less, to a point, where said right-of-way line intersects the North line of Section 27; thence Westerly along said North line of Section 27 and the North line of Section 28, 3220

Exhibit D (Schedule 1 - Appendix A)-1

NOR000136

feet, more or less, to the Northwest corner of the NE¼ of Section 28; thence Northerly along the North and South center line of Section 21, 1850 feet, more or less, to the high water line of the North bank of the Missoula River; thence Northwesterly and following the high water line of said River, and along said bank through the NE¼SW¼ of Section 21, to the confluence of the Big Blackfoot River therewith; thence Easterly and following the high water line of the said Big Blackfoot River, on the South bank thereof, through the SE¼NW¼ of said Section 21 to the North and South center line of said Section 21; thence Northerly and across the said Big Blackfoot River and following the East line of the NW¼ of Section 21, to the high water line of the North bank of said Big Blackfoot River; thence Westerly and following the course of the high water line on the North bank of the Big Blackfoot River, in all its bends, to a point where said high water line on the North bank aforesaid, intersects the South right-of-way line of the Northern Pacific Railway Company in the NW¼ of Section 21; thence Westerly and along the said South right-of-way line to the West side line of the E½SE¼NE¼ of Section 20; thence Southerly along said last mentioned line 875 feet, more or less, to the East and West center line of said Section 20, the point of beginning.

Recording Reference: Book 108 of Deeds at page 583

Parcel II

A strip of land 400 feet wide in the Northwest quarter (NW¼) of Section 21 and the East half of the Northeast quarter of the Northeast quarter E½NE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., its outside boundaries being 200 feet on each side of the center line of the abandoned main track of the Northern Pacific Railway Company as the same was originally located and staked out across said premises (and which said center line is now the center line of the track of the Missoula Street Railway) and extending from the West line of the E½NE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., to the high water line of the reservoir located in the SE¼NW¼ of said Section 21, Township 13 North, Range 18 West, M.P.M.

Excepting and reserving therefrom, however, and there is hereby specifically excepted and reserved therefrom a strip of land 80 feet wide, being 40 feet on each side of said center line of the abandoned main track of the Northern Pacific Railway Company as the same was originally located and staked out across the above described premises, and now occupied by the Missoula Street Railway .

Recording Reference: Book 126 of Deeds at page 472

Parcel III

A strip of land 80 feet wide in the NW¼ of Section 21 and the E½NE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., being 40 feet on each side of the center line of the main track of the Northern Pacific Railway

Exhibit D (Schedule 1 - Appendix A)-2

NOR000137

Company as the same was originally located and staked out across said premises, and extending from a line drawn at right angles to said center line of the main track at the point of intersection of the original Southwesterly boundary line of the Northern Pacific Railway Company right-of-way with the center line of the new main track of said Railway Company as the same is now constructed; thence over, along and across the NW¼ said of Section 21 and the E½NE¼NE¼ of said Section 20.

Recording Reference: Book 126 of Deeds at page 473

Parcel IV

All that portion of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company's 150 foot wide right-of-way and wye track right-of-way in the Northwest quarter (NW¼) and the Northwest quarter of the Northeast quarter (NW¼NE¼) of Section 28 and the Southwest quarter (SW¼) of Section 21, the East half of the East half of the Southeast quarter (E½E½SE¼) and the East half of the Southeast quarter of the Northeast quarter (E½SE¼NE¼) of Section 20, Township 13 North, Range 18 West, P.M.M.

EXCEPT that portion in the SE¼NW¼ said Section 28 lying southeasterly of former Railroad Engineer's Station 433+84, as measured perpendicular and at right angles to the Grantor's former main track centerline.

Recording Reference: Book 223 of Micro Records at page 564

Parcel V

The Northwest Quarter (NW¼) of Section Thirty-four (34), Township Thirteen (13) North of Range Eighteen (18) West, containing 160 acres. And also all that portion of the Southwest Quarter of the Northwest Quarter (SW¼NW¼) of Section Twenty-one (21), Township Thirteen (13) North of Range Eighteen (18) West, Montana Principal Meridian, lying south of the present used right of way of the Northern Pacific Railway Company, passing through said Southwest Quarter of the Northwest Quarter (SW¼NW¼).

Recording Reference: Book 126 of Deeds at Page 442

Parcel VI

All of Transferor's right, title and interest, if any, in the tracts described in Certificate of Survey No. 3441 filed in the office of the Clerk and Recorder of Missoula County, Montana in Book 256, Page 0638.

EXCEPTING from Parcels I, II, III, IV V and VI the interests conveyed by the following instruments:

(i)   Quitclaim Deed recorded April 30, 1941 in Book 131, Page 77, records of Missoula County, Montana.

Exhibit D (Schedule 1 - Appendix A)-3

(ii)    Quitclaim Deed recorded April 23, 1963 in Book 228, Page 272, records of Missoula County, Montana.

(iii)   Quitclaim Deed recorded July 2, 1963 in Book 229, Page 335, records of Missoula County, Montana.

(iv)   Bargain and Sale Deed recorded March 18, 1942 in Book 131, Page 427, records of Missoula County, Montana.

(v)    Modification of Reservation of Right to Flood, recorded September 7, 1983 in Book 194, Page 747, records of Missoula County, Montana.

(vi)   Bargain and Sale Deed, recorded June 11, 1942 in Book 131, Page 504, records of Missoula County, Montana.

(vii)  Correction Deed recorded April 12, 1983 in Book 186, Page 2233, records of Missoula County, Montana.

## B.    EASEMENTS

Easements granted or reserved to The Montana Power Company, or its predecessors in interest, or otherwise described, in the following-described instruments, for the right to flood and other purposes, but only to the extent such easements are used or held for use in connection with the operation of the Milltown Dam Project:

| Grantor | Grantee | Recorded | Book | Page |
|---|---|---|---|---|
| Big Blackfoot Milling Company | Clark-Montana Realty Company | October 19, 1906 | 37 | 217 |
| Missoula Public Service Company | The Montana Power Company | December 20, 1929 | 108 | 583 |
| The Montana Power Company | Luke M. Harris | March 18, 1942 | 131 | 427 |
| The Montana Power Company | John Ray Teague | June 11, 1942 | 131 | 504 |
| Anaconda Copper Mining Company | The Montana Power Company | November 30, 1942 | 131 | 625 |
| The Montana Power Company | Jack L. Green, II | April 12, 1983 | 186 | 2233 |
| The Montana Power Company | Ralph Roy Harris and June Harris | September 7, 1983 | 194 | 747 |
| Champion International | The Montana Power Company | June 6, 1986 | 241 | 0932 |

Exhibit D (Schedule 1 - Appendix A)-4

NOR000139

| International Corporation | Power Company | | | |
|---|---|---|---|---|

C.    OTHER RIGHTS IN REAL PROPERTY

All other rights and interests in real property owned by Transferor within the boundary of the Milltown Dam Project which are used or held for use in connection with the Milltown Dam Project and all other real property rights and interests used or held for use in connection with the Milltown Dam Project.

Exhibit D (Schedule 1 - Appendix A)-5

NOR000140

EXHIBIT E

ENVIRONMENTAL LIABILITIES SUPPORT AGREEMENT

THIS ENVIRONMENTAL LIABILITIES SUPPORT AGREEMENT (this "**Agreement**") is made as the 15th day of November, 2002, between NORTHWESTERN CORPORATION, a Delaware corporation ("**Parent**"), and NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company ("**Subsidiary**").

WHEREAS, on January 31, 2002, the Montana Public Service Commission issued its Order No. 6353c in Docket No. D 2001.1.5 pursuant to which, among other things, it approved the acquisition by Parent of the utility business of The Montana Power Company (the predecessor in interest to Subsidiary) and the continued operation of such business "as a subsidiary or division" of Parent;

WHEREAS, on February 15, 2002, Parent acquired, and continues to own 100% of the membership interests of Subsidiary;

WHEREAS, pursuant to the Asset and Stock Transfer Agreement, dated as of November 15, 2002 (the "**Transfer Agreement**"), between Parent and Subsidiary, the parties propose to consummate a restructuring transaction involving the assignment by Subsidiary to Parent and the assumption by Parent of substantially all of Subsidiary's assets and liabilities (the "**Transaction**");

WHEREAS, certain Excluded Liabilities (as such term is defined in the Transfer Agreement) of Subsidiary will not be transferred to or assumed by Parent pursuant to the Transaction;

WHEREAS, the Excluded Liabilities include all Environmental Liabilities, as such term is defined in Schedule 2 hereto, relating to the Excluded Assets described on Schedule 1 hereto (the "**Environmental Liabilities**"); and

WHEREAS, it is the desire of Parent and Subsidiary that they enter into this agreement providing for Parent, subject to the maximum amount set forth in this Agreement, to make available to Subsidiary funds necessary to ensure that Subsidiary will be able to make payment for all of its Environmental Liabilities subsequent to the consummation of the Transaction.

NOW, THEREFORE, Subsidiary and Parent agree as follows:

1.    Maintenance of Net Worth.  Parent agrees that it shall cause Subsidiary to have at all times a net worth, as determined in accordance with generally accepted accounting principles in the United States of America, of at least US$1,000.

Exhibit E-1

NOR000141

If Subsidiary at any time runs short of cash and other liquid assets to meet any obligation to make payments in respect of its Environmental Liabilities, then Subsidiary will promptly notify Parent of the shortfall and Parent will make available to Subsidiary, within a commercially reasonable period, funds sufficient to enable it to fulfill any such payment obligation. Subsidiary will use the funds made available to it by Parent solely for the payment of its Environmental Liabilities. In the event Parent funds any Environmental Liabilities as contemplated hereby and Subsidiary subsequently receives insurance proceeds with respect to such Environmental Liabilities, Subsidiary shall promptly pay to Parent an amount equal to the amount of such insurance proceeds, but Parent's remaining liability hereunder shall not be increased by the amount of such payment by Subsidiary. In the event Parent funds any Environmental Liabilities as contemplated hereby and Parent subsequently recovers an indemnity payment from Touch America Holdings Inc. ("**Touch America**") pursuant to the provisions of Section 10.04 (special environmental indemnification) of the UPA, as defined in the Transfer Agreement (the "**UPA**"), in respect of such Environmental Liabilities in whole or in part, then subject to Section 2 hereof Parent will be entitled to retain the whole amount of such indemnity payment and Parent's remaining liability hereunder shall not be increased by all or any portion of the amount retained. Parent agrees to use commercially reasonable efforts to claim for indemnification under Section 10.04 of the UPA all Environmental Liabilities incurred by Subsidiary.

2.    Maximum Liability of Parent. The total liability of Parent under Section 1 of this Agreement shall at no time exceed a maximum cumulative amount of Ten Million Dollars (US$10,000,000). In the event Parent recovers an indemnity payment from Touch America pursuant to the provisions of Section 10.04 of the UPA, then Parent shall (i) allocate to Subsidiary a pro rata share of such indemnity payment based on the ratio that the amount Parent claimed against Touch America under such Section 10.04 in respect of the Environmental Liabilities hereunder bears to the total amount Parent claimed under such Section 10.04 and (ii) pay over to Subsidiary an amount equal to the positive amount remaining, if any, equal to (x) the amount of such pro rata share minus (y) the total amount of the Environmental Liabilities theretofore funded by Parent hereunder.

3.    Waiver. Parent hereby waives any failure or delay on the part of Subsidiary in asserting or enforcing any of its rights or in making any claims or demands hereunder.

4.    Not a Guarantee. This Agreement is not, and nothing herein contained and nothing done pursuant hereto by Parent shall be deemed to constitute, a guarantee, direct or indirect, by Parent of Environmental Liabilities or any debt, liability or obligation arising out of a borrowing of money or a trade payable, or any other debt, liability or obligation, of any kind or character whatsoever, of Subsidiary.

5.    Modification and Amendment. This Agreement may be modified or amended only by the written agreement of Parent and Subsidiary, provided, however, that no such modification or amendment shall have any material adverse effect upon the ability of Subsidiary to meet its obligations in respect to the Environmental Liabilities without the prior written consent of the Director, Montana office, EPA Region 8, or any superior to such Director within the EPA.

Exhibit E-2

NOR000142

6.    Termination. This Agreement and the obligations of Parent hereunder shall terminate on the earlier of (i) payment in full of all amounts payable by Subsidiary in respect the Environmental Liabilities pursuant to settlement approved or consented to by the Director, Montana office, EPA Region 8, or any superior to such Director within the EPA and (ii) payments by Parent to Subsidiary hereunder of funds in an aggregate amount equal to the maximum cumulative amount specified in Section 2 hereof.

7.    Bankruptcy, Liquidation or Moratorium. Any rights and obligations which either of the parties has under this Agreement will remain valid and binding notwithstanding any bankruptcy, insolvency or liquidation of, or moratorium involving, Subsidiary.

8.    Successors and Assigns. The agreements herein set forth shall be mutually binding upon, and inure to the mutual benefit of, Parent and Subsidiary and their respective successors. Neither this Agreement nor the rights or duties of any party hereto may be assigned without the prior written consent of the other party hereto.

9.    Governing Law. This Agreement shall be governed by the internal laws of the State of New York, determined without reference to principles of conflicts of laws.

**[SIGNATURES TO THIS ENVIRONMENTAL LIABILITIES
SUPPORT AGREEMENT ARE ON THE FOLLOWING PAGE]**

Exhibit E-3

**[SIGNATURES TO THIS ENVIRONMENTAL LIABILITIES
SUPPORT AGREEMENT]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Environmental Liabilities Support Agreement to be executed and delivered as of the day and year first above written.

NORTHWESTERN CORPORATION

By: _____
      Name: _____
      Title: _____

NORTHWESTERN ENERGY, LLC

_____
By:
      Name: _____
      Title: _____

Exhibit E-4

NOR000144

SCHEDULE 1
(TO ENVIRONMENTAL LIABILITIES
SUPPORT AGREEMENT)

EXCLUDED ASSETS

1.      All of Transferor's right, title and interest in and to all of the assets and properties included within, or related or appertenant to (i) the Milltown Dam Project (the "**Milltown Dam Project**") as described in that certain application filed by The Montana Power Company on August 30, 1965, as amended on April 8, 1968, for a license under Section 4(e) of the Federal Power Act for constructed Project No. 2543 known as the Milltown Project (the "**Application**"); (ii) the Disposal Area Number 1, which is located on a bluff on the west side of the Milltown Dam reservoir, just south of the Bonner Tunnel (an abandoned railway tunnel), where The Montana Power Company deposited sediment removed from upstream of the Milltown Dam spillway in connection with repairs to the spillway made in 1986 and 1987; and (iii) the Milltown Rehabilitation Upland Disposal Area, which is located on the west side of the Milltown Dam reservoir, in the vicinity of the abandoned Chicago, Milwaukee, St. Paul & Pacific Railroad tracks, where The Montana Power Company deposited sediment removed from upstream of the base of the Milltown Dam in connection with repairs to the dam made in 1988 and 1989, including without limitation the following:

        a.      All lands and interests in lands (i) constituting the Milltown Dam Project area and enclosed by the project boundary, the limits of which are otherwise defined, the use and occupancy of which are necessary for the purposes of the Milltown Dam Project; such Milltown Dam Project area and project boundary being shown and described by Exhibits J and K: Sheet 1, FPC No. 2543-8 – showing location of project works and project boundary - which exhibits are attached to the Application; (ii) constituting the Disposal Area Number 1; (iii) constituting the Milltown Rehabilitation Upland Disposal Area; and (iv) constituting additional lands or interests in lands related to the Milltown Dam Project as included in the descriptions set forth below. A description of such lands, located in Missoula  County, Montana, is, without limiting the generality of the introductory paragraph or the foregoing general description, set forth on Appendix A, attached hereto.

        b.      Milltown Dam Project works consisting of the following:

                (i)      a dam in four sections:  a 244-foot concrete abutment wall, a 152-foot concrete gravity section (maximum height about 45 feet), integral with the powerhouse, a 52-foot long concrete sluice gate section containing four steel gates 9 feet by 14 feet and a 216-foot long rock crib spillway beyond the concrete sluice;

                (ii)      a reservoir with a capacity of approximately 300 acre-feet at maximum pond elevation of about 3,260 feet;

Exhibit E (Schedule 1)-1

NOR000145

(iii)    a brick powerhouse containing five units with a total installed capacity of 3,040 kilowatts;

(iv)    2.3 kv bus at the plant; and

(v)    appurtenant facilities; the location, nature and character of which are more specifically shown and described by Exhibit L, Sheet 1, FPC No. 2543-2 (Showing Project plan and elevations), Sheet 2, FPC No. 2543-3 (showing Powerhouse floor plan), Sheet 3 FPC No. 2543-4 (showing Powerhouse section), and Sheet 4, FPC No. 2543-5 (showing abutment wall elevation and sections), and Exhibit M (consisting of two typewritten pages entitled "General Description of Mechanical, Electrical, and Transmission Equipment, Milltown Project"), which exhibits were attached to the Application.

c.    All other structures, fixtures, equipment or facilities used or useful in the maintenance and operation of the Milltown Dam Project and located on the Milltown Dam Project area and all riparian or other rights, the use or possession of which is necessary or appropriate in the maintenance or operation of the Milltown Dam Project.

d.    The interconnection point (the "**Interconnection Point**") between the Milltown Dam Project and the Transferred Assets is that point located on the utility pole structure lying north of the Montana Rail Link Railroad right of way, approximately 500 feet north of the Milltown Dam Project, one pole south of the radial line's intersection with Transferor circuit number 61.

e.    Except for the transmission line from the Milltown Dam Project powerhouse to the Interconnection Point, the Excluded Assets shall not include any electric or gas transmission or distribution lines or related facilities which are located on the lands described in Section 1.a. to this Schedule 1.

f.    All water rights appurtenant to the Milltown Dam Project including without limitation the following:

(i)     Water Right Number 76F 30850 00, Ground Water Certificate;
(ii)    Water Right Number 76F 94407 00, Statement of Claim;
(iii)   Water Right Number 76M 94404 00, Statement of Claim;
(iv)    Water Right Number 76M 94405 00, Statement of Claim and
(v)     Water Right Number 76M 94406 00, Statement of Claim.

Exhibit E (Schedule 1)-2

NOR000146

MILLTOWN DAM PROJECT REAL PROPERTY
MISSOULA COUNTY, MONTANA
FEE LANDS, EASEMENTS AND OTHER INTERESTS

A.    **FEE LANDS**

Parcel I

That certain piece, parcel or tract of land located in Sections 20, 21, 22, 27, 28 and 34, Township 13 North, Range 18 West, M.P.M., Missoula County, Montana, and more particularly described as follows, to-wit:

Beginning at the Southwest corner of the E½SE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., and running thence South to the South line of the NE¼SE¼ of said Section 20; thence East along said South line of the NE¼SE¼ of said Section 20 and along the North line of SW¼SW¼ of Section 21, 820 feet more or less to a point where the North line of the SW¼SW¼ of Section 21 intersects the East right-of-way line of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company; thence along said East line of said Railroad right-of-way, across and through the S½SW¼ of Section 21, NW¼ and E½ of Section 28, 8255 feet, more or less, to the East line of said Section 28; thence South along the East line of said Section 28, 500 feet, more or less, to the Southeast corner of said Section 28; thence South along the West line of the NW¼ of Section 34, 2830 feet, more or less, to the Southwest corner of the NW¼ of Section 34; thence East along the South line of the NW¼ of Section 34, 2640 feet, more or less, to the center of said Section 34; thence North along the center line of Section 34, 920 feet; thence North 73° East, 367 feet; thence due East 250 feet; North 31° East, 334 feet, more or less to a point at the high water line on the South bank of the Missoula or Hellgate River; thence Northwesterly along the South bank of said river, and following the high water line of said River, on the West and South banks thereof to the West boundary line of NE¼ of Section 34; thence North and across said River, and along the North and South center line of said Section 34, to the South line of Section 27; thence Easterly along the South line of said Section 27, 1252 feet; thence North 5°5' West, 370 feet; thence North 23°10' West, 467 feet; thence North 35°25' West, 250 feet; thence North 8°20' West, 223 feet; thence North 27°30' West, 124 feet; thence North 44°30' West, 325 feet; thence North 79°30' West, 138 feet; thence North 30°01' West, 452.9 feet; thence South 53°17' West, 260 feet, more or less, to the center line of Section 27; thence Northerly along the center line of said Section 27, to the South boundary of the Northern Pacific Railway Company right-of-way; thence Northwesterly and along said right-of-way line and across the NW¼ of Section 27, 3260 feet, more or less, to a point, where said right-of-way line intersects the North line of Section 27; thence Westerly along said North line of Section 27 and the North line of Section 28, 3220

Exhibit E (Schedule 1 – Appendix A)-1

feet, more or less, to the Northwest corner of the NE¼ of Section 28; thence Northerly along the North and South center line of Section 21, 1850 feet, more or less, to the high water line of the North bank of the Missoula River; thence Northwesterly and following the high water line of said River, and along said bank through the NE¼SW¼ of Section 21, to the confluence of the Big Blackfoot River therewith; thence Easterly and following the high water line of the said Big Blackfoot River, on the South bank thereof, through the SE¼NW¼ of said Section 21 to the North and South center line of said Section 21; thence Northerly and across the said Big Blackfoot River and following the East line of the NW¼ of Section 21, to the high water line of the North bank of said Big Blackfoot River; thence Westerly and following the course of the high water line on the North bank of the Big Blackfoot River, in all its bends, to a point where said high water line on the North bank aforesaid, intersects the South right-of-way line of the Northern Pacific Railway Company in the NW¼ of Section 21; thence Westerly and along the said South right-of-way line to the West side line of the E½SE¼NE¼ of Section 20; thence Southerly along said last mentioned line 875 feet, more or less, to the East and West center line of said Section 20, the point of beginning.

Recording Reference: Book 108 of Deeds at page 583

## Parcel II

A strip of land 400 feet wide in the Northwest quarter (NW¼) of Section 21 and the East half of the Northeast quarter of the Northeast quarter E½NE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., its outside boundaries being 200 feet on each side of the center line of the abandoned main track of the Northern Pacific Railway Company as the same was originally located and staked out across said premises (and which said center line is now the center line of the track of the Missoula Street Railway) and extending from the West line of the E½NE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., to the high water line of the reservoir located in the SE¼NW¼ of said Section 21, Township 13 North, Range 18 West, M.P.M.

Excepting and reserving therefrom, however, and there is hereby specifically excepted and reserved therefrom a strip of land 80 feet wide, being 40 feet on each side of said center line of the abandoned main track of the Northern Pacific Railway Company as the same was originally located and staked out across the above described premises, and now occupied by the Missoula Street Railway .

Recording Reference: Book 126 of Deeds at page 472

## Parcel III

A strip of land 80 feet wide in the NW¼ of Section 21 and the E½NE¼NE¼ of Section 20, Township 13 North, Range 18 West, M.P.M., being 40 feet on each side of the center line of the main track of the Northern Pacific Railway

Exhibit E (Schedule 1 – Appendix A)-2

NOR000148

Company as the same was originally located and staked out across said premises, and extending from a line drawn at right angles to said center line of the main track at the point of intersection of the original Southwesterly boundary line of the Northern Pacific Railway Company right-of-way with the center line of the new main track of said Railway Company as the same is now constructed; thence over, along and across the NW¼ said of Section 21 and the E½NE¼NE¼ of said Section 20.

Recording Reference: Book 126 of Deeds at page 473

Parcel IV

All that portion of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company's 150 foot wide right-of-way and wye track right-of-way in the Northwest quarter (NW¼) and the Northwest quarter of the Northeast quarter (NW¼NE¼) of Section 28 and the Southwest quarter (SW¼) of Section 21, the East half of the East half of the Southeast quarter (E½E½SE¼) and the East half of the Southeast quarter of the Northeast quarter (E½SE¼NE¼) of Section 20, Township 13 North, Range 18 West, P.M.M.

EXCEPT that portion in the SE¼NW¼ said Section 28 lying southeasterly of former Railroad Engineer's Station 433+84, as measured perpendicular and at right angles to the Grantor's former main track centerline.

Recording Reference: Book 223 of Micro Records at page 564

Parcel V

The Northwest Quarter (NW¼) of Section Thirty-four (34), Township Thirteen (13) North of Range Eighteen (18) West, containing 160 acres. And also all that portion of the Southwest Quarter of the Northwest Quarter (SW¼NW¼) of Section Twenty-one (21), Township Thirteen (13) North of Range Eighteen (18) West, Montana Principal Meridian, lying south of the present used right of way of the Northern Pacific Railway Company, passing through said Southwest Quarter of the Northwest Quarter (SW¼NW¼).

Recording Reference: Book 126 of Deeds at Page 442

Parcel VI

All of Transferor's right, title and interest, if any, in the tracts described in Certificate of Survey No. 3441 filed in the office of the Clerk and Recorder of Missoula County, Montana in Book 256, Page 0638.

EXCEPTING from Parcels I, II, III, IV Vand VI the interests conveyed by the following instruments:

(i)     Quitclaim Deed recorded April 30, 1941 in Book 131, Page 77, records of Missoula County, Montana.

Exhibit E (Schedule 1 – Appendix A)-3

NOR000149

(ii)    Quitclaim Deed recorded April 23, 1963 in Book 228, Page 272, records of Missoula County, Montana.

(iii)   Quitclaim Deed recorded July 2, 1963 in Book 229, Page 335, records of Missoula County, Montana.

(iv)    Bargain and Sale Deed recorded March 18, 1942 in Book 131, Page 427, records of Missoula County, Montana.

(v)     Modification of Reservation of Right to Flood, recorded September 7, 1983 in Book 194, Page 747, records of Missoula County, Montana.

(vi)    Bargain and Sale Deed, recorded June 11, 1942 in Book 131, Page 504, records of Missoula County, Montana.

(vii)   Correction Deed recorded April 12, 1983 in Book 186, Page 2233, records of Missoula County, Montana.


**B.    EASEMENTS**

Easements granted or reserved to The Montana Power Company, or its predecessors in interest, or otherwise described, in the following-described instruments, for the right to flood and other purposes, but only to the extent such easements are used or held for use in connection with the operation of the Milltown Dam Project:

| Grantor | Grantee | Recorded | Book | Page |
|---|---|---|---|---|
| Big Blackfoot Milling Company | Clark-Montana Realty Company | October 19, 1906 | 37 | 217 |
| Missoula Public Service Company | The Montana Power Company | December 20, 1929 | 108 | 583 |
| The Montana Power Company | Luke M. Harris | March 18, 1942 | 131 | 427 |
| The Montana Power Company | John Ray Teague | June 11, 1942 | 131 | 504 |
| Anaconda Copper Mining Company | The Montana Power Company | November 30, 1942 | 131 | 625 |
| The Montana Power Company | Jack L. Green, II | April 12, 1983 | 186 | 2233 |
| The Montana Power Company | Ralph Roy Harris and June Harris | September 7, 1983 | 194 | 747 |
| Champion International | The Montana Power Company | June 6, 1986 | 241 | 0932 |

Exhibit E (Schedule 1 – Appendix A)-4

| International Corporation | Power Company | | | |
|---|---|---|---|---|

C.    <u>OTHER RIGHTS IN REAL PROPERTY</u>

All other rights and interests in real property owned by Transferor within the boundary of the Milltown Dam Project which are used or held for use in connection with the Milltown Dam Project and all other real property rights and interests used or held for use in connection with the Milltown Dam Project.

Exhibit E (Schedule 1 – Appendix A)-5

SCHEDULE 2
(TO ENVIRONMENTAL LIABILITIES
SUPPORT AGREEMENT)

EXCLUDED LIABILITIES

1.    All Environmental Liabilities relating to the Excluded Assets.

"**Environmental Liabilities**" shall mean and include any investigation, notice of violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, liability, obligation, sanction, abatement, proceeding, or claim (whether administrative, judicial or private in nature) arising: (A) pursuant to, or in connection with, an actual or alleged violation of any Environmental Law; (B) in connection with any Hazardous Materials or actual or alleged activity associated with any Hazardous Materials; (C) from any remediation, abatement, removal, remedial, corrective, or other response action in connection with any Hazardous Materials, Environmental Law or other order or directive of any Governmental or Regulatory Authority; (D) from any actual or alleged damage, injury, threat or harm to health, safety, natural resources, or the environment; (E) from the use, management, disposal or release (or threatened release) of Hazardous Materials; (F) from personal injury (including death), tangible or intangible property damage, damage to the environment or natural resources, pollution or contamination arising under Environmental Laws; or (G) from the contribution to the cost of investigating, removing, responding, remediating or monitoring the release of Hazardous Materials.

"**Environmental Laws**" shall mean all Federal, state, municipal and local laws (including common laws), regulations, rules, ordinances, codes, licenses, decrees, judgments, directives, or judicial or administrative orders relating to pollution, protection, preservation or restoration of human health, the environment or natural resources, including, without limitation, laws relating to releases or threatened releases of Hazardous Materials (including, without limitation, into or through ambient air, surface water, groundwater, land, wetlands, surface and subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling or Hazardous Materials, including without limitation the Clean Water Act, the Clean Air Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, in each case as amended, and their local counterparts.

"**Hazardous Materials**" shall mean (a) any petrochemical, petroleum or petroleum products, oil, flammable explosives, radioactive materials, radon gas, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and transformers or other equipment that contain dielectric fluid which may contain levels of polychlorinated biphenyls (PCBs); (b) any chemicals or other materials or substances which are now or hereafter become defined under any Environmental Law as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous chemicals", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "pollutants", "contaminants", "hazardous

Exhibit E (Schedule 2)-1

NOR000152

matter", "restricted hazardous materials", or words of similar import; and (c) any other chemical or other material or substance, the discharge, emission, release or exposure to which is now or hereafter prohibited, limited or regulated by any Governmental or Regulatory Authority under any Environmental Law.

2.    All liabilities and obligations under the following written notices of PRP liability under CERCLA and Montana statutes: (a) PRP notice issued by US EPA relating to the Milltown Dam issued September 27, 1985; and (b) PRP notice issued by US EPA in 1991 relating to the Butte Priority Soil Operable Unit Superfund Site.

Exhibit E (Schedule 2)-2

EXHIBIT F

INTERCONNECTION AGREEMENT

Exhibit F-1

NOR000154

EMPLOYEE SECONDMENT AND
ADMINISTRATIVE SERVICES AGREEMENT

THIS EMPLOYEE SECONDMENT AND ADMINISTRATIVE SERVICES AGREEMENT (this "**Agreement**") is entered into as of November 15, 2002, by and between NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company (the "**Company**"), and NORTHWESTERN CORPORATION, a Delaware corporation ("**Seconding Party**").

## W I T N E S S E T H :

WHEREAS, pursuant to that certain Asset and Stock Transfer Agreement dated as of November 15, 2002 by and between the Company and Seconding Party (the "**Transfer Agreement**"), the Company has agreed to transfer and assign to Seconding Party substantially of the assets and properties of the Company, including all of the employees of the Company; and

WHEREAS, pursuant to the terms of the Transfer Agreement, it is a condition precedent to the consummation of the transactions contemplated thereby that the parties enter into this Agreement whereby those certain employees who performed functions at the Milltown hydroelectric dam on the Clark Fork River (the "**Milltown Dam**"), and in connection with the regular operation thereof, will be seconded by Seconding Party to the Company; and

WHEREAS, pursuant to the terms of this Agreement, Seconding Party desires to second those employees who previously performed functions at the Milltown Dam, and in connection with the regular operation thereof, to the Company, and the Company desires such employees to be so seconded.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.   **SECONDMENT OF EMPLOYEES**

    1.1    Secondment of Employees.

    (a)    Seconded Employees. During the term of this Agreement, Seconding Party will second to the Company, and the Company will accept on secondment from Seconding Party, those employees and/or contracted staff of Seconding Party who perform functions at the Milltown Dam, and in connection with the regular operation thereof, as set forth on Appendix A attached hereto (each a "**Seconded Employee**"). Seconding Party shall have a reasonable and good faith belief that each Seconded Employee has the proper qualifications, training, background and experience for the position that each Seconded Employee will hold at the

Exhibit G-1

NOR000155

Company.  <u>Appendix A</u> shall be amended from time to time to include additional Seconded Employees upon appointment thereof for secondment to the Company, as mutually agreed by the parties.

(b)    <u>Status of Seconded Employees</u>.   Seconded Employees shall remain employees of Seconding Party at all times during the secondment, and Seconding Party shall retain all rights and duties under applicable labor and employment laws with respect to the direction and supervision of such Seconded Employees.  The Company, and not Seconding Party, shall have all duties and liabilities under applicable law to third parties caused by or arising out of acts, errors or omissions of Seconded Employees in the course of performing their duties for the Company, including the operation and maintenance of the Milltown Dam.  Without limiting the foregoing, Seconding Party shall use reasonable efforts to ensure that each Seconded Employee shall comply with the Company's policies, procedures, rules, regulations and instructions concerning his or her duties, vacations and day-to-day activities and the Company's rules of employment and human resource policies and procedures, as may be established and amended from time to time, in matters concerning his or her daily employment activities.  The Company shall at all times consistently apply its rules of employment and human resources and employee policies and procedures to each of the Seconded Employees without discrimination.  Unless otherwise agreed by the parties hereto in writing with respect to a given Seconded Employee, Seconding Party shall cause each Seconded Employee to devote such time and attention to the Company as would reasonably be expected of a full-time employee occupying the position to be held by the Seconded Employee.

1.2    Removal and Replacement of Seconded Employees.

(a)    <u>Removal by Seconding Party</u>.  The Seconding Party shall not remove any Seconded Employee without cause, unless mutually agreed by the parties.

(b)    <u>Removal by the Company</u>.   The Company shall not terminate the secondment of any Seconded Employee without cause, unless mutually agreed by the parties.  In connection with any such termination, Seconding Party shall have the right to appoint a replacement Seconded Employee to be seconded to the Company, which appointment shall be made in good faith within thirty (30) days of such termination.

(c)    <u>Resignation by Seconded Employee</u>.   In the event that any Seconded Employee terminates his or her employment with Seconding Party, or provides notice of such termination, Seconding Party shall immediately notify the Company and shall have the right to appoint a replacement Seconded Employee to be seconded to the Company, which appointment shall be made in good faith within thirty (30) days of such cessation of employment.

## 2.    COMPENSATION

2.1    Compensation.  Seconding Party shall be responsible for and shall pay each Seconded Employee's salary and all other compensation of such employee.  On a monthly basis,

Exhibit G-2

NOR000156

Seconding Party shall bill the Company for the salary and all the compensation it incurs with respect to each Seconded Employee.

    2.2    Other Expenses. Seconding Party shall bill the Company monthly for the cost of the following employment-related expenses of the Seconded Employees:

    (a)    Benefits. All employee benefits in accordance with Seconding Party's practices and policies then in effect, and the Company shall have no direct liability or responsibility for such payments or obligations whatsoever.

    (b)    Taxes. All employee taxes, employee withholding, trust funds, surcharges, allowances or deductions arising out of or relating to the employment or payment of employee compensation to the Seconded Employees, and the Company shall have no direct liability or responsibility for such payments or obligations whatsoever.

## 3. TERMINATION AND INDEMNIFICATION

    3.1    Term. This Agreement shall remain in effect until the earlier of such time as (i) five (5) years from the date hereof, or (ii) the date of termination or expiration of the Unit Power Purchase Agreement dated as of September 20, 2002, by and between Seconding Party and the Company. This Agreement also may be terminated at such time as the parties hereto may mutually agree.

    3.2    Indemnification.

    (a)    Seconding Party shall defend, indemnify and hold harmless the Company, its assigns, agents, officers and employees, harmless from and against any claims, losses, damages or judgments arising out of, resulting from or relating to any willful misconduct or gross negligence on the part of any Seconded Employee arising out of or relating to their employment with the Company.

    (b)    The Company shall defend, indemnify and hold harmless Seconding Party, its assigns, agents, officers and employees, from and against any liability to any third party caused by or relating to acts, errors or omissions of Seconded Employees in the course of performing their duties for the Company, including the operation of the Milltown Dam.

Exhibit G-3

NOR000157

4.    **ADMINISTRATIVE SERVICES**

Seconding Party shall at no cost to Company provide to Company certain administrative support services from and after the Closing, as reasonably requested by Company in connection with the administration and management of the Excluded Assets and the Excluded Liabilities, as such terms are defined in the Transfer Agreement, including without limitation, the engagement and coordination of counsel and other outside consultants.

5.    **MISCELLANEOUS**

5.1    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

5.2    Entire Agreement.    This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof, and this Agreement contains the sole and entire agreement among the parties with respect to the matters covered hereby.  This Agreement shall not be altered or amended except by an instrument in writing signed by or on behalf of the party entitled to the benefit of the provision against whom enforcement is sought.

5.3    Governing Law.  The validity and effect of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to principle of conflicts of laws.

5.4    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, legal representatives, successors and assigns.

5.5    Partial Invalidity and Severability.  All rights and restrictions contained herein may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws and are intended to be limited to the extent necessary to render this Agreement legal, valid and enforceable.  If any term of this Agreement, or part thereof, not essential to the commercial purpose of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining terms hereof, or part thereof shall constitute their agreement with respect to the subject matter hereof and all such remaining terms, or parts thereof, shall remain in full force and effect.  To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision which will implement the commercial purpose of the illegal, invalid or unenforceable provision.

5.6    Waiver.  Any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof, but only if such waiver is evidenced by a writing signed by such party.  No failure on the part of any party hereto to exercise, and no delay

NOR000158

in exercising any right, power or remedy created hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver by any party hereto to any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.

     5.7    Headings. The headings of particular provisions of this Agreement are inserted for convenience only and shall not be construed as a part of this Agreement or serve as a limitation or expansion on the scope of any term or provision of this Agreement.

     5.8    Number and Gender. Where the context requires, the use of the singular form herein shall include the plural, the use of the plural shall include the singular, and the use of any gender shall include any and all genders.

     5.9    Time of Performance. Time is of the essence in the performance of this Agreement.

     5.10   No Third Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

**[SIGNATURES TO THIS SECONDMENT AGREEMENT ON NEXT PAGE]**

Exhibit G-5

NOR000159

+

**IN WITNESS WHEREOF,** the parties have executed and delivered this Secondment Agreement as of the date first above written.

**COMPANY:**

NORTHWESTERN ENERGY, L.L.C.

By: _____
   Name: _____
   Title: _____

**SECONDING PARTY:**

NORTHWESTERN CORPORATION

By: _____
   Name: _____
   Title: _____

**[SIGNATURE PAGE TO SECONDMENT AGREEMENT]**

Exhibit G-6

APPENDIX A
(TO SECONDMENT AGREEMENT)

SECONDED EMPLOYEES

| **Name** | **Title** | **Employee Number** |
|---|---|---|
| William Scarbrough | Union-Hydro Foreman | P00080675 |
| Scott Doherty | Union-Maintenance | P00011311 |

Exhibit G (Appendix A)-1

<u>EXHIBIT H-1</u>

CLOSING CERTIFICATE (TRANSFEROR)

The undersigned officer of NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company (**"Transferor"**), hereby certifies to NORTHWESTERN CORPORATION, a Delaware corporation (**"Transferee"**), pursuant to the Asset and Stock Transfer Agreement, dated as of November 15, 2002, between Transferor and Transferee (the **"Agreement;"** all capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement) that:

(i)   The undersigned is the duly appointed [_____] of Transferor and is duly authorized to execute and deliver this certificate on behalf of Transferor; and

(ii)   Each of the conditions precedent to the obligations of Transferor set forth in <u>Section 8</u> of the Agreement have been satisfied or properly waived to the satisfaction of Transferor on and as of the date hereof.

November 15, 2002

**"TRANSFEROR"**

NORTHWESTERN ENERGY, L.L.C.,
(a Montana limited liability company)

By:_____
     Name: _____
     Title:  _____

Exhibit H1-1

<u>EXHIBIT H-2</u>

CLOSING CERTIFICATE (TRANSFEREE)

The undersigned officer of NORTHWESTERN CORPORATION, a Delaware corporation ("**Transferee**"), hereby certifies to NORTHWESTERN ENERGY, L.L.C., a Montana limited liability company ("**Transferor**"), pursuant to the Asset and Stock Transfer Agreement, dated as of November 15, 2002, between Transferor and Transferee (the "**Agreement**;" all capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement) that:

(i)    The undersigned is the duly elected [_____] of Transferee and is duly authorized to execute and deliver this certificate on behalf of Transferee; and

(ii)    Each of the conditions precedent to the obligations of Transferee set forth in <u>Section 7</u> of the Agreement have been satisfied properly waived to the satisfaction of Transferee on and as of the date hereof.

November 15, 2002

**"TRANSFEREE"**

NORTHWESTERN CORPORATION,
(a Delaware corporation)

By:_____
    Name: _____
    Title:  _____

Exhibit H2-1

NOR000163

31259-00034
0000132 SFOL
SFRC  r eew  SCK 3

F02306066
07.22.2003

NOR000164