# Exhibit 33

MAGTEN ASSET MANAGEMENT CORP. VS. NORTHWESTERN CORP.

MARY LEWICKI - 5/2/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Co. LLC
TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM



### Page 9

(2) our objection letter, our Rule 45
(3) objection letter dated April 6th?
(4)   **MR. KAPLAN:** We have -- I have.
(5)   **MR. BIALO:** Okay. And you noticed
(6) that in that letter, we have made the
(7) objection that discovery has been stayed
(8) by Judge Fried in the separate action
(9) brought by Magten against Bank of New
(10) York, in the New York County Supreme
(11) Court, and we are giving this deposition
(12) on the subjects that were defined by the
(13) April 25th production letter in the --
(14) which follows on the agreement after
(15) discussion between Ms. Nadritch and
(16) Mr. McCoy.
(17)   **MR. KAPLAN:** That is correct.
(18) **BY MR. KAPLAN:**
(19)   Q.   Ms. Lewicki, what is your current
(20) title at the Bank of New York?
(21)   A.   **I'm the conversion manager for the**
(22) **corporate finance and specialty products groups**
(23) **within corporate trust.**
(24)   Q.   And what do you do as the conversion
(25) manager?

### Page 10

(2)   A.   **I have been responsible for the**
(3) **movement of the issues, the assets, and the**
(4) **cash from the swap between Bank of New York and**
(5) **JPM related to the corporate trust business and**
(6) **the retail business, specifically the corporate**
(7) **trust business.**
(8)   Q.   And how long have you been in that
(9) role?
(10)   A.   **That's one year.**
(11)   Q.   And what was your role before that?
(12)   A.   **I was a control officer for the**
(13) **structured finance group within corporate**
(14) **trust.**
(15)   Q.   And how long were you in that role?
(16)   A.   **Approximately two years.**
(17)   Q.   So from -- just to put context, from
(18) 2004 to '06 or --
(19)   A.   **Probably mid 2004 through**
(20) **March 2006.**
(21)   Q.   And prior to that?
(22)   A.   **I was a -- I was a training officer**
(23) **for the corporate trust group.**
(24)   Q.   And when was that?
(25)   A.   **That started October, November 2003**

### Page 11

(2) **until I transferred over to the control officer**
(3) **position.**
(4)   Q.   And prior to October 2003?
(5)   A.   **I was a team leader in the corporate**
(6) **finance group and team leader relationship**
(7) **manager.**
(8)   Q.   And when? When were you the team
(9) leader?
(10)   A.   **I can't tell you exact dates when it**
(11) **began. It was two or three years.**
(12)   Q.   Two or three -- 2001 approximately?
(13)   A.   **Yes, yes.**
(14)   Q.   So for the period of 2001 and 2002,
(15) you were the team leader?
(16)   A.   **Yes.**
(17)   Q.   And what were your -- what was your
(18) responsibilities as the team leader?
(19)   A.   **As a team leader, I managed a group**
(20) **of approximately 12 people that were other**
(21) **relationship managers and trust associates, and**
(22) **just the general day-to-day administration of**
(23) **their accounts and projects processes within**
(24) **the bank.**
(25)   Q.   So did you -- so you oversaw the --



### Page 12

(2) well, just if you could --
(3)   A.   **Well, like a -- well, like a team**
(4) **leader is an interim step between -- you have a**
(5) **business manager, and you have a team leader.**
(6) **So you are not officially the manager, but you**
(7) **are taking on a lot of the management**
(8) **functionalities.**
(9)   Q.   Are there several different team
(10) leaders?
(11)   A.   **At the time I was in corporate**
(12) **finance, there were three.**
(13)   Q.   Were you the team leader responsible
(14) for the QUIPS, Quarterly Income Preferred
(15) Securities, that were issued by Montana Power?
(16)   A.   **I was the team leader and**
(17) **relationship manager.**
(18)   Q.   Okay. And what was your role as
(19) relationship manager?
(20)   A.   **I -- I was a -- as trustee, our role**
(21) **was to support the requirements under the**
(22) **governing documents, receipt of cash for debt**
(23) **service, or any other instances where it might**
(24) **be payment to bondholders. Confirmation that**
(25) **compliance documentation required under the**



### Page 13

agreement is received by us. Communications with bondholder of requests, some general -- typically, general requests from bondholders. Preparation of any notices, if that was a requirement.

Q. And were there multiple relationship managers for each issuance, or was there just one?

A. For the QUIPS issuance?

Q. For the QUIPS issuance.

A. There was only one issuance of debt for that.

Q. And why was there only one relationship -- were you the sole relationship manager for that issuance?

A. In 2003 or 2002, yes.

Q. Okay. Who did you report to?

A. My business group manager. At that time, it was Doug Macinnes, M-A-C-I-N-N-E-S.

Q. Were there others that reported to you in connection -- solely in connection -- I'm just focusing now on the QUIPS. Were there others who reported to you or were you solely responsible?

### Page 14

A. On the QUIPS, I had -- I had a trust associate that supported me.

Q. And who was that?

A. Jeremy Finkelstein. F-I-N-K-E-L-S-T-E-I-N, I think.



Q. Just some general questions about role of a trustee. When you are the trustee for a bond issuance, do you generally review the financial statements issued by the issuer?

A. No, we do not.

Q. Were there ever circumstances in which you review the financial statements of the issuer?

A. No, we do not. It's not a requirement under the governing documents.

Q. If -- do you receive -- are there occasions when you are the trustee, that you would receive financial statements from the company?

A. Typically, under a QUIPS Indenture, it's one of the requirements that they provide us with their financial statements.

Q. And what do you do when you receive those financial statements?

### Page 15

A. We make sure that they are the financial statements that are identified in the governing docs, typically 10Ks, 10Qs. Acknowledge that receipt by marking our tickler system. That's a system we use to monitor the receipt of compliance items and various actions we need to take, and then file into our file room.

Q. So you take it, you file it, but nobody actually reads them? Is that fair to say?

A. It's not -- it's not a trustee requirement under the document to read those.

Q. I'm going to show you a document and see if you can help me with it.

MR. BIALO: Is the document that you are about to show the witness marked "Confidential"?

MR. KAPLAN: It is.

MR. BIALO: I believe in connection with the production of documents, an e-mail was sent by Ms. Nadritch asking if people were willing to subscribe to the confidentiality agreement that prevails in

### Page 16

your case or cases with the appropriate changes to take account of the fact that these documents were being turned over by Bank of New York.

To my understanding, we have gotten a response from one party to the litigation. That's NorthWestern Corporation that said that they were willing to comply with the requests, and to treat documents that we have marked "Confidential" as confidential in accordance with the prevailing order in the litigations.

I have not heard from the two of you, and so if you could say whether you subscribe and who you represent, then we won't have any trouble showing confidential documents, such as the case may be.

MS. KRAFT: My name is Denise Kraft. I represent Mr. Hanson and Mr. Kindt. On behalf of Mr. Hanson and Mr. Kindt, we will undertake the proper undertaking as requested in your e-mail and hold the



Page 57

(2) opinion as to whether the covenants and
(3) conditions of the Indenture have been complied
(4) with"?
(5)   A.   Right. It starts up on the -- from
(6) the fourth line up?
(7)   Q.   Yes.
(8)   A.   Yes, that he has made a -- yes.
(9)   Q.   Is that language standard in
(10) Officer's Certificates?
(11)   A.   You would have to go back to the
(12) governing document that con -- that usually
(13) tells you what an Officer's Certificate has to
(14) state, and it can be different from indenture
(15) to indenture, but you would track this back
(16) to...
(17)   Q.   And did you -- in executing the
(18) Third Supplemental Indenture, did you rely upon
(19) this Officer's Certificate?
(20)   A.   Yes, we did.
(21)   Q.   Did you rely upon the truth of the
(22) statements in this Officer's Certificate?
(23)   A.   Yes, we did.
(24)   Q.   If you knew at the time that this
(25) Officer's Certificate was false, would you

Page 58

(2) nevertheless execute the Third Supplemental
(3) Indenture?
(4)   A.   Again, as a trustee, I am not going
(5) to know if there is a false statement unless I
(6) have received something in writing from someone
(7) notifying me that there is a false statement.
(8) I am relying on this pursuant to the agreement
(9) because it meets the terms of the agreement as
(10) being a truthful Officer's Certificate.
(11)   Q.   And I understand that, but what I'm
(12) asking is in a circumstance where you
(13) actually -- I understand that ordinarily you
(14) wouldn't know, and I'm not suggesting that you
(15) should or shouldn't know. All I'm saying is,
(16) if you actually did know that it was false?
(17)   A.   If I had actual knowledge, somebody
(18) in writing, I -- this would have been escalated
(19) again to management and to counsel to determine
(20) what the next steps would be.
(21)   Q.   At the -- do you recall whether at
(22) the time that you received this Officer's
(23) Certificate, you had any reason to believe that
(24) the statements contained in the certificate
(25) were false?

Page 59

(2)   A.   I don't have memory of the time that
(3) this Officer's Certificate came in. I don't
(4) remember the situation around the entire
(5) transaction.
(6)   Q.   Does Bank of New York ever conduct
(7) its own examination or investigation of the
(8) facts that are expressed in the Officer's
(9) Certificate?
(10)   A.   Again, we rely on the terms of the
(11) Officer's Certificate pursuant to the
(12) indenture, which allows us to rely on an
(13) Officer's Certificate and/or an opinion of
(14) counsel.
(15)   Q.   Do you recall why the Third
(16) Supplemental Indenture was executed?
(17)   A.   I mean I recall, if I can go back to
(18) the form of the Third Supplemental Indenture,
(19) it was for the NorthWestern Corporation to
(20) assume the duties and rights under the
(21) indenture from NorthWestern Energy LLC, which
(22) is one of their subsidiaries.
(23)   Q.   Do you recall whether -- under the
(24) indenture if NorthWestern assumed the
(25) obligations, whether Clark Fork would therefore

Page 60

(2) be released from its obligations?
(3)   MR. BIALO:   Objection to the form.
(4)   A.   I would have to go back and look at
(5) the actual governing document, the base
(6) indenture, to see what the terms and what the
(7) parties were to that indenture.
(8)   But to my knowledge, Clark Fork was
(9) not -- was not a party to the QUIPS Indenture.
(10)   Q.   And when I say Clark Fork, it was
(11) formerly known as NorthWestern Energy LLC. It
(12) changed its name to Clark Fork at some point.
(13)   A.   Okay.
(14)   Q.   I apologize if I confused you with
(15) Clark Fork.
(16)   MR. BIALO:   Maybe you want to state
(17) the question in a clearer way so that the
(18) witness can give you a clearer answer.
(19)   MR. KAPLAN:   Could you remind me of
(20) my question?
(21)   (Record read.)
(22)   Q.   Do you recall whether the Indenture
(23) provides that upon NorthWestern assuming the
(24) obligations for the QUIPS, that NorthWestern
(25) Energy LLC would be released from its

