# Exhibit 34

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2

   Civil Action No. C.A. No. 04-1494 (JJF)

3

   MAGTEN ASSET MANAGEMENT CORPORATION and

4  LAW DEBENTURE TRUST COMPANY OF NEW YORK,

5  Plaintiffs,

6  v.

7  NORTHWESTERN CORPORATION,

8  Defendant.

9  ------------------------------------------------

10 Civil Action No. C.A. No. 05-499 (JJF)

11 MAGTEN ASSET MANAGEMENT CORP.,

12 Plaintiff,

13 v.

14 MICHAEL J. HANSON and ERNIE J. KINDT,

15 Defendants.

16 ------------------------------------------------

17              DEPOSITION OF

18            MICHAEL J. HANSON

19 ------------------------------------------------

20

21

22

23

24

25 TAKEN ON:  6/27/2007          BY:  DANA ANDERSON



Page 14

1    Q.    At the time you signed those
2    officer's certificates, did you review the
3    indenture?
4    A.    I reviewed portions of the
5    indenture, not necessarily the whole
6    document.
7    Q.    So you may have seen portions
8    of a -- excerpted portions of an indenture
9    that was identified to you as relating to
10   the QUIPS?
11   A.    Just to be clear, I don't have
12   a recollection of specifically signing
13   officer's certificates related to the QUIPS.
14   But I do and have at times signed officer's
15   certificates, and when I did, I would review
16   those portions of the indenture documents to
17   make sure that I understood what I was
18   certifying to.
19   Q.    Okay.  We'll get to that then.
20         Let's talk about the business
21   structure of NorthWestern and the manner in
22   which the QUIPS were held just so that as
23   the deposition's going on, you and I can
24   talk about the same thing.
25         Now, at the time that

Page 15

1    NorthWestern was in the process of
2    acquiring the Montana Power Company assets
3    it submitted an application to the Montana
4    Public Service Commission, correct?
5    MS. DELANEY:  Just so the record
6    is clear, Bonnie, I believe the witness has
7    already testified what was acquired was the
8    Montana Power, LLC which had within it assets
9    and liabilities associated with the Montana
10   utility business.
11   THE WITNESS:  If we might describe
12   the acquisition itself, it may clarify so we
13   can move forward.
14   BY MS. STEINGART:
15   Q.    I'm just asking you a specific
16   question about an application to the
17   regulators.  So at the time that
18   the -- that NorthWestern acquired the
19   Montana Power Company, LLC, NorthWestern
20   made an application for permission to do
21   that with the Montana Public Service
22   Commission, correct?
23   A.    Just to be clear, what we
24   acquired was the unit interest or equity
25   ownership of the Montana Power, LLC, the

Page 16

1    assets and liabilities were those of the
2    LLC, we didn't acquire the assets directly,
3    we acquired the unit interest.  And at that
4    time we made an application for approval
5    with the Montana Public Service Commission
6    to acquire the LLC and hold it either as a
7    subsidiary of NorthWestern or a division of
8    NorthWestern.
9          (Deposition Exhibit Number 2
10   marked for identification.)
11   BY MS. STEINGART:
12   Q.    I'd like to show you what we've
13   marked as Hanson 2 and ask you whether you
14   recognize that as a copy of the application
15   with one of the exhibits to that
16   application excerpted on the back.
17   MR. KALECZYC:  Are you
18   representing, Bonnie, that this is not the
19   complete application with all exhibits?
20   MS. STEINGART:  All these exhibits
21   are not exact, only one of the
22   exhibits -- it's a copy of the body of the
23   application with a single exhibit in the
24   interest of not deforesting America because
25   that was the one exhibit we were interested

Page 17

1    in.
2          THE WITNESS:  It does appear to be
3    a copy of the application, there are some
4    number of attachments here, couple of
5    verification statements and then two
6    organizational charts.
7    BY MS. STEINGART:
8    Q.    These were -- so this was a
9    joint application by both NorthWestern and
10   the Montana Power Company, correct?
11   A.    Yes, it was.
12   Q.    And the charts that we have
13   attached were identified in the application
14   as Exhibit Number 7, correct?
15   A.    I don't recall that
16   specifically, it's labeled Exhibit 7 here.
17   Q.    Right.  So what I was -- wanted
18   to do was to walk through what the
19   structure was before and after.  Now, is
20   the document that's the first page of
21   Exhibit 7, and that's NOR 44694, a
22   depiction of the corporate structure before
23   that acquisition occurred?
24   A.    I don't believe so.  And the
25   reason it has a box on the right that shows

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 22

1 (indicating), off of what you have here.
2 So that to the extent that NorthWestern had
3 options about how to hold the company after
4 this acquisition, you could tell me which
5 option or which structure they
6 determined to have.
7     MR. KALECZYC:  You are not asking
8 the witness to testify about the accuracy of
9 the rest of the chart as it's depicted?
10     MS. STEINGART:  Well, the rest of
11 the chart is a copy of the chart that's here.
12 BY MS. STEINGART:
13     Q.    I'm not asking you to compare
14 it box for box.  It's a copy of the chart
15 that is listed in the Hanson Exhibit 2
16 except for the Montana Power, LLC.
17     A.    To get to your question, the
18 chart and the one you copied it from, each
19 of the boxes are not separate corporations.
20 There is a mixture here of corporations and
21 divisions.  But with that said, your
22 question is:  How was NorthWestern Energy,
23 LLC formerly Montana Power held?  It was a
24 direct subsidiary of NorthWestern
25 Corporation upon closing.

Page 23

1     Q.    So on February 15th Montana
2 Power, LLC with that name was a direct sub
3 of NorthWestern Corporation?
4     A.    That's correct.
5     Q.    So there would just be a
6 straight line.  Could you depict that in
7 whatever place you think it belongs?  Do
8 you have a pen?  I can give you the
9 streams.
10     A.    You can draw the line any
11 direction you like as long as it connects
12 directly to this line below NorthWestern
13 Corporation.
14     Q.    Could you draw a line that you
15 think is correct?
16     A.    I can draw a line.  Where
17 you've positioned it on the page it doesn't
18 make it easy to --
19     Q.    You can cross the line.
20     A.    Okay.
21     Q.    It's in here, it's not like the
22 Ghostbuster's thing where you can't cross
23 the streams.
24     A.    (Complies.)  Okay.  It's
25 understood that crossing the line has no
  meaning.

Page 24

1     Q.    Right.
2     A.    I do something like that.  I've
3 just drawn a line directly from that box to
4 the line below NorthWestern Corporation.
5     Q.    We'll mark something without
6 the line as 3 and we'll mark this as 3-A,
7 okay?  So I'm marking this as 3-A.
8     (Deposition Exhibit Number 3-A
9 marked for identification.)
10 BY MS. STEINGART:
11     Q.    So we'll have both as
12 deposition exhibits.
13     Now, during the period from
14 February 15th and before November 2002 when
15 the going-flat transaction occurred, did
16 that structure by which NorthWestern held
17 the Montana Power, LLC change, the
18 structure you've depicted here
19 (indicating)?
20     A.    Between the time of closing and
21 the transaction in November, to my
22 recollection today, the legal structure did
23 not change.  The management structure did,
24 but the legal structure did not, other than
25 changing the name to NorthWestern Energy,

Page 25

1 LLC that I recall.
2     Q.    One of the things that changed
3 is between February 15, 2002 and November
4 of 2002, the name was changed from Montana
5 Power, LLC to NorthWestern Energy, LLC?
6     A.    That's right.
7     Q.    When you say that the structure
8 didn't change but management changed, can
9 you describe that to me?
10     A.    Yes.  The chart that you have,
11 again, is depicting a legal ownership
12 structure of sorts, although I'd point out
13 that NorthWestern Public Service at no time
14 was a separate subsidiary of NorthWestern
15 Corporation, it was always a division of and
16 part of the same corporation.
17     Q.    Right.  I would just note that
18 the box here says "division."
19     A.    That's correct.  The management
20 structure, looking at that chart, as myself
21 as the president and CEO of NorthWestern
22 Public Service Division, the box next to it,
23 NorthWestern Services Group, and then CEO
24 initially but not president of then the
25 Montana Power, LLC.  Over time the

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 26

```
 1   then-president Jack Haffey retired as did a
 2   number of other executives of the Montana
 3   Power, LLC and we integrated the management
 4   between the Montana utility and the South
 5   Dakota/Nebraska utility.
 6        Q.   So from a management point of
 7   view, would we know, looking at the chart
 8   that's, let's say 3, the chart without the
 9   line, from a management point of view,
10   would there be a line from Montana Energy,
11   LLC to NorthWestern Public Service?
12        MR. KALECZYC:  Objection to vague.
13        THE WITNESS:  Not in a sense of
14   one reporting to.  The easiest way that I know
15   of to describe that is that everything to the
16   right, NorthWestern Services Group,
17   NorthWestern Public Service and the -- excuse
18   me, NorthWestern Energy, LLC over time as
19   retirements went the senior executives in
20   charge of that group managed all of those
21   utility properties.
22   BY MS. STEINGART:
23        Q.   So they managed those utility
24   properties as if they were all in one box,
25   more or less, there wasn't a hierarchy?
```

Page 27

```
 1        MS. DELANEY:  Objection.
 2        THE WITNESS:  I'm not sure what
 3   you mean by "hierarchy."  What I was trying to
 4   say is upon closing we had a complete
 5   complement of senior management at the Montana
 6   utility, Jack Haffey and several others, I was
 7   named CEO, we had a president, quite a number
 8   of them chose to retire at different stages
 9   along the way.  So between the closing and
10   November of 2002 as they retired, we would
11   combine the management responsibilities with
12   their counterparts in South Dakota or in
13   reverse where we named someone in charge of a
14   function in Montana would then assume that
15   responsibility across the other two states as
16   well, we integrated the management.  I don't
17   know any other more accurate way to describe
18   that.
19   BY MS. STEINGART:
20        Q.   So at no point between
21   February of 2002 and November of -- when
22   the going-flat transaction occurred, was
23   there any intermediate holding company
24   structure between NorthWestern Corp and
25   NorthWestern Energy, LLC?
```

Page 28

```
 1        A.   That's right.
 2        Q.   Though in terms of management
 3   and reporting, NorthWestern Energy, LLC was
 4   managed and reported through NorthWestern
 5   Services Group?
 6        MS. DELANEY:  Objection.
 7        THE WITNESS:  No.  NorthWestern
 8   Services Group is the consolidation of what at
 9   one time were separate non-utility
10   subsidiaries in the Midwest area,
11   communications, natural gas, marketing
12   function and appliance repair and the like.
13   They were at one time separate subsidiaries of
14   NorthWestern, they were combined of what was
15   called NorthWestern Services Group.  I had the
16   executive management responsibility of that,
17   all though each one of those segments had its
18   own CEO if you will.  Of the utility
19   NorthWestern Public Service upon closing we
20   had separate management other than myself, and
21   over the course of time as each change was
22   made, we had integrated management sometime
23   over the year follow closing.
24   BY MS. STEINGART:
25        Q.   So if I understand it,
```

Page 29

```
 1   NorthWestern Energy, LLC was managed and
 2   reported through NorthWestern Public
 3   Service Company to --
 4        A.   They were managed by the same
 5   people reporting to NorthWestern
 6   Corporation, the owner.
 7        Q.   All right.
 8        (Deposition Exhibit Number 4
 9   marked for identification.)
10   BY MS. STEINGART:
11        Q.   I'd like to show you what we've
12   marked as Hanson 4.
13        A.   (Reviews document.)
14        Q.   Sir, do you recognize Hanson 4
15   to be the minutes of the initial meeting of
16   the board of directors of NorthWest Energy
17   held April 2, 2002?
18        A.   Yes.
19        Q.   And you were present at that
20   meeting?
21        A.   Yes.
22        Q.   And you presented a proposed
23   slate of officers for NorthWest Energy,
24   correct?
25        A.   Yes.
```

8 (Pages 26 to 29)



Page 30

1    Q.    Then there was a discussion, if
2  you look at page 2 with me, it indicates
3  that you provided an executive summary, a
4  NorthWestern strategy update reviewing
5  specifically the 2002 strategic imperatives
6  and an overview of the integration of the
7  NorthWestern, LLC operations.
8          Do you see that?
9    A.    Yes.
10    Q.    So did NorthWestern Public
11  Services Group from a management
12  perspective oversee and review the
13  operations of NorthWestern Energy, LLC?
14          MR. KALECZYC:  Objection.
15          THE WITNESS:  I'm sorry, I don't
16  follow your reference to NorthWestern Public
17  Services Group.
18  BY MS. STEINGART:
19    Q.    I'm sorry.  Strike that.
20          Did NorthWestern Energy oversee
21  from a management perspective oversee and
22  manage the operations of NorthWestern
23  Energy, LLC?
24    A.    I'm not sure I follow the
25  question.  If the question was there some

Page 31

1  kind of a subordination role between
2  NorthWestern Energy, LLC which was the
3  former Montana Power, LLC and the utility
4  formerly called NorthWestern Public Service
5  Division of NorthWestern, the answer is no.
6          All this is describing is, as I
7  said, we had lost through retirements a
8  series of the senior executives and in April
9  of 2002, we had decided to manage both
10  utilities if you will, Montana and the
11  former South Dakota, Nebraska with a single
12  slate of officers and an internal board,
13  they didn't have separate corporations and
14  therefore separate board of directors but an
15  internal management board as a tool and
16  technique to oversee those operations.  It
17  does not describe the legal ownership
18  structure.
19    Q.    Now, in addition to having a
20  position or a status in NorthWest Energy
21  that we've just reviewed in these minutes,
22  did you have a position or designation in
23  NorthWestern Energy, LLC?
24          MR. KALECZYC:  Objection,
25  timeframe.

Page 32

1          THE WITNESS:  Upon closing of the
2  purchase of the Montana Power, LLC, I was CEO
3  of both.
4  BY MS. STEINGART:
5    Q.    Now, in addition to the
6  positions that you've had in NorthWest
7  Energy, you also had a title and a position
8  with respect to the NorthWestern Services
9  Group, correct?
10          MR. KALECZYC:  Objection.
11          THE WITNESS:  For a period of time
12  I did until that was eventually restructured
13  as well.
14  BY MS. STEINGART:
15    Q.    And with respect to
16  NorthWestern Corporation there are
17  documents that refer to you as a partner
18  entity CEO.  Are you familiar with that
19  term?
20    A.    Yes.
21    Q.    And what does that mean?
22    A.    It is a reference that
23  NorthWestern used to its business lines,
24  some of those were subsidiaries, some
25  were -- in the case of utility, a division

Page 33

1  of.  But the major business lines were
2  considered to be the utility operations what
3  eventually was called Expanets, Blue Dot and
4  CornerStone and the CEOs of each those
5  business lines were referred to as partner
6  entity CEOs.
7    Q.    And the employment agreement
8  that you had with -- was with NorthWestern
9  Corporation, correct?
10    A.    Yes.
11    Q.    It's that employment agreement
12  that -- through which you received your
13  designations and titles and compensation,
14  correct?
15    A.    I believe that's right.  The
16  titles would be presented and approved by
17  the board and I don't know that at all times
18  the agreement was updated to conform to the
19  title given to me by the board, but
20  generally speaking, that's correct.
21    Q.    So as time went on, you may
22  have gotten some more titles or
23  designations that weren't reflected
24  actually in the employment agreement?
25    A.    There may have been times where

9 (Pages 30 to 33)

Page 38

1  2002, were those requests made of
2  Mr. Hylland and Mr. Lewis?
3      A.    I don't want to get tripped up
4  on terminology. I can recall jointly with
5  Mr. Jacobsen asking them to consider a -- an
6  alternative compensation approach or
7  program, if you will. But I don't recall
8  any time what I would consider just
9  discretionary compensation where based upon
10  their position or authority they could just
11  award a sum to someone, that just was not a
12  practice that we had at NorthWestern.
13      Q.    Would it surprise you to learn
14  that it was Mr. Drook's understanding as
15  far as your compensation was concerned the
16  comp committee of the board looked to
17  Mr. Lewis and Mr. Hylland with respect to
18  their views?
19          MS. DELANEY: Objection.
20          THE WITNESS: I can't speak
21  to -- first of all, I don't know if Mr. Drook
22  was on what they call comp committee. I
23  remember him at one time being the chairman of
24  the governance committee, but -- assuming that
25  he was. I can't speak to who or what they

Page 39

1  relied on in their judgment, I wouldn't know.
2  BY MS. STEINGART:
3      Q.    Getting back to the activities
4  that you engaged in with respect to
5  NorthWestern Corporation, during the year
6  you attended meetings with Mr. Lewis and
7  Mr. Hylland?
8      A.    Yes.
9          MS. DELANEY: Do we have a
10  timeframe?
11          MS. STEINGART: During 2001 and
12  2002.
13  BY MS. STEINGART:
14      Q.    In addition to having meetings
15  with Mr. Lewis and Mr. Hylland, from time
16  to time you attended board meetings of the
17  NorthWestern board?
18      A.    Generally speaking, from time
19  to time I would attend parts of board
20  meetings.
21      Q.    In addition to that there were
22  meetings -- there were operations meetings
23  that occurred on a periodic basis with
24  respect to the NorthWestern Energy
25  businesses?

Page 40

1      A.    Yes.
2      Q.    Who attended the monthly
3  operation meetings of the NorthWestern
4  Energy businesses?
5      A.    If I'm following the label that
6  you are giving to those, it would be this
7  (indicating) internal management board
8  referenced in Exhibit Hanson 4 and most of
9  the officers of NorthWestern Energy,
10  although they may not have attended each one
11  if they didn't have some item on the agenda
12  related to their scope of authority.
13      Q.    So those persons that you
14  referenced would be Merle Lewis?
15      A.    Again, generally I don't know
16  that Merle attended every one, but
17  Merle Lewis, Dick Hylland, myself,
18  Dan Newell, Eric Jacobsen, Kipp Orme as the
19  internal board, and then the officers listed
20  here or some combination of them.
21      Q.    And "listed here" refers to
22  Exhibit 4.
23          And in addition to you received
24  periodic reports called management
25  financial information reports, correct,

Page 41

1  during 2002?
2      A.    Yes.
3      Q.    Also the end of 2001, correct?
4      A.    I don't know when those reports
5  began, but subject to verifying that it was
6  in 2001, most likely, yes.
7          MS. STEINGART: For the
8  convenience of counsel we've created another
9  binder. Do they have their binders?
10          MR. KIMBALL: Yes.
11          MS. STEINGART: I'm going to show
12  you another binder called the management
13  financial information report binder so this
14  way you have -- and we've put in there -- and
15  just -- there is one for the witness here
16  so -- just for reference during the
17  deposition, we've put in the MFIRs that are
18  dated December 2001 through November 2002.
19  BY MS. STEINGART:
20      Q.    So would you agree with me,
21  sir, looking at the binder that we've
22  placed before you that at least for the
23  period December 2001 though November 2002
24  there was periodic management financial
25  information reports that were distributed

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 42

1  to the partner entity CEOs among others?
2      MR. KALECZYC:  Could you read back
3  the question for me, please?
4      (Whereupon, the court reporter
5  read back the previous question.)
6      THE WITNESS:  I'm not sure I know
7  the full distribution list.  But if your
8  question is did I receive these reports at
9  least for this period of time, the answer is
10  yes, I did.
11  BY MS. STEINGART:
12      Q.    Thank you.  In addition to
13  those reports, there were monthly meetings
14  of a group called the executive/staff of
15  NorthWestern, correct?
16      A.    Yes.
17      (Deposition Exhibit Number 5
18  marked for identification.)
19  BY MS. STEINGART:
20      Q.    Sir, I've placed before you
21  what we've marked as Hanson Exhibit 5.  Do
22  you recognize that to be a calendar for
23  2002 with respect to management financial
24  and information report meeting?
25      A.    (Reviews document.)  That's

Page 44

1  believe I attended those, Kipp Orme would host
2  them, Dick Hylland I think attended many, if
3  not most, but Dave Monaghan who was the
4  controller of the utility.  And the purpose of
5  that was to work on the financial information
6  that was eventually included in these reports
7  which were circulated to the partner entity
8  CEOs.
9      Again, as I said, I don't know the
10  full distribution list.
11  BY MS. STEINGART:
12      Q.    And the financial information
13  and other business issues that were current
14  at the businesses were discussed at the NOR
15  staff executive meeting?
16      A.    I think you may be -- there is
17  a third set of meetings -- whether you are
18  confusing or just confusing me with the
19  references that -- the NOR staff meeting,
20  Merle's staff focused on NorthWestern
21  business.
22      And again, for the most part,
23  there was not a lot of discussion about
24  the --in fact, I don't think the other
25  partner entity CEOs routinely attended

Page 43

1  what it purports to be.  I don't recall
2  seeing such a calendar, but that's what it
3  purports to be.
4      Q.    Do you see the first bullet
5  point where it says "11th floor NOR
6  boardroom immediately following the NOR
7  staff/executive meeting"?
8      A.    Yes.
9      Q.    So did -- when these meetings
10  occurred, were there staff/executive
11  meetings then followed by meetings where
12  the, if you'll excuse my reference to
13  MFIRs, were discussed?
14      MS. DELANEY:  Objection.
15      THE WITNESS:  As best I recall
16  there was a staff meeting or executive meeting
17  that I would attend that was Merle Lewis,
18  Dick Hylland, the corporate officers and we
19  would have periodic staff meetings.  Following
20  that, the financial reporting personnel would
21  attend a meeting to discuss the preparation of
22  these financial information reports that you
23  are calling MFIRs.
24      For the most part, subject to
25  going back and looking at that, I don't

Page 45

1  those.
2      So there wasn't a lot of
3  discussion about business issues or
4  developments or whatever that was going on
5  in their businesses.  They, like
6  NorthWestern Energy, had their own version
7  of an operations meeting where we would go
8  through those details with our internal
9  board, but I was not on those and didn't
10  attend them.  We had a -- some frequency,
11  I'm not certain exactly how much, but I
12  believe quarterly there was what was called
13  a partner entity CEO meeting where Merle,
14  Dick, myself and the other partner entity
15  CEOs, couple of the other corporate officers
16  would get together and just discuss
17  generally the businesses.
18      Q.    The quarterly meetings that you
19  referenced, were there minutes kept at
20  those meetings?
21      A.    I don't recall if there was.
22      (Deposition Exhibit Number 6
23  marked for identification.)
24  BY MS. STEINGART:
25      Q.    I'd like to show you what we've

12 (Pages 42 to 45)

Page 62

1   business that was being acquired by
2   NorthWestern would be exposed to risks
3   presented by the non-utility businesses
4   being run by NorthWestern?
5       MS. DELANEY: At what time?
6       MS. STEINGART: Would you read the
7   question back.
8       (Whereupon, the previous question
9   was read back by the court reporter.)
10      MR. KALECZYC: Objection,
11  timeframe.
12      THE WITNESS: My understanding is
13  that their standard for review is to determine
14  whether or not the utility in Montana would
15  remain a fit and able provider of utility
16  service after the transaction was completed.
17  There were lots of questions asked by
18  intervening parties and commissioners at the
19  hearing, I don't recall without looking at the
20  transcript to what extent they inquired about
21  non-utility businesses.
22  BY MS. STEINGART:
23      Q.   Now, was the Montana Public
24  Service Commission concerned that there
25  would be increased capital costs for the

Page 63

1   utilities because of the risks that the
2   non-regulated businesses posed to the
3   financial condition of NorthWest?
4       MS. DELANEY: Objection.
5       MR. KALECZYC: Objection.
6       THE WITNESS: I apologize, but I
7   do not recall that question. The transcripts
8   will tell you the questions and responses.
9       But again, they were trying to
10  establish to their satisfaction whether they
11  believed that the utility would remain a fit
12  and able provider after closing and ask a lot
13  of questions about the management, about all
14  sorts of things. I do not recall that
15  particular question.
16  BY MS. STEINGART:
17      Q.   Wasn't the Montana Public
18  Service Commission concerned that the
19  stability of the utility businesses should
20  not be adversely affected by the risks
21  presented by NorthWestern's non-regulated
22  businesses?
23      MS. DELANEY: Objection.
24      MR. KALECZYC: Objection.
25      THE WITNESS: I can't speak to

Page 64

1   their concerns, only my recollection of what
2   their scope of inquiry is and, again, they
3   asked lots of questions. Now, you infer from
4   that a concern, I don't know that.
5   BY MS. STEINGART:
6       Q.   Was it important to the Montana
7   Public Service Commission that the
8   utilities' cost of capital not be increased
9   by the risks that the non-regulated
10  businesses posed to NorthWestern's
11  financial condition?
12      MS. DELANEY: Objection.
13      MR. KALECZYC: Objection.
14      THE WITNESS: I have no way of
15  knowing if that issue was of importance to
16  them or not.
17      What I know is that -- what their
18  stated inquiry was because that was clear. On
19  the onset of the application of the hearing,
20  they asked through discovery, on the stand
21  many, many questions and approved the
22  application.
23      What importance they gave to one
24  issue or the other, I can't speak to that. I
25  don't know.

Page 65

1   BY MS. STEINGART:
2       Q.   So when you told the
3   commissioners that NorthWestern had the
4   managerial and financial capability to
5   acquire MPC, you did not believe that you
6   were telling them that the stability of the
7   utilities would not be threatened by
8   NorthWestern's non-regulated businesses?
9       MR. KALECZYC: Objection.
10      MS. DELANEY: Objection.
11      MR. KALECZYC: The pre-file
12  testimony speaks for itself.
13      MS. STEINGART: I'm asking him
14  what he believed he was telling them.
15      THE WITNESS: I absolutely
16  believed at the time we had both the
17  managerial capability and the financial
18  capability to complete the transaction and
19  operate the utility as a fit and able provider
20  after closing.
21  BY MS. STEINGART:
22      Q.   So you --
23      A.   In connection with that, I
24  didn't have any knowledge or belief that
25  there were the threats that you are

17 (Pages 62 to 65)

Page 110

```
 1    question the transaction was accretive to
 2    earnings and cash flow and therefore
 3    strengthened the financial profile of the
 4    company.
 5    BY MS. STEINGART:
 6        Q.   Do you understand now as you
 7    look at this that that transaction, that
 8    the common thread that you referred to in
 9    those offerings were giving pro forma
10    effect to the acquisition of Montana Power?
11            MR. KALECZYC:  Objection.
12            MS. DELANEY:  Objection.
13            THE WITNESS:  I think that's a
14    truism.
15    BY MS. STEINGART:
16        Q.    The paragraph goes on to say
17    that NOR's retention of an investment grade
18    rating during this period, dash, absolutely
19    crucial to future liquidity, dash, was
20    entirely dependent on the pro forma utility
21    operations.
22            Do you see that?
23        A.    I see the reference.
24        Q.    Did you tell the Montana Public
25    Service Commission that the credit ratings
```

Page 111

```
 1    that NorthWestern had at the time it made
 2    its application and that you gave its
 3    testimony -- strike that.
 4            Did you tell the Montana Public
 5    Service Commission that NorthWestern's
 6    credit ratings that existed at the time you
 7    gave your testimony in January was
 8    dependent on the pro forma utility
 9    operations?
10            MR. KALECZYC:  Objection.
11            THE WITNESS:  Candidly, this
12    statement is -- this is overstating it.  Do
13    the credit ratings depend on the financial
14    strength cash flow interest rate coverage
15    ratios?  Of course.  Is it important to
16    strengthen the company to have an accretive
17    transaction, earnings and cash flow?  Of
18    course.  Are they entirely dependent on that?
19    No, I don't believe that to be the case and
20    obviously there is some advocacy going on.
21    The point we are trying to convey was this was
22    very important, took a lot of hard work from
23    people and deserves recognition, very
24    beneficial to our company.
25    BY MS. STEINGART:
```

Page 112

```
 1        Q.    It goes on to say that without
 2    the Montana Power Company transaction, it
 3    is doubtful that these capital transactions
 4    could have been completed.
 5            Do you see that?
 6        A.    I see it.
 7        Q.    Now, that's what you were
 8    telling your superiors in or about March of
 9    2002, correct?
10        A.    It's part of what we were
11    telling them in this memo.
12        Q.    Okay.  If we could go back to
13    the January 28th executive committee
14    minutes.  Sir, could you look at Exhibit 6
15    again?
16            Now, even in January you were
17    aware of the problems that Expanets was
18    having, correct.
19        A.    I was aware that they were
20    having problems, have any knowledge of the
21    details, but they reported a number of times
22    including this that they were having
23    problems and they were working to fix them.
24        Q.    At the meeting that you
25    attended on the 28th, there was an update
```

Page 113

```
 1    given with respect to the Expert system at
 2    Expanets, correct?
 3        A.    This would indicate that, yes.
 4        Q.    And you gave a presentation at
 5    that meeting concerning the
 6    Montana Power Company acquisition, correct?
 7        A.    I did, yes.
 8        Q.    And Mr. Orme gave a
 9    presentation with a financial update,
10    right?
11        A.    Yes, it appears that.
12        Q.    Now, if we look at -- and these
13    are the kinds of updates that occurred
14    throughout the year at these meetings,
15    right?
16        A.    There were updates like that,
17    you know, each of the minutes, you know, I
18    describe the specific ones.
19        Q.    In addition to a finance update
20    by Mr. Orme, right?
21        A.    I'm sorry?
22        Q.    In addition to this finance
23    update -- I'm sorry, I'm looking at the
24    page after your presentation.
25        A.    Mr. Orme gave a finance update,
```

29 (Pages 110 to 113)

**Page 114**

1  yes.
2  Q.  If we could look at that
3  together. Here Mr. Orme talks about the
4  money that was raised in the offerings,
5  doesn't he?
6  MR. KALECZYC: Objection.
7  THE WITNESS:
8  Indicates that -- he's talking about an
9  offering.
10  BY MS. STEINGART:
11  Q.  He's talking about a 100
12  million retail trust preferred that
13  occurred in January?
14  A.  Yes, that's what it says.
15  Q.  That was just two days after
16  your testimony to the Montana Power
17  Commission, correct?
18  A.  I don't remember the dates, but
19  I think it was January, yes.
20  Q.  And it goes on to say "He noted
21  that these preferred offerings are helpful,
22  however, there are still significant cash
23  flow issues affecting NOR."
24  Do you see that?
25  A.  Yes.

**Page 115**

1  Q.  At the end, if you look at the
2  last sentence with me, he reminded everyone
3  that NOR has gone through $175 million of
4  cash during the last quarter.
5  Do you see that?
6  A.  Yes.
7  Q.  55 to Blue Dot, right?
8  A.  That's what it says, yes.
9  Q.  70 to Expanets?
10  A.  Yes.
11  Q.  13 to CornerStone?
12  A.  Yes.
13  Q.  20 to NOR, right?
14  A.  Yes.
15  Q.  And then he says "In essence we
16  are no better off regarding working capital
17  than we were before the $200 million
18  offering."
19  Do you see that?
20  A.  I see it, that's what it says.
21  It doesn't -- look, talking about an
22  offering that was made, monies received, it
23  talks about how they were used in working
24  capital. And, you know, clearly they are
25  looking at having to approve it. But it

**Page 116**

1  doesn't talk about immediacy of the issue or
2  what to do. And you haven't gotten into the
3  rest of 2002, but we, you know, spent a lot
4  of time working to improve the cost
5  structure and therefore cash flow.
6  Q.  He indicates that there are
7  significant cash flow issues affecting NOR.
8  Do you see that?
9  A.  I see the reference, yes.
10  Q.  At or about that time, what did
11  you understand those cash flow issues to
12  be?
13  A.  I understood that these
14  businesses were not meeting their
15  projections. They were using more cash than
16  anticipated. They were providing less than
17  anticipated missing earnings targets and
18  that the management of those businesses said
19  they had the issues in hand, they were
20  working to improve them and this is nothing
21  more than the CFO saying we all need to
22  continue our efforts to improve the cash
23  flow of the company going forward. That was
24  my understanding.
25  Q.  And you understood that they

**Page 117**

1  were not only missing their projections but
2  they were not generating enough cash to
3  cover their operating cash flow, correct?
4  MS. DELANEY: Objection.
5  THE WITNESS: I don't recall ever
6  having that understanding. But what you are
7  talking about is, again, a time-specific, not
8  all businesses are positive cash flow every
9  day or every month. The utility is negative
10  cash flow today. Usually two out of four
11  quarters of the year, seasonal businesses. So
12  did I have the understanding? I do not recall
13  that understanding. Would that necessarily
14  alarm me? No.
15  BY MS. STEINGART:
16  Q.  In fact, that Expanets had
17  negative cash flow for an entire year did
18  not alarm you?
19  MS. DELANEY: Objection.
20  THE WITNESS: In and of itself
21  that does not describe what Expanets was
22  saying it's doing about the problem or how
23  it's going to improve the operations.
24  BY MS. STEINGART:
25  Q.  When Expanets continued to have

30 (Pages 114 to 117)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 118

```
 1   negative cash flow in the first quarter of
 2   2002, did that concern you?
 3             MR. KALECZYC:  Objection.
 4             THE WITNESS:  I don't have any
 5   recollection of being concerned.  I hear what
 6   they reported, their explanations seemed
 7   logical, taking action to improve it, the
 8   reports will speak for themselves.
 9   BY MS. STEINGART:
10        Q.   So in January you knew that
11   these issues existed and you also knew them
12   in March, right?
13             MR. KALECZYC:  Objection.
14   BY MS. STEINGART:
15        Q.   You knew the issues with
16   respect to Expanets and the issues with
17   respect to cash flow existed in March too,
18   didn't you?
19        A.   Are you referring to the memo
20   we just looked at?
21        Q.   Indeed I am.
22        A.   I believe the memo references
23   2001 performance.  And 2001 was completed as
24   of the end of the year.
25        Q.   Let's look again.  We are
```

Page 119

```
 1   reading on page 3, I think.  "The
 2   difficulties...", and I'm looking at that
 3   paragraph after it talks about the
 4   disappointing 2001.  The paragraph goes on
 5   to say "The difficulties encountered in
 6   obtaining a third-party credit facility and
 7   in implementing the Expert software system
 8   required NOR to substantially increase its
 9   cash commitment to Expanets."
10             Do you see that?
11        A.   I see it and it doesn't have a
12   time reference.
13        Q.   So is it your testimony, as you
14   sit here today, that you understood that as
15   being only in 2001?
16        A.   I didn't say that, but on its
17   face, it is historic and the reference at
18   the top of the paragraph says the last half
19   of 2001.
20        Q.   But you knew that these issues
21   that are referred to in the sentence the
22   difficulty in the third-party credit
23   facility in implementing Expert software
24   had continued into the beginning of 2002,
25   right?
```

Page 120

```
 1             MR. KALECZYC:  Objection.
 2             THE WITNESS:  As I just said,
 3   Counselor, what I knew or what information I
 4   had to me was entirely what was given in the
 5   various reports.
 6   BY MS. STEINGART:
 7        Q.   Okay.
 8        A.   And my recollection of those,
 9   they will speak for themselves.  Every time
10   they discussed a problem there was also a
11   discussion of actions they were going to do
12   about it and the constant theme was it's
13   going to improve, going to improve.
14        Q.   So they fooled you?
15             MS. DELANEY:  Objection.
16             MR. KALECZYC:  Objection.
17   BY MS. STEINGART:
18        Q.   Did they fool you?
19             MR. KALECZYC:  Objection.
20   BY MS. STEINGART:
21        Q.   Do you think that they fooled
22   you?  As you sit here today, knowing what
23   you know today, did they fool you?
24             MS. DELANEY:  Objection.
25             THE WITNESS:  I don't accept that
```

Page 121

```
 1   characterization.  I don't think that question
 2   is --
 3   BY MS. STEINGART:
 4        Q.   Okay.  Let's look at some other
 5   things then.  Let's look at the MFIRs.  You
 6   have a binder of those documents, why don't
 7   we look at them.  Let's look at May 2002.
 8   If we could look at page 458111.  Do you
 9   see that on the bottom of that page there
10   is a chart that shows incremental
11   borrowings by Expanets?
12        A.   I see that.
13        Q.   Did you understand that during
14   March and April that the incremental
15   borrowings of Expanets were increasing?
16        A.   I'm sorry, are you looking at
17   the graph?
18        Q.   Yeah, I'm looking at the chart
19   on the bottom of page 458111.
20        A.   And how is it that you are --
21        Q.   Do you see the chart shows
22   NorthWestern incremental borrowings?
23        A.   Yes.
24        Q.   Do you understand that this
25   chart depicts the borrowings of Expanets
```

31 (Pages 118 to 121)

Page 122

1    from NorthWestern?
2    A.  I'm not sure that's what it's
3  showing, incremental borrowings from
4  NorthWestern by Expanets.
5    Q.  Right.  It says the chart
6  showing the current -- this is the Expanets
7  section, right?  It says "Expanets" at the
8  top of the page, do you see that?
9    A.  Yes.
10    Q.  And there is a sentence here
11  that says "A chart showing..." and I'm
12  reading from the middle of the paragraph
13  right above that chart, "A chart showing
14  the current forecasted borrowings and
15  repayment schedule to NorthWest has been
16  added below."
17    Do you see that?  And one line
18  shows --
19    A.  I must need reading glasses, I
20  apologize.
21    Q.  I can wait until you are with
22  me.
23    A.  Can you help me with the line?
24    Q.  Sure.  If you look --
25    A.  Thank you.  Okay.  Yes, that's

Page 123

1  what it says.
2    Q.  Okay.
3    A.  Yes.
4    Q.  All right.
5    A.  And to my earlier point, it
6  shows falling off as the year goes on.
7    Q.  Indeed it does.  But you
8  learned later that those borrowings weren't
9  going to be repaid, didn't you?
10    MR. KALECZYC:  Objection.
11    THE WITNESS:  I don't know what
12  you are referencing.  But back to the
13  foundation of your question, what relevance
14  after acquired information, hindsight, in
15  other words, has to my understanding at the
16  time -- I'm missing the point of your
17  question.
18  BY MS. STEINGART:
19    Q.  Well, this is something -- the
20  incremental borrowings is something that
21  you understood were occurring in May of
22  2002, right?  Or --
23    A.  I have no understanding other
24  than the information given to me.
25    Q.  Well, this was information

Page 124

1  given to you, you received the MFIR?
2    A.  That's right.  I cannot explain
3  to you the details behind it.  I did not
4  manage those businesses. I do not know
5  those details.  I did not know those
6  details.  All I had was the information
7  given to me.  And as I said, you asked me a
8  recollection question, and the recollection
9  is consistent that they were saying we are
10  having problems but we are going to fix it
11  and things will improve.  And I think this
12  chart says that.
13    Q.  So this says by May they were
14  borrowing over $140 million from NorthWest,
15  correct?
16    A.  It would indicate that.
17    Q.  Did some of that $140 million
18  come from the utility operations?
19    MR. KALECZYC:  Objection.
20  BY MS. STEINGART:
21    Q.  Do you know?
22    A.  I don't know how you can make
23  that statement, it come from the general
24  funds of the corporation.  Each business
25  uses an amount of cash for investment and

Page 125

1  expense and they generate cash.  The utility
2  was positive cash flow.
3    Q.  You also knew at this time
4  because of what's contained in this
5  document that they were still doing system
6  fixes to Expanets, correct?
7    A.  That is what they are
8  indicating, yes.
9    Q.  And at this point they are
10  anticipating system fixes being implemented
11  by July, right?  "System fixes scheduled to
12  be implemented on July 4 are expected to
13  fix many of the billing problems that have
14  been occurring with customer bills."
15    Do you see that?
16    A.  I'm not finding a line
17  reference.
18    Q.  It's a couple of lines above
19  the line about the chart.
20    A.  Okay, I see that now, yes.
21    Q.  Okay.  Now, at that point, did
22  anyone tell you when they expected to fix
23  all of the billing problems?  This talks
24  about many of the billing problems, was
25  there any conversation in or about May

32 (Pages 122 to 125)

Page 138

1  reports were including cash of partner
2  entities and no longer due, I don't know
3  that.
4       Q.    Well, let's talk about the
5  partner entities for a minute.  Expanets
6  didn't have any cash, did it?
7            MR. KALECZYC:  Objection.
8            MS. DELANEY:  Objection.
9            THE WITNESS:  I don't know.
10 BY MS. STEINGART:
11      Q.    Certainly if Expanets had cash,
12 it could have been used to repay some of
13 those borrowings, right?
14           MR. KALECZYC:  Objection.
15           MS. DELANEY:  Objection.
16           THE WITNESS:  Are you asking me
17 the hypothetical if they had cash could they
18 use it for things they use cash for?
19 BY MS. STEINGART:
20      Q.    As far as you know, did
21 Expanets have any cash?
22           MR. KALECZYC:  Objection.
23           THE WITNESS:  I do not know.
24 BY MS. STEINGART:
25      Q.    Blue Dot?

Page 139

1            MR. KALECZYC:  Objection.
2            THE WITNESS:  I don't know.
3  BY MS. STEINGART:
4       Q.    CornerStone?
5       A.    I don't know.
6       Q.    Indeed at this point, as you
7  sit here today, the only partner entity
8  that you are aware of that could have had
9  cash was the regulated companies, correct?
10           MR. KALECZYC:  Objection.
11           MS. DELANEY:  Objection.
12           THE WITNESS:  I do not agree.
13 Could have had cash?  Any of them could have
14 had cash.  I think I just testified I don't
15 know what they had -- I do know the utility
16 was generating positive cash flow on an
17 annualized basis, but you are also coming into
18 the fall of the year where the demands for
19 energy purchases -- we had an all-time peak
20 use of cash at the utility at that time.  And
21 then it turns as you get into the winter
22 months.
23 BY MS. STEINGART:
24      Q.    So over the course of the year,
25 you were informed Expanets had borrowings,

Page 140

1  correct?
2       A.    I got the reports, yes.
3       Q.    And over the course of the
4  year, you were informed that the repayments
5  of those incremental borrowings would be
6  less than they were anticipated to be at
7  the beginning of the year, correct?
8       A.    I got the updates provided
9  here, yes.
10      Q.    And at some point you received
11 a further update that said that Expanets
12 wouldn't be paying anything back by the end
13 of the year, right?
14      A.    I'm sorry, what?
15      Q.    You knew that, didn't you, by
16 the fall of 2002, you knew Expanets was not
17 going to pay any of that anticipated
18 190 million of borrowings during 2002,
19 right?
20           MR. KALECZYC:  Objection.
21           THE WITNESS:  I don't believe so.
22 I don't know where you get that reference.
23 And incidentally just watching the cash
24 balance here, collective -- accepting there
25 may be cash at partner entities, that pattern

Page 141

1  doesn't surprise me at all just given the
2  seasonality of the utility business.  It
3  doesn't mean that it's not going to improve.
4  And that is my recollection, that these
5  reports will speak for themselves.  But every
6  time they come with a -- or missing a
7  projection there is also an indication that
8  it's going to improve.  Those charts say that.
9  BY MS. STEINGART:
10      Q.    And during the fall there was a
11 lot of activity going on at NorthWest to
12 raise funds to meet pressing liquidity
13 needs during that period, right?
14           MR. KALECZYC:  Objection.
15           MS. DELANEY:  Objection.
16           THE WITNESS:  I don't accept your
17 characterization of "pressing liquidity
18 needs."  Were there activities to raise cash?
19 Yes, they are in the reports.
20 BY MS. STEINGART:
21      Q.    And without that cash wouldn't
22 there have been serious implications for
23 NorthWest's credit ratings without raising
24 that cash?
25           MR. KALECZYC:  Objection.

36 (Pages 138 to 141)



Page 222

1  THE WITNESS: We'd have to check
2  the minutes to see what they say. I do recall
3  a discussion of that with the board where
4  counsel updated the board. But whether that
5  was an executive session that didn't get
6  detail in the minutes, again, I don't know
7  without going through all of these.
8  MS. STEINGART: To the extent such
9  a document exists, such a reference in the
10  board minutes exists, I would ask that it be
11  produced.
12  BY MS. STEINGART:
13  Q.   Let's talk about what you did
14  in furtherance of this directive. I'd like
15  to show you what we've marked as 22 and 23.
16  A.   (Reviews document.)
17  MS. STEINGART: Actually, as part
18  of 23 there are two copies of the officer's
19  certificate. You can take off that last one.
20  It's not signed.
21  MS. DELANEY: Do you want it
22  removed from the exhibit?
23  MS. STEINGART: Yeah, could you
24  remove it.
25  MS. DELANEY: Blue page and all?

Page 224

1  but --
2  Q.   Well, evidently you stood in
3  for Mr. Monaghan.
4  A.   Maybe. But yes, officer's
5  certificate signed by me. That is my
6  signature.
7  Q.   Do you understand what an
8  officer's certificate is?
9  A.   Yes.
10  Q.   If you look at paragraph 3 with
11  me.
12  A.   Uh-huh.
13  Q.   And in paragraph 3 you certify
14  that all conditions precedent, provided for
15  in the indenture relating to the execution
16  and delivery of the second supplemental
17  indenture dated as of the date hereof among
18  NorthWestern Energy, LLC and the trustee
19  including any covenants compliance which
20  constitute a condition precedent have been
21  complied with."
22  Do you see that?
23  A.   Yes, I do.
24  Q.   What did you do to satisfy
25  yourself that that was correct?

Page 223

1  MS. STEINGART: Yes. Thank you.
2  THE WITNESS: (Reviews document.)
3  BY MS. STEINGART:
4  Q.   My only question with respect
5  to 22 is whether you recognize it to be the
6  second supplemental indenture that you
7  executed on behalf of NorthWest Energy on
8  or about August 13, 2002?
9  A.   I believe that it is.
10  Q.   And with respect to 23 --
11  A.   Was I supposed to remove
12  something?
13  Q.   Yeah, just the blue page and
14  beyond.
15  A.   (Complies.)
16  Q.   And with respect to 23, that is
17  the officer's certificate that you executed
18  in August 2002 in connection with that
19  second supplemental indenture.
20  A.   (Reviews document.) Well, it's
21  an officer's certificate and that is my
22  signature, I'm not sure why it says "The
23  undersigned, David A. Monaghan, in his
24  capacity as CEO does hereby certify on
25  behalf of NorthWestern Energy that..."

Page 225

1  A.   I reviewed the documents that
2  are referenced in that case, it's the second
3  supplement and the fourth, it's the
4  indenture, and required of other management,
5  particularly Mr. Monaghan, and of counsel,
6  basically whether the conditions stated were
7  in compliance.
8  Q.   Well, doesn't paragraph 6 say
9  that counsel was relying on you?
10  A.   It indicates that Paul Hastings
11  will rely on the accuracy and truth of the
12  foregoing for purposes of rendering its
13  opinion to the trustee. But the
14  conversations I had were with --
15  Euclid Irving was one of the attorneys
16  advising on the -- advising me and
17  NorthWestern Energy, LLC on the transaction.
18  Q.   So you certified paragraph 3
19  based on what Mr. Monaghan told you?
20  MS. DELANEY: Objection.
21  THE WITNESS: I don't think I said
22  that. Based, number 3, on personal inquiry
23  and information provided to me by management
24  including Mr. Monaghan and advice of counsel.
25  BY MS. STEINGART:

57 (Pages 222 to 225)

Page 226

1    Q.    And describe the substance of
2    the personal inquiry.
3        A.    Reading the documents to figure
4    out what conditions precedent existed.  And
5    then inquiring whether or not we were in
6    compliance with those conditions.
7        Q.    As you sit here today, do you
8    recall what conditions precedent that you
9    inquired into?
10       A.    I don't recall.  But I think
11   they are in the document.
12       Q.    And in preparation for this
13   deposition, did you look at any of those
14   things?
15       A.    I did not, no.
16       Q.    Paragraph 4 says that you've
17   read the applicable provisions of the
18   indenture.
19           Do you see that?
20       A.    Yes.
21       Q.    What provisions did you read?
22       A.    I don't recall specifically.  I
23   had available the entire indenture document,
24   it was a -- I don't remember the date of it,
25   it's an older document, and went though its

Page 227

1    provisions.
2        Q.    It's a document that we marked
3    just by happenstance as the first exhibit
4    to this deposition.  Is this the document
5    (indicating)?
6        A.    (Reviews document.)  Yes.
7        Q.    It says you've also examined
8    originals or copies certified to his
9    satisfaction of the various certificates
10   and instruments prepared in connection with
11   the execution and delivery of the second
12   supplemental indenture.
13           What certificates and
14   instruments did you review?
15       A.    I don't remember other than
16   the -- the supplement indenture itself.  I
17   don't remember if there are certificates and
18   instruments in connection with it.  If there
19   are, I think I was provided with a complete
20   packet.
21       Q.    Do you have a recollection of
22   that?
23       A.    I don't know if there are
24   such -- I don't recall if there are other
25   certificates and instruments related to that

Page 228

1    or not.
2        Q.    And it indicates here "As well
3    as the indenture and such corporate records
4    and other instruments and documents."
5            What corporate records did you
6    look at?
7        A.    I don't remember looking at
8    other corporate records.  I recall making
9    inquiries of some number of people including
10   Mr. Monaghan and counsel, Euclid Irving.
11       Q.    As you sit here today, do you
12   recall either what Mr. Monaghan or what
13   counsel told you in that regard?
14       A.    Generally.  Not the specific
15   words.
16       Q.    What did they tell you?
17       A.    That, in general, the substance
18   was that we are -- we meet the requirements
19   of the covenants and the conditions.
20       Q.    And did you ask them what they
21   were they basing -- what information they
22   based those conclusions on?
23       A.    I don't recall asking him that.
24       Q.    Did they prepare memos or
25   summaries for you concerning what they

Page 229

1    looked at and what they found in the things
2    they looked at?
3        A.    I don't recall if there was
4    memos or other written material provided.
5        Q.    Then it goes on to say "And
6    made such examination and investigation as,
7    in his opinion, is necessary to unable him
8    to express an informed opinion as to
9    whether or not such covenants and
10   conditions have been complied with."
11       A.    Yes.
12       Q.    What examination and
13   investigation did you make?
14       A.    Just what I told you.
15       Q.    So that just refers to what you
16   received from Mr. Monaghan and counsel?
17       A.    As I said, there may have been
18   some number other than just Mr. Monaghan.
19   But my specific recollection today is that I
20   discussed with Mr. Monaghan and with
21   Mr. Irving.
22       Q.    Did you take any steps to
23   assure yourself that there was the capacity
24   to pay principal and interest on the part
25   of NorthWestern Corporation when you

58 (Pages 226 to 229)

Page 230

```
1    executed this indenture?
2         MS. DELANEY:  Objection.
3         (Whereupon, the court reporter
4    read back the previous question.)
5         THE WITNESS:  I don't recall
6    taking any specific steps relative to that
7    question.  But based on my view at the time, I
8    certainly -- I believe that there was such
9    capacity.  In fact, I think such payments were
10   made.
11   BY MS. STEINGART:
12        Q.    And was your view at the time
13   based on the company's SEC filings and
14   other public financial statements?
15        A.    In part as well as the other
16   management reports, financial reports we
17   talked about.
18        (Deposition Exhibit Number 26
19   marked for identification.)
20   BY MS. STEINGART:
21        Q.    I'd like to show you what we've
22   marked as Hanson 26.  It's a memo dated
23   October 16th to the board from Mr. Lewis
24   and Mr. Hylland.
25        A.    (Reviews document.)
```

Page 231

```
1         (Deposition Exhibit Number 27
2    marked for identification.)
3    BY MS. STEINGART:
4         Q.    And also Hanson 27, which is a
5    part of one of the attachments referenced
6    in that October 16th memo.
7         A.    (Reviews document.)
8         Q.    My only question now is whether
9    you recall seeing this cover, this e-mail
10   dated October 16th and the operating plan
11   and board summary that was -- that's noted
12   in the first bullet?
13        MR. KALECZYC:  Object to form.
14        THE WITNESS:  I don't
15   recall -- you say "this e-mail," are you
16   referring to this memo.
17   BY MS. STEINGART:
18        Q.    Yes.
19        A.    I don't recall seeing that and
20   don't know whether or not this was
21   circulated to people other than to board
22   members.  The reference plan summaries, I
23   don't recall seeing them in advance but did
24   attend that portion of the board meeting
25   where myself and each of the other partner
```

Page 232

```
1    entity CEOs went through our portion of a
2    presentation as well as the overall
3    discussion by Mr. Hylland.
4         Q.    And do you have an
5    understanding that a packet concerning NOR
6    liquidity and financing opportunities and
7    strategic plan sensitivities was also
8    provided to the board in preparation for
9    the November meeting?
10        A.    I see the reference and their
11   typically were board packets, but I don't
12   know that I knew at that time the contents
13   of the board packet.
14        Q.    We'll get to the meeting and
15   talk about 27 in connection with the
16   meeting.
17        (Deposition Exhibit Number 28
18   marked for identification.)
19   BY MS. STEINGART:
20        Q.    What we've marked as Hanson 28
21   which is a memo dated October 30th from
22   Mr. Orme to the board of directors.
23        A.    (Reviews document.)
24        Q.    And the only thing I'm going to
25   ask you about is the first paragraph under
```

Page 233

```
1    2002 Forecast.
2         A.    (Reviews document.)  Okay.
3         Q.    Do you recall having seen the
4    October 30th memo?
5         A.    I don't, no.
6         Q.    Did you learn in or around that
7    time, and that is at some point between
8    October 30th and November 5th or 6th board
9    meeting, that the current EPS forecast is
10   now 1.99 as compared with 2.30 reflected in
11   the prior submission?
12        A.    I recall at the meeting that
13   we've not yet discussed that a plan, both
14   operating and financial plan was presented
15   and that segment of sessions, which we
16   talked about, then myself and other partner
17   member CEOs were asked to leave.  But
18   following that, Mr. Lewis and Mr. Hylland
19   reported back that the board did not accept
20   and approve a plan and directed the company
21   management to go back and revise the plan
22   because they felt there was too much risk
23   contained in it.  And we had a revised plan.
24   I wouldn't recall specifically what that
25   said, but this memo would indicate that the
```

59 (Pages 230 to 233)

Page 270

1  directives tell you that nothing was
2  sacred?
3       A.    I don't remember them saying
4  that, but they may have.
5       Q.    Was that the understanding you
6  had in connection with the directives that
7  money was to be raised and nothing was
8  sacred?
9            MR. KALECZYC:  Objection.
10           THE WITNESS:  My understanding was
11  there were efforts under way to raise cash.
12           (Deposition Exhibit Number 30
13  marked for identification.)
14  BY MS. STEINGART:
15       Q.    I'd like to show you what we've
16  marked as Hanson 30 and ask you if you
17  could describe what that is for the record?
18       A.    (Reviews document.)  The
19  document, albeit unsigned, is an asset and
20  stock transfer agreement dated November 15th
21  by and between NorthWestern Energy, LLC and
22  NorthWestern Corporation.  This is the
23  agreement by which the utility assets and
24  liabilities were transferred from
25  NorthWestern Energy, LLC to NorthWestern

Page 271

1  Corp and other certain assets and
2  liabilities retained at NorthWestern Energy,
3  LLC, later named Clark Fork and Blackfoot,
4  LLC.
5       Q.    So this is the agreement by
6  which the going-flat transaction was
7  effectuated?
8       A.    I believe so.  As I said, it's
9  an unsigned version, but that's what it
10  looks like.
11       Q.    But there is one that's signed
12  and the transaction, in fact, occurred?
13      A.    Yes.
14           MS. STEINGART:  Just for the
15  record, if I can find a signed one, I will
16  make it an Exhibit 30-A.
17           (Deposition Exhibit Numbers 31 and
18  32 marked for identification.)
19  BY MS. STEINGART:
20       Q.    I'd like to show you what we've
21  marked as Exhibit 31 and Exhibit 32.
22       A.    (Reviews document.)
23       Q.    Sir, do you recognize Hanson 31
24  to be the third supplemental indenture that
25  was executed in connection with the

Page 272

1  going-flat transaction?
2       A.    Well, it is the third
3  supplemental indenture executed now by
4  NorthWestern Corporation and the Bank of
5  New York.
6       Q.    And it was executed in or
7  around November 15th in connection with the
8  going-flat?
9       A.    I believe it was, yes.
10      Q.    And exhibit 32, do you
11  recognize that to be the officer's
12  certificate that was executed by you in
13  connection with the going-flat transaction?
14      A.    (Reviews document.)  It is an
15  officer's certificate executed by me in
16  connection with that transaction.
17      Q.    Now, what did you do to satisfy
18  yourself with respect to paragraph 1 of the
19  officer's certificate that the transaction
20  complies with article 11 of the indenture
21  and all conditions precedent in the
22  indenture including any covenant compliance
23  which constitutes a condition precedent as
24  they relate to the transaction?
25      A.    Well, same answer as the prior

Page 273

1  one, I reviewed the documents referenced,
2  made inquiry of other management, to the
3  best of my recollection, Mr. Monaghan, and
4  conversations with counsel.
5       Q.    And did they prepare any memos
6  for you that summarized or described the
7  assurances that they were providing you
8  with?
9       A.    I don't recall if -- well, to
10  the best of my recollection, I don't think
11  they were internal management ones.  I don't
12  recall if there were memos or a memo from
13  counsel or not.
14      Q.    Looking at the earlier
15  paragraph, the sentence that begins "He has
16  read and is familiar with covenants and
17  conditions in the provisions in articles
18  11 and 12 of the indenture."
19           Did you rely on Mr. Monaghan
20  for that?
21      A.    I read those articles at the
22  time, had some discussions with
23  Mr. Monaghan, perhaps others, but I remember
24  Mr. Monaghan and counsel.
25      Q.    Then it says further down "And

69 (Pages 270 to 273)

Page 274

1  has examined the various certificate and
2  instruments prepared in compliance with the
3  covenants and conditions."
4         What certificates and
5  instruments did you review?
6      A.    I don't recall if there are any
7  or what they are.
8      Q.    What did you do to assure
9  yourself that NorthWestern was capable of
10 paying principal and interest in connection
11 with the QUIPS?
12        MS. DELANEY:  Objection.
13        THE WITNESS:  I didn't make a
14 specific analysis of that.  And as I said,
15 based upon my involvement in the company and
16 general understanding, I believe we had the --
17 the corporation had the ability to make such
18 payments and did, in fact, do so over at least
19 some period of time.
20 BY MS. STEINGART:
21     Q.    What documents or materials did
22 you base that belief on?
23     A.    I can't point to a specific
24 list of documents.  But we've discussed the
25 types of management reports and information

Page 275

1  that have been provided to me during that
2  time period.
3      Q.    So you referred to the
4  management financial information reports in
5  reaching that conclusion?
6      A.    Not solely, but in part.
7  Management information reports, 10-Ks and
8  10-Qs, presentations made to the board.
9      Q.    Did anyone prepare a fairness
10 opinion on behalf of Montana Power, LLC
11 that the going-flat transaction was fair
12 from a financial point of view to creditors
13 of Montana Power, LLC?
14     A.    To the best of my knowledge,
15 one was not required.
16     Q.    Did anyone prepare an
17 assessment for you of the value of the
18 assets being transferred and the
19 liabilities being assumed in connection
20 with the going-flat transaction?
21     A.    I don't recall any such
22 assessment nor do I think one was necessary.
23     Q.    Did anyone provide an
24 assessment for you about whether the
25 disparity in the value of the assets being

Page 276

1  transferred and the liabilities assumed in
2  connection with the going-flat transaction
3  made the going-flat transaction a
4  fraudulent transfer?
5         MR. KALECZYC:  Objection.
6         MS. DELANEY:  Objection.
7         THE WITNESS:  I'm assuming that
8  you are not asking for the legal conclusion.
9  To go back, the assets and the liabilities are
10 on the books of the subsidiary, in this case,
11 NorthWestern Energy, LLC.  The owner of the
12 assets and the liabilities, the difference
13 being equity, is NorthWestern Corporation.  We
14 just looked at a directive from the board of
15 directors of NorthWestern Corporation saying
16 move those up with the exception of Milltown
17 Dam and some incidentals.  They owned them
18 both.  There was no change.  They owned the
19 equity of it before the transaction.  They
20 owned it after the transaction.  So I just
21 dispute the premise that that type of fairness
22 opinion or assessment of those things was
23 necessary under the circumstances.
24 BY MS. STEINGART:
25     Q.    When you signed the officer's

Page 277

1  certificate that's Exhibit 32, were you
2  aware of the disparity in the value of the
3  assets transferred and liabilities assumed
4  in connection with the going-flat
5  transaction?
6      A.    I don't believe there is any
7  such disparity.
8         MS. DELANEY:  Objection.
9  BY MS. STEINGART:
10     Q.    What do you understand the
11 value of the assets transferred in the
12 going-flat transaction to be?
13     A.    It doesn't matter.  The assets
14 were worth what they were, the liability was
15 worth what they were and the net result of
16 those was the responsibility of and the
17 property of NorthWestern before and after
18 the transaction.
19     Q.    Sir, at the time you executed
20 the officer's certificate, did you have an
21 understanding of the value of the assets
22 transferred and the liabilities assumed in
23 connection with the going-flat transaction?
24     A.    I would have had, in the normal
25 course of things, the balance sheet that you

70 (Pages 274 to 277)

Page 278

1  are referring to of NorthWestern Energy,
2  LLC, had a general understanding. I did not
3  inquire at that time about what those
4  specific balances were.
5      Q.   Now, at the time of the
6  going-flat transaction, did counsel for
7  Montana Power, LLC indicate to you that you
8  should be aware of the value of the assets
9  being transferred as well as the
10  liabilities assumed in connection with the
11  going-flat transaction?
12      MS. DELANEY:  Objection.
13      MR. KALECZYC:  Objection.
14      MS. DELANEY:  To the extent this
15  calls for any privileged conversation with
16  counsel, I direct the witness not to answer.
17  BY MS. STEINGART:
18      Q.   Who represented Montana Power,
19  LLC in connection with the going-flat
20  transaction?
21      A.   I relied on advice from
22  Euclid Irving and Paul Hastings.
23      Q.   Who represented NorthWestern in
24  connection with the going-flat transaction?
25      A.   I don't know the answer to that

Page 280

1  certificate -- or the materials that you
2  were relying on included the MFIRs and the
3  10-Ks and 10-Qs, was there anything else?
4      A.   Yes.
5      Q.   What else?
6      A.   I cannot tell you. I used
7  those as examples. I had all the variety of
8  information provided to me in the normal
9  course of things available.
10      Q.   And to the extent that those
11  documents that you've been able to identify
12  for me were false and misleading, then you
13  relied on false information in executing
14  the officer's certificate, correct?
15      MS. DELANEY:  Objection.
16      MR. KALECZYC:  Objection.
17      THE WITNESS:  I have no basis for
18  believing that those documents were false or
19  misleading.
20  BY MS. STEINGART:
21      Q.   Are you familiar with the
22  restatements that NorthWestern made of its
23  first three quarter 10-Qs for 2002 in 2003?
24      A.   Generally, yes.
25      Q.   Are you familiar with the cease

Page 279

1  question.
2      Q.   It's true -- well, you knew
3  that Paul Hastings was also representing
4  NorthWestern, correct?
5      A.   I knew and recall that
6  Paul Hastings represented NorthWestern in a
7  variety of matters.
8      Q.   Did you consider, as the
9  individual who executed the officer's
10  certificate, that it was not in the best
11  interest of the creditors of Montana Power,
12  LLC for Montana Power, LLC to have the same
13  counsel as NorthWestern in connection with
14  the going-flat?
15      MR. KALECZYC:  Objection.
16      MS. DELANEY:  Objection.
17      THE WITNESS:  I did not.
18  BY MS. STEINGART:
19      Q.   Did anyone talk to you about
20  that?
21      A.   Not that I recall.
22      MR. KALECZYC:  Objection.
23  BY MS. STEINGART:
24      Q.   So you said that you had in
25  mind when you executed the officer's

Page 281

1  and desist order that was entered against
2  NorthWestern by the SEC?
3      A.   Generally.
4      Q.   Are you familiar with the
5  complaints that have been filed against
6  Merle Lewis, Kipp Orme, Mr. Whitesel and
7  Mr. Hylland?
8      MR. KALECZYC:  Object to the form.
9  BY MS. STEINGART:
10      Q.   Are you familiar with the SEC
11  complaint that was filed against Mr. Lewis?
12      A.   I'm aware that one was filed
13  from the news accounts and reports.
14      Q.   And are you aware that he
15  entered into a consent decree?
16      A.   I'm aware that there was a
17  fairly recent -- a news account indicating
18  that.
19      Q.   And the same is true -- is the
20  same true with respect to your awareness of
21  Mr. Hylland having a complaint filed and
22  entering into a consent decree? Are you
23  aware of those two things?
24      A.   I'm aware from the news
25  accounts. What I am saying is I have not

71 (Pages 278 to 281)

Page 282

1  read those complaints or familiar with or
2  knowledge of what resolution was reached
3  other than as relates to those individuals
4  other than what has been reported in the
5  news accounts of the case.
6      Q.   Are you aware that Mr. Orme
7  took the 5th Amendment in response to
8  questions concerning the falsity of the
9  first, second and third quarter 10-Qs for
10  2002?
11      MS. DELANEY:  Objection.
12      THE WITNESS:  Well, I don't know
13  in what context that may have happened.  But
14  no, I'm not aware of that.
15  BY MS. STEINGART:
16      Q.   It happened in the context of
17  this case, sir.  Did no one inform you of
18  that?
19      A.   To the best of my recollection,
20  I was informed that in response to a
21  question or line of questioning, that he had
22  taken the 5th Amendment.  But the scope of
23  that, I don't know.  And your question talks
24  about in relation to certain -- I wouldn't
25  know that, that context.

Page 283

1      Q.   So based on all of the items
2  we've just discussed, is it still your
3  sworn testimony that you have no reason to
4  believe that the first, second and third
5  quarter 10-Qs when they were filed in 2002
6  were not false and misleading?
7      MR. KALECZYC:  Objection.
8      MS. DELANEY:  Now, or in 2002?
9  I object.
10      THE WITNESS:  My testimony is that
11  upon signing these documents, I did not know
12  that nor did I have any basis to know or
13  believe that to be the case.
14  BY MS. STEINGART:
15      Q.   To the extent that -- I'm
16  asking you now, to the extent that those
17  documents were false at the time you signed
18  this officer's certificate, to the extent
19  those documents were false and misleading,
20  in signing this officer's certificate you
21  relied on false and misleading material,
22  correct?
23      MS. DELANEY:  Objection.
24      MR. KALECZYC:  Objection.
25      THE WITNESS:  In part.  I had all

Page 284

1  the many reports, all the information, the
2  public disclosures are just one of many.  So I
3  cannot say that I relied specifically on those
4  and but for that would not have signed.  I'm
5  just saying that was one of a body of
6  information that I had.  And the collective
7  body of information, it did not -- I had no
8  reason at that time to believe there was any
9  problem with it or that the company was not
10  able to manage this transaction.
11  BY MS. STEINGART:
12      Q.   But if it was false, if those
13  materials were false, then you relied on
14  false financials in signing the officer's
15  certificate, right?
16      A.   I am aware that allegations
17  have been made, that aspects of those were
18  false, I have no independent understanding
19  or opinion of whether or not that is the
20  case.
21      Q.   If they were false, then you
22  relied on false documents, correct?
23      MS. DELANEY:  Objection.
24      MR. KALECZYC:  Objection.
25      THE WITNESS:  Accepting that your

Page 285

1  question is a hypothetical, "if they were."
2  Well, as I said before, in part, but I relied
3  on the body of information that I had
4  available to me.
5  BY MS. STEINGART:
6      Q.   And in the body of information
7  that you had available to you, did you have
8  any information that evidenced to you in
9  2002 that those SEC files, 10-Ks and 10-Qs,
10  were false?
11      (Whereupon, the court reporter
12  read back the previous question.)
13      THE WITNESS:  And you are asking
14  the question as of November 15, 2002 and the
15  answer is no.
16      MR. KALECZYC:  Could we take a
17  break at this point?
18      MS. STEINGART:  Yes.
19      (Recess.)
20      (Deposition Exhibit Number 33
21  marked for identification.)
22  BY MS. STEINGART:
23      Q.   Sir, I'm handing you what we've
24  had marked as Hanson 33.  And it's a memo
25  dated December 7th from Dick Hylland and

72 (Pages 282 to 285)