# Exhibit 36

```
 1
 2    UNITED STATES DISTRICT COURT
 3    DISTRICT OF DELAWARE
 4    ------------------------------------------x
 5    MAGTEN ASSET MANAGEMENT CORPORATION and
 6    LAW DEBENTURE TRUST COMPANY OF NEW YORK,
 7                                 Plaintiffs,
 8              vs.
 9    NORTHWESTERN CORPORATION,
10                                 Defendant.
11    Civil Action No. C.A. No. 04-1494 (JJF)
12    ------------------------------------------x
13    MAGTEN ASSET MANAGEMENT CORP.,
14                                 Plaintiff
             v.
15
16    MICHAEL J. HANSON and ERNIE J. KINDT,

                                   Defendants
17
      Civil Action No. C.S. No. 05-499 (JJF)
18
      ------------------------------------------
19
                        July 12, 2007
20                      9:30 a.m.
21      CONFIDENTIAL -- ATTORNEYS' EYES ONLY
22            Deposition of TALTON R. EMBRY,
      held at the offices of Curtis,
23    Mallet-Prevost, Colt & Mosle, 101 Park
      Avenue, New York, New York, before David
24    Henry, a Certified Shorthand Reporter and
      Notary Public of the State of New York.
25
```

Page 14

2 Partnership?
3     A. It is not.
4     Q. With respect to Magten Asset
5 Management International Corporation, did
6 you ever buy any of the QUIP's at issue in
7 this litigation for the benefit of that
8 company?
9     A. Not that I recall.
10    Q. How about Magten Recovery
11 Associates?
12    A. I am unfamiliar with Magten
13 Recovery Associates.
14    Q. That is not a company that you
15 established?
16    A. Not that I am aware of.
17    Q. How about Magten Recovery Fund?
18    A. Not that I am aware of.
19    Q. When did you first acquire the
20 QUIP's?
21    A. I believe my first purchases were
22 approximately in April of 2003.
23    Q. How did you come to learn of the
24 existence of the QUIP's as a potential
25 investment?

Page 15

2     A. Through the news media.
3     Q. Do you remember specifically what
4 news media?
5     A. I do not.
6     Q. Were you ever advised or was
7 there a recommendation made with respect to
8 the QUIP's at that time by any broker with
9 whom you might have a relationship?
10      MS. STEINGART:  Object as to
11    form.  Are you asking if the broker
12    spoke to him about it?
13    Q. Do you understand the question,
14 Mr. Embry?
15    A. I saw information from Wall
16 Street on the company.  I am not aware of
17 on the QUIP's in particular.
18    Q. And did you buy the QUIP's on the
19 open market?
20    A. I did.
21    Q. Did you use a brokerage house to
22 buy those QUIP's?
23    A. Yes.
24    Q. And which brokerage?
25    A. A variety, I believe.

Page 16

2     Q. And do you remember which one you
3 used for the first acquisition?
4     A. I do not.
5     Q. What do you remember learning in
6 that April, May, 2003 time period about
7 Northwestern that led you to buy the
8 QUIP's?
9     A. I can't remember specifically.
10    Q. Do you remember generally
11 anything?
12    A. It's been a long time.
13    Q. Did you know at that time that
14 Northwestern had restated its financial
15 statements for 2002?
16      MS. STEINGART:  Object as to
17    form.
18    A. That was in the public record,
19 yes.
20    Q. And then we're talking about the
21 period immediately before the first
22 purchase of QUIP's by Magten?
23    A. I believe that's correct.
24    Q. At that time had you looked at
25 the restated financials of Northwestern?

Page 17

2     A. To the best of my knowledge, I
3 had.
4     Q. Do you remember anything from
5 those restated financials?
6     A. Not in specifics, no.
7     Q. Given that the financials were
8 restated and you had the opportunity to and
9 did review them, what made you think that
10 the purchase of the QUIP's from
11 Northwestern at that time would make money
12 for your clients?  And I think that's the
13 word you used earlier.
14      MS. STEINGART:  Objection as to
15    form.
16    A. To the best of my recollection
17 they were selling at a discounted price and
18 I thought that the discount was sufficient
19 to make them sufficiently attractive.
20    Q. At that time did you have any
21 concerns that Northwestern might file for
22 reorganization in bankruptcy?
23    A. I did not know what the company
24 was going to do.
25    Q. Well, I know that you didn't know

5 (Pages 14 to 17)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 18

1
2  what they were going to, but did you have
3  any concerns that that might be a direction
4  in which the company might ultimately be
5  headed?
6      A.  I can't recall.
7      Q.  Did you at the time that you
8  first acquired the QUIP's know anything
9  about Northwestern Liability Limited
10 Company?
11     A.  Not that I am aware of.
12     Q.  Do you know today what
13 Northwestern Energy, LLC is or was?
14     A.  I do not.
15     Q.  At the time that you first bought
16 the QUIP's, did you make any inquiry about
17 the historic performance of Montana Power
18 Company?
19     A.  I reviewed the financial
20 information that was available.
21     Q.  And when you say financial
22 information that was available, from what
23 sources?
24     A.  From the public documents that
25 were filed by the company, 10-Q's and

Page 19

1
2  10-K's.
3      Q.  When you say company, are you
4  talking about Montana Power Company?
5      A.  Northwestern.
6      Q.  And do you recall which K's and
7  Q's you have looked at, over what time
8  period would they have covered?
9          MS. STEINGART:  Objection as to
10     form.
11     A.  To the best of my recollection,
12 it would have been the 2002 10-Q's and 2001
13 10-K.
14     Q.  So prior to buying the QUIP's,
15 you did review the first quarter 2002?
16     A.  To the best of my recollection.
17     Q.  And same with the second quarter?
18     A.  To the best of my recollection.
19     Q.  And the third quarter?
20     A.  To the best of my recollection.
21     Q.  And then you reviewed the
22 restated financials that were issued in
23 April of 2003?
24     A.  If there were restated financials
25 issued in April of 2003, I would have

Page 20

1
2  reviewed them, but I do not recall those
3  with any specificity.
4      Q.  Do you recall if you had reviewed
5  an 8K from December of 2002 in which the
6  company issued a press release?
7      A.  I don't recall it.
8      Q.  Would it refresh your memory if I
9  told that you that that 8K generally stated
10 that the company might have to restate its
11 financials for 2002 and that it was looking
12 into the matter?
13     A.  It would not refresh my memory.
14     Q.  At the time before you first
15 acquired the -- any of the QUIP's, did you
16 review the unit purchase agreement between
17 Montana Power Company and Northwestern
18 Corporation for the acquisition of Montana
19 Power Limited Liability Company?
20     A.  I don't recall.
21     Q.  At the time that you first
22 acquired the QUIP's, did you look at the
23 asset transfer agreement between
24 Northwestern Corporation and Northwestern
25 Energy for the transfer of certain assets

Page 21

1
2  and liabilities from the subsidiary to the
3  parent?
4      A.  I don't recall.
5      Q.  At that time before you first
6  acquired QUIP's, did you look at the
7  indenture that's related to the QUIP's?
8      A.  To the best of my recollection, I
9  did.
10     Q.  And did you look at the First
11 Amendment to the indenture?
12     A.  To the best of my recollection, I
13 did.
14     Q.  The second amendment?
15     A.  Best of my recollection, I did.
16     Q.  And also the third?
17     A.  To the best of my recollection, I
18 did.
19     Q.  And did you also review at that
20 time the assumption agreement under which
21 Northwestern Corporation assumed
22 responsibility for payments related to the
23 QUIP's?
24     A.  To the best of my recollection, I
25 did.

6 (Pages 18 to 21)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 38

```
 2      Q. Do you know who he is?
 3      A. I do.
 4      Q. And who is he?
 5      A. I believe that he is a member of
 6  the board of Northwestern Corporation and
 7  president of the company.
 8      Q. Do you know what position
 9  Mr. Hanson held with Northwestern
10  Corporation in 2002?
11      A. I cannot recall.
12      Q. Do you know if Mr. Hanson held
13  any positions with Northwestern Energy, LLC
14  in 2002?
15      A. Do I know that now or did I know
16  that then?
17      Q. Do you know that now?
18      A. I don't know.
19      Q. At the time when you first
20  acquired the QUIP's in 2003, did you know
21  of a Michael Hanson associated with
22  Northwestern?
23      A. Not that I can recall.
24      Q. And you've never met Mr. Hanson?
25          MS. STEINGART: Face-to-face?
```

Page 39

```
 2      A. I've been in a room with
 3  Mr. Hanson, but I don't believe that I've
 4  ever met him.
 5      Q. And when was that, that you were
 6  in the room with him?
 7      A. Several years ago at a mediation.
 8      Q. Have you ever met Mr. Ernie
 9  Kindt?
10      A. I have not.
11      Q. Have you ever been in the same
12  room as Mr. Kindt?
13      A. Not that I am aware of.
14      Q. In 2003 when you acquired the
15  QUIP's, did you know of Ernie Kindt?
16      A. Not that I am aware of.
17      Q. Sitting here today, what do you
18  know about Mr. Kindt in terms of his
19  employment?
20      A. Present?
21      Q. Present or historical employment,
22  either.
23      A. Nothing specific.
24      Q. You do know that you named
25  Mr. Kindt as a defendant in a lawsuit?
```

Page 40

```
 2      A. That's correct.
 3      Q. And could you tell me why you
 4  sued Mr. Kindt?
 5      A. Mr. Kindt, to the best of my
 6  knowledge, was an officer of Clark Fork,
 7  and was responsible for the assets and
 8  liabilities of Clark Fork and owed a duty
 9  to me as an investor in Clark Fork
10  Securities.
11      Q. Were you an investor in the
12  QUIP's in 2002? And when I say you, Magten
13  on behalf of its clients.
14      A. No.
15      Q. And do you have a different
16  reason for why you named Mr. Hanson as a
17  defendant in this lawsuit, different than
18  the reason you gave me with respect to
19  Mr. Kindt?
20      A. Not that I am aware of.
21          (Embry 1, Magten 14-16, marked for
22      identification.)
23      Q. I've handed you what has been
24  marked as Embry deposition Exhibit
25  number 1. Can you just describe for me
```

Page 41

```
 2  what this document or set of documents is?
 3      A. This document is a Merrill Lynch
 4  research piece dated 19 May, 2003 from the
 5  high grade utility department, high grade
 6  credit research department.
 7      Q. And on the front page there is a,
 8  it looks like two e-mails, and that's Bates
 9  number document 00014.
10      A. Correct.
11      Q. And the e-mail at the bottom, is
12  that the e-mail from Tatyana Dobryanskaya
13  at Merrill Lynch sending that report to
14  you?
15      A. That is correct.
16      Q. And who is Megan Costello?
17          MS. STEINGART: She's one of my
18      associates.
19          MR. KALECZYC: If you would
20      like to testify, Bonnie, we'll swear
21      you in.
22      A. I can't recall.
23      Q. Now, the document that is Bates
24  numbered 15 and 16, which is the actual --
25  the Therm Monitor report, you received that
```

11 (Pages 38 to 41)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 90

2  answered.
3      A.  As I have testified previously, I
4  am not a registered investment advisor.
5      Q.  Have you ever been an investment
6  advisor?
7      A.  I have been.
8      Q.  And when was that?
9      A.  That was prior to -- I ceased to
10  be a registered investment advisor in 2002.
11      Q.  And for how long were you a
12  registered investment advisor?
13      A.  From 1978.
14      Q.  And did you voluntarily surrender
15  your registration in 2002?
16      A.  I did.
17      Q.  Was that in any way in connection
18  with the SEC action that you previously
19  testified to?
20      A.  No.  The SEC action was
21  fulfilled, done, or signed, in 1993.
22      Q.  Were you -- I know that you
23  currently do not hold any licenses.  Did
24  you ever hold any licenses as a securities
25  dealer or an agent, registered rep?

Page 91

2      A.  No, sir.
3      Q.  You continued to buy QUIP's after
4  Northwestern Corporation filed for
5  reorganization and bankruptcy in September,
6  2003, correct?
7      A.  Correct.
8      Q.  Of the total million plus QUIP's
9  that you hold today, can you tell me
10  approximately how many were purchased prior
11  to Northwestern going into bankruptcy?
12      A.  I cannot.
13      Q.  Would looking at Embry Deposition
14  Exhibit 2 help in any way in getting an
15  answer to that question?
16      A.  What was the question?
17      Q.  The question was, the original
18  question, Mr. Embry, was how many of the
19  QUIP's were acquired prior to Northwestern
20  filing for reorganization and bankruptcy,
21  you said you didn't remember.  I asked
22  whether the information contained in
23  Deposition Exhibit 2 might be helpful in
24  being able to come to that answer.
25      A.  It did not help.

Page 92

2      Q.  The trade date, and if you look
3  at Deposition Exhibit 2, there is a trade
4  date in the third column.
5      A.  Yes.
6      Q.  Is that the date of acquisition
7  in each instance?
8      A.  That's correct.
9      Q.  Would it be fair for me to say
10  that if I were to add up all of the
11  purchases that were made prior to
12  approximately September 15, 03, that that
13  would tell me how many QUIP's were bought,
14  at least tell me how many QUIP's were
15  bought prior to Northwestern going into
16  bankruptcy?
17      A.  Yes, it would.
18      Q.  And so anything after that date
19  would be post bankruptcy and purchases?
20      A.  Yes, sir.
21      Q.  And just so it's clear to me,
22  does Deposition Exhibit 2 show sales of
23  QUIP's or just purchases?
24      A.  This shows just purchases.
25      Q.  It's true though that some of

Page 93

2  your clients for whom you originally bought
3  QUIP's have sold their QUIP's some time
4  after their purchase?
5          MS. STEINGART:  Objection as to
6      form.
7      A.  I am aware of one small sale, and
8  other than that I am not aware.
9      Q.  Were any of your clients for whom
10  you acquired QUIP's part of the group of
11  QUIP's holders who elected to take from the
12  plan of reorganization and bankruptcy for
13  Northwestern?
14          MS. STEINGART:  Objection as to
15      form.
16      A.  Can you clarify that?
17          MS. STEINGART:  Are you asking
18      whether any of them were settling
19      QUIP's?
20          MR. KALECZYC:  Yes.
21      A.  Not that I am aware of.
22      Q.  Now, you testified earlier about
23  your decision to buy QUIP's before
24  Northwestern went into bankruptcy.  Did
25  your investment strategy change at all once

24 (Pages 90 to 93)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 94

2 Northwestern had filed for bankruptcy in
3 September of 03?
4    MS. STEINGART:  Objection as to
5    form.
6    A.  Yes.
7    Q.  In what way did it change?
8    A.  Northwestern was in bankruptcy.
9    Q.  Why did you continue to buy
10 QUIP's in Northwestern after Northwestern
11 was in bankruptcy?
12   A.  I thought it was a good
13 investment.
14   Q.  And why did you think it was a
15 good investment?
16   A.  Because the company had engaged
17 in a fraud which had -- which gave rise to
18 a fraudulent conveyance claim, which the
19 securities represent a claim on.
20   Q.  Now, when you say the company
21 engaged in a fraud, what is the fraud that
22 you are referring to?
23   A.  That the company was unable to --
24 that the company assumed the obligations of
25 the QUIP's when it was unable to do so.

Page 95

2   Q.  And when did you come to the
3 determination that the company had engaged
4 in the fraud that you just described?
5   A.  I don't mean to be picky or
6 anything, what does determination mean?
7 When did I think or when did I -- I mean,
8 did I determine?
9   Q.  You can answer the question in
10 any way that you would like.
11    MS. STEINGART:  Well, if you
12    don't understand the question, then
13    you don't have to answer it, so can
14    you indicate that you don't understand
15    it.  If you understand it, you can
16    answer it.
17   A.  Rework it, if you would.
18   Q.  When did you learn that
19 Northwestern Corporation was in bankruptcy?
20   A.  I believe the day it filed.
21   Q.  Prior to the day that it filed,
22 had you come to a determination, did you
23 think that a fraud had been committed of
24 the type that you described a few minutes
25 ago?

Page 96

2   A.  I did not know.
3   Q.  Did you suspect prior to the
4 filing that there might be a fraudulent
5 activity?
6   A.  I did not know.
7   Q.  I didn't say whether you know,
8 did you have any suspicion?
9   A.  I did not know.
10   Q.  What do you mean by did not know?
11   A.  That I was uncertain.
12   Q.  But it was in your mind that that
13 might be the case prior to the filing in
14 bankruptcy?
15   A.  That it might be the case, yes.
16   Q.  And how much in advance of the
17 filing in bankruptcy did you begin to think
18 that that might be the case?
19   A.  I don't know.
20   Q.  Was it a week?
21   A.  I don't know.
22   Q.  But it was not at the time when
23 you first bought the QUIP's, was it?
24   A.  I don't remember.
25   Q.  How long after Northwestern

Page 97

2 declared bankruptcy did your uncertainty
3 change to something more on the order of
4 the certainty that a fraud of the type you
5 described was committed?
6    MS. STEINGART:  Objection as to
7    form.
8   A.  In a month or two after the
9 filing of the bankruptcy.
10   Q.  And what led you to that
11 conclusion?
12   A.  I hired Fried Frank to review the
13 situation.
14    MS. STEINGART:  Other than
15    consult with counsel, I think that's
16    all he is permitted to testified to.
17    THE WITNESS:  I consulted with
18    counsel.
19    MS. STEINGART:  And thereafter
20    he is instructed on the basis of
21    privilege not to answer.
22    MR. PIZZURRO:  Well, the line
23    of questions we have right now is
24    going to investment decisions and the
25    reasons behind that that the witness

25 (Pages 94 to 97)

Page 114

1
2  office here in New York.
3     Q.  And was Katten Muchin
4  representing you at the time?
5     A.  No.
6     Q.  Were they representing
7  Mr. Ashner?
8     A.  No.
9     Q.  Why were you and Mr. Ashner in
10 the offices of Katten Muchin?
11    A.  We're directors of the company.
12    Q.  Did you have any discussion with
13 Mr. Ashner at that time regarding the claim
14 that had been brought by Magten with
15 respect to the claims against Northwestern?
16    A.  No.
17    Q.  Did Mr. Ashner ask you how the
18 case was going?
19    A.  He might have, I can't remember.
20    Q.  Do you know whether Mr. Ashner
21 was aware that there was a lawsuit being
22 brought by Magten against Northwestern with
23 respect to the QUIP's?
24    A.  I believe that he was.
25    Q.  And how did you know that?

Page 115

1
2     A.  I believe that I told him that.
3     Q.  When did you tell him that?
4     A.  I don't recall.
5     Q.  What did you tell him?
6     A.  I told him that we had a lawsuit.
7     Q.  What else did you tell him?
8     A.  That's all I recall.
9     Q.  Did you tell him your belief as
10 to the merits of the lawsuit?
11    A.  I don't recall.
12    Q.  Did you tell him anything about
13 what your lawyers had told you about the
14 merits of the lawsuit?
15    A.  I don't recall.
16    Q.  Did you negotiate at all with
17 Mr. Ashner over the price of the QUIP's?
18    A.  No.
19    Q.  Who made the offer?
20    A.  He made the offer.
21    Q.  And you accepted it?
22    A.  I accepted it.
23    Q.  If I recall correctly, from
24 what's been marked as Exhibit 3, the
25 initial purchase price back in late April,

Page 116

1
2  03 per QUIP was $9.25.
3        MS. STEINGART:  I object.  It
4     hasn't been established that this was
5     the first, though it may very well be.
6     Q.  I'm sorry, it was reflected as a
7  purchase of QUIP's at this time, was $9.25
8  per QUIP, is that correct?
9     A.  That is correct.
10    Q.  And by June of 2006, a little
11 more than three years later, you were
12 willing to pay without negotiating, without
13 question, without further discussion, $15,
14 is that correct?
15       MS. STEINGART:  I object as to
16    form.
17    A.  Correct.
18    Q.  What caused you to be willing to
19 pay $15 per QUIP in June of 06 when you
20 were only willing to pay $9.25 per QUIP in
21 late April of 03?
22       MS. STEINGART:  Object as to
23    form.  That's not what the record
24    shows.
25    A.  The $9.25 which I paid was what

Page 117

1
2  the market offered on that date.
3     Q.  Do you know whether Mr. Ashner
4  was aware of what you had paid for the
5  QUIP's back in April of 03?
6     A.  I'm not aware of that, no.
7     Q.  Was there any documentation that
8  was created in connection with the sale of
9  the QUIP's from Mr. Ashner to you for $15
10 in June of 06?
11    A.  A trade ticket.
12    Q.  Anything else?
13    A.  Not that I recall.
14    Q.  Were there brokers involved?
15    A.  Yes.
16    Q.  Who were the brokers?
17    A.  Morgan Stanley.
18    Q.  Was $15 the market price for the
19 QUIP's in June of 06?
20       MS. STEINGART:  Objection as to
21    form.
22    A.  I don't know.
23    Q.  But am I correct, sir, that this
24 was, regardless of whether there was a
25 market price, this was an independently

30 (Pages 114 to 117)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 134

```
 1
 2   QUIP's and the QUIP's litigation?
 3       A.  I cannot.
 4       Q.  Can you give us your best
 5   recollection of the sum and substance of
 6   any of the conversations that you had with
 7   Mr. Bakal concerning the QUIP's and the
 8   QUIP's lawsuit?
 9           MS. STEINGART:  And that's
10       other than the ones he's already
11       testified about, the more recent ones.
12           MR. PIZZURRO:  Correct.
13       A.  Other than -- the only vague
14   recollection that I have here is that after
15   the settlement was denied -- the settlement
16   was denied, and that we were back to square
17   one.
18       Q.  Is your recollection that in that
19   conversation, and I understand it may be
20   difficult to differentiate between or among
21   different conversations on the same subject
22   matter over a period of time, but is it
23   your recollection that in that conversation
24   Mr. Bakal would have known about the
25   proposed settlement?
```

Page 135

```
 1
 2       A.  To the best of my knowledge, he
 3   did not know about the proposed settlement.
 4       Q.  Do you have a recollection as
 5   best you can as to what Mr. Bakal's
 6   response was to your informing him that the
 7   settlement had broken down?
 8       A.  I can't recall.
 9       Q.  Okay, can you recall the sum and
10   substance of any other conversation or
11   conversations you may have had with
12   Mr. Bakal other than that one to which you
13   just testified and the ones to which you
14   earlier testified concerning the QUIP's
15   lawsuit?
16       A.  Not that I can recall.
17       Q.  Any other clients that you
18   discussed this lawsuit with?
19       A.  No.
20       Q.  Is Mr. Bakal still a client?
21       A.  He is.
22       Q.  Does his account still hold
23   QUIP's?
24       A.  It does.
25       Q.  Is Ms. --
```

Page 136

```
 1
 2       A.  Russell.
 3       Q.  Is she still a client?
 4       A.  Yes.
 5       Q.  Does your account hold QUIP's?
 6       A.  Yes, it does.
 7       Q.  Did you ever offer to purchase
 8   the Magten for yourself or any entity
 9   controlled by you to purchase QUIP's held
10   in the accounts of your other clients?
11       A.  No.
12       Q.  Did you cause Magten to invest in
13   QUIP's for the account of Ms. Russell
14   subsequent to the time that Northwestern
15   filed for Chapter 11 in September of 03?
16       A.  I can't recall.
17       Q.  Can you recall whether you caused
18   an investment to be made for the account of
19   Mr. Bakal?
20       A.  I can't recall.
21       Q.  Prior to the purchase of the 20
22   thousand QUIP's from Mr. Ashner that we
23   discussed earlier in June of 06 --
24       A.  May I correct the record here?  I
25   believe that I have been corrected by my
```

Page 137

```
 1
 2   counsel.  We presented -- we have given you
 3   the trade tickets on that transaction,
 4   presented those to whoever, and I believe
 5   it says May rather than June of 06, and I
 6   just want to get that correction there.  I
 7   think that's correct.  I just want -- I
 8   don't want anybody to go crazy because the
 9   May June thing.
10       Q.  It takes a lot more than that to
11   make me crazy.
12       A.  In this matter, anything sets
13   people off, pretty much.
14       Q.  Prior to the transaction of the
15   20 thousand QUIP's of Mr. Ashner in the
16   late spring of 2006, when was the most
17   recent purchase by Magten of QUIP's?
18       A.  I can't recall.
19       Q.  Do you recall as you sit here
20   today whether there were any purchases of
21   QUIP's between let's say the end of 2004
22   and June of 2006?
23       A.  I just don't know.  I've been
24   here for --
25           MS. STEINGART:  If you know,
```

35 (Pages 134 to 137)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017