# Exhibit 41

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

-------------------------------------- X

MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK,

Plaintiffs,

-vs-

NORTHWESTERN CORPORATION,

Defendant.

Civil Action No. C.A. No. 04-1494 (JJF)

-------------------------------------- X

MAGTEN ASSET MANAGEMENT CORP.,

Plaintiff,

-vs-

MICHAEL J. HANSON and ERNIE J. KINDT,

Defendants.

Civil Action No. C.S. No. 05-499 (JJF)

-------------------------------------- X

DATE: November 8, 2007

TIME: 9:00 a.m.

Deposition of ROBERT W. BERLINER, held at the offices of Curtis, Mallet-Prevost, Colt & Mosle, 101 Park Avenue, New York, New York,

Page 26

- ROBERT W. BERLINER -

**any attorneys representing the plaintiffs in this action regarding this Complaint?**

A. No, sir.

**Q. I'd like to refer your attention to Page 10 of the Complaint, Paragraph 51.**

**Do you have that, sir?**

A. Yes, I do.

**Q. It states, "The debtor was insolvent both immediately before and immediately after the acquisition of MPLLC and the assumption of related liabilities. Debtor was engaged in a business with unreasonably small capitalization and incurred debts beyond its ability to pay both immediately before and immediately after the acquisition of MPLLC and the assumption of liabilities."**

**Sir, do you understand that the debtor referred to in this paragraph is Northwestern Corporation, the defendant in this case?**

MR. KAPLAN: Rather than asking the question, it's defined up front. I'd rather have the witness look at the definition.

MR. PIZZURRO: That's fine. I just want his understanding.

A. That's my understanding, yes.

Page 27

- ROBERT W. BERLINER -

**Q. Do you recall, reviewing this paragraph of the Complaint, when you looked at the Complaint?**

A. Yes.

**Q. Were you ever asked to offer an opinion regarding the allegations contained in this paragraph?**

A. No.

**Q. Did you ever consider an opinion regarding the allegations contained in this paragraph?**

A. No.

**Q. Was there ever any discussion that you had either with your colleagues or with any attorneys representing the plaintiffs concerning the allegations contained in this paragraph?**

MR. KAPLAN: Object to the form.

A. I think the answer is yes.

**Q. Okay. And what -- with whom did you have that -- those discussions, conversations or conversation?**

A. With Mr. Holmes and Mr. Schwitter.

**Q. When did you have those conversations or conversation?**

A. In August or September of this year.

Page 28

- ROBERT W. BERLINER -

**Q. Do you recall whether it was more than one conversation?**

A. It was one conversation.

**Q. What was said? What did you say and what did they say, to the best of your recollection, in that conversation?**

A. The essence of the conversation was that they communicated to me that counsel had asked us to opine, as I have in the fourth opinion on Page 4 of my report, based on a hypothetical assumption that Clark Fork remained directly obligated for the QUIPS following the going flat transactions.

**Q. Sir, let me -- you do understand that the issue in Paragraph 51 is the solvency of Northwestern Corporation; do you not?**

A. Yes.

**Q. Can you explain to me, then, the relationship between that allegation and Opinion Number 4?**

MR. KAPLAN: Objection to form.

A. Yes.

**Q. Please, could you explain?**

A. In reading the deposition transcripts in the case, a lot of the testimony had to do with the

Page 29

- ROBERT W. BERLINER -

going flat transaction, the insolvency issues and those kinds of things. And I raised the question with my colleagues, you know, much of the testimony is seemingly irrelevant to the opinions that we're going to be expressing in our report and isn't that an odd situation for us?

And it was then that I learned that the only way that we were going to even remotely address any of those was by offering the opinion I referred to based on the hypothetical assumption.

**Q. Let's look at Opinion Number 4. Okay. It states, "Assuming that Clark Fork remained directly obligated for the QUIPS, following the November 15th, 2002, going flat transaction, its total liabilities would have materially exceeded its total assets."**

**Can you explain to me how that opinion relates to the solvency or insolvency of Northwestern before or after the going flat transaction?**

MR. KAPLAN: Asked and answered.

A. The relationship -- obviously, it doesn't relate. The relationship, in my mind, was -- it was the linkage as to how -- how come I

Page 30

- ROBERT W. BERLINER -

wasn't going to address the issues related to the going flat transaction and the solvency or insolvency of Northwestern that for some reasons, that were apparently legal reasons, counsel had restricted my attention to just this particular hypothetical assumption and that's the linkage.

**Q. So you understood -- am I correct that you understood that counsel was specifically not asking you to opine regarding the solvency of Northwestern?**

MR. KAPLAN: Object to the form.

A. Not because they said that in so many words but because this is all that I was asked to do, so obviously I wasn't asked to address the solvency of Northwestern.

**Q. Did you question that in the conversation that we're now referring to that you had with your colleagues, did you question why you were not being asked to offer an opinion regarding solvency or insolvency of Northwestern?**

A. Yes.

**Q. What did they tell you?**

A. They told me that this isn't our area of expertise and that may have been a reason why we

Page 31

- ROBERT W. BERLINER -

weren't asked to address it. But I never did find out by conversations with counsel as to the reason or not.

This was what I was asked to do. It was relatively easy to do it, and so I felt somewhat delighted that this is all I had to do because I was concerned about being able to render my report by the 19th of September.

**Q. What else was discussed regarding the allegations in this paragraph, Paragraph 51 of the Amended Complaint, during the conversation we're referring to?**

A. Nothing else.

**Q. You testified a moment ago that in that conversation you remarked that much of what you had read in the deposition testimony seemed to be irrelevant to the issues that you were being asked to opine on.**

**Do you recall saying that?**

A. Yes.

**Q. Why did you feel that way?**

A. Because I wasn't being asked to express any opinions such as the ones you've asked me about relating to the solvency or insolvency of

Page 32

- ROBERT W. BERLINER -

Northwestern or any of the ramifications relating to the going flat transaction.

**Q. You did rely, however -- strike that.**

**Your report reflects that you did review deposition transcripts taken in this case, correct?**

A. Correct.

**Q. Did you view those as irrelevant to any of the opinions that you've offered in this case?**

A. No.

**Q. Okay. But irrelevant to Opinion Number 4, is that what I understand; is that correct?**

MR. KAPLAN: Object to form.

A. Yes.

MS. DELANEY: Are you expecting any males to join us? There is apparently a Mr. Schwartz here to join the deposition. Does anyone know who he is?

**Q. Off the record.**

**(Whereupon, there was a brief recess in the proceedings.)**

**Q. Mr. Berliner, prior to your retention by Fried, Frank and Storch Amini in this case, had you ever been employed by Magten Asset Corporation?**

Page 33

**- ROBERT W. BERLINER -**

MR. KAPLAN: Object to the form.

A. No.

**Q. Had you ever had any associations with Magten?**

A. No.

**Q. Had you ever been employed by Law Debenture Corporation?**

A. No.

**Q. Had you ever had any association with Law Debenture Corporation?**

A. No.

**Q. To the best of your knowledge, did your organization prior to this retention have any prior association with Magten?**

A. No.

**Q. To the best of your knowledge prior to this retention, did your organization have any prior association with Law Debenture?**

A. No, sir.

**Q. Can we look, Mr. Berliner, at Exhibit A to your report, which is at Page -- there's a lot of different A-1s in here.**

A. I'll bet.

**Q. Which is your CV, your curriculum vitae.**

Page 42

- ROBERT W. BERLINER -

**As I recall, 2007 is this case, that's what you're referring to; is that right?**

A. And the second one covered both 2006 and '7.

**Q. So, am I correct in understanding that the work you did in 2006 with respect to a 142 goodwill impairment analysis is work that relates to this litigation?**

A. No.

**Q. I'm sorry. Did it relate to a litigation?**

A. Yes.

**Q. Did you offer an opinion as an expert in this litigation?**

A. No.

**Q. The work that you performed in 2005, was that also in connection with a litigation?**

A. Yes, sir.

**Q. Did you offer an opinion in that litigation?**

A. I did.

**Q. What was the name of that case? Do you recall the name of the case?**

A. Let me see if I can get it from -- the

Page 43

- ROBERT W. BERLINER -

name of the case was the Huff Alternative Income Fund LP against PriceWaterhouseCoopers LLP.

**Q. Is that the case which is listed at Page B2 of Exhibit B to your report?**

A. Yes, sir.

**Q. What was -- were you representing plaintiff or the defendant in that case?**

A. The plaintiff.

**Q. Was there a judgment or verdict in that case?**

A. I believe that case settled.

**Q. Sir, do you remember the name of the case you testified to in 1992 where there was a successful disqualification motion made with respect to your participation?**

MR. KAPLAN: Object to the form.

A. I refer to it as the Interfund case, but I don't think that was the exact name of the case, so I don't recall the exact name of the case.

**Q. What court was that case?**

A. I don't recall.

**Q. Do you recall the state?**

A. No.

**Q. Do you recall the name of the case --**

Page 44

- ROBERT W. BERLINER -

**the second case that you referred to, which I believe was 1993, in which a disqualification motion was made?**

A. Yes. It was a class action case involving the Republic Bank, maybe the First Republic Bank. I don't remember the exact name of -- Texas, not New York.

**Q. Do you recall what court that was in?**

A. Yes. It was a court in Texas.

**Q. Do you recall whether --**

A. Dallas, I believe. I believe federal court in Dallas.

**Q. Earlier, if you recall, we were discussing a discussion you had with your colleagues regarding the allegations in Paragraph 51 of the Complaint.**

**Do you recall that testimony?**

A. Not in the Complaint in this litigation, but the First Amended Complaint.

**Q. Yes, sir, the First Amended Complaint.**

A. Yes, sir.

**Q. Do you remember that testimony?**

A. Yes.

**Q. Sir, do you recall whether or not either**

Page 45

- ROBERT W. BERLINER -

**of your colleagues, Mr. Holmes or Mr. Schwitter, had done a preliminary analysis of Northwestern solvency either before or after the going flat transaction?**

A. I recall we did not.

**Q. You did not?**

A. No.

**Q. No one at your organization did; is that correct?**

A. That's correct.

**Q. Do you know if any such preliminary analysis was ever done by anyone in the employ of the plaintiffs in this case?**

A. No, I don't.

**Q. Sir, if we look back again at Page 4 of your report, Opinion Number 1. Opinion Number 1 states, "The consolidated financial statements of NW," -- Northwestern, "originally filed with the SEC Forms 10-Q for the quarters ended March 31st, June 30th and September 30th, 2002, were materially false and misleading as a result of various violations of GAAP and SEC regulations."**

**Sir, did you or do you have an understanding as to why -- strike that.**

Page 46

- ROBERT W. BERLINER -

**Do you have an understanding as to how that opinion is relevant to any issue in this lawsuit?**

A. Yes.

**Q. What's your understanding?**

A. One, had these violations not taken place, the covenants might not have been violated. Two, had the financial statements been properly presented, maybe the Montana Power Commission wouldn't have approved the going flat transaction or whoever had to approve it wouldn't have approved it. Maybe that would never have taken place.

Those would be the kinds of things I think would make my opinion relevant.

**Q. Where did you obtain that understanding?**

A. Purely supposition on my part.

**Q. Did anyone ever tell you those things?**

A. No.

**Q. Did you ever have a conversation in which you were told or in which it was discussed that this was why your opinion in Number 1 was relevant?**

A. No.

**Q. It was purely your own analysis based on**

Page 47

- ROBERT W. BERLINER -

**the reading of the Complaint; is that correct?**

A. And the deposition transcripts primarily.

**Q. Sir, do you have any experience with the Montana -- you called it the Montana Power Commission.**

**Were you referring to the Montana Public Service Commission?**

A. Yes.

**Q. Do you have any experience with the Montana Public Service Commission?**

A. No, sir.

**Q. Do you know what the scope of authority is of the Montana Public Service Commission?**

A. No.

**Q. Do you know whether the Montana Public Service Commission could have approved the going flat transaction?**

A. Not with any degree of certainty.

**Q. Why did you assume that your opinion given in Number 1 would be relevant, then, to whether or not the Montana Public Service Commission may have taken some action with respect to the going flat transaction?**

Page 48

- ROBERT W. BERLINER -

A. Because it seemed to me from all the documents I read that there was approval required for this transaction to go through. And I guess my recollection is that the Montana Public Service Commission -- Public Utility Service Commission was involved in that approval and that they might have thought differently about it had the financials -- the true financial condition of Northwestern been known.

**Q. Do you have an understanding as to whether or not the Montana Public Service Commission, in fact, approved the transaction?**

MR. KAPLAN: Object to form.

A. No.

**Q. Do you have any understanding as to when Northwestern may have applied to the Montana Public Service Commission for the approval of the transaction?**

MR. KAPLAN: Object to the form.

A. I assume it was prior to the transaction taking place.

**Q. Do you have any understanding as to whether or not the financials upon which you opine were put before the Montana Public Service**

Page 49

- ROBERT W. BERLINER -

**Commission at the time the application was made?**

MR. KAPLAN: Object to the form.

A. No, I don't.

**Q. Would it change your view if I were to tell you that, in fact, the financials upon which you offered an opinion were not before the Montana Public Service Commission when it approved the transaction?**

MR. KAPLAN: Object to the form.

A. Would it change what view?

**Q. The view that you expressed that your Opinion Number 1 is relevant; but for the violations of GAAP, the Montana Public Service Commission might have acted differently than it did?**

MR. KAPLAN: Object to the form.

A. Yes. That would change my view.

**Q. What would your view be if I were to tell you that?**

A. Well, if the financials for the first three quarters of 2002 had not been placed before the Montana Power Commission, then the misstatements in those financial statements, I guess, wouldn't have been known to the utility

- ROBERT W. BERLINER -

A. It's to take the impairment analysis that American Appraisal performed and update it. I don't know that I would call it an entirely new analysis.

**Q. I may come back to that, but for the moment I just want to direct your attention to the last part of your report. It's on Page 5-1 of your report.**

**Mr. Berliner, Page 5-1, the assumption which you built into your opinions that Clark Fork remained directly liable under the QUIPS following the going flat transaction.**

A. Yes.

**Q. What if Clark Fork had not remained liable on the QUIPS following the going flat transaction, would your opinion have changed?**

A. No. My opinion is based on a hypothetical assumption that's stated here, that such opinion would never change. It's based on that hypothetical assumption.

**Q. I see. So, your assumption -- your opinion is had Northwestern -- this has to be -- I think it's not explicit but it must be implicit.**

**Had Northwestern transferred all of the**

- ROBERT W. BERLINER -

**assets except the Milltown Dam to itself, but left liabilities, simply the QUIPS liabilities to be paid by Clark Fork, that would have rendered Clark Fork insolvent or would have put it in a position where its total liabilities exceeded its total assets.**

A. Exactly.

MR. KAPLAN: Objection to the form.

**Q. So it has to be both, both Northwestern had to take the assets and Northwestern had to leave that liability, correct?**

A. Correct.

**Q. If both of those assumptions aren't built in, of course, we're talking about a different set of facts and hypotheticals and you have no opinion; is that correct?**

A. That's correct.

**Q. It's a little like if my mother had wheels, she'd be a car.**

MR. KAPLAN: Objection.

A. I don't know your mother.

MR. PIZZURRO: Let's take five minutes, please.

(Whereupon, there was a brief recess in

- ROBERT W. BERLINER -

the proceedings.)

MR. PIZZURRO: I have no further questions.

EXAMINATION BY MR. KALECZYC:

**Q. Mr. Berliner, my name is Stan Kaleczyc. I represent Mike Hanson and Ernie Kindt in the Magten Asset Management versus Hanson and Kindt case.**

**If I understood your testimony earlier this morning, you personally came on board and were engaged to work on your expert report on about August 11th of 2007.**

MR. KAPLAN: Objection.

A. That was about when we found out the due date.

**Q. When did you -- well, when did you begin to personally work on the expert report that you've offered in this case?**

A. I began probably at the tail end of July.

**Q. For the 50 or so days between the end of July and September 19th, the date of the report, could you estimate for me about how much time you**

- ROBERT W. BERLINER -

**spent working on the report?**

A. Yes. I'd say about 200 hours.

**Q. You had two colleagues principally who also were working on the report?**

A. Yes.

**Q. Did they begin working on the report and reviewing documents before the end of July?**

A. Yes, they did.

**Q. Do you know about when they began?**

A. They began right after the November '06 meeting that I talked about.

**Q. So, they worked on the report for approximately ten months then, from November of '06 until September of '07?**

A. Yes.

**Q. And do you know approximately how many hours they worked on the report?**

A. I do.

**Q. Can you tell me that, please?**

A. Yes. Mr. Holmes worked approximately 800 hours, and Mr. Schwitter approximately 1600 hours.

**Q. So that's 2,400 hours for the two of them plus 200 hours of your time, so we're up to**

- ROBERT W. BERLINER -

**about 2700 hours?**

A. And a few hundred of some other people.

**Q. You anticipated my next question.**

**So maybe about 3,000 hours, give or take, by your firm?**

A. I think our total input hours through October 31st was 3,100 hours.

**Q. In preparing your expert report, did you review the Complaint filed in Magten versus Hanson and Kindt?**

A. Yes.

MR. KAPLAN: Objection to the form. Just to clarify you're talking about the First Amended Complaint?

MR. KALECZYC: No. I'm talking about the Complaint in Hanson and Kindt?

**Q. If you would turn, Mr. Berliner, to Paragraph -- or excuse me, Pages 2 and 3 of your report where you have the Scope of Engagement, Paragraph B.**

**Maybe I missed it, but I did not see the Hanson and Kindt report listed, unlike the First Amended Complaint in the Northwestern case.**

MR. KAPLAN: Objection to the form.

- ROBERT W. BERLINER -

**Q. Is that correct? It's not listed in as part --**

A. I believe that's correct.

**Q. What other materials did you review that are not listed either in Section B, Scope of Engagement, or on Exhibit E, which is the listing I think of Bates stamped documents you looked at?**

A. I don't think there are any others.

**Q. Throughout your report you refer to various accounting standards.**

**Were there any other accounting standards that you relied upon that are not discussed specifically in your report?**

A. The ones discussed in my report are the principal ones.

**Q. I understand that they're the principal ones that you relied upon.**

**My question, though, Mr. Berliner, was; in addition to the principal ones, are there other accounting standards upon which you relied but perhaps you did not reference?**

A. The answer is yes.

**Q. And could you tell me, from your memory sitting here today, which other accounting**

- ROBERT W. BERLINER -

**standards those were?**

A. No, I can't.

**Q. Could you describe them, if not by specific number, by the topic of the accounting standard?**

A. There are various accounting standards that deal with prior period adjustments and correction of errors.

There are standards that deal with materiality and those are the ones that come quickly to mind that aren't directly related to the specific issues.

**Q. Just so that it's clear to me, Mr. Berliner, did you specifically refer to those standards in preparing the report, or did you rely upon your general knowledge of the subject matter of those standards?**

A. The latter, my general knowledge of those matters.

**Q. So then the only accounting standards that you specifically reviewed in preparing the report are the ones that are cited in the report itself?**

A. Yes and no. I noticed in thumbing

- ROBERT W. BERLINER -

through the pages that on Page 1-3 I cited from SFAS Number 5. I know that standard pretty well, and so I did not go back to read that standard.

However, in drafting the report, my colleague excerpted from that standard. I read the excerpts on Page 1-3, and they conformed to my recollection of what that standard said. I didn't go back and check word for word that he had excerpted each word accurately.

**Q. I believe it was your testimony this morning -- and correct me if I didn't hear it or I'm remembering it not properly, that the appendices were prepared by your colleagues and reviewed -- you reviewed their work?**

A. That's correct.

**Q. So, you're not the original author of any of the material contained in the appendices to the report; is that correct?**

A. That's correct.

**Q. In reviewing the Complaint in Magten versus Hanson and Kindt, sitting here today, what is your understanding of what the allegations are against Mr. Hanson and Mr. Kindt?**

A. I don't recall what's in that Complaint.

- ROBERT W. BERLINER -

It was among the early documents that I looked at, and I did not address any allegations against any specific individuals. That was not within the scope of my engagement.

**Q. Did you discuss the Hanson and Kindt Complaint with anyone before the time that you prepared your expert report?**

A. I did not.

**Q. Have you discussed the Hanson and Kindt Complaint with anyone since the time that -- September 19th when the report was finalized?**

A. I did not.

**Q. Did anyone specifically tell you not to address the allegations contained in the Hanson and Kindt Complaint?**

A. No, sir.

**Q. Why is it then, Mr. Berliner, that your expert report references both the case against Northwestern and the case against Hanson and Kindt? When I say "references," I mean in the title caption on Page 1.**

A. I don't recall the reason.

**Q. In your report, do you render any opinion concerning Mike Hanson's knowledge**

- ROBERT W. BERLINER -

**concerning whether there was inadequate consideration given in the going flat transaction?**

MR. KAPLAN: Objection to the form.

A. No, I don't.

**Q. Did you examine that issue as part of the preparation of your expert report?**

A. I did not.

**Q. Did you, in the course of preparing your opinion, form an opinion as to whether Mike Hanson violated any generally accepted accounting principles?**

A. I did not.

**Q. Did you consider whether Mr. Hanson may have violated any generally accepted accounting principles?**

A. No. As I indicated, I didn't address myself to any one individual.

**Q. Likewise, then, I assume that you have no opinion as to whether Mr. Hanson failed to timely recognize any goodwill impairments?**

A. That's correct.

**Q. And it would be your same view, then, with respect to whether Mr. Hanson breached any fiduciary duties owed to anyone?**

- ROBERT W. BERLINER -

A. That's correct.

**Q. During the time period on or about November 15th, 2002, do you know what Mr. Hanson's position was with Northwestern?**

A. I understood him to be the -- the head of the utility business.

**Q. Could you -- when you say "utility business," what do you mean by that?**

A. Northwest Energy, the business in South Dakota and then eventually Montana as well.

**Q. Do you know if Northwestern had any utility business activities in any other states besides South Dakota and Montana?**

A. I think there was one other state. I can't recall whether it's North Dakota. There's one other state, maybe more than one other state.

**Q. With respect to Mr. Kindt, do you know what position Mr. Kindt held with Northwestern on or about November 15th, 2002?**

A. I think he was the vice president of accounting.

**Q. Was he the vice president of accounting for Northwestern Corporation?**

A. I think he was with Montana Power. I'm

- ROBERT W. BERLINER -

not certain of that.

**Q. Would it make any difference to you whether he was with Montana -- as you referred to it Montana Power, and I assume you mean Montana Power LLC rather than with Northwestern Corporation?**

A. No.

**Q. Why not?**

A. Because I expressed my opinions based upon Northwestern and it's collective management, not any specific individual. I did not address any of these positions I took in my report as they may apply to any specific individual.

**Q. So, then I assume your answers will be the same with respect to Mr. Kindt that I asked you with respect to Mr. Hanson, and that is that you did not form an opinion as to whether Mr. Kindt did anything the violate any generally accepted accounting principles in 2002?**

A. That's correct.

**Q. And likewise, you have no opinion as to whether Mr. Kindt failed to timely recognize any goodwill impairment for Blue Dot or Expanets?**

A. That's correct.

Page 150

- ROBERT W. BERLINER -

**Q. And similarly, you have no opinion as to whether Mr. Kindt was involved in a failure to provide adequate consideration with respect to the going flat transaction?**

A. That's correct.

**Q. And you have no opinion as to whether Mr. Kindt violated any fiduciary duties?**

A. That's correct.

**Q. Do you know whether Mr. Kindt had any responsibilities with respect to Blue Dot? I'm talking about the period in 2002.**

A. I don't know for certain, but my recollection is he did not.

**Q. Again, with respect to Mr. Kindt, do you know whether he had any responsibilities with respect to Expanets?**

A. No, I don't.

**Q. Do you know whether Mr. Kindt had any responsibilities with respect to the accounting of Northwestern Corporation as distinct from the accounting for the Montana utility business?**

MR. KAPLAN: Objection to form.

A. No, I don't.

**Q. With respect to Mr. Hanson, do you know**

Page 151

**- ROBERT W. BERLINER -**

**whether he had any responsibilities with respect to the management of Blue Dot?**

A. I don't believe he did.

**Q. Do you know whether Mr. Hanson had any responsibilities with respect to the management of Expanets?**

A. I don't believe he did.

**Q. Do you know whether Mr. Hanson was responsible for any of the accounting activities of Northwestern Corporation?**

A. I don't believe he was responsible for the accounting.

**Q. Do you know who was responsible during the 2002 time period for the accounting activities of Northwestern?**

A. I believe it was Mr. Orme.

**Q. Do you know who was responsible during that time for financial disclosures which may have been made by Northwestern Corporation?**

A. Again, I would say Mr. Orme.

**Q. You would agree with me that to your knowledge Mr. Hanson had no responsibilities for those accounting -- for those disclosure requirements and functions?**

Page 152

**- ROBERT W. BERLINER -**

MR. KAPLAN: Objection to form.

A. I would think if I were in his shoes and there were financial statements and disclosures that reflected various things relating to the operations for which I was responsible, I would be monitoring that.

**Q. And those responsibilities, as you testified earlier, refer to the utility business operations of Northwestern, correct?**

A. That's correct.

**Q. Would your answers be the same with respect to Mr. Kindt, concerning financial disclosures of Northwestern?**

A. Yes.

**Q. So that you would agree with me that Mr. Kindt's responsibilities, if any, associated with the disclosures by Northwestern Corporation's would be limited to the utility business with which he was familiar?**

A. That would be my recollection, yes.

**Q. And that would even be the utility business by which he was specifically employed?**

A. Yes.

**Q. Did you review the deposition of**

Page 153

**- ROBERT W. BERLINER -**

**Mr. Hanson in preparation of your expert report?**

A. I did.

**Q. Did you review the deposition of Mr. Kindt in preparation of your expert report?**

A. I did.

**Q. How about the deposition of Mr. Talton Embry?**

A. No, I did not.

**Q. Do you know who Mr. Embry is?**

A. I believe he's with Magten.

**Q. I think you had testified this morning, Mr. Berliner, that you did not find anything in the depositions that you reviewed to be particularly useful for your expert report.**

**Am I remembering your testimony correctly?**

MR. KAPLAN: Objection.

A. No. That was not accurate.

**Q. You would help me, then. I don't want to be inaccurate in asking you questions.**

**You reviewed -- tell me first, in addition to the Hanson, Kindt and Embry depositions, what other depositions did you review in the preparation of your expert report?**

- ROBERT W. BERLINER -

A. They're all listed in the last exhibit to my report; that's Exhibit E.

**Q. So with respect to those depositions that you did review, Mr. Berliner, you refresh my memory, then, so that the record is accurate as to what you testified to this morning with respect to these depositions.**

MR. KAPLAN: Just to clarify, I think he meant Exhibit F, so the record is clear.

THE WITNESS: You're right; it's Exhibit F.

MR. KAPLAN: I apologize for interrupting the questioning.

MR. KALECZYC: That's all right.

**Q. Again, my question was: If you could refresh my memory as to what you testified to this morning about the utility of those -- review of those depositions?**

A. Yeah. The deposition transcripts covered many subjects. What seems to me to be the principal subject covered, at least in terms of the attention devoted during the time of the depositions, had to do with the utility business, the acquisition of Montana Power, the going flat

- ROBERT W. BERLINER -

transaction, and that kind of stuff.

And that's what I meant that I didn't find relevant to the opinions that I would be expressing in my report. But there were other coverage of the Blue Dot and the Expanets situations and the other accounting improprieties at Northwestern that were relevant to the report.

**Q. Sitting here today, Mr. Berliner, was there anything in Mr. Kindt's deposition that you found relevant to your expert report that you've submitted in these cases?**

A. I really don't recollect any individual deposition that I read back in early August.

**Q. Would you agree with me that there are no references to Mr. Kindt's deposition contained in your expert report or the -- including the appendices, other than Exhibit F itself?**

A. Yes. I believe that's correct.

**Q. Was that because you found nothing terribly useful or relevant for purposes of the opinions that you'd rendered?**

A. Yes.

MR. KAPLAN: Objection.

**Q. With respect to Mr. Hanson's deposition,**

- ROBERT W. BERLINER -

**is there anything from Mr. Hanson's deposition that you found to be relevant to the opinions that you rendered in your report?**

A. I don't think so.

**Q. If we could turn to Page 4 of your report, which contains the opinions, Mr. Berliner. In Opinion Number 2, which contains the four Subparagraphs A through D, each one begins with the term, "Northwestern management knowingly," and then Sub A, "that Northwestern management knowingly violated GAAP in preparing Northwestern's consolidated financial statements for each of the first three-quarters."**

**When you refer to "Northwestern's management," to whom are you referring?**

A. I'm referring to primarily Mr. Orme, but Mr. Lewis, Mr. Hylland, those top people.

**Q. You said "primarily" those three individuals. Anyone else?**

A. Primarily those three, maybe Kendell Cleaver as well, but those people.

**Q. Mr. Lewis held what position in the company?**

A. CEO.

- ROBERT W. BERLINER -

**Q. Mr. Hylland had what position?**

A. I believe it was COO.

**Q. Mr. Orme?**

A. CFO.

**Q. And Mr. Kendell Cleaver?**

A. Director of accounting, something like that.

**Q. So when you're talking about Northwestern's management with respect to Opinion 2A, it would be those four individuals?**

A. Yes.

**Q. With respect to your Opinion 2B, which reads, "Northwestern's management knowingly failed to timely recognize goodwill impairment losses by intentionally providing artificial cash flow projections to American Appraisal."**

**Again, are you referring to the four individuals Lewis, Hylland, Orme and Cleaver, or are other people implicated in 2B?**

A. The other people that would be implicated would be the management of Expanets and the management of Blue Dot.

**Q. With respect to your Opinion 2C, which reads, "Northwestern's management knowingly failed**

Page 158

- ROBERT W. BERLINER -

**in its various filings with the SEC to comply with the disclosure requirements under SEC regulations."**

**Which individuals are you referring to as management with respect to 2C?**

A. Mr. Lewis, Mr. Hylland, Mr. Orme and Mr. Cleaver.

**Q. With respect to your opinion on 2D, which reads, "Northwestern's management knowingly disseminated materially false and misleading information to the public."**

**Again, the same question: Which individuals are you referring to as the management?**

A. Again, the same answer; the same four people.

**Q. With respect to your Opinion Number 3, which reads, "Northwestern would have violated its debt covenants for the quarters ended June 30th and September 30th, 2002, but for the violations of GAAP discussed in this report."**

**Do you have an opinion as to whether Mr. Hanson was responsible for any of those violations of GAAP discussed in your report?**

A. No, I don't.

**Q. How about Mr. Kindt, any opinion?**

Page 159

- ROBERT W. BERLINER -

A. I have no opinion.

**Q. In your opinion, which individuals were responsible for the GAAP violations?**

A. The four people I mentioned at Northwestern.

**Q. And that's --**

A. Mr. Lewis, Mr. Hylland, Mr. Orme and Mr. Cleaver, collectively.

**Q. Now, in your report in a number of places, you discuss such things as -- for example, the proper accounting for the contracts that Expanets had.**

**Do you remember that testimony -- that?**

A. Yes.

**Q. What type of analysis would be required to determine the appropriate accounting treatment for those contracts as to whether they should be done on a completed or ongoing basis?**

MR. KAPLAN: Objection to the form.

A. The nature of the contracts and what was called for under the contracts and the ability of the entity to reasonably estimate the percentage of completion.

**Q. For someone to make that determination,**

Page 160

- ROBERT W. BERLINER -

**what kinds of information would they need to have about those contracts?**

MR. KAPLAN: Objection to the form.

A. Need to have information as to what the deliverables were under the contract, how the estimates of what the costs would be involved to perform, what was required to be performed under the contract, whether the accounting systems and procedures of the company were such as to be able to reasonably estimate those costs and monitor them as time went on; information of that nature.

**Q. Would it be fair to say, given your prior answer, that you'd have to have a fairly good working knowledge of the business of Expanets in order to make that determination?**

A. That would help a lot.

**Q. In order to do a discounted cash flow analysis for appraisal purposes, is that the kind of activity that can be done by anyone who is a certified public accountant?**

MR. KAPLAN: Objection to the form.

A. No. There are many certified public accountants who don't get involved in that kind of work.

Page 161

- ROBERT W. BERLINER -

**Q. In fact, in order to do that kind of work, that requires a specialty or special expertise, wouldn't you agree?**

A. I don't know that I'd call it a special expertise. It would require some knowledge.

**Q. When you say "some knowledge," what kind of knowledge are you talking about?**

A. About what the technique is all about and how to apply it.

**Q. Having an accounting degree is not, in your view, sufficient background in order to do a discounted cash flow?**

MR. KAPLAN: Objection.

A. No. I think you need a little more than an accounting degree.

**Q. You might need more than just a certified public accountancy recognition, correct?**

A. No. I think that if one only had the recognition of a CPA but had experience in doing that kind of thing, that would suffice.

**Q. So it would require not only the CPA designation but also some practical experience doing that kind of work?**

A. It wouldn't even require the CPA