## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 04-1494 (JJF) |
| NORTHWESTERN CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |
| MAGTEN ASSET MANAGEMENT CORP., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 05-499 (JJF) |
| MICHAEL J. HANSON and ERNIE J. KINDT, | ) ) | |
| Defendants. | ) ) ) | |

## NORTHWESTERN CORPORATION'S MEMORANDUM OF
## LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
Joseph D. Pizzurro
Nancy E. Delaney
Myles K. Bartley
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000

Counsel for NorthWestern Corporation

Dated: November 30, 2007

**GREENBERG TRAURIG, LLP**
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 661-7000
counihanv@gtlaw.com
melorod@gtlaw.com

## Table of Contents

Page

SUMMARY OF ARGUMENT ................................................................... 1

STATEMENT OF FACTS .......................................................................... 6

   A.   The Acquisition of Montana Power Company Utility Assets ............................ 6

   B.   QUIPS and Going Flat ................................................................... 10

   C.   Expanets, BlueDot and NorthWestern's Financials for the First Three Quarters of 2002 ......................................................................... 14

   D.   Plaintiffs Are Late-Purchasers of the QUIPS and Never Relied Upon Any Statement by NorthWestern ............................................................. 16

   E.   Prior Proceedings ......................................................................... 17

       1.   NorthWestern Seeks Bankruptcy Relief and BoNY Resigns as Indenture Trustee ... 17

       2.   Plaintiffs Initiate Adversary Proceedings ............................................. 17

       3.   Plaintiffs' First Amended Complaint ................................................ 18

       4.   Ancillary Proceedings Involving BoNY ............................................. 19

       5.   Present Procedural Posture ........................................................... 20

ARGUMENT ........................................................................................ 20

I  Plaintiffs' Claim That There Was Fraud In Connection With The Third Supplemental Indenture Has No Support ............................................... 22

   A.   The Bank of New York Did Not Rely on NorthWestern's 2002 Financial Statements ................................................................................ 22

   B.   Plaintiffs Are Estopped From Arguing That The Bank of New York Would Have Taken Action If It Knew the True Financial Condition of NorthWestern ............................................................................. 23

   C.   NorthWestern Was Solvent Both Before and After the Going Flat Transaction ................................................................................ 25

   D.   Plaintiffs Cannot Prove That NorthWestern Did Not Intend To Pay the QUIPS ..................................................................................... 26

II  Plaintiffs' New Theory That But For NorthWestern's 2002 Financials The Going Flat Transaction Would Not Have Occurred Fails As A Matter Of Fact And As A Matter Of Law ............................................. 28

   A.   The Marcus Theory Was Never Pled and Should Not Be Permitted ............... 28

B.   Marcus' Report Is Flawed Because He Has No Basis To Predict the Actions of the MPSC ........................................................................................... 29

C.   There Is No Evidence That NorthWestern Misstated Its Financials In Order To Accomplish The Going Flat Transaction ....................................... 33

D.   Plaintiffs Have Failed to Prove Proximate Causation ...................................... 34

**III  Plaintiffs Have No Claim for Unjust Enrichment** ........................................... **38**

**CONCLUSION** ......................................................................................................... **39**

## Table of Authorities

Page

**Cases**

*Abry Partners V v. F & W Acquisition LLC*,
   891 A.2d 1032 (Del. Ch. 2006) ........................................................................ 21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................ 21

*Archawski v. Hanioti*,
   239 F.2d 806 (2d Cir. 1956) ........................................................................... 27

*Astropower Liquidating Trust v. KPMG LLP*,
   No. 06-469, 2007 U.S. Dist. LEXIS 38222 (D. Del. May 25, 2007) ...................... 38

*AUSA Life Ins. Co. v. Ernst & Young, LLP*,
   206 F.3d 202 (2d Cir. 2000) ........................................................................... 34

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield, Inc.*,
   448 F. 3d 573 (2d Cir. 2006) .......................................................................... 38

*Brooks, Jr. v. Fiore*,
   No. 00-803, 2001 U.S. Dist. LEXIS 16345 (D. Del. Oct. 11, 2001)........................ 33

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................ 21

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
   424 F. Supp. 2d 1229 (E.D. Ca. 2005)........................................................ 31, 32

*Creedon Controls v. Banc One Bldg. Corp.*,
   470 F. Supp. 2d 457 (D. Del. 2007)................................................................. 21

*Delaware River Port Authority v. Fraternal Order of Police*,
   290 F.3d 567 (3d Cir. 2002) ........................................................................... 25

*Dimensional Commc'ns, Inc. v. Oz Optics*,
   Ltd., No. 04-1817, 2005 U.S. App. LEXIS 17111 (3d Cir. 2005)........................... 29

*Eastern Mineral & Chems. Co. v. Mahan*,
   225 F.3d 330 (3d Cir. 2000) ........................................................................... 29

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) ........................................................................... 31

*Freeman v. Topkis,*
   40 A. 948 (Del. Super. Ct. 1893) ................................................... 27

*Goldman v. Metro. Life Ins. Co.,*
   5 N.Y.3d 561, 807 N.Y.S.2d 583 (2005) .......................................... 38

*Halligan v. Glazebrook,*
   59 Misc. 2d 712, 299 N.Y.S.2d 951 (N.Y. Sup. Ct. Suffolk Cty 1969) .............. 23

*Hecht v. Commerce Clearing House, Inc.,*
   897 F.2d 21 (2d Cir. 1990) ........................................................ 34

*Hill Stores Co. v. Bozic,*
   769 A.2d 88, 112 (Del. Ch. 2000) ................................................. 21

*Holmes v. Sec. Investor Protection Corp.,*
   503 U.S. 258 (1992) ................................................................ 34

*In re: NorthWestern Corp. (Magten Asset Mgmt. Corp. & Law Debenture Trust Co. of NY v. Northwestern Corp.),*
   313 B.R. 595 (D. Del. Bankr. 2004) .............................................. 18

*In re: Paragan Sec.,*
   589 F.2d 1240 (3d Cir. 1978) .................................................... 27

*In re: Rezulin Prods. Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y 2004) .............................................. 33

*J.S. Alberici Constr. Co. v. Midwest Conveyor Co.,*
   750 A.2d 518 (Del. 2000) ........................................................ 21

*Lama Holding Co. v. Smith Barney, Inc.,*
   88 N.Y.2d 413, 421 N.Y.S.2d 76 (1996) ...................................... 21, 33

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005) ..................................................... 34

*Levin v. Kazlowski,*
   13 Misc. 3d 1236(A), 831 N.Y.S.2d. 354, 2006 WL 3317048
   (NY Sup. Ct. NY Cty Nov. 14, 2006) .............................................. 25

*Magten Asset Mgmt. Corp. v. The Bank of NY,*
   15 Misc. 3d 1132(A), 841 N.Y.S.2d 219, 2007 N.Y. Misc. LEXIS 3320
   (Sup. Ct. N.Y. Co. May 8, 2007) ........................................ 20, 24, 25

*Marine Midland Bank v. Meehan's Express, Inc.,*
   72 A.D.2d 624, 420 N.Y.S.2d 788 (3d Dep't 1979) ............................... 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................ 21

*Maxwell v. KPMG, LLP*,
    No. 03 C 3524, 2007 U.S. Dist. LEXIS 52647 (N.D. Ill. June 19, 2007) ......................... 36, 37

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ....................................................................... 34, 35

*McLaughlin v. Diamond State Port Corp.*,
    No. 03-617, 2004 U.S. Dist. LEXIS 25513 (D. Del. Dec. 21, 2004) .............................. 29

*Mears v. Waples*,
    8 Del. 581, 1868 WL 1010 (Del. Super. Ct. 1868) ................................................ 27

*Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.*,
    801 F.2d 13 (2d Cir. 1986) ........................................................................ 35

*Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*,
    94 N.Y.2d 426, 706 N.Y.S.2d 46 (2000) ........................................................... 25

*Rochford v. New York Fruit Auction Corp.*,
    116 F.2d 584 (2d Cir. 1940) ....................................................................... 27

*Royal Indemnity Co. v. Pepper Hamilton LLP*,
    479 F. Supp. 2d 419 (D. Del. 2007) ............................................................... 33

*Wolf v. Magness Constr. Co.*,
    No. 13004, 1994 Del. Ch. LEXIS 214 (Del. Ch. Dec. 20, 1994) .................................... 33

## Statutes

Act of Aug. 8, 2005, Pub. L. No. 109-58, 2005 U.S.C.C.A.N. (119 Stat.) 594, 974. .................... 8

Fed. R. Civ. P. 56(c) .............................................................................. 21

Fed. R. Evid. 702 ............................................................................. 30, 31

## Other Authority

Todd H. Eveson, *Financial and Bank Holding Company
    Issuance of Trust Preferred Securities,* 6 N.C. BANKING INST. 315 (Apr. 2002) ................... 10

In accordance with the October 19, 2007 Second Stipulation and Order to Amend Rule 16 Scheduling Order, Defendant NorthWestern Corporation ("NorthWestern"), respectfully submits this memorandum of law in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the First Amended Complaint of Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively, "Plaintiffs"). As there is no genuine issue as to any material fact, NorthWestern is entitled to judgment as a matter of law.

## SUMMARY OF ARGUMENT

At the outset it is important to note what this case is and what it is not. It is not a fraud case in which the Plaintiffs claim to have purchased their securities (the "QUIPS") in reliance on NorthWestern's 2002 financial statements. Indeed, Magten purchased all of its QUIPS after NorthWestern restated its financials in April of 2003, with the majority of those purchases occurring after NorthWestern filed for Chapter 11 in September 2003.

Plaintiffs brought this case as a classic fraudulent conveyance action, based upon what has been referred to as the "Going Flat Transaction." That transaction in reality was the second step in NorthWestern's purchase of certain utility assets from the Montana Power Company. The first step was NorthWestern's purchase in February 2002 of the unit interest in a Montana limited liability corporation, Montana Power LLC, which owned the utility assets. The Going Flat Transaction occurred on November 15, 2002 when NorthWestern transferred the bulk of those utility assets from its subsidiary, renamed NorthWestern Energy LLC, and assumed the liabilities of that subsidiary, including the QUIPS.

Originally Plaintiffs' case was predicated on the assertion that, even though NorthWestern assumed the obligation to pay the QUIPS holders at the same time that it

transferred the Montana utility assets, its wholly owned subsidiary, renamed Clark Fork and

Blackfoot LLC ("Clark Fork"), remained liable on the QUIPS. Thus, it was argued, when

NorthWestern could no longer honor the QUIPS because it had filed for Chapter 11, Plaintiffs

could look to Clark Fork for payment. However Clark Fork was unable to pay because it had

transferred the utility assets to NorthWestern.

  This theory was laid to rest by Judge Case in his August 2004 decision on

NorthWestern's motion to dismiss the Complaint. Judge Case held that, pursuant to Section

1102 of the QUIPS Indenture, Clark Fork had been completely released from any liability to pay

the QUIPS when that obligation had been assumed by NorthWestern. Thus, the QUIPS holders

were no longer creditors of Clark Fork and there was simply no fraudulent conveyance about

which to complain. However, Judge Case did leave the Plaintiffs one opportunity to salvage

their case.

  Although the theory appears nowhere in the original Complaint, Plaintiffs had

argued in opposition to NorthWestern's motion to dismiss that the release of Clark Fork had

been procured by fraud. Plaintiffs asserted that NorthWestern was insolvent at the time it

assumed the obligation to pay the QUIPS and thus was unable to perform the obligations it was

undertaking. Plaintiffs claimed that these facts were concealed by NorthWestern's 2002

quarterly financial statements which materially misstated NorthWestern's true financial

condition at the time and which were restated in April 2003. It was this theory that Judge Case

said "may have legs," and that if Plaintiffs could in fact prove that NorthWestern "knew at the

time that it could not do the transaction," *i.e.* knew and concealed the fact that it was assuming

obligations it could not pay and had no intention of paying, the release of Clark Fork would be

vitiated by fraud. Thereafter, Plaintiffs filed the First Amended Complaint pleading for the first,

and only, time their fraud theory alleging that the Indenture Trustee, The Bank of New York, acted in reliance upon NorthWestern's 2002 financial statements.

The parties have now completed extensive discovery, including the production by NorthWestern of hundreds of thousands of pages of documents, and the exchange of expert reports and depositions. Throughout this process it has become clear that there is simply no evidence to support Plaintiffs' theory that the release of Clark Fork was procured by fraud. There is no evidence that NorthWestern was insolvent at the time it assumed the QUIPS obligations and no evidence that The Bank of New York relied upon NorthWestern's financial statements in connection with that transaction. This explains the consequent attempt by Plaintiffs to shift their case from the theory that the release of Clark Fork was induced by fraud to some sort of overarching financial fraud, with the Plaintiffs painting themselves as the victims, albeit collateral victims, of NorthWestern's financial statements.

But this case is not about attacking, or defending, NorthWestern's 2002 financial statements. Those statements can only be relevant if Plaintiffs can show that NorthWestern intentionally falsified its financials in order to accomplish the Going Flat Transaction and in fact intentionally used those financials as a tool in consummating that transaction. And there is not a scintilla of evidence to support that theory.

It is not at all surprising that Plaintiffs have abandoned the theory of the First Amended Complaint that The Bank of New York was induced to act in reliance on NorthWestern's financial statements. The undisputed testimony of The Bank of New York's representative establishes that the Indenture Trustee neither received nor relied upon NorthWestern's financials in connection with the Going Flat Transaction. Nor is there any evidence that NorthWestern falsified its financials to hide its insolvency from The Bank of New

York or anyone else. Indeed, there is no evidence at all to support Plaintiffs' original theory that NorthWestern was insolvent immediately before or after the Going Flat Transaction or that it knowingly assumed obligations it knew it could not perform. As set forth below, the only evidence of NorthWestern's solvency at the time of the Going Flat Transaction shows that NorthWestern was a solvent going concern. In fact, it is undisputed that NorthWestern did perform its obligations to the QUIPS holders and continued to do so for 10 months until it ultimately filed for Chapter 11 in September 2003. In short, Plaintiffs' theory of fraud in connection with the release of Clark Fork, the only thread by which their case hung after Judge Case's decision, fails for lack of any evidence of reliance by The Bank of New York, intent by NorthWestern, or that NorthWestern misrepresented its solvency and ability to pay. And there is no evidence that NorthWestern assumed the QUIPS obligations with the intent not to perform; a showing which, as a matter of law, Plaintiffs must make to succeed.

With the collapse of their fraud in the inducement theory, Plaintiffs have now attempted to save their action with a new, but never pleaded, fraud theory. This new theory is evidenced in the report of Plaintiffs' purported expert Paul Marcus. This theory is not based on any evidence which connects NorthWestern's financial statements to the Going Flat Transaction. There is none. Instead, Plaintiffs posit that if NorthWestern had accurately reported its financial condition in 2002, a cascading chain of events would have occurred that ultimately would have led the Montana Public Service Commission ("MPSC"), which has certain regulatory authority over NorthWestern's Montana utility operations, to "impede" the Going Flat Transaction. But this belated and desperate attempt to save Plaintiffs' case is fatally flawed.

First, the theory was never pleaded and is outside of the narrow parameters of Judge Case's decision. Plaintiffs simply should not be permitted to change their theory of the

case after the close of fact discovery, altering the scope and object of the alleged fraud from inducing The Bank of New York to execute the Third Supplemental Indenture to speculating on what a state regulatory body might do given some hypothetical set of circumstances. Indeed the Marcus theory has nothing to do with Judge Case's holding.

Second, the theory is based on rank speculation about what might have happened under alternative circumstances. At the heart of this theory is Marcus' "opinion" about what the MPSC might have done. But Marcus is no expert on the MPSC and, as a matter of law, predictions of what regulatory bodies might do given a hypothetical set of facts is not admissible as expert testimony. There is simply no support for Plaintiffs' new theory of the case.

Finally, the entire theory is based upon the notion of "but for" causation; but for the false financial statements certain events would have occurred, which events would then have led the MPSC to impede the Going Flat Transaction. However, as will be demonstrated below, the case law makes clear that this type of causation is not the proximate cause necessary to establish fraud and so Plaintiffs' new theory fails as a matter of law.

The undisputed facts in this case demonstrate beyond any doubt that there was no fraud in connection with the release of Clark Fork. The undisputed facts establish that the Going Flat Transaction simply was not a fraudulent conveyance. The QUIPS holders were not left as the creditors of some shell subsidiary which was unable to pay its obligations because NorthWestern had stripped it of its assets. Indeed, the QUIPS holders were not injured by the Going Flat Transaction at all. While it is true that the QUIPS ended up as the most junior debt in NorthWestern's capital structure, that is all they were entitled to under the terms of their own contract. And the fact that Plaintiffs ended up last in line in NorthWestern's reorganization does NOT give them a claim in this lawsuit.

Finally, Plaintiffs have no claim for unjust enrichment. That quasi-contractual cause of action may not be asserted where, as here, Plaintiffs have a valid contract – the QUIPS Indenture.

The material facts are undisputed and this case is ripe for summary judgment. NorthWestern's restated 2002 financial statements are irrelevant. The release of Clark Fork was not obtained by fraud. There was no fraudulent conveyance. NorthWestern is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

A.     The Acquisition of Montana Power Company Utility Assets

On September 29, 2000, NorthWestern, Touch America Holdings, Inc. and The Montana Power Company ("Montana Power") entered into the Unit Purchase Agreement whereby NorthWestern agreed to purchase substantially all of Montana Power's electric, natural gas and propane utility assets ("the Acquisition"). (Delaney Aff. Ex. 3.)[1] In order to facilitate the Acquisition, Montana Power created a subsidiary called Montana Power LLC ("MP LLC") into which Montana Power transferred its utility assets and which entity assumed certain liabilities of Montana Power. (Delaney Aff. Ex. 4.) NorthWestern agreed to purchase the equity interest in MP LLC. (Appendix Ex. 1 ¶¶ 34-38.)[2] By purchasing the equity in MP LLC, NorthWestern would own Montana Power's utility assets, worth approximately $1.1 billion and would assume unrelated liabilities of Montana Power of approximately $511 million. (Appendix Ex. 1 ¶¶ 34, 37.)[3]

---

[1] References in the form "Delaney Aff." are to the Affidavit of Nancy E. Delaney sworn to November 29, 2007 and submitted in support of this motion.

[2] References in the form "Appendix Ex." are to the Appendix of Exhibits in Support of NorthWestern Corporation's Motion for Summary Judgment submitted in support of this motion.

[3] NorthWestern financed the Acquisition through a $1 billion credit agreement with several lenders, including Credit Suisse First Boston. The credit agreement provided NorthWestern a $720 million term loan and a $280 million revolving credit facility. (Delaney Aff. Exs. 22 & 9 at Item 5.)

After entering into the agreement to sell the assets, NorthWestern and Montana Power jointly sought federal and state regulatory approval for the Acquisition, first applying to the Federal Energy Regulatory Commission ("FERC") on December 20, 2000 and then applying to the MPSC on January 11, 2001.  Both FERC and MPSC provided their respective approvals. (Delaney Aff. Exs. 6, 8.)

NorthWestern's financial statements for the first three quarters of 2002 were neither submitted to nor relied upon by FERC or the MPSC.

A concern for NorthWestern, and one explained from the beginning to both federal and state regulators, was how NorthWestern would hold the Montana utility assets.  For example, in the December 20, 2000 FERC application, NorthWestern and Montana Power explained that while the Acquisition was not contingent on any particular structure, NorthWestern was considering whether (1) to keep the assets in MP LLC as a wholly owned subsidiary or (2) to go to a "flat" structure and hold the assets in a division of the parent company.  (Delaney Aff. Ex. 5 at 17.)  NorthWestern and Montana Power similarly informed the MPSC that NorthWestern was considering different options for how the assets would be held once acquired, explaining in the joint application that at NorthWestern's election the "utility operations [acquired] under the LLC structure will become either a wholly owned subsidiary or a division of NorthWestern."  (Delaney Aff. Ex. 7.)

Part of NorthWestern's concern was that if it held the assets as a subsidiary, it could become a public utility holding company and subject to the regulatory requirements of the Public Utility Holding Company Act ("PUHCA").  (Patrizia Decl. ¶¶ 6-7[4]; Delaney Aff. Ex. 4 at

---

[4] References in the form "Patrizia Decl. ¶__" are to the declaration of Charles A. Patrizia dated November 27, 2007.

NOR002708.)[5] Because of PUHCA and the concerns of rating agencies related to NorthWestern's debt structure, NorthWestern made the decision in late 2001 to hold the acquired utility assets in a division of the parent company instead of in a subsidiary. (Patrizia Decl. ¶¶ 4, 6, 8.)

The decision to hold the utility assets in a division of the parent company instead of in a subsidiary required that NorthWestern complete the Acquisition in two steps. First, NorthWestern would purchase the equity interest in MP LLC. Second, NorthWestern would transfer MP LLC's utility assets to the parent level and hold those assets as a division of NorthWestern. (Delaney Aff. Ex. 4 at NOR002708.) This second step is referred to as "going flat" or the "Going Flat Transaction."

But for the need to address the unique circumstances associated with the presence of an active Superfund site in one of MP LLC's assets, the Milltown Dam, and the need to segregate that liability, NorthWestern could have merged MP LLC with Northwestern (with NorthWestern as the surviving entity) in a series of essentially simultaneous transactions and no PUHCA issues would have arisen. The problem with this approach, however, was that a merger of MP LLC into NorthWestern would have carried to NorthWestern the potential environmental liability associated with the Milltown Dam. Accordingly, an interim period was necessary during which NorthWestern addressed the issues associated with the Milltown Dam. (Delaney Aff. Ex. 4 at NOR002708; Patrizia Decl. ¶¶ 11-13.)

NorthWestern estimated that it needed approximately 18 months after the first step of the Acquisition to deal with the issue of the Milltown Dam. (Delaney Aff. Ex. 4 at

---

[5] PUHCA was administered by the Securities and Exchange Commission ("SEC") and was repealed on August 8, 2005. (Act of Aug. 8, 2005, Pub. L. No. 109-58, 2005 U.S.C.C.A.N. (119 Stat.) 594, 974.)

NOR002708-09.) However, during the 18 months between the first and second steps of the Acquisition, NorthWestern could be considered a public utility holding company subject to PUHCA. Therefore, on February 14, 2002, NorthWestern submitted an application to the SEC for a temporary exemption to PUHCA under Section 3(a)(3).[6] (Delaney Aff. Ex. 4 at NOR002703, NOR002708; Patrizia Decl. ¶ 10.) Pursuant to Section 3(c) of the statute, NorthWestern's application for a Section 3(a)(3) exemption was effective upon its good faith filing with the SEC.

After obtaining the necessary federal and state regulatory approvals and exemptions, NorthWestern completed the first step of the transaction. On February 15, 2002, NorthWestern paid $478 million in cash and assumed $511.1 million in "existing debt and mandatorily redeemable preferred securities of subsidiary trusts of The Montana Power Company, net of cash received" in order to purchase 100% of the equity interest of MP LLC from Montana Power. (Delaney Aff. Ex. 10 at 5.)

NorthWestern completed the second, going flat step of the Acquisition on November 15, 2002, and brought substantially all of the assets in its wholly owned subsidiary (the renamed NorthWestern Energy LLC ("NWE LLC")), except the Milltown Dam, to the NorthWestern parent level and assumed substantially all of the liabilities of the subsidiary, including the QUIPS.[7] (Delaney Aff. Ex. 14; see also Delaney Aff. Ex. 24 § 2.2.)

---

[6] Prior to the Acquisition, NorthWestern held all of its utility operations at the parent company level and had no subsidiaries that were "utility companies" as defined by PUHCA, and therefore NorthWestern was not regulated by the SEC as a "utility holding company". (Patrizia Decl. ¶ 5.)

[7] NorthWestern also sought approval from FERC for NorthWestern to assume the liabilities of MP LLC (which had been renamed NorthWestern Energy LLC ("NWE LLC") (Delaney Aff. Ex. 11)), including the QUIPS liabilities. NorthWestern submitted its application to FERC on October 25, 2002 (Delaney Aff. Ex. 12), and FERC approved NorthWestern's assumption of the liabilities of NWE LLC on November 15, 2002. (Delaney Aff. Ex. 13.)

After the Going Flat Transaction, NWE LLC was renamed Clark Fork and Blackfoot, LLC ("Clark Fork"). (Delaney Aff. Ex. 10.) NorthWestern then entered into two support agreements with Clark Fork: (1) to cover maintenance and operating expenses of the Milltown Dam and (2) an environmental liability support agreement indemnifying Clark Fork for environmental liability costs up to $10 million. (Delaney Aff. Exs. 25, 26.) Clark Fork was solvent after the Going Flat Transaction, continues to be solvent and has never filed for bankruptcy.

B.      QUIPS and Going Flat

The Plaintiffs in this case are holders of a particular type of security, 8.45% Cumulative Quarterly Income Preferred Securities, or "QUIPS," which were among the debt assumed by MP LLC prior to its acquisition by NorthWestern. The QUIPS were created in November 1996. Montana Power sold $65,000,000 worth of 8.45% Junior Subordinated Debentures to a trust it established entitled Montana Power Capital I ("Trust"). (Delaney Aff. Ex. 27 (hereinafter "QUIPS Indenture"); Delaney Aff. Ex. 28 §§ 2.08, 2.09.) As part of the establishment of the Trust, Montana Power entered into an Indenture, dated November 1, 1996, with The Bank of New York ("BoNY") as Indenture Trustee. (Delaney Aff. Ex. 27.) The Trust then issued the QUIPS to the public. QUIPS holders were entitled to receive quarterly distributions, at the annual rate of 8.45%, so long as no event of default shall have occurred. (Delaney Aff. Ex. 29; Delaney Aff. Ex. 27 at Art. 8.) The QUIPS mature in 2036. (Delaney Aff. Ex. 29 at i.)

The QUIPS are junior securities with extremely limited rights.[8] The QUIPS are deeply subordinated, unsecured securities subject to all senior debt of the issuer. (Delaney Aff.

---

[8] Todd H. Eveson, *Financial and Bank Holding Company Issuance of Trust Preferred Securities,* 6 N.C. BANKING INST. 315 (Apr. 2002).

Ex. 27 at Arts. 12, 15; Delaney Aff. Ex. 29 at i.)  Indeed, the QUIPS Indenture places no

limitation on the amount of senior debt that can be subsequently incurred by the issuer.  (Delaney

Aff. Ex. 29.)  The issuer also has the right to defer payment of interest on the QUIPS for up to 20

consecutive quarters without incurring a default.  (Delaney Aff. Ex. 29.)  Further, the issuer can

enter into supplemental indentures to evidence the assumption of the obligations under the

QUIPS Indenture by another entity without obtaining the consent of the QUIPS holders.

(Delaney Aff. Ex. 29 § 1201(a).)  The issuer can also, again without the consent of the QUIPS

holders, "convey or otherwise transfer, or lease, its properties and assets substantially as an

entirety to any Person" if it complied with the following three minimal requirements:

> (a) the entity formed by the consolidation is organized and validly
> existing under United States law and it assumes the payment on the
> securities described in the QUIPS Indenture and the performance
> of every covenant of the QUIPS Indenture (Delaney Aff. Ex. 27 §
> 1101(a));
>
> (b) no event of default shall occur immediately after the
> consolidation (Delaney Aff. Ex. 27 § 1101(b)); and
>
> (c) the issuer delivers to BoNY an Officer's Certificate and
> Opinion of Counsel stating that the consolidation and related
> supplemental indenture comply with Article 11 of the QUIPS
> Indenture and that all conditions precedent herein relating to
> consolidating transactions have been complied with.  (Delaney Aff.
> Ex. § 1101(c).)

Once the issuer complied with Section 1101(a), (b) and (c) (described above), the predecessor

entity is relieved of all obligations and covenants under the QUIPS Indenture.  (Delaney Aff. Ex.

27 § 1102.)  The QUIPS holders have no right to approve a sale or merger by the issuer.

(Delaney Aff. Ex. 27 §§ 1101, 1201.)

After entering into the QUIPS Indenture, three other indentures were entered into

supplementing the QUIPS Indenture.  On February 13, 2002, MP LLC and BoNY executed the

First Supplemental Indenture whereby MP LLC expressly assumed all the obligations of

Montana Power under the QUIPS Indenture. (Delaney Aff. Ex. 30.) On August 13, 2002, the Second Supplemental Indenture to the QUIPS Indenture was agreed to among NWE LLC, NorthWestern and BoNY. Under that indenture, NorthWestern fully and unconditionally assumed on a joint and several basis with NWE LLC all of MP LLC's obligations under the QUIPS Indenture. (Delaney Aff. Ex. 31.) Finally, on November 15, 2002, as part of the Going Flat Transaction, NorthWestern and BoNY executed the Third Supplemental Indenture whereby NorthWestern assumed all obligations on the QUIPS Indenture. (Delaney Aff. Ex. 32.) Pursuant to Section 1102 of the QUIPS Indenture, the Third Supplemental Indenture released NWE LLC (now Clark Fork) from all obligations under the QUIPS Indenture.

Prior to entering into the Third Supplemental Indenture, in compliance with Section 1101(c) of the QUIPS Indenture, NorthWestern submitted to BoNY an Officer's Certificate and an Opinion of Counsel. These two documents stated that the Third Supplemental Indenture and the transfer of substantially all the assets of NWE LLC and the assumption of substantially all the liabilities of NWE LLC by NorthWestern complied with Article 11 of the QUIPS Indenture and all conditions precedent therein, including that NorthWestern was a company organized and validly existing under the laws of the United States or any state thereof, and there would be no event of default immediately after the assumption by NorthWestern. (Delaney Aff. Ex. 33, 34.)

As explained by Mary Lewicki, the BoNY officer who was responsible for the QUIPS, when an issuer requests a supplemental indenture, BoNY's role as Trustee is extremely limited. (See Delaney Aff. Ex. 2 at 77.) In this case, as provided by the QUIPS Indenture, after receiving the request for the Third Supplemental Indenture, Ms. Lewicki and BoNY reviewed the Officer's Certificate and Opinion of Counsel and determined that each contained the required

form language under the QUIPS Indenture.  (Delaney Aff. Ex. 2 at 35, 87; Delaney Aff. Ex. 28 §8.03(i) & (iv).)  Ms. Lewicki testified that BoNY was entitled to rely, and did rely, on the statements made in the Officer's Certificate and Opinion of Counsel in executing the Third Supplemental Indenture.  (Delaney Aff. Ex. 2 at 35, 59, 87; accord Delaney Aff. Ex. 28 §8.03(i) ("Property Trustee may rely . . . upon any . . . statement . . . reasonably believed by it to be genuine and to have been signed or presented by the proper party") & §8.03(iv) ("any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by . . . [the Property Trustee] hereunder in good faith and in reliance thereon.").)

In contrast, Ms. Lewicki explained that BoNY did not review additional documents, perform any investigation, or seek the consent of the QUIPS holders prior to executing the Third Supplemental Indenture.  For example, Ms. Lewicki testified that BoNY did not review and had no obligation to review NorthWestern's 2002 financial statements in connection with its execution of the Third Supplemental Indenture.  (Delaney Aff. Ex. 2 at 14, 76-77.)  Further, BoNY was not required to obtain the consent of the QUIPS holders before entering into the Third Supplemental Indenture.  (Delaney Aff. Ex. 2 at 69-70; Delaney Aff. Ex. 27 §§1101, 1201.)

Nor did the fact that NorthWestern filed amended Quarterly Reports or 10Qs for the periods ended March 31, 2002, June 30, 2002, and September 30, 2002, alter what BoNY did as Trustee or alter it obligations as Trustee.  On April 15, 2003 NorthWestern filed amended quarterly reports for the first three quarters of 2002, restating certain information and including additional disclosures.  In response to that filing, BoNY did not conduct any investigation into

the financial condition of NorthWestern or the truth of the statements in the Officer's Certificate or the Opinion of Counsel.

The documents upon which BoNY did rely in executing the Third Supplemental Indenture were true in all respects. NorthWestern was created and existing under the laws of the United States and there was no immediate event of default after NorthWestern assumed the obligations on the QUIPS. The QUIPS holders continued to receive their quarterly interest payments after the assumption by NorthWestern. Quarterly interest payments were made on December 31, 2002 and March 31, 2003. (Delaney Aff. Ex. 2 at 19, 22; Delaney Aff. Ex. 36 at BNY0105-06.) Interest payments only stopped when, on May 23, 2003, NorthWestern announced that it would defer payment of interest on all of its trust preferred securities, including the QUIPS. (Delaney Aff. Ex. 15.) But even this deferral of interest payments was not an event of default, as NorthWestern was expressly permitted to defer payments of interest for up to 20 consecutive quarters. (Delaney Aff. Ex. 27 at Art. 8; Delaney Aff. Ex. 29 at 21.) Indeed, no default was declared or occurred until September 14, 2003, 10 months after the Going Flat Transaction, when NorthWestern commenced a Chapter 11 bankruptcy case by filing a voluntary petition for relief under Chapter 11.

C.     Expanets, BlueDot and NorthWestern's
       Financials for the First Three Quarters of 2002

NorthWestern's subsidiaries Expanets and Blue Dot were both formed in 1997. Expanets provided networked telecommunications equipment and services to medium-sized businesses and Blue Dot provided heating, ventilation and air conditioning services.

During 2000 and 2001, Expanets developed an information technology system, called the "EXPERT" system, to serve as a financial enterprise system for virtually all of its

operations, including sales, inventory, project management, billing, collections and financial statement preparation. Because of its planned scope and impact across operations, the functionality of the EXPERT system was critical to Expanets.

However, following its implementation in November 2001, the EXPERT system was unable to perform many of the basic tasks for which it had been designed. Expanets experienced significant problems with the system, including problems with the billing and collection functions, and numerous reporting deficiencies. For a period, the system could not generate any customer bills, the customer bills that later were generated were incomplete or inaccurate, and the system could not properly apply cash collected to costumer accounts or track the aging of accounts receivable balances.

NorthWestern's problems with its EXPERT system, as well as lower than expected operating performance at Expanets and at Blue Dot, resulted in NorthWestern announcing in December 2002 that it would miss its previously disclosed earnings estimates for 2002. (Delaney Aff. Ex. 16.) In that same announcement, NorthWestern also disclosed that it was evaluating the adequacy of its reserves at Expanets and that it would increase such reserves. In addition, the announcement explained that NorthWestern expected reduced revenues in the fourth quarter of 2002 and concluded that the combination of the increased reserves and reduction in expected revenue would "adversely affect" NorthWestern's anticipated 2002 results.

NorthWestern's problems continued in 2003. In April of 2003 NorthWestern announced significant charges in 2002, totaling $875.5 million, including nearly $600 million of goodwill and other impairment charges related to its Expanets and Blue Dot subsidiaries. (Delaney Aff. Ex. 18.) NorthWestern also restated its 10-Qs for the first three quarters of 2002. (Delaney Aff. Ex. 18.)

Following NorthWestern's restatement of its quarterly results, the SEC commenced a wide-ranging and multi-year investigation of NorthWestern. That investigation culminated in a March 7, 2007 order in which NorthWestern, without admitting or denying the SEC's findings, consented to the entry of a cease and desist order. (Delaney Aff. Ex. 17.) Significantly, the SEC made no finding of fraud against NorthWestern and imposed no monetary penalty against NorthWestern after its comprehensive, nearly four-year investigation. (Delaney Aff. Ex. 17.)

Notably, nowhere in its order does the SEC find any relationship between NorthWestern's restated quarterly reports and the Going Flat Transaction. Nor is there any mention or inference that the restated quarterly reports facilitated or were in any way used in connection with the Going Flat Transaction.

D.     Plaintiffs Are Late-Purchasers of the QUIPS and
       Never Relied Upon Any Statement by NorthWestern

Magten did not hold any QUIPS at the time of the Going Flat Transaction or even prior to NorthWestern's restatement of its quarterly reports for the first three quarters in 2002. Magten first purchased QUIPS in late April 2003, after the announcement of NorthWestern's restatement of its quarterly results, and continued to purchase QUIPS up to June 2006, years after NorthWestern petitioned for relief under Chapter 11. (Delaney Aff. Ex. 1 at 82, 91, 105.) It is apparent from the testimony of Magten's principal, Talton Embry, that Magten purchased its QUIPS as an investment in this lawsuit. (Delaney Aff. Ex. 1 at 94.)

-16-

E.    Prior Proceedings

    1.    NorthWestern Seeks Bankruptcy Relief
        and BoNY Resigns as Indenture Trustee

On September 14, 2003, NorthWestern commenced a Chapter 11 bankruptcy case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, as amended. On September 23, 2003, BoNY resigned as Indenture Trustee and Law Debenture succeeded BoNY as Indenture Trustee.

    2.    Plaintiffs Initiate Adversary Proceedings

This action was commenced by Plaintiffs on April 16, 2004, as an adversary proceeding in NorthWestern's bankruptcy case, asserting claims for fraudulent conveyance, two claims for constructive fraud, and a claim of unjust enrichment claim. (Appendix Ex. 2 ¶¶ 53-78.) The complaint asserted that the QUIPS holders remained creditors of Clark Fork and that Clark Fork was rendered insolvent by the Going Flat Transaction. Plaintiffs also alleged that NorthWestern was insolvent at the time of the Going Flat Transaction and that the damage to the QUIPS holders actually resulted from the QUIPS holders becoming creditors of NorthWestern and thereby subordinated to all other creditors. Finally, the complaint alleged that NorthWestern and its other creditors were unjustly enriched by the Going Flat Transaction.

On May 14, 2004, NorthWestern moved to dismiss the complaint on multiple grounds. NorthWestern argued, *inter alia*, that there was no fraudulent conveyance because, by operation of the QUIPS Indenture, Plaintiffs had become creditors of NorthWestern and Clark Fork had been released from all liabilities on the QUIPS by virtue of Section 1102 of the QUIPS Indenture. Plaintiffs responded to NorthWestern's motion with a new theory never pleaded in the original complaint. Clark Fork could not have been released under the QUIPS Indenture, it

was argued, because NorthWestern's financial statements fraudulently concealed the fact that

when it assumed the QUIPS NorthWestern was insolvent and unable to pay those obligations.

Bankruptcy Judge Charles G. Case, granted in part and denied in part

NorthWestern's motion to dismiss. *In re: NorthWestern Corp. (Magten Asset Mgmt. Corp. &*

*Law Debenture Trust Co. of NY v. Northwestern Corp.)*, 313 B.R. 595 (Bankr. D. Del. 2004).

Agreeing with NorthWestern, Judge Case held that Plaintiffs "lacked standing as creditors of

Clark Fork to pursue a fraudulent conveyance action against the Debtor . . ." *Id.* at 603. Judge

Case explained that because of the release in Section 1102 of the QUIPS Indenture Plaintiffs

lacked standing, thus Plaintiffs' claims should be dismissed. *Id.* However, Judge Case found

that Plaintiffs' fraud theory "may have legs" and stated that if Plaintiffs could prove their

assertion that NorthWestern "knew at the time that it could not do the transaction based on its

restated accountings [sic]", *i.e.*, that NorthWestern had assumed the QUIPS knowing and

intending that it would not perform its obligations, the Section 1102 release would be vitiated.[9]

*Id.*

3.    Plaintiffs' First Amended Complaint

In response to Judge Case's decision, Plaintiffs filed their First Amended

Complaint on October 4, 2004, adding a limited number of changes. For example, Plaintiffs

added a new claim, alleging that the transfer between NorthWestern and Clark Fork was void

because it was made while there was a violation of PUHCA.[10]  While the other allegations in the

---

[9] Plaintiffs had also argued that the transaction between NorthWestern and Clark Fork required the QUIPS holders' consent and had argued that NorthWestern was required to be solvent, under the QUIPS Indenture, to complete the transfer. Judge Case rejected both arguments, finding that the transaction did not require the QUIPS holders' approval and that QUIPS Indenture did not provide a "guarantee of solvency," it only required that NorthWestern "assume the obligation, not that it actually be able to perform the obligation. *Id.* at 600 Debtor in fact did assume the obligations." *Id.*

[10] Plaintiffs' PUHCA claims in this litigation are precluded. In the Order confirming NorthWestern's Second Amended and Restated Plan of Reorganization, the bankruptcy court acknowledged that Magten and Law Debenture had "belatedly raised an objection to [the] confirmation of . . .[NorthWestern's] Plan based on PUHCA." But the

First Amended Complaint largely mirrored the original complaint, Plaintiffs attempted to

respond to Judge Case's decision that their claim could be viable if they could assert fraud.

Thus, for the first time, Plaintiffs asserted a single, bare-bones allegation of fraud at paragraph 68

of the First Amended Complaint:

> The Third Supplemental Indenture, as executed by BNY in its
> capacity as Indenture Trustee did not include a release of Clark
> Fork's obligations under the Indenture and was executed by BNY
> in reliance upon Debtor's fraudulent financial statements, while the
> Debtor hid its true financial condition from BNY and from its
> investors.

As will be further discussed below and as made clear by the sworn testimony of BoNY's officer,

Ms. Lewicki, there is no evidence to support Plaintiffs' lone allegation of fraud, as BoNY

explicitly did not rely upon NorthWestern's financial statements when it entered into the Third

Supplemental Indenture.

    4.    <u>Ancillary Proceedings Involving BoNY</u>

        Separately, Magten initiated two different actions against BoNY that have a

bearing on the case at bar.  In the first action, Magten brought suit in Delaware Chancery Court

against BoNY asserting claims for violation of the Trust Indenture Act of 1939, breach of

contract and breach fiduciary duty.  At the oral argument on defendants' motion to dismiss, the

Court made it clear that it would dismiss Magten's complaint unless Magten could replead "real

facts" that would state a claim against BoNY.  (Appendix Ex. 5 at 103-05.)  Faced with a

dismissal with prejudice, on September 15, 2005 Magten entered into a stipulation with BoNY

and dismissed the case without prejudice.

---

court overruled the objection because "[n]either Magten nor Law Debenture presented any evidence in connection
with their PUHCA objection."  (Appendix Ex. 3 at 46 (Order Confirming Debtor's Second Amended and Restated
Plan of Reorganization under Chapter 11 of the Bankruptcy Code).)  That decision was affirmed by this Court.
(Appendix Ex. 4 at 5.)  That decision was never appealed.

After it withdrew its case in Delaware, Magten sued BoNY in New York Supreme Court. In this action, Magten asserted claims for breach of contract, post-default breach of fiduciary duties, and negligence. In a decision by Justice Bernard J. Fried, all claims against BoNY were dismissed. *Magten Asset Mgmt. Corp. v. The Bank of NY*, 15 Misc. 3d 1132(A), 841 N.Y.S.2d 219, 2007 N.Y. Misc. LEXIS 3320 (Sup. Ct. N.Y. Co. May 8, 2007). Justice Fried specifically held that none of NorthWestern's public announcements, including the April 16, 2003 statement that it was having financial difficulties and was instituting a "turnaround" plan, was an admission that NorthWestern was unable to pay its debts and thus an event of default under the QUIPS Indenture. *Id.* at *16. Justice Fried also held that none of NorthWestern's public statements created a duty for BoNY to "undertak[e] a complicated and unavoidably speculative investigation in order to decide whether there was or would be an event of default." *Id.* at *20.

     5.    <u>Present Procedural Posture</u>

On September 22, 2005, this Court withdrew the reference to the bankruptcy court for this adversary proceeding. Currently, all fact discovery is complete. Expert reports have been filed by both Plaintiffs and Defendants. The parties have responded to all expert-related document requests. Defendants have deposed Robert Berliner and Paul Marcus, the two individuals Plaintiffs have proffered as experts. Defendants' experts, Bruce B. Bingham, FASA and Christopher J. Kearns, C.P.A., C.F.A., are to be deposed in early January 2008. A bench trial is scheduled to begin March 3, 2008.

## ARGUMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" only if its existence or non-existence would affect the outcome of the suit under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In order to prevail in its opposition to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587; *Creedon Controls v. Banc One Bldg. Corp.*, 470 F. Supp. 2d 457, 460 (D. Del. 2007).

In order to establish a claim of actual fraud under either New York or Delaware law, a plaintiff must prove (1) a misrepresentation or a material omission of fact (2) which was false and known to be false by the defendant (3) made for the purpose of inducing the other party to rely upon it; (4) justifiable reliance by the other party; and (5) damages.  *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (1996); *Abry Partners V v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).[11]

Plaintiffs have failed to identify a single material fact to support any of their constantly evolving theories of the case.

---

[11] The QUIPS Indenture contains a New York choice of law provision.  (Delaney Aff. Ex. 27 § 112.)  Delaware courts will give effect to a contractual choice-of-law provision where (1) the designated jurisdiction "bears some material relationship to the transaction" and (2) applying the foreign law would not produce a result contrary to the public policy of Delaware.  *J.S. Alberici Constr. Co. v. Midwest Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).  A state may have a "material relationship to the transaction" where one of the parties is headquartered in that state or the contract was performed there.  *Hill Stores Co. v. Bozic*, 769 A.2d 88, 112 (Del. Ch. 2000).  Where a choice-of-law clause satisfies the two-pronged test, Delaware courts have held that it covers not only breach of contract claims, but also misrepresentation claims arising out of contract.  *See, e.g., Abry Partners*, 891 A.2d at 1047-49.

# I

## Plaintiffs' Claim That There Was Fraud In Connection With The Third Supplemental Indenture Has No Support

Following Judge Case's decision on NorthWestern's motion to dismiss, Plaintiffs amended their Complaint to add a simple allegation of fraud in paragraph 68, *i.e.* that NorthWestern induced BoNY to execute the Third Supplemental Indenture in reliance on NorthWestern's 2002 financial statements.

That theory has now been completely discredited.

A.    The Bank of New York Did Not Rely on NorthWestern's 2002 Financial Statements

On May 2, 2007, Plaintiffs deposed a Rule 30(b)(6) representative of BoNY, Mary Beth Lewicki.  Ms. Lewicki was the team leader and relationship manager responsible for the QUIPS.  (Delaney Aff. Ex. 2 at 11-13.)  Ms. Lewicki established that BoNY neither reviewed nor relied upon NorthWestern's financials in executing the Third Supplemental Indenture.

> Q:  When you are the trustee for a bond issuance, do you generally review the financial statements issued by the issuer?
>
> A:  No, we do not.
>
> Q:  Were there ever circumstances in which you review the financial statements of the issuer?
>
> A.  No, we do not.  It's not a requirement under the governing documents.

(Delaney Aff. Ex. 2 at 14.)

Ms. Lewicki also testified that BoNY does not approve supplemental indentures or the transactions contemplated by them.  It looks to the requirements of the governing document before executing a supplemental indenture.  (Delaney Aff. Ex. 2 at 34-35.)  In this case the Indenture required two things – an opinion of counsel and an officer's certificate.

> Again, when I am signing a Supplemental Indenture, it is based on the requirements by the governing documents.  If the documents I'm getting, such as the opinion and the Officer's Certificate, the

supplemental are in the form required by the governing document, and this had been reviewed by myself and counsel, I would sign the document as long as it met the terms and requirements.

(Delaney Aff. Ex. 2 at 38.)

Both statements BoNY relied upon were true. The opinion of counsel was that NorthWestern was a U.S. corporation. (Delaney Aff. Ex. 35.) It is. The officer's certificate stated that there would be no "immediate["] event of default." (Delaney Aff. Ex. 34.) And there was not. NorthWestern did perform its obligations to the QUIPS holders. Interest payments were made on December 31, 2002 and March 31, 2003. (Delaney Aff. Ex. 2 at 19, 22; Delaney Aff. Ex. 36 at BNY0105-06.) The June 30, 2003 payment was deferred pursuant to the terms of the QUIPS Indenture which permitted the deferral of interest payments for up to 60 months. (Delaney Aff. Ex. 15.) A deferral of interest payments which is provided for in the governing documents is not an event of default. In fact, there was no event of default until September 14, 2003 when NorthWestern filed for bankruptcy protection. As a matter of law, a default occurring ten months after the Going Flat Transaction is not an immediate event of default.[12]

B.     Plaintiffs Are Estopped From Arguing That The Bank of New York
       <u>Would Have Taken Action If It Knew the True Financial Condition of NorthWestern</u>

Plaintiffs have argued that if BoNY had only known the true financial condition of NorthWestern at the time it executed the Third Supplemental Indenture, it would have taken some action to protect the QUIPS holders and to prevent the Going Flat Transaction. This argument fails for two reasons. First, there is no evidence to support it. And, in fact, we know what BoNY would have done when it learned the true financial condition of NorthWestern – nothing. When NorthWestern restated its financials in April 2003 BoNY took no action.

---

[12] *See Halligan v. Glazebrook*, 59 Misc. 2d 712, 713, 299 N.Y.S.2d 951, 952 (N.Y. Sup. Ct. Suffolk Cty 1969) (looking to dictionary definition when interpreting meaning of statute providing for action immediately following the trial; "In Black's Law Dictionary, 4th Edition, the word 'immediately' is defined thus: 'without interval of time, without delay, straightway, or without any delay or lapse of time.'").

Second, BoNY had no legal duty to investigate NorthWestern's financial condition or take any other action regardless of NorthWestern's financial condition, unless there was an event of default.

Magten sued BoNY in the Supreme Court of New York, New York County. The basis for Magten's claims was that statements contained in NorthWestern's 10-K and 8-K filed on April 16, 2003, that it may not be able to pay its future debts, constituted an event of default under the QUIPS Indenture which required BoNY either to institute judicial proceedings to put aside the transfer of the utility assets from Clark Fork to NorthWestern or to impose a constructive trust upon those assets. Thus, Magten claimed, BoNY breached the QUIPS Indenture and breached its fiduciary duty to the QUIPS holders. The New York court rejected Magten's allegations and dismissed the complaint holding that NorthWestern's statements in its April 2003 10-K or 8-K did not constitute an event of default, and in the absence of an event of default, neither the law regarding an indenture trustee's duties, nor the QUIPS Indenture, required BoNY to undertake "a complicated and unavoidably speculative investigation in order to decide whether there was or would be an event of default." *Magten Asset Mgmt. Corp. v. The Bank of NY*, 15 Misc. 3d 1132(A), 841 N.Y.S.2d 219, 2007 N.Y. Misc. LEXIS 3320, at *20 (Sup. Ct. N.Y. Co. May 8, 2007). The court concluded, "As NorthWestern did not engage in the event of default, BNY did not err by failing to respond." *Id.* at *21.

Magten is estopped from relitigating whether NorthWestern's April 2003 statements constituted an event of default or whether BoNY was under a duty to examine

NorthWestern's financial reports or investigate its financial condition.[13]  In dismissing Magten's lawsuit, the New York court looked at both the QUIPS Indenture and an indenture trustee's duties under the law and held that BoNY was under no obligation to examine NorthWestern's financials or make any determination as to NorthWestern's solvency. *Id.* at 19.  Therefore Magten cannot argue that had BoNY known of NorthWestern's true financial condition in November of 2002 it would have undertaken some investigation of NorthWestern's financial condition or otherwise would have held up the Going Flat Transaction.  BoNY simply had no legal duty to do so.  Magten cannot relitigate that issue in this case.

C.     NorthWestern Was Solvent Both Before and After the Going Flat Transaction

        Plaintiffs' fraud theory has always been based on the assertion that NorthWestern's 2002 financial statements concealed the fact that NorthWestern was insolvent both before and after the Going Flat Transaction and that, therefore, NorthWestern knew at the time that it could not honor its obligations to the QUIPS holders.[14]  But there is no evidence whatsoever that NorthWestern was insolvent at that time.  Plaintiffs have failed to identify a single document among the hundreds of thousands of documents NorthWestern produced in this litigation or find an expert to support their allegation of insolvency.  Neither of Plaintiffs' experts has rendered any opinion regarding NorthWestern's solvency at the time of the Going Flat Transaction.  At his deposition on November 8, 2007, Plaintiffs' expert Richard W. Berliner

---

[13] Under Third Circuit law, in determining the preclusive effort of a state court judgment, courts apply the rendering state's law of *res judicata* and collateral estoppel. *Delaware River Port Authority v. Fraternal Order of Police, 290 F.3d 567, 573 (3d Cir. 2002).*  Under New York law, "[c]ollateral estoppel or issue preclusion, prevents a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party." *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 94 N.Y.2d 426, 431-32, 706 N.Y.S.2d 46, 49 (2000).  Even if there are variations in the facts alleged or a different relief is sought, if the separately stated causes of action are grounded on the same gravamen of the wrong upon which the action is brought, a plaintiff is estopped from raising the claim in the guise of a new theory. *See Levin v. Kazlowski*, 13 Misc. 3d 1236(A), 831 N.Y.S.2d 354, 2006 WL 3317048, at *7 (NY Sup. Ct. NY Cty Nov. 14, 2006).

[14] (*See* Appendix Ex. 2 ¶¶ 39, 78; Appendix Ex. 1 ¶¶ 51, 101; Dkt No. 04-53324, # 16 at 2 ,3, 12, 13, 15, 16, 17, 21; Dkt No. 1494-JJF, # 68 at 1, 2, 4, 9; Dkt No. 1494-JJF, # 111 at 3, 5; Dkt No. 1494-JJF, # 114 at 1.

testified that he was not asked to opine on the issue of the solvency of NorthWestern and that neither he nor his colleagues performed such an analysis. (Delaney Aff. Ex. 20 at 30-32, 44-45.) Plaintiffs' other expert, Paul Marcus, testified that he was "never asked to perform any form of insolvency analysis." (Delaney Aff. Ex. 19 at 19.)

Not only is the record devoid of any evidence that NorthWestern was insolvent at the time of the Going Flat Transaction, the only evidence in the record establishes that Northwestern was in fact solvent at that time. On April 4, 2003, NorthWestern's auditors, Deloitte & Touche, rendered an unqualified audit opinion, relating to the consolidated financial statements as of December 31, 2002 and for the year then ending. At the time, Deloitte, with knowledge of the salient facts related to NorthWestern's liquidity position and operating results of all its businesses, concluded that NorthWestern was a going concern.[15] (Delaney Aff. Ex. 35.)

In short, Plaintiffs' fraud theory fails for lack of any evidence that NorthWestern misrepresented its solvency or its ability to pay on the QUIPS. Absent such evidence, Plaintiffs cannot succeed on their claim.

D.    Plaintiffs Cannot Prove That NorthWestern Did Not Intend To Pay the QUIPS

In order to succeed on a claim for fraud based on the insolvency of NorthWestern, Plaintiffs must prove that NorthWestern not only knew that it was insolvent at the time of the Going Flat Transaction but that NorthWestern had no intention to pay on the QUIPS. Courts evaluate claims of fraud based on a party's failure to disclose its insolvency ("fraud-by-insolvency") under a standard somewhat distinct from either an actual fraud or a fraudulent concealment standard. In order to maintain a claim for fraud-by-insolvency, courts require a

---

[15] Plaintiffs served a third-party subpoena upon Deloitte & Touche pursuant to which Deloitte produced 16,785 documents, including its workpapers for the 2002-2003 period, and agreed to appear for a deposition. After reviewing the documents, Plaintiffs cancelled the deposition.

showing that not only did the debtor know of its insolvency but that it had a present intent not to repay the debt or pay for goods purchased at the time it undertook the obligation. *Rochford v. New York Fruit Auction Corp.*, 116 F.2d 584, 585 (2d Cir. 1940).

An intent to defraud cannot be inferred from the mere failure to disclose that the company is insolvent. *Marine Midland Bank v. Meehan's Express, Inc.*, 72 A.D.2d 624, 625, 420 N.Y.S.2d 788, 791 (3d Dep't 1979); *Archawski v. Hanioti*, 239 F.2d 806, 812 (2d Cir. 1956). Likewise, fraud will not be found where an insolvent party "merely continu[ed] business in the not unnatural hope 'that better times would come.'" *Rochford*, 116 F.2d at 585. Rather, the defendant must have entered into the transaction knowing that it was "hopelessly insolvent" and that payment would never be made. *Id.*[16] *See also In re: Paragan Sec.*, 589 F.2d 1240, 1244 (3d Cir. 1978) (receiving and depositing plaintiff's check for bond purchase the same day board met to authorize filing bankruptcy petition not fraudulent).

In this case, NorthWestern paid the QUIPS holders in December and March before deferring the June payment. The bankruptcy petition was not filed until ten months after the Going Flat Transaction was completed. There is simply no evidence that NorthWestern assumed the obligations on the QUIPS with no ability, and no intent, to pay the QUIPS holders. As there is no genuine issue for trial, summary judgment should be entered for NorthWestern.

---

[16] While the caselaw addressing fraud-by-insolvency claims under Delaware law is sparse, those few older cases that address the issue apply the same standards as are applied in New York. *See, e.g., Freeman v. Topkis*, 40 A. 948, 949 (Del. Super. Ct. 1893) ("Mere insolvency of the buyer, though well known to himself and concealed from the seller, does not in itself furnish sufficient grounds for rescinding a contract of sale."); *Mears v. Waples*, 8 Del. 581, 1868 WL 1010, at *18 (Del. Super. Ct. 1868) (same).

## II

### Plaintiffs' New Theory That But For NorthWestern's 2002 Financials The Going Flat Transaction Would Not Have Occurred Fails As A Matter Of Fact And As A Matter Of Law

Unable to find factual support for the allegations in their First Amended Complaint, Plaintiffs put forward a new fraud theory contained in the report of their expert Paul Marcus. Marcus opines that, had NorthWestern been accurately reporting its financial condition throughout 2002, the result would have been a series of economic events which would have strained NorthWestern's ability to access capital markets. These events in turn would have then led the MPSC to take certain unspecified actions that may have "impeded" (not prevented) NorthWestern's ability to do the Going Flat Transaction. This new theory fails as a matter of law because: Plaintiffs' time to amend is long overdue; expert opinion as to what a regulatory agency might do is impermissible as a matter of law; there is no evidence that NorthWestern falsified its financials in order to accomplish the Going Flat Transaction; and Plaintiffs' theory fails to establish proximate cause.

A.    The Marcus Theory Was Never Pled and Should Not Be Permitted

At paragraph 68 of their First Amended Complaint, Plaintiffs alleged that BoNY was induced to execute the Third Supplemental Indenture in reliance upon NorthWestern's 2002 financials. But in the Marcus Expert Report, there is no mention of BoNY as the object of the fraud. Indeed, Marcus does not identify any object of the fraud and his theory has nothing to do with the Third Supplemental Indenture. (Delaney Aff. Ex. 21 ¶ 70.) Plaintiffs last minute attempt to amend their pleadings through their expert report should be denied.

In its Rule 16 Scheduling Order dated November 3, 2006, the Court ordered that any amendments to pleadings must be done by February 2, 2007. (Dkt No. 1494-JJF, # 94.) Plaintiffs did nothing. If the Marcus Report is an effort to amend the pleadings ten months after

-28-

the cutoff date, it should be denied. *See Eastern Mineral & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000) (affirming denial of motion to amend made six months after Rule 16 amendment deadline); *Dimensional Commc'ns, Inc. v. Oz Optics, Ltd.*, No. 04-1817, 2005 U.S. App. LEXIS 17111, at *7 (3d Cir. 2005) (same). Courts have held that when the summary judgment deadline is approaching the moving party's delay becomes particularly egregious if they had an opportunity to amend before and they did not. *See McLaughlin v. Diamond State Port Corp.*, No. 03-617, 2004 U.S. Dist. LEXIS 25513, at *2 (D. Del. Dec. 21, 2004) (motion denied where motion filed four days before the date for filing dispositive motions and plaintiff failed to explain why leave to amend not sought before end of discovery). Plaintiffs' time to amend is over.

B.　Marcus' Report Is Flawed Because
　　He Has No Basis To Predict the Actions of the MPSC

In his expert report, Marcus opines:

> Had [NorthWestern's] true [financial] information been disclosed to the public prior to October 8 and November 15, 2002, respectively, the equity offering would not have occurred and the [Going Flat Transaction] would have been impeded by the attempts of security holders and regulators to protect their respective investment and constituents . . .

(Delaney Aff. Ex. 21 ¶ 70.)

Thus, Plaintiffs' new theory is based entirely on Marcus' prediction of how the MPSC might have reacted if NorthWestern had been accurately reporting its financial situation.[17] Not only does Marcus lack any qualifications as an expert on the MPSC but, as a matter of law, predictions of how a regulatory body might act are not admissible expert testimony.[18]

---

[17] Marcus' prediction that "security holders" would also have acted to impede the Going Flat Transaction is fundamentally flawed. The only security holders he refers to are the QUIPS. (Delaney Aff. Ex. 21 ¶ 122.) However, as demonstrated above, under the QUIPS Indenture, the QUIPS holders had no right to impede the Going Flat Transaction and the Trustee did not act even when NorthWestern's true financial situation was disclosed in April 2003.

[18] At his deposition, Marcus clarified that by "regulator" he meant the MPSC. (Delaney Aff. Ex. 19 at 59-60.)

During Marcus' deposition it became clear that he had no experience with the MPSC and no knowledge of its procedures or authority. He had never offered opinion testimony as an expert about any aspect of the MPSC. (Delaney Aff. Ex. 19 at 36)  He never testified as an expert before the MPSC. (*Id.* at 36-37.)  Indeed he never testified as an expert about any commission regulating utilities at a state or federal level. (*Id.* at 37.)  He was not familiar with the statutory structure pursuant to which the MPSC derives its authority. (*Id.* at 37.)  He did not review the Montana statutes which govern the MPSC in the preparation of his expert report. (*Id.* at 180)  He did not read any of the regulations of the MPSC. (*Id.*)  He never reviewed the joint applications submitted by the Montana Power Company and NorthWestern for the acquisition of MPC LLC. (*Id.* at 183)  He did not review the transcript of the proceedings related to the joint application for the acquisition of MPC LLC by NorthWestern. (*Id.*)  He could not recall ever advising a client on financing matters involving a company regulated by the MPSC. (*Id.* at 186)  He did not even know what utilities operated in Montana. (*Id.* at 187)  And other than the one order issued by the MPSC in the NorthWestern matter, he did not look at any other orders issued by the MPSC. (*Id.* at 189.)  Most significantly, Marcus had no idea of even whether the MPSC, having already approved NorthWestern's acquisition of the Montana utility assets in a "flat" structure where they would be held in a division of NorthWestern, had the authority to revisit the question and "impede" the Going Flat Transaction (*Id.* at 61-62, 69.)

Under the Federal Rules of Evidence, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, experience, training or education may testify" if three criteria are satisfied.  First, "the testimony [must be] based upon sufficient facts or data." *See* Fed. R. Evid. 702.  Second, "the testimony [must be] the product of reliable

principles and methods." *Id.* Third, "the witness [must] appl[y] the principles and methods reliably to the facts of the case." *Id.* Thus, there are "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Marcus' testimony makes clear that he lacks any qualifications as an expert on the MPSC.

However, Marcus' report should be disregarded in any event because even an expert on the MPSC (which Marcus is not) would not be permitted to offer opinion testimony on how the MPSC might rule in a hypothetical situation.

Courts refuse to permit experts to opine on how a regulatory body would rule, regardless of the qualifications an expert possesses. *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1231-32 (E.D. Ca. 2005) involved allegations by plaintiff, CFM, that defendant, Cocola, breached a purchase option contract involving a TV station in Omaha, Nebraska. The purchase option contract provided in pertinent part that upon the satisfaction of certain conditions, plaintiff had "an exclusive and irrevocable option" to purchase from defendant "all of the FCC authorizations and other assets used by [defendant] Cocola in the operation of the Station." *Id.*

Defendants contended that the purchase option contract was not enforceable under FCC law because FCC regulations prohibited one TV station owner from holding more than one license in any given area and plaintiffs had applications pending for licenses to two other TV stations in the area. *Id.* at 1232-35. In support of this theory, defendants submitted a report by an expert, Corbett, whose qualifications in the field of communications regulatory law and FCC matters made him an expert concerning the FCC. *Id.* at 1233.

Corbett went through an analysis of the criteria for FCC determination of TV license applications, reviewed the representations made by plaintiff in its application and concluded that plaintiff's "disqualifying misrepresentations under relevant FCC case law, [are] of a magnitude sufficient to render [plaintiff] unfit to hold any FCC license under FCC precedent." *Id.* at 1234-35. Corbett also submitted a supplemental expert report regarding three recent rulings by the FCC on a different case concerning the plaintiff. *Id.* at 1235-37. He concluded that the letter rulings indicated it was virtually certain that the FCC would deny plaintiff's application. *Id.*

The court held that "Mr. Corbett's opinions in the Report and Supplement about how the FCC will likely apply statutory and case law precedent to CFM's application, whether based on his interpretation of the law or his experience, are in any circumstances utterly unhelpful to the Court" and hence inadmissible. *Id.* at 1236. The court explained that "[t]he ultimate disposition of any legal proceeding is by nature unpredictable" and "[t]he Court is perfectly able to review FCC decisions and regulations to decide how the law applies to the present facts." *Id.* at 1237. Therefore, the court "prohibited [Mr. Corbett] from testifying about how FCC law applies to the facts of this case" and he is also "barred from testifying as to any conclusions" in his opinions "about the likely outcome of any future decision of the FCC." *Id.*

The court then also rejected the expert's method of analysis holding that "[t]o the extent Mr. Corbett's opinions about the FCC's likely actions rest merely on vague claims regarding his experience of practicing before the FCC" and his "review of FCC decisions and regulations" they amount to mere speculation. *Id.*

Unlike Corbett who had expertise regarding the FCC, Marcus is not an expert on the MPSC. But even if he was, his report should be disregarded because his methodology –

reviewing one decision by the MPSC – is unreliable and mere speculation. More importantly, his report should be disregarded because his prediction of what the MPSC would have done is inadmissible. *See also In re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y 2004) ("the opinions of these [expert] witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise").[19]

C.    There Is No Evidence That NorthWestern Misstated
      Its Financials In Order To Accomplish The Going Flat Transaction

Intent is a critical, indeed indispensable, element in any fraud theory. The defendant must be shown to have made the misstatement for the purpose of inducing the other party to rely upon it. *See Royal Indemnity Co. v. Pepper Hamilton LLP*, 479 F. Supp. 2d 419, 430 (D. Del. 2007) (Farnan, J); *Brooks, Jr. v. Fiore*, No. 00-803, 2001 U.S. Dist. LEXIS 16345, at *19 (D. Del. Oct. 11, 2001) (same); *Wolf v. Magness Constr. Co.*, No. 13004, 1994 Del. Ch. LEXIS 214, at *11 (Del. Ch. Dec. 20, 1994); *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (1996).

Here there is no evidence of any sort that NorthWestern misstated its 2002 financials in an effort to accomplish the Going Flat Transaction or that NorthWestern used its 2002 financials as a tool to accomplish the Going Flat Transaction, *i.e.* to induce BoNY, or regulators or anyone else, to approve the Going Flat Transaction. Indeed, Plaintiffs have been unable to adduce any evidence that even connects the 2002 financials to the Going Flat Transaction in any way. And the Marcus report contains nothing on NorthWestern's intent. Indeed, Marcus does not even identify an object of the fraud.

---

[19] NorthWestern will file a formal *Daubert* motion challenging both of Plaintiffs' experts prior to trial.

It is also significant in this regard that the SEC Cease and Desist Order contains no reference to the Going Flat Transaction and itself makes plain that whatever the reasons or intent behind the misstatements in NorthWestern's financials for the first three quarters of 2002, there was no relationship at all to the Going Flat Transaction.  And this was after four years of an extensive, and intensive, investigation by the SEC.  Absent any evidence of intent, Plaintiffs' fraud theory must fail.

D.    Plaintiffs Have Failed to Prove Proximate Causation

It is axiomatic that in order to succeed on any fraud theory the Plaintiffs must establish that the alleged misrepresentation directly caused their loss.  This concept of proximate cause requires that there be no supervening cause between the alleged misrepresentation and the injury.

Proximate cause is a legal construct designed to "limit a person's responsibility, for the consequences of that person's own acts."  *See Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  The underpinning of proximate cause is that a person is not liable to all those who may have been injured by his conduct, but only those with respect to whom his acts were "a substantial factor in the sequence of responsible causation and if the injury [was] reasonably foreseeable or anticipated as a natural consequence."  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007).

Although the concept has its genesis in the common law, courts frequently discuss proximate cause in the context of a fraud claim under the federal securities laws.  For example, under Rule 10b-5, a plaintiff must prove both transaction causation (analogous to but-for cause) and loss causation.  Loss causation is conceptually the same as proximate cause.  *See Lentell v.*

*Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005); *AUSA Life Ins. Co. v. Ernst & Young, LLP*, 206 F.3d 202, 209 (2d Cir. 2000) ("Loss causation is causation in the traditional 'proximate cause' sense – the allegedly unlawful conduct caused the economic harm."); *Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 21 (2d Cir. 1986) ("The requirement of 'loss causation' derives from the common law tort concept of 'proximate causation.'").

In the Third Circuit, courts make a distinction between "but for" cause and proximate cause. "But for" causation or transaction causation is defined as a situation where "but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007). On the other hand, in order to show loss causation or proximate cause it must be shown "that the fraudulent misrepresentation or omission actually caused the economic loss suffered." *Id.* The standard is the plaintiff must show that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Id.* Therefore, "[t]he loss causation requirement limits the circumstances in which an investor can sue over a failed investment so that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with the investment." *Id.*

Plaintiffs' new theory of fraud based on the Marcus construct utterly fails to establish any direct or proximate cause between NorthWestern's restated 2002 financial statements and the Going Flat Transaction. Indeed, this theory is a classic "but for" formulation, with multiple intervening causes.

Marcus opines that, but for the 2002 financials statements, NorthWestern's stock price would have dropped and its credit rating downgraded. There may also have been defaults on financial covenants and a suspension of NorthWestern's dividend. These events in turn

would have made it difficult for NorthWestern to access capital markets.  The resulting financial stress on NorthWestern would then have prompted the MPSC to step in to impede the Going Flat Transaction.  (Delaney Aff. Ex. 21 ¶¶ 70-124.)  It is hard to imagine a more tortured and indirect causal relationship between the restated financials and the Going Flat Transaction.

Just as significant is the fact that there is no evidence to even suggest a proximate causal relationship between the restated financials and Plaintiffs' injury.  There is no evidence at all that any misstatements in NorthWestern's 2002 financials had any relationship to NorthWestern's ability to pay the QUIPS holders.  The injury to Plaintiffs was not the Going Flat Transaction.  Indeed, it is undisputed that NorthWestern continued to perform on the QUIPS for ten months until it ultimately defaulted by filing its Chapter 11 petition.

This case is strikingly similar to *Maxwell v. KPMG, LLP*, No. 03 C 3524, 2007 U.S. Dist. LEXIS 52647, at *3 (N.D. Ill. June 19, 2007).  In that case, USWeb, an IT consulting company, relied on overstated earnings approved by the auditor KPMG and issued by management of the company, Whittman-Hart, in making a decision to merge with Whittman-Hart.  *Id.* at *3-*6.  A year later the combined company, marchFIRST, filed for bankruptcy and the trustee of the estate brought an action against KPMG alleging that but for the overstated financials, USWeb would have backed out of the merger and if USWeb backed out of the merger and Whittman-Hart would not have had problems integrating the company which is one of the reasons the company had to file for bankruptcy.  *Id.* at *7-*8.  The court granted KPMG's motion for summary judgment, holding that the Trustee was unable to prove proximate cause. *Id.* at *21.

In its causation analysis, the court started by stating that whether an action is styled as a tort claim or a contract claim, "[u]nder either theory, the plaintiff must prove

proximate causation." *Id.* at *11. It defined proximate cause as "one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause" such as market collapses. *Id.* at *14. Specifically, in this instance, "the Trustee must offer evidence demonstrating that KPMG's alleged negligence caused Whittman-Hart's losses." *Id.* However, the Trustee had admitted "that marchFIRST went bankrupt because of the effect market forces had on an unstable merger." *Id.* at *18. Therefore, even if KPMG had caused the unstable merger, the Trustee still had to establish that KPMG and the false financials caused the merger to fail and they had not done this. *Id.*

As in *Maxwell,* Plaintiffs here can show no direct causal link between the 2002 financials and any injury. Indeed, here the Plaintiffs cannot even establish a direct causal link between the 2002 financials and the Going Flat Transaction. At best their new theory is nothing more than rank speculation that, but for the 2002 financials, some alternative and attenuated chain of events may have impeded the Going Flat Transaction and left them as creditors of Clark Fork. This is a far cry from the required showing that the false financials directly and proximately caused the Going Flat Transaction *and* that the Going Flat Transaction caused Plaintiffs' injuries.

The simple fact is that after all the discovery in this matter there is no evidence whatsoever to connect NorthWestern's 2002 financials to the Going Flat Transaction. Those financials are irrelevant to any issue left in this case. There was no fraud. And there was no fraudulent conveyance.

## III

### Plaintiffs Have No Claim for Unjust Enrichment

In their First Amended Complaint, Plaintiffs claim that NorthWestern and its other creditors were unjustly enriched by the Going Flat Transaction because, absent that transaction, Plaintiffs would have remained creditors of a solvent Clark Fork and instead became junior creditors of an insolvent NorthWestern. (Appendix Ex. 1 ¶¶ 100-01.) This claim also fails as a matter of fact and as a matter of law.

In the first instance, as demonstrated above, there is no evidence to support Plaintiffs' factual allegation that NorthWestern was insolvent when it assumed the QUIPS. Furthermore, Plaintiffs have no legal basis for maintaining a claim for unjust enrichment.

Unjust enrichment, under New York and Delaware law, is a quasi contractual cause of action and may not be asserted where the plaintiff has a valid contract. *Goldman v. Metro. Life Ins. Co.,* 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 587 (2005); *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield, Inc.*, 448 F. 3d 573, 586-87 (2d Cir. 2006); *Astropower Liquidating Trust v. KPMG LLP*, No. 06-469, 2007 U.S. Dist. LEXIS 38222, at *18 (D. Del. May 25, 2007). Here, Plaintiffs have a valid contract evidenced by the QUIPS Indenture. And it is clear that Plaintiffs received all they were entitled to under the terms of their contract.

As described in the Indenture, the QUIPS were junior, unsecured, subordinate to all senior debt and subject to the deferral of interest payments. The Indenture gave the QUIPS holders no voice in the event of a sale or merger by the issuer and imposed no limit on the amount of senior debt that the issuer could take on. The terms of the QUIPS were disclosed in the Offering Prospectus, including the section entitled "Risk Factors."

Moreover, none of the QUIPS contract obligations were breached or impaired as a result of the Going Flat Transaction. The QUIPS payments continued through March 2003 until payment was deferred as contractually permitted in June 2003. The real injury alleged by Plaintiffs is that they went from being senior creditors of Clark Fork to being deeply subordinated creditors of NorthWestern. But that is all Plaintiffs were ever entitled to under the terms of their contact and such an allegation does not state a claim for unjust enrichment.

There is no genuine issue as to any material fact and the record taken as a whole could not lead a rational trier of fact to find for Plaintiffs. NorthWestern is entitled to judgment as a matter law.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that NorthWestern's motion for summary judgment be granted.

Dated: Wilmington, Delaware
      November 30, 2007

GREENBERG TRAURIG LLP

By: _____
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
counihanv@gtlaw.com
melorod@gtlaw.com

-and-

CURTIS, MALLET-PREVOST, COLT &
   MOSLE LLP
Joseph D. Pizzurro
Nancy E. Delaney
Myles K. Bartley
101 Park Avenue
New York, New York 10178-0061
Telephone:  (212) 696-6000
Facsimile:   (212) 697-1559

Attorneys for NorthWestern Corporation