IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 04-1494 (JJF)<br>)<br>)<br>)<br>)<br>) |
| MAGTEN ASSET MANAGEMENT CORP.,<br><br>Plaintiff,<br><br>v.<br><br>MIKE J. HANSON and ERNIE J. KINDT,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 05-499 (JJF)<br>)<br>)<br>)<br>) |

**NORTHWESTERN CORPORATION'S STATEMENT OF MATERIAL FACTS SUBMITTED IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

NorthWestern Corporation ("NorthWestern"), in support of its Motion for Summary Judgment Dismissing the First Amended Complaint, submits the following statement of material facts as to which there is no genuine issue to be tried:

**The Acquisition**

1. On September 29, 2000, NorthWestern, Touch America Holdings, Inc. and The Montana Power Company ("Montana Power") entered into the Unit Purchase Agreement whereby NorthWestern agreed to purchase substantially all of Montana Power's electric, natural gas and propane utility assets ("the Acquisition"). (Delaney Aff. Ex. 3.)

2. In order to facilitate the Acquisition, Montana Power created a subsidiary called Montana Power LLC ("MP LLC") into which Montana Power transferred its utility assets and which also assumed certain debt obligations of Montana Power. (Delaney Aff. Ex. 4.) NorthWestern subsequently agreed to purchase the equity interest in MP LLC for $478 million in cash and the assumption of $511 million in liabilities which had been transferred to that entity. (Appendix Ex. 1 ¶¶ 34-38.)

3. The liabilities to be assumed from Montana Power by NorthWestern were related to or associated with the Montana Power utility assets.

4. On December 20, 2000, NorthWestern and Montana Power filed a joint application to the Federal Energy Regulation Commission ("FERC") for approval of NorthWestern's purchase of the equity interest in MP LLC. In the application, NorthWestern and Montana Power stated that the Acquisition was not contingent on any particular structure and that NorthWestern may either (1) form a holding company so that it would acquire MP LLC as a wholly-owned subsidiary or (2) acquire MP LLC, move it to a flat structure and hold the assets in a division of the parent company (i.e., "going flat"). (Delaney Aff. Ex. 5 at 17.)

5. FERC approved the Acquisition on February 20, 2001. (Delaney Aff. Ex. 6.)

6. On January 11, 2001, NorthWestern and Montana Power submitted a joint application to the Montana Public Service Commission ("MPSC") for approval of NorthWestern's purchase of the equity interest of MP LLC. In the application, NorthWestern stated that at its election the "utility operations [acquired] under the LLC structure will become either a wholly owned subsidiary or a division of NorthWestern." (Delaney Aff. Ex. 7.)

7. On January 31, 2002, the MPSC issued Final Order No. 6353c approving a stipulation filed by NorthWestern, Montana Power and certain consumer groups authorizing Montana Power to complete its proposed sale of MP LLC to NorthWestern. (Delaney Aff. Ex. 8.)

8. The NorthWestern financial statements for the first three quarters of 2002 were not submitted to or relied upon by the FERC or the MPSC in connection with NorthWestern's applications for approval of the purchase of the equity interest of MP LLC. (Delaney Aff. Exs. 5, 7.)

9. In order to finance its acquisition of MP LLC, NorthWestern entered into a credit agreement with several lenders, including Credit Suisse First Boston ("CSFB") on January 14, 2002. The credit agreement consisted of a $720 million term loan of 364 days (beginning on the day after the loan closing) and a $280 million revolving credit facility. (Delaney Aff. Exs. 9, 22.)

10. If NorthWestern held MP LLC as a subsidiary, NorthWestern could become a public utility holding company and subject to the regulatory requirements of the Public Utility Holding Company Act ("PUHCA"). (Patrizia Decl. ¶¶ 6-7; Delaney Aff. Ex. 4 at NOR002708.)

11. Because of PUHCA and the concerns of rating agencies related to NorthWestern's debt structure, NorthWestern made the decision in late 2001 to hold the utility assets in MP LLC at the parent company instead of in a subsidiary. (Patrizia Decl. ¶¶ 4, 6, 8.)

12. The decision to hold the utility assets in a division instead of a subsidiary required that NorthWestern complete the Acquisition in two steps. First, NorthWestern would

purchase the equity interest in MP LLC. Second, NorthWestern would transfer the utility assets to the parent to be held in a division of NorthWestern. (Delaney Aff. Ex. 4 at NOR002708.)

13.   But for the need to address the unique circumstances associated with the presence of an active Superfund site in one of MP LLC's assets, the Milltown Dam, and the need to segregate the liability associated with the Milltown Dam, NorthWestern could have acquired MP LLC and merged MP LLC with and into Northwestern (with NorthWestern as the surviving entity) in a series of essentially simultaneous transactions and no PUHCA issues would have arisen. The problem with this approach, however, was that a merger of MP LLC into NorthWestern would have carried to NorthWestern the potential liability associated with the Milltown Dam Superfund site. Accordingly, an interim period was necessary during which NorthWestern addressed the issues associated with the Milltown Dam. (Delaney Aff. Ex. 4 at NOR002708.)

14.   NorthWestern estimated that it needed approximately 18 months after the first step of the Acquisition to dispose of the Milltown Dam. (Delaney Aff. Ex. 4 at NOR002708-09.)

15.   During the 18 months between the first and second step of the Acquisition, NorthWestern would be a public utility holding company subject to PUHCA. Therefore, on Feb. 14, 2002, NorthWestern submitted an application to the Securities and Exchange Commission for a temporary exemption to PUHCA under Section 3(a)(3). (Delaney Aff. Ex. 4 at NOR002703, NOR002708; Patrizia Decl. ¶ 10.)

16.   Under Section 3(c), NorthWestern's application for a Section 3(a)(3) exemption to PUHCA was effective upon its good faith filing with the SEC. (Patrizia Decl. ¶ 11; Delaney Aff. Ex. 5 at 17.)

17. The Unit Purchase Agreement closed on February 15, 2002. NorthWestern paid $478 million in cash and assumed $511.1 million in "existing debt and mandatorily redeemable preferred securities of subsidiary trusts of The Montana Power Company, net of cash received" and received 100% of the equity interest of MP LLC. (Delaney Aff. Ex. 10 at 5.)

18. On March 12, 2002, NorthWestern announced that MP LLC was renamed NorthWestern Energy LLC ("NWE LLC"). (Delaney Aff. Ex. 11.)

19. The Board of Directors of NorthWestern approved the second step of the transaction, known as the "Going Flat Transaction" on August 7, 2002. (Delaney Aff. Ex. 23.)

20. NorthWestern filed an application with FERC on October 25, 2002, for approval of its assumption of the liabilities of NWE LLC, including the QUIPS liabilities. (Delaney Aff. Ex. 12.)

21. FERC approved NorthWestern's assumption of the liabilities of NWE LLC on November 15, 2002. (Delaney Aff. Ex. 13.)

22. NorthWestern completed the second step of the Acquisition (i.e., the "Going Flat Transaction") on November 15, 2002. In this step, NorthWestern brought all assets in NWE LLC, except the Milltown Dam, to the parent level and assumed all liabilities in NWE LLC, including the QUIPS. (Delaney Aff. Ex. 14; see also Delaney Aff. Ex. 24 §2.2.)

23. NWE LLC was renamed Clark Fork and Blackfoot, LLC ("Clark Fork"). (Delaney Aff. Ex. 10 at 17.)

24. In connection with the Going Flat Transaction, NorthWestern entered into two agreements with Clark Fork: (1) to cover maintenance and operating expenses of the

Milltown Dam and (2) an environmental liability support agreement indemnifying Clark Fork for environmental liability costs up to $10 million. (Delaney Aff. Exs. 25, 26.)

25. Clark Fork was solvent after the second step of the Acquisition; it continues to be solvent and has never filed for bankruptcy.

### The QUIPS and the Assumption of Obligations by NorthWestern

26. In November 1996, Montana Power sold $65,000,000 worth of 8.45% Junior Subordinated Debentures to a trust it established entitled Montana Power Capital I ("Trust"). (Delaney Aff. Ex. 27 [hereinafter "QUIPS Indenture"]; Delaney Aff. Ex. 28 §§2.08-2.09.)

27. The Trust issued 8.45% Cumulative Quarterly Income Preferred Securities ("QUIPS") to the public.

28. Montana Power entered into an indenture with The Bank of New York ("BoNY") as indenture trustee dated November 1, 1996. (Delaney Aff. Ex. 27.)

29. The QUIPS were junior, unsecured securities subject to all senior debt of the issuer and matured after 40 years in 2036. (Delaney Aff. Ex. 27 at Arts. 12, 15; Delaney Aff. Ex. 29 at i.)

30. Under the QUIPS Indenture there was no limit on the amount of senior debt that could be incurred by the issuer. (Delaney Aff. Ex. 27 at Art. 15.)

31. The issuer had the right to defer payments of interest on the QUIPS for up to 20 consecutive quarters without incurring a default. (Delaney Aff. Ex. 29 at 21.)

32. Without the consent of the QUIPS holders, the issuer could enter into supplemental indentures to evidence the assumption of the obligations under the QUIPS Indenture by another entity. (Delaney Aff. Ex. 27 § 1201(a).)

33. Without the consent of the QUIPS holders, the issuer could "convey or otherwise transfer, or lease, its properties and assets substantially as an entirety to any Person" if it complied with the following three requirements:

(a) the entity formed by the consolidation is organized and validly existing under United States law and it assumes the payment on the securities described in the QUIPS Indenture and the performance of every covenant of the QUIPS Indenture (Delaney Aff. Ex. 27 § 1101(a));

(b) no event of default shall occur immediately after the consolidation (Delaney Aff. Ex. 27 § 1101(b)); and

(c) the issuer delivers to the BoNY an Officer's Certificate and Opinion of Counsel stating that the consolidation and related supplemental indenture comply with Article 11 of the QUIPS Indenture and that all conditions precedent herein relating to consolidating transactions have been complied with. (Delaney Aff. Ex. 27 § 1101(c).)

34. Under Section 1102, once the issuer complied with Section 1101(a), (b) and (c) (described above), the predecessor entity would be relieved of all obligations and covenants under the QUIPS Indenture. (Delaney Aff. Ex. 27 § 1102.)

35. The QUIPS holders had no right to approve a sale or merger by the issuer. (Delaney Aff. Ex. 27 §§ 1101,1201; *In re: NorthWestern Corp. (Magten Asset Mgmt. Corp. & Law Debenture Trust Co. of NY v. Northwestern Corp.)*, 313 B.R. 595, 600 (Bankr. D. Del. 2004).)

36. On February 13, 2002, MP LLC and BoNY executed the First Supplemental Indenture to the QUIPS Indenture by which MP LLC expressly assumed all the obligations of Montana Power under the QUIPS Indenture. (Delaney Aff. Ex. 30.)

37. On August 13, 2002, the Second Supplemental Indenture to the QUIPS Indenture was agreed to among NWE LLC, NorthWestern and BoNY. Under the Second Supplemental Indenture, NorthWestern fully and unconditionally assumed on a joint and several basis with NWE LLC, all of MP LLC's obligations under the QUIPS Indenture. (Delaney Aff. Ex. 31.)

38. On November 15, 2002, NorthWestern and BoNY executed the Third Supplemental Indenture whereby NorthWestern assumed all obligations on the QUIPS Indenture. (Delaney Aff. Ex. 32; *In re: NorthWestern Corp.*, 313 B.R. at 600.)

39. BoNY was not required to obtain the consent of the QUIPS holders before entering into the Third Supplemental Indenture. (Delaney Aff. Ex. 2 at 69-70; Delaney Aff. Ex. 27 §§1101, 1201; *In re: NorthWestern Corp.*, 313 B.R. at 600; *Magten Asset Mgmt. Corp. v. The Bank of NY*, 15 Misc. 3d 1132(A), 841 N.Y.S.2d 219, 2007 N.Y. Misc. LEXIS 3320, at *2 (Sup. Ct. N.Y. Co. May 8, 2007).)

40. Pursuant to Section 1102 of the QUIPS Indenture the Third Supplemental Indenture released NWE LLC from all obligations under the QUIPS Indenture. (*In re: NorthWestern Corp.*, 313 B.R. at 601.)

41. In compliance with Section 1101(c) of the QUIPS Indenture, NorthWestern also submitted to BoNY an Officer's Certificate and an Opinion of Counsel stating that the Third Supplemental Indenture and the transfer of substantially all the assets of NWE LLC and the assumption of substantially all the liabilities of NWE LLC by NorthWestern

complied with Article 11 of the QUIPS Indenture and all conditions precedent therein, including that there was no event of default immediately after the assumption of liability on the QUIPS. (Delaney Aff. Exs. 33, 34.)

42. BoNY reviewed the Officer's Certificate and Opinion of Counsel and determined that each contained the required form language under the QUIPS Indenture. (Delaney Aff. Ex. 2 at 35, 87.)

43. BoNY did not review NorthWestern's financial statements in connection with its execution of the Third Supplemental Indenture. (Delaney Aff. Ex. 2 at 77.)

44. BoNY was entitled to rely on the statements made in the Officer's Certificate and Opinion of Counsel and had no obligation to review NorthWestern's financial statements in connection with executing the Third Supplemental Indenture. (Delaney Aff. Ex. 2 at 35, 59, 87; Delaney Aff. Ex. 28 §8.03(i) & (iv).)

45. BoNY was not required to perform an independent investigation of the statements made in the Officer's Certificate or the Opinion of Counsel. (Delaney Aff. Ex. 27 at Arts. 11, 12; *Magten Asset Mgmt. Corp*, 2007 N.Y. Misc. LEXIS 3320, at *19.)

46. The statements contained in the Officer's Certificate and the Opinion of Counsel were true in all respects. There was no event of default immediately after NorthWestern's assumption of the QUIPS.

47. NorthWestern paid interest payments on the QUIPS for the quarterly periods ending December 31, 2002 and March 31, 2003. (Delaney Aff. Ex. 2 at 21-22; Delaney Aff. Ex. 36.)

48. In May 23, 2003, NorthWestern announced that it would defer payment of interest on all of its trust preferred securities, including the QUIPS. (Delaney Aff. Ex. 15.)

49. NorthWestern's deferral of the payment of interest on the QUIPS was in compliance with the QUIPS Indenture and did not violate any other contractual right of the QUIPS holders. (Delaney Aff. Ex. 27 §312.)

50. There is no evidence that NorthWestern was insolvent immediately before or after the Going Flat Transaction was completed on November 15, 2002.

51. NorthWestern was solvent as of December 31, 2002. (Delaney Aff. Ex. 35.)

52. There is no evidence that NorthWestern did not intend to perform its obligations on the QUIPS at the time it assumed the obligations from NWE LLC.

53. The going flat transaction did not violate the QUIPS Indenture or any other contractual right of the QUIPS holders.

54. Immediately prior to filing NorthWestern's 2002 Annual Report on Form 10-K, on April 15, 2003 NorthWestern filed amended Quarterly Reports on Form 10-Q/A for the periods ended March 31, 2002, June 30, 2002, and Sept. 30, 2002. The quarterly reports were restated and included additional disclosures. Subsequent to that filing, BoNY did not conduct any investigation into the financial condition of NorthWestern or the truth of the statements in the Officer's Certificate or the Opinion of Counsel and had no legal obligation to do so. (*Magten Asset Mgmt. Corp*, 2007 N.Y. Misc. LEXIS 3320, at *19.)

55. NorthWestern's announcement on April 16, 2003 that it was having financial difficulties and was instituting a "turnaround" plan was not an event of default under the QUIPS Indenture. (*Magten Asset Mgmt. Corp.*, 2007 N.Y. Misc. LEXIS 3320, at *8-*16.)

56. There was no event of default under the QUIPS Indenture until NorthWestern filed for bankruptcy on September 14, 2004.

## NorthWestern's Financials

57.   In November 2001, Expanets, a subsidiary of NorthWestern, implemented EXPERT, a billing and accounting software system. (Delaney Aff. Ex. 10 at 26.)

58.   It was evident during 2002, that there were problems with EXPERT related to the generation and disbursement of bills to customers. (Delaney Aff. Ex. 10 at 26.)

59.   On December 13, 2002, NorthWestern issued a press release announcing that it would miss its earnings estimates and that it may recognize a substantial impairment of goodwill and other intangible assets at Expanets and another subsidiary, Blue Dot. (Delaney Aff. Ex. 16.)

60.   In February 2003, NorthWestern announced the elements of a turnaround plan to focus on its core utility businesses and attempt to sell its "non-core assets, including Expanets, Blue Dot, the Montana First Megawatts generation project . . . ." (Delaney Aff. Ex. 10 at 6.)

61.   On April 15, 2003, NorthWestern issued restated Form 10-Qs for quarterly periods ending March 30, 2002; June 30, 2002 and September 30, 2002. NorthWestern restated its quarterly reports for 2002 by taking nearly $600 million in goodwill impairment charges and roughly $280 million in other charges, including discontinued operations, valuation allowances for deferred taxes, and billing and receivable adjustments, and making additional disclosures. (Delaney Aff. Ex. 10.)

62.   The SEC commenced an investigation of NorthWestern in 2003, after the announcement that NorthWestern was restating its financials for the first three quarters of 2002.

63. On March 7, 2007, NorthWestern, without admitting or denying the SEC's findings, consented to the entry of an order instituting cease and desist proceedings, making findings and imposing a cease and desist order. (Delaney Aff. Ex. 17.)

64. The SEC made no finding of fraud against NorthWestern and imposed no monetary penalty against NorthWestern after its investigation. (Delaney Aff. Ex. 17.)

65. There is no evidence that NorthWestern misstated its Form 10-Qs for the quarterly periods ending March 30, 2002; June 30, 2002 and September 30, 2002, in order to accomplish the Going Flat Transaction.

66. There is no evidence that NorthWestern used its misstated its Form 10-Qs for the quarterly periods ending March 30, 2002; June 30, 2002 and September 30, 2002 in any way to accomplish the Going Flat Transaction.

### NorthWestern Files for Chapter 11

67. On September 14, 2003, NorthWestern filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code").

68. There is no evidence that the misstatements in NorthWestern's quarterly reports for the first three quarters in 2002 caused NorthWestern to file for Chapter 11 relief.

69. There is no evidence that the Going Flat Transaction or NorthWestern's assumption of liabilities on the QUIPS caused NorthWestern to file for Chapter 11 relief.

70. Magten first purchased QUIPS in late April 2003, after the April 15, 2003 announcement of the restatement of NorthWestern's 2002 quarterly results and continued to purchase QUIPS up to and including June 2006, years after NorthWestern petitioned for relief under Chapter 11. (Delaney Aff. Ex. 1 at 82, 91, 105.)

Dated: Wilmington, DE
November 30, 2007

GREENBERG TRAURIG LLP

By: _____
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 661-7000
counihanv@gtlaw.com
melorod@gtlaw.com

-and-

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
Joseph D. Pizzurro
Nancy E. Delaney
Myles K. Bartley
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000

Attorneys for NorthWestern Corporation