LEXSEE 206 F.3D 202

**AUSA Life Insurance Company, Bankers United Life Assurance Company, Crown Life Insurance Company, General Services Life Insurance Company, Life Investors Insurance Company of America, Modern Woodmen of America, Monumental Life Insurance Company, The Mutual Life Insurance Company of New York, and The Prudential Insurance Company of America, Plaintiffs-Appellants, v. Ernst and Young, Defendant-Appellee.**

Docket No. 98-7162

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*206 F.3d 202; 2000 U.S. App. LEXIS 4120; Fed. Sec. L. Rep. (CCH) P90,772*

**December 7, 1998, Argued
March 17, 2000, Decided**

**SUBSEQUENT HISTORY:** [**1] As Amended March 31, 2000.

**PRIOR HISTORY:** Appeal from dismissal by the United States District Court for the Southern District of New York (William C. Conner, Judge) of the plaintiffs-appellants' Securities Act and other claims against the defendant-appellee after a bench trial, in a holding that loss causation had not been proven.

**DISPOSITION:** Vacated and remanded in part, and reversed in part.

**COUNSEL:** Peter Buscemi, Washington, DC (Morgan, Lewis & Bockius, LLP; Debra Brown Steinberg, Cadwalader, Wickersham & Taft, New York, NY, of counsel), for Plaintiffs-Appellants.

Kenneth S. Geller, Washington, DC (Mayer, Brown & Platt; Alan N. Salpeter, Michele Odorizzi, Howard J. Roin, Caryn Jacobs, Bradley J. Andreozzi, Linda T. Coberly, Mayer, Brown & Platt, Chicago, IL; Kathryn A. Oberly, Patricia A. Connell of Ernst & Young LLP, New York, NY, of counsel), for Defendant-Appellee.

(Alan I. Horowitz, Gerald Goldman, Jeffrey J. Swart, Miller & Chevalier, Chartered; Phillip E. Stano, Senior Counsel, Litigation, American Council of Life Insurance, Washington, DC, of counsel), for American Council of Life Insurance as Amicus Curiae in support of Plaintiffs-Appellants.

**JUDGES:** Before WINTER, Chief Judge, OAKES and JACOBS, Circuit Judges. Judge [**2] Jacobs concurs in the mandate of the opinion for the court in a separate opinion. Chief Judge Winter dissents in a separate opinion.

**OPINION BY:** OAKES

**OPINION**

OAKES, *Senior Circuit Judge*:

[*204] *I. Introduction*

Plaintiffs-appellants AUSA Life Insurance Company, Bankers United Life Assurance Company, Crown Life Insurance Company, General Services Life Insurance Company, Life Investors Insurance Company of America, Modern Woodmen of America, Monumental Life Insurance Company, The Mutual Life Insurance Company of New York, and The Prudential [*205] Life Insurance Company of America (collectively, "insurance companies" or "investors") appeal from the dismissal of their Securities Act and other claims against Ernst & Young ("E&Y") after a bench trial in the United States District Court for the Southern District of New York (William C. Conner, *Judge*).

*II. Facts*

The appellants are insurance companies that invested in the securities of JWP, Inc., a company which

206 F.3d 202, *205; 2000 U.S. App. LEXIS 4120, **2;
Fed. Sec. L. Rep. (CCH) P90,772

ultimately went belly-up, causing the appellants to lose most of their investments. [1] The appellee is the accounting firm that served as the independent auditor for JWP from 1985 through 1992, the period during which the appellants [**3] invested in JWP and the period during which the allegedly fraudulent activity was occurring.

> [1]   Our recitation of the facts comes from the district court's findings of facts with which we find no fault, in *AUSA Life Ins. Co. v. Ernst & Young, 991 F. Supp. 234 (S.D.N.Y. 1997)*, and Findings of Fact, Joint Appendix at 2466, *AUSA Life Ins. Co. v. Ernst & Young, 991 F. Supp. 234* (S.D.N.Y. Dec. 5, 1997) (94 Civ. 3116 (WCC)).

The appellants made their initial purchases of JWP's notes in November of 1988. Through March 1992, they purchased additional JWP notes, the investments totaling $ 149 million. The notes were purchased in accordance with agreements ("Note Agreements") which included, among other things, the financial representations made by JWP at the time of the notes' issuances, future procedures to which JWP agreed to adhere for certifying JWP's maintained financial viability, procedures to be followed in the event of a default on the notes, and the like.

In purchasing the [**4] notes, appellants relied on JWP's past financial statements, including annual reports certified by E&Y. These financial statements were required, under the Note Agreements, to be kept in accordance with generally accepted accounting principles ("GAAP"). Also, at the time of each annual audit by E&Y, E&Y was required under the Note Agreements to furnish to JWP a letter for JWP to transmit to noteholders, [2] referred to as a "no-default certificate" or a "negative assurance letter," which stated that E&Y had audited JWP's financial statements and that JWP was in compliance with the financial covenants in the Note Agreements.

> [2]   The letters were labeled "Independent Auditor's Reports on Compliance." *See* P 383, Findings of Fact, Joint Appendix at 2586, *AUSA, 991 F. Supp. 234* (S.D.N.Y. Dec. 5, 1997) (94 Civ. 3116 (WCC)).

In this instance and consistently, E&Y's statements about JWP's financial health were less than accurate and were not always in accordance with GAAP or GAAS ("generally accepted [**5] auditing standards").

However, E&Y did not fail to notice that often JWP's financial representations about itself were not in accordance with GAAP; rather, E&Y consistently noticed, protested, and then acquiesced in these misrepresentations:

> E&Y's failure lay in the seeming spinelessness of John LaBarca [the partner in charge of the JWP audit] and the other E&Y accountants in their dealings with JWP, and particularly with its CEO, Ernest Grendi . . . . Grendi almost invariably succeeded in either persuading or bullying them to agree that JWP's books required no adjustment. Part of the problem was undoubtedly the close personal relationship between Grendi and LaBarca. Grendi had been a partner of LaBarca in E&Y's predecessor firm and they continued to be good friends, regularly jogging together in preparation for the New York City Marathon.

*AUSA, 991 F. Supp. at 248.* "It became a well-worn inside joke to refer to the lax accounting standards at JWP as "EGAAP," an acronym for Ernest Grendi's Accepted Accounting Practices." *Id. at 253.*

[*206] JWP rapidly expanded between 1984 and 1992 with many aggressive acquisitions. The expansion was [**6] mainly financed by private placements of debt securities, which put JWP in an increasingly leveraged position. JWP's final, fatal acquisition was that of Businessland, Inc., in 1991. Businessland was a retailer of computers and a supplier of software. It had lost an average of ten million dollars a month over the ten months prior to the acquisition, and its auditors had issued a "going concern" qualification on its most recent audited financial statement, which indicated that the auditors doubted the company could survive.

Notwithstanding the gloomy financial picture, JWP executives saw potential. They believed that Businessland's structure could be converted into that of a "value-added" systems integrator; they thought that Businessland could be meshed into JWP's existing business which was heavily involved in installing wiring

206 F.3d 202, *206; 2000 U.S. App. LEXIS 4120, **6;
Fed. Sec. L. Rep. (CCH) P90,772

for computer networks; and they intended to capitalize on Businessland's trained sales force and existing clientele.

Unfortunately, this ambitious business venture did not evolve as envisioned. Upon JWP's acquisition of Businessland, JWP was forced to advance money to Businessland to meet the latter's operating expenditures. As well, the planned closure of [**7] most of Businessland's retail stores took longer than was initially anticipated. During the same general time period (the early 1990s), the retail computer market was the battleground for the "PC price wars," periods of intense competition, on bases including price. To nail the coffin shut, there was a downward trend in office construction which negatively impacted the electrical construction division of JWP.

In early 1992, David Sokol, JWP's new President and Chief Operating Officer, took note of what appeared to be serious accounting irregularities in JWP's records and statements. In August of 1992, JWP retained Deloitte & Touche ("D&T"), another major accounting firm, to review thoroughly JWP's books and E&Y's audits.

D&T concluded that JWP's annual reports for 1990-1992 should be restated to reduce the 1990 after-tax net income by 15% (from $ 59 million to $ 50 million), that the 1991 after-tax income should be reduced by 52% from $ 60 million to $ 29 million, and that 1992 loss of $ 612 million with a corresponding net worth of negative $ 176 million should be reflected. E&Y concurred.

JWP was able to continue paying the interest due on its notes through 1992, and JWP made [**8] partial payments through April 1993. However, JWP ultimately defaulted and was placed in involuntary bankruptcy in December 1993. Some appellants sold their notes at a huge loss in 1993 and 1994, and some appellants partially exchanged some of their notes for cash and securities of a lesser total value than the original notes. At the end of the day, appellants sustained at least a loss of approximately $ 100 million in lost principal and unpaid interest.

Over twenty lawsuits were filed as a result of JWP's demise. A consolidated suit, comprised of plaintiffs who had purchased JWP common stock in the open market between May 1, 1991, and October 2, 1992, was settled, as was a suit comprised of those who had sold their businesses to JWP in exchange for JWP common stock. Two actions remained: the instant one and *AUSA Life Ins. Co. v. Andrew T. Dwyer*, 94 Civ. 2201 (WCC). The latter

suit appears to be closed, having been settled or otherwise disposed of. *See* Civil Docket for Case #: 94-CV-2201 (S.D.N.Y. Docket as of March 15, 2000). This case remains.

In the district court, plaintiffs made essentially three categories of claims against E&Y: federal securities law claims, New York [**9] common law claims for fraud, and negligent misrepresentation claims. A bench trial was conducted over eleven weeks, and, at the conclusion of the trial, [*207] after post-trial briefs and proposed findings and conclusions were submitted by the parties, the district court issued an Opinion and Order detailing its findings and dismissing the plaintiffs' claims. *See AUSA*, 991 F. Supp. 234. At the same time, the court issued extensive Findings of Fact. *See* Findings of Fact, Joint Appendix at 2466, *AUSA*, 991 F. Supp. 234 (S.D.N.Y. Dec. 5, 1997) (94 Civ. 3116 (WCC)).

The court found the following: From 1988 to 1991, E&Y was aware of serious accounting irregularities with respect to the small tool inventories which increased JWP's net income, but E&Y did not insist on the correction of the irregularities. *See AUSA*, 991 F. Supp. at 242. E&Y knew that JWP was recording anticipated future tax benefits of net operating loss (NOL) carryforwards in clear violation of GAAP (presumably for the "purpose of dressing up its year-end consolidated balance sheet"), yet E&Y saw "nothing wrong" with this practice. *Id.* After discovering more accounting [**10] abuses as to NOLs which also seemed to inflate current net operating income, E&Y again "issued unqualified audit reports for the years in question," those years including the late 1980s. *Id. at* 243. E&Y was also aware of and acquiesced in numerous other accounting abuses in claims and receivables which inflated JWP's earnings and assets at least from 1989 forward. *See id. at* 243-46. In sum, "the annual no-default letters issued by E&Y were . . . false in that they certified that JWP's books had been kept in accordance with GAAP, which E&Y knew was untrue." *Id. at* 246.

The court determined that the plaintiffs established the materiality and reliance elements of federal securities law violations. *See id. at* 246-47. The court determined that it was questionable whether the plaintiffs established the scienter element of both the federal claims and the state claims. *See id. at* 247-248, 252. The court found definitively that the plaintiffs did not prove the causation element of both the federal and state law claims because

206 F.3d 202, *207; 2000 U.S. App. LEXIS 4120, **10;
Fed. Sec. L. Rep. (CCH) P90,772

the plaintiffs were not able to show loss causation -- the plaintiffs could not establish [**11] that E&Y's egregious accounting idiosyncracies caused plaintiffs' losses because JWP ultimately imploded due to Businessland's operations and the uncontrollable effects of the PC price wars. *See id.* at 248-50, 252. The court found that the financial devastation of JWP was a "result of unforeseeable and independent post-audit events and not because of fiscal infirmities which were concealed by JWP's misleading financial statements." *Id.* at 250. With respect to the negligent misrepresentation claims, the court further found both that privity and causation were lacking. *See id.* at 252-53. This appeal followed.

*III. Discussion*

Appellants based their claims on *Section 10(b)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*; the rules and regulations promulgated thereunder, including SEC *Rule 10b-5*; and the common law.

*Section 10(b)* provides that

It shall be unlawful for any person, directly or indirectly, . . . .

(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and [**12] regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j(b)*. To prove a violation of *§ 10(b)*, a plaintiff must prove (1) damage to the plaintiff, (2) which was caused by reliance on the defendant's misrepresentations or omissions of material facts, (3) which were made with scienter -- intent to deceive, manipulate, or defraud, or reckless disregard for the resultant deception, (4) which were made in connection with the purchase or sale of securities, and (5) which were furthered through the defendant's use of the mails or a national securities [*208] exchange. *See Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992).

SEC *Rule 10b-5* provides that

It shall be unlawful for any person, directly or indirectly, by the use of any

means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements [**13] made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5*. To establish a violation of *Rule 10b-5*, the plaintiff must prove that

in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material misrepresentation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.

*Press v. Chem. Invest. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999) (internal quotations and citation omitted).

With respect to the common law claims, plaintiffs made both common law fraud and deceit claims and common law claims for negligent misrepresentations and omissions. In New York state, to prove a fraud claim, a plaintiff must prove "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable [**14] reliance of the other party on the misrepresentation or material omission, and injury." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373, 646 N.Y.S.2d 76, 80 (1996). With respect to negligent misrepresentation, the Court of Appeals of New York has stated that

206 F.3d 202, *208; 2000 U.S. App. LEXIS 4120, **14;
Fed. Sec. L. Rep. (CCH) P90,772

[A] negligent statement may be the basis for recovery of damages, where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage, but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all.

*White v. Guarente, 43 N.Y.2d 356, 363-64, 372 N.E.2d 315, 319, 401 N.Y.S.2d 474, 478 (1977)* (internal citation omitted).

The appellants appeal on five bases, some of which pertain to the federal claims, some of which pertain to the state claims, and some of which pertain to both. These bases boil down to three arguments with the district court's determinations: (1) the district [**15] court's refusal to find causation between E&Y's actions or inactions and the appellants' losses; (2) the district court's standards for assessing the transaction causation and scienter elements of the appellants' federal securities claims and the appellants' common law fraud claims; and (3) the district court's finding that there was not a near-privity relationship between the investors and E&Y.

We hold that transaction causation was established. We vacate and remand the loss causation determination. We hold that scienter was established. We reverse the privity determination.

*A. Standard of Review*

As above stated, this case was tried without a jury before United States District Court Judge Conner. In such a posture, the court's determinations of fact will not be disturbed unless they are "clearly erroneous." *See Scribner v. Summers, 84 F.3d 554, 557 [*209] (2d Cir. 1996).* Questions of law are reviewed *de novo*, as are mixed questions of law and fact. *See id. at 557.*

*B. Causation*

We agree with the district court that E&Y did not perform the most efficacious accounting in this situation. *See AUSA, 991 F. Supp. at 253-254 [**16]* ("John LaBarca [senior E&Y accountant] and his associates apparently lacked the backbone to stand up to the intransigent and intimidating Ernest Grendi and insist upon the changes necessary for compliance with GAAP"). However, we part company with the district court on its determination that it was "unforeseeable post-audit developments [that] caused JWP's insolvency and default even if its financial condition had been fully as healthy as was represented in those reports." *Id. at 254.*

Causation in this context has two elements: transaction causation and loss causation. *See Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 380-381 (2d Cir. 1974).* Loss causation is causation in the traditional "proximate cause" sense -- the allegedly unlawful conduct caused the economic harm. *See id. at 380.* Transaction causation means that "the violations in question caused the appellant to engage in the transaction in question." *See id. at 380.* Transaction causation has been analogized to reliance. *See Currie v. Cayman Resources Corp., 835 F.2d 780, 785 (11th Cir. 1988).*

*1. Transaction Causation*

The district [**17] court determined that "It is by no means clear that plaintiffs have proven even transaction causation . . . . However, this Court need not resolve the issue of transaction causation because the evidence definitively fails to establish the necessary loss causation." *AUSA, 991 F. Supp. at 249-50.*

There is ample evidence in the record that the appellants relied on E&Y's certifications of the financial soundness of JWP both in making their note purchases and in continuing to hold the notes. This was not a situation where the notes were marketed en masse, and E&Y had a barely tangential role in the transaction. Rather, the purchasers of these private placement notes specifically required the audits of E&Y before purchasing the notes and as a condition of their purchase. The district court stated as much in the findings of fact: "If the plaintiffs had known the lack of quality of JWP's notes at the time of the offerings, they likely would not and in some cases could not have bought them." *See* P 447, Findings of Fact, Joint Appendix at 2606, *AUSA, 991 F. Supp. 234 (S.D.N.Y. Dec. 5, 1997) (WCC)).* [3]

3 Paragraph 450 of the district court's findings of fact might seem, at first blush, to be contradictory to the findings in Paragraph 447. Paragraph 450 states that

However, as long-term debt holders, plaintiffs' primary concern was whether JWP would be able to repay the principal and interest owed under the notes . . . . As indicated below, even given E&Y's misrepresentations, plaintiffs likely would have concluded that JWP's accounting abuses did not materially affect its ability to make good on the notes.

P 447, Findings of Fact, Joint Appendix at 2607, *AUSA, 991 F. Supp. 234* (S.D.N.Y. Dec. 5, 1997) (94 Civ. 3116 (WCC)). However, given the narrowness and specificity of the determination in Paragraph 447, quoted in the text immediately above, it is not at odds with the findings in Paragraph 450. To the extent that Paragraph 447 provides that the plaintiffs "likely would not and in some cases *could not* have bought" the notes, that is compelling. *See* P 447, Findings of Fact, Joint Appendix at 2606, *AUSA, 991 F. Supp. 234* (S.D.N.Y. Dec. 5, 1997) (94 Civ. 3116 (WCC)) (emphasis added).

[**18] Applying to these facts the legal definition of transaction causation, we find that transaction causation was established. [4] *Cf.* [*210] *Manufacturers Hanover Trust Co. v. Drysdale Secs. Corp., 801 F.2d 13, 20 (2d Cir. 1986)* (describing accountant's misrepresentations which led financial institutions to do business with a financially unsound company).

> 4    Although we could remand this issue to the district court for reconsideration, *see Brocklesby Transport v. Eastern States Escort Servs., 904 F.2d 131, 134 (2d Cir. 1990)*, we instead, in the interest of judicial efficiency, resolve the issue ourselves, *see Commercial Union Assurance Co. v. Milken, 17 F.3d 608, 615 (2d Cir. 1994)*.

*2. Loss Causation*

Addressing loss causation is a more difficult endeavor. How far back should the line be drawn in the causal chain, before which, "because of convenience, of public policy, of a rough sense of justice," proximate cause cannot be found? *Palsgraf v. Long Island R. Co., 248 N.Y. 339, 352, 162 N.E. 99, 103 (1928).* [**19] In

the vernacular, where does the buck stop?

We agree with most of the district court's factual determinations, set out both in the opinion -- *AUSA, 991 F. Supp. 234* -- and in the court's "Findings of Fact," Joint Appendix at 2466, *AUSA, 991 F. Supp. 234 (S.D.N.Y. 1997).* Those with which we do not agree are not clearly erroneous. However, given the true nature of the "loss causation" determination, as fully discussed below, the district court did not make all of the specific findings of fact required. We therefore vacate the court's determination and remand for reconsideration and more pertinent factual findings in light of this opinion.

*a. The District Court's Factual Determinations*

In the section of the "Findings of Fact" labeled "Loss Causation," the district court made findings focusing on whether the misrepresentations on the financial statements available to the investors prior to their note purchases pertained to JWP's cash flow, which "is the source of interest and principal payments to lenders." P 453, Findings of Fact, Joint Appendix at 2606, *AUSA, 991 F. Supp. 234 (S.D.N.Y. 1997)*; [**20] *see* PP 451-62, *id.* at 2607-2611. However, given the legal definition of loss causation, these factual determinations are not the most relevant. Since loss causation is causation in the traditional "proximate cause" sense, an examination by the district court of different facts relevant to whether the allegedly unlawful conduct caused the economic harm would have been more appropriate.

The following piecemeal factual determinations made by the district court are relevant: JWP was in default on its notes because it was in violation of the financial covenants in the Note Agreements. *See* P 440, *id.* at 2607. E&Y knew of these violations, but assisted in concealing them. *See* P 506, *id.* at 2625. This default could have allowed the plaintiffs to accelerate the due date on the notes. *See* P 471, *id.* at 2613. Accurate accounting, auditing, and reporting would have at least made the plaintiffs aware of the default and precarious financial position of JWP, though, at oral argument, the appellee maintained that JWP would have had thirty days to cure the default before the plaintiffs could accelerate the notes. At oral argument, the appellee [**21] also contended that, had the investors been made aware of the default, they would have waived it, and it would have become a non-issue. We need not speculate on that here. Suffice it to say that the factual findings establish that JWP was in default on its notes prior to its acquisition of

206 F.3d 202, *210; 2000 U.S. App. LEXIS 4120, **21;
Fed. Sec. L. Rep. (CCH) P90,772

Businessland, and the investors would have known of such had E&Y correctly performed their duties.

True, the district court found that "JWP would not have defaulted on its debt obligations but for its acquisition of Businessland, which turned out to be a veritable sinkhole for cash." *AUSA, 991 F. Supp. at 250*. But, as discussed above, had JWP's financial situation been accurately represented by E&Y, and had E&Y revealed the undisputed GAAP violations, JWP would have been in default on its notes prior to its acquisition of Businessland. Therefore, the acquisition of Businessland could not have taken place without a cure of the default or the investors' waivers of the default.

[*211] *b. The District Court's Application of Law to Fact*

The appellee maintains -- and the district court agreed --that the events leading to the demise of JWP and the loss of appellants' investments were due [**22] to external events for which appellee cannot be held accountable, and therefore loss causation was not established. The district court said specifically that

> JWP's insolvency and resulting default on its note obligations were caused not by the differences between its actual financial condition and that reflected in its audited annual reports, but by much more significant factors, including JWP's disastrous acquisition of the failing Businessland, in combination with the downturn in commercial construction and fierce competition in the PC market.

*Id. at 250*. We disagree, however, with this conclusion of the district court to the extent that the district court did not fully consider the legal definition of "loss causation" and the requisite factual points in determining whether loss causation was established.

A good starting point for our analysis of this case is *Marbury Management, Inc. v. Kohn, 629 F.2d 705 (2d Cir. 1980)*. In *Marbury Management*, the plaintiffs were purchasers of stock who sued the brokerage house (Wood, Walker) and the brokerage employee (Alfred Kohn) from whom they purchased the stock. Kohn, who induced the plaintiffs [**23] to purchase the stock and to continue to hold it, was not a licensed, registered representative broker as he had represented to the

purchasers. Instead, he was a trainee. *See id. at 707*. The stock lost value, and the plaintiffs, upon discovering that the selling employee was not a "security analyst," as his business card portrayed, sued for the money lost on the securities. *See id*. The district court dismissed the plaintiffs' claims as to the brokerage firm, holding that the plaintiffs failed to prove scienter vis-a-vis either conscious wrongful participation or negligence in supervision. *See id*. With respect to Kohn, the district court held him liable under *§ 10(b)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*. *See id*.

Kohn and the plaintiffs cross-appealed, and this court reversed the judgment in favor of Wood, Walker, and affirmed the judgment against Kohn. *See id*. A dissent, *see id. at 716-723*, argued that the majority ignored the fact that

> the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause. This elementary rule precludes [**24] recovery in the case at bar since Kohn's misrepresentations as to his qualifications as a broker in no way caused the decline in the market value of the stocks he promoted.

*Id. at 717*. The majority, however, held that this was simply a matter of imposing liability for losses resulting from fraudulent representations that "induced the retention of securities as an investment" and resulted in "damages flowing from retention." *Id. at 709*. The majority focused on both the fact that the unlicensed seller caused the plaintiffs to purchase securities that they otherwise might not have purchased and that the seller also encouraged the plaintiffs to hold the securities past a point at which they might have otherwise sold the securities. *See id. at 709-10*.

*Manufacturers Hanover Trust Co., 801 F.2d 13*, relied upon *Marbury*. We there defined our task as the quantification of "the role of the accountant, and the scope of his liability, in presenting to the financial community information about a financial institution seeking to attract or maintain business in transactions involving agreements to repurchase (or resell) [**25] government securities." *Id. at 18*. We noted that the requirement of loss causation "derives from the common law tort concept of 'proximate causation.'" *Id. at 20*

206 F.3d 202, *211; 2000 U.S. App. LEXIS 4120, **25;
Fed. Sec. L. Rep. (CCH) P90,772

(internal citation omitted). Going further, we relied on the language in *Marbury*, 629 F.2d at 708, which provided that loss causation [*212] "'in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation.'" *Manufacturers Hanover Trust*, 801 F.2d at 21 (internal citations omitted).

Returning, then, to *Marbury*, while the complained of "fraud," as it were, in *Marbury* was factually different from that here -- an unlicensed seller falsely purporting to be registered versus the auditor falsely certifying financial health -- the analysis in *Marbury* is broad enough to apply to our situation. We were concerned in *Marbury* with the facts that the fraud both induced the investors to make the investment and induced the investors not to abandon it. *See Marbury*, 629 F.2d at 709-10. The relatively tangential feel to the fact that the fraud causation was traced to a career misrepresentation disappeared [**26] once the court considered the context of the fact and its import in the causal chain. The same can be said here.

The majority in *Marbury* analyzed cases -- including *David v. Belmont*, 291 Mass. 450, 197 N.E. 83 (1935); *Rothmiller v. Stein*, 143 N.Y. 581, 38 N.E. 718 (1894); and *Continental Ins. Co. v. Mercadante*, 222 A.D. 181, 225 N.Y.S. 488 (1st Dept. 1927) -which found liability premised on assurances by a broker or seller which induced continued retention of a stock which ultimately plummeted in value, *regardless* of the cause of the final plunge in price. *629 F.2d at 709*. These cases are equally applicable here.

The careful analysis in *Continental Insurance Co.*, while certainly not binding, is worth noting. In that case, the plaintiff insurance companies sued the defendants (apparently stock brokers or company officers) for both inducing the plaintiffs to buy and inducing the plaintiffs to continue to hold securities that later became worthless. *See Continental Ins. Co.*, 222 A.D. at 182, 225 N.Y.S. at 489-90. The defendants induced the plaintiffs to buy and retain the securities by conveying false financial [**27] information as to the earnings and solvency of the underlying obligor on the securities. *See id.* The court considered whether the defendants could be held liable for the plaintiffs' decision not to sell the securities prior to the underlying obligor's default when the plaintiffs presented no proof that they intended to sell the securities *until* the defendants told them not to sell. *See Id.* at 184,

225 N.Y.S. at 491-92 ("We come, then, to the more difficult question of whether this inaction can be said to have been caused by the false representations, in view of the circumstances that the plaintiffs had not previously determined upon action.").

In resolving the issue, the court quoted *Smith v. Kay*, 7 H.L.C. 750, 770 (Lord Cranworth) (1859)

> It does not lie in the mouths of these persons to say what he would have done if they had not concocted the fraud, and if there had never been any deception at all practiced. That is not the question. The question rather is what this young man would have done, if he had known all that had really taken place.

*Continental Ins. Co.*, 222 A.D. at 185, 225 N.Y.S. at 492. Moreover, [**28] the court noted that

> The defendants intended that their misrepresentations should cause the plaintiffs to keep their bonds, desist from further inquiry, and remain passive . . . . Where [the defendant] accomplishes his dishonest purpose, and his misrepresentation can fairly be said to have contributed to this result, he should compensate for the loss which he intended to cause, and which by fraudulent conduct he induced. The test should not be whether the defrauded party might conceivably still have lost, had the fraud not been practiced, but whether there was a reasonable probability that the fraud actually accomplished the result it was intended to bring about.

*Continental Ins. Co.*, 222 A.D. at 186-87, 225 N.Y.S. at 493-94.

This line of reasoning can be extended to our situation. If the question is "did [*213] the fraud actually accomplish the result it was intended to achieve," the answer is yes: E&Y certified financial statements that induced the investors not to abandon JWP. As in *Continental Insurance Co.*, it is not determinative that the insurance companies did not present evidence that they were not intending to purchase more of JWP's notes [**29] or that they were intending to unload their JWP

206 F.3d 202, *213; 2000 U.S. App. LEXIS 4120, **29;
Fed. Sec. L. Rep. (CCH) P90,772

notes *until* E&Y provided rosy financial statements. *See id., 222 A.D. at 186-87, 225 N.Y.S. at 494.* Rather, it is sufficient to say that "there was a reasonable probability that the fraud actually accomplished the result it was intended to bring about." *Id.*

The district court below primarily relied upon *Citibank, N.A. v. K-H Corp., 968 F.2d 1489 (2d Cir. 1992)* and *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994)* in reaching its conclusion that loss causation was not proved. *See AUSA, 991 F. Supp. at 249.* The court also cited *Revak v. SEC Realty Co., 18 F.3d 81 (2d Cir. 1994). See AUSA, 991 F. Supp. at 250.* A careful reading of these cases, however, indicates that they do not compel the outcome reached by the district court.

In *Citibank*, plaintiff Citibank agreed to extend credit in the amount of approximately $ 140 million to Grabill Aerospace Industries, Ltd. ("GAIL") for the acquisition from the defendants of aerospace subsidiaries. *See 968 F.2d at 1491.* Citibank was not told that [**30] there was a $ 7 million three-week loan existing between GAIL's sole stockholder and the defendants that would technically violate the credit agreement Citibank had agreed to with GAIL. *See id. at 1492.* When GAIL later defaulted to Citibank and Citibank was unable to recover the loaned amount from the sale of GAIL's collateral, Citibank filed suit against the defendants for their role in concealing the initial fraud. *See id. at 1492-93.* Specifically, Citibank maintained that the defendants, by delivering to Citibank at the closing opinion letters from defendants' General Counsel indicating that the full closing price was received (as opposed to indicating that the full price less the $ 7 million loan was received), assisted in inducing Citibank to participate in this losing, fraudulent transaction. This, Citibank contended, violated, among other things, *Section 10(b)* of the Securities and Exchange Act of 1934, and constituted common law fraud. *See id. at 1492.* The district court granted the defendants' motion to dismiss, basing its decision in part on the determination that the plaintiffs failed to allege proximate causation between [**31] the default of GAIL and the undisclosed $ 7 million three-week loan. *See id. at 1493.*

With respect to the loss causation qua proximate causation issue, the Second Circuit Court of Appeals affirmed. *See id. at 1495-96.* We did not create a new test of causation; rather, we re-articulated that "this Court . . . requires the plaintiff to allege that the misrepresentation . . . was the cause of the actual loss suffered." *Id. at 1495.* More specifically, we recognized that "we have on occasion likened loss causation to the tort concept of proximate cause, because, similar to proximate cause, in order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation." *Id.* (internal citation omitted). We held that "because the fourth amended complaint did not properly allege proximate causation between the alleged fraud and the loss Citibank subsequently suffered, it failed to satisfy the loss causation requirement under § 10(b) and *Rule 10b-5.*" *Id. at 1496.* In the instant case, however, the complaint did allege proximate causation, and, given the facts [**32] found by the district court and discussed above, proximate cause was established.

For example, in PP 136 and 137 of the complaint, the plaintiffs alleged causation, claiming that E&Y violated GAAP, concealed accounting abuses, and did other manipulative things which resulted in the actual loss by preventing "the plaintiffs from exercising their rights and remedies [*214] under the note purchase agreements, which exercise would have inhibited JWP from continuing to raise financing for JWP's acquisitions and operations; and . . . avoiding the acceleration of outstanding notes owned by plaintiffs." The plaintiffs in *Citibank* made no such parallel allegations.

In *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994)*, also relied upon by the district court, the plaintiff-appellant was First Nationwide Bank ("FNB"). It had done business with commercial mortgage broker defendant Gelt Funding Corp. and Gelt principals, defendants Gross and Herzka. Gelt served as the mortgage broker between FNB and borrowers for nonrecourse loans of approximately $ 900 million. *See id. at 765-66.* Given that the loans were nonrecourse, the value of the collateral [**33] property was critical to FNB's decisions to make the loans. *See id. at 766.* After a higher number of the Gelt-brokered loans defaulted than other loans, FNB filed suit against Gelt, Gross, Herzka, and other borrowers, alleging that the defendants had engaged in a conspiracy in violation of RICO, 18 U.S.C. § 1962(c) and (d) and other pendent state laws. *See id. at 765.* FNB alleged that "the defendants misrepresented the value of properties pledged as collateral to secure nonrecourse loans, and thereby fraudulently induced FNB to make loans it otherwise would not have made." *Id.* The district court dismissed the claim under *Federal Rule of*

206 F.3d 202, *214; 2000 U.S. App. LEXIS 4120, **33;
Fed. Sec. L. Rep. (CCH) P90,772

*Civil Procedure 12(b)(6). See id.* The court held that the misrepresentation allegedly prohibited under RICO was not the proximate cause of the injuries. *See id.* at 766-67.

On appeal, the Second Circuit Court of Appeals affirmed, agreeing that FNB did not adequately plead injury and proximate cause. In affirming, we agreed that the three-part test articulated by the district court was a useful guide in evaluating FNB's proximate cause allegations. *See id.* at 770.

The test stated that

[A] [**34] borrower who misstates the value of loan property or its rental income proximately causes injury to a bank when (1) the misrepresented value of the property was substantially above its actual value at the time of the misrepresentation, (2) the injury was sustained soon after the misrepresentation, and (3) external factors did not contribute to the injury.

*Id.* (quoting the district court). With regard to this test, we said that

While these factors do not constitute an exhaustive list of the considerations that go into the proximate cause calculus, they do provide a useful guide for evaluating the sufficiency of [the] proximate cause allegations. In determining whether the required directness is present in the context of a fraudulently induced loan, important considerations are the magnitude of the misrepresentations, the amount of time between the loan transaction and the loss, and the certainty with which the loss can be attributed to the defendant's conduct.

*Id.*

We went on to determine that the methodology employed by FNB in assessing the magnitude of the defendants' overstatements of income was faulty, and the conclusions thereby reached defied [**35] logic. *See id.* at 772. Further, we found that FNB did not allege injury sufficiently close in time to the misrepresentations to infer a nexus between the two. *See id.* Tying the temporal connection to the presence of intervening factors --

namely, the real estate market collapse during the time when many of the borrowers defaulted -- we said that

When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim. Similarly, when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, [*215] the prospect that the plaintiff's loss was caused by the fraud decreases.

*Id.* The significant period of time between the alleged misrepresentations and the loss, coupled with the external factor of the real estate market crash, supported the conclusion that the alleged misrepresentations were not a substantial cause of FNB's injury. *See id.*

Nothing in our determination in *First Nationwide* precludes a different outcome on our different facts. Rather, we specifically noted there that we did [**36] not intend to bar a plaintiff from successfully pleading "proximate cause when the claim follows a market collapse." *Id.*

What is particularly important here, however, is the proximate cause and foreseeability language in *First Nationwide Bank.* We used the phrase "proximate cause" interchangeably with "loss causation," and we said that the plaintiff "must also show that the misstatements were the reason the transaction turned out to be a losing one." *Id.* at 769. By way of guidance on the inquiry, we said that

The purpose of the proximate cause requirement is to fix a legal limit on a person's responsibility, even for wrongful acts. Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were "a substantial factor in the sequence of responsible causation," and whose injury was "reasonably foreseeable or anticipated as a natural consequence." . . . Many considerations enter into the proximate cause inquiry including "the foreseeability of the

206 F.3d 202, *215; 2000 U.S. App. LEXIS 4120, **36;
Fed. Sec. L. Rep. (CCH) P90,772

particular injury, the intervention of other independent causes, and the factual directness of the [**37] causal connection."

*Id. at 769* (internal citations omitted).

The district court below also cited *Revak v. SEC Realty Corp., 18 F.3d 81, 89-90 (2d Cir. 1994)* to support the conclusion that

It would be manifestly unfair, as well as contrary to law, to hold E&Y jointly and severally liable to reimburse in full losses that JWP's noteholders sustained as a result of unforeseeable and independent post-audit events and not because of fiscal infirmities which were concealed by JWP's misleading financial statements.

*AUSA, 991 F. Supp. at 250.* While we do not disagree with the legal principles set out in *Revak*, we disagree with its application by the district court in this case.

In *Revak*, we said that

the only detriment asserted by plaintiffs is that they "were saddled with notes and deeds of trust whose default terms were far more onerous than they had been prepared to agree to." Accordingly, plaintiffs have not identified any loss attributable to the changed terms of the debt instruments, much less a loss that was the direct result of such changes.

*18 F.3d at 90.*

The same cannot be said [**38] in this case. The GAAP violations and the resulting concealments by E&Y were not latent faults that never manifested themselves, as were the misrepresentations about the default terms of the notes in *Revak*. Rather, the misrepresentations and concealed facts did become problematic, in part by allowing JWP to continue to make acquisitions because its default was never acknowledged. Having been told that JWP was in default on its notes would have at least made the investors aware of JWP's true financial picture. Whether or not the investors would have then waived the default and allowed the aggressive acquisition strategy to

continue is not a question for us to ponder. Suffice it to say that the district court's reliance on *Revak* in this situation is misplaced because the fraud and misrepresentations here were not latent time bombs, as in *Revak*, but rather were bombs the fuses of which were burning brightly.

[*216] The appellants cite, among other cases, *Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985)*; *DiLeo v. Ernst & Young, 901 F.2d 624 (2d Cir. 1990)*; *McGonigle v. Combs, 968 F.2d 810 (9th Cir. 1992)*; [**39] and *Bastian v. Petren Resources Corp., 892 F.2d 680 (7th Cir. 1990).* None of these cases mandate an outcome different than that we have reached.

*Bloor* involved a bankruptcy trustee claiming that the corporate counsel of a bankrupt company should be liable for the company's ultimate demise. *See generally Bloor, 754 F.2d 57.* The securities laws would not reach the counsel's conduct, we determined, because "the failure of the corporation to use proceeds wisely or the theft of corporate funds by officers was hardly a reasonably foreseeable result, let alone the direct result, of any of [the law firm's] alleged actions." *Id. at 62.*

*DiLeo v. Ernst & Young, 901 F.2d 624 (2d Cir. 1990)*, can be distinguished as well. In that case, the purchasers of securities of a company that suffered financial devastation sued the accountant for that company. The Seventh Circuit Court of Appeals, in affirming the district court's dismissal of the plaintiffs' claims, noted that the complaint did not identify financial problems or issues that the accountant should have caught. *See DiLeo, 901 F.2d at 627.* The court [**40] found that a claim for fraud was not pled, and the court stated that

The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition . . . . Investors must point to some facts suggesting that the difference is attributable to fraud . . . . That ingredient

206 F.3d 202, *216; 2000 U.S. App. LEXIS 4120, **40;
Fed. Sec. L. Rep. (CCH) P90,772

is missing in the [plaintiffs'] complaint.

*Id. at 627-28* (internal citations omitted). As discussed above, the district court in this case found that E&Y knew about JWP's accounting abuses, and ultimately E&Y blessed those abuses, despite misgivings, by certifying that various financial documents were in accordance with GAAP and that certain covenants in the Note Agreements were not violated. This is not *DiLeo*, where the court was asked to accept on blind faith that there "must have been fraud."

To where the above discussion brings us is: Loss causation is a separate [**41] element from transaction causation, and, in situations such as the instant one, loss causation cannot be collapsed with transaction causation. *See, e.g., First Nationwide Bank, 27 F.3d at 769.* Loss causation embodies notions of "the common law tort concept of 'proximate causation.'" *Manufacturers Hanover, 801 F.2d at 20; see Citibank, 968 F.2d at 1495.* Foreseeability is tied into loss causation, as well. *See Manufacturers Hanover, 801 F.2d at 21.*

We have consistently said that "loss causation in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation." *Manufacturers Hanover, 801 F.2d at 21* (internal citations omitted); *accord Citibank, 968 F.2d at 1495* (citing *Manufacturers Hanover*). However, *Prosser and Keeton on the Law of Torts* [5] states that "it must be repeated that the question [of foreseeability or reasonably foreseeable risk] is primarily not one of causation, and never arises until causation has been established." W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 43, at 280-81 (5th ed. [**42] 1984). In essence, this position contends that the foreseeability [*217] question need not be reached until causation is established, and foreseeability should then be used as a curb on all-encompassing liability, as a determination "of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." *Id. at 281.* This position strikes us as entirely sensible. However, given the language in *Citibank* and *Manufacturers Hanover* that seems to collapse the foreseeability inquiry into the proximate cause inquiry, and given that we are disinclined to retreat from an analysis that we have consistently employed, we will continue to treat loss causation qua proximate causation as a concept which embodies notions of foreseeability.

5    Given the usefulness of analogizing loss causation and related concepts in securities law to their common law counterparts, we continue to consult general tort law and related commentary.

In Paragraph 506(e) of the district court's Findings [**43] of Fact, the court states that the plaintiffs' reliance on JWP's annual audited reports for the years prior to their purchases "was not a proximate cause of the plaintiffs' losses." Joint Appendix at A-2625. A proximate cause determination in situations where "circumstances permit varying inferences as to the foreseeability of the intervening act" is generally a factual determination. *See Woodling v. Garrett Corp., 813 F.2d 543, 555 (2d Cir. 1987).* A foreseeability determination in and of itself is also a question of fact for resolution by the finder of fact. *See United States v. Molina, 106 F.3d 1118, 1121 (2d Cir. 1997); see also Snyder v. Four Winds Sailboat Centre, Ltd., 701 F.2d 251, 253 (2d Cir. 1983). But see United States v. Ekwunoh, 12 F.3d 368, 372 (2d Cir. 1993)* (Newman, *Chief Judge*, concurring) ("The 'reasonable foreseeability' standard is a legal standard that needs to be applied to the specific facts of a case. Any standard involving a determination of what is reasonable involves a legal standard. Application of a legal standard to facts is normally an issue of law."). However, we do not find in the [**44] record a discussion of facts indicating that the district court undertook to make findings of fact specifically pertinent to the foreseeability component of the proximate cause inquiry.

The foreseeability query is whether E&Y could have reasonably foreseen that their certification of false financial information could lead to the demise of JWP, by enabling JWP to make an acquisition that otherwise would have been subjected to higher scrutiny, which led to harm to the investors. [6] Given that the district court did not make factual findings as to foreseeability specifically, we remand for more factual findings. [7] In accordance with the factual findings, the court is then instructed to reconsider proximate cause in the context of its factual determinations on foreseeability.

6    As discussed in footnote 11, *infra*, by "harm" to the investors we are referring to losses incurred for risks which the investors did not intend to take nor of which they should have (or, in this case, even could have) been aware.

7    The facts discussed in Section III(B)(2)(a), above, merit re-consideration in the foreseeability

206 F.3d 202, *217; 2000 U.S. App. LEXIS 4120, **44;
Fed. Sec. L. Rep. (CCH) P90,772

context.

[**45] By way of offering a tow rope to assist the district court through this Serbonian Bog, [8] we note the following: A foreseeability finding turns on fairness, policy, and, as before, "a rough sense of justice." *Palsgraf, 248 N.Y. at 352, 162 N.E. at 103.* "A 'reasonably foreseeable act' might well be regarded as an act that a reasonable person who knew everything that the defendant knew at the time would have been able to know in advance with a fair degree of probability." *United States* [*218] *v. LaCroix, 28 F.3d 223, 229 (1st Cir. 1994).* Where foreseeability is less than immediately obvious, it is appropriate to make a judgment based on "some social idea of justice or policy." *First Nationwide Bank, 27 F.3d at 770; id. at 772* ("proximate cause determination necessarily involves a component of policy"). These considerations should be coupled with the recognition that proximate cause is a common law concept, and such concepts evolve in a manner that reflects "economic, social, and political developments." *Cullen v. BMW of North America, Inc., 691 F.2d 1097, 1102 (2d Cir. 1982)* (Oakes, *J.* dissenting). Therefore, [**46] it is appropriate to examine the underlying policy of the securities laws involved and the climate of securities regulation as it has evolved and as it currently exists.

8    "'Proximate cause,' in short, has been an extraordinarily changeable concept. 'Having no integrated meaning of its own, its chameleon quality permits it to be substituted for any one of the elements of a negligence case when decision on that element becomes difficult. * * * No other formula * * * so nearly does the work of Aladdin's lamp.'" *Prosser and Keeton on Torts,* § 42, 276 (quoting Green, *Proximate Cause in Texas Negligence Law,* 28 Tex. L. Rev. 471 (1950)). With respect to foreseeability, "there is perhaps no other one issue in the law of torts over which so much controversy has raged . . . ." *Id.* at § 43, 280.

"During the Great Depression, Congress enacted the 1933 and 1934 [Securities] Acts to promote investor confidence in the United States securities markets and thereby to encourage the investment [**47] necessary for capital formation, economic growth, and job creation." Private Securities Litigation Reform Act of 1995, P.L. 104-67, S. Rep. No. 104-98 (June 19, 1995), *reprinted in*

1995 U.S.C.C.A.N. 679, 683. The 1934 Act was intended "to impose regular reporting requirements on companies whose stock is listed on national securities exchanges." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).* This was part of an overall broad scheme of federal regulation enacted in the early 1930s, through which Congress wanted investors to have access to comprehensive, accurate information about the companies in which they were investing. [9] *See id.* (citing legislative reports of both the Securities Act of 1933 and the Securities Act of 1934).

9    To this point, the Securities Act of 1933 (Fletcher-Rayburn Securities Act of 1933) was also entitled the "Truth in Securities Act." *See* United States Code Annotated, Popular Name Table for Acts of Congress (1997).

[**48] In recent years, concern over potentially meritless securities lawsuits filed by "professional" plaintiffs abounded. *See* S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683. It was feared that these suits were filed in the hopes of obtaining quick settlements by anxious defendants who were adverse to litigation. *See id.* It was further feared that these suits and the potential resultant settlements would increase the cost of raising capital and would chill corporate disclosure. *See id.* Therefore, in response to these and other concerns, Congress enacted the Private Securities Litigation Reform Act of 1995 (the "1995 Act"). [10] *See* Private Securities Litigation Reform Act of 1995, H.R. 1058, 104th Cong. (1995) (codified in various provisions of *15 U.S.C. § 77 (1997)*).

10    The Private Securities Litigation Reform Act became law in 1995 over a Presidential veto.

The purposes of the 1995 Act are threefold: "(1) to encourage the voluntary disclosure of information [**49] by corporate issuers; (2) to empower investors so that they -- and not their lawyers -- exercise primary control over private securities litigation; and (3) to encourage plaintiffs' lawyers to pursue valid claims for securities fraud and to encourage defendants to fight abusive claims." *See* S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683. The first and the third of the purposes merit our consideration from a policy standpoint in addressing the instant factual situation. The first purpose makes clear that Congress continues to be concerned with disclosure. The third purpose indicates that Congress recognizes that not all plaintiffs' claims are

206 F.3d 202, *218; 2000 U.S. App. LEXIS 4120, **49;
Fed. Sec. L. Rep. (CCH) P90,772

valid, plaintiffs are often disinclined to come forward and make otherwise valid claims, and defendants sometimes fail to aggressively fight abusive claims.

These two considerations weigh in favor of finding loss causation has been established [*219] in the instant case. As to the first purpose, E&Y specifically hindered disclosure. As to the third purpose, though some might argue that the risk of abusive claims would increase should the district court ultimately find loss causation here, we disagree. Certainly there may be [**50] claims against an auditor that are meritless and abusive. However, this opinion, and a potential finding of loss causation by the district court on remand, will not open the barn door for such.

The *Restatement (Second) of Torts* (1977), sheds light on foreseeability and causation in the instant case. Section 548A of the Restatement provides that "[a] fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." *Id. at 106.* Comment a to § 548A helpfully provides that

> Causation, in relation to losses incurred by reason of a misrepresentation, is a matter of the recipient's reliance in fact upon the misrepresentation in taking some action or in refraining from it. . . . Not all losses that in fact result from the reliance are, however, legally caused by the representation. In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates.

*Id. at 106-7.* Comment b § 548A provides that

> Pecuniary losses that could not reasonably be expected [**51] to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability. This means that the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow. . . . In determining what is foreseeable as a result of the misrepresentation, the possibility of intervening events is not to be excluded

altogether. Thus, when the financial condition of a corporation is misrepresented and it is subsequently driven into insolvency by reason of the depressed condition of an entire industry, which has no connection with the facts misrepresented, it may still be found that the misrepresentation was a legal cause of the recipient's loss, since it may appear that if the company had been in sound condition it would have survived the depression, and hence that a loss of this kind might reasonably have been expected to follow.

*Id. at 107.*

The oracular drafters of § 548A further composed an illustration to assist us. Illustration 2 to § 548A provides that

> A, seeking to buy bonds for investment, approaches B. B offers A the bonds of X Oil Corporation, fraudulently [**52] misrepresenting its financial condition. In reliance upon these statements, A buys the bonds. After his purchase conditions in the oil industry become demoralized and as a result of financial losses the X Oil Corporation becomes insolvent. Because of the insolvency A suffers a pecuniary loss greater than that which would have resulted from the deterioration of conditions in the industry alone. It is found that if the financial condition of the Corporation had been as represented it would probably have weathered the storm and not become insolvent. B is subject to liability to A for the additional pecuniary loss resulting from the insolvency.

*Id. at 108.* While E&Y did not "offer" the insurance companies the bonds as directly as B offered A the bonds in the above illustration, E&Y knew the insurance companies were investors, at least after the insurance companies' first notes purchases, and E&Y certified to the inaccurate conditions necessary for the insurance companies to be able to purchase the notes. Moreover, E&Y continued to conceal the fact that JWP was not in default, and E&Y continued to give its imprimatur to the

206 F.3d 202, *219; 2000 U.S. App. LEXIS 4120, **52;
Fed. Sec. L. Rep. (CCH) P90,772

misrepresentations in [*220] JWP's financial reports. So while [**53] E&Y is not "B" in the above illustration to the extent that E&Y did not directly offer the notes to the insurance companies, E&Y is indisputably "B" to the extent that E&Y made the needed misrepresentations by giving the false statements the certified authority the insurance companies needed before they could invest in JWP notes.

In *David, 291 Mass. at 453, 197 N.E. at 85*, the court stated that

> If the defendant fraudulently induced the plaintiff to refrain from selling his stock when he was about to sell it, he did him a wrong; and a natural consequence of the wrong, for which he was liable, was the possibility of loss from diminution in the value of the stock from any one of numerous causes. Most, if not all, of the causes which would be likely to affect the value of the stock, would be acts of third persons, or at least conditions for which neither the plaintiff nor the defendant would be primarily responsible. * * * The defendant, if he fraudulently induced the plaintiff to keep his stock, took the risk of all such changes [in value].

(internal citations and quotations omitted). We agree.

The court in *Continental Insurance Co.* noted that [**54]

> It may be that this holding extends the content of what has thus far been defined as actionable deceit. If this be so, we think the extension is based upon a proper commercial morality and the logical import of the precedents that the purpose of the law is, wherever possible, to afford a remedy to defeat fraud.

*222 A.D. at 187, 225 N.Y.S. at 494.* We agree.

We conclude that the district court failed to make sufficient factual findings relevant to the foreseeability aspects of loss causation. We therefore vacate and remand.

*C. Scienter*

The district court did not fully address the scienter issue since the court was able to dispose of the case on the loss causation ground. Specifically, the court said

> It is a close question whether the justifications which Grendi advanced for JWP's accounting treatments with respect to each of the audit differences raised by E&Y were so unreasonable and whether the total amount involved was so substantial that E&Y's ultimate acceptance of those treatments would fairly support an inference that E&Y intended to deceive investors. As it happens, this is an issue which the Court need not resolve, for there is another [**55] reason why plaintiffs' claims of fraud must fail.

*AUSA, 991 F. Supp. at 248.* We turn now to address whether E&Y had the requisite intent to sustain the fraud claims. Though we could remand this issue to the district court for reconsideration, *see Brocklesby Transport, 904 F.2d at 134*, we instead, in the interest of judicial efficiency, resolve the issue now on appeal by finding that the appellants did prove scienter, *see Commercial Union Assurance, 17 F.3d at 615*.

In a *section 10(b)* action under the Securities Exchange Act of 1934, the complaining party must prove scienter by establishing that the offending party had the intent to "deceive, manipulate, or defraud." *Hochfelder, 425 U.S. at 193*. While we have "resisted accepting general allegations of scienter that would lead to the presumption of motive," we also recognize that intent is not easy to establish, particularly when "the 'intent' of a corporation is at issue." *See Press, 166 F.3d at 538*.

We have presumed, in different factual circumstances, that the requisite intent exists "when it is clear that a scheme, viewed broadly, is necessarily [**56] going to injure." *United States v. Chacko,* [*221] *169 F.3d 140, 148 (2d Cir. 1999); cf. Restatement (Second) of Torts § 8A comment b* (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."). Such a presumption is appropriate in circumstances such as these, where a large entity, firm, institution, or corporation is acting in a manner that easily can be foreseen to result in harm. *See generally United*

*States v. Regent Office Supply Co., 421 F.2d 1174, 1181 (2d Cir. 1970).*

Based on E&Y's financial certifications, it seemed that JWP was not a company teetering on the edge of demise. It seemed that, when faced with a "PC price war," JWP was healthy enough to sustain itself through a period of losses, perhaps attracting new capital or obtaining a loan, if needed. The risk that JWP would still collapse, even with the ability to sustain itself through losses and attract new capital, was a loss the investors assumed, based on the information E&Y provided to them. The higher likelihood of collapse given [**57] JWP's tenuous financial position was not a risk of which the investors were appraised and were intending to fully assume. Had the E&Y accountants contemplated for a moment the results to which their questionable accounting could lead, they could have imagined that saddling the investors with an undisclosed risk would harm [11] the investors, should the risk be realized. Therefore, we can easily find that E&Y possessed the requisite intent to deceive, manipulate, or defraud.

> 11 In using the word "harm" in this instance, we mean losses resulting from risks that were deliberately hidden from the investors, of which the investors in this case could not have otherwise been aware. We do not mean losses generally.

Moreover, it is sufficient to show that the defendant "'intentionally engaged' in 'manipulative conduct.'" *Securities and Exch. Comm'n v. U.S. Environmental, Inc., 155 F.3d 107, 111 (2d Cir. 1998).* Such is the case here, given that E&Y protested and then agreed to JWP's accounting abuses, [**58] knowing, as the district court found, that the insurance companies and others would be receiving and relying upon the manipulated financial reports.

The district court was concerned that E&Y lacked the motivation to commit fraud. *See AUSA, 991 F. Supp. at 247-48.* [12] The court indicated that, while E&Y did receive a fee for its auditing of JWP, it seemed "highly unlikely that E&Y would deliberately jeopardize its priceless reputation and expose itself to expensive and potentially disastrous litigation in order to retain such a small account." *Id. at 247.* This, however, inappropriately makes the scienter issue one of "what did the defendant *want* to happen" as opposed to "what could the defendant reasonably foresee as a potential result of his action." *See Restatement (Second) of Torts § 8A comment a (1965)*

("'Intent,'. . ., has reference to the consequences of an act rather than the act itself.").

> 12 The district court analyzed the evidence sustaining a factual finding of scienter under the rhetoric usually employed in addressing 10(b) pleading requirements, *see In re Time Warner Inc. Securities Litig., 9 F.3d 259, 269 (2d Cir. 1993)*, determining that the plaintiffs needed to have shown "motive and opportunity" to commit fraud in order to allow the court to infer scienter. *See AUSA, 991 F. Supp. at 247.* We do not feel compelled to employ exclusively that terminology given that the issue before us is the sufficiency of the evidence in the procedural posture of a bench trial.

[**59] E&Y is not an accounting dilettante. It knows well that its opinions and certifications are afforded great weight, and it must have known that its financial certifications with regard to JWP would be compelling to the investors. Given that it is sufficient for a plaintiff to allege and prove that a defendant could have foreseen the consequences of his actions but forged ahead nonetheless, *see Restatement (Second) of Torts § 8A* (1965), the district [*222] court's concerns are not legally determinative of the scienter issue.

*D. Privity*

With respect to the appellants' negligent misrepresentation claims, the district court held that there was no privity between the investors and E&Y. *See AUSA, 991 F. Supp. at 253.* The court so held because it found that the second prong of New York's three-prong test for determining whether a "near-privity" relationship exists was not met. *See id. at 253.* We disagree, and we reverse the district court.

The New York State Court of Appeals held in *Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435, 443 (N.Y. 1985)* that

> Before accountants may [**60] be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the

206 F.3d 202, *222; 2000 U.S. App. LEXIS 4120, **60;
Fed. Sec. L. Rep. (CCH) P90,772

furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Id. at 551, 483 N.E.2d at 118, 493 N.Y.S.2d at 443.* *Credit Alliance Corp.* actually involved two companion cases, and the Court of Appeals affirmed one and reversed the other. The factual distinction between the two cases is determinative here.

In the two cases in *Credit Alliance Corp.*, lenders brought separate actions against their borrowers' accountants, in the first action negligence and fraud, and in the second action negligence and gross negligence. In the second action, the Court of Appeals determined the relationship did approach privity, and in the first action the Court determined that there was no such [**61] relationship. *See id. at 541, 483 N.E.2d at 111-112, 493 N.Y.S.2d at 436-37.*

The first action -- *Credit Alliance Corp. v. Arthur Andersen & Co.* -- involved a situation where Arthur Andersen & Co., the auditors for L.B. Smith & Co., prepared the audited financial statements for Smith, which allegedly overstated Smith's net worth, assets, and financial health. *See id. at 543, 483 N.E.2d at 112-13, 493 N.Y.S.2d at 437-38.* These statements were provided to plaintiff Credit Alliance Corp., and Credit Alliance relied on these statements in deciding whether to finance, and continue financing, Smith. *See id.* However, the Court of Appeals determined that, because the plaintiff did not make an "adequate allegation of either a particular purpose for the [financial] reports' preparation or the prerequisite conduct on the part of the accountants," a privity or approaching privity relationship was not established. *Id. at 553.*

In the second action, *European American Bank and Trust Co. v. Strauhs & Kaye*, the plaintiff bank European American Bank and Trust Company ("EAB") alleged that they made substantial loans to Majestic Industries [**62] and its subsidiaries (collectively, "Majestic") in reliance on the interim and year-end reports prepared by the accounting partnership Strauhs & Kaye ("S&K"). *See 483 N.E.2d at 112-113.* They alleged that the information in the reports was purported to be in accordance with

GAAP, but was not. *See id. at 113.* When a Majestic subsidiary later defaulted on a loan, EAB began to discover that S&K's reports were seriously exaggerated in favor of Majestic. *See id.*

EAB brought suit for damages resulting from their reliance on the S&K reports which led to their losses. *See id.* They alleged that S&K was negligent in performing accounting and auditing services for Majestic because S&K knew at all relevant times that EAB was the primary lender, [*223] EAB was relying on S&K's financial statements and inventory valuations in determining what amount to lend to Majestic, and E&K was familiar with the terms of Majestic's lending agreements with EAB. *See id.* Additionally, EAB alleged that representatives of itself and S&K were in direct communication throughout the entire course of the lending relationship between EAB and Majestic, and EAB representatives met together to discuss Majestic's inventory [**63] and accounts receivables. *See id.* The Court of Appeals determined that "because EAB's complaint and affidavit posit a direct nexus between the parties, to wit: the direct communications between them concerning EAB's intended reliance upon S&K's financial evaluation of Majestic Electro, the causes of action for negligence and for gross negligence or reckless indifference are adequately alleged." *Id. at 114.*

The instant situation is more like *European American* than *Credit Alliance.* The district court made the factual determination that E&Y knew that the insurance companies qua investors existed. *See* P 438, Findings of Fact, Joint Appendix at 2602, *AUSA, 991 F. Supp. 234 (S.D.N.Y. 1997)* ("Pursuant to JWP's Note Agreements, Ernst & Young issued its 'Independent Auditor's Reports on Compliance' to the plaintiffs identified by name in those no-default certificates."). Moreover, the district court implicitly found that E&Y knew the insurance companies were relying on the no-default letters. *See* P 438, Findings of Fact, Joint Appendix at 2602, *AUSA, 991 F. Supp. 234 (S.D.N.Y. 1997)* [**64] ("Each no-default certificate specifically recited the names of the 'Insurance Company' noteholders that were entitled to 'use' and rely on Ernst & Young's certification of JWP's debt compliance.")

However, the district court determined that

E&Y had no way of knowing that its audit reports could be relied upon by these

206 F.3d 202, *223; 2000 U.S. App. LEXIS 4120, **64;
Fed. Sec. L. Rep. (CCH) P90,772

plaintiffs in making a decision to purchase JWP's notes. However, E&Y's annual no-default letters were a somewhat different matter. They were sent to JWP for the express purpose of being forwarded to the noteholders . . . . It therefore must [have] been aware of the possibility that some of those who received its no-default letters might be influenced by them in deciding whether to purchase such notes in the future. However, it could not possibly know even whether JWP would sell notes in the future, much less which of the recipients of its letters would buy them. Thus it appears clear that at least the second requirement of the *Credit Alliance* test was not satisfied and that there was no relationship of near-privity between E&Y and the future purchasers as defined in that case.

*AUSA, 991 F. Supp. at 253.*

We disagree with [**65] the district court's legal conclusion that "the second requirement of the *Credit Alliance* test was not satisfied." *Id.* Again, the second requirement of that test required the accountant to be aware its report would be used for a particular investor purpose, "in the furtherance of which a known party or parties was intended to rely." *Credit Alliance Corp.,* 65 N.Y.2d at 551, 483 N.E.2d at 118, 493 N.Y.S.2d at 443. To the extent that the "no-default" letters were intended to serve the purpose of conveying to the investors that the notes which they held were not in default, E&Y knew what the letters were for and E&Y knew for whom the letters were intended, as the district court so found. Therefore, the district courts could not hold that the second prong under *Credit Alliance Corp.* was not satisfied.

We reverse the district court's determination that there was no privity, and we remand so that the district court can consider whether the other elements of common law fraud were established.

[*224] *E. Damages*

Given that the district court found no loss causation, the court did not address the damages issue. On remand, when and if appropriate, the district court [**66] can address damages.

*IV. Conclusion*

The United States financial market is phenomenal. It can make poor people rich and rich people poor, it gives the United States international power, and it is a continual source of awe. While there is huge risk when dealing with the market, our legislators have consistently tried to at least ensure that the relevant information is conveyed accurately to those who want to assume the risk of jumping into the financial pool. Given that such a policy increases investor confidence, allows money to flow both in and out of the market in an honest way, and assists investors in maximizing their participation in the American economy, it is likely that this policy will endure. To this end, while we are far from holding auditors generally and absolutely liable to the investing public at large, the information publicly available to these market participants and certified as accurate needs to be just that.

For the above stated reasons, we reverse the district court in part, we vacate the district court in part, and we remand for reconsideration where appropriate in light of this opinion.

**CONCUR BY: JACOBS**

**CONCUR**

JACOBS, *Circuit Judge,* concurring:

Although [**67] the district court considered that *transaction* causation was "by no means clear," the court found it unnecessary to resolve the issue "because the evidence definitely fails to establish the necessary *loss* causation." *AUSA Life Ins. Co. v. Ernst & Young,* 991 F. Supp. 234, 249-50 (S.D.N.Y. 1997) (emphasis added). The loss, as the court found, was caused chiefly by JWP's inability to revitalize Businessland, a newly acquired company that unforeseeably turned into a "veritable sinkhole" for JWP's cash and ultimately forced JWP into bankruptcy. *Id. at* 239, 250.

I

In my view, the district court has made affirmable fact-findings that plaintiffs' losses were caused by the implosion of JWP's Businessland acquisition, and therefore were not caused by E&Y's misrepresentations that JWP's books complied with GAAP. Some of the findings of fact needed to support the district court's

206 F.3d 202, *224; 2000 U.S. App. LEXIS 4120, **67;
Fed. Sec. L. Rep. (CCH) P90,772

conclusion are absent from the section of the district court opinion that speaks to loss causation, but I think that all the necessary factual findings are available elsewhere in the opinion.

The question of loss causation has divided the panel three ways. Judge Oakes's [**68] opinion for the Court properly identifies loss causation as a fact inquiry--distinct from transaction causation--for resolution by the district court, but concludes that the categorical findings needed to decide the case have not been made, and therefore vacates the judgment and remands for further findings on whether E&Y could have reasonably foreseen that its misrepresentations could have led to JWP's demise--that is, the issue of loss causation. [1] Chief Judge Winter's dissenting opinion argues for reversal on the ground that, in this case, further findings on the issue of loss causation are unnecessary (1) because misrepresentations of the kind in this case understate management's willingness to take risks, such as the Businessland acquisition, and (2) because such misrepresentations, if corrected, would have disclosed the material datum that management was dishonest. See Dissenting Opinion at [3-5] [hereinafter "Diss. Op."].

> [1] Judge Oakes goes on to find transaction causation and scienter. Because I believe the loss causation issue is dispositive of the federal claim, I would not reach these questions.

[**69] Chief Judge Winter believes that remand is unnecessary because the particular findings that Judge Oakes would require [*225] (and that Chief Judge Winter deems irrelevant) have already implicitly been made. See Diss. Op. at [3-4] & n.1. I conclude (with Judge Oakes) that loss causation is a distinct fact inquiry for resolution by the district court, and (with Chief Judge Winter) that the district court has already implicitly made all the findings necessary to support a judgment. Unlike Chief Judge Winter, however, I believe that the district court's findings demonstrate the absence of loss causation. I therefore conclude that the district court's judgment should be affirmed.

The three opinions on this appeal argue for three different results, a division that would cause the appeal to misfire and leave the case undecided--an unacceptable outcome in a reviewing court. See Action House v. Koolik, 54 F.3d 1009, 1015 (Newman, C.J., concurring) (citing United States v. Blume, 967 F.2d 45, 50 (2d Cir. 1992) (Newman, J., concurring); United States v.

O'Grady, 742 F.2d 682, 694 (2d Cir. 1984) (in banc) (Newman, J. with [**70] whom Winter and Pratt, JJ., join, concurring)).

In order to allow the Court to issue a mandate, I have shifted my vote on the issue of loss causation--from affirmance, to vacatur with a remand for further findings. If, as I think, the district court has implicitly decided the fact question that is now being remanded for consideration, the district court's express adoption of those findings of fact will under this mandate result in the same judgment that the district court has entered and that I would affirm on the present record and findings. If, as Judge Oakes thinks, the fact question is open, I am content to let the district court decide it, whatever the result. Vacatur under the terms of the mandate that Judge Oakes has drawn and that I join will result in a correct outcome as to loss causation.

II

This Court has long held that there are two necessary and independent components to causation under Section 10 (b): transaction causation and loss causation. See Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 380 (2d Cir. 1974); Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992). Thus Judge Conner held that the plaintiffs [**71] "must prove not only that they would not have purchased JWP's notes but for [E&Y's] representations (transaction causation) but also that JWP would not have defaulted on its obligations on the notes if JWP's financial condition had been as represented (loss causation)." AUSA Life Ins. Co., 991 F. Supp. at 249.

In concluding that "the evidence definitely fails to establish the necessary loss causation," id. at 250, the district court found that there were several causes, chief among them JWP's inability to revitalize Businessland, a depressed market for commercial construction, and fierce competition in the PC market--not E&Y's misrepresentations. See id. at 250.

Judge Oakes believes that the district court's discussion of loss causation fails to decide whether JWP would have been able to purchase Businessland absent E&Y's misstatements. See Majority Opinion at [40] [hereinafter "Maj. Op."]. I think that is the wrong question. It has been found--and all opinions on appeal agree--that JWP's acquisition of Businessland was a calamity that overwhelmed all other financial circumstances and brought about JWP's bankruptcy.

206 F.3d 202, *225; 2000 U.S. App. LEXIS 4120, **72;
Fed. Sec. L. Rep. (CCH) P90,772

[**72] Therefore, I think that the loss causation inquiry should be: Was it foreseeable that E&Y's misstatement of accounts would cause the plaintiffs to suffer losses caused by the disastrous Businessland acquisition? In my view, the question is sufficiently answered by the district court's findings that the plaintiffs' chief investment concern was JWP's *actual* cash flow (which was perfectly adequate to fund plaintiffs' bonds and was unaffected by the misrepresentations ) and that the disastrous nature of the Businessland investment was unforeseeable. *See AUSA Life Ins. Co., 991 F. Supp. at 239, 250.*

[*226] Loss causation requires the plaintiffs to prove more than simply that E&Y induced them to enter into an ultimately unsuccessful investment. Such a "but-for" analysis would collapse loss causation into transaction causation. *See Citibank, 968 F.2d at 1495* (transaction causation "requires the plaintiff to allege that the misrepresentation induced it to enter into the transaction" ). Rather, loss causation requires proof that the E&Y's "misrepresentation was the cause of the actual loss suffered." *Id.* The damages suffered by the plaintiffs must be "a foreseeable [**73] consequence of the misrepresentation." *Id.* In this sense, loss causation closely corresponds to the common law principle of proximate cause. *See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 747 (2d Cir. 1992).*

I can find no flaw in the district court's application of loss causation principles to this case.

As an initial matter, the disastrous events subsequent to the Businessland acquisition were not a foreseeable consequence of E&Y's misrepresentations. JWP defaulted on the plaintiffs' notes as a result of its acquisition of Businessland in 1991. According to the testimony of JWP's former Chief Executive Officer, credited by the district court, Businessland became "a veritable sinkhole for cash" that would have bankrupted JWP even if JWP's books were as represented. *AUSA Life Ins. Co., 991 F. Supp. at 250.* There is no credible allegation that JWP would have defaulted in 1993 in the absence of the acquisition. *See id.* Therefore, neither E&Y nor JWP could have foreseen that their misrepresentations would have resulted in JWP's insolvency and the non-payment of the bond obligations.

Judge Oakes frames the foreseeability [**74] question in terms of "whether E&Y could have reasonably foreseen that their certification of false financial information could lead to the demise of JWP, by

enabling JWP to make an acquisition that otherwise would have been subjected to higher scrutiny, which led to harm to the investors." Maj. Op. at [40]. I think that this "enabling" issue is a variant of but-for causation, and that the relevant inquiry (considering that JWP's failure and bankruptcy is the proximate cause of the bondholders' loss) is whether E&Y's misrepresentations could foreseeably have led to the failure of the company. As to this question, the district court's factual findings are clear enough:

> JWP's insolvency and resulting default on its note obligations were caused *not* by the differences between its actual financial condition and that reflected in its audited reports, but by much more significant factors, including JWP's disastrous acquisition of the failing Businessland, in combination with the downturn in commercial construction and fierce competition in the PC market.

*AUSA Life Ins. Co., 991 F. Supp. at 250* (emphasis added).

Whether or not the acquisition [**75] was a foreseeable consequence of the misrepresentations cannot matter unless the misrepresentations are shown to have caused the resulting collapse. Even if one assumes (a stretch) that E&Y's misrepresentations allowed JWP to buy Businessland, E&Y's misrepresentations were not the reason for the resulting company's failure: JWP's ruin is easily attributable to business factors that were more potent than E&Y's misrepresentations, and were unrelated to them. *See AUSA Life Ins. Co., 991 F. Supp. at 238-39, 250.* The dispositive question is whether the JWP/Businessland combination would have collapsed even if JWP's books were accurately stated.

Judge Oakes heavily relies on this Court's analysis in *Marbury Management, Inc. v. Kohn, 629 F.2d 705 (2d Cir. 1980).* In that case, the compelling facts were that Alfred Kohn, a broker-trainee but not yet a broker, repeatedly told the customers that he was a broker. *See id. at 707.* Believing that Kohn was a broker, the [*227] plaintiffs bought and held securities on his recommendation, only to incur losses on their purchases. *See id.* It was clear that if the plaintiffs had known what was concealed--that [**76] broker-trainee Kohn was not the licensed broker he claimed to be--they would have

206 F.3d 202, \*227; 2000 U.S. App. LEXIS 4120, \*\*76;
Fed. Sec. L. Rep. (CCH) P90,772

declined to purchase the securities recommended by Kohn, and certainly would have sold the securities when they began to lose value: "Kohn's statements by their nature induced both the purchase and the retention of the securities, the expertise implicit in Kohn's supposed status *overcoming plaintiffs' misgivings prompted by the market behavior of the securities*." *Marbury Management, 629 F.2d at 708* & n.2 (emphasis added).

Though one can debate whether the circumstances that were said to be loss causation in *Marbury* amount to anything more than transaction causation, *Marbury* does not purport to change the rule--which we have consistently applied before and since--that a 10 (b) claim cannot succeed unless loss causation is demonstrated. We would be bound by *Marbury* to rule the same way on the same set of facts, but I think it would be a mistake to treat the *Marbury* facts as a template for loss causation and say (as I think my colleagues say) that under *Marbury*, loss causation can be satisfied by a nondisclosure that does no more than cause the investor to buy and [\*\*77] hold during a drop in the market price induced by other causes. This Court has never read *Marbury* to hold that transaction causation subsumes loss causation. Indeed the language of Marbury itself confirms this Court's tradition of considering the two separately: "The loss complained of must proceed *directly* and proximately from the violation claimed and not be attributable to some supervening cause." *Id. at 719* (citation omitted).

To collapse loss causation into transaction causation would distort the traditional application of *Section 10 (b)*. After all, private suits under *Section 10 (b)* are a judge-made cause of action. See *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 359, 111 S. Ct. 2773, 2779-80, 115 L. Ed. 2d 321 (1991)*; *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196 n. 16, 96 S. Ct. 1375, 1382 n. 16, 47 L. Ed. 2d 668 (1976)*. By requiring both transaction causation *and* loss causation, *section 10 (b)* sets a high bar for recovery, and deliberately so. There is a particular reluctance to expand liability in any direction, see *Central Bank v. First Interstate Bank, 511 U.S. 164, 177-78, 114 S. Ct. 1439, 1448, 128 L. Ed. 2d 119 (1994)*; [\*\*78] *Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 464, 97 S. Ct. 1292, 1296, 51 L. Ed. 2d 480 (1977)*; *Ernst & Ernst, 425 U.S. at 197, 96 S. Ct. at 1383*, let alone merge the required elements of the cause of action.

The misrepresentations in JWP's books (concerning treatment of acquisition costs, small tool inventories, net operating losses, and software costs) were not the proximate cause--*i.e.*, the loss causation--for the plaintiffs' loss. Those misrepresentations affected JWP's *apparent* cash flow, but they had no effect on JWP's *actual* cash flow. See *AUSA Life Ins. Co., 991 F. Supp. at 250*. This is a critical distinction. While JWP's equity investors were rightfully concerned with the discrepancies in the company's books (because such variances would have affected the company's stock price), JWP's debt holders--the plaintiffs--would not necessarily have had cause for alarm. *See id.* The primary concern of a debt holder is actual cash flow, the ability of the debt issuer to pay interest and principal as required. *See id.* Indeed, even after JWP's annual reports were restated, the company continued to meet its interest [\*\*79] payment schedule. *See id.*

The district court's findings suggest that the plaintiffs would have remained invested in JWP notwithstanding the Businessland acquisition even if they had known of the discrepancies in JWP's books, because prior to acquisition there was no indication that Businessland would become the "sinkhole for cash" that it became. *Id.* There is also no allegation that the plaintiffs would [\*228] have somehow prevented JWP from acquiring Businessland had they known of JWP's true financial condition. Therefore, JWP would still have been able to proceed with the acquisition that would have led to its insolvency and the plaintiffs' losses.

Moreover, it is hard to see how, had the auditors done a proper job, the bondholders would have been better situated or made more prescient. If, as it should have, E&Y had resisted JWP's pressure to misrepresent the company's financial condition, the bondholders would have received an accurate statement of accounts. But E&Y would not have been required to disclose management's thwarted desire to dress up the numbers. The job of the accountant is to ensure, within the parameters of the audit letter, that accounts comply with sound accounting [\*\*80] practice. The accountant's duty is to do this regardless of pressure from managers to present the company's financial status as favorably as they can. But that obligation does not require disclosure of management's pressure to make the overly favorable representation. See *Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477-78, 97 S. Ct. 1292, 1303, 51 L. Ed. 2d 480 (1977)*.

206 F.3d 202, *228; 2000 U.S. App. LEXIS 4120, **80;
Fed. Sec. L. Rep. (CCH) P90,772

Chief Judge Winter argues, however, that after the first year's misrepresentations, a restatement of accounts would have revealed that the previous financial statements had been knowingly falsified, and that such a disclosure would cause any investor, including debt holders, to jump ship. *See* Diss. Op. at **[3-5]**. Chief Judge Winter believes that knowledge of book-cooking would have dual effects, either of which is sufficient to demonstrate loss causation: (1) it would expose management's crookedness, and (2) it would warn investors that management may have an incentive to take greater risks. *See* Diss. Op. at **[4-5]**. Assuming (as I do not) that such a disclosure would have prevented the plaintiffs' losses, I doubt that such a disclosure would be required. No doubt, the auditors [**81] owed the plaintiffs (and others) a corrected statement of accounts over a several-year period, but there is no basis for holding that correction of the figures would require a disclosure that management corruptly insisted on making the initial (false) representations. Under *Santa Fe Industries, 430 U.S. at 477-78, 97 S. Ct. at 1303*, the duty to disclose facts (here, the numbers) does not entail a duty--on the part of the accountant--to disclose culpability or impure motives. Thus *Santa Fe Industries* holds that a *section 10 (b)* plaintiff cannot transform a fiduciary-duty claim or a mismanagement claim into a claim of non-disclosure. *See Panter v. Marshall Field & Co., 646 F.2d 271, 287-88 (7th Cir. 1981); Levine v. Prudential Bache Properties, Inc., 855 F. Supp. 924, 933-34 (N.D. Ill. 1994); Bucher v. Shumway, 1979 U.S. Dist. LEXIS 9217*, Fed. Sec. L. Rep. (CCH) P97,142, at 96,300 (S.D.N.Y. 1979) ("The securities laws, while their central insistence is upon disclosure, were never intended to attempt any such measures of psychoanalysis or purported self-analysis." ), *aff'd, 622 F.2d 572 (2d Cir. 1980)*. [**82]

In short, the proximate cause of the plaintiffs' losses was the failure of the Businessland acquisition, which was not a foreseeable result of E&Y's conduct.

**DISSENT BY: WINTER**

**DISSENT**

WINTER, *Chief Judge*, dissenting:

I agree with the conclusions reached by Judge Oakes's opinion as to transaction causation and scienter. With regard to loss causation, I would hold that the facts found by the district court demonstrate loss causation as a

matter of law. Limiting my discussion of applicable law to appellants' single federal claim, brought under *Section 10 (b)* of the '34 Act, *15 U.S.C. § 78j (b)*, I respectfully dissent.

I

Before turning to a detailed discussion of loss causation under *Section 10 (b)*, I briefly summarize my reasoning. The issues that are principally contested are: (i) transaction causation, or whether the [*229] fraud here was a but-for cause of appellants' losses; (ii) E&Y's knowledge of the fraud and its intent, or "scienter" in the jargon of securities law; and (iii ) loss causation, or whether the fraud was the "proximate cause" of appellants' losses.

Transaction causation was clearly established by the district court's findings regarding the materiality [**83] of the false statements and appellants' reliance upon those statements. *See AUSA Life Ins. Co. v. Ernst & Young, 991 F. Supp. 234, 246-47 (S.D.N.Y. 1997)*. Indeed, the district court specifically found that, had appellants known the truth as to the value of the JWP notes, "they likely would not and in some cases could not have bought them." P 447, Joint Appendix at 2606 (S.D.N.Y. Dec. 5, 1997 ) [hereinafter cited as "Findings P    , at    "].

In my view, scienter was also clearly established. As the district court expressly found, E&Y knew that the year-end financial statements and no-default letters contained false and misleading information. *See id.* P 359, at 2581; *see also 991 F. Supp. at 247-48*. E&Y timely informed JWP's management of that very fact with regard to many of the misstatements recited in the district court's opinion, but, when rebuffed, acquiesced in the fraud. *See 991 F. Supp. at 241-46*. Moreover, E&Y knew that appellants would rely upon the false statements. *See* Findings P 438, at 2602. Indeed, that was the purpose of the provisions of the notes requiring "no-default" letters prepared by E&Y. *See id.* [**84] *PP 431-32, at 2598-99*. No more is needed to establish scienter as a matter of law. *See Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989)* (to prove scienter, plaintiff in *Section 10 (b)* case must "adequately identify circumstances indicating conscious behavior by the defendants").

The main battleground is over *Section 10 (b)*'s element of loss causation. This is an issue of mixed fact and law, the factual components of which are reviewed only for clear error, while the legal conclusions drawn

206 F.3d 202, *229; 2000 U.S. App. LEXIS 4120, **84;
Fed. Sec. L. Rep. (CCH) P90,772

therefrom are reviewed *de novo*. *See Lopresti v. Terwilliger, 126 F.3d 34, 39 (2d Cir. 1997)* ("A district court's findings of fact following a bench trial will be set aside on appeal only if those findings are clearly erroneous. . . . However, the district court's application of the facts to draw conclusions of law, including a finding of liability, is subject to de novo review. So called mixed questions of law and fact are also reviewed de novo." (some internal punctuation and all citations omitted)).

Both the district court and my colleagues view the loss causation issue more narrowly than do I. The district court's reasoning went more or less as follows. [**85] Because of the misleading financial statements and no-default letters, appellants had a view of JWP's financial condition that was more rosy than the truth. However, the true financial condition of JWP was not so different from the rosy view that a fully informed reasonable investor would have apprehended a significantly greater risk of default. Rather, in the court's view, because the collapse was largely caused by the risky and mistaken business decision to acquire Businessland, it was not sufficiently connected to the misrepresentations to be deemed a foreseeable consequence of them.

Judge Oakes's opinion, in discussing *Restatement (Second) of Torts*, appears to take the same view of the issue. *See* Majority Opinion at 44-47. However, he would remand for more findings on whether, given the true financial picture, JWP's collapse was foreseeable. [1]

1 In my view, the district court clearly found a lack of foreseeability at several places in its opinion. I really don't understand what the district court can add to statements such as the "losses that JWP's noteholders sustained [were] as a result of unforeseeable and independent post-audit events, and not because of fiscal infirmities . . . concealed by JWP's misleading financial statements." *991 F. Supp. at 250*. I need not dwell on this issue, however, because I disagree with the district court.

[**86] [*230] I view the issue rather differently. I would ask the following question: Would a reasonable investor -- knowing in 1990 (i) that a firm's financial statements have deliberately and systematically misstated its condition over at least a two-year period, (ii) that the firm's auditor has supinely acquiesced in those misstatements, and (iii) that the auditor had also issued

fraudulent no-default letters on outstanding notes -- reasonably apprehend a new and significant danger that business decisions involving volatile risks might be made and that one such decision might lead to financial collapse without the investor having a timely opportunity to make an informed decision as to the exercise of contractual rights that might cap its losses? I would answer the question in the affirmative.

The core of my disagreement with my colleagues goes to the scope of the matters on which appellants were misled by what the district court aptly described as E&Y's "lap dog" approach to the auditing of JWP and to the preparation of the no-default letters. *See 991 F. Supp. at 248*. To be sure, appellants were misled as to JWP's financial condition. But they were also misled as to two other [**87] matters: (i) the quality of the firm's management and auditor; and (ii) the firm's current incentives with regard to risk aversion.

First, the various financial statements and no-default letters misstated the firm's financial condition and compliance with the terms of the notes, not only for the current year but also for prior years. By 1990, therefore, when the first purchase of notes at issue occurred, what was concealed was not simply the true financial condition of JWP but also the critical facts of (at least) two-years of false financial statements and no-default letters. If aware of those facts, a reasonable lender would have inferred that JWP had a management quite willing to lie systematically to investors and an auditor willing to certify the lies. A reasonable lender would then have discounted JWP's creditworthiness not only because of its less favorable financial condition but also, far more devastatingly, because of the questionable quality of its management and auditor. Reasonable investors surely view firms with an untrustworthy management and auditor far more negatively than they view financially identical firms with honest management and a watch-dog auditor. Moreover, [**88] a reasonable lender informed of the truth would also have known that outstanding notes held by the investor were actually in default. Such defaults would have prompted serious consideration of the exercise of contractual remedies. Indeed, had the defaults been known, the Businessland acquisition could not have occurred without either a cure by JWP detailing the years of fraud or a waiver by appellants.

Second, the concealed information about JWP's management and E&Y's performance as an auditor would

206 F.3d 202, *230; 2000 U.S. App. LEXIS 4120, **88;
Fed. Sec. L. Rep. (CCH) P90,772

have alerted a reasonable lender to JWP's incentives to make risky decisions such as the Businessland acquisition. When the management of a firm and its auditor knowingly issue a series of certified annual financial statements that depict a financial condition more favorable than the truth, a dilemma is created. Both know that the truth will ultimately emerge. All things being equal, the value of the firm's outstanding securities will then decline, and fresh capital will be more costly or simply unavailable without installing a new management and auditor. Only a deal so profitable as to improve the firm's financial condition sufficiently to offset both the financial implications of the [*89] false statements and the decline in confidence in management will preserve the firm's standing in capital markets. The "huge-deal" solution to the firm's dilemma, however, puts lenders at risk. Unknown to them, the firm is far less risk averse than would be expected from the publicly available financial statements, and the chances of a default resulting from a deal with high volatility risk -- like the Businessland acquisition -- are much greater. The collapse here was therefore a foreseeable risk resulting from [*231] the series of false financial statements, and loss causation has been shown. I now set out my views in somewhat more detail.

II

Although I find no fault in Judge Oakes's presentation of the facts, there are certain facts that I emphasize because they demonstrate the nature of the fraud at issue and are particularly relevant to loss causation.

Between 1984 and 1992, JWP, previously a small regulated water utility in Queens, engaged in an aggressive path of expansion by acquisition, primarily financed through private placements of debt securities that were illiquid and had maturities of ten or fifteen years. See AUSA, 991 F. Supp. at 238; Findings P 419, at [**90] 2594. Beginning in 1988, appellants purchased some $ 149 million of JWP notes. Because of the limitations period applicable to Section 10 (b) claims and that Section's limitation to a "purchase or sale," see Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-49, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975), the present federal action concerns appellants' purchase of $ 85 million of JWP notes between 1990 and 1992, well after the pattern of fraudulent JWP annual reports certified by E&Y and fraudulent no-default letters issued

by E&Y had begun. See AUSA, 991 F. Supp. at 251; Findings PP 5, 8, 10, at 2468-70. Appellants contracted for various financial covenants in the Note Agreements. Those covenants required, inter alia, that JWP's books be kept in accordance with GAAP and that E&Y annually furnish to JWP for transmittal to appellants a no-default letter stating that nothing in its audit caused it to believe that JWP had failed to comply with the terms of the particular Note Agreement. See Findings PP 436-37, at 2601-02. If JWP violated the financial covenants, appellants had the right, inter alia, to accelerate the due-date on the notes. [**91] See id. P 471, at 2613.

JWP's audited financial statements, certified by E&Y as accurate, portrayed the company "as a success story" of steady growth, increasing profits, and substantial net worth. Id. P 60, at 2484. "But the reality of JWP's financial condition was very different from the picture of financial health painted by JWP's audited financial statements." Id. Between 1987 and 1991, during which E&Y served as JWP's independent auditor, JWP routinely violated GAAP and the financial covenants in the Note Agreements. See id. P 440, at 2603. JWP's disregard for GAAP rules was so flagrant that "it was a frequently repeated inside joke at JWP to refer to . . . 'EGAAP,' an acronym for [JWP Chief Financial Officer] Ernest Grendi's Accepted Accounting Principles." Id. P 325, at 2568. The district court specifically found that E&Y knew of this inside joke. See id. at 2568-69.

Among other things, JWP improperly capitalized operating expenses as acquisition costs, improperly capitalized software development costs, illegitimately capitalized anticipated-net-operating-loss-carryforwards as "negative goodwill," arbitrarily wrote up small-tool inventories and offset [**92] them against an illegitimate "negative goodwill" account, concealed construction contract losses, and failed to set up adequate accounts receivable reserves. See AUSA, 991 F. Supp. at 240-46.

Several of JWP's accounting abuses served primarily to inflate reported net income, id. at 246, which would be relevant to purchasers and holders of equity securities interested in earnings per share and price/earnings ratios, but which would be less relevant to sophisticated purchasers of privately-placed debt securities. However, other accounting abuses were of great relevance to lenders. For example, JWP's illegitimate negative goodwill entries "changed the ratio of tangible to intangible assets," Findings P 129, at 2506, suggesting to

206 F.3d 202, *231; 2000 U.S. App. LEXIS 4120, **92;
Fed. Sec. L. Rep. (CCH) P90,772

debtholders an inflated level of tangible asset coverage for JWP's debt. Also, the district court found that the improper [*232] entries increased JWP's earnings before interest, taxes, depreciation and amortization ("EBITDA"). *See AUSA, 991 F. Supp. at 250.* Thus, JWP directly represented to debtholders a lower than actual Debt/EBITDA ratio, *i.e.*, depicted a higher than actual cash flow available to satisfy its [**93] debt obligations. Finally, JWP's failure to account adequately for anticipated losses on outstanding contracts and accounts receivable inflated the ratio of current assets to current liabilities, suggesting to lenders a heightened level of solvency. *See generally* Findings P 445, at 2605 ("In connection with their purchases of JWP's debt securities, [appellants'] financial analysts compared JWP's financial statements over a period of five or more years by means of ratio analysis." ). The relevance of these misrepresentations to debt investors in general, and to these debt investors in particular, is acutely demonstrated by the fact that the Note Agreements contain specific covenant provisions limiting JWP's activities based on each of these accounting items. *See, e.g.,* 1992 Note Agreement, Pl.'s Exh. 139B, P 6A (vii), at 13 (restricting JWP's assumption of additional debt absent JWP's meeting target ratios of debt to total capitalization and debt to earnings before interest and taxes ("EBIT")); *id.* P 6F, at 23 (requiring JWP to maintain ratio of current assets to current liabilities of not less than 1.25). [2]

> 2    The Note Agreement's definition of total capitalization specifically subtracts intangible assets from JWP's total net worth. *See id.* P 10B, at 48-49. The misrepresentations at issue would have even greater effect on JWP's Debt/EBIT ratio than its Debt/EBITDA ratio, because the misleading amortization items would not be backed out of EBIT figures.

[**94] E&Y was aware of, and complicit in, JWP's accounting abuses: "[E&Y] knew about the accounting irregularities that were pervasive at JWP . . . . In the face of this knowledge, [E&Y] abandoned its 'watchdog' obligations to bark an alarm. Instead, [E&Y] issued clean audit opinions and no-default certificates, thereby lending the considerable prestige of [E&Y's] imprimatur to JWP's erroneous financial statements." Findings P 359, at 2581. E&Y was also well aware of JWP's violations of the loan covenants. *See id.* P 440, at 2603. "Time and again, [E&Y] found the fraudulent accounting at JWP, but managed to 'get comfortable' with it." *Id.* P 348, at 2577.

Indeed, E&Y's "workpapers evidence that the Summary of Audit Differences was deliberately manipulated." *Id.* P 353, at 2579. "Part of the problem was undoubtedly the close personal relationship" between Grendi and his former partner John LaBarca, the lead E&Y auditor covering JWP. *AUSA, 991 F. Supp. at 248.* "The record suggests that . . . LaBarca and his associates exhibited a level of tolerance and timidity inappropriate for an independent auditor. The 'watch dog' behaved more like a lap dog." *Id.*

[**95] In mid-1991, after roughly four years of systematic accounting misstatements, JWP made its largest and riskiest acquisition -- the purchase of Businessland, a computer reseller. *See id.* at 238. It was a "massive bite for JWP to swallow." *Id.* at 239. At the time of this acquisition, JWP was in default on all of the notes held by appellants, and it is conceded that, had the defaults been known, the acquisition could not have taken place absent either a cure by JWP or a waiver by appellants.

Businessland's cash flow had been steadily deteriorating, and its auditors had issued a report reflecting substantial doubts about Businessland's future prospects as a going concern. *See* Findings P 35, at 2475. Despite this prognosis, JWP was convinced it could turn the company around. However, the floundering Businessland became an enormous cash drain on JWP. *See id.* P 44, at 2478. In 1992, the computer industry began to slash the prices of personal computers in what became known as the "PC price wars." *Id.* P 48, at 2479. Finally, JWP's mechanical and engineering business was in a slump due to the oversupply of commercial real estate. *See id.* [**96] [*233] P 54, at 2482. Although Businessland became profitable in the hands of its next owners, JWP had insufficient capital to stay the course. *See AUSA, 991 F. Supp. at 250.*

In 1992, JWP experienced a liquidity crisis and net losses of $ 612 million. *See* Findings PP 65, 67, at 2485-86. By year end, JWP stopped making full interest payments on the notes. *See id.* P 69, at 2486. In April 1993, JWP stopped making payments altogether. *See id.* On December 21, 1993, a number of creditors filed an involuntary Chapter 11 bankruptcy petition against JWP, to which JWP consented on February 14, 1994. *See id.* P 77, at 2489.

Between October 27, 1993 and February 18, 1994, appellants sold their notes for fair market value, at a

206 F.3d 202, *233; 2000 U.S. App. LEXIS 4120, **96;
Fed. Sec. L. Rep. (CCH) P90,772

substantial loss. *See id. P 423, at 2595-96.* They lost not only their unpaid principal but also their contractual right to receive interest income payable under the notes up to the dates of sale. *See id. P 425, at 2596.* The parties have stipulated to the amount of lost principal and unpaid interest under the Note Agreements. *See id. P 427, at 2596.*

III

We have stated that "loss causation" under *Section 10(b)* "corresponds . . . with [**97] [the] common law notion[] of . . . proximate causation." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 747 (2d Cir. 1992); accord Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp., 801 F.2d 13, 20 (2d Cir. 1986)* ("The requirement of 'loss causation' derives from the common law tort concept of 'proximate causation.'" (citing *Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 708 (2d Cir. 1980))*. Indeed, courts interpreting Section 10(b) and *Rule 10b-5* have often resorted to considering analogous tort law rules, *see, e.g., Blue Chip Stamps, 421 U.S. at 744; see also* VII Louis Loss & Joel Seligman, *Securities Regulation* 3421-22 (3d ed. 1989) ("hornbook elements of 'deceit' . . . . in large measure carry over to" fraud concepts under SEC statutes), perhaps because prior to the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, "no language in either [Section 10(b) or *Rule 10b-5* spoke] at all to the contours of a private cause of action for these [provisions'] violation," *Blue Chip Stamps, 421 U.S. at 749.*

Nevertheless, "in a 'suit on [**98] a statute'" liability "does [not] depend on whether there is proximate causation as that term is used at common law." *Abrahams v. Young & Rubicam Inc., 79 F.3d 234, 237 (2d Cir. 1996).* "With statutory claims, the issue is, instead, one of statutory intent . . . ." *Id.; see also Moore v. PaineWebber, Inc., 189 F.3d 165, 178 (2d Cir. 1999)* (Calabresi, J., concurring) ("The pertinent requirements of proximate cause in a [statutory] case are those intended by the legislature that passed the statute, and not those of the common law."). This is an important point to keep in mind lest we overwork the analogy between proximate cause in common law negligence and proximate cause in federal securities law violations.

For example, Judge Oakes correctly notes that "foreseeability" is the touchstone of loss causation. *See Marbury Mgmt., 629 F.2d at 708* (loss causation

"requires that the damage complained of be one of the foreseeable consequences of the misrepresentation" ). However, the concept of foreseeability may vary according to legal context. For example, use of the term "foreseeable" occurs, *inter alia,* in common law negligence [**99] cases, *see Stagl v. Delta Airlines, Inc., 52 F.3d 463, 473 (2d Cir. 1995 ), per se* negligence cases involving duties created by statute, *see De Haen v. Rockwood Sprinkler Co., 258 N.Y. 350, 179 N.E. 764, 765-66 (N.Y. 1932)* (finding negligence in failure to comply with statute requiring elevator shafts be fenced when object fell down unfenced shaft and killed man below because "the hazards to be avoided [by the statutory rule] . . . [were] the hazards that ensued" ), and cases involving liability under [*234] federal law for material misrepresentations or omissions in securities transactions, *see Manufacturers Hanover, 801 F.2d at 20-22.* "Foreseeability" in each of these categories of cases is not an identical concept; rather, it is a term verbalizing the parameters of liability under particular legal rules both as to classes of persons intended to be protected by those rules and the classes of injuries intended to be compensated. *See Moore, 189 F.3d at 178* ("Whether a statute's causation requirements are broader, narrower, or the same as those of the common law depends on what harms the statute is intended to address. [**100] ").

Of course, foreseeability in common law negligence cases has largely to do only with reasonably apprehending a particular kind of injury to a particular category of plaintiff. In the case of *per se* negligence claims where the defendant is under a statutory duty to behave in a specified fashion, "foreseeability" is determined by reference to whether that statute was intended to protect the particular category of plaintiffs and to avoid the particular kind of injury. *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 36, at 224-27 (5th ed. 1984) (to maintain action based on particular statute, plaintiff must bring himself within class of individuals legislature intended to protect, and harm must be one that statute was intended to prevent). While the distinction between proximate cause in negligence claims based on common law or on violation of a statute may not affect the outcome in many cases, the underlying analysis is nonetheless quite different.

In the case of securities fraud, the limits of "foreseeability" must be derived from the purposes of the federal securities laws. *See Moore, 189 F.3d at 179-80*

206 F.3d 202, *234; 2000 U.S. App. LEXIS 4120, **100;
Fed. Sec. L. Rep. (CCH) P90,772

("Where the defendant's behavior [**101] is made actionable by a statute, . . . the extent of his liability . . . . [is governed by] the statute and its purpose . . . ." (footnote omitted)). Those laws, as pertinent to the instant matter, impose a duty on firms to provide investors with truthful information relevant to the value of certain investments. "The purpose of [Section] 10(b) and *Rule 10b-5* is to protect persons who are deceived in securities transactions -- to make sure that buyers of securities get what they think they are getting . . . ." *Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984)* (Friendly, J.). The securities laws are, of course, not an insurance policy against all losses by investors, and the concept of proximate cause limits recovery to plaintiffs and to losses for which the intent of the laws is served by recovery and denies recovery when that intent is not served.

If the meaning of proximate cause in the present context is to be derived from the statutory purpose of making sure that firms provide the truthful information necessary to allow investors to "get what they think they are getting," then much of the requisite analysis must come from the definition [**102] of materiality under federal securities law, which governs the scope and content of the information that the firm is under a duty to provide. The test of materiality is whether a reasonable investor would consider the particular information significant or, put another way, whether the information would affect the "total mix" of information available to the investor. *See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).* The "foreseeability" of a loss in this context, therefore, turns upon the significance of the misrepresentations or omissions to the total mix of information available to the investor. Of course, in the context of common law negligence, it is generally foreseeability from the defendant's point of view that is at stake. In securities law, however, the critical issue is what a reasonable investor would have considered significant, and foreseeability is generally from the plaintiff's point of view because, once reliance and scienter are proven, the defendant is [*235] presumed to anticipate the apprehensions of a reasonable investor. [3]

> 3 I recognize of course that a different test might -- or might not -- be appropriate in a common law fraud claim.

[**103] Loss causation in the context of federal securities law thus requires consideration of the significance to a reasonable investor of the truth compared to the content of the misrepresentations or omissions. If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss. This is all that is meant by our rule "that the damage complained of be one of the foreseeable consequences of the misrepresentation." *Manufacturers Hanover, 801 F.2d at 21* (citing *Marbury Mgmt., 629 F.2d at 708*).

A major source of confusion in this regard is the use of causation language. The issue is not whether a misstatement "caused" a loss. Rather, the issues are: (i) whether a reasonable investor would find the total mix of information so significantly altered by the truth as to apprehend a zone of risk that would seem remote to an investor still under the spell of misstatements, [**104] and (ii) whether the ultimate loss falls within that zone of risk. For example, losses due to insolvency, much less insolvency itself, are not "caused" by misrepresentations. Currently insolvent firms may (often do) survive and ultimately prosper if skillfully managed. But if a firm is not so fortunate after an investor has been misled as to solvency, the investor should not be denied recovery on the ground that it was management's lack of skill rather than the false assurances of solvency that "caused" the loss.

Our cases are quite consistent with this analysis, notwithstanding language in some that takes a more cramped view of loss causation. *See, e.g., Bennett v. United States Trust Co., 770 F.2d 308, 313-14 (2d Cir. 1985)* (failing to find loss causation when "the misrepresentation neither induced the purchase nor [was] related to the [security's] value"). For example, in *Manufacturers Hanover*, an auditor overstated the solvency of a firm causing the plaintiff banks to enter into repurchase agreements ("repo's") involving government securities with the firm. *See 801 F.2d at 21-22.* We affirmed a jury's loss causation finding, even though [**105] the misrepresentations involved the value of neither the underlying securities being traded nor any investment in the firm. *See id. at 22.* We reasoned that because the repo's were "in connection with the purchase or sales of securities," *15 U.S.C. § 78j(b),* and the

206 F.3d 202, *235; 2000 U.S. App. LEXIS 4120, **105;
Fed. Sec. L. Rep. (CCH) P90,772

misinformation concealed the risk that the firm could not complete the transactions, there was loss causation. *See Manufacturers Hanover, 801 F.2d at 20, 22.*

Moreover, in *Marbury Management*, we found loss causation where a defendant falsely represented to the plaintiffs who purchased securities on his recommendation that he was a "security analyst" and "portfolio management specialist." *629 F.2d at 707.* We acknowledged that the securities did not "lose value because [the defendant] was not a registered representative" but rather because the market for these securities collapsed apparently as a result of ordinary business losses. *Id. at 708.* When the plaintiffs inquired about the poor performance of the securities, they were advised by the same defendant that their prices would go up. *See id. at 708 n.2.* We held [**106] that, as a result, the misrepresentations induced not only the purchase of the securities by the plaintiffs but their retention as well. *See id. at 708, 710.* Explaining that a defendant's false representation of a fact like his expertise must be analyzed in the same way as a fraudulent representation about the intrinsic [*236] worth of a security, we held that the defendant had proximately caused the plaintiff's loss. *See id. at 708-10.*

In *Marbury Management*, investors were deprived of a bargained-for-risk-profile, *i.e.*, a portfolio selected by a trained specialist. Instead, they got a portfolio with a significantly greater risk of poor performance because of the lack of the advertised skill, experience, and expertise in selecting it. To be sure, recovery would have to be denied if the ultimate losses were related to a different risk, such as an uninsurable natural disaster. Nevertheless, no purpose of the securities laws would be served by denying recovery because the concealed zone of risk was the heightened likelihood of failure of different firms in the portfolio, albeit due to business-related causes unique to each firm.

### IV

I turn now to the [**107] application of these principles to the present case. I address the situation as it existed in 1990, when appellants made their first purchase of JWP notes within the limitations period.

Finance is about risk probabilities - *i.e.*, risk allocation, diversification, and minimization. Every lender, when deciding whether and on what terms to make a loan, must evaluate the probability of default. *See*

Daniel R. Fischel, *The Economics of Lender Liability, 99 Yale L.J. 131, 134 (1989).* When appellants invested in JWP, they bargained for a certain risk profile that governed the decision to lend and matters such as maturity and interest rate. They also bargained for E&Y to monitor JWP's compliance with GAAP and for contractual rights, including acceleration, that might cap their losses should JWP default. E&Y's conduct deprived them of all these bargains and subjected them to concealed risks that resulted in losses.

It appears to have been the district court's view that E&Y misrepresented only particular financial information. It found that JWP's misrepresentations as to its financial condition had a calculable effect on the solvency of the firm so marginal that the [**108] risk of a default was not significantly understated by the misrepresentations. *See AUSA, 991 F. Supp. at 249-50.* The court concluded that the risky and mistaken acquisition of Businessland was therefore not within the risks related to those misrepresentations. *See id. at 250.* If the only material information misrepresented were the treatment of certain financial matters, I would agree. E&Y's conduct, however, misrepresented far more.

In each successive JWP financial statement, E&Y incorporated by reference prior fraudulent statements. For example, the 10-K prepared for the year ending December 31, 1990 included backward-looking balance sheet and income statement data for the previous five years. *See* Pl.'s Ex. 17, Part II, Item 6 at 22. The 10-K explicitly incorporated prior financial statements, including the prior year's balance sheet information and the 1988 and 1989 statements of income, cash flows, and stockholders' equity. *See id.* Part IV, Item 14(a), at 47. E&Y specifically represented:

> In our opinion, based on our audits, and for 1988 the report of other auditors, these financial statements . . . present fairly, in all material [**109] respects, the consolidated financial position of JWP . . . at December 31, 1990 and 1989, and the consolidated results of operations and cash flows for each of the three years in the period ended December 31, 1990 in conformity with [GAAP].

*Id. at 43.*

206 F.3d 202, *236; 2000 U.S. App. LEXIS 4120, **109;
Fed. Sec. L. Rep. (CCH) P90,772

The note purchases at issue here began in 1990. The fraud had been ongoing since 1987, and, by the time of the 1990 purchases, some of the appellants already owned millions of dollars of JWP notes. [4] [*237] A reasonable investor receiving the financial statements (and in two cases no-default letters) would have concluded that: (i) the risk profile established by prior financial statements was accurate and stable; (ii) E&Y was monitoring JWP's compliance with GAAP in its financial statements, and no default on the outstanding notes had occurred; and (iii) the ongoing monitoring by E&Y might afford some opportunity for appellants to cap their losses should JWP encounter unexpected difficulties. None of these conclusions would have been correct.

[4] Two appellants in the federal claim, AUSA and Prudential, had outstanding notes at the time of their 1990 purchase. See Findings PP 1, 10, at 2467, 2469-70. Appellant Monumental Life first purchased notes in 1990, see id. P 5, at 2468, and appellant Modern Woodmen first purchased notes in 1992, see id. 8, at 2469; thus, these appellants relied on fraudulent past financial statements but not no-default letters in purchasing the securities.

[**110] If the true facts had become known in 1990, the inferences that a reasonable investor would have drawn would not have been limited to adjusting the estimated risk of default by discounting the dollar value involved in the misrepresentations. Obviously, the total mix of information relevant to such an investor would have been radically altered. A reasonable investor would have concluded that JWP had a management quite willing to misrepresent systematically its financial condition and an auditor willing to certify the misrepresentations. [5] The note provisions requiring the auditor to certify the lack of a default annually would have been deemed worthless. Absent an auditor willing to do its duty, such an investor would attribute no value to contractual rights to take certain action in the event of default because a fully-informed exercise would not be possible. The purchase of yet more JWP notes would have been out of the question in light of the true information. Indeed, in discussing the "investment grade" rating assigned to JWP's securities, the district court found that "if the plaintiffs had known the lack of quality of JWP's Notes at the time of the offerings, they likely would [**111] not and in some cases could not have bought them." Findings P 447, at 2606. A reasonable noteholder would also have

seriously contemplated the wisdom of retaining its present JWP notes and the need to invoke its powers under those notes, including acceleration.

[5] Judge Jacobs speculates that E&Y could have issued a corrected statement of accounts for several years but would not have had to disclose that management had corruptly insisted on the earlier false statements. Even if that is so -- and I am not sure that it is -- such an extensive correcting of earlier years' books without any explanation would likely have had the same consequences as a full explanation for their need. Of course, any explanation that omitted a reference to management's role would have been yet another fraudulent misstatement.

The pattern of such misrepresentations itself created another risk to appellants that a reasonable investor would take into account. The management of a firm like JWP would have apprehended that, while such misstatements [**112] would reduce borrowing costs for a time, in all likelihood corrections in statements for prior years would eventually have to be made. The true financial condition of the firm would then be exposed, as would the misdeeds of JWP's management and E&Y. Investors' and analysts' evaluation of JWP would reflect both facts. Moreover, JWP's management and auditor would know that the corrections would reveal defaults on outstanding notes and perhaps trigger the exercise of the noteholders' contractual rights, including acceleration. (Indeed, the Businessland acquisition could not have proceeded if the default on the notes had been known, absent a cure by JWP -- admission of years of fraud -- or waiver by appellants.)

For a management facing such circumstances, the temptation to seek salvation in a risky deal is greatly heightened. Only a very profitable new venture could offset the effect of revelations of past financial misstatements and systematic fraud by existing management and the firm's auditor. [*238] To be sure, such a deal would also have a vast downside, but even the prospect of a financial collapse might not seem to management all that different from the circumstances that would prevail [**113] if profitability were not substantially increased before disclosure of the fraud. [6]

[6] JWP's diminished risk aversion is no more than a variation on the familiar principle that highly leveraged firms are less risk averse than

206 F.3d 202, *238; 2000 U.S. App. LEXIS 4120, **113;
Fed. Sec. L. Rep. (CCH) P90,772

similar firms with less debt. "The existence of debt creates an incentive for borrowers to invest in riskier projects. This incentive arises because the lender bears the downside risk if the project turns out poorly, but he does not share in the upside potential if the project turns out well." Daniel R. Fischel, *The Economics of Lender Liability*, *99 Yale L.J. 131, 134 (1989)*. "This incentive to invest in risky projects is a direct function of the amount the borrower has at risk . . . . In the extreme case . . . the firm has nothing to lose and everything to gain by adopting a 'shoot the moon' investment strategy." *Id.* JWP was in effect more highly leveraged than its debt investors had been led to believe. The equity base was less than advertised. Moreover, disclosure of the fraud would have driven down equity prices and dried up access to equity capital.

[**114] In short, when appellants began in 1990 to purchase the notes at issue, they were investing in a firm with compelling incentives that rendered it far less risk averse than the information certified by E&Y suggested. The chance that a highly risky venture would be undertaken that might lead to a default was far greater than could have been reasonably inferred from the false financial statements and no-default letters, and the contractual rights that might have minimized such a loss were in reality worthless.

Taking this view of the case, I have little difficulty in concluding that loss causation was amply shown. The essentials of appellants' bargain were a particular risk profile and contractual rights to monitor the debtor. The risk profile was false in that relevant financial information was misstated and the diminished risk averseness of the firm concealed. The contractual rights were rendered valueless because misstatements concealing existing and future defaults would forestall their exercise. In my view, therefore, the collapse of JWP as a result of the Businessland venture was well within the zone of risk concealed by the misrepresentations.

We would not stretch or strain [**115] our precedents in so holding. The nexus between the information concealed and the ultimate loss in the instant case is far stronger than it was in *Marbury Management*. There, the reason for the decline in the value of the securities was the simple failure of the firms to prosper, and liability rested on the false risk profile of expertise in

portfolio selection alone. *See 629 F.2d at 707-08.* Here, the fraudulent scheme itself secretly altered the firm's risk averseness, concealed existing defaults, and denied the investors an opportunity to make an informed exercise of their contractual rights. In *Marbury Management*, the plaintiffs retained the securities after receiving assurances from the defendant that their poor performance would improve. *See id. at 708 n.2.* Here, appellants retained the notes after the assurances contained in the no-default letters and financial statements.

Moreover, in *Manufacturers Hanover*, we found loss causation where the defendant accountant overstated the capitalization of a firm, causing the plaintiff bank to enter into repo's with the firm. *See 801 F.2d at 16.* Although *Manufacturers Hanover* [**116] involved no misrepresentation as to the value of the government securities traded or as to any investment in the firm, we upheld a liability verdict challenged on loss causation grounds. *See id. at 21-22.* In the instant matter, the misrepresentations concerned the financial condition, risk incentives, and quality of management and auditor of a firm in which investments were made.

I add three thoughts. First, the view of loss causation advanced by E&Y is entirely counterproductive -- indeed ranging from perverse to bizarre -- so far as the purposes of the securities laws are concerned. [*239] Had E&Y come forward just before the Businessland acquisition and admitted the truth, it would have been exposed to substantial liability -- namely, the difference between the price paid for the notes and their very diminished value resulting from the disclosure of a less favorable financial condition and of the years of fraud by management and E&Y. By concealing the truth until the final collapse, E&Y (and JWP if it were solvent) entirely escapes any liability. Under E&Y's theory, therefore, firms and auditors like JWP and E&Y have every incentive both to continue the fraud and to [**117] make riskier gambles in the hope of salvation. If the risks pay off, then equityholders rather than debtholders reap the rewards of the unbargained-for risks; if not, management and the independent auditor escape liability for the fraud altogether. In other words, all the excess risk caused by the auditor's ongoing fraud is shifted to the victims of the fraud. E&Y's view of loss causation is thus a rule that encourages the continuance -- even escalation -- of fraud at the price of increasing the potential loss to lenders.

Second, this is not a weak case for liability. In a

206 F.3d 202, *239; 2000 U.S. App. LEXIS 4120, **117;
Fed. Sec. L. Rep. (CCH) P90,772

significant number of securities cases that federal courts see, the harmful nature of the misrepresentation or omission is far more doubtful, and little actual recovery on the part of investors is expected. *See, e.g.*, Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions, 43 Stan. L. Rev. 497, 505-23, 528, 547-48 (1991)*; Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiff's Attorney's Role in Class Action and Derivative Regulation: Economic Analysis and Recommendations for Reform, 58 U. Chi. L. Rev. 1, 3 (1991)* ("[The private action] [**118] regulatory structure is poorly designed in a number of respects, particularly when applied to 'large-scale, small-claim' litigation in which the overall liability is large but the individual interests of the class members or corporate shareholders are small."); *cf.* A.C. Pritchard, *Markets as Monitors: A Proposal to Replace Class Actions With Exchanges as Securities Fraud Enforcers, 85 Va. L. Rev. 925, 928 (1999)* ("In the typical [fraud on the market] case, the corporation has neither bought nor sold its securities, and, accordingly, has not benefited from the fraud.").

It is an atypical proxy case, for example, in which anyone really thinks that the actual shareholders' vote might have been different if the particular information had been restated or included. And the main financial beneficiaries of class action litigation involving allegations of misleading proxies are generally counsel for the plaintiff class and for the defense. *See* Alexander, *43 Stan. L. Rev. at 597* ("Evidence seems to show that derivative actions tend to be resolved . . . with no tangible economic benefit to the corporation, plus large attorney's fees." ). In the instant [**119] matter, however, the systematic fraud was directed by E&Y specifically at appellants, who have each lost millions of dollars.

Finally, my view of loss causation is not a limitless theory imposing liability for every act of aggressive accounting. The district court found that the fraud began at least with the annual report for 1987. The notes at issue were purchased in 1990 or later. The misrepresentations at issue had thus gone on for more than two years when the notes were purchased and for almost four years at the time of the Businessland acquisition. That pattern of auditor acquiescence in management fraud is sufficiently longstanding to create the greatly diminished risk averseness discussed in this opinion. In cases where fraudulent accounting acts are isolated and short-run, my view of loss causation would be altered accordingly. [7]

[7]   In light of the majority's decision, I need not address the measure of damages to be derived from my theory of loss causation.

I therefore respectfully dissent.

*** Slip Sheet ***

Document

LEXSEE 448 F.3D 573

**BETH ISRAEL MEDICAL CENTER, LENOX HILL HOSPITAL, MONTEFIORE MEDICAL CENTER, NYU HOSPITALS CENTER, THE NEW YORK AND PRESBYTERIAN HOSPITAL, THE NEW YORK EYE AND EAR INFIRMARY, NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY, ST. LUKE'S-ROOSEVELT HOSPITAL CENTER, SAINT VINCENT'S HOSPITAL OF NEW YORK, and STATEN ISLAND UNIVERSITY HOSPITAL, Plaintiffs-Appellants, v. HORIZON BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, INC., Defendant-Appellee.**

**Docket No. 04-5783-cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*448 F.3d 573; 2006 U.S. App. LEXIS 12346*

**October 19, 2005, Argued**
**May 19, 2006, Decided**

**SUBSEQUENT HISTORY:**    As Amended July 17, 2006.

**PRIOR HISTORY:**    [**1] Appeal from a summary judgment entered October 20, 2004, in the United States District Court for the Eastern District of New York (Amon, J. dismissing claims of breach of contract, 19 breach of third-party contract, unjust enrichment, and engaging in a pattern of deceptive practices in an action brought to secure reimbursement for hospital services rendered.

**DISPOSITION:**    Affirmed in part, vacated in part, and remanded.

**COUNSEL:** ROY W. BREITENBACH (Fredrick I. Miller, Andrew Zwerling, of counsel), Garfunkel, Wild & Travis, P.C., Great Neck, NY, for Plaintiffs-Appellants.

KIMBERLY C. LAWRENCE, Hinman Straub P.C., Albany, NY, for Defendant-Appellee.

**JUDGES:** Before: KEARSE, MINER, and HALL, Circuit Judges. Judge Kearse dissents in part in a separate opinion.

**OPINION BY:** MINER

**OPINION**

[*575] MINER, *Circuit Judge*:

Plaintiffs-appellants appeal from a summary judgment entered October 20, 2004, in the United States District Court for the [*576] Eastern District of New York (Amon, *J.* ) dismissing their claims for breach of contract, breach of a third-party contract, unjust enrichment, and engaging in a pattern of deceptive practices in an action brought to secure reimbursement for hospital services rendered. [**2] The District Court dismissed plaintiffs' claims for breach of contract after determining that (i) *NEW YORK PUBLIC HEALTH LAW § 2807-c* completely abrogated the parties' pre-existing written contracts; (ii) all parties were performing under implied-in-fact contracts; (iii) those implied-in-fact contracts were illegal under *§ 2807-c*; (iv) all parties were equally at fault for non-compliance with *§ 2807-c*; and (v) it would not invoke its equitable powers to apply the rates set by *§ 2807-c* to the implied-in-fact contracts. The District Court dismissed plaintiffs' claims for unjust enrichment on the ground that it was "not against 'equity and good conscience'" for plaintiffs to have been paid as they were. The District Court also determined that plaintiffs could not establish claims for breach of a third-party contract or for engaging in a pattern of deceptive practices.

448 F.3d 573, *576; 2006 U.S. App. LEXIS 12346, **2

## BACKGROUND

### I. *Factual History*

Defendant-appellee Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is a non-profit health services insurance plan based in New Jersey and is affiliated with numerous Blue Cross Blue Shield Plans around the country ("Blue [**3] Cross Plans"). Because of this affiliation, Horizon has paid for treatments that its subscribers receive from hospitals associated with Blue Cross Plans in other states pursuant to an agreement called the Blue Cross Inter-Plan Bank Agreement (the "Inter-Plan Agreement"). Since the 1950s, by virtue of the Inter-Plan Agreement, subscribers of Horizon and its predecessor have received treatment from various hospitals in the New York City area that were under contract with the New York Blue Cross Plan, which is now known as Empire Blue Cross and Blue Shield ("Empire").

In addition, since the 1950s, Horizon has had Contracting Hospital Agreements ("CHAs") directly with some New York Hospitals. During the 1960s and 1970s, Horizon entered into CHAs with eight of the plaintiff-appellant hospitals: Beth Israel Medical Center, Lenox Hill Hospital, New York Eye and Ear Infirmary, New York Presbyterian Hospital, NYU Hospitals Center, St. Luke's-Roosevelt Hospital, St. Vincent's Hospital of New York, and Staten Island University Hospital. Plaintiffs-appellants The Hospital for Special Surgery and Montefiore Medical Center never entered into CHAs with Horizon. Lenox Hill terminated [**4] its CHA with Horizon on June 8, 1995. All other CHAs were terminated on December 31, 1996. Pursuant to the CHAs, the hospitals rendered services to subscribers of Horizon and the hospitals were reimbursed by Horizon.

The CHAs used by Horizon are standard forms drafted by employees of Horizon. The CHAs governed the relationship between Horizon and the hospitals as to many specific topics: types of services to be rendered by the hospitals, rate of payment, limitations of actions, notices of hospital admissions and eligibility for services, disposition of charges for ineligible services, effect of prior agreements, termination, availability of medical and financial records, confidentiality, and choice of governing law. The choice-of-law provision specified that the agreements would "be deemed made in and shall be construed according to the Laws of the State of New Jersey." The limitation of actions provision recited that

"no action at law or in equity shall be maintainable for any claim arising out of this Agreement unless [*577] brought within one year from the date when the cause of action accrued." As to the rate of payment, the CHAs provided that payment by Horizon to the [**5] party-hospital would be according to "the formula entitled 'Basis of Payment.'" The "Basis of Payment" formula provided for a per diem payment rate "equal to the finally established per diem rate payable to Hospital by the Associated Hospital Service of New York . . . ." Thus, the CHAs permitted Horizon to reimburse the party-hospital at the same rate that the Associated Hospital Service, and later Empire, reimbursed the party-hospital. [1]

> 1 The Associated Hospital Service of New York is the predecessor of Empire. *See* State of New York Insurance Department, *Report on Examination of the Empire Blue Cross and Blue Shield as of December 31, 1999*, 3 (Nov. 6, 2002) ("[Empire] is the direct successor to Associated Hospital Service of New York ('AHS').")., *available* *at* http://www.ins.state.ny.us/exam_rpt/embcbs99.pdf.

In 1988, the New York legislature amended the hospital rates legislation popularly known as the New York Prospective Hospital Reimbursement Methodology (the "NYPHRM"). As amended, [**6] the NYPHRM mandated that "payments to general hospitals for inpatient hospital services provided to persons who are not eligible for payments as beneficiaries of . . . (medicare) shall be determined pursuant to this section." *N.Y. PUB. HEALTH LAW § 2807-c(1)* (1988). [2] The NYPHRM also provided that "special payment rate methodology agreements other than those permitted in accordance with the provisions of paragraphs (a) and (b) of this subdivision shall not be authorized . . . ." *Id. § 2807-c(2)(c)*. The NYPHRM established a mandatory system of reimbursement with three tiers. The first tier rate was established for payments made by state governmental agencies or by "article forty-three corporations," [3] including Empire, and was designated the "Standard Rate." *Id. § 2807-c(1)(a)*. The Second tier related to payments made for hospital services pursuant to the workers' compensation law, volunteer firefighters' benefit law, the comprehensive motor vehicle insurance reparations act, or by certain self-insured funds. *Id. § 2807-c(1)(b)*. In this tier, the rate was set at the Standard Rate plus thirteen percent and was designated the [**7]

"Commercial Rate." *See id.* The rate for the third tier, governing all other payments, was set at the lower of the hospitals' actual charges or 120% of the Commercial Rate. *Id. § 2807-c(1)(c).* The third tier rate was known as the "Self-Pay Rate." Payments made by out-of-state health plans were subject to the Self-Pay Rate.

> 2    All citations to *N.Y. PUB. HEALTH LAW § 2807-c(1)* contained herein are to the 1988 version of that law. *See* 1988 N.Y. Sess. Laws 11-39, 44 (McKinney) (adding *section 2807-c*, retroactive to Jan. 1, 1988); 1988 N.Y. Sess. Laws 1169-72 (McKinney) (amending *section 2807-c* to add Foreign Blue Coss Exception, retroactive to Jan. 1, 1988 ).
>
> 3    The term "article forty-three corporations" refers to non-profit New York based health plans regulated under Article 43 of the New York Insurance Law.

The NYPHRM also contained a "Foreign Blue Cross Exception." The Foreign Blue Cross Exception permitted out-of-state non-profit health plans, like Horizon, [**8] to pay at the Standard Rate rather than the Self-Pay Rate. *N.Y. PUB. HEALTH LAW § 2807-c(1)(a)* (including in the Standard Rate tier those payments by "article forty-three corporations" "on behalf of subscribers of a foreign corporation as described in paragraph (d) of subdivision twelve of this section"). To be eligible for the Foreign Blue Cross Exception, the out-of-state health plan had to meet three conditions: First, the out-of-state health plan had to [*578] be a member of the Blue Cross Blue Shield Association. *Id. § 2807-c(12)(d).* Second, the law of the state where the out-of-state Blue Cross member was formed had to permit a New York Blue Cross member to pay for services to its subscribers at hospitals in that state at the same rate as the out-of-state Blue Cross member paid to those hospitals. *Id.* Third, an article forty-three corporation had to act as payment agent. *Id. § 2807-c(1)(a).*

It is undisputed that from the amendment of the NYPHRM in 1988 until December 31, 1996, the latest date relevant to this action, Horizon reimbursed the plaintiff-appellant hospitals at a rate equal to the Standard Rate, rather than the [**9] Self-Pay Rate.

## II. *Procedural History*

This action was commenced by the filing of a Complaint on July 7, 1998. At some later date not clear in the Record, an Amended Complaint was filed dismissing two of the original plaintiff hospitals, The New York Methodist Hospital and Westchester Square Medical Center, and adding two of the plaintiff-appellant hospitals, The New York Eye and Ear Infirmary and The New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery. A Second Amended Complaint also was filed. The Second Amended Complaint, like the initial Complaint, sought damages equal to the difference between the amounts the plaintiff-appellant hospitals (the "Hospitals") contended that Horizon should have paid under the Self-Pay Rate and the amounts that Horizon did pay under the Standard Rate for the period from January 1, 1991 through December 31, 1996. The Hospitals did not sue under the NYPHRM; they conceded in the District Court that "they have no private right of action under the statute." Instead, the Hospitals asserted claims sounding in (i) breach of contract; (ii) breach of third-party contract; (iii) unjust [**10] enrichment; and (iv) engaging in a pattern of deceptive practices. After discovery, the parties cross-moved for summary judgment. In an unpublished Memorandum and Order dated August 31, 2004, the District Court granted summary judgment to Horizon, denied summary judgment to the Hospitals, and dismissed the Hospitals' Complaint "in its entirety."

The District Court first determined that the NYPHRM "overrode the pre-existing contracts" between Horizon and the Hospitals and abrogated them completely. Accordingly, the District Court found that the choice-of-law provisions in the CHAs were irrelevant, that New York law governed the parties' relationships, and that the NYPHRM "governed the rates of reimbursement" to the Hospitals during its existence. As to whether Horizon was entitled, under the Foreign Blue Cross Exception, to pay the Standard Rate, the District Court determined that there were some contested issues of material fact. The District Court determined that those hospitals subject to a CHA -- all except the Hospital for Special Surgery, Montefiore, and, after June 8, 1995, Lenox Hill -- were paid directly by Horizon, which therefore was ineligible for the benefits [**11] of the Foreign Blue Cross Exception as to the CHA-covered hospitals. As to the excepted three hospitals, the District Court determined that Horizon was a Blue Cross member and that New Jersey law provided the "reciprocal option," thus satisfying two of the three requirements of eligibility for the Foreign Blue Cross Exception. However, the