LEXSEE 475 U.S. 574

## MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD, ET AL. v. ZENITH RADIO CORP. ET AL.

### No. 83-2004

### SUPREME COURT OF THE UNITED STATES

*475 U.S. 574; 106 S. Ct. 1348; 89 L. Ed. 2d 538; 1986 U.S. LEXIS 38; 54 U.S.L.W. 4319; 1986-1 Trade Cas. (CCH) P67,004; 4 Fed. R. Serv. 3d (Callaghan) 368*

**November 12, 1985, Argued**
**March 26, 1986, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.

**DISPOSITION:** *723 F.2d 238*, reversed and remanded.

**DECISION:**

Evidence of alleged predatory pricing conspiracy by Japanese television manufacturers held insufficient to preclude summary judgment dismissing antitrust action.

**SUMMARY:**

American manufacturers of consumer electronic products, principally television sets, brought suit against a group of their Japanese competitors in the United States District Court for the Eastern District of Pennsylvania, alleging that these competitors had violated 1 and 2 of the Sherman Act (*15 USCS 1, 2*), 2(a) of the Robinson-Patman Act (*15 USCS 13(a)*), and other federal statutes. This lawsuit claimed that the Japanese companies had conspired since the 1950's to drive domestic firms from the American market, by maintaining artificially high prices for these products in Japan while selling them at a loss in the United States. In a series of decisions, the District Court excluded the bulk of the evidence on which the American companies had relied. Finally, the District Court granted the Japanese companies' motion for summary judgment dismissing the Sherman Act and Robinson-Patman Act claims, stating that it found no significant probative evidence that the Japanese companies had entered into an agreement or

acted in concert with respect to exports in any way that could have injured the American firms (*513 F Supp 1100*). The United States Court of Appeals for the Third Circuit reversed and remanded for further proceedings, overturning the District Court's evidentiary rulings and determining that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out domestic competitors, funded by excess profits obtained in the Japanese market. Pointing in part to evidence of an agreement among the Japanese companies and their government to set minimum export prices, of the companies' common practice of undercutting the minimum prices through rebate schemes which they concealed from the governments of both countries, and of a further agreement among the companies to limit the number of their American distributors, the Court of Appeals concluded that there was direct evidence of at least some kinds of concerted action by the companies, and that precedents restricting the inference of conspiracy from purely circumstantial evidence of conscious parallel conduct were therefore not dispositive in this case (*723 F2d 238*).

On certiorari, the United States Supreme Court reversed and remanded the case for further proceedings. In an opinion by Powell, J., joined by Burger, Ch. J., and Marshall, Rehnquist, and O'Connor, JJ., it was held that the Court of Appeals had applied improper standards in evaluating the summary judgment, in that (1) the "direct evidence of concert of action" on which the Court of Appeals relied, consisting of evidence of other combinations among the Japanese companies, had little if any relevance to the alleged predatory pricing conspiracy, since a conspiracy to raise profits in one market did not

475 U.S. 574, *; 106 S. Ct. 1348, **;
89 L. Ed. 2d 538, ***; 1986 U.S. LEXIS 38

tend to show a conspiracy to sustain losses in another and the remaining combinations showed a tendency to raise prices; and (2) the Court of Appeals had failed to consider the absence of a plausible motive for the Japanese companies to engage in such a conspiracy, which involved substantial profit losses and showed little likelihood of success.

White, J., joined by Brennan, Blackmun, and Stevens, JJ., dissented, expressing the view (1) that the Court of Appeals had relied on the evidence of combinations other than the alleged predatory pricing conspiracy not to support a finding of antitrust injury to the American companies, but simply and correctly as direct evidence of concert of action among the Japanese companies distinguishing this case from traditional "conscious parallelism" cases, and (2) that the Court of Appeals was not required to engage in academic discussions about the likelihood of predatory pricing, but properly determined that expert testimony presented by the American companies was sufficient to create a genuine factual issue regarding long-term, below-cost sales by the Japanese companies.

## LAWYERS' EDITION HEADNOTES:

[***LEdHN1]

APPEAL §1267

APPEAL §1750

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §6

predatory pricing conspiracy -- irrelevant evidence and absence of motive --

Headnote:[1A][1B][1C]

In an action by American manufacturers of consumer electronic products which accuse their Japanese competitors of a conspiracy to monopolize the American market through predatory pricing, in violation of 1 and 2 of the Sherman Act (*15 USCS 1, 2*) and 2(a) of the Robinson-Patman Act (*15 USCS 13(a)*), a federal Court of Appeals applies improper standards in overturning a summary judgment entered by a federal District Court in favor of the Japanese companies on these claims, where

(1) the "direct evidence of concert of action" on which the Court of Appeals relies, consisting of evidence of other combinations among the Japanese companies to raise prices in Japan, fix minimum export prices, and limit the number of distributors of their products in the American market, has little if any relevance to the alleged predatory pricing conspiracy, since a conspiracy to raise profits in one market does not tend to show a conspiracy to sustain losses in another and the remaining combinations show a tendency to raise prices; and (2) the Court of Appeals fails to consider the absence of a plausible motive for the Japanese companies to engage in such a conspiracy, which involves substantial profit losses and shows little likelihood of success; on remand, the Court of Appeals is free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find the existence of such a conspiracy. (White, Brennan, Blackmun, and Stevens, JJ., dissented from this holding.)

[***LEdHN2]

APPEAL §1087.5

certiorari -- point not raised in petition

Headnote:[2A][2B]

The United States Supreme Court will not review a Court of Appeals decision, which reversed a summary judgment dismissing claims under a federal statute, where these claims are not mentioned in the questions presented in the petition for certiorari and have not been independently argued by the parties.

[***LEdHN3]

INTERNATIONAL LAW §6

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §21

acts in foreign countries -- application of antitrust laws --

Headnote:[3A][3B]

American manufacturers cannot recover antitrust damages from Japanese competitors based solely on an alleged cartelization of the Japanese market, because American antitrust laws do not regulate the competitive conditions of other nations' economies; the Sherman Act

475 U.S. 574, *; 106 S. Ct. 1348, **;
89 L. Ed. 2d 538, ***LEdHN3; 1986 U.S. LEXIS 38

(*15 USCS 1 et seq.*) reaches conduct outside the borders of the United States, but only when the conduct has an effect on American commerce.

[***LEdHN4]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §67

parties entitled to damages -- lack of injury from antitrust violation --

Headnote:[4]

American manufacturers cannot recover antitrust damages from Japanese competitors for any conspiracy by the latter to charge higher than competitive prices in the American market, as by setting minimum export prices in cooperation with the Japanese government, since, although such conduct would violate the Sherman Act (15 USCS 1-7), it could not injure the American companies; similarly, the American companies cannot recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output, such as the agreement among the Japanese companies limiting the number of their American distributors, since such restrictions, though harmful to competition, actually benefit competitors by making supracompetitive pricing more attractive.

[***LEdHN5]

EVIDENCE §979

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

antitrust conspiracy -- direct evidence -- actions not creating claim for damages --

Headnote:[5]

Since neither the alleged supracompetitive pricing by Japanese manufacturers in Japan, as conduct not affecting American commerce, nor the agreements among these manufacturers to limit the number of their distributors in the United States and to set minimum export prices, as conduct not injurious to their American competitors, can by themselves give competing American manufacturers a cognizable claim against the Japanese companies for antitrust damages, it is improper to treat evidence of these alleged conspiracies as direct evidence of a further

conspiracy that injured the American companies.

[***LEdHN6]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §67

parties entitled to damages -- cognizable injury --

Headnote:[6A][6B]

However one decides to describe the contours of an alleged conspiracy to violate the antitrust laws, parties suing for damages therefrom must show that the conspiracy caused them an injury for which the antitrust laws provide relief.

[***LEdHN7]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §36

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §67

predatory pricing -- requisites for antitrust injury --

Headnote:[7A][7B]

In an action under 1 of the Sherman Act (*15 USCS 1*) by American manufacturers who allege a predatory pricing conspiracy by their Japanese competitors, the American companies have not suffered an antitrust injury unless the Japanese companies have conspired to drive them out of the relevant markets by (1) pricing below the level necessary to sell their products, or (2) pricing below some appropriate measure of cost; they may not complain of conspiracies that set maximum prices above market levels, or that set minimum prices at any level. (White, Brennan, Blackmun, and Stevens, JJ., dissented from this holding.)

[***LEdHN8]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §4

antitrust conspiracy claim --

Headnote:[8]

In order for an action by American manufacturers, charging their Japanese competitors with a conspiracy to violate 1 and 2 of the Sherman Act (*15 USCS 1, 2*) and 2(a) of the Robinson-Patman Act (*15 USCS 13(a)*), to survive the Japanese companies' motion for summary judgment, the American companies must establish that there is a genuine issue of material fact as to whether the Japanese companies entered into an illegal conspiracy that caused the American companies to suffer a cognizable injury.

[***LEdHN9]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §4

antitrust conspiracy claim -- showing of injury --

Headnote:[9]

In order for an action by American manufacturers, charging their Japanese competitors with various conspiracies in restraint of trade, to survive the Japanese companies' motion for summary judgment, the American companies must not only show a conspiracy in violation of the antitrust laws, but must also show an injury to them resulting from the illegal conduct; since, except for an alleged conspiracy to monopolize the American market through predatory pricing, the alleged conspiracies could not have caused the American companies to suffer an antitrust injury because they actually tended to benefit them, evidence of these "other" conspiracies cannot defeat the motion for summary judgment unless, in context, it raises a genuine issue concerning the existence of a predatory pricing conspiracy.

[***LEdHN10]

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §4

genuine issue of material fact --

Headnote:[10]

When a party moving for summary judgment has carried its burden under *Rule 56(c) of the Federal Rules of Civil Procedure* of demonstrating the absence of a genuine issue of material fact, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts; the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial; where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

[***LEdHN11]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §36

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §4

antitrust conspiracy claim -- implausibility --

Headnote:[11A][11B]

In an action by American manufacturers charging their Japanese competitors with a conspiracy to monopolize the American market through predatory pricing, if the factual context renders the claim implausible--if the claim is one that simply makes no economic sense--then the American companies must come forward with more persuasive evidence to support their claim than would otherwise be necessary in order to defeat the Japanese companies' motion for summary judgment; the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of *Rule 56(e) of the Federal Rules of Civil Procedure*, since, if the Japanese companies had no rational economic motive to conspire, and their conduct is consistent with other, equally plausible explanations such as competitive behavior or an attempt to raise prices, the conduct does not give rise to an inference of conspiracy. (White, Brennan, Blackmun, and Stevens, JJ., dissented from this holding.)

[***LEdHN12]

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5

inferences in favor of nonmoving party --

Headnote:[12]

475 U.S. 574, *; 106 S. Ct. 1348, **;
89 L. Ed. 2d 538, ***LEdHN12; 1986 U.S. LEXIS 38

On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.

[***LEdHN13]

EVIDENCE §394

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

inferences as to conspiracy -- antitrust case --

Headnote:[13]

Antitrust law limits the range of permissible inferences from ambiguous evidence in a case under 1 of the Sherman Act (*15 USCS 1*); thus, conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.

[***LEdHN14]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §4

TRIAL §197

antitrust conspiracy -- possibility of independent action --

Headnote:[14]

In order to survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of 1 of the Sherman Act (*15 USCS 1*) must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.

[***LEdHN15]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §10

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §4

antitrust conspiracy claim -- competing inferences --

Headnote:[15]

In an action by American manufacturers charging their Japanese competitors with a conspiracy to monopolize the American market through predatory pricing, the American companies, in order to defeat a motion for summary judgment, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed them.

SYLLABUS

Petitioners are 21 Japanese corporations or Japanese-controlled American corporations that manufacture and/or sell "consumer electronic products" (CEPs) (primarily television sets). Respondents are American corporations that manufacture and sell television sets. In 1974, respondents brought an action in Federal District Court, alleging that petitioners, over a 20-year period, had illegally conspired to drive American firms from the American CEP market by engaging in a scheme to fix and maintain artificially high prices for television sets sold by petitioners in Japan and, at the same time, to fix and maintain low prices for the sets exported to and sold in the United States. Respondents claim that various portions of this scheme violated, *inter alia*, §§ *1* and *2* of the Sherman Act, § *2(a)* of the Robinson-Patman Act, and § 73 of the Wilson Tariff Act. After several years of discovery, petitioners moved for summary judgment on all claims. The District Court then directed the parties to file statements listing all the documentary evidence that would be offered if the case went to trial. After the statements were filed, the court found the bulk of the evidence on which respondents relied was inadmissible, that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged conspiracy, and that any inference of conspiracy was unreasonable. Summary judgment therefore was granted in petitioners' favor. The Court of Appeals reversed. After determining that much of the evidence excluded by the District Court was admissible, the Court of Appeals held that the District Court erred in granting a summary judgment and that there was both direct and circumstantial evidence of a conspiracy. Based on inferences drawn from the evidence, the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by

475 U.S. 574, *; 106 S. Ct. 1348, **;
89 L. Ed. 2d 538, ***LEdHN15; 1986 U.S. LEXIS 38

excess profits obtained in the Japanese market.

*Held*: The Court of Appeals did not apply proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment. Pp. 582-598.

(a) The "direct evidence" on which the Court of Appeals relied -- petitioners' alleged supracompetitive pricing in Japan, the "five company rule" by which each Japanese producer was permitted to sell only to five American distributors, and the "check prices" (minimum prices fixed by agreement with the Japanese Government for CEPs exported to the United States) insofar as they established minimum prices in the United States -- cannot by itself give respondents a cognizable claim against petitioners for antitrust damages. Pp. 582-583.

(b) To survive petitioners' motion for a summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. If the factual context renders respondents' claims implausible, *i. e.*, claims that make no economic sense, respondents must offer more persuasive evidence to support their claims than would otherwise be necessary. To survive a motion for a summary judgment, a plaintiff seeking damages for a violation of *§ 1* of the Sherman Act must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Thus, respondents here must show that the inference of a conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. Pp. 585-588.

(c) Predatory pricing conspiracies are by nature speculative. They require the conspirators to sustain substantial losses in order to recover uncertain gains. The alleged conspiracy is therefore implausible. Moreover, the record discloses that the alleged conspiracy has not succeeded in over two decades of operation. This is strong evidence that the conspiracy does not in fact exist. The possibility that petitioners have obtained supracompetitive profits in the Japanese market does not alter this assessment. Pp. 588-593.

(d) Mistaken inferences in cases such as this one are especially costly, because they chill the very conduct that the antitrust laws are designed to protect. There is little reason to be concerned that by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage conspiracies. Pp. 593-595.

(e) The Court of Appeals erred in two respects: the "direct evidence" on which it relied had little, if any, relevance to the alleged predatory pricing conspiracy, and the court failed to consider the absence of a plausible motive to engage in predatory pricing. In the absence of any rational motive to conspire, neither petitioners' pricing practices, their conduct in the Japanese market, nor their agreements respecting prices and distributions in the American market sufficed to create a "genuine issue for trial" under *Federal Rule of Civil Procedure 56(e)*. On remand, the Court of Appeals may consider whether there is other, unambiguous evidence of the alleged conspiracy. Pp. 595-598.

**COUNSEL:** Donald J. Zoeller argued the cause for petitioners. With him on the briefs were John L. Altieri, Jr., Harold G. Levison, Peter J. Gartland, James S. Morris, Kevin R. Keating, Charles F. Schirmeister, Ira M. Millstein, A. Paul Victor, Jeffrey L. Kessler, Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Donald F. Turner, and Henry T. Reath.

Charles F. Rule argued the cause pro hac vice for the United States as amicus curiae urging reversal. With him on the brief were Acting Solicitor General Wallace, Charles S. Stark, Robert B. Nicholson, Edward T. Hand, Richard P. Larm, Abraham D. Sofaer, and Elizabeth M. Teel.

Edwin P. Rome argued the cause for respondents. With him on the brief were William H. Roberts, Arnold I. Kalman, Philip J. Curtis, and John Borst, Jr. *

* Briefs of amici curiae urging reversal were filed for the Government of Japan by Stephen M. Shapiro; and for the American Association of Exporters and Importers et al. by Robert Herzstein and Hadrian R. Katz.

Briefs of amici curiae were filed for the Government of Australia et al. by Mark R. Joelson and Joseph P. Griffin; and for the Semiconductor Industry Association by Joseph R. Creighton.

**JUDGES:** POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and MARSHALL,

475 U.S. 574, *; 106 S. Ct. 1348, **;
89 L. Ed. 2d 538, ***; 1986 U.S. LEXIS 38

REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, post, p. 598.

**OPINION BY:** POWELL

**OPINION**

[*576] [***546] [**1350] JUSTICE POWELL delivered the opinion of the Court.

[***LEdHR1A] [1A]This case requires that we again consider the standard district courts must apply [**1351] when deciding whether to grant summary judgment in an antitrust conspiracy case.

I

Stating the facts of this case is a daunting task. The opinion of the Court of Appeals for the Third Circuit runs to 69 pages; the primary opinion of the District Court is more than three times as long. *In re Japanese Electronic Products* [*577] *Antitrust Litigation, 723 F.2d 238 (CA3 1983); 513 F.Supp. 1100 (ED Pa. 1981).* Two respected District Judges each have authored a number of opinions in this case; the published ones alone would fill an entire volume of the Federal Supplement. In addition, the parties have filed a 40-volume appendix in this Court that is said to contain the essence of the evidence on which the District Court and the Court of Appeals based their respective decisions.

We will not repeat what these many opinions have stated and restated, or summarize the mass of documents that constitute the record on appeal. Since we review only the standard applied by the Court of Appeals in deciding this case, and not the weight assigned to particular pieces of evidence, we find it unnecessary to state the facts in great detail. What follows is a summary of this case's long history.

A

Petitioners, defendants below, are 21 corporations that manufacture or sell "consumer electronic products" (CEPs) -- for the most part, television sets. Petitioners include both Japanese manufacturers of CEPs and American firms, controlled by Japanese parents, that sell the Japanese-manufactured products. Respondents, plaintiffs below, are Zenith Radio Corporation (Zenith) and National Union Electric Corporation (NUE). Zenith

is an American firm that manufactures and sells television sets. NUE is the corporate successor to Emerson Radio Company, an American firm that manufactured and sold television sets until 1970, when it withdrew from the market after sustaining substantial losses. Zenith and NUE began this lawsuit in 1974, [1] claiming that petitioners had illegally conspired to drive [*578] American firms from the American CEP market. According to respondents, the gist of this conspiracy [***547] was a "'scheme to raise, fix and maintain artificially *high* prices for television receivers sold by [petitioners] in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States.'" *723 F.2d, at 251* (quoting respondents' preliminary pretrial memorandum). These "low prices" were allegedly at levels that produced substantial losses for petitioners. *513 F.Supp., at 1125.* The conspiracy allegedly began as early as 1953, and according to respondents was in full operation by sometime in the late 1960's. Respondents claimed that various portions of this scheme violated §§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, § 73 of the Wilson Tariff Act, and the Antidumping Act of 1916.

1  NUE had filed its complaint four years earlier, in the District Court for the District of New Jersey. Zenith's complaint was filed separately in 1974, in the Eastern District of Pennsylvania. The two cases were consolidated in the Eastern District of Pennsylvania in 1974.

After several years of detailed discovery, petitioners filed motions for summary judgment on all claims against them. The District Court directed the parties to file, with preclusive effect, "Final Pretrial Statements" listing all the documentary evidence that would be offered if the case proceeded to trial. Respondents filed such a statement, and petitioners responded with a series of motions challenging the admissibility of respondents' evidence. In three detailed opinions, the District Court found the bulk of the evidence on which Zenith and NUE relied inadmissible. [2]

2  The inadmissible evidence included various government records and reports, *Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp. 1125 (ED Pa. 1980),* business documents offered pursuant to various hearsay exceptions, *Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp. 1190 (ED Pa. 1980),*

475 U.S. 574, *578; 106 S. Ct. 1348, **1351;
89 L. Ed. 2d 538, ***547; 1986 U.S. LEXIS 38

and a large portion of the expert testimony that respondents proposed to introduce. *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co.*, *505 F.Supp. 1313 (ED Pa. 1981).*

[**1352] [***LEdHR2A] [2A]The District Court then turned to petitioners' motions for summary judgment. In an opinion spanning 217 pages, the court found that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged [*579] conspiracy. At bottom, the court found, respondents' claims rested on the inferences that could be drawn from petitioners' parallel conduct in the Japanese and American markets, and from the effects of that conduct on petitioners' American competitors. *513 F.Supp., at 1125-1127.*After reviewing the evidence both by category and *in toto*, the court found that any inference of conspiracy was unreasonable, because (i) some portions of the evidence suggested that petitioners conspired in ways that did not injure respondents, and (ii) the evidence that bore directly on the alleged price-cutting conspiracy did not rebut the more plausible inference that petitioners were cutting prices to compete in the American market and not to monopolize it. Summary judgment therefore was granted on respondents' claims under *§ 1* of the Sherman Act and the Wilson Tariff Act. Because the Sherman Act *§ 2* claims, which alleged that petitioners had combined to monopolize the American CEP market, were functionally indistinguishable from the *§ 1* claims, the court dismissed them also. Finally, the court found that the Robinson-Patman Act claims depended on the same supposed conspiracy as the Sherman Act claims. Since the court had found no genuine issue of fact as to the conspiracy, [***548] it entered judgment in petitioners' favor on those claims as well. [3]

3    The District Court ruled separately that petitioners were entitled to summary judgment on respondents' claims under the Antidumping Act of 1916. *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co.*, *494 F.Supp. 1190 (ED Pa. 1980).* Respondents appealed this ruling, and the Court of Appeals reversed in a separate opinion issued the same day as the opinion concerning respondents' other claims. *In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 319 (CA3 1983).*

[***LEdHR2B] [2B]Petitioners ask us to review the Court of Appeals' Antidumping Act decision along with its decision on the rest of this mammoth case. The Antidumping Act claims were not, however, mentioned in the questions presented in the petition for certiorari, and they have not been independently argued by the parties. See this Court's Rule 21.1(a). We therefore decline the invitation to review the Court of Appeals' decision on those claims.

[*580] B

The Court of Appeals for the Third Circuit reversed. [4] The court began by examining the District Court's evidentiary rulings, and determined that much of the evidence excluded by the District Court was in fact admissible. *723 F.2d, at 260-303.* These evidentiary rulings are not before us. See *471 U.S. 1002 (1985)* (limiting grant of certiorari).

4    As to 3 of the 24 defendants, the Court of Appeals affirmed the entry of summary judgment. Petitioners are the 21 defendants who remain in the case.

On the merits, and based on the newly enlarged record, the court found that the District Court's summary judgment decision was improper. The court acknowledged that "there are legal limitations upon the inferences which may be drawn from circumstantial evidence," *723 F.2d, at 304,* but it found that "the legal problem . . . is different" when "there is direct evidence of concert of action." *Ibid.* Here, the court concluded, "there is both direct evidence of certain kinds of concert of action and circumstantial evidence having some tendency to suggest that other kinds of concert of action may have occurred." *Id., at 304-305.* Thus, the court reasoned, cases concerning the limitations on inferring conspiracy from ambiguous evidence were not dispositive. *Id., at 305.* Turning to the evidence, the court determined that a factfinder reasonably could draw the following conclusions:

1. The Japanese market for CEPs was characterized by oligopolistic behavior, [**1353] with a small number of producers meeting regularly and exchanging information on price and other matters. *Id., at 307.* This created the opportunity for a stable combination to raise both prices and profits in Japan. American firms could not attack such a combination because the Japanese

475 U.S. 574, *580; 106 S. Ct. 1348, **1353;
89 L. Ed. 2d 538, ***LEdHR2B; 1986 U.S. LEXIS 38

Government imposed significant barriers to entry. *Ibid.*

2. Petitioners had relatively higher fixed costs than their American counterparts, and therefore needed to [*581] operate at something approaching full capacity in order to make a profit. *Ibid.*

3. Petitioners' plant capacity exceeded the needs of the Japanese market. *Ibid.*

4. By formal agreements arranged in cooperation with Japan's Ministry of International Trade and Industry (MITI), petitioners fixed minimum prices for CEPs exported to the American market. *Id., at 310.* The parties refer to these prices as the "check [***549] prices," and to the agreements that require them as the "check price agreements."

5. Petitioners agreed to distribute their products in the United States according to a "five company rule": each Japanese producer was permitted to sell only to five American distributors. *Ibid.*

6. Petitioners undercut their own check prices by a variety of rebate schemes. *Id., at 311.* Petitioners sought to conceal these rebate schemes both from the United States Customs Service and from MITI, the former to avoid various customs regulations as well as action under the antidumping laws, and the latter to cover up petitioners' violations of the check-price agreements.

Based on inferences from the foregoing conclusions, 5 the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude that petitioners' price-cutting behavior was independent and not conspiratorial.

5  In addition to these inferences, the court noted that there was expert opinion evidence that petitioners' export sales "generally were at prices which produced losses, often as high as twenty-five percent on sales." *723 F.2d, at 311.* The court did not identify any direct evidence of below-cost pricing; nor did it place particularly heavy reliance on this aspect of the expert evidence. See n. 19, *infra.*

[*582] The court found it unnecessary to address petitioners' claim that they could not be held liable under the antitrust laws for conduct that was compelled by a foreign sovereign. The claim, in essence, was that because MITI required petitioners to enter into the check-price agreements, liability could not be premised on those agreements. The court concluded that this case did not present any issue of sovereign compulsion, because the check-price agreements were being used as "evidence of a low export price conspiracy" and not as an independent basis for finding antitrust liability. The court also believed it was unclear that the check prices in fact were mandated by the Japanese Government, notwithstanding a statement to that effect by MITI itself. *Id., at 315.*

[***LEdHR1B] [1B]We granted certiorari to determine (i) whether the Court of Appeals applied the proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment, and (ii) whether petitioners could be held liable under the antitrust laws for a conspiracy in part compelled by a foreign sovereign. *471 U.S. 1002 (1985).*We reverse on the first issue, but do not reach the second.

II

[***LEdHR3A] [3A] [***LEdHR4] [4] [***LEdHR5] [5]We begin by emphasizing what respondents' claim is *not.* Respondents cannot recover antitrust damages based solely on an alleged cartelization of the Japanese market, because American antitrust laws do not regulate the competitive conditions of other nations' economies. [**1354] *United States v. Aluminum Co. of America, 148 F.2d 416, 443 (CA2 1945)* (L. Hand, J.); 1 P. [***550] Areeda & D. Turner, Antitrust Law para. 236d (1978). 6 Nor can respondents recover damages for [*583] any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act, *United States v. Trenton Potteries Co., 273 U.S. 392 (1927)*; *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940)*, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price in CEPs. Cf. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488-489 (1977).* Finally, for the same reason, respondents cannot recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output. Such restrictions, though

475 U.S. 574, *583; 106 S. Ct. 1348, **1354;
89 L. Ed. 2d 538, ***550; 1986 U.S. LEXIS 38

harmful to competition, actually *benefit* competitors by making supra-competitive pricing more attractive. Thus, neither petitioners' alleged supracompetitive pricing in Japan, nor the five company rule that limited distribution in this country, nor the check prices insofar as they established minimum prices in this country, can by themselves give respondents a cognizable claim against petitioners for antitrust damages. The Court of Appeals therefore erred to the extent that it found evidence of these alleged conspiracies to be "direct evidence" of a conspiracy that injured respondents. See *723 F.2d, at 304-305.*

[***LEdHR3B] [3B]

6   The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce. *Continental Ore Co.* v. *Union Carbide & Carbon Corp., 370 U.S. 690, 704 (1962)* ("A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries"). The effect on which respondents rely is the artificially depressed level of prices for CEPs in the United States.

Petitioners' alleged cartelization of the Japanese market could not have caused that effect over a period of some two decades. Once petitioners decided, as respondents allege, to reduce output and raise prices in the Japanese market, they had the option of either producing fewer goods or selling more goods in other markets. The most plausible conclusion is that petitioners chose the latter option because it would be more profitable than the former. That choice does not flow from the cartelization of the Japanese market. On the contrary, were the Japanese market perfectly competitive petitioners would still have to choose whether to sell goods overseas, and would still presumably make that choice based on their profit expectations. For this reason, respondents' theory of recovery depends on proof of the asserted price-cutting conspiracy in this country.

[*584]     [***LEdHR6A]     [6A]Respondents

nevertheless argue that these supposed conspiracies, if not themselves grounds for recovery of antitrust damages, are circumstantial evidence of another conspiracy that *is* cognizable: a conspiracy to monopolize the American market by means of pricing below the market level. [7] The thrust of respondents' [***551] argument is that petitioners used their monopoly profits from the Japanese market to fund a concerted campaign to price predatorily and thereby drive respondents and other American manufacturers of CEPs out of business. Once successful, according to respondents, petitioners would cartelize the American CEP market, restricting output and raising prices above the level that fair competition would produce. The resulting [**1355] monopoly profits, respondents contend, would more than compensate petitioners for the losses they incurred through years of pricing below market level.

[***LEdHR6B] [6B]

7   Respondents also argue that the check prices, the five company rule, and the price fixing in Japan are all part of one large conspiracy that includes monopolization of the American market through predatory pricing. The argument is mistaken. However one decides to describe the contours of the asserted conspiracy -- whether there is one conspiracy or several -- respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief. *Associated General Contractors of California, Inc.* v. *Carpenters, 459 U.S. 519, 538-540 (1983); Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488-489 (1977);* see also Note, Antitrust Standing, Antitrust Injury, and the Per Se Standard, *93 Yale L.J. 1309 (1984).* That showing depends in turn on proof that petitioners conspired to price predatorily in the American market, since the other conduct involved in the alleged conspiracy cannot have caused such an injury.

[***LEdHR7A] [7A]The Court of Appeals found that respondents' allegation of a horizontal conspiracy to engage in predatory pricing, [8] [*585] if proved, [9] would be a *per se* violation of *§ 1* of the Sherman Act. 723 F.2d, at 306. Petitioners did not appeal from that conclusion. The issue in this case thus becomes whether respondents adduced sufficient evidence in support of their theory to survive summary judgment. We therefore examine the principles that govern the summary judgment

475 U.S. 574, *585; 106 S. Ct. 1348, **1355;
89 L. Ed. 2d 538, ***LEdHR7A; 1986 U.S. LEXIS 38

determination.

8    Throughout this opinion, we refer to the asserted conspiracy as one to price "predatorily." This term has been used chiefly in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in. *E. g., Southern Pacific Communications Co.* v. *American Telephone & Telegraph Co., 238 U. S. App. D. C. 309, 331-336, 740 F.2d 980, 1002-1007 (1984),* cert. denied, *470 U.S. 1005 (1985).* In such cases, "predatory pricing" means pricing below some appropriate measure of cost. *E. g., Barry Wright Corp.* v. *ITT Grinnell Corp., 724 F.2d 227, 232-235 (CA1 1983);* see *Utah Pipe Co.* v. *Continental Baking Co., 386 U.S. 685, 698, 701, 702, n. 14 (1967).*

[***LEdHR7B] [7B]There is a good deal of debate, both in the cases and in the law reviews, about what "cost" is relevant in such cases. We need not resolve this debate here, because unlike the cases cited above, this is a Sherman Act § 1 case. For purposes of this case, it is enough to note that respondents have not suffered an antitrust injury unless petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost. An agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices. Respondents therefore may not complain of conspiracies that, for example, set maximum prices above market levels, or that set minimum prices at *any* level.

9    We do not consider whether recovery should *ever* be available on a theory such as respondents' when the pricing in question is above some measure of incremental cost. See generally Areeda & Turner, Predatory Pricing and Related Practices Under *Section 2* of the Sherman Act, 88 Harv. L. Rev. 697, 709-718 (1975) (discussing cost-based test for use in *§ 2* cases). As a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational

businesses would not enter into conspiracies such as this one. See Part IV-A, *infra.*

III

[***LEdHR8] [8] [***LEdHR9] [9]To survive petitioners' motion for summary judgment, [10] respondents must establish that there [***552] is a genuine issue of material [*586] fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. *Fed. Rule Civ. Proc. 56(e);* [11]*First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-289 (1968).* This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. Respondents charge petitioners with a whole host of conspiracies in restraint of trade. *Supra, at 582-583.* Except for the alleged conspiracy to monopolize the American market through predatory pricing, these alleged conspiracies could not have caused respondents to suffer an "antitrust injury," [**1356] *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc., 429 U.S., at 489,* because they actually tended to benefit respondents. *Supra, at 582-583.* Therefore, unless, in context, evidence of these "other" conspiracies raises a genuine issue concerning the existence of a predatory pricing conspiracy, that evidence cannot defeat petitioners' summary judgment motion.

10    Respondents argued before the District Court that petitioners had failed to carry their initial burden under *Federal Rule of Civil Procedure 56(c)* of demonstrating the absence of a genuine issue of material fact. See *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).* Cf. *Catrett v. Johns-Manville Sales Corp., 244 U. S. App. D. C. 160, 756 F.2d 181,* cert. granted, *474 U.S. 944 (1985).* That issue was resolved in petitioners' favor, and is not before us.

11    *Rule 56(e)* provides, in relevant part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall

475 U.S. 574, *586; 106 S. Ct. 1348, **1356;
89 L. Ed. 2d 538, ***552; 1986 U.S. LEXIS 38

be entered against him."

[***LEdHR10] [10]Second, the issue of fact must be "genuine." *Fed. Rules Civ. Proc. 56(c), (e).* When the moving party has carried its burden under *Rule 56(c),* [12] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. See *DeLuca v. Atlantic Refining Co., 176 F.2d 421, 423 (CA2 1949)* (L. Hand, J.), cert. denied, *338 U.S. 943 (1950);* 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (1983); Clark, Special Problems [*587] in Drafting and Interpreting Procedural Codes and Rules, 3 Vand. L. Rev. 493, 504-505 (1950). Cf. *Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944).* In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" *Fed. Rule Civ. Proc. 56(e)* (emphasis added). See also Advisory Committee Note to 1963 Amendment of *Fed. Rule Civ. Proc. 56(e),* 28 U. S. C. App., p. 626 (purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Cities Service, supra, at 289.*

12  See n. 10, *supra.*

[***LEdHR11A] [11A]It follows from these settled principles that if the factual context renders respondents' claim implausible -- if the claim is one that simply makes no economic sense -- respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary. *Cities Service* is instructive. [***553] The issue in that case was whether proof of the defendant's refusal to deal with the plaintiff supported an inference that the defendant willingly had joined an illegal boycott. Economic factors strongly suggested that the defendant had no motive to join the alleged conspiracy. *391 U.S., at 278-279.* The Court acknowledged that, in isolation, the defendant's refusal to deal might well have sufficed to create a triable issue. *Id., at 277.* But the refusal to deal had to be evaluated in its factual context. Since the defendant lacked any rational motive to join the alleged boycott, and since its refusal to deal was consistent with the defendant's independent interest, the refusal to deal could not by itself support a finding of antitrust liability. *Id., at 280.*

[***LEdHR12]  [12]  [***LEdHR13]  [13] [***LEdHR14]  [14]  [***LEdHR15]  [15]Respondents correctly note that "[on] summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc., 369* [*588] *U.S. 654, 655 (1962).*But antitrust law limits the range of permissible inferences from ambiguous evidence in a *§ 1* case. Thus, in *Monsanto  Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984),* we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id., at 764.* See also *Cities Service, supra, at 280.* To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of *§ 1* must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *465 U.S., at 764.* Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that [**1357] could not have harmed respondents. See *Cities Service, supra, at 280.*

Petitioners argue that these principles apply fully to this case.  According to petitioners, the alleged conspiracy is one that is economically irrational and practically infeasible.  Consequently, petitioners contend, they had no motive to engage in the alleged predatory pricing conspiracy; indeed, they had a strong motive *not* to conspire in the manner respondents allege. Petitioners argue that, in light of the absence of any apparent motive and the ambiguous nature of the evidence of conspiracy, no trier of fact reasonably could find that the conspiracy with which petitioners are charged actually existed.  This argument requires us to consider the nature of the alleged conspiracy and the practical obstacles to its implementation.

IV

A

A predatory pricing conspiracy is by nature speculative.  Any agreement to price below the competitive level requires the conspirators to forgo profits that free competition would offer them.  The forgone profits may be considered an investment in the future.  For the investment [***554] to be rational, [*589]  the conspirators must have a reasonable

expectation of recovering, in the form of later monopoly profits, more than the losses suffered. As then-Professor Bork, discussing predatory pricing by a single firm, explained:

"Any realistic theory of predation recognizes that the predator as well as his victims will incur losses during the fighting, but such a theory supposes it may be a rational calculation for the predator to view the losses as an investment in future monopoly profits (where rivals are to be killed) or in future undisturbed profits (where rivals are to be disciplined). The future flow of profits, appropriately discounted, must then exceed the present size of the losses." R. Bork, The Antitrust Paradox 145 (1978).

See also McGee, Predatory Pricing Revisited, 23 J. Law & Econ. 289, 295-297 (1980). As this explanation shows, the success of such schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, "[the] predator must make a substantial investment with no assurance that it will pay off." Easterbrook, Predatory Strategies and Counterstrategies, 48 U. Chi. L. Rev. 263, 268 (1981). For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful. See, *e. g.*, Bork, *supra*, at 149-155; Areeda & Turner, Predatory Pricing and Related Practices Under *Section 2* of the Sherman Act, 88 Harv. L. Rev. 697, 699 (1975); Easterbrook, *supra*; Koller, The Myth of Predatory Pricing -- An Empirical Study, [*590] 4 Antitrust Law & Econ. Rev. 105 (1971); McGee, Predatory Price Cutting: The *Standard Oil (N. J.) Case*, 1 J. Law & Econ. 137 (1958); McGee, Predatory Pricing Revisited, 23 J. Law & Econ., at 292-294. See also *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co.*, 651 F.2d 76, 88 (CA2 1981) ("[Nowhere] in the recent outpouring of literature on the subject do commentators suggest that [predatory] pricing is either common or likely to increase"), cert. denied, *455 U.S. 943 (1982)*.

These observations apply even to predatory pricing by a *single firm* seeking monopoly power. In this case, respondents allege that a large number of firms have conspired over a period of many years to [**1358] charge below-market prices in order to stifle competition. Such a conspiracy is incalculably more difficult to execute than an analogous plan undertaken by a single predator. The conspirators must allocate the losses to be sustained during the conspiracy's operation, and must also allocate any gains to be realized from its success. Precisely because success is speculative and depends on a willingness to endure losses for an indefinite period, each conspirator has a strong incentive to cheat, letting its partners suffer the losses necessary to [***555] destroy the competition while sharing in any gains if the conspiracy succeeds. The necessary allocation is therefore difficult to accomplish. Yet if conspirators cheat to any substantial extent, the conspiracy must fail, because its success depends on depressing the market price for *all* buyers of CEPs. If there are too few goods at the artificially low price to satisfy demand, the would-be victims of the conspiracy can continue to sell at the "real" market price, and the conspirators suffer losses to little purpose.

Finally, if predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power seem slight. In order to recoup their losses, petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits [*591] what they earlier gave up in below-cost prices. See *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co., supra*, at 89; Areeda & Turner, 88 Harv. L. Rev., at 698. Two decades after their conspiracy is alleged to have commenced, [13] petitioners appear to be far from achieving this goal: the two largest shares of the retail market in television sets are held by RCA and respondent Zenith, not by any of petitioners. 6 App. to Brief for Appellant in No. 81-2331 (CA3), pp. 2575a-2576a. Moreover, those shares, which together approximate 40% of sales, did not decline appreciably during the 1970's. *Ibid.* Petitioners' collective share rose rapidly during this period, from one-fifth or less of the relevant markets to close to 50%. *723 F.2d, at 316.* [14] Neither the District Court nor the Court of Appeals found, however, that petitioners' share presently allows them to charge monopoly prices; to the contrary, respondents contend that the conspiracy is ongoing -- that petitioners are still

475 U.S. 574, *591; 106 S. Ct. 1348, **1358;
89 L. Ed. 2d 538, ***555; 1986 U.S. LEXIS 38

artificially *depressing* the market price in order to drive Zenith out of the market. The data in the record strongly suggest that that goal is yet far distant. [15]

13    NUE's complaint alleges that petitioners' conspiracy began as early as 1960; the starting date used in Zenith's complaint is 1953. NUE Complaint para. 52; Zenith Complaint para. 39.

14    During the same period, the number of American firms manufacturing television sets declined from 19 to 13. 5 App. to Brief for Appellant in No. 81-2331 (CA3), p. 1961a. This decline continued a trend that began at least by 1960, when petitioners' sales in the United States market were negligible. *Ibid.* See Zenith Complaint paras. 35, 37.

15    Respondents offer no reason to suppose that entry into the relevant market is especially difficult, yet without barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time. Judge Easterbrook, commenting on this case in a law review article, offers the following sensible assessment:

"The plaintiffs [in this case] maintain that for the last fifteen years or more at least ten Japanese manufacturers have sold TV sets at less than cost in order to drive United States firms out of business. Such conduct cannot possibly produce profits by harming competition, however. If the Japanese firms drive some United States firms out of business, they could not recoup. Fifteen years of losses could be made up only by very high prices for the indefinite future. (The losses are like investments, which must be recovered with compound interest.) If the defendants should try to raise prices to such a level, they would attract new competition. There are no barriers to entry into electronics, as the proliferation of computer and audio firms shows. The competition would come from resurgent United States firms, from other foreign firms (Korea and many other nations make TV sets), and from defendants themselves. In order to recoup, the Japanese firms would need to suppress competition among themselves. On plaintiffs' theory, the cartel would need to last at least thirty years, far longer than any in history, even when cartels were not illegal. None should be sanguine about the prospects of such a cartel,

given each firm's incentive to shave price and expand its share of sales. The predation recoupment story therefore does not make sense, and we are left with the more plausible inference that the Japanese firms did not sell below cost in the first place. They were just engaged in hard competition." Easterbrook, The Limits of Antitrust, *63 Texas L. Rev. 1, 26-27 (1984)* (footnotes omitted).

[*592] [**1359] The [***556] alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist. Since the losses in such a conspiracy accrue before the gains, they must be "repaid" with interest. And because the alleged losses have accrued over the course of two decades, the conspirators could well require a correspondingly long time to recoup. Maintaining supracompetitive prices in turn depends on the continued cooperation of the conspirators, on the inability of other would-be competitors to enter the market, and (not incidentally) on the conspirators' ability to escape antitrust liability for their *minimum* price-fixing cartel. [16] Each of these factors weighs more heavily as the time needed to recoup losses grows. If the losses have been substantial -- as would likely be necessary [*593] in order to drive out the competition [17] -- petitioners would most likely have to sustain their cartel for years simply to break even.

16    The alleged predatory scheme makes sense only if petitioners can recoup their losses. In light of the large number of firms involved here, petitioners can achieve this only by engaging in some form of price fixing *after* they have succeeded in driving competitors from the market. Such price fixing would, of course, be an independent violation of § 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940).*

17    The predators' losses must actually *increase* as the conspiracy nears its objective: the greater the predators' market share, the more products the predators sell; but since every sale brings with it a loss, an increase in market share also means an increase in predatory losses.

Nor does the possibility that petitioners have obtained supracompetitive profits in the Japanese market change this calculation. Whether or not petitioners have

475 U.S. 574, *593; 106 S. Ct. 1348, **1359;
89 L. Ed. 2d 538, ***556; 1986 U.S. LEXIS 38

the *means* to sustain substantial losses in this country over a long period of time, they have no *motive* to sustain such losses absent some strong likelihood that the alleged conspiracy in this country will eventually pay off. The courts below found no evidence of any such success, and -- as indicated above -- the facts actually are to the contrary: RCA and Zenith, not any of the petitioners, continue to hold the largest share of the American retail market in color television sets. More important, there is nothing to suggest any relationship between petitioners' profits in Japan and the amount petitioners could expect to gain from a conspiracy to monopolize the American market. In the absence of any such evidence, the possible existence of supracompetitive profits in Japan simply cannot overcome the economic obstacles to the ultimate success of this alleged predatory conspiracy. [18]

18    The same is true of any supposed excess production capacity that petitioners may have possessed. The existence of plant capacity that exceeds domestic demand does tend to establish the ability to sell products abroad. It does not, however, provide a motive for selling at prices lower than necessary to obtain sales; nor does it explain why petitioners would be willing to *lose* money in the United States market without some reasonable prospect of recouping their investment.

B

[***557] In *Monsanto*, we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct. *Monsanto*, 465 U.S., at 762-764. [*594] Respondents, petitioners' competitors, seek to hold petitioners liable for [**1360] damages caused by the alleged conspiracy to cut prices. Moreover, they seek to establish this conspiracy indirectly, through evidence of other combinations (such as the check-price agreements and the five company rule) whose natural tendency is to raise prices, and through evidence of rebates and other price-cutting activities that respondents argue tend to prove a combination to suppress prices. [19] But cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. See *Monsanto, supra*, at 763-764. "[We] must be concerned lest a rule or precedent that authorizes a search

for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Barry Wright Corp.* v. *ITT Grinnell Corp.*, *724 F.2d 227, 234 (CA1 1983)*.

19    Respondents also rely on an expert study suggesting that petitioners have sold their products in the American market at substantial losses. The relevant study is not based on actual cost data; rather, it consists of expert opinion based on a mathematical construction that in turn rests on assumptions about petitioners' costs. The District Court analyzed those assumptions in some detail and found them both implausible and inconsistent with record evidence. *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co., 505 F.Supp., at 1356-1363.* Although the Court of Appeals reversed the District Court's finding that the expert report was inadmissible, the court did not disturb the District Court's analysis of the factors that substantially undermine the probative value of that evidence. See *723 F.2d, at 277-282.* We find the District Court's analysis persuasive. Accordingly, in our view the expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors, discussed in Part IV-A, *supra*, that suggest that such conduct is irrational.

In most cases, this concern must be balanced against the desire that illegal conspiracies be identified and punished. That balance is, however, unusually one-sided in cases such as this one. As we earlier explained, *supra, at 588-593*, predatory pricing schemes require conspirators to suffer losses in order eventually to realize their illegal gains; moreover, the [*595] gains depend on a host of uncertainties, making such schemes more likely to fail than to succeed. These economic realities tend to make predatory pricing conspiracies self-deterring: unlike most other conduct that violates the antitrust laws, failed predatory pricing schemes are costly to the conspirators. See Easterbrook, The Limits of Antitrust, *63 Texas L. Rev. 1, 26 (1984).* Finally, unlike predatory pricing by a single firm, *successful* predatory pricing conspiracies involving a large number of firms can be identified and punished once they succeed, since some form of minimum price-fixing agreement would be necessary in order to reap the benefits of predation. Thus, there is little reason to be concerned that by granting summary judgment in cases where the [***558] evidence of

475 U.S. 574, *595; 106 S. Ct. 1348, **1360;
89 L. Ed. 2d 538, ***558; 1986 U.S. LEXIS 38

conspiracy is speculative or ambiguous, courts will encourage such conspiracies.

### V

[***LEdHR1C] [1C]As our discussion in Part IV-A shows, petitioners had no motive to enter into the alleged conspiracy. To the contrary, as presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains. Cf. *Cities Service, 391 U.S., at 279.* The Court of Appeals did not take account of the absence of a plausible motive to enter into the alleged predatory pricing conspiracy. It focused instead on whether there was "direct evidence of concert of action." *723 F.2d, at 304.* The Court of Appeals erred in two respects: (i) the "direct evidence" on which the court relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing.

[**1361] The "direct evidence" on which the court relied was evidence of *other* combinations, not of a predatory pricing conspiracy. Evidence that petitioners conspired to raise prices in Japan provides little, if any, support for respondents' [*596] claims: a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another. Evidence that petitioners agreed to fix *minimum* prices (through the check-price agreements) for the American market actually works in petitioners' favor, because it suggests that petitioners were seeking to place a floor under prices rather than to lower them. The same is true of evidence that petitioners agreed to limit the number of distributors of their products in the American market -- the so-called five company rule. That practice may have facilitated a horizontal territorial allocation, see *United States v. Topco Associates, Inc., 405 U.S. 596 (1972),* but its natural effect would be to raise market prices rather than reduce them. [20] Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to charge below-market prices in the American market over a period of two decades.

20  The Court of Appeals correctly reasoned that the five company rule might tend to insulate petitioners from competition with each other. *723*

*F.2d, at 306.* But this effect is irrelevant to a conspiracy to price predatorily. Petitioners have no incentive to underprice each other if they already are pricing *below* the level at which they could sell their goods. The far more plausible inference from a customer allocation agreement such as the five company rule is that petitioners were conspiring to *raise* prices, by limiting their ability to take sales away from each other. Respondents -- petitioners' competitors -- suffer no harm from a conspiracy to raise prices. *Supra, at 582-583.* Moreover, it seems very unlikely that the five company rule had any significant effect of any kind, since the "rule" permitted petitioners to sell to their American subsidiaries, and did not limit the number of distributors to which the subsidiaries could resell. *513 F.Supp., at 1190.*

[***LEdHR11B] [11B]That being the case, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of *Rule 56(e).* Lack of motive bears on the range of permissible conclusions that might be drawn [***559] from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, [*597] the conduct does not give rise to an inference of conspiracy. See *Cities Service, supra, at 278-280.*Here, the conduct in question consists largely of (i) pricing at levels that succeeded in taking business away from respondents, and (ii) arrangements that may have limited petitioners' ability to compete with each other (and thus kept prices from going even lower). This conduct suggests either that petitioners behaved competitively, or that petitioners conspired to *raise* prices. Neither possibility is consistent with an agreement among 21 companies to price below market levels. Moreover, the predatory pricing scheme that this conduct is said to prove is one that makes no practical sense: it calls for petitioners to destroy companies larger and better established than themselves, a goal that remains far distant more than two decades after the conspiracy's birth. Even had they succeeded in obtaining their monopoly, there is nothing in the record to suggest that they could recover the losses they would need to sustain along the way. In sum, in light of the absence of any rational motive to conspire, neither petitioners' pricing practices, nor their conduct in the Japanese

475 U.S. 574, *597; 106 S. Ct. 1348, **1361;
89 L. Ed. 2d 538, ***559; 1986 U.S. LEXIS 38

market, nor their agreements respecting prices and distribution in the American market, suffice to create a "genuine issue for trial." *Fed. Rule Civ. Proc. 56(e).* [21]

21   We did not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co.* v. *Spray-Rite Service Corp., 465 U.S. 752 (1984),* establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. *Id., at 763-764.* See *supra, at 588.*

[**1362]   On remand, the Court of Appeals is free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so. The evidence must "[tend] to exclude the possibility" that petitioners underpriced respondents to compete for business rather than to implement an economically [*598] senseless conspiracy. *Monsanto,* 465 U.S., at 764. In the absence of such evidence, there is no "genuine issue for trial" under *Rule 56(e),* and petitioners are entitled to have summary judgment reinstated.

VI

Our decision makes it unnecessary to reach the sovereign compulsion issue. The heart of petitioners' argument on that issue is that MITI, an agency of the Government of Japan, required petitioners to fix minimum prices for export to the United States, and that petitioners are therefore immune from antitrust liability for any scheme of which those minimum prices were an integral part. As we discussed in *Part II, supra,* respondents could not have suffered a cognizable injury from any action that *raised* prices in the American CEP market. If liable at all, petitioners are liable for conduct that is distinct from the check-price agreements. The sovereign compulsion [***560] question that both petitioners and the Solicitor General urge us to decide thus is not presented here.

The decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**DISSENT BY:** WHITE

**DISSENT**

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

It is indeed remarkable that the Court, in the face of the long and careful opinion of the Court of Appeals, reaches the result it does. The Court of Appeals faithfully followed the relevant precedents, including *First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 (1968),* and *Monsanto Co.* v. *Spray-Rite Service Corp., 465 U.S. 752 (1984),* and it kept firmly in mind the principle that proof of a conspiracy should not be fragmented, see *Continental Ore Co.* v. *Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).* After surveying the massive record, including very [*599] significant evidence that the District Court erroneously had excluded, the Court of Appeals concluded that the evidence taken as a whole creates a genuine issue of fact whether petitioners engaged in a conspiracy in violation of §§ 1 and 2 of the Sherman Act and § 2(a) of the Robinson-Patman Act. In my view, the Court of Appeals' opinion more than adequately supports this judgment.

The Court's opinion today, far from identifying reversible error, only muddies the waters. In the first place, the Court makes confusing and inconsistent statements about the appropriate standard for granting summary judgment. Second, the Court makes a number of assumptions that invade the factfinder's province. Third, the Court faults the Third Circuit for nonexistent errors and remands the case although it is plain that respondents' evidence raises genuine issues of material fact.

I

The Court's initial discussion of summary judgment standards appears consistent with settled doctrine. I agree that [**1363] "[where] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Ante,* at 587 (quoting *Cities Service, supra, at 289*). I also agree that "'[on] summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Ante,* at 587 (quoting *United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).* But other language in the

475 U.S. 574, *599; 106 S. Ct. 1348, **1363;
89 L. Ed. 2d 538, ***560; 1986 U.S. LEXIS 38

Court's opinion suggests a departure from traditional summary judgment doctrine. Thus, the Court gives the following critique of the Third Circuit's opinion:

"[The] Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, [***561] which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude [*600] that petitioners' price-cutting behavior was independent and not conspiratorial." *Ante*, at 581.

In a similar vein, the Court summarizes *Monsanto Co.* v. *Spray-Rite Service Corp.*, *supra*, as holding that "courts should not permit factfinders to infer conspiracies when such inferences are implausible . . . ." *Ante*, at 593. Such language suggests that a judge hearing a defendant's motion for summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence standing alone was insufficiently probative to justify sending a case to the jury. [1] These holdings in no way undermine [*601] the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

1    The Court adequately summarizes the quite fact-specific holding in *Cities Service*. *Ante*, at 587.

In *Monsanto*, the Court held that a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is not, *standing alone*, sufficient to create a jury question. 465 U.S., at 763-764. To understand this holding, it is important to realize that under *United States v. Colgate & Co.*, 250 U.S. 300 (1919), it is permissible for a manufacturer to announce retail prices in advance and terminate those who fail to comply, but that under *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U.S. 373 (1911), it is impermissible for the manufacturer and its distributors to agree on the price at which the distributors will sell the goods. Thus, a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is lawful under *Colgate, unless* the termination is pursuant to a shared understanding between the manufacturer and its distributors respecting enforcement of a resale price maintenance scheme. *Monsanto* holds that to establish liability under *Dr. Miles*, more is needed than evidence of behavior that is consistent with a distributor's exercise of its prerogatives under *Colgate*. Thus, "[there] must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." 465 U.S., at 764. *Monsanto* does *not* hold that if a terminated dealer produces some further evidence of conspiracy beyond the bare fact of postcomplaint termination, the judge hearing a motion for summary judgment should balance all the evidence pointing toward conspiracy against all the evidence pointing toward independent action.

If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language.

II

In defining what respondents must show in order to recover, the Court makes assumptions [**1364] that invade the factfinder's province. The Court states with very little discussion that respondents can recover under *§ 1* of the Sherman Act only if they prove that "petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or [***562] (ii) pricing below some appropriate measure of cost." *Ante*, at 585, n. 8. This statement is premised on the assumption that "[an] agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices." *Ibid.* In making this assumption, the Court ignores the contrary conclusions of respondents' expert DePodwin, whose report in very relevant part was

475 U.S. 574, *601; 106 S. Ct. 1348, **1364;
89 L. Ed. 2d 538, ***562; 1986 U.S. LEXIS 38

erroneously excluded by the District Court.

The DePodwin Report, on which the Court of Appeals relied along with other material, indicates that respondents were harmed in two ways that are independent of whether petitioners priced their products below "the level necessary to sell their products or . . . some appropriate measure of cost." *Ibid.* First, the Report explains that the price-raising scheme in Japan resulted in lower consumption of petitioners' goods in that country and the exporting of more of petitioners' goods to this country than would have occurred had prices in Japan been at the competitive level. Increasing [*602] exports to this country resulted in depressed prices here, which harmed respondents. [2] Second, the DePodwin Report indicates that petitioners exchanged confidential proprietary information and entered into agreements such as the five company rule with the goal of avoiding intragroup competition in the United States market. The Report explains that petitioners' restrictions on intragroup competition caused respondents to lose business that they would not have lost had petitioners competed with one another. [3]

    2    Dr. DePodwin summarizes his view of the harm caused by Japanese cartelization as follows:

    "When we consider the injuries inflicted on United States producers, we must again look at the Japanese television manufacturers' export agreement as part of a generally collusive scheme embracing the Japanese domestic market as well. This scheme increased the supply of television receivers to the United States market while restricting supply in the Japanese market. If Japanese manufacturers had competed in both domestic and export markets, they would have sold more in the domestic market and less in the United States. A greater proportion of Japanese production capacity would have been devoted to domestic sales. Domestic prices would have been lower and export prices would have been higher. The size of the price differential between domestic and export markets would have diminished practically to the vanishing point. Consequently, competition among Japanese producers in both markets would have resulted in reducing exports to the United States and United States prices would have risen. In addition, investment by the United States industry would

have increased. As it was, however, the influx of sets at depressed prices cut the rates of return on television receiver production facilities in the United States to so low a level as to make such investment uneconomic.

    "We can therefore conclude that the American manufacturers of television receivers would have made larger sales at higher prices in the absence of the Japanese cartel agreements. Thus, the collusive behavior of Japanese television manufacturers resulted in a very severe injury to those American television manufacturers, particularly to National Union Electric Corporation, which produced a preponderance of television sets with screen sizes of nineteen inches and lower, especially those in the lower range of prices." 5 App. to Brief for Appellants in No. 81-2331 (CA3), pp. 1629a-1630a.

    3   The DePodwin Report has this, among other things, to say in summarizing the harm to respondents caused by the five company rule, exchange of production data, price coordination, and other allegedly anti-competitive practices of petitioners:

    "The impact of Japanese anti-competitive practices on United States manufacturers is evident when one considers the nature of competition. When a market is fully competitive, firms pit their resources against one another in an attempt to secure the business of individual customers. However, when firms collude, they violate a basic tenet of competitive behavior, i. e., that they act independently. United States firms were confronted with Japanese competitors who collusively were seeking to destroy their established customer relationships. Each Japanese company had targeted customers which it could service with reasonable assurance that its fellow Japanese cartel members would not become involved. But just as importantly, each Japanese firm would be assured that what was already a low price level for Japanese television receivers in the United States market would not be further depressed by the actions of its Japanese associates.

    "The result was a phenomenal growth in

475 U.S. 574, *602; 106 S. Ct. 1348, **1364;
89 L. Ed. 2d 538, ***562; 1986 U.S. LEXIS 38

exports, particularly to the United States. Concurrently, Japanese manufacturers, and the defendants in particular, made large investments in new plant and equipment and expanded production capacity. It is obvious, therefore, that the effect of the Japanese cartel's concerted actions was to generate a larger volume of investment in the Japanese television industry than would otherwise have been the case. This added capacity both enabled and encouraged the Japanese to penetrate the United States market more deeply than they would have had they competed lawfully." *Id.*, at 1628a-1629a.

For a more complete statement of DePodwin's explanation of how the alleged cartel operated, and the harms it caused respondents, see *id.*, at 1609a-1642a. This material is summarized in a chart found *id.*, at 1633a.

[*603] [**1365] The [***563] DePodwin Report alone creates a genuine factual issue regarding the harm to respondents caused by Japanese cartelization and by agreements restricting competition among petitioners in this country. No doubt the Court prefers its own economic theorizing to Dr. DePodwin's, but that is not a reason to deny the factfinder an opportunity to consider Dr. DePodwin's views on how petitioners' alleged collusion harmed respondents. [4]

4  In holding that Parts IV and V of the Report had been improperly excluded, the Court of Appeals said:

"The trial court found that DePodwin did not use economic expertise in reaching the opinion that the defendants participated in a Japanese television cartel. *505 F.Supp. at 1342-46.* We have examined the excluded portions of Parts IV and V in light of the admitted portions, and we conclude that this finding is clearly erroneous. As a result, the court also held the opinions to be unhelpful to the factfinder. What the court in effect did was to eliminate all parts of the report in which the expert economist, after describing the conditions in the respective markets, the opportunities for collusion, the terms of certain undisputed agreements, and the market behavior, expressed the opinion that there was concert of action consistent with plaintiffs' conspiracy theory.

Considering the complexity of the economic issues involved, it simply cannot be said that such an opinion would not help the trier of fact to understand the evidence or determine that fact in issue." *In re Japanese Electronics Products Antitrust Litigation, 723 F.2d 238, 280 (1983).*

The Court of Appeals had similar views about Parts VI and VII.

[*604] The Court, in discussing the unlikelihood of a predatory conspiracy, also consistently assumes that petitioners valued profit-maximization over growth. See, *e. g., ante,* at 595. In light of the evidence that petitioners sold their goods in this country at substantial losses over a long period of time, see Part III-B, *infra,* I believe that this is an assumption that should be argued to the factfinder, not decided by the Court.

III

In reversing the Third Circuit's judgment, the Court identifies two alleged errors: "(i) [The] 'direct evidence' on which the [Court of Appeals] relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory [***564] pricing." *Ante,* at 595. The Court's position is without substance.

A

The first claim of error is that the Third Circuit treated evidence regarding price fixing in Japan and the so-called five company rule and check prices as "'direct evidence' of a conspiracy that injured respondents." *Ante,* at 583 (citing *In re Japanese Electronics Products Antitrust Litigation, 723 F.2d 238, 304-305 (1983)).* The passage from the Third [*605] Circuit's opinion in which the Court locates this alleged error makes what I consider to be a quite simple and correct observation, namely, that this case is distinguishable from traditional "conscious parallelism" cases, in that there is direct evidence of concert of action among petitioners. *Ibid.* The Third Circuit did not, as the Court implies, jump unthinkingly from this observation to the conclusion that evidence regarding the five company rule could support a finding of antitrust injury to respondents. [5] The Third [**1366] Circuit twice specifically noted that horizontal agreements allocating customers, though illegal, do not ordinarily injure competitors of the agreeing parties. *Id., at 306, 310-311.* However, after reviewing evidence of

475 U.S. 574, *605; 106 S. Ct. 1348, **1366;
89 L. Ed. 2d 538, ***564; 1986 U.S. LEXIS 38

cartel activity in Japan, collusive establishment of dumping prices in this country, and long-term, below-cost sales, the Third Circuit held that a factfinder could reasonably conclude that the five company rule was not a simple price-raising device:

"[A] factfinder might reasonably infer that the allocation of customers in the United States, combined with price-fixing in Japan, was intended to permit concentration of the effects of dumping upon American competitors while eliminating competition among the Japanese manufacturers in either market." *Id., at 311.*

I see nothing erroneous in this reasoning.

> 5 I use the Third Circuit's analysis of the five company rule by way of example; the court did an equally careful analysis of the parts the cartel activity in Japan and the check prices could have played in an actionable conspiracy. See generally *id., at 303-311.*

> In discussing the five-company rule, I do not mean to imply any conclusion on the validity of petitioners' sovereign compulsion defense. Since the Court does not reach this issue, I see no need of my addressing it.

B

The Court's second charge of error is that the Third Circuit was not sufficiently skeptical of respondents' allegation that petitioners engaged in predatory pricing conspiracy. But [*606] the Third Circuit is not required to engage in academic discussions about predation; it is required to decide whether respondents' evidence creates a genuine issue of material fact. The Third Circuit did its job, and remanding the case so that it can do the same job again is simply pointless.

The Third Circuit indicated that it considers respondents' evidence sufficient to create a genuine factual issue regarding long-term, below-cost sales by petitioners. *Ibid.* The Court tries to whittle away at this conclusion by suggesting that the "expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors . . . that suggest that such conduct [***565] is irrational." *Ante*, at 594, n. 19. But the question is not whether the Court finds

respondents' experts persuasive, or prefers the District Court's analysis; it is whether, viewing the evidence in the light most favorable to respondents, a jury or other factfinder could reasonably conclude that petitioners engaged in long-term, below-cost sales. I agree with the Third Circuit that the answer to this question is "yes."

It is misleading for the Court to state that the Court of Appeals "did not disturb the District Court's analysis of the factors that substantially undermine the probative value of [evidence in the DePodwin Report respecting below-cost sales]." *Ibid.* The Third Circuit held that the exclusion of the portion of the DePodwin Report regarding below-cost pricing was erroneous because "the trial court ignored DePodwin's uncontradicted affidavit that all data relied on in his report were of the type on which experts in his field would reasonably rely." *723 F.2d, at 282.* In short, the Third Circuit found DePodwin's affidavit sufficient to create a genuine factual issue regarding the correctness of his conclusion that petitioners sold below cost over a long period of time. Having made this determination, the court saw no need -- nor do I -- to address the District Court's analysis point by point. The District Court's criticisms of DePodwin's [*607] methods are arguments that a factfinder should consider.

IV

Because I believe that the Third Circuit was correct in holding that respondents have demonstrated the existence of genuine issues of material fact, I would affirm [**1367] the judgment below and remand this case for trial.

**REFERENCES**

Go To Supreme Court Brief(s)     *54 Am Jur 2d, Monopolies, Restraints of Trade and Unfair Trade Practices 44, 105, 186-189, 284*

24 Federal Procedure, L Ed, Monopolies and Restraints of Trade 54:254, 54:255

24 Am Jur Trials 1, Defending Antitrust Lawsuits

*15 USCS 1, 2, 13(a);* USCS, *Federal Rules of Civil Procedure, Rule 56*

US L Ed Digest, Appeal 1087.5(1), 1267, 1750; Evidence 394, 979; International Law 6; Restraints of Trade, Monopolies, and Unfair Trade Practices 10, 21, 36, 67;

475 U.S. 574, *607; 106 S. Ct. 1348, **1367;
89 L. Ed. 2d 538, ***565; 1986 U.S. LEXIS 38

Summary Judgment and Judgment on Pleadings 4-6; Trial 197

Index to Annotations, Restraints of Trade and Monopolies; Summary Judgment

Annotation References:

Reviewability of federal court's denial of motion for summary judgment. *17 L Ed 2d 886* .

Extraterritorial application of federal antitrust laws to acts occurring in foreign commerce. 40 ALR Fed 343.

*** Slip Sheet ***

Document

LEXSEE 2007 US DIST LEXIS 52647

**ANDREW J. MAXWELL, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., Plaintiff, v. KPMG, LLP, Defendant.**

**Case No. 03 C 3524**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 52647*

**July 19, 2007, Decided
July 19, 2007, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff Chapter 7 trustee filed suit against defendant auditor for breach of professional responsibilities. The auditor moved for summary judgment.

**OVERVIEW:** An information technology consulting company and an internet professional services firm merged to form the debtor company. The trustee alleged that the auditor breached its professional responsibilities by failing to inform the consulting company's board of directors, its audit committee, and others, that its 1999 net income and fourth quarter results were overstated in an unaudited Earnings Release prior to the closing of the merger. The trustee claimed that absent these breaches, the debtor would either have avoided insolvency altogether or would not have become as deeply insolvent as it was now because had the consulting company known about this overstatement, it would have backed out of the merger. The court found that the trustee was unable to prove proximate causation. The court reasoned that the events that caused the consulting company's demise were all unforeseeable post-audit events, including, most notably, a major market crisis and a bad merger choice. To hold the auditor liable in this case would make it an insurer against conditions that were outside of its control.

**OUTCOME:** The auditor's motion for summary judgment was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A genuine issue of material fact exists only where the potential evidence would permit a reasonable finder of fact to return a verdict for the nonmoving party. The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party.

*Torts > Malpractice & Professional Liability > Professional Services*
[HN2] The elements of a professional negligence cause of action are: (1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages.

*Torts > Malpractice & Professional Liability > Professional Services*
*Torts > Negligence > Causation > Proximate Cause > General Overview*
[HN3] Accounting malpractice, like legal malpractice, can be styled as a tort claim or a contract claim. Under either theory, the plaintiff must prove proximate causation. Under either a tort or contract theory, the elements of a legal malpractice claim are (1) an attorney-client relationship establishing a duty on the attorney's part, (2)

Case 1:05-cv-00499-JJF     Document 284-13     Filed 11/30/2007     Page 25 of 50

Page 2
2007 U.S. Dist. LEXIS 52647, *

breach of that duty, (3) proximate cause establishing that but for the breach the plaintiff would not have been injured, and (4) resulting damages.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Torts > Negligence > Causation > Proximate Cause > General Overview*
[HN4] Under Illinois law, a finding of "but for" causation (what philosophers call a necessary condition) is not a sufficient basis for imposing legal liability. Plaintiffs must prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances of intentional torts where fiduciaries are involved. Proximate causation, which is also referred to as loss causation in the securities context, is especially helpful in cases that involve natural or financial disasters such as market collapses. Although proximate cause generally is a fact question, it may be determined as a matter of law when the facts not only are undisputed but allow no difference in the judgment of reasonable men as to the inferences to be drawn therefrom.

*Torts > Negligence > Causation > Proximate Cause > General Overview*
[HN5] "Loss causation" is the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains. Courts have used variations of this principle to cut off liability when, though the plaintiff may be able to demonstrate "but-for" causation, he cannot demonstrate proximate causation. Though the distinction between but-for causation and legal causation for a plaintiff's loss is particularly well developed in securities cases, where it is known as the distinction between "transaction causation" and "loss causation," the idea of loss causation is not limited to securities fraud.

*Torts > Negligence > Causation > Proximate Cause > General Overview*
*Torts > Negligence > Causation > Proximate Cause > Intervening Causation*
[HN6] A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause.

*Torts > Malpractice & Professional Liability > Professional Services*
*Torts > Negligence > Causation > Proximate Cause > General Overview*

[HN7] In the context of a claim of professional negligence, it is not sufficient for an investor to allege only that it would not have invested but for the fraud. It is also necessary to allege that, but for the circumstances that the fraud concealed, the investment would not have lost its value.

*Torts > Negligence > Causation > Proximate Cause > General Overview*
[HN8] Legal cause exists where the injury was of a type that a reasonable person would foresee as a likely result of his or her conduct.

COUNSEL: [*1] For Andrew J Maxwell, not individually but as Chapter Trustee for the bankruptcy extates of marchFirst, Inc. as trustee for Marchfirst, Inc., Plaintiff: Steven Joseph Roeder, LEAD ATTORNEY, David E. Stevenson, Deborah H. Bornstein, Eric Richard Lifvendahl, Sean G Joyce, Theodore John Low, Thomas Charles Koessl, Williams, Montgomery & John, Ltd., Chicago, IL; Suzanne Lee, Suzanne Lee, Law Department, Chicago, IL.

For KPMG LLP, Defendant: James R. Figliulo, LEAD ATTORNEY, Gregory L. Stelzer, Michael K. Desmond, Peter A. Silverman, Figliulo & Silverman, Chicago, IL.

JUDGES: JOAN B. GOTTSCHALL, United States District Judge.

OPINION BY: JOAN B. GOTTSCHALL

OPINION

MEMORANDUM OPINION AND ORDER

On March 1, 2000, Whittman-Hart, Inc. ("Whittman-Hart"), an information technology consulting company, and USWeb/CKS Corporation ("USWeb"), an internet professional services firm, merged to form marchFIRST, Inc. ("marchFIRST"), an information technology consulting company. After the merger, the technology bubble burst and marchFIRST filed for bankruptcy just one year later, on April 12, 2001. Andrew J. Maxwell, the Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. (the "Trustee"), has sued KPMG LLP ("KPMG"), Whittman-Hart's [*2] independent auditor. Specifically, the Trustee alleges that KPMG breached its professional responsibilities by failing to inform Whittman-Hart's board of directors, its audit committee, and others, that its 1999 net income and fourth quarter results were overstated in an unaudited Earnings Release prior to the closing of the merger. The Trustee claims that absent these breaches, marchFIRST would either have avoided insolvency altogether or

would not have become as deeply insolvent as it is now because had USWeb known about this overstatement, it would have backed out of the merger. Had the merger not gone through, Whittman-Hart--unburdened by USWeb--would have survived the technology crash. Therefore, the Trustee seeks to hold KPMG liable for not saving Whittman-Hart from the disastrous consequences of the Whittman-Hart/USWeb merger.

KPMG has moved for summary judgment. For the reasons stated below, KPMG's motion is granted.

## I. BACKGROUND

Whittman-Hart was engaged in the business of providing information technology ("IT") consulting services primarily to middle-market and Fortune 500 companies. Those services included, among other things, systems integration, strategic planning, business [*3] process improvement, and design and electronic commerce solutions. In the late 1990's, more than half of Whittman-Hart's clients were demanding digital communications and/or Internet expertise. As part of a five-year strategic plan to expand its range of IT services and its geographic presence, Whittman-Hart sought acquisition opportunities or potential merger partners to increase its size and competitive position, and to gain access to the Internet and e-commerce sectors. During 1998 and 1999, Whittman-Hart acquired a number of IT consulting companies such as Four Points Digital, L.L.C., a company that had digital communications and Internet expertise. In the fall of 1999, Whittman-Hart identified USWeb as a potential merger candidate. The merger came together quickly and was "enthusiastically endorsed" by Whittman-Hart's management. Compl. PP 11-12.

On November 21, Whittman-Hart retained KPMG to perform an audit of its consolidated financial statements for the year ended December 31, 1999.

On December 12, 1999, the Whittman-Hart Board unanimously adopted resolutions approving the Merger Agreement and authorizing its corporate officers to execute, deliver and perform the Merger Agreement. [*4] Whittman-Hart subsequently entered into a written Agreement and Plan of Merger with USWeb (the "Merger Agreement"). According to the terms of the Merger Agreement, the merger was a stock-for-stock exchange. The stockholders of USWeb received .865 shares of Whittman-Hart for each share of USWeb common stock. After the merger, Whittman-Hart would be the surviving corporation.

On or about January 13, 2000, Whittman-Hart filed its Form S-4 Registration Statement, including a joint proxy statement, with the Securities and Exchange Commission ("SEC"). One of the purposes of this filing was to register the shares of common stock to be issued

in connection with the Merger Agreement. The S-4 Statement announced "the signing of a definitive agreement to merge" with USWeb, touting the anticipated strategic benefits of the merger. The S-4 Statement also included extensive risk disclosures, such as: (1) "The market for Internet professional services is relatively new, intensely competitive, rapidly evolving and subject to rapid technological change"; (2) "If the market for such services does not continue to develop or develops more slowly than expected, or if the combined company's services do not [*5] achieve market acceptance, its business will be negatively affected"; and (3) "[A] significant shortfall in demand for services could have an immediate and a significant negative effect on the combined company's business and results of operations." Ex. 18 to Def.'s Statement of Facts (Form S-4).

The stock market reacted negatively to the proposed merger. On the day it was announced, Whittman-Hart's stock price fell 31% and USWeb's stock price fell 14%. Despite this reaction, Whittman-Hart and USWeb pressed on to complete the merger. On January 21, 2000, KPMG met with Whittman-Hart's audit committee and reported on the status of its work auditing the company's 1999 financial statements, stating that it expected to substantially complete its fieldwork by January 24, 2000.

On January 24, 2000, Whittman-Hart issued an unaudited earnings release reporting its earnings for the fourth quarter of 1999, and the year ended December 31, 1999 ("1999 Earnings Release"). According to this earnings release, Whittman-Hart reported revenues of $ 133 million and net income of $ 8.4 million. For the year ended December 31, 1999, Whittman-Hart reported revenues of $ 480.9 million and net income of $ 30.3 [*6] million. The financial statements attached to the 1999 Earnings Release were identified as "unaudited." On January 26, Whittman-Hart filed a Form 8-K ("January 26 8-K") with the SEC, attaching a copy of the text of the 1999 Earnings Release. The January 26 8-K did not contain the unaudited Balance Sheet or the unaudited Income Statement from the 1999 Earnings Release.

On January 27, 2000, Whittman-Hart filed an amendment to its Form S-4 Statement related to the merger. Though KPMG consented to the use of Whittman-Hart's 1998 Financial Statements and its Audit Report for 1998 in connection with the S-4 Filings, KPMG did not consent to the use of any audit report on Whittman-Hart's 1999 Financial Statements in connection with the S-4 Filings.

On February 28, 2000, the shareholders of Whittman-Hart and USWeb voted to approve the merger. Following the meeting at which the merger was approved, KPMG met with Whittman-Hart's audit committee to present the results of the 1999 audit. KPMG informed

the committee it expected to deliver an unqualified audit report. The merger closed on March 1, 2000, and Whitt-man-Hart subsequently changed its name to march-FIRST.

There is no statement by KPMG associated [*7] with the financial information contained in the unaudited 1999 Earnings Release. Indeed, KPMG did not issue its audit report on Whittman-Hart's 1999 financial statements until March 27, 2000, well after the merger had closed. Further, Whittman-Hart did not file its Form 10-K for the period ended December 31, 1999, until March 30, 2000.

Following the merger, the technology market underwent a major economic crisis, often referred to as the bursting of the technology bubble. In the third quarter of 2000, marchFIRST announced earnings that badly missed analysts' expectations. The company's fortunes thereafter declined at a rapid rate, and on February 12, 2001, it announced a $ 6.8 billion loss for the year 2000. On April 12, 2001, marchFIRST filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. On or about July 16, 2001, Andrew J. Maxwell was appointed as the Chapter 7 Trustee for the bankruptcy estates of marchFIRST.

The Trustee has brought claims for professional malpractice and breach of contract against KPMG, alleging that the 1999 Earnings Release and the January 26 8-K overstated Whittman-Hart's revenues. The Trustee admits that there is no statement [*8] by KPMG associated with the financial information contained in the 1999 Earnings Release. However, KPMG did review the 1999 Earnings Release. KPMG admits--solely for the purposes of this motion--that Whittman-Hart would not have issued the Earnings Release if KPMG had not approved of the financial numbers contained therein. The Trustee contends that because KPMG either knew or should have known that there was a problem with the 1999 Earnings Release and the January 26 8-K, it should have insisted that Whittman-Hart issue and file correct financial information. Interestingly, the Trustee claims that while this allegedly correct information "would still show that Whittman-Hart was a successful company," it would "also show that Whittman-Hart was not growing rapidly through expanding internet services." Pl.'s Opp. 1. This, according to the Trustee, would have been enough to make USWeb back out of the merger. Had USWeb--a company that is much larger than Whittman-Hart--done so, then Whittman-Hart would not have "been burdened by the problems involved in attempting to integrate and manage a company more than twice its size," and the stand-alone Whittman-Hart would have been able to survive [*9] and succeed. Pl.'s Opp. 1-2.

The Trustee is suing KPMG for the difference between the value of a hypothetical stand-alone Whittman-Hart on April 12, 2001, and the purported negative value of marchFIRST on April 12, 2001, on the ground that had KPMG pointed out the problems with the 1999 Earnings Release, the merger would not have happened. [1]

[1] The Trustee's damages expert calculates damages as follows. Maxwell, as Trustee, offers the value of marchFIRST on April 12, 2001 (the date of bankruptcy), based on his estimates of what the liabilities and assets of the company were on that date. Maxwell asserts that the fair value of the debtors' business on the date of bankruptcy was negative $ 93.6 million. Marcus, the Trustee's damages expert, offers two figures. First, he estimates the value of Whittman-Hart's stock on the day before the merger ("February 29, 2000 valuation") had the accounting malpractice not occurred. Based on this value, he created a peer group stock index, using eight comparable companies, to estimate the value of Whittman-Hart had it not merged with USWeb and continued instead as a stand alone company ("April 12, 2001 valuation"). Marcus's index shows that comparable [*10] companies declined 70% in stock value over the observed time. Thus, he concludes that the stock market value of a hypothetical stand alone Whittman-Hart on April 12, 2001, (the date of bankruptcy) would have been $ 535 million. The total damages in this case are estimated to be the difference between this number and negative $ 93.6 million, the number that Maxwell opines is the value of marchFIRST on April 12, 2001. This leaves KPMG responsible for the $ 628.6 million difference that was caused by the merger. *See* Pl.'s Opp. to Motion to Exclude Opinion Testimony of Marcus, Maxwell.

## II. ANALYSIS

[HN1] Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* A genuine issue of material fact exists only where the potential evidence would permit a reasonable finder of fact to return a verdict for the non-moving party. *Caterpillar, Inc. v. Great Am. Ins. Co., 62 F.3d 955, 960 (7th Cir. 1995)* [*11] (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).* The court construes the evidence in the light most favorable to the nonmoving

party and draws all reasonable inferences in favor of the nonmoving party. *Gillis v. Litscher, 468 F.3d 488, 492 (7th Cir. 2006)* (citing *Anderson, 477 U.S. at 255*).

[HN2] "The elements of a professional negligence cause of action are: (1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages." *MC Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC, 364 Ill. App. 3d 6, 845 N.E.2d 22, 30, 300 Ill. Dec. 601 (Ill. App. Ct. 2006)* (citing *Belden v. Emmerman, 203 Ill. App. 3d 265, 560 N.E.2d 1180, 1181, 148 Ill. Dec. 583 (Ill. 1990)).* [2]

2    [HN3] Accounting malpractice, like legal malpractice, can be styled as a tort claim or a contract claim. Under either theory, the plaintiff must prove proximate causation. *See Cleveland v. Rotman, 297 F.3d 569, 572 (7th Cir. 2002)* ("Under either a tort or contract theory, the elements of a legal malpractice claim are (1) an attorney-client relationship establishing a duty on the attorney's part, (2) breach of that duty, (3) proximate cause establishing that but for the breach the plaintiff would not have been injured, and [*12] (4) resulting damages.")

[HN4] Under Illinois law, "a finding of 'but for' causation (what philosophers call a 'necessary condition') is not a sufficient basis for imposing legal liability." *Movitz v. First Nat. Bank of Chicago, 148 F.3d 760, 762 (7th Cir. 1998).* "[P]laintiffs must prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances of intentional torts where fiduciaries are involved." *Martin v. Heinold Commodities, Inc., 163 Ill. 2d 33, 643 N.E.2d 734, 747, 205 Ill. Dec. 443 (1994).* Proximate causation, which is also referred to as loss causation [3] in the securities context, is especially helpful in cases that involve natural or financial disasters such as market collapses. *See Ray v. Citigroup Global Mkts., Inc., 482 F.3d 991, 995 (7th Cir. 2007)* (loss causation "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame"). Although proximate cause generally is a fact question, *see Kavales v. City of Berwyn, 305 Ill. App. 3d 536, 712 N.E.2d 842, 238 Ill. Dec. 738 (Ill. 1999)),* it "may be determined as a matter of law when the facts not only are undisputed but allow no difference in the judgment of reasonable [*13] men as to the inferences to be drawn therefrom." *See Prodromos v. Everen Securities, Inc., 341 Ill. App. 3d 718, 793 N.E.2d 151, 159, 275 Ill. Dec. 671 (Ill. App. Ct., 2003)* (citing *Seef v. Ingalls Memorial Hospital, 311 Ill. App. 3d 7, 724 N.E.2d 115, 243 Ill. Dec. 806 (Ill. 1999)).*

3    [HN5] "Loss causation" is "the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Res. Corp., 892 F.2d 680, 685 (7th Cir. 1990).* Courts have used variations of this principle to cut off liability when, though the plaintiff may be able to demonstrate "but-for" causation, he cannot demonstrate proximate causation. *See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345-46, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)* (plaintiff in a 10b-5 action must prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss); *Tricontinental Indus. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 842 (7th Cir. 2007)* (common law fraud); *Movitz v. First Nat. Bank of Chicago, 148 F.3d 760, 764 (7th Cir. 1998)* (breach of contract and fiduciary duty in real estate case). Though the distinction between but-for causation and legal causation for a plaintiff's [*14] loss is particularly well developed in securities cases, where it is known as the distinction between "transaction causation" and "loss causation," the idea of loss causation is not limited to securities fraud. *See Movitz, 148 F.3d at 763* ("The requirement of proving loss causation is a general requirement of tort law."); *Martin v. Heinold Commodities, Inc., 163 Ill. 2d 33, 643 N.E.2d 734, 747, 205 Ill. Dec. 443 (Ill. 1994)* (adopting the principle of loss causation as analogous to the idea that "damages must be a proximate, and not remote, consequence of the [wrongful act]" (internal quotation marks omitted)).

[HN6] "A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Cleveland v. Rotman, 297 F.3d 569, 573 (7th Cir. 2002)* (citing *Kleen v. Homak Mfg. Co., 321 Ill. App. 3d 639, 749 N.E.2d 26, 255 Ill. Dec. 246 (Ill. App. 2001)).* In order to prove proximate causation, the Trustee must offer evidence demonstrating that KPMG's alleged negligence caused Whittman-Hart's losses. This goes beyond simply proving "but for" causation because an accountant cannot be held liable for losses if subsequent events over which the accountant had no control--such as the plaintiff's bad [*15] luck or poor management decisions--caused the losses. *See Ryan v. Wersi Elec. GmbH and Co., 59 F.3d 52, 54 (7th Cir. 1995)* (affirming summary judgment on loss causation grounds when plaintiffs "at best, made a showing sufficient to establish that [defendant's] false promises and misrepresentations were 'the cause of their entering into the transaction in which they

2007 U.S. Dist. LEXIS 52647, *

lost money but not the cause of the transaction's turning out to be a losing one.'" (quoting *Bastian v. Petren Res. Corp., 892 F.2d 680, 684 (7th Cir. 1990))*. As the Seventh Circuit recently noted in a fraudulent misrepresentation case, [HN7] "It is not sufficient for an investor to allege only that it would not have invested but for the fraud. . . . [I]t is also necessary to allege that, but for the circumstances that the fraud concealed, the investment would not have lost its value." *Ray, 482 F.3d at 995* (internal quotation marks omitted). In other words, the Trustee must offer evidence that shows a causal connection between KPMG's alleged negligence and Whittman-Hart's damages.

The Trustee must also prove that those losses were a foreseeable consequence of the violation of KMPG's legal duty. *See Cleveland, 297 F.3d at 573* ([HN8] "Legal [*16] cause exists where the injury was of a type that a reasonable person would foresee as a likely result of his or her conduct."); *Movitz, 148 F.3d at 763; Restatement (Second) of Torts § 548A, Comment b* (Legal causation is present only if the plaintiff's pecuniary loss is the foreseeable result of the matters misrepresented by the defendant.) In *Movitz*, a real estate investor relied on a bank's evaluation regarding a building's structural soundness prior to his purchase of the building. *Id. at 761.* After the purchase "turned out to be a disaster," and the real estate market took a plunge, the investor sued the bank. *Id. at 762.* The Seventh Circuit held that while the element of "but for" causation was met--had the bank been more careful and discovered the structural problems with the building, the deal might not have gone through--proximate causation was not. Importantly, the Seventh Circuit reasoned, "The care that the bank was contractually required to take in advising [the investor] with regard to the purchase of the office building was not intended to prophesy or avert market fluctuations but to make sure that the building was a sound purchase under current market conditions." *Id. at 763.*

Here, [*17] assuming without deciding that KPMG did in fact breach a duty to Whittman-Hart in connection with its review of the 1999 Earnings Report, the Trustee is not entitled to try this case before a jury because he is unable to prove proximate causation. The Trustee's theory is that but for KPMG's failure to raise a red flag regarding the 1999 Earnings Report, USWeb would have backed out of the merger with Whittman-Hart in 2000. But for this merger, the combined company would not have gone bankrupt in 2001. Because Whittman-Hart's business and entire worth were destroyed as a result of the merger, and because the merger would not have occurred if KPMG had not committed malpractice, the Trustee seeks to hold KPMG liable for the company's losses due to the merger. The Trustee's theory is too attenuated.

First, the Trustee's argument that KPMG's alleged malpractice caused Whittman-Hart's demise is belied by his own admissions that the cause of Whittman-Hart's failure was the bursting of the internet bubble and the fact that the merger partner, USWeb, was "a larger [technology] company." *See* Pl.'s Opp. 1-2 ("Had [Whittman-Hart] not been burdened by the problems involved in attempting to integrate [*18] and manage a company more than twice its size, a non-merged, stand-alone Whittman-Hart would have been able to survive and succeed."); *id.* 45-46 ("KPMG was a substantial factor in bringing about the merger which exposed Whittman-Hart to market forces that it otherwise would not have to endure in such a weakened condition."); *id.* 50 ("The destruction of Whittman-Hart's business and entire worth were in fact the result of the merger."). The Trustee himself admits that marchFIRST went bankrupt because of the effect market forces had on an unstable merger. Even if the Trustee could somehow prove that KPMG's failure to raise a red flag regarding the 1999 Earnings Report "caused" the merger, the Trustee cannot show that KPMG caused the merger *to fail. See Ryan, 59 F.3d at 54* (affirming summary judgment on loss causation grounds in Illinois Consumer Fraud Act claim when plaintiff failed to show that his business losses were caused by the defendant's misrepresentations, "as opposed to a general downturn in the market . . . or simple cash flow mismanagement"). Without a causal connection between KPMG's alleged negligence and the Trustee's damages, there is not enough to warrant a reasonable [*19] jury in finding that, had KPMG acted with due care, Whittman-Hart would not have gone bankrupt. [4]

----

4   The Trustee counters this point by arguing that his damages theory "very carefully attempts to segregate out those losses that Whittman-Hart would have incurred had there been no malpractice (and hence no merger)," thus excluding from the damages he seeks the effect market forces would have had on Whittman-Hart had there been no merger. Pl.'s Opp. 51. This does not resolve the fundamental flaw with the theory, however, which is that the Trustee is unable to prove that KPMG's actions caused the merger to fail.

Second, the Trustee has failed to demonstrate that KPMG should have foreseen that USWeb would be a poor merger partner for Whittman-Hart or that the technology market would undergo a major upheaval. There is no evidence that KPMG ever advised Whittman-Hart as to the wisdom or the risk of the merger with USWeb. Thus, even if KPMG knew that the 1999 Earnings Report painted a rosier picture of Whittman-Hart's growth than was merited, it should not have anticipated that its failure to raise a red flag would lead to Whittman-Hart's

2007 U.S. Dist. LEXIS 52647, *

demise because USWeb would prove to be a poor merger choice [*20] for Whittman-Hart, the technology market would undergo "a major economic crisis" and USWeb would be particularly susceptible to this market fluctuation. [5] *AUSA Life Ins. Co. v. Ernst & Young, 119 F.Supp.2d 394, 405 (S.D.N.Y. 2000)* (proximate cause of plaintiffs' loss was corporation's catastrophic decision to acquire a near-bankrupt retailer and other post-audit developments that could not have been anticipated by accountants); *see generally Movitz, 148 F.3d at 764* ("To hold the defendant liable for [a loss that was not the kind that the defendant's disclosure requirement was intended to prevent] would produce overdeterrence by making him an insurer against conditions outside his control.").

     5   In fact, if the Trustee's own argument is to be believed, KPMG had an interest in maintaining a long-term relationship with Whittman-Hart; it is incredible for the Trustee to argue that KPMG should have known its actions would destroy Whittman-Hart, rendering it bankrupt. *See* Pl.'s Opp. 25 ("In early 2000, Whittman-Hart was an important client for KPMG. . . . KPMG thus had strong incentives to continue a relationship, both

as auditor and as business advisor, with an entity that would be more than [*21] two times the size of Whittman-Hart. . . . KPMG lobbied to continue its profitable relationship with the company *after* the merger.") (emphasis in original).

    The events that caused Whittman-Hart's demise were all unforeseeable post-audit events, including, most notably, a major market crisis and a bad merger choice. To hold KPMG liable in this case would make it an insurer against conditions that are outside of its control. Because the Trustee is unable to prove proximate causation, the court does not reach KPMG's other arguments in support of its motion for summary judgment.

### III. CONCLUSION

    For the foregoing reasons, KPMG's motion for summary judgment is granted.

    JOAN B. GOTTSCHALL

    United States District Judge

    DATED: July 19, 2007

*** Slip Sheet ***

Document

LEXSEE 494 F3d 418

**DANIEL McCABE; RUSSELL E. McCABE; DAVID MOTOVIDLAK, Appellants v. ERNST & YOUNG, LLP; NICHOLAS R. TOMS, a/k/a Nic Toms; HUGO BIERMANN; GREGORY THOMAS; EDWARD STONE & COMPANY, INC; WAYNE CLEVINGER; JOSEPH ROBINSON; MIDMARK CAPITAL, LP; OTTO LEISTNER; BUNTER B.V.I. LTD.; GEORGE POWCH; STEPHEN M. DUFF; CLARK ESTATES, INC.; RAYMOND BROEK; DONALD ROWLEY; DOUGLAS L. DAVIS; BARBARA H. MARTORANO; JACQUI GERRARD**

No. 06-1318

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*494 F.3d 418; 2007 U.S. App. LEXIS 17467; Fed. Sec. L. Rep. (CCH) P94,364*

**January 31, 2007, Argued**
**July 23, 2007, Filed**

**PRIOR HISTORY:** [**1]
On Appeal from the United States District Court for the District of New Jersey. D.C. Civil Action No. 01-cv-5747. (Honorable William H. Walls).
*McCabe v. Ernst & Young, LLP, 2006 U.S. Dist. LEXIS 524 (D.N.J., Jan. 6, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, shareholders and officers, appealed from a judgment of the United States District Court for the District of New Jersey which granted summary judgment to defendant auditor on plaintiffs' claims alleging a violation of § 10(b) of the Securities Exchange Act of 1934, common law fraud, and negligent misrepresentation.

**OVERVIEW:** The district court found that the facts alleged by plaintiffs suggested transaction causation, not loss causation. The instant court found that plaintiffs presented no evidence that the value of the consideration they received, at the time the merger closed, was actually lower than they had been misled into believing. Even if they had presented such evidence, it alone would have been insufficient to satisfy the loss causation requirement. The instant court reasoned that it was not enough for § 10(b) plaintiffs to show that a misstatement or omission induced them to buy or sell securities at a price less favorable to them than they had been misled into believing. Rather, they must show that the misstated or omitted facts were a substantial factor in causing an eco-

nomic loss actually incurred by the plaintiffs. Finally, the instant court found that because plaintiffs could not point to sufficient record evidence to show that the very facts misrepresented or omitted by the auditor were a substantial factor in causing plaintiffs' economic loss, plaintiffs failed to create a genuine issue as to loss causation.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] An appellate court exercises de novo review of the district court's grant of summary judgment. Summary judgment is proper where the moving party has established there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. To demonstrate that no issue is in dispute as to any material fact, the moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial. To survive the motion, the non-moving party must show specific facts such that a reasonable jury could find in its favor. *Fed. R. Civ. P. 56(e)*. While the evidence

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence may be more than a scintilla. A court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

**Civil Procedure > Federal & State Interrelationships > Erie Doctrine**

[HN2] In interpreting state law in the absence of a controlling decision from a state's highest court, it is the duty of the federal court to ascertain from all the available data what state law is and apply it.

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices**

[HN3] Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the use or employment of any manipulative or deceptive device or contrivance," (2) in connection with the purchase or sale of any security, and (3) in contravention of SEC rules and regulations. *15 U.S.C.S. § 78j(b)*. SEC regulations, in turn, make it unlawful to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. *17 C.F.R. § 240.10b-5(b) (2006)*.

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Burdens of Proof**
**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview**
**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation**

[HN4] The United States Supreme Court has identified the six required elements of a Securities Exchange Act of 1934 § 10(b) private damages action: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss. The common law loss causation element is codified as a requirement in the Private Securities Litigation Reform Act: the plaintiff shall have the burden of proving that the act or omission

of the defendant caused the loss for which the plaintiff seeks to recover damages. *15 U.S.C.S. § 78u-4(b)(4)*.

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation**

[HN5] Under S.E.C. *Rule 10b-5* causation is two-pronged. A plaintiff must show both: (1) "transaction causation" (or reliance), i.e., that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security; and (2) "loss causation," i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered. In addressing Securities Exchange Act of 1934 § 10(b) claims, and especially their loss causation element, the United States Court of Appeals for the Third Circuit has distinguished between "typical" and "non-typical" claims. But the Third Circuit has consistently required that both transaction causation and loss causation must be established in § 10(b) cases, and have never allowed the elements to merge.

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation**

[HN6] Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff. A Securities Exchange Act of 1934 § 10(b) plaintiff must show both that (1) the plaintiff entered the transaction at issue in reliance on the claimed misrepresentation or omission (transaction causation) and (2) the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss (loss causation).

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation**

[HN7] In the context of the Securities Exchange Act of 1934 § 10(b), the loss causation requirement limits the circumstances in which an investor can sue over a failed investment, so that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with that investment.

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation**

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

[HN8] It is more difficult to categorize the required loss causation showing in non-typical Securities Exchange Act of 1934 § 10(b) actions than it is in typical § 10(b) actions. In a typical "fraud-on-the-market" § 10(b) action, the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission; to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff. But in a non-typical § 10(b) action, where the plaintiff does not simply allege that the price of a publicly-traded security has been affected, the factual predicates of loss causation fall into less of a rigid pattern.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN9] In order to satisfy the loss causation requirement in both typical and non-typical Securities Exchange Act of 1934 § 10(b) actions, the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN10] In the context of Securities Exchange Act of 1934 § 10(b), the loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN11] The United States Court of Appeals for the Fifth Circuit has offered a concise statement of what is required to show that a misrepresentation or omission proximately caused an economic loss: The plaintiff must prove that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The loss causation requirement is satisfied in a S.E.C. *Rule 10b-5* case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN12] If false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way related to the representations will not afford any basis for recovery. It was only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN13] The United States Supreme Court recently reiterated that a Securities Exchange Act of 1934 § 10(b) plaintiff must show both loss causation and transaction causation. And even in non-typical § 10(b) cases, where the court has called for a practical approach to loss causation, the United States Court of Appeals for the Third Circuit has consistently distinguished loss causation from transaction causation: the Third Circuit has required both loss causation and transaction causation to be established, and have analyzed them separately. This is because the two prongs of causation in § 10(b) cases are rooted in traditional common law principles, and serve different purposes: It must be remembered that, as in other areas of the law, causation embodies two distinct concepts: (1) cause in fact and (2) legal cause. Legal cause is frequently dealt with in terms of proximate cause. Cause-in-fact questions are frequently stated in terms of the sine qua non rule: but for the act or acts complained of, the injury would not have occurred. Legal cause represents the law's doctrinal basis for limiting liability even though cause in fact may be proven. Causation in securities law involves the same analysis of cause in fact and legal cause that was developed under the common law.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN14] The United States Courts of Appeals for the Second and Ninth Circuits have held that, in the limited circumstance of a defendant broker fraudulently inducing a plaintiff investor to purchase securities in order to "churn" plaintiff's portfolio and generate commissions, plaintiff need not show loss causation to make a Securities Exchange Act of 1934 § 10(b) claim, as long as the transaction causation requirement is met: The plaintiff

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

should not have to prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN15] Loss causation is a more exacting standard than transaction causation. That is because the loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement. The loss causation element requires the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN16] In the United States Court of Appeals for the Second Circuit, it is long settled that a securities-fraud plaintiff must prove both transaction and loss causation. In order to establish loss causation, it said, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. The court stated that its cases "require both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk. An allegation that fraud induced an investor to make an investment and to persevere with that investment was sufficient to establish loss causation.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN17] A Securities Exchange Act of 1934 § 10(b) plaintiff is required to establish both loss causation and transaction causation.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN18] The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome. It requires the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
*Torts > Negligence > Causation > Proximate Cause > Intervening Causation*
[HN19] An intervening act of a third party, which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN20] To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.

*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
[HN21] Proximate causation is a required element of both common law fraud and negligent misrepresentation under New Jersey law. Under New Jersey tort law, the test of proximate cause is satisfied where conduct is a substantial contributing factor in causing a loss.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN22] Judicially implied private securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions. The common law of deceit subjects a person who "fraudulently " makes a "misrepresentation" to liability "for pecuniary loss caused" to one who justifiably relies upon that misrepresentation. And the common law has long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss. Securities Exchange Act of 1934 § 10(b) expressly imposes on plaintiffs the burden of proving that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover. The statute makes clear Congress' intent to permit private

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.

**COUNSEL:** STEVEN M. KAPLAN, ESQUIRE (ARGUED), Kaplan & Levenson, New York, New York, Attorney for Appellants.

BRUCE M. CORMIER, ESQUIRE (ARGUED), Ernst & Young, New York Avenue, N.W. Washington, D.C., Attorney for Appellee Ernst & Young.

**JUDGES:** Before: SCIRICA, Chief Judge, FUENTES and CHAGARES, Circuit Judges.

**OPINION BY:** SCIRICA

**OPINION**

[*420] OPINION OF THE COURT

SCIRICA, *Chief Judge.*

The principal issue in this securities fraud action against auditors Ernst & Young, LLP is whether plaintiffs presented sufficient evidence of loss causation to survive a summary judgment motion. We will affirm the grant of summary judgment.

**I.**

**A.**

Plaintiffs Daniel McCabe, Russell McCabe, and David Motovidlak ("the ATS Plaintiffs") had been shareholders and officers of Applied Tactical Systems, Inc., a closely-held supply chain management company that was acquired by Vertex Interactive, Inc., a publicly-traded supply chain management company. The Merger Agreement was negotiated between October and December 2000, during which period Vertex's stock price fluctuated between $ 7.66 and $ 18.50 per share. The Merger [**2] Agreement provided the ATS Plaintiffs would exchange all their shares of ATS stock for three million unregistered shares of Vertex common stock, as well as stock options. Vertex promised to obtain an effective registration of the three million shares and the shares underlying the options "within fifteen (15) days of such time as financial results covering at least thirty (30) days of combined operations of Vertex and ATS have been published by Vertex . . . but in any event no later than May 14, 2001." The unregistered shares were restricted from resale until either (1) their registration or (2) expiration of a one-year "lockup" period established by SEC regulations, *17 C.F.R. § 230.144(d)(1) (2000),* [*421] whichever occurred first.

The Merger Agreement was signed on December 11, 2000. On that date Vertex's closing stock price was $ 8.69 per share. The merger was scheduled to close on December 29, 2000. In the Merger Agreement, Vertex made several representations, including that: (1) there were no pending or threatened legal claims against it that could reasonably be expected to have a material adverse effect on Vertex's financial performance or the merger; (2) all of its SEC filings contained [**3] no untrue statements and omitted no material fact necessary to make the filings not misleading; (3) the financial statements included in its SEC filings were prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and fairly presented Vertex's financial position; and (4) since the date of its SEC filings, Vertex's financial position had undergone no material change.

Between the merger's signing and closing dates, Vertex informed the ATS Plaintiffs that Ernst & Young was auditing Vertex's financial statements for the year ending September 30, 2000. The audited financial statements and Ernst & Young's unqualified opinion were scheduled to be published in Vertex's annual report (to be filed with its SEC Form 10-K), before the December 29 closing date. Ernst & Young knew the ATS Plaintiffs would be reading and relying on the audit results before deciding whether to close the merger. On December 19, Ernst & Young issued an unqualified audit opinion on Vertex's financial statements for the year ending September 30, 2000. The audit opinion certified that Vertex's financial statements were prepared in accordance with GAAP, audited in accordance with Generally Accepted [**4] Auditing Standards ("GAAS"), and fairly presented Vertex's financial position in all material respects.

The merger was scheduled to close on December 29, 2000. On that date Vertex's stock price had dropped to $ 6.25 per share. Subsequently, Vertex failed to meet its earnings and revenue targets by a wide margin, and had difficulty integrating ATS and other acquired companies. Vertex failed to register the ATS Plaintiffs' shares by the promised deadline of May 14, 2001 (by which time Vertex's stock price had declined to $ 2.48 per share). The parties disputed the cause of Vertex's financial problems. Vertex contended that "as a result of the dramatic downturn in high tech stocks and the generally weak economy, [it] found itself in a 'no growth' market." *McCabe v. Ernst & Young, No. 01-5747, 2006 U.S. Dist. LEXIS 524, 2006 WL 42371, at *2 (D.N.J. Jan. 6, 2006).* The ATS Plaintiffs blamed a variety of factors, specifically "Vertex's (a) failure to pay its vendors resulting in the inability to fulfill customer orders; (b) failure to properly manage its expenses; (c) breach of its various agreements to make payments and to register the shares of stock used as consideration in various acquisitions; and (d) failure to properly [**5] manage its business." *Id.*

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

Because of Vertex's registration default, the ATS Plaintiffs were unable to begin selling their Vertex shares until early 2002, after the one-year SEC lockup period had expired. By June 28, 2002, they had sold all their Vertex shares (which were never registered) in private transactions, realizing gross proceeds of approximately $ 940,000. Vertex's final stock price, immediately before its de-listing, was $ 0.07 per share.

The ATS Plaintiffs alleged it was only after the merger closed that they discovered Vertex had defaulted on similar registration obligations in the past; specifically, Vertex had failed timely to register with [*422] the SEC: (1) 1.3 million Vertex shares used as consideration for its acquisition of Communication Services International, Inc.; (2) 400,000 Vertex shares used as consideration for its acquisition of Positive Development, Inc.; and (3) 3 million shares in a private placement. The ATS Plaintiffs also alleged it was only after closing that they learned that former shareholders of Communication Services International and Positive Development had threatened to sue both Vertex and Ernst & Young over the registration defaults. [1] Additionally, [**6] the ATS Plaintiffs allegedly only then discovered that the nearly five million shares involved in Vertex's prior registration defaults were first exposed to market sales only when they were eventually registered in February 2001 (five months after negotiation of the price Vertex would pay for ATS) rather than in September 2000 (before the negotiations). The ATS Plaintiffs alleged this meant Vertex was "exposed to over $ 25 million in related contingent liabilities" that they were unaware of when they agreed to the merger. ATS Br. 10.

[1]    Former shareholders of Communication Services International and Positive Development had threatened Vertex with litigation over its registration defaults at least as early as November 2000. Former shareholders of Communication Services International filed suit against Vertex in United States District Court for the District of New Jersey on September 7, 2001, alleging breach of contract, fraud, and negligent misrepresentation. Compl., *Henley et al. v. Vertex Interactive et al.*, No. 01-4275 (D.N.J. Sept. 7, 2001). Communication Services International's former president stated in a deposition that the plaintiffs reached a settlement with Vertex "[t]owards [**7] the end of January . . . 2002 . . . ." (J.A. 558.) Former shareholders of Positive Development filed suit against Vertex in California Superior Court for the County of Los Angeles on November 20, 2001, alleging fraud, promissory fraud, breach of fiduciary duty, and negligent misrepresentation. Am. Compl. P 123, *McCabe*, No. 01-5747 (D.N.J. Mar. 21, 2002). Vertex disclosed the

Positive Development lawsuit in a January 25, 2002, Form 10-K filing with the SEC. Positive Development's former president stated in a deposition that the plaintiffs reached a settlement agreement with Vertex at some point, but its terms were confidential.

Neither Vertex's financial statements nor Ernst & Young's audit opinion (nor any of Vertex's prior SEC filings) disclosed that Vertex had defaulted on prior registration obligations or had been threatened with litigation as a result. The ATS Plaintiffs alleged Ernst & Young had known of these prior registration defaults and threatened lawsuits, but consciously decided not to disclose them "in plain violation of GAAP and GAAS." *Id.* at 11. The ATS Plaintiffs also alleged that, had they known of the prior registration defaults and associated threats of litigation, [**8] they would not have closed the merger. In a deposition, the Ernst & Young partner in charge of the Vertex audit conceded that if he had been in the ATS Plaintiffs' position, he, too, would have wanted to have that information before deciding whether to close the merger.

**B.**

After unsuccessful arbitration with Vertex, the ATS Plaintiffs sued both Vertex and Ernst & Young in December 2001. After negotiating a $ 4 million settlement with Vertex in November 2002, the ATS Plaintiffs proceeded with the three causes of action against Ernst & Young in their Amended Complaint: violation of *§ 10(b)* of the Securities Exchange Act of 1934; common law fraud; and negligent misrepresentation. All three claims were based on the same alleged omissions by Ernst & Young-- that Vertex had previously failed to register stock and had been threatened with lawsuits as a result. The ATS Plaintiffs contended this information should have been disclosed in Vertex's 2000 financial statements, and that they would not [*423] have closed the merger had they known it. Both parties presented expert testimony on whether the alleged omissions had actually caused the ATS Plaintiffs' economic loss.

Ernst & Young submitted deposition [**9] testimony and an expert report from University of Pittsburgh economics professor Kenneth Lehn that disclosure of Vertex's prior registration defaults had no material effect on the price of Vertex stock, and so the ATS Plaintiffs had incurred no damages as a result of the omissions. Lehn stated that the market did not become aware of any prior registration defaults by Vertex (or associated threats of litigation) until January 2002, when Vertex publicly disclosed that an action had been commenced against it by former shareholders of Positive Development. He opined that, even then, the price of Vertex stock did not change by a statistically significant amount,

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

demonstrating investors did not consider the information material. "In other words," the District Court summarized Lehn's view, the ATS Plaintiffs "suffered zero damages as a result of the alleged fraud." *McCabe, 2006 U.S. Dist. LEXIS 524, 2006 WL 42371, at *3.* Lehn also stated the ATS Plaintiffs could have realized between $ 4.9 and $ 5.7 million had they been able to sell their Vertex shares by the May 14, 2001, registration deadline. The ATS Plaintiffs contended this was tantamount to an admission that they suffered an economic loss of at least $ 4.76 [**10] million (the estimated May 14, 2001, sale price minus the $ 940,000 the ATS Plaintiffs were eventually able to obtain from the sale of their Vertex shares) because of Ernst & Young's omission. But the District Court concluded Lehn had done nothing more than calculate what *may* have occurred by a date certain, rather than attribute any responsibility to Ernst & Young.

The ATS Plaintiffs' expert, Fordham University finance professor John Finnerty, approached the question of loss causation in a different manner: using two common valuation methodologies, he estimated that ATS had an intrinsic value of between $ 34.49 million and $ 47.78 million at the time of the merger's closing. In his expert report, Finnerty noted the transaction with Vertex could be assigned an implied value of $ 26 million (because the ATS Plaintiffs were to receive three million shares of Vertex common stock, which was trading at $ 8.69 per share on the date the Merger Agreement was signed). But in his subsequent deposition he stated: "I was asked to value ATS, and that's what I valued. Nothing in my report implies anything about the value of the Vertex shares. There's an implied value which I cite. I valued ATS." [**11] Finnerty stated he had no opinion on the value of either the shares or stock options the ATS Plaintiffs received, but that "the McCabes sold the company too cheaply. I think it was worth more than the price they received." But he added: "I think that if I were to value all of those components [of the consideration the ATS Plaintiffs received] and add them up, I believe I would get a value within the [$ 34.49-$ 47.78 million] range I've estimated. I didn't try to do that, but I believe that to be the case."

Following discovery, Ernst & Young moved for summary judgment on all three causes of action. The District Court granted the motion, finding the ATS Plaintiffs had failed to create a genuine issue of material fact as to loss causation. It stated the facts alleged by the ATS Plaintiffs "suggest transaction causation, not loss causation." *McCabe, 2006 U.S. Dist. LEXIS 524, 2006 WL 42371, at *8.* The ATS Plaintiffs timely appealed.

**II.**

**A.**

The District Court had federal question jurisdiction under *28 U.S.C. § 1331* over [*424] the ATS Plaintiffs' Securities Exchange Act § 10(b) claim and supplemental jurisdiction under *28 U.S.C. § 1367* over their related fraud and negligent misrepresentation claims. We have jurisdiction under [**12] *28 U.S.C. § 1291.*

**B.**

[HN1] We exercise de novo review of the District Court's grant of summary judgment. *See, e.g., Slagle v. County of Clarion, 435 F.3d 262, 263 (3d Cir. 2006).* Summary judgment is proper where the moving party has established "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* To demonstrate that no issue is in dispute as to any material fact, the moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* To survive the motion, the non-moving party must show specific facts such that a reasonable jury could find in its favor. *See Fed. R. Civ. P. 56(e).* "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).* A court should view the facts in the light most [**13] favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.*

[HN2] In interpreting state law in the absence of a controlling decision from a state's highest court, "it is the duty of the [federal court] to ascertain from all the available data what state law is and apply it." *West v. AT&T Co., 311 U.S. 223, 237, 61 S. Ct. 179, 85 L. Ed. 139 (1940).*

**III.**

[HN3] *Section 10(b)* of the Securities Exchange Act forbids (1) the "use or employ[ment of] . . . any manipulative or deceptive device or contrivance," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of [SEC] rules and regulations." *15 U.S.C. § 78j(b) (2006).* SEC regulations, in turn, make it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. *17 C.F.R. § 240.10b-5(b) (2006)* ("Rule 10b-5").

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

[HN4] The Supreme Court has identified the six required elements of a Securities Exchange Act § 10(b) private damages action:

> (1) *a material misrepresentation (or omission)*;

> (2) *scienter*, i.e., a wrongful [**14] state of mind;

> (3) *a connection with the purchase or sale of a security*;

> (4) *reliance*, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";

> (5) *economic loss*; and

> (6) *"loss causation,"* i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (citations omitted). *See also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The common law loss causation element is codified [*425] as a requirement in the Private Securities Litigation Reform Act ("PSLRA"): "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (2006). *See also Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 208 n.15 (3d Cir. 2006).

**A.**

We have stated that [HN5] "[u]nder *Rule 10b-5* causation is two-pronged." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001). A plaintiff must show both: (1) "transaction causation" (or "reliance"), i.e., that but for the fraudulent misrepresentation or omission, the investor [**15] would not have purchased or sold the security; and (2) "loss causation," i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered. *Id.* at 172-73. In addressing § 10(b) claims, and especially their loss causation element, we have distinguished between "typical" and "non-typical" claims. *See, e.g., EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("In considering loss causation, it is important to recognize . . . how this case differs from the usual securities action."). But we have consistently required that both transaction causation and loss causation must be established in § 10(b) cases, and have never allowed the elements to merge. [2]

2  We noted in *EP MedSystems*, 235 F.3d at 871, that § 10(b) claims are typically brought in securities actions in which a plaintiff claims a defendant made material public misrepresentations or omissions in order to affect the price of its publicly-traded stock, i.e., to perpetrate "fraud on the market." But *EP MedSystems* and *Berckeley* involved § 10(b) claims alleging misrepresentations or omissions that induced another party into entering a private transaction. Nevertheless, *Berckeley* reaffirms [**16] that, fundamentally, the same loss causation analysis occurs in both typical and non-typical § 10(b) cases. *See infra*, Part III.A.

[HN6] "Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *Berckeley*, 455 F.3d at 222. [3] A § 10(b) plaintiff must show both that (1) the plaintiff entered the transaction at issue in reliance on the claimed misrepresentation or omission (transaction causation) and (2) the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss (loss causation).

3  [HN7] The loss causation requirement limits the circumstances in which an investor can sue over a failed investment, so that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with that investment. "Otherwise, for example, a seller who fraudulently induced a purchase of securities in early October 1987 would have become an insurer against the precipitous price decline caused in large part by the market crash on October 19." [**17] 3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.11[3] (5th ed. 2005) [hereinafter Hazen, *Securities Regulation* ].

**1.**

[HN8] It is more difficult to categorize the required loss causation showing in non-typical § 10(b) actions such as this one than it is in typical § 10(b) actions. In a typical "fraud-on-the-market" § 10(b) action, the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission; to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in [*426] causing a decline in the security's price, thus creating an actual economic loss for the

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

plaintiff. *Semerenko v. Cendant Corp., 223 F.3d 165, 184-85 (3d Cir. 2000). See also EP MedSystems, 235 F.3d at 884* (collecting typical § 10(b) cases).

But in a non-typical § 10(b) action, where the plaintiff does not simply allege that the price of a publicly-traded security has been affected, the factual predicates of loss causation fall into less of a rigid pattern. For example, [**18] the plaintiff corporation in *EP Medsystems* alleged the defendant corporation had violated *§ 10(b)* by inducing plaintiff to buy shares in defendant "imminent" business opportunities that were actually non-existent. *235 F.3d at 869.* We held the plaintiff's argument it had been "induced to make an investment of $ 1.4 million which turned out to be worthless" was a sufficient allegation of loss causation to survive a motion to dismiss. *Id. at 884.* And in *Newton*, a putative class of investors sued defendant broker for violating *§ 10(b)* by executing trades at stock prices established by an industry-wide system rather than on the reasonably available terms most favorable to plaintiffs. *259 F.3d at 162.* We stated that the difference between (1) the price at which a trade had been executed and (2) the price at which it could reasonably have been executed could be a sufficient showing of loss causation. *Id. at 181 n.24.* The ATS Plaintiffs' § 10(b) claim is clearly a non-typical one. In return for selling their ATS shares in a private transaction, they received consideration that included unregistered shares of and options for Vertex stock. That the ATS Plaintiffs [**19] could not re-sell those shares for a year unless Vertex registered them further distinguished the ATS Plaintiffs from the typical purchaser of publicly-traded securities who claims to have been misled into making the purchase by fraud on the market.

[HN9] In order to satisfy the loss causation requirement in both typical and non-typical § 10(b) actions, the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.

**2.**

[HN10] The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss. *See Semerenko, 223 F.3d at 185, 187* (stating "an investor must . . . establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation" and clarifying the loss causation requirement would not be met where "the misrepresentations were not a substantial factor"). In *EP MedSystems*, we characterized *Semerenko's* as "a practical approach, in effect applying general causation principles." *235 F.3d at 884.* Adopting this "practical approach," we considered the following loss causation allegations in *EP* [**20] *MedSystems*: the de-

fendant medical research and development company had told the corporate investor plaintiff that contracts between the company and four prominent corporations to market the company's new women's health products were "imminent," when in fact the company had never been on the verge of entering any such marketing contract; the company had provided the investor with sales projections (necessarily based on consummation of the aforementioned contracts) that showed the company would enjoy liquidity for two years; the statements and sales projections had induced the investor to purchase 280,000 shares of the company's preferred stock for $ 1.4 million, in the expectation of profiting from [*427] the "imminent" contracts; and the investor subsequently discovered that, because the "imminent" contracts were actually non-existent, the company would run out of operating funds within six months of the investment, which thus turned out to be worthless. We held the plaintiff's allegation of loss causation was sufficient to survive a motion to dismiss. [4]

> [4] We emphasized that loss causation "becomes most critical at the proof stage," *EP MedSystems, 235 F.3d at 884,* and also stated: "Although [**21] . . . the allegation that [plaintiff] 'sustained substantial financial losses as a direct result of the aforementioned misrepresentations and omissions on the part of [defendant]' could have more specifically connected the misrepresentation to the alleged loss, i.e., investment in a company with little prospects, when we draw all inferences in plaintiff's favor, we conclude that MedSystems has adequately alleged loss causation," *id. at 885.* The procedural posture of *EP MedSystems* necessitated a different approach to the loss causation requirement than here on summary judgment, where discovery has taken place. *See 3 Hazen, Securities Regulation § 12.11[3]* ("Loss causation issues can be highly factual, thus frequently precluding judgment on the pleadings."); *see also Dura, 544 U.S. at 346-47* (holding the plaintiff had not adequately alleged loss causation and noting that, in the context of a motion to dismiss, a plaintiff is only required to give a "'short and plain statement' . . . describing the loss caused by the defendants' . . . misrepresentations"); Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 276 (Supp. 2007) ("At its core, *Dura* is largely a case about pleading. [**22] The Court concluded its analysis by highlighting how little would have been necessary by the plaintiffs to have effectively pled this cause of action.").

In *Berckeley, 455 F.3d at 223,* another non-typical § 10(b) case, we held the loss causation requirement had

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

not been satisfied because plaintiff had failed to establish a "direct causal nexus between the misrepresentation and the plaintiff's economic loss." Plaintiff Colkitt, the chairman and principal shareholder of a corporation, entered a private agreement to sell convertible debentures to defendant, an offshore financing entity: Colkitt would receive $ 2 million in exchange for forty convertible debentures; and in lieu of repayment, the offshore entity was entitled to convert up to 50% of its debentures into unregistered shares in the corporation, to be issued by Colkitt. The number of shares the offshore entity was entitled to obtain depended on the market price of the corporation's stock. In the agreement, the offshore entity warranted that all subsequent sales of its debentures or shares would be undertaken in accordance with federal securities law registration requirements.

Soon after the agreement closed, Colkitt accused the [**23] offshore entity of short-selling in order to deflate the market price of the corporation's stock, so that it could obtain more shares from him upon conversion of its debentures. In retaliation, when the time came for Colkitt to convert the unregistered shares and thereby repay his debt, he converted only a small percentage of the shares the offshore entity requested, breaching the agreement. Both parties filed suit. One of Colkitt's arguments on summary judgment was that he was justified in not complying with the agreement because the offshore entity made material misrepresentations in the agreement to induce Colkitt into entering it, in violation of § 10(b). Specifically, Colkitt contended: securities laws required the offshore entity to file a registration statement before it could sell the shares it had purchased from him; the offshore entity warranted it would comply with securities laws in subsequent sales of the shares; the offshore entity later sold the still-unregistered shares; and therefore, because the offshore entity had intended to do this all along, its representations in the agreement [*428] that it would comply with applicable securities laws were misrepresentations.

In order [**24] to establish the loss causation element of his § 10(b) claim, Colkitt contended his shares in the corporation lost value as a direct and proximate result of the offshore entity's misrepresentations. We rejected this argument, noting Colkitt had (1) himself alleged that the corporation's stock price had decreased because of short-selling by the offshore entity, and (2) presented no evidence connecting the stock price to the misrepresentations.

Colkitt's complaint asserts that his NMFS share holdings lost value because of Berckeley's alleged misrepresentation. We disagree. Based on the record before us, there is absolutely no connection be-

tween the price decrease in NMFS shares and Berckeley's unrelated alleged misrepresentation as to its intent to comply with offshore registration requirements. . . . We hold that Colkitt failed to set forth sufficient facts that the precipitous loss in value in his NMFS share holdings was proximately caused by Berckeley's alleged misrepresentation. There is no evidence in the record that the decline in the price per share of NMFS stock was connected in any manner to alleged misrepresentations regarding Berckeley's intent to evade Section 5 registration [**25] requirements . . . .

*Berckeley, 455 F.3d at 223-24.* [5]

5   Colkitt made two additional § 10(b) claims, contending that, as a direct and proximate result of the offshore entity's misrepresentations, he suffered damages in the form of (1) the sale of shares in the corporation to the offshore entity at a 17 discount from their market value and (2) the possible requirement to pay interest and penalties on the outstanding debentures under the agreement. We remanded these claims because record evidence on loss causation was "unclear" as to them. *Berckeley, 455 F.3d at 223 n.25.* But we noted the remand was "only a Pyrrhic victory for Colkitt, who will not be able to recover his largest category of damages from Berckeley, which is the drop in stock prices . . . ." *Id. at 224 n.27.*

3.

[HN11] The Court of Appeals for the Fifth Circuit has offered a concise statement of what is required to show that a misrepresentation or omission proximately caused an economic loss:

The plaintiff must prove . . . that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The [loss] causation requirement is satisfied in a *Rule 10b-5* case only if the misrepresentation touches upon the reasons [**26] for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

*Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd on other grounds*, 459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983). *See also Berckeley*, 455 F.3d at 222 ("[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries.'") (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)). This approach has been advocated by some scholars, as well:

> [HN12] [I]f false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the representations will not afford any basis for recovery. It was only where the fact [*429] misstated was of a nature calculated to bring about such a result that damages for it can be recovered.

W. Page Keeton et al., *Prosser & Keeton* [**27] *on the Law of Torts* § 110 (5th ed. 1984). *See also* Dane A. Holbrook, *Measuring and Limiting Recovery Under Rule 10b-5: Optimizing Loss Causation and Damages in Securities Fraud Litigation*, 39 Tex. J. Bus. L. 215, 260-62 (2003) ("The materialization of risk approach requires plaintiffs to prove that the materialization of an undisclosed risk caused the alleged loss. . . . [C]ourts utilizing this approach will not compensate a plaintiff who assumes the risk of an intervening factor. . . . [This] approach most appropriately balances the interests of plaintiffs and defendants.").

We believe this approach is consistent with our loss causation jurisprudence in *Berckeley*, *Newton*, and *EP Medsystems*. Therefore, to make the requisite loss causation showing, the ATS Plaintiffs must show that Vertex's prior registration defaults and consequent litigation risks (the very facts Ernst & Young allegedly omitted) were a substantial factor in causing the ATS Plaintiffs' economic loss. [6]

> 6   This standard is consistent with the district court cases cited in the ATS Plaintiffs' brief. In *Rosen v. Communication Services Group, Inc.*, 155 F. Supp. 2d 310 (E.D. Pa. 2001), plaintiffs claimed they were induced to [**28] purchase convertible debentures from defendant in reliance on defendant's repeated promises that its company would go public (a "liquidity event" that would have converted the debentures into common stock); plaintiffs attributed their damages to

defendant's failure to go public (the very fact misrepresented), and the court, relying on *EP MedSystems*, found this a sufficient allegation of loss causation to overcome a motion to dismiss, *id. at 321*. *See also In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 629-30 (D. Del. 2003) (denying summary judgment because evidence created a genuine issue as to whether defendant's mischaracterization of a transaction as being a merger of equals rather than an acquisition prevented plaintiff from obtaining control premium it would have received had the transaction been properly characterized).

**B.**

Before addressing the adequacy of the ATS Plaintiffs' loss causation showing here, we address two points of their argument that warrant further discussion.

**1.**

First, the ATS Plaintiffs rely on *EP MedSystems* to contend that "plaintiffs must prove . . . that [Ernst & Young's] misstatements and omissions . . . were causally linked to . . . the loss of ownership [**29] of ATS." ATS Br. 22. Their argument is that they can satisfy the loss causation requirement by showing a causal nexus between (1) Ernst & Young's alleged omissions and (2) the ATS Plaintiffs' decision to close the merger (which is when they gave up their ATS shares). But by focusing only on whether the ATS Plaintiffs were induced into the transaction by Ernst & Young's alleged omissions, this argument impermissibly conflates loss causation with transaction causation, rendering the loss causation requirement meaningless. The ATS Plaintiffs essentially admit this is the approach they advocate: "Courts have acknowledged that where the omission of collateral facts fraudulently induces a transaction that would not have otherwise taken place, as in this case, loss causation and transaction causation 'effectively merge.'" *Id.* at 20 n.7.

[HN13] The Supreme Court recently reiterated that a § 10(b) plaintiff must show both loss causation and transaction causation. *Dura*, 544 U.S. at 341-42. And even in non-typical § 10(b) cases, where we have called for a practical approach to loss causation, this Court has consistently distinguished loss causation [*430] from transaction causation: we have required both loss [**30] causation and transaction causation to be established, and have analyzed them separately. *See, e.g., Newton*, 259 F.3d at 174-77 (analyzing transaction causation separately from loss causation); *EP MedSystems*, 235 F.3d at 882-83 (same). [7] This is because the two prongs of causation in § 10(b) cases are rooted in traditional common law principles, and serve different purposes:

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

It must be remembered that, as in other areas of the law, causation embodies two distinct concepts: (1) cause in fact and (2) legal cause. Legal cause is frequently dealt with in terms of proximate cause. Cause-in-fact questions are frequently stated in terms of the sine qua non rule: but for the act or acts complained of, the injury would not have occurred. Legal cause represents the law's doctrinal basis for limiting liability even though cause in fact may be proven. . . . Causation in securities law involves the same analysis of cause in fact and legal cause that was developed under the common law.

3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.11[1] (5th ed. 2005). *See also* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 276 (Supp. 2007) ("The Supreme Court decision in [**31] *Dura* was notable for its close reliance on common law concepts . . . .").

7 [HN14] The Courts of Appeals for the Second and Ninth Circuits have held that, in the limited circumstance of a defendant broker fraudulently inducing a plaintiff investor to purchase securities in order to "churn" plaintiff's portfolio and generate commissions, plaintiff need not show loss causation to make a § 10(b) claim, as long as the transaction causation requirement is met: "The plaintiff . . . should not have to prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security." *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir. 1984). In *Hatrock*, a stock broker repeatedly made misrepresentations about upcoming corporate takeovers, encouraging clients to engage in repeated sale and re-acquisition of certain stocks (whose value steadily declined) purely so that the broker could generate commissions. The court stated: "the customer may hold the broker liable for churning without proving loss causation." *Id. See also Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970) ("The issue is not [**32] whether Smith, Barney was actually manipulating the price on Chasins or whether he paid a fair price, but rather the possible effect of disclosure of Smith, Barney's market-making role on Chasins' decision to purchase at all on Smith, Barney's recommendation. It is the latter inducement to purchase by Smith, Barney without dis-

closure of its interest that is the basis of this violation . . . ."). The Ninth Circuit has emphasized the narrowness of this exception. *See Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1486 n.7 (9th Cir. 1991) ("We decline to [apply the *Hatrock* exception here] because the exception appears capable of swallowing the rule. We therefore view the *Hatrock* exception as limited to the facts of that case, which involved churning of trading accounts by brokers."); *see also Bastian v. Petren Res. Corp.*, 681 F. Supp. 530, 535 (N.D. Ill. 1988) (citing *Hatrock* and *Chasins* and stating that "the courts which have rejected a 'loss causation' requirement have done so in cases involving a particular and special form of § 10(b) violation--stock broker 'churning' of client accounts"). We cited *Hatrock* in dicta in *Berckeley*, but [**33] this Court has never found such an exception applicable.

We have never suggested that the loss causation inquiry may "effectively merge" with the transaction causation inquiry. In *Berckeley* (a non-typical § 10(b) decision) we stated that[HN15] "[l]oss causation is a more exacting standard" than transaction causation. *455 F.3d at 222.* That is because "'[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement.'" *Id.* (quoting *Suez Equity Investors,* [*431] *L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001)) (alteration in *Berckeley*). "[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries." *Id.* (quoting *Caremark*, 113 F.3d at 648).

The ATS Plaintiffs rely on *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980), in which investors sued a brokerage house for violating *§ 10(b)* after they had purchased and retained securities (whose value subsequently declined) on the advice of a trainee who misrepresented himself as a licensed broker and portfolio management [**34] specialist. The value of the securities did not decline because of the trainee's misrepresentation, but the Court of Appeals for the Second Circuit nevertheless held that the plaintiffs had satisfied the loss causation requirement. The majority wrote that, though the case was "not one in which a material misrepresentation of an element of value intrinsic to the worth of the security is shown to be false," the misrepresentation nevertheless proximately caused plaintiffs' economic loss, because it was foreseeable that the trainee's false credentials would have induced them to purchase and retain the stocks he recommended despite "misgivings prompted by the market . . . ." *Id. at 708.* The dissent, however,

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

wrote that the loss causation requirement had not been met:

> In straining to reach a sympathetic result, the majority overlooks a fundamental principle of causation which has long prevailed under the common law of fraud and which has been applied to comparable claims brought under the federal securities acts. This is, quite simply, that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause. This elementary rule precludes [**35] recovery in the case at bar since Kohn's misrepresentations as to his qualifications as a broker in no way caused the decline in the market value of the stocks he promoted.

*Id. at 716-17* (Meskill, J., dissenting). District courts within this Circuit have identified the majority opinion in *Marbury Management* as an outlier inconsistent with our precedents, and have instead followed Judge Meskill's dissent. [8]

> 8    *See Edward J. DeBartolo Corp. v. Coopers & Lybrand, 928 F. Supp. 557, 562 (W.D. Pa. 1996)* (citing *Marbury Management* for the minority view that no showing of loss causation is required where a showing of transaction causation has been made and citing Judge Meskill's dissent as providing the "rationale for requiring loss causation"); *Hartman v. Blinder, 687 F. Supp. 938, 943 n.5 (D.N.J. 1987)* (stating *Marbury Management* "found loss causation in a case where the facts would seem to support only a finding of transaction causation" and that "[t]he 'vehement dissent' of Judge Meskill has been lionized"); *In re Catanella and E.F. Hutton & Co. Sec. Litig., 583 F. Supp. 1388, 1417 (E.D. Pa. 1984)* ("I find the view articulated by Judge Meskill . . . to be logical and consistent with the definition [**36] of loss causation. A contrary view would render meaningless the distinction between transaction and loss causation, thereby writing the proximate cause requirement out of a section 10(b) cause of action.").

To the extent *Marbury Management* conflates the loss causation and transaction causation requirements in § 10(b) cases, it is contrary to our jurisprudence and, more importantly, to the Supreme Court's recent decision in *Dura. See Dura, 544 U.S. at 341-42* (stating a § 10(b) claim's "basic elements" include both transaction causation and loss causation). We also note the Court of Ap-

peals for the Second Circuit has apparently disavowed this aspect of *Marbury Management.* In *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)*, the court began its discussion of loss causation by stating: [HN16] " [*432] [i]t is long settled that a securities-fraud plaintiff must prove both transaction and loss causation." In order to establish loss causation, it said, "'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively [**37] affected the value of the security." *Id. at 173* (quoting *Suez Equity, 250 F.3d at 95*) (alteration in *Lentell*). The court stated that its cases "require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk," *id.*, and cited *Marbury Management* for the *contrary* proposition that an "allegation that fraud induced [an] investor to make an investment and to persevere with that investment [was] sufficient to establish loss causation," *id. at 174*. As two commentators noted, the Second Circuit thus "appeared implicitly to overrule the long-controversial opinion in *Marbury Management* [,] dismissing it with a 'but see' citation at the end of its analysis, and pointedly noting that '[w]e follow the holdings of *Emergent Capital, Castellano,* and *Suez Equity* '--conspicuously omitting *Marbury*." Martin Flumenbaum & Brad S. Karp, *Loss Causation in the Research Analyst Cases (and Beyond)*, N.Y.L.J., Jan. 26, 2005, at 3, 7 (quoting *Lentell, 396 F.3d at 174*) (second alteration in Flumenbaum & Karp). Even before *Lentell*, the Second Circuit had maintained that transaction causation and loss causation were to be considered separately. *See AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 216 (2d Cir. 2000)* [**38] (concluding, after discussing *Marbury Management* and case law in the Circuit subsequent to it, that "[l]oss causation is a separate element from transaction causation, and, in situations such as the instant one, loss causation cannot be collapsed with transaction causation"); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., Nos. 05-5132 & 05-2593, 493 F.3d 87, 2007 U.S. App. LEXIS 16382, 2007 WL 1989336, at *13 (2d Cir. July 11, 2007)* (stating "[a] plaintiff is required to prove both transaction causation . . . and loss causation" and concluding the allegation that a seller misrepresented that a fund was an accredited investor, in order to induce a buyer to enter a transaction, "might support transaction causation; it fails, however, to show how the fact that the Shaar Fund was not an accredited investor caused any loss"). Under *Dura*, as well as under our own jurisprudence, [HN17] a § 10(b) plaintiff is required to establish both loss causation and transaction causation.

2.

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

Second, the ATS Plaintiffs contend "they were dam-aged at the moment the ATS Merger closed," ATS Br. 20, when they sold a company worth up to almost $ 48 million in exchange for consideration whose "quality and value [were] far inferior to that which was represented [**39] to them," *id.* at 19. They cite cases from the Court of Appeals for the Second Circuit in support of the proposition that "in cases like this, plaintiffs do not have to demonstrate a post-acquisition decline in market price in order to establish loss causation." *Id.* at 15 n.5. [9] Their argument is that, when the plaintiff has been fraudulently induced to make an investment that is actually worth less than the plaintiff has been misled into believing, the loss causation requirement is satisfied at the moment the transaction occurs.

> 9  The ATS Plaintiffs' brief cites *Lentell*; *Castel-lano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001)*; *Suez Equity*; and *Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir. 1974)*.

As an initial matter, it is not clear that this would be a viable argument for the [*433] ATS Plaintiffs, even if it were a valid one. As discussed, they presented no evi-dence of the value of the consideration they received at the time the merger closed: Dr. Finnerty estimated the value of what the ATS Plaintiffs gave up, but expressed no opinion on the value of the Vertex shares and stock options they got back in return. Thus, there was insuffi-cient evidence to show an economic [**40] loss for the ATS Plaintiffs at the moment the transaction occurred. [10]

> 10  In fact, Dr. Finnerty arguably suggested the ATS Plaintiffs had suffered no economic loss at all at the moment the transaction occurred. He stated in his deposition that, although he had not tried to calculate the value of all the components of consideration the ATS Plaintiffs received, he believed that, had he done so, the figure would have been within the $ 34.49-$ 47.78 million range he estimated ATS to be worth.

More importantly, this argument is inconsistent with controlling precedent. In *Dura*, the Supreme Court ex-plicitly rejected the argument that a § 10(b) plaintiff could satisfy the loss causation requirement simply by showing that "'the price *on the date of purchase* was in-flated because of the misrepresentation.'" *544 U.S. at 342.* Reversing the Court of Appeals for the Ninth Cir-cuit, the Court explained:

> [T]he logical link between the inflated share purchase price and any later eco-nomic loss is not invariably strong. Shares are normally purchased with an eye to-

ward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresen-tation will not [**41] have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from in-evitably so. When the purchaser subse-quently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new indus-try-specific or firm-specific facts, condi-tions, or other events, which taken sepa-rately or together account for some or all of that lower price. . . .

> Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss.

*Id. at 342-43.* As the Supreme Court noted, this Court, too, has "rejected the Ninth Circuit's 'inflated purchase price' approach to proving causation and loss." *Id. at 344* (citing *Semerenko, 223 F.3d at 185*). The District Court rightly noted that *Dura* dealt with a typical fraud-on-the-market § 10(b) claim and is thus not directly controlling here, because the ATS Plaintiffs could not simply turn around and re-sell the unregistered Vertex shares they [**42] had received. *McCabe, 2006 U.S. Dist. LEXIS 2006 WL 42371, at *7.* [11]

> 11  *See also Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 944 n.1 (9th Cir. 2005)* ("Although the Supreme Court's deci-sion in [*Dura*] makes clear that in fraud-on-the-market cases involving publicly traded stocks, plaintiffs cannot plead loss causation simply by asserting that they purchased the security at issue at an artificially inflated price, the Court refused to consider 'other proximate cause or loss-related questions.' Here, at issue is a private sale of pri-vately traded stock and Livid not only asserted that it purchased the security at issue at an artifi-cially inflated price, but pled that the Defendants' misrepresentation was causally related to the loss it sustained. Under these circumstances, *Dura* is not controlling.") (quoting *Dura, 544 U.S. at 346*). Nevertheless, we believe the logic of *Dura* is persuasive.

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

[*434] The ATS Plaintiffs also cite a 2001 non-typical § 10(b) case from the Court of Appeals for the Second Circuit. In *Suez Equity, 250 F.3d at 87,* plaintiffs purchased $ 3 million in securities in a financing entity on the recommendation of defendant bank, which was already invested in the financing entity. [**43] Plaintiffs had asked the bank for a background report on the financing entity's controlling shareholder, Mallick, but the bank's report consciously omitted several negative events in Mallick's business career and financial history; instead, the bank claimed its investigation of Mallick had yielded a positive picture of his management skills. Within seven weeks of plaintiffs' investment, the financing entity suffered a cash flow crisis from which it never recovered, rendering their investment worthless. In their complaint, plaintiffs alleged the financing entity's collapse (and their consequent loss of the value of their investment) were attributable to Mallick's lack of management skills, the very facts omitted from the background report that induced plaintiffs to make their investment. The Second Circuit held that this allegation of loss causation was sufficient to survive a motion to dismiss:

> The complaint thus alleges that plaintiffs suffered a loss at the time of purchase since the value of the securities was less than that represented by defendants. Plaintiffs have also adequately alleged a second, related loss--that Mallick's concealed lack of managerial ability induced SAM Group's [**44] failure.

*Id. at 98.*

The ATS Plaintiffs cite *Suez Equity* to support the proposition that "in cases like this, plaintiffs do not have to demonstrate a post-acquisition decline in market price in order to establish loss causation." ATS Br. 15 n.5. But the Court of Appeals for the Second Circuit has clarified *Suez Equity,* undercutting the ATS Plaintiffs' argument:

> Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement. . . .
>
> In its misplaced reliance on *Suez Equity,* appellant overlooks a crucial aspect of that decision. . . .
>
> . . . Plaintiffs [in *Suez Equity*] claimed that the concealed events reflected the executive's inability to manage debt and maintain adequate liquidity. Plaintiffs also alleged that their investment ultimately became worthless because of the com-

pany's liquidity crisis and expressly attributed that crisis to the executive's inability to manage the company's finances.

> Thus, the *Suez Equity* plaintiffs did not merely allege a disparity between the price they had paid for the company's securities and the securities' "true" value at the time of the purchase. Rather, they specifically asserted a causal connection [**45] between the concealed information--*i.e.,* the executive's history--and the ultimate failure of the venture. . . . We did not mean to suggest in Suez Equity that a purchase-time loss allegation alone could satisfy the loss causation pleading requirement. To the contrary, we emphasized that the plaintiffs had "also adequately alleged a second, related, loss--that [Mallick's] concealed lack of managerial ability induced [the company's] failure."

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (2d Cir. 2003)* (quoting *Suez Equity, 250 F.3d at 98*) (last alteration in *Emergent Capital*). [12]

> 12 In clarifying *Suez Equity, Emergent Capital* apparently also clarified two earlier Second Circuit case cited by the ATS Plaintiffs for the proposition that "plaintiffs do not have to demonstrate a post-acquisition decline in market price in order to establish loss causation." ATS Br. 15 n.5. *See Castellano, 257 F.3d at 187* ("The rule affirmed in *Suez Equity.* . . is that 'plaintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the misrepresentations *and* that the defendants' misrepresentations induced a disparity [**46] between the transaction price and the true investment quality of the securities at the time of the transaction.'"); *Schlick, 507 F.2d at 380* ("[Loss causation] is demonstrated rather easily by proof of some form of economic damage, here the unfair exchange ratio, which arguably would have been fairer had the basis for valuation been disclosed."). The fourth case cited by the ATS Plaintiffs, *Lentell,* simply does not support their argument. *See 396 F.3d at 174* (citing *Emergent Capital* and stating that "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a 'purchase-time value disparity' between the price paid for a security and its 'true investment quality.'").

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

[*435]  In *EP MedSystems*, we used language similar to that of *Suez Equity* in describing plaintiffs' investment as "worthless," but we characterized the loss as occurring subsequent to the transaction rather than contemporaneously with it. *Compare Suez Equity, 250 F.3d at 94* ("As a result, plaintiffs' SAM Group securities were at the time of acquisition--and are today--worthless.") *with EP MedSystems, 235 F.3d at 884* ("In this case, MedSystems claims that as a result of fraudulent misrepresentations [**47] made in personal communications by EchoCath executives, it was induced to make an investment of $ 1.4 million which *turned out to be* worthless.") (emphasis added). Moreover, our discussion in *EP MedSystems* shows that the very facts which defendant misrepresented were allegedly a substantial factor in causing the subsequent loss of plaintiff's investment. First, we described the misrepresented future business opportunities: "DeBernardis represented that EchoCath had engaged in lengthy negotiations to license its products and was on the verge of signing contracts with a number of prominent medical companies . . . to develop and market EchoCath's women's health products." *EP MedSystems, 235 F.3d at 868.* Then we connected the subsequent economic loss to the failure of those future business opportunities to materialize:

> In the fifteen months after MedSystems made its investment, EchoCath failed to enter into a single contract or to receive any income in connection with the marketing and development of the women's health products. It also did not receive the expected payments from license fees. In September 1997, EchoCath advised MedSystems that EchoCath would run out of operating funds in [**48] 90 days if new investment in the company was not forthcoming.

*Id. at 869.* This is consistent with the Court of Appeals for the Second Circuit's clarification of *Suez Equity. See Em ergent Capital, 343 F.3d at 198* ("[T]he *Suez Equity* plaintiffs did not merely allege a disparity between the price they had paid for the company's securities and the securities' 'true' value at the time of the purchase. Rather, they specifically asserted a causal connection between the concealed information . . . and the ultimate failure of the venture.").

The ATS Plaintiffs presented no evidence that the value of the consideration they received, at the time the merger closed, was actually lower than they had been misled into believing. Even if they had presented such evidence, it alone would have been insufficient to satisfy the loss causation requirement. It is not enough for §

10(b) plaintiffs to show that a misstatement or omission induced them to buy or sell securities at a price less favorable [*436] to them than they had been misled into believing. Rather, they must show that the misstated or omitted facts were a substantial factor in causing an economic loss actually incurred by the plaintiffs.

**C.**

In order [**49] to survive summary judgment, then, the ATS Plaintiffs had to create a genuine issue as to whether Vertex's registration defaults and the threats of litigation associated with them (the very facts omitted by Ernst & Young) were a substantial factor in causing the ATS Plaintiffs' economic loss. That economic loss was embodied in Vertex's failure to meet its earnings and revenues targets following the merger, which resulted in a swift decline in the price of Vertex stock from $ 6.25 when the merger closed (on December 29, 2000) to $ 0.95 when the ATS Plaintiffs were finally able to begin selling off their shares (on December 31, 2001). The ATS Plaintiffs were able to realize only $ 940,000 on the eventual sale of three million unregistered shares of Vertex stock.

To restate the previous discussion, as well as rely on "general causation principles," *EP MedSystems, 235 F.3d at 884,* whether Ernst & Young's omission was a substantial factor in causing the ATS Plaintiffs' economic loss includes considerations of materiality, directness, foreseeability, and intervening causes. *See Berckeley, 455 F.3d at 222* ("[HN18] [T]he loss causation inquiry typically examines how directly the subject of the fraudulent [**50] statement caused the loss, and whether the resulting loss was a foreseeable outcome . . . . [It] requires the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries."); *Egervary v. Young, 366 F.3d 238, 246 (3d Cir. 2004)* ("[HN19] [A]n intervening act of a third party, which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about.") (citing *Restatement (Second) of Torts §§ 440-41* (1965)). [13]

13  It is particularly important for the ATS Plaintiffs to show that the very facts omitted by Ernst & Young were a substantial factor in causing the decline in Vertex's financial fortunes, because both parties placed Vertex's performance in the context of a "general downturn in the economy," particularly for high-tech stocks. (J.A. 318.) *See* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 1283-84 (5th ed. 2004) ("[W]hen the market declines after the published

rectification of a false earning statement that was used in the sale of an electronics [**51] stock, the misrepresentation is not the 'legal cause' of the buyer's loss, or at any rate not the *sole* legal cause, to the extent that a subsequent event that had no connection with or the relation to the misrepresentation caused a market drop--for example . . . *a softening of the market for all electronic stocks . . . .*") (second emphasis added).

We agree with the District Court that the factual record is devoid of sufficient evidence to create a genuine issue as to loss causation. The ATS Plaintiffs asserted in their counter-statement of material facts that "[a]mong the reasons for Vertex's failure to meet earnings and revenue targets was Vertex's . . . breach of its various agreements to make payments and to register the shares of stock used as consideration for various acquisitions." *McCabe, 2006 U.S. Dist. LEXIS 524, 2006 WL 42371, at *9.* This might have been a sufficient allegation of loss causation to survive a motion to dismiss, as in *EP MedSystems. See supra* note 4. But [HN20] "[t]o survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine [*437] issue." *Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005)* (quoting [**52] *Celotex 477 U.S. at 325*).

Whereas Vertex's expert witness, Dr. Lehn, attempted to show that the price of Vertex's stock had not been affected by the disclosure of Vertex's registration defaults, the report of Dr. Finnerty, the ATS Plaintiffs' expert witness, focused solely on the value of ATS at the time of the merger. His rebuttal report challenged Dr. Lehn's damages-calculation methodology, but still focused on ATS's value, contending it was the best measure of the ATS Plaintiffs' damages. In Dr. Finnerty's deposition, he stated that he was never asked to value Vertex stock, and that he had no opinion on "whether the alleged misrepresentations of Ernst & Young proximately caused the decline of values in the Vertex shares after the merger."

The ATS Plaintiffs also specify in their brief that, "[a]s a result of the Registration Defaults, Vertex was experiencing substantial problems integrating its former merger partners . . . into the company's operations." ATS Br. 23. In support, they point to the depositions of the former presidents of Communication Services International and Positive Development, respectively Roger Henley and Walter Reichman. Henley and Reichman each received unregistered [**53] shares of Vertex stock that Vertex failed to register in a timely manner. Both stated that, because the price of Vertex stock was dropping steadily, they wanted to sell off their shares, and were unable to do so as soon as they would have liked because of Vertex's registration defaults. The registration

defaults thus prevented Henley and Reichman from selling at as high a price as they would have been able to obtain had Vertex complied with its obligations, creating an economic loss. But neither attributed Vertex's falling stock price or declining financial performance to the registration defaults. Evidence of that connection is what was required from the ATS Plaintiffs to create a genuine issue as to loss causation.

Henley did say that, at the time Communication Services International agreed to a settlement with Vertex over Vertex's registration default, "Vertex was having a lot of difficulties[,] they had cash problems and . . . there wasn't going to be a lot of dollars for taking care of settlements or judgments. So from our perspective we were competing with [the ATS Plaintiffs] for a limited dollar pool . . . ." He also said that Vertex was having "a lot of operational issues" [**54] at the time, issues "about things getting paid, vendor problems, customer problems." These two statements suggest that settlement payouts were putting a strain on Vertex's already-struggling finances, thus potentially contributing to the ATS Plaintiffs' economic loss. But, even taken together, they are insufficient to create a genuine issue as to loss causation.

Finally, the ATS Plaintiffs contend Ernst & Young's own expert, Dr. Lehn, gave evidence of loss causation. In his report, Dr. Lehn theorized that, had the ATS Plaintiffs been able to begin selling off their Vertex stock on May 14, 2001 (by which date Vertex had promised to register the shares), they could have realized between $ 4.9 and $ 5.7 million. The ATS Plaintiffs characterize this as "an admission that Vertex's failure to register plaintiffs' shares caused plaintiffs to lose at least $ 4.76 million (*i.e.,* the $ 5.7 million that would have been realized had the shares been timely registered, less the $ 940,000 actually received)." ATS Br. 25. But we agree with the District Court that this alone is insufficient evidence of loss causation: the $ 4.76 million figure may be a measure of the ATS Plaintiffs' economic loss, and [**55] but for Ernst & Young's omissions [*438] the ATS Plaintiffs might not have been "locked into" that economic loss; but Dr. Lehn's report does not show that the omission proximately caused the economic loss. That is, it was not evidence that the falling price of Vertex stock was attributable to registration defaults and associated threats of litigation (the very facts omitted by Ernst & Young).

Because the ATS Plaintiffs cannot point to sufficient record evidence to show that the very facts misrepresented or omitted by Ernst & Young were a substantial factor in causing the ATS Plaintiffs' economic loss, we agree with the District Court that the ATS Plaintiffs failed to create a genuine issue as to loss causation.

IV.

494 F.3d 418, *; 2007 U.S. App. LEXIS 17467, **;
Fed. Sec. L. Rep. (CCH) P94,364

The District Court held that "[b]ecause [the ATS] Plaintiffs have failed to create a genuine issue as to loss causation, it follows that [the ATS] Plaintiffs' common law fraud and negligent misrepresentation claims must fail as a matter of law." *McCabe, 2006 U.S. Dist. LEXIS 524, 2006 WL 42371, at \*14.* We will affirm this holding, because the ATS Plaintiffs' failure to create a genuine issue as to loss causation also constitutes a fatal failure to create a genuine issue as to the proximate causation required [**56] for their claims under New Jersey law. *See, e.g., Berckeley, 455 F.3d at 224 n.28* ("[T]o the extent we have determined that Colkitt has stated a claim under *Section 10(b)*, we will also reinstate Colkitt's claim that Berckeley's conduct [constituted] common law fraud under New York law.").

As the District Court noted, there is no New Jersey decision that addresses the precise issue raised here. *McCabe, 2006 U.S. Dist. LEXIS 524, 2006 WL 42731, at \*12.* But [HN21] proximate causation is a required element of both common law fraud and negligent misrepresentation under New Jersey law. *See Kaufman v. i-Stat Corp., 165 N.J. 94, 754 A.2d 1188, 1196 (N.J. 2000)* (negligent misrepresentation); *Gennari v. Weichert Co. Realtors, 148 N.J. 582, 691 A.2d 350, 366-67 (N.J. 1997)* (fraud). Under New Jersey tort law, "[t]he test of proximate cause is satisfied where . . . conduct is a substantial contributing factor in causing [a] loss." *2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478, 640 A.2d 346, 351-52 (N.J. Super. Ct. 1994)* (citing *State v. Jersey Cent. Power & Light Co., 69 N.J. 102, 351 A.2d 337, 341-42 (N.J. 1976); Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463, 251 A.2d 278, 289 (N.J. 1969)).*

Like other courts of appeals, we "apply[] general causation principles" to § 10(b) claims. *EP MedSystems, 235 F.3d at 884.* [**57] *See also Berckeley, 455 F.3d at 222* (stating loss causation is "[s]imilar to the concept of proximate cause in the tort context," and citing *Suez Equity, 250 F.3d at 96*, and *Caremark, 113 F.3d at 648*). This approach was recently endorsed by the Supreme Court:

[HN22] Judicially implied private [*439] securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions. The common law of deceit subjects a person who "fraudulently " makes a "misrepresentation" to liability "for pecuniary loss caused" to one who justifiably relies upon that misrepresentation. And the common law has long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss.

. . . .

. . [Section 10(b)] expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.' The statute makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.

*Dura, 544 U.S. at 343-44, 345-46* (citations [**58] omitted). The § 10(b) loss causation standard we have reiterated here is similar to the "substantial contributing factor" test of proximate causation under New Jersey law. *2175 Lemoine Ave., 640 A.2d at 351-52.* Accordingly, for the same reasons that the ATS Plaintiffs failed to create a genuine issue as to loss causation (as required for their § 10(b) claim), they also failed to create a genuine issue as to proximate causation (as required for their common law fraud and negligent misrepresentation claims).

**V.**

We will affirm the grant of summary judgment.

*** Slip Sheet ***

Document