LEXSEE 2004 US DIST LEXIS 25513

**Dannette G. McLaughlin Plaintiff, v. Diamond State Port Corp. Defendant.**

**C.A. No. 03-617 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 25513*

**December 21, 2004, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Complaint dismissed at *McLaughlin v. Diamond State Port Corp., 2004 U.S. Dist. LEXIS 26351 (D. Del., Dec. 30, 2004)*

**DISPOSITION:**    Motion for leave to file amended complaint denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee originally filed an action against defendant employer alleging gender discrimination and unequal pay in violation of federal law. The employee filed a motion to amend her complaint to add a retaliation claim under Title VII of the Civil Rights Act of 1964 (Title VII), as amended, *42 U.S.C.S. § 2000e et seq.*, and an equal protection claim under *42 U.S.C.S. § 1983.*

**OVERVIEW:** The employee sought to amend her complaint to add a claim under *42 U.S.C.S. § 1983* and to add an additional claim for retaliation under Title VII. The proposed amendment was filed outside of the revised scheduling order provided by the court for such motions and was filed four days before the employer filed a motion for summary judgment on the original claims. The court held that the employee's amended claim under *42 U.S.C.S. § 1983* should not be allowed because the employee and her counsel should have known at the time that the employer filed its answer that it was a state actor. There was no reasonable excuse for delay of the § 1983 claim. The court also denied amendment to add the retaliation claim because the delay beyond the amended scheduling order was not necessary. The employee had received her second "right to sue" letter from the Equal Employment Opportunity Commission, and there was no reason why the matter could not have been addressed at

earlier pre-trail conferences. The employee delayed a number of months after receiving the letter, and there was no reason why she was not fully prepared to file the amended complaint while discovery was still pending.

**OUTCOME:** The court denied the employee's motion to amend her complaint.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
[HN1] Bearing in mind that leave to amend a pleading is to "be freely given," *Fed. R. Civ. P. 15(a)*, it is within the discretion of the court to deny leave where a party will be substantially or unduly prejudiced, or where the court finds bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment.

*Governments > State & Territorial Governments > Legislatures*
[HN2] See *Del. Code Ann., tit. 29, § 8735(a).*

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN3] Another consideration in deciding whether to permit an amendment to the pleadings is prejudice to the defendant.

**COUNSEL:**    [*1]    For DAMNETTE G. MCLAUGHLIN, Plaintiff: Laurence V. Cronin, Smith, Katzenstein, & Furlow, Wilmington, DE.

For DIAMOND STATE PORT CORP., Defendant: Donald E. Reid, Jason A. Cincilla, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

Presently before the court is plaintiff Dannette McLaughlin's Motion For Leave To File Her Amended Complaint. (D.I. 34.) In McLaughlin's original complaint, filed July 1, 2003, she alleged one count of unlawful gender discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended, 42 U.S.C. § 2000e et seq.* ("Title VII"), and one count of unequal pay in violation of the Equal Pay Act, *29 U.S.C. § 206 (1998).* (D.I. 1.) She now seeks to amend by adding a retaliation claim under Title VII, and an equal protection claim under *42 U.S.C. § 1983 (2003).* (D.I. 34.) Because McLaughlin has unduly delayed her request to amend, and because of the undue prejudice to the defendant that would result from an amendment, McLaughlin's motion will [*2] be denied.

**II. JURISDICTION**

The court has jurisdiction pursuant to *28 U.S.C. § 1331 (1993).*

**III. BACKGROUND**

As of the time the complaint was filed, McLaughlin had been a part-time employee of Diamond State Port Corp. ("Diamond State")for six years. (D.I. 1 P 12-13.) From September 2000 through May 2002, McLaughlin applied for various full-time positions with Diamond State. (Id. P 18.) However, she was unsuccessful in her bid to become full time and each position for which she applied was eventually filled by a man. (Id. P 20.) Although Diamond State proffered nondiscriminatory reasons for not hiring McLaughlin (id. PP 21, 26), she has reason to believe gender discrimination to be the true reason (id. PP 21-42). As a result, McLaughlin filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("the EEOC") on May 28, 2002. (D.I. 34 Ex. A.) On April 3, 2003, the EEOC issued McLaughlin a right-to-sue letter. (Id. Ex. B.) She then proceeded to file suit against Diamond State and the International Longshoreman's Assoc. on July 1, 2003. [1]

(D.I. 1.) A scheduling [*3] conference was held on February 25, 2004 during which the court set the deadline for amendments to the pleadings to be April 30, 2004. The discovery deadline was set at August 31, 2004, and the deadline for case-dispositive motions was set at September 14, 2004. (D.I. 17.)

> 1    International Longshoreman's Assoc. was dismissed as a defendant and only Diamond State remains. (Order of the Court, January 16, 2004.)

On July 29, 2004, McLaughlin signed a second EEOC Charge of Discrimination in which she alleges Diamond State retaliated against her for filing the first discrimination charge by passing her over for promotion. (D.I. 39 Ex. C.) The second charge is based on McLaughlin's assertion that Diamond State supervisor William Stansberry told James Woolford, who told Malik Davidum, who told McLaughlin, that "because [she] put this suit out, that [she'll] never get a job." (McLaughlin Dep. at 165:16-166:6, D.I. 39 Ex. D.) McLaughlin was issued another right-to-sue letter on September 20. (D.I. 34 Ex. D.) In the [*4] meantime, on August 30 plaintiff's counsel informed counsel for Diamond State of McLaughlin's intention to amend the complaint to add the retaliation and *§ 1983* claims:

> Please be advised that plaintiff has filed a new EEOC charge alleging retaliation. As soon as we receive the right to sue, we will be filing a Motion to Amend the Complaint. In addition, as discovery has revealed the Port to be a "state actor," we will also be adding a claim under *42 U.S.C. § 1983.* I wanted you to be aware of these issues before our Conference with Judge Sleet currently scheduled for September 1, 2004 at 9:00 a.m.

> I am on trial this week and will be difficult to reach. Please leave me a message if you have any questions and I will try to return your call before September 1, 2004. Thank you.

(August 30, 2004 Letter from Plaintiff's Attorney to Defendant's Attorney, D.I. 34 Ex. 2.)

Diamond State replied the same day:

> I received your letter of today in which you noted that McLaughlin intends to move to amend her complaint to add a claim or [sic] retaliation and a *section 1983* claim. You closed your letter by asking that I call if I have any questions.

[*5] I will do so now. I am writing as well in the event that you are carrying a Blackberry. The schedule entered by the court provides that the time to amend pleadings expired over 4 months ago. Obviously we will oppose any effort on the of [sic] McLaughlin to amend her pleadings to add additional, baseless claims. In all events, if you intend to raise this issue with the Court in any substantive manner at the September 1 teleconference, please send me a detailed email identifying what exactly you intend to present so that I can be prepared to respond.

(August 30, 2004 Email from Defendant's Attorney to Plaintiff's Attorney, D.I. 41 Ex. C.)

The teleconference referenced in the above correspondence actually took place on September 3, and resulted in a revised scheduling order. In particular, the court acceded to the parties' requests to move the discovery deadline to October 1 and the deadline for case-dispositive motions to October 18. (D.I. 26.) No mention of McLaughlin's desire to amend her complaint was made to the court by either party.

Pursuant to the amended scheduling order, McLaughlin was deposed on September 28. At her deposition, counsel for Diamond State requested [*6] a copy of the second EEOC Charge. (D.I. 41 at 8-9.) It was provided on October 8, along with an offer to make McLaughlin available for another deposition. (Id. Ex. A.) According to McLaughlin, Diamond State declined to re-depose her. (Id. at 9.) McLaughlin filed the present motion on October 14 (D.I. 34), and Diamond State filed a motion for summary judgment as to the claims in the original complaint on October 18 (D.I. 36.)

A pre-trial conference in this case is scheduled for January 5, 2005, and trial is scheduled for January 24, 2005.

## IV. DISCUSSION

[HN1] Bearing in mind that leave to amend a pleading is to "be freely given," *Fed. R. Civ. P. 15(a)*, it is within the discretion of the court to deny leave where a party will be substantially or unduly prejudiced, or where the court finds "bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment," *Lorenz v. CSX Corp., 1 F.3d 1406, 1413-14 (3d Cir. 1993)*.

As to McLaughlin's *§ 1983* claim, the court is truly at a loss as to how it escaped counsel for McLaughlin

[*7] that Diamond State is a state actor. Diamond State correctly points out that McLaughlin should have been alerted to this fact by the reference to *Del. Code Ann., tit. 29, § 8735(a)* (2003), in Diamond State's answer, filed on July 15, 2003 (D.I. 4 P 3). [HN2] *Section 8735(a)* states:

There shall be established within the Department of State a body corporate and politic, with corporate succession, constituting a public instrumentality of the State, and created for the purpose of exercising essential governmental functions which is to be known as the "Diamond State Port Corporation."

Thus, McLaughlin should have discovered Diamond State's status as a state actor as soon as counsel read the answer and did even cursory research as to its substance. Either this research did not happen, or counsel did not realize the potential for a *§ 1983* claim. Moreover, the court finds it difficult to believe McLaughlin worked for Diamond State for six years without knowing it is an arm of the State of Delaware. It is noteworthy that McLaughlin's submissions are conspicuously vague in outlining the reasons for this oversight. The only concrete explanation for [*8] delay the court can discern from the briefs is that McLaughlin "delayed raising the *§ 1983* [sic] until the retaliation claim had perfected in order to avoid a multiplicity of amendment motions." (D.I. 41 at 10.) Yet McLaughlin did not sign her second EEOC complaint until July 29, 2004, which was over one year after she was put on notice of Diamond State's status as a state actor. The court doubts counsel really thought it was proper to sit idly on its *§ 1983* claim for over a year (allowing the deadline for amendments to pass) in anticipation of a retaliation claim. Therefore, the court accords very little weight to McLaughlin's justification for the extraordinary delay in seeking to add the *§ 1983* claim.

As to the retaliation claim, the court is sympathetic to the plight of the employee who is retaliated against by her employer after the deadline for amendments to the pleadings has passed. Indeed, had McLaughlin's counsel raised the amendment issue at the September 3 teleconference, the court would have given it serious consideration (especially since the whole purpose of the teleconference was to amend the scheduling order). Instead, counsel chose to be inconsiderate of the [*9] court's time and burden it with lengthy, eleventh-hour briefing on an issue that could have been disposed at the teleconference with relative ease. Furthermore, counsel offers no excuse for this failure other than to say the defendant requested the issue not be brought up at the teleconference. Based

2004 U.S. Dist. LEXIS 25513, *

on the defendant's email of August 30, Diamond State merely requested details of the proposed amendment in order to properly prepare his response for the teleconference. Certainly, this was not an unreasonable request. Counsel for McLaughlin argues that such a request was, in fact, unreasonable because counsel for the defendant knew counsel for the plaintiff was on trial and would be unable to respond to a request for details. (D.I. 41 at 9.) In other words, McLaughlin's counsel sprung notification of amendment on Diamond State on the eve of the teleconference, and then condemns Diamond State for not accommodating counsel's busy trial schedule. It goes without saying that McLaughlin's position is untenable. Even further undermining her argument is the fact that the teleconference was actually delayed by two days (from September 1 to September 3), giving McLaughlin ample opportunity to [*10] fulfill Diamond State's request for details.

McLaughlin also argues that delay was necessary because she needed to receive a right-to-sue letter before seeking to amend. (Id. at 8.) However, McLaughlin fails to account for the fact that she could have sought leave to amend *before* the end of discovery. She received her right-to-sue letter on September 20, which was eight days before her own deposition and ten days before the end of discovery. Knowing of the impending deadlines, McLaughlin should have been fully prepared to file her motion to amend immediately upon receiving the letter. Instead she delayed until October 14, just two business days before the deadline for case-dispositive motions.

Another explanation is offered in a footnote:

> Plaintiff notes as well that much of the evidence of retaliation was not developed until very recently, after defendant first withheld and then provide [sic] documents and required that plaintiff return to depose a witness about issues on which Defendant prohibited discovery in prior depositions. See, Markow deposition (Affidavit of Laurence V. Cronin ("Cronin Aff.") at Ex. B). Indeed, it was not until Stansbury's deposition [*11] in September that defendant finally acknowledged that there had been promotions subsequent to the EEOC charge being filed, having failed to provide any documentation regarding those promotions and assured counsel that there was none. See Stansbury deposition (Cronin Aff. at Ex. D).

(D.I. 41 at 1 n.2.) This explanation is inadequate for two reasons. First and foremost, McLaughlin obviously had enough information to file a charge with the EEOC in July 2004. Thus, it was not a discovery problem that prevented her from seeking to amend her complaint. Second, the above footnote asks the court to draw inferences from three deposition transcripts with no pinpoint cites. The two Markow depositions total 220 pages and the Stansbury deposition is 137 pages. Counsel once again shows its disregard for the court's time by asking it to sift through 357 pages of testimony to find evidence of dilatory tactics. It is counsel's responsibility to point the court to relevant evidence. Consequently, the court does not accept McLaughlin's explanation for the delay in seeking to add her retaliation claim.

[HN3] Another consideration in deciding whether to permit an amendment is prejudice to the defendant. [*12] Although Diamond State does not explicitly argue this point, the court finds implicit prejudice. The purpose of a scheduling order is to provide concrete deadlines on which the parties can rely in planning their respective litigation strategies. If the court were to permit parties to ignore these deadlines, unfair surprise would abound.

In this case, briefing on McLaughlin's motion was completed on November 1. Even if the court would have decided the motion that day, Diamond State would have required time to file another answer. Additionally, it is quite likely that more discovery would have been necessary. [2] With the schedule now so compressed, it is likely that the filing of dispositive motions would have been precluded by the court or the time for trial postponed. Clearly, the loss to the defendant of the opportunity to achieve summary disposition of the matter or the delay resulting from an accommodation of the plaintiff's request to amend would be prejudicial to Diamond State.

> 2   McLaughlin disagrees that more discovery would be necessary. She is clearly mistaken. For instance, her main piece of retaliation evidence is at least double hearsay. Although Stansbury's statement may be non-hearsay as an admission of a party opponent, *Fed. R. Evid. 801(d)(2)*, the statement would only become admissible if Woolford testified, or if there were an applicable exception for Woolford's recital of Stansbury's statement to Davidum and for Davidum's recital of Woolford's statement to McLaughlin. Thus, it seems most likely that Woolford would need to be deposed.

[*13] V. CONCLUSION

Since McLaughlin does not adequately explain the prolonged delay in filing her motion to amend, and since permitting such an amendment would impose undue

prejudice on Diamond State, the court will deny her motion.

Dated: December 21, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED that:

The plaintiff's Motion For Leave To File Her Amended Complaint (D.I. 34) be DENIED.

Gregory M Sleet

UNITED STATES DISTRICT JUDGE

*** Slip Sheet ***

Document

# Westlaw.

3 Houst. 581                                                                                      Page 1
3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

Henry H. Mears and Robert W. Mears, trading under
the name and firm of H. H. Mears & Son v. Joseph
Waples.
Del.Super. 1868.

Superior Court of Delaware.
Henry H. Mears and Robert W. Mears, trading under
the name and firm of H. H. Mears & Son
v.
Joseph Waples.
Spring Session, 1868.

**\*1** A third person in whom property in the goods in
question is pleaded in an action of replevin, is not
thereby made a party to the suit, and is, therefore, not
an incompetent witness for either of the parties in it;
but if his interest in the result of it, is equally
balanced between them, or preponderates in favor of
the plaintiff, he is a competent witness for the
defendant.

The known and received usage of a particular trade,
and the established course of commercial dealings
under it, are tacitly annexed to the terms and become
part of a commercial contract. And yet, even a
number of banks, or commercial firms or houses in a
large commercial city cannot by their practice
establish a commercial usage, so as to make it
binding on the trading community generally. The
established custom or usage of a trade, is
undoubtedly the law of the trade. But to make it
binding, it must be certain, uniform, reasonable and
general, and of long standing, or, at least, of such
long standing as to have become generally known,
recognized and acted on by the trade, so as to raise a
fair presumption that the parties in entering into their
engagements did so with a silent reference to the
usage, and a tacit agreement that their rights and
responsibilities should be determined by it.

The States of the Union in this regard, stand in the
relation of foreign states to each other; so that a
custom or usage in one State or city, is not
necessarily binding or obligatory upon persons
engaged in the same trade in another State or city.
And in the absence of affirmative proof that a
commercial usage exists among merchants engaged
in the corn trade in the City of Baltimore or State of
Maryland, that a bill of lading of a cargo of corn
bought and shipped in the City of Philadelphia,
attached by a pin to a draft for the price of it drawn
there at one day's sight on a firm in the former city, is
not to be severed or detached from the draft at the
time of its presentation and acceptance, and retained
by the acceptor, but is to continue and remain
attached to it until the maturity and payment of the
draft, as security for the payment of it at maturity, the
jury cannot presume the existence of such a usage of
the trade in the latter city. And in the absence of
proof of instructions from the drawers to the bank in
Philadelphia, and from the latter to the bank in
Baltimore, through which the draft with the bill of
lading so attached was transmitted for acceptance and
collection, not to allow the bill of lading to be
detached from it until the payment of it, the jury will
not be justified in assuming that any instructions on
the subject had ever been given.

A contract which has been incepted in fraud, is so
vitiated by it that it may be rescinded and avoided at
the option of the injured party; and if it be a contract
of sale, the seller may reclaim the goods, provided
the rights of a third party, as a *bona fide* purchaser,
have not intervened. But the right of the seller to
rescind or avoid the contract, and reclaim the goods
from the buyer on the ground of fraud, exists only so
long as the goods are in the hands of the fraudulent
purchaser, or some one who has taken them of him
with knowledge of the fraud by which they were
obtained by him. It, therefore, follows that a
purchaser for a valuable consideration without notice
or knowledge of the fraud, takes a valid title from
such fraudulent buyer, which cannot be defeated by
the original vendor; and a consignee of goods who in
good faith makes advances upon them, stands in the
same position as a purchaser for value as against the
original vendor, and the same principles of law in this
regard apply to his case. After delivery of the goods
in pursuance of a sale, the seller cannot rescind the
contract and reclaim them on the ground of fraud,
without proving deceptive assertions or false
representations fraudulently made to induce him to
part with them. Mere insolvency of the buyer, though

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

well known to himself and concealed from the seller, does not in itself furnish sufficient ground for rescinding a sale. Nor will the fraudulent purchasing and obtaining goods with an intention of never paying for them, of itself, render the contract of sale absolutely void, even as between the seller and buyer, although it will render it voidable at the option of the seller; but if they are sold by such fraudulent buyer to an innocent third party for value, the latter will take and hold them by a valid title.

**\*2** A bill of lading by the custom of merchants, and according to the principles of the common law, is held to be, in a certain sense, a negotiable instrument, that is, an instrument transferable by indorsement. And the indorsee of it who holds it for value, or who has in good faith made advances on the receipt of it, has as good and effectual a title to the goods referred to in it, as he could have obtained by the actual manual delivery to him of the goods themselves. In other words, the indorsement and delivery of the bill of lading is equivalent to a delivery of the goods. So that according to the principles of commercial law, the indorsement of a bill of lading for a valuable consideration, without notice of fraud, or of any adverse interest, vests in the indorsee an indefeasible title, and makes him the absolute owner of the goods against all the world. No amount of fraud on the part of the person who indorsed the bill of lading to him, can affect the title of the indorsee to the goods, because his title is that of an honest purchaser without knowledge or notice of any defect in the indorser's title, or any sufficient reason to believe or suspect that fraud has been committed in the original purchase. Nor will the right of such a *bona fide* indorsee be altered or prejudiced by the fact that the person from whom he purchased the goods, had effected the contract with the first seller, or obtained possession of the goods, by means of false and fraudulent representations. And as regards sales for cash and sales on condition, the law is the same in the case of a *bona fide* purchaser without notice or knowledge of the condition, as where the possession of the goods have been obtained by fraud, without his knowledge.

If a party ships a cargo of corn on board of a vessel in pursuance of a contract of sale with, and upon account of, another, and knowingly takes from the captain of her, bills of lading in the name of such other person as shipper and owner therof, containing an engagement of the captain to deliver the cargo at a certain port named therein "to order" or "assigns," and draws on such other person a draft at one day's sight for the price of it, then it will amount to a

delivery of such corn to the latter, and will vest in him a title to the same, and enable him to pass or transfer the property in it to a *bona fide* purchaser.

The burden of proving that an indorsee for value of a bill of lading knew of the fraud by which the purchaser and shipper of the cargo and indorser of the bill of lading obtained the possession of it and of the cargo, rests on the original seller of it seeking to avoid the contract of sale with him, and to reclaim the cargo on the ground of such fraud.

This was an action of replevin by H. H. Mears & Son, the plaintiffs, against Waples, the defendant, who was the master of the schooner, Paugussett, for a cargo of indian corn on board of her, and which was lying in the river at New Castle bound with it from Philadelphia to Boston, when the writ was served upon him; and in which the pleas were 1st, *Non cepit in modo et forma.* 2nd, Property in himself. 3rd, Property in the firm of M. Hunt & Co. in the City of Baltimore. 4th, Property in the firm of Thomas D. Quincey & Co. in the City of Boston, and 5th, Property in a stranger.

**\*3** The evidence was that the firm of M. Hunt & Co. of Baltimore, had in the course of three or four years preceding the origin of the suit, purchased of the firm of H. H. Mears & Son of Philadelphia, the plaintiffs, several cargoes of indian corn amounting in the aggregate to over one hundred and fifty thousand dollars in value. The former firm was, during that period, largely engaged in the business of buying and shipping corn for sale to Boston and other Eastern ports, while the latter was principally engaged in the business of selling grain on commissions in the City of Philadelphia. The last cargo of corn before the one in question, consisting of six thousand eight hundred and forty bushels, was bought by the former of the latter firm on the 14th day of January 1867, and which was paid for by a draft at one day after sight drawn by the latter upon the former firm. In the latter part of February following, both in a personal interview with the plaintiffs, and soon afterward by letter, Montgomery Hunt of the former firm applied to them to purchase a cargo of ten to twelve thousand bushels in Philadelphia for his firm, representing to them that he had frequent orders for corn from the eastward, and often more than he could fill in Baltimore, and that he would furnish to such persons in the east the names and address of the plaintiffs, so that their orders could be sent direct to them on such occasions as he should be unable to fill them in Baltimore, and that the cargo he was then contracting for, he was buying upon such an order; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

particularly requesting of them that when purchased it should be shipped by them to the order of his firm, the same to be paid for as soon as shipped, by draft of the plaintiffs on his firm at one day's sight with bill of lading attached. The plaintiffs agreed to procure and furnish the cargo on the terms proposed, and accordingly shipped on board of the schooner mentioned and of which the defendant was then master, 11,451 32/56 bushels of corn at the port of Philadelphia, per account of M. Hunt & Co., and received during the time they were loading her, a letter from that firm dated March 1st 1867, instructing them to have her loaded by the Monday following, if the weather continued good, and to make the bill of lading the same as Waples', to order, and that they would name the point of destination by telegraph the next day; to draw on them when loaded, at one day's sight with bill of lading attached, and to try and get exchange as light as possible; and also another letter dated the 4th of that month, informing them that the schooner Paugussett would sail for Boston and report to No. 40, Commercial Street. On the 6th of that month, the plaintiffs had prepared by their clerk in their counting house, three bills of lading for the cargo, and had them duly signed by the defendant as master of the schooner, two of which they retained, leaving the third in his hands, in the following form: "Shipped in good order and condition by M. Hunt & Co. in and upon the Schooner called the Paugussett, whereof Joseph Waples is master for the present voyage, now lying in the port of Philadelphia, and bound to Boston, Mass., Eleven thousand four hundred and fifty-one 32/56 bushels corn to be delivered being marked and numbered in the margin; to be delivered in like good order and condition at the aforesaid Port of Boston, Mass., (the dangers of the seas only excepted) unto order, or assigns, he or they paying freight for the said goods at the rate of ten cents per bushel weight without primage and average accustomed."That put in evidence had the following indorsement on the back of it; "To the order of Thos. D. Quincey & Co.," and was introduced to sustain the plea of property in that firm. On the same day the plaintiffs drafted on the firm of M. Hunt & Co. at one day's sight for $11,908.65, the price of the cargo of corn, including the exchange on their draft, and indorsed it with the bill of lading attached to it, to the Philadelphia National Bank, which the bank received from them as cash and placed the amount of it to their credit, and immediately indorsed and forwarded it to the National Union Bank of Baltimore, and the following day it was presented with the bill of lading attached, by the messenger of that bank to Montgomery Hunt at the place of business of his firm in that City for

acceptance, when he took it from the messenger, wrote their name and acceptance upon the draft and then detached the bill of lading from it, and retaining it, handed the draft back to him without it. The messenger did not object to his doing it, but had objected on a former occasion a few months before that, to his detaching a bill of lading similarly attached by a pin merely to another draft of the plaintiffs for $10,000, when he presented it to him for acceptance and after he had written his acceptance upon it, to which Mr. Hunt then replied that on their acceptance they always kept the bill of lading, and as the bank, up to the occasion when the bill of lading in question was so severed, had never given him any instructions on the subject, he made no objection to his doing so at that time. The bank, however, had since directed him not to allow it to be done again in any instance until the drafts had been paid, and he had not allowed it to be done since in any case.

*4 On the same day on which M. Hunt & Co. accepted the draft of the plaintiffs, they drew on the firm of Thomas D. Quincey & Co. of Boston, a sight draft to the order of the Bank of Commerce of Baltimore, for $10,350, and indorsed it to the order of that firm and attached to it the same bill of lading which M. Hunt had that day detached from the draft of the plaintiffs and retained in his possession when he accepted it, and delivered it with the bill of lading attached to that bank, which it immediately remitted to the National Exchange Bank of Boston for collection, and which with the bill of lading attached to it was presented in two days thereafter to Thomas D. Quincey & Co. in Boston, and was paid by them, and the draft and bill of lading were thereupon delivered to them. In two days afterward the firm of M. Hunt & Co. failed, and the draft of the plaintiffs upon them was protested for non-payment and was returned to the Philadelphia National Bank, where it had since remained without any payment upon it; and upon the next day, the 12th of March, the firm of M. Hunt & Co. executed a deed of assignment of all their property in copartnership and individual, in trust for the benefit of their creditors.

The loading of the schooner had been completed by the plaintiffs on the 6th and had sailed for Boston on the 7th of March, and when they learnt on the 11th of the month, of the protest of their draft and the failure of M. Hunt & Co., they determined to stop the cargo in transitu and before it could be delivered in Boston if possible, and despatched an agent to that city for the purpose; but before his return they ascertained that she had been arrested by the ice in the river and was lying at New Castle, when a peremptory order

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581
3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

Page 4

was given by them to the defendant to proceed no further with the cargo, and afterward efforts were made by them to induce him to recognize their right to reclaim the possession of it without avail until the 19th of the month, when a formal and written demand was served on him by the plaintiffs for it, and when, the defendant still refusing to comply with their demands, this action was instituted.

On the trial the testimony of several bank officers and mercantile gentlemen engaged in the grain trade in Philadelphia, was introduced on behalf of the plaintiffs who proved their understanding of the usage and custom in such cases to be, that the acceptor of a draft has not a right to detach a bill of lading from it until it is paid, and that it is considered when so attached, to be a security for the payment of the draft at maturity, and so much a part of it up to that time, that it ought not to be detached from the draft until it is paid. Also that a sale of goods to be paid for by draft at ten days after sight or less, is equivalent to a sale for cash. Whilst on the other hand, the testimony of several other gentlemen engaged in the same business, and from the same city, was introduced by the defendant who proved their understanding in such case to be, that the only object of attaching a bill of lading to a draft was to satisfy the drawee that the goods upon the credit of which it was drawn, were on their way to him, and that he would be safe in accepting and paying it at sight, or at maturity, and they knew of no usage or custom of trade that would make it wrong or improper for the acceptor of such a draft to detach the bill of sale from it when he accepted it and before it was paid.

**\*5** Montgomery Hunt of the firm of M. Hunt & Co. was called as a witness on behalf of the defendant, and being sworn and examined on his *voir dire* at the instance of the plaintiffs, declared that he was a member of the firm up to the time of its failure, but he was not interested in the result of the suit.
West Headnotes

**Sales 343**  45

343 Sales
  343I Requisites and Validity of Contract
    343k42 Misrepresentation and Fraud by Buyer
      343k45 k. Insolvency or Inability to Pay, and Concealment Thereof. Most Cited Cases
Fraud cannot be imputed to one who buys goods on credit, from the fact that he knew, at the time he bought, that he was insolvent, but did not disclose the

fact to the seller.

**Customs and Usages 113**  19(1)

113 Customs and Usages
  113k19 Evidence as to Existence of Custom
    113k19(1) k. Burden of Proof. Most Cited Cases
From a custom in a city whence a cargo of grain is shipped that the bill of lading shall not be detached from the draft until its payment, a jury cannot presume that such a usage of trade exists in a neighboring city to which the cargo is consigned.

**Fraudulent Conveyances 186** 203

186 Fraudulent Conveyances
  186II Rights and Liabilities of Parties and Purchasers
    186II(D) Bona Fide Purchasers from Grantee
      186k201 Rights and Liabilities
        186k203 k. As to Creditors of Original Grantor. Most Cited Cases
A bona fide purchaser of property from a previous grantee, to whom it had been conveyed for the purpose of defrauding creditors, is entitled to protection against the claims of the creditors who were intended to be defrauded by the first conveyance.

*T. F. Bayard,* for the plaintiffs, objected, notwithstanding his declaration that he was not interested in the result of the suit, to his competency as a witness for the defendant, because as a member of that late firm, he would be liable to the firm of Thomas D. Quincey & Co. for the amount of their draft upon that house for the $10,350, which it had accepted and paid, in case it failed to establish a good right and title in this action to the cargo in question; and because among the several pleas filed in this case there was one to the effect that the property in the cargo at the time it was seized by the sheriff under the writ of replevin, was in the firm of M. Hunt & Co., of which he was a member before its failure and dissolution.
*Whitely,* (*Comegys* with him, for the defendant). The interest of the witness in the result of the suit was evidently an equal or balanced interest, for the only question involved in it, and to be decided by the court and jury was, whether the cargo of corn in dispute was the property of the plaintiffs, or of the firm of

Thos. D. Quincey & Co. for which they were concerned as counsel, when it was seized by the sheriff, and the liability of the witness would in effect be one and the same, whatever might be the result of this action: because if the plaintiffs prevailed, he would be liable to the firm of Thomas D. Quincey & Co., as had been stated on the other side, but if the latter firm prevailed, he would be liable, on the other hand, to the plaintiffs for the amount of their draft on the late firm of which he was a member, and which had been accepted by it, with the difference only, that he would be liable in that event, to the plaintiffs in a larger sum than he would be in the other event, to the house of Thos. D. Quincey & Co. But the plea of property in the late firm of M. Hunt & Co. did not make it in any sense a party to this action, nor were they parties to it in any manner whatever. No judgment could be rendered for or against them in it, not even for cost. 1 *Greenl. Rep.* 376. 8 *How.* 428. 4 *Mass.* 488.

*Gray*, for the plaintiffs, cited 1 *Greenl. Ev. secs.* 329, 391. 2 *Greenl. Ev. sec.* 590.

*By the Court.*

*6 This presents the case of a similar interest, if not an equal and balanced interest, on both sides of the suit, with this difference as to the interest of the proposed witness in the result of it, that it preponderates on the side of the party objecting to his competency, his liability to the plaintiffs in the event of their failure to recover in the action, being for the amount of their draft on the late firm of which he was a member and accepted by it, for $11,908.65, and on the other hand his liability to Thomas D. Quincey & Co. in case the plaintiffs succeed in the action, being for the amount of the draft of his late firm on that house and paid by it for $10,350. It consequently cannot exclude him; nor can the other objection for the reason stated in the argument. Both objections are therefore overruled.

The witness was then sworn in chief and testified that his firm commenced business in Baltimore in the year 1861, and for two or three years prior to March 1867, did business with H. H. Mears & Son of Philadelphia, and during that time, to the amount of from $150,000 to $200,000. The last cargo of corn they bought of them prior to the cargo involved in the present suit, was 6840 bushels on the 14th of January 1867, and which they paid for by a draft at one day's sight, drawn by them on his firm for the price of it. All their drafts on his firm from 1863 to 1867, were at one to three days after sight. He detached the bill of lading from their draft on his firm of March 6th 1867, and had done the same with all their other drafts before that when his firm accepted them; and it

was never objected to either by them, or by the bank. On the same day that he accepted their last draft and detached the bill of lading from it, he drew a draft in the name of his firm to the order of the Bank of Commerce in Baltimore, on the firm of Thomas D. Quincey & Co. of Boston, at sight, for $10,350, and attached the bill of lading to it, and delivered them to the Bank for transmission and collection. That was on the 7th of March 1867, and on the 9th of that month it was paid by that firm. His firm had been shipping corn during the time before mentioned to Boston, and sometimes to other eastern ports; but it had never before that cargo shipped any to that house, and even then he had no acquaintance with any member of it, but on the recommendation of a commercial gentleman in Baltimore, and upon inquiry of him for a good house in the trade there, concluded to ship that cargo to them, and then wrote to them that he might ship to them, which was not long before the cargo was ready to leave Philadelphia. He also wrote to them to insure the cargo there for $13,000. Corn was worth in that market during the months of March and April in that year, from $1.25 to $1.30 per bushel.

James Barrett of Philadelphia, another witness examined for the defendant, testified that on the 18th of March 1867, he received a letter from the firm of Thomas D. Quincey & Co. inquiring if he knew where the schooner Paugussett then was, and that they had an interest in the corn on board of her, and had advanced $10,000 on it, and that upon the 20th of the month he called on the plaintiffs and informed them of the facts above stated, and that Mr. Mears replied that it was all right, and that the captain had just left their office to start on the voyage with the corn to that firm, and that he immediately telegraphed to them to that effect.

*Gray*, for the plaintiffs. There was enough disclosed in the facts and circumstances of the case to warrant the position they were about to assume in the trial and argument of it, that M. Hunt & Co. by undue and improper means, fraudulently obtained the bill of lading for the cargo of corn in question from the plaintiffs, and thereby fraudulently obtained possession of the property of the plaintiffs in it, without paying for it according to the contract between them, in full view and anticipation of their speedy and inevitable failure which occurred in four days thereafter. When the possession of property is obtained under a fraudulent contract of sale, it is voidable and revocable at the option of the vendor, as soon as the fraud is discovered by him. And the next proposition we have to submit is, that no one can pass

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581

Page 6

3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)

**(Cite as: 3 Houst. 581)**

to another a better title than he himself has in goods, and therefore the voidable and revocable nature of such a title which has passed from the original vendor to the vendee, follows and abides with it every where, except where it has passed to an innocent purchaser without notice of the fraud; and any one so claiming the property, must bring himself within this exception to the general rule which he had just stated. But where a person fraudulently or erroneously obtains possession of property outside of the terms of the proposed contract of sale, and without the knowledge of the owner, he can confer no title to it upon another, however innocent such purchaser may be, except where the owner of it has voluntarily armed the wrong doer with the symbol of property, so as to enable the latter to perpetrate a fraud on such purchaser.

**\*7** We have proved enough to satisfy the jury that M. Hunt & Co. in this case, were guilty of a premeditated design to get this cargo of corn into their possession, and to sell it without paying the plaintiffs a cent for it, and the moment the plaintiffs discovered that design to defraud them in the transaction, and took steps to avoid and defeat it, all the title of M. Hunt & Co. to the cargo instantly ceased, and they could confer no title to it upon even an innocent purchaser without notice or knowledge of the fraudulent means by which they had acquired it. Because, in such a case he takes a tainted title, and that taint remains and inheres in it. *Hil. on Sales* 332, 334. We have shown that that firm obtained the possession of the corn under a contract to pay for it in cash, but with the intention not to pay for it as contracted for, or to pay for it at all; and the sale was, therefore, void, and passed no right or title whatever in it to them. *Earl of Bristol v. Willsmore* 8 *E. C. L. R.* 218. *Irving et al. v. Motley et al.* 20 *E. C. L. R.* 244. Since the time of these decisions, the cases had multiplied and have shed much light upon the question. If a vendee obtains goods under a contract to pay for them on delivery, and on the delivery of them gives a check without having the funds to meet, or a reasonable prospect of being able to meet it, he takes no title to the goods. *Hawes v. Crowe*, 21 *E. C. L. R.* 784. If a purchaser obtains possession of goods with the fraudulent intention of never paying for them, he acquires no property in them. The contract is void, and not merely voidable. *Load v. Green*, 15 *M. & W.* 216. *Ch. on Contr.* 321. And any purchaser of them from such a vendee, must affirmatively show that he is an innocent purchaser, and that he had no reason whatever to suspect the tainted and fraudulent title of such vendee in them. *Caveat emptor* is the emphatic and inflexible maxim which applies with all

its force in such cases. *Gill v. Cubitt*, 3 *Barn. & Cress.* 466. *Miller v. Race*, 1 *Smith's Ld. Ca.* 752. And such a purchaser is bound to inquire and to show that he had no ground to suspect the validity of such a vendee's title to them. *Copeland v. Bosquet*, 4 *Wash.* 594. When the owner of personal property has not conferred upon the vendor of it the apparent right of property in it, or right of disposal of it, a purchaser of it is not protected against the claims of the owner of it, though such purchaser acquires the property for a fair and valuable consideration in the usual course of trade, without notice of any conflicting claim or of suspicious circumstances calculated to awaken inquiry, or put him on his guard; and it was accordingly held that the purchaser of a part of the cargo of a vessel, was not protected against the claims of the real owner, although the purchase was made under a bill of lading regular and fair on its face, it appearing on the trial of the cause that the master of the vessel in which the goods were originally shipped, had fraudulently, at an intermediate port, transshipped them into another vessel and procured a bill of lading in his own name which he transferred to his agents, the vendors of them. *Saltus v. Everett, 20 Wend. 267*. *Mowry v. Walsh, 8 Cow. 243*. *Root v. French, 13 Wend. 572*. In the case now before the court, the symbolical possession of the property or cargo of corn consisted of the bill of lading, and M. Hunt & Co. obtained the possession of it without the consent, and contrary to the intention and expectation of the plaintiffs, and, of course, contrary to the contract of sale between them; and in such a case, even an innocent purchaser of the goods for a *bona fide* consideration without any notice or knowledge of the way in which the holder of the bill of lading got possession of it, gains no title to them against the real owner of them. For it has been ruled in a recent case in the Court of Queen's Bench, that the *bona fide* transferee for value of an indorsed bill of lading from another, was not entitled to the cargo, unless the latter had, not merely possession of the bill of lading, but a right to transfer it, inasmuch as bills of lading are not negotiable to the same extent as bills of exchange. *Gurney v. Behrend*, 77 *E. C. L. R.* 622.

**\*8** A fraudulent purchaser acquires no title as against the vendor; but where a vendor delivers possession of his goods with the intent, not only that the possession, but that the property in them shall pass, a *bona fide* purchaser from a fraudulent vendee will hold them in preference to the original owner; and in questions of fraudulent purchase of goods where there is a manual tradition of them, or an actual delivery of them to the vendee, the point submitted to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the jury should be, whether the vendor in parting with the possession of them, intended also to transfer his interest in the thing sold. _Andrew v. Dieterich, 14 Wend._ 31. In the sale of personal property where any thing remains to be done before the sale can be considered as complete, whether to be done by the vendee, or by the vendor, as between the parties themselves the right of property does not pass, although the property itself is placed in the possession of the vendee. _Ward v. Shaw, 7 Wend._ 404. And a fraudulent holder of a bill of lading, (and he is such who is to pay for the goods on the receipt of it, or within one day thereafter, but immediately transfers it with the goods by endorsement, without ever paying a cent for them) can pass no title to the goods by an indorsement of it to an innocent purchaser without notice of the fraud. _Decan v. Shipper, 11 Casey_ 239. It is also fraudulent for a person to purchase goods and take possession of them when he knows of his own insolvency, and has no reasonable prospect of paying, even when there is no other evidence of a fraudulent design on his part exhibited in the transaction. _Rowley v. Bigelow,_ 12 _Pick._ 306. The rule in this respect is the same with reference to a bill of lading, as it is with reference to the property to which it relates, for it passes the property on a _bona fide_ indorsement and delivery when it is so intended to operate, in the same manner as a direct delivery of the goods themselves would do, if so intended; but it can operate no further. For the symbol can not have a greater operation to enable the holder of it to defraud another, than the actual possession of the goods themselves which it represents could have. _Newson v. Thorton,_ 6 _East_ 17. And if M. Hunt & Co. had no valid title to the cargo when they indorsed the bill of lading in this case to Thomas D. Quincey & Co., the latter could have acquired none to the cargo, for the vendee of chattels cannot acquire a title to goods, if the vendor of them to him has none to transfer, even when the sale is made or confirmed by a bill of lading, or other instrument of the same nature, symbolizing and describing the property sold. If a bill of lading is placed in the hands of a purchaser or agent under circumstances which justify the belief that he is authorized to transfer it for value, or to deal with it as his own, it may operate as an estoppel in favor of all who give value for it on the faith of the appearance of authority or title thus created by it, and precludes the assertion of rights that would otherwise have been valid. But when the possession of an instrument of that kind is due to fraud or felony, it will confer no right or title as against the true owner, and the defect will not be removed by a subsequent negotiation of it in good faith.

*9 The right of stoppage _in transitu_ will not be defeated by the indorsement of a bill of lading by an agent in violation of the instructions of his principal. 1 _Smith's Ld. Ca._ 1087. And in any and every case in which the possession of such an instrument has been obtained by fraud, or with the preconceived intention of defrauding or cheating the true and rightful owner out of the goods, and is indorsed by such a vendor or holder of it to, even, an innocent purchaser of the goods for a valuable consideration on the faith of the bill of lading, it is incumbent upon such purchaser to prove that he bought them without notice or suspicion of the manner in which the party of whom he bought them, had acquired or purchased them. _Copeland v. Bosquet,_ 4 _Wash._ 588. A bill of lading is not a negotiable paper in the proper sense and legal signification of the term, for it does not represent money, or a debt due from one person, or a promise, or engagement to pay money to one person, or to a number of persons upon the order of another, nor does it possess any general currency or circulation as such, and was never designed or supposed to partake of the peculiar character and credit of a bill of exchange or promissory note, or to serve the great and important purposes for which they were introduced into commercial usage; because it possesses after all, but one faint feature of resemblance or analogy to them, and that is simply, that by commercial usage and the indulgence of the law, it is, like them transferable by indorsement merely, and as a symbol of the goods and chattels referred to in it, when so indorsed and delivered to a purchaser of them for a fair consideration and without any taint of fraud or illegality in the transaction, it will be considered to be a symbolic transfer of the goods themselves, and equivalent in law to an actual delivery of them to such purchaser. But there its office ends, for no action of law lies upon it _per se,_ either against the maker, receiver, or indorser of it. The case of _Lickbarrow v. Mason_ has probably done as much as any other, to sanction a contrary doctrine on this point, and may be cited on the other side; but it is not to be viewed or considered as giving bills of lading the character of negotiable instruments, which was wholly unnecessary for the purposes of the decision in that case. Nothing in fact, could be a greater departure from the principles and analogies of the common law, than to treat bills of lading or other documentary evidences of title to chattels personal, as negotiable instruments; for chattels personal are wholly insusceptible of negotiation in themselves, and it is manifestly inconsistent to give the instruments which represent them a different character. 1 _Smith's Ld. Ca._ 1088.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The plaintiffs had proved that by the original contract between them and M. Hunt & Co., the cargo of corn was to be paid for in cash on the delivery of it to his firm, but afterward at his special request, it was agreed between them that it should be paid for by a draft drawn by them on his firm payable one day after sight, and his detaching the bill of lading from it and indorsing and transmitting it to the firm of Thomas D. Quincey & Co. the same day it was presented to him and the day before it was payable, and without paying it, or having any funds to meet the payment of it on the following day, and which he then well knew was bound to go to protest the next day for that reason, was not only in direct violation of his contract of purchase, but it was also strong and conclusive evidence of a deliberate and premeditated design on his part, to get possession of the corn and to sell and transfer the property in it to another without ever paying for it, and thus to defraud the plaintiffs out of the price of it entirely. Such a contract for the purchase of it to be paid for by draft at one day's sight, was according to the usages of trade equivalent to a cash sale, or to a sale to be paid for on delivery of the cargo and the bill of lading, and the true meaning and intention of the contract in such a case was, that the bill of lading for it attached to the draft should remain attached to it, as a safeguard and security for the payment of it, until it was duly paid the next day according to the tenor of it; and it was, therefore, not to be considered an actual delivery of either the cargo, or the bill of lading which was but the legal symbol of it, no more than it was to be considered an actual delivery of the draft itself to which it was attached, before the payment of it, or when it was presented to him for acceptance merely. And as there was no proof whatever in the case that the failure of M. Hunt & Co. was at all unforseen or unexpected by them when it occurred, which was only four or five days afterward, the inference and conclusion was irresistible that it was the design of M. Hunt & Co., in anticipation of their speedy failure, to obtain in that fraudulent and surreptitious manner the possession of the bill of lading and of the cargo of corn which it symbolized and by a fiction of law represented, and by indorsing it to Thomas D. Quincey & Co. and attaching it to the draft drawn by him on that house at sight, and lodging it the same day in bank in Baltimore, to realize, at least, $10,350 out of it, before their failure, and on the very eve of it, and which he doubtless then foresaw and well knew was inevitably and rapidly approaching, and which, as he had before said, constituted not only a gross and outrageous breach of the contract of sale itself, but a deliberate and preconcerted fraud upon the plaintiffs, which upon the authority of the numerous cases he had before cited on that point, would utterly extinguish and annihilate any legal right or title which he or they could claim to have acquired by such dishonest means in the property.

*Whitely*, for the defendant. This is an action of replevin against the defendant, the captain of the vessel, who came into possession of the cargo in question, by no tortious or wrongful act, but lawfully, and the first objection he had to make to the plaintiffs' right to recover in it, was that there had been no demand made by them upon the defendant for the delivery of the corn to them before the institution of the suit against him for it. For what had been proved and put in evidence as their written demand served upon him on the 19th of March 1867, was not a demand for a delivery of the corn to them, but that he should hold, or in other words, retain the possession of it for them until such time as is indicated in it, and which was until they could have a reasonable opportunity of testing the question of their legal ownership of it. Besides, as the master of the schooner and the representative and agent of the owners of her, and as a common carrier of goods for hire, he had a specific lien on the cargo for the freight due the vessel upon it, and a legal right to hold and retain it in his possession, until the freight was paid or tendered to him, and which the proof also showed had not been done until after the commencement of the action. He should at the same time contend on the testimony of Mr. Barrett which had not been contradicted or denied, that the declaration made by Mr. H. H. Mears in his store in Philadelphia to him on the 20th of March, the day after the written demand of the plaintiffs had been served upon the defendant, when Mr. Barrett called there to ascertain where the schooner then was, that the captain had just before that left his store to go on board of her, that it was all right and that he might write to Mr Quincey that she was then on her voyage to Boston, amounted by way of admission to a waiver of their previous demand, such as it was, upon the defendant in regard to holding the cargo for them.

*10 There was, however, not only a complete delivery of the possession of the corn by the plaintiffs to M. Hunt & Co. at the port of Philadelphia, but a complete transfer of the property in it by them to the latter, as soon as the cargo was shipped and the bills of lading for it were signed and delivered by them in the name of M. Hunt & Co. In execution of the contract of charter the master of a ship signs the bill or bills of lading which is an acknowledgment of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581

3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)

**(Cite as: 3 Houst. 581)**

receipt of the goods on board of the ship, and of the obligation to carry them which he assumes. It contains the quantity and marks of the merchandise, the names of the shipper and consignee, the places of departure and discharge, and the name of the master and of the ship with the price of the freight therefor. The charter party is the contract for the hire of the ship, and the bill of lading for the conveyance of the cargo; and though it is signed by the master or captain, he does it as agent for the owners of the ship, and it is a contract binding upon them. By it the master engages as a common carrier to carry and deliver the goods to the consignee, or his order, dangers of the sea excepted; and by the common law, the owners of the ship were responsible for damages to the goods on board to the full extent of the loss. There are commonly three bills of lading prepared and made out, one for the shipper or freighter, another for the consigee or factor, and a third is usually kept by the master of the ship for his own use and instruction. And it constitutes the document and title of the goods shipped; and, as such, if it be to order or assigns, it is transferable in the market. The indorsement and delivery of it transfers the property in the goods from the time of the delivery; and the *bona fide* holder of the bill of lading, indorsed by the consignee, is entitled to the goods, if he purchased the bill for a valuable consideration. 3 *Kent's Com.* 206, 207. In one aspect of the case, the firm of Thomas D. Quincey & Co. were the second purchasers or vendees of the cargo of corn in question, although they were the first persons to whom it was consigned by the bills of lading after it was shipped in Philadelphia, the plaintiffs having purchased it for, and sold it to, the firm of M. Hunt & Co. in the city of Baltimore and shipped it in the name and to the order of the latter to the former firm in Boston; and it has been ruled that the second vendee of goods *in transitu* cannot, unless he be the indorsee and holder of the bill of lading for them, or unless the original vendor has made himself a party to the resale of them by clothing the first purchaser of them with documentary evidence of title to them, stand in a better situation with reference to them, than the first purchaser, his immediate vendor. If, therefore, goods are sold and delivered to a carrier to be forwarded to the purchaser, and the latter resells them *in transitu* and receives the price and then becomes insolvent, the first vendor may stop the goods at any time before they have come into the possession of such second purchaser, and hold them as a security for the due payment of the original purchase money. The right of property in the goods may be thereby transferred to the second purchaser, but he has no right to the possession of them, any

more or better than his immediate vendor had. If however, in such a case, the second purchaser claims the goods as the *bona fide* indorsee and holder of a bill of lading of them, the law is entirely different, and both his property in and legal title to the goods will be complete and absolute. Because what is called a bill of lading, is by the custom of merchants recognized and sanctioned by the common law, a negotible instrument, and the indorsement and delivery of it to third parties, who have given credit to such bill of lading, and have bought the goods mentioned in it in ignorance of the state of accounts between the shipper and his immediate purchaser, transfers the property to the indorsee as absolutely and effectually as if the goods themselves had been manually delivered to him. As between the consignor or first vendor and his immediate vendee, the indorsement or delivery of the bill does not destroy the right of stoppage *in transitu*, or deprive the unpaid vendor of his right to recover and retain possession of the goods. Its existence does in no degree alter or vary the rights and respective situations of the immediate parties to the sale. As between the shipper and master of the vessel, it fixes and determines the duty of the latter as to the persons to whom the goods are to be delivered, but it may be revoked and countermanded in case of the insolvency of the consignee, at any time before it has been actually executed and obeyed by the delivery of the goods themselves, like any other order or direction given to a common carrier. But as between the consignor or first vendor and third parties who are *bona fide* purchasers for a valuable consideration, the case is widely different. The first vendor by indorsing and delivering the instrument to his immediate purchaser, accredits the title of the latter to the goods, and holds him out to the mercantile world as the owner of them, and the *bona fide* indorsement and delivery of such purchaser to a third party consequently deprives the first vendor of all power and control over the goods, and destroys his right to stop them *in transitu* as against such *bona fide* holder of the bill of lading for value. If, however, the assignee of the bill is not a purchaser of the goods, and has given no value or consideration for the indorsement of the bill of lading, or if he knew of the insolvency of the consignee at the time he took it, even though he pays full value for the goods, he will be in no better situation than the consignee, his immediate vendor. *Add. on Contr.* 260, 262. The rule which has often been recognized, that where the purchaser is insolvent, and knows himself to be so, and has no reasonable expectation of being able to pay for the goods, or fraudulently misrepresents his ability to pay for them, he acquires no title to them as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against the vendor, is held equally applicable to a *bona fide* creditor of the purchaser, whose claim had accrued before the sale, and who, therefore, could not have trusted him upon the credit of the goods, claiming under a legal process against the purchaser. But a sale of this description is only voidable, and not void. And hence it is the prevailing doctrine that one who purchases *bona fide* from the first vendee, before the vendor elects to avoid the sale, (or, it seems, an attaching creditor whose claim had accrued after the sale) will in such a case hold the goods against the vendor. And what is meant by a purchaser in these cases, is one who obtains the goods, or the bill of lading from the vendee in the usual course of trade without notice; or in other words, one who gives value for them, by making advances, or incurring liabilities, or taking them in pledge for money loaned on their security. But not one who receives them in payment of, or as security for, a pre-existing debt. The mere possession by the vendee carries with it no right or authority to transfer the title. That continues in the vendor until the conditions of sale and delivery are complied with by the vendee, or are waived by the vendor. And this constitutes the precise distinction between a sale and delivery of goods on condition, and a sale procured by fraud, or false representations on the part of the vendee. In the latter case, the property in the goods passes by the sale and delivery, because such was the intention and agreement of both the parties at the time of the sale and delivery of them. And, therefore, in such a case the vendee having the property in the goods, as well as the possession of them, can pass a good title to the purchaser who takes them in good faith and without notice of the fraud. But the vendor can reclaim the goods by rescinding the contract and avoiding the sale, so long as they remain in the possession of the vendee, or of any one who has taken them with notice of the fraud, or without paying a valuable consideration for them. In such case, the title to the goods is in the vendee, though defeasible at the option of the vendor, because the vendee, or any one claiming under him with knowledge of the fraud, cannot honestly and legally hold the property against him. But in the case of a conditional sale and delivery, the title does not pass from the vendor until the condition is fulfilled. And any one who in good faith buys goods, or advances money, or incurs legal liability in the ordinary course of business on the faith and credit of the title of a fraudulent purchaser, is in law a *bona fide* purchaser of them. *Hil. on Sales*, 332, 333. *Caldwell v. Bartlett*, 3 Duer 341. *Hoffman v. Noble*, 6 Metc. 68. *Root v. French*, 13 Wend. 570. *Hall v. Hinks*, 21 Maryland 406. *Dows. v. Greene*, 16 Barb. 72. *Gilbert v. Hudson*, 4 Greenl. 345. *Durell v.*

*Haley*, 1 Paige 492. *Rowley v. Bigelow*, 12 Pick. 306.*Walter v. Ross*, 2 Wash. 283. *Conrad v. Atl. Ins. Co.* 1 Pet. 445. *Lickbarrow v. Mason*, 6 East. 19. 2 *Smith's Ld. Ca.* 388, 445. *Wright v. Campbell*, 4 Burr. 2046. *Noble v. Adams*, 7 Taunt. 59. *Tindall v. Ellison*, 4 Ell. & Black. 220. *Caldwell v. Baugh*, 1 T. R. 205. *Stewby v. Hayward*, 2 H. Black. 504. But as this alleged fraudulent purchase by M. Hunt & Co. occurred in Maryland, we have a leading and well considered case decided by the courts in that State, and not unlike the present in the statement of the facts and circumstances of it, to this effect, that it does not follow that a sale is fraudulent and void because the vendees at the time of the purchase are insolvent, and knew themselves to be so, and did not communicate that circumstance to the vendors, who were ignorant, and were known to be ignorant thereof by the vendees. *Powell & Fiddeman v. Bradlee & Co.* 9 Gill & Johns. 220. If a commission merchant in the usual course of business, makes advances to the owner of merchandise stored in a distant city, and receives from such owner as security, the warehouse certificates for it and an order thereon to deliver the property to himself, the legal title passes to him as security for his advances, and the goods cannot be attached and taken possession of as the property of the former owner, who has only an equitable interest therein, though neither the warehouseman nor the attaching creditor had notice of such transfer. *Gibson v. Stevens*, 8 How. 384. If a consignor takes from the carrier an obligation to deliver the goods to A. for the use of B. the purpose being to secure a debt due from the consignor to B. the assent of the latter will be presumed, and the property passes at once to B. and cannot be attached for a debt of the consignor. *Grove v. Brien*, 8 How. 429.

**\*11** The bill of lading in this case was delivered to the firm of M. Hunt & Co. in the regular and usual course of their trade and business in the City of Baltimore, and there was nothing wrong, improper or unusual in their detaching or unpinning it from the draft and retaining it when they accepted the latter. There was no such commercial usage or custom existing there to the contrary, as had been alleged and contended for on the other side, to forbid or preclude the propriety and legality of it. But even if it had been unusual, or irregular, or contrary to an established usage of trade in such a case, the delivery of the bill of lading to them was the act of the bank there, which allowed it to be detached and retained by them without any objection, and thereby tacitly sanctioned it, at least, and which was a conclusive answer to the allegation and a complete refutation of the pretext or pretension that they obtained the possession of it,

either tortiously, or fraudulently, or even improperly. If that bank, or the bank in Philadelphia through which the draft with the bill of lading attached was transmitted for their acceptance and collection at maturity, were not the true and legal owners, as well as holders of it, at the time when it was presented to them for acceptance, as it had already been cashed at the bank in Philadelphia and the amount of it had been entered upon its books to the credit of the plaintiffs, they were, at least, the agents directly of the plaintiffs in the transaction, and consequently their act as such in the premises was the act of their principals, and their delivery of the bill of lading to them under the circumstances, was the delivery of their principals, and was, in effect, the act of the plaintiffs themselves in the matter. And if the firm of M. Hunt & Co. were in the rightful possession of it, or were guilty of no fraud in obtaining the possession of it, their approaching failure, or actual insolvency at the time, even if it were then well known to them, could not have vitiated or invalidated their immediate indorsement and transmission of it to Thomas D. Quincey & Co. or in any manner impaired or affected the legal title of that firm to it, and to the cargo of corn of which it was the symbol, by virtue of the indorsement and delivery of it to them, and their acceptance at sight at the same time and payment of the accompanying draft of the firm of M. Hunt & Co. on account of it, for $10,350. But, even, if M. Hunt & Co. had been guilty of the grossest fraud both in law and fact, in obtaining the possession of the bill of lading in question, it still could not affect in the least, the title of Thomas D. Quincey & Co. to the cargo, unless the jury were satisfied that they had notice or knowledge of such fraud at the time when they received it and the draft accompanying it, and accepted and paid it; but of which it was scarcely necessary to add there was not one particle of evidence before them. Indeed, the evidence was so strong and conclusive to the contrary, that it was impossible for any reasonable person to entertain even a suspicion of it. *Hil. on Sales.* 306.*Cross v. Peters,* 1 *Greenl.* 376.

**\*12** *Comegys,* on the same side. The counsel for the plaintiffs seems to consider that they did not intend in this case to pass any title in the corn to M. Hunt & Co., the shippers of it, until their draft for the price of it had been paid by them, for there was no pretension that it was *in transitu* from the plaintiffs to that firm; or if not, that it was but a conditional sale of it by the former to the latter, under the facts and circumstances proved in the case. But the contract of sale was made in the State of Pennsylvania, and in this respect must be governed by the *lex loci,* but by the law and the

judicial decisions in that State, there can be no conditional sale, or a sale upon a secret condition, or a secret trust, for when a sale made there upon a secret trust or condition that no title is to pass to the party to whom the article is delivered until it is paid for, the trust or condition is void. *Story's Conf. of Laws, secs.* 242, 267. *Story on Sales, sec.* 313. *Martin v. Mathiot,* 14 *S. & R.* 214. *Story on Sales, sec.* 346. *Pars. on Notes & Bills* 328. *Stanton v. Eager,* 16 *Pick.* 467. *Cox v. Hurdon,* 4 *East* 211. *Add. on Contr.* 853. When the plaintiffs put that firm in possession of the cargo, as they did by shipping it in their name or to their order, they knew or must be presumed to have known that by the laws of that State they clothed them with the evidence of the title to it, and thus enabled them to deal with others in regard to it on the faith and credit of their being the rightful and lawful owners of it; and for that reason such a condition in the contract of sale, was in contemplation of law, fraudulent and void in that State. But there was in this case an absolute delivery of the cargo on board in Philadelphia by the plaintiffs to that firm, and there was therefore no right of stoppage *in transitu* applicable to it. *Story on Sales, sec.* 336. *Stubbs v. Lund,* 7 *Mass.* 474.

What is the effect of a sale of goods to be paid for, as in this case, by a draft at one day's sight? It is not strictly or literally a sale to be paid for in cash on delivery of the goods, although merchants may ordinarily regard it in their business transactions, as practically tantamount to it; but with the days of grace added to the day after presentation and acceptance of the draft, it was actually equivalent to a sale and delivery of the cargo on a credit of four days, at least, and no action would lie for the price of it until after the four days had expired. The order in the letter of M. Hunt & Co. to the plaintiffs, was to draw on them for the price of the cargo when shipped in their name and to their order at one day's sight with bill of lading attached, which was done by them, and this, he contended and asked the court to charge the jury, was a contract of sale of the cargo by the plaintiffs to them, on credit, or on time, and was not a sale of it for cash to be paid for on delivery. The plaintiffs had no right to retain the bill of lading with the draft after the latter had duly indorsed their acceptance upon it, because the cargo was not to be delivered to them in Baltimore, but upon the face of it, to their order at No. 40, Commerce Street in the City of Boston, and was shipped in their name, as the purchasers of it, in the City of Philadelphia to that destination. And how could any one say that was not a delivery of it to them from that moment, or was not a sale and delivery of it to them, to be paid for at a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581                                                    Page 12
3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

future day? M. Hunt & Co. were themselves the charterers of the schooner, procured the captain as well as the vessel for the voyage, "shipped by M. Hunt & Co." says the bill of lading, and the defendant as master, received the cargo as theirs and signed the bill of lading of it as such, and that made him their agent and carrier, and which made him responsible alone to them for the conveyance and delivery of it to their order and to the destination designated in it. The plaintiffs were, therefore, no parties to the bill of lading or the contract of shipment, and had no control or authority over the captain or the cargo in his custody and possession as the carrier of it, and had no right of action against him in any case, or in any event, on account of it. And so obvious was the fact that they had no right or property in it, that if they had applied to any insurance company to insure the cargo in their own name and disclosed these facts, they could not have effected an insurance upon it.

*13 There was no such usage or custom as had been alleged and contended for on the other side, that the National Exchange Bank of Baltimore ought not to have suffered Montgomery Hunt to detach the bill of lading from the draft of the plaintiffs, when he accepted it on its presentation to his firm, prevailing, or generally recognized and established in the city of Baltimore, or in the State of Maryland, or indeed, any where else in the country at that time. For the evidence of the plaintiffs had utterly failed to prove that any such common or general usage existed there, or elsewhere in the country, either then, or now. And not until it has been clearly shown to the satisfaction of the court, that such a general usage has been established, as would import whenever a bill of lading is attached or pinned to a draft payable after sight, an instruction to all concerned in them that they are not to be severed or detached from each other until the maturity and payment of the draft, it cannot be considered or held by the court that any contract for the sale of goods so to be paid for was made with reference to it, or that it became by the usage and course of trade and the implied understanding and assent of the parties to it, a part of the contract. For the existence, as well as the legal effect of such a commercial usage in any such case is, after all, a question for the court, and not for the jury to decide.

*T. F. Bayard*, for the plaintiffs. The first objection taken on the other side which he should notice was that the demand proved was not sufficient, the evidence in regard to which was that a positive and direct demand, both verbal and written, was made by the plaintiffs upon the defendant for the delivery of the corn to them, to which he responded by an unqualified and peremptory refusal without either demanding the freight, or stating the amount of it, which he was bound to do, if he intended to retain the possession of it for that reason, or to set it up as a matter of defense or justification in the present action. But his first and last and only reply to both demands uniformly was, that he would not give up the corn until he was compelled by law to do so. A conditional contract for the sale of goods was not void by law in the State of Pennsylvania unless it was tainted with fraud, actual or constructive; but in either case, the question of fraud is a question of fact to be decided by the jury under the instructions of the court as to the rules of law in regard to it. But in this case, was the delivery of the cargo, or of the bill of lading as the symbol of it, absolute or conditional? It was conditional. The understanding and agreement between the plaintiffs and the firm of M. Hunt & Co. was, as had been distinctly proved, that the cargo of corn was to be paid for in cash on the delivery of it to the latter on board the vessel in Philadelphia, and it would be remembered by both the court and jury that it had been as distinctly proved that it was afterward specially requested of the plaintiffs by Montgomery Hunt that as soon as loaded to the order of his firm and the bill of lading was so made out, they should draw upon his firm for the price of it, a draft at one day's sight with the bill of lading attached, and which in a few days thereafter was done in accordance with his request. But although it was so done, it did not involve, in the apprehension of either of the parties to it, the slightest deviation or departure from the strict terms of their original agreement and understanding that it was to be paid for in cash on the delivery of it as before stated; because it had also been as clearly and distinctly proved in the progress of the trial, that a payment by draft at one day's sight, is invariably considered in all commercial circles as equivalent to a payment in cash on delivery of the articles sold. It, therefore, remained according to the true intent and understanding of the parties to the contract of sale, a substantial part and condition of it that the corn was to be paid for on the delivery of it, and before the purchasers had parted with the possession of it and had sold and transferred their apparent right and property in it to another, or by an immediate indorsement and negotiation, or transfer of the bill of lading to an entire stranger to their contract and understanding for a valuable consideration, and without any notice of it, to absolutely divest the plaintiffs of any right, title or property whatever in it, and without ever paying them a solitary cent for it. Such an act was not only a gross and manifest breach

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

of the terms of the contract and the condition of sale, but if it was done as there was every reason for believing, by that firm in full view and expectation of its speedy failure, and with the secret knowledge and conviction that it was even then utterly and hopelessly bankrupt, it was even more than that, and far worse, for it was in that case, a flagrant and flagitious fraud, if not a crime, to obtain the possession of the property under such circumstances and with such a base and fraudulent intention. And such a breach of the condition of the contract of sale would wholly avoid it on their part, and could give them no legal right, title, or property in the cargo, although delivered to them under it. *Story on Sales*, 313. *Black on Sales*, 151. 4 *Wash*. 494. 2 *Smith's Ld. Ca*. 1095. *Add. on Contr*. 262. *Abb. on Ship*. 327, 328. *Brandt v. Bowlby*, 2 *Barn. & Ad*. 932. And a delivery of the goods sold under such circumstances, will not be allowed to defeat the real intention of the vendor, and the understanding of both the vendor and vendee, when so delivered, *Saltus v. Everett*, 20 *Wend*. 274.

*14 After reviewing the evidence at large, he asked the court to charge the jury that if the firm of M. Hunt & Co. obtained possession of the bill of lading contrary to the terms of the contract and the intention of the plaintiffs; it was a fraudulent transaction on their part and vested no right of property in them in the cargo which it represented, and, therefore, their indorsement and delivery of it to the firm of Thomas D. Quincey & Co. transferred no property in it to the latter, unless they took it in entire good faith, and without any notice or knowledge of the manner in which M. Hunt & Co. had obtained the possession of it, and also without any good ground or reason to surmise or suspect that they had obtained the possession of it contrary to the intention of the plaintiffs and their contract of sale with that firm for the cargo of corn in question, and that it was incumbent in law upon them, as the indorsees of it, to prove to the satisfaction of the jury that they so received it, or the verdict should be for the plaintiffs.
*Gilpin, C. J., charged the Jury.*
This is, as you are aware, an action of replevin, in which, under the pleadings, is involved the question of the ownership of the property which is the subject of controversy. In order to entitle the plaintiffs to a verdict in their favor, they must show that at the time the property was taken under the writ of replevin it belonged to them. If they have failed to establish their ownership of the property at that time, or if it appears that the property then belonged either to M. Hunt & Co. or to Thomas D. Quincey & Co., your verdict should be in favor of the defendant. The

controversy between the parties is not, it would seem, so much in regard to the real facts of the case, as it is in respect to the conclusions of law arising, or to be deduced from these facts. And, this being the case, I propose to state to you such of the material facts as are not disputed, in order that you may the more readily understand what I shall have to say upon the questions of law which have been presented by counsel on both sides, and upon which they have requested the court to instruct you.

It appears from the evidence that the firm of M. Hunt & Co. of Baltimore, had at different times since the year 1863, purchased from H. H. Mears & Son of Philadelphia, the plaintiffs in this action, sundry cargoes of grain amounting in the aggregate value, to the sum of one hundred and fifty or two hundred thousand dollars; so that it is thus made manifest to you that their business transactions with each other, extending through a period of about three years, were of considerable magnitude. It also appears from the testimony of Montgomery Hunt that H. H. Mears & Son were in the habit of drawing, from time to time, on M. Hunt & Co. for the value of these several purchases, at one and three days' sight. And some time in the latter part of February 1867, M. Hunt & Co. applied to H. H. Mears & Son personally, and also by letters, to purchase from them a cargo of ten or twelve thousand bushels of corn, and the latter firm agreed to sell and supply the same, and in pursuance of such agreement they afterward delivered on board of the schooner Paugusset, then lying in the port of Philadelphia, of which the defendant was master, eleven thousand four hundred and fifty one 32/56 bushels of corn "per account of M. Hunt & Co." On the 1st. of March M. Hunt & Co. wrote to H. H. Mears & Son saying, "You will have her [meaning the schooner Paugusset] loaded by Monday if weather continues good. The bill of lading make same as Waples' to order-will name point by telegraph tomorrow-draw when loaded at one day's sight, bill of lading attached-try and get exchange as light as possible."They wrote again to H. H. Mears & Son on the fourth of the same month saying "The Schooner Paugusset will sail for Boston and report to No. 40, Commerce Street."On the sixth of the same month, March 1867, H. H. Mears & Son caused to be prepared three bills of lading in the names of M. Hunt & Co., as shippers of the corn, and had them duly executed by the defendant, as Captain of the Schooner, and two of them were then delivered by the Captain to H. H. Mears & Son. The bills of lading were in fact made out by Mr. B. H. Tatum, the clerk or cashier of H. H. Mears & Son, in their counting house in the names of M. Hunt & Co. according to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581
3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

their request, and with the sanction and approval of H. H. Mears & Son. The witness, Tatum, says he remembers that M. Hunt & Co. on two previous occasions purchased cargoes of grain of H. H. Mears & Son. He recollects the purchase of a cargo in the preceding month of January, but cannot say who were named in the bill of lading as the shippers; the proof, however, shows that M. Hunt & Co. were named in the bills of lading as the shippers of this cargo. He states that the cargo of the sixth of March was sold for cash, and that H. H. Mears & Son drew at one day's sight at the request of M. Hunt & Co. as contained in their letter of the first of March 1867. The bill of lading offered in evidence is in the following form:-Shipped in good order and condition by M. Hunt & Co. in and upon the Schooner called the Paugusset whereof Joseph Waples is master for the present voyage, now lying in the port of Philadelphia and bound to Boston, Mass., eleven thousand four hundred and fifty-one 32/56 bushels corn to be delivered-being marked and numbered in the margin; to be delivered in like good order and condition at the aforesaid Port of Boston, Mass., (the

dangers of the seas only excepted) unto order, or to assigns, he or they paying freight for the said goods at the rate of ten cents per bushel, weight, without primage and average accustomed. Witness, &c.

**\*15** Dated Philadelphia 6th. of March 1867.
JOSEPH WAPLES.

Indorsed on the back "To the order of Thomas D. Quincey & Co.
M. HUNT & CO."

On the same day, March 6th. 1867, H. H. Mears & Son drew on M. Hunt & Co. at one day's sight for the sum of $11908.65, that being the value of the cargo including the exchange or discount on the draft, and indorsed the draft with the bill of lading attached, to the Philadelphia National Bank-the Bank taking the draft from them as cash, and placing the proceeds to their credit. The draft is as follows:

| "$11,908 65/100 . | Philadelphia, March 6th. 1867. |
|---|---|

One day after sight pay to the order of ourselves Eleven thousand nine hundred and eight 65/100 dollars, value received, which place to account of
H. H. MEARS & SON."

"To M. Hunt & Co. Baltimore."

It is indorsed on the back "H. H. Mears & Son." I may here remark that upon the transfer of the draft to the Philadelphia Bank by the indorsement of H. H. Mears & Son, it ceased to belong to them and became the property of the bank. The Philadelphia Bank immediately indorsed and remitted the same with the bill of lading attached, to the National Union Bank of Baltimore for acceptance and collection. On the next day, March the 7th, the draft with the bill of lading attached to it by a pin, was presented by Mr. Monnier, the collection clerk of the National Union Bank of Baltimore, to Montgomery Hunt, of the firm of M. Hunt & Co. for acceptance, who upon accepting the same in the name of his firm, detached the bill of lading, and retained it in his possession, without objection on the part of the bank clerk. Mr. Monnier, however, says that he had objected on a previous occasion, namely, on the occasion of presenting the draft for $10,000 in the month

of January preceding, for acceptance, but that Mr. Hunt said they had always detached and kept the bill of lading on accepting the draft; and so he kept it. But Mr. Monnier says expressly that he did not object to Mr. Hunt's detaching the bill of lading which accompanied the draft of the 6th of March. He says that he had not then received any instructions from the bank on the subject, but that some six months afterward he received instructions not to allow bills of lading to be detached until the drafts had been paid. Messrs. Hursteine and Levering, both dealers in grain in Philadelphia, say that a bill of lading attached to a draft, is pledged as security for the payment of the draft, and that an acceptor has no right to detach it until he has paid the draft. Mr. Torry, the Vice President of the Corn Exchange Bank of Philadelphia, says the "usage" is to hold the bill of lading until the draft is paid, or until satisfactory arrangements are made with the bank for its payment. That sometimes the bank permits acceptors to detach the bill of lading before payment of the draft, but in the absence of instructions he should not consider himself as having any authority or right to allow it to be detached, or delivered up to the acceptor; and that if he should do so, it would be at the risk and responsibility of the bank, and that if the bank had discounted the draft, or were the holders of it for value, they would, as owners of the draft, be entitled to hold the bill of lading attached to it, as security for its payment; or they might on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

acceptance permit the acceptor to detach and retain the bill of lading, but that if the bank did so, it would be at its own proper risk, so far as the interests of the drawer were concerned. Such it appears, Mr. Torry understands the "usage" to be, and such the responsibility of the bank, as resulting from that usage. James Barret, however, who has been engaged in the grain business for twenty-one or two years, does not know of any established usage in the trade to retain or detain the bill of lading until the draft has been paid. He understands the object of attaching the bill of lading to the draft to be to show the acceptor that the produce or goods has or have been shipped-"that the stuff has gone forward"-and has been consigned to the acceptor, so that he may know that he may with safety accept the draft. Montgomery Hunt states that in his business the bills of lading have always been delivered up to him on his acceptance of the accompanying drafts, and that no objection was ever made to his detaching and retaining them.

*16 On the 7th of March, M. Hunt & Co. drew on Thomas D. Quincey & Co. of Boston at sight, for the sum of $10,350, in favor of the Bank of Commerce in Baltimore, and delivered the draft to the said bank with the bill of lading attached, indorsed on the back thereof "to the order of Thomas D. Quincey & Co." The Bank of Commerce immediately remitted the same to the National Exchange Bank of Boston for collection, which draft upon being presented, on the ninth of March 1867, to Thomas D. Quincey & Co. was paid by them, and the same with the bill of lading was delivered up to them. On the 11th of March 1867, the draft drawn by H. H. Mears & Son on M. Hunt & Co. was duly protested for non-payment, and returned to the Philadelphia Bank, and has not since been paid by M. Hunt & Co. And on the 12th of March 1867, M. Hunt & Co. made an assignment of all their property for the benefit of their creditors. I have thus, I think, with substantial accuracy, stated the most material facts of this case. If, upon reviewing the evidence, you find I have misstated any fact, I beg of you to correct it; or if, on the other hand, I have omitted any material fact, I hope your better recollection will supply it. You are not to be governed by my statement, but by the evidence before you and as you remember the evidence to be. You will consider these and all subsidiary or surrounding facts or circumstances, and indeed, every thing disclosed by the testimony which may throw light upon the subject of your deliberations.

Now, gentlemen, if I understand the argument of counsel, or the grounds upon which the plaintiffs claim the property in dispute, they are substantially these. They insist in the first place, that there never was any real or valid contract of purchase and sale of the corn in question, between M. Hunt & Co. and the plaintiff. In other words,

they say that M. Hunt & Co. never had any title to, or property in the corn, either legal or equitable, by reason of the fraud which they allege M. Hunt & Co. practiced upon the plaintiffs; and that as the former could not pass to another a greater or better title than they themselves had, they having no valid title, could not by any act of theirs, convey to or vest in Thomas D. Quincey & Co. a good title, although the latter firm may have been innocent purchasers of the corn for value. And, secondly, that if M. Hunt & Co. had any title to, or property in the corn by force of the alleged contract of sale, it was a tainted title by reason of fraud, and therefore a defeasible and revocable title at the option of the plaintiffs, unless Thomas D. Quincey & Co. were innocent purchasers for value. They also insist that if M. Hunt & Co. are shown to be fraudulent purchasers, the burden of proof on this point is shifted, and that under this aspect of the case, it becomes incumbent upon Thomas D. Quincey & Co. to show by affirmative proof that they are innocent purchasers for value, that is to say, that they purchased for value without knowledge or notice of fraud. They, therefore, contend generally and broadly that M. Hunt & Co. were fraudulent purchasers, that they obtained possession of the corn, and of the bill of lading by fraud, and that Thomas D. Quincey & Co. purchased from M. Hunt & Co. with knowledge or notice of the fraud, and must, therefore, be deemed and taken to be parties to it. On the other hand, the counsel for the defendant contend first, that there was no fraud on the part of M. Hunt & Co. in making the purchase of the corn, nor in obtaining possession of the bill of lading; that M. Hunt & Co. and the plaintiffs were well known to each other ever since the year 1863; that between that time and March 6th, 1867, the plaintiffs had sold to them from $150,000 to $200,000 worth of grain, that previous cargoes had been purchased on the same terms as to time and mode of payment, that bills of lading for another, or other cargoes, had been made out by the plaintiff in the names of M. Hunt & Co. as shippers, and the bills of lading forwarded to them attached to the drafts, and that they had always detached the bill of lading upon accepting the draft, and in doing so, they had not violated any established usage of trade, but had only done what they had a perfect right to do, as no such usage as that contended for existed in Baltimore, nor in Philadelphia. And generally, they insist that there is no evidence before you, showing any fraudulent intention or conduct on the part of M. Hunt & Co. Secondly, they say, even assuing for the sake of the argument that M. Hunt & Co. were guilty of fraud in making the purchase of the corn, and in obtaining possession of the bill of lading, and that theirs was a defeasible and revocable title before the interests of innocent third parties intervened, yet, that Thomas D. Quincey & Co. being innocent purchasers for value, and taking the bill of lading under the indorsement of M. Hunt & Co. without notice or

3 Houst. 581                                                                                                    Page 16
3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

knowledge of the fraud, acquired a valid and indefeasible title against the plaintiffs.

*17 You thus perceive, gentlemen, that the first question for you to inquire about and decide is, whether M. Hunt & Co. were guilty of fraud in procuring the contract, or in obtaining possession of the corn and the bill. of lading. And in case you shall be of opinion that it has been shown that they were guilty of fraud in this regard, then in the next place you will inquire and decide whether their fraud, that is, fraud on the part of M. Hunt & Co. affects the title of Thomas D. Quincey & Co. And in order to aid you in arriving at just conclusions in regard to these questions, it is our duty to state to you as concisely as we can, what we understand to be the rules of law applicable to fraudulent purchases, and when, and under what circumstances, and to what extent, the rights of third parties may be affected by fraud.

But before doing so, I take occasion to advert for a moment, to the doctrine which has been urged in the argument, in relation to what is called the usage of trade in regard to detaching Bills of Lading from drafts, upon acceptance of the latter. There can be no doubt that the known and received usage of a particular trade, and the established course of commercial dealings under it, are tacitly annexed to the terms, and become part of a commercial contract. As, for instance, although a draft is on the face of it made payable at a future day certain, yet the three additional days of grace, according to the known and established custom of merchants, are understood to be annexed to, and constitute a part of the contract. And yet, even quite a number of Banks, or mercantile firms or houses in a large commercial City, can not by their practice establish a commercial usage, so as to make it binding as such, on the trading community generally. The established custom or usage of a trade, is undoubtedly the law of that trade. But to make it binding, it must be certain, uniform, reasonable and general, and of long standing, or, at least, of such long standing as to have become so generally known, recognized and acted on by the trade, as to raise a fair presumption that the parties in entering into their engagements, did so with a silent reference to the usage, and a tacit agreement that their rights and responsibilities should be determined by it. It must be the usage of the trade generally, and not the practice of a portion merely of the trade, or of particular firms or houses or banking establishments; for such limited or partial practice will not be sufficient to establish a commercial usage in the sense in which these terms are understood in the law. Moreover, it does not follow that because a custom or usage is recognized as obligatory in Philadelphia or New York, that it is recognized as such in Baltimore or New Orleans, or has any force or effect in these latter cities. The custom or usage in one State, may not be the same in another. The States of the Union in regard to commercial purposes, stand in the relation of foreign states toward each other, so that a custom or usage in one State, is not necessarily binding or obligatory upon persons engaged in the same trade in another State. Now, it does not appear from any evidence in this case, that any such usage as that contended for by plaintiffs' counsel, has ever at any time existed in Baltimore, or in the State of Maryland. And in the absence of affirmative proof, you can not presume the existence of such a usage. Again, in the absence of proof of instructions by H. H. Mears & Son to the Philadelphia Bank, and from the latter to the Baltimore Bank, not to allow the bill of lading to be detached from the draft before payment, you will not be justified in assuming that any instructions upon the subject had ever been given.

*18 Having thus endeavored to explain to you, our views of the law in respect to what are called customs or use-ages of trade, I now pass to the consideration of the question of fraud generally, and the rules of law applicable to the subject, which it is the duty of the court to state for your guidance in investigating the questions of fact submitted for your decision. And here allow me to say at the very outset, that good faith and fair dealing lie at the very foundation of all valid contracts, and that the law abhorring fraud of every nature and description as it does, will unkennel and expose it wherever it can be found, no matter how many, or what may be the character of the disguises which surround it. It may be laid down as a general rule, that all contracts incepted in fraud or tainted with fraud, are voidable contracts. Now actual or positive fraud may be said to be any false representation, deceit, device, or artifice used by one person with intent, or for the purpose of deceiving and misleading another to his injury. It assumes every shape and form, however. And, therefore, courts of justice have found it difficult to lay down any very exact rules in regard to its nature, or to give any very accurate definition of the term itself, or to prescribe any very definite rules as to the evidence necessary to establish the fact of fraud. And hence, they have refrained from attempting to do so from a prudent fear that they might thereby so limit their powers of investigation, as to afford opportunity to ingenious dishonesty successfully to evade the laws. I shall not, therefore, undertake to give you any precise definition of the term, but shall content myself by merely saying to you that the fact of fraud must be proved, either directly or inferentially as others facts are proved, by the circumstances attending or surrounding the particular transaction which is the subject of controversy. Fraud is never presumed to exist. On the contrary, it must be clearly established by the evidence. For where the circumstances attending the transaction are of a doubtful character merely, or raise but a bare suspicion of fraud in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regard to the party charged therewith, they will not be sufficient evidence of the fact. The circumstances relied on must be of such a nature as to raise more than a mere suspicion of fraud; they must be of such significance and force as clearly to establish the facts in the judgment of the jury. It is not necessary, however, that the proof should be direct and positive, it will be sufficient if the circumstances disclosed by the evidence, manifestly show that fraud has been practiced by the party.

A contract which has been incepted in fraud, is so vitiated by it that it may be rescinded and avoided, or not, at the option of the injured party. And if it be a contract of sale, the seller may reclaim the goods, provided the rights of a third party as a *bona fide* purchaser of them have not intervened. But the right of the seller to rescind or avoid the contract, and reclaim the goods from the buyer on the ground of fraud, exists only so long as the goods are in the hands of the fraudulent purchaser, or of some one who has taken them of such fraudulent purchaser with knowledge of the fraud by which they were originally obtained. I have already said that in case of fraud on the part of the buyer, the seller may avoid the contract before the interests of third parties, in good faith and for value, become involved in the transaction. Until then, it is at the seller's option to avoid, or affirm the contract. But until the contract is rescinded or avoided, the title or property in the goods is in the buyer, and he may sell or dispose of them to a *bona fide* purchaser for value, and thus vest in him a good, indefeasible, and irrevocable title to the property. It, therefore, follows both justly and logically, that a purchaser for a valuable consideration without knowledge or notice of fraud, takes a valid title from the fraudulent buyer which can not be defeated by the original vendor. And a consignee of goods who in good faith makes advances upon them, stands precisely in the same position as a purchaser for value, as against the original vendor, and the same principles of law in this regard, apply to his case. And permit me to say that this doctrine of the law is most reasonable and just, because the owner having voluntarily parted with his goods and clothed the buyer with a title which is good until the seller avoids it, which he may do, or not, as he pleases, it is through his own act that the buyer from him is enabled to re-sell the goods; and, therefore, a *bona fide* purchaser of them without knowledge of the circumstances ought not to be made to suffer. After delivery of the goods in pursuance of a sale, the seller can not rescind the contract, or reclaim the goods on the ground of fraud without proving deceptive assertions, or false representations, in some form or other, fraudulently made to induce him to part with his property. Mere insolvency of the buyer, though well known to himself and concealed from the seller, does not in itself furnish sufficient grounds for rescinding a contract of sale. Nor will the fraudulent

purchasing and obtaining of goods with an intention of never paying for them of itself render the contract of sale absolutely void, even as between the seller and buyer; yet, it will render it voidable at the election of the seller, but if the goods are sold by such fraudulent buyer to an innocent third party for value, the latter will take and hold them by a valid title. And, therefore, it may be laid down as settled law, that although as between the original parties, a sale and delivery of goods obtained by fraud is voidable, and may be rescinded at the option of the seller, and the goods reclaimed from the fraudulent purchaser, yet, as heretofore intimated, if the goods have passed into the hands of a *bona fide* purchaser for value, without knowledge or notice of the fraud, such purchaser will take a title which can not be revoked or impeached by the defrauded seller.

*19 A bill of lading by the custom of merchants and according to the principles of the common law, is held to be, in a certain sense, a negotiable instrument, that is, an instrument transferable by indorsement. And, indeed, it is well settled in the law that the indorsee of a bill of lading who holds it for value, or who has in good faith made advances on the receipt of it, has as good and effectual a title to the goods which it represents, as he could have obtained by the actual manual delivery to him of the goods themselves, In other words, the indorsement and delivery of a bill of lading is equivalent to a delivery of the goods; so that, according to the principles of commercial law, the indorsement of a bill of lading for a valuable consideration without notice of fraud, or of any adverse interest, vests in the indorsee an indefeasible title and makes him the absolute owner of the goods against all the world. No amount of fraud on the part of the person who indorsed the bill of lading, can, in the least, affect the title of the indorsee to the goods, for the plain reason that his title is that of an honest purchaser without knowledge or notice of any defect in the seller's title, or any sufficient reason to believe or suspect that fraud has been committed in the original purchase. Nor will the rights of such *bona fide* endorsee be altered or prejudiced by the fact that the person from whom he purchased, had effected the contract with the first seller, or obtained possession of the goods by means of false and fraudulent representations. As regards sales for cash and sales on condition, and the questions of law in respect to such sales which have been raised and argued by counsel, it is only necessary for us to say to you, in the language of Judge Bartoll that a "*bona fide* purchaser without notice of the condition upon which his vendor had acquired possession of the goods, will be protected against the claim of the original vendor in the same manner where the sale and delivery are conditional, as where the possession has been obtained by fraud."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Houst. 581
3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)
**(Cite as: 3 Houst. 581)**

And now, gentlemen, I beg to recall your attention closely to the consideration of all the facts of this case. The question to be determined by you is whether such fraud has been established by the evidence, as will affect the title of Thomas D. Quincey & Co. to the corn in dispute. And in regard to this question we again say to you that fraud can not be presumed, but must always be proved as any other fact. Now, if the plaintiffs shipped or placed the cargo of corn on board of the schooner Paugusset in pursuance of a contract of sale, and for account of M. Hunt & Co. and knowingly took from Captain Waples bills of lading in the names of M. Hunt & Co., as shippers and owners thereof, containing an engagement on the part of the captain to deliver the corn at the Port of Boston, "to order" or "assigns," and drew on the said M. Hunt & Co. at one day's sight, for the price or value of the cargo, then we say to you that these acts on the part of the plaintiffs, amounted to a delivery of the corn to M. Hunt & Co. and vested in them a title to the same, and thus enabled them to pass or transfer the property in the corn to a *bona fide* purchaser.

**\*20** But say the counsel for the plaintiffs, M. Hunt & Co. procured the contract of sale to be made and the corn to be delivered on board the Paugusset, and induced the plaintiff to have the bills of lading made out in the names of M. Hunt & Co. as shippers, and also induced the plaintiffs to give credit on the sale by drawing at one day's sight by artifice and false and fraudulent pretences and representations. Well, assuming for the moment and for the sake of the argument, that in these respects the conduct of M. Hunt & Co. was fraudulent. What then? Why simply this: the contract of sale, as between the plaintiff and M. Hunt & Co. would be revocable at any time before the title to, and property in, the corn passed to a *bona fide* purchaser, a purchaser for value, without knowledge or notice of the fraud. But until the contract was revoked or rescinded, M. Hunt & Co. could make a valid sale and transfer of the goods to an honest purchaser for value. But again, were M. Hunt & Co. in fact, guilty of fraud? This is a question to be determined by the jury in view of all the evidence before them. If M. Hunt & Co. were not guilty of fraud, then there is an end to the plaintiffs' case, and you need not inquire further. But assuming for the moment, that M. Hunt & Co. were guilty of fraud as alleged by the plaintiffs, then it will remain for you to consider and determine the further question, whether, according to the evidence before you, Thos. D. Quincey & Co. on the 9th of March 1867, at the time when they received the bill of lading and paid the draft of M. Hunt & Co. for $10,350.00, had knowledge or notice of any fraud committed by the latter. And we now distinctly say to you that no matter what may have been the fraudulent conduct of M. Hunt & Co. in relation to the purchase of the corn, or in obtaining possession of the bill of lading, if Thomas D. Quincey & Co. had no knowledge or notice of the fraud at the time when they received the bill of lading and paid the draft, their title to the corn can not be impeached, because Thomas D. Quincey & Co. having themselves violated no rule or principle of sound morals or of commercial honesty, and having advanced their money on the faith and credit of a bill of lading which could by no possibility have intimated to them that H. H. Mears & Son were or could be interested in the cargo, they ought not to suffer on account of M. Hunt & Co.'s misconduct; and we, therefore, say to you, if you find such to be the state of the case, that the title of Thomas D. Quincey & Co. was and is, a good and indefeasible title, your verdict should be in favor of the defendant. And this is so, according to the well settled rule of law that if the title to goods has been passed by indorsement and transfer of a bill of lading to a purchaser for value without knowledge or notice of fraud, such purchaser takes and holds a good title to the property against all the world: a rule of law, allow me to say, which is founded upon the just and equitable principle recognized in all courts of justice whether of law or equity, that where one of two innocent persons must suffer by the fraud of a third, the loss shall fall upon him who has enabled such third person to do the wrong. If, however, you shall be of opinion from the evidence that M. Hunt & Co. were guilty of fraud, and that Thomas D. Quincey & Co., on the 9th of March, at the time when they received the bill of lading and paid the draft, had knowledge or notice of the fraud, then your verdict should be in favor of the plaintiffs. The burden of showing that Thomas D. Quincey & Co. knew of the fraud, rests on the plaintiffs. If your verdict shall be in favor of the defendant, then, as the corn cannot be returned, it is necessary for you to ascertain the amount of his damages.

**\*21** The Chief Justice then stated the rule in regard to the measure of damages, and left the case with the Jury.

Verdict for the defendant for the amount claimed.

Del.Super. 1868.
Mears v. Waples
3 Houst. 581, 8 Del. 581, 1868 WL 1010 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*** Slip Sheet ***

Document

LEXSEE 801 F2D 13

**MANUFACTURERS HANOVER TRUST COMPANY, Plaintiff-Appellee and Cross-Appellant v. DRYSDALE SECURITIES CORPORATION; DRYSDALE GOVERNMENT SECURITIES, INC.; BMC ACQUISITION CORP., doing business under the name BUTTONWOOD MANAGEMENT; ARTHUR ANDERSEN & CO.; DAVID J. HEUWETTER; JOSEPH V. OSSORIO; and PETER J. WASSERMAN, Defendants, ARTHUR ANDERSEN & CO., Defendant-Appellant and Cross-Appellee**

**Nos. 85-7827, 85-7865, 85-7929**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*801 F.2d 13; 1986 U.S. App. LEXIS 30205; Fed. Sec. L. Rep. (CCH) P92,902*

**March 17, 1986, Argued**
**September 8, 1986, Decided**

**PRIOR HISTORY:** [**1] Appeal from a judgment entered in the United States District Court for the Southern District of New York, Richard Owen, Judge, in favor of plaintiff for $17 million plus interest and costs after a jury trial in an action seeking to recover damages claimed as a result of alleged false representations by an accounting firm made on behalf of a government securities dealer.

**DISPOSITION:** Judgment affirmed in part. Award of pre-judgment interest vacated and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant accounting firm appealed from a judgment of the United States District Court for the Southern District of New York in favor of plaintiff corporation in an action under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*.

**OVERVIEW:** Defendant accounting firm appealed from a jury verdict in favor of plaintiff corporation under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*, as a result of alleged false representations by the accounting firm made on behalf of a government securities dealer. The court on appeal held that repurchase agreements ("repos") were subject to § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*. The court found that the repos at issue fit within the language in the 1934 Act describing contracts to buy, purchase, or otherwise acquire securities, *15 U.S.C.S. § 78c(a)(13)*, and that repos were subject to the antifraud provisions of the 1934 Act. The jury's finding of fraud "in connection with" repos was a finding of fraud "in connection with" the purchase and sale of securities.

**OUTCOME:** The judgment for plaintiff corporation against defendant accounting firm for false representations was affirmed in part, but the award of pre-judgment interest was vacated and remanded on the issue of whether and to what extent pre-judgment interest was appropriate in the case.

**LexisNexis(R) Headnotes**

*Banking Law > Bank Activities > Securities > Retail Repurchase Agreements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN1] Even assuming that repurchase agreements are not securities, they are subject to § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*.

*Banking Law > Bank Activities > Securities > Retail Repurchase Agreements*

801 F.2d 13, *; 1986 U.S. App. LEXIS 30205, **;
Fed. Sec. L. Rep. (CCH) P92,902

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Definitions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN2] Where repurchase agreements ("repos") fit squarely within the statutory language in the 1934 Act describing contracts to buy, purchase or otherwise acquire securities, under *15 U.S.C.S. § 78c(a)(13)*, repos are subject to the antifraud provisions of the 1934 Act, § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*.

*Banking Law > Bank Activities > Securities > Retail Repurchase Agreements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN3] Since repurchase agreements ("repos") involve the purchase and sale of securities, it follows that a jury's finding of fraud "in connection with" repos is a finding of fraud "in connection with" the purchase and sale of securities.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN4] The standard for liability in a civil action under section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, is causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of the actual loss suffered.

*Securities Law > Liability > Remedies > Actual Damages*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
*Torts > Negligence > Causation > General Overview*
[HN5] The requirement of "loss causation" in a § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, derives from the common law tort concept of "proximate causation." In addition to this requirement as to the significance of the misrepresentation in the chain of causation, "loss causation" in effect requires that the

damage complained of be one of the foreseeable consequences of the misrepresentation.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Burdens of Proof*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN6] Plaintiff's burden of persuasion in a § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, action is simply to negate recklessness when defendant puts that in issue, not to establish due care.

*Business & Corporate Law > Agency Relationships > Types > General Overview*
*Securities Law > Regulation of Securities Markets > Borrowing & Margin Requirements > Regulation T*
*Securities Law > U.S. Securities & Exchange Commission > Necessity for Regulation*
[HN7] Regulation T expressly requires broker-dealers to ensure that a security purchased in a cash account is "held in the account" or that the creditor accepts in good faith the customer's statement that the security is owned by the customer or the customer's principal, and that it will be promptly deposited in the account. See *12 C.F.R. § 220.8(a)(2)*.

*Civil Procedure > Trials > Jury Trials > Polling of Jury*
*Civil Procedure > Appeals > Reviewability > Preservation for Review*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Failure to Object*
[HN8] In general, counsel must object to any procedure that it wishes to raise on appeal. See *Fed. R. Civ. P. 46*. Further, the failure to object precludes a party from contesting the oral, as opposed to written, form of the inquiry.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN9] As to the propriety of a judge's request for the bases of a jury's verdict, the reviewing court's standard of review is the abuse of discretion standard.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
[HN10] Juries are presumed to follow instructions.

801 F.2d 13, *; 1986 U.S. App. LEXIS 30205, **;
Fed. Sec. L. Rep. (CCH) P92,902

*Civil Procedure > Trials > Jury Trials > Jurors > Selection > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Right to Jury Trial*
[HN11] A jury selection procedure is unconstitutional if it "systematically and intentionally" discriminates or otherwise deprives a litigant of a chance to have his case heard by a cross-section of the community.

*Civil Procedure > Remedies > Judgment Interest > Pre-judgment Interest*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*
[HN12] Pre-judgment interest on federal securities claims, unlike on New York state law claims, is not mandatory.

*Civil Procedure > Remedies > Damages > Punitive Damages*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*
[HN13] It is well settled in the United States Court of Appeals for the Second Circuit that proof of fraud or misrepresentation in a private civil action, even if such proof would constitute grounds for punitive damages under common law, generally warrants no such damages under the federal securities laws.

**COUNSEL:** Barry R. Ostrager, Esq., New York, New York (John J. Kerr, Jr., Mark G. Cunha, David W. Sussman, Simpson, Thacher & Bartlett, New York, New York, of Counsel), for Plaintiff-Appellee and Cross-Appellant.

Robert L. King, Esq., New York, New York, (Martin Frederic Evans, Michael E. Wiles, Edwin G. Schallert, William F. Haigney, Debevoise & Plimpton, New York, New York, Charles W. Boand, Wilson & McIlvaine, Chicago, Illionis, of Counsel), for Defendant-Appellant and Cross-Appelee.

**JUDGES:** Pierce, Miner and Altimari, Circuit Judges.

**OPINION BY:** PIERCE

**OPINION**

[*15] PIERCE, Circuit Judge:

The defendant accounting firm appeals from a judgment entered in the United States District Court for the Southern District of New [**2] York, Richard

Owen, *Judge*, after a jury returned a verdict against it. The jury awarded plaintiff $17 million, to which the district judge added pre-judgment interest, post-judgment interest and costs, in a civil action seeking damages for losses that Manufacturers Hanover Trust Company ("Manufacturers" or "MHT") claimed to have suffered as a result of certain alleged misrepresentations that Arthur Andersen & Co. ("Andersen") made on behalf of Andersen's client, Drysdale Securities Corporation ("DSC") and its successor, Drysdale Government Securities, Inc. ("DGSI"). The district judge submitted seven separate theories of liability to the jury: misrepresentation or material omission "in connection with" the purchase or sale of securities, in violation of section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*, promulgated thereunder; misrepresentation or material omission "in" the purchase or sale of securities, in violation of section 17(a) of the Securities Act of 1933, *15 U.S.C. § 77q(a)(2)*; misrepresentation or material omission in a "prospectus" or "oral communication, [**3] " in violation of section 12(2) of the Securities Act of 1933, *15 U.S.C. § 77l(2)*; conspiracy to violate the above federal securities laws; aiding and abetting in the violation of the above federal securities laws; common law negligence; and common law fraud. The jury returned a general verdict, following which the judge requested that the jury state the cause or causes of action on which the verdict was premised, which it did.

On appeal, Andersen argues principally that the district court lacked federal subject matter jurisdiction; that the requisite loss causation standard for liability for securities fraud was not met; that plaintiff MHT caused its loss by its own recklessness; that it was error for the district [*16] judge to submit a negligence theory to the jury; that in selecting and instructing the jury the district judge deprived Andersen of a fundamentally fair trial; and that reversal of any of MHT's claims requires reversal of the entire verdict. MHT cross-appeals for a mini-trial exclusively on the issue of punitive damages. We affirm the judgment in favor of plaintiff in the amount of $17 million and deny the relief requested on cross-appeal. [**4] We also remand for further proceedings on the issue of pre-judgment interest only.

BACKGROUND

In this civil action MHT sought damages against the Andersen accounting firm, which it asserts made misrepresentations as to the financial status of DGSI, a company created by DSC to transact business through trading in repurchase agreements ("repos") or resale agreements ("reverse repos") involving government securities. [1] DSC, a brokerage house since 1889, engaged in a scheme to purchase and sell government securities through repos and reverse repos beginning in May 1980

and ending in May 1982, just three months after DSC had transferred the repo business to a separate, newly capitalized, corporation called DGSI. The appellees presented evidence to the jury that Warren Essner, a senior Andersen audit partner, misrepresented DGSI's net worth as $20.8 million when it actually was *negative* $190 million.

> 1   In a reverse repo transaction, which in economic terms is the identical transaction from the seller's perspective, DGSI would promise to resell government securities on a certain date, and the party dealing with DGSI would rely thereon.

[**5]   DSC had transferred the repo business to DGSI in February 1982 for two related reasons. First, it wanted to satisfy banks that had been serving as DSC agents (acting for an undisclosed principal) and that had begun to demand that DSC provide adequate assurances of sufficient capital to absorb the risk of insolvency in the repo market. Evidence was introduced showing that beginning in December 1981, DSC received requests for an audited financial statement from Chase Manhattan Bank, Chemical Bank, U.S. Trust Co., and MHT. Second, DSC wanted to avoid a New York Stock Exchange audit of DSC repo capitalization. The concerns for DSC's financial stability developed as DSC began to lose money because of financial losses in its securities trading and alleged misappropriation of monies by DSC Chairman Joseph Ossorio and DSC trader David Heuwetter. [2]

> 2   Ossorio and Heuwetter ultimately pleaded guilty to crimes relating to securities fraud.

The mechanics of DGSI's repo business are not disputed. Ossorio and Heuwetter [**6] created a so-called "Ponzi" scheme that profited from the use of coupon interest on securities sold. The essence of the scheme was DGSI's exploitation of an important difference between government securities transactions in (1) the "securities" or "cash" market, in which securities are straight-forwardly purchased and sold at market prices, and (2) the "repo market," in which government securities are purchased and sold pursuant to repo or reverse repo transactions. In the securities market, the price of a government security, such as a United States Treasury note, includes the market price of a particular issue *and* the accrued "coupon interest" on the security (i.e., the value of government payments due on the security at the time of the sale). In the repo market, the accrued coupon interest is paid only on the repurchase (or resale) transaction; the initial "loan" of the security is made at a price that includes only the market value of the security. Before the security is repurchased, its price will be "marked to market" periodically to reflect changed value. By borrowing increasing volumes of government bonds through

reverse repos, selling them in the cash market and utilizing [**7] the cash and temporarily obtained accrued coupon interest to meet obligations on previously borrowed bonds and to conduct other trades, DGSI managed to stay solvent between February 1, 1982 (when DGSI was created, with the liabilities it had [*17] inherited from DSC) and May 17, 1982, when DGSI's ultimate collapse occurred and investors lost some $300 million.

Unlike Ossorio and Heuwetter, Warren Essner, a partner at Andersen, and Andersen itself, were not principals in this scheme. There is no evidence that they profited from it, or that they stood to gain anything from DGSI's precarious situation. Rather, Essner and Andersen had a limited role relating to the *creation* of DGSI. The fundamental issue in this case involves the scope of liability that flowed from this limited role.

Andersen had audited DSC in 1977 and 1978, but had no business relationship with it again until January 8, 1982. On that date, Ossorio contacted Essner at the Andersen firm regarding tax and accounting concerns in the contemplated creation of DGSI. Essner and Ossorio drafted a January 31, 1982 letter announcing DGSI's formation and discussing its capitalization. The letter was intended for the [**8] benefit of potential DGSI clients and indicated that DSC would transfer $5 million in net assets and liabilities to DGSI. (These assets and liabilities constituted repo and reverse repo positions in DSC's portfolio.) In addition, it stated that Heuwetter would invest $12.8 million and Ossorio $2.7 million, bringing the total capitalization to almost $21 million.

There was evidence that during a meeting on January 31, Heuwetter had cautioned Essner about an $11 billion "matched book" [3] of repos and reverse repos that DSC controller Dennis Ruppert (who later pleaded guilty to state securities fraud charges) had fictitiously manufactured to create in part the purported $5 million transfer of DSC positions to DGSI. The true positions concealed by this false "matched book," Heuwetter testified, could not be disclosed, for fear that "if the dealer community found out the size of the positions that I was playing with . . . we would be out of business the next day. . . ."

> 3   In a "matched book," a government securities dealer maintains approximately equivalent positions in repos and reverse repos.

[**9]   On the evening of January 31, 1982, Essner prepared a "Statement of Subordinated Debt and Equity" to support the January 31 letter. This document did not disclose the size of the government securities positions transferred from DSC to DGSI. It reflected a purported capitalization of $20.8 million ($5 million net assets and liabilities transferred from DSC plus $15.8 million cash).

There was evidence that Essner prepared the statement without consulting DSC's books and records, which, in any event, allegedly had been in incomprehensible disarray.

On and after February 1, Heuwetter delivered copies of the letter and statement to financial institutions including MHT. However, Chase and MHT pressed for an *audited* financial statement prepared by an independent accounting firm, even though both had been doing business with DGSI since its inception on February 1.

The parties dispute whether Ossorio asked Essner to prepare an audited statement by January 31 or during the week of February 8. In either event, on behalf of Arthur Andersen, Essner prepared a "report on specified elements of a financial statement," which purported to constitute an unqualified opinion prepared in accordance [**10] with Generally Accepted Auditing Standards ("GAAS"). There is disputed evidence, however, that Essner never had conducted an audit, and that Essner later manufactured work papers in an apparent effort to legitimize his previous reports. MHT presented evidence at trial that Essner's and Andersen's work violated several procedures required by GAAS [4] as well as [*18] many of Andersen's own Audit Objectives and Procedures ("AOP"). [5] For preparing the letter, statement and report, Andersen billed and received from DSC $14,400. There is no evidence of any other payment to Essner or Andersen.

    4    For example, MHT adduced evidence that Andersen:

        failed to examine DGSI books or records even though Essner knew that $11 billion of securities positions were being transferred from DSC to DGSI;

        failed to audit the assets and liabilities transferred from DSC to DGSI even though Essner assigned to them a net value of $5 million;

        failed to investigate the adequacy of the internal controls of DSC and DGSI;

        failed to verify either that the $15.8 million in deposits in the Chemical account had cleared or that the amounts deposited were free from off-sets;

        failed to comply with GAAS related party disclosure procedures;

        failed to check for the existence of any material transactions between the date of the audit report and the date that field work was completed; and

        dated the audit report prior to the completion of audit field work.

[**11]
    5    For example, MHT adduced evidence that Andersen:

        never arranged for a second partner review;

        failed to have an audit team work on the audit;

        failed to complete a job arrangement letter;

        failed to have the audit referenced by an Andersen auditor not connected with the audit;

        failed to complete a related party checklist or investigate whether the transaction was done at arm's-length;

        added to Essner's audit work papers, long after the purported audit, materials that were unrelated to that audit; and

        failed to satisfy Andersen's requirements that a report on a special element of a financial statement be, in the words of Andersen's own accounting expert, "more extensive" than the report that Essner produced.

Andersen introduced evidence that at no time did MHT request a DGSI balance sheet as of February 1, 1982, or a DGSI balance sheet or income statement as of any later date. Andersen also introduced evidence that MHT inadequately monitored DGSI's creditworthiness and MHT's own risk exposure, in contrast to other financial institutions, several of which extricated themselves [**12] from business dealings with DGSI in time to avoid the kind of loss that MHT ultimately suffered.

MHT countered with evidence that its internal controls over relevant economic risks associated with its business with DGSI was reasonable when viewed in light of prevailing industry practice.

The judge instructed the jury on seven causes of action: the three substantive securities laws, conspiracy and aiding and abetting in the violation thereof, and common law fraud and negligence. He further instructed the jury to find "either in favor of the plaintiff or the defendant." After deliberation, the jury foreman announced that "we find for Manufacturers Hanover." The judge polled the jury, and then asked "which cause of action or causes of action you base this award on." Andersen did not object to this procedure. After returning to the jury room, and after some further instruction from the judge, the jury announced that "10B5 [sic], Section 12(2), 17 A [sic] and the two state statutes" had been violated. The jury was then discharged without another poll or further requests.

DISCUSSION

This case requires us to consider the role of the accountant, and the scope of his liability, in [**13] presenting to the financial community information about a financial institution seeking to attract or maintain business in transactions involving agreements to repurchase (or resell) government securities. In an SEC enforcement action arising from many of the same facts herein, we earlier held that the allegation that DSC and three of its officers, and Essner, violated section 10(b) of the 1934 Act and Rule 10b-5 thereunder and section 17(a) of the 1933 Act stated a valid federal cause of action. *SEC v. Drysdale Securities Corp., 785 F.2d 38 (2d Cir.), cert. denied, 476 U.S. 1171, 106 S. Ct. 2894, 90 L. Ed. 2d 981 (1986).* In this case, we are called upon to review jurisdictional, substantive and procedural issues arising from MHT's private action against Andersen for allegedly misrepresenting DGSI's financial status.

*I. Federal Subject Matter Jurisdiction.*

Andersen argues that repos are not securities, and hence that the district court lacked federal subject matter jurisdiction over this case. Whether or not repos are securities, it is clear that the district court had jurisdiction as to the claims under section [*19] 10(b) of [**14] the 1934 Act and section 17(a) of the 1933 Act. In the related litigation of *SEC v. Drysdale*, we assumed that repos and reverse repos are not securities, but held that it would suffice if the alleged fraud by DSC and Andersen were "in connection with the purchase or sale" of securities under section 10(b) and "in the offer or sale" of securities under section 17(a). *785 F.2d at 40-42 & n. 2.*

Of course, Judge Winter's reasoning in *Drysdale* may not apply to MHT's claim under section 12(2) of the

1933 Act, since the underlying government securities are exempt from the proscriptions of that section. *See 15 U.S.C. § 77c(a)(2)* (exempting securities "issued or guaranteed by the United States"); *id. § 77l(2)* (expressly exempting securities defined in subsection 77c(a)(2)). Thus, MHT's claim under section 12(2) may be cognizable only if the repos themselves are securities. However, since we need not decide whether repos are securities to affirm as we do on the sole basis of section 10(b) and *Rule 10b-5, see infra,* we express no view as to whether the submission of section 12(2) to the jury was proper.

*II. Section 10(b)* [**15] .

*A. Fraud "In Connection With" Repos.*

Andersen argues at the outset that the district court committed reversible error in instructing the jury that repos are securities. We disagree. Although several courts have defined repos, *compare, e.g., SEC v. Miller, 495 F. Supp. 465, 467 (S.D.N.Y. 1980)* (characterizing repos as essentially short-term collateralized loans); *In re Legel, Braswell Government Securities Corp., 648 F.2d 321, 324 n.5 (5th Cir. 1981)* (same); *United States v. Erickson, 601 F.2d 296, 300 n. 4 (7th Cir.)* ("in substance a secured loan"), *cert. denied, 444 U.S. 979, 100 S. Ct. 480, 62 L. Ed. 2d 406 (1979); Ehrlich-Bober & Co. v. University of Houston, 49 N.Y.2d 574, 577, 404 N.E.2d 726, 728, 427 N.Y.S.2d 604, 606 (1980)* ("in essence, a loan transaction"), *with City of Harrisburg v. Bradford Trust Co., 621 F. Supp. 463, 469-70 (M.D. Pa. 1985)* (repos are securities for purpose of the antifraud provisions of the 1933 and 1934 Acts); *SEC v. Gomez,* [Current Transfer Binder]Fed. Sec. L. Rep. (CCH) P 92,013 (S.D. Fla. 1985) (same), the question of whether [**16] repos are securities remains unresolved in this Circuit. *See Drysdale, 785 F.2d at 41 n.2* (assuming without deciding that repos are not securities, but holding that fraud "in connection with" repos is cognizable under section 10(b)). We need not resolve this question to hold, as we do today, that even assuming repos are not securities, the district court's instruction that they are securities, if erroneous, constitutes mere harmless error.

[HN1] Even assuming that repos are not securities, they are subject to section 10(b) and *Rule 10b-5. See Drysdale, supra, at 38; see also* Securities Act Release No. 33-6351, 1Fed. Sec. L. Rep. (CCH) P 2024, at 2559-2 (Sept. 25, 1981) ("The antifraud provisions [of the securities laws] . . . apply to the offer, sale and purchase of U.S. government securities occurring in connection with traditional repurchase agreements"); Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation, Letter SR-82-25 (FIS), 3Fed. Banking L. Rep. (CCH) P 60,798.35, at 38,858 (May 13, 1981) (same). [6] Viewing [**17] repos, as we must, from the perspective of their economic significance, *see, e.g.,*

*SEC v. W.J. Howey Co., 328 U.S. 293, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946)*, we think that [HN2] the repos at issue herein fit squarely within the statutory language in the 1934 Act describing "contract[s] to buy, purchase or otherwise acquire securities." *15 U.S.C. § 78c(a)(13)*. As such, and consistent with our holding in *Drysdale*, repos are subject [*20] to the antifraud provisions of the 1934 Act. *See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750-51, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975)*.

    6  We note that in *Drysdale*, the SEC did not contend that repos are securities and that, as *amicus curiae* herein, the SEC has urged that while repos are not securities, they are contracts to buy, sell, or loan securities and are thus subject to the antifraud provisions of the 1934 Act. Further, legislative history accompanying the Insider Trading Sanctions Act of 1984, P.L. No. 98-376, 98 Stat. 1264 (1984), which we read as persuasive authority bearing on the scope of the 1934 Act, see, e.g., *United States v. Carpenter et al., 791 F.2d 1024, 1030 (2d Cir. 1986)*, supports the view that repos, even if not separate securities, are subject to the reach of the 1934 Act antifraud provisions. See H.R. Rep. No. 258, 99th Cong., 1st Sess. 17 (1985).

[**18] [HN3] Since repos involve the purchase and sale of securities, it follows that the jury's finding of fraud "in connection with" repos was a finding of fraud "in connection with" the purchase and sale of securities. *See id.; see also Abrams v. Oppenheimer Government Securities, Inc., 737 F.2d 582, 586-89 (7th Cir. 1984)*. Indeed, even if one focuses exclusively on the "loan," as opposed to the "purchase and sale," characteristics of repos, for purposes of the antifraud provisions of the 1934 Act, "the terms 'sale' or 'sell' each include any contract to sell or otherwise dispose of a security." 15 U.S.C. § 78 c(a)(14). The repos herein certainly satisfy that broad definition. *Cf. Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 559 (2d Cir. 1985)* (Friendly, J.) (holding cognizable under antifraud provisions of 1933 and 1934 Acts fraud in connection with a "contract for the issuance or transfer of a security").

In our view, the preferred instruction would have been that repos may or may not themselves constitute securities, but that, in either event, fraud "in connection with" repos satisfies the language in section [**19] 10(b) and *Rule 10b-5* relating to "fraud in connection with the purchase or sale of securities." Nonetheless, the district judge's additional comment that repos themselves are securities, if inaccurate, amounts to mere harmless error in this case.

    *B.  Causation and Andersen's Recklessness Defense.*

As for the alleged violation of section 10(b), for which accountants may be held primarily liable, *see, e.g., Herman & MacLean v. Huddleston, 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983); Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath, 516 F.2d 811, 815 (2d Cir. 1975); Fund of Funds, Ltd. v. Arthur Andersen & Co., 545 F. Supp. 1314, 1351-53 (S.D.N.Y. 1982)*, Andersen argues principally that MHT failed to demonstrate "loss causation," and that the jury was not properly instructed on this element of the section 10(b) theory. [HN4] The standard for liability in a civil action under section 10(b) is causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of [**20] the actual loss suffered. *Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 & n.23 (2d Cir.) (Friendly, J.), cert. denied, 469 U.S. 884, 105 S. Ct. 253, 83 L. Ed. 2d 190 (1984); Marbury Management, Inc. v. Kohn, 629 F.2d 705 (2d Cir.), cert. denied, 449 U.S. 1011, 101 S. Ct. 566, 66 L. Ed. 2d 469 (1980); Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 380 (2d Cir. 1974), cert. denied, 421 U.S. 976, 95 S. Ct. 1976, 44 L. Ed. 2d 467 (1975)*. It is clear that on the record evidence a factfinder could conclude that Andersen's misrepresentations as to DGSI's solvency induced MHT (and other financial institutions) to do business with the newly-formed DGSI. There was evidence that the financial community, including MHT, sought assurance of adequate capitalization of DSC amidst growing concerns of insufficient funding; that Andersen materially misstated DGSI's capitalization in its audited financial statement; and that copies of the Andersen statement were distributed in Andersen envelopes with Andersen's knowledge to various financial institutions including MHT. There was [**21] evidence that MHT Senior Vice President Stephen Goodhue, head of MHT's Wall Street Department, relied primarily, though not exclusively, on the Andersen statement in approving DGSI for its government securities business. In light of this evidence, Andersen challenges the adequacy of the charge and the sufficiency of the evidence not as to "transaction causation" but only as to "loss causation."

[HN5] The requirement of "loss causation" derives from the common law tort concept of "proximate causation." *See Marbury Management, 629 F.2d at 708* (citing *Restatement (Second) of Torts § 548A* (1977)). In addition to this requirement as to the [*21] significance of the misrepresentation in the chain of causation, "loss causation" "in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation." *Id.* (citing *Oleck v. Fischer*, [1979 Transfer Binder]Fed. Sec. L. Rep. (CCH) P 96,898, at 95,702-03 (S.D.N.Y. 1979), *aff'd, 623 F.2d 791 (2d Cir. 1980))*.

801 F.2d 13, *; 1986 U.S. App. LEXIS 30205, **;
Fed. Sec. L. Rep. (CCH) P92,902

We find Andersen's argument that the district court failed [**22] to instruct the jury properly on "loss causation" to be without merit. The district judge clearly defined "proximate causation" and used that term throughout his charge. In defining the term, the judge specifically noted the requirement "that the damage was either a direct result of the misleading statement or one which could reasonably have been foreseen." Further, the judge charged that the jury must determine whether any of MHT's loss was due to its own business shortcomings; whether the bank caused its own losses, and if so, to return a verdict for Andersen even if Andersen acted improperly; whether Andersen caused part and MHT caused part of MHT's loss and, if so, to determine how much loss is attributable to Andersen; whether MHT had satisfied its burden of demonstrating that its loss was not caused by its own recklessness or negligence, and if MHT's recklessness caused any or all of its damage, then Andersen is not liable for such damage; and whether any of MHT's loss was caused not by Andersen's conduct but by MHT's own recklessness or the conduct of third parties, and if so, then MHT is not entitled to recover for such loss. Indeed, we note that the court's proximate cause [**23] charge was virtually identical to the charge requested by Andersen.

When it comes to evaluating the evidence of "loss causation," we cannot accept Andersen's argument, premised in part on *Bennett v. United States Trust Co.*, *770 F.2d 308 (2d Cir. 1985), cert. denied, 474 U.S. 1058, 106 S. Ct. 800, 88 L. Ed. 2d 776 (1986)* that "there is simply no direct or proximate relationship between the loss and the misrepresentation." *Id. at 314.* In *Bennett*, plaintiffs borrowed funds from the U.S. Trust Co. to purchase utility stocks which were then deposited with U.S. Trust as collateral. The stock declined in value, and ultimately U.S. Trust liquidated plaintiffs' account. Plaintiffs not only lost their equity in the stock, but also became liable to U.S. Trust for $1.2 million in unpaid interest and principal on their loan. Plaintiffs sued U.S. Trust, claiming that in making the loan, U.S. Trust knowingly or recklessly misrepresented to them that the Federal Reserve margin requirements do not apply to public utility stock deposited with a bank as collateral. Plaintiffs did not and could not allege, however, that U.S. Trust in any way [**24] recommended that they purchase public utility stock in general, or any particular public utility stock. Rather, "the Bennetts, and the Bennetts alone, decided to invest in public utility stock." *Id. at 313-14.* The same cannot necessarily be said of MHT. There was certainly evidence upon which a rational trier of fact could find, as the jury apparently found, that Andersen, by its misrepresentations, induced MHT to enter into repurchase agreements with DGSI involving the particular underlying government securities. The financial community had come to mistrust DSC's solvency before the

Andersen report was issued. In this context, the Andersen report portrayed a new, highly capitalized company on whose promises to repurchase or resell particular government securities, an institution such as MHT could reasonably rely. Andersen was aware that its report was intended to be and actually was circulated to institutions including MHT for the purpose of inducing them to participate in government securities repurchase agreements.

This case is thus distinguishable from *Bennett* and more similar to *Marbury Management, supra*. In the latter case, a trainee [**25] in a brokerage firm misrepresented his expertise by claiming that he was a stockbroker and a "portfolio management specialist." That misrepresentation induced the plaintiffs to purchase and retain specific securities that the trainee recommended, despite their misgivings about the [*22] stock. Similarly, by misrepresenting DGSI's financial status, Andersen may reasonably have been found to have induced MHT to enter into repurchase agreements involving DGSI government securities, despite MHT's (and the financial community's) earlier misgivings about the financial risk associated with entering into precisely these agreements with DGSI. Further, although the misrepresentation in *Marbury Management* did not go to the intrinsic *investment characteristics* of the stock, it did go to the *investment quality* of the stock purchases because, had the plaintiffs known that their "broker" was an inexperienced trainee, they asserted they would not have accepted his recommendations, especially given their initial reservations. Similarly, although the misrepresentation in the present case did not go to the *investment characteristics* of the underlying government securities -- and, [**26] even our holding in *Drysdale*, this was not required -- it did go to the *investment quality* of the repos since, presumably, MHT would not have contracted with DGSI to purchase and sell government securities had MHT known of the misrepresentation regarding DGSI's finances, particularly given that the Andersen statements were in part a response to the financial community's concern regarding DSC's stability.

Andersen also relies heavily on *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, *602 F.2d 478 (2d Cir. 1979), cert. denied, 444 U.S. 1045, 100 S. Ct. 734, 62 L. Ed. 2d 731 (1980)*, and argues that MHT's alleged "recklessness" caused its own loss, and that the verdict in the district court therefore contravenes the established principle that "'the securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment.'" *Id. at 486* (quoting *Hirsch v. du Pont, 553 F.2d 750, 763 (2d Cir. 1977)*). In our view, Andersen misapplies this principle in seeking to resurrect imperfections in MHT's internal operations as a bar to recovering for losses caused by Andersen's [**27] misrepresentations. Cf. *Faller Group, Inc. v. Jaffe, 564 F.*