# EXHIBIT
# 2

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
--------------------------------------X
MAGTEN ASSET MANAGEMENT CORPORATION and
LAW DEBENTURE TRUST COMPANY OF NEW YORK,

                 Plaintiffs,

       - against -

NORTHWESTERN CORPORATION,

                 Defendant.

CIVIL ACTION NO.: 04-1494(JJF)
--------------------------------------X
MAGTEN ASSET MANAGEMENT CORP.,

                 Plaintiffs,

       - against -

MICHAEL J. HANSON and ERNIE J. KINDT,

                 Defendants.

CIVIL ACTION NO.: 04-1494(JJF)
--------------------------------------X

               One New York Plaza
               New York, New York

               May 2, 2007
               1:15 p.m.


         Deposition of MARY LEWICKI, pursuant

to Notice, before Melissa Gilmore, a Notary

Public of the State of New York.


    ELLEN GRAUER COURT REPORTING CO. LLC
     126 East 56th Street, Fifth Floor
       New York, New York 10022
          212-750-6434
           REF: 84143

1    A P P E A R A N C E S:

2

3    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

4    Attorneys for Plaintiff Magten Asset Management

5         One New York Plaza

6         New York, New York 10004-1980

7    BY:   GARY L. KAPLAN, ESQ.

8         JORDANNA L. NADRITCH, ESQ.

9         PHONE 212-859-8812

10        FAX 212-859-4000

11        E-MAIL gary.kaplan@friedfrank.com

12

13

14   EMMET, MARVIN & MARTIN, LLP

15   Attorneys for Bank of New York

16        120 Broadway

17        New York, New York 10271

18   BY:   KENNETH M. BIALO, ESQ.

19        MATTHEW K. McCOY, ESQ.

20        PHONE 212-238-3058

21        FAX 212-238-3100

22        E-MAIL kbialo@emmetmarvin.com

23

24

25

1    A P P E A R A N C E S:   (Cont'd)

2

3    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

4    Attorneys for Defendant Northwestern Corporation

5         101 Park Avenue

6         New York, New York 10178-0061

7    BY:  NANCY E. DELANEY, ESQ.

8         PHONE 212-696-6939

9         FAX 212-697-1559

10        E-MAIL ndelaney@cm-p.com

11

12

13   EDWARDS ANGELL PALMER & DODGE LLP

14   Attorneys for Defendants Michael J. Hanson and

15   Ernie J. Kindt

16        919 North Market Street, Suite 1500

17        Wilmington, Delaware 19801

18   BY:  DENISE SEASTONE KRAFT, ESQ.

19        PHONE 302-777-7770

20        FAX 302-777-7263

21        E-MAIL dkraft@eapdlaw.com

22

23

24

25

1    A P P E A R A N C E S:   (Cont'd)

2

3    NIXON PEABODY LLP

4    Attorneys for Defendant Law Debenture Trust

5    Company of New York

6         437 Madison Avenue

7         New York, New York 10022-7001

8    BY:  CHRISTOPHER M. DESIDERIO, ESQ.

9         PHONE 212-940-3077

10        FAX 866-741-3993

11        E-MAIL cdesiderio@nixonpeabody.com

12

13

14   ALSO PRESENT:

15        ALEXANDER SHAPIRO, Bank of New York

16

17

18

19

20

21

22

23

24

25

1          LEWICKI

2      our objection letter, our Rule 45

3      objection letter dated April 6th?

4              MR. KAPLAN:  We have -- I have.

5              MR. BIALO:  Okay.  And you noticed

6      that in that letter, we have made the

7      objection that discovery has been stayed

8      by Judge Fried in the separate action

9      brought by Magten against Bank of New

10     York, in the New York County Supreme

11     Court, and we are giving this deposition

12     on the subjects that were defined by the

13     April 25th production letter in the --

14     which follows on the agreement after

15     discussion between Ms. Nadritch and

16     Mr. McCoy.

17             MR. KAPLAN:  That is correct.

18     BY MR. KAPLAN:

19         Q.    Ms. Lewicki, what is your current

20     title at the Bank of New York?

21         A.    I'm the conversion manager for the

22     corporate finance and specialty products groups

23     within corporate trust.

24         Q.    And what do you do as the conversion

25     manager?

1                        LEWICKI

2        A.    I have been responsible for the

3    movement of the issues, the assets, and the

4    cash from the swap between Bank of New York and

5    JPM related to the corporate trust business and

6    the retail business, specifically the corporate

7    trust business.

8        Q.    And how long have you been in that

9    role?

10       A.    That's one year.

11       Q.    And what was your role before that?

12       A.    I was a control officer for the

13   structured finance group within corporate

14   trust.

15       Q.    And how long were you in that role?

16       A.    Approximately two years.

17       Q.    So from -- just to put context, from

18   2004 to '06 or --

19       A.    Probably mid 2004 through

20   March 2006.

21       Q.    And prior to that?

22       A.    I was a -- I was a training officer

23   for the corporate trust group.

24       Q.    And when was that?

25       A.    That started October, November 2003

1                           LEWICKI

2   until I transferred over to the control officer

3   position.

4        Q.     And prior to October 2003?

5        A.     I was a team leader in the corporate

6   finance group and team leader relationship

7   manager.

8        Q.     And when?  When were you the team

9   leader?

10       A.     I can't tell you exact dates when it

11  began.  It was two or three years.

12       Q.     Two or three -- 2001 approximately?

13       A.     Yes, yes.

14       Q.     So for the period of 2001 and 2002,

15  you were the team leader?

16       A.     Yes.

17       Q.     And what were your -- what was your

18  responsibilities as the team leader?

19       A.     As a team leader, I managed a group

20  of approximately 12 people that were other

21  relationship managers and trust associates, and

22  just the general day-to-day administration of

23  their accounts and projects processes within

24  the bank.

25       Q.     So did you -- so you oversaw the --

1                          LEWICKI

2    well, just if you could --

3         A.    Well, like a -- well, like a team

4    leader is an interim step between -- you have a

5    business manager, and you have a team leader.

6    So you are not officially the manager, but you

7    are taking on a lot of the management

8    functionalities.

9         Q.    Are there several different team

10   leaders?

11        A.    At the time I was in corporate

12   finance, there were three.

13        Q.    Were you the team leader responsible

14   for the QUIPS, Quarterly Income Preferred

15   Securities, that were issued by Montana Power?

16        A.    I was the team leader and

17   relationship manager.

18        Q.    Okay.  And what was your role as

19   relationship manager?

20        A.    I -- I was a -- as trustee, our role

21   was to support the requirements under the

22   governing documents, receipt of cash for debt

23   service, or any other instances where it might

24   be payment to bondholders.  Confirmation that

25   compliance documentation required under the

1                     LEWICKI

2   agreement is received by us.  Communications

3   with bondholder of requests, some general --

4   typically, general requests from bondholders.

5   Preparation of any notices, if that was a

6   requirement.

7        Q.    And were there multiple relationship

8   managers for each issuance, or was there just

9   one?

10       A.    For the QUIPS issuance?

11       Q.    For the QUIPS issuance.

12       A.    There was only one issuance of debt

13  for that.

14       Q.    And why was there only one

15  relationship -- were you the sole relationship

16  manager for that issuance?

17       A.    In 2003 or 2002, yes.

18       Q.    Okay.  Who did you report to?

19       A.    My business group manager.  At that

20  time, it was Doug Macinnes, M-A-C-I-N-N-E-S.

21       Q.    Were there others that reported to

22  you in connection -- solely in connection --

23  I'm just focusing now on the QUIPS.  Were there

24  others who reported to you or were you solely

25  responsible?

1                    LEWICKI

2        A.     On the QUIPS, I had -- I had a trust

3    associate that supported me.

4        Q.     And who was that?

5        A.     Jeremy Finkelstein.

6    F-I-N-K-E-L-S-T-E-I-N, I think.

7        Q.     Just some general questions about

8    role of a trustee.  When you are the trustee

9    for a bond issuance, do you generally review

10   the financial statements issued by the issuer?

11       A.     No, we do not.

12       Q.     Were there ever circumstances in

13   which you review the financial statements of

14   the issuer?

15       A.     No, we do not.  It's not a

16   requirement under the governing documents.

17       Q.     If -- do you receive -- are there

18   occasions when you are the trustee, that you

19   would receive financial statements from the

20   company?

21       A.     Typically, under a QUIPS Indenture,

22   it's one of the requirements that they provide

23   us with their financial statements.

24       Q.     And what do you do when you receive

25   those financial statements?

1                         LEWICKI

2          just wanted to make sure that we were

3          clear on what the numbers were.

4                    MR. KAPLAN:  So we're only going to

5          mark this.  We are not going to mark that

6          piece.

7                    MR. BIALO:  So we are going to

8          remove BNY132 from Plaintiff's Exhibit 1?

9                    MR. KAPLAN:  That is correct.

10                   MR. BIALO:  Okay.

11     BY MR. KAPLAN:

12          Q.    Is this the entire extract of the

13     from the tickler system relating to the QUIPS?

14          A.    Let me just take a quick look to

15     make sure.

16                   (Perusing.)  Yes, it appears to be.

17          Q.    Turning to the first page, which is

18     BNY0105?

19          A.    Um-hum.

20          Q.    If you could just explain to me how

21     to read this page?  You see it says "Due Date,

22     Lead Date, Completion Date and Close Date"?

23                   Could you just explain to me what

24     those columns mean?

25          A.    Okay.  Do you want me to go across

1          LEWICKI

2   the top, too, or you don't care about that?

3        Q.    Sure.   If I need that to understand

4   the page, sure.

5        A.    Okay.   If you start off with the

6   issue document number with an R, within the

7   banks tickler system, each issuer -- each

8   Indenture is given a docket number.   That's

9   just for tracking purposes.   The office

10  represents the location where it was

11  administered, the unit, the corporate unit, the

12  RM, and the trust associate.

13          I don't know when this was run as

14  of, but this must have been after I left the

15  office.   It reflects Jeremy and another trust

16  associate.   Status would be "Terminated," and

17  the "Date open" reflects, I believe the actual

18  date of the governing documents.

19          And if you go down a little further,

20  you have a -- far left column, you have number

21  1.   That's the tickler number.   The tickler

22  description, you will see "Debt service

23  payment."   Again, that's a reminder of an

24  upcoming payment due to bondholders.

25          The "Lead Time" is "1," which

1                           LEWICKI

2       represents one month.  So the tickler would

3       appear on the report one month prior to the due

4       date.

5                   The "Start Date" is the date that

6       the first tickler was generated.  The "End

7       Date" is the end date that has been entered by

8       the administrator.

9                   "Frequency" let's you know that this

10      is a quarterly tickler that has an action due

11      on the due date.  And "Administrative Open,"

12      I'm not really sure what that means.

13                  The "Due Date" is the actual date of

14      an event that's going to occur.  In this case,

15      if you look at 3/31/99, that's when a debt

16      service payment was due.

17                  The "Lead Date" is the date that

18      that tickler will print on a pending payment or

19      a pending tickler report.  So on 2/28/99 would

20      be the first date that that tickler would

21      appear.

22                  The "Completion Status" in this

23      case, it's marked "Closed," meaning that the

24      payment was made, and then the date -- the

25      close date, itself, is the date that the

1                           LEWICKI

2    administrator actually marked it closed on the

3    system.

4          Q.    So just to clarify, so when it says

5    "Closed," it means that the interest payment

6    was actually -- was actually made on those

7    days?

8          A.    It was actually made, or if there

9    was another event related to it where payment

10   wasn't made, but another event replaced that,

11   it indicates that.

12         Q.    Okay.  If you turn to the page

13   marked BNY0111?

14         A.    Yes.

15         Q.    If you see towards the bottom of the

16   paged in the middle of the page, there is a

17   section that says "10/15/02, spoke to Gary

18   Staudinger at company, who requested a copy

19   of" --

20         A.    Um-hum.

21         Q.    Do you recall why you requested a

22   copy of the compliance certificate?

23         A.    I, personally, don't recall, but if

24   you read what's on this report, we called

25   because we hadn't gotten the certificate as of

1                     LEWICKI

2        A.     Okay.  (Perusing.)

3               Okay.

4        Q.     Do you recall signing this

5   Supplemental Indenture?

6        A.     I don't have a personal memory of

7   it.

8        Q.     Do you recall the transaction

9   generally?

10       A.     Not -- no.

11       Q.     Do you recall the reason that you --

12   that you were asked to execute the Supplemental

13   Indenture?

14       A.     I mean if you read from -- from the

15   Supplemental Indenture, it's basically

16   NorthWestern Corporation is jointly and

17   severally, assuming the obligations of the

18   company on the outstanding QUIPS deals.  That's

19   in the third WHEREAS clause.

20       Q.     Do you recall any conversations with

21   the issuer with respect to the execution of

22   this Second Supplemental Indenture?

23       A.     Not specifically, no.

24       Q.     What is Bank of New York's practice

25   or process regarding the approval and signing

1              LEWICKI

2    of supplementals to an Indenture?

3         A.    First of all, the Bank of New York

4    does not approve supplemental indentures.

5              MS. DELANEY:  Excuse me, I'm -- I'm,

6         just having trouble hearing you.  If you

7         could speak up, please?

8         A.    To start over, the Bank of New York

9    doesn't approve supplemental indentures or

10   transactions contemplated by them.  What we do

11   is typically get a request from an issuer for a

12   supplemental Indenture.

13             Pursuant to that request, we are

14   required to receive an Officer's Certificate

15   and an opinion of counsel.  It's reviewed by

16   the relationship manager.  It's also sent to

17   our external counsel for review and comment.

18   Typically, our external counsel will work with

19   issuer's counsel regarding any negotiation

20   matters.

21             Once it's confirmed that the

22   agreement conforms to what the Indenture

23   requirements are, and the opinion and Officer's

24   Certificate are in the correct format, then the

25   document can be executed by the Bank of New

1                          LEWICKI

2    York.

3         Q.    Why does Bank of New York insist on

4    receiving an Officer's Certificate?

5         A.    It's a requirement under the

6    governing document -- it's a right under the

7    governing document to receive an Officer's

8    Certificate.  If you go to the Indenture, it's

9    one of the stipulations when you are signing a

10   supplemental Indenture, that we can ask for an

11   opinion and an Officer's Certificate.

12        Q.    But I understand it's the right that

13   you have under the documents.  Do you know why

14   Bank of New York would insist on receiving an

15   Officer's Certificate?

16        A.    It's because the Officer's

17   Certificate has to make certain statements by

18   the client that we rely on, which we are

19   entitled to rely on under the terms of the

20   Indenture.

21        Q.    Would you execute a Supplemental

22   Indenture without receiving an Officer's

23   Certificate?

24        A.    Typically, it would depend on what

25   your governing documents said.  But if my

1                           LEWICKI

2    governing documents says I am entitled to

3    receive one, I would definitely require one.

4         Q.    If you received an Officer's

5    Certificate that created questions in your mind

6    with respect to the validity of the statements

7    contained in the certificate, what would you

8    do?

9         A.    What do you mean "validity" of the

10   statements?  I mean it's the Officer's

11   Certificate pretty much has to make statements

12   that are identified in the agreement.

13        Q.    If you have questions with respect

14   to the veracity of the statements in the

15   Officer's Certificate, what would you do?

16        A.    I mean typically, we are relying on

17   the form of the statements unless -- we are

18   relying on the form of the statements.  It's

19   reviewed by our counsel, it's reviewed with our

20   senior management if we do have a question,

21   but...

22        Q.    I just want to show you some

23   language, and it's still in the same Indenture.

24        A.    Okay.

25        Q.    If you look on page 3, which is

1          LEWICKI
2    NOR010001, in Section 302, there is a proviso
3    there that I would like you to focus on?
4          A.    (Perusing.)  Yes.
5          Q.    Specifically, the Supplemental
6    Indenture provides -- it says, "provided,
7    however, that the trustee shall not be
8    responsible in any manner whatsoever for, or in
9    respect of the validity or sufficiency of this
10   Second Supplemental Indenture,..." and then it
11   continues.
12            That language that I just read, is
13   that language that the Bank of New York always
14   insists upon in executing a supplemental
15   Indenture?
16         A.    I can't speak for everyone at the
17   Bank of New York.  That, I can say that is
18   typical language in a Supplemental Indenture.
19         Q.    When you were the relationship
20   manager, did you always insist on that language
21   in a Supplemental Indenture?
22         A.    I can't remember every situation
23   that I was in, but again, this is generally
24   language that is very typical of a Supplemental
25   Indenture.

1            LEWICKI

2        Q.    And do you know why such language

3   would be included?

4        A.    It's for the protections of the

5   trustee.

6        Q.    Would you sign a Supplemental

7   Indenture if you had doubts about its validity?

8            MR. BIALO:  I'm going to object to

9        the form.  You can answer.  If you can

10        figure it out, you can answer it.

11            THE WITNESS:  Okay.

12        A.    Again, when I am signing a

13   Supplemental Indenture, it is based on

14   requirements by the governing documents.  If

15   the documents I'm getting, such as the opinion

16   and the Officer's Certificate, the supplemental

17   are in the form required by the governing

18   document, and this has been reviewed by myself

19   and counsel, I would sign the document as long

20   as it met the terms and requirements.

21        Q.    I understand that.  The question I'm

22   asking, though, is if you had a question about

23   whether the Indenture or the Supplemental

24   Indenture is valid under the terms of the

25   Indenture, would you sign the Supplemental

1                          LEWICKI

2    Indenture?

3        A.    I think I'm confused with your

4    question.   I'm sorry.

5        Q.    Well, okay, and let me -- let me try

6    to be clearer.   This language -- as I interpret

7    this language, it says that the trustee is not

8    responsible in respect of the validity of the

9    Second Supplemental Indenture.

10            So what I'm asking is that if you

11   had a question -- while I understand it says

12   you are not responsible for its validity, if,

13   when you are signing it, however, you had a

14   question about whether it would be valid, would

15   you still sign it?

16       A.    This -- I mean it would not be my

17   decision alone to sign it.   Anything that we

18   sign, again, is through discussions with our

19   external counsel and with my manager.   But

20   again, in this type of situation, if I'm

21   provided with the documentation and the backup

22   documentation, I have no reason to believe it's

23   not a valid transaction or a valid agreement.

24       Q.    Do you have any recollection of

25   being told by the issuer why NorthWestern was

1                         LEWICKI

2          A.    I don't have memory of the time that

3    this Officer's Certificate came in.  I don't

4    remember the situation around the entire

5    transaction.

6          Q.    Does Bank of New York ever conduct

7    its own examination or investigation of the

8    facts that are expressed in the Officer's

9    Certificate?

10         A.    Again, we rely on the terms of the

11   Officer's Certificate pursuant to the

12   indenture, which allows us to rely on an

13   Officer's Certificate and/or an opinion of

14   counsel.

15         Q.    Do you recall why the Third

16   Supplemental Indenture was executed?

17         A.    I mean I recall, if I can go back to

18   the form of the Third Supplemental Indenture,

19   it was for the NorthWestern Corporation to

20   assume the duties and rights under the

21   indenture from NorthWestern Energy LLC, which

22   is one of their subsidiaries.

23         Q.    Do you recall whether -- under the

24   indenture if NorthWestern assumed the

25   obligations, whether Clark Fork would therefore

Page 60

1                         LEWICKI

2    be released from its obligations?

3              MR. BIALO:  Objection to the form.

4         A.    I would have to go back and look at

5    the actual governing document, the base

6    indenture, to see what the terms and what the

7    parties were to that indenture.

8              But to my knowledge, Clark Fork was

9    not -- was not a party to the QUIPS Indenture.

10        Q.    And when I say Clark Fork, it was

11   formerly known as NorthWestern Energy LLC.  It

12   changed its name to Clark Fork at some point.

13        A.    Okay.

14        Q.    I apologize if I confused you with

15   Clark Fork.

16             MR. BIALO:  Maybe you want to state

17        the question in a clearer way so that the

18        witness can give you a clearer answer.

19             MR. KAPLAN:  Could you remind me of

20        my question?

21             (Record read.)

22        Q.    Do you recall whether the Indenture

23   provides that upon NorthWestern assuming the

24   obligations for the QUIPS, that NorthWestern

25   Energy LLC would be released from its

1                          LEWICKI

2              MS. KRAFT:   I join in the objection.

3        Q.    If NorthWestern had submitted an

4   Officer's Certificate that did not comply with

5   the requirements of section 1101(c), would you

6   have executed the Third Supplemental Indenture?

7        A.    Again, we reviewed the supplemental

8   with counsel.  Based on counsel's review and

9   legal review, we do not sign -- we would not

10  sign off until all conditions under the

11  agreement are met.

12       Q.    Asked another way, if you or your

13  counsel concluded that it did not comply with

14  the terms of the Indenture, would you still

15  sign the Supplemental Indenture?

16       A.    It would be, again, brought up with

17  management.  Based on the discussion with them

18  and counsel, we make the determination whether

19  or not we would sign the Supplemental

20  Indenture.

21       Q.    Do you recall any discussions at all

22  in connection with the Third Supplemental

23  Indenture regarding the Officer's Certificate?

24       A.    No.

25       Q.    When executing the Third

1                          LEWICKI

2    Supplemental Indenture, you didn't seek the

3    consent of the holders of the QUIPS did you?

4                 MS. KRAFT:  Objection.

5         A.    I need to go -- can I look at the

6    agreement?

7         Q.    Absolutely.

8         A.    I'm going to read you from Section

9    1201, remember the Third Supplemental Indenture

10   is the assumption of the corporation of all of

11   the responsibilities under the QUIPS Indenture

12   from the LLC.  Section 1201 says, "Supplemental

13   indentures without consent of holder.  Without

14   the consent of any holders, the company and the

15   trustee, at any time and from time to time, may

16   enter into one or more indentures supplemental

17   thereto in a form satisfactory to the trustee

18   for any of the following purposes..." and I'm

19   going to read the first purpose in paragraph A,

20   "To evidence the succession of another person

21   to the company and the assumption by such

22   successor of the covenants of the company

23   herein and in the securities as provided in

24   Article 11."

25         Q.    Did you seek the consent of the

Page 70

1              LEWICKI

2    holders to execute the Third Supplemental

3    Indenture?

4         A.    Pursuant to this base Indenture,

5    consent was not required from the holders.

6         Q.    I'm not asking whether it was

7    required.  I'm asking whether you sought the

8    consent?

9         A.    It was not a requirement, no.

10         Q.    So no, you didn't seek the consent?

11    No, you did not seek the consent?

12         A.    No, I did not.

13         Q.    Okay.

14         A.    Again, it was -- to preface, it was

15    not a requirement under the governing document.

16         Q.    If the modification to the Indenture

17    had changed or modified the rights of the

18    holders of the securities, would you have

19    sought consent from the holders of the QUIPS?

20         A.    You would have to define what the

21    changes to the holders are.  We would have to

22    go back to the base Indenture to determine

23    whether or not a consent of holders is

24    required.

25         Q.    If you look at 1202 of the

1                    LEWICKI

2      included as a premise in your question,

3      which I don't think is fair to the

4      witness.

5          Q.    Just for the record -- and other

6  parties can correct me if I'm wrong -- in

7  connection with this litigation, there is a

8  motion to dismiss in which the bankruptcy judge

9  found that there was a release of the

10  subsidiary.  Now, there may be ways to

11  challenge that release, but the bankruptcy

12  court did find there was a release, and that's

13  the predicate.

14          MS. KRAFT:  I'm going to object to

15      the characterization of what the court did

16      or did not do.

17  BY MR. KAPLAN:

18      Q.    Assuming the Third Supplemental

19  Indenture effectuated a release of the initial

20  obligor such that the only obligor was going to

21  be NorthWestern Corporation, if we use that as

22  the base assumption, if you knew at the time

23  that NorthWestern's publicly-issued financial

24  statements were false and misleading, that

25  NorthWestern had grossly overstated its

Page 77

LEWICKI

1

2  revenues, would you nevertheless have executed

3  the Third Supplemental Indenture.

4          MS. KRAFT:  Objection.

5          MS. DELANEY:  Objection.

6      A.    Again, we talked about this on the

7  financials, that the role of the trustee -- we

8  do not review financials.  We just -- we just

9  confirm receipt of them.

10         I would not have any knowledge of --

11  of misstated financials, of a potential event

12  of default unless I had actually gotten

13  something from either the company or a

14  bondholder stating that fact to me.

15         Again, if I had something like that

16  in writing, addressed to me, it would have gone

17  up the chain-- up through the bank's process,

18  talking about it with my manager, with counsel,

19  and whatever action was determined, based on

20  those meetings and conversations, is the action

21  we would have chosen.

22     Q.    Again, I am speaking hypothetically

23  here.  Hypothetically, if you are asked to

24  execute a Supplemental Indenture such as --

25  similar to the Third Supplemental Indenture,

1          LEWICKI
2          MR. BIALO:  Fair enough.  Sorry.
3    BY MR. KAPLAN:
4          Q.    No problem.  What I was actually
5    asking -- this question was actually going to
6    the section on the assets and liabilities not
7    transferred.
8              And do you recall any discussion or
9    any analysis as to whether the non transfer of
10   these assets meant that NorthWestern Energy was
11   transferring less than substantially all of its
12   assets to NorthWestern?
13         A.    Again, I do not remember any
14   conversations to that issue.  And to go back to
15   what our process is for executing a
16   Supplemental Indenture, we are relying on an
17   Officer's Certificate and an opinion of counsel
18   that are stating that the terms and conditions
19   under the Indenture have all been met.
20             MR. KAPLAN:  We are going to mark
21        two documents.  We are going to mark them
22        as 10.  We are going to mark as -- it is a
23        Complaint.  It's not Bates numbered, but
24        it is a Complaint and Demand for Jury
25        Trial in the Montana Second Judicial