# EXHIBIT
# 8

Service Date:  January 31, 2002

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA
* * * * *

| | | |
|---|---|---|
| IN THE MATTER of the Application of | ) | UTILITY DIVISION |
| MONTANA POWER COMPANY for | ) | |
| Approval of its Electric Utility Restructuring | ) | DOCKET NO. D97.7.90 |
| Transition Plan Filed Pursuant to Senate Bill 390. | ) | ORDER NO. 5986w |
| | | |
| IN THE MATTER of | ) | UTILITY DIVISION |
| the Joint Application for Approval of the | ) | |
| Sale of Montana Power Company | ) | DOCKET NO. D2001.1.5 |
| To NorthWestern Corporation | ) | ORDER NO. 6353c |

## **FINAL ORDER**

### **APPEARANCES**

FOR THE APPLICANTS:

Montana Power Company

John Alke, Attorney at Law, Hughes, Kellner, Sullivan & Alke, 40 West Lawrence,
Suite A, P.O. Box 1166, Helena, Montana 59624-1166.
Michael P. Manion, Staff Attorney, Montana Power Company, 40 East Broadway,
Butte, Montana 59701

NorthWestern Corporation

Dennis Lopach, Attorney at Law, 208 N. Montana Avenue, Suite 104,
Helena, Montana 59601

FOR THE INTERVENORS:

Montana Consumer Counsel

Robert A. Nelson, Montana Consumer Counsel, 616 Helena Avenue, P.O. Box 201703,
Helena, Montana 59620-1703

Large Customer Group

Donald W. Quander, Attorney at Law, Holland & Hart, 401 North 31st Street,
Suite 1500, Billings, Montana 59101.

NOR000591

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    2
DOCKET NO. D2001.1.5, ORDER NO. 6353c

BEFORE:

    Gary Feland, Chairman
    Jay Stovall, Vice Chairman
    Bob Anderson, Commissioner
    Matt Brainard, Commissioner
    Bob Rowe, Commissioner

COMMISSION STAFF:

    Will Rosquist, Staff Economist
    Eric Eck, Bureau Chief, Revenue Requirements
    David Hoffman, Utility Division Administrator
    Robin A. McHugh, Staff Attorney

### INTRODUCTION

In this Order the Montana Public Service Commission (Commission) approves a Stipulation submitted by certain parties to these dockets, approves the sale of Montana Power Company to NorthWestern Corporation and closes Docket No. D2001.1.5, and settles the transition costs issue in Docket No. D97.7.90, all as explained and discussed below.

### FINDINGS

#### BACKGROUND

#### Docket No. D2001.1.5

1.    On January 12, 2001 the Montana Power Company (MPC) and NorthWestern Corporation (NorthWestern) jointly filed an application with the Commission for approval of the sale of MPC to NorthWestern.[1]  The application was assigned Docket No. D2001.1.5, sometimes referred to as the "sale" docket. The Commission issued a notice of the application on March 1, 2001, and on March 21, 2001 granted intervention in D2001.1.5 to the Montana Consumer Counsel (MCC), the Large Customer Group (LCG), Colstrip Energy Limited Partnership (CELP), Yellowstone Energy Limited Partnership (YELP), and the Montana Department of Natural Resources and Conservation.

---

[1] This Order applies to the sale of MPC's energy public utility businesses.  Other energy businesses are also included in the sale.

NOR000592

DOCKET NO. D97.7.90; ORDER NO. 5986w                                                    3
DOCKET NO. D2001.1.5, ORDER NO. 6353c

2.    On June 27, 2001, the Commission issued Order No. 6353 in the sale docket,
Order Denying Application as Filed and Providing Direction and an Opportunity to Refile. In
Order No. 6353 the Commission found, "[t]he application submitted by MPC and
[NorthWestern] is inadequate, given the scope of the Commission's authority and responsibility
to review and approve sales and transfers of public utility assets and service obligations." Id.,
pp. 3-4. The Commission declined to process the docket further until the applicants provided
additional information and analysis.

3.    In response to Order No. 6353 MPC and NorthWestern, on August 28, 2001,
made a supplemental filing in the sale docket. On October 19, 2001 MPC filed a Motion for
Expedited Procedural Schedule in the docket. In late October 2001, the Commission denied the
Motion, finding, among other things, that setting a schedule in the sale docket should wait until
after MPC's transition costs filing in Docket No. D97.7.90, which, at that time, was expected
shortly. See Notice of Commission Action, Docket No. D2001.1.5, October 26, 2001.


                                    Docket No. D97.7.90

4.    In 1997 the Montana Legislature passed and the Governor signed the Electric
Utility Industry Restructuring and Customer Choice Act (Choice Act),[2] codified at §§ 69-8-101 -
702, MCA. The Choice Act was amended in 1999 and 2001. Implementation of the Choice Act
has been largely the responsibility of the Commission. Shortly before the first utility company
filings pursuant to the Choice Act the Commission assigned Docket No. D97.7.90 to the MPC
transition plan filing, which was received on July 1, 1997.[3] All subsequent matters involving
MPC's transition plan have been processed under that docket, including MPC's most recent
transition cost filing, which is addressed by this Order. There are currently 38 intervenors in
Docket No. D97.7.90.[4]

---

[2] The Choice Act was signed and effective on May 2, 1997.
[3] MPC was required to file a transition plan pursuant to § 69-8-202(1), MCA.
[4] Montana Consumer Counsel; TransCanada Energy; Large Customer Group; Big Horn County
Electric Coop; Montana Electric Coops Association; Central Montana Electric Coop; PacifiCorp
Montana Department of Health and Human Services; MHA Ventures, Inc.; Montana Retail
Association; Natural Resources Defense Council/Renewables Northwest; Montana Department
of Environmental Quality; Northwest Power Planning Council; Montana-Dakota Utilities Co.;
District XI Human Resource Council; Montana Department of Natural Resources &
Conservation; Montana Resources, A Partnership; Oregon Public Utility Commission; Energy
Services, Inc.; Rainbow Energy Marketing; Power Procurement Group; United States Executive
[4] (cont'd) Agencies; Bonneville Power Administration; Washington Water Power

NOR000593

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    4
DOCKET NO. D2001.1.5, ORDER NO. 6353c

5.    The entire procedural history of Docket No. D97.7.90 is very complex and does not need to be reviewed here. Essentially, Docket No. D97.7.90 has been divided into two groups, or tiers, of issues. Tier I issues were addressed in Order No. 5986d (June 23, 1998), which contains an extensive background to the docket up to that time. On July 1, 1999 MPC made a filing to address Tier II issues, including transition costs. On November 24, 1999 the Commission issued Order No. 5986m, requiring, among other things, that MPC amend its Tier II filing with respect to transition costs. MPC filed a Motion for Reconsideration of Order No. 5986m, which, in significant part and with respect to the requirements of the Tier II transition costs filing, the Commission denied in Order No. 5986n, issued January 26, 2000.

6.    In February of 2000 MPC challenged Commission Order Nos. 5986m and 5986n in court, a challenge that was finally resolved by the Montana Supreme Court in June of 2001.[5] The Commission's direction to MPC to amend its July 1, 1999 Tier II transition plan filing, given in Order No. 5986m, was affirmed by the Montana courts. Thus, on October 29, 2001, almost two years after the Commission issued Order No. 5986m, MPC made an amended Tier II filing in Docket No. D97.7.90.

### Docket Nos. D2001.1.5 and D97.7.90

7.    Following MPC's amended Tier II filing the procedural histories of Docket Nos. D2001.1.5 and D97.7.90 merge. On October 30, 2001 MPC filed another Motion for Expedited Procedural Schedule in D2001.1.5. Rather than act on the Motion the Commission directed its staff to meet with the parties to see if agreement on a schedule could be reached. The schedule the parties and staff developed reflected a disagreement between MPC on the one hand, and the parties, the staff and the Commission on the other, over whether there was or might be a connection between the sale docket and the Tier II transition costs proceeding. MPC contended there was no connection; the others contended there either was a connection, or might be a connection. In order to explore a connection between the proceedings, and also expedite the sale

---

Company/Avista Energy, Inc.; Enron Capital & Trade; Colstrip Energy Limited Partnership; Yellowstone Energy Limited Partnership; Montana Society of Association Executives; Energy West Resources, Inc.; David Ewer; Cenex, Inc.; Continental Hydro Corporation; Xenergy; Montana Food Distributors Association; Montana Energy Brokers; Commercial Energy of Montana, Inc.; Confederated Salish and Kootenai Tribes of the Flathead Reservation; Montana Attorney General.
[5] Montana Power Company v. Montana Public Service Commission, Montana Consumer Counsel and Large Customer Group, 305 Mont. 260, 26 P.3d 91 (June 12, 2001).

DOCKET NO. D97.7.90; ORDER NO. 5986w                                             5
DOCKET NO. D2001.1.5, ORDER NO. 6353c

docket, the parties and staff proposed, and the Commission approved, a procedural order

covering both dockets and a common procedural schedule through the deadline for intervenor

testimony.  Compared to a normal schedule in a major Commission proceeding the schedule was

extremely expedited.  The procedural order was issued on November 9, 2001 and required

intervenor testimony to be filed by December 21, 2001.  After that date the schedule contained no

further deadlines for Tier II, but did contain further deadlines in the sale docket leading to an

anticipated hearing on January 16, 2002.[6]

8.      As the December 21, 2001 deadline for filing intervenor testimony approached,

the Commission was informed that certain parties to the sale docket and the Tier II proceeding

were intensely engaged in settlement discussions.  On December 21, 2001 these parties jointly

filed, and the Commission granted, an extension of the intervenor testimony filing deadline to

December 28, 2001; the negotiating parties pledged, "If an agreement is not reached [by that

date], testimony will be filed regarding Tier II and the Sale."  December 21, 2001 Motion to

Extend, p. 2.


                                         Stipulation

9.      On December 28, 2001, MPC, NorthWestern, MCC, LCC, and Commercial

Energy Montana (CEM)[7] filed a Stipulation settling certain issues in Docket Nos. D97.7.90 and

D2001.1.5.  A true and accurate copy of the Stipulation is attached hereto as Exhibit "A".

10.     The primary components of the Stipulation are as follows:

a.      NorthWestern has sufficiently demonstrated its capability to assume responsibility

for the MPC utility operations, and MPC's utility operations, as a subsidiary or division of

NorthWestern, will continue to be a fit, willing and able provider of adequate service and

facilities at just and reasonable rates;

---

[6] The procedural order and schedule also included Docket No. D2001.10.144, MPC's proposed
default supply portfolio (often referred to as the "portfolio" docket).  As with Tier II, the
schedule covered process in D2001.10.144 through the filing of intervenor testimony on
December 21, 2001.  The portfolio docket schedule was subsequently amended and the
intervenor testimony date extended to January 18, 2002.  This Order does not address the
portfolio docket.  The procedural order was in one document covering three dockets and has
three order numbers: Order No. 5986v (D97.7.90), Order No. 6353a (D2001.1.5), and Order
No. 6382a (D2001.10.144).  Procedural Order No. 6382a, as amended, remains effective in the
portfolio docket.
[7] Commercial Energy Montana is a party to Docket No. D97.7.90, but not to D2001.1.5.

NOR000595

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    6
DOCKET NO. D2001.1.5, ORDER NO. 6353c

    b.     MPC and NorthWestern will fund an account in an amount of $30 million to be used solely as a credit for the MPC electric distribution customers through the establishment of a per kilowatt hour credit beginning July 1, 2002. The credit will be calculated to exhaust the account in approximately a one-year period;

    c.     The net present value of MPC's transition costs is $244,711,065, and this amount shall constitute a full and final settlement of all transition costs claimed by the utility pursuant to § 69-8-211(5), MCA, and shall be a final release by MPC to all its customers with regard to all liabilities, including but not limited to all environmental liabilities associated with MPC's generation business;

    d.     No MPC customers, choice or non-choice, will have any obligation to pay any transition costs accrued under or relating to the accounting orders issued by the Commission in Docket D97.7.90, specifically including Order Nos. 5986d, 5986h, 5986l, 5986o, 5986r and 5986s; and NorthWestern will file with the Commission no later than March 29, 2002, information that will facilitate an evaluation of the feasibility of transition bond financing for all transition costs, in accordance with § 69-8-503, MCA.

    11.    On January 4, 2002, the Commission issued a Notice of Opportunity to Comment on Stipulation and Notice of Required Comments on Stipulation, served on the parties to Docket Nos. D2001.1.5, D97.7.90 and D2001.10.144, establishing a hearing date and procedure. Additionally, a Revised Notice of Public Hearing was issued by the Commission on January 4, 2002, for publication in the major newspapers, setting forth the primary components of the Stipulation and inviting both parties and the public to make comments at the hearing and to comment specifically on any implications the Stipulation may have on the portfolio docket, D2001.10.144.

    12.    In Dockets D97.7.90 and D2001.1.5, comments were received from the following: MCC, LCG, CELP/YELP, the Federal Executive Agencies ("FEA"), Central Montana Electric Power Cooperative, Inc. ("Big Horn"), American Association of Retired Persons ("AARP"), and Comanche Park, LLC ("Comanche"). No other written comments from intervenors were received.

    13.    During the period from January 16 through January 24, 2002, the Commission conducted public hearings throughout the State of Montana in which parties and the public

NOR000596

DOCKET NO. D97.7.90; ORDER NO. 5986w                                              7
DOCKET NO. D2001.1.5, ORDER NO. 6353c

provided the Commission with presentation of their evidence and/or comments regarding the

Stipulation issues. The Commission also received many written comments from citizens.

14.    Generally, all written comments filed by the parties support the adoption of the

terms of the Stipulation with respect to the sale of the MPC utility to NorthWestern, the

transition costs determination, and the other issues agreed to by the parties to the Stipulation.


### The Record in the Dockets

15.    The following was admitted into the evidentiary record at hearing:

a.    All data responses filed in D2001.1.5;

b.    All data responses filed in D97.7.90, since the October 29, 2001 Tier II filing;

c.    The Joint Application of MPC and NorthWestern in D2001.1.5;

d.    The prefiled testimony of Jerrold Pederson in D2001.1.5;

e.    The prefiled testimony of Patrick Corcoran in D97.7.90;

f.    The prefiled testimony of Ernie Kindt in D97.7.90;

g.    The prefiled testimony of William Pascoe in D97.7.90;

h.    The prefiled testimony of Ellen Senechal in D97.7.90;

i.    The prefiled testimony of James Stilwell in D97.7.90;

j.    The prefiled testimony of Michael Hanson in D2001.1.5;

k.    Accompanying exhibits to the prefiled testimony filed in D97.7.90 and

D2001.1.5;

l.    The Stipulation in D97.7.90 and D2001.1.5, attached to this Order.

16.    Also part of the evidentiary record is the examination of witnesses at the hearing.

All evidence described above was admitted only for the purpose of evaluating whether the

Commission should approve the Stipulation. Regarding the Stipulation, there is also much in the

administrative record of the dockets, including written comments of parties and nonparties, oral

comments and argument of attorneys for the parties, public comment both written and oral, and a

post-hearing brief from the parties to the Stipulation.


### DISCUSSION

### Docket No. D2001.1.5

17.    The Stipulation constitutes the case in chief of MCC and LCG. Brief of

DOCKET NO. D97.7.90; ORDER NO. 5986w                                              8
DOCKET NO. D2001.1.5, ORDER NO. 6353c

Stipulating Parties, p. 6. These parties assert that the Stipulation resolves their concerns
regarding the sale. Based on the responses to their discovery, MCC and LCG conclude that
NorthWestern has sufficiently demonstrated that it is capable of assuming responsibility for
MPC's utility operations. MCC and LCG argue that the Commission should approve the sale
and adopt the conclusion of the applicants: that MPC's utility operations will continue to be a
fit, willing and able provider of adequate utility service at just and reasonable rates under
NorthWestern ownership. Stipulation, p. 3.

        18.      The Commission conducted a review of the Joint Application, the Supplemental
Filing and the extensive written discovery conducted during the proceeding by MCC and LCG.
The Commission finds, based on this review, that these parties thoroughly inquired into
NorthWestern's financial, managerial and technical capabilities with respect to owning and
operating electric and natural gas public utility transmission and distribution systems.

        19.      The information contained in the record sufficiently demonstrates that
NorthWestern conducted reasonable due diligence in the course of submitting an offer and
negotiating the Unit Purchase Agreement, including the purchase price and terms contained
therein. Under the structure of the sale, the day-to-day operations of MPC will largely stay the
same, and there will not be an immediate impact on MPC's existing operational structure.
NorthWestern expects minimal efficiency gains, primarily from combining support systems and
developing common platforms for computers and the deployment of other technology. Transcript
of Proceedings (TR), p. 45.

        20.      Both MPC and NorthWestern currently provide high levels of service reliability.
The Commission is encouraged by NorthWestern's philosophy and commitment to build on the
strengths of MPC and to enhance the quality of utility service provided to customers. TR, p. 46.
The Commission also welcomes the more frequent dialogue and information exchange outside
the contested case process suggested by NorthWestern witness Michael Hanson. TR, p. 99.

        21.      Mr. Hanson, President and Chief Executive Officer of NorthWestern Public
Service, was questioned at length at the public hearing and discussed a wide range of issues
related to the operation and management of public utilities. TR, pp. 38-93. Mr. Hanson credibly
and capably represented NorthWestern before the Commission. NorthWestern is enthusiastic
about providing regulated public utility service in Montana and its rural communities. This is not
true of MPC. Rather than being an electric and natural gas utility, MPC would like to focus on

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    9
DOCKET NO. D2001.1.5, ORDER NO. 6353c

its telecommunications business. There is positive value for utility ratepayers in being served by
a company that genuinely wants to excel in the provision of regulated utility service.

22.    The Stipulation establishes a $30 million fund, "[t]o resolve the MCC and LCG
concerns regarding the disposition of the gain on the sale...." Stipulation, p. 3. The obligations
for establishing the fund are divided between Touch America ($20 million) and NorthWestern
($10 million). TR, pp. 190-191. The record does not establish any direct connection between the
$30 million fund and the after tax gain associated with the sale, which MPC witness Jerrold
Pederson, Chief Financial Officer, estimated would be roughly $32 million. TR, p. 15. The
$30 million fund results in significant near-term benefits to electric distribution ratepayers, who
may face substantial rate increases as a result of the portfolio docket (D2001.10.144). The record
does not contain a completely satisfying justification for the allocation of the $30 million fund
solely to electric ratepayers, when the Stipulation resolves issues related to the gain on the sale of
both the natural gas and electric utilities. However, in the context of the overall settlement of
multiple issues in multiple cases (discussed below), the Commission agrees that the $30 million
fund, combined with the other components in the Stipulation, represents a reasonable resolution
of the issues related to the gain associated with the sale in this particular case.

23.    No party to the case opposed the sale or presented testimony supporting approval
in a form different than that contained in the Stipulation.

<u>Docket No. D97.7.90</u>

24.    MPC's October 29, 2001 Tier II filing represented an affirmative showing of the
Company's claimed transition costs pursuant to § 69-8-211(2), MCA. This showing reflected
MPC's mitigation efforts. MPC reasonably demonstrated the methods it relied on to determine
the value of all generation assets, liabilities and electricity supply costs. MPC established a value
for the hydroelectric and thermal generating plants it sold to PPL Montana based on the purchase
price associated with that sale, which was the result of a competitive bid process. MPC
established a value for qualifying facility (QF) power production based on an estimate of the
future market value of the electricity provided by the QF contracts. Regulatory assets have value
because of past regulatory actions by this Commission. MPC identified the regulatory asset-
related costs it claimed as transition costs and the associated value of those assets carried on the
books and records of the Company. MPC showed the value of the Milltown dam as a function of

NOR000599

DOCKET NO. D97.7.90; ORDER NO. 5986w                                        10
DOCKET NO. D2001.1.5, ORDER NO. 6353c

its current book value and future environmental liabilities stemming from contamination due to
mining wastes that washed down stream and settled in sediments behind the dam.

    25.    MPC's Tier II filing provided a transition costs claim reduced to a net sum based
on the value of all generation assets, liabilities and electricity supply costs. This claim was
approximately $304.7 million in net present value. Thus, MPC complied with the requirements
of § 69-8-211, MCA as interpreted by the Commission in Order No. 5986m.

    26.    As with the sale of MPC to NorthWestern, Docket No. D2001.1.5, the Stipulation
represents the case in chief of intervenors MCC, LCG and CEM in Docket No. D97.7.90.
CELP/YELP, active parties in the dockets, filed comments on the methodology used by MPC in
the Stipulation regarding future prices of energy. CELP/YELP, however, withdrew their prefiled
testimony and did not enter an appearance at the public hearing.

    27.    The FEA filed comments stating that MPC's methodology resulted in collections
that are low compared to MPC's request in D2001.10.144. However, it appears FEA mistook the
"weighted average" figure from the portfolio filing for the in-market determination of QF costs.
Additionally, FEA stated the inflation rate used may be inappropriate.

    28.    Central Montana and Big Horn argued that as former and current customers of
MPC, they are among those who are released from all transition liabilities, including but not
limited to all environmental liabilities associated with MPC's generation business. Both of these
parties chose not to participate in the hearing on the Stipulation.

    29.    Comanche argued that the Stipulation should not affect the schedule of review of
the default supply filing in D2001.10.144, that action on the Stipulation by the Commission may
be premature because NorthWestern does not currently control MPC, that the Stipulation may
address issues that implicate § 69-8-210(4), MCA, and that the record is insufficient to justify
approval of the Stipulation. Comanche also chose not to participate in the hearing, nor did it
offer for introduction any testamentary or documentary evidence.

    30.    AARP urged the Commission to thoroughly evaluate the effects of the Stipulation.
AARP commented that the stipulating parties failed to provide the Commission with sufficient
information, data and reasoning to verify the terms of the Stipulation. AARP further commented
that, if the Commission is unable to obtain this information, data and reasoning, the Commission
should reject the Stipulation and go forward with an evidentiary proceeding.

DOCKET NO. D97.7.90; ORDER NO. 5986w                                    11
DOCKET NO. D2001.1.5, ORDER NO. 6353c

31.    For the reasons set forth below, the Commission finds that approving the
Stipulation produces a reasonable resolution of the transition costs issues as well as a lawful
basis for determining the amount of transition costs.

Settlements

32.    Settlements are an established and lawful means of resolving contested issues in
administrative proceedings before the Commission. Numerous Commission proceedings have
been resolved fully or in part by settlements reached among the parties. Settlements can produce
outcomes that are in the public interest. The settlement process can enhance the flow of
information among parties with disparate interests, which in turn can improve understanding of
the various positions. The settlement process can enhance a party's ability to negotiate for things
it values more and compromise on things it values less.

33.    Many variables can affect a settlement process, its outcome, individual bargaining
strategies and willingness to participate. Some of these variables include: sufficient
representation by parties with a broad range of interests, time pressures, perceived risk of an
adverse Commission decision relative to the desired outcome, information and evidence
available to participants, relative costs associated with participating in the settlement process and
the contested case process and the relative bargaining strength and abilities of the participants. If
the Commission determines that the settlement process includes an adequate array of interests,
each with sufficient access to the resources and skills necessary to represent their particular
interest, then the Commission can be reasonably confident that any stipulation resulting from the
settlement process falls within a range of reasonable outcomes that are in the public interest.
This is a threshold determination, but does not relieve the Commission from its responsibility to
make its own determination that the Stipulation is in the public interest, as described in this
Order.

34.    The Commission concludes that in this case the parties to the Stipulation were
fully capable of promoting their interests. MPC has been a public utility for over 80 years and
has represented its interests before the Commission since the Commission's creation. MPC has
sufficient legal, financial, economic and technical knowledge and expertise to evaluate and react
to settlement positions advanced by other participants.

35.    MCC is a state office created by the Montana Constitution for the express purpose of representing consumer interests before the Commission. Mont. Const. art. XIII, § 2. The office and activities of the MCC are funded by a special tax on regulated companies. The MCC has a full time staff that includes an economist, a rate analyst and an attorney. The MCC's budget allows it to contract for additional financial, economic and technical knowledge and expertise as needed to adequately perform his duties and to effectively represent consumers in settlement negotiations. The MCC has been an active party in Docket No. D97.7.90 since the Commission initiated the proceeding.

36.    LCG is made up of very large purchasers of electricity supply and delivery services from MPC. LCG's membership includes companies involved in mining, wood products, refining and manufacturing. For nearly 15 years LCG has been an active party in numerous Commission proceedings involving MPC's electric and natural gas utilities. LCG retains the services of an attorney and financial, economic and technical consultants as needed to adequately represent its interests in matters before the Commission and in settlement negotiations.

37.    CEM is an electricity and natural gas marketer licensed by the Commission to sell these products to retail consumers in the state of Montana. CEM is a frequent participant in Commission proceedings with considerable knowledge and expertise in energy markets. CEM has obtained contracts to sell electricity to a number of medium sized consumers including hospitals, schools and retail chain stores. CEM brings a strong understanding of the interests of these mid-sized businesses and organizations to Commission proceedings and settlement discussions.

38.    NorthWestern is an established electric and natural gas utility with customers in South Dakota and Nebraska. NorthWestern has experience appearing before regulatory commissions and negotiating settlements of contested cases. NorthWestern has arranged financing to close a $1.1 billion purchase of the MPC electric and natural gas utilities. NorthWestern has the financial, economic and technical knowledge and expertise to adequately represent its interests in settlement negotiations.

39.    Clearly the settlement process in this case was characterized by representation from a broad array of interests. Consumer interests, from the smallest household to the largest industrial plant, were fully engaged. There is no evidence suggesting a large disparity in

NOR000602

bargaining strength or abilities. MPC desired a quick resolution due to a business plan involving its telecommunications affiliate that depends heavily on the Commission approving the sale. Further, the financial condition of MPC's telecommunications affiliate appears dire. NorthWestern also was interested in quick approval in order to minimize financing costs. The consumer interests, while certainly in favor of a timely resolution, do not appear to have been motivated by time to the extent the utilities were. This may have worked to the advantage of the consumer interests. In any case, there is no indication that the consumer interests were negotiating from a position of weakness. To the contrary, the settlement process in this case appears to have produced a result that is balanced in achieving benefits for each of the participants.

### Commission Review

40.    Although the active parties did not submit prefiled testimony (the Stipulation was submitted in lieu of their testimony), substantial record information exists. In addition to the testimony, exhibits and work papers filed by MPC, active parties and the Commission conducted extensive discovery on MPC's filing. Once the Stipulation was filed, the Commission submitted additional requests for information from the stipulating parties. The Commission further investigated the Stipulation at the public hearing.

41.    Typically, in a contested case that does not settle, the Commission's decision relies heavily on record evidence, in the form of testimony and exhibits submitted by the witnesses for the parties. However, the Commission also relies on its own expertise in the decision-making process. So while intervenors in this case did not submit testimony, the Commission had substantial opportunity to evaluate the Stipulation based on other available information and its own expertise.

42.    Obviously the Commission is not in a position to replicate the rate case strategies that would have been used by MCC and LCG had there not been a stipulation. However, it is possible to obtain by careful review of the parties' discovery requests, and MPC's responses to those requests, a general sense of the issues MCC and LCG would have addressed in testimony. Of particular relevance in this case is the Commission's sense that MCC and LCG would not have challenged MPC's basic assertion that the sales price paid by PPL Montana for almost all MPC's hydroelectric and thermal generating plants established a reasonable value for these

NOR000603

DOCKET NO. D97.7.90; ORDER NO. 5986w                                              14
DOCKET NO. D2001.1.5, ORDER NO. 6353c

assets. It does appear that MCC and LCG would have questioned many of MPC's numerous
additions to and subtractions from this sales price to calculate the net transition costs amount. It
also appears they would have questioned some of the underlying assumptions related to MPC's
calculation of the QF-related transition costs. In a fully litigated contested case MPC is entitled
to an opportunity to rebut testimony submitted by the intervenors.

    43.    The Commission's analysis of record information in the case, together with the
inherent integrity of the settlement process in this case, indicates that the stipulated net transition
cost of $244.7 million, on a net present value basis, is demonstrable and verifiable within an
acceptable range of reasonableness.

    44.    The Commission evaluated alternatives to approving the Stipulation. The results
of this evaluation further convinced the Commission of the reasonableness of the overall balance
struck by the Stipulation.

    45.    Based on its extensive examination of parties and their positions, the Commission
accepts the stipulating parties' representations that any modification to the Stipulation would
cause it to unravel and would be tantamount to rejecting the Stipulation. The Commission also
finds credible the assertions of MPC and NorthWestern that rejecting the Stipulation would
probably mean the sale either would not or could not occur. If the Commission rejected the
Stipulation, the contested case process would resume for both the sale and Tier II dockets. MCC
and LCG would have the opportunity to submit testimony and presumably would argue that the
two cases are linked or related.

    46.    The Commission engaged NorthWestern extensively on the so-called "QF
shortfall" issue at the public hearing. The nature of this issue demonstrates the relationship
between Tier II and the sale; the Commission's decision on the level of net transition costs has a
direct impact on the cash flow generated by competitive transition charges and the utility's total
revenue from which QF contract costs must be paid. This relationship suggests that the
Commission should resolve the Tier II transition costs issue before it approves the sale so that it
can evaluate whether NorthWestern is financially capable of assuming any liability associated
with the transition costs decision. This is an important issue because the Choice Act requires
netting the value of various generation assets, liabilities and supply costs. With the sale
NorthWestern could assume liabilities related to certain MPC assets without having the
opportunity to benefit fully from other MPC assets that have positive value, namely the

NOR000604

hydroelectric and thermal plants previously sold to PPL Montana.

47.     It is reasonable to conclude that a fully litigated Tier II proceeding would take several more months at a minimum. Given the substantial interests involved, the Commission's decision could be followed by protracted litigation with an uncertain outcome. Under these conditions the sale might not occur for years, if ever. Approving the Stipulation produces benefits for consumers, including the $30 million fund and a company that desires to serve utility customers; rejecting the Stipulation risks losing those benefits and creating a very uncertain outcome. However, as discussed already, the level of transition costs in the Stipulation falls within a range of reasonableness, and off-setting benefits are not obvious given the large transactions costs associated with the fully litigated contested case scenario.

48.     NorthWestern participation in the settlement process offers some assurance that the level of transition cost liability the Company is acquiring is manageable within the Company's overall business and financial activities.

49.     Finally, no party opposed the level of transition costs in the Stipulation, or presented testimony or evidence supporting a different level of transition costs. The Commission heard comments from the public at nine satellite hearings around the state. The majority of the public comments supported the Stipulation. Extensive discussion at these meetings concerned the amount of information available to the Commission and the public; the terms of the settlement; NorthWestern's plans for the distribution system; the development of the default supply portfolio and other important issues in Montana energy policy; and specific issues such as those associated with the Milltown dam.

## CONCLUSIONS OF LAW

1.     All conclusions of law reached above are incorporated herein.

2.     The Montana Public Service Commission (Commission) regulates the rates and services of public utilities. Title 69, Chapter 3, MCA.

3.     The Montana Power Company (MPC) is a public utility subject to the jurisdiction of the Commission.

4.     If the sale of MPC to NorthWestern Corporation (NorthWestern) is completed, Montana Power, LLC, owned by NorthWestern, will be a public utility under the jurisdiction of the Commission, with the corresponding obligations of a public utility.

NOR000605

DOCKET NO. D97.7.90; ORDER NO. 5986w                                          16
DOCKET NO. D2001.1.5, ORDER NO. 6353c

5.    The Commission has jurisdiction over and must approve any sale or transfer of utility assets and obligations in order to assure generally that utility customers will continue to have adequate service, that utility rates will not increase as a result of the sale or transfer, and that the acquiring entity is fit, willing and able to assume the service responsibilities associated with owning utility facilities.

6.    The amount of transition costs that MPC or a successor public utility may recover from its customers must be determined and approved by the Commission. § 69-8-211, MCA.

7.    The Commission's approval of the Stipulation represents a final and lawful determination of the transition costs MPC/NorthWestern may recover from customers.

8.    The Commission's approval of the Stipulation does not violate § 69-8-210, MCA.

9.    When implementing the Choice Act the Commission must protect the interests of Montana consumers and foster the financial integrity of electric utilities.

10.    The Commission has the power to prescribe rules of procedure and to do all things necessary and convenient in the exercise of its powers, including the power to regulate the mode and manner of all investigations and hearings. Title 69, Chapter 3, MCA.

## ORDER

1.    The Commission hereby approves the Stipulation (in form attached hereto as Exhibit "A") in its entirety and without modification.

2.    MPC is authorized to complete its proposed sale of Montana Power, LLC (composed of its utility business) to NorthWestern, subject to the provisions of paragraphs 9-17 of the Stipulation. Funding of the $30 million credit account is contingent upon closing the sale transaction, as provided in the Stipulation.

3.    Upon completion of the sale, Montana Power, LLC (then being owned by NorthWestern) shall implement paragraphs 18-29 of the Stipulation, which include a final settlement of all transition cost claims, and also the filing with the Commission no later than March 29, 2002, of information needed to evaluate transition bond financing.

4.    The following Orders issued in Docket D97.7.90 are vacated and no longer effective immediately upon closing of the sale: Order No. 5986d (June 23, 1998); Order No. 5986h (March 31, 1999); Order No. 5986l (September 29, 1999); Order No. 5986o (February 4, 2000); Order No. 5986r (November 8, 2000); Order No. 5986s (January 19, 2001).

NOR000606

DOCKET NO. D97.7.90; ORDER NO. 5986w                                        17
DOCKET NO. D2001.1.5, ORDER NO. 6353c

5.    Montana Power, LLC shall timely file rates and tariffs with the Commission consistent with the terms of the Stipulation. Upon approval by the Commission, such rates and tariffs shall become effective July 1, 2002.

6.    The transition costs amount as set forth in the Stipulation is hereby approved as the full and final transition cost amount that may be collected by Montana Power, LLC.

7.    The parties to the Stipulation are hereby ordered to abide by all terms and conditions contained therein and as discussed in the above Order paragraphs.

8.    By this Order, the Commission closes out Docket D2001.1.5 and finalizes the transition costs portion only of Docket D97.7.90. Docket No. D97.7.90 remains open and will apply to remaining transition plan implementation.

DONE AND DATED this 29th day of January, 2002, by a vote of 5-0.

DOCKET NO. D97.7.90; ORDER NO. 5986w                                        18
DOCKET NO. D2001.1.5, ORDER NO. 6353c

BY ORDER OF THE MONTANA PUBLIC SERVICE COMMISSION

_____
GARY FELAND, Chairman


_____
JAY STOVALL, Vice Chairman


_____
BOB ANDERSON, Commissioner


_____
MATT BRAINARD, Commissioner


_____
BOB ROWE, Commissioner

ATTEST:

Rhonda J. Simmons
Commission Secretary

(SEAL)

NOTE:        Any interested party may request the Commission to reconsider this decision.  A
             motion to reconsider must be filed within ten (10) days.  See 38.2.4806, ARM.

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                    19

## CONCURRING OPINION OF COMMISSIONER ROWE

### Docket No. D2001.1.5

NorthWestern has demonstrated its commitment to providing good quality service to Montana customers, and has amply demonstrated its eagerness to work with Montana in times of great uncertainty. Montana is fortunate that the MPC properties are being acquired by a rural-based company with a reputation for good service. Particularly impressive are NorthWestern's vision as a provider of good service to relatively rural areas; its earnestness and modesty; and the apparent absence of a rigid agenda or grand scheme beyond its vision. I respect its sincere willingness to work with Montanans as we proceed through a critical and difficult period.[8]

A.      **Comments on the Stipulation.**

The Commission has aggressively managed an energy situation it did not create. I commend the Commission for taking many strong steps including:

- ✓ Rejecting a $.04 kWh supply price last Spring that subsequent events demonstrated would have been substantially out-of-market;

- ✓ Prevailing in litigation concerning determination of stranded costs, requiring that stranded costs be netted and summed;

- ✓ Rejecting pre-approval of Qualifying Facility buyout contracts;

- ✓ Refusing to pre-approve piecemeal power supply contracts proposed for inclusion in the default supply portfolio; and,

- ✓ Keeping tight control over the schedule and issues in these two dockets by finding MPC and NorthWestern's initial filing insufficient and requiring a comprehensive supplemental filing, by managing the sale and stranded cost dockets on parallel procedural schedules, and by actively examining potential relationships between the two cases.

---

[8] The PSC's review primarily concerns the future provision of monopoly utility service to Montana customers, and the highly contested matter of stranded costs associated with the "transition to choice." These decisions are critical to all sectors of the Montana economy. The PSC's review does not directly concern MPC's plans to become a competitive telecommunications provider. I do, however, wish Touch America well. If it succeeds and retains a strong Montana presence, that will also be good for Montana.

NOR000609

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                   20
                CONCURRING OPINION OF COMMISSIONER ROWE

But for the Commission's efforts, it is highly unlikely stranded cost issues would now be part of a final settlement. I am also very pleased with the detailed examination individual commissioners and staff gave to the issues and volumes of information in this case. Most especially, I commend the commissioners for engaging in an extended and informed discussion with the citizens of Montana concerning the issues before us.

I am satisfied that all sides in the negotiations leading to the stipulation were effectively represented. The stipulation reaches outcomes that generally appear to be within the range of reasonableness. As described immediately below, there are several areas where questions remain, or where a fully adjudicated case might have produced different outcomes. However, the substantial cost and uncertainty of rejecting the stipulation and proceeding through judicial review clearly and greatly outweighs the possible benefits. I reject this unpredictable certainty, and encourage us instead to focus on the questions outlined in Part B, below.

The Stipulation is far from perfect. Some parties' responses to the Commission's questions, in some cases, created more uncertainty than they resolved, nearly risking snatching rejection from the jaws of approval. For example:

- ✓ The thirty million dollar fund should perhaps more properly be funded entirely by MPC. From the structure of the stipulation, creation of this fund appears to recognize "the MCC and LCG concerns regarding disposition of gain on the sale." Paragraph 10. (At the hearing, the Consumer Counsel instead appeared to disclaim a connection.)

- ✓ Parties did not attempt to offer a principled explanation as to why the thirty million dollar fund benefits only MPC electric customers, even though natural gas customers also paid a return on and of the value of the assets being sold. The best answer I can offer is that, last year, the Commission mitigated the significant run-up in gas supply costs by offsetting thirty-two million dollars from gain on the sale of other MPC gas-related properties. Docket No. D96.2.22. We now do something similar for electric customers.

- ✓ The twenty-three million dollar write off of MPC' stranded cost claims benefits only those customers who did not take supply service from MPC, even though "non choice" customers paid the expenses which "choice" customers will now not have to

NOR000610

pay.[9] If non-choice customers receive a comparable benefit under the stipulation, it has not been explained in a way that is clear to me.

✓ It is correct to say that the cost of Qualifying Facility contract payments claimed for stranded cost recovery is known and has been reduced to a sum. Based on the record, it is at least more difficult to say that the offsetting value of those contracts has been demonstrated, and that mitigation and netting is adequate to comply with the Montana Supreme Court's decision in MPC v. PSC. 305 Mont. 260 (2001), interpreting Sections 69-8-211(2)(a), (b), and (3)(a).[10]

✓ NorthWestern assumed substantial risk under the stipulation. (It appears to have played the role of "reasonable party.") This is clearly true concerning stranded costs, where the eventual net outcome for NorthWestern is unknown. It is also true concerning future environmental costs, particularly concerning Milltown Dam. Significantly, the stipulation protects customers from rate increases associated with environmental costs; however, the Unit Purchase Agreement provides only partial indemnification by Touch America to NorthWestern. Stipulation paragraph 26; UPA Article X, paragraph 10.04. The Commission spent considerable effort assuring itself that NorthWestern would be able to manage the bundle of risks it is assuming with no greater risk to customers than would be faced under continued MPC management.

**B.    Distribution System Management.**

The Commission engaged in an extensive and productive discussion with NorthWestern's witness, President and Chief Executive Officer, Mike Hanson, concerning the company's plans for its Montana operation. Several of those issues merit follow up.[11] There are three areas I suggest for early attention:

---

[9] This benefit inures roughly eighty-five percent to the industrial class, fourteen percent to the commercial class (including institutional customers such as schools), and one percent to other (small business or residential) customers.

[10] We have MPC's case, including witness testimony, work papers, and responses to the Commission's and the parties' discovery. We do not have the analysis conducted by parties, including the analysis prepared separate and apart from settlement negotiations.

[11] Strikingly, MPC's attorney argued that the PSC should approve the sale in part because "the state has grown weary of my client's stewardship." (It should be noted that this view was not expressed by any of the commissioners or by others at the hearing.) MPC's attorney did not explain why this might be the case, but – to the extent there may be any truth – it does argue for NorthWestern actively to manage the operation it is now acquiring.

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                                    22
CONCURRING OPINION OF COMMISSIONER ROWE

1.    **Default portfolio design.**

Intervener testimony and data request responses in Docket D2001.10.144 raise significant questions concerning the process through which the portfolio was assembled, the allocation of risk among various contract parties, how renewables should be considered, whether efficiency is appropriately considered, and other issues.

More fundamental issues concern the relationship between default supply design and an eventual "transition to choice." These include the relative merits of long-term contracts as opposed to either short-term contracts or rate-basing resources; the potential for something like "stranded costs"; and, ultimately whether small customers will realistically "transition to choice" or remain as customers of an integrated distribution and supply service.

In addition to the standard practice of filing response testimony defending the portfolio decisions already made, I urge NorthWestern to consider seriously the many constructive comments offered by the Northwest Power Planning Council office and others, and where it believes those comments have merit to modify its filing accordingly.

2.    **Retail Competition.**

Montana's 1997 electric competition law was adopted based on a very specific set of assumptions, and was driven especially by the vision of one company.[12] Some of the initial assumptions have proven correct. Others have not.

At the hearing, most parties agreed that there is a long list of work remaining to be done even to finalize a "transition plan" appropriate for present circumstances. Items on this list include whether or how to transition small customers to retail choice; pilot programs; customer education and information; metering; billing and collection; and, rate design consistent with facilitating efficient choice decisions.

NorthWestern has not "restructured" in its home territory, South Dakota, and brings a very different perspective to the Montana discussions. As argued by the parties, the stipulation allows a fresh start in several areas. I am aware of no interest in returning large customers to captive service, and also believe there is room for expanded choice among medium-sized

---

[12] In 1997, one of the arguments for restructuring was the unSchumpetarian claim that a pro-competition statute would "save MPC as a Montana-owned company." Predictably instead, the law of unintended consequences set in motion a series of occurrences that, as to the specifics, no one could have foreseen. This was another unpredictable certainty.

NOR000612

customers. The tough nut, as it always has been, is meeting the needs of residential and small
business customers. I encourage NorthWestern to speak honestly and constructively concerning
its views about policies appropriate to meet the needs of smaller and medium-sized customers,
and I encourage others to respond in kind.

   a.    **Distribution System Mission, Structure, and Regulation.**

   Most mergers are touted on the basis of breathtaking "synergies." NorthWestern, more
honestly, states that because the Montana and South Dakota systems operate in asynchronous
power pools there are few operational efficiencies, but says there may be management
efficiencies to be gained. This, coupled with the obligations and risks assumed by NorthWestern
in the transaction, and the assurance that no acquisition adjustment will be sought (such
adjustments were prohibited under Montana law until 1995, and are still disfavored), place
NorthWestern in a critical position.

   There are two conflicting distribution system models.[13] Under one view, consistent with
the most rigorous approach to competition (which uses policy tools to drive hard toward
"workably competitive" rather than merely "contestable" retail markets), the "disco" may only
provide core monopoly functions, and others must provide all potentially competitive functions.
(This disco "ain't no party.") Under another view, the distribution company may be relatively
more entrepreneurial and innovative in meeting customers' needs. The appropriate model may
be different depending upon how Montana finally resolves issues concerning retail choice for
small customers. It is possible that, as in telecommunications, a more active disco may be
especially valuable in rural areas such as Montana. The appropriate model is also related to
choices to be made about appropriate regulation of the disco, and regulatory incentives it faces.

   Examples include traditional rate of return versus performance regulation; the appropriate
level of restrictions on affiliate interest activities; any role for something like integrated resource
planning;[14] decoupling of disco rewards from transmitting volumes of energy; incentives for high

---

[13] The pro-restructuring Center for the Advancement of Energy Markets is currently undertaking a "Disco
of the Future" project in which I am participating. See, http://www.caem.org.
[14] Many of the values citizens now say they want to achieve in energy policy and experts advocate have a
familiar ring to those who helped develop and implement integrated resource planning (IRP). These
include openness, accounting for positive and negative externalities; an end-to-end consideration of
economic alternatives, including but not limited to efficiency investments; the use of optioning to maintain
flexibility and shorten planning horizons. It is difficult but not impossible to achieve these goals in the
more delaminated restructured model.

NOR000613

quality or innovative customer service. As NorthWestern takes the reins, I look forward to continuing an open and in-depth discussion of these issues.

### 3.    Good Regulation and Missed Opportunities.

The parties bargained hard. I have no doubt that small customers were well represented in the negotiations by the Consumer Counsel. In this case, there does not appear to be anything in the stipulation might not have been agreed to many months earlier. The outcome appears to have been reached, when it was reached, by the combination of NorthWestern's determination to close the deal (it's focus and willingness to negotiate) and by the pressure of time. Uncertainty over the extent of the Commission's authority to review sales of property used to serve customers of regulated services may have affected negotiating positions.[15]

Stipulations are a simple (and sometimes crude) form of "alternative dispute resolution" (ADR). Stipulations can, under appropriate circumstances, achieve better results than can traditional regulation.[16] Well-designed ADR has many benefits as a compliment to traditional contested case approaches. In addition to certainty of outcomes, efficiency, and acceptance by parties, ADR can often identify and resolve issues that contested cases cannot. At its best, ADR can increase public confidence in commission outcomes affecting public interests.

An excellent example of ADR, dealing with much more complicated issues than those in the present case, is the highly open and transparent process through which this commission is working with other states on local telecommunications competition. A more modest version of ADR could have been employed in this case. It would have reached results at least as good as those achieved by the parties through traditional closed negotiations, would have resulted in greater public confidence in the outcome, and would have strengthened sound policy generally. Had the parties accepted such an approach when it was first suggested, I sincerely believe resolution could have been reached more quickly as well.

The Montana Consumer Counsel has an especially important role in developing appropriate regulatory practices and policies. Unlike any other party appearing before the

---

[15] This uncertainty has been a factor in previous cases, including most recently the sale of PacifiCorp's distribution system to Flathead Electric Cooperative.

[16] See, Zhongmin Wang, "The Negotiated Settlement Approach to Utility Ratemaking" (September 2001), comparing adjudication and negotiated settlement approaches in FERC rate cases, and concluding negotiated settlement improves welfare in multi-issue situations because it is not subject to an issue-by-issue agenda as would be the case in formal adjudication.

NOR000614

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                  25
CONCURRING OPINION OF COMMISSIONER ROWE

Commission, it has a constitutional duty to represent customers. Its interest, on behalf of the
citizens of Montana, should extend not just to good outcomes in specific cases, but also to
effective regulation generally. Attributes of good regulation include, at the least:

- ✓ As open a process as possible;
- ✓ Transparency of decision-making;
- ✓ Relative predictability of results; and,
- ✓ Sufficient analytical rigor.

In this case, the Consumer Counsel was "negotiating in a pressure cooker," and appears to
have done a good job. I encourage the Consumer Counsel to place great emphasis on promoting
good regulation generally. I look forward to positive discussions with the Consumer Counsel on
this topic at an appropriate time in the near future.

RESPECTFULLY SUBMITTED this 31st day of January, 2002.


———————————————————
Bob Rowe
Commissioner

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                      26

## CONCURRING OPINION OF COMMISSIONER ANDERSON

### The STIPULATED AGREEMENT

The Commission has voted unanimously to approve the stipulated agreement in these cases. The Commission's order explains well the virtues of both the process and the outcome.

Critics of the stipulation argued: not enough details about the agreement were known to enable the public to evaluate its merits; and the agreement was a "backroom deal" among the big companies.

Public opinion is important to the Commission. However, public opinion is not the Commission's only criterion for good decisions. More important is the quality of the outcome. It would not be in the public interest to reject a proposal which arouses public suspicion if the result would likely make the public worse off. It is the Commission's duty to look beyond the perception of the settlement to the result.

It is the PSC's responsibility to determine if the settlement:

- resulted from a robust process in which the public's interests were well represented, and
- the outcome is in the public interest.

The missing "details" in this case would have been the intervenors' testimony, due on December 28, 2001. Instead of filing that testimony, the intervenors, along with the filing companies, filed the stipulated agreement. In addition, there might have been useful information added to the record through discovery on intervenor testimony, rebuttal testimony, and cross-examination of witnesses' testimony.

The lack of this information is not necessarily fatal to good process or good outcomes. Perhaps the testimony would have been enlightening, but it can largely be inferred from the other information, such as data requests and responses, available in the record. The Commission and its staff have reviewed the record in great detail.

Also, importantly, the public can have confidence that its interests were just as effectively pursued in settlement negotiations as they would have been in litigation before the Commission.

Was the settlement a backroom deal? Yes—such is the nature of settlements. But, once made, the settlement was subject to careful scrutiny by commissioners and Commission staff. That scrutiny included examination of alternatives:

- accepting the agreement without modification,
- rejecting the agreement and setting the matters for hearing,
- accepting the agreement with minor modifications,
- adjusting the agreement and returning it to the parties for acceptance or rejection, and
- rejecting the agreement, approving the sale, and setting the other matters for hearing.

NOR000616

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                          27
CONCURRING OPINION OF COMMISSIONER ANDERSON

Examination of these alternatives included an assessment of legal viability (e.g. affording the parties their due process rights) and likelihood of achieving acceptable or better outcomes.

Rejecting the settlement (or altering it, even in minor ways, which would have been unacceptable at least to some of the parties) would have required confidence that a better outcome could have been achieved. That outcome would not just have to be as good as the stipulation; it would have to be better to offset:

- features of the stipulation not otherwise available (for example MPC's $20 million contribution to ratepayers and indemnification from environmental costs),
- additional costs, such as increased capital costs due to the likely financial demise of Touch America and, with it, Montana Power,
- additional costs of continued litigation before the Commission and the courts, and
- having a utility owner whose heart is not committed to its duty to serving its legal duty.

That examination led the staff to a strong recommendation to accept the agreement without modification. The Commission rightly concurred.

## THE FUTURE

Approval of the sale and settlement of stranded cost issues closes certain matters before the Commission. Others remain.

NWC cost recovery. Questions were raised in hearing about NorthWestern Corporation's ability to recover costs not currently in rates. Answers were less than satisfying: NWC said it would "manage" them and would not ask for rate increases to cover them. The Commission should closely monitor NWC's performance to be sure service quality and reliability aren't sacrificed.

Default supplier role. NWC will step into MPC's shoes as the default electricity supplier. At the same time, NWC has a generator in that default portfolio. This raises questions of affiliate relations and conflict of interest. The burden will be on NWC to convince the Commission that the portfolio is "prudent" and that its relations with a generation subsidiary are at arm's length.

The Commission should revisit the adequacy of its affiliate relations and transactions rules.

Additional transition issues. The promise of electric utility restructuring has been something of a chimera. Nevertheless, it is the law (probably irreversible) and the Commission must seek to fulfill its potential. In doing so, the Commission must address many issues. The Commission must carefully consider whether or not docket D97.7.90 should be closed at this time and these issues addressed in subsequent cases or the docket should remain open.

Regulation of the distribution company. In the press to deal with restructuring issues, one important one has been deferred: how to regulate a distribution company. Current tariffs are the

DOCKET NO. D2001.1.5, ORDER NO. 6353c                                    28
CONCURRING OPINION OF COMMISSIONER ANDERSON

result of unbundling the vertical utility. Going forward, NWC and Commission should examine
how the interests of the distribution company and its customers should be aligned.
These interests include:

- just and reasonable prices for customers,
- cost recovery for the company,
- effective price signals for the customers,
- minimizing externalities such as environmental effects, and
- energy conservation.

Rate-base, rate-of-return regulation may not be the best strategy. Various forms of performance-
based regulation, such as revenue-per-customer caps, should be examined.

Integrated Resource Planning. The Integrated Resource Planning statute remains in effect. How
should NWC plan for its investments to meet customer needs consistent with the statute, which
embodies principles still valid in the post-restructuring era?

    RESPECTFULLY SUBMITTED this 31st day of January, 2002.



                        _____
                        Bob Anderson
                        Commissioner

NOR000618