# EXHIBIT 21

# Expert Report of Paul A. Marcus

September 19, 2007


Huron
CONSULTING GROUP



## Statement of Opinions

70. My opinions in this matter are:

I. **The misstatements and omissions in NorthWestern's financial statements, Registration Statement in connection with the $720 million in bonds, and other public disclosures during 2002 enabled the Company to complete the October 2002 $87 million equity offering and the transfer of the NorthWestern Energy L.L.C. assets to NorthWestern in November 2002. Had the true information been disclosed to the public prior to October 8 and November 15, 2002, respectively, the equity offering would not have occurred and the asset transfer would have been impeded by the attempts of security holders and regulators to protect their respective investments and constituents because:**

- The market's knowledge that NorthWestern would never realize a return on or cash flow from its significant investment (including preferred stock and intercompany advances) in its unregulated subsidiaries, Blue Dot and Expanets, would have been accelerated.
- The precipitous drop in NorthWestern's stock price would have been accelerated.
- The downgrading of NorthWestern's credit to below investment grade would have been accelerated.
- NorthWestern would have defaulted on financial covenants related to its $280 million facility for which Credit Suisse First Boston ("CSFB") was the administrative agent.[145]
- CSFB would likely not have funded the $280 million facility.
- The suspension of NorthWestern's dividend would have been accelerated.
- The $390 million debt financing with CSFB would have been unlikely.

71. Even prior to the ultimate announcement of the Company's true problems, NorthWestern was aware of the difficulties and negative financial impact of issuing the upwards of $200 million of equity that the credit rating agencies and regulators were expecting,[146] its bond ratings were continually being reviewed for downgrades,[147] and

---

[145] Depending on context, CSFB refers to itself and other members of the bank group.
[146] Bear Stearns Presentation to NorthWestern Corporation Board of Directors, September 27, 2002, p. 6 (NOR255876). Moody's Investor Services, Global Credit Research Rating Action, Moody's Assigns Baa2 Rating to NorthWestern Corporation's Planned $700 million Note Offering, March 5, 2002. Moody's Press Release: Moody's Places Credit Ratings of NorthWestern Corporation and its Subsidiary NorthWestern Energy, L.L.C. Under Review for Possible Downgrade (Sr. Sec. At Baa1), August 1, 2002 (NOR076208). Standard and Poor's Press Release: NorthWestern Corp.'s Corporate Credit Rating Lowered to 'BB+'; Outlook Remains Negative, December 30, 2002 (NOR058328-32).



its liquidity was drying up.[148] As the true or previously concealed information was revealed over time, NorthWestern was forced to cut its cash dividend payments, saw its stock price plummet, lost its investment grade rating and ultimately declared bankruptcy. Had the information about the Company's problems, which were eventually made known to the marketplace (during press releases and financial disclosures from September 20, 2002 through April 15, 2003) been properly disclosed prior to November 15, 2002, a similar pattern of events, albeit at an earlier point in time, should be expected.

72. As discussed above, if the financial markets had access to accurate financial statements for the first three quarters of 2002 and if they had known that the Company would incur a significant write-off due to the impairment of Expanets and Blue Dot in June 2002 and that the approximately $140 million of EBITDA[149] that those subsidiaries were predicting for 2003 would be well below expectations causing the Company's expected future cash flow to be greatly reduced, the following would have been the immediate impacts:

a) The rating agencies would have likely downgraded the Company's debt during the first quarter of 2002 and in subsequent quarters. It is also likely that in reaction to the second quarter results, the ratings agencies at minimum would have downgraded NorthWestern's unsecured debt to below investment grade.

b) The Company's stock price would have fallen each quarter based on the significantly more pessimistic view of the Company's future prospects.

---

[147] Moody's Investor Services, Global Credit Research Rating Action, Moody's Downgrades Ratings of NorthWestern Corporation (Sr. Sec. To Baa3); Continues to Review Ratings for Possible Further Downgrade, December 20, 2002. Email from C. Thomson to J. Finch and D. Welch Re: Moody's Press Release, November 20, 2001 (CSFB010284-85). Fitch press release: NorthWestern Corp's $720MM Sr Notes Rated 'BBB+' By Fitch Ratings, March 8, 2002. Moody's Press Release: Moody's Places Credit Ratings of NorthWestern Corporation and its Subsidiary NorthWestern Energy, L.L.C. Under Review for Possible Downgrade (Sr. Sec. At Baa1), August 1, 2002 (NOR076208).
[148] Jacobsen Exhibit 7, Memo from K. Orme to M. Lewis, D. Hylland and E. Jacobsen Re: Financing Plans and Considerations, May 28, 2002 (NOR056238).
[149] Bear Stearns Presentation to NorthWestern Corporation, September 20, 2002, p. 3 (NOR057789). NorthWestern Corporation's Second Quarter Earnings Release conference call transcript, August 8, 2002, p. 15 (NOR099947).

31



    c) The Company would have breached the $350 million minimum net worth covenant and exceeded the funded debt to total capital covenant of 72% under its $280 million CSFB credit agreement[150] during the second and third quarters of 2002.[151]

73. As a result of these initial reactions to the release of accurate and truthful financial information, NorthWestern's prospects would have continued to diminish as its financial difficulties, in particular a shortage of cash, would have ultimately led to continued downgrades of its debt, no access to the conventional capital markets for debt or equity financing and the elimination of the Company's dividend. With all of the events occurring somewhat simultaneously in the capital markets (i.e., the release of negatively revised operation performance, ratings downgrades, dropping stock price, need to write-off Expanets and Blue Dot, and debt covenant defaults), the Company's overall financial profile would have been so bad that it would have been unlikely that it could have found a sizable enough source of capital to prevent the eventual bankruptcy filing that actually occurred.

74. Below, I have attempted to discuss each of the relevant factors, beginning with the three listed above, which would have contributed to NorthWestern's precarious financial position prior to November 15, 2002 had all the relevant information been disclosed. While I address them independently, they are frequently interrelated.

*Ratings downgrade*

75. Though the credit ratings for NorthWestern and its secured and unsecured debt were investment grade throughout 2002, a comparison of NorthWestern's financial ratios similar to ratios utilized by S&P to rate utility companies demonstrates that NorthWestern's ratios were indicative of a company with generally lower credit quality. Several mitigating conditions were relied upon by the rating agency to support the higher quality ratings including but not limited to: (1) the planned $200 million equity

---

[150] NorthWestern Form 10-Q for the period June 30, 2002 filed August 14, 2002, Exhibit 10.1, Amendment No. 2 to Credit Agreement, p. 1.
[151] Expert Report of Robert W. Berliner, CPA, CFE, September 19, 2007, Attachments A-1, A-2, A-3, and A-4 to the Basis for Opinion 4.



offering, (2) the transfer of NorthWestern Energy, L.L.C.'s assets to the parent level, and (3) a significant turnaround in the performance of the unregulated subsidiaries.[152]

76. As shown in Exhibit 7, using NorthWestern's restated financials (both Company restated as well as the revised restatements calculated by Mr. Berliner), the above mentioned financial ratios would have firmly indicated a below investment grade credit rating for NorthWestern beginning as early as the first quarter of 2002. To make this determination, I compared the credit ratings indicated by the ratios that NorthWestern would have had throughout 2002 if the true financials had been available to a selection of key utility financial ratios that were defined by S&P in its 2002 Corporate Ratings Criteria report.[153] The results of this comparison combined with the elimination of the above mentioned mitigating factors due to the appropriate disclosures, would have likely caused the Company's corporate and unsecured debt ratings, and its secured debt rating shortly thereafter, to drop to below investment grade.

77. Throughout this period, NorthWestern management understood both the importance of its credit ratings to its ability to obtain debt and equity financing and of its reported income (and the future prospects that are inferred by the reported income) to the determination of those ratings by the agencies. Specifically, as will be discussed, a below investment grade rating would have greatly impaired its ability to issue equity, pay quarterly cash dividends, and draw funds under the $280 million revolver, as well as significantly increased its interest expense.

*NorthWestern stock price drop*

78. Based on my review of available analyst coverage of NorthWestern, a number of issues were identified as contributing to the market's analysis of NorthWestern's future prospects and ultimately its stock price. These factors include but are not limited to

---

[152] Moody's Investor Services, Global Credit Research Rating Action, Moody's Assigns Baa2 Rating to NorthWestern Corporation's Planned $700 million Note Offering, March 5, 2002. Moody's Press Release: Moody's Places Credit Ratings of NorthWestern Corporation and its Subsidiary NorthWestern Energy, L.L.C. Under Review for Possible Downgrade (Sr. Sec. At Baa1), August 1, 2002 (NOR076208). Standard and Poor's Press Release: NorthWestern Corp.'s Corporate Credit Rating Lowered to 'BB+'; Outlook Remains Negative, December 30, 2002 (NOR058328-32). Fitch press release: Fitch Dwngr NorthWestern Corp Sr Sec To 'BBB+'; Outlook Negative, October 14, 2002. E-mail from C. Thomson to J. Finch and D. Welch Re: Moody's Press Release, November 20, 2001 (CSFB010284-85).

[153] S&P 2002 Corporate Ratings Criteria report, pp. 54-55.



leverage, liquidity, operating performance of its utility and unregulated subsidiaries, and the ability to pay dividends.

79. The following events are excerpted from the table in the Background section with the closing stock price on the day of the various actual events indicated. All else being equal, I would expect that a similar trend in the Company's stock price would generally have coincided with the actual disclosure of the information that was previously false or omitted. Regardless of the exact timing, it is reasonable to believe that had the market received all of the relevant information prior to November 15, 2002, it would have severely penalized the Company's stock price prior to that time. Given the content of e-mails and other documents, it is apparent that senior management had a similar understanding about what the market reaction would be and determined not to share the information.[154] Please refer to Exhibit 3 for a more complete diagram of the fluctuations during the relevant period in NorthWestern's stock price.

| Event | Closing price[155] |
|---|---|
| February 15, 2002<br>NorthWestern acquired Montana Power. | $21.60 |
| August 8, 2002<br>NorthWestern reaffirmed $2.30 -$2.55 EPS target for 2002. | $12.30 |
| September 20, 2002<br>NorthWestern filed amended 10-Q's for the first and second quarters of 2002. | $10.00 |
| October 8, 2002<br>NorthWestern completed common stock offering. | $7.48 |
| November 7, 2002<br>NorthWestern lowered its EPS target for 2002 to $1.50 -$1.60. | $7.88 |
| December 13, 2002<br>NorthWestern announced that it would miss its EPS targets and potential of goodwill impairment. | $5.00 |
| April 15, 2003<br>NorthWestern filed its 2002 10-K and restated the first three quarters of 2002. | $2.27 |

*Covenant default*

80. The CSFB $280 million credit facility, which was in place from January 14, 2002[156] until its repayment on February 10, 2003,[157] included financial covenants. The violation of

---

[154] Memo from K. Orme to M. Lewis, D. Hylland and E. Jacobsen, Re: Financing Plans & Considerations, May 5, 2002, pp. 3-5 (NOR056240-42).
[155] Bloomberg stock quote data



any of these covenants would have been considered an Event of Default and would have given CSFB the authority to cease funding the credit facility, demand payment of the full outstanding amount of the loan[158] or prohibit NorthWestern from paying cash dividends.[159]

81. The violation of a financial covenant is a significant negative signal to the market as it is an indication of a company's failing financial health. These covenants, which are typically set with cushion to give a company operating flexibility, are in place to protect lenders from a company with deteriorating financial performance. By setting these covenants at points where the lender believes that the company could still repay its loan, the lender can force the borrower to the negotiating table to allow for a satisfactory restructuring if necessary. Since the ramifications of covenant defaults can include the acceleration of existing loans or the prohibition on new funding, the existence of a default is material to the capital market's assessment of a company's financial status. At its extreme, a covenant default can call into question a company's ability to function as a going concern.

82. The three covenants were:

- Minimum net worth of the company must be at least $350 million on the last day of any fiscal quarter.[160]
- The funded debt to total capital ratio must not exceed 72% on the last day of any fiscal quarter prior to the termination date.[161]
- The utility business EBITDA to consolidated recourse interest expense ratio on the last day of any fiscal period must not be less than 2 to 1.[162]

83. Based on the covenant calculations provided by Mr. Berliner, beginning June 30, 2002 and continuing through the year, NorthWestern's net worth would have been below $350.[163] Additionally, NorthWestern's funded debt to total capital ratio would have

---

[156] NorthWestern Form 10-K405 for the period December 31, 2001 filed April 1, 2002, Exhibit 10(b)(1), p. 1.
[157] NorthWestern Form 10-K for the period December 31, 2002 filed April 15, 2003, p. 61.
[158] Form 10-K405 for the period December 31, 2001 filed April 1, 2002, Exhibit 10(b)(1), pp. 63, 70, 72.
[159] NorthWestern Form 10-K405 for the period December 31, 2001 filed April 1, 2002, Exhibit 10(b)(1), pp. 66-67.
[160] NorthWestern Form 10-K405 for the period December 31, 2001 filed April 1, 2002, Exhibit 10(b)(1), p. 63.
[161] NorthWestern Form 10-Q for the period June 30, 2002 filed August 14, 2002, Exhibit 10.1, Amendment No. 2 to Credit Agreement, p. 1.
[162] NorthWestern Form 10-Q for the period June 30, 2002 filed August 14, 2002, Exhibit 10.1, Amendment No. 2 to Credit Agreement, p. 2.
[163] Expert Report of Robert W. Berliner, CPA, CFE, September 19, 2007, Attachments A-1 and A-2 to the Basis for Opinion 4.

**Huron**
CONSULTING GROUP

exceeded 72% during the same period.[164] NorthWestern would therefore have been in violation of its minimum net worth and funded debt to total capital ratio covenants during that period and subject to the consequences of those violations, which I discuss below.

*Funding of CSFB $280 million credit facility*

84. Given the covenant default, one of the first financing issues that the Company would have faced is the funding of the CSFB $280 million revolving credit facility.[165] As calculated by Mr. Berliner, NorthWestern would have been in violation of two financial covenants at that time.

85. The default would have given a majority of the bank group the right to terminate their commitment or accelerate their loans,[166] which all else being equal would have, put NorthWestern into a negative cash position in the next quarter when it had debt repayments of over $150 million coming due.[167] As of June 30, 2002, NorthWestern's cash balance was approximately $80 million and during the third quarter, operations generated only $3 million in cash.[168] With few if any sources of additional funds, NorthWestern would not have been able to make the debt repayments if CSFB did not provide the funds. The outstanding amount borrowed under the revolver increased from $0 at the end of the second quarter[169] to $231 million at the end of the third quarter,[170] because, among other things, NorthWestern used draws on the revolver to pay off the debt that matured in September. Specifically, as of August 7, 2002, the balance on the revolver was $35 million with $11.7 million in letters of credit outstanding.[171] As of September 9, 2002, the balance was $68 million with $19.6

---

[164] Expert Report of Robert W. Berliner, CPA, CFE, September 19, 2007, Attachments A-3 and A-4 to the Basis for Opinion 4.
[165] NorthWestern Form 10-Q for the period June 30, 2002 filed August 14, 2002, p. 29.
[166] NorthWestern Form 10-K405 for the period December 31, 2001 filed April 1, 2002, Exhibit 10(b)(1), p. 72.
[167] NorthWestern Form 10-Q/A for the period June 30, 2002 filed April 15, 2003, pp. 49-53. NorthWestern Form 10-Q/A for the period September 30, 2002 filed April 15, 2003, pp. 52-53.
[168] NorthWestern Form 10-Q for the period June 30, 2002 filed August 14, 2002, Consolidated Statement of Cash Flows, pp. 4-5. NorthWestern Form 10-Q for the period September 30, 2002 filed November 14, 2002, Consolidated Statement of Cash Flows, pp. 4-5.
[169] NorthWestern Form 10-Q/A for the period June 30, 2002 filed April 15, 2003, pp. 49-53.
[170] NorthWestern Form 10-Q/A for the period September 30, 2002 filed April 15, 2003, p. 52.
[171] NorthWestern Form 10-Q for the period June 30, 2002 filed August 14, 2002, p. 29.

36



million in letters of credit outstanding,[172] and the balance increased to $231 million by the end of the month.

86. Additionally, because NorthWestern had not drawn on the CSFB facility at the end of the second quarter, CSFB would have been well positioned not to fund when the truth about NorthWestern's financially stressed situation was disclosed.

*$87 million equity offering*

87. The market's realization that the Company's future prospects were significantly worse due to the proper disclosure of information, combined with the likely negative reaction of the rating agencies and the stock price, and the defaulted status of its only present accessible source of credit financing (the CSFB credit facility) would have had a significant negative effect on the Company's ability to raise equity.

88. First, the maintenance of an investment grade credit rating was a condition of the underwriting agreement.[173] Independent of that agreement, the need for the Company to maintain its credit rating as an important factor in raising equity was also acknowledged by NorthWestern management: "Q. So to the extent NorthWestern wanted to close on the equity offering, it was important for the rating not to change, correct? A. That's one factor, yes."[174]

89. Second, as a result of its "junk bond" status and covenant default, the Company would have been unappealing to the debt markets; therefore, the equity markets (which rely on utility companies' ability to obtain large amounts of debt capital to fund themselves) would have been uninterested in investing in NorthWestern due to its nearly illiquid position.

90. Third, there was a high likelihood that the Company's stock price would have dropped significantly due the market's revised expectations regarding NorthWestern's future prospects causing an equity offering to be prohibitively dilutive and costly. As two quarters of consolidated EBITDA falling well below expectations would have been

---

[172] NorthWestern Form 10-Q/A for the period June 30, 2002 filed September 20, 2002, p. 38.
[173] NorthWestern Form 8-K for the period October 2, 2002 filed October 8, 2002, Exhibit 1.1, p. 12.
[174] Deposition of Eric Jacobsen, June 19, 2007, p. 155.



released by October 2002, as well as negative EBITDA at Expanets and the other disclosures described above,[175] and according to Mr. Berliner, a portion of the impairment would been recorded in the second quarter, a decline, similar to the one that actually occurred, in the Company's stock price would have occurred by October 2002. As the SEC stated, "NorthWestern recognized that improvement in the performance of both Expanets and Blue Dot was critical to its planned equity offering."[176]

91. These factors combined with the fact that the equity markets were increasingly tight throughout 2002, particularly for utilities, and not receptive to companies with high leverage and negative operating trends lead to the conclusion that the Company would have been unable to complete the October 2002 equity offering that raised $81 million in net proceeds.

92. With public equity financing ruled out as a reasonable financing alternative, NorthWestern would have considered private equity as an option to raise capital. However, the Company had endeavored to raise funds privately in September 2002 but was unable to complete this type of transaction as discussed by Bear Stearns: "Evercore [private equity firm] has completed its diligence efforts and has decided that it is not comfortable with a $200M investment... Primary reasons were: Structural concerns (secured vs. unsecured nature of investment) coupled with lack of visibility at Expanets".[177] These concerns were expressed prior to disclosure of the restated and omitted information. Visibility would have only increased Evercore's concerns.

93. Additionally, the $87 million equity offering that was completed was insufficient for the ratings agencies and for the equity analysts to change their negative opinions about the Company and was completed under false pretenses. The $8.75 share price[178] was troubling to the market as described in the following: "The company has previously indicated that it plans to issue approximately $200 million in new equity to strengthen

---

[175] NorthWestern Form 10-Q for the period March 31, 2002 filed April 15, 2003, p. 17. NorthWestern Form 10-Q for the period June 30, 2002 filed April 15, 2003, p. 23.
[176] Securities and Exchange Commission, Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934, March 7, 2007, p. 3.
[177] Bear Stearns Presentation to NorthWestern Corporation, September 20, 2002, p. 1 (NOR057787).
[178] NorthWestern Form 8-K for the period October 2, 2002 filed October 8, 2002, Exhibit 1.1, Schedule B.



its balance sheet. NorthWestern recently completed the sale of 10.0 million shares at $8.75. We expect further balance sheet strengthening may be required, either through additional equity sales and/or the sale of non-strategic assets."[179]

94. In addition, the equity offering did not alleviate the liquidity crisis NorthWestern was facing. A month later, in a November 15, 2002 Action Plan memo, Gary Drook, Chairman of Corporate Governance Committee of the Board of Directors of NorthWestern, wrote the following to Merle Lewis, CEO of NorthWestern and Richard Hylland:

> Diligently and expeditiously work to replace or amend the existing Company credit facility with CSFB as soon as possible... explore whether any financial sponsors or mezzanine funds would consider a debt for equity swap... Continue to pursue cost savings that can be accomplished within the next three months. Consider, among other things, (a) sell plane, (b) reduction in corporate events and contributions, (c) reduction in corporate personnel, (d) senior management compensation plans ... Consider nothing as sacred.[180]

95. The measures recommended in the memo reflect a growing desperation at the Company and a clear understanding of the severity of its situation.

96. With the promised equity offering not completed in 2002, had the proper financial disclosures been made, an additional ratings downgrade (more severe than the one following the agencies' disappointment at only raising $87 million in the October 2002 equity offering) would likely have occurred. The likelihood of this impact had been communicated by Bear Stearns to NorthWestern when it presented financing alternatives in September 2002: "Rating agencies will most likely downgrade debt due to no 'equity' component in the financing strategy".[181]

97. NorthWestern management clearly understood the debt market's expectation of an equity offering:

> During our March offering of the $720M in bonds we explicitly stated our intent to subsequently issue $200M equity in the near future and to use these proceeds, along with the Colstrip sale proceeds, to pay down debt.

---

[179] UBS Warburg, Global Equity Research, NorthWestern Corp., November 7, 2002.
[180] Memorandum Gary G. Drook to Merle D. Lewis and Richard R Hylland, Action Plan, November 15, 2002 (NOR521188-90).
[181] Bear Stearns Presentation to NorthWestern Corporation Board of Directors, September 27, 2002, p. 7 (NOR255877).

39



> To be fair, our bonds were issued at spreads significantly greater than comparable BBB companies, so a certain degree of uncertainty was originally priced into our bonds. Nevertheless, these same bondholders are now growing impatient as to our stock issuance (though, it is entirely likely that various of our bondholders have also taken short positions, thereby hedging their risks.) Our bonds have recently traded much wider than even the original spreads and the ability to sell our bonds is somewhat limited currently. Should we subsequently delay our equity offering there will be a negative repercussions with our bondholders and make it difficult to access this market in the future (at least until we subsequently perform against our original representations).[182]

98. The less than expected equity offering caused Fitch to downgrade each of its credit ratings for NorthWestern in October 2002.[183] The lack of equity was also cited as a contributing factor in later downgrades by S&P and Moody's.[184]

99. NorthWestern's management also concealed important facts that might have disrupted the offering. As an example, the billing and collectability problems at Expanets, which were known to NorthWestern management by October 2002,[185] were not disclosed in the prospectus related to the equity offering. In fact, the Expert system, which was the cause, was described as "operational" and generating "savings".

> In November 2001, Expanets installed an enterprise software system, the EXPERT system, and although additional costs have been incurred during 2002 to enhance the system's operational capabilities, the system has eliminated redundant costs incurred under the former transition service agreements executed with Avaya as part of the original Lucent GEM acquisition. The system is now operational and savings are expected to continue throughout 2002 both from efficiencies and the reduction of non-capitalizable integration costs from the project.[186]

*Suspension of cash dividend payment*

100. A further complication related to the violation of the financial covenants in the second quarter of 2002 is that the CSFB credit agreement provided that the Company could

---

[182] Jacobsen Exhibit 7, Memo from K. Orme to M. Lewis, D. Hylland and E. Jacobsen Re: Financing Plans and Considerations, May 28, 2002 (NOR056240-41).
[183] Fitch press release: Fitch Dwngr NorthWestern Corp Sr Sec To 'BBB+'; Outlook Negative, October 14, 2002.
[184] Moody's Investor Services, Global Credit Research Rating Action, December 20, 2002 (NOR99652-53). Standard & Poor's Press Release: NorthWestern Corp.'s Corporate Credit Rating Lowered to 'BB+'; Outlook Remains Negative, December 30, 2002 (NOR058328-32).
[185] Fresia Exhibit 13, Timeline of key events (ultimately) leading to 12/31/02 reserve (NOR306791-92).
[186] NorthWestern Corp. Form 424B2 filed October 3, 2002. S-41.

<small>
</small>



not pay dividends.[187] Similarly, the credit agreement provided that if NorthWestern's credit rating was downgraded to below BBB- by S&P and below Baa3 by Moody's which would have likely occurred as early as the first quarter,[188] the dividend would have to be suspended.[189]

101. This situation was noted by Merrill Lynch in August 2002:

> If for whatever reason NOR is unable to maintain its recent strength of operations (particularly in telecom), the dividend could be at risk. Moreover, given covenants on its bank line, in the event that its credit is downgraded to below investment grade, the common dividend would be suspended until credit strength is restored. Importantly, NOR's current debt rating remains two notches above junk (BBB2/negative outlook) and the Company's intent to ultimately raise $150-$200mm in new private and public equity is targeted to maintain its BBB rating.[190]

102. However, even if NorthWestern was allowed to pay dividends and the CSFB facility was fully funded because of a waiver, NorthWestern's realization of the unregulated subsidiaries failure to return any of NorthWestern's investments ($966.5 million at December 31, 2002[191]) nor provide any source of future cash flow to help reduce its highly leveraged balance sheet, would have forced NorthWestern to reevaluate the payment of cash dividends.

103. Bear Stearns, as financial advisor to the Company, repeatedly recommended that NorthWestern reduce or eliminate its dividend in September 2002 as a way to shore up the Company's balance sheet and maximize the return to its investors. Specifically, Bear Stearns stated in its September 23 presentation to NorthWestern, "[p]rovided management achieves its projections, all of the financing alternatives, coupled with a suspension in the dividend, will provide significantly more value to shareholders than proceeding with the common equity capital raising alternative... the suspension of the dividend alternative remains superior to the common equity offering..."[192]

---

[187] NorthWestern Form 10-K405 for the period December 31, 2001 filed April 1, 2002, Exhibit 10(b)(1), pp. 66-67.
[188] See Exhibit 4.
[189] NorthWestern Corp. Form 424B2 filed October 3, 2002, S-9. NorthWestern Form 10-Q for the period June 30, 2002 filed August 14, 2002, Exhibit 10.1, Amendment No. 2 to Credit Agreement, p. 2.
[190] Merrill Lynch, NorthWestern Corp., Too Many Uncertainties for Today's Market, August 19, 2002 (NOR026462).
[191] NorthWestern Form 10-K for the period December 31, 2002 filed April 15, 2003, pp. 25, 28.
[192] Bear Stearns Presentation to NorthWestern Corporation, September 23, 2002, pp. 3-4 (NOR057819-20).



104. Notably, Bear Stearns' recommendations to the Board were made at a time when the Company's bleak prospects were still concealed. It appears that NorthWestern resisted this advice to maintain the false appearance of normalcy being well aware that the negative consequences of a suspension of its dividend could include a drop in the stock price and "WSJ front-page exposure."[193] As NorthWestern determined that it would go to market with an equity offering in October 2002, it understood that an announcement related to a reduction or suspension in its dividend would be detrimental to the offering because as Bear Stearns communicated in another presentation to NorthWestern, the "...Company's short-term share price may be under significant pressure if a dividend suspension is announced."[194] Morgan Stanley explained this relationship in one of its reports on NorthWestern: "Our valuation is primarily yield driven. Any material change in the outlook for the dividend could affect the market's valuation of these shares."[195]

105. Indeed, when NorthWestern eventually announced that it was even deferring the decision to declare a dividend on February 6, 2003,[196] its stock price fell to $3.95 from $4.90 the day before. And when it announced the suspension of the dividend on February 19, 2003[197] the stock price fell to $2.60 – a nearly 50% decline in only two weeks.

106. In its Final Order related to the approval of the issuance of First Mortgage Bonds in connection with the CSFB $390 million term loan, even the MPSC stated its expectation that dividend reduction would be explored by NorthWestern:

> By approving this security application, subject to the conditions contained in this Order, the Commission is not satisfied that NorthWestern has pursued all available options for digging out of the financial crisis which threatens utility service quality and rates. The Commission expects the board of directors and management, to fully examine all options, including but not limited to: dividend policy and payouts; board of directors and senior management compensation levels and concessions; disposition of

---

[193] Bear Stearns Presentation to NorthWestern Corporation, September 27, 2002, p. 3 (NOR255873).
[194] Bear Stearns Presentation to NorthWestern Corporation, September 27, 2002, p. 3 (NOR057873).
[195] UBS Warburg, Global Equity Research, NorthWestern Corp., November 7, 2002, p. 2.
[196] Press Release: NorthWestern's Board of Directors Defers Dividend Decision, February 6, 2003.
[197] Press Release: NorthWestern Corporation Outlines Turnaround Plan Company Will Focus on Core Utility Business, Improving Liquidity and Paying Down Debt Common Stock Dividend Suspended Company Projects Charges of Approximately $700 Million in 2002, February 19, 2003.



non-utility assts/operations; and sale of the Montana First Megawatts project, or a portion thereof.[198]

107. The announcement of a dividend suspension would have resulted in further pressure on the Company's bond rating to the extent that it limited its ability to raise equity to improve its overleveraged balance sheet.

*$390 million CSFB financing*

108. By early October 2002, had all of the accurate information been known, NorthWestern's ability to meet its obligations would have been questionable. That fact combined with the inability to raise equity would have made it difficult to refinance the CSFB $280 million revolving credit facility (assuming that CSFB funded the facility in light of the above mentioned covenant defaults and greatly reduced prospects) with the CSFB $390 million senior secured term loan (backed by first mortgage bonds of all three operating utilities), particularly under the same terms and conditions as in the actual February 2003 financing. An important note is that the use of the $390 million of first mortgage collateral appears to cause NorthWestern to reach the maximum amount of First Mortgage Bonds that it can offer;[199] and therefore, would have prohibited the Company could not issue any additional first mortgage bonds as collateral for any new financing, its only practical option for raising capital with its very weak credit characteristics.

109. Furthermore, even if NorthWestern would have been able to complete the refinancing, the net $86 million ($366 million less $280 million)[200] would have done little to change the Company's prospects other than to postpone the inevitable demise of the Company.

110. One reason this financing was completed in the first place was to convert CSFB's outstanding $280 million credit facility to a facility secured by First Mortgage Bonds. CSFB essentially swapped its unsecured $280 million position for a $390 million fully

---

[198] Department of Public Service Regulation before the Public Service Commission of the State of Montana, In the Matter of the Application of NorthWestern Corporation for Authority to Consummate a Credit Agreement and Issue $390 Million in Principal Amount of Secured Long-Term Notes in the Form of First Mortgage Bonds, Final Order, January 27, 2003, p. 9 (NOR001614).
[199] NorthWestern Form 10-K for the period December 31, 2002 filed April 15, 2003, p. 63.
[200] NorthWestern Form 10-K for the period December 31, 2002 filed April 15, 2003, p. 6. RBC Capital Markets, NorthWestern Corporation, Pessimism Overhangs Stock, February 18, 2003, p. 23.

43



secured term loan. Other lenders (or CSFB if it did not have an existing loan) would not have had the incentive to lend into a new credit with junk ratings and severely limited prospects for recovery.

111. In addition, the MPSC had to approve the issuance of Montana First Mortgage Bonds for the $390 million loan. If that approval had been required before the going flat transaction, but after the serious questions about NorthWestern's viability were revealed, the MPSC would have had little incentive to grant the use of Montana First Mortgage Bonds as doing so would further expose the Montana rate payers to NorthWestern's risk.

112. As will be discussed in greater detail in the following section, members of the MPSC felt that they had been misled by NorthWestern and were concerned about the impact NorthWestern's financial condition would have on Montana consumers. This, at a time when it was not fully aware of all of NorthWestern's problems with its subsidiaries and other liquidity issues. Enumerating its disturbances, the MSPC noted specifically the fact that certain of NorthWestern's credit ratings were below investment grade as well as the significant funding requirements of the Montana First Megawatts project, Expanets, Blue Dot, and CornerStone.[201]

113. In his dissenting opinion, one of the Commissioners stated,

> The applicant has presented the Commission with a "fait accompli" by using part of the credit facility used in the purchase of MPC to finance non-utility ventures. Now that it is the time to restructure the credit facility the Commission is asked to sanction the use of utility assets to secure the debt of the non-utilities as well. This has been presented to the Commission as a unique event, the applicant is in desperate financial conditions and the utility itself is threatened by the conditions that face the applicant.
>
> The Commission should not succumb to the exigency of imminent crisis and establish precedent that will undoubtedly be visited in the future. The non-utility businesses are beyond the regulatory scope of the Commission. Profits, losses or catastrophic failures of non-utility

---

[201] Department of Public Service Regulation before the Public Service Commission of the State of Montana, In the Matter of the Application of NorthWestern Corporation for Authority to Consummate a Credit Agreement and Issue $390 Million in Principal Amount of Secured Long-Term Notes in the Form of First Mortgage Bonds, Final Order, January 27, 2003, p. 5 (NOR001610).



operations are beyond regulatory reach, hence regulated assets should not be tendered as security for those business ventures.[202]

114. Additionally, many of the reasons that formed the bases for the CSFB team's recommendation in November 2002, to proceed with the underwriting and syndicating of the financing to its Investment Banking Committee were later exposed to be false. These include:

- "Strong financial covenants... The proposed collateral is a first priority perfected security interest in validly issued and outstanding first mortgage bonds. The collateral represents at least 100% of the principal amount of the credit facility. NorthWestern's senior secured first mortgage bonds are rated Baa1/BBB"[203]
- "Credit facility will receive a private rating equal to NorthWestern Energy's senior secured rating (Baa1/BBB+)"[204]
- "NorthWestern is committed to strengthening its balance sheet and has embarked upon a program aimed at reducing debt by approximately $900 million over the next six years, through the issuance of equity and the sale of various non-core assets."[205]
- "NorthWestern management has assumed the following in it base case projections... $65.0 million in proceeds from the sale of Colstrip in Q3:2003 are used to repay debt at NorthWestern Energy - Montana"[206]
- "Continued improvement in unregulated businesses and full insulation from risks... Priority access to cash flows from Blue Dot and Exp@nets."[207]

115. Specifically, regarding Expanets, CSFB noted:

NorthWestern's investment in Exp@nets has created one of the nation's leading providers of networked communications and data services and solutions to medium-sized businesses.... Exp@nets plans to generate increasing cash flows from this business through organic growth by broadening the services and products it offers, focusing on higher growth and higher margin services, building recurring maintenance and service revenues and fostering existing and developing supply relationships with the leading technology companies... it is expected that Exp@nets will be

---

[202] Dissenting Opinion of Commissioner Brainard, Docket No. D2002.12.159, January 24, 2003 (NOR001617).
[203] Credit Suisse First Boston Submission to the Credit Committee $400,000,000 Senior Secured Credit Facility, November 2002, p. 7 (CSFB016305).
[204] Credit Suisse First Boston Submission to the Credit Committee $400,000,000 Senior Secured Credit Facility, November 2002, p. 8 (CSFB016306).
[205] Credit Suisse First Boston Submission to the Credit Committee $400,000,000 Senior Secured Credit Facility, November 2002, p. 18 (CSFB016316).
[206] Credit Suisse First Boston Submission to the Credit Committee $400,000,000 Senior Secured Credit Facility, November 2002, p. 22 (CSFB016320).
[207] Credit Suisse First Boston Submission to the Credit Committee $400,000,000 Senior Secured Credit Facility, November 2002, p. 8 (CSFB016306).

**Huron**
CONSULTING GROUP

positioned to deliver improved performance in 2002, having generated $56.2 million of EBITDA in the nine months ending September 30, 2003.[208]

116. Regarding Blue Dot, CSFB wrote:

> NorthWestern's management has also put in place an operational improvement plan aimed at improving Blue Dot's financial performance... As a result, Blue Dot's financial performance considerably increased over the last year [2001].[209]

117. Other than the collateral (which might not have been available as described above), each of these reasons would have been proven wrong had the Company made full disclosure of its problems.

*Transfer of NorthWestern Energy, L.L.C. assets*

118. On November 15, 2002, the Montana utility assets and liabilities of NorthWestern Energy, L.L.C., with the exception of the Milltown Dam, were transferred to NorthWestern. When the assets were initially acquired in February 2002, they were held as a subsidiary of NorthWestern.[210] As 2002 unfolded, however, and NorthWestern's leverage and liquidity situation worsened, maintenance of NorthWestern's credit rating continued to depend on the transfer of the Montana utility assets. When it was discussed at NorthWestern's board meeting, this fact was acknowledged as the impetus for the transfer: "NorthWestern Corporation believes it is advisable for rating agency purposes to move the assets of its wholly owned subsidiary, NorthWestern Energy LLC... to the Corporation to more directly support the obligations of the Corporation".[211]

119. The full consequences on ratings as well other financing activities of not transferring the assets were well known to NorthWestern. As Dennis Lopach, Senior Vice

---

[208] Credit Suisse First Boston Submission to the Credit Committee $400,000,000 Senior Secured Credit Facility, November 2002, pp. 11-12 (CSFB016309-10).
[209] Credit Suisse First Boston Submission to the Credit Committee $400,000,000 Senior Secured Credit Facility, November 2002, p. 16 (CSFB016314).
[210] NorthWestern Form 10-K for the period December 31, 2002 filed April 15, 2003, p. 5.
[211] NorthWestern Corporation, Board of Directors meeting, Minutes of Regular Meeting, August 7, 2002 (NOR009571).

Case 1:05-cv-00499-JJF    Document 285-22    Filed 11/30/2007    Page 20 of 20



President of Administrative Services at NorthWestern in 2002,[212] stated in his affidavit related to litigation attempting to stop the transfer, "[t]he continued ability of NOR to obtain the capital it relies upon to operate the utility businesses on reasonable terms is at risk if the restructuring is delayed. Moody's specifically noted that a delay in restructuring would likely result in a downgrade of NOR's rated debt, resulting in higher interest costs and, potentially, a reduced ability to obtain funds in the future."[213]

120. Had the true financial situation of NorthWestern been disclosed in a timely manner during 2002, the Company's likely inability to finance itself would have clearly been established by October 2002, for all the reasons discussed above. Prior to the time of the transfer in November 2002, the equity offering would have been cancelled, there would have been a default under the Company's credit facility, and it is likely that NorthWestern would have been in a negative cash situation due to its maturing debt and would have suspended its dividend.

121. Regarding the transfer, Michael Hanson, president and CEO of NorthWestern Energy in 2002,[214] stated that in executing the officer's certificate in connection with the transfer of the assets, he relied on NorthWestern's false and misleading financial statements.[215]

122. Given the dire circumstances, the transfer of the NorthWestern Energy L.L.C. assets likely would have been opposed by the stakeholders, including those holding the QUIPS, because it would have been apparent to these stakeholders that the prospects of being repaid by NorthWestern Energy L.L.C. were significantly better than the prospects of being repaid by NorthWestern.

123. Among these stakeholders would have also been the MPSC based on the concerns it expressed when NorthWestern requested approval from the Commission to issue Montana First Mortgage Bonds for the $390 CFSB financing in early 2003. At that time the Commission stated the following concerns about the financial health of NorthWestern and its potential impact on Montana consumers:

---

[212] Hanson Exhibit 11, Affidavit of Dennis Lopach, p. 2.
[213] Hanson Exhibit 11, Affidavit of Dennis Lopach, p. 7.
[214] "NorthWestern Energy ... was the trade name given to the utility operations in all three states..." Deposition of Michael Hanson, June 27, 2007, p. 9.
[215] Deposition of Michael Hanson, June 27, 2007, pp. 272-285.

47