# EXHIBIT 35

Preparer: CRA 4/9/2003
Reviewer: SLP 4/9/2003 CWH 4/15/2003

NOR Going Concern Memo                                                2361: 1/3

Date:    April 2, 2003
To:      The Files
From:    Cliff Hoffman, Craig R. Arends
Subject: NorthWestern Corporation – Going Concern Analysis

**Summary**

During our assessment of NorthWestern Corporation (NOR or the Company) as a going concern, we considered several factors as possible risks, e.g. significant goodwill and intangible write-downs, negative equity, recurring losses from operations, allowed rate of return by the utility commissions, etc. However, we believe that within the next year, NOR has access to necessary capital to continue as a going concern although we do note that the performance of the regulated Utility operations for 2003 and beyond, is critical to NOR. Additionally, in accordance with AUD 16 P26.06, as we have determined that the going concern assumption is appropriate without management's plans for future action (e.g. assets sales, A/R factoring, etc.) we are not required to consult with the RPPD. However discussions were held with the Minneapolis practice director (Pat Prunty) and the risk partner (Jan Umbaugh) assigned to Northwestern.

**Background**

During our conversations with NOR's management and meetings between Gary Drook, interim CEO, Becky Roof, Alix Partners, Kipp Orme, CFO and Mike Nieman, senior financial analyst for NOR, Cliff Hoffman, D&T audit partner, Steve Polacek, D&T audit partner, and Craig Arends, D&T senior manager, we noted that they prepared a base case scenario that included 1) asset sales, 2) small EBITDA contributions from Expanets and Blue Dot and 3) approximately 2% growth in its Utility operations. This scenario concluded that the Company would have significant cash, i.e. over $100 million, at the end of December 2003 and no debt covenant compliance issues.

However, during our conversation we requested NOR to perform sensitivity analysis on its base case. With the assistance of Alix Partners, a turnaround consulting firm hired by the Company, NOR prepared a "Utility only downside scenario"; see the attached financial model with debt covenant schedules. Significant assumption changes included 1) no asset sales, 2) no EBITDA contribution from Expanets and Blue Dot and 3) utility operations at 10% below budget from an EBITDA perspective. It should be noted that the Company's 2003 budget compared to 2002 actual results for the regulated utilities project approximately 2% growth, after giving pro-forma effect to January 2002 Montana Power results. The results of the Company's sensitivity analysis indicate that for 2003 and 2004 NOR would be in compliance with debt covenants and would have cash to operate, provided that the preferred dividend is deferred commencing in the second quarter of 2003 forward for the five year allowable deferral period.

**Conclusion**

Our conclusion is based on the following:

---
NorthWestern Corporation 2002 [Restored]
Period End: 12/31/2002

Preparer: CRA 4/9/2003
Reviewer: SLP 4/9/2003 CWH 4/15/2003

NOR Going Concern Memo                                    2361: 2/3

*1) NOR has cash liquidity and ability to be debt covenant compliant.*

As of December 31, 2002, NOR has unrestricted cash and cash equivalents of approximately $45.5 million and unrestricted investments of approximately $50 million. Additionally, while the "downside" analysis assume no assets sales, individuals with industry experience have indicated to us that the Montana First Megawatts' turbines could be sold quickly for $25 million and NOR believes that Colstrip Units #1-3 could be sold in a relatively short timeframe (i.e. 3 – 6 months) for $65 million. These events could provide liquidity for fiscal 2003. Finally, the December 31, 2002 cash and investment balances provide NOR financial flexibility during 2003 and 2004. The "downside" analysis indicated that the Company would have approximately $27 million of unrestricted cash as of December 31, 2003 and approximately $22 million of unrestricted cash as of December 31, 2004.

*2) NOR has flexibility in paying its trust preferred stock dividends*

As disclosed in its 10-K, if necessary, NOR could not pay the $29 million in cash dividends on its trust preferred securities in order to either 1) pay down debt to ensure compliance with its covenants and/or 2) prevent a liquidity crisis. NOR management indicated that this flexibility is available and can be accomplished without adverse consequences to other obligations of NOR. There is no penalty to NOR for not making these payments for the allowable five year period.

*3) NOR has flexibility in its projected capital expenditures*

Another option for NOR, although limited in nature due to the requirements of a regulated utility transmission and distribution business, to ensure liquidity and debt covenant compliance is to reduce capital expenditures in order to directly pay down debt or to avoid increasing debt, thus improving its EBITDA to Total Debt ratio. Management believes that it maintains flexibility in this area due to the fact that certain projects can be deferred into the next fiscal period.

*4) Reliability of NOR's sensitivity analysis*

Finally, management believes that its original or base financial forecast for 2003 is attainable and that the downside financial forecast is a worst case scenario due to 1) the regulated utility operations historically have not had significant volatility in their core regulated operations and 2) the exposure on Expanets and Blue Dot during 2003 is limited by $10 million in regulator funding restrictions in place from the $390 million credit facility that was consummated in February 2003.

*5) The Company believes it has two strategic buyers for Expanets*

Based upon our discussions with Alix Partners and interim CEO Gary Drook, as of the date of this memo there are two strategic buyers of Expanets conducting due diligence. Alix Partners and Drook believe the offers from these two buyers, who are already in the telecommunication business and who have financial systems (they would not need Expert) will be approximately $175 million. With the Avaya settlement in March 2003 of $26 million, if the Company receives in excess of $149 million for Expanets there would be a gain and a significant improvement in liquidity.

*6) Regulated operations first quarter of 2003 better than 2002*

Preliminary results through February 2003 for regulated operations indicate that actual operations are better than 2002 and approximately 5% below budget 2003. Historically, first quarter results are a strong

North Western Corporation 2002 [Restored]
Period End: 12/31/2002

CONFIDENTIAL

Preparer: CRA 4/9/2003
Reviewer: SLP 4/9/2003 CWH 4/15/2003

2361: 3/3

NOR Going Concern Memo

indicator of year end results. Therefore, it would appear that the regulated operations will be better than 90% of budget for 2003.

**Technical Literature**

**AAPMS POLICY:**

.P01    If we conclude, after considering identified conditions and events and management's plans, that substantial doubt remains about the entity's ability to continue as a going concern for a reasonable period of time [defined by SAS 59 (AU 341) as "a period not to exceed one year beyond the date of the financial statements being audited"], our report should be modified to clearly identify those matters that individually or collectively raise substantial doubt. Judgment should be applied in the application of the concept of "a reasonable period of time" so that the one-year period is not applied mechanically.

.P02    If we conclude that there is not substantial doubt after considering management's plans, we should not include a going concern uncertainty explanatory paragraph in our auditors' report, but we should evaluate the adequacy of the disclosure in the financial statements about the conditions and events that initially caused us to believe that there was substantial doubt and the mitigating factors. In addition, we should consider whether it may be appropriate to add an emphasis of a matter paragraph to our report. (See paragraphs .006-.007.)

.006    If we conclude that there is not substantial doubt after evaluating management's plans, we should not include a going concern uncertainty explanatory paragraph in our audit report, but we should evaluate the adequacy of the disclosure in the financial statements of the conditions and events that initially caused us to believe there was substantial doubt and the mitigating factors, including management's plans. We should also consider whether it may be appropriate to add an emphasis of a matter paragraph to our report; however, the wording of such a paragraph should not imply that we may have substantial doubt. Refer to AAPMS REP 225 for guidance concerning the wording of an emphasis of a matter paragraph.

.007    If we conclude, after considering any identified conditions and events that raise doubts about the entity's ability to continue as a going concern and management's plans for dealing with such conditions and events, that substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time remains, we should (1) consider the adequacy of disclosure about the entity's possible inability to continue as a going concern, and (2) include a going concern uncertainty explanatory paragraph in our report following our opinion paragraph to reflect that conclusion (as illustrated in Example A-1).

We believe that AAPMS .P02 applies and that appropriate disclosure of managements plans in Footnote 1, Risk Factors in the 10-K and Liquidity in the 10-K are appropriate. We believe that the cash obligations table discussed above gives the readers of the Company's financials statements appropriate financial transparency and clearly demonstrates that the Company will need substantial debt restructuring in 2005.

NorthWestern Corporation 2002 [Restored]
Period End: 12/31/2002

CONFIDENTIAL

DT 005421