**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 04-1494-(JJF) |
| NORTHWESTERN CORPORATION, | ) ) | PUBLIC VERSION |
| Defendant. | ) ) ) | |
| MAGTEN ASSET MANAGEMENT CORP., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-499 (JJF) |
| MICHAEL J. HANSON and ERNIE J. KINDT, | ) ) | PUBLIC VERSION |
| Defendants. | ) ) | |

**BRIEF OF MAGTEN ASSET MANAGEMENT CORPORATION**
**IN OPPOSITION TO MICHAEL J. HANSON AND**
**ERNIE J. KINDT'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ..................................................................................................................... 4

I.    DEFENDANTS CANNOT USE THE TIMING OF MAGTEN'S
      PURCHASES AS AN EXCUSE FOR AVOIDING THE MERITS OF THE
      CASE .................................................................................................................... 5

      A.  Defendants Have Already Litigated and Lost This Issue. ........................... 5

      B.  Even If Defendants Were Free to Relitigate the Issue, Their Arguments
          Would Fail. .................................................................................................. 7

      C.  Any Remaining Issues Related to the Timing of the QUIPS Purchases Can
          Be Cured by Amendment .............................................................................. 10

II.   THERE IS MORE THAN ENOUGH EVIDENCE TO CREATE A
      GENUINE FACTUAL DISPUTE AS TO THE DEFENDANTS'
      VIOLATION OF THEIR FIDUCIARY DUTIES TO CLARK FORK .................. 11

      A.  Applicable Legal Standards. ...................................................................... 11

          1.  Neither the Statute Nor Clark Fork's Governing Documents Preclude
              Liability for Ordinary Negligence. ................................................... 11

          2.  Defendants Cannot Avoid Liability By Claiming They Were Merely
              Following NorthWestern's Orders ...................................................... 12

          3.  Defendants Cannot Claim They Had No Reason to Know of Any
              Problems with the Transfer When They Failed to Take Reasonable
              Steps to Inform Themselves ................................................................ 13

      B.  Factual Evidence Establishing Defendants' Breach of Their Duties ............... 14

          1.  Defendants' Claims to Have Been Exonerated by NorthWestern, the
              SEC, and Their Own Hired Expert Are Irrelevant Red Herrings. ............ 14

          2.  Defendants Utterly Failed to Inquire Into the Bona Fides of the
              Transfer and Determine Whether It Was In Clark Fork's Interests ............ 17

          3.  There Is Substantial Evidence That Defendants Knew of
              NorthWestern's Desperate Financial Circumstances That Had Been
              Concealed From the Public and the QUIPS Holders. ............................. 21

i

TABLE OF AUTHORITIES

PAGE

## Cases

Anadarko Petroleum Corp. v. Panhandle E. Corp.,
    545 A.2d 1171 (Del. 1988) ................................................................................12

Anderson v. Liberty Lobby,
    477 U.S. 242 (1986).............................................................................................4

Arbaugh v. Y&H Corp.,
    546 U.S. 500 (2006).............................................................................................7

Bajana v. Potter,
    396 F. Supp. 2d 78 (D. P.R. 2005).......................................................................5

Baumgardner v. Wyeth Pharms.,
    No. 05-05720-JF, 2006 WL 1308232 (E.D. Pa. May 11, 2006)........................16

Brane v. Roth,
    590 N.E.2d 587 (Ind. Ct. App. 1st Dist. 1992) .................................................14

Brooks v. Kyler,
    204 F.3d 102 (3d Cir. 2000).................................................................................4

Cartwright v. Equitable Life Assurance Soc'y of the United States,
    914 P.2d 976 (Mont. 1996).................................................................................31

Cede & Co. v. Technicolor, Inc.,
    634 A.2d 345 (Del. 1993) ..................................................................................13

Chandler v. Madsen,
    642 P.2d 1028 (Mont. 1982)..........................................................................28-29

In re City of Philadelphia Litig.,
    158 F.3d 711 (3d Cir. 1998).................................................................................6

D'Addario v. Geller,
    No. 04-1687, 2005 WL 428779 (4th Cir. Feb. 24, 2005) ..................................16

Dayberry v. City of E. Helena,
    80 P.3d 1218 (Mont. 2003).................................................................................17

Drachman v. Harvey,
    453 F.2d 722 (2d Cir. 1971)...............................................................................10

iii

TABLE OF AUTHORITIES

PAGE

Dunfee v. Baskin-Robbins, Inc.,
  720 P.2d 1148 (Mont. 1986) ............................................................................................31

Durbin v. Ross,
  916 P.2d 758 (Mont. 1996) ..............................................................................................17

Edgeworth v. First Nat'l Bank of Chicago,
  677 F. Supp. 982 (S.D. Ind. 1988) ...................................................................................10

Finstad v. W.R. Grace & Co.-Conn.,
  8 P.3d 778 (Mont. 2000) ...................................................................................................33

First Nat'l Bank in Libby v. Twombly,
  689 P.2d 1226 (Mont. 1984) ....................................................................................... 31-32

Fogel v. Chestnut,
  668 F.2d 100 (2d Cir. 1981) ...............................................................................................6

Hayman Cash Register Co. v. Sarokin,
  669 F.2d 162 (3d Cir. 1982) .........................................................................................5, 10

Hegler v. Borg,
  50 F.3d 1472 (9th Cir. 1995) ............................................................................................10

Hoagland v. Sandberg, Phoenix & Van Gontard, P.C.,
  385 F.3d 737 (7th Cir. 2004) ............................................................................................16

Lewis v. Chiles,
  719 F.2d 1044 (9th Cir. 1983) ..........................................................................................10

Magten Asset Mgmt. Corp. v. NorthWestern Corp. (In re NorthWestern Corp.),
  313 B.R. 595 (Bankr. D. Del. 2004) ............................................................................ 19-20

In re Mercedes-Benz Antitrust Litig.,
  364 F. Supp.2d 468 (D. N.J. 2005) .....................................................................................6

Newville v. State of Montana, Dept. of Family Servs.,
  883 P.2d 793 (Mont. 1994) ..............................................................................................17

New York v. N. Storonske Cooperage Co.,
  174 B.R. 366 (Bankr. N.D.N.Y. 1994) ...............................................................................5

Nickel v. Gillette,
  No. 06-C-24-S, 2006 WL 3025397 (W.D. Wis. Sept. 13, 2006) ................................. 16-17

iv

TABLE OF AUTHORITIES

PAGE

N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,
    930 A.2d 92 (Del. 2007) ...................................................................................8

Performance Mach. Co., Inc. v. Yellowstone Mountain Club, LLC,
    169 P.3d 394 (Mont. 2007)...........................................................................30

Potter v. Pohlad,
    560 N.W.2d 389 (Minn. Ct. App. 1997)........................................................14

Prod. Res. Group, LLC v. NCT Group, Inc.,
    863 A.2d 772 (Del. Ch. 2004)..........................................................................8

Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.,
    123 F.3d  111 (3d Cir. 1997)............................................................................7

RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.),
    No. 01-11457, 2003 Bankr. LEXIS 1635 (Bankr. S.D.N.Y. Dec. 11, 2003) ...................13

Roberts v. Fleet Bank,
    342 F.3d 260 (3d Cir. 2003)..............................................................................4

Roselink Investors, L.L.C. v. Shenkman,
    386 F. Supp. 2d 209 (S.D.N.Y. 2004)............................................................12
Ryckman v. Wildwood, Inc.,
    641 P.2d 467 (Mont. 1982) ............................................................................11

Santa Fe Indus., Inc. v. Green,
    430 U.S. 462 (1977).......................................................................................15

Sax v. World Wide Press, Inc.,
    809 F.2d 610 (9th Cir. 1987) ...........................................................................8

Scott Acquisition Corp. v. Morris (In re Scott Acquisition Corp.),
    344 B.R. 283 (Bankr. D. Del. 2006) ..............................................................12

Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Capital, LLC),
    331 B.R. 47 (Bankr. E.D.N.Y. 2005)...............................................................5

Silling v. Erwin,
    881 F. Supp. 236 (S.D. W. Va. 1995)............................................................10

Smith v. Van Gorkum,
    488 A.2d 858 (Del. 1985) ........................................................................ 13-14

TABLE OF AUTHORITIES

PAGE

Spackman v. Ralph M. Parsons Co.,
   414 P.2d 918 (Mont. 1966)...............................................................................................28

State Farm Fire and Cas. Co. v. Holmes Prods.,
   No. 04-4532, 2006 U.S. App. LEXIS 2370 (3d Cir. Jan. 31, 2006)...................................10

Steel Co. v. Citizens for Better Env't.,
   523 U.S. 83 (1998)...............................................................................................................7

Tandycrafts, Inc. v. Initio Partners,
   562 A.2d 1162 (Del. 1989).................................................................................................34

In re Teleglobe Commc'ns Corp.,
   493 F.3d 345 (3d Cir. 2007)................................................................................... 12-13, 18

Todaro v. Bowman,
   872 F.2d 43 (3d Cir. 1989)...................................................................................................4

Town Pump, Inc. v. Diteman,
   622 P.2d 212 (Mont. 1981)................................................................................................30

Trifad Entertainment, Inc. v. Anderson,
   36 P.3d 363 (Mont. 2001)...................................................................................................32

In re Unisys Sav. Plan Litig.,
   74 F.3d 420 (3d Cir. 1996)....................................................................................................4

Unocal Corp. v. Mesa Petroleum Co.,
   493 A.2d 946 (Del. 1985)...................................................................................................13

Van Dusen v. Barrack,
   376 U.S. 612 (1964)...........................................................................................................10

## Statutes

Fed. R. Civ. P. 17(a) ...............................................................................................................11

Fed. R. Civ. P. 23.1 .................................................................................................................10

Fed. R. Civ. P. 56(c) .................................................................................................................4

Del. Ch. Ct. R. 23.1...............................................................................................................8-9

Mont. Code § 27-1-221(1), (5), (6).........................................................................................31

TABLE OF AUTHORITIES

Mont. Code § 35-8-102 ................................................................................................ 11

Mont. Code § 35-8-1104 ....................................................................................... 6, 9, 33

**Other Authorities**

18B CHARLES A. WRIGHT, ARTHUR MILLER, & EDWARD H. COOPER,
    FEDERAL PRACTICE AND PROCEDURE, § 4478 n.59 (2d ed. 2002) ..................................... 10

120087.01600/40172733v.1

Plaintiff Magten Asset Management Corporation ("Magten") respectfully submits this

brief in opposition to the motion for summary judgment filed by defendants Hanson and Kindt.[1]

## PRELIMINARY STATEMENT

This is a case about fiduciary duties and conflicts of interest. Defendants were the senior

officers of the entity now known as Clark Fork and Blackfoot LLC ("Clark Fork"), a solvent and

profitable Montana-based utilities company, as of November 15, 2002.[2] On that date, defendants

unquestioningly carried out the directions of Clark Fork's controlling owner NorthWestern

Corporation ("NorthWestern") to turn over substantially all of Clark Fork's assets (the

"Transfer") of its subsidiary to NorthWestern without ensuring that Clark Fork received

reasonably equivalent value for those assets, thus injuring Clark Fork's creditors, especially the

holders of the Clark Fork securities known as QUIPS.[3] Magten is presently the largest holder of

the QUIPS. Although NorthWestern purportedly agreed to be liable on the QUIPS in

connection with the Transfer, that agreement proved worthless in light of NorthWestern's

---

[1]     Because this opposition is being filed simultaneously with plaintiffs opposition to the summary judgment motion brought by defendant NorthWestern in 04-1494, which is consolidated with this case, and there is substantial overlap in the relevant evidence, plaintiffs are filing a single declaration of John W. Brewer ("Brewer Decl.") to place before the court all discovery material and similar documents referred to in either opposition. Plaintiffs are also submitting herewith (as well as in support of Plaintiffs' opposition in the NorthWestern case), the declarations of their experts Robert Berliner and Paul Marcus, which place before the Court their respective expert reports (the "Berliner Report" and "Marcus Report").

Defendants' moving brief is referred to as "H&K Br.," their purported statement of undisputed facts is referred to as "H&K SUF," and their supporting affidavits and declarations are referred to as, e.g., "Beatty Aff."

[2]     Clark Fork is the current name of an entity formerly known by various names, including Montana Power LLC and NorthWestern Energy LLC, and is the successor to the Montana Power Company. To minimize confusion, Clark Fork will be used to refer to this entity consistently throughout this brief, although some of the historical documents referred to use the name the entity had at previous points in time.

[3]     Technically speaking, the QUIPS were not issued directly by Clark Fork's predecessor. Rather, the Clark Fork predecessor issued debt securities ("Junior Debentures") to a related trust entity which in turn issued QUIPS to the investing public. H&K SUF #2, 3. For ease of exposition, we will follow the same practice as the defendants have in their papers and discuss the QUIPS as if directly issued by Clark Fork except where the two-step structure just described is specifically relevant to the point at hand.

subsequent chapter 11 filing, and Clark Fork, having been stripped by defendants of all of its assets except for a single property saddled with severe environmental liabilities and incapable of generating positive cash flow, lacked the wherewithal to fulfill its original obligations to the QUIPS holders.

In facilitating the Transfer, defendants breached their fiduciary duties by: (i) failing to consider whether and how Clark Fork's interests diverged from those of NorthWestern; (ii) failing to conduct any affirmative inquiry into the bona fides of the transaction or its likely effect on Clark Fork (which was, in the event, to render Clark Fork insolvent); (iii) failing to determine whether NorthWestern (which was at the time engaged in a massive fraud on the investing public to conceal its operating losses and liquidity crisis) had the capacity to meet the obligations it was purportedly assuming; and (iv) failing to determine whether the financial consequences of the Transfer would be consistent with the promises defendant Hanson had made to Clark Fork's primary regulator, the Montana Public Service Commission ("MPSC") in order to induce the commission to permit NorthWestern to acquire Clark Fork in the first place. Had defendants acted properly rather than blindly following NorthWestern's orders, it would have been obvious that the Transfer would have precisely the results it did: an insolvent Clark Fork and a bankrupt NorthWestern, leaving Magten and the other QUIPS holders with nothing.

In order to avoid defending the propriety of their conduct, defendants seek to hide behind technical defenses based on the timing of Magten's purchase of the QUIPS. But they raised these defenses in a prior summary judgment motion at the outset of this case when it was still pending in the District of Montana. Judge Cebull of that District rejected those arguments. Defendants have not shown either a basis to avoid the bar on relitigation imposed by the law of the case doctrine or that their previously rejected arguments should fare any better on second

2

hearing. In any event, those issues could be cured by amendment and addition of Law Debenture Trust Company of New York ("Law Debenture" -- the current indenture trustee for the QUIPS holders) as a co-plaintiff, which is the subject of another pending motion before this Court. D.I. 278, Case No. 05-499.

On the merits, defendants' contention that the undisputed facts eliminate any possibility that the jury could find them to have breached their fiduciary duties does not stand up to even cursory scrutiny.[4] Not only is there undisputed evidence of their failure to conduct any sort of reasonable inquiry before signing away title to $1.5 billion in assets for consideration worth at best less than half that amount, there is considerable evidence from which the jury could conclude that the defendants, Hanson in particular, knew or had reason to know of NorthWestern's ongoing fraud and perilous financial condition. Hanson, in fact, asked for and received a substantial bonus from NorthWestern in connection with giving NorthWestern unfettered access to Clark Fork's assets in a doomed attempt to use them to solve its other financial problems. Indeed, NorthWestern ultimately rewarded him by making him its CEO.

Finally, defendants' attempts to limit in advance the nature and quantum of damages the jury may award if it is convinced that the defendants breached their duties to Clark Fork are unsupported by the applicable law, and should be rejected. All issues related both to liability and damages are properly for the jury to determine, and this case should proceed to trial.

---

[4]     Consistent with the Court's individual practice and prior discussion with Chambers, Magten is submitting a full opposition brief on the merits in lieu of a point by point response to defendants' purported Statement of Undisputed Facts. Given the voluminous papers relating to this motion and the parallel motion in 04-1494, we do not think a formal separate counterstatement would be a productive use of additional pages. However, we note for the record that at a minimum the evidence set forth herein is sufficient to create a genuine issue of disputed fact as to numerous items, including without limitation 16, 17, 20, 23, 24, 25, 26, 31, 32, 33, 37, 44, 45, 46, 57, 67, 71, on defendants' list. Many other items on defendants' list, including 30, 47, 49, 51, 64, 65, 66, 68, 69, 72, 73, 74, 75, 76, 77, are also not "undisputed facts" because they are disguised contentions of law and/or address irrelevant matters.

3

## ARGUMENT[5]

On a motion for summary judgment, defendants must show that, on the record before the court, "there is no genuine issue as to any material fact and [they] [are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must determine, viewing the evidence in the light most favorable to the nonmoving party, in this case Magten, and without weighing the evidence or determining the truth of the matter, whether there are any genuine issues of material fact and whether judgment is appropriate as a matter of law. Roberts v. Fleet Bank, 342 F.3d 260, 264-65 (3d Cir. 2003); Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000). See also, In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 n. 10 (3d Cir. 1996) ("The party opposing the motion is entitled to have his allegations taken as true, to receive the benefit of the doubt when his assertions conflict with those of the movant and to have inferences from the underlying facts drawn in his favor.").

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989). Furthermore, to raise a genuine issue of material fact, "the opponent need not match, item for item, each piece of evidence proffered by the movant," and if the non-moving party has "exceeded the 'mere scintilla' threshold and offered a genuine issue of material fact," then summary judgment is inappropriate. Unisys, 74 F.3d at 433 n.10.

---

[5] In order to promote efficiency and prevent redundancy, Magten hereby incorporates by reference the description and background of the Transfer, the fraudulent scheme existent at NorthWestern and its impact, as detailed in plaintiffs' brief in opposition to NorthWestern's summary judgment motion at 8-22.

4

Finally, in cases such as this where the movants' state of mind and knowledge are in dispute, summary judgment is generally inappropriate. See Bajana v. Potter, 396 F. Supp. 2d 78, 89 (D. P.R. 2005) (questions involving the movants' state of mind are generally better left to the jury "as proof is generally predicated on inferences, rather than direct evidence"); Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Capital, LLC), 331 B.R. 47, 57-58 (Bankr. E.D.N.Y.2005); New York v. N. Storonske Cooperage Co., 174 B.R. 366, 390 (Bankr. N.D.N.Y. 1994).

I.    DEFENDANTS CANNOT USE THE TIMING OF MAGTEN'S PURCHASES AS AN EXCUSE FOR AVOIDING THE MERITS OF THE CASE

A.    Defendants Have Already Litigated and Lost This Issue.

Defendants devote nearly ten pages of their brief to the claim that Magten lacks standing to sue them for their breaches of fiduciary duty because it purchased its QUIPS subsequent to the date of the Transfer. But nowhere do they acknowledge what this Court already knows to be the undisputed truth: they moved for summary judgment on precisely this basis at the outset of the case (when it was still pending in the District of Montana), and the court expressly rejected this argument. Brewer Decl. Exh. 48 at 6-7. Among other things, Judge Cebull held that as a QUIPS holder Magten was an "express third party beneficiary to the Indenture" governing the QUIPS, and was authorized under Section 610 of the Indenture to enforce the trustee's rights "to the fullest extent permitted by law." Id. at 7. See also Brewer Decl. Exh. 49 (Order denying defendants' 12(b)(c) motion).

"Under the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances." Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir. 1982). No such circumstances are presented here. The fact that the case was transferred to this District from the District of Montana does not create an exception to the doctrine: indeed, such a transfer had occurred in Hayman, and the Third Circuit squarely

5

held that the doctrine "is even more important" in transferred cases because "the principles of comity among courts of the same level of the federal system provide a further reason why the transferee court should not independently re-examine an issue already decided by a court of equal authority." Id. at 169.

Two of the arguments defendants now extensively rely on (that the breach of duty claims are allegedly derivative rather than direct and that Mont. Code § 35-8-1104 requires contemporaneous ownership), were not explicitly considered by Judge Cebull in his decision. But that is because defendants failed to raise them in the briefs they filed in support of their earlier dispositive motions.[6] They have given, and can give, no excuse for this failure. The Montana statute existed in the same form then as it did now and the principal Montana authorities defendants now cite for the proposition that the claims should have been pled as derivative (H&K Br. at 22) are a Montana Supreme Court case from 1993 and Ninth Circuit case even older then that. See Fogel v. Chestnut, 668 F.2d 100, 109 (2d Cir. 1981) (holding that the law of the case doctrine applies also to everything decided by necessary implication: "It would be absurd that a party who has chosen not to argue a point on first appeal should stand better as regards [to] the law of the case than one who has argued and lost."). The Third Circuit has also expressly held that the law of the case effect of a prior adverse decision cannot be evaded by failing to brief a relevant argument before the original decision and then subsequently distinguishing the decision on the grounds that it did not address the omitted point. In re City of Philadelphia Litig., 158 F.3d 711, 720 (3d Cir. 1998). See also In re Mercedes-Benz Antitrust Litig., 364 F. Supp.2d 468, 475-76 (D. N.J. 2005) (holding that earlier rejection of motion to

---

6     See D.I. 53, #6 in Case 05-499 (formerly D.I. 15 on District of Montana Docket, Case 04-24) (Brief in Support of Motion for Summary Judgment); D.I. 55, #4 in Case 05-499 (formerly D.I. 21 on District of Montana Docket, Case 04-24) (Reply Brief).

dismiss complaint was binding as law of the case and had necessarily, if implicitly, rejected any and all arguments that the complaint did not state a claim).

The only argument defendants raise to evade the preclusive force of the (unacknowledged) prior contrary decisions is the contention that Magten's status as a proper plaintiff is (H&K Br. at 21) "jurisdictional," citing Public Interest Research Group of New Jersey (PIRG) v. Magnesium Elektron, Inc., 123 F.3d 111 (3d Cir. 1997), and thus cannot be waived. This is nothing but sophistry. The PIRG case involved the constitutional minimum requirement of Article III standing, but Magten's "standing" (in the sense of being a proper plaintiff under the appropriate governing law) has nothing to do with Article III or this Court's subject matter jurisdiction. This is a straightforward application of the same "distinction between two sometimes confused or conflated concepts: federal-court 'subject-matter' jurisdiction over a controversy; and the essential ingredients of a ... claim for relief" that the Supreme Court insisted on in Arbaugh v. Y&H Corp., 546 U.S. 500, 503 (2006). In that case, the Court made clear that what was often loosely termed a "jurisdictional" element of a plaintiff's claim under Title VII was a merits issue having nothing to do with the district court's subject matter jurisdiction, and accordingly rejected a defendant's belated attempt to raise it.[7]

B.    Even If Defendants Were Free to Relitigate the Issue, Their Arguments Would Fail.

Defendants base two arguments on the Montana statute they belatedly seek to invoke. Neither is valid, even assuming arguendo that the claims are better viewed as derivative than

---

[7]    The Court repeated its prior observation that "[j]urisdiction is a word of many, too many, meanings." Arbaugh, 546 U.S. at 510 (quoting Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 90 (1998)). The same may be true of the word "standing." But the "standing" questions here (such as the proper construction of a particular state statute and whether or not a particular indenture confers certain rights to sue on third party beneficiaries) are undeniably merits issues and cannot possibly be claimed to involve "standing" in the sense of the jurisdictional requirements for an Article III case or controversy.

7

direct.[8]  First, they contend that the Montana statute only contemplates derivative suits by

members (i.e. equityholders) of LLC's, not creditors.  Here, however, the sole member of Clark

Fork was NorthWestern (H&K SUF #12), which used its 100% equity ownership to loot Clark

Fork to Clark Fork's detriment and that of its creditors such as the Trust and the QUIPS holders.

Defendants' argument would thus lead to the absurd result that the only entity with standing to

complain about their breach of their duties to Clark Fork would be the very entity

(NorthWestern) that directed and benefited from those breaches.  That is not the law.

    As the cases make clear (see infra at 12-13), a 100% equityholder's otherwise

unquestioned right to control its subsidiary ends as soon the threat of insolvency (with its

accompanying prejudice to the interests of creditors) arises.  Indeed, defendants affirmatively

argue that this court should assume the Montana courts would follow Delaware cases such as

Production Resources Group, LLC v. NCT Group, Inc., 863 A.2d 772 (Del. Ch. 2004), and

North American Catholic Educational Programming Foundation, Inc. v. Gheewalla, 930 A.2d 92

(Del. 2007), which recognize creditor standing to bring derivative breach of fiduciary claims in

an insolvency situation.  Delaware Chancery Court Rule 23.1, like the Montana statute, assumes

that derivative suit plaintiffs will generally be equityholders and does not expressly contemplate

---

[8]    The direct versus derivative issue is of no moment, since it can be easily cured by amendment, such as that
which is the subject of Magten and Law Debenture's pending motion. D.I. 278, Case No. 05-499. But it is
worth noting that under the Montana law cited by defendants (H&K Br. at 22-23, citing Sax v. World Wide
Press, Inc., 809 F.2d 610, 614 (9th Cir. 1987)) a shareholder's claim may be brought as direct rather than
derivative when it involves "injury separate and distinct from that suffered by other shareholders." The
same rationale necessarily applies to claims brought by holders of debt securities. Here, the injury suffered
by the Trust and the QUIPS holders it represents is "separate and distinct" from that suffered by the holders
of Clark Fork's other pre-Transfer debt securities. Prior to the transfer, the QUIPS were subordinated to
Clark Fork's other debt but structurally senior to all NorthWestern debt. Because Clark Fork's other pre-
Transfer debtholders were secured and/or ranked contractually higher than the QUIPS holders, they did not
suffer the same injury as a result of the Transfer, because their claims were entirely or largely satisfied in
NorthWestern's chapter 11 plan which treated the QUIPS as out of the money. D.I. 1924, Case No. 03-
12872. Indeed, one of NorthWestern's experts has opined that for this reason Clark Fork's creditors other
than the QUIPS holders would generally have had no motive to oppose the Transfer even had they known
of NorthWestern's fraudulently concealed dire financial condition. Brewer Decl. Exh. 50 at 32-36.

creditor standing, but the Delaware courts have not hesitated to find it present in appropriate cases.

Second, defendants raise the "contemporaneous ownership" aspect of Mont. Code § 35-8-1104, which Magten allegedly does not satisfy because it purchased its QUIPS subsequent to the date of the Transfer. While plausible at first glance, this argument misses the mark because it focuses on the wrong securities. The relevant securities are not the QUIPS, but the underlying Junior Debentures which were issued by Clark Fork's predecessor in interest to Montana Power Capital I (the "Trust"). It is the Junior Debentures that ultimately give rise to the right to pursue derivative claims on behalf of Clark Fork as a Clark Fork creditor (assuming arguendo that the claims might need to be brought derivatively). There is no dispute (H&K SUF #2) that the Trust has owned the Junior Debentures continuously since they were originally issued in 1996. It owned them as of the date of the Transfer and defendants' breaches of fiduciary duty; it owned them as of the date this litigation was commenced; and it owns them today.

Under its governing documents, the Trust cannot sue in its own name. Either the appropriate trustee or another person authorized by the Indenture must do so. Judge Cebull held that Magten had standing under Section 610 of the Indenture to assert the Trust's rights. Brewer Decl. Exh. 48 at 6-7. Because Magten's rights are based on those of the Trust, it is the date of the Trust's ownership of the Junior Debentures that is relevant for purposes of Mont. Code § 35-8-1104, not the date of Magten's ownership of QUIPS.[9] Who may assert the Trust's rights in

---

[9]    Magten acknowledges that this Court focused on the timing of Magten's purchase of the QUIPS rather than the Trust's earlier acquisition of the Junior Debentures in granting defendant's 12(c) motion in No 04-1216 brought by Magten against the Paul Hastings law firm. Magten (which is represented in that action by different counsel than the undersigned) respectfully disagrees with that decision and has appealed it to the Third Circuit. Oral argument is currently scheduled for February 2008. But a crucial distinction between this case and the Paul Hastings case is that Paul Hastings had not previously litigated and lost the question and thus the law of the case doctrine did not apply. As noted above, the Third Circuit has expressly held that the law of the case doctrine must be followed with equal if not greater rigor when a case has been

9

court is purely a question of the Trust's own governing documents, and defendants provide no

plausible rationale why the Trust's right to bring a derivative claim cannot be delegated under

Section 610.[10]

        C.      Any Remaining Issues Related to the Timing of the QUIPS Purchases Can Be
              Cured by Amendment.

     When defendants first sought to relitigate this issue last February, Magten, together with

Law Debenture, promptly and timely moved for leave to amend the complaint to plead the

claims in the alternative as derivative claims and add Law Debenture as a co-plaintiff. D.I. 142,

Case No. 05-499. Since Law Debenture is the current trustee of the Trust, there can be no doubt

---

transferred from one federal court to another. Hayman, 669 F.2d at 169. See also Van Dusen v. Barrack, 376 U.S. 612 (1964) (transferee court is to follow choice of law rules that would govern in transferor court, so that transfer process does not create opportunity to shop for more favorable law); State Farm Fire and Cas. Co. v. Holmes Prods., No. 04-4532, 2006 U.S. App. LEXIS 2370, at *8 n.1 (3d Cir. Jan. 31, 2006) (applying Van Dusen's rule).

It should also be noted that while there is an exception to the law of the case doctrine for a trial court's "duty to apply a supervening rule of law despite its prior decisions to the contrary," Hayman, 669 F.2d at 170, this Court's decision in the case against Paul Hastings does not give rise to that exception because the exception only applies to controlling precedents such as, in this case a ruling of the Montana Supreme Court authoritatively construing the relevant Montana law in a fashion inconsistent with Judge Cebull's prior decision. See, e.g., Hegler v. Borg, 50 F. 3d 1472, 1475 (9th Cir. 1995) (intervening controlling authority is ground to depart from law of the case). See also 18B CHARLES A. WRIGHT, ARTHUR MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 4478 n.59 (2d ed. 2002) ("Ordinarily only an amendment of a statute or decision of a higher court will justify departure from the law of the case").

[10]    Again ignoring Judge Cebull's ruling that Magten has standing as an "express third party beneficiary" under the Indenture, Defendants cite to no authority from Montana or elsewhere addressing third party beneficiary standing to bring breach of fiduciary duty claims. Instead, Defendants cite to cases from other jurisdictions with little, if anything, to do with this issue. See Lewis v. Chiles, 719 F.2d 1044, 1048 (9th Cir. 1983) (holding under Oregon law that a former shareholder's derivative claim did not survive the dissolution of the corporation where she accepted cash in exchange for her shares); Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1971) (shareholders owning stock at time of alleged wrongful action have standing to assert derivative claims); Silling v. Erwin, 881 F. Supp. 236, 239 (S.D. W. Va. 1995) (because he was not a beneficiary or beneficial owner of the shares at the time of the alleged wrongful action, plaintiff did not have standing to bring a derivative suit against corporation for failure to declare dividends); Edgeworth v. First Nat'l Bank of Chicago, 677 F. Supp. 982 (S.D. Ind. 1988) (holding that beneficiary of a trust that in turn owned shares in a corporation could maintain a derivative action under Fed. R. Civ. P. 23.1).

In any event, whenever a securityholder which is a potential derivative plaintiff is an artificial entity like a trust or a corporation, there is the possibility that its relevant authorized decisionmakers will change over time. If a corporation which had owned stock in another corporation at the relevant time brought a derivative suit no one would think that the contemporaneous ownership rule meant that the plaintiff corporation was required to have the same directors, officers, or even controlling shareholders as when the claim arose.

that it would moot any contemporaneous ownership issue even if this Court were to permit

defendants to relitigate the issue and avoid Judge Cebull's prior decision on Magten's authority

under Section 610 of the Indenture. Magten and Law Debenture have now renewed that motion

(D.I. 278, Case No. 05-499) consistent with this Court's direction, and it will be fully briefed by

the same time the summary judgment motions are fully briefed. Even without that motion, any

dismissal based on a theory that Magten is not authorized to assert the Trust's rights with respect

to these breach of fiduciary duty claims would be subject to Fed. R. Civ. P. 17(a), requiring Law

Debenture to be afforded an opportunity for ratification, joinder, or substitution.

II.      THERE IS MORE THAN ENOUGH EVIDENCE TO CREATE A GENUINE
         FACTUAL DISPUTE AS TO THE DEFENDANTS' VIOLATION OF THEIR
         FIDUCIARY DUTIES TO CLARK FORK

         A.      Applicable Legal Standards.

         Hanson and Kindt do not deny that they were officers of Clark Fork as of the date of the

Transfer (Beatty Aff. Exh. 14), and that as such they owed fiduciary duties to Clark Fork as an

entity.[11] None of their attempts to limit the requirements of those duties are well-grounded in the

law.

                 1.      Neither the Statute Nor Clark Fork's Governing Documents Preclude
                         Liability for Ordinary Negligence.

         Defendants cite various provisions of Montana's LLC statute (H&K Br. at 31) for the

proposition that their fiduciary duties could only be violated by grossly negligent or reckless

conduct. But these statutory provisions on their face apply not to officers of LLCs, but only to

Members and Managers (both defined terms). There is no dispute that neither Hanson nor Kindt

---

[11]      Under Montana's LLC statute, "The rules of agency apply to limited liability companies. . . . For example,
          managers may designate an agent as 'President.'" Official Commentary to definition of "Manager" in
          Mont. Code § 35-8-102. Under Montana law, employment as an agent presumptively gives rise to a
          fiduciary relationship. See, e.g., Ryckman v. Wildwood, Inc., 641 P.2d 467, 471 (Mont. 1982).

11

was a Member or Manager of Clark Fork. Rather, NorthWestern was the sole Member and

Manager. See, e.g., H&K SUF #12. Clark Fork's own Operating Agreement (Beatty Aff. Exh. 5

at § 14) exculpates officers for ordinary negligence (but not fraud, willful misconduct, bad faith

or gross negligence) only for acts or omissions "taken or omitted in good faith . . . and in the

reasonable belief that such act or omission is in or is not contrary to the best interests of" Clark

Fork. Since here, as explained at length below, defendants acquiesced to NorthWestern's desire

to benefit itself at Clark Fork's expense, this protection is not available.

> 2. Defendants Cannot Avoid Liability By Claiming They Were Merely
> Following NorthWestern's Orders.

There is certainly no doubt that NorthWestern, which owned 100% of Clark Fork's

equity, directed defendants to carry out the Transfer. See, e.g., Beatty Aff. Exh. 9 (written

authorization dated as of Aug. 7, 2002 for the officers of Clark Fork to take steps necessary to

consummate the Transfer). But, when ordered to turn over substantially all of Clark Fork's

assets without being provided with reasonable compensation for them, those officers could not

simply claim to have been "just following orders." It is well-established that officers and

directors of a wholly-owned subsidiary cannot, when the subsidiary is in the zone of insolvency,

permit the controlling parent to loot the subsidiary to the prejudice of the subsidiary and its

creditors. See, e.g., Scott Acquisition Corp. v. Morris (In re Scott Acquisition Corp.), 344 B.R.

283, 289-90 (Bankr. D. Del. 2006); Roselink Investors, L.L.C. v. Shenkman, 386 F. Supp. 2d

209, 215 (S.D.N.Y. 2004).[12] See also In re Teleglobe Commc'ns Corp., 493 F.3d 345, 367

---

[12]    Scott and similar cases recognize that the so-called Anadarko principle (see Anadarko Petroleum Corp. v.
Panhandle E. Corp., 545 A.2d 1171 (Del. 1988)), i.e. that the directors and officers of a 100%-owned
subsidiary generally do not have any direct duties to the subsidiary and its stakeholders distinct from their
duties to the parent company, does not apply when the subsidiary is insolvent or in the "zone of
insolvency."

12

(3d Cir. 2007) (summarizing cases on effect of insolvency on relationship between corporate parent and wholly-owned subsidiary).

As one court has bluntly put it, there is "no basis for the principle . . . that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation." RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.), No. 01-11457, 2003 Bankr. LEXIS 1635, at *44 (Bankr. S.D.N.Y. Dec. 11, 2003). Here, defendants concede (H&K Br. at 26) that the jury could find that Clark Fork was in the zone of insolvency, and rightly so. It cannot seriously be questioned that a company which is about to carry out a transaction giving away substantially all of its assets without receiving equivalent compensation faces a serious risk of insolvency. Fiduciary duties in such circumstances require, at a minimum, determining with a high degree of confidence that adequate provision has been made for all actual and potential liabilities. See Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985) (fiduciaries should not be "passive instrumental[ities]," particularly when issues of fundamental corporate change are presented).

> 3.   Defendants Cannot Claim They Had No Reason to Know of Any Problems with the Transfer When They Failed to Take Reasonable Steps to Inform Themselves.

Fiduciaries cannot avoid liability by sticking their heads in the sand or passively avoiding raising questions that might lead to unwelcome answers. Officers and other fiduciaries have an affirmative legal duty to inform themselves sufficiently under the circumstances in which they act. Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 367 (Del. 1993) (fiduciaries "have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them") (citations omitted); Smith v. Van Gorkum, 488 A.2d 858, 872-73 (Del. 1985) (fiduciaries have a duty to inform themselves and must "act in an informed and deliberate

13

manner … [especially] in the merger context"); <u>Potter v. Pohlad</u>, 560 N.W.2d 389, 392 (Minn. Ct. App. 1997) (officers have a duty to inform themselves prior to making a business decision); <u>Brane v. Roth</u>, 590 N.E.2d 587, 592 (Ind. Ct. App. 1st Dist. 1992) (holding that directors could not blindly rely on information given to them by their agent and thus breached their fiduciary duties by making "no meaningful attempts to be informed").

B.    Factual Evidence Establishing Defendants' Breach of Their Duties.

Hanson and Kindt do not deny that their actions caused Clark Fork to consummate the Transfer. Indeed, Hanson admittedly personally executed on Clark Fork's behalf many of the key documents which were necessary to accomplish the Transfer. Beatty Aff. Exhs. 15, 16, 17, 18, 20, 21. <u>See also id.</u> Exh. 22 (letter of instructions signed by Kindt on behalf of Clark Fork requesting BONY to execute documents necessary to consummate the Transfer).

1.    Defendants' Claims to Have Been Exonerated by NorthWestern, the SEC, and Their Own Hired Expert Are Irrelevant Red Herrings.

Defendants inexplicably place great weight (H&K SUF #47, H&K Br. at 29-30, Hanson Aff. at ¶¶ 9-11, Kindt Aff. at ¶¶ 6-8) on the fact that neither NorthWestern's internal investigations nor the settlement resulting from the SEC's investigation affirmatively found that they had engaged in misconduct.[13] Even leaving aside the point that such "exoneration" is not even relevant, much less dispositive, this argument ignores the scope and purpose of those investigations.[14]

---

[13]    The sole purpose of the affidavits submitted by Hanson and Kindt in support of their motion appears to be to establish this irrelevancy.

[14]    Consider a civil action in which a private plaintiff has sued A, B, and C for fraud and the government has brought criminal fraud charges against A and B arising out of the same transaction. The discretionary decision not to prosecute C could not be argued with a straight face to entitle C to summary judgment in the civil action.

14

First, the entire gravamen of this complaint is that defendants breached their fiduciary duties to Clark Fork, and did so at the behest of NorthWestern. NorthWestern benefited from those breaches by receiving Clark Fork's assets without paying for them. Unsurprisingly, none of NorthWestern's internal investigations into the accounting fraud carried out by its senior management sought to determine whether Clark Fork's officers had breached their duties to Clark Fork in connection with the Transfer. NorthWestern had no motive to conduct such an investigation, and did not do so.

Likewise, the SEC had no reason to, and did not, investigate whether Clark Fork's officers breached their fiduciary duties to Clark Fork. Magten does not allege that defendants violated the federal securities laws, only that they violated the Montana common law governing their fiduciary duties. The SEC simply has no jurisdiction over state law issues of fiduciary duty. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977) (federal securities laws do not extend to state law claims of corporate mismanagement and breach of fiduciary duties).

Defendants also contend that are entitled to summary judgment because they have managed to retain a purported expert who is willing to opine that they did nothing wrong. H&K Br. at 35-36. But whether or not their expert's views are ultimately determined to be sufficiently helpful to the jury to be admissible,[15] there is no basis to argue that the jury will be compelled to accept those views. Defendants try to score points by pointing out that Magten's experts do not

---

[15]    Magten has not yet had the opportunity to take Mr. Scherf's deposition, which has been scheduled for early January. On its face, his report appears to be largely a supplemental brief arguing about what defendants knew or should have known based on evidence that the jury can interpret for themselves, without bringing any unique expertise to bear. The defendants' own affidavits submitted in support of their motion curiously refrain from making any claims as to their knowledge or lack thereof, presumably because the credibility of such self-serving assertions would too obviously be a matter for the jury. Claims about the defendants' subjective knowledge do not become more credible in the mouth of an expert who, whatever his expertise may be, is not a mindreader.

15

directly opine on whether defendants violated their duties, but they do not cite to any authority for the proposition that expert opinion is not only permissible but mandatory.

Questions of what defendants knew or should have known, and the inferences to be drawn from their acts and omissions are common-sense factual determinations perfectly within the province of the jury. This is simply not a technical subject like product design or the causation of cancer where it "takes an expert to beat an expert." See, e.g., Baumgardner v. Wyeth Pharms., No. 05-05720-JF, 2006 WL 1308232 (E.D. Pa. May 11, 2006) (recognizing that in a products liability case against a pharmaceutical company, expert testimony would be required on both sides). Nor is it a case of professional malpractice where specialized expertise may be necessary to judge departure from accepted professional standards. Defendants were not surgeons, but ordinary businessmen charged with duties to Clark Fork. Intelligent jurors are perfectly capable of understanding lack of care, disloyalty, failure to investigate, blind adherence to self-serving instructions in the teeth of an obvious conflict of interest, and the other issues presented here. D'Addario v. Geller, No. 04-1687, 2005 WL 428779, at *6 (4th Cir. Feb. 24, 2005) (reversing grant of summary judgment and holding that expert testimony is not required for a claim of breach of fiduciary duty because "it should not be unduly difficult to determine whether or not the defendants' actions constitute breaches of fiduciary duties"); Hoagland v. Sandberg, Phoenix & Van Gontard, P.C., 385 F.3d 737, 743-44 (7th Cir. 2004) (acknowledging, in context of refusing to permit belated amendment to add breach of fiduciary duty claim, that such a claim would have benefit of not requiring expert testimony); Nickel v. Gillette, No. 06-C-24-S, 2006 WL 3025397 (W.D. Wis. Sept. 13, 2006) (denying defendants' motion for summary

16

judgment where plaintiffs had enough evidence to sustain a claim for breach of fiduciary duty even without expert testimony to such effect).[16]

  2.  Defendants Utterly Failed to Inquire Into the Bona Fides of the Transfer and Determine Whether It Was In Clark Fork's Interests.

The Transfer was no garden-variety transaction. Rather, Clark Fork was being asked to dispose of substantially all of its assets without receiving reasonably equivalent value in return. NorthWestern has admitted that the value of the assets transferred was at least $1.15 billion, Brewer Decl. Exh. 1 at 3, and discovery has revealed an internal valuation done shortly after the Transfer valuing those assets at $1.5 billion. Brewer Decl. Exhs. 2 3 at 33–36. By comparison, the only "value" NorthWestern can claim to have provided Clark Fork in exchange for the assets was the assumption of debt worth no more than approximately $710 million, Brewer Decl. Exh. 1 at 4, leaving a gap of approximately $400 million to $800 million. Hanson specifically represented to BONY that the only asset being retained, the Milltown Dam, was essentially worthless and incapable of generating positive cash flow. Brewer Decl. Exh. 6. It would be obvious to any prudent fiduciary that the Transfer would jeopardize Clark Fork's solvency and viability, as it ultimately did.[17] Accordingly, defendants' fiduciary duties did not permit them to simply follow NorthWestern's directives without considering the possibly conflicting interests of Clark Fork itself and its stakeholders. How would Clark Fork be able to meet its liabilities going

---

[16]  Montana law is no different in this regard. See, e.g., Durbin v. Ross, 916 P.2d 758, 762 (Mont. 1996) (holding that a fraudulent misrepresentation claim which "hinges" on the defendant's knowledge and intent, unlike a claim of professional malpractice, does not require expert testimony); Dayberry v. City of E. Helena, 80 P.3d 1218, 1220-21 (Mont. 2003) (in design defect case, "expert testimony is required when the issue presented is sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence"); Newville v. State of Montana Dept. of Family Servs., 883 P.2d 793, 805 (Mont. 1994) (setting forth rationale why expert testimony is specifically required in professional malpractice cases).

[17]  Defendants do not dispute that the jury could find that Clark Fork was rendered insolvent as a result of the Transfer. H&K Br. at 44-45; H&K SUF #15 (noting that Clark Fork was solvent prior to the Transfer but making no claim as to its condition afterward).

17

forward? Would NorthWestern be able to honor the obligations it purportedly was undertaking to Clark Fork's creditors? Would the Transfer be consistent with prior representations that had been made to the MPSC? These were the obvious questions that prudence demanded the defendants ask and receive satisfactory answer to, but the record indicates that they did nothing of the kind.

First, Clark Fork's ability to meet liabilities going forward was entirely dependent on both: (a) NorthWestern's ability and willingness to provide additional funding pursuant to the so-called support agreements entered into in connection with the Transfer; and (b) the validity and enforceability of the purported release of Clark Fork from all potential liability with respect to the liabilities NorthWestern was purportedly assuming. While defendants point to the fact that NorthWestern was contractually obligated to provide funds necessary to enable a positive net worth of $1,000, they neglect to mention that the same agreement capped NorthWestern's aggregate payment obligations at a maximum of $10 million. Beatty Aff. Exh. 17 at § 2. But the face amount of the QUIPS obligations alone was $65 million. Brewer Decl. Exh. 5 at 10. The airtight validity of Clark Fork's release from those obligations was thus crucial to Clark Fork's post-Transfer solvency. Defendants did not either seek or receive any independent legal advice or other assurances on this score. Hanson conceded that he did not even consider whether Clark Fork should be advised by its own counsel in connection with the Transfer. Brewer Decl. Exh. 40 at 279.[18] See also Teleglobe, 493 F.3d at 355 (noting that when counsel retained by parent corporation interact with employees of subsidiary they are not necessarily representing the subsidiary as an entity with its own distinct interests). Indeed, there is no evidence defendants

---

[18]     Hanson also conceded that no valuation was done of the assets and liabilities being transferred, id. at 275, but the $400 - $800 million disparity between what Clark Fork gave and what it got was obvious and defendants do not appear to contend that they sincerely believed the Transfer was justified because Clark Fork was being adequately compensated.

ever considered the inherent conflict of interest between NorthWestern and Clark Fork and its implications for their duties. This is dramatically illustrated by the certificate Hanson gave to BONY in connection with the Transfer (Beatty Aff. Exh. 18), where Hanson signs in his capacity both as Clark Fork's officer and his separate (and conflicting) capacity as an officer of NorthWestern.[19]

Bizarrely, defendants claim that there is no dispute whether "Clark Fork was validly released from [its] obligation to make QUIPS payments," H&K Br. at 44, and cite the decision by Judge Case in the litigation brought by Magten and Law Debenture against NorthWestern. But the whole point of that decision was that there was a dispute precisely about the validity of the release of Clark Fork from that obligation – a dispute which could not be resolved without factual development (Magten Asset Mgmt. Corp. v. NorthWestern Corp. (In re NorthWestern Corp.), 313 B.R. 595, 603 (Bankr. D. Del. 2004)), and which has thus been litigated over the last three years and will be finally determined at trial. Defendants certainly never sought or received any advice that the release would be valid regardless of NorthWestern's financial condition and regardless of NorthWestern's fraudulent concealment of that condition.[20]

Second, as Judge Case's opinion makes clear, the validity of the release depends on whether or not NorthWestern was misrepresenting its financial condition and whether it accurately and reasonably believed it had the capacity to meet the obligations it was assuming.

---

[19]    Indeed, even in their present motion defendants purport to be baffled by the notion that there could be any conflict between the interests of NorthWestern and those of Clark Fork. See H&K SUF # 34, 45 (indicating their belief that NorthWestern, as owner of Clark Fork's equity, could do whatever it wanted with Clark Fork's assets).

[20]    The only legal opinion letter in the record before the Court, Delaney Aff. Exh. 34, was given to BONY, does not purport to speak to the validity of the release of Clark Fork, and, as is customary in such situations, recites that the lawyers relied without independent investigation on the authenticity of documents provided by NorthWestern and/or Clark Fork and assumed the accuracy of management's representations.

19

Magten, 313 B.R. at 603. Defendants did not request that any analysis be done of NorthWestern's ability to meet the obligations being assumed out of future cash flow. Brewer Decl. Exhs. 8 at 82, 149-50, 165, and 171; 20 at 96-97; and 40 at 229-30, 274-75, and 279. See also H&K SUF #41 (admitting Kindt never discussed with anyone NorthWestern's "ability to service the QUIPS debt after the" Transfer). As explained at length in plaintiffs' opposition to NorthWestern's summary judgment motion (at 16-19), by the time of the Transfer, NorthWestern had reached a crisis in terms of cash on hand and anticipated future cash, with the CFO warning the board that it was no longer possible for the company's operations to generate the liquidity it needed to survive. Brewer Decl. Exh. 35 at 1. Had an analysis or fairness opinion been sought, it would have confirmed that the Transfer was unjustifiable.[21]

Moreover, defendants seem to have given no consideration whatsoever to Clark Fork's obligations to its primary regulator, the MPSC (maintaining the trust of which was obviously a vital interest of the company, as a regulated utility). Hanson induced the MPSC to approve NorthWestern's acquisition of Clark Fork by promising that:

> "[C]apital will be no more expensive with NorthWestern as owner of [Clark Fork] than is the case today... While our corporate structure may seem complex on first examination, it assures separation of the utility related financing from other activities, and it should not create any new or additional concerns for this Commission . . . ."

Brewer Decl. Exh. 44 at NOR044711. The Transfer was fundamentally inconsistent with Hanson's promise to the MPSC, as the MPSC recognized almost immediately. Shortly after the Transfer had been consummated and the truth about NorthWestern's previously-concealed financial crisis and the failure of its non-utilities businesses had begun to leak out, the MPSC

---

[21]    Defendants' focus on whether NorthWestern was still technically solvent as of the date of the Transfer is misplaced, since a business can lack any reasonable prospect of meeting its future obligations as they come due despite not yet having become insolvent on a technical balance-sheet basis.

20

bluntly stated that "The performance of the non-utility entities and the resulting threats to the

provision of utility service is unacceptable to this Commission. The cost of borrowing money

has been increased due to losses at the non-utility companies." Brewer Decl. Exh. 45 at 6. But

defendants conducted no analysis as to the likely impact of the Transfer on the regulated

Montana utility business' cost of capital or access to the markets. Hanson, in particular,

apparently had no interest in assuring that Clark Fork acted consistently with the promise he had

made to the MPSC.

> 3.   There Is Substantial Evidence That Defendants Knew of NorthWestern's
> Desperate Financial Circumstances That Had Been Concealed From the
> Public and the QUIPS Holders.

The nature and extent of the massive fraud in NorthWestern's publicly disclosed

financials, as well as the severe and worsening (but undisclosed) liquidity crisis it was

experiencing from September through November 2002, are described at some length in section II

of plaintiffs' opposition to NorthWestern's summary judgment motion, and at greater length in

the Berliner Report and Marcus Report. Those descriptions (setting forth the various false

statements and omissions in NorthWestern's financials, many of which related to the failure of

its unregulated subsidiaries Expanets and Blue Dot and the fiasco involving Expanets' attempted

adoption of the so-called EXPERT system), are incorporated herein by reference. The jury will

not be required to accept defendants' self-serving claim that they had absolutely no idea that any

of this was going on. For Hanson, in particular, there is considerable evidence of his knowledge

of the true facts that were concealed from the public.[22]

---

[22]   There is less direct evidence in the record of Kindt's state of knowledge, but he cannot rely on ignorance as
a defense given his failure to fulfill his fiduciary duty to make sure he was appropriately informed before
acting. See supra at 13-14. He does not even assert that he relied on affirmative assurances from Hanson,
his superior, that the Transfer was appropriate. Indeed, on the one hand Mr. Kindt claims he never even
reviewed NorthWestern's financial statements in connection with the Transfer (H&K SUF #38), yet on the
other simultaneously claims that he had no concerns because he believed that the "balance sheet of

21

REDACTED

In fact, the record shows he was keenly aware of those problems from January through the date of the Transfer.

REDACTED

Shortly following NorthWestern's acquisition of Clark Fork, Hanson sent a memo to NorthWestern's CEO and others boldly suggesting that he receive a million-dollar-plus bonus for his work in facilitating the acquisition. Brewer Decl. Exh. 52. The memo stressed the worthlessness (concealed by the ongoing fraud) of Expanets and Blue Dot, and the value associated with Clark Fork as the only way NorthWestern could offset those drags on its performance:

REDACTED

---

NorthWestern was strong." H&K SUF #44. He is clearly trying to have it both ways: he had absolutely no way of knowing NorthWestern's financial condition, yet he was sure that it was healthy. The jury will be entitled to see through this self-serving and inconsistent position.

22

REDACTED

23

 Hanson also attended meetings throughout the year at which Expanets' ongoing problems were discussed. Brewer Decl. Exh. 40 at 41-42, 45, 48, and 113. Other testimony confirms that knowledge of Expanets' deteriorating performance was widespread. NorthWestern's 30(b)(6) designee testified that by May 2002 it was well known throughout NorthWestern that Expanets was having difficulties meeting its targets. Brewer Decl. Exh. 20 at 59. Merle Lewis (NorthWestern's CEO during 2002) testified that senior executives, including the CEOs of Expanets, Blue Dot, and the Utility businesses (which was Hanson at the time) were made aware of what was going on at the company as a whole and at the various subsidiaries through attendance of monthly meetings and through the "MFIR" reports. Brewer Decl. Exh. 53 at 33-34.

---

23   This memo also raises substantial questions about the sincerity of Hanson's promise to the MPSC, discussed supra at 21, that

REDACTED

Hanson acknowledges receipt and review of the MFIRs, H&K SUF #25 & 26; Brewer Decl. Exh. 40 at 42-43. These contained explicit descriptions of the consequences of Expanets' deterioration and consumption of cash for NorthWestern as a whole, as well as the negative direction of the trend. For example,

REDACTED

REDACTED

24

24

REDACTED

Defendants' euphemistic spin on these highly revealing documents (H&K SUF #26, documents reviewed by Hanson showed that Expanets "experienced some delays in repaying cash advances"; #24, Hanson "was informed during 2002 that Expanets was having certain problems, but was repeatedly informed Expanets was working to fix those problems") need not be credited by the jury. Every month, Hanson knew the situation was worse. Every month, Hanson knew that last month's plan for fixing the problem had failed but there was yet another new plan (with a further delayed timeline) for doing so. The jury is free to reject the notion that an experienced businessman like Hanson blindly accepted each new excuse at face value, believing this time it would be different.

Moreover, whatever Hanson may claim to have believed about the future prospects for Expanets' fixing the ongoing EXPERT fiasco and generating positive cash flow, he cannot evade his knowledge that NorthWestern's financials were fraudulent. At the very same time that Hanson acknowledges he knew of both the problems with EXPERT and the mounting unpaid advances, NorthWestern was issuing 10-Q's claiming that, "The [EXPERT] system is now

25

operational and savings are expected to continue throughout 2002," and failing to disclose the ever-increasing amount of the advances to Expanets and the decreasing likelihood of timely repayment thereof. Berliner Report 3-7; Brewer Decl. Exh. 46 at 25.

The MFIRs also put Hanson on notice of NorthWestern's rapidly deteriorating cash and liquidity situation.

REDACTED

Finally, Hanson was present at the climactic Board meeting in early November, at which the liquidity crisis came to a head and it became clear that the Board had lost faith in management. Brewer Decl. Exhs. 7 at 90; 38. He was also fully aware of, and involved in the response to, the followup directives from the board demanding that management urgently explore any and all sources of new cash and immediate cost savings (treating "nothing as sacred"), in an unsuccessful attempt to postpone the company's ultimate demise and bankruptcy filing. Brewer Decl. Exh. 36.

Beyond this specific evidence of knowledge, both defendants are also personally implicated in NorthWestern's corporate culture of fraud, thus further undercutting the credibility of their contentions that they believed the published financial data was accurate and had no reason to be suspicious. Bart Thielbar, who as of 2002 ran a subsidiary named NCS which reported to Mr. Hanson, testified that that there was an "aggressive environment" in the business unit led by Hanson and that: "There was a lot of emphasis on meeting targets, more so than what

26

I had experienced at my prior company." Brewer Decl. Exh. 55 at 38.  In 2002, internal auditors uncovered improper accounting at NCS.  The SEC has sued Thielbar (who remains on NorthWestern's payroll) in connection with his role in that improper accounting.  Case No. 06-4253 (D. S.D. 2006).

# REDACTED

After the internal auditors completed their investigation, they wished to share it with the NorthWestern's outside auditors and the Audit Committee of its board, but were told they could not do so until Hanson had a chance to respond.  Hanson stonewalled, causing weeks of delay throughout October 2002 (the very time when the company was reaching the culmination of its financial crisis), creating a risk that the financials for the third quarter might be finalized without the errors corrected.  Ultimately, on October 30 (four full weeks after Hanson promised they would be in a position to send the report to the Audit Committee within "a few days") the auditors took the risk of going around management and communicating directly with Bruce Smith, the outside director who chaired the Audit Committee.  Brewer Decl. Exh. 57.  This step proved risky indeed.  The internal auditors who had uncovered the fraud at NCS then received negative performance reviews delivered by Kindt.  The auditors understandably viewed these negative reviews as retaliation for their work uncovering the fraud that occurred in a subsidiary supervised by Hanson and appealed, resulting in a directive that Kindt's negative evaluations be vacated.  Brewer Decl. Exh. 58.

27

III.    DEFENDANTS HAVE NOT ESTABLISHED THAT THEIR DAMAGES EXPOSURE
        IS CAPPED AS A MATTER OF LAW

As if telegraphing their weakness on the merits of the case, defendants spend a

substantial portion of their oversize brief trying to limit the jury's discretion on the nature and

kind of damages that may be awarded. These arguments are not well-taken either legally or

factually.

A.    Compensatory Damages Are Not Capped by Magten's Purchase Price.

Defendants' argument that Magten's recovery of compensatory damages should be

limited to the amount Magten paid for the QUIPS on the secondary market is wholly

unsupported. Defendants' invocation of Spackman v. Ralph M. Parsons Co., 414 P.2d 918

(Mont. 1966), (which they concede has been limited by subsequent caselaw in any event) is

misplaced. H&K Br. at 45-46. Spackman involved a plaintiff who sought compensatory

damages after his personal and real property was destroyed by a flood in his basement caused by

the defendant's negligence. As to his personal property, the court limited his award of

compensatory damages to "their value in a used condition upon the market nearest the [time] of

their destruction or damage," rather than their original purchase price. Id. at 508. Here,

defendants seek to turn this principle on its head by focusing on a subsequent sales price, rather

than the value of the QUIPS as of the date of the damage caused by defendants' wrongful

conduct in enabling the Transfer. (Defendants do not contend that the QUIPS were not worth

their full face amount on the date of the Transfer.)

In each of the cases cited by the defendants, the party who sought compensatory damages

was the owner the damaged property at the time of the injury and the relevant inquiry on

compensatory damages focused on the value of the damaged property at the time of the injury.

See, e.g., Chandler v. Madsen, 642 P.2d 1028 (Mont. 1982) (plaintiffs sought compensatory

28

damages from a civil engineer whose negligence caused damage to their home while they lived

there). They cite no Montana cases that even address the relevance of a post-injury change of

ownership.

What defendants are really arguing is that Magten should not be able to stand in the shoes

of its predecessors in interest (the QUIPS holders as of the date of the injury and/or the Trust

which held and continues to hold the Junior Debenture) for purposes of damages calculation.

But defendants have already litigated and lost this issue.[25] In their original 2004 motion for

summary judgment when this case was pending in the District of Montana, defendants argued

that "Magten cannot seek to profit from its own actions" when it purchased QUIPS after the

injury had occurred. Brewer Decl. Exh. 59 at 8. Judge Cebull rejected this argument, and

explicitly held that Magten may stand in the shoes of its predecessors-in-interest in bringing this

action, as well being entitled to assert the rights of the trustee under Section 610 of the Indenture.

Brewer Decl. Exh. 48 at 6-7.[26]

Finally, Defendants' unsupported theory that Magten's recovery should be limited to its

purchase price of the QUIPS would promote an inefficient judicial system and would unjustly

benefit the Defendants. This would require each current and past owner of the QUIPS to seek

recovery from the Defendants in order to recover, in the aggregate, full compensation for the

harm done and the value destroyed by the defendants. Such a system would result in duplicative

litigation and a waste of judicial resources. Defendants seek an unjust windfall by being let off

---

[25] As discussed in Section I, supra, defendants are barred by the law of the case doctrine from relitigating Judge Cebull's rulings.

[26] As with defendants' other arguments arising from the timing of Magten's purchases, any issue that might arise if defendants were permitted to relitigate Judge Cebull's decision could be fully addressed by granting the pending motion to amend the complaint and add Law Debenture (to whom this fanciful damages limitation theory could not possibly apply) as a co-plaintiff.

29

the hook for the damages they caused that was partially reflected in the market price of the QUIPS at the time Magten acquired them. This self-serving stratagem should be rejected.

      B.    Defendants' Argument that Magten Failed to Mitigate its Damages is Equally Flawed Because Magten Has Not Caused the Value of the QUIPS to Decline.

There is no dispute that Montana law requires an injured party to act reasonably under the circumstances so as not to unnecessarily enlarge damages caused by a default or injury. H&K Br. at 46 (citing Performance Mach. Co., Inc. v. Yellowstone Mountain Club, LLC, 169 P.3d 394, 403 (Mont. 2007)). The cases cited by the Defendants confirm that the relevant inquiry is whether the party seeking damages has failed to take reasonable steps to prevent further damage to the injured property. See, e.g., Town Pump, Inc. v. Diteman, 622 P.2d 212, 215 (Mont. 1981) (affirming district court's judgment that plaintiff was not entitled to be indemnified when its own "subsequent" negligence and failure to act further damaged landowners' property). But there is no claim that this happened here. All of the injury to the value of the QUIPS occurred as a result of the Transfer, and is attributable to the acts of NorthWestern and the defendants; the change in the ownership has had no impact on the QUIPS' value. The QUIPS would be worth no more today had their holders as of the date of the Transfer continued to hold them rather than achieving partial compensation without litigation by taking advantage of the opportunity to sell them to Magten on the secondary market.[27] Let there be no doubt: there is simply no allegation

---

[27]    Defendants make much of Mr. Embry's admission that he "thought [purchasing the QUIPS] was a good investment." Def. Br. at 47. But NorthWestern's chapter 11 case was ongoing at the time of the purchases and it was uncertain (depending on both issues of priority and valuation) how the QUIPS would be treated. That the full extent of the damage to the QUIPS' value caused by the Transfer was not yet quantified as of the date of Magten's purchases does not mean that the purchase had any impact on the amount of damages. Ultimately, as a result of the Transfer the QUIPS were deemed out of the money and recovered nothing in NorthWestern's chapter 11 plan except for a minimal amount offered solely by way of settlement to those QUIPS holders who agreed to release Transfer-related claims such as those being litigated in this action and in 04-1494. D.I. 1924, at 35 / § 4.8(b), Case No. 03-12872.

that the damage to the value of the QUIPS was enlarged by virtue of Magten's purchase of the QUIPS or by any of Magten's subsequent actions or inaction regarding the QUIPS.

Furthermore, defendants are wrong in alleging that Magten has failed to take any steps to mitigate damages. Magten tried to render the continuation of this litigation unnecessary by attempting to get full recovery for the QUIPS under NorthWestern's chapter 11 plan from the bankruptcy court. Magten's efforts to mitigate the damages caused by defendants' misconduct continue through the present, as can be seen by its continued and aggressive prosecution of its damages claims against NorthWestern. It should be noted that defendants will be able to benefit from a reduction in their damages exposure to the extent of Magten's ultimate recovery from NorthWestern.[28]

C.    There Is No Basis To Take The Issue of Punitive Damages Away from the Jury.

Under Montana law, liability for punitive damages must be determined by the trier of fact. Mont. Code § 27-1-221(6). In awarding punitive damages, the factfinder must consider whether plaintiff has shown at trial, by clear and convincing evidence, that the defendant acted with actual fraud or actual malice. Mont. Code § 27-1-221(1), (5). The courts are extremely reluctant to take the issue of determining liability for punitive damages away from the jury. Cartwright v. Equitable Life Assurance Soc'y of the United States, 914 P.2d 976, 998 (Mont. 1996) ("liability for punitive damages must first be determined by the trier of fact"); Dunfee v. Baskin-Robbins, Inc., 720 P.2d 1148, 1155 (Mont. 1986) ("When the question [regarding evidence on punitive damages] for jury submission is a close one, doubt should be resolved in favor of the jury deciding a fact issue."); First Nat'l Bank in Libby v. Twombly, 689 P.2d 1226

---

[28] Due to the terms of NorthWestern's confirmed chapter 11 plan, however, Magten will only be able to recover a maximum of approximately 62% of its claims against NorthWestern, making it impossible to mitigate its damages fully by this means. D.I. 1924, at § 4.8(b)(i), Case No. 03-12872.

31

(Mont. 1984) (holding that the trial court erred in not letting the issue of punitive damages go before the jury).

Defendants cite only one case, <u>Trifad Entertainment, Inc. v. Anderson</u>, 36 P.3d 363 (Mont. 2001), in support of their argument that the issue of punitive damages should not be determined at trial. But <u>Trifad</u> was a post-verdict appeal from a bench trial, where the judge, and not a jury, was the factfinder. While the state supreme court reversed the trial judge on liability, it deferred to the trial judge's ruling, as factfinder, that punitive damages were not warranted. Because Magten has requested a jury trial in this action, Montana law requires that the jury make the ultimate decision on whether punitive damages are warranted.

Viewed most favorably to plaintiffs, the possibility of a jury finding of actual malice cannot be ruled out before trial. Both defendants totally ignored the conflict of interest that was obviously present in the situation. Both defendants gave no consideration whatsoever to the welfare of Clark Fork and its stakeholders, including the QUIPS holders, who were at obvious and foreseeable risk of injury, manifesting conscious indifference to their plight.

Hanson also reaped a handsome personal profit as a result of breaching his duties to Clark Fork at NorthWestern's direction and for NorthWestern's benefit. As noted above at 23, during the period leading up to the Transfer he asked NorthWestern for a million-dollar-plus bonus for his role in giving NorthWestern access to Clark Fork's assets as means of solving the severe problems it was facing as a result of the ongoing failure of Expanets and Blue Dot. While he did not receive his full request, he was given a bonus of $540,000 which, when combined with his considerable base salary and other compensation made him NorthWestern's third-highest-compensated employee for 2002, the year in which NorthWestern carried out both its massive fraud and the Transfer that the fraud (consummated as a result of Hanson's own acts as

32

CEO of Clark Fork) enabled.  Brewer Decl. Exh. 60 at 86.  Following the Transfer, and the use of the assets taken from Clark Fork to provide superior recoveries to other creditors in NorthWestern's chapter 11 while the QUIPS holders received nothing, Hanson continued to prosper, ultimately advancing to CEO of NorthWestern.

It will always be easy and tempting for officers of wholly-owned subsidiaries to follow the directives of the corporate parent without questioning them or considering the potentially divergent interests of the subsidiary and its own stakeholders.  That will generally be the path of least resistance, and may lead to more obvious financial reward, when acting as fiduciary to protect the subsidiary's distinct rights and interests may seem difficult and unrewarding.  The jury may properly find that punitive damages are thus especially appropriate here, to make clear that fiduciaries may not abandon their duties and blindly carry out orders which will render the company they owe those duties to insolvent, simply to avoid difficult situations and hard choices.  See Finstad v. W.R. Grace & Co.-Conn., 8 P.3d 778, 782 (Mont. 2000) ("under Montana law punitive damages serve two purposes: (1) to set an example, and (2) to punish the wrongdoer").

D.    The Applicable Law Provides for Attorneys' Fees If Magten Prevails.

Defendants claim that no basis for an award of attorney's fees exists, but manage to overlook the express language of the very provision of Montana law they invoked earlier in their brief.  They cite Mont. Code § 35-8-1104 as part of their argument that these claims must be brought as a derivative action on behalf of Clark Fork. H&K Br. at 24-27.  Subsection (4) of that very provision reads in pertinent part: "If a derivative action for a limited liability company is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney fees . . . ."

33

Moreover, courts have long recognized that exceptions to the so-called "American Rule" frequently apply in derivative litigation. <u>Tandycrafts, Inc. v. Initio Partners</u>, 562 A.2d 1162, 1164-65 (Del. 1989) (noting that such fee awards are generally appropriate when the lawsuit creates a common fund benefiting the company's stakeholders or another "corporate benefit"). Indeed, such fee-shifting may even be appropriate in a case brought by an individual plaintiff not technically proceeding as a derivative claimant but fulfilling a similar representative or quasi-representative role. <u>Id.</u> at 1166-67 (affirming fee award to just such a plaintiff). Here, where Magten is asserting the rights of the Trust (which in turn represents precisely that constituency of Clark Fork securityholders who were most severely injured by defendants' breaches of duty), there can simply be no contention on the present record that a fee award will be impermissible.

120087.01600/40172733v.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2008, I served by hand delivery and electronic filing the Public Version of the BRIEF OF MAGTEN ASSET MANAGEMENT CORPORATION IN OPPOSITION TO MICHAEL J. HANSON AND ERNIE J. KINDT'S MOTION FOR SUMMARY JUDGMENT using CM/ECF which will send notification of such filing(s) to the following:

Denise Seastone Kraft, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801

Kathleen M. Miller, Esquire
Smith Katzenstein & Furlow LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
Greenberg Traurig LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

I also certify that, on this 4th day of January, 2008, I served the aforementioned document, by e-mail and Federal Express, upon the following participants:

Stanley T. Kaleczyc, Esquire
Kimberly A. Beatty, Esquire
Browning, Kaleczyc, Berry & Hoven, P.C.
139 North Last Chance Gulch
P.O. Box 1697
Helena, Mt 59624

John V. Snellings, Esquire
Amanda D. Darwin, Esquire
Nixon Peabody LLP
100 Summer Street
Boston, Massachusetts 02110-1832

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
Myles Bartley, Esquire
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061

Dale R. Dubé  (No. 2863)

120087.01600/40172830v.1