

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
 2

    Civil Action No. C.A. No. 04-1494 (JJF)
 3

    MAGTEN ASSET MANAGEMENT CORPORATION and
 4  LAW DEBENTURE TRUST COMPANY OF NEW YORK,
 5  Plaintiffs,
 6  v.
 7  NORTHWESTERN CORPORATION,
 8  Defendant.
 9  ------------------------------------------------------
10  Civil Action No. C.A. No. 05-499 (JJF)
11  MAGTEN ASSET MANAGEMENT CORP.,
12  Plaintiff,
13  v.
14  MICHAEL J. HANSON and ERNIE J. KINDT,
15  Defendants.
16  ------------------------------------------------------
17                      DEPOSITION OF
18                      ERNIE KINDT
19  ------------------------------------------------------
20
21
22
23
24
25  TAKEN ON:  6/28/2007           BY:  DANA ANDERSON
```

Page 2

```
 1   APPEARANCES:
 2   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
       One New York Plaza
 3   New York, New York 10004-1980
       By:  Gary L. Kaplan, Esq.
 4        Philip Kimball, Esq.
 5   For the Plaintiffs
 6
 7
 8
 9   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
       101 Park Avenue
10   New York, New York 10178-0061
       By:  Nancy E. Delaney, Esq.
11
       For NorthWestern Corporation
12
13
14
15   BROWNING, KALECZYC, BERRY & HOVEN, PC
       139 North Last Chance Gulch
16   Helena, MT 59601
       By:  Stanley T. Kaleczyc, Esq.
17        Kimberly A. Beatty, Esq.
18   For Michael J. Hanson and Ernie J. Kindt
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:  (Continued)
 2     NIXON PEABODY, LLP
         100 Summer Street
 3     Boston, MA 02110-2131
         By:  John V. Snellings, Esq.
 4
       For Law Debenture Trust Company of New York
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   INDEX
 2   Examination by Mr. Kaplan, page 5
 3   Examination by Mr. Kaleczyc, page 83
 4   Further Examination by Mr. Kaplan, page 87
 5
 6   INDEX OF EXHIBITS
 7   Exhibit Number 1, NorthWestern Energy, LLC
       Resolution of Managing Member dated November 5,
 8   2002, page 13
 9   Exhibit Number 2, November 15, 2002 Letter from
       Ernie Kindt to The Bank of New York, page 19
10
       Exhibit Number 3, July 31, 2002 Memorandum from Eric
11   Jacobsen to NorthWestern Board of Directors
       regarding Going Flat Resolution, page 27
12
       Exhibit Number 4, Valuation Report Prepared for
13   NorthWestern Corporation, Valuation as of December
       31, 2002, page 34
14
       Exhibit Number 5, March 18, 2002 Confidential
15   Memorandum from Eric Jacobsen and Mike Hanson to
       Merle Lewis, Dick Hylland and John Van Camp
16   regarding MPC Compensation Proposal, page 58
17   Exhibit Number 6, NorthWestern Corporation Board of
       Directors Meeting, November 5-6, 2002, page 66
18
       Exhibit Number 7, November 14, 2002 Letter from
19   Michael Hanson to MaryBeth Lewicki regarding
       Economic Viability of Milltown Dam Hydroelectric
20   Facility Site, page 68
21
22
23
24
25
```

Page 5

```
 1   THE DEPOSITION OF ERNIE KINDT is taken on this 28th
 2   day of June, 2007, at the Holiday Inn Sioux
 3   Falls-City Centre Hotel in Sioux Falls, South
 4   Dakota, commencing at the hour of 1:08 p.m.,
 5   pursuant to Notice.
 6
 7        ERNIE KINDT,
 8   called as a witness, being first duly sworn, was
 9     examined and testified as follows:
10
11        EXAMINATION
12
13   BY MR. KAPLAN:
14   Q.  Good afternoon, Mr. Kindt.  My name is
15       Gary Kaplan.  I'm from Fried, Frank, Harris,
16       Shriver and Jacobson we are counsel to Magten
17       Asset Management in connection with this
18       litigation.
19            Just a couple of things that I am
20       going to go through that are for the benefit of
21       the court reporter.  I have a tendency to speak
22       fast.  So if I'm saying something that's too
23       fast or you don't understand my question, let
24       me finish my question, and then you can ask me
25       and I'll try to repeat it, try to clarify it.
```

2 (Pages 2 to 5)

Page 26

```
1          MS. DELANEY: Objection, lack of
2     foundation.
3          THE WITNESS: That was my
4     understanding.
5   BY MR. KAPLAN:
6   Q. That was your understanding.
7          You were involved in the application
8     process, if you will, in connection with
9     NorthWestern's acquisition of Montana Power,
10    correct?
11  A. The application process to the -- to who?
12  Q. To the Montana regulators.
13  A. No.
14  Q. Did you review any of the submissions that went
15    to the regulators with respect to the
16    acquisition?
17  A. I would have reviewed -- I would have read the
18    testimony of the -- of everybody.
19         MS. DELANEY: Could we just get a
20    timeframe, Gary? Are you talking about --
21         MR. KAPLAN: I'm talking in the
22    original acquisition of Montana Power, not
23    the going flat, the original acquisition by
24    NorthWestern of Montana Power.
25  BY MR. KAPLAN:
```

Page 27

```
1   Q. Is that what you were answering?
2   A. Yes.
3   Q. Would you have read the testimony prior to it
4     being submitted?
5   A. I believe so, yes.
6   Q. Would you have provided comments on it?
7   A. I don't believe I did.
8   Q. To the extent that you thought anything was
9     incorrect in the testimony, would you have
10    commented on it?
11         MR. KALECZYC: Objection.
12         THE WITNESS: If I thought something
13    was incorrect in -- yeah, I would have
14    commented.
15  BY MR. KAPLAN:
16  Q. But to the best of your recollection you didn't
17    comment on anything?
18  A. That's right.
19         (Deposition Exhibit Number 3 marked
20    for identification.)
21  BY MR. KAPLAN:
22  Q. Do you ever recall NorthWestern Corporation
23    issuing any public release or public statement
24    saying that they had been denied a PUCHA
25    exemption?
```

Page 28

```
1   A. That's so long ago. I don't really remember.
2   Q. Let me show you what we are marking as Kindt
3     Exhibit 3. It's a one-page document Bates
4     stamped NOR 066673.
5   A. (Reviews document.)
6   Q. For the record, it's a memo from Eric
7     R. Jacobsen to the NorthWestern board of
8     directors dated July 31, 2002. Have you ever
9     seen this before?
10  A. No.
11  Q. Is this memo consistent with your understanding
12    of NorthWestern Corporation's intentions with
13    respect to NorthWestern Energy LLC?
14  A. No.
15  Q. How does it differ?
16  A. This indicates that they had always intended to
17    go flat. That is different from my
18    understanding.
19  Q. And when Dave Monaghan had told you about the
20    going-flat transaction he never told you that
21    it was always their intention to do so, did he?
22  A. No.
23  Q. Did anybody ever tell you that they had always
24    intended to go flat?
25  A. No.
```

Page 29

```
1   Q. Did anybody ever tell you that part and parcel
2     of NorthWestern's acquisition of Montana Power,
3     that the last step would be to go flat?
4   A. No.
5   Q. Does this memo reflect your -- refresh your
6     recollection at all as to the timeframe of when
7     people started to discuss with you the
8     going-flat transaction?
9   A. No.
10  Q. Do you recall whether it was during the summer
11    of 2002?
12  A. No. It would have been later than that.
13  Q. So just to make sure I understand your
14    perspective and what you knew at the time. It
15    was your understanding at the outset when
16    NorthWestern acquired Montana Power, that they
17    would hold the Montana utility assets in a
18    separate LLC if they could, correct?
19  A. It was my understanding that if they could,
20    they would hold it as a separate entity.
21  Q. And then later on when they didn't get the
22    exemption or at least when you were told they
23    didn't have the exemption, that's when there
24    was at least the first discussion with you
25    about a going-flat structure?
```

8 (Pages 26 to 29)

Page 30

1  A. Yes.
2  Q. So it's not really accurate to say that this
3     was one sort of step of one large transaction
4     from -- of the acquisition of Montana Power, is
5     it?
6         MR. KALECZYC: Objection, calls for a
7     legal conclusion.
8         MS. DELANEY: Objection.
9         THE WITNESS: It was always a
10        possibility that if they could not hold it
11        as a separate company, that they would have
12        to merge them together.
13 BY MR. KAPLAN:
14 Q. They would have to do it at a subsequent date
15    if certain things happened, correct?
16 A. Correct.
17 Q. But your understanding was, again, at the time
18    it wasn't what they hoped to do or intended to
19    do?
20        MR. KALECZYC: Objection, asked and
21    answered.
22        THE WITNESS: It was -- it was not my
23    understanding of their preferred method of
24    holding the asset.
25 BY MR. KAPLAN:

Page 31

1  Q. In connection with the going-flat transaction,
2     did you review NorthWestern's -- when I say
3     NorthWestern, I mean the parent company's
4     financials?
5  A. As part of the going-flat structure, no, I did
6     not.
7  Q. Did you do any diligence to see whether
8     NorthWestern Corporation would be able to
9     satisfy obligations to the QUIPS holders?
10 A. NorthWestern owned the assets subject to the
11    liabilities that were outstanding. They were
12    assuming those liabilities. To the best of my
13    knowledge, they had the financial wherewithal
14    to continue to service the debt.
15 Q. What was that knowledge based on?
16 A. The cash flow was there. They were managing
17    the cash flow on a corporate basis at the time.
18    Whenever the utility needed cash, it was
19    available.
20 Q. Did you review projections to see whether the
21    cash flow would still be there?
22 A. No, I did not.
23        MS. DELANEY: Objection to form.
24 BY MR. KAPLAN:
25 Q. Did you -- did you review the financial

Page 32

1     statements of the other NorthWestern divisions
2     or entities to see how they were performing?
3  A. No, I did not.
4  Q. Did you discuss with anyone at NorthWestern
5     whether they would have the financial
6     wherewithal to honor their obligations under
7     the QUIPS?
8  A. No, I did not.
9  Q. Did you review NorthWestern's public financial
10    statements, its SEC filings in connection with
11    the going-flat transaction?
12 A. Not specifically in conjunction with the
13    going-flat.
14 Q. Did you have any discussions with Mr. Hanson
15    with respect to whether NorthWestern would be
16    able to satisfy its obligations under the
17    QUIPS?
18 A. No, I did not.
19 Q. Did you have any concerns with respect to
20    whether NorthWestern would be able to satisfy
21    its obligations under the QUIPS?
22 A. No, I did not.
23 Q. Did you have any views as to the value of the
24    assets that were being transferred to
25    NorthWestern?

Page 33

1         MR. KALECZYC: Objection, vague.
2         THE WITNESS: The assets that were
3     being merged with NorthWestern
4     were -- the book value less the liabilities
5     was the amount that the company carried on
6     its books as equity in the company. That
7     was basically NorthWestern's ownership
8     interest in the assets. That net was
9     positive. I don't know what more you --
10 BY MR. KAPLAN:
11 Q. Do you recall what that book value was, I guess
12    the net book value?
13 A. At that date, no.
14 Q. Did you request that any valuation be done of
15    the assets being transferred up to
16    NorthWestern?
17        MR. KALECZYC: Objection to time.
18 BY MR. KAPLAN:
19 Q. Prior to -- I'll say around the same time as
20    the going-flat transaction?
21 A. I didn't. But I do believe that there was an
22    update to the appraisal that was done at the
23    time that NorthWestern bought the assets.
24 Q. Do you recall what the value -- what the
25    appraisal said the value was when NorthWestern

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 34

1  first acquired the assets?
2  A. Well, what the appraisal did was allocate the
3     value that NorthWestern paid for the assets and
4     arrived at a goodwill.
5  Q. Do you recall what that number was?
6  A. Not off the top of my head.
7     (Deposition Exhibit Number 4 marked
8     for identification.)
9  BY MR. KAPLAN:
10 Q. I'll mark as Kindt Exhibit 4 a lengthy document
11    that is Bates stamped NOR 266670 through NOR
12    266724.
13 A. (Reviews document.)
14 Q. And it says on the front Valuation Report
15    Prepared for NorthWestern Corporation, and its
16    a valuation as of December 31, 2002.
17    Have you ever seen this document
18    before?
19 A. Yes, I have.
20 Q. When did you first see this document?
21 A. This is the report that I referred to that was
22    updated from the initial purchase. So I would
23    have seen it, probably drafts before it was
24    issued.
25 Q. Did you comment on the drafts before it was

Page 35

1  issued?
2  A. I don't remember if I had any issues with it or
3     not.
4  Q. Did you have discussions with Bearing Point
5     with respect to the valuation?
6  A. With the initial valuation, I do remember
7     conversations with the update. I don't
8     remember if there were any specific
9     conversations.
10 Q. If you recall, what was the nature of the
11    conversations that you had with Bearing Point?
12 A. There was discussion of the -- they came in and
13    spent several weeks preparing the initial
14    report going over all the assets. So there
15    would have been discussion of the nature of the
16    assets, how they should be valued, what was
17    subject to utility regulation, what wasn't.
18 Q. If you look on page 3, says that their rounded
19    grand total is $1.5 billion?
20 A. Uh-huh.
21 Q. Did you have any reason to disagree with that
22    valuation?
23 A. No, I wouldn't.
24 Q. Do you believe that the valuation is correct?
25 A. I wouldn't have any reason to doubt it.

Page 36

1  Q. Why was this valuation done?
2     MR. KALECZYC: Objection, foundation.
3     THE WITNESS: I don't know all of the
4     reasons that the valuation was done. But
5     from an accounting perspective, a valuation
6     was needed in order to set the goodwill on
7     the books.
8  BY MR. KAPLAN:
9  Q. Do you recall whether this valuation is higher
10    or lower than the initial valuation?
11 A. At this point I could not accurately answer
12    that.
13 Q. Do you recall whether this was substantially
14    different than the previous valuation?
15    MR. KALECZYC: Objection, vague.
16    MS. DELANEY: Objection.
17    THE WITNESS: I don't believe it's
18    substantially different.
19 BY MR. KAPLAN:
20 Q. Did the valuation conclusion of the
21    $1.5 billion surprise you?
22 A. No.
23 Q. Fair to say that it was generally consistent
24    with your views in the value of the assets?
25 A. It was generally consistent with my views of

Page 37

1  the gross assets.
2  Q. Now, you said earlier that in connection with
3     the going-flat transaction, NorthWestern
4     assumed certain liabilities, correct?
5  A. Correct.
6  Q. Do you recall the value of the -- or the total
7     liabilities that were assumed?
8  A. Off the top of my head, no.
9  Q. When the going-flat transaction was occurring,
10    did you look at whether there was a difference
11    between the value of the assets being
12    transferred and the liabilities being assumed?
13    MR. KALECZYC: Objection.
14    MS. DELANEY: Objection.
15    THE WITNESS: As I stated before, the
16    -- NorthWestern owned the LLC what's meant
17    that they owned the assets subject to the
18    liabilities, the difference between the
19    value of the assets and the value of the
20    liabilities was NorthWestern's ownership
21    interest.
22 BY MR. KAPLAN:
23 Q. But NorthWestern owned the equity, in essence,
24    of the LLC?
25 A. Yes.

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 38

1　Q. They didn't own the assets themselves?
2　A. Well, when you are dealing with an LLC,
3　　 effectively they own the assets.
4　Q. Perhaps for tax purposes -- I mean, but there
5　　 is a difference between effectively owning the
6　　 assets and owning the assets?
7　　　　 MR. KALECZYC: Objection to the extent
8　　 it calls for a legal conclusion.
9　　　　 MS. DELANEY: I'll join in the
10　 objection.
11　　　　 THE WITNESS: I would think that
12　　 that's a legal issue. I'm not a lawyer.
13　BY MR. KAPLAN:
14　Q. Let's put it this way: If NorthWestern already
15　　 owned the assets, what was the purpose of the
16　　 going-flat transaction?
17　　　　 MR. KALECZYC: Objection.
18　　　　 MS. DELANEY: Objection.
19　　　　 THE WITNESS: My understanding was the
20　　 going-flat transaction was to comply with
21　　 the PUCHA law.
22　BY MR. KAPLAN:
23　Q. But if NorthWestern already owned the assets,
24　　 why would it have any problem with PUCHA?
25　　　　 MR. KALECZYC: Objection.

Page 39

1　　　　 MS. DELANEY: Objection.
2　　　　 THE WITNESS: There is a lot of times
3　　 that the structure of a company has to meet
4　　 certain requirements.
5　BY MR. KAPLAN:
6　Q. As a technical matter, putting aside
7　　 effectively owning, as a technical matter,
8　　 prior to the going-flat transaction,
9　　 NorthWestern's ownership interest was ownership
10　 of the LLC interest?
11　A. That's correct.
12　Q. And following the going-flat transaction,
13　　 NorthWestern actually owned the assets
14　　 themselves?
15　A. That's correct.
16　Q. Okay. Now in connection with the going-flat
17　　 transaction, did you look at the value of the
18　　 assets being transferred and the amount of
19　　 liabilities that were being assumed by
20　　 NorthWestern?
21　　　　 MR. KALECZYC: Objection, vague.
22　　　　 THE WITNESS: No.
23　BY MR. KAPLAN:
24　Q. Did you look to ensure that the LLC was
25　　 receiving fair value from NorthWestern?

Page 40

1　　　　 MR. KALECZYC: Objection.
2　　　　 MS. DELANEY: Objection, foundation.
3　　　　 THE WITNESS: Like I previously
4　　 indicated, my understanding was that
5　　 NorthWestern owned the LLC and effectively
6　　 owned the net assets and that all they were
7　　 doing was converting their ownership
8　　 interest into ownership of the actual
9　　 assets and that there was no actual sale.
10　BY MR. KAPLAN:
11　Q. You were an executive officer of NorthWestern
12　　 Energy LLC prior to November 15, 2002, correct?
13　A. Correct.
14　Q. You weren't an officer of
15　　 NorthWestern Corporation prior to that point,
16　　 were you?
17　A. That's correct.
18　Q. And as -- and you took direction from Mike
19　　 Hanson, correct?
20　　　　 MR. KALECZYC: Objection, vague.
21　BY MR. KAPLAN:
22　Q. You reported --
23　A. I took direction through Dave Monaghan who
24　　 reported to Mike Hanson.
25　Q. And Mike Hanson was the CEO of NorthWestern

Page 41

1　　 Energy LLC, correct?
2　A. Correct.
3　Q. You didn't report to anyone at
4　　 NorthWestern Corporation, did you?
5　A. Not directly.
6　Q. And when you say "not directly," how did you
7　　 report indirectly, if you did?
8　A. Well, when you work for a subsidiary of a
9　　 company, there is always an indirect
10　 responsibility to the parent.
11　Q. In connection with the transfer, NorthWestern
12　　 Energy LLC didn't receive any cash from
13　　 NorthWestern, did it?
14　A. No, they did not.
15　Q. The only thing that they received -- the only
16　　 thing received, if you will, was that
17　　 NorthWestern assumed certain liabilities,
18　　 correct?
19　A. That's correct.
20　Q. You mentioned earlier that certain assets were
21　　 not transferred, correct?
22　A. Correct.
23　Q. Do you recall which -- the most significant of
24　　 those assets was the Milltown Dam, correct?
25　A. Correct.

11 (Pages 38 to 41)



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> NORTHWESTERN CORPORATION, <br><br> Defendant. | C.A. No. 04-1494-JJF |

**RESPONSES AND OBJECTIONS OF NORTHWESTERN CORPORATION TO PLAINTIFFS' MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK'S FIRST SET OF INTERROGATORIES FOR DEFENDANT NORTHWESTERN CORPORATION**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, NorthWestern Corporation ("NorthWestern") through its undersigned counsel, hereby submits the following responses and objections to Plaintiffs' Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company Of New York ("Law Debenture" and collectively with Magten "Plaintiffs") First Set of Interrogatories for Defendant NorthWestern Corporation, dated February 28, 2007 ("Interrogatories").

**GENERAL OBJECTIONS**

The following general objections are incorporated into each of NorthWestern's responses and objections to the Interrogatories, as if set forth fully therein. The stated objections shall be deemed continuous throughout the responses and objections to the specific Interrogatories that follow, even though such objections are not specifically referred to therein.

1.      NorthWestern's responses and objections are based upon information presently known to NorthWestern. These are made without prejudice to producing during discovery or at

trial information, documents or data that are (a) subsequently discovered or determined to be relevant for any purpose, or (b) produced as a result of ongoing investigations, or (c) subsequently determined to have been omitted from these disclosures.

    2.      NorthWestern reserves the right at any time to revise and/or supplement these responses and objections.

    3.      In each and every response to the Interrogatories where an objection is interposed, such objection shall be construed to preserve all rights to enter similar objections as to any future supplemental answer to such requests. Moreover, a failure to object herein shall not constitute a waiver of any objection that may be interposed as to future supplemental answers.

    4.      Failure to object to any Interrogatory on a particular ground or grounds shall not be construed as any type of waiver of the right to object on any additional ground.

    5.      NorthWestern objects to the Interrogatories including, without limitation, the "Definitions," and "Instructions" to the extent that they are inconsistent with the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Delaware ("Local Rules") or impose burdens or duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure or the Local Rules.

    6.      NorthWestern objects to the Interrogatories to the extent that they seek information subject to any privilege, including without limitation, the attorney-client privilege, the work product doctrine, and/or any other applicable privilege. Any disclosure of such information is inadvertent and does not waive any applicable privilege.

    7.      NorthWestern objects to the Interrogatories on the grounds that they are vague, ambiguous, overly broad, unduly burdensome, duplicative, cumulative, irrelevant, and/or that

- 2 -

plaintiffs have failed to establish that the requested material is reasonably calculated to lead to the discovery of admissible evidence.

8.    NorthWestern objects to the definition of "Transfer" insofar as it implies that the November 15, 2002 transfer of the Transferred Assets can be viewed in any respect as a discreet transaction rather than as the last step in NorthWestern's acquisition of the Transferred Assets commencing with the Unit Purchase Agreement between NorthWestern and Montana Power Company dated September 29, 2000.

9.    The production of any information when the production of such information is objected to herein shall not constitute a waiver of any applicable objections and is without prejudice to NorthWestern's right to object later that the production of any such information was inadvertent.

10.    No objection or limitation, or lack thereof, made in these responses and objections shall be deemed an admission by NorthWestern as to the existence or nonexistence of documents or information.

11.    NorthWestern's objections and/or responses to the Interrogatories, and its production of any documents or information shall not be construed as an admission of the relevance, materiality, or admissibility of any such documents or of the subject matter of any such documents, or as a waiver or abridgment of any applicable privilege or of any applicable objection set forth above or below, or as an agreement that requests for similar documents will be treated in a similar manner. The fact that NorthWestern responds to a particular interrogatory shall not be interpreted as implying that NorthWestern acknowledges the propriety of that request. NorthWestern submits these General Objections without conceding the competency, relevancy, materiality, or admissibility of the subject matter of any document or information

- 3 -

requested by the Interrogatories. NorthWestern reserves the right, without limitation, (i) to

supplement, amend, or correct all or any part of its objections or eventual responses; and (ii) to

object to the admissibility of the information ultimately provided in response to the

Interrogatories.

## SPECIFIC RESPONSES AND OBJECTIONS

Each of the foregoing general objections is expressly incorporated into each of the
specific responses and objections set forth below.

### INTERROGATORY NO. 1.

Specify the nature and dollar amount of all Value received by Clark Fork in exchange for
the Transfer of the Transferred Assets.

### INTERROGATORY RESPONSE TO NO. 1.

NorthWestern objects to this Interrogatory insofar as it uses the definition of "Transfer"

to imply that the transfer of Transferred Assets in November of 2002 can be viewed as a discreet

transaction. NorthWestern paid for and acquired the Transferred Assets in February 2002 when

it acquired the membership interests in The Montana Power LLC ("MPLLC") pursuant to the

terms of a Unit Purchase Agreement entered into with Touch America Holdings, Inc. ("Touch

America") and The Montana Power Company on September 29, 2000. NorthWestern paid

approximately $1.1 billion in cash and the assumption of liabilities of the seller for the

Transferred Assets. The "Transfer," as defined in the Interrogatories, was simply the last step in

a multi-step process in the overall transaction pursuant to which the Transferred Assets, already

paid for by NorthWestern, were brought up into NorthWestern as the parent of MPLLC, which

was renamed NorthWestern Energy LLC and then Clark Fork.

### INTERROGATORY NO. 2.

Identify all current or former directors, officers or employees of NorthWestern or any
subsidiary and/or affiliate thereof who knew that any of the Prior Financials were materially false
and misleading at the time(s) they were issued.

-4-

**INTERROGATORY RESPONSE TO NO. 2.**

NorthWestern objects to this Interrogatory in that it contains within it the false premise

that the Prior Financials, as defined, were materially false and misleading. NorthWestern further

objects to this Interrogatory in that it calls upon NorthWestern to ascertain or divine the state of

mind of any individual or individuals.

**INTERROGATORY NO. 3.**

Identify all current or former directors, officers or employees of NorthWestern or any
subsidiary and/or affiliate thereof who are the subject of any Wells notice issued by the Securities
and Exchange Commission, including but not limited to those Wells notices referenced in
NorthWestern's 10-K dated March 3, 2006 and 10Q's dated May 4, 2006, August 3, 2006, and
November 2, 2006 and describe the possible violations of law referenced in those Wells Notices
as to each individual identified.

**INTERROGATORY RESPONSE TO NO. 3.**

Bart Thielbar, Cary Griswold, Keith Beachler, David Monahan, Jana Quam, Merle Lewis,

Richard Hylland, Kipp Orme, Kurt Whitesel, Eric Jacobson, Richard Fresia, John Charters.

NorthWestern has not received the Wells Notices and does not know the contents of those

documents.

**INTERROGATORY NO. 4.**

State the date on which NorthWestern decided to cause Clark Fork to transfer the
Transferred Assets to it, rather than control those assets indirectly through its equity ownership of
Clark Fork.

**INTERROGATORY RESPONSE TO NO. 4.**

Consideration was given to holding the Transferred Assets at the parent company level at

least as early as January 11, 2001 which is the date of the applications for regulatory approval of

NorthWestern's acquisition of the membership interests in MPLLC pursuant to the terms of a

Unit Purchase Agreement entered into with Touch America and The Montana Power Company

on September 29, 2000. NorthWestern made clear in those applications that the Transferred

Assets would be held either in a subsidiary or at the parent company level. The final Board resolution approving the Transfer of the Transferred Assets to NorthWestern was dated August 7, 2002.

**INTERROGATORY NO. 5.**

State whether and when CSFB advised NorthWestern that it would not make the 2003 Loan or otherwise refinance the Bridge Loan unless the Transfer occurred.

**INTERROGATORY RESPONSE TO NO. 5.**

NorthWestern objects to this Interrogatory on the grounds that it is vague and ambiguous. Subject to this objection and the general objections contained herein, NorthWestern states that a term of the 2003 Loan that was negotiated by NorthWestern with CSFB was that the 2003 Loan would be secured by the First Mortgage Bonds issued pursuant to the Mortgage and Deed of Trust dated October 1, 1945 from The Montana Power Company to the trustee named therein, and pursuant to the General Mortgage Indenture and Deed of Trust dated as of August 1, 1993 between NorthWestern and The Chase Manhattan Bank, as trustee.

**INTERROGATORY NO. 6.**

State the date on which NorthWestern became Insolvent.

**INTERROGATORY RESPONSE TO NO. 6.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and calls for a legal conclusion. Subject to this objection and the general objections contained herein, the date upon which NorthWestern became insolvent was September 14, 2003.

**INTERROGATORY NO. 7.**

State the date on which NorthWestern became aware that it was Insolvent.

**INTERROGATORY RESPONSE TO NO. 7.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and

calls for a legal conclusion. Subject to this objection and the general objections contained

herein, NorthWestern became aware it was insolvent on September 14, 2003.

**INTERROGATORY NO. 8.**

State the date on which NorthWestern first began to consider the possibility of non-cash
charges relating to goodwill and/or other intangible assets, as referenced in its 8-K dated
December 13, 2002.

**INTERROGATORY RESPONSE TO NO. 8.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous

and incomprehensible. Subject to this objection and the general objections contained herein,

NorthWestern's consideration of the possibility of making material non-cash changes relating to

goodwill is best reflected in the 8-K dated December 13, 2002.

**INTERROGATORY NO. 9.**

State the date on which NorthWestern first began to consider the possibility that it would
miss previously disclosed earnings estimates, as referenced in its 8-K dated December 13, 2002.

**INTERROGATORY RESPONSE TO NO. 9.**

NorthWestern objects to this Interrogatory on the grounds that it is vague and

incomprehensible. Subject to this objection and the general objections contained herein,

NorthWestern's consideration of the possibility that it would miss previously disclosed earnings

estimates on a consolidated basis is best reflected in its 8-K dated December 13, 2002.

**INTERROGATORY NO. 10.**

State the date on which NorthWestern first began to consider the possibility of restating
any of the Prior Financials.

**INTERROGATORY RESPONSE TO NO. 10.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and incomprehensible. Subject to this objection and the general objections contained herein, the decision to restate certain financial statements for the first three quarters of 2002 was made on or about February 19, 2003.

**INTERROGATORY NO. 11.**

State the date on which NorthWestern first began to consider the possible need or desirability of reducing or suspending the payment of dividends on its common stock, as it ultimately did during 2003.

**INTERROGATORY RESPONSE TO NO. 11.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and incomprehensible. Subject to this objection and the general objections contained herein, the decision to suspend the payment of dividends on its common stock was made on or about February 19, 2003.

**INTERROGATORY NO. 12.**

State the date on which NorthWestern first began to consider the possible need or desirability of failing to make timely payments of interest on any debt securities (including those included in the Assumed Liabilities), as it ultimately did during 2003.

**INTERROGATORY RESPONSE TO NO. 12.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous and incomprehensible. NorthWestern further objects to the use of the term "debt securities" as vague and ambiguous. Subject to this objection and the general objections contained herein, NorthWestern did not fail to make required payments of interest on any Assumed Liabilities prior to September 14, 2003.

**INTERROGATORY NO. 13.**

State the total dollar amount of Clark Fork's property (at a fair valuation within the meaning of Montana Code Annotated § 31-2-329) and liabilities immediately following the Transfer.

**INTERROGATORY RESPONSE TO NO. 13.**

NorthWestern objects to this Interrogatory on the grounds that it is vague, ambiguous, incomprehensible, incapable of an answer and calls for a legal conclusion. Furthermore, at the present time NorthWestern has insufficient information to determine the precise fair valuation of Clark Fork's property immediately after the Transfer. However, the fair value of Clark Fork's assets was greater than its reasonably probable liabilities. Subject to this qualification and specific and general objections contained herein, NorthWestern states that the balance sheet of Clark Fork reflected total assets of $11,005,407 and total liabilities of $11,005,407 as of December 31, 2002.

Dated: Wilmington, Delaware
March 30, 2007

**GREENBERG TRAURIG LLP**

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Tel: (302) 661-7000

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
101 Park Avenue
New York, NY 10178
Telephone:    (212) 696-6000
Facsimile:    (212) 697-1559

Attorneys for NorthWestern Corporation

- 9 -



QuickLinks -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, D.C. 20549

# FORM 10-Q

(Mark One)

☒     QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2002

or

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES ACT OF 1934

For the transition period from _____ to _____

Commission File No. 0-692



| Delaware | 46-0172280 |
|---|---|
| (State of Incorporation) | IRS Employer Identification No. |

125 South Dakota Avenue
Sioux Falls, South Dakota 57104
(Address of principal office)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (D) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

Common Stock, Par Value $1.75
37,396,762 shares outstanding at November 11, 2002

Source: NORTHWESTERN CORP, 10-Q, November 14, 2002

Summary financial information for CornerStone is as follows (in thousands):

| | September 30, 2002 | December 31, 2001 |
|---|---|---|
| Accounts receivable, net | $ 19,043 | $ 121,843 |
| Other current assets | 67,803 | 59,854 |
| Current assets of discontinued operations | $ 86,846 | $ 181,697 |
| | | |
| Property, plant and equipment, net | $ 301,342 | $ 322,126 |
| Goodwill and other intangibles, net | 305,811 | 339,058 |
| Other noncurrent assets | 36,024 | 34,013 |
| Noncurrent assets of discontinued operations | $ 643,177 | $ 695,197 |
| | | |
| Accounts payable | $ 33,748 | $ 142,578 |
| Debt | 547,272 | 470,924 |
| Other current liabilities | 117,575 | 87,492 |
| Current liabilities of discontinued operations | $ 698,595 | $ 700,994 |
| | | |
| Long-term debt | $ — | $ 424,524 |
| Minority interests | 139,239 | 161,592 |
| Other noncurrent liabilities | — | 27,556 |
| Noncurrent liabilities and minority interests of discontinued operations | $ 139,239 | $ 613,672 |
| | | |
| Partners' capital of discontinued operations | $ (7,811) | $ 41,449 |

| | Three months ended | |
|---|---|---|
| | September 30, 2002 | December 31, 2001 |
| Revenues | $ 77,811 | $ 133,137 |
| Loss before income taxes and minority interests | $ (60,339) | $ (19,893) |
| Loss from discontinued operations, net of income taxes and minority interests | $ (40,102) | $ (15,490) |

| | Nine months ended | |
|---|---|---|
| | September 30, 2002 | September 30, 2001 |
| Revenues | $ 399,809 | $ 315,780 |
| Loss before income taxes and minority interests | $ (75,060) | $ (14,813) |
| Loss from discontinued operations, net of income taxes and minority interests | $ (40,102) | $ (6,490) |

9

Source: NORTHWESTERN CORP, 10-Q, November 14, 2002

The Corporation had provided a guaranty of CornerStone's $50.0 million credit facility. CornerStone breached its covenants under this facility and through an amendment executed January 18, 2002, the facility was continued but CornerStone's ability to pay minimum quarterly distributions to its common unit holders was suspended for the remaining term of the facility. On August 5, 2002, CornerStone announced that it had elected not to make an interest payment aggregating approximately $5.6 million on three classes of its senior secured notes, which was due on July 31, 2002, and was continuing to review financial restructuring and strategic options, including the potential commencement of a Chapter 11 case under the United States Bankruptcy Code. SYN, Inc., a majority owned subsidiary of the Corporation, extended a $9.0 million loan to CornerStone for immediate financing needs. On August 20, 2002, the Corporation purchased the lenders' interest in approximately $19.9 million of short–term debt, together with approximately $6.1 million in letters of credit, of CornerStone outstanding under CornerStone's credit facility, which the Corporation had previously guaranteed. No further drawings may be made under this facility. The financial exposures related to these events have been considered as of September 30, 2002, which resulted in the third quarter charge disclosed above.

The foregoing summary financial information with respect to CornerStone is unaudited and is subject to year–end audit adjustments by CornerStone. CornerStone adopted Statement of Financial Accounting Standards No. 142 during its fiscal year ended June 30, 2002. As noted in CornerStone's Current Report on Form 8–K dated September 11, 2002, filed with the Securities and Exchange Commission on September 12, 2002, CornerStone's preliminary evaluation of the impact of its adoption of SFAS No. 142 indicates that CornerStone is likely to have a material write–off of its goodwill and intangibles during such period. A provision for loss on discontinued operations as of September 30, 2002 has been recorded based on management's best estimates as of September 30, 2002 of the amounts expected to be realized on the disposition of its investment in CornerStone. The amount the Corporation will ultimately realize could differ from the assumptions currently used in arriving at this anticipated loss.

(5) Supplemental Guarantor Financial Information

The $65 million of 8.45% Cumulative Quarterly Income Preferred Securities, Series A (QUIPS) of Montana Power Capital I, which were assumed as part of the Montana Power acquisition, have been guaranteed by the Corporation. As guarantor, we provide an unconditional guarantee, on an unsecured junior subordinated basis, of payment on these securities. NorthWestern Energy LLC is in the process of transferring substantially all of its assets and liabilities to the Corporation, including all of the NorthWestern Energy LLC QUIPS obligations. Upon completion of these transfers, anticipated by the end of 2002, the Corporation will no longer be required to include the following information in the footnotes to its financial statements. The following presents condensed consolidating financial statements as of September 30, 2002 and for the quarters then ended.

10

Source: NORTHWESTERN CORP, 10-Q, November 14, 2002

Income Statement Consolidating Schedule
Three Months Ended September 30, 2002
(in thousands)

| | Parent and Consolidated Subsidiaries | NorthWestern Energy LLC | Eliminations | Total |
|---|---|---|---|---|
| Operating Revenues | $ | $ | $ | $ 509,300 |
| Cost of Sales | 203,092 | 57,604 | — | 260,696 |
| Gross Margin | | | | 248,604 |
| Selling, general, & administrative | 117,643 | 53,307 | — | 170,950 |
| Depreciation | | | | 24,124 |
| Amortization of intangibles | 7,981 | | | 7,981 |
| Operating income | | | | |
| Interest expense | (13,023) | (21,692) | | (34,715) |
| Investment income and other | | | | |
| Income before taxes and minority interests | 1,166 | 10,650 | — | 11,816 |
| Benefit (provision) for income taxes | | | | |
| Income before minority interests | 7,546 | 7,074 | | 14,620 |
| Minority interests | | | | |
| Income from continuing operations | 7,546 | 7,074 | | 14,620 |
| Discontinued operations, net of taxes and minority interests | | | | |
| Net income (loss) | (48,391) | 7,074 | | (41,317) |
| Minority interest on preferred securities of subsidiary trusts | | | | |
| Dividends on cumulative preferred stock | (295) | | | (295) |
| Earnings (loss) on common stock | | | | |

11

Source: NORTHWESTERN CORP, 10-Q, November 14, 2002

**Income Statement Consolidating Schedule**
**Nine Months Ended September 30, 2002**
**(in thousands)**

| | Parent and Consolidated Subsidiaries | NorthWestern Energy LLC | Eliminations | Total |
|---|---|---|---|---|
| Operating Revenues | $ 1,102,505 | $ 402,560 | $ — | $ 1,505,065 |
| Cost of Sales | 651,383 | 140,744 | — | 792,127 |
| Gross Margin | 451,122 | 261,816 | — | 712,938 |
| Selling, general, & administrative | 349,544 | 142,387 | — | 491,931 |
| Depreciation | 72,170 | 32,913 | — | 105,083 |
| Amortization of intangibles | 21,911 | | — | 21,911 |
| Operating Income | 7,497 | 86,516 | — | 94,013 |
| Interest expense | (37,603) | (49,861) | — | (87,464) |
| Investment income and other | (8,803) | 1,982 | — | (6,821) |
| Income before taxes and minority interests | 2,091 | 38,637 | — | 40,728 |
| Benefit (provision) for taxes | 9,417 | (13,690) | — | (4,273) |
| Income before minority interests | 11,508 | 24,947 | — | 36,455 |
| Minority interests | 23,014 | | — | 23,014 |
| Income from continuing operations | 34,522 | 24,947 | — | 59,469 |
| Discontinued operations net of taxes and minority interests | (101,023) | | — | (101,023) |
| Income (loss) on extraordinary item | (66,501) | 24,947 | — | (41,554) |
| Extraordinary item net of $7,247 | (13,447) | | — | (13,447) |
| Net income (loss) | (79,948) | 24,947 | — | (55,001) |
| Minority interest on preferred securities of subsidiary trusts | (3,264) | | — | (3,264) |
| Dividends on cumulative preferred stock | (391) | | — | (391) |
| Earnings on common stock | (79,948) | 24,947 | — | (55,001) |

12

Source: NORTHWESTERN CORP, 10-Q, November 14, 2002





Michael J. Hanson
President & CEO
605-978-2903
mike.hanson@northwestern.com

125 S. Dakota Avenue
Sioux Falls, SD 57104-6403
Telephone: 605-978-2960
Facsimile: 605-978-2963
www.northwesternenergy.com

VIA FACSIMILE & OVERNIGHT COURIER

November 14, 2002

MaryBeth Lewicki
Vice-President, Corporate Trust Administration
Bank of New York
1010 Barcley Street – 8W
New York, New York 10286

Re:  Economic Viability of Milltown Dam Hydroelectric Facility Site

Dear Ms. Lewicki:

Pursuant to the request of William Leet and Robert Pedersen, members of the Bryan Cave law firm, I am providing this letter to you on behalf of NorthWestern Corporation ("NorthWestern") and NorthWestern Energy, L.L.C. ("NorthWestern Energy") to substantiate our position to the effect that - from a pure economic standpoint - the Milltown Dam site (the "Dam Site") has no value when its performance is evaluated based on the state of the electricity market in Montana. The Milltown Dam is an integral part of an ongoing CERCLA investigation involving the U.S. EPA and the State of Montana.

While we believe that the Dam Site has no value or only a negative value solely based upon its involvement in the CERCLA matter, our economic analysis set forth below does not factor in any of the costs associated with the environmental remediation of the Dam Site reservoir. Instead, the analysis below assumes that there is no CERCLA problem involving the Dam Site and its owner. Further, we have considered the possibility of partitioning the Dam Site, but have concluded that any such partitioning could have a material adverse impact on NorthWestern Energy's current operations of the Dam Site and would not generate significant value – particularly when weighed against the below described ongoing costs and liabilities.

Dam Site Revenue Stream:

The Dam Site's current maximum generating capacity is 2 megawatts.  On a conservative basis, assuming the Dam Site generates its maximum capacity (2 megawatts) for each hour in the year, the maximum annual revenue stream generated by the Dam Site under the applicable contract price is $573,780.00. This amount is determined as follows: [(365 days per year x 24 hours per day) x 2 megawatts x $32.75 per megawatt-hour].

NOR000803

<u>Dam Site Cost Structure</u>:

We have reviewed our current Dam Site operating budget for the years 2002 through 2010. Todd Williams, an engineer with ELM Consulting, LLC (NorthWestern's consultant working on numerous Dam Site structural and biological issues), working closely with certain NorthWestern Energy operations employees, prepared this operating budget. Based upon these operating budget estimates, during this eight-year period, the cost to operate the Dam Site ranges from a low of $1,273,799.00 to a high of $2,293,980.00. Based on this cost range, during the next eight years, the Dam Site is projected to lose a minimum of $700,019.00 ($573,780.00 - $1,273,799.00) and a maximum of $1,720,200.00 ($573,780.00 - $2,293,980.00).

<u>Conclusion</u>:

On the basis of the above analysis, the Dam Site's fixed revenue stream is not sufficient to cover the projected cost to operate the generation facility. As a result, absent ownership by a vertically integrated utility under a traditional regulated utility environment, the Dam Site has no value as a stand-alone economic operating unit. In light of this fact, the Dam Site's adds no value to the overall bond indenture collateral package. This conclusion is reached without taking into account the environmental exposure and other current actual or future contingent liabilities associated with the Dam Site.

Sincerely,

Michael J. Hanson
President & CEO

Cc:    Todd Williams
       James McCarrick, Esq.

NOR000804



GARY DROOK  April 25, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) |
| Plaintiffs, | ) ) |
| -vs- | ) C.A. 04-1494 (JJF) ) |
| NORTHWESTERN CORPORATION, | ) ) |
| Defendants. | ) |

-----------------------------------

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORP., | ) ) |
| Plaintiff, | ) ) |
| -vs- | ) C.A. 05-499 (JFF) ) |
| MICHAEL J. HANSON and ERNIE J. KINDT, | ) ) ) |
| Defendants. | ) |


Deposition of GARY DROOK taken before CAROL
CONNOLLY, CSR, CRR, and Notary Public, pursuant to the
Federal Rules of Civil Procedure for the United States
District Courts pertaining to the taking of depositions,
at Suite 2018, O'Hare Hilton, Chicago, Illinois,
commencing at 10:51 a.m. on the 25th day of April, A.D.,
2007.

2 (Pages 2 to 5)

Page 2

1    GARY DROOK  April 25, 2007
2    There were present at the taking of this
3    deposition the following counsel:
4        FRIED, FRANK, HARRIS,
         SHRIVER & JACOBSON, LLP by
5        MS. BONNIE STEINGART and
         MS. SABITA KRISHNAN
6        One New York Plaza
         New York, New York 10004-1980
7        (212) 859-8004
8
         appeared on behalf of the Plaintiff
9        Magten Asset Management Corporation;
10   NIXON, PEABODY, LLP by
     MR. CHRISTOPHER M. DESIDERIO
11       437 Madison Avenue
         New York, New York 10022-7001
12       (212) 940-3000
13       appeared on behalf of the Plaintiff
         Law Debenture Trust Company of New York;
14
15   LATHAM & WATKINS, LLP by
     MS. MICHELE F. KYROUZ
16       505 Montgomery Street
         Suite 1900
17       San Francisco, California 94111-2562
         (415) 391-0600
18
         appeared on behalf of The Witness;
19
     CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP by
20   MR. JOSEPH D. PIZZURRO and
     MS. NANCY E. DELANEY
21       101 Park Avenue
         New York, New York 10178-0061
22       (212) 696-6196
23       appeared on behalf of the Defendant
         Northwestern Corporation;
24
25

Page 3

1        GARY DROOK  April 25, 2007
2    BROWNING, KALECZYC, BERRY & HOVEN, P.C. by
     MR. STANLEY T. KALECZYC and
3    MS. KIMBERLY A. BEATTY
     139 North Last Chance Gulch
4    Helena, Montana 59624
     (406) 443- 6820
5
6        appeared on behalf of the Defendants
         Michael J. Hanson and Ernie J. Kindt.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    GARY DROOK  April 25, 2007
2                I N D E X
3         DEPOSITION OF GARY DROOK
4          TAKEN April 25, 2007
5
6    EXAMINATION BY                PAGE
7    Ms. Steingart              5
8
9
10       - - - - - - - -
11
12       EXHIBITS MARKED
13              PAGE
14   Deposition Exhibit No. 1       5
15   Deposition Exhibit No. 2       16
16   Deposition Exhibit No. 3       22
17   Deposition Exhibit No. 4       40
18   Deposition Exhibit No. 5       47
19   Deposition Exhibit No. 6       85
20   Deposition Exhibit No. 7       95
21   Deposition Exhibit No. 8       97
22   Deposition Exhibit No. 9       142
23
24
25

Page 5

1        GARY DROOK  April 25, 2007
2            GARY DROOK,
3    called as a witness herein, having been first duly
4    sworn, was examined upon oral interrogatories and
5    testified as follows:
6            EXAMINATION
7         By Mr. Steingart:
8        Q  Good morning, Mr. Drook.
9        A  Good morning, Bonnie.
10       (Exhibit 1 marked as requested)
11       Q  Sir, I'm placing before you what we will mark
12   as Exhibit 1, and the question is, are you appearing for
13   testimony here pursuant to that subpoena?
14       A  Yes, I am. I think. Right?
15       MS. KYROUZ: Uh-huh.
16       THE WITNESS: Yes.
17       MS. STEINGART: Q  Mr. Drook, when did you first
18   become involved with NorthWestern?
19       MS. KYROUZ: Objection, vague. In what capacity?
20       MS. STEINGART: Q  In any capacity.
21       A  Well, I joined the board at some point in time,
22   but I really don't recall the date.
23       Q  Was your first involvement in a professional
24   way with NorthWestern?
25       A  Yes.

| Page 54 |
|---|

GARY DROOK  April 25, 2007

1      GARY DROOK  April 25, 2007
2      THE WITNESS: Say it again, Bonnie.
3      MS. STEINGART: Q  Do you remember why in 2002 it
4  was necessary for the board to have a series of meetings
5  about raising money?
6      A  I'm just kind of thinking back over this
7  timeframe.
8      Q  If you want to thumb through, you know, the
9  September minutes and then I can ask you the question
10  again, that's fine. I'm not trying to, you know -- test
11  your recollection if you want to look at the other
12  things.
13      A  Well, I kind of recall these series of
14  meetings, but your question was -- state your question
15  again.
16      Q  Why was it was necessary during September of
17  2002 to have a series of meetings about raising cash?
18      A  There were as I recall two reasons. One, the
19  operating units had not performed as well as had been
20  forecast and there was just a need for a general influx
21  of cash; and, number 2, that the debt equity ratio was
22  higher on the debt side than we would look, and one of
23  the alternatives -- I mean you can lower debt or raise
24  equity and one of the areas being considered was an
25  equity infusion.

| Page 55 |
|---|

1      GARY DROOK  April 25, 2007
2      Q  Wasn't it also the case that during this period
3  of time a number of the debt instruments of NorthWestern
4  was -- were maturing?
5      MS. KYROUZ: Object to form.
6      THE WITNESS: I don't recall that specifically.
7      MS. STEINGART: Q  If you could turn to your
8  June 30th, 2002 10-Q. It should be before the other one.
9      A  Got an August, 2002.
10      Q  That's for the June period. I apologize. If
11  you look at page 36.
12      A  This was issued in June.
13      Q  It's issued in August and covers the period
14  through June. The numbers are at the bottom.
15      A  Sometimes. 35, 36.
16      Q  And --
17      MS. KYROUZ: Can you give us a minute, Counsel.
18      THE WITNESS: This is risk factors I suppose,
19  subject to risk.
20      MS. STEINGART: Q  You know, ask you to look at the
21  bullet point in the top third of page 36 and ask whether
22  that refreshes your recollection that some of the debt of
23  NorthWestern was coming due during September of 2002.
24      A  I certainly recall I think the 150 aggregate
25  principal amount was a floating note from CS First

| Page 56 |
|---|

1      GARY DROOK  April 25, 2007
2  Boston, that one I recall. And the Cornerstone credit
3  facility and the equipment purchase, nonrecourse
4  equipment purchase noted, I recall those three.
5      Q  So during September there was a need for cash
6  as you said before because there was not -- cash was not
7  being generated by the subsidiaries.
8      A  Uh-huh.
9      Q  And there was a -- I think you said a debt to
10  equity ratio problem and would you agree that raising
11  cash was an issue in September also because the debt
12  instruments were coming due?
13      A  Well, I can't specifically say that. I'm sure
14  that was part of the equation, but I think at the time it
15  was considered more of a normal capital structure
16  discussion by the board.
17      Q  Now, during these series of meetings in
18  September when the board was talking about raising cash,
19  did anyone talk about the fact that $191 million had been
20  given to Expanets?
21      A  I don't recall that specifically.
22      Q  Is it your recollection that in September of
23  2002 that NorthWestern's -- that NorthWestern was
24  considered an attractive entity for lenders?
25      MS. KYROUZ: Objection, vague.

| Page 57 |
|---|

1      GARY DROOK  April 25, 2007
2      THE WITNESS: Now what do you mean by that --
3      MS. STEINGART: Q  Were the banks eager to provide
4  you unsecured debt in September of 2002?
5      MS. KYROUZ: I'm sorry. September or November?
6      MS. STEINGART: Q  September of 2002.
7      A  In September -- so the question is in September
8  of 2002 --
9      Q  Were banks eager to provide NorthWestern with
10  unsecured debt?
11      MS. KYROUZ: Objection, vague, lacks foundation.
12      THE WITNESS: I'm not sure banks ever give you
13  unsecured debt. I mean would it be -- is the question is
14  it fair to say in the question would the market -- were
15  the markets anxious to give us unsecured debt?
16      MS. STEINGART: Q  Uh-huh.
17      A  The markets always give you debt at the right
18  interest rate.
19      Q  Well, did NorthWestern hire Bear Stearns to try
20  to raise capital for it?
21      A  I think.
22      MS. KYROUZ: Objection, vague.
23      THE WITNESS: Did --
24      MS. STEINGART: Q  Did NorthWestern retain Bear
25  Stearns to try to raise capital for NorthWestern?

Page 58

GARY DROOK  April 25, 2007

1
2     A   The board was informed that the corporation had
3   hired Bear Stearns to help them think through several
4   strategic options.
5     Q   Was Bear Stearns also thinking about the
6   company's liquidity issues in September of 2002?
7     A   I don't recall a discussion about that in
8   particular.
9     Q   Did NorthWestern prepare reports for the board
10  that talked about the liquidity problems that the company
11  was having?
12     MS. KYROUZ:  Object to form.
13     THE WITNESS:  I don't know.
14     MS. STEINGART:  Why don't we look at the Bear
15  Stearns binder.
16     Q   Generally do you recall that NorthWestern
17  updated the board on September 12, September 20th,
18  September 23rd, September 27th and November 6th of 2002?
19     A   On what?  On financing?
20     Q   On various financial issues.
21     A   I know we had a series of meetings in September
22  dealing with several things that Bear Stearns and the
23  executive committee had been looking at.
24     Q   It wasn't typical for the board at NorthWestern
25  to have meetings so often within one month, was it?

Page 59

GARY DROOK  April 25, 2007

1
2     A   No.
3     Q   And during this period of time did the board
4   understand that there were critical liquidity issues that
5   were facing NorthWestern?
6     MS. KYROUZ:  Object to form.
7     THE WITNESS:  I don't personally recall us
8   considering -- considering this to be kind of a critical
9   emergency sort of thing.  I mean that's not my
10  recollection.
11     MS. STEINGART:  Q   If it wasn't an emergency why did
12  the board meet so often during September about these
13  issues?
14     MS. KYROUZ:  Objection, argumentative, lacks
15  foundation.
16     THE WITNESS:  Restate it.
17     MS. STEINGART:  Q   If there wasn't a pressing need
18  why did the board meet so often in each week to review
19  the liquidity options?
20     A   I think the board had injected itself in the
21  September timeframe into management discussions about
22  various options that were being presented to the company
23  and wanted to be involved in looking at and better
24  understanding what all the different options were that
25  the company might pursue.

Page 60

GARY DROOK  April 25, 2007

1
2     Q   And why did the board interject itself as far
3   as you understand it?
4     A   Well, I think there was a growing concern on
5   the board about the strategic direction that the company
6   and the leader had.
7     Q   What was that concern based on?
8     A   Operating performance.
9     Q   What about the operating performance led the
10  board to have these concerns?
11     A   Well, we just covered that earlier.  I mean the
12  operating units were not meeting their operational
13  targets -- operational targets they had established for
14  the year.
15     MS. KYROUZ:  You said we just covered that earlier?
16     THE WITNESS:  Yes.  Sorry.
17     MS. STEINGART:  Q   By a lot or by a little in your
18  view?
19     MS. KYROUZ:  Objection, vague.
20     THE WITNESS:  That seems kind of broad.  By more
21  than we thought it should be.
22     MS. STEINGART:  Q   Have you served on other boards
23  besides NorthWestern?
24     A   Yes.
25     Q   And what level of concern would you

Page 61

GARY DROOK  April 25, 2007

1
2   characterize it to take for a board to come in, step in
3   in the manner you've just described?
4     MS. KYROUZ:  Object to form.
5     THE WITNESS:  Well, I don't know.  I never -- that's
6   a hard question for me to answer.
7     MS. STEINGART:  Q   You've never been on a board that
8   did it before, were you?
9     A   Probably not.
10     Q   Could we look at page 1 of the September 12
11  Bear Stearns report.
12     A   Uh-huh.
13     Q   According to Bear Stearns due to a confluence
14  of a number of events NorthWestern is facing an important
15  strategic decision critical to the liquidity and capital
16  structure of the company.
17     Do you see that?
18     A   Yes.
19     Q   And on that page they list a number of
20  potential capital sources.  Do you see that?
21     A   Yes.
22     Q   Now that handwriting on the page is not yours,
23  is it?
24     A   No.
25     Q   Do you recall Bear Stearns walking through each

17 (Pages 62 to 65)

Page 62

GARY DROOK  April 25, 2007
1
2  of these items and talking about the pros and cons?
3     A   Yes.
4     Q   Do you recall them saying when it got down to
5  bank facility refinancing it was virtually impossible
6  today?
7     A   I do not recall that.
8     Q   What do you recall them saying about that?
9     A   I don't recall anything to be honest with you.
10  I don't know who wrote this, virtually impossible today
11  in there, but I thought in reality we did refinance the
12  CSFB bonds after this date.
13     Q   In 2003?
14     A   Uh-huh.
15     Q   I'm sorry?
16     A   Yes.
17     Q   And in 2003 after the Montana Power assets had
18  been moved up to NorthWestern?
19     A   That would be correct, yes.
20     Q   And by using the Montana Power assets as
21  security for such a facility, right?
22     A   Well, that would not be this one. One of the
23  areas that we pursued were the first mortgage notes, the
24  $250 million, the second bullet point, and those first
25  mortgage bonds were backed up with the asset utilities of

Page 63

GARY DROOK  April 25, 2007
1
2  South Dakota and Montana.
3     Q   That was one of the possibilities that was
4  being discussed by Bear Stearns?
5     A   Yes.
6     Q   But the CSFB notes that you were talking about
7  were in 2003 and secured by the Montana Power assets,
8  correct?
9     A   I don't know what they were -- I don't know
10  what that was secured by, that was a bridge loan that had
11  been provided by CSFB.
12     Q   We'll get to that. Now it talks here about an
13  asset sale of Colstrip, C-O-L-S-T-R-I-P?
14     A   Yes.
15     Q   By that time did the board know that Colstrip
16  was not a sale that was happening?
17     A   No, we thought is was going to happen every
18  day. We kept waiting for that to conclude.
19     Q   Did you know that by that point a complaint had
20  been filed against Colstrip by NorthWestern?
21     MR. KALECZYC: Objection, form.
22     THE WITNESS: What do you mean a complaint?
23     MS. STEINGART: Q A lawsuit had been filed.
24     A   Yes, we had filed a lawsuit against PPL
25  Montana, yes, to force the -- I don't know what you call

Page 64

GARY DROOK  April 25, 2007
1
2  it, but to force them to live up to their asset purchase
3  agreement.
4     Q   Right. So by that time NorthWestern knew that
5  there was a lack of interest in the purchaser of
6  Colstrip?
7     MR. KALECZYC: Objection, form.
8     THE WITNESS: I don't know if we knew that. I think
9  they always wanted these assets. They were trying to
10  basically renegotiate the price.
11     MS. STEINGART: Q Well, they never really bought
12  the assets, did they?
13     A   I don't know what eventually happened here.
14     Q   Let's look at page 2 --
15     MR. PIZZURRO: Could we get a range of Bates
16  numbers, please?
17     MS. STEINGART: The Bates numbers for the
18  September 12 Bear Stearns report are NOR 349336 through
19  374. Thank you, Jim.
20     Q   Let's look at page 2. Certainly feel free to
21  look at as much as you would like of the page --
22     A   Are we on 9343?
23     Q   Yes, sir. I was looking at the section -- I
24  would like to direct your attention to the section
25  concerning working capital issues.

Page 65

GARY DROOK  April 25, 2007
1
2     A   Working capital. Okay.
3     Q   Did the board discuss the issues with the
4  collection of the Expanets receivables?
5     A   Yes.
6     Q   And do you recall what that discussion was?
7     A   That we still had a large and abnormal amount
8  of account receivables outstanding and additional people
9  had been hired at Expanets, were working through the
10  backlog and we're going to get it fixed.
11     Q   Did the company view the issues with the
12  collection of Expanets' receivables as something that
13  made it more difficult to obtain new financing or capital
14  from outside sources?
15     MS. KYROUZ: Objection, vague, lacks foundation.
16     THE WITNESS: I don't recall that discussion.
17     MS. STEINGART: Q During this period of time there
18  was an equity investor that was looking at NorthWestern,
19  wasn't there?
20     A   Yes.
21     Q   And at the end of the day they decided not to
22  makes the investment, correct?
23     MS. KYROUZ: Objection, vague.
24     THE WITNESS: Well, which investor are you referring
25  to?

Page 66

GARY DROOK  April 25, 2007
1
2      MS. STEINGART: Q Evercore.
3      A  Evercore. I believe that the board elected not
4  to move forward with Evercore, that's my recollection.
5      Q  We'll get to that in a minute. If we could
6  look down to the asset sale bullet point.
7      A  Asset issues, company debt, are you on another
8  page?
9      Q  The asset issues it's right under working
10  capital. It says the Colstrip sale has been repeatedly
11  delayed.
12      A  That's correct.
13      Q  And at this point in the board discussion was
14  there any date at which the board anticipated that sale
15  would be completed?
16      A  We could not pin it down.
17      Q  Do you see the Montana first megawatts item?
18      A  Yes.
19      Q  And that was another item that required funding
20  from NorthWestern, correct?
21      A  Uh-huh.
22      Q  Do you see at the top of the page Bear Stearns
23  says there are a number of events converging to create a
24  liquidity issue?
25      A  Yes.

Page 67

GARY DROOK  April 25, 2007
1
2      MS. KYROUZ: I would just add the document goes on
3  to say over the next few quarters.
4      MS. STEINGART: Q Sir, is it your understanding
5  that the company had to raise capital before the end of
6  the fourth quarter of 2002?
7      MS. KYROUZ: Object to form, vague.
8      THE WITNESS: I don't recall the timeframe we had to
9  raise it in.
10      MS. STEINGART: Q Looking at these documents
11  doesn't refresh your recollection in that regard?
12      A  No, not really.
13      Q  Do you want to look at the last bullet point on
14  that page where it talks about company debt issues?
15      A  Okay.
16      Q  Now, did the company have an understanding that
17  the situation at Expanets was going to make it difficult
18  for the company to do an equity offering?
19      MS. KYROUZ: Object to form.
20      Counsel, you keep asking him about did the
21  company have an understanding. I want to clarify whether
22  you're referring to Mr. Drook's understanding.
23      MS. STEINGART: I'm always referring to Mr. Drook's
24  understanding.
25      THE WITNESS: Say it again, is it my understanding

Page 68

GARY DROOK  April 25, 2007
1
2  what?
3      MS. STEINGART: Q Did you have an understanding
4  during this period of time that the situation at Expanets
5  was going to make it difficult to obtain equity
6  financing?
7      MS. KYROUZ: Object to form.
8      THE WITNESS: The situation at Expanets was going to
9  make it difficult to obtain equity financing, I don't
10  remember a discussion of that kind.
11      MS. STEINGART: Q At this point in time, and this
12  is September of 2006 -- I'm sorry, September of 2002 --
13      A  September of 2002.
14      Q  At this point in time, September of 2002, even
15  though the third quarter 10-Q had not come out was the
16  board aware of the $191 million infusion into Expanets?
17      A  I'm not sure when the board became aware of
18  that.
19      Q  Let's go back to the minutes.
20      MS. KYROUZ: This be a good time to take a short
21  break?
22      MS. STEINGART: We haven't even gone for an hour.
23      MS. KYROUZ: Is the answer no?
24      MS. STEINGART: Go ahead.
25      MS. KYROUZ: When would you like to take the next

Page 69

GARY DROOK  April 25, 2007
1
2  break?
3      MS. STEINGART: I mean -- I'm fine. It makes it
4  very difficult to sort of complete the process we have
5  here if we can't go for an hour without a break. If
6  there's a reason --
7      MS. KYROUZ: We've gone for 55 minutes so if that's
8  not, you want to wait another 5 minutes, simply we
9  started at 10 of so I'm thinking it was about an hour,
10  but if that's not a good time for you.
11      MS. STEINGART: Go ahead, take a break.
12      (Off the record)
13      MS. STEINGART: Q Back to the September 12th board
14  minutes, 2002, board minutes.
15      A  This is a special meeting.
16      Q  That was the special meeting. That was the --
17  as you look at the minute, do you recall this was the
18  first of a series of meetings that were held in
19  September?
20      A  I do.
21      Q  At the meeting you recall being introduced to
22  Mr. Beutner?
23      A  I do.
24      Q  And what -- And who do you recall that to be?
25      A  Who do I recall Austin Beutner to be?

Page 86

1         GARY DROOK April 25, 2007
2     MS. STEINGART: My question was whether he recalled
3  learning that.
4     MS. KYROUZ: You asked whether on October 30th he
5  recalled learning that. I'm just noting the document you
6  put in front of him for that I believe is part of a
7  larger document. This is just a portion of the document.
8  I just want the record to reflect that.
9     MS. STEINGART: Why?
10     Q   Is there some other part of the document, sir,
11  you feel you need to see in order to answer my question?
12     A   Well, I don't know. Michele may be thinking of
13  something --
14     MS. STEINGART: Well, Michele, what are you thinking
15  of?
16     MS. KYROUZ: Just pointing out that you've handed
17  him a piece of a document that was actually a larger
18  board package.
19     MS. STEINGART: What do you think was in there
20  besides this?
21     MS. KYROUZ: The rest of the board package.
22     MS. STEINGART: What do you think was in there? Why
23  do you think there was anything else in there?
24     MS. KYROUZ: Because I'm familiar with the board
25  package.

Page 87

1         GARY DROOK April 25, 2007
2     MS. STEINGART: What else will tell us what else was
3  in there, Michele?
4     MS. KYROUZ: What difference does it make?
5     MS. STEINGART: You have made a statement on the
6  record that I showed him something partial. Tell me what
7  else you think was in there.
8     MS. KYROUZ: I'm telling you that the rest of the
9  board package gives the witness a better context for the
10  document you've shown him when he might have received it
11  you asked --
12     MS. STEINGART: So then tell us what it is.
13     MS. KYROUZ: It's the date. You asked him did he
14  ever receive this on October 30th, you've given a piece
15  of a document. If you look at the full board package he
16  might recall more specifically whether he actually got a
17  board package on October 30th or whether he might have
18  received it later. That's all it's relevant to.
19     MS. STEINGART: So are you saying later between
20  October 30th and November 6th?
21     MS. KYROUZ: Yes.
22     MS. STEINGART: Q   Does on or about October 30th,
23  sir, to you, sir, mean between October 30th and
24  November 6th? Do you want to change your testimony? I
25  don't want to mislead you into testifying wrongly about

Page 88

1  something because of the date a document I asked but --
2     A   Well, I think what I said was I recall at some
3  point in time as a board member hearing the board being
4  briefed on a reduction in the earnings forecast.
5     Q   And you learned about the reduction in the
6  earnings forecast before the November 6th meeting,
7  correct?
8     A   I don't know when I learned it I mean I got to
9  be honest there.
10     Q   Looking at the board minutes does it refresh
11  you that you may have known that before the board met on
12  November 6th?
13     A   Well, I don't know. I mean this could have --
14  I don't know whether this was handed to us before the
15  board meeting or at the board meeting. It could have
16  company, I don't know.
17     Q   You think you might have actually received this
18  at the board meeting?
19     A   Might have. That would not be uncommon for
20  people to put together an information package, date it
21  the day they put it together, stick it in the board
22  packet and get the board packet later. I mean --
23     Q   Do you have an understanding that -- When you
24  attended the board meeting on November 6th you knew that

Page 89

1         GARY DROOK April 25, 2007
2  there would be a further decline in the estimate of
3  earnings?
4     A   I think that's fair, either at or before that
5  meeting I found that out.
6     Q   Is that something that Mr. Lewis talked with
7  you about?
8     A   When he had the individual calls with board
9  members?
10     Q   Yes, sir.
11     A   I don't know if he discussed that or not, he
12  might have. I don't recall.
13     Q   Were there any other aspects of the proposed
14  operating plan that he talked with you about?
15     A   As I recall he wasn't calling to talk to us
16  about the plan, he was calling to get our feedback on the
17  plan that they had proposed.
18     Q   And had you received it by that time?
19     A   I had received a plan for the coming year and
20  commented to him on what I thought of the plan going
21  forward.
22     Q   And what were your comments?
23     A   Oh, God, Bonnie.
24     Q   If you recall.
25     A   And I'm not sure that I'm -- I know I had some

24  (Pages 90 to 93)

Page 90

GARY DROOK April 25, 2007
1
2  comments on it, but I can't recall specifically what I
3  commented on.
4      Q   At this point in time did you have confidence
5  in management of Northwest?
6      MS. KYROUZ: Objection to form.
7      MS. STEINGART: Q   That is November 6th, 2002?
8      A   Are you referring to the entire corporation?
9      Q   I'm referring to Mr. Lewis and Mr. Hylland.
10     A   I think my confidence was fading pretty bad by
11 November the 6th.
12     Q   What about Mr. Orme, did you have confidence in
13 Mr. Orme?
14     A   No.
15     Q   Mr. Charters, did you have confidence in him?
16     A   John was new on the job and I was reserving my
17 opinion on him. Tough job, tough company, tough
18 situation.
19     Q   When you saw what we've marked asterisk 6?
20     A   Asterisk 6?
21     Q   Drook 6, when you saw what we marked as Drook
22 6 --
23     A   This thing.
24     Q   Do you recall having seen this at any time?
25     A   Do I recall having seen this, no, not

Page 91

GARY DROOK April 25, 2007
1
2  specifically.
3      Q   But you do recall having learned of the decline
4  in earnings?
5      A   Yes.
6      Q   At that point did your views of Expanets
7  change?
8      MS. KYROUZ: Object to form.
9      THE WITNESS: In the September timeframe we had had
10 the series of meetings, we had filed an S4, the board had
11 signed off on it, we had questioned management
12 repeatedly, we had an earnings forecast on the street.
13 These were pretty tough days.
14     MS. STEINGART: Q   Did this confirm your view that
15 Expanets was a time bomb?
16     A   This confirmed my view that the leadership did
17 not have their hands on the workings of the company.
18     Q   Were there any other indications that Expanets
19 was creating further difficulties for the company in
20 addition to the news about the earnings decline?
21     MS. KYROUZ: Object to form.
22     THE WITNESS: Other than the earnings decline.
23     MS. STEINGART: Q   Drook 6 attributes part of the
24 earnings decline and performance to the performance of
25 Expanets. Do you see that?

Page 92

GARY DROOK April 25, 2007
1
2      A   Yes.
3      Q   Was that your understanding that the earnings
4  decline that was noted by the company in November of 2002
5  was attributable to Expanets?
6      MS. KYROUZ: Object to form.
7      THE WITNESS: I think some of it was, but I don't
8  think all of it.
9      MS. STEINGART: Q   What else was contributing to
10 that from your understanding?
11     A   Expanets was not performing. They had not sold
12 Colstrip, we didn't have the cash in, they didn't have
13 the power purchase agreement negotiated for Montana first
14 megawatts. There was just a lot of things hanging that
15 had not got concluded.
16     Q   Did the existence of these issues make raising
17 capital in the marketplace difficult for Northwest from
18 your point of view.
19     MS. KYROUZ: Object to form.
20     THE WITNESS: I don't know if they made it difficult
21 in the past, but it was sure as hell going to make it
22 difficult in the future.
23     MS. STEINGART: Q   On the next page of the November
24 6th minutes --
25     A   November 6th minutes, which page give me a

Page 93

GARY DROOK April 25, 2007
1
2  number?
3      Q   9599, if we look at the paragraph this begins
4  this time Mr. Pollock of Paul Hastings joined the meeting
5  and it says that Mr. Drook stated that Bear Stearns had
6  been retained as financial advisors to the board and
7  asked to provide information at this meeting. Do you see
8  that?
9      A   Yes.
10     Q   Why did you present that material if you
11 recall?
12     A   Well, at this point in time the board had
13 decided to become for lack of a better term involved in
14 almost the day-to-day running of the company and we had
15 hired a financial advisor Bear Stearns to work for the
16 board of directors to start giving us unfiltered
17 information on where the company was and what our options
18 were.
19     Q   When you say unfiltered information, what do
20 you mean by that?
21     A   Well, we didn't want a presentation that
22 management had helped to put together or management had
23 helped edit, we wanted advisors that were committed only
24 to the board of directors and gave us unvarnished,
25 unfiltered information, not to say any had been filtered,

Page 94

GARY DROOK April 25, 2007
1
2  we wanted to make sure we were getting the straight
3  scoop.
4      Q   Had you determined at that point that the
5  information you were receiving from management was
6  unreliable?
7      MS. KYROUZ: Object to form.
8      THE WITNESS: Well, we had just been through a
9  tremendous stepdown in the forecasted earnings for 2002
10 with what, two months left in the fiscal year. So we had
11 certainly lost confidence in the management team.
12     MS. STEINGART: Q  Now if we look at the minutes it
13 indicates after you introduced Bear Stearns that
14 Mr. Thompson and Mr. Morgenbesser describe the current
15 market for the corporations common stock and reviewed
16 several alternatives that they were recommending for the
17 board to consider. Do you see that?
18     A   Yes.
19     Q   And then it says a discussion followed. Do you
20 recall the substance of the discussion?
21     A   Well, I mean I think we're back here to -- kind
22 of all the options that are on the table. I mean do you
23 do another -- do you go back to the private equity
24 market, what are your debt options, do you sell the
25 company, do you replace the management team. I mean what

Page 95

GARY DROOK April 25, 2007
1
2  are all the things we can do here.
3      Q   And at that point after the discussion it says
4  here that the nonemployee members of the board then met
5  in executive session.
6      A   Yes.
7      Q   Do you see that? So that means that everyone
8  on the board who was management and all the others who
9  were attending --
10     A   It was only -- it was only the outside board
11 members.
12     Q   Do you recall what the discussion in executive
13 session was?
14     A   I do not in particular. I think we were --
15 well, I don't know.
16     (Exhibit 7 marked as requested)
17     Q   Okay. While we're on this I'd like to show you
18 what we're going to mark as Drook 7, NOR 66801. Do you
19 recall receiving the e-mail that's midway through this
20 page from Mr. Drook on or about November 12th, 2002?
21     A   I'm sorry. Do I recall receiving what --
22     Q   I'm sorry. The e-mail from Mr. Hylland -- I'll
23 start from the beginning.
24         Do you recall receiving an e-mail from
25 Mr. Hylland that attached the audit committee report?

Page 96

GARY DROOK April 25, 2007
1
2  Let's start there.
3      A   I don't recall the audit committee report, but
4  I do recall this memo.
5      Q   And what do you recall about the memo?
6      A   Well, this is the result of the board meeting
7  on November the 6th where there was a long discussion
8  between management, the outside directors and Deloitte
9  Touche that -- where there was obviously conflict and
10 disagreement between management and Deloitte Touche on
11 some book entries, I don't -- I want to say the third
12 quarter Q had not been closed because there was some
13 disagreement on some items so this was a followup to that
14 board meeting.
15     Q   Does this e-mail refresh your recollection at
16 all about when you learned of these intercompany
17 transfers to Expanets?
18     A   No.
19     Q   Okay.
20     A   You like that number though, I got you, but no
21 it doesn't -- it doesn't --
22     Q   Just because we looked at the third quarter
23 10-Q.
24     A   I know, I know.
25     Q   I just put --

Page 97

GARY DROOK April 25, 2007
1
2      A   But that wasn't the thing that was -- that
3  wasn't the thing that was jumping out at the board
4  meeting I don't think.
5      Q   Nor in the audit report from your point of
6  view?
7      A   No.
8      Q   Okay.
9      (Exhibit 8 marked as requested)
10     A   Okay.
11     Q   Is this something that you recall preparing and
12 sending to Mr. Hylland and Mr. Lewis on or about
13 November 15, 2002?
14     A   Yes.
15     Q   Did this come about as a result of a discussion
16 held by an executive session at the board?
17     A   Yes.
18     Q   The first paragraph of the memo marked as
19 Drook 8 indicates that based on the board meetings and
20 the information provided by management, do you see that?
21     A   I'm sorry.
22     Q   The first sentence --
23     A   Okay.
24     Q   And the information provided by management, do
25 you see that?

Page 142

GARY DROOK   April 25, 2007

1   preceded that, preceded that, but, you know --
2     MS. STEINGART: Q  Now, sir, are you aware that the
3   SEC has entered an order in connection with the cease and
4   desist proceeding concerning NorthWestern Corporation?
5     A  Is there a timeframe for this or is this a
6   recent thing?
7     Q  On March 7th, 2007.
8     A  On March 7th, 2007.
9     Q  I'm right this time, March 7th.
10    A  What did they issue?
11    Q  A cease and desist an order in connection with
12  a cease and desist proceeding.
13    A  I have no idea what you're talking about.
14    Q  Okay. Let's show it to him.
15    A  What am I looking at here, Bonnie?
16    Q  It's very last one.
17    MR. PIZZURRO: Would be this a good place for a
18  5-minute break, Bonnie?
19    MS. STEINGART: Of course. And I'll leave that with
20  you to peruse. I'll give you ten so that you get your
21  rest and your cigarette and perusal.
22    (Off the record)
23    (Exhibit 9 marked as requested)
24    MS. STEINGART: Q  Sir, you have before you what we

Page 143

GARY DROOK   April 25, 2007

1   marked as Exhibit 9, and during the break have you had an
2   opportunity to thumb through it?
3     A  I have.
4     Q  Now you've never seen this before?
5     A  Never seen it, didn't know it existed.
6     Q  During the period of time that you were CEO of
7   NorthWestern had the SEC commenced an investigation of
8   NorthWestern?
9     A  Yes.
10    Q  And were the subject matters in Exhibit 9 as
11  you understand it part of the subject matters of that
12  investigation?
13    A  Yes.
14    Q  Did you provide testimony to the SEC?
15    A  Yes, on several occasions.
16    Q  Do you recall what year that was?
17    A  I do not.
18    Q  If you could turn to page 2 with me of
19  Exhibit 9. Now, the SEC did its investigation that
20  resulted in this order and you in connection with your
21  role as CEO of the company did an investigation of
22  Mr. Hylland, correct?
23    A  Correct.
24    MS. KYROUZ: Objection to form.

Page 144

GARY DROOK   April 25, 2007

1     THE WITNESS: Well, the special committee did.
2     MS. STEINGART: Q  The special committee did. I
3   didn't mean you personally. And I'm going to ask you
4   about whether some of the findings that the SEC made are
5   consistent with what you learned in connection with the
6   special committee report on the conduct of Mr. Hylland.
7     A  Okay.
8     Q  So if we look at page 2 at the summary and
9   these questions really go to what you know in connection
10  with the special committee report on Mr. Hylland and what
11  you learned in connection with the restatement of the
12  10-Qs for the first quarters of 2002?
13    MR. PIZZURRO: I'm going to object to the line of
14  questioning to the extent that it is an attempt to get
15  the witness to testify on privileged matters that he
16  otherwise would not testify on. So I've got a standing
17  objection, I'll object to every question as well, but I
18  want to make it clear that by trying to elicit from this
19  witness whether or not there's an agreement between
20  something which is in Exhibit 9 and what he learned as a
21  result of the investigation of the special committee I
22  think that is a violation of the privilege.
23    MS. STEINGART: Okay. You know, I think I'm trying
24  to get at something a little different, but I

Page 145

GARY DROOK   April 25, 2007

1   certainly -- I agree for you to have a standing objection
2   and that we can resolve this later.
3     MR. PIZZURRO: I can't direct this witness not to
4   answer because he's not my client. If he were, I would
5   be directing him, but I want to make it clear for the
6   record right now.
7     MS. STEINGART: Q  Now, sir, is it your
8   understanding that during the first three quarters of
9   2002 as stated in the summary on page 2 of the -- of
10  Exhibit 9 that NorthWestern filed quarterly and current
11  reports with the commission that materially misstated
12  NorthWestern's financial position?
13    A  In the first quarter of 2003 we made the
14  decision to go back and restate our earnings, revenues,
15  just to redo the financial statements for the first,
16  second and third quarters of '02.
17    Q  On page 2 of the order the first sentence
18  indicates that during the first three quarters of 2002
19  NorthWestern filed quarterly and current reports with the
20  commission that materially misstated NorthWestern's
21  financial position, isn't that correct?
22    A  I believe that's accurate.
23    MR. PIZZURRO: Excuse me. Objection, I don't want
24  this record to be messed up. The question was -- can I

Page 146

GARY DROOK  April 25, 2007

1    GARY DROOK  April 25, 2007
2  have the question read back and the answer please so we
3  understand what the witness just testified to.
4    (Question and answer read)
5    MR. PIZZURRO: The question is whether or not it is
6  accurate that the first sentence in this --
7    MS. STEINGART: Q That was not -- no, that was not
8  the question, that's not what the witness understood the
9  question to be.
10    MR. PIZZURRO: I believe it was the question, that's
11  why I want a clear record.
12    MS. STEINGART: Q Is your understanding during the
13  fist three quarters of 2002 NorthWestern filed current
14  and quarterly reports that materially misstated
15  NorthWestern's financial position?
16    A  Yes.
17    Q  Is it your understanding, sir, that during the
18  first three quarters of 2002 NorthWestern filed quarterly
19  and current reports that materially misrepresented or did
20  not disclose required information about its nonutility
21  businesses Expanets and Blue Dots?
22    A  You mean information other than financial
23  information?
24    Q  I think that includes both financial and
25  nonfinancial information.

Page 147

1    GARY DROOK  April 25, 2007
2    A  There were some areas that in retrospect we
3  believe should have been disclosed and were not.
4    Q  Now, it's also the case that NorthWestern
5  overstated its income from continuing operations for the
6  first three quarters of 2002 by approximately 176
7  percent, 618 percent and 109 percent respectively, right?
8    A  To be honest with you I've never done the
9  calculation on what those percentages are. I see them
10  here. But the income from continuing operations was
11  overstated in those three quarters.
12    Q  Materially, sir?
13    A  Materially so.
14    Q  And NorthWestern's income from its continuing
15  operations was materially misstated because of improper
16  accounting for accounts receivable, correct?
17    A  That's correct. And other things.
18    Q  And because of improper adjustments to
19  customer's bills, correct?
20    A  Yes.
21    Q  And because of improper allocation of losses to
22  minority interests, correct?
23    A  As I said I mean there were a whole series of
24  things that when properly accounted for changed the
25  financial results of the corporation for those three

Page 148

1    GARY DROOK  April 25, 2007
2  quarters.
3    Q  NorthWestern also misstated or did not
4  disclose, among other things, the effects of significant
5  problems with Expanets' new technology information
6  system, correct?
7    A  We need to put a timeframe on that, don't we?
8    Q  During the first three quarters of 2002?
9    A  During each of those 10-Q -- those 10-Qs were
10  not complete in respect to the problems with Expanets'
11  billing system.
12    Q  During that period it was not just the 10-Qs,
13  it was also other public statements made by the company
14  and filed as 8-Ks, isn't that correct?
15    A  I think that's fair, yes.
16    Q  NorthWestern also misrepresented and did not
17  disclose the material impact of Expanets' reserve
18  reductions during the first three quarters of 2002,
19  correct?
20    A  Correct.
21    Q  NorthWestern also did not disclose large
22  intracompany advances NorthWestern made to support
23  Expanet's and Blue Dot during the first three quarters of
24  2002, correct?
25    A  Well, didn't you just show me a footnote in the

Page 149

1    GARY DROOK  April 25, 2007
2  third quarter Q that -- I mean I think that was
3  disclosed.
4    Q  Some of that was disclosed in the third
5  quarter. Wasn't others of that not disclosed.
6    A  I don't know. You just pointed out one of them
7  to me.
8    Q  Let's agree about the first two quarters then.
9  During the first two quarters until the third quarter do
10  you agree that the large intracompany advances
11  NorthWestern made to Expanets and Blue Dot were not
12  disclosed?
13    MS. KYROUZ: Objection, lacks foundation.
14    MS. STEINGART: Q If you don't know, you can say I
15  don't know.
16    A  I don't know.
17    Q  Did you know the SEC was looking into that?
18    A  Into --
19    Q  The failure to disclose large intracompany
20  advances NorthWestern made to Blue Dot and Expanets?
21    A  I don't know what they were looking at, what
22  those people do.
23    Q  During the time you were CEO and the
24  investigation was ongoing you weren't aware that was an
25  issue?

Page 150

1       GARY DROOK  April 25, 2007
2    A  No.
3    Q  The summary also makes reference to material
4  disclosures about the timing of anticipated payments from
5  the sale of certain utility assets.
6    A  Yes.
7    Q  Now during the first three quarters of 2002 did
8  NorthWestern misrepresent the timing of anticipated
9  payments from the sale of utility assets?
10    MS. KYROUZ: Objection, compound.
11    THE WITNESS: During the first three quarters did
12  NorthWestern misrepresent or --
13    MS. STEINGART: Q  Or fail to disclose the timing of
14  anticipated payments from the sale of certain utility
15  assets?
16    A  I don't know.
17    Q  Did NorthWestern during the first three
18  quarters misrepresent the prospects of its sale of the
19  Colstrip assets?
20    A  Bonnie, we're expecting cash any day now.
21    Q  Indeed. Still and yet?
22    A  Stick with me on this. 96 million, they're
23  just about ready to write the check, hang with me until
24  Monday. Don't pursue that one.
25    Q  It's true, isn't it, that through its financial

Page 151

1       GARY DROOK  April 25, 2007
2  misstatements, misrepresentations and omissions that
3  NorthWestern obscured the continuing poor performance of
4  its subsidiaries at a time when it was relying on those
5  subsidiaries' operations publicly to strengthen its
6  financial condition?
7    MS. KYROUZ: Object to form.
8    THE WITNESS: Object to form.
9       I mean in retrospect the subsidiaries we
10  concluded when we prepared the 10-K for 2002, we
11  concluded that the subsidiaries were not performing as
12  they had lead us to believe they were.
13       Does that answer your question?
14    MS. STEINGART: Q  You knew before you filed the
15  10-Q for 2002 that the subsidiaries were underperforming
16  from what the predictions were, didn't you?
17    MS. KYROUZ: Objection, misstates the record.
18    THE WITNESS: We knew that they were not achieving
19  their stated goal, but that's different, it seems to me
20  than what the SEC is alleging here, but --
21    MS. STEINGART: Q  You know this is what the SEC is
22  concluding, and I'm asking you whether that is a correct
23  statement or an incorrect statement?
24    A  Read me the statement again and I'll --
25    Q  Through its financial statements,

Page 152

1       GARY DROOK  April 25, 2007
2  misrepresentations and omissions, NorthWestern obscured
3  the continuing poor performance of its subsidiaries at a
4  time when it was publicly relying on these subsidiaries
5  operations to strengthen its financial condition?
6    MS. KYROUZ: Object to form.
7    THE WITNESS: I don't know if I'm qualified to
8  answer that that's certainly the conclusion that the SEC
9  has reached, Bonnie.
10    MS. STEINGART: Q  And you were CEO of the company
11  when corrective statements were made, correct?
12    A  When what?
13    Q  You were CEO of the company when corrective
14  statements were made?
15    A  What do you mean by corrective statements?
16    Q  When corrective 10-K -- amended 10-Qs were
17  filed?
18    A  When we amended the 10-Qs, yes.
19    Q  You were on the board of directors of the
20  company throughout 2002, correct?
21    A  Correct.
22    Q  Given the knowledge and experience you have
23  with the company through those various associations, are
24  you unable to answer that question?
25    MS. KYROUZ: Object to form.

Page 153

1       GARY DROOK  April 25, 2007
2    THE WITNESS: Well, my job in 2003 was to get the
3  financials correct, to get the 10-Qs correct, to get the
4  10-K correct and to make sure that going forward, you
5  know, that's the kind of document we produced every
6  quarter. This obviously reaches a conclusion,
7  NorthWestern obscured the continuing poor performance of
8  its subsidiaries. I don't know if we obscured it or not.
9  I mean I -- that's to some degree in the eyes of the
10  beholder. Clearly the SEC's conclusion is we obscured
11  it, but -- I don't know.
12    MS. STEINGART: Q  Let's take it in pieces.
13  NorthWestern failed to report the problems with the
14  EXPERT system, correct?
15    MS. KYROUZ: Object to form.
16    THE WITNESS: NorthWestern could have done a better
17  job -- my conclusion was NorthWestern could have done a
18  better job of disclosing the problems they were having
19  with the EXPERT system to not only their own board but
20  the public as well.
21    MS. STEINGART: Q  I'm not -- there is not an
22  accusation of the board.
23    A  But I'm looking at them while I'm at it.
24    Q  You definitely should look at --
25    A  She is typing it up, Bonnie, just in case.

Page 166

GARY DROOK  April 25, 2007

1        A   I don't know about 42.  I would certainly agree
2   with the last sentence, that NorthWestern made some kind
3   of a disclosure in the third quarter in a footnote in the
4   10-Q.
5        Q   Are you aware of any disclosures made prior to
6   that time in any of the 10-Qs?
7        A   I don't know.  I have very little recollection
8   of this, and only today when you pointed that out did I
9   even know that there was anything of the 10-Q about it.
10       Q   Now, up to the point we are in the order, if we
11  could just stop for a minute, the board appointed a
12  special committee, correct?
13       A   In what did we say --
14       Q   In May of 2003?
15       MS. KYROUZ:  I'm going to object to that date.  I
16  don't think they appointed the committee in May.
17       THE WITNESS:  That's when the committee reported.
18       MS. STEINGART:  Q   The board reported it -- the
19  special committee reported to the board in 2000 -- in May
20  of 2003 and was appointed in February of 2003.
21       A   That's correct.
22       Q   At the time the special committee was
23  appointed, were you aware that it would be necessary to
24  restate the financials for the first three quarters of

Page 167

GARY DROOK  April 25, 2007

1   2002?
2        A   No.
3        Q   In May when the special committee gave its
4   report, the restatements of these three 10-Qs had already
5   occurred, correct?
6        A   I think that had already occurred because those
7   were due I want to say April -- April 15th is when the Qs
8   are due, we got an extension, I don't know what the
9   automatic extension is what, ten days.  What date does it
10  show we filed that 10-K?
11       Q   April 15th, 2002.
12       A   So then the deadline must have been like the
13  10th.
14       Q   I think the K was filed at that point as well?
15       A   We filed them all on the same day.
16       Q   As a result of those restatements, and as a
17  result of the work of the special committee, did you
18  determine that there were members of senior management
19  who were responsible for causing Northwest to file
20  misleading financials during 2002?
21       MR. KALECZYC:  Objection, form.
22       THE WITNESS:  Did I conclude what now, Bonnie?
23       MS. STEINGART:  Q   There were members of
24  NorthWestern's management that caused NorthWestern to

Page 168

GARY DROOK  April 25, 2007

1   file false financials in 2002.
2        A   Well, I want to be careful how I answer this
3   from the standpoint of -- I mean at this point in time I
4   don't think I'm still quite -- when I filed the 10-K I
5   sort of have -- I have a great view of what the numbers
6   should be, I know what 2002 should look like, and I think
7   we have done a great job of restating those numbers and
8   issuing a 10-K with full disclosure, but at that point in
9   time I don't know if I've yet determined, if any, or how
10  many people are specifically responsible for what got us
11  to this point.
12       Q   There was someone who was fired for cause,
13  correct?
14       A   Yes.
15       Q   What about -- Mr. Hylland was fired for cause,
16  correct?
17       A   Correct.
18       Q   Did the board determine that he was responsible
19  for causing NorthWestern to file false financial
20  statements?
21       MS. KYROUZ:  At what point in time?  I think he was
22  answering the previous question as of the date of the K.
23       MS. STEINGART:  Q   Did the board determine in
24  connection with its special committee investigation at

Page 169

GARY DROOK  April 25, 2007

1   the conclusion thereof that Mr. Hylland had caused the
2   company to file false financial statements?
3        A   I don't recall if that was one of the
4   conclusions.  It doesn't -- it doesn't seem to me that
5   was a specific conclusion, but certainly he had his hands
6   on the wheel when this ship hit the rocks and as the COO
7   of the corporation, I mean, the board certainly held him
8   responsible partially for letting that occur.
9        Q   Isn't it the case that Mr. Hylland also mislead
10  the board about what the condition of the company was
11  during 2002?
12       A   I don't think there's any question about that,
13  and I would say a little differently.  You say mislead.
14  I would say or failed to inform which is kind of
15  misleading.  If I don't tell you that the EXPERT system
16  is not operating, if I don't tell you I'm not making ad
17  -- that I'm making cash advances to Expanets, it's not
18  necessarily misleading me in my mind, it's just not
19  telling me and let me reach the wrong conclusions on my
20  own.  I mean do you follow me?
21       Q   I do follow you.  Did you determine that there
22  were others in addition to Mr. Hylland who were involved
23  in either causing the company to file false financials or
24  in misleading the board?

44  (Pages 170 to 173)

Page 170

```
 1          GARY DROOK  April 25, 2007
 2      A   Yes.
 3      Q   And who else was responsible for that?
 4      A   Well, we terminated the chief financial
 5   officer.
 6      Q   Mr. Orme?
 7      A   Mr. Orme.  We terminated the comptroller
 8   Mr. Whitesel, we terminated the president and CEO of
 9   Expanets John Charters.  We terminated the CFO of
10   Expanets, Rick Fresia, we terminated the comptroller of
11   NorthWestern, Whitesel, we terminated the CFO of
12   NorthWestern Energy, David Monaghan.
13      Q   These were actions taken so you could ensure
14   the credibility of NorthWestern going forward would be
15   secure?
16      A   Absolutely, there may be others, but those are
17   the ones that come to mind off the top of my head.
18      Q   In fact, once this was done and as CEO of you
19   produced amended 10-Qs, those amended 10-Qs were found to
20   be truthful and fully -- have fully disclosed the
21   company's situation by the SEC, isn't that right?
22      A   Well, certainly nobody has come back and
23   challenged the veracity of those revised 10-Qs or the K.
24      Q   In the SEC's report the SEC comments on the
25   efforts the company made to uncover the wrongdoing and to
```

Page 171

```
 1          GARY DROOK  April 25, 2007
 2   make corrections?
 3      A   Yes.
 4      MS. KYROUZ:  You're referring to Exhibit 9?
 5      THE WITNESS:  Yes.
 6      MS. STEINGART:  Q  Yes.  But in order to achieve
 7   that those steps, those investigatory and firing steps
 8   were necessary, correct?
 9      A   We felt so, yes.
10      MS. STEINGART:  If you give me 5 minutes, I think I
11   can be done.
12      (Off the record)
13      MS. STEINGART:  Q  Just a few clean up things.
14      Could you tell me who Mr. Monaghan is?
15      A   David Monaghan was the top accounting person in
16   NorthWestern Energy, the utility company.
17      Q   Do you recall why he was fired for cause?
18      A   Well, yeah.  I thought he was stupid.
19      Q   The stupid cause.
20      A   The stupid cause.  I mean I just -- I thought
21   he was incompetent.
22      Q   But from your point of view as CEO of the
23   company at the time he wasn't involved in either
24   misleading the board or causing the company to make
25   financial misstatements?
```

Page 172

```
 1          GARY DROOK  April 25, 2007
 2      A   I don't recall anything in particular that he
 3   did that I thought was illegal.
 4      Q   Sir, are you receiving at this point any
 5   compensation from NorthWestern?
 6      A   No, but could we get that in the record that we
 7   probably should be.
 8      Q   And is NorthWestern paying for your counsel?
 9      A   They have agreed to pay for my counsel.  They
10   have written no checks yet.  Always a continuing battle.
11      Q   We'll send Mr. Knapp a transcript.
12      A   I appreciate it.
13      MS. STEINGART:  I have no further questions.  Thank
14   you very much for your patience.
15      MR. PIZZURRO:  No questions.
16      MR. KALECZYC:  No questions.
17      MS. KYROUZ:  Signature is reserved.
18      - - - - - -
19
20
21
22
23
24
25
```

Page 173

```
 1          GARY DROOK  April 25, 2007
 2   STATE OF ILLINOIS )
 3                     ) SS:
 4   COUNTY OF C O O K )
 5       The within and foregoing deposition of the
 6   aforementioned witness was taken before CAROL CONNOLLY,
 7   CSR, CRR and Notary Public, at the place, date and time
 8   aforementioned.
 9       There were present during the taking of the
10   deposition the previously named counsel.
11       The said witness was first duly sworn and was
12   then examined upon oral interrogatories; the questions
13   and answers were taken down in shorthand by the
14   undersigned, acting as stenographer and Notary Public;
15   and the within and foregoing is a true, accurate and
16   complete record of all of the questions asked of and
17   answers made by the forementioned witness, at the time
18   and place hereinabove referred to.
19       The signature of the witness was not waived,
20   and the deposition was submitted, pursuant to Rules 207
21   and 211 (d) of the Rules of the Supreme Court of
22   Illinois, to the deponent per copy of the attached
23   letter.
24
25
```