

KURT L. GOTTSCHALL (gottschallk@sec.gov) Colorado Bar No. 28377
NOEL M. FRANKLIN (franklinn@sec.gov) Colorado Bar No. 28969
Attorneys for U.S. Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, Colorado 80202
Telephone:  (303) 844-1000
Facsimile:  (303) 844-1052



FILED

APR 2 : 2007

CLERK

## UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>MERLE D. LEWIS,<br><br>        Defendant. | Civil Action Number: 07-4057<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission") for its complaint alleges as follows:

## I. SUMMARY OF THE ACTION

1.    During the first three quarters of 2002, Merle D. Lewis, the former chief executive officer ("CEO") and chairman of the board of NorthWestern Corporation

("NorthWestern"), and other NorthWestern senior executives misled investors about the financial performance and operations of NorthWestern and its subsidiaries, Expanets, Inc. ("Expanets") and Blue Dot Services, Inc. ("Blue Dot").

2.    Lewis's conduct took essentially three forms. First, Lewis and other NorthWestern senior executives misled investors during the relevant period about the status of the functionality of Expanets' new computer system, which caused problems in Expanets' customer billing and collection functions. As a result of these problems, and with the knowledge of Lewis and other NorthWestern senior executives, Expanets failed to properly adjust its financial statements to account for uncollectible receivables and adjustments to customer bills, causing overstatements of NorthWestern's reported income of 90% and 109% in the second and third quarters of 2002, respectively.

3.    Second, Lewis and other NorthWestern senior executives misled investors about the nature of NorthWestern's and Expanets' reported income. While NorthWestern and Expanets executives publicly claimed that Expanets had achieved profitability through its operations and cost savings, Expanets' reported income during 2002 was, in large part, derived from undisclosed reserve reductions, which helped Expanets reach its earnings targets, and from its receipt of unusual non-compete payments.

4.    Third, Lewis and other NorthWestern senior executives misled investors about critical issues that impacted NorthWestern's liquidity. Specifically, during 2002, Lewis and other NorthWestern senior executives knew that the marketplace closely monitored cash transfers between NorthWestern and its subsidiaries as a key indicator of financial performance. Lewis and other NorthWestern senior executives misled the public regarding the magnitude of cash that NorthWestern needed to transfer to both

Expanets and Blue Dot. Lewis and other NorthWestern senior executives also knew of a substantial risk to NorthWestern's ability to collect approximately $97 million it had publicly anticipated from its sale of certain utility assets, but that NorthWestern failed to properly disclose that risk.

5.     The conduct of Lewis and other NorthWestern senior executives helped facilitate NorthWestern's completion of more than $800 million in securities offerings in September and October 2002, including raising $87.5 million in an equity offering that provided the company with operating capital to improve its liquidity position.

6.     Approximately a year after this offering, and after restating its 2002 quarterly financial results, writing off significant investments in Expanets and Blue Dot, and disclosing the true results of its 2002 operations, NorthWestern declared bankruptcy.

## II. JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e)] for an order permanently restraining and enjoining Defendant and granting other equitable relief.

8.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

9.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].

10. In connection with the transactions, acts, practices, and courses of business described in this Complaint, Lewis, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of a national securities exchange, and/or of the means and instruments of transportation or communication in interstate commerce.

11. Certain of the transactions, acts, practices and courses of business constituting the violations of law alleged herein occurred within this judicial district. Moreover, Defendant Lewis resides in this judicial district.

### III. DEFENDANT

12. **Merle D. Lewis,** age 58, is a resident of Sioux Falls, South Dakota. Lewis became NorthWestern's CEO in February 1994 and the chairman of its board of directors in May 1997, positions which he held through December 2002. Lewis also served as chairman of the board of Expanets from December 1997 through December 2002. Prior to Lewis' tenure as NorthWestern's CEO and chairman, he worked in the company's legal department for nineteen years, and served for four years in operational roles as the company's executive vice-president and president.

### IV. RELATED PARTIES

13. **NorthWestern,** a Delaware corporation with its principal executive offices in Sioux Falls, South Dakota, operates a regulated utility business in South Dakota, Nebraska and Montana. During the period described herein, NorthWestern controlled and consolidated the financial results of two significant non-utility entities, Expanets and Blue Dot. NorthWestern's common stock was registered with the Commission under Section 12(b) of the Exchange Act and traded on the New York Stock Exchange until it

4

was delisted shortly before NorthWestern declared bankruptcy in September 2003. In November 2004, NorthWestern emerged from bankruptcy. Its common stock is now registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ Global Select Market.

14. **Expanets,** formerly headquartered in Englewood, Colorado, provided networked telecommunications equipment and services to medium-sized businesses nationwide. Expanets was comprised of approximately 26 small telecommunications equipment resellers and a former sales division of Lucent Technologies. NorthWestern wrote off substantially all of its investment in Expanets in its 2002 Form 10-K and announced its intent to sell Expanets in April 2003. In the second quarter of 2003, Expanets' operations were discontinued, and in May 2004, Expanets filed for bankruptcy. Proceeds from the sale of Expanets' assets were distributed in bankruptcy.

15. **Blue Dot**, formerly headquartered in Sunrise, Florida and Sioux Falls, South Dakota, was formed by NorthWestern in 1997 and provided heating, ventilation and air conditioning ("HVAC") services nationwide. Blue Dot was comprised of more than 90 small HVAC businesses. NorthWestern wrote off substantially all of its investment in Blue Dot in the company's 2002 Form 10-K and announced its intention to sell Blue Dot in April 2003. In the second quarter of 2003, Blue Dot's operations were discontinued, and NorthWestern thereafter sold or closed each of Blue Dot's HVAC businesses.

## V.    SUMMARY OF VIOLATIONS AND RELIEF SOUGHT

16. Defendant Lewis violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5,

240.13b2-1 and 240.13b2-2], and aided and abetted NorthWestern's violations of

Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a),

78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17

C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13], and unless restrained and enjoined

will violate or aid and abet violations of such provisions.

17. The Commission also seeks an order requiring Lewis to pay a $150,000 civil

penalty, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section

21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

18. The Commission also seeks an order barring Lewis from serving as an

officer and director of any public company for five years following the date of the entry

of a Final Judgment against him, pursuant to the equitable authority of the court, and

Section 21(d)(2) of the Exchange Act, as amended [15 U.S.C. § 78u(d)(2)].

## VI.    FACTS

### A.    Background -- NorthWestern's Expansion And The Poor Performance of Its Non-Utility Businesses Prior to 2002

19. For more than seventy years, NorthWestern operated a public utility

business, providing electricity and natural gas to customers in South Dakota and

Nebraska.

20. In the late-1990s, NorthWestern formed two non-utility entities, Expanets

and Blue Dot, to diversify into the potentially high-growth sectors of telecommunications

and HVAC services, respectively. NorthWestern intended to acquire telecommunications

and HVAC companies and then make the combined businesses more profitable.

21. NorthWestern expected that following an initial growth phase, Expanets and Blue Dot would provide substantial additional earnings and cash flow to NorthWestern through dividends on NorthWestern's preferred stock holdings in both entities.

22. However, despite NorthWestern's investment of hundreds of millions of dollars in Expanets and Blue Dot, both subsidiaries incurred large losses in most years and posted only small profits in other years. By December 31, 2001, NorthWestern had invested $314.1 million in Expanets and $329.9 million in Blue Dot. Despite this sizeable investment, neither Expanets nor Blue Dot had returned significant cash to NorthWestern.

23. Despite the poor performance of its non-utility subsidiaries, in February 2002, NorthWestern quadrupled its customer base for utility operations by acquiring Montana Power Company ("Montana Power") for approximately $1.1 billion. NorthWestern financed a substantial part of this acquisition by issuing $720 million in unregistered notes.

**B.    NorthWestern's Planned Equity Offering and Heightened Pressure to Meet Financial Performance Targets During 2002**

24. NorthWestern's markedly increased debt used to acquire Montana Power threatened the company's historically stable liquidity and top-tier credit ratings. Therefore, in early February 2002, NorthWestern publicly announced its intention to conduct an equity offering, and then use the proceeds to pay down a portion of its elevated debt. Lewis and other NorthWestern senior executives also confirmed the company's public guidance of between $2.30 and $2.55 earnings per share for 2002.

25. Throughout 2002, Lewis and other NorthWestern senior executives knew that the historical poor performance of NorthWestern's non-utility businesses and

NorthWestern's expansion of its utility operations together placed enormous pressure on the company's 2002 financial performance. Lewis and other NorthWestern senior executives also knew that NorthWestern's equity offering planned for later in 2002 was critical to the company's liquidity situation.

26. Lewis and other NorthWestern senior executives knew that NorthWestern's ability to meet its public earnings per share guidance for 2002 was dependent in part upon achieving markedly increased profitability at Expanets and Blue Dot.

27. NorthWestern also claimed that both Expanets and Blue Dot would demonstrate significant earnings improvements that would allow them to "upstream" cash in the form of preferred stock dividends to help service and ultimately pay down NorthWestern's elevated debt.

28. Prior to the completion of more than $800 million in securities offerings by NorthWestern in September and October 2002, Lewis and other NorthWestern senior executives repeatedly told the marketplace that Expanets was operating as expected and was achieving its earnings targets.

29. However, just two months later, in December 2002, NorthWestern disclosed that Expanets would take more than $50 million of charges for uncollectible accounts receivable and adjustments to customer bills.

30. In April 2003, NorthWestern restated its Forms 10-Q for the first three quarters of 2002 and erased Expanets' previously reported income. The company also disclosed significant ongoing problems with the EXPERT system, and the impact of unusual non-compete payments on Expanets' 2002 financial results.

31. Also in April 2003, NorthWestern filed its 2002 Form 10-K, in which it wrote off substantially all of its past investment of hundreds of millions of dollars in Expanets and Blue Dot. In that filing, NorthWestern also announced that, despite past assurances, neither of these entities would generate future cash flow in sufficient amounts to help service NorthWestern's debt.

32. Over the next five months, NorthWestern's liquidity situation continued to deteriorate until the company declared bankruptcy in September 2003.

C.    **Lewis's Role at NorthWestern**

33. During 2002, as NorthWestern's CEO and chairman, Lewis oversaw all of the company's operations, including those of Expanets and Blue Dot. In that capacity, Lewis also had a role in key issues impacting the company's financial results, including those at Expanets and Blue Dot.

34. Lewis reviewed and approved all of NorthWestern's earnings press releases and Commission filings made pursuant to the Exchange Act during 2002, including: NorthWestern's Forms 10-Q for the periods ended March 31, 2002, June 30, 2002 and September 30, 2002; NorthWestern's First Amended Forms 10-Q for the periods ended March 31, 2002 and June 30, 2002, filed with the Commission on September 20, 2002; NorthWestern's Forms 8-K dated May 1, 2002, August 8, 2002, and November 7, 2002; and NorthWestern's earnings press releases dated April 30, 2002, August 8, 2002 and November 7, 2002.

35. Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") and Commission Order 4-460, Lewis certified NorthWestern's Forms 10-Q for the periods

ended June 30, 2002 and September 30, 2002 and NorthWestern's First Amended Forms 10-Q for the periods ended March 31, 2002 and June 30, 2002.

36.   Lewis signed the following Commission filings pursuant to the Securities Act: NorthWestern's Form S-4 filed April 24, 2002; Form S-4/Amendment #1 filed July 12, 2002; Form S-4/Amendment #2 filed August 16, 2002; and Form S-4/Amendment #3 filed September 9, 2002.   Lewis also reviewed and approved the equity offering prospectus supplements that NorthWestern filed with the Commission on September 30, 2002 and October 3, 2002.

37.   Lewis knew or was reckless in not knowing that NorthWestern's Form 10-Q for the first quarter of 2002 was incorporated by reference into the amended Forms S-4 filed with the Commission on July 12, 2002, August 16, 2002 and September 9, 2002. Lewis also knew or was reckless in not knowing that NorthWestern's Form 10-Q for the second quarter of 2002 was incorporated by reference into the amended Forms S-4 filed with the Commission on August 16, 2002 and September 9, 2002, as well as the equity offering prospectus supplements that NorthWestern filed with the Commission on September 30, 2002 and October 3, 2002.

38.   Lewis signed management representation letters to NorthWestern's outside auditor for the periods ended March 31, 2002, June 30, 2002, and September 30, 2002, and for purposes of NorthWestern's filings to effectuate its equity offering in October 2002.

**D.    Problems With Expanets' Computer System**

39.   During 2000 and 2001, Expanets developed the EXPERT information technology system to serve as a platform for virtually all of its operations, including

sales, inventory, project management, billing, collections and financial statement preparation. Because of EXPERT's planned scope and impact across operations, the functionality of the system was critical to Expanets' operations and financial results.

40.  Following the implementation of EXPERT in November 2001, the system was unable to perform many of the basic tasks for which it had been designed. In particular, the EXPERT system experienced serious problems in generating timely and accurate customer bills and tracking customer payments. For example, for approximately one month following implementation, EXPERT could not generate any customer bills.

41.  Throughout the first three quarters of 2002, Lewis and other NorthWestern senior executives received detailed information from Expanets and NorthWestern personnel regarding serious, ongoing problems with the EXPERT system and its impacts across Expanets' operations, particularly as to customer billing and collections. Among other things, Lewis and other NorthWestern senior executives received weekly EXPERT updates, monthly operations reports and numerous candid emails regarding the system status. Lewis and other NorthWestern senior executives also participated in regular meetings regarding ongoing system problems and planned repairs.

42.  NorthWestern's first and second quarter Forms 10-Q for 2002, and NorthWestern's filings to effectuate its debt and equity offerings in September and October 2002, failed to disclose any of EXPERT's functionality problems or their material impact on Expanets' operations during the quarter. Instead, NorthWestern's first and second quarter Forms 10-Q stated, without qualification, that EXPERT was "fully operational" and "operational," respectively. Similarly, NorthWestern's filings to effectuate its debt and equity offerings characterized the EXPERT system as

"operational," again without qualification. Lewis knew or was reckless in not knowing these characterizations of the system, and NorthWestern's failure to disclose ongoing problems or their impact on Expanets' operations, were false and misleading.

43. After its securities offerings, NorthWestern disclosed in its Form 10-Q for the third quarter of 2002 and its 2002 Form 10-K that Expanets had experienced significant problems with EXPERT during the year, particularly as to billing and collections. The EXPERT system still was not functioning properly when NorthWestern decided to discontinue Expanets' operations in the second quarter of 2003.

E.    **Expanets' Material Understatement Of Its Bad Debt Reserve**

44. In anticipation that some customer accounts might prove uncollectible, Expanets maintained a "bad debt" reserve, which had the effect of reducing Expanets' operating income.

45. In the second quarter of 2002, Lewis was informed that Expanets had improperly failed to increase its bad debt reserve to account for the markedly increased difficulties with collections that resulted from the EXPERT implementation. For example, Expanets personnel informed Lewis and other NorthWestern senior executives that Expanets had not increased reserves to account for millions of dollars of aged receivables that pre-dated implementation of the EXPERT system in November 2001. Lewis also knew or was reckless in not knowing that after EXPERT implementation, a litany of system problems was greatly hampering collection, causing millions of dollars of receivables to become badly aged and therefore likely uncollectible.

46.  Lewis therefore knew or was reckless in not knowing that Expanets improperly failed to increase its bad debt reserve to account for additional uncollectible accounts receivable in its financial statements for the second quarter of 2002.

47.  Lewis knew or was reckless in not knowing that serious problems with Expanets' accounts receivable collections continued throughout the third quarter of 2002. For example, in mid-September 2002, approximately two weeks before NorthWestern's equity offering, Expanets personnel met with Lewis and other NorthWestern senior executives to discuss Expanets' accounts receivable. At that meeting, Lewis and other NorthWestern senior executives were provided a written report and told by Expanets personnel that $52 million of receivables were over 180 days old, including $21 million of receivables that were over 300 days old.

48.  Because these severely aged receivables were not likely to be collected, standard collection parameters suggested either writing off Expanets' receivables or increasing its bad debt reserve by $46 million. Because many of Expanets' aged receivables resulted from billing lapses and delays, Expanets personnel informed Lewis and other NorthWestern senior executives that they believed the bad debt reserve was understated by a lesser amount, approximately $32 million. However, Lewis and other NorthWestern senior executives knew that Expanets had not increased its reserve by any amount.

49.  On or about October 22, 2002, soon after the completion of NorthWestern's debt and equity offerings, Expanets personnel again met with Lewis and other NorthWestern senior executives and informed them that Expanets' accounts receivable balance had shown virtually no improvement since the mid-September meeting. Based

13

upon this data, Expanets personnel recommended a substantial increase in Expanets' bad debt reserve. However, Lewis and other NorthWestern senior executives knew that Expanets did not increase its reserve as a result of the information provided during this meeting.

50. NorthWestern's third quarter Form 10-Q disclosed, in part, that the EXPERT billing problems "*may* cause a need to increase the current reserve for bad debt, which *could* negatively impact financial performance in future quarters." (Emphases added) Lewis knew or was reckless in not knowing that this disclosure was false and misleading because by that time, Expanets' bad debt reserve was, in fact, already materially understated.

51. Lewis also knew or was reckless in not knowing that NorthWestern's management representation letters to its auditor for the periods ended June 30, 2002 and September 30, 2002, and for those letters issued in support of NorthWestern's equity offering in October 2002, did not properly disclose the information related to Expanets' bad debt reserve.

52. In April 2003, NorthWestern filed its 2002 Form 10-K which included fourth quarter 2002 charges of approximately $20 million relating to Expanets' uncollectible accounts receivable, and simultaneously restated its financial results for the second and third quarters of 2002, increasing Expanets' bad debt reserve for each of these periods by approximately $5.1 million and $6.3 million, respectively.

53. As a result of its improper accounting for uncollectible accounts receivable, NorthWestern overstated its income from continuing operations by approximately 19% and 39% for the second and third quarters of 2002, respectively, as reported in its Forms

14

10-Q and corresponding earnings releases attached to Forms 8-K. Moreover, in its

segment reporting for Expanets, NorthWestern overstated Expanets' operating income by

approximately 86% and 270%, respectively, for the second and third quarters of 2002.

F.    **Expanets' Material Understatement Of Its Reserve For Adjustments to
       Customer Bills**

54.  As a result of the inaccurate customer bills generated by the EXPERT

system, Expanets issued partial credits to affected customers. Expanets recorded these

credits as "billing adjustments," which reduced both its revenue and income in the current

period. Since Expanets credited customer accounts in periods after it initially recognized

revenue from a transaction, Expanets maintained a "billing adjustment reserve" for

anticipated credits to customer accounts.

55.  In the second and third quarters of 2002, Expanets personnel repeatedly

informed Lewis and other NorthWestern senior executives that, due to the serious

ongoing problems with EXPERT's billing function, actual and forecasted billing

adjustments were continuing to outpace even the elevated levels anticipated for 2002.

56.  For example, during this time, Lewis and other NorthWestern senior

executives received, among other things, monthly operations reports and other updates

describing billing adjustments and their negative impact on Expanets' financial results.

57.  For the third quarter of 2002, Expanets personnel informed Lewis and other

NorthWestern senior executives that actual billing adjustments for the quarter had

significantly exceeded its original and revised projections.

58.  As a result of receiving information throughout 2002, Lewis knew or was

reckless in not knowing that Expanets improperly failed to increase its billing adjustment

reserve in the second and third quarters of 2002.

59. Lewis also knew or was reckless in not knowing that NorthWestern's management representation letters to its auditor for the periods ended June 30, 2002 and September 30, 2002, and for those letters issued in support of NorthWestern's equity offering in October 2002, did not properly disclose the information related to Expanets' billing adjustment reserve.

60. In April 2003, NorthWestern restated its financial results for the first three quarters of 2002, increasing the billing adjustment reserve by $33 million. For the second and third quarters of 2002, NorthWestern's restated financial results corrected the understatement of Expanets' billing adjustment reserve by reducing reported quarterly revenue by approximately $10.1 million and $5.4 million, respectively.

61. As a result of Expanets' improper accounting for billing adjustments, NorthWestern overstated its income from continuing operations by approximately 46% and 31% for the second and third quarters of 2002, respectively, as reported in its Forms 10-Q and corresponding earnings releases attached to Forms 8-K. In its segment reporting for Expanets, NorthWestern overstated Expanets' operating income by approximately 1094% and 164%, respectively, for the second and third quarters of 2002.

**G.    Expanets' Reserve Reductions**

62. During the second and third quarters of 2002, Expanets reduced amounts recorded in at least fourteen reserve accounts that it maintained on its balance sheet, the effect of which was to materially increase NorthWestern's and Expanets' reported income over that same period. Lewis knew or was reckless in not knowing about these reductions, their material impact on the company's results of operations, and

16

NorthWestern's failure to properly disclose this information regarding Expanets' quality of earnings.

63. From at least May 2002 through the filing of NorthWestern's Form 10-Q for the second quarter 2002, Expanets personnel informed Lewis and other NorthWestern senior executives through various communications, including emails, written reports and/or verbal communications, that they planned to or had reduced Expanets' reserves during the second quarter, and that these reserve reductions had materially increased Expanets' reported income.

64. For purposes of the second quarter 2002 alone, approximately $8.8 million of Expanets' reported income was derived from reserve reductions. This amount was material in that it represented approximately 80% of Expanets' reported segment operating income of $11 million and approximately 27% of NorthWestern's income from continuing operations for that quarter.

65. Through his communications with Expanets, Lewis knew or was reckless in not knowing that a material portion of NorthWestern's and Expanets' reported results of operations for the second quarter 2002 was derived from Expanets' reserve reductions.

66. Both NorthWestern's Form 10-Q for the second quarter 2002 and its corresponding earnings release issued in August 2002 failed to disclose the material impact of these reductions on NorthWestern's and Expanets' results of operations for that quarter. Lewis knew or was reckless in not knowing about these material omissions from NorthWestern's Form 10-Q and earnings release attached to Form 8-K.

67. Following NorthWestern's filing of its Form 10-Q for the second quarter 2002 and through the completion of more than $800 million in securities offerings by

NorthWestern in September and October 2002, Expanets continued to inform Lewis and other NorthWestern senior executives through various communications, including emails, written reports and/or verbal communications, of its planned or actual reduction of reserves over the remainder of 2002.

68. Up through the completion of more than $800 million in securities offerings by NorthWestern in September and October 2002, a material portion of NorthWestern's and Expanets' income for that period of 2002 was derived from Expanets' reserve reductions. Through his communications with Expanets prior to these filings, Lewis knew or was reckless in not knowing about the materiality of these reductions.

69. NorthWestern's Commission filings to effectuate its debt and equity offerings in September and October 2002, respectively, failed to properly disclose the material impact of Expanets' reserve reductions on NorthWestern's and Expanets' results of operations. Lewis knew or was reckless in not knowing about these material omissions from NorthWestern's Commission filings.

70. Following NorthWestern's completion of its securities offerings, and up through the filing of its Form 10-Q for the third quarter 2002, Expanets continued to inform Lewis and other NorthWestern senior executives through emails, written reports and/or verbal communications of its planned or actual reduction of reserves for the third quarter and the remainder of 2002.

71. For example, during an operations review meeting with Expanets management in October 2002, Expanets personnel discussed with Lewis and other NorthWestern senior executives the possible reduction of $4.2 million of additional balance sheet reserves during the third quarter of 2002. As a result, Expanets reduced its

18

reserves by $4.2 million during the third quarter of 2002, thereby increasing NorthWestern's and Expanets' reported income.

72.  Approximately $27 million of Expanets' income was derived from reserve reductions during the third quarter of 2002.  With this income, Expanets was able to report $8.7 million of operating income rather than a substantial loss.  In addition, with this income, NorthWestern was able to report $14.6 million of income from continuing operations for that quarter rather than a loss.  Accordingly, the amount of Expanets' reserve reductions for the third quarter 2002 was material to both NorthWestern's and Expanets' results of operations for that period.

73.  Through his communications with Expanets, Lewis knew or was reckless in not knowing that a material portion of NorthWestern's and Expanets' reported results of operations for the third quarter 2002 was derived from Expanets' reserve reductions.

74.  Both NorthWestern's Form 10-Q for the third quarter and its corresponding earnings release issued in November 2002 failed to properly disclose the material impact of Expanets' reserve reductions.  Lewis knew or was reckless in not knowing about these material omissions from NorthWestern's Form 10-Q and earnings release attached to Form 8-K.

**H.     Expanets' Unusual Transactions**

75.  In conjunction with Expanets' acquisition of certain assets of a competitor in March 2000, Expanets agreed that, in exchange for payments from the competitor, Expanets would not solicit specific business of the competitor's customers.  Expanets' competitor was obligated to make these "non-compete" type of payments to Expanets

19

until March 2005. These payments were not characteristic of Expanets' regular operations and therefore represented unusual transactions.

76. Throughout 2002, Lewis and other NorthWestern senior executives knew that Expanets would be receiving these non-compete payments. Furthermore, throughout 2002, Expanets personnel informed Lewis and other NorthWestern senior executives through various communications, including emails, written reports and/or verbal communications, about the actual and projected impacts of these non-compete payments on Expanets' reported income for 2002.

77. In the first quarter of 2002, NorthWestern reported in its segment disclosures that Expanets had an operating loss of approximately $2.7 million. Approximately $9.3 million of Expanets' income came from the non-compete payments. The $9.3 million also represented approximately 25% of NorthWestern's consolidated income from continuing operations for the quarter. Accordingly, the amount of these non-compete payments was material to the operating results of both NorthWestern and Expanets for that period.

78. In the second quarter of 2002, NorthWestern reported in its segment disclosures that Expanets had operating income of approximately $11 million. Approximately $10 million of Expanets' income came from the non-compete payments. The $10 million also represented approximately 31% of NorthWestern's consolidated income from continuing operations for the quarter. Accordingly, the amount of these non-compete payments was material to both the operating results of NorthWestern and Expanets for that period.

79. In the third quarter of 2002, NorthWestern reported in its segment disclosures that Expanets had operating income of approximately $8.7 million. Approximately $15.3 million of Expanets' income came from the non-compete payments. The $15.3 million also represented approximately 68% of NorthWestern's consolidated income from continuing operations for the quarter. Accordingly, the amount of these non-compete payments was material to the operating results of both NorthWestern and Expanets for that period.

80. NorthWestern's Forms 10-Q for the first three quarters of 2002, its corresponding earnings releases for those quarters, and its filings to effectuate its debt and equity offerings in September and October 2002, respectively, failed to properly disclose Expanets' receipt of these unusual non-compete payments and their material effect on Expanets' and NorthWestern's reported results of operations for those periods.

81. Through his communications with Expanets throughout 2002, Lewis knew or was reckless in not knowing about the material impact of these non-compete payments, and he knew or was reckless in not knowing that NorthWestern's Commission filings and corresponding earnings press releases attached to Forms 8-K during 2002 failed to properly disclose the impact to NorthWestern's and Expanets' reported results of operations.

I.    **NorthWestern's Intercompany Advances to Expanets and Blue Dot**

82. Throughout 2002, NorthWestern and the marketplace focused on cash movements between NorthWestern and its subsidiaries as a critical metric of the subsidiaries' operational performance and NorthWestern's consolidated liquidity. It was therefore important that both Expanets and Blue Dot demonstrate the ability to provide

cash to NorthWestern during 2002 to help NorthWestern service its debt load. However, Lewis and other NorthWestern senior executives were informed that neither entity was providing meaningful cash to NorthWestern, that NorthWestern was actually required to fund these operations more than originally planned, and that NorthWestern failed to properly disclose this information.

83.   EXPERT's inability to generate any customer bills in late 2001 and early 2002 and other billing problems that followed caused Expanets' cash flow from operations during the first quarter of 2002 to be a deficit of approximately $68.7 million. As a result, NorthWestern provided Expanets with significant intercompany advances during the first quarter of 2002 to enable Expanets to pay operating and other expenses, including a scheduled amount on a third-party credit facility. By the end of the first quarter of 2002, NorthWestern's intercompany advances to Expanets totaled $63.3 million.

84.   Similarly, during the first quarter of 2002, NorthWestern provided Blue Dot with approximately $21 million in cash advances so that Blue Dot could pay off a large credit facility and operating expenses when due. NorthWestern's outstanding intercompany advances to Blue Dot totaled approximately $37.1 million at the end of the first quarter of 2002.

85.   NorthWestern's intercompany advances to Expanets and Blue Dot during the first quarter demonstrated that these businesses were continuing to require further investments from NorthWestern, rather than providing cash to the consolidated entity. NorthWestern's need to advance funds to Expanets and Blue Dot was information that

22

was necessary to understand NorthWestern's financial condition and was reasonably likely to impact NorthWestern's liquidity.

86. As a result of various communications, including emails, written reports and/or verbal communications, Lewis and other NorthWestern senior executives were informed about NorthWestern's first quarter intercompany advances to both Expanets and Blue Dot.

87. Lewis and other NorthWestern senior executives were also informed about the effect these advances had on NorthWestern's financial condition, including their likely impact to its liquidity, and that such information was material to the public, including analysts and rating agencies.

88. NorthWestern's Form 10-Q for the first quarter of 2002 failed to properly disclose NorthWestern's intercompany advances to Expanets or Blue Dot, including the significance of those advances to NorthWestern's liquidity. Given Lewis's knowledge of NorthWestern's intercompany advances to Expanets and Blue Dot at the time of this filing, Lewis knew or was reckless in not knowing about these material omissions from NorthWestern's Form 10-Q.

89. During the second quarter of 2002, EXPERT's continuing billing and collections problems caused Expanets' cash collections to lag significantly behind expected levels. Therefore, NorthWestern provided Expanets with additional intercompany advances to help Expanets pay operating expenses and another scheduled amount on a third-party credit facility. By the end of the second quarter, the balance of NorthWestern's intercompany advances to Expanets totaled $113.4 million.

90. During the second quarter of 2002, Blue Dot paid back some of the cash previously advanced by NorthWestern. Nevertheless, the quarter-end balance of NorthWestern's outstanding intercompany advances to Blue Dot still totaled approximately $22.8 million.

91. As a result of various communications, including emails, written reports and/or verbal communications, Lewis and other NorthWestern senior executives were informed about NorthWestern's second quarter intercompany advances to both Expanets and Blue Dot.

92. NorthWestern disclosed in its Form 10-Q for the second quarter of 2002 that it made intercompany advances to Expanets. However, NorthWestern failed to properly disclose its intercompany advances to Blue Dot or any information about the significance of the intercompany advances to either subsidiary. Given Lewis's knowledge of NorthWestern's intercompany advances to Expanets and Blue Dot at the time of this filing, Lewis knew or was reckless in not knowing about these material omissions from NorthWestern's Form 10-Q.

93. NorthWestern did not properly disclose the existence and significance of its intercompany advances to both Expanets and Blue for the first and second quarters of 2002 until NorthWestern filed amended Forms 10-Q for those quarters in September 2002.

**J.    The Colstrip Utility Asset Sale**

94. Also critical to NorthWestern's liquidity during 2002 was its anticipated receipt of approximately $97 million from an asset sale. Lewis knew or was reckless in

24

not knowing that final closure of the sale was at risk but that NorthWestern failed to properly disclose that risk and its impact to NorthWestern's liquidity.

95. In February 2002, when NorthWestern purchased Montana Power, NorthWestern became the successor-in-interest to a contract for the sale of certain assets known as the "Colstrip" transmission assets ("Colstrip assets"). The contract called for a payment of approximately $97 million to NorthWestern upon the satisfaction of certain conditions. During the second quarter of 2002, NorthWestern announced that it expected to collect the proceeds from the sale of the Colstrip assets by June or July 2002.

96. Throughout 2002, Lewis and other NorthWestern senior executives knew that the sale of the Colstrip assets was significant to NorthWestern because receipt of the $97 million would enhance NorthWestern's liquidity position by allowing it to pay down various debt obligations. Accordingly, analysts and rating agencies tracked the status of the sale.

97. Between May and July 2002, the other party to the Colstrip assets sale contract repeatedly informed NorthWestern that it would not close the sale until the parties were able to resolve other claims. Through various communications during that period, including emails, written reports and/or verbal communications, Lewis and other NorthWestern senior executives were informed about the other party's position.

98. On August 5, 2002, NorthWestern filed but did not serve a complaint against the other party to the Colstrip Asset sale in a Montana State court. Among other things, the complaint alleged that the other party was obligated to close the sale and pay NorthWestern the proceeds.

99.  Through various communications with NorthWestern personnel, prior to the filing of NorthWestern's second quarter Form 10-Q, Lewis and other NorthWestern senior executives were informed about NorthWestern's filing of its complaint.

100. NorthWestern's Form 10-Q for the second quarter of 2002 improperly failed to disclose the ongoing dispute regarding the Colstrip assets and the effect of that dispute on NorthWestern's financial condition, including its impact on NorthWestern's liquidity. Lewis knew or was reckless in not knowing about this material omission from NorthWestern's Form 10-Q.

101. On September 4, 2002, NorthWestern served its complaint on the other party to the Colstrip sale and subsequently disclosed the existence of its lawsuit in its Commission filings to effectuate its debt and equity securities offerings in September and October 2002.

102. In May 2005, NorthWestern announced that it had settled the lawsuit by agreeing to retain the Colstrip assets in exchange for, among other things, a $9 million payment from the other party.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 17(a)(1) of the
### Securities Act [15 U.S.C. § 77q(a)(1)])

103. Paragraphs 1 through 102 are hereby realleged and incorporated by reference.

104. As a result of the foregoing, Lewis directly and indirectly, with scienter, in the offer or sale of NorthWestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has employed a device, scheme, or artifice to defraud.

26

105. Lewis thereby violated, and unless restrained and enjoined, will violate Section 17(a)(1) of the Securities Act.

### SECOND CLAIM FOR RELIEF
### (Violation of Sections 17(a)(2) and 17(a)(3)
### of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)])

106. Paragraphs 1 through 102 are hereby realleged and incorporated by reference.

107. Lewis directly and indirectly, with scienter, in the offer or sale of NorthWestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of NorthWestern securities.

108. Lewis violated, and unless restrained and enjoined, will violate Section 17(a)(2) and 17(a)(3) of the Securities Act.

### THIRD CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and
### Rule 10(b)(5) thereunder [15 U.S.C. §§ 78j(b) and §240.10b-5])

109. Paragraphs 1 through 102 are hereby realleged and incorporated by reference.

110. Lewis directly and indirectly, with scienter, in connection with the purchase or sale of NorthWestern securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud;

made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which had been and are operating as a fraud or deceit upon the purchasers or sellers of such securities.

111. Lewis violated, and unless restrained and enjoined, will violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## FOURTH CLAIM FOR RELIEF
### (Violation of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1])

112. Paragraphs 1 through 102 are hereby realleged and incorporated by reference.

113. Lewis knowingly failed to implement a system of internal accounting controls, and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2)(A) of the Exchange Act.

114. Lewis violated, and unless restrained and enjoined, will violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM FOR RELIEF
### (Violation of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2])

115.   Paragraphs 1 through 102 are hereby realleged and incorporated by reference.

116.   Lewis directly or indirectly made or caused to be made materially false or misleading statements, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading, to NorthWestern's independent auditor in connection with an audit or

examination of NorthWestern's financial statements or in the preparation or filing of

NorthWestern's documents or reports filed with the Commission.

117.    By reason of the foregoing, Lewis violated, and unless restrained and

enjoined will violate Exchange Act Rule 13b2-2.

**SIXTH CLAIM FOR RELIEF**
**(Aiding and Abetting of NorthWestern's Violation of Section 13(a) of**
**the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20,  13a-11 and**
**13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13])**

118. Paragraphs 1 through 102 are hereby realleged and incorporated by

reference.

119. NorthWestern, an issuer of a security registered pursuant to Section 12(b) of

the Exchange Act, filed materially misleading quarterly and current reports with the

Commission.

120. By reason of the foregoing, NorthWestern violated Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17

C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13].

121. Lewis knew or was severely reckless in not knowing of NorthWestern's

violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13

thereunder and substantially assisted NorthWestern in committing these violations.

122. Lewis aided and abetted NorthWestern's violations of Section 13(a) of the

Exchange Act and Rules 12b-20, 13a-11 and 13a-13 thereunder, and unless restrained

and enjoined will continue to aid and abet violations of these provisions.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting NorthWestern's Violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)])

123.    Paragraphs 1 through 102 are hereby realleged and incorporated by reference.

124.    NorthWestern failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

125.    By reason of the foregoing, NorthWestern violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

126.    Lewis knew or was severely reckless in not knowing of NorthWestern's violations of Section 13(b)(2)(A) of the Exchange Act and substantially assisted NorthWestern in committing these violations.

127.    Lewis aided and abetted NorthWestern's violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## EIGHTH CLAIM FOR RELIEF
### (Aiding and Abetting NorthWestern's Violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)])

128.    Paragraphs 1 through 102 are hereby realleged and incorporated by reference.

129.    NorthWestern failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with

generally accepted accounting principles or any other criteria applicable to such statements and to maintain accountability for assets.

130.    By reason of the foregoing, NorthWestern violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

131.    Lewis knew or was severely reckless in not knowing of NorthWestern's violations of Section 13(b)(2)(B) of the Exchange Act and substantially assisted NorthWestern in committing these violations.

132.    Lewis aided and abetted NorthWestern's violations of Section 13(b)(2)(B) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Find that Lewis committed the violations alleged.

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Lewis from violating, directly or indirectly, the provisions of law and rules alleged in this complaint.

### III.

Issue an Order requiring Lewis to pay a $150,000 civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

31

**IV.**

Issue an Order pursuant to Exchange Act Section 21(d)(2), as amended by Section 305 of the Sarbanes-Oxley Act. [15 U.S.C. 78u(d)(2)], or pursuant to the equitable authority of the court, barring Lewis from serving as an officer and director of any public company for five years following the date of the entry of a Final Judgment against him.

**V.**

Grant such other relief as this Court may deem just or appropriate.

Dated:  April 2-4, 2007.

Respectfully submitted,

KURT L. GOTTSCHALL
NOEL M. FRANKLIN
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
Phone: (303) 844-1000
Fax: (303) 844-1052



FILED
APR 2  2007,

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

---

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

MERLE D. LEWIS,

      Defendant.

**Civil Action Number:** 07 - 4 05 7

**CONSENT OF
MERLE D. LEWIS**

---

1.     Defendant Merle D. Lewis ("Defendant") waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

2.     Without admitting or denying the allegations of the complaint (except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

     (a) permanently enjoins and restrains Defendant from violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§

1

240.10b-5, 240.13b2-1 and 240.13b2-2]; and aiding and abetting violations of Sections

13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a),

78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17

C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13]; and

      (b) orders Defendant to pay a civil penalty in the amount of $150,000 pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the

Exchange Act [15 U.S.C. § 78u(d)].

3.     Defendant agrees that he shall not seek or accept, directly or indirectly,

reimbursement or indemnification from any source, including but not limited to payment made

pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays

pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof

are added to a distribution fund or otherwise used for the benefit of investors. Defendant further

agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any

federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final

Judgment, regardless of whether such penalty amounts or any part thereof are added to a

distribution fund or otherwise used for the benefit of investors.

4.     Defendant waives the entry of findings of fact and conclusions of law pursuant to

Rule 52 of the Federal Rules of Civil Procedure.

5.     Defendant waives the right, if any, to a jury trial and to appeal from the entry of

the Final Judgment.

6.     Defendant enters into this Consent voluntarily and represents that no threats,

offers, promises, or inducements of any kind have been made by the Commission or any

member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

7.    Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

8.    Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9.    Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

10.    Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a

3

member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

11.    Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12.    Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes,

4

Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

13.    In connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, Defendant: (i) agrees to appear and be interviewed by Commission staff at such times and places as the staff requests upon reasonable notice; (ii) will accept service by mail or facsimile transmission of notices or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff; (iii) appoints Defendant's undersigned attorney as agent to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, waives the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Defendant's travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (v) consents to personal jurisdiction over Defendant in any United States District Court for purposes of enforcing any such subpoena.

14.    Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

5

15.     Defendant agrees that this Court shall retain jurisdiction over this matter for the
purpose of enforcing the terms of the Final Judgment.

Dated: _3/7/07_                          _____
                                         Merle D. Lewis

On _March 7_, 2007, _Merle Lewis_, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent.

                                         _____
                                         Notary Public
                                         Commission expires:



MICHAEL G. TAYLOR
NOTARY PUBLIC·MINNESOTA
My Commission Expires Jan. 31, 2010

6

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

MERLE D. LEWIS,

      Defendant.

Civil Action Number:

**FINAL JUDGMENT AS
TO DEFENDANT
MERLE D. LEWIS**

The Securities and Exchange Commission having filed a Complaint and Defendant

Merle D. Lewis ("Defendant") having entered a general appearance; consented to the Court's

jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final

Judgment without admitting or denying the allegations of the Complaint (except as to

jurisdiction); waived findings of fact and conclusions of law; and waived any right to appeal

from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)], by using any means or instruments of transportation or communication in interstate commerce or by using the mails, directly or indirectly:

(a)    to employ any device, scheme, or artifice to defraud, or

(b)    to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)    to employ any device, scheme, or artifice to defraud;

2

(b)    to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

### III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

and Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating Rule 13b2-2 under the

Exchange Act [17 C.F.R. § 240.13b2-2] by directly or indirectly making or causing to be made

materially false or misleading statements, or omitting to state or causing other persons to omit to

state material facts necessary in order to make statements made, in light of the circumstances

under which such statements are made, not misleading to an accountant in connection with:

(1) an audit or examination of the financial statements of an issuer required to be made pursuant

to the Exchange Act; or (2) the preparation or filing of any document or report required to be

filed with the Commission pursuant to the Exchange Act or otherwise.

### IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

3

13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 promulgated thereunder [17 C.F.R. § 240.13b2-1] by:

    (a)    falsifying or causing to be falsified any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act; or

    (b)    knowingly circumventing or knowingly failing to implement a system of internal accounting controls.

## V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from aiding and abetting any violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13], by knowingly providing substantial assistance to an issuer that:

    (a)    fails to file with the Commission any report or statement required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder, or information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act;

4

(b)    fails, in addition to the information expressly required to be included in a

statement or report, to add such further material information as is necessary to

make the required statements, in the light of the circumstances under which they

were made not misleading;

(c)    fails to make and keep books, records, and accounts, which, in reasonable detail,

accurately and fairly reflect the transactions and dispositions of assets of the

issuer; and

(d)    fails to devise and maintain a system of internal accounting controls

sufficient to provide reasonable assurances that:  transactions are executed

in accordance with management's general or specific authorization; transactions

are recorded as necessary to permit preparation of financial statements in

conformity with generally accepted accounting principles or any other criteria

applicable to such statements, and to maintain accountability for assets; access to

assets is permitted only in accordance with management's general or specific

authorization; and the recorded accountability for assets is compared with the

existing assets at reasonable intervals and appropriate action is taken with respect

to any differences.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a

civil penalty in the amount of $150,000 pursuant to Section 20(d) of the Securities Act [15

U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  Defendant shall

make this payment within ten (10) business days after entry of this Final Judgment by certified

5

check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission. The payment shall be delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Mail Stop 0-3, Alexandria, Virginia 22312, and shall be accompanied by a letter identifying Merle D. Lewis as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made pursuant to this Final Judgment. Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28 USC § 1961.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Defendant is prohibited for five years following the date of entry of this Final Judgment, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

6

## X.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE