

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

v.

JOHN C. CHARTERS,

                    Defendant.

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint, alleges:

### SUMMARY OF THE ACTION

1.    During the second and third quarters of 2002, Defendant John C. Charters, a former executive of Expanets, Inc. ("Expanets"), a former subsidiary of NorthWestern Corporation ("NorthWestern"), and NorthWestern senior executives misled investors about Expanets' financial performance and the nature of Expanets' reported income.

2.    First, with the knowledge of Charters and NorthWestern senior executives, Expanets failed to properly adjust its financial statements to account for uncollectible receivables and adjustments to customer bills, causing overstatements of NorthWestern's reported income of 90% and 109% in the second and third quarters of 2002, respectively.

3.    Second, while Charters and NorthWestern senior executives publicly claimed that Expanets had achieved profitability through its operations and cost savings, they failed to properly disclose that Expanets' reported income during 2002 was, in large

part, derived from the reduction of various reserve accounts, which helped Expanets

reach its earnings targets, and from its receipt of unusual non-compete payments.

4.    The conduct of Charters and NorthWestern senior executives helped

facilitate NorthWestern's completion of more than $800 million in securities offerings in

September and October 2002, including raising $87.5 million in an equity offering that

provided the company with operating capital to improve its liquidity position.

5.    Approximately a year after these offerings, and after restating its 2002

quarterly financial results, writing off significant investments in Expanets, and disclosing

the true results of its 2002 operations, NorthWestern declared bankruptcy.

## II. JURISDICTION AND VENUE

6.    The Commission brings this action pursuant to the authority conferred upon

it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)]

and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. §§ 78u(d) and (e)] for an order permanently restraining and enjoining Defendant

and granting other equitable relief.

7.    This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15

U.S.C. §§ 78u(e) and 78aa].

8.    Venue lies in this Court pursuant to Section 22(a) of the Securities Act and

Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].

9.    In connection with the transactions, acts, practices, and courses of business

described in this Complaint, Charters, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, of the facilities of a national

securities exchange, and/or of the means and instruments of transportation or communication in interstate commerce.

10. Certain of the transactions, acts, practices and courses of business constituting the violations of law alleged herein occurred within this judicial district. Moreover, Defendant Charters resides in this judicial district.

### III. DEFENDANT

11. **John C. Charters**, age 45, is a resident of Carbondale, Colorado. Charters was the chief executive officer ("CEO") of NorthWestern Growth Corporation ("NGC"), the division of NorthWestern that managed Expanets, from April through August 2002, and CEO of Expanets from August 2002 through July 2003. From April 2002 through July 2003, Charters was also a member of Expanets' board of directors. Prior to his position with Expanets, Charters was a member of NorthWestern's board of directors from February 2000 through April 2002. Through his roles as CEO of both NGC and Expanets, Charters served as the functional head of Expanets.

### IV. RELATED PARTIES

12. **NorthWestern Corporation**, a Delaware corporation with its principal executive offices in Sioux Falls, South Dakota, operates a regulated utility business in South Dakota, Nebraska and Montana. During the period described herein, NorthWestern controlled and consolidated the financial results of Expanets. NorthWestern's common stock was registered with the Commission under Section 12(b) of the Exchange Act and traded on the New York Stock Exchange until it was delisted shortly before NorthWestern declared bankruptcy in September 2003. In November 2004, NorthWestern emerged from bankruptcy. Its common stock is now registered with

3

the Commission pursuant to Section 12(b) of the Exchange Act and trades on the

NASDAQ Global Select Market.

13. **Expanets, Inc.,** a Delaware corporation formerly headquartered in

Englewood, Colorado, provided networked telecommunications equipment and services

to medium-sized businesses nationwide. Expanets was comprised of approximately 26

small telecommunications equipment resellers and a former sales division of Lucent

Technologies. NorthWestern wrote off substantially all of its investment in Expanets in

its 2002 Form 10-K and announced its intent to sell Expanets in April 2003. In the

second quarter of 2003, Expanets' operations were discontinued, and in May 2004,

Expanets filed for bankruptcy. Proceeds from the sale of Expanets' assets were

distributed in bankruptcy.

### V.    SUMMARY OF VIOLATIONS AND RELIEF SOUGHT

14. Defendant Charters violated Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and

78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and

240.13b2-1], and aided and abetted NorthWestern's violations of Sections 13(a),

13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)

and 78m(b)(2)(B)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§

240.12b-20, 240.13a-11 and 240.13a-13], and unless restrained and enjoined will violate

or aid and abet violations of such provisions.

15. The Commission also seeks an order requiring Charters to pay a $50,000

civil penalty, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

4

## VI.    FACTS

A.    Background — NorthWestern's Expansion And The Poor Performance Of
Expanets Prior To 2002

16.    For more than seventy years, NorthWestern operated a public utility
business, providing electricity and natural gas to customers in South Dakota and
Nebraska.

17.    In the late-1990s, NorthWestern formed Expanets to diversify into the
potentially high-growth sector of telecommunications.  NorthWestern intended to acquire
telecommunications companies and then make the combined businesses more profitable.

18.    NorthWestern expected that following an initial growth phase, Expanets
would provide substantial additional earnings and cash flow to NorthWestern through
dividends on NorthWestern's preferred stock holdings in Expanets.

19.    However, despite NorthWestern's investment of hundreds of millions of
dollars in Expanets, it incurred large losses in most years and posted only small profits in
other years.  By December 31, 2001, NorthWestern had invested $314.1 million in
Expanets.  Despite this sizeable investment, Expanets had not returned significant cash to
NorthWestern.

20.    Despite the historical poor performance of Expanets and another non-utility
subsidiary, in February 2002, NorthWestern quadrupled its customer base for utility
operations by acquiring Montana Power Company ("Montana Power") for approximately
$1.1 billion.  NorthWestern financed a substantial part of this acquisition by issuing $720
million in unregistered notes.

**B.**    **NorthWestern's Planned Equity Offering and Heightened Pressure to Meet**
**Financial Performance Targets During 2002**

21.  NorthWestern's markedly increased debt used to acquire Montana Power

threatened the company's historically stable liquidity and top-tier credit ratings.

Therefore, in early February 2002, NorthWestern publicly announced its intention to

conduct an equity offering, and then use the proceeds to pay down a portion of its

elevated debt.

22.  During the second and third quarters of 2002, Charters and NorthWestern

senior executives knew that the historical poor performance of Expanets and

NorthWestern's expansion of its utility operations together placed enormous pressure on

the company's financial performance during those periods.

23.  Charters and NorthWestern senior executives also knew that NorthWestern's

ability to meet its public earnings per share guidance for 2002 was dependent in part

upon achieving markedly increased profitability at Expanets.

24.  During the second and third quarters of 2002, Charters knew that Expanets'

improved profitability was dependent in part on the functionality of Expanets'

"EXPERT" information technology system, which had been implemented in late

November 2001 to serve as a platform for virtually all of Expanets' operations, including

sales, inventory, project management, billings, collections and financial statement

preparation.

25.  However, during the second and third quarters of 2002, Charters knew that

the EXPERT system was unable to perform many of the basic tasks for which it had been

designed.  The EXPERT system experienced particularly severe problems in generating

timely and accurate customer bills and tracking customer payments.

26.  Throughout the second and third quarters of 2002, Charters and NorthWestern senior executives received detailed information regarding serious, ongoing problems with the EXPERT system and its impacts across Expanets' operations, particularly as to customer billings and collections.  At various times during the second and third quarters of 2002, Charters and NorthWestern senior executives received weekly EXPERT updates, monthly operations reports and numerous candid emails regarding the system status.  During this time, Charters and NorthWestern senior executives also participated in regular meetings regarding ongoing system problems and planned repairs.

27.  As alleged below, Charters and NorthWestern senior executives also discussed throughout the second and third quarters of 2002 the impact of EXPERT problems on Expanets' accounts receivable collections and adjustments to customer bills.

28.  Prior to the completion of more than $800 million in securities offerings by NorthWestern in September and October 2002, Charters and NorthWestern senior executives told the marketplace that Expanets was operating as expected and was achieving its earnings targets.

29.  However, just two months later, in December 2002, NorthWestern disclosed that Expanets would take more than $50 million of charges for uncollectible accounts receivable and adjustments to customer bills.

30.  In April 2003, NorthWestern restated its Forms 10-Q for the first three quarters of 2002 and erased Expanets' previously reported income.  The company also disclosed significant ongoing problems with the EXPERT system, and the impact of various reserve reductions and unusual non-compete payments on Expanets' 2002 financial results.

7

31. Also in April 2003, NorthWestern filed its 2002 Form 10-K, in which it wrote off substantially all of its past investment of hundreds of millions of dollars in Expanets. In that filing, NorthWestern also announced that, despite past assurances, Expanets would not generate future cash flow in sufficient amounts to help service NorthWestern's debt.

32. Over the next five months, NorthWestern's liquidity situation continued to deteriorate until the company declared bankruptcy in September 2003.

C.    **Charters' Role at Expanets**

33. In Charters' roles as CEO of NGC and of Expanets, Charters oversaw and managed all of Expanets' operations.

34. Throughout his tenure managing Expanets, Charters knew that Expanets' financial statements were consolidated into NorthWestern's published financial statements. Charters also knew or was reckless in not knowing that NorthWestern's Forms 10-Q for the periods ended June 30, 2002 and September 30, 2002, and NorthWestern's earnings releases for those periods attached to Forms 8-K, included the misstated financial results of Expanets as further alleged herein. Charters further knew or was reckless in not knowing that NorthWestern's Form 10-Q for the period ended June 30, 2002 was incorporated by reference into the amended Forms S-4 filed with the Commission on August 16, 2002 and September 9, 2002, as well as the equity offering prospectus supplements that NorthWestern filed with the Commission on September 30, 2002 and October 3, 2002.

35. Charters spoke in NorthWestern's analyst conference call on August 8, 2002.

36. Charters reviewed and approved portions of NorthWestern's Form 10-Q for the period ended September 30, 2002 regarding Expanets' operations and results. Charters was a member of NorthWestern's internally-created disclosure committee that was designed to ensure compliance with the Sarbanes-Oxley Act and to support the certification of NorthWestern's Form 10-Q for the period ended September 30, 2002 by NorthWestern's CEO and chief financial officer.

D.   **Expanets' Material Understatement Of Its Bad Debt Reserve**

37. In anticipation that some customer accounts might prove uncollectible, Expanets maintained a "bad debt" reserve, which had the effect of reducing Expanets' operating income.

38. In the second quarter of 2002, Charters was informed that Expanets had failed to increase its bad debt reserve to account for the markedly increased difficulties with collections that resulted from the EXPERT implementation. For example, Charters knew or was reckless in not knowing that Expanets had not increased reserves to account for millions of dollars of aged receivables that pre-dated implementation of the EXPERT system in November 2001. Charters also knew or was reckless in not knowing that after EXPERT implementation, a litany of system problems was greatly hampering collection, causing millions of dollars of receivables to become badly aged and therefore likely uncollectible.

39. Charters therefore knew or was reckless in not knowing that Expanets improperly failed to increase its bad debt reserve to account for additional uncollectible accounts receivables in its financial statements for the second quarter of 2002.

9

40. Charters knew or was reckless in not knowing that serious problems with Expanets' collections of its accounts receivables continued throughout the third quarter of 2002. For example, in mid-September 2002, approximately two weeks before NorthWestern's equity offering, Charters and other Expanets personnel met with NorthWestern senior executives to discuss Expanets' accounts receivables. At that meeting, Charters and NorthWestern senior executives were provided a written report and told by Expanets personnel that $52 million of receivables were over 180 days old, including $21 million of receivables that were over 300 days old.

41. Because these severely aged receivables were not likely to be collected, standard collection parameters suggested either writing off Expanets' receivables or increasing its bad debt reserve by $46 million. Because many of Expanets' aged receivables resulted from billing lapses and delays, Expanets personnel informed Charters and NorthWestern senior executives that the bad debt reserve was understated by a lesser amount, approximately $32 million. However, Charters and NorthWestern senior executives knew that Expanets had not increased its reserve by any amount.

42. On or about October 22, 2002, soon after the completion of NorthWestern's debt and equity offerings, Charters and other Expanets personnel met again with NorthWestern senior executives and informed them that Expanets' accounts receivables balance had shown virtually no improvement since the mid-September meeting. Based upon this data, Expanets personnel recommended a substantial increase in Expanets' bad debt reserve.

43. Despite his receipt of these documents, Charters and NorthWestern senior executives knew that Expanets did not increase its reserve as a result of the information exchanged at this meeting.

44. After NorthWestern's securities offerings, the company's third quarter Form 10-Q disclosed in part that the EXPERT billing problems "*may* cause a need to increase the current reserve for bad debt, which *could* negatively impact financial performance in future quarters." (Emphases added) Charters knew or was reckless in not knowing that this disclosure was false and misleading because, by that time, Expanets' bad debt reserve was, in fact, already materially understated.

45. In April 2003, NorthWestern filed its 2002 Form 10-K which included fourth quarter 2002 charges of approximately $20 million relating to Expanets' uncollectible accounts receivable, and simultaneously restated its financial results for the second and third quarters of 2002, increasing Expanets' bad debt reserve for each of these periods by approximately $5.1 million and $6.3 million, respectively.

46. As a result of its improper accounting for uncollectible accounts receivable, NorthWestern overstated its income from continuing operations by approximately 19% and 39% for the second and third quarters of 2002, respectively, as reported in its Forms 10-Q and corresponding earnings releases attached to Forms 8-K. Moreover, in its segment reporting for Expanets, NorthWestern overstated Expanets' operating income by approximately 86% and 270%, respectively, for the second and third quarters of 2002.

E.    **Expanets' Material Understatement Of Its Reserve For Adjustments to Customer Bills**

47. As a result of the inaccurate customer bills generated by the EXPERT system, Expanets issued partial credits to affected customers. Expanets recorded these

11

credits as "billing adjustments," which reduced both its revenue and income in the current period. Since Expanets credited customer accounts in periods after it initially recognized revenue from a transaction, Expanets maintained a "billing adjustment reserve" for anticipated credits to customer accounts.

48.  In the second and third quarters of 2002, Expanets personnel repeatedly informed Charters and NorthWestern senior executives that due to the serious ongoing problems with EXPERT's billing function, actual and forecasted billing adjustments were continuing to outpace even the elevated levels anticipated for 2002.

49.  During this time, Charters and NorthWestern senior executives received, among other things, monthly operations reports and other updates describing billing adjustments and their negative impact on Expanets' financial results. For example, during a July 2002 meeting, Expanets personnel warned Charters and NorthWestern senior executives that Expanets' billing adjustment reserve might be understated by as much as $30 million for 2002. Despite his knowledge of the inadequacy of this reserve, Charters approved a $2.3 million adjustment for the second quarter which further reduced the billing adjustment reserve, for the purpose of enhancing Expanets' reported income.

50.  In the third quarter of 2002, Expanets personnel informed Charters and NorthWestern senior executives that actual billing adjustments for the quarter had significantly exceeded their original and revised projections. Despite this knowledge, Charters again approved a reduction in the billing adjustment reserve for the third quarter, this time for $4 million, for the purpose of enhancing Expanets' reported income.

51.  As a result of receiving this information throughout 2002, Charters knew or was reckless in not knowing that Expanets improperly failed to increase its billing

12

adjustment reserve in the second and third quarters of 2002. Charters further knew or was reckless in not knowing that NorthWestern had not disclosed in its Form 10-Q for the third quarter of 2002 that losses resulting from billing adjustments were probable or reasonably possible.

52.   In April 2003, NorthWestern restated its financial results for the first three quarters of 2002, increasing the billing adjustment reserve by $33 million. For the second and third quarters of 2002, NorthWestern's restated financial results corrected the understatement of Expanets' billing adjustment reserve by reducing reported quarterly revenue by approximately $10.1 million and $5.4 million, respectively. .

53.   As a result of Expanets' improper accounting for billing adjustments, NorthWestern overstated its income from continuing operations by approximately 46% and 31% for the second and third quarters of 2002, respectively, as reported in its Forms 10-Q and corresponding earnings releases attached to Forms 8-K. In its segment reporting for Expanets, NorthWestern overstated Expanets' operating income by approximately 1094% and 164%, respectively, for the second and third quarters of 2002.

F.    Expanets' Reserve Reductions

54.   During the second and third quarters of 2002, Expanets reduced amounts recorded in at least fourteen reserve accounts that it maintained on its balance sheet, the effect of which was to materially increase NorthWestern's and Expanets' reported income over that same period. Charters knew or was reckless in not knowing about these reductions, their material impact on NorthWestern's and Expanets' results of operations, and NorthWestern's failure to properly disclose this information regarding Expanets' quality of earnings.

13

55.  From at least May 2002 through the filing of NorthWestern's Form 10-Q for the second quarter 2002, Charters informed NorthWestern senior executives through various communications, including emails, written reports and/or verbal communications, that Expanets planned to or had reduced its reserves during the second quarter, and that the result of such reductions would be used to increase Expanets' reported income.

56.  For purposes of the second quarter 2002 alone, approximately $8.8 million of Expanets' reported income was derived from reserve reductions. This amount was material in that it represented approximately 80% of Expanets' reported segment operating income of $11 million and approximately 27% of NorthWestern's income from continuing operations for that quarter.

57.  Through his receipt of this information and communications with NorthWestern, Charters knew or was reckless in not knowing that a material portion of NorthWestern's and Expanets' reported results of operations for the second quarter 2002 was derived from Expanets' reserve reductions.

58.  However, during NorthWestern's August 2002 analyst call, Charters mischaracterized Expanets' financial position by stating that Expanets' profitability was based entirely upon permanent cost reduction measures without disclosing the material impacts of Expanets' reserve reductions. This statement was misleading because Charters knew or was reckless in not knowing that Expanets' reported income for the second quarter had been materially impacted by various non-recurring reserve reductions, and thus was not representative of its true run rate.

59.  Throughout the third quarter of 2002, Charters continued to inform NorthWestern senior executives through emails, written reports and/or verbal

14

communications of Expanets' planned or actual reduction of reserves for the third quarter and the remainder of 2002.

60.   For example, during an operations review meeting between Expanets and NorthWestern senior management in October 2002 attended by Charters, Expanets personnel discussed with NorthWestern senior executives the possible reduction of $4.2 million of additional balance sheet reserves during the third quarter of 2002.  As a result, Expanets reduced its reserves by $4.2 million during the third quarter of 2002, thereby increasing NorthWestern's and Expanets' reported income.

61.   Approximately $27 million of Expanets' income was derived from reserve reductions during the third quarter of 2002.  With this income, Expanets was able to report $8.7 million of operating income rather than a substantial loss.  In addition, with this income, NorthWestern was able to report $14.6 million of income from continuing operations for that quarter rather than a loss.  Accordingly, the amount of Expanets' reserve reductions for the third quarter 2002 was material to both NorthWestern's and Expanets' results of operations for that period.

62.   Through his receipt of information from Expanets personnel and through his communications with NorthWestern, Charters knew or was reckless in not knowing that a material portion of NorthWestern's and Expanets' reported results of operations for the third quarter 2002 was derived from Expanets' reserve reductions.

63.   NorthWestern's Form 10-Q for the third quarter failed to properly disclose the material impact of Expanets' reserve reductions.  Charters knew or was reckless in not knowing about these material omissions from NorthWestern's Form 10-Q.

G.    **Expanets' Unusual Transactions**

64.   In conjunction with Expanets' acquisition of certain assets of a competitor,
Expanets agreed in March 2000 that, in exchange for payments from the competitor,
Expanets would not solicit specific business of the competitor's customers.  Expanets'
competitor was obligated to make these "non-compete" type of payments to Expanets
until March 2005.  These payments were not characteristic of Expanets' regular
operations and therefore represented unusual transactions.

65.   During the third quarter of 2002, Charters and NorthWestern senior
executives knew that Expanets would be receiving these non-compete payments.
Furthermore, throughout the and third quarter of 2002, Expanets personnel informed
NorthWestern senior executives through various communications, including emails,
written reports and/or verbal communications, about the actual and projected impacts of
these non-compete payments on Expanets' reported income for 2002.

66.   In the third quarter of 2002, NorthWestern reported in its segment
disclosures that Expanets had operating income of approximately $8.7 million.
Approximately $15.3 million of Expanets' income came from the non-compete
payments.  The $15.3 million also represented approximately 68% of NorthWestern's
consolidated income from continuing operations for the quarter.  Accordingly, the
amount of these non-compete payments was material to the operating results of both
NorthWestern and Expanets for that period.

67.   NorthWestern's Form 10-Q for the third quarter of 2002 failed to properly
disclose Expanets' receipt of these unusual non-compete payments and their material
effect on Expanets' and NorthWestern's reported results of operations for that period.

68.  Through his receipt of information from Expanets accounting personnel and through his communications with NorthWestern during the third quarter of 2002, Charters knew or was reckless in not knowing about the material impact of these non-compete payments, and he knew or was reckless in not knowing that NorthWestern's Commission filing and corresponding earnings press release attached to Form 8-K for that period failed to properly disclose the impact to NorthWestern's and Expanets' reported results of operations.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 17(a)(1) of the
### Securities Act [15 U.S.C. § 77q(a)(1)])

69.  Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

70.  As a result of the foregoing, Charters directly and indirectly, with scienter, in the offer or sale of NorthWestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has employed a device, scheme, or artifice to defraud.

71.  Charters thereby violated, and unless restrained and enjoined, will violate Section 17(a)(1) of the Securities Act.

### SECOND CLAIM FOR RELIEF
### (Violation of Sections 17(a)(2) and 17(a)(3)
### of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)])

72.  Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

73.  Charters directly and indirectly, with scienter, in the offer or sale of NorthWestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has obtained money or property by means of untrue statements of material fact or omissions to state material

17

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of NorthWestern securities.

74.    Charters violated, and unless restrained and enjoined, will violate Section 17(a)(2) and 17(a)(3) of the Securities Act.

### THIRD CLAIM FOR RELIEF
**(Violation of Section 10(b) of the Exchange Act and
Rule 10(b)(5) thereunder [15 U.S.C. §§ 78j(b) and §240.10b-5])**

75.    Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

76.    Charters directly and indirectly, with scienter, in connection with the purchase or sale of NorthWestern securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which had been and are operating as a fraud or deceit upon the purchasers or sellers of such securities.

77.    Charters violated, and unless restrained and enjoined, will violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### FOURTH CLAIM FOR RELIEF
**(Violation of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]
and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1])**

78.    Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

79.  Charters knowingly failed to implement a system of internal accounting controls, and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2)(A) of the Exchange Act.

80.  Charters violated, and unless restrained and enjoined, will violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting NorthWestern's Violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13])

81.  Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

82.  NorthWestern, an issuer of a security registered pursuant to Section 12(b) of the Exchange Act, filed materially misleading quarterly and current reports with the Commission.

83.  By reason of the foregoing, NorthWestern violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13].

84.  Charters knew of NorthWestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 thereunder and substantially assisted NorthWestern in committing these violations.

85.  Charters aided and abetted NorthWestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 thereunder, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

19

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting NorthWestern's Violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)])

86.     Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

87.     NorthWestern failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

88.     By reason of the foregoing, NorthWestern violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

89.     Charters knew or was severely reckless in not knowing of NorthWestern's violations of Section 13(b)(2)(A) of the Exchange Act and substantially assisted NorthWestern in committing these violations.

90.     Charters aided and abetted NorthWestern's violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting NorthWestern's Violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)])

91.     Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

92.     NorthWestern failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with

generally accepted accounting principles or any other criteria applicable to such statements and to maintain accountability for assets.

93.    By reason of the foregoing, NorthWestern violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

94.    Charters knew or was severely reckless in not knowing of NorthWestern's violations of Section 13(b)(2)(B) of the Exchange Act and substantially assisted NorthWestern in committing these violations.

95.    Charters aided and abetted NorthWestern's violations of Section 13(b)(2)(B) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Find that Charters committed the violations alleged.

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Charters from violating, directly or indirectly, the provisions of law and rules alleged in this complaint.

### III.

Issue an Order requiring Charters to pay a $50,000 civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

IV.

Grant such other relief as this Court may deem just or appropriate.

Dated: July 23, 2007_____

Respectfully submitted,

s/ Kurt L. Gottschall_____
ELIZABETH ESPINOSA KRUPA
KURT L. GOTTSCHALL
NOEL M. FRANKLIN
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO 80202
Phone: (303) 844-1000
Fax: (303) 844-1052

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>JOHN C. CHARTERS,<br><br>     Defendant. | Civil Action Number: 07-CV-01550-RPM-MEH<br><br>**CONSENT OF<br>JOHN C. CHARTERS** |

1.    Defendant John C. Charters ("Defendant") waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

2.    Without admitting or denying the allegations of the complaint (except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

(a) permanently enjoins and restrains Defendant from violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5

1

and 240.13b2-1]; and aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11, 240.13a-13]; and

(b)  orders Defendant to pay a civil penalty in the amount of $50,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

3.    Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

4.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5.    Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

6.    Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any

member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

7.    Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

8.    Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9.    Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

10.    Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a

3

member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

11.    Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12.    Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes,

4

Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

13.    In connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, Defendant: (i) agrees to appear and be interviewed by Commission staff at such times and places as the staff requests upon reasonable notice; (ii) will accept service by mail or facsimile transmission of notices or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff; (iii) appoints Defendant's undersigned attorney as agent to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, waives the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Defendant's travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (v) consents to personal jurisdiction over Defendant in any United States District Court for purposes of enforcing any such subpoena.

14.    Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

5

15.     Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

Dated: 4/23/07



John C. Charters

On April 23, 2007, John C. Charters, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent.

Notary Public
Commission expires: July 27, 2010

DEBORAH L. RIGGS
Commission # 1678792
Notary Public - California
Santa Mateo County
My Comm. Expires Jul 27, 2010

6

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

JOHN C. CHARTERS,

Defendant.

Civil Action Number: 07-CV-O155O-RPM-MEH

FINAL JUDGMENT AS
TO DEFENDANT
JOHN C. CHARTERS

The Securities and Exchange Commission having filed a Complaint and Defendant

John C. Charters ("Defendant") having entered a general appearance; consented to the Court's

jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final

Judgment without admitting or denying the allegations of the Complaint (except as to

jurisdiction); waived findings of fact and conclusions of law; and waived any right to appeal

from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], by using any means

or instruments of transportation or communication in interstate commerce or by using the mails,

directly or indirectly:

      (a)      to employ any device, scheme, or artifice to defraud, or

      (b)      to obtain money or property by means of any untrue statement of a material fact or

any omission to state a material fact necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; or

      (c)      to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser.

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and

Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or

instrumentality of interstate commerce, or of the mails, or of any facility of any national

securities exchange, in connection with the purchase or sale of any security:

      (a)      to employ any device, scheme, or artifice to defraud;

2

(b)    to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

### III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 promulgated thereunder

[17 C.F.R. § 240.13b2-1] by:

(a)    falsifying or causing to be falsified any book, record or account subject to Section

13(b)(2)(A) of the Exchange Act; or

(b)    knowingly circumventing or knowingly failing to implement a system of internal

accounting controls.

### IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

and Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from aiding and abetting any violations of

Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a),

3

78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§

240.12b-20, 240.13a-11 and 240.13a-13], by knowingly providing substantial assistance to an

issuer that:

(a)     fails to file with the Commission any report or statement required to be filed with

the Commission pursuant to Section 13(a) of the Exchange Act and the rules and

regulations promulgated thereunder, or information and documents required by

the Commission to keep reasonably current the information and documents

required to be included in or filed with an application or registration statement

filed pursuant to Section 12 of the Exchange Act;

(b)     fails, in addition to the information expressly required to be included in a

statement or report, to add such further material information as is necessary to

make the required statements, in the light of the circumstances under which they

were made not misleading;

(c)     fails to make and keep books, records, and accounts, which, in reasonable detail,

accurately and fairly reflect the transactions and dispositions of assets of the

issuer; or

(d)     fails to devise and maintain a system of internal accounting controls

sufficient to provide reasonable assurances that:  transactions are executed

in accordance with management's general or specific authorization; transactions

are recorded as necessary to permit preparation of financial statements in

conformity with generally accepted accounting principles or any other criteria

applicable to such statements, and to maintain accountability for assets; access to

4

assets is permitted only in accordance with management's general or specific

authorization; and the recorded accountability for assets is compared with the

existing assets at reasonable intervals and appropriate action is taken with respect

to any differences.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a

civil penalty in the amount of $50,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C.

§ 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. Defendant shall make this

payment within ten (10) business days after entry of this Final Judgment by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission. The payment shall be delivered or mailed to the Office of Financial Management,

Securities and Exchange Commission, Operations Center, 6432 General Green Way, Mail Stop

0-3, Alexandria, Virginia 22312, and shall be accompanied by a letter identifying John C.

Charters as a defendant in this action; setting forth the title and civil action number of this action

and the name of this Court; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28 U.S.C.

§ 1961.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is

incorporated herein with the same force and effect as if fully set forth herein, and that Defendant

shall comply with all of the undertakings and agreements set forth therein.

5

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

VIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: _____, _____


_____

UNITED STATES DISTRICT JUDGE

6

# EXHIBIT 19

# REDACTED IN ITS ENTIRETY



1              IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF DELAWARE

2

    Civil Action No. C.A. No. 04-1494 (JJF)

3

    MAGTEN ASSET MANAGEMENT CORPORATION and

4   LAW DEBENTURE TRUST COMPANY OF NEW YORK,

5   Plaintiffs,

6   v.

7   NORTHWESTERN CORPORATION,

8   Defendant.

9   ------------------------------------------------

10  Civil Action No. C.A. No. 05-499 (JJF)

11  MAGTEN ASSET MANAGEMENT CORP.,

12  Plaintiff,

13  v.

14  MICHAEL J. HANSON and ERNIE J. KINDT,

15  Defendants.

16  ------------------------------------------------

17                  DEPOSITION OF

18                MICHAEL NIEMAN

19  ------------------------------------------------

20

21

22

23

24

25  TAKEN ON:  6/29/2007        BY:  DANA ANDERSON



**Page 2**

1  APPEARANCES:
2  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
   One New York Plaza
3  New York, New York 10004-1980
   By: Gary L. Kaplan, Esq.
4     Philip Kimball, Esq.
5  For the Plaintiffs
6
7
8
9  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
   101 Park Avenue
10 New York, New York 10178-0061
   By: Nancy E. Delaney, Esq.
11
   For NorthWestern Corporation
12
13
14
15 BROWNING, KALECZYC, BERRY & HOVEN, PC
   139 North Last Chance Gulch
16 Helena, MT 59601
   By: Stanley T. Kaleczyc, Esq.
17    Kimberly A. Beatty, Esq.
18 For Michael J. Hanson and Ernie J. Kindt
19
20
21
22
23
24
25

**Page 4**

1  INDEX OF EXHIBITS (continued)
2  Exhibit Number 11, October 30, 2002 Memorandum
   from Kipp Orme to NorthWestern Board of
3  Directors regarding Revised Proposed 2003
   Operating Plan, page 101
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1  INDEX
2  Examination by Mr. Kaplan, page 5
3
4  INDEX OF EXHIBITS
5  Exhibit Number 1, Notice of Deposition of
   NorthWestern Corporation Pursuant to Rule
6  30(b)(6), page 5
7  Exhibit Number 2, Management Financial and
   Information Report Meeting 2002 Calendar, page
8  11
9  Exhibit Number 3, NorthWestern Corporation
   Finance Summit Session February 2002, page 31
10
   Exhibit Number 4, May 28, 2002 Memorandum from
11 Kipp Orme to Merle Lewis, Dick Hylland and
   Eric Jacobsen regarding Financing Plans and
12 Considerations, page 38
13 Exhibit Number 5, NorthWestern Corporation's
   First Quarter 2002 Earnings Conference Call
14 April 30, 2002 Transcript, page 46
15 Exhibit Number 6, July 30, 2002 Memorandum
   from Mike Hanson to The Board of Directors
16 regarding Update on NorthWestern Energy
   Integration, page 50
17
   Exhibit Number 7, Affidavit of Dennis Lopach,
18 page 70
19 Exhibit Number 8, Expanets Summary Financial
   Information Package dated June 25, 2002,
20 page 73
21 Exhibit Number 9, June 17, 2002 Memorandum
   from Kipp Orme to NorthWestern Board of
22 Directors regarding Financing and IR Plans,
   page 74
23
   Exhibit Number 10, July 31, 2002 Memorandum
24 from Eric Jacobsen to NorthWestern Board of
   Directors regarding Going Flat Resolution,
25 page 81

**Page 5**

1  THE DEPOSITION OF MICHAEL NIEMAN is taken on
2  this 29th day of June, 2007, at the Holiday
3  Inn Sioux Falls-City Centre Hotel in
4  Sioux Falls, South Dakota, commencing at the
5  hour of 3:46 p.m., pursuant to Notice.
6
7            * * *
8        MICHAEL NIEMAN,
9  called as a witness, being first duly sworn,
10     was examined and testified as follows:
11           * * *
12
13       EXAMINATION
14
15     (Deposition Exhibit Number 1
16 marked for identification.)
17 BY MR. KAPLAN:
18     Q.  Good afternoon, Mr. Nieman.  My
19 name is Gary Kaplan.  I'm from Fried,
20 Frank, Harris, Shriver and Jacobson,
21 counsel to Magten Asset Management in this
22 action.  I'll hand to you what we've marked
23 as Nieman Exhibit 1.
24     A.  (Reviews document.)
25     Q.  That is the Notice of

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 14

```
 1   that occur each month potentially that might
 2   change the numbers from month to month.
 3       Q.    What kind of accounting
 4   adjustments?
 5       A.    I don't recall what specific
 6   accounting adjustments would have been made.
 7       Q.    Was there something specific to
 8   Expanets that it would have accounting
 9   adjustments versus the other segments of
10   NorthWestern's business?
11       A.    I don't believe there was
12   anything necessarily specific. In any
13   business there might be accounting
14   adjustments that are made to the financial
15   results particular in an interim month such
16   as January.
17       Q.    Now, we are going to look at a
18   couple of them. I want to flip through
19   some pages, just want to show you some
20   things and see if you can help me out
21   understanding them.
22       A.    Okay.
23       Q.    If we go to the May MFIR. See
24   there on NOR 458111. Do you see there is a
25   chart on the bottom of NorthWestern
```

Page 16

```
 1   specific in May. There are different charts
 2   and different graphs and information that
 3   are provided. This was kind of a dynamic
 4   document that was intended to provide the
 5   information that was pertinent at the time
 6   to executive management. And this
 7   presumably was a chart that senior
 8   management wanted to start tracking at that
 9   timeframe.
10       Q.    So senior management didn't
11   want to track incremental borrowings prior
12   to May 2002?
13           MS. DELANEY: Objection.
14           MR. KALECZYC: Objection.
15           THE WITNESS: Can you repeat the
16   question?
17   BY MR. KAPLAN:
18       Q.    I asked if NorthWestern senior
19   management did not want to track the
20   incremental borrowings prior to May of
21   2002?
22       A.    I'm sure that they wanted to
23   track it. I believe by putting it in this
24   report, it put a little more emphasis on it.
25   And it was shared with the partner entities'
```

Page 15

```
 1   Incremental Borrowings?
 2       A.    Yes.
 3       Q.    Do you know why that chart was
 4   included in May of 2002?
 5       A.    I believe that chart was
 6   included to reflect and track the borrowings
 7   that Expanets had needed from NorthWestern
 8   that were incremental to the preferred stock
 9   and the debt prior to December of 2001 that
10   was funded to Expanets.
11       Q.    What I am asking, though, is if
12   you look in the prior months, that chart
13   wasn't there. Do you know why in May it
14   was determined to include this chart?
15           MS. DELANEY: I believe it's been
16   asked and answered.
17           THE WITNESS: Can you clarify your
18   question?
19   BY MR. KAPLAN:
20       Q.    Since that chart was not here
21   in prior months, I want to understand if
22   there was something that happened in May
23   that somebody decided to include this
24   chart?
25       A.    I don't recall anything
```

Page 17

```
 1   CEOs, CFOs and I think it was an attempt to
 2   put some emphasis and focus that Expanets
 3   was to pay back that incremental borrowings
 4   as soon as possible.
 5       Q.    Well, if you look in August of
 6   2002, on the Expanets section which is on
 7   page 8 of 14.
 8       A.    (Reviews document.)
 9       Q.    See that the chart is no longer
10   there?
11       A.    I do not see the chart on that
12   page, no.
13       Q.    Is there a reason that in
14   August, no longer wanted to highlight the
15   issue of the intercompany advances to
16   Expanets?
17       A.    I do not know what that reason
18   would be, no.
19       Q.    If you look in the July MFIR.
20       A.    (Reviews document.)
21       Q.    Do you know who — who made the
22   decision to include that chart that we were
23   just looking at the May, June and July
24   MFIR?
25       A.    I don't recall who specifically
```

5 (Pages 14 to 17)

Page 18

1   would have made that decision.
2      Q.   Would you have been involved in
3   the decision-making?
4      A.   Not necessarily the decision.
5   I was involved in preparing this report.
6      Q.   Do you know who made the
7   decision to exclude the chart beginning in
8   August?
9          MS. DELANEY: Objection.
10         THE WITNESS: I do not.
11  BY MR. KAPLAN:
12     Q.   If you look at the July MFIR,
13  the page 13 of 14, you see there is a
14  summary of other investments towards the
15  bottom of the page?
16     A.   (Reviews document.) Yes.
17     Q.   And it lists Blue Dot preferred
18  stock, Expanets preferred stock and
19  Expanets loan?
20     A.   Yes.
21     Q.   And the total for the three of
22  those is approximately $783 million?
23     A.   Yes, I see that on the page.
24     Q.   Why were those numbers
25  included?

Page 19

1      A.   I believe those numbers were
2   reported here just to show the amount of the
3   investment that NorthWestern had invested in
4   Blue Dot and Expanets.
5      Q.   If you turn to the August MFIR,
6   it's on the same page, 13 of 14.
7      A.   (Complies.)
8      Q.   See those investments have
9   disappeared?
10     A.   I do not see them on the page,
11  if that's what you mean by "disappeared."
12     Q.   Do you know why those
13  investments are no longer being reflected
14  on the MFIR?
15     A.   I do not.
16     Q.   Was there any decision that the
17  valuation of those -- that the value of
18  those was impaired such that they should
19  not be shown on this report?
20         MS. DELANEY: Objection.
21         THE WITNESS: Repeat the question,
22  please.
23  BY MR. KAPLAN:
24     Q.   Sure. Was there a decision
25  that the value of those investments was

Page 20

1   impaired and therefore it should no longer
2   be shown on this financial statistic?
3          MS. DELANEY: Objection.
4          THE WITNESS: Not that I'm aware
5   of.
6   BY MR. KAPLAN:
7      Q.   Do you know who made the
8   decision not to continue to show those
9   other investments on this page of the MFIR?
10     A.   I do not.
11         MR. KALECZYC: Objection.
12  BY MR. KAPLAN:
13     Q.   The projected net funds
14  available, which is right above the summary
15  of other investments, what is that intended
16  to show?
17     A.   I believe it's intended to show
18  just as it says, the funds available -- this
19  is a NorthWestern Corporation consolidated
20  report, that's the net funds available after
21  factoring in all the items above.
22     Q.   And funds available through
23  when?
24     A.   I believe it's at that point in
25  time.

Page 21

1      Q.   But they are subtracting, if
2   I'm reading this right, you subtract future
3   cash needs, right?
4      A.   That's correct.
5      Q.   What is the future, is that
6   through to year end?
7      A.   It's not clear from this page
8   what time period it was intended to reflect.
9   As I recall, it was intended to demonstrate
10  the known future cash inflows and outflows
11  that were anticipated by the company. And
12  it wasn't over any specific time period.
13     Q.   And you see in the August MFIR
14  they have projected net funds available of
15  $90 million, correct?
16     A.   That's what this page says,
17  yes.
18     Q.   Okay. If you look up on the
19  future cash inflows --
20     A.   Yes.
21     Q.   -- net proceeds from equity
22  offering, $82 million?
23     A.   I see that, yes.
24     Q.   So if I'm reading this right,
25  if you were to have excluded the proceeds

6 (Pages 18 to 21)

Page 22

1   of the equity offering, by August
2   NorthWestern is projecting that it would
3   only have $8 million of cash available?
4       MS. DELANEY: If you exclude it?
5   BY MR. KAPLAN:
6       Q.   If you excluded the net
7   proceeds from the equity offering, this is
8   projecting that -- would show that in
9   August you were projecting you would only
10  have $8 million of cash?
11      MS. DELANEY: Objection.
12      MR. KALECZYC: Join.
13      MS. DELANEY: You can answer.
14      THE WITNESS: Doing the math here,
15  that's what this schedule would suggest, yes.
16      Can I add to that?
17      MS. DELANEY: If you need to,
18  sure.
19      THE WITNESS: There are footnotes
20  on that schedule there that further describe
21  some of the components there and what is being
22  done relative to those amounts. Again, as I
23  said, this was a dynamic document.
24  BY MR. KAPLAN:
25      Q.   You see in the August --

Page 23

1   focusing and continuing on the August one,
2   the projected future funds available
3   excluded cash at the partner entities?
4       MS. DELANEY: Where are you now?
5       MR. KAPLAN: The projected net
6   funds available, the line we were looking at
7   of the $90 million. It has a parenthetical
8   that it's excluding cash of the partner
9   entities.
10      MS. DELANEY: Is there a question?
11  BY MR. KAPLAN:
12      Q.   Do you see that?
13      A.   Yes, I see that.
14      Q.   Do you know why a determination
15  was made to exclude cash of partner
16  entities?
17      A.   I believe it was, again,
18  because this was a NorthWestern Corporation
19  financial report, and it was just clarifying
20  that it doesn't include the cash that might
21  be at Blue Dot or Expanets.
22      Q.   If you turn to the prior
23  months, for example, the July 2002 MFIR.
24      A.   (Complies.)
25      Q.   That same page, 13 of 14, see

Page 24

1   there that the projected future net funds
2   available does not exclude the cash of the
3   partner entities, right?
4       A.   I see the parenthetical is not
5   there, right.
6       Q.   Do you know why -- do you know
7   why this -- why the change was made
8   to -- to in August exclude the cash at the
9   partner entities?
10      MR. KALECZYC: Objection.
11      THE WITNESS: Can you repeat the
12  question?
13  BY MR. KAPLAN:
14      Q.   Sure. Do you know why the
15  decision was made in August to exclude the
16  cash at the partner entities?
17      A.   I do not know why. I'm not
18  sure that there was a decision made to
19  change anything. It might have just been as
20  simple as a clarification. As I recall, I
21  believe that line always excluded the cash
22  that was at the partner entities.
23      Q.   Why would you exclude the cash
24  at the partner entities if you are
25  including as cash outflows the needs of the

Page 25

1   partner entities?
2       A.   A reason to exclude it is that
3   they need that cash for their day-to-day
4   operating needs, and so it wouldn't be
5   available to NorthWestern Corporation.
6       Q.   If we look at the projected net
7   funds available.
8       MS. DELANEY: Which month?
9       MR. KAPLAN: We can look at June.
10  Let's start in June.
11      MS. DELANEY: What page?
12      MR. KAPLAN: 13 of 14.
13  BY MR. KAPLAN:
14      Q.   Do you see in June the
15  projected net funds available was
16  $77.5 million?
17      A.   I see that line here, yes.
18      Q.   That number started to sort of
19  continuously decline from June, didn't it?
20      MS. DELANEY: Objection.
21      THE WITNESS: I don't believe that
22  it did. I thought we were just looking at one
23  that was a higher amount in a later month.
24  BY MR. KAPLAN:
25      Q.   We'll get to that. June we

7 (Pages 22 to 25)

**Page 26**

1    agree is 77.5 million of projected future
2    net funds available, correct?
3        A.   That's what this page says,
4    yes.
5        Q.   Let's turn to July, if we
6    could, page 13 of 14.  You see there that
7    the projected future net funds available
8    has declined from 77.5 million down to
9    $52 million, right?
10       A.   I see that line on the page,
11   yes.
12       Q.   Okay.  And then if we could go
13   to August 2002.
14       A.   (Complies.)
15       Q.   Page 13 of 14.  This is what
16   you meant when you said, well, you know,
17   had seen that August was up to $90 million,
18   right?
19       A.   Yes.  There are different
20   components that are factored in each month
21   that things were changing on a
22   month-to-month basis, and so different
23   things were factored in each month to try to
24   demonstrate what we believed to be was
25   available at that time.

**Page 27**

1        Q.   And this -- to get to the
2    $90 million, as we discussed previously,
3    $82 million of this was going to be the
4    proceeds of the equity offering, correct?
5        A.   That's correct.  That's what
6    this says.  I believe there are different
7    components to each of these, though.
8        Q.   But so if we are looking
9    before, we had June we had 77 million, July
10   we had 52 million.  And then August, but
11   for the proceeds of the equity offering, we
12   would have $8 million?
13            MS. DELANEY:  Objection.
14            THE WITNESS:  I don't believe it's
15   fair to make it that simplistic of a
16   conclusion.
17   BY MR. KAPLAN:
18       Q.   And why not?
19       A.   Because, again, I think there
20   were different investment or future cash
21   needs and future cash potential inflows
22   factored in each month.
23       Q.   When you say "different," they
24   are additional or different ones --
25       A.   Potentially different or things

**Page 28**

1    were changing as to what the different
2    alternatives were.
3        Q.   I appreciate that.  But what
4    I'm asking is that just looking at this
5    linear we are now down from 77 to 52 to, if
6    not for the proceeds of the equity
7    offering, $8 million, right?
8            MS. DELANEY:  Objection.
9            MR. KALECZYC:  Objection.
10   BY MR. KAPLAN:
11       Q.   On the Future Projected Net
12   Funds Available line.
13            THE WITNESS:  I'd have to compare
14   each one of these and what was factored in on
15   each one of them a little more closely to draw
16   that conclusion.
17   BY MR. KAPLAN:
18       Q.   Is there anything on the page
19   that you see that's -- any of the pages
20   that says why you can't compare them
21   because they are so different?
22       A.   As an example, between June and
23   July, there is Expanets working capital and
24   a facility, that was factored in in July and
25   that wasn't factored in in June.  I'm not

**Page 29**

1    seeing any other significant changes,
2    though.
3        Q.   Then if we go forward from
4    August to September.
5        A.   Okay.
6        Q.   Look at page 13 of 14 in the
7    September MFIR, we are at $64 million,
8    correct?
9        A.   That's what this line says,
10   yes.
11       Q.   Okay.  And that is -- the Cash
12   and Marketable Securities line at the top,
13   the $45.4 million, do you see that line?
14       A.   Yes.
15       Q.   That would be inclusive of
16   whatever cash would have been raised in an
17   earlier equity raise, correct?
18       A.   I can't tell that for sure from
19   this, no.
20       Q.   Would that cash have been
21   excluded from available investments?
22       A.   Depends on what the use of the
23   proceeds was used for.
24       Q.   But if the proceeds were used
25   otherwise, it would just not show up,

8 (Pages 26 to 29)

Page 30

1  right, presumably there is not -- what I am
2  trying to get to is the $82 million equity
3  offering.
4      A.    Uh-huh.
5      Q.    That presumably this indicates
6  that of that this is the cash left?
7          MR. KALECZYC: Objection.
8          THE WITNESS: That's what I am
9  saying, you can't tell from this that that's
10  what's left from that offering. There are
11  other lines that have changed as well.
12  BY MR. KAPLAN:
13      Q.    Such as?
14      A.    The NOR CSFB amount outstanding
15  has decreased during that time period.
16      Q.    But in terms of actual -- in
17  terms of cash, the 45.405 is the amount of
18  cash that the company has at that point,
19  right?
20          MS. DELANEY: Objection.
21          MR. KALECZYC: Objection.
22          THE WITNESS: That's not what this
23  would say. I mean, there is outstanding debt
24  on the credit facility. Cash is fungible.
25  You pay down debt or you'd have cash

Page 31

1  available. That's why you show it as combined
2  here.
3  BY MR. KAPLAN:
4      Q.    And the net funds available is
5  $64 million, right?
6      A.    Based on what's factored in
7  here, yes.
8      Q.    Then if we go to October, cash
9  has dropped to $32.9 million, right,
10  page 13 of 14?
11      A.    The line Projected Net Funds
12  Available is $32 million approximately, yes.
13      Q.    Then if we go to November 2002
14  the projected net funds available is down
15  to $20 million, is that correct?
16      A.    That's what this says, yes.
17      Q.    Okay. You can put away the
18  MFIRs.
19          MR. KALECZYC: Are you done with
20  that book?
21          MR. KAPLAN: I never say done.
22          MS. DELANEY: He's never going to
23  give you that one.
24          (Deposition Exhibit Number 3
25  marked for identification.)

Page 32

1  BY MR. KAPLAN:
2      Q.    We are going to mark as Nieman
3  Exhibit 3 a document that's Bates stamped
4  NOR 182470 through NOR 182528. It's a
5  document entitled Finance Summit Session
6  February 2002.
7          Can you identify this document?
8      A.    (Reviews document.) I don't
9  recall this document, no. Says it was
10  finance summit session February 2002.
11      Q.    But you don't know what took
12  place at the finance summit session in
13  February of 2002?
14      A.    I do not recall that, no.
15      Q.    Did you ever hear of Hall of
16  Shame or Hall of Fame for -- internally at
17  NorthWestern?
18      A.    No.
19      Q.    Did you ever hear of the
20  formation of a cash flow committee in March
21  of 2002?
22      A.    I don't recall a committee
23  being formed, no.
24      Q.    If you would turn to a
25  small -- there's a 32, it's small in the

Page 33

1  darkened area, but the Bates stamp numbers
2  are cut off on mine. There is a 32 in the
3  middle of the page, see the page numbers in
4  the blackened area.
5          MR. KIMBALL: NOR 182501.
6  BY MR. KAPLAN:
7      Q.    See it says here "NorthWestern
8  credit rating critical element"?
9      A.    That's what it says here, yes.
10      Q.    What does that mean?
11      A.    It means that the credit
12  ratings need to be important to the company.
13      Q.    Why was the credit rating
14  important?
15      A.    I think it's important to any
16  company for the ability to raise funds, to
17  have terms with creditors, those sorts of
18  things.
19      Q.    And if you look at the prior
20  page, the previous page or page 31,
21  NOR 182500.
22      A.    Okay.
23      Q.    See on the top it says "No
24  performance, no investment grade credit
25  rating, no money"?

9 (Pages 30 to 33)

Page 34

```
1       A.   I see it says that here, yes.
2       Q.   What do you take that to mean?
3            MR. KALECZYC: Objection.
4            THE WITNESS: I think it means
5   what it says here. I think it's pretty
6   simplistic to demonstrate, as with any
7   company, without performance, you'd have no
8   investment and no money.
9   BY MR. KAPLAN:
10      Q.   Particularly important to
11  NorthWestern, though, at this time, wasn't
12  it?
13           MS. DELANEY: Objection.
14           MR. KALECZYC: Objection.
15           THE WITNESS: Not necessarily.
16  BY MR. KAPLAN:
17      Q.   Why not?
18      A.   I think it was always important
19  to NorthWestern.
20      Q.   Were you aware of other finance
21  summits where people talked about a
22  critical element being the credit rating?
23           MR. KALECZYC: Objection.
24           MS. DELANEY: Objection.
25           THE WITNESS: Can you ask your
```

Page 35

```
1   question again?
2   BY MR. KAPLAN:
3       Q.   Sure. Are you aware of other
4   finance summit sessions at NorthWestern
5   where the credit rating was called a
6   critical element?
7            MS. DELANEY: Objection.
8            MR. KALECZYC: Objection, assumes
9   facts not in evidence.
10           THE WITNESS: I'm not aware of any
11  other summit meetings regardless of topic.
12  BY MR. KAPLAN:
13      Q.   Did NorthWestern closely follow
14  what the rating agencies were saying about
15  NorthWestern?
16      A.   I believe that they did, yes,
17  as any company would.
18      Q.   In 2002 -- is it your testimony
19  that in 2002 it was not of particular
20  import to NorthWestern to maintain its
21  credit rating?
22           MS. DELANEY: Objection,
23  mischaracterizes the testimony.
24           THE WITNESS: I don't believe
25  that's what I said.
```

Page 36

```
1   BY MR. KAPLAN:
2       Q.   I'm trying to understand 2002
3   versus other years. In 2002 is it your
4   view that it was no more important than any
5   other year to maintain its credit rating?
6       A.   I can't answer to the degree of
7   importance.
8            MS. DELANEY: And it's been asked
9   and answered.
10  BY MR. KAPLAN:
11      Q.   Do you hear a lot of focus
12  today at NorthWestern with respect to
13  credit ratings?
14      A.   Yes.
15      Q.   More so than in 2002?
16      A.   I don't believe I could
17  compare.
18      Q.   NorthWestern --
19           MR. KAPLAN: Off the record.
20  BY MR. KAPLAN:
21      Q.   In 2002 NorthWestern undertook
22  a number of capital raising activities,
23  correct?
24      A.   Yes.
25      Q.   Raised equity on a couple of
```

Page 37

```
1   occasions, correct?
2       A.   I'm sorry --
3       Q.   It raised equity on a couple of
4   occasions, correct?
5       A.   I don't remember the number of
6   transactions, but I believe it did raise
7   equity during that period.
8       Q.   Also was looking at debt
9   financing?
10      A.   Yes.
11      Q.   And those equity raises and
12  debt financing raises were critical for
13  NorthWestern to have adequate liquidity,
14  correct?
15      A.   I believe they were important,
16  yes.
17      Q.   And if NorthWestern couldn't
18  complete the equity raises or the debt
19  financings, NorthWestern would have been --
20  its liquidity would have been very tight,
21  correct?
22           MS. DELANEY: Objection.
23           MR. KALECZYC: Objection.
24           THE WITNESS: I believe there was
25  a view that the liquidity was tight. And
```

10 (Pages 34 to 37)

Page 38

1  there were a variety of options being explored
2  to alleviate that.
3      MS. DELANEY: Are you finished
4  with Exhibit 3?
5      MR. KAPLAN: For now.
6      (Deposition Exhibit Number 4
7  marked for identification.)
8  BY MR. KAPLAN:
9      Q.  I'm going to mark as Nieman
10  Exhibit 4 a document Bates stamped
11  NOR 056238 through NOR 056245. It's a
12  memoranda from Kipp Orme to Merle Lewis,
13  Dick Hylland and Eric Jacobsen dated
14  5/28/02.
15      Have you ever seen this
16  memorandum before?
17      A.  (Reviews document.) I recall
18  seeing it in the materials that I reviewed
19  just recently.
20      Q.  And you should feel free to
21  review as much of it as you would like.
22  What I would like you to focus on is the
23  first bullet on the first page. See the
24  sentence that starts --
25      MS. DELANEY: He's just looking at

Page 39

1  it.
2      MR. KAPLAN: Take your time.
3  BY MR. KAPLAN:
4      Q.  See the sentence that says
5  "Schedule one attached depicts the above in
6  chart..." skip that. But "the major
7  takeaway from this is through the year end,
8  if we exclude CNO, we have $225 million in
9  debt coming due and potential sources of
10  197 million beyond our cash reserves."
11      Do you see that?
12      A.  I see that sentence, yes.
13      Q.  The potential sources of 197
14  are identified as $97 million for Colstrip,
15  60 million from Expanets and 50 million of
16  operating cash flow?
17      A.  I see that line, yes.
18      Q.  Then he says "While the debt
19  maturities are certainties, the sources are
20  subject to execution risk and are therefore
21  not nearly as certain."
22      A.  I see that line, yes.
23      Q.  Then you see he goes on to say
24  that "While the covenants in the working
25  capital facility would allow NorthWestern

Page 40

1  to fully draw today, that the debt to
2  capital ratio covenant narrows by the year
3  end so that if the balance sheet were to
4  remain as it is of that date, the covenants
5  would not allow any borrowings after
6  12/31/02."
7      Do you see that sentence?
8      A.  I see that here in the memo,
9  yes.
10      Q.  Do you have any reason to
11  disagree with that statement?
12      A.  Do I have a reason to disagree
13  with that statement?
14      Q.  Yeah, any basis to believe that
15  statement is incorrect?
16      A.  I have no basis to disagree
17  with it, no.
18      Q.  And you see at the end it goes
19  on to say "In summary, it would be fair to
20  say that assuming a reasonable level of
21  execution, we should be able to weather the
22  coming 12 months even if we are
23  unsuccessful in subsequent financing
24  activities though we would be stressed
25  financially and there would likely be other

Page 41

1  negative ramifications as discussed
2  subsequently."
3      A.  I see that line, yes.
4      Q.  That suggests that the
5  financing and other activities were pretty
6  important to NorthWestern in 2002, correct?
7      MS. DELANEY: Objection.
8      MR. KALECZYC: Objection.
9      THE WITNESS: I don't know if I
10  can draw that conclusion.
11  BY MR. KAPLAN:
12      Q.  Well, what conclusion can you
13  draw?
14      MS. DELANEY: If any.
15      THE WITNESS: This memo appears to
16  be a memo from Kipp Orme that's -- the subject
17  line is Financing Plans and Considerations.
18  Looks like a planning for -- to ensure that
19  there's adequate liquidity and financing
20  available to fund the company.
21  BY MR. KAPLAN:
22      Q.  I understand. But I'm saying
23  based on Kipp Orme's analysis, he's saying
24  that unless they are able to raise
25  additional financing, the company will be

11 (Pages 38 to 41)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 42

1  stressed financially and there would be
2  other negative ramifications, right?
3      A.    That's what it says here.
4      Q.    Right. And the conclusion to
5  be reached from this is that the financing
6  activities in 2002 were very important to
7  the company, right?
8          MS. DELANEY: Objection.
9          THE WITNESS: I believe the
10 financing activities were important to the
11 company.
12 BY MR. KAPLAN:
13     Q.    You see in the next bullet,
14 says that there have been numerous issues
15 raised publicly regarding NOR's
16 performance?
17     A.    I don't see that.
18     Q.    Next bullet, it's one, two,
19 three, four, five, six, seven -- about
20 seven lines down.
21     A.    Okay. Which line?
22     Q.    Says "There have been numerous
23 issues raised publicly regarding NOR's
24 performance."
25     A.    I see it.

Page 43

1      Q.    And it lists a number of things
2  including massive turnaround required at
3  Expanets and Blue Dot with related
4  questions regarding potential goodwill
5  impairment.
6          Do you see that?
7      A.    I see that.
8      Q.    What is -- what do you think
9  he's referring to when he says "the massive
10 turnarounds required at Expanets"?
11         MR. KALECZYC: Objection.
12         MS. DELANEY: Objection.
13 If you know.
14         THE WITNESS: I believe it was
15 well known that Expanets and Blue Dot were not
16 performing up to expectations and were
17 expected to turn around the performance.
18 BY MR. KAPLAN:
19     Q.    What were the related questions
20 regarding potential goodwill impairment?
21         MR. KALECZYC: Same objection.
22         MS. DELANEY: Objection.
23         THE WITNESS: Presumably if the
24 performance were to continue out indefinitely,
25 obviously that would have an impairment of

Page 44

1  goodwill potentially.
2  BY MR. KAPLAN:
3      Q.    So back in May of 2002 they
4  were beginning to -- people were beginning
5  to raise questions about whether there was
6  going to be goodwill impairment of Expanets
7  and Blue Dot?
8          MR. KALECZYC: Objection.
9          MS. DELANEY: Objection.
10         MR. KALECZYC: Mischaracterizes.
11         THE WITNESS: Right. That's not
12 what I said. I think it suggests that -- if
13 any company doesn't perform over the longer
14 period of time, there's the potential that the
15 goodwill associated with acquiring that
16 company could be impaired.
17 BY MR. KAPLAN:
18     Q.    So if I understand, and I'm not
19 attempting to mischaracterize, what you are
20 saying is unless there is a -- is it fair
21 to say unless there is a massive turnaround
22 at Expanets and Blue Dot, there may be a
23 requirement for a goodwill impairment, is
24 that fair?
25     A.    At some point it's fair to say

Page 45

1  that, yes. At some point the performance
2  needed to turn around, there's no question.
3      Q.    And you see it goes on to list
4  number 7, Potential Liquidity Concerns?
5      A.    I see that here.
6      Q.    What were the liquidity
7  concerns?
8          MR. KALECZYC: Objection.
9  BY MR. KAPLAN:
10     Q.    If you know.
11         MS. DELANEY: Objection.
12         THE WITNESS: I can't tell what
13 Kipp was referring to specifically here in
14 this memo.
15 BY MR. KAPLAN:
16     Q.    Were you aware of liquidity
17 concerns at NorthWestern in May of 2002?
18     A.    I think we just went through
19 the management information reports. I think
20 it was well known that liquidity was going
21 to be tight throughout the year.
22     Q.    I'm going back to the prior
23 page, I think it was the first sentence we
24 looked at where Mr. Orme talked about three
25 potential sources beyond cash reserves and

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 46

1  the sources being $97 million for Colstrip,
2  60 million for Expanets and $50 million of
3  operating cash flow.
4      A.   I see that line, yes.
5      Q.   Do you know what the
6  $97 million of Colstrip refers to?
7      A.   I don't know that refers to the
8  sale transaction of the Colstrip
9  transmission assets that was contemplated
10 with the purchase price of $97 million.
11     Q.   And isn't it true that in the
12 second quarter of 2002, NorthWestern
13 announced that it expected to receive the
14 proceeds from the sale of Colstrip by June
15 or July of 2002?
16     A.   I'd have to look at what you
17 are referring to to confirm that. Seems
18 generally about the right timeframe.
19         (Deposition Exhibit Number 5
20 marked for identification.)
21 BY MR. KAPLAN:
22     Q.   We are going to mark as Nieman
23 Exhibit 5 a document Bates stamped
24 NOR 379763 through NOR 379880.  This says
25 NorthWestern Corporation, April 30, 2002,

Page 47

1  10:00 a.m.
2          Do you know what this document
3  is?
4      A.   (Reviews document.) I don't
5  recall ever seeing it before.
6      Q.   See here it says "Welcome to
7  NorthWestern Corporation's First Quarter
8  2002 Earnings Conference Call"?
9      A.   Appears to be the transcript or
10 something of that nature related to that
11 call.
12     Q.   What I would like you to do is
13 turn to page NOR 379813.
14     A.   813 you said?
15     Q.   Yeah, 813. And you see at the
16 bottom of the page it says "As we said
17 earlier, as we take the proceeds from the
18 Colstrip sale, which will happen in the 1st
19 of July"?
20     A.   I see that line here, yes.
21     Q.   Okay. So in April NorthWestern
22 was telling the marketplace that they
23 expected to get the proceeds of Colstrip
24 in -- at the beginning of July, right?
25     A.   If that's, in fact, what this

Page 48

1  document is, then that's what it says here.
2      Q.   Is it fair to say that the
3  analysts and rating agencies were focused
4  on the sale of Colstrip?
5          MS. DELANEY: Objection.
6          MR. KALECZYC: Objection.
7          THE WITNESS: I don't know that I
8  could say that any financing -- or analyst
9  or -- did you say rating agency? I can't say
10 what they were focused on. I don't know that
11 they were. I know it was a separate
12 assumption, and you saw it highlighted in
13 Kipp's memo. So it was separately identified.
14 BY MR. KAPLAN:
15     Q.   It was separately identified.
16 And it was important to the company, right?
17         MS. DELANEY: Objection.
18         MR. KALECZYC: Objection.
19         THE WITNESS: I believe
20 $97 million would be important to any company.
21 BY MR. KAPLAN:
22     Q.   Particularly a company that is
23 having some liquidity issues, correct?
24         MR. KALECZYC: Objection.
25         MS. DELANEY: Objection.

Page 49

1          THE WITNESS: As I said, I think
2  $97 million would be important to any company.
3  BY MR. KAPLAN:
4      Q.   But wouldn't you agree that it
5  would be particularly important to a
6  company that's having liquidity issues?
7          MS. DELANEY: Objection.
8          MR. KALECZYC: Objection.
9          THE WITNESS: I'm not sure I can
10 say that.
11 BY MR. KAPLAN:
12     Q.   When did the sale of Colstrip
13 close?
14     A.   I don't believe the sale of
15 that -- that transaction was ever closed.
16     Q.   Did there come a time where the
17 company knew it was not going to close in
18 July of 2002?
19     A.   Presumably in July of 2002 when
20 it hadn't closed. Other than that, I don't
21 know for sure.
22     Q.   Do you know why it didn't close
23 in July of 2002?
24     A.   Not specifically, no.
25     Q.   Are you aware that Colstrip

13 (Pages 46 to 49)

Page 50

1  took the position that it would not close
2  on the sale until existing contract
3  disputes were resolved with NorthWestern?
4        MR. KALECZYC: Objection. The
5  question doesn't make any sense. Colstrip
6  refused to close?
7  BY MR. KAPLAN:
8        Q.   Are you aware that PPL said
9  that it would not close on the Colstrip
10  transaction until some existing disputes
11  were resolved between PPL and NorthWestern?
12        A.   That's my understanding.
13        Q.   Do you know when NorthWestern
14  first learned of that?
15        A.   Not exactly, no.
16        (Deposition Exhibit Number 6
17  marked for identification.)
18  BY MR. KAPLAN:
19        Q.   We'll mark as Nieman Exhibit 6
20  a document Bates stamped NOR 053568 through
21  NOR 053571.
22        A.   (Reviews document.)
23        Q.   This is a memorandum from
24  Mike Hanson to the board of directors dated
25  July 30th, 2002.

Page 51

1        Have you ever seen this before?
2        A.   I may have seen it in review of
3  documents recently. I don't recall it for
4  sure at the time.
5        Q.   Can you look at page 4.
6        MS. DELANEY: Review the document
7  if you need to.
8  BY MR. KAPLAN:
9        Q.   Do you see there is a section
10  entitled Colstrip Transmission Sale
11  Transaction?
12        A.   Yes, I see that here.
13        Q.   You see the second sentence
14  states that "PPL representative affirmed
15  their obligation and commitment to close
16  the transaction at the contracted price of
17  $97.1 million. However, they indicated a
18  strong desire to discuss resolution of some
19  unrelated claims prior to the close of the
20  sale."
21        Do you see that?
22        A.   I see that here, yes.
23        Q.   Are you aware of any public
24  disclosure by NorthWestern that PPL stated
25  it wasn't going to close the transaction

Page 52

1  until the contract dispute was resolved?
2        MS. DELANEY: Objection.
3        MR. KALECZYC: Join.
4        THE WITNESS: Can you specify --
5  any disclosure --
6  BY MR. KAPLAN:
7        Q.   Any disclosure by NorthWestern
8  prior to December 2002 in which
9  NorthWestern disclosed that the sale of
10  Colstrip was delayed as a result of the
11  dispute with PPL Montana, with PPL.
12        A.   I remember disclosure around
13  the situation there. I don't recall at what
14  point it was disclosed.
15        (Recess.)
16  BY MR. KAPLAN:
17        Q.   You see back on the same
18  document we've been looking at, the last
19  two sentences of the Colstrip transmission
20  sale transaction section, see that it says
21  "We have prepared a complaint to be filed
22  in Montana State Court alleging breach of
23  contract and seeking specific performance
24  along with other remedies"?
25        A.   I see that, yes.

Page 53

1        Q.   Do you know when NorthWestern
2  disclosed publicly that it had filed a
3  complaint against PPL?
4        A.   I do not remember the specific
5  time, no.
6        Q.   Given that Colstrip had told
7  NorthWestern that it was not going to close
8  the transaction until the other dispute was
9  resolved and given that a complaint was now
10  being filed by NorthWestern, isn't it fair
11  to assume that the Colstrip transaction was
12  unlikely to close any time soon?
13        MS. DELANEY: Objection.
14        MR. KALECZYC: Objection.
15        THE WITNESS: You have to repeat
16  the question. I believe you said Colstrip.
17  BY MR. KAPLAN:
18        Q.   Given that PPL had advised
19  NorthWestern that it would not close on the
20  Colstrip transaction while it had a pending
21  dispute on an unrelated contract and given
22  that NorthWestern was now filing a
23  complaint against PPL relating to that
24  other contract, is it fair to assume that
25  the Colstrip transaction was unlikely to

14 (Pages 50 to 53)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 54

1  close any time in the near term of this
2  memoranda?
3        MS. DELANEY: Objection.
4        MR. KALECZYC: Same objection.
5        THE WITNESS: Without fully
6  knowing what the filing of the complaint means
7  and exact circumstances, I guess I can't tell
8  how long it would have taken.
9  BY MR. KAPLAN:
10        Q.    We had looked earlier in the
11  memo from Mr. Orme, and aside from needing
12  to close the Colstrip transaction, he also
13  talked about needing significant additional
14  monies from Expanets.
15        Do you recall that?
16        MS. DELANEY: Objection.
17        MR. KALECZYC: Join the objection.
18        THE WITNESS: I recall it
19  generally. I don't recall the words
20  "needing."
21  BY MR. KAPLAN:
22        Q.    Well, okay, I'll correct that.
23        Do you recall that he had
24  included as a potential source, in addition
25  to the $97 million from -- relating to

Page 55

1  Colstrip, $60 million from Expanets?
2        A.    I believe that was in that
3  document, yes.
4        Q.    And that $60 million was on top
5  of what already was projected for Expanets
6  for the year, correct?
7        MS. DELANEY: Objection to the
8  form.
9        MR. KALECZYC: Objection.
10        THE WITNESS: I can't tell that
11  for sure.
12  BY MR. KAPLAN:
13        Q.    Do you know what the 2002
14  EBITDA projection was for Expanets?
15        MS. DELANEY: When?
16  BY MR. KAPLAN:
17        Q.    At this -- as of May 2002 what
18  was the forecasted 2002 EBITDA for
19  Expanets?
20        A.    I don't remember the number
21  without referring to other documents.
22        Q.    If I tell you it was
23  $87 million, would that refresh your
24  recollection, or would you need to look at
25  documents?

Page 56

1        A.    That sounds about right for
2  that time period.
3        Q.    Would that suggest to you that
4  the $60 million from Expanets would be
5  above the $87 million targeted EBITDA?
6        MS. DELANEY: Objection.
7        MR. KALECZYC: Objection.
8        THE WITNESS: Would you like me to
9  refer to that page again?
10  BY MR. KAPLAN:
11        Q.    Sure. If it would be helpful
12  to you.
13        MS. DELANEY: What exhibit are you
14  looking at?
15        MR. KAPLAN: It's the 5/28/02
16  memo.
17        MS. DELANEY: I think that's
18  Exhibit 4.
19        THE WITNESS: What are you
20  referring to?
21  BY MR. KAPLAN:
22        Q.    The paragraph in the middle of
23  the bullet on the first page that has the
24  parenthetical of $97 million Colstrip,
25  60 Expanets and 50 million operating cash

Page 57

1  flow.
2        MS. DELANEY: Is there a question?
3  BY MR. KAPLAN:
4        Q.    Whether that $60 million for
5  Expanets would be on top of the $87 million
6  of EBITDA forecasted for Expanets?
7        A.    It's not exactly clear here
8  what that 60 million is referring to. I
9  don't believe I can tell from this document.
10        Q.    Well, had NorthWestern lowered
11  its forecast for Expanets as of
12  May 28, 2002?
13        A.    I don't recall at that time
14  period. I know that the company did lower
15  its expectations from Expanets at some point
16  there in 2002. I don't know that it was as
17  of May 28th.
18        Q.    But if the -- if Expanets'
19  forecast was still $87 million as of the
20  date of this memo, would the $60 million
21  suggest to you that it was looking for that
22  over and above their EBITDA projection?
23        MS. DELANEY: Objection, calls for
24  speculation.
25        MR. KALECZYC: Objection.

15 (Pages 54 to 57)

Page 58

1     THE WITNESS: Where are you seeing
2 the 87 million?
3     MR. KIMBALL: It's in the MFIR.
4     THE WITNESS: Again, I can't tell
5 for sure.
6     MR. KAPLAN: We'll get it for you.
7     THE WITNESS: Again, the 87
8 million of EBITDA from Expanets would not be
9 cash directly available to NorthWestern.
10 BY MR. KAPLAN:
11    Q.   Why not? Where else would the
12 cash have to go?
13    A.   Expanets would have had its own
14 capital expenditure needs, for example,
15 interest payments, other things that aren't
16 factored in to EBITDA.
17    Q.   Now, you testified earlier that
18 during 2002 Expanets was having some
19 challenges, correct?
20    MS. DELANEY: Objection.
21    MR. KALECZYC: Objection.
22    THE WITNESS: I don't believe I
23 ever said those words.
24 BY MR. KAPLAN:
25    Q.   Well, in sum and substance you

Page 59

1 testified that in 2002 Expanets was having
2 difficulties?
3    A.   I think it was well known that
4 Expanets was not meeting its performance
5 expectations.
6    Q.   Was it well known by the end of
7 May of 2002?
8    MS. DELANEY: Objection.
9    THE WITNESS: Can you repeat or
10 rephrase your question?
11 BY MR. KAPLAN:
12    Q.   Sure. Was it known by
13 May -- by the end of May of 2002, was it
14 fairly well known that Expanets was having
15 difficulty meeting its financial targets?
16    MS. DELANEY: Objection.
17    MR. KALECZYC: Objection.
18    THE WITNESS: I believe it
19 probably was well known at that time.
20 BY MR. KAPLAN:
21    Q.   So when Mr. Orme said that one
22 of the things he was relying on was
23 $60 million from Expanets, that was a
24 source that was by no means guaranteed,
25 correct?

Page 60

1    A.   I don't think anything was
2 guaranteed, that's correct.
3    Q.   But that's one in particular,
4 given what was known about Expanets was
5 going to be particularly difficulty to
6 achieve, correct?
7    MS. DELANEY: Objection.
8    MR. KALECZYC: Objection.
9    THE WITNESS: I can't say for sure
10 what Kipp was thinking at that time. I
11 believe there was an expectation that Expanets
12 was going to improve its performance.
13 BY MR. KAPLAN:
14    Q.   And if you want to look in
15 the -- if you look at -- you can look in --
16 I think it's actually in all of them, but
17 if you look in the May 2002 MFIR.
18    A.   Okay.
19    Q.   Take a look on page 8 of 15.
20    A.   (Reviews document.)
21    Q.   You see there is a box that
22 says Full Year on the upper right-hand
23 side?
24    A.   I'm not sure I'm with you.
25 Where exactly are you referring to, page 8

Page 61

1 of 15?
2    Q.   Page 8 of 15, the next page.
3    A.   So it's 109?
4    Q.   It's the one that says Expanets
5 Summary of Financials and Statistics?
6    A.   Okay.
7    Q.   And you see it has a box in the
8 upper right-hand side that says Full Year?
9    A.   Yes, I see that.
10    Q.   You see the plan was
11 approximately $87 million of EBITDA?
12    A.   Yes.
13    Q.   Okay. I just wanted to make
14 sure we are talking about the same thing.
15    A.   I'd also point out the forecast
16 here says $96 million at that time.
17    Q.   Given, however, what was known
18 about Colstrip and the litigation that was
19 being filed by NorthWestern and given the
20 challenges facing Expanets, is it fair to
21 say that some of the additional sources
22 identified by Kipp continued to grow even
23 more uncertain as time passed?
24    MS. DELANEY: Objection.
25    MR. KALECZYC: Objection.

16 (Pages 58 to 61)

Page 78

1      Do you see that?
2      A.   I see that.
3      Q.   What do you think he means by
4    "evolving situations"?
5          MR. KALECZYC:  Objection.
6          MS. DELANEY:  Objection.
7          THE WITNESS:  I don't know for
8    sure what Kipp might mean by that.  Evolving
9    situations could mean that Blue Dot and
10   Expanets were startup companies, less than a
11   few years old at the time.  So that's what I
12   would take by "evolving situation."
13   BY MR. KAPLAN:
14     Q.   Then you see it says "During
15   recent discussions with Cappello Group they
16   have recommended that we pursue placing a
17   working capital facility for both Blue Dot
18   and Expanets through a noncommercial bank."
19     A.   I see that here, yes.
20     Q.   Why would somebody recommend
21   using a noncommercial bank versus a
22   commercial bank?
23         MS. DELANEY:  Objection.
24         MR. KALECZYC:  Join.
25         THE WITNESS:  I don't know why

Page 79

1    they would recommend that.
2    BY MR. KAPLAN:
3      Q.   Do you know what it means when
4    it says that noncommercial banks can take a
5    more pragmatic and holistic approach in
6    assessing the risks and viability of the
7    utility?
8          MR. KALECZYC:  Objection.
9          MS. DELANEY:  Objection.
10         THE WITNESS:  I don't know what he
11   would mean by that.
12   BY MR. KAPLAN:
13     Q.   Okay.  Back to the MFIR binder.
14   If you turn to -- we were in the July 2002
15   MFIR on page 9 of 14.
16         MR. KALECZYC:  You say July?
17         MR. KAPLAN:  Yeah, July.
18         THE WITNESS:  What page?
19   BY MR. KAPLAN:
20     Q.   Page 9 of 14.
21     A.   Okay.
22     Q.   Do you see on the top of the
23   page it talks about -- I'm sorry, if you go
24   in the -- towards the bottom of the page
25   there is something that starts "Cash

Page 80

1    collections for the month of July were
2    $72 million."
3      A.   Okay.
4      Q.   You see where it says "Their
5    customers have begun to receive accurate
6    bills"?
7      A.   Okay, yes, I see that.
8      Q.   Do you know what that's
9    referring to when it says they have begun
10   to receive accurate bills?
11     A.   I believe there were issues
12   with the Expert system producing and
13   Expanets wasn't able to, for a time period
14   to certain of their customers, to get an
15   accurate bill, and that's why customers were
16   not paying timely.
17     Q.   And it then says that it will
18   be into October before 100 percent of the
19   customers have received an accurate bill,
20   right?
21     A.   That's what it says here, yes.
22     Q.   Okay.  And then there is a
23   chart of incremental borrowings that shows
24   that -- and it says the forecasted payments
25   to NorthWest has steadily grown worse over

Page 81

1    the past few months which is due to the
2    fact that the system fix was not being able
3    to be implemented as quickly as originally
4    planned?
5      A.   I see that here, yes.
6      Q.   And you see that the chart
7    reflects that each forecast is getting
8    worse in terms of when Expanets would be
9    able to repay NorthWestern?
10     A.   That's what the chart reflects.
11   It does still continue to reflect the
12   downward trend and the amount of incremental
13   borrowings.  So that means to me that they
14   are expecting to be able to pay back, looks
15   like starting in August, to pay down that
16   amount of incremental borrowings.
17     Q.   Would Expanets' inability to
18   pay back advances negatively impact
19   NorthWestern's own liquidity?
20     A.   Would it negatively impact
21   NorthWestern's liquidity?  NorthWestern, as
22   we've seen, was counting on cash coming from
23   Expanets.  And so it would have an impact on
24   what was expected from Expanets, yes.
25         (Deposition Exhibit Number 10

21 (Pages 78 to 81)

Page 82

1  marked for identification.)
2  BY MR. KAPLAN:
3      Q.  We are going to mark as Nieman
4  Exhibit Number 10 a one-page document Bates
5  stamped NOR 066673.
6      A.  (Reviews document.)
7      Q.  For the record, this is a memo
8  from Eric Jacobsen to NorthWestern board of
9  directors dated July 31, 2002.
10     A.  (Reviews document.)
11     Q.  Have you ever seen this before?
12     A.  I remember seeing it yesterday
13  in reviewing documents.  Prior to that, no.
14     Q.  Were you aware that at the end
15  of July 2002 NorthWestern sought board
16  approval for the going-flat transaction?
17     A.  Yes.
18     Q.  Do you know what the reason
19  given to the board was at that time
20  for -- to do the going-flat transaction?
21         MS. DELANEY:  Object to form.
22         THE WITNESS:  My understanding and
23  recollection was that it was for the PUCHA
24  reasons and rating agency.  We talked about
25  those two reasons.

Page 83

1          This (indicating) refers to an
2  explanation of previous discussions with the
3  board and with rating agencies.  But my
4  recollection was that it was primarily for the
5  two reasons.
6          MR. KAPLAN:  Do you have the board
7  minutes binder?
8  BY MR. KAPLAN:
9      Q.  If you look at the
10  August 7th, 2002 board minutes.
11     A.  (Reviews document.)
12     Q.  If you look on page NOR 009571.
13  If you look at the first whereas clause.
14     A.  (Reviews document.)  Okay.
15     Q.  See there it says that
16  NorthWestern Corporation believes it's
17  advisable for rating agency purposes to
18  move the assets of NorthWestern Energy LLC
19  to NorthWestern?
20     A.  Yes, I see that.
21     Q.  Doesn't say there it's because
22  of PUCHA, does it?
23     A.  Not there, no.
24     Q.  So pursuant to this board
25  resolution, the company

Page 84

1  also -- NorthWestern also agreed to assume
2  certain liabilities of NorthWestern Energy,
3  correct?
4      A.  I'm sorry, where are you
5  referring to?
6      Q.  The board resolutions.
7          MS. DELANEY:  You can review them.
8          THE WITNESS:  Where specifically?
9  I'm sorry.
10  BY MR. KAPLAN:
11     Q.  Well, are you aware that in
12  connection with the going-flat transaction,
13  NorthWestern assumed certain liabilities
14  that had been liabilities of NorthWestern
15  Energy?
16     A.  Yes, along with the assets and
17  the entire NorthWestern Energy LLC with the
18  exception of some of the Milltown Dam assets
19  was assumed by the corporation.
20     Q.  So NorthWestern -- and you are
21  aware that one of the obligations assumed
22  by NorthWestern was the obligation with
23  respect to the QUIPS?
24     A.  Yes, I am.
25     Q.  In September of 2002 what was

Page 85

1  NorthWestern's perception of its financial
2  condition?
3      A.  In September of 2002?
4      Q.  Yes.
5      A.  Can you be more specific?
6      Q.  Sure.
7      A.  That's pretty general.
8      Q.  In September of 2002 is it fair
9  to say the -- NorthWestern was concerned
10  about its liquidity?
11         MS. DELANEY:  Objection.
12         THE WITNESS:  I think that would
13  be fair to say.  I mean...
14  BY MR. KAPLAN:
15     Q.  Was there -- is it fair to say
16  there were concerns with respect to future
17  cash flow needs of the company?
18         MS. DELANEY:  Objection.
19         MR. KALECZYC:  Join.
20         THE WITNESS:  I think it's clear
21  that there was a concern around liquidity.
22  And the company was doing what it could to
23  identify sources of cash to make sure that it
24  had sufficient liquidity.
25  BY MR. KAPLAN:

22 (Pages 82 to 85)

Page 86

1    Q.    If you look at the board
2    minutes binder, you'll see that in
3    September the board -- the board held a
4    number of meetings.
5        Do you see that?
6    A.    I see a few, yes, here, dated
7    September of 2002.
8    Q.    If you look prior to that there
9    is probably more board meetings in
10   September than there were the entire year
11   leading up to September, is that fair?
12       MS. DELANEY: Document speaks for
13   itself.
14       THE WITNESS: Looks like there
15   were several held in September, yes.
16   BY MR. KAPLAN:
17   Q.    Would you attribute that to the
18   fact that there were increasing concerns
19   with respect to NorthWestern's liquidity?
20       MS. DELANEY: Objection.
21       THE WITNESS: Not necessarily.
22   I'd have to review the minutes and the purpose
23   of each of the meetings.
24   BY MR. KAPLAN:
25   Q.    And if we look at the

Page 87

1    September 10th minutes, see there are three
2    topics addressed by the board?
3    A.    Yes, I see an operating update,
4    financial update and Project Noah.
5    Q.    Project Noah is what?
6    A.    I have no idea.
7    Q.    See it describes a potential
8    private equity investor in the corporation?
9    A.    I see it says that here, yes.
10   Q.    Is it fair to say that the
11   topics covered at the board meetings, the
12   special meeting held September 10th dealt
13   with the company's operations, its
14   financials and possible additional private
15   equity coming into the corporation?
16   A.    That's what these minutes
17   indicate, yes.
18   Q.    And then if we look at the
19   September 12th minutes.
20   A.    (Reviews document.)
21   Q.    Do you see that there
22   was a -- the discussion revolved around
23   potential private equity investor?
24   A.    Says here, yes, that we
25   discussed -- or Mr. Jacobsen -- Mr. Orme and

Page 88

1    Mr. Jacobsen provided background information
2    on the potential private equity investor,
3    yes.
4    Q.    And then if you look at
5    September 18th. Another special meeting at
6    which the topic discussed was the proposed
7    issuance of equity through a public
8    offering and then potential private equity
9    transaction, right?
10   A.    It refers to an equity offering
11   and additional financing, yes.
12   Q.    It's fair to say that this
13   suggests that the board was very focused on
14   financing and liquidity issues in
15   September?
16       MR. KALECZYC: Objection.
17       MS. DELANEY: Objection.
18       THE WITNESS: As I think it's
19   pretty clear from that time period, that
20   Kipp Orme and the management team were very
21   focused on it. And this appears to be a
22   series of board meetings to discuss those
23   different opportunities with the board.
24   BY MR. KAPLAN:
25   Q.    Would it be fair to

Page 89

1    characterize NorthWestern's position as
2    being -- as having a near-term liquidity
3    crisis?
4        MS. DELANEY: Objection.
5        MR. KALECZYC: Objection.
6        THE WITNESS: Can you ask that
7    again?
8    BY MR. KAPLAN:
9    Q.    Sure. Would it be fair to
10   characterize NorthWestern's position in
11   September of 2002 as having a near-term
12   liquidity crisis?
13   A.    I don't know that I would use
14   the word "crisis." Clearly liquidity was a
15   concern, and the company was doing what it
16   could to address that concern.
17   Q.    Do you see that on the report
18   for the September 12, 2002 report there is
19   a situation overview, it's NOR 349342?
20   A.    (Reviews document.) I'm sorry,
21   where?
22   Q.    The first Bear Stearns report
23   for September 12, 2002. It's really
24   page 1. Do you see page 1, the Situation
25   Overview?

23 (Pages 86 to 89)

Page 90

1    A.    (Reviews document.)
2    Q.    You see it says that "Due to a
3  confluence of a number of events,
4  NorthWestern is facing an important
5  strategic decision critical to liquidity
6  and capital structure of the company"?
7    A.    I see that it says that here,
8  yes.
9    Q.    Do you know what the strategic
10  decision was facing NorthWestern at the
11  time?
12    MR. KALECZYC: Objection, calls
13  for speculation. It's a Bear Stearns report.
14    MS. DELANEY: I join in the
15  objection.
16    THE WITNESS: I believe there are
17  a lot of different opportunities again being
18  evaluated at the time. I don't know for sure
19  what they are specifically referring to here.
20  BY MR. KAPLAN:
21    Q.    And you see it says "As a
22  result of management's focus on developing
23  financing options over the past year and
24  intensely over the past few months the
25  board has a range of alternatives

Page 91

1  available"?
2    A.    I see that, yes.
3    Q.    What was Bear Stearns role?
4    MS. DELANEY: Their role in what?
5  BY MR. KAPLAN:
6    Q.    In connection with
7  NorthWestern.
8    A.    I don't recall exactly. But I
9  think we probably can find out from this
10  document.
11    Q.    Do you know who hired Bear
12  Stearns?
13    A.    Not specifically, no.
14    Q.    Do you know when Bear Stearns
15  was hired?
16    A.    I don't know. I'd have to look
17  at the documents to see if they were, in
18  fact, ever hired.
19    Q.    Do you see on the --
20    A.    I'm not sure the purpose of
21  this document exactly.
22    Q.    This was a presentation
23  provided to the board in connection with
24  the September 12th board meeting. See on
25  the bottom of the first page it says "Bank

Page 92

1  facility financing," and then there is a
2  handwritten note next to it, "Virtually
3  impossible today"?
4    A.    I see that, yes.
5    Q.    Do you know why it would have
6  been impossible in September to complete a
7  refinancing at a bank?
8    MS. DELANEY: Objection. In the
9  view of the person who wrote the note on the
10  Bear Stearns document?
11    MR. KALECZYC: Objection.
12    MR. KAPLAN: In his view as a
13  noted representative of NorthWestern.
14  BY MR. KAPLAN:
15    Q.    Do you have a view whether it
16  would have been virtually impossible to
17  refinance the bank debt in September of
18  2002?
19    A.    I don't have a view. I don't
20  know whose handwriting that is. And I can't
21  recall whether or not that would have been
22  accurate or not.
23    Q.    Do you have a view as to
24  whether it would have been possible to
25  refinance the debt in September of 2002?

Page 93

1    A.    I believe the bank debt was
2  refinanced at some point.
3    Q.    If you look on the next page,
4  see it says "A number of events are
5  converging to create a liquidity issue over
6  the next few quarters"?
7    A.    Where is that?
8    Q.    Next page, Situation Overview
9  Continued, it's end of the big bullet?
10    A.    I see that.
11    Q.    See it says "A number of events
12  are converging to create a liquidity issue
13  over the next few quarters"?
14    A.    Yes, I see that.
15    Q.    Did you agree with that
16  statement?
17    A.    I believe there were a number
18  of events -- you know, we've talked about
19  some of those today that management was
20  concerned about. Could be what's being
21  referred to here.
22    Q.    And then you see under Working
23  Capital Issues, says "Issues with the
24  collection of Expanets receivables,
25  15 million of additional billing charges to

24 (Pages 90 to 93)

Page 94

1    be taken"?
2        A.   Yes, I see that.
3        Q.   Do you know what that's
4    referring to in terms of taking charges?
5        A.   Not exactly.  That presumably
6    is related to the customer collection issue
7    that resulted or revolved around the Expert
8    billing.
9        Q.   When it says "Billing charges
10   to be taken," do you take that to mean on
11   the financial statements?
12       A.   I can't tell for sure what that
13   means.  Again, this was apparently drafted
14   by Bear Stearns.  I don't know what they
15   would mean by that exactly.
16       Q.   Has both Bear Stearns and
17   NorthWestern Corporation on each page,
18   right?
19           MS. DELANEY:  Objection.
20           THE WITNESS:  I guess the answer
21   is yes, it has it on each page.
22   BY MR. KAPLAN:
23       Q.   And --
24       A.   Actually, back on a couple of
25   pages later it doesn't have NorthWestern, so

Page 95

1    it's not throughout.
2        Q.   If you look on page 23, see
3    there is a bullet that says "The Evercore
4    approach has some substantial benefits for
5    NorthWestern and its shareholders"?
6        A.   I see that here, yes.
7        Q.   And you see that one of them it
8    puts an end to a near-term liquidity
9    crisis?
10       A.   I see that it says that here,
11   yes.
12       Q.   Do you disagree with the fact
13   that there was a near-term liquidity
14   crisis?
15       A.   I believe I answered that
16   before.  I don't know that I would use the
17   term "crisis."  I mean, that's apparently
18   the term that they chose to use in this
19   document.  I wouldn't -- I mean, I think
20   it's people's -- what words you use is up to
21   the individual.  It's clear again that
22   management had liquidity issues to deal with
23   and they were dealing with them as they
24   could.
25           MR. KAPLAN:  Off the record for a

Page 96

1    second.
2           (Off the record.)
3    BY MR. KAPLAN:
4        Q.   When NorthWestern did the
5    going-flat transaction, did it undertake
6    any evaluation of whether it would be able
7    to honor its obligations under the QUIPS?
8        A.   I don't recall anything
9    specific to that transaction.  It involved
10   analysis that I've seen and am aware of,
11   considered the QUIPS and meeting those
12   obligations.
13       Q.   Are you aware of anything done
14   by Clark -- by NorthWestern Energy to
15   analyze whether NorthWestern would be able
16   to honor the obligations under the QUIPS?
17       A.   I'm sorry, that sounded like
18   the same question.
19       Q.   I'm focusing from the
20   perspective of NorthWestern Energy now
21   known as Clark Fork.  Prior to the
22   assumption of the liabilities by
23   NorthWestern and the transfer of the assets
24   to NorthWestern, are you aware of any
25   investigation undertaken by NorthWestern

Page 97

1    Energy as to whether NorthWestern would be
2    able to honor the obligations to the QUIPS?
3           MS. DELANEY:  Objection.
4           THE WITNESS:  I'm not following
5    your question, I guess.  One more time.
6    BY MR. KAPLAN:
7        Q.   Sure.  As a result of the
8    going-flat transaction, substantially all
9    of the assets of NorthWestern Energy were
10   transferred to NorthWestern Corporation,
11   right?
12       A.   Right.
13       Q.   As part of the going-flat
14   transaction, NorthWestern assumed the
15   obligations under the QUIPS, correct?
16       A.   NorthWestern Corporation?
17       Q.   NorthWestern Corporation
18   assumed the obligations under the QUIPS,
19   correct?
20       A.   Correct.
21       Q.   Okay.  When NorthWestern Energy
22   was transferring its -- substantially all
23   of its assets up to
24   NorthWestern Corporation, did NorthWestern
25   Energy undertake any investigation as to

25 (Pages 94 to 97)

Page 98

1   whether NorthWestern Corporation would be
2   able to honor its obligations under the
3   QUIPS?
4        A.    Again, I don't think -- there
5   was not any specific analysis done specific
6   to that transaction. The overall
7   corporation always included the QUIPS and
8   the analysis and its ability to fund and
9   meet all of its obligations.
10       Q.    But I'm going from the
11  perspective of NorthWestern Energy, not
12  NorthWestern Corporation, when NorthWestern
13  Energy was transferring up its assets, are
14  you aware whether it undertook any
15  investigation in order to decide?
16       A.    It was the same individuals.
17  So I'm confused, I guess, by your question.
18  It was same management team of NorthWestern
19  Energy LLC as for NorthWestern Corporation.
20       Q.    Who was the management at
21  NorthWestern Energy LLC?
22       A.    At NorthWestern Energy LLC that
23  was -- I think Mike Hanson was the CEO at
24  the time.
25       Q.    Was Mike Hanson also senior

Page 99

1   management at NorthWestern Corporation?
2        A.    Not -- I guess -- no, I guess
3   he was not.
4        Q.    So I'm looking at from the
5   management perspective of NorthWestern
6   Energy, whether they undertook any
7   investigation that you are aware of whether
8   NorthWestern would be able to honor its
9   obligations under the QUIPS?
10       A.    I'm not aware that they did
11  that, no.
12       Q.    Following the going-flat
13  transaction, what was NorthWestern Energy's
14  cash flow like?
15       A.    Can you be more specific?
16       Q.    Sure. Was --
17            MS. DELANEY: Objection.
18  BY MR. KAPLAN:
19       Q.    Following the going-flat
20  transaction was NorthWestern Energy
21  cash-flow positive?
22       A.    Cash-flow positive from what
23  standpoint? I mean, I believe it had its
24  ability to meet its obligations, if that's
25  what you're asking.

Page 100

1        Q.    Did it have its ability to meet
2   its obligations without support from
3   NorthWestern Corporation?
4        A.    You are referring to
5   NorthWestern Energy LLC now that's referred
6   to as Clark Fork and Blackfoot.
7        Q.    Yes.
8        A.    Okay. Clark Fork and Blackfoot
9   LLC would be able to meet all of its
10  obligations which were pretty simple. It
11  was one obligation related to the
12  environmental liabilities related to the
13  Milltown Dam. And there was a support
14  agreement from NorthWestern Corporation to
15  fund that which was capped at -- I believe
16  it was $11.4 million. So there wouldn't
17  have been a need for a lot of analysis on
18  Clark Fork and Blackfoot LLC's part to
19  figure out if they were going to meet their
20  obligations.
21       Q.    Well, but without the support
22  from NorthWestern to honor that
23  environmental liability, would Clark Fork
24  on its own been able to meet its
25  obligations?

Page 101

1        A.    Probably not. I mean, all that
2   was left was the asset of the Milltown Dam.
3   And then the other asset that was held there
4   was the receivable or the support agreement
5   from NorthWestern Corporation.
6            (Deposition Exhibit Number 11
7   marked for identification.)
8   BY MR. KAPLAN:
9        Q.    I'm going to mark now a
10  document that's Nieman Exhibit Number 11.
11  It's NOR 006177 through NOR 006219. It's
12  an October 30th memo to the NorthWestern
13  board of directors.
14       A.    (Reviews document.)
15       Q.    Do you see on page 3 of the
16  memoranda, not the attachments, but the
17  last page of the memo at the beginning,
18  third page?
19       A.    Third page?
20       Q.    Third page of the memo. Do you
21  see that it says "As discussed and
22  demonstrated in the base level liquidity
23  financing sheet on page 4 of the liquidity
24  financing section of the board package, the
25  liquidity provided by the base operating

26 (Pages 98 to 101)

# EXHIBITS  21 - 34

# REDACTED  IN  THEIR  ENTIRETY