

Service Date: January 27, 2003

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA

\* \* \* \* \*

IN THE MATTER of the Application )
of NORTHWESTERN CORPORATION for ) UTILITY DIVISION
Authority to Consummate a Credit Agreement )
and Issue $390 MILLION in Principal Amount ) DOCKET NO. D2002.12.159
of Secured Long-Term Notes in the Form of )
First Mortgage Bonds ) ORDER NO. 6474a

## FINAL ORDER

1.      On December 23, 2002, NorthWestern Corporation ("NorthWestern" or "Applicant"), a Delaware corporation authorized to transact business within Montana, filed with the Montana Public Service Commission ("Commission") its application ("Application") pursuant to §§ 69-3-501-507, MCA (2001), seeking an order authorizing Applicant to perform its obligations under a certain Credit Agreement and the related transactions contemplated by the Credit Agreement whereby long-term notes in the form of first mortgage bonds (the "First Mortgage Bonds") are to be issued over a period beginning with the issuance of the applicable Commission Order and, unless extended, through and including December 31, 2004 (the "Transaction"), and which provides that the loan proceeds shall be placed in escrow and cannot be accessed by or disbursed by the Applicant without the Commission approval of the Transaction.

2.      The Application is supported by exhibits and data in accordance with Commission practice and rules and regulations governing the issuance and sale of securities by public utilities operating within the State of Montana.

3.      The Commission is required to consider applications for the issuance of securities within 30 days of the application being filed as set forth at § 69-3-503, MCA. There is a provision in that section that consideration of an application may be extended. In this Docket the Commission extended the time for consideration of this application by an additional 30 days.  Proper notice of this filing was provided on the agenda for the

1|24

NOR001606

Commission's regularly scheduled business meeting held on January 6, 2003. No requests for intervention were received by the Commission in this Docket.

     4.     The Application states that Applicant is a public utility as defined at § 69-3-101, MCA, in that it furnishes electric and natural gas service in the State of Montana through NorthWestern Energy, a division of NorthWestern; that its principal executive office for its Montana operations is at 40 East Broadway, Butte, Montana; and that Applicant is duly qualified to do business in the State of Montana. For detailed information with respect to the general character of NorthWestern's business and the territory served by it, reference is made to the Application.

**FINDINGS**

     1.     Applicant is a corporation organized and existing under and by virtue of the laws of the State of Delaware and is qualified to transact business in the State of Montana.

     2.     Applicant is a public utility as defined at § 69-3-101, MCA, and is engaged in furnishing electric and natural gas service in the State of Montana through its division, NorthWestern Energy.

     3.     The Commission has jurisdiction over the subject matter of the Application pursuant to §§ 69-3-501-507, MCA. The Commission has jurisdiction over the entire $390 million of financing contained in the Application. The Commission historically addresses security issues in their entirety and again in this Docket will consider the entire amount of financing being contemplated by NorthWestern. Further, the Commission must evaluate all financing activity given the serious nature of the challenges now faced by NorthWestern.

     4.     The Application states that Applicant intends to issue and, potentially sell, First Mortgage Bonds. The First Mortgage Bonds will be issued under an indenture covering its Montana utility asset in the amount of $280 million (the "Montana Bonds") and under an indenture covering its South Dakota and Nebraska utility assets in the amount of $110 million (the "South Dakota Bonds"). As detailed in the Application, the Montana Bonds will be either (i) issued to a Collateral Agent to secure term loans under a new credit facility; and/or (ii) syndicated in a private placement to qualified institutional

buyers. The Montana Bonds (i) will be issued under and secured by the Mortgage and Deed of Trust dated October 1, 1945 from the Applicant to the trustees named therein, as supplemented from time to time, which indenture creates a general and first priority lien on substantially all of the Applicant's utility property in Montana, (ii) will be for terms of not less than nine months nor more than forty years, (iii) will have such redemption and/or repayment provisions as shall be determined at the time of sale, and (iv) will bear interest payable at such times and rates as shall be determined at the time of sale, all based on then-existing market conditions.

5.      The Application states that the Montana Bonds will secure term loans which will replace an existing $280 million credit facility as soon after the effective date of the Commission's Order as possible. It further states that the term loans secured by the Montana Bonds will be used for general corporate purposes allowed under § 69-3-501, MCA.

6.      Applicant has agreed to inform the Commission, after the issuance or sale, of the principal amount sold, the maturity, the interest rate, the redemption and/or repayment provisions and any other information with respect to the bonds that the Commission may request.

7.      Public notice of this Application was given by its inclusion on the Commission's Utility Division Agenda for January 6, 2002. Applicant has furnished complete financial data with its Application in accordance with the developed practice of the Commission. The Application sets forth a certified copy of the resolution of the Board of Directors of Applicant pertaining thereto, which was adopted on December 12, 2002.

8.      On December 20, 2002, Moody's Investors Service downgraded the debt ratings of NorthWestern senior secured to Baa3 from Baa1. Moody's indicated that it, "is continuing to review the long-term ratings for possible further downgrade, where they were placed August 1, 2002. This downgrade included ratings on obligations of the former NorthWestern Energy L.L.C., which became direct obligations of NorthWestern Corporation effective November 20, 2002 when the former subsidiary of NorthWestern was folded into NorthWestern's already existing utility division. The ratings downgrades reflect concerns about considerably less debt reduction to date than anticipated, as well

as weaker than anticipated cash flow relative to the consolidated debt load and fixed obligations." Moody's further stated, "The ratings downgrades also reflect North-Western's recently announced expectations for lower than expected earnings and cash flow for 2002 due to ongoing challenges and disappointing results at NorthWestern's nonutility operations. Those operations are Expanets, the telecommunications solutions business, and Blue Dot, the heating, ventilation and air conditioning service business." Moody's noted that "NorthWestern recently announced that it is anticipating a significant increase in reserves for accounts receivable and billing adjustments at Expanets, as well as substantial non-cash writedowns of goodwill and intangibles related to Expanets and Blue Dot. The full extent of the goodwill and intangible asset impairment will be determined in conjunction with the year-end audit which will be completed over the next several months." Moody's is continuing to review all of NorthWestern's long-term ratings for possible further downgrade due to uncertainties surrounding the amount of the expected asset impairment and the impact that action will have on NorthWestern's balance sheet. At the time of this writing the Commission is unable to evaluate the magnitude of the asset impairment because the year-end audit is not complete. Finally, Moody's noted that "absent access to the funds under the new CSFB facility—which would facilitate termination of the existing $280 million facility—the recent announcement related to expected non-cash charges could jeopardize NorthWestern's ability to remain in compliance with some of the financial covenants in that facility."

9.      On December 30, 2002 Standard and Poor's Ratings Services lowered its corporate credit rating on NorthWestern to BB+ from BBB+, and at the same time assigned its BBB- rating to NorthWestern's $390 million secured four-year bank loan and other senior secured debt. The ratings outlook remains negative. S&P stated that NorthWestern has about $1.7 billion in outstanding debt. S&P explained that "The downgrade is the result of the several problems facing NorthWestern Corporation, including a deteriorating balance sheet, continued poor performance in its Expanets and Blue Dot subsidiaries, and management's inability to adequately project the performance of the non-regulated businesses." S&P indicated that the financing plan for the Montana Power acquisition in early 2002 included $200 million of equity, to be issued in the first quarter of 2002. NorthWestern did issue about $83 million of equity in September 2002,

NOR001609

but given the company's current stock price ($5.51 on January 22, 2003) of half its book value, and general equity market conditions S&P does not believe that the company will issue additional equity in the foreseeable future. Instead, NorthWestern may potentially incur additional debt to substitute for equity issues. A new $390 million credit facility will be used to replace existing NorthWestern bank loans and fund capital expenditures at the utilities, will give the company additional liquidity, but will further weaken coverages for debtholders. S&P is also concerned about the performance of NorthWestern's non-utility businesses, specifically Expanets and Blue Dot.

10.    On January 16, 2002 Fitch rating service downgraded NorthWestern's senior unsecured notes and pollution control revenue bonds from BBB to BB+, the highest junk status Fitch has. Preferred stock and trust preferred securities for North-Western were also downgraded from BBB- to BB+. Secured debt with senior status was lowered from BBB+ to BBB- which is the lowest Fitch rating that still is investment grade. According to Fitch, NorthWestern's debt and preferred shares total $1.9 billion. The utility division's fixed assets carry a book value of $1.6 billion. That means NorthWestern's book value is less than the corporation's debt. Factors in the downgrades were NorthWestern's high debt, expected writeoffs against earnings this year and marginal performance at Expanets and Blue Dot. Fitch did indicate that "The utility is strong and has good cash flow, but despite that, there is a lot of debt at the parent company."

11.    On January 9, 2003, NorthWestern filed a letter which set forth the nature of the draws against the current credit facility. Non-utility activities accounted for $114 million of the $276 million expended through December 31, 2002. Montana First Megawatts (MFM), the proposed combined cycle gas plant in Great Falls drew $61 million, Expanets drew $37 million, Blue Dot contributed $10 million on a net basis, and CornerStone Propane drew $26. The new credit facility permits additional funds of $25 million to Blue Dot and $75 million to Expanets.

12.    The Commission views the financial condition of NorthWestern with great concern. The Commission approved NorthWestern as the purchaser of MPC's trans-mission and distribution systems. Since that approval the financial condition of North-Western has spiraled down due to non-utility activities at CornerStone Propane, Expanets

NOR001610

and Blue Dot. The Commission is dismayed at the erosion of NorthWestern's credit ratings to either the lowest investment grade or to junk status. The performance of the non-utility entities and the resulting threats to the provision of utility service is unacceptable to this Commission. The cost of borrowing money has been increased due to losses at the non-utility companies. In its January 9, 2003 letter, noted above, NorthWestern stated "It is the company's intent to move in the direction of a pure energy-distribution business." The Commission finds that the company's intention to become a pure utility company is the proper course of action. The Commission directs NorthWestern to devote its management to making sure that the company focuses all of its resources on changing its strategic direction in a timely manner. As was noted in the comments of the rating agencies, it is imperative that NorthWestern take timely action to reduce the amount of debt in the company's capital structure.

13.     During its review of this filing the Commission became aware of an incentive program adopted by the company in September 1999. The program was one in which certain key executives of NorthWestern and key team members NorthWestern Growth Corporation, which initiates strategic investments for NorthWestern, were provided the opportunity to make personal investments. The investment entity was structured as a limited liability company, is controlled and substantially owned by NorthWestern, and enables the investors to participate in long-term capital appreciation resulting from increases in the value of NorthWestern's interests in Blue Dot, Expanets and CornerStone above benchmark rates of return to NorthWestern approved by the independent Compensation Committee of NorthWestern's Board of Directors. The limited liability company has no indebtedness and is consolidated in NorthWestern's financial statements. No losses of these subsidiaries have been allocated to the minority interest owned by the limited liability company. In the year ended December 31, 2001, the following executive officers of NorthWestern received distributions Merle Lewis $1.1 million; Richard Hyland $.8 million; Daniel Newell $.8 million; Eric Jacobsen $.4 million and Kipp Orme $.1 million. This recruitment and retention program is no longer being utilized to provide long-term equity incentives and is no longer open to new participants, although the pre-existing interests of the participants remain outstanding. The Commission finds that this Long-Term Equity Incentive Plan is completely

inappropriate and directs NorthWestern to refrain from making any further payments under the plan until NorthWestern's financial condition has dramatically improved. Any future incentive plans for key executives must be approved by the Commission before they are adopted.

14.    Questions about accounting practices at NorthWestern have appeared in a number of comments by analysts and others. NorthWestern has decided to discontinue recording income from minority interest. The Commission finds that NorthWestern should follow Generally Accepted Accounting Principles and take all necessary steps to ensure that its accounting records properly reflect the true results from each segment of the company in a manner that is transparent and easily understood.

## CONCLUSIONS OF LAW

1.    NorthWestern Energy is a public utility in Montana subject to the supervision and regulation of the Montana Public Service Commission. §§ 69-3-101-102, MCA.

2.    NorthWestern Energy is a division of NorthWestern Corporation. NorthWestern Corporation is subject to §§ 69-3-501-507, MCA, for purposes of the action it proposes in this Docket.

3.    The Transaction proposed by the Application, as hereinafter authorized, will be for a lawful purpose and is consistent with the public interest; is necessary or appropriate for and consistent with the proper performance by Applicant of service as a public utility; and the aggregate amount of the securities outstanding, and proposed to be outstanding, will not exceed the fair value of NorthWestern's utility properties and business of Applicant.

## ORDER

1.    The Application of NorthWestern for authority to consummate the Transaction and to issue secured long-term notes in the form of the First Mortgage Bonds is approved with the conditions noted below. This authorization is for a period beginning with the issuance of this Order and, unless extended, through and including December 31, 2004.

2.    In accordance with § 69-3-507, MCA, neither the issuance and sale of securities by NorthWestern pursuant to the provisions of this Order, nor any other act or deed done or performed in connection therewith, shall be construed to obligate the State of Montana to pay or guarantee, in any manner whatsoever, any security authorized, issued, assumed or guaranteed under the provisions of §§ 69-3-501-507, MCA.

3.    Issuance of this Order does not mean acceptance of NorthWestern's exhibits or other material accompanying the Application for any purpose other than the issuance of this Order. Approval of this application is for financing purposes only. This approval is without prejudice to the regulatory authority of this Commission with respect to ratemaking, rates, service, accounts, valuations, estimates or determinations of cost, or any other matter subject to its jurisdiction as provided by law.

4.    Because the Commission has continuing concerns about the performance and prospects of Applicant's non-utility businesses, and the implications of their financial performance for utility customers, the following conditions are expressly added to this Order.

5.    NorthWestern Corporation has indicated it is exploring its options with regard to any of its non-utility entities, specifically including Blue Dot and Expanets. When a sale in whole or in part of any non-utility entities is completed the proceeds shall be as expeditiously as possible applied to debt reduction.

6.    NorthWestern Corporation's loan agreement allows the company to make additional equity investments in its subsidiaries of no more than $10 million over the five-year term of the agreement. Additionally, under the new loan agreement, secured loans of up to $25 million to Blue Dot and up to $75 million to Expanets are allowed by the lender.

7.    The Commission understands that NorthWestern may need to make limited capital available to the subsidiaries to ensure their viability while it completes its examination of alternatives for these entities. However, the Commission does not favor additional financing of the subsidiaries since further investments in the subsidiaries may not be in the best interests of utility customers.

8.    The Commission recognizes that NorthWestern Corporation's board of directors and management are responsible to prepare and implement a strategic workout

NOR001613

plan to resolve the financial crisis precipitated by a series of corporate decisions, non-utility ventures, poor performance, and acquisitions. The crisis did not develop overnight, and it will not be resolved overnight. Nevertheless, the Commission's outlook is negative, mirroring that of rating agencies. Neither NorthWestern's actions nor information presented to date allay the concerns.

9.      The Commission is primarily responsible to ensure that regulated energy services provided to Montana consumers are safe, adequate and reliable at rates that are just and reasonable. NorthWestern's ability to fulfill these requirements is placed at risk by its current financial condition. Serious questions exist about the ability and commitment of NorthWestern to pursue adequate and necessary maintenance, repair and replacement of critical utility infrastructure when potential bankruptcy and survival occupy the attention of the board of directors and management. Approval of this security application requires ongoing commitment to fully fund comprehensive operation, maintenance, repair and replacement of its public utility infrastructure in Montana. NorthWestern must file a maintenance plan and budget within 45 days of the issuance of this Order.

10.      By approving this security application, subject to the conditions contained in this Order, the Commission is not satisfied that NorthWestern has pursued all available options for digging out of the financial crisis which threatens utility service quality and rates. The Commission expects the board of directors and management, to fully examine all options, including but not limited to: dividend policy and payouts; board of directors and senior management compensation levels and concessions; disposition of non-utility assets/operations; and sale of the Montana First Megawatts project, or a portion thereof.

11.      Without prior approval from the Commission, NorthWestern may, if it deems it necessary, provide up to an additional $10 million in capital to any non-utility entities. However, the Commission expects NorthWestern's management to exercise this authority with the utmost caution and to first ensure that all steps are being taken within these subsidiaries themselves to minimize the need for external resources. NorthWestern must report all advances to non-utility companies within 5 business days of the advances to this Commission.

NOR001614

12.    If existing credit agreements for Blue Dot or Expanets are terminated NorthWestern may file an application with the Commission seeking approval to provide secured loan agreements not to exceed $20 million for Blue Dot and $30 million for Expanets.

DONE IN OPEN SESSION at Helena, Montana, this 24th day of January, 2003, by a vote of 4 to 1.

NOR001615

BY ORDER OF THE MONTANA PUBLIC SERVICE COMMISSION

_____
BOB ROWE, Chairman


_____
TOM SCHNEIDER, Vice Chairman


_____
GREG JERGESON, Commissioner


_____
MATT BRAINARD, Commissioner
Voting to Dissent, Opinion Attached


_____
JAY STOVALL, Commissioner

ATTEST:

Rhonda J. Simmons
Commission Secretary

(SEAL)

Note:  Any interested party may request that the Commission reconsider this decision.  A
       motion to reconsider must be filed within ten (10) days.  See 38.2.4806, ARM.

NOR001616

## Dissenting Opinion of Commissioner Brainard

### Docket No. D2002.12.159

As restrictive as the order may appear to some, it does little to retain the needed firewall between the utility and non-utility operations of the applicant. Certainly there is no reciprocity available to the utility and its customers to advantage themselves of the assets of the non-utility businesses, even if those businesses were financially robust and able. It is most certain that the Commission would not, could not, and should not ever order the use of non-utility assets to benefit the ratepayers.

The Commission has a duty to see that the utility owner lives up to legitimate obligations to manage the utility assets in a way that is not detrimental to the customers and the public interest. While it may be lawful for the company to have multiple business interests including utilities and non-utilities, a wall of separation should exist and business affairs should be conducted in a manner that insures that separation.

The applicant has presented the Commission with a "fait accompli" by using part of the credit facility used in the purchase of MPC to finance non-utility ventures. Now that it is time to restructure the credit facility the Commission is asked to sanction the use of utility assets to secure the debt of the non-utilities as well. This has been presented to the Commission as a unique event, the applicant is in desperate financial conditions and the utility itself is threatened by the conditions that face the applicant.

The Commission should not succumb to the exigency of imminent crisis and establish precedent that will undoubtedly be visited in the future. The non-utility businesses are beyond the regulatory scope of the Commission. Profits, losses or catastrophic failures of non-utility operations are beyond regulatory reach, hence regulated assets should not be tendered as security for those business ventures.

RESPECTFULLY SUBMITTED this 24th day of January, 2003.

_____
Matt Brainard, Commissioner
District #4

NOR001617



# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2002

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 0-692



Delaware
(State of Incorporation)

IRS Employer Identification No. 46-0172280

125 South Dakota Avenue
Sioux Falls, South Dakota 57104
(Address of principal office)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (D) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    ☒ Yes    ☐ No

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

Common Stock, Par Value $1.75
27,396,762 outstanding at August 12, 2002

Source: NORTHWESTERN CORP, 10-Q, August 14, 2002

approximately $5.6 million on three classes of its senior secured notes, which was due on July 31, 2002, and was continuing to review financial restructuring and strategic options, including the potential commencement of a Chapter 11 case under the United States Bankruptcy Code. After this announcement, the New York Stock Exchange announced that it had suspended trading in CornerStone's publicly traded partnership units and would seek to delist the partnership units due to their low price and CornerStone's decision not to make the scheduled interest payments. The Corporation will continue to evaluate CornerStone's financial restructuring and the impact upon creditors of CornerStone, including the Corporation, and expects to reflect any resulting financial implication in its third quarter 2002 results. During first quarter 2002, the Corporation recognized a loss from discontinued operations of $40.0 million. This was comprised of a write–down of its investment in CornerStone of $41.7 million, which was partially offset by income (net of taxes and minority interests) of $1.7 million for first quarter 2002. Subsequent losses of $5.1 million (net of taxes and minority interests) for the quarter ended June 30, 2002 have increased the amount of the recognized loss to $45.1 million. Summary financial information is as follows (in thousands):

| | June 30, 2002 | December 31, 2001 |
|---|---|---|
| Accounts receivable, net | $  20,090 | $  171,843 |
| Other current assets | 25,318 | 59,854 |
| Current assets of discontinued operations | $  45,408 | $  181,697 |
| | | |
| Property, plant and equipment, net | $  306,573 | $  322,126 |
| Goodwill and other intangibles, net | 332,883 | 339,058 |
| Other noncurrent assets | 34,005 | 34,013 |
| Noncurrent assets of discontinued operations | $  673,461 | $  695,197 |
| | | |
| Accounts payable | $  30,043 | $  142,578 |
| Other current liabilities | 57,278 | 87,492 |
| Current liabilities of discontinued operations | $  87,321 | $  230,070 |
| | | |
| Long–term debt | $  422,147 | $  424,524 |
| Minority interests | 184,092 | 152,596 |
| Other noncurrent liabilities | 67,155 | 27,556 |
| Noncurrent liabilities and minority interests of discontinued operations | $  673,394 | $  604,676 |
| | | |
| Partners' capital of discontinued operations | $  (933) | $  41,449 |

| | Three months ended | |
|---|---|---|
| | June 30, 2002 | June 30, 2001 |
| Revenues | $  265,749 | $  352,746 |
| Loss before income taxes and minority interests | $  (25,191) | $  (17,140) |
| Loss from discontinued operations (net of income taxes and minority interests) | $  (5,006) | $  (6,047) |

| | Six months ended | |
|---|---|---|
| | June 30, 2002 | June 30, 2001 |
| Revenues | $  605,627 | $  731,857 |
| Income (loss) before income taxes and minority interests | $  (14,721) | $  5,080 |
| Income (loss) from discontinued operations (net of income taxes and minority interests) | $  (45,088) | $  2,249 |

The Corporation has provided a guaranty of CornerStone's $50 million credit facility. At June 30, 2002, $17.7 million was outstanding under CornerStone's credit facility, along with $8.3 million in letters of credit.

8

A provision for loss on discontinued operations as of June 30, 2002 has been included based on management's best estimates as of June 30, 2002 of the amounts expected to be realized on the disposition of its investment. The amount the Corporation will ultimately realize could differ from the assumptions currently used in arriving at the anticipated loss.

(5)     Supplemental Guarantor Financial Information

The $65 million of 8.45% Cumulative Quarterly Income Preferred Securities, Series A (QUIPS) of Montana Power Capital I; which were assumed as part of the Montana Power acquisition, have been guaranteed by the Corporation. As guarantor, we provide an unconditional guarantee, on an unsecured junior subordinated basis, of payment on these securities. The following presents condensed consolidating financial statements as of June 30, 2002 and for the quarters then ended.

Income Statement Consolidating Schedule
Three Months Ended June 30, 2002
(in thousands)

| | Parent and Consolidated Subsidiaries | NW Energy LLC | Eliminations | Total |
|---|---|---|---|---|
| Operating Revenues | 378,313 | 137,399 | — | 515,652 |
| Cost of Sales | 218,122 | 43,618 | — | 261,740 |
| Gross Margin | 160,191 | 93,721 | — | 253,912 |
| Selling, general, & administrative | 118,129 | 54,702 | — | 172,831 |
| Depreciation | 13,522 | 11,902 | — | 24,424 |
| Amortization of intangibles | 6,841 | — | — | 6,841 |
| Operating income (loss) | 21,699 | 27,117 | — | 48,816 |
| Interest expense | (13,742) | (17,321) | — | (31,063) |
| Investment income and other | (3,194) | (987) | — | (4,181) |
| Income (loss) before taxes and minority interests | 4,763 | 10,493 | — | 15,256 |
| Benefit (provision) for taxes | 1,140 | (3,606) | — | (2,466) |
| Income (loss) before minority interests | 5,903 | 6,887 | — | 12,790 |
| Minority interests | 8,100 | — | — | 8,100 |
| Income from continuing operations | 14,003 | 6,887 | — | 20,890 |
| Discontinued operations, net of tax and minority interests | (5,086) | — | — | (5,086) |
| Net income | 8,917 | 6,887 | — | 15,804 |
| Minority interest on preferred securities of subsidiary trusts | (6,100) | (1,374) | — | (7,474) |
| Dividends on cumulative preferred stock | (89) | — | — | (89) |
| Earnings on common stock | 2,728 | 5,513 | — | 8,241 |

9

Source: NORTHWESTERN CORP, 10-Q, August 14, 2002

**Income Statement Consolidating Schedule**
**Six Months Ended June 30, 2002**
(in thousands)

| | Parent and Consolidated Subsidiaries | NW Energy LLC | Eliminations | Total |
|---|---|---|---|---|
| Operating Revenues | $ 747,736 | $ 248,029 | $ — | $ 995,765 |
| Cost of Sales | 448,291 | 83,140 | — | 531,431 |
| Gross Margin | 299,445 | 164,889 | — | 464,334 |
| Selling, general, & administrative | 234,191 | 86,790 | — | 320,981 |
| Depreciation | 25,184 | 20,775 | — | 45,959 |
| Amortization of intangibles | 13,930 | — | — | 13,930 |
| Operating income (loss) | 26,140 | 57,324 | — | 83,464 |
| Interest expense | (22,290) | (30,459) | — | (52,749) |
| Investment income and other | (2,925) | 1,122 | — | (1,803) |
| Income (loss) before taxes and minority interests | 925 | 27,987 | — | 28,912 |
| Benefit (provision) for taxes | 3,037 | (10,114) | — | (7,077) |
| Income (loss) before minority interests | 3,962 | 17,873 | — | 21,835 |
| Minority interests | 23,014 | — | — | 23,014 |
| Income from continuing operations | 26,976 | 17,873 | — | 44,849 |
| Discontinued operations, net of tax and minority interests | (45,086) | — | — | (45,086) |
| Income (loss) on extraordinary item | (18,110) | 17,873 | — | (237) |
| Extraordinary item, net of tax $7,241 | (13,447) | — | — | (13,447) |
| Net income (loss) | (31,557) | 17,873 | — | (13,684) |
| Minority interest on preferred securities of subsidiary trusts | (11,410) | (2,289) | — | (13,699) |
| Dividends on cumulative preferred stock | (706) | — | — | (706) |
| Earnings (loss) on common stock | (43,673) | 15,584 | — | (28,089) |

10

Source: NORTHWESTERN CORP, 10–Q, August 14, 2002

Gross margin for our natural gas utility operations in the second quarter of 2002 was $26.7 million, an increase of $21.2 million, or 392.3%, over gross margin in the second quarter of 2001. The growth was primarily attributable to the addition of NorthWestern Energy LLC's Montana operations which added $20.7 million in margin. Gross margin for previously owned operations increased $0.5 million in the second quarter of 2002 compared to the second quarter of 2001. As a percentage of revenues, gross margin improved from 18.3% in the second quarter of 2001 to 49.7% in the second quarter of 2002, primarily as a result of the significant decrease in commodity prices within Nebraska/South Dakota operations and the higher margin impact from operations in Montana. Margins for the six months ended June 30, 2002 were $56.9 million, or $41.5 million higher than the first six months of 2001. NorthWestern Energy LLC's Montana operations accounted for almost the entire increase, adding $41.4 million in margins. As with the quarter, margin percentages increased, rising from 14.6% for the first six months of 2001 to 43.2% for the first six months of 2002. This reflects the impact of lower commodity prices within the Nebraska/South Dakota operations and the higher margin NorthWestern Energy LLC's Montana operations.

Operating expenses for our natural gas utility operations in the second quarter of 2002 were $16.9 million, an increase of $12.4 million, or 273.6%, from results in the second quarter of 2001. Selling, general and administrative expenses grew $10.2 million in the second quarter of 2002 to $13.8 million compared to the second quarter of 2001, when such expenses were $3.7 million, primarily due to $11.0 million in additional expenses attributable to NorthWestern Energy LLC's Montana operations, while selling, general and administrative expenses at previously owned operations declined due to reduced customer service expenses, employee benefits and distribution expenses. Depreciation was $3.1 million in the second quarter of 2002, an increase of $2.2 million over depreciation during the second quarter of 2001. This increase was primarily due to the addition of NorthWestern Energy LLC's Montana operations. Operating expenses for the six months ended June 30, 2002, were $29.3 million, an increase of $19.6 million, or 203.5%, from results in the first six months of 2001. Selling, general and administrative expenses grew $15.7 million in the six month period ended June 30, 2002 to $23.6 million compared to the six months ended June 30, 2001 when such expenses were $7.9 million, primarily due to $17.8 million in additional expenses attributable to NorthWestern Energy LLC's Montana operations, while selling, general and administrative expenses at previously owned operations declined similar to the quarter changes. Depreciation was $5.6 million for the six months ended June 30, 2002, an increase of $3.9 million over depreciation during the first six months of 2001. This increase was primarily due to the addition of NorthWestern Energy LLC's Montana operations.

Operating income for our natural gas utility operations in the second quarter of 2002 was $9.7 million, compared to $0.9 million in the second quarter 2001. NorthWestern Energy LLC's Montana operations contributed $7.4 million to operating income in the second quarter of 2002 while the operating expense reductions in the previously owned operations more than offset the revenue shortfalls in these operations to add $2.2 million of income. For the six months ended June 30, 2002, operating income of $27.7 million, which was $21.9 million higher than operating income for the six months ended June 30, 2001, with NorthWestern Energy LLC's Montana operations contributing $19.6 million in income.

COMMUNICATIONS SEGMENT OPERATIONS

Revenues for the communications segment in the second quarter of 2002 were $210.3 million, a decline of $91.0 million, or 30.2%, from revenues of $301.3 million in the second quarter of 2001. The decline was due to revisions made in May 2001 to the original agreements executed in association with the acquisition of the Lucent Technologies' Growing and Energy Markets ("Lucent Gem") business in March 2002, which eliminated minimum sales referral obligations of Avaya, Inc. (formerly Lucent Technologies) and increased the volume of higher−margin recurring revenue service maintenance contracts. Overall market softness in the technology and communication segments of industry further depressed revenues. For the six months ended June 30, 2002, revenues were $412.2 million, or $157.9 million lower than revenues for the six months ended June 30, 2001. As with the second quarter of 2002, the six month decline in revenues was primarily due to revisions in the Lucent GEM agreements, as well as continued soft market conditions.

Cost of sales in the second quarter of 2002 were $116.7 million, a decline of $70.3 million from cost of sales in the second quarter of 2001 of $186.9 million. The decrease in cost of sales principally resulted from the lower sales volumes and efforts to continue to improve the revenue mix by reducing cost intensive equipment sales and increasing lower cost service sales. In addition, a technical assistance call center agreement signed with Avaya in March 2002 resulted in $10.1 million of reduced costs during the quarter ended June 30, 2002. Costs for the first six months of 2002 decreased 35.3% to $241.4 million when compared to cost of sales for the first six months of 2001. As with the

24

Source: NORTHWESTERN CORP, 10-Q, August 14, 2002

quarter, the six month decrease is also due primarily to the lower sales volumes, sales mix changes and renegotiated terms with Avaya.

Gross margin in the second quarter of 2002 was $93.6 million, a decline of $20.7 million compared to gross margin in the second quarter of 2001. The decrease in gross margin dollars resulted from the overall decline in sales volumes noted above. As a percentage of revenues, gross margin improved from 38.0% in the second quarter of 2001 to 44.5% in the second quarter of 2002. The improvement was principally a result of changes in sales mix by increasing maintenance and service revenues as compared to lower margin equipment sales. Additionally, a technical assistance call center agreement with Avaya reduced cost of sales and thereby also improved margin percentages. For the six months ended June 30, 2002, gross margins were $170.8 million as compared to $197.1 million for the six months ended June 30, 2001. This decrease is attributable to the lower sales volumes mentioned above, as well as the renegotiated agreement with Avaya. Gross margin percentage increased to 41.4% as compared to 34.6% for 2001 for similar reasons as noted in the quarter fluctuations.

Operating expenses in the second quarter of 2002 were $82.6 million, a decline of $46.4 million from results in the second quarter of 2001. Selling, general and administrative expenses declined $47.6 million to $68.7 million in the second quarter of 2002 from $116.4 million for the second quarter of 2001. Our communications segment workforce has been reduced throughout 2001 resulting in lower selling, compensation and benefits, travel and other personnel costs. In November 2001, Expanets installed an enterprise software system, the EXPERT system, and although additional costs have been incurred during 2002 to enhance the system's operational capabilities, the system has eliminated redundant costs incurred under the former transition service agreements executed with Avaya as part of the original Lucent GEM acquisition. The system is now operational and savings are expected to continue throughout 2002 both from efficiencies and the reduction of non–capitalizable integration costs from the project. Depreciation expense increased $4.2 million to $7.1 million in the second quarter of 2002 compared to the second quarter of 2001 as a result of continued capital expenditures. Amortization expense decreased $2.9 million in the second quarter of 2002 compared to the second quarter of 2001 due to implementation of SFAS No. 142, which has resulted in the discontinuance of a portion of the intangibles amortization. For the six months ended June 30, 2002, expenses decreased $98.0 million from the first six months of 2001. As with the quarter, the primary driver in the decrease in operating expenses is the decline in headcount from 2001 levels and cost reductions from former service agreements and EXPERT implementation. For the six months ended June 30, 2002, as compared to 2001, depreciation expense increased $6.4 million to $11.6 million from continued capital expenditures. Amortization expense decreased $4.7 million to $13.7 million, again as a result of the SFAS No. 142 implementation.

Operating income in the second quarter of 2002 was $11.0 million, compared to operating losses of $14.6 million in the second quarter of 2001. The reduction in losses resulted from the substantial decline in operating expenses. Management expects to see continued operational improvements throughout 2002 as a result of continued focus on expense reductions and margin improvement. Operating income for the six months ended June 30, 2002, of $8.3 million represents a $71.6 million increase when compared to operating losses of $63.3 million for the six month period ended June 30, 2001. As with the quarter above, the primary driver in this turnaround is due to the substantial decline in operating expenses.

## HVAC SEGMENT OPERATIONS

Revenues in our HVAC division in the second quarter of 2002 were $117.8 million, an increase of $6.1 million, or 5.5%, from results in the second quarter of 2001. Revenues from locations acquired subsequent to June 2001 contributed approximately $7.4 million to the increase in second quarter 2002 results, while revenues from existing locations declined $1.3 million from results in the second quarter of 2001. The decrease in existing location revenues is a result of poor market conditions in certain areas, mild weather and the overall continuation of a soft economy. For the six–month period ended June 30, 2002, revenues reached $212.3 million, a 0.5% growth over the first half of 2001. Revenues from locations acquired subsequent to June 2001 contributed approximately $15.7 million to the increase in 2002 results, while revenues from existing locations declined $14.7 million. As with the second quarter, the decrease in existing location revenues is a result of poor market conditions, mild weather, a soft economy, as well as several locations closing down certain divisions to improve overall profitability.

25

Cost of sales in the second quarter of 2002 was $74.2 million, an increase of $5.4 million, or 7.8%, from results in the second quarter of 2001. Costs of sales for newly acquired locations added approximately $4.3 million of costs in the second quarter of 2002 compared to the second quarter of 2001 while cost of sales within existing locations increased $1.1 million in the second quarter of 2002 compared to the second quarter of 2001. The increase in costs was primarily the result of price increases for labor and materials. For the six months ended June 30, 2002, costs of sales reached $134.0 million, a $2.6 million increase over costs for the first six months of 2001. Cost of sales from locations acquired subsequent to June 30, 2001, contributed approximately $10.0 million, while cost of sales within existing locations declined $7.3 million. This decrease is due primarily to the reduced sales activity mentioned above net of price increases for labor and materials.

Gross margin in the second quarter of 2002 was $43.6 million, an increase of $0.7 million from results in the second quarter of 2001. Gross margin from acquired locations contributed $3.1 million in the second quarter of 2002, but were offset by a $2.4 million decline in gross margin for existing locations in the second quarter of 2002 compared to the second quarter of 2001. This decrease is a result of the revenue shortfalls noted above, project pricing pressures and increased costs. As a percentage of revenues gross margins declined from 38.4% in the second quarter of 2001 to 37.0% in the second quarter of 2002. Gross margin for the six months ended June 2002 decreased $1.7 million to $78.3 million over margins for the six months ended June 30, 2001. As with the quarterly results, subsequent acquisitions account for $5.7 million of growth, but were offset by a decrease in gross margin for existing locations of $7.4 million. As a percentage of revenues gross margins for the six–month periods ending June 30, 2001 and 2002 declined from 37.9% to 36.9%, respectively, due mainly to cost pressures.

Operating expenses in the second quarter of 2002 were $41.2 million, an increase of $1.0 million, or 2.6%, in the second quarter of 2001. Selling, general and administrative expenses increased $3.3 million in the second quarter of 2002 from results in the second quarter of 2001. Acquired locations added approximately $2.0 million of costs in the second quarter of 2002 while expenses within the existing locations decreased $1.3 million in the second quarter of 2002. The increase is primarily attributable to fleet rent expenses, corporate office cost increases, as well as transition costs of the corporate office. Depreciation expense of $1.8 million for the quarter decreased $0.5 million as compared to the second quarter of 2001. During the second quarter of 2002, the company entered into a vehicle sale leaseback agreement resulting in a depreciation expense decrease of $0.6 million in the second quarter of 2002 as compared to the second quarter of 2001. Amortization expense decreased $1.7 million during the second quarter of 2002 from results in the second quarter of 2001, due to implementation of SFAS No. 142, which has resulted in the discontinuance of a portion of the intangibles amortization. For the six months ended June 30, 2002, operating expenses were $79.6 million, an increase of $0.7 million, or 0.9%. Selling, general and administrative expenses increased $4.0 million for the six months ended June 30, 2002 from the first six months of 2001. Acquired locations added approximately $4.0 million of costs for the six months ended June 30, 2002, while expenses within the previously owned operations were flat. Depreciation expense was basically flat between the periods at $4.4 million and $4.5 million, respectively. Amortization expense for the six months ended June 30, 2002, was $3.3 million less than the same period in 2001, as a result of the SFAS No. 142 implementation.

Operating income in the second quarter of 2002 was $2.4 million, a decline of $0.3 million from results in the second quarter of 2001. Gross margin increases noted earlier were offset by an increase in operating expenses. Operating losses for the six months ended June 30, 2002 were $1.3 million as compared to operating income of $1.1 million for the six months ended June 30, 2001. This decrease in operating income reflects lower gross margins during the periods as operating expenses were basically flat.

## ALL OTHER OPERATIONS

All Other primarily consists of our other miscellaneous service activities which are not included in the other identified segments, together with the unallocated corporate costs and investments, and any reconciling or eliminating amounts. The miscellaneous service activities principally include non–utility businesses engaged in voice and data networks and systems, and a portfolio of services to residential and business customers, including product sales and maintenance contracts in areas such as home monitoring devices and appliances.

Revenues for the quarter increased $8.3 million to $12.5 million compared to the second quarter of 2001. This growth is attributable to the addition of non–utility operations acquired with NorthWestern Energy LLC's Montana operations, which include revenues from statutory conservation and low income assistance charges, gas stranded costs collected in rates under a securitization program, underground services location operations and other unregulated operations, offset by declines in the previously owned operations from reduced sales activity. For the six months ended June 30, 2002, revenues were $22.7 million, a $15.0 million increase over revenues in the six month period ended June 30, 2001. As with the quarter, the increase was a result of the addition of NorthWestern Energy LLC's Montana operations which added $14.8 million in revenues.

26



```
1  Wayne Harper
   NORTHWESTERN ENERGY, LLC.
2  40 E. Broadway St.
3  Butte, MT 59701-9394
   (406)497-2257
4
   Stanley T. Kaleczyc
5  Kimberly A. Beatty
   BROWNING, KALECZYC, BERRY & HOVEN, P.C.
6  Attorneys at Law
7  139 North Last Chance Gulch
   Helena, Montana 59601
8  (406) 443-6820

9  Attorneys for NorthWestern Energy, LLC.

10         MONTANA SECOND JUDICIAL DISTRICT COURT,
11               BUTTE-SILVER BOW COUNTY

12 MARGARET A. MCGREEVEY;            )
13 THOMAS G. TAYLOR; JOANNE          )
   BARKELL; PATRICK BURTON;          )
14 ROSALIE BURTON; JAMES             )
   DUDLEY; JOSEPH MARTELLI;          )
15 and LAWRENCE A. LOMBARDO,         )
16                                   )
            Plaintiff,               )
17                                   )
18       v.                         )  AFFIDAVIT OF DENNIS LOPACH
                                     )
19 MONTANA POWER COMPANY, a          )
   Montana Corporation; MONTANA      )
20 POWER, L.L.C.; TOUCH AMERICA      )
   HOLDINGS, INC.; R.P. GANNON;      )
21 J.P. PEDERSON; M.J. MELDAHL;      )
22 KAY FOSTER; CARL LEHRKIND, III;   )
   DEBORAH D. McWHINNEY; TUCKER HART )
23 ADAMS; ALAN F. CAIN; JOHN G.      )
   CONNORS; R.D. CORETTE; JOHN R.    )
24 JESTER; MICHAEL E. ZIMMERMAN;     )
   JOHN D. HAFFEY; NOBLE E. VOSBURG; )
25 PPL MONTANA, LLC; GOLDMAN, SACHS &)
26 CO.,a Limited Partnership; THE    )
   GOLDMAN SACHS GROUP, INC.;        )
27 PANCANADIAN PETROLEUM LIMITED,    )
   a Canadian Corporation;           )
```

1                                                   108879

WESTMORELAND COAL COMPANY,                )
a Delaware corporation, and               )
its wholly- owned subsidiary              )
CES ACQUISITION CORP.; MILBANK,           )
TWEED, HADLEY & McCLOY, LLP;              )
and JOHN DOES 3-5                         )
                                          )
Defendant.                                )

---

Dennis Lopach, being first duly sworn, deposes and says:

1.   I presently hold the position of Senior Vice President Administrative Services for NorthWestern Energy, L.L.C. (NWE) and reside in Helena, MT.  In this position I am responsible for Legal Affairs, Government and Regulatory Relations and Communications.  I am a native of Great Falls, MT, and am licensed to practice law in Montana and Colorado.  I am a graduate of the University of Montana School of Law.

2.   I have a substantial amount of experience in issues relating to public utilities, particularly with regard to state regulation.  Shortly after I was admitted to practice in 1976, I became Chief Legal Counsel of the Montana Public Service Commission (MPSC).  Most recently I was Vice President-Law and Public Policy for MediaOne, U S WEST's cable television subsidiary, in Atlanta, GA.  Prior to that I was Associate General Counsel for U S WEST in Denver CO.

3.   In these various positions I have worked with a wide variety of public utility issues in states across the country and am generally familiar with a large number of regulatory,

2                                   108879

operational and financial issues involving electric companies,

telecommunications companies and cable television providers.

4.    I first became involved with NorthWestern Corporation

(NOR) in late 2000 when I was hired to lobby the 2001 Montana

Legislature on its behalf.  I became an employee in June 2001,

and have been continuously involved in Montana regulatory

affairs on behalf of NOR and NWE since that time.

5.    I was deeply involved in the purchase by NOR of the

Remaining Utility Assets of The Montana Power Company (MPC), and

I am familiar with the terms of the Unit Purchase Agreement

(UPA) entered into by NOR, MPC and Touch America Holdings (TA

Holdings) under the terms of which NOR acquired The Montana

Power, L.L.C. (MPLLC).

6.    I was specifically involved on behalf of NOR in securing

the approval of this acquisition of the Remaining Utility Assets

of MPC by the Montana Public Service Commission (MPSC).

7.    Section 5.08 of the UPA provided that NOR, as Purchaser,

"may determine, in its discretion to obtain the approval of the

Securities and Exchange Commission (SEC) under the 1935 Act (the

Public Utilities Holding Company Act)…to consummate the

transactions contemplated by this Agreement pursuant to an

exempt holding company structure under the 1935 Act."  NOR in

good faith filed for an exemption, which operated as an

1  exemption until the SEC acts otherwise.  In its application, NOR
2  represented that it would move to reorganize promptly.

3  8.    The Joint Application of MPC and NOR to the MPSC for
4  approval of the purchase and sale of the Remaining Utility
5  Assets was filed on January 11, 2001. The case was assigned PSC
6  Docket D2001.1.5, and was later consolidated with Docket
7  D97.7.90 (MPC's deregulation proceeding). The Joint Application
8  noted that "At NorthWestern's election, Montana Power's utility
9  operations under the LLC structure will become either a wholly
10  owned subsidiary or a division of NorthWestern and will continue
11
12  to operate as a separate utility operating company..."
13

14  9.    The MPSC's proceedings on the combined dockets continued
15  throughout calendar year 2001.  On December 28, 2001, the
16  parties to the two dockets filed a Stipulation proposing a
17  resolution of the sale and deregulation matters.  The parties to
18  the Stipulation were NOR, MPC, the Montana Consumer Counsel
19  (MCC), the Large Customer Group (LCG) and Commercial Energy of
20  Montana, who comprised all of the active parties to the MPSC
21  proceedings.  The Stipulation stated, at paragraph 9, that MCC
22  and LCG had analyzed NOR's financial and managerial ability to
23  operate the utility businesses, and that the parties requested
24  that the MPSC approve the sale and permit "MPC's  utility
25  operations [be operated] as a subsidiary or a division of
26  [NOR]."
27

4                              108879

10. On January 31, 2002, after conducting a series of public hearings around the state, the MPSC issued its Final Order approving the Stipulation in its entirety. This action provided NOR with the regulatory authority to hold the Remaining Utility Assets either as a subsidiary, as is now the case under the SEC's exemption from the 1935 Act, or as a division, which is the case today for the NOR's South Dakota and Nebraska utility properties. The Final Order was not appealed, and on February 15, 2002, NOR's purchase of the Remaining Utility Assets closed.

11. In order to close this transaction, NOR incurred approximately $700 million in short-term bank loans and assumed approximately $500 million in existing MPC debt. The bank loans were replaced with senior unsecured notes issued by NOR in March, 2002.

12. Utilities require substantial amounts of capital in order to transact their businesses. Substantial amounts are spent on maintenance and significant investments are made in plant upgrades that are necessary to ensure dependable service. Additionally, there are times of the year when cash expenditures far exceed operating cash flows. For example, NWE earns a substantial amount of its revenues in the winter months, while most maintenance and investment activity occurs in non-winter periods because of weather. It is very important to the smooth operation of utility businesses that they be able to obtain

capital when they need it, and on reasonable terms.  The primary
tool used by the investment community to assess the credit
worthiness of borrowers is the debt ratings that are established
by three rating agencies, Standard and Poor's (S&P), Fitch and
Moody's.  Each of these agencies has its own rating "system",
but their ratings are generally similar in that they consider
the financial health of the issuing entity and the ability of
the issuer to make payments on debt instruments as they become
due.  Ratings are made at a point on a scale, and are the
primary way in which a bond or note is viewed as "investment
grade" or "non-investment", with the financial characteristics
of the issuer determining the rating.  Investment grade carries
relatively low financial risk to the issuer, and so the
associated interest rates are generally lower than non-
investment grade bonds, which are considered relatively higher
in risk.  Non-investment grade bonds carry higher interest rates
and many types of investors, such as pension funds, are
precluded from owning these lower-rated instruments.

13.  When Moody's and Fitch rated NOR's senior unsecured
notes that were to be issued in March 2002 to replace the bank
loans that financed the purchase of the Remaining Utility
Assets, they analyzed the notes as being investment grade.
Moody's rating was Baa2, which is two "notches" above junk
status; Fitch was BBB+, (subsequently downgraded to BBB in

October, 2002), and S&P was BBB.  All three ratings agencies
noted that NOR intended to "collapse" its holding company
structure into a divisional structure at some time in 2002, and
noted that their ratings were conditioned on that restructuring.

14.  The continued ability of NOR to obtain the capital
it relies upon to operate the utility businesses on reasonable
terms is at risk if the restructuring is delayed.  Moody's
specifically noted that a delay in restructuring would likely
result in a downgrade of NOR's rated debt, resulting in higher
interest costs and, potentially, a reduced ability to obtain
funds in the future.  This could adversely affect NOR's ability
to maintain and upgrade its plant, to buy the power it needs to
serve the great bulk of its Montana electric and natural gas
customers, and to continue to operate its utility business in
its three states consistent with past practices.  None of these
consequences are desirable or are warranted when, as here, the
original sale of the utility business to NorthWestern was
approved by a super-majority of the sellers' shareholders, has
been a part of the proposed sale transaction from the beginning,
and has the approval of the

1  MPSC, the primary regulator of NOR's utility business in

2  Montana.

3      15.  Alternatively, if NOR proceeds with its restructuring

4  under the terms of the injunction requested by the Plaintiffs in

5  this case, NOR will be subject to a contingent liability based

6  upon the allegations contained in this law suit.  This could

7  adversely affect NOR's credit rating. If NOR's credit rating

8

9  were to fall below investment grade, then NOR would be unable

10 to: declare or pay dividends or make other distributions with

11 respect to any class of  its capital stock or purchase, redeem,

12 retire, or otherwise acquire any such stock without the consent

13 of the lenders.  If this were to occur, NOR's shareholders would

14 wrongly suffer significant injury and NOR's ability to provide

15 service to its Montana customers could be adversely affected.

16

17     FURTHER Affiant sayeth not.

18

19     _____

20     Dennis Lopach

21

22

23

24

25

26

27

8                                    108879

STATE OF MONTANA             )
                             : ss.
County of Silver Bow    )

     On this 29th day of October , 2002, before me, the
undersigned, a Notary Public in and for the State of Montana,
personally appeared Dennis Lopach,  known to me to be the person
whose name is subscribed to the foregoing instrument and
acknowledged to me that he executed the same.

     In witness whereof, I have hereunto set my hand and affixed
my notarial seal on the day and year first above written.


                         Kathleen Sparks
                         NOTARY PUBLIC FOR THE STATE OF MONTANA
(Notarial Seal)          Residing at: Butte        , Montana
                         My commission expires: Oct. 20, 2004

9                                              108879



FILED
BILLINGS DIV.

2005 JAN 27 PM 2 06

PATRICK E. DUFFY, CLERK

BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION, | ) )  ) | Cause No. CV-04-26-BU-RFC |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER** |
| MIKE J. HANSON AND ERIE J. KINDT, | ) ) ) | |
| Defendants. | ) ) | |

RECEIVED
JUL 18
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## BACKGROUND

0 5 - 4 9 9

On February 15, 2002, pursuant to the terms of a Unit Purchase Agreement ("UPA") entered into between NorthWestern, as purchaser, and Montana Power Company ("MPC") and Touch America Holdings, Inc. ("TAH"), as sellers, NorthWestern acquired sole unit interest in Montana Power, LLC ("MPLLC"). Two days previously, as part of a corporate reorganization of MPC into TAH, the electric and natural gas transmission and distribution assets of MPC, as well as MPC's interest in the Milltown Dam, was transferred from MPC to MPLLC. The assets and liabilities transferred to MPLLC were certain 8.45% Junior Subordinated Debentures due in 2036 which had been issued by MPC in or about 1996. The interest paid on these Junior Debentures

created the cash flow to make dividend payments on certain Series A 8.45% Quarterly Income Preferred Securities ("QUIPS") which had previously been issued by Montana Power Capital I (The "Trust"). The sole assets of the Trust are the Junior Debentures. Plaintiff Magten is a holder of 33% of the Series A 8.45% QUIPS, with a principal face value in excess of $20 million.

In August 2002, NorthWestern authorized and directed the transfer of the electric and natural gas transmission and distribution assets and liabilities held by its subsidiary to it, the parent corporation. The transfer was effected on November 15, 2002. The Montana Utility Assets and Liabilities transferred included the obligations associated with the Junior Debentures and QUIPS. Other assets and liabilities remained with the limited liability company, whose name was changed to Clark Fork and Blackfoot, LLC. Pursuant to the operation of the QUIPS Trust Documents, as amended on or about August 13, 2002, upon the closing of the transfer, Magten ceased to be a creditor of Clark Fork and became a creditor of NorthWestern only.

Subsequently, on September 14, 2003, NorthWestern filed a voluntary petition for reorganization in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. Magten filed an adversary proceeding against NorthWestern in the bankruptcy proceeding. On April 19, 2004 Magten filed a complaint against Officers of Clark Fork, Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen Senechal, alleging that Defendants had breached a fiduciary duty to Plaintiff because Clark Fork transferred certain assets and liabilities of Clark Fork (the "Montana Utility Assets and Liabilities") to its corporate parent and sole owner, NorthWestern.

2

Defendants have moved the Court for summary judgment on the grounds that Magten was not a creditor of Clark Fork, and therefore, Clark Fork does not have standing to assert a creditor's claim and Defendants owe no duty to Magten.

## STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150 (9th Cir. 1997) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Even if the evidence is merely colorable or is not significantly probative, a grant of summary judgment is still appropriate. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987). The party moving for summary judgment bears the initial burden of proof to identify the absence of a genuine issue of material fact.

Once the moving party has satisfied this burden, the opposing party must set forth specific facts showing there remains a genuine issue for trial, in order to defeat the motion. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986) (*cert. denied* 479 U.S. 949 (1986)). Mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 252.

## ANALYSIS

I.    **Does a prior judicial determination that Magten was not a creditor of Clark Fork and Magten's admission it was not a Creditor of Clark Fork at the time of the transaction result in Magten not having standing to assert a creditor's claim that Defendant owed a duty to Magten?**

Defendants argue that it has been judicially determined that Magten never was a creditor

of Clark Fork and Magten has admitted that it was not a creditor of Clark Fork at the time of the

transaction, and therefore, Clark Fork does not have standing to assert a creditor's claim and

Defendants owe no duty to Magten.

In an opinion dated July 23, 2004, Hon. Charles B. Case, II, who is presiding over

Northwestern's bankruptcy held as follows:

> The Debtor [Northwestern] has consistently alleged, and Magten has never disputed, that Magten did not own any of the debentures prior to the time the assets were transferred to the Debtor [Northwestern]. Rather, Magten acquired the debentures after the transaction was complete. Therefore, the Debtor [Northwestern] asserts and Magten has not disputed, that Magten was never a creditor of Clark Form at a time when Clark Form had the disputed energy assets. Rather, Magten became a holder of the debentures only after the transaction was completed and was a matter of public record.
>
>                                    *    *    *
>
> As noted above, Magten was not a creditor of Clark Form at the time the transaction took place. Rather, it only became a creditor of the Debtor [Northwestern] after the Debtor [Northwestern] assumed the liability associated with the junior subordinated debenture initially issued by Montana Power Company. Thus, Magten is not only not a party directly affected by the transaction -- such as Clark Fork itself -- but it was also not an indirect party at the time the transaction took place.

Memorandum Decision at 3, 6-7.

4

This Court may take judicial notice of the adjudicative facts determined by Judge Case in the Bankruptcy proceedings and entered in his July 23, 2004 Memorandum and Order. Fed.R.Evid. 201. Defendants argue that Judge Case's finding that Magten was not a creditor of Clark Fork is dispositive of the issues in this case and rely on the theories of issue preclusion and collateral estoppel to support their argument that summary judgment should be granted in their favor.

However, as pointed out Plaintiffs, Judge Case did not hold that Magten lacked standing to challenge the validity of the transaction. Judge Case's decision did not even address Magten's standing to sue here, but rather decided that NorthWestern's counsel would not be disqualified from representing the debtor in the ongoing Bankruptcy proceeding. Judge Case did not address Magten's ability to pursue damage claims with respect to the QUIPS against Defendants, NorthWestern, or any other entity. Accordingly, Magten's standing to pursue their breach of fiduciary duty claim has not been precluded by Judge Case's decision.

Defendants further argue that Magten has admitted it was not a creditor of Clark Fork at the time of the transfer. Magten concedes that it has never claimed to be a creditor of Clark Fork at the time of the transaction and it was not necessary for Magten to be a creditor. Magten's standing to pursue the breach of fiduciary duty claim derives from the Trustee, who failed to enforce the Trust's rights and the QUIPS holders who were Magten's predecessors in interest.

5

## II.    Did Magten's Acquisition of QUIPS After-the-Fact and with Full Knowledge of the Transfer Preclude Magten from Alleging Innocence?

Defendants argue that Tolton Embry, Magten's sole owner, testified at his deposition that he acquired his interest in the QUIPS with full knowledge of the Transfer of the Montana Utility Assets and Liabilities to NorthWestern before his first acquisition of QUIPS. Magten has conceded that it knew the transfer to NorthWestern had occurred prior to acquisition of the QUIPS. Defendants cite no specific authority in support of their position that because Magten knew of the Transfer of the Montana Utility Assets and Liabilities to NorthWestern it is precluded from making a claim for breach of fiduciary duty. Instead, Defendants rely on general maxims of legal jurisprudence. Without providing further specific authority in support of their position, Defendants' argument must fail.[1]

## III.    Can Magten Stand in the Shoes of its Predecessor-in-Interest to Assert its Creditor Status?

Defendants argue that Magten is precluded from asserting a claim for breach of fiduciary duty because the claim was not conveyed or assigned to Magten in writing, and Defendants rely upon Mont. Code Ann. § 30-1-206, to support their argument, which states:

---

[1] As an aside, Magten cites to *United States ex rel. Hill v. Teledyne, Inc.*, 103 F.3d 143 (9th Cir. 1996) in support of their argument. However, this is an unpublished opinion and Magten gave no indication to the Court in their argument that said opinion was unpublished. Further, the Federal Rules of Appellate Procedure with Ninth Circuit Rules and Circuit Committee Notes Rule 36-3 specifically states that unpublished dispositions and orders of the Ninth Circuit are not binding precedent and a copy of any cited unpublished disposition or order must be attached to the document in which it is cited, as an appendix. Counsel for Magten should take note of and abide by Rule 36-3 for all future filings with this Court.

> (1) Except in the cases described in subsection (2) a contract for the sale of personal property is not enforceable by way of action or defense beyond $5,000 in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by the party's authorized agent.

However, a further reading of Mont. Code Ann. § 30-1-206(2), supports Plaintiff's argument that Mont. Code Ann. § 30-1-206 is inapplicable because Mont. Code Ann. § 30-1-206(2) states that subsection (1) of the statute does not apply to contracts for the sale of goods (30-2-201) nor of securities (30-8-123) nor to security agreements (30- 9A-203).

Further, Section 610 of the Indenture provides that if the Property Trustee "fails to enforce its rights with respect to the Securities or the related Trust Agreement, a holder of Preferred Securities may institute legal proceedings directly against the Company to enforce the Property Trustee's rights with respect to the Securities or such Trust Agreement, to the fullest extent permitted by law . . ." The Trustee did not bring a claim against Defendants, and Magten is acting as an express third party beneficiary to the Indenture. Therefore, Defendants's argument fails.

### IV.    Did Magten Waive Complaints Stemming from the Transfer?

Defendant argues that Magten waived any complaints it may have from the transfer because Magten's predecessor and the Trustee acquiesced to the transfer. Magten relies on case law from other jurisdictions in support of their argument that waiver is a question of fact for the jury and summary judgment is appropriate only when waiver is the sole reasonable inference that can be drawn from the evidence (cited by Magten as *Lynch v. CIBY 2000*, No. Civ.A 97-9022, 1998 U.S. Dist. LEXIS 23497, *13-14 (D.Cal., July 6, 1998). Magten also argues that failure to

7

object immediately to a party's unlawful act does not by itself constitute a waiver. *See* 28 Am. Jur. 2d Estoppel and Waiver § 209; *Hansen v. 75 Ranch Company*, 1998 MT 77, 957 P.2d 32.

It appears that this argument or a similar argument has appeared before Judge Case, and in his August 20, 2004 Opinion, Judge Case discusses Magten's allegations that Defendants had a fraudulent intent and whether NorthWestern's assumption of obligations pursuant to the transaction was meaningless. Magten asserts that the Second and Third Supplemental Indentures were executed at a time when the only financial information publicly available concerning NorthWestern's financial condition were fraudulent and, therefore, the execution of the supplement indentures cannot be deemed a waiver of a right to assert a claim based upon the transaction. Because of these allegations by Magten, there appears to be several issues of material fact raised by Magten which would be best left to a jury's determination.

For the foregoing reasons, Defendants' Motion for Summary Judgment (*Doc. #14*) is DENIED. The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 24th day of January, 2005.

Richard F. Cebull
U.S. DISTRICT COURT JUDGE

CERTIFICATE OF MAILING
DATE: 1/27/05 BY: ____
I hereby certify that a copy
of this order was mailed to:
J. Goetz
J. Devian Geddes
B. Steingart
J. Brewer
K. Beatty
S. Kaleczye

8





IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

0 5 - 4 9 9

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION, | ) ) ) | Cause No. CV-04-26-BU-RFC |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER** |
| MIKE J. HANSON AND ERIE J. KINDT, | ) ) | |
| Defendants. | ) ) ) | |

## **BACKGROUND**

On February 15, 2002, pursuant to the terms of a Unit Purchase Agreement ("UPA") entered into between NorthWestern, as purchaser, and Montana Power Company ("MPC") and Touch America Holdings, Inc. ("TAH"), as sellers, NorthWestern acquired sole unit interest in Montana Power, LLC ("MPLLC"). Two days previously, as part of a corporate reorganization of MPC into TAH, the electric and natural gas transmission and distribution assets of MPC, as well as MPC's interest in the Milltown Dam, was transferred from MPC to MPLLC. The assets and liabilities transferred to MPLLC were certain 8.45% Junior Subordinated Debentures due in 2036 which had been issued by MPC in or about 1996. The interest paid on these Junior Debentures

created the cash flow to make dividend payments on certain Series A 8.45% Quarterly Income

Preferred Securities ("QUIPS") which had previously been issued by Montana Power Capital I

(The "Trust"). The sole assets of the Trust are the Junior Debentures. Plaintiff Magten is a

holder of 33% of the Series A 8.45% QUIPS, with a principal face value in excess of $20

million.

In August 2002, NorthWestern authorized and directed the transfer of the electric and

natural gas transmission and distribution assets and liabilities held by its subsidiary to it, the

parent corporation. The transfer was effected on November 15, 2002. The Montana Utility

Assets and Liabilities transferred included the obligations associated with the Junior Debentures

and QUIPS. Other assets and liabilities remained with the limited liability company, whose

name was changed to Clark Fork and Blackfoot, LLC. Pursuant to the operation of the QUIPS

Trust Documents, as amended on or about August 13, 2002, upon the closing of the transfer,

Magten ceased to be a creditor of Clark Fork and became a creditor of NorthWestern only.

Subsequently, on September 14, 2003, NorthWestern filed a voluntary petition for

reorganization in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. Magten filed an

adversary proceeding against NorthWestern in the bankruptcy proceeding. On April 19, 2004

Magten filed a complaint against Officers of Clark Fork, Mike J. Hanson, Jack D. Haffey, Ernie

J. Kindt and Ellen Senechal, alleging that Defendants had breached a fiduciary duty to Plaintiff

because Clark Fork transferred certain assets and liabilities of Clark Fork (the "Montana Utility

Assets and Liabilities") to its corporate parent and sole owner, NorthWestern.

Defendants Hanson and Kindt have moved to dismiss the complaint for the following

reasons: (1) as a matter of law, only the member of a limited liability company, in this case

2

NorthWestern, has the legal authority to order the transfer of assets and liabilities out of a limited liability company; (2) as a matter of law, Defendants owed no fiduciary duty to Magten; and (3) the terms of the relevant documents on which Magten bases its claim permitted the transfer of Montana Utility Assets and Liabilities from Clark Fork to NorthWestern.

## STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6) Fed. R. Civ. P. the Court must accept as true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to the plaintiffs. *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). Dismissal for failure to state a claim is appropriate if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957).

## ANALYSIS

1)    **Do only the members of a limited liability company have the legal authority to order the transfer of assets and liabilities out of a limited liability company?**

Defendants argue that only the members have the authority to transfer all or substantially all of the limited liability company's assets. Defendants assert that because NorthWestern was the sole Member of Clark Fork, they could merely carry out the directives of the Member and Manager and had no individual authority or power to bind or prevent Clark Fork from transferring the Montana Utility Assets and Liabilities from Clark Fork to NorthWestern.

Pursuant to the Montana Limited Liability Company Act, *"unless the articles of*

3

*organization or the operating agreement provide otherwise,* the only matters of a member-managed or manager-managed company's business requiring the consent of all of the members are . . . the sale, lease, exchange or other disposal of all, or substantially all, of the company's property with or without goodwill." Mont. Code Ann. §35-8-307(3)(l) (Emphasis added).

Because this Court was not provided with a copy of the operating agreement for Clark Fork and Black Foot, LLC, it is unable to determine whether only the members of the limited liability company have the legal authority to order the transfer of assets and liabilities out of the limited liability company. The language of Montana's Limited Liability Company Act clearly allows for the possibility of the operating agreement to authorize officers to sell, lease, exchange or dispose of the company's property.

2)    **Did Defendants owe a fiduciary duty to Magten, as one of Clark Fork's creditors?**

Defendants allege that NorthWestern was and is the sole Member and Manager of Clark Fork, and therefore, NorthWestern, as either Member or Manager, owes the fiduciary duties of loyalty and care to Clark Fork, so the Officers of Clark Fork have no duties or obligations conferred upon them by the Montana Limited Liability Company Act. This Court previously ruled in its January 27, 2005 Order that despite Judge Case's judicial determination that Magten never was a creditor of Clark, Magten is not precluded from asserting a breach of fiduciary duty claim.

4



**3)    Do the relevant documents on which Magten bases its claim permit the transfer of Montana Utility Assets and Liabilities from Clark Fork to NorthWestern?**

Defendants argue the Indenture and its supplements expressly state that a transfer of assets conducted in accordance with section 1101 of the Indenture has the affect of releasing the predecessor entity of all obligations under the Indenture or any Outstanding Securities thereunder. Defendants assert that this Indenture controls the rights of Plaintiff and Plaintiff should not be allowed to object to acts that were performed in accordance with the terms of the Indenture. Plaintiffs rebut this by arguing that there was no authorization for the transaction where the entity purportedly assuming Clark Fork's obligations to the Trust and the holders of the QUIPS were already insolvent and would never be able to meet the obligations.

Defendant is correct in that the Indenture does not expressly require the entity assuming the obligation be solvent. However, the Court must accept as true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to the plaintiffs. The Indenture at section 112 provides that it is governed by New York law and in *Blackman v. Estate of Battcock*, 587 N.E.2d 280, 285 (N.Y. 1991), the Court stated that the aim of the contract interpretation is not simply mechanical application of the literal language of the contract, but also consideration of what may reasonably be implied from the language in effectuating the parties' purpose in entering the contract. Further, as correctly stated by Plaintiff, the Indenture is subject to the inherent covenant of good faith and fair dealing. The covenant of good faith and fair dealing "is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the

5

benefits under the agreement." *Don King Productions, Inc. v. Douglas*, 742 F.Supp.741 (S.D.N.Y. 1990). There is a concern as to whether it is good faith and fair dealing in carrying out a transaction in which Clark Fork will be released of all further obligations under the Indenture because its obligations have been assumed by another entity which is known to be insolvent.

For the foregoing reasons, Defendants' Motion to Dismiss [*doc. #4*] is **DENIED**. The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this _____ day of April, 2005.

Richard F. Cebull
U.S. DISTRICT COURT JUDGE

CERTIFICATE OF MAILING
4/1/05     Ca.

S. Kaleczyc
K. Beatty
B. Steingart
J. Brewer
J. Goetz
J. Geddes

6

# EXHIBITS  50 - 52

# REDACTED  IN  THEIR  ENTIRETY