# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

--------------------------------------- X

MAGTEN ASSET MANAGEMENT CORPORATION and

LAW DEBENTURE TRUST COMPANY OF NEW YORK,

                        Plaintiffs,

        -vs-

NORTHWESTERN CORPORATION,

                        Defendant.

Civil Action No. C.A. No. 04-1494 (JJF)

--------------------------------------- X

MAGTEN ASSET MANAGEMENT CORP.,

                        Plaintiff,

        -vs-

MICHAEL J. HANSON and ERNIE J. KINDT,

                        Defendants.

Civil Action No. C.S. No. 05-499 (JJF)

--------------------------------------- X

DATE:       November 8, 2007

TIME:       9:00 a.m.


        Deposition of ROBERT W. BERLINER, held

at the offices of Curtis, Mallet-Prevost, Colt &

Mosle, 101 Park Avenue, New York, New York,

- ROBERT W. BERLINER -

1
2  A.  Yes.
3  Q.  -- you've listed as a document that you
4  reviewed creditors' First Amended Complaint dated
5  October 4th, 2004.
6       Do you recognize this as that First
7  Amended Complaint?
8  A.  Yes.
9  Q.  When did you review the Complaint for
10  the first time?
11  A.  In either August or September of this
12  year.
13  Q.  Who provided you with a copy of the
14  Complaint?
15  A.  Mr. Holmes and Mr. Schwitter.
16  Q.  Did you have any discussions with
17  Mr. Holmes or Mr. Schwitter regarding the contents
18  of the Amended Complaint --
19  A.  No.
20  Q.  -- at that time?
21       Did you ever have any conversations with
22  those two individuals regarding the content of this
23  Complaint?
24  A.  I did not.
25  Q.  Did you ever have a conversation with

25

- ROBERT W. BERLINER -

1  any attorneys representing the plaintiffs in this
2  action regarding this Complaint?
3
4  A.  No, sir.
5  Q.  I'd like to refer your attention to
6  Page 10 of the Complaint, Paragraph 51.
7       Do you have that, sir?
8  A.  Yes, I do.
9  Q.  It states, "The debtor was insolvent
10  both immediately before and immediately after the
11  acquisition of MPLLC and the assumption of related
12  liabilities. Debtor was engaged in a business with
13  unreasonably small capitalization and incurred
14  debts beyond its ability to pay both immediately
15  before and immediately after the acquisition of
16  MPLLC and the assumption of liabilities."
17       Sir, do you understand that the debtor
18  referred to in this paragraph is Northwestern
19  Corporation, the defendant in this case?
20       MR. KAPLAN:  Rather than asking the
21  question, it's defined up front. I'd rather have
22  the witness look at the definition.
23       MR. PIZZURRO:  That's fine. I just want
24  his understanding.
25  A.  That's my understanding, yes.

26

- ROBERT W. BERLINER -

1
2  Q.  Do you recall, reviewing this paragraph
3  of the Complaint, when you looked at the Complaint?
4  A.  Yes.
5  Q.  Were you ever asked to offer an opinion
6  regarding the allegations contained in this
7  paragraph?
8  A.  No.
9  Q.  Did you ever consider an opinion
10  regarding the allegations contained in this
11  paragraph?
12  A.  No.
13  Q.  Was there ever any discussion that you
14  had either with your colleagues or with any
15  attorneys representing the plaintiffs concerning
16  the allegations contained in this paragraph?
17       MR. KAPLAN:  Object to the form.
18  A.  I think the answer is yes.
19  Q.  Okay. And what -- with whom did you
20  have that -- those discussions, conversations or
21  conversation?
22  A.  With Mr. Holmes and Mr. Schwitter.
23  Q.  When did you have those conversations or
24  conversation?
25  A.  In August or September of this year.

27

- ROBERT W. BERLINER -

1
2  Q.  Do you recall whether it was more than
3  one conversation?
4  A.  It was one conversation.
5  Q.  What was said? What did you say and
6  what did they say, to the best of your
7  recollection, in that conversation?
8  A.  The essence of the conversation was that
9  they communicated to me that counsel had asked us
10  to opine, as I have in the fourth opinion on Page 4
11  of my report, based on a hypothetical assumption
12  that Clark Fork remained directly obligated for the
13  QUIPS following the going flat transactions.
14  Q.  Sir, let me -- you do understand that
15  the issue in Paragraph 51 is the solvency of
16  Northwestern Corporation; do you not?
17  A.  Yes.
18  Q.  Can you explain to me, then, the
19  relationship between that allegation and Opinion
20  Number 4?
21       MR. KAPLAN:  Objection to form.
22  A.  Yes.
23  Q.  Please, could you explain?
24  A.  In reading the deposition transcripts in
25  the case, a lot of the testimony had to do with the

28

- ROBERT W. BERLINER -

1    - ROBERT W. BERLINER -
2  going flat transaction, the insolvency issues and
3  those kinds of things. And I raised the question
4  with my colleagues, you know, much of the testimony
5  is seemingly irrelevant to the opinions that we're
6  going to be expressing in our report and isn't that
7  an odd situation for us?
8        And it was then that I learned that
9  the only way that we were going to even remotely
10  address any of those was by offering the opinion I
11  referred to based on the hypothetical assumption.
12    Q.   Let's look at Opinion Number 4.  Okay.
13  It states, "Assuming that Clark Fork remained
14  directly obligated for the QUIPS, following the
15  November 15th, 2002, going flat transaction, its
16  total liabilities would have materially exceeded
17  its total assets."
18        Can you explain to me how that opinion
19  relates to the solvency or insolvency of
20  Northwestern before or after the going flat
21  transaction?
22    MR. KAPLAN:  Asked and answered.
23    A.   The relationship -- obviously, it
24  doesn't relate.  The relationship, in my mind,
25  was -- it was the linkage as to how -- how come I
                    29

1    - ROBERT W. BERLINER -
2  wasn't going to address the issues related to the
3  going flat transaction and the solvency or
4  insolvency of Northwestern that for some reasons
5  that were apparently legal reasons, counsel had
6  restricted my attention to just this particular
7  hypothetical assumption and that's the linkage.
8    Q.   So you understood -- am I correct that
9  you understood that counsel was specifically not
10  asking you to opine regarding the solvency of
11  Northwestern?
12    MR. KAPLAN:  Object to the form.
13    A.   Not because they said that in so many
14  words but because this is all that I was asked to
15  do, so obviously I wasn't asked to address the
16  solvency of Northwestern.
17    Q.   Did you question that in the
18  conversation that we're now referring to that you
19  had with your colleagues, did you question why you
20  were not being asked to offer an opinion regarding
21  solvency or insolvency of Northwestern?
22    A.   Yes.
23    Q.   What did they tell you?
24    A.   They told me that this isn't our area of
25  expertise and that may have been a reason why we
                    30

1    - ROBERT W. BERLINER -
2  weren't asked to address it.  But I never did find
3  out by conversations with counsel as to the reason
4  or not.
5        This was what I was asked to do.  It was
6  relatively easy to do it, and so I felt somewhat
7  delighted that this is all I had to do because I
8  was concerned about being able to render my report
9  by the 19th of September.
10    Q.   What else was discussed regarding the
11  allegations in this paragraph, Paragraph 51 of the
12  Amended Complaint, during the conversation we're
13  referring to?
14    A.   Nothing else.
15    Q.   You testified a moment ago that in that
16  conversation you remarked that much of what you had
17  read in the deposition testimony seemed to be
18  irrelevant to the issues that you were being asked
19  to opine on.
20        Do you recall saying that?
21    A.   Yes.
22    Q.   Why did you feel that way?
23    A.   Because I wasn't being asked to express
24  any opinions such as the ones you've asked me about
25  relating to the solvency or insolvency of
                    31

1    - ROBERT W. BERLINER -
2  Northwestern or any of the ramifications relating
3  to the going flat transaction.
4    Q.   You did rely, however -- strike that.
5        Your report reflects that you did review
6  deposition transcripts taken in this case, correct?
7    A.   Correct.
8    Q.   Did you view those as irrelevant to any
9  of the opinions that you've offered in this case?
10    A.   No.
11    Q.   Okay.  But irrelevant to Opinion
12  Number 4, is that what I understand; is that
13  correct?
14    MR. KAPLAN:  Object to form.
15    A.   Yes.
16    MS. DELANEY:  Are you expecting any
17  males to join us?  There is apparently a
18  Mr. Schwartz here to join the deposition.  Does
19  anyone know who he is?
20    Q.   Off the record.
21        (Whereupon, there was a brief recess in
22  the proceedings.)
23    Q.   Mr. Berliner, prior to your retention by
24  Fried, Frank and Storch Amini in this case, had you
25  ever been employed by Magten Asset Corporation?
                    32

- ROBERT W. BERLINER -

1
2    MR. KAPLAN:  Object to the form.
3    A.  No.
4    Q.  Had you ever had any associations with
5    Magten?
6    A.  No.
7    Q.  Had you ever been employed by Law
8    Debenture Corporation?
9    A.  No.
10    Q.  Had you ever had any association with
11    Law Debenture Corporation?
12    A.  No.
13    Q.  To the best of your knowledge, did your
14    organization prior to this retention have any prior
15    association with Magten?
16    A.  No.
17    Q.  To the best of your knowledge prior to
18    this retention, did your organization have any
19    prior association with Law Debenture?
20    A.  No, sir.
21    Q.  Can we look, Mr. Berliner, at Exhibit A
22    to your report, which is at Page -- there's a lot
23    of different A-1s in here.
24    A.  I'll bet.
25    Q.  Which is your CV, your curriculum vita.

33

- ROBERT W. BERLINER -

1
2    Sir, you are a certified public
3    accountant?
4    A.  Yes, sir.
5    Q.  When was the last time you practiced as
6    a certified public accountant?
7    A.  I believe I'm doing that today.
8    Q.  Okay.  What is your specialty apart from
9    testimony as a certified public accountant?  Do you
10    perform audits?
11    A.  Yes.  My specialty was auditing and
12    accounting.
13    Q.  When was the last time you performed or
14    participated in an audit?
15    A.  The last time I directly participated in
16    an audit was about 1985.
17    Q.  So then, sir, is it safe to say that you
18    never participated as a CPA in any goodwill
19    impairment analysis under SFAS 142?
20    MR. KAPLAN:  Object to the form.
21    A.  No.  That's not fair to say.
22    Q.  Have you ever participated in such
23    analysis?
24    A.  I have.
25    Q.  When was that?

34

- ROBERT W. BERLINER -

1
2    A.  That was in 2005, 2006 and 2007.
3    Q.  Can you explain what you did in 2005?
4    A.  I was a participant in a goodwill
5    analysis with respect to the goodwill of a
6    defendant in a lawsuit.
7    Q.  What did you do?
8    A.  I reviewed various documents and
9    performed some calculations to determine whether or
10    not, and if so, how much the goodwill of the entity
11    had been impaired.
12    Q.  Did you perform a valuation in that
13    assignment?
14    A.  I did not.  I don't perform valuations.
15    Q.  Can you explain what you did in 2006?
16    MR. KAPLAN:  Object to the form.
17    A.  In 2006, I consulted with one of my
18    partners with respect to the question of when the
19    goodwill of a particular company was impaired.
20    Q.  What was the nature of that
21    consultation?
22    A.  We were dealing with one of the largest,
23    if not the largest, write-off of goodwill in the
24    history of the United States.  And we were
25    endeavoring to determine whether or not such

35

- ROBERT W. BERLINER -

1
2    write-off should have been taken earlier than it
3    was taken.
4    Q.  What was the nature of the work that you
5    did?
6    A.  I consulted with my partner, who was
7    responsible for that engagement, and offered my
8    views.
9    Q.  Your views with respect to what aspect
10    of the goodwill impairment analysis?
11    A.  The timing of the impairment.
12    Q.  Can you explain what you did in 2007 in
13    respect to -- with respect to goodwill impairment?
14    A.  In 2007, I addressed the very same issue
15    in this litigation.
16    Q.  I see.  Mr. Berliner, are you accredited
17    by any organization or professional society in
18    business valuation?
19    A.  I am not.
20    Q.  Are you an accredited senior appraiser?
21    A.  No, sir.
22    Q.  Do you have any credentials from the
23    American Institute of CPA accredited in business
24    valuation?
25    A.  I do not.

36

- ROBERT W. BERLINER -

1
2  Q.  Do you consider yourself to be an expert
3  in business valuation?
4      A.  I do not.
5      Q.  Have you ever been qualified as an
6  expert in valuation by any court or arbitration
7  tribunal?
8      A.  No, sir.
9      Q.  Have you ever offered any expert
10 testimony regarding business valuation in any
11 proceeding?
12        MR. KAPLAN: Object to the form.
13     A.  No, sir.
14     Q.  In any of those proceedings in which you
15 have offered an expert opinion, have you ever been
16 the subject of a Daubert motion, if you know?
17     A.  I know what a Daubert motion is. I have
18 been the subject of motions brought to disqualify
19 me as a testifying expert. I don't know whether
20 those motions would have been brought under the
21 so-called -- would qualify as a Daubert motion.
22     Q.  How many times have such motions to
23 disqualify been made to your knowledge?
24     A.  I would say between six and ten times.
25     Q.  Were you ever disqualified as a result

37

- ROBERT W. BERLINER -

1
2  of the motions?
3      A.  Twice.
4      Q.  When was the first time?
5      A.  The first time would have been around
6  1992, thereabouts.
7      Q.  What was the opinion that you offered,
8  to the best of your recollection, in 1992 that
9  resulted in your disqualification?
10     A.  I didn't offer any opinion. I had just
11 been engaged in a lawsuit and had hardly done any
12 work in that lawsuit at the time.
13     Q.  What was the basis for your
14 disqualification?
15     A.  The defendant in the lawsuit offered
16 three reasons: One, that I had a commanding
17 knowledge of its auditing methodology; two, that I
18 had a commanding knowledge of how it defends itself
19 in litigation; and three, that I was under
20 retention to them.
21     Q.  What was the basis for your
22 disqualification?
23     A.  A magistrate judge ruled in favor of the
24 motion. It was appealed, and the judge ruled that
25 there were no matters of law that would enable him

38

- ROBERT W. BERLINER -

1
2  to overrule the magistrate.
3      Q.  What did you understand to be the basis
4  for the magistrate judge's decision?
5      A.  Oh, I was retained by that accounting
6  firm some six or seven years prior to that time in
7  the defense of two of its partners in a
8  2E administrative proceeding brought by the
9  Securities and Exchange Commission, and that was
10 the basis of the decision, I believe.
11     Q.  Did you understand it was determined
12 that you had a conflict of interest and that's what
13 led to your disqualification?
14        MR. KAPLAN: Object to the form.
15     A.  I understood that the argument was that
16 the knowledge I had would be prejudicial to the
17 defendant in the litigation.
18     Q.  That was knowledge you had obtained as a
19 result of your association or employ by the
20 defendant, correct?
21     A.  Correct.
22     Q.  What was the second time that you were
23 disqualified?
24     A.  The second time I was disqualified was
25 in about I would say 1993 or so, or '4, and that

39

- ROBERT W. BERLINER -

1
2  was a similar situation in that the reasons offered
3  for the motion were again that I had a commanding
4  knowledge of the accounting firm's auditing
5  methodology and how they defend themselves in
6  litigation.
7      Q.  Sir, as a CPA, have you ever reviewed
8  valuations or appraisals done by appraisers to
9  determine whether an SFAS 142 goodwill impairment
10 analysis was necessary?
11        MR. KAPLAN: Object to the form.
12     A.  Yes.
13     Q.  When did you do that?
14     A.  I believe I did it in 2005 and again in
15 connection with this litigation.
16     Q.  Did you perform a valuation in this
17 litigation?
18     A.  I did not.
19     Q.  Let me ask you one question and then
20 maybe we'll take a two-minute break or five-minute
21 break.
22        Sir, are you familiar with the Uniform
23 Standards of Professional Appraisal Practice?
24     A.  I've learned of them in this case, but
25 I'm not familiar with them.

40

- ROBERT W. BERLINER -

1
2      Q.    When did you learn of them in this case?
3      A.    Well, I would have understood there to
4   exist such standards but the first time, I guess,
5   that I saw them in that particular terminology was
6   when I read the expert reports of the experts on
7   behalf of defendants in this case.
8      Q.    So that -- strike that.
9            Is it, therefore, safe to assume that
10  informing the opinions and in preparing your
11  report, which is Exhibit 1, that you did not refer
12  to or use any of the Uniform Standards of
13  Professional Appraisal Practice?
14          MR. KAPLAN:  Object to the form.
15     A.    It's fair to say that.
16          MR. PIZZURRO:  Maybe take five minutes.
17          (Whereupon, there was a brief recess in
18  the proceedings.)
19     Q.    Mr. Berliner, you referred to three
20  instances in which you participated in a SFAS 142
21  impairment analysis.
22          Do you recall that testimony?
23     A.    Yes.
24     Q.    You referred to years 2005, 2006 and
25  2007.

41

- ROBERT W. BERLINER -

1
2            As I recall, 2007 is this case, that's
3   what you're referring to; is that right?
4      A.    And the second one covered both 2006 and
5   '7.
6      Q.    So, am I correct in understanding that
7   the work you did in 2006 with respect to a
8   142 goodwill impairment analysis is work that
9   relates to this litigation?
10     A.    No.
11     Q.    I'm sorry.  Did it relate to a
12  litigation?
13     A.    Yes.
14     Q.    Did you offer an opinion as an expert in
15  this litigation?
16     A.    No.
17     Q.    The work that you performed in 2005, was
18  that also in connection with a litigation?
19     A.    Yes, sir.
20     Q.    Did you offer an opinion in that
21  litigation?
22     A.    I did.
23     Q.    What was the name of that case?  Do you
24  recall the name of the case?
25     A.    Let me see if I can get it from -- the

42

- ROBERT W. BERLINER -

1
2   name of the case was the Huff Alternative Income
3   Fund LP against PriceWaterhouseCoopers LLP.
4      Q.    Is that the case which is listed at
5   Page B2 of Exhibit B to your report?
6      A.    Yes, sir.
7      Q.    What was -- were you representing
8   plaintiff or the defendant in that case?
9      A.    The plaintiff.
10     Q.    Was there a judgment or verdict in that
11  case?
12     A.    I believe that case settled.
13     Q.    Sir, do you remember the name of the
14  case you testified to in 1992 where there was a
15  successful disqualification motion made with
16  respect to your participation?
17          MR. KAPLAN:  Object to the form.
18     A.    I refer to it as the Interfund case, but
19  I don't think that was the exact name of the case
20  so I don't recall the exact name of the case.
21     Q.    What court was that case?
22     A.    I don't recall.
23     Q.    Do you recall the state?
24     A.    No.
25     Q.    Do you recall the name of the case --

43

- ROBERT W. BERLINER -

1
2   the second case that you referred to, which I
3   believe was 1993, in which a disqualification
4   motion was made?
5      A.    Yes.  It was a class action case
6   involving the Republic Bank, maybe the First
7   Republic Bank.  I don't remember the exact name
8   of -- Texas, not New York.
9      Q.    Do you recall what court that was in?
10     A.    Yes.  It was a court in Texas.
11     Q.    Do you recall whether --
12     A.    Dallas, I believe.  I believe federal
13  court in Dallas.
14     Q.    Earlier, if you recall, we were
15  discussing a discussion you had with your
16  colleagues regarding the allegations in
17  Paragraph 51 of the Complaint.
18          Do you recall that testimony?
19     A.    Not in the Complaint in this litigation,
20  but the First Amended Complaint.
21     Q.    Yes, sir, the First Amended Complaint.
22     A.    Yes, sir.
23     Q.    Do you remember that testimony?
24     A.    Yes.
25     Q.    Sir, do you recall whether or not either

44

- ROBERT W. BERLINER -

1   - ROBERT W. BERLINER -
2   of your colleagues, Mr. Holmes or Mr. Schwitter,
3   had done a preliminary analysis of Northwestern
4   solvency either before or after the going flat
5   transaction?
6       A.   I recall we did not.
7       Q.   You did not?
8       A.   No.
9       Q.   No one at your organization did; is that
10  correct?
11      A.   That's correct.
12      Q.   Do you know if any such preliminary
13  analysis was ever done by anyone in the employ of
14  the plaintiffs in this case?
15      A.   No, I don't.
16      Q.   Sir, if we look back again at Page 4 of
17  your report, Opinion Number 1. Opinion Number 1
18  states, "The consolidated financial statements of
19  NW," -- Northwestern, "originally filed with the
20  SEC Forms 10-Q for the quarters ended March 31st,
21  June 30th and September 30th, 2002, were materially
22  false and misleading as a result of various
23  violations of GAAP and SEC regulations."
24      Sir, did you or do you have an
25  understanding as to why -- strike that.
45

1   - ROBERT W. BERLINER -
2       Do you have an understanding as to how
3   that opinion is relevant to any issue in this
4   lawsuit?
5       A.   Yes.
6       Q.   What's your understanding?
7       A.   One, had these violations not taken
8   place, the covenants might not have been violated.
9   Two, had the financial statements been properly
10  presented, maybe the Montana Power Commission
11  wouldn't have approved the going flat transaction
12  or whoever had to approve it wouldn't have approved
13  it. Maybe that would never have taken place.
14      Those would be the kinds of things I
15  think would make my opinion relevant.
16      Q.   Where did you obtain that understanding?
17      A.   Purely supposition on my part.
18      Q.   Did anyone ever tell you those things?
19      A.   No.
20      Q.   Did you ever have a conversation in
21  which you were told or in which it was discussed
22  that this was why your opinion in Number 1 was
23  relevant?
24      A.   No.
25      Q.   It was purely your own analysis based on
46

1   - ROBERT W. BERLINER -
2   the reading of the Complaint; is that correct?
3       A.   And the deposition transcripts
4   primarily.
5       Q.   Sir, do you have any experience with the
6   Montana -- you called it the Montana Power
7   Commission.
8       Were you referring to the Montana Public
9   Service Commission?
10      A.   Yes.
11      Q.   Do you have any experience with the
12  Montana Public Service Commission?
13      A.   No, sir.
14      Q.   Do you know what the scope of authority
15  is of the Montana Public Service Commission?
16      A.   No.
17      Q.   Do you know whether the Montana Public
18  Service Commission could have approved the going
19  flat transaction?
20      A.   Not with any degree of certainty.
21      Q.   Why did you assume that your opinion
22  given in Number 1 would be relevant, then, to
23  whether or not the Montana Public Service
24  Commission may have taken some action with respect
25  to the going flat transaction?
47

1   - ROBERT W. BERLINER -
2       A.   Because it seemed to me from all the
3   documents I read that there was approval required
4   for this transaction to go through. And I guess my
5   recollection is that the Montana Public Service
6   Commission -- Public Utility Service Commission was
7   involved in that approval and that they might have
8   thought differently about it had the financials --
9   the true financial condition of Northwestern been
10  known.
11      Q.   Do you have an understanding as to
12  whether or not the Montana Public Service
13  Commission, in fact, approved the transaction?
14      MR. KAPLAN:  Object to form.
15      A.   No.
16      Q.   Do you have any understanding as to when
17  Northwestern may have applied to the Montana Public
18  Service Commission for the approval of the
19  transaction?
20      MR. KAPLAN:  Object to the form.
21      A.   I assume it was prior to the transaction
22  taking place.
23      Q.   Do you have any understanding as to
24  whether or not the financials upon which you opine
25  were put before the Montana Public Service
48

- ROBERT W. BERLINER -

1
2     Q.   What is Mr. Holmes's educational
3     background?
4     A.   He's a college graduate.  I don't
5     recall -- I don't recall what school and whether he
6     has any advanced graduate degrees or not.  I don't
7     know.
8     Q.   Is he a CPA?
9     A.   He is.
10    Q.   Is he accredited by any organization or
11    professional society in business valuation?
12    A.   He is not.
13    Q.   Is he expert in business valuation?
14    A.   He's not.
15    Q.   Sir, I want to direct your attention to
16    Page 212.
17         Do you have that, sir?
18    A.   Yes.
19    Q.   The first paragraph under that
20    underlined heading, second sentence, it says,
21    "Therefore, I recalculated Expanets' business
22    enterprise value based on more realistic
23    assumptions of its projected operating performance
24    and cash flows."
25         Do you see that?

53

- ROBERT W. BERLINER -

1
2     A.   I do.
3     Q.   Did I misunderstand you earlier when you
4     said that you didn't perform any valuation in this
5     case?
6         MR. KAPLAN:  Object to the form.
7     A.   Yes.
8     Q.   Can you explain to me what you were
9     doing then, in this sentence that we just read?
10    A.   Yes.  I was taking the valuation that
11    was performed by American Appraisal and following
12    their methodology, correcting some of the
13    assumptions that they used and some of the data
14    that they based their valuation on based upon my
15    knowledge of the facts of the case.
16    Q.   Sir, do you understand that American --
17    American Appraisers Association, AAA is a
18    recognized expert in performing business
19    valuations?
20    A.   I do.
21        MR. KAPLAN:  Object to the form.
22    Q.   And you are not; is that correct?
23    A.   That's correct.
24    Q.   Do you know whether in performing the
25    valuation that you criticized AAA followed the

54

- ROBERT W. BERLINER -

1
2     Uniform Standards of Professional Appraisal
3     Practice?
4     A.   I do.
5     Q.   And did they?
6     A.   They did.
7     Q.   Did you in criticizing it?
8     A.   I did not.
9     Q.   Sir, how did you recalculate the
10    projected operating performance and cash flows in
11    coming to an alternative valuation of Expanets?
12        MR. KAPLAN:  Object to form.
13    A.   I recognized that despite the
14    credentials of American Appraisal, which you cited,
15    they expressly disclaimed any verification of the
16    data provided to them by Northwestern; therefore,
17    following the principle of garbage in-garbage out,
18    that doesn't mean that their business valuation is
19    appropriate, because to the extent that the
20    information they were given by Northwestern and
21    which they used to prepare their valuation were
22    erroneous, they would come up with an erroneous
23    valuation.
24        So I corrected as best as I could the
25    information that they obtained from Northwestern.

55

- ROBERT W. BERLINER -

1
2     But following that, used exactly their methodology
3     to come up with the valuation.
4         It's for that reason that I testified
5     that I don't believe I performed my own valuation.
6     What I did is modify their valuation by inputting
7     appropriate data.
8     Q.   Where did that appropriate data come
9     from?
10    A.   That appropriate data came from my
11    analysis of the financial data in the case,
12    primarily the monthly financial information reports
13    of Northwestern and e-mails and testimony and all
14    of the documents that I reviewed in this case.
15    Q.   And when were those monthly financial
16    information reports generated?
17    A.   They were generated on a monthly basis.
18    Q.   In what months?
19    A.   Every month of the year.
20    Q.   What months did you look at in order to
21    come to your revised projections?
22    A.   I believe we looked at all of the
23    months.
24    Q.   In what years?
25    A.   In the year 2002, and I think several in

56

- ROBERT W. BERLINER -

1  were provided by the management of both
2  Northwestern and Expanets, collectively referred to
3  as management. This information has been accepted
4  without further verification as proper
5  representations of the reporting units operations
6  and condition."
7       That is what I'm referring to.
8       Q.   When were those projections prepared; do
9  you know?
10      MR. KAPLAN: Object to the form.
11      A.   They would have been prepared -- I
12 believe they were Northwestern's projections as of
13 the beginning of the year.
14      Q.   Would it refresh your recollection if I
15 told you that they had been prepared in late
16 October 2001?
17      A.   That sounds reasonable, but as of the
18 beginning of the year.
19      Q.   Correct. Am I correct, this is just
20 simple logic, I guess, that the information upon
21 which you relied to revise the projections did not
22 exist at the time the projections were created?
23      MR. KAPLAN: Object to the form.
24      Q.   Is that correct?

65

- ROBERT W. BERLINER -

1       A.   No, that's incorrect.
2       Q.   What information -- which of the MFIRs,
3  which of the deposition transcripts, which of the
4  internal documents did you review, memoranda,
5  e-mails referred to in your report were generated
6  prior to the date the projections were created?
7       A.   As I believe I testified to earlier, I
8  looked at the MFIRs for 2001. I looked at e-mails
9  that were written in periods prior to
10 January 1st, '02. I looked at the deposition
11 testimony referring to the facts and circumstances
12 existing prior to January 1st, '02.
13      And all of the other documents that I
14 reviewed in this litigation gave me a feeling for
15 the financial performance and prospects of Expanets
16 using that information, supplemented by the fact
17 that information available subsequent to
18 January 1st, '02, confirmed what the information
19 available prior to January 1st, '02, indicated.
20      It became apparent to me that the
21 projections of Northwestern were overly optimistic
22 to say the least.
23      Q.   What's your best recollection from
24 reviewing all of these documents of the major

66

- ROBERT W. BERLINER -

1  reason why Expanets had financial difficulties and
2  operating performance difficulties in the first
3  part of 2002?
4       A.   I think that a very significant factor
5  was the nonfunctioning of what was called its
6  EXPERT system.
7       Q.   Do you have an understanding as to when
8  Expanets started to use or migrated to the EXPERT
9  system?
10      A.   I believe in November of 2001.
11      Q.   Okay. The projections we've established
12 were prepared in October of 2001?
13      MR. KAPLAN: Object to the form.
14      A.   Yes.
15      Q.   Which MFIRs for the year 2001 did you
16 review?
17      A.   I believe all of them.
18      Q.   All of 2001 MFIRs?
19      A.   Yes.
20      Q.   Did you review the 10-K of Northwestern
21 for fiscal year 2001?
22      A.   Yes.
23      Q.   Did you offer any opinion as to that
24 10-K?

67

- ROBERT W. BERLINER -

1       A.   No. I was not asked to address that. I
2  did not.
3       Q.   Can you explain for us, sir, what the
4  process is for determining an impairment, goodwill
5  impairment under SFAS 142?
6       A.   It's a two-step process. The first step
7  is a comparison of the business enterprise value
8  with the carrying value of the entity. To the
9  extent that the carrying value of the entity
10 exceeds the business enterprise value, step two is
11 invoked.
12      And under step two, one determines an
13 implied value of goodwill following the methodology
14 of SFAS -- I'm sorry -- APB 16, APB 16 on purchase
15 accounting. Then, one compares the implied value
16 of goodwill to the carrying value of goodwill to
17 determine whether or not goodwill is impaired.
18      Q.   Who performs the business enterprise
19 valuation that's used in step one?
20      A.   In this case, American Appraisal.
21      Q.   Would the auditing firm prepare that
22 valuation?
23      A.   The auditing firm would not because if
24 it did, it would be auditing its own work and would

68

- ROBERT W. BERLINER -

1  - ROBERT W. BERLINER -
2  lose its independence.
3      Q.   So you would bring in a professional
4  appraiser?
5      A.   That's correct.
6      Q.   Presumably the professional appraiser
7  would follow and be bound by the standards of the
8  profession, which are the Uniform Standards of
9  Professional Appraisal Practice?
10     A.   That's correct.  And the auditor --
11     Q.   In performing your alternative --
12         MR. KAPLAN:  Let him finish.  He was in
13  the middle of an answer.
14     A.   The auditor would be bound by generally
15  accepted auditing standards of which SFAS 73
16  relates to how the auditor would relate to the
17  outside specialist or appraiser.
18     Q.   So, in -- we've established that in
19  order to perform appropriately a 142 goodwill
20  impairment analysis, you must start with an
21  appropriate business enterprise valuation done by
22  professionals using the standards governing the
23  appraisal profession, correct?
24     A.   Yes.
25     Q.   Now, I think we've also established that
                        69

1  - ROBERT W. BERLINER -
2  when you did your alternative impairment analysis,
3  which is reflected in your report, you prepared a
4  business valuation, enterprise valuation which did
5  not follow those standards and with respect to
6  which you have no expertise; is that correct?
7         MR. KAPLAN:  Object to the form.
8      A.   No.  I wouldn't agree with the way
9  you've characterized what I did at all.
10     Q.   How would you disagree with my
11  characterization?
12     A.   Well, first, as I testified, I did not
13  do a business enterprise valuation.
14     Q.   Sir, your testimony was that in order to
15  perform an SFAS 142 impairment analysis, one must
16  start with an appropriate business enterprise
17  valuation, and that that must be done by
18  independent professionals who are governed by
19  standards of that profession.
20         You've also provided an opinion which
21  purports to be an SFAS 142 goodwill impairment
22  analysis.
23         And since we've agreed that you need to
24  have a business enterprise valuation done as part
25  of that analysis and since you've testified that
                        70

1  - ROBERT W. BERLINER -
2  you are not expert or qualified to do that, I just
3  want to understand how it is you could do an
4  alternative 142 impairment analysis.
5         MR. KAPLAN:  Object to the form.
6      A.   For the very reasons that statement on
7  auditing standard 73 sets forth guidance, and that
8  standard says that the auditor has to evaluate the
9  credentials of the outside specialist.  In this
10  case, they go without question.  As we discussed
11  before, American Appraisal is a highly recognized
12  appraiser, but also sets forth the need for auditor
13  to understand the assumptions that are used by the
14  appraiser.
15         And I used -- I'm repeating probably for
16  the third time, I used the American Appraisal
17  determination of business enterprise value but
18  recognizing the caveat in American Appraisal's
19  report that they did nothing to verify the
20  information provided to them.
21         I did and I looked at the information
22  provided to them and adjusted that information to
23  conform to reality, as I saw it.  I made no other
24  changes to the methodology that American Appraisal
25  used.
                        71

1  - ROBERT W. BERLINER -
2      So therefore, even though I'm not an
3  expert appraiser and wouldn't present myself as
4  being able to do the appraisal that American
5  Appraisal did, having their appraisal before me, I
6  could criticize their appraisal and modify it to
7  come up with an appropriate business enterprise
8  value based upon appropriate input information that
9  was realistic and not the optimistic unrealistic
10  information that was provided by the management of
11  Northwestern and Expanets.
12     Q.   Now, when you were explaining how the
13  143 process works --
14     A.   142 do you mean?
15     Q.   Sorry.  142, I apologize. -- 142
16  process works.  The valuation which is prepared by
17  the independent expert is presented to the
18  accounting firm which is conducting the audit; is
19  that correct?
20         MR. KAPLAN:  Object to form.
21     A.   By "independent expert" you mean an
22  American Appraisal?
23     Q.   Exactly.
24     A.   Yes.  It's presented to the company, not
25  to the accounting firm.  The company then gets it
                        72

- ROBERT W. BERLINER -

1  - ROBERT W. BERLINER -
2  from the accounting firm.
3      Q.   Then what is --
4      A.   From -- the accounting firm then gets it
5  from the company.
6      Q.   What's the role of the accounting firm
7  in this process?
8      A.   The role of the accounting firm is to
9  follow SFAS 73 in satisfying itself as to the
10 assumptions used and the credibility of the
11 appraiser.
12     Q.   And is the role of the accounting firm
13 that has a problem with the valuation or the
14 assumptions to perform an alternative valuation?
15     MR. KAPLAN:  Object to the form.
16     A.   That's one possibility, to engage their
17 own appraiser to perform a valuation to compare to
18 the company's, Northwestern's appraiser.
19     Q.   When you say employ or engage their own,
20 you're talking about another independent American
21 Appraisal type organization?
22     A.   Exactly.
23     Q.   Because the CPAs in the auditing firm
24 are not either qualified nor -- and they would risk
25 their independence if they themselves were to

73

1  - ROBERT W. BERLINER -
2  conduct an alternative valuation; is that right?
3      A.   Yes.
4      Q.   You're a CPA?
5      A.   Yes.
6      Q.   You conducted an alternative valuation?
7      A.   No.  I didn't conduct an alternative
8  valuation.
9      Q.   You did not?
10     A.   No.  I modified the American Appraisal
11 valuation.
12     Q.   That's something, however, that is
13 beyond the scope of any role that the accountants
14 as auditors would be performing in the normal 142
15 process, correct?
16     MR. KAPLAN:  Object to the form.
17     A.   I don't believe so.  I don't believe
18 that's correct.
19     Q.   So are you saying that the auditors
20 could perform their own valuation or unilaterally
21 modify the valuation with which they were presented
22 by the independent appraiser?
23     MR. KAPLAN:  Object to the form.
24     A.   The latter.  Just as an auditor in
25 examining the financial statements of its client

74

1  - ROBERT W. BERLINER -
2  makes certain adjustments, proposes certain
3  adjustments to those financial statements, that
4  doesn't mean the auditor is preparing the financial
5  statements.
6          Likewise, the auditor could propose an
7  adjustment to the appraiser's determination of the
8  business enterprise value if the auditor believed
9  that the -- some of the inputs that the client had
10 provided were inaccurate.
11         They're not overriding the expertise and
12 methodology of the appraiser.  They're modifying
13 it, because the appraiser disclaimed responsibility
14 for the data inputted.
15         So, I think that's a very logical
16 explanation of why I was able to modify the
17 American Appraisal determination of business
18 enterprise value and why I don't believe that in
19 that process I did my own business enterprise
20 valuation.
21     Q.   Do you know of any case where 142
22 analysis is being done where the auditor modified
23 the appraisal -- the independent appraisal with
24 which it was provided by the expert?
25     MR. KAPLAN:  Object to the form.

75

1  - ROBERT W. BERLINER -
2      A.   I'm not aware of those.  I mean, we have
3  to review practice.
4      Q.   You have never in a professional
5  capacity been employed by an auditing firm to
6  review an appraisal in connection with a 143 --
7  sorry, 142 goodwill impairment analysis; is that
8  right?
9      A.   In connection with an audit?
10     Q.   Correct.
11     A.   No, I have not.
12     Q.   I think you testified that you don't
13 believe you did an independent valuation because
14 you simply followed precisely the methodology of
15 American Appraisers; is that correct?
16     A.   Yes.  Yes.
17     Q.   With respect to Expanets, American
18 Appraisers also considered a market approach in
19 preparing the valuation; isn't that right?
20     A.   That's correct.
21     Q.   And you did not; is that right?
22     A.   I did not what?
23     Q.   You did not consider the market approach
24 in performing your alternative valuation?
25     A.   I considered the market approach.

76

- ROBERT W. BERLINER -

1
2  Q.  And where is it?  Is it reflected in
3  your report that you considered the market
4  approach?
5      A.  I considered -- I didn't do a market
6  approach.  I didn't attempt to change American
7  Appraisal's market approach because that was
8  something that would have been far more difficult
9  for me to do and would have been very costly and
10  time-consuming.  And it was not something that I
11  could do within the time frame that I was given to
12  develop this report.
13      Secondly, the American Appraisal
14  determination of business enterprise value based on
15  the market approach pretty much coalesced with its
16  determination of business enterprise value under
17  the income approach.  And American Appraisal gave
18  equal weight to the two approaches in their
19  opinion.
20      And, as I understand the valuation of
21  determination of business enterprise value, if done
22  correctly, the income approach and the market
23  approach tend to come up with the similar
24  valuations.  It's when the weighting changes, so
25  you need not necessarily, as an appraiser, say

77

- ROBERT W. BERLINER -

1
2  we're going to give equal weight to each.
3      There may be circumstances where one
4  approach may be giving greater weight than the
5  other.  That wasn't the case here.
6      So therefore, I considered the fact that
7  American Appraisal market approach pretty much
8  coalesced with their income approach, and I didn't
9  see any reason where I had to deal with the market
10  approach.
11      Q.  So if I understand your testimony, the
12  market approach when used by American Appraisers,
13  coalesced, cooperated the value it had obtained
14  doing the discounted cash flow analysis.
15      A.  It was very close.
16      Q.  Very close.  And yet you didn't attempt
17  to do any kind of market, independent market
18  analysis to see whether there's any way that you
19  could cooperate your own independent valuation
20  based on after acquired information relying solely
21  on the discounted cash flow approach; is that
22  right?
23      MR. KAPLAN:  Object to the form.
24      A.  Yes.
25      MR. PIZZURRO:  Let's mark this as the

78

- ROBERT W. BERLINER -

1
2  next exhibit.
3      (Whereupon, Berliner Exhibit 5 was
4  marked at this time.)
5      Q.  I'm going to hand you another document,
6  which is several pages, covered by the American
7  Appraisal Standard Board USPAP 2002, effective
8  January 1st, 2002, through December 31st, 2002.  I
9  would direct your attention to the third page of
10  the exhibit, which is the last page of the exhibit,
11  Standards Rule 9-4.
12      Do you see that, sir?
13      A.  Yes.
14      MR. KAPLAN:  That looks to be cut off.
15  Do you have a complete version of 9.4?
16      MR. PIZZURRO:  We have a complete -- we
17  have it here.
18      MS. DELANEY:  What's cut off?
19      MR. KAPLAN:  9.4 looks like it ends in
20  the middle of the page.
21      MR. PIZZURRO:  We can -- if you want, we
22  can have a copy made.  If you'll be more
23  comfortable, we'll have another copy made that you
24  can refer to.
25      MR. KAPLAN:  Yes.  I'd like the witness

79

- ROBERT W. BERLINER -

1
2  to be able to see the whole thing before you
3  question him on it.
4      MR. PIZZURRO:  Do you want to take a
5  break while that's being done?
6      MR. KAPLAN:  Either way.
7      MR. PIZZURRO:  Let's break for two
8  minutes, until she comes back with that.
9      (Whereupon, there was a brief recess in
10  the proceedings.)
11      Q.  Okay, Mr. Berliner, okay?  Mr. Berliner
12  ready to go?
13      A.  Yes, sir.
14      MR. KAPLAN:  Do you need time to review
15  it?
16      THE WITNESS:  No.  I've reviewed it.
17      Q.  Referring to Exhibit 5, what is now the
18  third page -- second to the last page now, Standard
19  Rule 9.4.
20      Do you see that, sir?
21      A.  I do.
22      Q.  9.4A states that, "An appraiser must
23  develop value opinions and conclusions by use of
24  one or more approaches that apply to the specific
25  appraisal assignment."

80

- ROBERT W. BERLINER -

1  - ROBERT W. BERLINER -
2      MR. PIZZURRO: Let's take five minutes.
3  Let's break for lunch.
4          (Whereupon, a lunch break was taken from
5  12:14 p.m. to 1:07 p.m.)
6  BY MR. PIZZURRO:
7      Q.   Mr. Berliner, can I ask you to please
8  turn to Page 2-1 of your report, which is Exhibit
9  1. The heading -- under the heading "Relevant
10 GAAP," you refer to SFAS 121.
11         Why do you have a reference to 121 under
12 "Relevant GAAP"?
13     A.   It was the predecessor document to 142,
14 and there was a valuation -- an impairment
15 valuation done as of December 31st, '01, using
16 SFAS 121, so that's why I included it.
17     Q.   Did you apply any of the criteria in
18 SFAS 121 in any analysis that you did?
19     A.   No.
20     Q.   Did you review the 121 analysis that was
21 done for Expanets and Blue Dot as of 12/31/01?
22     A.   I believe my people did.
23     Q.   And do you recall whether any fault was
24 found in that analysis -- strike that.
25         That analysis did not call for the
                        121

1  - ROBERT W. BERLINER -
2  impairment of any goodwill, did it?
3      A.   That's my understanding.
4      Q.   Did you find fault with that analysis?
5      A.   I don't recall.
6      Q.   Do you recall what the business
7  valuation for Expanets and Blue Dot was as of
8  December 31, '01?
9      A.   No, I don't.
10     Q.   Do you recall whether it was extremely
11 close to the valuation that AAA determined for both
12 of those entities as of January 1st, 2002?
13         MR. KAPLAN: Objection to form.
14     A.   No, I don't.
15     Q.   Would it surprise you to know that the
16 business valuation under the 121 analysis on
17 December 31st, '01, was very close to the valuation
18 done as of January 1st, '02, the following day?
19     A.   No.
20     Q.   One would expect that, correct?
21     A.   Yes.
22     Q.   One would not expect that the value of
23 the asset would plummet by 50 percent or more at
24 the tick of a clock, would one?
25         MR. KAPLAN: Objection.
                        122

1  - ROBERT W. BERLINER -
2      A.   No. One wouldn't expect that.
3      Q.   Can you look at Attachment A2 to your
4  report? It's right -- sometimes the attachments,
5  it's multiples, but it's right after the series of
6  pages that ends on 2-22. It's under "Attachments"
7  to "Basis for Opinion 2."
8          Do you have that, sir?
9      A.   I do.
10     Q.   Now, in doing your impairment analysis
11 for both Expanets and Blue Dot, you also computed
12 the carrying value of those entities; is that
13 correct?
14     A.   Yes, sir.
15     Q.   Does this attachment reflect the
16 carrying value that you calculated for those
17 entities?
18     A.   It does.
19     Q.   Now, in doing the impairment analysis
20 that you performed, you recalculated the business
21 enterprise value of Expanets and Blue Dot as of
22 January 1st, '02; is that correct?
23     A.   Yes.
24     Q.   You then compared it to the carrying
25 value of those entities that you computed as of
                        123

1  - ROBERT W. BERLINER -
2  June 30th, '02; is that correct?
3      A.   Yes.
4      Q.   Why would you do that?
5      A.   Give me a minute. I think the answer to
6  the question is -- despite the wording in the -- on
7  Page 2-12 and 2-13 of my report, the business
8  enterprise value of 163 million is really the value
9  as of June 30th of 2002, based upon the
10 January 1st, '02, American Appraisal valuation
11 adjusted for the input data.
12     Q.   Why, sir, would you change the valuation
13 date? What was the basis for doing that?
14     A.   The -- to see whether as of June 30th
15 there was an impairment.
16     Q.   What criteria or standard would permit
17 one to do that?
18         MR. KAPLAN: Objection to the form.
19     A.   To do what?
20     Q.   To ignore the as-of valuation date that
21 was actually done and create a new as-of date in
22 order to do an impairment analysis.
23         Northwestern had selected
24 January 1st, '02, as the date because that is what
25 the effective date of 142 was; is that correct?
                        124

- ROBERT W. BERLINER -

1   - ROBERT W. BERLINER -
2       A.   The adoption date.
3       Q.   The adoption date.  I thought you had
4   testified earlier this morning that you didn't have
5   any problem with Northwestern's use of that date,
6   correct?
7       A.   That's correct.
8       Q.   But you unilaterally did an analysis
9   which has nothing to do with that date but has to
10  do with a date six months later.
11          Is that what you did?
12          MR. KAPLAN:  Objection to the form.
13      A.   Yes.  In order to compare it to the
14  carrying value as of June 30th, '02.
15      Q.   What would permit you as an auditor or
16  anyone to unilaterally change the effective date
17  that was adopted by Northwestern in order to
18  determine a goodwill impairment analysis was
19  required?
20          MR. KAPLAN:  Objection to the form.
21      A.   Because I employed their methodology.  I
22  didn't change their methodology.
23      Q.   Is there anything that you can point to
24  in any accounting standards or accounting
25  principles that would permit that unilateral change
                    125

1   - ROBERT W. BERLINER -
2   of the date?
3       A.   There are many occasions where there's a
4   need to update an analysis, and this is just an
5   updated analysis.
6       Q.   Sir, can you tell us as an accountant --
7   as an expert in accounting what criteria you relied
8   upon to ignore the valuation date that American
9   Appraisal has used and Northwestern used to come up
10  with an as of June 30th, 2002, appraisal date for
11  purposes of doing a goodwill impairment analysis?
12          MR. KAPLAN:  Objection to the form.
13      A.   I don't think there's anything in the
14  accounting literature that address that specific
15  question.
16      Q.   You just did it?
17      A.   Yeah.  There is no reason that I
18  couldn't do it.  I -- just as you update any
19  analysis.
20      Q.   So do I understand, sir, that if the
21  goodwill impairment analysis was actually being
22  performed as of -- with a validation date as of
23  January 1st, '02, your analysis and report does not
24  address that situation but rather addresses a
25  situation in which the date is June 30th, '02, six
                    126

1   - ROBERT W. BERLINER -
2   months later; is that what you're telling us?
3       A.   Yes.
4          MR. KAPLAN:  Objection.
5       Q.   Let's look at Attachment A2 again, if we
6   could, please.  Before we get there, just let me
7   ask you this.
8          Your opinion is that the proper business
9   valuation or business enterprise valuation for
10  Expanets as of June 30th, '02, is $163 million; is
11  that correct?
12      A.   Yes.
13      Q.   Do you have any opinion, therefore, sir,
14  as to what the appropriate business valuation,
15  business enterprise valuation for Expanets was as
16  of January 1, '02?
17      A.   No.
18      Q.   Do you have any opinion as to what the
19  proper business enterprise value for Blue Dots was
20  as of January 1, '02?
21      A.   No.
22      Q.   Attachment A2.  If you look at the
23  entries which are below the line, it says,
24  "carrying value as of January 1, '02," and then
25  below that there are another series of entries.
                    127

1   - ROBERT W. BERLINER -
2          Do you see that, sir?
3       A.   Yes.
4       Q.   In computing the carrying value for
5   Expanets and Blue Dot as of June 30, '02, you used
6   a book value of debt as of September 30, '02.
7          Do you see that?
8       A.   I do.
9       Q.   Why would you use information which is
10  as of September 30 to compute the carrying value as
11  of June 30?
12      A.   Because I didn't have the information as
13  of June 30.
14      Q.   Where did you get the information as of
15  September 30?
16      A.   The documents, indicating NOR 375926 for
17  Expanets and NOR 376038 for Blue Dot.
18      Q.   There was no documentation that you had
19  that would have provided you with that information
20  as of June 30, '02?
21      A.   I didn't have any such documentation
22  that I could find.
23      Q.   That's the case for the equity value, as
24  well, where you used a September 30 date to compute
25  equity value for both Expanets and Blue Dot?
                    128

- ROBERT W. BERLINER -

1
2    A.   That's correct.
3    Q.   Sir, is it appropriate practice to use
4    information which is three months past the as-of
5    date to compute the carrying value?
6    A.   It's a surrogate; certainly appropriate
7    if you don't have the information as of one date to
8    use subsequent information and bring it back.
9    Q.   When would the book value of debt as of
10   9/30/02 for Expanets have become available?
11       MR. KAPLAN:  Objection.
12   A.   Available to whom?
13   Q.   To anyone.  To the public.
14   A.   To the public?  That's different than to
15   the company.  To the public, it would have become
16   available when the third quarter Q was issued,
17   sometime in November.
18   Q.   Okay.  Would the book value of debt as
19   of June 30th, '02, have been available with the
20   second quarter Q for that year?
21   A.   Can I hear that back, please?
22       (The question requested was read back by
23   the reporter.)
24   A.   I don't believe these figures are ^ --
25   appear in the Qs.  These are Expanets' figures.

129

- ROBERT W. BERLINER -

1
2    And so, I don't believe these figures could be
3    obtained from the financial statements of the Qs.
4    Q.   Well, if the book value of the debt for
5    Expanets and Blue Dot differed from the book value
6    for the debt of those entities --strike that.
7        If the book value of the debt of both
8    Expanets and Blue Dot as of June 30, '02, differed
9    from the book value of the debt of those entities
10   as of 9/30/02, that would change the computation of
11   the carrying value, correct.
12   A.   Yes, sir.
13   Q.   And that would change the goodwill
14   impairment analysis; isn't that correct?
15   A.   Yes.
16   Q.   Similar -- is the same true with respect
17   to equity value as of 9/30/02 as compared to equity
18   value as of June 30, '02?
19   A.   It is; the same is true.
20   Q.   It would have a compounding effect
21   because you have two different values that would
22   have been computed in determining the carrying
23   value, which come from a different quarter?
24   A.   You mean both the debt and the equity?
25   Q.   Correct.

130

- ROBERT W. BERLINER -

1
2    A.   Well, that's not compounding but there
3    would be two reasons -- two possible changes.
4    Q.   I just want to be very clear about this.
5        Is there anything that you can tell us
6    or point to which would have required Northwestern
7    to have done a goodwill impairment analysis as of
8    June 30, '02?
9    A.   Yes.
10   Q.   What's that?
11   A.   The standard would require goodwill
12   analyses to be done if there were triggering events
13   since the last analysis; so that here we have a
14   situation where there was significant adverse
15   developments that, in my mind, would have been
16   triggering events that would require the analysis
17   as of June 30th of '02.
18   Q.   Where would one find those triggering
19   events or definition of what those triggering
20   events would be?
21   A.   You mean where in the literature?
22   Q.   Yes, in the accounting standards, in the
23   literature.
24   A.   In the facts of the case.
25   Q.   In the accounting standards or in the

131

- ROBERT W. BERLINER -

1
2    literature.
3    A.   I believe that's discussed in 142.
4    Q.   Did you examine 142 to determine if
5    there was such a triggering event?
6    A.   Well, you wouldn't be able to determine
7    that from reading 142.  You'd have to go into the
8    facts and circumstances that existed with respect
9    to Expanets in the year 2002.
10   Q.   My question is; is there a specific
11   triggering event or criteria which is listed in 142
12   that you used in order to justify doing a goodwill
13   impairment analysis as of June 30, '02, as opposed
14   to what Northwestern had selected, which is
15   January 1, '02?
16       MR. KAPLAN:  Objection to the form.
17   A.   Yes.  I believe the 142 describes the
18   kinds of things that would be considered.
19   Q.   Is there any place in your report which
20   reflects your reliance on those criteria or
21   standards determining that there was a triggering
22   event?
23   A.   I don't think I discussed that in the
24   report.
25   Q.   Why not?

132

- ROBERT W. BERLINER -

1
2    A.   I don't recall.
3    Q.   Did you consider it?
4    A.   Did I consider what?
5    Q.   Whether there was a triggering event
6  under 142 which permitted or required that you do a
7  different goodwill impairment analysis than
8  that which was performed by the company.
9        MR. KAPLAN:  Objection to form.
10   A.   Could I hear that back, please?
11       (The question requested was read back by
12 the reporter.)
13   A.   I did.
14   Q.   What did you consider?
15   A.   The very adverse performance during the
16 first six months of 2002, the continuing problems
17 with the EXPERT system and the other problems
18 associated with the operations of Expanets.
19   Q.   Can you tell us, sir -- can you point us
20 to anything in 142 which would justify your
21 reliance on what you've described as triggering
22 events?
23   A.   If we had 142, I could take a look
24 through it.  It's a fairly long pronouncement, and
25 as best as I can recall without doing that, there

133

- ROBERT W. BERLINER -

1
2  is a description of the kinds of things that would
3  fall within triggering events.
4    Q.   Wouldn't it be appropriate in offering
5  an expert opinion that an alternative goodwill
6  impairment analysis was required to have provided
7  your analysis of the triggering event justifying
8  the opinion?
9        MR. KAPLAN:  Objection.
10   A.   The report is describing my
11 determination that there was an impairment as of
12 June 30, '02.  I didn't say anything in the report
13 about Northwestern having done the updated analysis
14 as of that date, but that's implied by my doing it.
15   Q.   But is there anything in your report
16 which points to anything in the accounting
17 literature which even starts to suggest that
18 Northwestern had an obligation to do what you
19 decided to do unilaterally?
20       MR. KAPLAN:  Objection to the form.
21   A.   There's nothing in the report that
22 describes that.
23   Q.   Why did you exclude it from your report?
24       MR. KAPLAN:  Objection to the form.
25   A.   Because I focused on the determination

134

- ROBERT W. BERLINER -

1
2  of whether or not there was an impairment as of
3  that date and it seemed pretty obvious that having
4  concluded that there was not only an impairment but
5  that the full amount of the goodwill should have
6  been written off as of that date, that it was
7  obvious to me that that suggested that Northwestern
8  should have done the analysis as of that date.
9    Q.   Is that reflected in your report?
10   A.   No.  I said it was obvious.  I didn't
11 bother stating it.
12   Q.   I see.  Now, if one was going to do an
13 entirely new goodwill impairment analysis as of
14 June 30, '02, one would need presumably to have a
15 new independent business enterprise valuation by an
16 independent expert, correct?
17   A.   That would be desirable but not
18 necessary.
19   Q.   Let me understand because I'm a little
20 confused, Mr. Berliner.  This morning when you were
21 testifying, you testified that you were doing your
22 valuation -- or you were actually adjusting the
23 valuation of American Appraisals as of January 1,
24 '02.  You were not performing -- I specifically
25 asked you about this and pointed to you the

135

- ROBERT W. BERLINER -

1
2  language in your report.
3        And you said, "No.  My valuation date is
4  as of January 1, '02."
5        You took issue with what was in the
6  valuation American Appraisals did because the
7  projections with which they had been provided were
8  at odds with the actual results of the company's
9  operations in the first six months of '02.
10       Do you remember that testimony?
11   A.   I took odds for reasons in addition to
12 the six months '02.
13   Q.   Fine.  I take your point.  But with that
14 addition, is what I just said an accurate
15 recapitulation of what you testified to this
16 morning?
17   A.   Yes.
18   Q.   Now you're testifying that that's not
19 what you did.  In fact, what you did was you
20 determined that there was some triggering event in
21 the interim between January 1, '02, and June 30,
22 '02, which required a completely new goodwill
23 impairment analysis to be done as of June 30, '02.
24       And what you did not do is simply go
25 back and revise a valuation which was as of January

136

- ROBERT W. BERLINER -

1, '02.

Is that what you're testifying to this afternoon?

MR. KAPLAN: Objection.

A. Well, I think there's a lot of confusion here. It's really both.

In other words, I used the January 1, '02, valuation by American Appraisal as the starting point to update it to June 30, '02, so that I didn't do an independent valuation as of June 30, '02.

And I don't think it would have been necessary to have an independent valuation done each quarter by Northwestern to be able to determine whether or not there was an impairment of goodwill that should be recognized in the financial statements.

So if you look at my analysis and how I calculated the business enterprise value as of June 30, '02, you could see that I used updated information at that time.

Q. To perform an entirely new goodwill impairment analysis, correct?

MR. KAPLAN: Objection to the form.

137

- ROBERT W. BERLINER -

A. It's to take the impairment analysis that American Appraisal performed and update it. I don't know that I would call it an entirely new analysis.

Q. I may come back to that, but for the moment I just want to direct your attention to the last part of your report. It's on Page 5-1 of your report.

Mr. Berliner, Page 5-1, the assumption which you built into your opinions that Clark Fork remained directly liable under the QUIPS following the going flat transaction.

A. Yes.

Q. What if Clark Fork had not remained liable on the QUIPS following the going flat transaction, would your opinion have changed?

A. No. My opinion is based on a hypothetical assumption that's stated here, that such opinion would never change. It's based on that hypothetical assumption.

Q. I see. So, your assumption -- your opinion is had Northwestern -- this has to be -- I think it's not explicit but it must be implicit.

Had Northwestern transferred all of the

138

- ROBERT W. BERLINER -

assets except the Milltown Dam to itself, but left liabilities, simply the QUIPS liabilities to be paid by Clark Fork, that would have rendered Clark Fork insolvent or would have put it in a position where its total liabilities exceeded its total assets.

A. Exactly.

MR. KAPLAN: Objection to the form.

Q. So it has to be both, both Northwestern had to take the assets and Northwestern had to leave that liability, correct?

A. Correct.

Q. If both of those assumptions aren't built in, of course, we're talking about a different set of facts and hypotheticals and you have no opinion; is that correct?

A. That's correct.

Q. It's a little like if my mother had wheels, she'd be a car.

MR. KAPLAN: Objection.

A. I don't know your mother.

MR. PIZZURRO: Let's take five minutes, please.

(Whereupon, there was a brief recess in

139

- ROBERT W. BERLINER -

the proceedings.)

MR. PIZZURRO: I have no further questions.

EXAMINATION BY MR. KALECZYC:

Q. Mr. Berliner, my name is Stan Kaleczyc. I represent Mike Hanson and Ernie Kindt in the Magten Asset Management versus Hanson and Kindt case.

If I understood your testimony earlier this morning, you personally came on board and were engaged to work on your expert report on about August 11th of 2007.

MR. KAPLAN: Objection.

A. That was about when we found out the due date.

Q. When did you -- well, when did you begin to personally work on the expert report that you've offered in this case?

A. I began probably at the tail end of July.

Q. For the 50 or so days between the end of July and September 19th, the date of the report, could you estimate for me about how much time you

140

- ROBERT W. BERLINER -

1  through the pages that on Page 1-3 I cited from
2  SFAS Number 5. I know that standard pretty well,
3  and so I did not go back to read that standard.
4        However, in drafting the report, my
5  colleague excerpted from that standard. I read the
6  excerpts on Page 1-3, and they conformed to my
7  recollection of what that standard said. I didn't
8  go back and check word for word that he had
9  excerpted each word accurately.
10     Q.  I believe it was your testimony this
11 morning -- and correct me if I didn't hear it or
12 I'm remembering it not properly, that the
13 appendices were prepared by your colleagues and
14 reviewed -- you reviewed their work?
15     A.  That's correct.
16     Q.  So, you're not the original author of
17 any of the material contained in the appendices to
18 the report; is that correct?
19     A.  That's correct.
20     Q.  In reviewing the Complaint in Magten
21 versus Hanson and Kindt, sitting here today, what
22 is your understanding of what the allegations are
23 against Mr. Hanson and Mr. Kindt?
24     A.  I don't recall what's in that Complaint.

145

- ROBERT W. BERLINER -

1  It was among the early documents that I looked at,
2  and I did not address any allegations against any
3  specific individuals. That was not within the
4  scope of my engagement.
5     Q.  Did you discuss the Hanson and Kindt
6  Complaint with anyone before the time that you
7  prepared your expert report?
8     A.  I did not.
9     Q.  Have you discussed the Hanson and Kindt
10 Complaint with anyone since the time that --
11 September 19th when the report was finalized?
12     A.  I did not.
13     Q.  Did anyone specifically tell you not to
14 address the allegations contained in the Hanson and
15 Kindt Complaint?
16     A.  No, sir.
17     Q.  Why is it then, Mr. Berliner, that your
18 expert report references both the case against
19 Northwestern and the case against Hanson and Kindt?
20 When I say "references," I mean in the title
21 caption on Page 1.
22     A.  I don't recall the reason.
23     Q.  In your report, do you render any
24 opinion concerning Mike Hanson's knowledge

146

- ROBERT W. BERLINER -

1  concerning whether there was inadequate
2  consideration given in the going flat transaction?
3        MR. KAPLAN:  Objection to the form.
4     A.  No, I don't.
5     Q.  Did you examine that issue as part of
6  the preparation of your expert report?
7     A.  I did not.
8     Q.  Did you, in the course of preparing your
9  opinion, form an opinion as to whether Mike Hanson
10 violated any generally accepted accounting
11 principles?
12     A.  I did not.
13     Q.  Did you consider whether Mr. Hanson may
14 have violated any generally accepted accounting
15 principles?
16     A.  No. As I indicated, I didn't address
17 myself to any one individual.
18     Q.  Likewise, then, I assume that you have
19 no opinion as to whether Mr. Hanson failed to
20 timely recognize any goodwill impairments?
21     A.  That's correct.
22     Q.  And it would be your same view, then,
23 with respect to whether Mr. Hanson breached any
24 fiduciary duties owed to anyone?

147

- ROBERT W. BERLINER -

1     A.  That's correct.
2     Q.  During the time period on or about
3  November 15th, 2002, do you know what Mr. Hanson's
4  position was with Northwestern?
5     A.  I understood him to be the -- the head
6  of the utility business.
7     Q.  Could you -- when you say "utility
8  business," what do you mean by that?
9     A.  Northwest Energy, the business in South
10 Dakota and then eventually Montana as well.
11     Q.  Do you know if Northwestern had any
12 utility business activities in any other states
13 besides South Dakota and Montana?
14     A.  I think there was one other state. I
15 can't recall whether it's North Dakota. There's
16 one other state, maybe more than one other state.
17     Q.  With respect to Mr. Kindt, do you know
18 what position Mr. Kindt held with Northwestern on
19 or about November 15th, 2002?
20     A.  I think he was the vice president of
21 accounting.
22     Q.  Was he the vice president of accounting
23 for Northwestern Corporation?
24     A.  I think he was with Montana Power. I'm

148

- ROBERT W. BERLINER -

1  not certain of that.
2      Q.   Would it make any difference to you
3  whether he was with Montana -- as you referred to
4  it Montana Power, and I assume you mean Montana
5  Power LLC rather than with Northwestern
6  Corporation?
7      A.   No.
8      Q.   Why not?
9      A.   Because I expressed my opinions based
10  upon Northwestern and it's collective management,
11  not any specific individual.  I did not address any
12  of these positions I took in my report as they may
13  apply to any specific individual.
14      Q.   So, then I assume your answers will be
15  the same with respect to Mr. Kindt that I asked you
16  with respect to Mr. Hanson, and that is that you
17  did not form an opinion as to whether Mr. Kindt did
18  anything the violate any generally accepted
19  accounting principles in 2002?
20      A.   That's correct.
21      Q.   And likewise, you have no opinion as to
22  whether Mr. Kindt failed to timely recognize any
23  goodwill impairment for Blue Dot or Expanets?
24      A.   That's correct.
25
                    149

- ROBERT W. BERLINER -

1      Q.   And similarly, you have no opinion as to
2  whether Mr. Kindt was involved in a failure to
3  provide adequate consideration with respect to the
4  going flat transaction?
5      A.   That's correct.
6      Q.   And you have no opinion as to whether
7  Mr. Kindt violated any fiduciary duties?
8      A.   That's correct.
9      Q.   Do you know whether Mr. Kindt had any
10  responsibilities with respect to Blue Dot?  I'm
11  talking about the period in 2002.
12      A.   I don't know for certain, but my
13  recollection is he did not.
14      Q.   Again, with respect to Mr. Kindt, do you
15  know whether he had any responsibilities with
16  respect to Expanets?
17      A.   No, I don't.
18      Q.   Do you know whether Mr. Kindt had any
19  responsibilities with respect to the accounting of
20  Northwestern Corporation as distinct from the
21  accounting for the Montana utility business?
22          MR. KAPLAN:  Objection to form.
23      A.   No, I don't.
24      Q.   With respect to Mr. Hanson, do you know
25
                    150

- ROBERT W. BERLINER -

1  whether he had any responsibilities with respect to
2  the management of Blue Dot?
3      A.   I don't believe he did.
4      Q.   Do you know whether Mr. Hanson had any
5  responsibilities with respect to the management of
6  Expanets?
7      A.   I don't believe he did.
8      Q.   Do you know whether Mr. Hanson was
9  responsible for any of the accounting activities of
10  Northwestern Corporation?
11      A.   I don't believe he was responsible for
12  the accounting.
13      Q.   Do you know who was responsible during
14  the 2002 time period for the accounting activities
15  of Northwestern?
16      A.   I believe it was Mr. Orme.
17      Q.   Do you know who was responsible during
18  that time for financial disclosures which may have
19  been made by Northwestern Corporation?
20      A.   Again, I would say Mr. Orme.
21      Q.   You would agree with me that to your
22  knowledge Mr. Hanson had no responsibilities for
23  those accounting -- for those disclosure
24  requirements and functions?
25
                    151

- ROBERT W. BERLINER -

1          MR. KAPLAN:  Objection to form.
2      A.   I would think if I were in his shoes and
3  there were financial statements and disclosures
4  that reflected various things relating to the
5  operations for which I was responsible, I would be
6  monitoring that.
7      Q.   And those responsibilities, as you
8  testified earlier, refer to the utility business
9  operations of Northwestern, correct?
10      A.   That's correct.
11      Q.   Would your answers be the same with
12  respect to Mr. Kindt, concerning financial
13  disclosures of Northwestern?
14      A.   Yes.
15      Q.   So that you would agree with me that
16  Mr. Kindt's responsibilities, if any, associated
17  with the disclosures by Northwestern Corporation's
18  would be limited to the utility business with which
19  he was familiar?
20      A.   That would be my recollection, yes.
21      Q.   And that would even be the utility
22  business by which he was specifically employed?
23      A.   Yes.
24      Q.   Did you review the deposition of
25
                    152

- ROBERT W. BERLINER -

1    - ROBERT W. BERLINER -
2    Mr. Hanson in preparation of your expert report?
3      A.   I did.
4      Q.   Did you review the deposition of
5    Mr. Kindt in preparation of your expert report?
6      A.   I did.
7      Q.   How about the deposition of Mr. Talton
8    Embry?
9      A.   No, I did not.
10     Q.   Do you know who Mr. Embry is?
11     A.   I believe he's with Magten.
12     Q.   I think you had testified this morning,
13   Mr. Berliner, that you did not find anything in the
14   depositions that you reviewed to be particularly
15   useful for your expert report.
16         Am I remembering your testimony
17   correctly?
18         MR. KAPLAN: Objection.
19     A.   No.  That was not accurate.
20     Q.   You would help me, then.  I don't want
21   to be inaccurate in asking you questions.
22         You reviewed -- tell me first, in
23   addition to the Hanson, Kindt and Embry
24   depositions, what other depositions did you review
25   in the preparation of your expert report?

153

1    - ROBERT W. BERLINER -
2      A.   They're all listed in the last exhibit
3    to my report; that's Exhibit E.
4      Q.   So with respect to those depositions
5    that you did review, Mr. Berliner, you refresh my
6    memory, then, so that the record is accurate as to
7    what you testified to this morning with respect to
8    these depositions.
9          MR. KAPLAN: Just to clarify, I think he
10   meant Exhibit F, so the record is clear.
11         THE WITNESS:  You're right; it's
12   Exhibit F.
13         MR. KAPLAN:  I apologize for
14   interrupting the questioning.
15         MR. KALECZYC:  That's all right.
16     Q.   Again, my question was:  If you could
17   refresh my memory as to what you testified to this
18   morning about the utility of those -- review of
19   those depositions?
20     A.   Yeah.  The deposition transcripts
21   covered many subjects.  What seems to me to be the
22   principal subject covered, at least in terms of the
23   attention devoted during the time of the
24   depositions, had to do with the utility business,
25   the acquisition of Montana Power, the going flat

154

1    - ROBERT W. BERLINER -
2    transaction, and that kind of stuff.
3          And that's what I meant that I didn't
4    find relevant to the opinions that I would be
5    expressing in my report.  But there were other
6    coverage of the Blue Dot and the Expanets
7    situations and the other accounting improprieties
8    at Northwestern that were relevant to the report.
9      Q.   Sitting here today, Mr. Berliner, was
10   there anything in Mr. Kindt's deposition that you
11   found relevant to your expert report that you've
12   submitted in these cases?
13     A.   I really don't recollect any individual
14   deposition that I read back in early August.
15     Q.   Would you agree with me that there are
16   no references to Mr. Kindt's deposition contained
17   in your expert report or the -- including the
18   appendices, other than Exhibit F itself?
19     A.   Yes.  I believe that's correct.
20     Q.   Was that because you found nothing
21   terribly useful or relevant for purposes of the
22   opinions that you'd rendered?
23     A.   Yes.
24         MR. KAPLAN: Objection.
25     Q.   With respect to Mr. Hanson's deposition,

155

1    - ROBERT W. BERLINER -
2    is there anything from Mr. Hanson's deposition that
3    you found to be relevant to the opinions that you
4    rendered in your report?
5      A.   I don't think so.
6      Q.   If we could turn to Page 4 of your
7    report, which contains the opinions, Mr. Berliner.
8    In Opinion Number 2, which contains the four
9    Subparagraphs A through D, each one begins with the
10   term, "Northwestern management knowingly," and then
11   Sub A, "that Northwestern management knowingly
12   violated GAAP in preparing Northwestern's
13   consolidated financial statements for each of the
14   first three-quarters."
15         When you refer to "Northwestern's
16   management," to whom are you referring?
17     A.   I'm referring to primarily Mr. Orme, but
18   Mr. Lewis, Mr. Hylland, those top people.
19     Q.   You said "primarily" those three
20   individuals.  Anyone else?
21     A.   Primarily those three, maybe Kendell
22   Cleaver as well, but those people.
23     Q.   Mr. Lewis held what position in the
24   company?
25     A.   CEO.

156

- ROBERT W. BERLINER -

1
2      Q.   Mr. Hylland had what position?
3      A.   I believe it was COO.
4      Q.   Mr. Orme?
5      A.   CFO.
6      Q.   And Mr. Kendell Cleaver?
7      A.   Director of accounting, something like
8   that.
9      Q.   So when you're talking about
10   Northwestern's management with respect to
11   Opinion 2A, it would be those four individuals?
12      A.   Yes.
13      Q.   With respect to your Opinion 2B, which
14   reads, "Northwestern's management knowingly failed
15   to timely recognize goodwill impairment losses by
16   intentionally providing artificial cash flow
17   projections to American Appraisal."
18          Again, are you referring to the four
19   individuals Lewis, Hylland, Orme and Cleaver, or
20   are other people implicated in 2B?
21      A.   The other people that would be
22   implicated would be the management of Expanets and
23   the management of Blue Dot.
24      Q.   With respect to your Opinion 2C, which
25   reads, "Northwestern's management knowingly failed

157

- ROBERT W. BERLINER -

1
2   in its various filings with the SEC to comply with
3   the disclosure requirements under SEC regulations."
4          Which individuals are you referring to
5   as management with respect to 2C?
6      A.   Mr. Lewis, Mr. Hylland, Mr. Orme and
7   Mr. Cleaver.
8      Q.   With respect to your opinion on 2D,
9   which reads, "Northwestern's management knowingly
10   disseminated materially false and misleading
11   information to the public."
12          Again, the same question: Which
13   individuals are you referring to as the management?
14      A.   Again, the same answer; the same four
15   people.
16      Q.   With respect to your Opinion Number 3,
17   which reads, "Northwestern would have violated its
18   debt covenants for the quarters ended June 30th and
19   September 30th, 2002, but for the violations of
20   GAAP discussed in this report."
21          Do you have an opinion as to whether
22   Mr. Hanson was responsible for any of those
23   violations of GAAP discussed in your report?
24      A.   No, I don't.
25      Q.   How about Mr. Kindt, any opinion?

158

- ROBERT W. BERLINER -

1
2      A.   I have no opinion.
3      Q.   In your opinion, which individuals were
4   responsible for the GAAP violations?
5      A.   The four people I mentioned at
6   Northwestern.
7      Q.   And that's --
8      A.   Mr. Lewis, Mr. Hylland, Mr. Orme and
9   Mr. Cleaver, collectively.
10      Q.   Now, in your report in a number of
11   places, you discuss such things as -- for example,
12   the proper accounting for the contracts that
13   Expanets had.
14          Do you remember that testimony -- that?
15      A.   Yes.
16      Q.   What type of analysis would be required
17   to determine the appropriate accounting treatment
18   for those contracts as to whether they should be
19   done on a completed or ongoing basis?
20          MR. KAPLAN: Objection to the form.
21      A.   The nature of the contracts and what was
22   called for under the contracts and the ability of
23   the entity to reasonably estimate the percentage of
24   completion.
25      Q.   For someone to make that determination,

159

- ROBERT W. BERLINER -

1
2   what kinds of information would they need to have
3   about those contracts?
4          MR. KAPLAN: Objection to the form.
5      A.   Need to have information as to what the
6   deliverables were under the contract, how the
7   estimates of what the costs would be involved to
8   perform, what was required to be performed under
9   the contract, whether the accounting systems and
10   procedures of the company were such as to be able
11   to reasonably estimate those costs and monitor them
12   as time went on; information of that nature.
13      Q.   Would it be fair to say, given your
14   prior answer, that you'd have to have a fairly good
15   working knowledge of the business of Expanets in
16   order to make that determination?
17      A.   That would help a lot.
18      Q.   In order to do a discounted cash flow
19   analysis for appraisal purposes, is that the kind
20   of activity that can be done by anyone who is a
21   certified public accountant?
22          MR. KAPLAN: Objection to the form.
23      A.   No. There are many certified public
24   accountants who don't get involved in that kind of
25   work.

160

- ROBERT W. BERLINER -

1
2  A.  That was one reason.  The other reason
3  is that the optimistic data that was inputted into
4  the income approach likewise impacted the market
5  approach, and given that they received equal
6  weighting, that we could come up with a reasonable
7  approximation of an impairment loss without doing a
8  market study.
9  Q.  I take it you were able to come to that
10  decision based upon the expertise that you
11  developed in reviewing valuations and business
12  enterprise value reports?
13  A.  It would be that plus the combined
14  expertise and experience of the other people on my
15  team.
16  Q.  Did the other people on your team also
17  have expertise with respect to critiquing business
18  valuation reports?
19  A.  Yes.
20  Q.  But you -- I believe you also testified
21  this morning that you yourself have never done a
22  valuation?
23  A.  I don't do valuations.
24  Q.  And, in fact, you have -- you're not, in
25  any way, have any certifications or recognitions as

165

- ROBERT W. BERLINER -

1
2  a value appraiser?
3  A.  That's correct.
4  Q.  You also testified this morning that the
5  first time, I think, you became aware of USPAP was
6  when you read the expert reports tendered by the
7  defendants in the two cases?
8  A.  The first time I became aware that the
9  standards that applied to the appraisal community
10  were called USPAP.
11  Q.  Was that the first time, then, that you
12  had reviewed USPAP standards was in response to the
13  expert reports filed by the defendants in this
14  case?
15  A.  Can I hear that back?
16  (The question requested was read back by
17  the reporter.)
18  A.  I did not review the USPAP standards in
19  connection with my review of the expert reports
20  filed by the defendants in this case.
21  Q.  Prior to the preparation of the expert
22  report in this case, have you ever reviewed USPAP
23  standards?
24  A.  No.
25  Q.  Were you aware of the existence of those

166

- ROBERT W. BERLINER -

1
2  USPAP standards prior to the time that you became
3  involved in the expert reports in this case?
4  A.  I think I testified that I was aware
5  that there were standards, that I didn't recall
6  them being commonly referred to as USPAP.
7  Q.  Did you refer -- excuse me.
8  Did you review Mr. Scherf's expert
9  report filed in this case?
10  A.  I reviewed three reports, including his.
11  Q.  Do you have any opinions concerning
12  Mr. Scherf's expert report?
13  A.  I didn't agree with the views in any
14  three -- in any one of those three reports.  What
15  specifically was said by Mr. Scherf, I don't
16  specifically recall at the moment.
17  Q.  If you would tell me generally what you
18  don't agree with in those three expert reports.
19  A.  Well, a number of things.  First, I
20  don't believe that you have to be a valuation
21  expert to review the report of a valuation expert,
22  and that's consistent with a statement on Auditing
23  Standard 73.  And so I think that the allegations
24  of my not having credentials in the appraisal
25  industry are without merit for that reason.

167

- ROBERT W. BERLINER -

1
2  I don't agree with the criticism that I
3  used hindsight inappropriately in the work I did.
4  And there were several other criticisms that I
5  didn't agree with.
6  Q.  Any of those others come to mind sitting
7  here today?
8  A.  Not at the moment.
9  Q.  If you would turn, sir, to Page 3-6 of
10  your report.  And I draw your attention to the
11  second paragraph that begins, "As further
12  indication of management knowledge," you refer to a
13  February 18th, 2002, memorandum.
14  Do you see that, sir?
15  A.  I do.
16  Q.  Did you have occasion to review that
17  memorandum in connection with the preparation of
18  your expert report?
19  A.  I don't recall.
20  Q.  If I represented to you, Mr. Berliner,
21  that this particular memorandum to which you're
22  referring was actually produced on or about
23  February 18th, 2003, rather than 2002, does that
24  change any of the opinions that you express with
25  respect to that report?

168