## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | C.A. No. 04-1494 (JJF) |
| NORTHWESTERN CORPORATION, | ) ) | |
| Defendant. | ) ) | |
| MAGTEN ASSET MANAGEMENT CORP., | ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 05-499 (JJF) |
| MIKE J. HANSON and ERNIE J. KINDT, | ) ) | |
| Defendants. | ) ) | |

## NORTHWESTERN'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF PAUL A. MARCUS AND ROBERT W. BERLINER

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
Joseph D. Pizzurro
Nancy E. Delaney
Myles K. Bartley
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000

GREENBERG TRAURIG, LLP
Victoria W. Counihan (No. 3488)
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 661-7000
counihanv@gtlaw.com
melorod@gtlaw.com

Counsel for NorthWestern Corporation

Dated: January 10, 2008

## Table of Contents

Page #

SUMMARY OF ARGUMENT.........................................................................................1

ARGUMENT.........................................................................................................................3

I    An Expert Must Meet The Criteria of Qualification, Reliability and Fit .......................3

II    Marcus's Report and Testimony Should Be Excluded  Because It Fails To Meet The Standards For Admission Under Fed. R. Evid. 702 ...............................6

     A.    Marcus's Opinion ...........................................................................................6

     B.    Marcus's Lacks Any Qualifications That Would Allow  Him To Predict How A Montana Regulatory Commission Might Act ....................................9

     C.    Marcus's Methodology in Analyzing the MPSC's Actions Based Upon A Dissenting Opinion In A Single Ruling Is Utterly Speculative And Should Be Rejected .................................................................................................11

     D.    Marcus's Prediction As To How The MPSC Might Act Must Be Rejected Because It Is A Legal Conclusion .........................................................14

     E.    Marcus's Report Lacks Any Methodology To Support His Opinion That NorthWestern Would Have Breached the Loan Covenants On June 30, 2002.........15

     F.    Marcus's Opinion That If The QUIPS remained the Obligations of Clark, Fork After the Going Flat Transaction, Clark, Fork Would  Be Unable To Pay On The QUIPS Is Irrelevant To The Facts Of The Case ...........................16

III    Berliner's Report and Testimony Should Be Excluded  Because It Fails To Meet The Standards For Admission Under Fed. R. Evid. 702 ........................................17

     A.    The Procedure for Determining Goodwill Impairment under SFAS 142 ................17

     B.    Berliner's Opinion .......................................................................................20

     C.    Berliner's Testimony Should Be Excluded Because He Lacks Any Qualifications As A Business Valuation Expert Or As A SFAS 142 Goodwill Impairment Analyst ......................................................22

     D.    The Methodology Used by Berliner In His Business  Valuation And In His SFAS 142 Analysis is Unreliable  Because It Ignores Established Appraisal and Accounting Standards.................................................................................24

         1.    Berliner Ignored the Market Approach .........................................................25

         2.    Berliner Used Information That Was Only Available Subsequent To The Effective Date Of The Appraisal ..................................................26

         3.    Berliner's Report is Internally Inconsistent ...................................................27

     E.    Berliner's Opinion That If The QUIPS Remained Obligations Of Clark Fork After The Going Flat Transaction, Clark Fork's Liabilities Would Materially Exceed Its Assets Is Irrelevant To The Facts Of The Case .........29

CONCLUSION .................................................................................................................30

## Table of Authorities

**Cases**

*American Marine Rail N.J., LLC v. City of Bayonne,*
289 F. Supp. 2d 569 (D. N.J. 2003).................................................................14, 15

*Amorgianos v. Amtrak,*
303 F.3d 256 (2d Cir. 2002).........................................................................................6

*Berckeley Inv. Group Ltd. v. Colkitt,*
455 F.3d 195 (3d Cir. 2006).......................................................................................16

*Cantor v. Perelman,*
No. 97-586-KAJ, 2006 U.S. Dist. LEXIS 86329 (D. Del. Nov. 30, 2006) ...............5

*Casper v. SMG,*
389 F. Supp. 2d 618 (D. N.J. 2005)...........................................................................17

*CFM Commc'ns, LLC v. Mitts Telecasting Co.,*
424 F. Supp. 2d 1229 (E.D. Ca. 2005) ......................................................13, 16, 17

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)......................................................................................................5

*Elcock v. Kmart Corp.,*
233 F.3d 734 (3d Cir. 2000)........................................................................................4

*Fedor v. Freightliner,*
193 F. Supp. 2d 820 (E.D. Pa. 2002).........................................................................5

*iGames Entm't, Inc. v. Chex Servs., Inc.,*
No. 04-180-KAJ, 2005 U.S. Dist. LEXIS 39049 (D. Del. June 9, 2005)...................7

*In re Diet Drugs Prod. Liab. Litig.,*
No. 1203, 2000 U.S. Dist. LEXIS 9661 (E.D. Pa. June 28, 2000) .............................5

*In re NorthWestern Corp.,*
313 B.R. 595 (Bankr. D. Del. 2004)..........................................................................18, 19

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717 (3d Cir. 1994)......................................................................................4, 6

*In re: Med Diversified, Inc.,*
334 B.R. 89 (Bankr. E.D.N.Y. 2005) ......................................................................6, 26

*Ortiz v. Yale Materials Handling Corp.,*
No. 03-3657, 2005 U.S. Dist. LEXIS 18424 (D. N.J. Aug. 24, 2005) ...................5, 7

*Player v. Motiva Enters. LLC,*
No. 02-3216, 2006 U.S. Dist. LEXIS 2288 (D. N.J. Jan. 20, 2006)....................11, 12

*Rich v. Bailey,*
No. 95-6932, 1996 U.S. Dist. LEXIS 19437 (E.D. Pa. Dec. 23, 1996)....................16

*Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.,*
No. 8:01-cv-2302-T-30MSS, 254 F. Supp. 2d 1239 (M.D. Fl. 27, 2003)..........28, 29

*Total Containment, Inc v. Dayco Prods. Inc.,*
No. 1997-cv-6013, 2001 U.S. Dist. LEXIS 15838 (E.D. Pa. Sept. 6, 2001)..............6

*United States v. Downing,*
753 F.2d 1224 (3d Cir. 1985) ......................................................................................7

*Waldorf v. Shuta,*
142 F.3d 601 (3d Cir. 1998) ........................................................................................4

*Wartsila NSD North America v. Hill Int'l. Inc.*,
  299 F. Supp. 2d 400 (D. N.J. 2003) ..................................................................................14
*Wilkinson v. Rosenthal & Co.*,
  712 F. Supp. 474 (E.D. Pa. 1989) ....................................................................................12
*Willis v. Besam Automated Entrance Sys., Inc.*,
  No. 04-CV-0913, 2005 U.S. Dist. LEXIS 26466 (E.D. Pa. Nov. 3, 2005) ...............................4

**Statutes**
Rule 702 of the Federal Rules of Evidence ........................................................................1, 3, 4

**Other Authorities**
R.J. Huefner & J.A. Largay III,
  *The Effect of the New Goodwill Accounting Rules on Financial Statements,* LXXIV, The CPA
  Jounal (Oct. 2004), at http://www.nysscpa.org/cpajournal/toc/toc1004.htm. ...........................19

4215464v6
*DEL 86205598v1 1/10/2008*

Defendant NorthWestern Corporation ("NorthWestern"), respectfully submits this memorandum of law in support of its motion in limine, pursuant to Rule 702 of the Federal Rules of Evidence, for an order: (i) striking the expert reports submitted by Robert W. Berliner and Paul A. Marcus; (ii) precluding reliance thereon by Plaintiffs; and (iii) precluding any testimony by either Mr. Berliner or Mr. Marcus at trial currently scheduled for March 3, 2008.

## SUMMARY OF ARGUMENT

Plaintiffs would submit to the Court the opinions of two purported experts in support of their claim that the release of Clark Fork and Black Foot LLC ("Clark Fork") as obligor on the QUIPS in the context of the Going Flat Transaction was procured by fraud.[1] Aside from the fact that neither expert offers any opinion that there was fraud in the procurement of that release, or indeed any fraud in any way connected to the Going Flat Transaction, both experts suffer from incurable flaws in terms of both their qualifications to offer their opinions and the methodology employed in reaching their conclusions.

Plaintiff's main expert, Paul A. Marcus, purports to be an expert in corporate finance, mergers and acquisitions, valuation and financial analysis. Marcus' operative opinion is that if NorthWestern had been accurately reporting its financial condition in the first three quarters of 2002, it would have experienced a series of cascading economic difficulties, from a downgrading of its debt rating to an inability to complete an equity offering, and that these events in turn would have led the Montana Public Service Commission ("MPSC") to "impede" the Going Flat Transaction. While this opinion is cloaked in a financial analysis about the economic consequences NorthWestern would have suffered, Marcus never offers the opinion

---

[1] A complete exposition of the factual and procedural background of this action can be found in NorthWestern's Statement of Material Facts and its Memorandum of Law, both submitted in support of NorthWestern's motion for summary judgment. (Dkt. No. 01494, #242, 243).

that those hypothetical economic events would have affected NorthWestern's ability to accomplish the Going Flat Transaction. Rather, it is his "opinion" that these hypothetical events would then have led the MPSC to somehow act and "impede" NorthWestern's transaction.

But Marcus is no expert on the MPSC. He has never dealt with, testified before, or in any way been involved with the MPSC. He does not know the basis or scope for its authority, and does not even know if the MPSC would have any legal basis to "impede" the Going Flat Transaction, having already given NorthWestern clearance to do that transaction.

In addition, Marcus' methodology, if it can be called that, in reaching his opinion is fatally flawed. Marcus simply read the dissenting opinion in a single MPSC ruling, issued in connection with the Commissions' approval of NorthWestern's secured financing in January 2003, and then speculates as to how the MPSC might have reacted to the hypothetical set of circumstances he posits would have occurred if NorthWestern's financial statements for the first three quarters of 2002 were accurate. Courts simply do not permit this type of rank speculation to masquerade as expert opinion.

Plaintiffs' other expert, Robert A. Berliner, is a retired CPA. He offers various opinions concerning the truth of NorthWestern's financial statements in the first three quarters of 2002, none of which deal with the Going Flat Transaction or any fraud in connection with that transaction, and which are therefore irrelevant to this case.[2] However, Berliner does offer one opinion which is relied upon by Marcus in formulating his hypothetical set of economic calamities. Berliner claims that NorthWestern should have recognized a goodwill impairment of its investments in Expanets and Blue Dot as of June 30, 2002, rather than as of December 31,

---

[2] Significantly, neither Berliner the CPA nor Marcus the financial expert could offer any opinion on whether NorthWestern was insolvent at the time of the Going Flat Transaction and therefore, in the words of Judge Case, "knew at the time that it could not do the transaction based on its restated accountings." This despite the fact that both experts had at their disposal every document and deposition transcript in the record of this case.

2002, as reflected in its 2002 10K. Berliner then states that this would have resulted in a covenant breach in NorthWestern's revolving credit facility with Credit Suisse First Boston ("CSFB"). Marcus then relies on this covenant breach to speculate that, as a result, NorthWestern would not have been able to use that revolver to pay off other debt that came due in September 2002, further exacerbating NorthWestern's situation.

The linchpin of Berliner's opinion on goodwill impairment is his recalculation of the appraised business enterprise value of Expanets and Blue Dot. However, Berliner has no qualifications or experience in performing such appraisals. And beside his lack of qualifications, Berliner's methodology in performing that appraisal, and then in performing the subsequent goodwill impairment analysis, is riddled with errors. Indeed, during his deposition Berliner had to admit that his report was erroneous because it compared an enterprise value at one date to a carrying value for a different date. He then tried to salvage his report by changing his analysis during the deposition.

Both Marcus and Berliner should be disqualified as experts and their opinions stricken. Neither has the qualifications to render their operative opinions and the methodology of both is fundamentally flawed.

## ARGUMENT

### I

### An Expert Must Meet The Criteria of Qualification, Reliability and Fit

The admissibility of expert testimony in the federal courts is governed by Federal Rule of Evidence 702 which provides:

> If scientific, technical or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as a expert by knowledge, skill,

-3-

> experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Third Circuit has held that under Fed. R. Evid. 702 there are "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The burden is on the party offering the proposed expert opinion testimony to establish by a preponderance of the evidence that the three criteria of qualifications, reliability and fit have been met. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

An expert can show he is qualified if he "at a minimum 'possesses skill or knowledge greater than the average layman.'" *Willis v. Besam Automated Entrance Sys., Inc.*, No. 04-CV-0913, 2005 U.S. Dist. LEXIS 26466, at *11 (E.D. Pa. Nov. 3, 2005) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). However, an expert for one purpose is not an expert for all purposes. Fed. R. Evid. 702 requires "the expert to have 'specialized knowledge' with regard to the area he is testifying about." *Ortiz v. Yale Materials Handling Corp.*, No. 03-3657, 2005 U.S. Dist. LEXIS 18424, at *11 (D. N.J. Aug. 24, 2005); *Fedor v. Freightliner*, 193 F. Supp. 2d 820, 828 (E.D. Pa. 2002) ("'Specialized knowledge' alone however is not sufficient to satisfy Rule 702. The Rule also requires the witness to have specialized knowledge relating to the area of testimony"); *In re Diet Drugs Prod. Liab. Litig.*, No. 1203, 2000 U.S. Dist. LEXIS 9661, at *9 (E.D. Pa. June 28, 2000) ("a court should exclude proferred expert testimony if the subject of the testimony lies outside the witness's area of expertise") (citations omitted).

-4-

Once it is determined that an expert is qualified, the expert must "explain how and why he or she has reached the conclusion being proferred and must have as a basis more than a subjective belief or speculation." *Cantor v. Perelman*, No. 97-586-KAJ, 2006 U.S. Dist. LEXIS 86329, at 6 (D. Del. Nov. 30, 2006). The focus of this inquiry "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). The court must ensure that every step of the expert's analysis is reliable. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 745 ("*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible"). In doing so, the court has to "'undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *In re: Med Diversified, Inc.*, 334 B.R. 89, 95 (Bankr. E.D.N.Y. 2005) (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002)). If the court "determines that either the data, methodology or the studies upon which the expert's opinion is based are inadequate to support the expert's conclusions, then the court must exclude the expert's testimony." (*Id.*)

In conducting this rigorous examination, the Third Circuit has established several criteria to determine the reliability of expert testimony: (1) whether a method consists of a testable hypothesis; (2) whether the method has been the subject of peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology and; (8) the non-judicial uses to which the method has been

put. *See Total Containment, Inc v. Dayco Prods. Inc.*, No. 1997-cv-6013, 2001 U.S. Dist. LEXIS 15838, at *10 (E.D. Pa. Sept. 6, 2001).

The final criteria, fit, requires "that the expert's testimony not only be reliable, but that it assist the jury by providing it with relevant information for the purpose of the case." *Ortiz*, 2005 U.S. Dist. LEXIS, at 15; *iGames Entm't, Inc. v. Chex Servs., Inc.*, No. 04-180-KAJ, 2005 U.S. Dist. LEXIS 39049, at *6 (D. Del. June 9, 2005) ("In screening a proferred expert opinion, one aspect of relevance that must be examined is 'fit,' i.e., whether the opinion is 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'") (quoting *United States v. Downing*, 753 F.2d 1224, 1243 (3d Cir. 1985)).

## II

### Marcus's Report and Testimony Should Be Excluded
### Because It Fails To Meet The Standards For Admission Under Fed. R. Evid. 702

#### A.    Marcus's Opinion

On September 19, 2007, Plaintiffs submitted the expert report of Paul A. Marcus. Marcus holds an M.B.A. from the University of Chicago and a Chartered Financial Analyst designation from the CFA Institute. (Pizzurro Aff. Ex. 1 at ¶ 7.) He worked as an investment banker at Bank of America, Shawmut Bank and Marlborough Capital Advisors for a number of years. (*Id.* at ¶ 8.) He represents himself as a professional with extensive experience in corporate financial analysis, mergers and acquisitions, business valuation and complex financial transactions. (*Id.* at ¶ 7.) Since leaving the investment banking industry, Marcus states that he has worked as a consultant and expert on numerous matters of valuation, lost profits, corporate finance, solvency, business modeling, bankruptcy and mergers and acquisitions. (*Id.* at ¶ 9.)

Notably, Marcus has no qualifications relating to regulatory bodies or commissions. He has no education or training on how regulatory bodies function at any level, state or federal. He has never authored any papers, articles or treatises on the behavior or rulings of any regulatory bodies. He has no experience working at any regulatory body or commission. He has never testified about the actions of regulatory bodies in any proceeding, prior to this case. (Pizzurro Aff. Ex. 2 at 36-37.)

The sole contact that Marcus has had with regulatory bodies is through his work as an investment banker. Marcus has been involved in the financing of utility companies and in this context he purports to have given advice and guidance to clients on how he thought a regulator would respond. (*Id.* at 194-195.) But even in the role of a banker, Marcus cannot recall ever having advised clients on the actions of any state commissions other than Massachusetts and New York. (*Id.* at 195.) He admitted that when he worked as a lender, "Montana was not specifically a state that was covered in [his] geographical area." (*Id.* at 186.) Significantly, he could not point to any instance where he has ever been involved in any capacity with the Montana Public Service Commission ("MPSC"). (*Id.* at 36.) He has never offered any expert testimony about any aspect of the MPSC. (*Id.* at 36-37.)

Marcus opined that if accurate financial information about NorthWestern had been known in the marketplace in 2002, a cascading series of events would have happened: the drop in NorthWestern stock price and credit rating would have been accelerated, NorthWestern would have defaulted on financial covenants related to its $280 million CSFB credit facility; CSFB would likely not have funded the $280 million facility; the suspension of NorthWestern's dividend would have been accelerated and; the CSFB $390 million debt financing would have been unlikely. (Pizzurro Aff. Ex. 1 at ¶ 13.)

4215464v6
DEL 86205598v1 1/10/2008

Marcus's chain of events is based in part upon the conclusion of Plaintiffs' other expert, Berliner, that NorthWestern would have been in default of financial covenants related to a $280 million CSFB revolving credit facility obtained in January, 2002. (*Id.* at ¶ 69.) Berliner's covenant breach conclusion is primarily related to his opinion that impairment charges should have been recognized as of June 30, 2002. (Pizzurro Aff. Ex. 3 at 2-13.)

In his report, Marcus repeatedly relied upon Berliner's analysis of the covenant breach to claim, which Berliner did not, that NorthWestern would have been in violation of the covenant breach *beginning* June 30, 2002. (Pizzurro Aff. Ex. 1 at ¶ 83.) Marcus admitted he did not conduct an independent calculation of the covenant breach. (Pizzurro Aff. Ex. 2. at 27:11-23, 73:06-13, 122:25-123:22.)

Marcus concluded that these series of events would have caused the MPSC and certain security holders to "impede" the Going Flat Transaction. (Pizzurro Aff. Ex. 1 at ¶ 13.) Marcus based his prediction as to how the MPSC would react on his reading of one dissenting opinion by a MPSC Commissioner in the MPSC's January 3, 2003 order which granted NorthWestern's bid to issue bonds secured by the utility assets. (*Id.* at ¶ 113.) Marcus was unable to point to any stakeholders, other than the QUIPS holders who he thinks might have "impeded" the Going Flat Transaction. (*Id.* at ¶ 122.)

Finally, Marcus opined that if Clark Fork & Blackfoot ("Clark Fork") remained liable on the QUIPS—which it did not—Clark Fork would be unable to meets its obligation to the QUIPS. (*Id.* at ¶ 131-35.)

4215464v6
*DEL 86205598v1 1/10/2008*

**B.    Marcus's Lacks Any Qualifications That Would Allow
Him To Predict How A Montana Regulatory Commission Might Act**

Although Marcus might be an expert in corporate financial transactions, he has

absolutely no credentials, training or work experience that would qualify him as an expert on the

MPSC, much less on what the MPSC would have done or had the power to do.

Marcus's curriculum vitae exhibits an utter lack of any education or coursework

in the functioning of regulatory commissions. At his deposition, Marcus was forced to admit

that he lacked the qualifications to offer an expert opinion regarding any aspect of the MPSC.

He testified that:

- he did not recall ever speaking to counsel about the regulations that govern the authority of the MPSC. (Pizzurro Aff. Ex. 2. at 38:11-15.)

- he did not review the Montana statutes which govern the MPSC. (*Id.* at 180:14-17.)

- he did not review any MPSC regulations. (*Id.* at 180.)

- he had no expert opinion on the scope of authority of the MPSC. (*Id.* at 41-42.)

- he did not know whether the MPSC had the legal ability to impede the Going Flat Transaction having given its approval to the transaction in January of '02. (*Id.* at 69.)

- he did not know whether the MPSC had ever rescinded approval of a transaction once that approval had already been given. (*Id.* at 62.)

- he had not read any rulings and cases of the MPSC, other than a dissenting opinion in a single MPSC ruling. (*Id.* at 38-39.)

Similarly, it was clear from his deposition that Marcus had absolutely no

experience working with the MPSC:

Q:   Do you have any experience in dealing with the Montana Public Service Commission?
A:   I don't recall.

Q:   Have you ever offered opinion testimony as an expert about any aspect of the Montana Public Service Commission?

4215464v6
*DEL 86205598v1 1/10/2008*

A:   I have not.

Q:   Have you ever testified as an expert before the Montana Public Service
     Commission?
A:   No, I have not.

Q:   Have you ever testified as an expert about any commission regulating
     utilities at a state level?
A:   I have not.

Q:   Have you ever testified as an expert about any utility regulatory
     commissions at a federal level?
A:   I have not.

(*Id.* at 36:16-37:10.)

Finally, even though Marcus claims he has worked on the financing of utility
companies, he does not recall ever advising a client on financing matters involving a company
regulated by the MPSC. (*Id.* at 186:06-09.) In fact, Marcus does not even know what regulated
utilities operate in Montana and he has never rendered any opinions similar to the type rendered
here about what a public service commission might do in a particular set of circumstances in a
legal case. (*Id.* at 187:02-04, 194:16-23.)

Courts have rejected similar attempts by an expert to use general qualifications in
unrelated areas to opine on the specific area at issue. In *Player v. Motiva Enters. LLC*, No. 02-
3216, 2006 U.S. Dist. LEXIS 2288, at *3 (D. N.J. Jan. 20, 2006), the expert opined regarding
damage involving the amount of reduction in plaintiffs' property value as a result of
contamination from a neighboring gas station. The court excluded plaintiff's expert, an
experienced property appraiser, from assessing the diminution in the value of the plaintiff's
property because there was no evidence that the expert had any experience in appraising
contaminated properties. (*Id.* at *21.) The court emphasized that general experience in property
appraisal without any corresponding knowledge or expertise in issues of contamination was not
enough because "an individual able to appraise an uncontaminated property may have no

-10-

grounds for appreciating the devaluation of the same property under unique conditions of contamination or stigma." (*Id.*)

Similarly, in *Wilkinson v. Rosenthal & Co.*, 712 F. Supp. 474, 475 (E.D. Pa. 1989), the court excluded an expert report by plaintiff's expert about whether the defendant broker had excessively traded plaintiff's commodities account.  The expert had an MBA and a Ph.D from the University of Chicago School of Business in Finance and extensive experience with the stock and bond markets. (*Id.* at 477.)  However, he had little work experience or academic history in the field of commodities other than some exposure to commodities scholarship as editor of several publications and one course on speculative markets that he had taught at Wharton which included materials on commodities trading. (*Id.*)  The court explained that though the expert may possess "more than a layman's knowledge of the 'introductory principles'" of commodities trading, "[a] basic understanding of a subject does not necessarily imply qualification as an expert on the precise issue for jury determination." (*Id.* at 478.)

Marcus is unqualified to offer an expert opinion as to how the MPSC would act given a certain set of circumstances.  His opinion should be stricken.

## C. Marcus's Methodology in Analyzing the MPSC's Actions Based Upon A Dissenting Opinion In A Single Ruling Is Utterly Speculative And Should Be Rejected

Marcus reached the conclusion that the MPSC would "impede" the Going Flat Transaction by reading the sole dissenting opinion of a MPSC Commissioner in a January 24, 2003 MPSC ruling that granted NorthWestern's application to issue bonds secured by the utility assets. (Pizzurro Aff Ex. 1 at ¶ 113.)  Marcus's simplistic "methodology" is as deficient as his qualifications.

In *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1236 (E.D. Ca. 2005) the court rejected the expert's attempt to predict the actions of the FCC based on the expert's reading of previous FCC rulings. Plaintiff alleged that defendant breached a purchase option contract involving a television station. (*Id.* at 1232.) Defendant contended that the purchase option contract was unenforceable because it was unlikely the FCC would grant the plaintiff a license to operate the television station. (*Id.*)

Defendant offered the testimony of an expert who both sides agreed was an expert in the field of regulatory law and the FCC. Based on FCC law and three rulings of the FCC in a different case involving the plaintiff, the expert opined that the FCC would deny plaintiff's application for a television license. (*Id.* at 1232-33.) The court precluded the testimony holding that the expert's opinion of how the FCC would act, based on a reading of the case law and previous rulings, was "unsupported speculation." (*Id.*)

Similarly, in *Wartsila NSD North America v. Hill Int'l, Inc.*, 299 F. Supp. 2d 400, 401-03 (D. N.J. 2003) plaintiff attempted to introduce expert evidence that plaintiff's loss in a previous arbitration was largely due to perjured testimony presented by defendant's employee. Both experts, McCue and Beisecker, based their analysis on a review of the arbitration record. (*Id.*) at 404-08. The court precluded McCue, who had extensive experience working with arbitrators, from testifying but admitted the testimony of Beisecker, a professor of speech communication who had published numerous articles regarding communications, witnesses and trial preparation. (*Id.*)

The court explained that while Beisecker "relies on accepted methods of social science, which although they may be shaky, provide a reliable connection between the arbitration

record and his conclusion" there was "no methodology for McCue's assessment of damages except his own view of the merits" from a reading of the arbitration transcript. (*Id.* at 406.)

Marcus's own view of the merits from reading one dissenting opinion is similarly deficient and should be stricken as unreliable.

Neither will Marcus's experience with Massachusetts and New York regulatory agencies in the context of his work as an investment banker give him the knowledge and experience to opine as to how a Montana regulatory commission might act.

In *American Marine Rail N.J., LLC v. City of Bayonne*, 289 F. Supp. 2d 569, 575 (D. N.J. 2003), the court excluded the opinion of an expert who had experience with the New York City waste management authorities from opining as to why the actions of a New Jersey agency caused plaintiff to lose a bid to transport waste from New York. New York City's Department of Sanitation ("NYCDOS") issued a Request for Proposal asking waste transport vendors to bid for a contract with the City of New York. (*Id.* at 575.) Plaintiff was forced to withdraw its proposal to transport the waste to New Jersey when the Hudson County Improvement Authority ("HCIA") rejected plaintiff's inclusion in the Hudson County's Solid Waste Management Plan. (*Id.* at 577.) Plaintiff's expert opined that there was a high probability that the plaintiff would have won the bid for the NYCDOS project if not for the HCIA. (*Id.* at 589.) Plaintiff's expert had served in various positions in the mayoral administrations of David Dinkins and Ed Koch and had wide experience concerning solid waste management issues and the procurement process that New York utilized in waste management contracts. (*Id.* at 589-90.)

The court held that the expert's opinion, based purely on his experience with the New York City waste management authorities, was speculative and unreliable. (*Id.*) The court

-13-

explained that the expert "has no specific or personal knowledge of the bidding and procurement process for the Request for Proposals to which plaintiff responded" and any general testimony as to how New York City handles its waste management projects would be entirely conjectural. (*Id.* at 590.)

Furthermore, even in cases where the expert had far greater experience with the specific regulatory agency on which he is opining than does Marcus, an expert opinion that attempts to predict how a regulatory body would act, merely on the grounds of experience has been rejected.

In *CFM Commc'ns LLC*, even though both sides agreed that the expert had extensive experience regarding the FCC, the court rejected as speculation the expert's opinion "about the FCC's likely actions."  424 F. Supp. 2d at 1236.  The court reasoned that since the expert relied "merely on vague claims regarding his experience of practicing before the FCC," his "review of FCC decisions and regulations" and his assertions of knowing the FCC's "typical" course of action, his opinion is speculation.  (*Id.*)

## D.     Marcus's Prediction As To How The MPSC Might Act Must Be Rejected Because It Is A Legal Conclusion

Marcus's predictions as to how the MPSC would rule in a hyopthetical set of circumstances is by its very nature a legal conclusion and should be precluded.

An expert's opinion on "whether specific conduct conforms to particular legal requirements is not a matter typically suited for expert testimony."  *Rich v. Bailey*, No. 95-6932, 1996 U.S. Dist. LEXIS 19437, at *17 (E.D. Pa. Dec. 23, 1996). Such testimony usurps the judge's role and does not assist the trier of fact.  *See Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (an expert cannot state what the governing law of a case is or apply

-14-

the law to the facts of a case); *Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D. N.J. 2005) ("The district court must limit expert testimony so as to not allow experts to opine on 'what the law required. The rule prohibiting experts from providing their legal opinions or conclusions is so well established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle'") (citations omitted).

In *CFM Commc'ns, LLC*, defendant's expert utilized FCC regulations, case law and three recent rulings by the FCC on a different case concerning the plaintiffs to conclude that the FCC was unlikely to grant plaintiff's application for a television station license in a given area (*Id.*) at 1235-36. The court prohibited the expert from opining on how past letter rulings of the FCC indicate its likely future decision on any legal issue, about how FCC law applied law to the facts of the case and barred him from testifying as to any conclusions about how the past or future conduct of a plaintiff would affect any future FCC decisions. (*Id.*) Marcus's legal conclusions about the MPSC's actions, given a certain set of circumstanes should be similarly stricken.[3]

## E.   Marcus's Report Lacks Any Methodology To Support His Opinion That NorthWestern Would Have Breached the Loan Covenants On June 30, 2002

Although Marcus presents himself as an expert in business valuation, he relied upon the opinion of Plaintiff's other expert, Berliner, that NorthWestern would have defaulted on its loan covenants. (Pizzurro Aff. Ex. 1 at ¶ 69.) Berliner's covenant breach opinion is

---

[3] Marcus also opined that certain security holders may have tried to take action to "impede" the Going Flat Transaction, but could point to no such security holder in particular other than the QUIPS holders. This opinion is flawed as well. Marcus admitted that he had "not analyzed each level and each individual in the capital structure [of NorthWestern]" to determine who specifically in this case would have the ability or the incentive to "impede" the Going Flat Transaction. (Pizzurro Aff. Ex. 2 at 53:23-54:10.) Further, he admitted that "[t]he security holders in the opinion is general" and "would be related to anyone who would have felt that their interests would have been disserved by having the assets transferred." (*Id.* at 52:23-53:02.) Finally he is unaware of what specific rights and authority, legal or contractual, any of these stakeholders had to "impede" the Going Flat Transaction. Marcus's opinion is based on inadequate facts and methodology and should be stricken.

4215464v6
DEL 86205598v1 1/10/2008

dependent upon his conclusion that impairment charges should have been recognized as early as of June 30, 2002.

As will be more fully discussed below, Berliner's opinion has been completely discredited. And to the extent Marcus relies on Berliner's discredited opinion his conclusion must be disregarded because, as Marcus admitted, he did not conduct an independent calculation of the covenant breach. (Pizzurro Aff. Ex. 2. at 27:11-23, 73:06-13, 122:25-123:22.)

But even if Berliner was correct—and he was not—and NorthWestern should have performed an additional goodwill impairment analysis as of June 30, 2002, the results of that analysis could not have caused a covenant breach ocurring on June 30, 2002 because that report could not have been completed before the end of October 2002. (Pizzurro Aff. Ex. 4 at 17.) Even Berliner did not go that far.

**F.    Marcus's Opinion That If The QUIPS remained the Obligations of Clark, Fork After the Going Flat Transaction, Clark, Fork Would Be Unable To Pay On The QUIPS Is Irrelevant To The Facts Of The Case**

Marcus opined that, assuming Clark Fork remained liable on the QUIPS, it would have been financially unable to meet these obligations. While that result may be true, the assumed facts have nothing to do with this case.

There is no dispute that in the Going Flat Transaction the assets of Clark Fork along with the obligation for the QUIPS were transferred to NorthWestern. Indeed, in *In re NorthWestern Corp.*, 313 B.R. 595, 600 (Bankr. D. Del. 2004), Judge Case has already found that, upon the execution of the Going Flat Transaction, "Debtor [NorthWestern] in fact did assume the obligations" of the QUIPS. As a result, the QUIPS holders "are creditors solely of Debtor as long as the transfer was in compliance with Section 1101 of the Indenture." (*Id.* at 599.) Even Marcus cannot point to any reason why this opinion is relevant to any issue in the

lawsuit. (Pizzurro Aff. Ex. 2. at 133:18-22, 134:15-22.)  Because this opinion is not tied to the

facts of the case and cannot aid the trier of fact, it does not fit and should be stricken as

irrelevant.

III

**Berliner's Report and Testimony Should Be Excluded**
**<u>Because It Fails To Meet The Standards For Admission Under Fed. R. Evid. 702</u>**

A.       **<u>The Procedure for Determining Goodwill Impairment under SFAS 142</u>**

Some background may be helpful in putting Berliner's opinion in context.  In

June 2001, The Financial Accounting Standards Board ("FASB") issued Statement of Financial

Accounting Standards No. 142, Goodwill and Other Intangible Assets, ("SFAS 142").  The new

rule made major changes to the accounting treatment of goodwill for the first time in over 30

years and companies were required to implement these new standards in fiscal years, beginning

after December 15, 2001.[4]

As stated in SFAS 142, Step 1 of the impairment test process is to determine if the

book or carrying value exceeds the fair value or business enterprise value of the entity.  (Pizzurro

Aff. Ex. 4 at 16; Pizzurro Aff. Ex. 3 at 2-3.)  This requires the determination of the enterprise

value of the entity as of the effective date of the valuation.  (Pizzurro Aff. Ex. 4 at 16; Pizzurro

Aff. Ex. 3 at 2-3.)  In order to determine the business enterprise value of the entity, the most

appropriate practice is for companies to engange an independent professional appraiser who is

governed in his valuation by the Uniform Standards of Professional Appraisal Practice

("USPAP").  (Pizzurro Aff. Ex. 5 at 68:19-69:10.)  The Uniform Standards of Professional

---

[4] <u>See</u> R.J. Huefner & J.A. Largay III, *The Effect of the New Goodwill Accounting Rules on Financial Statements,* LXXIV, The CPA Jounal (Oct. 2004), at http://www.nysscpa.org/cpajournal/toc/toc1004.htm.

-17-

Appraisal Practice ("USPAP") are the highest level of standards for performing valuations. (Pizzurro Aff. Ex. 4 at 6.)

USPAP Standard Rule 9-4(a), "requires the appraiser to use all relevant approaches for which sufficient reliable data are available" in his appraisal. (Pizzurro Aff. Ex. 4 at 7-8.) The appraiser then calculates a business enterprise value by assigning a weight to the business enterprise value derived under each methodology. (Pizzurro Aff. Ex. 4 at 9.) Further, under USPAP Standard 9-2(e), an appraiser "must be prepared to support the decision to exclude any information or procedure that would appear to be relevant to the client, an intended user, or the appraiser's peers in the same or similar assignment." (*Id.*)

American Appraisal Associates ("AAA") noted that for operating companies, the Market Approach and the Income Approach are both relevant. (*Id.* at 9-10.) The Market Approach is a way of determining a value of a business by comparing it to similar businesses. (*Id.* at 8.) In order to properly apply the Market Approach for a specific valuation date, a valuator must have reported financial information for that period not only for the subject company but also for the comparable public companies. (*Id.* at 16.) The Income Approach determines value by converting anticipated economic benefits into a single amount. (*Id.* at 8.)

If, as of the effective date, the carrying value is less than the appraised business enterprise value, then no goodwill impairment exists. (Pizzurro Aff. Ex. 3 at 2-3.) If, as of the effective date, the carrying value is greater than the business enterprise value, SFAS 142 requires a Step 2 requires a complex examination of the entity's underlying assets and liabilities to determine their value in order to establish fair value. (*Id.*)

NorthWestern adopted January 1, 2002 as the effective date for its SFAS 142 goodwill impairment analysis and engaged AAA, a 110 year old international valuation firm

4215464v6
DEL 86205598v1 1/10/2008

with trained and accredited valuators and 43 offices throughout the world, to prepare valuations with respect to two of its non-utility subsidiaries, Expanets and Blue Dot, as of January 1, 2002. (Pizzurro Aff. Ex. 4 at 5, 9.) NorthWestern also selected October 1 as its annual goodwill impairment test date and engaged AAA on December 27, 2002 to prepare valuations of Expanets and Blue Dot as of October 1, 2002. (*Id.* at 5.)

       AAA determined that both Expanets and Blue were operating companies and that in order to calculate a business enterprise value for each entity, an analysis of both the Income Approach and the Market Approach was relevant. (*Id.* at 9-10.) Accordingly, for both entities, AAA calculated a business enterprise value under the Income and Market Approach as of January 1, 2002. (*Id.*) After an extensive analysis, AAA arrived at a business enterprise value for Expanets by assigning an equal weight to the value determined using both approaches. (*Id.*) For Blue Dot, AAA also considered both the Income and the Market Approach but found the Market Approach to be inapplicable. (*Id.* at 10.) In its business valuation, AAA adhered to the USPAP rules. (*Id.*)

       On September 3, 2002, AAA determined for both Expanets and Blue Dot that the business enterprise value exceeded the carrying value as of January 1, 2002. (Pizzurro Aff. Ex. 3 at 2-4.) Therefore, no goodwill impairment existed as of that effective evaluation date. (*Id.*) AAA sent draft reports to NorthWestern's auditors, Deloitte & Touche ("D&T") for their comments. (Pizzurro Aff. Ex. 4 at 17.) D&T reviewed and commented on the drafts and approved the inclusion of the AAA reports in NorthWestern's September 30, 2002 10-Q without any change in the reported value. (*Id.* at 11.)

**B.**    **Berliner's Opinion**

On September 19, 2007, plaintiffs submitted the expert report of Robert W. Berliner. Berliner is a certified public accountant with an M.B.A. from the New York University Stern School of Business and a B.S. in Economics from the Wharton School. (Pizzurro Aff. Ex. 3 at Ex. A-3.) From 1954 to 1990, Berliner worked as an accounting and auditing professional in various capacities. (*Id.* at A-1.) From 1990 to the present, Berliner has been Director of Litigation Services at Marks Paneth & Shron LLP. He has served as a financial and accounting expert in numerous matters. (*Id.*)

Notably, Berliner has no education or work experience as a business appraisal or valuation professional. There is no evidence that he has taken any coursework in business valuation. He does not have any credentials as a valuation expert, such as Accredited Senior Appraiser, or any qualifications from the American Institute of CPAs Accredited in Business Valuation and in fact, is not accredited by any organization or professional society in business valuation. (Pizzurro Aff. Ex. 5 at 36:16-25.) He is not affiliated with professional valuation organizations in any capacity and has not published articles, or gathered teaching credits or been quoted in treatises on valuation issues. He has no work experience in valuation techniques and methodologies and he admits that he is not an expert in business valuation and has never qualified as an expert in valuation in any proceeding, legal or otherwise. (*Id.* at 37:1-13.)

In addition, it is clear that Berliner has never been employed in a professional capacity by an auditing firm to review an appraisal in connection with a SFAS 142 goodwill impairment analysis and that "[his] auditing days were long since over before [SFAS] 142 was issued." (*Id.* at 76:4-11, 102:14-15.) He openly stated that he has no experience with an actual audit situation involving a SFAS 142 analysis. (*Id.* at 102:10-15.) This lack of experience is

reflected in the fact that he has no idea how long it would take to complete Step 2 of the SFAS 142 analysis. (*Id.* at 102:16-20.)

Despite his lack of qualifications, Berliner reviewed portions of the record and opined that:

- AAA's business enterprise valuation of Expanets and Blue Dot as of January 1, 2002 was flawed. (Pizzurro Aff. Ex. 3 at 2-13, 2-18.)

- Based on his own independent business enterprise valuation of Expanets and Blue Dot as of January 1, 2002, NorthWestern violated GAAP by failing to record a goodwill impairment loss as of June 30, 2002. (*Id.* at 2-13, 2-18.)

- Had NorthWestern recorded a goodwill impairment loss in the second and third quarters of 2002, it would have been in violation of the debt covenants under the $280 million CSFB credit agreement for the second and third quarter of 2002. (*Id.* at 4-1.)

- If the QUIPS remained creditors of Clark Fork after the Going Flat Transaction, Clark Fork's Liabilities would materially exceed its assets. (*Id.* at 5-1.)

In his Report, Berliner stated that he would be performing an independent analysis of Expanets and Blue Dot goodwill impairment, as of June 30, 2002. (*Id.* at 2-12, 2-17.) However, to do so he first recalculated the business enterprise value for Expanets and Blue Dot as of January 1, 2002, using only the Income Approach. (*Id.*) In performing this valuation he did not follow USPAP because he knew nothing about it at the time he performed his calculations and he could point to no alternative standards he used in its stead. (Pizzurro Aff. Ex. 5 at 40:22-41:15.)

He then calculated the carrying value of the two entities, as of June 30, 2002. (Pizzurro Aff. Ex. 3 at 2-12, 2-17.) He compared the June 30, 2002 carrying value with the January 1, 2002 business enterprise value to conclude that, under Step 1, a goodwill impairment existed as of June 30, 2002. (*Id.* at 2-12 to 2-13, 2-17 to 2-18.)

As will be discussed more fully below, Berliner made three fatal errors in his goodwill impairment analysis of Expanets and Blue Dot as of June 30, 2002: he ignored the Market Approach; he utilitzed information that was only available subsequent to the effective date of his appraisal; and by using a business enterprise value as of January 1, 2002, for a goodwill impairment analysis as of June 30, 2002, his methodology was internally inconsistent and hence wrong.

**C.**      **Berliner's Testimony Should Be Excluded Because He Lacks Any Qualifications As A Business Valuation Expert Or As A SFAS 142 Goodwill Impairment Analyst**

At his deposition, Berliner readily admitted that in order to perform the SFAS 142 analysis, the appropriate protocol would be for NorthWestern to bring in, not an auditor, but an independent professional appraiser who "would follow and be bound by the standards of the profession which are the Uniform Standards of Professional Appraisal Practice" ("USPAP"). See Pizzurro Aff. Ex. 5 at 68:19-69:10, 69:18-24, 116:8-12. He further admitted that AAA is recognized widely as an expert in performing business valuations. (*Id.* at 54:16-20.)

Nevertheless, Berliner, a C.P.A. without any of the qualifications, experience or training in business valuation not only concluded that AAA's valuation as of January 1, 2002 was flawed but also performed his own "independent calculation of Expanets' business enterprise value" as of January 1, 2002. (Pizzurro Aff. Ex. 3 at 2-12.) At the conclusion of Step 1 he found "[b]ecause my computation of Expanets' business enterprise value was lower than its carrying value of June 30, 2002, I have concluded that a potential impairment loss in conformity with Step 1 of SFAS 142 existed as of that date." (*Id.*)

Berliner is not qualified to render an expert opinion on business valuation. As Berliner testified:

4215464v6
DEL 86205598v1 1/10/2008

- he is not an expert in business valuation and he does not perform valuations. (Pizzurro Aff. Ex. 5 at 35:4, 37:2-4.)

- he is not accredited by any organization or professional society in business valuation. ( *Id.* at 36:16-19.)

- he does not have any credentials from the American Institute of CPA accredited in business valuation. (*Id.* at 36:22-25.)

- he has never been qualified as an expert in valuation by any court or arbitration tribunal. (*Id.* at 37:5-8.)

- he did not use the USPAP in his appraisal and in fact had no knowledge of the USPAP until he "read the expert reports of the experts on behalf of the defendants in this case." (*Id.* at 40:22-41:15.)

Similarly, in terms of practical experience, there is no evidence that Berliner has done any business valuation work or been affiliated with business management publications. His curriculum vitae is conspicuously devoid of any:

- affiliation with professional valuation organizations

- publication of articles on valuation in valuation trade publications, such as the Business Valuation Review or Business Value Update

- valuation teaching credits

- instances where Berliner has been quoted in treatises or publications on valuation issues

- qualification as an expert in valuation by any court or arbitration tribunal

- qualification as an expert regarding business valuation in any proceeding

Forced to admit that he had no qualifications or experience as an expert business valuator, Berliner testified that he was, as an auditor, merely modifying AAA's valuation. But Berliner could point to no case where an auditor modified the independent appraisal which was provided by the expert appraiser. (Pizzurro Aff Ex. 5 at 75:21-76:3.) He agreed that "[t]he role of the accounting firm is to follow SFAS 73 in satisfying itself as to the assumptions used and the credibility of the appraiser" and that if the accounting firm had a problem with the appraisal

-23-

one possibility is "to engage their own appraiser to perform a valuation." (*Id.* at 73:06-22.) He also agreed that the reason the accountants would engage another independent appraiser is because, "the CPAs in the auditing firm are not [] qualified." (*Id.* at 73:19-74:03.)

Similar efforts to cloak an accountant with the mantle of a business valuation expert have been rejected. In *In re: Med Diversified, Inc.*, 334 B.R. at 96-97, the court granted defendant's motion to exclude the testimony of plaintiff's expert, rejecting the argument that the expert's "substantive experience over the past twenty-plus years as an accountant and as a liquidating agent or bankruptcy trustee" could "add up to a satisfactory substitute for formal education and training in business valuations." Yet, Berliner with his lack of business valuation experience purports to do exactly this. His report and testimony should be stricken.

Berliner is also not qualified to review or conduct a goodwill impairment analysis under SFAS 142 because he has never been employed in a professional capacity by an auditing firm to review an appraisal in connection with a SFAS 142 goodwill impairment analysis. He was forced to admit that "[his] auditing days were long since over before [SFAS] 142 was issued" and that he has no experience with an actual audit situation involving a SFAS 142 analysis. (Pizzurro Aff. Ex. 5 at 76:4-11,102:10-15.) This lack of experience is reflected in the fact that he has no idea how long it would take to complete Step 2 of the SFAS 142 analysis. (*Id.* at 102:16-20.) Yet, he purports to be qualified to do exactly this.

**D.    The Methodology Used by Berliner In His Business Valuation And In His SFAS 142 Analysis is Unreliable Because It Ignores Established Appraisal and Accounting Standards**

The highest level of standards followed by professional business valuation experts is USPAP. (Pizzurro Aff. Ex. 4 at 6.) Defendant's expert, Bruce Bingham, and Plaintiff's expert, Berliner, both agree that business valuation appraisers are required to follow USPAP.

(Id.; Pizzurro Aff. Ex. 5 at 69:06-10.) In performing his SFAS 142 analysis of Expanets and Blue Dot, as of June 30, 2002, Berliner did not follow USPAP and he made three fatal errors.

### 1. **Berliner Ignored the Market Approach**

Under USPAP Standard Rule 9-4(a), a person performing a business valuation must consider all relevant approaches. Further, under USPAP Standard 9-2(e) an appraiser must have sound reasons to support his decision not to perform a certain approach.

In calculating the business enterprise value of Expanets, Berliner blithely ignored the Market Approach. At his deposition, Berliner admitted that he didn't do the Market Approach because "that was something that would have been far more difficult for [him] to do and would have been very costly and time consuming" and "not something that [he] could do within the time frame that [he] was given to develop this report." (Pizzurro Aff. Ex. 5 at 77:05-12, 81:17-22.) Berliner explained that "as [he] understand[s] the valuation of determination of business enterprise value, if done correctly, the Income Approach and the Market Approach tend to come up with similar valuations." (*Id.*) Berliner points to no authority for this assumption.

In *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, No. 8:01-cv-2302-T-30MSS, 254 F. Supp. 2d 1239, 1243 (M.D. Fl. 27, 2003) the court rejected the business valuation of a forensic accountant on identical grounds. The purported expert did not follow the standard business valuation methodologies, namely, the asset-backed approach, the income approach and the market approach in calculating the fair market value of the business. (*Id.*) Instead, he "calculate[d] the future income, based on certain assumptions and then reduce[d] the figure to the present value." (*Id.* at 1244.) In explaining why he did not use the established methodologies, the expert replied that he was not performing a valuation of the business, but

4215464v6
*DEL 86205598v1 1/10/2008*

only purporting to do the math to calculate the future net income reduced to present value and by this method trying to get the fair value of the business. (*Id.*)

The court rejected both the accountant's valuation methodology and explanation. (*Id.*) It explained that in determining the fair market value of the business, the accountant was conducting a business valuation and "[t]he value of a business depends upon the facts unique to that business and therefore, appraisals tend to be factually intensive involving competing valuation methodologies." (*Id.* at 1244.) It then listed the established methodologies as the cost approach, the income approach and the market approach and emphasized that "[i]n valuing a business, the appraiser should consider each approach relative to the business in question and assign the appropriate weight to each of the values generated by the three approaches." (*Id.* at 1245.) The court concluded that the expert's report was inadmissible because "[the expert's] report does not discuss the three approaches" and "how they relate specifically to Plaintiff's business. He does not discuss the various factors that a business valuator should consider as they relate to weighting the three approaches in the valuation." (*Id.*)

Berliner's analysis suffers from exactly the same deficiencies as that of the expert in *Sun Ins. Mktg.* Berliner neither considers all relevant approaches nor does he explain his decision to ignore the Market Approach. His opinion should be stricken.

### 2. Berliner Used Information That Was Only Available Subsequent To The Effective Date Of The Appraisal

Under USPAP rules, a person performing a retrospective appraisal should be aware that "[i]n the absence of evidence in the market that data subsequent to the effective date were consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser." (Pizzurro Aff. Ex.

4215464v6
*DEL 86205598v1 1/10/2008*

4 at 8-9.) Current practice in the business valuation community also focuses on what the buyer or seller would have known at the valuation date or what trends were being considered at the valuation date. (Pizzurro Aff. Ex. 4 at 14.)

However, in calculating the business enterprise value of Expanets and Blue Dot as of January 1, 2002, Berliner often used information acquired after the effective valuation date. For example, in Berliner's business enterprise valuations of both Expanets and Blue Dot, the projections are based on the revenue forecast for 2002 including the June 30, 2002 Management and Financial Report ("MFIR"). (Pizzurro Aff. Ex. 3 at 2-11, 2-16.) But this MFIR was developed and distributed in late July 2002, approximately seven months after the effective date of the valuation. Berliner's valuations, based on the after acquired information, should be excluded.

### 3.     Berliner's Report is Internally Inconsistent

In his report, Berliner performed an "independent calculation" of "goodwill impairment loss as of June 30, 2002" for both Expanets and Blue Dot. (Pizzurro Aff. Ex. 3, at 2-12, 2-17.) In doing that analysis, he recalculated the business enterprise value of these entities as of January 1, 2002. (*Id.* at Attachment A-7, A-16; Pizzurro Aff. Ex. 5 at 58:13-24; 135:19-136:17.) He then recalculated the carrying value of these entities as of June 30, 2002 and compared it with his January 1, 2002 business enterprise value to determine that there was a goodwill impairment as of June 30, 2002. (Pizzurro Aff. Ex. 3 at 2-12, 2-17.) However, at his deposition Berliner was forced to admit that it would be an error to compare the January 1 date to the June 30 date. (Pizzurro Aff. Ex. 5 at 123-24.)

Unable to explain this discrepancy, Berliner changed his opinion and testified that the business enterprise values he calculated as of January 1, 2002 were really business enterprise

4215464v6
DEL 86205598v1 1/10/2008

valuations as of June 30, 2002. (Pizzurro Aff. Ex. 5 at 124:05-124:21.) He then testified that he had no opinion at all concerning the proper business enterprise value as of January 1, 2002, the date of AAA's appraisal. (*Id.* at 127:05-21.)

It then was apparent that Berliner had unilaterally changed the valuation date chosen by NorthWestern from January 1, 2002 to June 30, 2002. But under SFAS 142 NorthWestern could adopt any annual test impairment date to implement the goodwill impairment analysis. (Pizzurro Aff. Ex. 4 at 5.) Indeed, Berliner himself had agreed that he had no problem with NorthWestern's choice of January 1, 2002 as an effective date for the goodwill impairment analysis and Berliner was unable to explain on what basis he unilaterally changed the valuation date adopted by NorthWestern from January 1, 2002 to June 30, 2002. (Pizzurro Aff. Ex. 5 at 94:04-11, 127.)

In a desperate attempt to provide some basis for the change in test date, Berliner stated that SFAS 142 allows a new goodwill impairment analysis to be done by the auditor when there is a triggering event. (Pizzurro Aff. Ex. 5 at 131:5-132:18.) However, he was unable to point to any place in his report where he talked about triggering events under SFAS 142 or used the triggering event methodology as applied to NorthWestern's financial history to show the need for a new updated report. (*Id.* at 132:19-24.) Finally, Berliner admitted that there was nothing in his report that explained why, under normal accounting standards, NorthWestern or an auditor was obligated to do an updated analysis six months after its effective goodwill impairment analysis date and four months before its annual test date of October 1, 2002. He testified that he did not explain his methodology in his Report because "it was obvious" and "implied" so he "didn't bother stating it." (*Id.* at 134:15-135:11.) He was also unable to explain in more detail any analysis he had done to determine the nature of the triggering events. Such an

-28-

explanation does not meet the standards for reliability and Berliner's opinion should be excluded.[5]

### E.     Berliner's Opinion That If The QUIPS Remained Obligations Of Clark Fork After The Going Flat Transaction, Clark Fork's Liabilities Would Materially Exceed Its Assets Is Irrelevant To The Facts Of The Case

Like Marcus, Berliner opines that if Clark Fork remained directly obligated on the QUIPS following the November 15, 2002 Going Flat Transaction, its total liabilities would materially exceed its total assets and Clark Fork would be unable to pay on the QUIPS. That may be true—it is not this case.

Berliner admits that his opinion "is based on a hypothetical assumption" that NorthWestern took the assets and left behind the liabilities and that if both those assumptions are not built in, then there is no opinion. (*Id.* at 138:15-139:18.) Berliner's opinion on matters not in issue in the case should be stricken as irrelevant.

---

[5] One additional error in Berliner's SFAS 142 analysis is his use of information from the September 30, 2002 10-Q to calculate the June 30, 2002, carrying value "[b]ecause [he] didn't have the information as of June 30." (Pizzurro Aff. Ex. 5 at 128:09-13.) Berliner admits that if the book value of the debt and equity value, two variables he used to calculate the carrying value, as of June 30, 2002 differed from the book and equity value as of September 30, 2002, the computation of the carrying value could change, thereby, making his goodwill impairment calculation as of June 30, 2002 even more inaccurate. (*Id.* at 130:07-15.)

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that NorthWestern's motion in limine: (i) striking the expert reports submitted by Robert W. Berliner and Paul A. Marcus; (ii) precluding reliance thereon by Plaintiffs; and (iii) precluding any testimony by either Mr. Berliner or Mr. Marcus at trial currently scheduled for March 3, 2008, be granted.

Dated:   Wilmington, Delaware
         January 10, 2008

GREENBERG TRAURIG LLP

By: _Victoria W. Counihan_
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360
counihanv@gtlaw.com
melorod@gtlaw.com

-and-

CURTIS, MALLET-PREVOST, COLT &
     MOSLE LLP
Joseph D. Pizzurro
Nancy E. Delaney
Myles K. Bartley
101 Park Avenue
New York, New York 10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

Attorneys for NorthWestern Corporation

-30-