

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

------------------------------------- X

MAGTEN ASSET MANAGEMENT CORPORATION and

LAW DEBENTURE TRUST COMPANY OF NEW YORK,

                    Plaintiffs,

     -vs-

NORTHWESTERN CORPORATION,

                    Defendant.

Civil Action No. C.A. No. 04-1494 (JJF)

------------------------------------- X

MAGTEN ASSET MANAGEMENT CORP.,

                    Plaintiff,

     -vs-

MICHAEL J. HANSON and ERNIE J. KINDT,

                    Defendants.

Civil Action No. C.S. No. 05-499 (JJF)

------------------------------------- X

DATE:     November 13, 2007

TIME:     9:00 a.m.


          Deposition of PAUL A. MARCUS, held at

the offices of Curtis, Mallet-Prevost, Colt &

Mosle, 101 Park Avenue, New York, New York,

1            - PAUL A. MARCUS -

2    pursuant to Notice, before Hope Menaker, a

3    Shorthand Reporter and Notary Public of the State

4    of New York.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  - PAUL A. MARCUS -

2    assume for -- with me for the moment that

3    Mr. Berliner did not come to the conclusions and

4    opinions in his report.

5              How would that change your opinion in

6    this matter?

7              MR. KAPLAN:  Objection.

8         A.    Not at all.

9         Q.    Not at all?

10        A.    Not at all.

11        Q.    Did you do an independent assessment as

12   to whether or not there would be a covenant breach

13   by Northwestern on the $280 million revolver with

14   CSFB?

15        A.    I actually began a process of trying to

16   investigate that.  I came to the conclusion that I

17   didn't have enough information to accurately

18   calculate those covenants, and I didn't pursue it.

19              And then at a certain point, as I

20   understood it, Mr. Berliner was going to perform

21   that analysis and had all the accounting

22   information required to do that, and, therefore, I

23   used his calculation.

24        Q.    Sir, did you use his calculation, or did

25   you rely on his analysis?

1                  - PAUL A. MARCUS -

2    by an expert on the Commission?

3         Q.    No.   That's as specific as my question

4    is.   It's pretty specific.

5         A.    Let me try to answer it then.   I can

6    tell you that I have extensive experience working

7    in financing utility companies and reviewing

8    opinions of commissions throughout the country in

9    many jurisdictions.   I have experience in reviewing

10   other people's interpretation and understanding of

11   how those commissions function.   And I would

12   consider myself an expert in interpreting and

13   understanding how commissions work, what positions

14   they put forth, their interests, and the

15   constituencies that they represent.

16        Q.    Do you have any experience in dealing

17   with the Montana Public Service Commission?

18        A.    I don't recall.

19        Q.    Have you ever offered opinion testimony

20   as an expert about any aspect of the Montana Public

21   Service Commission?

22             MR. KAPLAN:   Objection to the form.

23        A.    I have not.

24        Q.    Have you ever testified as an expert

25   before the Montana Public Service Commission?

1                    - PAUL A. MARCUS -

2        A.    No, I have not.

3        Q.    Have you ever testified as an expert

4   about any commission regulating utilities at a

5   state level?

6        A.    I have not.

7        Q.    Have you ever testified as an expert

8   about any utility regulatory commissions at a

9   federal level?

10       A.    I have not.

11       Q.    Sir, are you familiar with the statutory

12  authority or the statutory structure pursuant to

13  which the Montana Power -- strike that.

14            -- Montana Public Service Commission

15  derives its authority?

16       A.    Not that I recall, no.

17       Q.    Are you familiar with any regulations

18  governing the authority or procedures of the

19  Montana Public Service Commission?

20       A.    Can you repeat that again, please?

21            MR. PIZZURRO:  Can you read the

22  question, please?

23            (The question requested was read back by

24  the reporter.)

25       A.    Yes.

Page 38

1                     - PAUL A. MARCUS -

2          Q.    And what are those regulations?

3          A.    I can't specifically articulate which

4    regulations I've read.  I have read through their

5    procedural announcements, their rulings on certain

6    cases; so from that perspective, I've actually seen

7    some of their rulings.

8                MS. BEATTY:  Excuse me.  Mr. Marcus, can

9    you speak up a little bit?  You're hard to hear.

10               THE WITNESS:  Sorry.

11         Q.    Have you ever spoken to counsel about

12   the regulations governing the authority of the

13   Montana Public Service Commission?

14               MR. KAPLAN:  Objection to the form.

15         A.    I don't recall that specific discussion.

16         Q.    Other than in this case, what rulings of

17   the Montana Public Service Commission have you

18   reviewed?  And by "this case," what I mean are any

19   rulings that the Montana Public Service Commission

20   made in connection with either the acquisition of

21   the Montana Power assets by Northwestern or any

22   subsequent approvals of financings that

23   Northwestern did which might have been required by

24   the Montana Public Service Commission.

25         A.    I'm sorry?

1              - PAUL A. MARCUS -

2      Q.    Better question.

3            Other than the proceedings and decisions

4    of the Montana Public Service Commission, which are

5    referenced in your report which is Exhibit 3, what

6    other rulings and cases of the Montana Public

7    Service Commission have you reviewed?

8      A.    None that I recall.

9      Q.    So is it safe to say --

10           MR. KAPLAN:  Just for the record, I'm

11   not sure you cited the right exhibit.  I'm not sure

12   it's Exhibit 3.

13           MR. PIZZURRO:  I believe it is.

14     Q.    Could you tell us -- when I say

15   Exhibit 3, I'm talking about Exhibit 3 in this

16   deposition, the deposition of today.

17           MR. KAPLAN:  Okay.  The deposition.

18           MR. PIZZURRO:  I didn't mean any exhibit

19   to the report.

20     Q.    What is the scope of the authority of

21   the Montana Public Service Commission?

22           MR. KAPLAN:  Objection to the form.  Are

23   you asking for a legal interpretation of their

24   scope of authority?  What are you asking this

25   witness to testify about?

1                    - PAUL A. MARCUS -

2    constituents within their states.  And I know that

3    from having worked with regulators in many

4    different states and having seen their opinions and

5    having seen how they interact with many different

6    utilities.

7        Q.    Mr. Marcus, my question was:  What is

8    the scope of the authority of the Montana Public

9    Service Commission?

10           If you want to say, "I don't know,"

11   that's fine.  I would like an answer to that

12   question.

13           MR. KAPLAN:  I still have an objection

14   to that question.

15       A.    I can't give you a legal interpretation,

16   but I can give you an interpretation I have as a

17   layperson, which is that all commissions,

18   regardless of what state they're in, have an

19   obligation to protect the constituents within those

20   states -- protect the rate payers and consumers in

21   those states.

22       Q.    I didn't ask you what their obligations

23   were.  I asked what the scope of authority of the

24   Montana Public Service Commission was, what

25   authority does it have?

Page 42

1                   - PAUL A. MARCUS -

2              MR. KAPLAN:  Objection.  Calls for legal

3    conclusion.  Asked and answered.

4         A.    As I just said, I can't give you a legal

5    conclusion what the scope is.  But I can tell you

6    as a layperson the scope of the work that the

7    commissions do is -- include protecting the rate

8    payers and the constituents that they have in the

9    state.

10        Q.    Let's go back to your opinions in

11   Paragraph 13.  Looks to be -- I guess that's -- is

12   that a I?  Bottom of Page 5 -- bottom of Page 5?

13        A.    Yes.

14        Q.    I'm just going to read the first part of

15   this, sir.  It says, "The misstatements and

16   omissions in Northwestern's financial statements

17   registration statement in connection with the

18   $720 million in bonds, and other public disclosures

19   during 2002, enabled the company to complete the

20   October 2002, $87 million equity offering and the

21   transfer of the Northwestern Energy LLC assets to

22   Northwestern in November 2002."

23             Sir, what did you mean when you used the

24   word "enabled" in that sentence?

25        A.    Meaning that the information that was

Page 52

1          - PAUL A. MARCUS -

2              I've come up with an opinion that's

3    based on assessing numerous documents, having years

4    of experience and knowledge of these markets and

5    these industries, and have concluded and given you

6    my opinion as to what would happen.  What you want

7    to call it -- prediction versus not a prediction, I

8    can't define that for you right here.

9         Q.    In the sentence that we were just

10   looking at, you say, "impeded by the attempts of

11   security holders."

12              Who are the security holders that you're

13   referring to here?

14              I'm not -- let me make it maybe a little

15   clearer.  I'm not trying to trick the witness.

16              If you look at Paragraph 122 of your

17   opinion, the only security holders to which you

18   refer are the QUIPS holders.  And I'm just trying

19   to get clear that that's what we're talking about

20   in this sentence, are the QUIPS holders.

21              MR. KAPLAN:  Objection.

22   Mischaracterizes 122.

23        A.    The security holders in the opinion is

24   general.  That would be related to anyone who would

25   have felt that their interests would have been

Page 53

1                    - PAUL A. MARCUS -

2    disserved by having the assets transferred.

3             What I think in Paragraph 122 talks

4    about stakeholders, and then there's a

5    parenthetical, says, "including those holding the

6    QUIPS."  It doesn't eliminate anyone else who might

7    be an interested party in seeing the transfer not

8    happen.

9        Q.    As you sit here today, sir, do you know

10   of any other security holders who have had such an

11   interest, in your opinion?

12       A.    I think all of the security holders at

13   some level, whether they were secured or not

14   secured, or whoever they were in the capital

15   structure, had all of this bad information been out

16   in the marketplace would have had a variety of

17   different reactions and would have done whatever it

18   would take to protect their own positions.

19            And in this particular case, protecting

20   their position would entail keeping those assets

21   within the Montana Power fence, if you will, and

22   not being transferred out to Northwestern.

23       Q.    So is it your testimony that all of the

24   security holders in Northwestern, secured debt,

25   unsecured debt, equity, would have an interest in

Page 54

- PAUL A. MARCUS -

1

2  trying to impede the going flat transaction or the

3  transfer of the assets and liabilities from the

4  subsidiary to the parent?

5       MR. KAPLAN:  Objection to the form.

6       Q.    Is that your testimony?

7       A.    I have not analyzed each level and each

8  individual security holder in the capital

9  structure, and that would be required to answer

10 your question.

11       But I am saying that if any security

12 holder believed that things were as -- what had --

13 as they ultimately turned out to be, that they were

14 better off in a nonbankrupt, self-contained Montana

15 Power than they were in the Northwestern umbrella;

16 that it would be something that they would consider

17 and potentially could take action to try to impede.

18       Q.    How were the QUIPS holders injured as a

19 result of the asset transfer and liability

20 assumption in November of '02?

21       MR. KAPLAN:  Objection to the form.

22       A.    I haven't been asked to assess damages

23 in this case.

24       Q.    No, sir.  I'm not asking the damages.

25 I'm asking how they would have been injured.  How

Page 62

1                    - PAUL A. MARCUS -

2     that they would have done whatever they could have

3     to protect their constituents.  And to the extent

4     that that meant taking action, I believe that they

5     would have done that.

6          Q.    My question wasn't whether they wanted

7     to do or not wanted to do.

8               My question is:  Do you know what they

9     had the authority to do, yes or no?

10         A.    I haven't made a legal determination of

11    what their authority is.

12         Q.    You don't know, do you?

13              MR. KAPLAN:  Objection.  Asked and

14    answered.

15         Q.    Withdrawn.

16              Do you know whether the Montana Public

17    Service Commission in its history has ever

18    rescinded approval of a transaction once that

19    approval had already been given?  Ever?

20         A.    That's a bit of a loaded question in

21    that if you're asking me for a good transaction,

22    did they rescind it?  I don't know.

23              I don't know if there have been any

24    transactions where material information was omitted

25    or misrepresented and they were then put in a

1                    - PAUL A. MARCUS -

2    position of having to change their opinions.  So I

3    guess it's not really a fair apples to apples

4    comparison.

5         Q.    Fair enough.

6              When did the MPSC approve the

7    transaction, including the assets held at the

8    parent company?

9              MR. KAPLAN:  Objection.

10        A.    When you say the "transaction" --

11        Q.    When did the MPSC approve Northwestern's

12   acquisition of Montana Power assets and

13   Northwestern's ability to hold those assets at the

14   parent company level?

15        A.    I don't recall the specific date.

16        Q.    Would it refresh your recollection if I

17   told you that it was in January of 2002?

18        A.    Yes.  That would be my understanding of

19   approximately when that happened.

20        Q.    So you're not suggesting in any way that

21   any of the financial information upon which the

22   MPSC based that decision was false and misleading,

23   are you?

24              MR. KAPLAN:  Objection to the form.

25        A.    I haven't analyzed what information was

Page 64

– PAUL A. MARCUS –

1
2      available at the time or what was or was not false
3      and misleading.  Obviously, there were
4      representations made about what the future held,
5      and I haven't assessed whether or not those were
6      misrepresented or not.
7          Q.    I want to understand, Mr. Marcus, other
8      than your experience in dealing with utility
9      commissions, and having read the opinion of the
10     MPSC in connection with the approval of the
11     $390 million secured financing in '03, is there
12     anything else that you base your opinion on that
13     the MPSC would have acted to impede the going flat
14     transaction?
15             MR. KAPLAN:  Objection to the form.
16         A.    Based on my belief that the financial
17     information that would have come out would have
18     been so bad and would have endangered the company
19     so much that it's just common sense that they would
20     do whatever they could to protect their
21     constituents.
22         Q.    What could they do to protect their
23     constituents in those circumstances?
24         A.    They could stop the assets from being
25     transferred.  They could restrict salaries.  They

Page 69

- PAUL A. MARCUS -

Q.    Well, why didn't the MPSC just say,
"Give the assets back to your subsidiary
Northwestern Energy LLC"?

MR. KAPLAN:  Objection.

A.    At that point, I don't know if they had
the legal ability to do that.  I just don't know
the answer to your question.

Q.    You also don't know whether they had the
legal ability to impede the going flat transaction
having given their approval to the transaction in
January of '02, correct?

MR. KAPLAN:  Objection.

Q.    I'm just trying to probe the limits of
what your knowledge is concerning the scope of
authority and ability of the MPSC to act.  You
offer an opinion they would have impeded.

A.    That's correct.

Q.    You don't know whether they could have
ordered the assets given back.

That's your testimony, correct?

A.    My testimony is I don't know the legal
steps that they can take.  I can tell you that my
experience has seen a variety of different measures
that utility commissions have taken to protect the

Page 73

- PAUL A. MARCUS -

1    Credit Suisse First Boston, CSFB, was the
2    administrative agent."
3             Do you see that, sir?
4        A.    I do see that, yes.
5        Q.    Do you have an opinion that this would
6    have occurred, which is independent of the analysis
7    and opinions offered by Mr. Berliner?
8        A.    I haven't fully analyzed whether or not
9    there would have been a covenant default, as I
10   mentioned to you earlier.  I did not have
11   sufficient information to complete that analysis.
12   I could if I were asked to.
13       Q.    Sir, is the answer no?  You have no
14   opinion independent of Mr. Berliner as to whether
15   there would have been a default on financial
16   covenants; is that your testimony?
17            MR. KAPLAN:  Objection.
18       A.    My testimony is that I used this piece
19   of information from Mr. Berliner because I did not
20   independently calculate the numbers myself.  Were I
21   to calculate the numbers myself, I might come up
22   with the same opinion.  I just haven't done that.
23       Q.    You testified this morning you didn't do
24   that because you didn't feel you had sufficient

Page 122

1                          - PAUL A. MARCUS -

2       Q.    Did you ask Mr. Berliner -- strike that.

3            Did you ask anyone that such an

4    analysis, that is, an analysis of the goodwill

5    impairment and possible covenant breach on the

6    revolver be done?

7            MR. KAPLAN:  Objection to the form.

8       A.    I'm sorry.  Could you repeat the

9    question?  I thought you weren't done.

10      Q.    Did you ask anyone that such an analysis

11   be prepared, that is, an analysis of goodwill

12   impairment and possible covenant breach of the

13   revolver?

14           MR. KAPLAN:  Objection to the form.

15      A.    Not that I recall.

16      Q.    Do you know if anyone at Huron made such

17   a request?

18      A.    Not that I know of.

19      Q.    Prior to the time that you received

20   Mr. Berliner's documentation, had you included any

21   assumptions in your draft or any draft of your

22   report concerning a covenant breach and an

23   inability to draw on the revolver?

24      A.    I don't recall.

25      Q.    Again, I apologize if I'm repeating

Page 123

1                      - PAUL A. MARCUS -

2    something we went over, but prior to receiving

3    Mr. Berliner's report, whatever it was you received

4    on that weekend, had you done any independent

5    analysis as to whether or not there was a covenant

6    breach and an inability to draw on the revolver?

7         A.    And I believe what I testified to

8    earlier was that some analysis was done regarding

9    the covenants and what those covenants would have

10   been given -- the restated financial information,

11   and that I came to the conclusion after doing that

12   that I did not have sufficient information.

13              MR. KALECZYC:  Can you keep your voice

14   up?

15        A.    That I did not have sufficient

16   information to complete that analysis.

17        Q.    When you made that realization, did you

18   then ever ask that someone else make that analysis?

19        A.    I did not, no.

20        Q.    Did anyone at Huron make such a request

21   of anyone, to the best of your knowledge?

22        A.    Not to my knowledge, no.

23        Q.    Was the asset -- you've called at this

24   time asset transfer and it's referred to in this

25   litigation as the going flat transaction.

1             - PAUL A. MARCUS -

2        Q.    Okay.  Strike it.  Withdrawn.

3             Let me refer you back again to your

4    Opinion -- Marcus Exhibit 3.  Look at Page 7,

5    Paragraph -- looks like II, which is above the

6    background heading.

7        A.    I see that.

8        Q.    There it says -- this, again, is so

9    we're clear, this is in the portion of your report

10   which is headed "Summary of Opinions."

11            Do you see that, sir?

12       A.    I do.

13       Q.    II says, "Had the assets of Northwestern

14   Energy LLC not been transferred to Northwestern,

15   the QUIPS investors would have been covered by the

16   former's assets and not junior to the debt and

17   other liabilities of Northwestern Corporation."

18            Sir, do you have an understanding as to

19   why that opinion -- strike that.

20            -- as to how that opinion is relevant to

21   any issue in this lawsuit?

22       A.    Not that I can recall, no.

23       Q.    Why did you include it as an opinion?

24       A.    As part of my assessment of the

25   company's prospects and analyzing it became an

1                  - PAUL A. MARCUS -

2    issue that became obvious, that, I guess, in

3    conversations with counsel there was a discussion

4    about it and I was asked the question, and I

5    included it as part of my opinions.

6        Q.    Give us the best recollection you have

7    of your discussions with counsel about this

8    opinion.

9        A.    My best recollections are that I was

10   asked whether or not they were better off or not,

11   depending where the assets were.  And I said I

12   would analyze that and that's part of my opinion.

13   I guess I don't recall exactly how it became part

14   of the opinion.

15       Q.    Do you recall in any of your discussions

16   with counsel obtaining an understanding as to why

17   it is relevant in this lawsuit as to whether the

18   QUIPS holders were better off as creditors of

19   Northwestern Energy LLC or Northwestern?

20             MR. KAPLAN:  Objection to the form.

21       A.    I don't recall a specific understanding

22   of that, no.

23       Q.    Do you recall whether in any of those

24   discussions it was stated that the injury to the

25   QUIPS holders resulted from the conclusions that

Page 180

1                     - PAUL A. MARCUS -

2    Energy -- the QUIPS debt at Northwestern Energy

3    LLC?

4         A.     I don't recall.

5         Q.     Do you know whether there was anything

6    in the indenture or debt covenants associated with

7    the QUIPS that would have prohibited Northwestern

8    Energy LLC from assuming additional or taking on

9    additional debt that was superior to the QUIPS

10   debt?

11                MR. KAPLAN:  Objection to the form.

12        A.     I don't recall.  I'd have to look at the

13   agreements again.

14        Q.     In preparation of your expert report,

15   Mr. Marcus, did you review the Montana statutes

16   which govern the Montana Public Service Commission?

17        A.     I did not, no.

18        Q.     Did you read any of the regulations of

19   the Montana Public Service Commission?

20        A.     I did not, no.

21        Q.     Earlier today in response to some

22   questions from Mr. Pizzurro, you talked about the

23   constituents of the Montana Public Service

24   Commission.

25                Who, in your opinion, are the

1                    - PAUL A. MARCUS -

2        Q.    I think I know that you don't know.

3            MR. KAPLAN:  Objection to the extra

4    commentary.

5        Q.    Withdrawn.

6            Mr. Marcus, have you ever advised a

7    client on financing matters involving a company

8    regulated by the Montana Public Service Commission?

9        A.    I might have.  I just don't recall.

10        Q.    In what capacity might you have done

11    that?

12        A.    Most specifically, it would have been at

13    the time when I was a lender at Bank of America.

14    We lent money to companies in the utility industry.

15            I was doing that out of their Chicago

16    office so I was covering utilities all throughout

17    the midwest.  Montana was not specifically a state

18    that was covered in our geographical area, although

19    I'm just not sure I remember whether or not some of

20    the utilities that I was working with would have

21    had some holding in Montana that would have caused

22    Montana to regulate them.

23        Q.    But nothing that stands out in your mind

24    sitting here today?

25        A.    That's correct.

1                    - PAUL A. MARCUS -

2        Q.    Do you know what utilities operate in

3    Montana, regulated utilities?

4        A.    Sitting here today, no.

5        Q.    This morning I think you had testified,

6    if I took my note correctly, that you had reviewed

7    certain procedural pronouncements of the Montana

8    Public Service Commission.

9              Do you recall that testimony?

10       A.    If by the "procedural pronouncements"

11   you're talking about the final order to the

12   dissenting order on the $390 million bond offering,

13   I did review that.

14       Q.    That would have been the order that came

15   out in the early part of 2003?

16       A.    I believe that was the time frame.

17       Q.    And that's the same order in which you

18   quote from the dissenting opinion of Commissioner

19   Brainard, B-R-A-I-N-A-R-D; is that correct?

20       A.    That would be correct.

21       Q.    Other than that one particular order,

22   did you review any other orders of the Montana

23   Public Service Commission?

24       A.    I believe there were other things.  I

25   just don't recall what they were specifically.

Page 188

- PAUL A. MARCUS -

1

2      Q.    Would they be reflected in the exhibit

3   that's attached to your expert report?

4      A.    They should be.

5      Q.    If you could turn to the exhibit then,

6   just identify which other Public Service Commission

7   orders you may have relied upon.

8         MR. KAPLAN:  I object to making the

9   witness go through a long list of many documents

10   and testing his memory and ability to find the

11   document on these long lists.

12      A.    I'm not sure I could do that sitting

13   here today.  Some of this stuff is identified by a

14   name and Bates number, but it could have an order

15   within it.  I just -- I'm not trying to not answer

16   the question.  I just can't answer it based on this

17   list.

18      Q.    Other than the order which you have

19   already identified and testified to, do you recall

20   relying upon any other orders of the Public Service

21   Commission in Montana for purposes of opinions you

22   formulate in your expert report?

23      A.    To the extent that I read other

24   opinions, they would have been included.  I think

25   my thinking of how the Commission would react in

1                    - PAUL A. MARCUS -

2    certain situations and my recollection is that I

3    saw some other things from earlier in the time

4    period from the Commission.  I just can't identify

5    them sitting here.

6         Q.    Would they have been other things

7    related to the docket whose subject was the

8    acquisition of Montana Power LLC by Northwestern?

9         A.    That would be my general understanding,

10   yes.

11        Q.    Do you have any recollection of looking

12   at any orders of the Montana Public Service

13   Commission dealing with dockets involving regulated

14   utilities other than Northwestern Corporation?

15        A.    I did not, no.

16        Q.    How did you locate those other orders?

17   Did you find them or your staff find them or were

18   they given to you?

19        A.    My staff provided them to me.  I don't

20   know if they independently found those or they

21   requested them from counsel.  I just don't know the

22   answer to that.

23        Q.    Are there any opinions or orders of the

24   Public Service Commission on which you relied that

25   are not referenced somewhere in your expert report?

Page 194

1                      - PAUL A. MARCUS -

2     of different information releases.  I have been

3     involved in seeing how they treated different

4     companies under a whole bunch of different

5     scenarios, if that answers your question.

6          Q.    In those other situations, were you

7     called upon to render expert opinion as you have

8     done in this case?

9                MR. KAPLAN:  Objection to the form.

10         A.    No.  They would have been in situations

11    where I was actually financing the utilities, for

12    the most part of that time.

13         Q.    This would have been the time when you

14    worked for Bank of America?

15         A.    Bank of America and Shawmut Corporation.

16         Q.    Since the time that you left Bank of

17    America and Shawmut, have you rendered any opinions

18    similar to the type that you render here about what

19    a public service commission might do in a

20    particular set of circumstances?

21         A.    In a legal case?

22         Q.    In a legal case.

23         A.    I have not, no.

24         Q.    How about other than in a legal case?

25         A.    I have had clients over the years who

1                - PAUL A. MARCUS -

2    were utility companies where I might have given

3    them advice or guidance as to how I thought a

4    regulator might respond to things.

5        Q.    But never as an -- as a testifying

6    witness in a legal proceeding.  By "legal

7    proceeding," I would include a regulatory

8    proceeding as well as a court proceeding.

9        A.    That's correct.

10       Q.    On which state commissions were you

11   opining on to your clients in these other

12   nonlitigated matters?

13       A.    Massachusetts would have been one.  I

14   think New York might have been one.  Those are two

15   that I recall.

16       Q.    Did you review the report by Steve

17   Scherf filed on behalf of Messrs. Hanson and Kindt

18   in this case?

19       A.    "Review" would be a strong word.  I did

20   skim through it quickly.

21       Q.    And in your looking at Mr. Scherf's

22   report, do you have any opinions or criticisms of

23   his report?

24            MR. KAPLAN:  Objection.

25       A.    Sitting here, I can't really remember