

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 04-1494-JJF |
| NORTHWESTERN CORPORATION, | : | |
| Defendant. | : | |
| MAGTEN ASSET MANAGEMENT CORP., | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 05-499-JJF |
| MIKE J. HANSON and ERNIE J. KINDT, | : | |
| Defendants. | : | |

## EXPERT REPORT OF BRUCE B. BINGHAM, FASA

[This Report has been designated as Confidential pursuant to orders entered by the Court.]

October 17, 2007

## Table of Contents

I.      Introduction and Qualifications............................................     1

II.     Summary of Opinions...........................................................     3

III.    Background and Overview of NorthWestern Corporation............     5

IV.     The Appraisals Prepared by American Appraisal Associates were
        Prepared in Accordance with USPAP..................................     6

        A.  Appraisers are Required to Follow USPAP..........................     6

        B.  The AAA Reports were Prepared in Accordance with
            USPAP.................................................................     9

V.      Berliner Lacks the Training, Experience or Credentials to
        Perform an Appraisal.........................................................     12

VI.     Berliner Ignored USPAP in the Preparation of his Appraisal for
        Expanets......................................................................     13

        A.  Berliner Utilizes Information Which Was Only Available
            Subsequent to the Effective Date of the Appraisal.......................     13

        B.  Berliner Ignores the Market Approach.................................     14

VII.    Berliner Violated USPAP in the Valuation of Blue Dot by Utilizing
        Information Which was Only Available Subsequent to the
        Effective Date of the Appraisal...........................................     15

VIII.   A Quantification of Goodwill Impairment of Expanets or Blue Dot
        as of June 30, 2002 would not have Been Completed Before the
        End of October 2002, and Most Likely not until Mid-November
        2002...........................................................................     16

IX.     Right to Supplement.........................................................     19

        Appendices

A.      Bruce B. Bingham Circulum Vitae

B.      Documents Relied on or Considered by Bruce B. Bingham

## I.    Introduction and Qualifications

I have been retained by Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis, Mallet") to provide opinions on: (i) the appropriateness of the valuations of Expanets, Inc. ("Expanets") and Blue Dot ("Blue Dot") performed by American Appraisal Associates ("AAA") and (ii) comment on the conclusions reached in the Expert Report of Robert W. Berliner, CPA, CFE dated September 19, 2007 (the "Berliner" report) in the matters of Magten Asset Management Corp. and Law Debenture Trust Company of New York, Plaintiffs, v. NorthWestern Corporation, Defendant and Magten Asset Management Corp., Plaintiff v. Mike J. Hanson and Ernie J. Kindt, Defendants.

I am the executive director of Capstone Valuation Services, LLC, a subsidiary of Capstone Advisory Group, LLC (together "Capstone"). Prior to Capstone, from July 1, 2004 to November 10, 2005, I was the senior managing director of Trenwith Valuation, LLC ("Trenwith"). Prior to July 1, 2004, I was a partner of BDO Seidman, LLP and national practice director of its Valuation Services practice. (On July 1, 2004, the Valuation Services practice became known as Trenwith and is now an affiliate of BDO Seidman, LLP.)

Prior to joining BDO Seidman in June 1997, I was a vice president and member of the executive committee of The Barrington Consulting Group, Inc ("Barrington"). At Barrington, I was the co-national director of the Valuation Practice and was responsible for numerous valuation and related projects for litigation and non-litigation clients and projects. Prior to joining Barrington, I was a principal (non-CPA Partner) at KPMG Peat Marwick, LLP where I was the principal in charge of the New York City

Appraisal/Valuation group. From 1971 to 1976, I was a commercial loan officer of the Connecticut Bank and Trust Company.

Over the course of my career, I have been retained as an expert witness or consulting expert numerous times. I have testified as to the value of private companies, public companies and other assets and liabilities. I have conducted more than a thousand business valuations in my career and served as an examiner for the American Society of Appraisers, reviewing valuation reports submitted by candidates seeking accreditation by the American Society of Appraisers in business valuation.

I am an elected fellow of the American Society of Appraisers ("FASA") and the past chairman of the Business Valuation Committee of the American Society of Appraisers, which is recognized as the governing body of the business valuation discipline in the United States. I am also a retired brigadier general, United States Army.

My curriculum vitae ("CV"), including a list of all cases in which I have testified as an expert either at trial or by deposition during the past four years, as well as other significant matters, is attached hereto as Appendix A.

In preparing this report, I have relied extensively on the knowledge and experience that I have gained through consultancy and work experience in the practice of business valuation.

My billing rate for this assignment is $595 per hour. I was assisted by others at Capstone, who worked at my direction and under my supervision. In addition, I have considered and relied upon various documents in the preparation of this report. A list of those documents is attached hereto as Appendix B.

## II.    Summary of Opinions

In my opinion:

1. AAA prepared valuation reports and opinions of fair value for Expanets and Blue Dot and as of January 1, 2002 and as of October 1, 2002 (together, the "AAA Reports"). I have reviewed the AAA Reports and found them to be prepared in accordance with Uniform Standards of Professional Appraisal Practice ("USPAP"). AAA is a prominent, internationally recognized and qualified business valuation firm whose certifying professionals are accredited in business valuation. AAA applied both the Market Approach and Income Approach to valuation as required by USPAP.

2. Deloitte & Touche (D&T"), NorthWestern's auditors, reviewed and accepted the AAA Reports. Based on my experience preparing and reviewing hundreds of valuation reports submitted for Statement of Financial Accounting Standard ("SFAS")142 goodwill impairment compliance, the comments of the D&T valuation partner reviewing the AAA report do not reflect any material concern or specific criticism justifying further analysis or any change in the reported value.

3. Berliner lacks the training, experience and credentials to be considered a valuation expert. Berliner is not a certified appraiser and blatantly disregards accepted appraisal procedures. Therefore, in my opinion, Berliner is not qualified to perform valuations or opine on valuations performed by AAA or other qualified valuation professionals.

4. Berliner violated the most basic professional standards of business valuation and failed to follow USPAP in determining the enterprise value of Expanets as of January 1, 2002. The conclusions reached by Berliner assume information which was only

available subsequent to the effective date of the valuation and he also ignored the Market Approach[1] to valuation, in violation of USPAP. Therefore, his valuation should not be considered in determining the enterprise value of Expanets as of January 1, 2002.

5. Berliner also violated the most basic professional standards of business valuation and failed to follow USPAP in determining the enterprise value of Blue Dot as of January 1, 2002. The conclusions reached by Berliner assume information which was only available subsequent to the effective date of the valuation, in violation of USPAP. Therefore, his valuation should not be considered in determining the enterprise value of Blue Dot as of January 1, 2002.

6. Based on my personal experience with dozens of SFAS 142 valuations prepared by AAA and considering the procedures used in its valuations for Expanets and Blue Dot, it is my opinion that even using the most expedited timeframe, the quantification of the June 30, 2002 goodwill impairment would not have been determined and finalized until the end of October 2002 at the earliest, and likely not until mid-November 2002. Even assuming Berliner's alternative valuations and goodwill impairment analysis were valid, which I do not, the goodwill impairment could not have been known until that time.

---

[1] The Market Approach to valuation is discussed in Section IV-A.

## III. Background and Overview of NorthWestern Corporation

NorthWestern is based in Sioux Falls, South Dakota. In 2001 and 2002, NorthWestern consisted of the following lines of business:

- a regulated electric and natural gas business in South Dakota, Nebraska and Montana (the Montana operations were acquired during 2002);

- a subsidiary that had investments in Expanets, a national provider of integrated communications, data solutions and network services to business customers;

- investments in Blue Dot, a national provider of heating, ventilating, air conditioning, plumbing and related services ("HVAC"); and

- a wholly-owned subsidiary that owned an interest in CornerStone Propane Partners, L.P. ("CornerStone"), a business that distributed retail propane and wholesale energy-related commodities throughout North America.[2]

NorthWestern adopted SFAS 142: Goodwill and other Intangible Assets as of January 1, 2002.[3] NorthWestern engaged AAA on June 30, 2002 to prepare valuations of its Expanets and Blue Dot businesses as of January 1, 2002[4] to assist in its implementation of SFAS 142. In accordance with SFAS 142, NorthWestern selected October 1 as its annual goodwill impairment test date and also engaged AAA on December 27, 2002 to prepare valuations of Expanets and Blue Dot as of October 1, 2002.[5]

---

[2] NorthWestern Corp. Form 10-K/A filed 9/20/2002 for Period Ending 12/31/2001, pages 4 - 6.
[3] Financial Accounting Standards Board, Statement of Financial Accounting Standard No. 142.
[4] Engagement letter of American Appraisal Associates dated June 30, 2002 (AAA144539).
[5] Engagement letter of American Appraisal Associates dated December 27, 2002 (AAA14495).

## IV. The Appraisals Prepared by American Appraisal Associates were Prepared in Accordance with USPAP

### A. Appraisers are required to follow USPAP

The profession of business valuation is based on established professional standards that provide clear and specific direction for the conduct of work. Compliance with these standards is not optional, and when they are not followed, erroneous or misleading conclusions can result.

The highest level of standards are USPAP, established in 1986-1987 by the Appraisal Foundation and its Appraisal Standards Board ("ASB"). According to the 2002 edition of USPAP: "The ASB of the Appraisal Foundation develops, publishes, interprets, and amends the USPAP on behalf of appraisers and users of appraisal services. Because USPAP will be used by state and federal regulatory agencies and others, the ASB has developed a publication policy to ensure that all interested parties are informed of interpretations of or amendments to USPAP in a regular and timely manner."[6]

Standards 1 through 8 relate primarily to the valuation of real property and personal property. Standards 9 and 10 relate to business valuation.

Standard 9 states that "In developing a business or intangible asset appraisal, an appraiser must identify the problem to be solved and the scope of work necessary to solve the problem and correctly complete the research and analysis steps necessary to produce a credible appraisal."[7]

---

[6] Uniform Standards of Professional Appraisal Practice – 2002 Edition at I.
[7] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 72.

Standards Rule 9-2(e) states "In developing a business or intangible asset appraisal, an appraiser must identify...the scope of work that will be necessary to complete the assignment."[8] This Standards Rule also states:

- "The scope of work is acceptable when it is consistent with:

    1) the expectations of participants in the market for the same or similar appraisal services; and

    2) **what the appraiser's peers' actions would be in performing the same or a similar business valuation assignment in compliance with USPAP**. (emphasis added)

An appraiser must have sound reasons in support of the scope of work decision and must be prepared to support the decision to exclude any information or procedure that would appear to be relevant to the client, an intended user, or the appraiser's peers in the same or similar assignment."[9]

Further, Standards Rule 9-4 states "In developing a business or intangible asset appraisal, an appraiser must collect and analyze all information pertinent to the appraisal problem, given the scope of work identified in accordance with Standards Rule 9-2(e)."[10]

Standards Rule 9-4(a) states: "An appraiser must develop value opinion(s) and conclusion(s) by use of one or more approaches that apply to the specific appraisal assignment."[11] The comment on this Standards Rule goes on to say: "This rule **requires** the appraiser to use **all relevant approaches for which sufficient reliable data are**

---

[8] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 73.
[9] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 73.
[10] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 74.
[11] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 74.

**available.** (emphasis added)   However, it does not mean that the appraiser must use all approaches in order to comply with the rule if certain approaches are not applicable." [12]

The "approaches" mentioned in the above rule are defined in the American Society of Appraisers Business Valuation Standards Definitions of Business Valuation Terms as follows:

- The *Income(Income-Based) Approach* – a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount. [13]

- The *Cost Approach* – a general way of determining a value indication of an individual asset by quantifying the amount of money required to replace the future service capability of that asset. [14]

- The *Market (Market-Based) Approach* – a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold. [15]

USPAP provides further clarification in its Statement on Appraisal Standards No. 3: Retrospective Value Opinions.  Following are the conclusions from that statement: [16]

- "A retrospective appraisal is complicated by the fact that the appraiser already knows what occurred in the market after the effective date of the appraisal."

---

[12] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 74.
[13] ASA Business Valuation Standards as of January 1, 2002 at 23.
[14] ASA Business Valuation Standards as of January 1, 2002 at 23.
[15] ASA Business Valuation Standards as of January 1, 2002 at 22.
[16] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 87.

• "Data subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date...In the absence of evidence in the market that data subsequent to the effective date were consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser."

## B.  The AAA Reports were Prepared in accordance with USPAP

I have reviewed the AAA Reports prepared for Expanets[17] and Blue Dot[18] as of January 1, 2002 and as of October 1, 2002.[19] [20]  AAA is a 110-year old international valuation firm with 43 offices throughout the world.[21]  Its valuators are trained and either accredited or candidates for accreditation.  In the course of my work at KPMG, BDO Seidman, LLP and Trenwith, I have had occasion to review dozens of valuation reports prepared by AAA, and found them to be in compliance with USPAP.

As required by USPAP, AAA considered both the Income Approach and the Market Approach in each of the AAA Reports.[22]  AAA describes and discusses the applicability of each approach.

AAA determined that both approaches were applicable to Expanets.  Therefore, AAA's opinion of value for Expanets included both approaches, which were equally weighted.  AAA concluded that the fair value of the business enterprise of Expanets was $790 million and $305 million as of January 1, 2002 and October 1, 2002 respectively.

---

[17] Expanets, Inc and Subsidiaries Fair Value report as of January 1, 2002 (NOR305016 – NOR305081)
[18] Blue Dot Services, Inc. and Subsidiaries Fair Value report as of January 1, 2002 (NOR365584 – NOR365647)
[19] Expanets, Inc and Subsidiaries Fair Value report as of October 1, 2002 (NOR305083 – NOR305139)
[20] Blue Dot Services, Inc. and Subsidiaries Fair Value report as of October 1, 2002 (NOR364662 – NOR364719)
[21] American Appraisal website (www.american-appraisal.com)
[22] The Cost Approach is not applicable in the valuation of income generating assets.

The Income Approach is based on projections provided by NorthWestern. Berliner states that AAA "accepted without further verification" NorthWestern's "aggressive projections for Expanet...."[23] USPAP allows valuators to disclose their reliance on management's information as being accurate and not perform further testing of provided information. However, the January 1, 2002 Expanets report states that "overall, the projections provided by management were deemed reasonable",[24] Therefore, AAA documented that they reviewed the projections and discussed the major assumptions with management.

In the Blue Dot reports, AAA also considered both the Income Approach and Market Approach. AAA calculated an enterprise value of $280 million as of January 1, 2002 based on the Market Approach. However, AAA determined that the "...value derived by the Market Approach understates the value of Blue Dot."[25] The fair value of the 100% interest in the business enterprise of Blue Dot as of January 1, 2002 was determined to be $351 million which is entirely based on the Income Approach. Therefore, AAA considered both methods but found the Market Approach to be inapplicable and documented such in accordance with USPAP.

Each of the AAA Reports includes certifications that they were prepared in compliance with USPAP and the Code of Ethics of the American Society of Appraisers. In addition, the AAA Reports were reviewed and accepted by NorthWestern's auditors, D&T. Berliner points out D&T's concerns with AAA's valuation of Expanets upon implementation of SFAS 142. Berliner points out that D&T partner Daniel Lynn expressed concerns regarding the AAA valuation of Expanets, as follows:

---

[23] Expert report of Robert W. Berliner at 2-12.
[24] Expanets, Inc and Subsidiaries Fair Value report as of January 1, 2002 (NOR305040)
[25] Blue Dot Services, Inc. and Subsidiaries Fair Value report as of January 1, 2002 (NOR365609)

"1. The indication of value derived from the Income Approach may be optimistic in light of the following factors:

a.    Indications of value derived from this approach are dependant on judgmental assumptions regarding future Expanet performance that anticipate significant revenue growth and substantial improvement in profitability.

b.    The discount rate selected by AAA may not adequately consider company-specific risk...

2.    The indications of value derived from the Market Approach are dependant upon judgmental comparisons to the guideline companies. Interpretations of the data which ascribe relatively more weight to recent Expanets financial performance could result in significantly lower indications of value."[26]

Berliner also points out similar comments made by D&T regarding the Blue Dot valuation reports. However, all of the AAA Reports were accepted by D&T without adjustment.

In my valuation career, I have read review comments on SFAS 142 valuations by valuation experts at D&T as well as all other prominent accounting firms. The language in the D&T comment quoted above does not reflect any material concern or specific criticism justifying further analysis or any change in the reported value. I know from personal experience that if D&T had any serious concerns with the AAA Reports, indications of value and approaches used to reach those indications of value, they could have and would have voiced them. Berliner's observation that "no changes were made to

---

[26] Expert report of Robert W. Berliner at 2-10.

11

management's projections or AAA's valuation as a result of D&T's comments"[27] only supports AAA's opinion.

Based on my review, the AAA Reports were prepared in accordance with USPAP and the Code of Ethics of the American Society of Appraisers. Therefore, in my opinion, the AAA Reports accurately represent the fair value of Expanets and Blue Dot as of January 1, 2002 and as of October 1, 2002.

## V.    Berliner Lacks the Training, Experience or Credentials to Perform an Appraisal

Berliner openly criticizes AAA, a reputable firm in business of performing appraisals. In addition, Berliner performs his own valuations for Expanets and Blue Dot. In reviewing Berliner's CV,[28] I noted that his experience and credentials do not include any of the following:

- credentials as a valuation expert, such as an Accredited Senior Appraiser ("ASA"] or American Institute of CPAs Accredited in Business Valuation ("AICPA/BV");

- issuance of valuation reports or fair value opinions;

- testifying experience as a valuation expert;

- business valuation work performed;

- professional valuation association affiliations;

- publication of articles on valuation or in valuation trade publications, such as the Business Valuation Review or Business Value Update;

- valuation teaching credits;

---

[27] Expert report of Robert W. Berliner at 2-11.
[28] Expert report of Robert W. Berliner at Exhibit A.

- instances where Berliner has been quoted in treatises or publications on valuation issues.

Therefore, in my opinion, Berliner is not qualified to perform valuations or opine on valuations performed by AAA or other qualified valuation professionals.

## VI. Berliner Ignored USPAP in the Preparation of his Appraisal for Expanets

Berliner makes two fatal errors in his approach to the valuation of Expanets as of January 1, 2002:

- Berliner utilizes information that was only available subsequent to the effective date of the appraisal.

- Berliner ignores the Market Approach.

### A.    Berliner Utilizes Information which was only Available Subsequent to the Effective Date of the Appraisal

Berliner frequently relies on information that was developed after the January 1, 2002 valuation date. In criticizing the projections used by AAA, Berliner states "Management's forecasts of Expanet's revenues are even more implausible in light of the **actual results for the first six months of 2002**."[29](Emphasis added)  Berliner then performs a valuation for Expanets based only on the Income Approach and his projections are based on the revenue forecast for 2002 included in the June 30, 2002 Management Financial and Information Report ("MFIR").[30]  This report was developed and distributed in late July of 2002, approximately seven months after the effective date of the valuation. In addition, Berliner adds his own assumptions to management's

---

[29] Expert report of Robert W. Berliner at 2-11
[30] Expert report of Robert W. Berliner at Attachment A-8 to opinion 2.

13

forecast including "...annual projected revenue growth reduced from an average of 10% to 5% to reflect decline in telecommunications industry and lower than expected sales growth..."[31] This adjustment had a direct impact on future cash flows and the January 1, 2002 enterprise value of Expanets.

Berliner's asserts that "...such adverse information was known prior to the issuance of AAA's valuation as of January 1, 2002."[32] However, this information was not available until July 2002, approximately seven months after the January 1, 2002 valuation date. Use of information such as actual company performance data after the effective date of the valuation is not permitted under USPAP, since it could not have been determined or known as of the valuation effective date.

Current practice in the business valuation community focuses on what the buyer or seller would have known at the valuation date or what trends were being considered at the valuation date. Thus, what would have been known at the January 1, 2002 effective date is relevant to the valuation, not what would have been known at the AAA report transmittal letter date of September 3, 2002 or when the June 30, 2002 MFIR was issued in July of 2002.

## B. Berliner Ignores the Market Approach

In opining this value, Berliner is in clear violation of Standards Rules 9-2(e)[33] and 9-4(a).[34] He has totally disregarded and not considered the Market Approach indication of value. While he actively criticizes the AAA Income Approach, he had no comments on the Market Approach, suggesting that he either had no criticisms or chose to ignore it

---

[31] Expert report of Robert W. Berliner at Attachment A-8 to opinion 2.
[32] Expert report of Robert W. Berliner at Attachment A-8 to opinion 2.
[33] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 73.
[34] Uniform Standards of Professional Appraisal Practice – 2002 Edition at 74.

in violation of the USPAP rules. Berliner, using only the Income Approach, states that "Employing these more realistic assumptions, my estimate of Expanets business enterprise value as of January 1, 2002 is $165 million."[35]

If Berliner had hypothetically utilized the AAA Market Approach along with his own inappropriately revised Income Approach as an indication of value based on subsequent information, then the reconciled conclusion of value for Expanets would be approximately $466 million, $301 million higher than the $165 million in his report.[36]

## VII. Berliner Violated USPAP in the Valuation of Blue Dot by Utilizing Information which was Only Available Subsequent to the Effective Date of the Appraisal

Similar to in the Expanets example, Berliner frequently relies on information that was developed after the January 1, 2002 valuation date. In the case of Blue Dot, Berliner states that "Management's forecast of Blue Dot's revenues and EBITDA were...very optimistic in light of the actual results for the first six months of 2002...therefore, I recalculated Blue Dot's business enterprise value that was substantially overstated."[37] The projections used by Berliner are based on the YTD revenue as of June 30, 2002 included in the MFIR for June 30, 2002. [38] This report was developed and distributed in late July of 2002, approximately seven months after the effective date of the valuation. Again, similar to Expanets, Berliner makes his own assumptions to management's

---

[35] Expert report of Robert W. Berliner at 2-12.
[36] Calculated as the average of the value derived by AAA under the Market Approach ($824.5 million) [NOR305042] and Berliner's conclusion under the Income Approach ($219 million) [Berliner report at Attachment A-7 to opinion 2] less a working capital deficiency of $56 million [NOR305042].
[37] Expert report of Robert W. Berliner at 2-17
[38] Expert report of Robert W. Berliner at Attachment A-17 to opinion 2.

forecast regarding revenue growth, gross margin and operating expenses[39] which reduce the future cash flows and the January 1, 2002 enterprise value of Blue Dot.

As in the case of the Expanets valuation, Berliner has used information developed subsequent to the effective date of the appraisal which is not permitted under USPAP, since it could not have been determined or known as of the valuation effective date.

## VIII. A Quantification of Goodwill Impairment of Expanets or Blue Dot as of June 30, 2002 would not have Been Completed Before the End of October 2002, and Most Likely not until Mid-November 2002

I have been asked to comment on the timeline associated with the preparation of a USPAP and SFAS 142 compliant report reflecting goodwill impairment as of Berliner's suggested date of June 30, 2002. As clearly stated in SFAS 142, Step 1 of the impairment test process is used to determine if the book value, or carrying value, of the entity being tested exceeds its fair value. This requires the determination of the enterprise value of the entity. To get the enterprise value in compliance with USPAP, all relevant approaches for which data is available must be considered. It has already been established that there is adequate data with which to apply the Market Approach, and that precedent had been set in the January 1, 2002 reports. To properly apply the Market Approach for a June 30, 2002 valuation date, a valuator must have the corresponding financial information for the comparable public companies. This data is required to be filed with the SEC within six weeks of the reporting date, or on approximately August 15, 2002. The Market Approach also requires the most accurate financial data on the subject company. Valuators will usually rely on financial statements filed with the SEC

---

[39] Expert report of Robert W. Berliner at Attachment A-17 to opinion 2.

by the company or its parent. NorthWestern's second quarter financials were filed with the SEC on August 14, 2002.[40]

With the requisite financial data in hand, the valuator can then perform the analysis needed to reach an indication of value under the Market Approach. In my experience, this analysis can typically take two weeks. At this point, the analysis is reviewed by engagement managers and partners for quality control. Once this is done, the indication of value reached under the Income Approach (which I assume could have been prepared earlier since it is based on future-looking projections, not historical data) are considered with the Market Approach indication of value to form an opinion of value. Depending on the availability of the senior members of the valuation team, this process can take another week.

The next step in the process is to submit the draft opinion and the supporting exhibits to the client for comment. Once any issues have been resolved, the client gives the draft to its outside auditors, in this case, D&T for its comments. The outside auditors then have the report reviewed by their valuation expert. I observed a similar process regarding the January 1, 2002 AAA reports with D&T providing its comments and AAA responding.

Again, depending on the availability of senior personnel at the accounting firm, the valuation firm and the client, this process can take one to two weeks. Once complete, and with the auditors accepting the draft conclusion, the opinion can be considered final and relied upon for determining if an impairment exists or not. Even with an expedited process, a final determination of whether an impairment existed at June 30, 2002 could not have been completed before mid-September 2002.

---

[40] NorthWestern Corp. 10-Q for the period ended June 30, 2002 filed August 14, 2002.

It is critical to note that all that has been determined in Step 1 is that an impairment may or may not exist and that Step 2, the actual quantification of the possible impairment is required.

If the carrying value is greater than the fair value, Step 2 requires a complex process. The lower fair value is treated like a hypothetical purchase price of the entity, and all underlying assets and liabilities must be allocated to that established fair value. Once all of the assets and liabilities have been valued, the new residual goodwill number is the figure subject to adjustment.

If an impairment test for June 30, 2002 had been ordered by NorthWestern, Step 2 would have started after Step 1 had been finalized in mid-September, 2002. As emphasized above, all real property, machinery and equipment, all accounts receivable, inventories, separate intangibles and loans on the balance sheet must be valued at June 30, 2002. Clearly, this involves a level of detail considerably greater than Step 1, and can take several weeks to complete. In my experience, due to the large number of assets that need to be valued, the Step 2 process can take 3 to 6 weeks, and then the valuator goes through the requisite comment and review process with the client and the outside auditor.

Based on my personal experience with dozens of SFAS 142 valuations and the AAA procedures used in its valuations for Expanets and Blue Dot, it is my opinion that even using the most expedited timeframe, the quantification of the June 30, 2002 goodwill impairment would not have been determined and finalized until the end of October 2002 at the earliest, and likely not until mid-November 2002.

## IX. Right to Supplement

My work in this matter is ongoing. To the extent that additional facts, documents, other information, or other expert materials in this action may become available in the future, I reserve the right to modify or supplement my conclusions accordingly. My conclusions are also subject to modification or supplementation based on further analysis of the data and information that have already been provided to me.

Bruce B. Bingham, FASA

## Appendix A: Curriculum Vitae of Bruce B. Bingham

### BRUCE B. BINGHAM, FASA

## EMPLOYMENT HISTORY

December, 2006 to the present

**Capstone Valuation Services, LLC**

*Executive Director*

Mr. Bingham is the Executive Director of this affiliate company of Capstone Advisory Group, LLC, specializing in valuations of public and privately held businesses, equity interests, intangible assets, lost profits and business interruption. His work is used in connection with transactions, litigation, restructuring, arbitration, accounting and tax, and board advisory/management planning purposes.

July, 2004 to November, 2006

**Trenwith Valuation, LLC**

*Senior Managing Director*

Mr. Bingham was Senior Managing Director of this affiliate company of BDO Seidman, LLP, specializing in valuations of public and privately held businesses, equity interests, intangible assets, lost profits and business interruption. His work was for transactions, litigation, accounting and tax, arbitration, and management planning purposes.

June 1997 to June, 2004

**BDO Seidman, LLP**

*Partner*

Mr. Bingham was the National Practice Director of Valuation Services, specializing in valuations of public and privately held businesses, intangible assets, lost profits and business interruption. His work was for litigation, accounting and tax, and management planning purposes.

October 1995 to May 1997

**The Barrington Consulting Group, Inc.**

*Vice President and Member of the Executive Committee*

Mr. Bingham was the co-national director of the Valuation Practice, and performed numerous valuations for litigation and non-litigation clients.

Bruce B. Bingham
Curriculum Vitae

## EMPLOYMENT HISTORY (Continued)

August 1978 to October 1995

> **KPMG Peat Marwick, LLP**
> *Principal*
> Mr. Bingham was the Principal in charge of the Appraisal/Valuation Group in the New York Office. He directed hundreds of business valuations and testified as an expert witness before Federal and state courts as well as arbitration panels.

September, 1971 to August, 1976

> **The Connecticut Bank and Trust Company**
> *Assistant Treasurer*
> Mr. Bingham was a commercial loan officer and assistant branch manager, with credit analysis and branch management responsibilities.

## EXPERT TESTIMONY EXPERIENCE

Herbert R. Axelrod and Evelyn Axelrod versus Central Garden & Pet Co., Inc. et al
*Superior Court of New Jersey, Monmouth County- Law Division, Docket numbers MON-L-5100-99 and MON-L-2127-99* (Provided expert report, deposition and jury testimony.)

Miltope Corp. and IV Phoenix Group, Inc. versus DRS Technologies, Inc. et al
*US District Court, Eastern District of NY, Docket No. CV 01/6545 (LDW)(ETB)* (Expert report and testimony)

Bessemer Trust Company, NA versus Francis S. Branin, Jr.
*US District Court, Southern District of NY, Case number 02 CV 10276 (JES)*

David C. Soward, et al, versus The & Trust, et al (Bosack and Lerner)
*American Arbitration Association number 74 y 181 00129 04 LOPE* (Expert report and testimony)

Gencor Industries, Inc. et al (Chapter eleven)
*US Bankruptcy Court, Middle District of Florida, Orlando Division, Case number 00-03597-6J1*

Judith A. Holcombe, Theodore A. Holcombe and Richard E. Stater versus Yum! Brands, Inc. and Pizza Hut International, LLC
*American Arbitration Association number 50 T 114 00299 02* (Expert report and testimony)

Triple B Clays, Inc. vs. County of Los Angeles et al

Bruce B. Bingham
Curriculum Vitae

## EXPERT TESTIMONY EXPERIENCE (Continued)

*Superior Court of California in and for the County of Los Angeles, Case No: BC 336826*

Innovative Service Technology Management Services, Inc. versus Bradley G. Jenkins, W. Guinn Jenkins and Randall Foster
*Superior Court of Fulton County, State of Georgia, Civil action file number 2000-CV-24578*

Qantum Communications Corp. versus Star Broadcasting, Inc.and Ronald Hale, Sr.
*United States District Court ,Southern District of Florida, case number 05-21722-Martinez/Bandstra*

Lefrak Organization versus Gulf Insurance
*In process, case and court information not yet available*

General Time Corp. et al versus Frederick Pistilli et al (Chapter Eleven) (Expert report)
*US Bankruptcy Court, Northern District of Georgia, Atlanta Division, Case 01-68893 and 03-9217-CRM*

William Holekamp and The Crawford Group, Inc.
*American Arbitration Association, Case number 58 168 Y 001 8504* (Testimony, deposition and expert report)

Studsvik, Inc. versus Metric Constructors, Inc. and Duke Engineering & Services, Inc., a joint venture (Expert report and testimony)
American Arbitration Association, Case number 39 Y 110 00109 99

## ARTICLES AND PUBLICATIONS

"A Second Opinion on Fairness Opinions," published in <u>Directorship Magazine</u>, Volume XXI, Number 3, March, 2005.

<u>U.S. Army Civil Affairs-The Army's "Ounce of Prevention,"</u> published by the <u>Institute of Land Warfare Papers</u>, Volume 41, March, 2003, with D. L. Rubini and M. J. Cleary.

"<u>The Internal Revenue Service and Treasury Turn Up the Enforcement Heat on Abusive Tax-Related Appraisals and Those Who Prepare Them</u>," published in Business Valuation Review, Volume 24, No. 3, Fall, 2005, by Jay Fishman, Bruce Bingham and Peter Barash.

"An Expert's View:  Bingham Says…," published in <u>Financial Valuation and Litigation Expert</u>, June/July 2006.

Bruce B. Bingham
Curriculum Vitae

## ARTICLES AND PUBLICATIONS (Continued)

IVSC Discussion Paper on the "Determination of Fair Value of Intangible Assets for IFRS Reporting Purposes," July, 2007. Chair of IVSC Workgroup preparing the Discussion Paper.

"An Expert's View: Bingham Says...Here's a concise progress report on valuation standards activity," published in Financial Valuation and Litigation Expert, August/September 2007.

## EDUCATION

**1978 - Yale School of Organization and Management, New Haven, CT**
Masters Degree in Public and Private Management (MPPM)

**1968 - Rutgers College, New Brunswick, NJ**
Bachelor of Arts Degree in English

## PROFESSIONAL AFFILIATIONS

**Accredited Senior Appraiser and elected Fellow of the College of Fellows** in Business Valuation, American Society of Appraisers (FASA)

**Chair, Intangible Asset Valuation Workgroup**, International Valuation Standards Committee

**Member of the Board of Governors**, American Society of Appraisers, 2003-2007

Elected **Member** of the Business Valuation Committee of the ASA, 1994-2000

Elected **Chairman** of the Business Valuation Committee of the ASA, 2003-2005

ASA's Liaison to The Appraisal Foundation Advisory Council (TAFAC), Washington, DC (2001-3)

Founding **Member**, Business Valuation Subcommittee of the American Institute of Certified Public Accountants (AICPA) 1989-1995

**Brigadier General (Ret.)**, United States Army

A-4

## Appendix B:  Documents Relied on or Considered by Bruce B. Bingham

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Expanets, Inc and Subsidiaries Fair Value report as of January 1, 2002 | NOR305016 | NOR305081 |
| Expanets, Inc and Subsidiaries Fair Value report as of October 1, 2002 | NOR305083 | NOR305139 |
| Blue Dot Services, Inc. and Subsidiaries Fair Value report as of October 1, 2002 | NOR364662 | NOR364719 |
| Blue Dot Services, Inc. and Subsidiaries Fair Value report as of January 1, 2002 | NOR365584 | NOR365647 |
| Expert Report of Paul A. Marcus dated September 19, 2007 | n/a | n/a |
| Expert Report of Robert W. Berliner dated September 19, 2007 | n/a | n/a |
| Un-Bates stamped emails to/from AAA regarding valuations | n/a | n/a |
| Blue Dot Services, Inc. and Subsidiaries Reporting Unit Fair Value (Continued Use) | NOR364613 | NOR364564 |
| Expert report of Chris Kearns dated October 17, 2007 | n/a | n/a |
| Complaint filed by Magten Asset Management Corp. and Law Debenture Trust Company of New York, plaintiffs vs. NorthWestern Corp., defendant | n/a | n/a |
| Complaint filed by Magten Asset Management Corp., plaintiff vs. Mike J. Hanson and Ernie J. Kindt, defendants | n/a | n/a |
| NorthWestern Corp. Management Financial and Information Report for the month ending June 30, 2002 | NOR362049 | NOR362064 |
| Engagement letter of American Appraisal Associates to NorthWestern Corp. dated December 27, 2002 | AAA14495 | AAA14506 |
| Engagement letter of American Appraisal Associates to NorthWestern Corp. dated June 30, 2002 | AAA14539 | AAA14547 |
| Appraisal Standards Board - Uniform Standards of Professional Appraisal Practice, 2002 Edition | n/a | n/a |
| American Society of Appraisers - ASA Business Valuation Standards as of January 1, 2002. | n/a | n/a |
| NorthWestern Corp. 10-Q for the period ended June 30, 2002 filed August 14, 2002 | n/a | n/a |
| NorthWestern Corp. Form 10-K/A filed 9/20/2002 for Period Ending 12/31/2001 | n/a | n/a |
| Financial Accounting Standards Board, SFAS 142: Goodwill and other Intangible Assets | n/a | n/a |
| American Appraisal Associates website (www.american-appraisal.com) | n/a | n/a |
| Blue Dot, Summary of Impairments resulting from Valuation Excel schedule | n/a | n/a |
| Memorandums, handwritten notes and schedules from American Appraisal Associates | AAA15761 | AAA15780 |
| Un-Bates stamped emails regarding Expanets | n/a | n/a |
| Correspondence from AAA regarding the valuation of Blue Dot stock | AAA03474 | AAA03482 |
| AAA draft schedules regarding October 1, 2002 Blue Dot valuation | AAA15757 | AAA15760 |
| Un-Bates stamped D&T memos and correspondance regarding SAS73 review of AAA January 1, 2002 valuation of Expanets | n/a | n/a |
| Memorandums, handwritten notes and correspondence from American Appraisal Associates | AAA09266 | AAA09322 |
| Deloitte & Touche SAS73 review workpapers and memorandum regarding October 1, 2002 Expanets and Blue Dot valuations | DT005839 | DT005850 |