# 5

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

-------------------------------------- X

MAGTEN ASSET MANAGEMENT CORPORATION and

LAW DEBENTURE TRUST COMPANY OF NEW YORK,

                    Plaintiffs,

        -vs-

NORTHWESTERN CORPORATION,

                    Defendant.

Civil Action No. C.A. No. 04-1494 (JJF)

-------------------------------------- X

MAGTEN ASSET MANAGEMENT CORP.,

                    Plaintiff,

        -vs-

MICHAEL J. HANSON and ERNIE J. KINDT,

                    Defendants.

Civil Action No. C.S. No. 05-499 (JJF)

-------------------------------------- X

DATE:      November 8, 2007

TIME:      9:00 a.m.


          Deposition of ROBERT W. BERLINER, held

at the offices of Curtis, Mallet-Prevost, Colt &

Mosle, 101 Park Avenue, New York, New York,

Page 2

1                - ROBERT W. BERLINER -

2        pursuant to Notice, before Hope Menaker, a

3        Shorthand Reporter and Notary Public of the State

4        of New York.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           - ROBERT W. BERLINER -

2           A.    That was in 2005, 2006 and 2007.

3           Q.    Can you explain what you did in 2005?

4           A.    I was a participant in a goodwill

5     analysis with respect to the goodwill of a

6     defendant in a lawsuit.

7           Q.    What did you do?

8           A.    I reviewed various documents and

9     performed some calculations to determine whether or

10    not, and if so, how much the goodwill of the entity

11    had been impaired.

12          Q.    Did you perform a valuation in that

13    assignment?

14          A.    I did not.  I don't perform valuations.

15          Q.    Can you explain what you did in 2006?

16          MR. KAPLAN:  Object to the form.

17          A.    In 2006, I consulted with one of my

18    partners with respect to the question of when the

19    goodwill of a particular company was impaired.

20          Q.    What was the nature of that

21    consultation?

22          A.    We were dealing with one of the largest,

23    if not the largest, write-off of goodwill in the

24    history of the United States.  And we were

25    endeavoring to determine whether or not such

1      - ROBERT W. BERLINER -

2      write-off should have been taken earlier than it

3      was taken.

4           Q.    What was the nature of the work that you

5      did?

6           A.    I consulted with my partner, who was

7      responsible for that engagement, and offered my

8      views.

9           Q.    Your views with respect to what aspect

10     of the goodwill impairment analysis?

11          A.    The timing of the impairment.

12          Q.    Can you explain what you did in 2007 in

13     respect to -- with respect to goodwill impairment?

14          A.    In 2007, I addressed the very same issue

15     in this litigation.

16          Q.    I see.  Mr. Berliner, are you accredited

17     by any organization or professional society in

18     business valuation?

19          A.    I am not.

20          Q.    Are you an accredited senior appraiser?

21          A.    No, sir.

22          Q.    Do you have any credentials from the

23     American Institute of CPA accredited in business

24     valuation?

25          A.    I do not.

Page 37

1                    - ROBERT W. BERLINER -

2          Q.    Do you consider yourself to be an expert

3     in business valuation?

4          A.    I do not.

5          Q.    Have you ever been qualified as an

6     expert in valuation by any court or arbitration

7     tribunal?

8          A.    No, sir.

9          Q.    Have you ever offered any expert

10    testimony regarding business valuation in any

11    proceeding?

12                MR. KAPLAN:  Object to the form.

13         A.    No, sir.

14         Q.    In any of those proceedings in which you

15    have offered an expert opinion, have you ever been

16    the subject of a Daubert motion, if you know?

17         A.    I know what a Daubert motion is.  I have

18    been the subject of motions brought to disqualify

19    me as a testifying expert.  I don't know whether

20    those motions would have been brought under the

21    so-called -- would qualify as a Daubert motion.

22         Q.    How many times have such motions to

23    disqualify been made to your knowledge?

24         A.    I would say between six and ten times.

25         Q.    Were you ever disqualified as a result

1             - ROBERT W. BERLINER -

2        was a similar situation in that the reasons offered

3        for the motion were again that I had a commanding

4        knowledge of the accounting firm's auditing

5        methodology and how they defend themselves in

6        litigation.

7             Q.    Sir, as a CPA, have you ever reviewed

8        valuations or appraisals done by appraisers to

9        determine whether an SFAS 142 goodwill impairment

10       analysis was necessary?

11            MR. KAPLAN:   Object to the form.

12       A.    Yes.

13            Q.    When did you do that?

14       A.    I believe I did it in 2005 and again in

15       connection with this litigation.

16            Q.    Did you perform a valuation in this

17       litigation?

18       A.    I did not.

19            Q.    Let me ask you one question and then

20       maybe we'll take a two-minute break or five-minute

21       break.

22            Sir, are you familiar with the Uniform

23       Standards of Professional Appraisal Practice?

24       A.    I've learned of them in this case, but

25       I'm not familiar with them.

Page 41

1              - ROBERT W. BERLINER -

2          Q.    When did you learn of them in this case?

3          A.    Well, I would have understood there to

4     exist such standards but the first time, I guess,

5     that I saw them in that particular terminology was

6     when I read the expert reports of the experts on

7     behalf of defendants in this case.

8          Q.    So that -- strike that.

9                Is it, therefore, safe to assume that

10    informing the opinions and in preparing your

11    report, which is Exhibit 1, that you did not refer

12    to or use any of the Uniform Standards of

13    Professional Appraisal Practice?

14               MR. KAPLAN:  Object to the form.

15         A.    It's fair to say that.

16               MR. PIZZURRO:  Maybe take five minutes.

17               (Whereupon, there was a brief recess in

18    the proceedings.)

19         Q.    Mr. Berliner, you referred to three

20    instances in which you participated in a SFAS 142

21    impairment analysis.

22               Do you recall that testimony?

23         A.    Yes.

24         Q.    You referred to years 2005, 2006 and

25    2007.

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 54

1              - ROBERT W. BERLINER -

2        A.    I do.

3        Q.    Did I misunderstand you earlier when you

4    said that you didn't perform any valuation in this

5    case?

6              MR. KAPLAN:  Object to the form.

7        A.    Yes.

8        Q.    Can you explain to me what you were

9    doing then, in this sentence that we just read?

10       A.    Yes.  I was taking the valuation that

11   was performed by American Appraisal and following

12   their methodology, correcting some of the

13   assumptions that they used and some of the data

14   that they based their valuation on based upon my

15   knowledge of the facts of the case.

16       Q.    Sir, do you understand that American --

17   American Appraisers Association, AAA is a

18   recognized expert in performing business

19   valuations?

20       A.    I do.

21             MR. KAPLAN:  Object to the form.

22       Q.    And you are not; is that correct?

23       A.    That's correct.

24       Q.    Do you know whether in performing the

25   valuation that you criticized AAA followed the

Page 58

1                - ROBERT W. BERLINER -

2          A.    Yes.

3          Q.    So, can you explain to me the basis for

4    your testimony that you were performing an analysis

5    of the value of the company as of June 30th when

6    your report says it's as of January 1st?

7          A.    I think for the reason I expressed.  I

8    used the January 1st, '02, business enterprise

9    value from the American Appraisal report to come up

10   with a revised value which I could then compare to

11   the carrying value of the goodwill as of

12   June 30th, 2002.

13         Q.    We'll get to that computation in a

14   minute.  Right now we're focused on what you did to

15   estimate a business enterprise value as of

16   January 1st, 2002, for Expanets as is in your

17   report.

18                Now, is it your testimony that the as-of

19   date is January 1st, 2002, or are you changing your

20   report now to say that the as-of date is

21   June 30th, 2002?

22                MR. KAPLAN:  Object to the form.

23         A.    No.  It's as stated here,

24   January 1st, '02.

25         Q.    Okay.  In revising that valuation, the

Page 68

- ROBERT W. BERLINER -

1

2       A.    No.  I was not asked to address that.  I

3   did not.

4       Q.    Can you explain for us, sir, what the

5   process is for determining an impairment, goodwill

6   impairment under SFAS 142?

7       A.    It's a two-step process.  The first step

8   is a comparison of the business enterprise value

9   with the carrying value of the entity.  To the

10  extent that the carrying value of the entity

11  exceeds the business enterprise value, step two is

12  invoked.

13          And under step two, one determines an

14  implied value of goodwill following the methodology

15  of SFAS -- I'm sorry -- APB 16, APB 16 on purchase

16  accounting.  Then, one compares the implied value

17  of goodwill to the carrying value of goodwill to

18  determine whether or not goodwill is impaired.

19      Q.    Who performs the business enterprise

20  valuation that's used in step one?

21      A.    In this case, American Appraisal.

22      Q.    Would the auditing firm prepare that

23  valuation?

24      A.    The auditing firm would not because if

25  it did, it would be auditing its own work and would

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 69

1            - ROBERT W. BERLINER -

2       lose its independence.

3            Q.    So you would bring in a professional

4       appraiser?

5            A.    That's correct.

6            Q.    Presumably the professional appraiser

7       would follow and be bound by the standards of the

8       profession, which are the Uniform Standards of

9       Professional Appraisal Practice?

10           A.    That's correct.  And the auditor --

11           Q.    In performing your alternative --

12           MR. KAPLAN:  Let him finish.  He was in

13      the middle of an answer.

14           A.    The auditor would be bound by generally

15      accepted auditing standards of which SFAS 73

16      relates to how the auditor would relate to the

17      outside specialist or appraiser.

18           Q.    So, in -- we've established that in

19      order to perform appropriately a 142 goodwill

20      impairment analysis, you must start with an

21      appropriate business enterprise valuation done by

22      professionals using the standards governing the

23      appraisal profession, correct?

24           A.    Yes.

25           Q.    Now, I think we've also established that

Page 73

1              - ROBERT W. BERLINER -

2        from the accounting firm.

3              Q.    Then what is --

4              A.    From -- the accounting firm then gets it

5        from the company.

6              Q.    What's the role of the accounting firm

7        in this process?

8              A.    The role of the accounting firm is to

9        follow SFAS 73 in satisfying itself as to the

10       assumptions used and the credibility of the

11       appraiser.

12             Q.    And is the role of the accounting firm

13       that has a problem with the valuation or the

14       assumptions to perform an alternative valuation?

15             MR. KAPLAN:  Object to the form.

16             A.    That's one possibility, to engage their

17       own appraiser to perform a valuation to compare to

18       the company's, Northwestern's appraiser.

19             Q.    When you say employ or engage their own,

20       you're talking about another independent American

21       Appraisal type organization?

22             A.    Exactly.

23             Q.    Because the CPAs in the auditing firm

24       are not either qualified nor -- and they would risk

25       their independence if they themselves were to

Page 75

1          - ROBERT W. BERLINER -

2      makes certain adjustments, proposes certain

3      adjustments to those financial statements, that

4      doesn't mean the auditor is preparing the financial

5      statements.

6              Likewise, the auditor could propose an

7      adjustment to the appraiser's determination of the

8      business enterprise value if the auditor believed

9      that the -- some of the inputs that the client had

10     provided were inaccurate.

11             They're not overriding the expertise and

12     methodology of the appraiser.  They're modifying

13     it, because the appraiser disclaimed responsibility

14     for the data inputted.

15             So, I think that's a very logical

16     explanation of why I was able to modify the

17     American Appraisal determination of business

18     enterprise value and why I don't believe that in

19     that process I did my own business enterprise

20     valuation.

21        Q.   Do you know of any case where 142

22     analysis is being done where the auditor modified

23     the appraisal -- the independent appraisal with

24     which it was provided by the expert?

25             MR. KAPLAN:  Object to the form.

Page 76

1                  - ROBERT W. BERLINER -

2          A.    I'm not aware of those.  I mean, we have

3      to review practice.

4          Q.    You have never in a professional

5      capacity been employed by an auditing firm to

6      review an appraisal in connection with a 143 --

7      sorry, 142 goodwill impairment analysis; is that

8      right?

9          A.    In connection with an audit?

10         Q.    Correct.

11         A.    No, I have not.

12         Q.    I think you testified that you don't

13     believe you did an independent valuation because

14     you simply followed precisely the methodology of

15     American Appraisers; is that correct?

16         A.    Yes.  Yes.

17         Q.    With respect to Expanets, American

18     Appraisers also considered a market approach in

19     preparing the valuation; isn't that right?

20         A.    That's correct.

21         Q.    And you did not; is that right?

22         A.    I did not what?

23         Q.    You did not consider the market approach

24     in performing your alternative valuation?

25         A.    I considered the market approach.

Page 77

- ROBERT W. BERLINER -

Q.    And where is it?  Is it reflected in
your report that you considered the market
approach?

A.    I considered -- I didn't do a market
approach.  I didn't attempt to change American
Appraisal's market approach because that was
something that would have been far more difficult
for me to do and would have been very costly and
time-consuming.  And it was not something that I
could do within the time frame that I was given to
develop this report.

Secondly, the American Appraisal
determination of business enterprise value based on
the market approach pretty much coalesced with its
determination of business enterprise value under
the income approach.  And American Appraisal gave
equal weight to the two approaches in their
opinion.

And, as I understand the valuation of
determination of business enterprise value, if done
correctly, the income approach and the market
approach tend to come up with the similar
valuations.  It's when the weighting changes, so
you need not necessarily, as an appraiser, say

Page 81

1          - ROBERT W. BERLINER -

2              Do you see that, sir?

3      A.    I do.

4      Q.    Do you see the comment under that which

5   reads, "This rule requires the appraiser to use all

6   relevant approaches for which sufficient reliable

7   data are available.  However, it does not mean that

8   the appraiser must use all approaches in order to

9   comply with the rule if certain approaches are not

10  applicable."

11             Do you see that?

12     A.    Yes.

13     Q.    Do you understand that approaches

14  includes the market approach as well as the

15  discounted cash flow approach?

16     A.    I do.

17     Q.    Where in your report does it reflect

18  your consideration of the market approach?

19             MR. KAPLAN:  Object to the form.

20     A.    It doesn't, because I could not

21  recalculate the market approach as I could the

22  income approach; but I believe the market approach

23  was equally flawed as was the income approach.

24             It seems to me that there is all the

25  more reason, given the circumstances of Expanets,

Page 94

1                  - ROBERT W. BERLINER -

2      much lower and the impairment of goodwill would

3      have been recognized at an earlier date.

4           Q.   I take it you don't have an issue with

5      Northwestern's having chosen January 1st, '02, as

6      the effective date of the goodwill impairment

7      analysis.

8                MR. KAPLAN:  Objection to the form.

9           Q.   Is that correct?

10          A.   That was the adoption date.  I have no

11     problem with that.

12          Q.   In your view -- strike that.

13               Would it have helped you to understand

14     what American Appraisers knew -- what verification

15     efforts they had taken if there had been a

16     deposition and an oral examination of somebody from

17     American Appraisers?

18               MR. KAPLAN:  Object to the form.

19          A.   Can I hear that question back, please?

20               MR. PIZZURRO:  Can you read it back?

21               (The question requested was read back by

22     the reporter.)

23               MR. KAPLAN:  Objection to form.

24          A.   I think so, yes.

25          Q.   Were you ever a party to any discussions

Page 102

1              - ROBERT W. BERLINER -

2      amount of any impairment.

3          Q.    Do you have any experience in conducting

4      a step two of the 142 analysis?

5              MR. KAPLAN:  Objection.

6          A.    I may have gotten into that in the 2005

7      litigation.  I don't recall specifically.

8          Q.    Let me put a finer point on the

9      question.

10             Do you have any experience with an

11     actual audit situation involving a 142 analysis,

12     step two?

13         A.    No.  142 is a fairly recent vintage, and

14     at this time, my auditing days were long since over

15     before 142 was issued.

16         Q.    So I guess you don't know how long it

17     might have taken to complete the step two of the

18     142 analysis; is that correct?

19             MR. KAPLAN:  Object.

20         A.    That's correct.

21         Q.    If you had been working for Deloitte &

22     Touche and you had received the valuation, you

23     would have presumably noted the results of the

24     market approach; is that right?

25         A.    Yes.

Page 116

1          - ROBERT W. BERLINER -

2               Then effectively, there is no need for

3     the independent expert who provides the business

4     valuation which is the basis for the 142 impairment

5     analysis; is that correct?

6               MR. KAPLAN:  Objection.

7          A.    No, not at all.

8          Q.    Am I just misunderstanding something?

9     Don't you need to have an independent business

10    enterprise valuation as fundamental and

11    indispensable components of any 142 analysis?

12         A.    Yes.  We had one here.

13         Q.    Okay.  I'm just trying -- so, there is

14    no basis or ability on the part of either the

15    client or the auditor to disregard or unilaterally

16    amend the work of the independent appraiser whose

17    business enterprise valuation is indispensable to

18    the underlying analysis; is that right?

19         A.    No.

20         Q.    It's not right?

21         A.    No.  Let's use an unrealistic example.

22    Let's assume that American Appraisal properly

23    employed the income approach and the market value

24    approach -- the market approach.

25               The auditor is reviewing their appraisal

Page 123

1              - ROBERT W. BERLINER -

2          A.    No.  One wouldn't expect that.

3          Q.    Can you look at Attachment A2 to your

4     report?  It's right -- sometimes the attachments,

5     it's multiples, but it's right after the series of

6     pages that ends on 2-22.  It's under "Attachments"

7     to "Basis for Opinion 2."

8              Do you have that, sir?

9          A.    I do.

10         Q.    Now, in doing your impairment analysis

11    for both Expanets and Blue Dot, you also computed

12    the carrying value of those entities; is that

13    correct?

14         A.    Yes, sir.

15         Q.    Does this attachment reflect the

16    carrying value that you calculated for those

17    entities?

18         A.    It does.

19         Q.    Now, in doing the impairment analysis

20    that you performed, you recalculated the business

21    enterprise value of Expanets and Blue Dot as of

22    January 1st, '02; is that correct?

23         A.    Yes.

24         Q.    You then compared it to the carrying

25    value of those entities that you computed as of

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 124

1              - ROBERT W. BERLINER -

2       June 30th, '02; is that correct?

3             A.    Yes.

4             Q.    Why would you do that?

5             A.    Give me a minute.  I think the answer to

6       the question is -- despite the wording in the -- on

7       Page 2-12 and 2-13 of my report, the business

8       enterprise value of 163 million is really the value

9       as of June 30th of 2002, based upon the

10      January 1st, '02, American Appraisal valuation

11      adjusted for the input data.

12            Q.    Why, sir, would you change the valuation

13      date?  What was the basis for doing that?

14            A.    The -- to see whether as of June 30th

15      there was an impairment.

16            Q.    What criteria or standard would permit

17      one to do that?

18                  MR. KAPLAN:  Objection to the form.

19            A.    To do what?

20            Q.    To ignore the as-of valuation date that

21      was actually done and create a new as-of date in

22      order to do an impairment analysis.

23                  Northwestern had selected

24      January 1st, '02, as the date because that is what

25      the effective date of 142 was; is that correct?

Page 125

1          - ROBERT W. BERLINER -

2          A.    The adoption date.

3          Q.    The adoption date.  I thought you had

4   testified earlier this morning that you didn't have

5   any problem with Northwestern's use of that date,

6   correct?

7          A.    That's correct.

8          Q.    But you unilaterally did an analysis

9   which has nothing to do with that date but has to

10  do with a date six months later.

11              Is that what you did?

12              MR. KAPLAN:  Objection to the form.

13          A.    Yes.  In order to compare it to the

14  carrying value as of June 30th, '02.

15          Q.    What would permit you as an auditor or

16  anyone to unilaterally change the effective date

17  that was adopted by Northwestern in order to

18  determine a goodwill impairment analysis was

19  required?

20              MR. KAPLAN:  Objection to the form.

21          A.    Because I employed their methodology.  I

22  didn't change their methodology.

23          Q.    Is there anything that you can point to

24  in any accounting standards or accounting

25  principles that would permit that unilateral change

Page 126

1          - ROBERT W. BERLINER -

2     of the date?

3          A.    There are many occasions where there's a

4     need to update an analysis, and this is just an

5     updated analysis.

6          Q.    Sir, can you tell us as an accountant --

7     as an expert in accounting what criteria you relied

8     upon to ignore the valuation date that American

9     Appraisal has used and Northwestern used to come up

10    with an as of June 30th, 2002, appraisal date for

11    purposes of doing a goodwill impairment analysis?

12          MR. KAPLAN:  Objection to the form.

13          A.    I don't think there's anything in the

14    accounting literature that address that specific

15    question.

16          Q.    You just did it?

17          A.    Yeah.  There is no reason that I

18    couldn't do it.  I -- just as you update any

19    analysis.

20          Q.    So do I understand, sir, that if the

21    goodwill impairment analysis was actually being

22    performed as of -- with a validation date as of

23    January 1st, '02, your analysis and report does not

24    address that situation but rather addresses a

25    situation in which the date is June 30th, '02, six

1               - ROBERT W. BERLINER -

2        months later; is that what you're telling us?

3               A.    Yes.

4               MR. KAPLAN:  Objection.

5               Q.    Let's look at Attachment A2 again, if we

6        could, please.  Before we get there, just let me

7        ask you this.

8               Your opinion is that the proper business

9        valuation or business enterprise valuation for

10       Expanets as of June 30th, '02, is $163 million; is

11       that correct?

12              A.    Yes.

13              Q.    Do you have any opinion, therefore, sir,

14       as to what the appropriate business valuation,

15       business enterprise valuation for Expanets was as

16       of January 1, '02?

17              A.    No.

18              Q.    Do you have any opinion as to what the

19       proper business enterprise value for Blue Dots was

20       as of January 1, '02?

21              A.    No.

22              Q.    Attachment A2.  If you look at the

23       entries which are below the line, it says,

24       "carrying value as of January 1, '02," and then

25       below that there are another series of entries.

Page 128

1              - ROBERT W. BERLINER -

2              Do you see that, sir?

3       A.    Yes.

4       Q.    In computing the carrying value for

5    Expanets and Blue Dot as of June 30, '02, you used

6    a book value of debt as of September 30, '02.

7              Do you see that?

8       A.    I do.

9       Q.    Why would you use information which is

10   as of September 30 to compute the carrying value as

11   of June 30?

12      A.    Because I didn't have the information as

13   of June 30.

14      Q.    Where did you get the information as of

15   September 30?

16      A.    The documents, indicating NOR 375926 for

17   Expanets and NOR 376038 for Blue Dot.

18      Q.    There was no documentation that you had

19   that would have provided you with that information

20   as of June 30, '02?

21      A.    I didn't have any such documentation

22   that I could find.

23      Q.    That's the case for the equity value, as

24   well, where you used a September 30 date to compute

25   equity value for both Expanets and Blue Dot?

Page 130

1              - ROBERT W. BERLINER -

2        And so, I don't believe these figures could be

3        obtained from the financial statements of the Qs.

4             Q.    Well, if the book value of the debt for

5        Expanets and Blue Dot differed from the book value

6        for the debt of those entities --strike that.

7                  If the book value of the debt of both

8        Expanets and Blue Dot as of June 30, '02, differed

9        from the book value of the debt of those entities

10       as of 9/30/02, that would change the computation of

11       the carrying value, correct.

12            A.    Yes, sir.

13            Q.    And that would change the goodwill

14       impairment analysis; isn't that correct?

15            A.    Yes.

16            Q.    Similar -- is the same true with respect

17       to equity value as of 9/30/02 as compared to equity

18       value as of June 30, '02?

19            A.    It is; the same is true.

20            Q.    It would have a compounding effect

21       because you have two different values that would

22       have been computed in determining the carrying

23       value, which come from a different quarter?

24            A.    You mean both the debt and the equity?

25            Q.    Correct.

1              - ROBERT W. BERLINER -

2          A.    Well, that's not compounding but there

3     would be two reasons -- two possible changes.

4          Q.    I just want to be very clear about this.

5                Is there anything that you can tell us

6     or point to which would have required Northwestern

7     to have done a goodwill impairment analysis as of

8     June 30, '02?

9          A.    Yes.

10         Q.    What's that?

11         A.    The standard would require goodwill

12    analyses to be done if there were triggering events

13    since the last analysis; so that here we have a

14    situation where there was significant adverse

15    developments that, in my mind, would have been

16    triggering events that would require the analysis

17    as of June 30th of '02.

18         Q.    Where would one find those triggering

19    events or definition of what those triggering

20    events would be?

21         A.    You mean where in the literature?

22         Q.    Yes, in the accounting standards, in the

23    literature.

24         A.    In the facts of the case.

25         Q.    In the accounting standards or in the

Page 132

1          - ROBERT W. BERLINER -

2     literature.

3          A.    I believe that's discussed in 142.

4          Q.    Did you examine 142 to determine if

5     there was such a triggering event?

6          A.    Well, you wouldn't be able to determine

7     that from reading 142.  You'd have to go into the

8     facts and circumstances that existed with respect

9     to Expanets in the year 2002.

10          Q.    My question is; is there a specific

11     triggering event or criteria which is listed in 142

12     that you used in order to justify doing a goodwill

13     impairment analysis as of June 30, '02, as opposed

14     to what Northwestern had selected, which is

15     January 1, '02?

16          MR. KAPLAN:  Objection to the form.

17          A.    Yes.  I believe the 142 describes the

18     kinds of things that would be considered.

19          Q.    Is there any place in your report which

20     reflects your reliance on those criteria or

21     standards determining that there was a triggering

22     event?

23          A.    I don't think I discussed that in the

24     report.

25          Q.    Why not?

Page 134

1              - ROBERT W. BERLINER -

2       is a description of the kinds of things that would

3       fall within triggering events.

4           Q.    Wouldn't it be appropriate in offering

5       an expert opinion that an alternative goodwill

6       impairment analysis was required to have provided

7       your analysis of the triggering event justifying

8       the opinion?

9              MR. KAPLAN:  Objection.

10          A.    The report is describing my

11      determination that there was an impairment as of

12      June 30, '02.  I didn't say anything in the report

13      about Northwestern having done the updated analysis

14      as of that date, but that's implied by my doing it.

15          Q.    But is there anything in your report

16      which points to anything in the accounting

17      literature which even starts to suggest that

18      Northwestern had an obligation to do what you

19      decided to do unilaterally?

20             MR. KAPLAN:  Objection to the form.

21          A.    There's nothing in the report that

22      describes that.

23          Q.    Why did you exclude it from your report?

24             MR. KAPLAN:  Objection to the form.

25          A.    Because I focused on the determination

Page 135

1          - ROBERT W. BERLINER -

2      of whether or not there was an impairment as of

3      that date and it seemed pretty obvious that having

4      concluded that there was not only an impairment but

5      that the full amount of the goodwill should have

6      been written off as of that date, that it was

7      obvious to me that that suggested that Northwestern

8      should have done the analysis as of that date.

9          Q.    Is that reflected in your report?

10         A.    No.  I said it was obvious.  I didn't

11     bother stating it.

12         Q.    I see.  Now, if one was going to do an

13     entirely new goodwill impairment analysis as of

14     June 30, '02, one would need presumably to have a

15     new independent business enterprise valuation by an

16     independent expert, correct?

17         A.    That would be desirable but not

18     necessary.

19         Q.    Let me understand because I'm a little

20     confused, Mr. Berliner.  This morning when you were

21     testifying, you testified that you were doing your

22     valuation -- or you were actually adjusting the

23     valuation of American Appraisals as of January 1,

24     '02.  You were not performing -- I specifically

25     asked you about this and pointed to you the

Page 136

1             - ROBERT W. BERLINER -

2       language in your report.

3             And you said, "No.  My valuation date is

4       as of January 1, '02."

5             You took issue with what was in the

6       valuation American Appraisals did because the

7       projections with which they had been provided were

8       at odds with the actual results of the company's

9       operations in the first six months of '02.

10            Do you remember that testimony?

11      A.    I took odds for reasons in addition to

12      the six months '02.

13      Q.    Fine.  I take your point.  But with that

14      addition, is what I just said an accurate

15      recapitulation of what you testified to this

16      morning?

17      A.    Yes.

18      Q.    Now you're testifying that that's not

19      what you did.  In fact, what you did was you

20      determined that there was some triggering event in

21      the interim between January 1, '02, and June 30,

22      '02, which required a completely new goodwill

23      impairment analysis to be done as of June 30, '02.

24            And what you did not do is simply go

25      back and revise a valuation which was as of January

Page 138

- ROBERT W. BERLINER -

A.    It's to take the impairment analysis
that American Appraisal performed and update it.  I
don't know that I would call it an entirely new
analysis.

Q.    I may come back to that, but for the
moment I just want to direct your attention to the
last part of your report.  It's on Page 5-1 of your
report.

Mr. Berliner, Page 5-1, the assumption
which you built into your opinions that Clark Fork
remained directly liable under the QUIPS following
the going flat transaction.

A.    Yes.

Q.    What if Clark Fork had not remained
liable on the QUIPS following the going flat
transaction, would your opinion have changed?

A.    No.  My opinion is based on a
hypothetical assumption that's stated here, that
such opinion would never change.  It's based on
that hypothetical assumption.

Q.    I see.  So, your assumption -- your
opinion is had Northwestern -- this has to be -- I
think it's not explicit but it must be implicit.

Had Northwestern transferred all of the

Page 139

1                  - ROBERT W. BERLINER -

2       assets except the Milltown Dam to itself, but left

3       liabilities, simply the QUIPS liabilties to be

4       paid by Clark Fork, that would have rendered Clark

5       Fork insolvent or would have put it in a position

6       where its total liabilities exceeded its total

7       assets.

8             A.     Exactly.

9             MR. KAPLAN:  Objection to the form.

10            Q.     So it has to be both, both Northwestern

11      had to take the assets and Northwestern had to

12      leave that liability, correct?

13            A.     Correct.

14            Q.     If both of those assumptions aren't

15      built in, of course, we're talking about a

16      different set of facts and hypotheticals and you

17      have no opinion; is that correct?

18            A.     That's correct.

19            Q.     It's a little like if my mother had

20      wheels, she'd be a car.

21            MR. KAPLAN:  Objection.

22            A.     I don't know your mother.

23            MR. PIZZURRO:  Let's take five minutes,

24      please.

25            (Whereupon, there was a brief recess in