# Exhibit 3

1

2

Department of Public Service Regulation
Montana Public Service Commission
Docket No. D2001.1.5
NorthWestern Corporation

3

4

5

### PREFILED TESTIMONY OF MICHAEL J. HANSON
### ON BEHALF OF NORTHWESTERN CORPORATION

6    Q.    Please state your name and business address.

7    A.    Michael J. Hanson, 4930 S. Western Ave., Sioux Falls, SD 57108.

8    Q.    Mr. Hanson, what is your position with NorthWestern Corporation?

9    A.    I am the President and Chief Executive Officer of both NorthWestern Public

10          Service, a division of NorthWestern Corporation, and NorthWestern Services

11          Group, Inc., a wholly owned subsidiary of NorthWestern Corporation. I will

12          generally refer to the entire family of NorthWestern companies simply as

13          NorthWestern in my testimony.

14   Q.    Please describe your education and business experience.

15   A.    I have been the President and Chief Executive Officer of NorthWestern's utility

16          entities since May 1998. Prior to accepting my current position with

17          NorthWestern, I was employed for seventeen years by Northern States Power

18          Company ("NSP") in a variety of positions, including General Manager and Chief

19          Executive of NSP – South Dakota from 1994-1998. I attended the United States

20          Naval Academy from 1977-1979 and graduated from the University of Wisconsin

21          in 1982 with a Bachelor of Science degree in accountancy. I received a Juris

22          Doctor degree from William Mitchell College of Law in 1989. Exhibit (MH-1),

23          attached to this testimony, contains a listing of my education and business

24          experience.

25   Q.    What is the purpose of your testimony?

26

MJH-1

1    A.    I will describe the structure, business goals and philosophy of NorthWestern. I

2          will also explain why NorthWestern is acquiring The Montana Power Company

3          ("MPC"). Finally, I will provide answers to Questions #2,4,5, and #7-10, set forth

4          in the Commission's Order 6353 entered in this docket.

5                            **NORTHWESTERN CORPORATION**

6    Q.    Please provide the Commission with a brief history and description of

7          NorthWestern.

8    A.    NorthWestern Public Service Company was incorporated on November 27, 1923,

9          in Wilmington, Delaware, bringing together two utility properties in Nebraska and

10         two in South Dakota. The facilities acquired were the stock and assets of the

11         Aberdeen (SD) Light & Power Company, the North Platte (NE) Light & Power

12         Company, the Columbus (NE) Light, Heat & Power Company, and an electric

13         system in Clark, South Dakota owned by the Union Power & Light Company of

14         Omaha, NE. In 1940 NorthWestern's electric properties in North Platte and

15         Columbus were sold to two newly established public power districts, as Nebraska

16         became totally public power. In January 1941, NorthWestern acquired the natural

17         gas systems in Grand Island and Kearney, NE, which were added to its natural gas

18         system in North Platte, NE. Natural gas systems in South Dakota were added

19         during the years 1957-61. NorthWestern continued to grow, acquiring Central

20         Electric & Gas Company in 1961, and extending natural gas to additional South

21         Dakota communities during the 1990s. NorthWestern now provides not only

22         electric and natural gas service to nearly 150,000 customers in the upper Midwest

23         (South Dakota and Nebraska), but also energy-related services, voice

24         communications, video and data network solutions. NorthWestern currently

25         operates in three additional industries in addition to its traditional electric and gas

26         services: Blue Dot Services Inc., a national provider of installation, maintenance,

1    repair and replacement services for heating, air conditioning, plumbing and

2    related systems for residential and light commercial customers; CornerStone

3    Propane Partners, L.P., a retail propane distributor serving residential,

4    commercial, industrial and agricultural customers from 275 customer service

5    centers in 34 states, and providing wholesale marketing and logistics in propane,

6    natural gas, crude oil and petroleum liquids through its division Coast Energy

7    Group; and Expanets, Inc., a national provider of integrated voice, data, video and

8    related network communication solutions to small- and medium-sized businesses.

9  Q.    Please describe NorthWestern's traditional electric and gas utility operations.

10  A.    NorthWestern is a combination local distribution company engaged in the

11    business of generating, transmitting and distributing electricity and natural gas at

12    retail to residential, commercial and industrial customers in South Dakota, and

13    natural gas only in Nebraska. NorthWestern also owns electric generation and

14    connecting segments of electric transmission lines from its generation in Iowa and

15    North Dakota. NorthWestern is a "public utility" within the meaning of Section

16    201 of the Federal Power Act and as defined in the South Dakota Public Utilities

17    Act (South Dakota Codified Laws Chapter 49-34A) and, as such, is subject to the

18    jurisdiction of the South Dakota Public Utilities Commission for the sale of gas

19    and electric service in South Dakota. The State of Nebraska has no centralized

20    regulatory agency with jurisdiction over the natural gas operations of

21    NorthWestern. Natural gas rates are subject to regulation by the four Nebraska

22    municipalities in which NorthWestern operates (the cities of Grand Island,

23    Kearney and North Platte, and the Village of Alda) which communities have been

24    grouped together in one rate area. NorthWestern is part of the Western Area

25    Power Administration's ("WAPA") Upper Great Plains East control area, a

26    control area certified by the North American Electric Reliability Council, and

MJH-3

1    currently has contracts for transmission service from WAPA for delivery of power

2    and energy from remote generation equivalent to approximately 50% of its

3    bundled retail requirements. Given the expanse between population centers in its

4    service territory, NorthWestern works with WAPA, the area's rural electric

5    cooperatives, and other investor-owned utilities in order to provide reliable

6    electric service at affordable prices to the citizens in its region. NorthWestern

7    owns approximately 312 megawatts (MW) of generation capacity, consisting of

8    its interests in three jointly-owned facilities, a three-year power purchase

9    agreement for up to 28 MW from Basin Electric Cooperative, certain peaking

10   units and purchases spinning reserves from WAPA. In addition, NorthWestern

11   provides transmission services and makes limited wholesale sales of electric

12   energy. NorthWestern provides transmission service for several small South

13   Dakota communities and South Dakota state institutions of their allocation of

14   power from WAPA and makes supplemental wholesale power sales to those

15   entities for electric needs in excess of their allocation. NorthWestern also

16   provides transmission service for the total electric requirements of the community

17   of Groton, SD, including its WAPA allocation and supplemental energy provided

18   by Heartland Consumers Power District. NorthWestern has a letter agreement

19   under which WAPA markets NorthWestern's excess energy in intersystem sales.

20   Q.   Please describe, in general terms, NorthWestern's overall business strategy.

21   A.   NorthWestern has focused its business strategy on pursuing success through

22        market leadership in energy and communications. Our success is achieved

23        through outstanding customer service and efficient operations. NorthWestern

24        believes that its acquisition of MPC is in complete accord with this overall

25        business strategy. MPC serves a geographic area with similar characteristics to

26

1           NorthWestern's existing area, and, like NorthWestern, has a record of providing

2           outstanding customer care.

3    Q.    What benefits do you foresee from NorthWestern's acquisition of MPC?

4    A.    We anticipate that the acquisition will allow the continued expansion of our

5           energy distribution capabilities, the integration of the energy-related businesses of

6           NorthWestern and MPC, and the creation of a platform for future growth

7           opportunities in the Northern Tier.  NorthWestern will strive to maintain a high

8           degree of reliability and customer satisfaction, stabilize utility rates for Montana

9           consumers, support the communities it serves, provide environmental stewardship

10         and be a good corporate citizen while operating the business to provide stable

11         earnings, cash flow and a fair return to its shareholders.

12    Q.   How does NorthWestern propose that MPC will fit within its corporate structure?

13    A.   NorthWestern plans to make the requisite filings, and take the other steps

14         necessary, to authorize it to obtain exempt status under the Public Utilities

15         Holding Company Act, as amended, with both MPC and NorthWestern Public

16         Service becoming subsidiaries of the parent corporation.  If NorthWestern

17         ultimately does not implement a holding company structure, then upon closing of

18         the transaction, it will retain its current divisional structure and MPC will become

19         a division rather than a subsidiary of the company.  Under either structure, MPC

20         and NorthWestern will continue to be headquartered in their existing locations in

21         Butte, Montana, and Huron and Sioux Falls, South Dakota, respectively.

22    Q.   Has NorthWestern enjoyed ready access to capital as it has implemented its

23         business plans?

24    A.   Yes.  NorthWestern has been able to issue stock and debt under favorable terms as

25         its business needs have required, even under difficult market conditions.  It has

26         obtained an acquisition credit facility from Credit Suisse First Boston in an

1        amount sufficient to finance 100% of the proposed equity purchase price for this

2        transaction, and anticipates issuing permanent financing through the public sale or

3        private placement of common stock.

4   Q.   Describe NorthWestern's philosophy regarding its dealings with regulators.

5   A.   NorthWestern maintains excellent open communication with the governmental

6        agencies charged with regulation of its businesses and works to negotiate with all

7        parties to any proceedings in order to bring about a result favorable to all interests:

8        customers, shareholders, the communities it serves, and team members.  Through

9        negotiations in rate and other proceedings, NorthWestern has been able to avoid

10      needless and costly litigation.

11                  **NORTHWESTERN'S ACQUISITION OF MPC**

12  Q.   What are NorthWestern's plans after it acquires MPC?

13  A.   NorthWestern's objective in operating MPC will be to provide value to all

14      constituencies affected by the transaction.  Because NorthWestern and MPC

15      operate in two, non-synchronized power pools and are not contiguous with each

16      other, large operating synergies are not expected in the combination of the two

17      entities.  There will, however, be an opportunity to capture efficiencies through

18      the combined procurement of materials, supplies and equipment, and in the

19      provision of joint administrative and general functions.  In addition, we expect to

20      minimize cost and maximize performance through the combination of the two

21      entities' information technology resources.  NorthWestern will combine senior

22      leadership, but the utility enterprise will operate as two largely self-contained

23      units that are combined at the top and supported by shared administrative

24      resources and consistent operational approaches.  This structure will optimize

25      performance while allowing flexibility for each utility unit to meet the unique

26      needs of the markets in which it operates.

1   Q.   Your operating plan after the acquisition seems very straightforward. Are you

2        over- simplifying?

3   A.   No. MPC and NorthWestern operate in entirely different power grids and will be

4        physically separated.  Because we are acquiring the entire company, not just its

5        assets, we are acquiring a self-sufficient, ongoing business.  That will allow us to

6        combine the strengths of the two companies in a manner that will be largely

7        transparent to the current customers of MPC.  Our objective is to successfully

8        operate on a going forward, long-term basis, a utility that will be regulated by this

9        Commission.  We are submitting this application in the belief that the PSC will

10       become comfortable with NorthWestern as the new owner of MPC.

11  Q.   Is NorthWestern a fit and willing buyer of MPC?

12  A.   Yes. NorthWestern has both the management capability and the financial

13       capability to acquire MPC.  Managerial capability is the expertise needed to

14       successfully run a utility.  In our case, we take pride in our long history of

15       successfully managing gas and electric operations in South Dakota and gas

16       operations in Nebraska.  We're very proud that we were recently acknowledged as

17       the operator of one of the most reliable electric utility systems in the United

18       States.  An integral part of our managerial capability is our management

19       systems—the controls and tools that are deployed to ensure that the business

20       operates in a way that is consistent with an established plan.  Our systems ensure

21       that decisions are disciplined, expenditures are controlled and investments are

22       sound.  Let me provide some examples regarding our cost control focus and our

23       introduction of new business systems.

24            NorthWestern has worked with its coal-fired generating plant co-owners at

25       the Big Stone Plant and the Coyote I Station to lower its costs of electric

26       generation.  In 1993 the owners negotiated coal supply and coal transportation

MJH-7

1    pricing reductions with Knife River Coal Mining Company and the Burlington

2    Northern Railroad for Big Stone. In 1995, we switched from North Dakota lignite

3    coal to Powder River Basin sub-bituminous coal, providing a more efficient and

4    cleaner burning alternative at Big Stone. In 1996 the owners sold their steel rail

5    cars and began leasing aluminum cars, providing additional savings at Big Stone.

6    NorthWestern and two of the other of the four Coyote co-owners brought an

7    arbitration action against Knife River, which culminated (after hearings) in a 1999

8    decision that lowered the cost of lignite coal by approximately $1 per ton (a

9    savings of more than $250,000 per year for NorthWestern's customers), applied

10   stronger price controls for future pricing of lignite under the coal supply

11   agreement and resulted in a cash damage award to the owners (with more than

12   $800,000 as NorthWestern's share) for prior charges.

13       Outside the generation area, we have used technology to achieve higher

14   productivity and cost reductions. For example, we are using a document imaging,

15   or paperless system for numerous types of records. This system contains search

16   capabilities and serves as a central records repository, reduces time for data entry

17   and frees up team members' time for higher priority work.

18       Paperless records now include the documentation of our distribution

19   system (records required by the Department of Transportation -- Office of

20   Pipeline Safety) at a central repository rather than in local offices; and accounts

21   payable (invoicing, etc.) which offers an online payment processing and approval

22   system, and serves as a paperless permanent record of the invoice process.

23       Also, centralized scheduling and dispatch of crews and resources improves

24   work force efficiencies and places team members where they are most needed.

25   This has significantly increased the productivity of our crews. For example, a

26   crew is dispatched to a work site. If a service call is received in the same location,

1      that crew can then move immediately from one task to the next task without

2      having to return to the office to be dispatched. This system also uses automated

3      time sheets and automatically records job costs, eliminating time-consuming data

4      entry.

5            Finally, we have created a "virtual call center" and use technology to tap

6      into customer service talent located in our utility's field locations to handle utility

7      customer service calls without moving those employees to a call center.

8            We are introducing technology where it makes sense to control costs and

9      improve service.

10  Q.    Please address financial capability under two aspects: financial strength and

11      financial flexibility. Can the company finance operations and any expansion that

12      might be needed? Is the capital structure consistent with industry norms, so that

13      different types of financing are available in any reasonably foreseeable economic

14      situation?

15  A.    We are certainly well aware of the industry norms and the Commission's

16      hypothetical capital structure in the last MPC electric transmission and

17      distribution rate order. These factors form the basis of our market evaluation over

18      the two years beyond the close of the transaction.

19            In general, we believe that capital will be no more expensive with

20      NorthWestern as owner of MPC than is the case today. As I indicated,

21      NorthWestern has enjoyed consistent access to capital on reasonable terms.

22      While our corporate structure may seem complex on first examination, it assures

23      separation of the utility related financings from other activities, and it should not

24      create any new or additional concerns for this Commission because MPC has

25      itself historically had significant non-utility operations. Finally, I think it is

26      important to remember that the standard regulatory approach to determining a

1      utility's cost of equity examines financial markets' expectations regarding the cost

2      of capital for comparable companies. That approach will be fully available to the

3      Commission in future proceedings.

4   Q.  In your judgment, does NorthWestern's operating and financial history

5      demonstrate its ability to operate the MPC system in a manner that will result in

6      customers receiving reasonably adequate service at just and reasonable rates?

7   A.  Absolutely. Electric and natural gas systems have a great deal in common,

8      regardless of the state in which they are situated. We know how to run these

9      systems. I do not want to minimize the default supply challenges facing the MPC

10     electric system, but I can confidently say we know what we are doing and will

11     make the best judgments we possibly can on behalf of our customers.

12     NorthWestern prides itself on customer service, and our team members are the

13     foundation of that service. Our compensation is consistent with industry norms,

14     and our team member job satisfaction is high. We have been able to attract and

15     retain top quality personnel, and we maintain excellent relationships with our

16     retired employees (many of whom are shareholders in NorthWestern).

17     With regard to post-close operations, we have been working in a

18     department-by-department collaboration process with MPC for the past eight

19     months. This has allowed departmental counterparts to become familiar with one

20     another, to understand the processes used by each and to begin to understand the

21     business challenges that are before us all. I'm confident that customers will see

22     very little of the transition process.

23                          **COMMISSION QUESTION #2**

24  Q.  What are the purchase prices for the electric and natural gas utility rate properties?

25

26

1    A.    We don't know yet how the total purchase price of $602 million in cash and $488

2          million in debt assumption will be allocated among the numerous entities that we

3          are buying. Those entities are listed in Mr. Pederson's testimony.

4                              **COMMISSION QUESTION #4**

5    Q.    What commitment is NorthWestern willing to make with respect to rate levels on

6          the MPC system after its acquisition by NorthWestern?

7    A.    NorthWestern works very hard to maintain stable electric rates in our South

8          Dakota operation. We will do our very best to maintain stable transmission and

9          distribution rates on the MPC system, except for extraordinary charges beyond the

10         Company's control, such as governmentally imposed charges, or the transition

11         charges in the Tier II proceeding. We will need some time to get our arms around

12         the Montana operation, and would hope that other parties would allow us that

13         opportunity by not pursuing near- term transmission and distribution rate

14         reductions.

15    Q.    I note you did not commit NorthWestern to a particular rate for default power

16          supply. Why is that?

17    A.    It simply is not possible to make such a commitment. Neither NorthWestern nor

18         MPC currently has a supply in place to meet default load requirements of the

19         existing MPC customers after June 30, 2002. Moreover, the cost of that supply

20         will not be determined by NorthWestern, but by the sellers in the bulk power

21         supply market. We will support MPC's efforts to put together a supply portfolio

22         that meets our customers' needs at the lowest possible price.

23                           **COMMISSION QUESTION #5**

24    Q.    What commitment is NorthWestern willing to make that an acquisition

25         adjustment will not be sought for any premium it has paid on the book value of

26         MPC's utility assets?

1   A.   NorthWestern will commit not to seek a rate base addition for the difference

2        between the purchase price (as finally allocated under GAAP and Sec. 338 of the

3        Internal Revenue Code) and the book value of the MPC utility assets in rates,

4        subject to one caveat. Under Sec. 338, the Company will receive certain tax

5        advantages from the stepped-up basis, including depreciation of the increment

6        over the historical book value. If in a future rate proceeding, the Commission

7        were to claim that increased tax advantage for ratepayers, then consistency and

8        fairness would require that the stepped-up basis be used as the rate base, as the tax

9        benefit will arise solely due to the stepped-up basis.

10                          **COMMISSION QUESTION #7**

11   Q.   Is NorthWestern able and willing to develop and maintain utility-scale generation

12        to serve load in the MPC service territory?

13   A.   If the inquiry is whether NorthWestern plans to build a new series of generating

14        stations to replace the ones sold by MPC to PP&L, the answer is no. Not only

15        would that be expensive and impractical, it would be contrary to the purpose of

16        the 1997 legislation, which was to separate generation ownership from the

17        transmission and distribution system. If the inquiry is whether NorthWestern

18        would act to maintain a default supply in accordance with the House Bill 474

19        from this year's legislative session, the answer is yes. Having said that, we believe

20        it is very important to note that NorthWestern is one of the few companies that

21        have stepped forward to develop new generation in Montana. NorthWestern is

22        finalizing plans to construct a proposed 240-megawatt electricity generating

23        facility near Great Falls, Montana, that will provide reasonably priced, reliable

24        electricity for Montana customers. The proposed generation facility will be

25        located about one mile north of Great Falls, adjacent to and east of Highway 87

26        (Havre Highway) in Cascade County. The project involves the construction of a

1    240-megawatt combined cycle, natural gas-fired generating facility, with the first

2    80-megawatt simple cycle combustion turbine originally hoped to come on line

3    early in 2002, the second 80-megawatt simple cycle combustion turbine in the

4    summer of 2002 and the conversion to a combined cycle facility (which will add

5    another 80 megawatts of electricity output) in late 2002. However, as of the filing

6    of this testimony, this timetable has now been delayed by the filing of several

7    appeals of the air quality permit issued by the Department of Environmental

8    Quality, and we are unable to predict a precise timetable.

9                         **COMMISSION QUESTION #8**

10   Q.   What operational efficiencies does NorthWestern expect to achieve after its

11        acquisition of MPC?

12   A.   As I testified earlier, the physical separation of the MPC system from the existing

13        NorthWestern system limits, to a degree, the efficiencies one could expect if the

14        two systems were physically consolidated. NorthWestern expects to achieve

15        efficiencies in the operation of the two systems that would not be achievable in

16        the absence of the acquisition. Moreover, NorthWestern is constantly searching

17        for ways, such as those involving technology that I outlined above, to improve

18        service to both its customers and team members. NorthWestern has implemented

19        programs to enhance the work environment of its team members. An enhanced

20        work environment will lead to innovations and efficiencies that will improve all

21        aspects of customer service. Furthermore, NorthWestern continuously surveys its

22        customers to determine what can be done to enhance the value of our services.

23        Finally, NorthWestern is constantly reviewing its processes and procedures. The

24        collaboration efforts with MPC have given NorthWestern the opportunity to

25        review all of its processes and procedures and compare them with MPC's. To the

26        extent that better processes and procedures are currently in place at either entity,

1          or through such discussions are developed, improvements to the operations at

2          both entities will be implemented.

3                              **COMMISSION QUESTION #9**

4     Q.    Did NorthWestern's due diligence reveal any weaknesses in the MPC system?

5     A.    No, it did not. That was one of the reasons the acquisition of MPC was attractive

6          to us.

7                             **COMMISSION QUESTION #10**

8     Q.    Please address how the ability of MPC to provide continued reliable service at just

9          and reasonable rates, as a division or subsidiary of NorthWestern, may be

10        impacted under any reasonable outcome in the Tier II proceedings under Docket

11        D97.7.90.

12    A.    Properly conducted Tier II proceedings, and the result of those proceedings,

13        should not impact the ability of MPC to provide reliable service at just and

14        reasonable rates. As long as the Tier II proceedings are conducted properly, and

15        the result of the proceeding is in accordance with Montana law, the ability of

16        MPC to provide good service at reasonable rates should not be impacted We urge

17        the Commission to expedite theTier II proceedings to provide certainty as the

18        default supply isassembled. In NorthWestern's opinion, the critical consideration

19        is not the outcome of the Tier II proceeding, but how the Commission intends to

20        ensure cost recovery associated with the expense of procuring a default power

21        supply under the provisions of House Bill 474.

22    Q.    Why do you believe the outcome of a properly conducted Tier II proceeding, with

23        a result in conformity with Montana law, should not impact the ability of MPC, as

24        a division or subsidiary of NorthWestern, to provide reliable service at reasonable

25        rates?

26

1    A.    The Tier II proceeding is a calculation of the costs MPC will incur as a result of

2          its transition from a vertically integrated utility with generation to a transmission

3          and distribution company without generation.  The original design of the

4          transition has now been altered by the requirement in House Bill 474 that MPC

5          assume the burden of acting as the default supplier for all non-choice customers.

6          There are four broad categories of transition cost which must be addressed: (1)

7          MPC contracts with the qualifying facilities ("QF"); (2) MPC owned generation;

8          (3) energy supply-related deferred charges and regulatory assets; (4) other.

9          MPC's sale of its generating facilities to PPL through a competitive bid process

10        has largely eliminated the second and third categories of cost.  In NorthWestern's

11        view, it should be an easy matter to address the category of "other" transition

12        costs, and the real challenge in Tier II will be to accurately estimate the out-of-

13        market cost of the contracts with the QF's.

14   Q.    Why have you characterized the accurate estimate of the out-of-market cost of the

15        contracts with the qualifying facilities as the "real challenge" of Tier II?

16   A.    The power from the contracts with the qualifying facilities will be part of the

17        supply portfolio used by MPC to meet its obligations as the default supplier under

18        House Bill 474.  If the out-of-market cost of the qualifying facilities is not

19        accurately estimated, it will affect the timing of the recovery of the costs, and the

20        distribution of the costs between choice and non-choice customers.

21   Q.    Please explain how an inaccurate measure of the out-of-market cost of the

22        qualifying facilities would affect the timing of the recovery of such costs, and the

23        distribution of the costs between choice and non-choice customers.

24   A.    The cost of the default power supply must be recovered on a current period basis.

25        In contrast, the out-of-market cost of the contracts with the qualifying facilities

26        will be recovered over time.  If default power supply costs are incorrectly

1        categorized and treated as transition costs, it will unreasonably defer the recovery

2        of current period default supply costs to a later period, and incorrectly distribute

3        such costs between choice and non-choice customers. Assume, for example, that

4        the out-of-market portion of the cost of power from the qualifying facilities was

5        set at too great a value (i.e., the projected market level of power was set at an

6        artificially low level). The resulting transition cost would be artificially high for

7        choice customers, and would effectively require them to subsidize power supply

8        costs for non-choice customers. Additionally, it would deny current period

9        recovery of what are, in reality, default power supply costs.

10  Q.    How would a Tier II determination that there are no transition costs impact the

11        financial ability of MPC to provide reliable service at just and reasonable rates?

12  A.    Such a determination would not be a reasonable outcome in the Tier II

13        proceedings. Among other things, it would require a determination that the entire

14        cost of power from the QF's, over the life of the contracts, is within market. We

15        don't believe that is a reasonable position. Although, in the near term, such a

16        determination may result in the full recovery of the cost of power under the QF

17        contracts, it would result in a highly unstable default power supply. A zero

18        transition charge determination would mean that customers with a choice could

19        choose an alternate supplier and avoid any responsibility for the cost of

20        transitioning the MPC system to choice. In effect, non-choice customers would

21        be subsidizing, through their cost of default power supply, the choice of an

22        alternate supplier by choice customers. It would be extraordinarily difficult for

23        MPC to acquire and maintain a reasonably priced default power supply under

24        these circumstances. I should add that this adverse result would not be unique to

25        NorthWestern's ownership of MPC. It would also be the case if current

26        ownership of MPC was maintained.

1    Q.    Why did you testify that the critical consideration is how the Commission intends

2          to ensure the recovery of the cost of the default power supply?

3    A.    The viability of MPC, whether it is owned by NorthWestern or its current owners,

4          will be critically dependent upon its ability to recover the costs it actually incurs

5          in providing the default power supply. No utility (regardless of the identity of its

6          ownership) can, for any length of time, sell power to its customers at a price less

7          than the cost of that power in the market.

8    Q.    Do you have any final comments for the Commission?

9    A.    Yes. NorthWestern is eager to move ahead on the sale and all other matters that

10         are currently pending at the PSC. We are available to work with the Commission

11         and parties on any reasonable timetable. July 1, 2002 is rapidly approaching, and

12         it is our sincere hope thatdecisions are reached soon concerning important

13         transition issues, our purchase of MPC and the development of the portfolio of

14         default supply contracts. We would prefer to spend the remaining time before

15         default supply service begins educating Montana customers on the impacts on

16         them of the many changes in the Montana electric utility industry, and helping

17         them to understand the methods they can use to help control their electricity bills.

18   Q.    Does that conclude your testimony?

19   A.    Yes.

20

21

22

23

24

25

26

Biographical Data For

# MICHAEL J. HANSON

47258 272nd Street

Sioux Falls, South Dakota  57108

| | |
|---|---|
| Position: | President & CEO<br>NorthWestern Services Group, Huron, South Dakota<br>NorthWestern Public Service, Huron and Sioux Falls, South Dakota |
| Date Effective: | April 20, 2000 |

Job History:

| | |
|---|---|
| 1981-82 | Northern States Power - Gas Operating Clerk |
| 1981-83 | Northern States Power - Accounting Coordinator |
| 1983-84 | Northern States Power - Accountant |
| 1984-89 | Northern States Power - Internal Auditor |
| 1989-94 | Northern States Power - Attorney |
| 1994-98 | Northern States Power - General Manager & Chief Executive |
| 1998-00 | NorthWestern Public Service - President & CEO |
| 2000-Present | NorthWestern Services Group - President & CEO |

| | |
|---|---|
| Birth: | December 12, 1958<br>Sparta, Wisconsin |
| Military Service: | Navy, 1977-1979<br>Midshipman (W-4) |
| Education: | Sparta Senior High School, 1977<br>United States Naval Academy, 1977-79<br>University of Wisconsin, 1982, BS<br>William Mitchell College of Law, 1989, Juris Doctor |
| Family: | Married Laura K. Eggers, Sparta, Wisconsin, February 16, 1980 |
| | Children -  Justin M. Hanson - born May 25, 1982<br>Danielle M. Hanson - born March 19, 1985 |
| Directorships: | Huron Regional Medical Center Foundation Board (Vice Chairman)<br>Sioux Council Boy Scouts Board (President), Immediate Past President<br>Marquette Bank - Sioux Falls<br>South Dakota Rural Enterprises, Inc. (1998-1999)<br>Sioux Falls Development Foundation (Chairman) (1997-98)<br>Fargo Cass County Economic Development Corp (1997-98)<br>Sioux Vocational Services (1994-97)<br>Sioux Empire United Way (1994-97) |

1

NorthWestern Corporation
Exhibit ___(MJH-1) Page 2 of 2

Club and Association Memberships:

        Edison Electric Institute
        South Dakota Electric Utility Companies (Chairman)
        Minnesota State Bar Association
        Hennepin County Bar Association
        American Bar Association
        Institute of Internal Auditors
        North East Council of Governments
        Downtown Rotary Club, Sioux Falls
        Gloria Dei Lutheran Church

Recognitions:    Juris Doctor Magna Cum Laude (1989)
        James R. Kelly Award Certified Internal Auditor (CIA) Exam (1984)
        Certificate of Excellence (CIA Exam) (1984)
        Daughters of the American Revolution Good Citizenship Award (1977)
        Student Council President (1976-77)
        Class President (1974-75)