# UNREPORTED CASES

UNREPORTED CASE


*RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.)*

LEXSEE



Analysis
As of: Jan 14, 2008

**In re: RSL COM PRIMECALL, INC. and RSL COM U.S.A., INC., Debtors. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF RSL COM PRIMECALL, INC. and RSL COM U.S.A., INC., -and- RSL COM U.S.A., INC., RSL COM PRIMECALL, INC., and LDM SYSTEMS, INC., Plaintiffs, -against- JOEL BECKOFF, NESIM BILDIRICI, GUSTAVO CISNEROS, PAUL DOMORSKI, AVERY FISCHER, ITZHAK FISHER, FRED LANGHAMMER, LEONARD A. LAUDER, RONALD S. LAUDER, ROLLAND MALLCOTT, MICHAEL MARINO, STEVEN SCHIFFMAN, EUGENE SEKULOW, DONALD SHASSIAN, JACOB SCHUSTER, NIR TARLOVSKY, NICHOLAS TROLLOPE, and RICHARD E. WILLIAMS, Defendants.**

**Chapter 11, Case Nos. 01-11457 and 01-11469 (ALG) (Jointly Administered), Adv. Proc. No. 03-2176 (ALG)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2003 Bankr. LEXIS 1635**

**December 11, 2003, Decided**

**SUBSEQUENT HISTORY:** Related proceeding at RSL Communs. PLC v. Bildirici, 2006 U.S. Dist. LEXIS 67548 (S.D.N.Y., Sept. 14, 2006)

**DISPOSITION:** [*1] Allegations of complaint with respect to claims for wrongful concealment and constructive fraud and for aiding and abetting constructive fraud dismissed. Allegations of complaint with respect to breach of fiduciary duty sustained only as to claims relating to guarantees by RSL USA and only as against Defendants Fisher, Shassian, Beckoff and Marino in their capacities as directors of RSL USA. Claims for aiding and abetting breach of fiduciary duty dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, debtors, together with the debtors' official committee of unsecured creditors, filed an adversary proceeding against defendants, officers or directors of he debtors and affiliated companies. The complaint alleged: (1) constructive fraud and aiding and abetting constructive fraud; (2) breach of fiduciary duty; (3) aiding, and abetting in a breach of fiduciary duty; and (4) piercing the corporate veil. Defendants moved to dismiss.

**OVERVIEW:** The allegations with respect to the claims for wrongful concealment and constructive fraud, and for aiding and abetting constructive fraud, were dismissed. The debtors included in this claim creditors who allegedly relied on defendants' concealment of the debtors' insolvency. The debtors had no standing to sue on behalf of these creditors. Even if the debtors had standing, they failed to plead this claim with particularity as required by Fed. R. Civ. P. 9. The breach of fiduciary duty claim alleged that the directors had a duty to liquidate upon insolvency. However, the decision by the directors to postpone a bankruptcy filing and attempt to

"work out" the debtors' financial problems was subject to the business judgment rule. However, the debtors did state a claim for breach of fiduciary duty regarding certain directors authorizing guarantees for affiliate entities of the debtors that allegedly did not benefit the debtors and without reviewing the propriety of such guarantees. Finally, the debtors' claims of lack of adequate capitalization and overlapping of officers and directors among the various affiliate entities failed to state a claim for piercing the corporate veil.

**OUTCOME:** The bankruptcy court denied the motion to dismiss with respect to the allegations of the complaint regarding breach of fiduciary duty relating to the authorization of the guarantees, and only as against certain directors. The bankruptcy court granted the motion to dismiss as to all of the remaining claims.

**CORE TERMS:** insolvency, fiduciary duty, insolvent, subsidiary, business judgment rule, constructive, corporate veil, constructive fraud, billion, piercing, fraud claims, shareholder, concealment, self-dealing, corporate form, wrongdoing, fraudulent, fiduciary, affiliate, pleaded, owe, injustice, abetting, breached, pierced, aiding, entity, veil, particularity, inception

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1]A complaint may not be dismissed under Fed. R. Civ. P. 12(b)(6), incorporated into adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7012(b)(6), unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2]In a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), upon consideration of the allegations contained in a complaint, including any exhibits attached thereto, a court is obligated to accept all of the allegations in the complaint as true and must draw all reasonable inferences in favor of a plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3]In a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the scope of a court's review is limited as the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. In order to survive a motion to dismiss, the plaintiff only has to allege sufficient facts, not prove them.

*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Elements*
[HN4]Constructive fraud has been defined as a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special attention.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Elements*
[HN5]In order to establish a claim for constructive fraud, a plaintiff must establish the same elements as a claim for fraud, except that the element of scienter is not essential in view of the existence of a fiduciary or confidential relationship between the parties.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Elements*
[HN6]The elements of a cause of action for constructive fraud under New York law are the following: (1) a representation was made; (2) the representation was of a material fact; (3) the representation was false; (4) the representation was made with intent that the other party would rely upon it; (5) the other party did, in fact, rely on the representation without knowledge of its falsity; (6) injury resulted; and (7) the parties were in a fiduciary or confidential relationship.

*Bankruptcy Law > Estate Property > Content*
*Bankruptcy Law > Reorganizations > Debtors in Possession > General Overview*
[HN7]It is black letter law that a trustee in bankruptcy (including a debtor in possession) may only pursue claims that belong to the estate. A claim may belong to a bankrupt company only where the complaint can identify

a direct injury to the debtor, or in limited circumstances where the claim is so generally for the benefit of all creditors as an undifferentiated group that the trustee can be considered to be acting for "creditors generally."

***Civil Procedure > Justiciability > Standing > General Overview***
***Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview***
***Evidence > Procedural Considerations > Burdens of Proof > General Overview***
[HN8]Because standing is a jurisdictional matter, the burden is on a plaintiff clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.

***Bankruptcy Law > Estate Property > Content***
[HN9]Whether a claim is property of a bankruptcy estate or of individual creditors depends on whether the claim is general or particular. If the claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of a debtor, a trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action.

***Bankruptcy Law > Estate Property > Content***
***Civil Procedure > Federal & State Interrelationships > Erie Doctrine***
[HN10]In bankruptcy, the question whether a claim is general, so that it should be brought by a bankruptcy trustee, or particular, so that it belongs to individual creditors, is a question of state law.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview***
***Governments > Fiduciary Responsibilities***
***Torts > Business Torts > Fraud & Misrepresentation > General Overview***
[HN11]Under New York law, a cause of action for fraudulent concealment requires, in addition to a misrepresentation and a fiduciary or confidential relationship, reliance and subsequent injury. In an adversarial proceeding in bankruptcy, by charging a state law wrong, plaintiffs are not relieved of their burden of alleging and proving individual reliance and damages. Fraud is a claim that peculiarly belongs to individual plaintiffs who had different access to information at

different times, and in some cases may not have relied on any information.

***Civil Procedure > Justiciability > Standing > General Overview***
***Governments > Fiduciary Responsibilities***
***Torts > Business Torts > Fraud & Misrepresentation > General Overview***
[HN12]The intentional distortion of a corporation's financial picture and its solvency, for the purpose of misleading creditors to extend goods and services, is undoubtedly wrongful. But absent an allegation of direct injury to a corporation, or a diversion of goods or services from the company, it cannot be presumed that the alleged wrongful concealment of the corporation's insolvency from creditors harmed or injured the corporation.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > General Overview***
[HN13]Fed. R. Civ. P. 9(b) provides that in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Irrespective of whether a claim is for actual fraud or constructive fraud, Fed. R. Civ. P. 9(b) applies.

***Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Fraudulent Transfers > General Overview***
***Torts > Business Torts > Fraud & Misrepresentation > General Overview***
[HN14]A constructive fraudulent transfer claim has nothing to do with fraud, and instead is based on a transferor's financial condition and the sufficiency of the consideration provided by the transferee.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Criminal Law & Procedure > Accusatory Instruments > Complaints***
[HN15]To pass muster under Fed. R. Civ. P. 9(b), a complaint must allege with some specificity the acts constituting fraud; conclusory allegations that a defendant's conduct was fraudulent or deceptive are not enough. This is particularly true where fraud is alleged

against multiple defendants. Where a case involves multiple defendants, Fed. R. Civ. P. 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act.

**Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview**
**Civil Procedure > Federal & State Interrelationships > Erie Doctrine**
[HN16]The law of the state of incorporation applies, the charges relate to the duties of a corporation's directors.

**Business & Corporate Law > Corporations > Directors & Officers > General Overview**
**Contracts Law > Contract Interpretation > Fiduciary Responsibilities**
**Governments > Fiduciary Responsibilities**
[HN17]Traditionally, under Delaware law, directors owe fiduciary duties to stockholders, and perhaps to the corporation, and the relationship between directors and creditors is not fiduciary but contractual in nature. Insolvency, however, changes the scope of a director's duties, and upon insolvency directors owe fiduciary duties to creditors or, stated differently, to the corporation and to all of its interested constituencies, including creditors and shareholders. The rationale behind the "insolvency exception" is that the fiduciary duties held ordinarily for the benefit of shareholders should shift to creditors who now occupy the position of residual owners.

**Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty to Third Parties**
**Governments > Fiduciary Responsibilities**
[HN18]When a corporation is "in the vicinity of insolvency," the directors owe fiduciary duties to the entire "community of interests" of those involved with the corporation, including creditors. When managing a corporation "in the vicinity of insolvency," directors must consider the best interests of the corporation, and not just the interests of either creditors or shareholders alone. While this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth-creating capacity.

**Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview**
[HN19]It has never been the law in the United States that directors are not afforded significant discretion as to whether an insolvent company can "work out" its problems or should file a bankruptcy petition. Surely, a doctrine like that would stand in the way of the development of any new enterprise. There is no duty to liquidate and pay creditors when a corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative.

**Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule**
**Civil Procedure > Judgments > General Overview**
**Evidence > Inferences & Presumptions > General Overview**
[HN20]The business judgment rule in Delaware law creates a presumption that in making a business decision the disinterested directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. The presumptive validity of an exercise of business judgment is rebutted in cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.

**Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview**
**Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims**
**Evidence > Procedural Considerations > Burdens of Proof > General Overview**
[HN21]A plaintiff bears the burden of alleging well-pleaded facts to overcome the presumption that in making a business decision the disinterested directors of a corporation act on an informed basis and survive a motion to dismiss.

**Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Self-Dealing**
[HN22]Courts that have actually addressed the issue of the duty of directors of insolvent corporations to file a

bankruptcy petition have uniformly found officers and directors not liable in the absence of self-dealing.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
[HN23]Domination and control of a corporate director is not established by arguing that a director is not independent because of selection by and ties to an interested director. This is a common and accepted way of becoming a corporate director.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
[HN24]Conclusory allegations, unaccompanied by specific factual allegations that directors of a corporation were somehow controlled or dominated are insufficient to establish a lack of independence.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
[HN25]The type of conduct which courts have held is proscribed for a corporation operating in the vicinity of insolvency include transactions, usually without fair consideration to the company, for the benefit of the parent corporation or related entities. Further, plaintiffs are not required allege that each defendant director was the recipient of a direct pecuniary benefit from a challenged transaction, but that the transaction allegedly benefited only a corporate affiliate and was patently inequitable to a subsidiary.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule***
***Governments > Fiduciary Responsibilities***
***Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities***
[HN26]The business judgment rule does not protect conduct of directors where material decisions are made in the absence of any information and any deliberation.

Allegations that corporate directors abdicated all responsibility to consider action that was arguably of material importance to the corporation puts directly in question whether the board's decision-making processes were employed in a good faith effort to advance corporate interests.

***Bankruptcy Law > Conversion & Dismissal > Lack of Good Faith***
***Contracts Law > Contract Conditions & Provisions > Exculpatory Clauses***
***Torts > Procedure > Settlements > Releases > General Overview***
[HN27]Where plaintiffs challenge the good faith of a corporation's directors, this is enough, at the motion to dismiss stage, to overcome an exculpation clause in the corporation's articles of incorporation.

***Business & Corporate Law > Corporations > Governing Documents & Procedures > Articles of Incorporation & Bylaws > General Overview***
***Contracts Law > Contract Conditions & Provisions > Exculpatory Clauses***
***Torts > Negligence > Defenses > Exculpatory Clauses > General Overview***
[HN28]An exculpation clause in a corporation's article of incorporation allocates the risk of loss only between the parties to the articles of incorporation, i.e., the shareholders and the directors, but not as among directors and third parties such as creditors, and it therefore does not affect suits by creditors.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > General Overview***
***Governments > Fiduciary Responsibilities***
[HN29]Delaware courts have recognized that directors who hold dual directorships in a parent-subsidiary context may owe fiduciary duties to each corporation.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Governments > Fiduciary Responsibilities***
[HN30]Under Delaware law, officers as well as directors may owe fiduciary duties.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > General Overview*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN31]Aiding and abetting a breach of duty is usually used to impose liability on third parties and raises the question as to whether the wrongdoing of the corporation itself is not a bar to the action. Aiding and abetting requires knowing participation in the wrongdoing.

*Business & Corporate Law > Corporations > Formation > Place of Incorporation > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN32]In determining whether the corporate form will be disregarded and a corporate veil pierced, the law of the state of incorporation is applied.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Fraud*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Sham Corporations*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN33]Under Delaware law, in order to pierce the corporate veil and establish alter ego liability, a party must show: (1) that the parent and the subsidiary operated as a single economic entity; and (2) that an overall element of injustice or unfairness was present. Allegations of mere domination or control by one entity over another are insufficient; in the context of veil piercing, it is not sufficient at the pleading stage to make conclusory allegations of control. Rather, the extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own. There must be an abuse of the corporate form to effect a fraud or an injustice--some sort of elaborate shell game.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Sham Corporations*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Torts > Transportation Torts > General Overview*
[HN34]To survive a motion to dismiss on a claim of corporate veil-piercing, a plaintiff must allege facts that the controlling owners operated the company as an "incorporated pocketbook" and used the corporate form to shield themselves from liability. Further, the plaintiff must plead facts showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud. The fraud or similar injustice that must be demonstrated in order to pierce the corporate veil under Delaware law must, in particular, be found in the defendant's use of the corporate form.

*Business & Corporate Law > Corporations > Governing Documents & Procedures > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Corporate Formalities*
*Business & Corporate Law > Corporations > Shareholders > Shareholder Duties & Liabilities > Controlling Shareholders > General Overview*
[HN35]In determining whether the corporate form has been misused under Delaware law, courts have considered the following factors: (1) whether the corporation was adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholders siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for a dominant shareholder.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
[HN36]If lack of adequate capitalization were alone enough to justify piercing the corporate veil, the veil of every insolvent subsidiary or failed start-up corporation could be pierced.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
[HN37]It is commonplace for subsidiaries governed by

the laws of different legal systems to be separately incorporated, so that their corporate structure can address the potential differences between applicable corporate laws.

**COUNSEL:** For Plaintiffs: William F. Gray, Jr., Esq., William F. Kuntz, II, Esq., Steven R. Schoenfeld, Esq., TORYS, LLP, New York, New York.

For Joel Beckoff, Nesim Bildirici, Paul Domorski, Avery Fischer, Itzhak Fisher, Ronald S. Lauder, Rolland Mallcott, Steven Schiffman, Jacob Schuster, Eugene Sekulow, Defendants: John S. Kiernan, Esq., Sean Mack, Esq., Emily O. Slater, Esq., DEBEVOISE & PLIMPTON, New York, New York.

For Donald Shassian, Defendant: P. Gregory Schwed, Esq., John Lang, Esq., Eric S. Manne, Esq., LOEB & LOEB LLP, New York, New York.

For Gustavo Cisneros, Fred Langhammer, Leonard A. Lauder, Nicholas Trollope, Defendants: Gary P. Naftalis, Esq., Alan R. Friedman, Esq., Steven S. Sparling, Esq., KRAMER LEVIN [*2] NAFTALIS & FRANKEL LLP, New York, New York.

For Michael Marino, Defendant: Robert Fryd, Esq., Donald M. Levinsohn, Esq., WARSHAW BURSTEIN COHEN SCHLESINGER & KUH, LLP, New York, New York.

**JUDGES:** Allan L. Gropper, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** Allan L. Gropper

**OPINION**

**MEMORANDUM OF DECISION**

   **ALLAN L. GROPPER**

   **UNITED STATES BANKRUPTCY JUDGE**

   On March 15, 2003, RSL COM U.S.A., Inc. ("RSL USA"), RSL COM PRIMECALL, Inc., its subsidiary, and LDM Systems, Inc., a third-tier subsidiary (collectively the "Debtors"), together with the Debtors' Official Committee of Unsecured Creditors, filed an adversary proceeding against eighteen individuals, some of whom were RSL USA's officers or directors and some

of whom were officers or directors of affiliated companies. [1] The complaint is in four counts and sets forth the following claims for relief: (1) breach of fiduciary duty, (2) aiding, abetting, inducing or participating in a breach of fiduciary duty, (3) constructive fraud and aiding and abetting constructive fraud, and (4) alter/ego, piercing the corporate veil. Defendants have moved to dismiss the complaint in its entirety.

> 1   The defendants ("Defendants") are: Joel Beckoff, Nesim Bildirici, Gustavo Cisneros, Paul Domorski, Avery Fischer, Itzhak Fisher, Fred Langhammer, Leonard A. Lauder, Ronald S. Lauder, Rolland Mallcott, Michael Marino, Steven Schiffman, Eugene Sekulow, Jacob Schuster, Donald Shassian, Nir Tarlovsky, Nicholas Trollope and Richard E. Williams. According to the complaint, the following were affiliated with LTD: Messrs. Cisneros, Langhammer, L. Lauder, Schuster, Sekulow, Shassian and Trollope were directors of LTD (Shassian denies this); Messrs. Beckoff, Bildirici, Domorski, Fisher, R. Lauder, Schiffman, Shassian and Tarlovsky were officers of LTD. The following were affiliated with PLC: Messrs. Bildirici, Fisher, Schuster, Sekulow, Tarlovsky and Williams were directors of PLC; R. Lauder was Chairman. The following were affiliated with RSL USA: Messrs. Beckoff, Domorski, Fisher, Mallcott, Marino, Schiffman, Shassian and Tarlovsky were directors of RSL USA at one time or another; Beckoff, A. Fischer, Fisher, Mallcott, Marino and Tarlovsky were officers of RSL USA. Two of the Defendants, Williams and Tarlovsky, did not appear in this proceeding; Plaintiffs were authorized to move to enter default judgments against them but have not done so.

[*3] **FACTS**

**The Facts as Alleged in the Complaint**

   The following facts alleged in the complaint, presented in the light most favorable to Plaintiffs on this motion to dismiss, are assumed to be true for purposes of this motion.

   The Debtors were part of a telecommunications conglomerate that provided services to businesses and residential customers in the United States and abroad. At

the top of the corporate structure was a holding company, RSL Communications, Ltd. ("LTD"), incorporated in Bermuda, where it is currently in liquidation proceedings. 2 According to the complaint, Ronald S. Lauder owned 28.4% of its stock and controlled 57.2% of the voting power. LTD in turn owned all the stock of RSL Communications PLC ("PLC"), an operating United Kingdom company that is currently in liquidation proceedings in the United Kingdom. PLC in turn owned RSL Com North America ("RSL North America"), an intermediate holding company whose only function was to hold 100% of the stock of RSL USA.

> 2   LTD also brought a proceeding in this Court under § 304 of the Bankruptcy Code to stay its creditors from taking action against its assets in this country in derogation of the Bermuda proceeding. (Case No. 01-11506.) The § 304 proceeding was largely unopposed and a permanent injunction was entered.

[*4]  The complaint categorizes Defendants primarily in two groups. Fourteen of the Defendants, a group Plaintiffs refer to as the "Lauder Control Group," are alleged to have controlled RSL USA for their own personal interests and to the detriment of the Debtors and their creditors. 3 The remaining four Defendants were directors of RSL USA, and are alleged to have supported and permitted the exercise of control by the Lauder Control Group. 4 The complaint alleges that the Lauder Control Group was able to exercise its control over RSL USA through Ronald S. Lauder and Itzhak Fisher, who were Chairman of the Board and President of LTD, respectively, and were allegedly able to pick and choose the directors of LTD at will. These two individuals indirectly controlled the election of the directors of RSL USA.

> 3   The Debtors allege the "Lauder Control Group" consisted of the following defendants: Messrs. Bildirici, Cisneros, A. Fischer, Fisher, Langhammer, L. Lauder, R. Lauder, Mallcott, Schuster, Sekulow, Shassian, Tarlovsky, Trollope and Williams.
> 4   This group includes Messrs. Beckoff (Director and Treasurer/Secretary of RSL USA and Corporate Controller of LTD), Domorksi (Director of RSL USA and President/CEO of LTD), Marino (Director and President of RSL USA) and Schiffman (Director of RSL USA and

CFO of LTD).

[*5]  Against the backdrop of alleged control of RSL USA by the Lauder Control Group and acquiescence by the four other Defendants, the complaint charges wrongdoing that can generally be categorized in the following manner. First, the complaint charges that RSL USA was insolvent and undercapitalized from inception, and/or that it was from the start unable to pay its debts as they became due. (Complaint, PP 43-44.) By concealing RSL USA's insolvency from creditors, it is alleged, Defendants breached a fiduciary duty to RSL USA and to its creditors, who were unaware of the insolvency, relied on false information and continued to provide goods, services and credit to RSL USA. Thus, the complaint alleges that the fraud damaged the Debtors and all creditors alike. (Complaint, PP 72-75.)

Second, the complaint asserts that Defendants breached their fiduciary duties to creditors by wrongfully prolonging the corporate existence of RSL USA and operating it well past the point of insolvency. It is argued that Defendants, in deciding to keep RSL USA in business, were not independent and continued to incur massive amounts of debt when the company should have been liquidated. (Complaint, PP 46-47.)  [*6]  As the principal example of Defendants' wrongdoing, the complaint claims that Defendants caused RSL USA to guarantee a total of $ 1.6 billion of the debt of PLC in February, 2000, 13 months prior to RSL USA's chapter 11 filing. This guarantee was of debt issued under seven indentures between PLC as issuer, LTD as guarantor and J.P. Morgan Chase Bank as indenture trustee, pursuant to which PLC issued approximately $ 1.6 billion in public debt securities from October 1996 through May 1999. RSL USA was not a party to and did not originally guarantee the debt. In February 2000, the complaint alleges, the Lauder Control Group caused PLC and LTD to enter into two additional indentures to raise more capital for the companies (and, it is further charged, to increase the value of Defendants' ownership interest). But unlike practice in connection with the previous seven indentures, the Lauder Control Group allegedly caused RSL USA to guarantee all of the debt, both old and new. On February 14, 2000, Defendants Fisher, Shassian, Beckoff and Marino signed a "Unanimous Written Consent" of the Board of Directors of RSL USA authorizing the officers of RSL USA to execute documentation guaranteeing [*7] the full $ 1.6 billion of old PLC debt, assertedly against RSL USA's interests and

without any independent analysis or evaluation. No other subsidiary of LTD had guaranteed the debt of PLC, making RSL USA the only operating subsidiary responsible for the PLC debt. (Complaint, P 56.)

Plaintiffs charge that this guarantee was wrongful and occurred at a time when the RSL enterprise as a whole was suffering net losses in excess of $ 600 million, with further losses expected through 2001 and beyond. (Complaint, P 53.) Furthermore, it is asserted that with declining revenue in all markets, PLC and/or LTD were unlikely to repay their obligations to the holders of the public debt securities. The complaint charges that Defendants who did not sign the "Unanimous Written Consent" and were not members of the Lauder Control Group also breached their fiduciary duty to the Debtors and their creditors by supporting the guarantees and by failing in their capacity as officers, directors and managers of the business of RSL USA.

Subsequent to the RSL USA guarantee of the $ 1.6 billion of PLC debt, the complaint further charges, the Lauder Control Group caused PLC, as borrower, and LTD and RSL USA as [*8] "guarantors," to enter into a Senior Standby Loan and Warrant Agreement ("the Lauder Loan Agreement"), dated July 6, 2000, with Ronald S. Lauder as lender. This agreement permitted PLC to borrow up to $ 100 million from Lauder and provided him with warrants to purchase up to 1.5 million shares of LTD stock. It is alleged that Defendant Itzhak Fisher signed the agreements on behalf of PLC, LTD and RSL USA, and that he authorized the guarantee by RSL USA without giving due regard to the interests of RSL USA and without the authorization of its Board of Directors. Plaintiffs charge that the Lauder Loan Agreement was exclusively for the benefit of the Lauder Control Group and to the detriment of the Debtors and their "non-insider creditors." It is also alleged that the other Defendants either supported or assisted in the making of the guarantee of the Lauder Loan Agreement and thereby failed to carry out their duties to manage the business and affairs of the Debtors in a proper manner. 5

5    This includes Messrs. Joel Beckoff (Director and Treasurer/Secretary of RSL USA and Corporate Controller of LTD), Paul Domorksi (Director of RSL USA and President/CEO of LTD), Michael Marino (Director and President of RSL USA) and Steven Schiffman (CFO of LTD).

[*9]  The alleged wrongful acts by Defendants can thus generally be summarized as follows: (i) wrongful concealment of the fact that RSL USA was insolvent from its inception to the detriment of RSL USA and its creditors; (ii) wrongful prolongation of the corporate existence of RSL USA to the detriment of RSL USA and its creditors; (iii) wrongful imposition on RSL USA of guarantees totaling $ 1.7 billion of debt of its parent, PLC; and (iv) misuse of RSL USA's corporate form in a manner that would permit piercing the corporate veil from the American subsidiaries through PLC to LTD. Defendants have sought dismissal as to all counts for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction as to the constructive fraud claims. Alternatively, they seek dismissal on the ground that the complaint does not allege fraud, breach of duty and grounds for piercing the corporate veil with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure and applicable Delaware law.

## DISCUSSION

### The Rule 12(b)(6) Standard

[HN1]A complaint may not be dismissed under Federal Rule of Civil Procedure 12(b)(6) [*10] , incorporated herein by Bankruptcy Rule 7012(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). [HN2]Upon consideration of the allegations contained in the complaint, including any exhibits attached thereto, the Court is obligated to accept all of the allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Stuto v. Fleishman*, 164 F.3d 820, 824 (2d Cir. 1999). [HN3]The scope of the court's review is limited as the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002); *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995). In order to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999).

It is with these legal standards in mind that this Court will consider the [*11] allegations of the complaint.

### Wrongful Concealment or Constructive Fraud

The complaint charges that Defendants wrongfully concealed certain facts from RSL USA and its creditors and that Plaintiffs suffered harm as a consequence. Defendants have moved to dismiss the constructive fraud claims on the grounds that: (i) Plaintiffs have no standing to bring the claims, and (ii) even if Plaintiffs have standing, the complaint does not plead the claims with the requisite particularity required by Bankruptcy Rule 7009(b), incorporating Federal Rule of Civil Procedure 9(b).

[HN4]Constructive fraud has been defined as "a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special attention." Grand Union Mount Kisco Employees Fed. Credit Union v. Kanaryk, 848 F.Supp 446, 455 (S.D.N.Y. 1994), citing Brown v. Lockwood, 76 A.D.2d 721, 730-31, 432 N.Y.S.2d 186, 193 (2d Dept. 1980). See also, Klembczyk v. Di Nardo, 265 A.D.2d 934, 935, 705 N.Y.S.2d 743, 744 (4th Dept. 1999); [*12] Callahan v. Callahan, 127 A.D.2d 298, 301, 514 N.Y.S.2d 819, 821 (3d. Dept. 1987). [HN5]In order to establish a claim for constructive fraud, a plaintiff must establish the same elements as a claim for fraud, except that the element of scienter is not essential in view of the existence of a fiduciary or confidential relationship between the parties. Burrell v. State Farm and Cas. Co., 226 F.Supp.2d 427, 438 (S.D.N.Y. 2002). [HN6]The elements of a cause of action for constructive fraud under New York law, which all parties agree is applicable on the constructive fraud claims, are the following: (1) a representation was made, (2) the representation was of a material fact, (3) the representation was false, (4) the representation was made with intent that the other party would rely upon it, (5) the other party did, in fact, rely on the representation without knowledge of its falsity, (6) injury resulted and (7) the parties were in a fiduciary or confidential relationship. See Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts, 717 F.Supp. 148, 155 (S.D.N.Y. 1989); Brown v. Lockwood, 76 A.D.2d at 730.

[*13]  *Standing*

Defendants first argue that Plaintiffs lack standing to pursue the constructive fraud claims. They contend that the constructive fraud charges (i) cannot be brought on behalf of all creditors generally because such claims, if they exist, belong to individual creditors, and (ii) cannot

be brought on behalf of RSL USA because it was not harmed or injured by the alleged wrongdoing.

[HN7]It is black letter law that a trustee in bankruptcy (including a debtor in possession) may only pursue claims that belong to the estate. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 429, 32 L. Ed. 2d 195, 92 S. Ct. 1678 (1972). A claim may belong to a bankrupt company, such as RSL USA, only where the complaint can identify a direct injury to the debtor, or in limited circumstances where the claim is so generally for the benefit of all creditors as an undifferentiated group that the trustee can be considered to be acting for "creditors generally." St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 696-700 (2d Cir. 1989); Murray v. Miner, 876 F.Supp. 512, 516-17 (S.D.N.Y. 1995), aff'd, 74 F.3d 402 (2d Cir. 1996). [HN8]Because [*14]  standing is a jurisdictional matter, the burden is on the plaintiff "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir. 1994).

[HN9]Whether a claim is property of the estate or of individual creditors depends on whether the claim is general or particular. "If the claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993), quoting St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d at 701. [HN10]The question whether a claim is general, so that it should be brought by a trustee, or particular, so that it belongs to individual creditors, is a question of state law, which in this case is New York law. Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 825 (2d Cir. 1997).

In the instant complaint Plaintiffs charge Defendants with failure to disclose [*15] certain facts, particularly that RSL USA was "insolvent from inception." Since RSL USA was in existence for approximately six years, Plaintiffs lump together creditors who allegedly relied on information made available by Defendants over a six-year period. In addition to a failure to plead fraud over such a long period with particularity (see below), there is no basis on which Plaintiffs' basic premise--that all creditors were damaged identically by a six-year course of non-disclosure--can be accepted, even on this

motion to dismiss. Plaintiffs cannot be deemed to act as surrogates for all creditors who extended credit to the Debtors throughout this entire period and necessarily relied (or did not rely) on different information at different times. It is no answer that the failure to disclose insolvency was common throughout the period. [HN11]A cause of action for fraudulent concealment requires, in addition to a misrepresentation and a fiduciary or confidential relationship, reliance and subsequent injury. See *Banque Arabe Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995); *Congress Fin. Corp v. John Morrell & Co.,* 790 F.Supp. 459, 472 (S.D.N.Y. 1992).* [*16] In this case, charging a State law wrong, Plaintiffs are not relieved of their burden of alleging and proving individual reliance and damages. *Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van* Amerongen, Ltd., 675 F.Supp. 122, 129 (S.D.N.Y. 1987). Fraud is a claim that peculiarly belongs to individual plaintiffs who had different access to information about RSL USA at different times, and in some cases may not be relied on any information. *In re Granite Partners,* 194 B.R. 318, 320 (Bankr. S.D.N.Y. 1996).

Defendants also challenge the standing of Plaintiffs on the ground that RSL USA was conferred a benefit and not harmed by the alleged wrongful concealment. [HN12]The intentional distortion of a corporation's financial picture and its solvency, for the purpose of misleading creditors to extend goods and services, is undoubtedly wrongful. But absent an allegation of direct injury to the corporation, or a diversion of goods or services from the company, it cannot be presumed that the alleged wrongful concealment of RSL USA's insolvency from creditors harmed or injured RSL USA. See *Colotone Liquidating Trust v. Bankers Trust New York Corp.,* 243 B.R. 620 (S.D.N.Y. 2000), [*17] where the court had before it claims for fraud and breach of fiduciary duty and held that there was no injury to the debtor Colotone where its controlling affiliate allegedly knowingly disseminated false financial information about it. "On the contrary, there is every reason to suppose that Colotone was the beneficiary of any such deceit because it would have resulted in its receiving goods and services, the obligation to pay for which was discharged in bankruptcy." *Id.* at 622.

Plaintiffs cite several cases for the proposition that RSL USA was harmed by the non-disclosure. In these cases, the real harm suffered by the company was the self-dealing or looting engaged in by insiders during the period of non-disclosure. See e.g., *Schacht v. Brown,* 711 F.2d 1343 (7th Cir. 1983), an action to recover for RICO violations against officers, directors and the parent corporation who allegedly kept an insurer in business past the point of insolvency; the court found that the corporation was harmed because the defendants looted the insurer of valuable business, not because of the non-disclosure; *Investors Funding Corp. of New York Sec. Litig. v. Dansker (In re Investors Funding Corp. Sec. Litig.),* 523 F.Supp. 533 (S.D.N.Y. 1980), [*18] where principal officers and directors created the false appearance of fiscal strength to raise capital for plundering.

Plaintiffs, in their papers responding to the instant motion, argue for the first time that all three alleged wrongful acts--the concealment of insolvency, the prolongation of the life of RSL USA and the guarantees of $ 1.7 billion of parent debt--are inextricably linked together and give the complaint any necessary allegations of looting. They argue that Defendants continued to sink RSL USA into deepening insolvency and hid RSL USA's insolvency from creditors so that they could wrongfully guarantee the $ 1.7 billion of parent company debt. Passing the fact that this new theory does not appear in the complaint, *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir. 1998), it does not bolster the Plaintiffs' standing to bring constructive fraud or wrongful concealment claims. First, there is no allegation that the fact of the guarantees was concealed. Second, the complaint is still insufficient for the Court to find that the constructive fraud claims can be brought on behalf of "creditors generally." Plaintiffs cannot bring the same constructive [*19] fraud claims on behalf of those creditors who may have extended credit after disclosure of the guarantees as they could on behalf of others who extended credit unknowingly.

Accordingly, Plaintiffs do not have standing to bring the constructive fraud claims on behalf of "creditors generally" of RSL USA, and Defendants' motion to dismiss these claims is granted. *A fortiori,* Plaintiffs do not have standing to pursue claims for aiding and abetting any such constructive fraud.

### Constructive Fraud Not Pleaded With 9(b) Particularity

In any event, the constructive fraud claims would have to be dismissed because they have not been pleaded

with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Rule[HN13] 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Irrespective of whether a claim is for actual fraud or constructive fraud, Rule 9(b) applies. *See Burrell v. State Farm & Casualty Co.*, 226 F.Supp.2d at 438; *Victor v. Riklis, 1992 U.S. Dist. LEXIS 7025, 1992 WL 122911, at *5 n.6 (S.D.N.Y. 1992)* ("Rule 9(b)'s [*20] particularity requirements are not 'relaxed' for constructive fraud claim."); *Frota v. Prudential Bache Sec., Inc., 639 F.Supp. 1186, 1193 (S.D.N.Y. 1986)* ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty--statutory, common law, tort, contractual or fiduciary.").

Plaintiffs argue that cases assessing the pleading requirements for constructive fraudulent *transfer* claims have held that the heightened pleading requirements of Rule 9(b) do not apply. *See Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999)*; *see also In re White Metal Rolling and Stamping Corp., 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998)*; *In re Allegheny Health, Educ. & Research Found., 253 B.R. 157, 162 n.2 (Bankr. W.D. Pa. 2000)*. This argument is misplaced. The instant claims are for constructive fraud or wrongful concealment, not for a constructive fraudulent *transfer*, which is a separate and distinct cause of action with different elements. [6] Moreover, in the cases cited by Plaintiffs, Rule 9(b) has been "relaxed" where a trustee who had no direct [*21] knowledge of the case has been appointed and could not frame a detailed complaint without discovery and access to information. Such is not the case here. Plaintiffs have already had discovery and access to information, including the books and records of RSL USA and deposition of both Ronald S. Lauder and Itzhak Fisher, the primary members of the alleged Lauder Control Group. [7]

[6]    [HN14]A constructive fraudulent transfer claim has nothing to do with fraud, and instead is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee. *See In re White Metal Rolling and Stamping Corp., 222 B.R. at 428-29* (noting also a split of authority as to whether Rule 9(b) applies to constructive fraudulent transfer claims).

[7]    This also answers Plaintiffs' contention that if Rule 9(b) does apply, they should be entitled to

leniency in the pleading requirement on the ground that courts sometimes grant such leniency to a trustee who has never had an opportunity to conduct discovery.

[*22]    Thus, the complaint's allegations of fraudulent concealment must comply with Rule 9(b). [HN15]"To pass muster [under Rule 9(b)] in this Circuit, a complaint 'must allege with some specificity the acts constituting fraud' ... conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd., 85 F.Supp.2d 282, 293 (S.D.N.Y. 2000)*, quoting *Lobatto v. Berney, 1999 U.S. Dist. LEXIS 13224, 1999 WL 672994, at *9 (S.D.N.Y. 1999)*. This is particularly true where fraud is alleged against multiple defendants. *Ellison v. Am. Image Motor Co., Inc. 36 F.Supp.2d 628, 640-41 (S.D.N.Y. 1999)* ("where a case involves multiple defendants F.R.C.P 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act.").

Here, even if Plaintiffs could overcome the standing requirements, they have not adequately pleaded the constructive fraud claims pursuant to Rule 9(b). It is not enough, as Plaintiffs argue, merely to state the elements of a constructive fraud claim and [*23] assert generally that a fiduciary relationship was established with creditors and subsequently breached. The complaint lacks any specific misrepresentation that was made to creditors or any specific detrimental reliance and subsequent injury thereto. Simply stating that RSL USA was "insolvent from inception" and that Defendants--all eighteen of them--are somehow culpable does not comport with the requirements of Rule 9(b).

**Wrongful Prolongation of RSL USA's Corporate Life**

The second principal charge against Defendants is that they (i) breached their fiduciary duties to creditors by wrongfully prolonging the corporate existence of RSL USA when they should have liquidated it for the benefit of creditors, and (ii) cannot rely on the business judgment rule because they were not independent. Defendants argue that these claims should be dismissed because (i) they did not breach any fiduciary duty to creditors, as there is no "duty to liquidate," and (ii) a decision by directors to keep an insolvent corporation operating is subject to the business judgment rule, and the complaint

does not set forth sufficient allegations to overcome the presumption of validity that the business [*24] judgment rule confers. The parties agree that [HN16]Delaware law applies, as RSL USA is a Delaware corporation and the charges relate to the duties of its directors. *See Walton v. Morgan Stanley Co., 623 F.2d 796, 798 (2d Cir. 1980); H.S.W. Enters., Inc. v. Woo Lae Oak, Inc., 171 F.Supp.2d 135, 142 (S.D.N.Y. 2001)*.

### The Alleged Duty to Liquidate

The fiduciary duty of a director of a financially troubled corporation has been the subject of much analysis by both courts and commentators. [HN17]Traditionally, under Delaware law, directors owe fiduciary duties to stockholders, and perhaps to the corporation, and the relationship between directors and creditors is not fiduciary but contractual in nature. *See Katz v. Oak Indus., Inc., 508 A.2d 873 (Del. Ch. 1986); Mia Shoes v. Republic Factors Corp., 1997 U.S. Dist. LEXIS 12571, 1997 WL 525401 (S.D.N.Y. 1997); Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.), 274 B.R. 71, 88 (D. Del. 2002). See also, 3A W. Fletcher, Private Corporations* § 1035.60 (2003). Insolvency, however, changes the scope of a director's duties, and upon insolvency directors owe fiduciary duties to creditors [*25] or, stated differently, to the corporation and to all of its interested constituencies, including creditors and shareholders. *See Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784 (Del. Ch. 1992); In re Subpoena Issued to Friedman, 286 B.R. 505, 508 (S.D.N.Y. 2002); In re Kingston Square Assocs., 214 B.R. 713, 736 n.24 (Bankr. S.D.N.Y. 1997)*. The rationale behind the "insolvency exception" is that the fiduciary duties held ordinarily for the benefit of shareholders should shift to creditors who "now occupy the position of residual owners." *Geyer v. Ingersoll Publ'ns Co., 621 A.2d at 787*.

In *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 Del. Ch. LEXIS 215, Civ. 12150, 1991 WL 277613, at *34 n.55 (Del. Ch. 1991)*, the Delaware Chancellor held that [HN18]when a corporation is "in the vicinity of insolvency," the directors owe fiduciary duties to the entire "community of interests" of those involved with the corporation, including creditors. Subsequent decisions have emphasized that when managing a corporation "in the vicinity of insolvency," directors must consider the best interests of the corporation, and not [*26] just the

interests of either creditors or shareholders alone. "While this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth creating capacity." *In re Hechinger Inv. Co. of Delaware, 274 B.R. at 89; In re Ben Franklin Retail Stores, Inc., 225 B.R. 646, 654 (Bankr. N.D. Ill. 1998), aff'd in part by, 1999 U.S. Dist. LEXIS 16645, 1999 WL 982963 (N.D. Ill. 1999), rev'd in part on other grounds, 2000 U.S. Dist. LEXIS 276, 2000 WL 28266 (N.D. Ill 2000). See also, Jonathan C. Lipson, Directors' Duties to Creditors: Power Imbalance and the Financially Distressed Corporation, 50 U.C.L.A. L.REV. 1189 (2003); Steven L. Schwarz, Rethinking a Corporation's Obligation to Creditors, 17 CARDOZO L. REV. 647 (1996); Ann E. Conway Stilson, Reexamining the Fiduciary Paradigm at Corporate Insolvency and Dissolution: Defining Directors' Duties to Creditors, 20 DEL. J. CORP. L. 1 (1995)*.

In the case at bar, the dispute between the parties as to the wrongful prolongation claims does not center around the abstract question whether directors [*27] of an insolvent corporation have fiduciary duties to creditors, but rather the scope of those duties. Most of the Defendants do not seriously contend that directors of an insolvent corporation are free of any fiduciary duties to creditors. Defendants argue principally that there is no absolute duty for directors of an insolvent corporation to liquidate for the immediate benefit of creditors. [8] Instead, in pursuance of their duties to the entire corporate enterprise, directors facing the decision whether to continue a corporation in business or to file an insolvency petition must still seek to "maximize the corporation's long-term wealth creating capacity." Such a decision, Defendants argue, is entitled to the protection of the business judgment rule absent self-dealing, which they assert has not been effectively alleged in this case.

> 8   Several of the Defendants contend that even when the corporation is insolvent, the directors of a subsidiary corporation owe duties only to the parent company. This argument is dealt with below.

[*28] There is no authority that supports Plaintiffs' position that there is a blanket duty to liquidate upon insolvency, untempered by the business judgment rule. Plaintiffs have not cited any case in the United States that supports this bald proposition. It would require directors

2003 Bankr. LEXIS 1635, *28

to determine what standard of insolvency might apply--two possibilities are inability to pay debts as they come due (as used in § 303(b)(1) of the Bankruptcy Code) and balance sheet insolvency (as defined in § 101(32)). *See* Geyer v. Ingersoll Publ'ns Co., 621 A.2d. at 789, which refers to them both. It would then require them to make a determination as to the exact status of the corporation's financial affairs, on pain of liability to creditors. In the absence of the protection of the business judgment rule, a director would ordinarily have to opt for an insolvency filing, as the director could have little confidence that the corporation would not, in the bright light of hindsight, be deemed to have been insolvent under one definition or the other. [HN19]It has never been the law in the United States that directors are not afforded significant discretion as to whether an insolvent company can "work [*29] out" its problems or should file a bankruptcy petition. *See* Sanford Fork & Tool Co. v. Howe, Brown & Co., 157 U.S. 312, 319, 39 L. Ed. 713, 15 S. Ct. 621 (1895), where the Court said, in a different context, "Surely, a doctrine like that would stand in the way of the development of any new enterprise." *See also,* In re Ben Franklin Retail Stores, Inc., 225 B.R. at 655, where the court rejected the notion of "a duty to liquidate and pay creditors when the corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative." [9]

    [9]    United States law differs markedly in this respect from the laws of many other countries, where by statute directors can be liable for corporate debts if they continue to trade after liquidation appears unavoidable. *See* In re Ionica, PLC, 241 B.R. 829, 839 (Bankr. S.D.N.Y. 1999), citing § 214(2) of the English Insolvency Act that makes a director liable for the debts of a corporation if he "knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation." *See also,* Carl Felsenfeld, *et al., International Insolvency* (2000), at vol. II, pp. U.K. 24-25 and U.S. 22-25 for a comparison of English and American law on this point.

    [*30]  Plaintiffs cite four cases for the proposition that the business judgment rule is inapplicable to insolvent corporations. None is persuasive. In Askanase v. Fatjo, 1993 U.S. Dist. LEXIS 7910, 1993 WL 208440 (S.D. Tex. 1993), the court considered a claim to recover a preferential transfer by the Chapter 7 trustee, and

discussed both Texas and Delaware law before ultimately concluding that it could not determine which state's law applied. In *dicta*, the court stated that the business judgment rule has no effect in the context of insolvency. [10] In Shultz v. Miramar Res., Inc., 208 B.R. 723 (M.D. Fla. 1997), the court does not even discuss the business judgment rule. In In re General Homes Corp., 199 B.R. 148 (Bankr. S.D. Tex. 1996), the court--applying Texas law--held that the business judgment rule has "no consequence in the context of a conservatorship." In Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.), 239 B.R. 93 (N.D. Tex. 1999), another case applying Texas law, the court cited *In re General Homes Corp.* for the proposition that the business judgment rule *may* be wholly inapplicable where the corporation is insolvent.

    [10]   The court held there were outstanding questions as to whether or not Delaware law applied to the case, but that if Delaware law were applicable, it would apply the Delaware Trust Fund Doctrine. This doctrine provides that under certain circumstances, a corporation's assets are deemed a *res*, held in trust by corporate fiduciaries for the benefit of creditors. *See* American Nat'l Bank of Austin v. Mortgage Am., (In re Mortgage Am.), 714 F.2d 1266, 1268-69 (5th Cir. 1983). The complaint contains no reference to the doctrine, and one commentator states it has been repudiated. 15A W. Fletcher, *Private Corporations* § 7373 (2003).

    [*31]  In sum, Plaintiffs have no substantial support for the proposition that a director's decision to postpone a bankruptcy filing and attempt to "work out" a financial problem is not subject to the business judgment rule, a rule that protects directors' decision-making in other situations.

### *The Business Judgment Rule*

    [HN20]The business judgment rule in Delaware law creates a presumption that in making a business decision the disinterested directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. *See* Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999); and Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985). The presumptive validity of an exercise of business judgment is rebutted in cases where

the decision under attack is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Ryan v. Aetna Life Ins. Co., 765 F.Supp. 133, 138 (S.D.N.Y. 1991).* [HN21]A plaintiff bears the burden of [*32] alleging well-pleaded facts to overcome the presumption and survive a motion to dismiss. *Id.; Aronson v. Lewis, 473 A.2d at 812.*

In the instant case, Defendants argue that Plaintiffs have failed to plead any specific facts that would demonstrate that their decision not to file an insolvency petition for RSL USA earlier than in 2001 was not taken on an "informed basis, in good faith and in an honest belief that the action was in the best interest of RSL USA." They argue further that [HN22]courts that have actually addressed the issue of the duty of directors of insolvent corporations have uniformly found officers and directors not liable in the absence of self-dealing. *See In re Ben Franklin Retail Stores, Inc., 225 B.R. at 655-56,* where the court--relying on Delaware law--dismissed a claim for wrongful prolongation of corporate life where the directors of an insolvent corporation were alleged to have manipulated accounts so that third parties would continue to lend money and supply inventory. The court found that the complaint was subject to dismissal because it did not allege specific facts demonstrating that the directors failed to use the corporate assets [*33] in "an informed, good faith effort to maximize the corporation's long-term wealth creating capacity", citing *Credit Lyonnais, 1991 Del. Ch. LEXIS 215, 1991 WL 277613, at *34.* The court further noted, in dismissing the claim, that "All of the decisions in which courts have allowed creditors to recover for breach of fiduciary duty have involved directors of an insolvent corporation diverting corporate assets for the benefit of insiders or preferred creditors." *Id. at 655,* citing Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty of Creditors,* 46 VAND. L.REV. 1485, 1512 (1993). [11] *See also, Bank of America v. Musselman, 222 F.Supp.2d 792, 799-800 (E.D. Va. 2002),* where the court also cites and relies on the Lin article.

> 11   In that article, on which the Defendants rely and which will be further discussed below, the author concludes that courts have permitted creditors to recover for breach of fiduciary duty in different contexts where self-dealing is alleged. The article includes, as one type of self-dealing, the situation where directors allegedly have

"permitted the company to engage in transactions, usually without fair consideration to the company, for the benefit of its parent corporation or related entities". Lin, 46 VAND. L. REV. at 1514.

[*34] Except for the transaction discussed below (the corporate guarantees), Plaintiffs have failed to allege any specific fact that would amount to self-dealing on the part of Defendants. One specific charge made by the complaint with respect to an "insider transaction" is that Ronald S. Lauder made a $ 100 million loan and received "valuable" warrants at a time when PLC, LTD and RSL USA were all insolvent. It appears that, as it turned out, the warrants were worthless, and Lauder received only a claim in two insolvency cases. [12] In any event, whether or not Lauder lost most of his investment, for present purposes it cannot be ignored that at a time when LTD, PLC an RSL USA were arguably insolvent and nearing collapse, Lauder put money into PLC on an unsecured basis, instead of taking it out. [13]

> 12   The Court can take judicial notice of the fact that Lauder filed a claim for $ 100 million in the RSL USA Chapter 11 cases; according to the Disclosure Statement for the Debtors' First Amended Plan of Reorganization, he will receive at best a very small recovery.
> 13   We discuss separately below the charge that RSL USA's guarantee of the Lauder Loan involved a breach of fiduciary duty.

[*35] As another example of alleged bad faith, Plaintiffs allege that Defendants should have sought equity infusions to fund RSL USA, rather than continuing to accumulate debt. It is, at best, an open question whether RSL USA could have attracted equity investors, given that Plaintiffs allege it was "insolvent from inception." In any case, absent well-pleaded allegations of specific acts of self-dealing or even bad faith, Plaintiffs cannot overcome the presumption afforded by the business judgment rule that the directors acted reasonably and in good faith in the manner in which they obtained funding for the business.

Nor have Plaintiffs shown that there was such a lack of independence on the part of the directors as to make the business judgment rule generally inapplicable. Plaintiffs have alleged that most if not all Defendants were not independent because they were close associates, "beholden" to Ronald S. Lauder and Itzhak Fisher, and that the other Defendants feared that the exercise of good

faith judgment could compromise their employment or other relationships. But [HN23]domination and control is not established by arguing that a director is not independent because of selection by and [*36] ties to an interested director. This is a common and accepted way of becoming a corporate director. *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 355 (Del. Ch. 1998), *aff'd in relevant part*, 746 A.2d 244 (Del. 2000); *Aronson v. Lewis*, 473 A.2d at 816. Plaintiffs also assert that each defendant had a personal stake in LTD in that he possessed a stock ownership interest in it. This, too, is not enough; [HN24]conclusory allegations, unaccompanied by specific factual allegations that directors were somehow controlled or dominated are insufficient to establish a lack of independence. *See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80 F. Supp. 2d 129, 1999 WL 754015, at *5 (S.D.N.Y. 1999); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225, 247 (S.D.N.Y. 2000).

Except in one respect, which will be discussed next, Plaintiffs have not in the instant complaint shown enough to rebut the presumptive validity of the business judgment of Defendants in continuing RSL USA's corporate existence.

**Wrongful Guarantee of Affiliate Debt**

The one exception referred to above, and the principal specific [*37] act of wrongdoing alleged in the complaint, is RSL USA's guarantee of $ 1.6 billion of the outstanding debt of PLC at a time when both entities were insolvent. It is alleged, and presumed as true, that the Defendants who were directors of RSL USA at the time--Messrs. Fisher, Shassian, Beckoff and Marino--signed a Unanimous Written Consent of Directors approving the guarantees. They thereby authorized the assumption of $ 1.6 billion of the debt of the parent, allegedly amidst the backdrop of net losses of the corporate group in excess of $ 600 million. It is alleged that the guarantee was approved just days after the directors took office without any independent analysis or evaluation whatsoever. It is also alleged that, thereafter, RSL USA guaranteed the $ 100 million Lauder Loan, bringing the total amount of PLC debt guaranteed by RSL USA to $ 1.7 billion, and that defendant Fisher signed that guarantee on behalf of RSL USA without even obtaining the authorization of the RSL USA Board. Plaintiffs argue that the directors of RSL USA breached their direct fiduciary duty to RSL USA

and that the other Defendants were *de facto* directors of RSL USA and directed and/or aided and abetted [*38] the breach of fiduciary duty of the RSL USA Board members. In short, Plaintiffs allege, all Defendants, in one way or another, breached a fiduciary duty to RSL USA in connection with the guarantees.

Defendants contend that these claims should be dismissed because (i) the guarantees embody decisions made by RSL USA officers and directors that are entitled to the protection of the business judgment rule, (ii) the complaint does not identify how any director benefited and that the guarantees accordingly did not reflect self-dealing, and (iii) Defendants who were not RSL USA board members had no fiduciary duties to RSL USA and certainly cannot be charged with the wrongdoing in connection with the guarantees.

As discussed above, decisions made by directors are protected by a presumption of validity under the business judgment rule. The allegations as to the guarantees, however, charge the directors with authorizing precisely that [HN25]type of conduct which the courts have held is proscribed for a corporation operating in the vicinity of insolvency: "transactions, usually without fair consideration to the company, for the benefit of the parent corporation or related entities." *See* Lin, [*39] 46 VAND. L. REV. at 1514, citing *Federal Deposit Ins. Co. v. Sea Pines Co.*, 692 F.2d 973 (4th Cir. 1982), *cert. denied*, 461 U.S. 928, 77 L. Ed. 2d 299, 103 S. Ct. 2089 (1983); *Clarkson v. Shaheen Co. Ltd.*, 660 F.2d 506 (2d Cir. 1981), *cert. denied*, 455 U.S. 990, 71 L. Ed. 2d 850, 102 S. Ct. 1614 (1982); *Automatic Canteen Co. of Am. v. Wharton*, 358 F.2d 587 (2d Cir. 1966); and *South Falls Corp. v. Rochelle*, 329 F.2d 611 (5th Cir. 1964). These cases do not require that the plaintiffs allege that each defendant director was the recipient of a direct pecuniary benefit from a challenged transaction, but in each the transaction allegedly benefited only the affiliate and was patently inequitable to the subsidiary. Here, especially in view of the enormous size of the guarantees and the lack of any record of any review of their propriety, the Plaintiffs' have adequately alleged self-dealing. *In re Healthco Int'l Inc.*, 208 B.R. 288, 305 (Bankr. D.Mass. 1997); *see also, Arwood v. Dunn (In re Caribbean K Line, Ltd.)*, 288 B.R. 908, 919 (Bankr. S.D.Fla. 2002); *In re STN Enters.*, 779 F.2d 901, 902 (2d Cir. 1985). [*40]

Moreover, [HN26]the business judgment rule does not protect conduct of directors where material decisions

are made in the absence of any information and any deliberation. Allegations that the RSL USA directors abdicated all responsibility to consider action that was arguably of material importance to the corporation puts directly in question whether the board's decision-making processes were employed in a good faith effort to advance corporate interests. *See In re Walt Disney Co. Derivative Litig., 825 A.2d 275 (Del. Ch. 2003); see also Pereira v. Cogan, 2001 U.S. Dist. LEXIS 2461, 2001 WL 243537, at *13 (S.D.N.Y. 2001)*. Based on the allegations in the complaint, a breach of fiduciary duty claim has been adequately pleaded against those RSL USA directors who signed the "Unanimous Written Consent" for the $ 1.6 billion guarantee, as well as against the director who purported to authorize the guarantee of the Lauder Loan without even obtaining Board approval.

These defendants argue that they are relieved from all potential liability on the facts alleged in the complaint by virtue of an exculpation clause in RSL USA's certificate of incorporation. RSL USA's exculpation clause eliminates [*41] directors' liability for all claims of breach of duty founded upon negligence, including gross negligence, but does not eliminate claims based on breach of loyalty and does not bar "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law...." With respect to the guarantees, [HN27]Plaintiffs have challenged the Defendants' good faith and this is enough, at this stage, to overcome the exculpation clause. *See In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003)*, where there was a similar clause at issue. It has also been held that [HN28]an exculpation clause allocates the risk of loss only between the parties to the articles of incorporation, *i.e.*, the shareholders and the directors, but not as among directors and third parties such as creditors, and that it therefore does not affect suits by creditors. *See Pereira v. Cogan, 2001 U.S. Dist. LEXIS 2461, 2001 WL 243537, at *10, In re Ben Franklin Retail Stores, Inc., 2000 U.S. Dist. LEXIS 276, 2000 WL 28266, at *7-8*.

The Defendants further contend that the facts alleged in the complaint, together with facts of record in the RSL USA Chapter 11 case, demonstrate that there could [*42] be no damages because RSL USA attempted to set aside the guarantees. But the Chapter 11 record shows that the Debtors were only partially successful in this effort. Moreover, it is premature to reach issues of damages on this motion. There may be defenses to the charges in the complaint, but at this stage a claim has been properly pleaded against four of the Defendants.

Finally, certain of these Defendants argue that they owed no duty to RSL USA because RSL USA was part of a larger corporate group and a subsidiary of another corporation. They advance this proposition by quoting out of context statements in several decisions where the actions of a parent corporation were challenged by the new shareholders of the subsidiary after the subsidiary had been spun off. *See Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1174 (Del. 1998)*, where the court stated, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders"; *see also Aviall v. Ryder System, 913 F.Supp. 826, 832 (S.D.N.Y. 1996), aff'd [*43] on other grounds, 110 F.3d 892 (2d Cir. 1997)*. In those cases, however, the holding merely reflected the principle that directors of a solvent corporation are obligated to manage it in the interest of the shareholders--in those cases, the parent corporation. None of the cases involved the duty that directors owe to the corporation and its entire community of interests when the corporation is in the vicinity of insolvency.

It would be absurd to hold that the doctrine that directors owe special duties after insolvency is inapplicable when the insolvent company is a subsidiary of another corporation. That is precisely when a director must be most acutely sensitive to the needs of a corporation's separate community of interests, including both the parent shareholder and the corporation's creditors. The [HN29]Delaware courts have recognized that directors who hold dual directorships in the parent-subsidiary context may owe fiduciary duties to each corporation. *Weinberger v. UOP, 457 A.2d 701, 710 (Del. 1983); In re Digex Inc. Shareholders Litig., 789 A.2d 1176, 1205-06 (Del. Ch. 2000)*, citing *Warshaw v. Calhoun, 43 Del. Ch. 148, 221 A.2d 487, 492 (1966)*; [*44] *see Shaev v. Wyly*, 1998 Del. Ch. LEXIS 2, 1998 WL 13858 (Del. Ch. 1998), *aff'd, 719 A.2d 490 (Del. 1998)*. There is no basis for the principle propounded by a few of the Defendants that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation.

*The Other Defendants*

Plaintiffs seek to impose liability not only on the directors of RSL USA who participated in the approval of the guarantees but also on additional defendants. These include the following:

1. The "Non-Participating" Directors of RSL USA and Its Officers

Plaintiffs have named as defendants four individuals who were directors of RSL USA at times that are not clearly stated in the complaint. This includes Domorski, a director starting "some time in 2000"; Mallcott, an officer starting February 3, 2000 and a director "in 2000"; Schiffman, a director from "on or about February 3, 2000"; and Tarlovsky, a director "at various times." Plaintiffs also name one individual, Avery Fischer, who was RSL USA's Assistant Secretary and General Counsel. These Defendants also seek dismissal of the complaint as against them, and they are [*45] entitled to it. In brief, the complaint is simply too vague to retain these individuals as defendants in a $ 1.8 billion lawsuit, when Plaintiffs do not even clarify when they became directors so that it is clear what they did wrong. *See Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1201-02 (Del. Ch. 1988); Jefferson Chemical Co. v. Mobay Chemical Co., 253 A.2d 512 (Del. Ch. 1969). See also, Stevelman v. Alias Research Inc., et al., 174 F.3d 79, 84 (2d Cir. 1999).* The same is true for defendant Fischer, who was not a director. [HN30]Under Delaware law, officers as well as directors may owe fiduciary duties. *Harris v. Carter, 582 A.2d 222, 234 (Del. Ch. 1990).* In order to sustain a claim against Fischer, however, Plaintiffs would have to allege more than that he held the office of Assistant Secretary and Legal Counsel. *See Lippe v. Bairnco Corp., 230 B.R. 906, 917 (S.D.N.Y. 1999).*

These Defendants are entitled to an order dismissing the complaint as against them.

2. The Non-RSL Officers and Directors

That brings us to the Defendants who were only officers and directors of PLC and LTD. [14] [*46] Plaintiffs seek to impose liability on these Defendants on two principal theories: (i) that they had *de facto* or effective control over the affairs of RSL USA and its directors; and (ii) that they aided and abetted the breach of fiduciary duty committed by the directors of RSL USA.

14    This includes Messrs. Bildirici, Cisneros, Langhammer, L. Lauder, R. Lauder, Schiffman, Schuster, Sekulow, Trollope, and Williams.

As to the concept of *de facto* control, Plaintiffs' allegations are too vague as to any wrongdoing on the part of these Defendants. As discussed above, there is much in the complaint regarding the "Lauder Control Group," but insufficient specificity as to facts that the Lauder Control Group (or Lauder personally) so dominated the RSL USA Board that they became *de facto* directors. *See Odyssey Partners, L.P. v. Fleming Cos., Inc., 735 A.2d 386 (Del. Ch. 1999); Aronson v. Lewis, 473 A.2d at 815-16.* Indeed, the parent corporation appointed at least several [*47] directors for RSL USA who were not directors of either PLC or LTD, and it was the responsibility of these and the other members of the Board of RSL USA to manage the corporation. [15]

15    According to the complaint, two of the defendants who were RSL USA directors, Messrs. Mallcott and Marino, were not either officers or directors of LTD or PLC.

The Defendants who were not directors of RSL USA also rely on the authority cited above that indicates that a subsidiary corporation should be operated in the interests of its shareholder parent and that neither the directors of the parent nor the directors of the subsidiary can be faulted for such action. *See, e.g., Anadarko Petroleum Corp. 545, A.2d at 1174.* As discussed earlier, this line of authority cannot be applied blindly to immunize an insolvent subsidiary's Board from liability for action in disregard of its own interests and those of its creditors. By the same token, the directors of the parent cannot be compelled at such time to attend only to the interests [*48] of the subsidiary, especially where (as here) *both* were insolvent. To the extent American corporate law would have been applicable, PLC and LTD were entitled to have directors who had due regard for their respective interests and the interests of their creditors, just as was RSL USA. *Lippe v. Bairnco Corp., 230 B.R. at 916; Aviall, Inc. v. Ryder Sys. Inc., 913 F.Supp. 826, 832 (S.D.N.Y. 1996), aff'd, 110 F.3d 892 (2d Cir. 1997).*

Plaintiffs' alternative theory is that the other Defendants aided and abetted the breach of duty of the RSL USA directors. [HN31]Aiding and abetting a breach of duty is usually used to impose liability on third parties and raises the question as to whether the wrongdoing of the corporation itself is not a bar to the action. *Shearson*

*Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991); *Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997).* Plaintiffs offer no authority that the doctrine has been used to impose wholesale liability on directors of an affiliate. Even if it could, aiding and abetting requires knowing participation in the wrongdoing, and Plaintiffs do not [*49] adequately plead specific facts demonstrating knowing participation by these other Defendants in the allegedly wrongful guarantees. *See In re Santa Fe Pacific Corp. Shareholder Litig., 669 A.2d 59, 72 (Del. 1995); Kolbeck v. LIT America, 939 F.Supp. 240, 246 (S.D.N.Y. 1996),* aff'd, 152 F.3d 918 (2d Cir. 1998).

These Defendants are also entitled to an order dismissing the complaint as against them.

### Alter Ego/Piercing the Corporate Veil

The complaint finally seeks to pierce the corporate veil of RSL USA and to hold PLC and LTD (and presumably their officers and directors) liable for all of the Debtors' debts. According to the complaint, Defendants exercised a degree of control over RSL USA that caused the Debtors to be mere instrumentalities or alter egos of the other corporations, and Defendants used their control to commit wrongs that resulted in loss and injury to Plaintiffs. Defendants have moved to dismiss this count, arguing that Plaintiffs fail to plead facts, which, if established, would show that piercing the corporate veils is warranted and that even if the veils were pierced, the affiliates' officers and directors [*50] would not become automatically liable for all of the debts of all of the companies.

[HN32]In determining whether the corporate form will be disregarded and a corporate veil pierced, the law of the state of incorporation is applied. *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995); Sunbeam Corp. v. Morgan Stanley & Co., (In re Sunbeam Corp.), 284 B.R. 355 (Bankr. S.D.N.Y. 2002).* Since RSL USA is a Delaware corporation, Delaware law applies. [HN33]Under Delaware law, in order to pierce the corporate veil and establish alter ego liability, a party must show: (1) that the parent and the subsidiary operated as a single economic entity; and (2) that an overall element of injustice or unfairness was present. *Fletcher v. Atex, Inc., 68 F.3d at 1457.* Allegations of mere domination or control by one entity over another are insufficient; in the context of veil piercing, "it is not sufficient at the pleading stage to make conclusory

allegations of control." *In re Sunbeam Corp., 284 B.R. at 366.* Rather, "the extent of the domination and control must preclude the controlled entity from having legal or independent significance of its [*51] own. There must be an abuse of the corporate form to effect a fraud or an injustice--some sort of elaborate shell game." *Id.*

[HN34]To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an "incorporated pocketbook" and used the corporate form to shield themselves from liability. *United States v. Golden Acres, Inc., 702 F.Supp. 1097, 1105-07 (D. Del. 1988); In re Sunbeam Corp., 284 B.R. at 368.* Further, the plaintiff must plead facts showing that the "corporation [is] a sham and exist[s] for no other purpose than as a vehicle for fraud." *Wallace v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999); see also Foxmeyer Drug Co. v. General Elec. Corp., 290 B.R. 229, 236 (Bankr. D. Del. 2003)* ("the fraud or similar injustice that must be demonstrated in order to pierce the corporate veil under Delaware law must, in particular, be found in the defendant's use of the corporate form.") (internal citations omitted). [HN35]In determining whether the corporate form has been misused under Delaware law, courts have considered the following factors:

> (1) whether the corporation was [*52] adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholders siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Fletcher v. Atex, Inc., 68 F.3d at 1458; In re Sunbeam Corp., 284 B.R. at 365.*

In support of its argument that the corporate veil of RSL USA should be disregarded, the Debtor and Committee rely on six principal factors: (i) RSL USA was undercapitalized and insolvent since its inception; (ii) there was significant overlap in the directors and executive officers of RSL USA, PLC and LTD; (iii)

certain directors of PLC and LTD had ownership interests in RSL USA; (iv) RSL USA was never able to sustain a financially viable business and thus was dependent on its parents for financing; (v) PLC and LTD provided managerial and other services to RSL USA, and PLC and LTD officers often became involved in and directed the day-to-day business of RSL [*53] USA; and (vi) RSL USA merely served as a tool to further the interests of Defendants.

These are insufficient allegations to state a claim that RSL USA and LTD operated as a single entity and that there was an overall element of injustice or unfairness present arising from abuse of the corporate form. [HN36]If lack of adequate capitalization were alone enough to justify piercing the corporate veil, the veil of every insolvent subsidiary or failed start-up corporation could be pierced. *United States v. Golden Acres, Inc., 702 F.Supp. at 1104.* Plaintiffs have alleged (i) extensive overlapping officers and directors; (ii) managerial and other services that LTD provided to RSL USA; and (iii) unspecified involvement in the day-to-day business affairs of RSL USA by several officers and directors of LTD. These do not show that RSL USA was a mere sham. Rather than supporting a finding of domination, the allegations of the complaint describe a "typical" relationship between parent and subsidiary. *See Fletcher v. Atex, Inc., 68 F.3d at 1459-60.* Plaintiffs further argue that RSL USA merely served as a tool to further Defendants' interests, and that this indicates an [*54] overall element of injustice. This claim alone cannot support a finding that RSL USA was used improperly for the benefit of its parents or affiliates, nor does it show overall fraud or injustice from the use of the corporate form. There are insufficient allegations to show an "overall element of injustice or unfairness" which would have arisen from the sham nature of RSL USA's corporate identity. *Fletcher v. Atex, Inc., 68 F.3d at 1461; see also LaSalle Nat'l Bank v. Perelman, 82 F.Supp.2d 279, 295 (D. Del. 2000).*

Moreover, the complaint recognizes that RSL USA operated three business units (some or all acquired as operating concerns) and had its own employees responsible for its day-to-day operations. (Complaint, PP 36, 38-39.) These allegations are inconsistent with the contention that RSL USA was a mere shell, and the existence of separate operating companies usually negates a piercing of the veils. *See Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.456 F.Supp. 831,*

*845-46 (D. Del. 1978).* Further, RSL USA, PLC and LTD were incorporated and doing business in three different nations. [HN37]It is commonplace for subsidiaries [*55] governed by the laws of different legal systems to be separately incorporated, so that their corporate structure can address the potential differences between applicable corporate laws. *See* Lynn M. LoPucki, *Cooperation in International Bankruptcy: A Post-Universalist Approach, 84 CORNELL L.REV. 696, 724-25, 750-51 (1999); see also, supra,* n.9. Plaintiffs have not cited to any authority in which courts have pierced the veils of affiliates doing business and incorporated in different countries.

As discussed above, the Debtors have adequately pleaded a claim against certain Defendants related to the guarantees given by RSL USA with respect to the $ 1.7 billion debt of PLC already guaranteed by LTD. But this well pleaded claim is not enough to justify a general piercing of the corporate veil and, in fact, appears to cut just the other way. Prior to the guarantees, RSL USA was not liable for its affiliates' substantial debts, even though there are allegations that PLC and LTD financed their subsidiary. If the guarantee was a wrong, it was because the companies were separate; if the veil between PLC and RSL USA were pierced, it would be pierced for all purposes, [*56] making RSL USA and its parent one company, and in substance validating the guarantees. *Cf. Geyer v. Ingersoll Publ'ns Co., 621 A.2d at 790; Eagle Transp. Ltd. v. O'Connor, 449 F.Supp. 58, 59-60 (S.D.N.Y. 1978).* Thus, the one adequately pleaded claim cuts against the concept of piercing the corporate veils.

Plaintiffs' fourth count is dismissed on the ground that the allegations of the complaint are insufficient to support a claim for piercing the corporate veils between RSL USA, PLC and LTD. There is no need to consider the further issue as to the liability of the directors of PLC and LTD if the veils were pierced.

**CONCLUSION**

The allegations of the complaint with respect to the claims for wrongful concealment and constructive fraud, and for aiding and abetting constructive fraud, are dismissed. The allegations of the complaint with respect to breach of fiduciary duty are sustained only as to the claims relating to the guarantees by RSL USA and only as against Defendants Fisher, Shassian, Beckoff and Marino in their capacities as directors of RSL USA. The claims for aiding and abetting a breach of fiduciary duty are dismissed, as are the [*57] claims relating to piercing

Page 20

2003 Bankr. LEXIS 1635, *57

the corporate veil. Defendants shall settle an order consistent with this decision on five days' notice.

Dated:

December 11, 2003

*Allan L. Gropper*

UNITED STATES BANKRUPTCY JUDGE

UNREPORTED CASE

*Arthur v. Guerdon Industries, Inc.*

LEXSEE



Caution
As of: Jan 14, 2008

CHARLES P. ARTHUR, et al., Plaintiffs, v. GUERDON INDUSTRIES, INC., et al.,
Defendants

Civil Action No. 85-244-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1990 U.S. Dist. LEXIS 14042

October 18, 1990

**CORE TERMS:** subsidiary, mobile homes, notice, amend, proper party, statute of limitations, specifically stated, manufactured, technicalities, manufacture, prejudiced, literal

**COUNSEL:** [*1] Januar D. Bove, Jr., Esquire, of CONNOLLY BOVE LODGE & HINTZ, Wilmington, Delaware. Michael P. Malakoff, Esquire, of BERGER KAPETAN MALAKOFF & MEYERS, Pittsburgh, Pennsylvania. Nicholas Gilman, Esquire, and Richard R. Stone, Esquire, of GILMAN OLSON & PANGIA, Washington, DC. Daniel F. Hayes, Esquire, of GALLAGHER & GOSSEEN, New York, New York. Attorneys for Plaintiffs.

James F. Burnett, Esquire, of POTTER ANDERSON & CORROON, Wilmington, Delaware. Attorney for Defendant Brigadier Homes, Inc.

Richard K. Herrmann, Esquire, of BAYARD HANDELMAN & MURDOCH, Wilmington, Delaware. Paul Blankenstein, Esquire, and Timothy Hatch, Esquire, of GIBSON DUNN & CRUTCHER, Washington, DC. Attorneys for Defendant Fleetwood Enterprises, Inc.

William O. LaMotte, III, Esquire, Jack B. Blumenfeld, Esquire, and Edmond D. Johnson, Esquire, of MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware. David R. McAtee, Esquire, James R. Peacock, III, Esquire, and Ralph I. Miller, Esquire, of

THOMPSON & KNIGHT, Dallas, Texas. Attorneys for Defendant Redman Industries, Inc.

**JUDGES:** Joseph J. Farnan, United States District Judge.

**OPINION BY:** FARNAN

**OPINION**

*MEMORANDUM OPINION*

This RICO action has a long history stretching back to 1985. The Court [*2] recently examined part of this history in its Memorandum Opinion issued on March 23, 1990. The Order implementing that Memorandum Opinion permitted, *inter alia*, the plaintiffs to file a second and third amended complaint. Presently, the plaintiffs seek to file a fourth amended complaint to add as defendants sixteen subsidiaries of the defendant Fleetwood Enterprises, Inc. ("Fleetwood") and one subsidiary of the defendant Redman Industries, Inc. ("Redman"). Both Fleetwood and Redman oppose plaintiffs' request to amend their complaint, arguing that this proposed fourth complaint is barred by the RICO four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 156 (1987).*

In support of the filing of their fourth complaint,

plaintiffs assert that the subsidiaries are necessary parties under Fed. R. Civ. P. 19(a)(1). Plaintiffs contend that they did not have notice that Redman Homes, Inc. ("Redman Homes") was possibly the proper party until May 11, 1990, when Redman for the first time specifically stated that its subsidiary, Redman Homes, had manufactured mobile homes. The plaintiffs contend, therefore, that they should now be permitted [*3] to add Redman Homes as a party. In addition, they assert that Fleetwood in its responses to interrogatories and in its pleadings specifically stated that it was not involved in the manufacture of mobile homes but did not indicate which of its subsidiaries were involved. Therefore, plaintiffs argue they should be permitted to name those Fleetwood subsidiaries as defendants. Fed. R. Civ. P. 15(a) requires that leave to amend a complaint be freely given "when justice so requires." Merely granting the requested amendments under Rule 15(a), however, is not enough to satisfy the plaintiffs' request. Plaintiffs also seek to have the "relation back" provision of Fed. R. Civ. P. 15(c) applied to the pleading. That provision allows amendments to be deemed filed as of the time of the filing of the original complaint. An application of that provision in this case would eliminate any problem which the plaintiffs would have with the RICO statute of limitations.

Rule 15(c) provides that "whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to [*4] the date of the original pleading." The Rule continues:

An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment, that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed. Civ. P. 15(c).

In order to determine where the effect of Rule 15(c) should be permitted in this case, the Court must consider whether all four parts of the following test have been met:

(1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled [*5] within the prescribed limitations period.

Schiavone v. Fortune, 477 U.S. 21, 29 (1986).

Both Redman and Fleetwood have filed separate briefs but both defendants make the same assertion. Both argue that the plaintiffs have not met the third requirement of showing that a "mistake" has been made concerning the identity of Redman Homes and the Fleetwood subsidiaries. Fleetwood and Redman argue that plaintiffs' lack of diligence and not "mistake" caused the plaintiffs failure to include the subsidiaries in the prior complaints. Both defendants thus claim that there has been no explanation of the delay in suing their respective subsidiaries and that, therefore, the motion to amend should be denied, as well as the request to have the complaint "relate back" to the date of the filing of the original complaint.

Both Redman's and Fleetwood's arguments share the contention that parent corporations have no duty to lead plaintiffs to the parent company's subsidiaries. As Fleetwood's counsel stated at oral argument, "litigation is an adversarial process, not a cooperative one." Such a statement is animated by a literal reading of the Federal Rules of Civil Procedure. Such literal readings [*6] led both Redman and Fleetwood to respond to the plaintiffs' allegations and requests for discovery with the unadorned statements that they were not involved in the manufacture of mobile homes.

The Court agrees that the defendants had no duty to *lead* the plaintiffs to the defendants' subsidiaries. Nevertheless, the defendants have used the technicalities of pleading to hide accurate information behind factual statements, when they both knew that the plaintiffs intended to sue whatever entities of Redman and Fleetwood that manufactured mobile homes. While the statements concerning Redman's and Fleetwood's noninvolvement in manufacturing may comport to current litigation practice, they should not now be permitted, given their taciturn nature, to act as a buffer

between the plaintiffs and Redman Homes and the various Fleetwood subsidiaries.

On the present record, the Court concludes that both Redman Homes and Fleetwood's subsidiaries should have known that but for plaintiffs' error this lawsuit would have been brought against them as the manufacturer of the mobile homes. *Schiavone, 477 U.S. at 29*. Both Redman and Fleetwood have been on notice since their entry into this case that [*7] their subsidiaries were the proper parties in the action and therefore plaintiffs should be allowed to amend their complaint to add the appropriate parties.

Further, the Court concludes that no prejudice will result to Redman Homes or the Fleetwood subsidiaries from the amendments. Rule 15(c) was designed to prevent technicalities from defeating a plaintiff's legitimate claim and this case presents the exact scenario for which the Rule was intended.

Accordingly, the Court will allow the complaint to be amended a fourth time and Fed. R. Civ. P. 15(c) will be applied.

An appropriate Order will be entered.

UNREPORTED CASE

*MCI Worldcom Network Servs. v. Graphnet, Inc.*

LEXSEE



Analysis
As of: Jan 14, 2008

**MCI WORLDCOM NETWORK SERVICES, INC.; MCI WORLDCOM COMMUNICATIONS, INC; UUNET TECHNOLOGIES, INC., Plaintiffs, v. GRAPHNET, INC., Defendant.**

**Civ. No. 00-5255 (WHW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2005 U.S. Dist. LEXIS 40835**

**May 10, 2005, Decided
May 11, 2005, Filed**

**NOTICE:**    [*1]  NOT FOR PUBLICATION

**PRIOR HISTORY:** Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 2003 U.S. App. LEXIS 18966 (3d Cir. N.J., 2003)

**CORE TERMS:** telex, settlement agreement, real party in interest, counterclaim, confirmation, substitution, telecommunication, discharged, notice, unjust enrichment, network, summary judgment, bankruptcy proceedings, traffic, amend, statute of limitations, relation-back, owed, particularity, confirmed, estoppel, affiliates, oral arguments, misrepresentation, substituted, subsidiary, discovery, enjoined, genuine, settle

**COUNSEL:** For WORLDCOM, INC., Plaintiff: PATRICK C. DUNICAN, JR., LEAD ATTORNEY, ADAM NELSON SUBERVI, GIBBONS, PC, NEWARK, NJ.

For GRAPHNET, INC., Defendant: MARC J. GROSS, GREENBAUM, ROWE, SMITH, ,& DAVIS, LLP, ROSELAND, NJ.

For MCI, LLC, MCI INTERNATIONAL, INC., a/k/a Western union International, Inc., MCI Communications, Inc and MCI, Inc., ThirdParty Defendants: ADAM NELSON SUBERVI, PATRICK C. DUNICAN, JR.,

GIBBONS, PC, NEWARK, NJ.

For GRAPHNET, INC., Counter Claimant: MARC J. GROSS, LEAD ATTORNEY, GREENBAUM, ROWE, SMITH & DAVIS, LLP, ROSELAND, NJ.

For WORLDCOM, INC., UUNET TECHNOLOGIES, INC., MCI WORLDCOM COMMUNICATIONS, INC., MCI WORLDCOM NETWORK SERVICES, INC., Counter Defendants: ADAM NELSON SUBERVI, PATRICK C. DUNICAN, JR., GIBBONS, PC, NEWARK, NJ.

**JUDGES:** William H. Walls, United States District Judge.

**OPINION BY:** William H. Walls

**OPINION**

**Walls, District Judge**

    Plaintiffs MCI Worldcom Network Services, Inc., MCI Worldcom Communications, Inc., and UUNET Technologies, Inc., move to dismiss defendant Graphnet's amended Counterclaim and strike defendant's Third Party Complaint. Defendant cross-moves to dismiss the Second

Amended [*2] Complaint or in the alternative for summary judgment. The Court heard oral arguments on these motions on April 22, 2005.

## FACTS AND PROCEDURAL BACKGROUND

The original plaintiff in this case, Worldcom, Inc., filed its Complaint in 2000 against Graphnet. Defendant moved to dismiss the Complaint and, on October 21, 2002, the Court issued an Order granting defendant's motion. That Order was appealed and the Third Circuit reversed the decision and remanded the case for further proceedings. On December 23, 2003, defendant filed its Answer with a Counterclaim against the original plaintiff, Worldcom, Inc. On May 20, 2004, defendant filed an Order to Show Cause seeking a temporary restraining order and a preliminary injunction to keep Worldcom, Inc. from stopping service on certain telecommunication lines. At a hearing on July 8, 2004, the Court denied defendant's motion. Thereafter, the parties entered into a Consent Order dated July 15, 2004, requiring, among other things, that Worldcom, Inc. maintain services on such lines for a certain period of time. The Consent Order also allowed the parties to amend their pleadings. More specifically, the July 15, 2004 Consent Order provided: [*3]

> Worldcom may amend the Amended Complaint to add additional claims and parties, including the proper parties in interest, for all claims held by Worldcom and its affiliates and successors against Graphnet, and Graphnet consents to such amendment of the Amended Complaint and will not object to such amendment on the ground that the Amended Complaint is untimely or prejudicial, except that Graphnet reserves any and all defenses it may have to any new claims or parties asserted in the Amended Complaint, as amended, including the right to move to dismiss and/or for summary judgment as to any claims advanced in such amendment.

(July 15, 2004 Consent Order at p.3.) A similar provision was included for defendant to amend its pleading.

## The Second Amended Complaint

On August 3, 2004, a Second Amended Complaint

was filed. The plaintiffs named in the Second Amended Complaint are MCI Worldcom Network Services, Inc., MCI Worldcom Communications, Inc., and UUNET Technologies, Inc., none of whom were the plaintiff in all the previous filings. The Second Amended Complaint alleges: MCI, Inc., ("MCI") formerly known as WorldCom, Inc. ("WorldCom") is the direct or indirect [*4] parent holding company of Plaintiffs MCI WorldCom Network, MCI WorldCom Communications and UUNET, the real parties-in interest in this action. All of the plaintiffs provide telecommunication services and UUNET also provides internet services. Graphnet provides communications services and network products for customers on a national and international basis.

The Second Amended Complaint begins with allegations concerning plaintiffs' bankruptcy proceedings: While defendant's earlier motion to dismiss was pending, on July 21, 2002, MCI and plaintiffs filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. On October 21, 2003, MCI and plaintiffs, together with other affiliates, filed their Debtors' Modified Second Amended Joint Plan of the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, Dated October 21, 2003 with the Bankruptcy Court. After further modification, the Bankruptcy Court confirmed the plan by Order dated October 31, 2003. After certain conditions were met or waived, the confirmed plan became effective on April 20, 2004 ("Effective Date"). Section 10.01 of the confirmed [*5] plan provides that, upon the Effective Date, all properties of the estates of the WorldCom Debtors (as defined in the Confirmed Plan), including plaintiffs, would vest in the reorganized WorldCom Debtors (including the plaintiffs). According to the documents submitted by plaintiffs in support of their motion, defendant was scheduled as a creditor of MCI International, Inc., in the bankruptcy proceedings and for that reason, a copy of the October 9, 2002 notice of the commencement of the bankruptcy cases filed by the WorldCom Debtors was sent to defendant. Similarly, a notice of the January 23, 2003 ("Bar Date") deadline for filing claims, dated November 12, 2002, was timely mailed to defendant at addresses in New York, New York and Teaneck, New Jersey on December 2, 2002. Publication notice of the Bar Date was also given. By Order dated May 28, 2003 ("Confirmation Hearing Order"), the Bankruptcy Court set a hearing ("Confirmation Hearing") for the confirmation of the

joint plan of reorganization filed by the WorldCom Debtors and directed that creditors be given notice of the Confirmation Hearing. Notice of the initial and adjourned Confirmation Hearings was timely mailed to defendant.

[*6] The Second Amended Complaint then alleges the facts underlying plaintiffs' claims: On November 14, 1991, TRT/FTC Communications, Inc. ("TRT/FTC") and defendant entered into an agreement (the "Telex Agreement") to provide two-way telex transmissions between their respective networks for telex traffic originating on each other's networks. This contract initiated a relationship or custom and practice between defendant and TRT/FTC (and TRT/FTC's corporate successors- in- interest, as defined below) pursuant to which they exchanged telex traffic between their respective networks and, over time, expanded the services to include the provision of "refile," "special transit," "indirect," or "least cost routing" telex transmission services to destinations around the world at varying rates and prices agreed to by the parties.

TRT/FTC subsequently changed its name to IDB WorldCom Services, Inc. ("IDB WorldCom"). In 1994, LDDS Communications, Inc. ("LDDS") acquired IDB Communications Group, Inc. ("IDB"), thereby acquiring IDB WorldCom, which, at that time, was a subsidiary of IDB. On June 30, 1999, IDB WorldCom was merged into MCI Communications Corp. ("MCI Communications"), a subsidiary of MCI. [*7] MCI Communications is not a party to this action. As part of that merger, MCI Communications contributed the assets belonging to IDB WorldCom, including IDB WorldCom's rights under the Telex Agreement, to MCI WorldCom Network. Thus plaintiff MCI WorldCom Network is the successor- in- interest to TRT/FTC's rights and interests under the Telex Agreement.

From November 19, 1991, through and until 2000, TRT/FTC and/or its corporate successors-in-interest, including MCI WorldCom Network, provided telex transmission services to defendant under the Telex Agreement. Certain of these services were provided to defendant under two account numbers (the "Telex Accounts"). TRT/FTC and/or its successors-in-interest, including MCI WorldCom Network, invoiced defendant on a monthly basis through and until 2000, during which time period settlement packages were sent to defendant on a quarterly basis for the services provided pursuant to the Telex Agreement. Plaintiffs allege that defendant has

failed to pay in full for the services plaintiffs provided it and defendant is indebted to MCI WorldCom Network for no less than $ 3,126,026.25 for the services provided.

Defendant entered into another agreement [*8] (the "Service Agreement") with MCI WorldCom Communications, whereby MCI WorldCom Communications agreed to provide defendant with additional telecommunications services and equipment. Defendant received various telecommunications services and related equipment pursuant to the agreement. Those services were provided under another account number (the "Service Accounts"). Plaintiffs allege that defendant has failed to pay for the services and equipment received pursuant to the Service Agreement and defendant owes MCI WorldCom Communications at least $ 311,960.77.

Defendant also entered into various agreements (collectively, "Wholesale Agreements") with MCI WorldCom Communications whereby plaintiff agreed to provide defendant with international, interstate and local telecommunications services and associated equipment pursuant to applicable tariffs (as identified and defined in the Wholesale Agreements) for resale to defendant's customers. Included in the Wholesale Agreements is a WorldCom On-Net Services Agreement, effective as of October 8, 2001, between MCI WorldCom Communications and defendant. Under a separate agreement (the "UUNET Agreement"), UUNET also agreed to provide defendant [*9] with telecommunications services and associated equipment for resale to defendant's customers. At least eight accounts (the "Wholesale Accounts") were set up by plaintiffs to provide services to defendant under these agreements. Plaintiffs allege that defendant has failed to pay for the services it has received under the Wholesale Accounts.

Beginning by at least August 2003, MCI WorldCom Communications, on behalf of itself and UUNET, demanded payment from defendant of the money owed on the Wholesale Accounts. Defendant responded by claiming that certain amounts demanded were incorrect. Over the course of the next nine months, MCI WorldCom Communications' Dispute Resolution Group researched and analyzed defendant's claims. Where appropriate, defendant received credit against its overdue invoices. In all, MCI WorldCom Communications determined that $ 4,923.38 (just over 1% of the amounts due) in credits were due to defendant. While researching defendant's

claims, MCI WorldCom Communications demanded payment of additional amounts due on the Wholesale Accounts. According to plaintiffs, allowing for credits, defendant owes plaintiffs not less than $ 410,697.92 on the Wholesale Accounts, [*10] plus any additional amounts including, but not limited to, any applicable early termination penalties. This amount excludes additional charges of $ 86,632.52 which are the subject of two disputes by defendant that are currently being analyzed by plaintiffs.

Based on these allegations, plaintiffs allege that defendant has breached the Telex, Service and Wholesale Agreements. Plaintiffs also alleges claims for unjust enrichment based on services provided to defendant pursuant to these agreements.

In sum, the Second Amended Complaint made two principal amendments: First, plaintiffs added new parties, MCI WorldCom Communications and UUNET Technologies, Inc., to bring claims for amounts owed by defendant to plaintiffs under the Wholesale Accounts (Counts V through VIII of the Second Amended Complaint). The Wholesale Accounts included the accounts which were the subject of defendant's May 2004 preliminary injunction motion. Second, plaintiffs substituted MCI WorldCom Network for WorldCom, Inc. as the real party in interest for claims relating to the Telex Agreement, the subject of the original complaint (Counts I and II). Plaintiffs also substituted MCI WorldCom Communications for WorldCom, [*11] Inc. as the plaintiff for claims relating to the Service Agreement that was also the subject of the original complaint (Counts III and IV).

**The Amended Counterclaim and Third Party Complaint**

Defendant filed an Answer to the Second Amended Complaint as well as a Counterclaim and Third Party Complaint against plaintiffs and third party defendants MCI International, Inc., MCI Communications, Inc., and MCI, Inc. All of the claims are against all of the plaintiffs and the third party defendants. The First Count alleges that the charges plaintiffs seek to recover under the agreements referenced in the Second Amended Complaint violate the Telecommunications Act and reference charges and rates never filed with the Federal Communications Commission ("FCC") in violation of the Telecom Act. Defendant seeks declaratory relief that the agreements are invalid and wants them rescinded. The

Second Count alleges that plaintiffs violated the Telecom Act by acting unjustly and unreasonably and/or discriminating against defendant by charging and seeking to collect unfiled rates and charges not due. The Third Count alleges that defendant and plaintiffs entered into the Telex Agreement and [*12] an agreement for plaintiffs to provide defendant with the use of certain telecommunication lines (the "Lines Agreement"). [1] Defendant says that on February 29, 2000, the parties entered into a Settlement Agreement to settle and resolve all telex traffic between the parties. Defendant alleges that plaintiffs breached the Telex and Wholesale Agreements by charging defendant more than what was owed, by refusing to apply credits, and by severing services. Defendant also alleges that plaintiffs breached the Settlement Agreement by instituting this lawsuit. Defendant wants specific performance of the Settlement Agreement. The Fourth Count alleges that plaintiffs breached the implied covenant of good faith and fair dealing with respect to the Telex, Wholesale and Settlement Agreements. The Fifth Count alleges that plaintiffs made fraudulent misrepresentations to defendant regarding the rates they would charge defendant, their intention to settle billing errors and telex traffic issues, and that it would discontinue this litigation for amounts owed under the Settlement Agreement. The Sixth Count states a claim for negligent misrepresentation. The Seventh Count states a claim for intentional [*13] tortious interference with defendant's customer agreements by bringing this lawsuit and severing services for certain telecommunication lines. The Eighth Count alleges a claim for intentional tortious interference with defendant's prospective economic advantage. The Ninth and final count states a claim for unjust enrichment.

> 1   At oral argument, plaintiffs' counsel helpfully pointed out that what defendant refers to as the Lines Agreement is the same as the Wholesale Agreements referred to by plaintiffs; defendant did not dispute this statement. For clarity purposes, the Court will refer to these agreements as the Wholesale Agreements.

**STANDARDS**

**Standard for a Rule 12(b)(6) Motion to Dismiss**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences

that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. [*14] Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. See Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n. 2, 97 S. Ct. 2490, 53 L. Ed. 2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. See Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 216 (3d Cir. 2003); [*15] see also 5B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 1998).

"A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" Mele v. FRB of N.Y., 359 F.3d 251, 255 n.5 (3d Cir. 2004) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." Id.

**Standard for Summary Judgment**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a

verdict for the non-movant and [*16] it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. Celotex v. Catrett, 477 U.S. 317, 318, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most [*17] favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

As noted, pursuant to the July 15, 2004 Consent Order, WorldCom Inc., and defendant were permitted to amend their pleadings. Both parties did so and plaintiffs substituted themselves as the real parties in interest with regard to the claims originally brought by WorldCom, Inc. in 2000. While defendant would have the Court view the Second Amended Complaint as a completely new complaint because of the substitution of the real parties in interest, the Court finds that the Second Amended Complaint properly substituted the real parties in interest and, thus, the Second Amended Complaint relates back to the date the original complaint was filed.

Fed. R. Civ. P. 17(a) and 15(c) allow substitution of real parties in interest and such amendment relates back to the original complaint:

Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has

been [*18] made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Fed. R. Civ. P. 17(a). Rule 15(c) provides:

An amendment of a pleading relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original [*19] pleading, or (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

The last line of Rule 17(a) reads a "substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." "Rule 15(c) has been used in conjunction with Rule 17(a) to enable an amendment substituting the real party in interest to relate back to the time the original action was filed." 6A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1555. Courts have interpreted Rule 17(a) to permit substitution of the real party in interest as the plaintiff if the plaintiff can show that the original plaintiff brought the case in its own name "as the result of an honest and understandable [*20] mistake." Feist v. Consolidated Freightways Corp., 100 F. Supp. 2d 273, 276 (E.D.Pa.,1999). The Advisory Committee Notes to Rule 17(a) support this interpretation: "It is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." Furthermore, "when determination of the correct party to bring the action was not difficult and when no excusable mistake was made, the last sentence of Rule 17(a) is inapplicable and the action should be dismissed." 6A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1555.

Plaintiffs argue that they did not discover the real parties in interest until the spring of 2004. They contend that they were uncertain who the real parties in interest were until that time because of the many mergers that occurred during the decade following the 1991 execution of the initial contract between defendant and TRT/FTC relating to the telex services at issue. At the oral hearing, plaintiff's counsel represented that because discovery in this matter was delayed by the earlier proceedings and an appeal to the Third Circuit, he did not discover the mistake under early in 2004. In [*21] light of the many mergers, acquisitions and name changes that have taken place since the parties first contracted in 1991, the Court is persuaded that the failure to name plaintiffs as the real parties in interest sooner than the Second Amended Complaint was the result of an honest and understandable mistake. Furthermore, while the Consent Order does not expressly permit substitution, it did allow plaintiff to "add parties, including the real parties in interest, for all claims held by WorldCom and its affiliates and successors . . . ." (July 15, 2004 Consent Order.) The Consent Order also says that defendant "consents to such amendment . . . and will not object to such amendment on the ground that the Amended Complaint is untimely or prejudicial . . . ." (Id.) By consenting to the addition of parties, including the real parties in interest, this indicates that a substitution of parties was contemplated.

The analysis does not end here, however, as there are additional requirements that must be satisfied in order for

an amended pleading to relate back to the date the original pleading was filed. There are three requirements to be satisfied for an amended complaint to relate back [*22] when the amendment substitutes a new plaintiff for the original one: 1) "the amended complaint must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading;" 2) "there must be a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them;" and 3) "undue prejudice must be absent." Allied Intern., Inc. v. International Longshoremen's Ass'n, AFL-CIO, 814 F.2d 32, 35-36 (1st Cir.1987) (citing Raynor Bros. v. American Cyanimid Co., 695 F.2d 382, 384-85 (9th Cir.1982); Staren v. American Nat'l Bank and Trust Co., 529 F.2d 1257, 1263 (7th Cir.1976); Unilever (Raw Materials) Ltd. v. M/T Stolt Boel, 77 F.R.D. 384, 390-91 (S.D.N.Y.1977)).

Plaintiffs argue that the criteria for application of the relation-back rule is satisfied because (1) defendant is not faced with "undue prejudice", (2) the claims based on the Telex Agreement and the Service Agreement in the Second Amended Complaint arise out of the same "conduct, [*23] transaction, or occurrence" in the original complaint, and (3) there is "a sufficient identity of interest" between the substituted plaintiffs, and WorldCom, Inc., and their respective claims.

With regard to whether the claims arise out of the same "conduct, transaction, or occurrence" in the original complaint, the allegations in the Second Amended Complaint concerning the Telex Accounts and the Service Agreement Accounts arise out of the exact same "conduct, transaction, or occurrence" as alleged in the original complaint.

As for the second element, whether there is a sufficient identity of interest between the original and new plaintiffs and their claims, plaintiffs rely on Young v. Lepone, 305 F.3d 1, 15 (1st Cir. 2002), where the court of appeals noted that a sufficient identity of interest has been found "when the original and added plaintiffs are a parent corporation and a wholly-owned subsidiary." Here, the original plaintiff, WorldCom, Inc., is the direct or indirect parent holding company of the substituted plaintiffs, a fact not disputed by defendant. Under these circumstances, this element also is satisfied.

As to the third element, the Court finds that [*24]

defendant is not unduly prejudiced by application of the relation-back rule. First, while defendant did not waive any defenses it might have to the Second Amended Complaint, it did agree not to object to such filing on the ground of prejudice. (July 15, 2004 Consent Order.) Nor is there any indication that defendant would be prejudiced by the relation-back rule. Although this action was originally filed in 2000, no discovery took place until late 2003 or 2004. Depositions did not begin until after the Second Amended Complaint was filed and numerous depositions remain to be taken. Defendant's counter-argument that its discovery and litigation strategy would have been different if it had been directed at the current plaintiffs rather than Worldcom, Inc. without stating how it would have been different does not persuade the Court to find undue prejudice here.

In its reply brief, defendant makes several arguments about the applicability of Rule 17(a). Defendant first claims that Rule 17(a) is "designed to protect defendants who have been improperly named as defendants, not for plaintiffs seeking to insert new and different parties to circumvent the statute of limitations." (Def.'s Reply [*25] at 7). This is supported by case law: "The rationale of the rule is to protect the defendant from a multiplicity of suits, to allow defendant to present all his defenses, to protect defendant from multiple liability." Pace v. General Elec. Co. 55 F.R.D. 215, 218 (W.D.Pa.1972). See also Celanese Corp. of America v. John Clark Industries 214 F.2d 551, 556 (5th Cir. 1954) ("The purpose of the practice long obtaining in the federal courts and now set forth in Rule 17 of the Federal Rules of Civil Procedure, 28 U.S.C.A., that every action shall be prosecuted in the name of the real party in interest, is to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter."). Defendant argues that if the Court were to adopt plaintiffs' position with respect to the substitution of the parties and the relation back rule, it would actually harm defendant and run afoul of the purpose of the rule. Defendant's failure [*26] to show how it is harmed by application of the relation-back rule, however, is detrimental to defendant's argument. And it cannot be argued that the rule may not apply to plaintiffs under appropriate circumstances. The Court is satisfied that plaintiffs' substitution was proper and that the relation-back rule is applicable under the circumstances. That said, the Court finds that the Second

Amended Complaint relates back to the date of the original complaint filed in 2000.

## I. Plaintiffs' Motion to Dismiss the Counterclaim and Third Party Complaint

Plaintiffs offer four reasons why defendant's Counterclaim and Third Party Complaint should be dismissed: (1) the claims were discharged in plaintiffs' bankruptcy proceedings; (2) the claims were adjudicated by the July 15, 2004 Consent Order; (3) defendant has failed to adequately plead claims for fraud and unjust enrichment; and (4) defendant did not seek leave of Court to file its Third Party Complaint.

A. Counterclaim and Third Party Complaint Discharged by Bankruptcy Proceedings

Plaintiffs first argue that the Counterclaim and Third Party Complaint should be dismissed because the claims were discharged in the WorldCom [*27] debtors' [2] bankruptcies and defendant is enjoined from litigating these claims. Before addressing this argument, the Court first notes that at oral argument, it took judicial notice of documents related to the WorldCom debtors' bankruptcy court proceedings. The documents include affidavits of service of certain relevant notices on defendant, orders setting confirmation hearing dates and the deadline for filing proofs of claim, and the order confirming the debtors' second amended joint plan of reorganization.

 2 The WorldCom debtors include both the original party plaintiff to this action and the current plaintiffs.

Moving on to plaintiffs' first argument, they charge that the claims that are the subject of defendant's Counterclaim and Third Party Complaint were discharged in the bankruptcy proceedings by the confirmation of the plan, and defendant is enjoined from litigating these claims. Plaintiffs rely on the following provision of the Bankruptcy Code, 11 U.S.C. § 1141(d)(1)(A): [*28]

Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan--

(A) discharges the debtor from any debt that arose before the date of such

confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) [3] of this title, whether or not--

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan.

In other words, this section provides that except as provided in the plan of reorganization or the confirmation order, the confirmation of a plan discharges a debtor from debts arising before confirmation, including post-petition administrative claims. 8 COLLIER ON BANKRUPTCY, P1141.05 at 1141-17 (15th ed. 2003).

 3 11 U.S.C. § 502(g)-(i) provide as follows:

(g) A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(h) A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed

under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(i) A claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(8) of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

[*29] The documents from the bankruptcy proceeding show that on October 31, 2003, the Bankruptcy Court entered an order confirming the plan. Furthermore, 11 U.S.C. § 1141(a) provides that a confirmed plan "bind[s] the debtor . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan." 11 U.S.C. § 1141(a). Plaintiffs argue that under § 1141(a) and the confirmation order, defendant is bound by the plan.

The confirmation plan itself addresses the discharge of claims against the debtors and the discharge of the WorldCom debtors. Section 10.02 of the plan provides for the discharge of all existing debts and claims against the debtors:

Except as otherwise provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete satisfaction, discharge and release of all existing debts and Claims . . . against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code [*30] . . . . Upon the Effective Date, all existing Claims against the Debtors . . . shall be, and shall be deemed to be, discharged . . . and all holders of Claims . . . shall be precluded and enjoined from asserting

against the Reorganized Debtors, or any of their assets or properties, any other or further Claim . . . based upon any omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim . . . .

It should be noted that defendant did not file a proof of claim in the bankruptcy proceedings. It is noted that at oral arguments, defendant's attorney acknowledged that his client had had notice of the bankruptcy proceedings and for strategic reasons chose not to file any claims. Section 10.03 of the plan further provides for the debts against the debtors to be discharged:

Upon the Effective Date and in consideration of the distributions to be made hereunder . . . each holder . . . of a Claim . . . shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from [*31] any and all Claims . . . rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim . . . .

As the effective date of the plan was April 20, 2004, plaintiffs argue that any claims that arose before that date were discharged by the Bankruptcy Code, the Confirmation Order, and the plan. Plaintiffs also state that to the extent some of defendant's claims appear related to the Wholesale Agreements that, the subject of last summer's Order to Show Cause, these are really not affirmative claims but rather defenses to plaintiffs' claims regarding those agreements.

Defendant advances several reasons why its claims should not be dismissed: First, that the Court should invoke the doctrine of equitable estoppel to prevent dismissal of its Counterclaim and Third Party Complaint. "Estoppel is 'an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law, that prohibits a party from repudiating a previously taken position when another party has relied on that [*32] position to his detriment.'" Casamasino v. City of Jersey

City, 158 N.J. 333, 354, 730 A.2d 287 (1999) (quoting State v. Kouvatas, 292 N.J.Super. 417, 425, 678 A.2d 1178 (App.Div.1996)). "To establish a claim of equitable estoppel, the claiming party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment." Miller v. Miller, 97 N.J. 154, 163, 478 A.2d 351 (1984) (citing Fidelity Union Trust Co. v. Essex Cty. Mortgage Co., 130 N.J.Eq. 351, 353, 22 A.2d 296 (E. & A.1941)).

Defendant argues that it relied on the representation of the original plaintiff in this action, WorldCom Inc., that it was the proper party in interest, and that such reliance was justified as WorldCom, Inc. was the named plaintiff for almost five years of litigation. The only possible detriment offered by defendant is its claim that its discovery and litigation strategy would have been different if it had been directed at the current plaintiffs [*33] rather than WorldCom, Inc. Defendant does not expand on what those differences would have been and plaintiffs point out that discovery is ongoing in this matter. Furthermore, as plaintiffs' counsel informed the Court at oral argument, all the depositions in this matter did not take place until after the current plaintiffs were named in the Second Amended Complaint and the current plaintiffs have already engaged in at least some additional document production and disclosures with defendant. The Court is unconvinced that defendant has been unduly prejudiced by the substitution of the real parties in interest.

Defendant also argues that it could not have filed claims in the bankruptcy proceedings against plaintiffs because it did not know they were the real parties in interest until now. While plaintiffs counter that the burden was on defendant to conduct sufficient due diligence to determine the claims it has against the WorldCom debtors, the Court finds it more significant that defendant chose not to file a proof of claim even against WorldCom, Inc. Defendant argues that it may have filed claims had it known that its claims were against the current plaintiffs rather than WorldCom, [*34] Inc. However, defendant has failed to show the Court why its strategy would differ depending on who the debtor was. As it were, the WorldCom debtors included the current plaintiffs and for purposes of the bankruptcy

plan, the assets of all the WorldCom debtors were combined such that regardless of which WorldCom entity a creditor had a claim against, all the claims were paid out from one source of funds. (Section 5.01 of the Confirmation Plan.) More specifically, section 5.01(a) provides that "each and every Claim filed or to be filed in the Chapter 11 case of any of the WorldCom Debtors shall be deemed filed against the WorldCom Debtors, and shall be one Claim against and obligation of the WorldCom Debtors." The Court agrees with plaintiffs that to the extent that defendant had valid claims against one or more of the WorldCom debtors, it was not imperative that the claim be filed against the "right" debtor.

Defendant's second argument as to why its claims should not be barred by the bankruptcy looks to exceptions to discharge under section 1141(d) found in 11 U.S.C. § 523(a). Defendant argues that the following exceptions are relevant and applicable:

A [*35] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . or (19) that . . . (B) results from . . . (ii) any settlement agreement entered into by the debtor.

11 U.S.C. § 523(a).

With regard to the first two exceptions offered by defendant, the Court finds defendant's arguments unpersuasive. As to the fraud claim, defendant appears to argue that the removal from the case of the original plaintiff constitutes fraud under 11 U.S.C. § 523(a)(2)(A). It contends that the substitution is fraudulent in that it was effected to avoid the impact of the statute of limitations on the new plaintiffs' claims and to avoid the Settlement Agreement. Defendant also claims that WorldCom's prosecution [*36] of the case for five years constitutes the "quintessential act of

prosecuting a case under false pretenses." (Def.'s Reply at 2). The Court does not see how the statute can be read in the manner advanced by defendant. As the Court reads it, the exception is for a claim by a creditor that the debt owed it was obtained by the debtor under false pretenses. In other words, a traditional claim for fraud. Defendant is arguing that the substitution of the party plaintiffs was fraudulent. The Court is not persuaded that this is a kind of fraud contemplated by the Bankruptcy Code. Defendant next argues that WorldCom's substitution out of the case constitutes a willful and malicious injury to defendant under 11 U.S.C. § 523(a)(6) by unlawfully prohibiting defendant's ability to defend itself and prosecute its counterclaims. Again, the Court does not agree that this is the kind of injury or claim contemplated by the Bankruptcy Code. [4]

> 4 With regard to defendant's claims for fraud and intentional torts found in the Fifth through Eighth Counts of the Counterclaim and Third Party Complaint, these claims were discharged by the bankruptcy proceedings despite the applicable exceptions listed in section 523(a) because section 523(c) provides that such debts are "automatically discharged unless the creditor to whom such debt is owed obtains a determination of the bankruptcy court that the particular debt is nondischargeable." 4 COLLIER ON BANKRUPTCY § 523.03. Because there is no indication that defendant obtained such a determination from the bankruptcy court, these claims too were discharged.

[*37] As to the last exception that defendant claims, defendant charges that because its claims relating to telex traffic charges arise out of the Settlement Agreement, this debt was not discharged under 11 U.S.C. § 523(a)(19)(B). While defendant fails to quote the language of the exception in full in their brief, the Court reviewed the statute in its entirety and discovered that this exception does not just except debts that result from any type of settlement agreement. Rather, a closer look at the statute reveals that the exception under 11 U.S.C. § 523(a)(19) is not just for any debt that results from a settlement, but only for debts that arise out of a settlement agreement based upon the debtors violation of federal or state securities laws. Section 523(a)(19) reads:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title

does not discharge an individual debtor from any debt . . . (19) that-- (A) is for-- (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order [*38] issued under such Federal or State securities laws; or (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; *and* (B) results from-- (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding; (ii) any settlement agreement entered into by the debtor; or (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

In other words, section 523(a)(19) excepts from discharge "debts arising from a judgment, order or settlement agreement based upon the debtor's violation of certain federal securities laws, state securities laws or regulations under federal or state securities laws, or for common law fraud, deceit or manipulation in connection with the purchase or sale of any security." 4 COLLIER ON BANKRUPTCY § 523.01 (15th revised ed. 2004). Because defendant does not argue, nor could it, that the Settlement Agreement here arose from plaintiffs violations of securities laws, this argument too must fail. Defense counsel [*39] conceded as much at oral argument but sought to use the statute as an analogue. The Court did not agree with that use.

The Court concludes that any of defendant's claims against plaintiffs that arose before April 20, 2004 were discharged by the Confirmation Plan, the Confirmation Order and the Bankruptcy Code. Because the Court finds that some of defendant's claims were discharged by the bankruptcy proceedings, the Bankruptcy Code, the Confirmation Plan, and the order confirming the plan all require that defendant be enjoined from litigating these claims. Section 524(a)(2) of the Bankruptcy Code provides that "[a] discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a

personal liability of the debtor, whether or not discharge of such debt is waived . . . ." Paragraph 18 of the confirmation order provides:

> Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against . . . any or [*40] all of the Debtors and other parties in interest . . . are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors with respect to any such Claim . . ., (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors or Reorganized Debtors on account of any such Claim . . ., (iv) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan . . . .

The same provision is included in the plan at section 10.04. Thus, to the extent defendant's Counterclaim and Third Party Complaint state claims that arose before April 20, 2004, those claims are dismissed.

B. Claims Adjudicated by July 15, 2004 Consent Order

Plaintiffs next charge that to the extent defendant argues that its Counterclaim and Third Party Complaint contains claims that arose after April 20, 2004, defendant is estopped from bringing that claim under the July 15, 2004 Consent Order. As [*41] noted, the Consent Order came about as a result of defendant's request for a preliminary injunction to stop WorldCom, Inc. from disconnecting certain telecommunication services provided defendant under the Wholesale Agreements. After the Court denied defendant's request, the parties agreed to enter into the Consent Order. The Consent Order provides in relevant part:

> ORDERED that MCI WORLDCOM Communications, Inc. and/or WorldCom, Inc. and their affiliates ("WorldCom")

agree to maintain telecommunications service to Graphnet for account numbers 1912, 00087077, 24390, 5293, 28203, 13549, and U02974 (the "Wholesale Accounts") through and including July 31, 2004 or such earlier date as may be agreed to and confirmed in writing by the parties, on which date WorldCom shall be permitted to disconnect and discontinue services on the Wholesale Accounts;

> ORDERED that WorldCom agrees to maintain telecommunications services to Graphnet of Account number 86336952 through and including August 31, 2004 or such earlier date as may be agreed to and confirmed in writing by the parties, on which date WorldCom shall be permitted to disconnect and discontinue services on account number 86336952.

[*42] (July 15, 2004 Consent Order.)

Plaintiffs contend that to the extent that defendant's claims are based on the allegations that plaintiffs' disconnection of the services was wrongful, those claims are barred. Plaintiffs argue that under the Consent Order, they maintained services to defendant, and properly disconnected them after the dates provided therein. They charge that defendant cannot now claim that the disconnection was unlawful when defendant specifically agreed to it and such action was authorized by this Court.

Defendant counters by charging that because the Consent Order involved the original plaintiff, defendant could not have waived any counterclaims against the new plaintiffs. Defendant relies on the law of waiver: "Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 291, 544 A.2d 377 (1988). Because questions of waiver "are usually questions of intent," such factual determinations "should not be made on a motion for summary judgment. [*43] " Id.

That argument is actually not necessary. The Court notes that the Consent Order allows defendant to add new claims to its pleading. To the extent defendant had new claims to assert against plaintiffs as a result of the

discontinuation of certain telecommunications services, defendant is permitted to do so pursuant to the Consent Order. The Court concludes that the Consent Order does not preclude defendant from asserting claims that relate to the services terminated under the Consent Order.

C. Failure to Plead Fraud with Particularity

Plaintiffs next argue that the Court should dismiss the Fifth Count of the Counterclaim and Third Party Complaint, which states a claim for fraud, on the ground that it fails to plead fraud with particularity. Fed. R. Civ. P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In order to satisfy Rule 9(b), a plaintiff must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants [*44] against spurious charges of immoral and fraudulent behavior." Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004) (quoting Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3d Cir. 1984)). This requirement may be satisfied two ways: First, a plaintiff can plead "the who, what, when, where, and how: the first paragraph of any newspaper story." Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999)). Second, the requirement can be satisfied through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Lum, 361 F.3d at 223-24 (quoting Seville Indus. Machinery, 742 F.2d at 791 (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations)). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." Id. (citations omitted). The Third Circuit has held that allegations which indicate [*45] the general content of a representation but fail to indicate who the speakers were or who received the information are inadequate to meet the requirements of Rule 9(b). Saporito v. Combustion Engineering Inc., 843 F.2d 666, 675 (3d Cir. 1988), vacated on other grounds, 489 U.S. 1049, 109 S. Ct. 1306, 103 L. Ed. 2d 576 (1989).

The only factual allegations supporting defendant's fraud claim are:

26. At relevant times hereto, MCI made certain representations to Graphnet that it would charge Graphnet a certain rate, settle and resolve all of its billing errors, that it would settle and resolve all telex traffic issues and that it would cease and discontinue its litigation against Graphnet on any amounts alleged due for telex traffic under the Settlement Agreement.

27. MCI knew or should have known that its representations were false when made.

(Am. Countercl. & 3d Party Compl. at PP26-27). Earlier in the pleading, defendant defines "MCI" as referring to all the plaintiffs and the third party defendants as well as such entities parents, subsidiaries and affiliates. (Id. at P8).

Defendant disputes this issue and points to one other factual allegation in the Counterclaim [*46] and Third Party Complaint to support its position that fraud has been adequately pled. Defendant points to paragraph 18 which alleges that "on February 29, 2000, MCI entered into a settlement agreement . . . with Graphnet to settle and resolve 'all telex traffic'" among and/or between the parties." Defendant asks the Court to read these allegations together to conclude that defendant has alleged plaintiffs made the specific representation to cease and discontinue the litigation in the Settlement Agreement.

The Court finds that this claim falls far short of pleading fraud with particularity. Even if the Court were persuaded by defendant's argument, it still fails to address the "when, where, and how" of other alleged misrepresentations. Furthermore, defendant's argument that the speakers have been identified by using the term "MCI," a reference to all the plaintiffs and third party defendants hardly puts plaintiffs on notice of who made such representations.

Defendant requests leave to amend if the Court were to find defendant's pleading deficient, which it has. As the Court informed defense counsel at the hearing, the Court would only grant defendant leave to amend if it found that [*47] any part of the claim was viable, not barred by the bankruptcy discharge. Paragraph 28 of the Counterclaim and Third Party Complaint reads "Graphnet relied upon MCI's representations by continuing to utilize

MCI's telecommunications services, by entering into the Telex Agreement, the Lines Agreement and the Settlement Agreement, by performing thereunder and by agreeing to waive and release certain claims against MCI." From this allegation, it appears that defendant may have a fraud claim that arose after April 20, 2004, though it is far from clear what the facts of that claim may be. The Court will allow defendant to amend its fraud claim to the extent defendant can allege, with required particularity, facts to support a fraud claim that arose after April 20, 2004.

D. Failure to Plead Elements of Unjust Enrichment

Plaintiffs next argue that defendant has failed to state a claim for unjust enrichment in the Ninth Count of the Counterclaim and Third Party Complaint. Plaintiffs charge that defendant's claim for unjust enrichment merely says that "MCI has been unjustly enriched" and fails to allege the required elements of this claim. They contend that defendant has failed to allege [*48] what benefit plaintiffs allegedly received or why plaintiffs retention of the purported benefit is improper. Defendant has also failed to allege why and how it expected remuneration from plaintiffs for the unspecified benefit plaintiffs allegedly received or that the plaintiffs' failure to provide remuneration enriched them beyond their contractual rights.

Defendant responds that plaintiffs ignored that the paragraph before its claim for unjust enrichment incorporates by reference all the previous allegations and that claim for unjust enrichment states that it arises as a result of the foregoing conduct. Defendant argues that the allegations show that plaintiffs received the benefit of the Settlement Agreement and the Wholesale Agreements, but charged defendant more than the amounts owed.

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994). The doctrine requires a plaintiff to "show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that [*49] the failure of remuneration enriched defendant beyond its contractual rights." Id.

Neither party addresses the standard for pleading unjust enrichment. Another court in this district recently wrote that "in order to state a claim for unjust enrichment,

a plaintiff must allege (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517, 544 (D.N.J. 2004). Under the general rules of pleading, all the pleading party must do to state a claim is include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The Third Circuit has noted that "as the Supreme Court noted in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), Rule 8 basically requires that a pleading provide sufficient notice to the defendant of the type of litigation that this involved." Barnhart v. Compugraphic Corp., 936 F.2d 131, 135 (3d Cir. 1991). Plaintiffs advance no law that would support a finding [*50] that defendant must plead a claim for unjust enrichment with the same particularity required as a claim for fraud. For these reasons, defendant's unjust enrichment claim is upheld to the extent it states a claim that arose after April 20, 2004.

E. Leave to File a Third Party Complaint

The last argument advanced by plaintiffs is that the Third Party Complaint should be stricken because defendant did not obtain leave of Court to file it as is required by Fed. R. Civ. P. 14(a). Rule 14(a) provides:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the third-party complaint not later than 10 days after serving the original answer. Otherwise the third-party plaintiff must obtain leave on motion upon notice to all parties to the action.

Plaintiffs argue that because defendant's [*51] Third Party Complaint was filed on November 2, 2004, more than ten days after defendant's original answer was filed on December 22, 2003, defendant needed to seek leave of Court to file such pleading and defendant did not do so.

In light of the language of the Consent Order allowing defendant to amend its pleading "to add additional claims and parties," the Court finds plaintiffs argument unpersuasive. Just as the addition of the proper parties in interest contemplates a substitution of parties, the addition of parties by defendant contemplates the filing of a Third Party Complaint. Thus, the Third Party Complaint may stand to the extent it states claims that arose after April 20, 2004.

In conclusion, plaintiffs' motion to dismiss the Counterclaim and Third Party Complaint is granted in part and denied in part. Defendant's claims that arose before April 20, 2004 are dismissed and those arising after that date survive. Defendant is granted leave to amend its Fifth Count within forty days of the date of this Opinion to the extent it can state a claim for fraud that arose after April 20, 2004.

## II. Defendant's Cross-Motion to Dismiss the Complaint or for Summary Judgment

[*52] A. Judicial Estoppel

Defendant's first argument is that the Second Amended Complaint should be dismissed because of the substitution of the current plaintiffs for the original plaintiff, WorldCom, Inc. Defendant invokes the doctrine of judicial estoppel to support its position. "The judicial estoppel doctrine seeks to prevent a party from playing fast and loose with courts by asserting contradictory positions." U.S. v. Vastola, 989 F.2d 1318, 1324 (3d Cir. 1993). "A party who has gained an advantage by characterizing the law or facts involved in a case should not later be able to contradict that characterization in order to obtain a further advantage." U.S. v. Kepner, 843 F.2d 755, 760 (3d Cir. 1988).

Defendant charges that plaintiffs have played "fast and loose" with the Court by taking advantage of the language in the Consent Order permitting the filing of a Second Amended Complaint to remove WorldCom, Inc. from this litigation when a counterclaim was pending against it and substituting the three current plaintiffs as the real parties in interest. Defendant argues that the real reason for this substitution was plaintiffs' desire to avoid [*53] the impact of the two year statute of limitations and the Settlement Agreement described earlier. Defendant argues that this Second Amended Complaint is really a new lawsuit and that trying to place the plaintiffs in the shoes of the original plaintiffs is a fraud upon the

Court. Defendant asks the Court to dismiss the Second Amended Complaint, or, at the very least, to award defendant attorneys' fees and costs for the time it spent defending the lawsuit brought by WorldCom, Inc.

For the reasons stated earlier, the substitution of plaintiffs is proper and does not amount to conduct which would warrant application of the doctrine of judicial estoppel. Defendant's motion to dismiss the Second Amended Complaint on this ground is denied. Defendant's motion for attorneys' fees and costs is also denied because it is meritless.

B. Statute of Limitations

As to Counts I through IV of the Second Amended Complaint, defendant's statute of limitations argument is related to the application of the relation-back rule discussed previously. Defendant argues that because the new plaintiffs did not file their claims until August 3, 2004, their claims are barred by the applicable statute of limitations. [*54] 5

5 Section 415(a) of the Federal Telecommunications Act states that "all actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after." 47 U.S.C. § 415(a). Section 415(b) states the statute of limitations for the recovery of damages rather than overcharges: "All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to subsection (d) of this section." 47 U.S.C. § 415(b). As to when a cause of action accrues, Section 415(e) provides that "the cause of action in respect of the transmission of a message shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after." 47 U.S.C. § 415(e). According to the Third Circuit, "the statute of limitations for purposes of § 415(a) accrues with 'discovery of the right or wrong or of the facts on which such knowledge is chargeable in law.'" MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1100 (3d Cir. 1995) (quoting Central Scott Tel. Co. v. Teleconnect Long Distance Servs. & Sys. Co., 832 F. Supp. 1317, 1320).

[*55] However, when the relation-back rule applies, which it does here, it ameliorates the effect of statutes of limitations. Nelson v. County of Allegheny, 60 F.3d 1010, 1015 (3d Cir. 1995). The goal of relation-back principles is "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." Fed. R. Civ. P. 15 Advisory Committee Note (1991). Having already decided that the substitution was proper and that the relation back rule applies, the Court finds this statute of limitations argument also without merit.

With regard to Counts IV through VIII, plaintiffs claim that these claims arising under the Wholesale Agreements became ripe only after the lawsuit was commenced back in 2000. Defendant charges that these claims too should be dismissed because they are barred by the statute of limitations, but the record is too sparse for the Court to make this determination. The only information the Court has about the Wholesale Agreements is that at least one of the agreements was entered into in October 2001, that by August 2003, defendant was [*56] in arrears on the Wholesale Accounts, and that the Second Amended Complaint was filed in August 2004. Without a further developed record, the Court cannot now determine whether defendant has a valid statute of limitations defense to Counts IV through VIII.

C. The Settlement Agreement

Defendant's last argument is that plaintiffs' claims are barred by the Settlement Agreement. On February 29, 2000, MCI International, Inc., ("MCII") formerly known as TC, entered into a settlement agreement with defendant to settle claims that were based upon activities that occurred prior to September 14, 1998. The activities that formed the basis for the Settlement Agreement were four separately identifiable causes of action that were, in turn, based upon various agreements. The first case is Graphnet, Inc. v. MCI International, Inc., No. 93-2046 ("Graphnet I"), commenced on or about May 17, 1993, in which Graphnet instituted a civil action against MCII in this district, alleging *inter alia* that MCII violated the antitrust laws. The second case is Graphnet, Inc. v. MCI International, Inc., (FCC File No. E-94-77), which is Graphnet's complaint with the Federal Communications Commission [*57] ("FCC"), challenging WUI Tariff FCC No. 22 on August 15, 1994. The third case is MCI

International, Inc. v. Graphnet, Inc., (FCC File No. E-96-37), begun on or about July 18, 1996, in which MCII filed a complaint with the FCC alleging violations under Sections 201(b) and 202(a) of the Communications Act, 47 U.S.C. §§ 201(b) and 202(a) (collectively referred to as "FCC Actions"). The fourth case, Graphnet, Inc. v. MCI International, Inc., No. 96-2637 ("Graphnet II."), is a civil action against MCII in this district, alleging *inter alia,* nonpayment for indirect and direct telex traffic based on tariff rates contained in Graphnet Tariff FCC No. 5. MCII counterclaimed, alleging, *inter alia,* nonpayment for indirect and direct telex traffic based on a 1992 intercarrier agreement between Western Union International, Inc. ("WUI"), now known as and hereinafter referred to as WorldCom International Data Services ("WIDS") and Graphnet. The agreements underlying the dispute in Graphnet I and the FCC Actions, two of the actions that led to the Settlement Agreement, are agreements between TC and defendant and the underlying issue in Graphnet II is [*58] an agreement between WIDS and defendant. (Nicholas Iacovano Decl.).

In support of its position that plaintiffs' claims are barred by the Settlement Agreement, defendant relies on Paragraph 1.1 of the agreement which states that it "applies to all telex traffic . . . ." The release provisions of the agreement, however, provide:

MCII, WUI, and their predecessors, successors, parents, subsidiaries, and affiliates hereby release and forever discharge Graphnet, GIC, and/or their predecessors, successors, parents, subsidiaries, affiliates, assigns, transferees, agents, directors, officers, employees, shareholders, attorneys, current and former directors, officers, employees, and shareholders from and against all actions, causes of action, claims, suits, debts, liens, damages, judgments, and demands whatsoever, whether matured or unmatured, whether at law or in equity, whether known or unknown, that they now have or may have had, or hereafter claims to have through the effective date of the tariff amendments set forth in Paragraph 1.3 of this Agreement, ***arising out of or relating to*** the FCC Actions, Graphnet I, Graphnet II and/or the GIC Account.

(Settlement [*59] Agreement at P3.1) (emphasis added). 6

    6    Paragraph 3.2 is an identical provision whereby Graphnet releases MCII from claims it had against it.

A settlement agreement voluntarily and willingly entered into by parties is a binding contract and enforceable. D.R. by M.R. v. East Brunswick Bd. of Educ., 109 F.3d 896, 900-901 (3d Cir. 1997). "Generally, 'courts should enforce contracts as made by the parties.'" Marchak v. Claridge Commons, Inc., 134 N.J. 275, 281, 633 A.2d 531 (1993) (quoting Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 101, 415 A.2d 1156 (1980)).

At the hearing, defense counsel admitted that there is a dispute between the parties whether the claims asserted by plaintiffs in this action arise out of or relate to the actions mentioned in the Settlement Agreement. Because that is a genuine issue of material fact, the Court denies defendant's motion for summary judgment on this ground.

**CONCLUSION**

In conclusion, plaintiffs' motion to dismiss the Counterclaim and Third [*60] Party Complaint is granted in part and denied in part. Defendant's claims that arose before April 20, 2004 are dismissed and those arising after that date survive. Defendant is granted leave to amend its Fifth Count to the extent it can state a claim for fraud that arose after April 20, 2004. Defendant's motion to dismiss the Second Amended Complaint, or in the alternative, for summary judgment is denied.

May 10, 2005

**s/William H. Walls**

United States District Judge

**ORDER**

**Walls, District Judge**

It is on this 10th day of May, 2005:

ORDERED that Plaintiffs' motion to dismiss the Counterclaim and Third Party Complaint is GRANTED in part and DENIED in part, Defendant is granted leave to amend its Fifth Count to the extent it can state a claim for fraud that arose after April 20, 2004, and Defendant's motion to dismiss the Second Amended Complaint, or in the alternative, for summary judgment is DENIED.

**s/William H. Walls**

United States District Judge