# EXHIBIT  1

**Exhibit No. 1 to Proposed Pre-Trial Order**

**Statement of Undisputed Facts (Local Civil Rule 16.3(c)(3))**

Capitalized terms are used herein with the same meaning given in the Proposed Pre-Trial Order unless otherwise specified. As to such facts, only the parties relevant to the action have agreed that they are undisputed. By agreeing that the facts set forth below are undisputed as a factual matter, the parties do not intend to, and do not, waive the right to dispute the legal relevance and significance, if any, of any particular fact.

1.    For many years prior to 2000, the Montana Power Company ("MPC") operated a regulated natural gas and electric utility business in Montana.

2.    In 1996, MPC sold $65 million worth of junior unsecured subordinated debt securities (the "Junior Debentures") to a trust it established entitled Montana Power Capital I (the "Trust"). The Trust issued 8.45% Quarterly Income Preferred Securities (the "QUIPS") to the public. The Trust was to distribute the interest and principal payments made by MPC on the Junior Debentures to the holders of the QUIPS.

3.    MPC entered into an indenture with The Bank of New York ("BONY") as indenture trustee dated November 1, 1996 (the "Indenture"). BONY initially served as trustee in various capacities under the documents (including the Indenture as well as those known as the "Trust Agreement" and "Guarantee Agreement") governing the Junior Debentures, the Trust, and the QUIPS.

4.    In 2000, NorthWestern sought to acquire MPC's Montana regulated natural gas and electric business.

1

5.    On or about September 28, 2000, MPC created a wholly owned subsidiary, Montana Power, LLC ("MP LLC"), by filing the required Articles of Incorporation with the Montana Secretary of State.

6.    On September 29, 2000, NorthWestern, Touch America Holdings, Inc. and MPC entered into the Unit Purchase Agreement whereby NorthWestern agreed to purchase the unit interest of MP LLC, ("the Acquisition").

7.    NorthWestern agreed to purchase 100% of the equity of MP LLC, subject to relevant regulatory approvals from, among other agencies, the Federal Energy Regulatory Commission ("FERC") and the Montana Public Service Commission ("MPSC").

8.    On December 20, 2000, NorthWestern and MPC filed a joint application to FERC for approval of NorthWestern's purchase of the equity interest in MP LLC. In the application, NorthWestern and MPC stated that the Acquisition was not contingent on any particular structure and that NorthWestern may either (1) form a holding company so that it would acquire MP LLC as a wholly-owned subsidiary or (2) acquire MP LLC, move it to a flat structure and hold the assets in a division of the parent company (i.e., "going flat").

9.    FERC approved the Acquisition on February 20, 2001.

2

10.     On January 11, 2001, NorthWestern and MPC submitted a joint application to the MPSC for approval of NorthWestern's purchase of the equity interest of MP LLC. In the application, NorthWestern stated, inter alia, that at its election the "utility operations [acquired] under the LLC structure will become either a wholly owned subsidiary or a division of NorthWestern."

11.     On January 31, 2002, the MPSC issued Final Order No. 6353c approving a stipulation filed by NorthWestern, MPC and certain consumer groups authorizing MPC to complete its proposed sale of MP LLC to NorthWestern.

12.     The NorthWestern financial statements for the first three quarters of 2002 were not in existence in January and February 2002 when the FERC and the MPSC approved NorthWestern's applications for approval of the purchase of the equity interest of MP LLC, and accordingly were not submitted to or considered by the FERC or the MPSC.

13.     On February 13, 2002, MP LLC and BONY executed the First Supplemental Indenture to the QUIPS Indenture.

14.     In order to finance its acquisition of MP LLC, NorthWestern entered into a credit agreement with several lenders, including Credit Suisse First Boston ("CSFB") on January 14, 2002. The credit agreement consisted of a $720 million term loan of 364 days (beginning on the day after the loan closing) and a $280 million revolving credit facility.

3

15.    In order to facilitate the Acquisition, on February 15, 2002, MPC transferred the assets and liabilities of its regulated electric and natural gas transmission and distribution business and other assets, including the Milltown Dam and certain liabilities into MP LLC.

16.    On February 15, 2002, NorthWestern completed its purchase of all of the outstanding units of MP LLC from Touch America Holdings, Inc.

17.    The MP LLC was renamed NorthWestern Energy LLC and later became known as Clark Fork and Blackfoot, LLC ("Clark Fork").

18.    In February 2002, NorthWestern was also engaged in other, non-utilities businesses, including the businesses of its subsidiaries known as Blue Dot (which provided air conditioning, heating, plumbing and related services) and Expanets (which provided networked communications and data services and solutions to medium–sized businesses.).

19.    Prior to receiving the MPSC's approval for its acquisition, NorthWestern told the MPSC that it would either continue to hold the Montana utilities assets in Clark Fork as a separately-organized business entity or it might elect to "go flat" and upstream those assets to itself.

20.    Prior to receiving the MPSC's approval for its acquisition, Mr. Hanson testified on behalf of NorthWestern to the MPSC that:

4

NorthWestern plans to make the requisite filings, and take the other steps
necessary, to authorize it to obtain exempt status under the Public Utilities
Holding Company Act, as amended, with both MPC and NorthWestern
Public Service becoming subsidiaries of the parent corporation. If
NorthWestern ultimately does not implement a holding company structure,
then upon closing of the transaction, it will retain its current divisional
structure and MPC will become a separate division rather than a subsidiary
of the company.

21.     Prior to receiving the MPSC's approval for its acquisition, Mr. Hanson

testified on behalf of NorthWestern to the MPSC that NorthWestern "believe[s] that

capital will be no more expensive with NorthWestern as the owner of MPC than is the

case today. ... While our corporate structure may seem complex on first examination, it

assures separation of the utility related financings from other activities, and it should not

create any new or additional concerns for this commission because MPC has itself

historically had significant non-utility operations."

22.     NorthWestern's board authorized the Going Flat Transaction by a

resolution adopted on August 7, 2002, which stated that NorthWestern "believes it is

advisable for rating agency purposes to move the assets of its wholly-owned subsidiary

[Clark Fork] ... to [NorthWestern] to more directly support the obligations of

[NorthWestern]."

23.     On August 7, 2002, NorthWestern, as the sole member and manager of

Clark Fork, executed a Written Consent of Sole Member to Action in Lieu of Meeting,

containing, among others, the following resolutions:

NOW, THEREFORE, BE IT RESOLVED that the Manager [NorthWestern]
hereby authorizes, empowers and directs the officers of [Clark Fork], or any of
them, to execute and deliver an asset and stock transfer agreement to be entered
into between [Clark Fork] and the Manager (the "Transfer Agreement"), to effect

5

the [Clark Fork] Asset Transfer, as well as any agreements, instruments, or documents contemplated thereby or in connection therewith ("Ancillary Agreements"), as the proper officers of the Corporation deem necessary or desirable, with such modifications or amendments thereto as such officers shall approve and the execution of such Transfer Agreement and Ancillary Agreements shall be deemed conclusive evidence of such approval.

FURTHER RESOLVED, that any and all actions taken by any officer or employee or agent of [Clark Fork] in furtherance of the foregoing resolutions and within the authority conferred by the foregoing resolutions are hereby ratified and approved in all respects.

24. On August 13, 2002, the Second Supplemental Indenture to the QUIPS Indenture was agreed to among NorthWestern Energy LLC, NorthWestern and BONY. Under the Second Supplemental Indenture, NorthWestern fully and unconditionally assumed on a joint and several basis with Clark Fork, all of Clark Fork's obligations under the QUIPS Indenture.

25. In August 2002, Mr. Hanson executed an Officer's Certificate pursuant to Section 1102 of the Indenture. In relevant part, Mr. Hanson certified that all conditions precedent provided in the Indenture relating to the execution and delivery of the Second Supplemental Indenture had been complied with.

26. On November 15, 2002, Clark Fork and NorthWestern entered into an Asset and Stock Transfer Agreement. Pursuant to the terms of the Asset and Stock Transfer Agreement, Clark Fork transferred the majority of its assets (the "Transferred Assets") and designated liabilities (the "Transferred Liabilities") to NorthWestern. Excluded from the Transaction were Clark Fork's assets and insurance policies relating to the Milltown Dam as well as a parcel of property located in Missoula County, Montana. Also excluded from the Transaction were certain liabilities, including environmental

6

liabilities associated with the Milltown Dam and liabilities and obligations relating to certain pending and potential litigation. (The entire preceding paragraph is referred to as the "Going Flat Transaction").

27.     On behalf of Clark Fork, on November 15, 2002, Mr. Hanson executed various documents necessary to the consummation of the Going Flat Transaction, including the Asset and Stock Transfer Agreement, Environmental Liabilities Support Agreement, Maintenance and Support Operating Agreement (for the Milltown Dam), the Assignment and Assumption Agreement (for the QUIPS), Assumption Agreement (QUIPS Guarantee), and the Officer's Certificate for the Third Supplemental Indenture.

28.     On behalf of Clark Fork, Ernie Kindt signed a letter to BONY formally requesting that BONY execute certain documents necessary to the consummation of the Going Flat Transaction.

29.     Prior to executing documentation necessary for the Going Flat Transaction, BONY reviewed and relied upon an officer's certificate executed by Mr. Hanson.

30.     On November 15, 2002, NorthWestern and BONY executed the Third Supplemental Indenture.

31.     As of the date of the Going Flat Transaction, the Transferred Assets had a value of at least $1.15 billion.

32.    In connection with the Going Flat Transaction, NorthWestern entered into two agreements with Clark Fork: (1) to cover maintenance and operating expenses of the Milltown Dam ("Maintenance and Operating Costs Support Agreement") and (2) an "Environmental Liability Support Agreement" indemnifying Clark Fork for environmental liability costs up to $10 million.

33.    As of the date of the acquisition of Clark Fork and ultimately at the time of the Going Flat Transaction, Mr. Hanson was President and CEO of MP LLC. He also served as Vice President for NorthWestern Public Service Division, a division of NorthWestern responsible for overseeing South Dakota and Nebraska utility operations.

34.    As of the date of the acquisition of Clark Fork and ultimately at the time of the Going Flat Transaction, Mr. Kindt was an officer of Clark Fork. He had no other positions or designations at NorthWestern.

35.    No fairness opinion was sought or received by Clark Fork in connection with the Going Flat Transaction.

36.    Clark Fork was not represented by separate counsel in connection with the Going Flat Transaction. Rather, both Clark Fork and NorthWestern were represented by Paul, Hastings, Janofsky & Walker LLP.

37.    No legal opinion was provided to Clark Fork in connection with the Going Flat Transaction.

38.    Prior to the Going Flat Transaction, Clark Fork was solvent, adequately capitalized, and capable of generating sufficient cash flow to meet all of its obligations, including its QUIPS-related obligations.

39.    Clark Fork and NorthWestern were unable to carry out the Going Flat Transaction until approval was received from FERC.

40.    NorthWestern filed an application with FERC on October 25, 2002, for approval of its assumption of the liabilities of Clark Fork, including the QUIPS liabilities.

41.    FERC approved NorthWestern's assumption of the liabilities of Clark Fork on November 15, 2002.

42.    As of the date of the Going Flat Transaction the total outstanding face amount of the QUIPS was approximately $67 million.

43.    On December 13, 2002, NorthWestern issued a press release announcing that it would miss its earnings estimates and that it may recognize a substantial impairment of goodwill and other intangible assets at Expanets and another subsidiary, Blue Dot.

44.    NorthWestern timely made two quarterly payments in connection with the QUIPS subsequent to the Going Flat Transaction for the quarterly periods ending December 31, 2002 and March 31, 2003.

45.    NorthWestern paid regular quarterly dividends on its common stock throughout 2002, but announced on February 19, 2003 that it would be discontinuing dividend payments.

46.    At the same time, NorthWestern also announced the elements of a turnaround plan to focus on its core utility businesses and attempt to sell its "non-core assets, including Expanets, Blue Dot, the Montana First Megawatts generation project . . . ."

9

47.    On April 15, 2003, NorthWestern issued restated financial statements for 1Q 02, 2Q 02 and 3Q 02.  On that same date NorthWestern also issued its 10-K for the year ended December 31, 2002, in which it recognized $878.5 million in charges.  Of that total, $590.4 million of impairment losses related to Expanets and Blue Dot.

48.    On May 23, 2003, NorthWestern announced that it would defer payment of interest on all of its trust preferred securities, including the QUIPS.

49.    On September 14, 2003, NorthWestern commenced a chapter 11 bankruptcy case.

50.    The filing of NorthWestern's chapter 11 case was an event of default under the Indenture.

51.    In NorthWestern's confirmed chapter 11 reorganization plan, the QUIPS holders were treated as subordinated creditors.  QUIPS holders received no distribution on account of the underlying QUIPS obligation unless they agreed to release all litigation claims related to the Going Flat Transaction, including the claims being asserted in these actions.  Those QUIPS holders who did not elect to release their claims were permitted to pursue these actions and, if a judgment is entered against NorthWestern, to receive a distribution under NorthWestern's Plan.

52.    Law Debenture succeeded BONY as:  (1) successor indenture trustee under the Indenture on December 17, 2003; (2) successor property trustee under the Trust Agreement on July 19, 2004; and (3) successor guarantee trustee under the Guarantee Agreement on December 17, 2003.  Law Debenture continues to serve in those capacities.

10

53.     In the order confirming NorthWestern's chapter 11 Plan, the Court stated that QUIPS holders that did not agree to release their litigation claims "shall be entitled to receive a Pro Rata Share of recoveries from the QUIPS Litigation, if any, upon resolution of such QUIPS Litigation, without the necessity of becoming plaintiffs in the QUIPS Litigation so long as the Indenture Trustee shall be a plaintiff in the QUIPS Litigation or as may be approved by the Court." D.I. 2237, Case No. 03-12872, at 68-69.

54.     Magten was not a creditor of Clark Fork at the time of the Acquisition or at the time of the Going Flat Transaction. Magten did not own or hold any interest in any QUIPS at any time prior to or as of the date of the Going Flat Transaction. Magten began to purchase QUIPS only after April 15, 2003 and continued to purchase QUIPS through June 2006. Before purchasing its QUIPS, Magten was aware that NorthWestern had restated the Original 2002 Quarterly Financials (as defined and described below).

55.     NorthWestern publicly reported its financial condition as of March 31, 2002 and for the quarter ending on that date ("1Q 02") in a 10-Q filed May 15, 2002.

56.     NorthWestern publicly reported its financial condition as of June 30, 2002 and for the quarter ending on that date ("2Q 02") in a 10-Q dated August 14, 2002.

57.     NorthWestern publicly reported its financial condition as of September 30, 2002 and for the quarter ending on that date ("3Q 02") in a 10-Q dated November 14, 2002.

58.     NorthWestern initially amended its 1Q 02 and 2Q 02 in amendments dated September 20, 2002.

11

59.    The 2Q 02 financial statements were included in a prospectus dated September 9, 2002 pursuant to which NorthWestern exchanged $720 million of new bonds for existing unregistered bonds.

60.    The 2Q 02 financial statements were also included in a prospectus pursuant to which NorthWestern sold approximately $87.5 million of new common stock in a secondary offering which closed on October 8, 2002, from which NorthWestern received approximately $81 million in net proceeds.

61.    On April 1, 2003, NorthWestern announced that it intended to issue restated quarterly financial statements for the first three quarters of 2002. On April 15, 2003, NorthWestern issued restated financial statements for 1Q 02, 2Q 02, and 3Q 02.

62.    The outstanding balance under NorthWestern's $280 million revolving credit facility with CSFB (the "CSFB Revolver") was repaid in connection with the closing of a new, secured term loan from CSFB (the "CSFB Secured Loan") on February 10, 2003. The Transferred Assets were used as collateral for the CSFB Secured Loan, which required MPSC approval.

63.    If Plaintiffs prevail in this action, Plaintiffs are entitled to a Class 9 Allowed Claim to be satisfied as provided for in NorthWestern's confirmed chapter 11 Plan in the amount of their damages, if any, Plaintiffs are determined at trial to be entitled to receive from NorthWestern.

# EXHIBIT 2

**Exhibit No. 2 to Proposed Pre-Trial Order**

**Plaintiffs' Statement of Issues of Fact Which Remain to Be Litigated**
**(Local Civil Rule 16.3(c)(4))**

The issues of fact which plaintiffs contend remain to be litigated are set forth

below.  Capitalized terms are used herein with the same meaning given in the Proposed

Pre-Trial Order and/or Plaintiffs' Statement of Undisputed Facts unless otherwise

specified.  In addition, plaintiffs incorporate herein the issues of law addressed in

Exhibit 5 to the extent the Court determines that such issues of law are properly

considered issues of fact.  Furthermore, to the extent the Court determines that the parties

should particularize each fact which may be evidenced, as opposed to each "issue of

fact," plaintiffs reserve their right to amend this listing to include all such specific facts,

including without limitation those set forth in the oppositions to defendants' summary

judgment motions [D.I. 260, Case No. 04-1494 and D.I. 298, Case No. 05-499] and their

supporting declarations and exhibits.  The issues of fact set forth herein are applicable to

both actions, except for numbers 20, 21, 22, 34, 35, 36, 39, 40 and 41, which are

applicable only to the NorthWestern Action, and numbers 42-53, which are applicable

only to the Hanson & Kindt Action and accordingly are advanced only by Magten.  By

setting forth these issues of fact, plaintiffs do not imply or concede that they bear the

burden of proof on any particular issue or that they must prevail on any particular issue in

order to be entitled to judgment in their favor.  Hanson and Kindt are barred by the law of

1

the case doctrine from relitigating issues of law or fact previously decided adversely to them by Judge Cebull, and such issues are accordingly not set forth herein.

1.      Whether Clark Fork received a reasonably equivalent value for the Transferred Assets.

2.      Whether the Transferred Assets were worth more than $1.15 billion as of the date of the Going Flat Transaction, and if so, how much more than $1.15 billion the Transferred Assets were worth.

3.      What, if any, value Clark Fork received in exchange for the Transferred Assets.

4.      Whether Clark Fork became insolvent as a result of the Going Flat Transaction.

5.      Whether Clark Fork became undercapitalized (i.e., its remaining assets were unreasonably small in relation to its business) as a result of the Going Flat Transaction.

6.      Whether Clark Fork was able to make any payments in connection with the QUIPS following the Going Flat Transaction.

7.      Whether the Going Flat Transaction was carried out with actual intent to hinder, delay, or defraud any creditor of Clark Fork.

8.      Whether Magten and the other QUIPS holders are creditors of Clark Fork.

2

9.    Whether the purported release of Clark Fork from its QUIPS-related obligations is valid and enforceable.

10.    Whether the purported release was obtained through fraud.

11.    Whether the purported release was obtained as part of a fraudulent scheme.

12.    Whether NorthWestern's 1Q 02, 2Q 02, and 3Q 02 financial statements as originally issued, including any associated press releases and, with respect to 1Q 02 and 2Q 02, as initially amended (collectively, the "Original 2002 Quarterly Financials") were materially false and misleading.

13.    Whether NorthWestern's financial statements for 2Q 02 failed to recognize a material impairment loss for goodwill associated with Blue Dot and Expanets.

14.    Whether NorthWestern's financial statements for 3Q 02 failed to recognize a material impairment loss for goodwill associated with Blue Dot and Expanets.

15.    Whether the various material misstatements and omissions in the Original 2002 Quarterly Financials were knowing and intentional and/or reckless.

16.    Whether other documents that included information contained in NorthWestern's Original 2002 Quarterly Financials, including prospectuses issued by NorthWestern, were materially false and misleading.

3

17.    Whether, as the SEC determined, NorthWestern and numerous members of its senior management team violated law in connection with the materially false and misleading Original 2002 Quarterly Financials.

18.    Whether NorthWestern caused Clark Fork to discontinue filing independent public financial reports, thus leaving the QUIPS holders to rely solely on the accuracy and integrity of NorthWestern's public filings in order to monitor the value of their investments and the potential impact of the Going Flat Transaction.

19.    As of November 15, 2002, the general public, the QUIPS holders and other relevant persons, such as BONY, FERC, MPSC, CSFB, and the various ratings agencies that monitored NorthWestern's creditworthiness, were not aware that the Original 2002 Quarterly Financials were materially false and misleading.

20.    Whether NorthWestern was in breach of its representation under the CSFB Revolver that all reports filed with the SEC were, at the time furnished, complete and correct in all material respects in connection with some or all of the draws of additional funds from the CSFB Revolver during 2002.

21.    Whether NorthWestern was in breach of the minimum net worth covenant for the CSFB Revolver as of the end of 2Q 02 and 3Q 02.

22.    Whether NorthWestern was in breach of the funded debt to total capital ratio covenant for the CSFB Revolver as of the end of 2Q 02 and 3Q 02.

23.    Whether NorthWestern knew or should have known prior to November 15, 2002 that accurate disclosure of its financial condition would have made it impossible for it to obtain sufficient cash to meet its liquidity needs.

24.    Whether NorthWestern knew prior to November 15, 2002 that it lacked the ability to generate sufficient positive cash flow to meet the obligations it was purportedly assuming in connection with the Going Flat Transaction, including the QUIPS-related obligations.

25.    Whether NorthWestern's fraud facilitated the consummation of the Going Flat Transaction.

26.    Whether NorthWestern's fraud facilitated its ability and/or Clark Fork's ability to present BONY with the documentation BONY required in connection with the Going Flat Transaction.

27.    Whether NorthWestern's fraud facilitated its ability and Clark Fork's ability to obtain relief from the injunction against the Going Flat Transaction that had been entered in McGreevey, et al. v. The Montana Power Company, et al., Case No. DV-01-141, Montana Second Judicial District Court.

28.    Whether NorthWestern's fraud facilitated its ability and/or Clark Fork's ability to obtain FERC approval for the Going Flat Transaction.

5

29.    Whether NorthWestern's fraud facilitated its ability to avoid being downgraded by the ratings agencies prior to the consummation of the Going Flat Transaction.

30.    Whether NorthWestern's fraud facilitated the avoidance of suspending the payment of dividends on its common stock prior to the consummation of the Going Flat Transaction.

31.    Whether NorthWestern was unable to make any further payments in respect of the QUIPS once NorthWestern's true financial condition had been properly disclosed.

32.    Whether NorthWestern's fraud facilitated its ability to avoid any contemporaneous objections to the Going Flat Transaction by QUIPS holders or other interested parties.

33.    Whether NorthWestern's fraud facilitated its ability to avoid any investigation of, or action intended to prevent, the Going Flat Transaction by the MPSC prior to the consummation of the Going Flat Transaction.

34.    Whether NorthWestern's fraud facilitated the drawing of additional funds from the CSFB Revolver following August 14, 2002.

35.    Whether NorthWestern made false representations to CSFB regarding its compliance with the representations, warranties and financial covenants in the CSFB Revolver.

6

36.     Whether NorthWestern used additional funds drawn from the CSFB
Revolver following August 14, 2002 to repay other maturing debt on which it otherwise
would have defaulted.

37.     Whether NorthWestern's fraud facilitated the secondary offering of
common stock it carried out in October 2002.

38.     Whether NorthWestern's fraud facilitated its ability to avoid running out of
cash, defaulting on other debt, and/or being forced to file for bankruptcy prior to the
consummation of the Going Flat Transaction.

39.     Whether NorthWestern was unjustly enriched by means of the Going Flat
Transaction through its misconduct or fault, whether NorthWestern benefited from the
Going Flat Transaction, and whether it would be unjust to allow NorthWestern to retain
such benefit.

40.     What amount of damages the plaintiffs have suffered as a result of
NorthWestern's conduct.

41.     Whether Law Debenture is entitled to a Class 9 Allowed Claim to be
satisfied as provided for in NorthWestern's confirmed Plan in the full amount of all
compensation, expenses, disbursements and advances, including fees and disbursements
of counsel incurred by Law Debenture as provided for under the Indenture, including
without limitation, all agreements of NorthWestern to indemnify and hold Law
Debenture harmless.

42.    Whether Clark Fork was in the zone of insolvency just prior to the Going Flat Transaction.

43.    Whether Hanson and/or Kindt conducted a sufficiently thorough inquiry prior to the Going Flat Transaction to determine whether the Going Flat Transaction was in the best interests of Clark Fork and its creditors.

44.    Whether Hanson and/or Kindt conducted a sufficiently thorough inquiry prior to the Going Flat Transaction to determine whether the Going Flat Transaction would leave Clark Fork insolvent and/or undercapitalized.

45.    Whether Hanson and/or Kindt conducted a sufficiently thorough inquiry prior to the Going Flat Transaction to determine whether NorthWestern would be able to meet the QUIPS-related obligations it was purportedly assuming.

46.    Whether Hanson and/or Kindt conducted a sufficiently thorough inquiry prior to the Going Flat Transaction to determine whether the purported release of Clark Fork from future QUIPS-related obligations would be valid and enforceable under the circumstances.

47.    Whether Hanson and/or Kindt conducted a sufficiently thorough inquiry prior to the Going Flat Transaction to determine whether the Going Flat Transaction would increase the cost of capital for the regulated Montana utility assets included in the Transferred Assets.

8

48.     Whether Hanson and/or Kindt knew, should have known, or were reckless in not knowing prior to the Going Flat Transaction that the Original 2002 Quarterly Financials were materially false and misleading.

49.     Whether Hanson and/or Kindt violated their fiduciary duties to Clark Fork and/or its creditors.

50.     What amount of damages Magten is entitled to recover as a result of Hanson and/or Kindt's conduct.

51.     Whether Magten is entitled to recover prejudgment interest from Hanson and Kindt and if so from what date.

52.     Whether Hanson and/or Kindt's conduct was such that Magten is entitled to punitive damages, and if so in what amount.

53.     Whether Magten is entitled to an award of attorneys' fees from Hanson and/or Kindt, and if so in what amount.

9

# EXHIBIT  3

**Exhibit [3] To Proposed Pre-Trial Order**

**NorthWestern's Statement of Issues of Fact
Which Remain To Be Litigated (Local Civil Rule 16.3(c)(4))**

It has been and continues to be the position of NorthWestern that there are no issues of material fact which remain to be tried in the action against it. This position is most fully set forth in NorthWestern's motion for summary judgment and all of the papers submitted in support thereof [D.I. 242-48, Case No. 04-1494], which are incorporated herein by reference. Without prejudice to this position, and reserving the right to amend this list to include any additional specific facts, NorthWestern set forth the following list of issues of fact, as to all of which Plaintiffs bear the burden of proof.

1.      Whether the Going Flat Transaction can be viewed as a discreet transaction or must be viewed as part of NorthWestern's acquisition of the utility assets from Montana Power Company.

2.      Whether the Magten and the other QUIPS holders are creditors of Clark Fork.

3.      Whether the purported release of Clark Fork from its QUIPS-related obligations is valid and enforceable.

4.      Whether the purported release was obtained through fraud.

5.      Whether NorthWestern knew prior to November 15, 2002, that it would be unable to meet the obligations it was purportedly assuming in connection with the Going Flat

Transaction, including the QUIPS-related obligations, and had a present intention not to pay those obligations.

6.  Whether NorthWestern was insolvent and incapable of performing its obligations to the QUIPS holders when it assumed those obligations as part of the Going Flat Transaction.

7.  Whether NorthWestern falsified its financials for the first three quarters of 2002 in order to accomplish the Going Flat Transaction.

8.  Whether the Bank of New York relied upon NorthWestern's financials for the first three quarters of 2002 when it executed the Third Supplemental Indenture.

9.  Whether any representation or fact relied upon by the Bank of New York in executing the Third Supplemental Indenture was untrue.

10.  Whether there was an event of default with respect to the QUIPS immediately after the Going Flat Transaction.

11.  Whether NorthWestern's financial statements for the first three quarters of 2002 proximately caused the Going Flat Transaction.

12.  Whether Plaintiffs suffered any legally cognizable injury as a result of the Going Flat Transaction.

13.  Whether the Going Flat Transaction constituted a violation of any provision of the QUIPS Indenture.

14.    Whether NorthWestern, had its actual financial situation been known in the first three quarters of 2002, would have put into place sufficient measures to enable it to accomplish the Going Flat Transaction.

15.    Whether NorthWestern was motivated to do the Going Flat Transaction both to meet the concerns of rating agencies that the utility assets it purchased from Montana Power Company be available to support the obligations of the corporation and to avoid application of the Public Utility Holding Company Act ("PUCHA").

16.    Whether the support agreements entered into between NorthWestern and Clark Fork as part of the Going Flat Transaction were sufficient to enable Clark Fork to continue to operate as a viable concern given the level of business it retained after that transaction.

17.    Whether Clark Fork became insolvent as a result of the Going Flat Transaction.

18.    Whether Clark Fork became undercapitalized (i.e., its remaining assets were unreasonably small in relation to its retained business) as a result of the Going Flat Transaction.

19.    The amount of damages, if any, to which the plaintiffs are entitled.

20.    Whether Law Debenture is entitled to recover the full amount of all compensation, expenses, disbursements and advances, including fees and disbursements of counsel incurred by Law Debenture and the amount thereof.

4258268v2

-3-

# EXHIBIT  4

**Exhibit No. [4] to Proposed Pre-Trial Order**

**Defendants Hanson and Kindt**

**Statement of Issues of Fact Which Remain to Be Litigated**

**(Local Civil Rule 16.3(c)(4))**

The issues of fact which Defendants Hanson and Kindt contend remain to be litigated are set forth below. Capitalized terms are used herein with the same meaning given in the Proposed Pre-Trial Order and/or Defendants Hanson and Kindt Statement of Undisputed Facts unless otherwise specified.

In addition, Defendants Hanson and Kindt incorporate herein the issues of law addressed in Exhibit 7 to the extent the Court determines that such issues of law are properly considered issues of fact.

Further, to the extent the Court determines that the parties should particularize each fact which may be evidenced, as opposed to each "issue of fact," Defendants Hanson and Kindt reserve their right to amend this listing to include all such specific facts, including without limitation those set forth in their Motion for Summary Judgment [D.I. 273, 274, 275, 276, 277, 278, and 279] and their supporting declarations and exhibits.

Defendants Hanson and Kindt reserve the right to amend or supplement this Exhibit in light of any determinations made by this Court on the pending Motion for Summary Judgments, Daubert Motions, or any motions in limine.

The issues of fact set forth herein are applicable only to the Hanson and Kindt Action as neither Hanson nor Kindt are parties to the NorthWestern Action. By setting forth these issues of fact, Defendants Hanson and Kindt do not concede that they bear the

EXHIBIT 4 TO FINAL PRE-TRIAL
ORDER                                                    1

burden of proof on any particular issue or that they must prevail on any particular issue in order to be entitled to judgment in their favor. Rather, plaintiff Magten has the burden of proof of each and every issue and element of the single cause of action pled in its Complaint and their failure to do so requires judgment be entered in favor of Defendants Hanson and Kindt.

Finally, nothing in this Exhibit 4 shall be construed as any agreement to any of the content of Plaintiff's Exhibit 2. Hanson and Kindt believe there are no material facts in dispute and that their motion for summary judgment should be granted. Moreover, Hanson and Kindt disagree with the substance of Plaintiff's Exhibit 2, with the "facts" Plaintiff asserts remain to be litigated, and with the Plaintiff's characterization of which of its facts apply to the Hanson and Kindt Action rather than to the NorthWestern Action. In many instances, Hanson and Kindt believe facts designated by Plaintiff as applicable to both cases, are in fact, only applicable to the NorthWestern Action, if they remain viable at all after determinations of the two pending motions for summary judgment filed in the Hanson and Kindt Action and in the NorthWestern Action.

1. Whether Hanson or Kindt owed any fiduciary duties to Magten.

2. Whether Clark Fork was rendered insolvent on November 15, 2002 as a result of the Going Flat Transaction.

3. If Clark Fork was rendered insolvent as a result of the Going Flat Transaction,

   a. whether Hanson knew or should have known that Clark Fork was rendered insolvent on November 15, 2002 as a result of the Going Flat Transaction;.

   b. whether Hanson acted with actual malice.

   c. whether Kindt knew or should have known that Clark Fork was rendered insolvent on November 15, 2002 as a result of the Going Flat Transaction; and

EXHIBIT 4 TO FINAL PRE-TRIAL ORDER                    2

          d.  whether Kindt acted with actual malice.

4.      Whether NorthWestern was insolvent prior to the November 15, 2002 Going Flat Transaction.

5.      If NorthWestern was insolvent prior to the Going Flat Transaction,

          a.  whether Hanson knew that NorthWestern was insolvent prior to the November 15, 2002 Going Flat Transaction;

          b.  whether Hanson acted with actual malice;

          c.  whether Kindt knew that NorthWestern was insolvent prior to the November 15, 2002 Going Flat Transaction; And

          d.  whether Kindt acted with actual malice.

6.      Whether NorthWestern was insolvent immediately after the November 15, 2002 Going Flat Transaction.

7.      If NorthWestern was insolvent immediately after the Going Flat Transaction,

          a.  whether Hanson knew that NorthWestern was insolvent immediately following the November 15, 2002 Going Flat Transaction;

          b.  whether Hanson acted with actual malice;

          c.  whether Kindt knew that NorthWestern was insolvent immediately following the November 15, 2002 Going Flat Transaction; and

          d.  whether Kindt acted with actual malice.

8.      Whether NorthWestern was unable to meet the obligations it assumed under the Indenture and the QUIPS immediately after the November 15, 2002 Going Flat Transaction.

9.      If NorthWestern was unable to meet its QUIPS obligations immediately after the Going Flat Transaction,

a.  whether Hanson knew that NorthWestern was unable to meet the obligations it assumed under the Indenture and the QUIPS immediately after the November 15, 2002 Going Flat Transaction;

b.  whether Hanson acted with actual malice;

c.  whether Kindt knew that NorthWestern was unable to meet the obligations it assumed under the Indenture and the QUIPS immediately after the November 15, 2002 Going Flat Transaction; and

d.  whether Kindt acted with actual malice.

10.  Whether Magten is entitled to any amount of compensatory damages from Defendants Hanson or Kindt.

11.  Whether Magten failed to mitigate its damages by, but not limited to, any of the following: (a) purchasing QUIPS after NorthWestern publicly announced that it might invoke the provision of the Indenture permitting it to defer payment of its QUIPS obligations for up to 20 consecutive calendar quarters without an event of default, and/or (b) continuing to purchase QUIPS after NorthWestern invoked the aforementioned Indenture provision, and/or (c) continuing to buy QUIPS after NorthWestern filed its petition in Bankruptcy, and even after Magten initiated this law suit.

12.  Whether Magten intentionally acquired interests in QUIPS in order to buy a law suit.

13.  Whether Magten is entitled to any amount of punitive damages from Defendants Hanson or Kindt.

14.  Whether Magten is entitled to the recovery of any amount of attorneys fees and costs from Defendants Hanson or Kindt.

15.  Whether Magten is entitled to any amount of pre-judgment interest.

EXHIBIT 4 TO FINAL PRE-TRIAL ORDER                    4

16.    If damages are awarded to Magten in the Hanson and Kindt Action, the
       amount of offset to Defendants Hanson and Kindt for any damages
       awarded to Magten in the NorthWestern matter.

EXHIBIT 4 TO FINAL PRE-TRIAL
ORDER                                          5

# EXHIBIT 5

**Exhibit No. 5 to Proposed Pre-Trial Order**

**Plaintiffs' Statement of Issues of Law Which Remain to Be Litigated
With Citation of Authorities
(Local Civil Rule 16.3(c)(5))**

The issues of law which plaintiffs contend remain to be litigated are set forth

below, with citation of authorities relied on. However, many of these issues are

addressed in the briefing on the currently pending summary judgment motions, and thus

may be adjudicated by the Court prior to trial. Plaintiffs hereby incorporate by reference

all legal arguments and citations to authority set forth in their briefs on the summary

judgment motion and the pending motion for leave to amend the complaint in the Hanson

and Kindt Action, as well as all such arguments and citations contained in the briefing

which has or will be filed on the various motions in limine. Capitalized terms are used

herein with the same meaning given in the Proposed Pre-Trial Order, the Statement of

Undisputed Facts, and/or Plaintiffs' Statement of Issues of Fact Which Remain to Be

Litigated unless otherwise specified. In addition, plaintiffs incorporate herein the issues

of fact addressed in Exhibit 2 to the extent the Court determines that such issues of fact

are properly considered issues of law. The issues of law set forth herein are applicable to

both actions, except for numbers 8, 11, 15, 16, and 18, which are applicable only to the

NorthWestern Action, and numbers 19-31, which are applicable only to the Hanson &

Kindt Action and accordingly are advanced only by Magten. By setting forth these issues

of law, plaintiffs do not concede that they must prevail on any particular issue in order to

be entitled to judgment in their favor. Hanson and Kindt are barred by the law of the case

1

doctrine from relitigating issues of law or fact previously decided adversely to them by Judge Cebull, and such issues are accordingly not set forth herein.

1.    If the Transfer is found to have been fraudulent, Clark Fork's creditors, including plaintiffs, "may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim" against Clark Fork from the transferee of the assets (in this case NorthWestern). Mont. Code § 31-2-340(2).

2.    The Transfer is fraudulent as to plaintiffs if made with actual "intent to hinder, delay, or defraud any creditor of the debtor." Mont. Code § 31-2-333(1)(a). Such actual intent can be determined circumstantially with reference to the various "badges of fraud" listed in Mont. Code § 31-2-333(2). Not all badges of fraud need to be established in any given case. "Often a single one of [the badges of fraud] may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent." Towe Antique Ford Found. v. IRS, 791 F. Supp. 1450, 1458 (D. Mont. 1992) (applying similar predecessor statute) (citations omitted).

3.    The Transfer is fraudulent as to plaintiffs without regard to subjective intent if it was made "without [Clark Fork] receiving a reasonably equivalent value in exchange for the transfer" and Clark Fork's remaining assets left it undercapitalized. Mont. Code § 31-2-333(b).

2

4.     The Transfer is fraudulent as to plaintiffs without regard to subjective intent if it was made "without [Clark Fork] receiving a reasonably equivalent value in exchange for the transfer" and Clark Fork was rendered insolvent. Mont. Code § 31-2-334.

5.     Only value actually received by Clark Fork (i.e., not provided to some third party) is relevant in determining whether the Transfer is fraudulent. Mont. Code §§ 31-2-333 & 334. Nat'l Westminster Bank NJ v. Anders Eng'g, Inc., 674 A.2d 638, 639 (N.J. Super. Ct. App. Div. 1996) (applying the New Jersey version of the Uniform Fraudulent Transfer Act).

6.     For purposes of determining whether Clark Fork received a reasonably equivalent value, "value does not include an unperformed promise made other than in the ordinary course of the promisor's business to furnish support to the debtor." Mont. Code § 31-3-330(1).

7.     The purported release of Clark Fork in connection with the transfer is void and unenforceable to the extent it was obtained by fraud or as part of a fraudulent scheme. Magten Asset Mgmt. Corp. v. NorthWestern Corp. (In re NorthWestern Corp.), 313 B.R. 595, 603 (Bankr. D. Del. 2004); Stanley v. Holms, 975 P.2d 1242 (Mont. 1999); Riggs et al. v. Gillespie, 241 F. 311 (4th Cir. 1917); Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Sys., Inc., 176 F. Supp. 2d 199 (S.D.N.Y. 2001); Ass'n of Unit Owners of the Deer Lodge Condo. v. Big Sky of Montana, Inc., 798 P.2d 1018 (Mont. 1990); Interdonato v. Interdonato, 521 A.2d 1124, 1133-34 (D.C. App. 1987).

3

8.    The fraudulent intent, acts, and omissions of NorthWestern's former senior management team with respect to Original 2002 Quarterly Financials and the Transfer are imputed to NorthWestern as a matter of law. Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 358-360 (3d Cir. 2001).

9.    Plaintiffs are entitled to an evidentiary inference from Kipp Orme's invocation at deposition of his Fifth Amendment right against self-incrimination that the answers to the questions he refused to answer would be favorable to plaintiffs' case. Rad Servs., Inc. v. Aetna Cas. and Sur. Co., 808 F.2d 271 (3d Cir. 1986); Brink's Inc. v. City of New York, 717 F.2d 700 (2d Cir. 1983). As Mr. Orme is not a party to this action, his Fifth Amendment concerns are implicated "to an even lesser degree" then when a party to a civil litigation has invoked the right. Rad Servs., 808 F.2d at 275. The presence of corroborating evidence is not necessary in order for an inference to be drawn from the assertion of the privilege by a non-party. Id.; Brink's Inc. v. City of New York, 717 F.2d 700, 710 (2d Cir.1983); Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509 (8th Cir.1984); Federal Deposit Ins. Corp. v. Fidelity & Deposit Co., 45 F.3d 969 (5th Cir.1995); LiButti v. U.S., 107 F.3d 110, 121 (2nd Cir. 1997).

10.   The Third Circuit has expressly held that the rule from Rochford v. New York Fruit Auction Corp., 116 F.2d 584, 585 (2d Cir. 1940), which requires a "knowledge of insolvency and a present intent not to pay" on the part of the defendant, only applies when the plaintiff "has not alleged that [the defendant] materially

4

misrepresented its financial position." In re Paragon Sec. Co., 589 F.2d 1240, 1244 (3d Cir. 1978).

11.    Plaintiffs are not required to negate affirmative defenses in their complaint and were thus not required to set forth in any detail in their pleadings the evidence demonstrating that the purported release of Clark Fork is invalid because tainted with fraud. Flight Sys., Inc. v. Elec. Data Sys. Corp., 112 F.3d 124, 127-29 (3d Cir. 1997); see also In re Bayou Group, 362 B.R. 624, 638-39 (Bankr. S.D.N.Y. 2007). NorthWestern has waived any argument that plaintiffs have not pled fraud with the requisite particularity. Huff v. Nationwide Ins. Co., 167 B.R. 53, 58 n.4 (W.D. Pa. 1992), aff'd, 989 F.2d 487 (3d Cir. 1993) (table case); Todaro v. Orbit Int'l Travel, Ltd., 755 F. Supp. 1229, 1234 (S.D.N.Y. 1991).

12.    Defendants cannot avoid liability on proximate causation grounds when it is clear that their misconduct deprived plaintiffs of an opportunity to take action to protect their interests, even if it is necessarily uncertain whether the lost opportunity would have resulted in success. Aasheim v. Humberger, 695 P.2d 824, 826-28 (Mont. 1985); Kilduff v. Adams, Inc., 593 A.2d 478, 482 (Conn. 1991).

13.    Reliance need not be directly proven to establish causation when a defendant has committed fraud by material omission, as long as the fraudulently omitted information would have been material to the relevant decisionmaker. Affiliated Ute

5

Citizens v. United States, 406 U.S. 128, 153-54 (1972); Sharp v. Coopers & Lybrand, 649 F.2d 175, 187 (3rd Cir. 1981).

14.    Defendants are presumed to intend the natural and foreseeable consequences of their acts and omissions. In re Americana Servs., Inc., 175 B.R. 1018, 1022 (W.D. Mo. 1994); In re Virginia Hall, 109 B.R. 149, 155 (W.D. Pa. 1990); NLRB v. Local 542, 542-A, and 542-B, Int'l Union of Operating Eng'rs, 485 F.2d 387, 392 (3d Cir. 1973).

15.    "The doctrine of unjust enrichment is an equitable means of preventing one party from benefiting by his or her wrongful acts." Albinger v. Harris, 48 P.3d 711, 716 (Mont. 2002). There must be "a showing of misconduct or fault to recover" under a theory of unjust enrichment. Id. "The theory of unjust enrichment requires that a person who has been unjustly enriched at the expense of another must make restitution to the other." Robertus v. Candee, 670 P.2d 540, 542 (Mont. 1983).

16.    A claim for unjust enrichment will survive notwithstanding the existence of an express contract between the parties where the conduct that is the subject of the claim is not governed exclusively by the contract. Cantor Fitzgerald, L.P. v. Cantor, No. C.A. 16297, 1998 WL 326686, at *6 (Del. Ch. June 16, 1998).

17.    Any alleged collateral estoppel effect from a trial court decision in separate state court litigation between Magten and The Bank of New York (a decision which is not final because it is the subject of a pending appeal) can have no application to the

6

claims of Law Debenture, which was not a party to that separate litigation and did not

have any ability to control Magten's litigation strategy in that action. Baker by Thomas

v. General Motors Corp., 522 U.S. 222, 238 n. 11 (1998); Montana v. United States, 440

U.S. 147, 155 (1979) (applying exception to general rule of no preclusive effect when

non-party to first litigation had "exercised control" over party's conduct of that

litigation); Monsour Medical Center v. Heckler, 806 F.2d 1185, 1195-96 (applying

Montana standard).

18.     An otherwise enforceable contract allocating attorneys' fees (here, the

provisions of the Indenture and other documents requiring NorthWestern to pay Law

Debenture's fees) is allowable in bankruptcy. Travelers Casualty & Surety Co. v. Pacific

Gas & Elec. Co., 127 S. Ct. 1199 (2007).

19.     Service as officer of an LLC gives rise to a fiduciary relationship. Ryckman

v. Wildwood, Inc., 641 P.2d 467, 471 (Mont. 1982).

20.     Officers are not insulated from liability for ordinary negligence when their

actions were influenced by a conflict of interest. Mont. Code Ann. 35-1-452, 35-1-457

(1991).

21.     When a wholly-owned subsidiary is insolvent or in the zone of insolvency,

its officers' fiduciary duties require them to consider whether or not to follow the

directives of the controlling parent. See, e.g., Scott Acquisition Corp. v. Morris (In re

Scott Acquisition Corp.), 344 B.R. 283, 289-90 (Bankr. D. Del. 2006); Roselink

Investors, L.L.C. v. Shenkman, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004); In re

Teleglobe Commc'ns Corp., 493 F.3d 345, 367 (3d Cir. 2007); RSL COM Primecall, Inc.

v. Beckoff (In re RSL COM Primecall, Inc.), No. 01-11457, 2003 Bankr. LEXIS 1635, at

*44 (Bankr. S.D.N.Y. Dec. 11, 2003).

     22.     Fiduciaries must take affirmative action reasonable under the circumstances

to inform themselves before making decisions.  Cede & Co. v. Technicolor, Inc., 634

A.2d 345, 367 (Del. 1993); Smith v. Van Gorkum, 488 A.2d 858, 872-73 (Del. 1985);

Potter v. Pohlad, 560 N.W.2d 389, 392 (Minn. Ct. App. 1997); Brane v. Roth, 590

N.E.2d 587, 592 (Ind. Ct. App. 1st Dist. 1992).  For officers, this duty is heightened in

the context of major transactions.  Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946,

954 (Del. 1985).

     23.     A breach of fiduciary duty can be sufficiently established without expert

testimony as part of the plaintiff's prima facie case. D'Addario v. Geller, No. 04-1687,

2005 WL 428779, at *6 (4th Cir. Feb. 24, 2005); Hoagland v. Sandberg, Phoenix & Van

Gontard, P.C., 385 F.3d 737, 743-44 (7th Cir. 2004).

     24.     An alleged "superseding, intervening event" relied upon to "cut off

defendant's liability" must have been "unforeseeable." Whiting v. State, 810 P.2d 1177,

1183 (Mont. 1991). "A defendant may not, however, introduce such non-party conduct

in an attempt to merely diminish its own responsibility." Faulconbridge v. State, 142

P.3d 777, 792 (Mont. 2006).

8

25.    Compensatory damages in property damage cases are to be determined with reference to the market value of the damaged property at the time it was injured, not the time it was purchased by the plaintiff. Chandler v. Madsen, 642 P.2d 1028 (Mont. 1982).

26.    A plaintiff in a property damage case has a duty to take reasonable steps to avoid further damage to the property. Town Pump, Inc. v. Diteman, 622 P.2d 212, 215 (Mont. 1981).

27.    Punitive damages are available in breach of fiduciary duty cases when the finder of fact finds, by clear and convincing evidence, that the defendant acted with actual fraud or actual malice. Mont. Code § 27-1-221(1), (5), (6).

28.    The purpose of punitive damages is to set an example and punish the wrongdoer. Finstad v. W.R. Grace & Co.-Conn., 8 P.3d 778, 782 (Mont. 2000).

29.    Prejudgment interest is available for tort claims. Schuff v. A.T. Klemens & Son, 16 P.3d 1002, 1027 (Mont. 2000). A party may receive prejudgment interest if the evidence establishes (i) an underlying monetary obligation; (ii) the amount of the recovery, which must be certain or be capable of being made certain by calculation; and (iii) the right to recover, which must vest on a particular day. LHC, Inc. v. Alvarez, 160 P.3d 502, 506 (Mont. 2007). Furthermore, the fact that a claim is disputed does not by itself make it uncertain as long as it can be certain on a specific day. Id; see also Safeco Ins. Co. v. Lovely Agency, 697 P.2d 1354, 1357 (Mont. 1985).

9

30.    A plaintiff whose lawsuit provides relief similar to that provided by a derivative suit because he is effectively representing a larger group of investors may be entitled to an award of attorneys' fees even when the suit is not technically a derivative suit.  Tandycrafts, Inc. v. Initio Partners, 562 A.2d 1162, 1166-67 (Del. 1989).

31.    A prevailing plaintiff in a derivative action brought on behalf of an LLC is entitled to an award of attorneys' fees.  Mont. Code § 35-8-1104(4).

10