# EXHIBIT 1

# SEALED DOCUMENT

# EXHIBIT 2

MAGTEN ASSET VS. NORTHWESTERN CORP

STEPHEN J SCHERF - 1/9/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 5

(1)      P R O C E E D I N G S
(2)          * * * *
(3)          (Whereupon an engagement letter was
(4)      marked as Scherf Exhibit 1 for
(5)      identification, as of this date.)
(6)  S T E P H E N   J.   S C H E R F,
(7)      having been first duly sworn by the
(8)      Notary Public, was examined and
(9)      testified as follows:
(10)
(11)  EXAMINATION BY
(12)  MS. STEINGART:
(13)      Q.   Mr. Scherf, could you look at
(14)  Exhibit number 1 and describe it for the
(15)  record, what it is, please?
(16)      A.   Exhibit number 1 is a copy of my
(17)  engagement letter in this matter.
(18)      Q.   Is this a letter typical of the
(19)  engagement letters that you use when you are
(20)  retained to do the expert testimony?
(21)      A.   Yes, it is.
(22)      Q.   Is there a place in the letter where
(23)  you indicate what you intend to opine on?
(24)      A.   There is a section in the document
(25)  that talks about our understanding of the role

Page 6

(1)
(2)  as well as the services that we expect to
(3)  provide.
(4)          Since it's an engagement letter, I
(5)  obviously haven't looked at documents at this
(6)  point in time, so I don't know what my opinions
(7)  are going to be at the time that the engagement
(8)  letter is issued.
(9)      Q.   In the portion of the letter on the
(10)  front page where it is called, "Understanding
(11)  of Our Role," the second sentence, I think,
(12)  says, "You have requested our assistance in
(13)  analyzing the transaction and the information
(14)  that was available to Hanson and Kindt prior to
(15)  the 'going flat' transaction in order to
(16)  determine what Hanson or Kindt knew or should
(17)  have known concerning the financial condition
(18)  of NorthWestern before or at the time of the
(19)  transfer."
(20)          Do you see that?
(21)      A.   Yes.
(22)      Q.   Do you understand that you were
(23)  being asked to ascertain whether you could give
(24)  an expert opinion with respect to that matter?
(25)      A.   I was retained to look at documents

Page 7

(1)
(2)  and analyze those documents to determine what a
(3)  reasonable person would be expected to glean
(4)  from those financial documents.
(5)      Q.   The next sentence indicates,
(6)  "Furthermore, you have asked us to provide our
(7)  observations concerning the reports prepared by
(8)  Paul Marcus of Huron Consulting and Robert
(9)  Berliner of Marks Paneth & Shron, LLP."
(10)          Do you see that?
(11)      A.   Yes.
(12)      Q.   What does the word "observations"
(13)  mean there?
(14)      A.   It's exactly what it means. It's —
(15)  I read the report. I see if the report makes
(16)  sense. I have observations with respect to the
(17)  report, and I was asked to comment and analyze
(18)  the reports and the conclusions drawn therein.
(19)      Q.   So you can make observations about
(20)  them?
(21)      A.   Well, so that I could analyze the
(22)  reports. That's typically the language that I
(23)  use. I make observations about other people's
(24)  reports.
(25)      Q.   Are observations opinions?

Page 8

(1)
(2)      A.   Yes, they turn to opinions. Yes,
(3)  they do. In my report that I guess we will get
(4)  to at some point in time today, I do express
(5)  certain opinions as to the opinions that were
(6)  expressed by Mr. Marcus and Mr. Berliner.
(7)          MS. STEINGART:  I'll give you 2 and
(8)      3 together, and then I will ask you about
(9)      them.
(10)          (Whereupon an invoice dated
(11)      October 23, 2007 was marked as Scherf
(12)      Exhibit 2 for identification, as of this
(13)      date.)
(14)          (Whereupon an invoice dated
(15)      November 13, 2007 was marked as Scherf
(16)      Exhibit 3 for identification, as of this
(17)      date.)
(18)          MR. KALECZYC:  Which is marked as 2,
(19)      Bonnie?
(20)          MS. STEINGART:  2 is the one you
(21)      just received, October 23rd invoice. 3 is
(22)      the one that is dated thereafter.
(23)      Q.   Sir, could you identify what I
(24)  handed to you as marked as Exhibits 2 and
(25)  Exhibits 3?

MAGTEN ASSET

BSA XMAX(11/11)
STEPHEN J SCHERF - 1/9/08

VS. NORTHWESTERN CORP

---

Page 41

(1)
(2)     for identification, as of this date.)
(3)     Q.   I'll show you what has been marked
(4)     as Exhibit 8 and ask if you could take your
(5)     time and look at it, and then just describe
(6)     what it is for the record.
(7)     A.   Exhibit 8 is a copy of my report in
(8)     this matter.
(9)     Q.   Is Exhibit A to your report a copy
(10)    of your resume?
(11)    A.   It is a copy of my CV and Federal
(12)    Rule 26 disclosures.
(13)    Q.   Did you review Exhibit A before its
(14)    inclusion in the report?
(15)    A.   At some point in time I did, yes.
(16)    Q.   And is it accurate in all respects,
(17)    as far as you know?
(18)    A.   As best as I could tell, yes.
(19)    Q.   Are you employed at this time?
(20)    A.   Yes.
(21)    Q.   And who do you work for?
(22)    A.   Executive Sounding Board Associates.
(23)    Q.   How long have you worked for
(24)    Executive Sounding Board Associates?
(25)    A.   I worked for them since October of

---

Page 42

(1)
(2)     2006.
(3)     Q.   What position did you have when you
(4)     joined Executive Sounding Board Associates in
(5)     October 2006?
(6)     A.   Managing director.
(7)     Q.   That's the same position, sir, you
(8)     hold today?
(9)     A.   That's correct.
(10)    Q.   Can you describe for me your
(11)    employment history beginning with graduation
(12)    from college? And I only ask that because I
(13)    don't have that as part of your resume, so I'm
(14)    sorry to take up the time but it's not here, so
(15)    I'm going to cover it.
(16)    A.   Sure, that's fine. I graduated from
(17)    college in December of 1980, and then at that
(18)    point in time I worked for the accounting firm
(19)    of Peat Marwick Mitchell & Company, now changed
(20)    its names for a merger, et cetera, to KPMG.
(21)         I left Peat Marwick in April of
(22)    2000 -- April of 1983, I believe.
(23)    Q.   What positions did you have while
(24)    you were at Peat Marwick?
(25)    A.   Assistant accountant, staff

---

Page 43

(1)
(2)     accountant, senior accountant.
(3)         I left that organization to join a
(4)     thrift organization -- no, I left that
(5)     organization to join IU International, which is
(6)     a diversified services company where I was a
(7)     senior accountant in their SEC reporting
(8)     department. I then moved to Horizon Financial.
(9)     Q.   How long were you at IU, sir?
(10)    A.   About six or nine months.
(11)    Q.   And then Verizon?
(12)    A.   Horizon -- do you want me to spell
(13)    that?
(14)    Q.   Horizon International?
(15)    A.   Horizon Financial.
(16)    Q.   Thank you.
(17)    A.   I was there for approximately five
(18)    years. I started out as a manager overseeing
(19)    their real estate functions. I was promoted to
(20)    vice president of special projects and became a senior
(21)    vice president of special projects and became
(22)    senior vice president of their loan workout
(23)    functions, their human resources, their
(24)    purchasing functions, et cetera.
(25)         I left there to become the chief

---

Page 44

(1)
(2)     financial officer of Emery Hill Management
(3)     Company. Subsequent to that I was the chief
(4)     financial officer of St. John Holdings.
(5)     Q.   When did you leave Emery?
(6)     A.   In 1992, I believe, somewhere
(7)     approximately at that point in time.
(8)     Q.   So is it your recollection that you
(9)     were at Emery between '89 and '92?
(10)    A.   That's probably right.
(11)    Q.   Approximately?
(12)    A.   Right.
(13)    Q.   And St. John Holding in 1992?
(14)    A.   Correct. I was there through 1995.
(15)    Q.   During that entire period you were
(16)    the CFO, sir?
(17)    A.   Yes.
(18)    Q.   Was that a public company?
(19)    A.   No, it was an employee-owned
(20)    investment company.
(21)    Q.   And after 1995?
(22)    A.   I joined the firm of Miller Coffey
(23)    Tate.
(24)    Q.   What position did you hold there?
(25)    A.   Principal.

---

Page 45

(1)
(2) **Q.** And in 19 —
(3) **A.** That was 1995. 1998 I joined the
(4) firm of Parente, Parent with an E on the end,
(5) R-A-N-D-O-L-P-H.
(6) **Q.** But you were at Miller Coffey —
(7) **A.** For approximately three years.
(8) **Q.** And in 1998, Parente Randolph, and
(9) what position did you have there?
(10) **A.** I was a principal of the firm, and
(11) then I stayed there until I joined Executive
(12) Sounding Board in October of 2006.
(13) **Q.** At Peat Marwick, what kind of
(14) accounting work did you do?
(15) **A.** I was in the audit department.
(16) **Q.** What kind of companies did you
(17) audit?
(18) **A.** I audited a various group of
(19) companies, financial services, real estate,
(20) manufacturing companies. I did pension plans.
(21) I did -- a broad range of companies that I had
(22) worked for or did audits of.
(23) **Q.** Was the audit work you did used in
(24) connection with SEC reporting?
(25) **A.** Some were and some were not.

Page 46

(1)
(2) **Q.** At IU International you were the
(3) senior accountant, and what did you do in that
(4) capacity?
(5) **A.** I was in their SEC reporting
(6) department. So what I did was I prepared
(7) financials and disclosures and all the
(8) information that went into the 10-K's, 10-Q's
(9) or any S1 filings that we had at that point in
(10) time.
(11) **Q.** And then at Emery Hill you were the
(12) CFO, and you said that was a private company?
(13) **A.** That was a privately held real
(14) estate developer with approximately 8 million
(15) square feet in the Pennsylvania, New Jersey,
(16) Delaware, Maryland marketplaces.
(17) **Q.** And there were you on the business
(18) side as opposed to the accounting side, or did
(19) you sort of do both?
(20) **A.** I was the CFO. I had a controller
(21) who reported to me who did the accounting.
(22) Most of my time at that point in time was on
(23) the finance side.
(24) **Q.** At St. John Holding was the same
(25) true?

Page 47

(1)
(2) **A.** Yes. I had accounting people report
(3) to me who did the day-to-day operations of the
(4) accounting, and then most of my time was spent
(5) on the finance side of the business.
(6) **Q.** What kind of business was St. John's
(7) in?
(8) **A.** St. John's was an employee-owned
(9) investment company. It was an ESOP owned by
(10) the employees, and we made investments. Most
(11) of my time was looking at potential acquisition
(12) type deals.
(13) **Q.** Did you function there more on the
(14) audit side or on the business side?
(15) **A.** More at St. John's on the business
(16) side.
(17) **Q.** And at Horizon?
(18) **A.** At Horizon, it depended what
(19) position I was in. At one point in time I ran
(20) the finance department for the organization,
(21) and there I was responsible for all of the
(22) operations with respect to closing the books
(23) and the financial statements, overseeing the
(24) audit function, et cetera.
(25)     Later on I moved more into an

Page 48

(1)
(2) operational role where I was in charge of their
(3) real estate joint ventures, their troubled
(4) loans that they had and certain other
(5) administrative areas of the bank such as human
(6) resources, purchasing, those type of functions.
(7) **Q.** At Miller Coffey you were a
(8) principal. What kind of business were they in?
(9) **A.** They are an accounting consulting
(10) firm.
(11) **Q.** And what kind of activities did you
(12) engage while you were there?
(13) **A.** I did some audit work, some tax
(14) work, but the majority of my work was forensic
(15) litigation support, dispute-related work. I
(16) also did some valuation work there as well.
(17) **Q.** At Parente Randolph?
(18) **A.** At Parente Randolph, initially
(19) joined their business or reorganization group
(20) and moved over into the forensic and litigation
(21) services group.
(22) **Q.** In the forensic group while at
(23) Parente, what did you do there?
(24) **A.** I did exactly what I do at Executive
(25) Sounding Board in that I assisted clients in

MAGTEN ASSET

BSA XMAX(13/13)
STEPHEN J SCHERF - 1/9/08

VS. NORTHWESTERN CORP

---

Page 49

(1)
(2) forensic investigations of various sorts. I at
(3) various points in time was employed as the
(4) accountant to the trustee on certain matters.
(5) I also analyzed commercial litigation matters
(6) and then prepared valuation work.
(7)  Q.  When you give -- prepare an expert
(8) report such as the one that is marked as
(9) Exhibit 8, do you consider that to be forensic
(10) work or do you consider that to be a separate
(11) aspect of your work, that is expert testimony
(12) or --
(13)  A.  No, that is forensic work.
(14)  Q.  So during the time that you were at
(15) Parente Randolph, did your forensic work
(16) involve giving expert testimony?
(17)  A.  Yes, at various points in time it
(18) did.
(19)  Q.  Did that make up the bulk of the
(20) forensic work that you did?
(21)  A.  No, the bulk of the work that I did
(22) while I was at -- well, it changed from year to
(23) year, but typically, you know, if you look at
(24) the Rule 26 disclosures, I end up testifying
(25) about six to eight times, maybe ten times a

---

Page 50

(1)
(2) year, depending.
(3)    Most of the work is just straight
(4) analysis work or valuation work or work for a
(5) trustee in some type of matter.
(6)  Q.  Your resume indicates in employment
(7) experience that you testified on numerous
(8) occasions in arbitrations, depositions and
(9) Federal Court.
(10)    Is that meant to say that you
(11) testified as an expert on numerous occasions?
(12)  A.  Yes.
(13)  Q.  And during -- is each of the
(14) testimony that you have listed in this appendix
(15) testimony you gave as an expert?
(16)  A.  Yes.
(17)  Q.  Let's just look at the initials that
(18) follow your name, because you have a lot of
(19) them, and I want to make sure we know what
(20) every one of them stands for.
(21)    CPA/ABV, what does that mean?
(22)  A.  I'm a certified public accountant.
(23) I also hold an accredited and business
(24) valuation business designation by the American
(25) Institute of Certified Public Accountants.

---

Page 51

(1)
(2)  Q.  When did you receive those
(3) designations?
(4)  A.  The CPA exam I passed in 1980. I
(5) received a designation in 1983 after obtaining
(6) my experience requirements.
(7)    The ABV exam, I passed that exam on
(8) the first time it was offered, and I forget the
(9) year that it was offered but I don't remember,
(10) so whenever they offered that credential, I
(11) took the exam. I had the experience
(12) requirements and obtained that credential.
(13)  Q.  CFE?
(14)  A.  Certified fraud examiner.
(15)  Q.  When did you receive that
(16) certification?
(17)  A.  I believe 1995 or thereabouts.
(18)  Q.  Who awards that certification?
(19)  A.  The Association of Certified Fraud
(20) Examiners.
(21)  Q.  CICA?
(22)  A.  Certified internal controls auditor.
(23)  Q.  When did you receive that
(24) designation?
(25)  A.  I don't recall. Sometime between --

---

Page 52

(1)
(2) sometime in the last ten years.
(3)  Q.  And who provides that?
(4)  A.  The Institute for Internal Controls.
(5)  Q.  CIRA?
(6)  A.  The certified insolvency
(7) restructuring advisor bestowed by the
(8) Association of the Certified -- the Association
(9) of Restructuring Advisors. I forget the name,
(10) but actually, it's probably down here on the --
(11)  Q.  On the associations?
(12)  A.  On the Association of Insolvency and
(13) Restructuring Advisors.
(14)  Q.  When did you receive that
(15) designation?
(16)  A.  I received that designation in, I
(17) believe 2005. I was awarded the gold medal for
(18) the exam that year.
(19)  Q.  And CRFA?
(20)  A.  Certified forensic accountant.
(21)  Q.  Who provides that designation?
(22)  A.  That is the American College Board
(23) of Forensic Examiners.
(24)  Q.  And CVA?
(25)  A.  Certified valuation analyst.

---

Page 69

(1)
(2) motions.
(3)   Q.   Were you asked to participate in the
(4) preparation of that motion?
(5)   A.   No, other than I prepared an
(6) affidavit that was filed with respect to that.
(7) So I was asked to --
(8)   Q.   Sign it?
(9)   A.   I was asked to review and prepare
(10) and sign the affidavit that I did.
(11)   Q.   There is an indication at the bottom
(12) of page 3 that when you testify at trial, you
(13) may illustrate your testimony with
(14) demonstrative aids.
(15)       Have you begun work on any of those
(16) demonstrative aids?
(17)   A.   No, I have not.
(18)   Q.   Have you discussed them with
(19) counsel?
(20)   A.   No.
(21)   Q.   The beginning of page 4 indicates
(22) that the analysis or your analysis was based on
(23) documentation listed in Exhibit B.
(24)   A.   Correct.
(25)   Q.   Do you see that?

Page 70

(1)
(2)   A.   Yes.
(3)   Q.   And that the documents and
(4) information utilized are the types of documents
(5) and information experts in your field typically
(6) rely upon?
(7)   A.   Correct.
(8)   Q.   What field are you referencing
(9) there?
(10)   A.   Well, the field of my expertise,
(11) which includes in this report
(12) accounting-related matters, analysis of
(13) financial statements, analysis of documents and
(14) their financial implications as well as certain
(15) valuation matters. I think that's kind of
(16) where most of the opinions go, but essentially
(17) what the statement says is that these documents
(18) that I looked at are typical documents that
(19) someone performing this type of analysis would
(20) look at.
(21)   Q.   Now, on page 4 there is a section
(22) entitled, "Analysis." Do you see that?
(23)   A.   Yes.
(24)   Q.   Can you tell me what the purpose of
(25) this section is?

Page 71

(1)
(2)   A.   This section of the report, which is
(3) the bulk of the report, provides an analysis of
(4) what I did, a discussion of the analysis that I
(5) performed in this matter.
(6)   Q.   When you say that it's a discussion
(7) of the analysis that you performed, is there
(8) some other section of the report that contains
(9) your opinions?
(10)   A.   Well, there is a summary section of
(11) the report called, "Conclusion," that
(12) highlights the opinions that are expressed and
(13) kind of tries to put those in a succinct
(14) manner, but the analysis, there are, as you
(15) will, sub conclusions with respect to various
(16) pieces of the analysis that are included in the
(17) analysis. So both part and parcel, the
(18) analysis and the conclusions formulate my
(19) opinion in this matter.
(20)       MS. STEINGART:  Can you read back
(21)   the answer?  I'll read it from the screen.
(22)   Q.   Are things that you call sub
(23) conclusions opinions?
(24)   A.   Yes.
(25)   Q.   Could you point me to the page that

Page 72

(1)
(2) has the conclusions on it?
(3)   A.   Yes. The conclusions start at the
(4) bottom of page 35 and go on to 36. It is a
(5) summary, a succinct summary of the analysis
(6) while when you look at the analysis, there may
(7) be some conclusions, and I can give you an
(8) example if you want.
(9)   Q.   We will get there.
(10)   A.   Okay.
(11)   Q.   But the material that is contained
(12) under the caption, "Conclusion," on pages 35 to
(13) 36, do these constitute your opinions in this
(14) matter?
(15)   A.   Yes, they do. In addition to that,
(16) there are opinions in this matter encompassed
(17) in section 3 of the report, the analysis
(18) section.
(19)   Q.   You mean in section 3 and its
(20) various sub parts?
(21)   A.   Correct. Section 3 starts on page 4
(22) and goes through page 35 of the report.
(23)   Q.   And contained on those pages there
(24) are also -- there is also statements that you
(25) would regard as opinions?

Page 73

(1)
(2)    A.  Absolutely.
(3)    Q.  Well, okay. Let's start in the
(4) introduction to your analysis. Does the
(5) introduction to your analysis contain opinions?
(6)    A.  Yes, it does.
(7)    Q.  Tell me what the opinions are.
(8)    A.  Well, actually, that whole paragraph
(9) is an opinion. It kind of essentially provides
(10) background into what you're going to see
(11) following in the documents supported by the
(12) analysis.
(13)       So the sentence, part of the
(14) sentence that starts with, "Plaintiff has
(15) failed to establish," all the way through the
(16) word "relevant" with a period, I think is an
(17) opinion.
(18)    Q.  And the support for those opinions
(19) are contained in the various subsections of
(20) part 3 of your report?
(21)    A.  That's correct.
(22)    Q.  And those subsections, of course,
(23) make reference to the documents that you have
(24) listed at the end as well, correct?
(25)    A.  Yes, there are some of the documents

Page 74

(1)
(2) that are listed at the end that are referenced
(3) in section 3 of the report.
(4)    Q.  I didn't mean to -- when I asked you
(5) for support, I didn't mean to exclude documents
(6) that you relied on as support. I don't want to
(7) confuse you.
(8)       So the material on page 4 that would
(9) be under "Analysis" that begins with,
(10) "Plaintiff has failed to establish to
(11) relevant," is also a statement of your
(12) professional opinion in this matter, correct?
(13)    A.  Yes.
(14)    Q.  In portion -- in the first part of
(15) that you state on page 3, "Plaintiff has failed
(16) to establish the proper relationship between
(17) the loss that they have allegedly suffered and
(18) the alleged breach of fiduciary duty by Hanson
(19) or Kindt."
(20)       Do you see that?
(21)    A.  Yes.
(22)    Q.  is there legal analysis that is
(23) necessary in order for you to reach that
(24) conclusion?
(25)    A.  No.

Page 75

(1)
(2)    Q.  What is that conclusion based on?
(3)    A.  It's based on my analysis of the
(4) documents that are attached as Exhibit B to my
(5) report.
(6)    Q.  Did you make any analysis of what
(7) the plaintiffs were entitled to in the event of
(8) a default under the QUIPS documents?
(9)    A.  I don't understand the question.
(10)    Q.  Well, the plaintiffs here own QUIPS,
(11) correct?
(12)    A.  Correct. They do.
(13)    Q.  And you understand what a QUIP is,
(14) don't you?
(15)    A.  I believe you.
(16)    Q.  And the rights of QUIPS holders are
(17) set forth in some -- strike that.
(18)       Some of the rights of QUIPS holders
(19) are set forth in the indenture with respect to
(20) QUIPS, correct?
(21)    A.  Correct.
(22)    Q.  What does that indenture provide
(23) with respect to what QUIPS holders are entitled
(24) to in the event of a default on payment of
(25) principal or interest under the QUIPS?

Page 76

(1)
(2)    A.  Are you asking me for a legal
(3) conclusion?
(4)    Q.  No, I'm asking you for what your
(5) understanding is as to what they are entitled
(6) to.
(7)    A.  My understanding is that they are
(8) entitled to the amounts that are paid forth
(9) under the QUIP over to them. They get
(10) distributed through the trust.
(11)    Q.  Does the indenture provide for
(12) acceleration of the amounts due in the event of
(13) default?
(14)    A.  And you're asking me for a nonlegal
(15) opinion? My read of the indenture is that upon
(16) certain events such as a filing of the
(17) bankruptcy, those amounts become due and
(18) payable.
(19)    Q.  And did that constitute an element
(20) of your analysis of the proper relationship
(21) between the loss that plaintiff suffered and
(22) the alleged breach of fiduciary duty?
(23)    A.  That did, but if you look at my
(24) analysis, I explain that further on in the
(25) analysis about what the loss and the measure of

Page 77

(1)
(2) loss should be calculated.
(3)     Q.   Is it your opinion that that is
(4) irrelevant to calculation of the damages that
(5) are due to the QUIPS holders in this matter?
(6)     A.   What is irrelevant?
(7)     Q.   The acceleration provisions of the
(8) QUIPS documents.
(9)     A.   As I understand the complaint, the
(10) answer to that is yes.
(11)    Q.   Who explained the complaint to you?
(12)    A.   As I read it.
(13)    Q.   So that is your view of the
(14) complaint as a layman?
(15)    A.   That's my view of the complaint as a
(16) layman. Essentially the complaint sets up a
(17) "but for" analysis; but for the transfer, what
(18) is the damages? Essentially the analysis is
(19) what are the damages to the QUIPS holder as a
(20) result of the transfer.
(21)    Q.   The next sentence says, "Plaintiff
(22) has failed to properly account for the risks
(23) that they assumed in purchasing the QUIPS, has
(24) failed to properly analyze and calculate their
(25) damages, and has failed to show that Hanson

Page 78

(1)
(2) and/or Kindt knew or should have known about
(3) the financial misstatements of NorthWestern and
(4) its subsidiaries."
(5)         What is that conclusion premised
(6) upon?
(7)     A.   The analysis that is contained in
(8) the report.
(9)     Q.   And the same is true with the next
(10) sentence?
(11)    A.   It starts with, "Moreover"?
(12)    Q.   Yes.
(13)    A.   Yes, that's correct.
(14)    Q.   And the same thing is true with, "As
(15) a result"?
(16)    A.   Yes.
(17)    Q.   In section 3.1, can you tell me what
(18) material or what statements contained in
(19) section 3.1 are opinions?
(20)    A.   The first paragraph on page 7 -- do
(21) you want me to go sentence by sentence?
(22)    Q.   The paragraph that begins with,
(23) "Based upon."
(24)    A.   Do you want me to go sentence by
(25) sentence? I'm trying too figure out how you

Page 79

(1)
(2) would like me to do this.
(3)     Q.   I'm trying to understand exactly
(4) what opinions you're rendering in this matter,
(5) and I will explain my premise, because most
(6) experts have or other experts in this case have
(7) listed their opinions at the beginning and then
(8) have supporting documentation.
(9)         I'm trying to understand if there is
(10) a discrete place where you state your opinions
(11) so that I understand what they are or whether
(12) there are different aspects of your opinions
(13) that are scattered throughout the report.
(14)    A.   There are different aspects of my
(15) opinion that are scattered throughout the
(16) report.
(17)    Q.   Well, then we are going to need to
(18) know sentence by sentence which of the
(19) statements in the report you consider opinion
(20) as a result -- as opposed to either an
(21) observation or a analysis or an intermediate
(22) conclusion that leads up to an opinion.
(23)    A.   Well, okay. I guess in order to do
(24) that, because I don't want to mislead you, in
(25) order to do that, I think we need to -- you're

Page 80

(1)
(2) going to have to ask me sentence by sentence of
(3) the report whether it's a statement of fact or
(4) analysis. I think its pretty obvious by
(5) looking at the document to determine that, but
(6) if you're going to count on that, on me doing
(7) that, then we are going to have to do it a
(8) different way. It's going to take longer.
(9)         I guess I'm going to have to read
(10) the report and make a determination whether
(11) that sentence is part of a factual basis or
(12) part of an analysis or ultimately results in an
(13) opinion. I'm prepared to do that and more than
(14) happy to do that, but I think the report pretty
(15) much shows that -- for example, on page 5 and
(16) page 6 of the report I'm talking about
(17) documents that I reviewed, what those documents
(18) say. Then at the first sentence on page 7 it
(19) says, "Based on an analysis of that and other
(20) research we've determined that a transaction
(21) such as the NorthWestern acquisition could
(22) occur, and principal and interest under the
(23) QUIPS is not guaranteed."
(24)        In other words, it's a fact that is
(25) inherent in the transaction or the structure

MAGTEN ASSET

BSA XMAX(21/21)
STEPHEN J SCHERF - 1/9/08

VS. NORTHWESTERN CORP

## Page 81

(1)
(2) and so, therefore, that is part of my opinion,
(3) but there may be, because I went through this
(4) quickly, a section or one sentence on page 5 or
(5) 6 that contains an opinion, and if we don't do
(6) it sentence by sentence, I'm not going to tell
(7) you that I got all of them.
(8)     So I'm trying to help you out and
(9) trying to make this as efficient as possible
(10) for you, but at the same point in time, I don't
(11) want to misinform you if I jump and miss a
(12) statement that I believe is an opinion. So
(13) however you would like to do it.
(14)     Q.   Well, my view is I would do it
(15) section by section, because we are entitled to
(16) know what your opinions are. I'm entitled to
(17) not to guess what your opinions are as
(18) opposed to conclusions you reach on the way to
(19) having an opinion. So we are going to have to
(20) do it section by section.
(21)     A.   That's fine.
(22)     Q.   And then we are going to have to go
(23) back and talk about your opinions, unless you
(24) want to tell me that your opinions, the
(25) opinions that you are rendering in this matter

## Page 82

(1)
(2) as an expert are, in fact, the material that is
(3) contained in the conclusion that you pointed
(4) out and in the beginning of the piece on
(5) section 3 and that the analysis is merely that,
(6) that it's analysis.
(7)     A.   No, I can't do that, because that's
(8) not how the report works. Sorry about that.
(9)     Q.   The issue here is what your opinions
(10) are. So it's your testimony that -- now we are
(11) on page 7 -- that based upon our analysis of
(12) the offering memorandum and other research on
(13) QUIPS, a transaction such as the NorthWestern
(14) energy acquisition could occur, and principal,
(15) interest under the QUIPS was not guaranteed;
(16) that is an opinion?
(17)     A.   Right.
(18)     Q.   And is this opinion based on any
(19) legal analysis?
(20)     A.   No.
(21)     Q.   By NorthWestern Energy acquisition,
(22) what are you referring to?
(23)     A.   The NorthWestern Energy acquisition
(24) was the acquisition of the Montana Power assets
(25) that ultimately resulted in NorthWestern owning

## Page 83

(1)
(2) the Montana power assets as a division rather
(3) than as a separate LLC.
(4)     Q.   So this refers to the acquisition by
(5) NorthWestern that occurred in February of 2002,
(6) correct?
(7)     MR. KALECZYC:   Objection.
(8) Mischaracterizes the evidence.
(9)     A.   No, I said it included -- I view the
(10) transaction, and the report states that I view
(11) the transaction as one transaction, but I refer
(12) to it here as both the transaction in February
(13) and the transaction in November.
(14)     Q.   So when you say Montana Power,
(15) Montana -- when you say NorthWestern Energy
(16) acquisition, you mean the February 2nd
(17) transaction and the going-flat transaction?
(18)     A.   The February and November. November
(19) is the November 15th. I don't recall exactly.
(20) I guess maybe it's in the report as to what day
(21) in February, but if you say it's February 2nd,
(22) then I will agree that that is the case.
(23)     Q.   We will talk about February 2002 and
(24) November 2002. How is that?
(25)     A.   That's fine.

## Page 84

(1)
(2)     Q.   But when you refer to this term,
(3) "NorthWestern Energy acquisition," you refer to
(4) what occurred of February of 2002 as well as
(5) what occurred in November of 2002; is that
(6) fair?
(7)     A.   That's correct.
(8)     The next sentence is also an opinion
(9) that QUIPS was also subject to the same risks
(10) associated with Montana Power.
(11)     Q.   When you say, "Montana Power," what
(12) are you referring to?
(13)     A.   That is the original Montana Power
(14) assets. It's -- essentially I have defined
(15) Montana Power on page 2 of the report as the
(16) Montana Power Company, which is what was
(17) acquired by NorthWestern Energy in the
(18) transaction.
(19)     The next sentence is a sub analysis
(20) of that giving where I say that the subject is
(21) to the same risks associated with Montana
(22) Power. I then go on and provide examples of
(23) those risks. So that's --
(24)     Q.   But they are not opinions, are they,
(25) that sentence, "These risks include but are not

MAGTEN ASSET

**BSA XMAX(24/24)**

STEPHEN J SCHERF - 1/9/08

VS. NORTHWESTERN CORP

Page 93

(1)
(2)    **Q.**   What does that have to do with this
(3)   litigation?
(4)    **A.   What does it have to do with --**
(5)    **Q.**   Yes. What does this have to do with
(6)   this litigation? Are you saying that somehow
(7)   that these lists of risks that you have here
(8)   are relevant to whether Mr. Hanson or Mr. Kindt
(9)   breached their duties?
(10)    **A.   No.**
(11)    **Q.**   Are you saying that this list of
(12)   risks right here are relevant to whether
(13)   Mr. Hanson or Mr. Kindt knew that there was a
(14)   far-reaching fraud at NorthWestern?
(15)          **MR. BARTLEY:** Objection.
(16)    **A.   No.**
(17)    **Q.**   Getting past the paragraph that
(18)   we've just discussed, is there anything else in
(19)   section 3.1 that you regard as an opinion,
(20)   starting with the paragraph, "Subsequent"?
(21)    **A.   I believe that based on our**
(22)   **discussion, the last two sentences of that**
(23)   **section on page 8 could be viewed as an**
(24)   **opinion.**
(25)    **Q.**   As noted previously, I'm sorry --

Page 94

(1)
(2)    **A.   No.**
(3)    **Q.**   I'm sorry. Are you on the next
(4)   page?
(5)    **A.   "Given the timing of Magten's**
(6)   **purchases of the QUIPS, it is clear they were**
(7)   **aware of the risks inherent in this investment.**
(8)   **We understand that any plaintiff has a duty to**
(9)   **mitigate its damages; Magten's continuing**
(10)   **purchases of the QUIPS does not appear**
(11)   **consistent with that duty."**
(12)    **Q.**   So when you say you understand
(13)   something, you are expressing an opinion?
(14)    **A.   No, but it is part of the sentence**
(15)   **that is part of the opinion. If you want me to**
(16)   **dissect the sentence, I can do that.**
(17)    **Q.**   I'm trying to understand what your
(18)   opinion is as opposed to something you were
(19)   informed about.
(20)          My understanding reading the
(21)   sentence, "We understand that any plaintiff has
(22)   a duty to mitigate," did counsel tell you that?
(23)    **A.   Yes.**
(24)    **Q.**   And you accepted that?
(25)    **A.   That is my basic understanding from**

Page 95

(1)
(2)   **doing this type of work. I do have an opinion**
(3)   **that Magten's continuing purchases of the QUIPS**
(4)   **does not appear consistent with that duty, and**
(5)   **the sentence before that, "Given the timing of**
(6)   **Magten's purchases of the QUIPS, it is clear**
(7)   **that they were aware of the risks inherent in**
(8)   **this investment."**
(9)    **Q.**   And those are opinions, and the
(10)   basis for the "Giving the timing" opinion is
(11)   just the timing, right?
(12)          Other than the timing, do you have
(13)   any other knowledge that Magten was aware or
(14)   any other -- strike that.
(15)          Other than timing, do you have any
(16)   other basis for concluding that Magten was
(17)   aware of the risks inherent in this investment?
(18)    **A.   No, because I don't know whether**
(19)   **they conducted adequate due diligence in their**
(20)   **investment.**
(21)    **Q.**   What expertise are you calling upon
(22)   in order to provide an opinion that given the
(23)   timing, it is clear they were aware of the
(24)   risks inherent in this investment? What do you
(25)   need to be an expert on to make that opinion?

Page 96

(1)
(2)   Do you need to be an accounting expert to make
(3)   that opinion?
(4)    **A.   Well, it's based upon my financial**
(5)   **background and accounting background.**
(6)    **Q.**   Is it your opinion that someone
(7)   without financial or an accounting background
(8)   could understand that?
(9)    **A.   Maybe they could.**
(10)    **Q.**   Let's look at 3.2, and let's talk
(11)   about what statements in this section are
(12)   opinions.
(13)    **A.   I believe you may consider, although**
(14)   **I think it's a statement of fact, the first**
(15)   **sentence of paragraph 2 as an opinion.**
(16)    **Q.**   Well, my issue is whether you
(17)   consider it to be an opinion.
(18)    **A.   No.**
(19)    **Q.**   This isn't my report. This is not
(20)   my report.
(21)    **A.   I believe that's a statement of**
(22)   **fact.**
(23)    **Q.**   And if the fact is wrong, there are
(24)   consequences, correct?
(25)          **MR. KALECZYC:** Objection.

MAGTEN ASSET

**BSA XMAX(25/25)**
STEPHEN J SCHERF - 1/9/08

VS. NORTHWESTERN CORP

Page 97

(1)
(2)    Q.   If that fact is incorrect, then
(3)   there are consequences with respect to other
(4)   opinions you render, right?
(5)        MR. KALECZYC:  Objection.
(6)    A.   No.
(7)    Q.   If that fact is incorrect, it has no
(8)   consequence with respect to anything else you
(9)   say in the report, correct?
(10)    A.   In an overall basis, the answer to
(11)   that is correct.
(12)    Q.   So given that, do you regard this as
(13)   an opinion? It's your report. It's not my
(14)   report.
(15)    A.   I believe that it is a statement of
(16)   fact, but I don't want to — I'm trying to help
(17)   you because of how you're trying to go through
(18)   the report, and I'm trying to be helpful. I'm
(19)   just pointing out that I think it's a statement
(20)   of fact. You may disagree with that, but I'm
(21)   just trying to cover the bases that you set out
(22)   for me to do this. I'll be happy to do it any
(23)   way you like.
(24)    Q.   I do understand what you mean when
(25)   you are trying to say helpful, that you are

Page 98

(1)
(2)   trying to be helpful, but you have to
(3)   understand what I say when I tell you that it's
(4)   not helpful one way or the other. The issue is
(5)   what you have in here that are your opinions.
(6)   That is what the deposition is about, so I
(7)   understand what you are opining on as an
(8)   expert.
(9)        So you don't need to make it easy
(10)   for me. You only need to say there may be
(11)   facts you assume, there may be documents you
(12)   rely on, there may be some conclusions you
(13)   reach or assumptions you make or analyses you
(14)   do on the way to giving an opinion, but you
(15)   don't have to — you just have to tell me if
(16)   there are — what the opinions are, and then
(17)   whatever the rest of it is I can try to figure
(18)   out and deal with.
(19)    A.   Well, I think the whole report is my
(20)   opinion. It includes my analysis which is the
(21)   basis for the opinion. So, therefore, I'm
(22)   trying to answer your question.
(23)        I believe that the whole report
(24)   constitutes the basis and underlying opinions
(25)   that I'm providing in this matter. You're

Page 99

(1)
(2)   trying to dissect it. I'm trying to be
(3)   helpful. I'm doing what you are asking me to
(4)   do, or at least I think I am.
(5)    Q.   So are you saying that you cannot
(6)   determine what statements you have in
(7)   section 3.2 are opinion?
(8)    A.   No, that's not what I said.
(9)    Q.   Well, then let's just go through
(10)   3.2, and I need you to tell me what you
(11)   consider to be an opinion.
(12)        To the extent that you say that that
(13)   sentence about there being the same transaction
(14)   is fact, that's fine. I have no issue with you
(15)   on that. I may disagree with you about fact,
(16)   but you can choose —
(17)    A.   Well, that's why I brought it up,
(18)   because —
(19)    Q.   It has to be your view, sir, not my
(20)   view. You have to decide what you have here
(21)   that are your opinions.
(22)        MR. KALECZYC:  Do you have a
(23)   question pending? You're instructing the
(24)   witness rather than asking questions. If
(25)   you have questions to ask him, Bonnie,

Page 100

(1)
(2)   let's get on with the deposition.
(3)    Q.   Can you tell me what statements
(4)   contained in 3.2 are statements of opinion in
(5)   your view?
(6)    A.   Page 9, the last paragraph, "The
(7)   November 15, 2002 transaction that occurred
(8)   between NorthWestern Energy and NorthWestern
(9)   was at fair market value, meaning reasonably
(10)   equivalent value was given and received."
(11)    Q.   Does your report contain an analysis
(12)   of the value that was given?
(13)    A.   The next sentence describes that
(14)   value, yes.
(15)    Q.   Other than a description in the next
(16)   sentence, is there anything in your report that
(17)   describes the value given?
(18)    A.   Did I put a number on it? The
(19)   answer to that is no.
(20)    Q.   My question is other than the next
(21)   sentence, is there anything in the report that
(22)   describes the value of your opinion?
(23)    A.   No, I think the whole paragraph
(24)   does.
(25)    Q.   Other than the whole paragraph,

Page 129

(1)
(2)    **Q.** And it's your recollection as you
(3)    sit here that NorthWestern stock did not
(4)    decline more steeply?
(5)    **A.** Well, during that ten-month time
(6)    period there were points when it mirrored the
(7)    market, and then subsequent to that it did not
(8)    mirror the market.
(9)    **Q.** Now, let's see if you can answer my
(10)   question.
(11)   **A.** Well, I'm trying to answer your
(12)   question.
(13)   **Q.** No, you're trying to make speeches,
(14)   but the record will reflect that.
(15)        **MR. KALECZYC:** Objection.
(16)        Bonnie, let's not badger him. If
(17)   you don't like the answer, you can ask him
(18)   another question.
(19)        **MS. STEINGART:** I don't think I'm
(20)   badgering him.
(21)        **MR. KALECZYC:** I think you are
(22)   badgering him.
(23)        **MS. STEINGART:** He can answer yes or
(24)   no and make a speech. It's up to him.
(25)        **MR. KALECZYC:** He can answer the

Page 130

(1)
(2)    question truthfully and honestly, and
(3)    that's what he is obligated to do.
(4)    **Q.** Sir, during the prior ten months had
(5)    NorthWestern suffered a significant diminution
(6)    in the value of its stock?
(7)        **MR. KALECZYC:** Objection.
(8)        **MR. BARTLEY:** Asked and answered.
(9)    **A.** I answered that question.
(10)   **Q.** Is the answer to that question yes?
(11)        **MR. KALECZYC:** Objection.
(12)   **Q.** Or is the answer to that question
(13)   yes, but not really?
(14)        **MR. KALECZYC:** Objection.
(15)   **A.** The answer to that question is that
(16)   at some portion of that time period
(17)   NorthWestern stock in the ten-month period, I
(18)   believe, based upon my recollection, sometimes
(19)   it outperformed the market and sometimes it
(20)   mirrored the market, and then later on and
(21)   during that ten-month period then it
(22)   underperformed the market.
(23)        So I'm trying to answer your
(24)   question. It's not a yes or no question. If
(25)   you want to give me a different question, I'd

Page 131

(1)
(2)    be able to answer it differently, but I can't
(3)    just answer the question the way you posed it
(4)    as a yes or no, because it's more complicated
(5)    than that.
(6)    **Q.** The information, you go on to say,
(7)    would indicate that the market viewed
(8)    NorthWestern as solvent on that date. Is that
(9)    an opinion?
(10)   **A.** No, that's essentially a statement
(11)   of fact that the market viewed, because it
(12)   traded a positive share price. The market view
(13)   was the company was solvent.
(14)   **Q.** What other opinions do you have in
(15)   this section?
(16)        **THE COURT:** I don't want to – well,
(17)   let me see. I guess the last sentence of
(18)   that paragraph of the second paragraph,
(19)   "Our analysis of their reports," meaning
(20)   Berliner & Marcus, "and other documents do
(21)   not indicate that management knew or
(22)   should have known of the alleged
(23)   fraudulent activities, including Hanson
(24)   and Kindt."
(25)   **Q.** Which management are you referring

Page 132

(1)
(2)    to in that sentence?
(3)    **A.** Well – the management is – the
(4)    management in that sentence that is defined or
(5)    used by Berliner or Marcus as well as
(6)    management in other documents as it relates to
(7)    this matter such as internal investigations or
(8)    SEC complaints about management. There doesn't
(9)    seem to be any mention of Hanson or Kindt.
(10)   **Q.** Is it your understanding that the
(11)   issue to be determined in this case is, in
(12)   fact, whether Hanson or Kindt knew or should
(13)   have known that that is the ultimate issue for
(14)   the trier of fact here? Is that your
(15)   understanding of the matter?
(16)        **MR. KALECZYC:** Objection to the
(17)   extent it calls for a legal conclusion.
(18)   **A.** I don't know how to answer that
(19)   question, because my understanding is that one
(20)   of the issues is it is a breach of fiduciary
(21)   duty count, and one of the issues is, you know,
(22)   what a certain party may or may not have known.
(23)        So I don't know what the legal
(24)   implications of that is. I'm just analyzing
(25)   documents based on my experience and making a

Page 145

(1)
(2)    it, we know what the damage for that is, don't
(3)    we?
(4)    A.  That --
(5)        MR. BARTLEY: Objection.
(6)        THE WITNESS: That is not how the
(7)    underlying documents work in this case.
(8)    So I can't agree with that. That is not
(9)    the way the underlying instruments work.
(10)   Q.  Let's look at section 3.4. Why
(11)   don't you tell me what statements you have in
(12)   section 3.4 that you say are opinions?
(13)   A.  3.4 is broken into 3.4.1 and a
(14)   different section. There is nothing in 3.4. I
(15)   think the section that starts, just one
(16)   paragraph that is 3.4, that is not an opinion.
(17)   We can go to 3.4.1.
(18)   Q.  So we can start from there, and that
(19)   is entitled as, "Information and Documents
(20)   Available to Kindt."
(21)   A.  I believe the opinion is on page 15,
(22)   the last paragraph.
(23)   Q.  Could you read that opinion into the
(24)   record?
(25)   A.  "Therefore, based upon our analysis

Page 146

(1)
(2)    of the documents and information that was
(3)    available to Kindt, it is our opinion within a
(4)    reasonable degree of professional certainty
(5)    that he did not know and had no reason to know
(6)    about future potential cash flow issues,
(7)    alleged misstatements or alleged lack of
(8)    disclosures by NorthWestern or its various
(9)    subsidiaries. As such, it was perfectly
(10)   reasonable and within prudent business judgment
(11)   for Kindt to execute the required November 15,
(12)   2002 transaction documents as mandated by the
(13)   sole member and manager, NorthWestern."
(14)   Q.  Now, did you review documents that
(15)   indicated what Mr. Kindt knew about funds being
(16)   transferred from Clark Fork to NorthWestern so
(17)   NorthWestern could advance them to Expanets?
(18)       MR. KALECZYC: Objection.
(19)       THE WITNESS: Can you restate the
(20)   question?
(21)       MS. STEINGART: Okay.
(22)   Q.  Did you inquire about Mr. Kindt's
(23)   knowledge concerning the siphoning of funds
(24)   from the utility businesses to support the
(25)   nonutility businesses at NorthWestern?

Page 147

(1)
(2)        MR. BARTLEY: Objection.
(3)        MR. KALECZYC: Objection.
(4)    A.  I saw no evidence that -- I didn't
(5)    see a document that showed that to be the case.
(6)    Q.  Did you have an understanding of
(7)    whether Mr. Kindt asked for documents from
(8)    NorthWestern so that he could understand what
(9)    the financial condition was of NorthWestern?
(10)   A.  I think Mr. Kindt had -- I don't
(11)   understand the question, but if your question
(12)   is did Mr. Kindt review financial documents, he
(13)   said he had access to publicly filed documents.
(14)   Q.  Did Mr. Kindt indicate in any way
(15)   that he asked for other documents and was
(16)   refused?
(17)   A.  Not to my knowledge.
(18)   Q.  Do you know whether he ever asked
(19)   for other documents?
(20)   A.  I think my knowledge would be what
(21)   he said in his deposition and the documents
(22)   that I reviewed which we understood he had
(23)   access to. I'm not aware that he was refused
(24)   any documents.
(25)   Q.  Do you know whether NorthWestern had

Page 148

(1)
(2)    any corporate policy of refusing documents to
(3)    those who were in positions of responsibility
(4)    in a NorthWestern subsidiary?
(5)        MR. KALECZYC: Objection.
(6)    A.  I don't know whether they had a
(7)    policy or not.
(8)    Q.  Do you have an understanding of
(9)    where NorthWestern got the cash that it used to
(10)   make advances to Expanets?
(11)   A.  No.
(12)   Q.  Do you know whether that cash came
(13)   from Clark Fork?
(14)       MR. KALECZYC: Objection. Asked and
(15)   answered.
(16)   A.  No, not based on the information
(17)   that I saw.
(18)   Q.  Do you know whether Mr. Kindt had
(19)   knowledge that funds were being removed from
(20)   Clark Fork and used by NorthWestern for
(21)   nonutility businesses?
(22)       MR. KALECZYC: Objection.
(23)   A.  That characterization is not my
(24)   understanding of what -- how Mr. Kindt
(25)   understood the cash flow management system.

Page 149

(1)
(2) **Q.** Did you ask him?
(3) **A.** I did not personally ask him.
(4) **Q.** Do you have an understanding of what
(5) Mr. Kindt would have learned if he asked?
(6) **MR. KALECZYC:** Objection.
(7) **A.** I don't know what he would have
(8) learned had he asked.
(9) **Q.** And no one has denied you such
(10) information, have they?
(11) **A.** No.
(12) **Q.** Without having made those inquiries,
(13) how can you make a conclusion that it was
(14) perfectly reasonable and within the prudent
(15) business judgment for Kindt to execute the
(16) required November 15th transaction documents?
(17) **A.** Because based upon -- my analysis
(18) was based upon the information that was
(19) available to him. Would a reasonable and
(20) prudent business person be able to execute the
(21) documents? I read his deposition. I read the
(22) documents. There is nothing in there to
(23) indicate that there was a problem with the
(24) disclosures or potential cash flows or alleged
(25) misstatements that would have caused him to not

Page 150

(1)
(2) believe that the transaction would have
(3) occurred as represented or as anticipated.
(4) **Q.** But haven't you just testified that
(5) you do not know what was available to him
(6) because he never he asked and you never asked?
(7) **A.** I performed an analysis of what was
(8) available to him to make a determination.
(9) Based upon what he saw on a reasonable basis
(10) using that information, was there something in
(11) there that he knew or should have known based
(12) on that information to call him to question
(13) based upon the rest of what he testified to?
(14) And the answer to that is there wasn't a red
(15) flag that would have indicated that he needed
(16) to ask for additional information.
(17) **Q.** Well, let's drill down on that a
(18) little bit. You've testified about documents
(19) that were made available to you, correct?
(20) **A.** Yes.
(21) **Q.** Do you have any idea as you sit here
(22) today what universe of documents was available
(23) to Mr. Kindt?
(24) **A.** My understanding that my analysis
(25) was based upon the documents that were

Page 151

(1)
(2) available to Mr. Kindt, and that's what I did.
(3) I looked at what was available to him based
(4) upon what was produced in discovery, and that's
(5) what I analyzed.
(6) **Q.** Who told you that the documents you
(7) have listed at the end of your report were the
(8) only documents that Mr. Kindt had available to
(9) him as opposed to the only documents that
(10) NorthWestern produced in this litigation?
(11) **THE WITNESS:** Can you repeat that
(12) question? I'm sorry.
(13) **(Whereupon the record was read back
(14) by the reporter.)**
(15) **A.** I guess counsel told me I requested
(16) all documents that were available to him, and
(17) that's consistent with what he testified to in
(18) his deposition. I didn't see anything
(19) different than that.
(20) So the answer to that is I relied
(21) upon what I understood the document universe
(22) was, and no one has told me there were
(23) additional documents that were available to him
(24) that were produced in this litigation. If you
(25) have one, I'll be happy to evaluate it.

Page 152

(1)
(2) **Q.** Let's go back. Counsel has
(3) certified to you that these were the only
(4) documents that were available to Mr. Kindt
(5) during the relevant period; is that what you
(6) said?
(7) **A.** I don't think that's exactly what I
(8) said, but the record speaks for itself.
(9) **Q.** And you did not ask Mr. Kindt
(10) whether there were documents available to him
(11) that were additional to documents that you have
(12) listed at the end of your report, correct?
(13) **A.** I did not, but I read his
(14) deposition, and his deposition indicates that
(15) there weren't additional documents the way I
(16) read it, anyway.
(17) **Q.** Sir --
(18) **MS. STEINGART:** Can you read my
(19) question back again?
(20) **Q.** Did you ask him?
(21) **MR. KALECZYC:** You asked him that
(22) question.
(23) **A.** No, you asked me that question. You
(24) asked me that question before, so I wasn't
(25) answering a question you already asked me. I'm

Page 153

(1)
(2) sorry for that.
(3) Q. Did you ascertain whether there were
(4) additional documents from NorthWestern that
(5) were nonpublic documents that were Mr. Kindt's
(6) for the asking during 2002?
(7) I'll start again. Strike that.
(8) Did you ascertain what documents
(9) were available to Mr. Kindt from NorthWestern
(10) during 2002 if only Mr. Kindt asked for them?
(11) MR. KALECZYC: Objection.
(12) A. I did not.
(13) Q. And, again, no one cut off your
(14) access to Mr. Kindt, did they?
(15) A. No.
(16) Q. What other opinions have you
(17) expressed in section 3.41?
(18) A. I don't think there is any other in
(19) 3.41. Or 3.4.1.
(20) Q. 3.4.2?
(21) A. There is no opinion in 3.4.2 that I
(22) can see right now. It's in the sub opinions or
(23) subparagraphs of that report.
(24) Q. I have a couple of questions about
(25) the introduction then.

Page 154

(1)
(2) At the end of the first paragraph
(3) under section heading 3.4.2, you have a
(4) sentence that says that the SEC determined that
(5) Mr. Hanson was not involved in the alleged
(6) scheme. Do you see that?
(7) A. Well, that's not exactly what it
(8) says.
(9) Q. Well, let's read exactly what it
(10) says. "Hanson was the highest-ranking
(11) NorthWestern officer at the time of the
(12) transaction who was determined" -- that's your
(13) word, right?
(14) A. Right.
(15) Q. -- by the internal, external and
(16) Security and Exchange Commission investigators
(17) not to be involved in the alleged scheme."
(18) Now, tell me which Security and
(19) Exchange Commission investigator determined
(20) that Mr. Hanson was not involved.
(21) A. Well, everything, every document
(22) that I saw with respect to the SEC reports did
(23) not implicate Mr. Hanson despite the fact that
(24) there were several other officers of the
(25) organization that were implicated.

Page 155

(1)
(2) Q. So you regard his not being
(3) implicated as a somehow -- his not being
(4) mentioned as somehow a determination that he
(5) was not involved; is that what you understand?
(6) A. That's the way I read those
(7) documents. They implicated almost a dozen
(8) people. I don't know how many.
(9) It's listed further in my report,
(10) and if you just give me a minute, I'll let you
(11) know. At least eleven individuals employed by
(12) NorthWestern.
(13) Q. So in your lexicon, the word
(14) "determined" means the same thing as not
(15) mentioned, right?
(16) A. Well, he wasn't implicated in the
(17) scheme, right.
(18) Q. He wasn't mentioned by -- he
(19) certainly wasn't -- there was no action started
(20) against him by the SEC, correct?
(21) A. That was correct.
(22) Q. Have you seen any piece of paper
(23) from the SEC that says a Security and Exchange
(24) Commission investigator determined that
(25) Mr. Hanson was not involved?

Page 156

(1)
(2) A. No, I didn't have access to the
(3) complete SEC files.
(4) Q. Did you read Mr. Orme's testimony?
(5) A. That was one of the depositions that
(6) I believe we had. It was read by another
(7) person on the staff and summarized.
(8) Q. Are you aware of the fact that when
(9) Mr. Orme was questioned about Mr. Hanson's
(10) involvement and knowledge, he asserted the
(11) Fifth?
(12) A. Well, he may have -- I believe he
(13) may have asserted the Fifth on numerous
(14) questions.
(15) Q. Indeed, he did. But on that
(16) question as well, correct?
(17) A. If you show me the document, maybe
(18) he did, maybe he didn't.
(19) Q. But that was not something you
(20) considered when you wrote this paragraph,
(21) correct?
(22) A. That a -- well, I was aware that he
(23) asserted the Fifth. We looked at that. I had
(24) other people on the staff look at that. If, in
(25) fact, that is the case, that doesn't change my

Page 157

(1)
(2)    statement there that I made.
(3)    Q.    Have you assessed whether Mr. Hanson
(4)    made any misstatements or misrepresentations to
(5)    the Montana Public Service Commission?
(6)    A.    That wasn't within the scope of what
(7)    my opinions were for.
(8)    Q.    Let's look at 3.4.2.1. Is there
(9)    anything there that expresses an opinion?
(10)    A.    On page 17, the sentence that -- the
(11)    second full sentence starting with,
(12)    "Furthermore."
(13)    Q.    Could you read what constitutes your
(14)    opinion into the record?
(15)    A.    "Furthermore, the MFIR's did not
(16)    contain balance sheets, income statements or
(17)    statements of cash flow for any of the
(18)    operating groups, making a complete financial
(19)    analysis of these companies extremely
(20)    difficult, if not impossible."
(21)    Q.    Is it your testimony that Mr. Hanson
(22)    did not have those other documents?
(23)    A.    My understanding is that he did not
(24)    have access to those other documents. They
(25)    weren't included in the documents. They

Page 158

(1)
(2)    weren't produced. They weren't included in the
(3)    documents that were in his office. He did have
(4)    access to the MFIR's, but I'm not aware of
(5)    those other documents being in his possession.
(6)    Q.    How do you know what documents were
(7)    in his office?
(8)    A.    Part of the discovery was documents
(9)    that were in Hanson's office.
(10)    Q.    And did Mr. -- did NorthWestern
(11)    produce all the documents that were in his
(12)    office that related to balance sheets, income
(13)    statements or cash flow of the operating
(14)    groups?
(15)        MR. BARTLEY: Objection.
(16)    Q.    To your knowledge, did they produce
(17)    those materials? Yes or no.
(18)    A.    My understanding is --
(19)        MR. BARTLEY: Same objection.
(20)    A.    -- that I obtained everything that
(21)    was produced.
(22)    Q.    Do you know what documents
(23)    NorthWestern refused to produce?
(24)        MR. KALECZYC: Objection.
(25)    A.    I don't know what they refused to

Page 159

(1)
(2)    produce.
(3)    Q.    So to the extent that NorthWestern
(4)    refused to produce documents in Mr. Hanson's
(5)    office that related to balance sheets, income
(6)    statements or statements of cash flow with
(7)    respect to the operating groups, you don't know
(8)    whether he had them or not, do you?
(9)        MR. BARTLEY: Objection.
(10)        MR. KALECZYC: Objection.
(11)    Q.    Do you know?
(12)        MR. KALECZYC: Same objection.
(13)    A.    I only -- I did my analysis based on
(14)    the documents I had. As my report says, if
(15)    there is an additional document, someone
(16)    provides that to me, I would be happy to
(17)    consider it.
(18)    Q.    Sir, I asked you how you know what
(19)    Mr. Hanson had in his office. Do you know what
(20)    Mr. Hanson had in his office?
(21)    A.    I never visited his office on
(22)    November 15, 2002, so I don't know exactly what
(23)    was in his office on that day.
(24)    Q.    Did you ask him what he had in his
(25)    office on November 15, 2002?

Page 160

(1)
(2)    A.    Did I?
(3)    Q.    Yes.
(4)    A.    No, I did not.
(5)    Q.    Did you ask him whether during the
(6)    period of January 1, 2002 until December 30,
(7)    2002 whether he, in fact, had income statements
(8)    or statements of cash flow from the operating
(9)    groups?
(10)    A.    I did not.
(11)    Q.    Any other opinions on this page?
(12)    A.    Sure. I think the next paragraph,
(13)    "Our examination of the underlying documents
(14)    noted that they changed over time and did not
(15)    contain enough information to determine the
(16)    purpose of their use. Therefore, any
(17)    conclusions drawn by Hanson from the
(18)    information could be subject to interpretation
(19)    or may be speculative."
(20)    Q.    As you sit here today, do you know
(21)    whether Mr. Hanson was limited to this
(22)    information, the information that you
(23)    considered to be not enough to determine its
(24)    purpose?
(25)    A.    My understanding is that's what he

Page 161

(1)
(2)    had, and that's what I evaluated.
(3)    Q.   And you don't have an understanding
(4)    of what more he had, correct?
(5)        MR. KALECZYC:  Objection.
(6)    A.   Assuming that he did have more, I
(7)    didn't evaluate it, and I don't know whether he
(8)    had more or not.  My understanding is he did
(9)    not.
(10)   Q.   Who told you he did not?
(11)   A.   I asked for documents that were
(12)   available to him from counsel of what was
(13)   produced, and I was told that I received
(14)   everything that was available to him.
(15)   Q.   Let's break that down.
(16)       Did you ascertain that every
(17)   document that was available to Mr. Hanson about
(18)   the corporation and its operating groups were
(19)   produced in connection with discovery here?
(20)   A.   First of all, this particular
(21)   section that we are talking about is with
(22)   respect to the MFIR's and the opinions
(23)   expressed and the analysis with respect to this
(24)   particular section.
(25)       I had other documents that I went

Page 162

(1)
(2)    through different sections, and we can talk
(3)    about those at that point in time, but I
(4)    believe that I have the MFIR's which is what
(5)    the subject of this section is.  If you're
(6)    asking me a different question, I'll be happy
(7)    to answer that.
(8)    Q.   We are talking about the opinion you
(9)    rendered here about conclusions that may be
(10)   drawn by Hanson, and here you indicate that
(11)   conclusions that may be drawn by him premised
(12)   on the MFIR's are limited, correct?
(13)   A.   Correct.
(14)   Q.   But you can express no opinion on
(15)   the conclusions he was able to draw based on
(16)   all the information that was available to him
(17)   because you don't know what all that
(18)   information was, do you?
(19)       MR. KALECZYC:  Objection.
(20)   A.   I did an analysis of different
(21)   discreet pieces of information that I
(22)   considered in their totality, and I come to a
(23)   conclusion with respect to those documents.  If
(24)   there are additional documents to which I
(25)   didn't have, I can't read his mind.  I'm not a

Page 163

(1)
(2)    mind reader.  I can't read what he -- I don't
(3)    know what was in his head.
(4)        My analysis or job or engagement was
(5)    to examine the documents that it was our
(6)    understanding and my understanding that he had
(7)    available to him to essentially say based on an
(8)    analysis of those documents what did he know or
(9)    should have known based on those documents and
(10)   on those documents alone.
(11)       I don't know if somebody whispered
(12)   to him in the hall.  I can't read his mind.  I
(13)   don't know that, but I can form an opinion
(14)   based on the documents that were available to
(15)   him and use my accounting and financial
(16)   expertise and all my other expertise to say
(17)   what do those documents say and what do they
(18)   mean in terms of if that's what the universe of
(19)   documents were, could a reasonable person come
(20)   to the conclusion that they did, as I state
(21)   here, that as a result of those documents,
(22)   would they have entered into the agreement and
(23)   been a prudent business judgment, et cetera, et
(24)   cetera, and that's my opinion.
(25)       If you're telling me there are other

Page 164

(1)
(2)    documents, please bring them forward to me.
(3)    I'll be happy to look at them and incorporate
(4)    them into my opinion.
(5)    Q.   I'm more interested in what you are
(6)    telling me.  You're telling me these are all
(7)    the documents that were available to you,
(8)    right?  You are not telling me that you have
(9)    any idea that these are all the documents
(10)   available to Mr. Hanson, correct?
(11)   A.   That is correct, because I don't
(12)   know.  My understanding is that all the
(13)   documents were produced, and I had the same
(14)   universe of documents.
(15)   Q.   Let's not backtrack into that.
(16)   Let's backtrack into the present question.
(17)       This report is based on the
(18)   documents that were made available to you,
(19)   right?  Step 1, correct?
(20)   A.   Right, the documents that are listed
(21)   in Exhibit B to the report, right.
(22)   Q.   Now, Mr. Hanson was a very senior
(23)   official at NorthWestern, correct?
(24)       MR. KALECZYC:  Objection.
(25)   Q.   Was he not?

Page 165

(1)
(2)        MR. KALECZYC: Objection.
(3)    A.  I don't know how you want to
(4)  classify that, but Mr. Hanson was the CEO of
(5)  the energy business.
(6)    Q.  Was he listed in the 10-K's during
(7)  2000 and 2001 and 2002 as being one of the five
(8)  most highly compensated individuals at
(9)  NorthWestern?
(10)   A.  I didn't look at 10-K's for all
(11)  those periods, but the relevant periods that I
(12)  looked at he was listed as one of the top
(13)  officers, right, from that standpoint.
(14)   Q.  And access to Mr. Hanson hasn't been
(15)  denied to you, right?
(16)   A.  Right.
(17)   Q.  And did you show him the list of
(18)  documents that you have and say, "These are
(19)  what were available to me. Is that all that
(20)  was available to you during 2002?" Did you ask
(21)  him that?
(22)   A.  I did not personally ask him that.
(23)  I didn't think I needed to. I didn't think
(24)  that I needed to in forming the opinion that I
(25)  formed.

Page 166

(1)
(2)    Q.  So when you say that the opinion on
(3)  page 17 that, "Furthermore, the MFIR's did not
(4)  contain balance sheets, income statements or
(5)  statements of cash flow for any of the
(6)  operating groups, making a complete financial
(7)  analysis of these companies extremely
(8)  difficult, if not impossible," you make that
(9)  opinion assuming that Mr. Hanson didn't have
(10)  those things so that the MFIR's were not as
(11)  helpful to him as they might be, correct?
(12)       MR. KALECZYC: Objection,
(13)  mischaracterizes the opinion.
(14)   A.  My understanding -- this is an
(15)  opinion with respect to the MFIR's.
(16)       In addition to that, I saw no
(17)  information that he had to answer your question
(18)  these other detailed balance sheets, income
(19)  statements or cash flow from the various
(20)  operating groups.
(21)   Q.  Now, the MFIR's were discussed at
(22)  monthly meetings, correct?
(23)   A.  Correct.
(24)   Q.  And Mr. Hanson attended those
(25)  monthly meetings, right?

Page 167

(1)
(2)    A.  My understanding is, yes, he did.
(3)  He may have missed one or two, but he generally
(4)  attended those meetings.
(5)    Q.  Thereafter there were meetings of
(6)  executives that talked about the prospects and
(7)  operations of the company, correct? There were
(8)  executive sessions, right?
(9)    A.  Yes.
(10)   Q.  And he attended those sessions,
(11)  right?
(12)   A.  I don't know if he attended all of
(13)  them, but, right, he attended the sessions.
(14)   Q.  Can you describe to me the
(15)  information that was distributed and discussed
(16)  at those meetings?
(17)   A.  I don't know what was given out at
(18)  those meetings.
(19)   Q.  What other opinions do you have in
(20)  this section?
(21)       MR. KALECZYC: Would this be a good
(22)  time to take a break?
(23)       MS. STEINGART: Let's just finish
(24)  3.4.2.1, because I think we just have one
(25)  little bit on the next page.

Page 168

(1)
(2)       THE WITNESS: No, it's just the last
(3)  paragraph.
(4)       MS. STEINGART: This is a fine time
(5)  for a break.
(6)       (A recess was taken from 2:55 p.m.
(7)  until 3:10 p.m.)
(8)    Q.  Before we took a break, Mr. Scherf,
(9)  you were describing some material at the end of
(10)  3.4.2.1 that was also an opinion?
(11)   A.  That's correct. The last paragraph
(12)  that starts out with, "Based upon our
(13)  analysis."
(14)   Q.  Can you read the opinion into the
(15)  record?
(16)   A.  Sure. "Based upon our analysis of
(17)  the MFIR's in conjunction with the statements
(18)  made by management to Hanson, we have
(19)  determined that, based on the MFIR's, Hanson
(20)  did not know and had no reason to know about
(21)  future potential cash flow issues, alleged
(22)  misstatements or alleged lack of disclosures by
(23)  NorthWestern or its various subsidiaries."
(24)   Q.  Thank you.
(25)       Let's look at text 3.4.2.2, and

Page 205

(1)
(2) recollection of the MFIR's at that point in
(3) time.
(4) **Q.** And that's not what this bonus memo
(5) says, that Expanets is losing money, and we are
(6) advancing money to the Expanets because of the
(7) cash flow utilities? Isn't that what that memo
(8) says?
(9) **MR. KALECZYC:** Objection.
(10) **A.** If you were to show me the memo, I
(11) would be happy to answer your question. My
(12) recollection of the memo without it being in
(13) front of me is that the operating performance
(14) that the memo discussed was operating
(15) performance for the year end December 31, 2001.
(16) **Q.** Have you looked at the bonus memo
(17) and compared it to the testimony that
(18) Mr. Hanson gave to the Montana Public Service
(19) Commission in January 2002?
(20) **A.** I looked at the bonus information.
(21) I did look at -- I know I have his testimony
(22) that he had given to the Montana Power
(23) Commission. I don't know -- I didn't directly
(24) compare the two of those.
(25) **Q.** Do you know whether anything in that

Page 206

(1)
(2) bonus memo indicates that in January 2002 he
(3) made misrepresentations to the Montana Public
(4) Service Commission?
(5) **MR. KALECZYC:** Objection.
(6) **A.** Not that I recall.
(7) **Q.** But that's not something anyone
(8) asked you to look at, right?
(9) **A.** No, because that wasn't what I was
(10) asked to look at. I was asked to look at
(11) whether in analyzing the documents based on my
(12) experience, you know -- I wasn't asked to mind
(13) guess -- to get into somebody else mind. I
(14) wasn't asked to mind read. I was asked to
(15) analyze the documents based upon those
(16) documents, make a determination based on my
(17) experience with whether a reasonable, prudent
(18) business person would have entered into the
(19) transaction based upon -- assuming that that
(20) was the information in the universe for what
(21) they knew or should have known.
(22) **Q.** Did Mr. Hanson help to hide the bad
(23) news about the losses and the nonutility assets
(24) from the Montana Public Service Commission?
(25) **MR. KALECZYC:** Objection.

Page 207

(1)
(2) **MR. BARTLEY:** Objection.
(3) **A.** That wasn't part of my analysis. I
(4) didn't look to that analysis.
(5) **Q.** Would that have helped to inform you
(6) in reaching an opinion Mr. Hanson's knowledge
(7) about lack of disclosure?
(8) **MR. KALECZYC:** Objection.
(9) **A.** I don't see why it would -- I'm
(10) looking at a transaction in November, and
(11) you're asking me about something in January.
(12) **Q.** Well, didn't you say that the two
(13) transactions are one?
(14) **A.** Yes, I did. It is my view that they
(15) are.
(16) **Q.** If there was fraud in connection
(17) with the initial approval, isn't there fraud in
(18) connection with the second part of it as well
(19) if it's one transaction?
(20) **MR. KALECZYC:** Objection.
(21) **A.** No.
(22) **Q.** Next section, I guess we have a
(23) summary here. 3.4.2.6, any opinions here?
(24) **A.** I think the whole summary is an
(25) opinion.

Page 208

(1)
(2) **Q.** So actually the predicate to this is
(3) based on the information you have received to
(4) date, correct?
(5) **A.** Correct.
(6) **Q.** That you have not made a personal
(7) assessment about the scope of information that
(8) was available to Mr. Hanson, correct?
(9) **MR. KALECZYC:** Objection.
(10) **A.** It's my understanding based upon
(11) Mr. Hanson's deposition Mr. Kindt's deposition,
(12) my conversations with counsel, I have all of
(13) the documents to which Mr. Hanson and/or
(14) Mr. Kindt had access to, that they would have
(15) used or been able to use to make a
(16) determination as to whether a reasonable and
(17) prudent businessperson would have entered into
(18) the transaction that they did, and so it's
(19) based on those documents that I have.
(20) I am not aware of any other
(21) documents. If there are other documents, I
(22) would be happy to look at them and I would be
(23) happy to reevaluate my opinion, but there
(24) aren't -- to my knowledge there aren't phantom
(25) documents. You keep asking me about phantom

MAGTEN ASSET

BSA XMAX(53/53)
STEPHEN J SCHERF - 1/9/08

VS. NORTHWESTERN CORP

---

Page 209

(1)

(2) documents. I don't think they exist. I have

(3) asked.

(4)   Q.   Who did you ask?

(5)   A.   I asked counsel whether there were

(6) other documents. I asked counsel, "Provide me

(7) all the documents" --

(8)   Q.   Whether documents existed or whether

(9) documents were produced?

(10)   A.   Documents that were produced.

(11)   Q.   Now, does NorthWestern have

(12) documents that weren't produced in this

(13) litigation, do you think?

(14)       MR. KALECZYC:  Objection.

(15)   Q.   Do you think?

(16)       MR. BARTLEY:  Objection.

(17)   A.   My experience in all litigations,

(18) there may be privileged documents that haven't

(19) been produced. I'm assuming that may be the

(20) case, but other than that, I'm not aware of any

(21) spoliation claims or any other types of claims

(22) that exist that could -- or potentially exist

(23) that anyone has alleged that documents haven't

(24) been produce.

(25)   Q.   What independent investigation did

---

Page 210

(1)

(2) you conduct to assess what documents were asked

(3) for, what documents were produced and what

(4) documents were withheld?

(5)   A.   I did not perform an independent

(6) investigation of that. My opinion, as it

(7) states, is based upon the documents that are

(8) relied upon and considered in performing my

(9) opinion.

(10)       If there are other documents, my

(11) report says I would be happy to consider those,

(12) and I would be more than happy to supplement my

(13) report if a document exists. I'm not aware of

(14) any document that exists.

(15)   Q.   So an accurate statement would be

(16) according to the documents you have reviewed,

(17) Hanson had more information concerning the

(18) results of the operations of NorthWestern's

(19) other operations and subsidiaries than did

(20) Kindt, correct?

(21)   A.   I can't disagree with that.

(22)   Q.   And the same thing is true for the

(23) second sentence, based on the documents that

(24) you have reviewed, while there was information

(25) that may have caused some concern on the part

---

Page 211

(1)

(2) of Hanson, other members of management, either

(3) superiors or persons directly involved in the

(4) management of those operations, indicated that

(5) the issues were going to be resolved in short

(6) order and that the company would meet their

(7) plan going forward, correct?

(8)   A.   Right. I can only form an opinion

(9) based on documents that I have reviewed, that's

(10) right.

(11)   Q.   In matters where you opine on what

(12) other people know, do you usually make an

(13) assessment of what the universe of documents

(14) are that are available to those persons?

(15)   A.   Yes, and I did that here.

(16)   Q.   What independent assessment did you

(17) make?

(18)   A.   I asked for those documents. I have

(19) been assured that I have all the documents that

(20) were available to those people. My report is

(21) based upon those documents.

(22)   Q.   I'm sorry. Were you assured that

(23) you had all the documents that were available

(24) or all the documents that were produced?

(25)   A.   All the documents that were produced

---

Page 212

(1)

(2) I have.

(3)   Q.   And in other matters, tell me what

(4) other matters have you opined as an expert at

(5) trial either before a judge or a jury about

(6) what other people knew?

(7)       MR. KALECZYC:  Objection

(8) mischaracterizes his opinion.

(9)   A.   I can't testify about what other

(10) people knew. I'm not a mind reader. All I can

(11) testify about is a financial analysis, which is

(12) what this report does.

(13)       That analyzes documents and says

(14) based on a financial analysis of those

(15) documents, this is what somebody should have

(16) known from that, knew or should have known from

(17) that, but I can't tell you independently if

(18) Mr. Hanson or someone whispered to him in the

(19) corner -- let's say Mr. Orme whispered to him

(20) in the corner, you know, that these Expanet

(21) financial statements are totally fraudulent. I

(22) have no idea whether that happened. I can't

(23) answer that. The only person who can answer

(24) that is Mr. Hanson.

(25)       That is not the opinion I was asked

---

Page 233

(1)
(2) report.
(3) Q.   And other information that you may
(4) not be aware of, correct?
(5)      MR. KALECZYC: Objection. Calls for
(6) speculation.
(7) A.   That's a speculative question.
(8) Q.   You think everything that Mike
(9) Hanson knew about NorthWestern are contained in
(10) the list of documents at the end of your
(11) report? You seriously -- are you giving sworn
(12) testimony on that?
(13)     MR. KALECZYC: Objection.
(14)     MR. BARTLEY: Objection.
(15) Q.   You think that's all Mr. Hanson
(16) knew?
(17)     MR. KALECZYC: Objection. That's
(18) argumentative.
(19)     MS. STEINGART: He's under oath.
(20)     MR. KALECZYC: It's argumentative
(21) and it's inappropriate.
(22)     Maybe this is time to take a break.
(23)     MS. STEINGART: If you want to take
(24) a break, we can take a break, but he's
(25) going to answer the pending question.

Page 234

(1)
(2) Q.   Is it your sworn testimony as you
(3) sit here today that you think all the
(4) information that Mr. Hanson had about Expanets
(5) and the subsidiaries and the business of
(6) NorthWestern are contained in the documents
(7) listed at the end of your report?
(8)      MR. KALECZYC: Objection. That's
(9) been asked and answered several times. We
(10) already have on the record what his
(11) testimony is.
(12) Q.   Or is it that you don't know?
(13) A.   As I testified before, I'm not a
(14) mind reader.
(15)     MS. STEINGART: We can take a break.
(16)     (A recess was taken from 4:34 p.m.
(17) until 4:45 p.m.)
(18) Q.   Back to Mr. Marcus' report. His
(19) second sentence of opinion number 1 says, "Had
(20) the true information been disclosed to the
(21) public prior to October 8 and November 15, 2002
(22) respectively, the equity offering would not
(23) have occurred and the asset transfer would have
(24) been impeded by the attempts of security
(25) holders and regulators to protect their

Page 235

(1)
(2) investments and constituents because."
(3)      Before we get to the "because," that
(4) is a statement you disagreed with in your
(5) report; is that correct?
(6) A.   That's correct.
(7) Q.   You disagree with that statement
(8) with respect to both the equity offering and
(9) the asset transfer; is that correct, or does
(10) your opinion relate only to the November 15th
(11) transaction?
(12) A.   It relates to both, because it's
(13) just speculative on his part as to whether
(14) those two items would have occurred or not.
(15) Q.   It relates to both, because as you
(16) sit here today you just decide it's all just
(17) speculative, or it relates to both because you
(18) were asked to consider it and you did consider
(19) it in formulating the opinion that is written
(20) down as Exhibit 8?
(21) A.   That's written down as Exhibit
(22) number 8?
(23) Q.   Well, I'm asking whether you're just
(24) sitting here and telling me you think it's
(25) speculative.

Page 236

(1)
(2) A.   No, it's discussed in my report why
(3) I think it's speculative.
(4) Q.   But did you make a determination
(5) that his statements were speculative both as to
(6) the October 8th offering and the
(7) November 15th asset transfer, or is the scope
(8) of your opinion addressed only to the
(9) November 15th asset transfer and doesn't reach
(10) conclusions one way or the other about
(11) October 8th?
(12) A.   I believe that structure of how he
(13) did this renders both speculative.
(14) Q.   When you rendered your opinion, that
(15) was the opinion that you were rendering,
(16) correct?
(17) A.   Yes, that's correct.
(18) Q.   Because -- and then we are going to
(19) go to the "becauses" -- "The market's knowledge
(20) that NorthWestern would never realize a return
(21) on or (cash flow from) its significant
(22) investment, including preferred stock in
(23) intercompany's advances in its unregulated
(24) subsidiaries, Blue Dot and Expanets would have
(25) been accelerated."