# UNREPORTED CASES

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 1308232 (E.D.Pa.)
**(Cite as: 2006 WL 1308232 (E.D.Pa.))**

**C**
Only the Westlaw citation is currently
available.

United States District Court,
E.D. Pennsylvania.
Renee Noll BAUMGARDNER, et al.
v.
WYETH PHARMACEUTICALS.
**Civil Action No. 05-05720-JF.**

May 11, 2006.

Arnold Anderson Vickery, Fred H. Shep-
herd, III, Paul F. Waldner, Vickery &
Waldner LLP, Houston, TX, Rosemary
Pinto, Feldman & Pinto PC, Philadelphia,
PA, for Renee Noll Baumgardner.

David B. Alden, Mark Herrmann, Jones,
Day, Reavis and Pogue, Cleveland, OH,
Reetu Dandora, Reed Smith LLP, Phil-
adelphia, PA, for Wyeth Pharmaceuticals.

*MEMORANDUM AND ORDER*
FULLAM, Sr. J.

**\*1** This case presents several procedural
anomalies and incongruities. There are 10
sets of plaintiffs, none of whom reside in
Pennsylvania. The only thing they have in
common (other than being represented by
the same law firm) is that they or the de-
cedents whom they represent allegedly
suffered severe adverse consequences from
ingestion of a prescription drug "Effexor"
or "Effexor XR" manufactured by the de-
fendant, Wyeth Pharmaceuticals, which is
located in this district. The claims of all of
the plaintiffs are set forth in a single com-
plaint, which contains 66 paragraphs, set
forth on 26 pages. In utter disregard of the
requirements of Fed.R.Civ.P. 8(a)(2) ("a
short and plain statement of the claim"),
this complaint is principally devoted to a
recitation of evidence seemingly derived
from expert opinions and/or technical pub-

lications, and would pass muster as an ap-
pellate brief.

On a more mundane level, the only named
defendant, Wyeth Pharmaceuticals, is not a
suable entity; rather, as the complaint al-
leges, it is alleged to be "an unincorporated
division of the corporation known simply
as 'Wyeth.' " (*See* Complaint at ¶ 13).

Counsel for the defendant has filed a mo-
tion to dismiss the complaint under
Fed.R.Civ.P. 12(b)(6). Alternatively, the
defendant contends that the claims of the
10 sets of plaintiffs should be severed, and
transferred to the various districts where
the plaintiffs reside. Defense counsel has
not addressed the non-compliance with
Rule 8 or the non-suability of the named
defendant, but contends merely that the
complaint embodies 10 separate claims
which are improperly joined, and therefore
should either be dismissed, or severed and
tried separately elsewhere.

At oral argument on the pending motion,
plaintiffs' counsel virtually conceded that
the 10 cases could not be tried to conclu-
sion in this district: each case would, to a
considerable extent, involve distinct facts,
and the application of the different laws of
the various states. Rather, plaintiffs' coun-
sel insists (1) that the cases should remain
in this district for consolidated pretrial dis-
covery; and (2) that there is one common
issue (whether the defendant's drug can
cause the adverse consequences experi-
enced by the plaintiffs) which should be
tried here. This is an issue which would re-
quire expert testimony on both sides, the
expense of which, plaintiffs contend,
should only be incurred once. Defense
counsel is willing to have the cases remain
in this district for consolidated pretrial dis-
covery, but remains convinced that the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

cases must be tried separately.

I have reached the following tentative conclusions:

1. There really are 10 separate cases. If plaintiffs wish to proceed in this court, each set of plaintiffs must pay the appropriate filing fee. The cases will therefore be severed from each other, to the extent set forth below.

2. The defendant shall hereafter be referred to as "Wyeth, d/b/a Wyeth Pharmaceuticals."

*2 3. The cases shall be deemed to have been consolidated for purposes of pretrial discovery which is either common to all these cases or, if applicable only to individual cases, may conveniently be conducted in this district.

4. Since eventual transfers to other districts are likely, the claims of each set of plaintiffs should be set forth in a separate document, and receive a separate sub-file number (e.g., 5720(1), (2), etc.).

5. Decision as to whether any alleged common issue can properly be tried in this district will be deferred until completion of discovery in this district.

An Order follows.

ORDER
AND NOW, this 11th day of May 2006, upon consideration of defendant's motion to dismiss, IT IS ORDERED:

1. The defendant shall hereafter be referred to in these actions as "Wyeth, d/b/a Wyeth Pharmaceuticals," or "Wyeth."

2. Each set of plaintiffs shall file an amended complaint which (a) complies with Fed.R.Civ.P. 8, and (b) bears a separate sub-file number. All of these com-

plaints will be deemed consolidated within C.A. 05-05720.

3. Each set of plaintiffs shall pay the required filing fee.

4. All of these cases are consolidated for purposes of pretrial discovery.

5. Decision as to whether one or more issues can properly be resolved in a single trial, whether one or more trials should take place in this district, etc., will await further development of the record.

Not Reported in F.Supp.2d, 2006 WL 1308232 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

LEXSEE



Analysis
As of: Jan 29, 2008

### RONALD CANTOR, IVAN SNYDER and JAMES A. SCARPONE, as TRUSTEES OF THE MAFCO LITIGATION TRUST, and as Successors in Interest to the Marvel Entertainment Group, Inc., et al., Plaintiffs, v. RONALD O. PERELMAN, et al., Defendants.

#### Civil Action No. 97-586-KAJ

#### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

#### 2006 U.S. Dist. LEXIS 86329

#### November 30, 2006, Decided

**PRIOR HISTORY:** Cantor v. Perelman, 2006 U.S. Dist. LEXIS 5210 (D. Del., Feb. 10, 2006)

**CORE TERMS:** expert testimony, legal opinion, custom, fiduciary duties, hypothetical, negotiation, unreliable, rebuttal, expert report, inadmissible, proposed testimony, methodology, bargaining, stock, ratio, board of directors, summary judgment, admissibility, shareholder, admissible, reliable, dilute, admit, case law, corporate law, majority shareholder, personal experience, breached, issue of law, experience-based

**COUNSEL:** [*1] Lawrence C. Ashby, Esq., Philip Trainer, Jr., Esq., Tiffany Geyer Lydon, Esq., Ashby & Geddes, Wilmington, Delaware, for Plaintiffs. Of Counsel: Edward A. Friedman, Esq., Andrew W. Goldwater, Esq., Daniel B. Rapport, Esq., Jonathan Gottfried, Esq., Friedman Kaplan Seller & Adelman LLP, New York, NY.

Thomas J. Allingham II, Esq., Anthony W. Clark, Esq., Paul J. Lockwood, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, Wilmington, Delaware, for Defendants.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION**

### MEMORANDUM OPINION

November 30, 2006

Wilmington, Delaware

**JORDAN, District Judge**

### I. INTRODUCTION

Presently before me are two motions to exclude expert testimony. Defendants, Ronald O. Perelman, Mafco Holdings Inc., MacAndrews & Forbes Holdings Inc., Andrews Group Inc., William C. Bevins, and Donald G. Drapkin (collectively, "Defendants"), filed a Motion to Exclude the Expert Testimony of Bevis Longstreth, William H. Purcell, Andrew S. Carron, Jeffrey L. Baliban, and Portions of the Testimony of Justice Joseph T. Walsh, Ret. (Docket Item ["D.I."] 466.) Plaintiffs, Ronald Cantor, Ivan Snyder, and James [*2] A. Scarpone (collectively, "Plaintiffs"), filed a Motion to Exclude the Testimony of Lawrence A. Hamermesh and Certain Opinions of Robert W. Hotthausen. (D.I. 470.)

Jurisdiction is proper under 28 U.S.C. § 1334. For the reasons that follow, both Motions will be granted in part and denied in part.

## II. BACKGROUND [1]

1 The following background information is taken from the parties' submissions and does not constitute findings of fact.

Plaintiffs are the trustees of the MAFCO Litigation Trust, which was created according to the plan of reorganization in the bankruptcy cases of Marvel Entertainment Group, Inc. ("Marvel") and its affiliates, in order to pursue Marvel's claims against Defendants. (D.I. 471 at 7; see also D.I. 467 at 1.) Defendant Ronald O. Perelman ("Perelman") was the controlling shareholder and Chairman of the Board of Marvel. (D.I. 471 at 7.) Perelman's controlling share of Marvel stock was held by a chain of corporations wholly-owned by Perelman (the "Marvel [*3] Holding Companies"). (Id.) The other individual defendants, William C. Bevins and Donald G. Drapkin, served as directors of Marvel and, along with Perelman, comprised the entire board of directors of each of the Marvel Holding Companies. (D.I. 469 at A182; see also D.I. 471 at 7.)

In 1993 and 1994, Defendants caused the Marvel Holding Companies to issue three tranches of notes (the "Notes"), which raised $ 553.5 million. (D.I. 471 at 8.) The Notes were secured by pledges of the Marvel stock held by the Marvel Holding Companies. (D.I. 471 at 1.) In the Notes, the Marvel Holding Companies promised to prevent Marvel from engaging in certain forms of corporate financing (the "Restrictions"). (D.I. 471 at 8.) The Restrictions prohibited Marvel from issuing certain types of debt unless specific financial ratios were met, from issuing any preferred stock except under specified circumstances, and from diluting Perelman's majority share of Marvel voting stock. (D.I. 469 at A110-11; see also D.I. 467 at 1.) Plaintiffs allege that Defendants breached their fiduciary duties by including those Restrictions in the Notes and by using Marvel's corporate resources to sell the Notes. (D. [*4] I. 471 at 8.)

Plaintiffs filed their complaint on October 30, 1997. (D.I. I.) The case was subsequently referred to Magistrate Judge Mary Pat Thynge. (D.I. 262.) Judge Thynge issued a report in the form of a Memorandum and Order on December 9, 2002, recommending that summary judgment for Plaintiffs be denied and that summary judgment for Defendants be granted in part. (D.I. 467 at 1; D.I. 384.) On February 18, 2004, I adopted Judge Thynge's report in all respects. (D.I. 467 at 1; D.I. 404.) On July 12, 2005, the United States Court of Appeals for the Third Circuit reversed the grant of summary judgment for Defendants With respect to the unjust enrichment claims and some of the damage claims, affirmed the denial of summary judgment for Plaintiffs, and remanded the case for further proceedings. Cantor v. Perelman, 414 F.3d 430, 442 (3d Cir. 2005). In accordance with the decision of the Third Circuit, I ordered the parties to identify any additional expert testimony on or before January 13, 2006, and to file any objections to such testimony no later than June 1, 2006. (D.I. 430 at 1-2.)

## III. STANDARD OF REVIEW

Motions to exclude expert testimony are committed [*5] to the court's discretion. See Jaasma v. Shell Oil Co., 412 F.3d 501, 513 (3d Cir. 2005) (holding that the decision to admit or reject expert testimony is reviewed under an "abuse of discretion" standard). To be considered an abuse of discretion, the court's decision must be "arbitrary, fanciful, or clearly unreasonable." Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002).

## IV. DISCUSSION

Federal Rule of Evidence 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 obligates judges to ensure that all expert testimony is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). [*6] An expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 144, 118 S. Ct. 512, 139 L. Ed. 2d 508(1997) (noting failure of respondent to explain "how and why the experts could have extrapolated their opinions"); cf. Kumho Tire, 526 U.S. at 152 (an expert must employ "in the

Page 2

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (expert testimony "must be supported by appropriate validation"). The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). Further, Rule 702 requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. *Daubert*, 509 U.S. at 591-92.

A. Proposed Testimony of Professor Lawrence [*7] A. Hamermesh and Justice Joseph T. Walsh, Ret.

Plaintiffs argue that the expert report of Professor Lawrence A. Hamermesh should be excluded because it merely provides his interpretation of Delaware corporate law. (D.I. 471 at 15-16.) Similarly, Defendants seek to exclude some of the testimony of Justice Joseph T. Walsh, Retired, on the grounds that it constitutes an impermissible legal opinion. (D.I. 467 at 10.) While Plaintiffs apparently concede that the testimony of both experts should either be admitted or excluded in their entirety (D.I. 478 at 25), Defendants attempt to distinguish the opinions offered by Professor Hamermesh and Justice Walsh (D.I. 467 at 11-13). Defendants contend that Professor Hamermesh only discusses whether Delaware law would permit the Marvel board of directors to dilute the position of a majority shareholder, whereas Justice Walsh also opines on whether Defendants breached their fiduciary duties. (*Id.* at 12.) Defendants claim that Professor Hamermesh's opinion is admissible because he addresses an issue of law that serves as a "fact" in this case. (*Id.*) On appeal, the Third Circuit held that Plaintiffs "should at least have the opportunity to [*8] establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." *Cantor*, 414 F.3d at 437. Defendants assert that Professor Hamermesh's legal opinion is a "fact" because it is necessary to construct the hypothetical bargaining described by the Third Circuit. (D.I. 467 at 12.) Defendants contend that, in analyzing the cost of a restriction that would prevent Marvel from diluting a majority shareholder, the board would have considered whether, even without that restriction, it

would have been permitted under Delaware law to dilute a majority shareholder. (*Id.*) For that reason, one of Defendants' other experts, Peter A. Fowler, relies on Professor Hamermesh's opinion in assessing the outcome of the hypothetical bargaining process. (D.I. 469 at A120, P 24.) Therefore, Defendants propose that both Professor Hamermesh and Justice Walsh should be permitted to testify as to the ability of a board of directors to dilute a majority shareholder, but not as to the law that governs Defendants' fiduciary duties. (D.I. 467 at 13.)

Each party appears to admit that [*9] their own expert offers a legal opinion regarding the proper interpretation of Delaware corporate law. (*Id.* at 12 (Defendants arguing that "Hamermesh's legal opinion is needed in order to construct the hypothetical bargaining"); D.I. 478 at 25 (Plaintiffs explaining that "Hamermesh and Walsh do have a significant disagreement concerning the proper interpretation of Delaware law").) The expert reports submitted by Professor Hamermesh and Justice Walsh confirm that they indeed focus on issues of law. Professor Hamermesh's report reviews the relevant case law (D.I. 469 at A170-72, PP 6-9), and concludes that "the practice and effect of Delaware corporate law as of the period from 1993 to 1996 largely duplicated the indirect effect of Section 4.09(a) of the indentures limiting Marvel's ability to issue shares to reduce the Marvel Holding Companies' ownership of Marvel voting stock to less than a majority" (*id.* at A172, P 10). Justice Walsh also conducted an analysis of Delaware case law (*id.* at A279-84, PP 9-18), but reached a different conclusion, namely that "where ... directors are motivated not by an intention to dilute control but by the desire to protect the interests [*10] of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control" (*id.* at A283, P 16). The Third Circuit has specifically instructed the district courts to "ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Since that is precisely the character of the proposed testimony of Professor Hamermesh and Justice Walsh, it cannot be admitted.

Part of the Third Circuit's holding in *Berckeley* is based on concern that an expert not "usurp the District Court's pivotal role in explaining the law to the jury." 455 F.3d at 217. But jury confusion is not the only rationale for the rule. The point of Rule 702 is to allow evidence

that will assist the fact finder. Despite the outstanding qualifications of both Justice Walsh and Professor Hamermesh, I will not be assisted in my role as fact finder in this bench trial by hearing the law explained from the witness stand. The able attorneys on both sides of this case can articulate the law in their arguments [*11] and post-trial briefing. This is simply not a case where the weight to be given proposed expert testimony is in question and hence determining admissibility might usefully be delayed. *Cf. Chase Manhattan Mortgage Corp. v. Advanta Corp., C.A. No. 01-507-KAJ, 2004 U.S. Dist. LEXIS 3933, 2004 WL 422681 at *9-10 (D. Del. Mar. 4, 2004)* (denying motion to exclude expert testimony in a bench trial so that judgment on the weight, if any, to be given to that testimony could be made on a more complete record). There is no benefit to delaying decision on admissibility here.

Defendants have failed to establish that the general rule prohibiting experts from offering legal opinions should not be applied to Professor Hamermesh. In support of their argument that his testimony serves as a "fact" in this case, Defendants cite to *Askanase v. Fatjo, 130 F.3d 657, 672-73 (5th Cir. 1997)*, for the proposition that "lawyers may testify as to legal matters when those matters involve questions of fact." (D.I. 467 at 12.) However, Defendants' reliance on *Askanase* is misplaced. In explaining what it meant by the phrase "questions of fact," the Fifth Circuit gave the example of a lawyer who was permitted [*12] to testify that the language in a boilerplate contract was standard. *Askanase, 130 F.3d at 673*. That example does not support Defendants' position that, in some circumstances, a lawyer can testify as to his interpretation of the law involved in the case. In contrast, the Fifth Circuit actually cautions that "if an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position." *Id.* That is exactly what the parties have done here.

Defendants also claim that the "law as fact" exception is demonstrated by decisions of the Delaware Court of Chancery that permitted experts to testify as to the likely outcome of related litigation. (D.I. 475 at 19-20 (citing *Onti, Inc. v. Integra Bank, 751 A.2d 904, 931-32 (Del. Ch. 1999)*); D.I. 481 at 19 (citing *In re The Walt Disney Co. Derivative Litig., 907 A.2d 693, 743 (Del. Ch. 2005)*).) Again, Defendants' argument is unpersuasive. The Chancery Court did not allow experts to simply explain the law. Rather, the experts offered

opinions about likely outcomes based on factual assumptions. *See, e.g.,* [*13] *In re The Walt Disney Co. Derivative Litig., 907 A.2d at 744*. That type of expert testimony is akin to that of Defendants' expert Peter A. Fowler, who explains how the law would affect the outcome of a hypothetical negotiation between Defendants and the Marvel board of directors. (D.I. 469 at A120-21, P 24; *id.* at A138-39.) Despite Defendants' contentions, Fowler can explain, without Professor Hamermesh's legal opinion, how any limit that Delaware law places on the ability of a board to dilute a majority shareholder would play a role in the negotiations. I will decide whether any such limitation actually exists under Delaware law. Accordingly, I will grant Plaintiffs' Motion to exclude the testimony of Professor Hamermesh, and I will grant Defendants' Motion to exclude the testimony of Justice Walsh. [2]

B. Proposed Testimony of Robert W. Halthausen

Plaintiffs assert that the opinion offered by Robert W. Halthausen for Defendants on the issue of damages should be excluded because it is not relevant. (D.I. 471 at 19-20.) According to Plaintiffs, Halthausen calculated damages based on the expected costs of Marvel's financial distress at the time the Notes were issued. [*14] (*Id.* at 21.) Plaintiffs contend that, in this case, damages should include any injuries that occurred subsequent to the issuance of the Notes. (*Id.* at 22.) More specifically, Plaintiffs believe that damages should be measured by the difference between the financial distress actually sustained by Marvel and that which it would have sustained "but for" Defendants' breach of fiduciary duty. (*Id.*)

> 2    Even though Defendants only moved to exclude portions of Justice Walsh's testimony (D.I. 467 at 13), Plaintiffs concede that the opinions of Professor Hamermesh and Justice Walsh cannot be distinguished (D.I. 478 at 25). Therefore, both will be excluded in their entirety.

Regardless of whether Plaintiffs' proposed method of calculating damages is appropriate in this case, their theory depends on a finding that Marvel's subsequent financial distress was proximately caused by Defendants' conduct. (*id.* at 24 ("as long as the harm that Marvel sustained was proximately caused by the Indenture Covenants, its [*15] recovery is not limited by the extent to which such injury was 'expected' at the time that the defendants breached their duties").) In the course of

arguing that the testimony of their own damages expert, William H. Purcell (*see infra* at 18-20), should be admitted, Plaintiffs stated that, "[t]o the extent defendants believe that there was some superseding or intervening cause why Marvel's equity became worthless, they can present evidence or cross-examine Purcell." (D.I. 478 at 12 n.5.) Since Plaintiffs admit that their theory of damages is dependent on proof of causation and that causation is an issue for trial, it would be inappropriate for me decide, at this stage in the proceedings, to apply their measure of damages and reject Defendants' approach. Accordingly, I will deny Plaintiff's Motion to exclude the testimony of Halthausen.

C. Proposed Testimony of Bevis Longstreth

Defendants move to exclude the testimony of Bevis Longstreth on several grounds. First, Defendants contend that portions of Longstreth's initial expert report are inadmissible legal opinions. (D.I. 467 at 15.) In his initial report, Longstreth purported to answer eight questions submitted by Plaintiffs' [*16] counsel (D.I. 469 at A181, A205-07), and Defendants claim that his answers to five of those questions should not be admitted (D.I. 467 at 15-16). Defendants' position is that Longstreth attempted "to dress up legal conclusions as facts." (*Id.* at 19.) In response, Plaintiffs argue that Longstreth provided permissible testimony regarding the customs and practices of the directors of a Delaware corporation. (D.I. 478 at 21.)

Plaintiffs have identified a proper, if somewhat subtle and occasionally difficult, distinction. While a witness cannot testify as to the law governing a case, expert testimony concerning business customs and practices is allowed. *United States v. Leo,* 941 F.2d 181, 196 (3d Cir. 1991). However, given that the present case involves allegations that Defendants breached their fiduciary duties, it is important to note that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley,* 455 F.3d at 218.

In general, the portions of Longstreth's [*17] initial report that are being challenged by Defendants discuss the process by which a company such as Marvel would handle a transaction involving an interested director. (*See id.* at A181-85, A187.) This is permissible testimony concerning the business customs and practices of a

corporation. On at least one occasion, though, Longstreth comes too close to offering a legal opinion. For example, he states that, "[a]s an independent director, it would be obvious to me that Perelman could not be expected to discharge his fiduciary duty to Marvel as both its controlling shareholder and as a director, while at the same time seeking to restrict Marvel's ability to conduct its affairs in order to sell the Notes and secure the net proceeds therefrom for himself personally, without any benefit to Marvel." (*Id.* at A184.) Testimony as to a breach of fiduciary duty will not be admitted. Nevertheless, Longstreth's initial report is still distinguishable from those submitted by Professor Hamermesh and Justice Walsh, which more plainly consist of legal opinions. Because this is a bench trial and I will not be influenced by a witness' view of the law, I will not exclude large portions of Longstreth's [*18] otherwise admissible testimony on the basis that a few statements in his initial report may address issues of law. I will rely on counsel for Defendants to renew their objection, if Longstreth's testimony at trial strays into the realm of purely legal opinion.

Defendants argue that even the portions of Longstreth's initial report that focus on business customs and practices should be excluded because the customs and practices of directors of Delaware corporations are defined by Delaware law. (D.I. 481 at 9.) This is certainly one of those instances where the line between admissible and inadmissible testimony may be difficult to determine. Nevertheless, and contrary to Defendants' assertion, the Third Circuit has held that it is permissible for an expert to testify, based on experience in the industry, as to how a company would operate under the law so long as "the expert ... [does] not give his opinion as to what was required under the law, or whether the defendant complied with the ... [law]." *Berckeley,* 455 F.3d at 218 (citing *Leo,* 941 F.2d at 197). Defendants claim that some of the customs and practices discussed in Longstreth's initial report [*19] are extremely similar to the requirements of Delaware corporate law. (D.I. 467 at 16-18.) However, Defendants have failed to identify any part of Longstreth's report in which he states that those customs and practices are required by law. That is a distinction with a meaningful difference, particularly where, as here, trial is to the bench and there is no risk of jury confusion. Indeed, the case law cited by Defendants is persuasive on this point. Defendants note that, in *In re The Walt Disney Derivative Litigation,* the Delaware Chancery Court acknowledged that an expert had simply

couched an opinion about alleged breaches of fiduciary duties in terms of custom and practice. (D.I. 481 at 9 (citing *In re The Walt Disney Co. Derivative Litig.*, 907 A.2d at 740-41).) The Chancery Court therefore recognized what was less than helpful in the expert's opinion, even though the testimony was admitted at trial. *In re The Walt Disney Co. Derivative Litig.*, 907 A.2d at 740-41. Likewise in this case, Defendants raise an issue of weight, not admissibility. [3]

> 3    In the course of arguing that Longstreth's initial report contains inadmissible legal opinions, Defendants also assert that parts of his report are not relevant to the hypothetical negotiation that the Third Circuit permitted Plaintiffs to address on remand. (D.I. 467 at 19-20.) As discussed below, I will not exclude expert testimony for that reason. (*See infra* at 20-21.)

[*20]    Defendants' next argument is that Longstreth's initial and rebuttal reports should be excluded under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469(1993), because they are unreliable. (D.I. 467 at 21-22.) With respect to his initial report, Defendants claim that Longstreth provides no "objective, analytical process or methodology" to support his opinions. (*Id.* at 22.) Yet, the only specific deficiency identified by Defendants in their opening brief is that Longstreth fails to explain why the Restrictions would create a "bet the ranch" situation that, "depending on future events that ... could not reasonably [be] anticipate[], might so restrict Marvel as to cause its demise." (*Id.* quoting D.I. 469 at A186).) As would be expected, in their brief opposing Defendants' Motion, Plaintiffs explain the basis for that particular portion of Longstreth's report. (D.I. 478 at 14-16.) Defendants then respond by accusing Plaintiffs of focusing "on a snippet of his opinion that has at least some framework to it" (D.I. 481 at 5), an odd criticism since Plaintiffs were dealing with the snippet selected by Defendants. Defendants admit that, "[w] ere this the full [*21] extent of Longstreth's opinion, ... [they] would not have made this motion because, on this small point only, Longstreth has explained the basis for his conclusion, and cross-examination is, therefore, readily available." (*Id.*) Since that "small point" is the only part of Longstreth's initial report that Defendants address in any detail, their argument essentially consists of their conclusory assertion that "the remainder of his analysis, and his conclusion, are either speculative and unreliable or legal

opinions." (*Id.*) I will not exclude Longstreth's initial report based on such a general allegation.

Defendants also contend that Longstreth's rebuttal report, which critiques Fowler's analysis of the hypothetical negotiation, is unreliable because it is based on Longstreth's *ipse dixit* assertions. (D.I. 467 at 22.) Again, Defendants have selected a small portion of his report and claim that it is unsupported. Defendants focus on the following statement from Longstreth's rebuttal report: "As to benefits, the wealth extraction from Marvel accrued solely to the benefit of Ronald O. Perelman. Nothing of benefit accrued to Marvel or its minority shareholders." (*Id.* at [*22] 23 (citing D.I. 469 at A210).) Since Plaintiffs' counsel informed Longstreth that the Marvel Holding Companies, which are owned by Perelman, received the entire $ 553.5 million from the Notes (D.I. 469 at A203), I do not find this statement to be so unreliable as to warrant excluding testimony based upon Longstreth's rebuttal report. [4] Defendants also argue that Longstreth's rebuttal opinion is unreliable because he failed to address Fowler's analysis of the financial alternatives to issuing the Notes. (D.I. 467 at 23.) However, Defendants have not established that, for a rebuttal expert's testimony to be admissible, it must address every factor taken into account by the opposing expert. Thus, if Longstreth did in fact fail to consider the alternatives set forth in Fowler's report, it is not an issue of admissibility, but one of the weight that should be given to Longstreth's opinion.

> 4    I emphasize that I relate here only what I understand to be a factual assumption upon which Longstreth was relying; I am not stating any factual or legal conclusion of my own.

[*23]    I now turn to Defendants' more general proposition that both of Longstreth's reports are unreliable because they are supported only by his personal experience. (*Id.* at 24-25; D.I. 481 at 8.) Defendants contend that expert testimony is routinely excluded when it is based entirely on experience and judgment, and not an identifiable methodology. (D.I. 467 at 24-25; D.I. 481 at 8.) However, no such bright line rule exists. To the contrary, the Supreme Court has acknowledged that experts may base their testimony upon personal experience. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (explaining that the purpose of *Daubert* "is to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Particularly telling is the Advisory Committee's explanation of the 2000 Amendment to Rule 702:

> Nothing in this amendment is intended to suggest that experience alone--or experience in conjunction with other knowledge, skill, training or education-- may not provide a sufficient foundation [*24] for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

Fed. R. Evid. 702 advisory committee's note. Accordingly, Longstreth's experience as a corporate lawyer and his service on several boards of directors (D.I. 469 at A180) can form the basis for reliable expert testimony in this case.

Defendants also argue that Longstreth's experience-based opinions are unreliable because they do not satisfy any of the Third Circuit's modified *Daubert* factors. (D.I. 467 at 26; D.I. 481 at 8.) That case law highlights a critical distinction. In *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000), a case cited by Defendants, an engineer offered his expert opinion that the front bumper of a particular truck would have been able to sustain the impact of a guardrail if it had been strengthened with either bracketry or wedge supports. *Id.* at 158. The opinion was excluded because the expert

"conducted no tests" and used "little, if any, methodology beyond his own intuition." *Id.* An important basis for that conclusion is that vehicle design is a testable hypothesis that can be demonstrated using an identifiable methodology. *See id.* (explaining that the expert could have, but did not, test the vehicle design under accident conditions or calculate the forces that could have been sustained by the truck bumper and guardrail at impact). In fact, the Third Circuit noted that "[a]lthough there may be some circumstances where one's training and experience will provide an adequate foundation [*26] to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case." *Id.*

An illustration of that distinction is *Berckeley*, in which the Third Circuit held that a former corporate lawyer could testify as to business customs and practices in the securities industry, based on her experience as counsel for the SEC. 455 F.3d at 218; *see also Davis*, 397 F.3d at 179 (holding that a police officer's opinion concerning the methods of operation of drug traffickers was sufficiently reliable based solely on his years of experience). Longstreth's opinion on the customs and practices of corporate directors is similar to the experienced-based testimony that the Third Circuit has approved, because the opinions expressed are not subject to proof by a particular methodology.

Although Defendants have failed to establish that I should entirely exclude Longstreth's testimony, they have identified another portion of that proposed testimony with which I do have concern. After critiquing Fowler's analysis of the hypothetical negotiation, Longstreth opined that "the fee suggested by Mr. Fowler would have been flatly unacceptable [*27] to Marvel," and that "the consideration that Marvel would have required would likely have been in the order of magnitude of $ 150 million." (D.I. 469 at A212.) Other than his opinion that, given the risks to Marvel, Fowler's proposed fee was too low, Longstreth offers no basis for his conclusion that $ 150 million would be an appropriate amount. (*Id.*) In fact, Longstreth admitted that it was a "ballpark judgment." (*Id.* at A312, 150:13-18.) Since I can discern no other grounds for the particular figure submitted by Longstreth, I have serious concerns about its reliability. On balance, however, I am persuaded that, in the particular circumstances of this bench trial, the testimony need not be excluded at this time. [5]

Defendants also argue that Longstreth's experience-based opinions are unreliable because they do not satisfy any of the Third Circuit's modified *Daubert* factors. (D.I. 467 at 26; D.I. 481 at 8.) However, Defendants' reading of the law is stricter than required. The Supreme Court explained that the *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire*, 526 U.S. at 151. Similarly, the Third Circuit has recognized that while the general requirement of reliability set forth in *Daubert* applies to all expert testimony, the "list of specific factors would often be of little use in evaluating non-scientific expert testimony." *United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005). [*25]

To support their position, Defendants point to several cases in which experience-based testimony was excluded as unreliable. (D.I. 467 at 26; D.I. 481 at 8.) That case law highlights a critical distinction. In *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000), a case cited by Defendants, an engineer offered his expert opinion that the front bumper of a particular truck would have been able to sustain the impact of a guardrail if it had been strengthened with either bracketry or wedge supports. *Id.* at 158. The opinion was excluded because the expert

[5] Plaintiffs should be aware that they will not be

permitted to establish a basis for Longstreth's opinion at trial unless they complied with the disclosure requirements of Fed. R. Civ. P. 26.

Finally, Defendants claim that Longstreth is not qualified [*28] to offer an opinion about the outcome of the hypothetical negotiation. (D.I. 467 at 28.) Defendants base their argument on what they believe to be an admission by Longstreth that he lacks the financial expertise to conduct such a financially complex negotiation. (*Id.*) But there is no such admission. When asked whether he would be a suitable candidate for the board to hire as a financial advisor on the negotiation, Longstreth explained that he would not, but only because he would be providing the legal advice, and he felt that the board should hire an independent financial expert. (D.I. 469 at A306, 32:14-23.) Longstreth never stated that he lacked the financial expertise necessary to assess the outcome of the hypothetical negotiation. Rather, Longstreth explained that, based on his experience giving both legal and financial advice, he is an expert in analyzing the "structures of a financing transaction." (*Id.* at A306, 32:2-13.) Therefore, Defendants have failed to demonstrate that Longstreth was unqualified to discuss the financial aspects of the hypothetical bargaining process. Accordingly, since I do not find any of Defendants arguments to be persuasive, I will deny Defendants' [*29] Motion to exclude Longstreth's testimony.

D. Proposed Testimony of William H. Purcell

Defendants seek to exclude testimony based upon the three expert reports of William H. Purcell, on the ground that his opinions are based entirely on experience and not on any particular methodology or objective criteria. (D.I. 467 at 28-29.) As previously discussed, merely asserting that an expert relied on personal experience in forming an opinion is insufficient to demonstrate that the opinion is inadmissible. (*See supra* at 14-16.) Since Defendants provide no further explanation as to why Purcell's initial expert report is unreliable, I will not exclude that report.

Defendants claim that Purcell's rebuttal report is inadmissible because he fails to provide an adequate basis for his opinion that, "*based on my experience as an investment banker,* the target capital structure for a company such as Marvel would have been no more than 30% debt and at least 70% equity." (D.I. 467 at 29 (emphasis added by Defendants).) Defendants allege that Purcell simply "made up" that ratio, and it is inadmissible

because it is not based on a "testable hypothesis" or "standards controlling the technique's [*30] operations." (*Id.* at 30-31.) However, Purcell's assessment of Marvel's likely capital structure in the absence of the Restrictions is supported by several principles of corporate finance set forth in his rebuttal report. (D.I. 469 at A254-55.)

In particular, Purcell's opinion rests on the principles that "it is best to finance long-term assets with long-term debt or equity," that "it is best to stretch out one's debt maturity schedule over as long a period of time as possible," and that "one should avoid over-reliance on short-term commercial paper or commercial bank debt." (*Id.*) Thus, though one may attack the soundness or applicability of the principles cited, it is not accurate to say Purcell provided an inadequate basis for his conclusion that Marvel should have had a higher percentage of equity than debt. Defendants also point out that Purcell admitted that the actual ratio "is an order of magnitude judgment." (*Id.* at A315, 125:15-25.) However, I will not exclude Purcell's testimony solely because he failed to explain how he determined that exact ratio. It is clear from Purcell's report that the ratio of 30% debt to 70% equity is an experience-based estimate given [*31] for purposes of comparison with Marvel's actual debt-to-equity ratio. (*See id.* at A259.)

Finally, Defendants argue that the measure of damages in Purcell's supplemental report should be excluded because it is simplistic and lacks the methodological rigor required by *Daubert.* (D.I. 467 at 32.) Critical to Purcell's damages calculation was that on November 12, 1996, a corporation wholly-owned by Perelman refused to invest funds in Marvel unless the Restrictions in the Notes could be amended. (D.I. 469 at A275.) Purcell calculated damages by multiplying the price that the common shares of Marvel closed at on November 11, 1996, the day before Perelman's announcement, by the number of outstanding shares prior to Marvel's bankruptcy petition in late December 1996. (*Id.*) Defendants criticize this calculation because it assumes that the drop in stock price and eventual bankruptcy is due entirely to the Restrictions, and, thus, it fails to account for other possible causes. (D.I. 467 at 32.) While Defendants may disagree with Purcell's method, they have not shown that it is so unsustainable as to render his testimony inadmissible. Again, the argument more properly goes to the weight [*32] of Purcell's opinion, not its admissibility. Accordingly, I will deny Defendants' Motion to exclude the testimony of Purcell.

E. Proposed Testimony of Andrew S. Carron and Jeffrey L. Baliban

Defendants move to exclude testimony based upon the expert reports of Andrew S. Carron and Jeffrey L. Baliban on the grounds that those reports were not timely submitted. (D.I. 467 at 34.) Defendants contend that, based on Plaintiffs' representations during a teleconference on September 9, 2005, the Scheduling Order (D.I. 430) of October 18, 2005 that allowed the parties to submit additional expert testimony was limited to testimony which addresses the issue of "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." (D.I. 467 at 34.) Thus, Defendants claim that because Carron and Baliban do not address that narrow issue, their reports are governed by the Scheduling Order of February 6, 2002 which required all expert testimony to be submitted by April 10, 2002. (*Id.* at 35.) Defendants argue that admitting the reports at this time would be prejudicial because they raise new theories of liability and remedy, [*33] and Defendants will not be able to make summary judgment motions on those issues. (D.I. 481 at 15.)

Defendants have failed to establish prejudice that would justify excluding the reports submitted by Carron and Baliban. Both reports were served by the deadline of January 13, 2006 for submitting additional expert testimony (*see* D.I. 459), as set forth in the Scheduling Order of October 18, 2006 (D.I. 430). In response, Defendants served rebuttal expert reports with respect to both Carron and Baliban. (D.I. 469 at A111; D.I. 472 at Ex. 7, P 2.) Defendants apparently also had the chance to depose Carron on April 7, 2006 (*see* D.I. 479 at B373) and Baliban on April 11, 2006 (*see* D.I. 469 at A297). Therefore, since Defendants have had a sufficient opportunity to address any issues raised in the expert

reports of Carron and Baliban, I will deny Defendants' Motion to exclude those reports.

**V. CONCLUSION**

Accordingly, I will grant Plaintiffs' Motion to exclude the testimony of Professor Lawrence A. Hamermesh, and I will deny Plaintiffs' Motion in all other respects. I will grant Defendants' Motion to exclude the testimony of Justice Joseph T. Walsh, Retired, and I will [*34] grant Defendants' Motion to the limited extent that proposed testimony by Bevis Longstreth as to breaches of fiduciary duty will not be permitted at trial. In all other respects, however, I will deny Defendants' Motion. An appropriate order will follow.

**ORDER**

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Exclude Expert Testimony (D.I. 470) is GRANTED as to Professor Lawrence A. Hamermesh and DENIED in all other respects. It is further ORDERED that Defendants' Motion to Exclude Expert Testimony (D.I. 466) is GRANTED as to Justice Joseph T. Walsh, Retired, and is GRANTED to the extent that Bevis Longstreth will not be permitted to opine regarding breaches of fiduciary duty; Defendants' Motion is DENIED in all other respects.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

November 30, 2006

Wilmington, Delaware

LEXSEE



Warning
As of: Jan 29, 2008

## IN RE: DIET DRUGS (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION; THIS DOCUMENT RELATES TO ALL CASES

### MDL DOCKET NO. 1203

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2000 U.S. Dist. LEXIS 9661; CCH Prod. Liab. Rep. P15,855

### June 28, 2000, Decided

**DISPOSITION:** [*1] Phentermine Defendants' and American Home Products Corporation's motions to exclude expert testimony of plaintiffs' experts Paul Wellman, Ph.D. and Timothy Maher, Ph.D. GRANTED IN PART and DENIED IN PART. Plaintiffs' Motion to Update Daubert Record DENIED.

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Defendants moved to exclude the expert testimony of plaintiffs' experts concerning the alleged medical effects of phentermine in humans pursuant to Fed. R. Evid. 702 and 703. Plaintiffs' moved to update the Daubert record and the responses thereto.

**OVERVIEW:** Plaintiffs' experts, pharmacologist and behavioral psychologist, were offered to provide expert testimony concerning the alleged medical effects of phentermine in humans. The court found that experts did not have any general expertise regarding disease causation in humans. The opinions did not amount to scientific knowledge and although their opinions may or may not have been proven in the future, their testimony was based more on personal opinion than on reliable scientific knowledge. The opinions were not generally

accepted within the scientific community. Although their views were published in a peer-reviewed journal, the court noted that experts did not rely on any epidemiological studies, nor on any testing performed on live, whole animals. Even if their data and the methodology were reliable, the conclusions they reached, that the fen-phen combination induces greater cardiovascular toxicity than fenfluramine alone, did not reliably flow from the data and methodology.

**OUTCOME:** Defendants' motion to exclude expert testimony of plaintiffs' experts was granted where it was based more on opinion than on reliable scientific knowledge and otherwise denied. Plaintiffs' motion to update the Daubert record was denied.

**CORE TERMS:** phentermine, serotonin, fenfluramine, animal, pulmonary, scientific, plasma, fen-phen, rat, brain, dose, dexfenfluramine, methodology, synergistic, expert testimony, pharmaceutical, clearance, clinical, platelet, disease, periphery, scientific evidence, causation, opine, warning, lung, levofenfluramine, interaction, monoamine, expertise

**LexisNexis(R) Headnotes**

2000 U.S. Dist. LEXIS 9661, *1; CCH Prod. Liab. Rep. P15,855

*Evidence > Relevance > Relevant Evidence*
*Evidence > Scientific Evidence > General Overview*
*Evidence > Testimony > Experts > Admissibility*
[HN1]Fed. R. Evid. 702 imposes an obligation on a trial judge to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. The party offering the expert has the burden of proving admissibility under Fed. R. Evid. 702.

*Evidence > Testimony > Experts > Daubert Standard*
*Evidence > Testimony > Experts > Helpfulness*
[HN2]In Daubert, the court required that the subject of an expert's testimony must constitute scientific knowledge. The adjective scientific implies a grounding in the methods and procedures of science, and the word knowledge connotes more than subjective belief or unsupported speculation. In addition, Fed. R. Evid. 702 requires that expert evidence or testimony assist the trier of fact. In other words, expert testimony must fit the issues in a case by having a valid scientific connection to the pertinent inquiry before the trier of fact.

*Evidence > Testimony > Experts > General Overview*
[HN3]See Fed. R. Evid. 702.

*Evidence > Testimony > Experts > Helpfulness*
[HN4]Faced with a proffer of expert testimony, the court must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact. In undertaking this gatekeeping function, the court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.

*Evidence > Testimony > Experts > Admissibility*
[HN5]In Daubert, the court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: whether the theory or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or method has general acceptance in the scientific community. The court's role as a gatekeeper is a flexible one and these factors are simply useful

signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.

*Evidence > Testimony > Experts > General Overview*
[HN6]The Third Circuit has listed other factors to consider to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge as well. Together, these factors are: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Evidence > Testimony > Experts > Daubert Standard*
[HN7]Under Daubert and its progeny, the court must examine an expert's methodology and conclusions in order to ensure reliability.

*Evidence > Testimony > Experts > General Overview*
[HN8]A district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.

*Evidence > Testimony > Experts > Daubert Standard*
[HN9]Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Evidence > Testimony > Experts > Admissibility*
[HN10]A court should exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise.

*Evidence > Testimony > Experts > General Overview*
*Torts > Negligence > Proof > Custom > Expert Testimony*

[HN11]A party cannot qualify an expert generally by showing that the expert has specialized knowledge or training, which would qualify him or her to opine on some other issue.

*Evidence > Testimony > Experts > General Overview*
[HN12]An expert's opinion must be based on scientific, technical or other specialized knowledge and not on subjective belief or unsupported speculation.

*Evidence > Testimony > Experts > General Overview*
[HN13]Not every opinion offered by an expert is an expert opinion and that an expert's opinion must be an expert opinion that is an opinion formed by the witness' expertise rather than simply an opinion broached by a purported expert.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Weight of the Evidence*
*Evidence > Testimony > Experts > General Overview*
[HN14]Testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Ultimate Issue*
*Torts > Negligence > Proof > Custom > Expert Testimony*
[HN15]Although expert's testimony on industry custom was admissible, once the jury heard all of the evidence on the scope of the defendant's duty, it was as qualified as the expert to determine whether the defendant breached that duty.

*Evidence > Testimony > Experts > General Overview*
[HN16]In undertaking a Daubert analysis, the court should also be mindful of other applicable rules.

*Evidence > Testimony > Experts > Admissibility*
[HN17]Fed. R. Evid. 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts and data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

*Evidence > Testimony > Experts > General Overview*
[HN18]Under Fed. R. Evid. 703, if the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.

*Evidence > Testimony > Experts > General Overview*
[HN19]A witness may be competent to testify as expert even though they may not, in the court's eyes, be the best qualified.

*Evidence > Scientific Evidence > Daubert Standard*
*Evidence > Testimony > Experts > Daubert Standard*
[HN20]A person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that area of expertise, or that are founded on a reliable methodology.

*Evidence > Relevance > Relevant Evidence*
[HN21]In order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves.

**COUNSEL:** For GREGORY P. MILLER, SPECIAL MASTER: GREGORY P. MILLER, MILLER, ALFANO & RASPANTI, P.C., PHILA, PA USA.

For IN RE: DIET DRUGS (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION: NINA M. GUSSACK, PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA.

For IN RE: DIET DRUGS (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION: MICHAEL T. SCOTT, REED, SMITH, SHAW & MC CLAY, PHILA, PA USA.

For IN RE: DIET DRUGS (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION: ARNOLD LEVIN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA USA.

For IN RE: DIET DRUGS (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE)

2000 U.S. Dist. LEXIS 9661, *1; CCH Prod. Liab. Rep. P15,855

PRODUCTS LIABILITY LITIGATION: EDWARD W. MADEIRA, JR., PEPPER, HAMILTON & SCHEETZ, PHILADELPHIA, PA.

**JUDGES:** LOUIS C. BECHTLE, J.

**OPINION BY:** LOUIS C. BECHTLE

**OPINION**

*MEMORANDUM AND PRETRIAL ORDER NO. 1351*

BECHTLE, J.

JUNE 28th, 2000

Presently before the court [*2] are the Phentermine Defendants' [1] and American Home Products Corporation's ("AHP") (collectively, "Defendants") motions to exclude the expert testimony of plaintiffs' experts Paul Wellman, Ph.D. and Timothy Maher, Ph.D. pursuant to Federal Rules of Evidence 702 and 703, Plaintiffs' Motion to Update *Daubert* Record and the responses thereto. For the reasons set forth below, the court will grant in part and deny in part the motions to exclude expert testimony and will deny the motion to update the record.

> 1    Eon Labs Manufacturing, Inc.; Fisons Corporation; Gate Pharmaceuticals, a division of Teva Pharmaceuticals USA, Inc.; Geneva Pharmaceuticals, Inc.; Ion Laboratories, Inc.; Jones Medical Industries, as successor to Abana Pharmaceuticals, Inc.; Medeva Pharmaceuticals, Inc.; MCR/American Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Rosemont Pharmaceutical Corporation; Rugby Laboratories, Inc.; Shire Richwood, f/k/a Richwood Pharmaceutical Company, Inc.; SmithKline Beecham Corporation; United Research Laboratories, Inc.; and Zenith Goldline Pharmaceuticals, Inc.

#### [*3] I. *BACKGROUND*

Timothy Maher, Ph.D., a pharmacologist, and Paul Wellman, Ph.D., a behavioral psychologist, have been offered by various plaintiffs in this MDL No. 1203 to provide expert testimony concerning the alleged medical effects of phentermine in humans. Essentially, Plaintiffs

seek to have Drs. Maher and Wellman offer the following opinions:

> 1. The fenfluramines (fenfluramine and dexfenfluramine) cause primary pulmonary hypertension ("PPH"). [2]
>
> > 1.1 Risk increases with duration.
>
> 2. The fenfluramines cause valvular heart disease ("VHD"). [3]
> > 2.1 Risk increases with dose.
> >
> > 2.2 Risk increases with duration.
>
> 3.    Pondimin    (fenfluramine) monotherapy had minimal clinical usage. [4]
> > 3.1 Levofenfluramine [5] caused unpleasant side effects.
> >
> > 3.2 Clinical efficacy required higher doses.
>
> 4. The clinical combination of Fen-Phen (fenfluramine and phentermine) intentionally exploited two pharmacological properties of phentermine. [6]
> > 4.1 Phentermine boosts the efficacy of dexfenfluramine. [7]
> >
> > 4.2 Phentermine blunts the unpleasant side effects of levofenfluramine in Pondimin.
>
> 5. The pharmacology of [*4] phentermine caused a dramatic increase in the use of Pondimin in the United States and thus the vast majority of Pondimin-induced VHD and PPH. [8]

2000 U.S. Dist. LEXIS 9661, *4; CCH Prod. Liab. Rep. P15,855

6. The Fen-Phen combination induces greater cardiovascular toxicity than does fenfluramine alone. [9]

> 6.1 Serotonergic mechanisms are implicated in the pathogenesis of both PPH and VHD.

> 6.2 Phentermine acts on serotonergic mechanisms in at least three ways:

> . by inhibiting the enzyme monoamine oxidase ("MAO") which metabolizes serotonin;

> . by causing the release of serotonin; and

> . by affecting serotonin receptors on heart valve tissue leading to cellular proliferation.

(Pls.' Post-Hr'g Mem. in Resp. to Defs.' Mots. to Exclude Expert Test. of Paul J. Wellman, Ph.D. and Timothy J. Maher, Ph.D. at 1-2.) Both the Phentermine Defendants and AHP filed motions to exclude the testimony of Drs. Maher and Wellman. Responses were filed and on March 7-8, 2000, the court held a *Daubert* hearing. At the hearing the following witnesses testified: (1) for Plaintiffs, Drs. Maher and Wellman; and (2) for the Phentermine Defendants, Anthony N. DeMaria, M.D., a cardiologist; Michael D. Gershon, M.D., a cellular [*5] biologist; Harihara M. Mehendale, Ph.D., a toxicologist; Charles V. Vorhees, Ph.D., a neurotoxicologist and neuropharmacologist; Timothy W. Higenbottam, M.D., a PPH expert; Mark T. Nelson, Ph.D., a pharmacologist; and Michael D. Decker, M.D., M.P.H., a specialist in epidemiology. Following the hearing, the parties filed post-hearing submissions.

2    For a discussion of the *Daubert* issues concerning this opinion, see *infra* III.D.

3    For a discussion of the *Daubert* issues concerning this opinion, see *infra* III.D.

4    For a discussion of the *Daubert* issues

concerning this opinion, see *infra* III.C, at footnote 23.

5    Levofenfluramine is the left molecule of fenfluramine.

6    For a discussion of the *Daubert* issues concerning this opinion, see *infra* III.C.1.

7    Dexfenfluramine is the right molecule of fenfluramine.

8    For a discussion of the *Daubert* issues concerning this opinion, see *infra* III.C.2.

9    For a discussion of the *Daubert* issues concerning this opinion, see *infra* III.B.

[*6] **II. *LEGAL STANDARD***

[HN1]Federal Rule of Evidence 702 imposes an obligation on a trial judge to "'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" [10] *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)). The party offering the expert has the burden of proving admissibility under Rule 702. *See Daubert,* 509 U.S. at 592 n.10 (citing Fed. R. Evid. 104(a)). [HN2]In *Daubert,* the Court required that the subject of an expert's testimony must constitute "scientific knowledge." *Id.* at 589-90. "The adjective 'scientific' implies a grounding in the methods and procedures of science," and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *id.* at 590. In addition, Rule 702 requires that expert evidence or testimony assist the trier of fact. *See id.* at 591. In other words, expert testimony must "fit" the issues in a case by having a "valid scientific connection to the pertinent inquiry" before the trier of fact. *Id.* at 591-92. [*7]

> 10    [HN3]The Rule provides: "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.

[HN4]Faced with a proffer of expert testimony, the court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact." *Id.* at 592. In undertaking this gatekeeping

Case 1:05-cv-00499-JJF   Document 328-2   Filed 01/31/2008   Page 18 of 56

2000 U.S. Dist. LEXIS 9661, *7; CCH Prod. Liab. Rep. P15,855

function, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid" and whether "that reasoning or methodology properly can be applied to the facts in issue." *Id. at 592-93.* [HN5]In *Daubert*, the Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: whether the theory [*8] or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or method has general acceptance in the scientific community. *See id. at 593-94* (listing factors which may bear on inquiry, but stating that such factors did not establish definitive checklist or test). [11] The court's role as a gatekeeper is a flexible one and these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999).*

> 11    [HN6]The Third Circuit has listed other factors to consider as well. Together, these factors are:
>
>> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.
>
> *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994).*

[*9] [HN7]

Under *Daubert* and its progeny, the court must examine an expert's methodology and conclusions in order to ensure reliability. *See Heller, 167 F.3d at 153* (stating that "[HN8]a district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used"). In *General Electric Company v. Joiner*, the Supreme Court instructed that:

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But [HN9]nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997).*

In addition, [HN10]a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." 4 Weinstein's Fed. Evid. § 702.06 [1], at 702-52 (2000); *see Wehling v. Sandoz Pharms. Corp., 162 F.3d 1158 (4th Cir. 1998)* [*10] (available at No. 97-2212, 1998 WL 546097, at *4 (4th Cir. Aug. 20, 1998)) (stating that pharmacist/toxicologist was unqualified to testify as to adequacy of drug warning where he had "never been involved with the drafting, regulation, or approval of product labeling for any prescription medication" and that "experience as a pharmacist, reading prescription labels and dispensing drugs, [did] not qualify him to testify about the adequacy of drug warnings"); *Robertson v. Norton Co., 148 F.3d 905, 907 (8th Cir. 1998)* (stating that, although ceramics expert "was undoubtedly qualified to testify about a manufacturing defect in an exploding ceramic grinding wheel, that did not qualify him as an expert on grinding wheel warnings," because, among other things, "he had never designed a warning for a ceramic product" and "his knowledge of ceramics would not provide the expertise on questions of display, syntax, and emphasis that the jury would expect from a bona fide warning expert"); *Kent v. Howell Elec. Motors, 1999 U.S. Dist. LEXIS 10940, No.Civ.A. 96-7221, 1999 WL 517106, at *5 (E.D. Pa. July 20, 1999) (excluding*

Page 6

engineering expert from offering opinion as to adequacy [*11] of warnings because expert admitted he was not expert in warning design); *Tyler v. Sterling Drug Co.*, 19 F. Supp. 2d 1239, 1245 (N.D. Okla. 1998) (excluding testimony of human factors psychologist as to product warnings); *Estate of Lam v. Upjohn Co.*, 1995 U.S. Dist. LEXIS 7642, No.Civ.A. 94-003- H, 1995 WL 478844, at *2 (W.D. Va. April 21, 1995) (recommending exclusion of expert testimony on pharmaceutical warnings when expert had "no academic training or regulatory experience and had never participated in any FDA-related proceedings addressing what constitutes an adequate warning"). In other words, [HN11]a party cannot qualify an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *See Redman v. John D. Brush and Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997) (holding that metallurgic expert could testify about properties and characteristics of metal safe, but was not qualified to testify about industry standards for design of safes because "he had never before analyzed a safe, engaged in the manufacture or design of safes, or received any training regarding safes," and, "even more [*12] importantly, he was not personally familiar with the standards . . . used in the safe industry"); *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 382 (5th Cir. 1996) (holding that ecologist with expertise in behavior patterns of rats was not qualified to opine on source of chromosomal damage exhibited by rats, nor was he qualified to opine on whether humans faced increased health risks from exposure to chemicals).

Furthermore, [HN12]an expert's opinion must be based on scientific, technical or other specialized knowledge and not on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see Textron, Inc. v. Barber-Colman Co.*, 903 F. Supp. 1558, 1564 (W.D.N.C. 1995) (stating that "[HN13]not every opinion offered by an expert is an expert opinion . . . [and that] an expert's opinion must be an 'expert' opinion (that is an opinion formed by the witness' expertise) rather than simply an opinion broached by a purported expert"). Moreover, [HN14]testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury. *See McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1987) [*13] (holding that [HN15]although expert's testimony on industry custom was admissible, "once the jury heard all of the evidence on the scope of [the defendant's] duty, it was as qualified as [the expert] to determine whether [the

defendant] breached that duty"); *STX, Inc. v. Brine, Inc.*, 37 F. Supp. 2d 740, 768 (D. Md. 1999) (stating that "'an expert's opinion on the ultimate legal issue must be supported by something more than a conclusory statement'") (quoting *In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991)), *aff'd*, 211 F.3d 588 (Fed. Cir. 2000), *aff'd*, 2000 U.S. App. LEXIS 11590, No. 99-1540, 2000 WL 564010 (Fed. Cir. May 8, 2000); *Securities and Exch. Comm'n v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (holding that expert's training and experience as accountant did not "specially equip him to divine what [the defendant] truly believed" about reliability of financial reports and that any opinions offered in that regard were "at worst, speculation [and] at best, they are credibility choices that are within the province of the jury").

[HN16]In undertaking a *Daubert* analysis, the court "should also be mindful of other [*14] applicable rules." *Daubert*, 509 U.S. at 595. [HN17]Federal Rule of Evidence 703 "provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts and data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Id.* (quoting Fed. R. Evid. 703). [HN18]Under Rule 703, "if the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 748 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985)).

## III. DISCUSSION

The court will grant in part and deny in part the Phentermine Defendants' and AHP's motions to exclude the expert testimony of Drs. Maher and Wellman. Initially, the court will address the qualifications of Drs. Maher and Wellman. Then, the court will address the opinions of Drs. Maher and Wellman, the basis for them, and the evidence introduced at the *Daubert* hearing. Last, the court will address Plaintiffs' [*15] motion to update the record.

### A. Qualifications of Drs. Maher and Wellman

Dr. Maher is a pharmacologist. He is Professor of Pharmacology, the Sawyer Professor of Pharmaceutical Sciences and Dean of Research Sponsored Programs at the Massachusetts College of Pharmacy. Dr. Maher is

Page 7

Case 1:05-cv-00499-JJF    Document 328-2    Filed 01/31/2008    Page 20 of 56

2000 U.S. Dist. LEXIS 9661, *15; CCH Prod. Liab. Rep. P15,855

also the Chief Executive Officer of Longwood Pharmaceutical Research, Inc.. He is a lecturer in the Department of Brain and Cognitive Sciences at the Massachusetts Institute of Technology ("MIT"), a Visiting Scientist at the Clinical Research Center at MIT and a Visiting Instructor in the Department of Pharmacology at the University of New England College of Osteopathic Medicine. He has research experience involving monoamines and other neurotransmitters, and how drugs affect them in the both the brain and periphery. [12] He has conducted research on the role of phentermine in the pathogenesis of heart valve disease and pulmonary hypertension, and has published those opinions. *See* Timothy J. Maher, *et al., Phentermine and Other Monoamine Oxidase Inhibitors May Increase Plasma Serotonin When Given With Fenfluramines*, 353 The Lancet 38 (1999) (Joint Ex. 2A at Tab 1 Ex. C); *Valvulopathy or [*16] Primary Pulmonary Hypertension as Possible Consequences of Administering a Serotonin Uptake Blocker With a Monoamine Oxidase Inhibitor ("Phen-Fen")*, 23 Cardiovascular Reviews Reports 312-13 (1999) (Joint Ex. 2A at Tab 1 Ex. D); P.J. Wellman and T.J. Maher, *Synergistic Interactions Between Fenfluramine and Phentermine*, 23 International Journal of Obesity 723-32 (1999) (Joint Ex. 2A at Tab 1 Ex. E); and Timothy J. Maher, *et al., Does Phentermine Inhibit Monoamine Oxidase?*, 353 The Lancet 1362-63 (1999) (Joint Ex. 2A at Tab 1 Ex. F). Dr. Maher is not a medical doctor, nor does he have expertise in epidemiology, pulmonology, cardiology, PPH, VHD or serotonin systems. He has never treated patients nor prescribed medications.

> 12    The term periphery refers to the area of the body excluding the brain and spinal cord.

Dr. Wellman is a behavioral psychologist. He is Professor and Head of Psychology at Texas A & M University. Dr. Wellman is a member of several psychological societies and is an ad hoc reviewer [*17] for several scientific journals. (Joint Ex. 3A at Tab 2, P 1.) He has studied anorectic drugs and their effects in animals and has extrapolated from the animal data to the probable effects those drugs may have on humans. [13] Dr. Wellman co-authored with Dr. Maher the article entitled *Synergistic Interactions Between Fenfluramine and Phentermine*, 23 The International Journal of Obesity 723-32 (1999). (Joint Ex. 3A at Tab 1 Ex. C.) Dr. Wellman is not a medical doctor and has never treated patients nor prescribed medications. Dr. Wellman does

not consider himself an expert in epidemiology, pulmonology, cardiology, PPH or VHD.

> 13    Primarily, his research has focused on how phenylpropanloamine ("PPA") reduces appetite in animals. (Tr. 3/7/00 at 168.)

The court notes an initial problem in the qualifications of both Drs. Maher and Wellman. Neither Dr. Maher nor Dr. Wellman are medical doctors who have treated patients, yet both proffer opinions regarding PPH and VHD causation in humans. The court recognizes that [*18] this does not per se preclude Drs. Maher or Wellman from testifying about causation of these diseases in humans. *See Holbrook v. Lykes Bros. SS Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996) (stating that "[HN19]witness may be competent to testify as expert even though they may not, in the court's eyes, be the 'best' qualified"); *In re Paoli RR Yard PCB Litig.*, 916 F.2d 829, 856 (3d Cir. 1990) (holding that district court abused its discretion in excluding doctors "because the experts did not have the degree or training which the district court apparently thought would be most appropriate"). Nonetheless, Drs. Maher and Wellman do not have any general expertise regarding disease causation in humans. The court will take into consideration Dr. Maher's and Dr. Wellman's absence of expertise in human disease causation as it examines the reliability of their opinions and in determining "fit" under the *Daubert* standard. *See Smith v. Rasmussen*, 57 F. Supp. 2d 736, 766 (N.D. Iowa 1999) (stating that Supreme Court has "made clear that [HN20]a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond [*19] that area of expertise, or that are founded on a reliable methodology").

**B. *Opinion That the Fen-Phen Combination Induces Greater Cardiovascular Toxicity Than Does Fenfluramine Alone.***

Drs. Maher and Wellman opine that phentermine acts synergistically with fenfluramine to increase the risk of PPH and VHD. The "most plausible and likely mechanisms by which phentermine increases the toxicity of fenfluramine is by interfering with the clearance of serotonin from the lungs and the immediate local areas of pulmonary arteries and left side of the heart, through monoamine oxidase inhibition, and/or by increasing the local levels of extra-cellular serotonin by triggering the release of serotonin from platelets." [14] (Pls.' Post-Hr'g Mem. in Resp. to Defs.' Mots. to Exclude Expert Test. of

2000 U.S. Dist. LEXIS 9661, *19; CCH Prod. Liab. Rep. P15,855

Paul J. Wellman, Ph.D. and Timothy J. Maher, Ph.D. at 21; Joint Ex. 2A (Maher) at Tab 3 P 3(j).) Drs. Maher and Wellman both admit that their views on this subject are not generally accepted in the scientific community. The court recognizes that Dr. Maher's and Dr. Wellman's views have been published in a peer-reviewed journal. The court will consider these factors in undertaking its [*20] Daubert analysis.

> 14   A platelet is a cell fragment that floats freely in the blood plasma. ( Joint Ex. 5 (Gershon) at Tab 2 P 30.) Plasma is the fluid in which the cellular components of blood are suspended. Id. at 46 n.16.

### 1. Epidemiological Data.

Scientists often rely upon epidemiologic studies to test hypotheses about disease causation in humans. A fundamental premise of epidemiology is the use of controls or comparison groups in scientific studies. (Joint Ex. 8, Stampfer Decl. P 25.) Control groups are an essential component to epidemiological studies because many diseases occur in persons who have not been exposed to a particular drug or substance under study. [15] Id. This is particularly significant here, where both PPH and VHD have a background rate. In other words, both PPH and VHD occur in persons who have not been exposed to phentermine alone or in combination with fenfluramine and/or dexfenfluramine.

> 15   The rate of disease in the unexposed population is called the "background rate." (Joint Ex. 8, Stampfer Decl. 25.)

[*21] Epidemiologists compare rates of disease in various populations to determine whether there is an increased risk of disease in those who used a particular substance in comparison to non-users. (Joint Ex. 8, Stampfer Decl. P 26.) Thus, without utilizing a control group for comparison purposes, a conclusion that a substance caused a particular condition is scientifically unreliable. Id.

Plaintiffs concede that, at this time, no epidemiologic data support the position that phentermine, when combined with fenfluramine, increases the risk of PPH or VHD in humans. (Tr. 3/7/00 at 20.) In his testimony, Dr. Wellman also conceded this point. (Tr. 3/7/00 at 217.) Plaintiffs, however, argue that epidemiologic data are not necessary to demonstrate causation. (Tr. 3/7/00 at 25.)

### 2. Data Regarding Studies Performed on Whole, Live Animals.

Similarly, Plaintiffs have not shown any scientific evidence demonstrating that phentermine, when used in combination with fenfluramine, induces PPH or VHD in whole, live animals. (Tr. 3/7/00 at 225.) The biological mechanism of PPH is unknown and animal studies have not reproduced PPH in the laboratory. (Joint Ex. 9 (Higgenbottam) at Tab 5 PP 56, [*22] 59 & 63.) With respect to VHD, Dr. Wellman conceded that phentermine has never been shown to induce VHD in live, whole animals. [16] (Tr. 3/7/00 at 225.)

> 16   Dr. Wellman has referred to the Bratter Study in suggesting that the combination of phentermine with fenfluramine has been shown to produce "what appears to be" VHD in animals. (Tr. 3/7/00 at 225; Supp. Mem. of Phen. Defs. in Support of Mot. to Exclude Expert Test. of Drs. Wellman and Maher Ex. 2.) This study cannot reliably support Dr. Wellman's conclusion. The Bratter study involved pregnant rats that were administered phentermine and dexfenfluramine. Although 25% of the offspring reported valvular thickening, none of the mothers were reported to have valvular thickening. No meaningful conclusion can be drawn from this finding. Offspring are connected to their mother's circulation through the placenta and there are a number of interactions dealing with circulation that could cause valvular thickening quite apart from the effects of the diet drugs on the heart. (Tr. 3/8/00 at 23.)
>
> In addition, no rats in this study were administered phentermine or dexfenfluramine alone. Because the combination of phentermine and dexfenfluramine was not compared to dexfenfluramine alone, there is no way to determine whether valvular thickening was in any way caused by phentermine. Moreover, large doses of phentermine and dexfenfluramine were administered to the rats in the Bratter Study. (Supp. Mem. of Phen. Defs. in Support of Mot. to Exclude Expert Test. of Drs. Wellman and Maher Ex. 2 at R2.)

### [*23] 3. Serotonin Hypotheses.

The parties are divided as to whether serotonin is

Case 1:05-cv-00499-JJF    Document 328-2    Filed 01/31/2008    Page 22 of 56

2000 U.S. Dist. LEXIS 9661, *23; CCH Prod. Liab. Rep. P15,855

causally related to the pathogenesis of PPH and VHD. The Phentermine Defendants characterize serotonin as one of the many substances that is potentially responsible for PPH and VHD and which remains merely part of a hypothesis to be investigated further. *See* Joint Lit. Ex. 199 (Weir) at 2219 (stating that it is unlikely that serotonin is involved with PPH); Joint Lit. Ex. 169 (Rubin) at 195 (stating that "role of serotonin in the pathogenesis of PPH remains unclear"); Tr. 3/8/00 at 137 (Higgenbottam) (citing growing body of literature suggesting that serotonin is unlikely mechanism for PPH); Joint Ex. 4 (DeMaria) at Tab 2 PP 60-64 (stating that causal relationship between serotonin and VHD has not been established). Plaintiffs characterize serotonergic mechanisms as important to the pathogenesis of diet drug induced PPH and VHD. *See* Joint Lit. Ex. 56 (Egermayer) at 165 (stating that "serotonergic mechanisms are important in the pathogenesis of dietary pulmonary hypertension"); Joint Lit. Ex. 70 (Fristrom) (noting in study of drug Aminorex that there was relationship between serotonin and VHD [*24] and pulmonary hypertension); Joint Lit. Ex. 184 (Simonneau) (noting relationship between serotonin and VHD and PPH); Joint Lit. Ex. 65 (Fishman) (same).

The court will first examine whether there is any underlying data supporting Dr. Maher's and Dr. Wellman's opinions involving the connection between phentermine, when used in combination with fenfluramine, and PPH and VHD and serotonergic mechanisms. Dr. Maher's and Dr. Wellman's opinions are based upon various animal studies and human blood studies. Their opinions are grounded upon the notion that plasma serotonin levels are important in determining the cause of PPH and VHD and that phentermine produces elevated plasma serotonin levels. Both Drs. Maher and Wellman agreed that elevation of plasma serotonin is critical to their opinions. (Tr. 3/7/00 at 92-94, 227, 229-30 & 235-36.) Dr. Wellman testified that plasma serotonin is critical because it interacts with the tissues and organs of the body.

However, Plaintiffs have not set forth evidence demonstrating that phentermine, when used alone or in combination with fenfluramine, increases plasma serotonin in humans. (Tr. 3/8/00 at 11; Joint Ex. 5 (Gershon) at Tab 4 PP 48-50.) Drs. [*25] Maher and Wellman conceded that they could not identify any scientific evidence showing an increase in plasma serotonin levels in humans who ingested phentermine,

alone or in combination with fenfluramine. [17] (Tr. 3/7/00 at 96, 107-08 & 230.) Similarly, Drs. Maher and Wellman do not rely on any scientific evidence demonstrating that phentermine, either alone or in combination with fenfluramine, increases plasma serotonin levels in live animals. (Tr. 3/7/00 at 233-34; Tr. 3/8/00 at 11-12.) In fact, Dr. Wellman performed a rat study using phentermine alone that was inconclusive with regard to an increase of plasma serotonin levels. (Tr. 3/7/00 at 233-34.)

> 17 The Phentermine Defendants argue that a study by Dr. Redmon, *et al.* as well as another recent study support their position that plasma serotonin levels in patients who ingested phentermine and fenfluramine do not increase. (Joint Lit. Exs. 147 & 164.) Drs. Maher and Wellman dispute the Phentermine Defendants' interpretation of this data. More important, however, is that Drs. Maher and Wellman have not identified any scientific evidence to support their opinions that ingestion of phentermine, alone or in combination with fenfluramine, causes an increase in plasma serotonin levels in humans.

[*26] Lacking direct data to support their opinion that phentermine acts synergistically with fenfluramine to cause an increase in plasma serotonin, Dr. Maher's and Dr. Wellman's opinions are grounded primarily on theories involving serotonergic mechanisms. The court will examine these opinions regarding serotonergic mechanisms.

### a. Monoamine Oxidase Inhibition

Monoamine oxidase ("MAO") is an enzyme that breaks down serotonin in the periphery. Drs. Maher and Wellman rely on in vitro animal studies and opine that phentermine inhibits MAO, resulting in increased serotonin in the periphery. There are several problems with both these studies and these opinions. Most importantly, the concentrations of phentermine used in the animal studies relied upon by Drs. Maher and Wellman are significantly higher than that ingested by humans. (Tr. 3/7/00 at 144 & 258-59.) Dr. Maher also opined that phentermine might accumulate at critical locales in the body, including the lung. (Tr. 3/7/00 at 95.) Dr. Maher relies on the Mehendale study for this proposition. (Joint Lit. Ex. 138.) However, Dr. Mehendale's experiment provides no basis for the claim that phentermine accumulates in human lung tissue.

Page 10

Case 1:05-cv-00499-JJF    Document 328-2    Filed 01/31/2008    Page 23 of 56

2000 U.S. Dist. LEXIS 9661, *27; CCH Prod. Liab. Rep. P15,855

[*27] *See infra* III.B.3.b.

Dr. Maher acknowledges that the only human data on which he relies for his opinion that phentermine is an MAO inhibitor is his own study evaluating serotonin levels in the blood of human phentermine users. Dr. Maher's study did not find an increase in plasma serotonin levels. Instead, the study found an increase in platelet serotonin levels. Dr. Maher conceded that he is not aware of any scientific evidence showing that increased platelet serotonin leads to the development of PPH and VHD in humans. (Tr. 3/7/00 at 114.) In fact, the organs and tissues of the body are not exposed to serotonin in the platelet. *Id.* Moreover, Dr. Maher has acknowledged that platelet serotonin levels from his study cannot be used to demonstrate that plasma serotonin levels increase in those who ingest phentermine. (Joint Ex. 2B at Tab 5 at 160.)

Dr. Maher also refers to the drug Aminorex (an anorexic drug as is phentermine) as having the pharmacokinetics of inhibiting both MAO and serotonin uptake. To the extent that Dr. Maher relies on this as a basis for his opinion that phentermine synergistically interacts with fenfluramine to inhibit MAO, the court finds that such a conclusion [*28] does not reliably follow. *See Joiner, 522 U.S. at 145-46* (upholding district court's decision, in case involving PCB-exposure, not to rely on study involving similar harms caused by mineral oil where no mention of PCBs were made in study).

**b. Interference with Pulmonary Clearance of Serotonin.**

Drs. Maher and Wellman also opine that phentermine interferes with the pulmonary clearance of serotonin in the lung. (Tr. 3/7/00 at 246-47.) However, Dr. Wellman testified that he was unaware of any scientific evidence that phentermine alone interferes with the ability of the human lung to clear serotonin. [18] (Tr. 3/7/00 at 246-47.) Dr. Wellman also testified that he was unaware of any scientific evidence that phentermine when used with fenfluramine interfered with the pulmonary clearance of serotonin. [19] (Tr. 3/7/00 at 247.)

> 18  Dr. Gershon agreed with this concession. (Tr. 3/8/00 at 14.)
>
> 19  Dr. Gershon also agreed with this concession. (Tr. 3/8/00 at 14.)

Drs. Maher and Wellman rely on [*29] the Morita and Mehendale study in support of their opinion that

phentermine inhibits pulmonary clearance of serotonin. (Joint Lit. Ex. 138.) In that study, different dosages of chlorophentermine and phentermine were injected directly into the lungs of rats through the jugular vein. [20] (Tr. 3/8/00 at 70-71 & 76-77.) This experiment is not comparable to the human oral ingestion of phentermine. (Tr. 3/8/00 at 75-76.) As Dr. Mehendale testified, medication taken orally is absorbed into the blood circulation and metabolized. Some of the medication is excreted and what remains would be available for absorption into the body. (Tr. 3/8/00 at 76.) Only a fraction of that remaining phentermine would be taken up by organs and tissues. (Tr. 3/8/00 at 76.)

> 20  The objective of the experiment was to investigate the effects of different doses of chlorophentermine and phentermine on lung clearance of serotonin in rats.

In addition, only the highest dose of phentermine administered in the Morita and Mehendale study--20 mg/kg--had [*30] any effect on pulmonary clearance of serotonin. [21] (Tr. 3/8/00 at 72-79; Joint Lit. Ex. 138 at 749 fig. 3.) The human clinical dose in the study--0.5 mg/kg--had no effect on pulmonary clearance of serotonin. (Tr. 3/8/00 at 72-79; Joint Lit. Ex. 138 at 749 fig. 3.)

> 21  Dr. Mehendale referred to this dosage as a "whopping dose." (Tr. 3/8/00 at 79.) Dr. Wellman agreed that this dosage was substantially higher than the human clinical dose. (Tr. 3/7/00 at 248-51.) Moreover, the Morita and Mehendale study concluded that pulmonary clearance of serotonin was only "marginally inhibited" by this "whopping dose" of phentermine. (Joint Lit. Ex. 138 at 749 fig. 3.)

Nonetheless, Plaintiffs argue that phentermine's inhibition of the pulmonary clearance of serotonin is recognized in scientific literature. (Joint Lit. Ex. 44 (Connolly) at 588; Joint Lit. Ex. 65 (Fishman) at 159; Joint Ex. 2A (Maher) at Tab 3 Ex. 10, p.9.) These articles, however, simply cite to the Morita and Mehendale article and do not address the [*31] problems, discussed above, associated with extrapolating these study results to reach a conclusion that phentermine inhibits pulmonary clearance of serotonin in the human lung. [22] Dr. Connolly has acknowledged that the reference in her study to phentermine's interference with pulmonary clearance of serotonin was to an animal model

Case 1:05-cv-00499-JJF    Document 328-2    Filed 01/31/2008    Page 24 of 56

2000 U.S. Dist. LEXIS 9661, *31; CCH Prod. Liab. Rep. P15,855

and that there was no scientific data that would have permitted her to extrapolate the data from the rat study to humans. (Joint Ex. 12 (Connolly) at Tab 1, at 203 & 206-07.)

> 22  In addition, two of the articles, Dr. Fishman's *and* Dr. Maher's, have referred to the Morita and Mehendale study as performed on rabbits, although it actually involved rats. (Joint Lit. Ex. 65 (Fishman) at 159; Joint Ex. 2A (Maher) at Tab 3, Ex. 10 p.9.)

#### c. Serotonin Release.

Drs. Maher and Wellman also opine that phentermine causes serotonin to be released from blood platelets. However, there is no scientific evidence that phentermine causes the release of serotonin in the human periphery--from [*32] platelets or other cells into other compartments of the blood. (Tr. 3/7/00 at 242; Tr. 3/8/00 at 14.) Nor is there scientific evidence that phentermine, when combined with fenfluramine, causes serotonin to be released in the human periphery. (Tr. 3/7/00 at 243; Tr. 3/8/00 at 14.) Dr. Wellman has referred to the Fristrom study in forming his opinion that phentermine causes serotonin to be released from blood platelets. (Joint Lit. Ex. 70.) The Fristrom study measured the effect of, among other things, phentermine on platelets extracted from rabbit blood. This study is unreliable to support an extrapolation of its results to humans. The concentration of phentermine necessary to cause serotonin release from the rabbit platelets was 100 times greater than the human clinical concentration of phentermine. (Tr. 3/7/00 at 244-46.)

#### d. Stimulation of Serotonin Receptors.

Drs. Maher and Wellman also opine that phentermine affects serotonin receptors on heart valve tissue causing cellular proliferation. Dr. Maher relies on the Fitzgerald study for this opinion. (Joint Lit. Ex. 68.) The Fitzgerald study, according to Dr. Maher, found that "serotonin receptors on heart valve tissue, when [*33] stimulated produced the fibroplasia seen in fen-phen induced" VHD. (Joint Ex. 2A (Maher) at Tab 3 P 14.) However, the Fitzgerald study expressly finds that "phentermine, the other component of the 'fen-phen' combination, was found to be inactive at these receptors." 23 (Joint Lit. Ex. 68 at 79; Tr. 3/7/00 at 134-37.)

> 23  Dr. Gershon confirmed that in the Fitzgerald

study, phentermine did not have an effect upon the serotonin receptors. (Tr. 3/8/00 at 19-22.)

#### 4. Synergistic Toxicity

The Phentermine Defendants assert that synergy is a pharmacological phenomenon where the combined effect of two substances is greater than the sum of the effect of each substance alone. There is a generally accepted methodology for demonstrating synergy that involves the comparison of dose response curves of each drug alone with dose response curves for the two drugs together, using various fixed ratios of the drugs and an isobolographic analysis. There is no study in humans or animals in which synergy of the fen-phen [*34] combination has been demonstrated. (Tr. 3/8/00 at 109-110.)

Plaintiffs respond that:

> the word "synergism" has both a broad and a narrow meaning. In the broadest sense, it refers to any drug-drug interaction that increases or decreases an effect of another drug. More precisely used, it means only a narrow subset of such interactions, where both drugs have an effect, say, of 1, but $1 + 1 = 3$ or more. Where $1 + 1 = 2$ in a measured effect, that is additivity. Sometimes, one drug has no effect, the other a mild one, but $1 + 0 = 2$ or more, and then pharmacologists say there is potentiation by the drug with the zero effect. But "synergisms" in the title of Maher and Wellman's paper was used in the broad sense, including all types of these drug-drug interactions.

(Pls.' Post-Hr'g Mem. in Resp. to Defs.' Mots. to Exclude Expert Test. of Paul J. Wellman, Ph.D. and Timothy J. Maher, Ph.D. at 17-18.) Plaintiffs argue that "since it is not clear that phentermine alone can cause PPH, it is not knowable whether phentermine's boosting effect on fenfluramine PH is merely additive, or truly 'synergistic.'" *Id.* at 17.

This argument demonstrates the unreliability of [*35] Dr. Maher's and Dr. Wellman's opinions. Based on Plaintiffs' arguments, Drs. Maher and Wellman could present each of these theories of drug-drug interaction and have the jury choose between and among them and

Case 1:05-cv-00499-JJF    Document 328-2    Filed 01/31/2008    Page 25 of 56

2000 U.S. Dist. LEXIS 9661, *35; CCH Prod. Liab. Rep. P15,855

the weight to apply to them. Because these theories have merely been posited by Drs. Maher and Wellman and not tested, allowing such testimony would not assist the trier of fact.

Plaintiffs' position on synergistic toxicity also appears to be based, at least in part, upon the notion that synergy as to one outcome (appetite suppression) establishes synergy with respect to other outcomes, namely PPH and VHD. Plaintiffs cite to a number of studies in support of their synergy claims. These studies do not support the opinions of Drs. Maher and Wellman regarding synergistic toxicity. The Weintraub Study did not examine the effects of the fen-phen combination with regard to PPH or VHD. [24] (Joint Lit. Ex. 197.) Other studies reporting that fenfluramine and phentermine yield a larger increase in brain serotonin on the brains of rats and mice than either drug alone are also unreliable to support that notion that diet drugs can cause PPH or VHD in humans. These animal brain studies suffer [*36] from several deficiencies. First, in most of these. studies, an isobolographic analysis was not employed in analyzing synergy. [25] Second, the study improperly relies on results measuring brain serotonin and extrapolates those results to serotonin in the periphery. [26] Third, extrapolating the data on rats to humans is unreliable for a number of reasons, including: (1) differences in species; (2) higher dosages are used in animals; (3) animals are often administered the drugs through injection rather than oral ingestion, thereby increasing the concentration of the dose; and (4) the pharmacokinetics of animals and humans differ. (Tr. 3/8/00 at 112-15.)

> 24   The Weintraub study primarily examined the effect of diet drugs with respect to weight loss and adverse side effects. The study suggested a synergistic effect of the fen-phen combination with regard to a subjective assessment of "total fullness" by study participants. (Joint Lit. Ex. 197 at 1145.) The study also reported that those on combination therapy lost the same amount of weight as those on monotherapy. (Joint Lit. Ex. 197; Joint Ex. 7 (Vorhees) at Tab 4 P 14.) In addition, with regard to adverse effects, the Weintraub study found that there "was no significant difference between [the fen-phen] combination and placebo or between the three active treatments in total complaints." (Joint Lit. Ex. 197, at 1146.)

[*37]

> 25   Although an isobolographic analysis was employed in the Roth and Rowland Study, the data from that study could not be properly interpreted because, among other things, the researchers used recycled rats in the study. (Joint Lit. Ex. 159; Joint Ex. 7 (Vorhees) at Tab 3 at 30-31.) In addition, the Roth and Rowland Study did not measure any relation between the diet drugs and PPH or VHD. Moreover, these authors were unable to replicate their findings in a subsequent study. (Joint Lit. Ex. 168.)
>
> 26   Such an extrapolation is unreliable for several reasons, including: (1) serotonin in the brain originates in the brain and does not pass out of the brain into the periphery, and serotonin in the periphery does not enter the brain (the "blood-brain barrier"); (2) serotonin in the brain is confined to highly localized synapses, while serotonin released in the periphery may circulate throughout the body in the plasma; (3) serotonin receptors in the brain and periphery differ; and (4) mechanisms for the clearance of serotonin in the brain and periphery differ. (Tr. 3/8/00 at 112-15.)

Additionally, [*38] Plaintiffs cite the Reeve study for the proposition that phentermine causes pulmonary artery vasoconstriction. (Joint Lit. Ex. 148.) The Reeve study examined the effects of phentermine and dexfenfluramine on pulmonary artery pressures in perfused rat lungs. It also examined the drugs' effects on potassium channel current [27] and a corresponding electrical function in isolated smooth muscle cells [28] from rats. The Reeve study does not provide reliable support to show that phentermine acts synergistically with dexfenfluramine to block potassium channels in pulmonary smooth muscle cells, or causes pulmonary artery vasoconstriction in humans. (Tr. 3/8/00 at 175-80.) Significantly, the concentration of Phentermine used was at least 100 times greater than the clinically relevant concentration in humans. (Tr. 3/8/00 at 177.)

> 27   Ion channels regulate the contraction of smooth muscle cells. (Tr. 3/8/00 at 174.)
>
> 28   Smooth muscle cells line all the hollow organs of the body. Specifically, they make up the wall of the pulmonary arteries. (Tr. 3/8/00 at 173.)

[*39] **5. Summary**

The court finds that the opinions of Drs. Maher and Wellman do not amount to scientific knowledge and that

although their opinions may or may not be proven in the future, their current testimony is "based more on personal opinion than on [reliable] scientific knowledge." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1319 (11th Cir. 1999). The opinions of Drs. Maher and Wellman are not generally accepted within the scientific community. Although their views have been published in a peer reviewed journal, the court notes that Drs. Maher and Wellman have not relied on any epidemiological studies, nor have they relied on any testing performed on live, whole animals. [29]

> 29  The lack of these types of studies is not, in and of itself, fatal to Plaintiffs' proffer of these witnesses. *See Heller*, 167 F.3d at 158-59 (stating that district court erred to extent that it *required* doctor's testimony to be backed by scientific studies, but that court could consider that doctor relied on few, if any, studies linking exposure to hazardous substances) (emphasis added).

[*40]  Drs. Maher and Wellman have not demonstrated reliable data to support their hypothesis that elevated levels of plasma serotonin cause PPH or VHD. With regard to Dr. Maher's and Dr. Wellman's plasma serotonin hypothesis, there is also a problem with testability. Plasma serotonin levels are difficult to measure. (Joint Ex. 5 (Gershon) at Tab 3, at 71.) Moreover, while Dr. Maher's own human study showed elevated platelet serotonin levels, there is no reliable support to extrapolate these results to plasma serotonin.

Instead, Drs. Maher and Wellman have based their opinions on what they believe would be the likely effects of phentermine, when used in combination with fenfluramine, on human serotonin mechanisms. However, these opinions are based on in vitro animal studies. To the extent that Drs. Maher and Wellman have relied on in vitro studies performed on animals, the results cannot be reliably extrapolated to an opinion on human causation. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 743 (stating that "[HN21]in order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans just as the methodology [*41] of the studies must constitute good grounds to reach conclusions about the animals themselves"). Animal and human systems differ. Additionally, the concentration of phentermine used in these in vitro animal studies greatly exceeded any the human clinical dosage. These gaps in scientific data are amplified by the fact that Drs. Maher and Wellman are neither medical doctors, nor experts in epidemiology, cardiology or pulmonology.

The conclusions reached by Drs. Maher and Wellman have to "fit" with the data and the methodology that precede them. *See Heller*, 167 F.3d at 159. Even if their data (e.g., in vitro animal studies) and the methodology (serotonergic mechanisms) are reliable, the conclusions that Drs. Maher and Wellman have reached (that the fen-phen combination induces greater cardiovascular toxicity than does fenfluramine alone) do not reliably flow from this data and methodology. *See id.* Under these circumstances, the court finds that there is "too great an analytical gap" between the available scientific data and the opinions proffered by Drs. Maher and Wellman. *Joiner*, 522 U.S. at 146. Thus, thus the court will grant Defendants' motions [*42] to exclude the opinions of Drs. Maher and Wellman regarding the notion that the fen-phen combination induces greater cardiovascular toxicity than does fenfluramine alone.

### C. *Opinions Regarding Antagonistic Tolerability, Synergistic Efficacy and Increase in the Use of Pondimin.*

Drs. Maher and Wellman were identified by Plaintiffs pursuant to Pretrial Order No. 417 as "experts who would testify on general causation, i.e. the ability or tendency of the drugs to cause any of the injuries alleged." PTO No. 417. At the *Daubert* hearing, Drs. Maher and Wellman opined that phentermine, when taken in combination with fenfluramine, reduced the unpleasant side effects of fenfluramine. [30] Plaintiffs refer to this interaction as antagonistic tolerability. Drs. Maher and Wellman also opined that when phentermine and fenfluramine were combined, patients could take a lower dose and still lose as much weight. Plaintiffs refer to this interaction as synergistic efficacy. Drs. Maher and Wellman also opined that the pharmacological properties of phentermine caused a dramatic increase in the use of Pondimin in the United States and, thus, led to the vast majority of Pondimin-induced VHD [*43] and PPH. These opinions are quite apart from any opinion that phentermine contributes to the medical causation of PPH or VHD.

> 30  Drs. Maher and Wellman also provided the opinion that Pondimin monotherapy had minimal clinical usage because levofenfluramine caused unpleasant side effects and monotherapy required

2000 U.S. Dist. LEXIS 9661, *43; CCH Prod. Liab. Rep. P15,855

higher doses of the drug. Neither AHP nor the Phentermine Defendants have fashioned a direct challenge to these opinions. Thus, to the extent that a trial court finds them relevant, the court will not exclude these opinions on the present *Daubert* challenge.

**1. Antagonistic Tolerability and Synergistic Efficacy.**

According to Drs. Maher and Wellman, the adverse side effects of fenfluramine are caused by levofenfluramine's inhibition of the neurotransmitter dopamine. Drs. Maher and Wellman also opine that phentermine increases dopamine levels in the brain, thereby blunting the adverse effects of levofenfluramine. The Phentermine Defendants argue that Plaintiffs have not pointed to any scientific [*44] evidence concerning the effects of levofenfluramine and phentermine on dopamine in the brain. In fact, the Phentermine Defendants point out that Dr. Maher's and Dr. Wellman's paper refers to "antagonistic tolerability" as only a theoretical effect. [31]

> 31 According to the Maher and Wellman paper, "mixing phentermine with racemic fenfluramine would theoretically cancel out these dopaminergic effects, so as to minimize patient complaints and improve compliance." (Joint Lit. Ex. 203 at 724.)

Inasmuch as Plaintiffs also rely on the Weintraub and Brauer studies for their opinions regarding antagonistic tolerability, the Phentermine Defendants argue that these studies are unreliable to support the proposition. (Joint Lit. Exs. 197 & 28.) Drs. Maher and Wellman reported that the Weintraub study concluded that "fewer adverse effects were reported for the combination of fen-phen than for either drug alone." (Joint Lit. Ex. 203 at 723.) The Weintraub study, however, reported that there "was no significant difference between [*45] [the fen-phen] combination and placebo or between the three active treatments in total complaints." (Joint Lit. Ex. 197 at 1146.) With regard to the Brauer study, although it suggested "that phentermine may dampen some aversive effects of fenfluramine," the authors noted several limitations to their study and pointed out that their observations could only be confirmed with dose-response studies. (Joint Lit. Ex. 28 at 237-39.)

Drs. Maher and Wellman also rely on the Weintraub study for their opinion that the fen-phen combination is more effective at weight loss than the drugs alone. However, the Phentermine Defendants argue that the Weintraub study only suggested a synergistic effect of the fen-phen combination with regard to a subjective assessment of "total fullness" by study participants. (Joint Lit. Ex. 197 at 1145.) In fact, the study reported that those on combination therapy lost the same amount of weight as those on monotherapy. (Joint Lit. Ex. 197; Joint Ex. 7 (Vorhees) at Tab 4 P 14.)

With regard to the *Daubert* issues concerning these opinions concerning antagonistic tolerability and synergistic efficacy, [32] the court notes that Drs. Maher and Wellman [*46] are qualified to give a pharmacological explanation for the fen-phen combination. In addition, the court finds that the conclusions of Drs. Maher and Wellman could reliably follow from the studies and methodologies on which they rely. Although experts may disagree about interpretations of these studies, that goes more to the weight of the evidence than to reliability for *Daubert* purposes.

32 *See supra* at section I, PP 4, 4.1 and 4.2.

**2. Increased Use of Pondimin**

Drs. Maher and Wellman rely on several of Defendants' internal sales and marketing data for their opinion that the pharmacological properties of Phentermine caused a dramatic increase in the use of Pondimin. Neither Dr. Maher, a pharmacologist, nor Dr. Wellman, a behavioral psychologist, are qualified to testify about the sales and marketing trends involving phentermine and fenfluramine. It may be, for example, that Dr. Maher is qualified to opine on the pharmacological properties of phentermine, and Plaintiffs may seek to introduce evidence [*47] showing that phentermine, when combined with fenfluramine, caused an increase in Pondimin use. Such evidence, if admitted by the transferor court at trial, could be used to support Plaintiffs' legal argument that the Phentermine Defendants are responsible, in part, for the dangers caused by fenfluramine. However, the court finds that Drs. Maher and Wellman are not qualified to opine about the marketplace effect that phentermine had on Pondimin sales in the United States.

**D.** *Opinions That Fenfluramines Cause PPH and VHD.*

As part of their opinions, Drs. Maher and Wellman

Page 15

have stated that fenfluramines cause PPH and VHD. As discussed above, Drs. Maher and Wellman are not medical doctors and have limited experience in examining disease causation in humans. In fact, Drs. Maher and Wellman rely substantially on epidemiological studies to support their opinions with regard to the fenfluramines. *See* Pls.' Post-Hr'g Mem. in Resp. to Defs.' Mots. to Exclude Expert Test. of Paul J. Wellman, Ph.D. and Timothy J. Maher, Ph.D. at 2-3 (referring to two epidemiological studies and world-wide consensus statement that fenfluramines cause PPH). However, Drs. Maher and Wellman are not [*48] epidemiologists. In addition, to the limited extent that Drs. Maher and Wellman have done research with respect to diet drugs, it has focused mainly on phentermine and its potential synergistic effects. [33] With this background, the court finds that Drs. Maher and Wellman are not qualified to testify about whether fenfluramine or dexfenfluramine alone cause PPH or VHD.

> [33] Indeed, the court has reviewed the opinions of Drs. Maher and Wellman with regard to phentermine's potential synergistic qualities and will exclude any testimony by these witnesses on the issue.

#### E. *Plaintiffs' Motion to Update Record.*

On May 12, 2000, Plaintiffs filed a motion to update the record. Plaintiffs seeks to admit six new exhibits relevant to Defendants' motions to exclude the testimony of Drs. Maher and Wellman: (1) Exhibit 43, Julius M. Gardin, M.D., *et al.*, *Valvular Abnormalities and Cardiovascular Status Following Exposure to Dexfenfluramine or Phentermine/Fenfluramine*, 283 JAMA, No. 13 at 1703-09 (April 5, 2000); [*49] (2) Exhibit 44, Margaret R. MacLean, *Pulmonary Hypertension, Anorexigens and 5-HT: Pharmacological Synergism in Action?*, 20 Trends in Pharm. Sciences 490-95 (December 1999); (3) Exhibit 45, P. Valodia and J.A. Syce, *The Effect of Fenfluramine on the Pulmonary Disposition of 5- Hydroxytryptamine in the Isolated Perfused Rat Lung: a Comparison with Chlorophentermine*, 52 J. Pharm. Pharmacol. 53-58 (2000); (4) Exhibit 46, *European Withdrawal of Anorectic Agents/Appetite Suppressants* (forthcoming April 2000) 26 Current Problems in Pharmacovigilance; (5) Exhibit 47, *The European Union Bans Phentermine*, 4 Obesity Meds and Research News, Issue 4, at 4 (April 2000); and (6) Exhibit 48, Ismail H. Ulus, *et al.*,

*Characterization of Phentermine and Related Compounds as Monoamine Oxidase (MAO) Inhibitors*, 59 Biochemical Pharmacology 1611-21 (2000).

The Gardin Study (Ex. 43) was first presented in November 1998 at the annual meeting of the American Heart Association. For this hearing, the parties jointly submitted a slide containing the data on mitral valve regurgitation to which this study refers. A manuscript of the MacLean Study (Ex. 44) was marked as Exhibit 27 to Dr. Wellman's [*50] MDL deposition. It was not offered at the March 7-8, 2000 hearing. The Valodia Study (Ex. 45) does not involve or make any conclusions about phentermine. Exhibits 46 and 47 are news articles and do not qualify as "scientific" evidence. The manuscript of the Ulus Study (Ex. 48) was examined at Dr. Maher's MDL deposition and at the March 7-8, 2000 hearing.

Accordingly, the court finds that these exhibits are not new, and in some cases, not relevant. In any event, they do not present sufficient justification for the court to reopen the record. Thus, the court will deny Plaintiffs motion to update the record.

#### IV. *CONCLUSION*

For the foregoing reasons, the court will grant in part and deny in part the Phentermine Defendants' and American Home Products Corporation's motions to exclude the expert testimony of plaintiffs' experts Paul Wellman, Ph.D. and Timothy Maher, Ph.D. pursuant to Federal Rules of Evidence 702 and 703 and will deny Plaintiffs' motion to reopen the record.

An appropriate Pretrial Order follows.

#### *PRETRIAL ORDER NO. 1351*

AND NOW, TO WIT, this 28 day of June, 2000, upon consideration of the Phentermine Defendants' and American Home Products Corporation's [*51] motions to exclude the expert testimony of plaintiffs' experts Paul Wellman, Ph.D. and Timothy Maher, Ph.D. pursuant to Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), the responses thereto and the evidence elicited at a hearing held March 7 and 8, 2000, IT IS ORDERED that said motions are GRANTED IN PART and DENIED IN PART:

    1. to the extent that Drs. Maher or

2000 U.S. Dist. LEXIS 9661, *51; CCH Prod. Liab. Rep. P15,855

Wellman seek to offer opinions that the Fen-Phen combination induces greater cardiovascular toxicity than does fenfluramine alone, the motions are GRANTED;

2. to the extent that Drs. Maher or Wellman seek to offer opinions that the fenfluramines cause primary pulmonary hypertension ("PPH") or valvular heart disease ("VHD"), the motions are GRANTED;

3. to the extent that Drs. Maher or Wellman seek to offer opinions that the pharmacology of phentermine caused a dramatic increase in the use of Pondimin in the United States, the motions are GRANTED;

4. to the extent that Drs. Maher or Wellman seek to offer opinions that

Pondimin monotherapy had minimal clinical usage because levofenfluramine caused unpleasant side effects and clinical efficacy [*52] required higher doses, the motions are DENIED; and

5. to the extent that Drs. Maher or Wellman seek to offer opinions that the clinical combination of Fen-Phen caused phentermine to boost the efficacy of dexfenfluramine and blunt the unpleasant side effects of levofenfluramine in Pondimin, the motions are DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Update *Daubert* Record is DENIED.

BY THE COURT:

LOUIS C. BECHTLE, J.

Westlaw.

1987 WL 8953                                                                    Page 1
Not Reported in F.Supp., 1987 WL 8953 (D.Del.), Fed. Sec. L. Rep. P 93,230
**(Cite as: 1987 WL 8953 (D.Del.))**

▷
United States District Court, D. Delaware.
John T. HILL, et al., Plaintiffs,
v.
EQUITABLE BANK, National Association, Defendant.
**Civ. A. No. 82-220 CMW.**

March 3, 1987.
Steven D. Goldberg, of Theisen, Lank, Mulford & Goldberg, Wilmington, for plaintiffs; Richard I. Kovelant, and Douglas Clark Hollman, of Goldman, Kruger, Kovelant, Hurtt, Hollmann & Kaiser of Laurel, Maryland, of counsel.

Martin I. Lubaroff, of Richards, Layton & Finger, Wilmington, for defendant; Michael D. Colglazier, and Ty Cobb, of Miles & Stockbridge, Baltimore, Maryland, of counsel.

*OPINION*
CALEB M. WRIGHT, Senior District Judge.

*1 Defendant Equitable Bank has filed a motion in limine to exclude the expert testimony of Professor John C. Long of the University of Oklahoma Law School. Plaintiffs propose to have Professor Long testify as to whether defendant's alleged omissions and misrepresentations were "material." [FN1] Defendant claims that such testimony runs afoul of Federal Rules of Evidence 702 and 704. Defendant's motion will be granted. [FN2]

Under Federal Rule of Evidence 702, the testimony of an expert is admissible if it will "assist the trier of fact." The expert's proposed testimony will be to evaluate the facts as alleged and determine if the bank's misrepresentations and omissions were material. Both parties apparently agree that a fact is material if it "is one that a reason-

able man would attach importance to in determining his choice of action in the transaction in question.... [A] material fact is one that a reasonable man would deem important in determining whether or not to purchase a corporation's stock." 3 Devitt and Blackmar, *Federal Jury Instructions* § 98.05 (1977). The question in the instant case then becomes whether an expert's testimony concerning whether the facts omitted or misrepresented by the bank were material will assist a jury in making the determination.

In determining whether expert testimony is proper, " 'there is no more certain test than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' Ladd, *Expert Testimony*, 5 Vand.L.Rev. 414, 418 (1952)." Notes of Advisory Committee on Proposed Rules. The question of materiality depends in large part upon the reasonable man standard. Determining what effect a particular fact would have upon the action of a reasonable man is, in all areas of the law, an area of inquiry typically belonging to the finder of fact. In *S.E.C. v. Bausch & Lomb, Inc.*, for example, the materiality of a fact in a securities case was determined by the judge. 565 F.2d 8, 14 (2d Cir.1977).

In securities cases, expert testimony has been allowed, but it typically has been permitted in situations where the expert testifies to a technical aspect of the securities industry, not to legal conclusions derived from the facts of a transaction.

The Second Circuit Court of Appeals elaborated on this in *Marx & Co., Inc. v.*

*Diners Club, Inc.,* 550 F.2d 505 (2d Cir.), *cert. denied,* 434 U.S. 861 (1977). The court upheld the admission of testimony concerning a lawyer's typical practice in fulfilling securities laws requirements but reversed admission of testimony concerning the legal requirements of the contract at issue. *Id.* at 509. The court noted that securities experts were sometimes appropriate in litigation but only for purposes of explaining different aspects of the industry and not for reaching a legal conclusion about certain practices. *Id.* at 512. [FN3] In short, the expert, if allowed to testify, will simply impose his judgment of what a reasonable investor should do given certain information; such a determination is precisely the decision a jury should make. "It is for the jury to evaluate the facts in the light of the applicable rule of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum." *Marx,* 550 F.2d at 510. In the instant case, it is for the jury to evaluate the facts of omission and misrepresentation and apply them to the applicable securities law as explained by the judge. In that decisionmaking process, there is no room for an expert law professor.

*2 Although Federal Rule of Evidence 704 abolishes the "ultimate issue rule", it does not permit an expert to replace the judge in explaining the law to the jury. That is the core of the problem with the expert's testimony: it does nothing more than invade the province of the Court in rendering judgments on matters of law. In the course of the many opinions issued in this case, the Court has ruled several times on which of the plaintiffs' allegations, if true, would result in recovery. In essence, that is all plaintiffs' expert would be doing, albeit for only one element of the claim. At trial, it should be the Court and not an expert, to explain the law of materiality to the jury. As defendant's opening brief quite

forcefully points out, the expert viewed himself as a surrogate judge. *See* Defendant's Opening Brief at 12. This is as true for the question of materiality as it is for the "ultimate" question of liability. In either case, the witness will be testifying that if the facts are as alleged then a certain legal conclusion results.

Defendant has cited to an impressive list of authority prohibiting a witness-- either an expert or a layperson--to testify to the legal significance of a particular set of facts. *See Tones v. City of Oakland,* 758 F.2d 147 (6th Cir.1985) (prohibiting testimony by layperson that plaintiff had not been discriminated against); *United States v. Zipkin,* 729 F.2d 384 (6th Cir.1984) (prohibiting bankruptcy judge from testifying to his view of the proper interpretation of the bankruptcy laws); *F.A.A. v. Landy,* 705 F.2d 624, 633 (2d Cir.), *cert. denied,* 464 U.S. 895 (1983) (proper exclusion of former Federal Aviation Administration official's understanding of certain Federal Aviation Regulations); *Christian v. National Savings & Trust Company,* 683 F.2d 520, 529 (D.C.Cir.1982) (proper exclusion of lay legal conclusion about a "fiduciary relationship"); *Strong v. E.I. du Pont de Nemours, Inc.,* 667 F.2d 682, 685-686 (8th Cir.1981) (proper exclusion of testimony finding warnings "inadequate" and product "unreasonably dangerous").

These cases all indicate the basic principle that it is the function of the trial judge to determine the law of the case. *Zipkin,* 729 F.2d at 387. In this case, it is this Court's function to explain to the jury the legal meaning of materiality. It will then be the jury's function to apply the facts to the judicially explained law. Expert testimony on this issue will be superfluous and will therefore be excluded.

An Order will enter in conformity with this

Opinion.

> FN1. Plaintiffs conceded in their memorandum that it would be improper for Professor Long to testify on the issue of liability.

> FN2. In defendant's reply brief, defendant contended that the motion would be moot if the Court granted defendant's then pending Motion to Alter the Judgment and dismissed plaintiffs' securities claims. Even after granting this motion in part, however, the securities claims of plaintiff James Stritzinger remain. Also, the RICO claims of all the plaintiffs survived the Motion To Alter the Judgment. The plaintiffs will thus want to prove the predicate acts of securities fraud even though they cannot recover for the securities fraud directly.

> FN3. Plaintiffs make much of a footnote in *Marx* that cites to an earlier Second Circuit opinion in which the court held an expert's testimony about "materiality" to be admissible. *United States v. Cohen,* 518 F.2d 727 (2d Cir.1975), *cert. denied, sub nom Deutch v. United States,* 423 U.S. 926 (1977). In that case, however, both sides used experts to discuss the issue, and it was only the testimony of the second expert that was contested. Second, the witness in *Cohen* testified to "concepts" of materiality and not to the kind of conclusion from the facts that plaintiffs' expert will testify to here.

Not Reported in F.Supp., 1987 WL 8953 (D.Del.), Fed. Sec. L. Rep. P 93,230

**END OF DOCUMENT**

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

LEXSEE



Analysis
As of: Jan 29, 2008

## DOROTHY H. NICKEL, Plaintiff, v. NEVIN J. GILLETTE and DIVERSIFIED FINANCIAL OF ILLINOIS, INC., Defendants

### 06-C-24-S

### UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN

### 2006 U.S. Dist. LEXIS 66741

### September 13, 2006, Decided

**PRIOR HISTORY:** Nickel v. Gillette, 2006 U.S. Dist. LEXIS 50526 (W.D. Wis., July 19, 2006)

**CORE TERMS:** accounting, documentation, summary judgment, expert testimony, genuine, investment advisors, fiduciary relationship, actual damages, nonmoving party, equitable remedy, legal remedy, discrepancies, complicated, fiduciary duty, favorably, discovery, earnings, broker

**COUNSEL:** [*1] For DOROTHY H. NICKEL, Plaintiffs: RICHARD R. GRANT, CONSIGNY, ANDREWS, HEMMING & GRANT, JANESVILLE, WI.

For NEVIN J. GILLETTE, DIVERSIFIED FINANCIAL OF ILLINOIS, INC., Defendants: MICHAEL B. VAN SICKLEN, FOLEY & LARDNER, MADISON, WI.

**JUDGES:** JOHN C. SHABAZ, District Judge.

**OPINION BY:** JOHN C. SHABAZ

**OPINION**

MEMORANDUM AND ORDER

Plaintiff Dorothy Nickel commenced this action for fraud, breach of fiduciary duty and negligence against her investment advisors and brokers, defendants Nevin Gillette and Diversified Financial of Illinois, Inc. The matter is presently before the Court on defendants' motion for summary judgment. The following is a summary of facts viewed most favorably to plaintiff.

FACTS

Plaintiff is a Wisconsin resident and an unsophisticated investor. Defendant Gillette is an Illinois investment advisor and broker and an agent of defendant Diversified. In 1985 defendants made representations to plaintiff and her husband and solicited them to open an account with defendants for the purpose of purchasing securities and life insurance. Plaintiff and her husband opened an account and invested funds, relying on defendants to make investment decisions on their behalf. Defendants made [*2] the following representations to plaintiff and her husband: that defendants would invest to preserve principal, maximize return and maintain liquidity; that defendants were experienced, knowledgeable investment advisors; that plaintiff and her husband would profit from the investments; that plaintiff's risk exposure would be limited. Thereafter defendants received funds from and rendered reports to plaintiff setting forth investments allegedly made on plaintiff's behalf and the value of plaintiff's account. After plaintiff's husband's death in October 2005 plaintiff sought documentation of her investments from

Page 1

defendants. When defendants provided only limited and inaccurate documentation plaintiff commenced this action on January 11, 2006.

Notwithstanding numerous discovery conferences and motions to compel discovery, defendants have been unable to present the type of third party documentation which would normally be expected had investments been made as defendants represented in their statements. Defendants have provided incomplete and inadequate documentation and explanations of investments. During her relationship with defendants plaintiff and her husband had sent $ 254,000 to [*3] defendants and had withdrawn $ 69,380.57. On May 2, 2006 defendants paid plaintiff $ 354,717.91, an amount which defendant represented to be the total of plaintiff's contributions and earnings held by defendants. Plaintiff's expert has opined that the lack of adequate documentation makes it impossible to determine whether the amount paid represents the actual balance of funds and earnings.

## MEMORANDUM

Defendants move for summary judgment on the basis that plaintiff lacks essential expert testimony to prove damages at trial. Plaintiff contends that damages may established based on documents and testimony at trial which could establish that a greater return was realized on certain investments. Defendants also advanced several arguments relating to elements of plaintiff's liability case, which they abandoned in their reply brief.

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P. [*4] A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable factfinder, applying the appropriate evidentiary standard of proof, could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

Concerning the liability aspect of the motion, the facts viewed most favorably to plaintiff, particularly the virtual lack of documentation provided by defendants, could sustain the inference that defendants falsely reported the investments they were making on plaintiff's behalf, converting the funds to a different purpose. Such conduct clearly could sustain claims of negligence, misrepresentation and breach of fiduciary duty even in the absence of expert testimony that it is improper.

Defendants correctly note that proof of actual damages is an essential element of each of defendant's tort claims, Widemshek v. Fale, 17 Wis. 2d 337, 340, 117 N.W.2d 275 (1962), [*5] and that punitive damages are not recoverable in the absence of compensatory discrepancies. Tucker v. Marcus, 142 Wis. 2d 425, 418 N.W.2d 818 (1988). However, record keeping discrepancies and testimony could establish some amount of actual damages for which expert testimony would not be required.

More importantly, defendants' motion entirely overlooks plaintiff's alternative claim for the equitable remedy of an accounting. In general, an accounting is available as an equitable remedy when the legal remedy appears inadequate because underlying facts have been undiscoverable, the accounts are complicated and a fiduciary relationship exists. Anitgo Superior Nursing Home, Inc. v. First Fed. S & L Ass'n, 51 Wis. 2d 196, 201, 186 N.W.2d 265; Walter Diehnelt, Inc. v. Root, 183 Wis. 535, 198 N.W. 388 (1924). See also 1 Am. Jur. 2d Accounts and Accounting § 59 (2005) ("equity jurisdiction may be exercised and an accounting decreed, in actions arising out of a tort where there is an allegation of fraud, especially where there is an additional ground for jurisdiction, such as the existence of [*6] a fiduciary relationship, or where the accounts and transactions alleged to have been tainted with fraud were complicated").

Accordingly, the evidence necessary to establish liability and damages (or the inability to prove damages so that a remedy at law is inadequate) is largely the same as that necessary to obtain an accounting. Defendants' disregard for the possibility of an accounting remedy at the conclusion of trial is particularly striking in light of their vigorous opposition to plaintiff's recent motion to compel on the basis that the accounting remedy remained available pursuant to count V of the complaint. See Defendants' response to plaintiff's motions at P 2.

The evidence of record and inferences from it could sustain a finding that defendants breached their duty to plaintiff and defrauded her, and that she sustained damages as a result. In the absence of sufficient proof of damages at trial plaintiff may be entitled to an accounting as an equitable alternative based on the fact that defendants' conduct itself precluded her from establishing a legal remedy.

ORDER

IT IS ORDERED that defendants' motion for summary judgment is DENIED.

Entered this 13th day of September, [*7] 2006.

BY THE COURT:

S/ JOHN C. SHABAZ

District Judge

**ERMA WOODHULL, as Personal Representative of the Estate of Michael Woodhull, deceased, Plaintiff, v COUNTY OF KENT; SHERIFF LAWRENCE A. STELMA; CORRECTIONAL MEDICAL SYSTEMS, INC., a foreign corporation; CORRECTIONAL MEDICAL SERVICES, INC., a foreign corporation; DR. NASIM YACOB, M.D.; DR. DAVID CARREL, D.O.; DR. NAN ALT, M.D.; CATHERINE WHITE, R.N.; TAMMY SYSWERDA, R.N.; GWEN LANSER, R.N.; NANCY SQUIRES, R.N.; KAREN PROUDFOOT, R.N.; SHARON FISHER, R.N.; C. SYMKO; THE FAMILY OUTREACH CENTER, a Michigan corporation; RYAN VEENEMAN; and CORNERSTONE COMMUNITY MENTAL HEALTH SERVICES, a Michigan corporation, jointly and severally, Defendants.**

**Case No. 1:04-cv-203**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2006 U.S. Dist. LEXIS 54028*

**August 3, 2006, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at *Woodhull v. County of Kent, 2007 U.S. Dist. LEXIS 8039 (W.D. Mich., Feb. 5, 2007)*

**PRIOR HISTORY:** *Woodhull v. County of Kent, 2006 U.S. Dist. LEXIS 48594 (W.D. Mich., July 18, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the mother of a deceased pretrial detainee, sought to recover against defendants, two nurses, two doctors, and a corporation that had contracted to provide medical care to prisoners, under *42 U.S.C.S. § 1983*, alleging that their alleged deliberate indifference to the detainee's medical needs resulted in his death. Other defendants and state claims had been dismissed, and the remaining defendants sought summary judgment.

**OVERVIEW:** The detainee was at the jail for three days. During that time, he did not receive his seizure medication. He was subsequently hospitalized for seizures and later died. At issue was whether defendants were deliberately indifferent to the detainee's serious medical needs. In granting defendants' motion for summary judgment, the court held that (1) nurse one was

not deliberately indifferent because it was undisputed that she did not recognize the severity of the detainee's condition and it was not possible to say that she disregarded a risk of serious harm; (2) nurse two responded to the seizures, and, although the mother questioned the sufficiency of the response, medical malpractice did not become a constitutional violation merely because the victim was a prisoner; (3) although doctor one's actions could support a finding of malpractice, they did not rise to the level of a constitutional violation; (4) doctor two had no personal involvement in treating the detainee, and there was no showing, based on admissible evidence, that doctor two or the corporation had a de facto policy or custom of ignoring inmates' medication needs.

**OUTCOME:** The court granted defendants' motion for summary judgment.

**LexisNexis(R) Headnotes**

*Evidence > Judicial Notice > Domestic Laws*
[HN1] Federal courts may take judicial notice of proceedings in other courts of record.

*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN2] Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* In evaluating a motion for summary judgment, a court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*

[HN3] The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by showing--that is, pointing out to a district court--that there is an absence of evidence to support the nonmoving party's case.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Materiality*

[HN4] While inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing a motion for summary judgment, when the moving party has carried its burden under *Fed. R. Civ. P. 56(c),* its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.

*Civil Procedure > Summary Judgment > Standards > Materiality*

[HN5] Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material" for summary judgment purposes.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim*

*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN6] The pivotal question on a motion for summary judgment is whether the party bearing the burden of proof has presented a jury question as to each element of its case.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
*Evidence > Hearsay > General Overview*
*Evidence > Relevance > Relevant Evidence*

[HN7] A party opposing summary judgment must present more than a mere scintilla of evidence in support of her position; she must present evidence on which a jury could reasonably find for the nonmovant. In addition, under *Fed. R. Civ. P. 56(e),* evidence submitted in opposition to a motion for summary judgment must be admissible. Accordingly, hearsay evidence may not be considered on a motion for summary judgment. Hearsay evidence, as well as evidence which is irrelevant to the issue presented, must be disregarded.

*Evidence > Testimony > Experts > Daubert Standard*

[HN8] *Fed. R. Evid. 702* provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if certain conditions are met. *Rule 702* imposes on judges a gatekeeping role to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Faced with a proffer of expert scientific testimony, then, a trial judge must determine at the outset, pursuant to *Fed. R. Evid. 104(a),* whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. However, although Daubert specifically dealt with "scientific" evidence, courts have recognized that the "gatekeeper" analogy is applicable to all expert testimony offered under *Rule 702.*

*Evidence > Testimony > Experts > Helpfulness*

[HN9] *Fed. R. Evid. 704(a)* provides that testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to

be decided by the trier of fact. However, such opinion evidence must still be helpful to the trier of fact.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
*Evidence > Testimony > Experts > Helpfulness*
*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*
[HN10] No one, including an expert, can delve into a defendant's subjective state of mind. Objective facts and circumstances may provide evidence of a defendant's state of mind, but conclusory statements that a defendant acted with deliberate indifference with respect to a prisoner's medical needs do not assist the trier of fact. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. An expert may not opine on the question of deliberate indifference because this expresses a legal conclusion.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Rights Law > Section 1983 Actions > Elements > Color of State Law > General Overview*
*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
[HN11] To state a claim for relief in an action brought under *42 U.S.C.S. § 1983*, a plaintiff must establish both that he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of state law. Where a defendant makes a properly supported summary judgment motion in such an action, the non-moving party must demonstrate a genuine issue of material fact as to these two elements.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*
*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*
[HN12] Deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain prohibited by the *Eighth*

*Amendment* proscription against cruel and unusual punishment.

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*
*Constitutional Law > Substantive Due Process > Scope of Protection*
[HN13] The *Fourteenth Amendment's Due Process Clause* operates to guarantee *Eighth Amendment* protections to pretrial detainees.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*
*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*
[HN14] The U.S. Supreme Court has adopted a mixed objective and subjective standard for ascertaining the existence of deliberate indifference in the context of the *Eighth Amendment*: A prison official cannot be found liable under the *Eighth Amendment* for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. The objective component of the test requires the existence of a "sufficiently serious" medical need. A sufficiently serious medical need is predicated upon the inmate demonstrating that he or she is incarcerated under conditions imposing a substantial risk of serious harm. The subjective component, by contrast, requires a showing that the prison official possessed 'a sufficiently culpable state of mind in denying medical care.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*
*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*
[HN15] Deliberate indifference requires a degree of culpability greater than mere negligence, but less than

Case 1:05-cv-00499-JJF    Document 328-2    Filed 01/31/2008    Page 39 of 56

Page 4
2006 U.S. Dist. LEXIS 54028, *

acts or omissions for the very purpose of causing harm or with knowledge that medical harm will result. Prison official's state of mind must evince deliberateness tantamount to intent to punish. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference. Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment. A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention.

*Civil Rights Law > Prisoner Rights > Medical Treatment*

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*

*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*

[HN16] Deliberate indifference to a prisoner's medical needs describes a state of mind more blameworthy than negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.

*Civil Rights Law > Prisoner Rights > Medical Treatment*

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*

*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*

[HN17] An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment. The requirement that the official have subjectively perceived a risk of harm and then disregarded it, is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference to a prisoner's

medical needs must show more than negligence or the misdiagnosis of an ailment. A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment*. Deliberate indifference describes a state of mind more blameworthy than negligence. When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted for the very purpose of causing harm or with knowledge that harm will result. Officials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain.

*Civil Rights Law > Prisoner Rights > Medical Treatment*

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*

*Evidence > Relevance > Circumstantial & Direct Evidence*

*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*

[HN18] Deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. Although a plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by the usual ways, including inference from circumstantial evidence.

*Civil Rights Law > Prisoner Rights > Medical Treatment*

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*

*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*

[HN19] Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Civil Rights Law > Prisoner Rights > Medical*

Case 1:05-cv-00499-JJF    Document 328-2    Filed 01/31/2008    Page 40 of 56

Page 5
2006 U.S. Dist. LEXIS 54028, *

*Treatment*

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*
*Healthcare Law > Treatment > Failures & Refusals to Treat > Prisoners*
[HN20] Federal courts are generally reluctant to second guess medical judgments in cases alleging failure to provide appropriate medical treatment to prisoners.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Civil Rights Law > Immunity From Liability > Local Officials > Deliberate Indifference*
[HN21] Although a superior officer cannot be held vicariously liable under *42 U.S.C.S. § 1983* on a respondeat superior theory, he may be found liable under *§ 1983* on the basis of his own acts or omissions. One way in which a supervisor's behavior may come within this rule is by formulating a policy, or engaging in a custom, that leads to the challenged occurrence. Even if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it. A supervisor may be held liable for what he does or fails to do if his behavior demonstrates deliberate indifference to conduct that is itself violative of a plaintiff's constitutional rights.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Civil Rights Law > Immunity From Liability > Local Officials > Deliberate Indifference*
[HN22] There are a number of ways to establish a deliberate indifference claim against a supervisor: establishment of an unconstitutional policy, direct knowledge of the unconstitutional conduct of a subordinate at issue in the case, or the existence of a widespread pattern of violations suggesting that the supervisor should have been aware of the situation.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*
*Healthcare Law > Treatment > Failures & Refusals to*

*Treat > Prisoners*
[HN23] Non-compliance with the policies of a private organization does not amount to deliberate indifference to a prisoner's medical needs.

COUNSEL: [*1] For Erma Woodhull, Personal Representative of the Estate of Michael Woodhull, Deceased estate of Michael Woodhull, plaintiff: Douglas A. Merrow, Law Office of Douglas A. Merrow PLLC, Portage, MI.

For Kent County Sheriff's Department, named as the Kent County Sherriff Department jointly and severally, defendant: Peter A. Smit, Varnum Riddering Schmidt & Howlett LLP (Grand Rapids), Grand Rapids, MI.

For Gwen Lanser, named as Gwen Lanser, RN, jointly and severally, Tammy Syswerda, named as Tammy Syswerda, RN, jointly and severally, David Carrel, named as Dr. David Carrell, D.O., jointly and severally, Nasim A. Yacob, named as Dr. Nasim Yacob, MD, jointly and severally, Correctional Medical Services, Inc., a foreign corporation, jointly and severally, defendants: David B. Mammel, Ronald W. Chapman, Chapman and Associates PC, Bloomfield Hills, MI.

For Facilitative Mediator, mediator: William W. Jack, Jr., Smith Haughey Rice & Roegge, PC (Grand Rapids), Grand Rapids, MI.

JUDGES: Wendell A. Miles, Senior U.S. District Judge.

OPINION BY: Wendell A. Miles

OPINION

OPINION AND ORDER ON CMS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this removal action asserting claims under *42 U.S.C. § 1983* [*2] , plaintiff Erma Woodhull, alleges that the decedent, her son Michael Woodhull, died on November 3, 2001 after receiving inadequate medical care for a seizure disorder while in custody at the Kent County jail. The remaining defendants are a corporation, Correctional Medical Services, Inc. ("CMS"), which entered into a contract with the County to provide medical services to inmates at the jail, in addition to four individuals -- Nasim Yacob, M.D., Daniel Carrel, D.O., Tammy Syswerda, R.N., and Gwen Lanser, R.N. --

employed as doctors and nurses responsible for providing medical care at the jail.

The matter is currently before the court on a motion by the remaining defendants (collectively, "the CMS defendants" unless otherwise noted) for summary judgment (docket no. 131). Plaintiff has opposed the motion. For the reasons to follow, the court GRANTS the motion.

I

At relevant times, the Kent County jail had a capacity of approximately 1,100 inmates. Typically, it operated at a very full capacity. Nineteen year-old Michael Woodhull was incarcerated at the jail between September 11 and 14, 2001. He left the jail in an ambulance, which took him to a local hospital, where he remained [*3] until his death several weeks later on November 3, 2001. He died from complications resulting from a seizure disorder. The evidence appears undisputed that Michael did not receive medication prescribed for his seizures between the time he was admitted to the jail on September 11, 2001 and shortly before he was hospitalized on September 14, 2001.

CMS is a private corporation which has, at all times relevant to this action, contracted with Kent County to provide certain medical services to inmates incarcerated at the Kent County jail. Nasim Yacob, M.D., Daniel Carrel, D.O., Tammy Syswerda, R.N., and Gwen Lanser, R.N. are persons who, at all times relevant to this action, were employed by CMS to provide medical services to inmates at the Kent County jail. Dr. Yacob worked part-time for CMS as a primary care physician at the jail and also served as medical director of the facility. His duties in that position included seeing inmates at the jail requiring medical attention, in addition to reviewing the jail's medical policies and procedures. Dr. Carrel, who worked part-time as a primary care physician at the jail, and nurses Syswerda and Lanser, who are registered nurses, were present [*4] at the jail and saw Michael Woodhull at various times during his stay between September 11 and 14, 2001. It is undisputed that Dr. Yacob himself never saw Michael during his stay at the jail, although he did have overall responsibility for managing the care of inmates at the jail. Although he served as medical director of the jail, Dr. Yacob did not participate in the drafting or negotiation of the agreement between CMS and Kent County.

Michael Woodhull had suffered from intractable seizures since he was a small boy. His seizure disorder was suspected to have been caused by head trauma which Michael likely sustained when he fell from a moving car; he began having seizures approximately two weeks after the incident. Numerous treatments undertaken to control Michael's seizures, including multiple surgeries, were apparently unsuccessful. Michael's condition caused him to become developmentally delayed, or "slow." At some point, when Michael was a teenager, his behavior became aggressive, and his mother Erma Woodhull, the plaintiff in this action, sent him elsewhere to live because she could no longer manage him.

On September 11, 2001, Michael was residing in an adult foster care home [*5] in Kentwood, Michigan when he bit a staff member employed at the home. Police were called, and Michael was arrested by Kentwood police on a charge of aggravated assault late that evening. Before taking him to jail, however, the police took Michael to St. Mary's Medical Center for an evaluation to determine whether he was an acceptable candidate for admission to jail. Although it is unclear whether police acted due to concern about Michael's mental state, or his physical state, or both, what is clear is that Michael was evaluated by a physician before he was taken to jail.

At the time of his examination at St. Mary's on the evening of September 11, 2001, a history was provided that Michael suffered from seizures, mental retardation, diabetes, and an oppositional disorder. The physician who examined Michael, Dr. Michael Olgren, listed Michael's medications as Depakote, Keppra, Geodon, Bactroban, folic acid, Effexor, Dilantin, and Seroquel. Although Michael was uncertain whether he had experienced any seizures on that day, he denied having any other physical complaints. Plaintiff's Exhibit ("Pl. Ex.") 4 (Emergency Care Report). Dr. Olgren concluded that Michael was in satisfactory condition [*6] and was medically stable for jail. Dr. Olgren executed a "clearance" report, which he apparently provided to police, indicating that Michael was acceptable for admission to jail, with the stipulation to "continue current medications." Pl. Ex. 5 (Prisoner Medical Clearance Report). The names of the medications, dosages, and administration were not listed by Dr. Olgren in his report. Michael was discharged from St. Mary's at approximately 11:00 p.m. that night and was taken to the Kent County jail.

During booking at the jail at approximately 11:30 p.m. on September 11, 2001, Michael appears to have denied suffering from any serious medical conditions. It was, however, noted at booking that Michael was "mentally slow" and that he had been taken to the hospital for a "psyc" (presumably either a psychiatric or psychological) evaluation. It was also noted that Michael had been jailed on previous occasions. Pl. Ex. 7 (Inmate Initial Classification).

During booking, Michael was also medically screened by someone employed at the jail. There has been no evidence submitted that whoever interviewed Michael during the screening process was employed by CMS, or even that the person was medically [*7] trained. However, what is undisputed is that the interview resulted in the entry of a computerized "Jail Medical Screening," which recorded affirmative answers to the following: (1) recent hospital treatment; (2) allergies; (3) mental history; (4) on medication; (5) "psyc" medication; and (6) diabetes. The Jail Medical Screening recorded negative answers to the following (among other inquiries): (1) under doctor's care; (2) seizures-epilepsy; and (3) under "psyc" care. However, the Jail Medical Screening also contained remarks noting that Michael took "unk (unknown) meds," "pills for diabetes," and that he "was seen at hospital for psyc evaluation." Pl. Ex. 8. Michael therefore denied having seizures. Nonetheless, because he had diabetes and took medications, the intake screener referred Michael for a medical evaluation.

It is unclear whether Michael was seen by anyone employed by CMS on September 11 or 12, 2001. However, it is undisputed that nurse Syswerda saw Michael at 1:05 a.m. on September 13, 2001, and that at that time he reported to her that he had a seizure disorder for which he needed medications because he was having seizures. Syswerda had Michael sign a release so that [*8] she could get his medication records from the crisis home. She also placed him on a "sick call" list and noted that he should be seen by the jail psychiatrist (who is no longer part of this action). Although there is evidence that the crisis home faxed the medication records to the jail on September 13, there is no evidence that any of the individual CMS defendants saw or took action on these records on that day.

At 5:30 a.m. on the morning of September 14, 2001, one of the deputies on duty at the jail called nurse Syswerda to tell her that Michael was feeling sick and

had thrown up. However, Syswerda did not go to see Michael at that time; instead, she made a note that she would pass the information on the next shift, as it was close to time for a shift change. Dr. Carrel saw Michael at 10:40 a.m. that morning, approximately five hours after it had been first been reported to nurse Syswerda that Michael had thrown up. Dr. Carrel observed Michael having petit mal seizures. He ordered Depakene for the seizures and a Phenergan injection for the vomiting that had been reported earlier. Dr. Carrel planned to obtain Michael's medication records before taking any further action.

At 11: [*9] 40 a.m., another deputy noticed that Michael was having a seizure, and she spoke to nurse Lanser. Lanser instructed the deputy to keep Michael on his side so that he could breathe. Lanser also apparently contacted Dr. Carrel, who came back to see Michael at 11:50 a.m. Dr. Carrel by this time had located Michael's medication records and ordered that Michael be given his prescribed seizure medications by mouth; these were given. Dr. Carrel also ordered an injection of Valium for the seizures, which was also given.

Still, at 12:05 p.m., the deputy notified nurse Lanser that Michael was having yet another seizure and vomiting. Lanser went to the cell and found Michael unresponsive. She remained with him for a time, but then later left, instructing the deputy how to position Michael in the event that he had another seizure. Michael did have another seizure, at 1:20 p.m. Lanser was eventually called to respond, and this time she sought a doctor's order to have Michael taken to the hospital.

Michael was transported to the hospital by EMS personnel, during which time he continued to have seizures. At the hospital, Michael was placed on a mechanical ventilator due to breathing difficulties. [*10] He remained on the ventilator until November 1, 2001, when the ventilator was removed after his condition deteriorated. Michael died on November 3, 2001. The cause of death was identified as diffuse alveolar damage and aspiration pneumonia due to his seizure disorder.

Plaintiff Erma Woodhull, Michael's mother, was appointed the personal representative of the estate of her son by the Allegan County Probate Court on June 25, 2002. Plaintiff originally filed this action in Michigan's Kent County Circuit Court in February, 2004, naming as defendants Kent County, the Kent County Sheriff's Department, and Sheriff Lawrence Stelma. These

defendants filed a Notice of Removal on March 24, 2004. Plaintiff later stipulated to the dismissal of the claims against the Sheriff's Department, which was dismissed from the action with prejudice in an order entered on May 3, 2004 (docket no. 13).

On July 1, 2004, plaintiff filed an amended complaint (docket no. 21) which added a number of defendants, including the CMS defendants. Plaintiff's amended complaint also added as defendants The Family Outreach Center and Cornerstone Community Health Services, as well as other individuals involved in her son's [*11] care at the jail. Plaintiff later agreed to the dismissal of the claims against Correctional Medical Systems, Inc., Nan Alt, M.D., Karen Proudfoot, R.N., and Sharon Fisher, R.N., and her claims against these defendants have been dismissed with prejudice (docket nos. 53, 89). Pursuant to a written settlement agreement, plaintiff's claims against a number of the other defendants -- including the County, Sheriff Stelma, The Family Outreach Center, Cornerstone Community Health Services, Ryan Veeneman, Cathy White, R.N., and Nancy Squires, R.N. -- have also been dismissed (docket no. 126). Plaintiff's claims against defendant C. Symko have also been dismissed, for lack of service (docket no. 127).

Plaintiff's amended complaint asserts claims against the CMS defendants for violation of *42 U.S.C. § 1983* and "gross negligence" under state law. As relief, plaintiff seeks both compensatory and punitive damages. Plaintiff also seeks declaratory relief that Michael's constitutional and state law rights were violated. In addition, plaintiff seeks injunctive relief requiring the defendants "to change their policies and procedures and training regimen so that similar violation [*12] will not and cannot recur." First Amended Complaint at 40. [1]

> 1    It is noted that although the amended complaint demands injunctive relief requiring changes at the jail, Michael Woodhull, the alleged victim of the claimed constitutional violation, is deceased and will therefore not be subjected to any future violations. Nor do the pleadings assert the claims of any other plaintiffs who are live residents of the jail. In short, the basis for the demand for injunctive relief escapes the court.

On December 22, 2004, several months after she had filed this action, plaintiff also filed a second action in state court arising out of these same events. In that action,

plaintiff asserted malpractice claims against the CMS defendants -- and others -- based on Michael Woodhull's treatment at the jail. Michigan's Kent County Circuit Court dismissed that action as time-barred by the two-year limitations period applicable to malpractice actions, *M.C.L. § 600.5805(6)*. The dismissal of the claims [*13] as time-barred was affirmed on appeal. *Woodhull v. Veeneman, 2005 Mich. App. LEXIS 2385, No. 262569, 2005 WL 2402041 (Mich. App. Sept. 29, 2005).* [2]

> 2    The state court's decision in the malpractice action is a proper subject for judicial notice. See *Granader v. Public Bank, 417 F.2d 75, 82 (6th Cir. 1969)* [HN1] ("Federal courts may take judicial notice of proceedings in other courts of record").

On March 27, 2006, this court issued an order declining to exercise supplemental jurisdiction over plaintiff's state law claims based on gross negligence because Michigan law was unclear regarding whether it would recognize gross negligence claims based on the same facts as time-barred malpractice claims which had been dismissed. Therefore, the claims at issue in this case are now limited to the federal civil rights claims against the CMS defendants. [3]

> 3    In their briefs, the parties appear to assume, based on language contained in a district court decision, that gross negligence is indistinguishable from deliberate indifference, the standard applicable to plaintiff's federal claims. See *Soles v. Ingham County, 316 F. Supp.2d 536, 545-546 (W.D. Mich. 2004).* This language does not does not represent Sixth Circuit law, which holds that "'[g]ross negligence' is not enough to ground liability according to the Supreme Court[.]" *Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994).* However, because the court has declined to exercise supplemental jurisdiction over plaintiff's claims based on gross negligence, those claims are not addressed on the merits.

[*14] Discovery in this case was to have been completed by October 1, 2005. Stipulated Order Extending Case Management Dates (docket no. 87), P 3 (entered Jan. 10, 2005). Plaintiff was to identify her experts by April 1, 2005, and defendants by May 1, 2005. Id. Plaintiff was to provide written reports of her experts by July 1, 2005, and defendants were to do the same by

August 1, 2005. Id.

The present motion was fully briefed as of December, 2005. Oral argument on the motion was scheduled and adjourned a number of times before it was ultimately held on June 29, 2006. For reason(s) which she has not explained, on June 19, 2006, plaintiff filed an additional, second "affidavit" of one her prison medical experts, Corey Weinstein. On June 26, 2006, CMS filed a motion to strike this late-filed affidavit. Plaintiff failed to respond to the motion, which the court granted on July 18, 2006 (docket no. 171).

**II**

[HN2] Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter [*15] of law." *Fed.R.Civ.P. 56(c)*. In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. [HN3] The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by "'showing'--that is, pointing out to the district court'--that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. While inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, "[w]hen the moving party has carried its burden under *Rule 56(c)*, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. [HN5] Only factual disputes which may have an effect on the outcome [*16] of a lawsuit under the applicable substantive law are "material." *Anderson, 477 U.S. at 248*. [HN6] "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996)*.

[HN7] "The plaintiff must present more than a mere scintilla of evidence in support of her position; [she] must present 'evidence on which the jury could reasonably find for the plaintiff.'" Id. (quoting *Anderson, 477 U.S. at 252, 106 S.Ct. at 2512*). In addition, "[u]nder *Fed.R.Civ.P. 56(e)*, evidence submitted in opposition to a motion for summary judgment must be admissible." *U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997)*. "Accordingly, hearsay evidence may not be considered on a motion for summary judgment." *Hartsel, 87 F.3d at 799*; see *U.S. Structures, 130 F.3d at 1189* ("Hearsay evidence, as well as evidence which is irrelevant to the issue presented, must be disregarded"). Because, as the CMS defendants have noted, plaintiff has [*17] submitted materials consisting of hearsay or double hearsay -- which include the Office of Recipient Rights Investigative Report (Plaintiff's Exhibit 12) and unsigned, unsworn transcripts of statements purportedly made by former Kent County jail inmates to a private investigator (Plaintiff's Exhibits 14, 15, 16, and 17) -- these materials must be disregarded. [4]

> 4    Plaintiff has not provided foundational facts establishing that the Office of Recipient Rights Investigative Report falls within *Fed.R.Evid. 803(8)*, which provides a hearsay exception for certain "public" records and reports. However, even if plaintiff were to establish the applicability of this exception, the report itself contains hearsay not falling within any recognized exception.

As noted above, the court has also stricken the second expert affidavit of Dr. Corey Weinstein. The court has therefore not considered this affidavit, dated June 13, 2006. [5] In addition, however, both sides have submitted evidence which [*18] includes opinions of other medical and nursing experts.

> 5    In its Order striking Dr. Weinstein' second affidavit (docket no. 171), the court concluded that the affidavit included new matters or opinions not timely disclosed in the written report required by *Fed.R.Civ.P. 26(a)(2)*. More specifically, paragraphs 27 and 28 of the second affidavit, regarding policies and procedures, training and supervision, and custom and practice of CMS personnel at the jail, were not disclosed in Dr. Weinstein's original "preliminary" report, which plaintiff submitted as Exhibit 38 to her brief in response to the motion for summary judgment.

[HN8] *Fed.R.Evid. 702* provides that "[i]f scientific, technical, or other specialized knowledge will assist the

trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or [*19] otherwise," if certain conditions are met. In the seminal case on the matter, *Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, the United States Supreme Court held that *Rule 702* imposes on judges a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *509 U.S. at 589, 113 S.Ct. at 2795.* "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to *[Fed.R.Evid.] 104(a)*, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *509 U.S. at 592, 113 S.Ct. at 2796* (footnotes omitted). However, "[a]lthough Daubert specifically dealt with 'scientific' evidence, [courts] have recognized that the 'gatekeeper' analogy 'is applicable to all expert testimony offered under *Rule 702*.'" *First Tennessee Bank Nat'l Assn. v. Barreto, 268 F.3d 319, 334 (6th Cir. 2001)* (citation omitted).

Here, the question with respect to both sides' expert opinion evidence [*20] is one of relevance, not reliability. Specifically, both sides' experts have opined regarding "deliberate indifference." [HN9] *Fed.R.Evid. 704(a)* provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, such opinion evidence must still be helpful to the trier of fact. As will be noted below, whether or not a defendant acted with deliberate indifference is dependent upon their subjective state of mind. *Farmer v. Brennan, 511 U.S. 825, 839, 114 S.Ct. 1970, 1980, 128 L. Ed. 2d 811 (1994).* [HN10] No one, including an expert, can delve into a defendant's subjective state of mind. Objective facts and circumstances may provide evidence of a defendant's state of mind, but conclusory statements that a defendant acted with deliberate indifference do not assist the trier of fact. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier, 387 F.3d 1244, 1262-1263 (11th Cir. 2004).* Deliberate indifference [*21] "is a legal term." *Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994).* An expert may not opine on the question of deliberate indifference because this expresses a legal

conclusion. See *id. at 1352-1353* (expert could not testify that lax discipline policies of police department indicated city was deliberately indifferent). The parties' production of conflicting opinions of experts regarding whether the CMS' defendants' conduct met the standard of care or was "deliberately indifferent" does not create a triable issue on plaintiff's constitutional claims. Accordingly, the court has disregarded those opinions of both sides' experts which express a legal conclusion that a defendant was or was not deliberately indifferent. See Defendant's Exhibit H, Expert Report of Lisa Horstman, R.N., Ps D(1) and (2) (opining that Syswerda and Lanser were not "deliberately indifferent"); Defendant's Exhibit K, Expert Report of Michael Grebner, M.D., PD ("there is no evidence of deliberate indifference"); Defendant's Exhibit L, Expert Report of Leon Pedell, M.D. ("I can find nothing to suggest any deliberate indifference"); Defendant's Exhibit M, Expert Report [*22] of William Luetcher, M.D., Ps D(1) and (2) (opining that Drs. Yacob and Carrel were not "deliberately indifferent"); Defendant's Exhibit N, Expert Report of Gary Trock, M.D., PD (same); Plaintiff's Exhibit 38, "Preliminary Report" of Corey Weinstein, M.D., P26 (opining that jail staff were "deliberately indifferent to the medical needs of Michael Woodhull"); Plaintiff's Exhibit 40, "Preliminary Report" of Joe Goldenson, M.D., at 18 (opining regarding "deliberate indifference" and "gross negligence").

### III

[HN11] To state a claim for relief in an action brought under *§ 1983*, a plaintiff must establish both that he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of state law. E.g., *American Mfrs. Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 985, 143 L. Ed. 2d 130 (1999).* Where the defendant makes a properly supported summary judgment motion in such an action, the non-moving party must demonstrate a genuine issue of material fact as to these two elements. *Miller v. Calhoun County, 408 F.3d 803, 812 (6th Cir. 2005).* The CMS defendants do not dispute that they [*23] acted under color of state law. What they do dispute is whether plaintiff can establish that Michael Woodhull was deprived of a right secured by the Constitution, namely, the *Eighth Amendment*.

"It is well settled" that [HN12] deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain

prohibited by the *Eighth Amendment* proscription against cruel and unusual punishment. *Terrance v. Northville Regional Psychiatric Hosp., 286 F.3d 834, 843 (6th Cir. 2002)* (citing *Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L. Ed. 2d 251 (1976)*). Even though Michael Woodhull was an unconvicted detainee, [HN13] the *Fourteenth Amendment's Due Process Clause* operates to guarantee the same *Eighth Amendment* protections to pretrial detainees. *Miller, 408 F.3d at 812.* As stated in Miller,

> [HN14] The Supreme Court has adopted a mixed objective and subjective standard for ascertaining the existence of deliberate indifference in the context of the *Eighth Amendment*:

>> [A] prison official cannot be found liable under the *Eighth Amendment* for denying an inmate humane conditions of confinement unless the official [*24] knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).* The objective component of the test requires the existence of a 'sufficiently serious' medical need. *Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir.2004).* A sufficiently serious medical need is predicated upon the inmate demonstrating that he or she 'is incarcerated under conditions imposing a substantial risk of serious harm.' Id. (quoting *Farmer, 511 U.S. at 834, 114 S.Ct. 1970*).

The subjective component, by contrast, requires a showing that the prison official possessed 'a sufficiently culpable state of mind in denying medical care.' Id. (quoting *Farmer, 511 U.S. at 834, 114 S.Ct. 1970*). [HN15] Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result. [*25] ' *Farmer, 511 U.S. at 835, 114 S.Ct. 1970.* The prison official's state of mind must evince 'deliberateness tantamount to intent to punish.' *Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir.1994).* 'Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.' Id. Thus, 'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.' *Farmer, 511 U.S. at 838, 114 S.Ct. 1970.*

*Miller, 408 F.3d at 812-813*

A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).* The CMS defendants do not dispute that Michael Woodhull's seizure condition could be classified as a serious medical need. Therefore, the objective component of plaintiff's [*26] claim is satisfied. The true dispute therefore lies in the subjective component of plaintiff's claim of deliberate indifference. Because the subjective component of plaintiff's claim is in dispute, the court must address the facts against each of the CMS defendants individually.

[HN16] Deliberate indifference "describes a state of mind more blameworthy than negligence," *Farmer, 511 U.S. at 835, 114 S.Ct. at 1978,* but can be "satisfied by

something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. Under Farmer, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id. at 837, 114 S.Ct. at 1974*; see also *LeMarbe v. Wisneski, 266 F.3d 429, 435 (6th Cir.2001).* "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn, 22 F.3d at 660.*

Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that [HN17] "an official's failure [*27] to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer, 511 U.S. at 838, 114 S.Ct. at 1979.* The requirement that the official have subjectively perceived a risk of harm and then disregarded it, is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. See *Estelle, 429 U.S. at 106, 97 S.Ct. at 292* ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment*."); *Farmer, 511 U.S. at 835, 114 S.Ct. at 1978* (noting that deliberate indifference "describes a state of mind more blameworthy than negligence"). When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. [*28] On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." *Farmer, 511 U.S. at 835, 114 S.Ct. at 1978*; see also *Horn, 22 F.3d at 660* ("Officials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain."). Instead, [HN18] "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer, 511 U.S. at 836, 114 S.Ct. at 1978.* Although the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by "the usual ways, including inference from circumstantial evidence." *Farmer, 511 U.S. at 842, 114 S.Ct. at 1981.*

### Nurse Syswerda

Nurse Syswerda worked on the third nursing shift at the jail, which ran from 10:30 p.m. until 7:00 a.m. She first saw Michael at 1:05 a.m. on September 13, 2001, after she was called to his cell by a deputy. Although there is no evidence that the deputy witnessed Michael having a seizure, Michael did tell Syswerda [*29] that he had been having seizures and that he took medication for both diabetes and seizures. Syswerda responded by putting Michael on the sick-call list to be seen by a medical doctor. (There was no doctor at the jail on third shift, and Syswerda did not attempt to call one.) Syswerda also noted that the jail psychiatrist, Dr. Alt, should see Michael that day. (Plaintiff's claims against Dr. Alt have been previously dismissed and are not at issue here.) Syswerda also took steps so that the jail could obtain Michael's medication records from the crisis home, having him sign a release to begin the process.

Syswerda testified that she did not consider all seizures to be a medical emergency. There is in fact a distinction between petit mal and grand mal seizures. "Petit mal" is defined as

> A form of epilepsy with very brief, unannounced lapses in consciousness. A petit mal seizure involves a brief loss of awareness, which can be accompanied by blinking or mouth twitching. Petit mal seizures have a very characteristic appearance on an electroencephalogram (EEG).

> Petit mal (little illness in French) seizures are also known as absence seizures. Petit mal seizures take the form [*30] of a staring spell: the person suddenly seems to be 'absent.'

MedicineNet.com, MedTerms Medical Dictionary, http://www.medterms.com/script/main/art.asp?articlekey=4854 (Last visited July 27, 2006). "Grand mal," in contrast, is defined as

> A form of epilepsy characterized by tonic-clonic seizures involving two phases --the tonic phase in which the body becomes rigid, and clonic phase in which there is uncontrolled jerking. Tonic-clonic seizures may or may not be preceded by

an aura, and are often followed by headache, confusion, and sleep. They may last for mere seconds, or continue for several minutes. If a tonic-clonic seizure does not resolve or if such seizures follow each other in rapid succession, seek emergency help. The person could be in a life-threatening state known as status epilepticus. Treatment is with antiseizure medications.

Grand mal means big illness in French and is in contrast to another type of epilepsy known as petit mal.

MedicineNet.com, MedTerms Medical Dictionary, http://www.medterms.com/ script/main/art.asp?articlekey=32957 (Last visited July 27, 2006). There is no indication that at the time she saw Michael, he had experienced, [*31] or Syswerda knew that he had experienced, a grand mal seizure while he was in the jail.

There is, however, evidence that Syswerda was contacted a second time about Michael on at 5:30 a.m. on the morning of September 14, 2001, when one of the deputies on duty at the jail called nurse Syswerda to tell her that Michael was feeling sick and had thrown up. Syswerda did not go to see Michael at that time; instead, she made a note that she would pass the information on the next shift, as it was close to time for a shift change. According to Syswerda's testimony, first shift nurses began work at 6:30 a.m., and the first half-hour of the shift would consist of gathering information from nurses coming off the previous shift. Therefore, Syswerda would most likely have passed the information about Michael to first shift nursing between one and one-half hours after she received the report that he had vomited. There is no evidence that Syswerda was subjectively aware of any relationship between petit mal seizures and vomiting, assuming that there was such a medical connection. Moreover, there is no dispute that Syswerda did in fact pass on the information about Michael, because he was in fact seen [*32] by Dr. Carrel later that morning.

Plaintiff argues that Syswerda should have taken more prompt steps to determine Michael's medications, such as by reviewing his records from a previous jail stay, by contacting the St. Mary's hospital emergency room where Michael had been cleared for admission to

the jail, or by contacting his family members (assuming they knew the names and dosages of his medications). Plaintiff also argues that Syswerda should have made sure that Michael was seen by a doctor immediately; she contends that Syswerda should have viewed Michael's situation as a medical emergency because he had already been without his anti-seizure medication since his admission into the jail. According to plaintiff, Syswerda's actions were so "woefully inadequate" to amount to no treatment at all for Michael's seizure disorder.

It is unclear how plaintiff believes that "inadequate" treatment satisfies the subjective standard required to support her constitutional claim against Syswerda -- or any defendant, for that matter. Even if Syswerda's actions were in hindsight insufficient to prevent Michael's descent into grand mal seizures, she did respond to his needs on each occasion: on [*33] the first occasion by taking steps to obtain his medication records and by putting him on the sick call list, and on the second occasion by alerting the next nursing shift -- during which a doctor would be on duty -- to Michael's vomiting. Plaintiff herself concedes that Syswerda did not recognize the severity of Michael's condition. Plaintiff's Brief in Support at 27. Under the circumstances, it is not possible to say that Syswerda disregarded a risk of serious harm to Michael. Even if Syswerda committed malpractice, the evidence does not as a matter of law support a finding of deliberate indifference.

### Nurse Lanser

Nurse Lanser's only involvement with Michael was on September 14, 2001, when she administered medication to him upon the orders of Dr. Carrel and responded twice to reports that Michael was having seizures, at 12:10 and 1:30 p.m. At 12:10 p.m., Lanser found Michael having a grand mal seizure. She positioned him for safety and stayed with him until his seizure activity diminished. According to Lanser, she did not send Michael to the hospital when he had this first grand mal seizure because she had given him an intramuscular injection of Valium only 20 minutes [*34] earlier, and she wanted to give the medication an opportunity to work. Lanser also educated the deputy about seizures; because Michael was in a camera cell, he could be observed by the deputy immediately if he began to have another seizure. When Lanser was informed at 1:30 p.m. that Michael was having another seizure, she instructed the deputy to call an ambulance.

Plaintiff argues that a jury could determine that Lanser was deliberately indifferent to Michael because she neither contacted the on-call physician for further orders nor called for an ambulance when she first found Michael having a seizure at 12:10 p.m. on September 14. According to plaintiff, Lanser simply left Michael "lying on the floor" of his cell after this first seizure. However, even assuming that Michael was on the floor when Lanser left him, he was, according to Lanser, awake, alert, and able to position himself. After this first seizure, the undisputed evidence shows that Lanser, who remained with Michael while he was having a seizure, did exercise her medical judgment and determine to give the medication which she had administered time to work. Even if plaintiff believes this to be malpractice, Lanser's actions [*35] do not, as a matter of law, amount to deliberate indifference because there is no evidence that she acted with a sufficiently culpable state of mind. Therefore, the subjective element of plaintiff's claim is lacking. Lanser did respond to Michael's seizures, even though plaintiff questions the sufficiency of her response. However, [HN19] "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle, 429 U.S. at 106, 97 S.Ct. at 292.*

### Dr. Carrel

During the relevant time period, Dr. Carrel worked as a primary care physician at the jail part-time for CMS for four hours (between 8:00 a.m. and noon) on Thursdays and Fridays. He saw Michael only on two occasions on the morning of Friday, September 14, 2001. Dr. Carrel observed Michael having petit mal seizures, and he treated him for both the seizures and vomiting. After Michael had a grand mal seizure, Dr. Carrel ordered additional medications, including Valium, to control the seizures.

Dr. Carrel therefore did respond to Michael, even though plaintiff questions whether his response was medically appropriate. "Where a prisoner has received some medical attention [*36] and the dispute is over the adequacy of the treatment, [HN20] federal courts are generally reluctant to second guess medical judgments." *Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976).* As with nurses Syswerda and Lanser, plaintiff's evidence as to Dr. Carrel could potentially support a finding of medical malpractice, but under Supreme Court case law "[m]edical malpractice does not become a constitutional

violation merely because the victim is a prisoner." *Estelle, 429 U.S. at 106, 97 S.Ct. at 292.*

### Dr. Yacob and CMS

Plaintiff does not dispute that Dr. Yacob had no personal involvement in treating Michael at the jail. She has also not shown that Dr. Yacob was even made aware of Michael's condition or his presence at the jail. As a result, plaintiff cannot establish the subjective element of her claim against Dr. Yacob.

Plaintiff relies on the fact that Dr. Yacob was the medical director of the jail. She argues that in his position, he likely could have made certain that some mechanism was in place to ensure that a prisoner -- such as Michael -- with a serious health condition received prescribed medication. [HN21] Although a superior [*37] officer cannot be held vicariously liable under *42 U.S.C. § 1983* on a respondeat superior theory, see *Monell v. Dep't of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978)*, he may be found liable under *section 1983* on the basis of his own acts or omissions.

One way in which a supervisor's behavior may come within this rule is by formulating a policy, or engaging in a custom, that leads to the challenged occurrence. See *Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 2436-37, 85 L. Ed. 2d 791 (1985).* Even if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it. A supervisor may be held liable for what he does (or fails to do) if his behavior demonstrates deliberate indifference to conduct that is itself violative of a plaintiff's constitutional rights. See, e.g., *City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).*

[HN22] There are a number of ways to establish [*38] a deliberate indifference claim against a supervisor: establishment of an unconstitutional policy, direct knowledge of the unconstitutional conduct of a subordinate at issue in the case, or the existence of a widespread pattern of violations suggesting that the supervisor should have been aware of the situation. Plaintiff attaches great significance that Jon McKay, a social worker who worked for Alternative Outreach Team providing mental health services in the jail, at one

time stated that it was not uncommon for a new inmate to go up to three days without receiving medication. Plaintiff sees this as evidence of a "policy." However, an actual review of McKay's testimony indicates that his statement was based on his experience with inmates being started on *psychiatric* medicine. Plaintiff's Exhibit 13, Transcript of Dep. of Jon McKay, at 34. According to McKay's testimony, his experience was with psychiatric medicines used for psychiatric symptoms, not medical problems such as seizure disorders. Id. at 34-35.

Plaintiff also relies on hearsay evidence to support her position that there was an unconstitutional "policy" or "custom" of not timely giving medications to prisoners. [*39] Plaintiff does appear to attempt to show some more widespread existence of violations of prisoner's rights, for she has submitted unsworn statements of four former inmates, given to a private investigator, indicating that medications were not timely provided. She has also submitted a copy of a complaint filed in another lawsuit against CMS making similar allegations. However, even if the court can consider this hearsay evidence, there is no evidence that Dr. Yacob was aware of these particular problems discussed in the hearsay documents. As plaintiff herself has recognized, notice is a salient consideration in determining the existence of a supervisor's liability. Here, there is no evidence that Dr. Yacob was aware of what happened with these other inmates, even if the court assumes that one of the doctor's subordinates at some point violated an inmate's rights. Importantly, three of the incidents described in plaintiff's hearsay evidence happened years after September, 2001 (occurring in 2003 and 2004), when Michael was in the jail. Two of the alleged incidents occurred years earlier (1996 and 1997). Two limited instances occurring in a jail with a population of over 1,000 -- even [*40] assuming that Dr. Yacob or CMS was made aware of these instances -- do not amount to a custom or practice and are not sufficient to place these defendants on notice that the jail's policies, procedures, or training were inadequate.

Had plaintiff provided the proper proofs, she might have made a case against Dr. Yacob or CMS. However, if there is a case to be made against either or both of these defendants, plaintiff has not made it. Instead of pointing to actual admissible evidence, plaintiff relies on hearsay, on evidence pertaining to other defendants no longer a

part of the action, or on her pleadings. However, this is insufficient to create a genuine issue for trial. Simply put, plaintiff lacks admissible evidence of a de facto policy or custom of ignoring inmates medication needs.

Plaintiff also incorrectly relies on national standards, adopted by a private organization, the National Commission on Correctional Health Care. Plaintiff argues that the jail's noncompliance with such standards is evidence of deliberate indifference. However, [HN23] non-compliance with the policies of a private organization does not amount to deliberate indifference, even if one assumes that CMS adopted [*41] these standards as its own policies. [6]

> 6 Plaintiff has not provided the court with a copy of Kent County's contract with CMS. Thus, there is no evidence that the County bestowed full policy-making authority on CMS or Dr. Yacob. Dr. Yacob testified that his duties included "review [of] policies and procedures of the facility." Plaintiff's Exhibit 42, Dep. of Dr. Yacob, at 8. However, Dr. Yacob did not testify that he established the jail's medical policies and procedures.

There is some indication that -- late in the case -- plaintiff realized that she had neglected the aspect of her case directed to the liability of Dr. Yacob and CMS. Specifically, her belated submission of a second affidavit of one of her experts, Dr. Weinstein, appears to be directed to addressing elements of her case that were lacking, including policies, procedures, and failure to train. However, the additional paragraphs of the affidavit, which has been stricken, are too little, too late to create a genuine issue of material fact on the [*42] liability of Dr. Yacob and CMS.

## Conclusion

The motion of the CMS defendants for summary judgment is granted.

So ordered this 3rd day of August, 2006.

/s/ Wendell A. Miles

Senior U.S. District Judge

LEXSEE



Positive
As of: Jan 29, 2008

**LORI ANN YANCEY, et al., Plaintiffs, v. MARTY CARSON, et al., Defendants.**

**No. 3:04-CV-556, 3:04-CV-610, CONSOLIDATED (VARLAN/SHIRLEY)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE**

**2007 U.S. Dist. LEXIS 78289**

**October 19, 2007, Filed**

**SUBSEQUENT HISTORY:** Affirmed by Yancey v. Carson, 2007 U.S. Dist. LEXIS 82419 (E.D. Tenn., Nov. 5, 2007)

**PRIOR HISTORY:** Yancey v. Carson, 2007 U.S. Dist. LEXIS 74442 (E.D. Tenn., Oct. 4, 2007)

**CORE TERMS:** methodology, expert testimony, training, shooting, admissibility, scientific, expert report, inadmissible, reliable, combat, law enforcement officers, trier of fact, reliability, testifying, subjective, expertise, opine, state of mind, expert witness, expert opinions, consciousness of guilt, ultimate issue, intentionally, certification, specialized, discipline, plant, shot, years of experience, use of firearms

**COUNSEL:** [*1] For Lori Ann Yancey, Individually, Lori Ann Yancey, Estate Of Hubert Yancey, Lori Ann Yancey, next friend Logan Yancey, next friend Blake Yancey, next friend Chase Yancey, Johnny Yancey, State of Tennessee, on its relationship to plaintiffs, Plaintiffs: Herbert S Moncier, LEAD ATTORNEY, David S Wigler, Law Office of Herbert S. Moncier, Knoxville, TN.

For Judith Gordon, Plaintiff: David S Wigler, LEAD ATTORNEY, Herbert S Moncier, LEAD ATTORNEY, Law Office of Herbert S. Moncier, Knoxville, TN.

For Marty Carson, Defendant: John C Duffy, LEAD

ATTORNEY, John C. Duffy, Knoxville, TN.

**JUDGES:** C. Clifford Shirley, Jr., United States Magistrate Judge.

**OPINION BY:** C. Clifford Shirley, Jr.

**OPINION**

*MEMORANDUM & ORDER*

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), the Rules of this Court, and by Order [Doc. 54] [1] of the Honorable Thomas A. Varlan, United States District Judge, for disposition of the defendants' Motion in Limine to Exclude Qulia's Testimony. [Doc. 42] On October 5, 2007, the parties came before the Court for a hearing on the instant motion. Attorney David Wigler was present on behalf of the plaintiffs and attorney John Duffy was present on behalf of the defendants. [2]

> 1   For ease of reference, the [*2] Court will refer only to the document numbers identified in the lead case, 3:04-CV-556.
> 2   Based on the briefs of the parties, it should have been obvious that this hearing was essentially a pre-trial *Daubert*-type hearing. As such, the Court expected, as in other *Daubert*

Page 1

hearings, that the plaintiffs' proposed "expert" witness would testify. Remarkably, the plaintiffs did not have Mr. Qulia present. Accordingly, the Court is left to resolve this issue based solely on Mr. Qulia's expert report. [Doc. 41-7]

The defendants move the Court to exclude certain opinion testimony of the plaintiffs' expert, Richard Qulia. Specifically, the defendants object to the three opinions identified in Mr. Qulia's report, those opinions being that: (1) Mr. Carson's shooting of John John Yancey was intentional; (2) Mr. Carson did not shoot John John Yancey in self defense; and (3) Mr. Carson's account of the shooting indicates consciousness of guilt. The defendants contend that the opinions are inadmissible as expert testimony, are irrelevant, and are overly prejudicial. The plaintiffs oppose the defendants' motion, arguing that the opinions are admissible, relevant, and not overly prejudcial, and that even [*3] if the opinions are inadmissible, that it would still be appropriate for Mr. Qulia to testify as to his investigation in this matter.

## I. BACKGROUND

This lawsuit arises from the fatal shooting of Hubert Dean "John John" Yancey ("John John Yancey") on November 28, 2003. [Doc. 1] The plaintiffs contend that the defendants are responsible for the wrongful death of John John Yancey, who was fatally shot while performing his duties as a deputy sheriff of Scott County, Tennessee. [Id.] The shooting occurred while John John Yancey and other members of the Scott County Sheriff's Department were conducting a criminal investigation of a trailer located at 2543 Williams Creek Road in Scott County, Tennessee. [Id.] The plaintiffs allege that Sheriff's Deputy Marty Carson intentionally shot and killed John John Yancey during the course of the investigation. [Id.]

## II. APPLICABLE LAW: ADMISSIBILITY OF EXPERT TESTIMONY

The defendants have filed a motion challenging the admissibility of Mr. Qulia's testimony under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Rule 702 of the Federal Rules of Evidence governs [*4] the admissibility of expert testimony:

If scientific, technical, or other

specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial judge must act as a gatekeeper, admitting only that expert testimony that is relevant and reliable. *Daubert*, 509 U.S. at 589. With regard to scientific knowledge, the trial court must initially determine whether the reasoning or methodology used is scientifically valid and is properly applied to the facts at issue in the trial. *Id.* To aid the trial court in this gatekeeping role, the Supreme Court has listed several key considerations: (1) whether the scientific knowledge can or has been tested; (2) whether the given theory or technique has been published or been the subject of peer review; (3) whether a known error rate exists; [*5] and (4) whether the theory enjoys general acceptance in the particular field. *Id.* at 592-94. The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995).

Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994). The trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The trial judge enjoys broad discretion in determining whether the factors listed in *Daubert* reasonably measure reliability in a given [*6] case. *Id.* at 153. With this framework in

mind, the Court will now address the defendants' motion.

## III. RICHARD QULIA

The defendants move to exclude the plaintiffs' expert witness, Richard Qulia, from testifying as to his opinions set forth in his preliminary report dated November 9, 2006. [Doc. 41-7]. Specifically, the defendants seek to preclude Mr. Qulia from testifying to three specific opinions: (1) Mr. Carson's shooting of John John Yancey was intentional; (2) Mr. Carson did not shoot John John Yancey in self defense; and (3) Mr. Carson's account of the shooting indicates consciousness of guilt. In support of their argument, the defendants contend that Mr. Qulia is not qualified to opine on the issues presented in his expert report; that Mr. Qulia's opinions are all impermissible attacks on the credibility of one witness by another witness; that Mr. Qulia's opinions impermissibly address the subjective state of mind of Mr. Carson; that Mr. Qulia's opinions invade the province of the jury; that Mr. Qulia's opinions are irrelevant; and that any testimony presented by Mr. Qulia is inadmissible under Rule 403 of the Federal Rules of Evidence because such testimony would be more prejudicial [*7] than probative. [Doc. 43] The plaintiffs disagree, arguing that Mr. Qulia's testimony is relevant and admissible.

The plaintiffs oppose the defendant's motion, arguing that Mr. Qulia's experience in training law enforcement officers provides a basis for his expert testimony; that Rule 704(b) of the Federal Rules of Evidence applies only to criminal cases, not civil, and thus testimony as to the defendant's state of mind is not barred; and that even if the three opinions at issue are excluded, Mr. Qulia should still be allowed to testify as to the facts surrounding his investigation in this matter. [Doc. 56]

### A. Qualifications

The Court begins its analysis by noting that Mr. Qulia has approximately thirty-four years of experience with the Federal Bureau of Investigation, including several years of experience as a Polygraph Examiner, as well as several years of experience training other law enforcement officers in the use of firearms and tactical combat procedures. [Doc. 41-7 at 17-18] Mr. Qulia also has approximately three years experience running his own company, which provides, among other things, polygraph services and training in the use of firearms and tactical combat procedures. [*8] [*Id.*] However, while

Mr. Qulia is a trained polygrapher, there is no evidence that he has given Mr. Carson a polygraph test. Instead, Mr. Qulia has read Mr. Carson's deposition, has examined the scene of the shooting, and has developed opinions as to Mr. Carson's motivation and actions based upon that limited information.

The Sixth Circuit has previously warned against the dangers of certifying experts in generic areas of expertise, such as the non-existent "field [of] police policies and practices." *Berry v. City of Detroit,* 25 F.3d 1342, 1352 (6th Cir. 1994). The Berry court expanded its warning as follows:

> Any witness . . . may be allowed to opine based on observation and experience if a proper foundation is laid. But here, there was no foundation at all for discipline testimony, even though it would fall under the general label of "police policies and practices." This term, however, is so broad as to be devoid of meaning. It is like declaring an attorney an expert in the "law." A divorce lawyer is no more qualified to opine on patent law questions than anyone else, and it is a mistake for a trial judge to declare anyone to be generically an expert.

*Id.*

The Court also finds the case [*9] of *Fisher v. Ciba Specialty Chemicals Corp.,* 238 F.R.D. 273 (S.D. Ala. 2006) to be particularly instructive. In that case, the plaintiff property owners brought a putative class action against the defendant chemical company, alleging that they had incurred damages due to the company's pesticide manufacturing. The defendants sought to strike or exclude the expert reports submitted in favor of the plaintiff's motion for class certification. The plaintiff's pharmacology and toxicology expert, Dr. Farber, submitted a report which provided the Court with a detailed discussion on the history and properties of DDT. The Court refused to exclude Dr. Farber, noting that his report "reveal[ed] information that the Court has found nowhere else in the voluminous class certification record," and while noting that such information was not crucial to the Court's class certification analysis, "it is unquestionably useful background data that has enhanced and enriched the undersigned's understanding of the

primary chemical compound of interest in this lawsuit."
*Id.* at 280.

The [*10] Fisher Court, however, excluded the plaintiff's administrative law expert, Ms. McFaddin. In so doing, the Court noted as follows:

> Much of her report appears to be a factual narrative of contamination-related events occurring at the Ciba plant, as well as Ciba's interactions with regulatory agencies, during the time period at issue. To the extent that McFaddin's report offers a synopsis of facts concerning the Ciba plant based on her reading of other exhibits, it does not state expert opinions at all, but simply provides the witness's slant on facts that are in the . . . record.

> \* \* \*

> . . . The document reads like the fact section of a brief, not the report of an expert witness. The vast majority of McFaddin's report simply summarizes and states her advocacy-based interpretation of documents in the record concerning Ciba's historical conduct. These statements of alleged fact do not appear to benefit from, or to be based to any extent on, McFaddin's status as a regulatory expert. The Court's task in examining the Rule 23 issues presented here is not assisted by McFaddin's one-sided recitation of the record facts. She does not show that she has special skills that render her reading of record [*11] documents concerning the history of the Ciba plant, and her conclusions as to what Ciba has or has not done, any more or less persuasive than that of a layperson. For example, McFaddin concludes that Ciba has failed and refused to take action to remediate its off-site contamination. But how is that conclusion bolstered by her expertise as a "regulatory expert"? Is she not simply acting as another advocate for plaintiffs in arguing the facts in a manner that is most beneficial to her clients? How does this purported expert report differ from a

supplemental brief submitted by another lawyer for plaintiffs?

*Id.* at 281.

In the instant case, it is clear that Mr. Qulia does have some experience in training law enforcement officers in the proper use of firearms in combat situations, but the opinions to be offered by Qulia greatly exceed the scope of that expertise. Instead, Mr. Qulia has offered his interpretation of facts that are already in the record. He has essentially marshaled the facts in the record which support the plaintiff's position. The Court finds that Mr. Qulia's proffered opinions simply do not relate to, or benefit from, his expertise as a polygrapher, nor does Mr. Qulia's [*12] experience in combat training provide any special insight in this case that would allow him to opine as to the thought processes and motivations of a third party acting in a potential combat situation. The Court does not find that Mr. Qulia's opinions would therefore be helpful to the trier of fact on this issue. For these reasons, Mr. Qulia's testimony will be excluded with respect to his three identified opinions.

**B. Basis of Opinions**

As an additional basis for the Court's decision, the Court notes that even if the Court found that Mr. Qulia were qualified to offer the opinions in question, the plaintiffs have failed to demonstrate that the reasoning or methodology used by Mr. Qulia was valid and was properly applied to the facts at issue. *See Daubert*, 509 U.S. at 589. Whether an expert's testimony is based upon scientific, technical, or other specialized knowledge, *Daubert* and its progeny "require[] a valid . . . connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable [*13] basis in the knowledge and experience of the relevant discipline.'" *Kumho Tire*, 526 U.S. at 149 (citations omitted).

The Court finds that the report of Mr. Qulia is virtually devoid of any evidence that his opinions were arrived at by any methodology, let alone any reliable methodology. Rather, his opinions are merely based on the use of selective testimony, drawing biased inferences therefrom, and then making what are essentially legal arguments as to the conclusions that should be drawn. As

Page 4

such, his report is more in the nature of an attorney's closing argument than expert testimony. There is little, if any, indication of the principles upon which his opinions are grounded, the methodology used, or how that methodology was applied. There is no way to objectively test his "technique" or approach, because it is merely his own subjective conclusory opinions. Such an approach cannot be tested for reliability. Nor is there any indication these opinions derive from any generally accepted principles, methodology, or independently conducted research. Rather, they appear to be opinions reached solely for the purpose of testifying in this litigation.

In performing its gatekeeper function, this [*14] Court must have sufficient information regarding the basis for the opinions reached, the principles and methodology employed, and their application. In this case, the plaintiffs essentially ask the Court to take Mr. Qulia's word for his reliability and at best offer only subjective, self-serving assurances of reliability. This Court finds that is precisely the type of "expert" testimony warned against by *Daubert* and *Kumho Tire*.

Additionally, while Mr. Qulia's testimony is based upon his knowledge and experience training other law enforcement officers, the Court finds that the testimony Mr. Qulia seeks to offer extends far beyond simply as to what sort of training Mr. Carson should have received, instead concluding that Mr. Carson must have acted in a certain manner and with certain motivations. The Court cannot find that Mr. Qulia's opinions are supported by the necessary reliable basis in the knowledge and experience of the relevant discipline, and thus his opinions must be excluded.

## C. Ultimate Issue

As a further basis for the Court's decision, the Court finds that the opinions to be offered by Mr. Qulia express inadmissible legal conclusions. While Rule 704 of the Federal Rules of Evidence [*15] does not preclude an expert opinion that "embraces an ultimate issue to be decided by the trier of fact," the Sixth Circuit has held that "the issue embraced must be a factual one." *Berry, 25 F.3d at 1353*. In the instant case, Mr. Qulia takes the facts, analyzes them, and concludes that Mr. Carson must have intentionally shot John John Yancy. Whether Mr. Carson acted intentionally, whether he acted in self-defense, and whether Mr. Carson's testimony indicates consciousness of guilt are not factual determinations, but instead are simply Mr. Qulia's "legal"

opinions (for which he is not qualified to testify) based upon the facts as he has interpreted them. Thus, Mr. Qulia's opinions are inadmissible, because they do not merely embrace the ultimate issue, but instead seek to completely weigh the evidence, assess credibility, and resolve the matter without the jury's assistance. The Court further finds that Mr. Qulia's opinions will not assist the trier of fact. Untrained lay men and women can determine these issues, after hearing the facts, without the assistance of Mr. Qulia's unreliable opinions.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that Mr. Qulia is not qualified [*16] to offer the three opinions identified in his expert report. Accordingly, the Court finds the defendants' motion [Doc. 42] to be well-taken and the same is hereby **GRANTED in part.** Additionally, the Court notes that the defendants requested that Mr. Qulia's opinions be excluded both at trial and during the District Court's consideration of the then pending motion for summary judgment. The District Court has since resolved the motion for summary judgment [See Docs. 57, 58], thus, the defendants' motion [Doc. 42] is **DENIED in part as moot,** to the extent that the motion for summary judgment has already been resolved.

In light of this Court's ruling, Mr. Qulia shall not be allowed to testify as to what Mr. Carson did, what he did not do, his subjective intent, his state of mind, or what motivated his action or inaction. Nor shall Mr. Qualia be allowed to introduce the three identified opinions indirectly by discussing proper tactical training and seeking to apply it to Mr. Carson or this case. The Court does not exclude [3] Mr. Qulia from testifying as a fact witness (including such areas of discussion as the dimensions and configuration of the trailer where the shooting occurred, the locations [*17] of certain fixtures, such as lights or doors, therein, or the aural and visual differences between the firing of a shotgun and a pistol), so long as Mr. Qulia does not attempt to introduce impermissible opinion testimony under the guise of factual testimony.

> 3 In ruling that Mr. Qulias' factual testimony is not excluded, the Court does not rule that the Mr. Qulia shall necessarily be allowed to offer such testimony at trial. Rather, the District Court will make the final determination of admissibility regarding any factual testimony at trial based

Page 5

2007 U.S. Dist. LEXIS 78289, *17

upon the evidentiary landscape before it at that time.

**IT IS SO ORDERED.**

s/ C. Clifford Shirley, Jr.

United States Magistrate Judge