# EXHIBIT 5

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Magten Asset Management Corporation and
Law Debenture Trust Company of New York,
　　　　　Plaintiffs,

v.

NorthWestern Corporation,
　　　　　Defendant.

Magten Asset Management Corporation,
　　　　　Plaintiff,

v.

Michael J. Hanson and Ernie J. Kindt,
　　　　　Defendants.

**SUBPOENA IN A CIVIL CASE**

Civil Action No. 04-1494-(JJF)
Pending in the U.S. District Court for the
District of Delaware

Civion Action No. 05-499 (JJF)
Pending in the U.S. District Court for the
District of Delaware

TO:  Records Custodian
　　　PAUL HASTINGS JANOFSKY & WALKER LLP
　　　875 15th Street, N.W.
　　　Washington, DC 20005

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.  ⋆

| PLACE OF DEPOSITION    Fried Frank Harris Shriver & Jacobson LLP 1001 Pennsylvania Ave., NW, Washington, DC 20004* | DATE AND TIME 9.00 a.m. February 15, 2008* |
|---|---|

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

Documents identified in attached Schedule A.

| PLACE    Fried Frank Harris Shriver & Jacobson LLP 1001 Pennsylvania Ave., NW, Washington, DC 20004 | DATE AND TIME   5:00 p.m. February 5, 2008 |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

　　Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   *Dale R. Dube*   Attorney for Plaintiff Magten Asset Management Corp. | DATE 1/25/08 |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER Dale R. Dube, Esquire, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801    (302) 425-6467 | |

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

* Deponent will not be required to appear if the documents are produced by the
date and time specified herein.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE 1/25/08 | PLACE Paul Hastings, et al., 875 15th Street, N.W., Washington, D.C. 20005 |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Records Custodian Paul Hastings, et al., | Served by hand on Kathryn M. Medina, who was authorized to accept service on behalf of Records Custodian. |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Joseph R. DeSantis | Coordinator, Managing Attorney's Office |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on    January 28, 2008
DATE

SIGNATURE OF SERVER
1001 Pennsylvania Avenue, N.W.,
Suite 800, Washington, D.C. 20004-2505
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

*(remaining fine-print legal text of Rule 45 illegible)*

## Schedule A

## DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth below:

1.      The term "you" and "your" means or refers to Charles A. Patrizia, Esq., in his individual capacity, as well as Paul Hastings, as well as all persons and/or entities affiliated with either of them, acting in concert with or under the direction of either of them, or purporting to act on either of their behalfs.

2.      "Acquisition" means the transaction that occurred on or about February 15, 2002 pursuant to which NorthWestern acquired 100% of the equity interest in Clark Fork.

3.      "All" means "any and all," and "any" means "any and all."

4.      "Clark Fork" means Clark Fork and Blackfoot, LLC, formerly known as, among other things, NorthWestern Energy, LLC and Montana Power, LLC, and any of its affiliates, subsidiaries, predecessors and any person or entity acting or purporting to act on behalf of, at the direction of or in concert with it, including but not limited to Clark Fork's present and former officers, directors, employees, servants, agents, representatives and attorneys.

5.      "Concerning" includes referring to, relating to, embodying, in connection with, commenting on, responding to, showing, demonstrating, declaring, describing, analyzing, reflecting, containing or constituting.

6.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any medium -- oral, written or otherwise.

7.      "Document" is used herein in the broadest sense and includes, but is not limited to, all originals, whether printed or handwritten, non-identical copies, copies with marginal

notations or interlineations of any writing, recording, photograph, computer data, film, e-mail, video or audio tape (including transcripts or memoranda reflecting or referring to the contents thereof), any written, typewritten or other tangible form of recording or preserving communication or thought (including computerized records of any kind), including any non-identical copy thereof, or any other items containing information of any kind or nature, however produced or reproduced, whatever its origin or location and regardless of the form in which such information exists or is maintained.

      8.    "NorthWestern" means NorthWestern Corporation, its affiliates and any parent, subsidiaries, predecessors and successors, and any person or entity acting or purporting to act on behalf of, at the direction of, or in concert with it, including but not limited to NorthWestern's present and former officers, directors, employees, servants, agents, representatives and attorneys; provided, however, that NorthWestern shall not be construed to include Clark Fork, which has been separately defined herein.

      9.    "Paul Hastings" means Paul Hastings Janofsky & Walker LLP, its agents, attorneys, representatives and all other persons acting on its behalf.

      10.    "Patrizia Declaration" means the Declaration of Charles A. Patrizia in Support of NorthWestern's Motion for Summary Judgment, dated November 27, 2007, and submitted to the Court in the above-referenced action.

      11.    "Person" includes any natural person, group, investigatory body, governmental unit, governmental agency or department, corporation, association, partnership, limited partnership, joint venture, sole proprietorship, business, business entity, organization, or institution.

2

12. "Transfer" means the transfer of the Transferred Assets from Clark Fork to NorthWestern that occurred on or about November 15, 2002. Transfer shall also include any and all strategies for the eventual acquisition and direct ownership of the Transferred Assets by NorthWestern.

13. "Transferred Assets" means those assets that were transferred from Clark Fork to NorthWestern on or about November 15, 2002.

## INSTRUCTIONS

1. Every request shall be answered separately and fully in writing.

2. If any part of a request is objected to, the reasons for the objection should be stated with particularity. If an objection is made to part of any item or category, the part should be specified.

3. "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this request all responses that might otherwise be construed to be outside of its scope.

4. References to the singular shall include the plural, and references to the plural shall include the singular.

5. The documents covered by this request include all documents in the possession, custody or control of Charles A. Patrizia and/or Paul Hastings, or any documents that were generated or received by Charles A. Patrizia and/or Paul Hastings or otherwise came into existence or were utilized by Charles A. Patrizia and/or Paul Hastings through the date of production. This request also calls for the production of documents kept or maintained by counsel for Charles A. Patrizia and/or Paul Hastings.

3

6.      A request for a document shall be deemed to include a request for any transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document, and any file folder in which the document was maintained, in addition to the document itself.

7.      A request for a document shall be deemed to include a request for all drafts and successive iterations thereof and all modifications thereto, in addition to the document itself.

8.      If any document is withheld in whole or part on the ground that it is privileged or otherwise not discoverable, state:

      (a)      the date of the document;

      (b)      the name of each person to whom the document is addressed;

      (c)      the name of each person, other than the addressee(s), to whom the document has been sent or shown, or by whom it has been reviewed;

      (d)      the name of each person who signed or authored the document;

      (e)      the title and job description of each person identified in (b), (c), and (d) above;

      (f)      the subject of the document and the number of pages in the document;

      (g)      the specific privilege claimed and the grounds for any such claim; and

      (h)      the name and address of the person who has custody of the document.

9.      If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this lawsuit or unless otherwise permitted by the Court.

4

10.     All documents requested are to be produced in a form which renders the documents susceptible to copying and examination for content in the language or numerical expression of the original.

11.     Unless otherwise expressly stated, the documents covered by this request include any documents that were generated, crated, circulated, dated or otherwise came into existence during the period of January 1, 2001 to present.

12.     Each request for production of documents herein shall be construed as continuing in nature, requiring supplemental responses if further or different documents responsive to any request are discovered or obtained at any time prior to any judgment on the merits.

## REQUESTS FOR PRODUCTION

### REQUEST NO. 1

All documents relating to or concerning the following statements in ¶ 2 of the Patrizia Declaration:

(a) "I was personally involved in that representation"; and

(b) "I advised NorthWestern on regulatory issues relating to the potential application of the Public Utility Holding Company Act of 1935 ("PUHCA") to the Transaction and to the corporate structures related to the Transaction."

### REQUEST NO. 2

All documents relating to or concerning the following statements in ¶ 3 of the Patrizia Declaration:

5

(a) "The second step, which was completed on November 15, 2002, involved the transfer of all MPLLC's assets, except those specifically related to the Milltown Dam, to the parent company level at NorthWestern";

(b) "[T]he assumption by NorthWestern of MPLLC liabilities";

(c) "[T]he entry by NorthWestern into support agreements with MPLLC";

(d) "The Milltown Dam was associated with an active Superfund site, and NorthWestern sought to continue to segregate that potential liability from the remaining MPLLC operations";

(e) "NorthWestern did not want to move assets associated with Milltown Dam to the parent company level"; and

(f) "This two-step process was contemplated from the very beginning of the Transaction."

## REQUEST NO. 3

With respect to ¶ 4 of the Patrizia Declaration, all documents relating to or concerning the "reasonable and legitimate business objectives of NorthWestern: (i) to avoid burdensome and duplicative regulation; and (ii) to address the interests of rating agencies and capital markets, which preferred that NorthWestern hold the MPLLC assets at the parent level."

## REQUEST NO. 4

All documents relating to or concerning the following statements in ¶ 6 of the Patrizia Declaration:

(a) "NorthWestern preferred that the Transaction not result in its becoming a registered utility holding company, and therefore sought to structure the Transaction in a way that would avoid that possibility"; and

6

(b) "MPC preferred that the initial sale be in the form of a 'stock' rather than an 'asset'

transaction, and the presence of certain assets in MPLLC would make MPLLC an

'electric utility company' for PUHCA purposes."

## REQUEST NO. 5

With respect to ¶ 8 of the Patrizia Declaration, all documents relating to or concerning the

statement that: "Specifically, the transfer of the MPLLC assets to the parent level at

NorthWestern provided greater transparency into NorthWestern's utility operations and was

viewed favorably by the rating agencies and the capital markets."

## REQUEST NO. 6

All documents relating to or concerning the following statements in ¶ 9 of the Patrizia

Declaration:

(a) "Because the transfer of assets could not be completed until NorthWestern had

identified all of the MPLLC assets (including bills of sale and deeds, where applicable)

and obtained various consents and regulatory approvals, there was inevitably some time

between the initial acquisition of MPLLC (the first step in the Transaction), and the

structural restoration of NorthWestern as a 'flat' utility company"; and

(b) "In that circumstance, unless it otherwise qualified for an exemption from PUHCA,

NorthWestern would have been subject to federal regulation and oversight under

PUHCA."

## REQUEST NO. 7

All documents relating to or concerning NorthWestern's exemption from PUHCA as

referenced in ¶ 9 of the Patrizia Declaration, including all documents submitted by NorthWestern

to any regulatory agency concerning NorthWestern's exemption from PUHCA.

7

**REQUEST NO. 8**

All documents relating to or concerning the following statements in ¶ 10 of the Patrizia Declaration:

(a) "The regulatory implications of the two-step process had been identified at the very earliest stages of considering the Transaction, and NorthWestern explored throughout the Transaction period the possible bases on which it would qualify for exemption from PUHCA regulation";

(b) "Ultimately, by the end of 2001, it became clear in discussions with the SEC staff that because of various factors, including the relative size of NorthWestern's utility businesses in Montana, South Dakota, and Nebraska following the acquisition of MPLLC, NorthWestern would not meet the quantitative standards historically used by the SEC staff under sections 3(a)(1) and 3(a)(2) of PUHCA";

(c) "After further discussion of the issues with the SEC staff, in February 2002 NorthWestern filed an application for an exemption under Section 3(a)(3) of PUHCA to address its status during the period necessary to complete the structural restoration"; and

(d) "In the application, NorthWestern showed that, given the lines of business it was then conducting and the historic gross revenues of those various businesses, NorthWestern was only 'incidentally a holding company, being primarily engaged or interested in one or more businesses other than the business of public-utility company and ... not deriving, directly or indirectly, any material part of its income from any one or more subsidiary companies, the principal business of which is that of a public-utility company.'"

8

**REQUEST NO. 9**

All documents relating to or concerning the following statements in ¶ 11 of the Patrizia Declaration:

(a) "NorthWestern's application for a 3(a)(3) exemption was effective upon its good faith filing with the Securities and Exchange Commission, and remained in place until the MPLLC assets were transferred to the parent company level in November 2002 and the Milltown Dam thereafter qualified as an EWG"; and

(b) "In this respect, the 3(a)(3) exemption was 'temporary' and had always been intended to be 'temporary' – not because there was any specific time limitation under PUHCA, but rather because NorthWestern had always intended to return promptly to its original 'flat' structure, and once the necessary steps were taken to do so, the exemption was no longer necessary."

**REQUEST NO. 10**

All documents relating to or concerning any communications from any regulatory agency stating that NorthWestern was not entitled to the exemption under PUHCA that it obtained as referenced in Mike Hanson and Eric Jacobsen's January 28, 2002 Memorandum to NorthWestern's Board of Directors (NOR142389-NOR142392).

**REQUEST NO. 11**

All documents relating to or concerning NorthWestern's determination that it would not proceed with the Acquisition if it was unable to either (i) isolate the Milltown Dam assets and/or (ii) effectuate the Transfer.

9

**REQUEST NO. 12**

All documents relating to or concerning any communication from any regulatory agency to NorthWestern that NorthWestern would be in violation of any regulatory requirement by virtue of holding the Transferred Assets in a subsidiary.

**REQUEST NO. 13**

All documents relating to or concerning any factual or legal issue which Charles A. Patrizia may testify about at the forthcoming trial in the above-referenced action.

**REQUEST NO. 14**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about the structure of the Acquisition and/or the Transfer.

**REQUEST NO. 15**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about NorthWestern's "reasonable and legitimate business objectives" relating to the Acquisition and/or the Transfer, as such phrase is used in the Patrizia Declaration.

**REQUEST NO. 16**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about any regulatory issues impacting the structure or timing of the Acquisition and/or the Transfer.

**REQUEST NO. 17**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to

10

NorthWestern, about the interests or potential reactions of rating agencies and capital markets with respect to the Acquisition and/or the Transfer.

## REQUEST NO. 18

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about the timing of effectuating the Transfer following the Acquisition.

## REQUEST NO. 19

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about the potential impact of the accuracy or inaccuracy of NorthWestern's publicly issued financial statements on the Acquisition and/or the Transfer.

11

# EXHIBIT 5

# EXHIBIT 6

AO88. (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

**SUBPOENA IN A CIVIL CASE**

Magten Asset Management Corporation and
Law Debenture Trust Company of New York,
          Plaintiffs,

     v.

NorthWestern Corporation,
          Defendant.

Civil Action No. 04-1494-(JJF)
Pending in the U.S. District Court for the
District of Delaware

Magten Asset Management Corporation,
          Plaintiff,

     v.

Michael J. Hanson and Ernie J. Kindt,
          Defendants.

Civion Action No. 05-499 (JJF)
Pending in the U.S. District Court for the
District of Delaware

TO: Charles A. Patrizia, Esquire
    PAUL HASTINGS JANOFSKY & WALKER LLP
    875 15th Street, N.W.
    Washington, DC 20005

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Fried Frank Harris Shriver & Jacobson LLP<br>1001 Pennsylvania Ave., NW, Washington, DC 20004 | DATE AND TIME  9:00 a.m.<br>February 15, 2008 |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Documents identified in attached Schedule A.

| PLACE    Fried Frank Harris Shriver & Jacobson LLP<br>1001 Pennsylvania Ave., NW, Washington, DC 20004 | DATE AND TIME  5:00 p.m.<br>February 5, 2008 |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Dale R. Dube*  Attorney for Plaintiff<br>        Magten Asset Management Corp. | 1/25/08 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Dale R. Dube, Esq., Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801
(302) 425-6467

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

¹ If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

| PROOF OF SERVICE | | |
|---|---|---|
| | DATE 1/25/08 | PLACE Paul Hastings, et al., 875 15th Street, N.W., Washington, DC 20005 |
| SERVED | | |
| SERVED ON (PRINT NAME) Charles A. Patrizia, Esq. | | MANNER OF SERVICE Served by hand on Kathryn M. Medina, who was authorized to accept service on behalf of Charles A. Patrizia, Esq. |
| SERVED BY (PRINT NAME) Joseph R. DeSantis | | TITLE Coordinator, Managing Attorney's Office |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on    January 28, 2008
                              DATE

_____
SIGNATURE OF SERVER
1001 Pennsylvania Ave., N.W.,
Suite 800, Washington, DC 20004-2505
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## Schedule A

### DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth below:

1.    The term "you" and "your" means or refers to Charles A. Patrizia, Esq., in his individual capacity, as well as Paul Hastings, as well as all persons and/or entities affiliated with either of them, acting in concert with or under the direction of either of them, or purporting to act on either of their behalfs.

2.    "Acquisition" means the transaction that occurred on or about February 15, 2002 pursuant to which NorthWestern acquired 100% of the equity interest in Clark Fork.

3.    "All" means "any and all," and "any" means "any and all."

4.    "Clark Fork" means Clark Fork and Blackfoot, LLC, formerly known as, among other things, NorthWestern Energy, LLC and Montana Power, LLC, and any of its affiliates, subsidiaries, predecessors and any person or entity acting or purporting to act on behalf of, at the direction of or in concert with it, including but not limited to Clark Fork's present and former officers, directors, employees, servants, agents, representatives and attorneys.

5.    "Concerning" includes referring to, relating to, embodying, in connection with, commenting on, responding to, showing, demonstrating, declaring, describing, analyzing, reflecting, containing or constituting.

6.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any medium -- oral, written or otherwise.

7.    "Document" is used herein in the broadest sense and includes, but is not limited to, all originals, whether printed or handwritten, non-identical copies, copies with marginal

notations or interlineations of any writing, recording, photograph, computer data, film, e-mail, video or audio tape (including transcripts or memoranda reflecting or referring to the contents thereof), any written, typewritten or other tangible form of recording or preserving communication or thought (including computerized records of any kind), including any non-identical copy thereof, or any other items containing information of any kind or nature, however produced or reproduced, whatever its origin or location and regardless of the form in which such information exists or is maintained.

8.     "NorthWestern" means NorthWestern Corporation, its affiliates and any parent, subsidiaries, predecessors and successors, and any person or entity acting or purporting to act on behalf of, at the direction of, or in concert with it, including but not limited to NorthWestern's present and former officers, directors, employees, servants, agents, representatives and attorneys; provided, however, that NorthWestern shall not be construed to include Clark Fork, which has been separately defined herein.

9.     "Paul Hastings" means Paul Hastings Janofsky & Walker LLP, its agents, attorneys, representatives and all other persons acting on its behalf.

10.    "Patrizia Declaration" means the Declaration of Charles A. Patrizia in Support of NorthWestern's Motion for Summary Judgment, dated November 27, 2007, and submitted to the Court in the above-referenced action.

11.    "Person" includes any natural person, group, investigatory body, governmental unit, governmental agency or department, corporation, association, partnership, limited partnership, joint venture, sole proprietorship, business, business entity, organization, or institution.

2

12. "Transfer" means the transfer of the Transferred Assets from Clark Fork to NorthWestern that occurred on or about November 15, 2002. Transfer shall also include any and all strategies for the eventual acquisition and direct ownership of the Transferred Assets by NorthWestern.

13. "Transferred Assets" means those assets that were transferred from Clark Fork to NorthWestern on or about November 15, 2002.

## INSTRUCTIONS

1. Every request shall be answered separately and fully in writing.

2. If any part of a request is objected to, the reasons for the objection should be stated with particularity. If an objection is made to part of any item or category, the part should be specified.

3. "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this request all responses that might otherwise be construed to be outside of its scope.

4. References to the singular shall include the plural, and references to the plural shall include the singular.

5. The documents covered by this request include all documents in the possession, custody or control of Charles A. Patrizia and/or Paul Hastings, or any documents that were generated or received by Charles A. Patrizia and/or Paul Hastings or otherwise came into existence or were utilized by Charles A. Patrizia and/or Paul Hastings through the date of production. This request also calls for the production of documents kept or maintained by counsel for Charles A. Patrizia and/or Paul Hastings.

3

6.    A request for a document shall be deemed to include a request for any transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document, and any file folder in which the document was maintained, in addition to the document itself.

7.    A request for a document shall be deemed to include a request for all drafts and successive iterations thereof and all modifications thereto, in addition to the document itself.

8.    If any document is withheld in whole or part on the ground that it is privileged or otherwise not discoverable, state:

>    (a)    the date of the document;
>
>    (b)    the name of each person to whom the document is addressed;
>
>    (c)    the name of each person, other than the addressee(s), to whom the document has been sent or shown, or by whom it has been reviewed;
>
>    (d)    the name of each person who signed or authored the document;
>
>    (e)    the title and job description of each person identified in (b), (c), and (d) above;
>
>    (f)    the subject of the document and the number of pages in the document;
>
>    (g)    the specific privilege claimed and the grounds for any such claim; and
>
>    (h)    the name and address of the person who has custody of the document.

9.    If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this lawsuit or unless otherwise permitted by the Court.

4

10.    All documents requested are to be produced in a form which renders the documents susceptible to copying and examination for content in the language or numerical expression of the original.

11.    Unless otherwise expressly stated, the documents covered by this request include any documents that were generated, crated, circulated, dated or otherwise came into existence during the period of January 1, 2001 to present.

12.    Each request for production of documents herein shall be construed as continuing in nature, requiring supplemental responses if further or different documents responsive to any request are discovered or obtained at any time prior to any judgment on the merits.

## REQUESTS FOR PRODUCTION

### REQUEST NO. 1

All documents relating to or concerning the following statements in ¶ 2 of the Patrizia Declaration:

(a) "I was personally involved in that representation"; and

(b) "I advised NorthWestern on regulatory issues relating to the potential application of the Public Utility Holding Company Act of 1935 ("PUHCA") to the Transaction and to the corporate structures related to the Transaction."

### REQUEST NO. 2

All documents relating to or concerning the following statements in ¶ 3 of the Patrizia Declaration:

5

(a) "The second step, which was completed on November 15, 2002, involved the transfer of all MPLLC's assets, except those specifically related to the Milltown Dam, to the parent company level at NorthWestern";

(b) "[T]he assumption by NorthWestern of MPLLC liabilities";

(c) "[T]he entry by NorthWestern into support agreements with MPLLC";

(d) "The Milltown Dam was associated with an active Superfund site, and NorthWestern sought to continue to segregate that potential liability from the remaining MPLLC operations";

(e) "NorthWestern did not want to move assets associated with Milltown Dam to the parent company level"; and

(f) "This two-step process was contemplated from the very beginning of the Transaction."

## REQUEST NO. 3

With respect to ¶ 4 of the Patrizia Declaration, all documents relating to or concerning the "reasonable and legitimate business objectives of NorthWestern: (i) to avoid burdensome and duplicative regulation; and (ii) to address the interests of rating agencies and capital markets, which preferred that NorthWestern hold the MPLLC assets at the parent level."

## REQUEST NO. 4

All documents relating to or concerning the following statements in ¶ 6 of the Patrizia Declaration:

(a) "NorthWestern preferred that the Transaction not result in its becoming a registered utility holding company, and therefore sought to structure the Transaction in a way that would avoid that possibility"; and

6

(b) "MPC preferred that the initial sale be in the form of a 'stock' rather than an 'asset'

transaction, and the presence of certain assets in MPLLC would make MPLLC an

'electric utility company' for PUHCA purposes."

**REQUEST NO. 5**

With respect to ¶ 8 of the Patrizia Declaration, all documents relating to or concerning the

statement that: "Specifically, the transfer of the MPLLC assets to the parent level at

NorthWestern provided greater transparency into NorthWestern's utility operations and was

viewed favorably by the rating agencies and the capital markets."

**REQUEST NO. 6**

All documents relating to or concerning the following statements in ¶ 9 of the Patrizia

Declaration:

(a) "Because the transfer of assets could not be completed until NorthWestern had

identified all of the MPLLC assets (including bills of sale and deeds, where applicable)

and obtained various consents and regulatory approvals, there was inevitably some time

between the initial acquisition of MPLLC (the first step in the Transaction), and the

structural restoration of NorthWestern as a 'flat' utility company"; and

(b) "In that circumstance, unless it otherwise qualified for an exemption from PUHCA,

NorthWestern would have been subject to federal regulation and oversight under

PUHCA."

**REQUEST NO. 7**

All documents relating to or concerning NorthWestern's exemption from PUHCA as

referenced in ¶ 9 of the Patrizia Declaration, including all documents submitted by NorthWestern

to any regulatory agency concerning NorthWestern's exemption from PUHCA.

7

**REQUEST NO. 8**

All documents relating to or concerning the following statements in ¶ 10 of the Patrizia Declaration:

(a) "The regulatory implications of the two-step process had been identified at the very earliest stages of considering the Transaction, and NorthWestern explored throughout the Transaction period the possible bases on which it would qualify for exemption from PUHCA regulation";

(b) "Ultimately, by the end of 2001, it became clear in discussions with the SEC staff that because of various factors, including the relative size of NorthWestern's utility businesses in Montana, South Dakota, and Nebraska following the acquisition of MPLLC, NorthWestern would not meet the quantitative standards historically used by the SEC staff under sections 3(a)(1) and 3(a)(2) of PUHCA";

(c) "After further discussion of the issues with the SEC staff, in February 2002 NorthWestern filed an application for an exemption under Section 3(a)(3) of PUHCA to address its status during the period necessary to complete the structural restoration"; and

(d) "In the application, NorthWestern showed that, given the lines of business it was then conducting and the historic gross revenues of those various businesses, NorthWestern was only 'incidentally a holding company, being primarily engaged or interested in one or more businesses other than the business of public-utility company and … not deriving, directly or indirectly, any material part of its income from any one or more subsidiary companies, the principal business of which is that of a public-utility company.'"

8

**REQUEST NO. 9**

All documents relating to or concerning the following statements in ¶ 11 of the Patrizia Declaration:

(a) "NorthWestern's application for a 3(a)(3) exemption was effective upon its good faith filing with the Securities and Exchange Commission, and remained in place until the MPLLC assets were transferred to the parent company level in November 2002 and the Milltown Dam thereafter qualified as an EWG"; and

(b) "In this respect, the 3(a)(3) exemption was 'temporary' and had always been intended to be 'temporary' – not because there was any specific time limitation under PUHCA, but rather because NorthWestern had always intended to return promptly to its original 'flat' structure, and once the necessary steps were taken to do so, the exemption was no longer necessary."

**REQUEST NO. 10**

All documents relating to or concerning any communications from any regulatory agency stating that NorthWestern was not entitled to the exemption under PUHCA that it obtained as referenced in Mike Hanson and Eric Jacobsen's January 28, 2002 Memorandum to NorthWestern's Board of Directors (NOR142389-NOR142392).

**REQUEST NO. 11**

All documents relating to or concerning NorthWestern's determination that it would not proceed with the Acquisition if it was unable to either (i) isolate the Milltown Dam assets and/or (ii) effectuate the Transfer.

9

**REQUEST NO. 12**

All documents relating to or concerning any communication from any regulatory agency to NorthWestern that NorthWestern would be in violation of any regulatory requirement by virtue of holding the Transferred Assets in a subsidiary.

**REQUEST NO. 13**

All documents relating to or concerning any factual or legal issue which Charles A. Patrizia may testify about at the forthcoming trial in the above-referenced action.

**REQUEST NO. 14**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about the structure of the Acquisition and/or the Transfer.

**REQUEST NO. 15**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about NorthWestern's "reasonable and legitimate business objectives" relating to the Acquisition and/or the Transfer, as such phrase is used in the Patrizia Declaration.

**REQUEST NO. 16**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to NorthWestern, about any regulatory issues impacting the structure or timing of the Acquisition and/or the Transfer.

**REQUEST NO. 17**

All documents constituting or concerning any communications between or involving you and/or NorthWestern, including any legal or other professional advice provided to

10

NorthWestern, about the interests or potential reactions of rating agencies and capital markets
with respect to the Acquisition and/or the Transfer.

### REQUEST NO. 18

All documents constituting or concerning any communications between or involving you
and/or NorthWestern, including any legal or other professional advice provided to
NorthWestern, about the timing of effectuating the Transfer following the Acquisition.

### REQUEST NO. 19

All documents constituting or concerning any communications between or involving you
and/or NorthWestern, including any legal or other professional advice provided to
NorthWestern, about the potential impact of the accuracy or inaccuracy of NorthWestern's
publicly issued financial statements on the Acquisition and/or the Transfer.

11

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

MAGTEN ASSET MANAGEMENT CORPORATION  :
and LAW DEBENTURE TRUST COMPANY OF NEW  :
YORK,  :
:
Plaintiffs,  :          C.A. No. 04-1494-JJF
:
v.  :
:
NORTHWESTERN CORPORATION,  :
:
Defendant.  :
:

---

### DEFENDANT NORTHWESTERN CORPORATION'S INITIAL DISCLOSURES

Northwestern Corporation ("Northwestern"), defendant in the above-captioned

action (the "Action"), by and through its counsel, Greenberg Traurig, LLP and Curtis, Mallet-

Prevost, Colt & Mosle LLP, makes the following initial disclosures (the "Initial Disclosures")

pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure ("Rule 26"), to plaintiffs

Magten Asset Management Corp. ("Magten") and Law Debenture Trust Company of New York

("Law Debenture") (collectively, "Plaintiffs").

### RESERVATION OF RIGHTS

The Initial Disclosures are made subject to the following reservation of rights,

objections and qualifications (the "Reservation of Rights"), which are incorporated by reference

in each of the Initial Disclosures below, as if fully set forth therein.

The Initial Disclosures are based upon a good faith, reasonable review of

information presently available to Northwestern. By making the Initial Disclosures,

Northwestern does not represent that it has identified all witnesses, information, documents or

other evidentiary material that Northwestern may use to support its defenses in the Action.

2661780v2

Northwestern's investigation of the claims and defenses at issue in the Action is continuing and

it may learn of additional witnesses, information, documents or other evidentiary material that it

may use to support its defenses in the Action. Northwestern expressly reserves the right to revise

and/or supplement the Initial Disclosures at a future time with information which would

otherwise be required to be disclosed pursuant to the Federal Rules of Civil Procedure and/or the

Federal Rules of Evidence. By making the Initial Disclosures, Northwestern does not waive, and

hereby expressly reserves, all rights to object to any discovery requests which may be served in

connection with the Action or any other actions, whether by Plaintiffs, or any other parties or

non-parties. Notwithstanding the disclosures contained herein, Northwestern expressly reserves

the right to object to the testimony of any witness, or the production of any documents,

information or other evidentiary material on the grounds of privilege, work product doctrine,

relevance, undue burden, or any other valid objection, or in the absence of an appropriate

confidentiality agreement.

### I. INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION REGARDING CLAIMS AND DEFENSES

*Rule 26(a)(1)(A). The name and, if known, address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.*

Subject to the Reservation of Rights set forth above, Northwestern hereby

identifies the following individuals who may have discoverable information relating to

NorthWestern's defenses in the Action:

1.    Michael J. Hanson. Mr. Hanson is currently the President and Chief

Executive Officer of NorthWestern. Mr. Hanson previously served as Chief Executive Officer

of Clark Fork & Blackfoot, LLC ("Clark Fork") as of November 15, 2002, at which time certain

of Clark Fork's assets and liabilities (the "Utility Assets and Liaibilities") were transferred to NorthWestern in the transaction known as the "Going Flat Transaction." Mr. Hanson is believed to have knowledge of the facts and circumstances of the actions taken to close the Going Flat Transaction. In addition, Mr. Hanson is believed to have knowledge of the operations and financial condition of Clark Fork in and around 2002. Mr. Hanson is represented by counsel, and may be contacted only through Stanley T. Kaleczyz, Esq. and Kimberly Beatty, Esq., Browning, Kaleczyc, Berry & Hoven, P.C., 139 North Last Chance Gulch, Helena, Mt. 59624, Telephone: (406) 433-6820.

2.    Ernie J. Kindt.  Mr. Kindt served as the Chief Financial Officer of Clark Fork as of November 15, 2002, at which time the Utility Assets and Liabilities were transferred to NorthWestern in the Going Flat Transaction. Mr. Kindt is believed to have knowledge of the operations and financial condition of Clark Fork in and around 2002. Mr. Kindt is represented by counsel, and may be contacted only through Stanley T. Kaleczyz, Esq. and Kimberly Beatty, Esq., Browning, Kaleczyc, Berry & Hoven, P.C., 139 North Last Chance Gulch, Helena, Mt. 59624, Telephone: (406) 433-6820.

3.    Representative(s) of the Bank of New York.  The Bank of New York served as the original Trustee of Montana Power Capital 1 Trust (the "Trust"), which issued certain Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS"), and effectuated the transfer of obligations relating to the QUIPS from Clark Fork to NorthWestern in or around November 15, 2002. It is believed that representatives of The Bank of New York possess knowledge of the Trust documents governing the QUIPS obligations, and the facts and circumstances surrounding the execution of documents evidencing the succession of obligations relating to the QUIPS, including the transfer of such obligations to Northwestern in or around

–3–

2661780v2

November 15, 2002 and the release of Clark Fork's obligations pertaining to the QUIPS at that time. Upon information and belief, The Bank of New York is located at One Wall Street, New York, New York 10286, Telephone: (212) 495-1784, and is represented by Emmet, Marvin & Martin, LLP, 120 Broadway, New York, N.Y. 10271 (212) 238-3000.

       4.    <u>Representative(s) of Law Debenture Trust Company of New York</u>. Law Debenture is the current Trustee of the Trust, having succeeded The Bank of New York in this capacity. It is believed that representatives of Law Debenture possess knowledge of the Trust documents governing the QUIPS obligations, the purchase and ownership of the QUIPS by plaintiffs and/or other QUIPS holders, and the facts and circumstances surrounding the execution of documents evidencing the succession of obligations relating to the QUIPS, including the transfer of such obligations to Northwestern in or around November 15, 2002 and the release of Clark Fork's obligations pertaining to the QUIPS at that time. Upon information and belief, Law Debenture may be contacted through its counsel in the Action, John Snellings, Esq., of Nixon, Peabody LLP, 100 Summer Street, Boston, Mass., 02110, Telephone: (617) 345-1000.

       5.    <u>Talton Embry.</u> Mr. Embry is Chairman of Magten and is believed to have knowledge concerning Magten's purchase and ownership of QUIPS, and other facts and circumstances relied upon by Magten in its decision to acquire the QUIPS. Upon information and belief, Mr. Embry may be contacted through counsel for Magten in the Action, Bonnie Steingart, Esq., of Fried, Frank, Shriver and Jacobson LLP, One New York Plaza, New York, New York 1004, Telephone: (212) 859-8000.

## II.    DESCRIPTION OF DOCUMENTS, DATA COMPILATIONS AND TANGIBLE THINGS

      *Rule 26(a)(1)(B). A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control*

–4–

of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

Subject to the foregoing Reservation of Rights, NorthWestern states that, pursuant to agreement between the parties to the Action, disclosures under Rule 26(a)(1)(B) are not required at this time.

### III.    COMPUTATION OF DAMAGES

*Rule 26(a)(1)(C). A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.*

Subject to the foregoing Reservation of Rights, NorthWestern states that, at this time, it has not asserted a claim for damages in the Action.

### IV.    INSURANCE AGREEMENTS

*Rule 26(a)(1)(D). For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.*

Subject to the foregoing Reservation of Rights, NorthWestern states that there are no applicable insurance agreements which require disclosure under the provisions of subdivision (a)(1)(D) of Rule 26.

Dated: New York, New York
        January 20, 2006

GREENBERG TRAURIG, LLP

By :

Victoria Watson Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, Delaware 19801
Tel: (302) 661-7000
Fax: (302) 661-7360

–5–

-and-

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

Joseph D. Pizzuro, Esq.
Steven J. Reisman, Esq.
Nancy E. Delaney, Esq.
Miriam K. Harwood, Esq.
101 Park Avenue
New York, New York 10178-0061
Tel: (212) 696-6000
Fax: (212) 697-1559

*Counsel for Defendant Northwestern Corp.*

–6–

2661780v2

# EXHIBIT 8

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

MAGTEN ASSET MANAGEMENT CORP. and  :
LAW DEBENTURE TRUST COMPANY OF  :
NEW YORK,  :
  :
              Plaintiffs,  :
  :  Civil Action No. 04-1494-JJF
       - against -  :
  :
NORTHWESTERN CORP.,  :
  :
              Defendant.  :
  :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

MAGTEN ASSET MANAGEMENT CORP.,  :
  :
              Plaintiff,  :
  :
       - against -  :
  :  Civil Action No. 05-499-JJF
MIKE J. HANSON and ERNIE J. KINDT,  :
  :
              Defendants.  :
  :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

City of Washington        )
                 : ss
District of Columbia      )

### DECLARATION OF CHARLES A. PATRIZIA IN SUPPORT OF
### NORTHWESTERN CORP.'S MOTION FOR SUMMARY JUDGMENT

CHARLES A. PATRIZIA, ESQ., under penalty of perjury, deposes and says:

1.    I am a member of the Bar of the District of Columbia and a partner at the

law firm of Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"). I submit this

declaration in support of NorthWestern Corporation's Motion for Summary Judgment.

2.    Beginning in early 2000, Paul Hastings represented NorthWestern Corporation ("NorthWestern") in connection with its acquisition of the regulated electric utility and natural gas businesses of The Montana Power Company ("MPC"), hereafter referred to as the "Transaction." I was personally involved in that representation. As part of my involvement in the representation, I advised NorthWestern on regulatory issues relating to the potential application of the Public Utility Holding Company Act of 1935 ("PUHCA") to the Transaction and to the corporate structures related to the Transaction.

3.    As set forth below, the Transaction occurred in two steps. The first step, which was completed as of February 15, 2002, involved MPC's transfer of its regulated electric and natural gas utility operations, together with certain unassociated liabilities, to MPC's wholly owned, newly formed subsidiary, Montana Power LLC ("MPLLC"), and NorthWestern's acquisition of 100% of the membership interests of MPLLC. The second step, which was completed on November 15, 2002, involved the transfer of all MPLLC's assets, except those specifically related to the Milltown Dam, to the parent company level at NorthWestern; the assumption by NorthWestern of MPLLC liabilities; and the entry by NorthWestern into support agreements with MPLLC to ensure that MPLLC would have the financial wherewithal to meet the obligations associated with its remaining assets. The Milltown Dam was associated with an active Superfund site, and NorthWestern sought to continue to segregate that potential liability from the remaining MPLLC operations. Therefore, NorthWestern did not want to move assets associated with Milltown Dam to the parent company level. This two-step process was contemplated from the very beginning of the Transaction. Thereafter, in July 2003,

MPLLC became an "exempt wholesale generator" ("EWG"), pursuant to the provisions of PUHCA, as amended.

4.    The steps outlined in paragraph 3, above, were a part of structuring the Transaction so as to achieve two reasonable and legitimate business objectives of NorthWestern: (i) to avoid burdensome and duplicative regulation; and (ii) to address the interests of rating agencies and capital markets, which preferred that NorthWestern hold the MPLLC assets at the parent level.

**The Structure of the Transaction**

5.    Prior to the Transaction, NorthWestern held all of its utility operations at the parent company level. Because it had no subsidiaries that were "utility companies" as defined by PUHCA, NorthWestern was not regulated by the Securities and Exchange Commission ("SEC") as a "utility holding company". Rather, NorthWestern was regulated by the Federal Energy Regulatory Commission under the Federal Power Act (as to sales of electric power at wholesale in interstate commerce, and the transmission of electricity in interstate commerce) and by either state regulatory authorities as to its retail electric operations, or its franchise agreements as to its gas operations.

6.    Because of various restrictions and other limitations under PUHCA, NorthWestern preferred that the Transaction not result in its becoming a registered utility holding company, and therefore sought to structure the Transaction in a way that would avoid that possibility. However, MPC preferred that the initial sale be in the form of a "stock" rather than an "asset" transaction, and the presence of certain assets in MPLLC would make MPLLC an "electric utility company" for PUHCA purposes.

3

7.    The final structure, described above in paragraph 3, assured that at the end of the Transaction the utility related operations (except for Milltown Dam) would all be held at the parent company level at NorthWestern, and Milltown Dam would either be sold to a third party or would be qualified as an exempt wholesale generator. Thus, NorthWestern would remain structured so that it held no subsidiary that would be an "electric utility company", and NorthWestern would not be not a "utility holding company" within the meaning of PUHCA. In that form, NorthWestern would remain subject to state regulation as to retail sales of electricity, and to its franchise agreements as to retail sales of natural gas, but would not be subject to restrictions or limitations under PUHCA.

8.    Structuring the Transaction in this manner also held other benefits for NorthWestern. Specifically, the transfer of the MPLLC assets to the parent level at NorthWestern provided greater transparency into NorthWestern's utility operations and was viewed favorably by the rating agencies and the capital markets.

**NorthWestern's 3(a)(3) Application**

9.    Although the completion of the Transaction meant that NorthWestern was not a utility holding company and was therefore outside of PUHCA, during the period from the initial acquisition of MPLLC until the time that the utility operating assets were moved to the parent level and Milltown Dam became an EWG, NorthWestern was technically a "holding company" within the meaning of PUHCA. Because the transfer of assets could not be completed until NorthWestern had identified all of the MPLLC assets (including bills of sale and deeds, where applicable) and obtained various consents and regulatory approvals, there was inevitably some time between the initial acquisition of

4

MPLLC (the first step in the Transaction), and structural restoration of NorthWestern as a "flat" utility company. In that circumstance, unless it otherwise qualified for an exemption from PUHCA, NorthWestern would have been subject to federal regulation and oversight under PUHCA, even though it was clear that there was no long-term basis for that regulation.

      10.    The regulatory implications of the two-step process had been identified at the very earliest stages of considering the Transaction, and NorthWestern explored throughout the Transaction period the possible bases on which it would qualify for exemption from PUHCA regulation. As part of that exploration, NorthWestern submitted draft applications under Section 3 of PUHCA to the SEC staff, as early as December 2000. Ultimately, by the end of 2001, it became clear in discussions with the SEC staff that because of various factors, including the relative size of NorthWestern's utility businesses in Montana, South Dakota, and Nebraska following the acquisition of MPLLC, NorthWestern would not meet the quantitative standards historically used by the SEC staff under sections 3(a)(1) and 3(a)(2) of PUHCA. After further discussion of the issues with the SEC staff, in February 2002 NorthWestern filed an application for an exemption under Section 3(a)(3) of PUHCA to address its status during the period necessary to complete the structural restoration. In the application, NorthWestern showed that, given the lines of business it was then conducting and the historic gross revenues of those various businesses, NorthWestern was only "incidentally a holding company, being primarily engaged or interested in one or more businesses other than the business of public-utility company and . . . not deriving, directly or indirectly, any

5

material part of its income from any one or more subsidiary companies, the principal business of which is that of a public-utility company."

11.    Under Section 3(c) of PUHCA, NorthWestern's application for a 3(a)(3) exemption was effective upon its good faith filing with the Securities and Exchange Commission, and remained in place until the MPLLC assets were transferred to the parent company level in November 2002 and the Milltown Dam thereafter qualified as an EWG. In this respect, the 3(a)(3) exemption was "temporary" and had always been intended to be temporary—not because there was any specific time limitation under PUHCA, but rather because NorthWestern had always intended to return promptly to its original "flat" utility structure, and once the necessary steps were taken to do so, the exemption was no longer necessary.

12.    Indeed, NorthWestern in its application for the 3(a)(3) status specifically noted that it would hold that status only for a limited period necessary to accomplish the restoration to a flat structure.

13.    Thus, in the 3(a)(3) application, NorthWestern explained, for example, that its purchase of MPLLC would "proceed in two steps: As part of the first step, [Montana Power] will transfer the MPC Utility Operations to a newly-formed subsidiary Montana limited liability company, Montana Power LLC, and NorthWestern will acquire 100% of the membership interests of the LLC." Form U-1 Application Under the Public Utility Holding Company Act of 1935, filed Feb. 14, 2002, at NOR 3484 (attached as an exhibit to the affidavit of Nancy E. Delaney in support of NorthWestern Corp.'s motion for summary judgment).

6

14.    The application further explained that although NorthWestern would be a utility holding company "[u]pon closing of the first step of the Transaction," that status would be temporary and was "not anticipated to last more than 18 months from the date of the closing of the first step of the transaction." (Id.)

15.    Finally, the application provided that, "upon receipt of any necessary regulatory approvals . . . NorthWestern currently intends to undertake the second step of the Transaction in which it would acquire the transmission and distribution assets of [MPLLC]." (Id.)

16.    Structuring the Transaction in two stages had been described to the SEC staff, disclosed in other filings NorthWestern had made concerning the Transaction, and set out in statements by NorthWestern to analysts and rating agencies. As noted above, NorthWestern implemented the Transaction in the way described, and upon completion of the steps and the filing of an EWG application for Milltown Dam, NorthWestern was no longer a utility holding company and returned to its original status as outside PUHCA.

17.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on November _27_, 2007.

_____
CHARLES A. PATRIZIA

7

# EXHIBIT 9

### NORTHWESTERN CORPORATION
### BOARD OF DIRECTORS
### MINUTES OF REGULAR MEETING
### AUGUST 7, 2002

A regular meeting of the Board of Directors of Northwestern Corporation, (the

"Corporation") was held at 7:00 a.m. MDT on August 7, 2002, at The Summit at Big Sky

Resort, Big Sky, Montana. The following Directors were present in person:

> Randy G. Darcy
> Gary G. Drook
> Richard R. Hylland
> Jerry W. Johnson
> Merle D. Lewis
> Larry F. Ness
> Marilyn R. Seymann
> Bruce I. Smith

Also present were Daniel K. Newell, Eric R. Jacobsen, Michael J. Hanson, John C.

Charters, and Alan D. Dietrich of the Corporation, Mark Toney of AlixPartners, and

Lionel L. Nowell, III.

The meeting was called to order by the Chairman of the Board, Merle D. Lewis,

who served as Chairman of the meeting, and Mr. Dietrich served as Secretary.

**Governance Committee Nominating Report**

Governance Committee Chair Drook introduced Mr. Nowell, whom the

Committee was recommending for election to fill a vacancy on the Board of Directors,

and who had consented to serve on the Corporation's Board. Following a discussion,

the Board members unanimously adopted the following resolution:

> BE IT RESOLVED by the Board of Directors of NORTHWESTERN
> CORPORATION (the "Corporation") that Lionel L. Nowell, III is hereby
> elected as a member of the Board of Directors, in Class III, to serve from
> this date for the balance of the current term for Directors in such Class,
> and until a successor is elected and qualifies.

MOU-00143
CONFIDENTIAL

**Consideration of dividends payable September 1, 2002**

The Chairman then noted that the next regular quarterly dividend payment on the

Corporation's outstanding Cumulative Preferred Stock is September 1, 2002. He

indicated that the Board should also consider declaration of a quarterly dividend on the

outstanding Common Stock of the Corporation. Mr. Dietrich stated that the

Corporation, consistent with the authorization approved at the April 30 – May 1, 2002

Board meeting, had redeemed all of the outstanding shares of 4½% Cumulative

Preferred Stock, as of July 31, 2002, and, in addition, had proposed a purchase of the

outstanding shares of 6½% Cumulative Preferred Stock to the two holders of that

security, to be effective August 15, 2002. Because the executed purchase agreements

for the 6½% Preferred shares had not been received as of the time of this meeting, Mr.

Dietrich recommended that the Board approve a tentative dividend on such shares,

payable September 1, 2002, only if the shares had not been repurchased at such time.

Thereupon, on motion duly made and seconded, the Directors unanimously

adopted the following resolution with regard to the Commutative Preferred Stock of the

Corporation:

BE IT RESOLVED by the Board of Directors of NORTHWESTERN
CORPORATION (the "Corporation") that there shall be, and is, hereby
declared the following dividend upon each of the outstanding shares of
6½% Cumulative Preferred Stock of the Corporation, if outstanding
September 1, 2002:

Quarterly dividend in the amount of $1.625 per share;

payable out of the surplus of the Corporation available therefore, on
September 1, 2002, and that August 15, 2002 be, and the same is,
hereby declared to be the record date for the determination of
stockholders entitled to receive payment of the said dividend;

MOU-00144
CONFIDENTIAL

FURTHER RESOLVED, that there shall be, and is, hereby declared upon each of the outstanding shares of Common Stock of the Corporation, a quarterly dividend in the amount of $0.3175 per share payable out of the surplus of the Corporation available therefore, on September 1, 2002, and that August 15, 2002 be, and the same is, hereby declared to be the record date for the determination of stockholders entitled to receive payment of the said dividend.

**Approval of Minutes of Previous Meetings**

The Chairman stated that there had been provided to each Director for his or her information and approval copies of the minutes of the annual meeting of the Board of Directors held on April 30 – May 1, 2002, and of the special meeting of the Board of Directors held on June 21, 2002.

Thereupon, on motion duly made and seconded, the Directors adopted the following resolution:

BE IT RESOLVED by the Board of Directors of NORTHWESTERN CORPORATION that the minutes of the annual meeting of the Board of Directors held on April 30 – May 1, 2002, and the special meeting held on June 21, 2002, are hereby approved as recorded.

**Montana Operations Restructuring**

Mr. Jacobsen stated that following the acquisition of The Montana Power Company's utility transmission and distribution business in February, the Corporation has operated the acquired business as a subsidiary, NorthWestern Energy, L.L.C., but that as was previously discussed with the Board, with the market, and with rating agencies, the Corporation has intended to go to a "flat" structure by moving the Montana operations from the LLC to the Corporation as part of its utility division, NorthWestern Energy. He stated that management was recommending the Board authorize the officers of the Corporation to take the necessary steps to go to the "flat"

MOU-00145
CONFIDENTIAL



structure. Following a discussion, the members of the Board of Directors unanimously

adopted the following resolution:

WHEREAS, NorthWestern Corporation (the "Corporation") believes it is advisable for rating agency purposes to move the assets of its wholly-owned subsidiary, NorthWestern Energy, L.L.C. (referred to herein as "NWE", formerly known as The Montana Power, L.L.C. ("MPLLC") into which The Montana Power Company was merged on February 13, 2002, with MPLLC being the surviving entity), to the Corporation to more directly support the obligations of the Corporation;

WHEREAS, the Corporation desires that NWE transfer substantially all of NWE's assets to it, except for those assets (and liabilities) associated with the Milltown hydroelectric dam on the Clark Fork River (the "Milltown Dam") (collectively, excluding the Milltown Dam assets and liabilities, the "NWE Assets and Liabilities");

WHEREAS, the Board of Directors desires to effect the transfer of the NWE Assets and Liabilities to it by NWE (the "NWE Asset Transfer") such that upon the consummation of the NWE Asset Transfer all assets and liabilities associated with the Milltown Dam remain with NWE and from and after the consummation of the NWE Asset Transfer, to operate the business comprising the NWE Assets and Liabilities as a division of the Corporation to be known as the "NorthWestern Energy Division".

NOW, THEREFORE, BE IT RESOLVED that the Board of Directors hereby authorizes, empowers and directs the officers of the Corporation, or any of them, to execute and deliver an asset and stock transfer agreement to be entered into between the Corporation and NWE (the "Transfer Agreement") to effect the NWE Asset Transfer, as well as any agreements, instruments, or documents contemplated thereby or in connection therewith ("Ancillary Agreements"), as the proper officers of the Corporation may deem necessary or desirable, with such modifications or amendments thereto as such officers shall approve and the execution of such Transfer Agreement and Ancillary Agreements shall be deemed conclusive evidence of such approval;

FURTHER RESOLVED, that the Board of Directors hereby authorizes, empowers and directs the proper officers of the Corporation, or any of them, to execute and deliver a power purchase agreement with NWE for the purchase of power from the Milltown Dam at a price equal to the price authorized in NWE's Tier II proceeding (the "PPA") and keepwell agreements to be entered into between the Corporation and NWE pursuant to which the Corporation will ensure that NWE will have necessary funds to pay (i) the maintenance and operating costs of the Milltown Dam not paid pursuant to the PPA and (ii) NWE's allowable

MOU-00146
CONFIDENTIAL

share of environmental liabilities relating to the Milltown Dam (collectively, the "Keepwell Agreements"), on mutually agreeable terms, with such modifications or amendments thereto as such officers shall approve and the execution of such PPA and Keepwell Agreements shall be deemed conclusive evidence of such approval;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed on behalf of the Corporation to take all other actions to effect the NWE Asset Transfer, such as, among other things, obtaining any necessary or desirable consents, or providing necessary or desirable notices, certificates, ratings confirmation letters or taking other actions, including, without limitation, under, or in connection with, the Credit Agreement among the Corporation, Credit Suisse First Boston ("CSFB"), CIBC Inc. ABN AMRO Bank, N.V., and Barclays Capital, as co-arrangers, and CSFB, as administrative agent, lead arranger and sole book runner, dated as of January 14, 2002, and as such officer shall deem necessary or desirable;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed on behalf of the Corporation and in its name to prepare, execute and file with the Securities and Exchange Commission any and all documents, reports, statements, filings, requests and information supplements as may be necessary or desirable for the purpose of completing the transactions contemplated by, or in connection with, the NWE Asset Transfer;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed on behalf of the Corporation to take all action, and act in the name of, or represent, the Corporation where necessary or desirable to comply with any and all applicable federal, state and local laws, rules and regulations applicable to the Corporation or the NWE Asset Transfer, including, without limitation, in connection with the Federal Energy Regulatory Commission and state and other federal regulatory agencies;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them is, authorized, empowered and instructed, for and on behalf of the Corporation, to retain such consultants, advisors, attorneys, independent contractors, investor and public relations firms as they deem necessary or desirable and on such terms and conditions as they deem appropriate to effect the NWE Asset Transfer and further the purposes and intent of these resolutions;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed, for and on behalf of the Corporation, to take all such further actions and to negotiate,

MOU-00147
CONFIDENTIAL

execute and deliver any and all documents, filings, reports, statements, instruments and certificates, and to do or cause to be done any and all acts as such officers may deem necessary or appropriate in order to carry out the purposes and intentions of these resolutions, including, but not limited to, the transactions in anticipation of, contemplated by, or in connection with the NWE Asset Transfer;

FURTHER RESOLVED, that Eric R. Jacobsen and Michael J. Hanson, or either of them, shall have a proxy to adopt the necessary or appropriate resolutions of the Corporation as manager of NWE to approve as manager of NWE the NWE Asset Transfer and related actions; and

FURTHER RESOLVED, that any and all actions taken by any director, officer, employee or agent of the Corporation in furtherance of the foregoing resolutions and within the authority conferred by the foregoing resolutions are hereby ratified and approved in all respects.

Mr. Jacobsen then stated that NorthWestern Energy, L.L.C., has had a continuing SEC reporting responsibility because of its public debt. In addition to administrative burdens and costs related to these additional 10-K and 10-Q filings, such reporting is confusing to the market because of the similarity in reporting entity name and the different financial information reported. He advised that the additional reporting responsibility could be avoided by the Corporation agreeing to jointly (with the LLC) guarantee the obligations under the 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPs") of Montana Power Capital I. Following a discussion, the members of the Board of Directors unanimously adopted the following resolution:

WHEREAS, pursuant to a Unit Purchase Agreement, dated as of September 29, 2000, by and between NORTHWESTERN CORPORATION (the "Company"), Touch America Holdings, Inc. and The Montana Power Company, on February 15, 2002, the Company acquired all the outstanding membership interests in NorthWestern Energy, L.L.C., formerly known as The Montana Power, L.L.C. and successor to The Montana Power Company ("NW Energy LLC"), and NW Energy LLC became a direct wholly-owned subsidiary of the Company; and

WHEREAS, NW Energy LLC is currently required to file reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as a result of the issuance, sale and listing on the New York Stock

MOU-00148
CONFIDENTIAL

Exchange of $65,000,000 aggregate liquidation amount of the 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPs") of Montana Power Capital I (the "Trust") and the issuance and sale of certain other securities under the Securities Act of 1933, as amended;

WHEREAS, in connection with the issuance and sale of the QUIPs, NW Energy LLC issued $67,010,325 aggregate principal amount of its 8.45% Junior Subordinated Debentures due December 31, 2036 (the "QUIPs Debentures"), all of which are currently outstanding, to the Trust pursuant to an Indenture, dated as of November 1, 1996, between The Montana Power Company and The Bank of New York (the "Trustee"), as amended by the First Supplemental Indenture, dated as of February 13, 2002, between NW Energy LLC and the Trustee (as supplemented, the "Indenture");

WHEREAS, in connection with the issuance and sale of the QUIPs, NW Energy LLC also entered into (i) the Guarantee Agreement, dated as of November 1, 1996, between The Montana Power Company and the Trustee, as amended by the Side Letter, dated as of February 13, 2002, from NW Energy LLC to the Trustee (as supplemented, the "Guarantee Agreement"), pursuant to which NW Energy LLC irrevocably and unconditionally agreed to make certain payments, on the terms and conditions set forth in the Guarantee Agreement, for the benefit of the holders of the QUIPs, (ii) the Amended and Restated Trust Agreement of the Trust, dated as of November 1, 1996 (the "Trust Agreement"), among The Montana Power Company, as depositor, the Trustee, as property trustee, The Bank of New York (Delaware), as Delaware trustee, and Ellen M. Senechal, Jerrold P. Pederson and Pamela K. Merrell, as administrative trustees and (iii) the Agreement as to Expenses and Liabilities, dated as of November 1, 1996 (the "Expense Agreement" and, together with the Guarantee Agreement and the Trust Agreement, the "QUIPs Agreements"), between The Montana Power Company and the Trust;

WHEREAS, the Board of Directors of the Company deems it in the best interests of the Company to suspend the reporting obligations of NW Energy LLC under the Exchange Act, while maintaining the listing of the QUIPs on the New York Stock Exchange;

WHEREAS, in order to suspend the reporting obligations of NW Energy LLC under the Exchange Act, while maintaining the listing of the QUIPs on the New York Stock Exchange, the Board of Directors of the Company deems it in the best interests of the Company to fully and unconditionally assume on a joint and several basis with NW Energy LLC, (i) the due and punctual payments of the principal of and premium, if any, and interest, if any, on all of the outstanding QUIPs Debentures and (ii) the performance of every covenant, obligation and agreement of NW

MOU-00149
CONFIDENTIAL

Energy LLC under the Indenture with respect to the outstanding QUIPs Debentures and under the QUIPs Agreements;

NOW, THEREFORE, BE IT HEREBY RESOLVED, that this Board of Directors authorizes the Company to fully and unconditionally assume on a joint and several basis with NW Energy LLC, (i) the due and punctual payments of the principal of and premium, if any, and interest, if any, on all of the outstanding QUIPs Debentures and (ii) the performance of every covenant, obligation and agreement of NW Energy LLC under the Indenture with respect to the outstanding QUIPs Debentures and the QUIPs Agreements, to the same extent as if the Company were deemed to be NW Energy LLC for all purposes of the QUIPs Debentures, the Indenture and the QUIPs Agreements, which assumption shall be subject to all of the terms and conditions related to the QUIPs Debentures contained in the Assumption Agreements (as defined below), the QUIPs Debentures, the Indenture and the QUIPs Agreements; and be it

FURTHER RESOLVED, that the Company enter into a Supplemental Indenture (the "Supplemental Indenture"), Amendment to Guarantee Agreement ("Guarantee Amendment") and Assumption Letter Agreement ("Assumption Agreement" and, collectively with the Supplemental Indenture and the Guarantee Agreement, the "Assumption Agreements"), and any other agreements, documents, instruments and certificates related thereto, and any and all amendments, restatements, renewals and extensions thereof, with the parties listed therein, providing for, among other things, the full and unconditional assumption on a joint and several basis with NW Energy LLC of NW Energy LLC's obligations under the QUIPs Debentures, the Indenture and the QUIPs Agreements, substantially in the forms presented to the Board of Directors, with such changes, amendments and modifications as each or any of the Chairman and Chief Executive Officer; the President and Chief Operating Officer; the Vice President and Chief Financial Officer; the Vice President, General Counsel, Chief Legal Officer and Assistant Secretary; the Treasurer and Controller; the Vice President—Legal Administration and Corporate Secretary of the Company (each such officer referred to as an "Authorized Officer"), acting jointly or individually, shall determine, the execution and delivery thereof to be conclusive evidence of such determination; that the Authorized Officers, any one of whom may act without the joinder of any of the others, are hereby authorized, empowered and directed, in the name and on behalf of the Company and/or any of its subsidiaries, as provided in these resolutions to execute and deliver the Assumption Agreements, and any other agreements, documents, instruments and certificates related thereto, and any and all amendments, restatements, renewals and extensions thereof; that the Company is hereby authorized to comply with the provisions of, and perform all of the transactions contemplated by the Assumption Agreements, and any other agreements, documents, instruments and

MOU-00150
CONFIDENTIAL

NOR009575

certificates related thereto, and any and all amendments, restatements, renewals and extensions thereof; and that upon execution thereof by an Authorized Officer, such Assumption Agreements, and any other agreements, documents, instruments and certificates related thereto, and any and all amendments, restatements, renewals and extensions thereof, shall be the legal, valid and binding obligations of the Company, enforceable against it in accordance with their respective terms; and be it

FURTHER RESOLVED, that the Company is authorized, and each and any Authorized Officer is hereby authorized, empowered and directed, to take, or to instruct others to take, any and all actions, in the name and on behalf of the Company and/or any of its subsidiaries, with the New York Stock Exchange, and to pay any and all fees necessary or advisable to the New York Stock Exchange, to reflect the assumption of the QUIPs Debentures, the Indenture and the QUIPs Agreements by the Company; and be it

FURTHER RESOLVED, that the Company is authorized, and each and any Authorized Officer is hereby authorized, empowered and directed, to apply, in the name and on behalf of the Company and/or any of its subsidiaries, for the registration under the Exchange Act of the assumption of the QUIPs Debentures, the Indenture and the QUIPs Agreements by the Company and the qualification of the Assumption Agreements under the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), and in connection therewith to prepare and file with the Securities and Exchange Commission such applications, registration statements and other instruments as may be necessary or advisable to comply with the Exchange Act and the Trust Indenture Act and the rules and regulations adopted by the Securities and Exchange Commission thereunder; and be it

FURTHER RESOLVED, that the Company is authorized, and each and any Authorized Officer is hereby authorized, empowered and directed, to take, or to instruct others to take, any and all actions, in the name and on behalf of the Company, as manager of NW Energy LLC, necessary or desirable to suspend the reporting obligations of NW Energy LLC under Section 15(d) of the Exchange Act, including the filing of Form 15 with the Securities and Exchange Commission;

FURTHER RESOLVED, that each and any Authorized Officer is authorized, empowered and directed, in the name and on behalf of the Company and/or any of its subsidiaries, to execute and deliver any agreement, document, instrument, certificate or other written matter as may be necessary or advisable in connection with the foregoing resolutions or any amendment, restatement, renewal, extension or other modification thereof, and to take any and all actions and do, or authorize to be done, all things necessary or advisable to more fully effectuate the

MOU-00151
CONFIDENTIAL

NOR009576

foregoing resolutions, the execution and delivery thereof and the taking of any such action to be conclusive evidence that the same has been authorized and approved by this resolution, and which agreement, document, instrument, certificate or other written matter, and any amendment, restatement, renewal, extension or other modification, upon execution by an Authorized Officer, shall be the legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms.

**Audit Committee Report**

Audit Committee Chair Smith reported, on behalf of the Committee, that the Committee had met the prior day with representatives of Deloitte & Touche, LLP ("Deloitte") and members of management. Mr. Smith reviewed the Committee's discussion with Deloitte concerning the audit plan for 2002 for the Corporation, the work being done by Deloitte for the June 30, 2002 10-Q report, tax liability issues related to the sale of the Corporation's interest in Cornerstone Propane, the impact of SFAS 141 and 142 on the Corporation's accounting practices, and the appraisal work being done by American Appraisal with regard to the Corporation's investments in Blue Dot Services Inc. and Expanets, Inc., and new legislation and new SEC regulations affecting Audit Committee and executive responsibilities. Mr. Smith also noted that the Committee had met with the Deloitte representatives and without management present. He reported that the Committee was planning to hold a special meeting prior to the filing of the 10-Q report the following week, to discuss the report information with management and with Deloitte. A discussion followed.

**Compensation Committee Report**

Compensation Committee Chair Darcy stated that the Committee had met the prior day, along with representatives of Towers Perrin, the Committee's compensation consultants, and Mr. Van Camp and Jan Nolander of the Corporation. The meeting had

MOU-00152
CONFIDENTIAL

begun with all members of the Board present, and the Towers Perrin representatives

provided a review of legislative and regulatory issues affecting executive compensation.

Mr. Darcy further reported that the non-Committee Board members then left the

Committee meeting, and the Committee discussed with the Towers Perrin and

management representatives the Towers Perrin study of the Corporation's executive

compensation, discussed specific actions to be undertaken, and agreed to hold a

further meeting in Minneapolis on September 18, 2002. A discussion followed.

**Further Governance Committee Report**

Corporate Governance Committee Chairman Drook further reported, on behalf of

the Committee, that Mr. Lewis had tendered his resignation as a member of the

Committee, and the Committee had accepted such rsignation.    Mr. Drook

recommended that Mr. Nowell be appointed as a additional member of the Audit

Committee. Following a discussion, the Directors unanimously adopted the following

resolution:

> BE IT RESOLVED by the Board of Directors of NORTHWESTERN
> CORPORATION (the "Corporation") that Lionel L. Nowell, III is hereby
> appointed to serve on the Audit Committee of the Board, for the period
> from this meeting through April 2003.

Mr. Drook reported that representatives of the Paul, Hastings, Janofsky & Walker

law firm had provided a briefing to all the members of the Board of Directors and to

representatives of management concerning new Federal laws and regulations,

anticipated regulations, and New York Stock Exchange initiatives, all relating to

governance of corporation boards and executives. A discussion followed. Mr. Drook

recommended, on behalf of the Committee, that the legal department of the

Corporation lead an effort to review the by-laws, articles of incorporation, Committee

MOU-00153
CONFIDENTIAL

NOR009578

charters, and code of business ethics and conduct to determine if any changes should be made to these documents. He also recommended that management, working with its advisors, provide information to the members of the Board of Directors concerning processes and procedures to be followed on a regular basis by the Board and its Committees related to corporate governance. Finally, Mr. Drook recommended that the Board provide formal meetings of its outside Directors, without management present, appointing a chair for such meetings and determining a method to record the minutes of such meetings. A discussion followed.

Thereupon, on motion duly made and seconded, the Board unanimously adopted the following resolution:

> BE IT RESOLVED by the Board of Directors of NORTHWESTERN CORPORATION (the "Corporation") that the Corporation's general counsel is authorized and directed to conduct a review of the governing documents for the Board of Directors of Corporation and its Committees, consistent with good corporate practices, and to recommend any changes to the Governance Committee at its next regularly scheduled meeting.

**Amendment to By-Laws**

Mr. Dietrich discussed a proposed amendment to the by-laws of the Corporation to provide more flexibility with regard to the quarterly meeting dates for Board meetings in order to allow additional time to gather and present financial information as part of the materials provided to the Board members in advance of these meetings. He stated that currently the by-laws provide for the quarterly meetings to be held on the first Wednesday of the months of February, August and November (with the May meeting being held in conjunction with the annual meeting of shareholders, on a date established by the Board). Management was recommending that the Board adopt the amendment proposed which would establish the quarterly Board meeting dates within

MOU-00154
CONFIDENTIAL



the first two weeks of those months, and the record date for any dividends approved at

such meeting would be set to be 8-10 days thereafter, with dividend payment dates on

the same dates as currently provided.   Following a discussion, the Board unanimously

adopted the following resolution:

> BE IT RESOLVED by the Board of Directors of NORTHWESTERN CORPORATION (the "Corporation") that the By-Laws of the Corporation are hereby amended, effectively immediately, as follows:
>
> Article III, Section 3 is amended to read as follows:
>
> Section 3.  **Annual, Regular and Special Meetings.**  The annual meeting of the Board of Directors shall be held in each year in conjunction with the annual meeting of stockholders, for the transaction of such business as may come before the Board; and regular meetings of the Board shall be held at least quarterly during the first two weeks of the months of February, August and November in each year  at the office of the Company in the City of Sioux Falls, South Dakota, or such other place and at such time and date as may from time to time be established by resolution of the Board or as may be specified by the Chairman of the Board or the President with respect to each such meeting.  Special meetings of the Board may be called by the Chairman of the Board, the President, or any two Directors, and shall be held at such time and place as may be specified by the officer or Directors calling the meeting, or in the absence of such specification as to place, at the office of the Company in the City of Sioux Falls, South Dakota. Notice stating the place, date, and hour of each meeting of the Board (other than the annual meeting, as to which no notice need be given) shall be given to each Director either by mail to his residence or place of business not less than forty-eight (48) hours before the date of the meeting, or personally by telephone, telegram, telecopy, electronic mail, or similar means of communication on twenty-four (24) hours' notice. All or any of the Directors may waive notice of any meeting, and the presence of a Director at any meeting of the Board shall be deemed a waiver of notice thereof by him.

**Discussion Items**

Mr. Newell provided a strategic and operating plan update for Blue Dot Services

Inc.  A discussion followed.

MOU-00155
CONFIDENTIAL

NOR009580

Mr. Lewis provided an update on the reorganization plans at Cornerstone

Propane, L.P. ("Cornerstone"), including SYN INC. loans made to Cornerstone to assist

its liquidity needs. A discussion followed.

Mr. Orme provided a financing update for the Corporation and its affiliates. A

discussion followed.

**Strategic Opportunity**

Mr. Hanson described a strategic opportunity that NorthWestern Energy was

considering and requested Board authorization to move forward with further due

diligence and negotiations. Following a discussion, the Board unanimously adopted the

following resolution:

> WHEREAS, officers of NorthWestern Corporation (the "Corporation") have engaged in discussions with Xcel Energy Inc., a Minnesota corporation ("Seller"), regarding the purchase by the Corporation of all the outstanding capital stock of Cheyenne Light, Fuel & Power Company, a Wyoming corporation ("Target");
>
> WHEREAS, the Board of Directors has been presented with a form of a Stock Purchase Agreement, between the Corporation or one of its subsidiaries, as Buyer, and Seller, attached hereto as Exhibit A (the "Purchase Agreement"), which Purchase Agreement is based on the Term Sheet executed by the Corporation and Seller on July 3, 2002 (the "Term Sheet"), and includes the proposed revisions, comments and additions of officers of the Corporation and the Corporation's legal advisers;
>
> WHEREAS, the Board of Directors has had an adequate opportunity to review and discuss the preliminary due diligence analysis of the business and operations of Target prepared by management of the Corporation, the form of the Purchase Agreement and other materials presented at this meeting and management's recommendations with respect thereto, and to raise any questions and discuss any concerns with the foregoing; and
>
> WHEREAS, the Board of Directors has determined that the proposed terms and conditions of the Purchase Agreement, including the purchase price for the capital stock of Target of $81 million, subject to certain working capital and other adjustments and less the amount of any outstanding long-term debt of Target, represent an attractive opportunity for the Corporation to enhance its business, financial growth and market position, and are in the best interests of the Corporation.

MOU-00156
CONFIDENTIAL

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors approves the terms and conditions of the Purchase Agreement and hereby authorizes, empowers and directs the officers of the Corporation, or any of them, to

— continue negotiating the terms of the Purchase Agreement, conduct such additional due diligence as they may deem necessary and, upon satisfactory completion of such due diligence, to execute and deliver the Purchase Agreement, substantially in the form presented in Exhibit A, with such modifications or amendments thereto as such officers shall approve and the execution of such Purchase Agreement shall be deemed conclusive evidence of such approval

— prepare, execute and file any and all documents, notices, reports, statements, filings, requests and information supplements as may be necessary or desirable, to take all other action and act in the name of, or represent, the Corporation, where necessary or desirable, to comply with any and all applicable federal, state and local laws, rules and regulations for the purpose of completing the transactions contemplated by the Purchase Agreement or in connection with the proposed acquisition of the capital stock of Target, including, without limitation, the Hart-Scott-Rodino Antitrust Improvements Act and all rules and regulations promulgated by the Securities and Exchange Commission, the Federal Energy Regulatory Commission and the applicable regulatory agencies in Wyoming, South Dakota and Delaware;

— release, with Seller and/or Target, one or more press releases and/or press conferences upon the execution of the Purchase Agreement and from time to time thereafter, as shall be determined to be necessary or desirable by the officers of the Corporation; and

— retain such consultants, advisors, attorneys, independent contractors, investor and public relations firms as they deem necessary or desirable and on such terms and conditions and they deem appropriate to effect the potential acquisition of the capital stock of Target and further the purposes and intent of these resolutions;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed on behalf of the Corporation, to take all such further actions and to negotiate, execute and deliver any and all documents, filings, reports, statements, instruments, certificates and shareholder proxies of subsidiaries, and to do or cause to be done any and all acts as such officers may deem necessary or appropriate in order to carry out the purposes and intentions of these resolutions, including, but not limited to, the transactions in anticipation of, contemplated by, or in connection with the proposed acquisition of the capital stock of Target; and

MOU-00157
CONFIDENTIAL

FURTHER RESOLVED, that any and all actions taken by any director, officer, employee or agent of the Corporation in furtherance of the foregoing resolutions and within the authority conferred by the foregoing resolutions are hereby ratified and approved in all respects.

The Board then met in executive session. Following that session, Chairman Lewis and the non-employee members of the Board met to conduct the quarterly CEO evaluation.

There being no further business to come before the meeting, the meeting was adjourned.

_____
M. D. Lewis, Chairman of the Board


_____
Alan D. Dietrich, Corporate Secretary

MOU-00158
CONFIDENTIAL