# UNREPORTED CASES

LEXSEE 2003 US DIST LEXIS 25977

## CITIZENS FINANCIAL GROUP, INC., Plaintiff, -VS- THE CITIZENS NATIONAL BANK OF EVANS CITY and CITIZENS, INC., Defendants.

### Civil Action No. 01-1524

## UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

### *2003 U.S. Dist. LEXIS 25977*

#### April 23, 2003, Filed

**PRIOR HISTORY:** *Citizens Fin. Group, Inc. v. Citizens, Inc., 2003 U.S. Dist. LEXIS 25978 (W.D. Pa., Mar. 20, 2003)*

**DISPOSITION:**    [*1] Defendants' motions to preclude expert testimony and other evidence granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff junior user bank sought a declaration that it did not infringe on defendant senior user bank's trademark. The senior user filed a counterclaim alleging trademark infringement, unfair competition, and unjust enrichment. The junior user filed an omnibus motion seeking to preclude the senior user from offering certain expert testimony and other evidence based on Daubert and *Fed. R. Evid. 702*, and the senior user also filed Daubert motions.

**OVERVIEW:** The junior user acquired the business of a third party, and the senior user alleged that the junior user's name infringed upon its trademark. The court granted in part and denied in part the parties' motions. The court held, inter alia, that (1) the senior user's likelihood of confusion survey was inadmissible because few participants were likely to be part of the customer base based on the location of the study and the screener questions asked; (2) the junior user's survey was admissible because the questions posed and the controls included secured its reliability; (3) the opinions of one of the senior user's experts with respect to name rehabilitation, damage, and name confusion were inadmissible because they were ipse dixit; (4) the opinion

of one of the other senior user's experts regarding color usage was inadmissible because she had no expertise in the neurological process of color perception and, if no expertise was necessary, there was no need to have expert testimony; and (5) there was no support for the senior user's theory that would not allow an expert report to be jointly written with the caveat that each expert would testify solely on their topic of expertise.

**OUTCOME:** The court granted the parties' motions in part and denied the parties motions in part.

**LexisNexis(R) Headnotes**

*Evidence > Testimony > Experts > Helpfulness*

[HN1] Faced with a proffer of expert scientific testimony, the trial court judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Evidence > Testimony > Experts > Daubert Standard*

[HN2] The trial court's role as a "gatekeeper" announced in Daubert requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the

facts of the case. Thus, pursuant to Daubert, the gatekeeping function requires the court to ensure that the expert testimony is both reliable and relevant. Daubert.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Daubert Standard*

[HN3] As to the first Daubert requirement, qualification of a proffered witness as an expert, the United States Court of Appeals for the Third Circuit has eschewed imposing overly rigorous requirements of expertise and has been satisfied with more general qualifications. *Fed. R. Evid. 702's* liberal policy of admissibility extends to the substantive as well as the formal qualification of experts. Thus, an expert can qualify based on a broad range of knowledge, skills, training and experience.

*Evidence > Testimony > Experts > Daubert Standard*

[HN4] The second inquiry under Daubert focuses upon methodology. The inquiry into methodology is designed to ensure that an expert's opinions are based upon methods and procedures of science rather than on subjective belief or unsupported speculation. Reliability is assessed by determining whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses.

*Evidence > Testimony > Experts > General Overview*

[HN5] In addition to the eight factors considered to assess reliability of an expert's opinion, some courts also consider additional factors relevant in determining reliability, including: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (iii) whether the expert has adequately accounted for alternative explanations; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert.

*Evidence > Testimony > Experts > Daubert Standard*

[HN6] Daubert and *Fed. R. Evid. 702* require that an expert's testimony "fits" the facts of the case. "Fit" requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case.

*Trademark Law > Federal Unfair Competition Law > General Overview*
*Trademark Law > Infringement Actions > Expert Witnesses*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*

[HN7] The relevant factors used to access reliability and trustworthiness of a survey (its methodology) in a trademark case include, inter alia: 1. The universe was properly chosen and defined; 2. The sample chosen was representative of that universe; 3. The questions asked of the interviewees were framed in a clear, precise and nonleading manner; 4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; 5. The data gathered were accurately reported; 6. The data were analyzed in accordance with accepted statistical principles; and 7. Objectivity of the entire process was assured.

*Trademark Law > Federal Unfair Competition Law > General Overview*
*Trademark Law > Infringement Actions > Expert Witnesses*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Reverse Confusion*

[HN8] In reverse confusion cases, the appropriate universe is the senior user's customer base.

*Trademark Law > Federal Unfair Competition Law > General Overview*
*Trademark Law > Infringement Actions > Expert Witnesses*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*

[HN9] In reverse confusion case, the geographical area surveyed cannot be based on mere sampling convenience rather than upon scientific or sampling grounds.

*Evidence > Procedural Considerations > Preliminary*

*Questions > Admissibility of Evidence > General Overview*

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*

[HN10] In a jury trial, the court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time consuming when it offers essentially nothing of real probative value.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*

[HN11] See *Fed. R. Evid. 403.*

*Trademark Law > Federal Unfair Competition Law > General Overview*

*Trademark Law > Infringement Actions > Expert Witnesses*

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*

[HN12] A relevant factor used to assess reliability and trustworthiness of a likelihood of confusion survey in a trademark case is whether the questions asked of the interviewees were framed in a clear, precise and nonleading manner.

*Trademark Law > Infringement Actions > Expert Witnesses*

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*

[HN13] A court must not look to whether a likelihood of confusion survey in a trademark case is "perfect" but whether it is reliable: One must keep in mind that there is no such thing as a "perfect" survey. The nature of the beast is that it is a sample, albeit a scientifically constructed one. Like any scientific method related to statistics in the social sciences, every survey, no matter how carefully constructed and conducted, has some potential flaws somewhere. The proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*

[HN14] Pursuant to *Fed. R. Evid. 403*, a court must consider the probative value of a likelihood of confusion survey in a trademark case in relation to the danger of unfair prejudice, confusion of the issues, misleading the jury, or waste of time.

*Evidence > Testimony > Experts > Admissibility*

*Evidence > Testimony > Experts > Daubert Standard*

[HN15] In a court's gatekeeper role, it must determine whether an expert's testimony is more than a subjective belief or unsupported speculation. Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*

*Evidence > Testimony > Experts > Admissibility*

[HN16] At a minimum, a proffered expert witness must possess skill or knowledge greater than the average layman.

*Trademark Law > Subject Matter > Strength*

[HN17] Although the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, the extensive use of the term in other markets may also have a weakening effect on the strength of the mark.

*Trademark Law > Infringement Actions > Expert Witnesses*

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 3rd Circuit Court*

[HN18] If confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in a trademark infringement analysis. However, the United States Court of Appeals for the Third Circuit has declined to issue a "blanket rule," indicating that an analysis must be performed on a case-by-case basis and that as with all cases involving the likelihood of confusion under the Lanham Act, courts should employ all the relevant Lapp factors and weigh each factor to determine whether in the

totality of the circumstances marketplace confusion is likely.

### Civil Procedure > Trials > Jury Trials > Province of Court & Jury

*Evidence > Testimony > Experts > General Overview*
[HN19] Legal conclusions are inadmissible because such matters are the exclusive province of the judge and jury.

### Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards

*Copyright Law > Civil Infringement Actions > Remedies > Damages > Infringer Profits*

### Trademark Law > Infringement Actions > Remedies > Damages > General Overview

[HN20] Though the standards for (1) awarding profits; (2) determining whether such an award should be enhanced; and (3) awarding attorneys' fees under the Lanham Act differ somewhat, the issue of willful infringement is central to each. Willful infringement has a central role in the availability of these kinds of relief because of the relevance of equitable factors in determining their appropriateness on a given set of facts.

### Evidence > Testimony > Credibility > General Overview
*Evidence > Testimony > Experts > General Overview*
[HN21] Rebuttal evidence can be offered to explain, repel, counteract or disprove an opinion.

### Trademark Law > Subject Matter > Strength
[HN22] Any analysis of trademark strength must necessarily look at both inherent strength and commercial strength.

### Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview

*Evidence > Testimony > Experts > Admissibility*
[HN23] A mere recitation of legal principles is not admissible expert testimony.

### Evidence > Testimony > Experts > Daubert Standard

*Trademark Law > Infringement Actions > Expert Witnesses*

### Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview

[HN24] Although evidence of third party confusion

within and without a senior user's market is relevant to a determination of commercial strength, an expert report must provide sufficient foundation as a basis for his conclusions.

**COUNSEL:** For CITIZENS FINANCIAL GROUP, INC., plaintiff: William V. Conley, Margaret A. Keane, LeBoeuf, Lamb, Greene & MacRae, Pittsburgh, PA; Paul F. Ware, Jr., Cerise H. Lim, R. David Hosp, Greer N. Shaw, Jaren D. Wilcoxson, Mark S. Puzella, Goodwin Proctor, Boston, MA; Kandis M. Kahn, Goodwin Procter, New York, NY.

For CITIZENS NATIONAL BANK OF EVANS CITY, defendant: Frederick W. Thieman, Thieman & Farrell, Pittsburgh, PA.

For CITIZENS, INC., defendant: Donna M. Wagner, Office of the Attorney General, Pittsburgh, PA; David M. Kelly, Andrea Anderson, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC; Ray F. Middleman, Malone, Larchuk & Middleman, Wexford, PA; Frederick W. Thieman, Thieman & Farrell, Pittsburgh, PA.

**JUDGES:** Donetta W. Ambrose, Chief U. S. District Judge.

**OPINION BY:** Donetta W. Ambrose

## OPINION

AMBROSE, Chief District Judge.

### OPINION and ORDER OF COURT

#### SYNOPSIS

CFG has filed one Omnibus Motion seeking to preclude CNBEC from offering certain expert testimony and other evidence based on *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)* [*2] and its progeny. (Docket No. 134). CNBEC has also filed *Daubert* Motions. (Docket Nos. 138, 137, 148, 149). A hearing on the same was held on March 31, 2003 through April 1, 2003. Thereafter, CFG and CNBEC filed responsive briefs. In addition, CNBEC filed a Motion for Leave to File a Supplemental Memorandum in Support of its Motion to Exclude Expert Report and Testimony of Henry D. Ostberg. (Docket No. 157). After carefully considering the submissions of the parties and the evidence presented at the hearing, said

Motions (Docket Nos. 134, 137, 138, 148, 149, 157) are granted and/or denied as more fully set forth below.

## OPINION

This case arises out of CFG's agreement of sale with Mellon Bank, N.A. to acquire Mellon Bank's retail banking business. On July 27, 2001, CNBEC filed a Praecipe for Writ of Summons in the Court of Common Pleas of Butler County against, *inter alia*, CFG. On August 13, 2001, CFG filed a declaratory judgment action with this Court seeking a declaration that CFG did not infringe on CNBEC's trademark. Thereafter, on August 16, 2001, CFG filed an Amended Complaint. (Docket No. 9). CNBEC answered and filed a Counterclaim against CFG asserting trademark [*3] infringement / unfair competition and unjust enrichment. (Docket No. 13).

To prevail on its claims, CFG seeks to exclude the following evidence:

> 1) Guideline Research Corporation's Survey and the accompanying testimony of Robert Reitter;

> 2) The Report and certain testimony of Lawerence R. Werner;

> 3) The Report and certain testimony of Paul A. Adams, Esq.;

> 4) The Report and certain testimony of Dennis St. J. Mulvihill, Esq.;

> 5) The Report and certain testimony of Bryan F. DiLucente, CPA; and

> 6) The Report and certain testimony of Maureen Morin, Ph.D.

*See,* Docket No. 134. In a similar fashion, CNBEC seeks to exclude the following evidence:

> 1) Expert Report and portions of the Rebuttal Report of Dwight B. Crane and William T. Gregor;

> 2) Portions of the Expert Report and Rebuttal Report of Francis J. Kelly, III;

> 3) The Rebuttal Report of Michael J. Burke; and

> 4) The Expert Report and Survey of Henry D. Ostberg.

I will address each in turn, though not necessarily in the order set forth above.

## ANALYSIS

### A. The *Daubert* Standard and *Rule 702*

In *Daubert,* the Supreme Court held [*4] that:

> [HN1] faced with a proffer of expert scientific testimony, ... the trial court judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-93, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1992).* In the Third Circuit, [HN2] the trial court's role as a "gatekeeper" announced in *Daubert* requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. *In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741-42 (3d Cir. 1994).* Thus, pursuant to *Daubert,* the gatekeeping function requires the court to ensure that the expert testimony is both reliable and relevant. *Daubert, 509 U.S. at 589; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)* [*5]

[HN3] As to the first requirement, qualification, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more general qualifications." *Paoli, 35 F.3d at 741.* "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts." *Id.* Thus, an expert can qualify based on a broad range of knowledge, skills, training and experience.

[HN4] The second inquiry focuses upon

2003 U.S. Dist. LEXIS 25977, *5

methodology. [1] The inquiry into methodology is designed to ensure that an expert's opinions are based upon "'methods and procedures of science' rather than on subjective belief or unsupported speculation." *Id. at 742.* Reliability is assessed by determining whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial [*6] uses. *See Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp.2d 584, 593-94 (D. N.J. 2002).* [HN5] "Some courts also consider additional factors relevant in determining reliability, including: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation ...; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion...; (iii) whether the expert has adequately accounted for alternative explanations ...; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context...; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert... ." *Magistrini, 180 F. Supp.2d at 594-95* (citations omitted).

> 1 Methodology has been defined as a "body of methods, rules and postulates employed by a discipline: a particular procedure [or] set of procedures." *Oddi v. Ford Motor Co., 234 F.3d 136, 156 n.20 (3d Cir. 2000).*

[*7] Finally, [HN6] *Daubert* and *Rule 702* require that the expert's testimony "fits" the facts of the case. "'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." *Id., citing, Paoli, 35 F.3d at 743.*

## B. Guideline Research Corporation's Survey and the accompanying testimony of Robert Reitter

Pursuant to *Daubert,* CFG seeks to exclude CNBEC's likelihood of confusion survey and the accompanying testimony of Robert Reitter, to the extent that it is offered to demonstrate reverse confusion. [2] *See,*

CFG's Brief in Support, at p. 1 (Docket No. 139). Counsel for CNBEC hired Guideline Research Corporation ("Guideline Research") located in New York, New York, to conduct a "study to determine what [the] likelihood of confusion between [the] banks [is], if any...." *See,* Survey at Docket No. 145, Tab 1, p. 1. Robert Reitter designed, supervised and implemented the study. *Id.* at 2. The study was conducted at two malls in Allegheny County: Ross Park Mall and Robinson Towne Center. *See,* Survey at Docket No. 145, Tab 1, p. 5. The study utilized [*8] a questionnaire which had two parts: a screener and a main questionnaire. *Id.* at 8. The purpose of the screener question was to identify and question only those individuals who belonged to the relevant universe. *Id.*

> 2 CFG does not object to the survey or any testimony concerning the survey to the extent that it addresses "forward" or "direct" confusion. *See,* CFG's Brief in Support, p. 2, n.2 (Docket No. 139).

[HN7] The relevant factors used to access reliability and trustworthiness of a survey (its methodology) include, *inter alia:*

> 1. The universe was properly chosen and defined;
>
> 2. The sample chosen was representative of that universe;
>
> 3. The questions asked of the interviewees were framed in a clear, precise and nonleading manner;
>
> 4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted;
>
> 5. The data gathered were accurately reported;
>
> 6. The data were analyzed in accordance [*9] with accepted statistical principles; and
>
> 7. Objectivity of the entire process was assured.

McCarthy on Trademarks and Unfair Competition, § 32:159 (4th Ed. 2003); 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed. 2001). CFG's main objection is that the study is conducted in an improper universe and, thus, it is fatally flawed and has no probative value. *See,* CFG's Brief in Support (Docket No. 139). As set forth above, when conducting a survey in a trademark case the first crucial step is determining the proper universe. *Id.;* 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed. 2001). A universe "is that segment of the population whose perceptions and state of mind are relevant to the issues in the case." McCarthy on Trademarks and Unfair Competition, § 32:159 (4th Ed. 2003). Accordingly, the propriety of a survey can turn on the geographical area covered. 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed. 2001); McCarthy on Trademarks and Unfair Competition, § 32:161. "A survey of the wrong 'universe' will be of little probative value in litigation." McCarthy on Trademarks and Unfair Competition, [*10] § 32:159. At the hearing, Reitter acknowledged that it is essential that the proper universe be correctly identified. "It is incumbent upon the researcher to make explicit the universe of interest prior to undertaking a research assignment." *See,* Survey at Docket No. 145, Tab 1, p. 5. The burden of proving that the universe is proper is on the proponent of the survey. *Id; see also,* 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67.

[HN8] In reverse confusion cases, like this one, the appropriate universe is the "senior user's [CNBEC's] customer base." McCarthy on Trademarks and Unfair Competition, § 32:159; 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed. 2001). Currently, twelve of the sixteen CNBEC branches are in Butler County, no branches are in Beaver County, only one branch is in Armstrong County and only three branches are in northern Allegheny County near the Butler County line. *See,* CNBEC's Brief in Opposition, p. 4 (Docket No. 155). For the past 108 years, CNBEC and its predecessors in interest have offered retail banking services in this area and not beyond. Thus, in this case there can be no doubt that CNBEC's customer "base" [*11] is within Butler county and extreme northern Allegheny county, rather than Allegheny county as a whole. *See,* Docket 146, Ex. 5.

To that end, CFG argues that sites chosen to conduct the surveys, Ross Park Mall and Robinson Towne Center, are outside of CNBEC's customer base of Butler county and extreme northern Allegheny county. *Id.* The closest CNBEC branches are 7 and 17 miles, respectively, away from the malls. *Id.* All of the other CNBEC branches are further away. *Id.* In response, CNBEC argues that the universe consisted of potential customers of both and, thus, was appropriate. *See,* CNBEC's Brief in Opposition, p. 8 (Docket No. 155). I disagree with CNBEC. While it is true that the appropriate universe consists of individuals who have access to both litigants and are a customer or a potential customer, when conducting a survey in a reverse confusion case, the universe is further limited to the senior user's "customer base." *See,* McCarthy on Trademarks and Unfair Competition, § 32:159; 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67. At the hearing Mr. Reitter testified, and counsel for CNBEC also acknowledged, that he and CNBEC would have [*12] liked to have conducted the survey at Clearview Mall in Butler County, but that Clearview Mall would not let them do a survey there. At the same time, Mr. Reitter recognized that the survey could have been anywhere else in Butler County, but that it would have just been more difficult. However, [HN9] "the geographical area surveyed cannot be based on mere sampling convenience rather than upon scientific or sampling grounds." McCarthy on Trademarks and Unfair Competition, § 32:161.

CNBEC further argues that it has a marketing presence beyond Butler county and into the Pittsburgh area, such that the greater Pittsburgh area is a part of the universe. *See,* CNBEC's Brief in Opposition, pp. 8-12 (Docket No. 155). I am not persuaded by this argument because it is not supported by the facts. The scope, media type, volume, and frequency of its advertising and promotional efforts regularly focus on Butler county, not Allegheny county. *See,* Docket 146, pp. 47-48. The evidence indicates that CNBEC's advertising and marketing efforts outside of Butler County are sporadic. Moreover, even if I accept CNBEC's figures, under 8% of CNBEC's customer base is in Allegheny County. [3] Thus, any customers [*13] that CNBEC obtains outside of their main customer base of Butler County and northern Allegheny county is, in the words of counsel for CNBEC, "spill over." I do not consider "spill over" to be a part of CNBEC's "customer base."

    3 CNBEC does not differentiate what percentage of the 8% is in northern Allegheny County where

CNBEC has three branches versus what percentage is outside of that area, such that the majority of the 8% may come from its northern Allegheny County customer base.

Even assuming, *arguendo*, that the study was conducted in the proper universe, the survey would have necessarily excluded those individuals that were likely to be customers or potential customers of CNBEC. As mentioned previously, the second and third relevant factors used to assess reliability and trustworthiness of a survey are whether the sample chosen was representative of that universe and whether the questions asked of the interviewees were framed in a clear, precise and nonleading manner. McCarthy on Trademarks and Unfair [*14] Competition, § 32:159; 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67. Here, screener question A asked the following question: "But first, do you live or work in this general area or are you just visiting?" *See,* Docket No. 146, Tab J, Exhibit C, Screener Survey. "General area" and "just visiting" were not defined by the study. This is not a clear and precise question. Furthermore, if the individual answered "just visiting," then the interview was terminated without any further questioning and the individual was excluded from the questionnaire. *Id.* Contrary to the argument of CNBEC, it is not reasonable to conclude a Butler county resident would consider himself from the "general area" when at Ross Park Mall or Robinson Towne Center given their location in Allegheny county. Thus, many of the individuals that should have been included in the proper universe (Butler county and extreme northern Allegheny county) would have been automatically excluded from the survey. Therefore, because of the location of the study and the screener question asked, few (if any) participants were likely to be part of CNBEC's customer base. Consequently, the failure to conduct the [*15] survey within CNBEC's customer base and then to exclude those individuals who may potentially come from within the customer base is fatal.

My role is as the gatekeeper with regard to expert witness testimony. *See, Kumho Tire Co., 526 U.S. at 141-42.* Thus, I must pass on the threshold question of the validity of a survey before a jury may consider it. *See, Simon Property Group v. MySimon, Inc., 104 F. Supp.2d 1033 (S.D. Ind. 2000).* Although I recognize that no survey is beyond criticism and there is no perfect survey, the problems with the Guideline Research Survey are so fundamental and basic that the survey is stripped of any

significant probative value. Therefore, I am convinced that the Guideline Research survey is not simply ill-tailored (so as to go to the weight), but is fatally flawed due to an irrelevant and improper universe, such that it must be excluded from evidence at trial.

Even if I did not find that the Guideline Research survey was fatally flawed so as to exclude it under *Daubert* and *Rule 702,* I would still exclude the same based on *Rule 403* [4] of the Federal Rules of Evidence. *See, Trouble v. The Wet Seal, Inc., 179 F. Supp.2d 291, 306-308 (S.D. N.Y. 2001).* [*16] CFG argues that the limited probative value of the study is "greatly" outweighed by the danger of unfair prejudice that flows from the inherently flawed design. *See,* CFG's Brief in Support, at pp. 3, 16-17 (Docket No. 139). I agree. If the universe is skewed, then the conclusion will similarly be skewed. If an expert, a person with special knowledge and expertise, testifies as to the skewed results, a jury is likely to give special weight to the skewed conclusion. Any minimal probative value that the skewed results may have is outweighed by the unfair prejudice, confusion and waste of time that would necessarily result. As the court in *Simon* noted, "the vast majority of reported cases dealing with problematic survey evidence have involved injunction hearing or bench trials. In such cases, the safest course for the trial judge is to admit the evidence and to treat the criticisms as going to the weight of the evidence...." *104 F. Supp.2d at 1039 n.3.* [HN10] In a jury trial, however, the court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time consuming...when it offers [*17] essentially nothing of real probative value. *Rule 403* was written for just this sort of case." *Id.* Like *Simon,* this case is scheduled for a jury trial. Consequently, the Guideline Research survey and any testimony regarding the same is inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

> 4    [HN11] *Rule 403 of the Federal Rules of Evidence* provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**C. Portions of the Expert Report and Rebuttal Report of Francis J. Kelly, III**

CNBEC has raised objections, under *Daubert,* to the expert report and rebuttal report of Francis J. Kelly. (Docket No. 149). As to Kelly's main report, CNBEC's only objection is to paragraphs 51-60 wherein Kelly opines that injunctive [*18] relief should not be granted. I agree with CNBEC that this evidence is irrelevant to the jury as they are not charged with the issue of whether to grant injunctive relief. Accordingly, Kelly cannot testify as to the appropriateness of injunctive relief to the jury. However, Kelly may testify with regard to these issues to the court. Below, I will detail the logistics of the manner in which this will be dealt with at trial. See, Analysis Section L *infra.* As to Kelly's rebuttal report, CNBEC objects to Paragraphs 21-25 claiming that Kelly lacks the qualifications to opine on trademark survey methodology. In Paragraphs 21-25 of the rebuttal report, Kelly deals solely with issues related to the Guideline Research Report prepared by Mr. Reitter. Given the fact that I am excluding this report and any testimony by Mr. Reitter in its entirety, I likewise must exclude this portion of Mr. Kelly's report as moot.

**D. The Expert Report and Survey of Henry D. Ostberg [5]**

> 5    CNBEC filed a Motion for Leave to File Supplemental Memorandum in Support of its Motion to Exclude Expert Report and Testimony of Henry D. Ostberg. (Docket No. 157). I will grant the same and consider it in my analysis.

[*19] Pursuant to *Daubert,* CNBEC seeks to exclude the expert report and survey of Henry D. Ostberg. First, CNBEC argues that the report is not a proper rebuttal. CFG claims that the report is in rebuttal to CNBEC's expert, Dr. Vikas Mittal. Dr. Mittal's report reaches the conclusion that "banking consumers in the Pittsburgh Area shorten the name of a banking institution a vast majority of the time" and that "the pattern of results for Citizens Bank is very similar to the pattern of results obtained for the aggregate sample." Report of Dr. Mittal at p. 2. Accordingly, Dr. Mittal concludes that "a large majority of the consumers tend to shorten the name of Citizens Banks to 'Citizen(s)'." *Id.* Dr. Mittal reached these conclusions through the use of a consumer survey designed by Dr. Mittal that targeted consumers in Allegheny, Armstrong, Beaver and Butler counties. CFG does not assert that Dr. Ostberg's report is designed to

refute the exact premise of Dr. Mittal's report. Rather, CFG argues that Dr. Ostberg's report is offered as a necessary follow-up to Dr. Mittal's report in order to explain or amplify the results thereof. CFG argues that by the Mittal survey, CNBEC would suggest [*20] to the jury that consumers conversationally refer to both CFG and CNBEC simply as CITIZENS and that consumers will likely be confused as a result. Accordingly, CFG argues that Dr. Ostberg's report is needed to demonstrate that consumers are well aware that CITIZENS refers to more than one bank. Although CNBEC claims that it does not intend to use the Mittal survey iu the fashion suggested by CFG, I agree with CFG that a jury may logically draw this inference. Given that finding, Dr. Ostberg's report is a proper rebuttal and I will not exclude his report on that basis. See, *Blackstone v. Osche, 192 F. Supp. 174 (W.D. Pa. 1961).*

CNBEC also argues that the survey question posed by Dr. Ostberg is not reliable as it is not clear and understandable. *See,* CNBEC's Brief in Support (Docket No. 138). Under the standards cited above, [HN12] a relevant factor used to assess reliability and trustworthiness of a survey is whether the questions asked of the interviewees were framed in a clear, precise and nonleading manner. McCarthy on Trademarks and Unfair Competition § 32:159 (4th Ed. 2003). Specifically, CNBEC argues that the question posed to respondents is capable of various [*21] meanings rendering the question useless. In his survey, Dr. Ostberg asked respondents: "Do you think one bank *company . . .* or more than one bank *company . . .* has these words in its name." Ostberg Report, Exhibit A, Memorandum of Points and Authorities in Support of Defendants' Motion to Exclude the Expert Report and Survey of Ostberg at Tab B. Dr. Ostberg asked this same question using the name "First National," "Citizens," and "Wachovia." *Id.* Subsequently, Dr. Ostberg asked the following question: "Now, referring to banks *in this community,* are you aware of a bank called: Mars National Bank? Citizens Bank? PNC?" *Id.*

Counsel for CNBEC has argued that a respondent could believe that the survey was asking about branches as opposed to companies. *See,* CNBEC's Brief in Support. However, during the *Daubert* hearings, Dr. Ostberg made it clear that the survey was designed with safeguards in place to prevent such misunderstanding on the part of respondents. Dr. Ostberg explained that he purposefully chose to use the names "First National" and

"Wachovia" as controls. Further, as an individual location of a bank is called a "branch" it would not have been reasonable [*22] to expect that a respondent asked about a bank "company" would assume he is being asked about a bank "branch."

Counsel for CNBEC seems to suggest that the Ostberg survey could have been designed in a different manner to avoid these potential issues. However, I am not convinced that the question at issue was anything other than clear and concise. In addition, [HN13] I must not look to whether a survey is "perfect" but whether it is reliable:

> One must keep in mind that there is no such thing as a 'perfect' survey. The nature of the beast is that it is a sample, albeit a scientifically constructed one . . . Like any scientific method related to statistics in the social sciences, every survey, no matter how carefully constructed and conducted, has some potential flaws somewhere. The proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.

*The Learning Network, Inc. v. Discovery Communications, Inc., 153 F. Supp.2d 785, 789 (D. Maryland 2001).* Herein, the questions posed along with the controls included [*23] secured the reliability of the Ostberg survey.

Lastly, CNBEC argues that the Ostberg report should be excluded under *Rule 403* as any probative value of the report is outweighed by prejudice. *Fed. R. Evid. 403.* [HN14] Pursuant to *Rule 403*, I must consider "the probative value of a survey in relation to the danger of unfair prejudice, confusion of the issues, misleading the jury, or waste of time." *Sears, Roebuck & Co. v. Menard, Inc.,* 2003 U.S. Dist. LEXIS 951, No. 1 C 9843, 2003 WL 168642 (N.D. Ill. Jan. 24, 2003). Unlike Reitter's Report, the survey results herein are not skewed in any sense by unreliable questions. Further, I do not find the Ostberg report too complex, misleading, time-consuming or wasteful of the jury's time. *Id.* Accordingly, I do not find the Ostberg report unfairly prejudicial to CNBEC.

**E. The Report and certain testimony of Lawrence R. Werner**

CFG takes issue with the three opinions offered by Lawrence R. Werner. *See,* CFG's Brief in Support, at p.2 (Docket No. 141). First, Werner opines that "consumers and prospective consumers of banking services are likely to confuse the two banks due to CFG's use of the name 'Citizens.'" Docket No. 145, Tab 13, p. [*24] 4. Second, he opines that "serious damage has been inflicted upon [CNBEC] and its name due to CFG coming into [CNBEC's] market and using the same name, Citizens." *Id.* Third, he opines that even if CNBEC is "successful in litigation and ...[is] returned to its original position as the only Citizens in its market, Citzens will still be required to undertake a significant advertising, marketing and public relation campaign to rehabilitate its name...." *Id.* CFG argues that Werner's opinions should be excluded based on *Daubert* and *Rule 702 of the Federal Rules of Evidence. See,* CFG's Brief in Support, at p. 2 (Docket No. 141). I will address the issues raised by CFG in reverse order.

**1. Name rehabilitation opinion**

CFG argues that Werner's opinion regarding name rehabilitation is conclusory and not grounded in principle, methodology, fact, or other data. *See,* CFG's Brief in Support, at p. 6. As a result, CFG submits that his name rehabilitation opinion is nothing more than an *"ipse dixit"* which is insufficient to satisfy *Rule 702 of the Federal Rules of Evidence. Id.* At the *Daubert* hearing, Werner testified twice and was given [*25] multiple chances to articulate what principles or methodology he relied on in making his conclusion that "the only way to save [CNBEC] is for [CNBEC] to regain its sole use of the Citizens' name, representing its brand and reputation in the marketplace. Even if that happens, Citizens will be forced to undertake an intensive and extensive rebranding and repositioning marketing campaign in an effort to restore its reputation and brand." Docket No. 145, Tab 13, p. 8. The only response from Werner was that it was based on his marketing experience. For whatever reason, he refused to elaborate on his answer. [HN15] In my gatekeeper role, I must determine whether Werner's testimony is "more than [a] subjective belief or unsupported speculation." *Daubert, 509 U.S. at 579.* "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the

*ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)*. Without more from Werner, I [*26] agree with CFG that Werner's name rehabilitation opinion is nothing more than *ipse dixit.*

In opposition, counsel for CNBEC argues that the Werner's report contains the basis of and methodology for his name rehabilitation opinion. *See,* CNBEC's Brief in Opposition, pp. 6-10 (Docket No. 163). As I mentioned at the *Daubert* hearing, it is interesting that the basis for Werner's opinion should be outlined by counsel for CNBEC, but not Werner. After a review of Werner's report, Werner's analysis appears to be nothing more than his instinctive reaction to the materials provided to him. He cites to no standards for his opinions, nor does he provide any explanation that could be tested or subjected to peer review as to how he reached his opinions. As a gatekeeper, I simply cannot permit Werner's *ipse dixit* name rehabilitation testimony to go to the jury.

**2. Damage opinion**

CFG argues that Werner's opinion that "serious damage has been inflicted upon [CNBEC]" is not based on any facts or other data and does not assist the trier of fact to determine the pertinent issue of whether the supposed name confusion has *caused* the proffered damages. *See,* CFG's Brief [*27] in Support, at p. 4-5. As a result, CFG argues that the "damages" testimony should be excluded. In opposition, CNBEC argues that "Werner specifically relies upon his marketing and banking experience to explain that confusion between CFG and [CNBEC] has and will result...." *See,* CNBEC's Brief in Opposition, p. 5 (Docket No. 163). In the next paragraph CNBEC states "Werner's conclusions and methodology is rational and clearly articulated." After a review of Werner's report, I disagree with CNBEC. Werner's damage opinions, like his name rehabilitation opinion, appear to be nothing more than his instinctive reaction to the materials provided to him. He cites to no standards for his opinions, nor does he provide any explanation that could be tested or subjected to peer review as to how he reached his opinions. As a gatekeeper, I simply cannot permit Werner's *ipse dixit* damage testimony to go to the jury.

**3. Name confusion opinion**

CFG argues that werner's opinion that name confusion is likely is unreliable. *See,* CFG's Brief in Support, at p. 2 pp. 2-4. To that end, CFG similarly submits that Werner's name confusion conclusion is not the product of reliable principles [*28] or methods applied to any facts or other data. *Id.,* at p. 3. Moreover, CFG also argues that Werner cites no factual support for this conclusion and relies on unspecified documents and interviews to support his opinions. *Id.* Further, CFG submits that Werner makes other assertions that are not based on facts or data. *Id.* For example, Werner asserts that CFG is "attempting to take on the appearance of a small, community bank" and that "both [CNBEC] and CFG advertise in media that reach throughout the Pittsburgh area," but he cites to no evidence to support this claim. *Id.* at 3-4, *citing,* Docket No. 145, Tab. 13, p. 6.

In opposition, CNBEC argues that "it is clear from a review of Werner's report that his opinions regarding name confusion are well grounded in his extensive experience." *See,* CNBEC's Brief in Opposition, p. 3 (Docket No. 163). However, a review of Werner's report does not reveal the same. For example, throughout Werner's name confusion opinion, he simply makes statements without any support (e.g. "People tend to use the shortened version of company names," "blue...and...green...are two of the most commonly used colors by banks and are very close [*29] on the color scale," "I assume that CFG's customers...also [reside throughout the Pittsburgh area]," "convenience has always been a prime consideration for consumers in selecting banks for all or part of their banking business," "The fact that CFG has a number of branches in Citizens' market area makes it confusing for customers of both banks, and perhaps more important, potential customers of Citizens"). *See,* Docket No. 145, Tab. 13, p. 5-6. If he does cite to support, then he relies on his experience without any further elucidation on what specifically in his experience supports that opinion. Werner simply does not cite to any reports, treatises, tests, or any other authority for making his name confusion opinions. *Id.* I cannot discern from his report or his testimony any methodology or principles he relied on in making his opinions. Consequently, as gatekeeper, I am precluding Werner from testifying at trial regarding name confusion. *See, Daubert, supra.* Therefore, Werner's testimony is inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

**F. The Report and certain testimony of Maureen Morrin, [\*30] Ph.D.**

In its Brief in Support, CFG asserts that the five basic opinions of Maureen Morrin, Ph.D. regarding the likelihood of consumer confusion (*see*, Docket No. 145, Tab. 14, pp. 23-24) should be excluded because they do not satisfy the qualifications, reliability and/or fit requirements of *Daubert* and *Rule 702*. *See*, CFG's Brief in Support, at p. 3 (Docket No. 144). At the *Daubert* hearing, counsel for CFG submitted that it no longer objects to Dr. Morrin testifying as to her first opinion. Therefore, CFG's objection to Dr. Morrin's first opinion is denied as moot. As a result, I will only discuss opinions 2-5.

**1. Opinion 2**

CFG argues that Dr. Morrin lacks the qualifications to proffer Opinion 2. *See*, CFG's Brief in Support, at p. 5 (Docket No. 144). Dr. Morrin's Opinion 2 states:

> Loss of a unique brand name could be devastating to [CNBEC] in its future ability to compete in the marketplace due to the critical nature of brand trust in the banking industry and the lack of other differentiating factors among product offerings in the industry.

Docket No. 145, Tab 14, p. 24. In it brief, CFG argued that Dr. Morrin is not qualified [\*31] to testify on the issues of brand identity and brand trust in the banking field because she is not a "banking expert." After a review of her *curriculum vitae* and her testimony regarding her qualifications, I am satisfied that Dr. Morrin is qualified to testify regarding brand trust in the banking industry. [6]

> 6 At the *Daubert* hearing, counsel for CFG also argues that Morrin cannot testify using the term "devastating." I do not find this term so prejudicial that she should be precluded from using it. Finally, at the hearing, counsel for CFG argued that Morrin cannot testify regarding her predictions for the future. CNBEC did not address this issue in the Brief in Opposition. Regardless, I find that Morrin is qualified to make such an opinion and that CFG can adequately deal with this issue on cross-examination.

**2. Opinion 3**

CFG argues that Dr. Morrin's Opinion 3 does not fit the case. *See*, CFG's Brief in Support, at p. 6 (Docket No. 144). Dr. Morrin's Opinion 3 states:

> Existence [\*32] of other banks named "Citizens" in markets outside the Pittsburgh metropolitan region is not relevant to the consumer choice process in Allegheny, Armstrong, Beaver, and Butler counties, due to the critical importance of branch/ATM locations in the consumer choice process.

Docket No. 145, Tab 14, p. 24. First, CFG argues that Opinion 3 does not fit the case because it has no bearing on the issue of whether consumers are aware that "Citizens" is a common name for banks. *See*, CFG's Brief in Support, at p. 6 (Docket No. 144). CFG also argues that this is an attempt to get in a legal concept that was previously rejected. *Id.* at pp. 6-7. Thus, CFG submits that Dr. Morrin be precluded from testifying regarding her Opinion 3. *Id.*

In opposition, CNBEC argues that CFG misconstrues Dr. Morrin's Opinion 3. *See*, CNBEC's Brief in Opposition, pp. 9-11 (Docket No. 166). CNBEC argues that "Morrin opines that consumers in [CNBEC's] marketplace are not likely to consider utilizing the services of geographically remote banks because...consumer research has revealed that the convenience of branch and ATM locations is among the most important criteria that consumers use in selecting [\*33] a bank." *Id.* at 10. To the extent that Dr. Morrin is attempting to testify that convenience and location is an important factor, Dr. Morrin may so testify. However, I do not find that the first part of the statement regarding the relevancy of other banks named "Citizens" outside the Pittsburgh region to be necessary for her to state her basic opinion. In other words, I find the first clause of Opinion 3 to be irrelevant. Thus, Dr. Morrin would not be prejudiced by the exclusion of the same.

Nevertheless, even if it was necessary and relevant, I would still exclude the first clause pursuant to *Rule 403 of the Federal Rules of Evidence* because the limited probative value is outweighed by the prejudice that may result therefrom. Specifically, other banks named "Citizens" outside the Pittsburgh region may be relevant

regarding the strength of the mark. Yet, there is a likelihood that Dr. Morrin's testimony would cause significant confusion among the jurors and mislead them regarding the relevancy of the same. Consequently, I find that Dr. Morrin may not testify regarding the first part of Opinion 3 regarding the relevancy of other banks named "Citizens" outside the Pittsburgh region.

[*34] **3. Opinion 4**

CFG argues that Dr. Morrin's Opinion 4 should be inadmissible. *See,* CFG's Brief in Support, at p. 7 (Docket No. 144). Dr. Morrin's Opinion 4 states:

> Reported instances of confusion likely underestimate the extent of consumer confusion because the rate of reporting such instance is analogous to consumer complaint behavior, which suggest the actual incidence of customer dissatisfaction is considerably higher than indicated by the number of complaints reported to firms.

Docket No. 145, Tab 14, p. 24. Specifically, CFG argues that the rate of reporting consumer confusion is not based on any supportive facts or data. *See,* CFG's Brief in Support, at p. 7 (Docket No. 144). As a result, CFG submits that this opinion is based purely on speculation and should not be admissible. *See,* CFG's Brief in Support, at p. 7 (Docket No. 144). In response, CNBEC argues that so long as her opinion is reliable, it is admissible. *See,* CNBEC's Brief in Oppsition, pp. 12-13 (Docket No. 166). I agree with CNBEC that Dr. Morrin's opinion must be reliable to be admissible. Unfortunately, I do not find any evidence of a reliable basis for Dr. Morrin's opinion [*35] 3. She testified at the *Daubert* hearing that she was not aware of a larger universe of people who were confused and did not take any steps to make such a conclusion. Moreover, she had no basis for her opinion that customer complaints are analogous to customer confusion other then a purely theoretical basis on her part. In other words, she did not cite any authority or evidence to support her theory. Without more, I find this opinion too speculative and prejudicial to be admissible.

**4. Opinion 5**

CFG does not challenge Dr. Morrin's Opinion 5 regarding the issue of likelihood of confusion

"generally", but takes issue with two of her reasons for her conclusion that consumers are likely to confuse CNBEC and CFG. *See,* CFG's Brief in Support, at p. 8. (Docket No. 144). CFG argues that Dr. Morrin's Opinion 5a and 5h should be inadmissible. *See,* CFG's Brief in Support. (Docket No. 144). Dr. Morrin's Opinion 5a and 5h provide:

> Consumers are likely to confuse Citizens and CFG for many reasons including the following:
>
> > a) For consumers, the banks possess identical names: Citizens....
> >
> > h) Blue and green are commonly used colors in the banking industry [*36] in the Pittsburgh metropolitan region, and thus are not effective at differentiating bank brands here.

Docket No. 145, Tab 14, pp. 24-25. Specifically, with regard to Morrin Opinion 5a, CFG argues that there is no factual basis that the banks possess identical names and thus the opinion is unreliable. *Id.* at 8-9. After reviewing Dr. Morrin's report and hearing her testimony, I disagree. There is sufficient evidence that Dr. Morrin's Opinion 5a is based on her research that show that consumers tend to shorten brand names. *See,* Docket No. 145, Tab 14, p. 11. I am satisfied that this issue goes to the weight/credibility of her opinion and can be adequately dealt with by CFG on cross-examination. Consequently, CFG's Motion in this regard is denied.

With regard to Opinion 5h, CFG argues that Dr. Morrin is not qualified to testify regarding the neurological process of color perception. *Id.* at 9. At the *Daubert* hearing, Dr. Morrin testified she does not have any special expertise in the neurological process of color perception, but that you do not need special expertise to know that green and blue are close on the color spectrum. Assuming this is a true statement, [*37] then there is no need to have expert testimony to help a jury understand this concept. *See, Fed. R. Evid. 702* (the proffered

opinion poses no benefit in assisting the "trier of fact to understand the evidence or to determine a fact in issue...."). On the other hand, if I find that the statement is not true, then Dr. Morrin still cannot testify to this issue because she acknowledged that she does not have the requisite qualifications. [HN16] "At a minimum, a proffered expert witness...must possess skill or knowledge greater than the average layman...." *Betterbox Comm. Ltd. v. BB Technologies, Inc., 300 F.3d 325, 328(3d Cir. 2002), quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998).* As a result, said opinion is inadmissible at trial. Lastly, any rebuttal evidence presented with regard to the opinions of Dr. Morrin hereby excluded is necessarily inadmissible as moot.

### G. The Expert Report and portions of the Rebuttal Report of Dwight B. Crane and William T. Gregor

CNBEC raises several objections under *Daubert* to the expert report and certain sections of the rebuttal report of Dwight B. Crane and William T. Gregor. I will address [*38] the arguments regarding the rebuttal report first and then I will address the arguments regarding the main report.

#### 1. Rebuttal Report

CNBEC argues that Sections IV and VI of the rebuttal report should be excluded based on qualifications. See Memorandum of Points and Authorities in Support of CNBEC"S Motion to Exclude the Expert Report of Crane and Gregor at p. 17. Specifically, CNBEC argues that Crane and Gregor opine on issues of trademark survey methodology, branding, consumer perception, and the consumer choice process, all of which are issues outside of their respective areas of expertise. Section IV of the rebuttal deals with the report of Dr. Maureen Morrin. First, to the extent that I am excluding the report of Dr. Morrin, any corresponding rebuttal of Crane and Gregor is necessarily excluded as moot.

In the remaining portions of Section IV of the rebuttal Crane and Gregor opine that consumers can distinguish between bank names, they address the issue of differences in banking versus consumer product purchasing decisions, and they address the ability of the elderly to distinguish among banks. Rebuttal Report of Crane and Gregor at pp. 12-20. After a review of Crane [*39] and Gregor's qualifications, and their testimony

regarding same, I am satisfied that they are qualified to testify with regard to these issues.

Section VI of the rebuttal report addresses both the survey performed by Guideline Research Corporation and that performed by Dr. Mittal. As I have excluded the report of Guideline Research Corporation, the rebuttal of Crane and Gregor is necessarily excluded as moot.

As to the rebuttal of Dr. Mittal's report, Crane and Gregor do not actually opine on trademark survey methodology in as much as they comment on the meaning of the results. However, even if the report can be interpreted as opining on trademark survey methodology, Professor Crane is clearly qualified to opine on this issue. As his testimony makes clear, Professor Crane has extensive experience in conducting and evaluating surveys:

> [A] significant part of my own research has involved either conducting surveys or relying on surveys of others. So, I'm familiar with surveys from that point of view. I've also been involved in evaluating surveys and survey methodology in my administrative role at the school. I've served also as a senior associate dean at Harvard Business School [*40] for eight or nine years in two different roles. One of those roles, I was the director of the research program of the school. So what I was responsible for was evaluating proposals, making funding decisions for those proposals, and many of the proposals came from the marketing faculty. Some of them had to do with branding topics. Many of them had to do with surveys.

Transcript of Proceedings at p. 23. Likewise, Gregor, with vast experience in strategic marketing for the banking industry, can certainly opine as to whether Dr. Mittal's results were skewed based on the universe selected.

Counsel for CNBEC argues that the rebuttal report as well as certain sections of the main report should be excluded because Crane and Gregor are not each, independently, experts on every topic covered in the rebuttal report and the main report. Although I agree with

CNBEC that Crane and Gregor cannot testify to areas that are not within their respective expertise, I find no support for any theory that would not allow an expert report to be jointly written and submitted with the caveat that each expert would necessarily testify solely on their topic(s) of expertise. CFG insists that both Crane [*41] and Gregor are well qualified to opine as to each topic in both the report and rebuttal. Obviously, the experience of each of these experts is sufficiently diverse to suggest that this may not be the case with equal force for each aspect of the report. Nonetheless, CNBEC has not sufficiently stated their objections in this regard as to particular sections of the main report and the rebuttal. I decline to do so *sua sponte*.

### 2. Main Report

As to the main report, CNBEC argues that Crane and Gregor should not be permitted to rely on the "apparent" judgments of the Pennsylvania Department of Banking to allow banks to operate under similar names in Pennsylvania as this is irrelevant to a determination of likelihood of confusion. In their report, Crane and Gregor state as follows:

> This prevalence of similarly named financial institutions is significant for at least two reasons. First, with respect to Pennsylvania, it illustrates an apparent judgment by bank executives and the Pennsylvania Department of Banking alike that relatively subtle difference in name, such as a single word, geographic identifier, or even the spacing between words are sufficient to distinguish [*42] one bank from another. Examples are shown in Exhibit 5, including: "East Penn Bank" and "First Penn Bank," "Keystone Savings Bank" and "Keystone State Savings Bank;" "PeoplesBank" and "Peoples National Bank;" and "CommunityBanks" and "Community Bank.."

Report of Crane and Gregor at p. 9 (emphasis in original). I agree with CNBEC that the judgment of the Pennsylvania Department of Banking is irrelevant to the issue of likelihood of confusion and, therefore, does not "fit" the case. Therefore, I am excluding Crane and Gregor's report to the extent that it deals with same. Next,

CNBEC argues that the Crane and Gregor report should be excluded as it relies on third party uses of the "CITIZENS" mark outside of the Citizen's marketplace and, therefore, has no relation to the "relevant customer group." As the Court of Appeals for the Third Circuit has held, third party use of a mark outside of the market at issue is relevant to an inquiry as to the strength of a mark: [HN17] "Although the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, the extensive use of the term in other markets may also have a weakening [*43] effect on the strength of the mark." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 223 (3rd Cir. 2000).* Therefore, Crane and Gregor's considerations of such third party uses of the term CITIZENS "fits" the case and should not be excluded.

In addition, CNBEC argues that the report should be excluded because it concluded that injunctive relief should not be granted. As noted above with regard to Francis J. Kelly, I agree with CNBEC that this evidence is irrelevant to the jury as they are not charged with the issue of whether to grant injunctive relief. Accordingly, Crane and Gregor cannot testify as to the appropriateness of injunctive relief to the jury. However, Crane and Gregor may testify with regard to this issue to the court. Below, I will detail the logistics of the manner in which this will be dealt with at trial. See, Bifurcation Section L.

Finally, CNBEC argues that the report utilizes tests for confusion that are legally incorrect. CNBEC argues that neither the *Lanham Act* nor judicial authority suggests that violation of the Lanham Act is only established where there is a potential for "significant economic impact" or only where [*44] there is a likelihood that confusion will "persist without corrective measures." Therefore, CNBEC argues that Crane and Gregor's conclusions regarding the likelihood of confusion, in resting upon these artificial standards, do not fit the issues of the case. Accordingly, CNBEC argues that Sections I-IV of the main report should be excluded in their entirety. In opposition, CFG argues that Crane and Gregor are merely opining as to whether the confusion evidence presented by CNBEC has meaningful effect within the marketplace. CFG cites to *Checkpoint Sys. v. Check Point Software Techs.,Inc., 269 F.3d 270, 297 (3rd Cir. 2001),* for the proposition that [HN18] if "confusion has little or no meaningful effect in the marketplace, it is of little or no consequence [in the] analysis." However, in *Checkpointe,* the Third Circuit

declined to issue a "blanket rule," indicating that an analysis must be performed on a case-by-case basis and that "as with all cases involving the likelihood of confusion under the Lanham Act, courts should employ all the relevant Lapp factors and weigh each factor to determine whether in the totality of the circumstances marketplace confusion is [*45] likely." *Checkpointe, 269 F.3d 270, 297.* In utilizing a definition of confusion that necessitates economic harm and systematic confusion, I find that Crane and Gregor's report does not analyze the relevant facts in light of the applicable legal standards. The use and application of this improper standard would not only be unhelpful to the jury but may mislead the jury and, therefore, should be excluded.

This is not to say, however, that Sections I through IV of the main report should be excluded in their entirety. In Sections I through IV of the main report, Crane and Gregor opine, *inter alia,* that bank customers are accustomed to distinguishing among banks with similar names; customers choose among banks based upon substantive characteristics; entries in CNBEC's log can be largely explained by one-time events; and that the entries are not extraordinary in volume or content. Although Crane and Gregor cannot instruct the jury with regard to the concept of "meaningful" confusion, explain their conclusions with regard to whether the evidence presented by CNBEC is "meaningful" confusion, or imply that the confusion is not "meaningful" by use of terms such as "significant [*46] confusion", they may otherwise opine on these issues. In sum, Crane and Gregor may testify with regard to each of these sections without comment or reliance on the definition, explanation or import of "meaningful" confusion and without opining on whether the evidence of CNBEC constitutes "meaningful" confusion.

Lastly, any rebuttal evidence regarding issues I have excluded from Crane and Gregor is necessarily inadmissible as moot.

## H. The Report and certain testimony of Paul A. Adams, Esq.

CFG's objection to Paul A. Adams, Esq. is not brought pursuant to *Daubert.* Rather, in support of it's Motion to Exclude the report and certain testimony of Paul A. Adams, CFG has filed a one paragraph (two sentence) argument. *See,* CFG's Brief in Support (Docket No. 136). Therein, CFG submits:

It is well established that "as a general rule, an expert's testimony on issues of law is inadmissible." *Whitmill v. City of Philadelphia, 29 F. Supp.2d 241, 246 (E.D. Pa. 1988)* (quoting *United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).* As a result, while Mr. Adams may be able to testify, if qualified, regarding the process by [*47] which the Pennsylvania Banking Commission approves names, he may not testify as to the legal conclusions that may be drawn from that process.

*Id.* In his report, Adams considers the following:

Whether the Pennsylvania Department of Banking considers the trademark rights, registered or unregistered, regarding names used by prospective or exiting third party federally-charted banking institutions when deciding pursuant to *sections 804* and *805* of the Pennsylvania Banking Code of 1965, *7 P.S. § 804, 805,* whether to assent to a name reservation and approve the use of a name by a prospective or existing Pennsylvania state-chartered bank, bank and trust company, or savings bank. I also considered the relationship between a determination by the Pennsylvania Department of Banking for name approval and trademark rights under the Lanham Act, *15 U.S.C. § 1501 et seq.* and common law.

*See,* Adams' report, attached to the Second Declaration of Neil Smith, at Tab 18, p. 3 (Docket No. 145). As I have previously noted above in addressing CNBEC's Motion to Exclude the Expert Reports of Crane and Gregor, the practices and procedures of the Pennsylvania [*48] Department of Banking are irrelevant. Therefore, I am excluding Adams' testimony and report based on the same.

## I. The Report and certain testimony of Dennis St. J. Mulvihill, Esq.

CFG's objection to Dennis St. J. Mulvihill, Esq. is not brought pursuant to *Daubert.* Rather, in support of it's Motion to Exclude the report and certain testimony of

2003 U.S. Dist. LEXIS 25977, *48

Dennis St. J. Mulvihill, Esq., CFG has filed a one paragraph (two sentence) argument. *See*, CFG's Brief in Support (Docket No. 135). Therein, CFG submits:

> It is well established that "as a general rule, an expert's testimony on issues of law is inadmissible." *Whitmill v. City of Philadelphia, 29 F. Supp.2d 241, 246 (E.D. Pa. 1988)* (quoting *United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)*. Mr. St. J. Mulvihill's testimony appears to be nothing more than a recitation of legal conclusions having little or nothing to do with the issues involved in this case.

*Id.* In opposition, CNBEC asserts that Mulvihill's report is relevant to CFG's claims of tortious interference (Counts II and III of the Amended Complaint, Docket No. 9), as well as to CFG's intent with [*49] respect to trademark infringement. *See*, CNBEC's Brief in Opposition, pp. 3-5 (Docket No. 164). To that end, I find that Mulvihill's report is relevant.

However, according to Mr. Mulvihill's report, he was contracted by CNBEC to offer his opinion on the "legal effect of filing a praecipe in Butler County" in connection with the instant case. *See*, Mulvihill's report, attached at Tab 17, p. 1 (Docket No. 145). After reviewing his report, I find that it is what it purports to be, a legal conclusion on the filing of a praecipe for a writ of summons. As counsel for CNBEC acknowledges, [HN19] legal conclusions are inadmissible because such matters are the exclusive province of the judge and jury. *Dunn v. HOVIC, 1 F.3d 1362, 1369, 28 V.I. 526 (3d Cir. 1993); Life & Health Ins. Co. of Am. v. Federal Ins. Co., 1995 U.S. Dist. LEXIS 5827, Civ. A. No. 92-6736, 1995 WL 263551 (E.D. Pa. May 2, 1995); Roberson v. City of Philadelphia, 2001 U.S. Dist. LEXIS 2163, Civ. A. No. 99-3574, 2001 WL 210294, *5 n.10 (E. D. Pa. March 1, 2001)*. The facts that CNBEC filed a praecipe for writ of summons, the writ was never served, and the writ expired are simply that, facts of the case. [*50] The jury does not need legal expert testimony to understand said concepts. Furthermore, it is my responsibility to instruct the jury on law of the case. Consequently, I find that Mr. Mulvihill's testimony is inadmissible.

**J. The Report and certain testimony of Bryan F.**

**DiLucente, CPA**

CFG takes issue with the opinions offered by Bryan F. DiLucente, CPA, CNBEC's proffered damage expert. *See*, CFG's Brief in Support (Docket No. 140). CFG argues that Dilucente's opinions should be excluded based on *Daubert* and *Rule 702 of the Federal Rules of Evidence*. [7] *Id*. Specifically, CFG seeks to preclude CNBEC from presenting the testimony of DiLucente at trial because his report is unreliable, it does not "fit" the case, and/or lies outside of DiLucente's expertise. *See*, CFG's Brief in Support, at p. 2 (Docket No. 141). I will address each issue raised by CFG.

> 7    CNBEC argues that the Motion regarding DiLucente is "more aptly characterized as a premature Motion in Limine." *See*, CNBEC's Brief in Opposition, p. 1 (Docket No. 162). Regardless of how it is characterized, I will address the issues raised by CFG in its Motion.

[*51] **1. Expertise**

CFG argues that damage testimony from DiLucente should be excluded because it does not fit his expertise. *See*, Docket No. 140, p. 4. DiLucente is a Certified Public Accountant with degrees in industrial management, managerial economics, and accounting. Docket No. 145, Tab. 12. After a review of his *curriculum vitae* and his testimony regarding his qualifications, I am satisfied that DiLucente is qualified to testify regarding damages.

**2. Damage assumptions based on testimony of others**

CFG argues that DiLucente should be precluded from testifying regarding his damage opinions because they are not based on any reliable method or principle. *Id.*, at pp. 2-4. To the extent that DiLucente's opinions are based solely on the opinions of others that have been excluded from testifying (e.g. Werner, Morrin), DiLucente's opinions must be excluded. For example, DiLucente cannot testify as to rebranding costs if solely relying on the testimony of Werner. As CNBEC has recognized, "DiLucente's testimony [should] not be offered before a jury until the factual predicate for his opinion is established." *See*, CNBEC's Brief in Opposition, p. 4 (Docket [*52] No. 162).

**3. Other attacks by CFG**

2003 U.S. Dist. LEXIS 25977, *52

Page 18

## a. DiLucente's opinions regarding CNBEC's financial performance

Specifically, CFG asserts that DiLucente's observations are based on budgets which are not provided and provides no information regarding how the budgets were prepared. *Id.* at 5. CFG further asserts that DiLucente's focus on growth trends are based on a "cherry picked" single asset (loans) and a single liability (deposits) instead of growth trends of assets and liabilities as a whole. *Id., citing,* Docket No. 145, Tab 12, pp. 5-7. Additionally, CFG asserts that DiLucente's report is deficient in that it does not set forth the methodology for choosing the peer group banks he selected, it uses an insufficient number of peer group banks for comparison, and it fails to list the "economic and environmental factors and conditions" which he took into account. *See,* CFG's Brief in Support, at pp. 5-6. CFG finally argues that DiLucente's conclusions regarding CNBEC's performance are unreliable because DiLucente has not provided the entirety of the performance statements upon which the conclusion is based, he does not explain who prepared them and for what purpose they [*53] were prepared. *See,* CFG's Brief in Support, at pp. 6-7. After DiLucente's testimony at the *Daubert* hearing, I am satisfied that these issues go to the weight / credibility of his opinion and can be adequately dealt with by CFG on cross-examination.

### b. Causal link

The last reason CFG asserts that I should exclude DiLucente's testimony is that it will not assist the trier of fact to determine whether the name confusion has caused the proffered damages. *See,* CFG's Brief in Support, at p. 7. Specifically, CFG argues that DiLucente offers nothing to substantiate his claims that CFG's use of the name Citizens caused CNBEC to abandon its advertising campaign and that CNBEC will have to rehabilitate its brand, even if successful in this litigation. *Id.* [8] Rather, DiLucente's opinions are based on the opinions rendered by others. *Id.* CNBEC does not specifically address the issue of causal connection. *See,* CNBEC's Brief in Opposition (Docket No. 162). After a review of DiLucente's report, the briefs and his testimony, I agree with CFG that DiLucente cannot testify as to causation. He is qualified to testify as to damages, but he has no qualifications to testify [*54] as to the causal link. For example, DiLucente may testify that deposits went down, but he may not testify that deposits went down because of

customer confusion regarding the name Citizens.

[8] CFG further argues that even if successful, CNBEC is not entitled to recover costs of corrective advertising, CFG's profits, or CNBEC's attorneys fees and costs because there is no credible evidence of willfulness, bad faith or exceptional circumstances and, therefore, those amounts do not "fit" this case and DiLucente should not be permitted to testify regarding the same. *See,* CFG's Brief in Support, at p. 7. I agree with CFG that pursuant to *15 U.S.C. § 1117*, CNBEC must establish willfulness before DiLucente is permitted to testify as to damages regarding the same. [HN20] "Though the standards for (1) awarding profits; (2) determining whether such an award should be enhanced; and (3) awarding attorneys' fees under the Lanham Act differ somewhat, the issue of willful infringement is central to each." *Securacomm Consulting, Inc., v. Securacom Inc., 166 F.3d 182, 187 (3d Cir. 1999), citing ALPO Petfoods, Inc. v. Ralston Purina Co., 286 U.S. App. D.C. 192, 913 F.2d 958, 968 (D.C. Cir. 1990)* ("an award based on defendant's profits requires proof that the defendant acted willfully or in bad faith"); 5 J. Thoms McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30.91 at 30-148, n 6 (4th Ed. 1996) (willful infringement provides usual basis for enhancing profit award) (collecting cases); *Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 47 (3d Cir. 1991)* (showing bad faith, fraud, malice or willfulness necessary for award of attorneys' fees). "Willful infringement has a central role in the availability of ...these kinds of relief because of the relevance of equitable factors in determining their appropriateness on a given set of facts." *Securacomm, 166 F.3d at 187, n.1.* CNBEC argues that it will present evidence at trial to establish the same. Therefore, CFG may renew its objection at trial, if appropriate, and I will rule on the issue at that time based on the evidence presented.

## [*55] K. The Rebuttal Report of Michael J. Burke

CNBEC objects to the rebuttal report of Michael J. Burke on several grounds. First, CNBEC claims that

Page 19

2003 U.S. Dist. LEXIS 25977, *55

Burke's report does not qualify as a rebuttal. CFG offers the report of Burke in rebuttal to the opinion of Paul A. Beck. CFG claims that Beck has offered incomplete and potentially confusing opinions and that Burke's report is necessary to explain and disprove Beck's opinion. I agree with CFG that [HN21] rebuttal evidence can be offered to explain, repel, counteract or disprove an opinion. See, *Blackstone v. Osche, 192 F. Supp. 174 (W.D. Pa. 1961).* Herein, Beck states that the Patent and Trademark Office ("PTO") did not compare CFG's marks with CNBEC's marks. Burke's report explains that although the PTO did not compare CFG's mark with CNBEC's mark it did compare CFG's mark to other federally registered marks. I find this to be relevant and proper rebuttal as Burke's opinion clarifies Beck's opinion and addresses any probable conclusions.

In addition, although Burke discusses the "commercial strength" of a mark and Beck does not, this does not make the rebuttal improper as [HN22] any analysis of strength must necessarily [*56] look at both inherent strength and commercial strength. See *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3rd Cir. 2000).* Accordingly, I find that Burke's opinion is proper rebuttal and I will not exclude it on that basis.

Next, CNBEC objects to Burke's opinion on the basis that it exceeds the permissible bounds of expert testimony by instructing the jury on the legal concept of commercial strength. Clearly, [HN23] a mere recitation of legal principles is not admissible expert testimony. However, to the extent Burke explains the procedures used by the PTO, his explanations are necessary and useful in the determination of the manner in which the PTO necessarily operated herein. Accordingly, Section I of his report is not excluded on this basis. However, in Section II, Burke merely recites legal principles in an effort to support his conclusion that,

> although the term CITIZENS may be inherently distinctive as applied to banking or financial services, both marks exist in a crowded field of other CITIZENS marks for banking and financial services, and are thus weak marks deserving of a narrow scope of protection.

Burke Report at p. 9. Thus, [*57] Section II of the Burke

report should be excluded on that basis alone. However, I also agree with CNBEC that Burke has further failed to provide a foundation for this conclusory statement. Burke makes the above statement without any indication that he conducted any analysis or investigation other than a "trademark.com" search for marks that contain the name "CITIZENS." [HN24] Although evidence of third party confusion within and without a senior user's market is relevant to a determination of commercial strength, an expert report must provide sufficient foundation as a basis for his conclusions. Burke does not perform any required analysis other than a finding that other uses of the name CITIZENS exist. Under *Daubert,* Burke's conclusion is, therefore, no "more than [a] subjective belief" and should be excluded. Accordingly, Section II of Burke's report is excluded in its entirety.

## L. Bifurcation

CNBEC has argued that the issue of injunctive relief is not proper for a jury, but rather is to be considered by me. In response, counsel for CFG suggested that I bifurcate the case. After consideration of this issue, I agree and will bifurcate the case in the following manner: [*58] On the trial days where counsel has a witness(es) that is going to testify as to injunctive relief, counsel must inform the court at the beginning of the day. Depending upon the number of injunctive relief witnesses for a particular day, I will allow for the jury to be excused early and will hear testimony from those witnesses at the end of the day. Thus, a witness may testify first thing in the morning, but be recalled in the afternoon, after the jury is excused, to testify with regard to injunctive relief.

## M. References to Parties at Trial

Because it would be unfair for either party to refer to itself as "Citizens" at trial and to ensure that the parties are referred to in a consistent manner during the trial, I find that it is necessary to restrict the parties to the following names at all times during the trial: Citizens National Bank of Evans City is to be referred to as CNBEC and only as CNBEC, and Citizens Financial Group is to be referred to as CFG and only CFG.

## ORDER OF COURT

And now, this **23rd** day of April, 2003, after a review of the submissions of the parties, it is hereby ordered as follows:

1. CFG's Motion to Exclude Guideline Research [*59] Corporation's Survey and the accompanying testimony of Robert Reitter (Docket No. 134) is granted. Thus, any testimony regarding the same is inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

2. CFG's Motion to Exclude the Report and certain testimony of Lawrence R. Werner (Docket No. 134) is granted. Thus, any testimony regarding the same is inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

3. CFG's Motion to Exclude the Report and certain testimony of Paul A. Adams, Esq. (Docket No. 134) is granted.

4. CFG's Motion to Exclude the Report and certain testimony of Dennis St. J. Mulvihill, Esq. (Docket No. 134) is granted.

5. CFG's Motion to Exclude the Report and certain testimony of Bryan F. DiLucente, CPA (Docket No. 134) is granted in part and denied in part. I find that DiLucente is qualified to testify, but to the extent that DiLucente's opinions are based solely on the opinions of others that have been excluded from testifying (e.g. Werner, Morrin), DiLucente's opinions are be excluded. Furthermore, DiLucente can testify at trial regarding [*60] his opinions of CNBEC's financial performance. Finally, DiLucente cannot testify as to causation.

6. CFG's Motion to Exclude the Report and certain testimony of Maureen Morrin, Ph.D. (Docket No. 134) is granted in part and denied in part. Morrin can testify as to her opinion numbers 1 (brand name confusion), 2 (braud trust) and 5a (identical names). Morrin cannot testify as to her opinion numbers 4 (tip of the iceberg), and 5h (color perception). Morrin may not testify regarding the first part of Opinion 3 regarding the relevancy of other banks named "Citizens" outside the Pittsburgh region, but may testify as to the remaining portion of opinion number 3.

7. CNBEC's Motion to Exclude the Expert Report and Portions of the Rebuttal Report of Dwight B. Crane and William T. Gregor (Docket No. 148) is granted in part and denied in part as more fully set forth in my accompanying Opinion;

8. CNBEC's Motion to Exclude Portions of the Expert Report and Rebuttal Report of Francis J. Kelly, III (Docket No. 149) is granted in part and denied in part. Kelly cannot testify as to paragraphs 51-60 of his main report to the jury but may testify to the court. Paragraphs 21-25 of his rebuttal report [*61] are excluded as moot.

9. CNBEC's Motion to Exclude The Rebuttal Report of Michael J. Burke (Docket No. 137) is granted in part and denied in part. Section II of Burke's report is excluded.

10. CNBEC's Motion to Exclude The Expert Report and Survey of Henry D. Ostberg (Docket No. 138) is denied; and

11. CNBEC's Motion for Leave to File Supplemental Memorandum in Support of its Motion to Exclude Expert Report and Testimony of Henry D. Ostberg (Docket No. 157) is granted.

The Clerk of Courts is directed to file and docket Defendants' Supplemental Memorandum of Points and Authorities in Support of Motion to Exclude Expert Report and Testimony of Henry D. Ostberg that it received on April 4, 2003.

12. The case will be bifurcated with regard to the testimony relating to injunctive relief.

13. The parties will be restrict at trial to referring to Citizens National Bank of Evans City as CNBEC and to Citizens Financial Group as CFG.

BY THE COURT:

Donetta W. Ambrose,

Chief U.S. District Judge

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1867713 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Humphreys v. Regents of University of California
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Karen Moe HUMPHREYS, Plaintiff,
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Defendants.
**No. C 04-03808 SI.**

July 6, 2006.

Andrew Thomas Sinclair, Sinclair Law Offices, Oakland, CA, Seung Yun Lee, Arne Wagner, Kathleen V. Fisher, Matthew Brooks Borden, Calvo & Clark, LLP, San Francisco, CA, for Plaintiff.
Clariza Casenillo Garcia, G. Martin Velez, Gary T. Lafayette, Paul Yang, Susan T. Kumagai, Lafayette & Kumagai LLP, San Francisco, CA, for Defendants.

**ORDER RE: MOTIONS TO EXCLUDE EXPERT WITNESSES**

SUSAN ILLSTON, District Judge.

**\*1** On April 28, 2006, the Court heard argument on defendants' motion to exclude plaintiff's expert witnesses and on plaintiff's motion to exclude defendants' rebuttal expert witnesses. Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS IN PART both motions.

**BACKGROUND**

Plaintiff Karen Moe Humphreys was terminated from her position in the University of California, Berkeley, Athletic Department in early 2004. She filed this suit later that year, claiming that her termination was the product of illegal gender discrimination, and that it was also in retaliation for her having engaged in protected activities. At the end of discovery, plaintiff produced a number of reports from experts that she intends to call at trial to testify on various topics. Defendants responded with three experts intended to rebut the testimony of plaintiff's experts. The parties have now filed cross motions to exclude the opposing party's expert witnesses from trial.

**LEGAL STANDARD**

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."Fed.R.Evid. 702. Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993)."Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."*Elsayed Mukhtar v. Cal. State Univ., Hayward,* 299 F.3d 1053, 1063 n. 7 (9th Cir.2002), *amended by* 319 F.3d 1073 (9th Cir.2003).

When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Id* . at 1063."As the Supreme Court emphasized, however, '[t]he inquiry envisioned by Rule 702 is ... a flexible one,' ... and must be 'tied to the facts of a particular case.' " *Id.* (citing *Daubert,* 509 U.S. at 594, and *Kumho Tire v. Carmi-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*chael,* 526 U.S. 137, 150 (1999)).

## DISCUSSION

As mentioned above, the parties have filed cross motions to exclude the opposing party's expert witnesses. Although the Court finds that some of the proposed expert witnesses are qualified to testify, the Court's ruling should not be interpreted as a sign that the witness may testify to all of his or her conclusions at trial. Rather, the ruling means simply that the expert meets the threshold requirement that he or she is qualified and that some facets of the testimony will be helpful to the jury.

### 1. Defendants' Motion

Defendant seeks to exclude five of plaintiff's expert witnesses from trial: Dr. Jay M. Finkelman; Anthony R. Pierno, Esq.; Donna de Varona; Donna A. Lopiano; and Dr. Robert R. Trout.

### A. Dr. Finkelman

*\*2* Finkelman is "Interim Systemwide Dean in charge of the California School of Business and Organizational Studies and Program Director and Full Professor of the Organizational Studies Division of CSBOS at Alliant International University."Velez Decl., Exh. A at 1. His expert report covers best human resources management practices, and concludes that the University's treatment of plaintiff was inconsistent with a number of those practices. For example, Finkelman states that downsizing "is usually viewed as an opportunity to retain the strongest workers," and notes that plaintiff was laid off despite her long and "outstanding career as an athlete, coach, and administrator."*Id.* at 10.Similarly, Finkelman discusses business organizations' obligations "to ameliorate the impact [of downsizing] by offering a viable and alternative position," if one is available. *Id.* at 11.He contrasts this obligation with the University's decision to fill a compliance position a month before plaintiff was notified that she was being laid off, rather than keep it available for plaintiff. Other topics covered by Finkelman include the inadequacy of a marketing position plaintiff was offered in lieu of being laid off, and the lack of involvement by senior human resources administrators in the layoff process.

The Court agrees with plaintiff that Finkelman's proposed testimony about the University's deviation from good human resources practices is proper expert testimony under Rule 702. The University's failure to follow such practices is relevant to plaintiff's contention that the layoff was a pretext for gender discrimination or retaliation, and Finkelman's testimony will assist the jury because the average juror is unlikely to be familiar with human resources management policies and practices. The Court, however, agrees with defendants that Finkelman may not testify that the University's failure to comply with good human resources practices is indicative of discrimination. While the jury may ultimately accept such an inference, Finkelman's testimony to that effect is unlikely to assist the jury and runs the risk that the jury will pay unwarranted deference to Finkelman's expertise. *Cf. Kotla v. Regents of the Univ. of Cal.,* 115 Cal.App. 4th 283, 291-93 (Cal.App.2004) (collecting federal cases and concluding that testimony that "certain facts in evidence were 'indicators' of retaliation" was inadmissible).

As to reliability, defendants argue that Finkelman does not meet the *Daubert* criteria for reliability. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593-94 (1993). The criteria from *Daubert* that de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fendants cite, however, concerned "scientific" knowledge. *See id.* at 590 n. 8 ("Our discussion is limited to the scientific context because that is the nature of the expertise offered here."). When expert testimony is offered for "specialized "knowledge," courts have long recognized that reliability may come from experience in the field. *See, e.g., Hangarter v. Provident Life and Acc. Inc. Co.,* 373 F.3d 998, 1015-16 (9th Cir.2004); *Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269-70 (9th Cir.1996).

**\*3** Here, Finkelman is a Professor of Organizational Studies who teaches the "advanced elective doctoral level course ... focusing on the human resource management issues in employment and discrimination litigation, as well as the doctoral level course in Human Resource Management."Velez Decl., Exh. A at 1. He holds a Ph.D. in Industrial/Organizational Psychology from New York University, and is a member of numerous professional organizations. *Id.* at 2. Further, he worked for 13 years in the staffing and employment industry, and was founding partner of a consulting firm for staffing issues. *Id.* As his list of qualifications indicates, Finkelman has testified and published extensively on human resources issues. *See id.* at 3-9.The Court agrees with plaintiff that Finkelman's experience, training, and education render his conclusions sufficiently reliable to satisfy the *Daubert* standard.

**B. Anthony R. Pierno, Esq.**

Pierno is an attorney who formerly served as Senior Vice President of MAXXAM, Inc., and its subsidiary corporations. Velez Decl., Exh. B. He was formerly a partner at the Los Angeles office of Pillsbury, Madison & Sutro, and also served as Commissioner of Corpora-

tions in California under Governor Ronald Reagan. *Id.* Plaintiff offers Pierno to give his opinion about two areas: a discussion of the purported financial bases for plaintiff's layoff, specifically including the University's decision to execute "sweetheart" severance agreements with members of the Athletic Department's Executive Team; and a discussion of improprieties surrounding the University's use of Korn/Ferry, an executive search firm, to hire senior administrative members of the athletic department.

The Court agrees with defendants that Pierno may not testify regarding the Korn/ Ferry search, for a number of reasons. First, while Pierno has demonstrated that he may have sufficient familiarity with severance agreements to satisfy Rule 702's reliability requirements, he has not demonstrated that he has such familiarity with the procedures used by executive search firms. Pierno's experience is limited to "having been recruited twice to new positions by such firms ... [and] having hired such firms to conduct searches on numerous occasions."*Id.* at 5. Although Pierno argues that he "thoroughly explored their methods with them" during these processes, he never actually worked for such a firm. The Court finds that Pierno's limited experience does not meet the "reliability" standard for expert testimony.

Federal Rule of Evidence 403 provides a further reason for excluding Pierno's testimony regarding the executive search process. The Korn/Ferry search, while central to plaintiff's original complaint, is of extremely marginal relevance to the allegations in the fourth amended complaint. The fourth amended complaint refers to the search in a single paragraph, and nowhere mentions Korn/Ferry by name. Allowing expert testimony on a subject of such limited relevance would create a strong risk of confusion of the issues, misleading the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1867713 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

jury, and waste of time. *See*Fed.R.Evid. 403.

**\*4** The Court, however, finds that Pierno may testify to a limited degree regarding the "sweetheart deals" that the University allegedly signed with senior administrators in the Athletic Department both before and after Humphreys left.[FN1] Pierno's history as outside counsel to corporate clients, as a board member of educational institutions, and as a senior corporate officer provide him with sufficient familiarity with executive severance agreements to testify reliably in this case. Further, his proposed testimony that the "sweetheart deals" are unusually generous is relevant to plaintiff's contention that budgetary savings were a pretext for her layoff. Pierno's testimony will also likely be helpful to the jury, which will likely be unfamiliar with the contents of severance agreements. Accordingly, the Court finds that Pierno's may testify on the limited subject above.

> FN1. Although Pierno's report purportedly covers this topic, the bulk of the report consists of a summary of the facts supporting plaintiff's theory of the case. This summary contains a number of fairly biased comments, such as: "[s]ome people might call [the timing of plaintiff's layoff] coincidence-such people also believe the Holocaust never occurred"; "Taking steps to solve any institution's budgetary problems is critically important. It is never so important as to justify gender discrimination...."; "The issue is not whether he was overly generous to the three males mentioned, but whether his generosity toward the males is to be compared to the penuriousness toward Ms. Humphreys in determining whether there was

gender discrimination."; "In terminating Ms. Humphrey ... the University discriminated against her in comparison to how it had treated others of lesser import in the broader community in which the University must function."; and "In limiting her termination compensation to the minimums for which she would otherwise have qualified ... the University discriminated against Ms. Humphreys."*Id.* at 3-5.Plainly, Pierno may not testify to these conclusions at trial.

### C. Donna de Varona

De Varona, a television and radio sportscaster for the past forty years, has been intricately involved with the development of women's sports in this country, including "working with Congress to help shape Title IX," serving as a member of President Ford's Commission on Olympic Sports Commission, and most recently serving on President Bush's Commission on Opportunity in Athletics. Plaintiff offers de Varona to "testify to the dearth of female administrators, advocates, mentors and role models in intercollegiate athletics" and to rebut defendants' claim that plaintiff's position "could be eliminated without severe disruption to the Athletic Department."Pl. Oppo Br. at 8.

The Court agrees with defendants that de Varona's proposed testimony is not proper expert testimony under Rule 702. The majority of de Varona's report consists of repeated praise of plaintiff and her accomplishments. While likely well-deserved, such testimony does not reflect "specialized knowledge," nor is it likely to be helpful to the jury, given that plaintiff will be available to testify. Further, testimony regarding the lack of women in university athletic departments and the impact

of plaintiff's departure on female student athletes at UC Berkeley raises a substantial possibility of confusion of the issues and misleading the jury. *See*Fed.R.Evid. 403.

**D. Donna A. Lopiano**

Lopiano is Chief Executive Officer of the Women's Sports Foundation, a national non-profit organization that seeks to educate the public about gender issues in athletics. Velez Decl., Exh. D at 1. Lopiano's report offers her opinion about the University's treatment of plaintiff, plaintiff's value to the University, the "culture of discrimination" in the UC Berkeley Athletic Department, and about plaintiff's future in intercollegiate athletics.

The Court agrees with defendants that many of Lopiano's conclusions should be excluded from trial. For example, much of Lopiano's expert report consists of little more than a recitation of plaintiff's evidence, combined with her conclusion that the evidence demonstrates that plaintiff was discriminated against. Allowing this form of testimony would greatly infringe upon the role of the jury. Similarly, Lopiano's conclusion that there was a "general culture of gender discrimination and hostility towards women" in the UC Berkeley Athletic Department is based on a recitation of evidence that Lopiano did not observe. *Id.* at 11.Once again, however, her conclusions are not based upon any specialized knowledge; the jury can consider the same evidence she has considered and is certainly qualified to make conclusions based upon that evidence.

*5 Although Lopiano's conclusions may be unhelpful to the jury, plaintiff also offers her as a general resource on Title IX and NCAA. The Court believes this testimony may be helpful to the jury, as the average juror in unlikely to be familiar with the contours of Title IX or the intricate regulatory scheme created by the NCAA rules. Further, the Court finds that Lopiano's extensive experience is more than sufficient to qualify her as an expert on these topics. Indeed, Lopiano has testified in front of congressional committees many times, and heads a non-profit organization dedicated to educating the public about gender issues in athletics. Her education and qualifications easily satisfy the threshold reliability requirement.

Accordingly, the Court DENIES defendants' motion as to Lopiano.

**E. Dr. Robert R. Trout**

Finally, plaintiff proffers Trout as an expert on the economic damages she has suffered. Defendants' sole objection to Trout's report is that he failed to take into account plaintiff's duty to mitigate her damages. Defendant has not cited a single case holding that such a reason is sufficient to exclude an expert. The Court agrees with plaintiff that defendants' argument goes to the weight of Trout's conclusions, not their admissibility. Indeed, defendants have proffered their own rebuttal expert to point out the fact that Trout did not consider plaintiff's duty to mitigate. Accordingly, defendants' motion is DENIED as to Trout.

**2. Plaintiff's Motion**

Plaintiff moves to exclude defendants' three rebuttal experts from trial: John G. Harlow; Craig Pratt; and George Fruehan.

**A. John G. Harlow**

Defendant offers Harlow's testimony to rebut the proposed testimony of plaintiff's expert Anthony R. Pierno. As discussed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

above, Pierno's expert report concludes that there were numerous improprieties in an executive search process employed by UC Berkeley to fill executive level positions in its Athletic Department shortly before Humphreys was terminated. Harlow's rebuttal report describes the search process and concludes that no improprieties occurred. Sinclair Decl., Exh. 2.

As discussed above, the Court believes that Pierno's testimony should be excluded from trial to the extent it covered the Athletic Department's executive search. The search is of extremely marginal relevance to this case, and expert testimony about the search raises a substantial risk of confusion of the issues and misleading the jury. As the Court has held that Pierno may not testify concerning the executive search process, the Court finds that Harlow's rebuttal testimony is unnecessary. Accordingly, the Court GRANTS plaintiff's motion as to Harlow.

## B. Craig Pratt

Defendants offer Craig Pratt as a rebuttal witness to Dr. Jay Finkelman, plaintiff's expert on human resources policies and procedures. Pratt's report, however, is only 3 paragraphs long, and the entirety of his opinion reads as follows: "I read the report of Plaintiff's expert, Dr. Jay Finkelman and, based on my understanding of the discovery record, I disagree with many of his conclusions. I believe Dr. Finkelman has made a faulty analysis and/or otherwise improperly applied principles in my field attendant to the prevention of discrimination and/or retaliation in the context of an organizational 'reduction-in-force.' " Sinclair Decl., Exh. 3. Pratt's report also states that he expects "to review additional discovery materials, including but not limited to the material Dr. Finkelman reviewed pri-

or to his report." *Id.*

**\*6** Pratt's report fails to comply with the basic requirements of the Federal Rules of Civil Procedure, which require "a complete statement of all opinions to be expressed and the basis and reasons therefore."Fed.R.Civ.P. 26(a)(2)(B). Without more information, plaintiff is prevented from understanding the reasons behind Pratt's opinion, and the Court certainly is unable to determine whether Pratt's report meets the threshold "reliability" requirement for expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993). Further, it appears that Pratt reached his conclusion after reviewing only Finkelman's report, which is the sole document that Pratt's report specifically states that he reviewed. Sinclair Decl., Exh. 3. This further suggests that Pratt's opinion is unreliable.

Defendants have failed to comply with the most basic requirements of expert disclosure under Federal Rule 26. Accordingly, the Court GRANTS plaintiff's motion as to Pratt.

## C. George R. Fruehan

Defendants offer Fruehan as a damages expert to rebut the testimony of Dr. Robert R. Trout, plaintiff's expert on damages. Fruehan's report concludes that Trout did not consider plaintiff's duty to mitigate damages. Sinclair Decl., Exh. 4. It also concludes that Trout inappropriately assumed an average pay increase of 3.1 % per year, arguing instead that plaintiff's salary would have hit the maximum salary within her "salary band" at some point. *Id.*

Plaintiff raises two concerns with Fruehan's report. First, she contends that Fruehan's report indicates that he found multiple problems with Trout's method of com-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1867713 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

putation, yet only discloses the "salary band" problem. *See* Sinclair Decl., Exh. 4 ("There are also problems with the method of computation."). The Court agrees with plaintiff that Fruehan may not testify at trial regarding matters outside the scope of his report.

Second, plaintiff contends that Fruehan's report improperly includes a discussion of plaintiff's duty to mitigate damages. Plaintiff contends that plaintiff's duty to mitigate is not properly rebuttal testimony because Trout made no opinion on plaintiff's duty to mitigate damages. The Court disagrees. Fruehan's report exposes a potential flaw in Trout's method of determining the amount of damages. Accordingly, it is properly classified as rebuttal testimony. Plaintiff is also concerned that Fruehan will testify that plaintiff had a legal duty to accept a specific marketing position in the Athletic Department that the University offered her in lieu of being laid off. The Court agrees with plaintiff that, while plaintiff may have had a legal duty to mitigate, Fruehan may not testify that she had an obligation to accept the marketing position.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' motion (Docket No. 238) and GRANTS IN PART plaintiff's motion (Docket No. 184).

## IT IS SO ORDERED.

N.D.Cal.,2006.
Humphreys v. Regents of University of California
Not Reported in F.Supp.2d, 2006 WL 1867713 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 U.S. DIST. LEXIS 17154

## INSTITUT PASTEUR and CENTRE NATIONAL DE LA RECHERCHE SCIENTIFIQUE, Plaintiffs, v. ADAM J. SIMON, Ph.D., Defendant.

## CIVIL ACTION No. 98-727

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2005 U.S. Dist. LEXIS 17154*

## August 16, 2005, Decided
## August 16, 2005, Filed

**SUBSEQUENT HISTORY:** Partial summary judgment denied by *Institut Pasteur v. Simon, 384 F. Supp. 2d 802, 2005 U.S. Dist. LEXIS 17269 (E.D. Pa., Aug. 19, 2005)*

**PRIOR HISTORY:** *Institut Pasteur v. Simon, 374 F. Supp. 2d 449, 2005 U.S. Dist. LEXIS 17764 (E.D. Pa., 2005)*

## CASE SUMMARY:

**PROCEDURAL POSTURE:** In a patent action, plaintiffs brought a motion to strike the reply expert report of one expert, portions of a second reply expert report, and to limit testimony offered by a third expert.

**OVERVIEW:** The current motion by plaintiffs was based on grounds that the defense experts improperly rendered opinions that were pure legal conclusions which usurped the role of the court and jury. The court granted plaintiffs' motion in part and denied it in part. The court found that the third expert would not be permitted to testify about what constituted scientific discovery or inventorship and was prohibited from offering legal conclusions or testimony about the legality of any actors and could not offer conclusions of defendant's inventive behavior or plaintiffs' allegedly fraudulent behavior. Opinions of the first expert as to the best mode requirement, the duty of candor and the law of inventorship were barred as legal conclusions inappropriate for expert testimony. Under *Fed. R. Civ. P. 26(a)(2)(C)*, insofar as expert one's reply report addressed matters that had been barred, those portions would also be barred, but the court permitted him to testify within

that framework, provided that he avoided legal opinions. Finally, sanctions under *Fed. R. Civ. P. 37* were not necessary where no prejudice was apparent from comments of the second expert which attempted to bolster other testimony.

**OUTCOME:** The court granted plaintiffs' motion as to the barring of expert testimony concerning legal opinions and the legality of any actors in the litigation. The court denied the balance of the motion.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Disclosures > General Overview*
*Civil Procedure > Discovery > Methods > Expert Witness Discovery*
[HN1] Under *Fed. R. Civ. P. 26(a)(2)(C)*, expert reply reports are limited to testimony that is intended solely to contradict or rebut evidence on the same subject matter identified by another party.

*Civil Procedure > Discovery > Misconduct*
[HN2] See *Fed. R. Civ. P. 37(c)(1)*.

**COUNSEL:** [*1] For INSTITUT PASTEUR, CENTRE NATIONAL DE LA RECHERCHE SCIENTIFIQUE, Plaintiffs: ALBERT J. BRENEISEN, CHRISTOPHER L. OGDEN, ELIZABETH GARDNER, PATRICE P. JEAN, RICHARD S. GRESALFI, WILLIAM G.

JAMES, KENYON AND KENYON, NEW YORK, NY; DANIEL F. SCHIFF, DORSEY & WHITLEY, LLP, NEW YORK, NY; DAVID W. MARSTON, JR., THOMAS B. KENWORTHY, JOHN V. GORMAN, MORGAN LEWIS & BOCKIUS, PHILA, PA; LYNN COLLINS, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., PHILADELPHIA, PA; MARI SHAW, OBERMAYER REBMANN MAXWELL & HIPPEL LLP, PHILADELPHIA, PA.

For ADAM J. SIMON, Ph.D., Defendant: CURTIS B. MINER, DAVID BOIES, STEPHEN R. NEUWIRTH, BOIES & SCHILLER, LLP, ARMONK, NY; DANIEL M. COHEN, H. LADDIE MONTAGUE, JR., PETER R. KAHANA, BERGER & MONTAGUE, P.C., PHILA, PA.

**JUDGES:** Pollak, J.

**OPINION BY:** Pollak

**OPINION**

**MEMORANDUM/ORDER**

Before this court is Plaintiffs' Motion to Strike the Reply Expert Report of John McDonnell, and Portions of the Reply Expert Report of Russell L. Parr, and to Limit Testimony Offered by Walter Hill. For the reasons stated below, plaintiffs' motion will be granted in part and denied in part.

**Walter Hill and John McDonnell**

On February 24, 2005, Simon moved to strike the expert report of [*2] Nancy J. Linck, a lawyer who has served as Solicitor of the Patent and Trademark Office ("PTO"), "on the grounds that she improperly renders opinions that are pure legal conclusions which usurp the role of the Court and invade the province of the jury." Def. Mot. to Strike the Expert Report of Nancy J. Linck, Esq. at 1. On April 1, 2005, this court ruled that while Ms. Linck would be permitted to testify as to the practices and procedures of the PTO, she "may not testify as to the legality, *vel non,* of any of the actors in this litigation." Institut Pasteur and CNRS now move this court to limit the testimony of Dr. Walter Hill and to strike portions of the reply expert report of Dr. John McDonnell on similar grounds.

**A.**

Walter Hill is a biophysicist and lawyer. In his reports, he offers a series of conclusions about "inventorship," "best mode," and fraud. For example, Dr. Hill describes Simon's "inventive contributions" and opines that Simon "should have been listed as a co-inventor on this patent." Hill Expert Report, Ex. C at 15. *See also id.* at 21. Dr. Hill defines "best mode" and opines that Simon's contributions "should have been incorporated into the patent documents [*3] as best mode." Ex. C, 23; *see also id.* at 23-25. Dr. Hill also makes a series of statements labeling plaintiffs' actions as "fraudulent" (*See, e.g.* Ex D, at 17 and 21). These opinings constitute legal conclusions, not appropriate for expert testimony before a jury by Dr. Hill whether as lawyer or as biophysicist.

Dr. Hill also offers more general conclusions about the nature of "scientific discovery" (Ex. C at 2) and "what constitutes an inventor" *Id.* at 21. Despite Dr. Hill's legal background, Simon insists that Dr. Hill is being presented solely as a scientific expert and will be offering opinions about inventorship "from a scientific standpoint, not from a legal standpoint." Hill Reply Report, Ex. D at 2. However, the court agrees with plaintiffs that, even if Dr. Hill does not intend to offer legal conclusions, "he is a lawyer and he is doing just that or, at best, will be perceived by the jury to be doing so." P. Br. at 19. Therefore, Dr. Hill will not be permitted to testify about what constitutes scientific discovery or inventorship. In sum, like Ms. Linck, Dr. Hill will be prohibited from offering legal conclusions or testifying about the legality of any actors [*4] in this litigation. In particular, Dr. Hill may not offer conclusions about Dr. Simon's "inventive contributions," the nature of inventorship more broadly, "best mode" or plaintiffs' allegedly fraudulent behavior.

**B.**

John McDonnell is an organic chemist and patent lawyer retained by Simon to reply to the expert reports of Ms. Linck and Dr. Max Gottesman. He did not submit a report during either of the first two rounds of expert disclosures. [1] Dr. McDonnell's reply report offers opinions about whether Simon's research constituted "inventive contributions," the "best mode" requirement, the "duty of candor," and how ownership and inventorship disputes affect the value of patents. Plaintiffs seek to strike Dr. McDonnell's reply report on the grounds that it is "tantamount to a legal brief" and

Case 1:05-cv-00499-JJF    Document 359-2    Filed 02/07/2008    Page 31 of 41

Page 3
2005 U.S. Dist. LEXIS 17154, *4

offers improper legal conclusions. Dr. McDonnell's opinings about the "best mode" requirement, (see section VI) the "duty of candor," (see section VII), as well as the law of inventorship and whether Simon's research constituted "inventive contributions" (see section IV), are legal conclusions, inappropriate for expert testimony, and Dr. McDonnell will be prohibited from so opining [*5] at trial.

> 1 Plaintiffs object to Dr. McDonnell's testimony on the ground that he is "a brand new legal expert" witness whose report was submitted five months after initial expert disclosures were due. Each party was required to disclose the subject of any expert as to an issue on which the sponsoring party would bear the burden of proof at trial by January 19, 2005. At that time, Pasteur submitted the expert report from Ms. Linck. Following this court's April 1, 2005 order striking much of Ms. Linck's opening expert report, Pasteur submitted a second report from Linck as a rebuttal report. Given the timing of the Linck report, this court does not consider the timing of Dr. McDonnell's report alone to be a ground for striking his testimony.

Institut Pasteur and CNRS also move to strike Dr. McDonnell's report on the basis that significant portions of the report are non-responsive to plaintiffs' rebuttal expert reports and, therefore, exceed the proper scope of a reply expert report. [HN1] Under *Fed. R. Civ. P. 26(a)(2)(C)* [*6] , expert reply reports are limited to testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Simon claims that section IV of the McDonnell report, entitled "Dr. Simon's Inventive Contributions," is directly responsive to the Linck rebuttal report. However, those portions of the Linck rebuttal report addressing inventorship and Simon's inventive contributions, to which Dr. McDonnell is allegedly responding, are expressly conditioned upon this court permitting Dr. Hill to testify on those issues. 2 Because, for the reasons discussed above, Dr. Hill will not be permitted to present the proposed testimony, there will be no occasion for Ms. Linck to rebut that testimony. As a result, section IV of McDonnell's report, insofar as it seeks to respond to Linck testimony that will not be presented, turns out to be superfluous. In contrast, sections V and VIII of McDonnell's report, to the extent that they address permitted aspects of Linck's report, are unobjectionable,

and Dr. McDonnell may testify within that framework, provided that he avoids legal opining of the kind reflected in sections IV, VI and VII to which reference [*7] has been made above.

> 2 In January 2005, plaintiffs submitted an opening expert report from Ms. Linck. On April 1, 2005, this court struck much of that report, ruling that Ms. Linck would be permitted to testify as to the practices and procedures of the PTO, but "may not testify as to the legality, *vel non*, of any of the actors in this litigation." Thereafter, plaintiffs submitted a second, new report from Dr. Linck as a rebuttal report, principally responding to the proposed testimony of Dr. Hill. In addition to describing the practices and procedures of the PTO, Ms. Linck states, "If Professor Hill is permitted to testify about what determines inventorship in a patent application, then I intend to rebut his testimony, if permitted to do so, as I believe that Professor Hill is not applying the correct standards." Linck Rebuttal Report, Ex. 6, at AP 25.

**Russell Parr**

Russell Parr is a financial analyst retained by Simon to address the issue of damages. In his expert reply report, in addition to responding [*8] to the rebuttal reports submitted by plaintiffs' experts, Mr. Parr comments on, and expresses agreement with, the reports submitted by Vivian Lee, another damages expert also retained by Simon. After describing the content of Ms. Lee's report (see Parr Reply Report, Ex. B at 3-4), Mr. Parr opines, "My experience confirms [Ms.] Lee's opinion." *Id.* at 4.

Plaintiffs contend that the three paragraphs in Mr. Parr's reply report that comment on Ms. Lee's opinion exceed the proper scope for a reply report, which, under *Rule 26(a)(2)(C)*, is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." In particular, plaintiffs argue that Mr. Parr has utilized his reply report to "bolster" the opening report of Ms. Lee. Plaintiffs object to this testimony as untimely 3 and move this court to sanction Simon by excluding that portion of Mr. Parr's testimony, pursuant to [HN2] *Rule 37(c)(1)*, which reads, in part: "A party that without substantial justification fails to disclose information required by *Rule 26(a)* . . . is not, unless such failure is harmless, permitted to use as evidence at a trial,

at a hearing, or on a motion any witness or information [*9] not so disclosed. . . .". This court agrees that the portion of Mr. Parr's reply report at issue does little more than bolster Ms. Lee's testimony. However, plaintiffs have not been unduly surprised by Mr. Parr's comments on Ms. Lee's report. No prejudice is apparent. Therefore, a *Rule 37* sanction is inappropriate in this instance. *Cf. Johnson v. Vanguard Mfg., Inc, 34 Fed. Appx. 858 (3d. Cir. 2002)* (prohibiting an expert witness from testifying at trial about evidence that was not included in his expert report); *Baldwin v. Graphic System, Inc. v. Siebert, Inc., 2005 U.S. Dist. LEXIS 10692, 2005 WL 1300763 (N.D. Ill. Feb. 22, 2005)* (striking expert report that challenged the validity of patents at issue for the first time in rebuttal report).

3 In their motion to strike, plaintiffs state:

> To the extent such testimony would even have been permitted, it should have been included in the opening reports submitted by Dr. Simon's experts. . . . Indeed, nothing prevented Dr. Simon's experts from congratulating one another on the contents of their respective opening expert reports

back in January" when the initial reports were submitted. Pls' Mot. to Strike at 9.

[*10] For the foregoing reasons, it is hereby **ORDERED** that plaintiffs' motion is **GRANTED** in part and **DENIED** in part.

The motion is GRANTED as follows: Dr. Hill and Dr. McDonnell may not testify as to the legality, *vel non*, of any of the actors in this litigation. Accordingly, Dr. Hill may not offer conclusions about Simon's "inventive contributions," the nature of "inventorship" more broadly, "best mode," or "fraud." Dr. McDonnell may not testify to the legal opinions expressed in sections IV, VI, or VII of his reply report, and any testimony under sections V and VIII must avoid legal opining.

The balance of the motion is DENIED.

BY THE COURT:

Pollak, J.

**August 16, 2005**

Westlaw.

Not Reported in F.Supp.                                          Page 1
Not Reported in F.Supp., 1995 WL 115421 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

▷
International Business Machines Corp. v.
Fasco Industries, Inc.
N.D.Cal.,1995.
Only the Westlaw citation is currently
available.
United States District Court, N.D. Califor-
nia
INTERNATIONAL BUSINESS MA-
CHINES CORPORATION, Plaintiff,
v.
FASCO INDUSTRIES, INC., Defendant.
**C-93-20326 RPA.**

Mar. 15, 1995.

### ORDER GRANTING IN PART IBM'S MOTION TO EXCLUDE FASCO'S "REBUTTAL" EXPERTS

AGUILAR, District Judge.

**\*1** International Business Machines
Corporation ("IBM") moves to exclude
from trial certain of Fasco Industries, Inc.'s
("Fasco") expert witnesses on the ground
that Fasco failed to designate the witnesses
by the deadline set forth in this court's
scheduling order. The court has read the
moving and responding papers and has
heard the argument of counsel. For the
reasons discussed below, IBM's motion is
GRANTED in part.

#### BACKGROUND

IBM filed this breach of contract action
in May 1993, alleging that Fasco supplied
it with defective blowers used to cool the
electronic components of an IBM data stor-
age machine. Fasco filed a counterclaim
which alleges that IBM prematurely ter-
minated their contract.

In July 1994, this court issued a
scheduling order establishing deadlines for
fact discovery, expert witness disclosure
and expert discovery. That order set the
cut-off for expert discovery on December
6, 1994, and required the parties to simul-
taneously disclose their expert witnesses on
November 30, 1994. Through a series of
stipulations, expert discovery cut-off was
extended to January 20, 1995, and the date
for disclosing experts was extended to
January 11, 1995.[FN1]

On January 11, IBM designated three
expert witnesses: engineers Iain Finnie and
Robert F. Streidel, Jr., and economist Ben-
jamin Klien. According to the expert wit-
ness reports, Finnie and Steidel will testify
that Fasco's blowers were defective, while
Klien will testify on the subject of lost
profits suffered by IBM as a result of the
allegedly defective blowers.

Fasco disclosed one expert on January
11-Brian W. Napper-who will testify about
economic damages sought in connection
with Fasco's counterclaim and will dispute
the theories of IBM's economic damages
expert. Fasco did not disclose any experts
on the subject of the defectiveness of its
blowers. Instead, Fasco told IBM that it
would designate such experts thirty days
later as "rebuttal" experts under Federal
Rule of Civil Procedure 26(a)(2)(C). On
February 10, 1995, Fasco disclosed six
"rebuttal" expert witnesses: engineers
Tardiff, Williams, Comfort and Clay, who
plan to testify that the blowers were not de-
fective; another engineer, McKnight, who
will testify on the industry custom and
practice regarding the testing of blowers;
and Bourg, an economic damages expert.

IBM maintains that the "rebuttal" des-
ignations were untimely and that these ex-
perts should be precluded from testifying.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pending this court's ruling, however, IBM has begun deposing Fasco's "rebuttal" experts in the event they are permitted to testify.

## ANALYSIS

IBM argues that Fasco violated the scheduling order and subsequent stipulations by designating experts after the January 11, 1995 expert witness disclosure deadline. As a sanction, IBM urges that Fasco's "rebuttal" experts named on February 11 be excluded from trial. Fasco counters that its disclosures were timely under Fed.R.Civ.P. 26(a)(2)(C), which it argues is controlling because the scheduling order does not mention "rebuttal" experts.

**\*2** Under amended Fed.R.Civ.P. 26, which took effect December 1, 1993, all parties and the court should possess full information well in advance of trial on any proposed expert testimony. Rule 26(a)(2) now requires all parties to disclose to their adversaries the identity of any person who may testify at trial under Federal Rules of Evidence 702, 703, or 705. Rule 26(a)(2)(C) dictates the timing of the disclosures:

These disclosures shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial, or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party. The parties shall supplement these disclosures when required under subdivision (e)(1).

Rule 26(a)(2)(C) thus provides an alternative procedure for the disclosure of

experts in the event a court does not give any guidance on the subject. In this case, however, the court gave explicit directions regarding the time for disclosing expert witnesses. The scheduling order directed the parties to simultaneously disclose their experts and the anticipated testimony on November 30, 1994. Three subsequent stipulations extended this date to January 11, 1995. Because this court assumed responsibility for setting disclosure dates, Rule 26(a)(2)(C)'s alternative procedure never kicked in.

Fasco argues that, notwithstanding the court's scheduling order, the Rule 26(a)(2)(C) deadline for rebuttal experts applies because the scheduling order and stipulations were silent as to rebuttal experts. The critical question, however, is whether the court has spoken on the subject of expert disclosures generally, not whether it has specifically substituted its own deadlines for those proposed in Rule 26(a)(2)(C). The scheduling order does not have to account for every deadline set forth in Rule 26(a)(2)(C). When the court crafted its own schedule for expert disclosures, the mechanism set forth in Rule 26 was nullified, including the provision for supplemental disclosures. Fasco's argument mistakenly reads into Rule 26(a)(2)(C) a substantive right to supplement an initial witness disclosure with rebuttal experts. The rule merely provides alternative deadlines should the court neglect to set its own schedule. The language "[i]n the absence of other directions from the court" makes this clear. The scheduling order controls and does not allow for supplemental disclosures.

The expert discovery cut-off date further demonstrates that Rule 26(a)(2)(C)'s supplemental disclosure dates are inapplicable. The expert discovery cut-off date was January 20, 1995. If Rule 26(a)(2)(C)'s

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 115421 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

Page 3

schedule applied, Fasco could have properly designated its rebuttal experts twenty-one days after the close of expert discovery, meaning that IBM would be entirely precluded from deposing Fasco's rebuttal experts. This anomalous result undermines Fasco's interpretation of the interplay between the court's scheduling order and Rule 26(a)(2)(C). Fasco's February 11 designations were untimely and violated the scheduling order. The only question is what the sanction should be.

**\*3** A district court has the authority to exclude the testimony of expert witnesses for a breach of a scheduling order or Rule 26. *Campbell Industries v. M/V Gemini,* 619 F.2d 24, 27 (1980); *Jenkins v. Whittaker,* 785 F.2d 720, 728 (9th Cir.1986), *cert. denied,*479 U.S. 918 (1986). Because Fasco followed the mechanism set forth in Rule 26(a)(2)(C), it makes sense to use that rule's limits on Fasco's rebuttal expert testimony as a benchmark for determining an appropriate sanction. Under Rule 26(a)(2)(C)'s disclosure mechanism, a party may designate additional experts thirty days after initial expert disclosures, with one caveat: the additional experts' testimony is limited to rebutting or contradicting the expert testimony initially designated by the opposing party. The supplemental or "rebuttal" experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts. In this respect, a party can control the scope of the testimony of its adversary's rebuttal experts by limiting its own experts' testimony to a given subject matter. A party who forgoes designating experts on the initial disclosure date will thus find itself in a purely reactive mode, greatly restricted in its ability to offer expert testimony.

· Judging from the expert witness reports describing their expected testimony, four

of Fasco's six experts disclosed on February 10 were properly designated as rebuttal experts. According to IBM's January 11 disclosure, IBM's engineering experts will opine that zinc was an improper material for use in blowers and that the steel and aluminum-backed impeller designs were inadequate. These experts will offer a theory regarding the "creep instability" of these materials. The reports accompanying the disclosure of four of Fasco's technical experts -Clay, Adams, Tardiff, and Comfort-indicate that these witnesses will confine their testimony to curtiquing the validity of the "creep instability theory" and other theories promulgated by IBM's experts. Given that this testimony is within the boundaries of Rule 26(a)(2)(C) rebuttal testimony, Fasco properly designated these four engineers as rebuttal witnesses.

On the other hand, two of Fasco's rebuttal experts should have been designated on the initial disclosure date because they plan to opine on subjects that IBM's experts will not address. James Samuel McKnight will testify on the industry custom and practice for testing blowers, industry standards for blowers and accelerated life testing. IBM has not designated an expert to opine on these issues, so McKnight will have nothing to rebut. Similarly, Fasco's expert economist, John Bourg, plans to devote part of his testimony to subject matter outside the scope of IBM's experts' testimony; i.e., to out-of-pocket damages. Accordingly, Fasco improperly designated McKnight and Bourg. Under Rule 26(a)(2)(3), then, McKnight could not testify, period, and Bourg could not testify on out-of-pocket damages. With this in mind, the court turns to the question of an appropriate sanction.

**\*4** The enforcement of discovery deadlines is absolutely essential in promoting the just and efficient administration of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

justice. This court's practice of strictly enforcing scheduling deadlines is widely known. Fasco's failure to adhere to the scheduling order, while not done in bad faith, demonstrated poor judgment and created a burdensome distraction from IBM's pretrial preparation. Even conceding that Fasco's interpretation of Rule 26(a)(2)(C) is reasonable, the discrepancy between the discovery deadline and the Rule's disclosure schedule should have alerted Fasco that there might be a problem with its interpretation. It was presumptuous and reckless for Fasco not to seek guidance from the court at that time. "What we have here is failure to communicate." *Cool Hand Luke,* Warner Bros.-Seven Arts, Inc. (1967).

Nonetheless, while Fasco's behavior must be taken seriously, it would be draconian for this court to exclude all of Fasco's rebuttal experts. Given the importance of technical issues to this case, the trial would be over before it started. Instead, the court will limit Fasco to calling only two witnesses from the ranks of Clay, Tardiff, Adams and Comfort. In addition, McKnight is excluded, and Bourg's testimony as to out-of-pocket damages is excluded. As discussed above, this testimony would not be improper even under Fasco's interpretation of Rule 26. Finally, needless to say, the testimony of Fasco's rebuttal experts will be strictly limited to poking holes in the theories of IBM's experts.

IT IS SO ORDERED.

> FN1. A further stipulation extended the expert discovery cut-off date to January 27, 1995, "solely to allow time to complete expert witness depositions as to experts previously designated IBM and Fasco."

N.D.Cal.,1995.
International Business Machines Corp. v. Fasco Industries, Inc.

Not Reported in F.Supp., 1995 WL 115421 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 610411 (D.Neb.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Schreiber v. Nebraska
D.Neb.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Nebraska.
Carla J. SCHREIBER, Plaintiff,
v.
State of NEBRASKA, and Nebraska State Patrol, The, Defendants.
No. 8:05CV537.

Feb. 23, 2007.

Terri M. Weeks, Bowman, Krieger Law Firm, Lincoln, NE, Vincent Valentino, Angle, Murphy Law Firm, York, NE, for Plaintiff.
Frederick J. Coffman, Kevin K. Stephenson, Attorney General's Office, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER ON MOTIONS IN LIMINE (EXPERT MATTERS)

LAURIE SMITH CAMP, United States District Judge.

**\*1** This matter is before the Court on the parties' motions in limine. Both sides have requested a hearing, but based on the parties' arguments and affidavit evidence, I conclude that a hearing is not necessary. Plaintiff Carla J. Schreiber claims that she was denied promotions and suffered other adverse employment actions on the basis of her sex and that she was retaliated against for engaging in protected activities in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Filing No. 24).

The State of Nebraska and the Nebraska State Patrol ("NSP") (hereafter collectively "Defendants") have filed a motion in limine to exclude the testimony of

Plaintiff's proposed expert witness, Jose Soto, who is identified as having expertise in matters of personnel and affirmative action. (Filing No. 114). The Defendants contend that Soto's opinions are not relevant or reliable, and they do not constitute expert opinion under Federal Rule of Evidence 702. Schreiber also has filed a motion in limine to exclude the testimony of the Defendants' proposed expert witness, David Peterson, Ph.D., a statistician. Schreiber seeks to exclude Dr. Peterson on the basis that the data that he has relied upon are too limited, covering only the two years after Schreiber filed her charge of discrimination against the NSP. She argues that restricting the data to 2004-06, generates unreliable opinions based on an incomplete analysis. Schreiber also seeks to exclude Dr. Peterson's testimony because Schreiber is unable to rebut it by analyzing the years prior to 2004, due to the Defendants' destruction of documents relating to the NSP's promotional decisions prior to 2004. Schreiber contends that the Defendants had an obligation to retain personnel records pursuant to statute, and that their failure to retain them justifies the sanction of preventing Dr. Peterson from testifying as to his analysis for 2004-2006.

For the reasons that follow, both motions will be granted.

### *Daubert* Standard

A witness qualified as an expert by knowledge, skill, experience, training, or education, may offer an opinion based on scientific, technical, or other specialized knowledge if it will assist the trier of fact. Fed.R.Evid. 702. Under Rule 702, the Court must consider whether (1) the testimony is based upon sufficient facts or data,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 2007 WL 610411 (D.Neb.)
**(Cite as: Not Reported in F.Supp.2d)**

(2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. The Advisory Committee Notes to the 2000 Amendments to Rule 702, made in response to the *Daubert* decision, list other factors courts often consider when determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. Among these are (1) whether the research was conducted independent of the litigation or the opinions were developed expressly for purposes of the litigation, (2) whether the expert has extrapolated from an accepted practice to an unfounded conclusion, leaving an analytical gap, (3) whether the expert has adequately accounted for alternative explanations, at a minimum ruling out the most obvious alternative causes, (4) whether the expert has employed the same level of care and intellectual rigor in reaching the opinion as the expert would employ when working outside the courtroom in the expert's field of expertise, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert is offering.

**\*2** To be admissible, expert testimony must be both relevant and reliable, and the trial court's unique role as "gatekeeper" affords the trial court broad discretion in determining whether these standards have been met. *Daubert v. Merrell Dow Pharms., Inc .,* 509 U.S. 579, 589 (1993); *Kumho Tire v. Carmichael,* 526 U.S. 137 (1999); *see also Wagner v. Hesston Corp.,* 450 F.3d 756, 758 (8th Cir.2006). The proponent of the expert testimony must prove its admissibility, that is, its relevance and reliability, by a preponderance of the evidence. *Lauzon v. Senco Products, Inc.,* 270 F.3d 681, 686 (8th Cir.2001) (citing *Daubert,* 509 U.S. at 592.) When dealing with the sufficiency of statistical evidence, the Eighth Circuit Court has stated:

To be legally sufficient, the plaintiffs' statistical evidence "must show a disparity of treatment, eliminate the most common nondiscriminatory explanations of the disparity, and thus permit the inference that, absent other explanation, the disparity more likely than not resulted from illegal discrimination."*Hervey v. Little Rock,* 787 F.2d 1223, 1228 (8th Cir.1986) (quotation omitted).

*Morgan v. United Parcel Service of America, Inc.,* 380 F.3d 459, 463-464 (8th Cir.2004).

### Jose Soto, J.D.

Schreiber offers Soto as an expert qualified to offer testimony based on his educational background and professional experience as an affirmative action and personnel specialist. Soto earned a bachelor of arts degree with emphasis in psychology and social sciences from the IntraAmerican University of Puerto Rico; took some graduate level courses in psychology; and earned a juris doctor degree from the University of Nebraska at Lincoln in 1984. Soto has held the position of Vice President for Affirmative Action, Equity and Diversity for Southeast Community College in Lincoln, Nebraska, for approximately 15 years. In formulating his opinions, Soto has relied on documents provided to him by Schreiber's counsel, and he has referred to formulas adopted by the EEOC. (Soto's reports are located at Filing No. 115, Attachments 1 and 2.)

The Defendants seek to exclude Soto's opinions for several reasons. First, the Defendants contend that Schreiber is using Soto's testimony to advance a disparate impact theory. Soto's opinions include that the NSP's policy and procedures have an adverse impact on females. The Court has ruled that Schreiber may not proceed on a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00499-JJF    Document 359-2    Filed 02/07/2008    Page 39 of 41

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2007 WL 610411 (D.Neb.)
(Cite as: Not Reported in F.Supp.2d)

disparate impact theory of discrimination (Filing Nos. 101, 75), and expert evidence will not be allowed for that purpose. The admissibility issue remains, however, because statistical evidence also may be used to show pretext in disparate treatment cases, although "[g]eneralized statistics used to prove a particular intent must be scrutinized closely."*See Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1254 (8th Cir.1981).

The Defendants contend that these opinions are not the type of expert opinion evidence contemplated by Rule 702 because they are unreliable, and, therefore, not relevant, and not helpful to the trier of fact. As I indicated in the Memorandum and Order denying the Defendants' motion for summary judgment, some of the underlying data extracted from the Omaha and Lincoln police departments may be probative of some fact at issue in this case. However, for reasons explained below, I conclude that the expert opinion evidence offered by Soto should be excluded under Rule 702 and *Daubert* and its progeny and Rule 702.

*3 There is no doubt that Soto has analyzed certain information and statistics that have been made available to him through this case. Specifically, Soto has reviewed statistical information gathered from the Omaha and Lincoln Police Departments and a national survey in which the NSP participated in 1999 and 2002. Soto has also reviewed the procedures used by the NSP in making promotional decisions. He has formed opinions based his review of that information within the context of his professional experience. Soto's opinions include that female officers are underrepresented and underutilized by the NSP; that the NSP has failed to avail itself of numerous opportunities to select for promotion women who were "arguably equally

qualified, if not more qualified," than the males selected for those positions; that the NSP has failed to take affirmative action to remedy the significant under-utilization and under-representation of women within the sergeant and lieutenant ranks; and that the NSP's affirmative action efforts could have been "more aggressive." He is of the opinion that "plausible and likely explanations" for the relatively low number of female NSP employees who have been promoted include 1) an historic and extant preference for males in leadership and command positions and 2) a selection process that is imbued with subjectivity that permits decision-makers to discriminate for unlawful reasons. Soto also states that "the adverse actions the plaintiff is complaining about were more likely than not motivated by unlawful bias based on her gender."(Filing Nos. 115, Attachments 1 and 2).

While Soto has earned a law degree and has more than 15 years of experience in the personnel field (which includes matters relating to affirmative action), I find that his educational and professional background do not qualify him to render expert opinion evidence in this case. There is no evidence that he has engaged in scholarly research or writing on the subject of affirmative action in the law enforcement arena. He has not been trained as a statistician. I find that his opinions do not adequately account for alternative explanations. I find that Soto's opinions are based, in part, on irrelevant considerations and insufficient data. For example, some of his opinions relate to recruitment of females into law enforcement, not promotional decisions. Recruitment is not material to this case. His analysis is not the product of recognized and respected methodologies, nor does it address or incorporate any measures of validity or accuracy. For example, he does not address whether chance played any role in any se-

lection process for NSP promotions, and, at least initially, he ignored the impact of standard deviations on this type of statistical analysis. Soto offer his opinions "to a reasonable degree of certainty available in the professional practice of human resources and affirmative action," which does not reflect an area of expertise that is known for reaching reliable results for the types of opinions that Soto is offering.

**\*4** If permitted, Soto would summarize the evidence in this case, which the jury can and should perform on its own, and Soto would render his personal opinion regarding the ultimate issue of whether NSP discriminated against Schreiber in the promotional process on the basis of her sex, a matter in the province of the jury. Soto's methodology and his opinions do not satisfy the *Daubert* standard. I find that Soto's testimony would not help the jury determine the outcome of any material fact at issue. For these reasons, I will grant the Defendants' motion in limine.

**David Peterson, Ph.D**

Schreiber seeks to exclude Dr. Peterson from testifying in this case because 1) his data are incomplete and insufficient; and 2) the Defendants have destroyed personnel records relating to NSP's promotional decisions for all years prior to 2002, rendering her incapable of rebutting Dr. Peterson's opinions. She argues that Defendants' failure to maintain promotional employment records prior to 2002 constitutes intentional destruction of evidence, and that the appropriate sanction for this conduct is to exclude Dr. Peterson's testimony regarding promotions during 2004 to 2006.

The Defendants' two-page brief makes clear that the purpose of retaining Dr. Peterson was to "establish that Mr. Soto

did not have sufficient data, did not present any comprehensive analysis that links Plaintiff's gender to those of any other Highway Patrol employee or to any of the promotion decisions being challenged by the Plaintiff."Defendants state that Dr. Peterson was retained to demonstrate that Soto "did not present any certifiable data to show that the Plaintiff had been discriminated against."(Filing No. 128).

The Defendants' brief does not respond to or rebut the Plaintiff's argument that the Defendants violated a duty to retain personnel records.[FN1] Because I have ruled that Soto will not be permitted to testify during this trial; because the Defendants concede that their purpose in retaining Dr. Peterson was to establish that Plaintiff's expert lacked sufficient underlying data to make a comprehensive analysis relevant to this case; and because the Defendants did not respond to the Plaintiff's argument that the Defendants had a duty to retain documents and information related to their promotional decisions and failed to do so, I conclude that Dr. Peterson should also be excluded from testifying at this trial.

> FN1. The document retention policy was signed by Colonel Thomas Nesbitt in 2003, and superseded a 1988 policy. (Filing No. 89, Attachment # 7, Ex. 207). I did not find in the file a copy of the 1988 policy, which would have governed the retention of documents in 2000-2002.

As the Defendants have stressed, this is not a disparate impact case. The Plaintiff's motion to amend the Complaint to add such a claim was denied."[A]llegations that an employer's general practices and procedures have an adverse effect on minority promotions, although highly relevant to disparate impact claims, cannot [solely] support a claim of discrimination based on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 610411 (D.Neb.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

a disparate treatment theory."*Cardenas v. AT & T Corp.,* 245 F.3d 994, 1000 (8th Cir.2001). Schreiber's case will proceed to trial based on her claim of disparate treatment discrimination based on her gender and on her claim of retaliation in violation of federal law. For all these reasons,

**\*5** IT IS ORDERED:

1. Defendants' Motion in Limine (Filing No. 114) is granted, and Jose Soto, J.D., is excluded from testifying at trial;

2. Plaintiff's Motion in Limine (Filing No. 124) is granted, and David Peterson, Ph.D., is excluded from testifying at trial; and

3. Because David I. Rosenbaum, Ph.D., was identified by Plaintiff as a rebuttal expert and Dr. Peterson has been excluded as an expert witness in this case, Dr. Rosenbaum will not be permitted to testify at this trial.

D.Neb.,2007.
Schreiber v. Nebraska
Not Reported in F.Supp.2d, 2007 WL 610411 (D.Neb.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.